IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division



| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) 2:19cr47 |
| KENT MAERKI, | ) 18 U.S.C. § 1349 |
| (Counts 1-18) | ) Conspiracy to Commit Mail and Wire Fraud |
| | ) (Counts 1-2) |
| DAVID ALCORN, | ) |
| (Counts 2, 7-17, 19) | ) 18 U.S.C. §§ 1343 and 2 |
| | ) Wire Fraud |
| AGHEE WILLIAM SMITH II | ) (Counts 3-17) |
| (Counts 1-2, 8-9, 16-17) | ) |
| | ) 18 U.S.C. § 1956(h) |
| TONY SCOTT SELLERS, | ) Conspiracy to Launder Monetary |
| (Counts 1-2, 7, 12, 16-17) | ) Instruments |
| | ) (Count 18) |
| THOMAS L. BARNETT | ) |
| (Counts 1-2, 10-11, 16-17) | ) 18 U.S.C. § 1957 |
| | ) Unlawful Monetary Transactions |
| NORMA JEAN COFFIN | ) (Count 19) |
| a/k/a "Norma Jean Maule," | ) |
| "Norma Maerki" | ) 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1) |
| (Counts 1, 3-6, 16-18) | ) 28 U.S.C. § 2461 |
| | ) Criminal Forfeiture |
| | ) |

INDICTMENT

March Term – at Norfolk, Virginia

THE GRAND JURY CHARGES THAT:

At all times relevant to this Indictment, unless otherwise stated:

GENERAL ALLEGATIONS

1.    KENT MAERKI ("MAERKI") was a resident of Scottsdale, Arizona. MAERKI

was the founder of Dental Support Plus, LLC, and the President and Marketing Director of

Dental Support Plus Franchise, LLC and Dental Support Group, LLC.  MAERKI also was the

founder and former owner of Janus Spectrum, LLC. Until January 2014, MAERKI held a 45%
ownership interest in Janus Spectrum, LLC.

2.      In or about 1984, in a case brought by the Securities and Exchange Commission
("SEC"), a United States District Court permanently enjoined MAERKI from engaging in the
securities industry. In or about 1985, the Federal Trade Commission sued MAERKI for making
misrepresentations regarding the value of spectrum licenses. MAERKI consented to a judgment
in that action in which he was permanently enjoined from misrepresenting the value of Federal
Communications Commission ("FCC") spectrum licenses. In 1988, the National Association of
Securities Dealers ("NASD") barred MAERKI from the securities industry.

3.      DAVID ALCORN ("ALCORN") was a resident of Scottsdale, Arizona.
ALCORN was the president of David Alcorn Professional Corporation which became the sole
owner of Janus Spectrum, LLC, in January 2014. Prior to January 2014, ALCORN's
professional corporation held a 55% ownership interest in Janus Spectrum.

4.      AGHEE WILLIAM SMITH II ("SMITH") was an insurance salesman located in
California. SMITH owned and controlled A.W. Smith & Associates, Inc. through which he
offered financial services to clients. SMITH previously was licensed to sell securities, but was
not permitted to sell securities during the relevant timeframe of this indictment.

5.      TONY SCOTT SELLERS ("SELLERS") was an insurance salesman located in
Idaho. SELLERS owned and controlled Sellers Financial Advisors, Inc. through which he
offered financials services to clients. SELLERS was not licensed to sell securities.

6.       THOMAS L. BARNETT ("BARNETT") was an insurance salesman located in California.  In 2012, BARNETT incorporated The Financial Light, a financial advisory services company.  BARNETT was not licensed to sell securities.

7.       NORMA JEAN COFFIN ("COFFIN"), also known as NORMA JEAN MAULE and NORMA MAERKI, was a resident of Scottsdale, Arizona.  COFFIN co-founded Dental Support Plus Franchise and was, at various times, listed as a Vice President and the Chief Financial Officer of Dental Support Plus Franchise.  COFFIN also controlled bank accounts for the following companies:  Dental Support Plus Franchise, LLC; NJM Spectrum, LLC; Intellection, LLC; PECS Management, LLC; Sugar Time Management, LLC; and Nascence, LLC.  COFFIN was married to MAERKI.

8.       BayPort Credit Union was a federally-insured credit union that operated in the Eastern District of Virginia.

9.       Wells Fargo Bank was a federally-insured bank that operated across the country.

10.      Arizona Business Bank was a federally-insured bank that operated in Arizona.

11.      JPMorgan Chase Bank was a federally-insured bank that operated across the country.

12.      First Citizens Bank was a federally-insured bank that operated across the country.

13.      Zions First National Bank was a federally-insured bank that operated in a variety of states including Idaho.

14.      The Bank of Commerce was a federally-insured bank that operated in a variety of states including Idaho.

## DENTAL SUPPORT PLUS FRANCHISE, LLC

15.     On or about November 26, 2010, MAERKI, and others, organized Dental Support Plus Franchise, LLC ("DSPF") as a member-managed limited liability company in Arizona. MAERKI, and others, claimed that DSPF was a franchisor of a dental marketing program franchise that was offered and sold to investors.  MAERKI, and others, claimed the franchise entity would refer patients to dentists, and that the dentists would return a portion of the fees they earned from these patients to the franchise entity.  Such payments allegedly would constitute the return on the investment of the franchise purchasers.

16.     The DSPF business model was based on a prior failed former investment called Dazzle Dental.  MAERKI and SMITH were well aware that Dazzle Dental was a failed investment that resulted in substantial losses to numerous investors on the West Coast.

17.     Starting in or about January 2011, MAERKI, SMITH, SELLERS, BARNETT, and others known and unknown to the grand jury, pitched DSPF to investors across the country using advertisements that were materially false and misleading.  The advertisements offered an "absentee-owned fully-managed dental support franchise with a 5-year track record producing annual profits up to 40% or more."  In truth and in fact, DSPF did not actually have any successful absentee-owned fully-managed dental support franchises in existence and did not have a 5-year track record of producing annual profits up to 40% or more.

18.     The advertisements further claimed that DSPF had a "proprietary" method of delivering patients to dentists.  In truth and in fact, DSPF did not have a "proprietary" method of delivering patients to dentists.

19.     The advertisements further claimed that investors would "own" a Dental Support

Plus "franchise" that they would not have to manage.  They also claimed that the franchise

would refer patients to dentists and, in turn, investors would receive 16.5% of patient collections

with "profits taken BEFORE expenses, not AFTER expenses."  The advertisement stated that a

franchise unit cost $25,000 and that the franchise would be "fully operational" within 180 days.

In truth and in fact, investors rarely, if ever, received any funds from dentists and the majority of

the alleged "franchises" were not operational within 180 days.

20.     MAERKI, SMITH, SELLERS, BARNETT and others known and unknown to the

grand jury represented, or caused to be represented, to investors that the Dental Support Plus

"franchises" would provide regular income – at least $200 a month – per "franchise unit."  The

conspirators sold "franchise units" to unsuspecting investors for $20,000-$25,000 per unit.

21.     The Franchise Disclosure Document contained numerous material

misrepresentations and omissions.  According to the Franchise Disclosure Document, the

Virginia State Corporation Commission's Division of Securities and Retail Franchising required

DSPF to defer payments of the initial franchise fee owed by franchisees until the franchisor had

completed its pre-opening obligations.  Despite this limitation, MAERKI, and others, took

Virginia investors' funds prior to Dental Support Plus engaging in any required actions.

22.     Despite representations that the "franchise units" would earn at least $200 a

month starting within 180 days of investment, DSPF deposited little, if any, funds into investors'

bank accounts.

23.     In or about January 2012, MAERKI became associated with Conspirator #1, who

had an investment company with offices in the Eastern District of Virginia.  Through

5

Conspirator #1 and his companies, MAERKI offered his fraudulent DSPF investment to numerous investors located throughout the Hampton Roads area.

24.     For example, in or about March 2012, based on numerous fraudulent misrepresentations, PA and CA, a retired couple from Chesapeake, Virginia, purchased four (4) separate Dental Support Plus "franchise units" for a total of $100,000. PA and CA believed that each "franchise unit" would provide a monthly supplement of at least $200 a month. PA and CA did not have a background in dentistry, knew nothing about running a dentistry franchise, and did not have any intention or ability to run such a "franchise."

25.     In or about August 2012 – approximately 180 days after their investment – PA and CA had not received any income from their four "franchises." PA and CA also had not received a business manual, been notified as to the location of their alleged franchise "territory," received an approved "site" for their alleged "franchise," or received any training in how to purportedly run their alleged "franchise."

26.     In or about August 2012, BR – an elderly, retired woman from Chesapeake, Virginia – purchased three (3) Dental Support Plus "franchise units" for a total of $75,000. BR also was told that each franchise unit would provide at least $200 a month to supplement her income. BR did not have a background in dentistry, knew nothing about running a dentistry franchise, and did not have any intention or ability to run a franchise.

27.     In or about February 2013 – approximately 180 days after BR's investment – BR had not received a single penny from her three alleged "franchises." BR also had not received a business manual, nor been notified as to the location of her alleged franchise "territory."

6

28.     Throughout this scheme, COFFIN was the signatory on numerous bank accounts connected to DSPF and caused investor funds to be paid to numerous family members and funneled through various bank accounts into personal accounts that she controlled.  From there, COFFIN used investor funds to support her and MAERKI's lavish lifestyle.

29.     On or about July 11, 2012, MAERKI testified under oath before the Securities Division of the Arizona Corporation Commission during an investigation into DSPF.  During this deposition, MAERKI testified as follows:

Q:      So why would I buy a franchise if I can go out and recruit a dentist and I can go out and find patients for that dentist?  Why would I give you 20 grand or 25 grand for the franchise?

A:      We introduce you to the idea that you didn't have before.  That's the initiation.  You didn't know about it before.  Most people think dentists have all the patients they want.  Most people think dentists have all the patients they want.  They don't.

                                    ****

Q:      The franchisee, who assigns their territory?

A:      Dental Support Plus Franchise.

Q:      Okay.  And how is that territory assigned?

A:      There is only one territory, and it's approximately the Southwest states of the United States.

                                    ****

Q:      [I]f Metro Media sent 100 patients to the various dentists and got paid for it and that money needs to go back out to the franchisees, how is that divided?

A:      ....But those patients are put into a randomizer and they're assigned and coded to specific franchisees.  So, a specific franchisee gets a specific patient via the randomizer, and that patient is coded to them for the life of the arrangement.

30.     At no time, did MAERKI disclose to investors that the Securities Division of the Arizona Corporation Commission was investigating DSPF, nor did he stop selling DSPF "franchise units."

31.     In or about December 2012, BARNETT knowingly told materially false information to MY and PY to convince them to invest funds into a "franchise unit." PY first heard BARNETT on a Christian radio talk show. BARNETT falsely represented that DSPF was doing really well and that he personally owned several franchises. BARNETT further claimed that DSPF was a successful "marketing company" similar to 1-800-DENTIST. At BARNETT's instruction, MY and PY created a limited liability company to operate their "franchise" and opened a bank account for the company at Wells Fargo to receive the returns on their DSPF investment. No money ever went into the account.

32.     In late 2012, Conspirator #1 created, managed, and controlled DSPF Group LLC ("DSPF Group") – an entity aimed at "pooling" investor funds to purchase Dental Support Plus "franchise units." DSPF Group was a Virginia limited liability company. In reality, MAERKI, and his conspirators, used DSPF Group to defraud new investors so as to pay off previous investors in the failed "franchises."

33.     In or about January 2013, Conspirator #1 pitched DSPF Group, LLC to DB, a woman from Chesapeake, Virginia. Conspirator #1 advised DB to invest in DSPF Group, LLC claiming that it was a good investment and that DB's money would be pooled with other investors' funds to invest in alleged "franchises." Conspirator #1 did not tell DB that he would use her funds to pay off unhappy investors.

8

34. On or about January 25, 2013, DB invested $50,500 (approximately 50% of her 401k savings) into DSPF Group, LLC.

35. On or about March 1, 2013, one of SELLERS' clients sent him an email after receiving a questionnaire from the Idaho Department of Finance about Dental Support Plus. SELLERS forwarded the email to MAERKI and other conspirators, asking for advice on how to respond. In response, a conspirator sent an email to SELLERS, MAERKI, and others, stating that his client should reply in writing that "DSP is not an investment, I bought a franchise" and say nothing more. As SELLERS and MAERKI were well aware, this statement was false and they had, in fact, sold DSPF as a hands-off, passive investment and not as a fully functioning franchise.

36. In or about March 30, 2013, MAERKI caused notices to be sent via United States mail to all investors in DSPF stating that they also were now members of the Systemic Healthcare Membership Organization. This notice claimed that DSPF principals had created this entity – at no cost to the franchisees – to "magnify our primary purpose of introducing patients and dentists."

37. On or about October 21, 2013, MAERKI talked about DSPF during a conference call with sales people across the country during which he encouraged them to continue to sell the purported "franchises". In this call, MAERKI admitted that he and others involved in this scheme were propping up this failed venture through the continued sale of franchise units to investors:

> We have almost 600 franchise units sold. We have a responsibility to them. *And, the more franchises we sell, the more we can support this on a long-term basis*....The only problem that we have ever had ... with Dental Support Plus was

the original expectation created by Oracare and Metromedia along with the $7 million they wasted with their methods which were not scaleable beyond the first dozen franchise units....They couldn't handle more than 12. So, what were we supposed to do when they couldn't perform...were we supposed to quit? Our accountant said we should have. Most people or most companies would have quit. Economically it was the sound thing to do. Rationally it might have been the sound thing to do. But, great companies are not made by quitters.... We invite you guys and you gals to continue to help *by selling franchise units which provide the funding to support the WebOp efforts of 1500 dollars each week that we send out for advertising on the Internet.*

38.     In or about November 2013, MAERKI admitted in a recorded conference call with JT and AT, two Virginia DSPF investors, that he and Conspirator #1 were using DSPF Group to buy out investors who were "unhappy" and "disgruntled." MAERKI stated Conspirator #1's company was managing a "queue" of disgruntled investors to be repaid.

39.     On or about November 18, 2013, MAERKI again talked about DSPF during a conference call involving sales people across the country. In this call, MAERKI encouraged his salesmen to continue to sell DSPF:

A few far-sighted salespersons have been selling DSPF, dental support plus franchise, why? They know David Bailey and my team will make it work. They know it. They know it. They have great confidence. Each week it gets better from different points of view with a stronger foundation. These men and women who are salespersons that are selling are keeping it alive and kicking. It's important. So, when a salesperson says until we get better returns, I don't feel comfortable in selling it. Well tell the people to leave their ... money in T-bills, CDs, and treasury bonds, and annuities then. We could easily accomplish that each year ....We could make a decision here not to keep it alive and shut it down and make all of our lives a lot easier. However, this is a valuable asset and I predict it will be the best one we have ever done long term .... Keep selling Dental Support Plus.

40.     Despite knowing that Dental Support Plus was not fulfilling the promised returns and that the alleged "franchises" were not actually operating – and certainly did not have a "track record" of success – MAERKI, COFFIN, SELLERS, BARNETT, and other conspirators

10

continued to sell franchise units and shares in DSPF Group to unsuspecting investors all the while falsely claiming the franchise has a multi-year track record of success.

41.     In or about July 2013, BARNETT invested $41,000 of MY and PY's funds into DSPF Group.  MY and PY had placed the money in a fund to make premium payments on an insurance policy BARNETT had procured for them.  Without the approval of MY and PY, BARNETT invested the $41,000 in DSPF Group.  This investment in DSPF resulted in interstate wires into and out of the Eastern District of Virginia

42.     In or about December 2013, BARNETT told materially false information to LZ to convince her to invest funds into DSPF Group.  LZ told BARNETT that she had received $200,000 from the settlement of the estate of her parents, who had died in a tragic accident. BARNETT falsely represented to LZ that her investment in DSPF Group would provide dental care to low income families and would generate a guaranteed "stream of income" and an 8-10% return.  Based on this, and other material misrepresentations, LZ invested $50,000 in DSPF Group.  LZ's investment in DSPF resulted in interstate wires into and out of the Eastern District of Virginia.

43.     On or about January 3, 2014, SELLERS – who had invested some of his own money in DSPF "franchise units" – received a payment of $40,000 via interstate wire from DSPF Group account at BayPort Credit Union in the Eastern District of Virginia to repay him for his investment in two DSPF "franchise units." SELLERS facilitated this payment despite knowing full well: (1) that he was selling DSPF franchise units to DSPF Group's investors that were not performing and would never perform; (2) that a conspirator received these funds by falsely representing to other investors that DSPF was a successful enterprise; (3) that he was being

11

repaid $40,000 before his own clients received any return or refund; and (4) that DSPF was a failed enterprise and his clients were going to lose all of the money that, based on his advice and recommendation, they had invested in the scheme.

44.     On or about April 7, 2014, MAERKI again talked about DSPF during a conference call with sales people across the country. In this call, MAERKI falsely claimed that the "principals" of DSPF were spending their "own personal money" to support the enterprise because franchise sales had slowed. MAERKI further stated: "Somebody said why would you sell more franchises into this? Because we have hope that it's going to go forward and we know more about now than ever before and we sold more franchises, 500 of them in the first 2 years without knowing where we were going at all...."

45.     On or about July 9, 2014, MAERKI sent a memorandum via email via interstate wire to his DSPF salesforce. In this memorandum, MAERKI informed his salesforce that: "June 30, 2014 was a sad day for Dental Support Plus Franchise, LLC ("DSPF"). We have run out of liquidity and, therefore, can no longer fund the overhead of DSPF." MAERKI provided numerous reasons for this failure and concluded by saying: "[h]indsight is, of course, 20/20 and I personally wish we would have stopped earlier, but we believed there was a light at the end of the tunnel –the tunnel was too long and we didn't have the capital to make it. I am 72 and beat up—it's over." This notice was not sent to investors.

46.     On or about August 8, 2014, MAERKI sent an email via interstate wire informing all "franchise" owners that "we have simply run out of capital and cannot continue to operate or funding [sic] the business, effective June 30, 2014." In contrast to the July 2014 email, MAERKI suggested to the investors that the "business model" may work given time:

12

> We can absolutely guarantee DSPF's failure by simply shutting it down.  On the other hand, we can take some time and give DSPF a chance to possibly succeed in the future rather than simply "get it behind us" for expediency purposes.  DSPF is now a good, somewhat seasoned model that simply has run out of money—we had evolved to having suitable patient and dentist resourcing—and as a result, we should "shelve" the company until we can capitalize and reorganize it—NOT permanently closing.  There is only one reason to shelve, or to temporarily discontinue operating DSPF—it is out of money—it cannot continue to operate without money.  Nevertheless, I believe that we should allow the franchisees to stay in business with no overhead in the meantime.

In truth and in fact, as the conspirators were well aware, the investors had indeed lost the entirety of their investment in alleged "franchise units" or shares of DSPF Group.  In truth and in fact, the sole purpose of this letter was to continue to lull investors into believing that they had not lost the entirety of their investments.

47.     Despite the claim that DSPF was only "shelved," in truth and in fact – as the conspirators well knew – all current investors into DSPF and DSPF Group – lost all of their money.   The total losses arising from this scheme are over $9 million.

<u>THE SPECTRUM INVESTMENTS</u>

48.     In or about October 2011, MAERKI and ALCORN formed Janus Spectrum, LLC ("Janus Spectrum").  Janus Spectrum was a New Mexico limited liability company with its principal place of business in Phoenix, Arizona.  At first, MAERKI held a 45% ownership interest and ALCORN's entity, David Alcorn Professional Corporation ("DAPC"), held a 55% ownership interest in Janus Spectrum.  After January 2014, DAPC became the 100% owner of Janus Spectrum.

49.     ALCORN was the sole officer, director, and shareholder in DAPC.  Pursuant to the terms of the operating agreement of Janus Spectrum, DAPC exercised power and control

over the business and management of Janus Spectrum.  In reality, MAERKI and ALCORN both exercised control over Janus Spectrum.

50.     Under the management and control of MAERKI and ALCORN, Janus Spectrum offered FCC license application services to investors.

51.     Starting in or about at least January 2012 through August 2015, MAERKI, ALCORN, SMITH, SELLERS, BARNETT, and others known and unknown sold, and caused to be sold, fraudulent spectrum investments to investors and then continued to lull investors regarding the purported value of such investments.

52.     In his "Money from Thin Air" video presentation, which was placed on the Internet and used to solicit potential investors, MAERKI falsely represented to investors:

> It's a work free business.  It really is a work free business.  It is ownership of spectrum.  It has very high income historically.  It has very low risk, hardly any…It's work free, there is just nothing to do.  You look at your tower, you don't see anything happening, you go home.
>
> ****
>
> [D]emand for 600, 700, 800, and 900 MHz spectrum is the most efficient out there. That is what we are talking about today, those are the Rolls Royce of spectrum.
>
> ****
>
> Sprint is going to need [the 800 MHz spectrum]…But if they don't take it, AT&T needs it, and so does Verizon.  More importantly, T-Mobile really needs it.  So do the other ones.
>
> ****
>
> In summary, let's put it this way.  There is a limited number of available licenses. Of course, it's on a first come/first serve basis, very unique income stream opportunity, own somebody else's income stream that they have to give up.  Very low risk, as a result, very high income.  Small investment, high value, certainly work free…How long before I make money?  We have discussed that, a year to two

years unless it's a border, two to five years.  Why isn't everyone doing this? Simply, they haven't learned about it yet … Urgency? Yes.  First come/first serve. These will be gone in three to five months.

In truth and in fact, as MAERKI and the conspirators knew:

- The spectrum investments were extremely high risk;

- The investment was not "work free" as the FCC cancels any license not put to use within one year;

- Sprint and other mainstream providers could not use the 800 MHz spectrum for broadband transmission, and thus it was not the "Rolls Royce" of spectrum;

- Because Sprint and the other major wireless carriers could not use the 800 MHz spectrum for broadband transmission, any licenses granted to Janus Spectrum would have little value; and

- The actual cost of obtaining spectrum licenses could be as low as a few hundred dollars.

53.     In or about early 2012, ALCORN created a "pro forma" to estimate the value of the spectrum licenses.  ALCORN fraudulently estimated annual returns ranging up to 3373% depending on the economic area, and an average annual return from all 25 areas of 298%.

54.     MAERKI and ALCORN sold their application services primarily through insurance salespeople located across the country.  In particular, Conspirator #1 created three Virginia limited liability companies – Janus Spectrum Group, LLC; Spectrum 100, LLC; and Prime Spectrum, LLC – aimed at selling these fraudulent spectrum investments in the Eastern District of Virginia and elsewhere.

55.     Conspirator #1's Investment Offerings contained the numerous false representations outlined above and, in terms of fees, also falsely represented that only "Summit Trust will receive an asset management fee of two percent (2%) of the gross assets for managing

and custodian [sic] of the separately managed account." In fact, Conspirator #1 misappropriated approximately 47%-70% of each investor's funds – a portion of which went to pay the salesperson. SMITH, SELLERS, BARNETT, and others, sold these spectrum investments to investors through Conspirator #1's fraudulent investment offerings. Each investment in Conspirator #1's fraudulent spectrum offerings caused interstate wires into and out of the Eastern District of Virginia.

56.     In or about October 2013, SMITH met CG at church and learned she had received an inheritance from her parents when she turned 65. SMITH made numerous material misrepresentations to CG about the spectrum investment. Upon SMITH's recommendation, CG invested $100,000 in Spectrum 100. This investment resulted in interstate wires into and out of the Eastern District of Virginia. Upon receipt, Conspirator #1 siphoned approximately 53% of the invested funds to three limited liability companies that he controlled.

57.     In or about November 2013, SMITH made numerous material misrepresentations to RB and TB about the spectrum investment. Upon SMITH's recommendation, RB and TB ultimately invested $287,500 in Spectrum 100. This investment resulted in interstate wires into and out of the Eastern District of Virginia. Upon receipt, Conspirator #1 siphoned approximately 36% of the invested funds to two limited liability companies that he controlled.

58.     In or about December 2013, BARNETT made numerous material misrepresentations to LZ about the spectrum investment. BARNETT claimed that Spectrum 100, LLC was a company that was going to sell broadband licenses to expand the availability of Internet access to remote areas of the country. Upon BARNETT's recommendation, LZ invested $50,000 into Spectrum 100. This investment resulted in interstate wires into and out of the

Eastern District of Virginia.  Upon receipt, Conspirator #1 siphoned approximately 36% of the invested funds to two limited liability companies that he controlled.

59.     In or about March 2014, SELLERS made numerous material misrepresentations and omissions to RC and BC as well as MB and BB in connection with an investment into Prime Spectrum LLC ("Prime Spectrum").  BC was blind and was in his late 70s at the time he invested $20,000 of his retirement funds in Prime Spectrum.  MB and BB were in their late 60s when they invested $25,000 in Prime Spectrum.  These investments resulted in interstate wires into and out of the Eastern District of Virginia.  Upon receipt, Conspirator #1 siphoned approximately 70% of the invested funds by transferring the funds to two Virginia limited liability companies that he controlled.  Conspirator #1 paid 30% of the investor funds directly to SELLERS.

60.     On or about March 3, 2014, MAERKI and ALCORN caused Janus Spectrum, LLC to file for bankruptcy in the United States Bankruptcy Court for the District of Arizona. Despite filing for bankruptcy, MAERKI and ALCORN neither stopped selling the fraudulent spectrum investments nor informed potential investors that the company had filed for bankruptcy.

61.     In or about late April 2014, the Securities and Exchange Commission ("SEC") subpoenaed MAERKI and ALCORN to appear for a deposition in connection with a federal securities investigation into Janus Spectrum.

62.     On or about May 15, 2014, the SEC deposed MAERKI in its ongoing investigation into the spectrum investments.

63.     On or about June 16, 2014, the SEC deposed ALCORN in its ongoing investigation in the spectrum investments.

17

64.     Despite knowledge of the ongoing SEC's fraud investigation, MAERKI, ALCORN, and others continued to sell the spectrum investments and did not disclose the existence of the investigation to current and potential investors.

65.     On or about April 6, 2015, the SEC filed a civil complaint against MAERKI, ALCORN, and Conspirator #1, among others, accusing the parties of running a multi-million dollar scheme to defraud investors arising from the sale of unregistered securities.  The complaint outlined the misrepresentations contained in, among others, the offering documents related to the spectrum investments.

66.     The conspirators did not disclose the existence of the complaint to potential investors from whom they solicited additional funds.

67.     Through in or about July 2017, conspirators, including Conspirator #1, held conference calls with spectrum investors aimed at concealing the fraud and attempting to lull investors into believing the spectrum investments continued to have value.

<u>COUNT ONE</u>
(Conspiracy to Commit Mail and Wire Fraud)

1.        The allegations contained in paragraphs 1 through 67 of the General Allegations section of the Indictment are realleged and incorporated as if set forth fully herein.

2.        From in or about January 2011 through in or about August 2014, in the Eastern District of Virginia and elsewhere, defendants KENT MAERKI, AGHEE WILLIAM SMITH II, TONY SCOTT SELLERS, THOMAS L. BARNETT, NORMA JEAN COFFIN, also known also "Norma Jean Maule" and "Norma Maerki," and others known and unknown, knowingly and intentionally combined, conspired, confederated and agreed to commit the following offenses against the United States:

(a)        Mail Fraud:  defendants, and others known and unknown, having devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, did knowingly place and caused to be placed in any post office and authorized depository for mail, any matter and thing whatever to be sent and delivered by the Postal Service; did deposit and caused to be deposited any matter and thing whatever to be sent and delivered by any private and commercial interstate carrier; and caused to be delivered by mail and such carrier any matter and thing whatever according to the direction thereon, for the purpose of execution of such scheme and artifice, in violation of Title 18, United States Code, Section 1341; and

(b)        Wire Fraud: defendants, and others known and unknown, having devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted

19

by means of wire communication in interstate commerce writings, signs, signals, pictures, and

sounds for the purpose of execution of such scheme and artifice, in violation of Title 18, United

States Code, Section 1343.

THE PURPOSE OF THE CONSPIRACY

3.      The purpose of the conspiracy was for the conspirators to personally profit by

misleading investors in material ways about an investment in Dental Support Plus Franchise

("DSPF").

THE WAYS, MANNER, AND MEANS OF CONSPIRACY

The ways, manner and means by which MAERKI, SMITH, SELLERS, BARNETT,

COFFIN and others known and unknown sought to accomplish this conspiracy included, but

were not limited to, the following:

4.      MAERKI, COFFIN, and others known and unknown to the grand jury, created

Dental Support Group, LLC and DSPF.

5.      The conspirators created materially misleading, false, and fraudulent marketing

materials regarding the DSPF investment.

6.      MAERKI, and others known and unknown to the grand jury, recruited

salespeople – primarily insurance salespeople unlicensed to sell securities – to sell DSPF

"franchise units."

7.      MAERKI, SMITH, SELLERS, BARNETT, and others known and unknown to

the grand jury, sold DSPF "franchise units" and shares in DSPF Group, LLC to unsuspecting

investors using materially false, fraudulent and misleading representations.

20

8.      MAERKI, SMITH, SELLERS, BARNETT, COFFIN, and others known and unknown, financially benefited from the sales of the fraudulent DSPF investment.

9.      The conspirators caused, and attempted to cause, materially false information to be provided to regulators regarding the DSPF investment.

10.     The conspirators continued to sell DSPF investments to unsuspecting investors knowing full well that this was a failed investment that did not have a proven track record of performance.

11.     In furtherance of this conspiracy, MAERKI, and others known and unknown to the grand jury, used the interstate wires to orchestrate and participate in weekly conference calls with the sales force during which MAERKI, and other conspirators, encouraged sales people to sell DSPF despite their knowledge that it was failed investment.

12.     In furtherance of the conspiracy, the conspirators advertised for the DSPF investment via the Internet via interstate wire.

13.     In furtherance of the conspiracy, the conspirators caused funds involved in DSPF investments to move via interstate wire into and out of the Eastern District of Virginia.

14.     In furtherance of the conspiracy, the conspirators caused materially false, fraudulent, and misleading information to be sent via email, via interstate wire, to investors in the Eastern District of Virginia.

15.     In furtherance of the conspiracy, the conspirators used interstate telephone signs, signals, and wires to communicate with each other and to provide materially false and fraudulent information to current and potential investors.

21

16.     In furtherance of the conspiracy, the conspirators used interstate wires, signals, and signs to advertise the spectrum investments by discussing such investments during radio shows.

17.     In furtherance of the conspiracy, the conspirators caused materially false, fraudulent, and misleading letters, memoranda, and updates regarding the DSPF investment to be sent via the U.S. Mail and private and commercial interstate carrier into the Eastern District of Virginia.

(In violation of Title 18, United States Code, Sections 1349, 1341, 1343).

<u>COUNT TWO</u>
(Conspiracy to Commit Mail and Wire Fraud)

1.    The allegations contained in paragraphs 1 through 67 of the General Allegations section of the Indictment are realleged and incorporated as if set forth fully herein.

2.    From in or about January 2011 through in or about August 2017, in the Eastern District of Virginia and elsewhere, defendants KENT MAERKI, DAVID ALCORN, AGHEE WILLIAM SMITH II, TONY SCOTT SELLERS, THOMAS L. BARNETT, and others known and unknown, knowingly and intentionally combined, conspired, confederated and agreed to commit the following offenses against the United States:

(a)    Mail Fraud:  defendants, and others known and unknown, having devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, did knowingly place and caused to be placed in any post office and authorized depository for mail, any matter and thing whatever to be sent and delivered by the Postal Service; did deposit and caused to be deposited any matter and thing whatever to be sent and delivered by any private and commercial interstate carrier; and caused to be delivered by mail and such carrier any matter and thing whatever according to the direction thereon, for the purpose of execution of such scheme and artifice, in violation of Title 18, United States Code, Section 1341; and

(b)    Wire Fraud: defendants, and others known and unknown, having devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and

23

sounds for the purpose of execution of such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

<u>THE PURPOSE OF THE CONSPIRACY</u>

3.      The purpose of the conspiracy was for the conspirators to personally profit by misleading investors in material ways about an investment in cellular spectrum.

<u>THE WAYS, MANNER, AND MEANS OF CONSPIRACY</u>

The ways, manner and means by which MAERKI, ALCORN, SELLERS, BARNETT, and others known and unknown sought to accomplish this conspiracy included, but were not limited to, the following:

4.      MAERKI, ALCORN, and others known and unknown to the grand jury, created Janus Spectrum, LLC.

5.      The conspirators created materially misleading, false, and fraudulent marketing materials regarding the spectrum investments.

6.      MAERKI, and others known and unknown to the grand jury, recruited salespeople – primarily insurance salespeople unlicensed to sell securities – to sell the spectrum investments.

7.      MAERKI, ALCORN, SMITH, SELLERS, BARNETT, and others known and unknown caused to be sold or sold the spectrum investments to unsuspecting investors using materially false, fraudulent and misleading representations.

8.      The conspirators financially benefited from the sales of the fraudulent spectrum investments.

24

9.     The conspirators failed to disclose the existence of regulatory investigations into the spectrum investments.

10.    MAERKI and ALCORN caused Janus Spectrum, LLC to file for bankruptcy. MAERKI and ALCORN did not disclose this bankruptcy to investors and continued to sell the fraudulent spectrum investments.

11.    In furtherance of this conspiracy, MAERKI, and others known and unknown to the grand jury, used the interstate wires to orchestrate and participate in weekly conference calls with the sales force during which MAERKI, and other conspirators, encouraged sales people to sell the spectrum investments despite knowing of their fraudulent nature.

12.    In furtherance of the conspiracy, conspirators advertised the fraudulent spectrum investments via the Internet.

13.    In furtherance of the conspiracy, conspirators caused funds involved in the spectrum investments to move via interstate wire into and out of the Eastern District of Virginia.

14.    In furtherance of the conspiracy, conspirators caused materially false, fraudulent, and misleading information to be sent to investors via email, via interstate wire, to investors in the Eastern District of Virginia.

15.    In furtherance of the conspiracy, conspirators used interstate telephone signs, signals, and wires to communicate with each other and to provide materially false and fraudulent information to current and potential investors.

16.    In furtherance of the conspiracy, conspirators caused materially false, fraudulent, and misleading letters, memoranda, advertisements, and updates regarding the spectrum

investment to be sent via the U.S. Mail and private and commercial interstate carrier into the Eastern District of Virginia.

(In violation of Title 18, United States Code, Sections 1349, 1341, 1343).

COUNTS THREE - SEVENTEEN
(Wire Fraud)

1.     The allegations contained in paragraphs 1 through 67 of the General Allegations
section, paragraphs 1 through 17 related to Count One of this Indictment, and paragraphs 1
through 16 related to Count Two of this Indictment are realleged and incorporated as if set forth
fully herein.

2.     On or about the dates set forth below, in the Eastern District of Virginia and
elsewhere, for the purpose of executing the above-described scheme and artifice to defraud and
for obtaining money and property by means of materially false and fraudulent pretenses,
representations and promises, the defendants KENT MAERKI, DAVID ALCORN, AGHEE
WILLIAM SMITH II, TONY SCOTT SELLERS, THOMAS L. BARNETT, NORMA JEAN
COFFIN, also known as "Norma Jean Maule" and "Norma Maerki," and those known and
unknown, knowingly transmitted and caused to be transmitted by means of a wire
communication in interstate commerce certain writings, signs, signals, pictures and sounds, as
follows:

| Count | Defendant | On Or About Date of Wire | Item Wired |
|---|---|---|---|
| 3 | MAERKI COFFIN | July 9, 2014 | Email from MAERKI to DSPF salesforce sent to salesman RH located in Norfolk, Virginia |
| 4 | MAERKI COFFIN | August 9, 2014 | Email from MAERKI to victim BR in Chesapeake, Virginia |
| 5 | MAERKI COFFIN | August 9, 2014 | Email from MAERKI to victims AT and JT in Virginia Beach, Virginia |
| 6 | MAERKI COFFIN | August 9, 2014 | Email from MAERKI to victim TW in Chesapeake, Virginia |
| 7 | MAERKI ALCORN SELLERS | April 4, 2014 | Interstate wire processing $13,500 payment to SELLERS from Conspirator #1's Prime Spectrum, |

27

| Count | Defendant | On Or About Date of Wire | Item Wired |
|-------|-----------|--------------------------|------------|
|       |           |                          | LLC bank account at BayPort Credit Union |
| 8 | MAERKI ALCORN SMITH | May 14, 2014 | Interstate wire processing $58,800 ECF transfer from Conspirator #1's bank account at BayPort Credit Union to Intuit Payroll to pay SMITH's commission |
| 9 | MAERKI ALCORN SMITH | ~~January 22, 2014~~ April 10, 2014 | Interstate wire processing ~~$14,000~~ $9,360 ECF transfer from Conspirator #1's bank account at BayPort Credit Union to Intuit Payroll to pay SMITH's commission |
| 10 | MAERKI ALCORN BARNETT | July 2, 2014 | Interstate wire processing $2,600 ECF transfer from Conspirator #1's bank account at BayPort Credit Union to Intuit Payroll to pay BARNETT's commission |
| 11 | MAERKI ALCORN BARNETT | December 31, 2014 | Interstate wire processing $3,200 ECF transfer from Conspirator #1's bank account at BayPort Credit Union to Intuit Payroll to pay BARNETT's commission |
| 12 | MAERKI ALCORN SELLERS | April 8, 2014 | Interstate wire totaling $41,200 from Conspirator #1's Prime Spectrum, LLC bank account at BayPort Credit Union to Janus Spectrum, LLC's account at Arizona Business Bank |
| 13 | MAERKI ALCORN | April 8, 2014 | Interstate wire totaling $123,600 from Conspirator #1's Spectrum 100, LLC bank account at BayPort Credit Union to Janus Spectrum, LLC's account at Arizona Business Bank |
| 14 | MAERKI ALCORN | April 24, 2014 | Interstate wire totaling $123,600 from Conspirator #1's Spectrum 100, LLC bank account at BayPort Credit Union to Janus Spectrum, LLC's account at Arizona Business Bank |
| 15 | MAERKI ALCORN | May 15, 2014 | Interstate wire totaling $288,400 from Conspirator #1's Spectrum |

28

| Count | Defendant | On Or About Date of Wire | Item Wired |
|-------|-----------|--------------------------|------------|
|       |           |                          | 100, LLC bank account at BayPort Credit Union to Janus Spectrum, LLC's account at Arizona Business Bank |
| 16    | MAERKI ALCORN SMITH SELLERS BARNETT COFFIN | April 7, 2014 | Interstate conference call with sales force about DSPF and Janus Spectrum |
| 17    | MAERKI ALCORN SMITH SELLERS BARNETT COFFIN | May 19, 2014 | Interstate conference call with sales force about DSPF and Janus Spectrum |

(In violation of Title 18, United States Code, Sections 1343 and 2).

29

COUNT EIGHTEEN
(Conspiracy to Launder Monetary Instruments)

1.      The allegations contained in paragraphs 1 through 67 of the General Allegations

section, paragraphs 1 through 17 related to Count One of the Indictment and paragraphs 1

through 16 related to Count Two of the Indictment are realleged and incorporated as if set forth

fully herein.

2.      From in or about January 2011 through in or about December 2016, in the Eastern

District of Virginia and elsewhere, defendants KENT MAERKI and NORMA JEAN COFFIN,

also known as "Norma Jean Maule" and "Norma Maerki", and others known and unknown,

knowingly and intentionally combined, conspired, confederated and agreed to commit the

following offenses against the United States:

(a)     Laundering of monetary instruments, that is, to knowingly conduct and attempt to

conduct financial transactions affecting interstate and foreign commerce, which transactions

involved the proceeds of specified unlawful activity, that is, mail and wire fraud, knowing that

the transactions were designed in whole and in part to conceal and disguise the nature, location,

source, ownership, and control of the proceeds of specified unlawful activity, and that while

conducting and attempting to conduct such financial transactions, knew that the property

involved in the financial transactions represented the proceeds of some form of unlawful activity,

in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

(b)     Laundering of monetary instruments, that is, to knowingly engage and attempt to

engage, in monetary transactions by, through, and to a financial institution, affecting interstate

and foreign commerce, in criminally derived property of a value greater than $10,000, that is the

30

deposit, withdrawal, and transfer of monetary instruments, such property having been derived from a specified unlawful activity, that is, mail and wire fraud, in violation of Title 18, United States Code, Section 1957.

THE WAYS, MANNER, AND MEANS OF CONSPIRACY

The ways, manner and means by which MAERKI and COFFIN, and others sought to accomplish this conspiracy included, but were not limited to, the following:

3.      MAERKI and COFFIN marketed the DSPF and spectrum investments in the Eastern District of Virginia.

4.      MAERKI and COFFIN received investor funds via interstate wires from BayPort Credit Union located in the Eastern District of Virginia.

5.      MAERKI and COFFIN created numerous limited liability companies for purposes of laundering fraud proceeds.  These companies include, but are not limited to, Intellection, LLC; PECS Management, LLC; NJM Spectrum, LLC; Practice Enhancement Systems, LLC; and Sugar Time Management, LLC.

6.      MAERKI and COFFIN concealed the original and true source of fraudulently obtained funds by transferring and laundering those monies through multiple financial accounts.

7.      MAERKI and COFFIN opened multiple bank accounts in the name of PC, a relative of COFFIN, for the purpose of laundering fraud proceeds.

8.      MAERKI and COFFIN laundered funds to conceal those monies from regulators and law enforcement.

9.      MAERKI and COFFIN transferred and laundered funds through multiple financial accounts in order to avoid paying federal taxes on such funds.

10.    MAERKI and COFFIN transferred and laundered funds through financial accounts to avoid disclosing the failure of investment offerings to victims.

11.    MAERKI and COFFIN transferred and laundered funds exceeding $10,000 to support their lavish lifestyle.

12.    MAERKI and COFFIN used American Express cards connected to an account in the name of PC to purchase jewelry, clothes, plastic surgery, vacations, and other luxury items. After laundering fraud proceeds through Intellection, LLC and PECS Management, LLC, MAERKI and COFFIN used investor funds to make payments in excess of $10,000 each month.

13.    In addition, the ways, manner, and means that defendants MAERKI and COFFIN used to accomplish the objectives of the conspiracy included, but were not limited to, the following acts and transactions all originally derived from investor funds:

| DATE (on or about) | MONETARY/FINANCIAL TRANSACTION (approximately) |
|---|---|
| October 4, 2013 | $9,346.92 transfer from Dental Support Group, LLC's JPMorgan Chase bank account to Intellection, LLC's JPMorgan Chase bank account. |
| October 7, 2013 | $450,000 transfer from Intellection, LLC's JPMorgan Chase checking account to Intellection, LLC's JPMorgan Chase savings account. |
| October 10, 2013 | $17,637.79 transfer from Dental Support Group, LLC's JPMorgan Chase bank account to Intellection, LLC's JPMorgan Chase bank account. |
| October 10, 2013 | $20,000 transfer from Intellection, LLC's JPMorgan Chase bank account to PEC's Management, LLC's JPMorgan Chase bank account. |
| October 11, 2013 | $20,000 transfer from PECS Management, LLC's JPMorgan Chase bank account to pay MAERKI and COFFIN's personal American Express charges. |
| October 22, 2013 | $20,000 transfer from PECS Management, LLC's JPMorgan Chase bank account to pay MAERKI and COFFIN's personal American Express charges. |

| DATE (on or about) | MONETARY/FINANCIAL TRANSACTION (approximately) |
|---|---|
| October 23, 2013 | $250,000 transfer from Intellection, LLC's JPMorgan Chase savings account to PECS Management, LLC's JPMorgan Chase bank account. |
| October 24, 2013 | $15,332.95 transfer from Dental Support Group, LLC's JPMorgan Chase bank account to Intellection, LLC's JP Morgan Chase bank account. |
| October 24, 2013 | $20,000 transfer from Intellection, LLC's JPMorgan Chase bank account to PECS Management, LLC's JPMorgan Chase bank account. |
| October 29, 2013 | $20,000 transfer from PECS Management's JPMorgan Chase bank account to pay MAERKI and COFFIN's personal American Express charges. |
| November 5, 2013 | $60,000 transfer from PECS Management's JPMorgan Chase bank account to pay MAERKI and COFFIN's personal American Express charges. |
| November 13, 2013 | $26,083.51 transfer from PECS Management's JPMorgan Chase bank account to pay MAERKI and COFFIN's personal American Express charges. |
| November 21, 2013 | $40,000 transfer from PECS Management's JPMorgan Chase bank account to pay MAERKI and COFFIN's personal American Express charges. |
| April 2, 2014 | $11,507.01 transfer from Dental Support Group, LLC's JPMorgan Chase bank account to Intellection, LLC's JPMorgan Chase bank account. |
| April 9, 2014 | $19,822.09 transfer from Dental Support Group, LLC's JPMorgan Chase bank account to Intellection, LLC's JPMorgan Chase bank account. |
| April 10, 2014 | $40,000 transfer from PECS Management, LLC's Wells Fargo bank account to pay MAERKI and COFFIN's personal American Express charges. |
| April 14, 2014 | $8,491.09 transfer from Dental Support Group, LLC's JPMorgan Chase bank account to Intellection, LLC's JPMorgan Chase bank account. |
| April 15, 2014 | $49,226.42 transfer from PECS Management, LLC's Wells Fargo bank account to pay MAERKI and COFFIN's personal American Express charges. |
| May 1, 2014 | $10,100.30 transfer from Dental Support Group, LLC's First Citizens Bank account to Intellection, LLC's First Citizens Bank account. |

| DATE (on or about) | MONETARY/FINANCIAL TRANSACTION (approximately) |
|---|---|
| June 17, 2014 | $21,373.92 transfer from Dental Support Group, LLC's First Citizens Bank account to Intellection, LLC's First Citizens Bank account. |
| June 17, 2014 | $7,627.06 transfer from Dental Support Plus Franchise, LLC's First Citizens Bank account to Intellection, LLC's First Citizens Bank account. |
| June 18, 2014 | $30,000 check from Intellection, LLC's First Citizens Bank account to PECS Management, LLC's Wells Fargo Bank account. |
| June 12, 2014 | $25,000 transfer from PECS Management, LLC's Wells Fargo Bank account to pay MAERKI and COFFIN's personal American Express charges. |
| July 15, 2014 | $20,000 transfer of proceeds from Janus Spectrum, LLC's First Citizens Bank account to Intellection, LLC's First Citizens Bank account. |
| July 15, 2014 | $13,141.54 transfer of proceeds from Dental Support Group, LLC's First Citizens Bank account to Intellection, LLC's First Citizens Bank account. |
| October 16, 2014 | $19,968.92 transfer of proceeds from Dental Support Plus Franchise, LLC's First Citizens bank account into Intellection, LLC. |
| October 16, 2014 | $2,776.08 transfer of proceeds from Dental Support Group, LLC's First Citizens Bank account into Intellection, LLC's First Citizens Bank account. |
| October 21, 2014 | $24,000 transfer from Intellection, LLC's First Citizens Bank account to PECS Management, LLC's Wells Fargo bank account. |
| October 22, 2014 | $24,000 transfer from PECS Management, LLC's Wells Fargo bank account to pay MAERKI and COFFIN's personal American Express charges including, but not limited to, charges for jewelry, clothing, flights, hotels, and a $26,266 payment to Necker Island in the British Virgin Islands. |

(All in violation of Title 18, United States Code, Section 1956(h)).

## COUNT NINETEEN
(Engaging in an Unlawful Monetary Transaction)

1.      The allegations contained in paragraphs 1 through 67 of the General Allegations section and paragraphs 1 through 16 related to Count Two of this Indictment are realleged and incorporated as if set forth fully herein.

2.      On or about May 1, 2015, in the Eastern District of Virginia and elsewhere, defendant DAVID ALCORN did unlawfully and knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, such funds having been derived from a specified unlawful activity, that is wire fraud, involving wire transfers from the Eastern District of Virginia, in violation of Title 18, United States Code, 1343, as follows: depositing a cashier's check totaling $100,093.05 into his retirement plan bank account.

(In violation of Title 18, United States Code, Section 1957.)

## **FORFEITURE**

THE GRAND JURY FURTHER FINDS PROBABLE CAUSE THAT:

1.      Defendants KENT MAERKI, DAVID ALCORN, AGHEE WILLIAM SMITH II, TONY SCOTT SELLERS, THOMAS L. BARNETT, and NORMA JEAN COFFIN, also known as "Norma Jean Maule" and "Norma Maerki" if convicted of one or more of the violations alleged in Counts One through Seventeen of the Indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, which constitutes or is derived from proceeds traceable to the violations.

2.      Defendants KENT MAERKI, DAVID ALCORN, and NORMA JEAN COFFIN if convicted of one or more of the violations alleged in counts Eighteen through Nineteen of the Indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, involved the violation, and any property traceable to such property.

3.      If any property that is subject to forfeiture above, as a result of any act or omission of the defendant, (a) cannot be located upon the exercise of due diligence, (b) has been transferred to, sold to, or deposited with a third party, (c) has been placed beyond the jurisdiction of the Court, (d) has been substantially diminished in value, or (e) has been commingled with other property that cannot be divided without difficulty, it is the intention of the United States to seek forfeiture of any other property of the defendant, as subject to forfeiture under Title 21, United States Code, Section 853(p).

4.      The property subject to forfeiture includes, but is not limited to, the following property:

a.   A sum of money of at least $5,865,276 representing the proceeds KENT MAERKI obtained from the offenses charged in counts one through seventeen;

b.   A sum of money of at least $3,963,916 representing the proceeds DAVID ALCORN obtained from the offenses charged in counts two and seven through seventeen;

c.   Real property located at 12040 133rd Way, Scottsdale, Arizona 85259;

d.   A sum of money of at least $600,225, representing the proceeds AGHEE WILLIAM SMITH II obtained from the offenses charged in counts one through two, eight through nine, and sixteen through seventeen;

e.   A sum of money of at least $219,352, representing the proceeds TONY SCOTT SELLERS obtained from the offenses charged in counts one through two, seven, twelve, and sixteen through seventeen;

f.   A sum of money of at least $158,020, representing the proceeds THOMAS L. BARNETT obtained from the offenses charged in counts one through two, ten through eleven, and sixteen through seventeen;

g.   A sum of money of at least $5,865,276, representing the proceeds NORMA COFFIN obtained from the offenses charged in counts one, three through six, and sixteen through seventeen.

(All in accordance with Title 18, United States Code, Section 982(a)(1); Title 18, United States Code, Section 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461(c); and Title 21, United States Code, Section 853(p).)

37

Pursuant to the E-Government Act, the original of this page has been filed under seal in the Clerk's Office.

*United States v. Kent Maerki, et. al.*
Criminal No. 2:19cr **47**

A TRUE BILL:

**REDACTED COPY**

_____
FOREPERSON


G. Zachary Terwilliger
United States Attorney


By:  _Melissa E. O'Boyle_

Melissa E. O'Boyle
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
Phone:  (757) 441-6331
Fax:  (757) 441-6689
E-Mail:  melissa.oboyle@usdoj.gov


By:  _____

Elizabeth M. Yusi
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
Phone:  (757) 441-6331
Fax:  (757) 441-6689
E-Mail:  elizabeth.yusi@usdoj.gov

By:  _____

Andrew Bosse
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
8000 World Trade Center

101 West Main Street
Norfolk, VA 23510
Phone:  (757) 441-6331
Fax:  (757) 441-6689
E-Mail:  andrew.bosse@usdoj.gov