IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
*Norfolk Division*

UNITED STATES OF AMERICA,

v.

AGHEE WILLIAM SMITH, II,

Defendant.

Criminal No. 2:19-cr-47-3

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR ORDER DIRECTING U.S. MARSHAL TO ARRANGE INDIGENT DEFENDANT'S TRAVEL AND LODGING DURING TRIAL**

Mr. Smith is indigent. The court assessed his financial information and appointed the Federal Public Defender's Office. Because he remains indigent, he does not have the ability to pay to travel and live in a city thousands of miles away from his home and family for four to five weeks during trial. The government objects to his request for lodging assistance, arguing that a local jail, halfway house, or homeless shelter are suitable, despite Mr. Smith's presumption of innocence and his compliance on bond. Mr. Smith has lodging in California, but the government is prosecuting him here and it is his constitutional and statutory right to be present at trial. Incarcerating Mr. Smith or curtailing his freedom for a month or more for no other reason than lack of financial means is unfair and unjust. It is economic discrimination.

Mr. Smith, through counsel, acknowledged in his Motion that there is no perfect solution under the law. Courts across the country have noted with frustration that there is no obvious legal mechanism for providing indigent defendants lodging during trial. Instead, courts have used a variety of ways to ensure that indigent defendants have lodging when required to be in a distant city for a substantial period of time to attend trial and to assist in their defense as guaranteed by the Constitution. Mr. Smith has presented several options for the Court's consideration that would not involve incarceration solely on the basis of his economic status. And it bears repeating that the All Writes Act

1

was created precisely for this reason: to allow the courts to fill a legal gap, particularly when constitutional rights and a person's liberty are at stake. After all, there are few things more central to American jurisprudence.

### I. Requiring Mr. Smith to pay for his own lodging or confining him for indigency violates the Fifth and Sixth Amendments.

The Fifth Amendment to the Constitution guarantees that a person cannot be "deprived of life, liberty, or property, without due process of law," providing both due process rights and the guarantee of equal protection of the laws. U.S. Const. amend V; *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 213-14 (1995) (applying an equal protection guarantee in the Fifth Amendment). And the Sixth Amendment protects the right to a speedy and public trial, the right to confront witnesses, and the right to a jury trial, among others. U.S. Const. amend. VI. "A defendant has the right to be present at every stage of the trial." *United States v. Rosales-Rodriguez*, 289 F.3d 1106, 1109 (9th Cir. 2002); *see also United States v. Gagnon*, 470 U.S. 522, 526 (1985) ("The constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment, but we have recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him."); *Snyder v. Massachusetts*, 291 U.S. 97, 105-06 (1934) (a defendant has a due process right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend himself against the charge…")

Further, the Due Process and Equal Protection clauses protect defendants "at all stages" of the criminal process from "invidious discriminations." *Griffin v. Illinois*, 351 U.S. 12, 18 (1956). "Fundamental fairness" in justice is "the touchstone of due process." *Gagnon v. Scarpelli*, 411 U.S. 778, 790 (1973). As the Fifth Circuit discussed, "the equal protection analysis can be boiled down to the following: take two [ ] arrestees who are identical in every way – same charge, same criminal backgrounds, same circumstances, etc. – except that one is wealthy and one is indigent… One arrestee is able to post bond, and the other is not… this state of affairs violated the equal protection clause."

2

*O'Donnell v. Harris County*, 892 F.3d 147, 163 (5th Cir. 2018) (holding that bail-setting procedures were inadequate to protect indigent defendants' due process and equal protection rights).

Time and again, the United States Supreme Court has held that indigent defendants cannot be penalized for their inability to pay. The Supreme Court requires representation for those who cannot afford it when even the *possibility* of jail exists. *See, e.g., Gideon v. Wainwright*, 372 U.S. 335 (1963); *Argersinger v. Hamlin*, 407 U.S. 25 (1972) (holding that a "petty-offense prosecution" that may "actually lead[ ] to imprisonment even for a brief period" requires counsel). This right to be free from incarceration due solely to poverty extends not only to those who are presumed innocent, but also to those who have been found guilty. *See, e.g., Griffin*, 351 U.S. at 18 (denying a poor defendant an appellate transcript violated due process); *Tate v. Short*, 401 U.S. 395 (1971) (finding indigent defendant was denied equal protection when held in prison for inability to pay fine); *Bearden v. Georgia*, 461 U.S. 660 (1983) (revoking probation for failure to pay fine violates due process where no inquiry into whether he was financially capable of paying the fine). In these cases, the Supreme Court protected indigent defendants from jails and prisons, and ensured their access to the criminal legal system, *after* they were found guilty of some offense.

Mr. Smith has not been found guilty of any offense. Yet his constitutional rights are at stake and the government advocates for curtailing his liberty while Mr. Smith is exercising his right to a fair and public trial. During trial, Mr. Smith has a right to present evidence, cross-examine witnesses, and participate in his defense. To do so, he must travel and stay in Virginia to attend his trial, where he has no friends or family. Because Mr. Smith has no friends or family to stay with in the area and cannot afford hotel accommodations, the government essentially seeks to have his bond revoked. Of course, the fact that Mr. Smith is indigent is not a valid basis for bond revocation.

The three options the government has proposed – jail, halfway house, homeless shelter – are untenable. ECF No. 213, Response, at 3-5 ("[l]odging at … a local jail… may be an option"). Requiring

a defendant to spend his trial in a jail or halfway house *solely* because of indigency violates the Constitution and federal statutes. Lawyers and judges tout fairness and equality as core principles of our legal system, yet cases like this test whether those grand ideals carry the day in the trenches. *See Bearden*, 461 U.S. at 671 ("But it must be remembered that the State is seeking here to use as the *sole* justification for imprisonment the poverty of a probationer who, by assumption, has demonstrated sufficient bona fide efforts to find a job and pay the fine and whom the State initially thought it unnecessary to imprison."). The court in *United States v. Badalamenti*, 1986 WL 8309 (S.D.N.Y. July 22, 1986), for example, ordered the government to either provide decent, *non-custodial* lodging or to cover the cost of it for out-of-town defendants as a matter of due process. *Id.* at *2. To do so, the court relied on Federal Rule of Criminal Procedure 43 and the Due Process Clause, reasoning that "it is not consistent with fundamental fairness or due process that an accused defendant, regardless of the crime, be driven to ruin by the expense of attending trial at a place far from his home, nor that he be required to take refuge in jail because of an inability to meet the expense of attending trial." *Id.*

## II. Imprisoning a defendant during trial for the sole reason that he is poor violates the Bail Reform Act.

Pursuant to the Bail Reform Act, the "[j]udicial officer may not impose a financial condition that results in the pretrial detention of the person." 18 U.S.C. § 3142(c)(2). The very purpose of the Bail Reform Act is to allow defendants to be released on bond, with the least restrictive conditions, regardless of financial status. Here, Mr. Smith was not found to be a threat or a risk of flight, was granted bond, and has not violated the terms of his bond. There is no cause to revoke his bond or further curtail his liberties.

Instead, the government argues that staying in a jail or halfway house is appropriate because the defendant has turned down "generous" plea offers and has the assistance of court-appointed counsel to investigate the case. Response, at 6. This reasoning offends the basic principles of liberty

and justice enshrined in the U.S. Constitution. Holding the government to its burden at trial, protecting Mr. Smith's constitutional right to a defense and competence counsel, and maintaining the presumption of innocence are not grounds for essentially revoking bond. Another court declared it "would not remand an indigent defendant who is compliant with her bail conditions simply because of her inability to pay for her own lodging." *United States v. Mendoza*, 734 F.Supp.2d 281, 284 (E.D.N.Y. Aug. 26, 2010). Neither should this Court.

The government argues that 18 U.S.C § 3154(4) includes housing at a halfway house to "ensure" that defendants "appear in court." If that was meant to apply to lodging during trial, there is no reason it would not also apply to travel to Virginia, "a construction that would render 18 U.S.C. § 4285 superfluous." *Mendoza*, 734 F.Supp.2d 281. The Criminal Justice Act, on the other hand, anticipates defendants and their attorneys needing other services. 18 U.S.C. § 3006A(e)(1). Lodging is "necessary" for Mr. Smith to attend his trial and to protect his Fifth and Sixth Amendment rights. *Id.* In fact, in *United States v. Diego Garcia*, No. 2:16-cr-265, 2019 WL 5541230, at *1 (D. Nev., Oct. 25, 2019), the court found "that lodging expenses incurred by [the defendants] during trial in this matter constitute[d] 'other services necessary for adequate representation[,]' under the Criminal Justice Act, 18 U.S.C. § 3006A(e)(1), (the 'CJA')." In that case, the court granted in part the defendants' motion for food and lodging expenses during trial, reimbursing the defendants for "up to $10,000.00, upon submission and approval of CJA vouchers containing all required documentation." *Id.* Additionally, the court noted that counsel could request additional funding for lodging, if necessary. *Id.* at n1. The motion was denied, in part, as to the defendants' request for assistance with food expenses. *Id.* at *1.

Justice requires that Mr. Smith be present in a Norfolk courthouse, and able to participate in his trial. And justice *forbids* incarcerating Mr. Smith incarcerating him for indigence. Mr. Smith's liberty interest and his Fifth and Sixth Amendment rights must be protected. His fundamental rights deserve the utmost consideration.

A halfway house restricts one's liberty. *See Asquith v. Department of Corrections,* 186 F.3d 407 (3d Cir. 1999) (holding that placement in a halfway house amounts to "institutional confinement" when significant restrictions are placed on the freedom of its residents). In the federal system, halfway houses are also referred to as Community Correctional Centers (CCC)[1], requiring "the defendant's liberties [to] be strictly controlled," far beyond what is necessary under the Bail Reform Act. *Mendoza*, 734 F.Supp.2d at 285. "Because such facilities, which have strict rules, serve as transitional facilities primarily for offenders who are in the process of reentering the community," it is nearly unheard of for a pretrial defendant in this jurisdiction to be placed in a halfway house for any reason. *Id.* The two local halfway houses, one in Norfolk and the other in Newport News, are operated by CoreCivic. CoreCivic is the leading provider of "corrections management services."[2] It describes its mission as providing "effective reentry programming" so prisoners can "ease into their new life after incarceration" and "return to the community successfully."[3] "[R]esidents are either in the closing weeks of their sentence or have been assigned to the facility in lieu of prison or a jail sentence."[4] Because of this focus, residents must abide by curfews, must receive permission to leave the facility, have limited phone access, limited privacy, and communal living. Accordingly, courts have refused to unduly limit the liberty of a defendant. "[F]orcing a defendant to submit to restrictions on [his] liberty, either in a halfway house or in a jail, as a condition of asserting her constitutional right to a trial would be a serious and… unacceptable burden on that right." *Mendoza*, 734 F.Supp.2d at 286.

---

[1] BOP, About Our Facilities: Reentry Centers, available at: https://www.bop.gov/about/facilities/residential_reentry_management_centers.jsp (last visited Oct. 26, 2021) ("The terms 'CCC,' 'Halfway House,' or RRC are interchangeable.")

[2] CoreCivic, *Safety: Correctional Services*, available at: https://www.corecivic.com/safety/correctional-services (last visited Oct. 25, 2021)

[3] CoreCivic, *What We Do*, available at: https://www.corecivic.com/what-we-do-what-we-dont-do (last visited Oct. 25, 2021)

[4] CoreCivic, *Residential Services*, available at: https://www.corecivic.com/community/residential-services

### III. Forcing Mr. Smith into a communal facility would jeopardize his health and his trial.

As the Court is well aware, the COVID-19 pandemic has affected many aspects of society, and communal settings like jails, prisons, nursing homes, and halfway houses, have been particularly impacted. The Court has considered many compassionate release motions from inmates who are ill or scared of becoming ill from COVID-19 due to their compromised health. The local halfway houses typically have 8 to 20 men living in each room with bunkbeds, similar to a prison, and those individuals share showers and bathroom facilities. Despite this virus infecting millions of people in the last 19 months, the Ghent Residential Reentry Center (RRC) has only tested **one person**, not even testing other residents after that person tested positive.[5] The James River RRC in Newport News is no better: 3 people were tested in 19 months, and all three were positive.

| Facility Name ▲ | No. of Inmates with Completed Tests | No. of Inmates with Pending Tests | No. of Inmates with Positive Tests |
|---|---|---|---|
| GHENT RRC (NORFOLK, VA) (RRC) | 1 | 0 | 1 |
| JAMES RIVER RRC (NEWPORT NEWS, VA) (RRC) | 3 | 0 | 3 |

It is clear that the local RRCs are not taking the virus seriously. They are not testing individuals living or working in the facilities despite the constant rotation of new residents cycling in and out of the center.

A homeless shelter will be no safer. The population of individuals experiencing homelessness is transient by nature, typically lacking access to medical care, and housed in close quarters. Additionally, homeless shelters are typically first-come first-serve, which means that by the time Mr.

---

[5] BOP, *Coronavirus*, available at: https://www.bop.gov/coronavirus/ (last visited Oct. 25, 2021).

7

Smith is done with trial for the day, meets with counsel to prepare for the following day, and gets to the shelter, he likely will not have a spot for the night. For example, the Union Mission's men's shelter in Norfolk is first-come first-serve, and anyone who wants a bed for the night must check in between 9:00 a.m. and 2:00 p.m. This must be done every day. That would not be possible for someone who is required to be in trial.

As it relates to Mr. Smith, living in a communal setting is a health concern. Mr. Smith is 70 years old, increasing his risk of illness, long-term symptoms, and death from COVID-19.[6] Not surprisingly given his age, Mr. Smith has myriad health issues that also increase his risk, including high blood pressure and cardiac issues, among other ailments. *See* Ex. 1 at 1 ("systolic heart failure"). Placing Mr. Smith in a facility with dozens of other men in the same communal space is unnecessarily risky. Furthermore, it heightens the chances of Mr. Smith of not only getting sick, but being exposed to COVID-19 in the facility and needing to quarantine for at least 14 days. Interrupting trial for such a quarantine or being unable to complete the trial because the defendants were housed with dozens of others would unnecessarily delay proceedings, jeopardize the fairness of the trial, and potentially compromise the jury.

**IV.   Mr. Smith's poor health has interfered with employment.**

Mr. Smith filled out a financial affidavit with the Court and was approved for court-appointed counsel. He is indigent. As the government noted, since his indictment, Mr. Smith has filed for bankruptcy, showing pretty clearly that his financial situation has not improved. Mr. Smith has tried to work. He was making limited income driving for Uber for a time. More recently, he obtained his commercial driver's license (CDL) in May 2021. However, due to ongoing medical issues, Mr. Smith has not been able to work reliably. For example, on September 8, 2021, an ambulance rushed Mr.

---

[6] CDC, COVID-19 Risks and Vaccine Information for Older Adults, available at: https://www.cdc.gov/aging/covid19/covid19-older-adults.html (last visited Oct. 25, 2021).

Smith to the hospital, where he was admitted for 5 days with systolic heart failure, sepsis, syncope, and cellulitis. Ex. 1 at 1, 13. Instructions provided from the hospital to Mr. Smith at discharge instructed him to use a walker and forbade driving. *Id.* at 4. The Department of Motor Vehicles suspended his driver's license for medical cause. Ex. 1 at 14.

The government does not object to the U.S. Marshals Service paying for Mr. Smith's travel expenses, thereby acknowledging that Mr. Smith "is financially unable to provide the necessary transportation to appear before the required court." 18 U.S.C. § 4285. It is inconsistent to argue that Mr. Smith cannot afford a plane ticket but can afford lodging for over a month in Norfolk. No one is suggesting that Mr. Smith should be placed in a luxury hotel, but he needs basic accommodations at a local motel in order to attend trial and assist in his defense. This trial is much longer than most trials, which often last several days or a week. Expecting a defendant to pay for a couple nights at a hotel is different than expecting an indigent defendant to afford over a month of lodging in an unfamiliar city.

\* \* \*

Mr. Smith's constitutional trial rights are fundamental, as is the foundational belief that poverty is not a reason to incarcerate or deprive a person of their liberty. Mr. Smith must come to Norfolk to attend his trial, where he is exercising his rights to plead not guilty, to be heard by a jury, to cross-examine his accusers, and hold the government to their burden. He is indigent and his family is across the country in California. The defense respectfully asks the Court to enter an order directing the U.S. Marshal to arrange for Mr. Smith's noncustodial transportation, as well as an order directing that he be provided with non-custodial lodging in Norfolk, Virginia, for the duration of trial in this matter.

9

Respectfully submitted,

AGHEE WILLIAM SMITH, II

By:_____/s/_____

Lindsay Jo McCaslin
VSB No. 78800

Andrew W. Grindrod
VSB 83943

Assistant Federal Public Defenders
Attorneys for Aghee William Smith, II
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
Telephone: 757-457-0800
Telefax: 757-457-0880
Email: lindsay_mccaslin@fd.org
andrew_grindrod@fd.org