IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

NORFOLK DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL NO. 2:19cr47 |
| v. | ) | |
| | ) | |
| DAVID ALCORN, | ) | |
| | ) | |
| AGHEE WILLIAM SMITH, II, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THOMAS L. BARNETT, | ) | |
| | ) | |
| Defendants. | ) | |

GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S
MOTION *IN LIMINE* TO EXCLUDE EVIDENCE
<u>RESPECTING THE STATUS OF INVESTMENTS UNDER THE SECURITIES LAWS</u>

The United States, by its undersigned counsel, hereby responds to defendants' motion *in limine* to exclude evidence "respecting the status of investments under securities law."  ECF Nos. 222, 232, & 242.  The government notes at the outset that it is unclear precisely what evidence the defendants are seeking to exclude, as the government does not intend to present expert testimony "respecting the status of investments under securities law."  Nor would it be possible to excise from the trial testimony all references to securities, given that the investment products at issue were, in fact, securities, as the jury found in the recent trial of *United States v. Bank et al.*, Case No. 2:17-cr-126, and as the federal court hearing the Securities and Exchange Commission's case involving spectrum investments concluded, and as the Arizona State Corporation Commission concluded with respect to Dental Support Plus Franchise.  The Indictment contained a multitude of references to securities, including that the defendants were

not licensed to sell securities, that the investments were targeted in several regulatory securities fraud investigations, and that the defendants continued to sell these investments to unsuspecting investors across the country without disclosing the existence of these investigations.  As the Indictment makes clear, the case is about a complex investment fraud scheme involving the sale of securities.

As discussed below, the government intends to present highly relevant evidence to support the allegations made in the Indictment.  That evidence will include the facts and circumstances surrounding the securities investigations; the civil complaint brought against Alcorn and Janus Spectrum, LLC; and the Securities and Exchange Commission (SEC) Consent Decree signed by conspirator Daryl Bank.  All of the government's proposed evidence is proof of defendants' scheme to defraud as well as each defendant's intent to defraud.  The government does not intend to present expert testimony (as it did in the corresponding *Bank* trial) about the legal definition of these investments as unregistered securities.[1]  Nor does the government intend to admit as evidence in its case-in-chief against the remaining three defendants the Arizona State Corporation Commission's Order concluding that DSPF was an unregistered security (Exhibit A) or the Arizona District Court's Order granting summary judgment against Alcorn, and others, concluding that Alcorn had violated securities laws in connection with the Janus Spectrum, LLC, investments (Exhibit B).  To the extent that defendants are seeking to exclude such expert

---

[1] At the trial of conspirators Daryl G. Bank and Billy Seabolt, 2:17-cr-126, the government called securities expert Philip A. Feigin to testify about the specific attributes of the investments at issue in that case.  The government presented this testimony to address the specific securities fraud charges alleged in that indictment.  In that case, the grand jury charged Bank with conspiracy to sell unregistered securities and securities fraud, substantive counts of the sale of unregistered securities, and substantive counts of securities fraud. Mr. Feigin's expert testimony was necessary in that case to prove the securities fraud allegations in that indictment.  However, the government has not charged stand-alone securities fraud counts in this case, and does not intend to call Mr. Feigin as an expert in this trial.

testimony that the products they were selling were securities, then this motion is premature and will prove to be unnecessary.  To the extent that defendants are seeking to exclude witness testimony that references these investments as securities, or evidence of defendants' and their conspirators' regulatory backgrounds, licensure information, the regulatory investigations, and lawsuits pending during their schemes to defraud elderly investors of investment funds, the motion should be denied.  In support of its position, the government states as follows:

## I.     BACKGROUND FACTS

### A.     Defendants' Motion *in Limine*

On October 27, 2021, defendant Aghee William Smith, II ("Smith"), filed a motion *in limine* seeking to exclude "evidence respecting the status of investments under securities law." ECF No. 222.  David Alcorn ("Alcorn") adopted this motion on October 28, 2021.  ECF No. 232.  And, Thomas L. Barnett ("Barnett") adopted this motion on October 30, 2021.  ECF No. 242.  Defendants have moved to strike evidence regarding the "status of the investments under securities laws," claiming that such evidence would be: (1) irrelevant; and (2) excludable under Fed. R. Evid. 403 due to purportedly being confusing, unfairly prejudicial, and a waste of time.  ECF No. 222.

At this time, it is unclear precisely what evidence, specifically, defendants are seeking to exclude.  As discussed below, all of the evidence the government intends to present at trial is highly relevant to proving the alleged schemes to defraud as well as defendants' intent to defraud.  Such evidence is not confusing, unfairly prejudicial, or a waste of time and, as such, it should be admitted.

## II.  ANALYSIS

### A.  Standard of Review

Although the Federal Rules of Evidence do not specifically provide for motions *in limine*, "their use has evolved under the federal courts' inherent authority to manage trials." *See Luce v. United States,* 469 U.S. 38, 41 n.4 (1984).  Litigants file motions *in limine* "to allow a court to rule on evidentiary issues in advance of trial in order to avoid delay, ensure an even-handed and expeditious trial, and focus the issues the jury will consider." *United States v. Verges*, 2014 WL 559573, *3 (E.D. Va. Feb. 12, 2014) (citing *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999).  It is within the district court's discretion whether to grant, deny, or hold in abeyance pending the evidence presentation at trial a party's motion to exclude evidence. *Id.*

A motion *in limine* to exclude evidence should be granted only when the evidence is "clearly inadmissible on all potential grounds." *Id.*  As the *Verges* court explained, this principle applies because "a court is almost always better situated during the actual trial to assess the value and utility of evidence." *Id.* (citing *Silicon Knights, Inc. v. Epic Games, Inc.*, 2011 WL 5439153, at *1 (E.D.N.C. Nov. 8, 2011) (citations omitted).  Thus, when deciding a motion *in limine*, a district court "may reserve judgment until trial so that the disputed evidence is placed in the appropriate factual context." *Id.* (citing *Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Grp.*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996).  Applying these principles here, the government submits that defendant's motion *in limine* must fail.

### B.  The Evidence at Issue Is Highly Relevant to the Fraudulent Scheme Alleged in the Indictment and to Defendants' Knowing Intent to Defraud

The evidence the government intends to present at trial was alleged in the Indictment and is highly relevant to the scheme to defraud and defendants' knowing intent to defraud; thus, it clearly satisfies Rule 401.  Federal Rule of Evidence 401 provides "that evidence is relevant if:

4

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  As the Fourth Circuit has noted, relevance "typically presents a low barrier to admissibility."  *United States v. Leftenant*, 341 F.3d 338, 346 (4th Cir. 2003) (citing *United States v. Van Metre*, 150 F.3d 339, 349 (4th Cir. 1998)).  To be admissible, evidence need only be "'worth consideration by the jury,' or have a 'plus value.'"  *Id.* (quoting *United States v. Queen*, 132 F.3d 991, 998 (4th Cir. 1997).

### 1. The Indictment

On March 21, 2019, a grand jury returned an indictment against six defendants, including the remaining defendants, Alcorn, Smith, and Barnett.  ECF No. 1 (indictment). Count 1 charges Smith and Barnett with Conspiracy to Commit Mail and Wire Fraud, in violation of 18 U.S.C. § 1349, arising from their sale of Dental Support Plus Franchises and investments in DSPF Group, LLC, to investors.  Count 2 charges Alcorn, Smith, and Barnett with conspiracy to commit mail and wire fraud, also in violation of 18 U.S.C. § 1349.  Count 2 arises from the development and sale of fraudulent investments to elderly victims across the country related to spectrum.  Counts 7-17 charge the defendants with wire fraud related to the above-referenced schemes to defraud, in violation of 18 U.S.C. § 1343.  Finally, Count 19 charges Alcorn with making unlawful monetary transactions with fraud proceeds exceeding $10,000.

The Indictment includes numerous references to the illegal securities and the regulatory investigations into the fraudulent investments at issue in this case.  In the General Allegation section, the Indictment alleges the following:

- "In 1988, the National Association of Securities Dealers ("NASD") barred Maerki from the securities industry."  *Id.* at ¶ 2.

- "Smith was an insurance salesman located in California….Smith previously was licensed to sell securities, but was not permitted to sell securities during the relevant timeframe of this indictment." *Id.* at ¶ 4.

- "Sellers was an insurance salesman located in Idaho….Sellers was not licensed to sell securities." *Id.* at ¶ 5.

- "Barnett was an insurances salesman located in California….Barnett was not licensed to sell securities." *Id.* at ¶ 6.

The Indictment further alleges that there was an investigation into DSPF by the Securities Division of the Arizona Corporation Commission, that the existence of this investigation was not disclosed to investors, and that the conspirators did not stop selling DSPF despite knowing there was a securities investigation into it. *Id.* at ¶¶ 29-30.

The Indictment further alleges that "[i]n or about late April 2014, the Securities and Exchange Commission ("SEC") subpoenaed Maerki and Alcorn to appear for a deposition in connection with a federal securities investigation into Janus Spectrum." *Id.* at ¶ 61. The next two paragraphs allege that the SEC deposed Maerki and Alcorn in 2014. *Id.* at ¶¶ 62-63. In paragraph 64, the Indictment alleges that [d]espite knowing of the ongoing SEC's fraud investigation, Maerki, Alcorn, and others continued to sell spectrum investments and did not disclose the existence of the investigation to current and potential investors." *Id.* at ¶ 64. The Indictment states in Paragraph 65:

> On or about April 6, 2015, the SEC filed a civil complaint against Maerki, Alcorn, and Conspirator #1, among others, accusing the parties of running a multi-million scheme to defraud investors arising from the sale of unregistered securities. The complaint outlined the misrepresentations contained in, among others, the offering documents related to the spectrum investments.

*Id.* at ¶ 65. This is followed by the allegation that "[t]he conspirators did not disclose the existence of the complaint to potential investors from whom they solicited funds." *Id.* at ¶ 66.

6

These introductory allegations – which include specific references to the fact that none of the defendants were authorized to sell securities and the regulatory investigations – were incorporated by reference into each of the individual counts in the Indictment. *Id.* Moreover, in Count One of the Indictment, the grand jury alleged that one of "The Ways, Manner, and Means of the Conspiracy" was: "Maerki, and others known and unknown to the grand jury, recruited salespeople – primarily insurance salespeople unlicensed to sell securities – to sell DSPF "franchise units." *Id.* (Count One ¶ 6). Likewise, in Count Two of the Indictment, the grand jury again alleged that one of "The Ways, Manner, and Means of the Conspiracy" was: "Maerki, and others known and unknown to the grand jury, recruited salespeople – primarily insurance salespeople unlicensed to sell securities – to sell the spectrum investments." *Id.* (Count Two ¶ 6). This is followed by the allegations that "[t]he conspirators failed to disclose the existence of regulatory investigations into the spectrum investments." (Count Two ¶ 9). As such, the allegations are highly relevant and intrinsic to the scheme and artifice at issue.

## 2.  The Government's Proposed Evidence Is Highly Relevant

The government intends to present evidence to support the allegations presented in the Indictment. The government intends to present evidence that Smith and Barnett are, in fact, insurance salesmen who were not licensed to sell securities and should never have been selling the DSPF and the spectrum investments to elderly, unsophisticated investors, much less doing so using lies and material misstatements. *Id.* at ¶¶ 4&6. The government intends to call Andrew Gulcher – the Regional Supervising Investigator for the California Department of Insurance – to testify about the standards governing insurance salesmen in the State of California. Mr. Gulcher will testify that Smith and Barnett held licenses issued by the State of California and, as such, had fiduciary responsibilities towards their clients and were limited in the types of products they

could sell to clients.  Specifically, as licensed insurance salesmen, Smith and Barnett could only sell insurance and certain annuity products authorized by the state of California.  This evidence is highly relevant, as Smith's and Barnett's blatant disregard for the limitations on what products they were allowed to sell their clients is highly probative of their intent to defraud.

Peter Melley works for the Financial Industry Regulatory Authority (FINRA) and will testify that, as alleged in the Indictment, Smith previously was licensed to sell securities, having passed the Series 7, Series 22, and Series 63 examinations.  *Id.* at ¶ 4 (alleging Smith previously was licensed to sell securities).  Mr. Melley will testify about these tests – which covered things like the duty of care owed to clients, due diligence, and the bedrock principal that an investment advisor cannot lie to his clients – and that Smith's license to sell securities lapsed before the sales at issue here.  As part of his testimony about what a registered representative is and what a registered representative like Mr. Smith does, Mr. Melley will by necessity talk about the definition of a security.  That and other testimony will show that Smith is not a novice to the world of investing or to the duties and obligations someone selling an investment owes to the client.  Having held advanced securities licenses and worked in the industry for over 30 years, he knew full well what types of investment products he could sell unaccredited, unsophisticated investor clients versus the types of investments he was actually permitted to sell with a California insurance license.  Again, this type of evidence is highly relevant evidence of Smith's intent to defraud.  Mr. Melley also will testify regarding the regulatory backgrounds of defendants' conspirators, Kent Maerki and Daryl Bank.  Alcorn, Smith, and Barnett were aware of these issues or reckless in not knowing them, yet each elected to continue to align themselves with these conspirators, despite in some cases being specifically warned against continuing to

associate with them.  Such evidence is likewise highly probative evidence of defendants' intent to defraud.

Again, as specifically alleged in the indictment, the government intends to present evidence regarding the regulatory and court actions taken by the Arizona State Corporation Commission ("Arizona SCC") and the United States Securities and Exchange Commission ("SEC") to prevent the continued sale of the DSPF and the spectrum investments, which the defendants continued to sell without disclosing to clients that the products were under investigation.  In 2015, conspirator Kent Maerki called Smith to testify on his behalf at the Arizona SCC's administrative hearing.  At this hearing, Smith testified that he sold investments in Dazzle Dental (again as alleged in the Indictment at ¶ 16), that his clients lost their funds in that investment, and that he nevertheless went on to sell DSPF investments to even more unsuspecting, elderly clients.  The government presents this evidence to demonstrate not only the scheme to defraud, but the *mens rea* of the defendants and conspirators.

The government also intends to present evidence, consistent with the allegations in the Indictment, about the SEC investigation and civil complaint ultimately filed against Janus Spectrum, LLC (Alcorn's business entity), David Alcorn, and David Alcorn Professional Corporation, among others.  This evidence is highly relevant to the conspirators' scheme to defraud, given that Alcorn and his conspirators neither stopped selling these fraudulent investments nor disclosed the existence of this investigation to potential investors.

With respect to Alcorn, the government's proposed evidence on this front is particularly damaging, as several of his own agents warned him to stop associating with Daryl Bank and to stop selling this fraudulent investment while the SEC investigation was pending.  For example, as outlined in the government's response in opposition to Alcorn's motion to exclude privileged

communications with counsel (ECF No. 268), on December 9, 2013, attorney Alan Baskin wrote

Alcorn an email stating the following:

> [A]s I told you a few months ago, Daryl Bank has been barred from the securities
> industry; it is hard to pick a worse person with whom to raise money.  It is
> unfathomable to me how that could have happened (or be continuing) in the midst
> of the SEC investigation and in light of our comments and concerns.  If it hasn't
> already it needs to stop.  Now.

(Government Exhibit 509D).  Alcorn did not heed his attorney's excellent advice and instead

continued to sell spectrum investments with conspirators Daryl Bank, Thomas L. Barnett, and

Aghee William Smith to unsuspecting, mostly elderly, investors for another four years.

On November 21, 2013, Mr. Baskin sent Alcorn an email in which he stated the

following:

> So, while Jere has developed new agreements, the recent developments make it
> such that I cannot recommend that Janus solicit new clients or take money from old
> clients.   This may only make matters worse, and nothing about the recent
> developments in the investigation is making me feel good.  In addition, I do not
> know how the program is being marketed, by whom and what disclosure are being
> made about the SEC investigation.

(Government Exhibit 509B).  That same day, Janus Spectrum, LLC's attorney, Jere Friedman,

seconded Baskin's recommendation and made it explicitly clear.  Mr. Friedman stated:  "Given

the recent turn of events with the SEC investigation, I also advise both of you – as owners and

representatives of Janus Spectrum, LLC – to completely cease any activity related to bringing on

new clients or taking funds from existing clients until you know that you're 'out of the woods'

with the SEC."  Id.  As the evidence will show, Alcorn did not accept his attorneys' advice and

instead continued to sell and participate in fraudulent spectrum investments through Bank,

Smith, Barnett, and others for another four years.

Baskin and Friedman were not the only attorneys who warned Alcorn against raising

money from investors with Daryl Bank.  On May 5, 2013, Nathaniel Dodson sent Alcorn an

10

email stating: "David, I have some concerns about how Daryl is putting money together in a fund, but then the explanation that it's through 'managed accounts' versus a Reg D or registered securities offering.  All investments must be registered or qualify for an exemption." Government Exhibit 316A.  Alcorn replied "No worries, we don't have a dog in this race."  *Id.* To which Dodson replied:  "You may and definitely a fight if the accounts ever went belly up and the attorneys/regulators start looking for recovery."  *Id.*  Once again, Alcorn ignored the concerns of his attorney and continued selling illegal spectrum investments through Bank, Smith, Barnett, and others, despite his attorney's expressed concerns that doing so would violate the securities laws.  As discussed below, this evidence – much of which includes references to the investment products as at least potential securities – is highly relevant to Alcorn's intent to defraud investors.

Finally, Alcorn and Smith continued to associate and sell Bank's fraudulent spectrum investments even after their conspirator Bank entered into a Consent Decree with the SEC.  Bank entered into the decree, which permanently restrained and enjoined Bank from violating securities laws, on January 13, 2017.  Nevertheless, Smith continued to sell yet another fraudulent spectrum investment with Bank – Xcel Bandwidth – using "member loan agreements."  Alcorn also continued to associate with Bank, doing "consulting work" and arranging to get fraud proceeds funneled through his accountant's entity – Stephcourt, LLC – all the way until Bank's arrest in August 2017.

As explained above, the government does not intend to present expert testimony about the securities laws or an expert who will apply the laws to these investment vehicles and provide an expert opinion that they are securities.  It will likely elicit from Mr. Melley or other witnesses basic information about the securities regulation regime, what it means for a security to be

registered, and the fact that the products at issue here were not registered.  That is all completely relevant to the scheme to defraud: the defendants *knew* that the investments they were selling to unsophisticated investors had not been reviewed by any regulatory authority, and that knowledge is one of several factors probative of the fraudulent nature of the scheme.

Indeed, the government would be well within its rights to call a securities expert here, as the fact that what the defendants were selling were quite obviously unregistered securities would be yet another piece of relevant evidence probative of the fraudulent nature of the investments. Securities are required to be registered to prevent fraud, and so intentionally selling *unregistered* securities that have not been vetted by the SEC or the appropriate state corporation commission would support the government's other evidence that this was a scheme to defraud.  That said, for reasons of economy, the government does not at this time intend to present a securities law expert in its case-in-chief.[2]  But the testimony and evidence described above are simply the facts and circumstances surrounding the fraudulent schemes alleged in the Indictment.  Such evidence is necessary to prove defendants' schemes to defraud and each defendant's fraudulent intent. Despite knowing all of the evidence discussed above, the defendants continued to sell these products to unsuspecting, elderly, and unsophisticated investors for over five years.  That is highly relevant evidence of fraud, deception, and motive, and it should be admitted before the jury.

Nor is the admission of such evidence out of the ordinary in fraud cases.  Indeed, courts often permit evidence of governing regulations for the purpose of showing a defendant's intent to

---

[2] Should the defendants testify, the government will also be well within its rights to question them about their knowledge of securities and other investment vehicles, the registration requirement for securities, and the fact that they sold these investments knowing they were unregistered.  For the same reasons outlined above, the defendants' knowledge they were selling unregistered securities supports the government's other evidence that the defendants were selling fraudulent investments using fraudulent misstatements and misrepresentations.

defraud, particularly where, as here, it would be impossible for the jury to understand a particular regulatory program without reference to the governing regulations. *See United States v. Offill*, 666 F.3d 168, 171 (4th Cir. 2011) (affirming admission of testimony to explain the regulatory landscape in a securities fraud case); *United States v. Stefan*, 784 F.2d 1093, 1097-99 (11th Cir. 1986) (affirming admission of evidence of banking regulation violation). In such circumstances, courts have concluded that reference to the regulations is necessary to provide context for the jurors to understand the scheme to defraud. *United States v. Arthur*, No. 09-20877, 2011 WL 2749609 (5th Cir. July 15, 2011) (affirming admission of Medicare regulations in health care fraud case); *United States v. Munoz-Franco*, 487 F.3d 25, 65-66 (1st Cir. 2007) (affirming admission of banking regulatory violations to provide context and to establish defendants' knowledge of the impropriety of their activities).

### 3.  The Proposed Evidence Is Not Confusing, Unfairly Prejudicial or a Waste of Time

The government agrees that the evidence is damaging, compelling and prejudicial to the defendants. It demonstrates that these defendants ignored the limitations of their insurance licenses, the advice of counsel, SEC and Arizona SCC regulatory investigations, and even the existence of civil lawsuits, in their quest for money from victims. There is nothing inappropriate with the admission of damaging evidence against the defendants. As the Seventh Circuit explained, "[t]he vast majority of the government's evidence against a defendant is prejudicial to him. That's the idea." *United States v. Gougis,* 432 F.3d 735, 743 (7th Cir. 2005) (citations omitted).

As the Fourth Circuit has noted, "'[u]nfair prejudice under Rule 403 does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence.'" *United States v. Mohr*, 318 F.3d 613, 619 (4th Cir. 2003) (citing 2 Jack B. Weinstein & Margaret

A. Berger, *Weinsten's Federal Evidence*, § 404.21[3][b])).  Instead, Rule 403 "only requires suppression of evidence that results in unfair prejudice—prejudice that damages an opponent for reasons other than its probative value."  *Id.*  Here, all of the evidence described above relates to the scheme itself, its perpetrators, and to defendants' intent to defraud.  The probative value is high, and the *unfair* prejudice is nil.  There is no valid Rule 403 argument to exclude it.

Likewise, the evidence described above, including evidence that references the status of the investments as securities, will not be confusing or a waste of time.  The jury in *Bank* heard more complicated evidence related to the legal definition of securities – evidence the government does not at this time intend to introduce in its case-in-chief – and had no difficulty understanding the case or the legal issues it raised.  Indeed, any ruling that the government is limited from presenting evidence related to securities would present a serious risk for confusion and waste of time, given that the case is about a fraudulent investment scheme involving securities.

Finally, the Court also could give a limiting jury instruction about the admission of regulatory standards which, if given, would alleviate any potential risk of jury confusion.  The government's proposed Jury Instruction #34 directly addresses the relationship between violations of civil regulations and criminal law.  The government submits that the Court could give this jury instruction if defendants remain concerned about any potential jury confusion arising from the admission of this highly probative evidence.

In summary, because the value of this highly relevant evidence arises solely from its legitimate probative force, it should not be excluded on 403 grounds.

## III.    CONCLUSION

For the reasons outlined above, the government respectfully requests that the Court deny defendant's motion *in limine* to exclude evidence of the "status" of the Dental Support Plus Franchise and spectrum investments under securities law.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:    _____/s/_____

Melissa E. O'Boyle
Virginia State Bar No. 47449
Elizabeth M. Yusi
Virginia State Bar No. 91982
Andrew Bosse
Attorneys for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number - 757-441-6331
Facsimile Number - 757-441-6689
E-Mail Address - Melissa.OBoyle@usdoj.gov

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 10, 2021, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send a notification of such filing

(NEF) to all counsel of record.


By: _____ /s/_____
        Melissa E. O'Boyle
        Assistant United States Attorney