

0000184831

1

**BEFORE THE ARIZONA CORPORATION COMMISSION**

2

COMMISSIONERS

3

TOM FORESE – Chairman
BOB BURNS

4

ANDY TOBIN
BOYD DUNN

5

JUSTIN OLSON

Arizona Corporation Commission
DOCKETED

JAN  3 2018

DOCKETED BY

6

7   In the matter of:

8   KENT MAERKI and NORMA JEAN COFFIN aka
NORMA JEAN MAERKI, aka NORMA JEAN

9   MAULE, husband and wife,

10  DENTAL SUPPORT PLUS FRANCHISE, LLC, an
Arizona limited liability company,

11  Respondents.

DOCKET NO. S-20897A-13-0391

DECISION NO. _____76530_____

**OPINION AND ORDER**

12

DATES OF PRE- HEARING CONFERENCES:

13

14

DATES OF HEARING:

15

16  PLACE OF HEARING:

17  ADMINISTRATIVE LAW JUDGE:

18  APPEARANCES:

19

20

21

January 16, May 22, July 9, September 26, and
November 13, 2014, February 6 and February 26,
2015

July 13, 14, 15, 16, 20, 21, 22 and 28, 2015

Phoenix, Arizona

Marc E. Stern

Mr. Kent Maerki and Ms. Norma Jean Coffin, Pro
Per; and

Ms. Wendy Coy, Staff Attorney, on behalf of the
Securities Division of the Arizona Corporation
Commission.

22  **BY THE COMMISSION:**

23      On November 18, 2013, the Securities Division ("Division") of the Arizona Corporation

24  Commission ("Commission") filed a Notice of Opportunity for Hearing ("Notice") against Kent

25  Maerki and Norma Jean Coffin aka Norma Jean Maerki, aka Norma Jean Maule, husband and wife,

26  and Dental Support Plus Franchise, LLC ("DSPF") (collectively "Respondents"), in which the Division

27  alleged multiple violations of the Arizona Securities Act ("Act") in connection with the offer and sale

28

DOCKET NO. S-20897A-13-0391

1   of securities in the form of investment contracts.

2          Respondents were duly served with a copy of the Notice.

3          On December 10, 2013, Respondents filed requests for hearing in response to the Notice in this
4   matter pursuant to A.R.S §44-1972 and A.A.C. R14-4-306.

5          On December 11, 2013, by Procedural Order, a pre-hearing conference was scheduled on
6   December 23, 2013.

7          On December 19, 2013, Respondent, Kent Maerki, filed a Motion for a Continuance stating
8   that he would be unavailable due to previously scheduled business travel arrangements.

9          The Division indicated that it did not object to a brief continuance.

10          On December 20, 2013, by Procedural Order, the pre-hearing conference was continued to
11   January 16, 2014.

12          On January 16, 2014, at the pre-hearing conference, the Division appeared through counsel and
13   Respondents appeared on their own behalf. Counsel for the Division requested that a hearing be
14   scheduled and estimated that the proceeding would require approximately two weeks for hearing.
15   Respondents did not object to this request, but indicated they were considering retaining an out of state
16   attorney who would comply with Arizona law to appear *pro hac vice*.

17          On January 17, 2014, by Procedural Order, a hearing was scheduled to commence on June 2,
18   2014, with additional days of hearing scheduled during the following weeks.

19          On May 9, 2014, the Division filed a Motion to Allow Telephonic Testimony stating five of its
20   prospective witnesses would be unduly burdened if they were required to appear in Phoenix for the
21   proceeding.  There were no objections to the Division's request.

22          Respondent, Kent Maerki, on May 9, 2014, filed a Motion for a Continuance due to several
23   conflicts that had arisen for him with the scheduled hearing dates.  The conflicts in two of three
24   instances involved court proceedings in separate venues, the United States Bankruptcy Court for the
25   District of Arizona on June 4, 2014 and the Maricopa County Superior Court on June 12, 2014.[1]  The
26   third conflict was purportedly based on a November 2013 invoice and involved an "unmovable

27

28   _____

[1] According to Mr. Maerki's Motion, these proceedings were scheduled during the first week in May.

2                    DECISION NO.    76530

1   business trip" which was to begin on June 2, 2014; however Mr. Maerki failed to raise this issue when

2   the Commission's proceeding was scheduled in January.

3          On May 12, 2014, the Division filed its response to Respondent Maerki's request for a

4   continuance of the proceeding.  With respect to the June 4, 2014, proceeding in the United States

5   Bankruptcy Court, the Division stated that Mr. Maerki's request for a continuance did not specify how

6   this matter conflicted with this proceeding since the Petition in the bankruptcy proceeding lists Janus

7   Spectrum, LLC as the debtor and named an unknown third party as the president or managing director

8   of Janus Spectrum, LLC.  The Division further noted that the Superior Court proceeding on June 12,

9   2014 was only scheduled for a status conference limited to 30 minutes and was to begin at 9:45 a.m.

10  so that the Commission's proceeding on that date could be scheduled to begin in the early afternoon

11  on that date.  Lastly, the Division argued that the copy of the invoice was dated May 6, 2014, and did

12  not bear any reference to a business meeting that would conflict with the Commission's proceeding

13  that had been scheduled to commence on June 2, 2014.

14         On May 15, 2014, by Procedural Order, good cause for a continuance of the proceeding was

15  not found, but Mr. Maerki was afforded an opportunity to explain the merits of his motion further at a

16  procedural conference scheduled on May 22, 2014.  The Division's request to authorize telephonic

17  testimony was also granted.

18         On May 22, 2014, at the procedural conference, the Division appeared with counsel and Mr.

19  Maerki appeared on his own behalf.  Mrs. Maerki did not appear and an appearance was not entered

20  on behalf of DSPF.  At the outset, a brief discussion took place concerning Mr. Maerki's request for a

21  continuance followed by Mr. Maerki's revelation that he had retained counsel, the Mirch Law Firm,

22  LLP, from San Diego, California.  Mr. Maerki provided a copy of a letter that was addressed to the

23  presiding Administrative Law Judge from Attorney Marie Mirch which confirmed the firm's retention

24  by the Respondents.  Attorney Marie Mirch's letter indicated she was in the process of applying for

25  *pro hac vice* status in Arizona and that a motion to associate counsel *pro hac vice* would be filed in the

26  near future by local counsel.  Additionally, Attorney Mirch indicated that she was unavailable for any

27  hearing in June at the Commission due to other previously scheduled proceedings in California.  A

28

DECISION NO.   **76530**

1    further discussion took place concerning a continuance and it was determined that the proceeding
2    should be continued and a status conference should be scheduled in its place on July 9, 2014.

3         On May 27, 2014, by Procedural Order, the hearing scheduled to commence on June 2, 2014,
4    was continued, and a status conference was scheduled on July 9, 2014.  The Division was further
5    granted authorization to utilize telephonic testimony during the presentation of its evidence.

6         On July 9, 2014, at the status conference, the Division appeared with counsel.  Respondents
7    were present with local counsel.[2]  The Division requested that a hearing be scheduled and estimated
8    that the proceeding would require approximately three weeks of hearing.  After discussions with
9    counsel, it was agreed that the matter would be scheduled to commence in late September and continue
10   into October, 2014.  It was also noted that the Division was planning to utilize approximately 13
11   witnesses and that the Respondents would possibly utilize six witnesses.

12        On July 10, 2014, by Procedural Order, a hearing was scheduled to commence on September
13   29, 2014.

14        On July 30, 2014, Respondents filed a Motion to Associate Counsel *Pro Hac Vice* pursuant to
15   Arizona Law and the Rules of the Arizona Supreme Court.

16        On August 1, 2014, the Division filed a response stating that it had no objections to the Motion
17   to Associate Counsel *Pro Hac Vice* filed by Respondents.

18        On August 5, 2014, by Procedural Order, Respondents' Motion to Associate Counsel *Pro Hac*
19   *Vice* was granted.

20        On September 22, 2014, Respondents filed an Emergency Application to Continue Hearing
21   ("Emergency Application") because Respondent, Kent Maerki, had suffered a stroke on August 27,
22   2014, and was hospitalized for two days. Respondent Maerki's counsel requested a continuance of at
23   least eight weeks to permit him time to recover from his stroke.  Attached to the Emergency Application
24   as Exhibit 1 was a note from Mr. Maerki's cardiologist who recommended a delay in any legal
25   proceedings for at least eight weeks because it was important for Mr. Maerki to maintain a low stress
26   level, after which he would be reevaluated by his physician.

27   _____

28   [2] Attorney Mirch joined in the proceeding telephonically from California and indicated that her application to appear *pro hac vice* was pending with the State Bar of Arizona.

DECISION NO. ___76530___

DOCKET NO. S-20897A-13-0391

1    On September 23, 2014, the Division filed a response to the Emergency Application and argued

2    that it should be denied.  In support of its response, counsel for the Division argued that the medical

3    evidence in support of the Emergency Application was not entirely clear, and even after eight weeks

4    whether Mr. Maerki would be able to participate in the proceeding. Additionally, the Division stated

5    that it appeared that Respondent Maerki did not plan to attend the proceeding the week of September

6    29th because its investigator had learned that Respondent Maerki had a reservation at a hotel in Las

7    Vegas, Nevada beginning on September 30, 2014, to attend the third week of a three part seminar that

8    he had been participating in earlier in the year.

9    On September 24, 2014, by Procedural Order, Respondents were directed to reply to the

10   Division's response which had been filed in this proceeding before a ruling would be made. Due to the

11   short time available, a telephonic procedural conference was scheduled on September 26, 2014, to

12   address the issues raised by the Emergency Application.

13   On September 24, and 25, 2014, the Division filed two supplemental responses in opposition

14   to the Emergency Application.

15   On September 26, 2014, the Respondents filed an additional pleading purporting to be an

16   affidavit in support of the Emergency Application. However, the document was not notarized.

17   Subsequently, on September 26, 2014, at the procedural conference, the Division and the

18   Respondents appeared telephonically and argued the issues raised by the filing of the Emergency

19   Application.

20   On September 26, 2014, by Procedural Order, it was found that good cause was established to

21   continue the proceeding, and a procedural conference was scheduled on November 13, 2014, to

22   determine the rescheduling of the hearing to avoid conflicts with the schedules of counsel and to allow

23   for further medical evaluation of Respondent Maerki.  Additionally, Respondent Maerki was ordered

24   to provide the Division with the necessary medical releases so that the appropriate physicians could be

25   contacted to discuss the Respondent's medical condition and his ability to participate in a three to four

26   week long legal proceeding.

27   On November 13, 2014, at the procedural conference, the Division and Respondents appeared

28

DECISION NO. ___76530___

1   through counsel. Mr. Maerki's present state of health was discussed and also when his treating

2   physician would provide an indication of whether Respondent Maerki would be able to participate in

3   a legal proceeding lasting several weeks. At that time, it was believed that Mr. Maerki would see his

4   cardiologist in mid-December and if a problem developed with the hearing that was to be scheduled,

5   then the issue would be addressed upon the filing of the appropriate documentation.

6         On December 10, 2014, by Procedural Order, the hearing was scheduled to commence on

7   February 9, 2015.

8         On January 14, 2015, Respondents filed a Motion to Continue Hearing for two reasons. First,

9   Respondents included a copy of an affidavit from Respondent Kent Maerki's cardiologist, Dr. Jack

10   Wolfson, who examined Mr. Maerki on January 7, 2015, and cited numerous heart related problems

11   which in his opinion "can lead to life-threatening consequences." Dr. Wolfson further stated that Mr.

12   Maerki's "participation or appearance in any legal matter could have a very serious negative impact on

13   his health." Additionally, he stated that he had advised Mr. Maerki not to participate in any "stressful

14   events, in particular any legal proceedings." However, Dr. Wolfson failed to state, in his opinion, when

15   Mr. Maerki would be physically able to appear at the Commission to address the allegations against

16   him contained in the Notice. Second, Respondents stated that local counsel, Mark Chester, would not

17   be available "on the dates set for hearing" due to a trial scheduled in the United States District Court

18   for the Southern District of California. This trial was scheduled by a Scheduling Order dated September

19   22, 2014, that was also filed as an exhibit. However, no mention was made of this matter by an attorney

20   from Mr. Chester's office who was present at the procedural conference on November 13, 2014, in

21   order to avoid any possible conflicts with the scheduling of this hearing.

22         On January 20, 2015, the Division filed its response to the Motion to Continue Hearing filed by

23   Respondents. The Division stated that it objected to any further continuances of the hearing in this

24   matter. The Division pointed out that Mr. Maerki's medical records reflect a lengthy history of medical

25   problems, but they had not prevented him from being involved in multiple businesses. Additionally,

26   the Division related that a medical report of a neuropsychologist who examined Mr. Maerki on October

27   9, 2014, stated that Respondent functioned well under self-induced stress when starting a new business,

28

1  but was stressed by his legal problems. Another report from Scottsdale Healthcare Outpatient Therapy

2  stated that Mr. Maerki worked 70 hours per week running his businesses. The Division, based on these

3  reports, concluded that Mr. Maerki "should be able to assist in his defense." However, the Division

4  failed to address Dr. Wolfson's opinion made in his affidavit.

5       The Division, with respect to Respondents' local counsel's conflict with his earlier scheduled

6  hearing in the United States District Court, stated that when scheduling this hearing no mention was

7  made of the federal court hearing. The Division cited the Arizona Supreme Court Rule 38(a)(2) and

8  argued that there was no specific requirement for Mr. Chester to personally appear with Ms. Mirch

9  who was to appear for the Respondents *Pro Hac Vice* in the proceeding and who, from all appearances,

10  is acting as lead counsel.

11       On January 22, 2015, in the Eleventh Procedural Order, it was determined that before a ruling

12  would be made on Respondents' Motion to Continue that supplemental filings would have to be made

13  by the Respondents and the Division. The Respondents would have to file a clarification from Dr.

14  Wolfson of when, in his opinion, Mr. Maerki would be able to physically appear at the hearing on this

15  matter if he chose to do so. The continuance requested by Mr. Chester due to his scheduling conflict

16  would be addressed concurrently with the request due to Mr. Maerki's medical problem. The Eleventh

17  Procedural Order ordered that Respondent's Motion for Continuance of Hearing was taken under

18  advisement, and that Respondents were ordered to file by January 29, 2015, additional documentation

19  from Dr. Jack Wolfson as to his opinion on a date certain that Respondent Maerki would be physically

20  able to appear at the hearing if he wished to do so.

21       It was further ordered that the Division should file its response to the initial filing which

22  contained Dr. Wolfson's opinion on January 14, 2015, and to any supplemental filing which contained

23  clarification by Dr. Wolfson by February 5, 2015.

24       On January 29, 2015, Respondents filed a supplement to their Motion to Continue Hearing

25  stating that Dr. Wolfson's affidavit would be forthcoming, but had not yet been received by

26  Respondents' counsel. Additional reasons were also stated in support of the need of local counsel's

27  presence at the hearing. Lastly, Ms. Mirch who was appearing *Pro Hac Vice* further stated that she

28

DECISION NO. _____76530_____

1  had another reason for continuing the hearing due to the fact that her elderly mother who lived in Dallas,
2  Texas had "become very ill" and that she would be flying to Dallas to be with her for as long as
3  necessary.

4       On January 30, 2015, the second affidavit by Dr. Wolfson was filed wherein he stated that "Mr.
5  Maerki should not participate in this hearing."  Further, Dr. Wolfson opined "that Mr. Maerki's
6  participation or appearance in any legal matter could have a very serious negative impact on his health.
7  Therefore, I have advised Mr. Maerki that he is not to participate in any stressful events, in particular
8  any legal proceedings."

9       On February 3, 2015, the Division responded that "Respondent Maerki should not be granted
10  immunity due to his health issues."  The Division argued that Mr. Maerki had freely selected his own
11  counsel who "is able to adequately protect" the rights of Mr. Maerki at a hearing, and that Respondent
12  Maerki's rights would be protected.

13       With respect to Ms. Mirch's argument for the presence of local counsel during the hearing on
14  this matter, the Division represented that there was no specific requirement under the Arizona Rules of
15  the Supreme Court for local counsel to personally appear and participate in the hearing, and that local
16  counsel's scheduling conflict had not been disclosed earlier.  In light of the illness of Ms. Mirch's
17  mother, the Division objected to the lack of information provided by Ms. Mirch as to the nature of her
18  mother's illness or how much of a delay would be required.

19       On February 5, 2015, Respondents' counsel, Ms. Mirch, filed an affidavit to further supplement
20  and support the Motion to Continue filed on January 14, 2015, setting forth more fully the facts
21  surrounding her 89 year old mother's medical condition and the fact that she would have to be in Dallas
22  for at least the first week or more of the hearing.

23       The Division filed, on February 5, 2015, its Second Motion for Telephonic Testimony which
24  named two additional witnesses that the Division wished to call as witnesses telephonically because
25  they reside outside of Arizona and that it would be unduly burdensome for them to appear in Phoenix
26  for the hearing.

27       On February 6, 2015, a teleconference took place with Ms. Mirch for the Respondents, and
28

DECISION NO. _____ **76530**

1  counsel for the Division present.  The issues raised by the Motion to Continue and the Division's
2  objection to the Motion to Continue were argued by counsel.  When the arguments were concluded,
3  the presiding Administrative Law Judge ("ALJ") advised counsel for the parties that the proceeding
4  would be continued and a procedural conference scheduled to reschedule the hearing.

5       On February 10, 2015, by Procedural Order, the Respondents' Motion to Continue and the
6  Division's Second Motion to Allow Telephonic Testimony were granted.  It was further ordered that a
7  procedural conference be held on February 26, 2015.

8       On February 26, 2015, at the procedural conference, the Division and Respondents appeared
9  through counsel.  Counsel discussed the number of witnesses for the parties and the expected length of
10  the hearing.  Additionally, the Division and the Respondents were advised that they should exchange
11  copies of their complete Witness and Exhibit Lists by June 1, 2015, if not previously exchanged, with
12  courtesy copies provided to the presiding ALJ.  Respondents' counsel, Ms. Mirch, agreed that if she
13  were to request to withdraw from the proceeding due to a fee dispute she would do so no later than
14  June 1, 2015.  Lastly, the parties agreed that the hearing should commence on July 13, 2015, and
15  believed that the evidentiary portion of the hearing would be concluded by the end of the month.

16       On March 17, 2015, by Procedural Order, the hearing was scheduled to commence on July 13,
17  2015.

18       On May 15, 2015, Respondents' counsel, Attorney Marie Mirch, who had been granted *Pro*
19  *Hac Vice* status to appear on behalf of the Respondents, filed a Motion to Withdraw as Counsel
20  ("Motion to Withdraw").  Attorney Mirch cited E.R. 1.16(b) of the Rules of Professional Conduct in
21  support of her Motion to Withdraw.  Ms. Mirch represented that the Respondents had been notified of
22  her intent to withdraw as counsel of record and had been notified in writing of the status of the
23  proceeding together with all upcoming deadlines.  She also provided the Commission with all last
24  known mailing addresses of the Respondents and the email address of Respondent Kent Maerki.

25       Neither the Respondents nor Respondents' local counsel, who it was presumed was aware of
26  Ms. Mirch's action herein, responded to Attorney Mirch's Motion to Withdraw.

27       Shortly after Ms. Mirch's filing on May 15, 2015, the Division filed a response to Attorney

28

DECISION NO. ___**76530**___

DOCKET NO. S-20897A-13-0391

1   Mirch's Motion to Withdraw and stated that it did not object to her Motion to Withdraw so long as the

2   hearing schedule was not affected. Counsel for the Division further stated that Respondents' local

3   counsel had thus far taken no action on Attorney Mirch's Motion to Withdraw.

4        On May 27, 2015, by Procedural Order, Attorney Mirch's Motion to Withdraw was granted,

5   and local counsel was ordered to make a filing to inform the presiding Administrative Law Judge of

6   his intentions with respect to whether he would continue in his representation of the Respondents, and

7   whether he would be counsel of record at the hearing.

8        On June 1, 2015, Respondent, Kent Maerki, filed a request for an extension of time for the

9   exchange of Respondents' copies of their Witness List and Exhibits and a filing on the franchise issue

10  in the proceeding. Respondent Maerki stated that he was involved in other litigation and this litigation

11  was slowing his response time since he now represented himself in this proceeding.

12       On June 2, 2015, Attorney Mark Chester, who had acted as local counsel for the Respondents,

13  filed a Motion to Withdraw as Counsel of Record pursuant to E.R. 1.16(b) after Attorney Mirch's

14  Motion to Withdraw was granted by Procedural Order on May 27, 2015.

15       On June 4, 2015, the Division filed separate responses to each of the aforementioned filings by

16  Respondent Maerki and by Attorney Chester. With respect to Respondent Maerki's request, the

17  Division noted that the Arizona Supreme Court Rules prohibit Respondent Maerki from representing

18  his spouse who had been named as a Respondent in the proceeding solely for the purpose of

19  determining the liability of the marital community pursuant to A.R.S. § 44-2031(C). The Division

20  further argued it was illogical to believe that Respondent Maerki was not aware of the filing deadlines

21  in light of Ms. Mirch's representations in her Motion to Withdraw. Further, the Division stated that on

22  April 14, 2014, and January 5, 2015, copies of Witness Lists and Exhibits were provided to the Division

23  by Respondent Maerki and Attorney Mirch, respectively. Lastly, with respect to an extension for the

24  filing of a memorandum on the franchise issue, the Division stated that the Thirteenth Procedural Order

25  dated March 17, 2015, established the filing date for this memorandum and that ample time had been

26  allowed for the filing of this document.

27       With respect to Attorney Chester's Motion to Withdraw as Counsel of Record, the Division

28

10                          DECISION NO.   **76530**

1   argued that Mr. Chester's motion should be denied because Respondents had not complied with their
2   obligations to produce complete copies of Witness Lists and Exhibits and had failed to file a
3   memorandum on the franchise issue. Further, the Division argued that the withdrawal of Respondents'
4   remaining attorney could have a material adverse effect on the Respondents' interests.

5       On June 9, 2015, by Procedural Order, Respondents were granted an extension until July 1,
6   2015, to provide complete Witness Lists and Exhibits, and also given until July 1, 2015, to address the
7   franchise issue or to do so in their closing brief. The Motion to Withdraw as Counsel of Record by
8   Attorney Mark Chester was also granted.

9       On July 6, 2015, Respondents filed Defendants' Motion to Allow Telephonic Testimony.
10  Therein, Respondent Kent Maerki stated that he was representing himself and his wife "pro per."
11  Further, Respondent Maerki requested leave to call 12 of his witnesses telephonically because they
12  would be "unduly burdened." He also named the Division's counsel in this proceeding on this list and
13  failed to state any specific reasons as to why any of these proposed witnesses could not appear.

14      On July 8, 2015, the Division filed its response to the Defendants' Motion to Allow Telephonic
15  Testimony arguing that no specific reasons were cited in Respondents' request to call witnesses
16  telephonically, but if good cause was demonstrated, the Division would have no objections to
17  Respondents "utilization of telephonic testimony." The Division also objected to Respondent Maerki's
18  representation that he was representing his wife, Norma Jean Coffin, who had been named as a
19  Respondent solely to determine the liability of the marital community in the proceeding pursuant to
20  A.R.S. § 44-2031(C). The Division, in support of this objection, cited Rule 31 of the Rules of the
21  Arizona Supreme Court which prohibits the unauthorized practice of law. Lastly, the Division
22  requested that Ms. Wendy Coy, the Division's Staff Attorney in the proceeding, be prevented from
23  being called as a witness in the proceeding and also noted that at no prior time had the Respondents
24  ever listed Ms. Coy as a witness.

25      On July 10, 2015, by Procedural Order, after a review of the filings by Respondent Maerki and
26  the Division, the Defendants' Motion to Allow Telephonic Testimony was taken under advisement
27  pending a showing of "good cause" with respect to why each proposed witness should appear

28

DECISION NO. ___76530___

DOCKET NO. S-20897A-13-0391

1  telephonically.   Ms. Coy's inclusion with the proposed telephonic witnesses to be called by
2  Respondents was inexplicable, and she was not required to appear as a witness.  With respect to
3  Respondent Kent Maerki's representation that he was representing his wife in the proceeding, it was
4  ordered that he was barred from this representation by the Rules of the Arizona Supreme Court.

5       On July 13, 2015, a full public hearing was convened before a duly authorized Administrative
6  Law Judge of the Commission at its offices in Phoenix, Arizona.  The Division appeared with counsel
7  and Respondents appeared pro per.  Upon the conclusion of the evidentiary portion of this proceeding
8  on July 28, 2015, the parties were directed to file their closing briefs by September 18, 2015, and the
9  matter taken under advisement, pending submission of a Recommended Opinion and Order to the
10  Commission.

11      On September 8, 2015, Respondent Kent Maerki filed a motion for an extension of time in
12  which to file his closing brief until after October 31, 2015, arguing that subsequent to the hearing he
13  and his wife had filed on August 7, 2015, for bankruptcy protection pursuant to Chapter 7 of the United
14  States Bankruptcy Code.  Respondent, Maerki argued "it is my understanding that the case may be
15  stayed due to the bankruptcy filing".  Mr. Maerki argued further "if that is not the case he requested
16  the delay until after October 31, 2015," due to the burden of the Commission's proceeding and other
17  pending litigation in which he was involved.

18      On September 9, 2015, the Division filed its response to Mr. Maerki's Motion citing *In re*
19  *Knoell*, 160 Bankr. Rep. 825 (D.Ariz.1993), which stands for the proposition that actions by the
20  Commission are not stayed by a bankruptcy filing as such actions are an exercise of police and
21  regulatory power, and are exempt from the automatic stay of the United States Bankruptcy Code.  The
22  Division, however, further indicated that it was willing to agree to a 30 day extension for both parties
23  to file their closing briefs.

24      On September 15, 2015, Respondent Maerki filed a reply to the Division's response contending
25  that the exemption from the automatic stay was somewhat ambiguous without adequately citing with
26  particularity why the automatic stay should be enforced to delay the Commission's action herein.
27  Alternatively, Respondent Maerki offered a compromise date for the requested extension to be set at

28

DECISION NO. _____76530_____

1   October 23, 2015, for the filing of the parties' closing briefs.

2       On September 17, 2015, the Division filed an additional response in reply to Mr. Maerki's
3   September 15, 2015, filing with the Commission and therein the Division further substantiated its
4   position.

5       On September 17, 2015, by Procedural Order, the date for the filing for closing briefs was
6   extended to October 19, 2015.

7       On October 19, 2015, closing briefs were filed by the parties.

8            *      *      *      *      *      *      *      *      *      *

9       Having considered the entire record herein and being fully advised in the premises, the
10  Commission finds, concludes, and orders that:

11  **FINDINGS OF FACT**

12      1.    Respondent, Kent Maerki is a resident of Arizona and married to Norma Jean Coffin,
13  who is also known as Norma Jean Maerki and as Norma Jean Maule. (Ex. S-7)

14      2.    Respondent, Kent Maerki is the co-founder, president, marketing director and a member
15  of DSPF. (Ex. S-2) (Ex. S-3) (Ex. S-7)

16      3.    During the time the DSPF offering was made, Respondent Maerki was not registered to
17  sell securities as either a salesman or dealer. (Tr. 518-519:20-4)( (Ex. S-1(a))

18      4.    DSPF was organized as a member-managed limited liability company in Arizona on
19  November 26, 2010, and also on August 28, 2012, DSPF formed a limited liability company in Nevada.
20  (Ex. S-2) (Ex. S-3)

21      5.    DSPF conducted business in or from Scottsdale, Arizona. (Ex. S-7)

22      6.    According to Arizona and Nevada records, Respondent Maerki and his wife were the
23  only two members of DSPF. (Ex. S-2) (Ex. S-3)

24      7.    DSPF was not registered as a broker/dealer in Arizona and had not registered any
25  securities with the Commission. (Tr. 519:5-12) (Ex. S-1)

26      8.    At all relevant times herein, Norma Jean Coffin, aka Norma Jean Maerki, aka Norma
27  Jean Maule, has been the spouse of Respondent Kent Maerki and was joined in the action pursuant to

28

DECISION NO. ___**76530**___

DOCKET NO. S-20897A-13-0391

1   A.R.S. § 44-2031(C) for the purpose of determining the liability of the marital community.  (Ex. S-7)
2   (Ex. S-8)

3        9.      Based on the record, it was established that Respondent Maerki was acting for his own
4   benefit and for that of the marital community.

5        10.      After the formation of DSPF in 2010, Respondent Kent Maerki acting as its owner and
6   President, developed a business entity that was termed a franchise for a dental marketing program that
7   was offered and sold to investors.  Purportedly, the entity would provide able-to-pay patients to dentists,
8   who in turn were to return a portion of the fees which they earned as a return on the investment to the
9   investor in the entity.

10       11.      The Division, in support of its allegations in the Notice, called four investor witnesses,
11  Alfred Hoyoak, James Orosel, Edward Maznio and Harold G. Knowlton, II.  Additionally, the Division
12  called three sales representatives involved in the offering along with the Chief Executive Officer of a
13  company involved in recruiting dentists for the investors in the marketing program.  Additionally, the
14  Division called Mr. Gary Clapper, the Division's Chief Investigator.

15       12.      Respondent Maerki responded to the allegations made by the Division in the Notice by
16  calling three witnesses as follows:  Aghee W. Smith, who offered and sold the offering by DSPF; Dale
17  C. Murray, who had been involved in the marketing of the offering; and Ms. Lynne D. Shelton, a
18  franchise attorney from Texas who had been involved in the preparation of the Uniform Franchise
19  Disclosure Document ("FDD") and other documents related to the offering described in the Notice.

20  James Orosel

21       13.      Mr. James Orosel, a retired resident of Phoenix, Arizona, testified that he had formerly
22  worked for the City of Los Angeles, California, and had worked for an electrical company.

23       14.      Mr. Orosel testified that he had previously made investments through an investment
24  company and also invested in real estate in California and in Arizona.  (Tr. 31:11-18)

25       15.      Mr. Orosel stated he had invested with DSPF and first became interested in the offering
26  after hearing about it on a radio show.  (Tr. 31-32:25-8)

27       16.      Mr. Orosel stated that when he first heard the radio show, Respondent Maerki was being
28  interviewed and talking about DSPF.  (Tr. 35:10-14)

DECISION NO. ___76530___

17.     According to Mr. Orosel, he became interested in DSPF because the discussion on the radio promoted a high rate of return and that investors would not need to know anything about the business. (Tr. 35:15-22)

18.     Subsequently, Mr. Orosel went to the Phoenix Convention Center where he met and spoke with Mr. Maerki and a salesman by the name of Mr. Jones who discussed the investment opportunity.  (Tr. 36:1-9)

19.     Mr. Orosel stated that an email which he initially received from DSPF on November 15, 2011, explained the fact it was an absentee-owned, fully managed dental franchise with a five-year track record, which could produce annual profits of up to 40 to 60 percent or more. Mr. Orosel went on to state the purported return of 40 to 60 percent annually and the fact the investment was absentee-owned "sounded awfully good."  (Tr. 36-37:23-9)(Ex. S-61(a))

20.     Mr. Orosel thought the five-year track record referred to in the email, was the track record of DSPF.  (Tr. 37:10-12)

21.     Mr. Orosel understood the absentee-owned, fully-managed dental franchise meant that the business would be managed by on-site managers and all he would have to do was to invest and receive monthly checks.  (Tr. 37:16-20)

22.     Mr. Orosel stated that he received a document from DSPF by email which was 26 pages long and contained "frequently asked questions."  (Tr. 39:2-14)( (Ex. S-61(a))

23.     The first page of the document concerning the frequently asked questions refers to the DSPF franchise and states in bold print "offers an absentee-owned fully-managed franchise with a five-year track record, producing annual profits up to 40 to 60 percent or more." (Tr. 39:15-23)

24.     Mr. Orosel further testified the DSPF document failed to disclose that the five-year track record referred to within the document was not that of DSPF.  (Tr. 40:6-8)

25.     It was Mr. Orosel's understanding that DSPF, or a business entity that was recommended by DSPF, would locate dentists and supply them with paying patients.  A percentage of the fees paid to the dentists would then be returned to the investor in the DSPF offering.  (Tr. 41:1-7)

26.     Mr. Orosel further testified that he had absolutely no experience in the dental field and no background in marketing or finding patients for dentists.  (Tr. 41:8-17)

DECISION NO.   76530

27.     The program was promoted to Mr. Orosel as producing five new patients per month who would be able to spend at least $1,000 each with a dentist in the program.  (Ex. S-61(a))

28.     Additionally, the program was promoted as being fully-managed with professional management.  (Ex. S-61(a))

29.     According to the promotional materials, Mr. Orosel's franchise was supposed to be fully operational within 180 days.  (Ex. S-61(a))

30.     The DSPF document further points out that the business investment would be less time-consuming with quick productivity and that "investors (franchisees) share in gross revenue, off the top, versus net profits, if any."  (Ex. S-61(a))

31.     The document went on to describe that on a projected investment of $20,000, a 53.1 percent annual return would be earned on the investment.  (Ex. S-61(a))

32.     In the promotional document from DSPF, the program was described as "our business model is quite lucrative for us and our capital partners" to further promote the offering to prospective investors.  (Ex. S-61(a))

33.     Mr. Orosel stated further that the DSPF marketing brochure made reference to the year 2003 when Dental Support Plus developed a so-called "proprietary" method of delivering patients to four dental offices in the Phoenix area.  (Tr. 45-46:24-6)(Ex. S-61(a))

34.     According to the DSPF marketing documentation, a network dentist would receive 65 percent of the fee generated from a patient referred by a DSPF franchise with 35 percent going to the investor (franchisee). However, the franchisee's portion was further reduced by a so-called franchise fee of 4 percent and a fee for dental support services of 19 percent and marketing support service of 29 percent, leaving the franchisee 16.5 percent of all money collected from a patient that had been referred to the network dentist.  (Ex. S-61(a))

35.     Mr. Orosel stated that he had been told by the DSPF representatives that it would take up to six months for his investment in a franchise to begin to pay a return.  (Tr. 50:15-25)

36.     According to Mr. Orosel, he was sent documents from DSPF explaining that there were two approved vendors, MetroMedia, that would provide so-called "quality patients," and that OraCare would find dentists to service the patients for investors who did not plan to operate the franchise.

DECISION NO. _____76530_____

37.     Mr. Orosel stated that he was influenced by the "track record" that had been explained to him and the fact that he would receive a return on his investment within 180 days.  (Tr. 56:16-18)

38.     Mr. Orosel believed that the vendors to which he was referred by DSPF would do all the work and he would "get money" and receive an accounting and pay taxes.

39.     Mr. Orosel stated that he was never required to attend any mandatory training classes related to the franchise.  (Tr. 57:10-12)

40.     Further testifying, Mr. Orosel stated that with a managed franchise he believed that he would not be required to obtain dentists or patients.  (Tr. 57-58:23-1)

41.     Mr. Orosel stated that he never intended to operate his franchise as a business.  (Tr. 58:1-3)

42.     Mr. Orosel testified that he created a limited liability company, Sonora Dental Management, LLC ("Sonora Dental") for the operation of his franchises.  According to a franchise agreement between DSPF and Sonora Dental, Mr. Orosel's first franchise was established on April 3, 2012.  (Ex. S-59(a))

43.     Mr. Orosel invested again in a second franchise with DSPF on November 19, 2012, when his second franchise was established with DSPF through Sonora Dental.  (Ex. S-59(b))

44.     The cost for each franchise was $25,000.

45.     Mr. Orosel explained that he had begun inquiring about the investment opportunity in 2011, but his initial investment had not occurred until April, 2012.  (Tr. 62-63)

46.     According to a third franchise agreement between DSPF and Mr. Orosel's limited liability company, Sonora Dental, on November 19, 2012, he invested in a third franchise for another $25,000.  (Tr. 64)

47.     Additionally, on November 19, 2012, Mr. Orosel invested in a fourth franchise with DSPF.  (Ex. S-59(d))

48.     Based on the record, Mr. Orosel testified that he invested in the DSPF offering in seven separate franchise programs beginning in April, 2012 through November, 2012, investing a total of $175,000.

49.     Although it had been represented to him that within 180 days each franchise was to be

DECISION NO. ___76530___

1  up and running, it was not disclosed that other investors did not have their programs completely started
2  within that time frame.  (Tr. 74:5-10)

3      50.    Further testifying, Mr. Orosel stated that prior to his investments, he was not informed
4  that none of the prior franchisees/investors were making any money.  (Tr. 74:11-14)

5      51.    According to Mr. Orosel, he was under the impression that he would get funds and then
6  pay the different people involved in the programs, but the money subsequently was to go to a
7  "bookkeeping group," and it was supposed to send the money to the investor.  (Tr. 74-75:18-4)

8      52.    According to Mr. Orosel, he did not collect any monies from the dentists in the program
9  as the money went through the hands of so-called "bookkeeping group" who he thought was either a
10  vendor or a part of DSPF.

11      53.    Mr. Orosel stated that on September 17, 2012, he sent an email to DSPF after more than
12  200 days had passed and he had not received any return on his first investment even though his first
13  investment had been promoted to provide a return within 180 days.  (Tr. 76-77:13-15)

14      54.    Mr. Orosel stated that in return for his $175,000 investment in the seven franchises, he
15  received only "$49.00 and a couple cents."  (Tr. 78:10-20)

16      55.    Mr. Orosel's return on investment was nowhere near the promised 40 to 60 percent
17  return that he had been told he would receive from his franchises.  (Tr. 79:3-5)

18      56.    Mr. Orosel testified that he recalled receiving a letter from a representative of what was
19  called Dental Support Management referring to another entity called Dental Support Group which he
20  believed employed all the vendors that would perform the work for investors.  (Tr. 79:19-22)

21      57.    Mr. Orosel recalled receiving a flyer from Dental Support Group which represented that
22  an investor "can leave all the heavy lifting to us" and he believed that it operated from the same address
23  as DSPF.  (Tr. 80:1-15)

24      58.    Mr. Orosel stated that he invested in his last six franchises through an individual named
25  Daryl Bank, who had offices in Virginia and Florida.  (Tr. 80:16-21)

26      59.    A flyer sent out by Dominion Private Client Group, which was owned by Daryl Bank,
27  states that for the last five years DSPF had been increasing patient flow to dental offices and increasing
28  cash flow dramatically.  (Tr. 81:1-12)

DECISION NO. _____ **76530**

60.     A flyer from Dominion Private Client Group referred to the franchise option to invest in DSPF with an initial investment of $30,000, but it also referred to an investor being able to invest in a pool of DSPF franchises for $5,000 and $1,000 multiples thereafter.  Another document offered shares of stock at $1,000 per share related to the DSPF offering.  (Tr. 82-83)

61.     Further testifying, Mr. Orosel identified a Dominion Private Client Group promotional document dated October, 2012, describing how the franchise model was built on a results-proven platform over an eight year time frame, which included five years of research and development and three years of successful performance and also referenced the fact that a franchise was targeted to be fully operational in 180 days.  (Tr. 84)

62.     The literature from Dominion Private Client Group described a DSPF model being designed to achieve annual profits of up to 30 percent or more after one or two years of operation.  (Tr. 85:4-7)

63.     Mr. Orasel had not been interested in the pooling investment opportunity for the dental franchises, and he only invested in the full franchise model for which he paid $25,000 each.

64.     Mr. Orasel recalled receiving a newsletter from DSPF dated September 13, 2013, in which it referred to Dental Support Group being a preferred vendor that was well funded.  (Tr. 91)

65.     The September 13, 2013, newsletter from DSPF and Respondent Maerki contained a statement which stated that "we don't get paid until you get paid."  (Tr. 91-92:6-2)

66.     Although Mr. Orasel recalled receiving approximately $49.00, he stated that those funds were received only after the management company, franchise fees, OraCare and MetroMedia were paid.  (Tr. 92:6-16)

67.     Mr. Orasel stated he remembered receiving a DSPF memorandum from Respondent Maerki of DSPF, which was sent to franchisees on or about August 8, 2014, at which time he had not been earning forty to sixty percent on his investment, or any regular income.  (Tr. 93)

68.     According to the memorandum, as of June 30, 2014, DSPF had run out of money and funding because the franchises had not been profitable and as a result DSPF had not been profitable and according to the memorandum, would be shelved.  (Tr. 94:1-7)

69.     Mr. Orosel stated that since the closing of DSPF, he has not received any of his funds.

DECISION NO. ____**76530**____

DOCKET NO. S-20897A-13-0391

1    (Tr. 94:12-15)

2        70.    Mr. Orosel stated he did not know anything about Dazzle Dental which was mentioned

3    in the August 8, 2014 memo from Respondent Maerki.  (Tr. 94:19-24)

4        71.    Mr. Orasel stated that when he had not begun to see a return on his investment after 180

5    days, he believed he spoke with Mr. Maerki and one of his associates and also some accountants in

6    Texas and was told Respondents had a lot of problems, but thought that they would be able to fix them.

7    (Tr. 95: 3-12)

8        72.    Further testifying, Mr. Orasel stated that at no point did Mr. Maerki ever tell him as a

9    franchisee he was required to get his own patients or to find dentists and at no point did anyone with

10   DSPF tell him it was his responsibility.  (Tr. 95:13-25)

11       73.    Mr. Orasel believed that if there were problems with the franchises, it was the

12   organizations', DSPF and their vendors, responsibility to make them successful.  (Tr. 96)

13       74.    Mr. Orasel testified that he had received DSPF's FDD.  (Tr. 96:19-25)(Ex. S-10)

14       75.    The   disclosure   document   states   that   Respondent   Maerki   was   the   co-

15   founder/President/Marketing Director of DSPF.  (Ex. S-10)

16       76.    The disclosure document does not disclose that Respondent Maerki was the subject of

17   a Securities and Exchange Commission ("SEC") action involving an entity called Food Source.  (Ex.

18   S-10)

19       77.    Additionally, there is no mention made in the disclosure document that Mr. Maerki had

20   been involved in litigation in some of his businesses.  (Ex. S-10)

21       78.    Mr. Orosel stated that none of his franchises produced a forty to sixty percent annual

22   profit.  (Tr. 98:13-15)

23       79.    Mr. Orasel recalled that he received franchise disclosure documents for each of his

24   DSPF franchises.  (Tr. 105-106:14-1)

25       80.    Mr. Orasel understood that "approved vendors" were to provide the dentists and patients

26   for his franchises.  (Tr. 113:15-25)

27       81.    According to Mr. Orosel, although he "always got the two confused," OraCare was to

28   provide dentists and MetroMedia was to provide the patients.  (Tr. 114:1-5)

DECISION NO.   76530

DOCKET NO. S-20897A-13-0391

82.     Mr. Orasel understood that DSPF was to deal with OraCare and MetroMedia because he didn't deal with them. (Tr. 114:16-25)

83.     Based on the record, Mr. Orasel was unsure of how he was to receive a return on his investment.

84.     According to Mr. Orasel, he was not buying a business that he would operate, but he was making an investment with DSPF. (Tr. 140:20-23)

85.     Mr. Orasel stated that his intent was to receive a return on an investment and to not do any work. (Tr. 140-141:23-2)

86.     Further testifying, Mr. Orasel said he based this opinion on the fact the promotional material he received talked about an absentee-owned fully-managed dental franchise. (Tr. 141:5-8)

Alfred Holyoak

87.     Mr. Holyoak, a resident of Idaho Falls, Idaho, testified that he was contacted by Tony Sellers, an individual who had sold him an annuity in the past, but in May, 2011, contacted him about the DSPF offering and making an investment.

88.     Mr. Holyoak stated that Mr. Sellers, his representative in Idaho, brought some forms over for him to sign, but he did not see any documents prior to investing. (Tr. 144:9-17)

89.     Mr. Holyoak stated that in order to invest with DSPF he took the funds from his annuity, which was valued at approximately $80,000 at the time. (Tr. 144:21-23)

90.     Mr. Holyoak identified his DSPF franchise agreement which was dated May 17, 2011, between himself as the franchisee and DSPF as the franchisor.  Mr. Holyoak identified himself as Holyoak Dental Group. (Tr. 145-146:12-4)(Ex. S-56(a))

91.     Mr. Holyoak stated that it was his understanding that DSPF had a proven track record of five years, and provided for an absentee-owned fully-managed business with a return on investment of forty to sixty percent after a six-month start-up period. (Tr. 147:9-14)

92.     According to Mr. Holyoak, he was going to receive a fully-managed franchise with assigned territory and "they" would find "qualified dentists" and would do the set up for the doctors and for billing and everything else including the software that went with it. (Tr. 146:15-24)

DECISION NO. __76530__

DOCKET NO. S-20897A-13-0391

93.　According to Mr. Holyoak he had nothing to do except "provide the money." (Tr. 146-147:25-1)

94.　Mr. Holyoak expected to see a return on his investment after 180 days sometime in November, 2011. (Tr. 147:2-5)

95.　Mr. Holyoak stated that he did not plan to operate the franchise because he had absolutely no business experience and he had been told that the business would be fully-managed and had already been running successfully for five years. (Tr. 147:8-15)

96.　It was Mr. Holyoak's understanding that Mr. Maerki had the five-year track record and would be running the business. (Tr. 147:16-18)

97.　Mr. Holyoak believed Mr. Maerki was in charge because he mailed his funds and everything else to Mr. Maerki. (Tr. 147:20-21)

98.　According to Mr. Holyoak, he relied on a number of the representations made by his local sales representative in Idaho who promoted DSPF as a "super fantastic investment" with a forty to sixty percent return. (Tr. 149:3-10)

99.　Mr. Holyoak stated he purchased two franchises on the same day, each for $20,000, for a total of $40,000. (Tr. 150:3-14)

100.　On December 10, 2013, Mr. Holyoak sent a letter to Respondent Maerki and DSPF demanding the return of his $40,000 investment for the two DSPF franchises. (Ex. S-56(b))

101.　Mr. Holyoak stated he did not receive any money back from the Respondents after his letter of December 10, 2013. (Tr. 155:2-6)

102.　Mr. Holyoak made it clear the reason he invested with DSPF was because he did not want to be involved in any work or day-to-day operations. (Ex. S-56(d))

103.　Mr. Holyoak referred to a DSPF brochure which promoted 60 months of proven performance and stated that he relied on this representation in making his investment and the fact that within six months he would start to receive patients for his franchise. (Tr. 163-164:19-7)

104.　Mr. Holyoak stated that he did not receive his first patient until February 26, 2013, for one of his franchises, almost two years after he invested. (Tr. 166:8-14)

105.　According to correspondence from Respondent Maerki dated May 1, 2013, in August

22

DECISION NO.　**76530**

DOCKET NO. S-20897A-13-0391

of 2012, Mr. Maerki and his wife and two other DSPF staff members had created Dental Support Group as an improved DSPF vendor because OraCare and MetroMedia had failed to perform in providing dentists and patients. (Tr. 169:18-23)

106. After Mr. Holyoak filed a Complaint with the Arizona Attorney General's Office, he received a response from DSPF stating that he had failed to provide any dental patients or dentists and did not have a claim against DSPF. (Tr. 618:2-8)(Ex. S-56)

107. Mr. Holyoak reiterated that when he invested with Mr. Sellers in Idaho, he had agreed to a "fully managed system." (Tr. 618:13-16)

108. Mr. Holyoak stated he was unaware that DSPF had pre-paid OraCare and MetroMedia $5,000,000 each upfront for their operations to work as approved vendors for DSPF. (Tr. 621:20-24)

109. Mr. Holyoak testified that he had no advance notice that DSPF was going to cease operations until he received the memorandum from Respondent Maerki dated August 8, 2014. (Ex. S-61(b))

110. Further testifying, Mr. Holyoak stated he was unaware of a SEC action against Respondent Maerki and Food Source and unaware of a Federal Trade Commission ("FTC") action against Mr. Maerki also. (Tr. 624:14-19)

111. Mr. Holyoak stated that he would have wanted to know about problems Mr. Maerki had with the SEC, which resulted in a permanent injunction against him before Mr. Holyoak invested in his franchises. (Tr. 625:13-18)

112. Mr. Holyoak testified that the disclosure of the SEC and FTC actions would have been red flags to him. (Tr. 625-626:19-1)

113. Further testifying, Mr. Holyoak confirmed he had received a copy of the FDD, which had been filled out by his salesman and he signed and he subsequently received copies back from DSPF which had been signed by their representatives. (Tr. 623)(Ex.S-10)

114. Mr. Holyoak stated that the actions by the SEC and the FTC against Respondent Maerki were not disclosed in the FDD. (Tr. 624)

115. Additionally, the FDD does not indicate the franchisor has been a party to any criminal or civil actions, legal proceedings, or settlement agreements within the last 10 years prior to the

DECISION NO. _____ **76530**

1  disclosure document.  (Tr. 625)(Ex. S-10)

2   116. Mr. Holyoak stated when he bought the two franchises he paid for them both with one

3  check and they were sold to him by Mr. Sellers as a fully functioning, managed system.  (Tr. 629)

4  Edward Maznio

5   117. Mr. Edward Maznio, a Glendale, Arizona resident, stated he became familiar with DSPF

6  after investing in a franchise in 2011.  (Tr. 193:18-20)

7   118. Mr. Maznio stated he had attended a meeting at Respondent Maerki's office in

8  December, 2010 along with his father and several other individuals who had been involved in earlier

9  models of the dental program where Mr. Maerki spoke along with an individual named David White.

10  (Tr. 194:13-18)

11   119. Mr. Maznio stated that the individuals who spoke presented it as an opportunity which

12  would utilize proven systems involving the marketing and deployment of the dental program developed

13  by DSPF and would lead to a good result.  (Tr. 195:5-11)

14   120. Mr. Maznio testified that he was provided with a brochure at the December, 2010

15  meeting and it described a business opportunity with absentee ownership.  (Ex. S-58)

16   121. As Mr. Maznio understood the franchise program, it provided for him to make an

17  investment and employ company approved vendors who would create relationships with dentists and

18  secure patients for the dentists.  (Tr. 197:9-24)

19   122. According to Mr. Maznio, the fully managed business would be operated with one

20  hundred percent of the management of the franchise covered by someone other than himself.  (Tr.

21  198:7-16)

22   123. As the DSPF franchise brochure indicated, Mr. Maznio would be able to expect a

23  minimum of five new patients a month with each producing at least $1,000 in revenue for a dentist

24  which he did not believe to be out of the ordinary.  (Tr. 198:17-25)

25   124. DSPF's brochure promoted the five-year track record of a "proven platform" of an

26  organization known as Dazzle Dental offices that were already in the Phoenix area with proven

27  marketing strategies to acquire patients and the dentists to provide them with services.  (Tr. 199:8-

28  20)(Ex. S-58)

DECISION NO. **76530**

125.   Mr. Maznio understood that DSPF's franchises were based on systems developed by the consultants who had developed similar businesses as the franchise and making the programs successful and ongoing.  (Tr. 200:1-18)(Ex. S-58)

126.   Mr. Maznio testified that his understanding was that the consultants were representing everything that Dazzle Dental did and that he was going to be involved in a "virtual Dazzle Dental." (Tr. 202:1-11)

127.   According to the DSPF brochure and what Mr. Maznio was told, each franchise would cost $20,000 and he could expect a forty to sixty percent rate of return.  (Tr. 203:1-9)(Ex. S-58)

128.   Mr. Maznio was led to believe that the marketing of the dental program would be done with flyers and the use of telemarketing to find new patients.  (Tr. 204:4-11)

129.   According to a brochure from MetroMedia, it was represented that MetroMedia assumed one hundred percent responsibility for the day-to-day management of the DSPF franchise. (Ex. S-58)

130.   Mr. Maznio referred to a DSPF document captioned "frequently asked questions," which stated that the DSPF system had been specifically designed for people who may already have a full-time job and by utilizing employees at MetroMedia, franchisees would spend minimal time operating their franchises.  (Ex. S-58)

131.   In order to operate his franchise, Mr. Maznio formed a limited liability company known as Blueprint Dental, LLC ("Blueprint") and entered into an agreement with MetroMedia to market his franchise on January 1, 2011.  (Tr. 210-211) (Ex. S-58)

132.   Mr. Maznio stated he received $4,040 on his $20,000 investment over a period of about one and a half years.  (Tr. 212:13-22)

133.   A letter and check from David White, the CEO of MetroMedia dated August 16, 2012, included what was termed a "customer appreciation payment" of $250 for his patience in continuing to utilize MetroMedia even though new patients were "dwindling."  (Tr. 216)

134.   In a subsequent memorandum from DSPF and Respondent Maerki, franchisees were informed that MetroMedia was having a difficult time providing patients for the dentists, but they were few and far between and cash flow was sporadic.  (Tr. 217:8-22)

DECISION NO. _____  **76530**

DOCKET NO. S-20897A-13-0391

135.    Mr. Maznio recalled receiving a DSPF memorandum from Respondent Maerki dated August 8, 2014, which stated that DSPF had run out of money and funding and had closed down effective June 30, 2014.  (Ex. S-61(b))

136.    The memorandum references Steven Vereen, who developed what was termed a marketing concept in franchise form called Dazzle Dental.  (Ex. S-61(b))

137.    Mr. Maznio stated that he had met Mr. Vereen at his initial meeting to discuss an investment with DSPF and he also saw him at the DSPF offices.  (Tr. 222:19-23)

138.    Mr. Maznio stated that when he met him, Mr. Vereen had not disclosed any prior violations of the Act.  (Tr. 223:4-8)

139.    Also referenced in Mr. Maerki's August 8, 2014 memorandum, were two men, Mr. Dale Murray and Mr. David White, who were described as part of Mr. Vereen's team who "owned successful dental offices supported by their unique marketing methods, which had supplied a significant number of patients to their Dazzle Dental offices."  (Tr. 223:22-24)(Ex. S-61(b))

140.    Prior to Mr. Maznio's investment in DSPF in 2011, when he had first met the men involved, he was not informed that their offices were not operating and had closed for financial reasons.  (Tr. 224:9-14)

141.    With respect to the FDD, Mr. Maznio stated that there was no disclosure concerning Respondent Maerki's previous SEC permanent injunction or anything about an FTC action either.  (Tr. 226:1623)

142.    Additionally, Mr. Maerki did not disclose any ongoing investigation he was involved in prior to the time Mr. Maznio invested.  (Tr. 226-227:24-4)

143.    Mr. Maznio did not believe he would have continued on with making an investment if that information had been disclosed to him.  (Tr. 227:7-8)

144.    As far as the status of Mr. Maznio's investment, he stated "It's dead.  My LLC remains, but as far as income from the franchise, it's dead."  (Tr. 227:9-12)

145.    According to Mr. Maznio, although he knew that Mr. Vereen, Mr. Murray and Mr. White were a part of Dazzle Dental, he though they were consultants partnering on the new venture involving DSPF.  (Tr. 230:10-18)

DECISION NO. _____ **76530**

146.    Mr. Maznio stated he was unaware that of the $20,000 paid for his franchise, that up-front payments of $7,000 was paid to Metro Media and $7,000 was paid to OraCare for the purpose of finding patients and dentists, respectively.  (Tr. 237:1-8)

147.    Mr. Maznio believed that his $20,000 was utilized to fund DSPF.  (Tr. 237:12-17)

148.    Further testifying, Mr. Maznio stated besides OraCare and MetroMedia, he was aware that Dental Support Group was involved as another vendor, but he was not sure whether it was a subsidiary of DSPF, or had separate ownership to manage the franchise or the other vendors.  (Tr. 239:5-12)

149.    Mr. Maznio testified that as the cash flow was dwindling, or stopping, he contacted various representatives at DSPF about the problems in 2012.  (Tr. 244-245:5-2)

150.    According to Mr. Maznio, he never received a forty to sixty percent return as was represented to him in the promotion of the offering.  (Tr. 246:13-15)

151.    Mr. Maznio stated that at the time he first met with Mr. Maerki and Mr. Vereen, Mr. White and Mr. Murray, who had been connected to Dazzle Dental, it was presented that Dazzle Dental had been successful, but no one explained that they had gone out of business.  (Tr. 246-247:20-8)

152.    According to Mr. Maznio, the disclosure of the failure of Dazzle Dental "wouldn't have been a good marketing message."  (Tr. 247:19-24)

David White

153.    Mr. David White of Phoenix, Arizona, testified that he had been associated with the entity known as Dazzle Dental and had been employed by MetroMedia and OraCare.  (Tr. 250:1-18)

154.    Mr. White stated that Dazzle Dental started in approximately 2006 and operated into the beginning of 2010.  (Tr. 250:19-21)

155.    Mr. White stated he was familiar with DSPF and was the President of both MetroMedia and OraCare, who were hired to be vendors for the franchises offered and sold by DSPF.  (Tr. 250-251:22-7)

156.    Testifying further, Mr. White stated MetroMedia was a company that marketed for dentists and acquired patients for them.  (Tr. 251:16-20)

157.    With respect to OraCare, Mr. White stated that as was the case with MetroMedia, he

1   owned and managed it and employed people to recruit dentists for the program. (Tr. 252:14-20)

2        158.    According to Mr. White, at one point Respondent Maerki had a role with the entities,
3   helped to recruit dentists, and his name showed up as the President of OraCare, but prior to any actual
4   operations occurring, he was no longer involved. (Tr. 252-253:21-3)

5        159.    Mr. White referred to an entity known as Hassle Free Dental, which was the subject of
6   a Confidential Private Placement Memorandum dated July 21, 2010. He stated Hassle Free Dental
7   hired MetroMedia and OraCare to bring patients and dentists who needed patients together. (Tr. 253:7-
8   25)(Ex. S-49)

9        160.    Mr. White testified that investor funds were raised for Hassle Free Dental through the
10  private placement. (Tr. 254:1-3)

11       161.    At the time of this offering, Mr. Maerki was listed as the President of OraCare, but Mr.
12  White further explained that Mr. Maerki wasn't involved on a daily basis and an actual dentist was
13  employed in that position by the end of 2010. (Tr. 254:8-22)

14       162.    Mr. White identified a document, the MetroMedia Marketing Vendor Agreement, which
15  would have been executed between DSPF and MetroMedia and provided that franchisees could only
16  purchase or utilize services from an approved supplier. He stated it would have been executed prior to
17  the first sale of a franchise. (Tr. 256-257:20-24)(Ex. S-15)

18       163.    According to the MetroMedia Marketing Vendor Agreement, franchisees were to pay
19  the vendor, in this case MetroMedia, twenty-nine percent of the franchisee's gross revenues generated
20  from patients provided by the vendor. (Ex. S-15)

21       164.    Under the terms of OraCare's Vendor Agreement, franchisees were to pay OraCare
22  nineteen percent of patient receivables for managing the relationship with the dentist. (Ex. S-14)

23       165.    On April 26, 2012, a notice of default was sent from the law firm of Shelton & Power,
24  LLC, to OraCare and to MetroMedia because the vendors were not able to keep up with the capacity
25  that was required both for dentists and qualified patients. (Ex. S-16)

26       166.    According to Mr. White, Mr. Maerki was aware of the problems in securing dentists
27  and patients for the franchisees, but Mr. White had no control whether DSPF slowed the sale of the
28  franchises.

167.    Mr. White stated Mr. Maerki was aware that Dazzle Dental had gone out of business in 2010.  (Tr. 264:21-24)

168.    Mr. White testified that at some point in time DSPF moved into the offices where MetroMedia and OraCare were located.  (Tr. 267:14-17)

169.    Testifying further, Mr. White stated a brochure utilized by DSPF and distributed to its franchisees referred to 60 months proven performance, but stated that DSPF had not been in business for 60 months, but was referring to the track record of the management team at MetroMedia in working to bring patients to Dazzle Dental offices.  (Tr. 267-268:18-15)

170.    Mr. White testified that both MetroMedia and OraCare were formed in June, 2010 on the same day and neither entity had a five-year track record, but the reference made in the DSPF brochure was to the management team which had been involved with Dazzle Dental previously.  (Tr. 269-270:23-4)

171.    As stated in the memorandum sent to franchisees from DSPF and Mr. Maerki, Mr. White acknowledged that OraCare and MetroMedia each received approximately $5,000,000 in prefunding from DSPF for operations.  (Tr. 272:8-14)

172.    Referring to a MetroMedia letter sent to franchisees, Mr. White stated he had signed it informing the franchisees that MetroMedia had fallen behind in securing patients and was voluntarily offering customer appreciation payments to compensate for the lack of cash flow due to the delays being experienced.  (Tr. 276:1-20)(Ex. S-33)

173.    According to Mr. White, Mr. Maerki was involved in meetings with him and other principals of MetroMedia along with attorneys who discussed the appreciation payments that were made to investors who were past their six month start-up time frame.  (Tr. 277:3-13)

174.    According to Mr. White, the monies to pay the appreciation payments came from MetroMedia's bank account which included monies pre-paid by DSPF, and began in April 2012.

175.    Based on the record, customer appreciation payments were made by MetroMedia over a period of several months, and were paid through August of 2012.

176.    The payments were stopped because MetroMedia had no more funds and it was fired by DSPF.

DECISION NO. _____ **76530**

177.    According to Mr. White, OraCare and MetroMedia were paid up front when a new franchisee decided to invest in a franchise.  OraCare and MetroMedia were then to find patients and dental providers after the franchise was purchased.

178.    Mr. White stated if there were no patient payments, no money would come to OraCare or MetroMedia.  (Tr. 281:12-14)

179.    Referring to a January, 2012 newsletter from OraCare and MetroMedia, Mr. White stated that most of these newsletters were drafted by his attorney and were to give franchisees a general update with respect to the success or progress of the companies.  (Tr. 282)(Ex. S-43)

180.    Although the franchisees were told that their investments would be up and running within 180 days, the newsletter stated it was important for the investors to understand the process from contracting with a practice to delivering patients generally required 270 days or more.  (Ex. S-43)

181.    According to Mr. White, he did not know who the newsletters were sent to, but he assumed it was the franchisees after he sent the newsletter to Respondent Maerki.  According to Mr. White, although DSPF began its offering in January, 2011, the first appreciation payments were not begun until April of 2012; however, at the inception of DSPF there was no consideration given to the idea of appreciation payments.

182.    Mr. White stated the original arrangement OraCare and MetroMedia had with DSPF was that when a franchisee invested his funds, $14,000 would be divided equally between MetroMedia and OraCare.  (Tr. 287:20-24)

183.    Based on Mr. White's experience, OraCare was able to find dentists for the franchisees, but the problem was that finding enough patients who could afford to pay for their treatment was not easy; the primary method of locating patients was through call centers, but the use of cell phones magnified that issue as lists of cellular numbers were not available.

184.    The use of the appreciation fees, which essentially were penalties for lack of performance by OraCare and MetroMedia, was not planned initially, and was developed to appease the franchisees, but the approved vendors eventually ran out of money.  (Tr. 292-293:19-7)

185.    Mr. White stated OraCare provided over 30 dentists to the franchisees and he believed over 1,000 patients during the time frame were provided by MetroMedia for the franchisees.  (Tr. 294-

DECISION NO. _____ 76530

1 | 295:10-5)

2 |     186.    According to Mr. White, the number of patients were insufficient to accomplish the
3 | business plan for the franchises.

4 |     187.    Mr. White stated that MetroMedia and OraCare were failed businesses and unable to
5 | sustain operations after 2012 and described receiving the letter from DSPF when it ceased operations
6 | and went on to describe the entities as "failed businesses." (Tr. 296:7-14)

7 |     188.    According to Mr. White, although a franchisee could choose to operate the business
8 | themselves, to his knowledge there were no franchisees that chose to do so, and all franchises employed
9 | MetroMedia and OraCare to secure patients and dentists for their franchises. (Tr. 308:1-12)

10 | Louis Baca

11 |     189.    Mr. Louis Baca testified that he became familiar with DSPF and Mr. Maerki in the
12 | summer of 2010 when he invested $55,000 through a private placement in an entity known as Hassle
13 | Free Dental. As he explained it, at the time it involved Dental Plus, which became DSPF, OraCare and
14 | MetroMedia. (Tr. 316-317)

15 |     190.    According to Mr. Baca, he was also discussing becoming a salesman in what was to
16 | become DSPF.

17 |     191.    Mr. Baca stated in relation to the Hassle Free Dental opportunity, reference was made
18 | to Mr. Maerki being the President of OraCare. (Tr. 321-322:19-2)

19 |     192.    Mr. Baca stated that he invested in Hassle Free Dental on September 2010. (Tr. 322:3-
20 | 5)(Ex. S-50)

21 |     193.    Mr. Baca stated his subscription agreement for his investment in Hassle Free Dental
22 | initially contained a number of blank spaces and it was his understanding it was given to Mr. Maerki
23 | who had promised to send him a copy of the document, but he never received one. Subsequently, when
24 | he threatened legal action, he received an electronic copy, but it was forged in places he had left blank
25 | and it was filled in with information that said "I had assets over a million dollars and that I qualified as
26 | a qualified investor, all of which was completely untrue." (Tr. 323:4-20)

27 |     194.    According to Mr. Baca, he had spoken with Mr. Maerki's associate who told him he
28 | shouldn't worry about leaving blanks on the form, and every check mark and the figures written on the

DECISION NO. __76530__

1   form were not his writing.

2       195.    After making his investment on September 13, 2010, Mr. Baca began training with Mr.

3   Maerki and his associates to become a salesman for DSPF. (Tr. 324:16-22)

4       196.    Mr. Baca related that he subsequently attended sales meetings run by Respondent

5   Maerki and his colleagues, including David White and Steven Vereen. Mr. Maerki was the chairman

6   of the meetings and he introduced Mr. Vereen to the group. (Tr. 325:1-18)

7       197.    Mr. Baca stated eight to ten individuals were being trained as salesmen, and during the

8   training Hassle Free Dental and DSPF were described as investments. (Tr. 326:1-11)

9       198.    Mr. Baca stated in his training he was taught to offer to interested individuals an

10   opportunity to be involved in a franchise investment. (Tr. 326:12-17)

11       199.    Mr. Baca further stated individuals would earn a return on their investment based on

12   "secret sauce" by providing new patients to an existing dental practice utilizing MetroMedia and

13   OraCare. (Tr.326-327:18-4)

14       200.    The plan was to use existing dental offices and to not develop any new dental practices,

15   with a percentage of income from the new patients being shared between the dental office with the

16   investor and the principals of the three entities (i.e., DSPF, MetroMedia and OraCare). (Tr. 327:4-10)

17       201.    According to Mr. Baca, during the training sessions the program was touted as an

18   investment in a business venture that would guarantee a ninety-five percent success rate.

19       202.    Further testifying, Mr. Baca stated during training he had been told that a franchise

20   would be up and running within 60 days. (Tr. 328:3-7)

21       203.    Mr. Baca further testified that on January 5, 2011, he told Mr. Maerki he could not be a

22   salesman for DSPF any longer. (Tr. 330:18-21)

23       204.    According to Mr. Baca's account, salesmen were taught to promote the investment by

24   emphasizing that investors could work smarter and not harder and that they could be an absentee owner

25   with the business operated through DSPF, MetroMedia and OraCare.

26       205.    Mr. Baca recalled that salesmen weren't to emphasize the operation of the business by

27   the investor, but were to utilize the services of DSPF, MetroMedia and OraCare. Mr. Baca stated that

28   he did not sell any DSPF franchises, and that in late December 2010, after Mr. Maerki announced a

DECISION NO. __76530__

1  monetary goal for the sale of the franchises at $24,000,000, he decided to meet with management
2  including Mr. Maerki and told him he would not be involved.  (Tr. 332:10-25)

3      206.   Mr. Baca stated that although the minimal investment would be $20,000 initially,
4  salesmen were trained to encourage a prospective investor to invest in multiple franchises if the investor
5  was willing to do so.  (Tr. 333-334:22-8)

6      207.   Mr. Baca stated that in October, 2010, Mr. Maerki announced that the franchises could
7  be categorized as an investment.  (Tr. 335:10-12)

8      208.   According to Mr. Baca, his investment with Hassle Free Dental has been a complete
9  nightmare and financially devastating seeing less than $1,000 over a five-year period.

10  Paul Montgrain

11     209.   Mr. Paul Montgrain, a resident of Littleton, Colorado, testified in the proceeding that he
12  is currently licensed as an insurance agent, but has a background in securities and financial planning.

13     210.   Mr. Montgrain testified that he was introduced to Mr. Maerki and DSPF in the latter
14  part of 2011 concerning a possible business opportunity for clients who were interested in earning
15  money through a passive investment with a promised double digit return if an individual invested in a
16  franchise.  (Tr. 359-360:18-2)

17     211.   Mr. Montgrain became familiar with Mr. Maerki and DSPF through another individual
18  whom he knew represented various insurance companies and business opportunities.

19     212.   Mr. Montgrain testified he was to receive commissions for selling franchises in DSPF.
20  (Tr. 361:13-15)

21     213.   Initially, Mr. Montgrain stated he was to receive $1,500 for each franchise sold, but
22  depending upon volume, he thought he could achieve payment of $2,000 per franchise.  (Tr. 361:16-
23  24)

24     214.   According to Mr. Montgrain, he began looking into being a salesman for DSPF in late
25  2011, and did receive some training in talking about the business opportunity and the anticipated returns
26  that could be expected.  (Tr. 362)

27     215.   A regular sales meeting was usually held on Mondays and led by Respondent Maerki.
28  (Tr. 362-363:22-7)

DECISION NO.   **76530**

216.     According to Mr. Montgrain, part of the training which he experienced with DSPF dealt with the rate of return that investors or franchisees could obtain according to a spreadsheet which they received that showed a double digit return, usually around ten percent.  During the sales meetings, a double digit return was referred to frequently.  (Tr. 364-365:23-3)

217.     Mr. Montgrain stated it was his impression that DSPF had been in existence for several years prior to his joining the organization, which occurred around the end of 2011.  (Tr. 366)

218.     Further testifying, Mr. Montgrain indicated he understood DSPF was a successful business based on sales figures which looked very good.  (Tr. 367:1-7)

219.     Mr. Montgrain stated that during his training period he understood that from the time a franchise was sold it would be fully functional with a return coming back to the investor within 9 to 12 months, but what happened was, as time passed, the franchises passed the 12 month, 15 month and 18 month periods, and never did start to perform anywhere near close to the time frame promoted by DSPF.  (Tr. 367:8-23)

220.     Mr. Montgrain testified that the investment opportunity promoted by DSPF emphasized that an investment was attractive because it was being promoted as a passive opportunity in that the investor could merely pay the purchase price of the franchise and then the vendors would take over providing dentists and patients to those dentists.  As a result, after a year of operations, the investor could expect approximately ten to eleven percent return on the initial $20,000 investment.  (Tr. 368)

221.     Mr. Montgrain stated that the first franchises he sold were at the end of 2011, and that he sold a total of six altogether, and decided to pause in his activities because he was not happy with the way things were going and was going to wait until he saw positive things happening with the operations of DSPF.  (Tr. 369:1-8)

222.     Mr. Montgrain stated that the returns were "nothing" and costs were increasing.  However, the marketing was almost non-existent as well.  (Tr. 369:12-23)

223.     According to Mr. Montgain, his training suggested he was to promote the management company over the self-operation of a franchise because the preferred vendors employed by DSPF knew what they were doing in the operations area.  The marketing companies were "supposedly trained and very successful" so that the franchisees would not need to operate their franchises.  (Tr. 371)

224. According to Mr. Montgrain, he sold the investments as a franchise and not as an investment and his investors were not expected to actively participate in the operations of the business.

225. To the best of Mr. Montgrain's recollection, as of June 18, 2012, none of his six clients had received any patients through MetroMedia. (Tr. 378:15-24)

226. Referring to a promotional DSPF memorandum from Respondent Maerki dated September 18, 2012, which promoted the development of the business of DSPF and the selling of its franchises, Mr. Montgrain had become concerned about his clients' investments because he had begun to see non-performance by DSPF due to the fact his franchisees were not receiving their expected revenues. (Tr. 382-383:1-7)(Ex. S-65)

227. Mr. Montgrain stated he had a great deal of concern because he saw promises being broken and could not get a response to his questions. (Tr. 383:10-15)

228. Mr. Montgrain further stated that at some point in time his clients who wanted to rid themselves of the franchises they had invested in could not do so because "they didn't have any real value at this point from a monetary standpoint" and that the investments turned out to be something they should not have invested in. (Tr. 385:13-24)

229. Mr. Montgrain stated that none of the 6 investors who he brought to the franchise program ever intended to participate actively in their investments and had purchased them based on them being promoted as passive income opportunities (Tr. 387:14-22)

230. Mr. Montgrain stated that when the franchise prices went to $25,000 and then dropped to $20,000 again, he saw it as a red flag. (Tr. 388-389:15-6)

231. Mr. Montgrain testified that the price of the franchises increased again to $30,000, impliedly due to the demand for the franchises, but he began to suspect the price was being artificially inflated to add additional value, but his clients were still not seeing any monetary value that added to the net worth of his clients. (Tr. 389-390:10-5)

232. Further testifying, Mr. Montgrain stated that although he understood that the return on investment for a franchise was to be 40 to 60 percent yearly, allegedly due to the low overhead associated with a franchise, "it was doable," but the number of patients and dentists never materialized. (Tr. 390:6-20)

233.    Mr. Montgrain stated that MetroMedia and OraCare disappeared from the picture and other third party marketing companies were brought in, but nothing really changed. (Tr. 392)

234.    Mr. Montgrain testified that he recalled a couple of his clients receiving a $50 payment from DSPF as a good faith payment, but these did not continue and at no time was he told to stop selling the franchises. (Tr. 393)

235.    At no time during sales meetings could Mr. Montgrain recall being told to stop making representations regarding the 40 to 60 percent rate of return. (Tr. 394:2-13)

236.    Prior to representing DSPF in the sale of its investments, Mr. Montgrain was not informed of any prior actions by the SEC or the FTC, or any other regulatory issues, and was not provided with any information concerning pending litigation against Respondent Maerki. (Tr. 395:1-12)

237.    When Mr. Montgrain learned that MetroMedia and OraCare each had been prefunded with $5,000,000 to support them while the franchise program was developed, Mr. Montgrain stated it was a ridiculous business decision and "financial suicide" to do that type of thing. (Tr. 399:1-8)

238.    Mr. Montgrain testified that DSPF's problem was they had given away all of their operating capital and had to rely on new sales of franchises to keep capital coming into the company even when there were so many problems with the old franchises. (Tr. 400:13-20)

239.    Mr. Montgrain testified that his relationships with his six clients who invested in DSPF's franchises is in limbo and damaged because of the problems resulting from the operation of DSPF. (Tr. 402:3-20)

240.    Mr. Montgrain further stated that the marketing methodology utilizing MetroMedia and OraCare as proven marketing programs was incorrect and unfounded since those approved vendors were incapable of providing the results necessary to make the franchises work.

Harold G. Knowlton, II

241.    Mr. Harold Knowlton, a retiree from Buckeye, Arizona, testified that he had investments primarily from investing in the stock market.

242.    Mr. Knowlton stated he became familiar with DSPF after attending a luncheon conducted by a financial planner named Paul Smith in January, 2011. (Tr. 433:22-25)

243.   Mr. Smith talked about DSPF as an investment opportunity with potential returns of 30 percent plus.  (Tr. 434:4-7)

244.   Mr. Smith's introduction to the business model of DSPF was very interesting to Mr. Knowlton and his wife so they requested more information from DSPF.

245.   Mr. Knowlton stated he and his wife received the documentation requested from DSPF in February, 2011.  (Tr. 435:1-2)

246.   Mr. Knowlton stated he and his wife had received the DSPF FDD.

247.   Mr. Knowlton stated he and his wife on April 20, 2011, invested in two franchises, and according to DSPF's numbering system they were franchise numbers 25 and 26 for which they paid $20,000 each.  (Tr. 437:3-11)

248.   Further testifying, Mr. Knowlton stated that, after reviewing the DSPF documentation and meeting with Respondent Maerki and three of his associates, they were told they could make the investment and not be actively involved by utilizing the approved vendors recommended by DSPF, MetroMedia and OraCare.  (Tr. 437:12-22)

249.   According to Mr. Knowlton, he and his wife formed a limited liability company, K2 Dental, LLC, ("K2") to invest in two dental franchises purchasing them both from the Respondents on April 20, 2011.

250.   Mr. Knowlton also testified that as an investor in more than one franchise, he had an opportunity to become an area developer.

251.   Mr. Knowlton further identified a marketing agreement, which he executed on behalf of K2, with MetroMedia to be the marketing representative for K2's franchises.  (Ex. S-20)

252.   Mr. Knowlton testified that he learned that MetroMedia was in the same office location as DSPF when he first visited Respondent Maerki and his associates in February, 2011.  (Tr. 441:14-19)

253.   According to Mr. Knowlton, MetroMedia and OraCare were the approved marketing organizations utilized by DSPF for the franchises.  He believed that he was prohibited from using any other vendors other than the approved vendors for K2's operations.  (Tr. 442:16-24)

254.   Mr. Knowlton stated he did not understand the relationship between Respondent Maerki

DECISION NO.   76530

1 and MetroMedia and OraCare until much later.  (Tr. 443:7-10)

2   255.   Mr. Knowlton testified that the source of the funds he used to make his investments in
3 his two franchises came from one of his individual retirement accounts.  (Tr. 444-445:23-3)

4   256.   Further testifying, Mr. Knowlton stated that an employee of DSPF, Deborah Jenkins,
5 who also was connected to an entity called the IRA Institute, helped the Knowltons create K2.

6   257.   Referring to an email dated June 9, 2011, Mr. Knowlton testified that he and his wife
7 had questions regarding the status of their franchises becoming active stating that he had not received
8 any information, and further stating that he thought the franchises were to be active within 180 days of
9 the investment.  Further, he stated he and his wife were concerned with the status of their investment
10 and whether it was a safe investment.  (Ex. S-20)

11   258.   Mr. Knowlton testified that he and his wife received quarterly newsletters from OraCare
12 and MetroMedia approximately 3 or 4 times.  (Tr. 450:10-14)

13   259.   According to Mr. Knowlton, based on a 180 day time period when their franchises
14 should have been activated with patients being assigned to the franchises, the Knowltons expected that
15 by October 25, 2011, this would have occurred.  Mr. Knowlton could not specifically recall when they
16 were notified there were problems supplying patients within the 180 day time frame described in the
17 offering materials, but they did receive correspondence basically telling them that DSPF's franchises
18 were not receiving the projected number of patients.  (Tr. 451:5-17)

19   260.   Mr. Knowlton referred to a September 16, 2011 email from David White, the President
20 of MetroMedia that referred to an earlier email about the first dentist and the receipt of patients and
21 cash flow, but nowhere does it indicate there is a difficulty in obtaining patients or dentists.  (Tr. 453:12-
22 20)

23   261.   On October 8, 2011, Respondent Maerki sent an email which was received by the
24 Knowltons informing them the cost of a franchise was increasing from $20,000 to $25,000, and
25 nowhere in the document is there any information concerning difficulties securing patients or dentists.
26 (Tr. 454:2-16)

27   262.   Mr. Knowlton testified that he believed his franchises were proceeding as scheduled
28 and the Knowltons became somewhat excited when they saw the increasing price for franchises,

DECISION NO.   76530

1    believing that there was value in their investment.  (Tr. 454:17-23)

2        263.    As part of the October 8, 2011, promotional email promoting the sale of franchises

3    before they increased to $25,000, was a representation that DSPF's "numbers" are being proved each

4    month; however, Mr. Knowlton stated they did not have any way of verifying the information.  (Tr.

5    455:8-16)

6        264.    It appeared to Mr. Knowlton that the email was encouraging people to invest more

7    money in the franchises.  (Tr. 455:22-25)

8        265.    Mr. Knowlton described the payment procedure for a franchisee as follows: a patient

9    referred to a dentist pays the dentist, who in turn would be billed by DSPF.  DSPF would then take the

10   percentages that were payable to MetroMedia and OraCare from that cash flow and pay the balance to

11   the franchisee, who after reviewing the numbers, would pay DSPF their percentage of the return and

12   the franchisee would keep the remaining balance.  (Tr. 456:1-14)

13       266.    Mr. Knowlton stated that the net cash flow he and his wife received as a result of the

14   their franchise operations was $674.05, only a fraction of the promised return on investment.  (Tr.

15   458:1-14)

16       267.    Mr. Knowlton further stated that only one of their two franchises became active with

17   the second franchise never being activated.  Additionally, he stated it took 516 days from the time he

18   acquired his franchises to receive any monies as opposed to the 180 days that were promoted in the

19   offering.  (Tr. 459:1-10)

20       268.    Further testifying, Mr. Knowlton stated that after requesting franchise status

21   information from DSPF, no information was sent to him.  (Tr. 460:14-22)

22       269.    According to Mr. Knowlton, he and his wife believed that their only responsibility was

23   to review reports that would be sent to them and make sure they understood what was happening and

24   to pay DSPF their fee because DSPF had set up a bookkeeping vendor to do the accounting for the

25   franchises as the Knowltons were passive investors.

26       270.    According to Mr. Knowlton, they decided that they did not wish to use the DSPF's

27   approved vendor for bookkeeping services that was a limited liability company known as the Bodytree

28   Institute located in Spanish Fork, Utah.  (Ex. S-20)

DECISION NO.  __76530__

271.     Expected monthly expenses for a franchisee were described in documentation from the Bodytree Institute and listed as follows: Franchiser Fee, four percent of monthly deposit paid to DSPF; Dental Support Services Fee, nineteen percent of monthly deposit paid to OraCare; Marketing Support Services Fee, twenty-nine percent of monthly deposit paid to MetroMedia; and Bookkeeping Support Services Fee, aside from a $39.00 set up fee, $10.00 for the first franchise plus $6.00 for each additional franchise paid to the Bodytree Institute.  (Ex. S-20)

272.     In a marketing document from MetroMedia, it states that MetroMedia assumes 100 percent responsibility for day-to-day management of your dental support plus franchise.  (Ex. S-20)

273.     Mr. Knowlton testified that he and his wife were not informed that references made concerning DSPF's business model related to model franchises which were unrelated to DSPF and that they had been operated by the managers of OraCare and MetroMedia.  (Tr. 468)

274.     Further testifying, Mr. Knowlton stated that he learned the model dental offices that were promoted by DSPF went out of business in 2010 because they weren't making any money.  (Tr. 468)

275.     Mr. Knowlton stated it would have made a difference to him to know this information because questions arose as to whether or not the entire business model worked.  (Tr. 469:1-5)

276.     Mr. Knowlton testified that on January 5, 2012, he sent an email to Respondent Maerki expressing concerns over the fact that approximately nine months after investing he had not yet had a single patient referred to his one active franchise.  Mr. Knowlton went on to state that he received no response from Respondent Maerki.  (Tr. 473)

277.     On January 12, 2012, David White of MetroMedia responded to Mr. Knowlton's email of a week earlier trying to encourage him with the thought that his franchises would be operational in 30 to 60 days in response to his earlier email.  (Tr. 475:1-5)(Ex. S-20)

278.     Mr. Knowlton indicated he was very discouraged at the time he sent his email in January 2012, because the revenue that was to come from the franchises was important for the Knowltons' retirement plans.  (Tr. 476:5-18)

279.     According to Mr. Knowlton, as of March, 2012, he had not received any patients yet. Further, he stated he did not receive his first patient until September 25, 2012.  (Tr. 477-478:20-2)

DECISION NO. __76530__

280.    Based on the record, a number of emails were received by the Knowltons to placate them with respect to their investment.

281.    In July, 2012, Mr. Knowlton stated that appreciation payments of $500 each were being made by MetroMedia to franchises because of poor performance and lack of income.  He stated that the Knowltons' first franchise received four of those payments of $500 each, for a total of $2,000, and they did not have to make any payments to anyone else.  (Tr. 487:1-19)

282.    Mr. Knowlton referred to an email dated August 16, 2012, which he sent to Mr. Maerki concerning the problems that the Knowltons were having with the operation of the franchise and the lack of cash flow.  (Tr. 488)

283.    Mr. Knowlton stated that in January, 2013, he met with Mr. Maerki and learned that MetroMedia and OraCare were in default in terms of their contract with DSPF and that they were in receipt of over a million dollars of pre-paid expenses which DSPF was not going to attempt to recover.  (Tr. 494:1-12)

284.    According to Mr. Knowlton, Respondent Maerki also informed Mr. Knowlton that he was looking into establishing a new operation involving an 800 number for referrals for patients to dentists.

285.    Mr. Knowlton concluded from his meeting with Mr. Maerki that there were problems and changes were going to take place in the operation of the franchises, but Mr. Maerki was not going to inform him of what the changes would be.  (Tr. 496:14-22)

286.    Mr. Knowlton testified that he received a memorandum from Respondent Maerki dated August 8, 2014, which informed him that DSPF had run out of money and funding as of June 30, 2014, and could not continue the business.  Upon receipt of Mr. Maerki's memorandum, the Knowltons knew they had lost $40,000 with the investment in DSPF.  (Tr. 497:1-12)

287.    According to Mr. Knowlton, in reviewing the memo from DSPF dated August 8, 2014, it was the first time he had learned that more than five million dollars was pre-funded to OraCare and MetroMedia.  (Tr. 497-498:22-3)

288.    Mr. Knowlton testified that he and his wife had received the disclosure document with regards to their investment, and with respect to Respondent Maerki, there was no mention of a

41                                    DECISION NO. _____76530_____

DOCKET NO. S-20897A-13-0391

1  permanent injunction against him from the SEC or an action against him by the FTC, and it did not
2  contain information concerning civil litigation pending against him.  (Tr. 499:13-24)(Ex. S-20)

3      289.   Further testifying, Mr. Knowlton stated he would not have invested with Respondents
4  if he had known of those problems with respect to Respondent Maerki.  (Tr. 500:1-3)

5      290.   Prior to the Knowltons' investment with DSPF and Respondent Maerki, they were not
6  informed that Mr. Maerki at one time was named as the President of OraCare.  (Tr. 501:6-12)(Ex. S-
7  49)

8      291.   Further testifying, Mr. Knowlton stated that with a franchise such as Subway or
9  McDonald's he understood it would be a business requiring him to operate it, but in this instance with
10  the investment with DSPF, based on the disclosure documents that services would be provided by
11  OraCare and MetroMedia, his services were not required for the operation of a franchise.  (Tr. 504:6-
12  24)

13      292.   Based on Mr. Knowlton's understanding of the operation of his investment, anything to
14  do with the operation of the business had to be approved by DSPF.  (Tr. 509:5-17)

15      293.   Mr. Knowlton also stated that although training and operational manuals were to be
16  provided to the investors in the franchises, there was neither training nor operational manuals provided
17  to him.  (Tr. 509:22-24)

18      294.   Mr. Knowlton testified that based on the documentation disclosures that he reviewed,
19  he believed that Respondent Maerki was the President of DSPF.  (Tr. 513:8-11)

20  Gary Clapper

21      295.   Mr. Gary Clapper, the Chief Investigator for the Securities Division, testified that he
22  was involved in investigating DSPF.  (Tr. 517:1-19)

23      296.   Mr. Clapper testified that with respect to Respondents, Maerki and DSPF, neither was
24  registered to sell securities as either a salesman or dealer, licensed as an investment advisor or
25  investment advisor representative, or registered with the Commission.  Mr. Clapper further stated he
26  made this determination from reviewing Commission records including certified documents from the
27  Commission.  (Ex. S-1(a))(Ex. S-1(b))

28      297.   Based on Commission records, DSPF was organized as a limited liability company on

42                                  DECISION NO. __76530__

1  November 22, 2010, and its members were Respondent, Kent Maerki and his wife, Norma Jean Coffin.

2  (Ex. S-2)

3  298.  Mr. Clapper further testified that his investigation found that DSPF had also been

4  organized as a limited liability corporation in the State of Nevada.  A certified copy of the Nevada

5  Articles of Organization dated August 28, 2012, was obtained and contained the name of Respondent

6  Kent Maerki as the manager.  (Tr. 520-521:15-14)(Ex. S-3)

7  299.  Mr. Clapper testified that on August 22, 2012, according to the certified records from

8  the Nevada Secretary of State's office, Dental Support Group, LLC was organized on August 23, 2012,

9  and Respondent, Kent Maerki was listed as its manager.  (Ex. S-4)

10  300.  Subsequently, a change was made to the manager position according to records on file

11  with the Nevada Secretary of State dated December 18, 2012, with Norma Coffin now listed as the

12  manager.  (Ex. S-4)

13  301.  Mr. Clapper further testified that he had received another certified copy from the Nevada

14  Secretary of State concerning an entity called Dental Plus Management, LLC, which was organized on

15  November 14, 2012, and listed Norma Coffin as its manager.  (Ex. S-5)

16  302.  An additional document filed on March 25, 2014, with the Nevada Secretary of State

17  also reflects Norma Coffin as the Manager of Dental Plus Management, LLC.  (Ex. S-5)

18  303.  Further testifying, Mr. Clapper obtained a copy of a Complaint for Injunction filed by

19  the SEC on February 14, 1984, against a company called Food Source, Inc., ("Food Source") several

20  other individuals and the Respondent herein, Kent Maerki.  (Ex. S-6(a))

21  304.  In the SEC action, Mr. Clapper described Mr. Maerki's role with Food Source as being

22  one of recruiting agents and conducting seminars for the product.  (Tr. 526:9-12)

23  305.  Mr. Clapper testified that the Division had also secured a copy of the Consent of

24  Respondent Maerki to the issuance of an Order of Permanent Injunction and Other Equitable Relief in

25  the SEC proceeding dated September 20, 1984.  (Ex. S-6(b))

26  306.  Mr. Clapper identified a document dated September 21, 1984, in the same related SEC

27  case, which was an Order of Permanent Injunction and Other Equitable Relief against Maerki in that

28  proceeding.  (Ex. S-6(c))

DECISION NO. _____ **76530**

307.    During the course of Mr. Clapper's investigation of Mr. Maerki, the Division secured a copy of a Complaint filed on November 12, 1985, by the FTC against a company by the name of The Cellular Corporation, several other corporations, and several individuals including Mr. Maerki.  (Ex. S-70(a))

308.    On March 3, 1986, the parties to the FTC action including Respondent Maerki, consented to a Decree and Permanent Injunction resolving the Complaint brought earlier.  (Ex. S-70(f))

309.    Further testifying, Mr. Clapper stated that the Division obtained a copy of an Arizona Department of Insurance Notice of Hearing dated December 24, 2002 involving Respondent Maerki the result of which was that Mr. Maerki's insurance licenses issued by the Department were suspended for 6 months from June 25, 2003.  (Tr. 528-529)(Ex. S-71)

310.    Mr. Clapper stated there remains another regulatory action against Respondent Maerki involving a company by the name of Smartcomm that was filed against him in Arizona.  (Tr. 529-530:20-5)

311.    Mr. Clapper stated additionally that during Mr. Maerki's Examination Under Oath ("EOU"), he indicated that the Illinois Department of Securities during 1988 or 1989 brought an action against him that was resolved with an agreement and a fine.  (Tr. 531:1-8)

312.    Further testifying, Mr. Clapper stated he conducted an undercover investigation of Respondents, which commenced on May 14, 2012, according to an email using the undercover name of Jason Eddie.  (Ex. S-11)

313.    Mr. Clapper testified that the first email he received from DSPF told him he had been enrolled in a sequence of emails to educate him about DSPF as an absentee-owned fully-managed dental franchise with a 5-year track record producing annual profits up to 40 to 60 percent or more with a 98 percent success rate.  The emails also promised almost immediate high cash flows and contained other information from DSPF.  (Tr. 532:11-21)

314.    On May 15, 2012, Mr. Clapper stated he received another email from DSPF which contained a list with links to different information including information about MetroMedia and management team accomplishments.  (Tr. 533:1-14)

315.    Mr. Clapper further stated that he printed documents from some of the links listed in the

1   email. (Tr. 533:15-17)

2      316.   On May 15, 2012, an email from DSPF informed Mr. Clapper/Jason Eddie that there

3   was a live webinar in one hour, which said please join us to learn more. (Ex. S-11)

4      317.   Mr. Clapper testified that the May 15, 2012 email, described DSPF's "unique business

5   model" as follows: absentee-owned; turnkey; high-yield; patient delivery system; designed to bring a

6   dentist $500,000 of additional new patient revenues; franchisees; profit is $165.00 of each $1,000 paid

7   for dental treatments, or, 16.5 percent; and capital costs as low as $25,000 per franchise unit. (Tr.

8   534:4-14)

9      318.   In an email received by Mr. Clapper in his undercover capacity, on May 17, 2012, a

10   representative of DSPF stated that over 400 units of the franchises had been sold since March of 2011.

11   (Tr. 534-535:22-6)(Ex. S-11)

12      319.   It was represented in the email received by Mr. Clapper on May 17, 2012, that DSPF

13   had five years of research and development and performance based on a business model to rely on, but

14   it was not disclosed that DSPF itself did not have that experience.

15      320.   DSPF's May 17, 2012 email to Mr. Clapper, represents that as a franchisee very little

16   effort by him would be required if he utilized the professional management services of MetroMedia in

17   locating patients and OraCare in locating qualified dentists. (Tr. 535:19-23)

18      321.   The email promoted a 40 percent or higher rate of return if the amount spent per patient

19   exceeds $1,000. (Ex. S-22)

20      322.   The May 17, 2012, email from DSPF further states "own a unique carefree, turn-key

21   business, not a job! Use investment funds for monthly income or IRA funds to grow your nest egg!"

22   (Ex. S-11)

23      323.   In an email dated July 26, 2012, from DSPF to Mr. Clapper/Jason Eddie, it again refers

24   to double-digit returns and proven performance based on five years of research, development and

25   performance. (Ex. S-11)

26      324.   Further testifying, Mr. Clapper stated he received a brochure from Dental Support

27   Group representing "how to work smarter not harder" and being a premier dentist and patient provider.

28   Mr. Clapper had previously identified Dental Support Group as a Nevada limited liability company

1  which was managed by Mr. Maerki's wife, Norma Coffin.  (Tr. 537:10-16)

2      325.    Mr. Clapper stated he received a number of further communications from DSPF after
3  his initial contact whereby the Respondent communicated to him information concerning webinars or
4  more information on the business.  (Tr. 537-538:20-2)(Ex. S-12)

5      326.    Mr. Clapper stated that on January 27, 2013, he received an email from Mr. Maerki
6  which consisted of a four minute video conversation referencing the enthusiasm that DSPF felt for its
7  investment opportunity and was positive about its future success.  However, based on Mr. Clapper's
8  investigation as of that date, investors were not receiving a return of 40 to 60 percent as represented
9  and were already complaining about franchises not being activated and income not being received.  (Tr.
10  538-539:9-4)

11      327.    Mr. Clapper further stated that, based on his investigation, both MetroMedia and
12  OraCare had been defaulted by DSPF by December 31, 2012, and there was no information about
13  problems that DSPF or its investors were having.  (Tr. 539:9-14)(Ex. S-12)

14      328.    In an email received by Mr. Clapper dated November 27, 2012, with a subject of DSPF,
15  a representative stated that 500 franchises had been sold and they were currently selling for $30,000
16  each.  (Ex. S-12)

17      329.    A related email received by Mr. Clapper was from the director of marketing of a
18  company named Dominion Investment Group, and stating that it had sold the DSPF offering and
19  contained a representation that Dominion Investment Group was the national sales management group
20  for DSPF.  (Tr. 541:1-6)(Ex. S-12)

21      330.    Another investigator for the Division, Ronald Baran, had initially been involved in the
22  investigation for the Division, but in May, 2012, Mr. Clapper took over the case because Mr. Baran
23  had retired.  (Tr. 541:17-23)

24      331.    On Friday, January 13, 2012, Mr. Baran in his undercover capacity as Bernard Crane,
25  was told he would be receiving a series of five emails describing the franchise investment being offered
26  by DSPF from one of its representatives, Deborah Jenkins.  (Tr. 542:5-11)(Ex. S-9)

27      332.    Mr. Clapper testified that the materials sent to Mr. Baran were almost identical to those
28  which he had received in his undercover capacity.  (Tr. 542:1-4)

DECISION NO. _____ **76530**

DOCKET NO. S-20897A-13-0391

333.    Mr. Clapper testified that the language in the offering materials received by Mr. Baran referenced absentee owned, fully-managed dental franchise with a five-year track record which would produce an annual profit of up to 40 to 60 percent or more.  (Tr. 544:16-18)

334.    The promotional materials which had been sent to investigator Baran also promoted the five-year track record promoted by DSPF and described a "proven platform" with more than five years of research, development and performance.  (Ex. S-9)

335.    According to Mr. Clapper, his investigation showed that the franchises were not receiving patients in January, 2012, as was promoted by DSPF.  (Tr. 545:3-9)

336.    According to the promotional materials received by investigator Baran, a franchise was to be fully operational within 180 days, but as of January, 2012, based on the Division's investigation, a number of these franchises were not up and running.  (Tr. 545:13-19)

337.    According to Mr. Clapper, among the documentation from DSPF was a copy of a feasibility modeling tool using the marketing support services that utilized MetroMedia and OraCare for the management of the franchise.  (Tr. 547)

338.    Mr. Clapper further testified that investigator Baran had received a copy of a document titled Management Team Accomplishments, referencing development of dental offices in North Phoenix and three other locations, but from the Division's investigation, these did not involve DSPF franchises and instead referenced another organization known as Dazzle Dental.  (Tr. 548)(Ex. S-9)

339.    Mr. Clapper referred to another document received by investigator Baran, which was captioned "Annual Collections" for three dental offices for the year 2009, which averaged $547,319.00, but it fails to disclose that these are figures from Dazzle Dental and not DSPF.  (Tr. 549:7-18)

340.    Nowhere in the documentation reviewed by Mr. Clapper was there any indication that Dazzle Dental failed and went out of business by the beginning of 2010.  (Tr. 549:19-23)

341.    Mr. Clapper testified that the Division contacted DSPF and subpoenaed documents relative to this proceeding on April 10, 2012.  (Tr. 550-551:16-2)

342.    Mr. Clapper further testified that one of the documents which was provided to the Division pursuant to its subpoena, promoted the offering by DSPF, stating that "no dental experience was required" and that the business could be absentee owned.  Additionally, the document refers to a

DECISION NO.    76530

1  turn-key operation with a high yield and 60 months proven performance with a franchise that would be
2  fully operational after 180 days.  (Ex. S-13)

3    343. Mr. Clapper stated that the Division also subpoenaed OraCare for documents, and that
4  one of the documents received was the OraCare Vendor Agreement dated February 19, 2011, between
5  DSPF, which was signed by Respondent Maerki as the President of DSPF, and by Mr. David White on
6  behalf of OraCare.  (Ex. S-14)

7    344. The Division conducted an EUO for both Respondent Maerki and his wife, Norma
8  Coffin.  (Ex. S-7)(Ex. S-8)

9    345. Both Mr. Maerki and Ms. Coffin indicated they were married to each other during their
10  EUOs.

11    346. Mr. Clapper testified that during the course of the Division's investigation, a web site
12  for DSPF was found.  (Tr. 554:7-15)(Ex. S-18)

13    347. Mr. Clapper described the offering presented on DSPF's web site, reading into the
14  record promotional information for viewers of the website as follows:  "our unique, carefree business
15  model is a highly qualified, patient delivery system, designed to provide a dentist with an average of
16  10 new patients weekly, earning the franchisee a net annual profit of $6,448 (a return on equity of 21.49
17  percent) using a manager option."  (Tr. 554:16-22)

18    348. Referring to a section of the DSPF web site, a section is called "Franchise Overview"
19  and it describes that DSPF was in the business of dental patient delivery by providing a dental practice
20  with patients who could afford dental treatment.  (Ex. S-18)

21    349. Another section of the DSPF web site termed "About Us" describes a management team
22  with an extensive history of marketing accomplishments with the development of four dental offices;
23  however, nothing in this section of the web site indicates that the track record is not that of DSPF, but
24  that of another entity.  (Ex. S-18)

25    350. Further, the DSPF web site does not indicate any information about OraCare,
26  MetroMedia, or any managers from another entity.  (Ex. S-18)

27    351. Mr. Clapper stated based on his review of the DSPF web site involving a franchise
28  opportunity, this portion of the web site was referring to DSPF's background and not that of another

1   management group.  (Tr. 557:14-22)

2       352.    During the course of the Division's investigation of DSPF, Mr. Clapper spoke with two

3   dentists who had been involved in the program with OraCare and DSPF and were promised prequalified

4   patients with the ability to pay for dental treatments, but that 80 percent of the patients who were

5   scheduled for appointments failed to show up and the other 20 percent who did show up had no

6   insurance or no ability to pay for the treatment.  (Tr. 559)

7       353.    According to Mr. Clapper, during Mr. Maerki's EUO in July, 2012, he indicated there

8   were problems with OraCare or MetroMedia and that they had been issued default letters.

9       354.    Mr. Clapper testified that the letters were sent on April 26, 2012, to OraCare and on

10  April 30, 2012 to MetroMedia by the attorneys for DSPF notifying them they were in default.  (Tr.

11  561:8-13)(Ex. S-16)

12      355.    Mr. Clapper further testified that, based on his investigation, OraCare, MetroMedia and

13  DSPF were all located in the same location at 17200 North Perimeter Drive, Suite 100, Scottsdale,

14  Arizona.  (Tr. 562:3-17)

15      356.    Further testifying, Mr. Clapper stated he had received a copy of an advertisement for

16  DSPF which had appeared in the Wall Street Journal in 2011 or 2012 which offered "an exciting

17  opportunity in the dental industry, no dental experience required.  Absentee-owned, fully-managed,

18  five-year track record producing up to 40 to 60 percent annual profits and more."  Further, Mr. Clapper

19  stated the phone number appearing for the ad was that of DSPF.  (Tr. 563:12-25)(Ex. S-67)

20      357.    Mr. Clapper testified that the Division prepared a list of investors in DSPF from a

21  number of different documents provided by the Respondents, but not all of the information contained

22  on the list could be verified.  (Tr.567)(Ex. S-57)

23      358.    According to the DSPF investor list approximately $13,514,958 was invested in the

24  offering.  (Ex. S-57)

25      359.    Mr. Clapper testified that although some of the investors who were contacted indicated

26  they received the so-called "appreciation" payments, not all of the investors that the Division was able

27  to contact received them.  (Tr. 570:2-8)

28      360.    Mr. Clapper stated that DSPF did not provide an accounting of how much investors

DECISION NO. _____ 76530

actually received in payments either from dentists or the vendors in the form of appreciation payments. (Tr. 571:3-7)

361.    Mr. Clapper stated that as a result of Mr. Maerki's EUO, the Division was informed that approximately 400 franchises were sold and of that number all franchises were selected with the managed portion using OraCare and MetroMedia, but only one was self-managed and that was Mr. Maerki's franchise.  (Tr. 574:1-12)

362.    Mr. Clapper testified that Mr. Maerki was the sole source of information utilized for the FDD for DSPF, and that he operated Dental Plus Management to collect funds from the dentist.  (Tr. 576-577)

363.    Mr. Clapper testified that in response to a Division subpoena, Wells Fargo Bank returned documents for OraCare which reflected signers on the documents, and Respondent Maerki was listed as the owner of the business on the bank documents dated August 5, 2010.  (Ex. S-73)

364.    Further testifying, Mr. Clapper identified Commission Decision No. 61102 (August 27, 1998) in which Mr. Stephen Vereen was named as a Respondent and found in violation of the Act.[3] (Ex. S-74)

365.    Mr. Clapper further testified that during the course of his investigation, he secured documents relative to a lawsuit against Respondent Kent Maerki who was named as a defendant.  The action had been filed in the Maricopa County Superior Court on November 15, 2010, and subsequently resulted in a default judgment against the defendants, but that the action had not been disclosed in the FDD provided to investors in the DSPF franchises.  (Ex. S-75(a) and 75(b))

Jeff Eschrich

366.    Mr. Jeff Eschrich, a resident of Sacramento, California, testified that in October, 2010 he was introduced to DSPF because of another offering in the form of a Private Placement memorandum ("PPM") and was asked whether he would be interested in representing the private placement offering to accredited high-net-worth investors. (Tr. 640)(Ex. S-23)

367.    Mr. Eschrich stated that he was introduced to the PPM offering for a company called

---

[3] Mr. Vereen had been involved with Dazzle Dental and OraCare.

1  Practice Management Ventures, LLC, by a man named Bill Smith; and that the purpose of the PPM

2  was to raise $550,000 at a $1,000 per unit with a minimum investment of 50 units.  (Tr. 641-642)

3      368.   The PPM referenced developing up to 8 joint ventures with dental practice marketing

4  and listed OraCare, DPM, and MetroMedia.  (Tr. 642-643)

5      369.   Mr. Eschrich testified that OraCare was described in the PPM, and identified

6  Respondent Kent Maerki as its president.  (Tr. 644:5-9)

7      370.   Mr. Eschrich stated that subsequently he and Mr. Smith were invited to Scottsdale,

8  Arizona to meet with Mr. Stephen Vareen, Mr. Dale Smith, Mr. David White, and Mr. Maerki.  (Tr.

9  645:16-23)

10     371.   Subsequently, at the Scottsdale meeting, Mr. Eschrich learned that the offering was

11  being restructured and would be sold in the first part of 2011.  (Tr. 647:14-24)

12     372.   Further testifying, Mr. Eschrich stated he learned about DSPF which involved an

13  offering to be made to non-accredited individuals in the form of a model framework of previous

14  dealings, and that he heard about this offering from Mr. Maerki.  (Tr. 649-650:19-1)

15     373.   Mr. Eschrich testified that on April 13, 2011, in his office with Mr. Vareen and Mr.

16  Murray present, a presentation was made to one of Mr. Eschrich's clients regarding franchises available

17  at $20,000 each.  (Tr. 651:4-12)

18     374.   Mr. Eschrich testified that he understood that the franchise would work as an absentee-

19  owned business with vendors in place and that investors in a franchise would do nothing other than

20  bookkeeping.  (Tr. 652:6-16)

21     375.   Mr. Eschrich stated that in January, 2011, profits with each franchise were touted at 40

22  to 60 percent. (Tr. 653:1-3)

23     376.   Mr. Eschrich went on to explain that the profit percentage was reduced to 16.5 percent,

24  which was considerably less than what was originally promised.  (Tr. 653:4-9)(Ex. S-24)

25     377.   According to Mr. Eschrich, DSPF's representatives informed his client there would be

26  a six month waiting period before a franchise became fully operational once the investment was made.

27  His client subsequently purchased 14 franchises at $20,000 apiece.  (Tr. 653-654:16-13)

28     378.   Mr. Eschrich stated that on March 14, 2011, he signed a contract to be a salesperson for

DECISION NO.   **76530**

1    DSPF.  (TR. 657:3-8)

2       379.    Further, Mr. Eschrich stated he did not receive any training to sell the DSPF franchises

3    (TR. 657:9-11)

4       380.    According to Mr. Eschrich, on Monday mornings DSPF held sales conference meetings

5    to market the offering and these meetings were led by Mr. Maerki.  (Tr. 657:13-25)

6       381.    Further testifying, Mr. Eschrich stated that his clients who invested with DSPF all

7    elected to use the approved vendors based on Mr. Maerki's recommendation.  (Tr. 658:1-5)

8       382.    Mr. Eschrich stated that DSPF would send salespeople emails to assist them in having

9    a dialogue with prospective investors in the franchises and included representations concerning

10   absentee owned franchises which earned up to 53 percent or more, and described MetroMedia with a

11   six-year record of success managing the franchise.  (Tr. 660:1-5)(Ex. S-26)

12      383.    Mr. Eschrich stated that Mr. Maerki had sent out the email promoting DSPF for its

13   salesmen and the success of MetroMedia operated by Mr. Vereen and Mr. Murray, but he was not

14   informed that those dental offices which they had managed were closed by 2010.  (Tr. 660-661)

15      384.    Mr. Eschrich further testified that the patients that were located by MetroMedia for

16   dental treatment were not screened for their ability to pay for services.  (Tr. 662:15-20)

17      385.    After June, 2012, Mr. Eschrich was involved in presenting the DSPF offering at a trade

18   show for franchises in California, but he testified that he was uncomfortable with the amount of

19   profitability being presented to the general public because the real amount of return on investment was

20   not illustrated because expenses were not included.  (Tr. 664-665)

21      386.    In August, 2012, Mr. Eschrich testified that he became concerned with the DSPF

22   offering because one of his clients had received notification that Mr. Steven Vereen had filed for

23   bankruptcy in May, 2012, and he understood that Mr. Vereen and Mr. Maerki were partners which

24   caused a "red flag" after this notification took place.  (Tr. 667:1-17)

25      387.    Mr. Eschrich had been told that 379 franchises had been sold by the end of 2011, in the

26   DSPF offering in the United States.  (Tr. 668:14-20)

27      388.    A client of Mr. Eschrich sent a certified letter to Respondent Maerki and DSPF

28   requesting a return of a $60,000 deposit which was paid in good faith by Mr. Eschrich's client for an

DECISION NO. _____76530_____

1  additional 3 DSPF franchises, but their monies were not returned.  Prior to that time, they already
2  owned 11 franchises.  (Tr. 669-670)(Ex. S-32)

3      389.   According to Mr. Eschrich, after July, 2011, he sold a total of 16 frachises.  (Tr. 685:18-
4  21)

5      390.   Further testifying, Mr. Eschrich stated he was aware that by April, 2012, franchises were
6  not becoming fully operational within 180 days.  (Tr. 706:17-25)

7      391.   Mr. Eschrich further testified that he was not told to stop selling franchises because they
8  were not meeting their obligation of becoming operational within 180 days.  (Tr. 707:1-4)

9      392.   Mr. Eschrich testified that in selling the DSPF franchises, he utilized information from
10  documents that had been emailed to him by Mr. Maerki that were not part of the FDD. (Tr. 711-712)

11  Lynn D. Shelton

12      393.   Respondent Maerki, who represented himself, called as a witness Lynn Shelton, the
13  attorney for DSPF who was involved in the DSPF offering.

14      394.   It was Mr. Maerki's intention to call Ms. Shelton as an expert witness, but she had not
15  previously been identified as an expert.  Additionally, although Mr. Maerki had previously waived his
16  attorney-client privilege, there was an issue with him now claiming a possibility of an attorney-client
17  privilege during Ms. Shelton's examination.

18      395.   Ms. Shelton represented that if the issue of attorney-client privilege was posed in a
19  question to her, she would reply that the answer would be privileged and withhold divulging that
20  information.

21      396.   With respect to the issue of Ms. Shelton testifying as an expert witness, the Division
22  was granted the right to call an expert witness if the need arose after her examination.

23      397.   Ms. Shelton testified that she has worked for 8 years as a franchise attorney and 2 years
24  as a franchise paralegal along with being involved as a franchisor for approximately 8 years, and that
25  she obtained her certification as a Certified Franchise Executive ("CFE") in 2012.  (Tr. 728:10-18)

26      398.   Although Arizona has no franchise laws, it does have the Securities Act (A.R.S. § 44-
27  1801, et seq.), but for purposes of this proceeding, Ms. Shelton's testimony concerning franchise laws,
28  and their related regulation by the FTC, was permitted.

DECISION NO.   **76530**

399.   Ms. Shelton testified that Mr. Maerki wanted DSPF to be established with a franchise form because he wanted it to be registered in California, which by law regulates both securities offerings and the sales of franchises.  (Tr. 741)

400.   According to Ms. Shelton, the DSPF franchise offering was to establish a franchise for the franchisee, which would market a program to dentists to obtain additional patients so they could increase the size of their practices.  (Tr. 745:18-24)

401.   Ms. Shelton stated the FDD was created to meet FTC guidelines and to qualify in states such as California that required registration.  (Ex. S-10)

402.   Further testifying, Ms. Shelton stated that besides California, DSPF's FDD met the registration requirements of the following states:  Hawaii; Illinois; Indiana; Maryland; Michigan; Minnesota; New York; North Dakota; Oregon; South Dakota; Virginia; Washington; and Wisconsin.  (Tr. 747:7-20)

403.   Ms. Shelton further stated that states such as Arizona, which do not regulate franchises, require Federal compliance utilizing the FTC guidelines.   States with franchise registration requirements require additional things such as state choice of law, and if mediation was to occur that it be pursuant to that particular state's legal requirements.  (Tr. 748:4-18)

404.   Ms. Shelton is aware that a lot of franchisees do not read the FDD in its entirety because it is 100's of pages long, and that it recommended that prospective franchisees consult attorneys or other franchise professionals, such as an accountant, to understand the terms of the document with the franchisor.  (Tr. 754:12-24)

405.   According to Ms. Shelton, if a vendor such as MetroMedia was not meeting the requirements of its agreement with the franchisee, a franchisee would have the option of firing them and retaining new vendors to provide patients to a dental practice.  (Tr. 764:6-18)

406.   Further testifying, Ms. Shelton stated it is not common to pre-pay a substantial amount of funds to the recommended vendor prior to the vendor producing results.  (Tr. 766:6-11)

407.   Ms. Shelton stated that the decision as to how a franchise was managed was the sole decision of the franchisee.  (Tr. 766:18-22)

408.   According to Ms. Shelton, the FDD set forth a specific quota for the franchisee to meet

DECISION NO.   76530

DOCKET NO. S-20897A-13-0391

of five new patients per quarter, whether the approved vendor recommended by DSPF failed to produce them or not. (Tr. 767-768)

409.    Ms. Shelton stated that it is the franchisee's decision as to who will run their business. (Tr. 769:14-15)

410.    Ms. Shelton further testified that if the vendor is not producing, that the franchisee should fire them and cancel their contract replacing them as you would an employee who wasn't working. (Tr. 770:13-16)

411.    Ms. Shelton later corrected herself and stated DSPF was making use of approved vendors and not recommended vendors, and that there was an agreement between the franchisor and the vendor that the vendor would supply the service and agree to add franchisees as they became part of the franchise. (Tr. 771)

412.    Ms. Shelton testified that a franchisee could not be a passive investor, but had to be active or at least hire a manager to run the franchise as DSPF was not the manager, but merely a franchisor. (Tr.776)

413.    Ms. Shelton further stated DSPF had no responsibilities or obligations to attract or contract with dentists and had no responsibilities or obligations to attract patients for the dentists. (Tr. 781:4-10)

414.    Further testifying, Ms. Shelton stated that OraCare and MetroMedia were not the only approved vendors for DSPF.

415.    Ms. Shelton testified that the OraCare agreement with DSPF was signed by Stephen Vereen and the MetroMedia agreement was signed by Mr. David White. (Tr. 783:14-18)

416.    Further testifying, Ms. Shelton stated that DSPF did not receive remuneration from either OraCare or MetroMedia, but received its payments from franchisees when they had income. (Tr. 785:5-11)

417.    According to Ms. Shelton, of the initial franchise fee of $20,000, $7,000 was paid to MetroMedia and $7,000 was paid to OraCare as prepayments on their contracts with the franchisees. (Tr. 785:20-24)

418.    Ms. Shelton further stated that the prepayments of $7,000 to OraCare and $7,000 to

DECISION NO. _____ 76530

1    MetroMedia were not required and was not a good way for DSPF to do business.  (Tr. 786:12-25)

2         419.    Ms. Shelton testified that approved vendors could be terminated by DSPF, even through
3    their contract was between the franchisee and the vendor, when the vendor failed to perform or meet
4    the requirements which were required of them.  (Tr. 792:1522)

5         420.    Further testifying, Ms. Shelton confirmed that both MetroMedia and OraCare were
6    issued notices of default and subsequently terminated.  (Tr. 792-793:23-4)

7         421.    Ms. Shelton confirmed that it was her opinion that the DSPF franchises sold by DSPF
8    were not subject to either the Securities Act of 1933 or the Securities Exchange Act of 1934 because
9    the requirements of *SEC v. Howey* 328 U.S. 293 (1946), in which the United States Supreme Court
10   established a four prong test and defined an investment contract as involving the investment of funds
11   in a common enterprise with an expectation of profit solely from the efforts of the promoter or a third
12   party, were not met.  (Tr. 800-803)

13        422.    Ms. Shelton in a memorandum to Mr. Maerki marked "confidential" presented her
14   analysis that the offering as described herein did not constitute a security.  (Ex. R-123)

15        423.    According to Ms. Shelton, business entities are precluded by law from being both a
16   franchise and a security; however, Ms. Shelton could not cite any particular case law which would
17   support that proposition.  (Tr. 806-807)

18        424.    According to Ms. Shelton, the material discussed in the FDD came either from
19   documents prepared by a previous franchise attorney, or from information that was submitted to her by
20   the Respondents.  (Tr. 807:9-18)

21        425.    Further testifying, Ms. Shelton indicated that the material included in the FDD must be
22   accurate, not misleading and not refer to expected earnings, but instead refer to financial performance
23   based upon historic information.  (Tr. 808)

24        426.    Ms. Shelton stated that the financial information included within DSPF's FDD was
25   gathered from "an affiliate company" that was involved in dealing with providing dental patients for
26   dentists.  (Tr. 809:16-25)

27        427.    Ms. Shelton stated further that if an FDD contains misleading information or omits
28   material facts, a franchisor is violating FTC franchise regulations.  (Tr. 810:7-11)

DOCKET NO. S-20897A-13-0391

428.    The individual who provided information to Ms. Shelton concerning disclosures made within the FDD would have had to certify to its accuracy whether it was Mr. Maerki or not.  (Tr. 810:21-25)

429.    Ms. Shelton further indicated that with respect to the offerings in 2012 and 2013, the information contained in the FDD failed to disclose that franchisees who had invested in 2011 were not finding success with their investments because there were no representations which described either the number of dentists or the number of patients.  (Tr. 812)

430.    Although DSPF was registered in a number of states which require the registration of franchises, when the decision was made to close the business due to its lack of success in June, 2014, its registrations were withdrawn from the states in which it was registered (Tr. 813-814)

431.    Ms. Shelton stated it was the responsibility of DSPF that its approved vendors met the requirements established by DSPF in order for them to be recommended to the franchisees.  (Tr. 816:21-25)

432.    Ms. Shelton was unaware that Mr. Stephen Vareen who operated OraCare had been found in violation of the Act and that he had not paid restitution or the administrative penalties.  (Tr. 817:1-14)

433.    Ms. Shelton was unaware of how many salespeople DSPF had selling its franchises and was unaware of their backgrounds.

434.    According to Ms. Shelton, it was DSPF's responsibility to supervise its sales representatives to ensure they were not misleading investors.  (Tr. 820:13-21)

435.    Ms. Shelton stated she was unaware that a sales representative for the Respondents, Darrel Bank, had been barred by the Financial Industry Regulatory Authority ("FINRA") for misappropriating $161,000 in commissions and other payments in 2010.  (Tr. 822:5-20)

436.    Ms. Shelton acknowledged that she was familiar with the tri-fold brochures used in the sales of the franchises to investors, and that they touted absentee ownership, 60 months' of proven performance and promising a high yield on the investment with absentee ownership of the franchise being fully-managed by a marketing company that would run the day-to-day operations of the franchise.

DECISION NO.  **76530**

437.    Ms. Shelton stated she was unaware that the affiliated dental operation similar to DSPF had closed in 2010 for financial reasons.  (Tr. 829)

438.    Further testifying, Ms. Shelton indicated that if the information contained in the tri-fold marketing brochures was inaccurate, it would be a problem in states that had a registration process for franchises.  (Tr. 831:1-3)

439.    Ms. Shelton stated that Respondents sold over 600 franchises to investors.  (Tr. 836:1-2)

440.    According to Ms. Shelton, DSPF was involved with approximately five marketing vendors similar to MetroMedia between 2010 and mid-2012.  (Tr. 837-838:14-8)

441.    Testifying further, Ms. Shelton stated that she learned from Mr. David White of MetroMedia, that if an investor chose a vendor other than MetroMedia, DSPF continued to pay a $7,000 fee to MetroMedia and $7,000 to OraCare from the franchise fee paid by the investor.  Ms. Shelton stated she had.  (Tr. 838-839)

442.    According to Ms. Shelton, the FDD contained a required Federal admonishment stating that sales representatives were not to make any claims or statements as to the earnings, sales, profits, prospects, or chances of success of a DSPF franchise business other than what was set forth in Item 19 of the FDD.  (Tr. 850-851:15-3)

443.    Ms. Shelton stated that the FDD at Item 19 contained an FTC statement of caution warning prospective franchisees about statements by sales representatives referencing earnings or prospective profits.  (Tr. 851:13-23)

444.    Ms. Shelton stated further that if a franchisee was not meeting the minimum sales requirements and not fully operational within 180 days, utilizing the approved vendors, their obligation under the franchise agreement would not be fulfilled even though the approved vendors were used because their obligation was to actually have the patients for the dentists.  (Tr. 853)

445.    In a legal opinion authored by an attorney in Ms. Shelton's firm, dealing with DSPF's operation of its franchise system as it related to the Securities Act of 1933, or the Securities and Exchange Act of 1934, it did not state that the Act was precluded by FTC regulations.

446.    Ms. Shelton stated she was absolutely unaware that Mr. Maerki was listed as the

1  President of OraCare in a discussion contained in a confidential PPM dated July 21, 2010, for a

2  company by the name of Hassle Free Dental, LLC.  (Tr. 858)(Ex. S-49)

3        447.   Ms. Shelton argued that the Act did not apply because Respondents followed franchise

4  law pursuant to the FTC's rules, but she was unaware of what transpired between the investors in the

5  franchises and the salesmen that offered and sold the offering.  (Tr. 869)

6        448.   Throughout Ms. Shelton's testimony, she maintained that the sale of a franchise was not

7  an investment in a security under Arizona law.

8        449.   According to Ms. Shelton, a franchisor is only responsible for those items that are

9  contained within the FDD.  (Tr. 1064:13-19)

10       450.   Ms. Shelton stated there were specific time frames set forth by the FTC required for

11  disclosure in the FDD and none go back more than 10 years; however, under the Act, disclosure is

12  required of all adverse actions involving an offeror such as Mr. Maerki.

13       451.   Ms. Shelton stated the FDD statements regarding projections of income are the only

14  statements upon which a franchisee should rely, not those in promotional materials used by salesmen.

15  (Tr. 1069-1070:20-24)

16       452.   Further testifying, Ms. Shelton stated that she did not think it was a good business

17  decision for Respondent Maerki to pre-pay the approved vendors, MetroMedia and OraCare, even

18  though Mr. Maerki wanted the franchisees to succeed, and was trying to facilitate a system to help them

19  succeed in their businesses.  However, it was Mr. Maerki's business decision to do this.  (Tr. 1075-

20  1076:14-12)

21       453.   Ms. Shelton stated that for DSPF to be profitable, the investors had to have profitable

22  franchises.  (Tr. 1077:9-18)

23       454.   According to Ms. Shelton, a DSPF franchise was not a passive investment.  (Tr. 1081:2-

24  4)

25       455.   Although it was disclosed in the FDD that MetroMedia had operated a franchise, Ms.

26  Shelton stated that "they were never a franchisee."  (Tr. 1093:2-4)

27       456.   Ms. Shelton acknowledged that she did not know where in a marketing document which

28  described the "management team accomplishments," utilized by DSPF salesmen, you could determine

DECISION NO.   **76530**

1   who the management team was.  (Tr. 101:10-14)(Ex. S-30)

2   457.   Ms. Shelton stated that according to a marketing brochure utilized by the Respondents
3   in the sales of the offering, MetroMedia was a marketing vendor and not a day-to-day management
4   company responsible for 100 percent of the day to day operations.  (Ex. S-24)

5   458.   Ms. Shelton testified that MetroMedia was a marketing vendor and not the day-to-day
6   manager of a DSPF franchise, which was contrary to the promotional brochure provided to franchisees
7   by salesmen promoting absentee ownership with a right to contract with a marketing company
8   responsible for running the business.  (Ex. S-24)

9   459.   According to Ms. Shelton, the FDD specified that the designated manager should be
10  designated in writing by the franchisee, and approved in writing by the franchisor, for that individual
11  or entity to be the designated manager of the business.  (Tr. 1106)

12  460.   Ms. Shelton stated that the franchisee was the designated manager of a franchise unless
13  that individual submitted in writing the name of the designated manager they had chosen and none of
14  the franchisees did so.  (Tr. 1110:6-21)

15  461.   Ms. Shelton stated she was aware that DSPF promoted absentee ownership of the
16  franchises, but not fully-managed franchises.  (Tr. 1112:8-13)

17  462.   Ms. Shelton further testified that she was unaware that a management company would
18  be responsible for 100 percent of the day-to-day hands-on management of the franchise as contained
19  in the offering materials provided to an investor.  (Tr. 1112:14-19)(Ex. S-9)

20  463.   Ms. Shelton maintained that promotional materials that contained misrepresentations
21  about the management of a franchise did not govern, and that the franchise agreement controls the
22  requirements for managing a franchisee.

23  464.   Ms. Shelton testified that she was not present when the franchises were sold to investors.
24  (Tr. 1115:3-6)

25  465.   Ms. Shelton further testified that the written FDD superseded all oral presentations by
26  salesmen and if they said something improperly or misrepresented how a franchise would operate
27  contrary to the FDD, it would amount to fraud by that salesman.  (Tr. 111:12-20)

28

DECISION NO. ___76530___

Aghee W. Smith, II

466.    Mr. Aghee Smith, a California resident, who is a licensed in California as an insurance salesman, was called as a witness by Respondent Maerki, and testified that he had previously held several different securities licenses.  (Tr. 893-894)

467.    Mr. Smith testified that he had signed a salesperson agreement for DSPF, and that he had an earlier sales relationship with the founders of MetroMedia and OraCare.  (Tr. 894:16-24)

468.    Further testifying, Mr. Smith stated that in approximately 2007, he had become familiar with Steven Vereen and Dazzle Dental and that MetroMedia and OraCare were part of that organization.  (Tr. 895)

469.    Mr. Smith described Dazzle Dental as a series of dental offices utilizing specialists in practice management of multi-service dental centers that utilized the services of MetroMedia and OraCare, and at that time Respondent Maerki was not involved.  (Tr. 896:1-11)

470.    Mr. Smith stated that he learned about DSPF in approximately 2012 from the principals of the Dazzle Dental who developed the concept of franchising their work.  (Tr. 896)

471.    According to Mr. Smith, the founders of Dazzle Dental were Steven Vereen, Dale Murray and David White, and Respondent Maerki was brought into the picture with the intention of franchising their centers and expanding the programs.  (Tr. 897)

472.    Mr. Smith stated that Mr. Mearki had been president of DSPF.  (Tr. 898:21-23)

473.    Mr. Smith stated he sold over 20 franchises for DSPF.  (Tr. 899:6-20)

474.    Mr. Smith testified that he did not present the offering as a passive investment which required no participation from the owner of the investment.  (Tr. 899:18-22)

475.    According to Mr. Smith, a DSPF franchisee had an active responsibility for the franchise, and if a DSPF approved vendor was utilized, the franchisee retained responsibilities to operate the franchise.  (Tr. 900:1-9)

476.    Mr. Smith testified that he knew Jeff Eschrich, another salesperson for DSPF, who testified in the proceeding.

477.    It was Mr. Smith's understanding that the responsibility for the success of the franchise turned on the franchisee and if MetroMedia and OraCare did not perform as projected, then the

DECISION NO.   76530

1   franchisee could look for other options.  (Tr. 910:1-10)

2      478.    Mr. Smith stated that the franchisee was solely responsible for the success of his

3   franchise whether a vendor was hired or not.  (Tr. 911:4-7)

4      479.    According to Mr. Smith, the DSPF franchise did not guarantee the success of a

5   franchise, but merely that it was "designed" to lead to a successful operation.  (Tr. 911)

6      480.    Based on Mr. Smith's knowledge, claims of 60 months of proven performance, or a five

7   year history of research and development, was a reference to Dazzle Dental, Steven Vereen, Dale

8   Murray, and David White, and had nothing to do with Respondent Maerki or DSPF.  (Tr. 912)

9      481.    Mr. Smith testified that he had been involved in the earlier offering of Dazzle Dental

10  wherein membership interests were offered to investors by means of a private placement, but he was

11  unaware that it was not a registered offering, and that investors that he placed into the offering did not

12  recover their expected profit.

13     482.    Further testifying, Mr. Smith stated he became aware that some of the Delta Dental

14  offices were closing in approximately 2010.

15     483.    Mr. Smith stated he was introduced to Respondent Maerki by the individuals involved

16  in Dazzle Dental when the franchise offering developed.  (Tr. 934:1-4)

17     484.    Mr. Smith stated he was unaware that Respondent Maerki had a permanent injunction

18  issued against him by the SEC, or that there was an action by the FTC involving Mr. Maerki.  (Tr.

19  934:12-18)

20     485.    Further testifying, Mr. Smith stated that he was also unaware of lawsuits which were

21  pending against Mr. Maerki.  (Tr. 934:19-22)

22     486.    Although Mr. Smith sold some of his clients' franchises that were offered and sold by

23  DSPF, he did not know whether they received the return on their investments that he presented to them.

24  (Tr. 940:11-17)

25     487.    Further testifying, Mr. Smith indicated that he heard from some of his investors in the

26  DSPF franchises, and that their reports were unhappy.  (Tr. 940:18-20)

27     488.    Mr. Smith utilized copies of the DSPF promotional brochure with potential clients who

28  were thinking about purchasing a franchise from DSPF.

DECISION NO.   **76530**

489.    Mr. Smith stated he had salesmen who worked for him who also sold the franchises, but he was not aware if they all followed the same procedures in presenting the offering. (Tr. 944:6-8)

490.    Mr. Smith subsequently became aware that MetroMedia and OraCare were not meeting their financial targets on patient delivery when he spoke with a representative at DSPF who told him that she was concerned with its operations. (Tr. 944-945:13-3)

491.    According to Mr. Smith, when he learned that there were problems in the offering, he stopped doing business with the individuals he had been dealing with to make the offering.

492.    Mr. Smith stated that both MetroMedia and OraCare, approved vendors for DSPF, failed the investors in the franchises offered and sold by DSPF. (Tr. 963:2-7)

Dale Murray

493.    Mr. Dale Murray, a resident of Anthem, Arizona, testified that he first became involved with operating four dental clinics known as Dazzle Dental beginning in 2002 until 2010, when they finally ceased operations due to a lack of income.

494.    Mr. Murray stated that one of the clinics was located in Anthem and the other 3 were in the southeastern part of the Phoenix area. Each of these centers operated with four dentists, two general dentists, and two specialists in each office.

495.    Mr. Murray stated that the dental centers were very successful in attracting patients initially starting out with door hangers and then proceeding to open houses and telemarketing.

496.    Mr. Murray testified that a number of things caused the dental centers to fail, the first of which was expenses. (Tr. 972:11-14)

497.    Further testifying, Mr. Murray stated that they had excess staff in their centers, that the two general dentists could not generate enough patients for the specialists, and that outside dentists would not refer patients to their specialists because they were afraid of losing patients from their practices.

498.    Additionally, Mr. Murray stated that the recession which occurred in approximately 2008, also was a major contributor to their increasing financial losses. (Tr. 974:1-9)

499.    Mr. Murray stated that he met Respondent Maerki after Dazzle Dental had failed, but they discussed the business of bringing patients to dentists who were already up and operating. (Tr.

DECISION NO. _____

76530

DOCKET NO. S-20897A-13-0391

1    974:10-21)

2       500.     According to Mr. Murray, Dazzle Dental was capitalized by investors through a private

3    placement. (Tr. 977:7-17)

4       501.     Mr. Murray testified that he was one of the first managers of Dazzle Dental because he

5    had operational experience, and that David White was also involved because he had been classified as

6    an owner of Dazzle Dental. He also referred to Mr. Steven Vereen who had operated as a consultant

7    from the beginning of the operations. (Tr. 978-979)

8       502.     According to Mr. Murray, in 2010, he and his associates were working with multiple

9    attorneys and meeting with Respondent Maerki on how to establish the DSPF franchise, and OraCare

10   was formed to bring in the dentists, and MetroMedia was formed to locate the patients for dental care.

11      503.     At or about the time that DSPF was organized, Mr. Murray stated that Mr. White owned

12   both OraCare and MetroMedia. (Tr. 979-980:24-18)

13      504.     Mr. Murray further stated that once the initial franchise fee of $20,000 fee was paid to

14   DSPF, the majority of the funds were disbursed to OraCare and MetroMedia with the remainder of the

15   funds being retained by DSPF, which would also receive royalties from the franchisees as they

16   continued successful operations. (Tr. 982-983)

17      505.     According to Mr. Murray, franchisees had two options, they could either run the

18   business themselves, or they could hire others to operate their business. (Tr. 983-984:16-2)

19      506.     Mr. Murray confirmed that neither OraCare nor MetroMedia were successful in

20   attracting enough dentists and patients to enable the franchises to become successful in their ongoing

21   operations.

22      507.     Mr. Murray stated the failures by OraCare and MetroMedia resulted in written notices

23   threatening default by DSPF and resulted in the development of the appreciation payments paid to

24   franchisees, but ultimately OraCare and MetroMedia were defaulted, and they went out of business.

25   (Tr. 986-987)

26      508.     According to Mr. Murray, the multi-page document touting "Management Team

27   Accomplishments" was created by Mr. Murray and others, and actually was referencing MetroMedia

28   and OraCare to illustrate to franchisees the support they would receive for their franchises. (Tr. 993-

DECISION NO.    __76530__

1    994)(Ex. S-30)

2    509.    Mr. Murray testified that the statistics cited in the document entitled "Management
3    Team Accomplishments" were not those of OraCare and MetroMedia, but those of Dazzle Dental.  (Tr.
4    998:2-11)(Ex. S-30)

5    510.    Mr. Murray reviewed an exhibit which portrayed the DSPF website, and acknowledged
6    that reference made to DSPF "based on a proven 8-year business model by the management team"
7    contained reference to Dazzle Dental, and could be misleading because statistics quoted therein related
8    to Dazzle Dental and not DSPF.  (Tr. 1000-1003)(Ex. S-18(a))

9    511.    After reviewing a promotional brochure utilized by DSPF referencing absentee
10   ownership, 60 months of proven performance and no mention of either Dazzle Dental or MetroMedia
11   or OraCare, Mr. Murray stated that he believed he was looking at information for DSPF.  (Tr. 1006)

12   512.    Mr. Murray stated that Dazzle Dental raised $42,000,000 from investors with their
13   projected 36 percent rate of return, but this rate of return was not realized and not all of their investors
14   got their money back.  (Tr. 1009:7-19)

15   513.    Mr. Murray was not aware that Mr. Maerki had been the subject of an action by the SEC
16   that resulted in a permanent injunction against him.  (Tr. 1013:4-21)

17   514.    Mr. Murray testified that Dazzle Dental was not successful even though promotional
18   materials utilized by DSPF referenced a successful system.  (Tr. 1021:4-9)

19   515.    After the Division concluded its presentation of its evidence and Respondent Maerki
20   had called witnesses to present the Respondents' evidence in the proceeding, Mr. Maerki declined to
21   present any testimony himself.

22   516.    Under the circumstances herein, after our review of the entire record in this matter, and
23   of the applicable law, we conclude that multiple violations of the Securities Act occurred through the
24   actions of Respondents, Kent Maerki and DSPF through the offering and selling of securities in the
25   form of investment contracts.  While the investment was offered in the form of a franchise, satisfying
26   many other states' registration requirements for a franchise, the Division established that under Arizona
27   case law, which follows the holding in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed.
28   1244 (1946), an investment contract was formed by the investment of money in a common enterprise

DECISION NO.    76530

1   with profits to come from the efforts of others.[4] Pursuant to *Howey,* the test whether an instrument

2   qualifies as a security depends on four elements: (1) an investment of money, (2) in a common

3   enterprise, (3) with the expectations of profits, (4) through the efforts of others. The facts in this case

4   show that: (1) investors paid money for the franchise program; (2) there was a correlation between the

5   success of the investor and the promoter showing a common enterprise; (3) the investors expected

6   profits; and (4) the investors expected that those profits would be generated through the efforts of

7   others.

8       517.    The Division established that neither the investment contracts nor the Respondents

9   were registered with the Commission in violation of the Securities Act A.R.S. §§ 44-1841 and 44-1842.

10      518.    In addition, the Division established by a preponderance of the evidence that

11  Respondents committed multiple violations of the antifraud provision of the Securities Act A.R.S. §

12  44-1991, associated with each offering of the securities, by misrepresenting to offerees and investors

13  that DSPF had a 60-month proven track record; by failing to disclose that most of the DSPF programs

14  sold were not fully operational within 180 days; by failing to disclose that none of DSPF's investors

15  were earning 40-to-60 percent annual profit as represented; by filing after April 30, 2012, to disclose

16  that MetroMedia and Oracare were defaulted for not providing a sufficient number of partner dentists

17  and patients to support the program; and by failing to disclose to offerees and investors the SEC's

18  permanent injunction and FINRA's bar against Maerki while listing his business experience since 1971.

19  Thus, it is clear from the evidence presented that Respondents should be held liable for their violations

20  of the Securities Act, and should be required to make restitution and pay an administrative penalty.

21                                  **CONCLUSIONS OF LAW**

22      1.      The Commission has jurisdiction of this matter pursuant to Article XV of the Arizona

23  Constitution and A.R.S. § 44-1801, et seq.

24      2.      The investment offerings as described herein and sold by Respondents Maerki and

25  DSPF constituted securities within the meaning of A.R.S. § 44-1801.

26      3.      Respondents Maerki and DSPF acted as dealers and/or salesmen within the meaning of

27

28  _____
[4] *See S.E.C. v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 (9th Cir. 1973) *cert denied* 414 U.S. 821 (1973).

DECISION NO. __**76530**__

DOCKET NO. S-20897A-13-0391

1   A.R.S. § 44-1801(9)(22).

2       4.    The actions and conduct of Respondents Maerki and DSPF constitute the offering and

3   sales of securities within the meaning of A.R.S. § 44-1801(21).

4       5.    The securities were neither registered nor exempt from registration in violation of

5   A.R.S. § 44-1841.

6       6.    Respondents Maerki and DSPF offered and sold unregistered securities within or from

7   Arizona in violation of A.R.S. § 44-1841.

8       7.    Respondents Maerki and DSPF offered and sold securities within or from Arizona

9   without being registered as a dealer and/or a salesman in violation of A.R.S. § 44-1842.

10      8.    Respondents Maerki and DSPF failed to meet their burden of proof pursuant to A.R.S.

11   § 40-2033 to establish that the securities offered and sold herein were exempt from registration under

12   the Act.

13      9.    Respondents Maerki and DSPF committed fraud in the offer and sale of unregistered

14   securities, engaging in transactions, practices or a course of business which involved untrue statements

15   and omissions of material facts in violation of A.R.S. § 44-1991.

16      10.    Respondents, Maerki and DSPF have violated the Act and should cease and desist

17   pursuant to A.R.S. § 44-2032 and from any future violations of A.R.S. §§ 44-1841, 44-1842, 44-1991,

18   and all other provisions of the Act.

19      11.    The actions and conduct of Respondents Maerki and DSPF constitute multiple

20   violations of the Act and are grounds for an order of restitution pursuant to A.R.S. § 44-2032 and

21   administrative penalties pursuant to A.R.S. § 44-2036.

22      12.    The marital community of Respondents Kent Maerki and Norma Jean Coffin, aka

23   Norma Jean Maerki, aka Norma Jean Maule should be included in any order of restitution and

24   administrative penalties ordered herein pursuant to A.R.S. § 44-2031.

25                                 **ORDER**

26       IT IS THEREFORE ORDERED that pursuant to the authority granted to the Commission under

27   A.R.S. § 44-2032, Respondents, Kent Maerki and Dental Support Plus Franchise, LLC shall cease and

28   desist from their actions described hereinabove in violation of A.R.S. §§ 44-1841, 44-1842, and 44-

DECISION NO.   **76530**

DOCKET NO. S-20897A-13-0391

1   1991.

2   IT IS FURTHER ORDERED that pursuant to the authority granted to the Commission under

3   A.R.S. § 44-2036, Respondents, Kent Maerki, Norma Jean Coffin, aka Norma Jean Maerki, aka Norma

4   Jean Maule, and Dental Support Plus Franchise, LLC shall pay jointly and severally as administrative

5   penalties for the violation of A.R.S. § 44-1841 the sum of $25,000; for the violation of A.R.S. § 44-

6   1842 the sum of $25,000 and for the violation of A.R.S. § 44-1991 the sum of $50,000.  The payment

7   obligation for these administrative penalties shall be subordinate to any restitution and shall become

8   immediately due and payable only after restitution payments have been paid in full, or upon

9   Respondents' default with Respondents' restitution obligations.

10   IT IS FURTHER ORDERED that pursuant to the authority granted to the Commission under

11   A.R.S. § 44-2036, the Respondents, Kent Maerki and Norman Jean Coffin, aka Norma Jean Maerki,

12   aka Norma Jean Maule and Dental Support Plus Franchise, LLC jointly and severally shall pay the

13   administrative penalties ordered herein above in the amount of $100,000 payable by either Cashier's

14   Check or Money Order payable to the "State of Arizona" and presented to the Arizona Corporation

15   Commission for deposit into the general fund for the State of Arizona.

16   IT IS FURTHER ORDERED that if Respondents, Kent Maerki and Norman Jean Coffin, aka

17   Norma Jean Maerki, aka Norma Jean Maule and Dental Support Plus Franchise, LLC fail to pay the

18   administrative penalties hereinabove, any outstanding balance plus interest at the rate of the lesser of

19   10percent per annum, or the rate per annum equal to 1percent plus the prime rate as published by the

20   Board of Governors of the Federal Reserve System of Statistical Release H.15 or any publication that

21   may supersede it on the date that the judgment is entered, may be deemed in default and shall be

22   immediately due and payable, without further notice.

23   IT IS FURTHER ORDERED that pursuant to the authority granted to the Commission under

24   A.R.S. § 44-2032, Respondents, Kent Maerki and Norman Jean Coffin, aka Norma Jean Maerki, aka

25   Norma Jean Maule and Dental Support Plus Franchise, LLC, shall jointly and severally make restitution

26   in the amount of $13,514,958 pursuant to A.A.C. R14-4-308 subject to any legal-setoffs by the

27   Respondents and confirmed by the Director of Securities with said restitution to be made within 60

28   days of the effective date of this Decision.

Decision No. 76530

1    IT IS FURTHER ORDERED that the restitution ordered hereinabove shall bear interest at the

2    rate of the lesser of 10percent per annum, or the rate per annum that is equal to 1percent plus the prime

3    rate as published by the Board of Governors of the Federal Reserve System of Statistical Release H.15

4    or any publication that may supersede it on the date that the judgment is entered, may be deemed in

5    default and shall be immediately due and payable, without further notice.

6    IT IS FURTHER ORDERED that all restitution payments as ordered hereinabove shall be

7    deposited into an interest-bearing account(s) if appropriate, until distributions are made.

8    IT IS FURTHER ORDERED that pursuant to the authority granted to the Commission under

9    A.R.S. § 44-2031(c), the marital community of Respondents, Kent Maerki and Norman Jean Coffin,

10    aka Norma Jean Maerki, aka Norma Jean Maule shall be jointly and severally liable to the extent

11    allowable pursuant to A.R.S. § 25-215 for restitution in the amount of $13,514,958 and administrative

12    penalties in the amount of $100,000.

13    IT IS FURTHER ORDERED that default shall render Respondents, Kent Maerki and Norman

14    Jean Coffin, aka Norma Jean Maerki, aka Norma Jean Maule and Dental Support Plus Franchise, LLC

15    liable to the Commission for its costs of collection and interest at the rate of lesser of 10percent per

16    annum, or the rate per annum that is equal to 1percent plus the prime rate as published by the Board of

17    Governors of the Federal Reserve System of Statistical Release H.15 or any publication that may

18    supersede it on the date that the judgment is entered

19    IT IS FURTHER ORDERED that the Commission shall disburse the funds on a pro-rata basis

20    to the investors shown on the records of the Commission.  Any restitution funds that the Commission

21    cannot disburse because an investor refuses to accept such payment, or any restitution funds that cannot

22    be disbursed to an investor because an investor is deceased and the Commission cannot reasonably

23    identify and locate the deceased investor's spouse, or natural children surviving at the time of

24    distribution shall be disbursed on a pro-rata basis to the remaining investors shown on the records of

25    the Commission.  Any funds that the Commission determines that it is unable to or cannot feasibly be

26    disbursed shall be transferred to the general fund of the State of Arizona.

27    IT IS FURTHER ORDERED that if Respondents, Kent Maerki and Norman Jean Coffin, aka

28    Norma Jean Maerki, aka Norma Jean Maule and Dental Support Plus Franchise, LLC, fail to comply

76530

DOCKET NO. S-20897A-13-0391

1   with this Order, the Commission may bring further legal proceedings against Respondent(s) including

2   application to the Superior Court for an order of contempt.

3       IT IS FURTHER ORDERED that if any of the Respondents fail to comply with this Order, any

4   outstanding balance shall be in default and shall be immediately due and payable without further notice

5   or demand.  The acceptance of any partial or late payment by the Commission is not a waiver of default

6   by the Commission.

7       IT IS FURTHER ORDERED that pursuant to A.R.S. § 44-1974, upon application, the

8   Commission may grant rehearing of this Order.  The application must be received by the Commission

9   at its offices within twenty (20) calendar days after entry of this Order, and, unless otherwise ordered,

10  filing an application for rehearing does not stay this Order.  If the Commission does not grant rehearing

11  within twenty (20) calendar days of the filing of the application, the application is considered to be

12  denied.  No additional notices will be given of such denial.

13      IT IS FURTHER ORDERED that this Decision shall become effective immediately.

14          BY ORDER OF THE ARIZONA CORPORATION COMMISSION.

15

16

17      CHAIRMAN FORESE                          COMMISSIONER DUNN

18

19  COMMISSIONER TOBIN      COMMISSIONER OLSON      COMMISSIONER BURNS

20

21                      IN WITNESS WHEREOF, I, TED VOGT, Executive Director of
                        the Arizona Corporation Commission, have hereunto set my
22                      hand and caused the official seal of the Commission to be affixed
                        at the Capitol, in the City of Phoenix, this ____3rd____ day
23                      of __January__ 2018.

24

25                      TED VOGT
                        EXECUTIVE DIRECTOR

26

27  DISSENT _____

28  DISSENT _____
    MS:sa

70

76530

DOCKET NO. S-20897A-13-0391

SERVICE LIST FOR:

DOCKET NO.:

Kent Maerki
Norma Jean Coffin
Dental Support Plus Franchise, LLC
10632 N. Scottsdale Road
Suite B479
Scottsdale, AZ 85254

Matt Neubert, Director
Securities Division
ARIZONA CORPORATION COMMISSION
1300 West Washington Street
Phoenix, AZ 85007

KENT MAERKI and NORMA JEAN COFFIN

DOCKET NO. S-20897A-13-039

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

76530