**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | | |
|---|---|---|
| Securities and Exchange Commission, | ) | No. CV-15-609-PHX-SMM |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| Janus Spectrum LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

The Plaintiff, Securities and Exchange Commission ("SEC"), initiated this lawsuit alleging that Defendants Janus Spectrum LLC, David Alcorn, David Alcorn Professional Corporation, Kent Maerki, Bobby Jones, Premier Spectrum Group, PMA, and other individual defendants and their associated fundraising entities,[1] are responsible for planning and operating an investment scheme to apply for, obtain, and monetize Federal Communication Commission ("FCC") spectrum licenses that Alcorn and his accomplice, Maerki, and the other Defendants knew or should have known had little value. (Doc. 105.) The SEC has filed motions for summary judgment against Defendants Janus Spectrum LLC,

---

[1] All other named Defendants, both individual and fundraising entities, have filed their notices of settlement consent with the Court and Judgment has been entered against them: Defendants Daryl G. Bank; Dominion Private Client Group, LLC; Janus Spectrum Group, LLC; Spectrum Management, LLC; Spectrum 100, LLC; Spectrum 100 Management, LLC; Prime Spectrum, LLC; Prime Spectrum Management, LLC; Terry W. Johnson; Raymon G. Chadwick, Jr.; Innovative Group, PMA; Premier Group, PMA; and Prosperity Group, PMA. (See Docs. 107-111 and 228-235.) Collectively, the fundraising entities under the individual Defendants will be referred to as "Fundraising Entities").

David Alcorn, David Alcorn Professional Corporation, Kent Maerki, Bobby Jones, and the Premier Spectrum Group, PMA. (Docs. 189, 191.)

Currently before the Court is SEC's Motion for Summary Judgment against Defendants Janus Spectrum, LLC ("Janus Spectrum"), David Alcorn ("Alcorn"), David Alcorn Professional Corporation ("DAPC") and Kent Maerki ("Maerki"). (Doc. 191.) In support, the SEC submits its Statement of Facts (Doc. 192) and the supporting Declarations of Sana Muttalib, Lorraine Pearson, Coleman Bazelon, and David Van Havermaat, along with the submitted evidence of record. (Docs. 137-161, 193, and 211-213.)

Defendants Janus Spectrum, Alcorn and DAPC filed their response to the SEC's motion for summary judgment (the "Alcorn Defendants"). (Doc. 204), In support, Janus Spectrum, Alcorn and DAPC submitted their Controverting Statement of Facts (Doc. 205) and the supporting Declarations of Jack "Tripp" Forest and David Alcorn (Docs. 206, 207). Defendant Maerki did not file any opposition to the SEC's motion for summary judgment. (Doc. 218.) Subsequently, Janus Spectrum, Alcorn and DAPC filed a revised response to the SEC's motion for summary judgment. (Docs. 209, 210.) The SEC then filed its Reply. (Doc. 216.)

The Court has reviewed and considered all of the pleadings and finds that the SEC is entitled to summary judgment against Defendants Janus Spectrum, Alcorn, DAPC, and Maerki.[2]

## I. BACKGROUND

Initially, the Court must resolve Defendant Maerki's failure to respond to the SEC's motion for summary judgment. (Doc. 218.) Under Fed. R. Civ. P. 56, Defendant Maerki's failure to respond to the SEC's assertions of fact permits the Court to "consider the fact[s] undisputed for purposes of the motion" and to grant summary judgment "if the motion,

---

[2]The request for oral argument is denied because the parties have had an adequate opportunity to present their written arguments, and oral argument will not aid the Court's decision.  See Lake at Las Vegas Investors Grp., Inc. v. Pacific Malibu Dev., 933 F.2d 724, 729 (9th Cir. 1991).

including the facts considered undisputed, show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2); Heinemann v. Satterberg, 731 F.3d 914, 917 (9th Cir. 2013) (stating that the 2010 revisions to Rule 56 "prohibit the grant of summary judgment by default even if there is a complete failure to respond to the motion."). Consequently, the Court will consider the SEC's properly filed statement of facts in this matter (Doc. 192), as undisputed against Maerki. See Fed. R. Civ. P. 56(e).

### A. Spectrum Overview

The FCC regulates wireless communications; it oversees the various frequencies that comprise the country's available wireless capacity or spectrum. (Docs. 89-10, 192 at 3.) The FCC issues licenses to own and use various frequencies throughout the country. (Doc. 89-10.) In 2004, the FCC adopted a plan to reconfigure the 800 MHz wireless spectrum band. (Docs. 89-10, 138, and 161 at 9-10.) Public safety operations were moved to the lower portion of the 800 MHz band and commercial wireless systems were moved to the higher portion of the band. (Docs. 89-10, 161 at 9-10.) As part of its plan, the FCC designated the expansion band and guard band to maintain separation between public safety and cellular operations on the 800 MHz band. (Id.)

FCC rules specify that a license using either the expansion band or the guard band is only authorized to use a maximum bandwidth of 20 kHz. (Docs. 192 at 4, 89-11.) Major wireless carriers require a minimum bandwidth of 1.25 to 1.4 MHz. (Id.) It is undisputed that major wireless carriers could not operate their cellular services on the 800 MHz expansion band or guard band because those cellular services would not fit within the FCC's authorized maximum bandwidth of 20 kHz. (Id.) For instance, regarding the use of the FCC spectrum licenses in the guard and expansion band, Defendants were repeatedly warned in trade articles, in conversations with Sprint, and by their own advisors, that their underlying business model of leasing the FCC spectrum back to Sprint could not succeed. (Doc. 192 at 18-22.)

### B. Janus Spectrum Business Model

Janus Spectrum operated as a business seeking to apply, obtain, and resell FCC

licenses in the expansion and guard band. (Docs. 89-13, 192 at 5-7.) Janus Spectrum prepared applications for FCC cellular spectrum licenses on behalf of third-party clients, Defendant Fundraising Entities. (Docs. 192 at 5-7.) Janus Spectrum referred to the fundraising entities as "clients." (Doc. 89-13.) These application services included working with third parties, such as engineers and attorneys, to prepare and file spectrum applications with the FCC for 800 MHz spectrum licenses in the expansion and guard band. (Docs. 89-13; 97-3 at 1-7; 161 at 1-31, 63-66.) In addition to offering license application services, Janus Spectrum also offered to manage and monetize any spectrum licenses that would be granted by the FCC to its clients.[3] (See, e.g., Docs. 89-13, 97-3, 139-3, 142-4.)

During the period at issue, 2011-2015, Janus Spectrum used three successive versions of agreements with its clients. (Id.) Under the original version of its "broker services agreement," paragraph 7 provided that Janus Spectrum was appointed to act as the client's exclusive agent to manage and monetize the spectrum licenses, for which it would receive an 18% "transaction fee" or commission on any such transaction. (Id.) This 18% profit sharing provision was in addition to the payment of an upfront non-refundable $40,000 license application fee charged by Janus Spectrum. (Id.)

Subsequently, Janus Spectrum revised its original broker services agreement, in part, to delete paragraph 7, and for its existing clients to execute a new version of Janus Spectrum's services agreement entitled Commercialization Agreement. (Docs. 97-3, 139-3.) The revised agreement deleted paragraph 7. (Doc. 139-3 at 1.) However, Janus Spectrum was

---

[3] Janus Spectrum, Alcorn and DAPC contend that they subsequently revised their contracts with clients withdrawing the provision that Janus Spectrum would broker a subsequent sale or to help clients monetize an acquired license. (Doc. 210 at 3-4.)

The record is clear that Janus Spectrum was more than simply a license application services company. (See Doc. 216 at 6-7.) Alcorn's testimony confirms this status. (Doc. 152-9) (Alcorn testifying that under the original services agreement, licenses would be managed and monetized by Janus Spectrum and that under the revised services agreement clients would continue to use Janus Spectrum in an attempt to monetize and manage the licenses). In an email, Alcorn further confirmed that the message should be clear that Janus Spectrum is the best qualified to manage client's licenses. (Doc. 142-3.)

- 4 -

 still appointed to act as the client's exclusive agent in connection with any sale or lease of the spectrum licenses, and Janus Spectrum retained an 18% profit sharing interest in the management and monetization of spectrum licenses, in the form of a commission. (Doc. 139-3.) Janus Spectrum and its clients continued to expect that Janus Spectrum would be responsible for the management and monetization of the spectrum licenses under the revised agreement. (Doc. 192 at 7.)

The Commercialization Agreement was again subsequently amended. (Doc. 149-2.) The revised agreement deleted Janus Spectrum's 18% profit sharing interest. (Id.) Notwithstanding the revisions to Janus Spectrum's agreements with its clients, Janus Spectrum's clients continued to look to Janus Spectrum to manage and monetize the licenses. (See, e.g., Docs. 154-5 at 15-17, 25-26, 31-38; 192 at 6.)

Under all these various agreements, Janus Spectrum received from approximately 325 nationwide investors, including the Fundraising Entities, spectrum license application fees totaling $9,242,167. (Doc. 185 at 9-10.)

*C. Fundraising Entities*

The fundraising entity under Judgment Defendant Bobby Jones ("Jones") was Premier Spectrum Group, PMA ("PSG"). Under Judgment Defendant Daryl Bank ("Bank") were Dominion Private Client Group, LLC; Janus Spectrum Group, LLC; Spectrum Management, LLC; Spectrum 100, LLC; Spectrum 100 Management, LLC; Prime Spectrum, LLC; and Prime Spectrum Management, LLC. Under Judgment Defendants Terry Johnson ("Johnson") and Raymon Chadwick ("Chadwick") were Innovative Group, PMA; Premier Group, PMA; and Prosperity Group, PMA.

1. Judgment Defendant Bobby Jones

Jones formed Premier Spectrum Group in January 2013. (Docs. 137-3, 145.) Prospective investors received the Articles of Association for Premier Spectrum Group and the Texas Joint-Stock Company (Bearer Shares) of Premier Spectrum Management before investing with Premier Spectrum Group. (Docs. 138-6, 138-7.) Jones drafted a document entitled "Membership Fee Offering, Presented Exclusively By Premier Spectrum Group, a

Private Membership Association" that was sent to prospective investors. (Docs. 137-3, 212-4 at 6-7.) Among other things, the offering materials described the opportunity for its members to obtain significant profits resulting from the acquisition and monetization of "valuable" FCC spectrum. (Doc. 137-3.) The materials stated that "Premier Spectrum Group has a strategic alliance with channel partners whose staff members, in the late 1980s, helped investors take advantage of a similar, little-recognized opportunity to acquire FCC licenses. The value of the combined spectrum acquired by those investors for $75 million back in the 1980s is today worth greater than $3.6 billion – a 48 time return on investment." (Id. at 7.) The materials asserted that an opportunity presently exists to file and own valuable spectrum in the top 100 largest markets in the U.S., including New York, Washington, DC, and Chicago, IL. (Id.) "This spectrum is in close proximity to spectrum for which AT&T and Verizon paid nearly $17 billion in 2008; it is these channels on which both carriers are building out their modern LTE networks." (Id.) "Today, this targeted 800 MHz Spectrum is among the most coveted spectrum to wireless carriers. The wireless industry has already acknowledged that future mobile broadband connections will run over this lower band spectrum. We anticipate ownership of this valuable, lower band spectrum will provide Premier Spectrum Group with opportunities for increases as the value of spectrum rises over time, and attractive income opportunities through a lease or joint-venture with one or more wireless service providers." (Id.)

The offering stated that "Premier Spectrum Group will apply for 5 channels in each of the 25 largest Economic Area Markets, for a total of 125 channels." (Id. at 8.) The offering materials further stated that "Revenue is forecasted to begin within approximately 24 months" (id. at 10), and contained a section entitled "our team," describing Alcorn and Maerki, and referring to Maerki as a "recognized icon in the wireless industry." (Id. at 13.)

In all, Jones's fundraising entity, PSG, raised a total of $407,050 from 13 nationwide investors. (Doc. 157 at 23.) Of that amount, it sent $350,000 to Janus Spectrum. (Id. at 6, 9.) In addition, Jones received, in his capacity as trustee of the "Because He Lives" trust, $567,140 in commissions or finders fees from Janus Spectrum for referring other investors.

1   (Id. at 7.)

2          Jones made no effort to determine whether his investors in PSG were accredited

3   investors. (Doc. 192 at 9.) Other than paying for the license applications, Jones did not

4   expect investors to do any additional work. (Id.) Investor funds in PSG were pooled and used

5   to purchase ten license applications from Janus Spectrum for $40,000 each. (Id.) The licenses

6   are still not available for the geographic areas of PSG's applications; PSG has yet to acquire

7   or monetize, any spectrum licenses. (Id.) Pursuant to the terms of the broker services

8   agreement between Janus Spectrum and PSG, Janus Spectrum would have had a managerial

9   role in monetizing any licenses that would be awarded to PSG. (Id.)

10         2. Judgment Defendant Daryl Bank, et al.

11         Prospective investors in Bank's fundraising entities, Janus Spectrum Group, LLC,

12  Spectrum 100, LLC, and Prime Spectrum, LLC, received an Operating Agreement and an

13  Investment Offering and Investment Summary. (Docs. 192 at 7-8, see also 144-2 thru 144-4.)

14  Each Operating Agreement provides that the respective fundraising entity has been formed

15  for the purpose of acquiring and monetizing 800 MHz Specialized Mobile Radio ("SMR")

16  and 900 SMR licenses, and that their respective management companies would "have

17  complete power and authority for the management and operation of the Company's assets

18  and business." (See, e.g., Doc. 144-2.) On the cover page, the Investment Summary

19  document for Prime Spectrum, LLC acknowledged that its offering was a "security" but

20  claimed that it was "exempt from SEC registration." (Doc. 144-7.) The investors in Bank's

21  entities never exercised voting power with respect to any activities of the entities, and their

22  participation was entirely passive. (Doc. 192 at 7-8.)

23         The "Investment Offering" and "Investment Summary" documents further stated that

24  Dominion Private Client Group, LLC had partnered with Janus Spectrum to offer investors

25  with opportunities to achieve a 100% annual preferred return on invested capital plus 50%

26  of additional profits, derived from anticipated revenues resulting from the acquisition and

27  monetization of valuable FCC spectrum licenses. (Docs. 144-6, 144-7.) These documents

28  included projections of monthly cash flow from licenses in the top 100 economic areas in the

1    United States and projected annual returns on investment ranging over 1000% depending on
2    the economic area. (Id.) The Investment Offering and Investment Summary documents also
3    stated that acquisition costs for each license ranged from $100,000 to $125,000, depending
4    on the fundraising entity. (Id.)

5        These documents also described the Janus Spectrum team, including profiles of
6    Alcorn and Maerki, which described Maerki as being "recognized as an icon in the wireless
7    industry" and had been a managing partner of The Cellular Corporation, where Maerki and
8    his clients "invested $75 Million in an FCC lottery and was awarded spectrum that is
9    currently valued at $3.6 Billion." (Doc. 144-6 at 15.)

10       Bank's entities sent to prospective investors one-page "opportunity alerts" that stated
11   that "Dominion Private Client Group, LLC has partnered with Janus Spectrum and its team
12   who, in the late 1980s, helped investors take advantage of a little recognized opportunity to
13   acquire FCC licenses." (Docs. 139-9, 140-1.)

14       In all, Bank and his fundraising entities raised $8,359,400 from 111 nationwide
15   investors. Of that total amount, Bank sent $3,864,500 to Janus Spectrum. (Doc. 157 at 14.)

16       3. Judgment Defendants Johnson and Chadwick

17       Johnson and Chadwick solicited investors to join a "private membership association"
18   ("PMA") in which each investor would become a member and would own a percentage
19   interest in each spectrum license held by the association based on the amount of their
20   investment. (Docs. 192 at 8-9; see also 138-5.) Members in the Johnson and Chadwick
21   entities received a copy of their respective entities' "articles of association." (See, e.g., Doc.
22   138-5.) Johnson and Chadwick also provided to their members a copy of the broker services
23   agreement between Janus Spectrum and the PMA. (Docs. 139-2, 139-3.) The purpose of each
24   PMA was to apply for 25 licenses in the expansion band or guard band through Janus
25   Spectrum.(Doc. 153-9 at 23.) Johnson later admitted at his deposition that the agreements
26   Innovative Group, Premier Group and Prosperity Group had with their members were
27   "securities" under the three-part test laid out in SEC v. W.J. Howey Co., 328 U.S. 293
28   (1946). (Id. at 4-6.)

1    Johnson and Chadwick charged their members $62,500 per spectrum license
2    application, even though Janus Spectrum only charged Johnson's and Chadwick's entities
3    $40,000 per application. (Id. at 8.) To conceal their "commissions" from their investors,
4    Johnson and Chadwick obtained a "commission side letter" from Alcorn, in order to have a
5    receipt that they could show to their investors, showing they had sent $61,500 to Janus
6    Spectrum, rather than $40,000. (Docs. 139-7, 192 at 9.)

7    In all, Johnson and Chadwick raised $3,859,580, from a total of 201 nationwide
8    investors, which funds were pooled to purchase license applications. (Doc. 157 at 22-23.) All
9    of those funds were raised before February 1, 2014. Of that total amount, $2,785,000 was
10   sent to Janus Spectrum. (Id.) In addition, Johnson and Chadwick received, through their
11   control of the Integrity Group bank account, $260,000 in commissions or finders fees from
12   Janus Spectrum. (Id. at 23.)

13       *D. Roles of Defendants Janus Spectrum, Alcorn, DAPC, and Maerki*

14   The SEC has filed a very lengthy evidentiary record in support of the spectrum license
15   scheme that Defendants orchestrated against the investors and potential investors. (Docs.
16   137-161, 184-188, 211-213.) Alcorn and Maerki, through Janus Spectrum, were the
17   orchestrators of the scheme.

18   Alcorn is the president of David Alcorn Professional Corporation, DAPC, which
19   became the sole owner of Janus Spectrum as of January 2014. (Docs. 128, 152-8.) Prior to
20   January 2014, DAPC held a 55% ownership interest in Janus Spectrum. (Id.)

21   Alcorn and Maerki, through presentations, webinars, emails, in-person meetings,
22   phone calls, conference calls, and radio shows, made representations to potential clients and
23   investors in the Fundraising Entities about the characteristics and benefits of acquiring FCC
24   spectrum licenses. (Docs. 192 at 11.) Alcorn and Maerki represented the use of such licenses,
25   the expected returns on investing in spectrum licenses, the lack of risk and passive nature of
26   the investment, the urgency in filing license applications, the associated application fees, and
27   the experience of the Janus Spectrum's principals. (Id.)

28   Maerki created the audio-video presentations entitled "Educational Preview About

- 9 -

1    Airwaves Presentation" and "Money from Thin Air." Alcorn and Maerki provided these

2    presentations to Bank, Jones, Johnson, and Chadwick for their use in soliciting investors.

3    (Docs. 192 at 11, 137-5, 216 at 8 n.5.) Alcorn created a "*pro forma*" estimate of the value of

4    licenses in the expansion and guard bands in the top 25 economic areas and forwarded it to

5    Jones, Bank, Johnson, and Chadwick for their use in soliciting investors.  (Doc. 192 at 13.)

6    Alcorn estimated annual returns ranging up to 3373% depending on the economic area, and

7    an average annual return from all 25 economic areas of 298%. (Id.)

8       In his "Money from Thin Air" presentation, Maerki claimed: "It's a work free

9    business. It really is a work free business. It is ownership of spectrum. It has very high

10   income historically. It has very low risk, hardly any… It's work free, there is just nothing to

11   do. You look at your tower, you don't see anything happening, you go home." (Doc. 137-5

12   at 18.) He also referred to the opportunity to own spectrum that was "high demand spectrum

13   that is already in use with current income streams." (Id. at 20.) Maerki also stated that

14   "demand for 600,700, 800, and 900 MHz spectrum is the most efficient out there. That is

15   what we are talking about today, those are the Rolls Royce of spectrum." (Id. at 25.)

16      Maerki further claimed explained that "Sprint or somebody [like] them" does not want

17   to lose their capacity and would "probably lease it back [from] you and pay you $4,800 a

18   month." (Doc. 137-5 at 34.) Maerki continued, "Sprint is going to need [the 800 MHz

19   spectrum] . . . But if they don't take it, AT&T needs it, and so does Verizon. More

20   importantly T-Mobile really needs it. So do the other ones." (Id. at 34-35.)[4] Maerki also

21   explained the expected revenues that could be realized from owning spectrum licenses:

22   "They have 360 channels in that area, dividing that into the million, they're making about

23

24       [4]Contrary to the claims of the Alcorn defendants, Andrew Seybold (Docs. 154-7, 212-
25   10), Jack Tripp Forrest (Docs. 153-5, 211-10, 212), Peter Lewis (Docs. 154-2, 212-6), and
     Peter Moncure (Docs. 213-4, 146-2, 146-3), all agreed that spectrum in the expansion and
26   guard bands could not be used by the major wireless carriers. Another Alcorn Defendants'
     witness, Alan Tilles, stated that "There will be at some point a way to apply for these
27   frequencies. The better question is why would you apply for them." (Docs. 145-8, 152-9 at
     25-27.) In March  2012, Tilles also told Alcorn that "There's NO spectrum below 861 MHz
28   (and above 851 MHz) that can be used for any kind of broadband." (Doc. 151.)

1   $3,000 a channel. Your license in that area, should you select to be in that area, would be for

2   four channels times $3,000 or $12,000 a month. Wow." (Id. at 34.) Maerki continued: "In

3   summary, let's put it this way. There is a limited number of available licenses. Of course, it's

4   on a first come/first serve basis, very unique income stream opportunity, own somebody

5   else's income stream that they have to give up. Very low risk, As a result, very high income.

6   Small investment, high value, certainly work free . . . How long before I make money? We

7   have discussed that, a year or two years unless it's a border, two to five years. Why isn't

8   everyone doing this? Simply, they haven't learned about it yet . . . Urgency? Yes. First

9   come/first serve. These will be gone in three to five months." (Id. at 35-37.) At the end of his

10  "Educational Preview About Airwaves Presentation," Maerki explained to investors that

11  "over 50 percent of the spectrum available as a result of what I have just described has

12  already been applied for. This is very limited, so please get more information quickly." (Id.

13  at 12.)

14  In an effort to recruit additional investors, Alcorn sent an email to Jones and Johnson,

15  copying Maerki and others, stating that "Kent [Maerki] and I are open for suggestions on

16  how we can help our people energize their individual and group "Operation Market Thrust."

17  (Doc. 141-1.) Alcorn continued, "We are prepared to throw any amount of time and

18  resources your way to help." (Id.) Alcorn also stated, "Keep in mind, the "Icon" [Kent

19  Maerki] is not only willing to address your people but eager to do so. I personally have now

20  witnessed him doing these over and over and with consistent and positive results. Never has

21  there been a presentation that did not create sales. Use all your tools! Let us know how we

22  can help you!!!" (Id.)

23  Alcorn spoke with a person in the legal department at Sprint and was told that Sprint

24  would not have an interest in Janus Spectrum's licenses and that Sprint was forbidden from

25  buying them. (Doc. 192 at 21.)

26  Alcorn also assisted Bank in creating Bank's "pitch book," reviewed Bank's offering

27  materials, and provided Bank with a list of potential investors who had contacted Janus

28  Spectrum. (Doc. 143-3, 147, 151-7, 192 at 13.) Alcorn was also aware that Bank was pooling

1    investors' monies to acquire licenses from Janus Spectrum. (Id.)

2        Alcorn and Maerki attended an event hosted by Jones to solicit investors for PSG.

3    Maerki told attendees, "We have two of our licenses. We will have more and ultimately we

4    will have all 25. Everybody will have their licenses. . . . If you hire us, we will go talk to

5    Sprint and make a deal. That's what we can guarantee. We can't guarantee anything else."

6    (Doc. 138-1 at 40.) At the same meeting, Alcorn told an investor, "The most likely user will

7    be Sprint but the market is very deep." (Doc. 152-8 at 21.)

8        Alcorn and Maerki held a conference call with clients and prospective clients offering

9    30% commissions and discussed using a private placement memorandum in soliciting

10   investors. (Docs. 137-9, 192 at 14.) Maerki knew that Bank was using the "Money From

11   Thin Air" video to solicit investors as he had given Bank permission to use it. (Doc. 192 at

12   14.) Maerki also sent a PowerPoint presentation and a revised version of the "Money from

13   Thin Air" video to Jones. (Id.) Maerki also advised Jones, Johnson and Chadwick on how

14   they should set up their respective fundraising entities. (Id.)

15   **II.  STANDARD OF REVIEW**

16   *Summary Judgment*

17       "A party may move for summary judgment, identifying each claim or defense–or the

18   part of each claim or defense–on which summary judgment is sought." Fed. R. Civ. P. 56(a).

19   A court must grant summary judgment if the pleadings and supporting documents, viewed

20   in the light most favorable to the nonmoving party, show "that there is no genuine issue as

21   to any material fact and the movant is entitled to judgment as a matter of law." Id.; see

22   Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v. Nevada Fed. Credit Union,

23   24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are material. See

24   Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); see also Jesinger, 24 F.3d at 1130.

25   "Only disputes over facts that might affect the outcome of the suit under the governing law

26   will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. The

27   dispute must also be genuine, that is, the evidence must be "such that a reasonable jury could

28   return a verdict for the nonmoving party." Id.; see Jesinger, 24 F.3d at 1130.

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." Celotex, 477 U.S. at 323-24. Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir. 1994). The moving party need not disprove matters on which the opponent has the burden of proof at trial. See Celotex, 477 U.S. at 323. The party opposing summary judgment may not rest upon the mere allegations or denials of the party's pleadings, but must set forth "specific facts showing that there is a genuine issue for trial." See Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)); Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. Anderson, 477 U.S. at 247-48.

## III. DISCUSSION

*A. SEC's Section 5 Securities Allegations Against Janus Spectrum, Alcorn and Maerki*

Based on the material evidence presented, the SEC alleges that it is entitled to summary judgment on its claim that Janus Spectrum, Alcorn and Maerki violated Section 5 of the Securities Act, 15 U.S.C. § 77e(a) and (c) ("Section 5"), by selling securities without the required prior registration. (Doc. 191 at 11-14.) The SEC alleges that Janus Spectrum, Alcorn and Maerki are liable both for (1) Janus Spectrum's offer and sale of securities, and (2) as substantial participants in each Fundraising Entity's offer and sale of securities. (Id. at 11.)

Janus Spectrum and Alcorn contend that they did not offer services to the public at large or manage a business which managed people's investments; they offered services for a fee to license applicants who applied to the FCC to be the exclusive owners and builders of certain spectrum licenses. (Doc. 210 at 3.) Janus Spectrum and Alcorn contend that they did not sell securities, and, consequently, the registration requirements of the Securities Act are not required. (Id.) Alcorn further states he had no reason to believe that Janus Spectrum

was involved in the sale of securities because while he was associated with Smartcomm, he was informed that the SEC had investigated that entity, and its similar business model, and found no action necessary. (Id. at 5.) As to the SEC's substantial participant allegation, Janus Spectrum/Alcorn disputes causation, asserting that it was Maerki who orchestrated the events relied upon by the SEC. (Id. at 13.)

The SEC replies that the "success of the venture" was dependent on Janus Spectrum's ability to sell or lease the spectrum back to Sprint or to another major wireless carrier, as opposed to simply preserving the license for some indeterminate future use. (Doc. 216 at 7.) The SEC cites Alcorn's testimony in support of its argument that Alcorn and Maerki were both "a necessary participant and substantial factor" in each Fundraising Entity's offering and sale of securities. (See Doc. 216 at 8 n.5) (Alcorn testifying that he offered to help Bank improve his business with Janus Spectrum and offered to review Bank's offering materials; that Alcorn reviewed and edited "Money From Thin Air" while at Janus Spectrum; that Alcorn created and used pro forma financial projections when speaking with clients and prospective clients; that Alcorn and Maerki sent both the "Educational Preview About Airwaves" and "Money From Thin Air" videos to potential investors and to Bank, Jones, Johnson and Chadwick for their use in soliciting investors).

### 1. Fundraising Entities' Offerings Were Securities

The Court first finds that the membership interests that Jones, Johnson, and Chadwick sold to investors for the purchase of FCC spectrum licenses were securities. (Doc. 192 at 8-11.) Additionally, the Court finds that the agreements that Bank made with his investors, including the Operating Agreement, Investment Offering, and Investment Summary, were securities. (Id. at 7-8.)

Under both the Securities Act, 15 U.S.C. § 77b(a)(1), and the Exchange Act, 15 U.S.C. § 78c(a)(10), a security is defined as, among other things, an investment contract. The showing of an investment contract is established by: (1) an investment of money; (2) in a common enterprise, evidenced by either horizontal or vertical pooling; (3) with an expectation of income or profits to be derived solely from the efforts of the promoter or a

1   third party. <u>See</u> <u>SEC v. W.J. Howey Co.</u>, 328 U.S. 293, 298-99 (1946); <u>SEC v. Rubera</u>, 350

2   F.3d 1084, 1090 (9th Cir. 2003).

3              *a. Investment of Money*

4        The investment of money prong requires that the investor commit his assets to the

5   enterprise in such a manner as to subject himself to financial loss. <u>See</u> <u>Rubera</u>, 350 F.3d at

6   1090.

7        Jones drafted the document entitled "Membership Fee Offering, Presented Exclusively

8   by Premier Spectrum Group, a Private Membership Association." (Docs. 192 at 7, 137-3.)

9   The "Membership Fee Offering" was sent to potential investors, soliciting the opportunity

10  to acquire and monetize allegedly valuable FCC licenses. (Doc. 137-3.) The "Membership

11  Fee Offering" for PSG further stated that "Revenue is forecasted to begin within

12  approximately 24 months." (<u>Id.</u>) PSG purchased ten license applications from Janus

13  Spectrum in 2013 for $40,000 each. (Doc. 192 at 9.) In all, Jones through PSG raised a total

14  of $407,050 from 13 nationwide investors, which was pooled to invest in FCC spectrum

15  licenses. (<u>Id.</u>)

16       Bank forwarded to potential investors documents entitled "Investment Offering" and

17  "Investment Summary." (Docs. 144-6, 144-7.) These documents state that Dominion Private

18  Client Group, LLC had partnered with Janus Spectrum to offer investors with opportunities

19  to achieve a 100% annual preferred return on invested capital plus 50% of additional profits,

20  derived from anticipated revenues resulting from the acquisition and monetization of

21  valuable FCC spectrum licenses. (<u>Id.</u>) These documents included projections of monthly cash

22  flow from licenses in the top 100 economic areas in the United States and projected annual

23  returns on investment ranging over 1000% depending on the economic area. (<u>Id.</u>) The

24  Investment Offering and Investment Summary documents also stated that acquisition costs

25  for each license ranged from $100,000 to $125,000, depending on the fundraising entity. (<u>Id.</u>)

26  In all, Bank and his fundraising entities raised $8,359,400 from 111 nationwide investors.

27  Of that total amount, Bank sent $3,864,500 to Janus Spectrum. (Doc. 157 at 14.)

28       In order to avoid the application of securities laws, Maerki advised Jones, Johnson,

1   and Chadwick to use a "private membership association" ("PMA") instead of an LLC. (Docs.

2   149-4, 153-9.) Consequently, Johnson, Chadwick, and Jones solicited investors to join a

3   PMA in which each investor would become a member and own a percentage interest in each

4   spectrum license held by the association based on the amount of their investment. (Docs. 192

5   at 8-9; see also 138-5.) Members in the Johnson and Chadwick entities received a copy of

6   their respective entities' "articles of association." (Id.) Johnson and Chadwick promised

7   investors that the PMA would apply for spectrum licenses in each of the top 25 wireless

8   economic areas through Janus Spectrum, projecting a monthly return of 85%. (See, e.g.,

9   Docs. 149-5, 139-8.) In all, Johnson and Chadwick raised $3,859,580, from a total of 201

10  nationwide investors, which funds were pooled to purchase license applications. (Doc. 157

11  at 22-23.)

12              *b. Common Enterprise*

13          The Ninth Circuit recognizes traditional horizontal commonality where pooling is

14  present. See Hocking v. Dubois, 885 F.2d 1449, 1459 (9th Cir. 1989) (*en banc*). In horizontal

15  commonality, the investors pool their assets in return for a *pro rata* share of the profits of the

16  common enterprise. Id. Vertical commonality requires that the investor and the promoter,

17  seller, or other party be involved in some common venture. Brodt v. Bache & Co., 595 F.2d

18  459, 461 (9th Cir. 1978).

19          Here, horizontal commonality is present as Jones, through PSG, Banks, through his

20  numerous fundraising entities, and Johnson/Chadwick all pooled investors' funds to allow

21  them to purchase packages of license applications from Janus Spectrum for $40,000 each

22  (Johnson/Chadwick charging $62,500 each). (Doc. 192 at 7-11.) Moreover, vertical

23  commonality is also satisfied. The fundraising entities of Jones, Bank, and

24  Johnson/Chadwick all depended on Janus Spectrum to prepare, file, and obtain FCC

25  spectrum licenses for the investors. (Id.)

26              *c. Expectation of Profits Produced by Others*

27          The third element of the Howey test requires that the investor be led to expect profits

28  solely from the efforts of others. Rubera, 350 F.3d at 1091-92; see also SEC v. Comcoa, 855

F. Supp. 1258, 1261-62 (S.D. Fla. 1994) (finding defendants' offering of spectrum license application services constituted a security under Howey, where investors were dependent on Comcoa for obtaining and leasing licenses).

Here, this element of Howey is also satisfied because the investors always looked to and expected that Janus Spectrum would prepare, file, and obtain FCC spectrum licenses for the investors, as well as  manage and monetize the licenses obtained. (Docs. 192 at 7-11; 142-3; 142-10; 152-9 at 19-20, 48-49, 55-56.)

Thus, the undisputed facts establish that Jones's, Bank's, and Johnson/Chadwick's Fundraising Entities offered and sold securities to investors.

### 2. Section 5 Violation of the Securities Act

Next, the SEC alleges that Maerki, Alcorn, and Janus Spectrum violated the Securities Act because Section 5(a)(1) prohibits the direct or indirect sale of securities unless a registration statement is in effect, and Section 5(c) prohibits the offer or sale of securities unless a registration statement is in effect. (Doc. 191 at 11-15.)

Under Section 5 of the Securities Act, the SEC must show that (1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly sold or offered to sell securities; and (3) the sale or offer was made through interstate commerce. See SEC v. CMKM Diamonds, Inc., 729 F.3d 1248, 1255 (9th Cir. 2013). Once the SEC introduces evidence that the registration provisions have been violated, the burden shifts to the defendant to show that an exemption applies. See 15 U.S.C. § 77c(b); SEC v. Murphy, 626 F.2d 633, 641 (9th Cir. 1980). Section 5 is a strict liability offense and requires no showing of scienter, or even negligence. CMKM Diamonds, 729 F.3d at 1256.

Here, the Fundraising Entities sold securities to investors nationwide which had been pooled to invest in FCC spectrum licenses through Janus Spectrum. (Doc. 192 at 7-11.) Thus, the SEC introduced evidence establishing that the Fundraising Entities sold securities through interstate commerce. (Id.) Further, it is undisputed that the Fundraising Entities never registered with the SEC the offer and sale of these securities. (Doc. 128.)

Section 5 liability extends to those who are "both a necessary participant and a

- 17 -

1    substantial factor in the sales transaction[s]." SEC v. Phan, 500 F.3d 895, 906 (9th Cir.

2    2007). The test is "whether, but for the defendant's participation, the sales transaction would

3    not have taken place." Murphy, 626 F.2d at 651-52. The defendant's acts must have been

4    more than *de minimis*. Id. Thus, section 5(a) and (c) impose liability on persons who "directly

5    or indirectly" offer or sell an unregistered security. Section 5 is not limited to the person or

6    entity who ultimately passes title to the security. Murphy, 626 F.2d at 649.

7          Here, Janus Spectrum, Alcorn and Maerki are liable for the offer and sale of the

8    securities offered by the Fundraising Entities and their principals. Although Janus Spectrum,

9    Alcorn and Maerki did not directly offer or sell the Fundraising Entities' securities, they did

10   so indirectly as they were both "a necessary participant and substantial factor" in all of the

11   Fundraising Entities' offerings and sale of securities. Although the Fundraising Entities were

12   the actual issuers of their securities, Janus Spectrum, Alcorn and Maerki orchestrated and

13   oversaw all of their offerings. Janus Spectrum, through Alcorn and Maerki, played a critical

14   role in promoting the sale of the membership interests by, among other things: providing

15   promotional videos for use in soliciting investors using "Money From Thin Air;" and

16   "Educational Preview About Airwaves Presentation." Alcorn and Maerki assisted with

17   drafting marketing materials; provided sample offering documents; training salespeople;

18   participating in investor presentations or meetings for each fundraising entity; answering

19   potential investors questions; making investor referrals to the fundraising entities; creating

20   financial projections to be used in soliciting investors; and, by agreeing to manage and

21   monetize the spectrum licenses. (Doc. 192 at 11-14.) Without the services of Janus Spectrum,

22   through Maerki and Alcorn, the Fundraising Entities would not have been able to offer and

23   sell securities to its investors. (Id.)

24         Therefore, based on the evidence submitted, Janus Spectrum, Alcorn and Maerki were

25   both necessary participants and substantial factors in the Fundraising Entities' offerings and

26   sales transactions of securities in violation of Sections 5(a) and (c) of the Securities Act. The

27   SEC is entitled to summary judgment against Janus Spectrum, Alcorn and Maerki on the

28   SEC's Third Claim for Relief. (Doc. 105 at 29-30.)

*B. SEC's Fraud Allegations Against Janus Spectrum, Alcorn, Maerki, and DAPC*

Next, the SEC alleges it is entitled to summary judgment on its claim that Janus Spectrum, Alcorn and Maerki violated the anti-fraud provisions of Section 17(a) of the Securities Act, 15 U.S.C. § 77q ("Section 17"). (Docs. 191 at 14-19, 105 at 28.) The SEC also alleges that it is entitled to summary judgment on its claim that Janus Spectrum, Alcorn and Maerki violated Section 10(b) of the Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j, and 17 C.F.R. § 240.10b-5 ("Rule 10b-5") (collectively "Section 10(b)"). (Id.) In its Rule 10b-5 allegations, the SEC further alleges that DAPC, as a control person, also violated Rule 10b-5.[5] (Id.)

The Alcorn Defendants first contend that there is no liability for a fraudulent scheme because omissions are actionable only if there was a duty to disclose that information. (Doc. 210 at 14 (citing WPP Luxembourg Gamma Three Sari v. Spot Runner, Inc., 655 F.3d 1039, 1048 (9th Cir. 2011).) According to the Alcorn Defendants, parties to an impersonal market transaction have no such duty without a fiduciary or agency relationship, prior dealings, or circumstances of trust and confidence. (Id.) Next, the Alcorn Defendants contend that material misrepresentations are generally issues for the jury, not for summary judgment, and further that the SEC has not established that the Alcorn Defendants made material misrepresentations. (Id. at 15.) Finally, the Alcorn Defendants contend that scienter is a question of fact for the jury. (Id. at 16.)

Although Janus Spectrum, Alcorn, and Maerki did not directly offer or sell the Fundraising Entities' securities, they did so indirectly as they were all both "a necessary participant and substantial factor" in the Fundraising Entities' offerings and sales of securities. At issue is whether Janus Spectrum, Alcorn, and Maerki also violated the anti-fraud provisions of Section 17 and Section 10(b).

---

[5] The Court will consider *infra* DAPC's liability as a control person pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). The SEC alleges that DAPC is liable as a control person for violations of both Rule 10b-5 and Section 15(a)(1) of the Exchange Act.

1        <u>1. Section 17(a) and Section 10(b)</u>

2        Generally, Section 17(a) prohibits fraud in the offer or sale of securities, and Section

3   10(b) prohibits fraud in connection with the purchase or sale of any security. <u>See</u> <u>SEC v.</u>

4   <u>Dain Rauscher, Inc.</u>, 254 F.3d 852, 855-56 (9th Cir. 2001). Under Sections 17(a)(1) and (3),

5   it is unlawful for any person to employ any device, scheme, or artifice to defraud, or to

6   engage in any transaction, practice, or course of business which would operate as a fraud or

7   deceit upon the purchaser. 15 U.S.C. § 77q(a)(1),(3). Similarly, Section 10(b) makes it

8   unlawful, in connection with the purchase or sale of a security, "to employ any device,

9   scheme, or artifice to defraud" or "to engage in any act, practice, or course of business which

10  operates or would operate as a fraud or deceit upon any person." 15 U.S.C. § 78j(b); 17

11  C.F.R. § 240.10b-5(a),(c). Section 17(a)(2) makes it unlawful, in the offer or sale of a

12  security by the use of interstate commerce, to obtain money or property by means of any

13  untrue statement of a material fact or any omission to state a material fact necessary in order

14  to make the statements made, in light of the circumstances under which they were made, not

15  misleading. 15 U.S.C. § 77q(a)(2).

16       A showing of scienter is required to establish a violation of Section 17(a)(1) and

17  Section 10(b); however, a violation of Sections 17(a)(2)-(3) requires either a showing of

18  scienter or simple negligence. <u>Aaron v. SEC</u>, 446 U.S. 680, 696-97 (1980). Scienter is

19  defined as a "mental state embracing intent to deceive, manipulate or defraud." <u>Ernst & Ernst</u>

20  <u>v. Hochfelder</u>, 425 U.S. 185, 193 n.12 (1976). In the Ninth Circuit, scienter is established by

21  a showing of either actual knowledge or recklessness. <u>Gebhart v. SEC</u>, 595 F.3d 1034, 1040

22  (9th Cir. 2010). Reckless conduct is conduct that consists of a highly unreasonable act, or

23  omission, that is an extreme departure from the standards of ordinary care, and which

24  presents a danger of misleading buyers or sellers that is either known to the defendant or is

25  so obvious that the actor must have been aware of it. <u>See Dain Rauscher</u>, 254 F.3d at 856

26  (citation and quotation omitted). Negligence, by contrast, is the absence of "reasonable

27  prudence." <u>Id.</u>

28  ///

- 20 -

<u>2. Elements of Liability</u>

To establish liability under both Section 17(a)(1) and Section 10(b), the SEC must show, in the offer or sale, or in connection with the purchase or sale of a security: (1) that Janus Spectrum, Alcorn, and Maerki engaged in a scheme to defraud; (2) with scienter; (3) by means of interstate commerce. <u>See</u> <u>Aaron</u>, 446 U.S. at 696-97; <u>Dain Rauscher</u>, 254 F.3d at 855-56. Alternatively, under Section 17(a)(3), the SEC must show that Janus Spectrum, Alcorn, and Maerki: (1) engaged in a course of business that would operate as a fraud or deceit upon a purchaser; (2) acted at least negligently; (3) by means of interstate commerce. <u>Id.</u>

To establish liability under Section 17(a)(2), the SEC must show, in connection with the offer or sale of a security, that Janus Spectrum, Alcorn, and Maerki: (1) by means of interstate commerce; (2) obtained money or property; (3) by means of a material false statement or omission; and (4) acted at least negligently. <u>Id.</u>

<u>3. Sections 17(a)(1),(3) and Section 10(b)</u>

*a. Scheme to Defraud*

The Court finds that Janus Spectrum, Alcorn, and Maerki engaged in a scheme to defraud and engaged in a fraudulent course of business. (Doc. 192 at 11-14.) The evidence shows that Janus Spectrum, through Alcorn and Maerki, promoted FCC spectrum licenses in the guard and expansion band as the "new black gold" and that the spectrum being promoted was high demand spectrum that is already in use with current income streams. (<u>Id.</u>)

Maerki, in his presentation entitled "Money from Thin Air," misled investors assuring them that either Sprint, Verizon, AT&T, or T-Mobile were going to lease back from investors this spectrum on the guard or expansion band, paying investors a monthly fee, when in reality the major wireless carriers such as Sprint could not and would not use that spectrum to operate technology for cellular voice and data services due to the expansion or guard band channel only being authorized by the FCC to use a maximum bandwidth of 20 kilohertz. (Docs. 137-5, 192 at 3-4.) The cellular voice and data technology used by the major wireless carriers requires a minimum bandwidth of 1.25 to 1.4 MHz. (Doc. 192 at 4.) Despite this

reality, Maerki claimed that "Sprint or somebody [like] them" does not want to lose their capacity and would "probably lease it back [from] you [the investor] and pay you $4,800 a month." (Doc. 137-5 at 34.) Maerki continued, "Sprint is going to need [the 800 MHz spectrum] . . . But if they don't take it, AT&T needs it, and so does Verizon. More importantly T-Mobile really needs it. So do the other ones." (Id. at 34-35.) Maerki also asserted the expected revenues that could be realized from owning spectrum licenses: "They have 360 channels in that area, dividing that into the million, they're making about $3,000 a channel. Your license in that area, should you select to be in that area, would be for four channels times $3,000 or $12,000 a month. Wow." (Id. at 34.) Maerki continued: "In summary, let's put it this way. There is a limited number of available licenses. Of course, it's on a first come/first serve basis, very unique income stream opportunity, own somebody else's income stream that they have to give up. Very low risk, As a result, very high income. Small investment, high value, certainly work free . . . How long before I make money? We have discussed that, a year or two years unless it's a border, two to five years. Why isn't everyone doing this? Simply, they haven't learned about it yet . . . Urgency? Yes. First come/first serve. These will be gone in three to five months." (Id. at 35-37.) In fact, Alcorn even spoke with a person in the legal department at Sprint and was told that Sprint would not have an interest in Janus Spectrum's licenses and that Sprint was forbidden from buying them. (Doc. 192 at 21.)

This was reckless conduct. The prospective spectrum licenses at issue were not already in use generating current income streams. Janus Spectrum, through Alcorn and Maerki, made statements in presentations and emails that materially misled investors. (Doc. 192 at 11-14.) The undisputed evidence show that they knew that the spectrum being sold had little or no value. (Id.) It is reckless conduct for an actor to mislead buyers when it is either known to the defendant or is so obvious that the actor must have been aware of it. See Dain Rauscher, 254 F.3d at 856. Janus Spectrum, through Alcorn and Maerki, knew that these representations about the value and uses of the spectrum being promoted, the expansion and guard bands, the alleged need for application urgency, and the ease to which those

licenses could be monetized, were all false. (Doc. 192 at 11-14.) Maerki also falsely claimed that "demand for 600,700, 800, and 900 MHz spectrum is the most efficient out there. That is what we are talking about today, those are the Rolls Royce of spectrum." (Doc. 137-5 at 25.) Rather, the undisputed evidence establishes that the 800 MHz spectrum licenses that Janus Spectrum, through Alcorn and Maerki, was promoting and selling through the Fundraising Entities had little or no value. (See Docs. 89-11, 89-12, 89-25 and 89-44.) The evidence shows that, unlike the broadband spectrum used by major cellular companies which can carry data, video and voice transmissions, the narrow spectrum being promoted and applied for could only be used for discrete purposes, such as push-to-talk, walkie-talkie-type radios used by dispatchers, and machine-to-machine communications. (Doc. 96 at 8-9.)

Janus Spectrum charged it clients $40,000 per spectrum license application. Alcorn and Maerki led their clients to believe that the $40,000 application fee was covering the actual cost for applying for FCC spectrum licenses in the 800 MHz expansion band and guard band. (Doc. 192 at 17.) In fact, Janus Spectrum paid Tusa Engineering approximately $4,000 per application. (Id.) In addition to the license application fees Janus Spectrum paid to Tusa Engineering, Janus Spectrum paid $410 per license application for FCC filing fees, and $300 per channel to RadioSoft for frequency coordination services. (Id.) In order to avoid disclosing to Janus Spectrum's clients/investors how much it was paying Tusa Engineering to prepare license applications, Alcorn asked Tusa Engineering for invoices that described the services provided and stated "paid in full" but did not specify a dollar amount. (Id.)

In addition to these fraudulent representations, Maerki failed to disclose his extensive disciplinary history in the securities industry. For instance, in 1984, Maerki was sued by the SEC for securities fraud and permanently enjoined from participating in the securities industry due to violations of the registration and antifraud provisions of the federal securities laws based on his offer and sale of investment contracts.(Doc. 192 at 18-19); see also SEC v. Prater, 289 F. Supp. 2d 39, 52-53 (D. Conn. 2003) (stating that "[t]he failure to disclose anywhere on the websites or in other materials any information about [Defendant's]

extensive criminal history, including convictions for fraud, would certainly constitute a material omission which a reasonable investor might view as important in deciding whether to trust their money with [Defendant] or his company.")

Further, Alcorn prepared "commission side letters" for Johnson and Chadwick to conceal their 33% commissions from their investors. (Doc. 192 at 9.) Alcorn also created a "pro forma" estimate of the value of licenses in the expansion and guard bands in the top 25 economic areas and forwarded it Janus Spectrum's clients, including Bank, Jones, Johnson and Chadwick, for their use in soliciting investors. Alcorn estimated annual returns ranging up to 3373% depending on the economic area, and an average annual return from all 25 economic areas of 298%. (Id. at 13.)

Thus, based on all of the above evidence, Janus Spectrum, Alcorn, and Maerki, violated the anti-fraud provisions of Section 17 of the Securities Act and Section 10(b) of the Exchange Act.

### b. Scienter

Next, the Court finds that Janus Spectrum, through Alcorn and Maerki, engaged in reckless conduct, therefore meeting the scienter requirement. (Doc. 192 at 18-19.) Reckless conduct is conduct that consists of a highly unreasonable act, or omission, that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it. See Dain Rauscher, 254 F.3d at 856. Recklessness may also be inferred from circumstantial evidence. SEC v. Burns, 816 F.2d 471, 474 (9th Cir.1987).

The Court has already discussed the factual basis for its finding of reckless conduct undertaken by Janus Spectrum, through Alcorn and Maerki. (See supra at 21-24.) In addition, the facts also show that Alcorn and Maerki did not conduct their required due diligence on the value or potential uses of the FCC spectrum licenses in the guard and expansion band, and were repeatedly warned in trade articles, in conversations with Sprint, and by their own advisors, that their underlying business model of leasing the FCC spectrum back to Sprint could not succeed. (Doc. 192 at 18-22.)

- 24 -

For instance, Alcorn and Maerki received and read copy of a March 5, 2012, newsletter published by Communications Daily, a reputable industry publication, which contained an article entitled "Phoenix Company Prepares License Application for Not-Yet Available Spectrum," discussing Smartcomm. (Doc. 145-8.) In the article it states that Smartcomm "is marketing license preparation services for spectrum the FCC is not even close to making available, and which may have little value when it does." (Id.) The article notes that Smartcomm charged $42,000 per application for 800 MHz licenses, up to 280 times what others are charging for similar services. (Id.) The article also discusses Pendelton Waugh, the founder of Smartcomm, and his prior criminal convictions for securities fraud, conspiracy to structure financial transactions to evade securities and banking reporting requirements, and prior securities fraud lawsuit brought by the SEC. (Id.) The article also notes that the spectrum at issue was located in the expansion and guard bands, and will not work for broadband because each channel is only 25kHz, and would only be attractive to private businesses like pizza restaurants who might use the push to talk media to communicate with its delivery drivers. (Id.) The article also quotes Alan Tilles, a Washington, D.C. area lawyer specializing in FCC work, who stated "There will be at some point a way to apply for these frequencies. The better question is why would you apply for them." (Docs. 145-8, 152-9 at 25-27.) In fact, in March 2012, Tilles told Alcorn that "There's NO spectrum below 861 MHz (and above 851 MHz) that can be used for any kind of broadband." (Doc. 151.)

Furthermore, as all of this relates to Janus Spectrum, since a corporation acts through its officers, the culpability of an entity's principals is imputed to the corporation. See, e.g., SEC v. Platforms Wireless Int'l Corp., 559 F. Supp. 2d 1091, 1096 (S.D. Cal. 2008) (citation omitted).

### c. Interstate Commerce

Although Janus Spectrum, Alcorn, and Maerki did not directly offer or sell the Fundraising Entities' securities, they did so indirectly as they were both "a necessary participant and substantial factor" in all of the Fundraising Entities' offerings and sale of

securities. Without question, the Fundraising Entities sold securities to investors nationwide, thus establishing interstate commerce. (Doc. 192 at 7-11.) For instance, Jones, by selling membership interests in PSG, raised a total of $407,050 from 13 nationwide investors, which was pooled to invest in spectrum licenses. (Id. at 10-11.)

### d. Conclusion

The SEC has established all of the elements showing that Janus Spectrum, Alcorn, and Maerki violated Sections 17(a)(1),(3) and Section 10(b) by undisputable evidence. The SEC unequivocally demonstrated that Janus Spectrum, Alcorn, and Maerki, in connection with the offer or sale of a security, were engaged in a scheme to defraud investors with scienter, and did so through means of interstate commerce. Therefore, the SEC is entitled to summary judgment against Janus Spectrum, Alcorn, and Maerki on the SEC's First and Second Claim for Relief for violations of Sections 17(a)(1),(3) and Section 10(b). (Doc. 105 at 28-29.)

### 4. Section 17(a)(2)

In order to establish a violation of Section 17(a)(2), the SEC must show that Janus Spectrum, Alcorn, and Maerki, in connection with the offer or sale of a security, (1) by means of interstate commerce; (2) obtained money or property; (3) by means of a material false statement or omission; and (4) acted at least negligently. See Aaron, 446 U.S. at 696-97. The misstatements and omissions must concern material facts. Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988). A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. See TSC Indus. v. Northway, 426 U.S. 438, 449 (1976). Liability arises not only from affirmative representations but also from failures to disclose material information. Dain Rauscher, 254 F.3d at 855-56. The antifraud provisions impose a duty to disclose material facts that are necessary to make disclosed statements not misleading, whether mandatory or volunteered. SEC v. Fehn, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996) (further citation and quotation omitted). Moreover, whether a statement or omission is material is determined as a matter of law where the statement or omission is so obviously important to an investor, that reasonable minds cannot differ on the question of materiality. See Murphy, 626 F.2d at 653

- 26 -

("surely the materiality of information relating to financial condition, solvency and profitability is not subject to serious challenge").

The Court has already found that although Janus Spectrum, Alcorn, and Maerki did not directly offer or sell the Fundraising Entities' securities, they were intimately involved and thus were both "a necessary participant and substantial factor" in all of the Fundraising Entities' offerings and sale of securities by means of interstate commerce. The Court has further found that Janus Spectrum, Alcorn, and Maerki were engaged in a scheme to defraud investors with scienter, and therefore, the Court need not repeat the evidence utilized to establish these elements. All that remains is the element of whether Janus Spectrum, Alcorn, and Maerki defrauded investors by means of material false statement(s) or omission(s).

*a. Material False Statement or Omission*

The Court finds that the following facts were material because there is a substantial likelihood that a reasonable investor would consider them important prior to making an investment decision. See TSC Indus., 426 U.S. at 449. First, Janus Spectrum, Alcorn and Maerki's statements regarding the value and potential uses of licenses in the expansion and guard bands were materially false and misleading and they knew that their statements were false and misleading. (Doc. 192 at 15.) All of the high investment returns that were represented to investors were based on leasing to major wireless carriers, such as Sprint, Verizon, AT&T, and T-Mobile. (Id.) Because investors would not be able to lease to major wireless carriers, and instead only had the option to lease to a small business, or create a new business from the ground up, greatly diminished the represented value of the licenses. (Id.) The misstatements made by Janus Spectrum, through Alcorn and Maerki, were material to a reasonable investor, as there would have been no reason for a reasonable investor to pay tens of thousands of dollars for a license application for an investment that had little value. See, e.g., SEC v. Research Automation Corp., 585 F.2d 31, 35 (2d Cir. 1978) (finding materiality of misleading statements and omissions established because a reasonable investor would want to know if his investment is being diverted to company officers); see also SEC v. First Pac. Bancorp, 142 F.3d 1186, 1189, n.3 (9th Cir.1998) (discussing diversion of

1   investor funds in the context of securities fraud and disgorgement).

2       Janus Spectrum, Alcorn and Maerki also misled investors by showing Maerki's

3   "Money From Thin Air" video, in which Maerki said that the spectrum at issue for licensing

4   was "High demand spectrum that's already in use with current income streams." (Doc. 137-5

5   at 20.) In fact, no channel that was available in the expansion or guard bands that Janus

6   Spectrum, Alcorn and Maerki, through Maerki, was promoting had any existing income

7   stream. (Doc. 192 at 15.)

8       Next, Janus Spectrum, Alcorn and Maerkis' representations that the investment was

9   "low risk" and "work free" were equally false and misleading. (Id. at 16.) The FCC will not

10  sell an expansion or guard band license until an operating system is in place. (Id.) Thus, FCC

11  regulations require, prior to sale of an expansion or guard band license, that the licensee build

12  and operate a bona fide transmission system. (Id.) Buildout requirements ensure that

13  spectrum will be used efficiently. (Id.) If the licensee does not build a transmission system

14  within one year, the FCC will cancel the license. (Id.)

15      Finally, it was false for Janus Spectrum, Alcorn and Maerki to represent to potential

16  investors that it was important to apply for the FCC licenses as quickly as possible because

17  the licenses were going to be issued by the FCC on a first-come, first-served basis. (Id. at 16-

18  17.) These statements about application urgency were false and misleading to investors.

19  There was no need to prepare applications, or to solicit payments for such applications before

20  the FCC issued a Public Notice opening up a particular geographic area. (Id.) The majority

21  of the license applications created for Janus Spectrum clients were for geographic areas that

22  were not subject to the FCC's first or second Public Notice. (Id. at 17.) As a result, the

23  majority of the license applications created for Janus Spectrum's clients were for geographic

24  areas for which the expansion and guard band licenses were not available at that time. (Id.)

25          b. Conclusion

26      Therefore, based on the above false statements and omissions, the SEC has

27  demonstrated that Janus Spectrum, through Alcorn and Maerki's actions violated Section

28  17(a)(2). The SEC has shown that Janus Spectrum, Alcorn and Maerki acted at least

negligently in marketing this investment scheme through the Fundraising Entities to prospective investors. In connection with the offer or sale of a security and through interstate commerce, Janus Spectrum, Alcorn and Maerki obtained money or property by means of these materially false statements and omissions. See Aaron, 446 U.S. at 696-97. The Court further finds that Janus Spectrum, Alcorn and Maerki's false statements, misrepresentations, and omissions were material to investors since they concerned the fundamental, underlying value of the FCC spectrum licenses. See, e.g., Murphy, 626 F.2d at 653 (stating that the materiality of information is not subject to serious challenge when it relates to financial condition, solvency and profitability).

Therefore, the SEC is entitled to summary judgment against Janus Spectrum, Alcorn and Maerki on the SEC's First Claim for Relief for violation of Section 17(a)(2). (Doc. 105 at 28.)

*C. SEC's Section 15 Allegations Against Janus Spectrum, Alcorn and Maerki*

The SEC alleges that Janus Spectrum, Alcorn, Maerki, and DAPC as a control person, violated Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1) ("Section 15").[6] (Doc. 191 at 19-21.)  The SEC argues that Janus Spectrum, Alcorn and Maerki violated Section 15(a)(1) because Section 15(a)(1) makes it unlawful for a broker or dealer "to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security" unless such broker or dealer is registered with the SEC in accordance with Section 15(b). (Id.) The SEC need not prove the broker's scienter to establish a violation of Section 15(a). See SEC v. National Exec. Planners, Ltd., 503 F. Supp. 1066, 1073 (M.D. N.C. 1980).

The Alcorn Defendants contend that nothing links these Defendants to solicitations to these investors. (Doc. 210 at 17.)

Section 3(a)(4)(A) of the Exchange Act defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. §

---

[6]As mentioned earlier, the Court will consider *infra* DAPC's liability as a control person pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

78c(a)(4)(A). Activities that indicate a person may be a "broker" are: (1) regular participation in securities transactions, (2) employment with the issuer of the securities, (3) payment by commission as opposed to salary, (4) history of selling the securities of other issuers, (5) involvement in advice to investors, and (6) active recruitment of investors. See SEC v. George, 426 F.3d 786, 797 (6th Cir. 2005).

The undisputed evidence demonstrates that Janus Spectrum, Alcorn and Maerki acted as a broker because they actively solicited investors to purchase interests in spectrum licenses through the various Fundraising Entities of Bank, Jones, and Johnson/Chadwick. (Doc. 192 at 11-14.) The Court further finds that Janus Spectrum, Alcorn and Maerki regularly participated in the securities transactions at key points during the formation and closing of investor transactions, as they described the merits of investing in spectrum licenses to potential investors, answered investor questions, and solicited potential investors by email, in one-on-one meetings, and/or held live presentations for potential investors. (Id.) Finally, it is undisputed that neither Janus Spectrum, Alcorn nor Maerki were registered as a broker-dealer with the SEC.

Based on this factual record, the Court concludes that Janus Spectrum, Alcorn and Maerki violated Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78o(a)(1). Therefore, the SEC is entitled to summary judgment against Janus Spectrum, Alcorn and Maerki on the SEC's Fourth Claim for Relief for violation of Section 15(a)(1). (Doc. 105 at 30.)

*D. SEC's Allegations Against DAPC as Control Person*

The SEC alleges that DAPC is liable, as a control person, for Janus Spectrum's violations of Section 10(b) and 15(a)(1) of the Exchange Act. (Doc. 191 at 21-22.)

Under Section 20(a) of the Exchange Act, a person may be held liable for another person's violation of the Exchange Act as a "control person." 15 U.S.C. § 78t(a). Section 20(a) applies to "every person," and Section 3(a)(9) of the Exchange Act expressly defines "person" to include a company. 15 U.S.C. § 78c(a)(9). To establish control person liability under the Exchange Act, the SEC must demonstrate: (1) a violation of the Exchange Act, and (2) that the control person directly or indirectly controls the person liable for the violation.

1  SEC v. Todd, 642 F.3d 1207, 1223-24 (9th Cir. 2011); Hollinger v. Titan Capital Corp., 914

2  F.2d 1564, 1575 (9th Cir. 1990) (*en banc*) (holding it unnecessary to show "culpable

3  participation" by control person). Under Rule 12b-2 of the Exchange Act, control is defined

4  as the "power to direct or cause the direction of the management and policies of a person,

5  whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. §

6  240.12b-2. The SEC need not prove that DAPC was a culpable participant in the violations

7  or that there was the exercise of actual power. Merely possessing the power to control the

8  activities underlying the violations is sufficient. Howard v. Everex Systems, Inc., 228 F.3d

9  1057, 1065 (9th Cir. 2011). However, even if a securities violation occurs, there is no

10  liability if the controlling person acted in good faith and did not directly or indirectly induce

11  the acts constituting the violation. See Id. at 1065 ("A defendant is entitled to a good faith

12  defense if he can show no scienter and an effective lack of participation.")

13      Here, DAPC has actual power or control over Janus Spectrum. (Docs. 128 at 5, 192

14  at 5.) DAPC has always been a managing member of Janus Spectrum, and it has been the

15  sole owner of Janus Spectrum since January 2014 (prior to which it was a 55% owner). (Doc.

16  192 at 5.) According to the operating agreement of Janus Spectrum, DAPC is vested with

17  final decision-making authority on behalf of Janus Spectrum, including all power over its

18  finances and its corporate structure. (Id.)

19      Regarding the proceeds of the fraud, the evidence shows that DAPC received the

20  proceeds, which further demonstrates its control over Janus Spectrum's scheme. (Doc. 185

21  at 6-7); see Arthur Children's Trust v. Keim, 994 F.2d 1390, 1397-98 (9th Cir. 1993)

22  (reversing summary judgment on Section 20(a) claim granted in favor of a director on

23  management committee of issuer who claimed he did not direct the investments at issue,

24  noting that Section 20(a) claim arose "not because he controlled those marketing the

25  investment  contracts but because he was one of the persons controlling the issuer of the

26  investment contracts").

27      The Court finds that DAPC is liable, as a control person, for Janus Spectrum's

28  violations of Section 10(b) and 15(a)(1) of the Exchange Act. Therefore, the SEC is entitled

to summary judgment on the SEC's Second and Fourth Claims for Relief against DAPC as a control person for its violations of Section 10(b) and 15(a)(1) of the Exchange Act. (Doc. 105 at 28-30.)

**IV. RELIEF**

*A. Permanent Injunction*

The SEC argues that here the evidence establishes a reasonable likelihood of a future violation of the securities laws, and therefore a permanent injunction should be granted in this matter. See Murphy, 626 F.2d at 655-56. Factors to be considered by the Court include the degree of scienter involved; the isolated or recurrent nature of the infractions; the defendant's recognition of the wrongful nature of his conduct; the likelihood that, based on the defendant's occupation, future violations might occur; and the sincerity of the defendant's assurances against future violations. Id.

The SEC argues that all of those factors weigh in favor of the Court issuing a permanent injunction. The Court agrees and a permanent injunction will be ordered.

*B. Disgorgement/Prejudgment Interest*

Next, the SEC requests that the Court order disgorgement of illgotten gains. See SEC v. First Pac. Bancorp, 142 F.3d 1186, 1191 (9th Cir. 1998). Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable. Id. Disgorgement usually includes prejudgment interest to ensure that the wrongdoer does not profit from the illegal activity. See SEC v. Manor Nursing Ctr. Inc., 458 F.2d 1082, 1105 (2d Cir. 1972). Disgorgement need be only a "reasonable approximation" of the defendant's ill-gotten gains. See SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1096 (9th Cir. 2010). Once such evidence has been presented by the SEC, the burden shifts to the defendant to "demonstrate that the disgorgement figure was not a reasonable approximation." Id.

Here, the SEC has calculated a reasonable approximation of the amount of ill-gotten gains obtained by Janus Spectrum, DAPC, Alcorn and Maerki. (Doc. 185 at 9.) Based on these calculations, Janus Spectrum, DAPC, Alcorn and Maerki will be ordered to pay

$6,172,360 in disgorgement and to be jointly and severally liable with each other for this disgorgement amount. Joint and several liability is appropriate when codefendants "collaborate or have a close relationship in engaging in the violations of the securities laws." See Platforms Wireless, 617 F.3d at 1098; First Pacific Bancorp, 142 F.3d at 1191-92 (defendants ordered jointly and severally liable even where one co-defendant received no personal benefit because of the closeness of the co-defendants' relationship in orchestrating their fraud).

Janus Spectrum, DAPC, Alcorn and Maerki will also be ordered to pay prejudgment interest from May 1, 2012 to January 13, 2017, the date of filing of the SEC's motion for summary judgment. Prejudgment interest on $6,172,360 for this period is $959,436. (Doc. 193). Thus, the total amount of disgorgement and prejudgment interest owed by Janus Spectrum, DAPC, Alcorn and Maerki, on a joint and several liability basis, is $7,131,796. (Id.)

C. Civil Penalties

Civil penalties are meant to punish the individual wrongdoer and to deter him and others from future securities law violations. SEC v. Lyndon, 39 F. Supp. 3d 1113, 1123 (D. Haw. 2014). Because civil penalties are imposed to deter the wrongdoer from similar conduct in the future, in assessing civil penalties, courts frequently apply the factors set forth in Murphy, 626 F.2d at 655-56, which also determine the appropriateness of injunctive relief. See Lyndon, 39 F. Supp. 3d at 1123-24. Those factors are: the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the likelihood, because of the defendant's professional occupation, that future violations might occur; and the sincerity of the defendants' assurances, if any, against future violations. Murphy, 626 F.2d at 655.

Here, Alcorn's, and Maerki's violations were egregious, recurrent, and involved a high degree of scienter. In addition, Maerki is a recidivist, and neither Alcorn nor Maerki has expressed remorse or given any assurance against future violations.

According to the SEC, the Securities Act and Exchange Act provides that penalties

1    be assessed in accordance with a three-tier system. The third, or highest, tier applies to

2    violations that: (1) involve "fraud, deceit, manipulation, or reckless disregard for a regulatory

3    requirement"; and (2) "directly or indirectly resulted in substantial losses or created a

4    significant risk of substantial losses to other persons." 15 U.S.C. §§ 77t(d)(2)(C),

5    78u(d)(3)(B)(iii). For each fraud violation, the maximum third-tier penalty is the greater of

6    (1) $160,000 for each violation occurring after March 5, 2013, or (2) the "gross amount of

7    pecuniary gain" to the defendant as a result of the violation. 15 U.S.C. §§ 77t(d)(2)(C),

8    78u(d)(3)(B)(iii); 17 C.F.R. § 201.1004 & 201.1005 & Tables IV & V (2014).

9    In addition to disgorgement and prejudgment interest, the Court will assess civil

10   penalties against Alcorn and Maerki in an amount to be determined at a future hearing.

11   **V. CONCLUSION**

12   Accordingly, based on the foregoing,

13   **IT IS HEREBY ORDERED** granting the Plaintiff SEC's Motion for Summary

14   Judgment against Defendants Janus Spectrum, David Alcorn Professional Corporation,

15   David Alcorn and Kent Maerki. (Doc. 191.)

16   **IT IS FURTHER ORDERED** denying Defendants Janus Spectrum LLC, David

17   Alcorn, and David Alcorn Professional Corporation's motion to strike "Plaintiff SEC's

18   Objection to Alcorn Defendant's Index and Supplementary Declaration of Sana Muttalib."

19   (Doc. 221.)

20   **IT IS FURTHER ORDERED** establishing **Friday, October 27, 2017**, as the

21   deadline for the SEC to file its motion for disgorgement, prejudgment interest, and civil

22   penalties against Judgment Defendants Daryl Bank; Dominion Private Client Group, LLC;

23   Janus Spectrum Group, LLC; Spectrum Management, LLC; Spectrum 100, LLC; Spectrum

24   100 Management, LLC; Prime Spectrum, LLC; and Prime Spectrum Management, LLC.

25   **IT IS FURTHER ORDERED** setting a hearing on civil penalties against Alcorn and

26   Maerki for **Tuesday, December 5, 2017, at 2:00 p.m.** in Courtroom 401, 401 West

27   ///

28   ///

1    Washington Street, Phoenix, AZ, before Senior Judge Stephen M. McNamee.

2         DATED this 29th day of September, 2017.

3

4    _____

5                          Stephen M. McNamee
                 Senior United States District Judge
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28