IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
*Norfolk Division*

UNITED STATES OF AMERICA,

v.

AGHEE WILLIAM SMITH, II,
          Defendant.

Criminal No. 2:19-cr-47-3

**SMITH'S REPLY IN SUPPORT OF MOTION TO PRECLUDE TRIAL ADMISSION OF DEPOSITION TESTIMONY UNDER CONFRONTATION CLAUSE**

The defendant, Aghee William Smith, II, invoked the right to confront and cross-examine witnesses against him in court before the jury. *See* ECF No. 224. The government wants to break from the deeply-rooted historic practice of in-court confrontation – a Sixth Amendment guarantee – and instead offer at trial three video depositions taken in Sacramento, California, on November 5, 2021. *See* ECF No. 294.

The government does not dispute that the Sixth Amendment precludes admitting the deposition testimony of VH, SB, and KS unless it establishes that the witnesses are unavailable to testify in court at trial. ECF No. 294, at 4. The Supreme Court held as much in *Crawford v. Washington*, when it wrote that testimonial statements of witnesses absent from trial may be admitted "*only where the declarant is unavailable*, and only where the defendant has had a prior opportunity to cross-examine." 541 U.S. 36, 59 (2004) (emphasis added). The government spends much of its brief discussing Federal Rule of Evidence 804's unavailability provisions and Federal Rule of Criminal Procedure 15's procedures for taking depositions. But it is axiomatic that such rules cannot "abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072. Thus, when assessing a defendant's rights under the Confrontation Clause, "the 'unavailability' of a witness is ultimately a constitutional question rather than one of the interpretation of statutorily created rules of evidence." *State v. Carroll*, 513 A.2d 1159, 1160 (Vt. 1986).

1

Witness unavailability under the Sixth Amendment must be analyzed through a historical lens. The Supreme Court "held in *Crawford* that the Confrontation Clause is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding." *Giles v. California*, 554 U.S. 353, 358 (2008) (quotation marks omitted). Later in *Giles*, the Supreme Court again reaffirmed the historical nature of the Confrontation Clause inquiry when it held that "the State's proposed exception to the right of confrontation [in *Giles* was] plainly not an exception established at the time of the founding." *Id.* (cleaned up).

The question here is whether the government has proven that VH, SB, and KS are "unavailable" under the unavailability framework established as an exception to the right to in-court confrontation at the time of the founding. The government failed to do so.

I. **Generalized concerns about COVID-19 do not render every out-of-state witness over age 63 "unavailable" under the Sixth Amendment.**

The government's first argument is that COVID-19 makes it dangerous for these witnesses to travel from their homes in California to where the government elected to charge this case in Norfolk, Virginia. There is no denying the seriousness of the COVID-19 pandemic. But the government here claims that three witnesses are "unavailable" to testify at trial *solely* due to their age and the need to travel during in February 2022. Unavailability cannot be established on that basis.

Notably, the government does not offer any preexisting condition or risk factor for these witnesses other than age. The government relies on age and age alone. KS is 64 years old, SB is 81, and VH is 73. Without some additional showing, age does not render these witnesses categorically unavailable.

By trial, COVID-19 vaccines will have been available for over a year.[1] In the post-vaccine world, even older people have traveled safely. For example, Dusty Baker is 72 years old. Yet he just

---

[1] Peter Loftus & Melanie Grayce West, *First Covid-19 Vaccine Given to U.S. Public: A nurse in New York was among the first to receive the shot Monday morning*, Wall St. J. (Dec. 14, 2020), ("The first U.S.

2

managed the Houston Astros for an entire Major League Baseball season. He traveled across the country for the 162-game regular season and then through the playoffs to a World Series appearance.[2] Baseball is important and a treasured part of American history. But it's not as important as the Sixth Amendment.

Mr. Smith – a defendant in this case who lives in the Sacramento area – is 70 years old himself. The government does not assert that Mr. Smith's age and residence in California make it impossible for him to appear at trial. And Mr. Smith is not even vaccinated. Is it the government's position that Mr. Smith can travel safely to Virginia for trial and yet these witnesses cannot?

To be clear, the government is not claiming that the age of these witnesses has rendered them sick or infirm. The government's COVID-19 argument is simply that the age of the witness along with the need to travel from Sacramento renders them unavailable due to the risk that they might become infected with the virus. That proves too much.

Critically, the government declined to tell the Court whether VH, SB, or KS are vaccinated against COVID-19. Counsel for Mr. Smith has tried to investigate the vaccination status of these witnesses but we have been unable to get an answer from the witnesses. *See* Ex. 1 (Decl. Respecting SB, KS, and VH). Counsel for Mr. Smith also asked the government to provide the vaccination status of the witnesses. *See* Ex.2 (Email from A. Grindrod to E. Yusi (Nov. 19, 2021)). The government never responded. If these witnesses are vaccinated, there is no reason they cannot travel safely during the pandemic.

---

Covid-19 vaccinations outside of clinical trials began Monday [December 14, 2020]…."), *available at* https://www.wsj.com/articles/covid-19-vaccinations-in-the-u-s-slated-to-begin-monday-11607941806 (last visited Nov. 23, 2021).

[2] Tim Keown, *World Series 2021: For 24th time as a manager, Houston Astros' Dusty Baker heads home without a title*, ESPN (Nov. 3, 2021), *available at* https://www.espn.com/mlb/story/_/id/32522906/world-series-2021-24th-manager-houston-astros-dusty-baker-heads-home-title (last visited Nov. 16, 2021).

The CDC says that "[a]dults 65 and older who received both doses of either Pfizer-BioNTech or Moderna COVID-19 vaccines showed a 94% reduced risk of COVID-19-related hospitalization."[3] For that reason, the CDC has told vaccinated seniors that they "can participate in many of the activities that you did before the pandemic." *Id.* Just below that statement on the CDC website is a link, directing fully vaccinated senior citizens to those activities they can return to: "**UPDATED** What You Can Do Once You're Fully Vaccinated." *Id.* One of the activities on that list is domestic travel: "Fully vaccinated travelers are less likely to get and spread SARS-CoV-2 and can now travel at low risk to themselves within the United States."[4]

In other contexts, the government has argued and this Court has found that a person's vaccination status seriously alters the risk assessment for COVID-19. For example, in *United States v. Gale*, this Court noted that an obese 58-year-old with "stage 3 chronic kidney disease … hyperlipidemia, uncontrolled hypertension, chronic depression and anxiety, and several additional ailments" could not show extraordinary and compelling reasons for his release from prison because he had "been fully vaccinated." Case No. 4:17cr47, ECF No. 95, at 5 (E.D. Va. May 12, 2021) (Jackson, J.). The Court reached this conclusion based on the CDC's assessment that "COVID-19 vaccines are effective at preventing COVlD-19 disease, especially severe illness and death." *Id.*

It would be surprising if the government did not know whether its witnesses are fully vaccinated. But whether the government has decided not to tell the Court or defense counsel the vaccination status of these witnesses out of a tactical litigation decision or because it neglected to find

---

[3] CDC.gov, *COVID-19 Recommendations for Older Adults*, available at https://www.cdc.gov/aging/covid19-guidance.html (last visited Nov. 23, 2021) (attached as Exhibit 3).
[4] CDC.gov, *Interim Public Health Recommendations for Fully Vaccinated People*, available at https://www.cdc.gov/coronavirus/2019-ncov/vaccines/fully-vaccinated-guidance.html (last visited Nov. 16, 2021) (attached as Exhibit 4).

out, the government cannot meet its burden of proving that the pandemic renders these witnesses unavailable when they all could be fully vaccinated and thus able to travel safely according to the CDC.

In any event, a witness is not unavailable for purposes of the confrontation requirement "unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Ohio v. Roberts*, 448 U.S. 56, 74 (1980), *abrogated in part by Crawford*, 541 U.S. at 36. Nowhere in its motion does the government explain the efforts it made to obtain the presence of these witnesses at trial. These three witnesses all reside in or around Sacramento, California. The government could charter a *single* flight for these three witnesses if it believes that wearing a mask on a commercial flight is insufficient protection against transmission of the virus.[5] It could offer the witnesses the option of driving by car, bus, or RV (or being driven). The government did not discuss whether it explored travel by Amtrak train, which would allow each witness to have a private roomette isolated from all other passengers during the ride from Sacramento to Washington, D.C.; from Washington, D.C., they could take a regular train and social distance or ride by car for that three-hour leg. *See* Exhibit 5 (Amtrak roomette available from Sacramento to Washington, D.C.).

In sum, the government's COVID-19 argument fails because age alone does not make commercial air travel unsafe if someone is vaccinated and the government failed to even proffer vaccination status to the Court. Plus, even if commercial air travel were unsafe for these witnesses (despite the government's failure to make that showing), the government made no good-faith effort to secure the presence of these witnesses through some other travel arrangements.

### II. VH's need to care for her husband does not make her unavailable under the Confrontation Clause.

As the Supreme Court explained in *Crawford*, the confrontation right in England prior to ratification of the Sixth Amendment turned on "relatively strict rules of unavailability." *Crawford*, 541

---

[5] There could be even greater cost savings if the two defendants from Sacramento, Messrs. Smith and Barnett, took the same chartered flight.

U.S. at 44. *See generally* Tim Donaldson, *Gradually Exploded: Confrontation vs. The Former Testimony Rule*, 46 St. Mary's L.J. 137, 156 (2015) (collecting cases). Although death or inability to travel could suffice, the government has cited zero cases in which a witness was deemed unavailable for confrontation purposes based on the need to care for a spouse. *Cf. United States v. Newbern*, 451 F. App'x 242, 248 (3d Cir. 2011) ("Binyon is not unavailable; the fact that she is taking care of Newbern's child does not establish unavailability as a matter of law.").

No doubt, VH's commitment to her husband is laudable. But the husband appears able to provide basic care for himself. He appeared at VH's deposition in California dressed in a suit and he walked under his own power (though with the assistance of a cane). Moreover, in her initial interview with government investigators, VH did not claim that she was *unable* to travel to Virginia for trial. She said "it would [ ] be difficult for her to travel because she needed to take care of [SH]." *See* Ex. 6 (Memorandum of Interview with VH). At the same time, VH and SH have four children and 15 grandchildren. *Id.* Even if caring for a family member could in theory make a witness unavailable for purposes of the Confrontation Clause, the government has not shown why one of VH's adult children or grandchildren could not look after SH while VH is in Virginia for a day or two. Nor has the government explained what good-faith efforts it took to make it possible for VH to attend the trial in Virginia. The government has perhaps shown that it would be inconvenient for VH to appear in Virginia. But neither unavailability nor the Sixth Amendment turn on matters of convenience.

      **III.**     **The government failed to meet its burden of proving that SB's mental condition renders her unavailable for purposes of the Sixth Amendment.**

The Supreme Court of Idaho recently addressed the question whether (and under what circumstances) a witness's mental illness can render her unavailable for purposes of the Confrontation Clause. *See State v. Anderson*, 402 P.3d 1063, 1069 (Idaho 2017). The court recognized that "despite the importance of the Confrontation Clause, relatively little federal clarification has been provided with respect to what makes a witness unavailable," and observed that "the United States Supreme Court

has not issued any opinions establishing a standard for unavailability due to mental illness." *Id.* But the court canvassed the existing precedent and determined that mental illness can render a witness unavailable, but the court must assess the effects of the mental illness and what the witness is capable of. *Id.*

In *Anderson*, the court ultimately concluded that the government had *failed* to meet its burden of proving that the witness's mental illness rendered her unavailable for purposes of the confrontation right:

> [T]he State failed to produce sufficient evidence to demonstrate that Messerly was unavailable to testify at the time of trial. The affidavit from Dr. Eric J. Heidenreich and the testimony of Lisa Bunker are insufficient to establish that Messerly was physically, emotionally, or mentally precluded from testifying at trial. Dr. Heidenreich opined that "testifying would put Ms. Messerly at substantial risk for relapse on controlled substances and pose a significant risk to her mental health." Bunker testified that "[Messerly] has a very fragile, if you will, mental health state, and it is our belief that it would re-traumatize her at this point in time." While this Court is sensitive to the adverse emotional effects associated with providing testimony of a traumatic event, the aforementioned testimony does not demonstrate that Messerly was unavailable. In this case, the concern was regarding a possible relapse due to her fragile mental state. As noted by the court in *Burns*, the severity of the mental illness itself may not automatically render a witness unavailable. The judge must consider the symptoms, what tasks a witness is then capable of. *See Burns* [v. *Clusen*, 798 F.2d 931, 937 (7th Cir. 1986)] Indeed, Messerly was able to provide testimony, albeit with breaks, at the preliminary hearing.

*Anderson*, 402 P.3d at 1070.

Here, SB's mental condition is entirely self-reported. The government has provided no medical evidence to the Court either substantiating her history of mental illness or explaining the implications of her current condition with respect to travel. This is so even though the defense specifically challenged the government's proffer and asserted that medical evidence was required to substantiate a government claim as to unavailability due to illness. *See* ECF No. 224, at 4. The only corroboration

of SB's self-declared medical condition is a Postal Inspector's conclusory observation that, when he met with SB on the day of her deposition, she "appeared extremely anxious." ECF No. 294-4, at 3.

The absence of any medical evidence whatsoever to support the government's unavailability proffer is especially curious when one compares the government's representations to the Court and SB's own statements about her condition. For example, the government asserts that SB suffered "a complete mental breakdown" and "continues to have extreme, crippling anxiety that makes her unable to travel." ECF No. 294, at 7. Yet SB stated that this mental and emotional breakdown happened sometime in the 1970s or 1980s; and SB twice described herself as having "recovered" from it after eight years of therapy. In fact, SB noted that she "did do a little speaking" to women's business groups after she "recovered." The relevant excerpts from her deposition testimony are included here:

```
16   Q        How long did you work at the telephone company for?
17   A        25 years.
18   Q        And when did you stop working?
19   A        When I had a complete mental and emotional breakdown
20   on the job.
21   Q        When was that?  Do you recall approximately?
22   A        I don't know.  Somewhere in -- I don't know if it
23   was '80s or the '70s.
24   Q        Okay.
25   A        I don't know.  It's just a long time ago.
```

SB Dep. Tr. 11:16-25.

```
 1   Q      And back -- you had worked for AT&T for 25 years,
 2   right?
 3   A      Yes.
 4   Q      You were a marketing representative?
 5   A      I had a lot of different jobs and worked my way up
 6   in the company, yes.
 7   Q      And one of those jobs was marketing representative,
 8   right?
 9   A      Yes.
10   Q      Another one was doing work with, like, telephone
11   orders, taking orders --
12          (Reporter clarification.)
13          MR. GRINDROD:  Sorry.
14   BY MR. GRINDROD:
15   Q      -- setting up systems, moving systems, telephone
16   systems?
17   A      Yes.
18   Q      And then you worked as a computer operation's
19   manager there, right?
20   A      Yes.
21   Q      And then after you left AT&T, you were -- sometimes
22   were a speaker at business women's groups?
23   A      After I recovered from having an on-the-job mental
24   and emotional breakdown, when I recovered after eight years
25   working with a counselor, yes.  I did do a little speaking
```

```
 1   of, you know, don't push yourself over the edge because you
 2   don't know if you can get back, because it took me a long
 3   time to get back.
```

*Id.* at 50:1-51:3.

Finally, there is conflicting evidence as to what SB can do notwithstanding her proffered mental condition. SB was able to attend and participate in a deposition in Sacramento, California, on November 5, 2021. *Id.* So her condition does not present any impediment to appearing and answering questions in a court. The only purported problem is that – according to SB – her anxiety prevents her from *traveling* to Virginia to appear physically at the trial in this matter. Yet in an interview with a defense investigator, SB indicated that she plans to move from California to Northern Virginia sometime soon to live with her son who resides there. Ex. 1, at ¶ 1. Thus, travel to Virginia is apparently not *impossible*. The government has not explained how a witness who plans to move to Virginia is at the same time unable to travel to Virginia for a different reason—*i.e.*, to ensure that Mr. Smith's constitutional rights are protected.

If the government does not want to inconvenience witnesses, it does not have to call them. But if the government wants to use these witnesses as a tool for condemning Mr. Smith to prison, it must make a good-faith effort to bring them to court. SB is not truly unable to travel to Virginia, so she is not "unavailable." Thus, the Sixth Amendment bars the introduction of her out-of-court video deposition.

\*   \*   \*

Before deposition testimony may be admitted at trial, the government must establish the unavailability of the witness as historically understood under the Confrontation Clause. The government has not made that showing. In such circumstances, the Sixth Amendment gives Mr. Smith the right to personally confront and cross-examine these witnesses in front of the jury.

10

Respectfully submitted,

AGHEE WILLIAM SMITH, II

By:_____/s/_____
Lindsay Jo McCaslin
VSB No. 78800

Andrew W. Grindrod
VSB No. 83943

Assistant Federal Public Defenders
Attorneys for Aghee William Smith, II
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
Telephone: 757-457-0800
Telefax: 757-457-0880
Email: lindsay_mccaslin@fd.org