

FILED
IN OPEN COURT

MAY 5 2018

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Criminal No. 2:17cr126 |
| | ) |
| DARYL G. BANK, | ) 18 U.S.C. § 1349 |
| (Counts 1-28) | ) Conspiracy to Commit Mail and Wire Fraud |
| | ) (Count 1) |
| | ) |
| RAEANN GIBSON, | ) 18 U.S.C. §§ 1341 and 2 |
| (Counts 1-28) | ) Mail Fraud |
| | ) (Counts 2-6) |
| and | ) |
| | ) 18 U.S.C. §§ 1343 and 2 |
| BILLY J. SEABOLT | ) Wire Fraud |
| (Counts 1-22, 28) | ) (Counts 7-12) |
| Defendants. | ) |
| | ) 18 U.S.C. § 371 |
| | ) Conspiracy to Sell Unregistered Securities |
| | ) and to Commit Securities Fraud |
| | ) (Count 13) |
| | ) |
| | ) 15 U.S.C. §§ 77e, 77x and 18 U.S.C. § 2 |
| | ) Sale of Unregistered Securities |
| | ) (Counts 14-18) |
| | ) |
| | ) 15 U.S.C. §§ 77q, 77x and 18 U.S.C. § 2 |
| | ) Securities Fraud |
| | ) (Counts 19-22) |
| | ) |
| | ) 18 U.S.C. § 1956(h) |
| | ) Conspiracy to Launder Monetary |
| | ) Instruments |
| | ) (Count 23) |
| | ) |
| | ) 18 U.S.C. §§ 1957 and 2 |
| | ) Unlawful Monetary Transactions |
| | ) (Counts 24-28) |
| | ) |
| | ) 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1) |
| | ) 28 U.S.C. § 2461 |
| | ) Criminal Forfeiture |

SECOND SUPERSEDING INDICTMENT

May 2018 Term – at Norfolk, Virginia

THE GRAND JURY CHARGES THAT:

At all times relevant to this Second Superseding Indictment, unless otherwise stated:

GENERAL ALLEGATIONS

1.      DARYL G. BANK ("BANK") created, owned, and operated Dominion Investment Group, LLC ("DIG").  DIG was a Virginia limited liability company with offices operating from 4301 Commuter Drive, Virginia Beach, Virginia, 1391 NW St. Lucie West Boulevard, Port St. Lucie, Florida, and 1100 SW St. Lucie West Boulevard, Port St. Lucie, Florida.  BANK was the managing member of DIG with approximately an 85% ownership interest in the company.

2.      RAEANN GIBSON ("GIBSON") was the Director of Operations of DIG. GIBSON ran the day-to-day operations of DIG.  GIBSON owned an estimated 10% interest in DIG.

3.      BILLY J. SEABOLT ("SEABOLT") was an attorney licensed in the Commonwealth of Virginia.  SEABOLT owned and operated his own law firm called the Family Wealth Law Group, P.C.  SEABOLT's offices were located in Williamsburg and Lynchburg, Virginia.  SEABOLT specialized in wills, estates, trusts and elder law.  However, with regard to DIG and affiliated offerings, SEABOLT reviewed investment offerings, negotiated funding agreements, served as the registered agent for limited liability companies, provided estate

2

services for BANK's clients, and assisted in concealing the failure of investment offerings and lulling victims.

4.　　BayPort Credit Union was a federally-insured credit union that operated in the Eastern District of Virginia.

5.　　Oculina Bank was a federally-insured bank that operated in Florida.

6.　　BANK created, owned, and operated Dominion Private Client Group, LLC ("DPCG"). DPCG was a Virginia limited liability company with its principal place of business initially in Virginia Beach, Virginia. BANK was the managing member of DPCG. BANK, GIBSON, SEABOLT, and others used DPCG to offer various Investment Offerings to potential investors. Many of the investors were retirees with limited assets.

7.　　The Financial Industry Regulatory Authority, Inc. ("FINRA") is a private organization authorized by Congress to protect investors by making sure the broker-dealer industry operates in a fair and honest manner. On February 5, 2010, after an investigation, FINRA issued a final order concluding that BANK had, among other things, misappropriated funds, provided false information during FINRA interviews, and created inaccurate books and records. As a result, FINRA issued an order permanently barring BANK from professionally associating with any FINRA member in any capacity. For all practical purposes, the FINRA ban prevented BANK from associating with any FINRA-licensed broker/dealer authorized to sell securities.

8.　　Despite the FINRA ban, BANK, GIBSON, SEABOLT, and others created, promoted, and sold fraudulent "private equity" investment opportunities. These investment opportunities were unregistered, securities. BANK, GIBSON, SEABOLT, and others made

3

material misrepresentations and omissions to sell the illiquid, high risk securities to investors in the Eastern District of Virginia and across the country. BANK, GIBSON, SEABOLT, and others failed to disclose that FINRA had banned BANK for fraudulent activities, that BANK and GIBSON funneled investment funds through entities that BANK controlled, and that BANK and GIBSON almost immediately misappropriated substantial portions of investment funds for undisclosed personal and business purposes.

DENTAL SUPPORT PLUS "FRANCHISES" AND DSPF GROUP

9.      Starting in or about December 2011, BANK and others pitched an investment offering from DIG and Dominion Franchise, LLC to his clients and sales force. The advertisement offered an "absentee-owned fully-managed dental support franchise with a 5-year track record producing annual profits up to 40% or more." The investors would "own" a Dental Support Plus "franchise" that they would not have to manage. The franchise would refer patients to dentists and, in turn, investors would receive 16.5% of patient collections with "profits taken BEFORE expenses, not AFTER expenses." The advertisement stated that a franchise unit cost $25,000 and that the franchise would be "fully operational" within 180 days. Conspirator #1 was the founder and President of Dental Support Plus. In truth and in fact, these "franchises" were unregistered securities.

10.      BANK represented, and caused to be represented, to investors that the Dental Support Plus "franchises" would provide regular income – at least $200 a month – per "franchise unit." BANK falsely represented to his client, TW, that if the franchise did not produce revenue within six months, then TW would be paid $200 per month per franchise from Dental Support. Relying on these and other material misrepresentations and omissions, investors purchased

4

"franchise units." In some instances, clients at and near retirement age with no background in dentistry and no ability to run a franchise purchased multiple "franchise units" each costing $25,000.

11.  According to the Franchise Disclosure Document, the Virginia State Corporation Commission's Division of Securities and Retail Franchising required Dominion Franchise to defer payments of the initial franchise fee owed by franchisees until the franchisor had completed its pre-opening obligations. Despite this limitation, BANK, GIBSON, and others, took investors' funds prior to Dental Support Plus engaging in required actions.

12.  At BANK's and GIBSON's suggestion, many investors held the investment in newly created limited liability companies that BANK and GIBSON controlled. At investor expense, BANK and GIBSON created over 40 limited liability companies in investors' names in Virginia all with the principal place of business at 4301 Commuter Drive, Virginia Beach, Virginia.

13.  From in or about April 2012 through April 2013, BANK and GIBSON opened over 30 bank accounts at BayPort Credit Union on behalf of the investors' limited liability companies. The investors were not signatories on these bank accounts; instead, BANK and GIBSON held signatory authority on investor accounts.

14.  Despite representations that the "franchise units" would earn at least $200 a month starting within 180 days of investment, Dental Support Plus deposited little, if any, funds into investors' bank accounts at BayPort Credit Union. Despite knowing that Dental Support Plus was not fulfilling the promised returns and that the alleged "franchises" were not actually operating, BANK and GIBSON continued to sell the "franchise units" to investors.

5

15.     In or about April 2013, a representative from BayPort Credit Union contacted GIBSON to inquire about the lack of funds in the investor bank accounts. The representative told GIBSON that bank accounts go dormant after one year with no activity and inquired as to why the investors were not receiving the "minimum" guarantee. GIBSON ignored the question about the "minimum guarantee" and justified the lack of funds by stating that there was a problem with a "vendor." Despite knowing that this was a failed investment, BANK and GIBSON continued to sell the "franchise units."

16.     In addition, BANK and GIBSON created a new method for investors to fund "franchises." In late 2012, BANK and GIBSON created, managed, and controlled DSPF Group LLC ("DSPF Group") – an entity aimed at "pooling" investor funds to purchase Dental Support Plus "franchise units." In reality, BANK and GIBSON used DSPF Group to defraud new investors to pay off previous investors in the failed "franchises." BANK and GIBSON also controlled DSPF Management, LLC – an entity purportedly organized to "manage" the investors' funds.

17.     In late 2012, BANK, Conspirator #2 and others prepared an Investment Offering for DSPF Group. Conspirator #2 was the Chief Investment Officer at DPCG. Despite knowing that Dental Support Plus "franchises" were failing, the Investment Offering for DSPF Group claimed that "[f]or some time Dental Support Plus has been offering franchise opportunities to investors in its proven strategy," that "Dental Support Plus Franchise owners … receive 9.97% of all new patient revenue produced from every patient provided by the Dental Support Plus Franchise," and "[t]he Dental Support Plus Franchise model is designed to achieve annual profits up to 30% or more after one or two years in operation." The Investment Offering also falsely

6

represented that "Dental Support Plus offers dentists a turnkey patient delivery system using a proprietary 'direct to consumer' approach within the dentists' communities." The Investment Offering further claimed that "[a]n investment into the Investment Group incurs no fees to the investor. 100% of the investment participates directly in 100% of the pool of franchisees in the Group." This was false as BANK and GIBSON consistently stole approximately 31% of investor funds by transferring investor funds immediately to BANK's companies. Finally, the Investment Offering did not disclose BANK's role in the investment or his FINRA ban. In truth and in fact, this offering was for unregistered securities.

18.     Starting in or about January 2013, BANK pitched DSPF Group to his clients and encouraged his sales representatives across the country to pitch it to their clients. In or about January 2013, knowing that the Dental Support Plus "franchise units" were failing, BANK pitched DSPF Group to DB, a woman from Chesapeake, Virginia. BANK advised DB to invest in DSPF Group claiming that it was a good investment and that the money would be pooled with others to invest in franchises. BANK did not tell DB that the investment was failing or that her funds would be used to pay off previous investors.

19.     On or about January 25, 2013, based on material misrepresentations and omissions and at BANK's direction, DB invested $40,500 (approximately 50% of DB's 401k savings) into DSPF Group.

20.     On or about January 29, 2013, approximately four days after DB's investment, GIBSON siphoned approximately $12,000 (approximately 31%) of DB's investment by transferring the funds to limited liability companies controlled by BANK for his use.

7

21.     Two months later, GIBSON misappropriated the remainder of DB's money –
approximately $35,000 – to pay off a previous investor in the failed franchise units.

22.     In March 2013, BANK and GIBSON learned that the Idaho Department of
Finance was contacting investors in Dental Support Plus "franchises" to investigate potential
security violations.  Conspirator #3 – who worked for DIG – told BANK that she would contact
investors, tell them that it was "just a routine letter," and that, if the investors elected to respond,
"all they should say is that DSP is a franchise, not an investment."

23.     On or about May 13, 2013, a potential salesman notified a DIG representative
about various misrepresentations in the investment offering materials.  He also complained that
Conspirator #1 had previously declared bankruptcy and had regulatory problems in the past.  The
DIG representative notified BANK about these issues.  BANK and GIBSON did not disassociate
from Conspirator #1 and continued to sell the fraudulent "franchises" as well as other
investments related to Conspirator #1.

24.     In early 2013, GIBSON and BANK continued to sell and process DSPF Group
investments to repay certain previous investors – a group that included GIBSON's family
member – for their failed investments in Dental Support Plus "franchises."

25.     On or about May 17, 2013, RK invested $150,000 into DSPF Group.  BANK
caused material misstatements and omissions to be made to the investor.  RK was told that the
"franchises" were successful and was not told that his funds would be used to pay off previous,
disgruntled investors.  Upon receipt of RK's investment funds, GIBSON immediately siphoned
approximately $47,499 (31% of his investment) by transferring RK's funds to limited liability

8

companies controlled by BANK for his use. GIBSON also misappropriated a portion of RK's funds to repay disgruntled, previous investors – including her family member.

26. On or about June 3, 2013, GIBSON prepared and signed a $25,000 check from the DSPF Group bank account – an account funded entirely with investor funds – to IRA Services for the benefit of her family member. This family member previously had invested $40,000 to purchase two "franchise units" and had not received the promised return on investment. GIBSON's family member was one of very few investors to receive a full refund (plus an alleged $5,000 "increase" in value) for an alleged "franchise unit." GIBSON's family member withdrew the $25,000 repayment in two installments on June 14, 2013, and July 17, 2013 from the IRA Services account.

27. From in or about January 2013 through January 2014, BANK, GIBSON, and others represented, and caused to be represented, numerous material misrepresentations and omissions to induce clients to invest in DSPF Group. Based on these material misrepresentations and omissions, over 20 investors invested approximately $892,500 into DSPF Group. Despite telling investors that an investment would incur "no fees to the investor," BANK and GIBSON siphoned approximately $310,000 to limited liability companies controlled by BANK. BANK used these monies for his own purposes.

28. BANK and GIBSON also used approximately $315,000 of new DSPF Group investor funds to repay previous investors without disclosing this purpose to the new investors.

29. On or about August 8, 2014, Conspirator #1 informed all "franchise" owners that Dental Support Plus had "run out of money and funding." Therefore, Conspirator #1 "had no choice but to 'shelve' DSPF." All investors – in Virginia and elsewhere – who had invested in

9

Dental Support "franchises" and DSPF Group lost the entirety of their invested funds. BANK's and GIBSON's investors lost over $3,000,000 in this investment.

30.  Despite this massive failure, BANK and GIBSON continued to associate and promote investments with Conspirator #1.

THE SPECTRUM INVESTMENTS

31.  From in or about August 2012 through in or about August 2015, BANK and GIBSON pitched three investment opportunities involving 800MHz Spectrum: Janus Spectrum, Spectrum 100, and Prime Spectrum. In truth and in fact, these offerings were for unregistered securities. BANK learned about this investment from Conspirator #1.

32.  BANK, Conspirator #2, and others prepared the offering documents for these three investment opportunities. The Investment Offerings falsely represented that only "Summit Trust will receive an asset management fee of two percent (2%) of the gross assets for managing and custodian [sic] of the separately managed account." In fact, BANK and GIBSON misappropriated approximately 47%-70% from each investor's funds. Finally, the Investment Offering did not disclose BANK's role in the investment and his FINRA ban.

33.  In early 2013, through material misrepresentations and omissions, BANK convinced WB to invest in Janus Spectrum Group LLC ("Janus Spectrum") and Spectrum 100 LLC ("Spectrum 100"). BANK concealed that he was raising funds for companies that he controlled and that he intended to misappropriate approximately half of WB's retirement funds immediately upon receipt.

34.  On or about March 29, 2013, WB invested $39,500 in Janus Spectrum – a company controlled by BANK. That same day, GIBSON siphoned approximately $18,762.50

10

(47.5%) of the investment by transferring the money to two companies that BANK owned and controlled. To conceal that they had misappropriated approximately 47.5% of WB's funds, BANK and GIBSON knowingly and intentionally caused WB to receive Summit Trust statements via the mail reflecting that WB's funds were whole and had retained full market value.

35.     On or about April 10, 2013, based on BANK's material misrepresentations and omissions, WB invested $110,000 in Spectrum 100 – another company controlled by BANK. At the time of WB's investment, Spectrum 100's bank account balance was $5.00. Five days after receiving WB's funds, GIBSON siphoned approximately $59,180 (53.8%) of the investment by transferring the funds to three companies that BANK owned and controlled. To conceal that they had misappropriated approximately 53.8% of the investment funds, BANK and GIBSON caused WB to receive Summit Trust statements via the mail reflecting that WB's invested funds were whole and had retained full market value.

36.     In addition to selling directly to clients, BANK and GIBSON caused sales representatives across the country to sell these investments to their clients. BANK developed a nationwide network of sales representatives with the help of Conspirator #1. BANK also located sales representatives by putting online ads on Craigslist.

37.     In March 2014, BANK caused numerous material misrepresentations and omissions to be made to RC and BC as well as MB and BB in connection with an investment into Prime Spectrum LLC ("Prime Spectrum"). BC was blind and was in his late 70s at the time he invested $20,000 of his retirement funds in Prime Spectrum. MB and BB were in their late 60s when they invested $25,000 in Prime Spectrum. Upon receipt, BANK and GIBSON

11

siphoned approximately 70% of the invested funds by transferring the funds to two companies that BANK controlled and to the salesman. No one ever disclosed to RC, BC, MB or BB that BANK and GIBSON would siphon 70% of their investment funds within weeks of receipt for purposes other than the stated investment.

38.     In or about late April 2014, the Securities and Exchange Commission ("SEC") subpoenaed BANK to appear for a deposition in connection with a federal securities investigation into Janus Spectrum. Despite knowledge of the ongoing SEC investigation, BANK, GIBSON, and others continued to sell the spectrum investments and did not disclose the existence of the investigation to current and potential investors.

39.     On or about April 6, 2015, the SEC filed a civil complaint against, among others, BANK, Janus Spectrum Group, Spectrum 100 and Prime Spectrum accusing the parties of running a multi-million dollar scheme to defraud investors arising from the sale of unregistered securities. The complaint outlined the misrepresentations contained in, among others, the offering documents related to the spectrum investments.

40.     In or about April 2015, JL met with BANK by video conference call. At that time, BANK falsely represented that the Spectrum 100 investment was doing well and that investors were earning 12% interest. BANK falsely represented to JL that DIG had vetted the investment and that it was secure. BANK did not inform JL about the SEC's investigation and lawsuit in connection with this investment.

41.     In or about July 2015, based on material misrepresentations and omissions and without knowledge of the SEC lawsuit, JL invested $50,000 into Spectrum 100. Almost immediately, GIBSON siphoned approximately $29,400 (58.8%) of the investment by

transferring the funds to three companies that BANK owned and controlled. To conceal that they had misappropriated approximately 58.8% of JL's funds, BANK and GIBSON caused Summit Trust to send quarterly statements to JL via the United States mail that falsely represented that JL's investment into Spectrum 100 was whole and had retained full market value.

42. After the SEC filed its civil complaint alleging fraudulent sale of unregistered securities, BANK, GIBSON, and others continued to sell the Spectrum investments through three separate investment vehicles that they created: (1) Spectrum 100; (2) Venture Capital; and (3) Xcel Bandwith. At no time did BANK, GIBSON, and others disclose to prospective investors the existence of the SEC's fraud lawsuit nor that they intended to use a portion of their Spectrum-invested funds to pay attorneys to defend them against that lawsuit.

43. From in or about September 2012 through in or about July 2014, BANK, GIBSON, and others represented, and caused to be represented, numerous material misrepresentations and omissions to investors to obtain investments into Janus Spectrum Group. Based on these material misrepresentations and omissions, over 25 investors invested approximately $2,515,000 into Janus Spectrum Group. BANK and GIBSON almost immediately misappropriated approximately $1,199,095 of the investment funds.

44. From in or about April 2013 through July 2017, BANK, GIBSON, and others represented, and caused to be represented, numerous material misrepresentations and omissions to investors to obtain investments into Spectrum 100. Based on these material misrepresentations and omissions, over 100 investors invested approximately $7,500,000 into

13

Spectrum 100. BANK and GIBSON misappropriated approximately $4,300,000 of the investment funds.

45.     From in or about December 9, 2013 through March 2014, BANK, GIBSON, and others represented, and caused to be represented, numerous material misrepresentations and omissions to investors to obtain investments into Prime Spectrum. Based on these material misrepresentations and omissions, approximately five (5) investors invested $130,000 into Prime Spectrum. BANK and GIBSON almost immediately misappropriated $74,000, including payments to DPCG, Spectrum Management LLC, Prime Spectrum Management LLC, and MR Diamonds Group c/o Wonder Jewelry.

46.     From in or about August 2015 through in or about July 2017, BANK, GIBSON, and others represented, and caused to be represented, numerous material misrepresentations and omissions to investors to obtain investments into Xcel Bandwidth investments. Based on these material misrepresentations and omissions, over 70 investors invested approximately $5,191,856.82 into Xcel Bandwidth. BANK and GIBSON misappropriated approximately $2,876,495.93.

47.     In or about July 2017, BANK, and others at his direction, held conference calls with investors aimed at concealing the misappropriation of funds and attempting to lull investors into believing that their Spectrum investments continued to have value.

## VENTURE CAPITAL I

48.     Starting in or about December 2014 through in or about November 2015, BANK, GIBSON, and others represented, and caused to be represented, numerous material representations and omissions to investors to obtain investments into Venture Capital I. In truth

14

and in fact, this offering was for unregistered securities. BANK and GIBSON created, managed and controlled this investment through which, yet again, the conspirators misappropriated substantial portions of investor funds.

49.     In or about November 2015, BANK and GIBSON caused fraudulent misrepresentations to be made to BS to invest in this alleged diversified mutual-fund type investment.

50.     On or about November 13, 2015, based on material misrepresentations and omissions, BS invested $300,000 of his retirement funds into Venture Capital I.  Approximately one month after receiving BS's funds, BANK and GIBSON transferred $150,000 of his retirement funds to pay for expenses related to the operation of McPherson Trailer Park in North Carolina.  At no time did BANK, GIBSON, and any other individual disclose to BS that his funds would be used and were in fact used to support a trailer park.  In truth and in fact, BS specifically had rejected the opportunity to invest in the McPherson Trailer park.

<u>WEMONITOR GROUP</u>

51.     In late 2012, BANK and GIBSON organized, created and controlled weMonitor Group LLC ("weMonitor Group") and weMonitor Management LLC ("weMonitor Management").  weMonitor, Inc. is a company located in California that BANK did not control.

52.     Starting in or about December 2012, BANK, GIBSON, and others worked on an investment offering related weMonitor Group, Inc.  weMonitor Group, Inc. was a company that was in the process of developing a home monitoring system that claimed to be able to reduce utility bills by $150 a month.  Through DPCG, BANK endeavored to raise funds for weMonitor

15

Group, Inc. SEABOLT was involved in drafting a "funding agreement" with weMonitor Group, Inc. In truth and in fact, this offering was for unregistered securities.

53. On or about February 6, 2013, SEABOLT and BANK received an email regarding the weMonitor Group investment noting that the monitoring device was not yet developed and that there "isn't even an Alpha model, yet a Beta or First customer model."

54. On or about February 19, 2013, BANK sent SEABOLT the Investment Offering document that he drafted to mislead investors to believe that weMonitor had a fully functioning device, and concealed the fact that BANK controlled all of the relevant investment entities. The Investment Offering also falsely represented that "Summit Trust will receive an asset management fee of two percent (2%) of the gross assets for managing and custodian [sic] the separately managed account." In fact, BANK and GIBSON misappropriated at least 26% from each investor's funds. Finally, the Investment Offering did not disclose BANK's FINRA ban.

55. On or about February 22, 2013, SEABOLT sent an email to BANK and others defending his version of the "funding agreement" as appropriate because weMonitor, Inc. would get "close to $4 million net without personal guarantees, with little collateral, an incomplete monitoring device, no working business model, no working franchise model, decent salaries and benefits and the possibility of becoming millionaires all the while keeping control of the company and the other side hopes and prays they can do it." SEABOLT was well aware that such pertinent, material information was not contained in DPCG's Investment Offering.

56. On or about February 27, 2013, BANK sent an e-mail to SEABOLT and another individual instructing him to get the funding agreement signed because: "1-we are getting paid

16

handsomely 2-the firm picks up 4% plus 3-Billy captured extra territory 4-The commission is strong."

57.    On or about March 5, 2013, the parties executed the funding agreement.

58.    From in or about February 2013 through in or about August 2015, BANK, GIBSON, SEABOLT, and others represented, and caused to be represented, numerous material misrepresentations and omissions to investors to obtain investments into weMonitor Group. Based on these material misrepresentations and omissions, over 60 investors invested approximately $4,100,000 into weMonitor Group.  Upon receipt of the funds, BANK and GIBSON immediately siphoned over $1,000,000 (26%) of the investment by transferring the funds to companies under BANK's control.

59.    On or about March 24, 2013, SEABOLT sent BANK an email requesting a written agreement regarding his payouts stating that he did not spend that much "time and effort (and future time and effort) to get 'a little piece.'"  GIBSON and BANK paid SEABOLT 1% of all investor funds raised for weMonitor.

60.    This investment required weMonitor, Inc. to make quarterly interest payments to investors.  Instead of seeking payment from weMonitor, Inc., BANK and GIBSON intermingled funds from other investments to make quarterly interest payments to weMonitor Group investors.

61.    GIBSON used weMonitor Group investor funds to repay her family member who invested in two failed Dental Support Plus "franchises."  On or about April 16, 2014, GIBSON cut a $17,500 check from weMonitor Group's bank account to IRA Services for the benefit of her family member.  GIBSON's family member had never invested in weMonitor Group.

17

62.     GIBSON's family member retained the funds in the IRA Services account for approximately one month. On or about May 30, 2014, GIBSON directed that all the funds in the IRA Services account, including the proceeds of the weMonitor Group check, be wired to Summit Trust. Four days later, on or about June 3, 2014, GIBSON caused the $17,500 in funds to be wired back to weMonitor Group so that her family member would be considered an investor in weMonitor Group.

63.     In or about April 2015, weMonitor, Inc. did not have the financial means through which to make its scheduled investor interest payments. To conceal the failing health of weMonitor, Inc., BANK and GIBSON used new investor funds to make interest payments to previous investors.

64.     On or about July 10, 2015, weMonitor Management sent a letter via the United States mail to all weMonitor Group investors falsely stating that "[d]ue to taxes, efficiency, and the desire to keep costs down, we have decided to move the location of weMonitor Group LLC from Virginia to Florida." The letter failed to disclose that, in truth and fact, as all conspirators were aware almost two weeks earlier, the Virginia State Corporation Commission ("SCC") had filed a motion for a temporary injunction against BANK, GIBSON, and all of BANK's affiliated companies to enjoin them from the fraudulent sale of unregistered securities.

65.     More than a year later, in July 2016, BANK, GIBSON, and others finally disclosed to investors that weMonitor, Inc. had failed. On July 25, 2016, Conspirator #2 sent a letter via interstate mail to weMonitor investors stating that he was "a partner at FAS Partners, LLC in Florida" and "an officer of BlueDot Corporation, a newly created entity that was

18

incorporated to hold the assets of weMonitor, Inc." Conspirator #2 did not disclose his past affiliation with BANK and that he was one of the architects of the Investment Offering.

66.     In this letter, Conspirator #2 falsely represented that "a gross total of $4,551,050 was funded to weMonitor, Inc." In reality, BANK and GIBSON had siphoned over $1,000,000 of those investor funds for other purposes. Conspirator #2 further claimed that "weMonitor made interest payments on the promissory notes as required up to the first quarter of 2016," but concealed that BANK and GIBSON had been using new investor funds to make interest payments to previous investors since the inception of the investment.

67.     On or about May 5, 2017, Conspirator #2 sent another letter to weMonitor investors informing them he was resigning as an officer of BlueDot Corporation, effective July 10, 2017, and placing the burden on the investors to nominate suitable candidates to act as officers of the corporation.

PLI GROUP LLC

68.     Starting in or about October 2012, BANK, Conspirator #2 and others prepared the offering document for Project Lifesaver ("PLI Group investment"). According to the Investment Offering, "PLI Group is a LLC formed to license, market, retail and distribute the new SARTrack bracelets and associated technologies and provide related product training, certification, and support to law enforcement and other public safety organizations and community groups." In truth and in fact, this offering was for unregistered securities. The Investment Offering sought a $500,000 capital raise from investors. BANK, Conspirator #2, and others created the Investment Offering to conceal the multiple roles BANK played in this investment offering:

19

- BANK controlled DPCG – the company presenting the Investment Offering and soliciting the investment funds;
- BANK created and controlled PLI Group LLC ("PLI Group") – the company that received all investment funds;
- BANK created and controlled PLI Management LLC – the company formed to manage and guarantee the investor funds; and
- BANK created and controlled SARTrack Group LLC ("SARTrack Group") – the company formed to acquire the licensing agreement for the SARTrack bracelet and that also guaranteed the investor funds.

69.     To address fees, the offering only represented that "Summit Trust will receive an asset management fee of two percent (2%) of the gross assets for managing and custodian [sic] of the separately managed account." In fact, BANK and GIBSON ultimately misappropriated a substantial portion of all investor funds. Finally, the Investment Offering did not disclose BANK's role in the investment and his FINRA ban.

70.     On or about May 28, 2013, the PLI Group investment was fully funded with $500,000 from at least 18 investors investing various amounts.

71.     By late 2013, the company developing the SARtrack bracelet had encountered substantial problems during the development phase and had reported those problems to BANK. By that point, BANK only had provided $100,000 of investor funds to the company to develop the bracelet. On or about November 1, 2013, BANK sent an email copying SEABOLT demanding that the company return the $100,000 noting that: "There is not a device. Reasonably there will NOT be a device, that you committed to, ever delivered." The company did not return the funds, and BANK severed the relationship with the company.

72.     Instead of disclosing the failure of the investment and transferring any remaining funds back to investors, on or about November 26, 2013 and December 5, 2013, BANK,

20

GIBSON, and SEABOLT caused the remaining PLI Group investor funds to be transferred into the weMonitor Group account.

73.    On or about December 16, 2013, to conceal that they had transferred the investment funds from PLI Group investment, BANK and GIBSON transferred $4,166.69 from the weMonitor Group account back into the PLI Group account to cut checks for the December PLI Group interest payments.  As a result, PLI Group investors continued to believe that their funds were fully invested in a successful business venture.

74.    SEABOLT did not prepare any documents regarding the transfer of funds at the time.  BANK did not notify the PLI Group investors that he had transferred their monies into an entirely different investment.  Indeed, BANK and GIBSON caused Summit Trust to send statements to these investors that falsely represented that the value of their original investments were intact and remained fully vested in PLI Group.

75.    On or about January 1, 2014, the PLI Group bank account balance was $3,657.50. Despite the fact that: (1) the PLI Group investment had been fully funded since May 2013; (2) in November 2013, the conspirators recognized that the investment was a failure; and (3) all remaining investor funds had been transferred to weMonitor Group, BANK caused yet another investor, MG, to invest $25,000 into the PLI Group investment.

76.    On or about January 10, 2014, based on numerous material misrepresentations and omissions, MG invested in PLI Group.  BANK and GIBSON used MG's $25,000 to repay a previous investor in PLI Group.  MG was never told that the investment had failed and that her money would be used to repay an earlier investor.

77.    Despite the fact that the PLI Group investment had failed (and all remaining monies moved out of the investment) prior to MG's investment, BANK and GIBSON caused Summit Trust to send statements to MG via the mail that reflected that her $25,000 investment was whole and fully vested in PLI Group.

78.    To conceal that the investment had failed, BANK and GIBSON laundered funds from other investments into the PLI Group account to make quarterly interest payments.

79.    In or about June 2014, BANK again contacted SEABOLT about the PLI Group investment and the transfer of PLI Group funds.  At this time, SEABOLT became aware that BANK still had not disclosed to the PLI Group investors that the project had failed nor that he had transferred their monies to another investment.

80.    In or about July 2014, SEABOLT created documents in an attempt to fix the "screwy deal" and sent them to BANK and GIBSON.  SEABOLT continued to assist BANK and GIBSON cover-up the transaction despite his knowledge that the investors falsely believed that their funds continued to be fully vested in PLI Group.

81.    In or about January 2015, SEABOLT again assisted BANK in developing documents to justify the transfer of PLI Group investor funds following the execution of a federal search warrant at DIG.

82.    On or about February 11, 2015, SEABOLT lashed out at BANK and another employee about participating in a cover-up of the fraudulent transfer of funds (which investors still did not know about).  SEABOLT stated, among other things:

3) Despite what you may believe or other people may say, these are not simple agreements that we can just throw together and get back to the other side and wrap it up.  These agreements concern people's money.  These agreements are

22

being looked at by the FBI, the SCC, two or three state Attorney Generals, possibly the FCC, the Post Office (due to solicitation by mail), and others. These things that you guys sign might involve years in jail and hundreds of thousands of dollars in fines for you guys if perceived to be fraudulent. They need to be well thought through and done right.

4) All the funding agreements are out of the usual and the original PLI Group agreement was just weird to begin with ($500,000 raised, $400,000 that Sartrack is Responsible for, $100,000 that PLI is responsible for, Fees from licenses but never a stock exchange for PLI a non-profit and the whole thing was a bet on unprovable technology) and now complicated because some of the money is gone with no real value to account for it and a Canadian Company that may have ripped PLI off. The PLI Group money was given to weMonitor (a for profit company for another adventure unrelated to the first) with no agreement in place (which can be perceived as playing around with client money by the various States and the Feds). Now we have to hammer some kind of agreement that will make sense for: 1) PLI, 2) PLI Group investors, weMonitor, weMonitor Group investors, SarTrack, etc.

5) After a couple of requests, I still do not have an accurate account of where $500,000 went that was raised for PLI Group.

Despite the reservations outlined in this email, SEABOLT prepared the requested documents. Moreover, throughout this entire series of events, SEABOLT, GIBSON, and BANK were well aware that PLI Group investors falsely believed that their funds remained fully vested (and had retained their full value) in PLI Group.

83. On or about July 10, 2015, almost two years after BANK had transferred all remaining funds to a different investment, PLI Management sent a letter via the United States mail to all PLI Group investments, including those located in the Eastern District of Virginia, announcing that "[d]ue to taxes, efficiency, and the desire to keep costs down, we have decided to move the location of PLI Group, LLC from Virginia to Florida." The letter neglected to mention that the investment had already failed, that BANK and GIBSON had transferred all

23

funds to a separate investment, and that the SCC had filed for a temporary restraining order against BANK and GIBSON.

84.     In or about July 2016, GIBSON and Conspirator #2 contacted the PLI Group investors and stated that they now had an interest in BlueDot Corporation (the entity purportedly organized to sell the "assets" of weMonitor, Inc.).

85.     On May 5, 2017, Conspirator #2 sent another letter to PLI Group investors informing them he was resigning as an officer of BlueDot Corporation, effective July 10, 2017, and placing the burden on the investors to nominate suitable candidates to act as officers of BlueDot.

86.     BANK, GIBSON, and SEABOLT created and sold numerous other purported "private equity" investments using the same and similar fraudulent methods.

87.     BANK and GIBSON regularly caused interstate wirings of investor funds to BANK and others for their personal use.  For example, in 2014, GIBSON transferred via interstate wires over $1,000,000 in siphoned investor funds to BANK's personal bank account.

88.     Throughout this time, GIBSON also transferred investor funds from bank accounts associated with the various companies that BANK controlled to BANK's personal bank account for his use.

89.     GIBSON also used investor funds to pay herself from bank accounts associated with Spectrum Management, Spectrum 100 Management, DIG, DPCG, and Dominion Franchise Group.

90.     GIBSON also used investor funds to pay SEABOLT and SEABOLT knowingly received a percentage of investor funds as payment for his contributions to this conspiracy.

24

91.     In or about July 2017, Oculina Bank served notice on BANK and GIBSON that they needed to close all Oculina bank accounts within two weeks. On or about July 14, 2017, BANK and GIBSON moved all accounts to MidFlorida Credit Union. Approximately three weeks later, on or about August 8, 2017, BANK and GIBSON closed these accounts and moved funds to Centerstate Bank of Florida and Generations Federal Credit Union in San Antonio, Texas.

## COUNT ONE
(Conspiracy to Commit Mail and Wire Fraud)

1.    The allegations contained in paragraphs 1 through 91 of the General Allegations section of the Second Superseding Indictment are realleged and incorporated as if set forth fully herein.

2.    From in or about January 2012 through in or about July 2017, in the Eastern District of Virginia and elsewhere, defendants DARYL G. BANK, RAEANN GIBSON, BILLY J. SEABOLT, and others known and unknown, knowingly and intentionally combined, conspired, confederated and agreed to commit the following offenses against the United States:

(a)    Mail Fraud:  defendants, and others known and unknown, having devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, did knowingly place and caused to be placed in any post office and authorized depository for mail, any matter and thing whatever to be sent and delivered by the Postal Service; did deposit and caused to be deposited any matter and thing whatever to be sent and delivered by any private and commercial interstate carrier; and caused to be delivered by mail and such carrier any matter and thing whatever according to the direction thereon, in violation of Title 18, United States Code, Section 1341; and

(b)    Wire Fraud: defendants, and others known and unknown, having devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and

26

sounds for the purpose of execution of such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## THE PURPOSE OF THE CONSPIRACY

3.　　The purpose of the conspiracy was for DARYL G. BANK, RAEANN GIBSON, BILLY J. SEABOLT, and others to profit personally by misleading investors in material ways about the use of investment funds, who controlled the investment funds, the nature of the investment, and the status of invested funds.

## THE WAYS, MANNER, AND MEANS OF CONSPIRACY

The ways, manner and means by which BANK, GIBSON, SEABOLT, and others sought to accomplish this conspiracy included, but were not limited to, the following:

4.　　BANK and GIBSON, operating through DIG, DPCG and related entities Dominion Franchise Group LLC and Dominion Diversified Strategies LLC, offered various investment opportunities to potential investors.

5.　　BANK, SEABOLT, Conspirator #2, and others prepared materially false and misleading investment offering documents that intentionally misled investors about the use of their investment funds, who controlled the investment funds, and the nature of the investment.

6.　　BANK, GIBSON, SEABOLT, and others, made and caused to be made, material misrepresentations, deceitful statements and omissions to potential investors about these investments during sales pitches, live presentations, radio shows, social security maximization seminars, and other communications. The purpose of these fraudulent actions was to create a false impression, mislead and to otherwise deceive investors about the use of the investment funds, the identity of who controlled the investment funds, and the nature of the investment.

27

7.     BANK, GIBSON, and others, recruited sales agents across the country (principally insurance sales agents unregistered to sell securities) to sell DIG's and DPCG's false, misleading, and deceptive investment offerings to unsuspecting and unsophisticated investors.  BANK and other conspirators regularly participated in weekly sales calls to encourage the sales agents to sell the fraudulent investment offerings.

8.     BANK, GIBSON, SEABOLT, and others principally targeted investors at and near retirement age from across the country to invest in fraudulent investment offerings.

9.     BANK, GIBSON, SEABOLT, and others created and utilized a complex web of limited liability companies to conceal the misappropriation of investor funds.  The conspirators did not invest any personal capital into these companies; instead, the companies functioned solely on investor funds.  BANK, GIBSON, SEABOLT, and others concealed from investors that BANK wholly controlled the companies sponsoring the private equity offering, the companies controlling the investment funds, and the companies purportedly "managing" the investment funds.

10.     BANK, GIBSON, and others directed investors to withdraw funds from various sources – including legitimate 401(k) and other retirement accounts – and transfer the funds to self-directed Individual Retirement Accounts at trust companies.  Thereafter, GIBSON and others completed paperwork directing the trust companies to wire funds to accounts that she and BANK controlled.  Often times, GIBSON only provided the signature pages to investors instructing them to authorize the transfer of funds to accounts that she and BANK controlled. The victims had no knowledge that they were authorizing the trust company to send retirement funds to accounts controlled solely by BANK and GIBSON.

28

11. BANK, GIBSON, and others concealed that, upon immediate receipt of investment funds, the conspirators directly siphoned substantial portions of the investment funds by transferring the funds to separate bank accounts under their control.

12. BANK, GIBSON, and others used investments from new investors to make payments to previous investors – including one of GIBSON's family members – without first disclosing such a purpose to the new investors.

13. BANK and GIBSON intermingled funds between investments without disclosing such activities to the investors.

14. In furtherance of this conspiracy, BANK, GIBSON, SEABOLT, and others routinely caused interstate wirings of investment funds into and out of bank accounts they controlled at BayPort Credit Union located in the Eastern District of Virginia and Oculina Bank located in Florida.

15. BANK, GIBSON, and others knowingly and intentionally used investor funds for private purposes including, but not limited to, supporting BANK's lavish lifestyle.

16. In furtherance of this conspiracy, BANK, GIBSON, SEABOLT, and others knowingly and intentionally concealed, misled, and deceived investors as to the status of their investment funds by causing trust companies to send, via the United States mail, fraudulent quarterly statements to the investors. The account statements gave the false impression that the investors' funds were whole, fully invested, and, in some instances, increasing in value. Many of these mailings came to addresses within the Eastern District of Virginia.

17. BANK, GIBSON, SEABOLT, and others concealed from investors the existence of regulatory investigations into DPCG's investment offerings.

29

18.     BANK, GIBSON, SEABOLT, and others caused letters to be sent to investors aimed at misleading and deceiving investors regarding the status of the investments, and at concealing that they had misappropriated substantial portions of investor funds.

19.     BANK and others held conference calls with investors aimed at misleading and deceiving investors regarding the status of the investments, and at concealing that he and his conspirators had misappropriated substantial portions of investor funds.

20.     As a result of this conspiracy, at least 375 investors in the Eastern District of Virginia and elsewhere have suffered losses exceeding $25 million.

(In violation of Title 18, United States Code, Sections 1349, 1341, 1343).

## COUNTS TWO – SIX
(Mail Fraud)

1.     The allegations contained in paragraphs 1 through 91 of the General Allegations section and paragraphs 1 through 20 related to Count One of this Second Superseding Indictment are realleged and incorporated as if set forth fully herein.

2.     On or about the dates set forth below, in the Eastern District of Virginia and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, and attempting to do so, the defendants DARYL G. BANK, RAEANN GIBSON, and BILLY J. SEABOLT knowingly caused to be delivered by U.S. mail and any private and commercial interstate carrier any matter and thing whatever according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, the following matters:

| Count | In or About Date | Item Mailed |
|-------|------------------|-------------|
| 2 | March 2015 | Federal Express mailing of DR's Summit Trust documents. |
| 3 | August 2015 | Mailing of Summit Trust statement to PS in Virginia Beach, Virginia. |
| 4 | July 2015 | Mailing of PLI Management statement about the company's relocation to MG in Chesapeake, Virginia |
| 5 | July 2015 | Mailing of weMonitor Management statement about the company's relocation to BS in Chesapeake, Virginia |
| 6 | May 2017 | BlueDot Corporation mailing to TW in Chesapeake, Virginia. |

(In violation of Title 18, United States Code, Sections 1341 and 2).

31

## COUNTS SEVEN – TWELVE
(Wire Fraud)

1.      The allegations contained in paragraphs 1 through 91 of the General Allegations section and paragraphs 1 through 20 related to Count One of this Second Superseding Indictment are realleged and incorporated as if set forth fully herein.

2.      On or about the dates set forth below, in the Eastern District of Virginia and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, the defendants DARYL G. BANK, RAEANN GIBSON, and BILLY J. SEABOLT knowingly transmitted and caused to be transmitted by means of a wire communication in interstate commerce certain writings, signs, signals, pictures and sounds, as follows:

| Count | On Or About Date of Wire | Item Wired |
|---|---|---|
| 7 | December 19, 2013 | Interstate wire transfer of $50,000.00 belonging to LZ from a Wells Fargo bank account to DSPF Group LLC's bank account (account number ending in 9219) at BayPort Credit Union located in the Eastern District of Virginia. |
| 8 | May 29, 2013 | Interstate wire transfer of $61,000.00 belonging to AM from a Wells Fargo bank account to DSPF Group LLC's bank account (account number ending in 9219) at BayPort Credit Union located in the Eastern District of Virginia. |
| 9 | January 10, 2014 | Interstate wire transfer of $25,000.00 belonging to MG from a Wells Fargo to PLI Group LLC's bank account (account number ending in 8817) at Bay Port Credit Union located in the Eastern District of Virginia. |
| 10 | March 3, 2014 | Interstate wire transfer of $45,000.00 belonging to BC, RC, MB, and BB from a Wells Fargo bank account to Prime Spectrum LLC's bank account (account number |

| Count | On Or About Date of Wire | Item Wired |
|-------|--------------------------|------------|
|       |                          | ending in 5296) at BayPort Credit Union located in the Eastern District of Virginia. |
| 11    | June 3, 2014             | Interstate wire transfer of $17,500.00 from a Wells Fargo bank account to WeMonitor Group LLC's bank account (account number ending in 3724) at BayPort Credit Union located in the Eastern District of Virginia. |
| 12    | December 16, 2013        | Interstate wire transfer of $78,000.00 from Dominion Private Client Group's bank account (account ending in 8622) at BayPort Credit Union located in the Eastern District of Virginia to a Wells Fargo Bank account. |

(In violation of Title 18, United States Code, Sections 1343 and 2).

33

## COUNT THIRTEEN
(Conspiracy to Sell Unregistered Securities and to Commit Securities Fraud)

1.     The allegations contained in paragraphs 1 through 91 of the General Allegations section of this Second Superseding Indictment are realleged and incorporated as if set forth fully herein.

2.     From in or about January 2012 through in or about August 2017, in the Eastern District of Virginia and elsewhere, defendants DARYL G. BANK, RAEANN GIBSON, BILLY J. SEABOLT and others known and unknown, knowingly and intentionally combined, conspired, confederated and agreed to commit the following offenses against the United States:

(a)     Unlawful Sale of Unregistered Securities:  defendants, and others known and unknown, willfully offered and sold, and caused the offer and sale of, securities to the individuals when no registration statement was filed with the United States Securities and Exchange Commission and in effect as to the securities, and used the means and instruments of transportation and communication in interstate commerce and the mails in connection with the offer and sale of securities in violation of Title 15, United States Code, Sections 77e and 77x; and

(b)     Securities Fraud: defendants, and others known and unknown, willfully and knowingly, in the offer and sale of securities by the use of the means and instruments of transportation and communication in interstate commerce and by the use of the mails, directly and indirectly:  (a) employed a device, scheme, and artifice to defraud; (b) obtained money by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made,

34

not misleading; and (c) engaged in transactions, practices, and courses of business which operated and would have operated as a fraud and deceit upon the purchasers, in violation of Title 15, United States Code, Sections 77q(a) and 77x.

## THE PURPOSE OF THE CONSPIRACY

3.      The purpose of the conspiracy was for the defendants to enrich themselves through the fraudulent sale of unregistered securities.

## THE WAYS, MANNER, AND MEANS OF CONSPIRACY

The ways, manner and means by which BANK, GIBSON, SEABOLT and others sought to accomplish this conspiracy included, but were not limited to, the following:

4.      BANK and GIBSON, operating through DIG, DPCG and related entities Dominion Franchise Group LLC and Dominion Diversified Strategies LLC, offered various investment opportunities to potential investors.

5.      BANK, SEABOLT, Conspirator #2, and others prepared materially false and misleading investment offering documents that intentionally misled investors about the use of their investment funds, who controlled the investment funds, and the nature of the investment.

6.      BANK, SEABOLT, GIBSON and Conspirator #2 did not register these securities with appropriate federal and state agencies.

7.      BANK, GIBSON, SEABOLT, and others, made and caused to be made, material misrepresentations, deceitful statements and omissions to potential investors about these investments during sales pitches, live presentations, radio shows, social security maximization seminars, and other communications.  The purpose of these fraudulent actions was to create a

false impression, mislead and to otherwise deceive investors about the use of the investment funds, the identity of who controlled the investment funds, and the nature of the investment.

8.      In furtherance of this conspiracy, BANK often pitched the securities to victims via video teleconference and on the telephone.

9.      In furtherance of this conspiracy, BANK, GIBSON and others mailed false and misleading solicitations labeled "Opportunity Alert" to advertise the securities.

10.     BANK, GIBSON, SEABOLT, and others created and utilized a complex web of limited liability companies to conceal the misappropriation of investor funds. The conspirators did not invest any personal capital into these companies; instead, the companies functioned solely on investor funds.

11.     BANK and GIBSON pooled all investors for a specific investment into a limited liability company over which BANK maintained complete control.

12.     In furtherance of this conspiracy, BANK, GIBSON, SEABOLT, and others routinely caused interstate wirings of investment funds into and out of bank accounts they controlled at BayPort Credit Union located in the Eastern District of Virginia and Oculina Bank located in Florida.

13.     In furtherance of the conspiracy, BANK, GIBSON, SEABOLT and others continued to sell securities after becoming aware that federal and state regulatory agencies were investigating the investment offerings as being unregistered and fraudulent.

<u>OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY</u>

In furtherance of the conspiracy and to effect the purpose thereof, the following overt acts, among others, were committed in the Eastern District of Virginia and elsewhere:

14.     The government incorporates by reference the acts described in the General Allegations section of this Second Superseding Indictment as overt acts in furtherance of this conspiracy.

15.     On or about January 8, 2014, GIBSON sent an email to a conspirator attaching the "signature pages" of the Operating Agreements for victim MG to sign.

16.     On or about April 11, 2013, BANK made fraudulent misrepresentations and omissions to victim AR about numerous securities.

17.     On or about July 2, 2013, the conspirators caused victim KG to wire $25,000 to purchase an interest in the security weMonitor Group, LLC.

18.     On or about December 19, 2013, the conspirators caused victim LZ to wire $50,000 to purchase an interest in the security DSPF Group, LLC.

19.     On or about November 14, 2014, SEABOLT wrote a letter to the Virginia SCC claiming that his "client has not been selling securities at all."

20.     On or about December 12, 2014, the conspirators caused victim GC to wire $160,000 to purchase an interest in the security Venture Capital I.

21.     On or about June 17, 2015, the conspirators caused victim GB to wire $100,000 to purchase an interest in the security Venture Capital I.

22.     On or about June 23, 2015, the conspirators caused victims NC and GC to wire $32,000 to purchase an interest in the security Spectrum 100, LLC.

(In violation of 18 U.S.C. § 371, 15 U.S.C. §§ 77e, 77q and 77x).

## COUNTS FOURTEEN - EIGHTEEN
### (Unlawful Sale of Unregistered Securities)

1.     The allegations contained in paragraphs 1 through 91 of the General Allegations section and paragraphs 1 through 22 of Count Thirteen of this Second Superseding Indictment are realleged and incorporated as if set forth fully herein.

2.     On or about the dates set forth below, in the Eastern District of Virginia, and elsewhere, defendants DARYL G. BANK, RAEANN GIBSON, BILLY J. SEABOLT, and others known and unknown, willfully offered and sold, and caused the offer and sale of, securities to the individuals identified below when no registration statement was filed with the United States Securities and Exchange Commission and in effect as to the securities, and used the means and instruments of transportation and communication in interstate commerce and the mails in connection with the offer and sale of securities:

| Count | On or About Date | Victim(s) | Amount |
|-------|------------------|-----------|--------|
| 14 | December 12, 2014 | GC | $160,000 |
| 15 | June 17, 2015 | GB | $100,000 |
| 16 | December 19, 2013 | LZ | $ 50,000 |
| 17 | July 2, 2013 | KG | $ 25,000 |
| 18 | June 23, 2015 | NC & GC | $ 32,000 |

(In violation of Title 15, United States Code, Sections 77e and 77x and Title 18, United States Code, Section 2).

38

## COUNTS NINETEEN – TWENTY-TWO
(Securities Fraud)

1.      The allegations contained in paragraphs 1 through 91 of the General Allegations section and paragraphs 1 through 22 related to Count Thirteen of this Second Superseding Indictment are realleged and incorporated as if set forth fully herein.

2.      On or about the dates set forth below, in the Eastern District of Virginia, and elsewhere, defendants DARYL G. BANK, RAEANN GIBSON, BILLY J. SEABOLT, and others known and unknown, willfully and knowingly, in the offer and sale of securities by the use of the means and instruments of transportation and communication in interstate commerce and by the use of the mails, directly and indirectly:  (a) employed a device, scheme, and artifice to defraud; (b) obtained money by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, and courses of business which operated or would have operated as a fraud and deceit upon investors:

| Count | In or About Date | Security |
|-------|------------------|----------|
| 19 | January 2013 through in or about January 2014 | Interests In DSPF Group LLC |
| 20 | April 2013 through in or about July 2017 | Interests In Spectrum 100 LLC |
| 21 | February 2013 through in or about August 2015 | Interests In weMonitor Group LLC |
| 22 | October 2012 through in or about January 2014 | Interests In PLI Group LLC |

(In violation of 15 U.S.C. §§ 77q(a), 77x and 18 U.S.C. § 2).

39

## COUNT TWENTY-THREE
(Conspiracy to Launder Monetary Instructions)

1.      The allegations contained in paragraphs 1 through 91 of the General Allegations section and paragraphs 1 through 20 related to Count One of the Second Superseding Indictment are realleged and incorporated as if set forth fully herein.

2.      From in or about January 2012 through in or about August 2017, in the Eastern District of Virginia and elsewhere, defendants DARYL G. BANK and RAEANN GIBSON, and others known and unknown, knowingly and intentionally combined, conspired, confederated and agreed to commit the following offenses against the United States:

(a)      Laundering of monetary instruments, that is, to knowingly conduct and attempt to conduct financial transactions affecting interstate and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, mail and wire fraud, knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

(b)      Laundering of monetary instruments, that is, to knowingly engage and attempt to engage, in monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is deposit, withdrawal, and transfer of monetary instruments, such property having been derived

40

from a specified unlawful activity, that is, mail and wire fraud, in violation of Title 18, United States Code, Section 1957.

THE WAYS, MANNER, AND MEANS OF CONSPIRACY

The ways, manner and means by which BANK, GIBSON, and others sought to accomplish this conspiracy included, but were not limited to, the following:

3.     BANK and GIBSON concealed the original and true source of fraudulently obtained funds by transferring and laundering those monies through multiple financial accounts.

4.     BANK and GIBSON laundered funds to conceal those monies from law enforcement.

5.     BANK and GIBSON transferred and laundered funds through multiple financial accounts in order to avoid paying federal taxes on such funds.

6.     BANK and GIBSON transferred and laundered funds through financial accounts to avoid disclosing the failure of investment offerings to victims.

7.     BANK and GIBSON transferred and laundered funds exceeding $10,000 to support BANK's lavish lifestyle.

8.     In addition, the ways, manner, and means that defendants BANK and GIBSON used to accomplish the objectives of the conspiracy included, but were not limited to, the following acts and transactions all originally derived from investor funds:

| DATE (on or about) | MONETARY/FINANCIAL TRANSACTION (approximately) |
| --- | --- |
| 2/29/2012 | $13,000 transfer from Dominion Franchise Group's BayPort Credit Union Account #xx9806 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |

41

| DATE (on or about) | MONETARY/FINANCIAL TRANSACTION (approximately) |
|---|---|
| 3/29/2012 | $7,000 transfer from Dominion Franchise Group's BayPort Credit Union Account #xx9806 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 5/30/2012 | $44,000 transfer from Dominion Franchise Group's BayPort Credit Union Account #xx9806 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 6/1/2012 | $43,495 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for jewelry repair, Neiman Marcus, Cartier, Saks Fifth Avenue, etc. |
| 6/28/2012 | $20,000 transfer from Dominion Franchise Group's BayPort Credit Union Account #xx9806 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 7/31/2012 | $32,000 transfer from Dominion Franchise Group's BayPort Credit Union Account #xx9806 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 8/31/2012 | $21,000 transfer from Dominion Franchise Group's BayPort Credit Union Account #xx9806 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 10/17/2012 | $42,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 11/20/2012 | $41,260 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for Louis Vuitton, Cartier, Thomas Pink, Liljenquist & Beckstead, Mattress Firm, Capetown Diamond, etc. |
| 1/22/2013 | $35,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 1/22/2013 | $31,420 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for Louis Vuitton, Saks Fifth Avenue, Chanel, Hamilton Jewelers, Trafalgar, Loft, etc. |
| 2/19/2013 | $55,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 2/22/2013 | $52,712 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for Thomas Pink, Saks Fifth Avenue, Tory Burch, Neiman Marcus, jewelry, Hermes, Gucci, Swarovski, J Crew, West Elm, etc. |

| DATE (on or about) | MONETARY/FINANCIAL TRANSACTION (approximately) |
|---|---|
| 3/21/2013 | $50,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 4/19/2013 | $40,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 5/15/2013 | $42,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 6/17/2013 | $66,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 6/20/2013 | $25,000 transfer from Dominion Franchise Group's BayPort Credit Union Account #xx9806 to BANK's BayPort Credit Union Account #xx8157 |
| 6/21/2013 | $56,329 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for Restoration Hardware, Saks Fifth Avenue, Thomas Pink, Neiman Marcus, Bloomingdale's, J Crew, Massage Envy, entertainment tickets, etc. |
| 7/9/2013 | $10,000 transfer from DSP Management's BayPort Credit Union Account #xx8157 to BANK's BayPort Credit Union Account #xx8157 |
| 7/9/2013 | $10,000 transfer from weMonitor Management's BayPort Credit Union Account #xx3730 to BANK's BayPort Credit Union Account #xx8157 |
| 7/12/2013 | $30,000 transfer from Dominion Diversified Strategy's BayPort Credit Union Account #xx5984 to BANK's BayPort Credit Union Account #xx8157 |
| 7/12/2013 | $70,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 7/12/2013 | $58,650 transfer from BANK's Bayport Credit Union Account #xx8157 to M.R. Diamonds USA c/o Wonder Jewelers for personal jewelry |
| 8/15/2013 | $55,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 8/25/2013 | $41,254 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for Hamilton Jewelers, Boot Star, Neiman Marcus, Gucci, Mezlan, Massage Envy, J Crew, Bealls, Nordstrom, etc. |

43

| DATE (on or about) | MONETARY/FINANCIAL TRANSACTION (approximately) |
|---|---|
| 9/18/2013 | $74,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 9/22/2013 | $57,529 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for Tumi, Hermes, Gucci, J Crew, etc. |
| 10/16/2013 | $50,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 11/8/2013 | $15,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's BayPort Credit Union Account #xx8157 |
| 11/20/2013 | $75,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 12/16/2013 | $4,166.69 transfer from weMonitor Group's Bayport Credit Union Account #xx3724 to PLI Group's Bayport Credit Union Account #xx8817 |
| 12/16/2013 | $78,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 1/13/2014 | $5,000 transfer from Warped Cigar Management's BayPort Credit Union Account #xx5031 to BANK's BayPort Credit Union Account #xx8157 |
| 1/13/2014 | $5,000 transfer from PLI Management's BayPort Credit Union Account #xx8821 to BANK's BayPort Credit Union Account #xx8157 |
| 1/22/2014 | $110,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 1/23/2014 | $98,120 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for Tourneau, Thomas Pink, Gray and Sons, Massage Envy, Cartier, Gucci, BCBG, etc. |
| 2/21/2014 | $76,900 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 2/25/2014 | $14,000 transfer from Spectrum Management's BayPort Credit Union Account #xx8618 to BANK's BayPort Credit Union Account #xx8157 |
| 3/11/2014 | $16,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |

44

| DATE (on or about) | MONETARY/FINANCIAL TRANSACTION (approximately) |
|---|---|
| 3/25/2014 | $65,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 4/22/2014 | $30,071 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 4/25/2014 | $110,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 4/25/2014 | $89,241 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for Bloomingdales, Joan of Art, Neiman Marcus Last Call, Gilt Groupe, Berluti, J Crew, S.Y.L.K., Brushing on Bisque, Tea Collection, Seaworld, etc. |
| 5/21/2014 | $65,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 6/18/2014 | $25,000 transfer from Spectrum 100 Management's Bayport Credit Union Account #xx5690 to Buckley Sandler LLP |
| 6/24/2014 | $65,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 7/25/2014 | $75,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 8/27/2014 | $100,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 8/27/2014 | $94,808 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for ILori, Stubbs & Wotton, Neiman Marcus, Art Brokerage Inc., Celebrity Press, Cartier, Thomas Pink, La Martina, Hermes, J Crew, Massage Envy, etc. |
| 9/26/2014 | $82,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 9/26/2014 | $81,627 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for Hermes, Swatch, Celebrity Press, Thomas Pink, Louis Vuitton, Saks Fifth Avenue, Ulta, Saks Off Fifth, Castro's Interiors, Pbteen, Guitar Center, J Crew, etc. |

| DATE (on or about) | MONETARY/FINANCIAL TRANSACTION (approximately) |
|---|---|
| 10/28/2014 | $103,854 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for Barney's New York, KentWang.com, Celebrity Press, Palm Beach Opera, Hermes, Agent Provocateur, J Crew, Saks Fifth Avenue, Tory Burch, etc. |
| 10/28/2014 | $118,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 11/26/2014 | $87,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 12/1/2014 | $87,402 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for Gucci, Celebrity Awards, Celebrity Press, Thomas Pink, Saks Fifth Avenue, Omega, Gilt Groupe, J Crew, Off Fifth, H&M, etc. |
| 12/24/2014 | $92,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 12/25/2014 | $74,736.05 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for Cartier, Celebrity Press, Nordstrom, Massage Envy, etc. |
| 1/14/2015 | $150,000 transfer from Spectrum 100 Management's BayPort Credit Union Account #xx5690 to BANK's BayPort Credit Union Account #xx8157 |
| 1/30/2015 | $100,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 1/31/2015 | $81,108 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for Beecroft & Bull, Grace's Tailor Shop, Celebrity Press, Nordstrom, KentWang.com, Saks Fifth Avenue, Watch U Want, Gucci, Robert Graham, Thomas Pink, Charles Tyrwhitt, etc. |
| 2/27/2015 | $99,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 3/1/2015 | $92,499 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for Lacoste, Neiman Marcus Last Call, Celebrity Press, Omega, Neiman Marcus, BCBG, etc. |

| DATE<br>(on or about) | MONETARY/FINANCIAL TRANSACTION<br>(approximately) |
|---|---|
| 3/25/2015 | $27,695 transfer from Dominion Investment Group's Bayport Credit Union Account #xx9056 to Buckley Sandler LLP |
| 3/31/2015 | $70,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 3/31/2015 | $16,000 transfer from BANK's Bayport Credit Union Account #xx8157 to Wolcott River Gates |
| 3/31/2015 | $56,940 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for Thomas Pink, Celebrity Press, Chanel, Barney's New York, Garnet Hill, One Kings Lane, J Crew, Zara, etc. |
| 4/2/2015 | $74,000 transfer from BANK's Bayport Credit Union Account #xx8157 Account to Singer Legal Group, LLC |
| 4/24/2015 | $100,000 transfer from Spectrum 100, LLC's Bayport Credit Union Account #xx5687 to Buckley Sandler LLP |
| 4/30/2015 | $95,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 5/1/2015 | $82,659 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for Gucci, Celebrity Press, Celebrity Awards, Tumi, Total Wine, Thomas Pink, Land's End, Massage Envy, BCBG, J Crew, Tory Burch, etc. |
| 5/28/2015 | $77,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 6/25/2015 | $55,000 transfer from Dominion Private Client Group's BayPort Credit Union Account #xx8622 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 6/26/2015 | $20,000 transfer from Prime Spectrum's Bayport Credit Union Account #xx5296 to Buckley Sandler LLP |
| 7/29/2015 | $78,000 transfer from Dominion Private Client Group's Oculina Bank Account #xx3011 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 8/6/2015 | $5,000 transfer from Dominion Investment Group's BayPort Credit Union Account #xx9056 to BANK's BayPort Credit Union Account #xx8157 |

| DATE (on or about) | MONETARY/FINANCIAL TRANSACTION (approximately) |
|---|---|
| 8/31/2015 | $85,000 transfer from Dominion Private Client Group's Oculina Bank Account #xx3011 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 9/2/2015 | $68,010 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for Vault, Celebrity Press, J Crew, Hermes, Law Offices of Joshua Deckard, West Elm, Ulta, Stella & Dot, Madewell, One Kings Lane, Just in Case Bail Bonds, Seaworld, etc. |
| 9/24/2015 | $15,700 transfer from Dominion Financial DBA Dominion Investment Group's Oculina Bank Account #xx3348 to Norris & St. Clair, P.C. |
| 10/1/2015 | $120,000 transfer from Dominion Private Client Group's Oculina Bank Account #xx3011 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 10/3/2015 | $111,457 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for Scotts Police K9, Orvis Company, Brooks Brothers, Orin Swift Cellars, Victoria's Secret, Petco, JP Boden, J Crew, West Elm, Ticketmaster, etc. |
| 10/29/2015 | $62,000 transfer from Dominion Private Client Group's Oculina Bank Account #xx3011 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 10/29/2015 | $46,850 transfer from BANK's Wachovia/Wells Fargo Bank Account #xx7355 to American Express for charges for Louis Vuitton, Hermes, Tory Burch, Homegoods, Dior, etc. |
| 11/24/2015 | $50,000 transfer from Dominion Private Client Group's Oculina Bank Account #xx3011 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 12/24/2015 | $48,000 transfer from Dominion Private Client Group's Oculina Bank Account #xx3011 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 1/5/2016 | $40,656 transfer from Dominion Financial DBA Dominion Investment Group's Oculina Bank Account #xx3348 to Buckley Sandler LLP |
| 1/20/2016 | $20,000 transfer from Dominion Financial DBA Dominion Investment Group's Oculina Bank Account #xx3348 to Norris & St. Clair, P.C. |
| 1/27/2016 | $17,943 transfer from Dominion Financial DBA Dominion Investment Group's Oculina Bank Account #xx3348 to Norris & St. Clair, P.C. |
| 1/29/2016 | $76,000 transfer from Dominion Private Client Group's Oculina Bank Account #xx3011 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |

| DATE (on or about) | MONETARY/FINANCIAL TRANSACTION (approximately) |
| --- | --- |
| 3/3/2016 | $75,000 transfer from Dominion Private Client Group's Oculina Bank Account #xx3011 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 3/14/2016 | $55,000 transfer from Dominion Private Client Group's Oculina Bank Account #xx3011 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 4/15/2016 | $10,000 transfer from Sovereign Asset Group's Oculina Bank Account #xx4808 to BANK's Wachovia/Wells Fargo Bank Account #xx7355. |
| 6/21/2016 | $10,000 transfer from Dominion Financial DBA Dominion Investment Group's Oculina Bank Account #xx3348 to Buckley Sandler LLP |
| 6/21/2016 | $10,000 transfer from Dominion Financial DBA Dominion Investment Group's Oculina Bank Account #xx3348 to Norris & St. Clair, P.C. |
| 8/4/2016 | $10,000 transfer from Dominion Financial DBA Dominion Investment Group's Oculina Bank Account #xx3348 to Norris & St. Clair, P.C. |
| 11/29/2016 | $10,000 transfer from Dominion Financial DBA Dominion Investment Group's Oculina Bank Account #xx3348 to Buckley Sandler LLP |
| 6/23/2017 | $60,000 transfer from Xcel Bandwidth's Oculina Bank Account #xx7718 to Norris & St. Clair, P.C. |
| 6/23/2017 | $60,000 transfer from Xcel Bandwidth's Oculina Bank Account #xx7718 to Singer Legal Group |
| 8/8/2017 | $143,137.28 cashier's check number 999494 from Xcel Bandwidth's MidFlorida Credit Union Account #xx1973 and deposited into Centerstate Bank of Florida |
| 8/16/2017 | $200,000 cashier's check number 999489 from Xcel Bandwidth's MidFlorida Credit Union Account #xx1973 and deposited into Generations Federal Credit Union in Texas |

(All in violation of Title 18, United States Code, Section 1956(h)).

49

## COUNTS TWENTY-FOUR – TWENTY-EIGHT
(Engaging in an Unlawful Monetary Transaction)

1.      The allegations contained in paragraphs 1 through 91 of the General Allegations section and paragraphs 1 through 20 related to Count One of this Second Superseding Indictment are realleged and incorporated as if set forth fully herein.

2.      On or about the following dates and in the manner described below, in the Eastern District of Virginia and elsewhere, defendants DARYL G. BANK, RAEANN GIBSON, and BILLY J. SEABOLT knowingly engaged and attempted to engage in the following monetary transactions by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000, that is, money deposits which represented fraudulently obtained funds from investors, such property having been derived from a specified unlawful activity, that is, wire fraud in violation of Title 18, United States Code, Section 1343:

| Count | Defendants | On or About Date | Financial Transaction |
|-------|------------|------------------|------------------------|
| 24 | BANK and GIBSON | December 23, 2013 | Payment of $55,493.50 for Daryl Bank's personal American Express card. |
| 25 | BANK and GIBSON | July 12, 2013 | Wire of $58,650.00 to M.R. Diamonds USA c/o Wonder Jewelers. |
| 26 | BANK and GIBSON | October 5, 2015 | Payment of $111,458.46 for Daryl Bank's personal American Express card. |
| 27 | BANK and GIBSON | August 26, 2014 | Check for $29,715.00 written to and negotiated by The Gibson Irrevocable Trust. |
| 28 | BANK, GIBSON, and SEABOLT | April 22, 2014 | Check for $25,000 written to and negotiated by Billy J. Seabolt. |

(In violation of Title 18, United States Code, Sections 1957 and 2).

## FORFEITURE

THE GRAND JURY FURTHER ALLEGES AND FINDS PROBABLE CAUSE THAT:

1.     Defendants DARYL G. BANK, RAEANN GIBSON, and BILLY J. SEABOLT, if convicted of one or more of the violations alleged in Counts One through Twenty-two of the Second Superseding Indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, which constitutes or is derived from proceeds traceable to the violation.

2.     Defendants DARYL G. BANK, RAEANN GIBSON, and BILLY J. SEABOLT if convicted of one or more of the violations alleged in counts Twenty-three through Twenty-Eight of the Second Superseding Indictment, shall forfeit to the United States, as part of the sentencing pursuant to Federal Rule of Criminal Procedure 32.2, any property, real or personal, involved the violation, and any property traceable to such property.

3.     If any property that is subject to forfeiture above, as a result of any act or omission of the defendant, (a) cannot be located upon the exercise of due diligence, (b) has been transferred to, sold to, or deposited with a third party, (c) has been placed beyond the jurisdiction of the Court, (d) has been substantially diminished in value, or (e) has been commingled with other property that cannot be divided without difficulty, it is the intention of the United States to seek forfeiture of any other property of the defendant, as subject to forfeiture under Title 21, United States Code, Section 853(p).

4.     The property subject to forfeiture includes, but is not limited to, the following property:

a.     A sum of money of at least $4,706,425.83, representing the proceeds DARYL G. BANK obtained from the offenses charged in counts one through twelve;

b.     A sum of money of at least $483,645.15, representing the proceeds RAEANN GIBSON obtained from the offenses charged in counts one through twelve;

c.     A sum of money of at least $137,851.65, representing the proceeds BILLY J. SEABOLT obtained from the offenses charged in counts one through twelve;

d.     $75,812.39 in U.S. currency seized from 814 SW St. Julien Court, Port St. Lucie, Florida on August 24, 2017;

e.     $1,565 in U.S. currency seized from Daryl Bank at the time of his arrest;

f.     Real property and improvements located at 814 SW St. Julien Court, Port St. Lucie, Florida 34986;

g.     Real property and improvements located at 9686 SW Flowermound Circle, Port St. Lucie, Florida 34987;

h.     Real property and improvements located at 1140 Northside Road, Elizabeth City, North Carolina 27906, also known as McPherson's Mobile Home Park;

i.     2011 Land Rover LR4 with VIN # SALAG2D41BA554792;

j.     2012 BMW 535i with VIN # WBAFR7C58CC815577;

k.     $143,558.26 seized on August 29, 2017 from Centerstate Bank account 20437174;

l.     Generations Credit Union account #1556709;

m.     Generations Credit Union account #1556674;

n.     One diamond ring 5.01K VS2 GIA #2151479679 and band;

o. All diamonds purchased by DARYL G. BANK from M.R. Diamonds between January 2015 and February 2016;

p. Approximately $325,840.00 on M.R. Diamonds' open book account for Dominion Investment Group;

q. One lot of jewelry seized from 814 SW Julien Court, Port St. Lucie, Florida on August 24, 2017;

r. One lot of jewelry seized from Daryl Bank at the time of his arrest;

s. One lot of watches seized from seized from 814 SW Julien Court, Port St. Lucie, Florida on August 24, 2017;

t. One lot of artwork seized from 814 SW Julien Court, Port St. Lucie, Florida on August 24, 2017;

u. One lot of sculptures seized from 814 SW Julien Court, Port St. Lucie, Florida on August 24, 2017;

v. One lot of collectable coins/currency seized from 814 SW Julien Court, Port St. Lucie, Florida on August 24, 2017;

w. One lot of antique clocks and trunks seized from 814 SW Julien Court, Port St. Lucie, Florida on August 24, 2017;

x. One lot of handbags, scarves, belts, sunglasses, and clothing accessories seized from 814 SW Julien Court, Port St. Lucie, Florida on August 24, 2017;

y. One Hermes belt seized from Daryl Bank at the time of his arrest;

z. One Visconti Dragon Pen seized from Daryl Bank at the time of his arrest; and

aa.     One lot of prepaid credit cards seized from 814 SW Julien Court, Port St. Lucie, Florida on August 24, 2017;

bb.     The following firearms:

- One Benelli Model M4 Shotgun

- One Sig Sauer 5.56 NATO Model M400 Rifle

- One Glock Model 17 "Third Generation" Pistol With Laser Max Laser Site Model 5A01247

- One Silver Taurus Model 445 Revolver

- One Interarms/Star Model PD 45 Cal Pistol

- One Davis Industries Model D25 "D-Series" Silver Derringer Handgun

- One Bersa Model 383A Silver Semi-Automatic Handgun With Wood Grips

- One Astra Model A100 Pistol

- One Glock Model 30 Pistol

- One Rohm GMBH Model RG17 Derringer

- One Sig Sauer Model P226 Pistol

- One Smith & Wesson Model 36 Revolver

- One Romarm/Cugir WASR-10 .762 Caliber Rifle

- One Colt Model CSR15 Rifle With Bump Stock

- One FN Herstal Model Scar 17S Rifle

- One Maverick Arms Model 88 12 GA. Shotgun

- One Tikka Beretta Bolt Model T3 Rifle

- One ATN Model X-Sight HD Wi-Fi GPS HDMI Scope (From Beretta Bolt)

- One Browning / Abercrombie & Fitch Over/Under Shotgun

- One Bushmaster AR-15/Carbon 15 Rifle (With Scope Model 1X30ST S/N 81350268)

- One New Haven/Mossberg Model 283B Bolt Rifle (Black/Wood) With Screw Choke

- One Sears Roebuck & Co. Model: Ted Williams Black/Wood Rifle

- One Weaver Scope (From Sears Rifle)

(All in accordance with Title 18, United States Code, Section 982(a)(1); Title 18, United States Code, Section 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461(c); and Title 21, United States Code, Section 853(p).)

*United States v. Daryl G. Bank et. al*
Criminal No. 2:17cr126

Pursuant to the E-Government Act,
the original of this page has been filed
under seal in the Clerk's Office

A TRUE BILL:

_____

FOREPERSON

G. Zachary Terwilliger
United States Attorney

By: *Melissa E. O'Boyle*
_____
Melissa E. O'Boyle
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
Phone: (757) 441-6331
Fax: (757) 441-6689
E-Mail: melissa.oboyle@usdoj.gov

By: _____
Elizabeth M. Yusi
Assistant United States Attorney
Attorney for the United States
United States Attorney's Office
8000 World Trade Center
101 West Main Street
Norfolk, VA 23510
Phone: (757) 441-6331
Fax: (757) 441-6689
E-Mail: elizabeth.yusi@usdoj.gov