IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 2:19cr47 |
| DAVID ALCORN | |
| and | |
| AGHEE WILLIAM SMITH II, | |
| Defendants. | |

**GOVERNMENT'S TRIAL BRIEF**

The United States, by and through its undersigned counsel, hereby submits its trial brief in the above-captioned case.

**I.     The Indictment**

On March 21, 2019, a grand jury returned an indictment against defendants David Alcorn ("Alcorn"), Aghee William Smith II ("Smith"), and others.[1]  ECF No. 1 (indictment). Count 1 charges Smith with Conspiracy to Commit Mail and Wire Fraud, in violation of 18 U.S.C. § 1349, arising from the sale of Dental Support Plus Franchises to investors.   Count 2 charges

---

[1] The indictment also charged defendants Kent Maerki, Tony Scott Sellers, Norma Jean Coffin, and Thomas Barnett with conspiracy and other substantive crimes.   On November 5, 2020, Maerki pleaded guilty to Count One of the indictment, and the Court later sentenced him to 16 years in prison.   On July 20, 2021, Tony Scott Sellers pleaded guilty to a criminal information charging him with conspiracy to commit wire fraud in violation of 18 U.S.C. § 371, and the Court sentenced him to 5 years' incarceration.   On November 10, 2021, Coffin pleaded guilty to a criminal information charging her with conspiracy to commit money laundering in violation of 18 U.S.C. § 371, and her sentencing is scheduled for March 14, 2022.   On January 20, 2022, Barnett pleaded guilty to a criminal information charging him with conspiracy to commit wire fraud in violation of 18 U.S.C. 18 U.S.C. § 371, and his sentencing is scheduled for May 23, 2022.

Alcorn and Smith with conspiracy to commit mail and wire fraud, also in violation of 18 U.S.C. § 1349.   Count 2 arises from the development and sale of fraudulent investments to victims across the country related to spectrum licenses.   Counts 7-17 charge the defendants with wire fraud in violation of 18 U.S.C. § 1343 related to various wires effectuating the two conspiracies.

Finally, Count 19 charges Alcorn with Engaging in an Unlawful Monetary Transaction in violation of 18 U.S.C. § 1957.   The 39-page indictment provides substantial details of this scheme through which the defendants successfully defrauded more than 300 investors across the country of over $20 million.

## II.   Anticipated Testimony and Evidence

The trial of defendants David Alcorn ("Alcorn") and Aghee William Smith II ("Smith") is scheduled to commence on February 1, 2022.   This case is related to *United States v. Daryl G. Bank et al.*, Case No. 2:17-cr-126.   The five-week trial of conspirators Daryl G. Bank and Billy J. Seabolt commenced in April 2021 and resulted in the conviction of both defendants.   As alleged in the Indictment here, the instant case involves the same schemes to defraud investors throughout the country via the fraudulent sale of fraudulent investments.

Defendant Alcorn was the founder and owner of Janus Spectrum, LLC, and the business partner of conspirator Kent Maerki.   Through Janus Spectrum, LLC, Alcorn and Maerki created the platform – the sale of fraudulent spectrum license application services – that Smith, conspirator Daryl Bank, and others used to steal millions of dollars from investors across the country.   As the trial will demonstrate, like his conspirators, Alcorn knowingly and intentionally lied to investors – and caused others to lie to investors – to obtain investment funds which he then used for his own personal benefit.   Alcorn's misrepresentations included, but were not limited to, lies about the potential uses of the specific spectrum licenses, who would monetize

those licenses, the amount of money needed to acquire such licenses, and the amount of potential return investors could expect from these investments. Through this scheme, Alcorn defrauded investors of millions of dollars and became a multi-millionaire.   After the Securities and Exchange Commission served him with a subpoena, Alcorn concealed his fraud proceeds by transferring over a million dollars to another's control in an attempt to prevent federal authorities from seizing his ill-gotten gains.

Defendant Smith was an insurance agent licensed in the State of California.   He did not hold a license to sell securities, and his insurance license did not allow for the sale of investment products like those at issue here.   Smith became associated with Maerki by selling fraudulent investments in Dental Support Plus Franchise as well as in an earlier iteration of the same scheme, Dazzle Dental, a failed investment that lost millions of dollars and which was the basis for Dental Support Plus Franchise's claimed "track record" of success.   At the same time, Smith also worked with Maerki and Alcorn to sell fraudulent spectrum license applications, first through his own entity and then through Bank's entities.   From 2011 all the way through 2017, Smith repeatedly lied to his clients – most of them elderly and unsophisticated in matters of finance – about material facts regarding these investments for his own personal financial gain.

Having presided over the trial of defendants' conspirators, the Court already is familiar with much of the evidence that the government intends to present in its case-in-chief.   As in the Bank trial, the government intends to present the majority of its case-in-chief through the testimony of the following categories of witnesses:

**The Investors:** The government will call numerous investors in the defendants' fraudulent schemes as witnesses.   Specifically, the government intends to call investors who invested in DSPF, DSPF Group, LLC, Janus Spectrum Group, LLC, Prime Spectrum, LLC,

Spectrum 100, LLC, and Xcel Bandwidth.   The government also will call victims who invested in other spectrum investments sold directly by Alcorn, Smith, and Sellers through Janus Spectrum, LLC.   The investors generally will testify about: (1) their relationships with Smith, Alcorn, or other conspirators; (2) what the defendants, or their conspirators, told them to convince them to invest; and (3) what losses they have sustained as result of these investments.

**Cooperating Witnesses:**   The government also may call three cooperating defendants at trial.   As in the Bank case, the government intends to call Raeann Gibson to testify about her role in this conspiracy.   While the government does not expect Ms. Gibson's testimony to last as long as it did in the Bank trial, her direct examination will once again be lengthy due to the number of exhibits that will be moved into evidence through her.   As in the last trial, the government intends to streamline its presentation of evidence by admitting business records and other documents, when possible, through Ms. Gibson.   The government also intends to call Tony Scott Sellers to testify about his role in this conspiracy.   As Mr. Sellers will explain, he conspired with defendants to fraudulently sell DSPF franchises and spectrum investments to victims located in Idaho, Utah, and other states.   Finally, the government also may call Tom Barnett as a witness in this trial.   Mr. Barnett recently accepted responsibility for his role in selling fraudulent Dental Support Plus Franchise and spectrum investments.

**Banking Professionals:** The government intends to call certain banking witnesses such as Denise Brown, who worked at BayPort Credit Union and recognized concerns with the DSPF investment.

**Company Insiders and Defendants' Agents:**   The government intends to call witnesses who worked for and with Alcorn and Smith.   For example, the government intends to call an employee from Dental Support Plus Franchise, and an employee of Dominion Insurance

Brokerage who specifically warned Smith not to continue to work with Daryl Bank.   The government also intends to call three of Alcorn's attorneys – Alan Baskin, Nathaniel Dodson, and Jere Friedman – to testify about their warnings to Alcorn about continuing to work with Daryl Bank and their advice to cease and desist from selling spectrum license application services while an SEC investigation was pending, all of which Alcorn ignored.

**Expert Witness:** The government intends to call one expert witness in this case.   The government provided notice that it intends to call Coleman Bazelon to testify about spectrum, spectrum license applications, the value of spectrum, including in the guard band and expansion band, misrepresentations about those same matters in the offering documents and advertising material used in the spectrum scheme, and other relevant topics outlined in his expert report filed with the Court.   Mr. Bazelon previously provided expert testimony on all of these matters at the Bank trial.

**Witnesses with Specialized Knowledge:**   The government also intends to call Peter Melley from the Financial Industry Regulatory Authority ("FINRA") and Andrew Gulcher from the California Department of Insurance.   Mr. Melley will testify about Smith's background in the securities industry and the NASD/FINRA-administered examinations passed by Smith and Alcorn, and also will present evidence regarding Daryl Bank and Kent Maerki and their regulatory bans from the securities industry – issues that Alcorn and Smith were well aware of when participating in the conspiracies charged in this case.   Mr. Gulcher will testify about California's standards governing the actions of individuals – such as Smith – who hold licenses to sell insurance, including their status as fiduciaries, the type of financial products their

insurance licenses allow them to market, and the higher level of responsibilities owed to elderly clients.[2]

**Law Enforcement:**   The government will present witness testimony from a forensic accountant who analyzed over 150 bank accounts and traced how conspirators treated investment funds.   In particular, the forensic accountant will present testimony about Janus Spectrum, LLC's bank accounts and what, specifically, Alcorn, Maerki, and Coffin did with such funds. He also will testify about the lengths Alcorn went to conceal his ownership of the fraudulent proceeds to ensure that the Securities and Exchange Commission, and other entities, could not seize his ill-gotten gains.   The government also intends to call a regulatory investigator from Arizona who assisted with the state's investigation of Dental Support Plus Franchise and who was present for Mr. Smith's testimony in that matter.   If necessary, the government may also call an FBI agent to testify about the investigation and to present additional evidence at trial.

## III.   Bases for the Admissibility of the Government's Anticipated Evidence

Given the volume of evidence likely to be introduced during the upcoming trial, the government believes it may be helpful to the Court to summarize the bases for admissibility of the government's key evidence.

### A.  Stipulations

The parties have already stipulated to the admission of a great deal of evidence, including business records of various regulatory agencies, trust accounts, bank records, and corporate entities controlled by defendants.   *See* Exhibit A (Government Exhibit 2000 – Stipulations).

---

[2]  On direct examination, the government does not intend to ask Mr. Gulcher about the two California Department of Insurance investigations into Smith.   Instead, his testimony will focus on the standards that applied to licensed insurance salesmen such as Smith during the time period alleged in the Indictment.   However, the government reserves the right to ask questions about the regulatory investigations, which relate to Smith's truthfulness and candor, if Smith testifies in his defense.

The parties also have stipulated to several facts that go to the elements of various charged offenses, for example, interstate commerce and the use of the wires.   *Id.*   The government has marked the stipulations as Government Exhibit 2000, and the parties have agreed that the stipulations may be marked, admitted as evidence in the case, and submitted to the jury.   *Id.*; *cf. United States v. Aragon*, 983 F.2d 1306, 1309 (4th Cir. 1993) (allowing stipulations as to testimony to be sent to the jury).   Because the stipulations here contain agreements as to certain facts that relate to the elements of the charged crimes, and because the parties have affirmatively agreed that they may go to the jury, the government asks that the Court permit them to do so. The government also will read the stipulations into the record at relevant times during its presentation of the evidence.

## B.  Expert Testimony

At trial, the government intends to introduce opinion testimony from one expert witnesses:   Coleman Bazelon on wireless spectrum.[3]

Rule 702 of the Federal Rules of Evidence allows for testimony of experts with specialized knowledge when it "will assist the trier of fact to understand the evidence or to determine a fact in issue."   FED. R. EVID. 702.   Although "opinion testimony that merely states a legal conclusion is less likely to assist the jury in its determination," the Fourth Circuit has explained that testimony that arguably states a legal conclusion is admissible in cases involving specialized industries.   *United States v. Barile*, 286 F.3d 749, 760 n.7 (4th Cir. 2002) (citations omitted).   In other words, expert opinion testimony does not present an improper legal conclusion merely because the testimony involves legal subject matter.

---

[3] The Court previously qualified Mr. Bazelon as an expert at the *Bank* trial and permitted him to testify from his expertise in spectrum and wireless telecommunications.   Case No. 2:17-cr-126, ECF No. 426 at 1919.

Here, the government's expert in wireless spectrum, Mr. Coleman, is necessary to explain the complex field of wireless spectrum, spectrum licenses, and spectrum valuation. Mr. Coleman will explain how wireless spectrum is used to facilitate wireless communication, and the methods the FCC has used to license particular bandwidths in particular geographical areas. He also will explain that certain ranges of bandwidth, including the "expansion band" and "guard band" portions of the 800 MHz range that were the basis of most of the spectrum investments at issue in this case, were not sought after by major wireless carriers or usable for broadband applications, as the defendants claimed in their offering documents and other advertising materials. Mr. Coleman will not offer testimony on ultimate legal conclusions, defendants' intent, or any other ultimate issue.

On November 1, 2021, the government provided notice that it would seek to introduce expert testimony from Mr. Coleman by sending a letter to the defense that included as attachments Mr. Coleman's expert report and curriculum vitae. On the same day, the government also filed an Expert Notice to ensure that the Court had sufficient time to review the proposed expert's qualifications and proposed opinions.

### C. Charts and Summaries under Rules 1006 and 611

Pursuant to Federal Rules of Evidence 1006 and 611, the government intends to present certain summary charts illustrating the flow of assets received from investors through accounts tied to defendants' various investment offerings.

Rule 1006 provides that a "proponent may use a summary, chart, or calculation to prove the content of voluminous writings . . . that cannot be conveniently examined in court." Fed. R. Evid. 1006. It is well-established that "[s]ummary charts are admissible if they aid the jury in ascertaining the truth." *United States v. Loayza,* 107 F.3d 257, 264 (4th Cir. 1997) (citing *United States v. Johnson*, 54 F.3d 1150, 1156 (4th Cir. 1995)). This rule authorizes the

admission of charts into evidence that serve "as a surrogate for underlying voluminous records that would otherwise be admissible into evidence," thereby "reduc[ing] the volume of written documents that are introduced into evidence."   *United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004).   Rule 1006 further requires the proponent to "make the originals or duplicates available for examination . . . at a reasonable time and place."   Fed. R. Evid.1006.

The use of summary evidence is particularly appropriate in a case of this complexity. "The complexity and length of the case as well as the number[ ] of witnesses and exhibits [is also] considered" in determining whether summary evidence is appropriate.   *United States v. Loayza*, 107 F.3d 257, 264 (4th Cir. 1997).   Bank records often are the subject of proffered summary charts, as they typically are voluminous and do not lend themselves to easy examination in the courtroom.   *See Loayza*, 107 F.3d at 264 (affirming the admission of summary charts of bank records); *United States v. Duke*s, No. 05-5266, 2007 WL 1962954,*49-51 (4th Cir. July 3, 2007) (affirming admission of summary charts of bank records).   The government intends to introduce into evidence numerous charts that summarize the deposits into and withdrawals from defendants' bank accounts, as well as the movement of funds and wire transfers.   These charts qualify as summary charts under Rule 1006 because they summarize the full contents of these bank accounts and will aid the jury in understanding how the defendants and their conspirators moved investor funds through numerous limited liability companies.   The government produced the vast majority of these summary charts to defense counsel nearly two years ago, on April 15, 2019.   Defense counsel have had the underlying bank accounts on which these summary charts are based for approximately three years.

Under Federal Rule of Evidence 611(a), summaries and charts of evidence already in the record may also be presented.   *Janati*, 374 F.3d at 273.   In a recent decision, the Fourth Circuit

reaffirmed its earlier holding, in *United States v. Johnson*, 54 F.3d 1150, 1159 (4th Cir. 1995), that Rule 611(a) summary charts may be admitted into evidence.   *United States v. Simmons*, 11 F4th 239, 262 n.12 (4th Cir. 2021).   Such charts may be used to "'aid the jury in its understanding of the evidence that has already been admitted,' by, for example, 'reveal[ing] inferences drawn in a way that would assist the jury.'"   *United States v. Oloyede*, 933 F.3d 302, 311 (4th Cir. 2019) (quoting *Janati*, 374 F.3d at 273).   For example, the Fourth Circuit recently allowed the presentation of charts of banking transactions that were presented at a criminal trial to "help the jury understand how various related records demonstrated a pattern of suspicious activity engaged in by the defendants."   *Id.*   It has also recognized the particular value of summary materials in health care fraud trials to aid the jury's understanding of complex subject matter.   *Janati*, 374 F.3d at 274.

Here, the government intends to present Rule 611 summary charts that summarize the flow of funds from investors/victims through accounts controlled by the defendants and their conspirators.   The government admitted many of these same charts into evidence during the Bank trial.   The government also intends to present charts that summarize the flow of funds in Mr. Alcorn's and Mr. Smith's bank accounts.   Defendants have had the summary charts for four months, and the underlying documents were themselves produced years ago during discovery. The government intends to call Alain Martell, an FBI Financial Analyst, to testify about these charts.

### D.  Admission of Evidence Under the Hearsay Rules

The parties have stipulated that much of the government's documentary evidence constitutes business records, which are admissible under a hearsay exception.   FED. R. EVID. 803(6).   The government previews below several evidentiary issues that may arise during trial involving the application of other hearsay rules.

### 1.  Statements Excluded From Hearsay Under Rule 801

In particular, the government intends to present statements, emails, recordings, and other documents that FED. R. OF EVID. 801 defines as non-hearsay when offered by the government. As noted by Wright & Miller, "the Advisory Committee urges 'generous treatment of this avenue to admissibility.'"   Wright & Miller, 30B Fed. Prac. & Proc. Evid. § 6772 (2021 ed.).

Rule 801(d)(2) defines as non-hearsay the statements of party opponents.   While the government can introduce the statements of the defendants and their conspirators under this Rule—because, as statements of party opponents, they are not hearsay—the defendants cannot use the same rule to introduce hearsay statements made by themselves, their conspirators or agents, or anyone else who is not their party opponent.   Again, as explained in Wright & Miller:

> A party cannot introduce its own statements, or those of its own employee, conspirator, agent, and so on under Rule 801(d)(2).   Qualifying statements can only be "offered against" the party who uttered them.   This prevents, among other things, criminal defendants from introducing their own exculpatory statements under the rule in lieu of live testimony to the same effect.

*Id.*  In practice, this means that Alcorn and Smith cannot use Rule 801(d)(2) to introduce their own hearsay statements or the statements of their conspirators such as Maerki, Bank, Gibson, Sellers, Coffin, and Barnett to the jury.[4]   The admission of such testimony could "effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury."   *United States v. McDaniel*, 398 F3d 540 (6th Cir. 2005).

---

[4] Smith has noticed his intention to attempt to admit statements of conspirators including Maerki, Bank, and others during its cross-examination of witnesses.   ECF No. 366.   As noted herein, Smith does not have an 801(d)(2) exception through which to elicit hearsay statements of himself or his alleged conspirators through witnesses at this trial, whether on cross-examination or direct examination.

### a. Statements of Defendants (Rule 801(d)(2)(A))

The government will introduce many statements made by the defendants themselves, such as those made to investors, employees, and co-conspirators, as well as public statements made by the defendants.   Such statements are admissions of a party opponent and are therefore excluded from the definition of hearsay under Federal Rule of Evidence 801(d)(2)(A) (excluding from the hearsay definition statements "offered against an opposing party" and "made by the party in an individual or representative capacity").   Further, when testimony relates to conversations with the defendant, the government may seek to introduce statements of the person with whom the defendant was speaking in order "to place [the defendant's] responses into context," *United States v. Wills*, 346 F.3d 476, 490 (4th Cir. 2003), and to make the defendant's statements "intelligible to the jury and recognizable as admissions," *id.* (quoting *United States v. Lemonakis*, 485 F.2d 941, 948 (D.C. Cir. 1973)).

In a recent filing, Smith moved *in limine* to exclude from the evidence his own statements allegedly made to a victim in this case after the date of the indictment.   ECF No  351.   Smith seeks to exclude a highly relevant false statement that he made to a victim in this case in April 2019 – a few weeks after a grand jury indicted him – in which he stated that "he had invested his personal money and his family's money in the same spectrum investments and has the same questions and concerns as Browne."   *Id.* at 2.   Smith claims that, under Fed. R. Evid. 403, the Court should exclude this statement made by Smith after the indictment because it is purportedly "irrelevant" and carries the danger of "unfair prejudice, confusing the issues, and misleading the jury."   *Id.*   Smith is simply wrong.

The fact that Smith lied to his client about having invested "his own personal money" in spectrum – a fact that is demonstrably false – within weeks of being indicted is highly relevant

evidence of Smith's intent to defraud in this case.   Smith's denial of engaging in illegal conduct, lying about his own personal investments, and attempting to shift blame to others are examples of "lulling" activities that aimed at evading personal responsibility for his crimes and are highly relevant to the question of Smith's intent to defraud.   *United States v. Titus*, 2012 WL 1237793, at *11 (4th Cir. April 13, 2012) (citing *United States v. Kelley*, 551 F.3d 171, 176 (2d Cir. 2009) (concluding that lulling activities were relevant to the question of intent)).   Here, Smith's attempt to evade detection of his own illegal activity by lying to his clients is evidence that has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."   FED. R. EVID. 401.   Indeed, the mere fact that proffered evidence came into existence after the events that the evidence is proffered to prove, does not render the evidence irrelevant.   *See Kelley*, 551 F.3d at 176 (finding that fraudulent account statements sent by defendant two to four years after alleged securities violations were relevant to defendant's intent at the time of the alleged violation); *United States v. Mangual-Santiago*, 562 F.3d 411, 428-29 (1st Cir. 2009) (finding that evidence of bank account activity after a conspiracy had ended was relevant to defendant's intent to conceal funds).   There is no exception to the admissibility of relevant statements simply because they are made after the date of an indictment; if that were the case, post-indictment confessions, attempts at witness tampering, or obstruction of justice would be inadmissible.   The Court should permit the government to present such highly relevant evidence at trial.

### b.  Statements Made By Agents (Rule 801(d)(2)(D))

The government also will introduce numerous statements made by defendants' agents pursuant to Federal Rule of Evidence 801(d)(2)(D).   FED. R. EVID. 801(d)(2)(D) provides that statements "made by a party's agent or employee on a matter within the scope of that

relationship and while it existed" are not considered hearsay and are therefore admissible.   Here, the government intends to enter into evidence statements and emails made by, among others, several of Alcorn's attorneys, who repeatedly advised him: (1) not to continue to do business with Bank; and (2) to stop soliciting investor funds while the SEC's fraud investigation was pending.   This evidence is highly relevant to Alcorn's specific intent to defraud investors in this case through the continued sale of fraudulent spectrum license application services.   Moreover, the attorneys' statements are admissible non-hearsay against a defendant/client "because they were made by [an attorney], acting as his agent, during and within the scope of the principal-agent relationship."   *See generally United States v. Gordon*, 754 Fed. App'x 171 (4th Cir. Nov. 7, 2018) (affirming admission of pleadings filed by counsel under FED. R. EVID. 801(d)(2)(D)); *see also United States v. Blood*, 806 F.2d 1218, 1221 (4th Cir. 1986) ("Generally, statements made by an attorney concerning a matter within his employment may be admissible against the retaining client.").[5]

This hearsay exception is broad and would apply even if the agent were "not authorized to speak on the matter," as long as the statement is "about a matter within the scope of [] employment."   *United States v. Poulin*, 461 Fed. App'x 272, 282 (4th Cir. Jan. 18, 2012) (quoting *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 321 (4th Cir. 1982)). Consistent with this principle, even "a statement of illegal activity can still be within the scope of employment and can be admissible under 801(d)(2)(D)."   *United States v. Riley*, 621 F.3d 312,

---

[5] Anticipating the government's use of this highly relevant evidence, Alcorn filed a motion *in limine* to bar it based on an assertion of the attorney-client privilege.   ECF No. 255.   As the government stated in its response, Alcorn waived his right to attorney-client privilege by relying on an "advice of counsel" defense in the SEC matter.   ECF No. 268.   Alcorn cannot use the attorney-client privilege as both a sword in the SEC matter and a shield in this criminal case. For the reasons stated in its earlier response, the government submits that such statements are admissible under Fed. R. Evid. 801(d)(2)(D).

338 (3d Cir. 2010), *as amended* (Oct. 21, 2010) (citing *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 488 (4th Cir. 1982)).

### c.   Statements Made By Co-Conspirators (Rule 801(d)(2)(E))

The government also intends to introduce statements made by defendants' co-conspirators during and in furtherance of the conspiracy.   Under Federal Rule of Evidence 801(d)(2)(E), such statements are excluded from the definition of hearsay when offered by the government.

In order to admit co-conspirator statements under Rule 801(d)(2)(E), the government "must show that (i) a conspiracy did, in fact, exist, (ii) the declarant and the defendant were members of the conspiracy, and (iii) the statement was made in the course of, and in furtherance, of the conspiracy." *United States v. Graham*, 711 F.3d 445, 453 (4th Cir. 2013) (quoting *United States v. Pratt*, 239 F.3d 640, 643 (4th Cir. 2001)).   Each of these three factors "must be supported by a preponderance of the evidence." *Id.* (citing *United States v. Blevins*, 960 F.2d 1252, 1255 (4th Cir. 1992)). The Fourth Circuit has explained, however, that district courts are not required "to hold a hearing to determine whether a conspiracy exists before admitting statements under the rule." *Id.*   Instead, a reviewing court will affirm a district court's judgment "where the record reveals that the co-conspirator's statements were plainly admissible, whether or not a detailed rationale for admitting the statements had been stated by the trial court." *Id.* (quoting *Blevins*, 960 F.2d at 1256).

In support of the admission of co-conspirator statements, the government will introduce evidence sufficient to support a finding as to each of the three necessary factors.   Importantly, the Fourth Circuit has stated that "[a] statement by a co-conspirator is made 'in furtherance' of a conspiracy if it was intended to promote the conspiracy's objectives, whether or not it actually

has that effect." *United States v. Smith*, 441 F.3d 254, 262 (4th Cir. 2006) (quoting *United States v. Shores*, 33 F.3d 438, 443 (4th Cir. 1994)).   In addition, the Fourth Circuit has construed the requirement that the proffered statements be made in support of the conspiracy "so broadly that even casual relationships to the conspiracy suffice to satisfy the exception."   *Id.* (quoting 5 Weinstein's Federal Evidence §§ 801.34[5], 801–89).

Here, the government intends to introduce numerous co-conspirator statements made in support of the defendants' ongoing scheme to enrich themselves by making false statements to induce victims to invest in these fraudulent schemes.   There were many conspirators who played a role in these schemes, including but not limited to Kent Maerki, Daryl Bank, Raeann Gibson, Tony Sellers, and Tom Barnett.   The government intends to present evidence of their statements and the statements of other conspirators in furtherance of this scheme.

### 2. Business Records (Rule 803(6))

The government will seek to admit many documents as business records.   As detailed above, the parties have stipulated to the admission of a great deal of these records, including records detailing the operation of several entities controlled by the defendants and their conspirators as well as bank records tracking the flow of money through defendants' fraudulent schemes.   *See* Exhibit A.

To satisfy the relevant hearsay exception—Federal Rule of Evidence 803(6)—a document "must be '(1) made by a regularly conducted business activity, (2) kept in the regular course of that business, (3) the regular practice of that business to make the memorandum, (4) and made by a person with knowledge or from information transmitted by a person with knowledge.'" *United States v. Cone*, 714 F.3d 197, 219 (4th Cir. 2013) (quoting *Clark v. City of L.A.*, 650 F.2d 1033, 1036–37 (9th Cir. 1981) (second set of internal quotation marks omitted)).

IV.     **Smith's Recently Filed Motions** *In Limine*

As trial approached, Smith filed three evidentiary motions seeking either to exclude highly relevant evidence intrinsic the scheme to defraud, or to proactively preclude the Court from making adverse rulings regarding hearsay and other evidentiary objections not yet lodged in this case.   ECF Nos. 365, 366, 367.   Two of these motions included references to purported "errors" the Court allegedly made during the Bank trial.   ECF Nos. 365 & 366.   The government respectfully disagrees that the cited references show error by the Court, and submits that the issues raised in the defendant's briefs related to hearsay and admissibility should be ruled on, to the extent necessary, with the benefit of the full context provided by the actual presentation of evidence at trial.   The government will object at trial, when appropriate and necessary, to attempts by the defendants to shoehorn hearsay statements into evidence by re-labeling them as "verbal acts."   "[A] 'verbal act' is a statement that 'affects the legal rights of the parties.' … Such acts are limited to statements that have independent legal significance, such as contractual offers or inter vivos gifts."   *United States v. Stover*, 329 F.3d 859, 870 (D.C. Cir. 2003) (quoting FED. R. EVID. 801 advisory committee's note and citing 5 Weinstein & Berger, Weinstein's Federal Evidence § 801.11[3] (2d ed. 1997)).

On November 10, 2021, out of an abundance of caution, the government provided notice to defendants of potential Rule 404(b) evidence that it may present in its case-in-chief.   The standards governing 404(b) evidence are well established.   Federal Rule of Evidence 404(b) provides for the admissibility of evidence of other crimes, wrongs or bad acts for purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity and absence of mistake or accident.   *See, e.g.*, *United States v. Queen*, 132 F.3d 991, 994 (4th Cir. 1997); *United States v. Bailey*, 990 F.2d 119, 122 (4th Cir. 1993); *United States v. Mark*, 943 F.2d 444,

447 (4th Cir. 1991); *United States v. Rawle*, 845 F.2d 1244, 1247 (4th Cir. 1988).

However, resort to Rule 404(b) is not needed to present evidence of acts that are "intrinsic" to the charged offense.   *United States v. Kennedy*, 32 F.3d 876, 886 (4th Cir. 1994) (approving evidence of criminal conduct involving uncharged individuals that took place a year before the charged conspiracy period, without recourse to Rule 404(b)); *accord United States v. Lipford*, 203 F.3d 259, 268-69 (4th Cir. 2000) (shooting at police officers executing search warrant, hitting one, was intrinsic to the crime charged, not governed by Rule 404(b)); *United States v. Chin*, 83 F.3d 83 (4th Cir. 1996) (approving evidence of uncharged murder and threats to murder in prosecution of heroin distribution and other drug-related crimes as acts intrinsic to the alleged crime); *Mark*, 943 F.2d at 448 (evidence of uncharged criminal activity admissible "where it furnishes part of the context of the crime"); *United States v. Masters*, 622 F.2d 83, 87 (4th Cir. 1980) (evidence of uncharged criminal conduct admissible if it "served to complete the story of the crime on trial").

### A.  Smith's Testimony About Dazzle Dental in 2015 Is Intrinsic To The Scheme

Evidence related to Smith's sale of investments in Dazzle Dental is intrinsic to this scheme to defraud.   As alleged in Paragraph 16 of the Indictment, "[t]he DSPF business model was based on a prior failed former investment called Dazzle Dental.   Maerki and Smith were well aware that Dazzle Dental was a failed investment that resulted in substantial losses to numerous investors on the West Coast."   ECF No. 1 at 4.   On July 22, 2015, Smith testified in a regulatory action that he raised $2 million from investors for Dazzle Dental, but that his investors did not receive the expected rate of return.   Government Exhibit 286.   Nevertheless, Smith went on to sell millions of dollars of Dental Support Plus Franchises – an investment built on the same failed platform as Dazzle Dental, and for which Dazzle Dental's business model purportedly

provided DSPF's "track record" of success – for another 3 years.   Smith did not disclose to new clients that his investors in Dazzle Dental had lost their money.   To the contrary, Smith told his clients that DSPF had a 5-year track record, that it was a "turnkey operation," and that it had a history of returns totaling 40% or more.   None of those things were true, and he knew it; indeed, by virtue of his direct involvement in selling Dazzle Dental, he knew it better than any other salesman involved in the scheme.   The Dazzle Dental evidence is intrinsic to the scheme because it goes directly to Smith's mens rea about the falsity of his representations to the DSPF investors.   It does not depend on Rule 404(b) for its admissibility – but even if it did, it is clearly admissible under the Rule, as discussed in more detail below.

Smith was involved in DSPF from the very beginning.   In fact, he received override payments on most DSPF purchases, including the ones sold to clients here in Virginia.   And, just like his clients in Dazzle Dental, investors who invested their retirement funds in DSPF lost millions.   As conspirator Maerki disclosed in a letter to investors, "[f]our years ago, we made the decision to franchise a marketing concept created by Steven Vereen of Dazzle Dental….Steven Vereen's business model did not work and was not scalable."   Government Exhibit 274.   Accordingly, Smith's sale of $2 million in the failed Dazzle Dental investment is highly relevant evidence that is intrinsic to the scheme to defraud alleged in Count 1 of the Indictment.

**B.  Smith's Testimony at the 341 Hearing Is Highly Probative Evidence**

Likewise, Smith's admissions under oath during his bankruptcy meeting of creditors hearing (commonly referred to as a "341 hearing" in reference to 11 U.S.C. § 341(a)) are, again, intrinsic to the case and demonstrate highly relevant evidence of his fraudulent intent.   After being indicted in this case, Smith filed for bankruptcy in California and listed his clients,

including clients to whom he sold the DSPF and spectrum investments, as "creditors," thereby seeking a discharge from any claims they might have against him.   Because he filed for bankruptcy, Smith subjected himself to a 341 hearing in which he had to answer questions under oath.   At the 341 hearing, Smith was represented not only by his bankruptcy attorney, but also by his criminal defense attorneys in this case.

During the 341 hearing, Smith made numerous admissions that are highly relevant to this case and are admissible under FED. R. EVID. 801(d)(2)(A).   For example, Smith testified under oath:

- "Most of my business was seniors and they died."

- Smith admitted that the DSPF entities "closed down" in 2013 and that spectrum "collapsed" in 2013.

- "Predators in law firms and criminals in government caused all of these damages and drove us in to bankruptcy."

- "Every law firm that took license to come after me as an innocent solicitor are the ones that are predators….[Victim CG] and [Victim RM] that attorney that handled that is a predator and a criminal."

- "There are no files at my home office left.   When predators came after me, I joyfully shredded them."

Government Exhibit 1215.

This evidence is not 404(b) evidence.   To the contrary, it is highly relevant evidence of Smith's intent to defraud the victims in this case.   They are his own statements, made under oath and with the benefit of counsel, about the schemes at issue here.   Smith's admission that "most of his business was seniors" demonstrates that he knew that he was dealing with a vulnerable population when he sold them these highly speculative, fraudulent investments.   Smith's admission that "spectrum collapsed" in 2013 is extremely probative given that he continued to sell spectrum investments with Bank and Alcorn until *August 2017*.

Also, Smith's testimony about victims CG and RM is particularly important.   Before he testified at this hearing, Smith was well aware that victim CG was involved in this case. Paragraph 56 of the Indictment specifically mentioned CG, an elderly client Smith met at church, and that he lied to her and that, as a result, CG invested $100,000 in Spectrum 100, LLC.   ECF No. 1.   Despite knowing that victim CG was involved in this case, Smith knowingly and intentionally testified about CG under oath at his 341 hearing and called her a criminal and a predator.   The government intends to call victims CG and RM at this trial.   The jury will hear from them, and they will testify about the lies and misrepresentations that Smith made to them to convince them to invest in these highly speculative, fraudulent investments.   In response, Smith refers to them and their counsel as criminals and predators.   This is how Smith viewed the clients that he defrauded, and it is extremely probative evidence of his fraudulent intent in this case.

Finally, the fact that Smith "*joyfully* shredded" his client files after Bank was indicted is, again, highly relevant evidence of fraudulent intent and that he was fully aware that he had something to hide.   An innocent man who has done nothing wrong does not "joyfully shred" his client files when his co-conspirator is indicted in federal court.   These recordings of his testimony under oath – which he subjected himself to after this case was indicted and during which he was represented by three separate attorneys – constitute highly relevant evidence that the jury should be able to consider.[6]

---

[6] If Smith's primary concern regarding these recorded statements is about unfair prejudice because he filed for bankruptcy, then the government is open to any suggestions defense counsel may have on a limiting instruction.   Respectfully, however, citation to a historical treatise about bankruptcy reaching back to the 15th century and further back to ancient Egypt, India, and Greece – where certain debtors supposedly "had to surrender their children to be exported as slaves" – has little to no relevance to the purported biases against individuals who declared personal bankruptcy in the United States after passage of its modern Bankruptcy Code.   *See*

### C.  Standards Governing 404(b) Evidence

In *United States v. Queen*, 132 F.3d 991, 994 (4th Cir. 1997), the Fourth Circuit established the standard for admissibility of Rule 404(b) evidence.   The refined four-part test under *Queen* holds that evidence of prior acts is admissible if: (1) the evidence is relevant to an issue, such as an element of the offense, and is not offered to establish the defendant's bad character; (2) the act is necessary in that it is probative of an essential claim or an element of the offense; (3) the evidence is reliable; and (4) its probative value is not substantially outweighed by confusion or unfair prejudice "in the sense that it tends to subordinate reason to emotion in the fact finding process."   *Id*. at 997.

For evidence to have probative value under Rule 404(b), prior acts must be sufficiently similar in nature to the acts charged.   The more similar the prior acts are, either in terms of physical similarity or state of mind, the more relevant the prior-act evidence becomes.   *Queen*, 132 F.3d at 997; *Mark*, 943 F.2d at 448.   It is not necessary, however, that the prior acts and the acts charged "be identical in every detail"; it is sufficient if they either share certain unique features or "a number of common features of lesser uniqueness . . . of significant probative value when considered together."   *United States v. Myers*, 550 F.2d 1036, 1045 (5th Cir. 1977) (internal citations omitted).   In *Queen*, prior-act evidence tending to make it less probable that the defendant's current actions were undertaken with an innocent purpose was deemed to be relevant under the restated test.   *Queen*, 132 F.3d at 997.

Evidence of prior acts is "necessary" when it is an "essential part of the crimes on trial, or where it furnishes part of the context of the crime."   *Id*. at 998 (citing *Mark*, 943 F.2d at 448).

---

ECF No. 367 at 15 (citing Efrat, *The Evolution of Bankruptcy Stigma*, 7 Theoretical Inquiries in L. 365 (2006)).   Smith's statements are highly probative evidence of his intent to defraud and, as noted above, should be admitted under FED. R. EVID. 801(d)(2)(D).

For the prior-act evidence to be "reliable," there must be proof such that a reasonable juror could find that the defendant committed the prior act.   *Huddleson v. United States*, 485 U.S. 681, 689 (1988).   For the reasons stated below, the government's proposed evidence is almost all intrinsic to the scheme and so does not fall under the auspices of Rule 404(b)—and to the extent it is not intrinsic, it is both necessary and reliable, and probative of the defendant's motive, intent, plan, knowledge, and absence of mistake.

In the Rule 404(b) context, undue prejudice requires exclusion of prior-act evidence only in those instances where the trial judge believes that "there is a genuine risk that the emotions of the jury will be excited to irrational behavior . . . disproportionate to the probative value of the offered evidence."   *United States v. Hernandez*, 975 F.2d 1035, 1041 (4th Cir. 1992) (citing *Masters*, 622 F.2d at 87); *see also Mark*, 943 F.2d at 449.   Prior-act evidence that is prejudicial only because it is "so highly probative," but does not "invoke emotion in place of reason," thereby causing a jury to act irrationally, satisfies the Rule 403 balancing test.   *Queen*, 132 F.3d at 998; *see also United States v. Powers*, 59 F.3d 1460, 1467 (4th Cir. 1995).

### D.  Alternatively, The Dazzle Dental Evidence Is Admissible Under 404(b)

If the Court concludes that the Dazzle Dental evidence is not intrinsic to the scheme to defraud alleged in Count 1 of the indictment, then the government respectfully submits that the Court should admit it as Rule 404(b) evidence because it is highly relevant evidence of defendant's fraudulent intent, his plan to defraud investors, his knowledge that the dental marketing platform was a failure, and absence of mistake.   The evidence that Smith sold $2 million of a failed investment product that involved providing a marketing arm for dentists – the same purported goal of DSPF, and on which the defendant knew DSPF's business plan and model was based – is highly relevant evidence of his fraudulent intent.   Unlike many other

conspirators involved in this scheme, Smith knew first-hand that the claims that DSPF had a "five-year track record" of producing "annual returns of 40% or more" were complete fabrications.   Smith knew these claims were false because he watched as his clients lost millions of dollars in the Dazzle Dental investment.   Far from an attempt to simply criticize his character, this evidence goes directly to the heart of this scheme and Smith's specific intent to defraud. Likewise, the Dazzle Dental evidence is necessary because it is probative of an essential claim or an element of the offense:   fraudulent intent.   The evidence is reliable given that Smith's prior testimony regarding Dazzle Dental was given under oath at a regulatory hearing where Maerki called him to testify.   Also of note is the fact that the Dazzle Dental investment was offered to accredited investors.   Smith knew that, and then turned around and sold DSPF, based on the same failed model, to unaccredited and mostly elderly investors who lost everything.

Finally, the probative value of this evidence is not substantially outweighed by confusion or unfair prejudice.   The proposed 404(b) evidence involving Dazzle Dental is prejudicial to defendant's case "just as all evidence suggesting guilt is prejudicial to a defendant."   *United States v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006); *United States v. Gougis*, 432 F.3d 735, 743 (7th Cir. 2005) ("The vast majority of the government's evidence against a defendant is prejudicial to him.   That's the idea.").   But the fact that evidence is prejudicial because it is probative does not justify exclusion.   Instead, "[e]vidence may be excluded under Rule 403 only if the evidence is *unfairly* prejudicial and, even then, only if the unfair prejudice *substantially* outweighs the probative value of the evidence."   *United States v. Siegel*, 536 F.3d 306, 317-19 (4th Cir. 2008).   As such, "[e]vidence is unfairly prejudicial and thus should be excluded under Rule 403 when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and . . . this risk is disproportionate to the probative value of the offered evidence."

*Id.* (quoting *Williams*, 445 F.3d at 730).   The government's proposed Dazzle Dental evidence is not unfairly prejudicial to the defendant.   There is no risk of confusion or danger of unfair prejudice.   The government is not going to call any of the elderly victims Smith defrauded through this investment, but instead will simply rely solely on Smith's own words, spoken under oath during an administrative hearing.   Accordingly, the government's proposed Dazzle Dental evidence is intrinsic to the scheme or, alternatively, satisfies every factor of the *Queen* test and should be admitted as 404(b) evidence.[7]

## V.    CONCLUSION

The government is cognizant of the difficulties of trying cases during the COVID pandemic and, as such, will present a focused and streamlined evidentiary presentation during its case-in-chief.   If necessary, it will ask the Court to address the admissibility of any 404(b) evidence that it intends to present at its case in chief.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:    /s/
Melissa O'Boyle (Va. Bar No. 47449)
Elizabeth Yusi (Va. Bar No. 91982)
Andrew Bosse
Assistant United States Attorneys
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number: 757-441-6331
Facsimile Number: 757-441-6689
Email: melissa.oboyle@usdoj.gov

---

[7] The government also reserves the right to question Smith about the Dazzle Dental investment on cross-examination should he elect to take the stand.   Questions about this, and other, failed and fraudulent investments Smith has sold to his elderly clients go directly to his credibility should Smith decide to take the stand and testify in his own defense.

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 31st day of January, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification to all counsel of record.

/s/
Melissa O'Boyle
Assistant United States Attorney
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Tel. – 757-441-6331
Fax – 757-441-6689
Email: melissa.oboyle@usdoj.gov