## EXHIBIT A

```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE

 2                    EASTERN DISTRICT OF VIRGINIA

 3                         NORFOLK DIVISION

 4

 5   --------------------------------

 6   UNITED STATES OF AMERICA,        )

 7   v.                               )

 8   DAVID ALCORN, AGHEE WILLIAM      )  Case No. 2:19-cr-47

 9   SMITH II, THOMAS L. BARNETT,     )

10   and NORMA JEAN COFFIN,           )

11        Defendants.                 )

12                                    )

13   --------------------------------

14

15         VIDEOTAPED DEPOSITION OF VERA HULLUM

16             FRIDAY, NOVEMBER 5, 2021,

17

18

19

20

21              BEHMKE REPORTING AND VIDEO SERVICES, INC.

22                  BY:  HECTOR CONTRERAS, CSR NO. 14051

23                      455 MARKET STREET, SUITE 970

24                      SAN FRANCISCO, CA 94105

25                          (415) 597-5600
```

1

2

3

4

5

6

7

8          Videotaped Deposition of Vera Hullum, taken on

9    behalf of the United States of America, at 501 I Street,

10   Sacramento, CA 95814, commencing at 8:34 a.m., Friday,

11   November 5, 2021, before Hector Contreras, Certified

12   Shorthand Reporter No. 14051, pursuant to notice of

13   Videotaped Deposition.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    APPEARANCES OF COUNSEL:

 2    FOR PLAINTIFF:

 3         U.S. ATTORNEY'S OFFICE, EASTERN DISTRICT OF VIRGINIA

 4         BY:  ELIZABETH M. YUSI, ASSISTANT U.S. ATTORNEY

 5         MELISSA E. O'BOYLE, ASST. U.S. ATTORNEY (Appearing Remotely)

 5         101 West Main Street, Suite 8000

 6         Norfolk, Virginia  23510

 7         Telephone:  (757) 441-3555

 8         Email:  Elizabeth.yusi@usdoj.gov

 9

10    FOR DEFENDANT, AGHEE WILLIAM SMITH II:

11         THE OFFICE OF THE FEDERAL PUBLIC DEFENDER -

12         EASTERN DISTRICT OF VIRGINIA

13         BY:  ANDREW W. GRINDROD, ASSISTANT FEDERAL PD

14         150 Boush Street, Suite 403

15         Norfolk, Virginia  23510

16         Telephone:  (757) 457-0860

17         Email:  andrew_grindrod@fd.org

18

19

20

21

22

23

24

25
```

```
 1    APPEARANCES OF COUNSEL - CONTINUED:

 2    FOR DEFENDANT, THOMAS L. BARNETT:

 3         ANCHOR LEGAL GROUP, PLLC

 4         BY:  ANTHONY M. GANTOUS, ESQ. (Appearing Remotely)

 5         5101 Cleveland Street, Suite 100

 6         Virginia Beach, Virginia  23462

 7         Telephone:  (757) 529-0000

 8         Email:  unavailable

 9

10    FOR DEFENDANT, NORMA JEAN COFFIN:

11         GREGORY K. MATTHEWS, PC

12         BY:  GREGORY K. MATTHEWS, ESQ. (Appearing Remotely)

13         P.O. Box 5277

14         Portsmouth, Virginia  23703

15         Telephone:  (757) 356-5744

16         Email:  unavailable

17

18    ALSO PRESENT:

19           JASON W. THOMASSON, U.S. POSTAL INSPECTION SERVICE

20           JASON BUTKO, VIDEOGRAPHER

21           AGHEE WILLIAM SMITH II

22           SILVESTER HULLUM

23

24

25
```

```
 1                            INDEX

 2   FRIDAY, NOVEMBER 5, 2021                      PAGE

 3   PROCEEDINGS                                     8

 3   VERA HULLUM

 4        Examination by ELIZABETH M. YUSI           9

 5        Examination by ANDREW W. GRINDROD         27

 6        Further Examination by ELIZABETH M. YUSI  44

 7

 8

 9                          ---oOo-

10

11

12

13

14             QUESTIONS WITNESS REFUSED TO ANSWER:

15                        PAGE     LINE

16                        (None.)

17

18

19

20

21

22

23

24

25
```

```
 1                    GOVERNMENT'S EXHIBITS

 2                        VERA HULLUM

 3   Number                    Description                    Page

 4   Exhibit 802   Investment Authorization - 1 page           21

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    DEFENDANTS' EXHIBITS

 2                       VERA HULLUM

 3   Number                 Description                    Page

 4   Exhibit 515  Franchise Agreement for Franchise #1

 5                June 7, 2021 - 2 pages                    29

 6

 7   Exhibit 516  Shelton & Power, LLC, June 7, 2021,

 8                Letter - 2 pages                          31

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          THE VIDEOGRAPHER:  Here begins Media Number One in
 2    the deposition of Vera Hullum in the matter of United States
 3    of America v. David Alcorn, Aghee Williams Smith II, Thomas
 4    L. Barnett, and Norma Jean Coffin.  This is being held in
 5    the United States District Court for the Eastern District of
 6    Virginia, Norfolk Division, Case Number 2:19-cr-47.  Today's
 7    date is November 5th, 2021.  The time is approximately
 8    8:36 a.m.
 9          My name is Jason Butko from Behmke Court Reporting
10    and Video Services located at 455 Market Street, Suite 970,
11    in San Francisco, California.  This deposition is being
12    taken at the United States Attorney's office, 501 L Street
13    in or -- I street in Sacramento, California.  And it was
14    noticed by Elizabeth Yusi of the United States.
15          Counsel, can you, please, identify yourself and who
16    you represent starting with the questioning attorney.
17          MS. YUSI:  I'm Elizabeth Yusi.  I'm assistant U.S.
18    attorney, and I represent the United States.  I also have on
19    the webcam Melissa O'Boyle present who also represents the
20    United States, and -- and to my left I have Jason Thomasson
21    with the United States Postal Inspection Service.
22          MR. GRINDROD:  Andrew Grindrod representing Aghee
23    Smith.
24          THE VIDEOGRAPHER:  Okay.  Can the court reporter,
25    please, swear the witness.
```

```
 1              (Whereupon, the witness was sworn in.)
 2              THE VIDEOGRAPHER:  You may proceed.
 3              MS. YUSI:  Thank you.  And for the record, we do
 4     have Aghee Smith in here and Silvester Hullum is also in
 5     attendance.
 6                           VERA HULLUM,
 7     having been sworn by the Certified Shorthand Reporter,
 8     HECTOR CONTRERAS, to tell the truth, the whole truth, and
 9     nothing but the truth, testified as follows:
10
11                           EXAMINATION
12     BY MS. YUSI:
13     Q       Good morning, Ms. Hullum.  Thank you for being here.
14     Could you identify yourself.  Introduce yourself to the
15     Court.
16     A       My name is Vera Hullum.
17     Q       How do you spell your last name?
18     A       H as in Howard, u-l-l-u-m.
19     Q       And how old are you today?
20     A       I'm 73.
21     Q       And where do you live?
22     A       We live in Antelope, California, 8424 Sage Canyon
23     Court.
24     Q       Is that outside of Sacramento, California?
25     A       Sacramento County.
```

1    Q       Okay.  How long have you lived in Antelope
2    approximately?
3    A       We live at our present home for 27 years.
4    Q       And are you working now?
5    A       No, I retired.
6    Q       And what did you do prior to retirement?
7    A       I was a registered nurse.
8    Q       How about -- how long were you a registered nurse
9    for?
10   A       Well, the first 15 years I was an LPN and then I
11   went back to college and I was a registered nurse for
12   30 years.
13   Q       Okay.  And -- and when did you retire?
14   A       I retired in November of 2013.
15   Q       And are you married?
16   A       I am.
17   Q       To whom are you married?
18   A       Silvester Hullum.
19   Q       How long have you guys been married?
20   A       We've been married for 54 years.
21   Q       Is he retired as well?
22   A       Yes.
23   Q       What did he do prior to retirement?
24   A       He was a pipe fitter mechanic for Campbell Soup
25   Company.

1    Q        Was that at a factory?

2    A        Yes.  It's here on Franklin Boulevard until they

3    closed the company down.  He took the early out.

4    Q        Okay.  And when did he retire?

5    A        2010.

6    Q        And do you know about how old he was at that --

7    A        66.

8    Q        66?

9    A        Mm-hmm.

10   Q        And while you both were working, were you saving for

11   retirement?

12   A        Yes.

13   Q        Was that important to you all?

14   A        Very important.

15   Q        Now, I want to talk to you about the Defendant,

16   Aghee Wills -- Aghee William Smith also known as Bill Smith.

17   Do you know the Defendant Bill Smith?

18   A        Yes.

19   Q        And can you identify him today?

20   A        Yes.  He -- they -- can you pull your mask down a

21   little?

22            Yes, that's him.

23   Q        Okay.  And -- and just for the record --

24            MR. GRINDROD:  We'll stipulate.

25            MS. YUSI:  Thank you -- that she identified him.

BY MS. YUSI:

Q    When did you first meet Bill Smith?

A    About the time my husband was preparing to retire late 2009, early 2010.  He met him -- well, it was a friend that worked with my husband at Campbell Soup, and my husband come home and tell me about Mr. Smith being someone who could successfully take care of our retirement funds and, you know, help us with them.  And so I agreed to go out to his office, which was on Melanie Lane and meet with Mr. Smith.  And we went out and met with him initially, and we decided to go ahead and let him handle our retirement, and from then on we met with him many, many times.

Q    And -- and at that time, was it -- what was -- your husband, did he get a pension or was this savings or kind of an employee benefit program from Campbells?

A    He had -- he had his -- while I worked he did most all the savings and I kind of used a lot of the money that I made to -- for the household things, so my retirement fund was not as much as -- my husband had quite a bit more retirement funds than I had.  So it was his pension, retirement fund that we decided to put in the hands of Mr. Smith so that he could manage them for us.

Q    And did Mr. -- and did your husband, Silvester Hullum, did he give all -- all of his retirement to Mr. Smith for his -- to help with the retirement?

```
 1   A        Yes.

 2   Q        About how much was that if you know?

 3   A        Let's see.  There was 80,000 and then there was

 4   another 300- and close to 400,000.

 5   Q        Did you have anything else to -- to live on in

 6   retirement besides that?

 7   A        Well, my retirement was about maybe 60,000 and so --

 8   and -- and we -- we eventually gave Mr. Smith about 40,000

 9   from that.

10   Q        Okay.  And then what was your understanding of who

11   Mr. Smith was and what he did for a living?

12   A        We felt, like, that -- well, I actually called the

13   Better Business Bureau and received a letter from them

14   saying that they had nothing.

15            MR. GRINDROD:  Objection.  Hearsay, foundation.

16   BY MS. YUSI:

17   Q        Did -- let me rephrase.

18            Did you -- did you try to check out Mr. --

19   Mr. Smith's --

20   A        Yes.

21   Q        -- reputation prior to meeting with him?

22   A        Yes.  I called the Better Business Bureau.  I wrote

23   them a letter.

24   Q        And did -- and don't tell me what they said, but did

25   you feel comfortable going to --
```

```
 1   A        Yes.

 2            (Reporter clarification.)

 3            MS. YUSI:  Sure.

 4   BY MS. YUSI:

 5   Q        We'll just -- yeah.  I'll ask my question and then

 6   you'll answer.

 7            And -- and -- and -- so you checked him out, and

 8   then you went to him.  What did Mr. Smith tell you guys

 9   about who he was and what he did?

10   A        He let us know that he did handle retirement funds

11   and that he could invest them for us.  He was an investment

12   person, broker, and he was a specialist at what he did and

13   he had a great amount of experience.  And very easy to talk

14   to, very easy-going person, and we felt that he was

15   truthful.  He -- he -- he gave us the impression that he

16   loved God and that he was a God-fearing man and that many

17   times he prayed and -- and -- and that he was a good person.

18   And -- and, of course, we love God, and we just felt that he

19   was a good person to handle our retirement.

20   Q        Now, when you were looking for -- for assistance in

21   terms of your retirement, were you looking for, like, a

22   retirement income to last throughout your retirement?

23   A        Yes.

24   Q        Okay.

25   A        Yes.
```

```
 1   Q        What did Mr. Smith suggest for investments, just the
 2   general type?
 3   A        Well, he had several places that he could invest it,
 4   you know.  Was it Northridge and Western -- there were
 5   401(k)s.  There were various places that he could invest it.
 6   I can't remember all of them right now, but there was about
 7   four or five different places that he diversified our funds.
 8   Q        Okay.  And -- and what -- and -- and what was your
 9   comfort level with risk in terms of your funds.  Were you
10   willing to lose your -- your retirement?
11   A        Well, I felt, like, this was something that -- that
12   there were people who did this, and as I say, I did talk to
13   the Better Business Bureau.  So, yes, I -- at first I felt
14   comfortable, yes.
15   Q        Okay.  Now -- and did Mr. Smith know the entirety of
16   your -- of your financial situation?  He knew everything
17   that you all owned and -- and what -- what you planned on --
18   on retiring on, et cetera?
19   A        Yes.  We -- well, we told him what our expectations
20   were and, you know, that we had grandchildren and -- and, of
21   course, all our children were grown at that time.  And --
22   and we told him our expectations, and that we wanted to be
23   able to, you know, travel and -- and give to our
24   grandchildren and take them on cruises and if we could help
25   them with college, whatever we could possibly do to help.
```

```
 1   Q        Now, when you first met him in 2010, did you ever
 2   hear or -- when did you first hear about an investment
 3   called Dental Support Plus Franchises after the first time
 4   you met with him in 2010?
 5   A        It was in about a year.
 6   Q        Okay.
 7   A        About maybe 2011 that we heard about it.
 8   Q        And who told you about that?
 9   A        Mr. Smith.
10   Q        What did he say about Dental Support Plus?
11   A        He said there was another avenue that we could
12   venture into, that we could get substantial income, as much
13   as four, five years down the road, as much as maybe 5,000 a
14   month, you know.
15   Q        And did -- did he say if this was a proven
16   investment, or did it have track record?
17   A        He said it was solid.
18   Q        Okay.
19   A        That -- I don't know if that's exact words, but
20   that's the impression given, that it was a solid investment
21   and that there was next to no way that we could lose in this
22   investment.
23   Q        Did he talk to you about a man named Kent Maerki?
24   A        Yes.  He did tell us about Mr. Maerki.
25   Q        What did he say about Kent Maerki?
```

1    A        He said his office was in Scottsdale and that -- I

2    think he was the -- what I would call the CO more or less,

3    and that he had -- had many people that -- many people that

4    had invested in this venture and that it -- it would be a

5    good thing.  Since we had trusted him with all our funds, we

6    felt, like, him telling us it would be a good thing for us

7    to invest in -- we felt, like, it would be a good avenue for

8    us to go.

9    Q        Now, did you or your husband -- do you have any

10   background or training in investments?

11   A        None.

12   Q        Okay.  Would you consider yourself a sophisticated

13   investor?

14   A        I realize that ignorance is no excuse.  I would not

15   consider us sophisticated in any shape or form.  However, we

16   were trusting.

17   Q        All right.  And -- and did -- did Mr. Smith say

18   about the fee or commission that he -- did he talk about any

19   fees or commission that would come out of your money for the

20   Dental Support Plus Franchise?

21   A        Well, there was an office there in Arizona that --

22   I'm trying to remember how it all went.  He said everything

23   would be taken out of the money, and the money that we

24   gained, you know, for --

25   Q        So at the back.  Once you started making money --

```
 1  A       Yes.

 2  Q       -- that's where --

 3          MR. GRINDROD:  Object.

 4  BY MS. YUSI:

 5  Q        -- they would get their --

 6  A       Yes.

 7          MR. GRINDROD:  Objection.  Leading.

 8          MS. YUSI:  Can you let me answer -- say my question

 9  first and then do the objection so we get a clean record?

10          MR. GRINDROD:  I'll make my -- if my objection is to

11  my questions, I'm going to object when it's objectionable.

12          MS. YUSI:  We need a clean record for the Court.

13          MR. GRINDROD:  I understand.

14          MS. YUSI:  If I -- if he -- if the Judge rules that

15  I can ask that, we can't dub (phonetic) you out from it.  So

16  just -- I'm going to do the same for you.  Okay.

17          MR. GRINDROD:  Okay.

18  BY MS. YUSI:

19  Q       Now -- so -- so he said that money would -- I'm just

20  trying to listen to what you just said.  He said the money

21  would be taken out from what you earned?

22  A       Yes.

23          MR. GRINDROD:  Objection.  Leading.

24  BY MS. YUSI:

25  Q       What was your answer?
```

```
 1   A       Yes.
 2   Q       Thank you.
 3           And you said that he had other -- did you say -- and
 4   you said he -- he knew other -- he had other people that
 5   were successful in investing in this investment?
 6           MR. GRINDROD:  Objection.  Leading.
 7           THE WITNESS:  That's what we were told.
 8           MS. YUSI:  Pardon?
 9           MR. GRINDROD:  Objection.
10   BY MS. YUSI:
11   Q       I'm sorry.  I'm just trying to clarify what you said
12   earlier.  What did you say about other people investing in
13   the --
14   A       He said that Kent Maerki had -- it was a very, you
15   know, successful venture, and there were other people --
16   many other people.
17   Q       And -- and -- and this is what Bill Smith told you?
18   A       Yes.
19   Q       Did he say anything about himself investing?
20   A       He didn't say he invested.  He said he worked with
21   Mr. Maerki with this venture.
22   Q       Okay.
23   A       Which gave us another level of confidences because
24   we felt like he was, you know --
25   Q       And -- and did you all decide to do an investment
```

1   with the Dental Support Plus Franchise?

2   A       Yes, we did.

3   Q       And how much did you put in?

4   A       40,000.

5   Q       And in order to do this investment, did you have

6   to -- what did Mr. Smith do in terms of -- what did he do to

7   help you with this investment?

8   A       Well, he gave us a list of all investments that he

9   had made for us and he took so much out of -- I think it was

10  four or five of them that -- that added up to something

11  like -- it was around 43,000 when we added together what he

12  used.

13  Q       Did you go to a bank with Mr. Bank -- with

14  Mr. Smith?

15  A       Yes.  There was an account open at the Wells Fargo

16  Bank there in -- I think it's Citrus Heights.  It's right

17  off of Auburn Boulevard.

18  Q       Okay.  And what was the purpose of going to the

19  bank?

20  A       Well, we were told that we would open account there

21  and all of our funds and -- not all of our funds but all of

22  our money that we would receive and all the money that would

23  be -- would go through that bank.

24  Q       Did he introduce you to anyone at that bank?

25  A       He had a relative.  I believe it was a daughter or a

```
 1    daughter-in-law, someone that was some kin to him that
 2    worked in that bank, yes.
 3    Q        Okay.  Now, I'm going to show you what's been marked
 4    for identification as Exhibit 802.  If you could just look
 5    at that real quick.  Do you recognize that document?
 6    A        We had a few that look like this, yes.
 7    Q        Okay.  And -- and is that -- whose signature is at
 8    the bottom of it?
 9    A        My husband.
10             MS. YUSI:  We move to admit Exhibit 802.
11             (Government's Exhibit 802 was marked for
12             identification.)
13    BY MS. YUSI:
14    Q        Now, is -- what is the date of his signature if you
15    can see that on exhibit --
16    A        7/13/11.
17    Q        Okay.  Was that -- so July 2011 is that
18    approximately when you all made your investment into --
19    A        Yes.  Yes.
20             (Reporter clarification.)
21             MS. YUSI:  Sorry.
22    BY MS. YUSI:
23    Q        Is that -- in July 2011 is that when you all made
24    your investment in Dental Support Franchise?
25    A        Yes.  About a year after we started working with
```

```
 1   Mr. Smith.
 2   Q       Okay.  And was there a lot of paperwork that you
 3   received concerning the franchise?
 4   A       Books and books.
 5   Q       And did Mr. Smith go through that paperwork with you
 6   at all?
 7   A       Well, more or less told we could read it at our
 8   leisure.
 9   Q       Okay.  So -- so --
10   A       It was a lot of -- a lot.
11   Q       All right.  So did he ever sit down and go page or
12   anything with you all?
13   A       No.  No.  We didn't go page by page.
14   Q       What was your understanding when you first invested
15   as to any work or effort you would have to make in the
16   Dental Support Plus Franchise?
17   A       No -- no work.
18   Q       No -- it was hands off?
19   A       As far as -- yes.
20   Q       Okay.
21   A       Yes.
22   Q       How often would you speak with Mr. Smith?
23   A       He was very available.  Anytime we called him he
24   made himself available, sometimes twice a month, sometimes
25   once a month.  He was available --
```

```
 1   Q        Okay.

 2   A        -- at first, yeah.

 3   Q        And -- and what happened?  You said, "At first."

 4   What do you mean by that?

 5   A        I mean, of course, towards the end of the whole

 6   situation, he was less approach -- available.  My husband

 7   talked to him, I think, about maybe two months ago on the

 8   phone -- about two, maybe three months.  It's been a while.

 9   And that's the last time we talked to him.  And before then

10   it was very sketchy.  Yeah, two or three months, you know.

11   Q        Okay.  Did Mr. Smith ever say there are any issues

12   with any of your investments?

13   A        Well, he didn't say anything that he had that was

14   any problems with.

15   Q        Okay.  What -- what did he say?

16   A        You mean verbatim what did he say?  Let's see.  How

17   can I put this?  He -- until we were -- started to get

18   letters from Virginia letting us know there was an ongoing

19   investigation and litigation was in process and things were

20   beginning to happen, we didn't know that we had a real big

21   problem, not with that $40,000.  No, we didn't know.

22   Q        Okay.  And did you ever -- do you recall receiving

23   any money from the Dental Support Plus investment?

24   A        Now, I don't recall receiving checks, but I

25   understand there were some checks that were signed in the
```

```
 1    front by someone.  I --
 2    Q      Well, I'm just asking what you recall.
 3    A      No.
 4    Q      Okay.
 5    A      Not initially, no.
 6    Q      Okay.  And did you ever ask for any money back from
 7    your investment over the years?
 8    A      The 40,000, no --
 9    Q      Okay.
10    A      -- not from that.  From the other money he had --
11           MR. GRINDROD:  Objection.
12           MS. YUSI:  What's your basis?
13           MR. GRINDROD:  I object -- object to relevance as to
14    other investments.
15           THE WITNESS:  Okay.
16    BY MS. YUSI:
17    Q      Did you receive any money back from the investments
18    that you made with Mr. Smith?
19    A      Are you talking about the 40,000?
20    Q      Just all your investments.
21           MR. GRINDROD:  Objection.  Relevance.
22           THE WITNESS:  Can I answer?
23    BY MS. YUSI:
24    Q      Yeah.
25    A      I remember one time we wanted to get a car, and I
```

```
 1    think we got 20,000.  And then I remember that we had an
 2    insurance -- a life insurance that he invested money that we
 3    received roughly 1,200 a month, and we were promised that
 4    after that would automatically kick into a higher amount
 5    that we would get continually and that ran out and I called
 6    him.  And they said there were no more funds available.
 7    There's no more -- giving you.  Since we had lost all of our
 8    money, we are reduced to living on Social Security.  That's
 9    all I and my husband live on now.  That's all we have.
10    Q       When -- with the other investments you made, did
11    Mr. Smith ever say anything about Kent Maerki being involved
12    with them or was the --
13    A       No.
14    Q       -- Dental Support Plus the first time you heard
15    about Mr. Maerki?
16    A       As far as I can remember, Dental Plus was the first
17    time I heard about Mr. Maerki.
18    Q       Okay.  Did -- what, if anything, did Mr. Smith tell
19    you about his involvement with Dazzle Dental?  Do you
20    know --
21    A       Who?
22    Q       Dazzle Dental.  Did he ever say anything about his
23    involvement with Dazzle Dental?
24    A       No.
25    Q       Did Mr. Smith say anything to you, if anything,
```

```
 1   about any involvement with other dental franchise or
 2   investments that were failed prior to selling this one to
 3   you?
 4   A       No.  No.
 5   Q       Okay.  What, if anything, did Mr. Smith say to you
 6   concerning Mr. Maerki's -- Mr. Maerki's -- let's see.  I'm
 7   going to rephrase.
 8           Did -- what, if anything, did Mr. Smith tell you
 9   after your investment concerning state regulatory
10   investigations into the Dental Support Plus Franchise?  Did
11   he ever update you on those?
12   A       No.
13   Q       Did he --
14   A       Not that I remember.
15   Q       Did Mr. Smith ever talk to you about -- about
16   testifying on Mr. Maerki's behalf concerning the franchises?
17   A       No.
18           MR. GRINDROD:  Objection.
19           MS. YUSI:  If I could just have one moment.  I'm
20   just talking to -- I think those were all my questions right
21   now, Ms. Hullum.  I believe other counsel will have some.
22           For the record, I just want to reflect that Anthony
23   Gantous on behalf of Thomas Barnett is -- counsel for Thomas
24   Barnett he's on -- he's involved on this via the Webex as
25   well as Greg Matthews who is counsel for Norma Jean Coffin?
```

```
 1          Go ahead.
 2                    EXAMINATION
 3   BY MR. GRINDROD:
 4   Q       Good morning, ma'am.
 5   A       Good morning.
 6   Q       My name is Andrew Grindrod.  I represent Mr. Smith.
 7   A       Yes.
 8   Q       And, ma'am, what I'd like to do is start off talking
 9   about a timeline.  I know this was a long time ago?
10   A       Yes.
11   Q       So I'm going to show you some documents and walk
12   through some dates with you.  Okay.
13           I'm going to hand you a document that's been marked
14   Government Exhibit 804.  You recognize that document?
15   A       It looks like the front of one of the books that we
16   received.
17   Q       Okay.  And feel free to flip through that to
18   familiarize yourself with it.  I'm going to ask you --
19           MS. YUSI:  Are you admitting it under your own
20   defense exhibit number?
21           MR. GRINDROD:  I mean, I -- do I have to mark it as
22   a different -- why can't --
23           MS. YUSI:  Well, it will be just your exhibit.
24   We're not admitting it so...
25           MR. GRINDROD:  That's fine.  But it's already marked
```

```
 1  as yours, so I wasn't going to remark it unless --
 2          MS. YUSI:  I just want it to be clear for the
 3  record.
 4          MR. GRINDROD:  Sure.
 5          MS. YUSI:  Yeah.  Just make it a different or
 6  Mr. Smith's exhibit.
 7          MR. GRINDROD:  Okay.  You want me to remark it as my
 8  own?
 9          MS. YUSI:  That's fine.
10          MR. GRINDROD:  That's fine or no?
11          MS. YUSI:  Oh, yeah, of course.
12          THE WITNESS:  Yeah.  How many times my husband --
13          (Reporter clarification.)
14          THE WITNESS:  I'm seeing how many times he
15  initialled this.  He has the book.
16  BY MR. GRINDROD:
17  Q      So, ma'am, just whenever you're done --
18          MS. YUSI:  Are you admitting?  Hold on.  You're --
19          (Reporter clarification.)
20  BY MR. GRINDROD:
21  Q      So now that you've seen that document, do you
22  recognize that document?
23  A      I would have to go through my -- I have so many --
24  so many papers at home in book form that I would have to go
25  through my file.  I recognize this one but I do recognize my
```

```
 1   husband's signature.
 2   Q        And your husband's signature is throughout that
 3   document?
 4   A        Signature and -- and initialling, yes.
 5   Q        Okay.
 6            MR. GRINDROD:  Okay.  I offer that and I'll -- I can
 7   remark it as Smith Exhibit 515.
 8            (Defendants' Exhibit 515 was marked for
 9            identification.)
10            MS. YUSI:  Okay.
11   BY MR. GRINDROD:
12   Q        Ma'am, just so I can put this sticker on it, would
13   you pass that back to me.  Thank you.  There you are.
14            Would you go, ma'am, to the very last page of that
15   document.  It's actually on the back.
16   A        Turn to the back?
17   Q        Yes, ma'am.
18            Now, that's the Dental Support Plus Franchise
19   application, right?
20   A        Okay.
21   Q        And you see that there's signatures on that last
22   page?
23   A        Yes.
24   Q        Your -- your signature, right?
25   A        Yes.
```

1    Q        Sorry, ma'am?

2    A        Yes.

3    Q        And -- and your husband's signature?

4    A        Yes.

5    Q        And there's a date next to that, right?

6    A        Mm-hmm, 3/23/11.

7    Q        Okay.

8    A        Mm-hmm.

9    Q        And so March 2011 is the general time period where

10   you all started looking into or seriously looking into

11   Dental Support Plus Franchise, right?

12   A        Okay.

13   Q        Is that right?

14   A        It was 2011, yes.  I -- is this the first page --

15   paper that we received?  I'm sorry?  I had a lot of

16   surgeries done on my mouth.

17   Q        Oh, no.  That's okay.

18   A        Is this the first one we received?

19   Q        So I'm not allowed to answer questions for you.

20   A        Oh, well, if this is the first one we received, I

21   assume the date is proper.

22   Q        Okay.

23   A        Yes, sir.

24   Q        And let's look at what's been premarked as

25   Government's Exhibit 801 that I'm going to mark as Smith

```
 1   Exhibit 516.
 2          (Defendants' Exhibit 516 was marked for
 3          identification.)
 4          MS. YUSI:  Can you just put it over our thing
 5   because it's not our exhibit.  Sorry.  It's fine on that one
 6   but just on future ones.
 7   BY MR. GRINDROD:
 8   Q       Do you recognize that document, ma'am?
 9   A       I've seen this name before, yes.
10   Q       And is that a letter from Attorney Lynne Shelton to
11   you?
12   A        This is June.  It has our name on it.  Yes.  I
13   assume it was sent to us.  I could go through the papers at
14   home and tell you if we have this exact one, but I can't
15   tell you just by looking at it here.  And there's no
16   signature on this one.
17   Q       Do you -- well, turn to page 2.
18   A       Mm-hmm.
19   Q       You see a signature at the bottom there of Lynne
20   Shelton?
21   A       Yes.
22   Q       Okay.  And at the top, is that addressed to
23   Silvester Hullum?
24   A       That is our address there.
25   Q       Okay.  So do you believe you -- you all received
```

```
 1   this letter in connection with --
 2   A        We do have -- we do have letters from this person,
 3   yes.
 4   Q        Okay.
 5   A        But I don't know -- but we do have letters from this
 6   person, yes.
 7            MR. GRINDROD:  Okay.  I'll offer Smith 516.
 8            MS. YUSI:  I'll object.  She doesn't remember if she
 9   got this letter.  Give a basis or the foundation for this.
10            THE WITNESS:  If you had requested, I would have
11   bought the whole box of stuff in.
12   BY MR. GRINDROD:
13   Q        You have a whole box of stuff at home?
14   A        Yeah.
15   Q        And did you --
16   A        I keep everything.
17   Q        Did you remember getting letters from Lynne Shelton
18   about --
19            (Reporter clarification.)
20   BY MR. GRINDROD:
21   Q        Did you get letters like that from Lynne Shelton?
22   A        I remember that name, yes, sir.
23   Q        Okay.  I know you remember the name.  But did you
24   get letters about Dental Support Plus Franchise from Lynne
25   Shelton?
```

```
 1   A        Yes.

 2   Q        And did Lynne Shelton send you along with those

 3   letters lots of --

 4   A        Books.

 5   Q        -- documents?

 6   A        Yeah, in book form.

 7   Q        Book form?

 8   A        (Witness nods head up and down.)

 9   Q        And those documents were about Dental Support Plus

10   Franchise?

11   A        Yes.

12   Q        And Ms. Shelton -- Attorney Shelton asked you to --

13   to review those documents, right?

14   A        Yes.  They always ask us to review them.

15   Q        Okay.  And attorney Shelton even told you in those

16   letters to -- to, you know, get your own independent, legal

17   advice if you wanted to about anything that was in those

18   documents?

19            MS. YUSI:  I'm going to object as hearsay and I

20   don't -- I don't have a -- there's no document to tie it to

21   that's been stipulated to, so I'm going to object to

22   hearsay.

23   BY MR. GRINDROD:

24   Q        You can answer the question.

25   A        I never talked to these people personally --
```

```
 1    Q        Sure.
 2    A        -- in letter form.  As I say, because we have no
 3    education in legal matters, we -- everybody says you should
 4    read what you sign but if it's in a -- I don't know.
 5    Q        Do you remember that Ms. Shelton instructed you
 6    to -- if you wanted to move forward, to sign the documents
 7    and send them somewhere?
 8             MS. YUSI:  I'm going to object, again, to hearsay.
 9    BY MR. GRINDROD:
10    Q        You can answer, ma'am.
11    A        Any instructions we got we got through Mr. Smith.
12    Q        Okay.  So --
13    A        He -- I don't even remember any of this coming in
14    the mail.  I remember everything coming through Mr. Smith's
15    office.
16    Q        And, ma'am, you mentioned that you had documents --
17    A        I do.
18    Q        -- at home.
19    A        I do.
20    Q        Did the prosecutors ever ask you for those
21    documents?
22    A        No.
23    Q        No?
24    A        No.
25    Q        Did they -- did you tell them I have all these
```

```
 1   documents from Lynne Shelton at home about these matter?
 2   A       I didn't say Lynne Shelton.  I said Mr. Smith had
 3   given us books.  We have books and we have documents and we
 4   have documents about all the other moneys that we had that
 5   he said he was putting in various places for us so that we
 6   could reap benefits and I have a copy of everything I've
 7   ever been given.  But as far as Lynne Shelton, I thought
 8   Lynne was a man to tell you the truth.  I didn't know it was
 9   a woman.  I didn't -- yeah.
10   Q       But you have all these documents --
11   A       I do.  I do.
12   Q       -- at home.  And no one from the IRS or the U.S.
13   Attorney's Office or anybody ever asked you to look at all
14   these documents you have at home?
15   A       No.
16           MS. YUSI:  Object to relevance.
17   BY MR. GRINDROD:
18   Q       I believe, ma'am, you said in direct that you
19   remembered the name Kent Maerki.
20   A       I do.
21   Q       And I think you said from your perspective he was
22   the CO?
23   A       Yes.
24   Q       What does that mean?
25   A       He was the officer and chief of the whole -- the
```

```
 1   whole Dental Plus division.  I don't think I ever met
 2   Mr. Maerki, and I remember one time asking Mr. Smith about
 3   the notary republic on something that she said Mr. Maerki
 4   would sign.  But he says, "When I get back to Scottsdale,
 5   they'll have this notarized."  And he'll sign it.  I
 6   remember that but I don't think I ever met -- now, I could
 7   be mistaken, but I don't think I ever met Mr. Maerki.
 8   Q       And, ma'am, I want to turn your attention back to
 9   that first document I showed you --
10   A       Yes, sir.
11   Q       -- which I believe is Smith 515.  So turn to the
12   very first page of that document if you would, ma'am.  Now
13   you said on -- on direct that you -- your understanding was
14   that this was a hands-off business?
15   A       Yes.
16   Q       But you understood obviously that this was a
17   franchise that you were investing in, right?
18   A       You want to explain the word "franchise."
19   Q       Well -- so do you know, like, what a franchise --
20   you know McDonald's is a franchise?
21   A       Okay.  That means it can be independently owned.
22   Q       Well, I can't -- yeah.  I'm just asking questions.
23           But you knew all along that this was a franchise,
24   right?
25   A       I -- I saw the wording but I was going by trust that
```

1  we had in Mr. Smith that everything would be handled without

2  our having to do anything.

3  Q      Sure.  And that was because --

4  A      -- money.

5  Q      That was because, you know, as a franchisee, just

6  like McDonald's can hire a general manager, you can hire

7  vendors like Metromedia or OraCare to actually handle the

8  day-to-day operations of the Dental Support Plus Franchise,

9  right?

10  A      Okay.

11  Q      Okay.  So that was your understanding as to how it

12  was going to run.  But you knew all along it was a

13  franchise, right, because as you said, the word franchise is

14  all over this stuff, right?

15         MS. YUSI:  I'm going to object that you're inserting

16  a lot of information that has not been presented in terms of

17  Metromedia or anything like that.  She's not -- laid any

18  foundation that she knows anything about what those are, so

19  I'm going to object to foundation.

20  BY MS. YUSI:

21  Q      So, ma'am, you knew all along that this was a

22  franchise, right?

23  A      I knew the wording.  I didn't know how much that

24  entailed that we would have to do.

25  Q      Right.

```
 1   A        I only knew the wording.  And I only knew the word
 2   franchise because I knew someone that -- that bought a
 3   McDonald's once, and that's the word that she used.
 4   Q        Right.  And so you -- of this roughly $440,000 that
 5   you invested with Mr. Smith, that was the total amount?
 6   A        Close to it.  I couldn't -- I can't give you the
 7   exact amount.
 8   Q        Okay.  So $40,000 of that was invested with Dental
 9   Support Plus Franchise, right?
10   A        Yes, sir.
11   Q        That's Kent Maerki's company?
12   A        Yes, sir.
13   Q        The company in Arizona?
14   A        Yes, sir.
15   Q        And you got about $2,000 in returns from Dental
16   Support Plus Franchise, right?
17   A        Are you telling me this or I'm supposed --
18   Q        I'm asking you the question.
19            MS. YUSI:  I'm going to object that this
20   mischaracterizes her earlier testimony.
21            MR. GRINDROD:  It's not a characterization of her
22   testimony.  It's a question.  Objection is noted.
23   BY MR. GRINDROD:
24   Q        You can answer the question.  I'll ask it again for
25   the record.
```

```
 1          Ma'am, you got about $2,000 in returns from --
 2   related to your investment in Dental Support Plus Franchise,
 3   right?
 4          MS. YUSI:  And I'm going to object again because
 5   when I asked her earlier, she said she did not recall
 6   getting any money from this.  She said she understands that
 7   there's paperwork otherwise --
 8          MR. GRINDROD:  Ms. Yusi, please --
 9          MS. YUSI:  Can you let me put my --
10          MR. GRINDROD:  No.  This subpoena --
11          MS. YUSI:  -- objection on the record?
12          MR. GRINDROD:  This is --
13          (Reporter clarification.)
14          MR. GRINDROD:  Let me -- let me make my objection
15   first.  This is an improper speaking objection, and you're
16   coaching the witness through an objection, so I'm objecting
17   to your objection.  You can do what you want, but it's
18   improper.
19          MS. YUSI:  I'm going to object as to
20   mischaracterization of her earlier testimony.  Go ahead.
21   BY MR. GRINDROD:
22   Q      So, ma'am, I'm going to ask -- that was a lot of
23   back and forth.  I'm going to ask the question one more
24   time.
25          Ma'am, you got about $2,000 in returns related to
```

1  your Dental Support Plus Franchise investment, right?

2  A       I don't remember getting $2,000 from Dental Support.

3  I do remember going into Wells Fargo Bank with my husband.

4  He signed all the papers.  In fact, this is the -- that I

5  signed it because I remember when -- you have my signature

6  on here.  I remember, when we started this, that I told my

7  husband I wish -- all of the -- taking your money out of

8  your account and put it in what we thought were capable

9  hands of Mr. Smith, but I am not going with you on this

10 Dental Support thing.  I said, "If you want to do this, this

11 is your venture," because I don't remember signing this, but

12 that is my signature.

13 Q       So it was really your husband who had the

14 involvement in this whole thing?

15 A       Well, everything he's involved with I'm sitting

16 beside him.

17 Q       Sure.

18 A       That's what we do.  But I don't remember signing --

19 I don't remember signing this, but that's my signature.

20 Q       And it's -- it is mostly your husband's signature

21 that's throughout that document, right?

22 A       It must be all his, except that one because I don't

23 remember signing at all.  And I don't remember how it was

24 presented to me that I would sign it.  I don't know.

25 Q       Okay.

```
 1   A         As far as getting money, the question you asked me,
 2   I don't remember receiving any tangible money in my hand.  I
 3   remember going in the bank, signing things, but I don't
 4   remember getting any money.  I really don't.
 5   Q         Let me show you a document that I've marked as
 6   Smith 517.
 7   A         Yes.
 8   Q         On the -- each page of that document, do you see
 9   there's a check?
10   A         I see it.
11   Q         And it's a check with your -- that your husband
12   signed by endorsing it?
13   A         Right.  And I've seen this before.
14   Q         You've seen those before?
15   A         Mm-hmm.
16   Q         Okay.  Do they appear to be accurate copies of the
17   deposited checks?
18             MS. YUSI:  Objection.  Foundation.
19   BY MR. GRINDROD:
20   Q         Do you recognize -- let me -- let me ask you this
21   ma'am --
22   A         -- money given to me to take him or is this
23   something he signed that would be deposited?
24   Q         Let me ask you a different question.  Those -- those
25   appear to be checks that are deposited and endorsed by your
```

```
 1   husband, right?
 2   A        That's his signature.
 3   Q        And the -- what the document is is a check made out
 4   to your husband, right?
 5   A        Yes.  But it doesn't mean we took any money home.
 6   Q        So when -- what happens when you endorse a check and
 7   put it in the bank?
 8   A        It goes into an account.
 9   Q        Okay.  So your husband signed four $500 checks and
10   endorsed them and put them into an account; is that right?
11            MS. YUSI:  Objection.  Foundation.
12            THE WITNESS:  They did go into an account.
13   BY MR. GRINDROD:
14   Q        And -- so is there four checks each for $500 related
15   to Dental Support Plus?
16   A        I'm trying to see where it says Dental Support Plus
17   on here.  This is the account that they opened for us at
18   Wells Fargo Bank.  That's true.  However, it wasn't in
19   Scottsdale.  It was in Citrus Heights, I believe.  Wasn't in
20   Scottsdale.  It was in Citrus Heights.
21   Q        So if there was money that came back from Dental
22   Support Plus to you all, that would have gone -- that would
23   have been handled by your husband, not by you; is that
24   right?
25   A        You mean if we actually had money in our hands it
```

1    would have been handled by my husband?

2    Q        If you actually had money coming into your hand or

3    an account that, you know -- your bank account.

4    A        I do all the -- all the bill paying and I handle all

5    the money.

6    Q        Including for that account that's related to your

7    franchise?

8    A        I didn't handled this.

9    Q        Okay.  So if money came into that account --

10   A        And he went in and he signed checks and it was

11   deposited.  I don't remember getting any money from this

12   account.

13   Q        I understand.

14            And so from -- by the way, your -- your husband is

15   sitting in this room.

16   A        Yes, he is.

17   Q        Okay.  But you're the one that's having to answer

18   all these questions about Dental Support, so I understand.

19   A        My husband, his vision is bad.  They took away his

20   driver's license.  He cannot hear because of working at

21   Campbell Soup for 30-plus years and crawling under the

22   kettles and doing all the welding and stuff he did.  His

23   knees are bad.  They -- they decided that maybe I should be

24   the best person to do it.

25   Q        I understand.

```
 1            And so from your perspective, you -- you made this
 2   $40,000 investment in the Dental Support Plus Franchise,
 3   right?
 4   A         Yes.
 5   Q         And as far as you recall, you don't -- you don't
 6   remember getting any of that back, right?
 7   A         I'm not saying it didn't happen, but I don't
 8   remember it.
 9   Q         Fair enough.
10            MR. GRINDROD:  No further questions.
11            MS. YUSI:  Anybody?  Mr. Gantous or Mr. Matthews,
12   looking online to see.  Do you -- does anyone have
13   question -- other questions before I do a little bit of
14   redirect.
15            MR. GANTOUS:  I have no questions.
16            (Reporter clarification.)
17            MS. YUSI:  Anthony Gantous first said he had no
18   questions, and then Greg Matthews said he had no questions.
19                    FURTHER EXAMINATION
20   BY MS. YUSI:
21   Q         Just a couple follow-ups, Ms. -- Ms. Hullum.  On
22   that -- the checks in front of you, Smith 517 exhibit, in
23   the memo do they all say customer appreciation payment?
24   A         In the memo?
25   Q         At the bottom of the check, you know, where there's
```

```
 1   a little memo line?
 2   A        Oh --
 3   Q        Do you see --
 4   A        -- yes.
 5   Q        What does it say there?
 6   A        Customer appreciation payment, yes.
 7   Q        Okay.  And out of the roughly estimate of 440,000,
 8   you said only 40,000 was with DSP.  But did you -- did you
 9   get any of your investments back?
10   A        No.
11            MR. GRINDROD:  Objection.  Relevance.
12   BY MS. YUSI:
13   Q        You can answer.
14   A        No.  No.  We are living off of Social Security, and
15   if anything ever happens to it -- the government doesn't
16   know what they're going to do with Social Security, and it
17   might run out whenever.  If something happens to us before
18   we die, we will have no income.
19            MR. GRINDROD:  Objection.  Move to strike as
20   nonresponsive.
21   BY MS. YUSI:
22   Q        All right.  Thank you, Ms. Hullum.  I think those
23   are all my questions today, and I appreciate you being here.
24   A        Thank you.
25            THE VIDEOGRAPHER:  All right.  This concludes the
```

1    deposition on November 5th, 2021.  We're off the record at

2    9:24 a.m.  Master media will be held by Behmke Reporting and

3    Video Services.

4           (Deposition concluded at 9:23 a.m.)

5                         ---oOo---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    STATE OF CALIFORNIA      )

 2                             )    ss.

 3                             )

 4                    I hereby certify that the witness in the

 5    forgoing deposition, VERA HULLUM, was by me duly sworn to

 6    testify to the truth, the whole truth, and nothing but the

 7    truth, in the within-entitled cause; that said deposition

 8    was taken at the time and place herein named; and that the

 9    deposition is a true record of the witness's testimony as

10    reported by me, a duly certified shorthand reporter and a

11    disinterested person, and was thereafter transcribed into

12    typewriting by computer.

13                       I further certify that I am not interested

14    in the outcome of the said action, nor connected with nor

15    related to any of the parties in said action, nor to their

16    respective counsel.

17               IN WITNESS WHEREOF, I have hereunto

18      affixed my signature this 11th day of November, 2021.

19      Reading and Signing was NOT REQUESTED.

20

21

22

23               HECTOR CONTRERAS, CSR

24               Certified Shorthand Reporter #14051

25
```