1    IN THE UNITED STATES DISTRICT COURT FOR THE

2      EASTERN DISTRICT OF VIRGINIA

3       NORFOLK DIVISION

4

5 --------------------------------

6 UNITED STATES OF AMERICA,   )

7 v.          )

8 DAVID ALCORN, AGHEE WILLIAM  ) Case No. 2:19-cr-47

9 SMITH II, THOMAS L. BARNETT,  )

10 and NORMA JEAN COFFIN,   )

11    Defendants.     )

12            )

13 --------------------------------

14

15

16   VIDEO TAPED DEPOSITION OF KENNETH SYKES

17     FRIDAY, NOVEMBER 5, 2021

18

19

20

21    BEHMKE REPORTING AND VIDEO SERVICES, INC.

22     BY:  HECTOR CONTRERAS, CSR NO. 14051

23       455 MARKET STREET, SUITE 970

24        SAN FRANCISCO, CA 94105

25         (415) 597-5600

1

2

3

4

5

6

7

8         Videotaped Deposition of Kenneth Sykes, taken on

9  behalf of the United States of America, at 501 I Street,

10  Sacramento, CA, 95814, commencing at 2:59 p.m., Friday,

11  November 5, 2021, before Hector Contreras, Certified

12  Shorthand Reporter No. 14051, pursuant to notice of

13  Videotaped Deposition.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:

 2   FOR PLAINTIFF:

 3        U.S. ATTORNEY'S OFFICE, EASTERN DISTRICT OF VIRGINIA

 4        BY:  ELIZABETH M. YUSI, ASSISTANT U.S. ATTORNEY

 5        MELISSA E. O'BOYLE, ASST. U.S. ATTORNEY (APPEARING REMOTELY)

 6        101 West Main Street, Suite 8000

 7        Norfolk, Virginia  23510

 8        Telephone:  (757) 441-3555

 9        Email:  Elizabeth.yusi@usdoj.gov

10

11   FOR DEFENDANT, AGHEE WILLIAM SMITH II:

12        THE OFFICE OF THE FEDERAL PUBLIC DEFENDER

13        EASTERN DISTRICT OF VIRGINIA

14        BY:  ANDREW W. GRINDROD, ASSISTANT FEDERAL PD

15        LINDSAY J. McCASLIN, ESQUIRE (APPEARING REMOTELY)

16        150 Boush Street, Suite 403

17        Norfolk, Virginia  23510

18        Telephone:  (757) 457-0860

19        Email:  andrew_grindrod@fd.org

20

21

22

23

24

25
```

```
 1    APPEARANCES OF COUNSEL - CONTINUED:

 2    FOR DEFENDANT, THOMAS L. BARNETT:

 3         ANCHOR LEGAL GROUP, PLLC

 4         BY:  ANTHONY M. GANTOUS, ESQUIRE (APPEARING REMOTELY)

 5         5101 Cleveland Street, Suite 100

 6         Virginia Beach, Virginia  23462

 7         Telephone:  (757) 529-0000

 8         Email:  unavailable

 9

10    FOR DEFENDANT, NORMA JEAN COFFIN:

11         GREGORY K. MATTHEWS, PC

12         BY:  GREGORY K. MATTHEWS, ESQUIRE (APPEARING REMOTELY)

13         P.O. Box 5277

14         Portsmouth, Virginia  23703

15         Telephone:  (757) 356-5744

16         Email:  unavailable

17

18

19

20

21

22

23

24

25
```

```
 1      APPEARANCES OF COUNSEL - CONTINUED:

 2      FOR DEFENDANT, DAVID ALCORN:

 3           RICHARD S. YAROW, LLC

 4           BY:  RICHARD S. YAROW, ESQUIRE (APPEARING REMOTELY)

 5           821 W. 21st Street, Suite 208

 6           Norfolk, Virginia 23517

 7           Telephone:  (757) 337-3963

 8           Email:  unavailable

 9

10      ALSO PRESENT:

11           JASON W. THOMASSON, U.S. POSTAL INSPECTION SERVICE

12           JASON BUTKO, VIDEOGRAPHER

13           AGHEE WILLIAM SMITH II

14           DAVID ALCORN

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                           INDEX

 2    FRIDAY, NOVEMBER 5, 2021

 3    KENNETH SYKES                                  PAGE

 4         Examination by ELIZABETH M. YUSI           10

 5         Examination by ANTHONY M. GANTOUS          39

 6         Examination by ELIZABETH M. YUSI           65

 7

 8

 9                         ---oOo---

10

11

12

13

                 QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
14
                             PAGE     LINE
15
                               NONE
16

17

18

19

20

21

22

23

24

25
```

1                         GOVERNMENT EXHIBITS

2                           KENNETH SYKES

3      Number                  Description                Page

4      Exhibit 826   December 14, 2015, Sykes Structured

5                    Income Planning E-mail - 3 pages         19

6      Exhibit 827   December 14, 2015, Sykes Structured

7                    Income Planning E-mail - 3 pages         21

8      Exhibit 828   December 14, 2015, E-mail

9                    A. W. Smith & Associates, Inc.

10                   - 26 pages                               24

11     Exhibit 830   April 7, 2016, RE: Money - 2 pages       26

12     Exhibit 831   Investment Authorization - 2 pages       27

13     Exhibit 832   Representative Authorization - 2 pages   28

14     Exhibit 833   June 24, 2016, Buyer's Agreement

15                   (retained by counsel.)                   29

16     Exhibit 835   Operating Agreement of XCEL

17                   Bandwidth Two - 17 pages                 31

18     Exhibit 836   Member Loan - 2 pages                    32

19

20

21

22

23

24

25

1                    DEFENDANTS' EXHIBITS

2                        KENNETH SYKES

3    Number                Description              Page

4    Exhibit 512  November 1, 2019, E-mail - 4 pages    59

5    Exhibit 514  July 10, 2019, E-mail - 1 page        63

6    Exhibit 520  DOM Business Brokers - 1 page          46

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          FRIDAY, NOVEMBER 5, 2021; 2:59 P.M.

2          THE VIDEOGRAPHER:  Here begins Media Number One in

3     the deposition of Kenneth Sykes in the matter of United

4     States of America v. Donald Alcorn, Aghee William Smith II,

5     Thomas L. Barnett, and Norma Jean Coffin in the United

6     States District Court, Eastern District of Virginia, Norfolk

7     Division, Case Number 2:19-cr-47.  Today's date is

8     November 5th, 2021.  The time is approximately 3:00 p.m.

9          My name is Jason Butko from Behmke Reporting and

10    Video Services at 455 Market Street, San Francisco,

11    California.  This deposition is being taken at the United

12    States Attorney's office, 501 I Street, Sacramento,

13    California.  This was noticed by Elizabeth Yusi, Assistant

14    U.S. Attorney of the United States.

15          Counsel, can you, please, identify yourself and who

16    you represent starting with the questioning attorney.

17          MS. YUSI:  I'm Elizabeth Yusi.  I'm with the U.S.

18    Attorney's Office.  I represent the United States.  With me

19    I have Postal Inspector Jason Thomasson with the United

20    States Postal Inspection Service.

21          MR. GRINDROD:  Andrew Grindrod, attorney for Aghee

22    Smith who is present in the room where the deposition is

23    being taken, and my co-counsel, Lindsay McCaslin, is

24    attending virtually.

25          MS. YUSI:  Just for the record, I see Richard Yarow,

```
 1    counsel for David Alcorn and Mr. Alcorn are both present
 2    virtually as well as Anthony Gantous who is counsel for
 3    Thomas Barnett.
 4              THE VIDEOGRAPHER:  Okay.  Can the court reporter,
 5    please, swear in the witness.
 6              (Whereupon, the witness was sworn in.)
 7              THE VIDEOGRAPHER:  You may proceed.
 8                        KENNETH SYKES,
 9    having been sworn by the Certified Shorthand Reporter,
10    HECTOR CONTRERAS, to tell the truth, the whole truth, and
11    nothing but the truth, testified as follows:
12              EXAMINATION BY ELIZABETH M. YUSI, ESQ.
13    BY MS. YUSI:
14    Q       Good afternoon.  Can you introduce yourself to the
15    Court?
16    A       My name is Kenneth Frank Sykes.
17    Q       How do you spell your last name?
18    A       S-y-k-e-s.
19    Q       And how old are you?
20    A       I'm 64.
21    Q       And what city, state do you live in?
22    A       I live in El Dorado Hills, California.
23    Q       Is that near Sacramento?
24    A       Yes.  It's east of Sacramento.
25    Q       Do you currently work?
```

```
1    A        We have our own small business.

2    Q        What kind of business is that?

3    A        We sell industrial parts, various industries.

4    Q        And how long have you all owned your business?

5    A        About 20 years now.

6    Q        And are you married?

7    A        Yes, I am.

8    Q        What is your wife's name?

9    A        Kathleen Ann Sykes.

10   Q        And does she work with you in the business?

11   A        Yes, she does.

12   Q        Now, as you've been -- what is the name of your

13   business?

14   A        Name of the company is American Bearing Works,

15   Incorporated.

16   Q        And -- and since you've been owning that, have you

17   guys been saving money for retirement?

18   A        My previous company I -- I had a pretty good 401, so

19   yeah.  We've been investing some money but not with the

20   economy ups and downs, you know.  It's very difficult to do

21   that at times.

22            (Reporter clarification.)

23            THE WITNESS:  Sure.

24   BY MS. YUSI:

25   Q        Do you have any background or training in
```

```
 1   investments?
 2   A       No, I don't.  Just reading books, you know,
 3   listening to other people.
 4   Q       Self-taught?
 5   A       Yeah, self-taught.
 6   Q       Okay.  Do you know the Defendant, Aghee William
 7   Smith, also known as Bill Smith?
 8   A       Right.  Correct.  Yes.
 9   Q       You do know him?
10   A       Yes.
11   Q       How did you first come to hear of him?
12   A       I believe it was around 2014, 2015 I heard him on
13   the -- on the radio -- his radio show, Money Talks, which
14   was 1380 on the local radio station in Sacramento.
15   Q       And -- and was it an advertisement, or what -- what
16   did you hear?
17   A       Basically I was traveling north to my parents'
18   estate.  They passed away so I was listening to various
19   radio shows and came across him and that's where I got --
20   got his information.
21   Q       And -- and what was your understanding based on his
22   radio show as to who he was or what he did?
23   A       Well, he -- he was talking about his investments and
24   how normal investing in the stock market was nothing but a
25   casino, you know, high risk.  And -- and he -- he was
```

1   talking about how he could make -- make you more money, you

2   know, less fees, that type of thing.

3   Q       And -- and so did you end up calling him?

4   A       Eventually I did.  I listened to him -- I don't know

5   how many road trips I was on, quite a few, but eventually

6   I -- I wrote down his phone number and -- and got -- got

7   ahold of his partner, John Kennedy.

8   Q       What were you looking for in terms of financial

9   advice?

10  A       Well, what he was saying, you know, kind of lit my

11  eye a little bit -- eyes a little bit, you know, about the

12  fees and that type of thing, what normal investment brokers

13  charge, so that sounded pretty interesting to me.

14  Q       Okay.

15  A       And so...

16  Q       Did you make an appointment to meet with him?

17  A       Yes, I did.

18  Q       And when do you think you first met with him?

19  A       It was -- it had to be 2015 -- sometime 2015.  I

20  don't know the exact date.

21  Q       Okay.  And -- and what did -- when you met with

22  Mr. Smith, what did he tell you about his background and

23  experience?

24  A       When I checked out his website, you know, it all

25  looked, you know, pretty legit to me so -- but we talked and

1     he -- he threw out some ideas of what I can invest in.

2     Q        Did -- did he talk about his experience in the past

3     dealing with other people's money?

4     A        Yes, he did.  He -- he bragged -- he was talking

5     about that he invested for a former president.  I believe it

6     was Bush, maybe Reagan, and then I believe, if I recall, he

7     was -- he had the inside in Washington DC helping the

8     military -- some officers in the military, I believe, in

9     investments so...

10    Q        And -- and what was his role towards you?  What was

11    your understanding of -- of what he would be doing for you?

12    What would his role be?

13    A        Well, like I said, he offered -- he was showing me

14    some options on investments, and there was three.  There was

15    one.  I think it was on a debt -- making money off of other

16    people's debts.  I can't remember the name of the company

17    but -- and there might have been another one.  But the

18    Spectrum deal is what seems like he -- what he was pushing?

19    Q        Okay.

20    A        He had -- he had this -- he had the DVD there and --

21    and talking about, you know, how -- what the potential was

22    there in -- in -- in Texas and, I think, in Missouri as

23    well.

24    Q        Did you trust Mr. Smith?

25    A        I -- yeah.  I think he -- he was -- he was nice to

1   me and -- and, you know -- you know, we got along well.  I

2   had the first meeting.  It was just Smith and myself.  And

3   then the second meeting I brought in my wife, and it didn't

4   go off very well between my wife and I because he didn't

5   impress her too much, especially when he fell out of his

6   chair, so -- so it was kind of an embarrassing moment for

7   everybody.

8   Q       So when -- when you -- when you -- when you stayed

9   with him, this was between you and him and your wife was not

10  really --

11  A       Right.  The first -- the first -- first go around.

12  Q       Okay.  What did Mr. Smith -- I want to talk to you

13  about XCEL.  What's your understanding of what XCEL was?

14  A       Well, XCEL was -- it was building towers.  It was

15  part of Rapid Link Communications.  Having these towers --

16  these -- these cell towers in the Texas area where, you

17  know, there was a lot of oil and shale, and he gave me the

18  information on Rapid Link, and it was now owned with the

19  part of Daryl Bank's deal.  And so not knowing who Daryl

20  Bank was at the time, it all looked pretty good on -- on --

21  on the returns with what Mr. Smith was -- was telling me

22  about so...

23  Q       What did he say about the returns?

24  A       He would -- he was promising -- he could say it was

25  9 to 12 percent returns.  I could, you know, get my money

1    back anytime I want and, you know, it was -- it sounded, you

2    know -- now that I look back it was too good to be true type

3    thing, you know.  He was being a -- definitely being a

4    salesman.

5    Q       And did he talk about any risk?

6    A       No, not really.  I -- he -- his -- what he told me

7    risk is how -- how the money -- my -- my money with my

8    current investments were more at risk than what he was -- he

9    was selling.

10   Q       So this was a safer option?

11   A       Yeah.

12   Q       And what about timing, what was your understanding

13   based on what Mr. Smith said about how quickly you would

14   start seeing returns?

15   A       It was going to be pretty quick.  It was going to be

16   pretty quick.  So he set me up with a conference call

17   with -- with Daryl Bank, and Daryl Bank, you know, doing his

18   smooth talking with me, you know, it all sounded good.  But

19   then -- but then from there it kind of went downhill.

20   Q       And we'll talk about --

21   A       Okay.

22   Q       -- that, you know --

23   A       Okay.

24   Q       I'm talking about prior to your investment for now.

25   A       Okay.  Okay.  Okay.

```
 1   Q        Who was in the conference call with you and Daryl
 2   Bank?
 3   A        Mr. Smith.
 4   Q        Was that in his office?
 5   A        It was -- it was on the phone.  It was a conference
 6   call.  I was in my office.
 7   Q        What, if anything, did Mr. Smith say about his own
 8   investment in this?
 9   A        Oh, he said he was -- he was invested in it as well.
10   Q        Okay.
11   A        I think he said he had 300,000 in it if I recall.
12   Q        And did he say anything about the success or track
13   record of this type of investment?
14   A        Pretty much it was -- to him it was a sure thing.
15   Q        And that's what he told you?
16   A        Right.
17   Q        What was your understanding of who Daryl Bank was?
18   A        Daryl Bank according to Mr. Smith he -- he -- he had
19   the inside on -- on -- in -- in Washington, DC with various
20   peoples if I recall.
21   Q        Prior to making a decision about your investment,
22   did Mr. Smith say anything about an SEC investigation into
23   the Spectrum investments?
24   A        Not --
25            MR. GRINDROD:  Object -- sorry.
```

1          MS. YUSI:  Go ahead.

2          MR. GRINDROD:  Objection as to what Spectrum

3    investment and relevance and foundation.

4    BY MS. YUSI:

5    Q        Go ahead.  Did he say anything?

6    A        No.

7    Q        Did he say anything about any other regulatories

8    looking into other investments that had the same principles

9    involved?

10   A        No.

11   Q        How much did you end up -- well, I'm going to show

12   you some e-mails.  Did you provide some e-mails between

13   yourself and Mr. Smith to the government?

14   A        Yes, I did.

15   Q        Okay.  I'm going to go over a few of these with you.

16   A        Okay.

17   Q        If you can look at what's been marked as government

18   Exhibit 826.  What's the date of this?

19   A        This would be 2000 -- excuse me, December 14, 2015.

20   Q        And who is the e-mail from?

21   A        It is from Mr. Smith.

22   Q        And to whom?

23   A        To -- that -- that is my e-mail.

24   Q        All right.

25            MS. YUSI:  Move to admit Exhibit 826.

```
 1              (Government's Exhibit 826 was marked for

 2              identification.)

 3   BY MS. YUSI:

 4   Q        What is he sending you here?

 5   A        I want to reach out to --

 6              (Reporter clarification.)

 7              THE WITNESS:  Okay.  Got it.

 8   BY MS. YUSI:

 9   Q        And if you need a minute to review that --

10   A        Yeah.

11   Q        -- there's a couple pages.  Please take that.

12   A        All right.  Yes.  This is regarding the three

13   different assets that we talked about.  One is a cash

14   account, second is the Spectrum asset, and the last is the

15   Collins 8 percent secured funds.

16   Q        And if we can look at page 3, was this one of the

17   attachments recorded --

18   A        Yes.  Yes.

19              (Reporter clarification.)

20   BY MS. YUSI:

21   Q        Sorry.  I'll try to --

22   A        Sorry.

23   Q        -- give you a sign to say it's okay to answer.

24              So page 3 of Exhibit 826, what -- what was -- what's

25   your understanding of what this was?
```

```
 1    A       This -- this was Scenario A, income plan, and he has
 2    the -- the -- the Spectrum, the Collins investing.  I don't
 3    know if that's the total income that -- money that I
 4    invested accounts -- yeah, what -- what my return would be.
 5    After so many years would be $753,600.
 6    Q       And at the top of this, this was a structured income
 7    plan for you and your wife; is that right?
 8    A       Yes.
 9    Q       And Mr. Smith prepared this?
10    A       Yes, he did.
11    Q       All right.  And the $753,000 that's on the bottom
12    right of page 3, is that what you're looking at?
13    A       Correct.  That looks like that's based on the two,
14    Spectrum and Collins.  That's the total amount.
15    Q       And this December 14, 2015, e-mail, is this around
16    the time when you first met him?
17    A       Yes.
18    Q       Okay.  All right.  We're done with that one.  I'm
19    going to give you another e-mail here.
20    A       Okay.
21    Q       This is Exhibit 827 that's been marked.
22    A       Okay.
23    Q       And we're going to have to go kind of backwards, I
24    guess, from this because it's an e-mail.  Do you recognize
25    this document?  Do you recognize this?
```

```
1    A         Yes, I do.

2    Q         And are these e-mails between yourself and

3    Mr. Smith?

4    A         Yes.  That's -- that is -- that is me.

5    Q         Okay.

6              MS. YUSI:  I'm going to move to admit Exhibit 827.

7              (Government's Exhibit 827 was marked for

8              identification.)

9    BY MS. YUSI:

10   Q         On page 2 --

11   A         Mm-hmm.

12   Q         -- of Exhibit 827, you have an e-mail at the top of

13   that.  Could you -- could you read that for us?

14   A         The e-mail at the top is --

15   Q         Yes.

16   A         -- awscep2@sbcgobal.net.

17   Q         Who's e-mail is that?

18   A         That -- that -- that is Mr. Smith's.

19   Q         And can you read starting with "Hi Bill"?

20   A         "Hi Bill.  Thank you very much."

21   Q         And keep going.

22   A         "Like I mentioned in our phone conversation, Kathy

23   is on the fence with this, and she's led to believe the

24   other way with the books she" -- "she" -- "she reads" --

25   excuse me.  "Led to believe the other way with the books she
```

1    reads with" -- "and so on.  We might have to set up another

2    meeting or maybe change some numbers around.  She would like

3    to see or read about other clients that have benefitted like

4    this.  I'll need some" -- "I'll need some ammo.  I've been

5    reading up when I can, and there will be no shortage of

6    Spectrum.  I'm excited about" -- "about it."

7    Q       And on page 1 of Exhibit 827, is that Mr. Smith's

8    response to your questions?

9    A       Yes.  "My team has already demonstrated decades" --

10   "expertise with each asset independent with the good

11   opinions of others.  1982 with the Spectrum asset until

12   today.  1981 --

13            (Reporter clarification.)

14            THE WITNESS:  Sorry.

15            "1981 with the collateralized 8 percent secured

16   funds.  I have follow up e-mails we, also, provide.  The

17   brief Spectrum two discloses my teams history of client

18   returns from the early 1980.  We're allowed to disclose in

19   general terms historic facts.  Specific client references

20   are not allowed and violate both state and federal laws

21   free" -- "feel free to contact me with further questions or

22   observations.

23   Q       And I'm going to show you -- we're done with that

24   one.  I'm going to show you Exhibit 828.  Well, actually

25   we'll stay on Exhibit 827 just for a moment.  With the --

```
 1    when -- when Mr. Smith says 19 -- since 1982 or 1991, what

 2    was your understanding of what that meant?

 3    A        That he's been doing a long time.

 4    Q        These particular -- these particular investments?

 5    A        Just investments in general is the way I took it.

 6    Q        Okay.  I'm going to show you Exhibit 828 here.  I

 7    think we're done with that one.

 8    A        Okay.

 9    Q        And what is Exhibit 828?

10    A        Two other -- related to Spectrum.

11    Q        Is this another e-mail and attachment?

12    A        This would be -- yes.  This is to -- oh, this is

13    from John Kennedy so...

14    Q        And to whom?

15    A        To -- to me the, client, Ken Sykes.

16    Q        And what was the date?

17    A        That was December 14th, 2015.

18    Q        And you mentioned John Kennedy.  What was your

19    understanding of who John Kennedy was?

20    A        He -- John Kennedy worked in the backroom.  He

21    was -- I don't -- I don't even think I put a foot in his --

22    his office.  I can't remember.

23    Q        Was he in the same office as Mr. Smith?

24    A        Yes.

25    Q        Okay.  We move to -- I'm sorry.  Go ahead.
```

```
 1      A       Kennedy pretty much had, you know -- he had the

 2      printer back there and maybe another computer and he

 3      would -- he would bring the paperwork out to -- to Smith's

 4      front office.

 5              MS. YUSI:   And we move to admit Exhibit 828.

 6              (Government's Exhibit 828 was marked for

 7              identification.)

 8      BY MS. YUSI:

 9      Q       Now, it says, "Sincerely John Kennedy," and it says

10      on the first page News Talk Radio, Money Talks.   What was

11      Money Talks radio program if you know?

12      A       What was it?

13      Q       Yeah.

14      A       That was -- that was Mr. Smith's radio show --

15      Q       Okay.

16      A       -- talking about investing.

17      Q       And what was your understanding of what these

18      attachments were that he sent to you?

19      A       This is pretty much explaining about the FCC license

20      and maybe -- bear with me.

21      Q       What was --

22      A       I haven't seen this in five years, so this is hard

23      for me to comprehend all at once here.   Yeah.   This is

24      explaining the Spectrum deal with Rapid Link.   Motorola,

25      that was another name that was thrown out there, you know.
```

1    A big company like Motorola gave me some comfort to know

2    that -- that this was a legit thing.

3    Q        And -- and the point on the back -- the back three

4    pages of Exhibit 828 --

5    A        The very back?

6    Q        Yeah.  Just all the way to the back, the back three

7    pages.

8    A        Oh, okay.

9    Q        Do -- do you know what we're looking at here?

10   A        This -- yeah.  This is another chart on -- on how

11   much can be made and it's been a long time, but yeah.

12   Q        And those are -- those are projections --

13   A        Projections.

14   Q        -- kind of profits?

15   A        Yes.

16   Q        All right.  Did it take you a few months to decide

17   to put money in this investment?

18   A        Yeah.  My wife and I we went back on it.  She did

19   not want me to do it, but I went -- I went ahead forward and

20   said, well, you know -- it was coming out of my account,

21   not -- not hers.  Now, I can -- I can say this that Bill

22   tried to get me to -- to take all my money out of my current

23   investments and then -- and same with Kat's.

24   Q        Your wife's --

25   A        Yeah, Kathy's investments.

```
 1    Q        About how much was that?
 2    A        I didn't give Bill all my -- my -- all my numbers
 3  but I think I, you know -- I might have said 180,000.  Kathy
 4  was maybe half that.
 5    Q        And -- and how much did you end up investing?
 6    A        25,000.
 7    Q        I'm going to show you what's been marked for
 8  identification as Government Exhibit 830, and we're done
 9  with that if you want to put that aside.
10    A        Okay.
11    Q        Is this another e-mail string between you and Bill
12  Smith?
13    A        Yes, it is.  Yes.  I talked to my -- my investor.
14  Then I -- I had them wire money out of my account.
15             MS. YUSI:  We're going to move to admit Exhibit 830.
16             (Government's Exhibit 830 was marked for
17             identification.)
18  BY MS. YUSI:
19    Q        And so on April -- this -- this e-mail is from
20  April 2016; is that right?
21    A        Yes.
22    Q        And where did you have to move money from in order
23  to make this investment?
24    A        My investors are in Roseville.
25    Q        Okay.  Was -- was this --
```

```
1    A      -- which was local for us.

2    Q      Was this -- was this your savings for retirement?

3    A      Yes.  Yeah.  With my prior company I was pretty

4    aggressive in putting money away.

5    Q      Okay.  And if we can -- if I can have that --

6    A      Sure.

7    Q      -- exhibit, I'm going to show you what's been marked

8    for identification as Exhibit 831.

9    A      Yep.

10   Q      Do you recognize this?

11   A      Yes, I do.

12   Q      And what is it?

13   A      That's -- that's the money that went into IRA

14   Services that we wired.

15   Q      As the investment authorization?

16   A      Yes.

17          MS. YUSI:  Move to admit Exhibit 831.

18          (Government's Exhibit 831 was marked for

19          identification.)

20          THE WITNESS:  Yeah.  And there was -- yeah.  He's

21   got XCEL.  And there was some -- something was -- if I

22   recall, something strange happened there.  He had me wire --

23   wire money to one location.  Then he called back and said,

24   "Oh, no.  It's got to go somewhere else."  But I don't -- I

25   don't -- I don't -- I think the first one had to -- went to
```

1   Arizona and then the second one went to -- was going to

2   Florida to -- to -- to Bank's location.

3   Q       And this was on page 1 of Exhibit 831.  It says,

4   "Invest exactly 24,000."  Was that how much you ended up

5   putting in for XCEL?

6   A       Yeah.  I think the -- I think -- yeah.  I had to

7   keep 1,000 to IRA Services for the fees, which I got a

8   whopping $75 back a couple -- couple months ago.

9   Q       And then on the second page is that your signature?

10  A       That is my signature.

11  Q       And that was May 19th, 2016?

12  A       Correct.

13  Q       All right.  I'm going to show you -- I can take that

14  one back -- what's been marked as Exhibit 832, which says

15  representative authorization.  Do you recognize this?

16  A       Yes, I do.

17  Q       Is that your signature on page 2?

18  A       Yes.  Yes, it is.

19          MS. YUSI:  We move to admit Exhibit 832.

20          (Government's Exhibit 832 was marked for

21          identification.)

22  BY MS. YUSI:

23  Q       Now, this says representative author- --

24  authorization.  In the second one -- says, "Add a

25  representative to my account."  Who was the representative

```
 1    that you signed to be on this account?
 2    A       My wife.
 3    Q       Look on page 1, please.
 4    A       Oh, page 1.
 5    Q       Sorry.  Under add a representative to my account,
 6    who does it say in there was your representative?
 7    A       Oh, Bill -- Bill Smith.
 8    Q       All right.  I'm going to show you what's been marked
 9    for identification as Exhibit 833.  I'll take -- I'll take
10    the other one.  Thank you.
11            Do you recognize this document?
12    A       I do.
13    Q       And does it state it is?
14    A       Date on this is 6/24/16 and this was --
15    Q       6/24/16?
16    A       Mm-hmm.
17    Q       Okay.  And what does it say at the top that it is,
18    what kind of agreement?
19    A       It's a buyer's agreement.
20    Q       And on the last page is that your signature?
21    A       Yes, it is.
22            MS. YUSI:  We move to admit Exhibit 833.
23            (Government's Exhibit 833 was marked for
24            identification.)
25    ////
```

```
 1    BY MS. YUSI:
 2    Q        So is this -- this is a buyer agreement.  Was this
 3    one of the things that you had to sign for this investment?
 4    A        Right.
 5    Q        And who provided all of this documentation to you?
 6    A        Smith did.
 7    Q        And did he go paragraph by paragraph and explain
 8    what these all meant?
 9    A        I don't recall that at all.
10            (Reporter clarification.)
11            THE WITNESS:  He -- he told me, you know, read it,
12    look over it, and I did.
13    BY MS. YUSI:
14    Q        And did you have any understanding -- on the first
15    page it references DOM Business Brokers -- who DOM Business
16    Brokers were?
17    A        Well, that would be Daryl Banks I believe.
18    Q        Did you know that at the time?
19    A        No, I did not.
20    Q        And the seller's name on page 1 says, "Excel
21    Bandwidth."
22    A        Mm-hmm.  That's what -- yeah.
23    Q        Did you know who controlled Excel Bandwidth?
24    A        I -- I think I did by then because I did have the
25    conversation with Daryl Bank.
```

1    Q        Okay.

2    A        Yeah.

3    Q        And what about Excel Bandwidth Two, what was your

4    understanding of who controlled that?

5    A        Everything that -- that I'm aware of was controlled

6    by -- by Mr. Smith and Daryl Bank.

7    Q        Did you have a good understanding as to why the

8    seller, Excel Bandwidth, was selling an equity into XCEL

9    Bandwidth Two and how that worked?

10   A        No, I don't.

11   Q        And page -- the last page where your signature is --

12   A        Mm-hmm.

13   Q        -- under broker, who's listed as DOM -- DOM business

14   broker?

15   A        Bill Smith.

16   Q        And I'm going to show you what's been marked as

17   Government Exhibit 835.  You recognize this?

18   A        The operating agreement, yes.

19   Q        And what was that?  Did -- did you have any idea

20   what that -- the purpose of that?

21   A        Well, that's just all the legalities, that part of

22   the investment that I signed off on.

23            MS. YUSI:  Move to admit Exhibit 835.

24            (Government's Exhibit 835 was marked for

25            identification.)

BEHMKE REPORTING AND VIDEO SERVICES, INC.        31
(415) 597-5600

```
 1    BY MS. YUSI:
 2    Q      Now, on the second to last -- let's see.  I'm sorry.
 3           Third to last page of this agreement -- sorry,
 4    flipping around I know -- is that your signature there?
 5    A      Yes, it is.
 6    Q      All right.  And I'm going to show you one last
 7    document.  I apologize.  But if we can look at 836, states
 8    member loan.  Do you see that?
 9    A      I -- I do.
10    Q      And is it your -- did you sign this document at all?
11    A      I don't -- I do not see my signature --
12    Q      Okay.
13    A      -- signature on --
14           MS. YUSI:  Move to admit exhibit 836.
15           (Government's Exhibit 836 was marked for
16           identification.)
17    BY MS. YUSI:
18    Q      Did you have an understanding or did Bill Smith
19    explain to you why there's an operating agreement, why there
20    was a buyer agreement, why one company controlled by Daryl
21    Bank was borrowing another from another company, anything
22    like that?
23    A      Nothing --
24           MR. GRINDROD:  Object to form.
25           THE WITNESS:  Nothing was said.
```

```
 1    BY MS. YUSI:
 2    Q       Did you understand the structure of what was going
 3    on?
 4    A       Not really.  I tried.
 5    Q       Okay.  Now, your money -- did you have any
 6    understanding of how the fees or commissions or how the
 7    actual businesses were going to make money?
 8            MR. GRINDROD:  Object to form, compound.
 9            THE WITNESS:  How I was going to make money is by --
10    BY MS. YUSI:
11    Q       Well, I'm sorry.  How was -- how were -- did you --
12    did you discuss or what was your understanding of any fees
13    or commissions that would be taken out of your investment?
14    A       The -- the fees that came out were through IRA
15    Services the way I understood that.
16    Q       Were those the only fees you were aware of?
17    A       Yeah.  And then Mr. Smith was just talking about how
18    great the returns were going to be.
19    Q       Okay.
20    A       And --
21    Q       Did he talk about how much money he was going to
22    get?
23    A       I don't -- I don't think so.  I don't recall that
24    but when I see the membership interest, I remember -- I
25    remember getting the phone -- phone call from Smith on our
```

1    home phone saying, you know -- saying we're -- we're in now.

2    We're all good.  I remember that.  I remember that number.

3    Q        Saying everything was official and --

4    A        Yeah.  Yeah.  Yeah.

5             (Reporter clarification.)

6             MS. YUSI:  I'm sorry.

7    BY MS. YUSI:

8    Q        He said that --

9    A        Everything was official and you're in.

10   Q        Okay.  Now after you made this investment in 2016 --

11   A        Yeah.

12   Q        May 2016, did you keep up to date with your

13   investment and what was going on?

14   A        Yeah.  I would get -- I would get a statement from

15   IRA Services.

16   Q        Did you ever listen to any phone calls or conference

17   calls?

18   A        I was in -- I was in five -- I believe five

19   conference calls.

20   Q        What were the conference calls?

21   A        It was Daryl Bank and then there was other voices in

22   the background but I don't know who they were.

23   Q        And -- and what did they say in terms of how the

24   investment was going?

25   A        Bank was saying that, you know, the equipment is,

1    you know, moving in, things are happening.  They were very

2    short conference calls.  And then one of the last conference

3    calls Bank wasn't there, and I found out that Bank was

4    arrested.  So I called up Mr. Smith.  I go, Bill Smith, Bank

5    has been arrested.  What's going on?

6            Oh, that has nothing to do with XCEL.  That's

7    something else that happened.

8    Q       Okay.

9    A       Okay.

10   Q       You said has nothing to do with your investment?

11   A       Right.  Has nothing do with my investment, so the

12   red flag obviously went up with me, and so I contacted Bill

13   again.  I don't know how many times I set up a couple

14   meetings with him when I was making some sales calls out in

15   Roseville with my company.  He assured me that everything

16   was still good.  But I said, "Well, what's happening

17   with" -- "with Bank."  And then he started laying some other

18   company on me.  I can't remember that name, but all I

19   remember is, like, a -- on his computer, like, a bullet

20   train on the front of it.  So I'm going wait a minute.  Is

21   this -- is this company taking over what Bank initially

22   started?

23           Oh, no.  No.  This is -- this is something else we

24   can look at.

25           I go, I want my money.  This is not working.

1    Q       So he -- he went -- he was offering you another

2    investment?

3    A       Right.  And then -- so I said this -- this -- this

4    is not going well because the statements I was getting, I

5    don't know, from IRA Services, the quarterly statements,

6    there was -- there was nothing coming in.  There was no

7    return on investment at all.  So I -- I -- I called these

8    meetings and said, "You've got to tell me what's going on

9    here."  And he just kind of blew me off and laughed it off.

10           And he also told me if the FBI calls, me not to say

11   anything.  I'm going what?  So that's about the time I --

12   I -- and I was already probably looking into it, checking

13   the backgrounds.  And then -- and I saw the article in the

14   Virginia-Pilot, and I contacted the writer when seeing Daryl

15   Bank's arrest, and -- and Smith was involved with something

16   back in 2012.  I think it was -- I think it had something to

17   do with that bone dental franchise.

18   Q       So that's the only -- the first time that you ever

19   found out that something was --

20   A       Yeah.

21   Q       -- truly wrong with your investment?

22   A       True -- truly wrong, yeah.  It was -- it was real

23   bad scene and not only just because of my investment but --

24   but my -- my -- my wife, Kathy, you know -- this would have

25   been -- I told Bill -- I go this is going to destroy my

```
 1    marriage if I don't get my money back.
 2    Q       Did he offer --
 3            MR. GRINDROD:  Object -- sorry.  Objection.  Move to
 4    strike as nonresponsive.
 5    BY MS. YUSI:
 6    Q       What did -- what, if anything, did Mr. Smith say
 7    about trying to get your money back?
 8    A       He -- he started talking about another investment,
 9    and this is with the Hilton family.  So he tells -- he
10    tells -- he says, "I can get you $7,500 back right now,
11    Kenny.  You just give me, you know, 2,000 bucks.  Write the
12    check now for $2,000.  I'll get you $7,500 right way.  So he
13    has his sidekick, Kennedy, go in his office, gives me the
14    FedEx envelope.  He says, "Here" -- "here's some
15    paperwork" -- "paperwork stuff inside and send the money to
16    another Florida address."  And by this time I was just
17    playing with him.  I -- I knew he was, you know -- I won't
18    say in front of the camera, but -- but he was playing me big
19    time.
20    Q       But --
21    A       And -- and -- and the thing is I would -- I would
22    listen to his radio show, and he's touting that Hilton
23    thing.  And that he's going to have -- oh, we're going to
24    have a big meeting.  We're going to have 250 people at this
25    meeting.  And you could tell -- I could tell that he was,
```

```
 1    like, just reaching for the sky in desperation.
 2           MR. GRINDROD:  Objection.  Move to strike as
 3    narrative and unresponsive.
 4    BY MS. YUSI:
 5    Q       Did you get -- ever -- ever get any of your money
 6    back?
 7    A       No, I did not.  Other than -- I -- I contacted IRA
 8    Services.  I said -- I said, "Look, I'm" -- "I've been part
 9    of a scam here."  And I go I want my money back.
10           They said, "Well, you've got to contact Bill Smith
11    on that."  And they wouldn't -- they wouldn't tell me how
12    much money was -- I knew there was -- there was cash in
13    there, but I had no idea where my money went to.  Obviously
14    went to Bank and he did what he did with it.
15           But they told me that -- and then by that time I was
16    working with Agent Bowers and he was -- he was -- he -- he
17    was of great help.  And even though I had all this evidence
18    from articles in the paper and so on and so forth, IRA
19    Services would not give me my money back.  There's like $500
20    left.
21    Q       Let me ask.  Did -- so did you end up getting any
22    money back from IRA services?
23           MR. GRINDROD:  Sorry.  Sorry.  For -- for the -- I
24    was trying to wait for him to complete the answer.
25           MS. YUSI:  Sure.
```

```
 1              MR. GRINDROD:  Object to narrative and unresponsive
 2    and relevance.
 3    BY MS. YUSI:
 4    Q        So did you end up getting any money back from IRA
 5    Services?
 6    A        I got $75 back.
 7    Q        And that's all you got back?
 8    A        That was all --
 9              (Reporter clarification.)
10              MS. YUSI:  Sorry.
11    BY MS. YUSI:
12    Q        Is that all you got back from your investment?
13    A        Yes.
14    Q        All right.  I think those are all my questions right
15    now.  I'm sure Mr. Smith's attorney will have some for you.
16    If you could answer -- I'll take the exhibits so you don't
17    have to keep that in front of you.
18              MR. GRINDROD:  I'm going to ask him about some of
19    those.
20              MS. YUSI:  That's fine.  I'll help him --
21              MR. GRINDROD:  Okay.
22              EXAMINATION BY ANDREW W. GRINDROD, ESQ.
23    BY MR. GRINDROD:
24    Q        Mr. Sykes, my name is Andrew Grindrod.  I represent
25    Mr. Smith.  I'm just going to ask you some questions today.
```

```
1    A        Okay.

2    Q        So I want to start by going back to the beginning,

3    like, when you first met Mr. Smith?

4    A        Mm-hmm.

5    Q        So you said that was in late 2015, maybe

6    December 2015?

7    A        It -- it was -- I think it was 2015.  I can't give

8    you the exact date.

9    Q        And at -- at that time you were the president of

10   that company you referred to, American Bearing --

11   A        Yeah.  That's our -- that's -- that's our company,

12   my wife and I.

13   Q        And you came to Mr. Smith because you were trying to

14   make up for not having saved enough money in retirement over

15   the last 15 years, right?

16   A        Yeah.  I was hit with the -- the dot-com bust and,

17   of course, the financial crisis --

18   Q        So --

19   A        -- like everybody.

20   Q        Sure.

21            And so you were in some sense looking to make up for

22   that lost time saving?

23   A        Sure.

24   Q        And Mr. Smith told you about this company called

25   Excel Bandwidth?
```

```
 1     A        Correct.

 2     Q        Among other things?

 3     A        Right.

 4     Q        And you knew that alternative investments like this,

 5     like notes and private investments, carry significant risk,

 6     right?

 7     A        Of course.

 8     Q        Let's look at -- well, specifically you know that

 9     they -- among the risks that are involved is the risk of

10     losing your entire investment, right?

11     A        Right.

12     Q        And as part of your meetings and -- and going over

13     forms with Mr. Smith, he told you about the risks?

14     A        He -- all he talked about how much money we would

15     make.

16     Q        Did he -- do you remember him giving you a form that

17     explicitly told you, look, investments like this carry a

18     substantial risk, including the risk that you'll lose

19     everything?

20              MS. YUSI:  Objection.  Foundation.

21              Go ahead.

22              THE WITNESS:  Well, yeah.  All investments carry

23     that, so I -- I -- I understood that.

24     BY MR. GRINDROD:

25     Q        Okay.  And just to -- to talk in generals terms
```

1    about the timing, so sometime 2015 time period generally is

2    when you start talking to Mr. Smith, right?

3    A        Right.

4    Q        And you didn't actually invest in XCEL until summer,

5    May, June 2016?

6    A        Yeah.  Sounds about right.

7    Q        So there -- this wasn't somewhere, you know, you

8    came in, signed on the dotted line on the first meeting, and

9    that was it, right?

10   A        No.  I -- I -- he gave me -- he gave me information.

11   He gave me a DVD.  I did -- I did go on the web and check up

12   on Spectrum and that type of thing so -- but unfortunately I

13   did not -- I did not check on -- on Mr. Smith and Daryl Bank

14   until later on.

15   Q        And --

16   A        Especially after my returns were -- there's nothing

17   coming in.

18   Q        On direct examination you said that you didn't talk

19   to Mr. Smith, I guess, one way or the other on him getting a

20   commission, right?

21   A        The commission -- I -- I wasn't -- I don't know

22   about his commission.  I'm sure, you know, like anything

23   he -- he had a deal struck with -- with Bank, you know.

24   Q        So you assumed he was getting some sort of

25   commission?

1    A        Right, right, right.

2    Q        Okay.  And you mentioned on direct that Mr. Smith

3    mentioned to you that he and his family, I guess, had some

4    amount of money in Spectrum investments or had something at

5    stake there?

6    A        Right, right.  I recall that.  There was -- in fact

7    I came in there to visit, and he just got off the phone with

8    somebody else who was making an investment in the same thing

9    I was doing --

10   Q        And --

11   A        -- so...

12   Q        Just to be clear though, Mr. Smith didn't tell you

13   specifically that he had purchased $300,000 in equity in

14   some specific company, right?

15   A        I don't recall that.

16   Q        He was just saying he had stake -- he had some --

17   some stake in Spectrum investments?

18   A        Right.

19   Q        Okay.  Let's look at Government Exhibit 826, which

20   was one that Ms. Yusi talked with you about.

21   A        Okay.

22   Q        So just to reorient you with that, this is the

23   one -- the e-mail that has that scenario A chart attached.

24   A        Right, right, right.

25   Q        Okay.  So that scenario A chart is on page 3.  I

1    want you to flip to page 2 if you could.

2    A        Okay.

3    Q        And page 2 was part of this e-mail that Mr. Smith

4    sent you, right?

5    A        Okay.

6    Q        Is that right?

7    A        If it has my name, yes.  It has my name on it.  I'm

8    sure I received it.

9    Q        Okay.  And right in the middle of page 2 it says,

10   "Important note, the values on the income plan in orange are

11   hypothetical returns, right?

12   A        Right.  I see that.

13   Q        And then in the section below that it says, "This is

14   a hypothetical example only, and it's not intended to

15   predict the actual performance of any specific product,"

16   right?

17   A        Correct.

18   Q        And it tells you again all investments have risk

19   associated -- associated with them and the future loss is

20   possible, right?

21   A        Right.

22   Q        And then it says, again, in the second to last line

23   of that paragraph, "All income projections are hypothetical,

24   and should not be considered indicative of actual income,"

25   right?

```
 1    A       Right.
 2    Q       And then if you flip to page 3, the assumption here
 3    about the amount that was going to be invested is $100,000,
 4    right?
 5    A       Right.
 6    Q       And so that's -- that's just not what you ever ended
 7    up investing in XCEL or otherwise, right?
 8    A       No, it's not.
 9    Q       So these numbers don't reflect anything about what
10    you actually did as far as an investment with Mr. Smith,
11    right?
12    A       Right, right.
13    Q       You can set that aside.
14            MR. GRINDROD:  Ms. Yusi, can you remind me, did
15    you offer Government Exhibit 834?
16            MS. YUSI:  What is it?  No, I did not.
17            MR. GRINDROD:  Okay.
18    BY MR. GRINDROD:
19    Q       So just for the record, this was previously marked
20    as Government Exhibit 834 for identification purposes.  I'm
21    now remarking it by putting a sticker over the government's
22    exhibit sticker and labeling it Smith Exhibit 520.
23            So, sir, I'm handing you what's now been marked as
24    Smith Exhibit 520.
25    A       Yeah, I'm quite familiar with it.
```

```
 1    Q        Okay.  So you've seen this before?

 2    A        Yep.  That's what -- I would get this occasionally

 3    from -- from -- in my e-mail from Bank.

 4    Q        From Daryl Bank?

 5    A        Daryl Bank I believe it came from.

 6    Q        Okay.  And does this appear -- I guess flip the

 7    page 2, which is on the back there.

 8    A        Oh.

 9    Q        That's your signature there?

10    A        Right.

11    Q        And the date on it is June 24, 2016?

12    A        Okay.

13             MR. GRINDROD:  I'd offer Smith Exhibit 520.

14             (Government's Exhibit 520 was marked for

15             identification.)

16    BY MR. GRINDROD:

17    Q        And basically, you know, what this is is an overview

18    of XCEL Bandwidth 2, right?

19    A        Mm-hmm.

20    Q        It talks about -- it gives some basic information

21    about the company, right?

22    A        Right.

23    Q        And it's more in like a -- kind of laymen

24    explanation, not like those big, long legal technical

25    documents we were looking at earlier, right?
```

1    A        Right, right.

2    Q        And it says that it's -- it's an operational push to

3    talk network --

4    A        Right.

5    Q        -- right?

6    A        Mm-hmm.

7    Q        Describes the concept?

8    A        Mm-hmm.

9    Q        Sorry.  For the court reporter can you just say,

10   like, yes or no?

11   A        Yes.  Sorry.

12   Q        And the concept is basically to create a seamless

13   push to talk radio for transportation, construction, oil,

14   and gas, those kinds of businesses, right?

15   A        Correct, correct.

16   Q        And I think you had said on -- on direct you had

17   specifically talked about the shale --

18   A        Right, right.

19   Q        In Texas, right?

20            (Reporter clarification.)

21            THE WITNESS:  Right, right.

22   BY MR. GRINDROD:

23   Q        It talks about the relationship between XCEL One and

24   XCEL Two and Rapid Link Wireless, right?

25   A        Correct.

```
 1    Q        And page 2 describes some of the assets and -- and
 2    projects that XCEL Two was working on?
 3    A        Right.
 4    Q        And you read this and understood it, right?
 5    A        I did.
 6    Q        Okay.  You can set that aside.
 7    A        Okay.
 8    Q        If haven't offered that, already offer it.
 9             Can we flip to Government Exhibit 828, which you
10    spoke about with Ms. Yusi?  So this is an e-mail that has
11    some attachments, and one of them is a Slide Deck, right?
12    Power point slides there?
13    A        All right.
14    Q        So this e-mail came from that John Kennedy guy,
15    right?
16    A        Yes.  That came from John -- John Kennedy with cc'ed
17    to Smith.
18    Q        And to you, right?
19    A        And to me.
20    Q        Could you flip to page 8.  I think it's back --
21    those are back to front, so you're going to actually want to
22    go to page 4.  Sorry, sir.  It's the first page of -- flip
23    it one more forward.  Sorry.  The first page of the
24    PowerPoint presentation.  There you go.  So that's a
25    PowerPoint presentation --
```

| | | |
|---|---|---|
| 1 | A | Right. |
| 2 | Q | -- about Rapid Link Wireless? |
| 3 | A | Mm-hmm. |
| 4 | Q | Is that a yes? |
| 5 | A | Yes. |
| 6 | Q | And it says that that Slide Deck was prepared by a |
| 7 | | guy named Dale Gray, right? |
| 8 | A | Yes. |
| 9 | Q | So you knew that Mr. Smith had not prepared that |
| 10 | | Slide -- Slide Deck? |
| 11 | A | Correct. |
| 12 | Q | And those -- if you flip all the way to the very |
| 13 | | end, last three pages that you talked about with Ms. Yusi, |
| 14 | | those charts. |
| 15 | A | Okay. |
| 16 | Q | So these charts that were prepared by somebody |
| 17 | | else -- |
| 18 | A | Mm-hmm. |
| 19 | Q | -- if you look at the bottom, it says that these are |
| 20 | | intended only as an estimate of potential earnings, right? |
| 21 | A | Okay. |
| 22 | Q | Is that correct? |
| 23 | A | This is correct. |
| 24 | Q | Okay.  And you understood that at the time? |
| 25 | A | Yes, I did. |

```
 1   Q        And, also, this Slide Deck is about RapidLink
 2   Wireless, right?
 3   A        Right.
 4   Q        Which was a company that worked in the same space
 5   and with XCEL Two but wasn't the company you actually
 6   invested in, right?
 7   A        Right.
 8   Q        Okay.  So you can set that aside.  We're done with
 9   that for now.
10   A        Thank you.
11   Q        XCEL Bandwidth and XCEL Bandwidth Two, these were
12   not Mr. Smith's companies, right?
13   A        Correct.  He was working with Bank.
14   Q        Right.  And you knew at the time -- the whole time
15   you were having conversations about this that they were
16   not -- they were not Mr. Smith's companies, right?
17            MS. YUSI:  Objection.  Asked and answered.
18   BY MR. GRINDROD:
19   Q        Sorry.  Let me -- let me rephrase.  So I think I
20   asked you earlier whether they were -- whether you know now
21   that they're Mr. Smith's.  What I'm asking -- what I'm
22   trying to ask you now is back then when you were looking
23   into investing in these, did you know back then that they --
24   these companies were not Mr. Smith's companies?
25   A        I'm aware of that.
```

```
 1     Q        Okay.
 2     A        But I knew it was Banks.
 3     Q        Okay.  So you knew back then that they were run by
 4   this guy named Daryl Bank?
 5     A        Correct.
 6     Q        And you believed that -- specifically that Mr. Bank
 7   was the guy who was putting the XCEL investment together?
 8     A        Correct.
 9     Q        And before making the investment, you received
10   written materials.  We talked about some of those.  But you
11   were also before investing were on a call -- conference call
12   with Daryl Bank, right?
13     A        And with Smith.
14     Q        Right.  With the -- you, Mr. Smith, and Mr. Bank?
15     A        Right.
16     Q        And so you got to hear about XCEL Bandwidth sort of
17   straight from the horse's mouth?
18     A        Correct.
19     Q        And you had -- at least some of those materials
20   about XCEL, you had received before that conference call
21   with Mr. Bank, right?
22     A        Repeat that again.
23     Q        So at least some of the materials you had, you had
24   some materials about XCEL before that conference call with
25   Mr. Bank; is that right?
```

```
 1    A        Yes.

 2    Q        Okay.  So on that conference call you would have had

 3    the opportunity to, you know, ask Mr. Bank, hey, I don't

 4    understand what this is or I have a question about that,

 5    right?

 6    A        Correct.

 7    Q        Do you remember whether you asked Mr. Bank any

 8    questions?

 9    A        I probably asked a few questions but I -- off the

10    top of my head, I -- I can't remember.  That's, you know --

11    Q        It's been forever.  I get it.

12    A        Not getting any easier.

13    Q        But as far as you can recall, if you had questions,

14    Mr. Bank answered them?

15    A        Right.

16    Q        Okay.

17    A        But primarily I went to Bill for -- for questions.

18    Q        I understand.

19             So after you invested in XCEL --

20    A        Mm-hmm.

21    Q        -- Daryl Bank was the contact person as far as

22    substantive updates, right?

23    A        Right.

24    Q        And -- and there were -- specifically there were

25    regular conference calls with Daryl Bank?
```

```
 1    A       Yeah.  I believe I was on four or five of those, and
 2    then he disappeared.
 3    Q       And those calls came from XCEL out of Bank's office
 4    in Port -- St. Port -- St. --
 5    A       I believe they did, yeah.
 6    Q       Sorry.  I was trying to say Port St. Lucie, Florida.
 7    A       Right.
 8    Q       Okay.  And like you just said, I mean, those --
 9    those calls went kind all the way up until he got arrested
10    basically, right?
11    A       Correct.
12    Q       And when those calls stopped, is when, you know, you
13    said he dropped off the map.  That's because as you later
14    found out he got picked up by the Feds, right?
15    A       Right.
16    Q       And there's obviously no question, right, that you
17    did not get money back that went to Daryl Bank in XCEL?
18    A       I did not.
19    Q       Okay.  So in 2019 you reached out to --
20    A       Though I did ask for it back but --
21    Q       Sure.
22    A       -- he gave me the song and dance.
23    Q       Sure.
24            So in 2019 you reached out to -- to Ms. Yusi, this
25    federal prosecutor, right?
```

```
1    A        I -- first I contacted the writer of Daryl Bank's
2    arrest from the Virginia-Pilot.
3    Q        Sure.
4    A        And then I believe she forwarded -- forwarded me
5    Elizabeth's information, contact information.
6    Q        And -- and after you got Ms. Yusi's contact
7    information, you contacted her, right?
8             MS. YUSI:  Objection.  Relevance.
9    BY MR. GRINDROD:
10   Q        Is that right?
11   A        Yes.
12   Q        I'm going to show you what's been premarked as Smith
13   Exhibit 513, and because it's an e-mail chain, sir, the --
14   the oldest e-mail is all the way at the bottom.  So if you
15   turn to page 2, I think it's the oldest e-mail.  And are
16   these e-mails between you and federal prosecutors, and you
17   and federal investigators?
18   A        Yes.
19            MS. YUSI:  Objection.  Relevance.
20   BY MR. GRINDROD:
21   Q        And in that first e-mail --
22            MS. YUSI:  Are you admitting --
23            MR. GRINDROD:  I'll -- I'll offer it.
24            MS. YUSI:  And I'm going to object to the extent
25   there is hearsay --
```

```
 1              MR. GRINDROD:  Okay.
 2              MS. YUSI:  -- as well as relevance.
 3    BY MR. GRINDROD:
 4    Q        So all the way on page 2 all the way at the bottom,
 5    that's that first e-mail from you to Ms. Yusi?
 6    A        Correct.
 7    Q        And you told Ms. Yusi, "I may be a victim of Daryl
 8    Bank," right?
 9    A        Correct.
10    Q        And then in the same e-mail you say -- the second to
11    last line into the last line you say you're asking if your
12    name is on file with respect to, quote, Bank's fraud
13    investments, right?
14              MS. YUSI:  If I can have -- I'm going to object to
15    this.  Are you doing -- are you trying to impeach or you
16    trying to --
17              MR. GRINDROD:  No.
18    BY MR. GRINDROD:
19    Q        Do you -- do you remember -- do you remember saying
20    that?
21    A        When I contacted Andrew Bowers --
22    Q        So we're --
23    A        -- he -- he -- he did not have my name on file with
24    Bank.
25    Q        Right.
```

```
1    A        And then that's when I started forwarding the
2    information that I was invested with Mr. Bank.
3    Q        Right.  And --
4    A        Bank, Smith.
5    Q        We're going to walk through that, but I'm just
6    asking.
7    A        Okay.
8    Q        This -- this first e-mail that you said -- you say,
9    "I may be a victim of Daryl Bank," and you -- you're asking
10   whether your name is on file with respect to Bank's fraud
11   investment, right?
12   A        Right.
13   Q        Okay.
14   A        Because I heard nothing.
15   Q        Right.
16   A        I was expecting a call from -- from the FBI because
17   he told me not to talk to him.
18   Q        Sir, there's not -- there's not a question pending.
19            MS. YUSI:  Can you let him answer his question.
20            MR. GRINDROD:  There wasn't a question pending.
21            MS. YUSI:  I'm going to have you -- you can say --
22   because why?  You were expecting a call from the FBI because
23   why?
24            THE WITNESS:  I was expecting a call from the FBI
25   but it never came and -- and -- and Smith told me not to
```

```
 1    talk to the FBI.

 2            MS. YUSI:  Okay.  Thank you.

 3            MR. GRINDROD:  Move to strike as nonresponsive.

 4    This is not your examination.

 5    BY MR. GRINDROD:

 6    Q       So going up on the same e-mail chain, Ms. Yusi

 7    tells -- asks the federal investigators to reach out to you,

 8    right?

 9            MS. YUSI:  Objection.  Hearsay.

10            You can go ahead.

11            THE WITNESS:  Yes.

12    BY MR. GRINDROD:

13    Q       Okay.  And -- and then you got this -- this e-mail

14    at the bottom of page 1 carrying onto page 2 from Agent

15    Bowers with the IRS, right?

16    A       Correct.

17    Q       He asked you to give him a call or -- or send

18    him a --

19    A       Right.

20    Q       And -- and so your e-mail to Agent Bowers is -- is

21    at the top of that first page, right?

22    A       Correct.

23    Q       And in the very first sentence there you refer to

24    this as my investment with Daryl Bank, right?

25    A       Correct.
```

1    Q       And then in the second paragraph you refer to XCEL

2    as an investment you made, quote, through smooth-talking

3    Bank?

4    A       Right.

5    Q       So you're talking about Daryl Bank, right?

6    A       I am.

7    Q       And so from early on all the way up to -- what is

8    this -- June 24th, 2019, you're talking about this

9    investment in terms of Daryl Bank, right?

10   A       Correct.

11   Q       And then three days after this e-mail chain on

12   June 27th, 2019, you spoke with IRS Agent Bowers?

13   A       Correct.

14   Q       And he -- he wanted to talk to you on the phone

15   rather than by e-mail, right?

16   A       I -- I don't recall.  It does --

17   Q       If I showed you your e-mails with him, would that

18   refresh your recollection?

19   A       Possibly.

20           MS. YUSI:  I'm going to object to the relevance of

21   this line of questioning.

22   BY MR. GRINDROD:

23   Q       So I'm going to show you what's been marked for

24   identification purposes as Smith Exhibit 512 just to see if

25   this refreshes your recollection.  And you can -- you can

1    look at the whole document, but you might want to look at

2    the -- this bottom e-mail that carries over from page 1 onto

3    the top of 2.

4    A      Are you -- are you referring to the part that I'd

5    rather do this through e-mail instead of a phone

6    conversation?   Is that what you're referring to?

7    Q      Give me one moment.   I may have handed you the wrong

8    document.

9           So I'm referring to, at the very top page 2, that

10   e-mail from Agent Bowers where he says --

11          MS. YUSI:   I'm going to object to the hearsay, and

12   this document is not in evidence.

13          MR. GRINDROD:   Okay.   I'll offer it.

14          (Defendants' Exhibit 512 was marked for

15          identification.)

16          MS. YUSI:   And I object because there's hearsay in

17   it and -- and to the relevance.

18   BY MR. GRINDROD:

19   Q      Do -- do you recognize this document?

20   A      Well, yeah.

21   Q      It's e-mails between you and the agent -- right?

22   A      Yeah, that's me.

23   Q      And it's a fair and accurate copy of it?

24   A      Yes.

25          MS. YUSI:   And were you using this -- if you're

```
 1    using it to refresh his recollection, then you give it to
 2    him.  Ask him if it refreshes his recollection.  Then you
 3    take it back and ask your question again.  Is that what you
 4    were doing or now you're offering this.
 5            MR. GRINDROD:  I'm offering it.
 6    BY MR. GRINDROD:
 7    Q      So on -- at the top of page 2, Agent Bowers says to
 8    you, "I was going to call you but you indicated --
 9            MS. YUSI:  I'm going to object to the hearsay.
10            MR. GRINDROD:  I understand.  Do you have any other
11    objections?
12            MS. YUSI:  No.
13            MR. GRINDROD:  Okay.
14    BY MR. GRINDROD:
15    Q      At the top of page 2, Agent Bowers says, "I was
16    going to call you, but you indicated in your e-mail that you
17    did not want me to call because your spouse.  So, please,
18    give me a call when you're free."
19            And then he says some more, and then at the bottom
20    he says, "Sorry I can't give you additional information over
21    e-mail, but feel free to give me a call," right?
22    A      So I did.
23    Q      Okay.  So you called him, right?
24    A      I did.
25    Q      And then that was the conversation that you had on
```

1    June 27th, 2019, right, with the agent?

2    A       Okay.

3    Q       And you spoke with Agent Bowers?

4    A       I did.

5    Q       Same guy on that e-mail?

6    A       I did.

7    Q       Same guy who wanted to communicate by phone rather

8    than e-mail, right?

9            MS. YUSI:  Objection.  Argumentative.

10   BY MR. GRINDROD:

11   Q       You can answer.

12   A       Repeat that again.

13   Q       We're talking about the same guy who wanted to

14   correspond by phone rather than e-mail, right?

15   A       Right.

16   Q       And Agent Bowers when you talked to him he told you

17   that the government was investigating Mr. Smith?

18           MS. YUSI:  Objection.  Hearsay.

19   BY MR. GRINDROD:

20   Q       Is that right?

21   A       Yes.

22   Q       And he asked you questions about Mr. Smith?

23   A       Yes.

24   Q       And he put in your head the idea that Mr. Smith had

25   done something wrong, right?

```
 1              MS. YUSI:  Objection.  Argumentative --
 2              MR. GRINDROD:  Can you wait?
 3              MS. YUSI:  -- relevance, and hearsay.
 4              MR. GRINDROD:  Okay.
 5     BY MR. GRINDROD:
 6     Q       I'm going to ask you the question again.  He put in
 7     your head that Mr. Smith had done something wrong, right?
 8              MS. YUSI:  Same objections.
 9              THE WITNESS:  He not -- he did not put it in my
10     head.  I already knew --
11     BY MR. GRINDROD:
12     Q       Okay.
13     A       -- just by -- just by what I investigated myself and
14     what he was involved with back in 2012 or whatever it was.
15     Q       Sure.
16              So let's talk about that.  So after -- about a week
17     after you get -- you finished that interview with the IRS
18     agent, you started Googling Mr. Smith online, right?
19              MS. YUSI:  Objection.  Foundation.
20     BY MR. GRINDROD:
21     Q       Is that right?
22     A       Yes.
23     Q       And you found an article online about him, right?
24     A       Correct.
25     Q       A Virginia-Pilot article?
```

```
 1    A        Correct.

 2    Q        And you -- it talked about Mr. Smith being charged

 3    in this case, right?

 4    A        Correct.

 5    Q        And in the headline of the article it said, "This is

 6    what the, quote, Feds say," right?

 7             MS. YUSI:  Objection.  Hearsay.

 8             THE WITNESS:  I don't -- I can't recall that.

 9    BY MR. GRINDROD:

10    Q        I'm handing you what's been premarked as Smith

11    Exhibit 514.  You recognize that document?

12             (Defendants' Exhibit 514 was marked for

13             identification.)

14             THE WITNESS:  That's the Pilot news article.

15    BY MR. GRINDROD:

16    Q        And that's the Pilot news article that you found,

17    right?

18    A        Right.

19    Q        And the headline says --

20    A        Yeah.

21    Q        -- "This is what the, quote, Feds say," right?

22    A        Mm-hmm.

23    Q        Is that right?

24             MS. YUSI:  I'm going to object to hearsay.

25    ////
```

```
 1    BY MR. GRINDROD:
 2    Q       Is that right, sir, for the record?
 3    A       Yeah.  Yes.
 4    Q       And you forward that article to the IRS agent,
 5    right?
 6    A       I did.
 7    Q       And you said -- you called Mr. Smith a scumbag,
 8    right?
 9    A       I did.
10    Q       And --
11    A       And I still hold that.
12    Q       Right.  And the truth is, Mr. Sykes, that it was
13    after you read this article about what the Feds say and
14    after you spoke on the phone with the IRS agent, that's when
15    this case for you became about wrongdoing by Mr. Smith,
16    right?
17    A       Right.
18    Q       Because before that, before you read those articles
19    and when you talked to investigators, you were talking about
20    the loss of your money through XCEL being about Daryl Bank,
21    right?  Yes or no.
22    A       Aghee Smith was representing Bank, so I grouped them
23    together as ripping me off.
24    Q       Sure.  But in all those e-mails we saw before you
25    spoke with the IRS agent, right, you were talking about the
```

1    loss and about being a victim of Daryl Bank, right?

2    A       Right.  Because Daryl Bank was the head of the whole

3    deal, and he represented Bank.

4    Q       I understand.  Just --

5    A       I don't -- I don't know where -- what you're trying

6    to get to.

7            MR. GRINDROD:  Move to strike as nonresponsive.

8            No further questions.

9            MS. YUSI:  Anyone else online remotely have any

10   questions before I do --

11           MR. GANTOUS:  This is Anthony Gantous --

12           (Reporter clarification.)

13           MS. YUSI:  Anthony Gantous does not, yeah.

14           Mr. Yarow, do you --

15           MR. YAROW:  No questions.

16           MS. YUSI:  Thank you, Mr. Yarow.

17           MR. MATHEWS:  Greg Mathews, no questions.

18           MS. YUSI:  Thank you.

19           I have a few follow-ups, Mr. Sykes, and then we'll

20   be done.

21           THE WITNESS:  Okay.

22           EXAMINATION BY ELIZABETH M. YUSI, ESQ.

23   BY MS. YUSI:

24   Q       Mr. Grindrod was showing you some small print

25   about -- these are -- on the pro forma that they're

```
 1    estimates on your income plan.

 2    A       Mm-hmm.

 3    Q       When you spoke with Mr. Smith, did he remind you

 4    verbally this is just estimates?  This is just -- this is

 5    not -- this is hypothetical.

 6    A       Way I understood it, there was potential returns

 7    on -- on investment.  I -- I didn't, you know -- it's like

 8    any investment.  There's no guarantee on anything.

 9    Q       Did he -- did he emphasize the risks involved

10    with --

11    A       Not really.  I don't recall.

12    Q       You don't recall him saying that?

13    A       I -- I do not.

14            MR. GRINDROD:  Objection to characterization.

15    BY MS. YUSI:

16    Q       And Mr. Grindrod was asking you quite a bit about

17    Mr. Bank.  What did -- did -- did Mr. Smith say what his

18    relationship was or how long he'd known and been selling

19    things for Mr. Bank prior to your investment?

20    A       He just -- he talked about, you know, that he was

21    the -- thinking back that he was in with the people in --

22    in -- in DC doing investments and type -- that type of

23    thing.  And he -- he did -- he's saying the same thing, you

24    know, doing investments for the president and other people.

25    Q       That Mr. Bank was --
```

```
 1    A        Yeah.
 2    Q        -- or -- okay.
 3             Did he say how long he had been selling Mr. Bank's
 4    products?
 5    A        No.  I don't recall that.
 6    Q        Did he talk about having had to testify in
 7    regulatory or courts concerning these products and -- and
 8    issues that have been going on?
 9    A        Nothing was ever brought up.  I -- I found all that
10    on my own doing my own research.
11             MR. GRINDROD:  Object to asked and answered and
12    mischaracterizing the facts in evidence.
13             MS. YUSI:  Sorry.  I just need to find --
14    BY MS. YUSI:
15    Q        And you spoke with Mr. Bank that one time, but who
16    provided you all the documentation to sign?
17             MR. GRINDROD:  Objection.  Argumentative.
18             THE WITNESS:  Mr. Smith did.
19    BY MS. YUSI:
20    Q        And -- and who did you contact when you wanted to
21    know how your investment was doing?
22    A        I -- I contacted Mr. Smith.
23    Q        And what was your understanding of any duty that
24    Mr. Smith owed to you?
25             MR. GRINDROD:  Objection.  Outside the scope and
```

```
 1    irrelevant --
 2           THE WITNESS:  Repeat that.
 3           MR. GRINDROD:  -- and foundation.
 4    BY MS. YUSI:
 5    Q     What was your understanding of -- of -- of --
 6    actually, I'm going to rephrase that.
 7           I'm not going to ask that.  I'm good.  I think those
 8    are all my questions right now, Mr. Sykes.  Thank you.
 9           Anyone else?
10           THE WITNESS:  I -- doing my research, I don't know,
11    I went in --
12           MR. GRINDROD:  I'm going to object to this.  There's
13    not --
14           MS. YUSI:  He can talk.
15           MR. GRINDROD:  What's that?
16           MS. YUSI:  You can object to it.  Go ahead.
17           MR. GRINDROD:  I object to there's not a question
18    pending.
19           THE WITNESS:  Okay.  Business profile on Mr. Smith
20    and I -- there were some -- there were some bad things said
21    about him on his business, and I called Smith on it.  I go,
22    you've got some bad ink out there going on with you ripping
23    off people.
24           Oh, no.  They don't know what they're talking about,
25    you know.
```

1          One guy called him the magic man because, you know,

2     I guess he made money disappear, but it's just -- just a

3     sad -- sad thing to go through.

4     BY MS. YUSI:

5     Q      Okay.

6     A      -- just not -- I was not getting any help from him.

7          MR. GRINDROD:  Objection.  Move to strike.  There

8     was not a question pending.

9          THE WITNESS:  Okay.

10          MR. GRINDROD:  Hearsay.

11          MS. YUSI:  I got it.

12          MR. GRINDROD:  Relevance.

13          MS. YUSI:  All right.  Thank you, Mr. Sykes, and I'm

14     going to end that for everyone.

15          THE WITNESS:  Okay.

16          MS. YUSI:  Thank all.

17          THE VIDEOGRAPHER:  Okay.  This concludes the

18     deposition on November 5th, 2021.  We're off the record at

19     4:15 p.m.  Master media will be held by Behmke Reporting and

20     Video Services.

21          THE REPORTER:  Before we conclude, Mr. Grindrod, did

22     you need a copy of any of the transcripts from today?

23          MS. YUSI:  We'll take care of that.  We -- I think

24     we have an expedited order going for, like, end of next

25     weekend.

1              (Deposition concluded at 4:14 p.m.)

2                          ---oOo---

3

4              _____

5                       KENNETH SYKES

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    STATE OF CALIFORNIA      )

 2                             )    ss.

 3                             )

 4                    I hereby certify that the witness in the

 5    forgoing deposition, KENNETH SYKES, was by me duly sworn to

 6    testify to the truth, the whole truth, and nothing but the

 7    truth, in the within-entitled cause; that said deposition

 8    was taken at the time and place herein named; and that the

 9    deposition is a true record of the witness's testimony as

10    reported by me, a duly certified shorthand reporter and a

11    disinterested person, and was thereafter transcribed into

12    typewriting by computer.

13                    I further certify that I am not interested

14    in the outcome of the said action, nor connected with nor

15    related to any of the parties in said action, nor to their

16    respective counsel.

17                    IN WITNESS WHEREOF, I have hereunto

18    affixed my signature this 14th day of November, 2021.

19    Reading and Signing was NOT REQUESTED.

20

21

22

23    HECTOR CONTRERAS, CSR

24    Certified Shorthand Reporter #14051

25
```