1          IN THE UNITED STATES DISTRICT COURT FOR THE

2                  EASTERN DISTRICT OF VIRGINIA

3                       NORFOLK DIVISION

4

5   --------------------------------

6   UNITED STATES OF AMERICA,        )

7   v.                               )

8   DAVID ALCORN, AGHEE WILLIAM      )  Case No. 2:19-cr-47

9   SMITH II, THOMAS L. BARNETT,     )

10  and NORMA JEAN COFFIN,           )

11       Defendants.                 )

12                                    )

13  --------------------------------

14

15          VIDEOTAPED DEPOSITION OF SHARYON BEAN

16               FRIDAY, NOVEMBER 5, 2021,

17

18

19

20

21            BEHMKE REPORTING AND VIDEO SERVICES, INC.

22               BY:  HECTOR CONTRERAS, CSR NO. 14051

23                    455 MARKET STREET, SUITE 970

24                    SAN FRANCISCO, CA 94105

25                         (415) 597-5600

1

2

3

4

5

6

7

8           Videotaped Deposition of Sharyon Bean, taken on

9    behalf of the United States of America, at 501 I Street,

10   Sacramento, CA 95814, commencing at 1:21 p.m., Friday,

11   November 5, 2021, before Hector Contreras, Certified

12   Shorthand Reporter No. 14051, pursuant to notice of

13   Videotaped Deposition.

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFF:
 3        U.S. ATTORNEY'S OFFICE, EASTERN DISTRICT OF VIRGINIA
 4        BY:  ELIZABETH M. YUSI, ASSISTANT U.S. ATTORNEY
 5        MELISSA E. O'BOYLE, ASST. U.S. ATTORNEY (Appearing Remotely)
 6        ANDREW C. BOSSE, ASST. U.S. ATTORNEY (Appearing Remotely)
 7        101 West Main Street, Suite 8000
 8        Norfolk, Virginia  23510
 9        Telephone:  (757) 441-3555
10        Email:  Elizabeth.yusi@usdoj.gov
11
12   FOR DEFENDANT, AGHEE WILLIAM SMITH II:
13        THE OFFICE OF THE FEDERAL PUBLIC DEFENDER -
14        EASTERN DISTRICT OF VIRGINIA
15        BY:  ANDREW W. GRINDROD, ASSISTANT FEDERAL PD
16        LINDSAY J. McCASLIN, ASST. FEDERAL PD (Appearing Remotely)
17        150 Boush Street, Suite 403
18        Norfolk, Virginia  23510
19        Telephone:  (757) 457-0860
20        Email:  andrew_grindrod@fd.org
21
22
23
24
25
```

```
 1   APPEARANCES OF COUNSEL - CONTINUED:

 2   FOR DEFENDANT, THOMAS L. BARNETT:

 3       ANCHOR LEGAL GROUP, PLLC

 4       BY:  ANTHONY M. GANTOUS, ESQ. (Appearing Remotely)

 5       5101 Cleveland Street, Suite 100

 6       Virginia Beach, Virginia  23462

 7       Telephone:  (757) 529-0000

 8       Email:  unavailable

 9

10   FOR DEFENDANT, NORMA JEAN COFFIN:

11       GREGORY K. MATTHEWS, PC

12       BY:  GREGORY K. MATTHEWS, ESQ. (Appearing Remotely)

13       P.O. Box 5277

14       Portsmouth, Virginia  23703

15       Telephone:  (757) 356-5744

16       Email:  unavailable

17

18   FOR DEFENDANT, DAVID ALCORN:

19       RICHARD S. YAROW, LLC

20       BY:  RICHARD S. YAROW, ESQ. (Appearing Remotely)

21       821 W. 21ST Street, Suite 208

22       Norfolk, Virginia  23517

23       Telephone:  757-337-3963

24       Email:  unavailable

25
```

1    APPEARANCES OF COUNSEL - CONTINUED:

2    ALSO PRESENT:

3            JASON W. THOMASSON, U.S. POSTAL INSPECTION SERVICE

4            JASON BUTKO, VIDEOGRAPHER

5            AGHEE WILLIAM SMITH II

6            DAVID ALCORN (Appearing Remotely)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX

 2   FRIDAY, NOVEMBER 5, 2021                            PAGE

 3   PROCEEDINGS                                            9

 4   SHARYON BEAN

 5        Examination by ELIZABETH M. YUSI                 10

 6        Examination by ANDREW W. GRINDROD                47

 7        Further Examination by ELIZABETH M. YUSI         63

 8

 9                           ---oOo-

10

11

12

13

14            QUESTIONS WITNESS REFUSED TO ANSWER:

15                      PAGE     LINE

16                        (None.)

17

18

19

20

21

22

23

24

25
```

```
1                      GOVERNMENT'S EXHIBITS

2                         SHARYON BEAN

3   Number                Description                Page

4   Exhibit 815  XCEL Bandwidth Member Loan - 2 pages      20

5

6   Exhibit 817  XCEL Bandwidth Operating Agreement

7                - 18 pages                                22

8

9   Exhibit 818  FedPayments Manager - Funds - 1 page      26

10

11  Exhibit 819  Sharyon L. Bean IRA, June 26, 2017

12               through October 31, 2017 - 4 pages        31

13

14  Exhibit 820  Scenario A - Income Plan - 1 page         35

15

16  Exhibit 821  Account Summary, December 31, 2018

17               - 6 pages                                 37

18

19  Exhibit 823  Notice of File Proof of Claim Due to

20               Possible Recovery Assets - 2 pages        44

21

22  Exhibit 824  Account Summary, December 31, 2018

23               - 3 pages                                 42

24

25
```

```
 1                    DEFENDANTS' EXHIBITS

 2                       SHARYON BEAN

 3   Number                  Description                    Page

 4   Exhibit 504   DOM Business Brokers - 2 pages             52

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE VIDEOGRAPHER:  Here begins Media Number One in

2    the deposition of Sharyon Bean in the matter of the United

3    States of America v. David Alcorn, Aghee William Smith II,

4    Thomas L. Barnett, and Norma Jean Coffin.  This is venued in

5    the United States District Court for the Eastern District of

6    Virginia, Norfolk Division, Case Number 2:19-cr-47.  Today's

7    date is November 5th, 2021.  The time is approximately

8    1:23 p.m.

9          Name is Jason Butko contracted by Behmke Court

10   Reporting and Video Services located 455 Market Street in

11   San Francisco, California.  This deposition is being taken

12   at the U.S. Attorney's Office at 501 I Street in Sacramento,

13   California.

14         Counsel, can you, please, identify yourself and who

15   you represent starting with the questioning attorney.

16         MS. YUSI:  My name is Elizabeth Yusi.  I'm an

17   assistant U.S. attorney, and I represent the United States.

18   And I have Melissa O'Boyle and Andrew Bosse, both assistant

19   U.S. attorneys remotely that are, also, representing the

20   United States.

21         MR. GRINDROD:  Andrew Grindrod representing Aghee

22   Smith who's physically present here in the room where the

23   deposition is being taken.

24         MS. YUSI:  And for the record, I also have Jason

25   Thomasson with the United States Postal Inspection Service,

```
1    and remotely we have Mr. Rick Yarow who is counsel for David
2    Alcorn, along with his client is online.  We have Gregory
3    Mathews, counsel for Norma Jean Coffin.  Anthony Gantous who
4    is counsel for Thomas Barnett, and Lindsay McCaslin is also
5    online remotely, also, for Mr. Smith with the Federal Public
6    Defender's Office.  I think I got everyone identified.  All
7    right.
8              THE VIDEOGRAPHER:  Can the court reporter, please,
9    swear in the witness?
10             (Whereupon, the witness was sworn in.)
11             THE VIDEOGRAPHER:  You may proceed.
12             MS. YUSI:  Thank you.
13                       SHARYON BEAN,
14   having been sworn by the Certified Shorthand Reporter,
15   HECTOR CONTRERAS, to tell the truth, the whole truth, and
16   nothing but the truth, testified as follows:
17
18                       EXAMINATION
19   BY MS. YUSI:
20   Q      Good afternoon.  Can you introduce yourself to the
21   Court?
22   A      Sharyon Lee Bean.
23   Q      And how do you spell your first name?
24   A      S-h-a-r-y-o-n.
25   Q      And your last name?
```

| | | |
|---|---|---|
| 1 | A | B-e-a-n. |
| 2 | Q | How old are you today? |
| 3 | A | Excuse me.  81. |
| 4 | Q | And what city and state do you live in? |
| 5 | A | Citrus Heights, California. |
| 6 | Q | Is that outside of Sacramento? |
| 7 | A | Just on the outskirts, yes. |
| 8 | Q | How long have you lived in Citrus Heights? |
| 9 | A | 20 years. |
| 10 | Q | And do you work right now. |
| 11 | A | No. |
| 12 | Q | What did you do for a living prior to -- to now? |
| 13 | A | I worked at the telephone company, and then I spent |
| 14 | | the last eight and a half working years at a law firm |
| 15 | | downtown here at 3rd and Capitol Mall. |
| 16 | Q | How long did you work at the telephone company for? |
| 17 | A | 25 years. |
| 18 | Q | And when did you stop working? |
| 19 | A | When I had a complete mental and emotional breakdown |
| 20 | | on the job. |
| 21 | Q | When was that?  Do you recall approximately? |
| 22 | A | I don't know.  Somewhere in -- I don't know if it |
| 23 | | was '80s or the '70s. |
| 24 | Q | Okay. |
| 25 | A | I don't know.  It's just a long time ago. |

1    Q        Did -- were you on disability after that?

2    A        Yes.  Until they switched me over at 65 to regular

3    Social Security.

4    Q        While you were working, did you save money for

5    retirement?

6    A        No.  I didn't really have any to save.

7    Q        Okay.  Now, I want to talk to you about the

8    Defendant, Aghee William Smith.  Do you know Aghee William

9    Smith also known as Bill Smith?

10   A        Yes.

11   Q        How -- about when or -- and how did you get to know

12   him?

13   A        At -- he came to a spiritual, study-group meditation

14   and all that and I was there.

15   Q        Do you remember around how long ago that was?

16   A        Probably -- oh, I don't know.  I just don't

17   remember.

18   Q        That's okay.

19   A        A long time ago.

20   Q        Okay.  And what was your relationship with him when

21   you first got to know him?

22   A        Just acquaintances --

23   Q        And --

24   A        -- from the spiritual study group.

25   Q        And then did -- did you develop a friendship with

1    him?

2    A       Well, you know, we just see each other at meetings.

3    Q       What kind of meetings were these?

4    A       Spiritual meetings, classes, meditations, that kind

5    of thing.

6    Q       Were those -- where were those held?

7    A       Usually at different people's homes.  The teacher

8    had a lot of classes at her home at the time.

9    Q       Okay.  Did you ever have any of these meetings at

10   your home?

11   A       No.

12   Q       Did you ever go to Mr. Smith's office?

13   A       Yes.

14   Q       How about his home?

15   A       Yes.

16   Q       Did he ever go to your home?

17   A       Yes.

18   Q       What kind of home is that?

19   A       My mobile home.

20   Q       And is that the home you've lived in since you lived

21   in Citrus Heights?

22   A       20 years, yeah.

23   Q       You went to Mr. Smith's home.  What was that like?

24   A       What do you mean "what was that like?"

25   Q       What was his home like?

```
 1              MR. GRINDROD:  Objection.  Relevance.

 2              MS. YUSI:  Go ahead.

 3              THE WITNESS:  Okay.  Well, let me just say he lived

 4    a very nice lifestyle.

 5              (Reporter clarification.)

 6              THE WITNESS:  Yes.  Nice home, nice cars, nice

 7    motorcycles, nice everything.

 8    BY MS. YUSI:

 9    Q       Okay.  Now, in 2017 did you come into some money?

10    A       I did.  I got a letter from AT&T saying that they

11    had 12 years back pension for me, and I had no idea that I

12    had that coming.

13    Q       And -- and about how much was that?

14    A       It was a hundred thousand plus 2- to 3,000 that I

15    used to pay some bills.  The rest I gave to Bill Smith --

16    Q       Okay.  And -- and --

17    A       -- to invest for me supposedly.

18    Q       Was this -- like was this a --

19              (Reporter clarification.)

20              MS. YUSI:  Sorry.

21    BY MS. YUSI:

22    Q       What kind of money was this?  Was the check free and

23    clear?  You could do whatever you want with?

24    A       I believe so and I knew that I had to roll it over

25    or the tax -- the taxes would be crazy.  My son sent me a
```

1    letter off the Internet from an attorney in Hollywood that

2    handles that kind of issues with Hollywood people.

3    Q      And -- and -- and what did -- did -- did you talk to

4    Bill Smith about this money, or what did he know about the

5    money?

6    A      Well, I think in the group, you know, we just always

7    shared, you know, what was going on in our lives and all

8    because we were there to meditate our way through it and

9    learn how to detach from things of the world and all that,

10   so I'm sure that I said something about it.

11   Q      And -- and how did -- did you end up having

12   Mr. Smith -- how did Bill Smith end up with your money?

13   A      Well, I don't remember exactly all that went on, but

14   I know that I was made aware that for 42 years that had been

15   his business in investing money for people.  And I said,

16   "Well," you know, "this is all I have from retirement, and

17   so you have to take really good care of that and really good

18   care of me and I don't understand all this stuff, so you

19   have to be available to explain it."  And, of course,

20   explain, explain, explain.  If you don't know it, it just,

21   like, goes over your head.  You just --

22   Q      And -- and who did you tell that all to?

23   A      Bill.

24   Q      Okay.  And you said he had 42 years of experience.

25   What else did you know about his -- his business if

1    anything?

2    A        Well, I knew he was Mormon.

3    Q        Okay.  Did -- did he talk about religion?

4    A        He did.  He had me -- he and his wife had me over

5    one day -- two kids, you know, riding the bicycles and stuff

6    and they came and they talked and they gave me a book, which

7    I wasn't interested in.  I just put it on my shelf and later

8    threw it away.

9    Q        Did you trust Mr. Smith in general?

10   A        I had no reason not to --

11   Q        Okay.

12   A        -- until I investigated what was going on.

13   Q        What did -- what, if anything, did Mr. Smith know

14   about why you stopped working?

15   A        Well, I'm kind of an open-book person.  So being

16   together in groups and stuff I'm sure it must have come out

17   somewhere there.  But then we'd talk, you know, when I'd

18   go -- I'd go to his house sometimes for meditation.  He

19   usually came to mine when it was about trying to keep me

20   calm about the money and why it wasn't coming in and, you

21   know, all that.

22   Q        Okay.  We'll talk a little bit more about that in a

23   minute.  Now, when you started talking to Mr. Smith about

24   this -- this retirement money that you had --

25   A        Mm-hmm.

1    Q        -- what -- what investments or what did Mr. Smith

2    suggest you do with it?

3    A        Well, there were two tech companies, Soniqui

4    (phonetic) and XCEL that, you know -- he gave me these nice

5    booklets that a company would put out to inform people that

6    either they wanted them to invest, or they just wanted them

7    to know about the company.  I don't know.  Anyway, I got

8    those.

9    Q        And -- and -- and about the XCEL investment, what

10   type of -- what was your understanding of what type of

11   company the --

12   A        Just that they were a tech company, which I knew

13   nothing about.

14   Q        Do you own a cell phone?

15   A        No.

16   Q        Do you own a computer?

17   A        No.

18   Q        Did you --

19   A        Wouldn't have them in my life ever.

20   Q        Did you understand what XCEL was?

21   A        I only slightly, you know -- I knew from pictures

22   and stuff in the book that they were I think -- I don't

23   remember if they were the ones, but one of them was, like,

24   putting up cell towers over a large area of sea, maybe sort

25   of northeast.  Anyway, big area and they were supposed to be

```
1    big on growth.  Soniqui, I don't remember what I thought
2    about them.
3    Q       And -- and who explained all this, you know, what it
4    was --
5            (Reporter clarification.)
6            THE WITNESS:  Oh, I'm sorry.
7    BY MS. YUSI:
8    Q       Who explained all this to you when you -- when you
9    spoke with Mr. Smith?
10   A       Bill, yeah, just he and I.
11   Q       What was your understanding of -- of the return on
12   this investment?
13   A       Well, you have paperwork with the notes that he made
14   to show a picture that turned out to not be reality.
15   Q       What was -- what do you recall though just sitting
16   there without looking at the documents that --
17   A       What I recall is just lots of handwritten numbers
18   and notes and things.
19   Q       Did -- did there -- did he -- did Mr. Smith talk
20   about the track record or any risk going on that was with
21   XCEL?
22   A       Yes.  I'm sure he did and I don't remember exact
23   words, but yes.
24   Q       What was --
25   A       You know, he -- he was trying to paint a -- trying
```

1    to let me know that this was a company that was accountable,

2    and, you know, my money would be safe with them.  It was

3    Soniqui and I don't even remember which one got 25,000 of my

4    money, and which one got 75,000.  And then there was a

5    15,000 plus that went into a cash fund, which I was told was

6    required on investments.  So I just went with it, and the

7    money was turned over to Provident until I put a stop to

8    that, you know.  Every year they were charging me for

9    nothing but meaningless numbers on a page that had no money

10   behind them that I was aware of.

11   Q      Well, let's look --

12          MR. GRINDROD:  I'm going to object and move to

13   strike as narrative and nonresponsive.

14   BY MS. YUSI:

15   Q      I'm going to talk to you about some of the documents

16   and show you a few of these things.  I'm going to show you

17   what's been marked for identification as Government's

18   Exhibit 815?

19   A      Let me put my glasses so I can see better.

20   Q      Sure.

21          And before -- before talking about the document, did

22   you provide a box of documents to the government that --

23   A      Yes.

24   Q      -- you attached from -- from these investments?

25   A      Yes.  Everything from the first letter from AT&T

1    through every single piece of paper that I got from Bill's

2    office.

3    Q        And so was that the entirety of all the documents

4    you ever received?

5    A        As far as I know, yes.  I just put everything in a

6    box and kept it.

7    Q        Okay.  If you can look at 815 -- Government

8    Exhibit 815, says XCEL bandwidth member loan, and it's two

9    pages.  If you look at the second page --

10   A        Oh, XCEL 25.  Okay.  Yes.

11   Q        -- is that your signature?

12   A        My signature, yes.

13            MS. YUSI:  Okay.  I'm going to move to admit

14   Exhibit 815.

15            (Government's Exhibit 815 was marked for

16            identification.)

17   BY MS. YUSI:

18   Q        Now, this says on page 1 of Exhibit 815, "$25,000

19   member loan," and it says, "For value received the

20   undersigned, XCEL Bandwidth 2, herein promises to pay to the

21   order of Sharyon Bean the principal sum," which was $25,000.

22   Do you see that?

23   A        Yes, I see that.

24   Q        And then the -- the rest of it is -- is -- on number

25   three on page 1, that's blank, correct?

1    A        Yes.

2    Q        And page 2 of Exhibit 815 you said that's your

3    signature?

4    A        Yes, it is.

5    Q        We don't know what date -- the date on any of these

6    is not filled out; is that right?

7    A        Correct.

8    Q        And did you ever get a fully executed member loan

9    from -- from -- from Mr. Smith concerning this $25,000?

10   A        I don't know what that would have looked like.

11   Q        Well, did you ever get a piece -- a -- a member loan

12   with all of this information signed by XCEL and everything

13   filled out?

14   A        I don't believe so but like I said, my memory isn't

15   as good as it used to be.

16   Q        Sure.

17            Did you understand what a member loan was?

18   A        I still don't understand, so not really.  I mean, I

19   was a member of this company now on paper, and so I was

20   loaning them money.  I think that's probably what was meant.

21   Q        Okay.  And -- and any questions that you had, who

22   would you ask about this?

23   A        Only Bill.

24   Q        Mr. Smith?

25   A        Mr. Smith, yes.

1    Q        All right.

2    A        Thank you for correcting me.

3    Q        Oh, no.  I'm not.  I'm just trying to make the

4    record clear.

5             I'm going to show you what's been marked for

6    identification as Government's Exhibit 817.  Do you

7    recognize that document?

8    A        Not really.  I recognize the heading on it as XCEL

9    Bandwidth.

10   Q        Okay.  If you can go to the last page of

11   Exhibit 817; is that your signature?

12   A        Page 17?

13   Q        Or the last page of Exhibit 817, the very last page

14   of that exhibit.

15   A        Oh, I'm sorry.  They stuck together.  I didn't

16   realize that.

17   Q        Is that your signature?

18   A        Yes --

19   Q        Okay.

20   A        -- it is.

21            MS. YUSI:  We move to admit Exhibit 817.

22            (Government's Exhibit 817 was marked for

23            identification.)

24   BY MS. YUSI:

25   Q        And -- and this says it's an operating agreement of

1    XCEL Bandwidth 2.  Did Mr. Smith go through this with you as

2    to what it meant?

3    A       I don't remember but he -- I always asked him.  I

4    said, "I don't understand this."  So I went to his office a

5    lot of times to try and understand all this stuff, but no.

6    I know, you know -- I -- no background -- money, so I -- all

7    of this was, like, foreign territory.

8    Q       Okay.  And did he -- so any information you had in

9    terms of trying to understand is that through Mr. Smith?

10   A       Yes.

11   Q       And if we look to the back page, again, of

12   Exhibit 17, and feel free to get a glass of water --

13   A       Thank you.

14   Q       -- if you need that.  The very last page...

15   A       Yeah, the one with my signature.

16   Q       Sure.  It says "buyer" with your name, correct, at

17   the top?

18   A       Mm-hmm.

19   Q       Seller says --

20   A       Yes.

21   Q       -- "XCEL Bandwidth" and that's blank and not filled

22   out, right?

23   A       Correct.

24   Q       And then the broker, DOM Business Brokers, LLC, by

25   Bill Smith and agent name, Bill Smith.  Is that Mr. Smith's

1    signature if you know?

2    A       Yes.

3    Q       And do you know what a broker is?

4    A       I -- is that a person, like, between a customer and

5    the -- whoops.  I don't really know the exact definition.  I

6    would think maybe it's between some representative of the

7    company and the person who was selling me this stock or

8    whatever it is.

9    Q       And DOM Business Brokers, did you know what DOM

10   business Brokers or who was behind that?

11   A       I don't think I ever looked at that, you know.  All

12   of this stuff is like -- you might as well be talking Greek

13   because I don't understand it.  I don't have a background, I

14   don't have training, or anything.  It was kind of, like, all

15   Greek to me, but he always took my calls.

16   Q       Okay.  And -- and what were you calling him about

17   after you did -- made your investment?

18   A       Well, anything -- mostly when is the money supposed

19   to be coming in, and according to documents that he googled

20   information on, I thought I should have been getting

21   something, so I just kept checking in with him.  Or if I had

22   questions, I would just call him.

23   Q       Okay.  I'm going --

24   A       Excuse me.

25   Q       -- show you -- I don't know if you've seen this but

1    it's a -- I'm going to show you what's been marked for

2    identification as Government Exhibit 818?

3    A       Are we through with this one?

4    Q       Yes, for now.  Thank you.

5    A       Oh, this doesn't look familiar.

6    Q       Well, this is a wire record.

7    A       Mm-hmm.

8    Q       And you see the amount, $25,000, which is about --

9    A       Oh, yes.

10   Q       Uh-huh.  And from Provident trust group.  Did you

11   have an account with Provident trust group?

12   A       I ended up with one.

13   Q       And why did you end up with one?

14   A       Well, they were supposed to be, like -- I don't

15   know -- keeping track, keeping a record of this -- this

16   money flow.  I don't really know what they actually did.

17   Q       Okay.

18   A       Except I know they sent me a bill for $400 every

19   year.

20   Q       Okay.  Who suggested that you have an account with

21   Provident Trust if you know?

22   A       I think it just was part of the package.  I don't

23   know.

24   Q       It was part of -- of doing your business with XCEL

25   Bandwidth as far --

1    A        With Bill Smith.

2    Q        Okay.

3    A        Yeah.

4    Q        And then at the bottom when it's under the

5    beneficiary information, it says XCEL Bandwidth.

6    A        Mm-hmm.

7    Q        And at the top is the date July --

8             MR. GRINDROD:  Are you moving this?

9             MS. YUSI:  I will be.

10            MR. GRINDROD:  Okay.

11   BY MS. YUSI:

12   Q        July 10th, 2017, do you see that?

13   A        Yes.

14   Q        Okay.  Does that appear to be around the date that

15   you put money into XCEL Bandwidth?

16   A        That probably was the date.

17   Q        Okay.

18   A        Not good with dates.

19            MS. YUSI:  All right.  We're going to move to admit

20   Exhibit 818.

21            (Government's Exhibit 818 was marked for

22            identification.)

23            THE WITNESS:  Oh.

24   BY MS. YUSI:

25   Q        So that one is July 2017.  You said you -- you --

```
 1    you would call.  How long were you -- was -- were you
 2    supposed -- was it going to be before you started seeing any
 3    returns on this money?
 4    A        Well, I never knew.  That's why I kept calling.
 5    Q        Do you recall anything that was said or that you
 6    read that told you how quickly you would start seeing money
 7    come in when you -- before you made the investment?
 8    A        Well, he made copies, which I kept, of course, of
 9    things off the computer and wrote down dates to show me.
10    Q        Okay.
11    A        How it was supposed -- I didn't understand.  I just
12    accepted he knew what he was doing, and I didn't have any --
13    any clue, so I trusted him.
14    Q        Did your son ever have an occasion to try to speak
15    with Mr. Smith?
16    A        Yes.
17    Q        Was that after your investment?
18    A        Yes.
19    Q        And -- and were you there for the conversation?
20    A        Yes.
21    Q        Can you tell us what -- well, what was the purpose
22    of -- of your son talking to Mr. Smith?  And I don't want
23    you to tell me what he was saying, but how did this come
24    about?
25             MR. GRINDROD:  Objection.  Relevance.
```

```
 1   BY MS. YUSI:
 2   Q      Go ahead.
 3   A      I'm supposed to say now?
 4   Q      No.  You can tell me why -- why -- why did your son
 5   end up talking with Mr. Smith or meeting with him.
 6   A      Well my son lives in New Washington, DC in
 7   Virginia --
 8   Q      Okay.
 9   A      -- because he works on government contracts.  He
10   works for a private company, but he's retired Air Force.
11   And he was here visiting, and because I had trusted my whole
12   retirement to Bill Smith, I just wanted them to meet
13   thinking Bill was a friend.  He was watching out for me and
14   all that stuff so...
15   Q      So did your -- your son call or meet with him?
16   A      We both went so I could introduce him to Bill.  I
17   think we went into a conference room and Bill was talking --
18   started talking about some legion -- whatever it's called,
19   legion, some small investment and -- which I ended up
20   investing and can't get ahold of them probably anymore but
21   anyway.  But he was talking to my son.  He wanted my son to
22   invest, but my son is smart about this.  He manages his
23   money and, you know, he's very well educated and all that.
24   So he asked questions, which he was not given any answers
25   to.
```

```
 1    Q       Who --
 2            MR. GRINDROD:  Objection.  Let me just --
 3            MS. YUSI:  Sure.
 4            MR. GRINDROD:  Objection to the last answer as
 5    narrative, nonresponsive, and irrelevant.  Move to strike.
 6    BY MS. YUSI:
 7    Q       Okay.  What -- who was not answering his questions?
 8    A       Bill Smith.
 9    Q       Okay.  And -- and -- and did Mr. Smith say anything
10    about the questions?
11            MR. GRINDROD:  Objection.  Relevance.
12    BY MS. YUSI:
13    Q       Go ahead.
14    A       I asked Bill later and he said, "Oh, I don't answer
15    questions because," he said, "if people want in, they want
16    in.  If they want out, fine."  So he -- he made it okay that
17    he didn't answer questions.  He just doesn't do business
18    that way.
19    Q       Okay.  And -- and when you -- when you were deciding
20    to make this investment, what was -- could -- did you ask
21    if -- if you could get your money back if you weren't happy
22    with it, or did you have any understanding of -- of whether
23    or not this was a possibility that you'll get out if you
24    weren't happy?
25    A       I don't recall having that thought.
```

```
 1   Q       Okay.  When -- after you made your investment in
 2   2017, how often would you contact Mr. Smith about your
 3   investments?
 4   A       Whenever I had questions about anything, when is the
 5   money coming, what's going on with it, whatever.
 6   Q       And what was his general response?
 7   A       Well, when I finally got a -- the answer that was
 8   given to me eventually was, oh, the damn government is
 9   investigating.  I don't know.  Daryl Banks or something
10   there's a -- I won't say because I found out that later what
11   it was.
12   Q       Okay.  So -- so just before you -- you were aware
13   that there were any possible issues with your investment --
14   A       Mm-hmm.
15   Q       -- did -- did Mr. Smith say anything about any
16   regulatory issues or investigation into this investment?
17   A       Not specifically that investment but just -- I felt,
18   like, it was all moneys I'd give him because all -- nothing
19   was forthcoming.  I never got one red cent from anything.
20           MR. GRINDROD:  Objection.  Move to strike as
21   nonresponsive.
22   BY MS. YUSI:
23   Q       I'm going to show you what's been marked as
24   exhibit -- Government Exhibit 819.  It's a few pages.  If
25   you can look at that document.
```

```
 1    A        We're through with this one?

 2    Q        Yes.  Thank you.

 3    A        Okay.  So look at -- oh --

 4    Q        And if you look at page -- well -- and this is

 5    page 2.  Is this an account statement from June 26th, 2017,

 6    through October 31st, 2017, from Provident Trust Group?

 7             MR. GRINDROD:  Object to form.

 8    BY MS. YUSI:

 9    Q        Do you recognize this as -- as an account statement?

10    A        Yes.  Something I would have taken to Bill's office

11    and asked him to explain since I didn't understand any of

12    this.

13             MS. YUSI:  Move to admit Exhibit 819.

14             (Government's Exhibit 819 was marked for

15             identification.)

16             MR. GRINDROD:  I object on relevance and hearsay.

17             MS. YUSI:  Is that it?

18             MR. GRINDROD:  Foundation.

19    BY MS. YUSI:

20    Q        All right.  If we're looking -- looking at

21    Exhibit 819, Provident Trust -- you said that was part of

22    your -- that was part of the deal --

23             (Reporter clarification.)

24    BY MS. YUSI:

25    Q        Provident Trust Group, you said that was part of the
```

1   deal.  You had to have an account there when you made this

2   investment?

3   A       That was my understanding.

4   Q       And would you routinely get account statements from

5   them in the mail or -- or -- yes?

6   A       Yes.  And mostly with a bill attached.

7   Q       Okay.  And -- and what would you do with those

8   account statements?

9   A       Put them in the box just like this one.

10   Q       Did -- well, you said -- you said you -- did you

11   ever talk to Mr. Smith about this?

12   A       Oh, Yes.

13           MR. GRINDROD:  Objection.  Leading.

14   BY MS. YUSI:

15   Q       What would you do with these statements?

16   A       I would first contact Bill and say, "I don't

17   understand this."  And we'd get together and he would --

18   that's his writing on here and --

19   Q       Okay.

20   A       -- he'd try -- he tried to make it clear.

21           MS. YUSI:  I'm going to admit Exhibit 819.

22   BY MS. YUSI:

23   Q       So the handwriting on --

24           MR. GRINDROD:  Sorry.  Same objections when offered

25   before.

```
 1   BY MS. YUSI:
 2   Q       The handwriting on this -- on this exhibit, who's
 3   handwriting is this?
 4   A       Bill Smith.
 5           MR. GRINDROD:  Object to foundation.
 6   BY MS. YUSI:
 7   Q       Okay.  Did he do this handwriting in front of you?
 8   A       Yes.
 9   Q       All right.  And did you recognize Mr. Smith's
10   handwriting?
11   A       Yes.  I've seen it on other forms before --
12   Q       Okay.
13   A       -- so I recognized it.
14   Q       Okay.
15   A       His writing is better than mine, but I recognized
16   it.  I will never forget.  The whole thing is burned into my
17   brain.
18   Q       And -- and so this was end of October 31st, 2017.
19   Let's look at page 2.
20   A       Same Exhibit, 819?
21   Q       Yes.  Yes.  Exhibit --
22           (Reporter clarification.)
23   BY MS. YUSI:
24   Q       Okay.  And there's a circle, the 25,000.  That's
25   what you put into the XCEL, correct?
```

```
 1              MR. GRINDROD:  Objection to form.
 2              THE WITNESS:  Yes.
 3    BY MS. YUSI:
 4    Q        All right.  And if we look at page 3 of Exhibit 819,
 5    what's the circled number there?
 6    A        99,000.
 7    Q        Okay.  Was that -- what was that 99,000 if you know?
 8    It says -- to the left says, "June 27, 2017, rollover
 9    contribution."
10    A        Right.
11    Q        Where is that -- what was the $99,000 if you know?
12    And if you don't, that's totally fine?
13    A        I don't remember.
14    Q        Okay.
15    A        But it might have been the check.
16              MR. GRINDROD:  Objection.
17              MS. YUSI:  Can you let her finish before you object?
18              MR. GRINDROD:  Sure.
19              THE WITNESS:  I didn't like you when I talked to you
20    on the phone, and If I'd known I didn't have to, I wouldn't
21    talk to --
22              MS. YUSI:  Ms. Beam, let's continue this.
23              THE WITNESS:  I'm sorry.
24    BY MS. YUSI:
25    Q        Okay.  All right.  Now, I'm going to show you
```

```
 1      Exhibit 820.

 2      A        Okay.

 3      Q        We're done with that one.

 4      A        Yeah.

 5      Q        Do you recognize Exhibit 820?

 6      A        Yes.  I've seen this before.

 7      Q        And what is the date at the top of it?

 8      A        October 31st, 2017.

 9      Q        And did you provide this to the government?

10      A        Yes.

11      Q        And who -- who gave you this chart?

12      A        Bill Smith in his office.

13      Q        All right.

14               MS. YUSI:  And we move to admit Exhibit 820.

15               (Government's Exhibit 820 was marked for

16               identification.)

17               MR. GRINDROD:  Object to relevance.

18      BY MS. YUSI:

19      Q        And this says, "Scenario A, income plan."  What was

20      your understanding of what this was or how did this -- how

21      did you end up getting this income plan?

22      A        When I was meeting with Bill in his office.

23      Q        Okay.  And what was he -- what was your

24      understanding of the purpose of -- of this?  What was he --

25      what did he give it to you -- why did he give it to you?
```

```
 1              MR. GRINDROD:  Objection.  Foundation, lack of
 2    personal knowledge.
 3    BY MS. YUSI:
 4    Q       I'm asking what your understanding was.
 5    A       Okay.  Just to help me understand what was going on
 6    with my money.
 7    Q       Okay.  And if you look under the structured income,
 8    it says, "XCEL Bandwidth, 25,000."  And then there's money
 9    coming up there.  Do you recall what -- why -- why he gave
10    this to you, what the purpose of it was?
11              MR. GRINDROD:  Objection.  Asked and answered.
12    BY MS. YUSI:
13    Q       Well, what were these numbers in particular if you
14    know?
15    A       I -- I don't know.
16    Q       Okay.  And -- and the handwriting on the right --
17    A       Mm-hmm.
18    Q       -- I can't really read it.  Whose handwriting is
19    that?
20    A       The money market account --
21    Q       Okay.
22    A       -- and all that's encircled was mine.  The rest was
23    Bill.
24    Q       Okay.  All right.  We're done with that one.
25    A       Okay.
```

1    Q        I'm going to show you Government Exhibit 821.

2    A        This looks really familiar.

3    Q        Okay.  Do you recognize this document?

4    A        Absolutely.

5    Q        And what is it?

6    A        It's a statement from Provident Trust Group.

7    Q        And did you receive this from Provident Trust Group?

8    A        I believe I did.

9    Q        And did you provide this to the government?

10   A        Yes, I did.

11   Q        All right.

12            MS. YUSI:  We move to admit Exhibit 821.

13            (Government's Exhibit 821 was marked for

14            identification.)

15            MR. GRINDROD:  Objection.  Relevance, hearsay,

16   foundation.

17   BY MS. YUSI:

18   Q        And we've got the date on this account statement.

19   On the upper right it says January 1st, 2018, to

20   December 31st, 2018, correct?

21   A        Yes.

22   Q        So was this a year-end statement you received if you

23   know?

24   A        Probably, yes.

25   Q        And whose -- I'm looking at the handwriting under

1    your account summary.  Do you recognize that handwriting?

2    A        Account summary -- Yes.

3    Q        Okay.  I -- I see under secured notes there says

4    Soniqui, then XCEL, then Legion.

5    A        Mm-hmm.

6    Q        Whose handwriting is -- is the cursive?

7    A        That was mine.

8    Q        All right.  How about the numbers, who wrote the

9    numbers?

10   A        Bill Smith.

11   Q        And did he do that in front of you?

12   A        Yes.

13   Q        All right.  What was he doing -- this is, I guess,

14   after December 31st, 2018.  Did you bring this to him to

15   look at?

16   A        Yes, I believe I did.

17   Q        And -- and why did you do that?

18   A        Because I needed to know what was -- what it was and

19   that is all.

20   Q        What was your -- what did Mr. -- did you ever -- did

21   you ask Mr. Smith how your investments were doing?

22   A        Let's see.  I -- I would, you know -- what's the

23   hold up?  Yeah.  I -- I -- I wasn't getting anything, and I

24   thought I should have been getting something by then

25   according to some of the other notes that he gave me.

```
 1   Q       Okay.  Did -- did -- did you ever hear the term --
 2   the name Kent Maerki in -- in any relation to -- to this
 3   investment?
 4   A       I don't recall that name.
 5   Q       Okay.
 6   A       That doesn't mean I didn't hear it, but I don't
 7   recall it at all.  Doesn't sound familiar.
 8   Q       All right.  What, if anything, did Mr. Smith talk to
 9   you about having to or giving testimony on behalf of
10   Mr. Maerki in another investment?  Did he say anything about
11   that prior to your investment?
12           MR. GRINDROD:  Objection.  Relevance.
13   BY MS. YUSI:
14   Q       If you recall, did he say anything about having to
15   go to court?
16   A       No, absolutely not.
17   Q       And what, if anything, did Mr. Smith say to you
18   about any judgments by the SEC concerning Spectrum
19   investments that you invested in?
20   A       Never heard of that.
21           MR. GRINDROD:  Objection.
22           (Reporter clarification.)
23           MR. GRINDROD:  Sorry.  Objection.  Relevance, facts
24   not in evidence, foundation.
25           THE WITNESS:  I never heard any of that.
```

1    BY MS. YUSI:

2    Q      You never said anything of note -- did Mr. Smith

3    ever tell you he knew about any investigations other --

4    until -- I'm talking about prior to the end and your

5    understanding of this litigation going on.

6    A      Right.

7    Q      Did Mr. --

8    A      Right.

9    Q      -- Smith say anything to you about any of the SEC

10   investigation into these types of investments?

11          MR. GRINDROD:  Objection.  Sorry.  Objection to

12   "these types of investments."  A -- different Spectrum

13   investments.

14          MS. YUSI:  Can you not do a speaking -- just give

15   your reasons.

16          MR. GRINDROD:  Sure.  Relevance, mischaracterizes

17   testimony, facts not in evidence, foundation.

18   BY MS. YUSI:

19   Q      I'm going to rephrase this.

20   A      Okay.

21   Q      What, if anything, did Mr. Smith tell you about his

22   knowledge of the Securities and Exchange Commission

23   investigating the -- the XCEL Spectrum investment?

24   A      The only thing I remember was he was angry with the

25   government.  When I, you know -- I kept questioning --

```
 1    questioning like -- shut me up I guess.

 2    Q       What did he say?

 3    A       He was angry with the government for -- I'm trying

 4    to think of how he put it.  Something like messing with

 5    whatever was going on with all of this and that may be when

 6    Daryl Banks was getting zapped but I don't know.

 7    Q       What -- what did you hear about Daryl Bank?

 8            MR. GRINDROD:  Objection.  Relevance, hearsay.

 9    BY MS. YUSI:

10    Q       What did you hear from Mr. Smith about Daryl Bank?

11    A       Just -- I just heard his name several times.  I

12    don't remember exactly, but I know when I asked you

13    what's -- what's holding my money up, it was like, oh, no.

14    It's the government's fault.

15    Q       And did Mr. Smith ever tell you that -- that or --

16    did -- did -- were you ever informed by Mr. Smith that

17    your -- your money was gone?

18    A       No, never.

19    Q       I'm going to show you Government's --

20    A       We through with this one?

21    Q       Yes, I am.

22            Government Exhibit 824.

23    A       Okay.

24    Q       Do you recognize this document?

25    A       Looks familiar.
```

```
 1   Q       What is it?
 2   A       Another account statement, 2019, from Provident
 3   Trust Group.
 4   Q       And during this whole time, was -- were you getting
 5   bills from Provident Trust Group?
 6   A       Once a year, yes.
 7   Q       Do you remember about --
 8           (Reporter clarification.)
 9   BY MS. YUSI:
10   Q       Do you remember about how much they were?
11           MR. GRINDROD:  Objection.  Relevance.
12           THE WITNESS:  Can I answer --
13   BY MS. YUSI:
14   Q       Sure.
15   A       -- now?  Okay.  It was just under $400 at a time.
16   Q       And had you made any money on these investments?
17   A       Oh, no, nothing.
18   Q       Now, back to Exhibit 824, is this account statement
19   for year-end 2019?
20   A       Yes.
21   Q       Did you provide this to the government?
22   A       Yes.
23           MS. YUSI:  We move to admit Exhibit 824.
24           (Government's Exhibit 824 was marked for
25           identification.)
```

1                MR. GRINDROD:  Object to foundation, hearsay,
2     relevance.
3     BY MS. YUSI:
4     Q        And so on -- at the end -- year-end statement of
5     December 2019, how much did it say that you still had in
6     your account or that your account was worth, all these
7     investments?
8                MR. GRINDROD:  Objection.  Hearsay.
9                THE WITNESS:  It's printed right here, assets,
10    including cash, secured notes, loans, and notes receivable,
11    cash, common stock total.
12    BY MS. YUSI:
13    Q        And what was the total that -- your account market
14    value?
15    A        Was it the same?
16    Q        In the -- the -- do you see where it says your
17    account market value?
18    A        Oh, yes.  Yes, 92,697.06.
19    Q        All right.  Have you ever been able to get that
20    money?
21    A        Not a penny.
22    Q        You said you were never informed about -- let's see.
23    You were -- you said never informed about any issues, just
24    that the government was messing things up?
25    A        Yes.  That's about the exact words, too.  I couldn't

```
 1   think of that, but yeah.  That sounds really like --
 2   Q      I'm looking for one -- sorry, one of my exhibits
 3   that I had a minute ago.  If I could just have a moment.
 4   Here we go.  I'm going to show you Exhibit 823.
 5   A      Mm-hmm.
 6   Q      Do you recognize this document?
 7   A      Oh, the bankruptcy court.  Yes, I do remember this.
 8   Q      And did you provide this to the government?
 9   A      Everything in that box, yes.
10          MS. YUSI:  I'm going to move to admit Exhibit 823.
11          (Government's Exhibit 823 was marked for
12          identification.)
13          MR. GRINDROD:  Objection to relevance, foundation,
14   and multiple levels of hearsay.
15          MS. YUSI:  Now, you understand you did stipulate to
16   bankruptcy records?  Anyway --
17          MR. GRINDROD:  Sure.
18   BY MS. YUSI:
19   Q      At the bottom of Exhibit 823 it says, "Dated."
20   A      Mm-hmm.
21   Q      When was the date that this -- this notice of -- to
22   file proof of claim due to possible recovery of assets, what
23   date was this?
24   A      9/30/2019.
25   Q      Okay.  And did you do anything after you received
```

1    this notice to file proof of claim?

2    A       Actually, I did.  I'm trying to think who I called.

3    Oh, I know.  I called the Vote (phonetic) Law Firm.  My --

4    that's -- one of my best friends is married to the owner and

5    she -- she's a paralegal there.  And I said, "Would you and

6    George take a look at this?  I need a bankruptcy attorney to

7    tell me what to do if I need to do anything."  So I had to

8    get a bankruptcy attorney to pay him.

9    Q       And what was your understanding of -- of what this

10   notice was?

11   A       I think protection of his assets.

12   Q       Well, why did you get this?  What started this --

13   A       Well --

14   Q       -- if you know?

15   A       I don't know why I got the copy.

16   Q       Okay.  But this was -- this was signed for -- to

17   you.  And up here --

18   A       Yeah.

19   Q       -- at the top, what -- what -- what court was

20   issuing this notice?

21   A       United States Bankruptcy Court, Eastern District of

22   California.

23   Q       And debtor name, do you see that a little bit

24   further down?

25   A       Yes.

```
1    Q        Who were the debtors?

2    A        Aghee Will Smith, Susan Blair Smith.

3    Q        All right.  Did you call Mr. Smith after you

4    received this notification?

5    A        No.  I had no more communication with him.

6    Q        I'm just checking my notes here real quick.

7             What was your understanding of -- going backwards a

8    little bit.  What was your understanding of -- did -- did --

9    what, if anything, did you know of Mr. Smith's own interest

10   in this?  Did he have any financial interest in -- in the

11   XCEL or Spectrum investments?

12   A        Or even the legion.  He always mentioned all these

13   friends he had in high places with all of this, so I thought

14   he knew what he was talking about.

15   Q        Okay.

16            MR. GRINDROD:  Move to strike as nonresponsive.

17            THE WITNESS:  Can I get some more water, please?

18   BY MS. YUSI:

19   Q        Oh, absolutely.

20   A        Thank you.  My throat is dry.  Thank you.

21   Q        And just to clarify, so there's a clean record,

22   prior to you buying the XCEL investment --

23   A        Mm-hmm.

24   Q        -- did Mr. Smith make you aware of any investigation

25   into Spectrum investments with the people that were involved
```

```
1    with this?
2    A      I don't recall hearing the word "Spectrum" --
3    Q      Okay.
4    A      -- in any way, shape, or form.
5    Q      Just XCEL?
6    A      Yeah, XCEL, Soniqui, and Legion Capital.
7    Q      Okay.  Those are all my questions right now.  I
8    believe Mr. Smith's attorney will have some questions for
9    you.  If you can answer them in the same respectful manner.
10   A      Civilly, respectfully, yes.  I'm a respectful
11   person.
12          MS. YUSI:  Mm-hmm.
13                     EXAMINATION
14   BY MR. GRINDROD:
15   Q      Ma'am, I'd like to start off by talking about your
16   relationship with Mr. Smith before you made this investment.
17   You had a personal relationship with Mr. Smith before this
18   investment, right?
19   A      We just saw each other at different spiritual
20   functions and that so -- and -- and -- and I did go to a
21   couple -- a few times to his home for meditation groups that
22   he was sponsoring and stuff so...
23   Q      You would refer to him as having been your spiritual
24   friend?
25   A      No.  Just an acquaintance that I met at these
```

1    functions.

2    Q       Do you remember, ma'am, meeting with F -- an FBI

3    agent when you were first interviewed about this case?

4    A       Only the gentleman -- only on the phone --

5    Q       Right.

6    A       -- and the gentleman that came to pick up the box of

7    all my paperwork.

8    Q       Just in October, just, like, less than a month ago,

9    do you remember telling the FBI agent that you had been

10   spiritual friends with Bill Smith for approximately ten

11   years before you invested money with him?

12   A       I had been spiritual acquaintances, yes.  I

13   probably -- possibly used that terminology.

14   Q       And you and Mr. Smith meditated together?

15   A       From time to time, yes.

16   Q       You took classes together?

17   A       Yes.  He joined the group from time to time that I

18   was associated with.

19   Q       You knew him for about ten years?

20   A       I don't know, maybe eight to ten years.  I don't

21   really remember how long exactly.

22   Q       You had been to his home several times?

23   A       I wouldn't say several, but I had been to his home a

24   few times.

25   Q       Met his wife?

```
 1    A        Yes, I met his wife.

 2    Q        He would come to your house?

 3    A        Only when he was trying to explain to me what was

 4    going on with this paperwork, with my money.

 5    Q        And you -- I think you mentioned on direct even

 6    though you hadn't invested any money with him at that point,

 7    you -- you learned that he had handled investments for

 8    42 years or something like that?

 9    A        Yes, exactly.  Yeah.  That's what I was told.

10    Q        And over your relationship with him before you made

11    any investments, you found him to be honest, right?

12    A        I didn't really have -- the appearance was -- yes.

13    Q        He was kind to you?

14    A        He was kind to everybody.

15    Q        Okay.  And so -- but before you invested with

16    Mr. Smith, you knew that he was someone who had built a

17    reputation in this industry for 40-some years, right?

18    A        That's what I was told.

19    Q        And you knew that he had built a relationship with

20    you of some kind for about ten years -- eight to ten years?

21    A        I don't know if it was that long, but that's my

22    guess.

23    Q        Okay.  And then in 2017 I think that's when you

24    received this money from AT&T, right?

25    A        Yes.
```

```
 1   Q        And back -- you had worked for AT&T for 25 years,
 2   right?
 3   A        Yes.
 4   Q        You were a marketing representative?
 5   A        I had a lot of different jobs and worked my way up
 6   in the company, yes.
 7   Q        And one of those jobs was marketing representative,
 8   right?
 9   A        Yes.
10   Q        Another one was doing work with, like, telephone
11   orders, taking orders --
12            (Reporter clarification.)
13            MR. GRINDROD:  Sorry.
14   BY MR. GRINDROD:
15   Q        -- setting up systems, moving systems, telephone
16   systems?
17   A        Yes.
18   Q        And then you worked as a computer operation's
19   manager there, right?
20   A        Yes.
21   Q        And then after you left AT&T, you were -- sometimes
22   were a speaker at business women's groups?
23   A        After I recovered from having an on-the-job mental
24   and emotional breakdown, when I recovered after eight years
25   working with a counselor, yes.  I did do a little speaking
```

1    of, you know, don't push yourself over the edge because you

2    don't know if you can get back, because it took me a long

3    time to get back.

4    Q        And so you had this money from AT&T, and you went to

5    Mr. Smith, right?

6    A        I wouldn't say I went to him because I -- I really

7    didn't know until he mentioned that, oh, I've been doing

8    investing for people for 42 years, and I knew nothing.  What

9    do I do with this money?  Except I knew I had to roll it

10   over, so anyway.  When I knew what he did, then I thought

11   great.  I can, you know, have someone who knows how to do

12   this handle it.

13   Q        Sure.

14            And when you were having these conversations with

15   Mr. Smith about what to do with your money, one of the

16   options that he gave you information about was XCEL

17   Bandwidth 2, right?

18   A        Yes.

19   Q        And Mr. Smith gave you some written information

20   about XCEL Bandwidth, right?

21   A        Yes.

22   Q        I'm going to show you what's been marked as

23   Defendant Smith Exhibit 504.  It's a two-page document,

24   ma'am.  If you could just kind of briefly look at both

25   pages.

```
 1   A        Mm-hmm.
 2   Q        And the second page has your signature on the
 3   bottom, right?
 4   A        Mm-hmm, it does.
 5   Q        So you've seen this document before?
 6   A        Yes.  It was probably in that booklet that I got
 7   about from this Soniqui.
 8   Q        And you -- you actually sent this document to the --
 9   to the prosecutors in this case, right?
10   A        Yes.
11   Q        Okay.
12            MR. GRINDROD:  Move to admit Smith 504.
13            (Defendants' Exhibit 504 was marked for
14            identification.)
15   BY MR. GRINDROD:
16   Q        And so what this document does is essentially it
17   describes XCEL Bandwidth 2, right?
18   A        I guess so, yeah.
19   Q        It gives an overview of what the company does,
20   right?
21   A        Mm-hmm.
22            MS. YUSI:  Objection.  Foundation.
23            MR. GRINDROD:  Can you elaborate a little?
24            MS. YUSI:  I don't know if she understands it.  I
25   don't even know if she knows what's in the document.
```

1           MR. GRINDROD:  Okay.

2           THE WITNESS:  I don't -- I don't know if I even read

3    it.

4    BY MR. GRINDROD:

5    Q       Okay.  Well --

6    A       It's over my head.

7    Q       Flip to the second page for me if you would.

8    A       Yes.  Okay.

9    Q       And right above your signature it says, "I have read

10   and understood this business term sheet," right?

11   A       Yes.

12   Q       And then you signed below indicating that you had

13   read and understood this business term sheet, right?

14   A       Yes.

15   Q       So --

16   A       That's what it would appear to be, not that I did

17   but...

18   Q       Well, you -- you signed --

19   A       Yes.

20   Q       -- on the dotted line --

21   A       Yes.

22   Q       -- certifying that you did read and understand it,

23   right?

24   A       This was given to me, and I was asked to, please,

25   sign it.

```
 1    Q       Okay.

 2    A       Not that I understood it.

 3    Q       So you -- your testimony today is that you signed

 4    this document right below the line that says I've read and

 5    understand this, but you didn't read or understand it?

 6            MS. YUSI:  Objection.  Asked and answered.

 7    BY MR. GRINDROD:

 8    Q       You can answer me.

 9    A       I don't know.  What did you say?

10    Q       Sure.  So your testimony today is that you signed

11    your name right below this statement that says I have read

12    and understood -- and understand this business term sheet,

13    and you did that even though --

14    A       I didn't --

15    Q       -- you did not read or understand it?

16    A       Right.

17    Q       Okay.

18    A       I was --

19            (Reporter clarification.)

20            MS. YUSI:  If you can let her finish her question or

21    answer.

22            THE WITNESS:  Just -- just signing a bunch of things

23    that I had signed while I was there.

24    BY MR. GRINDROD:

25    Q       Sure.
```

1           But after you signed this saying that you read and
2    understood it, right, you gave it to Mr. Smith, right?
3    A       Yes, I did.
4    Q       So you were telling Mr. Smith that you had read this
5    and understood it, right?
6    A       I suppose, yes.
7    Q       Okay.  And you signed it, ma'am, on -- on page 2 it
8    says 6/22/2017, right?
9    A       I don't know.  Does it?  Yes.
10   Q       Okay.  And you didn't actually -- the money was not
11   actually wired to XCEL until July 10th of that year, right?
12   A       I have no idea what happened to my money.
13   Q       Well, let's go back to Government Exhibit 818, which
14   is already in front of you.
15           MS. YUSI:  I'll get it for you.
16           THE WITNESS:  Okay.  Okay.  Thank you.  Thanks,
17   Beth.
18   BY MR. GRINDROD:
19   Q       Do you have 818 in front of you, ma'am?
20   A       Yes.
21   Q       And at the very top it -- it says July 10th, 2017,
22   right?
23   A       Yes.
24   Q       So that's when the money was wired to XCEL, right?
25   A       I assume so.

```
 1   Q        Okay.  So between -- well, I'll withdraw that.
 2            Could you turn, ma'am, to Government Exhibit 820,
 3   and Ms. Yusi asked you some questions about this document on
 4   direct examination.  Do you remember those questions?
 5   A        No.  But I remember this document.
 6   Q        Okay.  Well, this document was in your paper files
 7   at home before you sent it to prosecutors, right?
 8   A        Yes.
 9   Q        And on the -- on the top it says, "Date,
10   October 31st, 2017," right?
11   A        Yes.
12   Q        And on the bottom left all the way in the bottom
13   corner it says, "Printed on October 31st, 2017," right?
14   A        Yes.
15   Q        So you only ever made one investment with XCEL
16   Bandwidth, right?
17   A        I don't know what happened to my money.
18   Q        Okay.  Well, all the documents we've looked at show
19   that there was one $25,000 investment in XCEL Bandwidth; is
20   that right?
21   A        Yes.
22   Q        And that shows that that one investment went
23   through.  The wire was sent on July 10th, 2017, right?
24   A        Yes.
25   Q        So this document that we're looking at, Government
```

```
 1    Exhibit 820, was created more than three months after you
 2    had already invested the one time in XCEL Bandwidth, right?
 3    A       Yes.
 4    Q       So fair to say this document is not something that
 5    you considered when you were deciding whether or not to
 6    invest in XCEL Bandwidth, right?
 7    A       I don't know.
 8    Q       Well, for that to be the case, that would have meant
 9    that you relied on a document that was created three months
10    after you actually made the investment.  So that's -- that's
11    probably not what happened, right?
12    A       I don't know.
13    Q       Okay.
14    A       It was -- it was a while back.
15    Q       You see the handwriting across the bottom of that --
16    A       Yes.
17    Q       -- document, ma'am?
18    A       I do.
19    Q       Whose handwriting is that?
20    A       Bill.
21    Q       And what does it say in all caps across the bottom?
22    A       For illustration purposes only, results may vary.
23    Q       And so Mr. Smith wrote that on there, right?
24    A       Yes.  Yes.
25    Q       And he also told you that orally, right?
```

1    A        Probably, yes.

2    Q        Okay.  And the money -- you can set that aside,

3    ma'am.  We're done with that one.

4             The money for your XCEL investment, that money

5    actually went to XCEL, right?

6             MS. YUSI:  Objection.  Foundation.

7             THE WITNESS:  I have no idea what happened to my

8    money.

9    BY MR. GRINDROD:

10   Q        Well, go back to Government Exhibit 818 that the

11   government offered and that you went through with Ms. Yusi,

12   please.

13   A        Okay.

14   Q        And Government 818 is that the wire, right?  It's

15   the one we talked about, the wire going through on

16   July 10th --

17   A        Yeah.

18   Q        -- 2017?

19   A        Yeah.

20   Q        And in the -- in the bottom right it shows that the

21   wire went to an account associated with XCEL Bandwidth and

22   it lists an address in -- in St. Lucie West -- in St. Lucie

23   West Boulevard in Port St. Lucie, Florida?

24   A        I see that.

25   Q        So the money went to XCEL Bandwidth in July of 2017,

```
 1   right?
 2          MS. YUSI:  Objection.  Foundation.
 3   BY MR. GRINDROD:
 4   Q      You can answer.
 5   A      I suppose.  I really don't know.
 6   Q      You know that XCEL Bandwidth had an address in Port
 7   St. Lucie, Florida, right?
 8   A      I don't know that.  I could never reach them.
 9   Q      You know that Daryl Bank was the manager of XCEL
10   Bandwidth, right?
11   A      I only know that I heard his name.
12   Q      Let's go to what's already been admitted as
13   Government Exhibit 817, ma'am.  If you could go to page 14
14   of that document.  The numbering is very small and at the
15   bottom, but it's page 14 of 17?
16   A      I see it.  I see it.  Page 14?
17   Q      Yes.  Yes, ma'am.
18          Okay.  And you see a signature there?
19   A      Yes.
20   Q      And then below the signature it says, "Daryl Bank"?
21   A      Yes.
22   Q      And then it says manager, "XCEL Bandwidth, LLC"?
23   A      Yes.
24   Q      So you had documents showing that Daryl Bank was the
25   manager of XCEL Bandwidth, right?
```

```
 1    A      That's what the document says.

 2    Q      And --

 3    A      And I have the documents.

 4    Q      Right.

 5           And, ma'am, you know that -- you eventually learned

 6    that Daryl Bank had been accused of fraud, right?

 7    A      Yes.

 8    Q      And that he had been taking money from people who

 9    invested with him?

10    A      I didn't hear anything about the case, except the

11    final result.

12    Q      You heard that he had been convicted of fraud?

13    A      Yes.

14    Q      And, ma'am, you -- you physically gave Mr. Smith

15    your money, right?

16    A      Yes.

17    Q      And you didn't get a dime back?

18    A      No.

19    Q      And you're very upset about that, right?

20    A      Yes.

21    Q      But sitting here today you cannot think of a single

22    thing that Bill ever said to you that was not true, right?

23           MS. YUSI:   Objection.   Argumentative.

24    BY MR. GRINDROD:

25    Q      Ma'am, is that right?   You can't --
```

1    A        It was a long time ago.

2    Q        Mm-hmm.

3    A        God only knows what he might have said.  I don't

4    know.

5    Q        I understand that and it was a long time ago.  I

6    understand all that.  But what I'm asking you, ma'am, is

7    under oath, sitting here today, can you think of anything

8    that Bill Smith told you related to this investment that

9    wasn't true?

10            MS. YUSI:  Same objection.

11            Go ahead.

12            THE WITNESS:  I don't know.

13   BY MR. GRINDROD:

14   Q        You don't know whether you can think of anything?

15   A        I can think that I don't understand.  Whatever he

16   might have said or done doesn't register with me.  I don't

17   understand it.  I know he mentioned Daryl Bank to me several

18   times as well as all the people he knew at Lincoln --

19   whatever it's called.  I can't even think now.  Yeah.

20            He mentioned all the hoity-toits that were at the

21   top of these -- all these companies that ripped people off.

22   Q        Well, I understand that you believe in your heart

23   that Bill Smith ripped you off, right?

24   A        I believe he mishandled my money, yes.

25   Q        Okay.  And you believe that because you didn't get

```
 1    any of your money back, right?
 2    A        Didn't get a dime, no.
 3    Q        But what I'm asking you is can you tell me anything
 4    that Bill told you that was a lie?
 5             MS. YUSI:  Objection.  Asked and answered.
 6    BY MR. GRINDROD:
 7    Q        Is the answer no, ma'am?
 8    A        No.  I'm not giving an answer.
 9    Q        You're -- you're refusing to answer the question?
10             MS. YUSI:  Objection.  Asked and answered,
11    argumentative.
12             THE WITNESS:  Thank you.
13    BY MR. GRINDROD:
14    Q        Ma'am, are you declining to answer the question of
15    whether Bill Smith ever told you anything that was a lie?
16             MS. YUSI:  Objection.  Asked and answered.
17    BY MR. GRINDROD:
18    Q        You can answer.
19    A        He could have told me there was an elephant in the
20    room, and it was painted purple.  I wouldn't have known the
21    difference.  I didn't understand the things he was saying no
22    matter how -- he tried so hard to make it clear to me so I
23    would understand.  What he was making me understand later I
24    found out -- I don't know what to think about that.
25    Q        I understand.
```

```
 1              MR. GRINDROD:  No further questions at this time.
 2              MS. YUSI:  Does anyone else that's here remotely
 3     have questions for him before I do some redirect?  Anyone?
 4              MR. GANTOUS:  I have no questions.
 5              (Reporter clarification.)
 6              MS. YUSI:  That was Anthony Gantous.
 7              MR. MATHEWS:  No questions.
 8              MS. YUSI:  Thank you.
 9                        FURTHER EXAMINATION
10     BY MS. YUSI:
11     Q        I just have a couple followups, Ms. Bean.  I know
12     it's been a long afternoon.
13     A        That's okay.
14     Q        All of the information, the -- the loan agreements,
15     the operating agreements, the charts, things like that, who
16     gave those to you?
17     A        Bill Smith.
18     Q        And who gave you all of your information about this
19     investment that you made?
20     A        Bill Smith.
21     Q        Did you have any other sources of information
22     besides what he -- he gave and told you?
23     A        No.  I trusted him completely.
24     Q        And did he explain page by page and paragraph by
25     paragraph when you told him you didn't understand things?
```

1    A        If I needed it, he drew pictures, wrote notes, and

2    things and I still didn't really understand.

3    Q        And how often would you -- would you go to him and

4    try to get explanations or for understanding?

5    A        Anytime I was getting to the point where, you know,

6    what happened to my money, when are things going to loosen

7    up and I might see something, when I needed to, I could

8    reach him.  He would call me back.

9    Q        And -- and -- and during all those conversations,

10   did he say this is -- none of my clients are -- did he ever

11   say anything about any of his clients not doing well in

12   these investments?

13   A        I only heard about all of that later.

14   Q        Okay.  After -- after the federal government made

15   arrests?

16   A        Yes.  Yes.

17   Q        Did Mr. -- did Mr. Smith ever ask you do you

18   understand all this?

19   A        I don't know whether he did or didn't.  But, you

20   know, who am I?  I just go along with the program thinking I

21   was working with someone who cared about me and was looking

22   out for my best interest.

23   Q        And when you heard that he had 42 years in the

24   business in doing this, who told you that?

25   A        He did.

1        MS. YUSI:  Those are all of my questions.

2        THE WITNESS:  Okay.

3        MS. YUSI:  Anyone else?

4        MR. GRINDROD:  This is Andrew Grindrod.  I don't

5   have anymore.

6        MR. GANTOUS:  Anthony Gantous, no further questions.

7        MS. YUSI:  Thank you.

8        THE VIDEOGRAPHER:  This concludes the deposition on

9   November 5th, 2021.  We're off the record at 2:28 p.m.

10  Master media will be held by Behmke Reporting and Video

11  Services.

12           (Deposition concluded at 2:27 p.m.)

13                    ---oOo---

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    STATE OF CALIFORNIA      )

 2                             )   ss.

 3                             )

 4                    I hereby certify that the witness in the

 5    forgoing deposition, SHARYON BEAN, was by me duly sworn to

 6    testify to the truth, the whole truth, and nothing but the

 7    truth, in the within-entitled cause; that said deposition

 8    was taken at the time and place herein named; and that the

 9    deposition is a true record of the witness's testimony as

10    reported by me, a duly certified shorthand reporter and a

11    disinterested person, and was thereafter transcribed into

12    typewriting by computer.

13                    I further certify that I am not interested

14    in the outcome of the said action, nor connected with nor

15    related to any of the parties in said action, nor to their

16    respective counsel.

17              IN WITNESS WHEREOF, I have hereunto

18       affixed my signature this 11th day of November, 2021.

19       Reading and Signing was NOT REQUESTED.

20

21

22

23              HECTOR CONTRERAS, CSR

24              Certified Shorthand Reporter #14051

25
```