## EXHIBIT D

```
 1            IN THE UNITED STATES DISTRICT COURT FOR THE

 2                   EASTERN DISTRICT OF VIRGINIA

 3                        NORFOLK DIVISION

 4

 5    --------------------------------

 6    UNITED STATES OF AMERICA,        )

 7    v.                               )

 8    DAVID ALCORN, AGHEE WILLIAM      )   Case No. 2:19-cr-47

 9    SMITH II, THOMAS L. BARNETT,     )

10    and NORMA JEAN COFFIN,           )

11          Defendants.                )

12                                     )

13    --------------------------------

14

15            VIDEOTAPED DEPOSITION OF PHILLIP YEE

16               FRIDAY, NOVEMBER 5, 2021,

17

18

19

20

21            BEHMKE REPORTING AND VIDEO SERVICES, INC.

22               BY:  HECTOR CONTRERAS, CSR NO. 14051

23                    455 MARKET STREET, SUITE 970

24                    SAN FRANCISCO, CA 94105

25                        (415) 597-5600
```

EXHIBIT D

1

2

3

4

5

6

7

8          Videotaped Deposition of Phillip Yee, taken on

9   behalf of the United States of America, at 501 I Street,

10  Sacramento, CA 95814, commencing at 10:34 a.m., Friday,

11  November 5, 2021, before Hector Contreras, Certified

12  Shorthand Reporter No. 14051, pursuant to notice of

13  Videotaped Deposition.

14

15

16

17

18

19

20

21

22

23

24

25

EXHIBIT D

```
 1    APPEARANCES OF COUNSEL:
 2    FOR PLAINTIFF:
 3        U.S. ATTORNEY'S OFFICE, EASTERN DISTRICT OF VIRGINIA
 4        BY:  ELIZABETH M. YUSI, ASSISTANT U.S. ATTORNEY
 5        MELISSA E. O'BOYLE, ASST. U.S. ATTORNEY (Appearing Remotely)
 5        101 West Main Street, Suite 8000
 6        Norfolk, Virginia  23510
 7        Telephone:  (757) 441-3555
 8        Email:  Elizabeth.yusi@usdoj.gov
 9
10    FOR DEFENDANT, AGHEE WILLIAM SMITH II:
11        THE OFFICE OF THE FEDERAL PUBLIC DEFENDER -
12        EASTERN DISTRICT OF VIRGINIA
13        BY:  ANDREW W. GRINDROD, ASSISTANT FEDERAL PD
14        LINDSAY J. McCASLIN, ASSISTANT FEDERAL PD  (Appearing Remotely)
15        150 Boush Street, Suite 403
16        Norfolk, Virginia  23510
17        Telephone:  (757) 457-0860
18        Email:  andrew_grindrod@fd.org
19
20
21
22
23
24
25
```

EXHIBIT D

```
 1    APPEARANCES OF COUNSEL - CONTINUED:

 2    FOR DEFENDANT, THOMAS L. BARNETT:

 3        ANCHOR LEGAL GROUP, PLLC

 4        BY:  ANTHONY M. GANTOUS, ESQ. (Appearing Remotely)

 5        5101 Cleveland Street, Suite 100

 6        Virginia Beach, Virginia  23462

 7        Telephone:  (757) 529-0000

 8        Email:  unavailable

 9

10    FOR DEFENDANT, NORMA JEAN COFFIN:

11        GREGORY K. MATTHEWS, PC

12        BY:  GREGORY K. MATTHEWS, ESQ. (Appearing Remotely)

13        P.O. Box 5277

14        Portsmouth, Virginia  23703

15        Telephone:  (757) 356-5744

16        Email:  unavailable

17

18    ALSO PRESENT:

19          JASON W. THOMASSON, U.S. POSTAL INSPECTION SERVICE

20          JASON BUTKO, VIDEOGRAPHER

21          AGHEE WILLIAM SMITH II

22

23

24

25
```

EXHIBIT D

1                          INDEX

2    FRIDAY, NOVEMBER 5, 2021                        PAGE

3    PROCEEDINGS                                        9

3    PHILLIP YEE

4         Examination by ELIZABETH M. YUSI            10

5         Examination by ANTHONY M. GANTOUS           34

6         Further Examination by ELIZABETH M. YUSI    45

7         Further Examination by ANTHONY M. GANTOUS   47

8

9                        ---oOo-

10

11

12

13

14         QUESTIONS WITNESS REFUSED TO ANSWER:

15                   PAGE     LINE

16                      (None.)

17

18

19

20

21

22

23

24

25

EXHIBIT D

```
 1                    GOVERNMENT'S EXHIBITS

 2                         PHILLIP YEE

 3    Number                  Description                Page

 4    Exhibit 805  Tom Barnett E-mail from May 17, 2013

 5                 - 3 pages                              19

 6

 7    Exhibit 807  Summit Asset Purchase Investment Account

 8                 Signed 5/17/2013 - 2 pages             20

 9

10    Exhibit 808  Operating Agreement of DSPF Group, LLC

11                 - 21 pages                             22

12

13    Exhibit 809  Tom Barnett E-mail from February 5, 2014

14                 - 2 pages                              23

15

16    Exhibit 810  E-mail from September 10, 2014

17                 - 2 pages                              25

18

19    Exhibit 811  E-mail from September 10, 2014 Premium

20                 is Due for Michelle Yee - 4 pages      26

21

22    Exhibit 812  E-mail from September 10, 2014

23                 Update on Investment - 6 pages         28

24

25
```

EXHIBIT D

```
 1              GOVERNMENT'S EXHIBITS - CONTINUED

 2                        PHILLIP YEE

 3   Number                Description                 Page

 4   Exhibit 813  FedEx Label with Check Image

 5                - 3 pages                             29

 6

 7   Exhibit 814  Operating Agreement of DSPF Group, LLC

 8                - 21 pages                            31

 9

10   Exhibit 200G Dental Support Plus Franchise

11                Franchise Overview - 19 pages         46

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT D

```
1                    DEFENDANTS' EXHIBITS

2                         PHILLIP YEE

3   Number                 Description                    Page

4   Exhibit TB1  FedEx Label with Check Image

5                - 33 pages                                42

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

EXHIBIT D

```
 1            THE VIDEOGRAPHER:  Here begins Media Number One in

 2    the deposition of Phillip Yee in the matter of the United

 3    States of America v. David Alcorn, Aghee William Smith II,

 4    Thomas L. Barnett, and Norma Jean Coffin in the United

 5    States District Court for the Eastern District of Virginia,

 6    Norfolk Division, Case Number 2:19-cr-47.  Today's date is

 7    November 5th, 2021.  The time is approximately 10:35 a.m.

 8            My name is Jason Butko here with Behmke Court

 9    Reporting and Video Service located at 455 Market Street in

10    San Francisco, California.  This deposition is being taken

11    at the U.S. Attorney's Office at 501 I Street in Sacramento

12    California.  It was noticed by Elizabeth Yusi.

13            Can the court -- can the attorney, please, identify

14    themself and who they represent, starting with the

15    questioning attorney.

16            MS. YUSI:  My name is Elizabeth Yusi, and I'm an

17    Assistant U.S. Attorney.  I represent the United States, and

18    with us via Webex we have Melissa O'Boyle with the United

19    States.  To my left I have Jason Thomasson with the United

20    States Postal Inspection Service.

21            MR. GRINDROD:  Andrew Grindrod.  I'm representing

22    Aghee Smith who is present physically with me in the room

23    where the deposition is being held.

24            MS. YUSI:  And I also -- for the record, I'll

25    identify that Anthony Gantous and -- is the counsel for
```

EXHIBIT D

```
 1   Defendant, Tom Barnett, is present online along with his
 2   client.  Appears to be having -- have logged in as well, and
 3   Lindsay McCaslin with the Public Defenders Office, also, for
 4   Mr. Smith, and Greg Matthews who is Norma Jean Coffin's
 5   attorney.  I think that covers everyone.
 6              THE VIDEOGRAPHER:  Okay.  Can the court reporter,
 7   please, swear the witness.
 8              (Whereupon, the witness was sworn in.)
 9              THE VIDEOGRAPHER:  You may proceed.
10                        PHILLIP YEE,
11   having been sworn by the Certified Shorthand Reporter,
12   HECTOR CONTRERAS, to tell the truth, the whole truth, and
13   nothing but the truth, testified as follows:
14
15                        EXAMINATION
16   BY MS. YUSI:
17   Q       Thank you.  Good morning.
18           Could you introduce yourself to the Court.
19   A       My name is Phillip Yee.
20   Q       How do you spell your last name?
21   A       Y-e-e.
22   Q       And how old are you today?
23   A       62.
24   Q       And the city and state you live in.
25   A       Fremont, California.
```

BEHMKE REPORTING AND VIDEO SERVICES, INC.        10
(415) 597-5600

EXHIBIT D

1    Q        Is -- and where is that in?

2    A        That's south of San Francisco.

3    Q        And do you currently work?

4    A        Yes.

5    Q        What do you do?

6    A        I'm a realtor, advertising designer, and contractor.

7    Q        And are you married?

8    A        Yes.

9    Q        Who is your wife?

10   A        Michelle Yee.

11   Q        How long have you guys been --

12            (Reporter clarification.)

13            MS. YUSI:  Can everyone put themselves on mute

14   unless you need to object or say anything?  Thank you.

15            I am muted.

16   BY MS. YUSI:

17   Q        And how long have you been married?

18   A        35 years.

19   Q        And while you guys have been working, have you been

20   saving money for retirement?

21   A        Yes.

22   Q        And where do you have that?  Is it a 401?  IRA?

23   Savings?

24   A        Both.

25   Q        Do you have any background in investments?

EXHIBIT D

```
 1    A       No.
 2    Q       Any training -- does your wife have any background
 3    or training in investments?
 4    A       No.
 5    Q       I want to talk to you about the Defendant Thomas
 6    Barnett or Tom Barnett.  Are you familiar with Tom Barnett?
 7    A       Yes.
 8    Q       How did you first come to know Mr. Barnett?
 9    A       First was my brother told me about him, and then I
10    heard him through the KFAX Christian radio show.
11    Q       And -- and who -- what's your brother's name?
12    A       Brother's name is William Yee.
13    Q       And you said you heard him on a Christian radio
14    show?
15    A       Yeah.
16    Q       Tell me about that.
17    A       He was advertising life insurance.
18            (Reporter clarification.)
19            MS. YUSI:  Right.  I'm looking to see who is not
20    muted.
21            Anthony, can you mute yourself?  Thank you.  I think
22    that's it.  Only other ones that are not unmuted is us,
23    which we can't, but that helps.  Okay.  Sorry about that,
24    sir.
25    ////
```

EXHIBIT D

```
 1    BY MS. YUSI:
 2    Q      And -- and so you heard Mr. Barnett on the radio
 3    program.  Did he have his own program?
 4    A      No.  I think it was a commercial.
 5    Q      And did you call him?
 6    A      My brother gave me the information first.
 7    Q      All right.  And so did you end up meeting with
 8    Mr. Barnett in person?
 9    A      Yes.
10    Q      Do you recall about when that was?
11    A      2013.
12    Q      Okay.  And did you meet with him in person?
13    A      Yes.
14    Q      Where -- where did you meet with him?
15    A      My wife and I at his office.
16    Q      Where is that located?
17    A      Sacramento.
18    Q      When you met with Mr. Barnett, what did he say, if
19    anything, about his background?
20    A      He does insurance and he does some kind of finance
21    investment.
22    Q      All right.  And -- and did you -- did you have any
23    understanding if he had a fiduciary duty to you and your
24    wife?
25    A      Yes.
```

EXHIBIT D

```
1              MR. GANTOUS:  Objection.
2              MS. YUSI:  What's your basis?
3              MR. GANTOUS:  Lack of foundation as to what
4      fiduciary duty means.
5      BY MS. YUSI:
6      Q      Do you understand what a fiduciary duty is?
7      A      Yes.
8      Q      What is it?
9      A      Somebody that would tell me the truth and all the
10     facts and not put anything behind the facts.
11     Q      What was your understanding of any fiduciary duty
12     that Mr. Barnett had towards his clients?
13     A      Just telling me the truth of the -- the investment
14     that I was putting into.
15     Q      All right.  Did you trust Mr. Barnett?
16     A      At first I did.
17     Q      How many times did you meet with him before you
18     invested?
19     A      Probably three times.
20     Q      And what were you and your wife looking for in terms
21     of financial advice or investments?
22     A      Well, the first time we went to him was for life
23     insurance, and it was a tool for, you know, investment that
24     we can take out money from our investment.
25     Q      Through -- through a life insurance policy?
```

EXHIBIT D

```
1    A        Through a life insurance policy.

2    Q        And did you -- did you invest with him on that?

3    A        Yes, I did.

4    Q        And I want to talk to you about Dental Support Plus

5    Franchise Group or Dental Support Plus Group?

6    A        Yes.

7    Q        When did you -- when did you first hear about Dental

8    Support Plus Group?

9    A        He told me about it, he called me in, and told me

10   about the franchise.

11   Q        Is that -- who -- who is he?

12   A        Tom Barnett.

13   Q        And I apologize.  I'm just trying to get --

14   A        Right.

15   Q        -- a straight record for this.  Mr. Barnett --

16   and -- and how -- how long after you first invested with him

17   do you think that was?

18   A        Say a couple months or a month.

19   Q        So around -- in 2013?

20   A        2013, yeah.

21   Q        What was your understanding of what Dental Support

22   Plus or General Support Plus Group was?

23   A        It was a marketing company that targets the dental

24   office that are people who are retiring, the dentistry are

25   retiring, and then the marketing comes in there to boost
```

EXHIBIT D

1    the -- the sales for the dentistry.

2    Q      Okay.  And -- and how would you or how would an

3    investor make money in this group investment?

4    A      Well, the -- the extra -- once the dental practice

5    is sold, they make money from it.

6    Q      Did -- did Mr. Barnett talk to or did you ask about

7    risk involved with this investment?

8    A      Yes.

9    Q      What was -- what did he say?

10   A      He said there's some risk, but right now it seems,

11   like, it's a win-win situation.

12   Q      And what, if anything, did you know about Dental

13   Support Plus Franchises, which is a different investment?

14   Did you -- did you talk about that at all?

15   A      I -- I didn't know anything about it in the

16   beginning.

17   Q      In the beginning.

18          Okay.  And did Mr. Barnett say anything about a

19   track record or if this was an ongoing successful

20   investment?

21   A      Yeah.  He -- he mentioned that it was -- started

22   somewhere in Arizona, it was doing real well, and they have,

23   you know, a dozen offices that are doing really well.

24   Q      What, if anything, did Mr. Barnett say about fees or

25   commissions?

EXHIBIT D

1    A        He didn't mention too much about the fees and

2    commissions.

3    Q        Okay.  Did anything strike you as -- as -- as costly

4    in terms of -- of fees or commissions in terms of what you

5    spoke about or what you saw?

6    A        Well, he kept on saying, well, if you invest now,

7    it's, you know -- in the beginning it was 20,000 with your

8    brother.  Now with you in it, now it's up to $30,000.

9    Q        Okay.  For -- just for one investment?

10   A        Yeah, for one franchise.

11   Q        What was the expected return based on what

12   Mr. Barnett presented to you?

13   A        He mentioned something like it's a good, you know, 6

14   or 10 percent.

15   Q        At return on your investment?

16   A        Return on the investment.

17   Q        And how quickly would you start realizing profits or

18   money from your investment?

19   A        Within a year or two.

20   Q        Did Mr. Barnett say anything -- what, if anything,

21   did Mr. Barnett say about if he had his own money in the --

22   in the investment?

23   A        I asked him that.  And he said, yes, he has a couple

24   of franchise he owns.

25   Q        Did he say anything about how he was doing?

EXHIBIT D

```
1    A        He said they're doing well.

2    Q        And in terms of -- what was his suggestion about --

3    did -- did he give you any advice of whether or not you

4    should do this?

5    A        Well, he just told me that, you know, franchises

6    are -- is -- it can be risky and it might be risky, but

7    right now it seems, like, it's a good thing.

8    Q        Okay.  I want to talk to you about at first how much

9    did you and your wife invest in Dental Support Plus

10   Franchise Group or DSPF Group?

11   A        First franchise was about $30,000 --

12   Q        Okay.

13   A        -- I think.

14   Q        All right.  I'm going to show you -- let's see --

15   what's been marked as Government Exhibit 805, if you can

16   take a look at that, and it's an e-mail.  So it's kind of

17   backwards if you start from the back forwards.  What are the

18   dates of these e-mails on Exhibit 805?

19   A        May 17, 2013.

20   Q        And who are the e-mails in between?

21   A        In between?

22   Q        Or who are they between?

23   A        It's for Michelle, signed documents for insurance.

24   Q        Let's look at the first page where it says from Tom

25   Barnett, tommylee@mstar.net.
```

EXHIBIT D

```
 1    A        Right.

 2    Q        Do you recognize that e-mail address?

 3    A        Yes.  That's his e-mail address.

 4    Q        Tom Barnett's?

 5    A        Tom Barnett's.

 6    Q        And visualgraphics@comcast.net, whose is that?

 7    A        That is mine.

 8    Q        Okay.  Does this appear to be a true and accurate

 9    representation of e-mails between yourself and Mr. Barnett?

10    A        Yes.

11             MS. YUSI:  We move to admit Exhibit 805.

12             (Government's Exhibit 805 was marked for

13             identification.)

14             THE WITNESS:  Yes.

15    BY MS. YUSI:

16    Q        So this is in May 2013, and on page 2 -- look at

17    page 2 of Exhibit 805 -- Mr. Barnett says, "Yes.  They're

18    supposed to send it.  I need two checks written.  First,

19    60,000 to Minnesota Life for the new policy.  Second, 30,100

20    goes to Summit Trust for the investment in the trust fund.

21    What is -- what is that referring to if you know?

22    A        That was transferring my old insurance -- old mutual

23    insurance into the Minnesota Life, and then like he said,

24    30,000 goes in the Summit Trust Company.

25    Q        Was that how much you all were putting into what you
```

EXHIBIT D

1    call the trust fund?

2    A       Yes.

3    Q       All right.  I'm going to show you what's been marked

4    for identification as Exhibit 807, Government Exhibit 807,

5    and if you can look at page 1 and page 2.  Were you with

6    your wife when she signed any documents concerning these

7    investments?

8    A       Yes, just for this one.

9    Q       Okay.  And if we look at page 2 of Exhibit 807, is

10   that Michelle Yee, your wife's signature?

11   A       Correct.

12   Q       And what is the date of that?

13   A       5/17/2013.

14           MS. YUSI:  And right now we'll move to admit

15   Exhibit 807.

16           (Government's Exhibit 807 was marked for

17           identification.)

18   BY MS. YUSI:

19   Q       Now, this is the asset purchase investment account,

20   and on page 1 of Exhibit 807 is says, "DSPF Group, LLC,

21   30 units at 1,000 each," so for $30,000.  Was that your

22   first investment or your -- your -- that was your investment

23   that you knew of in DSPF Group?

24   A       Yes.

25   Q       And what, if anything, did Mr. Barnett say about

EXHIBIT D

1    where this money would go to?  Would it be going to the

2    investment or -- or what -- what -- what did he say?

3    A      The -- well, the remaining was supposed to go into

4    the insurance, and it's supposed to be liquid.

5    Q      Okay.

6    A      You can pull out anytime.

7    Q      That's the 60,000?

8    A      Right, the 60,000.  The 30,000 was to go to the

9    franchise --

10   Q      Did --

11   A      -- DSPF.

12   Q      Did Mr. Barnett say anything about this money going

13   into a pool of investors?

14   A      No.

15   Q      Did -- what, if anything, did you know about your

16   money being used to pay off disgruntled investors in earlier

17   DSPF investments?

18   A      No, none.

19   Q      I'm going to show you what's been marked for

20   identification as Government Exhibit 808 and if you can

21   look -- just look through that, including the back page or

22   back two pages.  The second from the back of Exhibit 808, is

23   that, again, your wife's signature?

24   A      Yes, it is.

25   Q      All right.  And is it notarized?

EXHIBIT D

```
1    A        Yes.

2    Q        All right.  And if I look at -- does this look like

3    a true and accurate copy of the operating agreement of the

4    $30,000 investment you all made in May of 2013?

5    A        Correct.

6             MS. YUSI:  Move to admit this at this time.

7             (Government's Exhibit 808 was marked for

8             identification.)

9    BY MS. YUSI:

10   Q        Now, three pages from -- from the end of the

11   invest -- of the operating agreement, there's a signature

12   page but from Daryl Bank.  Had you all ever heard of Daryl

13   Bank when you were speaking to Mr. Barnett?

14   A        He said he was the owner, CEO.

15   Q        Of...

16   A        Of DSPF.

17   Q        Okay.  Of the DSPF Group?

18   A        Right.

19   Q        Your investment?

20   A        Yes.

21   Q        Did he say anything about Kent Maerki?

22   A        No.

23   Q        No.  Had you ever heard that name at that time?

24   A        No.

25   Q        And after a few months or a year, you said a year or
```

EXHIBIT D

```
1    so, did you start -- did you and your wife start making

2    money on this investment?

3    A       None whatsoever.  I've been contacting him every --

4    every two or three months calling for the annual reports.

5    Q       This is Tom Barnett you were contacting?

6    A       For Tom Barnett, yes.

7    Q       And what did he say?

8    A       He said, "Nothing is going out yet, and they're

9    coming soon.  You just have to wait until it comes."

10   Q       What did he -- what did he say, if anything, about

11   how the investment was going?

12   A       He said everything was fine.

13   Q       Okay.  I'm going to show you what's been marked for

14   identification as Government Exhibit 809.  This is an e-mail

15   from February 2014.  Do you recognize these e-mails?

16   A       Yes.

17   Q       Are they between you and Mr. Barnett?

18   A       Yes.

19           MS. YUSI:  And we move to admit Exhibit 809.

20           (Government's Exhibit 809 was marked for

21           identification.)

22   BY MS. YUSI:

23   Q       This says -- at the bottom of page 1, Mr. Barnett

24   says, "Phillip, good to hear from you.  Sorry for the delay

25   in getting back to you, but let me give you a quick update
```

EXHIBIT D

```
1    on DSPF."  And it's goes on to say, "David Bailey, the CEO
2    of WebOps, is finding ways to bring new clients to each
3    franchise."  Was there any indication that things were not
4    going well with your investment as of February 2014?
5    A       No.
6    Q       Did -- what, if anything, did you know about an
7    investment called Spectrum 100?
8    A       I think he mentioned it to me before, but I didn't
9    know anything about it.
10   Q       Okay.  This is not something you did an investment
11   in?
12   A       No.
13   Q       Okay.  Talked to you about September 2014.  What did
14   you find out in September of 2014 about your investment?
15   A       September that's -- I think that's when he told me
16   DSPF went bankrupt.
17   Q       Who told you that?
18   A       Tom Barnett.
19   Q       Okay.  I'm going to show you what's been marked for
20   identification as Exhibit 810.  Is this another e-mail chain
21   between you and Mr. Barnett?
22   A       Yes.
23   Q       Is it from September 2010?
24   A       Yes.
25   Q       And on page 2 --
```

EXHIBIT D

```
 1              MS. YUSI:  We move to admit Exhibit 810.
 2              (Government's Exhibit 810 was marked for
 3              identification.)
 4       BY MS. YUSI:
 5       Q      On page 2 of Exhibit 810, there's an e-mail from you
 6       saying, "Hi, Tom.  How do we take our" -- "the funds in our
 7       insurance to pay for the one that is due, Minnesota Life
 8       Insurance, for Michelle?"  And what did he respond in terms
 9       of -- of what was going on with your money?
10       A      I don't recall what I -- I said after that.
11       Q      Okay.  On page 1 on September 10th, 2014, Tom
12       Barnett -- can you -- can you read what the first couple
13       sentences of what Mr. Barnett said to you starting with
14       Phillip?
15       A      "Phillip, I'm sorry for the delay in getting back to
16       you.  I was a bit confused on what you're referring to.
17       According to my records, I could be wrong.  You only have
18       the one policy on Michelle."
19       Q      All right.  What did you find out in September 2014
20       besides the DSPF, the 30,000?  What did you find out about
21       your -- the other money that -- that you have with
22       Mr. Barnett?
23       A      The rest of the --
24              MR. GRINDROD:  Objection.  Relevance, foundation.
25       ////
```

EXHIBIT D

```
 1    BY MS. YUSI:
 2    Q       Go ahead.
 3    A       The rest of the money was still liquid, supposed to
 4    be at the Summit Trust, is what I was told.
 5    Q       Okay.
 6    A       And we didn't authorize anybody to take anything out
 7    of there.
 8    Q       So what was your understanding of your entire
 9    investment into DSPF group?
10    A       It was all loss.
11    Q       Well, was it -- what was your -- what was -- when
12    you guys invested, how much did you believe you had invested
13    in DSPF group?
14    A       30,000.
15    Q       All right.  I'm going to go to Exhibit 811.  Do you
16    recognize that and the attachment behind it?
17    A       Yes.
18    Q       Is this another e-mail from Mr. Barnett to you in
19    September 2014?
20    A       Yes.
21            MS. YUSI:  Move to admit Exhibit 811.
22            (Government's Exhibit 811 was marked for
23            identification.)
24    BY MS. YUSI:
25    Q       What did Mr. Barnett -- can you read what he said to
```

EXHIBIT D

```
 1    you in this e-mail on page 1 of Exhibit 811?
 2    A       "This is the letter that the company sent to all the
 3    franchise and trust investors.  This went out in August 8th
 4    of last month.  My hunch has kept me busy since June of this
 5    year as I felt something of this nature was in the making.
 6    It was the main reason for my desire to meet with everyone
 7    who was involved since then."
 8    Q       Did you meet with Mr. Barnett once you found this
 9    out?
10    A       No.
11    Q       This was just the e-mail.  Did you talk to him on
12    the phone?
13    A       Yes.
14    Q       What did he say?
15    A       During this time I was a little bit upset, you know.
16    Everything was looking pretty bad for my investment.
17    Q       And page 2 -- starting on page 2 of Exhibit 811, is
18    this a memo from Kent Maerki to DSPF Franchises?
19    A       Yes.
20    Q       And this is -- is this how you found out that you
21    had lost your investment in DSPF group?
22    A       Well, first Tom told me about it, and then he sent
23    me this, yeah.
24    Q       Okay.  All right.  I'm going to show you what's been
25    marked for identification as Exhibit 812.  Do you recognize
```

EXHIBIT D

```
 1    Exhibit 812 and page 1 and then the attachment?
 2    A       Yep.  Yes.
 3    Q       Does it appear to be true and accurate?
 4    A       True.
 5    Q       Is that a yes?
 6    A       But we didn't -- we didn't purchase two.
 7    Q       Well, I'm saying is this a true and accurate copy --
 8    A       Yes, it is.
 9    Q       -- of those documents?
10            MS. YUSI:  We move to admit Exhibit 812.
11            (Government's Exhibit 812 was marked for
12            identification.)
13            THE WITNESS:  Correct.
14    BY MS. YUSI:
15    Q       Okay.  Can you read the -- the e-mail from
16    Mr. Barnett on page 1?
17    A       Yeah.  "Phillip, I just got this form.  I just got
18    this from my contact at Dominion regarding the whole
19    investment in DSPF.  Michelle Yee actually has 71,000 in
20    DSPF Group.  She did two purchases.  One was for 30,000 on
21    6/5/13, and the second was 41,000 on 7/15/13.  I have
22    attached a statement of her account from the opening until
23    today so you can see all of the transaction."
24    Q       Okay.  We'll stop there.
25            And if we look at page 2 --
```

EXHIBIT D

```
1    A         Yeah.
2    Q         -- what is -- is this an account statement from
3    Summit Trust?
4    A         Yes.
5    Q         Had you all ever received any of these statements
6    before you got this e-mail?
7    A         No.
8    Q         And if we look at page 3 of Exhibit 812, it says
9    DSPF Group.  The amount shares is 71.  What was the total
10   cost that you apparently had in DSPF Group?
11   A         71,000.
12   Q         And did you know that you had 71,000 and not 30,000
13   prior to Mr. Barnett telling you this on that day?
14   A         No.
15   Q         I'm going to show you what's been marked for
16   identification as Exhibit 813.  Do you recognize this
17   document?
18   A         Yeah, I remember it.
19   Q         Okay.  Does it appear to be a true and accurate copy
20   of that document?
21   A         It is a copy, yes.
22             MS. YUSI:  We move to admit Exhibit 813.
23             (Government's Exhibit 813 was marked for
24             identification.)
25   ////
```

EXHIBIT D

```
1    BY MS. YUSI:

2    Q       If we look at page 1 of Exhibit 813, what is -- what

3    is that check apparently for?

4    A       Summit Trust Company, that's supposed to put the

5    rest of the money in a -- in a liquid bank account is what I

6    thought it was.

7    Q       All right.  On page 2 before -- had you ever seen

8    this that there was a DSPF Group apparently made by your

9    wife for 41 units for $41,000?

10   A       I don't think she -- no.  We didn't -- we didn't

11   sign for it.

12   Q       Okay.  And so you -- you thought the 41 --

13   A       I thought the 41,000 was supposed to go into the --

14   the insurance fund is what we were thinking.

15   Q       Okay.  And not until you found out that DSPF had

16   gone bankrupt or was --

17   A       Right.

18   Q       -- a failed investment did you find out you had

19   71,000?

20   A       Right.

21   Q       All right.  I'm going to show you Government

22   Exhibit 814.  Do you recognize this document, or have you

23   seen this document before?  And if you look at the second to

24   last page --

25   A       Yeah.  It looks like the first franchise that we
```

EXHIBIT D

```
 1    purchased.  They gave us the same -- same piece of paper
 2    here, right.
 3    Q       Does it appear to be your wife's signature on the
 4    second to last page of Exhibit 814?
 5    A       It appears to be.
 6            MS. YUSI:  I'm going to move for admission of
 7    Exhibit 814.
 8            (Government's Exhibit 814 was marked for
 9            identification.)
10    BY MS. YUSI:
11    Q       Are there any dates in this document showing when
12    your wife signed this?
13    A       No whatsoever.
14    Q       And is it -- is it notarized?
15    A       No.  That's -- that's my main concern.  First one
16    was only notarized.  This one is not.
17    Q       Okay.  And is it -- the initials on the first page,
18    is there a second spot fully filled out for this operating
19    agreement of DSPF Group?
20    A       No.
21    Q       All right.
22    A       None.
23    Q       Where did the money come from when you all put the
24    30- -- the 30,000?
25    A       It came from my retirement funds, my IRA.
```

EXHIBIT D

1    Q       Okay.  And how about the extra 41,000 that you said
2    was going into kind of a liquid account with -- with Summit
3    Trust, where -- did that -- did that come from the same
4    place?
5    A       Same place.
6    Q       Okay.  After you heard from Mr. Barnett, did he
7    say -- what, if anything, did he say about trying to get
8    your money back, if at all?
9    A       He said if you invest more of your retirement funds
10   with me, I can get it back within three to four years.
11   Q       Did he say how?
12   A       He said some other mutual funds that he can put
13   together, within three, four years you'll get your money
14   back.
15   Q       What was your response?
16   A       I said, "No way."
17   Q       What, if anything -- what, if anything, did
18   Mr. Barnett say about an Arizona state corporation
19   commission having been investigating Dental Support Plus
20   having been -- let me rephrase.
21           What, if anything, did Mr. Barnett say anything
22   about a state corporation commission looking into the
23   legitimacy of Dental Support Plus prior to you all investing
24   the 30,000?
25   A       Never -- he never mentioned anything about that.

EXHIBIT D

```
 1    Q        Okay.  And did you get any of your money back from
 2    either the 30,000 that you're aware of or the 41,000 that
 3    ended up in --
 4    A        No.
 5    Q        -- DSPF Group?
 6    A        No, none.
 7    Q        I think those are all my questions right now.  We
 8    probably have some questions from other defense counsel.
 9    A        Sure.
10             MS. YUSI:  Who wants to start?
11             (Reporter clarification.)
12             MS. YUSI:  Hold on.  You need to start that again,
13    Anthony.  Go ahead, Anthony.  Start again.
14             MR. GANTOUS:  Mr. Yee, can you hear me?
15             (Reporter clarification.)
16             MR. GANTOUS:  Mr. Yee, can you hear me now?
17             (Reporter clarification.)
18             MS. YUSI:  If you can talk a little slower so we can
19    hear you.
20             Does it go up further, Jason?
21    BY MR. GANTOUS:
22    Q        Mr. Yee, can you hear me now?
23    A        I hear you.
24    Q        My name is Anthony Gantous.  I represent Tom Barnett
25    in this matter.
```