```
                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
                             Norfolk Division


   - - - - - - - - - - - - - - - - - -
                                       )
   UNITED STATES OF AMERICA             )
                                       )
   v.                                   )     CRIMINAL ACTION NO.
                                       )            2:19cr47
   DAVID ALCORN and                     )
   AGHEE WILLIAMS SMITH II,             )
                                       )
          Defendants.                   )
                                       )
   - - - - - - - - - - - - - - - - - -

                    ** Jury Trial - Day 3 **

               EXCERPT TRANSCRIPT OF PROCEEDINGS
              (Cross-Examination of A. Tottossy)

                      Norfolk, Virginia

                     February 3, 2022


   BEFORE:   THE HONORABLE RAYMOND A. JACKSON
             United States District Judge, and a jury


   APPEARANCES:

             UNITED STATES ATTORNEY'S OFFICE
             By:  Andrew C. Bosse
                  Melissa E. O'Boyle
                  Elizabeth M. Yusi
                  Assistant United States Attorneys
                  Counsel for the United States

             RICHARD S. YAROW LLC
             By:  Richard S. Yarow
                  Counsel for Defendant David Alcorn

             FEDERAL PUBLIC DEFENDER'S OFFICE
             By:  Andrew W. Grindrod
                  Lindsay Jo McCaslin
                  Assistant Federal Public Defenders
                  Counsel for Defendant Aghee William Smith II
```

Carol L. Naughton, Official Court Reporter

1                              I N D E X

2  GOVERNMENT'S
   WITNESSES                                                    PAGE
3
    ANDREA TOTTOSSY
4        Cross-Examination By Mr. Yarow                            3
         Cross-Examination By Mr. Grindrod                        10
5

6

7                            E X H I B I T S

8                             (None offered.)

A. Tottossy - Cross (By Mr. Yarow)

1 　　　　　　　　　　　* * * * * * *
2 　　　　ANDREA TOTTOSSY, called by the Government, having
3 been first duly sworn, was examined and testified as follows:
4 　　　　　　　　　　　* * * * * * *
5 　　　　　　　　　　CROSS-EXAMINATION
6 BY MR. YAROW:
7 Q.　Ms. Tottossy, my name is Rick Yarow.  I represent David
8 Alcorn.
9 　　　　You kept on saying "Janus Spectrum" -- I think you
10 were saying, "Group."  Did you invest in Janus Spectrum Group
11 or Janus Spectrum?
12 A.　What I referred to as "Janus Spectrum," "Janus Spectrum
13 Group," to me, the wording is the same thing.
14 Q.　Now, you said that you formed -- you were required to
15 form an LLC by Roger?
16 A.　Uh-huh.
17 Q.　And who were the members of that LLC?
18 A.　That LLC was actually formed prior to our investing with
19 Roger.  It was for my personal consulting business.
20 Q.　Who were the members of the LLC?
21 A.　I formed that LLC in 2011.  So my -- I know I was on the
22 LLC.  I may have put my husband on it.  I'm not certain for
23 sure.
24 Q.　Okay.  So were all of your investments with -- your
25 purchases of Janus Spectrum through this LLC, the same LLC?

A. Tottossy - Cross (By Mr. Yarow)

1  A.  I didn't touch my LLC.  When we purchased investments,
2  those funds were given directly to Dominion from my personal
3  checking account.
4  Q.  So Roger Hudspeth is someone that you knew and trusted?
5  A.  Yes.
6  Q.  And he was a friend of the family?
7  A.  Yes.
8  Q.  And you would consider him your financial advisor?
9  A.  Yes.
10 Q.  Did he explain anything to you about risk versus reward
11 as your financial advisor?
12 A.  He did.  I mean, he talked about, yes, you're spending
13 the money, you're taking money out of something that is very
14 secure, a bank account, and putting it in for something and
15 you are anticipating this outcome or this profit.  But
16 there's always going to be risk, no matter what you're
17 investing in, and there's going to be a reward.
18 Q.  So he explained to you that there were risks involved
19 with this investment?
20 A.  Very, very, very minor.  This was a secure, sure thing.
21 Q.  And, specifically, the Janus Spectrum investment, what
22 did he describe to you about the risks of that?
23 A.  We didn't talk about risk.
24 Q.  Okay.
25 A.  Not to my memory.

A. Tottossy - Cross (By Mr. Yarow)

1  Q. So he never talked to you about risk?
2  A. No.
3  Q. Did he tell you that you were actually purchasing an
4  application to receive a license?
5  A. No.
6  Q. Did he tell you that this was something that would
7  require you to do some work on your part as far as building
8  out?
9  A. No.
10 Q. Did Mr. Hudspeth tell you that this is something that
11 depended upon the FCC releasing certain markets?
12 A. He did talk about the releasing of the licenses to
13 markets. I don't recall him discussing an application
14 process.
15 Q. Okay. Did he explain to you that this was something that
16 was beyond their control, that this is something that the
17 government -- this government agency, FCC, released?
18 A. I don't recall that, no.
19 Q. Did Mr. Hudspeth have you -- have you ever -- do you
20 remember signing an agreement with Janus Spectrum, or just an
21 agreement with Daryl Bank or Roger Hudspeth's organization?
22 A. So the answer to that is I don't know. We signed a lot
23 of papers. I don't know with whom they were specifically
24 associated with. I mean, we were signing them at the office
25 of Dominion Investments. You know, my assumption in signing

―――A. Tottossy - Cross (By Mr. Yarow)―――

1  is it was with Dominion Investments and Janus.
2  Q.  Okay.  So were you investing -- didn't it seem strange to
3  you that you would have to open an account that you didn't
4  have access to?
5  A.  When I look back on it, absolutely.  But at the time, you
6  know, the trust that we had with Roger and -- to me, he had a
7  very strong rationale as to why he only needed visibility and
8  not us.
9  Q.  I'm sorry.  I couldn't catch that.  Repeat.  He needed
10 what, now?
11 A.  Visibility.
12       So when we talked about the bank account -- like you
13 said, was it not strange?  Yes, it's odd for me to have a
14 bank account that I don't have access to.  And when we asked
15 Roger about that, he had what seemed to be a very viable
16 rationale, plausible rationale for why that was necessary.
17 Q.  Okay.  When you went to go visit the post office for the
18 Dental Support, where their office address led you to, did
19 you come back and address that with Roger?
20 A.  Yes.
21 Q.  And as a result of that, what happened?
22 A.  Nothing.
23 Q.  Okay.  So it was after -- you were told you were going to
24 get an $800-a-month return?
25 A.  Yes.

Carol L. Naughton, Official Court Reporter

———A. Tottossy - Cross (By Mr. Yarow)———

1  Q.  Okay.  So by my quick calculation -- I could be wrong --
2  that's 800 times 12.  That's $9,600 a year?
3  A.  Yes.
4  Q.  That's $9,600 a year on a 25,000-dollar investment?
5  A.  Yes.
6  Q.  So by my quick calculation, that's about a 40 percent or
7  better return?
8  A.  It looked to be a very good investment.
9  Q.  And were you told -- I mean, you would consider that to
10 be a high-return investment?
11 A.  I was excited to have the opportunity to purchase that
12 investment, yes.  Yeah.
13 Q.  And how did -- did you ask Roger about, "Well, Roger,
14 this is a very high investment.  What about the risk of this
15 investment because it's so high?"
16 A.  It was presented to us as sure-fire.  The rationale and
17 framework around that investment made so much sense.  It
18 seemed to be, for us, oh, wow, this is an untapped market,
19 we've got this great opportunity to get in.  And there are
20 times when people go in and hit the jackpot and are, like,
21 wow, this is great, and that's what we were hopeful for, and
22 that's why we purchased.
23 Q.  Had you ever had any experience with purchasing
24 franchises or purchasing spectrum-type investments?
25 A.  No.  None.

A. Tottossy - Cross (By Mr. Yarow)

1  Q. Okay. And you had no experience in running a franchise
2  or doing anything involving --
3  A. We did not. And we were told that they would be
4  absentee-owned franchises, that there would not be a
5  requirement for us to do anything.
6  Q. Okay. And the only person -- you never actually met Kent
7  Maerki; is that correct?
8  A. Not face to face, no.
9  Q. Okay. You did have a chance to speak with Kent Maerki,
10 or you were on a call with Kent Maerki?
11 A. Yes.
12 Q. How many times?
13 A. I want to say one time.
14 Q. Okay. So during that one time, were you just talking
15 about the Dental Support investment?
16 A. We spoke specifically about the Dental Support.
17 Q. Not the Janus Spectrum; is that correct?
18 A. No, not the Janus.
19 Q. Okay. Did Roger -- did Roger discuss how much his fee
20 would be on the 25,000 -- each of the $25,000 purchases?
21 A. He didn't discuss his specific fee, but we -- like I said
22 earlier, we had asked about fees with him and were assured
23 they were just minimal, we wouldn't feel them, they were just
24 very small fees.
25 Q. And this would come out of -- was it explained to you

A. Tottossy - Cross (By Mr. Yarow)

1  this would come out of the investment?  In other words, the
2  25,000 covered the investment plus Roger's fee?
3  A.  That was never shared with me.
4  Q.  You didn't ask any questions about this?
5  A.  We asked questions about fees, and because of our
6  trusting relationship with Roger, we accepted his responses.
7  Q.  Okay.  I mean, you've run schools in your past?
8  A.  Yeah.
9  Q.  You've been a consultant in the past?
10 A.  Yes, sir.  At a school, yes, sir.
11 Q.  You would consider yourself a fairly -- maybe not
12 financially sophisticated, but a fairly worldly,
13 sophisticated-type person?
14 A.  I can stand on my own two feet, yes, sir.
15 Q.  But you just trusted Roger.  You didn't ask any specific
16 questions about where the money was going?
17 A.  I'm astonished that I fell for it, I mean, everything you
18 just said.  I have a doctorate.  I've run high schools.  I
19 fell for this.  So, yeah.  It's pretty extraordinary.
20 Q.  You don't know David Alcorn?
21 A.  I've seen his name on some documents, but we've never
22 met.
23 Q.  Never spoken to David Alcorn?
24 A.  Not to my knowledge.  I don't remember speaking to him on
25 a call, ever.

Carol L. Naughton, Official Court Reporter

---- A. Tottossy - Cross (By Mr. Grindrod) ----

1  Q.  Okay.
2          MR. YAROW:  That's all the questions I have.  Thank
3  you.
4          THE WITNESS:  Thank you.
5          THE COURT:  Any cross from Defendant Smith?
6                      CROSS-EXAMINATION
7  BY MR. GRINDROD:
8  Q.  Good morning, ma'am.
9  A.  Good morning.
10 Q.  So just to go quickly through this, the main person you
11 dealt with about these things was Roger Hudspeth, right?
12 A.  He was the main person we dealt with, yes.
13 Q.  And Roger worked in Daryl Bank's office in Virginia
14 Beach, right?
15 A.  I think they were partners in the business, but they did
16 work together in that office in Virginia Beach.
17 Q.  And that was called Dominion Investments?
18 A.  Dominion Investments.
19 Q.  And then you also had some dealings with Daryl Bank,
20 right?
21 A.  Yes, sir.
22 Q.  And you understood him to be the person in charge at
23 Dominion Investments?
24 A.  Yes.
25 Q.  And then you had those dealings with Kent Maerki, talked

A. Tottossy - Cross (By Mr. Grindrod)

1   about the phone call?
2   A. Yes.
3   Q. And you understood him to be the person in charge of the
4   Dental Support Plus Franchise in Arizona?
5   A. Yes, sir.
6   Q. And I know you just talked about this with Mr. Alcorn,
7   but those guys -- you said, I think, you fell for it. They
8   ripped you off, essentially, right?
9   A. The organization did, yes.
10  Q. And I think you said on direct, this money was not
11  nothing to you, right? You were careful about it, and you
12  still believed that these things made sense at the time?
13  A. Certainly. At the time we purchased, yeah. And my
14  income had dramatically increased when I left the
15  principalship at Maury. As a private consultant, we had, you
16  know, a bit of excess, and we wanted to take that and invest
17  it towards our retirement.
18  Q. Even when there were questions, like the things -- like
19  the bank account or things that maybe now, in hindsight, you
20  go "Yeah, why would they have me do that," at the time, they
21  gave you an explanation that made sense, right?
22  A. When we asked questions, the responses that we received
23  were plausible, yeah.
24  Q. So we talked about Daryl Bank, Roger Hudspeth, and Kent
25  Maerki. Let's talk quickly about Bill Smith. His full name

A. Tottossy - Cross (By Mr. Grindrod)

1   is Aghee William Smith.  He goes by Bill Smith.
2   A.  Okay.
3   Q.  Mr. Smith never told you anything about Dental Support
4   Plus Franchise, right?
5   A.  I never spoke with him directly, but there were people
6   also involved in the business other than Kent Maerki and
7   Roger and Daryl.  There was a board.  There were people
8   working.  We did receive communication, and I believe on the
9   website there were names of board members and other folks
10  involved.
11  Q.  But you didn't -- you said you didn't speak with
12  Mr. Smith?
13  A.  I wouldn't have expected to speak with him, no.
14  Q.  And that applies to spectrum too; he didn't talk to you
15  about spectrum or sell you spectrum?
16  A.  I wouldn't have anticipated that.  I mean, you know, when
17  we originally purchased, even Dental with Roger, all of our
18  questions stayed right at Dominion.  It was only when we --
19  the radar went up that we started reaching out and trying to
20  figure things out.
21  Q.  Sure.
22          MR. GRINDROD:  I don't have any further questions,
23  Your Honor.
24                          * * * * * *
25

Carol L. Naughton, Official Court Reporter

```
 1
 2                          CERTIFICATION
 3
 4       I certify that the foregoing is a correct excerpt
 5   transcript from the record of proceedings in the
 6   above-entitled matter.
 7
 8
 9                   _____/s/_____
10                         Carol L. Naughton
11                         February 15, 2022
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Carol L. Naughton, Official Court Reporter