```
                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE EASTERN DISTRICT OF VIRGINIA
                              Norfolk Division


   - - - - - - - - - - - - - - - - - -
                                       )
     UNITED STATES OF AMERICA          )
                                       )
     v.                                )   CRIMINAL ACTION NO.
                                       )         2:19cr47
     DAVID ALCORN and                  )
     AGHEE WILLIAMS SMITH II,          )
                                       )
            Defendants.                )
                                       )
   - - - - - - - - - - - - - - - - - -

                     ** Jury Trial - Day 5 **

              EXCERPT TRANSCRIPT OF PROCEEDINGS
                (Cross-Examination of J. Kurtz)

                        Norfolk, Virginia

                        February 7, 2022


   BEFORE:   THE HONORABLE RAYMOND A. JACKSON
             United States District Judge, and a jury


   APPEARANCES:

             UNITED STATES ATTORNEY'S OFFICE
             By:  Andrew C. Bosse
                  Melissa E. O'Boyle
                  Elizabeth M. Yusi
                  Assistant United States Attorneys
                  Counsel for the United States

             RICHARD S. YAROW LLC
             By:  Richard S. Yarow
                  Counsel for Defendant David Alcorn

             FEDERAL PUBLIC DEFENDER'S OFFICE
             By:  Andrew W. Grindrod
                  Lindsay Jo McCaslin
                  Assistant Federal Public Defenders
                  Counsel for Defendant Aghee William Smith II
```

Carol L. Naughton, Official Court Reporter

```
 1                            I N D E X

 2    GOVERNMENT'S
      WITNESSES                                              PAGE
 3
        JACOB KURTZ
 4          Cross-Examination By Ms. McCaslin                  3

 5

 6
                              E X H I B I T S
 7

 8    DEFENDANT SMITH'S
      NO.                                                    PAGE
 9
        132                                                    5
10
```

─────J. Kurtz - Cross (By Ms. McCaslin)─────

1                    * * * * * * *
2        JACOB KURTZ, called by the Government, having been
3 first duly sworn, was examined and testified as follows:
4                    * * * * * * *
5                  CROSS-EXAMINATION
6 BY MS. McCASLIN:
7 Q. Good morning, Mr. Kurtz.
8 A. Good morning.
9 Q. My name is Lindsay McCaslin. I represent Mr. Smith. I
10 have a couple questions about the collateralized fixed-asset
11 planning.
12        MS. McCASLIN: If we can pull up Government's 637.
13 BY MS. McCASLIN:
14 Q. So this has already been offered into evidence. You
15 discussed this with Ms. Yusi, correct?
16 A. I think so, yeah. Is that the first sheet that he gave
17 me? Yes.
18 Q. Now, if we could scroll down to the second page.
19 A. Okay.
20 Q. This handout doesn't mention any specific investment,
21 correct?
22 A. No.
23 Q. It doesn't mention anything about spectrum?
24 A. No, not specifically.
25 Q. It's just a very general handout.

J. Kurtz - Cross (By Ms. McCaslin)

1  A.  Well, he represented it as being a pretty standardized
2  investment process for sophisticated or high-level investment
3  bankers.
4  Q.  And as part of this plan, it looks at specifically a
5  collateral column and a cash flow column, correct?
6  A.  Uh-huh.
7  Q.  And it was your understanding that the cash flow column
8  would be bringing in money each month or fairly consistently,
9  right?
10 A.  Yes.
11 Q.  Now, the collateral side is going to be something that is
12 very low risk, like an annuity or something, correct?
13 A.  I guess, yes.  I think so.  I'm not 100 percent sure what
14 you're asking.
15         MS. McCASLIN:  If we could scroll down to Page 4,
16 please.
17 BY MS. McCASLIN:
18 Q.  So here we see, on the collateral side, a fixed annuity,
19 which is typically what you were relying on for the safer
20 investment, correct?
21 A.  Yes.
22         MS. McCASLIN:  If we could take that down, please.
23 BY MS. McCASLIN:
24 Q.  Now, you understood that Xcel had existing towers in
25 Texas, right?

Carol L. Naughton, Official Court Reporter

J. Kurtz - Cross (By Ms. McCaslin)

1  A.  Yes.
2  Q.  And RapidLink Wireless was going to be updating the
3  system?
4  A.  Yes.
5  Q.  And expanding the system?
6  A.  Yes.
7  Q.  And they were working with Motorola in Texas?
8  A.  I believe Motorola, yes.
9  Q.  And they were working on a push-to-talk system, correct?
10 A.  I remember about that too.  Those were all things that
11 were appealing to me.
12 Q.  Right.
13         MS. McCASLIN:  If we could pull up Smith 132, only
14 for the witness.
15 BY MS. McCASLIN:
16 Q.  Does this look familiar to you?  And we can scroll down
17 to the next couple pages if --
18 A.  Yes.  I looked at this sheet.
19 Q.  So this is one of the handouts that you received about
20 RapidLink Wireless?
21 A.  Yes.
22         MS. McCASLIN:  I move to admit, please.
23         MS. O'BOYLE:  No objection.
24         THE COURT:  The exhibit will be admitted.
25         (Defendant Smith's Exhibit 132 was admitted.)

Carol L. Naughton, Official Court Reporter

J. Kurtz - Cross (By Ms. McCaslin)

1   THE WITNESS: Incidentally, this is one of the
2   sheets that made me feel more comfortable about this as an
3   investment.
4   BY MS. McCASLIN:
5   Q. Because it talks about Motorola, right?
6   A. Sure. There's a lot of reasons why, but it made me feel
7   more comfortable.
8   Q. It also says that this CTS investment has resulted, in
9   2014, in annual revenue of over 300,000, right?
10  A. Uh-huh. Yes, I'm sorry.
11  Q. Thank you.
12      If we could go to Page 2, please. And there's a map
13  of where the towers are, right?
14  A. Yes. A general layout there, from what I was able to
15  gather.
16  Q. And this gave you confidence?
17  A. Yes.
18  Q. Did you do any of your own research on spectrum and the
19  push-to-talk system?
20  A. Well, limited. I relied mostly on what I was told; but,
21  yeah, I mean, a little bit here and there, and it seemed
22  legitimate.
23  Q. And at one point, you e-mailed Bill an article about a
24  regional wireless system that reminded you of it, correct?
25  A. Yes. I found something. I forget exactly what it was

J. Kurtz - Cross (By Ms. McCaslin)

1  now, but yeah.
2  Q.  And when you had questions about Xcel that Bill perhaps
3  couldn't answer, he got Daryl on the phone for you?
4  A.  Once.
5  Q.  Okay.  So you are, of course, aware that Daryl Bank was
6  in charge of Xcel?
7  A.  Was what?
8  Q.  In charge of Xcel Bandwidth.
9  A.  Yes, eventually.
10 Q.  Okay.  And you listened to the conference calls, you
11 mentioned?
12 A.  I listened to two.
13 Q.  And the conference calls that you did hear sounded like
14 business as usual, right?
15 A.  That's what I thought.
16 Q.  Sounded like everything was going really well?
17 A.  That was my hope.
18 Q.  And were those run by Daryl Bank?
19 A.  Were they what?
20 Q.  Were those conference calls held by Daryl Bank?
21 A.  No.  There was a third party, a guy from Texas that was
22 holding them.  I don't remember his name.
23 Q.  Okay.
24 A.  Daryl never held any of those.  He and I spoke
25 separately.

J. Kurtz - Cross (By Ms. McCaslin)

1  Q.  So you were aware that there was another third party
2  involved in this venture?
3  A.  A management company, yes.
4  Q.  And you know from being a businessman that businesses do
5  fail all the time, right?
6  A.  I would say, yeah, there's a high probability of business
7  failure, especially in the first year.
8  Q.  And so when you were considering the risk of investing in
9  something like this, you were considering the business
10 aspects of this venture, correct?
11 A.  I was looking at the hard assets as being the collateral
12 in lieu of an annuity, because this wasn't an annuitized,
13 protected investment.
14 Q.  Right.
15 A.  And hard assets are worth something; spectrum licenses
16 are worth something; equipment is worth something; towers are
17 worth something.  And that gave me the confidence that this
18 is probably the best way to go at the time.
19 Q.  And so when you were evaluating the risk of investing,
20 you weren't in -- you weren't considering that Daryl Bank
21 would be laundering your investor funds, correct?
22 A.  No, I didn't think -- yeah.
23 Q.  You didn't think that Daryl Bank was going to be spending
24 the investor funds on his personal credit card bills?
25 A.  Absolutely did not.

J. Kurtz - Cross (By Ms. McCaslin)

1  Q. And once you sent your money off to Alliance first, you
2  didn't give that money initially to Bill, right?
3  A. No.
4  Q. You didn't write a check to Bill?
5  A. No.
6  Q. You wrote it to the trust company that was working with
7  Daryl Bank?
8  A. The connectivity of the transaction, I'm not 100 percent
9  clear about. I don't know if it went through CTS or -- I'm
10 not sure how the money got from me into the custodian.
11 Q. That's fair. That's fair.
12 A. Okay.
13 Q. But once you did send your money off to Xcel to invest in
14 Xcel, you never got anything back, right?
15 A. That's correct.
16     MS. McCASLIN: Thank you. I have no further
17 questions.
18                  * * * * * * *

Carol L. Naughton, Official Court Reporter

```
 1                         CERTIFICATION
 2
 3      I certify that the foregoing is a correct excerpt
 4   transcript from the record of proceedings in the
 5   above-entitled matter.
 6
 7
 8                  _____/s/_____
 9                         Carol L. Naughton
10                         February 15, 2022
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Carol L. Naughton, Official Court Reporter