```
1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
2                            Norfolk Division

3
   - - - - - - - - - - - - - - - - - - -
4                                      )
      UNITED STATES OF AMERICA         )
5                                      )
      v.                               )        CRIMINAL ACTION NO.
6                                      )             2:19cr47
      DAVID ALCORN and                 )
7     AGHEE WILLIAMS SMITH II,         )
                                       )
8            Defendants.               )
                                       )
9  - - - - - - - - - - - - - - - - - - -

10                      ** Jury Trial - Day 6 **

11               EXCERPT TRANSCRIPT OF PROCEEDINGS
                 (Cross-Examination of S. Newell)
12
                         Norfolk, Virginia
13
                         February 8, 2022
14

15 BEFORE:  THE HONORABLE RAYMOND A. JACKSON
            United States District Judge, and a jury
16

17 APPEARANCES:

18            UNITED STATES ATTORNEY'S OFFICE
              By:  Andrew C. Bosse
19                 Melissa E. O'Boyle
                   Elizabeth M. Yusi
20                 Assistant United States Attorneys
                   Counsel for the United States
21
              RICHARD S. YAROW LLC
22            By:  Richard S. Yarow
                   Counsel for Defendant David Alcorn
23
              FEDERAL PUBLIC DEFENDER'S OFFICE
24            By:  Andrew W. Grindrod
                   Lindsay Jo McCaslin
25                 Assistant Federal Public Defenders
                   Counsel for Defendant Aghee William Smith II
```

```
1                            I N D E X

2    GOVERNMENT'S
     WITNESSES                                          PAGE
3
       SUSAN NEWELL
4          Cross-Examination By Mr. Grindrod              3

5

6

7
                           E X H I B I T S
8    DEFENDANT SMITH'S
     NO.                                                PAGE
9
       3                                                  5
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

S. Newell - Cross (By Mr. Grindrod)

1           * * * * * * *

2           SUSAN NEWELL, called by the Government, having been

3   first duly sworn, was examined and testified as follows:

4           * * * * * * *

5           CROSS-EXAMINATION

6   BY MR. GRINDROD:

7   Q.  Good morning, ma'am.

8   A.  Good morning.

9   Q.  So, ma'am, you mentioned you learned pretty early on that

10  David Alcorn and Kent Maerki had formed this company called

11  "Janus," right?

12  A.  In 2011 we learned that, yes, sir.

13  Q.  Okay.  And especially in those early days, almost all of

14  the information you got about Janus and spectrum came from

15  either Alcorn or Maerki or some combination of those two

16  people, right?

17  A.  Yes, sir.

18  Q.  And you talked about all those conversations and all the

19  information that was shared with you on direct.  We're not

20  going to go back through all of that.  But basically you

21  found that information that you were getting to be credible,

22  right?

23  A.  Yes, sir.

24  Q.  And you didn't just take their word for it, right; you

25  did some of your own research?

———— S. Newell - Cross (By Mr. Grindrod) ————

1  A.  We did a little bit of research before we met them.

2  Q.  Right.

3       MR. GRINDROD:  So let's pull up Government's

4  Exhibit 700A, please.  And this has already been admitted.

5  BY MR. GRINDROD:

6  Q.  So, ma'am, do you remember this chart?

7  A.  I sure do.

8  Q.  And on direct, you said, I think, that all of this

9  information down here was not on the original chart that you

10  got from Alcorn and Maerki, right?

11  A.  That's correct, sir.

12  Q.  So when they gave you information, you asked questions or

13  asked for more information to clarify, right?

14  A.  Yes, sir.

15       MR. GRINDROD:  And we can take that down,

16  Ms. McCaslin.

17  BY MR. GRINDROD:

18  Q.  I'm showing you on the screen here -- this has already

19  been admitted.  This is Alcorn 21.

20       Do you remember this, that you talked about with

21  Mr. Yarow?

22  A.  Yes, sir.

23  Q.  And one of the documents that was attached here was FAQ,

24  right?

25  A.  Yes.

S. Newell - Cross (By Mr. Grindrod)

1   Q.  Frequently asked questions about Janus?

2   A.  Right.

3            MR. GRINDROD:  Let's take a look at Smith Exhibit 3,

4   just for the witness, please.  This has not been admitted.

5   BY MR. GRINDROD:

6   Q.  Is this those FAQs about Janus, ma'am?

7   A.  Yes, sir.

8   Q.  Do you recognize that document?

9   A.  I do.

10           MR. GRINDROD:  Your Honor, I would offer Smith 3.

11           THE COURT:  Any objection?

12           MS. O'BOYLE:  No objection, Your Honor.

13           THE COURT:  It will be admitted.

14           (Defendant Smith's Exhibit 3 was admitted.)

15  BY MR. GRINDROD:

16  Q.  So this is the frequently asked questions, and you got

17  that pretty early on, right?

18  A.  Yes, sir.

19           MR. GRINDROD:  And let's take a look --

20  Ms. McCaslin, could we go to Page 11 -- or sorry, the last

21  page, paragraph 11.

22  BY MR. GRINDROD:

23  Q.  And, ma'am, can you read that part I just highlighted

24  there?

25  A.  Yes.

S. Newell - Cross (By Mr. Grindrod)

1          "Verizon and AT&T will be very interested in
2     obtaining access to additional 800-megahertz band spectrum
3     for their respective cellular networks covering a large part
4     of the U.S."
5     Q.  So that's what -- that kind of thing about the major cell
6     carriers being interested in the spectrum was, not just what
7     they told you, but what they gave you documents about?
8     A.  That's correct.
9     Q.  I'm sorry, I should use an antecedent.  When I say
10    "they," I mean Alcorn and Maerki.  Right?
11    A.  Alcorn and Maerki, yes, sir.
12    Q.  And there were -- this frequently-asked-questions packet
13    that they gave you also gave information on other resources
14    you could look to, right?
15    A.  Yes, sir.
16    Q.  It says you could go to the FCC website and look at
17    certain public documents, right?
18    A.  Yes.
19    Q.  And it refers you to some of those documents?
20    A.  Yes.
21    Q.  It carries over on to the next page, right?
22    A.  Yes, sir.
23    Q.  And so those were the kind of things that you looked at
24    when you were doing your own research, right?
25    A.  We did, sir, yes.

S. Newell - Cross (By Mr. Grindrod)

1   Q.  And from what you were seeing, the stuff that Alcorn and

2   Maerki told you still made sense, right?

3   A.  It did, indeed.

4   Q.  Okay.  And this was -- I think you mentioned this with

5   Mr. Yarow.  You didn't have a background in the EG/BG or

6   whatever, this particular kind of spectrum, right?

7   A.  It was all a learning experience for us, yes, sir.

8   Q.  But you had a pretty extensive background in business?

9   A.  Yes.

10  Q.  And the same with your husband?  He's the Stanford MBA?

11  A.  Yes, that's correct.

12  Q.  And then you had worked in telecom in some capacity for a

13  long time, right?

14  A.  15 years.

15  Q.  And so after all of that, the talking with Alcorn and

16  Maerki, the documents you looked at, this still seemed to you

17  like, hey, this makes sense, right?

18  A.  Yes.

19          MR. GRINDROD:  Okay.  We can take that down,

20  Ms. McCaslin.

21  BY MR. GRINDROD:

22  Q.  And then when it came to the business side of things, you

23  sort of dug into the details there, too, right?

24  A.  I'm detail-oriented, yes.

25  Q.  I wish I were more detail-oriented.

S. Newell - Cross (By Mr. Grindrod)

1            So you went back and forth with Mr. Alcorn about
2  what the specific contract provisions were going to say,
3  right?
4  A.  Yes, sir.
5  Q.  Let's just real quick look at Government's Exhibit 712.
6            MR. GRINDROD:  This has been admitted, I believe.
7            MS. O'BOYLE:  Yes, it has been admitted.
8  BY MR. GRINDROD:
9  Q.  And so this is an e-mail from you, right?
10  A.  Yes, sir.
11  Q.  And you're talking to some of the other folks in your
12  investment group?
13  A.  Yes, sir.
14  Q.  And you're relaying to them information that you learned
15  in a conversation with David Alcorn, right?
16  A.  Yes, sir.
17  Q.  And you are talking about amendments to the agreements
18  and going back and forth over that, right?
19  A.  That's correct.
20            MR. GRINDROD:  We can take that down, Ms. McCaslin.
21  BY MR. GRINDROD:
22  Q.  So through all of these interactions -- the documents,
23  the e-mails, the conversations -- you were confident enough
24  to want to invest, yourself, right?
25  A.  Yes, sir.

S. Newell - Cross (By Mr. Grindrod)

1    Q.  But you were also confident enough that you brought in

2    people that you really cared about to invest also, right?

3    A.  The initial investment, they wanted one investor for

4    350,000, and my husband and I did not want to invest that

5    much, and so we asked would it be agreeable if we talked

6    about this with our friends and family and colleagues.  And

7    that was agreeable, and so we did.

8    Q.  Right.  But you never would have done that if you thought

9    this was a bad idea, right?

10   A.  That's correct.  Absolutely.

11   Q.  And the people you brought in, I mean, some of them were,

12   I guess, other people who were Jackson Hewitt franchisees?

13   A.  Yes.  I would say about half of them were other Jackson

14   Hewitt franchisees, and the others were family and long-time

15   friends.

16   Q.  Folks like your sister, right?

17   A.  My sister.

18   Q.  And two brothers-in-law?

19   A.  Yes, sir.

20   Q.  And when you were talking to these people in your

21   investment group, you were telling them about what Alcorn and

22   Maerki told you, right?

23   A.  That is correct, sir.

24   Q.  Did you show them some of those materials that you got

25   from Alcorn and Maerki?

S. Newell - Cross (By Mr. Grindrod)

1   A.  Yes, sir.

2   Q.  And you told these people that you thought this was a

3   good idea, this is going to be a good investment, right?

4   A.  We went out to meet with them face to face with one of

5   our partners so we could come back and feel more confident

6   telling these people that we all cared about that it was a

7   good investment.

8   Q.  Right.  When you told these people that you thought this

9   was a good investment, told them your understanding of how it

10  worked, obviously you weren't intentionally lying to these

11  people, right?

12  A.  Never.

13  Q.  You told them that because you believed it?

14  A.  Absolutely, sir.

15  Q.  Let's take a look at Government's Exhibit 707, which also

16  has been admitted.

17          So do you remember talking about this e-mail with

18  the prosecutor?

19  A.  Yes, sir.

20  Q.  Okay.  And this is from -- sorry, I just took it down.

21  This is from July 2013?

22  A.  Yes, sir.

23  Q.  It's an e-mail from Mr. Alcorn to you and your husband,

24  right?

25  A.  That is correct.

———S. Newell - Cross (By Mr. Grindrod)———

1  Q.  And Mr. Alcorn tells you that Janus received SEC
2  subpoenas, right?
3  A.  Yes, sir.
4  Q.  But he's basically telling you in this e-mail it's no big
5  deal, right?
6  A.  That's correct.
7  Q.  He's saying the SEC has not made any claims -- let me
8  make sure I get the language right.
9  A.  First sentence of the second paragraph.
10 Q.  Thank you, ma'am.  I should invite you up here to do
11 this.
12         THE COURT:  Ms. Newell, do not do that in the
13 future.
14         THE WITNESS:  Yes, sir.
15 BY MR. GRINDROD:
16 Q.  What does he say in that first sentence of the second
17 paragraph?
18 A.  "It is important to know that the SEC has not made any
19 claims or allegations against us."
20 Q.  What else does he tell you in that paragraph?
21 A.  "Business will remain uninterrupted."
22 Q.  And that explanation, that satisfied you, right?
23 A.  At that time, yes, sir.
24 Q.  Okay.  And Mr. Alcorn also tells you kind of why he's not
25 able to discuss it with you in more detail, right?

─────── S. Newell - Cross (By Mr. Grindrod) ───────

1   A.  Yes.

2   Q.  Basically, he's not supposed to -- his lawyers said not

3   to talk more about it, right?

4   A.  Right.

5   Q.  And after this e-mail, you and -- you put more money into

6   Janus investments, right?

7   A.  Yes.  Every time we invested, something good had

8   happened.

9   Q.  Right.  But I guess here what -- you invested not because

10  David Alcorn hid the SEC investigation from you entirely,

11  right?

12  A.  That's right, sir.

13  Q.  You were able to still have confidence because he

14  convinced you that the SEC investigation was just no big

15  deal?

16  A.  That is correct, sir.

17  Q.  And then we talked about the Napa conference on direct

18  examination, right?

19  A.  At Silverado, yes, sir.

20  Q.  And that was in August of 2013; is that right?

21  A.  That is correct.

22  Q.  So even after that conference -- now jump ahead to

23  September of 2013 with me.

24  A.  Okay.

25  Q.  After that conference, you and your group still believed

S. Newell - Cross (By Mr. Grindrod)

 1   that Janus was going to be able -- was going to be the group

 2   monetizing the licenses, right?

 3   A.  Yes, sir.

 4   Q.  Your understanding was that it was not up to you to go

 5   out and do the groundwork --

 6   A.  Absolutely --

 7   Q.  -- Janus was going to do it?

 8   A.  I'm sorry.  Yes, sir.

 9   Q.  And then we jump ahead to February of 2014, right?

10        MR. GRINDROD:  Let's look at Government's

11   Exhibit 712.  This has already been admitted.

12   BY MR. GRINDROD:

13   Q.  This is another one of these e-mails of you updating your

14   group based on a conversation that you had with Alcorn,

15   right?

16   A.  Yes, sir.

17   Q.  And the conversation that you had with Alcorn was

18   basically that whatever the document said, Janus fully

19   intends to continue to be involved in the process, right?

20   A.  That's correct.

21   Q.  And the process was the process of monetizing the

22   spectrum?

23   A.  That is right.

24   Q.  So when you told Linda and Charlie and George that, you

25   told them that because you believed it was true, right?

S. Newell - Cross (By Mr. Grindrod)

1    A.   Yes, sir.

2    Q.   Based on what Mr. Alcorn told you?

3    A.   That's right.

4    Q.   Okay.

5         MR. GRINDROD:   Let's look at Government's

6    Exhibit 713, which has also been admitted.

7    BY MR. GRINDROD:

8    Q.   So, ma'am, these are your notes from that Janus workshop

9    in Washington, D.C., right?

10   A.   That is correct.

11   Q.   In 2014, June of 2014?

12   A.   Right.

13   Q.   And before this workshop, you knew that Janus had filed

14   for bankruptcy, right?

15   A.   In March of that year.

16   Q.   March of that year?

17   A.   Yes, sir.

18   Q.   And, again, that was something that David Alcorn didn't

19   hide from you, right?

20   A.   Correct.

21   Q.   But he explained it in a way that made it seem like it

22   was no big deal?

23   A.   It had something to do with his other legal issues, yes.

24   Q.   But it wasn't something --

25   A.   It wasn't going to affect us.

S. Newell - Cross (By Mr. Grindrod)

1   Q.  Yeah, it wasn't something you needed to worry about or
2   that was going to affect your ability to make money on the
3   spectrum investment?
4   A.  He certainly said not to worry.
5   Q.  And then at this meeting, the SEC inquiry comes up again,
6   doesn't it?
7   A.  Yes, updating us.
8   Q.  Right.  And these are your notes of what Alcorn told you,
9   right?
10  A.  Correct.
11  Q.  So, again, the message coming from Alcorn and Maerki is
12  "no indication that we're accused of anything," right?
13  A.  Right.
14  Q.  Essentially, the SEC inquiry is no big deal?
15  A.  Right.
16  Q.  Okay.  And, then -- now we're on Page 6.  Again, your
17  notes, right?
18  A.  Yes, sir.
19  Q.  About what Alcorn said?
20  A.  The "DA" to the left of it means that he said it.
21  Q.  And he's telling you here again that it's still possible
22  to monetize these licenses by leasing them back to a major
23  carrier like Sprint, right?
24  A.  That's correct.
25  Q.  That's in June of 2014?

S. Newell - Cross (By Mr. Grindrod)

1    A.   Right, sir.

2    Q.   And so in July of 2013, you knew about the SEC

3    investigation, right?

4    A.   Yes, sir.

5    Q.   Knew about the bankruptcy, right?

6    A.   Yes, sir.

7    Q.   And you're being told you can still license these things

8    back to Sprint or some major carrier?

9    A.   Yes, sir.

10   Q.   So you put more money in in July of 2014, right?

11   A.   Based on this information we were given in that meeting,

12   yes, sir.

13   Q.   Right.  And you never would have done that if you didn't

14   believe the information you were given, right?

15   A.   Correct, sir.

16   Q.   But we're talking about a serious amount of money that

17   you put at stake.  It was like, all told, like, almost a

18   million dollars?

19   A.   That's correct.

20   Q.   So these aren't decisions that you're making lightly or

21   on a whim, right?

22   A.   That is correct.

23        MR. GRINDROD:  Let's look at Government 719, which

24   also has been admitted.

25        Ms. McCaslin, can you jump to Page 9 for me?

——————————— S. Newell - Cross (By Mr. Grindrod) ———————————

1   BY MR. GRINDROD:

2   Q.  Let me scroll up so you can actually see who this e-mail

3   is from.

4         So this is an e-mail from George Cushman, right?

5   A.  He's one of our investing members, yes, sir.

6   Q.  In your little investment group?

7   A.  Yes, sir.

8   Q.  And this is from September of 2014?

9   A.  Yes, sir.

10  Q.  And Mr. Cushman's asking, still in September of 2014,

11  "Are the major players Sprint, AT&T, and Verizon a prospect

12  for our licenses now in the cities we have or later as we

13  have more cities or not at all?"

14        Right?

15  A.  He was asking that, yes, sir.

16  Q.  And so it's clear, at least some of these people in your

17  investment group, all the way through at least September

18  2014, still don't realize that these licenses can't be leased

19  back to a major carrier, right?

20  A.  We're starting to suspect that's the case, yes, sir.

21  That's why we were asking.

22  Q.  Right.  But it's still like a question at that point --

23  A.  Oh, yeah --

24  Q.  -- nobody's come out and told you --

25        THE COURT:  Wait a minute.  Only one of you can talk

S. Newell - Cross (By Mr. Grindrod)

1    at a time, now.

2            THE WITNESS:  I beg your pardon.  I'm sorry, Your

3    Honor.

4            MR. GRINDROD:  I'm sorry.

5    BY MR. GRINDROD:

6    Q.  So it's still just a question at that point.  No one has

7    come out and told you that, right?

8    A.  Correct, sir.

9    Q.  And so in this September 2014 time period, that's when

10   you had that meeting at Mr. Alcorn's house?

11   A.  Yes, sir.

12   Q.  And if Alcorn or any of the principals knew at that point

13   that these licenses couldn't be leased back to a major

14   carrier, they weren't telling you that, right?

15   A.  We were not told that at that meeting.  As of that point

16   in time, we were not told that that was not possible.

17   Q.  If they knew then, they were covering that up from you?

18   A.  Yes, sir.

19           MR. GRINDROD:  We can take that down, Ms. McCaslin.

20   BY MR. GRINDROD:

21   Q.  So, Ms. Newell, that meeting you had with Mr. Alcorn in

22   September 2014, I think you mentioned on direct examination

23   that you had a planned meeting the next day with Dale Gray?

24   A.  Yes, sir.

25   Q.  And you said that was to do due diligence?

S. Newell - Cross (By Mr. Grindrod)

1   A.  Yes, sir.

2   Q.  Due diligence on what?

3   A.  Because our licenses hadn't been monetized to that point

4   in time and it didn't appear that Janus was actively working

5   on it, we felt compelled to try to save our investment by

6   looking for ways to monetize ourselves, and Dale Gray was the

7   only option that we were aware of at the time.

8   Q.  And was Dale Gray involved in a company called RapidLink

9   Wireless?

10  A.  I don't believe that he was a partner in RapidLink

11  Wireless, but he was part of the engineering portion of that

12  potentially.

13  Q.  And was that -- was RapidLink Wireless the company you

14  were talking about due diligence, to looking into?

15  A.  Yes, sir.

16  Q.  Was RapidLink Wireless -- was the plan with RapidLink

17  Wireless to use push-to-talk communications with Motorola

18  technology?

19       MS. O'BOYLE:  Objection.  Hearsay and beyond the

20  scope of the direct.

21       THE COURT:  Well, the question is does she know

22  this?  So I will overrule the objection, only if she knows

23  what the plan was.

24  BY MR. GRINDROD:

25  Q.  Do you know what the general plan was with RapidLink

---
S. Newell - Cross (By Mr. Grindrod)
---

1   Wireless?

2   A.   Based on the meeting we had with Mr. Gray, that's

3   basically what we were told, yes, sir.

4   Q.   What?   What I had asked earlier?

5   A.   That it was a push-to-talk option.

6   Q.   Okay.   And you ended up -- your investment group ended up

7   spending money basically pursuing that option, that

8   push-to-talk option, right?

9   A.   Yes, sir.

10  Q.   And so even though all this monetization through Janus

11  had not worked out, you hadn't given up on trying to figure

12  out a way to make money with these 800-megahertz spectrum

13  licenses, right?

14  A.   We had invested almost $1 million through Janus with

15  absolutely no evidence of any return on investment, and we

16  felt compelled to try to save -- salvage what we could of the

17  investment, and so we pursued this.

18  Q.   And that was, again, before you -- before you would put a

19  bunch of money into RapidLink Wireless, you did some due

20  diligence, right?

21  A.   Yes, sir.

22  Q.   And, ultimately, you determined that it was worth putting

23  about $500,000 into that?

24  A.   It was the only option we had, yes, sir.

25  Q.   I understand.

S. Newell - Cross (By Mr. Grindrod)

1          But that was ultimately what you decided to do,

2    right?

3    A.  I'm not sure it was quite that much, but it was multiple

4    hundred thousand dollars.

5    Q.  Now, obviously, ma'am, none of these investments worked

6    out for you or your friends, right?

7    A.  Correct, sir.

8    Q.  Not Janus?

9    A.  Right.

10   Q.  Not RapidLink Wireless?

11   A.  Right.

12   Q.  And I think you said on direct examination that you felt,

13   on some level, guilty about your involvement in this?

14   A.  Yes, sir.

15   Q.  And responsible?

16   A.  Yes, sir.

17   Q.  Because you -- and you felt that way, guilty and

18   responsible, because you had brought this opportunity to

19   other people and they lost money too, right?

20   A.  That's correct, sir.

21   Q.  And, ma'am, even if you feel that, of course, you did not

22   intentionally lie to anyone about these investments, right?

23          THE COURT:  That question has been asked before,

24   Mr. Grindrod.

25   BY MR. GRINDROD:

Carol L. Naughton, Official Court Reporter

―――――S. Newell - Cross (By Mr. Grindrod)―――――

1   Q.  Ma'am, you only ever told people what you believed to be

2   true, right?

3   A.  That's correct, sir.

4         MR. GRINDROD:  I have no further questions for this

5   witness, Your Honor.

6                         *  *  *  *  *  *  *

7

8                         <u>CERTIFICATION</u>

9

10      I certify that the foregoing is a correct excerpt

11   transcript from the record of proceedings in the

12   above-entitled matter.

13

14

15         _____/s/_____

16                     Carol L. Naughton

17                     February 15, 2022

18

19

20

21

22

23

24

25