```
 1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
 2                          Norfolk Division

 3
    - - - - - - - - - - - - - - - - - -
 4                                      )
       UNITED STATES OF AMERICA         )
 5                                      )
       v.                               )        CRIMINAL ACTION NO.
 6                                      )             2:19cr47
       DAVID ALCORN and                 )
 7     AGHEE WILLIAMS SMITH II,         )
                                        )
 8          Defendants.                 )
                                        )
 9  - - - - - - - - - - - - - - - - - -

10                   ** Jury Trial - Day 7 **

11               EXCERPT TRANSCRIPT OF PROCEEDINGS
                 (Cross-Examination of R. Gibson)
12
                        Norfolk, Virginia
13
                        February 9, 2022
14

15  BEFORE:  THE HONORABLE RAYMOND A. JACKSON
             United States District Judge, and a jury
16

17  APPEARANCES:

18              UNITED STATES ATTORNEY'S OFFICE
                By:  Andrew C. Bosse
19                   Melissa E. O'Boyle
                     Elizabeth M. Yusi
20                   Assistant United States Attorneys
                     Counsel for the United States
21
                RICHARD S. YAROW LLC
22              By:  Richard S. Yarow
                     Counsel for Defendant David Alcorn
23
                FEDERAL PUBLIC DEFENDER'S OFFICE
24              By:  Andrew W. Grindrod
                     Lindsay Jo McCaslin
25                   Assistant Federal Public Defenders
                     Counsel for Defendant Aghee William Smith II
```

1                           I N D E X

2       GOVERNMENT'S
        WITNESSES                                            PAGE
3
         RAEANN GIBSON
4           Cross-Examination By Ms. McCaslin                 3

5                         E X H I B I T S

6

7       DEFENDANT'S
        NO.                                                  PAGE
8
         30                                                   7
9        32                                                   8
         33                                                   9
10       61                                                  22
         10                                                  25
11       482                                                 43

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

R. Gibson - Cross (By Ms. McCaslin)

1                    * * * * * * *

2            RAEANN GIBSON, called by the Government, having been

3    first duly sworn, was examined and testified as follows:

4                    * * * * * * *

5                    CROSS-EXAMINATION

6    BY MS. McCASLIN:

7    Q.  Good afternoon, Ms. Gibson.  My name is Lindsay McCaslin.

8    I represent Bill Smith.

9    A.  Good afternoon.

10   Q.  I just want to start off with some questions about Daryl

11   Bank.  You said that you worked with him at Resource Bank

12   first, right?

13   A.  Correct.

14   Q.  And he was an investment banker there?

15   A.  Investment advisor, financial advisor.

16   Q.  So did he sell stocks, bonds, mutual funds?

17   A.  Yes.

18   Q.  And he was successful?

19   A.  Correct.

20   Q.  And then he had a similar role at Bank of the

21   Commonwealth?

22   A.  Yes.

23   Q.  And there, was he in charge of the investment division?

24   A.  Yes.

25   Q.  So between 2005 and 2017, so about a 12-year period, when

---

---R. Gibson - Cross (By Ms. McCaslin)---

1   Daryl moved employers, you went with him?

2   A.  I did.

3   Q.  You didn't have to go with him, right?

4   A.  No, I didn't.

5   Q.  You didn't get fired from them?

6   A.  No.

7   Q.  You just chose to go with him?

8   A.  Yes.

9   Q.  One of the reasons you stayed with him is because you

10  trusted him?

11  A.  I did.

12  Q.  And Daryl can be very enthusiastic, right?

13  A.  Yes.

14  Q.  He's believable and persuasive?

15  A.  Yes.

16  Q.  And beyond just a boss or a colleague, you loved him,

17  right?

18  A.  I did.

19  Q.  And there was almost nothing Daryl knew that you didn't

20  in the company?

21          MS. O'BOYLE:  Well, objection as to calls for

22  speculation as to what went on in Mr. Bank's head.

23          THE COURT:  Sustained.

24  BY MS. McCASLIN:

25  Q.  You worked with Daryl every day?

———— R. Gibson - Cross (By Ms. McCaslin) ————

1    A.   Yes.

2    Q.   You were copied on just about every e-mail?

3    A.   Several.  Not all, but several.

4    Q.   And he confided in you?

5    A.   What do you mean by "confided" in me?

6              THE COURT:  Don't ask her questions.

7              THE WITNESS:  I'm sorry.

8    BY MS. McCASLIN:

9    Q.   So you were in on every meeting, almost?

10   A.   No.

11   Q.   No?

12   A.   No.

13   Q.   Okay.  You guys had lunch every day together?

14   A.   Not every day.

15   Q.   Most days?

16   A.   All depends.  Many days we didn't take lunch.

17   Q.   Okay.  And any time that you were about to quit, he gave

18   you a raise or a reason to stay, right?

19   A.   No.

20   Q.   No?

21   A.   No.

22   Q.   Okay.  So when you were going to leave after DSPF, you

23   decided to stay with Daryl, right?

24   A.   Yes.

25   Q.   Okay.  And when you were thinking about leaving in 2017,

————— R. Gibson - Cross (By Ms. McCaslin) —————

1    Daryl gave you $10,000, right?

2    A.  That's correct.

3    Q.  And when you were living in Ohio earlier on, he got you

4    to move to Virginia by doubling your pay, right?

5    A.  Correct.

6    Q.  I want to start off by talking about DSPF, and we'll

7    leave DSPF Group for a little bit later.  Okay?

8    A.  Okay.

9    Q.  So DSPF was created by Kent Maerki in Arizona, right?

10   A.  Yes.

11   Q.  And your office was selling franchises of DSPF to the

12   clients?

13   A.  Correct.

14   Q.  Now, many of the clients that Daryl and Roger sold

15   franchises to had clients here in Virginia?

16   A.  Yes.

17   Q.  And your office was able to sell franchises in Virginia

18   because it had been approved as a franchise by the state?

19   A.  Correct.

20          MS. McCASLIN:  Mr. Grindrod, if we can bring up,

21   just for the witness, Smith 30.

22          And for the Court, pursuant to our stipulation,

23   Government 2000, under category A-1, I move to admit this

24   under the State Corporation Commission.

25          THE COURT:  Any objection?

———— R. Gibson - Cross (By Ms. McCaslin)————

1          MS. O'BOYLE:  No objection, Your Honor.

2          THE COURT:  Smith 30 will be admitted.

3          (Defendant Smith's Exhibit 30 was admitted.)

4    BY MS. McCASLIN:

5    Q.  Ms. Gibson, who is this from?

6    A.  Commonwealth of Virginia, State Corporation Commission.

7    Q.  And who is the letter to?

8    A.  Lynne Shelton, Esquire, of Shelton & Power LLC.

9    Q.  Do you know what kind of law Lynne Shelton specialized

10   in?

11   A.  I know one of her specialties was franchises.

12   Q.  And if we can look at this first paragraph, can you read

13   that first sentence, please?

14   A.  "The Division of Securities and Retail Franchising,

15   'Division,' has received the application to renew

16   registration of the above-named franchise in the Commonwealth

17   of Virginia."

18   Q.  Okay.  And the next sentence, please.

19   A.  "Please be advised that the renewal application has been

20   approved with an effective date of June 9, 2012."

21   Q.  Thank you.

22          MS. McCASLIN:  Mr. Grindrod, if we could bring up

23   Smith 32, just for the witness, please.

24          And for the Court, pursuant to the stipulation,

25   Government 2000, under A-18, we move to admit Smith 32.

R. Gibson - Cross (By Ms. McCaslin)

1    THE COURT:  Any objection?

2    MS. O'BOYLE:  No objection, Your Honor.

3    THE COURT:  Smith 32 will be admitted.

4    (Defendant Smith's Exhibit 32 was admitted.)

5  BY MS. McCASLIN:

6  Q.  Who is this letter from?

7  A.  Shelton & Power LLC, Attorneys At Law.

8  Q.  And it is going to who?

9  A.  The Franchise Examiner of the Virginia State Corporation

10 Commission, Securities and Franchising Division.

11 Q.  Now, if I scroll down here a bit, you see that there's a

12 certification here.

13 A.  Yes.

14 Q.  And whose name appears to be signed here at the bottom?

15 A.  Kent Maerki.

16 Q.  Correct.

17    And if you don't mind reading that first paragraph

18 or that first sentence under "Certification."

19 A.  "I certify and swear under penalty of the law that I have

20 read and know the contents of this application, including the

21 Franchise Disclosure Document with an issuance date of

22 January 4, 2011, attached as an exhibit, and that all

23 material facts stated in all those documents are accurate,

24 and those documents do not contain any material omissions."

25 Q.  Thank you, Ms. Gibson.

———————R. Gibson - Cross (By Ms. McCaslin)———————

1  A.  Yes.

2  Q.  I just have one more similar document.

3          MS. McCASLIN:  Mr. Grindrod, for the witness, could

4  you bring up Smith 33.

5          Pursuant to the stipulations under A-18, I move to

6  admit this.

7          MS. O'BOYLE:  No objection, Your Honor.

8          THE COURT:  Smith 33 is admitted.

9          (Defendant Smith's Exhibit 33 was admitted.)

10  BY MS. McCASLIN:

11  Q.  What is this?

12  A.  Uniform Franchise Registration Application.

13  Q.  And who received it?

14  A.  Department of Corporations, San Francisco.

15  Q.  And that was on April 20, 2011?

16  A.  Yes.

17  Q.  Thank you.

18          MS. McCASLIN:  We can take that down, Mr. Grindrod.

19  Thank you.

20  BY MS. McCASLIN:

21  Q.  The franchise of DSPF kept getting approved every year in

22  Virginia until Mr. Maerki shut it down, right?

23  A.  Yes.

24  Q.  And that was in 2014?

25  A.  Yes.

———— R. Gibson - Cross (By Ms. McCaslin) ————

1   Q.  For the marketing materials for Dental Support Plus

2   Franchise, that all came from Mr. Maerki?

3   A.  Yes, it did.

4   Q.  And Mr. Maerki kept the salesmen and the clients informed

5   with memos that he sent out?

6   A.  Yes.

7   Q.  And weekly calls?

8   A.  Yes.

9   Q.  And did you ever join those calls?

10  A.  I didn't.

11  Q.  Okay.  Did you ever have a chance to talk to Mr. Maerki

12  about Dental Support Plus Franchise?

13  A.  I mean, I had conversations with him.  Of course, I'm

14  sure some were about Dental, but not as far as deals.  Again,

15  I handled more on the operational side.  So if I talked to

16  him, it probably would have been about a process, you know,

17  paperwork or sales, things like that.

18  Q.  Mr. Maerki, though, was always optimistic about DSPF?

19          MS. O'BOYLE:  Objection.  Hearsay.

20          THE COURT:  Sustained.

21  BY MS. McCASLIN:

22  Q.  His mood, when you talked to him about DSPF, was

23  positive?

24  A.  Yes.

25  Q.  And he was -- this was such a good plan, that you

R. Gibson - Cross (By Ms. McCaslin)

1   actually convinced your parents, or your parents were
2   convinced to buy $40,000 worth of DSPF?
3   A.   Yes.
4   Q.   So they gave $40,000 to Mr. Maerki?
5   A.   Correct.
6   Q.   And you wouldn't have recommended this to your parents if
7   you had originally thought that DSPF was going to fail,
8   right?
9   A.   Correct.
10  Q.   Now, as we just said, we know that DSPF was shelved in
11  August 2014, right?
12  A.   Yes.
13  Q.   Now, just a few months before Mr. Maerki shut down DSPF,
14  do you recall a conference in Las Vegas?
15  A.   Yes.
16  Q.   Was that around March 2014?
17  A.   Yes, it was.
18  Q.   Did you attend that?
19  A.   I did.
20  Q.   Mr. Maerki spoke at the conference, right?
21  A.   Yes, he did.
22  Q.   Was he very energetic?
23  A.   Yeah.
24  Q.   Encouraging for sales?
25           MS. O'BOYLE:   Objection.   Hearsay.

R. Gibson - Cross (By Ms. McCaslin)

1          MS. McCASLIN:  Your Honor, it's encouraging.

2          THE COURT:  I think she can testify about how she

3   perceived it.  So the Court will overrule it.

4          THE WITNESS:  Yes.

5   BY MS. McCASLIN:

6   Q.  He was encouraging?

7   A.  Yes.

8   Q.  And there was never any advice to stop selling?

9   A.  No.

10  Q.  Now, you and all of the salesmen received a memo from

11  Mr. Maerki on July 5, 2014, that DSPF was out of money,

12  right?

13  A.  Yes.

14  Q.  But two days before that, on July 3rd, Daryl talked to

15  Mr. Maerki individually, right?

16  A.  Yes.

17  Q.  Okay.  So before everybody else, you and Daryl knew that

18  Kent Maerki was about to shelve DSPF?

19         MS. O'BOYLE:  Well, objection.  Lack of foundation.

20         THE COURT:  Sustained.  Sustained as to what Daryl

21  knew.

22         MS. McCASLIN:  Mr. Grindrod, can you bring up

23  Government 271?

24  BY MS. McCASLIN:

25  Q.  Do you recognize this?

—————— R. Gibson - Cross (By Ms. McCaslin) ——————

1   A.  I don't think I'm on that e-mail.

2   Q.  Okay.  I believe you did testify to it on direct,

3   correct?

4           MS. O'BOYLE:  Objection.  Lack of foundation.  No,

5   she did not.

6           THE COURT:  Wait a minute.

7           MS. McCASLIN:  If we can bring up Government 270A.

8           THE COURT:  Hold on.  With respect to the objection,

9   I didn't rule on the objection.

10          It was not clear what you were asking the witness.

11  "I believe you did testify to it."  Are you talking about the

12  exhibit or a specific question or what?

13          MS. McCASLIN:  Your Honor, I'm going to just move on

14  to a different -- I'm just going to move on to a different

15  exhibit.  It will be much more clear.

16          THE COURT:  All right.

17          MS. McCASLIN:  If we can bring up Government's

18  Exhibit 270A, which has been admitted by the government.

19          Just technical difficulties.  Just one moment.

20          (Pause in the proceedings.)

21  BY MS. McCASLIN:

22  Q.  Now, you saw this e-mail just recently, right, just

23  today?

24  A.  Yes, I did.

25  Q.  And if I scroll down, you and Daryl are talking on

R. Gibson - Cross (By Ms. McCaslin)

1    July 3rd, correct?

2    A.   Yes.

3    Q.   And you were talking about how dealing with the clients

4    is going to be hard, right?

5    A.   Yes.

6    Q.   And you are talking about DSPF closing down?

7    A.   Correct.

8    Q.   And you know this two days before the major e-mail gets

9    sent out to all the salesmen?

10   A.   Yes.

11   Q.   Now, the day after this, Mr. Maerki had sent you and

12   Daryl a draft letter from Shelton & Power, right?

13   A.   I don't recall right off.

14   Q.   But Mr. Maerki did continue to send you and Mr. Bank

15   draft memos that he was going to send to the clients?

16   A.   He probably sent them to Mr. Bank, and Mr. Bank might

17   have forwarded them or shown them to me.

18   Q.   So those conversations were going on between Mr. Maerki

19   and Mr. Bank pretty regularly?

20   A.   Yes.

21   Q.   I do want to ask about DSPF Group.

22        MS. McCASLIN:   We can take that exhibit down.

23   BY MS. McCASLIN:

24   Q.   You said on direct that DSPF Group was to help unhappy

25   clients find new buyers for their franchises, right?

```
                      ─── R. Gibson - Cross (By Ms. McCaslin) ───
```

 1  A.  Yes.

 2  Q.  Okay.  And that was managed by Daryl?

 3  A.  Yes.

 4        MS. McCASLIN:  If we can pull up Government 56,

 5  which is admitted.

 6  BY MS. McCASLIN:

 7  Q.  I'm just going to zero in on the agents.  So we've

 8  already gone over that each of these lines is a sale to a

 9  different person, right?

10  A.  Correct.

11  Q.  And there's a column for what agent was involved?

12  A.  Yes.

13  Q.  Now, Bill Smith was not involved in any of these for DSPF

14  Group, correct?

15  A.  Correct.

16  Q.  Tom Barnett was?

17  A.  Yes, he was.

18  Q.  And if I can scroll down, this was where you were

19  tracking the actual transfers, right?

20  A.  Yes.  This is the queue for anyone who was not happy and

21  wanted to put in a request to sell their franchise units.

22  Q.  And so, again, there is a column here for rep?

23  A.  Yes.

24  Q.  That's for the sales representative?

25  A.  Correct.

R. Gibson - Cross (By Ms. McCaslin)

1  Q.  Now, we see Tony Sellers is one of the reps, right?

2  A.  Yes.

3  Q.  Roger and Daryl?

4  A.  Yes.

5  Q.  Mr. Smith is not on this section, correct?

6  A.  No, he's not.

7  Q.  He's not anywhere on these sheets for DSPF Group?

8  A.  No, he's not.

9  Q.  Thank you.

10       So Mr. Smith only sold through Kent Maerki in

11  Arizona?

12  A.  Yes.

13  Q.  Now, you talked about Tony Sellers being on this list to

14  sell his units, right?

15  A.  Yes.

16  Q.  And the one he sold was September 2013?

17  A.  I think there was a few he sold.

18  Q.  Okay.  Now, I am going to bring up, if I can -- just one

19  second -- Government 268.

20       You went over this on direct, right?

21  A.  Yes.

22  Q.  So when we scroll down, this e-mail is about how Tony

23  wanted to sell some of his units, correct?

24  A.  Yes.

25  Q.  And Tom Barnett had a client who wanted to buy units?

———————— R. Gibson - Cross (By Ms. McCaslin) ————————

1   A.  Yes.

2   Q.  Now, you guys had set this up as a blind sale, correct?

3   A.  Yes.

4   Q.  So Tom Barnett didn't know whose units his client was

5   buying from?

6           MS. O'BOYLE:  Objection as to what Tom Barnett knew.

7           THE COURT:  Sustained.

8   BY MS. McCASLIN:

9   Q.  You didn't tell Tom Barnett that his client was buying

10  units from Tony Sellers?

11  A.  I did not.

12  Q.  And on this e-mail up at the top, is this Tony Sellers's

13  e-mail address?

14  A.  Yes, it is.

15  Q.  Is this Tom Barnett's e-mail address?

16  A.  Yes, it is.

17  Q.  And you're on this as well, right?

18  A.  Yes.

19  Q.  Now, Daryl says that Tony Sellers desires to remain

20  anonymous.

21  A.  Yes.

22  Q.  He gave several reasons.  Two of them are not

23  broadcasting to his clients that he is selling --

24  A.  Yes.

25  Q.  -- and the next one is not broadcasting to the sales

R. Gibson - Cross (By Ms. McCaslin)

1   force that a top salesman was liquidating.

2   A.  Correct.

3   Q.  Now, Tony had actually purchased 15 units of DSPF, right?

4   A.  I don't know exactly how many units he purchased.

5           MS. McCASLIN:  Can we bring up Government 200F?

6   BY MS. McCASLIN:

7   Q.  Tony Sellers is on this spreadsheet for DSPF?

8   A.  Yes.

9   Q.  And does it show how many units over here?

10  A.  Yes.

11  Q.  How many?

12  A.  15.

13  Q.  Now, the amount being purchased on the third line down,

14  how much was Tony Sellers buying of DSPF?

15  A.  300,000.

16  Q.  And if I could just scroll down a bit, this is the amount

17  that DSPF actually received from Tony Sellers, right?

18  A.  This isn't my spreadsheet.

19  Q.  Correct.

20  A.  This was created from Kent Maerki's company.

21  Q.  Correct.

22  A.  It states that this was the amount received.  Where it

23  was received or who by, I didn't know.

24  Q.  How much does it say that was received?

25  A.  On that third line, 200,000.

R. Gibson - Cross (By Ms. McCaslin)

1   Q.  Thank you.

2       Now, of all the people, Tony selling his franchises

3   would have signaled that he had lost faith in DSPF, right?

4   A.  I don't know why Tony Sellers was selling his units.

5   Q.  Correct.

6       But Daryl said that he did not want to broadcast

7   Tony's sales to the other salesmen.

8   A.  Correct.

9   Q.  And the fact that Tony did sell a unit and was trying to

10  sell units was never broadcast on any of the weekly calls or

11  memos that were sent out to salesmen, that you saw, right?

12      MS. O'BOYLE:  Objection.  Lack of foundation.

13      THE COURT:  Sustained.

14  BY MS. McCASLIN:

15  Q.  Did you see any of the memos or marketing materials for

16  DSPF?

17  A.  Did I see any of them?  Yes.

18  Q.  So you saw some of the written materials from Kent Maerki

19  about updates on DSPF?

20  A.  Yes.

21  Q.  Did any of those say that Tony Sellers wants to sell his

22  units?

23  A.  No.

24  Q.  Thank you.

25      MS. McCASLIN:  And if we could go back to

R. Gibson - Cross (By Ms. McCaslin)

1   Government 268, just briefly.

2   BY MS. McCASLIN:

3   Q.  Now, after Mr. Maerki says that he's a strong proponent

4   of transparency -- just a moment, Ms. Gibson.

5           So Daryl says to Kent "You and I had numerous

6   conversations about this transaction."

7           Correct?

8   A.  Yes.

9   Q.  And "This should not be aired through cc'ing the whole

10  group"?

11  A.  Yes.

12  Q.  Thank you.

13          MS. McCASLIN:  We can take that down.

14  BY MS. McCASLIN:

15  Q.  To switch gears a bit and talk about Dominion, how many

16  people worked in the office at Dominion?

17  A.  It depends on the time frame.  Early on, it was just

18  Daryl and I.  Towards the end, there was, I want to say,

19  maybe 10 to 15 total, probably was the most we had.

20  Q.  And Dominion also had an attorney that you regularly

21  worked with, right?

22  A.  Yes.

23  Q.  What was his name?

24  A.  Billy Seabolt.

25  Q.  And you and Daryl spoke to Mr. Seabolt often?

———— R. Gibson - Cross (By Ms. McCaslin) ————

1   A.   Yes.

2   Q.   The only people that had contact with Mr. Seabolt,

3   though, were inside your office typically, right?

4   A.   Yes.

5   Q.   The salesmen weren't part of those calls with the

6   attorney?

7   A.   No.

8   Q.   And your office worked with other attorneys at various

9   times?

10  A.   Yes.

11  Q.   You also worked with Revzon Consulting?

12  A.   Yes.

13  Q.   And am I correct that Revzon Consulting, or Mr. Revzon,

14  was a compliance officer for Dominion?

15  A.   He was a -- he was one that we consulted or contracted

16  with for compliance.

17  Q.   And you and Daryl also spoke to Mr. Revzon regularly?

18  A.   Yes.

19  Q.   And the salesmen were not part of those calls, either,

20  right?

21  A.   He actually came to a couple of our seminars where he

22  spoke at the seminars where the sales representatives were at

23  as well.

24  Q.   Right.  But on the phone calls, he wasn't part of

25  those -- or they weren't part of those?

———————— R. Gibson - Cross (By Ms. McCaslin) ————————

1   A.  No, correct.

2   Q.  Now that you mention conferences...

3           MS. McCASLIN:  Mr. Grindrod, can we pull up

4   Smith 61, just for the witness.

5   BY MS. McCASLIN:

6   Q.  Ms. Gibson, do you recognize this?

7   A.  Yes.

8   Q.  Is this an accurate representation of what was posted for

9   your business?

10  A.  Yes.

11          MS. McCASLIN:  I move to admit Smith 61.

12          THE COURT:  Any objection?

13          MS. O'BOYLE:  No objection, Your Honor.

14          THE COURT:  Smith 61 will be admitted.

15          (Defendant Smith's Exhibit 61 was admitted.)

16  BY MS. McCASLIN:

17  Q.  So who is this person by the podium?

18  A.  That is Les Revzon.

19  Q.  And he has a board next to him, and what does it say in

20  large letters?

21  A.  "Compliance."

22  Q.  And the two pictures below show a variety of men in

23  seats, correct?

24  A.  Correct.

25  Q.  So they are kind of in a seminar room?

---R. Gibson - Cross (By Ms. McCaslin)---

1   A.   Yes.

2   Q.   And are they listening to a presentation by Les Revzon?

3   A.   Yes.

4   Q.   Thank you.

5        And this was through Dominion Investment Group?

6   A.   Yes.

7        MS. McCASLIN:   We can take that down, please.

8   BY MS. McCASLIN:

9   Q.   Now, you also worked with Summit Trust?

10  A.   Yes.

11       MS. McCASLIN:   If we could bring up Government 73,

12  which is already admitted, and if we could go to Page 29.

13  BY MS. McCASLIN:

14  Q.   Who is Kevin Brown?

15  A.   He's the president of Summit Trust Company.

16  Q.   And this bio says that he has nearly -- he has 26 years

17  of experience in virtually all aspects of running a

18  broker/dealer, right?

19  A.   Correct.

20  Q.   I'll just scroll.

21       And who is this?

22  A.   George Brown.   He's the chief marketing officer for

23  Summit Trust Company.

24  Q.   So they are kind of the two that are in charge of Summit,

25  right?

R. Gibson - Cross (By Ms. McCaslin)

1   A.   Yes.

2   Q.   Under his picture, it says that for the past 22 years,

3   he's been actively involved in choosing money managers for

4   both his personal high-net-worth clients and for his

5   institutional clients, right?

6   A.   Yes.

7   Q.   Now, Mr. Bank also had a CPA?

8   A.   Yes.

9   Q.   That happened with accounting and taxes?

10   A.   Yes.

11   Q.   And at one point, Daryl had an independent audit of the

12   financials of DIG, right, Dominion Investment Group?

13   A.   Yes.

14   Q.   And do you recall that CPA was Robert Guest?

15   A.   Yes.

16        MS. McCASLIN:   If we could bring up Smith 10, just

17   for the witness.

18   BY MS. McCASLIN:

19   Q.   Does this look familiar to you?

20   A.   Yes.

21   Q.   And what is it?

22   A.   This is a letter from Robert Guest at Guest, Peavy &

23   Guest, in regards to his findings of doing an audit.

24        MS. McCASLIN:   Your Honor, under the stipulations

25   for Government's Exhibit 2000, under A-18, we move to admit

```
                          ─── R. Gibson - Cross (By Ms. McCaslin) ───
```

1   Smith 10.

2           THE COURT:  Any objection to Smith 10?

3           MS. O'BOYLE:  No objection, Your Honor.

4           THE COURT:  Smith 10 will be admitted.

5           (Defendant Smith's Exhibit 10 was admitted.)

6   BY MS. McCASLIN:

7   Q.  Now, can you read this second paragraph from Mr. Guest?

8   A.  Yes.

9           "The date of my engagement began on May 19, 2014.

10  Mr. Bank hired me due to concerns he had regarding the

11  previous CFO, specifically relating to any misappropriation

12  of funds within the accounting system.  Mr. Bank gave me

13  complete access to all of the accounting records.  During my

14  time spent, which was over a six-week period, I found no

15  substantiation to the concerned allegations."

16  Q.  Thank you.

17          MS. McCASLIN:  We can take that down.

18  BY MS. McCASLIN:

19  Q.  Now, obviously, Daryl was the head of the office.

20  A.  Yes.

21  Q.  And you're aware that he had the FINRA ban?

22  A.  Yes.

23  Q.  And he didn't necessarily hide it, correct?

24  A.  No, he didn't.

25  Q.  But you and Daryl would tell people that Daryl was kind

——————— R. Gibson - Cross (By Ms. McCaslin) ———————

1   of a whistleblower?

2   A.   Yes.

3   Q.   Or that there was a personality conflict and that Daryl

4   took the high road by not fighting it?

5   A.   I never heard that.

6   Q.   So the whistleblower was the more common?

7   A.   Yes.

8   Q.   Now, you did mention on direct that when the company was

9   moving from Virginia to Florida in 2015, it was because of

10  the Virginia State Corporation Commission investigation; is

11  that right?

12  A.   Yes.

13  Q.   You didn't tell people that that's why the company was

14  shutting down all the businesses and reopening them in

15  Florida, right?

16  A.   No, we did not.

17  Q.   Moving on to spectrum, the salesmen had Monday calls for

18  spectrum as well; is that right?

19  A.   Some of it was -- spectrum was brought in to some of

20  those Monday morning calls that Kent Maerki did.

21  Q.   And Daryl presented on those?

22  A.   Yes, he did.

23  Q.   Because spectrum and dental, DSPF, were happening at the

24  same time?

25  A.   Correct.

─────────── R. Gibson - Cross  (By Ms. McCaslin) ───────────

1   Q.  And those calls, if you're aware, have sales agents that

2   are across the country?

3   A.  Yes.

4   Q.  Now, you first heard about spectrum through Kent Maerki?

5   A.  Yes.

6   Q.  Did Mr. Maerki -- well, Mr. Maerki regularly brags about

7   his past business experiences, right?

8   A.  Yes.

9   Q.  He's talked about how he made clients millions of dollars

10  in the '80s and '90s?

11  A.  Yes.

12  Q.  And he said that he's mentioned in two books written

13  about spectrum?

14  A.  Yes.

15  Q.  Do you know the names?

16  A.  "Money From Thin Air" and "Wireless Network" or "Wireless

17  Nation."

18  Q.  And you've also heard Mr. Maerki referred to as an icon

19  in the spectrum industry?

20  A.  Yes.

21  Q.  And you and Daryl told people that as well, right?

22  A.  I, probably, not so much.  Daryl is the one who would

23  have been presenting more.  So, yes.

24  Q.  You saw it on the marketing materials, though, as well,

25  right?

R. Gibson - Cross (By Ms. McCaslin)

1   A.   Yes.

2   Q.   So if a salesman was going to offer one of Daryl's

3   products, like Spectrum 100, they would get the information

4   about Spectrum 100 from your office?

5   A.   Correct.

6   Q.   And most of the information in those marketing materials,

7   you said, came from David Alcorn and Kent Maerki?

8   A.   Yes.

9   Q.   Now, we've seen a lot of advertisements in the last two

10  days, so I won't open that up again.  But you didn't --

11  you're not aware of any salesmen providing input into those

12  marketing materials, are you?

13  A.   No.

14  Q.   Now, salesmen were able to call Daryl and set up a

15  conference call for him to do a sales pitch for spectrum,

16  right?

17  A.   Yes.

18  Q.   And salesmen took him up on that offer?

19  A.   Yes, they did.

20  Q.   And Bill called Daryl to have Daryl give pitches for his

21  clients?

22  A.   Yes.

23  Q.   And Bill Smith would also call Daryl if he and/or a

24  client had questions about the offering?

25  A.   Yes.

R. Gibson - Cross (By Ms. McCaslin)

1  Q.  Now, when a client purchased an investment, the salesman

2  got a commission?

3  A.  Correct.

4  Q.  And you worked in multiple banks before Dominion.

5  Salesmen often get paid by commission?

6  A.  Yes.

7          MS. McCASLIN:  If we could bring up Government 206,

8  please, which is admitted.

9  BY MS. McCASLIN:

10  Q.  Now, we are looking at the DSPF units but only for the

11  Dominion office, right?

12  A.  Yes.

13  Q.  So if we look on the right-hand side, the agents listed

14  down are pretty much all Daryl?

15  A.  Yes.

16  Q.  And then when we get to a second page, there's a couple

17  other names but not Mr. Smith?

18  A.  Correct.

19  Q.  Now, the second-to-the-last column is called "Override

20  Received"; is that right?

21  A.  Yes.

22  Q.  What is an override?

23  A.  It would be like if there was a bonus or an additional --

24  if Kent's office, if they -- they sent a referral fee, so if

25  there was an override for somebody or, again, an additional

———— R. Gibson - Cross (By Ms. McCaslin) ————

1   incentive, they would put that on there.

2   Q.  Okay.  So, for example, one of the overrides went to

3   Terri Walsh?

4   A.  Yes.  And, actually, let me correct myself a little bit.

5        Ms. Walsh referred a client; I think it was Patricia

6   Hundley.  So if we had a client to refer somebody else in,

7   they would get paid a referral fee for that.

8   Q.  Right.

9        And so the salesmen and the clients could both get

10  referral fees?

11  A.  Correct.

12  Q.  And the salesmen could get bonuses from or referral fees

13  from Kent Maerki by bringing on other salesmen, correct?

14  A.  I don't know what Kent's arrangement was or how he set

15  those up for them.

16  Q.  Now, there were conferences for spectrum, right?

17  A.  Yes.

18  Q.  And there was one in Napa in August 2013?

19  A.  Yes.

20  Q.  And you were at that?

21  A.  I was.

22  Q.  Now, the Janus Spectrum had just recently gotten the

23  first round of their FCC licenses.  Do you remember that?

24  A.  I don't remember that being right at that time.

25  Q.  Do you remember the mood being very upbeat?

———————— R. Gibson - Cross  (By Ms. McCaslin) ————————

1   A.   Yes.

2   Q.   And for the spectrum offerings through Dominion, Summit

3   Trust was involved, at least in the beginning?

4   A.   Yes.

5   Q.   And you mentioned that if a client had paid $50,000 for a

6   Spectrum 100 license, their Summit account would show

7   $50,000?

8   A.   That's correct.

9   Q.   That amount, until it failed, never went up or down,

10  right?

11  A.   Correct.  Did not.

12  Q.   And it wouldn't have gone up and down unless you had

13  called Summit or e-mailed them and asked to change it?

14  A.   That's right.

15  Q.   And so the amount didn't fluctuate depending on how well

16  the business was doing?

17  A.   Correct.

18  Q.   And so it looked like $50,000 was always in the account?

19  A.   Yes.

20  Q.   Now, the salesmen weren't able to change the amount that

21  showed in the Summit Trust statements, right?

22  A.   They were not.

23  Q.   Now, I know that there's a lot of entities, and the word

24  "spectrum" has been thrown around, so I just want to be

25  clear.

─────────── R. Gibson - Cross (By Ms. McCaslin) ───────────

1          Spectrum 100, Prime Spectrum --

2          Which is Tony Sellers, right?

3   A.  Correct.

4   Q.  -- and Janus Spectrum Group, they are all similar in that

5   they are pooling people together to get an FCC license?

6   A.  Yes.

7          MS. McCASLIN:  If we could pull up Government 314,

8   which is admitted.

9   BY MS. McCASLIN:

10  Q.  Now, what spreadsheet is this for?

11  A.  This page here is the sales tracker for Janus Spectrum

12  Group.

13  Q.  There's a column for agent, right?

14  A.  Yes.

15  Q.  None of these are Bill Smith?

16  A.  No.

17  Q.  And if I continue down, none of the agents for Janus

18  Spectrum Group are going to be Bill Smith?

19  A.  Nope.

20          MS. McCASLIN:  If we could bring up Government 59.

21  BY MS. McCASLIN:

22  Q.  And what spreadsheet is this for?

23  A.  This is the sales tracker sheet for Spectrum 100.

24  Q.  Okay.  And, of course, Bill Smith did sell under

25  Spectrum 100?

─────────── R. Gibson - Cross (By Ms. McCaslin) ───────────

1   A.  Yes.

2   Q.  So if we could take -- I know the writing is very small,

3   so bear with me.  If we can look at that second line down, it

4   says -- line 21 -- for Sandra Bear, right?

5   A.  Yes.

6   Q.  How much did she invest?

7   A.  100,000.

8   Q.  Move over to the rest of that line.

9       So we see the 100,000 on the far left now, right?

10  A.  Yes.

11  Q.  And Bill Smith sold that?

12  A.  He did.

13  Q.  And his commission was 12,000?

14  A.  Yes.  At that time, it was -- they were at 12 percent.

15  Q.  Right.  So it's 12 percent across the board?

16  A.  Correct.

17  Q.  So it didn't fluctuate depending on if 25,000 were sold

18  or 500,000 were sold?

19  A.  Correct.

20       MS. McCASLIN:  We can take that down, please.  Thank

21  you.

22  BY MS. McCASLIN:

23  Q.  And for all of those groups -- Spectrum 100, Prime

24  Spectrum, Janus Spectrum Group -- all of the marketing

25  materials always said stuff like "Spectrum is the new black

R. Gibson - Cross (By Ms. McCaslin)

1  gold," right?

2  A.  Yes.

3  Q.  And "beachfront property"?

4  A.  Yes.

5  Q.  And then a bit later, we have Xcel Bandwidth?

6  A.  Yes.

7  Q.  Now, Xcel Bandwidth, unlike the other ones, actually had

8  an existing tower system in Texas, right?

9  A.  That's correct.

10  Q.  It had actual towers with actual signals?

11  A.  Yes.

12  Q.  And it had existing customers on that system?

13  A.  Yes, it did.

14  Q.  And Xcel Bandwidth was working with a company called

15  BearCom?

16  A.  Yes.

17  Q.  And BearCom is a Motorola dealer, right?

18  A.  Yes.

19  Q.  And a lot of the marketing materials talk about how Xcel

20  is working with Motorola, right?

21  A.  Yes, I believe it did.

22  Q.  And BearCom, because they have already been working with

23  the system, is familiar with the customers on the system,

24  right?

25  A.  Yes.

───────── R. Gibson - Cross (By Ms. McCaslin) ─────────

1   Q.  And the customers that were already on the system

2   included independent school districts?

3   A.  Yes.

4   Q.  Towing companies?

5   A.  Yes.

6   Q.  Concrete companies?

7   A.  Yes.

8   Q.  Car service companies?

9   A.  Yes.

10  Q.  Landscaping companies?

11  A.  Yes.

12  Q.  And so that push-to-talk is really geared toward

13  industries?

14  A.  Yes.

15  Q.  And you went to Texas and saw the tower system, right?

16  A.  Yes.

17  Q.  And you met with customers that were using the system?

18  A.  I did not meet with actual customers.

19  Q.  You did not.  Okay.  But you did see towers?

20  A.  The actual equipment, yes.

21  Q.  Okay.  You saw the equipment.

22          And, in fact, Bill went to Texas to learn about Xcel

23  as well, right?

24  A.  Yes.

25  Q.  He went down there to see the system and meet the team?

R. Gibson - Cross (By Ms. McCaslin)

1   A.  Yes.

2   Q.  And the point of Xcel was to expand that existing network

3   to other areas of the country, right?

4   A.  Yes.

5   Q.  Now, we had mentioned earlier that Daryl was also working

6   with Bob LaBine with RapidLink Wireless to do this?

7   A.  Correct.

8   Q.  And Bob LaBine had applied for his own spectrum licenses,

9   too, right?

10  A.  That, I don't know.

11  Q.  Okay.  That's fair enough.

12          THE COURT:  We're going to stop right here for a

13  break.  We'll take a 15-minute break at least.

14          (The jury exited the courtroom.)

15          (Recess from 3:59 p.m. to 4:20 p.m.)

16          THE COURT:  We may have to go at least to 5:30 to

17  accomplish what you want to do, but we'll see if we can

18  accommodate both parties here.

19          MS. O'BOYLE:  Thank you, Your Honor.

20          (The jury entered the courtroom.)

21          THE COURT:  Let the record reflect all jurors are

22  present in the courtroom.

23          MS. O'BOYLE:  The United States agrees.

24          MR. YAROW:  Mr. Alcorn agrees.

25          THE COURT:  You may be seated.

—————— R. Gibson - Cross (By Ms. McCaslin) ——————

1           Ladies and gentlemen, before we get started, I want

2      to address one thing here.

3           To the extent you cannot see or hear, raise your

4      hand, and we will recognize you, and we will make the

5      adjustment with respect to documents on the screen, or if you

6      cannot hear, I think I said early on raise your hand, and

7      someone up here will recognize it, and we will get the

8      witness to speak louder or do what we need to do.

9           One other thing I want to mention.  I think several

10     of you indicated you would like permission to go outside for

11     lunch.  This building has 11 courtrooms in it.  Usually we

12     might be running 11 courtrooms in a day.  Because of the

13     pandemic, we can only run two trials in the courthouse at a

14     time.  We're using three courtrooms.  You are assembling in

15     one; the public is over here on the left; and we're using

16     this courtroom to space you and to keep you apart.

17          The Chief Judge for the United States District Court

18     for the Eastern District of Virginia, where we're located,

19     has issued protocols that we're to follow to avoid having a

20     problem; wearing a mask, separating, avoiding having jurors

21     have to go out in the street for lunch, and et cetera.  They

22     are among the protocols that we are to follow.  So it's

23     painful for everybody, but we have to follow the protocols to

24     make sure we don't have any problems.  So far, we haven't

25     developed any problems doing business in here in the

R. Gibson - Cross (By Ms. McCaslin)

1    courthouse because we've been following the protocols.

2           So I understand.  I would love to be under a tree

3    doing this trial in warm weather, but it's not happening.  So

4    we're going to have to follow the protocols, so please bear

5    with us for a while.

6           All right.  You may continue.

7    BY MS. McCASLIN:

8    Q.  All right.  So before we broke for a short recess, we

9    were talking about RapidLink Wireless working with Xcel,

10   right?

11   A.  Yes.

12   Q.  Now, RapidLink was supposed to be trying to help expand

13   the Texas system, correct?

14   A.  Yes.

15   Q.  Now, Bob LaBine and RapidLink Wireless, if you recall,

16   would let Daryl know how much money they needed in order to

17   keep expanding it.

18           Are you aware of that?

19   A.  That, I don't know.

20   Q.  Okay.  So you're not sure, or are you sure -- do you know

21   whether or not Daryl was able to keep up with the payments to

22   Bob LaBine?

23   A.  I don't know.  I know we took over at some point and

24   purchased that CTS system, instead of RapidLink doing it, but

25   I don't recall what happened in that instance.

———— R. Gibson - Cross (By Ms. McCaslin) ————

1   Q.  Okay.  And that's fine.

2           Now, eventually, Xcel did default, right?  Somebody

3   else took over that tower system?

4           MS. O'BOYLE:  Well, objection.  Lack of foundation.

5           THE COURT:  She said she didn't know.  So let's see

6   if you can give her further details or something so that she

7   can answer you specifically.

8           MS. McCASLIN:  Yes, Your Honor.

9   BY MS. McCASLIN:

10  Q.  Daryl no longer owns that tower system in Texas, right?

11  A.  Correct.

12  Q.  Are you aware of who else owns it?

13  A.  I'm not.

14  Q.  Okay.  But we did see on direct examination the money

15  move sheet for Xcel, right?

16  A.  Yes.

17  Q.  And there was about 41 percent of the investor money that

18  stayed with that investment.  Does that sound right?

19  A.  Yes.

20  Q.  Now, the money move sheet wasn't available to the

21  clients, was it?

22  A.  No, it wasn't.

23  Q.  It wasn't available to the salesmen?

24  A.  No.

25  Q.  And you can't fund a project that big when somebody is

R. Gibson - Cross (By Ms. McCaslin)

1   stealing 60 percent of the money, right?

2   A.  Correct.

3   Q.  I do have just a few questions about the financials of

4   the company.

5        You had access to all the bank accounts for

6   Dominion; is that right?

7   A.  Yes.

8   Q.  The salesmen did not have access to those accounts?

9   A.  They did not.

10  Q.  And neither did the clients?

11  A.  No.

12  Q.  And the only people who had access to the money move

13  sheet were in your office?

14  A.  Correct.

15  Q.  None of the paperwork for Spectrum 100 or the others

16  explained to the clients how the money was being moved,

17  right?

18  A.  Correct.

19  Q.  The investment summary for them didn't explain it?

20  A.  It did not.

21  Q.  On top of that, there were several people in the office

22  who had an American Express card under Daryl's name, right?

23  A.  Yes.

24  Q.  You had a credit card under Daryl's name?

25  A.  I did.

R. Gibson - Cross (By Ms. McCaslin)

1    Q.   Daryl obviously had one?

2    A.   Yes.

3    Q.   Roger Hudspeth?

4    A.   Yes.

5    Q.   Daryl's wife?

6    A.   Yes.

7    Q.   And Doug Dunn?

8    A.   Correct.

9    Q.   And Daryl paid for all the bills for those cards?

10   A.   Yes.

11   Q.   Now, you all had access to the monthly statements online?

12   A.   I know Daryl and I did, and probably Catrina.  I don't

13   think the others did.

14   Q.   Okay.  But you typically handled actually paying the bill

15   for Daryl; is that right?

16   A.   Most of the time.

17   Q.   And you were aware that some of the employees, like Doug

18   Dunn, were using the American Express card on themselves,

19   right?

20   A.   We didn't find that out until after the fact.

21   Q.   So when Doug Dunn left Dominion --

22        Right?

23   A.   Yes.

24   Q.   -- Daryl accused him of stealing funds?

25        MS. O'BOYLE:  Objection.  This is beyond the scope

—————— R. Gibson - Cross (By Ms. McCaslin) ——————

1    of direct.

2         MS. McCASLIN:  It's not.  It's going to where all

3    the money is going in Dominion.

4         MS. O'BOYLE:  Objection.  She is attempting to

5    pre-impeach a witness.

6         THE COURT:  Objection sustained.

7         And the Court was going to raise a relevancy on it.

8    I mean, you're talking about someone taking some money out of

9    the American Express card, and this whole case is about

10   something basically different, about how the money is being

11   handled with respect to these investments.  So the Court

12   sustains that objection.

13   BY MS. McCASLIN:

14   Q.  Bill didn't have an American Express card, though, right?

15   A.  He did not.

16   Q.  And Daryl did use investor funds for his own personal

17   use, right?

18   A.  Yes.

19         MS. McCASLIN:  If we could pull up, just for the

20   witness, Smith 482, Mr. Grindrod.

21   BY MS. McCASLIN:

22   Q.  I'm aware you haven't seen this in a while, so I'm just

23   going to scroll so that you know what you're looking at.

24   Okay?

25   A.  All right.  Thank you.

R. Gibson - Cross (By Ms. McCaslin)

1    Q.  Does this look familiar?

2    A.  Yes.

3    Q.  And does this look familiar?

4    A.  Yes.

5    Q.  So what are you looking at right now?

6    A.  These are wire request forms, and the first page that we

7    saw was a wire confirmation from the bank.

8            MS. McCASLIN:  I move to admit Smith 482.

9            MS. O'BOYLE:  No objection.

10           THE COURT:  Smith 482 will be admitted.

11           (Defendant Smith's Exhibit 482 was admitted.)

12   BY MS. McCASLIN:

13   Q.  Now, this was, you said on the first page, a wire

14   confirmation; is that right?

15   A.  Yes.

16   Q.  For how much money?

17   A.  $78,000.

18   Q.  Going from what account?

19   A.  Dominion Private Client Group.

20   Q.  To where?

21   A.  To Daryl or Catrina Bank.

22   Q.  And what is this sheet?  It looks different than the

23   other one.

24   A.  Yes.  This is the wire request form that had to be

25   completed and signed off on and sent to the bank to request

R. Gibson - Cross (By Ms. McCaslin)

1    for that wire to be done.

2    Q.   Now, who is the accountholder?

3    A.   Dominion Private Client Group.

4    Q.   And how much money is being wired?

5    A.   $19,100.

6    Q.   And down below, what is it for?

7    A.   It says the name is "Watch U Want, Inc."

8    Q.   Do you know what Daryl was buying?

9    A.   A watch.

10   Q.   And that happened on December 20 of 2013, right?

11   A.   Yes.

12   Q.   And this came out of the business account?

13   A.   Yes, it did.

14   Q.   And just a couple days later, on December 23rd, 2013,

15   there's another wire transfer, right?

16   A.   Yes.

17   Q.   And how much is that for?

18   A.   That is 8,000.

19   Q.   And what is it for?

20   A.   "Watch U Want."

21   Q.   What was Daryl buying?

22   A.   A watch.

23   Q.   And just a couple weeks later, in January 2014, did he

24   buy another watch?

25   A.   Yes.

R. Gibson - Cross (By Ms. McCaslin)

1   Q.  How much was it for?

2   A.  12,300.

3   Q.  Were these for his personal use?

4   A.  As far as I know, yes.

5   Q.  This is another wire.  How much is it for?

6   A.  $65,000.

7   Q.  And it's leaving the business account and going to where?

8   A.  Going to Daryl and Catrina Bank.

9   Q.  This is another wire.  How much is it for?

10  A.  110,000.

11  Q.  Going from the business account to where?

12  A.  Daryl and Catrina Bank.

13  Q.  How about this one?

14  A.  $100,000, going from Dominion Private Client Group to

15  Daryl and Catrina Bank.

16  Q.  And this is just a small sample of the wires going to

17  Daryl and his wife, right?

18  A.  Correct.

19  Q.  I think you mentioned on direct that Daryl also bought a

20  $25,000 dog?

21  A.  Yes.

22  Q.  Now, before you were indicted, you never went to the

23  police and told them that there was a fraud going on in

24  Dominion, right?

25  A.  I did not.

─────────────── R. Gibson - Cross (By Ms. McCaslin) ───────────────

1   Q.  And, in fact, the first time that you publicly spoke

2   about everything going on in Dominion was at Daryl's trial,

3   right?

4   A.  Yes.

5   Q.  Was that in April 2021?

6   A.  Yes.

7   Q.  And you never told Daryl to stop stealing the funds,

8   right?

9   A.  I did not.

10  Q.  And you didn't speak up in your office to the other

11  employees, right?

12  A.  I did not.

13        MS. McCASLIN:  Thank you.  No further questions.

14                    * * * * * * *

15                    CERTIFICATION

16

17     I certify that the foregoing is a correct excerpt

18  transcript from the record of proceedings in the

19  above-entitled matter.

20

21

22        _____/s/_____

23                    Carol L. Naughton

24                    February 15, 2022

25

Carol L. Naughton, Official Court Reporter