IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>DAVID ALCORN,<br><br>and<br><br>AGHEE WILLIAM SMITH, II,<br><br>    Defendants. | Criminal No.  2:19-cr-47 |

## MOTION FOR A PRELIMINARY ORDER OF FORFEITURE

Comes now the United States of America, by counsel, and moves this Honorable Court to enter a preliminary order of forfeiture for each of the above-named defendants pursuant to Fed. R. Crim. P. 32.2(b).  Both David Alcorn and Aghee William Smith, II were convicted by a jury of a mail and wire fraud conspiracy, as well as a number of substantive violations described in more detail below.  The government is now seeking the imposition of a monetary judgment against both defendants, as well as the forfeiture of certain assets from each of them, described below.  The monetary judgments the government is seeking represent the proceeds each defendant obtained from the fraud scheme and conspiracy of which they have both been convicted.  The evidence presented at trial supports the forfeiture the government seeks.

FACTUAL BACKGROUND

This case is closely related to the Daryl Bank case, which is case number 2:17-cr-126. As adduced at trial, Daryl Bank, Kent Maerki, David Alcorn, and Aghee William Smith, II, among others, engaged in a six year-plus conspiracy and scheme to defraud investors of millions of dollars.  Exacerbating matters, most of the victim investors were at or near

1

retirement age. The evidence at trial proved that Alcorn and Smith, along with Bank, Maerki, and others defrauded over three hundred investors across the U.S. of over $25,000,000.

Alcorn was the founder and owner of Janus Spectrum, LLC, and the business partner of his co-conspirator Maerki. Through Janus Spectrum, LLC, Alcorn and Maerki created the platform, consisting of the sale of fraudulent spectrum license application services, that Smith, Bank, and others used to steal millions of dollars from investors across the country. Like his co-conspirators, Alcorn knowingly and intentionally lied to investors and caused others to do so in order to obtain investment funds which he then used for his own personal benefit. Alcorn's misrepresentations included, but were not limited to, lies about the potential uses of the specific spectrum licenses, who would monetize those licenses, the amount of money needed to acquire such licenses, and the amount of potential return investors could expect from these investments.

The details of Alcorn's involvement with the spectrum investments are found on pages five through twelve of his presentence report (Document 449). These spectrum investments included Spectrum 100, Janus Spectrum, and Prime Spectrum. Alcorn, Smith, and others sold these fraudulent spectrum investments and then lulled them regarding the purported value of the investments. Alcorn told investors that these spectrum investments would produce annual returns up to 3,373% in some areas and an average annual return from all areas of 298%. In fact, Alcorn and Maerki caused Janus Spectrum to file for bankruptcy in 2014. That same year, the Securities and Exchange Commission subpoenaed Alcorn and Maerki to appear for a deposition in connection with a securities fraud investigation centered on the spectrum investments. Still, neither the bankruptcy nor the SEC investigation kept them from continuing to sell these fraudulent spectrum investments. Further, they did not

inform investors that Janus Spectrum had filed for bankruptcy and that the spectrum investments were being investigated for fraud by the SEC. Alcorn was also provided another "investment opportunity" through Diversified Financing, which he actually used to siphon off investor funds, as detailed in the PSR.

Through this fraudulent investments scheme, Alcorn defrauded investors of millions of dollars and became a multi-millionaire. After the Securities and Exchange Commission served him with a subpoena, Alcorn concealed his fraud proceeds by transferring over a million dollars to another's control in an attempt to prevent federal authorities from seizing his ill-gotten gains. The proceeds Alcorn obtained from the fraud scheme were illustrated in government's exhibit 1100, admitted at trial. In all, government's exhibit 1100 showed $3,963,916 in investor funds from the various spectrum investments being deposited into Alcorn-controlled accounts. Government's exhibit 1101 showed that in that same timeframe, less than three percent of Alcorn's money came from sources outside of the spectrum investments fraud.

The government's evidence at trial also showed how Alcorn spent his fraud proceeds. Government's exhibit 1112 showed that he invested $400,000 into FRGC Properties. FRGC Properties was (and is) in the process of developing real estate in Arizona. Those funds remain invested and their liquidation is not presently possible. Government's exhibit 1114 showed that Alcorn also transferred $1,241,152.52 to Brooksam. Brooksam is a company owned by B.S., a certified public accountant who helped Alcorn with various financial matters. Alcorn transferred that $1,241,152.52 to Brooksam over the course of three days, the last day being August 15, 2013. Then, on August 15, 2013, Brooksam used $1,240,000 to purchase the real property at 12040 North 133rd Way, Scottsdale, Arizona. This property was

pictured in government's exhibit 1113. Alcorn had been living at 12040 North 133rd Way prior to Brooksam purchasing the property and Alcorn had been renting the property from the prior owner. The property went into foreclosure, though, prompting Alcorn to talk to B.S. about purchasing the property. After Brooksam purchased 12040 North 133rd Way with Alcorn's funds, Alcorn remained living in the property and treated it in all respects as his own. On March 21, 2019, Alcorn was indicted in this case. A few days later, case agents discovered that 12040 North 133rd Way was pending sale and in escrow with a closing date of March 27, 2019. On March 25, 2019, agents obtained a seizure warrant authorizing the seizure of the property's sales proceeds and executed it, thereby seizing $1,431,866.50 on April 1, 2019.

 As for Smith, he was an insurance agent licensed in California. He did not hold a license to sell securities and his insurance license did not allow for the sale of investment products like those at issue in this case. Smith became associated with Maerki by selling fraudulent investments in Dental Support Plus Franchise as well as in an earlier iteration of the same scheme, Dazzle Dental. Dazzle Dental was a failed investment that lost millions of dollars, but which was the basis for Dental Support Plus Franchise's claimed "track record of success." At the same time, Smith also worked with Maerki and Alcorn to sell fraudulent spectrum license applications, first through his own entity and then through Bank's entities. From 2011 through 2017, Smith repeatedly lied to his clients, most of whom were seniors unsophisticated in matters of finance, about material facts regarding these investments for his own personal financial gain. As shown in government's exhibit 1201 from the trial, Smith obtained a total of $529,369.35 from the fraud scheme.

## PROCEDURAL HISTORY

Alcorn, Smith, Maerki, and three others were first indicted by the federal grand jury sitting in Norfolk on March 21, 2019 (Document 2). This is the same indictment on which Alcorn and Smith went to trial. The charges against them included mail and wire fraud conspiracies, as well as substantive counts of wire fraud. In addition, Alcorn was charged with unlawful monetary transactions. The indictment contained a forfeiture notice (Document 2, pp. 36-37). The case proceeded to a jury trial on February 1, 2022. That jury trial concluded February 23, 2022. After hearing the evidence presented, the jury found both defendants guilty as charged (Documents 420 and 422). After rendering their verdict, the jury was discharged and sentencing for Alcorn was set for June 23, 2022 at 2:30 PM (Document 424). Smith's sentencing was set for 11:00 AM that same day, June 23, 2022 (Document 425).

## ASSETS SOUGHT AS TO ALCORN

As to David Alcorn, the government seeks the forfeiture of the following:

a. A sum of money of $3,963,916, representing the proceeds Alcorn obtained from the scheme and conspiracy of which he was convicted in counts two and seven through seventeen;

b. $1,431,866.50 in proceeds from the sale of 12040 North 133rd Way, Scottsdale, Arizona seized by the Federal Bureau of Investigation on April 1, 2019;

c. All right, title, and interest, including any right to any return on investment, that Alcorn has acquired as a result his investment in FRGC Properties, LLC; and

d. A 2014 Land Rover Range Rover Sport with VIN # SALWR2EF1EA326845.

The government seeks each of the above assets as proceeds of the offenses of conviction.

ASSETS SOUGHT AS TO SMITH

As to Aghee William Smith, II, the government seeks the forfeiture of the following:

e. A monetary judgment in the amount of $529,369.35, representing the proceeds he obtained from the conspiracies and schemes of which he was convicted in counts one, two, eight, nine, sixteen, and seventeen; and

f. Smith's Legion Capital Stock.

The government seeks the stock as a substitute asset.

STANDARDS GOVERNING

Mail fraud and wire fraud carry forfeiture of proceeds of the scheme as a penalty. The statutory authority for criminal forfeiture is found in 18 U.S.C. § 981(a)(1)(C), as incorporated by 28 U.S.C. § 2461(c). 28 U.S.C. § 2461(c) is an incorporation statute enacted as part of the reforms of the Civil Asset Forfeiture Reform Act of 2000, also known as CAFRA. § 2461(c) allows the government to seek forfeiture in a criminal prosecution based on statutes which provide for civil forfeiture. United States v. Blackman, 746 F.3d 137, 143 (4th Cir. 2014) ("Section 2461 thus acts as a bridge or gap-filler between civil and criminal forfeiture, authorizing criminal forfeiture when no criminal forfeiture provision applies to the crime charged against a particular defendant but civil forfeiture for that charged crime is nonetheless authorized.") (internal quotation marks and citing references omitted). As for 18 U.S.C. § 981(a)(1)(C), that statute provides for the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of [any of thirty-four enumerated offenses] or any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." Included within 18 U.S.C. §

1956(c)(7)(A)'s definition of specified unlawful activity is "any act or activity constituting an offense listed in Section 1961(1) of this title except [for certain Title 31 offenses]." It is in 18 U.S.C. § 1961(1) where one finds the reference to mail and wire fraud.

Where substantive fraud offenses are charged as part of an ongoing scheme, the defendant is liable for the full amount of the proceeds from the overall fraud scheme, not just the individual executions of the scheme in the stand alone counts. See, e.g., United States v. Cox, 851 F.3d 113, 128-29 (1st Cir. 2017) (agreeing with holdings of other circuits "that, in the case of crimes that involve a scheme to defraud, funds obtained as a result of the offense consist of the funds involved in that fraudulent scheme, including additional executions of the scheme that were not specifically charged or on which the defendant was acquitted"); United States v. Lo, 839 F.3d 777, 792-94 (9th Cir. 2016) (forfeiture in a mail or wire fraud case is not limited to the executions of the scheme on which the defendant was convicted, rather it includes the proceeds of the entire scheme, "including additional executions of the scheme that were not specifically charged or on which the defendant was acquitted"), cert. denied 138 S.Ct. 354 (2017); United States v. Venturella, 585 F.3d 1013, 1015 (7th Cir. 2009) ("[t]he mail fraud count that the defendants were convicted of also alleged a broader scheme to defraud…[a]s a result, the forfeiture is not limited to the particular mailing but extends to the entire scheme"); United States v. Emor, 850 F.Supp.2d 176, 217-18 (D.D.C. 2012) ("[w]hen a defendant has engaged in a mail or wire fraud scheme, forfeiture is not limited to the proceeds gained through the particular mailing or wire transaction on which the conviction was based; rather it extends to the entire scheme of which the mailing or wire transaction was a part"); United States v. Budden, Criminal No. 3:11-2129, 2012 WL 1315366, at *3 (D.S.C. Apr. 17, 2012) (where defendant pled guilty to a single mail fraud count, the Court noted that "where the defendant pleads guilty to a single

7

count which is part of a fraudulent scheme, forfeiture is not limited to that single count but should cover the entire scheme"); United States v. Boesen, 473 F.Supp.2d 932, 952 (S.D.Iowa 2007) (fraud statutes criminalize executions of the fraud scheme, "the overall scheme is thus inherently part of the offenses of which Defendant has been convicted…[t]he Court will therefore include in the forfeiture amount the gross proceeds from the overall scheme charged in the indictment").

Likewise, where a defendant is convicted of a conspiracy, the defendant must forfeit the proceeds he obtained over the course of the entire conspiracy, not just the substantive offenses of conviction. See, e.g., United States v. George, 886 F.3d 31, 41 (1st Cir. 2018) ("In determining what constitutes the 'proceeds' of a conspiracy or other common enterprise, several courts of appeals have recognized that the scope of forfeitable property may extend to all the ill-gotten gains of that conspiracy or enterprise, not just those ill-gotten gains that flow from the underlying substantive offense. We align ourselves with these courts…"); United States v. Capoccia, 402 Fed.Appx. 639, 641 (2d Cir. 2010) ("We discern no error, far less plain error, in the district court's conclusion that the transactions covered by the conspiracy count were subject to forfeiture regardless of whether the corresponding conduct was charged in the substantive counts of conviction."); United States v. Molina-Sanchez, 298 F.R.D. 311, 313 (W.D.N.C. 2014) ("Accordingly, property identified as criminal proceeds of a conspiracy, or as property derived from such proceeds, may be forfeited criminally from a convicted member of the conspiracy, even where the property relates to substantive acts which were not charged or on which the defendant was acquitted.").

Forfeiture is a mandatory aspect of the sentence to be imposed in this case. Blackman, 746 F.3d at 143 ("The word 'shall' does not convey discretion… The plain text of the statute

thus indicates that forfeiture is not a discretionary element of sentencing."). Courts may not deny forfeiture based on equitable considerations. Id. ("Insofar as the district court believed that it could withhold forfeiture on the basis of equitable considerations, its reasoning was in error."). Likewise, the Fourth Circuit has held that Courts may not deny a forfeiture order based on a defendant's inability to pay. Id. at 143-44 ("[t]he fact that a defendant is indigent or otherwise lacks adequate assets to satisfy a judgment does not operate to frustrate the entry of a forfeiture order").

As the Court is aware, judicial criminal forfeitures are a multi-step process, with the steps being found in Fed. R. Crim. P. 32.2 and 21 U.S.C. § 853.[1] The first step is the entry of a preliminary order of forfeiture at or prior to the sentencing, pursuant to Fed. R. Crim. P. 32.2(b). Fed. R. Crim. P. 32.2(b)(4)(A) provides that, in general, at the time of sentencing, the preliminary order of forfeiture becomes final as to the defendant, but not as to third parties. When specific assets are forfeited, third party interests are dealt with in the ancillary proceeding, a quiet title-type process covered under 21 U.S.C. § 853(n) and Fed. R. Crim. P. 32.2(c). See United States v. Cox, 575 F.3d 352, 358 (4th Cir. 2009) (Court must defer consideration of third party interests to the ancillary proceeding rather than considering them when issuing the preliminary order of forfeiture). Insofar as the government seeks a monetary judgment, Rule 32.2(c)(1) provides that "no ancillary proceeding is required to the extent that the forfeiture consists of a money judgment."

The United States must prove the nexus between the property to be forfeited and the offenses of conviction by a preponderance of the evidence. United States v. Martin, 662 F.3d

---

[1] Although 21 U.S.C. § 853 is a drug forfeiture statute, its procedures apply even in this fraud forfeiture because of the provisions of 28 U.S.C. § 2461(c) (as to mail and wire fraud forfeiture under 18 U.S.C. § 981(a)(1)(C)).

301, 307 (4th Cir. 2011) ("the government must establish a nexus between the property for which it is seeking forfeiture and the crime by a preponderance of the evidence"); United States v. Herder, 594 F.3d 352 (4th Cir. 2010) ("The burden is on the government to establish, by a preponderance of the evidence, that the property at issue is subject to forfeiture").  As for the entry of the preliminary order, Fed. R. Crim. P. 32.2(b)(1)(B) provides that "[t]he Court's determination may be based on evidence already in the record . . . or information presented by the parties … after the verdict or finding of guilty."  See, e.g., United States v. Farkas, 474 Fed. Appx. 349, 360 (4th Cir. 2012) (under Rule 32.2(b)(1)(B), the Court may base its forfeiture determination on evidence already in the record and on any additional evidence or information submitted); United States v. Sabhnani, 599 F.3d 215, 262-63 (2d Cir. 2010) (forfeiture may be based on testimony in the record from the guilt phase of the trial); United States v. Capoccia, 503 F.3d 103, 109 (2d Cir. 2007) (the Court may rely on evidence from the guilt phase of the trial, even if the forfeiture is contested; it is not necessary for the government to reintroduce that evidence in the forfeiture hearing).  Mathematical exactitude is not required in calculating the amount of a forfeiture monetary judgment.  United States v. Prather, 456 Fed.Appx. 622, 626 (8th Cir. 2012) (law does not require mathematical exactitude in calculating the money judgment, rather the Court may make reasonable extrapolations from the facts); United States v. Roberts, 660 F.3d 149, 166 (2d Cir. 2011) (the calculation of the money judgment need not be exact).

ARGUMENT

As the evidence at trial demonstrated, Alcorn and Smith executed a number of investment fraud schemes from approximately 2011 to 2017.  Those schemes caused losses of over $20,000,000 to more than 200 victims.  Out of that enormous loss amount, Alcorn obtained

$3,963,916 in personal gross gain.  Rather than investing those monies in the way he had promised his investors, he instead siphoned off and pocketed those fraud proceeds.  In particular, Alcorn spent $1,240,000 on a high-end real property at 12040 North 133rd Way, Scottsdale, Arizona.  Government's exhibit 1114 showed the flow of fraud proceeds Alcorn used to pay for the Scottsdale property.  Moreover, Alcorn did not simply purchase the property himself, rather he laundered that $1,240,000 through Brooksam in order to acquire the property, but conceal the fact that he was the true party in interest.  Soon after being indicted, Alcorn tried to close a sale on the property, but the government seized the $1,431,866.50 in net sales proceeds.  Government's exhibit 1112 showed that Alcorn also invested $400,000 of his fraud proceeds into FRGC Properties, LLC.  Finally, check # 1130 in government's exhibit 1117, Alcorn's Charles Schwab accounts, was used to purchase the Land Rover Range Rover Sport with VIN # SALWR2EF1EA326845.  As shown at trial, Alcorn's Charles Schwab account was funded with fraud proceeds.  As further demonstrated by government's exhibit 1101, less than three percent of Alcorn's money came from sources outside the investment fraud scheme.

      Proceeds include any property that the defendant would not have but for the offense.  United States v. Kenner, 443 F.Supp.3d 354, 363 (E.D.N.Y. 2020); United States v. Ivanchukov, 405 F.Supp.2d 708, 712 (E.D.Va. 2005).  This includes any property that would not have been obtained, retained, or maintained but for the crime.  United States v. Clark, 165 F.Supp.3d 1215, 1221 (S.D.Fla. 2016).  As demonstrated by the aforementioned trial exhibits and the testimony that accompanied them, the Scottsdale property, the FRGC Properties investment, and the Land Rover all constitute direct proceeds of Alcorn's fraud offenses of conviction.  While it is true that the Scottsdale property was liquidated by Alcorn and generated sales proceeds in excess of his original investment, any appreciation earned off the investment of criminal proceeds likewise

11

constitutes proceeds. See, e.g., United States v. Betancourt, 422 F.3d 240, 251 (5th Cir. 2005) (if defendant buys a lottery ticket with drug proceeds, the lottery winnings are traceable to the offense even though the value of the ticket appreciated enormously when it turned out to contain the winning number); United States v. Swanson, 394 F.3d 520, 529 n.4 (7th Cir. 2005) (a change in the form of the proceeds does not prevent forfeiture; property traceable to the forfeitable property is forfeitable as well); United States v. Yeh, 199 F.Supp.3d 998, 1005 (E.D.Va. 2016) (appreciation in defendant's stock portfolio is forfeitable in its entirety even if the initial investment of drug proceeds increase due to defendant's special skill and insight in stock trading). Since the evidence at trial demonstrated by at least a preponderance of the evidence the nexus between the fraud charged and the proceeds from the sale of the Scottsdale property, as well as the FRGC Properties investment and the Land Rover, those assets must be forfeited.

As for Aghee William Smith, II, government's exhibit 1201 from trial showed that he obtained a total of $529,369.35 from the fraud scheme. Given that Smith obtained $529,369.35 from the fraud offenses for which he was convicted, a monetary judgment in that same amount is now required. Blackman, 746 F.3d at 145 (affirming imposition of a monetary judgment based on the defendant's proceeds). Smith did use fraud proceeds to purchase a real property at 3088 Big Bear Drive, Roseville, California, but that real property is subject to an ongoing bankruptcy proceeding in case number 19-25091 in the U.S. Bankruptcy Court for the Eastern District of California. Smith's Chapter 7 bankruptcy petition was admitted as government's exhibit 1213 at trial. The government has conferred with the bankruptcy trustee, who intends to liquidate the real property for the benefit of creditors in that proceeding. Notably, those bankruptcy creditors are also victims in this criminal case, thus the government is not seeking the real property for forfeiture.

The evidence from the trial also enables the Court to find that the requirements of 21 U.S.C. § 853(p) have been satisfied as to both defendants.  That code section, 21 U.S.C. § 853(p), provides that the Court shall order the forfeiture of substitute assets where, among other disjunctive requirements, the directly forfeitable property cannot be located upon the exercise of due diligence or has been transferred to a third party.  United States v. Manlapaz, 825 Fed.Appx. 109, 116-17 (4th Cir. 2020) ("Section 853(p) is not discretionary" and "there are no limits on what property may be substituted for the proceeds"); United States v. Alamoudi, 452 F.3d 310, 314-15 (4th Cir. 2006) (Courts interpret 21 U.S.C. § 853(p) liberally to prevent defendants from frustrating the forfeiture laws); United States v. Gardenhire, No. 15-87, 2017 WL 6371362, at *11 n.8 (W.D.Pa. Dec. 13, 2017) (requirements of § 853(p)(1) are disjunctive).  As explained above, the government believes that the trial evidence proved that each of the assets now sought from Alcorn in this motion is directly forfeitable as fraud proceeds.  The point of making the finding now that the 21 U.S.C. § 853(p) requirements have been satisfied is that there would be no need to make such a finding in the future if the government later finds additional, substitute assets and moves for their forfeiture to help satisfy the balance on the monetary judgments after the forfeiture and liquidation of the assets now sought in this motion.

Extensive evidence was presented at trial about the thorough financial investigation undertaken in this case.  Aside from the assets described and sought as proceeds in this motion, the comprehensive financial investigation revealed no further recoverable proceeds.  United States v. Gordon, 710 F.3d 1124, 1166 (10th Cir. 2013) (noting that the government generally has little difficulty in making the necessary showing under 21 U.S.C. § 853(p)—a financial analyst's affidavit stating that he has reviewed the defendant's records and could not find the proceeds is sufficient); Alamoudi, 452 F.3d at 314-15 (it suffices if an agent submits that she has

13

searched for the missing assets and that, despite the exercise of due diligence, she has been unable to find them). As such, the substitute asset requirements of 21 U.S.C. § 853(p) have been satisfied. The Court making that finding now will obviate the need to do so later should the government find substitute assets going forward and move for their forfeiture. United States v. BCCI Holdings (Luxembourg) S.A. (Petition of Bank of California International), 980 F.Supp. 522, 524 (D.D.C. 1997) (the preliminary order may be amended as often as necessary to include additional property subject to forfeiture that the government may identify).

Through Smith's presentence report, the government has identified a substitute asset which can be forfeited in partial satisfaction of his money judgment. Smith's PSR shows that he has approximately $12,000 in Legion Capital Stock.[2] FBI's extensive financial investigation did not show that the stock constituted proceeds. Nonetheless, "there are no limits on what property may be substituted for the proceeds." Manlapaz, 825 Fed.Appx. at 117. The stock's value is but a fraction of the money judgment the government seeks as to Smith. Given that forfeiture of substitute assets is mandatory where the prerequisites are satisfied, Smith's Legion Capital Stock account must be forfeited.[3] Id.

## PROCEDURE WITH RESPECT TO THIS MOTION

Fed. R. Crim. P. 32.2(b)(4)(A) provides that, at sentencing, a preliminary order of forfeiture becomes final as to the defendant. Therefore, in general, a preliminary order of

---

[2] The PSR also shows a 2017 Dodge Ram, but FBI confirms that this vehicle was sold to CarMax on December 31, 2021.

[3] Though the government does not have the account number for the stock, the government plans to submit the defendant's name, date of birth, and Social Security number to the financial institution so that the subject account can be located and seized. To that end, though the government has filed with this motion a proposed preliminary order of forfeiture without any attachments, the government will submit a paper copy of a proposed preliminary order with a sealed attachment A containing the defendant's identifying information.

forfeiture must be entered as to a defendant at the time of sentencing, at the latest. See, e.g., United States v. Petrie, 302 F.3d 1280, 1284-85 (11th Cir. 2002) (preliminary order of forfeiture entered approximately six months after the defendant's sentencing vacated because the District Court no longer had jurisdiction to enter the order). But see United States v. Martin, 662 F.3d 301, 307 (4th Cir. 2011) (missing the sentencing deadline to enter a forfeiture order does not deprive the District Court of jurisdiction to do so, provided the Court makes clear prior to sentencing that it plans to order forfeiture); United States v. Mearing, Case No. 18-4026, at p. 4-5 (4th Cir. May 29, 2018) (citing Martin). The government is not requesting a hearing and, for its part, is asking the Court to determine this matter on the pleadings. However, if either party requests a hearing on the forfeiture, Fed. R. Crim. P. 32.2(b)(1)(B) provides that "the court must conduct a hearing . . .." Therefore, should the defendant request a hearing, the government respectfully requests that the Court take up this motion no later than at the sentencing hearing itself, prior to the imposition of sentence. The government notes that under Local Criminal Rule 47, a defendant has fourteen days to file a response to this motion and register his objection to the forfeiture.

Fed. R. Crim. P. 32.2(b)(4)(B) provides that the Court "must include the forfeiture when orally announcing the sentence or must otherwise ensure that the defendant knows of the forfeiture at sentencing." That same rule also provides that the Court "must…include the forfeiture order, directly or by reference, in the judgment."

## CONCLUSION

Based on the above, the government respectfully requests that the Court enter a preliminary order of forfeiture as to both Alcorn and Smith providing for the forfeiture of the requested assets. A proposed order for each defendant is attached for the Court's consideration.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By:       /s/ Kevin Hudson
      Kevin Hudson
      Assistant United States Attorney
      Virginia State Bar No. 81420
      Attorney for the United States
      101 West Main Street, Suite 8000
      Norfolk, VA 23510
      Office Number: (757) 441-6331
      Facsimile Number: (757) 441-6689
      Email Address: kevin.hudson@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on the 31st day of May 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send a notification of such filing (NEF) to all counsel of record.

By:    /s/ Kevin Hudson
       Kevin Hudson
       Assistant United States Attorney
       Virginia State Bar No. 81420
       Attorney for the United States
       101 West Main Street, Suite 8000
       Norfolk, VA 23510
       Office Number: (757) 441-6331
       Facsimile Number: (757) 441-6689
       Email Address: kevin.hudson@usdoj.gov