IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE EASTERN DISTRICT OF VIRGINIA
*Norfolk Division*

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Case No. 2:19cr47 |
| v. ) | |
| ) | |
| AGHEE WILLIAM SMITH, II, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT'S OBJECTIONS TO THE PRESENTENCE REPORT**

The Defendant, Aghee William Smith, II, submits the following objections to the Presentence Investigation Report (PSR).

**I.   MR. SMITH SHOULD NOT BE ATTRIBUTED WITH LOSSES SUSTAINED BY PEOPLE HE NEVER MET THROUGH TRANSACTIONS TO WHICH HE HAD NO CONNECTION**

The PSR proposes that, for loss-attribution purposes, Mr. Smith be held accountable for virtually all losses caused by schemes run by Kent Maerki and Daryl Bank: losses sustained by people Mr. Smith never met, losses associated with investment products Mr. Smith never sold, and losses tied to transactions for which Mr. Smith received no compensation and to which he had no personal connection. For example, the government proposes attributing losses to Mr. Smith based on people losing money through investments in Dental Support Group even though there is no evidence that Mr. Smith even knew about the existence of Dental Support Group. Because the government has not proven that these losses were part of *Mr. Smith's* jointly undertaken criminal activity or that they were reasonably foreseeable to him, the Court should not attribute these losses to Mr. Smith.

The Fourth Circuit has said that "to hold a defendant accountable for the conduct of his coconspirators, [courts] should make particularized findings with respect to both prongs of § 1B1.3(a)(1)(B)." *United States v. Bolden*, 325 F.3d 471, 499 (4th Cir. 2003). Thus, the Court must make particularized findings as to which (if any) acts or omissions of others were (i) within the scope of the

1

jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity. U.S.S.G. § 1B1.3(B). It is important, in making these findings, to remember that the scope of jointly undertaken criminal activity is not necessarily the scope of the entire conspiracy – in fact, conspiracy liability is generally much broader than jointly undertaken criminal activity under § 1B1.3. *See United States v. Flores-Alvarado*, 779 F.3d 250, 255 (4th Cir. 2015), *as amended* (Mar. 11, 2015).

There are problems with the government's proof as to several categories of losses.

First, the PSR attributes losses to Mr. Smith for investments made in Diversified Financing. PSR ¶ 39. But no record evidence links Mr. Smith to Diversified Financing investments other than Xcel Bandwidth investments made through Diversified. And those losses are already taken into account by the Xcel losses described in paragraph 40. It is unclear what these "Diversified Financing" losses are even referencing. It is possible that they relate to investments in Collins Asset Group, which is not part of this case. But it is hard to even argue against such a vague statement. The PSR's conclusory assertion in paragraph 39 fails to put Mr. Smith on sufficient notice of the allegation so that he can make a meaningful response. Certainly, the PSR's barebones assertion does not support the sort of particularized findings contemplated by *Bolden*. 325 F.3d at 499.

As noted in the introduction, the PSR also attributes Mr. Smith with almost $1 million in losses for investments made in DSPF Group. PSR ¶ 28. But Dental Support Group (Bank's company) was different from DSPF (Maerki's company in Arizona). Trial testimony was that Daryl Bank set up Dental Support Group either as a way to allow investors to pool smaller sums of money to buy a DSPF franchise unit (*i.e.*, without having to come up with $25,000 to buy a whole unit), or it was set up by Bank to buy out disgruntled DSPF franchise owners with funds from new investors. Either way, this was an operation separate from DSPF. In fact, it is more properly viewed as a *competitor* of DSPF. In cases like *United States v. Studley*, courts have highlighted that the existence of competition

2

can cut off the scope of jointly undertaken criminal activity. 47 F.3d 569, 576 (2d Cir. 1995). Studley and his coconspirators worked as salespeople for a fraudulent telemarketing operation – each salesperson was paid on commission, and all worked out of a two-room operation center. *Id.* In determining that "the evidence . . . support[ed] the conclusion that Studley's agreement to participate in the fraudulent scheme was limited to his own fraudulent activity," the Second Circuit emphasized that "the evidence, in fact, show[ed] that [Studley] was competing *against* the other sales representatives for commissions." *Id.* Similarly, Dental Support Group was undercutting DSPF with every sale because buying a franchise from an existing franchisee (instead of from DSPF) cost DSPF revenue. Dental Support Group's activities inherently exceeded the scope of any jointly undertaken criminal activity that was defined by DSPF's success.

Additionally, Dental Support Group was run by Bank for Bank. There was no record evidence that Mr. Smith knew about DSG or that he had any association with the company. Dental Support Group was not part of the jointly undertaken criminal activity and losses associated with it were not foreseeable to Mr. Smith.

Compounding that problem with DSG losses, the PSR attributes $3.1 million in losses to Mr. Smith without identifying either who lost the money or whether it was a DSPF loss or a Dental Support Group loss. PSR ¶ 29. As a threshold matter, paragraph 29 does not distinguish between DSPF and DSG. Because Mr. Smith had no involvement in Dental Support Group, these ambiguous losses cannot be attributed to him. But, perhaps more importantly, those losses in paragraph 29 should be stricken because a conclusory assertion that there existed some unspecified loss to some unspecified person cannot carry the government's burden of proving a loss. The same holds true for the $1.3 million in conclusory losses without dates, investor names, or any other information that are attributed to Mr. Smith in relation to Western Spectrum "losses." *See* PSR ¶ 38. These barebones assertions cannot support a finding of fact.

The PSR also attributes the full losses for all of DSPF to Mr. Smith. See PSR ¶ 27. But the government's trial exhibits purport to show that Mr. Smith sold only about $1.4 million in DSPF franchises, not $4.1 million. Gov't Ex. 20. Just because Mr. Smith was a salesman for a larger operation does not mean that the entire operation was part of his jointly undertaken criminal activity. "[A] relevant factor in determining whether an activity is jointly undertaken is whether the defendant assisted in designing and executing the scheme." *United States v. Hunter*, 323 F.3d 1314, 1321 (11th Cir. 2003). In *United States v. Allmendinger*, the Fourth Circuit indicated that Allmendinger's status as "principal architect[]" of an investment scheme was a relevant factor in determining both the scope of jointly undertaken criminal activity and reasonable foreseeability. 706 F.3d 330, 341 (4th Cir. 2013). Allmendinger founded the life settlement investment company that perpetrated the investment scheme in that case, and he established many facets of the scheme. *Id.* Here, Kent Maerki founded DSPF and established how the entire scheme worked. That is to say, Mr. Maerki is the parallel to Mr. Allmendinger. Not Mr. Smith. To be sure, salespeople like Mr. Smith offered franchise units to various folks and Mr. Smith was aware of the existence of other salespeople. But "mere awareness that [Maerki] was involved in a much larger scheme is not enough to hold [Mr. Smith] accountable for the activities of the entire conspiracy." *Hunter*, 323 F.3d at 1321.

That is why in cases like *United States v. Otuya*, 720 F.3d 183, 185 (4th Cir. 2013), courts have limited losses to those in which a particular conspirator had some concrete tie. Otuya and several coconspirators operated a scheme to defraud Bank of America through the use of stolen checks. *Id.* Otuya and his confederates would drive around stealing mail out of roadside mailboxes, comb through the mail for credit card convenience checks, deposit those checks into various accounts, and then withdraw the funds before the bank figured everything out. *Id.* Otuya was intimately involved in planning and organizing the offense and making key decisions; he was a supervisor of the scheme and ultimately received a three-level enhancement for his leadership role. *Id.* at 192. Still, when it came to

4

the loss calculation, Otuya was not held responsible for every loss associated with the conspiracy. To calculate the loss, "the court referenced a detailed spreadsheet that the government constructed describing 78 specific losses that were intended in the course of the fraud scheme." *Id.* at 191. But the court did not count all of them; it "selected the 33 particular losses that it found to be in furtherance of the conspiracy and reasonably foreseeable to Otuya, either because he *personally perpetrated* the underlying fraudulent transactions *or* because he *had a close working connection with the conspirators who did*." *Id.* (emphasis added). If the losses attributed to a leader and organizer of a fraud should be so limited, certainly that principle should apply to people like Mr. Smith who were not involved in the planning, organizing, or supervising of the broader conduct. Mr. Smith's losses – like Otuya's – should be limited to transactions he personally perpetrated or those conducted by people with whom he had a close working connection. Under that rule, Mr. Smith's DSPF losses should be no more than $1.4 million.

Similarly, the PSR attributes Mr. Smith with over $7 million in losses for investments made in Spectrum 100. PSR ¶ 37. But according to the government, Mr. Smith sold only about $2.8 million in Spectrum 100 investments. Gov't Ex. 520. At trial, Ms. Gibson testified that her spreadsheets recounting how much had been invested in Spectrum 100 and what happened to the money had never been seen by people outside of Daryl Bank's inner circle until she testified at trial. Mr. Smith was not privy to the overall scheme and certainly was not involved in "designing and executing the larger illegal scheme." *Hunter*, 323 F.3d at 1321. Unlike Allmendinger, whose status evinced the scope of his jointly undertaken criminal activity and his ability to foresee losses, Mr. Smith was not the architect. Bank and his right-hand-woman, Gibson, occupied that role. *Allmendinger*, 706 F.3d at 341.

Mr. Smith sold Spectrum 100 investments like he sold annuities. He had some general awareness that other people were selling the same product, but he did not engage in jointly undertaken criminal activity with those people. And given this limited role, $5 million in additional losses from

sales that other people made were not foreseeable to Mr. Smith. The Spectrum 100 losses attributed to Mr. Smith should be limited to no more than $2.8 million, which corresponds to the losses in which he had personal involvement.

With these corrections, Mr. Smith's loss amount under § 2B1.1(b)(1) would be more than $3.5 million but less than $9.5 million, resulting in an 18-point increase in his offense level. The 20-level enhancement set out in paragraph 52 should be so modified.

## II. THE SPECIFIC OFFENSE ENHANCEMENT FOR INVESTMENT ADVISERS WHO VIOLATE SECURITIES LAW CANNOT APPLY

The PSR recommends adding a four-level enhancement under § 2B1.1(b)(20)(A)(iii). *See* PSR ¶ 55. That enhancement applies if the offense involves "a violation of securities law and, at the time of the offense, the defendant was … an investment adviser, or a person associated with an investment adviser." U.S.S.G. § 2B1.1(b)(20)(A)(iii). The government has not met either prong of this conjunctive test.

First, the government has not demonstrated that the offense involved a violation of securities law within the meaning of the guideline provision. "'Securities law' (i) means 18 U.S.C. §§ 1348, 1350, and the provisions of law referred to in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(47)); and (ii) includes the rules, regulations, and orders issued by the Securities and Exchange Commission pursuant to the provisions of law referred to in such section." U.S.S.G. § 2B1.1(b)(20)(A)(iii), cmt. n.16(A). Mr. Smith was not charged with a violation of securities law, the PSR does not lay out any legal or factual theory under which Mr. Smith violated securities law, and nothing in the record here supports such a finding. Mr. Smith will respond to any theory the government puts forward to support a finding. But, to date, Mr. Smith has only the PSR's conclusory assertion that he violated securities law. That is not sufficient to support a finding under this enhancement. If the government develops a theory in its sentencing filing, Mr. Smith reserves the right to respond to it.

Second, the government has not demonstrated that Mr. Smith was an investment adviser at the time of the offense.

"'Investment adviser' has the meaning given that term in section 202(a)(11) of the Investment Advisers Act of 1940 (15 U.S.C. § 80b-2(a)(11))." U.S.S.G. § 2B1.1(b)(20)(A)(iii), cmt. n.16(A). Under the Investment Advisors Act or "IAA,"

> "Investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; but does not include … (C) any broker or dealer whose performance of such services is solely incidental to the conduct of his business as a broker or dealer and who receives no special compensation therefor; (D) the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation; … or (H) such other persons not within the intent of this paragraph, as the Commission may designate by rules and regulations or order.

15 U.S.C. § 80b-2(a)(11).

Here, Mr. Smith was not "in the business" of providing advice "for compensation." Mr. Smith received commissions for selling various investment products. He was a salesperson, not an adviser. To be sure, the Court would have to find first that at least some number of these products were securities to find that Mr. Smith was advising others as to investing in, purchasing, or selling securities. But even if the Court makes that finding and determines that Mr. Smith was, in some sense, advising others about investing in securities, any advice was incidental to his sale of investment products. He was in the sales business – in the business of selling annuities, life insurance, and other products. And it was for those sales that he received compensation. He was not "in the business" of providing advice. The IAA was not intended to sweep into its definition of investment advisers people who were compensated like Mr. Smith.

The legislative history of the IAA demonstrates that people who received transaction-based compensation for the sale of securities were *not* intended to be considered investment advisers.

> [T]he IAA was passed in response to an SEC report that detailed the emergence of a largely unregulated community of professional investment advisers. *See* H.R. Doc. No. 477. Two characteristics distinguished investment advisers from broker-dealers: the fact that investment advisers gave advice for its own sake; and the fact that investment advisers were compensated specifically for that advice. *See* Laby, *Reforming the Regulation of Broker–Dealers,* at 400–01; Opinion of General Counsel Relating to Section 202(a)(11)(C) of the Investment Advisers Act of 1940, Investment Company Release No. 2, 11 Fed.Reg. 10996 (Sept. 27, 1946); *Fin. Planning Ass'n,* 482 F.3d at 485.

*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1166 (10th Cir. 2011). Thus, the idea was to create a definition that included people who were compensated for giving advice but to *exclude* salespeople who were compensated through commissions or analogous transaction-based compensation. Congress ensured that people compensated via commissions or other transaction-based measures would not be "investment advisers" by carving out traditional broker-dealers; an exemption in the IAA excluded from the definition of "investment advisers" broker-dealers who gave advice about the value of securities unless the broker-dealer received "special compensation" for that advice. 15 U.S.C. § 80b-2(a)(11)(C). Even the Supreme Court has observed that the IAA reflects a congressional desire to distinguish investment *advisory* relationships from relationships in which someone selling an investment is compensated via commission, with all the potential conflicts of interest that might be associated with that. *See SEC v. Cap. Gains Rsch. Bureau*, 375 U.S. 180, 191-92 (1963). Investment advisers provide advice about securities and are compensated for that advice. People who sell securities and are compensated on a commission basis for such sales are not investment advisers. Obviously, in the context of securities, the IAA definition was premised on the notion that such people who received commissions from sales of securities would be broker-dealers or agents thereof. But the Act distinguishes based on whether the person is "in the business" of *advising* about securities

8

(as opposed to selling them). Acting as an unregistered broker-dealer may have other legal consequences but failing to register as a broker-dealer or representative thereof does not convert someone into an investment adviser.

It would be inconsistent with the statutory scheme to label as an "investment adviser" someone who is compensated by commission, receives no special compensation for providing advice, and merely sells an investment product to a purchaser. People who bought investments products from Mr. Smith generally understood that he was being compensated via commission. Several witnesses testified at trial to that effect. And no one testified that they compensated Mr. Smith directly by paying him for his time or for any advice. To be sure, some courts have relied on a 1987 SEC "staff interpretation" of this 1940 statute to read quite broadly the statutory requirement that an investment adviser be "in the business of advising others" and doing so "for compensation." *See, e.g.*, *United States v. Miller*, 833 F.3d 274, 281 (3d Cir. 2016); *United States v. Elliott*, 62 F.3d 1304, 1310 (11th Cir. 1995), *amended*, 82 F.3d 989 (11th Cir. 1996). However, even that broadly interpreted guidance states that one consideration for delineating "in the business" is if the person "receives any separate or additional compensation that represents a clearly definable charge for providing advice about securities." *Miller*, 833 F.3d at 281 (quoting Applicability of the Inv. Advisers Act to Fin. Planners, Pension Consultants, and Other Persons Who Provide Inv. Advisory Servs. as a Component of Other Fin. Services, S.E.C. Release No. 1092, 39 S.E.C. Docket 494 (Oct. 8, 1987)). Furthermore, the SEC's informal position is entitled to no formal deference. *Thomas*, 631 F.3d at 1162-63 (noting that the court "would defer to the SEC's interpretation [of the IAA] if it were embodied in a rule or regulation that has the force of law" but "the SEC has not promulgated such a rule or regulation" so the court "consult[ed] the SEC's position only for its persuasive value"). The better evidence of a statute's meaning comes at the time of its enactment, not forty-seven years later. And this definition applies in many legal contexts outside the sentencing guidelines, so adopting an interpretation at odds with the text and structure of the IAA

9

as a whole could have far-reaching negative effects. Neither the text of the IAA nor its enactment history supports such a broad interpretation.

### III. THE ABUSE-OF-TRUST ENHANCEMENT SHOULD NOT APPLY

The PSR proposes applying a two-level increase in Mr. Smith's offense level under § 3B1.3 based on the conclusion that Mr. Smith abused a position of public or private trust. PSR ¶ 57. This enhancement should not apply for two independent reasons.

First, the guidelines are clear that Mr. Smith cannot receive **both** the specific-offense enhancement for being an investment advisor **and** an abuse-of-trust enhancement under Chapter 3. As the First Circuit explained,

> Section 2B1.1(b)(19)(A) applies where "the offense involved ... a violation of securities law and, at the time of the offense, the defendant was ... an investment adviser." The focus of this enhancement, like the more general "abuse of position of trust or use of special skill" enhancement under § 3B1.3, is on the defendant's conduct: the use of her position as an investment adviser to commit her crimes. ***For this reason, the guidelines specifically prohibit the application of both a § 2B1.1(b)(19)(A) enhancement and an abuse-of-trust enhancement under § 3B1.3 in the same case.*** *See* U.S.S.G. § 2B1.1, cmt. n.15(C) ("If [§ 2B1.1](b)(19) applies, do not apply § 3B1.3.").

*United States v. O'Brien*, 870 F.3d 11, 20 (1st Cir. 2017) (emphasis added).[1] In other words, the commentary explicitly says that Mr. Smith cannot receive both enhancements under § 2B1.1(b)(20) and § 3B1.3. If he receives the Chapter 2 enhancement, he is ineligible for the Chapter 3 enhancement. The government agrees with this point.

Second, if the Court agrees with the defense that the investment advisor enhancement does not apply, it is still not appropriate to apply the abuse-of-trust enhancement under § 3B1.3. Courts have not applied the abuse-of-trust enhancement when defendants did not manage client money but instead merely sold investments. For example, the Second Circuit wrote recently in *United States v.*

---

[1] Since the *O'Brien* decision, the relevant specific-offense enhancement moved from b(19) to b(20), and the relevant comment note from 15(C) to 16(C). The substance is the same.

10

*Huggins*, "Unlike other cases where the defendant served as a financial adviser or had discretionary authority for the victim's financial portfolio, Huggins was merely a salesman for an investment scheme." 844 F.3d 118, 125 (2d Cir. 2016). And Huggins' sales to people with whom he had a personal relationship also did not change the dynamic. "The fact that Huggins was a friend of at least two investors is part and parcel of being a salesman. By itself, personal friendship is not evidence that the victims viewed Huggins as occupying a fiduciary-like position that conferred trust over their financial matters." *Id.*

Or, as the Eleventh Circuit put it,

> Often there is a component of misplaced trust inherent in the concept of fraud, such as in this case. One must hold a position of trust before it can be abused, however. Fraudulently inducing trust in an investor is not the same as abusing a bona fide relationship of trust with that investor.

*United States v. Mullens*, 65 F.3d 1560, 1567 (11th Cir. 1995). Here, the government alleged and proved that Mr. Smith was a salesperson. He sold investment products to customers in arms-length transactions. And, no doubt, people trusted him. But that does not mean he was in a bona fide relationship of trust. Mr. Smith was different from someone who had discretionary authority on how to manage a client's money. Mr. Smith presented several products to people, and they decided whether to purchase any through him. That does not create the sort of fiduciary relationship that, when abused, leads to an abuse-of-trust enhancement.

### IV. THE GOVERNMENT HAS NOT SHOWN THAT MR. SMITH CONSCIOUSLY ACTED WITH THE PURPOSE OF OBSTRUCTING JUSTICE

"Under Section 3C1.1 of the Sentencing Guidelines, a sentencing court is directed to impose a two-level upward adjustment if the defendant 'willfully, obstructed or impeded ... the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction.'" *United States v. Freeman*, 24 F.4th 320, 328 (4th Cir. 2022) (quoting U.S.S.G. § 3C1.1). "A

11

defendant acts 'willfully' if he 'consciously acted with the purpose of obstructing justice.'" *Id.* (quoting *United States v. Thorson*, 633 F.3d 312, 320 (4th Cir. 2011)).

The PSR applies the obstruction enhancement on two bases. First, K.S. claimed that Mr. Smith advised him not to talk to investigators. PSR ¶ 42. Second, Mr. Smith stated in a bankruptcy proceeding that he had joyfully shredded documents and cleaned his computer of certain client files. *Id.* As to the issue with K.S., the government offered no evidence as to why Mr. Smith may have mentioned the FBI to K.S. The obstruction enhancement cannot be applied based on K.S.'s trial testimony alone because there is no evidence of Mr. Smith's *mens rea*.

The obstruction enhancement also cannot be applied based on Mr. Smith's alleged destruction of certain files. The government has not shown that Mr. Smith had any obligation to retain files or that Mr. Smith shredded documents that were *material* to an investigation *for the purpose* of obstructing an investigation. Indeed, the timing and circumstances do not support such an inference.

The government never tried to subpoena any documents from Mr. Smith or his company. Investigators never executed a search warrant to get his computers or files. Mr. Smith could not obstruct an investigation by shredding files that the government never even bothered to seek. To this day, the government has not explained how the allegedly shredded documents were material to this investigation. And the enhancement applies only to "destroying . . . evidence *that is material.*" U.S.S.G § 3C1.1 cmt. n.4(D) (emphasis added).

Moreover, logic dictates Mr. Smith did not think he had done anything wrong by shredding these files (or he would not have spoken about it out of the blue in the bankruptcy court). *See* Gov't Ex. 1215-14 (audio). If he had destroyed any evidence *for the purpose* of obstructing an investigation, he presumably would have tried to cover up that action. Instead, he did the opposite. Consciousness of guilt is a two-way street and Mr. Smith evidenced no guilty conscience after shredding these files.

Finally, Mr. Smith had a legitimate reason to shred these files. As Mr. Smith explained on the record at the bankruptcy hearing, he recently closed an insurance and annuities business that he had run for 40 years. He decided not to renew his license and he was cleaning out his home office. It is quite conceivable that he responsibly disposed of documents from his closed business as a legitimate business practice, with many or all of the documents being entirely unrelated to this investigation. In the end, we are left to speculate as to whether any documents material to the investigation were destroyed and, if so, why. That does not meet the government's burden.

### V.  FACTUAL OBJECTIONS RELATED TO CHARGED OFFENSES

As the Court is aware, Mr. Smith was convicted after trial and has not admitted to the offense conduct listed in the PSR. Failure to object to information in the PSR can be deemed an admission under certain circumstances. *See generally United States v. Milam*, 443 F.3d 382, 386 (4th Cir. 2006). Mr. Smith thus objects to those facts in the PSR that effectively assert his guilt on these charges to avoid any implicit admission by inference. This objection encompasses those objections on Pages 37-39 of the PSR, which are incorporated here by reference, not otherwise addressed in this filing. As he did at trial, Mr. Smith does not admit his guilt and exercises his right to remain silent as to the offenses charged in this case.

Respectfully submitted,

AGHEE WILLIAM SMITH, II

By:_____/s/_____

Lindsay Jo McCaslin
VSB No. 78800

Andrew W. Grindrod
VSB 83943

Assistant Federal Public Defenders
Attorneys for Aghee William Smith, II
Office of the Federal Public Defender
150 Boush Street, Suite 403
Norfolk, Virginia 23510
Telephone: 757-457-0800
Telefax: 757-457-0880
Email: lindsay_mccaslin@fd.org
andrew_grindrod@fd.org