IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE *EASTERN DISTRICT OF VIRGINIA*
*Norfolk Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 2:19cr147 |
| v. | ) | |
| | ) | |
| AGHEE WILLIAM SMITH, II, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S POSITION ON STATUTORY SENTENCING FACTORS

The Defendant, Aghee William Smith, II, by counsel and pursuant to Federal Rule of Criminal Procedure 32, Section 6A1.2 of the United States Sentencing Guidelines, and the Sentencing Procedures Order, and having reviewed the Presentence Investigation Report ("PSR"), states his position with respect to the statutory sentencing factors. Objections to the PSR and guidelines are filed separately.

### I.   OVERVIEW OF SENTENCING REQUEST

Had Mr. Smith pled guilty pursuant to the offered plea agreement, Mr. Smith's sentence would have been – at most – 5 years. Some of his co-defendants accepted similar plea offers and received 5-year sentences. Since the Court accepted the plea agreements for those in similar positions as Mr. Smith (like Sellers and Barnett), it is clear that a plea in this case would have been accepted as well.

The sentencing guidelines suggest that a defendant should receive some modest benefit for pleading guilty, which is reflected by the three-level reduction for "acceptance of responsibility." *See* U.S.S.G. § 3E1.1. When Mr. Smith exercised his constitutional right to trial, he lost the benefit of that guidelines reduction. But nothing in our legal systems suggests that people should receive dramatic windfalls for pleading guilty or dramatic punishments for exercising the constitutional right to trial. Whether a person goes to trial or pleads guilty, the offense conduct, the harm to victims, the

1

legitimate interests in punishment – the fundamental equities at stake in sentencing – remain unchanged. We ask this Court to limit the trial tax to one that is reasonable under the guidelines. An outsized tax is unwarranted and contrary to concepts embodied in our Constitution. This is not only important to ensuring that the sentences given to the different defendants in this case are fair but also to ensuring that people across the federal criminal legal system – often people over whom the government already has tremendous leverage – are not effectively coerced into giving up their constitutional right to trial.

Similarly situated co-defendants who pleaded guilty in this case received sentences of 60 months. Sixty months is a guidelines sentence for a first-time offender with offense level 24. But, of course, that would reflect a three-level reduction for acceptance under § 3E1.1. Withholding from Mr. Smith that incentive to plead guilty proscribed by the guidelines would give him an offense level of 27, resulting in a recommended sentence of 70 to 87 months.

Accordingly, considering the other sentences in the case for disparity, and without a reduction for acceptance, Mr. Smith respectfully requests a sentence between 70 and 87 months. At 70 years old and with no criminal history, such a sentence will certainly punish Mr. Smith while also acknowledging that it is likely to comprise much of his remaining life, if not all of it. A sentence from 70-87 months is sufficient but not greater than necessary under § 3553(a).

## II.   MR. SMITH'S HISTORY & CHARACTERISTICS REVEAL A LIFE OF FAMILY AND CHURCH.

For nearly 70 years, Mr. Smith lived a quiet life that revolved around family and church. He had never been charged or convicted of a crime, never received a civil injunction, and had certainly never spent a day in jail. Now, at 70 years old, he sits in Western Tidewater Regional Jail facing a potential life sentence.

Born premature and with Cerebral Palsy, Mr. Smith's required a lot of medical treatment early in life. PSR ¶ 79. He was unable to walk, eventually only being able to walk with leg braces. He

2

had colon surgery at five years old, and his parents sent him oversees for an additional surgery to hopefully enable him to walk normally. Neither parent was able to accompany him oversees due to work duties and a new baby (Mr. Smith's sister), so his grandmother went in their place. Exhibit 3 (letter from Debra Curtis). Being far away, his parents weren't able to comfort him much while he was in the hospital as a young child.

Despite these medical absences from the home, Mr. Smith grew up in a tight-knit military family that moved to a new location every few years. PSR ¶ 70. His father worked in Chaplain Services for the Air Force for over 20 years, and along with his wife, raised four children in a Christian household. PSR ¶¶ 70-72. Mr. Smith grew up attending the Church of Latter-Day Saints, but since his father worked in non-denominational Chaplain Services, Mr. Smith formed strong connections to other churches and religions too. PSR ¶ 71.

In Mr. Smith's teen years, the family returned to the United States. At 17, he left school to begin working, and later returned to earn his GED. PSR ¶ 90. He entered a rebellious phase, drinking excessively and experimenting with drugs a couple times. PSR ¶ 87. In his 20s, Mr. Smith had two failed marriages, one ending in divorce and the other quickly annulled. PSR ¶ 73. At 30 years old, Mr. Smith decided that he needed to change his life. He acknowledged his problems with alcohol, began going to Alcoholics Anonymous ("AA"), and stopped drinking. PSR ¶ 88. Mr. Smith has remained completely sober for over 40 years. *Id.*

Once sober, Mr. Smith married Sue, to whom he has now been married for over 30 years. Mr. Smith had two children from his first marriage, and Sue had four children from a previous marriage. PSR ¶¶ 74-75. Combining the families, Mr. Smith raised the younger of Sue's children as his own. Today, Mr. Smith maintains a good relationship with the children, one of whom has been living with he and Sue due to medical issues. PSR ¶ 75. The youngest child, Rebecca Miles, recalls that Mr. Smith came into her life after her biological father left, and "loved me as his own." Exhibit

1 (letter from Rebecca Miles). She fondly remembers that Mr. Smith "adopted me officially when I was 11 years old. It was one of the most special days of my life. I was able to take on his last name, which I was proud to carry." *Id.* During a rough time in her adult life, Mr. Smith welcomed Rebecca back into the home along with her newborn son. *Id.* Now 9 years old, her son and his "papa" share a bond that "is unlike any other." *Id.* Reflecting on the relationship between her son and her dad, Rebecca writes, "[h]e spent quality time with my son [], helped mold him into the sweet boy he is now." *Id.* Now with eight children, Rebecca is happy that "papa now has a whole bundle of kids to love and teach." *Id.*

Apart from his family, Mr. Smith's free time revolved around church and AA. He was ordained into the Church of Latter-Day Saints in the 1970s. PSR ¶ 76. He and Sue have attended the same temple for decades. Over the years, Mr. Smith helped the church in many capacities, including training those responsible to teach Sunday school, serving in the bishopric, as a counselor, and as an ordinance worker. PSR ¶ 76. He "carries out his ecclesiastical responsibilities with impeccable integrity." Exhibit 6 (letter from Nancy Ralls). Mr. Smith and fellow church member Stephen Edwards "spent a year together co-teaching the youth (10yr) in the primary program. Our duties consisted of reading, singing, acting, and learning about positive role models." Exhibit 5 (letter from Stephen Edwards). Mr. Edwards also met with Mr. Smith a "few times a week over the last three years" to "deep dive into the scriptures." *Id.* After regular and close contact, Mr. Edwards finds Mr. Smith to be "a kind and generous man." *Id.*

It's important to note that this religious devotion is not a newfound salvation for Mr. Smith – religion has been a constant in his life for decades. Those closest to him recall the steady importance of church and faith in his life. When his mother was ill in her final years, Mr. Smith "would drop everything and come give her a Blessing by 'The laying on of hands' that he was bestowed from the Priesthood of the Mormon Church and his faith to give." Exh. 3. According to

his sister Debra, it "seemed to help all of us." *Id.* His sister writes that Mr. Smith "sincerely believes in the hereafter and that the way you live your life here on earth determines whether or not you get to be with your family, loved ones and the Heavenly Father." *Id.*

Friends and family repeatedly tell stories of kind things that Mr. Smith has done over the years simply to help others.

- Mr. Edwards recalls losing his job at the age of 50 and feeling lost, and Mr. Smith giving him a desk and chair to help him start over. Exh. 5.

- Tim Womeldorf describes Mr. Smith helping disadvantaged men find housing and employment. Exh. 10.[1]

- Nancy Ralls recounts the time Mr. Smith bought a full set of tires for someone who needed them. Exh. 6.

- Matt Fowles says Mr. Smith helped his driving instructor find safer housing. Exh. 9.

- His wife Sue remembers many times when Mr. Smith would bring someone into their home just to let them shower, wash their clothes, and to rest. He even helped one man get some teeth fixed at the dentist.  Exh. 2.

- Janice Hansen describes a homeless man that Mr. Smith was helping with his alcohol addiction. "This young man spent many hours at the Smith home during the day because he was homeless and could only be at the homeless shelter over night. Bill and Sue included him in family dinners and activities just to help him." Exh. 7.

- His daughter Rebecca remembers "innumerable times he brought struggling people over from [AA meetings], and helped them by finding them work (either in our home or elsewhere)." Exh. 1. "He has shown me what it means to love everyone, regardless of status, regardless of whether or not they've even had a recent shower, there is no judgement from him." *Id.*

In the same letters that describe simple and caring things that Mr. Smith has done for those in his local community, there is a commonality of describing Mr. Smith as "a bit too trusting at times." Exh. 4 (letter from Cherie Bradley). His sister-in-law Cherie Bradley uses that phrase, and she has known Mr. Smith for 30 years. His wife Sue wrote that "he has always expected to be able to trust

---

[1] Exhibit 10 contains two versions of the letter, both provided by Mr. Womeldorf. One version is signed, but image is blurry. He also sent an unsigned copy that is easier to read. Counsel included both for the Court's convenience.

those he associated with." Exh. 2. Despite not wanting to "speak ill of my brother [Mr. Smith]," Debra admits that "anyone who knows Bill" knows that "he is gullible." Exh. 3. She continues, "There is not a time that I remember that whatever the newest miracle cure or herbal remedy he would try and instantly he was the best poster child they could have for a product." *Id.* Very much aligned with his sister's observation, Mr. Smith sister-in-law notes that if Mr. Smith "saw others in physical pain he would offer his help in his remedies that he had felt he had success with." Exh. 4.

Even with 40 years of sobriety, Mr. Smith continues to attend AA classes several times per week, and daily if possible. Exh. 6. Over the decades, Mr. Smith has sponsored numerous individuals new to the AA program to help with accountability. Mr. Smith enjoys the mentorship and the friendships he built along the way.

Mr. Smith understands that he has been found guilty of serious charges and that many people have been financially hurt. He also wants the Court to know that the charges do not represent the whole of his life. At 70 years old, his time left in this life is much more limited than many who come before this Court. He hopes to become a contributing member of society once again, to spend time with his grandchildren, and use what time is left to serve his community, like he has done for most of his life.

## III. MR. SMITH'S AGE AND MEDICAL DIAGNOSES SUPPORT A SENTENCE WELL BELOW GUIDELINES.

Section 3553 requires this Court to consider the sentencing factors as they related to *Mr. Smith*, and the guidelines are just one factor of many. While the guidelines produce a numerical range for the courts to consider, the Guidelines Manual acknowledges that the recommended range does not always reflect a just sentence, and that additional "specific offender characteristics" may need to be taken into account. Section 5H1.1 states that "[a]ge may be a reason to depart downward in a case in which the defendant is elderly and infirm." It further states that "[p]hysical condition, which

may be related to age," "may be relevant in determining whether a departure is warranted." § 5H1.1; § 5H1.4.

As noted in the PSR, Mr. Smith suffers from numerous medical problems that require careful monitoring. Less than a year ago, he was hospitalized for six days for systolic heart failure, sepsis, and syncope. PSR ¶ 81. He remains on several medications for these conditions. PSR ¶ 84. Related to his medical appointment in June 2021, and again in November 2021, Mr. Smith will very likely require surgery soon. PSR ¶¶ 80, 82. If the Court were to sentence Mr. Smith to 70 to 87 months' incarceration, he would be released in his mid to late 70s. Such a term of incarceration will necessarily amount to a greater proportion of his remaining life, and could even amount to a life sentence. *See* Hannah T.S. Long, *The "Inequality" of Incarceration*, 31 Colum. J. L. & Soc. Probs. 321, 343-44 (1998) (suggesting that prison sentences be adjusted for life expectancy due to age and illness).

In addition to Mr. Smith's current medical issues, he will necessarily endure prison conditions that will lead to further deterioration and ultimately reduce his life expectancy. "[P]revalent problems of inmates older than age 55… accelerate their aging processes to an average of 11.5 years older than their chronological ages after age 50." U.S. Dep't of Justice, National Institute of Corrections, *Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, at 10 (2004), *available at* https://nicic.gov/correctional-health-care-addressing-needs-elderly-chronically-ill-and-terminally-ill-inmates. Elderly inmates "are frightened, anxious, and dependent, particularly on prison staff… often producing illness and debilitation as manifestations of decompensation." *Id.* Sadly, for these very reasons, BOP struggles to care for elderly inmates. In 2016, the Department of Justice admitted:

> BOP institutions lack appropriate staffing levels to address the needs of an aging inmate population and provide limited training for this purpose. Aging inmates often require assistance with activities of daily living, such

as dressing and moving around within the institution. However, institution staff is not responsible for ensuring inmates can accomplish these activities.[2]

To further compound the problem, elderly inmates "can go unnoticed when older prisoners who are weaker and less resistant just disappear from the sphere of staff, staying in their cells. The fact that they cause few problems in terms of order and security can contribute to the perception that they do not require attention."[3] Whether Mr. Smith receives proper medical treatment or not, though, it's certainly true that any term of imprisonment is time that he will not be spending with his family – time that becomes far more valuable as one ages.

Furthermore, the efficacy of a lengthy prison sentence is not supported by data. According to the Bureau of Prisons, only 2.7% of inmates are over 65 years old.[4] The recidivism rate for those over 65 years old when released is by far the lowest at 6.5%.[5] For fraud offenses, the recidivism rate for those over 60 years old is even lower.

[2] Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, Dept. of Justice, at ii, available at https://oig.justice.gov/reports/2015/e1505.pdf (last accessed June 16, 2022).
[3] Int'l Committeee of the Red Cross, *Aging and Imprisonment*, at 11, available at https://www.silvereco.org/en/wp-content/uploads/2018/10/ageing-and-imprisonment-summary-report.pdf (last accessed June 16, 2022).
[4] Bureau of Prisons, *Inmate Age*, available at https://www.bop.gov/about/statistics/statistics_inmate_age.jsp (last accessed June 16, 2022).
[5] U.S. Sent. Commission, *The Effects of Aging on Recidivism Among Federal Offenders*, at 29, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (last accessed June 16, 2022).

## Recidivism Rates of Recidivism Study Offenders by Primary Offense Type and Age at Release

| | N | Rearrest % | Reconviction % | Reincarceration % |
|---|---|---|---|---|
| **60 Years of Age or Older** | | % | % | % |
| **Primary Offense Type** | | | | |
| Drug Trafficking | 286 | 17.5% | 10.1% | 6.6% |
| Firearms | 96 | 30.2% | 20.8% | 15.6% |
| Fraud | 297 | 12.5% | 6.7% | 4.7% |
| Robbery | 29 | 34.5% | 13.8% | 13.8% |
| All Other | 496 | 14.5% | 7.7% | 5.9% |

Interestingly, research on white-collar offenders in particular found no difference in the deterrent effect of probation compared to that of imprisonment. *See* David Weisburd *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995); Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007) ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."). According to "the best available evidence, … prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen *et al.*, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). It is unnecessary to impose a lengthy prison sentence in this case to achieve general deterrence. *See also* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006) (noting "increases in severity of punishments do not yield significant (if any) marginal deterrent effects"). Mr. Smith's age alone makes him statistically less likely to engage in any criminal activity, and the average rate of recidivism will continue to decrease with age. Not only is lengthy incarceration unnecessary for deterrence and recidivism, but any time given will amount to harsher punishment for Mr. Smith than for younger inmates.

**IV.    A SENTENCE OF 70-87 MONTHS IS "JUST," WOULD "PROMOTE RESPECT FOR THE LAW," AND WOULD ACCOUNT FOR MEDICAL TREATMENT IN THE "MOST EFFECTIVE MANNER."**

This Court should pause before sentencing Mr. Smith to a term of years amounting to a life sentence. "There is a worthy tradition that death in prison is not to be ordered lightly, and the probability that a convict will not live out his sentence should certainly give pause to a sentencing court." *United States v. Wurzinger*, 467 F.3d 649, 652 (7th Cir. 2006) (collecting cases); *see also* Kathleen Dean Moore, *Pardons: Justice, Mercy, and the Public Interest* 173-74 (1989) (describing tradition of "deathbed pardons").

Section 3553 requires the Court to consider what period of incarceration is "just" and would "promote respect for the law." Here, a sentence of 70-87 months is "just" in light of age and medical condition. The "justness" of incarceration should be viewed not in a vacuum, but rather in the context of an American judicial tradition that recognizes the unique severity of a de facto life sentence.

> Death is by universal consensus a uniquely traumatic experience, and prison often deprives defendants of the ability to be with their families or to otherwise control the circumstances of death. A sentence that forces this experience on a prisoner is quantitatively more severe than a sentence that does not consume the entirety of a defendant's life, inflicting greater punishment and creating a stronger deterrent effect.

*Wurzinger*, 467 F.3d at 652 (internal citations omitted); *cf. United States v. Gullett*, 75 F.3d 941, 951 (4th Cir. 1996) (holding that when life sentence is unauthorized by statute, court must consider defendant's life expectancy to avoid imposing a sentence that—though stated as a term of years—is likely to be a *de facto* life sentence).

Under federal law, the "judge must sentence in a manner that reflects his role as the implementor of society's search for justice … without ever being indifferent to a defendant's plea for compassion, **for compassion also is a component of justice**." *United States v. Kloda*, 133 F. Supp. 2d 345, 348 (S.D.N.Y. 2001) (emphasis added). For example, in *United States v. McDougal*, the

court imposed a time-served sentence due to the defendant's health concerns and wrote, "Surely, this approach will create and motivate greater respect for the system. Indeed, mercy and compassion are just as vital and essential to the system as strictness."  16 F. Supp. 2d 1047, 1048 (E.D. Ark. 1998). As in *McDougal*, the need to promote respect for the law weighs in favor of a sentence that reasonably punishes without equating to a life sentence.

## V.  A SENTENCE OF 70-87 MONTHS WOULD PREVENT UNWARRANTED SENTENCE DISPARITIES.

Comparing Mr. Smith's case to other similar cases, a sentence of 70-87 months is appropriate for two reasons. First, such a sentence takes into consideration similar cases, including co-defendants of this case and unrelated fraud cases. Second, no policy rationale supports significant and systemic increases to the incentive to plead guilty when the federal guilty plea rate is already unhealthily high.

### (1)  Similar cases support a sentence of 70-87 months.

Section 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Mr. Smith's decision to take his case to trial and exercise his Fifth Amendment right against self-incrimination does not change his record or the conduct for which he stands convicted. So a sentence disparity between what he would have received as a result of a plea and the sentence he receives here can be justified only if "warranted."  Yet the law is clear that Mr. Smith's decision to go to trial can have no bearing on the sentencing imposed. *See Hess v. United States*, 496 F.2d 936, 938 (8th Cir. 1974). Accordingly, any disparity between the sentence Mr. Smith would have received had he pleaded guilty and the one receives here is an "unwarranted" under § 3553(a)(6) and should be avoided.

In this case, the indictment named six co-defendants, *see* ECF No. 1, and in the related case of *United States v. Daryl Bank*, 2:17cr126, ECF No. 105 (E.D. Va. May 25, 2018), the indictment

named three co-defendants. The defendants who designed the investments, who created the marketing materials, and who controlled the money were: Kent Maerki, Daryl Bank, David Alcorn, and Raeann Gibson. The indictments listed three salesmen: Mr. Smith, Tony Sellers, and Thomas Barnett. In addition, Billy Seabolt served as Daryl Bank's attorney and advisor, while Norma Jean Coffin is Kent Maerki's wife and was Chief Financial Officer of DSPF. She also controlled the multitude of personal and business bank accounts they held.

Daryl Bank, who founded numerous investments, relocated to avoid law enforcement, and had previously been barred from FINRA, received a sentence of 35 years. At 51 years old, Daryl is considerably younger than Mr. Smith and others. 2:17cr126, ECF No. 472. This Court sentenced Raeann Gibson, who handled all of the money and bank accounts for Mr. Bank, created and tracked everything on meticulous spreadsheets, and was described by the Court as the "heart" of the conspiracy, to ten years in prison. 2:17cr126, ECF. No. 288. Like Mr. Bank, Ms. Gibson is relatively young. Kent Maerki, at 78 years old, received a sentence of 16 years – much lower than Mr. Bank's – despite being a founder of both DSPF and Janus Spectrum, as well as a self-proclaimed expert on spectrum. ECF Nos. 161, 165. Mr. Alcorn has not yet been sentenced. For the salesmen, Tony Sellers received a sentence of five years. ECF No. 325. Mr. Barnett has not yet been sentenced, but his sentence will be capped at five years as well.

To look at similar yet unrelated fraud cases, in *United States v. Mearing*, 2:17cr94 (E.D. Va. Dec. 21, 2017), the court sentenced the defendant to 60 months for fraud resulting in a loss of over $15 million. Similarly, in *United States v. Klekamp*, 3:16cr414 (E.D. Va. Sept. 14, 2017), the court imposes a sentence of 51 months for a bank fraud that resulted in over $10 million in loss. In *United States v. Frank*, 1:17cr114 (E.D. Va. Sept. 8, 2017), the court sentenced the defendant to 78 months for embezzling $19.4 million and using the money to purchase an Aston Martin, a Ferrari, BMWs, Porches, McLarens, and other expensive cars.

In this case, Mr. Smith was not alleged to have created any of these investments. He was not alleged to control the money or even have access to the bank accounts. His profit through commissions was far below the loss amount, with the vast majority of the funds going to those in charge.

Mr. Smith's sentence should not be comparable to Mr. Maerki's, who is listed at the top of the indictment for being the most culpable and was pivotal in the creation and execution of DSPF and spectrum. For those who are similarly situated, such as Tony Sellers, it is incomprehensible that Mr. Sellers would receive 60 months whereas Mr. Smith could receive a 400% higher sentence for the nearly the same activity. (It appears that Mr. Sellers will likely have his 60-month sentence reduced for testifying against Mr. Smith, even though he lied under oath at trial and had to be impeached with his own statement of facts.) Accordingly, a sentence of 70-87 months would consider the other sentences in this case, as well as minimize sentencing disparities with other cases.

### (2) The current federal guilty plea rate of nearly 98% is unhealthy and detrimental to the justice system.

Nearly 98% of federal offenders pled guilty in 2020, according to the Sentencing Commission.[6]  This figure is up from 84% in 1990, which led the Wall Street Journal to announce in 2012 that the "triumph of plea bargaining in the federal system, which has gathered pace in recent years, is nearly complete."[7]  Indeed, it cannot go much higher.

As one district court observed, "An excessively high rate of guilty pleas is unhealthy for our justice system."[8]  In 2003, two scholars evaluating the federal-plea rate concluded, "We do not have

---

[6] U.S.S.C., *Overview of Federal Criminal Cases: Fiscal Year 2020*, at 12 (97.8%), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/FY20_Overview_Federal_Criminal_Cases.pdf (last accessed June 16, 2022).

[7] Gary Fields and John R. Emshwiller, *Federal Guilty Pleas Soar As Bargains Trump Trials*, Wall St. J. (Sept. 23, 2012), *available at* http://www.wsj.com/articles/SB100008723963904435893045776 37610097206808 (last accessed June 16, 2022).

[8] *United States v. Kupa*, 976 F. Supp. 2d 417, 451 (E.D.N.Y. 2013), *aff'd*, 616 F. App'x 33 (2d Cir. 2015); *see also* Ronald Wright & Marc Miller, *Honesty and Opacity in Charge Bargains*, 55 Stan. L.

a 'magic rate' of trials that reveals an unhealthy system, but a rate of 3.4% seems sufficiently low to be worrisome."[9] Since then, the trial rate has only gone down. This is "worrisome" for a number of reasons.

*First*, the demise of the trial undermines the broader criminal justice system because most rights held sacred by the system are tied directly or indirectly to trial. Professor Graham Hughes has observed that the virtual disappearance of the criminal trial in favor of pleas "fundamentally disorients the system, for our professed constitutional model depends upon the setting of a trial."[10] "Constitutional rights and the due process model are connected with incidents of a trial or events that look forward to a trial."[11] Indeed, nearly every constitutional right enjoyed by a criminal defendant is abandoned by entering a plea of guilty—or at least it becomes functionally meaningless. Although waivers are not inherently problematic, when the trial rate is so high that these rights are virtually pled out of existence, the criminal justice system as whole suffers.

*Second*, the lack of federal criminal trials threatens more fundamental structural aspects of our constitutional system. The criminal jury trial is not important only to criminal defendants; it is a check on the power of the government and a hallmark of popular sovereignty. According to the Supreme Court, "Jury service preserves the democratic element of the law, as it guards the rights of the parties and ensures continued acceptance of the laws by all of the people."[12]

Of all the constitutional checks on government power discussed around the time of the Founding, the criminal jury was the most important because it is a check controlled directly by the

---

Rev. 1409, 1416–17 (2003) ("[E]ven in the modern administrative criminal system, some minimum trial rate is necessary as a measure of a healthy system.").

[9] Wright & Miller, *Honesty and Opacity in Charge Bargains*, at 1416–17.
[10] Graham Hughes, *Pleas Without Bargains*, 33 Rutgers L. Rev. 753, 753 (1981).
[11] *Id.*
[12] *Powers v. Ohio*, 499 U.S. 400, 407 (1991).

people. Indeed, "the only right secured in all state constitutions penned between 1776 and 1787 was the right to trial by jury in criminal cases."[13]

> [The right to a criminal jury was] born of an astute, practical understanding of government power and its exercise. The court system is where government policy is imposed on individual people, and juries historically are the last popular hurdle the government must clear before that imposition. […] It is clear beyond peradventure that what the Founders had in mind by protecting criminal juries was the protection of the people's ability to continue so to rule. […]
>
> The criminal jury is not simply a machine into which we insert data and out of which come "facts" for judges' use in legal rulings. It is also—and more importantly—an independent source of power in our constitutional system.[14]

It is important that the right to a jury trial—especially a criminal jury trial—be regularly exercised, lest it become a vestige of the constitutional system it was designed to protect.

*Third*, excessively high plea rates reflect a compelling incentive to plead guilty, which applies to the innocent and guilty alike. To state the obvious, "plea bargaining pressures even innocent defendants to plead guilty to avoid the risk of high statutory sentences."[15] As discussed below, the decision whether to plead guilty is—for a rational defendant—unrelated to guilt or innocence. The decision is governed by the difference between the expected trial and plea outcomes. A plea rate of 97.8% indicates that there exists a *strong* incentive to plead. It is important to recognize that this incentive applies equally to the innocent and the guilty.

*Fourth*, when a substantial reduction for pleading is the norm, the trial tax becomes highly feared. Scholars have questioned this "reward" theory. In a system where 98% of cases end in a plea, "it is unclear why the 'discounted' punishment imposed in that [98%] of cases should not rather be

---

[13] *United States v. Kandirakis*, 441 F. Supp. 2d 282, 310–11 (D. Mass. 2006) (quoting Akhil Reed Amar, *America's Constitution: A Biography*, 83 (2005))

[14] *Kandirakis*, 441 F. Supp.2d at 310-14.

[15] Rachel E. Barkow, *Separation of Powers and the Criminal Law*, 58 Stan. L. Rev. 989, 1034 (2006).

considered the norm."[16] "Where almost no one pays the 'manufacturer's suggested retail price,' and almost everyone buys the item at a 'discounted' price, no one really gets a 'bargain,' and the product's real price is what is actually charged in the marketplace."[17] There is something fundamentally odd about discussing this reward/penalty phenomenon as though "95% of the 2,292,133 Americans behind bars ha[ve] been rewarded for their pleas of guilty and therefore sentenced less severely than they deserved (or than was necessary to fully protect the public)."[18] To quote a judge who put it bluntly:

> Criminal trial rates in the United States … are plummeting due to the simple fact that today we punish people—punish them severely—simply for going to trial. It is the sheerest sophistry to pretend otherwise.… Sugarcoat it as we may with terms like "acceptance of responsibility" … new and unprecedented is the severity of the punishment we are meting out to those whose only differentiating factor is that they ask for the chance to have an independent jury evaluate the evidence.[19]

Even the Department of Justice has recognized that the lighter sentences for those who avoid trial "problematic" because it "demonstrate[s] that if a defendant opts to invoke the Sixth Amendment right to a trial by jury, he or she will likely have a more unfavorable outcome."[20]

Judge Wald of the D.C. Circuit observed that whether a court "raise[s] [a man's] sentence because he went to trial or denie[s] [him] a shorter sentence for the same reason is irrelevant because his constitutional right was burdened either way."[21]  Even the Supreme Court has implicitly suggested that, in reality, plea discounts punish:

---

[16] Gerard E. Lynch, *Screening Versus Plea Bargaining: Exactly What Are We Trading Off?*, 55 Stan. L. Rev. 1399, 1401 (2003).

[17] *Id.*

[18] Albert W. Alschuler, *Lafler and Frye: Two Small Band-AIDS for A Festering Wound*, 51 Duq. L. Rev. 673, 702 (2013).

[19] *Berthoff v. United States*, 140 F. Supp. 2d 50, 68–70 (D. Mass. 2001) (footnotes omitted).

[20] Bureau of Justice Assistance, U.S. Dept. of Justice, *Plea and Charge Bargaining: Research Summary*, at 2 (Jan. 2011), *available at* https://www.bja.gov/Publications/PleaBargainingResearch Summary.pdf (last accessed Sept. l6, 2016).

[21] *United States v. Jones*, 997 F.2d 1475, 1487 (D.C. Cir. 1993) (Wald, J., dissenting).

> [Defendants] who do take their case to trial and lose receive longer sentences than even Congress or the prosecutor might think appropriate, because the longer sentences exist on the books largely for bargaining purposes. This often results in individuals who accept a plea bargain receiving shorter sentences than other individuals who are less morally culpable but take a chance and go to trial.[22]

In the present case, the Court could consider the more appropriate benchmark to be what the sentence would have been had Mr. Smith pled guilty: 0 to 60 months. Now the government is asking for substantially more. But the Court's calculation of an appropriate starting point and initial benchmark for determining the appropriate sentence does not need to change also. In any event, the Court should account in some way for the fact that a 400% increase to a defendant's guidelines range is an extraordinary additional incentive to plead guilty for which there is no policy need.

*Finally*, it is worth noting that this Court's ruling serves an important signaling function. "Sentencing law becomes relevant at the end of a criminal case, after conviction, but the effects of sentencing radiate back much earlier in the case to influence both guilty plea decisions and acquittal outcomes."[23] This Court's ruling will be announced in a public order and reviewed by lawyers practicing in this court. And in a future defendant's calm, counseled consideration of whether to exercise his constitutional rights, this Court's expressed policy disagreement with plea deals that swing the trial-versus-plea sentences by 400% will have a real impact. What the Court does here directly affects Mr. Smith's life, but it will also inevitably impact the decisions of countless other men and women who stand charged with a federal crime and are considering whether the exercise of their Sixth Amendment right to trial is worth the price. Right now, 98% say "no."

---

[22] *Missouri v. Frye*, 132 S. Ct. 1399, 1407 (2012) (quoting Rachel Barkow, *Separation of* Powers, at 1034).

[23] Ronald F. Wright, *Trial Distortion and the End of Innocence in Federal Criminal Justice*, 154 U. Pa. L. Rev. 79, 129 (2005).

\*   \*   \*

This Court must impose a sentence that adequately protects the public and punishes Mr. Smith, while recognizing that Mr. Smith has lived the vast majority of his life focused on family, his faith, and helping his community. Here, nothing in § 3553(a) demands a sentence of more than 70-87 months, certainly not a sentence tantamount to life in prison. The defense respectfully requests that the Court not impose more.

Respectfully submitted,

AGHEE WILLIAM SMITH, II

By: _____/s/_____
    Lindsay J. McCaslin
    Virginia State Bar No. 78800

    Andrew W. Grindrod
    Virginia State Bar No. 83943

    Attorneys for Aghee Smith
    Assistant Federal Public Defender
    Office of the Federal Public Defender
    150 Boush Street, Suite 403
    Norfolk, Virginia 23510
    Telephone: 757-457-0800
    Facsimile: 757-457-0880
    lindsay_mccaslin@fd.org
    andrew_grindrod@fd.org