**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF VIRGINIA**

**Norfolk Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. 2:19-cr-47** |
| | ) | |
| **AGHEE WILLIAM SMITH II,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>GOVERNMENT'S POSITION ON SENTENCING</u>**

The United States of America, by and through its attorneys, Jessica D. Aber, United States Attorney for the Eastern District of Virginia, and Melissa E. O'Boyle, Elizabeth M. Yusi, and Andrew Bosse, Assistant United States Attorneys, offers the following with respect to the sentencing factors under both the United States Sentencing Guidelines and 18 U.S.C. § 3553(a). The government has no objections to the Pre-Sentence Report (PSR) and advocates for a sentence of 25 years' incarceration.    The defendant's objections are addressed below, and if necessary, the government will call FBI Forensic Accountant Alain Martell and/or IRS-CI Special Agent Andrew Bowers to present additional evidence to support the sentencing enhancements in this case.    The government will submit victim impact statements connected to this case and may have victims request the opportunity to address the Court prior to sentencing. Pursuant to 18 U.S.C. § 3771, the government intends to give such victims an opportunity to be heard at the sentencing hearing.    In support of its position, the government states as follows:

1

## I.     Background Facts

On March 21, 2019, a grand jury sitting in Norfolk returned an indictment against Kent Maerki (Maerki), David Alcorn (Alcorn), Aghee William Smith II (Smith), Tony Scott Sellers (Sellers), Thomas L. Barnett (Barnett), and Norma Jean Coffin (Coffin) arising from their scheme to defraud hundreds of investors across the country.   The indictment charged the defendants with conspiracy to commit mail and wire fraud in violation of Title 18, United States Code, Section 1349; wire fraud in violation of Title 18, United States Code, Section 1343; conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h); and engaging in unlawful monetary transactions in violation of Title 18, United States Code, Section 1957.   The charges stemmed from a massive multi-year scheme to defraud investors – almost all of whom were at or near retirement age – of millions of dollars.   The indictment provided substantial details about this scheme, through which the defendant and others successfully defrauded investors across the country.

Trial began on February 1, 2022, and spanned three full weeks. After listening attentively to witness testimony and viewing numerous exhibits and videos, the jury convicted Alcorn and Smith of all pertinent counts in the indictment.   Specifically, the jury convicted Smith of two counts of conspiracy to commit mail and wire fraud, and four counts of wire fraud.   After trial, the Court remanded the defendant into the custody of the U.S. Marshals and scheduled sentencing for 11:00 a.m. on June 23, 2022.

## II.     Standards Governing Sentencing

In three separate opinions, the Supreme Court established the modern federal sentencing regime.   In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court rendered the

2

Sentencing Guidelines purely advisory, but emphasized that a sentencing court must consider both the Guidelines and the 18 U.S.C. § 3553(a) factors when making a sentencing decision. *Id.* at 264.    The Supreme Court reaffirmed this principle in *United States v. Kimbrough*, 552 U.S. 85 (2007), emphasizing that "the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence."    *Id.* at 90. Finally, in *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court instructed that the sentencing court should calculate the sentencing guideline range, permit the government and the defendant "an opportunity to argue for whatever sentence they deem appropriate," consider all of the § 3553(a) factors, and finally pronounce a sentence taking into account all of the relevant factors.    *Id.* at 49–51.    The *Gall* Court further instructed that, in the event that the sentencing court decides to impose a variance sentence, the court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* (noting that a "major departure should be supported by a more significant justification than a minor one.").

Applying these standards, the Fourth Circuit has concluded that a sentencing court must: "(1) properly calculate the Guideline range; (2) allow the parties to argue for the sentence they deem appropriate and determine whether the § 3553(a) factors support the sentences requested by the parties; and (3) explain its reasons for selecting a sentence."    *United States v. Simmons*, No. 07-4888, 2008 WL 681764, at *1 (4th Cir. March 11, 2008) (citing *United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007)).

### III.    The Advisory Guideline Range Was Appropriately Calculated

The government has no objections to the Pre-Sentence Report and maintains that the appropriate advisory guideline range is 262-327 months.    Defendant has objected to: (1) the general facts proven at trial; (2) the twenty-level increase for creating losses greater than $9,500,000 but less than $25,000,000; (3) the enhancement for securities law violations under U.S.S.G. § 2B1.1(b)(20)(A)(iii); and (4) the two-level increase for obstruction of justice based, in part, on Smith telling a client not to speak with law enforcement and his admitted shredding of all of his documents after knowing about the investigation.    To the extent necessary, the government will refer the Court to specific testimony presented during trial as well as admitted trial exhibits to support the validity of the allegations and calculations in the PSR.

### A.    The Pre-Sentence Report

The probation office calculated defendant's advisory guideline range as 262-327 months. Defendant's base offense level is 7 pursuant to U.S.S.G. § 2B1.1.    The probation office appropriately concluded that the following enhancements applied:

- A 20-level enhancement because the losses exceeded $9,500,000 (U.S.S.G. § 2B1.1(b)(1)(K));

- A 6-level enhancement because the offense resulted in substantial financial hardship to 25 or more victims (U.S.S.G. § 2B1.1(b)(2)(C));

- A 4-level enhancement because the offense involved a violation of a securities law and, at the time of the offense, the defendant was an investment advisor or a person associated with an investment adviser (U.S.S.G. § 2B1.1(b)(20)(A)(iii)); and

- A 2-level enhancement for obstruction of justice (U.S.S.G. § 3C1.1).

4

The application of these enhancements results in an adjusted offense level of 39.   Defendant is in criminal history category I.   Accordingly, defendant's advisory guideline range is 262-327 months.

### B.   Defendant's Objections Are Without Merit

#### 1.   Defendant Has Not Carried His Burden Of Demonstrating That The Facts Proven At Trial Are Untrue or Inaccurate

Defendant made a generalized objection to the facts in the PSR that were proven at trial. Each and every paragraph in the PSR was based on evidence the government presented at trial. The government is not relying on relevant conduct to enhance the defendant's sentence.   As discussed further below, the government has been extremely conservative about the loss estimates in this case, including by excluding losses related to weMonitor Group, LLC, from its loss calculation despite the fact that Smith sold that junk investment as well.   Defendant's objections to the offense paragraphs are incorrect and without merit because he fails to demonstrate why the facts – proven at trial – are unreliable, untrue, or inaccurate.

The Fourth Circuit has rejected defendants' attempts to turn sentencing hearings into substantive retrials of the facts established before a petit jury.   Specifically, the Fourth Circuit has concluded:

> A mere objection to the finding in the presentence report is not sufficient.   The defendant has an affirmative duty to make a showing that the information in the presentence report is unreliable, and articulate the reasons why the facts contained therein are untrue or inaccurate.   Without an affirmative showing the information is inaccurate, the court is "free to adopt the findings of the [presentence report] without more specific inquiry or explanation."   The burden is on the defendant to show the inaccuracy or unreliability of the presentence report.

*United States v. Terry*, 916 F.2d 157, 162 (4th Cir. 1990) (citations omitted); *see also*

*United States v. Love*, 134 F.3d 595, 606 (4th Cir. 1998).   Smith has failed to carry his

burden that the factual paragraphs are in any way inaccurate and untrue.    The jury heard

all of this evidence at trial and convicted him of all counts in the indictment against him –

including two conspiracy counts.    The government respectfully submits that defendant's

objections to the offense conduct should be overruled.

### 2. The Pre-Sentence Report Appropriately Applied A 20-Level Enhancement For Actual Loss

Defendant objects to the 20-level enhancement for losses exceeding $9,500,000.

U.S.S.G. § 2B1.1(b)(1)(K).    The Court is well aware of the standards applicable to the loss

calculation.    Pursuant to the Guidelines, the court "need only make a reasonable estimate of the

loss."    U.S.S.G. § 2B1.1, App. Note 3(C).    The guidelines further note that "[t]he sentencing

judge is in a unique position to assess the evidence and estimate the loss based upon that

evidence."    *Id.*    As a result, a sentencing judge's calculation of the loss is entitled to

"appropriate deference."    *See United States v. Allmendinger*, 706 F.3d 330, 341 (4th Cir. 2013)

("The determination of loss attributable to a fraud scheme is a factual issue for resolution by the

district court, and we review such a finding of fact only for clear error.").    Here, actual loss

means the "reasonably foreseeable pecuniary harm that resulted from the offense."    *Id.* at App.

Note 3(A)(i).    And, for purposes of this guideline, the reasonably foreseeable pecuniary harm

means "pecuniary harm that the defendant knew, or under the circumstances, reasonably should

have known, was a potential result of the offense."    *Id.* at App. Note 3(A)(iv).

The government presented substantial evidence at trial of the *actual losses* sustained by

the victims, and those losses total more than $9,500,000.    Among dozens of other witnesses, the

government called FBI Forensic Accountant Alain Martell.    He testified to the massive amount

of losses that the victims sustained in this case.    Specifically, the government entered into

evidence Mr. Martell's binders and other exhibits that documented the amount of funds that each individual victim invested in the fraudulent securities, what happened to those funds, and how much each individual victim lost.    *See, e.g.*, Gov. Exs. 250 (DSPF Group, LLC), 517 (Spectrum 100, LLC).    If necessary, the government intends to call Mr. Martell to further substantiate the losses detailed in the Pre-Sentence Report.    The loss calculations included in the Pre-Sentence Report included losses arising from: (1) Dental Support Plus Franchise; (2) DSPF Group, LLC; (3) Spectrum 100, LLC; (4) Western Spectrum I; (5) Western Spectrum II; and (6) Xcel Bandwidth.    All of the losses related to these investments were proven at trial.    Notably, the government did not seek to include any losses related to weMonitor Group, LLC – another fraudulent investment created by Bank that Smith also sold to unsuspecting investors.    Instead, the government has elected solely to rely on the losses demonstrated at trial that were reasonably foreseeable to Smith as a participant in the two conspiracies that the jury convicted him of.    The defendant has not explained, or come forward with evidence showing, which of the losses detailed in the Pre-Sentence Report were incorrectly calculated.    These losses were real, and they were sustained by real people across this country.    The Report's inclusion of the 20-point enhancement is factually correct, and so the objection to the loss amount should be overruled.

### 3.  The Pre-Sentence Report Appropriately Applied A 4-Level Enhancement For Violation of Securities Law

Defendant also has objected to a 4-level enhancement for an offense involving a violation of securities law while the defendant was an investment advisor or a person associated with an investment advisor.    U.S.S.G. § 2B1.1(b)(20)(A)(iii).    "Investment advisor" has the meaning given that term in the Investment Advisers Act of 1940.    U.S.S.G. § 2B1.1 App. Note 16. Under the Act, "investment adviser" is defined as

7

any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities…

15 U.S.C. § 80b-2(a)(11).

"[T]he definition of investment adviser does not depend on the defendant's formal education or licensing.   Instead, the definition focuses on the defendant's business practice and how he holds himself out to investors."   *United States v. Elia*, 579 Fed. App'x 752, 754-755 (4th Cir. 2014) (citing *United States v. Elliott*, 62 F.3d 1304, 1310 (11th Cir. 1995)).

At trial, the government presented a plethora of evidence whereby Smith advertised himself as a retirement and investment advisor, and in which he sold fraudulent unlicensed securities to unsuspecting victims.   Gov. Exs. 202, 637, 826, 833, 860, 1216.   Smith even had his own radio show where he advertised himself as a retirement investment expert.   And, numerous of Smith's clients testified that they believed Smith was their investment advisor and owed them a fiduciary duty.   *See, e.g.,* testimony of Sharyon Bean; Ken Sykes.   Smith was well aware of what securities were and the restrictions on the use of deceit to sell them – he had previously been associated with a number of broker-dealers, including Stonehurst Securities, Legacy Financial Services, Sammons Securities Co., Aura Financial Services, Woodbury Financial Services, Money Securities Corp., Fortis Investors, and Quest Securities, Inc., after he passed the rigorous Series 7 examination to become a licensed securities broker.   Gov. Ex. 3 at 5-7.   He cannot now plead ignorance as to the nature of the investments he was selling or claim that he was not acting as an investment advisor.   The Court should overrule defendant's objection to this enhancement.

#### 4. The 2-Level Enhancement for Obstruction of Justice is Deserved and Appropriate

Defendant included in his objections the enhancement for obstruction of justice.

Paragraph 47 of the Pre-Sentence Report outlined the two distinct ways in which Smith

obstructed justice.   First, witness Ken Sykes testified that he spoke with Smith about the

criminal investigation.   Mr. Sykes said in no uncertain terms that Smith told him, "do not talk

to" law enforcement should they come to speak with him.   There was no objection to this

testimony nor any follow-up questions that challenged Mr. Sykes' assertion.

Second, Smith himself testified under oath during his bankruptcy deposition that he

obstructed justice.   As the Court may recall, the bankruptcy trustee asked Smith about

documents pertaining to his clients and business:

```
TRUSTEE:  Can you elucidate for me what types of files are at your
home office?
BILL SMITH:  There are no files at my home office left.  When the
predators came after me, I joyfully shredded them and I would do the
same thing again.
TRUSTEE:  So, I'm sorry, at what point in time did you shred
documents and what documents did you shred?
BILL SMITH:  When I decided to get out of the insurance business.
TRUSTEE:  Which was when, sir?
BILL SMITH:  Okay.  Which was around the beginning of 2018, and
decided not to renew my license.  It was not required for me to
archive any of their documents.  And so I joyfully got rid of them
and had my office reorganized and I use that person randomly for any
person I chose ... for any activity I chose ... organize files,
clean the computers, anything I asked her to do, she would do it.
Again, no issue and no account.
```

Govt. Ex. 1215.

Smith stated he "gleefully" shredded all pertinent documents and files concerning his

investment business and clients and cleaned his computers.   Due to these two distinct actions,

9

the 2-level enhancement is warranted and Smith's objection should be overruled.   *See* U.S.S.G. 3C1.1, App. Notes 4(A) and (D) (noting that covered conduct includes unlawfully influencing potential witnesses and shredding relevant documents).

## IV.   18 U.S.C. § 3553(a) Factors

Under § 3553(a), "[t]he Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a).   Those purposes are "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."   18 U.S.C. § 3553(a)(2).   In determining the appropriate sentence, this Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), "the kinds of sentences available," § 3553(a)(3), the Guidelines and Guideline range, § 3553(a)(4), the Guidelines' policy statements, § 3553(a)(5), "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," § 3553(a)(6), and "the need to provide restitution to any victims of the offense," § 3553(a)(7).

In light of these factors, a sentence of 25 years' imprisonment for Smith's convictions is reasonable and appropriate.

### A.   Nature and Circumstances of the Offenses

It would be hard to overstate the seriousness of defendant's crimes.   He stole *millions* of dollars from investors, most of them elderly.   He robbed innocent people of their money, their

retirements, their plans for their families and for the last decades of their life, and their trust. He did so out of an insatiable greed and complete and utter disregard of others.   The defendant, an experienced financial professional who knew the rules of the securities markets, exploited the trust his clients placed in him to steal their hard-earned money.   Even before 2010, when DSPF first came about, Smith knew that the dental investments were junk based on his millions of dollars' worth of sales of Dazzle Dental investments, all of which ended as complete losses for his clients.   Despite this, Smith doubled down and started selling DSPF.   He knew, more than any other salesman, that the claims in the offering materials for DSPF were nonsense, because he knew the previous investment on which they were based was completely wiped out.   He pitched this bunk investment mainly to those who had little to absolutely no experience in investments. He touted his alleged faith in God to make clients feel safe and secure giving him their money. And, after knowing his first investor – and then his second, and third, etc. – never received the promised returns, he continued to pitch DSPF to new investors, using the same lies, and never telling them that in fact no one was getting anything close to the returns he was touting.   Had he told them that, they would not have invested, and he would not have received his lucrative commissions.   Smith lied from the start, and that lie was compounded every time he sold DSPF to a new and unsuspecting client.

Smith also sold spectrum investments.   He started with his own Western Spectrum investment, touting the bogus lies about the investment's prior success and reliability.   Even though his own spectrum company was a failure, Smith continued to sell Bank, Maerki, and Alcorn's spectrum investments.   Again, he never told anyone about his knowledge that these were complete failures from the get-go, or that the claims he was using to sell them were not

true.   He never told his clients these were sure to fail.   Rather, he continued to brag about his supposed investment prowess and his trustworthiness due to his faith, experience, and history in the investment industry.   All of these were lies, and Smith had no problem perpetrating these lies for years.

Had investors known the truth about any of the investments on offer – and the truth of what would happen to their money after they signed on the dotted line – none of them would have gone through with the transactions.   They invested because Smith lied about the investments and they trusted Smith.   Smith abused that trust to enrich himself.   He did not care whether these investments succeeded or failed as long as he got his commission check or so-called "referral fees."

As this Court is well aware, this case is not just about a fraudulent investment scheme, improper due diligence, or misleading marketing materials.   Nor is it about standard market risk – investments with potential that simply did not pan out.   Here, the purported investment "opportunities" were just the hooks for the conspirators' larger theft scheme.   It did not matter what the claimed opportunity was – worthless dental "franchises" or spectrum licenses.   Those opportunities were the means used to steal money and enrich Smith and other conspirators.

Because Smith elected to proceed to trial, the Court has heard witness after witness describe both schemes.   Given the Court's comprehensive view of the evidence, and the fulsome recounting of the frauds in the Pre-Sentence Report, the government will not rehash the facts in detail here.   Suffice to say that the breadth of the fraud, and the length of time Smith continued it, including jumping from junk spectrum product to junk spectrum product as each in

turn failed or came under regulatory scrutiny, was extraordinary.   The losses, and their impact on the victims in this case, are equally extraordinary.

The Court has numerous impact statements submitted by Smith's and his conspirator's victims.   They are the people who are left to live the consequences of Smith's crimes, and their stories of the effect this fraud had on their lives is heartbreaking.   The impact statements give the clearest portrait of the extraordinarily serious nature and circumstances of the fraud Smith engaged in for *years*.   Because of the scale of his theft, its effects on the victims will continue for the rest of their lives.

To give one example, the Court heard at trial from Sharyon Bean, who testified about how she knew Smith for many years from their mutual spiritual group.   Ms. Bean was surprised when she received a payout from her former job, and had no idea what to do with it.   Ms. Bean discussed how clueless she was about investing, but that she trusted Smith to do right by her. When Smith started talking about some spectrum investment, Ms. Bean did not understand the technology or the investment.   Ms. Bean did not even own a cell phone.   But Smith assured her that her investment money, which was all she had for her retirement, would be safe and provide her with income and security.   Smith sold Ms. Bean the spectrum investment years after knowing that the investment had never made a dime, that all of his prior investors had lost everything, and that it was far from safe and secure.   Sure enough, due to Smith, Ms. Bean lost everything she had for her retirement.

Another victim, among many others, was Carol Groff.   She knew Smith from her church.   When she came into an inheritance, she had no clue what to do with it; she had struggled with learning disabilities her entire life, and so money and investing were well beyond

her expertise.   Trusting that Smith was a good, religious, trustworthy person, Ms. Groff gave him the entire inheritance to invest.   Once again, Smith never told Ms. Groff that he knew this was a bogus investment, that he never knew a single investor to make a dime off of it, or that all of her money would be gone forever the minute she gave invested it – that what Smith himself did not receive directly, others would steal.   Ms. Groff now has no money for her retirement, and no time to make up for it.

The victims in this case are more than numbers on a spreadsheet.   They are real people, with real lives, who have been left to attempt to fix the devastation Smith and his conspirators caused.   His actions are reprehensible, and he should be in prison for a substantial amount of time.   A sentence of 25 years will adequately account for the defendant's leading role as the longest-tenured and most successful salesman peddling these junk investments.

**B.      Defendant's History and Characteristics**

The defendant was born in Denver, Colorado, and had a supportive, loving family.   PSR ¶¶ 70-71.   He eventually got a GED.   He eventually became a licensed securities broker, an insurance salesman, and an investment advisor.   Smith stated he was raised with "strong" Christian ideals and was very involved in his church up until he was convicted in this matter. PSR ¶¶ 71, 76, 90.

The defendant refused to answer questions regarding his employment, but the Court knows that Smith has been involved in the investment and insurance industry for decades.   He had a weekly radio talk show where he would discuss his "expertise" in investments, and obtained many clients based on his radio appearances and claimed investment expertise.   Smith

was involved with the financial services industry until at least 2019, when he was charged in the instant matter.

Smith has no prior criminal convictions.    However, this is not unusual for fraud defendants.    Despite no official criminal history, the evidence at trial shows Smith was engaged in selling fraudulent investments for approximately a decade prior to being charged in this matter.    The indictment relates to an ongoing scheme of daily lawbreaking that ran for years – from 2011 until he was arrested.    And the evidence showed that Smith had been selling an earlier iteration of the DSPF fraud, Dazzle Dental, for years prior to 2011.    It is often said that a given defendant stopped committing crimes only because he was arrested.    That is eminently true here: nothing, including state regulatory lawsuits, action by the Securities and Exchange Commission, and an ongoing FBI investigation, stopped the defendant.

The defendant will undoubtedly argue that his lack of a criminal history should weigh in his favor at sentencing.    But by and large the government disagrees with the contention.    Smith had personal advantages rarely seen in criminal defendants who appear before this Court.    He passed multiple intensive industry examinations and worked for years as a licensed and registered finance professional.    He is a convincing salesman, and he has certainly been industrious in his career.    He committed crime on essentially a daily basis beginning at least in 2011 with Dental Support Plus Franchise, and nothing deterred him as long as the money kept flowing his way.    He used his personal history and characteristics, the skills and talents he acquired along the way, and his alleged religious fervor, to gain the trust of innocent investors – and then exploited those victims.    Smith's personal history and characteristics support the requested sentence.

15

### C.      Need to Deter Future Criminal Conduct and to Protect the Public

Given the defendant's lack of remorse and single-mindedness during his execution of this scheme, specific deterrence and the need to protect the public weigh heavily here.    As the Court heard from the victims' testimony, and from Smith's own testimony during the bankruptcy trustee depositions, Smith has absolutely no remorse for what he did to these victims.    He was indignant and blamed the "predators" for why he is here today.    If given the opportunity, the government believes Smith would pick up right where he left off and continue to perpetrate schemes to defraud an unsuspecting public.    In cases like this, the need for specific deterrence and the protection of the public is at its apex.

The need for general deterrence also favors a significant sentence.    Smith abused his expertise and experience in the finance industry, and used his professional qualifications to further his scheme.    The fraud was sophisticated and wide-ranging, and proving it required a complex and lengthy trial.    The sentence requested here would send a clear message to the finance community, whose members are entrusted with the hard-earned retirement money of their clients, that fraud and theft are extraordinarily serious crimes that will be met with serious consequences, regardless of the pedigree or professional accomplishments of the wrongdoer.

### D.      Need to Avoid Unwarranted Sentencing Disparities

Among the defendants convicted in this case and in its related cases, *United States v. Bank*, No. 2:17-cr-126, and *United States v. Hudspeth*, No. 2:17-cr-122, Smith is more culpable than most of the other defendants.    He lied to, manipulated, and took advantage of victims directly.    He used his religion to gain their trust, and he never paused even after knowing, year after year, that what he was selling was junk.    He has shown absolutely no remorse, nor has he

taken any responsibility for his role.    For that reason, the sentence requested by the government will not lead to an unwarranted disparity.

The first defendant who accepted responsibility for his role was Roger Hudspeth. Hudspeth was a financial advisor involved in this scheme with Bank and Raeann Gibson. Hudspeth sold the fraudulent investments directly to the victims and personally pocketed $737,183 in ill-gotten gains.    On May 21, 2018, the Honorable Robert G. Doumar sentenced him to 151 months' imprisonment for his role.    *See United States v. Roger Odell Hudspeth*, 2:17-cr-122, ECF No. 38.

Next, Bank's right-hand woman, Raeann Gibson, also accepted responsibility and pleaded guilty to two counts of conspiracy in this matter.    Gibson was in charge of the day-to-day operations of Bank's companies.    She frequently interacted with victims, lied to them about the status of their investments, and helped launder the millions of dollars stolen from them.    As was clear from her testimony, though, she acted on Bank's direction.    She did not originate the scheme or reap most of its benefits – rather, she helped Bank carry it out.    On July 1, 2020, the Court sentenced Gibson to 120 months' imprisonment – the statutory maximum under the plea agreement – and ordered her to pay $25,608,156 in restitution.    *United States v. Bank*, 2:17-cr-126, ECF No. 292.    Gibson expressed sincere remorse for the damage she inflicted on the victims, including during her trial testimony.

Kent Maerki, 78 years old and the initial mastermind behind several of the fraudulent investments, also pleaded guilty to conspiracy to commit mail and wire fraud.    In contrast to the defendant, Daryl Bank, Billy Seabolt, and David Alcorn, Maerki actually accepted responsibility for his role in the fraudulent scheme. Maerki, with assistance from others, created the Dental

17

Support Plus Franchise investment and initially introduced Bank and others to the spectrum investments.   He was sentenced to 192 months' imprisonment and ordered to pay over $23,000,000 in restitution.   ECF No. 165.

In April 2021, conspirators Daryl Bank and attorney Billy Seabolt went to trial for their roles in this scheme.   Seabolt, the corporate counsel for Bank's entities, was convicted of numerous counts of conspiracy to commit mail and wire fraud, mail fraud, conspiracy to commit the sale of unregistered securities, and the sale of unregistered securities.   He never accepted responsibility.   However, he also never interacted with any of the victims and had a smaller role behind the scenes of the scheme.   On September 15, 2021, the Court sentenced Seabolt to 120 months' imprisonment and ordered him to pay over $4.5 million in restitution.   *See United States v. Seabolt*, 2:17cr126.

Seabolt, however, was the least culpable defendant in the scheme.   Unlike Smith, Seabolt worked behind the scenes and did not use bald-faced lies to sell fraudulent product after fraudulent product directly to investors.   To the contrary, Smith looked each and every one of his investors in the eye and told them to trust him, all the while knowing that he was lying to them and that they were simply the means through which he could earn a fat commission check. Smith also received a substantially larger share of the fraud proceeds than Seabolt.   Smith received over a $1 million, whereas Seabolt was paid $137,851.65 for his role in this scheme. Seabolt's total losses exceeded just over $4 million, whereas Smith's losses exceed $20 million. In short, Smith is not similarly situated to Seabolt in this scheme.

As mentioned, Bank was convicted in the same trial, but for additional counts including securities fraud and unlawful monetary transactions, among others.   Indeed, he was one of the

masterminds of the illegal schemes and investment, and he personally received millions of dollars to directly fund his lavish lifestyle.   He too never accepted responsibility, and worse, he routinely interacted with victims to encourage them to put their hard-earned money into these fraudulent investments.   On September 20, 2021, the Court sentenced Bank to 420 months' imprisonment and ordered him to pay over $25 million in restitution to the victims.   *See United States v. Bank*, 2:17cr126.

Sellers and Barnett, two other salesmen, and Coffin also pleaded guilty and accepted responsibility for their respective roles in the conspiracy.   The Court sentenced Sellers and Coffin   to 60 months' imprisonment, which was the statutory maximum allowed for each defendant.   Barnett is still pending sentencing.   However, each of these defendants accepted responsibility for their respective roles in this scheme and took advantage of unusually generous plea offers the government made in the midst of the pandemic in an attempt to resolve this case without a massively lengthy multi-defendant trial.   Sellers and Barnett, vice Smith, can be distinguished in a number of ways.   First, unlike Smith, neither Sellers nor Barnett sold Dazzle Dental, and neither had pre-existing and first-hand knowledge that the Dental Support Plus Franchise "system" was already an abject failure.   Second, unlike Smith, Sellers and Barnett did not receive overrides for every victim who fell prey to the DSPF scheme.   Third, Sellers and Barnett sold far fewer investments than Smith and, in 2015, Sellers removed himself from the illegal conduct.   Unlike Smith, who continued to sell fraudulent investments – including Xcel Bandwidth – with Bank and Alcorn all the way through August 2017, Sellers stemmed the bleeding in 2015 and stopped selling.   Smith rode this fraud to the bitter end, including through various re-brandings of the spectrum scheme, which he continued to sell years after knowing it

was junk.   As the sales tracker charts introduced at trial show, Smith sold these fraudulent investments for longer than any other salesman.

Hudspeth, Gibson, Sellers, Coffin, and Maerki all accepted responsibility for their respective roles in this matter.   The government entered into appropriate plea agreements that limited their sentencing exposure in large part because they acknowledged the harm done to the victims.   The defendant exercised his right to trial, and the government is not penalizing him for doing so.   But the comparator sentences in this case and its related cases were handed down to conspirators who accepted responsibility for their roles in the scheme and took advantage of unusually generous plea offers made in the midst of a pandemic that capped their statutory exposure, and the sentences they received reflect that.   Smith had the same opportunity, with the same statutory cap, and he spurned it.   He knew that if he lost at trial he would face these guidelines, and so he should not be heard to complain about them now.   He could have accepted responsibility for the devastation he caused by his lies and his greed, but he elected not to do so. While Smith may not have created some of the fraudulent investments (other than his own Western Spectrum vehicle), he was the face of the scheme that hooked the many unsuspecting investors who trusted him.   Smith's direct, crucial, and longstanding role in the fraud is deserving of the 25 years requested and is consistent with the Court's mandate to avoid unwarranted sentencing disparities.

## V.   Conclusion

The jury heard a multitude of evidence and convicted Smith of all crimes charged. What the jury did not hear was the effect of the defendant's fraud on their lives.   The particulars of the devastation he caused, unique to each victim, are captured in the many impact statements

submitted in this case, which tell the story of his crimes as well or better than any sentencing submission by the government could.    The defendant has not shown the slightest remorse for what he did.    His many crimes merit the significant punishment requested here.

For the reasons stated above, the government asks the Court to impose a sentence of imprisonment of 25 years, a substantial term of supervised release, forfeiture, and full restitution to his victims.

<div style="margin-left:40%">

JESSICA D. ABER
UNITED STATES ATTORNEY

By:                /s/                
Melissa E. O'Boyle
VA Bar No. 47449
Elizabeth M. Yusi
VA Bar No. 91982
Andrew C. Bosse
Assistant United States Attorneys
Attorney for the United States
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number:    757-441-6331
Facsimile Number: 757-441-6689
E-Mail Address:    melissa.oboyle@usdoj.gov
                    elizabeth.yusi@usdoj.gov
                    andrew.bosse@usdoj.gov

</div>

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 16th day of June, 2022, I electronically filed the

foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of

such filing (NEF) to all counsel of record.

I FURTHER CERTIFY that on this 16th day of June, 2022, I caused a true and correct

copy of the foregoing Position of the Government with Respect to Sentencing Factors to be e-

mailed to the following:

<div align="center">

Robert K. Bell
U.S. Probation Officer

</div>

/s/
Elizabeth M. Yusi
Assistant United States Attorney

<div align="center">22</div>