```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
 2                         Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                        )
 5      UNITED STATES OF AMERICA,        )
                                        )
 6      v.                               )    CRIMINAL ACTION NO.
                                        )    2:19cr47
 7      DAVID ALCORN and                 )
        AGHEE WILLIAM SMITH, II,         )
 8                                       )
             Defendants.                 )
 9   - - - - - - - - - - - - - - - - - -

10                    ** Jury Trial - Day 12 **

11                    TRANSCRIPT OF PROCEEDINGS

12                        Norfolk, Virginia

13                        February 17, 2022

14

15   BEFORE:  THE HONORABLE RAYMOND A. JACKSON
                United States District Judge, and jury
16

17   APPEARANCES:

18           UNITED STATES ATTORNEY'S OFFICE
             By:  Andrew C. Bosse
19                Elizabeth M. Yusi
                  Melissa E. O'Boyle
20                Assistant United States Attorneys
                  Counsel for the United States
21
             RICHARD S. YAROW, LLC
22           By:  Richard S. Yarow
                  Counsel for Defendant David Alcorn
23
             FEDERAL PUBLIC DEFENDER'S OFFICE
24           By:  Lindsay Jo McCaslin
                  Andrew W. Grindrod
25                Assistant Federal Public Defenders
                  Counsel for Defendant Aghee William Smith, II
```

JILL H. TRAIL, Official Court Reporter

1                              I N D E X

2


3    DEFENDANTS'
     WITNESSES                                          PAGE
4
       PETER LEWIS
5           Cross-Examination By Mr. Bosse             2246
            Redirect Examination By Mr. Grindrod       2271
6    JACK THRASH "TRIPP" FORREST, III
            Direct Examination By Ms. McCaslin         2276
7           Cross-Examination By Mr. Yarow             2292
            Cross-Examination By Mr. Bosse             2295
8           Redirect Examination By Ms. McCaslin       2311
     TERENCE DALE PINKSTON, JR.
9           Direct Examination By Ms. McCaslin         2314
            Cross-Examination By Ms. Yusi              2342
10          Redirect Examination By Ms. McCaslin       2350

11


12


13                          E X H I B I T S

14   GOVERNMENT'S
     NO.                                               PAGE
15
       2218                                            2249
16     2219                                            2264
       600                                             2269
17     300T                                            2301
       337                                             2304
18


19   DEFENDANT SMITH'S
     NO.                                               PAGE
20
       1009                                            2288
21     13                                              2317
       1                                               2326
22     2                                               2329
       14                                              2330
23     15                                              2332
       11                                              2334

24


25

```
 1              (Proceedings commenced at 9:30 a.m.)

 2              THE COURT:  Good morning, ladies and gentlemen.

 3              MR. BOSSE:  Good morning.

 4              THE COURT:  Are we ready to get started here this

 5    morning?

 6              MR. YAROW:  Your Honor, before the jury is brought

 7    in, I do -- I told Patrice I didn't have any issues, but

 8    there is something I would briefly like to raise before the

 9    Court gets started.

10              THE COURT:  Is it necessary to do it now, or at the

11    break, or at lunch?

12              MR. YAROW:  I think now would be best.

13              THE COURT:  All right.  Let's make it quick.  Is

14    it something we can do without the witness being here?

15              MR. YAROW:  I don't think it matters if the witness

16    is here.

17              THE COURT:  All right then.

18              MR. YAROW:  Your Honor, I believe that the

19    government is going to attempt to introduce two documents

20    they provided to me, 2218 and 2219; they are going to

21    attempt to introduce with this witness.  The Court hasn't

22    seen the documents.  They were just given to me yesterday

23    evening or yesterday afternoon.

24              THE COURT:  So, what's the problem?

25              MR. YAROW:  These are --
```

JILL H. TRAIL, Official Court Reporter

```
1            THE COURT:  Maybe the witness shouldn't be here if
2    we're going to get into the details of what these documents
3    really are.
4            Mr. Lewis, step down and step right into that room
5    right there.  That's the jury room.
6            Have him step in the jury room right there.
7            (The witness exited the courtroom.)
8            THE COURT:  Okay.  Now, let's go.
9            MR. YAROW:  Okay.  These are -- these email chains
10   are -- if the government moves to introduce them, they would
11   be completely out of the scope of what was asked in direct.
12   I do not believe they're attempting to show any bias on this
13   witness, or going to try to impeach the witness with them.
14   They're simply going to introduce them as evidence against
15   my client, and it's completely outside of the scope of what
16   was asked in the direct examination, which the Court even
17   commented was very short.
18           MR. BOSSE:  Judge, this witness testified that he
19   was hired as a consultant by Mr. Alcorn for monetizing the
20   licenses.  That was -- that's the core of his entire
21   testimony.  These two emails relate directly to the
22   monetization, to asking Mr. Lewis by Mr. Alcorn about
23   monetization of the licenses.
24           THE COURT:  All right.
25           MR. BOSSE:  They couldn't be more direct to his
```

1    testimony.

2          THE COURT:  I'm going to tell you something.  The

3    core of his testimony was about really that program, going

4    through the details of the program that he introduced; that

5    was the core.  That was the core of his testimony.

6          MR. BOSSE:  Yes, sir.

7          THE COURT:  Now, he said he was consulted, and he

8    was hired for a specific purpose, but he did not get into

9    the details of what advice he gave him about monetization.

10   So, the Court doesn't see this particular cross-examination

11   turning into an intricate detail about monetization and FCC,

12   the mobility fund and everything else.  We're not going

13   there, Mr. Bosse.  You can tell me it's the core all you

14   want to, but we're not going to spend the morning going into

15   something he clearly did not emphasize on his direct

16   examination.

17         MR. BOSSE:  Yes, sir.  And if I could be heard,

18   Your Honor.  I went back last night, and I carved it back

19   but, Your Honor, this is an email that's sent before the

20   conference where Mr. Lewis is telling Mr. Alcorn about

21   essentially what can and can't be done in the run-up to the

22   conference.  This couldn't be more core to his testimony.

23         THE COURT:  No.  No.  In your view it couldn't be.

24         MR. BOSSE:  Yes, sir.

25         THE COURT:  But the simple truth is we do not need

1    to get into great detail of this monetization.  You

2    certainly can ask him did he give him advice on

3    monetization, but we're not going line by line through this

4    particular Exhibit 2218 on that, because that was not his

5    emphasis.

6            MR. BOSSE:  I don't plan to go line by line.  I

7    plan to offer it and ask him about, I think, two lines in

8    each email.

9            THE COURT:  Well, then you don't even need to put

10   the whole email in there if you're going to ask him about

11   two things that's in the email.

12           MR. BOSSE:  Well, I do need to have it in evidence

13   to show the jury, Your Honor.

14           THE COURT:  I don't know that.

15           MR. BOSSE:  Okay.  Your Honor, why don't we see how

16   it goes?  I really am planning to try to move quickly

17   through this, but this 2218 is the email that sets up the

18   conference where he talks -- and this is to Mr. Alcorn.

19           THE COURT:  What in 2218 are you emphasizing?  It's

20   a long email here.

21           MR. BOSSE:  Yes, sir.  I am emphasizing 1-A, where

22   Mr. Lewis tells Mr. Alcorn, "I'm advising you that the first

23   step be the complete eradication of any notion to aggregate

24   frequencies with others," and that's why he pitches the

25   Internet of Things at the conference.  So, he's telling him

1    that this cannot be used for cellular spectrum.  That is the
2    core.  That's why IoT is what pops up at the conference.
3          And then, Your Honor, 2219, Mr. Alcorn makes a
4    statement that he never had a plan to monetize to Mr. Lewis.
5    These are his own statements, Your Honor.  They can come
6    into evidence.
7          THE COURT:  All right.  Let's look at 2219.
8          MR. BOSSE:  Yes, sir.
9          THE COURT:  You know, so you said they can come in.
10   The Court determines what can come in.
11         MR. BOSSE:  Yes, sir.  I am suggesting it can under
12   the Rules of Evidence, but I understand that, Your Honor.
13         Your Honor, in 2219, if you look at the last
14   paragraph, Mr. Alcorn says, "It is my responsibility to
15   convey options for monetization to our clients, and I accept
16   the fact that I did not do so, but I never had any viable
17   monetization options to present."  That couldn't be more
18   core.  He's telling that to Mr. Lewis.
19         THE COURT:  Okay.  That's fine.  The Court will let
20   you put that in.  The simple truth is we're just not going
21   to spend all day line by line on this email, because it was
22   not the gist of what he testified.
23         But, Mr. Yarow, the Court finds that those two
24   things he mentioned, they are pertinent, and they are on
25   point.  They might hurt your client, but they are pertinent,

```
 1    and they are on point.
 2             MR. YAROW:  Yes, Your Honor.
 3             THE COURT:  I just don't want us to get grinding
 4    away down on the email on every potential utterance there
 5    was.
 6             MR. BOSSE:  Yes, sir.
 7             THE COURT:  When I said let's be narrow about the
 8    approach, that's exactly what I mean.  Because everything he
 9    said is not all that important in these emails.
10             Bring Mr. Lewis back in.
11             (The witness entered the courtroom.)
12             THE COURT:  Bring the jury in.
13             (The jury entered the courtroom at 9:37 a.m.)
14             THE COURT:  You may be seated.
15             The record will reflect that all jurors are present
16    this morning.
17             Counsel agree?
18             MR. BOSSE:  Yes, sir, Your Honor.
19             MR. YAROW:  Mr. Alcorn agrees, Your Honor.
20             MS. MCCASLIN:  Mr. Smith agrees.
21             THE COURT:  Thank you.
22             Good morning, ladies and gentlemen.
23             THE JURORS:  Good morning.
24             THE COURT:  We will commence with the
25    cross-examination of Mr. Lewis.
```

1          MR. BOSSE:  Thank you, Your Honor.

2          PETER LEWIS, called by Defendant Smith, having been

3   previously sworn, was examined and testified as follows:

                          CROSS-EXAMINATION

4

5   BY MR. BOSSE:

6   Q.  Good morning, Mr. Lewis.

7   A.  Good morning.

8   Q.  I am from the government.  I just have a few questions

9   here.

10         You recollected that you were hired by David Alcorn

11  as a consultant for Janus Spectrum?

12  A.  Yes.

13  Q.  And you were hired by them to think of ideas to help them

14  monetize some of the licenses at issue here in the guard and

15  expansion bands, correct?

16  A.  Correct.

17  Q.  And you were hired, I think you said, in May or June of

18  2014?

19  A.  Yes.

20  Q.  You knew the principal of the company was David Alcorn,

21  but that a man named Kent Maerki was also involved in the

22  company?

23  A.  Yes.

24  Q.  And was it Mr. Maerki who introduced you to Mr. Alcorn?

25  A.  Yes.

```
 1    Q.  Okay.  Did you know that David Alcorn and Kent Maerki had
 2    been selling these licenses since about 2011?
 3    A.  I didn't know when they had started selling them, no.
 4            MR. YAROW:  Your Honor, that question is
 5    misleading, because they weren't selling licenses.  They
 6    were selling applications.
 7            MR. BOSSE:  That's fair.
 8            THE COURT:  All right.  Then rephrase.
 9            MR. BOSSE:  Yes, sir.
10    BY MR. BOSSE:
11    Q.  I'm sorry.  And I said licenses.
12    A.  Yes.
13    Q.  They were selling application services for licenses since
14    around 2011, as Janus?
15    A.  Right.  I didn't know when they had started doing that.
16    Q.  Okay.  And there are other things that you didn't -- you
17    came in purely as a consultant.  You didn't know what had
18    happened in the years prior to you entering into the
19    consultancy, correct?
20    A.  Just what I was told, that, you know, people had applied
21    for these 800-megahertz licenses and, you know...
22    Q.  Okay.
23    A.  But I wasn't involved before that.
24    Q.  And just to be clear, I want to tick through a couple of
25    things that I think you didn't know.
```

```
 1          You didn't know what Mr. Alcorn had been telling to
 2    clients to get them to get this license application service?
 3    You didn't know the pitch that was being made?
 4    A.   That's correct.
 5    Q.   Okay.  And you didn't know what they were charging per
 6    application?
 7    A.   No.
 8    Q.   Okay.
 9    A.   I didn't get into that.
10    Q.   And you didn't know what the clients were told about who
11    would be responsible for monetizing the licenses, correct?
12    A.   I'm sorry.  Repeat that.
13    Q.   Sure.
14          You didn't know what the clients were told about who
15    would be responsible for monetizing the licenses, before you
16    came on?
17    A.   No.
18    Q.   Okay.  And if I can, I am going to show you a document
19    that's marked as Government's 2218.
20          Just for the witness, please.
21          Okay.  Do you see that there on your screen?
22    A.   Yeah.  Do you want me to use the book or the screen?
23    Q.   Really whatever is easier for you.  I have it in the book
24    also, but really I am just going to focus --
25    A.   Okay.
```

1    Q.  I've been encouraged to focus narrowly, and I think it's
2    better that I do that.
3    A.  All right.
4    Q.  Just to be clear, this is an email that you sent to Kent
5    Maerki, copying Tripp Forrest and David Alcorn in April of
6    2014?
7    A.  Yes.  I see that.
8    Q.  Okay.  And so is that maybe when you started first
9    engaging with them as NetMoby?
10   A.  Yes.  That probably is the case, yeah.
11   Q.  All right.  And is this an email about monetizing Janus'
12   800-megahertz licenses?
13   A.  Okay.  All right.
14          MR. BOSSE:  Okay.  I'll offer then, Your Honor,
15   Government's 2218.
16          THE COURT:  Exhibit 2218 is admitted.
17          (Government's Exhibit 2218 received in evidence.)
18   BY MR. BOSSE:
19   Q.  Okay.  So, really one of the first things that you told
20   Mr. Alcorn and Mr. Maerki was that the first step be the
21   complete eradication of any notion to aggregate frequencies
22   with others or moving in a direction of building a regional
23   system that would compete with -- and then you go on to name
24   Verizon, AT&T, and T-Mobile, correct?
25   A.  Yeah.  Let me just read it real quick.

JILL H. TRAIL, Official Court Reporter

1    Q.   Yes, sir.

2    A.   Yes.  That is what I wrote, yes.

3    Q.   Okay.  And the reason for that is that the bandwidth of

4    the channels and the interference protection criteria set

5    forth by the FCC are both limiters insofar as how the guard

6    and expansion band spectrum can be employed, correct?

7    A.   Yes.

8    Q.   Okay.  And you told them that in April of 2014, before

9    the conference that you talked about yesterday?

10   A.   Yes.

11   Q.   Okay.  We can take that down, please.

12           THE COURT:  Is that microphone on over there?

13           THE WITNESS:  Testing:  1, 2.

14           THE CLERK:  It's on.

15           THE COURT:  Okay.  Just hold it closer to your

16   mouth.

17           THE WITNESS:  Let me just test:  1, 2, 1, 2.  I

18   guess it's better down here.  Okay.

19           MR. BOSSE:  I can hear him.

20           THE COURT:  I want to make sure they can hear.

21           MR. BOSSE:  Yes, sir.

22   BY MR. BOSSE:

23   Q.   And you knew, because you looked them up, that these

24   licenses were 25-kilohertz narrow band channels?

25   A.   Correct.

1    Q.  And you knew and you told -- were clear with the people

2    at Janus that these could be used for small data transfers,

3    but couldn't do things like video streaming, they were simply

4    too narrow for that, correct?

5              MR. GRINDROD:  Your Honor, I would object just as

6    to vagueness as to the people at Janus.  The people who were

7    told what is what is important here --

8              THE COURT:  Sustained.

9              MR. GRINDROD:  -- so if we can use names.

10             MR. BOSSE:  Yes.

11             THE COURT:  Sustained.

12             MR. BOSSE:  That's very fair.

13   BY MR. BOSSE:

14   Q.  When I say Janus, I may be using that as a shorthand, and

15   I really just mean Mr. Alcorn and Mr. Maerki.

16   A.  Okay.

17   Q.  Okay.  So, if I use that shorthand, you'll understand

18   what I mean?

19   A.  Right.

20   Q.  Okay.  And you told -- before the conference, you were

21   clear with the people at Janus, Mr. Alcorn and Mr. Maerki,

22   that this was -- the narrowband channels they had could be

23   used for sort of single voice or small data packets and not

24   for video streaming and things like that, correct?

25   A.  That's correct.

```
 1   Q.  Okay.  And you actually use an example.  I think at one

 2   point you talked about, you know, trying to put a PowerPoint

 3   presentation across one of these channels, a 50-page

 4   PowerPoint could take up to, you know, 12 hours or something

 5   like that?

 6   A.  Right.

 7   Q.  Okay.

 8   A.  People would have probably received it, but it wouldn't

 9   be something that would occur in a matter of minutes or...

10   Q.  Okay.  And it was never -- as you're speaking with

11   Mr. Alcorn and Mr. Maerki, I mean, they didn't think that

12   these were broadband channels that AT&T and Verizon could run

13   video across, for example, correct?

14           MR. YAROW:  Your Honor, I object.  I don't know

15   what --

16           THE COURT:  Wait a minute now.  You have to let the

17   court reporter know who is objecting.

18           MR. YAROW:  Yes, sir.  I'm sorry.  Rick Yarow

19   objects on behalf of Mr. Alcorn.

20           Your Honor, I think there has to be a foundation

21   laid for this witness to be able to testify and answer the

22   question about what Mr. Alcorn or what Kent Maerki may have

23   known.  I don't know that he --

24           MR. BOSSE:  I can ask it a different way; that's

25   fair.
```

```
 1              THE COURT:  Let me rule before you respond.
 2              MR. BOSSE:  Yes, sir.
 3              THE COURT:  You have to be more specific in the way
 4     you phrase your questions, Mr. Bosse.
 5              MR. BOSSE:  Yes, sir.
 6              THE COURT:  So, it's sustained.
 7     BY MR. BOSSE:
 8     Q.  Okay.  Let me try that a different way.
 9              You told directly David Alcorn and Kent Maerki that
10     the revenue that they could expect on these licenses is not
11     the kind of revenue they could expect on a broadband license?
12     A.  Right.  Because they were not as wide of a bandwidth,
13     yeah.
14     Q.  Okay.  All right.  And then you went and did this
15     conference in Washington, D.C. that we talked about
16     yesterday, correct?
17     A.  Yes.
18     Q.  Okay.  And present at that conference were Mr. Alcorn,
19     Mr. Maerki, a man named Tripp Forrest, who I think you know,
20     correct?
21     A.  Yes.
22     Q.  And there were also clients and other people present at
23     that conference, correct?
24     A.  That's correct.
25     Q.  Okay.  About how many people do you think were there?
```

1   A.  45 to 50.

2   Q.  All right.  And you were told by Mr. Alcorn that there

3   would be sales -- salespeople there, salesmen there as well,

4   correct?

5   A.  I really don't recall the people, that specific

6   conversation.  The primary thing I knew is that there would

7   be some of these licensees that won these frequencies, and

8   some of the people that were, you know, involved with Janus,

9   like Kent Maerki and David would be there.

10  Q.  Okay.  I am going to show something to you on your

11  screen.

12  A.  Okay.

13  Q.  If we could see, just for the witness, Government's 2211,

14  page 1.

15       Okay.  And just to bring you back, I am going to use

16  this just to refresh your recollection.

17  A.  Okay.

18  Q.  I am not saying you said anything wrong.

19  A.  Okay.

20  Q.  But you remember testifying here under oath in

21  Mr. Bank's trial?

22  A.  Yes.

23  Q.  Okay.  And that was April 20 of 2021?

24  A.  Yes.

25  Q.  Okay.  And I actually got to ask you questions that day,

1  right?

2  A.  Right.  I remember.

3  Q.  Okay.  Could we see page 37 of this document, please?

4        Okay.  And I don't want you to read this out loud,

5  sir.  I just want you to read it to yourself, and let me know

6  if that refreshes your recollection about whether you were

7  told salespeople would be there.

8  A.  You want me to read my answer?

9  Q.  Yes, sir, just to yourself.

10  A.  All right.  Okay.  I don't deny that that was -- I stated

11  that.

12  Q.  Okay.  Well, does that refresh your recollection that you

13  were told that salespeople would be there as well?

14  A.  Yes.

15  Q.  Okay.  Could we see --

16        I want to talk about the PowerPoint briefly, that you

17  walked us through yesterday.

18  A.  Okay.

19  Q.  Could we please see Smith 131 at page 9?

20  A.  Yes.

21  Q.  Okay.  You remember this was part of the PowerPoint

22  yesterday?

23  A.  Yes.

24  Q.  And this lists, sort of, the nested roles of the

25  different entities involved.  You're NetMoby down here in the

1    bottom right, correct?

2    A.   That's correct.

3    Q.   And these are Janus Spectrum, Mr. Maerki, Mr. Alcorn's

4    roles here, correct?

5    A.   Yes.

6    Q.   Okay.  And over on the left, it's called "Licensee Lines

7    of Effort," correct?

8    A.   Yes.

9    Q.   Okay.  And so your understanding was that the way that --

10   the only way that this was going to -- the licensees were

11   going to make money on the licenses is that they have to put

12   in their own efforts and their own additional capital in

13   order to monetize these licenses, correct?

14   A.   Well, let me just refresh myself on it.

15   Q.   Of course.

16   A.   I did create this document, yes, and this was my vision

17   of what the responsibilities were in a three-tiered

18   nested-type, you know, illustrated document.  So, let me just

19   read it real quick.

20   Q.   Of course.

21   A.   Okay.  I've reviewed it, but I didn't see anything about

22   the licensees there.

23   Q.   Okay.

24   A.   They said that they would fund the -- or words to that

25   effect, that they would fund these efforts, but I don't think

1    I said that here.

2    Q.  Okay.  Well, let me ask you.  Your understanding is the

3    licensees would have to take measures to ensure the license

4    is in a safe harbor, meaning that it's been activated within

5    a year?

6    A.  Yes.  They are the licensees, and they were responsible

7    to make sure, since they were the ones that were licensed by

8    the FCC, that they would have to make sure that they got it

9    up in time.  Otherwise, there would be the risk --

10   Q.  Right.

11   A.  -- of the license being taken away.

12   Q.  And it does cost money to do that, right?  You have to

13   rent space on a tower and put up a transmitter of some sort?

14   A.  Yes.  There is no specific guidelines.  It has to be

15   constructed.

16   Q.  Okay.

17   A.  You know.

18   Q.  And in the presentation you gave, you said that licensees

19   would be responsible for business oversight and

20   transformation into profitable operations, fair?

21   A.  Yeah.

22   Q.  Okay.

23   A.  Because that's their license.

24   Q.  Right.  And you didn't know, because you weren't told how

25   they were pitched, as far as who was going to have the

```
 1    responsibility for actually monetizing these, correct?
 2    A.  No.  I mean, I just assumed that since they were the
 3    licensee that it was their license, and therefore they would
 4    be responsible for it.
 5    Q.  Yes, sir.
 6               THE COURT:  Pull the microphone back up to your
 7    mouth.
 8               THE WITNESS:  Okay.  How is this?
 9               THE COURT:  Keep it up there.
10               MR. BOSSE:  I can hear you very well.
11               THE COURT:  I know, but...
12               THE WITNESS:  I'll press it up to my chin; I think
13    that works.
14               THE COURT:  All right.
15    BY MR. BOSSE:
16    Q.  That's even better.
17               Okay.  I've brought you down just to page 11, and I
18    just want to bring in your focus to this part here.
19               Your vision for the Internet of Things, you
20    understood, and people at Janus, Mr. Alcorn and Mr. Maerki,
21    understood that it was going to require what are called
22    capital calls; in other words more fundraising, more rounds
23    of fundraising in order to fund the effort, correct?
24    A.  Yeah.  Because at that point, you know, there was just a
25    license.  There wasn't any system.  So, someone had to spend
```

```
 1    money on antennas and radios and, you know, lease of antenna
 2    towers, and back call to a data center or Amazon web services
 3    or something.
 4    Q.   Okay.  And if we could go to page 17.
 5         And these are some of the -- you talked about this in
 6    your testimony yesterday, but these are some of the ways that
 7    in 2014, you were talking about potential uses for Internet
 8    of Things?
 9    A.   Yeah.
10    Q.   Things like parking meters?
11    A.   Yes.
12    Q.   And things like traffic signal control boxes?
13    A.   Right.
14    Q.   And then things like a fish counting, counting fish?
15    A.   Uh-huh.
16    Q.   Okay.  And you knew, and you weren't shy, you didn't hide
17    the fact that these were not going to generate the kind of
18    revenue that broadband was going to generate, correct?  In
19    other words, you never pitched this as saying, well, you're
20    going to do better than broadband by doing these things with
21    the narrowband channels?
22    A.   Well, yeah.  I mean, I never said that.  What I said is
23    that the frequencies themselves, the value, if you just look
24    at it 1 to 1, a wide band or broadband channel versus a
25    narrowband that, you know, obviously a broadband channel
```

```
 1    would secure more money if that channel was sold.  But
 2    insofar as the business and generating revenue, you know, I
 3    am an IoT guy, an Internet of Things guy.  And I think when
 4    you put hundreds or thousands of devices on one of these
 5    frequencies, it could clearly do better than a broadband.
 6    Q.  Okay.  And it could also do better -- your opinion that
 7    you expressed to them is that it could also do better than
 8    push-to-talk sort of walkie-talkie-type system, correct?
 9    A.  Yes.
10    Q.  Okay.
11    A.  It was -- you know, Internet of Things was coming into
12    its own, and a prediction of Gartner Group and others were
13    predicting 50 billion devices or more being connected
14    worldwide.
15    Q.  Sure.
16    A.  So, with those kind of statistics from reputable
17    companies like that, I had no reason to doubt Gartner or
18    anyone else.  And that's the case now, billions of devices
19    are being connected.
20    Q.  Okay.
21    A.  So, I think they would have enjoyed the revenue from
22    that.
23    Q.  Okay.  And sort of -- this is not the end, but just to
24    cut to one of the questions I was going to ask at the end.
25    You know that they didn't actually ever do any of this,
```

```
 1    correct?
 2    A.   You mean the IoT?
 3    Q.   I mean the Janus licenses and the IoT application aspect.
 4    A.   I think there was the attempt to do that and measures
 5    were taken such as, you know, I had recommended that, you
 6    know, mailing lists be estimated and things of that nature,
 7    so you could identify what I call donors of, you know, of
 8    devices such as the Department of Transportation in Madison,
 9    Wisconsin.  There is going to be a department of trans, and
10    under that there is going to be a, you know, a red light
11    control manager --
12    Q.   Sure.
13    A.   -- you know, that would be the owner, so to speak, of
14    those devices, and that's who the mailing lists would be
15    directed to.
16    Q.   Okay.
17    A.   And, you know, so Mr. Alcorn directed me to get
18    estimates, you know, for mailing lists, mailing lists and
19    things of that nature --
20    Q.   Okay.
21    A.   -- as a prelude to beginning this process.
22    Q.   But you know that -- well, you -- it was never finished.
23    I mean, you never actually -- the mailing lists didn't go
24    out, nothing like that ever happened?
25    A.   The estimates were done.
```

```
 1    Q.   Right.
 2    A.   And the numbers for thousands of people in each of these
 3    cities were identified for the mailing lists, but then things
 4    started coming to a halt insofar as my consultancy to the
 5    company because of...
 6    Q.   Well, that's -- I understand.  But, again, just really
 7    dial in with this one.  That never -- the mailing lists were
 8    never used.  It never happened, to your knowledge?  To your
 9    knowledge?
10    A.   We started the process, but to my knowledge, no.  We
11    never did.  We got to the point of estimates and identifying
12    those subgroups that should be in receipt.
13    Q.   So, people who manage red light camera systems?
14    A.   Right.  Exactly.
15    Q.   Okay.  All right.  You were asked on your direct
16    examination about a second kind of opportunity that you
17    presented at the conference that had to do with something
18    called the Connect America Fund?
19    A.   Correct.
20    Q.   Okay.  And I want to be really clear, that didn't have
21    anything to do with the guard and expansion band license
22    holders.  You were pitching that to the people there?
23    A.   Yes.  This was to make them aware of, you know, all of
24    these millions of dollars that the Federal Communications
25    Commission under their universal service administrative
```

```
 1    corporation was literally giving to people that qualified or
 2    had applied and then won a reverse auction.
 3    Q.  Right.
 4    A.  Then they would fund the Cap-X and Op-X costs for, you
 5    know, mobile systems.  So, I just wanted them to be aware it
 6    was another telecom opportunity.
 7    Q.  Okay.  It was a business idea that you had that you
 8    wanted the people there to hear?
 9    A.  Well, it wasn't a business idea.  I just wanted them to
10    know about it.  And then if Janus and those clients were
11    interested, you know, I could certainly assist them with the
12    applications and the process, the arduous process they would
13    have to go through to get those funds.
14    Q.  All right.  And you continued to consult after this
15    conference --
16    A.  Yes.
17    Q.  -- for some time into 2015, I think?
18    A.  Yes, into 2015.  And the consultancy lasted, again, for
19    about 12 months, until Mr. Alcorn had said that he couldn't,
20    you know, pay me anymore because of legal issues.
21    Q.  Okay.  I want to show you something on your screen.
22            Just for the witness, Government's 2219, please.
23            And this is an email chain, am I correct, between you
24    and Mr. Alcorn, copying Kent Maerki, from the February 2015
25    time period?
```

1    A.  Okay.  Yeah.  I see that heading.

2    Q.  Okay.  All right.  And it's about your continued

3    consulting work, about thinking about how these licenses

4    could be monetized, correct?

5    A.  Yes.

6    Q.  Generally?

7    A.  Yes.

8    Q.  All right.  If we can --

9              MR. BOSSE:  I'll offer 2219.

10             THE COURT:  2219 will be admitted.

11             (Government's Exhibit 2219 received in evidence.)

12   BY MR. BOSSE:

13   Q.  Okay.  And if we could go to page 2.

14             And so in January, this is an email to you from

15   Mr. Alcorn that sets up the email we're going to briefly talk

16   about, but I want to just ask you if I've -- I am going to

17   put this in the record by reading it rather than having you

18   read it.

19             But Mr. Alcorn writes, "The objective to uncover

20   opportunities to monetize clients' licenses has produced

21   exactly zero offers, despite everyone's best efforts."

22             And he was asking you then to think more about how

23   monetization could occur, correct?

24   A.  Yeah.  I need more time just to read this, because I

25   wasn't -- you were going through it pretty quick.

 1    Q.  Oh, sure.

 2    A.  You're saying he was asking me for?

 3    Q.  Well, your response to it is that you're going to modify

 4    as you deem fit.  "I sincerely want this to succeed."

 5            And then you have more email exchanges about

 6    monetization that follow this later in time?

 7    A.  Yeah.  If I can just review this real quick?

 8    Q.  Of course.

 9    A.  Okay.  I've read it.

10    Q.  Okay.

11    A.  So...

12    Q.  I'm sorry.  I'm sorry.

13    A.  Can you clarify the question?

14    Q.  Yes.

15            One of the things that you mention in your email back

16    to him is that you're going to start looking into this

17    RapidLink situation?

18    A.  Yes.

19    Q.  Okay.  Let's go up to the first page of the email and --

20    one moment.  Okay.  I am going to highlight a portion of

21    Mr. Alcorn's email here.

22    A.  Okay.

23    Q.  And am I correct that Mr. Alcorn wrote to you now,

24    February of 2015, in response to your last email, "From the

25    Janus standpoint, it is imperative that our clients not lose

```
 1    confidence in us or in the utilization of their licenses.  To

 2    date, they have no tangible indication that we can assist

 3    them in monetization.  The most important thing is that we

 4    provide them with offers and options, not necessarily whether

 5    or not they elect to take them.  Those that committed to

 6    RapidLink pretty much did it because they had no other offers

 7    to consider."

 8             Is that part of the conversation that you had over

 9    email with Mr. Alcorn about the RapidLink option?

10    A.   Yeah.  But they did have -- where it says there was no

11    other option, during the June 2014 conference at the Embassy

12    Suites, Mr. Alcorn made it pretty clear in there that if

13    people wanted to talk to me about the Internet of Things and

14    implementing it, that they could.  I was sort of miffed about

15    the fact that after all of the evidence and everything that I

16    presented in as far as where IoT was going that nobody wanted

17    to move forward with it.

18    Q.   Okay.

19    A.   So, I would say that was certainly an option.  It wasn't

20    just the RapidLink option.

21    Q.   Oh, I understand.

22    A.   There was also the option of Internet of Things.

23    Q.   Yes, sir.

24             And you did present that to the people who were at

25    the Washington, D.C. meeting?
```

```
1    A.   Correct.
2    Q.   Okay.  And you see here before your last email, which
3    we'll go through very briefly, that Mr. Alcorn writes, "It is
4    my responsibility to convey options for monetization to our
5    clients, and I accept the fact that I did not do so, but I
6    never had any viable monetization options to present."
7             Do you see that there?
8    A.   Yes, I do.
9    Q.   Okay.  And your view is that, well, IoT was a viable
10   option?
11   A.   Absolutely.  Yeah.
12   Q.   Okay.
13   A.   And he did act on that because, like I said, we had
14   started on the mailing lists and looking at AWS, Amazon Web
15   Services, as the back office for servers and whatnot to
16   aggregate these clients' licenses, you know, to split the --
17   you know, whereas each client would not have to go it alone
18   with data center, and go it alone with mailing lists, that,
19   you know, those things could be centralized.
20   Q.   Okay.  And I just want to take you to your answer.  And
21   you say you're going to adjust your thinking cap.
22             You're trying to help.  You're obviously a
23   consultant.  Your job is to help the client?
24   A.   Yeah.  I wanted to see everyone succeed.
25   Q.   Of course.
```

```
 1          And you reminded him here again, "One thing is for
 2   sure, these expansion guard band 800-megahertz frequencies
 3   are narrow in nature, and each channel is the width of what
 4   one analog cellular voice channel was originally."
 5   A.   Correct.
 6   Q.   And you go back to the Internet of Things again, correct?
 7   A.   Yeah.
 8   Q.   Okay.
 9   A.   Yeah.  Because cellular started off with narrowband and
10   1G and 2G.
11   Q.   Right.  And they aggregated?
12   A.   Well, it was just new spectrum that, you know, came
13   onboard, and they were able to do wider bandwidths and video
14   all of that.
15   Q.   Okay.  I would like to show you one more document, which
16   is Government's 600, please.
17          And this goes, again, to your consultancy for
18   monetization.
19          Just for the witness.
20          We're in March of 2015, and are you talking here
21   about RapidLink with Mr. Alcorn?
22   A.   Okay.
23   Q.   Okay.  And it's just between you, Mr. Alcorn, and
24   Mr. Maerki, correct?
25   A.   Yes.  That's what's on here.  That's who the email is
```

1   addressed to.

2          MR. BOSSE:  I will offer, Your Honor, 600 please.

3          MR. GRINDROD:  Your Honor, I think this one, now

4   we're well beyond the scope of anything having to do with

5   the conference that took place the year before.

6          MR. BOSSE:  Your Honor, this is a continued email

7   string about different monetization options.  He was asked

8   -- he testified that he was hired as a consultant to help

9   them monetize, and this is him doing exactly that.  He's

10  being consulted about the monetization option of RapidLink

11  this time.

12         THE COURT:  Objection overruled.

13         MR. BOSSE:  Okay.

14         THE COURT:  Government's Exhibit 600 will be

15  admitted.

16         (Government's Exhibit 600 received in evidence.)

17  BY MR. BOSSE:

18  Q.  Again, we're not going to go through the whole thing, but

19  were you asked to evaluate a business plan for a push-to-talk

20  network by Mr. Alcorn?  Do you remember that?

21  A.  Yes.

22  Q.  Okay.  And did you identify for him some potential

23  obstacles to that plan?

24  A.  Let's see.  Yes.

25  Q.  Okay.  And can you read out, so it's not just me reading,

```
 1   can you read out obstacle one that you told Mr. Alcorn and
 2   Mr. Maerki?
 3   A.   Yeah.  "Obstacle one, cell phones.  I have talked to
 4   several veterans in the business.  They have told me that
 5   when the Nextel iDEN network shut down on June 5th, 2013,
 6   many customers fled to regular cell phones as the means to
 7   dispatch their field workers.  Many were disgruntled with the
 8   loss of capital equipment purchases that they made for Nextel
 9   phones."
10   Q.   Okay.  And what you're telling them here -- and I don't
11   want to misconstrue it -- what you're telling them here is
12   that an obstacle to a push-to-talk network is the fact that a
13   lot of people switched over to cell phones, people who were
14   plumbers and pizza delivery people and construction workers
15   who may have in the past relied on something like a Nextel
16   push-to-talk network; fair to say?
17   A.   Yeah.  It was clearly competitive with -- cell phones
18   were clearly an alternate means of communications, especially
19   for tradesmen and tradeswomen, you know, plumbers,
20   electricians, et cetera.
21            MR. BOSSE:  Yes, sir.  Let me look up briefly to see
22   if I have anything else to cover, and I don't.  So thank you
23   very much, sir.
24            I have no further questions, Your Honor.
25            THE COURT:  All right.  Thank you very much.
```

```
 1              Any redirect?
 2              MR. GRINDROD:  Yes, Your Honor, briefly.
 3                      REDIRECT EXAMINATION
 4   BY MR. GRINDROD:
 5   Q.  So, Mr. Lewis, yesterday we were talking mostly about the
 6   conference.
 7          Today you looked at, I think, three emails or three
 8   different exhibits with a chain of emails with Mr. Bosse.
 9   And those emails talked generally about how those -- how
10   these licenses could not be used, correct?
11   A.  Correct.
12   Q.  Okay.  So, I want to talk to you about that in the
13   context of those emails.
14   A.  Okay.
15   Q.  Was Bill Smith on any of those emails about how the
16   licenses could not be used?
17   A.  I don't recall.
18   Q.  Okay.  Let's just take a quick look if we could at -- if
19   the government could help me out with the electronic ones --
20   Government 2218.
21   A.  I'm not saying he wasn't.  I just don't recall whoever
22   the addressee was on it.
23   Q.  That's fair.  That's fair.
24          And so up here, this is you and Kent Maerki, right?
25   A.  Yes.
```

1    Q.   And then Tripp Forrest.

2         Do you know who Tripp Forrest is?

3    A.   Yes.  He was the engineering consultant.

4    Q.   For?

5    A.   For Janus, uh-huh.

6    Q.   Okay.  And then David Alcorn?

7    A.   Yes.

8    Q.   And do you know who Al Schneider or Robert Kelly is?

9    A.   Yeah.  Al Schneider was a partner of mine in cellular and

10   was familiar with some of the folks in Janus.

11        And Robert Kelly was my lead attorney on the battle

12   against The Washington Post and everyone who was going to win

13   the first license for D.C. and Baltimore.

14   Q.   Okay.  So, these are all either --

15        Well, Bill Smith isn't on this email?

16   A.   No, he was not.

17   Q.   If we could take a look at 2219.

18        This one should be a little simpler.  This is from

19   you to who?

20   A.   To David Alcorn and a cc to Kent Maerki.

21   Q.   Is Bill Smith on it?

22   A.   No.

23   Q.   Any other salesmen on it?

24   A.   No.

25   Q.   Okay.  And then Government 600, please.

```
 1            Peter Lewis to who?
 2   A.  David Alcorn and Kent Maerki.
 3   Q.  Okay.  So, we can take that down.  Thank you.
 4            And emails like that, did you ever send an email like
 5   that talking about how the licenses could not be used to Bill
 6   Smith?
 7   A.  No.  In general, I don't recall having any direct
 8   communications with any salespeople that were working with
 9   Janus.  Or I may have even had conversations with him during
10   that June 2014, but I don't recall people by name.  I was
11   primarily working with --
12   Q.  Sure.
13   A.  -- with the executive staff of Janus.
14   Q.  And so going back to that June conference, was the focus
15   of your presentation at the June conference on how the
16   licenses could not be used, or on how they could be used?
17   A.  How they could be used.
18   Q.  Okay.
19   A.  Yeah.
20   Q.  And was that the Internet of Things idea?
21   A.  Yes.
22   Q.  Okay.  Mr. Bosse asked you some comparative questions
23   about IoT versus broadband.  Do you remember that?
24   A.  Yes.
25   Q.  Okay.  So, when you spoke about IoT at the conference,
```

```
 1    were you excited about that as a possibility?
 2    A.  Very much so, because there was -- clearly, the stars
 3    were aligned for, you know, Internet of Things, narrowband
 4    frequencies.  There is this animal called the NB-IoT, which
 5    means narrowband-IoT.  And most Internet of Things
 6    applications, like for a red light controller which goes
 7    haywire, or an underground Exxon gas tank that's low, it
 8    doesn't require a lot of data at all, you know, just very few
 9    bytes of data.  So narrowband is generally what's needed for
10    Internet of Things transactions on these small devices to
11    report things like malfunctions and status checks and things
12    of that nature.
13    Q.  If we could take a look, Ms. McCaslin, at Smith 131.
14            I think I already had the page up for you.  So, this
15    was one of your slides.
16            And just going back to the question, Mr. Bosse asked
17    you about comparisons of broadband versus Internet of Things.
18    I mean, did you tell the conference attendees how valuable
19    you thought the Internet of Things market was going to be?
20    A.  Yes.
21    Q.  And how were you measuring that, in billions?
22    A.  In billions, yes.
23    Q.  Okay.  And Mr. Bosse asked you about the attendees of the
24    conference.  Do you remember that question?
25    A.  Yes.
```

```
 1    Q.  And I think you said there were salesmen and license
 2    holders?
 3    A.  Yes.
 4    Q.  Did you give the same presentation to the salesmen and
 5    the license holders?
 6    A.  Yeah.  Everyone was in one room, hotel room, and there
 7    were no separate rooms or separate meetings.  It was just
 8    everyone together in that one room.
 9              MR. GRINDROD:  Thank you.
10              I have no further questions, Your Honor.
11              THE COURT:  Thank you.
12              May the witness be permanently excused?
13              MR. BOSSE:  Yes, sir.
14              MR. GRINDROD:  Yes, Your Honor.
15              MR. YAROW:  Yes, Your Honor.
16              THE COURT:  All right.  Step down then, Mr. Lewis.
17    You are excused.
18              Your next witness.
19              MS. MCCASLIN:  We call Tripp Forrest.  We call
20    Tripp Forrest.
21              THE COURT SECURITY OFFICER:  Stand right here and
22    be sworn.
23              THE CLERK:  Please raise your right hand.
24              (The witness was duly sworn.)
25              THE CLERK:  Thank you.
```

2276

```
 1              JACK THRASH "TRIPP" FORREST, III, called by the

 2    Defendant, having been first duly sworn, was examined and

 3    testified as follows:

 4                          DIRECT EXAMINATION

 5    BY MS. MCCASLIN:

 6    Q.  Good morning, Mr. Forrest.

 7    A.  Good morning.

 8    Q.  You just want to make sure that the microphone is up

 9    close so that all of the people in the back can hear you.

10    A.  Roger that.

11    Q.  Can you tell the jury your name?

12    A.  Jack Forrest, III.

13    Q.  And do you go by a nickname?

14    A.  Tripp.

15    Q.  And can you spell your name for the court reporter,

16    please?

17    A.  Jack, J-A-C-K, Thrash, T-H-R-A-S-H, Forrest,

18    F-O-R-R-E-S-T.

19    Q.  Thank you.

20          And what city and state do you live in?

21    A.  Hammond, Louisiana.

22    Q.  And where do you currently work?

23    A.  I work for myself from home.  My company is EZ-Spectrum.

24          THE COURT REPORTER:  Could you say that one more

25    time?
```

1              THE WITNESS:  EZ-Spectrum, and it's actually letter

2     E, letter Z, Spectrum.

3     BY MS. MCCASLIN:

4     Q.   I assume that's in the field of spectrum?

5     A.   Absolutely.

6     Q.   Okay.  What year did you become involved in Janus

7     Spectrum?

8     A.   Somewhere in 2011, 2012.

9     Q.   And what, just very generally speaking, what was your

10    role with Janus?

11    A.   My role was to acquire expansion band and guard band

12    channels for them in whatever economic areas they were

13    interested in.

14    Q.   Were you an employee of Janus?

15    A.   I was not.

16    Q.   What was your relationship?

17    A.   I would say that I was a subcontractor to Tusa

18    Consulting, who was the main point of contact for Janus, who

19    the contract with Janus was with.

20    Q.   Okay.  So Janus had contracted with Tusa?

21    A.   Correct.

22    Q.   And you were with Tusa Consulting?

23    A.   Correct.

24    Q.   Now, what was the frequency that you were hired to work

25    on with Janus?

1    A.    It was an 800-megahertz band in the guard band.

2    Q.    Now, do you have a degree in this field?

3    A.    My degree is in electrical engineering.

4    Q.    I just want to talk briefly about your previous

5    experience that led you to work with Janus.

6          After college, how did you get involved in spectrum?

7    A.    I went to work for the State of Florida as their spectrum

8    manager for their statewide law enforcement radio system.

9    Q.    Okay.  So, who -- so, it's the entire State of Florida?

10   A.    Uh-huh.

11   Q.    Is that a yes?

12   A.    That's a yes.

13   Q.    Okay.  And who was using that radio system?

14   A.    Both state and local agencies, government agencies.  So,

15   it would be Florida Fish and Wildlife, Florida Highway

16   Patrol, Florida Department of Law Enforcement.  And then

17   there would be certain counties that were third parties on

18   that system as well, so county sheriffs' offices, fire,

19   emergency medical services, that kind of thing, public

20   safety.

21   Q.    And what was your purpose as a spectrum manager there?

22   A.    It was to maintain their existing licenses and acquire

23   new spectrum licenses when they were needed, and that would

24   be either if a radio tower site, for instance, was being cued

25   when the officers would key up, then they would need extra

1    capacity so that they wouldn't be put on hold in emergency

2    scenarios; or if there was a coverage hole and they couldn't

3    speak, then new radio tower sites would have to be built to

4    provide coverage in those critical areas.  And I would have

5    to find frequencies for those new radio tower sites as well.

6    Q.   Okay.  So, you were dealing with the frequencies and the

7    towers, all aspects of it?

8    A.   Correct.

9    Q.   How many towers did you manage in the State of Florida?

10   A.   Roughly 200.

11   Q.   And how long were you the spectrum manager in Florida?

12   A.   Four years.

13   Q.   And where did you go to work after you left -- after

14   working with the Florida system?

15   A.   Tusa Consulting.

16   Q.   And what type of work were you hired to consult on with

17   Tusa?

18   A.   That was a wide variety of things.  There was an expert

19   witness case that I was brought onto immediately that was a

20   lawsuit between Tyco Electronics and the former shareholders

21   to Anaconda-Ericsson from a purchase transaction where Tyco

22   Electronics purchased all of the business for the State of

23   Florida from the former shareholders of Anaconda-Ericsson,

24   but there was an $8 million clause that never got paid, so...

25   Q.   So, you worked on a variety of stuff?

```
1    A.  I did all kinds of things.
2    Q.  Did that include spectrum?
3    A.  It did.  It was mostly spectrum, mostly spectrum.
4    Q.  And it sounded like from your previous statement that
5    Janus Spectrum hired Tusa, correct?
6    A.  Correct.
7    Q.  Did Tusa assign you to this?
8    A.  Yes.
9    Q.  When you were working with Janus but for Tusa, how much
10   were you paid?
11   A.  At the time I was making $60 an hour.
12   Q.  Did you receive any bonuses from Janus?
13   A.  Yes.
14   Q.  What were your bonuses?
15   A.  $500 per successful license application.
16   Q.  Okay.  And the $60 an hour came from Janus or Tusa?
17   A.  Tusa.
18   Q.  Do you know what Tusa was paid by Janus Spectrum?
19   A.  Roughly.  I know roughly, something like in the 4- to
20   $7,000 range per application, something like that.
21   Q.  Okay.  Do you know what the overall payment was?
22   A.  I do not.
23   Q.  Okay.  Do you know if it was about a million?
24   A.  Probably, maybe more, maybe a little more.
25   Q.  Okay.  Now, when you started working with Janus Spectrum,
```

1    who specifically were you working with?

2    A.   David Alcorn.

3    Q.   Did you ever get a chance to meet them early on, or meet

4    Janus Spectrum early on in your consulting?

5    A.   Fairly early on.  First in person meeting was to meet

6    Peter Moncure.  I met them at the Atlanta airport, picked

7    them up and drove them to Peter Moncure's office.

8    Q.   So, who was at this meeting?

9    A.   Both David Alcorn and Kent Maerki.

10   Q.   And who is Peter Moncure?

11   A.   Peter Moncure is a frequency coordinator.

12   Q.   So, he's the go-between between you guys and the FCC?

13   A.   Yes.

14   Q.   And why did you want to meet with the FCC coordinator,

15   Mr. Moncure?

16   A.   Because at that time the rules had not been published for

17   how guard band and expansion band were going to be licensed,

18   and we hoped to get some insight from him on what to expect,

19   so that was it.

20   Q.   Were there any rules in particular that you were hoping

21   to get answers on?

22   A.   The main one that I wanted to know is whether the

23   spectrum was going to be licensed on an economic area basis

24   or an individual radio tower site basis.

25   Q.   And why did that matter to you?

1    A.  Because it would change how I had to apply for the

2    spectrum.

3    Q.  And when you had this meeting with Mr. Moncure, these

4    licenses and these frequencies hadn't been released yet,

5    right?

6    A.  Correct.

7    Q.  Now, at the time did you know how Janus Spectrum planned

8    to use those frequencies?

9    A.  I did not know how they intended to, although they had

10   asked about whether or not Sprint would be a viable candidate

11   for them.

12   Q.  And what was your answer to whether Sprint and the other

13   major carriers would be a viable answer?

14          MR. BOSSE:  I am going to object to that.  That's

15   hearsay.

16          MS. MCCASLIN:  Well, Your Honor, it's advice that

17   he gave.

18          THE COURT:  Well, rephrase it that way.

19          MS. MCCASLIN:  Okay.

20          MR. BOSSE:  You know, I'll withdraw it.  I'll

21   withdraw it.

22   BY MS. MCCASLIN:

23   Q.  What was your answer to whether or not they could be

24   leased back to Sprint or the other major carriers?

25   A.  That at the time that there was -- we were still in the

```
 1    middle of a rebanding; that in order for it to happen, it
 2    wasn't going to happen soon.  Old wounds would have to heal,
 3    meaning rebanding would have to be finished, and then we
 4    would be able to do it with a roll over, you know, as long as
 5    Sprint could prove that they wouldn't cause interference to
 6    public safety.  That was the whole reason the rebanding was
 7    going on.
 8    Q.  So, what do you mean by old wounds need to heal?
 9    A.  I mean, you know, the FCC and Sprint had been spending
10    billions of dollars on moving public safety from frequencies
11    that were close to Sprint to frequencies that were far from
12    Sprint to resolve existing interference problems.
13    Q.  So, they're probably not going to want Sprint to jump
14    back in?
15              MR. BOSSE:  I object.
16              MS. MCCASLIN:  That's fair.
17              THE COURT:  Sustained.
18              MS. MCCASLIN:  That's fair, Your Honor.
19              THE COURT:  I said the Court sustained.  I know you
20    said it was fair.  I just wanted to catch it that the Court
21    sustained.
22              MS. MCCASLIN:  Thank you, Your Honor.
23    BY MS. MCCASLIN:
24    Q.  Now, did you start working on these applications for
25    these frequencies before they were released?
```

1    A.   Yes.

2    Q.   Okay.  And if you could walk us through the steps that

3    you took to engineer these applications.  Where did you

4    start?

5    A.   Okay.  Well, I would start with receiving a request for a

6    specific economic area.  At that time I would look to see if

7    there were any existing licensees that had been grandfathered

8    into that expansion band/guard band area that we would have

9    to avoid, right?  Because not all of the frequencies were

10   available at that time.

11   Q.   So --

12   A.   The next step -- go ahead.

13   Q.   I'm sorry to interrupt.

14        So, if there was another frequency there, would you

15   be allowed to use that as well, or did you have to avoid it?

16   A.   I had to avoid it; it would cause problems to the

17   existing user.

18   Q.   Thank you.

19        And what came next?

20   A.   After that, I would try to pick radio tower sites with

21   maximum -- where I could get maximum antenna height so that I

22   could cover as much of the population centers as possible

23   from a single radio tower site.

24   Q.   Why would you want to maximize the height and the

25   population centers?

1    A.   Because the more coverage that you have, the more people

2    that you can cover, and the more devices you can cover.

3    Q.   How did you go about picking a city or a location?

4    A.   I received the request from Janus.

5    Q.   Okay.  Did you have certain priorities that you were

6    looking for?

7    A.   Well, population is the main one.

8    Q.   Okay.  Now, when the FCC did announce that frequencies

9    would be available, were all of your applications in those

10   areas, or were they elsewhere as well?

11   A.   They were elsewhere as well.

12   Q.   Okay.  And what would you have to do if the applications

13   you had prepared were not where the licenses, the frequencies

14   were released?

15   A.   Well, so there is an example of that where, like I said,

16   Kansas City, Missouri, is a highly populated area, because it

17   straddles two states.  When the public notice came out to

18   release guard band spectrum, it was released only on the

19   Kansas side, not on the Missouri side.  So, the radio tower

20   sites that were covering Kansas City, Missouri, had to be

21   moved because you can't radiate into Missouri now.  So, the

22   strategy then would change about covering population.  I

23   would try to get a site with a low antenna height as close to

24   the state border as I can without radiating over to take

25   advantage of one of the FCC rules that requires that nobody

be within 55 miles of your radio tower site on the same

channel without a rule waiver.

Q.  Okay.  So, your strategy switched from a high antenna to

a low antenna?

A.  Correct.

Q.  Okay.  And what is this 55-mile rule that you've

mentioned?

A.  No one -- no one is allowed to use the same frequency

within -- on the same -- on different radio tower sites that

are closer than 55 miles.

Q.  And how would that be to your benefit when choosing a

tower?

A.  Well -- so, the benefit in the Kansas City, Missouri,

example is that now if you're getting really close to the

state border with your radio tower site, you've basically

blocked future licensees from using that channel on the

Missouri side.

Q.  So, you have options in the future?

A.  Correct.

Q.  Why did you start the engineering before the public

notice came out?

A.  Because there was a lot of applications I expected to

come in, and a lot of them did.  The timeline between when a

public notice was released and when it had to be submitted to

the coordinator was going to be very short, so I had to

1   pre-engineer and then make adjustments based upon the public

2   notice when it came out.

3   Q.  Now, when you were preparing these applications, did you

4   have to be familiar with the FCC reports about the

5   800-megahertz spectrum?

6   A.  Yes.

7   Q.  Okay.  If we could bring up Smith 1008 just for the

8   witness.

9        Do you recognize the FCC orders like this?

10  A.  Yes.  This is the common format for them.  This is not

11  one of the ones that involved the expansion band and guard

12  band, per se, but it's a good -- it's an example of exactly

13  what they look like when they come out.

14  Q.  And this involves the public safety communications in the

15  800-megahertz band?

16  A.  Yes, ma'am.

17       MS. MCCASLIN:  I move to admit Smith 1008.

18       MR. BOSSE:  Your Honor, I'll object because he

19  can't identify this document, and said it didn't have to do

20  with guard and expansion band.

21       THE COURT:  He said --

22       MS. MCCASLIN:  Your Honor, it does have to -- I'm

23  sorry.

24       THE COURT:  Well, he said it looked like one of

25  those reports that they used, but he has not said it's

```
 1    specifically what you're talking about.
 2              MS. MCCASLIN:  Okay.
 3              THE COURT:  So, the Court will sustain the
 4    objection.
 5              MS. MCCASLIN:  Thank you, Your Honor.
 6    BY MS. MCCASLIN:
 7    Q.  If we could bring up Smith 1009.
 8         Does this one look familiar to you, from 2012?
 9    A.  It does.
10    Q.  And this is also an order from the FCC?
11    A.  Yes, ma'am.
12              MS. MCCASLIN:  I move to admit Smith 1009.
13              THE COURT:  Any objection?
14              MR. BOSSE:  No objection.
15              THE COURT:  Smith 1009 is admitted.
16              (Smith Exhibit No. 1009 received in evidence.)
17    BY MS. MCCASLIN:
18    Q.  Now, we see at the top of this document that this is
19    before the FCC, correct?
20    A.  Correct.
21    Q.  And what is this regarding?
22    A.  So, mainly along the -- along the U.S.-Mexico border
23    there is -- there is a sharing agreement, maybe even a
24    treaty.  I'm not really sure what the exact agreement is, but
25    when -- the Mexican side does not have a public database of
```

1    who is using what frequencies where, like the U.S. side does.

2    This would tell you, okay, well, these frequencies are going

3    to be primary for Mexico.  They can use it on their side.

4    Other frequencies are going to be primarily for the U.S. that

5    we can use on our side.  And it would also have what the, you

6    know, radiation requirements are, what the maximum amount of

7    power that you can put into each other's countries on those

8    frequencies.

9    Q.  And did you need to know this border issue when you were

10   picking economic areas?

11   A.  I think San Diego required it.

12   Q.  Okay.  Now, what date was this notice released?

13   A.  August 17th, 2012.

14   Q.  And this says it's the fourth further notice of proposed

15   rule making?

16   A.  Correct.

17   Q.  So, when the FCC makes a rule, are there adjustments and

18   further rules that come out afterward?

19   A.  There are, and prior -- getting to the bottom of one of

20   these is very difficult because the footnotes are full of

21   other referenced reports and orders and decisions that you

22   have to read to fully understand the few pages in this one.

23   Q.  Okay.  All right.  If we could take that down, please.

24       And who at Janus did you have the most contact with?

25   A.  David Alcorn.

```
1   Q.   Did you have much contact with the investors or the
2   salesmen?
3   A.   Not much.
4   Q.   Okay.  Now, Janus held a couple of events.  Did you
5   attend any of them?
6   A.   Yes.
7   Q.   Okay.  Which events did you attend?
8   A.   The Silverado investor retreat, and I guess you call it
9   the investor updates at the Embassy Suites in D.C.
10  Q.   Now, the Silverado retreat, where was that?
11  A.   Napa Valley.
12  Q.   And do you recall when that was?
13  A.   Um, 20 -- maybe 2012, sometime.
14  Q.   Now, what was the -- do you know the purpose of the
15  retreat?
16  A.   Yes.  It was to give the investors an update, let them
17  mingle, and also have them ask any questions, and let them
18  know how successful the very first round of applications had
19  gone.
20  Q.   So, had you already received licenses?
21  A.   Yes.
22  Q.   Okay.  And what was your success in the applications that
23  you submitted?
24  A.   So, I actually learned this at the retreat, but it was
25  over 90 percent of what we applied for was granted.
```

```
 1   Q.  Was the tone of the conference -- what was the tone and
 2   environment of the conference like?
 3   A.  Excitement, high energy.
 4   Q.  Now, do you remember how many got approved?
 5   A.  No, ma'am.
 6   Q.  Do you remember any presentations that were given?
 7   A.  Just -- just the one that mentioned how successful our
 8   licenses were.  And also in that presentation some
 9   monetization strategies were offered up with a company called
10   Y-Tech.
11   Q.  Did you speak at all at the conference?
12   A.  Just to answer questions.
13   Q.  Now, you also mentioned that you were at the D.C.
14   conference?
15   A.  Correct.
16   Q.  Okay.  And to your understanding, what was the purpose of
17   that conference?
18   A.  To offer up some further monetization strategies that
19   Peter Lewis had come up with.
20   Q.  And were you present for the presentations?
21   A.  I was.
22   Q.  Did you give a presentation at that conference?
23   A.  I did not.
24   Q.  What did you think of Peter's ideas when he presented at
25   the conference?
```

```
 1                 MR. BOSSE:  I am going to object to that --
 2                 THE COURT:  Sustained.
 3                 MR. BOSSE:  -- for relevance.
 4                 THE COURT:  Sustained on relevance and opinion.
 5   BY MS. MCCASLIN:
 6   Q.  At the time of these conferences, did you know what
 7   investors were paid for the application services through
 8   Janus?
 9   A.  I am not sure if I knew at that time.
10   Q.  Just one second.
11            Did you review any of the marketing materials for
12   Janus?
13   A.  I did not.
14   Q.  Did you review any of the contracts or agreements with
15   Janus?
16   A.  I did not.
17   Q.  So, is it fair to say that you focused on the engineering
18   piece?
19   A.  Yes.
20            MS. MCCASLIN:  Thank you.  I have no further
21   questions.
22            THE COURT:  Any cross, Mr. Yarow?
23                     CROSS-EXAMINATION
24   BY MR. YAROW:
25   Q.  Good morning, Mr. Forrest.
```

```
 1    A.   Good morning.
 2    Q.   My name is Rick Yarow.  I represent David Alcorn.
 3          You mentioned at the Napa Valley conference that
 4    Y-Tech was discussed.  What exactly is that?
 5    A.   Y-Tech had a business plan where they would use 60-, 70-,
 6    and 80-gigahertz microwave lengths in downtown areas.
 7    Columbus, Ohio, I believe is where they started.  And they
 8    would use their microwave links to offload data from the
 9    cellular providers in order to provide public Wi-Fi at the
10    expense of the cellular carriers.  So, like downtown
11    Columbus, as I understand it, the city got free Wi-Fi
12    downtown, and it was paid for by the carriers offloading
13    their data on the back haul.  That's what the microwave
14    lengths are.
15    Q.   Okay.  Is this something that the guard band was suitable
16    with?
17          MR. BOSSE:  I object on foundation, and he may be
18    able to lay it, but it's not there yet.
19          THE COURT:  You can rephrase and lay the foundation
20    if you wish to.
21          MR. YAROW:  Yes, sir.
22    BY MR. YAROW:
23    Q.   And what exactly -- the Y-Tech business plan, what
24    exactly were they -- were they -- what was the speed at which
25    they were, or what was the bandwidth that they were trying to
```

1    offer people in these downtown areas?

2    A.   Well, it was Wi-Fi.  So, yeah, whatever Wi-Fi's bandwidth

3    is.  I actually don't know off the top of my head, but it's,

4    you know, megahertz wide.

5    Q.   Okay.  And when you -- you testified that you first met

6    with Mr. Alcorn and Mr. Moncure, the frequency coordinator.

7    I'm sorry, that was in -- where was that meeting?

8    A.   The name of the town is Toccoa.

9    Q.   Just generally, what state is that in?

10   A.   It's in Georgia.

11   Q.   Georgia?

12   A.   It's outside of Atlanta.

13   Q.   All right.  So, when you met with Mr. Alcorn in Georgia,

14   that was the first time you had met with him?

15   A.   Yes.

16   Q.   Okay.  Did you have any discussions with Mr. Alcorn about

17   spectrum, 800-megahertz band of spectrum?

18   A.   I am sure we had some discussions at that point.  I don't

19   know what the scope of those discussions were.

20   Q.   Okay.

21   A.   I am sure we had spoken on the phone before we met.

22   Q.   And do you remember -- do you remember whether you had an

23   impression on Mr. Alcorn's knowledge of these areas of this

24   spectrum?

25   A.   Well --

```
 1              Go ahead.
 2              MR. BOSSE:  Well, I think I am objecting.  He's
 3   calling for an opinion, a statement from the witness.
 4              THE COURT:  Sustained.
 5              MR. YAROW:  I am asking for his impression.
 6              THE COURT:  That's calling for an opinion.  You can
 7   talk about the weather, the color of the sky, those are
 8   opinions that are acceptable.  That opinion is that not.
 9              Sustained.
10              MR. YAROW:  I understand, Your Honor.
11              That's all of the questions I have.
12              THE COURT:  Any cross?
13              MR. BOSSE:  Yes, sir, Your Honor.
14                        CROSS-EXAMINATION
15   BY MR. BOSSE:
16   Q.  Good morning, Mr. Forrest.
17   A.  Good morning.
18   Q.  Nice to see you.  I am Andrew Bosse from the government.
19              I want to clear up a couple of things, the things you
20   didn't know when you started out working for Janus.
21              You started as a frequency engineer with Tusa
22   Consulting, correct?
23   A.  Correct.
24   Q.  And you worked most closely, you said, with David Alcorn?
25   A.  Correct.
```

1    Q.   And you helped him get some of the licenses we talked

2    about here today, correct?

3    A.   Correct.

4    Q.   Do you recall that you submitted in round one -- well,

5    let me back up.

6         The licenses didn't all become available from the FCC

7    all around the country all at once, right?

8    A.   Correct.

9    Q.   It happened in stages.  There were different rounds of

10   areas that were released that you could apply for?

11   A.   Correct.

12   Q.   Okay.  And you know that that process is still ongoing

13   today for guard and expansion band?

14   A.   Yes.

15   Q.   Okay.  And you filed some round one licenses for Janus

16   clients, correct?

17   A.   Correct.

18   Q.   And I think that you filed -- you estimated that you

19   filed about 20 to 30 round one licenses with the FCC; is that

20   correct?

21   A.   That's what I said last time.

22   Q.   Okay.  And you never submitted round two applications for

23   Janus, correct?

24   A.   Correct.

25   Q.   Okay.  So, those were prepared, but never submitted to

1    the FCC?

2    A.   That's correct.

3    Q.   Okay.  You didn't ever sell yourself any license

4    application services for Janus, correct?

5    A.   Correct.

6    Q.   And so you may have interacted with investors at some of

7    these meetings, but you never were pitching to them that they

8    should buy license application services from Janus?

9    A.   Correct.

10   Q.   And you didn't know what Mr. Alcorn and Mr. Maerki and

11   any salesmen associated with them were saying about the

12   particular spectrum at issue here, right?

13   A.   Correct.

14   Q.   And you know that that's the guard and expansion band

15   spectrum?

16   A.   Correct.

17   Q.   You said guard band, I think.

18   A.   Yeah.  I encouraged them to stay in the guard band versus

19   expansion band, because that spectrum is adjacent to Sprint,

20   and it would be most useful to them many years down the road,

21   should -- you know, that was -- the idea was, you know, what

22   I told them, you come up with a service you can use today,

23   and then later when the wounds heal, you should be able to

24   flip it.

25   Q.   But you were clear with Mr. Alcorn and Mr. Maerki that

```
 1   there was no broadband use of these spectrum licenses that
 2   you were applying for in the 2012 time period?
 3   A.  Right.
 4   Q.  Okay.  And you were clear with them that Sprint and AT&T
 5   and Verizon weren't going to come knocking down the door
 6   immediately to lease these back from license holders?
 7   A.  Correct.
 8   Q.  And you didn't know, because you weren't involved in the
 9   sales pitches, that investors were -- you didn't know the
10   timeline investors were being told they could expect to make
11   money from a lease back to a major carrier?
12   A.  Correct.
13   Q.  Okay.  You didn't know also how much Janus was charging
14   its clients to apply for each license, at the time you were
15   doing these?  You might have learned these since?
16   A.  Correct.
17   Q.  But you didn't know at the time?
18   A.  Right.
19   Q.  Okay.  And you were -- these were site licenses; is that
20   right?
21   A.  Correct.
22   Q.  And I don't want to rehash what you said with
23   Ms. McCaslin, but these were for particular sites in
24   particular cities?
25   A.  Right.
```

```
 1    Q.  And one of your responsibilities was within that site how

 2    to get the maximum coverage for this 25-kilohertz channel?

 3    A.  Correct.

 4    Q.  All right.  And you would agree that you could not use a

 5    guard and expansion band channel for high density like LTE,

 6    things we use our cell phones for today?

 7    A.  Yes.

 8    Q.  Okay.  All right.  And were you aware -- I think you

 9    were -- were you aware that the FCC itself was saying that

10    Sprint and Verizon would not be able to use these channels?

11    A.  I know that that high density term that you just used

12    comes straight from the public notice.

13    Q.  Okay.  And the FCC was clear that that could not be an

14    application used on these channels?

15    A.  Right.

16    Q.  And were you aware that Sprint itself actually put out

17    materials to tell people that they would not be getting this

18    stuff back from license holders?

19    A.  I was not.

20    Q.  Okay.  But none of this was hidden from -- you didn't

21    hide any of this information from Mr. Alcorn or Mr. Maerki?

22    A.  No.

23    Q.  And in fact you talked about this with them, the

24    limitations on the channels that were in the guard and

25    expansion band.  You talked about that with Mr. Alcorn as
```

```
1    early as 2010 or 2011, is what you recollected, correct?
2    A.  I would believe that, if I said it the last time.
3    Q.  Okay.  And I think you estimated the Tusa costs for the
4    engineering, the actual engineering costs to be between 4-
5    and $7,000 per application?
6    A.  Right.
7    Q.  And that over time that went down a little bit, correct?
8    A.  Right.  I gave a little advice to the guys and said,
9    look, you know, make it more expensive in the beginning while
10   I'm figuring out what the rules are, and I should be able to
11   streamline the process over time.
12   Q.  And you were able to do that, to streamline the process.
13   And I think you estimated the average cost for a license
14   application from the Tusa service was about $4,000, not
15   exact, but averaging?
16   A.  Right.
17   Q.  Okay.  I am going to show you on your screen -- and this
18   is not in yet -- 300T.
19        Okay.  And who is Greg Brockman?
20   A.  Back office for Tusa Consulting.
21   Q.  Okay.  And is this -- just so we can get this into
22   evidence -- is this an email string between you and
23   Mr. Alcorn and another gentleman at Tusa Consulting about
24   invoices for license application fees?
25   A.  Yes, it is.
```

 1    Q.  All right.

 2              MR. BOSSE:  I'll offer 300T, Your Honor.

 3              THE COURT:  Any objection?  Hearing no objection,

 4    300T will be admitted.

 5              (Government's Exhibit 300T received in evidence.)

 6    BY MR. BOSSE:

 7    Q.  Okay.  And we're going to do this briefly, but the first,

 8    the top email, so the latest in time from June 14th of 2012,

 9    could you read Mr. Alcorn's email to your colleague,

10    Mr. Brockman?

11    A.  "Thanks, Greg.  Sorry to be a pain, but we need an

12    invoice that describes the services and states paid in full,

13    but does not give the amount.  We make this available to our

14    investors, but it is not necessary for the investors to know

15    the amounts we pay.  It is, however, important that they know

16    the services have been paid for.  Give me a call to discuss,

17    or if you have any questions."

18    Q.  Okay.  So, we're going to look at an example of this, but

19    what Mr. Alcorn is asking for is an invoice that says paid,

20    but doesn't actually tell the amount that was paid?

21    A.  Right.

22    Q.  But does describe the services that you provided?

23    A.  Right.

24    Q.  And the reason for that is because it's not necessary for

25    the investors to know what Janus is paying to Tusa?

```
 1    A.   Right.
 2    Q.   Okay.  Could we see for the witness, please, 300U?
 3              And is this an example of what we just talked about?
 4              Oh, I'm sorry.  Do you recognize this document?
 5    A.   I don't, because I don't see invoices, but it looks like
 6    what was just described.
 7    Q.   Okay.
 8              MR. BOSSE:  All right.  I'll offer 300U.
 9              THE COURT:  Well --
10              MR. YAROW:  Objection, Your Honor.
11              THE COURT:  Sustained.  He doesn't do -- he doesn't
12    deal with invoices, but that's what it looks like.
13              Objection sustained.
14              MR. BOSSE:  Okay.
15    BY MR. BOSSE:
16    Q.   Did you have correspondence in the previous email about
17    invoices and sending invoices?
18    A.   I was on that email string.
19    Q.   Okay.  Have you ever seen a Tusa Consulting Services
20    invoice before, in the time that you worked there?
21    A.   No.
22    Q.   Okay.  We can take that down then.
23              All right.  The application fee from the FCC per
24    application was about $410?
25    A.   So, 410 is what goes to the FCC.  And then per channel,
```

```
 1   the frequency coordinator will charge between 210 and 510 per
 2   channel.  So, a five-channel license, we're talking 2,500 in
 3   coordination fees plus the application fee.
 4   Q.  Right.  So, there is one application fee to the FCC, and
 5   then for each channel you're applying you have to pay the
 6   frequency engineer, in this case Peter Moncure, a fixed fee
 7   per channel?
 8   A.  Correct.
 9   Q.  Okay.  And do you recall that being $300 per channel for
10   these licenses?
11   A.  Well, like I said, it should be 210 to 510.  So, 300 is
12   in that range.
13   Q.  Okay.  Let's just see for the witness only, please, 337.
14       Okay.  And you're not -- well, you're copied on this
15   email here at the bottom.  This is from the frequency
16   coordinator, Peter Moncure, to you in November of 2012.  Do
17   you see that there?
18   A.  I do.
19   Q.  Okay.  And then do you see that Mr. Moncure has continued
20   to correspond with Mr. Alcorn as the email string progresses?
21   A.  Yes, I do.  I am trying to read it.  I'm sorry.
22   Q.  I'm sorry.  I'm sorry, Mr. Forrest, no, not yet.  I am
23   just going to get it into evidence.
24       This is your email to Mr. Moncure copying David
25   Alcorn about the fees we've just been talking about, correct?
```

```
 1    A.  Yes.
 2    Q.  Okay.
 3              MR. BOSSE:  So, I'll offer Government's 337.
 4              THE COURT:  Government's Exhibit 337 will be
 5    admitted.
 6              (Government's Exhibit 337 received in evidence.)
 7    BY MR. BOSSE:
 8    Q.  Okay.  And just so the jury can see, this is you telling
 9    Mr. Moncure and Mr. Alcorn the fees for 18 applications.  And
10    this is the FCC fee for 18 applications, correct?
11    A.  Correct.
12    Q.  Okay.  And some of those applications have multiple
13    channels, and each channel is $300, correct?
14    A.  Right.
15    Q.  Okay.  And so the total before Tusa -- I want to be fair
16    -- before the Tusa Consulting costs, the total for 18
17    applications for 112 total channels was $40,980?
18    A.  That looks right.
19    Q.  Okay.  I want to ask you --
20              You can take that down.
21              You were asked about the Napa Valley conference that
22    you attended?
23    A.  Yes, sir.
24    Q.  Okay.  And if we could see 316D, please.
25              And this is just to set the date.  So, you're not on
```

1    this email, but do you recall this being about right?  It was

2    in August of 2013, at the Silverado Resort?

3    A.   Sure.  Okay.  Yeah.  Now I am, yeah.

4    Q.   Okay.  And there were investors at the conference?

5    A.   Yes.

6    Q.   And there were other people associated with Janus at the

7    conference?

8    A.   Yes.

9    Q.   And while you were there, you answered questions?

10   A.   Yes.

11   Q.   Okay.  And what kind of questions did you answer?

12   A.   They were more broad about how frequencies work, how they

13   were coordinated, the same kind of questions that I've had

14   here.

15   Q.   Okay.  And you didn't hide from anybody that you were

16   talking to, to the fact that these were narrow band channels,

17   correct?

18   A.   Correct.

19   Q.   All right.  And was that known generally, to your

20   impression, at the conference?

21   A.   I have no idea.

22            MS. MCCASLIN:  Your Honor, objection.

23            THE COURT:  Objection sustained.

24            MR. BOSSE:  Okay.

25   BY MR. BOSSE:

1    Q.   Let me ask you this.  Was the fact that these were narrow

2    band channels talked about at the conference, that you heard,

3    by you or anybody else?

4    A.   I can't recall.

5    Q.   Okay.  That's fair.

6         You didn't tell anybody, you certainly didn't tell

7    anybody at the conference that these could be leased back to

8    Sprint, you know, in the very near future?

9    A.   No.  No.

10   Q.   You remember you were asked about hearing a presentation

11   about some kind of Wi-Fi thing maybe called Y-Tech?

12   A.   Right.

13   Q.   Do you remember a man named Bill Gray doing that

14   presentation?

15   A.   Yes, I do.

16   Q.   And that presentation, it was given as a way to

17   potentially monetize these licenses.  That presentation that

18   you heard did not involve the sale or lease back of these

19   licenses to major carriers like Sprint, Verizon, and AT&T?

20   A.   Correct.

21   Q.   You went to another conference in Washington, D.C. in the

22   summer of 2014, I believe, correct?

23   A.   I remember that it was within a year of that, so that

24   sounds right.

25   Q.   Okay.  Let's pull up, if we could, 713.

```
 1          Okay.  And I should have just showed you this.  But
 2   does June 24th, 2014, sound correct?
 3   A.  Yes.
 4   Q.  And you see you're listed there as one of the people from
 5   Tusa Engineering?
 6   A.  Yes.  Yes, sir.
 7   Q.  And Peter Lewis was there from NetMoby, and he spoke.
 8   You remember hearing him speak?
 9   A.  Uh-huh.
10   Q.  Okay.  If we could page down.
11          Okay.  Do you remember Mr. Lewis talking about the
12   fact that these licenses are best suited for local data only
13   operations?
14   A.  Uh-huh.
15   Q.  Okay.  And he talked about that with you and with
16   Mr. Alcorn and with Mr. Maerki before the conference,
17   correct?
18   A.  I am sure.
19   Q.  Okay.  As time went on --
20          We can take that down.  Thank you.
21          As time went on, you actually started getting
22   contacted directly by some unhappy frustrated investors who
23   were -- who were unhappy with Mr. Alcorn, to be fair,
24   correct?
25   A.  I can't -- I know that they contacted me.  I remember the
```

```
 1    Newells reaching out.

 2            MR. YAROW:  Your Honor.

 3            THE WITNESS:  I can't remember what we discussed

 4    though.

 5            MR. YAROW:  Your Honor, Mr. Alcorn objects to this.

 6            THE COURT:  Well, to the extent you're getting into

 7    what anybody said to you, you cannot do that.

 8            THE WITNESS:  Okay.

 9    BY MR. BOSSE:

10    Q.  So, let me just -- I'll sharpen that up.

11            Do you remember being contacted by frustrated

12    investors as time went on, without telling us what they said?

13    A.  Well, it's hard to -- so, here, let me answer that

14    question in full.  The Newells contacted us, and we

15    actually --

16            MR. YAROW:  Your Honor.

17            THE COURT:  As long as you don't tell us what the

18    Newells said.

19            THE WITNESS:  Right.  Right.  No.  They contacted

20    us about something separate to help their daughter get into

21    a program at Georgia Tech Energy Center.

22            But I know they were highly frustrated investors,

23    but I don't remember if they called me because they were

24    frustrated.

25    BY MR. BOSSE:
```

```
 1   Q.  Okay.  Let me show for the witness then, 723, please.
 2         Okay.
 3   A.  Oh, yeah.  Okay.  Okay.
 4   Q.  Okay.  Do you recognize now this being an email from
 5   Mr. Newell to you in June of 2015?
 6   A.  Let me read what it says here.
 7             MS. YUSI:  This is in.
 8             MR. BOSSE:  Oh, okay.
 9             This is already in, Your Honor, so we can show
10   this.
11   BY MR. BOSSE:
12   Q.  And this is Mr. Newell expressing frustrations to you and
13   asking for a one-on-one meeting with you, correct?
14   A.  Oh, okay.  Yeah.  I gotcha.  That's a different question
15   than their frustration.
16         That's because when I would apply, I applied for
17   five channels, right, for every application.
18   Q.  Okay.
19   A.  When I would apply for five channels, the process was
20   there were a lot of other people applying at the same time,
21   so they got handed out in a round robin.  The end licenses
22   didn't always have five channels on them because somebody
23   else got them, they applied at the same time based on the
24   process that the frequency coordinators use.
25   Q.  Right.  Right.  Okay.
```

```
 1            Did they also express frustrations to you, though,
 2   about Mr. Alcorn's failure to monetize their licenses?  For
 3   example, in this paragraph here on the next page of the
 4   email, and the language is a little strong but, "We didn't
 5   mail off $1 million to Janus so we could wallpaper our dining
 6   room with licenses we bought.  Cash flow as outlined by Janus
 7   that they would negotiate with" -- do you see that there?
 8   A.  I do.  I do.  I don't remember this email, but obviously
 9   it happened.
10   Q.  And you forwarded this, or you somehow got this to
11   Mr. Alcorn, because he appears later in time on the email
12   chain, correct?
13   A.  Yes.
14   Q.  Okay.  We can take that down.
15            And as far as you know, the licenses that Janus
16   clients did get from that round one of applications, those to
17   your knowledge were never put to work, correct?
18   A.  Correct.
19   Q.  Okay.
20            MR. BOSSE:  That's all of the questions I have.
21   Thank you.
22            THE COURT:  There may be some redirect, but we're
23   going to take a break now.
24            MS. MCCASLIN:  It's very short.
25            THE COURT:  Okay.  Hold on then.  We'll do the
```

```
 1    redirect then.

 2                    REDIRECT EXAMINATION

 3    BY MS. MCCASLIN:

 4    Q.  Mr. Forrest, you had mentioned on cross-examination with

 5    the government that the public notices talk about high

 6    densities?

 7    A.  (Witness nodded head.)

 8    Q.  When the FCC is talking about towers and using

 9    frequencies, they talk about high density and what else?

10    A.  Low density.

11    Q.  Low densities?

12    A.  Uh-huh.

13    Q.  Okay.  Do they talk about requirements with tower heights

14    or antennas?

15    A.  No, not specifically.  No, not specifically.  I know what

16    they mean by high density from my own experience in the

17    field.  And high density means that the tower sites are

18    packed closely.  That's how cellular networks work.

19    Q.  And do you know if the FCC has a particular definition

20    for the term "high density"?

21    A.  I am not sure if there is a lookup for it.

22    Q.  Okay.  Do they tend to use the words "high density/low

23    density" versus broadband and whatever else?

24              MR. BOSSE:  I think it's asked and answered and

25    beyond the scope.  He testified they weren't high density.
```

```
 1              THE COURT:  I think he just said he had no idea
 2    about high density.  So, the Court will sustain the
 3    objection to the extent that you asked him about it being
 4    high density.  I don't know what his response would be when
 5    you made reference to low density.  I don't know what his
 6    response would be to that.
 7    BY MS. MCCASLIN:
 8    Q.  Is it fair to say that the FCC notices that you have to
 9    stay up-to-date with are pretty technical?
10    A.  Yes.
11    Q.  Does it take you a long time to read some of them?
12    A.  Yes.  If you start from scratch, and you go down through
13    all of the footnotes and references, it can take a very long
14    time.
15    Q.  And these FCC notices, if you're reading through them,
16    would you say it's dozens of pages, hundreds, thousands?
17    A.  If you were to pull from all of the footnotes, I am sure
18    you would be in the thousands.
19              MS. MCCASLIN:  Thank you.  No further questions.
20              THE COURT:  May the witness be permanently excused,
21    Counsel?
22              MS. MCCASLIN:  Yes, Your Honor.
23              MR. BOSSE:  Yes, Your Honor.
24              MR. YAROW:  Yes, sir.
25              THE COURT:  All right, Mr. Forrest, you are
```

```
 1    permanently excused.  You may step down.

 2            Okay, ladies and gentlemen, we're going to take a

 3    15-minute break.

 4            (The jury exited the courtroom at 10:59 a.m.)

 5            THE COURT:  Court will stand in recess.

 6            (Court stood in recess from 11:00 a.m. to

 7    11:20 a.m.)

 8            (The jury entered the courtroom at 11:20 a.m.)

 9            THE COURT:  You may be seated.

10            The record will record that all jurors are present.

11            Counsel agree?

12            MS. YUSI:  Yes, Your Honor.

13            MR. YAROW:  Mr. Alcorn does, Your Honor.

14            MS. MCCASLIN:  Mr. Smith agrees.

15            THE COURT:  All right.  You may call your next

16    witness.

17            MS. MCCASLIN:  Your Honor, we call Terence

18    Pinkston.

19            THE CLERK:  If you can please raise your right

20    hand.

21            (The witness was duly sworn.)

22            THE CLERK:  Thank you.

23            TERENCE DALE PINKSTON, JR., called by the

24    Defendant, having been first duly sworn, was examined and

25    testified as follows:
```

```
 1                        DIRECT EXAMINATION
 2   BY MS. MCCASLIN:
 3   Q.  Good morning, Mr. Pinkston.
 4   A.  Good morning.
 5   Q.  You will probably need to keep that microphone right by
 6   your mouth --
 7   A.  Okay.
 8   Q.  -- for the people in the back to hear you.
 9   A.  Okay.  You got it.
10   Q.  Can you tell us your name, please?
11   A.  Terence Dale Pinkston, Jr.
12   Q.  And can you spell your first and last name for our court
13   reporter?
14   A.  Yeah.  Terence, T-E-R-E-N-C-E, Pinkston, P-I-N-K-S-T-O-N.
15   Q.  Thank you.
16           And what city and state do you live in?
17   A.  Scottsdale, Arizona.
18   Q.  And can you tell the jury a little bit about your
19   educational background?
20   A.  My background, I have a bachelor's degree from the
21   University of Texas at Arlington, and it's a BBA, so it's a
22   bachelor's in business administration with a major in
23   marketing.
24   Q.  And do you have much work experience in marketing and
25   business?
```

```
 1   A.  Yes, ma'am, over 25 years.

 2   Q.  And how are you involved in this case today?

 3   A.  I went to work for Dental Support for about a year, in

 4   Dental Support Plus Franchises.

 5   Q.  At what point did you meet Kent Maerki?

 6   A.  I responded to an ad for a marketing position for Dental

 7   Support.  I met Mr. Maerki at the office for an interview.

 8   Q.  Do you remember about what time this occurred?

 9   A.  Early 2012.

10   Q.  And did you ultimately accept a position with DSPF?

11   A.  I did, yes, ma'am.

12   Q.  What excited you about the job?

13   A.  I thought it was a unique marketing idea, you know.

14   There is dentists.  There is patients.  Bringing the two

15   together in a little different way to me seemed very, very

16   interesting, and I had never done anything in the medical

17   field, so that's what drew me in.

18   Q.  What location did you work in?

19   A.  In the North Scottsdale.

20   Q.  Is that headquarters?

21   A.  That was the headquarters, yes, ma'am.

22   Q.  Can you just describe the building briefly?

23   A.  A very nice building, class A office space, pretty large

24   building, a little unusual on the inside because when you

25   walk in, of course, normal lobby area and all of that, but on
```

```
 1    the right-hand side was a large space for a call center that

 2    was behind kind of closed doors.  There was a conference room

 3    across from it, and in the back were all of the private

 4    offices.

 5    Q.  And did you share the space with any other companies?

 6    A.  Yes, ma'am.  There were two other companies there.

 7    Q.  And what were they?

 8    A.  MetroMedia and Oracare.

 9    Q.  At some point did you guys move offices?

10    A.  We did.  We moved pretty much across the street into a

11    building that was probably three times that size.

12    Q.  And was there an actual call center?

13    A.  Yes.

14    Q.  And how large was the call center?

15    A.  The call center in the second space was about two to

16    three times the size of the first space, somewhere in the

17    neighborhood of 50 to 75 agents, but it had space for at

18    least twice that many agents.  It was large.

19    Q.  Okay.  And what was the purpose of the call center?

20    A.  The call center was there mostly to get the patients, so

21    mostly outbound calling, that sort of thing, to try to find

22    people that were looking for dentists and connect them to the

23    network.

24    Q.  And did your wife work for any of these entities?

25    A.  She did after me.  She actually went to work.  I believe
```

JILL H. TRAIL, Official Court Reporter

```
 1    it was MetroMedia that she worked for, and she was there to
 2    try to help get dentists into the network.
 3    Q.  So, she was recruiting dentists?
 4    A.  Yes.  She was on the dental side for the dentists.
 5    Q.  Okay.
 6             Mr. Grindrod, if we can bring up Smith 13 just for
 7    the witness.
 8             I am going to show you a document, Mr. Pinkston.  I
 9    am going to see if you recognize this.  And I can blow up
10    sections if that helps.
11    A.  Yes.  Yes.  That was something from Kent, a message out
12    to the sales force.
13    Q.  And did it come from you?
14    A.  It came from my email, correct.
15             MS. MCCASLIN:  I move to admit Smith 13.
16             MS. YUSI:  No objection, Your Honor.
17             THE COURT:  Smith 13 will be admitted.
18             (Smith Exhibit No. 13 received in evidence.)
19    BY MS. MCCASLIN:
20    Q.  So, we're looking at an email here, and it says -- who is
21    this from?
22    A.  That's from me.
23    Q.  And what was your position there, your title?
24    A.  Vice president of sales and marketing, but mostly it was
25    an administrative position.
```

1    Q.  Okay.  And the note came from or the message came from

2    who?

3    A.  Correct, from Kent Maerki.  All of the messages came

4    directly from Kent, and he was the one that would ask us to

5    send it out and who it should go to.

6    Q.  Now, if I could go to -- scroll to page 2.

7            And you can see in this email that you were talking

8    about Oracare and MetroMedia, correct?

9    A.  Correct.

10   Q.  Okay.  If you could read this paragraph here.

11   A.  It said, "While MetroMedia and Oracare have gotten off to

12   a very slow start, it appears that they have the wherewithal

13   to get caught up by this year end, December 31, 2012."

14   Q.  Okay.  And what was the date that this was sent out?

15   A.  That was August 26th, the same year, 2012.

16   Q.  So, the expectation was to get all caught up with

17   patients by -- in the next few months?

18   A.  Correct.

19   Q.  Now, when you sent that out, were you intentionally

20   providing anyone with false information?

21   A.  No, not at all.

22   Q.  And at some point DSPF got another marketing vendor,

23   correct?

24   A.  Correct.

25   Q.  Do you know who that was?

1    A.  We were looking for different ways to bring in both

2    patients and dentists into the system, and David Bailey at

3    WebOp was the gentleman that we had many meetings and many

4    discussions with to try to help out.

5    Q.  Did you ever meet David Bailey?

6    A.  Many times, yes.

7    Q.  Okay.  And what do you remember about meeting him,

8    without saying anything that he specifically said?

9    A.  David, very professional guy, clearly one of those

10   internet guys from early on, a very tight-knit group of folks

11   that he worked with and highly technical; you could tell by

12   his office.

13   Q.  And how would you describe his personality?

14   A.  Kind of bigger than life, a large gentleman, very

15   outspoken, very polished.

16   Q.  And did you ever go to his offices?

17   A.  Yes.

18   Q.  Can you describe what you saw at the offices?

19   A.  Kind of to me it looked more like a Wall Street-type

20   thing, a lot of computers.  He had all of his web developers

21   and staff all sitting close together doing web development

22   and web design, but he also had monitors on a lot of the

23   walls that would show all of the businesses that he was

24   working with, kind of like Wall Street.  It's red and green

25   and graphs and metrics and all of that sort of thing.

```
 1    Q.  Now, did DSPF also have a lawyer?

 2    A.  Yes, ma'am.

 3    Q.  Who was that?

 4    A.  Lynne Shelton, Shelton & Power.

 5    Q.  And do you know what Shelton & Power specialized in?

 6    A.  Franchises.

 7    Q.  And what role did Lynne Shelton play at DSPF?

 8    A.  She was the lead attorney in charge of all of the

 9    documents and all of the legal side of the franchise

10    business.

11    Q.  And so when you joined DSPF and learned that they had a

12    franchise attorney, what effect did that have on you?

13    A.  She was -- she was a very, very strong woman, extremely

14    experienced, very serious about everything that she did.  She

15    was kind of a "dot the I's and cross the T's" type person.

16    Q.  Did it give you confidence?

17    A.  Yes, quite a bit.

18    Q.  If we could bring up Smith 37 just for the witness.

19         MS. MCCASLIN:  And, Your Honor, I am going to move to

20    admit this under our stipulation Government 2000A-9, under

21    the records of California Department of Business Oversight.

22         THE COURT:  Any objection?

23         MS. YUSI:  Can we look at it for a second, Your

24    Honor?

25         THE COURT:  Okay.
```

```
 1              MS. YUSI:  Can you scroll through it?
 2              THE COURT:  You know, one thing I will say to
 3    counsel, even though you have all agreed that you're going
 4    to admit it, the record, it can be admitted under 803, there
 5    still has to be a foundation and relevance for the document.
 6    And so I think before you move to admit it, we need to get
 7    some foundation here.
 8              MS. MCCASLIN:  Understood, Your Honor.
 9              MS. YUSI:  Your Honor, I am not sure the relevance
10    or the foundation that this particular witness would have
11    regarding this.
12              THE COURT:  Well, let's see if you can lay a
13    foundation, and then we'll come back to any relevancy
14    objection.
15              MS. MCCASLIN:  Okay.
16    BY MS. MCCASLIN:
17    Q.  Now, in various states in the country, do you know if you
18    had to have permission to sell DSPF in those states?
19    A.  That I was not familiar with --
20    Q.  Okay.
21    A.  -- regarding multi states.
22    Q.  Are you familiar with what a franchise disclosure
23    document is?
24    A.  I know that's the actual, I think, documents themselves
25    that are part of the national franchise association and
```

1    everything that you have to have legal, on the legal side.

2    Q.  And that would have been taken care of probably by Kent

3    and Lynne?

4    A.  Correct.

5    Q.  Now, if you can look at this document in front of you.

6    What company is this dealing with?

7    A.  For Dental Support Plus Franchises.

8    Q.  Okay.  And --

9            MS. YUSI:  Your Honor, I am going to object that

10   she's reading from the document.  And I know she's just

11   trying to get him familiar with it, but he said he has no

12   foundation in terms of what the legal requirements for the

13   states were or any information; that Kent and Lynne dealt

14   with it.

15           THE COURT:  Well, the Court is going to ask this

16   question:  Do you know anything about this document in front

17   of you?

18           THE WITNESS:  This document?  No, sir.

19           MS. MCCASLIN:  Well, Your Honor, it is under the

20   stipulation and there is relevance, if I can explain to the

21   Court the relevance.

22           THE COURT:  Well, it doesn't make any difference if

23   it's relevant.  It may be relevant for another witness to

24   put it in, but this witness cannot lay the foundation for

25   putting the document in.  He knows nothing about it.

```
 1              MS. MCCASLIN:  Your Honor, the foundation goes to
 2     the authenticity.  The authenticity has been stipulated by
 3     the government.  We have adhered to our stipulations under
 4     that.
 5              THE COURT:  But you have to show some relevance,
 6     too.
 7              MS. MCCASLIN:  And I can very easily.  When DSPF
 8     was registered in California, which I've already --
 9              MS. YUSI:  Objection.
10              THE COURT:  Wait a minute --
11              MS. MCCASLIN:  -- I've already put those documents
12     into evidence.
13              THE COURT:  Listen.  Objection sustained.  The
14     document is not coming in through this witness.
15              Let's move on.
16              MS. MCCASLIN:  Your Honor, can I have a sidebar?
17              THE COURT:  No.
18     BY MS. MCCASLIN:
19     Q.  Now, there were a lot of independent salespeople that
20     sold DSPF, correct?
21     A.  Yes, ma'am.
22     Q.  Are you familiar with weekly calls that DSPF held?
23     A.  Yes, ma'am.
24     Q.  And who ran those weekly calls?
25     A.  That was Kent Maerki.
```

1   Q.  What was the mood of those calls?

2   A.  It was -- the mood was definitely always sell, sell,

3   sell, very upbeat, very positive.

4   Q.  Okay.  Did you recall Mr. Maerki ever telling a salesman

5   to slow down the sales or stop the sales?

6   A.  Absolutely not.

7   Q.  Did you ever hear Mr. Maerki suggest that the company was

8   not going to succeed?

9   A.  No, ma'am, definitely not.

10  Q.  And according to the calls, what was the outlook for

11  DSPF?

12  A.  It was always very bright, everything was okay,

13  everything was going to get better.  It's everything kept

14  expanding.  The office went into a much larger space, a lot

15  more staff.

16  Q.  And did DSPF corporate provide marketing materials to the

17  salespeople?

18  A.  Yes, ma'am.

19  Q.  And your background is in marketing, so did you have a

20  role in drafting these marketing materials?

21  A.  They were all created prior to me joining.

22  Q.  So, who did the materials come from?

23  A.  The -- we had a tri-fold brochure that was, like, blue

24  and pink, and that was developed by a Utah firm, an

25  advertising, I believe.

1   Q.  Who --

2   A.  And I don't remember their name.  I'm sorry.  They also

3   were the ones that did the website.

4   Q.  Who determined the content of the tri-fold brochure and

5   the other --

6   A.  Content and --

7           MS. YUSI:  Your Honor, I am going to object to the

8   foundation -- he said it was all done prior to him being

9   there -- unless he knows.

10          THE WITNESS:  I can answer the question.

11          THE COURT:  Hold on.

12          No.  No.  No.  You wait until I rule.

13          Counsel, would you like to go back and rephrase and

14  attempt to address this issue again with the witness?

15          MS. MCCASLIN:  Yes, Your Honor.

16          THE COURT:  Okay.

17  BY MS. MCCASLIN:

18  Q.  Do you know who created the content for the marketing

19  documents?

20  A.  Yes, ma'am.

21  Q.  Who was that?

22  A.  That was Kent Maerki.

23  Q.  And do you know who decided what messaging came out of

24  DSPF headquarters?

25  A.  Kent and Kent only, Mr. Maerki.

1    Q.  And did DSPF headquarters and Kent Maerki have the same

2    messaging for the sales force as with the clients?

3    A.  I am only familiar with the sales force, but yes, the

4    messaging with the sales force was consistent and always only

5    Kent Maerki.

6    Q.  Before you or other staff answered questions, did you

7    usually need to get permission or an answer from Mr. Maerki?

8    A.  That was very explicit that, yes, we were only to do

9    exactly what he said and only what he said.

10   Q.  If we could bring up Smith Exhibit 1 just for the

11   witness.

12        Now, are you familiar with sheets where Kent Maerki

13   would give instructions on how you needed to act with

14   salesmen?

15   A.  Yes, very familiar.

16   Q.  And have you seen this document before?

17   A.  I have seen this document, yes, ma'am.

18   Q.  Okay.  Thank you.

19        MS. MCCASLIN:  I move to admit Smith Exhibit 1 also

20   under the authenticity, also under stipulation 2000A-18.

21        MS. YUSI:  No objection, Your Honor.

22        THE COURT:  Smith 1 is admitted.

23        (Smith Exhibit No. 1 received in evidence.)

24   BY MS. MCCASLIN:

25   Q.  Now, if we can just walk through this briefly.  Who is

```
 1    this document from?
 2    A.   That is directly from Kent Maerki.
 3    Q.   And what is it titled?
 4    A.   "The Discipline of Restraint When Talking to Sales Reps."
 5    Q.   Now, if you could read this section.
 6    A.   Kent says, "The number one thing we are doing is not
 7    giving the reps what they want and not giving the reps what
 8    we want.  We are giving them what they need to have,
 9    confidence in selling the franchises.  That's it."
10    Q.   Okay.  How about this one?
11    A.   "Anything not on the program, any information shared with
12    a single person not in front of the group will damage this
13    delicate formula.  We cannot afford to let this happen at any
14    level."
15    Q.   And one more.
16    A.   "If you have not rehearsed a question or an answer, do
17    not ask or answer any questions.  Period.  End of story.
18    Ultimately, we can all prove we are smart by producing
19    results as promised."
20    Q.   So, before there were events with DSPF, were you often
21    told not to answer something and just refer it to Kent?
22    A.   That is correct.  Everything had to go through Kent.
23    Q.   And would he also give verbal instructions and commands
24    about this same instruction?
25    A.   He gave -- he gave commands about everything, and most
```

```
 1    everything was always in writing.
 2    Q.  So, when he did give a speech of some kind, did he have
 3    notes?
 4    A.  Yes.
 5    Q.  If we could bring up Smith Exhibit 2.
 6          Now, you're aware of -- or are you aware of the rules
 7    of communications with sales persons at DSPF?
 8    A.  I am, yes, ma'am.
 9          MS. MCCASLIN:  I move to admit Smith 2.
10          MS. YUSI:  Your Honor, I am going to object for
11    lack of foundation as to this document.  He said he's
12    familiar with them.
13          THE COURT:  I tell you what you can do.  You can
14    just ask him a couple of more questions to lay the
15    foundation.
16          MS. MCCASLIN:  Yes, Your Honor.
17    BY MS. MCCASLIN:
18    Q.  If you could look at this document with the instructions.
19    Are these instructions that you have received from Kent
20    Maerki?
21    A.  They are, and they are consistent with his messaging.
22          MS. MCCASLIN:  I move to admit.
23          MS. YUSI:  No objection.
24          THE COURT:  Document Smith 2 will be admitted.
25          MS. MCCASLIN:  Thank you.
```

1                    (Smith Exhibit No. 2 received in evidence.)

2       BY MS. MCCASLIN:

3       Q.  All right.  So, for the jury, what is the purpose of this

4       memo?

5       A.  The rules of communications with sales persons at event.

6       Q.  Now, if we could readjust the -- this section of the

7       second bullet point.

8       A.  "We have to treat them like they are high explosives and

9       handle them consistently and with care."

10      Q.  Okay.  These bullet points as well, please.

11      A.  "Everyone has to speak with the same consistent message.

12      When asked any question, the actual practiced response has to

13      be, There's a great question.  Let me write that down and get

14      it to Kent.  However, I'm sure we will be covering that in

15      tomorrow's presentation.  Do not give an answer.  Any answer

16      is the wrong answer.  Any insider info is the wrong answer."

17      Q.  So, these are the instructions to the salesmen?

18      A.  Correct.

19      Q.  How would you --

20              We can take down Smith 2, please.

21              How would you describe Kent Maerki's personality?

22      A.  Larger than life.

23      Q.  Can he talk to anybody?

24      A.  He could talk to anybody at any time.

25      Q.  And since you worked for Mr. Maerki, what was his style

```
 1    like?
 2    A.   I would call that style like a master puppeteer.
 3    Q.   Why a master puppeteer?
 4    A.   He had to control everything at all times.
 5    Q.   Including all of the information that went out of DSPF?
 6    A.   Especially the information that went out.
 7    Q.   If we could pull up Smith 14, just for the witness,
 8    please.
 9            Now, this is an email.  And if you can check the
10    date, were you working at DSPF at that time?
11    A.   I was, yes.
12    Q.   Okay.  And are you familiar with this document about
13    marketing materials that were forwarded?
14    A.   I am.
15    Q.   Okay.
16            MS. MCCASLIN:  I move to admit Smith 14.
17            MS. YUSI:  No objection, Your Honor.
18            THE COURT:  Smith 14 will be admitted.
19            (Smith Exhibit No. 14 received in evidence.)
20    BY MS. MCCASLIN:
21    Q.   Now, this email, what was the date of this email?
22    A.   That was June the 4th of 2012.
23    Q.   And who is it from?
24    A.   From, directly from Kent Maerki.
25    Q.   And what is being included here?  You don't need to read
```

```
 1    it word for word, but...
 2    A.  It's -- it's -- the whole thing was about belief, and it
 3    was about the relationship and building the relationship.
 4    Q.  Okay.  Now, if you could read this sentence here starting
 5    with "We ask".
 6    A.  "We ask that you do nothing with the contents of the
 7    mailer you received until you attend this required conference
 8    call."
 9    Q.  Did Kent always want to talk to people before they used
10    his materials?
11    A.  Always.
12    Q.  And who was this -- who was this booklet going to be used
13    on?
14    A.  Used by salespeople for -- for the clients.
15    Q.  Okay.  We can take this down, Mr. Grindrod.
16             If we can bring up Smith 15, just for the witness.
17             And, Mr. Pinkston, this is a similar document, and
18    this was sent while you were working at DSPF?
19    A.  Correct.
20    Q.  And this is also giving instructions to salesmen?
21    A.  It is a follow through regarding the relationship,
22    correct.
23    Q.  Are you familiar with this document?
24    A.  I am.
25             MS. MCCASLIN:  Move to admit Smith 15.
```

```
 1              THE COURT:  Smith 15 will be admitted.
 2              MS. MCCASLIN:  Thank you.
 3              (Smith Exhibit No. 15 received in evidence.)
 4   BY MS. MCCASLIN:
 5   Q.  Now, this was sent from who?
 6   A.  That was sent directly from Kent.
 7   Q.  On what date?
 8   A.  That's a few days later.  That was the 6th of June, 2012.
 9   Q.  And what is this email about?
10   A.  It's how the sales staff were supposed to follow through
11   with their clients and their leads.
12   Q.  And what does Kent say about how to follow through with
13   leads?
14   A.  As always, use it as we have been instructed to use it.
15   Q.  And --
16   A.  "Again, use it exactly as designed and instructed."
17   Q.  Thank you, Mr. Pinkston.
18              We can take that down.
19              Let's talk a bit about the paper marketing materials.
20              If we could bring up Government 202.
21              Are you familiar with this document?
22   A.  Yes, ma'am.  We called that the tri-fold brochure.
23   Q.  Were there different versions of this document over time?
24   A.  Yes, there were.
25   Q.  Can you tell what version and date that this one was made
```

```
 1   on?
 2   A.  That would be April the 1st, 2012.  It's the 31st
 3   version.
 4   Q.  Were you working at DSPF at that time?
 5   A.  Yes, ma'am.
 6   Q.  Now, the second page of this document, are you familiar
 7   with this page as well?
 8   A.  I am.
 9   Q.  And what is this?
10   A.  Kent referred to this as his pro forma.
11   Q.  Now, you do have a business degree.
12          When you saw this, did this seem reasonable to you?
13   A.  Yes.  It's a -- it's a typical spreadsheet with revenues,
14   expenses, and, you know, ROI, and percentages.
15   Q.  Did it raise any red flags?
16   A.  It did not.
17   Q.  And this was among the things given to the salesmen?
18   A.  This was one of the main pieces, yes, ma'am.
19   Q.  We can take that down, Mr. Grindrod.
20          At some point did somebody take over as DSPF's
21   national field sales manager?
22   A.  Yes, ma'am.
23   Q.  Who was that?
24   A.  That was Mr. Daryl Bank.
25   Q.  If we can bring up Smith 11 for just for the witness.
```

```
 1              And this was sent while you were working there?
 2    A.  Yes, ma'am.
 3    Q.  And are you familiar with this memo about the new sales
 4    manager?
 5    A.  I am.
 6              MS. MCCASLIN:  Move to admit Smith 11.
 7              THE COURT:  Smith 11 will be admitted.
 8              (Smith Exhibit No. 11 received in evidence.)
 9    BY MS. MCCASLIN:
10    Q.  Now, for the jury, who is this from and when?
11    A.  Directly from Kent Maerki, August 13, 2012.
12    Q.  And is this about the appointment of Daryl Bank, as you
13    just mentioned, as the national sales manager?
14    A.  That is correct.
15    Q.  And you were having a role in this as well, correct?
16    A.  Yes.  I was there to help assist with Daryl and others.
17    Q.  And what directive does Kent give regarding Daryl?
18    A.  Very specific.  Listen to him.  His methods work.  He
19    will be in touch with you, each of you soon, or each of you.
20    Q.  Okay.  Now, going to page 2, there is a bit of background
21    about Daryl, correct?
22    A.  Correct.
23    Q.  And you don't know if any of this information in here is
24    true, correct?
25    A.  I do not.
```

1   Q.  Okay.  I am just going to highlight a couple of sections
2   for you, just one moment.
3           What educational background did this memo say that
4   Daryl had, Daryl Bank had?
5   A.  Master's in business administration from Regent
6   University.
7   Q.  And was there another master's degree as well?
8   A.  I am not familiar if there was an additional master's
9   degree.
10  Q.  Okay.  Does the highlighted portion list two of them?
11  A.  We got Old Dominion and -- yes, Old Dominion and Regent.
12  Q.  Okay.  And with this next highlighted portion, it says
13  "Daryl began."  What does that section say?
14  A.  He said he began his financial career at Morgan Stanley.
15  Q.  And what happened in 2005?
16  A.  I know he joined a bank, it was the Bank of the
17  Commonwealth, and formed an investment division that was
18  there.
19  Q.  Okay.  We can take that down, please.  Thank you.
20          Now, you said that you started at DSPF maybe early
21  2012?
22  A.  Yes, ma'am.
23  Q.  How many days a week did you work in the headquarters
24  office?
25  A.  Five days a week, Monday through Friday.

```
 1    Q.  And there were other employees that worked there
 2    regularly?
 3    A.  Correct.
 4    Q.  Okay.  Can you name a couple of the names who worked
 5    there?
 6    A.  Max White.  Kim White is her real name.  Max is her
 7    nickname.  She was also with administration.  Later on that
 8    year Tuesday -- I forget Tuesday's last name -- Tuesday came
 9    in, admin support underneath Max.  There was a marketing
10    support person, kind of back office gentleman by the name of
11    Kurt Coning, and that pretty much -- that was us, plus Kent.
12    That's pretty much what our office side looked like on a
13    daily basis.
14    Q.  Okay.  And did you have access to the accounting or bank
15    records while you were at DSPF?
16    A.  No, ma'am.
17    Q.  Did you deal with any of the money when it came in from
18    investors?
19    A.  No, absolutely not.
20    Q.  And when did you leave DSPF?
21    A.  It would have been early 2013.
22    Q.  So, you were there about a year?
23    A.  About a year.
24    Q.  And during that year, did you come to have any concerns
25    about DSPF?
```

A.   The concerns grew throughout the year.  It was always
they were going to improve.  They're getting better.  We're
getting larger.  We're figuring this out, and by the end of
the year everything is going to be fine.

         As we get closer towards the end of the year, I'm
seeing the numbers not making sense.  We don't have the
dentists that we need.  We don't have the patients we need.
It's not making sense was the time that I went directly to
Kent and had a conversation with him.  I am not a franchise
person, but I am business and marketing.  And my question to
him, I asked him directly, you as the franchisor, clearly
you're responsible for the performance of both the patients
and the dentists, and what are you going to do about it?  And
this is the one that shocked me the most.  Kent with a big
smile on his face --

         MS. YUSI:  Objection, Your Honor, hearsay.

         MS. MCCASLIN:  Your Honor, this is not going to be
for the truth of the matter.  This statement is actually, I
would argue, quite false, so by definition it's not hearsay.

         MS. YUSI:  Your Honor, he's stating something,
whether -- it's the fact he's stated it is what she's
eliciting here, and it is still hearsay.

         MS. MCCASLIN:  Your Honor, that is not the
definition of hearsay.  According to the Supreme Court, if
it is offered for another purpose, or if it is --

1          MS. YUSI:  Your Honor --

2          THE COURT:  Wait a minute.  Wait a minute.  Wait a

3    minute.  We're not going to make legal arguments in front of

4    the jury.  Get on the headsets.  All of you get on the

5    headsets.

6          MS. MCCASLIN:  Yes, Your Honor.

7          (Sidebar conference as follows:)

8          THE COURT:  Testing 1, 2.  Testing 1, 2.  Testing

9    1, 2.

10         Okay, Ms. McCaslin.

11         MS. MCCASLIN:  Yes, Your Honor.

12         THE COURT:  You want to admit this on the ground

13   that you're not offering it for the truth of it.  So, why

14   are you offering it?

15         MS. MCCASLIN:  Your Honor, just to show that what

16   was said and to show the mindset of Mr. Maerki.

17         In *Anderson versus United States*, which was

18   417 U.S. 211, Supreme Court, 1974, in that case the

19   government was trying to admit a statement that was actually

20   going to be false, and the Supreme Court decided that that

21   was not hearsay because it was not offered for the truth.

22         There are also, of course, many other cases that

23   state that if you're not asserting a fact, it is not

24   hearsay.  One example, would be -- just one moment -- that

25   in *United States versus Gibson* in the Sixth Circuit, a

1    defense witness tried to testify about a direct command

2    given by his superior at work.  That comment was, "Get her

3    over here and let's find out what's going on."  The Sixth

4    Circuit found that that was not hearsay because there is no

5    fact asserted.  It's just a command.  It's just an

6    instruction.

7            And so the response that I am trying to elicit here

8    -- because the jury can't hear me right now -- is that Kent

9    Maerki responded with a smirk.  I'm sorry.  Let me go back.

10           Mr. Pinkston said, "As a franchisor, isn't it your

11   responsibility to make sure the franchise owners are taken

12   care of?"

13           I expect his response to be that Kent Maerki

14   replied -- he was smirking -- "Of course, it's not my

15   responsibility."

16           I am not introducing it for the truth that this was

17   not Kent Maerki's responsibility.  I absolutely am arguing

18   that it is.

19           THE COURT:  Okay.  Thank you.

20           The Court is looking at Rule 803 on the definition

21   of hearsay.  Hearsay means a statement that:  Number one,

22   that the declarant does not make while testifying at the

23   current trial or hearing.

24           Mr. Maerki is not testifying here yet.

25           Number two, a party offers it into evidence to

1    prove the truth of the matter asserted in the statement.

2              And defense counsel just indicated she's not

3    offering this to prove the truth of the matter stated.

4              And so the Court hasn't had an opportunity to read

5    these two cases that she's raising, but the Court believes

6    that if you are looking directly at the definition of

7    hearsay, the Court would find the statement to be

8    admissible.  So, that's where the Court's position is, that

9    statement is admissible.

10             MS. YUSI:  All right.

11             THE COURT:  And clearly it's not the worst thing

12   we've heard in this case about Mr. Maerki.  So, let's not

13   get all out of shape on this.

14             MS. YUSI:  Yes, sir.  I understand.

15             THE COURT:  All right.  Let's go.

16             (End of sidebar conference.)

17   BY MS. MCCASLIN:

18   Q.  All right.  So, to return to our conversation,

19   Mr. Pinkston, you were confronting Kent Maerki about

20   inconsistencies that you had seen?

21   A.  Correct.

22   Q.  And what did you approach Mr. Maerki with?

23   A.  I approached the fact that I was concerned that we did

24   not have enough dentists and did not have enough patients,

25   and the fact that I felt and I still feel that it was his

1    responsibility as the franchisor.  And he told me that it was

2    not his responsibility, it was the responsibility of the

3    marketing companies.

4    Q.  Okay.  Did you disagree with him?

5    A.  Strongly.

6    Q.  Okay.  Did he back down at all?

7    A.  Not at all.

8    Q.  Did you ever hear him tell the salesmen that it's not his

9    responsibility to make sure that DSPF succeeds?

10   A.  Absolutely not.

11   Q.  What happened shortly after that conversation?

12   A.  Not much longer after that, one day I went to log into my

13   email in the morning, I couldn't get into my email.  I tried

14   to log in through our CRM system, I couldn't get in there.

15   All of my passwords had been changed.

16          I called Kent.  He would not respond.  I emailed

17   him.  I reached out to Kurt Coning, same thing.  And I never

18   heard from Kent, Kurt, or anyone else from Dental Support

19   after that.

20   Q.  Did anybody tell you that you were fired?

21   A.  No.

22   Q.  They just shut everything down?

23   A.  Everything down.

24          MS. MCCASLIN:  Okay.  Thank you.  No further

25   questions.

```
 1              The government and other counsel may have questions

 2    for you.

 3              THE COURT:  Any questions?

 4              MR. YAROW:  No questions from Mr. Alcorn.

 5              THE COURT:  Any questions from the United States?

 6              MS. YUSI:  Yes, Your Honor.

 7                         CROSS-EXAMINATION

 8    BY MS. YUSI:

 9    Q.  Good morning, Mr. Pinkston.  It's nice to see you.

10    A.  Good morning.

11    Q.  Now, you were there, you said, from early 2012 to early

12    2013?

13    A.  Correct.

14    Q.  So about a year?

15    A.  Yes, ma'am.

16    Q.  All right.  And you worked in marketing?

17    A.  Correct.

18    Q.  You were not a salesman, correct?

19    A.  Correct.

20    Q.  You were not selling DSPF franchises to investors?

21    A.  Correct.

22    Q.  And you were making about $40,000 a year?

23    A.  40-, 45-, something around there.

24    Q.  And when you got there, you understood that these

25    salesmen had been selling since 2011 these franchises, right?
```

1    A.   Correct.

2    Q.   And you knew that many of these salesmen were experienced

3    salesmen, had been so for a long time?

4    A.   Yes.

5    Q.   Many of them were insurance salesmen?

6    A.   Yes.

7    Q.   Okay.  And you said that it was obvious to you that this

8    business model is not working by late 2012, correct?

9    A.   Correct.

10   Q.   And early in 2012, you knew that there weren't enough

11   dentists and patients signed up so far, correct?

12   A.   They weren't at that time, correct.

13   Q.   All right.  And you knew that salesmen were still selling

14   DSPF, right?

15   A.   Yes.

16   Q.   And you talked about these sales calls.  These were

17   weekly sales calls?

18   A.   Every week.

19   Q.   And with salespeople?

20   A.   Yes.

21   Q.   And about 20-plus people on the sales calls?

22   A.   That's about right.

23   Q.   And at some point in 2012, while Mr. Maerki would say

24   "keep selling," he also talked about the lack of performance,

25   the lack of dentists, the lack of patients as well, right?

```
 1    A.   Correct.
 2    Q.   And most of these sales calls started with the numbers of
 3    dentists or patients that had been signed up the week before,
 4    right?
 5    A.   I don't recall if it started with numbers, but I know he
 6    read something every week that was the same thing.
 7    Q.   Okay.  And so there was no lack of transparency in terms
 8    of the numbers of dentists and patients that were being
 9    signed up?
10    A.   There wasn't a lot of talk about the number, actual
11    number of the dentists nor the patients.
12    Q.   Okay.  But it was talked about during some of the sales
13    calls?
14    A.   It was more of a lack of performance of MetroMedia and
15    Oracare.
16    Q.   Okay.  And they were in charge of finding dentists and
17    patients?
18    A.   And the patients, yes, ma'am.
19    Q.   All right.  And do you know how many franchises had been
20    sold?
21    A.   I have no idea, no, ma'am.
22    Q.   All right.  And you knew that most dentists, the most
23    dentists that were ever signed up were only about 20 or 25
24    dentists?
25    A.   From what I saw, the few times I saw lists, 20, 25.
```

1    Q.  And that was done through the call center with Oracare

2    and MetroMedia?

3    A.  Correct.

4    Q.  And that number of dentists actually went down at some

5    point, right?

6    A.  It did.

7    Q.  All right.  And you knew that even with the dentists that

8    had signed up, Dental Support Plus was having difficulty

9    collecting money from those dentists?

10   A.  That I am very familiar with, yes, ma'am.

11   Q.  And that was discussed on some of the sales calls?

12   A.  Correct.

13   Q.  All right.  And to your knowledge, the salesmen never

14   stopped selling in 2012?

15   A.  Correct.

16   Q.  Did any of the salespeople speak up on these calls and

17   say, "Maybe we should stop selling"?

18   A.  Nobody ever said anything except Kent Maerki or anyone he

19   brought in, such as MetroMedia or Oracare, to present on

20   behalf of the group.

21   Q.  Now, you were aware that at some point a list started of

22   franchise investors who wanted to get out of their

23   investments?

24   A.  Not -- I have not seen that list, no.

25   Q.  Okay.  But were you aware that there was a list of

1    investors who were trying to sell?

2    A.  I heard talk about an investor -- I don't know how many

3    investors it was -- that was looking to do something, but I

4    was not a part of that.

5    Q.  Okay.  Now, in 2012, while you were there, the price of

6    the DSPF franchises went from 20,000 to 25,000?

7    A.  That is correct.

8    Q.  And then later it went from 25- to 30,000?

9    A.  Not when I was there, but I think there was talk that it

10   was going to.

11   Q.  Okay.  And, again, while this was not a working

12   investment, correct?

13   A.  Correct.

14   Q.  All right.  Now, if we can pull up Exhibit 202.  I think

15   we just looked at that.

16        This is the tri-fold brochure that you said you were

17   familiar with, this one?

18   A.  Yes.  Yes.  Uh-huh.

19   Q.  And the 60 months' proven performance, it said it had

20   been more than five years of research, development, and

21   consistent performance.

22        Did you have an understanding that that had to do

23   with Oracare and MetroMedia's performance?

24   A.  It had to do specifically with Oracare and MetroMedia,

25   and I don't know which of the two entities it was.

```
 1    Q.   Okay.  And you understood that MetroMedia and Oracare
 2    used to be involved with a business called Dazzle Dental?
 3    A.   Correct.
 4    Q.   And you understood that Dazzle Dental was a failed
 5    business?
 6    A.   I didn't know anything about Dazzle, but I heard the
 7    name.
 8    Q.   Okay.  And you understood that some of these sales teams
 9    had come from Dazzle Dental, salesmen had come from Dazzle
10    Dental to DSPF?
11    A.   That I'm -- I didn't ever see any commingling of
12    salespeople between MetroMedia, Oracare, or Dental Support.
13    Q.   Okay.  And you knew at some point in -- well, I'm going
14    to continue on this.
15         At the bottom here it says, "Learn more about our
16    proven proprietary new patient delivery system."
17         What was the proprietary delivery system, if you
18    know?
19    A.   We had asked and never received an answer to that.
20    Q.   Okay.
21    A.   I never saw anything proprietary.
22    Q.   All right.  And you were looking at this, and you said
23    this looks like a typical pro forma?
24    A.   Correct.
25    Q.   But were you commenting on the numbers, that you found
```

1    these reasonable?

2    A.   The numbers that I -- I didn't look at every single

3    number on there, but everything I did look at looked

4    reasonable to me, yes.

5    Q.   Okay.  But you had no background as to what had happened

6    with Oracare, MetroMedia --

7    A.   No, ma'am.

8    Q.   -- and Dazzle Dental prior?

9    A.   Correct.

10   Q.   Now, at some point -- well, in going on with the sales --

11        Go back to page 1, I'm sorry.

12        Each franchisee or each purchaser or investor that

13   bought a franchise, they were supposed to be given a

14   territory; is that right?

15   A.   I only knew it as a unit.

16   Q.   Okay.

17   A.   And I think that unit can exist -- I don't know if there

18   was a geographic specific location for a unit.  So, there is

19   no brick and mortar on this type of a franchise.

20   Q.   Okay.  But you understood that with the failing

21   investment that none of these investors had been getting paid

22   because there was no money coming in?

23   A.   Correct.

24   Q.   Thank you, Ms. O'Boyle.

25        And at some point you start talking about David

JILL H. TRAIL, Official Court Reporter

1   Bailey and WebOp, or David Bailey as knowing him as coming in
2   to work with DSPF?
3   A.  Yes.
4   Q.  And they were replacing MetroMedia and Oracare?
5   A.  Yes.
6   Q.  And that was discussed on sales calls because they were
7   failing, MetroMedia and Oracare?
8   A.  Correct.
9   Q.  David Bailey was coming in?
10  A.  Yes.
11  Q.  But did you understand that David Bailey had lots of
12  customers, that DSPF would only be one of many?
13  A.  Yes.  I actually am the one who introduced David Bailey
14  to Kent Maerki.
15  Q.  Okay.  Because you knew him?
16  A.  I knew him prior to the position I was in.  We had worked
17  at the same organization.
18  Q.  And DSPF was not going to be their sole priority?
19  A.  Correct.
20  Q.  All right.  Now, while you were there at DSPF, did you
21  see a track record of success at all?
22  A.  The track record of success was always promised and never
23  delivered.
24  Q.  All right.  And it was not generating revenues anywhere
25  close to the 40 percent that had been on some of the

```
 1   marketing?

 2   A.  I don't know what the revenues were, but I just knew we

 3   didn't have enough patients and didn't have enough dentists.

 4   Q.  Okay.  And the salespeople knew all of this because they

 5   were getting regular updates about the progress on the status

 6   calls, correct?

 7   A.  The sales calls.

 8           MS. MCCASLIN:  Objection, Your Honor.

 9           THE COURT:  Sustained.

10           MS. MCCASLIN:  Speculation about -- thank you.

11           THE COURT:  Sustained.

12           MS. YUSI:  I think those are all of my questions,

13   Your Honor.  Thank you.

14           THE COURT:  Any redirect?

15           MS. MCCASLIN:  Yes, Your Honor.

16                      REDIRECT EXAMINATION

17   BY MS. MCCASLIN:

18   Q.  Now, on cross-examination the government mentioned Dazzle

19   Dental?

20   A.  Yes, ma'am.

21   Q.  And you also mentioned that DSPF did not have any brick

22   and mortar dentist office?

23   A.  Correct.

24   Q.  Are you aware of the differences in the business models

25   between Dazzle and DSPF?
```

1    A.  I do not know what Dazzle Dental was.

2    Q.  Thank you.

3         Would you agree that you being in the office five

4    days a week, like you said, you had more information about

5    DSPF than somebody who might live in another state?

6    A.  I would.

7              MS. YUSI:  Objection, Your Honor, speculation and

8    leading.

9              THE COURT:  Sustained.

10   BY MS. MCCASLIN:

11   Q.  Now, you do have experience in business?

12   A.  Yes, ma'am.

13   Q.  When did you enter the field of business and marketing?

14   A.  In 1992.

15   Q.  And was there anything about Mr. Maerki's background that

16   gave you confidence?

17             MS. YUSI:  Objection, Your Honor.  This is beyond

18   the scope of my cross.

19             THE COURT:  And I think that you asked that

20   question on direct at one point, too, so I sustain that.

21             And your questions have to be within the scope of

22   those that she asked on cross, and that was not.

23             MS. MCCASLIN:  Yes, Your Honor.

24   BY MS. MCCASLIN:

25   Q.  Now, when there was discussion at DSPF about bringing

1    David Bailey on, was everybody really excited?

2    A.  Very excited.

3    Q.  Was that excitement portrayed to the salesmen on the

4    sales calls?

5    A.  Significantly, yes.

6    Q.  And in the memos that were sent out from DSPF?

7    A.  Correct.

8    Q.  Now, the calls that were just discussed on

9    cross-examination, you heard at least some of those, right?

10   A.  I did.

11   Q.  Did the calls change every week or were they repetitive?

12   A.  They were repetitive, rinse and repeat, the same thing

13   every week.

14   Q.  Okay.  Now, you left, you said, in early 2013?

15   A.  Correct.

16   Q.  And Bill Smith stopped selling in early 2013 as well,

17   right?

18            MS. YUSI:  Objection, Your Honor, foundation.

19            THE COURT:  Sustained.  And it's beyond the scope

20   of the cross.

21            MS. MCCASLIN:  Can we bring up -- Mr. Grindrod, can

22   we bring up Government 200F?

23            MS. YUSI:  Your Honor, I am going to object again,

24   that this is well beyond the scope in terms of when people

25   started and when people stopped.

```
 1              THE COURT:  Well --
 2              MS. MCCASLIN:  Your Honor, she's been questioning
 3    him about how the salesmen kept selling and kept selling and
 4    kept selling.  And if Mr. Smith stopped selling in early
 5    2013, that is relevant to the cross-examination.
 6              MS. YUSI:  Your Honor, he was gone in early -- I'm
 7    sorry.
 8              THE COURT:  But it's beyond the scope.
 9              MS. MCCASLIN:  Okay.
10              THE COURT:  It's beyond the scope.  There was no
11    mention of Mr. Smith.
12    BY MS. MCCASLIN:
13    Q.  The entire time you were there, was the message
14    enthusiastic?
15    A.  Extremely and consistently.
16    Q.  And that DSPF was going to succeed?
17    A.  Yes, ma'am.
18              MS. MCCASLIN:  Thank you.  No further questions.
19              THE COURT:  May this witness be permanently
20    excused?
21              MS. MCCASLIN:  Yes, Your Honor.
22              MS. YUSI:  Yes, Your Honor.
23              MR. YAROW:  Yes, Your Honor.
24              THE COURT:  All right.  You may step down.
25              THE WITNESS:  Thank you.
```

```
 1                THE COURT:  You may call your next witness.

 2                MS. MCCASLIN:  Your Honor, may I have a moment with

 3    counsel?  Can we take a short break?

 4                THE COURT:  You mean you want to confer with him,

 5    or you want the Court to take a break?

 6                MS. MCCASLIN:  Either.  I would like to speak with

 7    Mr. Grindrod for a second.

 8                THE COURT:  All right.  That's fine.  You can do

 9    that.  And if there is another matter you want us to take up

10    without us taking a break, we'll get back on the headphones.

11                MS. MCCASLIN:  Okay.

12                THE COURT:  Okay.  Do you desire a conference with

13    the Court?

14                MR. YAROW:  Yes, sir.

15                THE COURT:  All right.  Get on the headphones.

16                Excuse us, ladies and gentlemen.

17                (Sidebar conference as follows:)

18                THE COURT:  Testing 1, 2.  Testing.  Testing.

19    Okay.

20                Testing for the government.  Okay.  Ms. Yusi, can

21    you hear the Court?

22                Okay.  All right, Ms. McCaslin.

23                MS. MCCASLIN:  Yes, Your Honor.

24                We did want to do this outside the presence of the

25    jury, or at least so they cannot hear us.  We do understand
```

```
 1    the Court's previous rulings about the bankruptcy petition
 2    for Miss Hullum.  We do move to enter it into evidence so
 3    that it is at least in the Court's record.  That would be
 4    Smith 59.
 5            THE COURT:  Well, we can do that at the end of the
 6    day or any other time to preserve the record, if that's what
 7    you want to do.  We could have done that at the break or any
 8    other time just to preserve the record.
 9            MS. MCCASLIN:  Yes, Your Honor.
10            And I also spoke to my co-counsel in the last
11    couple of minutes.  We are prepared to rest.
12            THE COURT:  Okay.
13            Let me ask the United States something.  Does the
14    United States intend to recall any rebuttal witnesses in
15    here?
16            MS. YUSI:  No, Your Honor.  We do not.
17            THE COURT:  Okay.  Well, here is what the Court is
18    going to do.  This is a lot quicker than the Court
19    anticipated.  The Court has to finish the batch of
20    instructions.  The Court has to refigure this whole thing
21    here because the Court has to try to finish these
22    instructions, and we also need to get a chance to go over
23    those instructions with you.
24            So, what we're going to do is we're going to have
25    you come in at 9:30 on Tuesday morning.  We'll have the jury
```

```
 1   come in at 11:00.  And we're going through these
 2   instructions.  And so that's what we're going to do.  So, if
 3   that be the case, they're going to get an early start on the
 4   weekend here.  I don't think anybody will be objecting.
 5   Okay.
 6            MR. GRINDROD:  Just for the record, Your Honor,
 7   before we formally rest in front of the jury, we do offer
 8   Smith 59.
 9            THE COURT:  And what was Smith 59?
10            MR. GRINDROD:  It's the Hullum bankruptcy petition,
11   Your Honor.
12            THE COURT:  Okay.  The Court will put that in the
13   record.  It's not admitted, but it's in the record and
14   preserved for any appellate purposes.
15            MR. GRINDROD:  Thank you, Your Honor.
16            And can we just get -- what is the basis for it not
17   being admitted?
18            THE COURT:  I've stated the basis, and I'm not
19   going back over that again, Mr. Grindrod.
20            MR. GRINDROD:  Okay.
21            THE COURT:  All right.
22            MS. MCCASLIN:  Your Honor, may I ask a question?
23            We are coming here on Tuesday at 9:30 to go over
24   jury instructions with you.  Will closing arguments be that
25   day or the next day?
```

```
 1              THE COURT:  We will do closing arguments that same
 2    day.
 3              MS. MCCASLIN:  Okay.  On Tuesday?
 4              THE COURT:  We always do the jury instructions, and
 5    then you know the Court is going to instruct the jury.  The
 6    rules require me to do that.  Of course, you know that.
 7              MS. MCCASLIN:  Yes.
 8              THE COURT:  And we're going to be doing
 9    instructions that same day.
10              I'll tell you what we can do.  Since we know we're
11    going to let the jury go, I'm going to get off the system,
12    and if you all have any follow-up questions or anything, you
13    can ask me after they are gone.
14              MS. MCCASLIN:  Thank you, Your Honor.
15              THE COURT:  All right.
16              (End of sidebar conference.)
17              THE COURT:  With respect to Mr. Smith, you may call
18    your next witness.
19              MS. MCCASLIN:  Mr. Smith rests his case.
20              THE COURT:  All right.
21              Does the United States have any rebuttal evidence
22    it wishes to produce?
23              MS. YUSI:  We do not, Your Honor.
24              THE COURT:  Ladies and gentlemen, what it boils
25    down to is all of the evidence has been produced in this
```

```
 1    case that will be produced in this case, which means the
 2    evidence is finished.  The next stage here would be for the
 3    Court to meet with you and instruct you on the jury
 4    instructions.  It is required that the Court meet with
 5    counsel and review every single one of those instructions
 6    that you will be getting.  That takes some time.  So, there
 7    is no necessity for you to be here, which means that your
 8    day is concluded.
 9              Now, did you order lunches this morning?
10              THE JURY:  Yes, Your Honor.
11              THE COURT:  We will not waste the lunches.  So, you
12    may return to the jury room, eat the lunches.  When you're
13    finished eating your lunch, you will be excused.
14              You will be required to return here at
15    11:00 o'clock a.m. on Tuesday morning.  Monday is a holiday.
16    11:00 o'clock a.m. on Tuesday morning, where you will then
17    begin to hear the closing arguments in this case.
18              Do not over this long break discuss this case with
19    anyone.  Do not do any research on social media.  Do not
20    text anyone.  We've come too far to have a problem now.  So,
21    I want you to be safe.
22              Eat your lunch, and then the court security officer
23    will have you depart.
24              Hold one second.
25              If the lunch is in a form so that you can take it
```

1    to go, you can do that.  Whatever.  The truth is you will be
2    finished here, and we will determine what officially
3    happens.
4              All right.  All rise.
5              (The jury exited the courtroom at 12:19 p.m.)
6              THE COURT:  You may be seated.
7              I will tell counsel that had the Court known that
8    we would be ending at this time, the Court would not have
9    given them Friday off and would not have scheduled other
10   things on Friday.  The Court had anticipated we probably
11   would be going into the middle of next week, but we can
12   still work with it.
13             Any other matters that you need to bring up other
14   than what's in the record?
15             Did we get in the exhibit that Defendant Smith
16   wants into the record, preserved for appellate purposes?
17             MS. YUSI:  Your Honor, we probably need to discuss
18   how long we have for closing arguments.
19             THE COURT:  Yes, ma'am.  I'm most definitely going
20   to get to that.  That might take all of next week.  You
21   never know.
22             How much time do you anticipate you will need for
23   your direct argument, the first argument?
24             MS. YUSI:  Your Honor, we were talking about having
25   two hours total, which would include the rebuttal.

```
 1              THE COURT:  Two hours total, thank you.
 2              How much time do you anticipate you need,
 3    Mr. Yarow, for your argument?
 4              MR. YAROW:  Not anywhere close to two hours, Your
 5    Honor.
 6              THE COURT:  What are you asking me?
 7              MR. YAROW:  15 minutes.
 8              THE COURT:  How many?
 9              MR. YAROW:  20 minutes.
10              THE COURT:  Well, I tell you what, the Court will
11    allocate for planning purposes at least a half hour.
12              MR. YAROW:  Yes, sir.  Thank you.
13              THE COURT:  How much time do you anticipate you
14    will need, Ms. McCaslin?
15              MS. MCCASLIN:  Your Honor, like the government, we
16    are requesting two hours.
17              THE COURT:  So your single argument is going to be
18    two hours?  Okay.  That's fine.
19              I will tell the government this, and I will tell
20    you this too, Ms. McCaslin, something I always tell all of
21    the defendants, and probably Ms. O'Boyle has heard it.  They
22    stop listening at some point.  They start cooking.  Now,
23    they're hearing all kinds of things, and they're not
24    listening at you.  So, I am sure you're very well aware of
25    that, very clear, crisp, and concise in your arguments.
```

```
1              Okay.  Two hours.  Two hours.  So, we've allocated

2    for four and a half hours for argument.  The Court doesn't

3    anticipate each of you is going to use two hours.  The Court

4    thinks you're going to get tired at some time during that

5    two hours.

6              At any rate, court will be in recess until --

7              Oh, one other thing.  Does Mr. Alcorn wish to

8    attend the charge conference, or does he wish to waive it,

9    Mr. Yarow?

10             MR. YAROW:  Mr. Alcorn would like to be present,

11   Your Honor.

12             THE COURT:  He wishes to be present?

13             MR. YAROW:  Yes, sir.

14             THE COURT:  All right.

15             MR. GRINDROD:  Your Honor, Mr. Smith will waive his

16   presence at the charge conference.

17             THE COURT:  Okay.  That has a lot to do with where

18   we will be convening.  I think where we will convene will be

19   right here in this courtroom.  We will work on them right in

20   the courtroom.

21             Yes, ma'am?

22             MS. YUSI:  Your Honor, may our agents be excused

23   from the charge conference?

24             THE COURT:  They are not required to be here.

25             MS. YUSI:  Thank you.
```

```
 1              THE COURT:  If the defendants are not required to
 2    be here, certainly an agent is not required to be here.  So,
 3    it's optional.  So, you may excuse yourself.  You may come
 4    back at 11:00, if you wish, whatever.
 5              Anything else?
 6              I think what you need to do here is you need to
 7    check with Ms. Thompson about the documents that have been
 8    admitted, and I can tell you take this time now to figure
 9    out what's been admitted, what's not been admitted.  I'll be
10    in chambers if there is a problem, so we will be straight on
11    all of that.  Okay?
12              THE CLERK:  Yes, sir.  I'll go over it with them.
13              THE COURT:  All right.  If there is nothing else,
14    the Court will be in recess until further notice.
15         (Proceedings concluded at 12:23 p.m.)
16                        CERTIFICATION
17
18       I certify that the foregoing is a correct transcript
19    from the record of proceedings in the above-entitled matter.
20
21
22         _____/s/_____
23                    Jill H. Trail
24                   August 12, 2022
25
```