```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
 2                          Norfolk Division

 3

 4    - - - - - - - - - - - - - - - - - -
                                          )
 5     UNITED STATES OF AMERICA           )
                                          )
 6     v.                                 )     CRIMINAL ACTION NO.
                                          )          2:19cr47
 7     DAVID ALCORN and                   )
       AGHEE WILLIAM SMITH II,            )
 8                                        )
             Defendants.                  )
 9    - - - - - - - - - - - - - - - - - -

10                      ** Jury Trial - Day 2 **

11                      TRANSCRIPT OF PROCEEDINGS

12                          Norfolk, Virginia

13                          February 2, 2022

14

15    BEFORE:  THE HONORABLE RAYMOND A. JACKSON
                United States District Judge, and a jury
16

17    APPEARANCES:

18            UNITED STATES ATTORNEY'S OFFICE
              By:  Andrew C. Bosse
19                 Melissa E. O'Boyle
                   Elizabeth M. Yusi
20                 Assistant United States Attorneys
                   Counsel for the United States
21
              RICHARD S. YAROW LLC
22            By:  Richard S. Yarow
                   Counsel for Defendant David Alcorn
23
              FEDERAL PUBLIC DEFENDER'S OFFICE
24            By:  Andrew W. Grindrod
                   Lindsay Jo McCaslin
25                 Assistant Federal Public Defenders
                   Counsel for Defendant Aghee William Smith II
```

Carol L. Naughton, Official Court Reporter

```
 1              (Proceedings resumed at 10:04 a.m.)

 2              (The venire, Jury Panel C, is present in the

 3   courtroom.)

 4              THE CLERK:  United States of America vs. David

 5   Alcorn and Aghee William Smith II, in Criminal Action

 6   2:19cr47.

 7              Ms. Yusi, is the government ready to proceed?

 8              MS. YUSI:  We are.  Good morning, Your Honor.

 9              THE COURT:  Good morning.

10              THE CLERK:  Mr. Yarow, is Mr. Alcorn ready to

11   proceed?

12              MR. YAROW:  We are ready, Your Honor.  Good morning.

13              THE COURT:  Good morning.

14              THE CLERK:  Ms. McCaslin, is Mr. Smith ready to

15   proceed?

16              MS. McCASLIN:  We are.  Good morning, Your Honor.

17              THE COURT:  Good morning.

18              THE CLERK:  Members of Jury Panel C, will you please

19   stand and answer "present."  Please remain standing until the

20   next number is called and then be seated.

21              Juror Number 1.

22              PROSPECTIVE JUROR:  Present.

23              THE CLERK:  Juror Number 4.

24              PROSPECTIVE JUROR:  Present.

25              THE CLERK:  Juror Number 13.
```

```
 1                PROSPECTIVE JUROR:  Present.

 2                THE CLERK:  Juror Number 16.

 3                PROSPECTIVE JUROR:  Present.

 4                THE CLERK:  Juror Number 31.

 5                PROSPECTIVE JUROR:  Present.

 6                THE CLERK:  Juror Number 37.

 7                PROSPECTIVE JUROR:  Present.

 8                THE CLERK:  Juror Number 46.

 9                PROSPECTIVE JUROR:  Present.

10                THE CLERK:  Juror Number 49.

11                PROSPECTIVE JUROR:  Present.

12                THE CLERK:  Juror Number 52.

13                PROSPECTIVE JUROR:  Present.

14                THE CLERK:  Juror Number 57.

15                PROSPECTIVE JUROR:  Present.

16                THE CLERK:  Juror Number 59.

17                PROSPECTIVE JUROR:  Present.

18                THE CLERK:  Juror Number 64.

19                PROSPECTIVE JUROR:  Present.

20                THE CLERK:  Juror Number 76.

21                PROSPECTIVE JUROR:  Present.

22                THE CLERK:  Juror Number 85.

23                PROSPECTIVE JUROR:  Present.

24                THE CLERK:  Juror Number 87.

25                PROSPECTIVE JUROR:  Present.
```

```
 1              THE CLERK:  Juror Number 99.

 2              PROSPECTIVE JUROR:  Present.

 3              THE CLERK:  Juror Number 101.

 4              PROSPECTIVE JUROR:  Present.

 5              THE CLERK:  Juror Number 108.

 6              PROSPECTIVE JUROR:  Present.

 7              THE CLERK:  Juror Number 121.

 8              PROSPECTIVE JUROR:  Present.

 9              THE CLERK:  Juror Number 130.

10              PROSPECTIVE JUROR:  Present.

11              THE CLERK:  Juror Number 139.

12              PROSPECTIVE JUROR:  Present.

13              THE CLERK:  Juror Number 140.

14              PROSPECTIVE JUROR:  Present.

15              THE CLERK:  Juror Number 142.

16              PROSPECTIVE JUROR:  Present.

17              THE COURT:  Juror Number 153.

18              PROSPECTIVE JUROR:  Present.

19              THE CLERK:  There are 24 jurors present, Your Honor.

20              Are there any juror present whose number I have not

21      called?

22              Members of the jury, will you please stand and raise

23      your right hand to be sworn.

24              You shall true and perfect answer make to such

25      questions that may be propounded to you by the Court or
```

1  counsel, so help you God?

2          THE VENIRE:  (Answered in the affirmative.)

3          (The venire, Jury Panel C, was duly sworn.)

4          THE CLERK:  Thank you.  You may be seated.

5          THE COURT:  Good morning, ladies and gentlemen.

6          As I tell all juries, I have a microphone here, and

7  you can hear me all the way to the back door.  I cannot hear

8  you, so you will have to speak loudly in responding to the

9  Court.  This morning, as we go through this process, I will

10 always want you to stand, state your juror number before you

11 respond.

12         You do not have to respond to every question "yes"

13 or "no."  If no one stands, then I know you do not have a

14 response.  Your response is not a negative to that question,

15 or a positive depending on what the question is.

16         This morning, we are here for trial, a criminal

17 trial, which is expected to last approximately four weeks, as

18 you were informed when you received the jury questionnaire.

19         In this case, there are two defendants, Mr. David

20 Alcorn -- Mr. Alcorn, will you please stand up.

21         Mr. Alcorn is represented by Attorney Richard Yarow.

22 Mr. Alcorn is charged with conspiracy to commit mail and wire

23 fraud, wire fraud, and engaging in unlawful monetary

24 transactions.

25         You may have a seat.

1          Also, the second defendant is Mr. Aghee Smith.
2    Mr. Smith is represented by Attorneys Andrew Grindrod and
3    Lindsay McCaslin of the Federal Public Defender's Office.
4    Mr. Smith is charged with conspiracy to commit mail and wire
5    fraud and several counts of wire fraud.
6          You may have a seat.
7          Representing the United States and prosecuting this
8    case are three Assistant United States Attorneys, Mr. Andrew
9    Bosse, Ms. Elizabeth Yusi, and Attorney Melissa O'Boyle.
10         Also with them are their paralegals and two special
11   agents of the FBI, and I'll leave it to them to introduce
12   them.
13         MS. YUSI:  With the FBI, we have FBI Special Agent
14   Julie Shields, FBI Special Agent Jennifer Collins.  We also
15   have U.S. postal inspector Jason Thomasson, and IRS Special
16   Agent Andy Bowers.
17         THE COURT:  And I return to Defendant Smith.
18   There's also an investigator working with counsel.
19         MS. McCASLIN:  Yes, we have Susan Harrison Jones.
20   She's an investigator with the Federal Public Defender's
21   Office.
22         THE COURT:  Thank you very much.
23         Ladies and gentlemen, I ask you to pay close
24   attention to the defendants and to counsel because at a
25   future point, I will ask you further questions about the

1    counsel and the defendants in this case.

2           We are ready to start what is referred to as the

3    jury selection process.  A jury in a criminal case consists

4    of 12 qualified jurors, and the Court usually selects

5    alternate jurors.  And we are selecting six alternate jurors

6    because these are pandemic times.

7           The alternate jurors selected will sit with the

8    jury, will have the same duties and obligations as the other

9    jurors, but an alternate juror who does not replace a juror

10   prior to the jury retiring to deliberate will be discharged

11   and may not participate in deliberations.

12          In summary, the Court is selecting 18 jurors.  Some

13   were selected yesterday; some will be selected this morning

14   among you.

15          The parties have a right to have a qualified and

16   impartial jury, a fair jury.  A qualified and impartial jury

17   is one which is responsible and capable and which will,

18   without favor, fear, bias, prejudice, sympathy, or passion,

19   objectively hear and decide the issues to be tried and render

20   its verdict solely based upon the facts that come out in this

21   case and the instructions of law as given to you by the

22   Court.

23          Your impartiality, your qualification may not be

24   assumed without some question, some inquiry.  In this inquiry

25   we're about to make is a time-honored process that the courts

1    follow.  It's called voir dire.  Its purpose is to develop

2    the truth about your competency, your frame of mind, and your

3    ability to abide by the oath you took just a few minutes ago.

4            Your answers will permit the Court to determine

5    whether you need to be excused based upon the Court's

6    determination or the motion of one of the parties in the

7    case.  Your answers will also assist the parties in

8    determining how to use their peremptory strikes.

9            A peremptory strike or peremptory challenge, if you

10   want to call it that, is an opportunity that the law gives a

11   party to strike a juror without giving a cause or statement

12   or reason for that strike.

13           So it's important that your answers be complete and

14   be truthful.  Each of you is under an obligation to disclose,

15   upon a general question, any and all matters which might tend

16   to disqualify you.  So while the sweep of the questions might

17   be general, you are to conscientiously and honestly answer

18   the real implication of the question asked as full as

19   possible.

20           Now, false or misleading answers may result in

21   someone being seated on the jury panel who should not be

22   here.  This would be a miscarriage of justice, and we intend

23   to avoid that.  We will avoid that.

24           So consider each question very carefully and don't

25   wait until you are selected to see whether you are going to

1    be on the panel before you raise something that might get you

2    off the panel.  I always tell jurors if you do that, it's not

3    going to work out well for you.

4         So while the questions may be addressed to all of

5    you, process them carefully and individually.  The Court will

6    not assume anything.

7         So my first question is simply this:  Can each of

8    you read, write, and speak the English language?

9         You don't have to answer one way or the other.  You

10   don't have to vocally answer.  If no one stands up, then I

11   know that you don't have a problem.

12        You stood up, sir.

13        PROSPECTIVE JUROR:  I can read and write.

14        THE COURT:  Okay.  You don't need to stand up.  You

15   don't need to respond.  If someone has a problem with that

16   question, then you stand up and state your juror number.

17        So I take it no one has a language barrier.

18        Do any of you have a physical problem with sight and

19   hearing issues?  If so, stand up and let the Court know.

20        Okay.  We have two.

21        PROSPECTIVE JUROR:  I have somewhat of a hearing

22   problem.

23        THE COURT:  Okay.  Juror number?

24        PROSPECTIVE JUROR:  Juror Number 101.

25        THE COURT:  Okay.  Can you hear me?

```
 1              PROSPECTIVE JUROR:  I can hear you right now, yes,
 2    sir.
 3              THE COURT:  Okay.  We will have microphones in here.
 4    We also have some hearing aids in here also.  So we will deal
 5    with that issue as we go along.
 6              PROSPECTIVE JUROR:  Yes, sir.
 7              THE COURT:  Yes?  Juror number?
 8              PROSPECTIVE JUROR:  121.
 9              THE COURT:  I think we can hear you clearly.  Go on.
10              PROSPECTIVE JUROR:  Thank you.  I have a blood-clot
11    issue.  I'm awaiting --
12              THE COURT:  Wait a minute.  Take the microphone over
13    there.  I was wrong.
14              PROSPECTIVE JUROR:  I've been diagnosed with Leiden
15    factor V.  I take medication for blood clotting.  So I can't
16    sit still for more than two hours at a time.
17              THE COURT:  Well, we will be taking breaks about two
18    hours or every hour and a half to two hours.  Thank you very
19    much.
20              And I think we have someone standing on the front
21    here.  Let's start.  Let's see if we can hear you.
22              PROSPECTIVE JUROR:  Juror Number 1.  I'm on
23    medication for high blood pressure, so I have the second pill
24    that makes me use the bathroom every so often, so I have to
25    go back and forth.
```

```
 1              THE COURT:  Okay.  Thank you very much, Juror
 2    Number 1.
 3              Have any of you had the opportunity to serve on a
 4    jury panel -- civil, criminal, grand jury -- in the past?  If
 5    you have, please stand, tell us where you served, when you
 6    served, if you have prior jury service.
 7              Juror Number 52.
 8              PROSPECTIVE JUROR:  Reno, Nevada.  Eight years ago.
 9    It was a sex offender case.
10              THE COURT:  Next juror?
11              PROSPECTIVE JUROR:  (Juror Number 85)  I think it
12    was 1983 in Norfolk.  It was a murder trial.
13              THE COURT:  Where was it?
14              PROSPECTIVE JUROR:  Norfolk.
15              THE COURT:  Okay.  Thank you.
16              Next juror?
17              PROSPECTIVE JUROR:  (Juror Number 101.)  Suffolk,
18    2019, I had criminal court in Suffolk.
19              THE COURT:  Juror number?
20              PROSPECTIVE JUROR:  101.
21              THE COURT:  Always start with your juror number.
22              PROSPECTIVE JUROR:  Yes, sir.
23              THE COURT:  Next, behind you.
24              PROSPECTIVE JUROR:  Juror Number 140.  It was in
25    Virginia Beach.  It was a criminal case.  It's been about ten
```

```
 1   years.

 2            THE COURT:  What type of case?

 3            PROSPECTIVE JUROR:  It was a -- at the state of

 4   Virginia down in Virginia Beach at the courthouse.  It was a

 5   case where the gentleman had actually shot his wife, and he

 6   was still missing, and they found him in Florida.

 7            THE COURT:  Okay.  Thank you.

 8            Next?

 9            PROSPECTIVE JUROR:  Juror Number 130.  It was about

10   30 years ago in Portsmouth, Virginia.  It was a rape case.

11            THE COURT:  Thank you.

12            And finally Juror Number 1.

13            PROSPECTIVE JUROR:  It was five or six years ago.  I

14   served twice.  One was for an accident, a car accident.  The

15   other one was for drug charges here in Norfolk.

16            THE COURT:  Thank you very much.

17            Ladies and gentlemen, we told you that this case

18   involves conspiracy to commit mail and wire fraud, and I

19   think one count of money laundering.  These offenses

20   allegedly occurred between January 2011 through August 2014

21   on one of the conspiracy counts; on another count, it was

22   2011 through 2017 here in the Eastern District of Virginia,

23   in other parts of the country, and around the country.

24            So the Court simply tells you that because the Court

25   wants to know have any of you heard anything or read anything
```

1    about this case?

2           Okay.  No affirmative response.

3           Are any of you related by blood or marriage to any

4    of the parties, the defendants, or the counsel in this case?

5           Have any of you had any professional or personal

6    contact with counsel for the United States?  They stood a few

7    minutes ago.

8           Have any of you had any personal or professional

9    relationships or contacts with counsel for the defendants?

10          Have any of you had any type of personal or

11   professional contact with either of the two defendants?

12          Ladies and gentlemen, a number of witnesses may be

13   called in this case over the next few weeks.  I will call the

14   names of a number of these witnesses that may be called.  If

15   you are not sure whether you know one of the witnesses, you

16   simply let the Court know, listen, and we will come back and

17   see if we can get the parties to tell you whether that

18   witness is a local person or anything else to help you

19   determine whether it's the same person that you know.

20          Starting with Charlotte Annas, Teresa Austin, Brian

21   Avery, Teresa Avery, Margaret Babich, Thomas L. Barnett,

22   Debra Barry, J. Michael Barry, Peggy Barry, Alan Baskin,

23   Coleman Bazelon, Sharyon Bean.  That's S-h-a-r-y-o-n Bean.

24          Wilfried Berndt, B-e-r-n-d-t, Bonnie Berndt, Bob

25   Berndt, Ryan Braley, Denise Brown, Jeffrey Browne,

1    B-r-o-w-n-e, Teresa Busch, Richard Busch, Gary Clapper,

2    Darryl Clark, Ruth Clark, Roger Courson, C-o-u-r-s-o-n, Susan

3    Courson, George Cushman, Nathaniel Dodson, Tuesday Douglas,

4    L. Doug Dunn, Rosie Eads.

5           Jeff Eschrich, E-s-c-h-r-i-c-h, Constance Flammang,

6    F-l-a-m-m-a-n-g, Matthew Fowles, Jere Friedman, Raelene

7    Gastman, Nicholas Gentile, Kyle Gerek, Raeann Gibson, Carol

8    Groff, Sunshine Grissom, Andrew Gulcher, G-u-l-c-h-e-r,

9    Vanaleen Hatfield, Laura Houston, Vera Hullum, H-u-l-l-u-m.

10          Patricia Hundley, Kimberly Husted, David Idigpio,

11   Deborah Jenkins, Jacob Kurtz, Helen Larson, Edward Lichtig,

12   Michael Lindauer, Justin Lira, Lawrence Lyon, Alain Martell,

13   Ray Martin, Dennis McCrumb, Peter Melley, M-e-l-l-e-y, Craig

14   Newell, Susan Newell;

15          Jon Palmieri, Amos Parker, Peter Perry, Dee

16   Pinkston, Adan Rangel, Matthew Roth, Barbara Russell, Tony

17   Sellers, Brian Semple, S-e-m-p-l-e, Robert Semple, Brian

18   Smith, Rosie Smith, Grecie Suarez, Ken Sykes, Alan Tilles,

19   Andrea Tottossy, Joe Tottossy;

20          Terri Walsh, Charles West, Michael J. Wilhelm,

21   Phillip Yee, Lucille Zenke, Z-e-n-k-e, Daryl Bank, Tripp

22   Forrest, Steve Gasser, Robert Guest, Bob LaBine, Peter Lewis,

23   Kent Maerki, M-a-e-r-k-i, Terence Pinkston, Wanda Rivera,

24   Lynne Shelton, Aaron Bobkin, Darcy Oliver, Robert Jones,

25   Peter Lewis, and Thomas Littler.

```
 1              If you at some point determine that you do know one
 2      of these potential witnesses, please bring it to the
 3      attention of the Court, and the Court will respond
 4      accordingly.
 5              Has any member of the panel ever been a victim of
 6      fraud; you or your immediate spouse or immediate family
 7      member?
 8              All right.
 9              PROSPECTIVE JUROR:  Juror Number 4.  My Social
10      Security number was used by another individual, which ended
11      up a summons being issued and also a credit card taken out.
12              THE COURT:  Okay.  Thank you.
13              PROSPECTIVE JUROR:  Juror Number 13.  The company
14      that my husband owns, someone got ahold of one of our checks
15      and reproduced it and cashed made-up checks in Gloucester,
16      Williamsburg, Yorktown.  We went to court for it.
17              THE COURT:  How much was involved in this?
18              PROSPECTIVE JUROR:  About 8,000.
19              THE COURT:  Thank you.
20              PROSPECTIVE JUROR:  Juror Number 108.  I had someone
21      to get my card information and was withdrawing money out of
22      my account in California.
23              THE COURT:  Okay.  Thank you.
24              Three of you indicated that you have been victims of
25      fraud.  Do you believe there's anything about that experience
```

1    that would keep you from rendering a fair and impartial

2    verdict in this case?

3              A few minutes ago a number of you indicated you've

4    had some prior jury service.  Was there anything about that

5    jury experience that you believe that would cause you not to

6    be able to render a fair and impartial verdict in this case?

7              Have any of you been employed in a law enforcement

8    capacity?

9              PROSPECTIVE JUROR:  Juror Number 130.  I have -- I

10   actually just retired from the police department as a

11   civilian the end of the year.

12             THE COURT:  What police department?

13             PROSPECTIVE JUROR:  Chesapeake Police Department.

14             THE COURT:  What was your position there?

15             PROSPECTIVE JUROR:  Stenographic reporter.  And --

16   well, I guess this doesn't matter.  I've worked for the

17   probation office as well in the Commonwealth Attorney's

18   Office.

19             THE COURT:  Okay.  Thank you.

20             PROSPECTIVE JUROR:  Uh-huh.

21             PROSPECTIVE JUROR:  Juror Number 139.  I'm

22   commissioned as a special police officer for the City of

23   Norfolk.  I issue summonses to take people to court.

24             THE COURT:  Thank you.

25             PROSPECTIVE JUROR:  Juror Number 46.  I was a police

```
 1    officer in the City of Little Rock, Arkansas, about 25, 30
 2    years ago, in my early 20s.  In 2002, I began working for the
 3    City of Chesapeake as a 911 dispatcher, and they were up
 4    under the police department there.  I stayed there for 17
 5    years, and now I work for the City of Portsmouth as a
 6    dispatch emergency communications administrator, and I've
 7    been there for two years.
 8                THE COURT:  Thank you.
 9                Juror Number 4.
10                PROSPECTIVE JUROR:  Juror Number 4.  I've been
11    retired a year.  I did 31 years as a civilian at the Virginia
12    Beach Police Department.  I was administrative assistant.  I
13    was a clerk in the Detective Bureau.  And I don't know if it
14    matters, but my husband is a police officer with the Virginia
15    Beach Police Department.
16                THE COURT:  Thank you.
17                And perhaps I should have made it clear.  Do any of
18    you have a spouse or immediate relative who is a police
19    officer?
20                Yes, ma'am?  Juror Number 76?
21                PROSPECTIVE JUROR:  Yes, sir.  My son is a Virginia
22    Beach sheriff's officer.
23                THE COURT:  Okay.  Thank you.
24                PROSPECTIVE JUROR:  You're welcome.
25                PROSPECTIVE JUROR:  (Juror Number 46)  I also have
```

1    relatives that are police officers, but they reside in the

2    state of Arkansas and Texas.

3            THE COURT:  Thank you.

4            PROSPECTIVE JUROR:  31.  My nephew is a Norfolk

5    police officer.

6            THE COURT:  Thank you.

7            PROSPECTIVE JUROR:  Juror Number 64.  My

8    father-in-law retired from the Navy as a military police.

9            THE COURT:  Thank you.

10            At least seven of you have indicated that you have

11    either been in law enforcement or have a relative that has

12    been in law enforcement, and my question is:

13            Is there anything about your association with the

14    relatives or your experience as police officers or law

15    enforcement officers that would cause you to be unable to sit

16    in this case and render a fair and impartial verdict based

17    upon the facts and the law as given to you by the Court?

18            Would any of you give more or less weight to the

19    testimony of a law enforcement officer than to the testimony

20    of any other witness solely because of his or her employment

21    in a law enforcement capacity?

22            Bottom line, would you tend to believe a police

23    officer less or more because he or she is a police officer?

24            PROSPECTIVE JUROR:  Probably.  I mean just because

25    of my experience, I do think I would probably be more

1   weighted -- I'm sorry.  Juror Number 4.  And I probably would

2   give a little more credence to the police as opposed to not.

3           THE COURT:  Thank you.

4           PROSPECTIVE JUROR:  Juror Number 130.  I answered

5   "yes" on my questionnaire, but I think it also depends on the

6   situation, so I would say most likely, but it would just

7   depend on the testimony.

8           THE COURT:  Thank you very much.

9           PROSPECTIVE JUROR:  Juror Number 142.  I think my

10  tendency would be to trust police officers a little bit more

11  just because of their position.  I would try not to.  I would

12  try to weigh everyone equally, but it might also be my

13  tendency in that direction.

14          THE COURT:  We had one up front.

15          PROSPECTIVE JUROR:  Juror Number 49.  I also, on the

16  questionnaire last month, answered that I would be more

17  inclined to give a bit more credence to the testimony of a

18  police officer.  In thinking about it, since you asked the

19  question again today, I honestly likely would be more

20  inclined to trust the police than...

21          THE COURT:  Ladies and gentlemen, this is a criminal

22  case.  A criminal case is different from a civil case.  Under

23  our Constitution, there are certain rights that an individual

24  enjoys who is charged with a crime.

25          Number one, an individual charged with a crime is

1    presumed to be innocent until proven guilty beyond a

2    reasonable doubt.  Is there anyone who disagrees with this

3    basic principle of law?

4            Secondly, the United States is required to prove a

5    defendant's guilt beyond a reasonable doubt.  Is there anyone

6    who disagrees with this requirement?

7            Thirdly, a defendant is not required to prove his

8    innocence.  A defendant is not required to present any

9    evidence, to even cross-examine a witness.  The defendant has

10   a constitutional right to remain silent.

11           Is there anyone who disagrees with these basic

12   principles?

13           Is there anyone among you who has formulated an

14   opinion about the guilt or innocence of these two defendants

15   because they have been charged?

16           Do any of you have any personal, professional, or

17   prior relationship with each other?  In other words, you

18   attend the same church, same baseball league, whatever, work

19   in the same place.

20           Do any of you belong to any group which advocates

21   the reform or the repeal of any criminal laws?

22           Do any of you belong to any organizations that

23   support or serve as an advocate group for law enforcement?

24           Number 4?

25           PROSPECTIVE JUROR:  Yes.  I'm a part of a --

```
 1              THE COURT:  Wait a minute.
 2              PROSPECTIVE JUROR:  Juror Number 4.  I'm part of a
 3    Facebook group for local police officer wives.
 4              THE COURT:  Okay.  Thank you.
 5              Do any of you have any moral, religious, or ethical
 6    belief that would make it difficult for you to sit as a juror
 7    in this case?
 8              Now, if you are selected as a juror in this case,
 9    you will be required to put aside any feeling of passion or
10    prejudice and decide this case solely on the evidence
11    introduced during the trial and the instructions of law as
12    given to you by the Court.  Do any of you feel you cannot do
13    this?
14              Now, the Court has asked a series of questions
15    designed to determine your frame of mind and your ability to
16    abide by the oath that you took a few minutes ago, but I ask
17    you to search your conscience.  Do any of you know of any
18    reason why you think you could not sit in this case and
19    render a just, fair, impartial, honest verdict?
20              What the Court is going to do at this time is the
21    Court wants to have a brief conference with the counsel in
22    the case.  Make every effort not to hear.  We're going to be
23    on phones up here.
24              (A sidebar conference was held as follows:)
25              THE COURT:  Counsel, those are the basic questions
```

134

1    I'm going to ask.  Is there anything else?

2         MR. YAROW:  This is Mr. Yarow for David Alcorn.  I

3    think when you were asking the questions, you asked if

4    anybody knows any of the defendants two times.  I think one

5    time you meant to ask if you know any of defendants' counsel.

6    I'm not sure that you asked that question.  And I do

7    recognize somebody in the jury.  They may not recognize me.

8         THE COURT:  Okay.  I thought my question was have

9    you had any personal or professional contact with counsel for

10   the defendants?  Well, perhaps they don't recognize you.  I'm

11   going to ask it again and have you take your mask off.

12        MR. YAROW:  I will.

13        THE COURT:  I will do that.

14        MR. YAROW:  Okay.

15        MR. BOSSE:  Your Honor, this is Andrew Bosse for the

16   government.  I think that's Juror Number 49.  I guess I would

17   like to know -- I mean, we could bring him up and ask do you

18   know Mr. Yarow?

19        MS. YUSI:  Should we do motions for strikes on some

20   of the answers so far, Your Honor?

21        THE COURT:  I'll get to that.  First I want to find

22   out how many more questions you all have.

23        MS. McCASLIN:  Your Honor, this is Lindsay McCaslin

24   representing Mr. Smith.  We do have a couple questions.

25        THE COURT:  Could you speak a little louder?

Carol L. Naughton, Official Court Reporter

```
 1              MS. McCASLIN:  Yes.  Your Honor, for Number 49 --
 2    I'm sorry, let me go back up to 4.  For Number 4, the juror
 3    indicated that -- I'm sorry.  I'm sorry, Judge.  It's for
 4    Number 1.
 5              Juror Number 1 indicated that, on her questionnaire
 6    for Question Number 50, that she was unsure about whether or
 7    not she would have difficulty following the rules about the
 8    presumption of innocence and whether the defendant needs to
 9    testify.  So we would like clarification on that.
10              For Number 49 -- no.  We're going to skip that one.
11    Sorry.
12              For Number 108, the questionnaire, the juror
13    indicated on Number 48 that they -- they checked "yes," that
14    they may consider the indictment as evidence, so we would
15    like follow-up on that.
16              For Juror Number 121, the juror indicated on
17    questionnaire Number 13 that they would have a hard time
18    avoiding looking up the case during the trial based on
19    curiosity.
20              And I believe that's our questions.
21              THE COURT:  Okay.  I think what we can do is
22    eliminate some of these questions by the strikes.
23              Let's go back to any strikes that the parties want
24    to make, and that may cure the need to bring up a couple of
25    these people.
```

1           Let's go back to Juror Number 1.  Any questions
2    about Juror Number 1?
3           MS. McCASLIN:  I do have a question about the
4    presumption of innocence and whether she would require that
5    the defendant testify.  Questionnaire Number 50 is
6    concerning, for constitutional reasons.
7           MR. GRINDROD:  Just if you are trying to eliminate
8    the need to bring people up here, I just wanted to make the
9    Court aware, that was also the member who said that they were
10   on a medication that required frequent trips to the bathroom,
11   so I don't know if you're going to excuse that juror.
12          THE COURT:  That's the one reason the Court inquired
13   about the strikes, potentially, with Juror Number 1.  If she
14   requires frequent trips to the bathroom, the Court only takes
15   a break every hour and a half to two hours.
16          MR. BOSSE:  This is Andrew Bosse for the government.
17   If they're going to have her come up and examine her about
18   the presumption of innocence, we could ask her about if there
19   is accommodations the Court could make, if she's coming up
20   anyway.
21          THE COURT:  Okay.  We'll let that one go.
22          If there are no other strikes --
23          MR. BOSSE:  Okay.  Never mind.  If you're going to
24   do strikes -- I have a couple other questions, but if we're
25   going to do strikes first, it's fine.

```
 1          THE COURT:  The Court is asking for strikes so we
 2   can avoid bringing somebody up here.  If we're going to
 3   strike them, we don't need to bring them up here.
 4          Does anybody have any others?
 5          MR. GRINDROD:  Your Honor, we do.
 6          MS. McCASLIN:  Your Honor, we would move to strike
 7   Juror Number 4.  The juror did indicate that her spouse is an
 8   officer, she is part of a wives group for police officer
 9   wives.  She has worked at the Virginia Beach Police
10   Department for 31 years and stated pretty clearly that she
11   probably would give more weight to law enforcement.
12          THE COURT:  Ms. McCaslin, it's very difficult to
13   hear you.  I don't know what the problem is with the
14   microphone over there.
15          MS. McCASLIN:  Sorry.  Can you hear me better now?
16          (Pause.)
17          THE COURT:  Any objection to that strike?
18          MR. BOSSE:  No, sir, Your Honor.
19          THE COURT:  We will strike Number 4.
20          Any other strikes?
21          MS. McCASLIN:  Yes, Your Honor.  This is Lindsay
22   McCaslin again.  We are moving to strike Number 49.  The
23   individual indicated on their questionnaire, Number 52, that
24   they might have a police bias in favor of trusting police.
25   They also indicated that -- they also stood up today and
```

1    indicated that they would also trust police.

2           On the questionnaire, they also, on Number 69,

3    checked that they would base their verdict on personal views

4    instead of law.

5           MR. BOSSE:  Is this the same juror that may know

6    Mr. Yarow?  Okay.  There's no objection to striking that

7    juror.

8           THE COURT:  Number 49 is stricken.

9           Any others?

10          MS. McCASLIN:  Yes, Your Honor.  Juror Number 130.

11   The juror also indicated that she would be trusting the law

12   enforcement officers over other witnesses.

13          THE COURT:  I think she said it depended upon the

14   situation, and I think we'd have to do some further inquiry

15   before the Court would be inclined to strike her.

16          MR. YAROW:  She also said in her questionnaire she

17   believe -- I'm sorry, she has a predisposition against those

18   that steal other people's money.

19          MR. BOSSE:  This is Andrew Bosse for the government.

20   I don't think there's anything wrong with anyone having a

21   predisposition against people who steal.  That doesn't have

22   anything to do with whether they could be a fair judge of the

23   facts in the case as they're presented here in this trial.

24          MS. McCASLIN:  This is Lindsay McCaslin.  I would

25   disagree because this case does involve fraud.  Obviously if

1    the juror is more inclined to just seek restitution and

2    punishment as opposed to holding the government to their

3    burden of proof, that is a constitutional concern for

4    Mr. Smith.

5            THE COURT:  Well, I'll tell you what, we will

6    question the juror about that.  I think most people in the

7    room have a predisposition against people who steal.  So

8    there's nothing unusual about that statement, but we will

9    inquire.

10           Any others?

11           MR. BOSSE:  Judge, this is Andrew Bosse.  I did have

12   other people I wanted to ask about bringing up for further

13   inquiry, but no other strikes from the government.

14           THE COURT:  Who are the others?

15           MR. BOSSE:  Your Honor, there's -- Juror Number 99

16   wrote in her questionnaire that she had served as an expert

17   witness for mental competency in criminal cases, and I just

18   want to find out, you know, was it all for the defense, was

19   it all for the prosecution, or for both sides.  And she also,

20   I think, had noted some travel concerns.

21           Juror Number 142 is the juror who is raising funds

22   to be a missionary and had also made a statement about

23   needing to have 100 percent proof before making a finding of

24   guilt.  So we would ask for 99 and 142.

25           And if I could consult briefly?

1          (Pause.)

2          MR. BOSSE:  Juror Number 60 may know our postal

3    inspector Jason Thomasson.

4          THE COURT:  Which one?

5          MR. BOSSE:  60, who is a postal carrier who may know

6    Mr. Thomasson.  I doubt that that would be a problem, but it

7    would make sense, I think, to inquire.

8          THE COURT:  The Court has, bringing back for

9    inquiry, Number 108, Number 121.  I can't remember, what did

10   121 say?

11         MS. McCASLIN:  Your Honor, this is Lindsay McCaslin.

12   This juror had -- didn't know if they would be able to avoid

13   looking up the case during the jury trial.  Also, they have a

14   strong opinion of financial advisors, and we don't know

15   anything about that.  That's Question Number 32 on the

16   questionnaire.

17         THE COURT:  Okay.  Number 99, Number 142, and 16.

18   That's five we're bringing back.

19         What did we say about Juror Number 1?

20         MR. BOSSE:  I think the Court was going to bring her

21   back and, also, 130 as well.

22         THE COURT:  I don't remember what I said -- oh, yes,

23   Number 130, I remember.  Well, we've got about eight here

24   that we're going to be bringing back -- seven.  Let's get

25   started.  I'll start with the lowest number first.

```
 1              (To the venire:)  Juror Number 1, will you please
 2   step forward.
 3              (Juror Number 1 entered the conference.)
 4              THE COURT:  You are Juror Number 1?
 5              PROSPECTIVE JUROR:  Yes, sir.
 6              THE COURT:  Ma'am, you indicated you had a medical
 7   issue.
 8              PROSPECTIVE JUROR:  Yes, sir.
 9              THE COURT:  And that you may have to use the rest
10   facilities; is that correct?
11              PROSPECTIVE JUROR:  Yes, sir.
12              THE COURT:  And how frequently do you encounter this
13   problem?
14              PROSPECTIVE JUROR:  Because the medication is every
15   day, so I haven't used it this morning because of the jury
16   summons.  I usually go, like, 10 to 15 minutes.
17              THE COURT:  Every 10 to 15 minutes?
18              PROSPECTIVE JUROR:  Uh-huh.
19              THE COURT:  Okay.  Thank you, ma'am.  You may step
20   down.
21              PROSPECTIVE JUROR:  Thank you.
22              (Juror Number 1 exited the conference.)
23              MR. GRINDROD:  Your Honor, this is Andrew Grindrod.
24   We move to strike.
25              THE COURT:  The Court will grant that strike.
```

```
 1              MR. BOSSE:  No objection, for the record.
 2              THE COURT:  (To the venire:)  Juror Number 16, step
 3    forward.
 4              (Juror Number 16 entered the conference.)
 5              THE COURT:  You are Juror Number 16?
 6              PROSPECTIVE JUROR:  Yes, sir.
 7              THE COURT:  And what is your occupation?
 8              PROSPECTIVE JUROR:  I work for the United States
 9    Post Office.
10              THE COURT:  Do you know Agent Thomasson.
11              PROSPECTIVE JUROR:  I do not believe I do.
12              THE COURT:  You do not believe you do?
13              PROSPECTIVE JUROR:  No, sir, I don't believe I do.
14              THE COURT:  Okay.  Thank you very much.  Step down.
15              (Juror Number 16 exited the conference.)
16              THE COURT:  (To the venire:)  Juror Number 121.
17              (Juror Number 121 entered the conference.)
18              THE COURT:  You are Juror Number 121?
19              PROSPECTIVE JUROR:  I am.
20              THE COURT:  One of the directives the Court has to
21    the jury is that the jury avoid doing research on this case
22    or anything pertaining to this case if selected as a juror,
23    and on your questionnaire, did you indicate that you would
24    have a hard time avoiding doing that?
25              PROSPECTIVE JUROR:  Sir, I don't remember that.
```

```
 1                THE COURT:  But do you understand you cannot do
 2      that?
 3                PROSPECTIVE JUROR:  I do understand that.
 4                THE COURT:  Are you able to avoid doing independent
 5      research or talking to other people about this case while you
 6      are a juror?
 7                PROSPECTIVE JUROR:  If -- yes, I can.
 8                THE COURT:  I notice you hesitated.  Why did you
 9      hesitate?
10                PROSPECTIVE JUROR:  Because my husband and I are
11      very close and we talk about everything.  Before we go to bed
12      at night, we talk about our day.  I also have two children
13      that we live in a compound together.  We live on -- I live on
14      a farm.  We all have our houses together.  We eat together
15      three or four times a week.  We discuss our days.
16      We share -- I share my grandchildren with them.
17                THE COURT:  So you don't think you could avoid
18      talking to them about something that the Court tells you not
19      to talk about?
20                PROSPECTIVE JUROR:  I think that I can with -- I
21      know myself.  I don't want to tell you that I can and I
22      can't.  I mean, I will do my best.  But there are times when
23      we -- I just want to be honest with you.
24                THE COURT:  Okay.
25                PROSPECTIVE JUROR:  I mean, you asked me the
```

```
 1    question, sir.

 2            THE COURT:  Oh, yeah, we want you to be

 3    straightforward and honest.  That's why you're under oath.

 4            PROSPECTIVE JUROR:  That's exactly right.

 5            THE COURT:  You don't know whether you're going to

 6    talk about the case, honestly?

 7            PROSPECTIVE JUROR:  I would do my best not to.

 8            THE COURT:  All right.  Thank you very much.  You

 9    may step down.

10            PROSPECTIVE JUROR:  Thank you, sir.

11            (Juror Number 121 exited the conference.)

12            MS. McCASLIN:  Your Honor, we do have a motion to

13    strike.

14            MR. BOSSE:  No objection from the government.

15            THE COURT:  Number 121 is stricken.

16            (To the venire:)  Juror Number 99.

17            (Juror Number 99 entered the conference.)

18            THE COURT:  You are Juror Number 99?

19            PROSPECTIVE JUROR:  Yes, sir.

20            THE COURT:  On your form, you indicated that you

21    testify as an expert?

22            PROSPECTIVE JUROR:  Yes.

23            THE COURT:  In what field?

24            PROSPECTIVE JUROR:  Mental health.

25            THE COURT:  Mental health?
```

```
1              PROSPECTIVE JUROR:  Uh-huh.

2              THE COURT:  When you testify as an expert, for whom

3    do you testify; plaintiffs, defendants, or who?

4              PROSPECTIVE JUROR:  I testified regarding the

5    defendant's competency to stand trial.  I really testify for

6    neither the prosecutor nor the defendant, really as an expert

7    for the Court.

8              THE COURT:  Okay.  Do you have any travel that would

9    prevent you from serving as a juror in this case?

10             PROSPECTIVE JUROR:  My sister is getting married out

11   of state in March, so I will be leaving on the -- I believe

12   it's Thursday the 10th.  I've actually forgotten.  Her

13   wedding is Saturday the 12th.

14             THE COURT:  Thank you very much.  You may step down.

15             (Juror Number 99 exited the conference.)

16             THE COURT:  (To the venire:)  Juror 108.

17             (Juror Number 108 entered the conference.)

18             THE COURT:  You are Juror Number 108?

19             PROSPECTIVE JUROR:  Yes.

20             THE COURT:  On your questionnaire, I believe you

21   indicated that you might consider the indictment as evidence.

22   Did you say that?

23             PROSPECTIVE JUROR:  No.

24             THE COURT:  You have to speak.

25             PROSPECTIVE JUROR:  No.  No.  I don't recall saying
```

1    that.  That could have been something I did in error.

2              THE COURT:  Do you understand that the mere fact

3    that someone is indicted is not evidence of guilt?

4              PROSPECTIVE JUROR:  Correct.  I do.

5              THE COURT:  Would you in any way consider the fact

6    that these two defendants have been indicted as evidence that

7    they're guilty?

8              PROSPECTIVE JUROR:  No.

9              THE COURT:  Are you able to listen at the facts and

10   the instructions given by the Court to render a verdict

11   that's fair, just, and impartial?

12             PROSPECTIVE JUROR:  Yes, sir.

13             THE COURT:  And do you promise that you will do that

14   if selected?

15             PROSPECTIVE JUROR:  Yes, sir.

16             THE COURT:  Step down.

17             (Juror Number 108 exited the conference.)

18             THE COURT:  (To the venire:)  Juror Number 142.

19             (Juror Number 142 entered the conference.)

20             THE COURT:  You are Juror Number 142?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  Put it up closer to your mouth.  I'm

23   still having a problem hearing you.

24             Juror Number 142, right?

25             PROSPECTIVE JUROR:  Yes.

1             THE COURT:  Now, I think you indicated that you
2    would probably -- you would require 100 percent proof of
3    guilt of the defendants in this case.
4             PROSPECTIVE JUROR:  Yes.
5             THE COURT:  Do you understand that the standard is
6    proof beyond a reasonable doubt?
7             PROSPECTIVE JUROR:  I guess maybe that's what I was
8    referring to.  I would have to be sure, and like you were
9    saying, it would have to be proof beyond doubt; there would
10   need to be no doubt.
11            THE COURT:  Are you able to hear her, ma'am?
12            THE STENOGRAPHER:  Yes, sir.
13            THE COURT:  So it would have to be proof in what
14   sense?
15            PROSPECTIVE JUROR:  Without doubt, like you were
16   saying, above -- how did you word that?
17            THE COURT:  Proof beyond a reasonable doubt.
18            PROSPECTIVE JUROR:  Yes.
19            THE COURT:  Okay.  Now, do you engage in
20   fundraising?
21            PROSPECTIVE JUROR:  I'm a missionary, and so we
22   raise our -- in a sense, we raise our own salary.
23            THE COURT:  Okay.  And do you have any conflicts
24   with your fundraising with respect to this trial?
25            PROSPECTIVE JUROR:  My husband is going to try to

```
 1    take over this month and see if he can't do the bulk of the
 2    work.
 3              THE COURT:  But otherwise, you are able to serve?
 4              PROSPECTIVE JUROR:  Yes, sir.
 5              THE COURT:  Step down.
 6              (Juror Number 142 exited the conference.)
 7              THE COURT:  (To the venire:)  Juror Number 130.
 8              (Juror Number 130 entered the conference.)
 9              THE COURT:  You are Juror Number 130?
10              PROSPECTIVE JUROR:  Yes, sir.
11              THE COURT:  The Court asked you a question whether
12    you would give more or less weight to the testimony of a
13    police officer because he or she is a police officer than you
14    would to another witness, and you answered, I think,
15    "depending on the situation."  What do you mean by that?
16              PROSPECTIVE JUROR:  Well, I would more than likely
17    give more weight, but it depends on, like, how they come
18    across on the stand.  I don't know -- don't know exactly how
19    to say it.
20              THE COURT:  Would you tend to believe a police
21    officer more than you would, let's say, another witness in
22    the case who is not a police officer and they're testifying
23    about the same events?
24              PROSPECTIVE JUROR:  Yes, sir.
25              THE COURT:  You would tend to believe the police
```

```
 1   officer?
 2           PROSPECTIVE JUROR:  Yes, sir.
 3           THE COURT:  Not the police officer, let's say any
 4   law enforcement officer.
 5           PROSPECTIVE JUROR:  Yes, sir.
 6           THE COURT:  And what is the reason you would tend to
 7   believe the law enforcement officer?
 8           PROSPECTIVE JUROR:  The reason being is, I guess,
 9   because of my background, because I've worked in the
10   Detective Bureau, and I've worked in the Commonwealth's
11   Attorney's Office and the probation office.  So I guess with
12   my past experience, that's why I would tend to believe that.
13           THE COURT:  All right.  Thank you very much.
14           PROSPECTIVE JUROR:  You're welcome.
15           THE COURT:  You may step down.
16           (Juror Number 130 exited the conference.)
17           MS. McCASLIN:  Your Honor, this is Lindsay McCaslin.
18   We have a motion to strike.
19           THE COURT:  Really?
20           MS. McCASLIN:  We do.
21           MR. BOSSE:  No objection from the government, Your
22   Honor.
23           THE COURT:  130 is stricken.
24           Those are all the strikes that the Court has and all
25   the jurors the Court will bring up.  What we're going to do
```

1   is we're going to move to the strikes.  We need to -- we need
2   to select one more juror because we lost 123 yesterday, and
3   we're going to select six alternates.  You get two strikes
4   for those six alternates.
5           So between defense, you're going to have to break it
6   down to two strikes, and the government, two strikes.  That
7   wasn't two strikes per defendant.  That was just two strikes.
8   So each one of you-all take one strike, if you'd like, and
9   the government will take two strikes, and that should leave
10  us with six alternates.  All right.
11          THE CLERK:  Your Honor, would you like me to state
12  who's been stricken?
13          THE COURT:  Oh, yes, please.
14          THE CLERK:  Juror Number 4 -- excuse me.  Juror
15  Number 1, Juror Number 4, Juror Number 49, Juror Number 121,
16  Juror Number 130.
17          THE COURT:  So that's 4, 1, 49, 121, and 130.
18          THE CLERK:  Yes, sir.
19          THE COURT:  We struck five.  Okay.
20          MS. O'BOYLE:  Your Honor, this is Melissa O'Boyle
21  for the government.  I just wanted to double check.  Are we
22  putting one name on the board first --
23          THE COURT:  We're going to deal with trying to get
24  that one name first.
25          MS. O'BOYLE:  Okay.  Thank you, Your Honor.  I was

1    just clarifying that before we got the board.

2            THE COURT:  We'll do one name first, and then we'll

3    move to the alternates.

4            MS. O'BOYLE:  Thank you.

5            MR. GRINDROD:  Just to make sure we're on the same

6    page as far as remaining strikes, is it right that the

7    government, I think, has two left, and each defendant

8    individually has two each, so a total of four over here and

9    two over there?

10           MR. BOSSE:  That's our count for the government,

11   yes.

12           THE COURT:  That's the count that the Court

13   understands.

14           (The sidebar conference concluded.)

15           THE COURT:  Ladies and gentlemen, we have concluded

16   the voir dire examination.  Now we will move to the strikes.

17   The counsel will be moving through the strikes by passing a

18   board backwards and forward up here for a period of time, and

19   at the end of that process, we will know who among you will

20   be selected to serve as jurors in this case.

21           (Pause.)

22           THE CLERK:  The following jurors have been selected

23   for trial:  As your number is called, will you please stand

24   and remain standing.

25           Juror Number 46, Juror Number 59, Juror Number 85,

1    Juror Number 87, Juror Number 99, Juror Number 101, Juror

2    Number 140.

3             THE COURT:  Okay.  Ladies and gentlemen, those of

4    you who were selected, you may have a seat.

5             Ladies and gentlemen, we want to thank you for

6    coming in to participate in this time-honored process.  Those

7    who have been selected, you will have to return here at

8    2:00 p.m.  Be here promptly at 2:00 p.m.  The Court

9    recommends that you come in before 2:00 so that you can get

10   your mask on and do whatever else you need to do.

11            Those who have not been selected, we thank you for

12   coming.  I did not tell you this earlier, but this is a

13   public courtroom that you've paid for.  You are free, as you

14   are free in any American courtroom, to come in and sit down

15   and listen at what happens.

16            You don't have to be part of the process or the

17   ceremony or what's going on.  So feel free to return any

18   time, not just for this case, any time you want to come in

19   and see what's going on in the federal court.

20            At this time, you may be excused.  You should depart

21   quietly.  Leave your masks and your paddles on the bench.

22   Put your other mask back on, the N95, KN95, whichever you

23   were given.  Put those on before you begin to depart.

24            (The venire, Jury Panel C, exited the courtroom.)

25            MR. GRINDROD:  Your Honor, would the Court

```
 1    remind the jury not to --
 2               THE COURT:  Yes.
 3               Now, ladies and gentlemen, for those of you who have
 4    been selected, do not discuss this case with anyone, do not
 5    do any research, do not do anything.  Keep an open mind.
 6    Come back here to get further instructions from the Court.
 7    Do not let anyone approach you to talk to you about this
 8    case.
 9               (The jury exited the courtroom.)
10               THE COURT:  Counsel, we will return here at
11    2:00 p.m. for the preliminary instructions to the jury, and
12    after that, we will move to opening arguments this afternoon.
13               (Recess from 11:50 a.m. to 2:15 p.m.)
14               THE COURT:  Bring the jury in, please.
15               (The jury entered the courtroom.)
16               THE COURT:  Good afternoon, ladies and gentlemen.
17    The next time you all come in, you can move with dispatch to
18    the very seat that you're sitting in.  Just go right back to
19    the same seat you're sitting in, and it should be done very
20    quickly.
21               Now that you have been sworn and selected as a jury,
22    I will briefly tell you something about your duties as jurors
23    and give you some preliminary instructions to guide you as
24    you listen to the evidence in this case.  But right now,
25    we're going to have the roll call to make sure you are all
```

```
 1   here.
 2          THE CLERK:  Members of the jury, will you please
 3   answer "present" as your number is called.
 4          Juror Number 7.
 5          THE JUROR:  Present.
 6          THE CLERK:  Juror Number 23.
 7          THE JUROR:  Present.
 8          THE CLERK:  Juror Number 26.
 9          THE JUROR:  Present.
10          THE CLERK:  Juror Number 38.
11          THE JUROR:  Present.
12          THE CLERK:  Juror Number 43.
13          THE JUROR:  Present.
14          THE CLERK:  Juror Number 46.
15          THE JUROR:  Present.
16          THE CLERK:  Juror Number 59.
17          THE JUROR:  Present.
18          THE CLERK:  Juror Number 84.
19          THE JUROR:  Present.
20          THE CLERK:  Juror Number 85.
21          THE JUROR:  Present.
22          THE CLERK:  Juror Number 87.
23          THE JUROR:  Present.
24          THE CLERK:  Juror Number 90.
25          THE JUROR:  Present.
```

```
 1            THE CLERK:  Juror Number 99.

 2            THE JUROR:  Present.

 3            THE CLERK:  Juror Number 101.

 4            THE JUROR:  Present.

 5            THE CLERK:  Juror Number 112.

 6            THE JUROR:  Present.

 7            THE CLERK:  Juror Number 117.

 8            THE JUROR:  Present.

 9            THE CLERK:  Juror Number 118.

10            THE JUROR:  Present.

11            THE CLERK:  Juror Number 136.

12            THE JUROR:  Present.

13            THE CLERK:  Juror Number 140.

14            THE JUROR:  Present.

15            Members of the jury, would you please stand and

16   raise your right hand to be sworn.  And will the defendants

17   please stand and face the jury.

18            You shall well and truly try and true deliverance

19   make between the United States of America and David Alcorn

20   and Aghee William Smith II, defendants at the Bar whom you

21   shall have in charge, and a true verdict give according to

22   the evidence, so help you God.

23            (The jury answered in the affirmative.)

24            THE CLERK:  Thank you.  You all may be seated.

25            THE COURT:  Once again, now that you have been
```

1    sworn, the Court will give you some information to guide you

2    as you listen at the testimony and certainly assist you when

3    it comes time for your deliberations.  For those of you who

4    have served before, the instructions from the Court may seem

5    repetitive, but nevertheless, these are important

6    instructions.  At the end of the trial, the Court will give

7    you more detailed instructions, and those instructions will

8    control your deliberations.

9           Remember, there are six alternate jurors among you.

10   The alternate jurors selected will sit with the jury, will

11   have the same duties, as I told you before, and obligations

12   as the other jurors, but an alternate juror who does not

13   replace a juror prior to the jury retiring to deliberate will

14   be discharged and may not participate in deliberations.

15          It will be your duty to decide from the evidence

16   what the facts are.  You and you alone are the judges of the

17   facts.  You will hear the evidence, decide what the facts

18   are, and then apply those facts to the law which the Court

19   gives you.  This is how you will arrive at your verdict.

20          In doing so, you must follow the law whether you

21   agree with it or not.  You must not take anything that I may

22   say as judge during the course of this trial, or anything I

23   may do, as indicating what your verdict should be.  Don't be

24   influenced by my note-taking at times.  What I write down may

25   have nothing to do with what you're required to do in this

1    trial as a juror.

2          It's sometimes the duty of the Court to admonish an

3    attorney who, out of zeal for his or her cause, does

4    something which is not in keeping with the Rules of Evidence

5    or procedure.  Do not permit this, if it should happen, to

6    have any effect on your evaluation and merits of the case.

7          You will decide what the facts are from the evidence

8    which will be produced and be presented in this courtroom.

9    That evidence will consist of the testimony of witnesses,

10   depositions -- that is, testimony taken under oath out of the

11   court -- documents, and other things received in evidence as

12   exhibits, and any facts on which the attorneys stipulate --

13   that means they agree on these facts -- and things or facts

14   which I instruct you to accept.

15         The following things, ladies and gentlemen, are not

16   evidence, and you must not consider them as evidence in

17   deciding this case -- in deciding the facts of this case:

18         Number one, statements and arguments of the

19   attorneys, questions and objections of the attorneys,

20   testimony the Court instructs you to disregard, anything you

21   may see or hear outside of this courtroom when it's not in

22   session, even if you see or hear it done or see it by one of

23   the parties or by one of the witnesses.

24         There are two kinds of evidence that you must

25   consider or may consider, direct and circumstantial evidence.

1          Direct evidence is just what it appears to be,
2   testimony by a witness about what that witness personally saw
3   or heard or did.  Circumstantial evidence is indirect
4   evidence.  That is, it is proof of one or more facts for
5   which you or one can find or infer another fact.
6          My common example I use all the time in trials is,
7   the fact that you walk outside and it's wet everywhere, you
8   are in here with no windows, but you can conclude
9   circumstantially that it rained while you were in here.
10          You may consider both direct and circumstantial
11   evidence in deciding this case.  The law permits you to give
12   equal weight to both, but it is for you to decide how much
13   weight to give to any evidence.
14          You as jurors must decide this case based solely on
15   the evidence presented here within the four walls of this
16   courtroom.  This means that during this trial, you must not
17   conduct any independent research about this case, the matters
18   in the case, and the individuals or the corporations involved
19   in this case.
20          In other words, you should not consult dictionaries,
21   reference materials, search the internet, websites, blogs, or
22   use any other electronic tools to obtain information about
23   this case or to help you decide the case.  Please do not try
24   to find out information from any source outside the confines
25   of this courtroom.

1          Until you retire to deliberate, you may not discuss

2    this case with anyone, even your fellow jurors.  After you

3    retire to deliberate, you may begin discussing the case with

4    your fellow jurors.  But you cannot discuss this case with

5    anyone else until you have returned a verdict in the case at

6    hand.  And this includes family who may want to know what you

7    are doing.

8          I know that many of you have cell phones, other

9    types of tools.  You must not use these tools to communicate

10   electronically with anyone about this case.  This includes

11   family members and friends.

12         You may not communicate with anyone about this case

13   on your cell phone, through e-mail, Instagram, Snapchat, or

14   any internet or any technology they invent before we finish

15   this case.  You just leave this technology alone, and it will

16   keep you out of trouble.

17         So you are excluded from using any technology, even

18   if I have not mentioned that technology.  There's somebody

19   working on something right now.

20         Now, there are Rules of Evidence which control what

21   can be received into evidence.  When a lawyer asks a question

22   or offers an exhibit into evidence and opposing counsel

23   thinks that it should not be permitted into evidence or the

24   question is improper, that counsel may object.

25         If I overrule the objection, it means that the

1    question may be answered or the exhibit may be admitted.  If

2    I sustain the objection, the question cannot be answered, or

3    the exhibit cannot be received.  When I sustain an objection

4    to a question, you must ignore the question.  Do not

5    speculate about what the witness probably would have said if

6    the judge hadn't stopped him.

7              Also, you must not be prejudice for or against any

8    party for objecting, whether the Court sustains or overrules

9    the objection.  It is the duty of lawyers to object when they

10   believe that it's appropriate.

11             Sometimes the Court may order that evidence be

12   stricken from the record, that you disregard or ignore the

13   evidence.  I guess it's somewhat like unringing a bell that

14   you heard.  But it simply means that when you are deciding

15   the case, you must not consider the evidence which the Court

16   told you to disregard.  It cannot weigh into your

17   consideration.

18             Sometimes evidence is admitted for a limited

19   purpose.  When the Court instructs you that an item of

20   evidence is coming in for a specific purpose, you must limit

21   your consideration of that evidence to the purpose for which

22   the Court admitted it.

23             Now, in deciding this case, you will have to decide

24   which witnesses to believe, which witnesses not to believe.

25   You may believe everything a witness says, only part of it,

1    or none of it.  The choice is yours.

2            In deciding what to believe, you may consider a

3    number of factors, including the witness's ability to see or

4    hear or know the things a witness testifies about; the

5    quality of the witness's memory; the witness's manner while

6    testifying on the stand; any interest the witness may have in

7    the outcome of the case; or any motive, bias, or prejudice

8    the witness may have; any contradiction of the witness by

9    anything the witness said or wrote or did before trial; or

10   contradiction of the witness by other evidence; and certainly

11   you may consider the reasonableness of a witness's testimony

12   when considered in the light of other evidence which you do

13   believe.

14           Now, limitations, ladies and gentlemen, are imposed

15   on the ability of a witness to give an opinion.  A witness's

16   testimony may be limited to facts as to what happened or what

17   was seen or done.

18           Where, however, a witness has some specialized

19   knowledge concerning a particular subject matter which might

20   assist an ordinary jury and an ordinary judge to understand a

21   complicated or technical field, that witness is called an

22   expert witness, and that witness is permitted greater

23   latitude in giving opinions.

24           There will be, as the Court understands it, an

25   expert witness in this case.  You should endeavor to evaluate

1   the testimony of an expert witness just as you evaluate the

2   testimony of any other witnesses under the factors the Court

3   mentioned a few seconds ago.

4          But additionally, in the case of an expert, you

5   should evaluate the expert's training, qualifications, and

6   knowledge of the subject matter concerning which the expert

7   is testifying.

8          Of course, you should realize that the testimony of

9   an expert is no more controlling than that of any other

10  witness because it is your judgment in final analysis which

11  will decide the questions of credibility; what to believe and

12  what not to believe.

13         This is a criminal case, ladies and gentlemen, as

14  the Court told you early on.  There's some basic rules that

15  apply to a criminal case that you need to keep in mind.

16         First, each defendant is presumed innocent until

17  proven guilty.  This indictment against each defendant

18  brought by the United States is only an accusation, nothing

19  more.  It is not proof of guilt or anything else.  Each

20  defendant, therefore, starts out with a clean slate.

21         Second, the government has the burden of proof in a

22  criminal case.  A defendant has no burden to prove his

23  innocence or to present any evidence or to testify.  And

24  since the defendant has the right to remain silent, the law

25  prohibits you, in arriving at your verdict, from considering

1    that any defendant in this case may not testify.

2            Third, the government must prove the defendant's

3    guilt beyond a reasonable doubt.  The Court will give you

4    further instructions before you go out to deliberate on this

5    point.  But bear in mind that this is a criminal case.  It's

6    different from a civil case where there's a lesser burden of

7    proof.

8            Now, the Court has instructed you that these

9    defendants are charged with conspiracy to commit mail fraud

10   and wire fraud, and wire fraud and mail fraud, and some

11   engaging in unlawful monetary transactions; sometimes called

12   money laundering.

13           You will be given detailed instructions on what the

14   United States is required to prove beyond a reasonable doubt

15   to convict either of these defendants.

16           Let me say a few words about your conduct as jurors.

17           First, I reiterate, restate, do not talk to each

18   other about this case, about anyone else who has anything to

19   do with it, until you retire to deliberate.

20           When the Court says do not talk to anyone else, I

21   emphasize again, do not go home and let your family debrief

22   you or interrogate you.  Do not discuss this case with them.

23   You put them off until after the verdict has been achieved.

24           Do not talk to witnesses that you may see.  If you

25   meet one of the witnesses or one of the attorneys in the

1    elevator or someplace, do not discuss anything with them.
2    And don't let them discuss anything with you.
3         Also, while you may not go on the internet, you may
4    take the daily paper -- the Court doesn't know -- or some
5    other newspaper.  Do not read any stories or anything in
6    print or anything about this case.  Do not follow any
7    television reports or radio reports.  In other words, don't
8    let anything infect your mind about this case or in any way
9    sway you about this case.  The Court has already emphasized
10   that you will not do any research.
11        Finally, the Court will simply say, ladies and
12   gentlemen, do not make up your mind about what the verdict in
13   this case should be until after you have heard all the
14   evidence, received instructions of the Court, and deliberated
15   with your fellow jurors.
16        It should be remembered that the lawyers and the
17   parties and their representatives, under no circumstances,
18   can talk to you or socialize with you during the course of
19   this trial.
20        You will note we have a court reporter here taking
21   down every word said.  However, at the end of this trial, you
22   will have to make your decision based on what you recall of
23   the evidence.  You will not have a transcript to consult.
24   This is not what happens on TV or in some other courts around
25   the country.  There will be no read back of testimony.

1          Now, this is a difficult proposition to be reading

2    back testimony to the jury.  So the Court encourages you to

3    pay close attention.  Ordinarily, the Court doesn't encourage

4    note-taking, but this case is going to be long, so the Court

5    will give you a legal pad that you can put your name on to

6    take notes.  They are your notes, not some other juror's

7    notes.

8          If you choose to take notes, the Court will give you

9    an instruction about how to treat your notes.  Do not be

10   distracted by your note-taking.  Pay close attention to what

11   is going on.  You will put your name on the notes and leave

12   those notepads when you leave at the end of the day.

13         You will not be permitted to ask questions of the

14   jury -- or the attorneys during the case, so please do not

15   interrupt the lawyers during their examination of witnesses

16   or otherwise.  If you are unable to hear or see, you raise

17   your hand, and we will attend to that issue.

18         One other thing.  The temperature in this courtroom

19   is controlled from somewhere in America; I think it's

20   Philadelphia or someplace.  When we want heat, we have to

21   call up GSA and get them to adjust the thermostat, so the

22   Court would encourage you to bring something that you can put

23   on or take off depending on whether you're cold or whether

24   you're hot.

25         Let me outline for you how this trial will run here:

1          Generally, we start around 9:30 or 10:00.  We're
2     going to start most days at 10:00, and some days the Court
3     might move it back to 9:30.  We will take a lunch break
4     usually at 1:00 p.m.  During the morning, usually every hour
5     and a half, two hours at the most, the Court will take a
6     15-minute break.  That doesn't mean the Court won't do an
7     emergency break.  If there's an emergency, then we'll take a
8     break.  Otherwise, we will follow that pattern.
9          We will try to go to 5:00 or 5:30.  It's rare that
10    the Court will go to 6:00.  It all depends upon where we are
11    and whether we have a witness that we have to finish.  But
12    the Court intends for everybody to go home for dinner.  We're
13    not cooking dinner around here.
14         From time to time during the course of this trial,
15    it will be necessary to confer with the lawyers, and we're
16    not going to be sending you back out to the jury assembly
17    room that you're using.  So we're going to end up using this
18    technology here that we used during the voir dire.  Make
19    every effort not to listen at what the Court is trying to do
20    or what we're trying to resolve because by law there's some
21    things that you cannot get involved in or hear.
22         Now, let me give you an instruction on how this case
23    will work here.
24         We will start with opening statements.  An opening
25    statement is nothing but an outline of what the prosecution

1    or the defense, if they want to put on evidence, will show

2    you.  It's an outline of the case.  It's not the evidence.

3    It's an outline.  After the opening statement by the

4    prosecution, if the defense wishes to make an opening

5    statement -- they are not required to do so -- they will do

6    so.

7            After the opening statements, the first witness will

8    be called by the United States.  Any witness called may be

9    cross-examined by the opposing side.  Once the United States

10   has gone through all of its witnesses, the Court will give

11   the defendants an opportunity to produce evidence if they

12   wish to.  They are not required by law to produce anything.

13           If the defendants should happen to call any

14   witnesses, they will be subject to cross-examination by the

15   prosecution team.  If they produce any witnesses, since the

16   United States has the burden of proof, the law gives the

17   United States an opportunity to call rebuttal witnesses.  If

18   they want to put on rebuttal witnesses, they may do so.

19   Those witnesses would be subject to cross-examination by the

20   defendants' counsel.

21           When all the evidence is in, the Court will have to

22   meet with counsel to let them know what those detailed

23   instructions will be that the Court will give you for your

24   deliberations.

25           Then we will return to court for closing arguments.

1   First the United States will make a closing argument about

2   what they think the evidence has proved to persuade you to

3   return a verdict for the United States.  The defendants may

4   also make a closing argument to persuade you to return a

5   verdict for the defendants.  And once again, because the

6   United States has the burden of proof, the law gives them an

7   opportunity for a rebuttal closing argument.

8          When all of that is finished, the Court will then

9   read to you in detail every single instruction that you need

10  to deliberate.  Those instructions the Court reads to you

11  will be given to you in writing, capitalized, double-spaced,

12  and indexed so you can go back to whatever instruction you

13  have some question about, and you can find it and reread it.

14         That's the way it will work.

15         Now, if no alternate juror has been excused -- only

16  12 will be permitted in the jury room.  While the Court may

17  send 12 back there and excuse six, you still cannot discuss

18  the case with anyone because you need to wait, because if you

19  need to be called back in here for some purpose to replace

20  someone, we don't want you out there having been tainted by

21  your discussion with somebody else.  You still have got to

22  wait until the verdict is in in the event you need to be

23  called back to replace someone who is deliberating.

24         Ladies and gentlemen, that's all the preliminary

25  instructions the Court will give you.  The Court will give

Opening Statement - By Ms. Yusi

```
 1    you other instructions as we go through this case.
 2            We are at the stage now where we're going to try to
 3    get through the opening statements.  I don't know whether
 4    we're going to be able to put on any witnesses today or not.
 5    If we are, hopefully they will be -- they can be short, or
 6    whatever.  I will wait and see where we are at the end of the
 7    closing statements.
 8            Okay.  Is the United States ready to start?
 9            MS. YUSI:  We are, Your Honor.  First we would like
10    to make a motion to sequester all witnesses.
11            THE COURT:  Any persons in the courtroom who are
12    witnesses, potential witnesses, please go to the witness
13    conference room at this juncture.
14            I think we have all persons who are supposed to be
15    in here in here.
16            MS. YUSI:  May it please the Court, counsel, court
17    staff.  Ladies and gentlemen, this case is about lies and
18    greed.  As the evidence will show, from 2011 to 2017,
19    defendants David Alcorn and Aghee William Smith, along with
20    others, were members of a nationwide conspiracy to sell bogus
21    investments to unsuspecting victims.
22            You will hear from victims of this conspiracy from
23    here in the Tidewater area, and you will hear from victims
24    from California and out west as well.  You will hear all
25    about the lies and greed that bring us to court today.
```

─────Opening Statement - By Ms. Yusi─────

1          One of these victims is Ms. Sharyon Bean.  Sharyon
2     Bean will tell you how she worked for 25 years at a local
3     telephone company in Northern California until she had to
4     retire early due to a medical condition.  She wasn't able to
5     save for retirement when she was working because there simply
6     wasn't any money to save.
7          Much to her surprise, in 2017 Ms. Bean got a letter
8     from AT&T saying she had approximately $100,000 in
9     back-pension from her time with the phone company years
10    before.  Ms. Bean had no idea this was coming.  She did not
11    know what to do with it, so she talked to her friend Aghee
12    William Smith, who she knew as Bill Smith.  She knew Bill
13    Smith from her spiritual study group.
14         Bill Smith told Ms. Bean that he had been investing
15    people's money for retirement for over 40 years.  Bill Smith
16    knew this was all Ms. Bean had for her retirement, and he
17    knew that she did not know the first thing about investing.
18    Bill Smith convinced Ms. Bean to put $25,000 into a highly
19    speculative, unproven investment called Xcel, which had to do
20    with wireless spectrum.
21         Now, the evidence will show Xcel was the latest
22    investment in a long line of failed spectrum investments that
23    all started with Defendant David Alcorn helping to create and
24    run a company called Janus Spectrum.
25         Bill Smith told Ms. Bean that her money would be

—————Opening Statement - By Ms. Yusi—————

1   safe, and Ms. Bean trusted him.  What Bill Smith didn't tell

2   Ms. Bean was that he had been dealing with the same group of

3   businessmen selling similar kinds of investments for years.

4   He never told her that none of his clients had ever made any

5   money on these investments.

6        He never told her that he had to testify before the

7   Arizona State Corporation Commission regarding his

8   involvement with another fraudulent investment involving one

9   of the same businessmen who created the spectrum investments

10  with David Alcorn.

11       He never told Ms. Bean that some of the managers of

12  this investment had been banned from selling securities by

13  the United States Securities and Exchange Commission.  He

14  never told Ms. Bean that one of the prior investments had

15  filed for bankruptcy.

16       He never told Ms. Bean that the spectrum investments

17  were under investigation at the time Ms. Bean gave him her

18  money.  Ms. Bean lost everything, and Ms. Bean's story,

19  ladies and gentlemen, is why you are here for trial.  She is

20  just one victim that you will hear from who were lied to by

21  Bill Smith, David Alcorn, and other conspirators.

22       As you will hear and see from these witnesses and

23  the documents, this was a scheme perpetrated for over six

24  years, fleecing victims from hard-earned money, many times

25  their entire retirement, all to benefit the defendants and

———Opening Statement - By Ms. Yusi———

1    their cohorts.

2           Ladies and gentlemen, my name is Elizabeth Yusi, and

3    along with Melissa O'Boyle and Andrew Bosse, we represent the

4    United States in this case.

5           Right now, as the judge told you, I have the

6    opportunity to give you an outline of what we expect our

7    evidence will show, and I'm going to briefly review the

8    charges or the crimes that the defendants are charged with

9    and that you'll be considering in this fraud case against

10   Defendant David Alcorn and Defendant Aghee William Smith, or

11   as you'll hear him called, Bill Smith.

12          What I say now or what the other attorneys say is

13   not evidence in this case.  The evidence is going to come

14   from the witness testimony and from documents you will be

15   able to look at for yourselves.  These documents and those

16   witnesses are going to paint a disturbing picture of a

17   massive fraud and conspiracy which was driven by greed.

18          The evidence will show that these two defendants,

19   David Alcorn and Bill Smith, took in millions of dollars from

20   unsuspecting investors, who were just trying to save for

21   retirement, all for greed.

22          During this trial, as I mentioned, many witnesses

23   you will hear from are the victims of this fraud.  And as I

24   mentioned, some are from right here in the Tidewater area.

25   They were sold these investments, including the ones created

———Opening Statement - By Ms. Yusi———

1    and led by David Alcorn, by a man named Daryl Bank, and

2    others, through a company called Dominion Investment Group,

3    which used to have a company or an office in Virginia Beach.

4            Because the sales to the people were here in

5    Virginia and the use of wires and money going in and out of

6    Virginia and banks, that's why we're here in Norfolk for

7    trial.  Other victims you will meet are from the West Coast

8    and elsewhere.

9            These victims were sold these investments by

10   insurance salesmen like Defendant Bill Smith and others like

11   Tony Sellers and Tom Barnett.  And while David Alcorn was

12   actually a creator and manager of the spectrum investment,

13   he, too, also sold investments directly to victims.  And you

14   will hear from a few of those people that he sold directly

15   to.

16           What you will hear from these victims are that they

17   trusted their salesmen.  They trusted Bill Smith and others

18   to look after their best interests.  They thought that Bill

19   Smith, David Alcorn, and others were telling the truth, and

20   they thought they were being sold legitimate, proven, safe

21   investments.  They trusted these defendants running the

22   investments knew what they were doing, and the evidence will

23   show that none of this was the case, and these victims were

24   duped.

25           The evidence will show that there's a number of

Carol L. Naughton, Official Court Reporter

Opening Statement - By Ms. Yusi

1   people involved in this fraud.  There's plenty of blame to go
2   around, and many had a role to play in this fraud.  In this
3   trial, though, we're only focusing on these two defendants.
4   That doesn't mean that there are not others responsible.  And
5   you will actually hear from some of those people, some
6   people's names who were involved as well.  You will even hear
7   in testimony from a few who have been convicted of this
8   conspiracy as well.
9           To break it down to simple terms, you had basically
10  two categories of bad actors:
11          The first were the insiders, the people that ran and
12  created the investment or the business themselves, like David
13  Alcorn is one of those that ran the fraudulent investment and
14  was one of those in charge; and the second category were
15  those that sold the bogus products, like Bill Smith, though I
16  did mention David Alcorn sold a few, too, directly.
17          You will hear from those who helped run the
18  businesses, like Raeann Gibson, who is already convicted for
19  her role in this scheme and who worked at Dominion Investment
20  Group in Virginia Beach.  She will talk about how these
21  investments worked in terms of where the money went once they
22  got it from victims.
23          You will also hear from attorneys who advised these
24  businessmen; sometimes warning them to stop.  And you will
25  hear about the enormous amount of money going to these

Carol L. Naughton, Official Court Reporter

Opening Statement - By Ms. Yusi

1  insiders including to David Alcorn and to salesmen such as
2  Bill Smith.
3        In terms of the salesmen, you'll also hear from Tony
4  Sellers, who helped sell these investments, how he helped
5  further these lies and has already been convicted for his
6  role in this scheme.  He will explain how the information
7  flowed from the investment companies to the salesmen to the
8  investors and how they sold these investments.
9        You will hear about the money the salesmen were
10 being paid by the companies, including to Bill Smith.  You
11 will even see how Bill Smith was making overrides on many
12 sales, meaning he got paid thousands of dollars on other
13 people's sales in addition to his own sales.
14       Now, exactly what were David Alcorn and Bill Smith
15 selling?  You will mostly hear about two types of
16 investments, the first being Dental Support Plus Franchises.
17 Sometimes you'll hear it called DSPF or DSP.  These
18 franchises were supposed to help dentists and patients find
19 each other, and the investors who bought the franchise would
20 get a percentage of the money paid to those dentists as their
21 profit.
22       The second investment that I'll talk about is what I
23 will refer to as spectrum investments.  They go by several
24 names -- Xcel, Janus Spectrum, Eagle Spectrum, Western
25 Spectrum, Spectrum 100 -- but they all had to do with buying

1    wireless spectrum licenses from the federal government.

2          To talk a little bit more about the DSPF, or the

3    Dental Support Plus Franchise investment, the evidence will

4    show that in around 2010, a man named Kent Maerki and his

5    wife, Norma Jean Coffin, another one responsible for this

6    fraud, and others created DSPF in Arizona where Kent Maerki

7    and his wife lived.

8          DSP was supposed to sell franchises to investors

9    that were then being tied to dental patients, and the

10   investors, as I mentioned, would get a percentage of their

11   fees to the dentists.  They sold DSPF for $20,000 apiece and

12   then $25,000 apiece, and then $30,000 per franchise.  The

13   more an investor bought, the more they would earn, is what

14   they were told.

15         DSPF printed a brochure and other marketing

16   materials, and you will see those materials in this trial.

17   The ad said the investors would get up to 40 to 60 percent

18   return on their investments, and while this was named a

19   franchise investment, DSPF sold this to investors as

20   completely hands-off.  They would not have to lift a finger

21   to run them.  DSPF in Arizona would take care of the running

22   of the franchises if you just gave them their money.

23         You will see the advertisement stated that there's a

24   five-year proven track record showing that this is a

25   successful investment, but yet another advertisement stated

Carol L. Naughton, Official Court Reporter

───Opening Statement - By Ms. Yusi───

1  that DSPF had a nine-year track record showing this was
2  successful.  And time was of the essence; investors needed to
3  get in early so they could get the first patient's money --
4  first patients to start making their money.
5          Kent Maerki and Daryl Bank recruited salesmen from
6  across the country to sell these franchises, and they started
7  selling them in January 2011.  Defendant Bill Smith, a
8  licensed insurance salesman from California, started selling
9  DSPF in January 2011.
10         You'll hear and see from witnesses that he sold
11 Dental Support Plus Franchises mainly to older folks who were
12 looking to figure out their money for retirement.  Bill Smith
13 sold DSPF mainly to clients who had no investment background
14 at all and relied on him to look after their best interests.
15         Bill Smith told these clients that DSPF was a great
16 investment, a sure thing, their money would be safe and only
17 grow.  He told them they'll start making money in about four
18 to six months, which was a quick return on their initial
19 investment into the franchise.
20         Bill Smith sold these franchises for over two years,
21 into 2013, never changing his pitch, ensuring these clients
22 that this was a great investment.  He told some of these
23 clients that he had invested his own money in these
24 franchises, so he knew firsthand it was a great business.
25         What did Bill Smith not tell them?  The evidence

Opening Statement - By Ms. Yusi

1 will show that Bill Smith had never invested in DSPF

2 himself -- never.  Bill Smith did not tell his clients that

3 since the very first Dental Support Franchise that he sold in

4 January 2011, the investment was a failure.

5          From the very first investor, DSPF never worked.  A

6 few people may have made a few hundred dollars at the very

7 beginning, but these were pennies on the tens of thousands of

8 dollars they had invested and lost.

9          Did Bill Smith warn his clients after a few months

10 of selling DSPF that they were not working?  Did he warn his

11 clients that these investments were high risk, that they may

12 fail, that he knew they could fail?  No.  Did he tell them

13 that he had clients that were contacting him that were very

14 upset?  He never told any of his new clients anything about

15 that and kept selling.

16          This continued until August 2014 when Kent Maerki

17 finally shuttered DSPF and told the investors it was done.

18 Bill Smith was certainly not the only salesman who told these

19 lies.  Unfortunately, he was one of many who sold millions of

20 dollars in these franchises to unsuspecting clients.

21          You will hear from Tidewater victims who were sold

22 DSPF right down the street from where we are.  But Bill Smith

23 is a salesman, and others sold it too, but he is the salesman

24 that we are considering in this trial.

25          I want to talk to you about the second investment,

—————Opening Statement - By Ms. Yusi—————

1    the spectrum investments.  This is where David Alcorn fits

2    in.  He was one of the creators and masterminds and partner

3    with Kent Maerki, the same mastermind behind the dental

4    franchises in 2011, to create this spectrum investment.  Who

5    else sold spectrum investments for David Alcorn?  Bill Smith.

6           Now, actually, what is wireless spectrum that these

7    defendants sold?  Wireless communications -- phones, tablets,

8    computers using Wi-Fi -- don't use phone lines, they use

9    invisible airwaves known as spectrum.

10          In our country, the government owns the spectrum

11   frequencies, and they grant licenses to companies to use the

12   spectrum.  There are all sorts of spectrum.  Some of it is

13   very valuable, like the kind of broadband spectrum Verizon,

14   Sprint, AT&T, T-Mobile run their network on.  And these

15   companies get their licenses through highly competitive

16   auctions that cost them billions, billions of dollars.  Other

17   sorts of spectrum are not valuable at all.

18          As the evidence will show, the kind that's not

19   valuable to major cell phone carriers were what David Alcorn

20   and Bill Smith were selling as beachfront-property spectrum,

21   the Rolls Royce of spectrum.  The evidence will show this was

22   simply not the case.  This was not the valuable type of

23   spectrum they touted it to be.

24          You will hear from the government's expert, Coleman

25   Bazelon, who will explain to you how these spectrum

Opening Statement - By Ms. Yusi

1    investments were not valuable and explain the reality behind

2    the lies David Alcorn and Bill Smith were touting.  But as

3    you will see from the evidence, reality did not matter to

4    Defendant Alcorn or Defendant Smith.

5         In 2011, Alcorn, Maerki, Daryl Bank, and others

6    created the spectrum investments.  They and their salesmen,

7    like Bill Smith, continued to sell these as safe investments,

8    sure things, and developed spreadsheets to show investors the

9    thousands of dollars that they would earn if they invested.

10        You will see that one of the projections used to

11   sell the investments showed an annual return of 2,000 percent

12   for an investment in just one economic area.  Another

13   marketing document showed investors would make tons of money

14   saying "Investors are provided with opportunities to achieve

15   100 percent annual preferred return on invested capital plus

16   50 percent of annual additional profits."

17        The evidence will show the defendants and others who

18   developed and marketed spectrum investments bragged to

19   potential investors that Janus Spectrum, the company that

20   David Alcorn co-founded, was stacked with people that had

21   made millions of dollars through spectrum and had been in the

22   industry for decades.

23        In reality, back in 1986, Kent Maerki, David

24   Alcorn's partner, had been barred by the Federal Trade

25   Commission from making misrepresentations about wireless

—Opening Statement - By Ms. Yusi—

1    spectrum applications.  No one ever told the investors that.

2           All of this may sound too good to be true, with the

3    2,000 percent return, 150 percent return, but these clients

4    were trusting Bill Smith, David Alcorn, and others who were

5    selling -- kept telling them that this was true.  You will

6    see these marketing materials and those lies in evidence

7    submitted at trial.

8           For example, you will hear that David Alcorn and

9    Bill Smith told investors that Sprint and other major cell

10   phone carriers would pay for the investors' licenses, and

11   this would create massive returns and profits to the

12   investors.  This was never true, and the evidence will show

13   that.  That is just the hook that they used to lure the

14   investors into giving them their money.  It just wasn't true.

15          You will also see that the U.S. Securities and

16   Exchange Commission started to investigate the spectrum

17   investments in 2013.  They sent subpoenas to David Alcorn's

18   company.  David Alcorn knew this.  He talked about it on

19   conference calls to the salesmen, one of whom was Bill Smith.

20          What did the defendants do?  Did they move on from

21   trying to sell these types of licenses of airwaves?  No.

22   They created another company called Xcel.  No one ever told

23   the investors that put money into Xcel that this was just the

24   latest in a long line of failed investments David Alcorn and

25   Kent Maerki were involved with, that Bill Smith had been

───Opening Statement - By Ms. Yusi───

1    selling these failed investments for years.  No.  They just

2    kept convincing clients to give them their hard-earned money.

3           You will see that Janus Spectrum, the main spectrum

4    company, filed bankruptcy in 2014.  Did they stop selling or

5    reconsider things?  No.  And no one told the investors this

6    before they put their hard-earned money into this investment.

7           Bill Smith, David Alcorn, and others, you'll hear,

8    continued to sell this junk from 2011 to 2017.  They never

9    stopped.  And no one was making money except for them.

10          The defendants continued to sell millions of dollars

11   of these investments because they were making tons of money.

12   Sometimes the companies took 40 percent straight off the top

13   of these victims' money.  Sometimes they took 70 percent

14   straight off the top.

15          They paid Bill Smith his commission for selling this

16   fraudulent investment, and David Alcorn would transfer

17   hundreds of thousands of dollars to his own bank account so

18   he could do whatever he wanted with it.  It's pure and simple

19   greed, ladies and gentlemen.

20          I want to briefly talk to you about the indictment,

21   which is the charging document that lists the laws that the

22   defendants are charged with breaking.

23          David Alcorn and Bill Smith are charged together in

24   12 counts in this indictment, and then Bill Smith has an

25   additional count, as well as David Alcorn has an additional

Carol L. Naughton, Official Court Reporter

Opening Statement - By Ms. Yusi

1    count.  So in total, there are 14 pending counts in the

2    indictment.  Each count is alleging a separate crime.

3           At the end of this trial, before you deliberate,

4    you're going to get instructions on the law and on these

5    charges from Judge Jackson, and so I'm only going to describe

6    the charges briefly here before I wrap up, and they fall into

7    two groups.

8           First, mail and wire fraud charges.  Both defendants

9    are charged with a conspiracy to commit mail fraud and wire

10   fraud and 11 individual counts of wire fraud, which relate to

11   11 times where money was taken from victims, were wired

12   between bank accounts, in and out of our district, the

13   Eastern District of Virginia, or when national conference

14   phone calls were made for talking to insiders and salesmen

15   about the investments.

16          These fraud charges are straightforward, based on

17   the scheme that I just described to you; the

18   misrepresentations and omissions in how these investments

19   were sold, the statements designed to stop the investors from

20   finding out what happened to their money, and the looting

21   from victims who thought they were making legitimate

22   investments, not handing their money to defendants and others

23   so they could spend it on themselves.

24          The last charge is a money laundering charge, and

25   that only deals with Mr. Alcorn here.  It's based on David

184

1    Alcorn and what he did with the money after the victims paid

2    for the investments.  It concerns the movement of the

3    victims' money from company to company, from bank account to

4    bank account, before it ends up paying for David Alcorn's

5    million-dollar home.

6          Ladies and gentlemen, this is just an outline of the

7    evidence I expect you are going to hear during the

8    government's case.  And you'll be hearing from a lot of

9    witnesses, including some who helped these men carry out this

10   fraud.  You will hear from victims of fraud.  You'll hear

11   from the expert.

12         The government expects that the defendants will

13   attempt to blame others for their crimes, like Daryl Bank or

14   Kent Maerki.  However, ladies and gentlemen, keep in mind

15   that the evidence will show that Bill Smith and David Alcorn

16   started working with Daryl Bank and Kent Maerki in 2011 and

17   continued to work with them through 2017.

18         The evidence will show they continued to work with

19   them through regulatory investigations, a corporate

20   bankruptcy, complaints from investors who lost their life

21   savings, and they continued to work with them after

22   investment after investment failed, over six long years,

23   never telling the investors of all the bad facts they

24   personally knew.

25         And you may hear an argument the defendants hoped

Opening Statement - By Ms. Yusi

1    that these investments were going to turn around.  But,
2    ladies and gentlemen, for what they hoped for is not the
3    issue in this case.  What is the issue is that the investors
4    were told what they were told and what they were not told.
5    They were never told that there was anything to fix in these
6    investments.  They were told these were safe, solid
7    investments.
8              We ask for your patience as we put witnesses on
9    because we don't always get them in the order that we
10   necessarily like because of travel issues and COVID issues.
11   And you are going to see a lot of exhibits and names and
12   dates.
13             Judge Jackson, as he mentioned, allows jurors to
14   take notes, and we encourage you to do so if you think that
15   would be helpful, but what the evidence will show and what
16   you are going to find out at the end of this case is that
17   while the scheme was carried out in a complex manner, using
18   shell companies, money laundering, changing names of
19   companies, et cetera, the crimes the defendants committed
20   were straightforward.
21             The evidence will show that the defendants told lies
22   to investors to convince them into handing over their savings
23   to buy fraudulent investments and that then the defendants
24   took that money.  It's theft, pure and simple.
25             By the end of this case, it's going to be clear that

1   this was fraud from top to bottom.  You will hear that this

2   was not some -- you will hear that this was not some

3   misunderstanding.  These were not proper fees or payments to

4   the conspirators.  This is not how real investments work.

5   This was just fraud.  These guys knew it, and you will too.

6           We will have another chance to address you at the

7   end of this case in closing arguments, and at that point, we

8   will ask the jury to find the defendants, David Alcorn and

9   Aghee William Smith, guilty on all counts.

10          Thank you.

11          THE COURT:  Thank you.

12          Mr. Yarow?

13          MR. YAROW:  May it please the Court.

14          My name is Rick Yarow.  I'm an attorney here in

15  Norfolk, and I represent David Alcorn, Mr. Alcorn, and also

16  you will hear "David."  That's my client.  And I want to

17  thank you very much for serving on the jury, particularly

18  during these difficult times.

19          We have to wear a mask all day long while you're in

20  here, and it's not the most comfortable thing, but this is a

21  very important day for my -- or month, really, for that

22  matter, for my client David.

23          The subject matter that my client is charged with,

24  as the government alluded to, has nothing to do with the DSP.

25  You are going to hear witnesses concerning the Dental

─────Opening Statement - By Mr. Yarow─────

1    Support, and my client really had nothing to do with that.

2    What my client is accused of having something to do with is

3    the spectrum investments.

4           It's a complicated subject.  It took me quite a

5    while to learn.  There's a lot of terminology that most

6    people are not going to be familiar with, and there's going

7    to be a lot to learn as you go through the evidence and you

8    hear what the evidence is.

9           David's company was called Janus Spectrum LLC.  As

10   the government also alluded to, there's a lot of names that

11   you're going to hear that sound very familiar to each other.

12   You are going to hear Janus this, you're going to hear

13   Spectrum this, Spectrum 100.  You're going to hear different

14   names that are different derivatives of those two words, but

15   there's one company that my client was involved with, which

16   was Janus Spectrum LLC -- or that he owned, which was Janus

17   Spectrum LLC.

18          David is a 77-year-old man, and after having spent

19   nearly his entire career in commercial real estate sales, he

20   hit a roadblock in 2008 with the Great Recession.  Most of

21   you will remember.  Some of you may not be old enough, but it

22   was a very difficult time, and the real estate market

23   collapsed.  And during that period of time, the commercial

24   real estate business that Mr. Alcorn, David, had been

25   involved with his entire professional career had dried up.

Opening Statement - By Mr. Yarow

1          After having spent decades in this business,
2    Mr. Alcorn found himself having to go out and find another
3    field of work to support himself and his wife.  David, during
4    a dinner conversation, heard about a company that was hiring
5    from a family friend.  The name of the company was SmartCOMM.
6          SmartCOMM had a business model that was to prepare
7    and submit spectrum license applications to the Federal
8    Communications Commission.  We're going to refer to that as
9    the FCC, Federal Communications Commission.
10         On behalf of their clients in the spectrum bands of
11   the -- or the spectrum guard bands, which is also very
12   complicated -- I'm not going to go into it in opening, but
13   you will probably hear from an expert brought in by the
14   government who, I think, will probably do a very good job --
15   or try to do a very good job explaining what exactly the
16   expansion band is within the spectrum.
17         David was hired at SmartCOMM as an independent
18   marketing rep, and he continued to work there from 2010 until
19   2011.  This is the time that David was first introduced to
20   the word "spectrum."  He had no background in it.  David had
21   no prior experience.  And he was not a technically savvy
22   person.  He had a lot to learn.
23         The evidence at trial, I suspect, will show David
24   received training and an introduction to spectrum, and more
25   specifically the guard band, that had recently become

Opening Statement - By Mr. Yarow

1    available due to the rebanding act of 2004 while working at

2    SmartCOMM.

3            It was at SmartCOMM where David was first introduced

4    to Kent Maerki and Pendleton Waugh.  You may hear some things

5    about Pendleton Waugh.  You're going to hear a lot today

6    about Kent Maerki -- I'm sorry, this month about Kent Maerki.

7            Pendleton Waugh will be described by witnesses as

8    the genius in the backroom who really understood all this

9    complicated stuff and business to do with spectrum.  David

10   would later come to learn that Waugh was not such a great

11   person and that some of the things he had been told by Waugh

12   may not have been correct and that Waugh had a troubled past.

13           It will be testified to that Kent Maerki was revered

14   at SmartCOMM as an expert in the spectrum, in the

15   800-megahertz guard band, and someone who had done very well

16   in the spectrum business in the 1980s.  He was also

17   considered by everyone at SmartCOMM to be the go-to person.

18           It was at SmartCOMM where David was told by

19   Pendleton Waugh and Carole Downs, who also owns SmartCOMM,

20   that this spectrum would be enticing to Sprint and other cell

21   phone carriers, and Kent Maerki corroborated the belief

22   during David's training and held that it would be very

23   profitable.

24           The evidence will show that David was told, and he

25   was trained, that guard band could be used for cell phones,

Carol L. Naughton, Official Court Reporter

─────Opening Statement - By Mr. Yarow─────

1    that spectrum had limited availability.  There was no more of

2    it being created; it was a finite source.  The FCC had

3    estimated the value on this guard band, based on previous

4    sales at auctions in the 1980s, that 800 megahertz, which is

5    where the guard band is located within the spectrum, is

6    desirable for cell phone usage because it can permeate

7    buildings and transmit further.  The guard band could be

8    integrated with broadband with FCC waivers and proper

9    technology.

10        David believed he did his due diligence.  He

11   believed these things that SmartCOMM told to him and that

12   there was a real opportunity.  David himself purchased

13   SmartCOMM applications for himself and also family members.

14   He bought into what he believed.

15        Over time, David became disillusioned with SmartCOMM

16   in the way he felt -- not the SmartCOMM product, but the way

17   that SmartCOMM treated their customers.  But based on what he

18   learned and heard at SmartCOMM, the guard band seemed to

19   present a tremendous opportunity.

20        It was at this time that David chose to leave

21   SmartCOMM and start his own venture to reform the SmartCOMM

22   business model.  The evidence will show that David lacked the

23   confidence to set out on his own and felt it was necessary to

24   have Kent Maerki's expertise available to him, and Kent was

25   offered a minority ownership in what became known as Janus

─Opening Statement - By Mr. Yarow─

 1   Spectrum.  David owned 55 percent; Kent owned 45 percent.
 2   Later, David would also learn that Kent was not such a savory
 3   character, and he bought Kent out of that business.  He
 4   ejected Kent from that business.
 5          The Janus Spectrum business model was to prepare and
 6   sell application services and to assist the license holders
 7   with monetization of those licenses.  You will hear during
 8   this trial that most of Janus Spectrum customers were not
 9   individuals but entities formed to pull together funds to
10   purchase applications.  Many of these customers and entities
11   had previously purchased applications in different markets
12   from SmartCOMM and were familiar with spectrum.
13          Most of the people that David sold to were
14   sophisticated investors that were -- that had formed LLCs or
15   different entities to group their money together to purchase
16   these applications.
17          While David's plan always included a fee for the
18   application services, it was also important for him to
19   collect a separate commission for potential monetization
20   services.  You are going to hear a lot about this, I expect,
21   at trial.
22          David charged, in his contract with his clients, an
23   18 percent monetization -- 18 percent return on the
24   monetization.  In other words, he would benefit if the client
25   benefitted, and you will also hear that that was very

Opening Statement - By Mr. Yarow

1    important to him.  And this is something that he took, this

2    concept he took from his time in the commercial real estate

3    business where apparently this is also a concept.

4            David believed that the commission is where Janus

5    Spectrum would see the real profit because how lucrative he

6    was told the spectrum licenses were.  At the conclusion of

7    the trial, it will be up to you to determine whether David's

8    belief was real and whether his intentions were genuine.

9            I would like you to remember this is a criminal

10   trial and not a civil trial.  It is necessary for the

11   government to prove criminal intent beyond a reasonable doubt

12   to convict David of these charges.  Therefore, I ask that you

13   focus throughout this trial, as you hear the evidence, on

14   David's intentions and not whether he was actually right or

15   wrong in his understanding of this spectrum, in the

16   intricacies of the technology.

17           At the end of the trial, I believe the evidence will

18   show that David believed in what he was selling -- the guard

19   band applications -- and that his clients would ultimately

20   benefit; and at the end of the trial, I will be asking you to

21   return a verdict of not guilty on all charges.

22           Thank you very much.

23           THE COURT:  Thank you, Mr. Yarow.

24           Mr. Grindrod?

25           (Pause in the proceedings.)

─────────Opening Statement - By Mr. Grindrod─────────

1          MR. GRINDROD:  May I proceed, Your Honor?

2          THE COURT:  You may.

3          MR. GRINDROD:  In a good con, the dupe doesn't know

4    he's been taken until it's too late, and you're going to hear

5    that Daryl Bank and Kent Maerki ran a great con.  For years,

6    Kent Maerki and Daryl Bank lied, cheated, and stole millions

7    of dollars in retirement savings.

8          These two men ran a series of different companies

9    that projected great returns for investments.  Maerki and

10   Bank recruited independent salespeople from around the

11   country to pitch these investments to everyday folks who were

12   saving for their retirements.

13         But the evidence will show that Bank and Maerki lied

14   about some aspects of these investments, that they hid

15   important information about the companies, and, most

16   importantly, that they straight up stole investor funds.

17   They spent millions on fancy watches, designer clothes,

18   whatever they wanted.

19         To pull off a massive fraud like this, Bank and

20   Maerki conned a bunch of people.  They misled regulators,

21   they deceived accountants, they tricked investors, and the

22   evidence will show they conned their own salesmen.  My

23   client, Bill Smith, was one of those salesmen.  The evidence

24   will show that for several years, Mr. Smith sold investments

25   in companies, these companies we've just mentioned, and that

Opening Statement - By Mr. Grindrod

1    he made commissions on them.

2         I think Ms. Yusi is right, that the facts in this

3    case are complex, but the question at the end of the day is

4    pretty simple.  Federal prosecutors think that Mr. Smith was

5    in on the fraud, so the question for you is this:

6         Is it clear beyond a reasonable doubt that Mr. Smith

7    was in on it?  Or was he just one more person fooled by Kent

8    Maerki and Daryl Bank?

9         Ladies and gentlemen, my name is Andrew Grindrod.

10   Lindsay McCaslin and I represent Bill Smith.  You may hear

11   him referred to as Aghee William Smith II or Aghee, but

12   generally people call him Bill.  And Lindsay and I are

13   honored to represent him in these proceedings.

14        Long trials are tough, and COVID is not going to

15   make this one any easier.  So the truth is that I think the

16   next four weeks are going to be a grind for you.  But when

17   you're feeling like you just can't listen to any more talking

18   or look at any more documents, please pause for a moment and

19   reflect on how serious this is.

20        The jury in a criminal case is the ultimate

21   constitutional protection.  The federal government cannot

22   take someone's liberty unless 12 everyday folks from the

23   community sign off on it.

24        You may hear the prosecutors say that they represent

25   the United States government, and they do.  But in the "we

Opening Statement - By Mr. Grindrod

1    the people," you're the people.  It's an incredible

2    responsibility.  I thank you for serving on this jury, and I

3    would ask you to just try your best to pay attention to what

4    the evidence shows, as Ms. Yusi said, not what the lawyers

5    say or what we suggest, but what the facts actually show.

6          So I want to take you back about ten years.  Bill

7    Smith is sitting in his office.  He reaches for a folder of

8    materials, materials about various investments, just like he

9    had done many times before, because Bill had been helping

10   clients fund their retirements through annuities and life

11   insurance and stuff like that since 1970.

12         He's had some help here and there, but basically

13   he's a one-man operation.  And over the years, you will hear

14   that about 80 percent of his business was insurance products.

15   Now, later in his career, Bill Smith had a radio program on

16   the local Christian radio station in Sacramento, California,

17   where he and his wife lived, and he used the radio program to

18   share his insights with listeners and also to generate new

19   business.

20         But for 40 years you will hear that he had been

21   talking to clients, showing them different options for their

22   savings and retirement, this annuity, that insurance policy,

23   and every time, with every client for 40 years, Bill Smith

24   built his business and his reputation.

25         You will hear that in 2011, Bill Smith started

1    showing people information about a company called Dental

2    Support Plus Franchise.  Dental Support Plus Franchise, or

3    DSPF, had its corporate offices in Arizona, and it was run by

4    a man named Kent Maerki.

5           You are going to hear that name a lot over the next

6    few weeks, and the evidence is going to show that before Bill

7    Smith sold these franchises, he met with Mr. Maerki to learn

8    more about the company.  You're going to hear about an

9    earlier company called Dazzle Dental, and Bill knew about

10   this company because he had some clients who invested in

11   that.

12          And you're going to hear that Dazzle Dental failed,

13   basically because it spent too much money.  You're going to

14   hear that Dazzle built these large dental centers with

15   multiple dentists and patient rooms and equipment and office

16   space, and all that cost a lot of money.  So even though

17   Dazzle was able to generate a lot of patients, it was just

18   too expensive to run these dental centers.

19          And Bill learned that Maerki's new company was not

20   going to run its own dental offices, with all those costs.

21   Instead, this new company was going to partner with existing

22   dentists and get patients for them.  In other words, you're

23   going to hear that Maerki's plan was to take Dazzle's system

24   for getting new patients and to free it from those burdensome

25   costs.

1          The evidence will show that Bill Smith was

2    impressed, impressed with the plan, but maybe more

3    importantly, impressed with Kent Maerki.  Maerki explained

4    how he had been involved in successful franchises before,

5    like Airport SuperShuttle, and Bill learned that Maerki's new

6    dental franchise company was working with this person who was

7    supposed to be an expert in franchising law, a woman who

8    you're going to hear come up frequently in this case, I

9    think.  Her name is Lynne Shelton.  She's the franchise

10   lawyer.

11          And you're going to hear that this franchise model,

12   the idea behind it, was supposed to be so that everyday

13   investors could get in on the action.  It's not just for the

14   super-rich.  And Bill had spent 40 years trying to help

15   everyday folks with their savings and retirement, so

16   naturally, he was excited.

17          And you'll hear that after visiting the company's

18   headquarters in Arizona, Bill was convinced.  So he signed on

19   with Maerki to be one of many independent salespeople across

20   the country who would offer these Dental Support Plus

21   Franchises.  You're not going to hear from many of those

22   salesmen in the course of this trial, but I think you're

23   going to hear from some.

24          The evidence will show that one of these salesmen, a

25   man named Tony Sellers, believed in this venture so much,

Opening Statement - By Mr. Grindrod

1   believed in this Dental Support Plus Franchise so much, that

2   he bought multiple franchises for himself.  He put something

3   like $200,000 of his own money in it.

4          You're also going to hear about another salesman, a

5   guy named Daryl Bank.  He's an investment advisor in Virginia

6   Beach.  The evidence will show that Daryl Bank started off as

7   a salesperson for Dental Support, but over time, he became

8   more and more involved with Maerki, more and more involved

9   with DSPF.  Eventually, he became the national sales

10  coordinator for the company.

11         So Kent Maerki had all these independent salespeople

12  throughout the country, and the evidence will show that

13  DSPF's corporate office sent marketing materials to all these

14  salesmen.  You'll hear that Mr. Smith received the marketing

15  materials from Maerki and that he used them.  He used them

16  when he was talking to clients.  But the evidence will show

17  that Bill Smith did not create those marketing materials or

18  come up with the information that was provided in it.

19         The evidence is going to show that those marketing

20  materials were created by Maerki and run through DSPF's

21  corporate lawyer, Lynne Shelton.  Bill Smith took those

22  materials, took the information he was given, and passed it

23  along to his clients.

24         The evidence will show that Bill Smith sold dental

25  franchises from 2011 to 2013, and you're going to hear that

1   those sales ran through DSPF's lawyers at Shelton & Power.

2   That's Lynne Shelton's firm.  You're going to hear that the

3   money went to Kent Maerki in Arizona.

4        The evidence is going to show that Bill Smith was

5   paid commissions, but the evidence is not going to show that

6   investor funds stayed with Mr. Smith.  The evidence is going

7   to show that every penny that was supposed to go to DSPF went

8   to DSPF.

9        And over the years, Mr. Smith visited DSPF's

10  corporate offices in Arizona.  He attended these weekly calls

11  that were held by Mr. Maerki about the company.  And he also

12  received written materials about the company's performance,

13  again, from Mr. Maerki.  And you're probably going to hear

14  about at least some of those calls.  You may even hear some

15  of them.  You're going to see some of those memos from Kent

16  Maerki.

17       The evidence will show that the consistent message

18  coming out of DSPF corporate, a message from DSPF insiders,

19  was that these franchises were going to succeed.

20       For example, in April 2013 -- so this is the end of

21  the time period when Mr. Smith was selling dental franchises.

22  In April 2013, there's a memo that you're going to see from

23  Kent Maerki saying that he expected 2013 to be a productive

24  and profitable year for all franchisees.  He called DSPF a

25  strong, stable company.

─────────Opening Statement - By Mr. Grindrod─────────

1          Now, in 2011 and 2012, while Bill was helping sell

2    these dental franchises, Kent Maerki was building another

3    company with Mr. Alcorn.  That company was called Janus

4    Spectrum.

5          Now, I can tell you, as I think both the other

6    lawyers have alluded to, the spectrum stuff is going to get

7    complicated.  But let me give you a quick preview.

8          Spectrum, as Ms. Yusi said, this is the radio waves.

9    So there's frequency that exists, and sending signals over

10   the frequency is how all of our smart things talk, even if

11   it's watching TV, a cell phone, your internet-connected

12   devices.  Everything, basically, that's wireless uses some of

13   this spectrum to communicate.  That's what the signal travels

14   over.

15         The Federal Communications Commission, or the FCC,

16   is the federal agency that regulates wireless communications.

17   One of the ways they do that is by giving licenses to folks

18   who want to use certain parts of the spectrum, because you

19   can't have a bunch of people in the same place using the same

20   frequencies or you get interference.  Basically, it doesn't

21   work.  So the FCC grants a license to a particular person or

22   a particular company to use that frequency in a particular

23   geographic area, and you're going to hear those referred to

24   over the course of this case -- those are spectrum licenses.

25         So the evidence is going to show that Kent Maerki

─────Opening Statement - By Mr. Grindrod─────

1   and David Alcorn, both, had backgrounds working in spectrum.

2   For example, you're going to hear that Maerki bragged about

3   having made people a fortune in the 1980s through spectrum

4   investments.  You're going to hear about how Kent Maerki

5   bragged about how his name appeared in books about spectrum,

6   "Money From Thin Air" and "Wireless Nation."  Listen for

7   those to come up.

8           You're going to see a video that Kent Maerki

9   created, that he put together, to pitch this opportunity to

10  talk about what spectrum is, how valuable he said it was, and

11  how all of these investments were going to work.

12          The evidence will show, as Mr. Yarow alluded to,

13  that more recently, not in the '80s, more recently, David

14  Alcorn and Kent Maerki worked together at this other company,

15  SmartCOMM.  And when Maerki and Alcorn left SmartCOMM, they

16  started their own competing company -- it was basically doing

17  the same thing -- called Janus Spectrum.

18          And the idea behind Janus was to take advantage of

19  some regulatory changes, and this is where it starts to

20  involve lawyers and engineers and federal regulators, and it

21  gets really complex.  But you're going to hear basically that

22  the FCC announced plans to reband the 800-megahertz part of

23  the spectrum.

24          So Nextel, which you may have heard of, later bought

25  by Sprint -- Nextel had licenses to operate in the

Opening Statement - By Mr. Grindrod

1    800-megahertz frequencies, but you're going to hear that the

2    new regulations were going to change all that around.  So

3    Nextel was moving out of the 800-megahertz, and you're going

4    to hear that the FCC planned to offer licenses to operate in

5    that frequency where Nextel had been and some nearby.

6            It's complicated, but that's the quick version, and

7    you're going to hear more about it.

8            Why do we care about all that?  We care because

9    Maerki and Alcorn created Janus to help people apply for

10   spectrum licenses in that area and to turn those licenses

11   into money.  To turn them into money, the idea, they said, at

12   least early on, was that they were going to lease these

13   licenses back to Sprint or some other wireless carrier.

14           People would pay -- the idea was people would pay

15   Janus to research the existing networks, draw up some specs,

16   have the engineering done, put together the FCC license

17   application, submit it to the FCC, and if a license was

18   granted, then Janus's client would now have a spectrum

19   license.  And you're going to hear that Janus charged quite a

20   bit to do that, and submitting the application didn't

21   guarantee that you were going to actually get a license.

22           So you're going to hear from an engineer -- you're

23   going to hear from an engineer who worked with Janus on these

24   applications, and he's going to talk about some of the things

25   that he did to try to increase the chance that you were going

1    to be successful, but at the end of the day, it wasn't a
2    guarantee because somebody else could get the same license
3    that you applied for.
4          So the evidence will show that some folks came up
5    with a way to try to reduce the risk a little by creating
6    LLCs, companies that would submit multiple license
7    applications on behalf of their members.
8          The evidence will show, for example, that if ten
9    people wanted to apply for spectrum licenses, they could each
10   apply individually, but if eight of the ten got the license,
11   then two people would be totally shut out.  And then even the
12   eight people who got licenses, you're going to hear and the
13   evidence will show, that some of the licenses were more
14   valuable than others based on the geographic market.
15         So you're going to hear that folks came up with a
16   way to try to solve that problem, and you're going to hear
17   that these companies were supposed to basically allow people
18   to pool their money together and spread the risk out.  So you
19   would become a member of the company, and that company would
20   apply for the applications.
21         So if we take that same example, apply for the ten
22   licenses and only get eight, instead of two people being shut
23   out, everybody would have a one-tenth share in the eight
24   licenses.  It's a back-of-the-napkin example, but that's the
25   idea, these pooled spectrum investments.  And you're going to

1    hear that the main person who was offering these pooled

2    spectrum investments was Daryl Bank.

3            Remember I talked about him earlier.  He's the

4    investment advisor from Virginia Beach who became national

5    sales coordinator for Maerki's dental business.

6            But the evidence will show that Daryl Bank became

7    deeply involved in these pooled spectrum investments.  He ran

8    a few different ones, and you may hear about some of those,

9    but I think the main one you're going to hear about is

10   probably Spectrum 100.  So when you hear "Spectrum 100,"

11   think that's Daryl Bank and the pooled spectrum investments.

12           So back in 2013, when Kent Maerki is still sending

13   out letters about how strong Dental Support Plus Franchise

14   is, Mr. Smith was invited to offer spectrum investments to

15   his clients as well.  And the dental and spectrum -- Ms. Yusi

16   is right -- they involved a lot of the same players.

17           You're going to hear that David Alcorn and Kent

18   Maerki and some other folks sat down with Bill Smith to

19   explain to him the idea behind these spectrum investments.

20   You're not going to hear that Mr. Smith had any background in

21   spectrum, in the '80s, more recently, or ever.

22           But the evidence will show that these principals,

23   these insiders, showed Mr. Smith documents explaining what it

24   was, touting the value of these investments.  And the

25   evidence is also going to show that Mr. Smith saw that Janus

1    was working with other folks who had experience and a track

2    record in the field.

3            You're going to hear about a guy named Peter Lewis

4    who consulted with Janus and presented at a Janus conference

5    that Mr. Smith attended.  You're going to hear that Peter

6    Lewis was introduced at that conference as a former Army

7    signal officer who was commander of the largest signal

8    communications company in the United States, that he

9    co-founded the first cell company in the United States, that

10   he consulted with the FAA and all these federal agencies, and

11   you're going to hear that Peter Lewis shared with Bill Smith

12   and other conference attendees his belief in the value of

13   these spectrum licenses.

14           You're going to hear about an engineer who worked

15   with Janus on this project, a guy named Tripp Forrest.

16   You're going to hear how his involvement and his presence at

17   these Janus conferences lent immediate credibility to these

18   licensed ventures based on his background and his experience

19   in the field.

20           The evidence will show that Alcorn and Maerki and

21   Bank touted these spectrum investments as highly valuable

22   assets, and you're going to hear that Bill Smith agreed to

23   present these spectrum investments to his clients, and he

24   did.

25           Just like with the dental franchises, you're going

─────Opening Statement - By Mr. Grindrod─────

1    to see that Mr. Smith basically used the marketing materials

2    that he got from spectrum insiders, spectrum executives.

3    You're going to see that he repackaged some of it.  You're

4    even going to see that he made his own little copy of Kent

5    Maerki's video.  You're going to see that Mr. Smith shortened

6    it a little, but he basically used Kent Maerki's script and

7    Kent Maerki's slides.

8          The evidence will show that Mr. Smith may have put

9    the pitch in his own words or his own package, but he told

10   prospective clients what he was told.

11         The last company we're going to talk about is Xcel

12   Bandwidth.  So Xcel Bandwidth -- let me say this:  At some

13   point it became clear, the evidence will show, to everyone

14   that these spectrum licenses and the 800-megahertz band, that

15   band we're talking about, could not, in fact, be leased back

16   to these major carriers; Sprint, AT&T, T-Mobile, whatever --

17   couldn't do that.

18         And you're going to hear that there was kind of some

19   conflicting views.  Different folks had different opinions as

20   to how those licenses and those frequencies should be used.

21   But one idea, and the one that Xcel was formed on, was to use

22   them to create push-to-talk networks.

23         So this is, like, push the button on the side, and

24   you have two-way radio communication, like for construction,

25   oil fields, truck drivers, that kind of thing.

─────Opening Statement - By Mr. Grindrod─────

1          So you're going to hear that Daryl Bank created this
2    company called Xcel Bandwidth.  That was based around
3    building these actual push-to-talk networks, so not getting
4    licenses, you're going to hear, but actually building --
5    physically building these networks out; equipment on towers,
6    putting these technologies to work.
7          You're going to hear that they actually bought an
8    existing radio system in Texas that was already using the
9    800-megahertz frequency and that they planned to expand that
10   system further.  So that's Xcel Bandwidth.
11         And you're going to hear that Bill Smith offered
12   clients investments in Xcel Bandwidth, and you're going to
13   see the information that he provided to folks.  You're going
14   to see the two-page form, written in layman's terms, that he
15   gave to Sharyon Bean, that she signed and said she
16   understood.  It's not a big, thick legal document about this
17   membership and that, just explaining in plain language this
18   is what we're doing, push-to-talk, in Texas.
19         So those are the investments that are at issue in
20   this case.  We've got Dental Support Plus Franchise, that's
21   Kent Maerki in Arizona; Janus Spectrum, that's Kent Maerki
22   and David Alcorn; Spectrum 100 and the other pooled spectrum
23   investments -- Spectrum 100 is Daryl Bank -- and then Xcel
24   Bandwidth, that's the push-to-talk, the actual towers in
25   Texas, and that's Daryl Bank.

—————Opening Statement - By Mr. Grindrod—————

1          So I know it's a lot.  I know it's a lot of names

2     and a lot of companies, but it's important to understand all

3     this because you're going to be asked at the end of the day

4     to decide important questions that depend on who knows what,

5     who's involved in what, and how all this fits together.

6          So that's a preview of the information about these

7     companies, but let's talk a little bit about some different

8     categories of problems you're going to hear about.  And it

9     may be helpful to think of these in three different groups.

10          So first I want to talk to you about just what I'm

11     going to call, for discussion purposes, "no big deal"

12     problems.  So these are issues that insiders and executives

13     at the companies, like Maerki and Bank, didn't hide from

14     anybody but they claimed were no big deal.

15          For example, you're going to hear that Dental

16     Support Plus had issues with vendors who were struggling to

17     perform, struggling to get patients generated.  But you're

18     going to see that, at some point at least, Kent Maerki

19     acknowledged those issues, but he told existing franchisees

20     and salespeople alike that the company was still in great

21     shape because they had a new vendor that was going to resolve

22     all those issues.

23          Another example from spectrum, right, another

24     example of what I'm calling the "no big deal" problem.

25     You're going to hear that the SCC started an investigation

Opening Statement - By Mr. Grindrod

1  into Maerki and Alcorn's company, the Janus company, but

2  you're going to see and hear that Janus consistently and

3  repeatedly told investors and salespeople alike that the SCC

4  investigation was no big deal; explicitly told the

5  salespeople that Janus had not been accused of any

6  wrongdoing.

7          You're going to see time and again that the

8  salespeople and potential investors received the same

9  information from company insiders.  When the executives

10  acknowledged the problem, it was always explained away as no

11  big deal.

12          The second category of problems you're going to hear

13  about are the cover-ups.  You're going to hear that there

14  were some problems or issues that the big wigs, the insiders

15  at these companies, knew about but affirmatively hid.

16          For example, the evidence will show that some Janus

17  executives knew that the main way that Janus had talked about

18  turning these licenses into money, leasing them back to the

19  major cell phone companies -- some of the insiders knew that

20  couldn't be done, but they didn't tell anybody.  They didn't

21  tell investors, they didn't tell salespeople.

22          Another -- well, I guess what I would say to -- the

23  other way to look at this is look for not just examples of

24  what the insiders hid, but you're going to see direct

25  evidence of a conspiracy among the insiders and executives to

Opening Statement - By Mr. Grindrod

1    hide the truth from salesmen like Bill Smith.  You're going

2    to see a memo from Kent Maerki to his employees at Dental

3    Support's corporate offices, the people in Arizona, just

4    before salesmen were supposed to come for a visit to the

5    corporate office, and the memo in the headline says, quote,

6    "The discipline of restraint when talking to sales reps."

7            The evidence will show that Maerki forbid his

8    employees at corporate from speaking freely with sales reps

9    like Bill Smith.  "Don't answer their questions."  "Do not

10   give them information."  Maerki wrote in that memo, that DSPF

11   memo, in black and white his philosophy for dealing with

12   salespeople.

13           Quote:  "We are giving them what they need to have

14   confidence in selling the franchises.  That's it."  All caps,

15   bold, exclamation point.

16           Watch for this.  Over the course of the trial, pay

17   attention when you see executives and insiders at these

18   companies tightly controlling the information that gets to

19   the salesmen.

20           You're also going to see an e-mail from Daryl Bank

21   that's really critical to understanding how these insiders

22   ran these companies.  The evidence is going to show that one

23   of the salesmen -- I mentioned this earlier -- a guy named

24   Tony Sellers, put a bunch of his own money into Dental

25   Support.

Opening Statement - By Mr. Grindrod

1       But then there came a time when Tony Sellers wanted
2   to dump that investment, and the evidence will show that
3   Daryl Bank tried to cover up the fact that Tony Sellers was
4   liquidating, was selling his ownership in those franchises.
5   And why?  The evidence will show that Daryl Bank said exactly
6   why.
7       In an e-mail he said he wanted to keep that
8   information secret so that other salesmen wouldn't learn
9   about it, wouldn't learn that another salesman was selling.
10  He wanted to keep the salesmen in the dark to keep their
11  confidence up in the company.
12      In these memos and e-mails, ladies and gentlemen,
13  you're going to see smoking-gun evidence that Kent Maerki and
14  Daryl Bank hid negative information about these companies
15  from their salesmen like Bill Smith.
16      So we've got "no big deal" problems; we've got
17  cover-ups.  Third category:  Stolen money.
18      You're going to see that Maerki and Bank just
19  straight up stole investor funds.  When the money came into
20  Spectrum 100, you're going to see that behind the scenes,
21  Daryl Bank and his minions were just embezzling large chunks
22  of that money.
23          THE COURT:  You have four more minutes.
24          MR. GRINDROD:  Yes, Your Honor.
25      It's right there in the accounting books.  So you're

Carol L. Naughton, Official Court Reporter

1    going to see that Daryl Bank was paying his American Express

2    bill with investor funds.  You're going to see that he was

3    buying expensive watches with investor funds.  You're going

4    to see that he bought a $25,000 dog with investor funds.

5         Daryl Bank and Kent Maerki stole millions from

6    investors, and it ruined people's lives.  People put their

7    life savings into these companies, their retirement into

8    these companies, and with only a few exceptions, they didn't

9    see that money again.

10        These con artists, you're going to see, they tricked

11   people into trusting them, and you're going to hear from a

12   lot of those people, people who repeatedly put their trust in

13   Maerki and Bank year after year, time and again.

14        There's no question, ladies and gentlemen, that the

15   evidence is going to show there was a massive fraud.  The

16   question, the critical question in this case, and the one

17   you're going to have to answer, is:  Was Bill Smith in on it?

18        The evidence will show that Maerki and Bank got

19   people like Mr. Smith to pitch investments for them by

20   pitching investments to them.

21        Now, the evidence is going to show that a couple

22   salespeople stumbled into the truth when they were

23   accidentally copied on an e-mail by mistake by company

24   insiders.  They got to peek behind the curtain, as you'll

25   see.  But the evidence will show that Bank and Maerki's fraud

Opening Statement - By Mr. Grindrod

1    depended on many salespeople throughout the country going to

2    people in their lives.

3          The evidence is going to show that Bill Smith and

4    his wife, Susan, had lived in the same town outside

5    Sacramento for 21 years, they had attended the same church

6    for 30 years, and that Bill Smith went to these folks and

7    pitched these investments.

8          The evidence is going to show that Maerki and Bank

9    got Bill Smith and other salesmen around the country to sell

10   these investments to people that they went to church with and

11   that they saw every day, not by recruiting the salesmen into

12   a criminal conspiracy, but by convincing them that these were

13   good investments.

14         Ladies and gentlemen, at some point, you're going to

15   hear passion in this case, passion and emotion.  You may hear

16   about things that Mr. Smith said when he was passionate and

17   emotional right after he was accused of this.

18         When you're accused of something that you feel like

19   you didn't do, especially when you know you actually were the

20   one -- were one of the people who were duped, you would be

21   angry, you would be frustrated.  People say things that

22   aren't flattering when they're frustrated, embarrassed,

23   angry.  In other words, the evidence is going to show that

24   Bill Smith is a human being.

25         You're also going to hear emotion from investors.

```
                 ┌─Opening Statement - By Mr. Grindrod─
  1              And I'm not telling you to ignore that, ladies and gentlemen.
  2              These folks lost a lot of money, and you should feel sorry
  3              for them.  Try to set that aside when you're deciding
  4              questions of "What did Bill Smith know?"  "Was Bill Smith in
  5              on it?"  But it's okay to feel sympathy for these people.
  6              They lost a lot.
  7                      Ladies and gentlemen, as the judge told you, at the
  8              end of this case, the government is going to have to prove
  9              beyond a reasonable doubt that Mr. Smith was in on it, that
 10              he intentionally lied to people to get money, that he entered
 11              into an agreement, a conspiracy to defraud.  Saying something
 12              that you believed to be true and it turned out to be wrong,
 13              that's not a crime.  That's a mistake.  It's an accident, but
 14              it's not a crime.
 15                      Ladies and gentlemen, at the end of this case, after
 16              you've heard all the evidence, Lindsay McCaslin is going to
 17              stand up and ask each of you to carry out your individual
 18              responsibility to judge the evidence in this case.
 19                      The evidence in this case will show that Daryl Bank
 20              and Kent Maerki tricked a lot of people, that they hid the
 21              truth from a lot of people, and that Mr. Smith was one of
 22              those people.  That's why we're going to ask you to find him
 23              not guilty.
 24                      THE COURT:  Ladies and gentlemen, we're going to
 25              take a 15-minute break.
```

```
 1              (The jury exited the courtroom.)
 2              THE COURT:  I don't know whether the government will
 3    be able to finish its witness today, but we're going to try
 4    to go to around maybe 5:15, 5:30 at the latest.
 5              MS. YUSI:  Yes, sir.
 6              (Recess from 3:57 p.m. to 4:15 p.m.)
 7              THE COURT:  Okay.  The Court has changed its
 8    position on this witness here.  I think that we're going to
 9    start on this witness fresh tomorrow morning at 9:30.  So
10    we'll have the jury just go on and leave, and that's the way
11    we're going to proceed 9:30 tomorrow morning.
12              Have them come on in.
13              (The jury entered the courtroom.)
14              THE COURT:  Let the record reflect that all jurors
15    are present in the courtroom.
16              Does counsel concur?
17              MS. YUSI:  The government does.
18              MR. GRINDROD:  Yes, Your Honor.
19              MR. YAROW:  Yes, Your Honor.
20              THE COURT:  Ladies and gentlemen, the Court has made
21    a determination we will not be calling a witness here at this
22    juncture.  We will be coming back tomorrow morning at 9:30.
23    Be here so you will be ready to go at 9:30.  We don't start
24    at 9:35 or 9:40, now.  We're starting at 9:30, which means
25    you want to get in here in time so that you can get past the
```

```
 1   check-in and et cetera.
 2          Do not discuss this case with your family or anybody
 3   else that's interested.  They'll just have to hold their
 4   curiosity until you can finish the case.  Be safe, protect
 5   yourself, and we'll see you in the morning.
 6          I wanted to remind you, do not bring your lunches.
 7   Throughout this trial, you will be eating lunch here in the
 8   building, and the United States, the taxpayer, will provide
 9   you lunch.  When you come in, you will be given a chance at
10   some point to put in an order for your lunch so it will be
11   ready to go at 1:00 when we break for lunch.
12          The reason the Court is doing that is to cut down on
13   the likelihood that we'd have any problems.  We're trying to
14   remain safe, and that's the reason we're doing it.  Some of
15   you will be eating down here in that jury assembly room, and
16   others may be in another room to make sure you have the
17   proper spacing since you have to take your mask off.
18          You may be dismissed.
19          (The jury exited the courtroom.)
20          THE COURT:  I had a conversation with the
21   United States Marshal.  In order to move these witnesses that
22   the Marshal has to move, they don't have a lot of staff, so
23   they need some notice.  So you need to give them some notice
24   about when you want your witnesses in here.
25          You cannot give them notice on Friday that you want
```

217

```
 1   a witness on Monday morning because you may not be able to
 2   get that witness.  So give them notice.
 3           I know, for the defense, you have to wait and see
 4   when the government might be ending, but I think they'll give
 5   you enough notice so you can get your witnesses in here.
 6   That's the only thing I had to say, and I had forgotten to
 7   tell you that.
 8           Now I think we're out of here.
 9           (Proceedings adjourned at 4:21 p.m.)
10
11
12                           CERTIFICATION
13
14       I certify that the foregoing is a correct transcript
15   from the record of proceedings in the above-entitled matter.
16
17
18           _____/s/_____
19                      Carol L. Naughton
20                      August 30, 2022
21
22
23
24
25
```