```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                     Norfolk Division

 3

 4  - - - - - - - - - - - - - - - - - - -
                                        )
 5    UNITED STATES OF AMERICA          )
                                        )
 6    v.                                )    CRIMINAL ACTION NO.
                                        )         2:19cr47
 7    DAVID ALCORN and                  )
      AGHEE WILLIAM SMITH II,           )
 8                                      )
           Defendants.                  )
 9  - - - - - - - - - - - - - - - - - - -

10                ** Jury Trial - Day 3 **

11              TRANSCRIPT OF PROCEEDINGS

12                   Norfolk, Virginia

13                   February 3, 2022

14

15  BEFORE:  THE HONORABLE RAYMOND A. JACKSON
           United States District Judge, and a jury

16

17  APPEARANCES:

18          UNITED STATES ATTORNEY'S OFFICE
            By:  Andrew C. Bosse
19               Melissa E. O'Boyle
                 Elizabeth M. Yusi
20               Assistant United States Attorneys
                 Counsel for the United States
21
            RICHARD S. YAROW LLC
22          By:  Richard S. Yarow
                 Counsel for Defendant David Alcorn
23
            FEDERAL PUBLIC DEFENDER'S OFFICE
24          By:  Andrew W. Grindrod
                 Lindsay Jo McCaslin
25               Assistant Federal Public Defenders
                 Counsel for Defendant Aghee William Smith II
```

Carol L. Naughton, Official Court Reporter

```
1                         I N D E X

2    GOVERNMENT'S
     WITNESSES                                             PAGE
3
      ANDREA TOTTOSSY
4         Direct Examination By Ms. Yusi                    224
          Cross-Examination By Mr. Yarow                    257
5         Cross-Examination By Mr. Grindrod                 264
          Redirect Examination By Ms. Yusi                  267
6     BARBARA RUSSELL
          Direct Examination By Ms. Yusi                    268
7     ANDREW GULCHER
          Direct Examination By Mr. Bosse                   285
8         Cross-Examination By Mr. Yarow                    294
          Cross-Examination By Mr. Grindrod                 295
9     KYLE GEREK
          Direct Examination By Mr. Bosse                   299
10        Cross-Examination By Mr. Yarow                    328
          Cross-Examination By Ms. McCaslin                 334
11        Recross-Examination By Mr. Yarow                  340
      RUTH CLARK (Via videotape)
12        Direct Examination By Mr. Bosse                   342
          Cross-Examination By Mr. Yarow                    354
13        Redirect Examination By Mr. Bosse                 356
      TERRI WALSH
14        Direct Examination By Ms. Yusi                    357
      DENISE BROWN
15        Direct Examination By Ms. O'Boyle                 377
          Cross-Examination By Mr. Yarow                    450
16        Cross-Examination By Ms. McCaslin                 451

17

18                      E X H I B I T S

19   GOVERNMENT'S
     NO.                                                   PAGE
20
      1005C                                                 241
21    268A                                                  243
      242                                                   251
22    1005                                                  252
      1001C                                                 255
23    37                                                    304
      39                                                    308
24    40                                                    308
      42                                                    309
25    43                                                    311
```

```
 1                        I N D E X
                         (Continued)
 2
                       E X H I B I T S
 3
    GOVERNMENT'S
 4  NO.                                              PAGE

 5   44                                              313
     45                                              313
 6   46                                              313
     47                                              313
 7   48                                              313
     49                                              317
 8   304                                             319
     305                                             319
 9   54                                              328
     33                                              357
10   733                                             357
     203                                             366
11   91                                              379
     41                                              382
12   210                                             382
     211                                             383
13   212                                             383
     213                                             384
14   214                                             384
     215                                             385
15   216                                             385
     217                                             385
16   218                                             386
     219                                             386
17   220                                             397
     221                                             401
18   226                                             409
     228                                             410
19   250B                                            410
     251B                                            411
20   301B                                            411
     303                                             412
21   313B                                            412
     315B                                            415
22   401                                             415
     1012A                                           416
23   403                                             418
     409B                                            418
24   410B                                            419
     501                                             419
25   1013                                            420
```

1

I N D E X
(Continued)

2

E X H I B I T S

3

GOVERNMENT'S
NO.                                                                    PAGE

1014                                                                    421
1015                                                                    422
503                                                                     423
517B                                                                    424
518B                                                                    424
604                                                                     425
604A                                                                    425
65                                                                      426
67                                                                      426
70                                                                      427
72                                                                      427
77                                                                      428
78                                                                      428
81                                                                      428
83                                                                      429
15                                                                      429
17                                                                      430
29                                                                      431
265                                                                     431
863                                                                     432
878                                                                     433
890                                                                     434
1007A                                                                   435
1008A                                                                   436
1009A                                                                   438
1010A                                                                   439
1011A                                                                   439
1002A                                                                   441
1002C                                                                   442
1002D                                                                   442
1002F                                                                   443
1002G                                                                   443
1002I                                                                   444
1002J                                                                   444
1002L                                                                   445
1108                                                                    445
1002N                                                                   445
1002P                                                                   445
1102                                                                    446
1104                                                                    446
1107                                                                    446

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                              I N D E X
                               (Continued)
2
                           E X H I B I T S
3
     GOVERNMENT'S
4    NO.                                                         PAGE

5     1110                                                        446
      1116                                                        447
6     1120                                                        447
      1122                                                        447
7     1117                                                        447
      1202                                                        447
8     1204                                                        447
      1205                                                        448
9     1206                                                        448
      1207                                                        448
10    1208                                                        448
      1209                                                        448
11    1210                                                        449
      1212                                                        449
12    1001A                                                       449
      1020C                                                       449
13    1020E                                                       450
      1019U                                                       450
14    1019X                                                       450
      1020A                                                       450
15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Proceedings resumed at 9:37 a.m.)

 2          THE COURT:  Good morning, counsel.  I understand a

 3   motion was filed by the defendant.  I've read the motion.

 4          I want to explain something.  During the course of

 5   this trial, during the time that the jury is sitting in

 6   there, the Court will not spend any time addressing matters

 7   raised by the parties.  It's either going to be addressed

 8   before the trial starts, quickly on a break, at lunch, or in

 9   the evening, but they're not going to sit in there while

10   we're arguing a motion.

11          With respect to the motion, the Court has read it.

12   The government hasn't had a chance to respond to it.  The

13   Court has a response to the motion.  I'll give you a chance

14   to deal with it sometime during the midmorning break, if

15   you're going to call the witness this morning; otherwise, we

16   will deal with it when we break for lunch.

17          So at what point are you going to be calling this

18   witness?

19          MR. BOSSE:  Thank you, Your Honor.  This may go on

20   in the morning, and so if I could address it, there are some

21   accusations in there that I have to make record on for our

22   purposes.

23          THE COURT:  We'll make a record, but we're not going

24   to do it now.

25          MR. BOSSE:  Yes, sir.  Understood.
```

A. Tottossy - Direct

```
 1              THE COURT:  Bring the jury in.
 2              (Jury entered the courtroom.)
 3              THE COURT:  Good morning, ladies and gentlemen.
 4              Let the record reflect that all jurors are present
 5    this morning.
 6              Does counsel agree?
 7              MS. YUSI:  The government agrees, Your Honor.
 8              MR. YAROW:  Defendant Alcorn agrees, Your Honor.
 9              MS. McCASLIN:  Mr. Smith agrees, Your Honor.
10              THE COURT:  Ladies and gentlemen, we were prepared
11    to go at 9:30.  We had technical difficulties with the
12    equipment, but we're now ready to go.
13              The government may call its first witness.
14              MS. YUSI:  Your Honor, the government calls Andrea
15    Tottossy.
16              (Witness sworn.)
17              THE COURT:  You may proceed.
18              MS. YUSI:  Thank you.
19              ANDREA TOTTOSSY, called by the Government, having
20    been first duly sworn, was examined and testified as follows:
21                         DIRECT EXAMINATION
22    BY MS. YUSI:
23    Q.  Could you introduce yourself to the Court.
24    A.  Yes.  Good morning.  My name is Andrea Tottossy.
25    Q.  Where do you live now?
```

A. Tottossy - Direct

1   A.   I live at 106 Neuse Drive in Shawboro, North Carolina.

2   Q.   How far is that from Norfolk?

3   A.   About an hour and 15 minutes.

4   Q.   Did you ever live in the Tidewater area?

5   A.   Yes, ma'am.

6   Q.   When did you leave Tidewater?

7   A.   I left Tidewater August of 2020.

8   Q.   Where in Tidewater had you been living?

9   A.   I had been living in Virginia Beach.

10  Q.   And if you could just make sure that that microphone --

11  you may want to pull it up towards you so that everyone can

12  hear.  Thank you.

13       You said you lived in Virginia Beach?

14  A.   Yes, ma'am.

15  Q.   How long had you lived in Virginia Beach?

16  A.   We moved here in 1980.

17  Q.   And how far did you go in school?

18  A.   I earned my doctorate from Virginia Tech.

19  Q.   In what?

20  A.   Leadership and policy degree.

21  Q.   What do you do for a living?

22  A.   I'm a national director for Houghton Mifflin Harcourt.

23  Q.   I'm sorry, for what?

24  A.   Houghton Mifflin Harcourt.  It's a publishing company.

25  Q.   And if you could just talk a little slower, too, so that

A. Tottossy - Direct

1    everyone can hear.

2         What do you do as a national director there?

3    A.   I manage consultancy work in schools across the country.

4    Q.   How long have you been doing that?

5    A.   Since February of 2017.

6    Q.   What did you do before that?

7    A.   Before that, I was a consultant for Houghton Mifflin

8    and -- for the International Center for Leadership and

9    Education.  That's a division of Houghton Mifflin.

10   Q.   Did you ever teach?

11   A.   Yes, ma'am.

12   Q.   How long were you in the school system?

13   A.   I was in the school system from 1992 until the end of

14   2011.

15   Q.   And where did you work?

16   A.   I was a teacher at Northside Middle School, guidance

17   counselor at Northside, dean of students at Northside,

18   assistant principal at Granby High School, principal at

19   Northside Middle School, and principal at Maury High School.

20   Q.   During your time working, did you save for retirement?

21   A.   Diligently, yes.

22   Q.   Were you ever married?

23   A.   Yes, ma'am.

24   Q.   What is your ex-husband's name?

25   A.   Joseph Tottossy.

A. Tottossy - Direct

1   Q.   When did you all get divorced?

2   A.   Our divorce was final in August of 2020.

3   Q.   What did he do or what does he do for a living?

4   A.   So Joe is a retired teacher from Norfolk Public Schools.

5   He's also a lieutenant colonel in the U.S. Army Reserves.  He

6   did four years of active duty prior to teaching.  He's also a

7   volunteer paramedic for Virginia Beach EMS.

8   Q.   How long were you married for?

9   A.   About 27 years.

10  Q.   Did he also save for retirement while you all were

11  married?

12  A.   Yes, ma'am.

13  Q.   Do you know an individual named Roger Hudspeth?

14  A.   Yes, ma'am.

15  Q.   How so?

16  A.   Roger was a very close family friend.  I met him when I

17  was doing undergrad at Old Dominion.

18  Q.   Did you maintain your relationship with him, you and your

19  ex-husband when you were married?

20  A.   Yes.  We were very close during college.  He was one of

21  the groomsmen in our wedding.  We attended tons of holidays

22  together, children's events together.  He was very much like

23  family.

24  Q.   If you know, after he graduated from college, do you know

25  what he did for work?

A. Tottossy - Direct

1    A.   Yes.  Roger went back for some training, and he was
2    working as a paralegal.
3    Q.   After that, what did he do?
4    A.   After that, he started working in the financial industry.
5    Q.   Do you know where he was working?
6    A.   He was working at Bank of the Commonwealth.
7    Q.   Where was that located?
8    A.   The office that I visited him was in Norfolk.
9    Q.   Now, when -- what did he do at the Bank of the
10   Commonwealth, if you know?
11   A.   I would say he was a financial advisor at Bank of the
12   Commonwealth.
13   Q.   And when he was a financial advisor, did you and Joe work
14   with him on your finances?
15   A.   Yes, we did.  It took a long time to start that
16   relationship with him, but we did, yes.
17   Q.   Why did it take a long time?
18   A.   We were very, very skeptical of mixing money and
19   friendship.  So we just really wanted to take our time and
20   see how well he was going to do in the business.
21   Q.   And when did you start working with him regarding your
22   and Joe's finances?
23   A.   I would say around 2008.
24   Q.   Where was he working at that time?
25   A.   I want to say Bank of the Commonwealth.

A. Tottossy - Direct

```
 1   Q.  Did you meet anyone else he was working with at Bank of
 2   the Commonwealth?
 3   A.  He introduced us to Daryl Bank.
 4   Q.  What was your understanding of who Daryl Bank was?
 5   A.  My understanding of Daryl Bank is that he was a colleague
 6   of Roger's at Commonwealth bank and that he was also a
 7   financial advisor.
 8   Q.  Did there come a time when Mr. Hudspeth left the Bank of
 9   the Commonwealth?
10   A.  Yes, ma'am.
11   Q.  Do you know around when?
12   A.  I'm not sure.  Maybe 2010ish.  It was prior to 2011.
13   Q.  Eventually, where did he end up after that?
14   A.  He ended up at Dominion Investments.
15   Q.  Where was Dominion Investment Group located?
16   A.  So I had visited an office for Dominion initially in
17   Virginia Beach, but I also visited a Norfolk office later.
18   Q.  What was his job at Dominion Investment Group?
19   A.  His job at Dominion Investment Group was a financial
20   advisor.
21   Q.  He was doing the same thing?
22   A.  Yes, ma'am.
23   Q.  As far as you knew, who was in charge of the Dominion
24   Investment Group?
25   A.  As far as I knew, it's my understanding that Daryl Bank
```

A. Tottossy - Direct

1    was the operating person for Dominion.  He was the head

2    person, president, CEO.  I don't know what his title was, but

3    he was the number-one slot.

4    Q.  How did you know that?

5    A.  I'm fairly sure it was said to us at some point, but the

6    way he presented himself, he had the large office; he was the

7    one going to the meetings, bringing all the news back; and

8    any decisions had to always go through Daryl from Roger.

9    Q.  Did you continue to work with Mr. Hudspeth when he went

10   to Dominion Investment Group?

11   A.  Yes.

12   Q.  In terms of your professional relationship with him, what

13   was his role, if any, towards you?

14   A.  In terms of our professional relationship, I expected

15   Roger's role to be that he would help us plan for retirement,

16   offer us opportunities that would lead us to have a

17   retirement that we could live life as we had been living.  He

18   was taking care of our financial security and helping us with

19   that for retirement.

20   Q.  Did you trust Mr. Hudspeth?

21   A.  We did.

22   Q.  So much so, did you refer family to him?

23   A.  Yes.  I referred some friends to him as well and my

24   parents, Peter and Margo Perry.

25   Q.  What did you and Joe tell Mr. Hudspeth about your comfort

A. Tottossy - Direct

1   level with risk in terms of the money that you were
2   investing?
3   A.   Yeah, so it was always a discussion about risk.  We were
4   very conservative but, at the same time, were willing to push
5   a little bit if there was something proven, that was fairly
6   safe, more risky investment, but he knew we never intended --
7   nobody intends to ever lose money.  Certainly our intention
8   was to gain with what we were able to put aside at that time.
9   Q.   And what, if anything, did Roger Hudspeth say or talk to
10  you about risk versus potential?
11  A.   I don't remember having that conversation.
12  Q.   That's fine.
13           I want to take you back to 2011 and Mr. Hudspeth at
14  Dominion Investment Group.  Did both you and your husband
15  have savings for retirement that you were looking to invest
16  elsewhere?
17  A.   Yes, we did.
18  Q.   And what was your goal in terms of your retirement money?
19  A.   Our goal was to live a life as we were accustomed to
20  living.  We did not want to work our whole lives and work so
21  hard to save for retirement only to have to significantly cut
22  back upon retirement.
23  Q.   Were you all careful about your money?
24  A.   Extremely careful.
25  Q.   How so?

A. Tottossy - Direct

1   A.  We had really good practices in our home.  We balanced

2   the checkbook every month, paid our credit cards off every

3   month.  We had zero debt, except for maybe a car note and the

4   house.  We were very, very careful with money.

5   Q.  Did Mr. Hudspeth ever introduce you to an investment

6   known as Dental Support Plus Franchises?

7   A.  Yes, ma'am.

8   Q.  When do you recall him starting to talk to you about

9   that?

10  A.  That would have been around 2011.  I have to pull my

11  dates up because it's hard to remember.

12  Q.  What did he say about Dental Support Plus Franchises?

13  A.  So the opportunity was presented to us as being an

14  absentee owner of a franchise.  We were buying into a

15  franchise that we would own, and the work of that franchise

16  would be to secure dental patients and bring them into

17  dentists' offices as new patients.  The theory behind that

18  was that dentists are dentists, they're not businesspeople,

19  and the research showed that their dental chairs were 40

20  percent unused.

21          So the idea was to own a franchise where the

22  marketing company went out, got patients, brought them in,

23  and the dentist won because he got, obviously, the fees, and

24  we won because we got a portion, a percentage of those fees.

25  Q.  What was your understanding of how much you would make on

———A. Tottossy - Direct———

1  owning a franchise?

2  A.  I remember this just like it was yesterday.  Sitting in

3  Roger's office, he had a whiteboard on the wall and showed us

4  how after six months of franchise ownership, our percentage

5  of what we would see in the account would be about $800 a

6  month.

7  Q.  And how much was one franchise at that time?

8  A.  At that time, one franchise was $25,000.

9  Q.  What, if anything, were you told about the success in the

10 past or the track record of this DSPF franchise?

11 A.  Right.  So being very conservative, we had a lot of

12 questions about that.  We were told that it had been a proven

13 business model, I believe in Arizona, and it was exploding,

14 and there was so much demand and not enough franchises to be

15 sold, and so much so, that the price was going up to $30,000,

16 so a sense of urgency was established to purchase on a proven

17 model.

18 Q.  What, if anything, were you told about others that you

19 knew or were familiar with having invested in these

20 franchises?

21 A.  We were told that there was great success with the

22 franchises; so much so that Roger's parents invested, Daryl's

23 parents had invested, Raeann's parents had invested.  We were

24 understanding that the people in Dominion Investments were

25 purchasing this, too, as well as their families.

A. Tottossy - Direct

1   Q.  You said "Raeann."  Who is Raeann?

2   A.  Raeann Gibson.  She initially seemed more like an office

3   administrator, but as time went on, I saw her more as Daryl's

4   right-hand administrative assistant, really running the

5   operations with Daryl.

6   Q.  She worked at Dominion Investments as well?

7   A.  She worked at Dominion Investments.

8   Q.  What was your understanding of who was in charge of DSPF,

9   or Dental Support Plus Franchise?

10  A.  For the whole thing, Kent Maerki.

11  Q.  Do you know where they were located?

12  A.  Arizona.

13  Q.  Now, what type of investment did -- you said this was a

14  franchise.  What were you required to have in order to buy a

15  franchise?

16  A.  So in order to purchase the franchise, we needed to

17  produce a check for $25,000 and sign the paperwork that came

18  with the franchise ownership.  That was it.

19  Q.  Did you have to have any corporate entity of your own in

20  order to have this?

21  A.  Yes.  Thank you for that.  Yes, we had to have a

22  leadership -- sorry, an LLC.  Mine was called Teaching and

23  Learning for All.  And we were required to have an LLC so

24  that the franchise could go into that LLC.

25  Q.  All right.  And what about a bank account?  Where was any

A. Tottossy - Direct

1   profit that you were supposed to make going to?

2   A.  So we were also required to open an account at BayPort

3   Credit Union.  We opened it with a $5 deposit, and we were

4   not given access to that account.

5   Q.  What was the BayPort Credit Union account supposed to be

6   for?

7   A.  So the BayPort account was strictly for flow-in and

8   flow-out of funds for the franchises.  So as our franchise

9   earned percentages of, you know, the money that came in, it

10  flowed into that account, and then any fees that went out

11  were also paid through that account.

12  Q.  What was your understanding of what you and Joe would

13  have to do to run the franchise?

14  A.  Absolutely nothing.

15  Q.  Who was going to do the marketing?

16  A.  So at the beginning, it was WebOp and Oracare -- no,

17  Oracare and MetroMedia.  Oracare and MetroMedia were the

18  initial, I guess, contractors that went out and secured the

19  patients to come into the dental offices.

20  Q.  Was there a lot of paperwork when you invested in this?

21  A.  There was a ton of paperwork.  We tease about the big

22  binder of paper that we received.  Yes, lots of paper.

23  Q.  When did you buy your first unit of DSPF?

24  A.  June of 2012.

25  Q.  How many did you buy?

A. Tottossy - Direct

1  A.  At that time, we bought one.

2  Q.  And that was for 25,000?

3  A.  Yes, ma'am.

4  Q.  At that point, how long had you been talking to Daryl and

5  Dominion about this investment?

6  A.  I want to say going on a year, probably.

7  Q.  And was there any -- did they update you prior to June of

8  2012 about how things were going?

9  A.  No, never, just that they -- well, that things were going

10  well, you know.  There was still a push for us to purchase

11  because it was still a very good viable investment.

12  Q.  Did you buy any more franchises after 2012?

13  A.  We bought one more in November of 2012 and a third unit

14  in January of 2013.

15  Q.  How did you end up buying those two other units?

16  A.  Again, there was a sense of urgency established around

17  the success of the business.  And we were informed a price

18  increase was coming, so -- to 30- or $35,000.  So we felt

19  that sense of urgency, and it hadn't-- we were starting to

20  wonder a little bit, but it hadn't been six months yet where

21  we were supposed to start seeing that $800.  So we bought the

22  two additional ones.  We felt it was going to be a good

23  investment.

24  Q.  Where did that money come from when you bought your

25  franchises?

A. Tottossy - Direct

1   A.  So the first one just came out of our savings account.

2   We didn't have the $50,000 readily available for the two

3   additional units, so those funds were pulled from Roth IRAs.

4   My parents pulled from my kids' 529 for theirs.  But it came

5   from many different sources.  I had to close accounts out and

6   push money around.

7   Q.  You mentioned that you referred friends and family to

8   Roger for these franchises.  Did anyone in your family buy

9   any of these DSPF franchises?

10  A.  Yes.  My parents purchased two.

11  Q.  In total, how much did you invest in DSPF?

12  A.  $75,000.

13  Q.  Now, you purchased the franchises.  Did you do any other

14  investments with Dominion Investments?

15  A.  Yes.  We purchased Janus Spectrum, and we also purchased

16  two units of WeMonitor.

17  Q.  I want to talk about Janus Spectrum.

18  A.  Okay.

19  Q.  Who introduced you to Janus Spectrum?

20  A.  Roger.

21  Q.  And what was your understanding of what the Janus

22  Spectrum investment was?

23  A.  So in a very lay way of saying it, because I don't

24  understand all of the technological aspect of it, but the way

25  it was presented is there's a frequency of broadband, the

A. Tottossy - Direct

1  radio waves, and there was one frequency that was used for

2  EMS, fire, you know, public safety, and that that group of

3  users was having to move to another frequency, so that

4  vacated the frequency that they were on before.

5        And with the explosion of 5G -- or LG, 5G, cell

6  phones, and the increase of users of cell phones and

7  smartphones in the country, there was a tremendous need for

8  more bandwidth, so this band right here was going to be

9  available for cell phone companies to purchase.

10       And the thinking behind spectrum, as it was

11  explained to us, was that we would purchase part of that band

12  so that when Verizon, Sprint, those companies came looking

13  for that space, we would be the sellers.

14  Q.  You said that was explained to you.  Who explained that

15  to you?

16  A.  Roger.

17  Q.  Do you recall anything about how much the return would be

18  on this investment?

19  A.  I don't recall what that return would have been, but it

20  would have made sense.

21  Q.  Okay.  What was your understanding about the risk, any

22  risk associated with the spectrum investment?

23  A.  Again, high success model, very little risk.

24  Q.  And what was your -- did you end up buying?

25  A.  We did.  We purchased one unit in February 2013 for

A. Tottossy - Direct

1   $30,000.

2   Q.   And was that with Janus Spectrum?

3   A.   Yes, ma'am.

4   Q.   After you bought the spectrum investment, were you kept

5   updated on how spectrum was doing?

6   A.   No.

7   Q.   At that point in February 2013, had you made any money on

8   your DSPF investments?

9   A.   No.

10  Q.   Did there come a time when you and Joe became concerned

11  about your investments?

12  A.   Very much so, yes.

13  Q.   Around when was that?

14  A.   About the summer of 2013, early summer.

15  Q.   And tell us, beyond not getting any money from your

16  investments, were there any other concerns?

17  A.   Yeah.  There were quite a few concerns.  We were not

18  getting statements from any of the investments.  We asked

19  over and over and over again for statements or some type of

20  update or documentation as to what was happening with the

21  investments.

22          We were interested in the outcome.  We wanted to

23  know what's going to be the return, and we were not getting

24  any information, no information on the health of the

25  companies.  We also couldn't get statements from BayPort

A. Tottossy - Direct

1    because we were not given access to that account.  So there
2    were just some things going on, and our radar started to go
3    up at that point.
4    Q.  Who would you talk to, at least initially, about your
5    concerns?
6    A.  We always took our concerns to Roger, especially
7    initially.  He was our person.
8    Q.  Did you talk to other people?
9    A.  Yes.  Between my husband and I -- I know I talked to
10   Grecie, I talked to Raeann, I talked to Roger, I talked to
11   Daryl.  There were other people we talked to, but we were not
12   getting any answers.  We just felt like we were being put off
13   constantly.
14            So we contacted Kent Maerki.  We contacted -- I
15   don't remember all the other names, but Spectrum and
16   WeMonitor, to set up something just to talk and see what was
17   going on.  So at that point, we had to go to the source.
18   Q.  I want to start looking at -- there's a binder in front
19   of you with some exhibits.
20   A.  Yes.
21   Q.  If you can look at Exhibit 1005C.
22            Do you recognize this document?
23   A.  Yes.
24   Q.  What is it?
25   A.  This is an e-mail that I sent to Raeann.  This was in

A. Tottossy - Direct

1    that summer of 2013 when we were getting concerned, and I

2    asked if Kent Maerki was also working with Janus, because he

3    was over the dental, so we were trying to see if there's a

4    connection, what's going on here.

5    Q.  On the top of Page 1, Exhibit 1005C, what e-mail address

6    is this from?

7    A.  So "TottossyBiz" is an account that my husband and I used

8    for business matters.  So everything related to Roger

9    investments, all were funneled to this e-mail.

10   Q.  And to whom was the top e-mail from or to?

11   A.  Raeann Gibson.  It was to that account, and she addressed

12   the e-mail to me.

13   Q.  And does this exhibit appear to be a true and accurate

14   copy of the e-mails that you just mentioned?

15   A.  Yeah.  I remember it very well.

16         MS. YUSI:  Your Honor, we move to admit

17   Exhibit 1005C.

18         THE COURT:  Any objection?

19         MR. GRINDROD:  No objection.

20         THE COURT:  It will be admitted.

21         (Government's Exhibit 1005C was admitted.)

22   BY MS. YUSI:

23   Q.  At the bottom of here -- you said this is August 2013?

24   A.  Yes.

25   Q.  What did you ask Raeann?

A. Tottossy - Direct

1    A.  I was asking her is Kent Maerki also working with Janus.

2    I wanted to know if there was a connection.  I had seen his

3    name in some marketing materials, and the light bulb just

4    went off, and I wanted to ask if he was also connected.

5    Q.  So this was after you made your investment already in

6    Janus Spectrum?

7    A.  Oh, yes.

8    Q.  And what did Raeann tell you?

9    A.  Raeann said that he was part of the company in the '80s.

10   She said he's now spokesman on behalf of the company, but

11   he's not working in or for the company.

12   Q.  If you can look at -- thank you.  We're done with that

13   one.

14           If you can look in front of you at Exhibit 268A.  Do

15   you recognize this document?

16   A.  Yes.

17   Q.  And it's approximately 11 pages, I believe.  In general,

18   what is this document?

19   A.  This is an e-mail chain that went on for months.  Again,

20   this was our trying to find information out about our

21   accounts.  This is where we were asking questions, and at

22   this point we were, you know -- we always document.  So this

23   e-mail is a lengthy chain of the conversations that we had

24   with Roger about our accounts at Dominion.

25   Q.  And does it appear to a true and accurate e-mail chain

A. Tottossy - Direct

1   that you just described?

2   A.  Yes.

3         MS. YUSI:  We move to admit Exhibit 268A.

4         THE COURT:  Hearing no objection, it's admitted.

5         (Government's Exhibit 268A was admitted.)

6   BY MS. YUSI:

7   Q.  If we can look at Page 11 of Exhibit 268A.  What is this

8   first -- what date is this first e-mail?

9   A.  November 29, 2013.

10  Q.  And is this during the time when you are still trying to

11  find out what is going on?

12  A.  Yes.

13  Q.  And this says to Roger Hudspeth and Grecie Suarez.  Who

14  was Grecie Suarez, as far as you knew?

15  A.  Like a receptionist at Dominion.  She was, in our minds,

16  helping Roger just with simple communications, nothing -- no

17  major questions, just helping out a little bit.

18  Q.  If we can go to Page 4 of Exhibit 268A.  At the bottom of

19  Page 4 is an e-mail from December of 2013.  Who is it from?

20  A.  That e-mail is from Roger.

21  Q.  Okay.  And he has a number of numbers up where he's

22  responding in his e-mail.

23  A.  Yes.

24  Q.  Number 1 saying "The sheer number of times you have

25  e-mailed, called myself and staff," what is he talking about?

A. Tottossy - Direct

1   A.  So we started being very concerned in the summer of that

2   year.  This is December now, and we're getting frustrated, so

3   we're calling.  At that time, I think Roger had been on

4   vacation, was getting ready to go on vacation, and when

5   someone is going to be gone for a week and you need an

6   answer, you're going to ask someone else.

7           So we would call, and if he wasn't there, we would

8   ask for Raeann or Grecie or somebody to help us.  And that

9   frustrated Roger, quite a bit apparently, as he wrote in

10  there.

11  Q.  On Page 5, on number 5, this same document, "promise,"

12  what is he talking about there?

13  A.  There were some important things that we really wanted,

14  our statements about these investments from the companies.

15  We had asked over and over for those.  I had given him a

16  chart that I actually created that was name of investment,

17  when we purchased it, how much it was.  Like, we didn't have

18  any -- anything about that information.

19          And another big thing was the marketing had changed

20  in the dental prior to the purchase of our second unit, and

21  when I found out about that marketing change, I was very

22  upset because it had an impact on what we would be earning.

23  Q.  What marketing change are you referring to?

24  A.  Okay.  So originally, as I said earlier, it was Oracare,

25  MetroMedia, and they were the company that went out and

A. Tottossy - Direct

1   secured the patients to come to the dental offices, right, so
2   they were -- obviously, if no one was getting any money, they
3   weren't performing well, so they were not -- they were cut
4   out from working with Dental.
5            Another man, David Bailey, with WebOp was coming in
6   to work and secure those patients, but there was a big
7   difference.  With the first way that we bought our units with
8   was the percentage.  So if your dental bill is $1,000, it was
9   10 percent -- or 20 percent, and we'd get $200 from the
10  investment.
11           It switched to a per-patient flat fee, which was
12  somewhere around $100.  So instead of getting a percentage
13  over time and a client relationship with this dentist over
14  years, we're now just getting about $100 a patient.  And if
15  you think about, you know -- they said you'd get, maybe, four
16  a month.  That would be $400, but over the course of one
17  year, it's 48.  It would have taken us five years just to
18  recover our initial investment.  It made no sense.  None at
19  all.
20  Q.  Were you told about that change prior to buying your
21  second and third franchise?
22  A.  Going back to the documents, Roger said we were told.  He
23  said we had received a mailing about it.  And we asked over
24  and over and over and over again to send us the mailing.  We
25  had not seen it and were not informed before purchasing those

A. Tottossy - Direct

 1   units.

 2   Q.  Okay.  I'm going to go to number 7 at the bottom of this

 3   page where it's titled "Profanity by Daryl."

 4          What is that referring to?

 5   A.  So by now, there's some frustration.  We're asking a lot

 6   of questions, and they're probably sick -- well, I can't

 7   infer that.  Roger let us know that we were wearing them out

 8   with the level of communication.

 9          So we came in for a meeting with Roger.  We had some

10   questions.  He could not answer those questions, so he

11   conferenced in Daryl Bank.  Daryl Bank was extremely angry,

12   bothered that he needed to join a conference call with us to

13   answer our questions.

14          He said he didn't have time for it, and he wasn't

15   going to answer questions.  He used the words "goddamn" and

16   "fucking" in front of us.  And I was appalled, absolutely

17   appalled.  We weren't getting anything about what we had put

18   so much money into, and this guy's going to use that

19   language.

20   Q.  On Page 6 of Exhibit 268A, towards the bottom it talks

21   about "You have broken the agreed chain of command."

22   A.  Yeah.

23   Q.  What does that refer to?

24   A.  So Roger assigned us a chain of command for how we were

25   allowed to communicate with the office.  So we were only

A. Tottossy - Direct

1  allowed to call Roger or Grecie, and when Roger and Grecie

2  weren't getting us what we needed, we continued to call Daryl

3  and Raeann, or whomever, even reaching into the companies

4  themselves, and apparently we had broken that chain of

5  command established by Roger for us.

6  Q.  At this point in time, December 2013, had you all gotten

7  any money?

8  A.  By that point, we may have gotten -- I think we did by

9  then.  It was right around there we got a couple hundred

10  dollars for new patients, and that's the only money we ever

11  saw.

12  Q.  And that was after how long?

13  A.  We bought the first unit in June 2012.  Gosh, that would

14  have been 18 months, at least.

15  Q.  All right.  Now, was there a time that you actually tried

16  to go to the DSPF headquarters in Arizona?

17  A.  I did.  And it was, again, that summer of 2013 when

18  things were just not sitting very well, and I had -- at the

19  time, I was a consultant, and I had some work out in Arizona.

20  So I said, well, I'm here, I may as well drive by and see

21  what the place looks like.

22         So I did.  I put the address in, and it took me to

23  one of those, like, mailbox places in a strip mall where you

24  go in and you have a P.O. box in there.  It was one of those.

25  I even looked at the number on the building to make sure that

A. Tottossy - Direct

1   it was the right place, and it was, and it was not an office

2   building.

3   Q.  You mentioned that you were trying to talk to people that

4   actually were in the DSPF Arizona office.

5   A.  Yes.

6   Q.  Did you actually ever talk to anyone there?

7   A.  We did.  And we had a conference call with Kent Maerki in

8   November of 2013.

9   Q.  Who was on that conference call?

10  A.  That call was my husband and myself on one end of the

11  call, and on the other end of the call was Kent Maerki and

12  Cindy Maule.

13  Q.  Do you know who Cindy Maule was?

14  A.  I believe she was an office assistant that worked with

15  Kent in the dental business.

16  Q.  Were you aware of any familial relationship that Cindy

17  Maule had with Kent Maerki at the time?

18  A.  I think she was his sister-in-law.

19          THE COURT:  Don't speculate if you don't know.

20          THE WITNESS:  Correct.  Then I can't say.

21          Thank you, Your Honor.

22  BY MS. YUSI:

23  Q.  You said the call was November 2013.  Did you all record

24  this?

25  A.  Yes, we did.

A. Tottossy - Direct

1  Q.  All right.  When you spoke with Kent Maerki and Cindy
2  Maule, what, if anything, did you ask about selling your
3  franchises?
4  A.  So we asked if we could -- if there was any way we could
5  sell the franchises back or get a refund, for another way to
6  say it.  We were very dissatisfied with the performance of
7  the investments -- it had been 18 months -- and so we were
8  really hoping.  We never got an answer from Roger or Daryl
9  about how to do that or sell our franchise.  So that was one
10 of our first questions to Kent Maerki.
11 Q.  And what did he say, if anything, about that?
12 A.  So Kent had said that he was aware that there were many
13 dissatisfied franchise owners, and he had said that he had
14 personally spoken with Daryl about it and asked Daryl to set
15 up a way that as new people purchased, that money then went
16 to refund an unhappy client for that amount of money.
17 Q.  Do you remember what that was called or what he referred
18 to that process as?
19 A.  DSPF Group.
20 Q.  And -- I'm sorry.  Give me one moment.
21         And what did you find out about MetroMedia and
22 Oracare versus the second marketing -- WebOp?
23 A.  Yeah.  That was the big difference.  MetroMedia/Oracare,
24 the agreement with them was a percentage, and it was a
25 percentage over time, repeated visits, the lifetime

A. Tottossy - Direct

 1   relationship with client-dentist.  When it switched to WebOp,

 2   the profit structure for the owner was a flat fee of around

 3   $100 per patient.

 4   Q.  Did you ask or talk to Kent Maerki about the number of

 5   franchises that have been sold around the country?

 6   A.  Yes.  He said that they oversold the franchises.

 7   Q.  And did he say if they were still selling franchises?

 8   A.  He said they were still selling, and we actually asked

 9   about that because we weren't sure at first, because we

10   wanted to know, well, if you're not selling, we won't get our

11   potential refund, so we asked very specifically, "Are you

12   still selling?"  For us, that was potential to get money

13   back.

14   Q.  What was his response?

15   A.  His response was "Yes."

16   Q.  That they were still selling this?

17   A.  Roger and -- I know Roger and Daryl were.

18   Q.  What, if anything, did you ask about the future of DSPF?

19   A.  So Kent was actually very specific about the future of

20   the company.  He said he was very concerned about the health

21   of the company, that it was an unhealthy company.  He said

22   that they needed about $200,000 -- no, they had $200,000 in

23   escrow -- we asked about escrow -- and he said that it's

24   costing them, to keep it open, $1,500 a day.

25           So he said that in order to sustain staying open --

A. Tottossy - Direct

1    we were concerned it was going to be shut down.  He said in

2    order to stay open with the $1,500 a day and the $200,000 in

3    the bank, that he -- they would have to sell about eight

4    units a month to sustain staying open.

5    Q.  Now, if you can look in your binder, I believe in either

6    the front or back pocket of the binder, is there a disk?

7    A.  Yes.

8    Q.  Do you recognize that?

9    A.  Yes.

10   Q.  Is it marked Exhibit 242?

11   A.  Yes.

12   Q.  And what is on that disk?

13   A.  This is the call with Kent Maerki.

14   Q.  That's the recorded call?

15   A.  Yes.

16   Q.  And did you initial it to confirm that you had reviewed

17   it?

18   A.  Yes.

19           MS. YUSI:  Your Honor, we move to admit Exhibit 242.

20           MR. GRINDROD:  No objection.

21           MR. YAROW:  No objection.

22           THE COURT:  242 is admitted.

23           (Government's Exhibit 242 was admitted.)

24   BY MS. O'BOYLE:

25   Q.  Besides talking to Kent Maerki about it, did you try to

A. Tottossy - Direct

1   sell your franchises?

2   A.  We didn't know we could.  There was never a process

3   shared on how to sell your franchise.  We were an absentee

4   owner.  We had no idea what to do, which is why we were

5   asking Roger and Daryl and why we called Kent Maerki and then

6   we found out about the queue.

7   Q.  Did you ever get any money back on these franchises?

8   A.  No.  We did not on those, no.

9   Q.  I'm going to show you -- if you can look in the binder

10  again at Exhibit 1005.  Do you recognize that document?

11  A.  Yes.

12  Q.  What is it?

13  A.  It's an e-mail from Kent Maerki to my husband and I,

14  TottossyBiz@cox.net, and, yeah, this is the notice of the

15  shelving of Dental Support.

16          MS. YUSI:  Your Honor, we move to admit

17  Exhibit 1005.

18          MR. GRINDROD:  No objection.

19          THE COURT:  1005 will be admitted.

20          (Government's Exhibit 1005 was admitted.)

21  BY MS. YUSI:

22  Q.  If we can look at Exhibit 1005.  What is the date of this

23  e-mail from Kent Maerki?

24  A.  August 9, 2014.

25  Q.  All right.  And if we look at Page 2 of Exhibit 1005,

A. Tottossy - Direct

1  what was this?

2  A.  You asked what was this?

3  Q.  Yes.

4  A.  This is the memo that we received indicating that the

5  company was no longer sustainable and that they were shelving

6  the opportunity.

7  Q.  Shelving?

8  A.  Shelving.  It's another word for closing it but not

9  closing it.

10  Q.  What did that mean to you all?

11  A.  It meant to us that there would be no more systemic

12  support to get patients into the dentists' offices, the

13  marketing companies wouldn't be working, and, you know, then

14  there would be no opportunity to make any profit.

15  Q.  And for the Janus Spectrum, what had you heard about

16  that?

17  A.  We really didn't hear a lot about Janus other than the

18  opportunity had been presented to us.  We knew there was

19  going to be some time, of course, before we would receive any

20  return.  We hadn't received any updates at all on Janus.

21        MS. YUSI:  Thank you.  We can take that one down.

22  BY MS. YUSI:

23  Q.  Did you ever travel to California or anything for Janus

24  Spectrum?

25  A.  No.

A. Tottossy - Direct

1   Q.  So you had not heard -- had you heard anything about how

2   it was going for Janus Spectrum?

3   A.  No.

4           MS. YUSI:  Your Honor, at this point, we have a

5   lengthy stipulation that we would like to admit into evidence

6   that the parties have signed regarding a number of documents

7   and things.  I'm not going to read the whole thing, but what

8   I would like to do is, as it pertains to one of the documents

9   we would like to admit, just read that portion of it.

10          THE COURT:  Hearing no objection, you may do so.

11          MS. YUSI:  Your Honor, we move to admit Government's

12   Exhibit 2000, which is a stipulation between the parties.

13   And stipulation number 1 is:

14          "The parties stipulate and agree that the categories

15   of records listed below in numbered paragraphs 1 through 34

16   are authentic and constitute records of regularly conducted

17   business activity pursuant to Rule 803(6) of the Federal

18   Rules of Evidence or records or statements of a public office

19   pursuant to Rule 803(8) of the Federal Rules of Evidence

20   without requiring further authentication, certification, or

21   testimony of a custodian."

22          Paragraph 21 includes Wells Fargo records including

23   account application, signature cards, account statements,

24   deposits, transfers, credits, memoranda, wire transfers,

25   checks, and other banking documents.

A. Tottossy - Direct

1         Your Honor, we move to admit Exhibit 1001C, which

2    are account statements and checks from Wells Fargo.

3         THE COURT:  Hearing no objection, they will be

4    admitted.

5         (Government's Exhibit 1001C was admitted.)

6    BY MS. YUSI:

7    Q.  I'm going to show you part of 1005C, Ms. Tottossy,

8    specifically -- well, just to go back a little bit before we

9    show that to you, do you know who controlled the bank account

10   for the companies, Janus Spectrum or DSPF?

11   A.  I would --

12   Q.  At the time that you invested.

13   A.  Oh, Daryl Bank.

14   Q.  Prior to investing, did you know anything about Daryl

15   Bank's or Roger Hudspeth's issues with regulatory authorities

16   regarding the selling of securities?

17   A.  We had received a call from FINRA about some -- a concern

18   that had come up with Roger.

19   Q.  Don't tell me what they said to you.

20   A.  Okay.

21   Q.  But what did you do in response to that call?

22   A.  We answered their questions.  We did talk with Roger

23   about it.  He wrote it off as something very minor, was able

24   to explain what happened, and we just moved on.

25   Q.  Okay.  Were you ever told of any of the percentage of

A. Tottossy - Direct

1    money or fees and commissions that were taken out of DSPF or

2    your spectrum investment?

3    A.   No.   We were advised that it was a very minimal

4    percentage that would come out.   I mean, we knew something

5    would come out with Roger being our financial advisor, but we

6    were advised it was very, very minimal.

7    Q.   Did your father get any money back from his investments

8    into DSPF?

9    A.   No.

10   Q.   If we can look at Page 1409 of Exhibit 1001C.

11           Do you recognize what type of document this is?

12   A.   That's a check.

13   Q.   And who is the check from?

14   A.   It's from Dental Support Plus Franchise LLC.

15   Q.   Who is it paid to the order of?

16   A.   Aghee W. Smith.

17   Q.   What is the date?

18   A.   July 7, 2012.

19   Q.   And what is in the memo here?

20   A.   "Teaching and Learning for All LLC."

21   Q.   What is Teaching and Learning for All LLC?

22   A.   That was my LLC.

23   Q.   Did you have any idea who Aghee Smith was at that point?

24   A.   I have no clue.

25   Q.   And if we can look at Page 862 of 1001C.   And who is this

A. Tottossy - Cross (By Mr. Yarow)

1   check from?

2   A.   Same, Dental Support Plus Franchise LLC.

3   Q.   What is the date?

4   A.   March 4, 2012.

5   Q.   Who is it to?

6   A.   Aghee W. Smith.

7   Q.   And in the memo, "Peter and Margo Perry LLC," who are

8   they?

9   A.   They are my parents.

10  Q.   How much was the check for?

11  A.   $2,000.

12  Q.   Is that approximately around when your parents invested

13  in DSPF?

14  A.   Yes, ma'am.  They purchased in March of 2013, 2012 --

15  March 2012, before we did.

16          MS. YUSI:  I believe those are all my questions

17  right now.  I'm sure other people will have questions for

18  you.

19          THE WITNESS:  Certainly.

20          MS. YUSI:  Thank you.

21          THE COURT:  Cross-examination?  Do you have any

22  questions, Mr. Yarow?

23          MR. YAROW:  Thank you.

24                      CROSS-EXAMINATION

25  BY MR. YAROW:

A. Tottossy - Cross (By Mr. Yarow)

1   Q.  Ms. Tottossy, my name is Rick Yarow.  I represent David
2   Alcorn.
3           You kept on saying "Janus Spectrum," I think you
4   were saying, "Group."  Did you invest in Janus Spectrum Group
5   or Janus Spectrum?
6   A.  What I referred to as "Janus Spectrum," "Janus Spectrum
7   Group," to me, the wording is the same thing.
8   Q.  Now, you said that you formed -- you were required to
9   form an LLC by Roger?
10  A.  Uh-huh.
11  Q.  And who were the members of that LLC?
12  A.  That LLC was actually formed prior to our investing with
13  Roger.  It was for my personal consulting business.
14  Q.  Who were the members of the LLC?
15  A.  I formed that LLC in 2011.  So my -- I know I was on the
16  LLC.  I may have put my husband on it.  I'm not certain for
17  sure.
18  Q.  Okay.  So were all of your investments with -- your
19  purchases of Janus Spectrum through this LLC, the same LLC?
20  A.  I didn't touch my LLC.  When we purchased investments,
21  those funds were given directly to Dominion from my personal
22  checking account.
23  Q.  So Roger Hudspeth is someone that you knew and trusted?
24  A.  Yes.
25  Q.  And he was a friend of the family?

Carol L. Naughton, Official Court Reporter

A. Tottossy - Cross (By Mr. Yarow)

1    A.   Yes.

2    Q.   And you would consider him your financial advisor?

3    A.   Yes.

4    Q.   Did he explain anything to you about risk versus reward

5    as your financial advisor?

6    A.   He did.  I mean, he talked about, yes, you're spending

7    the money, you're taking money out of something that is very

8    secure, a bank account, and putting it in for something and

9    you are anticipating this outcome or this profit.  But

10   there's always going to be risk, no matter what you're

11   investing in, and there's going to be a reward.

12   Q.   So he explained to you that there were risks involved

13   with this investment?

14   A.   Very, very, very minor.  This was a secure, sure thing.

15   Q.   And, specifically, the Janus Spectrum investment, what

16   did he describe to you about the risks of that?

17   A.   We didn't talk about risk.

18   Q.   Okay.

19   A.   Not to my memory.

20   Q.   So he never talked to you about risk?

21   A.   No.

22   Q.   Did he tell you that you were actually purchasing an

23   application to receive a license?

24   A.   No.

25   Q.   Did he tell you that this was something that would

Carol L. Naughton, Official Court Reporter

A. Tottossy - Cross (By Mr. Yarow)

1  require you to do some work on your part as far as building

2  out?

3  A.  No.

4  Q.  Did Mr. Hudspeth tell you that this is something that

5  depended upon the FCC releasing certain markets?

6  A.  He did talk about the releasing of the licenses to

7  markets.  I don't recall him discussing an application

8  process.

9  Q.  Okay.  Did he explain to you that this was something that

10 was beyond their control, that this is something that the

11 government -- this government agency, FCC, released?

12 A.  I don't recall that, no.

13 Q.  Did Mr. Hudspeth have you -- have you ever -- do you

14 remember signing an agreement with Janus Spectrum, or just an

15 agreement with Daryl Bank or Roger Hudspeth's organization?

16 A.  So the answer to that is I don't know.  We signed a lot

17 of papers.  I don't know with whom they were specifically

18 associated with.  I mean, we were signing them at the office

19 of Dominion Investments.  You know, my assumption in signing

20 is it was with Dominion Investments and Janus.

21 Q.  Okay.  So were you investing -- didn't it seem strange to

22 you that you would have to open an account that you didn't

23 have access to?

24 A.  When I look back on it, absolutely.  But at the time, you

25 know, the trust that we had with Roger and -- to me, he had a

A. Tottossy - Cross (By Mr. Yarow)

1   very strong rationale as to why he only needed visibility and
2   not us.
3   Q.  I'm sorry.  I couldn't catch that.  Repeat.  He needed
4   what, now?
5   A.  Visibility.
6            So when we talked about the bank account -- like you
7   said, was it not strange?  Yes, it's odd for me to have a
8   bank account that I don't have access to.  And when we asked
9   Roger about that, he had what seemed to be a very viable
10  rationale, plausible rationale for why that was necessary.
11  Q.  Okay.  When you went to go visit the post office for the
12  Dental Support, where their office address led you to, did
13  you come back and address that with Roger?
14  A.  Yes.
15  Q.  And as a result of that, what happened?
16  A.  Nothing.
17  Q.  Okay.  So it was after -- you were told you were going to
18  get an $800-a-month return?
19  A.  Yes.
20  Q.  Okay.  So by my quick calculation -- I could be wrong --
21  that's 800 times 12.  That's $9,600 a year?
22  A.  Yes.
23  Q.  That's $9,600 a year on a 25,000-dollar investment?
24  A.  Yes.
25  Q.  So by my quick calculation, that's about a 40 percent or

A. Tottossy - Cross (By Mr. Yarow)

1    better return?

2    A.  It looked to be a very good investment.

3    Q.  And were you told -- I mean, you would consider that to

4    be a high-return investment?

5    A.  I was excited to have the opportunity to purchase that

6    investment, yes.  Yeah.

7    Q.  And how did -- did you ask Roger about, "Well, Roger,

8    this is a very high investment.  What about the risk of this

9    investment because it's so high?"

10   A.  It was presented to us as sure-fire.  The rationale and

11   framework around that investment made so much sense.  It

12   seemed to be, for us, oh, wow, this is an untapped market,

13   we've got this great opportunity to get in.  And there are

14   times when people go in and hit the jackpot and are, like,

15   wow, this is great, and that's what we were hopeful for, and

16   that's why we purchased.

17   Q.  Had you ever had any experience with purchasing

18   franchises or purchasing spectrum-type investments?

19   A.  No.  None.

20   Q.  Okay.  And you had no experience in running a franchise

21   or doing anything involving --

22   A.  We did not.  And we were told that they would be

23   absentee-owned franchises, that there would not be a

24   requirement for us to do anything.

25   Q.  Okay.  And the only person -- you never actually met Kent

A. Tottossy - Cross (By Mr. Yarow)

1   Maerki; is that correct?

2   A.  Not face to face, no.

3   Q.  Okay.  You did have a chance to speak with Kent Maerki,

4   or you were on a call with Kent Maerki?

5   A.  Yes.

6   Q.  How many times?

7   A.  I want to say one time.

8   Q.  Okay.  So during that one time, were you just talking

9   about the Dental Support investment?

10  A.  We spoke specifically about the Dental Support.

11  Q.  Not the Janus Spectrum; is that correct?

12  A.  No, not the Janus.

13  Q.  Okay.  Did Roger -- did Roger discuss how much his fee

14  would be on the 25,000 -- each of the $25,000 purchases?

15  A.  He didn't discuss his specific fee, but we -- like I said

16  earlier, we had asked about fees with him and were assured

17  they were just minimal, we wouldn't feel them, they were just

18  very small fees.

19  Q.  And this would come out of -- was it explained to you

20  this would come out of the investment?  In other words, the

21  25,000 covered the investment plus Roger's fee?

22  A.  That was never shared with me.

23  Q.  You didn't ask any questions about this?

24  A.  We asked questions about fees, and because of our

25  trusting relationship with Roger, we accepted his responses.

A. Tottossy - Cross (By Mr. Grindrod)

1   Q.   Okay.  I mean, you've run schools in your past?

2   A.   Yeah.

3   Q.   You've been a consultant in the past?

4   A.   Yes, sir.  At a school, yes, sir.

5   Q.   You would consider yourself a fairly -- maybe not

6   financially sophisticated, but a fairly worldly,

7   sophisticated-type person?

8   A.   I can stand on my own two feet, yes, sir.

9   Q.   But you just trusted Roger.  You didn't ask any specific

10  questions about where the money was going?

11  A.   I'm astonished that I fell for it, I mean, everything you

12  just said.  I have a doctorate.  I've run high schools.  I

13  fell for this.  So, yeah.  It's pretty extraordinary.

14  Q.   You don't know David Alcorn?

15  A.   I've seen his name on some documents, but we've never

16  met.

17  Q.   Never spoken to David Alcorn?

18  A.   Not to my knowledge.  I don't remember speaking to him on

19  a call, ever.

20  Q.   Okay.

21           MR. YAROW:  That's all the questions I have.  Thank

22  you.

23           THE WITNESS:  Thank you.

24           THE COURT:  Any cross from Defendant Smith?

25                    CROSS-EXAMINATION

A. Tottossy - Cross (By Mr. Grindrod)

1    BY MR. GRINDROD:

2    Q.  Good morning, ma'am.

3    A.  Good morning.

4    Q.  So just to go quickly through this, the main person you

5    dealt with about these things was Roger Hudspeth, right?

6    A.  He was the main person we dealt with, yes.

7    Q.  And Roger worked in Daryl Bank's office in Virginia

8    Beach, right?

9    A.  I think they were partners in the business, but they did

10   work together in that office in Virginia Beach.

11   Q.  And that was called Dominion Investments?

12   A.  Dominion Investments.

13   Q.  And then you also had some dealings with Daryl Bank,

14   right?

15   A.  Yes, sir.

16   Q.  And you understood him to be the person in charge at

17   Dominion Investments?

18   A.  Yes.

19   Q.  And then you had those dealings with Kent Maerki, talked

20   about the phone call?

21   A.  Yes.

22   Q.  And you understood him to be the person in charge of the

23   Dental Support Plus Franchise in Arizona?

24   A.  Yes, sir.

25   Q.  And I know you just talked about this with Mr. Alcorn,

A. Tottossy - Cross (By Mr. Grindrod)

1    but those guys -- you said, I think, you fell for it.  They

2    ripped you off, essentially, right?

3    A.  The organization did, yes.

4    Q.  And I think you said on direct, this money was not

5    nothing to you, right?  You were careful about it, and you

6    still believed that these things made sense at the time?

7    A.  Certainly.  At the time we purchased, yeah.  And my

8    income had dramatically increased when I left the

9    principalship at Maury.  As a private consultant, we had, you

10   know, a bit of excess, and we wanted to take that and invest

11   it towards our retirement.

12   Q.  Even when there were questions, like the things -- like

13   the bank account or things that maybe now, in hindsight, you

14   go "Yeah, why would they have me do that," at the time, they

15   gave you an explanation that made sense, right?

16   A.  When we asked questions, the responses that we received

17   were plausible, yeah.

18   Q.  So we talked about Daryl Bank, Roger Hudspeth, and Kent

19   Maerki.  Let's talk quickly about Bill Smith.  His full name

20   is Aghee William Smith.  He goes by Bill Smith.

21   A.  Okay.

22   Q.  Mr. Smith never told you anything about Dental Support

23   Plus Franchise, right?

24   A.  I never spoke with him directly, but there were people

25   also involved in the business other than Kent Maerki and

A. Tottossy - Redirect

1  Roger and Daryl.  There was a board.  There were people
2  working.  We did receive communication, and I believe on the
3  website there were names of board members and other folks
4  involved.
5  Q.  But you didn't -- you said you didn't speak with
6  Mr. Smith?
7  A.  I wouldn't have expected to speak with him, no.
8  Q.  And that applies to spectrum too; he didn't talk to you
9  about spectrum or sell you spectrum?
10  A.  I wouldn't have anticipated that.  I mean, you know, when
11  we originally purchased, even Dental with Roger, all of our
12  questions stayed right at Dominion.  It was only when we --
13  the radar went up that we started reaching out and trying to
14  figure things out.
15  Q.  Sure.
16       MR. GRINDROD:  I don't have any further questions,
17  Your Honor.
18       THE COURT:  Thank you.
19       Any redirect?
20       MS. YUSI:  Briefly, Your Honor.
21       THE COURT:  Of course all within the scope of any
22  cross.
23       MS. YUSI:  Yes.
24              REDIRECT EXAMINATION
25  BY MS. YUSI:

B. Russell - Direct

1    Q.  Do you have any idea why Bill Smith received money from

2    you and your parents?

3    A.  I have no idea.  I didn't know that money went to him.

4    It's the first time I've seen those checks.

5              MS. YUSI:  Thank you.

6              THE COURT:  You may step down.

7              THE WITNESS:  Thank you, Your Honor.  Have a good

8    day.

9              THE COURT:  May this witness be permanently excused,

10   counsel?

11             MS. YUSI:  Yes, Your Honor.

12             THE COURT:  Switch back into your regular mask and

13   you may be permanently excused.

14             (The witness was excused.)

15             THE COURT:  Next witness.

16             MS. YUSI:  Your Honor, the government calls Barbara

17   Russell.

18             (Witness sworn.)

19             BARBARA RUSSELL, called by the Government, having

20   been first duly sworn, was examined and testified as follows:

21                        DIRECT EXAMINATION

22   BY MS. YUSI:

23   Q.  Good morning.  Could you introduce yourself to the Court.

24   A.  Barbara Russell.

25   Q.  How do you spell your last name, Ms. Russell?

B. Russell - Direct

1   A.   R-u-s-s-e-l-l.

2   Q.   How old are you today?

3   A.   83.

4   Q.   Where do you live, just the city and state?

5   A.   Chesapeake, Virginia.

6   Q.   Are you currently employed?

7   A.   No.

8   Q.   Are you retired?

9   A.   Yes.

10  Q.   Approximately when did you retire?

11  A.   I retired from the federal government in 1994, and my

12  second career was a substitute teacher, and I guess the last

13  time I was there was in 2019.

14  Q.   Okay.  And what did you do before you retired from the

15  federal government?

16  A.   Before?

17  Q.   Well, what did you do while you were working for the

18  federal government?

19  A.   I worked 30 years for the government.

20  Q.   Where was that?

21  A.   In Washington, D.C.

22  Q.   What did you do?

23  A.   I was a management analyst for the Department of

24  Commerce, Bureau of Economic Analysis.

25  Q.   And while you were working, did you save money for

B. Russell - Direct

 1  retirement?

 2  A.   I did.

 3  Q.   And how long did you do that for?

 4  A.   The entirety into the civil service system.

 5  Q.   In the civil service system?

 6  A.   Yes.

 7  Q.   Were you pleased with how that was doing, with the money

 8  in there?

 9  A.   Fine, uh-huh.  It was a Thrift Savings Plan.

10  Q.   Okay.  The Thrift Savings Plan.  At some point, did you

11  have or obtain or get some money outside of your Thrift

12  Savings Plan to invest?

13  A.   No.

14  Q.   Well, at some point, did you make extra money that you

15  were looking to invest?

16  A.   At the time, that was the only money that I had.

17  Q.   After you retired, was there a time when you had extra

18  money to invest?

19  A.   Yes.

20  Q.   How did that happen?

21  A.   The money from my Thrift Savings Plan, I had that, and

22  then I sold a home in 2004, and I had money from that.

23  Q.   Okay.  If you could just -- make sure that you pull that

24  microphone right up to you.

25          THE COURT:  Pull your mask up also, ma'am.

B. Russell - Direct

 1   BY MS. YUSI:

 2   Q.  And approximately how much, when you sold that home in

 3   2004, did you have, I guess, extra or you were looking to

 4   invest?

 5   A.  Approximately 100,000.

 6   Q.  At some point, did you talk to someone about what to do

 7   with that money?

 8   A.  Yes.  The real estate agent that I was involved with at

 9   that time referred me to Roger Hudspeth.

10   Q.  Where did you meet Mr. Hudspeth?

11   A.  I met him in his office.

12   Q.  Where was that located?

13   A.  In Virginia Beach, Virginia.

14   Q.  Do you know what company he was working for?

15   A.  Dominion Investments.

16         THE COURT:  Ma'am --

17   BY MS. YUSI:

18   Q.  What was your understanding of what Roger Hudspeth did at

19   Dominion Investment?

20   A.  He was an investor -- I mean, well, he handled

21   investments for the company.

22   Q.  Okay.

23         THE COURT:  Ladies and gentlemen, let me interject

24   something.  If at any time you cannot hear the witness, raise

25   your hand, and the Court will have her raise her voice or

———— B. Russell - Direct————

1    turn up the microphone.

2            Ma'am, keep your voice up, please.

3            Continue.

4            MS. YUSI:   Thank you.

5    BY MS. YUSI:

6    Q.  Did you talk with him on the phone as well?

7    A.  I did.

8    Q.  And when you met with Mr. Hudspeth, what were you looking

9    for in terms of your investment goals with that extra money

10   from the sale of your house?

11   A.  I was hoping to --

12   Q.  If you can talk a little bit louder.

13   A.  I was hoping that I could make more money.

14   Q.  What was your comfort level with risk?  Were you willing

15   to lose that money from the sale of your house?

16   A.  No.  I have never took risks in investments.

17   Q.  Did you talk to Mr. Hudspeth about that?

18   A.  Yes.

19   Q.  Did you know much about investing at that time?

20   A.  I did not.

21   Q.  And what was your understanding of his role in terms of

22   what he was supposed to do for you?

23   A.  To advise me in, you know, the current investments.  I

24   was in bonds and stocks, stocks and bonds, and he was to help

25   me -- advise me with that.

B. Russell - Direct

1   Q.   Okay.  Did he ever talk to you about his family?

2   A.   Yes, he did.

3   Q.   What did he say?

4   A.   He was a family person, you know.  He had a daughter and

5   mother and father, and he would constantly, you know -- he

6   would always talk about them.  And that's -- yeah, uh-huh.

7   Q.   Did you trust Mr. Hudspeth?

8   A.   I did.

9   Q.   Did you ever know the name Daryl Bank?

10  A.   I knew he was associated with the company.

11  Q.   With Dominion?

12  A.   With Dominion.

13  Q.   Okay.  Now, in 2012, did Mr. Hudspeth talk to you about

14  an investment called Dental Support Plus Franchise?

15  A.   Yes, he did.

16  Q.   Approximately how old were you at that time?  This was

17  about ten years ago.

18  A.   About 74.

19  Q.   What was your understanding of what the Dental Support

20  Plus Franchise would be?

21  A.   It was an investment that naturally I could make more

22  money, and he told me it was a company or investment that

23  dealt with dental, and he assured me that the dentists, when

24  they would have clients or patients, I would make money from

25  that visit each time.

──────B. Russell - Direct──────

1    Q.   Did you talk with Mr. Hudspeth about the risk associated

2    with this investment?

3    A.   I did.  I always talk about risk.

4    Q.   What did he say?

5    A.   Obviously assured me that there would not be any risk.

6    Q.   Did you talk about fees, or did you ask about fees or

7    commissions?

8    A.   For myself, yes.  He just -- at that time, I can't

9    remember the specifics, but he said every time, you know, a

10   dentist had serviced a patient, I would make proceeds off of

11   that.

12   Q.   Did you talk about how Mr. Hudspeth and Dominion, where

13   the company, Dental Support Plus, would make money and their

14   fees?

15   A.   No.

16   Q.   Did you sign any papers regarding this investment?

17   A.   Yes, I did.

18   Q.   Were there a lot?

19   A.   Yes.

20   Q.   Where did you sign them?  Where were you?

21   A.   In his office and sometimes he would deliver papers to my

22   home.

23   Q.   Who else would deliver papers to your home on occasion?

24   A.   He had an assistant at that time.  I don't know -- I

25   can't remember who she was, but I do know that Raeann was one

B. Russell - Direct

1   of them that delivered papers.

2   Q.  Do you know Raeann's last name?

3   A.  I can't remember.

4   Q.  Well, when Raeann would bring the papers to you, did you

5   talk to her about Dental Support Plus?

6   A.  I did.

7   Q.  And what did she say, if anything?

8   A.  She assured me that -- she said her dad was -- had

9   purchased, you know -- he was in it.

10  Q.  In September 2012, how much did you invest in Dental

11  Support Plus?

12  A.  All of my funds that I had.  And I believe it was,

13  like -- I know I got three franchises at 25,000 each, and

14  then I had some left over that didn't make up 25,000, so he

15  put those in other investments.

16  Q.  And that came from the approximate 100,000 from when you

17  sold the house?

18  A.  Yes.

19  Q.  What type of money did Mr. Hudspeth say or any of the

20  materials you saw say that you would make from these

21  investments?

22  A.  I think he told me that I would be guaranteed

23  approximately $6,000 a year.

24  Q.  And do you know how quickly you were supposed to start

25  seeing that money?

B. Russell - Direct

1    A.   It wasn't long.   It was longer than I had hoped, but it
2    wasn't that long.
3    Q.   Now, did you have any experience in running a franchise?
4    A.   No.
5    Q.   What was your understanding of what you would have to do
6    to run this franchise?
7    A.   I had no idea.
8    Q.   Did you have to open an account somewhere, a bank
9    account, in order to make this investment?
10   A.   The money was supposed to go into a bank at that time,
11   and I can't remember the name of the bank.
12   Q.   Okay.   Did you have access to that account at that bank?
13   A.   Yes.
14   Q.   Now, prior to investing the $75,000 in Dental Support,
15   did Mr. Hudspeth talk to you about issues he or Daryl Bank
16   had had with securities regulatory authorities?
17   A.   No.
18   Q.   Did he say anything about how other people were doing in
19   their investments in Dental Support Plus prior to you
20   investing?
21   A.   I don't remember him speaking to me about that.
22   Q.   Okay.   Did you ever make any money on your Dental Support
23   investments?
24   A.   I think I got one check of like $90 or something.
25   Q.   $90 from the 75,000 that you put in?

———B. Russell - Direct———

1    A.   Yes.

2    Q.   Did you make anything else after that?

3    A.   No.

4    Q.   Is that "no"?

5    A.   "No."

6    Q.   Did you try to call anyone about what was going on with

7    your investment?

8    A.   I did.

9    Q.   Who did you talk to?

10   A.   I talked to the organization or the company, the Dental

11   Plus people and -- yeah.

12   Q.   What did they say?

13   A.   They gave me the runaround.

14   Q.   Did you talk to Roger Hudspeth about your concern?

15   A.   I did.

16   Q.   What did you tell him?

17   A.   I told him the problem that I was having, I hadn't

18   received anything, and he was very, you know -- he wasn't

19   helpful at all in helping me.  I made a comment to him that

20   from what I could see, that I wouldn't be able to -- I would

21   die before I would get anything.

22   Q.   What did he respond?

23   A.   His remark was, "Well, then, you don't have anything to

24   worry about."

25   Q.   Did you talk to Daryl Bank about that comment?

─────B. Russell - Direct─────

1    A.   I did.   I reported it to Daryl.

2    Q.   What did he say?

3    A.   He told me that, you know, Roger had a tendency to say

4    things that he shouldn't say.

5    Q.   Okay.   Did you ever try to get your money back or try to

6    sell any of your franchises?

7    A.   I did.

8    Q.   Were you able to do that?

9    A.   They told me that they sold one.

10   Q.   And did you get any money from that?

11   A.   No, because it went to another investment.

12   Q.   So they didn't give you the money they supposedly sold?

13   A.   No.

14   Q.   One moment.

15        What is your understanding of what happened to your

16   money?   Or where is your money now?

17   A.   I don't know.   I got several letters from Dental Plus

18   explaining, you know, what was going on and the company had

19   dissolved and -- nothing to my satisfaction.

20   Q.   Did you get things in the mail about Dental Support Plus?

21   A.   Yes, I did.

22   Q.   Have you gotten any of your money back besides that $90?

23   A.   I got something in certificates and so forth, which were

24   useless.

25   Q.   But no money?

Carol L. Naughton, Official Court Reporter

```
 1   A.  No.
 2             MS. YUSI:  Thank you.  Those are all my questions
 3   right now.
 4             THE COURT:  Any cross?
 5             MR. YAROW:  No questions, Your Honor.
 6             THE COURT:  All right.
 7             MR. GRINDROD:  No questions, Judge.
 8             THE COURT:  May this witness be permanently excused?
 9             MS. YUSI:  Yes, sir.
10             (The witness was excused.)
11             THE COURT:  You may step down.
12             Ladies and gentlemen, I think what we're going to do
13   is we'll take a 15-minute break here.
14             (The jury exited the courtroom.)
15             THE COURT:  Mr. Bosse, I think now is the time the
16   Court will give you a brief opportunity to respond to this
17   motion that has been filed here since, I think, Mr. Gulcher
18   is coming up as the next witness.
19             MR. BOSSE:  Yes, sir.
20             THE COURT:  Let's hear it.
21             MR. BOSSE:  Thank you, Judge.
22             So, Your Honor, I woke up this morning and saw that
23   after midnight last night, counsel for Mr. Smith filed this
24   motion.  It has two parts.  One of them, it accuses us of a
25   discovery violation for late production of *Jencks* materials,
```

1   and then the second one, it argues that Mr. Gulcher's

2   testimony is irrelevant.  And I would like to address both of

3   those.

4          First I would like to address the timing of the

5   motion as to relevancy.  This witness was disclosed, and what

6   he was going to testify about was disclosed by the government

7   in an expert report.  Even though he's not an expert, we

8   disclosed it anyway, and we did that on November 1st of the

9   year 2021.

10          And so they have had the information that they are

11  complaining about here since before the last setting of this

12  trial.  And we found out, you know, this morning, after

13  midnight, that they were moving to exclude him based on

14  information they've had the entire time.

15          And so that's the timing issue.  I want to address

16  the -- I'll just go right into the relevance.

17          THE COURT:  Let's save some time here.  Relevancy is

18  not an issue here.  We don't need to hear any more argument

19  about relevancy.  I've read the defendant's brief.  I

20  understand it.  I understand this case.  Relevancy -- nothing

21  is going to be excluded based on relevance.

22          MR. BOSSE:  Yes, sir.

23          THE COURT:  The Court knows what's relevant.  Let's

24  get to the question about the alleged 800 pages that he

25  attached to the e-mail on January 26th.

1          MR. BOSSE:  Yes, sir.  So the motion says that this

2    is *Jencks* material.  This is not *Jencks* material.  *Jencks*

3    material is a statement, a recorded or written statement of a

4    witness.  None of this, I don't think, was *Jencks* material

5    when we have a witness who sends us materials, as we're

6    prepping them, and in this case, which we can show the Court

7    if the Court wants to see, it's a bunch of California

8    insurance tests, because I was curious about what is asked on

9    these tests, so he sent me a bunch of tests.

10         And as soon as we got that -- we had some of it

11   e-mailed on Friday.  The rest were mailed.  We got it on

12   Monday.  We immediately scanned it and produced it to avoid

13   this problem, being accused of discovery violation

14   baselessly.  We produced it immediately.  None of it is

15   *Jencks*.

16         And I want to say, if I could, Your Honor, one brief

17   thing, is that the severe misstatement of how Rule 26.2 works

18   that is in this brief.  We've had other witnesses, Your

19   Honor -- we had one just last week where they, unbeknownst to

20   us, had created an outline, a timeline of events, and they

21   sent it to us, and of course, we have to produce that.

22         And they said, you know -- we went back and found

23   these notes to refresh our recollection, and so we asked

24   them, out of an abundance of caution, send us everything you

25   looked at because we have an obligation, out of an abundance

```
 1   of caution, to produce it.  And the idea that we're
 2   violating, when we're going above and beyond, as we have this
 3   entire case -- Your Honor, in this case, we gave proffers to
 4   both of these defendants where we laid out our entire case
 5   for them, for one of them pre-indictment.
 6            And so the idea that we're going to be accused the
 7   morning of witnesses coming on of a discovery violation, you
 8   know, we've also done things like -- we were going to have an
 9   agreement with the defense that we would tell them who our
10   witnesses were for the next day.  We don't have to do that,
11   but we were going to do that.  And we're going to have to
12   reevaluate the way we're going to litigate the case if this
13   is going to be the practice we have here.
14            THE COURT:  Let's get something straight here.  For
15   the Court's purposes, just to get things moved along, if
16   you're able to tell them who the witnesses are the next day,
17   that's fine, so it won't slow us down.
18            Now, let me cut to the heart of it.  With respect to
19   this alleged 800-page attachment first, it's not *Jencks*.  The
20   Court doesn't have any problem with that.  It's not *Jencks*.
21            So let's go to is there anything in that 800-page
22   attachment that you are planning to use other than what
23   you've told them you are going to use in this case?
24            MR. BOSSE:  No.  I'm not showing him a single page
25   of that material, and if they had asked me that, I would have
```

1  told them that.  I mean, this is just -- when a witness gives

2  us something, I try to produce it so I don't get accused of

3  something later.

4          THE COURT:  All right.  If you're not using anything

5  from the 800-page attachment, that's that.  It's not *Jencks*.

6  It's not even relevant.  The motion is denied.  We're on

7  break.  I don't need to hear from the defendant.

8          (Recess from 11:01 a.m. to 11:22 a.m.)

9          THE COURT:  I think the Court needs to clarify its

10 ruling on the motion for the record.

11         Under 18 U.S.C. Section 3500, to the extent the 800

12 exhibits or attachments to the e-mail pertain to what

13 Mr. Gulcher is going to testify to, it may be considered

14 *Jencks*, but the Court entered an order directing the parties

15 to turn over *Jencks* even though they are not required to do

16 so by law.  They can and are required, under 18 U.S.C. 3500,

17 to turn it over after the fact.  But as a matter of practice

18 and procedure, the Court has required them to turn it over

19 before the fact.

20         Now, from what the Court has read in the defendant's

21 motion and what the United States has said, this material

22 came after the United States had complied with the Court's

23 order.  So the Court doesn't find a violation of *Jencks* here.

24 That's what the Court needs to say.

25         Secondly, it's the Court's understanding that

```
 1    whatever was turned over, even if you consider the 800 pages
 2    of attachments, whatever, to be Jencks, it's not something
 3    that the United States is saying they are using, in any
 4    event, in this case.  But there's no violation of Jencks
 5    here.  The Court doesn't find there's a discovery violation,
 6    in a nutshell.
 7              All right.  Bring the jury in.
 8              (The jury entered the courtroom.)
 9              THE COURT:  Let the record reflect that all jurors
10    are present.
11              Does counsel concur?
12              MR. BOSSE:  Yes, Your Honor.
13              MR. GRINDROD:  Yes, Your Honor.
14              THE COURT:  Mr. Yarow?
15              MR. YAROW:  Yes, sir.
16              THE COURT:  You may proceed.
17              MR. BOSSE:  Your Honor, the government calls Andrew
18    Gulcher.
19              THE COURT:  Mr. Bosse, you're calling him as a fact
20    witness; is that correct?
21              MR. BOSSE:  Yes, sir.
22              THE COURT:  All right.
23              MR. BOSSE:  Based on his experience.
24              (Witness sworn.)
25              ANDREW GULCHER, called by the Government, having
```

A. Gulcher - Direct

1  been first duly sworn, was examined and testified as follows:

2                           DIRECT EXAMINATION

3  BY MR. BOSSE:

4  Q.  Good morning, sir.

5  A.  Good morning.

6  Q.  Would you please introduce yourself to the jury.

7  A.  My name is Andrew Gulcher, A-n-d-r-e-w G-u-l-c-h-e-r.

8  Q.  What city and state do you live in?

9  A.  Los Angeles, California.

10  Q.  Who are you employed by?

11  A.  State of California, the Department of Insurance.

12  Q.  How long have you been with the California Department of

13  Insurance?

14  A.  14 years in July.

15  Q.  What was your career before that?

16  A.  I was a police officer for the City of Culver City for 14

17  years.

18  Q.  Tell us, please, about your role with the state

19  Department of Insurance in California.

20  A.  My working title is a regional supervising investigator,

21  and our division and people investigate conduct and

22  wrongdoing by licensees and insurance companies transacting

23  insurance.

24  Q.  As part of your work responsibilities, are you familiar

25  with California's licensing system for insurance salesmen?

─────A. Gulcher - Direct─────

1   A.  Yes, I am.

2   Q.  Are you familiar with what products licensed insurance

3   salesmen in California are and are not allowed to sell by

4   virtue of having an insurance license?

5   A.  I am.

6   Q.  Are you familiar with the duties that licensed insurance

7   salesmen in California owe to their clients?

8   A.  I am.

9   Q.  As part of your preparation for testifying here today,

10  did you become familiar with the name Aghee William Smith II?

11  A.  I did.

12  Q.  Are you also familiar with an insurance salesman in

13  California named Thomas Barnett?

14  A.  I am.

15  Q.  Let me ask you, was Mr. Smith a licensed insurance

16  salesman in California at one point?

17  A.  Yes.  He held a couple of licenses from the Department.

18  Q.  Do you recall when he started holding those licenses and

19  when --

20  A.  I believe it was approximately 1989 and through 2018.

21  Q.  Okay.  So through the year 2018, Mr. Smith held the

22  licenses we're going to talk about?

23  A.  Yes.

24  Q.  All right.  And how about Mr. Barnett?  When did he

25  become a licensed insurance salesman in California?

─A. Gulcher - Direct─

1   A.  It was approximately the same time.  It might have been
2   1999 or 1998, but it was approximately about that same year
3   starting, and I think through 2019.
4   Q.  All right.  Can you tell me what type of licenses,
5   insurance licenses, Mr. Smith and Mr. Barnett held?
6   A.  They both held what is called a life-only license, and
7   they both held an accident-and-health license.  Mr. Smith,
8   also, for a short time period, held a variable contracts
9   license.
10  Q.  Let me ask you first, the one you call the
11  health-and-accident, is that the kind we're familiar with,
12  car and auto and home insurance?
13  A.  Actually, it would be for health insurance, like for
14  going to the doctor, disability insurance, that kind of
15  thing, sort of like Aflac or health insurance.
16  Q.  How about the life license?
17  A.  Life license allows someone to transact life insurance
18  and annuities.
19  Q.  What is an annuity, just generally?
20  A.  An annuity is an investment vehicle where someone gives a
21  set amount of money to an insurance company for, generally, a
22  set amount of money in return.  For example, someone could
23  give an insurance company $100,000, and then that insurance
24  company would give the person a set amount a month, usually
25  tied to a percentage, 2 or 3, sometimes 4 percent per month

A. Gulcher - Direct

1    for the rest of their life.

2    Q.  And who does the money go to?  If you go to buy an

3    annuity through your insurance salesman, who is the money

4    actually going to?

5    A.  Most technically, the money is generally going straight

6    to the insurance company.  A check is written from the

7    consumer to the insurance company, and then the insurance

8    agent receives a commission from the company they are

9    authorized to work with.

10   Q.  And I want to ask you just a little bit about -- I want

11   to make sure we have the basis of your knowledge about the

12   different licenses that these men held.

13          How does California keep track of the licensing

14   information, who has a license, and, for example, when they

15   lapse?

16   A.  Sure.  Many states use a system that California uses

17   called the Sircon, which is controlled and input in several

18   ways.  It's monitored and controlled by the State of

19   California.  It tracks an application, the process through

20   application.  Once an application is approved and someone

21   gets their license, it also tracks what licenses they have

22   and, also, the continuing education credits they have.  It

23   tracks the companies that they work for or are appointed with

24   and any notes or misconduct or other things that might be

25   relevant to the licensee.

A. Gulcher - Direct

1    Q.  And so that's how you know about when these men got the
2    licenses and when they lapsed?
3    A.  Yes, it is.
4    Q.  Let me ask you about how in California you go about
5    getting a license to sell these different kinds of insurance.
6           How do you become a licensed insurance agent in
7    California?
8    A.  The first thing that happens is an applicant would need
9    to take pre-licensing courses, and that consists of 20 hours
10   of general insurance knowledge plus 12 hours of ethics
11   training.  Those are separate hours that are required before
12   they can even sit to take the test.
13          They have to pass a background test, meaning any
14   kind of arrest, convictions, any civil actions, anything that
15   would affect their fiduciary capacity for operating in trust.
16   Then they have to submit their fingerprints and then sit for
17   a written test at a state facility and monitored by the
18   Department.
19   Q.  Are you familiar through your work with what is taught in
20   preparation for these tests and how the tests are conducted?
21   A.  Yes.  Generally the pre-licensing covers general
22   principles of insurance and covers what suitability is for
23   the different types of consumers, because insurance products
24   vary greatly depending on who the person is and what is being
25   insured.  So it covers those things.

A. Gulcher - Direct

```
 1          It covers, you know, risk analysis, underwriting,
 2    general insurance terms and principles, some accounting, and
 3    ethics and duties responsible for California consumers.
 4    Q.  And what is the content of the ethics portion of what
 5    they are required to learn?
 6    A.  How to handle money, because oftentimes cash or other
 7    assets are provided to an insurance agent, to make sure that
 8    they understand their fiduciary duty with respect to the
 9    money, how to handle that money in that they have to have
10    trust accounts and how to handle, you know, an operating
11    account versus a trust account, also how to interact with
12    people in terms of age differences, seniors.  Those over 65
13    are treated very differently.
14    Q.  Let me stop you there and ask you:  What are they taught
15    about the difference in how people over 65 have to be
16    treated?
17    A.  There are additional laws regarding seniors that have a
18    higher standard of care for anyone over 65.  Absent any other
19    responsibility, it specifically says in the code that they
20    have to be honest and they have to deal fairly and honestly
21    with a senior.
22    Q.  Okay.  And speaking just in general of clients generally,
23    are people who want to be become insurance agents taught and
24    tested on whether they are allowed to tell things to their
25    clients that are lies?
```

A. Gulcher - Direct

1   A.  That's correct.  That is part of the ethics training and

2   also the general insurance training.

3   Q.  All right.  So let's say you've gone ahead and you've

4   gotten fingerprinted and you've passed the test and you have

5   these licenses.  How long do the licenses last without you

6   doing anything more?

7   A.  A period of two years.

8   Q.  And then what do you do to renew them?

9   A.  Pay your filing fees, depending on the type of license

10  you have, and show and have taken certified continued

11  education credits by a Department of Insurance-authorized

12  vendor and show that certain hours and certain courses meet

13  certain requirements, meaning the four hours of ethics

14  training for two years and 20 hours of general insurance

15  related to the specific line of insurance.

16  Q.  Sorry to cut you off.  But did Mr. Smith and

17  Mr. Barnett -- did they complete those continuing education

18  requirements, keep their licenses throughout the time period

19  you were talking about?

20  A.  They did.

21  Q.  And so they were taught at least every two years an

22  update on ethics?

23  A.  Yes.

24  Q.  You talked about life insurance products that you can

25  sell with holding a life license that includes annuities.

—————A. Gulcher - Direct—————

1          Does your insurance license give you the ability to
2    sell other investment products to investors?
3    A.  Outside of annuities and life insurance products, that
4    license would not allow that.
5    Q.  All right.  And let me ask you this:  Are the companies
6    that make the insurance products, the life insurance policies
7    that you get, or the annuities that you get, are those
8    companies also regulated by California?
9    A.  Yes.  For a product to be sold in California, the
10   Department of Insurance has to have reviewed the product for
11   suitability for consumers and risk to be admitted to be sold
12   in California.
13   Q.  So would it be fair to say, then, that the salesmen are
14   limited in what they can sell by virtue of having an
15   insurance license?
16   A.  Yes.
17   Q.  And also the things that they sell are highly regulated
18   to look for consumer welfare purposes?
19   A.  Yeah.  And for the health of the consumer marketplace.
20   Q.  Okay.  You mentioned earlier the duties toward clients
21   and the word "fiduciary."  Can you explain to the jury what
22   that term of art means in California?
23   A.  Yes.  In many cases, an agent is required to act in the
24   best interests of the person they are providing information
25   for so that they can make the best choice.  And that's

A. Gulcher - Direct

1    important that the consumer know honest and accurate

2    information regarding the product they might be buying and

3    the risks involved in buying that product.  Some people have

4    a higher risk tolerance, and some people have a lower risk

5    tolerance.

6    Q.  Does that relate to what you mentioned earlier about

7    suitability and the word "suitability"?

8    A.  Yes.  And that can vary from person to person depending

9    on their circumstance.

10   Q.  All right.  The legal duties, whether you are a fiduciary

11   for someone over 65 or you just have the regular insurance

12   salesman duties, are you allowed to make knowing

13   misstatements to your clients and tell them things that you

14   know are not true in getting them to buy insurance products?

15   A.  No.  Both of those are specifically addressed under

16   California Insurance Code law.

17   Q.  And are those legal duties covered in the education that

18   insurance salesmen receive before they can be licensed in

19   California?

20   A.  Yes.  It's frequently tested and listed in continuing

21   education, and it is a question related to initial licensing

22   as well.

23   Q.  Is there a separate licensing system to become a

24   certified financial advisor?

25   A.  I'm not completely sure, but I do know that the State of

A. Gulcher - Cross (By Mr. Yarow)

1  California relies heavily on --

2        MR. GRINDROD:  Objection to speculation and lack of

3  personal knowledge to the continuing answer.

4        THE COURT:  The Court will sustain that.

5        MR. BOSSE:  I'll try to lay a foundation for that.

6  BY MR. BOSSE:

7  Q.  Are you familiar, through your work in the insurance

8  field, with other regulatory schemes that some insurance

9  salesmen may be subjected to, including people who hold

10 themselves out as financial planners, financial advisors,

11 things like that?

12 A.  That is something that we have to check, if someone is a

13 licensee and offering other products, like investments, we do

14 check with other federal and state agencies to see if they

15 are holding licenses that allow them to offer those types of

16 instruments.

17       MR. BOSSE:  If I could have one moment, Your Honor,

18 to confer.  I think I'm probably ready to wrap up.

19       (Pause.)

20       MR. BOSSE:  Thank you, Your Honor.  And thank you,

21 Mr. Gulcher.  I'm going to pass the witness.

22       THE COURT:  Cross-examination, Mr. Yarow.

23       MR YAROW:  Just very quickly, Your Honor.

24                   CROSS-EXAMINATION

25 BY MR. YAROW:

A. Gulcher - Cross (By Mr. Grindrod)

1    Q.   Mr. Gulcher, my name is Rick Yarow I represent David

2    Alcorn.

3              In the State of California, does your organization

4    have any -- does it have any oversight on the sale of

5    applications for licenses controlled by the FCC?

6    A.   Can you be more specific?  Can you rephrase it for me?

7    Q.   Does your organization have any oversight on the sale of

8    applications to purchase spectrum licenses?

9    A.   No.

10             MR. YAROW:  Thank you.

11                        CROSS-EXAMINATION

12   BY MR. GRINDROD:

13   Q.   Good morning, sir.

14   A.   Good morning.

15   Q.   Those regulations that you spoke about this morning,

16   those are California state regulations, right?

17   A.   Yes, sir.

18   Q.   And they are civil or regulatory standards, right?

19   A.   Some are, some are not.

20   Q.   None of the things -- none of the things you talked about

21   are federal laws, though, right?

22   A.   Correct.

23   Q.   Certainly not federal criminal laws.

24   A.   Correct.

25   Q.   So these regulations that you talked about, they govern

A. Gulcher - Cross (By Mr. Grindrod)

1    certain people, right?  People who are licensed?

2    A.   Yes.

3    Q.   And the sale of -- they govern those people when they are

4    selling certain products?

5    A.   Yes.

6    Q.   The regulated products that you talked about?

7    A.   Yes.

8    Q.   And so I think you mentioned Mr. Smith had a life

9    license?

10   A.   Life-only and accident-and-health.

11   Q.   And the life-only one is the one that I guess -- life

12   insurance and annuities, I think were the big categories?

13   A.   Yes, sir.

14   Q.   You mentioned in response to a question from Mr. Bosse --

15   you explained kind of what an annuity is?

16   A.   Generally.

17   Q.   Right.  So I just have a quick follow-up on that.

18          So I think you had said that generally annuities

19   have a fixed specified rate of return, right?

20   A.   That's most often common, but they come in different

21   flavors.

22   Q.   And some annuities -- like, are you familiar with the

23   term "fixed index annuity"?

24   A.   Yes.

25   Q.   And I guess, generally, what is that?

A. Gulcher - Cross (By Mr. Grindrod)

1   A.   Generally speaking, variable-type annuities tend to be

2   tied to certain market conditions.  It could be, for example,

3   tied to the stock market, and the annuity would do better if

4   the stock market does well and not do as well if the stock

5   market doesn't do -- it would be a riskier type of annuity or

6   considered having more risk.

7   Q.   Right.  So because it's indexed, is it how some other

8   market or some other measure performs?  It can go up and

9   down.  It's not necessarily, like, you get X amount of

10  dollars every single month no matter what?

11  A.   Sure.  Oftentimes there is a minimum, but that's sort of

12  the upside sell of it because if it's better, you can do much

13  better.

14  Q.   And the reason why you might do that instead of just,

15  like, going and buying a mutual fund is that even those fixed

16  index annuities still have the principal protected, right?

17  A.   They can.

18           THE COURT:  Objection?

19           MR. BOSSE:  Objection.  What are we talking about

20  here?  Speculation.

21           THE COURT:  Okay.  Mr. Grindrod, you're taking him

22  beyond the scope and depth of his direct testimony, and he

23  has not been presented as any type of individual familiar

24  with the performance of mutual funds and certain other

25  things.

A. Gulcher - Cross (By Mr. Grindrod)

1            MR. GRINDROD:  I understand, Your Honor.  I'll move
2       on.
3            THE COURT:  Okay.
4       BY MR. GRINDROD:
5       Q.  Sir, on direct you said that the license limits what the
6       license holder can sell, right?
7       A.  Yes.
8       Q.  Isn't it more accurate to say that it limits what the
9       license holder can sell under that license?  Right?
10      A.  Can you rephrase that?
11      Q.  I guess what I'm saying is, as the license holder, if
12      you're selling something under that license, then you can
13      only sell certain things under that license, but if someone
14      happens to hold an insurance license and also has a car lot,
15      they can still sell the cars off the car lot, right?
16      A.  Absolutely.
17      Q.  It just has nothing to do with the specific regulatory
18      regime that your office is involved with?
19      A.  Sure.  But if -- yes.
20           MR. GRINDROD:  No further questions, Your Honor.
21           THE COURT:  All right.  Redirect?
22           MR. BOSSE:  No redirect, Your Honor.  This witness
23      may be excused for the government.
24           THE COURT:  Do the defendants concur on excusing
25      this witness permanently?

K. Gerek - Direct

 1          MR. YAROW:  Yes, Your Honor.

 2          MR. GRINDROD:  Yes, Your Honor.

 3          THE COURT:  All right, sir.  You may return to

 4   Los Angeles.  Thank you for coming.

 5          (The witness was excused.)

 6          THE COURT:  Next witness?

 7          MR. BOSSE:  Your Honor, the government calls Kyle

 8   Gerek.

 9          (Witness sworn.)

10          KYLE GEREK, called by the Government, having been

11   first duly sworn, was examined and testified as follows:

12                    DIRECT EXAMINATION

13   BY MR. BOSSE:

14   Q.  Good morning, sir.  Would you please state your name for

15   our record.

16   A.  Kyle Gerek.

17   Q.  Spell your last name, please?

18   A.  G-e-r-e-k.

19   Q.  How old are you, Mr. Gerek?

20   A.  36.

21   Q.  Which city do you live in?

22   A.  Virginia Beach.

23   Q.  And please tell us a little bit about your career --

24   brief background on your career.

25   A.  Just real estate for the last 12 years.

K. Gerek - Direct

1   Q.  Okay.  So you are involved in the real estate field?

2   A.  Yes.

3   Q.  If you can pull that microphone closer to your mouth.  I

4   know it's hard through the mask.

5            I want you to go back, thinking back to the

6   2011-2012 time period.  How knowledgeable were you about --

7   would you describe yourself about investments, the world of

8   investments?

9   A.  Not too much.

10  Q.  And had you ever been involved in running a franchise of

11  any kind?

12  A.  No.

13  Q.  Had you ever been involved before at that point in the

14  dental business?

15  A.  No.

16  Q.  And how about the business of telecommunications or

17  wireless spectrum?  Did you bring any of your own business

18  background knowledge?  Did you have any background in that?

19  A.  No.

20  Q.  Did there come a time that you met a man named Roger

21  Hudspeth?

22  A.  Yes.

23  Q.  When approximately was that, as best you can recall?

24  A.  2011 -- 2011.

25  Q.  And again, this is whatever your best recollection of the

K. Gerek - Direct

1   date is.  It doesn't have to be a precise date.  You think it
2   was around 2011?
3   A.   Yeah.
4   Q.   How did you hear about Mr. Hudspeth?
5   A.   Just through a family friend.
6   Q.   What was the purpose of you wanting to find out about
7   him?
8   A.   Just through investments and, you know, investing money
9   and getting some returns back, and my family friend was using
10  him and, at that time, recommended him.
11  Q.   So did you find yourself with some money to invest?
12  A.   Yes.
13  Q.   How much money was that?
14  A.   100,000.
15  Q.   Was that a surprise to you, or how did that come about?
16  A.   That was from an injury lawsuit.
17  Q.   So you were injured?
18  A.   Uh-huh.
19  Q.   And you got a settlement for 100,000?
20  A.   Correct.
21  Q.   Did you ever, at other times in your life, have 100,000
22  that you didn't know what to do with, or was this an unusual
23  occurrence?
24  A.   Unusual occurrence.
25  Q.   Is that why you talked to Roger Hudspeth?

K. Gerek - Direct

1   A.   Yes.  To invest.

2   Q.   Did you eventually meet with him in person?

3   A.   Yes.

4   Q.   Where did you meet with Mr. Hudspeth?

5   A.   At their office.

6   Q.   Where?  Which city was that in?

7   A.   At that time, it was Virginia Beach, off of Holland Road.

8   Q.   Do you know the name of the company Mr. Hudspeth was

9   associated with?

10   A.   Should be, like, Dominion Investment Group.

11   Q.   And when you went in and spoke to Mr. Hudspeth, what did

12   you ask him to do for you?

13   A.   Just kind of tell me what he has to offer, and I'm

14   looking to put the money to work and just...

15   Q.   Looking for investment advice?

16   A.   Yeah.

17   Q.   All right.  Did you tell him about the amount of money

18   you had and where it came from, that it was an unusual event?

19   A.   Yes.

20   Q.   Did you tell him that what you were looking for as far as

21   the growth potential for an investment or the risk of the

22   investment, anything like that that you recall?

23   A.   Can you repeat that again?

24   Q.   Do you recall telling Mr. Hudspeth -- speaking with him

25   about what you were looking for as far as the riskiness of

K. Gerek - Direct

1   the investment?  Let's start there.

2   A.  No, not really.

3   Q.  Okay.  And how did -- what investment did he describe to

4   you?

5   A.  That day, the first meeting would have been the Dental

6   Support.

7   Q.  You said "Dental Support"?

8   A.  Uh-huh.

9   Q.  What did he describe Dental Support as?

10  A.  A franchise business that you can invest into pretty much

11  handsfree, didn't have to do anything, and you get a profit

12  off of dentist offices using that product or franchise.

13  Q.  All right.  And I think you said this, but did he tell

14  you you would be responsible for finding patients for

15  dentists or anything like that?

16  A.  Huh-uh.

17  Q.  Were you shown some marketing materials when you went in

18  to talk to him about this investment?

19  A.  Yes.

20          MR. BOSSE:  Could we see, just for the witness,

21  please, Government's Exhibit 37.

22  BY MR. BOSSE:

23  Q.  And, Mr. Gerek, this is available on your screen.  Is

24  this one of the documents that you were shown about this

25  investment?

K. Gerek - Direct

1   A.  Yes.

2   Q.  All right.  And it looks like -- do I have this right?

3   It looks like a paper -- sort of bracketed at the top, a

4   multipage paper advertisement for the DSPF?

5   A.  Correct.

6   Q.  You've reviewed this before, right?

7   A.  Yes.

8   Q.  It appears to be true and correct as far as you recall?

9   A.  Yes.

10          MR. BOSSE:  I'll offer 37, Your Honor.

11          THE COURT:  Any objection?

12          MS. McCASLIN:  No objection.

13          THE COURT:  37 is admitted.

14          (Government's Exhibit 37 was admitted.)

15   BY MR. BOSSE:

16   Q.  Page 1, "Revolutionizing Dentistry," and Page 2 -- is

17   this what was described to you, the opportunity to own a

18   managed dental franchise with a six-year track record of

19   success?

20   A.  Yes.

21   Q.  And this is in the year 2011 that you were told the

22   company had a six-year track record?

23   A.  Correct.

24   Q.  All right.

25          MR. BOSSE:  Could we see Page 8, please.

K. Gerek - Direct

1   BY MR. BOSSE:

2   Q.  And is this the business that you were just describing, a

3   patient delivery system for dental offices?

4   A.  Yes.

5   Q.  And do you see that the advertisement here states that

6   it's "proven, proprietary, and has six years of consistent

7   performance"?

8   A.  Yes.

9   Q.  All right.  And the names down at the bottom here being

10  Oracare, MetroMedia, and Dental Support Plus?

11  A.  Correct.

12  Q.  All right.  I'm going to --

13          MR. BOSSE:  I think I can do this myself.

14          No.  Page 10, please.

15  BY MR. BOSSE:

16  Q.  Is this what you were told about the cost of a franchise

17  unit, that it would be $25,000 per unit?

18  A.  Correct.

19  Q.  And is this what you were told about how soon you could

20  expect the franchise to be operational, 180 days, or six

21  months?

22  A.  Correct.

23  Q.  Is that document and what you heard from Mr. Hudspeth,

24  are those things that you considered in deciding whether to

25  make this investment?

K. Gerek - Direct

1  A.  Yes.

2  Q.  Did you have any reason to doubt what you read in that

3  document based on what you heard from Mr. Hudspeth?

4  A.  No.

5  Q.  Before you made the decision to buy Dental, was a man

6  named Daryl Bank involved at any point in making this pitch

7  to you?

8  A.  Yes.

9  Q.  All right.  Whatever you recall about Mr. Bank's

10  involvement, how was he involved?

11  A.  Normally, Roger would just kind of -- I met with him most

12  of the time.  And whenever he needed, like, a final talk or

13  needed more explanation for the products or I guess you could

14  call it kind of closing me out, would be -- Daryl would get

15  on the phone call.

16  Q.  So Daryl was acting as sort of a closing salesman.  Is

17  that a fair way to put it?

18  A.  Correct.

19  Q.  All right.  And at any point in speaking with these

20  men -- Mr. Hudspeth, Mr. Bank -- did they ever give you the

21  impression that this business was not up and running?

22  A.  No.

23          THE COURT:  Keep your voice up, please.

24  BY MR. BOSSE:

25  Q.  It's really the mic.  It almost has to be touching the

K. Gerek - Direct

1    mask.  Pull it right in there.

2            What, if anything, were you told about whether this

3    franchise was already working for other people?

4    A.  He said that it -- they already had tons of people

5    signing up and that it was working smoothly and they had a

6    track record of profits coming back.

7    Q.  All right.  Were you ever told anything about a specific

8    franchise territory that you would get for your franchise?

9    A.  No.

10   Q.  And did you end up -- after hearing all the pitch and

11   hearing what you just described, that it was already working

12   and making money, did you decide to invest in this investment

13   product that was offered?

14   A.  Yes.

15   Q.  How much did you invest?

16   A.  25,000.

17   Q.  So you bought one franchise unit?

18   A.  One unit, yes.

19   Q.  Did you receive paperwork to sign?

20   A.  Yes.

21   Q.  A lot of paperwork to sign?

22   A.  Yes.

23           MR. BOSSE:  Could we see, for the witness,

24   Government's 39, please.

25   BY MR. BOSSE:

––––––––K. Gerek - Direct––––––––

1  Q.  I'm not going to show you all of it, but is this the

2  transmittal form that was filled out for your purchase with

3  the purchase date of November 2nd, 2012?

4  A.  Correct.

5  Q.  All right.

6          MR. BOSSE:  I'll offer 39.

7          THE COURT:  Any objection?

8          MS. McCASLIN:  No objection.

9          MR. YAROW:  No objection.

10         THE COURT:  Exhibit 39 will be admitted.

11         (Government's Exhibit 39 was admitted.)

12         MR. BOSSE:  40, please.

13  BY MR. BOSSE:

14  Q.  Do you recognize this, sir?

15  A.  Yes.  It's my check I gave to them.

16  Q.  Say that again.

17  A.  It's the check I gave to them for the unit.

18         MR. BOSSE:  I'll offer 40.

19         THE COURT:  Hearing no objection, it's admitted.

20         (Government's Exhibit 40 was admitted.)

21  BY MR. BOSSE:

22  Q.  You see the amount of the check that you paid was

23  $26,067?

24  A.  Yes.

25  Q.  There's a note here, "DSPF Gerek LLC."  What is that

K. Gerek - Direct

1   about?

2   A.  That's just the LLC, I guess, they had set up for me for

3   the Dental Support Group.

4   Q.  Was that part of making this investment, was they had you

5   set up an LLC?

6   A.  Yes.

7   Q.  All right.  Did anyone involved in making the sale to

8   you, Mr. Hudspeth or Mr. Bank or anyone else -- did anyone

9   tell you that in Virginia, they are not allowed to take your

10  money on a franchise until they meet what are called

11  preclearance requirements?

12  A.  No.

13  Q.  And, in fact, your money was taken and accepted by them?

14  A.  Oh, yes.

15          MR. BOSSE:  Could I see, please, for the witness,

16  Government's 42.

17  BY MR. BOSSE:

18  Q.  Is this the very -- is this the first page of a very long

19  franchise agreement that was involved in your purchase of

20  this?

21  A.  Yes.

22          MR. BOSSE:  I'll offer 42.

23          THE COURT:  Exhibit 42 is admitted, hearing no

24  objection.

25          (Government's Exhibit 42 was admitted.)

K. Gerek - Direct

```
 1          MR. BOSSE:  Could we go to Page 73 of 42, please.
 2   BY MR. BOSSE:
 3   Q.  Did anyone involved in the sale of this to you ever
 4   explain this portion of what you were signing to you, which
 5   says that -- which puts limits on the ability of the
 6   franchise company to take your money without certain
 7   requirements being met?
 8   A.  No, I don't --
 9          THE COURT:  What is the answer?  What was your
10   answer?
11          THE WITNESS:  Repeat yourself.  Sorry.
12   BY MR. BOSSE:
13   Q.  Sure.  Did anyone involved in the sale -- this is what we
14   talked about before, the preclearance requirements.  Did
15   anybody involved in the sale draw your attention to this and
16   tell you, hey, we can't take your money until we, the
17   franchisor, does a lot of things --
18   A.  No.
19   Q.  -- to meet these preclearance requirements?
20   A.  No.
21          MR. BOSSE:  Can we see 43, for the witness, please?
22   BY MR. BOSSE:
23   Q.  Again, we're not going to look at every page of this, but
24   is this the Area Development Agreement that was also part of
25   the packet of information you signed to get this franchise?
```

K. Gerek - Direct

1   A.  Yes.

2   Q.  And you see "DSPF Gerek" down there as, quote/unquote,

3   the developer?

4   A.  Correct.

5           MR. BOSSE:  I'll offer 43.

6           THE COURT:  Hearing no objection, it's admitted.

7           (Government's Exhibit 43 was admitted.)

8   BY MR. BOSSE:

9   Q.  And were you told at any point before you made the sale

10  that you would need to develop this business or find a

11  franchise territory or find any patients for dentists?

12  A.  No.

13  Q.  Were you told that those things would be done for you?

14  A.  Yes.

15  Q.  All right.  After you made the investment, did you get

16  letters from time to time, from a man named Kent Maerki,

17  about this investment?

18  A.  Yes.

19  Q.  Where did you receive those letters?  Did you get them

20  here in Virginia?

21  A.  Uh-huh, came to my mailbox.

22          MR. BOSSE:  If I could do this, I'm going to show

23  the witness and then offer a stream of documents so we don't

24  have to do them one at a time.  So just for the witness,

25  please, could we have 44.

K. Gerek - Direct

1    BY MR. BOSSE:

2    Q.  Do you recognize this?

3    A.  Yes.

4    Q.  Picture of Kent Maerki at the top and "Dear Kyle" in the

5    first line?

6    A.  Yes.

7              MR. BOSSE:  Could we see 45.

8    BY MR. BOSSE:

9    Q.  And do you recognize this one as well?

10   A.  Yes.

11             MR. BOSSE:  46, please.

12   BY MR. BOSSE:

13   Q.  Do you recognize this?

14   A.  Yes.

15             MR. BOSSE:  47.

16   BY MR. BOSSE:

17   Q.  Do you recognize it?

18   A.  Yes.

19             MR. BOSSE:  And the last one, 48.

20   BY MR. BOSSE:

21   Q.  Same?

22   A.  Yes.

23   Q.  Are these all communications and correspondence you

24   received either from Kent Maerki or from the Dental Support

25   company that was sent to you as part of your investment?

---

K. Gerek - Direct

1    A.  Yes.

2         MR. BOSSE:  I'll offer, Your Honor, 44 through 48

3    into evidence.

4         MS. McCASLIN:  No objection.

5         MR. YAROW:  No objection.

6         THE COURT:  Exhibits 44, 45, 46, 47, and 48 are

7    admitted.

8         (Government's Exhibits 44, 45, 46, 47, and 48 were

9    admitted.)

10        MR. BOSSE:  Could we have 44 back for the witness

11   and the jury.

12   BY MR. BOSSE:

13   Q.  This is the first one we looked at.  You see the date is

14   April 22 of 2013.  Is that correct?

15   A.  Yes.

16   Q.  And I want to highlight for you here.  Is this Kent

17   Maerki telling you, the investor, that there have been

18   disappointments from Oracare and MetroMedia and touting a

19   different group called WebOp?

20   A.  Yes.

21   Q.  Had anyone told you, anyone involved in this, up to this

22   point that there had been disappointments about this

23   investment and how it had performed?

24   A.  No.

25   Q.  Had you been getting money on the investment that you

---

K. Gerek - Direct

1    made?  Did you get any money after the six-month period?

2    A.  No.

3    Q.  All right.  In other words, so you make the investment,

4    six months passes, do you start getting money or no?

5    A.  No.

6         MR. BOSSE:  If we could go to Exhibit 45, please.

7    BY MR. BOSSE:

8    Q.  And again, you see Kent Maerki's face there at the top --

9    A.  Yes.

10   Q.  -- of the exhibit?

11        I'm asking you just so we can make a verbal record

12   for the court reporter.

13        You see here that they had sold, by this point, 236

14   franchise units at 200,000 [sic], and then they increased the

15   price to 25- and then to 30- due to what the letter describes

16   as demand?

17   A.  Yes.

18        THE COURT:  Counsel, you meant 20,000, not 200,000.

19        MR. BOSSE:  Oh, thank you.  25,000, and then 30,000.

20   Yes, sir.

21   BY MR. BOSSE:

22   Q.  And then do you see here that in two years, this group

23   sold 469 paid-in-full franchise units?

24   A.  Yes.

25   Q.  And if we go down to Page 2, what is at the top?  First

K. Gerek - Direct

1   full paragraph on Page 2, can you read the first sentence

2   there?

3   A.  "The simple truth is Oracare and MetroMedia failed."

4   Q.  All right.  You see it goes on to describe the waste of

5   $5 million, and at the end of this paragraph, it describes

6   the results, 1,100 patients and 13 dentists?

7   A.  Yes.

8   Q.  How does Mr. Maerki describe the performance there at the

9   end of that paragraph?

10  A.  "Awful."

11  Q.  Let's go to the next exhibit, please, 46.

12          And what is this that we're looking at here?

13  A.  It looks like a deposit they made to me.

14  Q.  Is this a letter notifying you they made a deposit of

15  $49.88?

16  A.  Yes.

17  Q.  Do you recall getting other moneys out of the $25,000

18  invested other than this letter?

19  A.  No.

20  Q.  Did you ever get that $25,000 back?

21  A.  No.

22  Q.  Do you know what happened to your franchise?

23  A.  I have no idea.

24  Q.  Did you later speak with Mr. Hudspeth and Mr. Bank about

25  how the dental investment was performing?

K. Gerek - Direct

1    A.  Yes.

2    Q.  What were you asking them?

3    A.  Just asked them for updates and when will I start seeing

4    returns on money and just basic questions anyone investing

5    money to an investment would ask.

6    Q.  What was the response?  What sort of response were you

7    getting from them?

8    A.  Usually it's everything was good and we're just waiting

9    for some more stuff to come in and hit the ground running,

10   but everything is good.

11   Q.  Okay.  Did you then get, later on, a notice that the

12   investment had been put on a shelf or shut down in some way?

13   A.  Yes.

14          MR. BOSSE:  Could we see 49, please.

15   BY MR. BOSSE:

16   Q.  And 49, can you describe what we're seeing here?

17   A.  That is --

18   Q.  Let me lay a better foundation.

19          Did you inquire with DSP about certain documents

20   that you needed to prepare your own taxes?

21   A.  Yes.

22   Q.  Is this the response from a woman at Dominion Investment

23   Group that attaches a number of other documents to it?

24   A.  Yes.

25   Q.  All right.  Relating to the same investment we've been

K. Gerek - Direct

1   discussing?

2   A.  Yes.

3          MR. BOSSE:  I'll offer 49, Your Honor.

4          THE COURT:  Hearing no objection, 49 will be

5   admitted.

6          (Government's Exhibit 49 was admitted.)

7   BY MR. BOSSE:

8   Q.  Looking down at Page 2 of Exhibit 49, is this the letter

9   here in August of 2014 where Kent Maerki is telling you, the

10  investor, that he's putting the investment on the shelf?

11  A.  Yes.

12         MR. BOSSE:  We can take that exhibit down, please.

13  BY MR. BOSSE:

14  Q.  I want to ask you about a different investment that you

15  made.  After you made the dental investment, so after you've

16  given the money to Roger for the dental investment, did he

17  continue to approach you about other investment

18  opportunities?

19  A.  Yes.

20  Q.  What other investment opportunities did Mr. Hudspeth

21  describe to you?

22  A.  Spectrum and WeMonitor.

23  Q.  Okay.  So we're not going to talk about WeMonitor.  We're

24  going to focus on spectrum here.

25         Was Mr. Bank also involved in selling spectrum to

K. Gerek - Direct

1    you?

2    A.   Yes.

3    Q.   Can you tell the jury, how is the spectrum investment

4    described to you by Mr. Hudspeth and Mr. Bank?

5    A.   That it's pretty much buying into airwaves, so kind of

6    leasing out airwaves to businesses and getting, you know --

7    making money off the leases for the airwaves.

8    Q.   All right.  Did they present different offering documents

9    and advertisements to you as they are discussing this with

10   you?

11   A.   Yes.

12   Q.   What did the men say to you about potential returns on

13   the investment, as best as you can recall?

14   A.   Just that there -- it was moving ahead and that they

15   would be getting returns coming up soon but nothing super

16   specific.

17   Q.   But was the impression you were getting was that this was

18   already up and running?

19   A.   Yes.

20          MR. BOSSE:  Could we see, just for the witness for

21   identification, 305, please.

22   BY MR. BOSSE:

23   Q.   Is this one of the advertisements you were given related

24   to Janus Spectrum Group LLC?

25   A.   Yes.

K. Gerek - Direct

 1           MR. BOSSE:  And 304, please.

 2   BY MR. BOSSE:

 3   Q.  Is this an Investment Offering circular for Janus

 4   Spectrum Group that you also reviewed?

 5   A.  Yes.

 6           MR. BOSSE:  I'll offer, Your Honor, Government's 304

 7   and 305.

 8           THE COURT:  Hearing no objection, they are admitted,

 9   304 and 305.

10           (Government's Exhibits 304 and 305 were admitted.)

11           MR. BOSSE:  Let's look first at 305, please, the

12   one-pager.

13   BY MR. BOSSE:

14   Q.  You see that this is an opportunity alert for Janus

15   Wireless Spectrum?

16   A.  Yes.

17   Q.  And I want to draw your attention to this paragraph, and

18   I want to ask if this is the kind of information you were

19   getting when you were being pitched this investment, that

20   it's an offering focused on asset appreciation and income

21   generation and that investors are provided with opportunities

22   to achieve 100 percent annual preferred return on invested

23   capital plus 50 percent of additional profits?

24   A.  Yes.

25   Q.  And that those would come from revenues resulting from

K. Gerek - Direct

1  acquiring and monetizing valuable FCC licenses or spectrum?

2  A.  Yes.

3  Q.  And you see down here at the bottom of the offering

4  document, the offering advertisement, some quotations,

5  "Bandwidth is the new black gold," "Spectrum is the most

6  valuable natural resource of the information age," that sort

7  of thing?

8  A.  Yes.

9      MR. BOSSE:  Let's go to the circular, please, which

10  is Government's 304.

11  BY MR. BOSSE:

12  Q.  And could we go to Page 4, please.  You see Page 4 here

13  is called "The Opportunity Overview"?

14  A.  Yes.

15  Q.  All right.  And we're not going to go through the whole

16  thing, but I want to put a few matters on the record because

17  this was one of the things that was shown to you.

18      You see here it says "Not since the early '90s, when

19  the FCC moved from lotteries to public auctions to award

20  spectrum, has the opportunity for individuals or investor

21  groups to effectively participate in the ownership of newly

22  offered, highly coveted wireless spectrum."

23      Do you see that here?

24  A.  Yes.

25  Q.  Do you see the note here, "Historically, owners of

K. Gerek - Direct

1    high-demand spectrum have sold, leased, or joint-ventured

2    these assets to wireless operators generating significant

3    profits," and it goes on from there?

4    A.  Yes.

5    Q.  Was that in line with what you were hearing from Mr. Bank

6    and Mr. Hudspeth as they pitched this investment to you?

7    A.  Yes.

8    Q.  All right.  And similarly, at the bottom of this page,

9    you see the statement here that "This targeted 800-megahertz

10   spectrum is among the most coveted spectrum to wireless

11   carriers."

12   A.  Yes.

13           THE COURT:  That is not on the monitor.  You might

14   have to switch the screen.  What you're reading is not on the

15   screen.

16   BY MR. BOSSE:

17   Q.  Let me use my curser.  Following my cursor here, starting

18   with "Today, this targeted 800-megahertz spectrum is among

19   the most coveted spectrum to wireless carriers."

20           Is that accurately stated?

21   A.  Yes.

22   Q.  And you see that they talk here about "attractive income

23   opportunities through a lease or joint venture with wireless

24   service providers" at the end of that paragraph?

25   A.  Yes.

K. Gerek - Direct

```
 1          MR. BOSSE:  All right.  Can we see Page 12 of this
 2    document, please, of 304.
 3    BY MR. BOSSE:
 4    Q.  Are you familiar through your work in the real estate
 5    world with what a pro forma is?
 6    A.  Yes.
 7    Q.  Okay.  If I said it generally is a projection that people
 8    are shown before they make an investment, is that a fair
 9    statement?
10    A.  Yes.
11    Q.  Do you see here there's market names, and it has various
12    sort of metropolitan areas listed down here in the chart, and
13    then it talks about monthly operating revenue, monthly cash
14    flow, and monthly cash flow per channel?  DO you see there's
15    projections here in this pro forma?
16    A.  Yes.
17    Q.  Let's go to the next page, please.
18          Continuing the pro forma, do you see projections for
19    the annual return on investment in the right-most column
20    here?
21    A.  Yes.
22    Q.  Do you see that the projection for the annual return in
23    New York, that sort of Long Island-Connecticut-Pennsylvania-
24    Massachusetts-Vermont area, is 2,024 percent?
25    A.  Yes.
```

K. Gerek - Direct

1  Q.  And that it goes down from there with the lowest annual

2  return on investment being projected for Kansas City of

3  194 percent?

4  A.  Yes.

5          THE COURT:  What is your question for him,

6  Mr. Bosse?

7          MR. BOSSE:  Whether I have accurately summarized

8  what the pro forma he saw had on it, Your Honor.  Otherwise,

9  we won't have the words.

10          Can we see the next page, please, and the -- the

11  page after.  Sorry.

12  BY MR. BOSSE:

13  Q.  Okay.  Who is the first name that's listed as the team

14  for Janus Spectrum LLC?

15  A.  David Alcorn.

16  Q.  Did you see that -- do you see here that it talks about

17  the fact that the accomplishments of his team have been cited

18  in various books and that he's the manager of Janus Spectrum

19  LLC?

20  A.  Yes.

21  Q.  Who is the second name listed under Mr. Alcorn's name?

22  A.  Kent Maerki.

23  Q.  All right.  And the fourth name down, who is that listed

24  as the consulting engineer.

25  A.  Jack Forrest.

Carol L. Naughton, Official Court Reporter

K. Gerek - Direct

1  Q.  Were you invited to public meetings about spectrum

2  investments here in the local Hampton Roads area?

3  A.  Yes.

4  Q.  Do you recall one of those meetings in particular

5  downtown here?

6  A.  Uh-huh.

7  Q.  Where did it occur?

8  A.  It was in the -- what's it called? -- Town Point or --

9  Q.  The Town Point Club downtown?

10  A.  Yes.

11  Q.  Who all was there for this meeting that you recall?

12  A.  Roger, Daryl.  Those were the main ones I remember.

13  Q.  Were there other investors there or --

14  A.  Oh, yeah.  It was a good crowd, good showing.

15  Q.  And do you recall whether any particular businesses were

16  discussed there?

17  A.  The spectrum.

18  Q.  And without going into everything that was said that you

19  recall, is it generally what we've talked about here today as

20  far as the pitch that was being made, what we've seen in

21  these documents?

22  A.  Yes.

23  Q.  Did you decide -- after hearing all of this and seeing

24  all of this, did you decide to invest?

25  A.  Yes.

K. Gerek - Direct

1    Q.   In Janus Spectrum Group?

2    A.   Yes.

3    Q.   How much did you put into that investment, if you

4    remember?

5    A.   50,000.

6    Q.   Okay.  Possibly 60-?

7    A.   60-, yes, sir.

8    Q.   And did Daryl Bank at any point tell you that the money

9    you put into that investment would be going to a company that

10   he controlled?

11   A.   No.

12   Q.   Did he tell you that portions of your money were going to

13   be transferred to other companies he controlled?

14   A.   No.

15   Q.   Did he tell you that part of your money was going to go

16   to a company that David Alcorn controlled?

17   A.   No.

18   Q.   And did he tell you that David Alcorn and Kent Maerki

19   were going to take more than half of what they got in

20   supposed fees?

21   A.   No.

22   Q.   Did he or anyone involved in this investment tell you

23   that the cost for applying for an FCC license was somewhere

24   in the order of a couple hundred dollars?

25   A.   No.

K. Gerek - Direct

1    Q.  After you made that $60,000 investment, did you get

2    statements from a trust company that showed what the value of

3    your investment was over time?

4    A.  Yes.

5    Q.  Did they continue to show month after month the same

6    60,000-dollar value?

7    A.  Yes.

8    Q.  So looking at those statements, did you have any reason

9    to fear that your money had been spent?

10   A.  No.

11   Q.  After you made the Janus Spectrum investment, were you

12   invited to join conference calls about that investment?

13   A.  Yes.

14   Q.  Who was on the calls, speaking generally, if you can tell

15   us?

16   A.  Usually Daryl.

17   Q.  Were there other investors on the calls that you could

18   tell?

19   A.  People listening in, yes.

20   Q.  Were they allowed to talk?

21   A.  No.  No one was allowed to talk.

22   Q.  What was the tone of the calls?  What was happening on

23   the calls?

24   A.  Just a few minutes of just saying everything is moving

25   forward and we should see some investments and returns coming

K. Gerek - Direct

1   up soon.

2   Q.  At one point, did you learn that the Securities and

3   Exchange Commission, the SEC, was investigating the spectrum

4   investments?

5   A.  Yes.

6   Q.  Did you ask about that?

7   A.  I did.

8   Q.  What did you hear back?

9   A.  That everything was good.

10          MR. BOSSE:  Could we see, just for the witness

11  please, Government's 52.

12  BY MR. BOSSE:

13  Q.  Is this a multipage e-mail string between you and Roger

14  Hudspeth where you're trying to set up calls to ask about

15  this?

16  A.  Yes.

17  Q.  Okay.

18          MR. BOSSE:  I will offer 52, Your Honor.

19          THE COURT:  Hearing no objection, 52 will be

20  admitted.

21          MR. BOSSE:  We don't need to go through that with

22  the witness.  We can take that down.

23  BY MR. BOSSE:

24  Q.  Did you have a call with Daryl Bank about the

25  investigation that you heard about?

———————————K. Gerek - Cross (By Mr. Yarow)———————————

1   A.  Yes.

2   Q.  What do you remember about that call?

3   A.  He was -- he said he was pretty much -- that it was lies

4   and false.

5         MR. BOSSE:  Okay.  Could we see for the witness 54,

6   please.

7   BY MR. BOSSE:

8   Q.  Is this another e-mail string between you and Daryl Bank

9   where, among other things, you're trying to get your money

10  back on the investment?

11  A.  Yes.

12        MR. BOSSE:  I'll offer 54.

13        THE COURT:  Hearing no objection, 54 is admitted.

14        (Government's Exhibit 54 was admitted.)

15  BY MR. BOSSE:

16  Q.  Without going through all of these e-mails as you're

17  trying to make this happen, were you ever able to get your

18  money back from this investment?

19  A.  No.

20        MR. BOSSE:  Let me look up to confer briefly with

21  everybody.  No more questions, and I'll pass the witness.

22  Thank you, Your Honor.

23        THE COURT:  Cross.

24                    CROSS-EXAMINATION

25  BY MR. YAROW:

K. Gerek - Cross (By Mr. Yarow)

1   Q.   Is it "Gerek"?

2   A.   Correct.

3   Q.   Okay.  Just to make sure I've got that correct.

4            MR. YAROW:  Would the government mind pulling back

5   up Exhibit 304, which has already been introduced, and go to

6   Page 4, please.

7   BY MR. YAROW:

8   Q.   So, Mr. Gerek, you bought this spectrum investment from

9   Roger Hudspeth?

10  A.   Hudspeth, yes.

11  Q.   And Daryl Bank?  Those are the two people that you were

12  mostly involved with, correct?

13  A.   Correct.

14  Q.   Okay.  And you read this Opportunity Overview; is that

15  correct?

16  A.   Correct.

17  Q.   And you saw that the name of the company that you were

18  actually investing in was Janus Spectrum Group LLC; is that

19  correct?

20  A.   Yes.

21  Q.   And if you go down to -- and then in the next paragraph,

22  it says "Dominion Private Group LLC."  Dominion Private Group

23  LLC, that was also a Daryl Bank entity; is that correct?  Or

24  do you know?

25  A.   At that point, it could have been or could not have been.

K. Gerek - Cross (By Mr. Yarow)

1   Q.  You don't know.  That's fine.

2         They had partnered with Janus Spectrum.  So you

3   heard -- you knew you were investing in Janus Spectrum Group.

4   Had you ever heard of Janus Spectrum other than this little

5   paragraph right here?  Just Janus Spectrum, not Janus

6   Spectrum Group.

7   A.  No.

8   Q.  It never came up in conversations with Daryl; Janus

9   Spectrum versus Janus Spectrum Group?  Let me reask the

10  question.

11        Did Daryl Bank or Roger Hudspeth ever tell you that

12  you were actually investing with a company called Janus

13  Spectrum, or as far as you knew it was just Janus Spectrum

14  Group?

15  A.  I just knew Janus Spectrum.

16  Q.  Janus Spectrum Group?

17        MR. BOSSE:  The witness just said Janus Spectrum.

18        THE COURT:  Raise it in terms of an objection.

19        MR. BOSSE:  Objection, because it's asked and

20  answered, and he just tried to put another phrase in the

21  witness's mouth.

22        THE COURT:  All right.  I think the jury heard what

23  he said.  So let's go with what the witness said and move on.

24        MR. YAROW:  Would you go to Page 12, please, of this

25  exhibit.

———————K. Gerek - Cross (By Mr. Yarow)———————

1   BY MR. YAROW:

2   Q.  Mr. Gerek, you said you've been a real estate agent for

3   12 years now; is that correct?

4   A.  Correct.

5   Q.  What type of real estate do you sell?

6   A.  Residential.

7   Q.  Do you sell any residential real estate that ends up with

8   investors, people that purchase the property not to live in

9   but to rent out?

10  A.  Yes.

11  Q.  Okay.  Are you familiar with investors who use pro

12  formas?

13  A.  Say that again.

14  Q.  You are familiar with that the investors will use a pro

15  forma to evaluate an investment.  You are familiar with that

16  concept in real estate?

17  A.  Concept, yes.

18  Q.  You've never -- have you after created a pro forma for

19  anything that you've sold?

20  A.  No.

21         MR. YAROW:  Would you turn to the next page, please,

22  Page 13.

23  BY MR. YAROW:

24  Q.  Now, can you tell me what a pro forma is in your own

25  words?  Do you know?

K. Gerek - Cross (By Mr. Yarow)

1    A.  Calculations on projected return.

2    Q.  And when somebody uses these calculations, they're based

3    on variables; in other words, numbers that are not fixed but

4    can fluctuate depending on the investment?

5            MR. BOSSE:  Objection.  We're asking for his

6    speculation, I think.

7            MR. YAROW:  I'm asking if he understands.

8            THE COURT:  Sustained.

9    BY MR. YAROW:

10   Q.  Are you familiar with the term "reward/risk" or

11   "risk/reward"?  Have you ever heard that term?

12   A.  I have.

13   Q.  So generally, the higher your risk, the higher the reward

14   you expect; is that correct?

15   A.  That's what they say, yeah.

16   Q.  That's what they say.  Okay.

17           And have you ever heard of any investment returning

18   a 2,024 percent return in a year?

19   A.  I've never heard anything like that.

20   Q.  And you saw this, yet you still invested in it, right?

21   There was no red flag raised here?

22   A.  I...

23           THE COURT:  What was your response?

24           THE WITNESS:  No.  There was no question.

25   BY MR. YAROW:

K. Gerek - Cross (By Mr. Yarow)

1  Q.  Okay.  And have you had -- ever had any contact with --
2  there was a paragraph that mentioned Mr. Alcorn as the
3  managing partner with Janus Spectrum.  Had you ever had any
4  contact with Mr. Alcorn?
5  A.  No.
6  Q.  You wouldn't recognize him?  You've never seen him?
7  A.  Never met him in my life.
8  Q.  Okay.  At these conference calls that you were invited to
9  to speak, it was just -- I'm sorry, not to speak, but to
10 hear, it was just Daryl that was talking, did all the
11 talking?
12 A.  They both talked, but yeah, Daryl talked a lot.
13 Q.  Who is the other person besides Daryl?
14 A.  Roger.
15 Q.  It was just Daryl and Roger doing the speaking?
16 A.  From what I recollect 11 years ago, correct.
17 Q.  Okay.  And who did you learn about the SEC investigation
18 from?  Who told you about that?
19 A.  I got something in the mail.
20 Q.  You got something in the mail?
21 A.  Uh-huh.
22 Q.  Okay.  You don't know who that came from?
23 A.  I mean, it's -- it's a lot of paperwork.  I can't
24 remember exactly who it came from.  I'm pretty sure it had an
25 envelope with a name on it.

K. Gerek - Cross (By Ms. McCaslin)

1    Q.  And then you had a follow-up call, once you received
2    that, with Daryl?
3    A.  Yeah.
4    Q.  And he said it was nothing to be worried about, nothing
5    to be concerned with?  He downplayed it, in other words?
6    A.  Correct.
7              MR. YAROW:  Thank you.  That's all the questions I
8    have.
9              THE COURT:  Cross.
10             MS. McCASLIN:  Yes, Your Honor.
11                           CROSS-EXAMINATION
12   BY MS. McCASLIN:
13   Q.  Hi, Mr. Gerek.  I just have a few questions for you.
14             I want to start with DSPF.  Before you invested, you
15   obviously received materials about DSPF, right?
16   A.  Correct.
17   Q.  And it was your understanding that the dentistry industry
18   is a successful industry?
19   A.  Yes.
20   Q.  But the dentists aren't trained in business, and so they
21   could use help in bringing in patients?
22   A.  Yes.
23   Q.  Pretty logical idea to you for a franchise, right?
24   A.  Yes.
25   Q.  Okay.  And your understanding was that you would own it

K. Gerek - Cross (By Ms. McCaslin)

1   but DSPF would manage everything for you?

2   A.   Pretty much, yeah.

3   Q.   And you obviously are aware that Kent Maerki was in

4   charge of DSPF?

5   A.   Yes.

6   Q.   I know some of these seem very basic.

7        MS. McCASLIN:   If we could pull up Government 37.

8   BY MS. McCASLIN:

9   Q.   This has already been admitted.  You've seen this.

10       If we could go to Page 4.  Sorry, Page 3.

11       So this screen is just a little bit of background, a

12  snapshot of Kent Maerki, right?

13  A.   Yeah.

14  Q.   And I assume you were reassured by the information on

15  this page that he's been in financial services for 43 years

16  and capitalized $3 billion in something previously?

17  A.   That's what it says, yes.

18  Q.   Now, after you invested and you started getting the

19  e-mails and the letters, did you also participate in the

20  weekly calls?

21  A.   I participated in as many calls as I could get on, so if

22  they had weekly ones, sure.

23  Q.   Fair to say that the tone of the calls were very

24  enthusiastic?

25  A.   Every call was very enthusiastic.

K. Gerek - Cross (By Ms. McCaslin)

1    Q.  Similar to the tone of most of the letters that you
2    received, right?
3    A.  Uh-huh.
4    Q.  And you knew that they were bringing in a new vendor,
5    WebOp, with David Bailey, right?  Do you remember that name?
6    A.  I'm -- I mean, yeah, I recollect.  Again, it's been quite
7    a while.
8    Q.  Okay.  Let's bring up Government 45 just to help you
9    remember.  If we could go to Page 3.
10            This has already been admitted, but this paragraph
11   that I'm showing you is all about how WebOp, David Bailey and
12   WebOp, are well-known for Match.com and Ticketmaster.com and
13   other big companies, right?
14   A.  Yes, that's what it says.
15   Q.  Did that give you some reassurance that DSPF was about to
16   get right on the right track and that this was still a good
17   investment?
18   A.  That's what they were saying, yes.
19   Q.  Now, when you received the letter from Mr. Maerki in
20   August 2014 saying that they were shutting down DSPF, were
21   you surprised?
22   A.  Yeah.
23   Q.  Because it was very different than all of the other calls
24   and mailings that you previously received, right?
25   A.  Yeah, because it was the first time someone was speaking

K. Gerek - Cross (By Ms. McCaslin)

1    the truth.

2    Q.  Right.  In the truth, it was the first time that they

3    said we just can't keep this business going, right?

4    A.  Yes.

5    Q.  And Kent Maerki did not tell you in that letter, though,

6    shutting it down, that he and his wife were laundering money

7    that you had invested?

8    A.  No, he did not tell me that.

9    Q.  If we could move on to Janus Spectrum.  Correct me if I'm

10   wrong, but you were under the impression that the licenses

11   that you were going to be getting from the FCC could be used

12   by major cell phone carriers like Verizon and Sprint and

13   AT&T?

14   A.  To lease them out, yeah.

15   Q.  Right.

16          Did you do any research into spectrum yourself?

17   A.  All the material they sent me and then I Googled it and

18   stuff, yeah.

19   Q.  Did you understand what you found in Google, in your

20   Google research?

21   A.  I understood the spectrum and the basis behind

22   everything, yes.

23   Q.  Did you find that the further you dove into the topic,

24   the more technical it got?

25   A.  I mean, what do you mean about -- repeat that again.

K. Gerek - Cross (By Ms. McCaslin)

1   Q.  I'll withdraw the question.

2         The research that you did, though, seemed to line up

3   with what you were told by Mr. Hudspeth and Mr. Bank?

4   A.  As far as the spectrum industry, yes.

5   Q.  Enough so that you invested in it, at least?

6   A.  Uh-huh.

7   Q.  And you described Mr. Bank as a closer, right?

8   A.  Yes.

9   Q.  Mr. Bank is fairly convincing?

10  A.  Yes.

11  Q.  Yes.

12        And it seemed like a really good opportunity to

13  invest in something that had a limited, finite supply, right?

14  A.  Yes.

15  Q.  And you're aware that Kent Maerki was involved in Janus

16  Spectrum as well?

17  A.  Yes.

18        MS. McCASLIN:  If we could bring up Government's

19  Exhibit 304.  This has already been admitted.  If we could go

20  to Page 15.

21  BY MS. McCASLIN:

22  Q.  So you've already seen this page, but I just wanted to

23  bring up one additional person in the Janus team.  That was

24  Kent Maerki.

25        Going through this document, you learned that Kent

K. Gerek - Cross (By Ms. McCaslin)

1    Maerki is an icon in the wireless industry, right?

2    A.   That's what it says.

3    Q.   And that previously his clients invested $75 million in

4    FCC lotteries that is currently valued at 3.6 billion?

5    A.   Again, yes, that's what it reads.

6    Q.   I assume it would make you more comfortable investing in

7    Janus Spectrum knowing that somebody that's in charge of the

8    business knows the ins and outs of the industry and has for

9    decades?

10   A.   Of course.

11   Q.   And after you invested, I think you mentioned that you

12   also participated in weekly calls?

13   A.   I don't want to say they were weekly, but whenever they

14   had a call, I would jump on it, sure.

15   Q.   Okay.  And again, everything was upbeat; we're just

16   waiting for things to fall in place, right?

17   A.   Yeah.

18   Q.   You didn't have access to Dominion's bookkeeping,

19   correct?

20   A.   No.

21   Q.   You didn't know where your money was going, right?

22   A.   Correct.

23   Q.   You didn't know that Daryl Bank was spending tens of

24   thousands of dollars on fancy watches with your money?

25   A.   Nope.

```
                       K. Gerek - Recross (By Mr. Yarow)
 1   Q.  And when you asked him, Daryl Bank, if he was under
 2   investigation, he didn't completely answer you, did he?
 3   A.  He beat around the bush.
 4           MS. McCASLIN:  I have no further questions.  Thank
 5   you.
 6           THE COURT:  Any redirect?
 7           MR. BOSSE:  No, sir, Your Honor.
 8           THE COURT:  May this witness be permanently excused?
 9           MR. YAROW:  Your Honor, may I ask a couple follow-up
10   questions?
11           THE COURT:  On what examination?
12           MR. YAROW:  Well, I'm just asking the Court's
13   permission to ask a couple follow-up questions.
14           THE COURT:  It's very unusual, but I'll give you a
15   couple, but only within the scope of, I think, what Attorney
16   McCaslin has asked.
17           MR. YAROW:  Okay.
18                       RECROSS-EXAMINATION
19   BY MR. YAROW:
20   Q.  Mr. Gerek, I just want to ask you a couple more questions
21   about the Janus Spectrum investment.
22           Daryl Bank and Roger Hudspeth never told you that
23   you would be the -- what you were purchasing would be the
24   application services to purchase -- to apply for a license
25   for this spectrum?
```

Carol L. Naughton, Official Court Reporter

1   A.  Repeat that again.

2   Q.  Yes, I will.  Did --

3           THE COURT:  Hold on a second.

4           MR. BOSSE:  I object to the question as stated

5   because the witness has already talked about this.  It's also

6   not within Ms. McCaslin's cross.

7           THE COURT:  I think the other thing, Mr. Yarow, that

8   is beyond the scope of what the last counsel examined the

9   witness on.

10          MR. YAROW:  Okay.  Your Honor, that was basically my

11  question.

12          THE COURT:  Then let's let it go.

13          May the witness be excused permanently?

14          MR. BOSSE:  Yes, sir.

15          THE COURT:  Step down, sir.

16          (The witness was excused.)

17          THE COURT:  We will start the next witness.

18          MR. BOSSE:  For the next witness, we were going to

19  play -- we have a deposition.  It would take us through the

20  1:00 hour, but we would be happy to pause it.  It's something

21  we can start and stop whenever is convenient.

22          THE COURT:  Well, then, let's start and stop the

23  deposition.

24          MR. BOSSE:  If I could just make -- for the record,

25  this is Ruth Clark, who was deposed in Idaho Falls, Idaho.

```
                      ──────R. Clark - Direct──────
 1            THE COURT:  Does this witness have any objections?
 2            MR. BOSSE:  No, sir.
 3            THE COURT:  Okay.  Then let's move it.
 4            MR. BOSSE:  Your Honor, what we're going to do,
 5    because there's some documents, it's hard to pause it and
 6    offer them.  My plan -- I don't think there's going to be
 7    objection to the documents in this deposition.  I'm going to
 8    offer them after we play the video, unless anyone has any
 9    objection to that.
10            MR. GRINDROD:  That's fine with Mr. Smith.
11            MR. YAROW:  That's fine with Mr. Alcorn, Your Honor.
12            THE COURT:  Okay.  Fine.  Then we will move on.
13            (Video deposition played in open court as follows:)
14            THE VIDEOGRAPHER:  We are on the record.  This is
15    the beginning of file number 1.  Today's date is November 8,
16    2021.  The time is approximately 9:35 a.m.  This is the
17    deposition of --
18            (The video was paused.)
19            MS. YUSI:  Sorry.
20            (The video continued as follows:)
21            (Witness sworn.)
22            RUTH CLARK, called by the Government, having been
23    first duly sworn, was examined and testified as follows:
24                          DIRECT EXAMINATION
25    BY MR. BOSSE:
```

R. Clark - Direct

1   Q.   Good morning, ma'am.  Would you please state your name

2   for our record.

3   A.   Ruth Clark.

4   Q.   Ms. Clark, where do you live?

5   A.   I live in Idaho Falls, Idaho.

6   Q.   How long have you lived in Idaho Falls?

7   A.   Almost 50 years.

8   Q.   How old are you?

9   A.   85.

10  Q.   Were you married in the past?

11  A.   Yes.

12  Q.   To whom were you married?

13  A.   Bernell A. Clark.

14  Q.   And did Mr. Clark pass away?

15  A.   Yes.

16  Q.   When was that?

17  A.   January 16th of 2019.

18  Q.   How long had you and Bernell been married?

19  A.   65 years, almost 66.

20  Q.   Okay.  Ma'am, what is your educational background, if you

21  can tell me briefly?

22  A.   I graduated from high school.

23  Q.   And how about Bernell's?

24  A.   Bernell -- one year of college.

25  Q.   Did you work outside the home before retirement?

R. Clark - Direct

1   A.   Yes.  I worked as a telephone operator and hung wallpaper

2   professionally and run a little store inside my home.

3   Q.   How about Bernell?  Did he work before retirement?

4   A.   As a truck driver and then he worked for the INEL for 36

5   years -- 35 years.

6   Q.   Okay.  And the INEL, is that -- tell us what that is.

7   A.   It's Idaho National Energy Laboratory.

8   Q.   And you said he was a driver?

9   A.   A bus driver, yes.

10  Q.   And so what -- day to day, he was driving a bus?

11  A.   He would go to work, pick up passengers and truck them

12  out into the desert about 50 miles, stay all day, and come

13  back.

14  Q.   How long was Bernell a bus driver?

15  A.   Almost 35 years.

16  Q.   And when did he retire?

17  A.   10 years early; so 55.

18  Q.   Why did he retire early?

19  A.   He had a lot of health problems.  He had had five bypass

20  heart surgeries, several heart attacks, and they didn't want

21  him to drive bus anymore --

22  Q.   Okay.

23  A.   -- and be responsible for 48 passengers.

24  Q.   Sure.  At the time that Bernell retired, tell us a little

25  about the kind of savings that you and he had saved up over

———R. Clark - Direct———

1    the years.

2    A.  Well, Bernell had them hold out money from his paycheck

3    every week as a savings for when he retired.  And when he

4    retired, they would not let him leave the money with the

5    company.  He had to take it with him, and we had no place to

6    put it.  We didn't know what to do with it.  And that's when

7    Tony Sellers approached us to --

8    Q.  Okay.  Before I ask you about Mr. Sellers, let me ask you

9    a couple of general questions.  Thinking back to the time

10   period of the investments we're going to talk about today,

11   how knowledgeable would you describe you and Bernell about

12   the world of investing?

13   A.  Absolutely nothing.

14   Q.  Okay.  Had you ever before been a member of a limited

15   liability corporation?

16   A.  No.

17   Q.  Had you or Bernell ever been involved in the

18   telecommunications or spectrum businesses?

19   A.  No.

20   Q.  Did either of you have any specialized knowledge about

21   that industry?

22   A.  No.

23   Q.  Okay.  So you mentioned Tony Sellers.  When did you first

24   meet or hear about Tony Sellers, as best as you can recall?

25   A.  I don't remember the year, but Bernell had some

R. Clark - Direct

1   investment with him through -- with an insurance-type thing,
2   which wasn't doing well, and so Tony suggested that he get
3   out of that and put that money towards this investment.
4   Q.  And when you say "this investment," what kind of
5   investment are you talking about?
6   A.  With the cellular towers with -- that's what we
7   understood it was.
8   Q.  Okay.  So before the investment was made, did you and
9   Bernell meet with Mr. Sellers to talk a little bit about your
10  financial situation?
11  A.  You mean before the meeting at the library?
12  Q.  Yes.
13  A.  He was in our home several times on different -- through
14  probably the other investment we had, but not so much until
15  after this meeting when we invested in this company.
16  Q.  Okay.  Well, you said he came to visit you and Bernell at
17  your home.
18  A.  Yes.
19  Q.  And when he was there, did you talk about the money you
20  had to invest, the fact that it was your retirement?
21  A.  Yes.  And Bernell was very specific with him that this
22  was our life savings and that it had to be -- he couldn't
23  afford to lose it, it had to be safe.  We just couldn't
24  afford to lose it.  That was 35 years of savings.
25  Q.  So fair to say that it was made clear to Mr. Sellers you

R. Clark - Direct

1   weren't looking for a high-risk investment?

2   A.  Absolutely not.

3   Q.  You mentioned a meeting at a library.  Tell us what you

4   recall about that.

5   A.  Tony called and invited us to a meeting at the library in

6   Idaho Falls.  There was probably, I would say, 30 to 40

7   people at that meeting.  Tony took charge of the meeting and

8   then introduced several different people who took over the

9   meeting.  And we thought it was a good thing to go with.

10  Q.  So tell -- do you remember when this was?

11  A.  In 2013.

12  Q.  Summer of 2013?  Does that sound right?

13  A.  The summer, yes.

14  Q.  Okay.  How many people -- not Mr. Sellers and the other

15  people presenting, but if you can estimate, about how many

16  other people were there to hear the presentation?

17  A.  I would think at least 30, maybe a few more.

18  Q.  And what was the presentation about?

19  A.  They were explaining about getting towers for cellular

20  phones, and that was just coming into being, and we thought

21  that was going to be a big thing.

22  Q.  From the meeting that you remember hearing, did the

23  presenters make it sound like it was going to be a big thing?

24  A.  Yes.

25  Q.  You said that Mr. Sellers spoke initially and that he

R. Clark - Direct

1   introduced some people.  Do you remember any of the people
2   that he introduced who spoke at that meeting?
3   A.   I remember one person, a Mr. Alcorn, because he was
4   partially blind and my husband was blind.
5   Q.   Bernell was blind at this time?
6   A.   Yes.
7   Q.   Okay.  What, if anything, do you remember being said
8   about the timeline of returns for this investment, how long
9   it would take to make money on this investment that was being
10  pitched?
11  A.   Okay.  We asked, and they said about four months we
12  should start getting some return on our money.  This was
13  early summer.  So we said okay.  By December, that would give
14  you another couple of months.  By the end of the year, we
15  should be getting some investment, which was maybe six
16  months.
17  Q.   Okay.  Did anybody during the presentation say anything
18  about this being a high-risk investment?
19  A.   No.
20  Q.   And did anyone say, during the presentation, that the
21  co-founder of Mr. Alcorn's company had been banned from the
22  securities industry?
23  A.   Never heard anything about that.
24  Q.   You said that Mr. Alcorn spoke with Bernell after the
25  main presentation?

Carol L. Naughton, Official Court Reporter

R. Clark - Direct

1   A.   Yes.  After the meeting, he came and visited with Bernell

2   and I because of their blindness.  That's how I remember him.

3   Q.   Okay.  Anything specific you remember from that

4   conversation, other than the main presentation that

5   Mr. Alcorn had given?

6   A.   No.  He just said how -- when he would travel, it was

7   easier for him on airplanes and things.  Because of his

8   blindness, he would need special attention to him.  It was

9   kind of a rapport.

10  Q.   So he connected with Bernell over that?

11  A.   Right, uh-huh.

12  Q.   In the end, did you and Bernell decide to make an

13  investment in this wireless spectrum investment opportunity?

14  A.   We did.

15  Q.   And do you recall how much was initially invested?

16  A.   Initially, I believe it was 220 -- no, $235,000.

17  Q.   Okay.  Let me show you what I've marked as Government's

18  Exhibit 733.  If you can take a look at that.

19  A.   Uh-huh.

20  Q.   Do you recognize having seen this document before?

21  A.   Yes.

22  Q.   And this was one -- a document that you had in your

23  possession?

24  A.   Yes.

25  Q.   Okay.  And can you tell us what the cover says?

─────R. Clark - Direct─────

1   A.  It says "Organizational deposition" -- no -- "Resolutions

2   of the Managers of Lincoln Spectrum and Texas Limited

3   Liability Company."

4   Q.  And so is Lincoln Spectrum the first spectrum investment

5   that you made through Mr. Sellers?

6   A.  Yes.

7   Q.  Okay.  Let me have that, if I could.  And looking now at

8   the last page of this exhibit -- the last two pages are the

9   listing of capital contributions, Schedule 2.

10          Do you see your name and Bernell's name there with

11  the amount of money invested?

12  A.  Yes.  The original investment was 235,000.

13  Q.  Let's talk about that second investment that was made.

14          Did there come a time that you later, with Bernell,

15  made a second smaller investment in a company called Prime

16  Spectrum?

17  A.  Yes.  Tony called and said there was a short period of

18  time that we -- there was a few openings if we wanted to

19  invest more money, but we didn't have very many days to

20  decide.  And Bernell at that time decided to put another

21  $20,000 in.

22  Q.  Okay.

23  A.  This was in February of 2014.

24  Q.  And what, if anything, did Mr. Sellers tell you about

25  whether the second investment was a high-risk investment?

—————————————R. Clark - Direct—————————————

1   A.   No.

2   Q.   Had you told him anything between the Lincoln Spectrum

3   investment and the second investment about -- that you were

4   ready for high-risk investments, anything like that?

5   A.   No.

6   Q.   Did you understand at the time you made the second

7   investment that it was in a different company called Prime

8   Spectrum?

9   A.   I don't really remember, but I know that it changed from

10  one thing that they were doing on towers.  It changed to

11  totally something different that they were doing.

12  Q.   And do you recall what it changed to?

13  A.   They were trying to get land and -- I don't really know

14  what they were doing.

15  Q.   Did Mr. Sellers say anything similar about the amount of

16  time you could expect to wait until you would make money on

17  this investment?

18  A.   No.  We -- we knew we weren't getting anything, and

19  Bernell would have me call numbers because he couldn't dial

20  them.  He would talk to different people, and they would --

21  they wouldn't give him answers.  They'd say call someone else

22  or -- it was always a runaround, whatever they thought he

23  would like to hear to satisfy him.

24  Q.   At the time that that Prime Spectrum -- the smaller

25  second investment was made, did Mr. Sellers tell you that the

352

R. Clark - Direct

1   company that your money was being put into was controlled by
2   a man named Daryl Bank?
3   A.  I didn't know that he was controlling it, but I knew the
4   name.  Bernell talked to him.
5   Q.  Okay.  Did he tell you at any point that Daryl Bank had
6   been banned from the securities industry?
7   A.  No.
8   Q.  Did Mr. Sellers tell you at any point that he and Daryl
9   Bank together would take about 70 percent of your investment
10  right off the top in the form of fees and commission?
11  A.  No.  Never -- never heard that.
12  Q.  I'm going to show you what I've marked as Government's
13  Exhibit 33.  And if you could take a look at this and tell me
14  what this page shows.
15  A.  This is showing a copy of the check that I originally
16  wrote for 200 -- no.  This is for $20,100.
17  Q.  And is that the check you wrote for the Prime Spectrum,
18  the second investment?
19  A.  Yes.
20  Q.  Okay.
21  A.  But it wasn't written out to Prime.  It was written out
22  to Summit.
23  Q.  Tell me about that.  Do you know why it was written out
24  to a company called Summit Trust Company?
25  A.  No.

R. Clark - Direct

1   Q.  Ma'am, let me ask you a little bit more about -- about
2   the investment that was made in Prime.
3          Do you see the date there that the check was written
4   as February 27th of 2014?
5   A.  Yes.
6   Q.  Okay.  Before you made this investment in 2014, did
7   Mr. Sellers or anyone else tell you that the Securities and
8   Exchange Commission was investigating Mr. Bank and Mr. Alcorn
9   and some of their companies?
10  A.  No.
11  Q.  Did anyone tell you that some of the money you invested
12  would be used to pay for Mr. Bank's legal defense?
13  A.  No.
14  Q.  And the money that was invested in the original Lincoln
15  Spectrum and then the Prime Spectrum, so a total of
16  255,000 -- where did that money come from?
17  A.  Well, some of it -- most of it came from Bernell's
18  savings as he worked, but some of it came out of the
19  original -- was it insurance policy or something that he had
20  with Sellers?  And so Mr. Sellers said, "Well, it's not doing
21  anything.  Why don't you take your money out of that and put
22  it into this other," which cost us a lot of money to get out
23  of that.
24  Q.  So you're saying there was a fee that was paid to
25  withdraw the money from the earlier investment and then put

———————— R. Clark - Cross (By Mr. Yarow)————————

1   it into the spectrum investment?

2   A.  Right.  And as I remember, it was maybe around 30-,

3   $35,000.  If was a lot of money that we -- that it cost us to

4   get out of that.

5   Q.  Ma'am, as time went on, to your knowledge, did you and

6   Bernell ever make money on the Lincoln and Prime Spectrum

7   investments?

8   A.  Never a penny.

9   Q.  Did you ever get any of your investment money back for

10  either of those two investments?

11  A.  Nothing.  No.

12          (The videotape was paused.)

13          MR. BOSSE:  Your Honor, I think we can finish.

14  There's only about four or five minutes left.

15          THE COURT:  All right.  It will be five minutes past

16  the time to quit, but let's try completing it.

17          (Video continued as follows:)

18          MS. McCASLIN:  This is Lindsay McCaslin representing

19  Aghee Smith.  We have no questions.  Thank you.

20                      CROSS-EXAMINATION

21  BY MR. YAROW:

22  Q.  Ms. Clark, my name is Rick Yarow.  I represent David

23  Alcorn.

24          You invested in two separate companies through

25  Mr. Sellers; is that correct?

—————R. Clark - Cross (By Mr. Yarow)—————

1   A.   Yes.

2   Q.   Okay.  And the first one was called Prime Spectrum?

3   A.   No.  It was called Lincoln Spectrum, I believe.

4   Q.   Okay.  The first one was Lincoln, and the second one was

5   Prime Spectrum; is that correct?

6   A.   Yes.

7   Q.   Okay.  And how many times had you met David Alcorn?

8   A.   Only once.

9   Q.   Okay.  And at the meeting, that was in -- near your home

10  in Idaho?

11  A.   Yes.  At the library.

12  Q.   At the library.  Okay.

13          And do you know why Mr. Alcorn was there?

14  A.   Well, he was probably part of the people promoting the

15  company.

16  Q.   You're guessing.  You really don't know -- you really

17  don't know the reason he was there; is that correct?

18  A.   No.

19  Q.   And you don't really know the reason that Mr. Alcorn was

20  there; is that correct?

21  A.   No.

22  Q.   Okay.  And did Mr. Alcorn talk to you or only Bernell?

23  A.   To both of us, after the meeting.

24  Q.   Okay.  Was it primarily small talk concerning the mutual

25  blind -- the mutual difficulty in seeing?

R. Clark - Redirect

1   A.  Yes.

2   Q.  So Mr. Alcorn was not there to talk to you about the

3   Lincoln or the Prime Spectrum investments; is that correct?

4   A.  No.

5          MR. YAROW:  Okay.  That's all the questions I have.

6   Thank you.

7                    REDIRECT EXAMINATION

8   BY MR. BOSSE:

9   Q.  Ma'am, thinking back to the meeting at the library, was

10  Mr. Alcorn one of the men who presented information about

11  spectrum to the group?

12  A.  I believe so.

13  Q.  Okay.  And so what you're saying is that the small

14  meeting that you and he and Bernell had after, that was small

15  talk, and you weren't talking individually about spectrum?

16  A.  Right.

17         MR. BOSSE:  Okay.  No further questions.

18         (The video concluded.)

19         MR. BOSSE:  Now that that's concluded, I'll offer

20  Government's Exhibits 733 and 33.

21         THE COURT:  733 and 33?

22         MR. BOSSE:  Yes, sir.

23         THE COURT:  Any objections to those two exhibits?

24         MR. YAROW:  No, Your Honor.

25         THE COURT:  Hearing none, Government Exhibits 733

───────────── T. Walsh - Direct ─────────────

1    and 33 are admitted.

2           MR. BOSSE:  Thank you, Your Honor.

3           (Government's Exhibits 33 and 733 were admitted.)

4           THE COURT:  Ladies and gentlemen, we're going to

5    stop here for lunch.  We will be back here at 2:30.  Your

6    lunches hopefully should be here.  You may be separated in

7    different rooms just for spacing purposes for lunch, but we

8    will see.

9           (The jury exited the courtroom.)

10          (Recess from 12:59 p.m. to 2:30 p.m.)

11          (The jury entered the courtroom.)

12          THE COURT:  Let the record reflect all jurors are

13   present this afternoon.

14          Does counsel agree?

15          MS. YUSI:  The government agrees, Your Honor.

16          MR. YAROW:  David Alcorn agrees, Your Honor.

17          MS. McCASLIN:  Mr. Smith agrees, Your Honor.

18          THE COURT:  You may call your next witness.

19          MS. YUSI:  Your Honor, we tall Terri Walsh.

20          (The witness was sworn.)

21          TERRI WALSH, called by the Government, having been

22   first duly sworn, was examined and testified as follows:

23                      DIRECT EXAMINATION

24   BY MS. YUSI:

25   Q.  Good afternoon, Ms. Walsh.  Could you introduce to the

─────T. Walsh - Direct─────

```
 1   Court.
 2   A.  I'm Terri Walsh.
 3   Q.  How do you spell your first name Terri?
 4   A.  T-e-r-r-i W-a-l-s-h.
 5   Q.  And if you could make sure -- if you want to pull the
 6   microphone closer to you, and speak right into it and loud
 7   and clear so everyone in the court can hear you.  Thank you.
 8             How old are you today?
 9   A.  71.
10   Q.  What city and state do you live in?
11   A.  Virginia Beach, Virginia.
12   Q.  And what is your educational background?
13   A.  I have an associate's degree in medical science.
14   Q.  And what did you do predominantly for work?
15   A.  I did urgent care nursing for the last 25 years with
16   Sentara.
17   Q.  Urgent care nursing?
18   A.  Uh-huh.
19   Q.  Did you retire from nursing?
20   A.  Yes, ma'am.
21   Q.  When did you retire?
22   A.  2017.
23   Q.  Are you currently working?
24   A.  I am.
25   Q.  What are you doing?
```

T. Walsh - Direct

1  A.  I'm a pastor's administrative assistant at a church.

2  Q.  Is that full time or part time?

3  A.  Part time.

4  Q.  Now, over the course of your work history, did you save

5  funds for retirement?

6  A.  10 percent of every check I made from the time I was 16.

7  Q.  10 percent, you said?

8  A.  Yes, ma'am.

9  Q.  And how did you save this money?

10  A.  At first, it went into savings accounts, and then I

11  branched into different investments.

12  Q.  At some point did you eventually have some unexpected

13  costs that limited your ability to save for retirement?

14  A.  Yes, ma'am.  One day I came home from work and inherited

15  three children.

16  Q.  Are those your grandchildren?

17  A.  Those are my grandchildren.  So I wasn't able to save at

18  the same rate.

19  Q.  Do you know an individual named Daryl Bank?

20  A.  Yes, I do.

21  Q.  Around when did you first meet Mr. Bank?

22  A.  2010.

23  Q.  And how did you meet him?

24  A.  He was working at my bank as an investment counselor, and

25  I was introduced to him at the bank, and then after the

T. Walsh - Direct

1   2008-'9 crash and our portfolios took a dive, I thought I
2   would check with a professional to see if there was anything
3   I could do better with my investments to try to regain the
4   losses that we had --
5   Q.  Was Daryl Bank that person you met with?
6   A.  Yes.
7   Q.  You said he was working at a bank at that point.  Which
8   bank was he working at?
9   A.  It was called the Bank of the Commonwealth.  It's now
10  Southern Bank.
11  Q.  And at some point, did he stop working for that bank and
12  go elsewhere?
13  A.  Yes, ma'am.  I got a letter that said he had opened his
14  own office.
15  Q.  Do you remember what that office was called?
16  A.  Dominion Investments.
17  Q.  And approximately when do you think he went to Dominion
18  Investments or started Dominion Investments?  If you recall.
19  A.  I can't -- I don't remember.
20  Q.  Did you ever go to Daryl Bank's new office?
21  A.  Yes, I did.
22  Q.  Where was that located?
23  A.  That was right off Holland Road in Virginia Beach.
24  Q.  Now, you said what he was doing at the Bank of the
25  Commonwealth.  What was he doing with Dominion?

─────── T. Walsh - Direct ───────

1   A.  His investments -- he did investments.

2   Q.  The same thing?

3   A.  Yes.

4   Q.  What was your understanding of any duty, if anything,

5   that he owed to you?

6   A.  Any duty?

7   Q.  Any duties towards you.

8   A.  One of the biggest things when he introduced himself and

9   his company to me is he went into elaborate detail of what a

10  fiduciary company was, and that every investor should know

11  that they are under obligation to provide us with investments

12  at what is best for our interest and not their own.  So they

13  would never put us into something that would be a great risk

14  or a great loss to us.

15  Q.  Did you trust Daryl Bank at that point?

16  A.  I did.

17  Q.  You said you had things in investments.  Did you consider

18  yourself a sophisticated investor?

19  A.  No.

20  Q.  Let's talk about 2011.  Were you still working as a

21  nurse?

22  A.  Yes, ma'am.

23  Q.  What was your plan about retirement?

24  A.  Well, I had planned to retire and travel, and then when I

25  got the girls, I had to see them through their education

T. Walsh - Direct

1   process, so my plans were put on hold.

2   Q.  Did Daryl Bank know your family situation?

3   A.  Absolutely, yes.

4   Q.  How did you ask to be treated in terms of your investment

5   risk tolerance?

6   A.  My tolerance was zero risk.  I didn't want any money put

7   into anything that would be risky at all.

8   Q.  Were you clear about that to Mr. Bank?

9   A.  Over and over again.  And I questioned every time we

10  discussed any changes that I could not -- I didn't have the

11  time at my age to recoup from another loss after the 2008

12  crash.

13  Q.  Was there anyone else from Dominion that you dealt with

14  regularly?

15  A.  Yes, ma'am.  Raeann Gibson, Roger Hudspeth, and then

16  there was a guy with a mustache, bald hair, and cowboy boots.

17  Q.  What was Ms. Gibson's, Raeann Gibson's role as far as you

18  knew?

19  A.  As far as I was aware, she was, I thought, his

20  administrative assistant.

21  Q.  Mr. Bank's administrative assistant?

22  A.  Daryl Bank's assistant, yes, ma'am.

23  Q.  At some point, did you hear anything about Daryl Bank

24  being banned by FINRA from selling securities?

25  A.  I received a letter from the Bank of the Commonwealth,

```
                              ┌─T. Walsh - Direct─┐
  1   and it talked about some questionable activities, and it did

  2   not go into any details.  It didn't really explain anything.

  3         I called Raeann and asked her what that was about,

  4   and what she had said to me was that there was some

  5   personality conflicts and some rock throwing, and Daryl had

  6   decided to take the high road due to costs of defending his

  7   reputation, and he wasn't going to challenge it.  Right after

  8   that, I got a --

  9   Q.  Let me stop you right there.  Sorry, I didn't mean to

 10   interrupt.

 11         Did Ms. Gibson's explanation satisfy you at that

 12   time?

 13   A.  Yes.

 14   Q.  Now, are you familiar with an investment called Dental

 15   Support Plus Franchise?

 16   A.  Yes, I am.

 17   Q.  How did you first learn about DSPF?

 18   A.  Daryl had brought it to my attention because I had

 19   invested in a health care REIT which had come -- which went

 20   public and the three years was up.  And it did very well.  I

 21   had nothing to do, just invest in it.  And he said, "Well, if

 22   you like that, then there's another one coming up, and it's a

 23   dental one, same kind of thing."

 24   Q.  What was your understanding of how you would make money

 25   in this DSPF investment?
```

T. Walsh - Direct

1    A.  I was, as he said, like a silent partner.  I invested

2    some money, and then as the practices grew and once their

3    bills were paid, basically the proceeds then would be divided

4    between the investors.

5    Q.  And did he say anything about the amount of money you

6    would make?

7    A.  Yes, ma'am.  The thing he told us, that we would get a

8    minimum of $200 a month, which was a minimum guarantee,

9    regardless of what the practices were doing, and then the

10   practice was supposed to do better, then we had the chance of

11   making more, but we were guaranteed a minimum of $200 a

12   month.

13   Q.  And how long would you start seeing this $200 a month

14   after you invest?

15   A.  Within six months.

16   Q.  Were you interested in running a franchise yourself?

17   A.  Absolutely not.

18   Q.  And what was your understanding of who would be running

19   the investments?

20   A.  Not me.

21   Q.  And what was your understanding of the level of risk?

22   A.  There was supposedly no risk because I had the guarantee

23   of $200-a-month income.

24   Q.  Did you ask about any fees or commissions that might be

25   taken out of your investments?

Carol L. Naughton, Official Court Reporter

—————— T. Walsh - Direct ——————

1   A.   The way -- no.   There was nothing other than when the

2   practices paid their responsibilities, that's -- and then

3   that would cover the cost.

4   Q.   Now, were you required to open a corporate entity under

5   your own name, like an LLC?

6   A.   Yes.   He said to me that he recommended that we do the

7   LLC because that's what he did for his mom when he put her

8   money into it, because that protects us against anybody

9   coming after us personally.

10  Q.   Okay.   And he did that for his mom?

11  A.   His mother, yes.

12  Q.   Did he say his mom had invested in this?

13  A.   Yes.   He said that's what he did when he put his mom into

14  it.

15  Q.   Was there paperwork involved in the investment?

16  A.   Yes, ma'am.

17  Q.   I'm going to show you -- there's a binder in front of

18  you.   If you can look under the tab 203, Exhibit 203.

19           MS. YUSI:   Has that been admitted?

20           THE CLERK:   The jurors can't see it.

21           MS. YUSI:   Thank you.

22  BY MS. YUSI:

23  Q.   Do you recognize this document?   Do you recognize this

24  document?

25  A.   Yes, ma'am.   This looks like -- it looks a little smaller

————————— T. Walsh - Direct —————————

1   than the original, but, yeah, it's big.

2   Q.  And you'll see it's double-sided in your --

3   A.  Oh, okay.

4   Q.  Is it the Virginia Franchise Disclosure Document or a

5   copy of what you received?

6   A.  Yes, ma'am.

7           MS. YUSI:  The government moves to admit

8   Exhibit 203.

9           THE COURT:  Any objection?

10          MS. McCASLIN:  No objection.

11          THE COURT:  Exhibit 203 will be admitted.

12          (Government's Exhibit 203 was admitted.)

13  BY MS. YUSI:

14  Q.  You said you received paperwork.  Was there a lot of

15  paperwork involved with this investment?

16  A.  Tremendous -- a big, thick -- a big, thick packet of

17  papers, yes.

18  Q.  Did anyone go page by page through this with you?

19  A.  No.

20  Q.  Did you have a chance to read all of it?

21  A.  No.

22  Q.  If we can go to Page 23 of Exhibit 203.  And at the

23  bottom of Page -- I'm going to highlight.  You can see that.

24  I know it's a little bit blurry here.

25          "Our preopening obligations," do you see that?

T. Walsh - Direct

1    A.  Yes.  I see it on the screen.

2    Q.  And, number one, to designate your territory and,

3    number two, select a site.  Do you see those?

4    A.  Yes, ma'am.

5    Q.  And I'm going to go to the next page here.  Number five

6    and number six of the preopening obligations, you get a

7    standard overview for the build-out of the franchise business

8    and, six, provide an initial training program.

9            Did you ever get a territory assigned to you for

10   DSPF?

11   A.  No, ma'am.

12   Q.  Did you ever get an overview of a build-out?

13   A.  No, ma'am.

14   Q.  Any training program?

15   A.  No.

16   Q.  If we can go to Page 288 of Exhibit 203.  And this is

17   entitled "Addendum required by the Commonwealth of Virginia."

18           And number two says that the person selling you or

19   the entity selling you, it requires them to defer payments of

20   the franchise fee or other payments until they've completed

21   their preopening obligations.  Do you see that?

22   A.  Yes, ma'am.

23   Q.  Did Daryl Bank or DSPF refuse your money at first?

24   A.  No.

25   Q.  But they had not provided any of those things listed in

T. Walsh - Direct

1   preopening obligations?

2   A.   No.

3   Q.   Thank you.

4           Did you hear the name "Kent Maerki" at all involved

5   with this investment?

6   A.   Yes.  I believe he was, like, the president of this

7   Dental Support.

8   Q.   Do you know where that company was supposed to be

9   located?

10  A.   In Arizona.

11  Q.   Were you told by anyone at Dominion anything about

12  Mr. Maerki's regulatory issues?

13  A.   No.

14  Q.   Now, did you ever go to a meeting after your -- when did

15  you first invest or purchase?

16  A.   The paperwork started December 2011, and it was completed

17  in January 2012.

18  Q.   How many franchises did you buy at first?

19  A.   Two.

20  Q.   And how much were each franchise?

21  A.   20,000.

22  Q.   So you bought two franchises at 20,000 apiece in January

23  2012?

24  A.   Uh-huh.

25  Q.   Now, after your first franchises were bought, did you go

T. Walsh - Direct

1   attend a sales meeting or presentation at a restaurant?

2   A.   Yes.  Steinhilber's.

3   Q.   Where was that?

4   A.   Steinhilber's.

5   Q.   Steinhilber's?

6   A.   Yes.

7   Q.   Did you bring anyone with you?

8   A.   I brought a friend of mine, Pat Hundley.

9   Q.   Who is she?

10  A.   She's a friend of mine.

11  Q.   What did she do for a living?

12  A.   She's a nurse.  We met years ago at work.

13  Q.   Is she a sophisticated investor?

14  A.   No.

15  Q.   Does she have money to invest?

16  A.   No.

17  Q.   Who was at the dinner at Steinhilber's?

18  A.   Roger Hudspeth and Raeann Gibson.

19  Q.   Did they give a presentation?

20  A.   Yes, ma'am.  They had a big whiteboard with "fiduciary"

21  written in great big letters, and they went into a detailed

22  explanation of the definition of "fiduciary" and how that

23  they are under law to look out for our best interest and not

24  to jeopardize us financially in any way.

25  Q.   Now, after or around this meeting, did you talk to

T. Walsh - Direct

1   Mr. Bank about Patricia Hundley, your friend?

2   A.  Yes, I did.

3   Q.  What did you tell him?

4   A.  I told him that she could not handle any kind of risk,

5   and if there was any chance of any loss, not to put her into

6   this.

7   Q.  Do you know if Patricia Hundley bought a franchise from

8   Dominion?

9   A.  Yes, she did.

10  Q.  Do you know how much she paid?

11  A.  $25,000.

12  Q.  Now, after your first two purchases in January 2012, did

13  you have any further discussions regarding additional

14  purchases of DSPF?

15  A.  Yes.  Daryl contacted me and said that it was going so

16  well, that the price was going up considerably and that we

17  really needed to move and get two more units.

18  Q.  What was your reaction?

19  A.  I didn't really want to because it had only been three

20  months and I had not received any payment or earned any money

21  in the three months.  I wanted to wait.  And then he said

22  that, "Well, the price is going up, and it's going to cost

23  you so much more if we don't do it now."

24          And I asked him at that point in time, "Well, why

25  can't we use our option," because the first two had an option

T. Walsh - Direct

1  that you could purchase two additional units at the beginning

2  price, which was 20-, instead of the increase now, because by

3  this three months, the price had gone up.

4  Q.  To 25,000?

5  A.  Yes.

6  Q.  And did Mr. Bank suggest, okay, let's use your options?

7  A.  No.  He said, "No, you don't want to do that.  That's a

8  big mistake because once your units start paying off, we can

9  sell your options, and then you'll make that much more

10  money."

11  Q.  All right.  Did you end up buying more franchises?

12  A.  I bought two more.

13  Q.  When was that?

14  A.  March of 2012.

15  Q.  How much were those two franchises?

16  A.  Those were 50 -- 50,000.

17  Q.  Were they 25,000 each?

18  A.  25- each, yeah.

19  Q.  So in total, you had four franchises?

20  A.  Yes.

21  Q.  Now, after you received -- or after you purchased these

22  franchises, were you receiving any updates on the progress

23  and how DSPF was doing?

24  A.  No.  I was getting no communication whatsoever, no

25  statements, no accounting, no any -- nothing, other than

T. Walsh - Direct

1  every now and then I would get a thing from Kent Maerki which

2  was, like, a brochure to sell more units and a CD.  It had

3  nothing specific to me or my account or any of that

4  information.

5  Q.  And how did you receive those?

6  A.  I got those in the mail.

7  Q.  And at one point, were you asked to do some marketing of

8  your own?

9  A.  I got, I believe, an e-mail saying that they wanted us to

10  try to recruit patients for these practices.  I immediately

11  called Raeann -- well, I called Daryl, but he wouldn't take

12  my calls at this point, so I was left with Raeann.  And

13  that's a conflict of interest for me because I was employed

14  medically, and we have to sign a disclosure that we cannot

15  have interest in any kind of medical like that, and so I

16  would never do anything like that.

17  Q.  The marketing part?

18  A.  Right.  I would never have invested in it if I knew that

19  was any kind of an obligation or duty that I would have.

20  Q.  Did you ever ask -- well, did you ever ask to sell your

21  units?

22  A.  Multiple times.

23  Q.  What were you told?

24  A.  At first, I was told kind of wait it out.  You're jumping

25  off too fast.  And then they said -- Raeann said to me,

T. Walsh - Direct

1   "Well, okay, I will put them on the list."

2          And my question, "Why are you selling more units

3   when the first ones haven't even started paying?  How can you

4   keep selling?"

5   Q.  Did she ever respond?

6   A.  Her thing was that it was growing so fast, that's why the

7   cost was going up and people were trying to get in on the

8   beginning of this.

9   Q.  Okay.  In August 2014, did you receive another e-mail or

10  message from Kent Maerki?  Let me rephrase that.

11         In August 2014, did you find out that DSPF was over

12  and being shelved?

13  A.  Yes.  I just needed to know which e-mail you were talking

14  about.

15  Q.  Sure.  Do you recall that e-mail?

16  A.  Yes.  We got an e-mail that said that they were putting

17  everything on hold.  They were not closing down.  They

18  were -- and they used the word "shelved."  We're putting this

19  on the shelf so we can regroup our marketing strategy and

20  then see if we can open back up.

21  Q.  Did you do anything in response when you got that e-mail?

22  A.  Oh, yeah.

23  Q.  What did you do?

24  A.  Well, I started -- I was a thorn in their side throughout

25  this process because I called Kent multiple times, I talked

T. Walsh - Direct

1    to Norma.  I wanted to have --

2    Q.  Who is Norma?

3    A.  Norma is his wife.

4    Q.  Kent's wife.  Was she involved in DSPF as far as you

5    knew?

6    A.  As far as I know, yes.

7    Q.  What did you do after you got the e-mail saying it was

8    being shelved?

9    A.  I called Raeann immediately and asked her what was going

10   on.

11   Q.  What was her response?

12   A.  She said -- she said, "Oh, we're distraught too because

13   we were just out there."  And just two weeks before, they had

14   said that they had been out there and everything was

15   wonderful and everything was growing and everything was doing

16   well and they're just as shocked as I was to get this

17   information.

18   Q.  Now, did you ever get any money back from your

19   franchises?

20   A.  Well, no.  As far as I did not get anything, but I found

21   out about a bank account in BayPort Credit Union, and I

22   called them, and my name was on it, but I never had any

23   information, and there was $168 in it, and I told them I want

24   it sent to me immediately.

25   Q.  Did they do that?

Carol L. Naughton, Official Court Reporter

T. Walsh - Direct

```
 1   A.   Yep.
 2   Q.   What happened?
 3   A.   Raeann told me I had to give it back.
 4   Q.   Did you give the $168 back?
 5   A.   Fool me once, shame on you, fool me twice, shame on me.
 6   No.  I wasn't giving it.  They said they would prosecute me.
 7        No disrespect, sir, but I told them go ahead.
 8   Q.   And how about your friend, Patricia Hundley?  Did she
 9   ever get her money back?
10   A.   No.
11   Q.   I'm going to show you what's already been admitted as
12   Exhibit 1001C, Page 640.  I will blow this up for you on the
13   screen.  Do you see this is a check?
14   A.   It has my name on it.
15   Q.   Well, who is the check from?
16   A.   Dental Support.
17   Q.   And who is it made to?
18   A.   Aghee W. Smith.
19   Q.   And how much is it for?
20   A.   $800.
21   Q.   And what is the date of this?
22   A.   1/13/2012.
23   Q.   And what is the memo on the bottom left?
24   A.   My name.
25   Q.   Well, is it Terri --
```

─────────────── T. Walsh - Direct ───────────────

1   A.  Terri J. Walsh IRA LLC.

2   Q.  What is that?  Is that the LLC you mentioned?

3   A.  Yes, because the units were done with qualified money for

4   retirement.  That was my retirement.

5   Q.  Okay.  And do you have any idea who Aghee W. Smith is?

6   A.  This is the first I've ever heard or seen this.

7   Q.  Okay.

8   A.  So that person got more money than I did.

9           MS. YUSI:  Those are all my questions at this time,

10  but I'm sure the defense counsels will have some questions

11  for you.

12          THE COURT:  Cross?

13          MR. YAROW:  No cross.

14          THE COURT:  Any cross from defendants?

15          MS. McCASLIN:  No questions, Your Honor.

16          THE COURT:  May the witness be permanently excused,

17  counsel?

18          MS. YUSI:  Yes, sir.

19          THE COURT:  Ma'am, you may step down.

20          (The witness was excused.)

21          THE COURT:  You may call your next witness.

22          MS. O'BOYLE:  Your Honor, the government calls

23  Denise Brown.

24          (Witness sworn.)

25          DENISE BROWN, called by the Government, having been

D. Brown - Direct

```
 1   first duly sworn, was examined and testified as follows:
 2                       DIRECT EXAMINATION
 3   BY MS. O'BOYLE:
 4   Q.  Good afternoon, Ms. Brown.  Could you please state and
 5   spell your name for the court reporter.
 6   A.  Denise D-e-n-i-s-e Brown B-r-o-w-n.
 7   Q.  And where do you live, Ms. Brown, just the city and
 8   state, please?
 9   A.  Norfolk, Virginia.
10   Q.  Did you previously go by the name Denise Owen?
11   A.  I did.
12   Q.  Ms. Brown, where do you work?
13   A.  I work at BayPort Credit Union.
14   Q.  What do you do for BayPort Credit Union?
15   A.  I'm a commercial banker.
16   Q.  What are your responsibilities as a commercial banker?
17   A.  I handle business accounts and business loans for
18   business clients.
19   Q.  Does BayPort Credit Union operate from locations
20   throughout Hampton Roads?
21   A.  Yes, they do.
22   Q.  So where do they have offices?
23   A.  We have offices, several on the Peninsula, and on the
24   south side, we have Newport News, Williamsburg, Grafton,
25   Gloucester, Virginia Beach, Norfolk, Chesapeake, Suffolk,
```

D. Brown - Direct

1    Smithfield.

2    Q.   And where are BayPort's headquarters?

3    A.   Newport News.

4    Q.   Is that where they were back in the 2012 time frame?

5    A.   Yes.

6    Q.   And I want to take you back to that time frame and ask

7    you if you knew an individual named Daryl Bank.

8    A.   Yes.

9    Q.   How did you meet Mr. Bank?

10   A.   I actually met Mr. Bank when I worked for Resource

11   Bank --

12   Q.   When was that?

13   A.   -- prior to working for BayPort.

14   Q.   And when did you work for Resource Bank, approximately?

15   A.   From probably 2003 through 2008.

16   Q.   Okay.  And did Mr. Bank eventually become a client of

17   BayPort Credit Union?

18   A.   Yes, he did.

19   Q.   Over the years approximately -- do you recall

20   approximately how many bank accounts Mr. Bank was a signatory

21   on at BayPort Credit Union?

22   A.   He had dozens of accounts.

23   Q.   And at some point, did someone at BayPort create a

24   summary of all those accounts?

25   A.   Yes.

D. Brown - Direct

```
 1   Q.  I'd like to show you what's been marked for
 2   identification as Government's Exhibit 91.  Do you recognize
 3   Government's Exhibit 91?
 4   A.  Yes.
 5   Q.  Is this the summary that we were just talking about?
 6   A.  That's correct.
 7           MS. O'BOYLE:  Government moves in Exhibit 91.
 8           THE COURT:  Exhibit 91 will be admitted.
 9           (Government's Exhibit 91 was admitted.)
10   BY MS. O'BOYLE:
11   Q.  This first column on the left, what is this column?
12   A.  That's the name of the accountholder.
13   Q.  And what are all of these accounts in this first column?
14   A.  They are all LLCs.
15   Q.  Did they have -- were there bank accounts in connection
16   with each of those LLCs?
17   A.  Yes.
18   Q.  Moving to the right, what is in the next column?
19   A.  Those are the six-digit account numbers assigned by
20   BayPort to the account.
21   Q.  And then the next column to the right?
22   A.  The date when the account was opened.
23   Q.  And then the column -- the fourth column to the right?
24   A.  The date when the account was closed.
25   Q.  And then the last four, are those lists of different
```

D. Brown - Direct

1   items, banking items?

2   A.  Yes.

3   Q.  And then if we could go -- we're going to scroll down.

4   This is the third page of this document.  In total, how many

5   accounts did Mr. Bank have at BayPort Credit Union?

6   A.  88.

7   Q.  Are you familiar with an investment called Dental Support

8   Plus?

9   A.  Yes.

10  Q.  How did you first learn about that investment?

11  A.  Daryl had approached me and said that he needed to be

12  able to open accounts on behalf of people who would be

13  creating what he called a self-directed IRA, and they would

14  sign a document that would give him the authority to manage

15  the account, and he needed to be able to open these accounts,

16  you know, as he worked with these various clients.

17  Q.  Do you know what a self-directed IRA is?

18  A.  It's basically a -- it's when you can take the money that

19  you would normally invest in, like, a Roth IRA or a mutual

20  fund, and instead of that, you invest it in an LLC that you

21  manage yourself and you -- that's how you manage your

22  retirement funds instead of it being in a traditional type of

23  account.

24  Q.  What, if anything, did Mr. Bank say about the actual

25  Dental Support Plus investment?

D. Brown - Direct

1  A.  He said it was a company that had, like, a call center
2  that would manage incoming calls for dentists.  Like,
3  dentists would buy into it and use the service to drive more
4  business to their dental offices.
5  Q.  And how would Mr. Bank's clients get money?
6  A.  They would invest their portion or their -- however much
7  they decided to invest into the Dental Support, and once they
8  had a certain number, then they would -- that's like buying a
9  franchise.  And then as that -- as the call center and the
10 advertising and all the things that they were supposed to do
11 to drive business to the dentists, as that ramped up, the
12 more profitable the dentist became, then the more money the
13 person would earn.
14 Q.  Based on this conversation, did Mr. Bank open a number of
15 accounts related to this investment?
16 A.  Yes, he did.
17 Q.  Let's look at a couple of those.
18       MS. O'BOYLE:  If we could start, for identification,
19 Government's Exhibit 41.
20 BY MS. O'BOYLE:
21 Q.  And just generally, high level, what is Government's
22 Exhibit 41?
23 A.  That's an online banking cash management application.  So
24 it just accompanies an account.  If you want to have online
25 banking for the account, you have to fill out this form as

──────────── D. Brown - Direct ────────────

1   well.

2   Q.  And then if we go through the rest of these documents,

3   are these banking documents related to this particular

4   account?

5   A.  This is -- that's the signature card.

6   Q.  Okay.  And is this in connection with DSPF Gerek LLC?

7   A.  Yes.

8   Q.  Is this one of the accounts connected to the Dental

9   Support Plus investment?

10  A.  Yes, it is.

11          MS. O'BOYLE:  Government moves in Exhibit 41.

12          THE COURT:  Exhibit 41 will be admitted.

13          (Government's Exhibit 41 was admitted.)

14  BY MS. O'BOYLE:

15  Q.  We're going to go through a number of these, and then

16  we'll come back and talk about a couple.  If we can go to

17  Government's Exhibit 210.

18          Do you recognize 210?

19  A.  Yes, I do.

20  Q.  What is it?

21  A.  It's a signature card for DSPF Walsh LLC.

22          MS. O'BOYLE:  Government moves in Exhibit 210.

23          THE COURT:  Exhibit 210 will be admitted.

24          (Government's Exhibit 210 was admitted.)

25          MS. O'BOYLE:  Pull up 211, please.

D. Brown - Direct

1    BY MS. O'BOYLE:

2    Q.  Do you recognize Government's Exhibit 211?

3    A.  Yes.  This is an online banking application for Barbara

4    Russell LLC.

5    Q.  And before you came in, at some point within the last

6    year, did you review all of these exhibits and take a look at

7    them and determine whether or not they were BayPort exhibits?

8    A.  Yes.  I spent several hours in an office looking at all

9    the papers.

10   Q.  And so the rest of this is also -- what follows is the

11   signature card and the bank account information related to

12   Barbara Russell LLC?

13   A.  Yes.

14           MS. O'BOYLE:  Government moves in Exhibit 211.

15           THE COURT:  211 will be admitted.

16           (Government's Exhibit 211 was admitted.)

17           MS. O'BOYLE:  Let's go to 212 please.

18   BY MS. O'BOYLE:

19   Q.  Do you recognize 212?

20   A.  Yes.  This is DSPF Houston LLC.

21   Q.  It's the bank account information?

22   A.  Bank account signature card package.

23           MS. O'BOYLE:  Government moves in Exhibit 212.

24           THE COURT:  212 will be admitted.

25           (Government's Exhibit 212 was admitted.)

———————— D. Brown - Direct ————————

```
 1            MS. O'BOYLE:  Go to 213, please.
 2    BY MS. O'BOYLE:
 3    Q.  Do you recognize 213?
 4    A.  Yes.  This is the package for DSPF DBunn LLC and that is
 5    for the signature card for the account, and the online
 6    banking.
 7            MS. O'BOYLE:  Government moves in Exhibit 213.
 8            THE COURT:  213 will be admitted.
 9            (Government's Exhibit 213 was admitted.)
10            MS. O'BOYLE:  If we could go to Government's
11    Exhibit 214.
12    BY MS. O'BOYLE:
13    Q.  Do you recognize 214?
14    A.  Yes.
15    Q.  What is it?
16    A.  It's the signature card package for DSPF A. Rangel LLC.
17            MS. O'BOYLE:  Government moves in Exhibit 214.
18            THE COURT:  214 will be admitted.
19            (Government's Exhibit 214 was admitted.)
20            MS. O'BOYLE:  Go to 215, please.
21    BY MS. O'BOYLE:
22    Q.  Do you recognize 215?
23    A.  Yes.
24    Q.  What is this?
25    A.  This is the signature card package for DSPF T. Austin
```

385

─────────────────────D. Brown - Direct─────────────────────

1   LLC.

2              MS. O'BOYLE:  Government moves in Exhibit 215.

3              THE COURT:  215 will be admitted.

4              (Government's Exhibit 215 was admitted.)

5              MS. O'BOYLE:  Go to 216.

6   BY MS. O'BOYLE:

7   Q.  Do you recognize 216, ma'am?

8   A.  Yes, I do.

9   Q.  What is it?

10  A.  It's the signature card package for DSPF M. Gray LLC.

11             MS. O'BOYLE:  Government moves in 216.

12             THE COURT:  216 will be admitted.

13             (Government's Exhibit 216 was admitted.)

14             MS. O'BOYLE:  Three more.  If we could have

15  Government's Exhibit 217.

16  BY MS. O'BOYLE:

17  Q.  Do you recognize this?

18  A.  Yes.

19  Q.  What is it?

20  A.  Signature card package for DSPF H. Gray LLC.

21             MS. O'BOYLE:  Government moves in Exhibit 217.

22             THE COURT:  217 will be admitted.

23             (Government's Exhibit 217 was admitted.)

24  BY MS. O'BOYLE:

25  Q.  Take a look at Government's Exhibit 218.  Do you

———D. Brown - Direct———

1    recognize this?

2    A.   Yes.   This is the signature card package for Teaching and

3    Learning For All, LLC.

4               MS. O'BOYLE:   Government moves in Exhibit 218.

5               THE COURT:   218 will be admitted.

6               (Government's Exhibit 218 was admitted.)

7    BY MS. O'BOYLE:

8    Q.   And finally, if we can go to Government's Exhibit 219.

9    Do you recognize this?

10   A.   Yes.   It's the signature card package for Peter and Margo

11   Perry LLC.

12              MS. O'BOYLE:   Government moves in Exhibit 219.

13              THE COURT:   219 will be admitted.

14              (Government's Exhibit 219 was admitted.)

15   BY MS. O'BOYLE:

16   Q.   Let's go back and talk to the jury a little bit about

17   Government's Exhibit 211.

18   A.   Okay.

19   Q.   I'm just going to pull up the top of 211.

20              And up here in the right-hand corner, there's a

21   number.   What is that?

22   A.   That's the six-digit account number that's assigned by

23   BayPort to the account.

24   Q.   And so what is this particular document that we're

25   looking at?

D. Brown - Direct

1    A.   The online banking application for -- if you wanted to

2    have online banking, you have to fill this out.

3    Q.   So what was the business that this bank account related

4    to?

5    A.   Barbara Russell LLC.

6    Q.   What is the street address where Barbara Russell LLC

7    purportedly operated?

8    A.   4301 Commuter Drive, Virginia Beach.

9    Q.   Do you recognize that address?

10   A.   Yes.  That was the address for Dominion Investment Group.

11   Q.   And does BayPort have any restrictions or limitations on

12   who can open bank accounts?

13   A.   Yes.  I mean, you have to be a citizen or a -- you have

14   to live, work, worship, attend school in Hampton Roads.

15   Q.   I'm going to show you Page 4 of Exhibit 211.  What is

16   this that we're looking at?

17   A.   That's the signature card for the business account.

18   Q.   And this is in connection again with Barbara Russell LLC?

19   A.   Yes.

20   Q.   And who were authorized signatories on this account?

21   A.   Daryl Bank, Raeann Gibson, and Hilary Hatfield.

22   Q.   Do you recognize -- we've talked about Mr. Bank, but do

23   you know who Ms. Gibson is?

24   A.   She was the CFO, I think, or -- you know, she was a

25   manager at Dominion Investment Group.

D. Brown - Direct

1   Q.  Do you know who Hilary Hatfield was?

2   A.  Yes.  I mean, I had met her probably once.  She was just

3   an employee at Dominion Investment Group.

4   Q.  Okay.  And down here on Page 5, do you recognize the

5   signature on the first line?

6   A.  Yes.  That's Daryl Bank's signature.

7   Q.  Do you recognize the signature on the second line?

8   A.  Yes.  That's Raeann Gibson's signature.

9   Q.  And I moved down now to Page 6.  What is Page 6?

10  A.  Page 6 is a Resolution of Authority, where the LLC

11  designates who is allowed to sign on behalf of the LLC.

12  Q.  Do you know Ms. Russell, Barbara Russell?

13  A.  No.

14  Q.  Do you know why Ms. Russell was not a signatory on this

15  account?

16  A.  No.  She would -- she would have signed a form that gave

17  Daryl permission to run her LLC.

18  Q.  Okay.  And so what is this particular form that we're

19  looking at?

20  A.  This is the Resolution of Authority for Barbara Russell

21  LLC.

22  Q.  And if you could read the very first sentence.

23  A.  It says "Entity certifications.  I, Daryl Bank,

24  authorized signer's name, certify that I am the managing

25  member, authorized signer's title, designated to act on

D. Brown - Direct

1    behalf of Barbara Russell LLC, authorizing entity."
2    Q.  Why did you require this particular document to be
3    signed?
4    A.  It's a legal document that protects the credit union
5    because in case someone signs something that wasn't supposed
6    to, we can refer back to this and say, no, this is what you
7    designated as the appropriate signers for this account.
8    Q.  Okay.  And you mentioned a minute ago something that
9    Ms. Russell would have signed to permit Mr. Bank to operate
10   this account; is that right?
11   A.  Yes.
12   Q.  I'm showing you, on the screen, Page 11.  Do you
13   recognize this particular document?
14   A.  Yes.
15   Q.  And what is it?
16   A.  It is the designation form that the owners of the funds
17   would sign to designate Dominion Investment -- or it says
18   Dominion Franchise LLC or its agents to operate their LLC.
19   Q.  Okay.  And down here, does it appear to be signed by
20   Ms. Russell?
21   A.  Yes.
22   Q.  If we could go to Page 22 of this bank account, please.
23   And this is the first time the jury is seeing a bank
24   statement from BayPort Credit Union.  I would like to walk
25   through it slowly.

D. Brown - Direct

```
 1              What is the number 308324 at the top?
 2    A.  That's the account number for the account Barbara Russell
 3    LLC.
 4    Q.  And then right below it, what is -- what are the dates
 5    here?
 6    A.  9/20/12, 9/30/12.
 7    Q.  And what does that designate?
 8    A.  The period of time that the statement covers.
 9    Q.  And what is over here in the left-hand corner?
10    A.  That's the address where the statement would be mailed.
11    Q.  And so this appears to be a statement for the month, the
12    latter part, of 2012 for Barbara Russell LLC?
13    A.  Yes.
14    Q.  Now, I'm going to highlight at the very tippy top of
15    this, the middle of the page, and it starts 9/20, business
16    savings balance forward.  What is this?
17    A.  So balance forward means what was on the last statement,
18    and apparently this account wasn't opened until
19    September 20th because there was no balance forward.  And
20    then the account was opened on the 20th, and then on the
21    26th, a deposit was made for $5 from Dominion Trust.
22    Q.  Okay.  And is this the savings account, or is this also
23    the money that was deposited into the bank account?
24    A.  This is a savings account that was deposited into -- you
25    know, it's the bank account, though, yeah.
```

D. Brown - Direct

1   Q.  And then down here -- is there a difference because -- is
2   there a difference between this block at the top and then
3   this other block at the bottom?
4   A.  Yes.
5   Q.  Okay.  Could you please explain that for the jury.
6   A.  When you're a member of a credit union, you have to have
7   a share savings account because that is what designates you
8   as a member of the credit union.  You are buying a share, and
9   our minimum is $5 to buy into the credit union, so every
10  single person or business that has an account at BayPort has
11  a savings account.
12  Q.  Okay.  So that's what is reflected at the top?
13  A.  Correct.
14  Q.  And, then, now let's focus down here at the block at the
15  bottom.  What is reflected here in the block at the bottom?
16  What is this?
17  A.  This is a -- pardon me -- this is a business checking
18  account.
19  Q.  What does it reflect happened on this account on
20  September 27, 2012?
21  A.  An incoming deposit, which was made via ACH, which is an
22  Automated Clearing House.  It's an electronic transfer of
23  funds.  The money was deposited.  It came from John Hancock
24  Life Insurance Company, I guess -- or it doesn't really go
25  into the full name, but I would assume it's John Hancock Life

—————————————— D. Brown - Direct ——————————————

1   Insurance.

2   Q.   And what was the amount?   How much was --

3   A.   $83,066.79 was the amount of the transaction.

4   Q.   And then on the same day, was there a transfer out?

5   A.   Yes.   On the same day, a wire for $75,000 was initiated

6   out of the account.

7   Q.   Okay.   And if we could go to the next page.   Is this the

8   next month's statement, October 2012?

9   A.   Yes, it is.

10  Q.   And what ultimately was the ending balance, then, in

11  October of 2012?

12  A.   On October 31st, the ending balance was $533.19.

13  Q.   Now, this is the bank account that Mr. Bank's client

14  Ms. Russell was supposed to receive proceeds from this Dental

15  Support Plus investment, correct?

16  A.   Correct.

17  Q.   So let's take a look.   Let's scroll down to Page 24.

18  This -- this is the statement for November, right, of 2012?

19  A.   Yes.

20  Q.   What was the ending balance in Ms. Russell's account in

21  November of 2012?

22  A.   $533.19.

23  Q.   Let's go just to the next month, December 2012.   What was

24  the balance in Ms. Russell's account?

25  A.   $533.19.

D. Brown - Direct

1          MS. O'BOYLE:  Mr. Bosse, if you could take me to
2    Page 34.
3    BY MS. O'BOYLE:
4    Q.  Now, we've jumped to -- sorry.  We have jumped to
5    September of 2013.  Is that right?
6    A.  Yes.
7    Q.  What was the starting balance in September of 2013?
8    A.  $533.19.
9    Q.  So the same as what it was in November and December of
10   2012?
11   A.  Yes.
12   Q.  And then it appears that there's some money that's
13   actually taken out of this account; is that right?
14   A.  Yes.  That would be a check.  Check number 1004 was
15   written for $50.
16   Q.  And how do you know that it was check 1004?
17   A.  That's how we code our checks.  It says "draft," which
18   means it was actually a paper check that was written out.
19   Q.  Okay.  And so, then, what was the balance of
20   Ms. Russell's account at the end of September 2013?
21   A.  $477.19.
22   Q.  Okay.  And if we go to the next month, October 2013, what
23   is the balance?
24   A.  $471.19.
25   Q.  And it has a withdrawal of minus $6.  Do you know what

──────────D. Brown - Direct──────────

1   that is?

2   A.   Yes.

3   Q.   What is that?

4   A.   The accounts -- this particular type of account -- it's

5   called a Select 50 Business Checking -- requires an average

6   daily balance of $500, and so when it drops below, there's a

7   fee.

8   Q.   Okay.  Now, we've gone to Page 36 of this exhibit, and

9   this is the November 2013 statement; is that right?

10  A.   Correct.

11  Q.   Now, there's a little bit of activity in the account that

12  month.  So let's take a look at it.  So what was the starting

13  balance?

14  A.   $471.19.

15  Q.   And then on November 4th, was there a deposit?

16  A.   Yes.  $142.50 via ACH deposit.

17  Q.   From where?

18  A.   From Dental Support.

19  Q.   Two days later, was there another deposit?

20  A.   Yes, there was.  $99.76 from Dental Support.

21  Q.   Okay.  So almost a year later, Ms. Russell gets two

22  deposits totaling about $242; is that right?

23  A.   Correct.

24  Q.   And then what happens on November 13?

25  A.   On November 13th, $45.61 was debited from the account via

D. Brown - Direct

1   electronic transfer from Dental Support Plus.

2   Q.   And were there two debits that day?

3   A.   And then on -- yes.   $54.15 was withdrawn to ACH to DSPF

4   LLC.

5   Q.   So they deposited $242.26 and then took almost $100 back?

6   A.   Yes.

7   Q.   And what was -- so she got a total of about $140, maybe?

8   A.   Yes.

9   Q.   What was her ending balance in November of 2013?

10   A.   $613.69.

11   Q.   Let's go to the next page, December 2013.   What is

12   Ms. Russell's balance?

13   A.   613.69.

14   Q.   And then January of 2014, what is her balance?

15   A.   $613.69.

16   Q.   And in February 2014, what is her balance?

17   A.   $613.69.

18   Q.   Let's go to Page 46, please, of this account.   What month

19   is this account from?

20   A.   September of 2014.

21   Q.   And what is the balance?

22   A.   $613.69.

23   Q.   And what ultimately ends up happening with this account

24   of the next month?

25   A.   The next month, the account was withdrawn down to -- $613

D. Brown - Direct

1  was withdrawn from the account, and it had a balance of $.69

2  remaining in it.

3  Q.  Let's take a look just briefly at Exhibit 41.  And for

4  the jury, is this an account in the name of DSPF Gerek LLC?

5  A.  Yes.

6  Q.  And does this have many of the same documents that we

7  just went over with respect to Ms. Russell?

8  A.  Yes.

9  Q.  Is this the signature card for DSPF Gerek LLC?

10  A.  Yes.

11  Q.  Do you know an individual named Kyle Gerek?

12  A.  No.

13  Q.  What was the address of Mr. Gerek, or DSPF Gerek LLC?

14  What was that address?

15  A.  4301 Commuter Drive, Virginia Beach, Virginia.

16  Q.  And if you could go to Page 22 of Exhibit 41.  And so

17  this is the statement in November of 2012 for DSPF Gerek LLC;

18  is that right?

19  A.  Yes, uh-huh.

20  Q.  And here, does it reflect a deposit of $26,067 on

21  November 6th?

22  A.  Yes.  That's correct.

23  Q.  And then what happens on November 16th?

24  A.  An outgoing wire for $25,000.

25  Q.  Okay.  And so what was the ending balance in Mr. Gerek --

D. Brown - Direct

1    or the DSPF Gerek LLC account in November of 2012?

2    A.   $545.

3    Q.   And December 12, 2012, what is the balance?

4    A.   $545.

5    Q.   And January 2013, the balance?

6    A.   $545.

7    Q.   And at some point, did you start to get concerned in

8    connection with these accounts in particular?

9    A.   Yes.

10   Q.   And what were you concerned about?

11   A.   That there was no money being deposited.  There was no

12   money being deposited into the accounts.

13   Q.   What did you do about your concerns?  What, if anything,

14   did you do?

15   A.   I reached out to Raeann and Daryl and asked what was

16   going on.

17   Q.   I'd like to show you what's been marked for

18   identification as Government's Exhibit 220.  Do you recognize

19   Exhibit 220?

20   A.   Yes.  It's e-mails between Raeann and myself.

21            MS. O'BOYLE:  Government moves in Exhibit 220.

22            THE COURT:  Hearing no objection, 220 is admitted.

23            (Government's Exhibit 220 was admitted.)

24   BY MS. O'BOYLE:

25   Q.   Let's go to the bottom e-mail and work our way up to the

———D. Brown - Direct———

1   top.

2         Who is this an e-mail from?

3   A.  It's from me.

4   Q.  Was it when you went by Denise Owen?

5   A.  Yes.

6   Q.  What is the date of your e-mail?

7   A.  Thursday, May 9, 2013.

8   Q.  Who is it to?

9   A.  To Raeann Gibson and Daryl Bank.

10  Q.  What is the subject?

11  A.  Dental franchise accounts.

12  Q.  Could you please read for the jury what you told

13  Ms. Gibson and Mr. Bank.

14  A.  "I need to write up a memo for the dental franchise

15  accounts that have not received deposits.  The accounts are

16  monitored and go dormant after one year with no activity.  I

17  spoke to Raeann about six weeks ago or so about these

18  accounts.  I seem to remember being told initially, last year

19  when I met with Daryl, that if the investor hadn't begun

20  reaping dividends by a certain number of months, that they

21  would get a minimum guarantee.  Can you please update me on

22  this one more time?  Thank you for your help."

23  Q.  So you said, "The accounts are monitored and go dormant

24  after one year with no activity."  Can you explain that for

25  the jury?  What are you telling them?

399

D. Brown - Direct

1   A.   There's a -- it's called going dormant when there's no

2   activity because after a certain -- if it sits dormant for a

3   certain number of years, we're obligated to turn the money

4   over to the state, if the person isn't using the account,

5   because they may have passed away or they may have moved and

6   forgot about it or whatever.  So it can't just sit there

7   forever.  So that's why the accounts are monitored.

8   Q.   Now, you said that "If the investor hadn't begun reaping

9   dividends by a certain number of months, they would get a

10  minimum guarantee."  And "minimum" is in quotes; is that

11  right?

12  A.   Yes.

13  Q.   Who told you that?

14  A.   Daryl.

15  Q.   What was your understanding of what the minimum guarantee

16  would be?

17  A.   I didn't know a dollar amount, but he basically was, you

18  know -- he met with me to explain what this dental franchise

19  was, and he, you know -- it sounded, you know, like they were

20  going to be getting a lot of money.  And so he said if they

21  don't get that, then they're going to get something.

22  Q.   The next e-mail in the chain is another e-mail from you

23  to Ms. Gibson and Mr. Bank; is that right?

24  A.   Yes.

25  Q.   What is the date of that e-mail?

D. Brown - Direct

1   A.   May 21st, 2013.

2   Q.   And what do you tell them?

3   A.   I was following up because neither of them had replied to

4   the other e-mail that I sent, and I was asking them to please

5   reply.

6   Q.   Did Ms. Gibson ultimately respond to you?

7   A.   She did.

8   Q.   She responded that day, May 21st, 2013?

9   A.   Yes.

10  Q.   And what did she tell you?

11  A.   She said, "Sorry for the delay.  These accounts should

12  all begin to see some activity within the next few months.

13  This program ran into a problem with a previous vendor.  They

14  have removed that vendor and are back on track with a new

15  one.  Things are beginning to roll out; however, they are

16  right now in a catch-up phase.  Please let me know if you

17  need anything else."

18  Q.   Now, in addition to this e-mail to Ms. Gibson, did you

19  ultimately write a memo related to these accounts?

20  A.   Yes, I did.

21  Q.   Why did you prepare a memo related to these accounts?

22  A.   Because the fraud department at our credit union was

23  concerned that there was no activity on the accounts after,

24  you know, they had been told that they would start to see

25  funds coming in.  And, you know, the whole self-directed IRA

———— D. Brown - Direct ————

1    and the people signing over to Daryl the right to run their
2    LLC, I mean, we don't really -- we didn't really have any
3    kind of legal responsibility to monitor that, but we were,
4    like, "What's going on here?  It seems kind of weird."  So we
5    were just following up.
6    Q.  If you could take a look at Government's Exhibit 221.  Do
7    you recognize Government's Exhibit 221?
8    A.  Yes.
9    Q.  What is it?
10   A.  It's a memo that I wrote to Jorge Gonzales, Pearl King,
11   and Jennifer Coyne.  Jorge is the vice president of the fraud
12   detection department at the credit union.
13   Q.  I don't mean to interrupt you, but we'll get it into
14   evidence, and then we can chat about it.
15          Is this the memo that you wrote in connection with
16   these dormant accounts?
17   A.  Yes, it is.
18          MS. O'BOYLE:  Government moves in Exhibit 221.
19          THE COURT:  Hearing no objection, 221 is admitted.
20          (Government's Exhibit 221 was admitted.)
21   BY MS. O'BOYLE:
22   Q.  Okay.  So you were just starting to go over who you wrote
23   this memo to; is that right?
24   A.  Yes.
25   Q.  Who is Jorge Gonzales?

D. Brown - Direct

1    A.   He is the head of fraud at BayPort Credit Union.

2    Q.   And Ms. Pearl King?

3    A.   Pearl King is also in the fraud department at BayPort

4    Credit Union.

5    Q.   And Jennifer Coyne?

6    A.   Jennifer Coyne is now the COO of BayPort Credit Union.

7    At the time, she was the vice president of business banking.

8    Q.   Okay.  And this was a memo from you?

9    A.   Uh-huh.

10   Q.   And if you could just read the first paragraph.

11   A.   "Per your request, this memo is to address concerns about

12   a lack of investment returns on the above-referenced

13   accounts.  I was doing a review of my accounts in early

14   April.  I noticed that the accounts were not receiving a

15   return.  I contacted Dominion via e-mail on April 10 to

16   inquire about why.  I advised them that if an account sits

17   with no activity for a year, it becomes dormant, and asked

18   when we could expect activity to commence."

19   Q.   In the next two paragraphs, were you basically informing

20   the individuals you wrote this memo to the information that

21   you had received from Mr. Bank?

22   A.   Yes.

23   Q.   And Ms. Gibson?

24   A.   Yes.

25   Q.   And let's go to Page 2 of this document.  Could you

D. Brown - Direct

1   please read the first paragraph on Page 2.

2   A.  "I also asked if they anticipated referring any more of

3   these accounts to BayPort to be opened.  I was told once the

4   returns begin to be deposited into the accounts, we

5   anticipate additional referrals."

6   Q.  And why, Ms. Brown, did you ask Mr. Bank and Ms. Gibson

7   if they anticipated referring any more of these accounts to

8   BayPort?

9   A.  Since none of the existing accounts had gotten any money

10  coming in, I was concerned that, you know, there would be

11  more people opening the same type of account when it wasn't

12  really performing as promised.

13  Q.  Were you concerned that clients would lose money?

14  A.  Yes, I was.

15  Q.  And it says on there, "I was told, quote, 'once the

16  returns begin to be deposited to the accounts, we anticipate

17  additional referrals.'"

18          Do you see that?

19  A.  Yes.

20  Q.  And who told you that?

21  A.  I believe it was Raeann that said that, but it may have

22  been Daryl.  I can't remember, I'm sorry.

23  Q.  That's okay.

24  A.  It was definitely one of them.

25  Q.  And ultimately, do you recall whether these particular

D. Brown - Direct

1   accounts ever started receiving regular returns?

2   A.   They did not.

3   Q.   And ultimately, what happened with all of those accounts

4   that we have just been going over?

5   A.   All of the accounts were closed.

6           MS. O'BOYLE:  And let's pull up Government's Exhibit

7   91, which has already been admitted.

8   BY MS. O'BOYLE:

9   Q.   And we've looked, Ms. Brown, at a number of these

10   accounts.  Have we put into evidence today every single

11   dental account that was opened at BayPort?

12   A.   Yes.

13   Q.   Well, every single one?

14           MS. McCASLIN:  Objection.  Asked and answered.

15           MS. O'BOYLE:  That's fine.  I will withdraw the

16   question.

17   BY MS. O'BOYLE:

18   Q.   Let's take a look at the exhibit.  On Exhibit 91:  37,

19   DSPF AKwong LLC.  Do you see that?

20   A.   Yes.

21   Q.   Have we put that account into evidence today?

22   A.   Oh, I misunderstood the question.

23   Q.   It was an inartful question.  I apologize.

24   A.   No.  I did not review that paperwork today.

25   Q.   DSPF Annas LLC, the account that's referenced here under

D. Brown - Direct

1    the 38th account, did we put that into evidence?

2    A.   Not today.

3    Q.   DSPF Black LLC, Number 40, did we put that into evidence?

4    A.   No.

5    Q.   Taking a look at this, starting at line 37, generally

6    when were all of these accounts closed?

7    A.   In 2014, towards the end of the year.

8    Q.   And that's the ones that are on the first page.  Let's go

9    ahead and go to the third page.

10         Are there a number of other accounts starting with

11   line 45 all the way to at least 76 that all start "DSPF"?

12   A.   Yes.

13   Q.   And when were all of those accounts closed, just

14   generally?

15   A.   Almost all of them were closed in 2014, late 2014.

16         MS. O'BOYLE:  Your Honor, I'm going to move into

17   putting in a number of documents.  So I'm happy to start that

18   process, but I didn't know if you wanted to take a --

19         THE COURT:  I think we will.  We'll take a 15-minute

20   break, and then we'll come back.

21         (The jury exited the courtroom.)

22         THE COURT:  You may step down, ma'am, during the

23   break.

24         THE WITNESS:  Okay.

25         MS. O'BOYLE:  Your Honor, can I ask one question?

———————D. Brown - Direct———————

```
 1    It's -- sorry.  It's more a procedural-related question
 2    related to Government's Exhibit 2000, which were the
 3    stipulations that we talked about this morning.
 4            As in the Bank case, there are a number of factual
 5    stipulations to wires and things of that nature, and so we've
 6    asked, and the parties agreed, too, that these could be
 7    marked and submitted as evidence to the jury.
 8            And so we just wanted to clarify whether the Court
 9    would admit Government's Exhibit 2000, which has a number
10    of -- they've stipulated, Your Honor, to the use of the
11    wires, financial transactions affecting interstate
12    commerce --
13            THE COURT:  Is that the full length of that exhibit
14    that you want to put into the jury?
15            MS. O'BOYLE:  Yes.
16            THE COURT:  Usually the Court will not permit
17    stipulations to go to the jury, but since both parties have
18    requested it, that means nobody is appealing it, and it will
19    be permitted.
20            MS. O'BOYLE:  Thank you, Your Honor.
21            THE COURT:  Okay.
22            MR. GRINDROD:  Your Honor, since the direct
23    testimony is still ongoing, will you instruct the witness not
24    to discuss her testimony on the break.
25            THE COURT:  That's fine.  The Court usually does
```

—————————D. Brown - Direct—————————

 1   that, Mr. Grindrod.

 2          Do not discuss your testimony.  You are still under

 3   review.

 4          THE WITNESS:  Okay.

 5          (Recess from 3:41 p.m. to 4:04 p.m.)

 6          (The jury entered the courtroom.)

 7          THE COURT:  You may be seated.

 8          Let the record reflect that all jurors have returned

 9   to the courtroom.

10          Does counsel agree?

11          MS. O'BOYLE:  Yes, Your Honor.

12          MR. YAROW:  Yes, Your Honor.

13          MS. McCASLIN:  Yes, Your Honor.

14          THE COURT:  You may resume.

15          MS. O'BOYLE:  Thank you, Your Honor.

16          Mr. Bosse, if you could pull up Government's Exhibit

17   2000, which are the stipulations.

18          We're going to read a couple of those, Your Honor,

19   before we move in some documents.

20          THE COURT:  Okay.

21          MS. O'BOYLE:  This is Stipulation Number 1 related

22   to business records and public records.

23          The parties stipulate and agree that the categories

24   of records listed below in numbered paragraphs 1 through 34

25   are authentic and constitute records of regularly conducted

D. Brown - Direct

1    business activity pursuant to 803(6) of the Federal Rules of

2    Evidence or records or statements of a public office pursuant

3    to 803(8) of the Federal Rules of Evidence without requiring

4    further authentication, certification, or testimony of a

5    custodian.  The parties retain the right to object to the

6    admissibility of these records under any other Rule of

7    Evidence or constitutional right.

8            And then if we could go to Page 3, please.

9            Stipulation 20.  Under this paragraph, BayPort

10   Credit Union records, including account applications,

11   signature cards, account statements, deposits, transfers,

12   credits, memoranda, wire transfers, checks, and other banking

13   documents.

14           23, JPMorgan Chase Bank records, including account

15   applications, signature carts, account statements, deposits,

16   transfers, credits, memoranda, wire transfers, checks, and

17   other banking documents.

18           25, First Citizens Bank records, including account

19   applications, signature cards, account statements, deposits,

20   transfers, credits, memoranda, wire transfers, checks, and

21   other banking documents.

22           26, Arizona Business Bank, CoBiz, financial records,

23   including account applications, signature cards, account

24   statements, deposits, transfers, credits, memoranda, wire

25   transfers, checks, and other banking documents.

──────── D. Brown - Direct ────────

 1          27, Bank of Kansas City records, including account

 2  applications, signature cards, account statements, deposits,

 3  transfers, credits, memoranda, wire transfers, checks, and

 4  other banking documents.

 5          31, the Golden 1 Credit Union records, including

 6  account applications, signature cards, account statements,

 7  deposits, transfers, credits, memoranda, wire transfers,

 8  checks, and other banking documents.

 9          32, Charles Schwab Bank records, including account

10  applications, signature cards, account statements, deposits,

11  transfers, credits, memoranda, wire transfers, checks, and

12  other banking documents.

13          34, Intuit Inc. records, including payroll records.

14          Mr. Bosse, if you could pull up, just for the

15  witness, Exhibit 226.

16  BY MS. O'BOYLE:

17  Q.  Do you recognize 226, Ms. Brown?

18  A.  Yes.

19  Q.  What is it?

20  A.  It's a signature card for DSPF Group LLC.

21          MS. O'BOYLE:  Government moves in Exhibit 226.

22          THE COURT:  Any objection?

23          Hearing no objection, it is admitted.

24          (Government's Exhibit 226 was admitted.)

25          MS. O'BOYLE:  Go to 228, please.

─────────── D. Brown - Direct ───────────

1   BY MS. O'BOYLE:

2   Q.  Do you recognize 228?

3   A.  Yes.

4   Q.  What is it?

5   A.  It's a signature card package for DSP Management LLC.

6           MS. O'BOYLE:  Government moves in Exhibit 228.

7           THE COURT:  It's admitted.

8           (Government's Exhibit 228 was admitted.)

9           MS. O'BOYLE:  If you can go to 250B, as in bravo.

10  BY MS. O'BOYLE:

11  Q.  Do you recognize this?

12  A.  Yes.

13  Q.  What is it?

14  A.  It's a bank statement for DSPF Group LLC.

15          MS. O'BOYLE:  Government moves in Exhibit 250B.

16          THE COURT:  It is admitted.

17          (Government's Exhibit 250B was admitted.)

18          MS. O'BOYLE:  251B.

19  BY MS. O'BOYLE:

20  Q.  Do you recognize 251B?

21  A.  Yes.

22  Q.  What is it?

23  A.  It's a bank statement for DSP Management LLC.

24          MS. O'BOYLE:  Government moves in 251B.

25          THE COURT:  It is admitted.

Carol L. Naughton, Official Court Reporter

411

———— D. Brown - Direct ————

1     (Government's Exhibit 251B was admitted.)

2         MS. O'BOYLE:  If we could pull up 301B, please.

3  BY MS. O'BOYLE:

4  Q.  Do you recognize 301B?

5  A.  Yes.

6  Q.  What is it?

7  A.  It's a signature card package for Janus Spectrum Group

8  LLC.

9         MS. O'BOYLE:  Okay.  And actually, let's -- I'm

10  sorry.  The government moves in Exhibit 301B.

11        THE COURT:  301B is admitted.

12        (Government's Exhibit 301B was admitted.)

13  BY MS. O'BOYLE:

14  Q.  Okay.  What is the account number of Janus Spectrum Group

15  LLC?

16  A.  308580.

17  Q.  And so this is a bank account for Janus Spectrum Group

18  LLC; is that correct?

19  A.  That's correct.

20  Q.  And then what is the address of Janus Spectrum Group LLC?

21  A.  4301 Commuter Drive, Virginia Beach, Virginia.

22  Q.  And do you recognize that address?

23  A.  Yes.

24  Q.  What address is that?

25  A.  That's the address for Dominion Investment Group.

D. Brown - Direct

```
 1   Q.  And if we could go down here, who were signatories on
 2   this account?
 3   A.  Daryl Bank, Raeann Gibson, and Hilary Hatfield.
 4   Q.  If we could go to Government's Exhibit 303.  Do you
 5   recognize 303?
 6   A.  Yes.
 7   Q.  What is it?
 8   A.  It's a signature card package for Spectrum Management
 9   LLC.
10          MS. O'BOYLE:  Government moves in Exhibit 303.
11          THE COURT:  303 is admitted.
12          (Government's Exhibit 303 was admitted.)
13   BY MS. O'BOYLE:
14   Q.  If we could go to Government Exhibit 313B.  Do you
15   recognize 313B?
16   A.  Yes.  That's a bank statement for Janus Spectrum Group
17   LLC.
18   Q.  Is this the bank account for Janus Spectrum Group LLC?
19   A.  Yes.
20          MS. O'BOYLE:  Government moves in Exhibit 313B.
21          THE COURT:  313B is admitted.
22          (Government's Exhibit 313B was admitted.)
23          MS. O'BOYLE:  If you could, Mr. Bosse, pull up
24   Page 10 of 313B that we just admitted.
25   BY MS. O'BOYLE:
```

413

—————D. Brown - Direct—————

1   Q.   Ms. Brown, what is this on Page 210 of 313B?

2   A.   It's a check.

3   Q.   And what bank account is this connected to?

4   A.   Janus Spectrum Group LLC.

5   Q.   So the one we've just been talking about?

6   A.   Yes.

7   Q.   What is the date of it?

8   A.   November 21st, 2012.

9   Q.   And who is it to?

10  A.   David Alcorn.

11  Q.   What is the amount?

12  A.   $210,000.

13  Q.   And do you recognize this signature on this check --

14  A.   Yes.

15  Q.   -- on the front of the check?

16  A.   Yes.  That's Raeann's signature.

17  Q.   We're going to go Page 211, which is the next page.  What

18  is this, Ms. Brown?

19  A.   It is a check on the Janus Spectrum Group LLC account as

20  well.

21  Q.   And who is it paid to the order to?

22  A.   Janus Spectrum LLC.

23  Q.   What is the date?

24  A.   November 29, 2012.

25  Q.   What is the amount?

D. Brown - Direct

1    A.   $40,667.

2    Q.   And going to go the next page, Page 212, what is this?

3    A.   A check from Janus Spectrum Group LLC payable to Janus

4    Spectrum LLC for $57,740.

5    Q.   And what is the date?

6    A.   December 11, 2012.

7    Q.   Going to Page 213 -- actually, let's break this up.  This

8    is the last page we'll do, but we're going to break this up.

9            Does this page have four checks on it?

10   A.   Yes.

11   Q.   And if you could, I've broken up -- the first two checks,

12   could you explain what they are?

13   A.   Yes.  Janus Spectrum Group LLC, that is a check that they

14   wrote to Janus Spectrum LLC for $6,590 on December 19, 2012.

15   Q.   And then what is the check below it?

16   A.   It is another check from Janus Spectrum Group to Janus

17   Spectrum LLC for $157,500 on January 17, 2013.

18   Q.   If we go to the bottom two checks, what's check number

19   1006?

20   A.   Janus Spectrum Group LLC, a check payable to Janus

21   Spectrum LLC for $157,500 on February 5, 2013.

22   Q.   And what is the check 1007?

23   A.   A check from Janus Spectrum Group LLC payable to Janus

24   Spectrum LLC for $52,500 on February 14, 2013.

25   Q.   Okay.  If we could just for the jury -- or just for the

D. Brown - Direct

1  witness, if we could pull up 315B.  Do you recognize 315B?

2  A.  Yes.  It is a bank statement for Spectrum Management LLC.

3  Q.  And is this the full bank account?

4  A.  Yes.

5          MS. O'BOYLE:  Government moves in 315B.

6          THE COURT:  315B is admitted.

7          (Government's Exhibit 315B was admitted.)

8          MS. O'BOYLE:  Could we place have, for the witness,

9  401.

10 BY MS. O'BOYLE:

11 Q.  Do you recognize 401?

12 A.  Yes.  It's a signature card for Prime Spectrum LLC.

13 Q.  Okay.

14         MS. O'BOYLE:  Government moves in Exhibit 401.

15         THE COURT:  401 is admitted.

16         (Government's Exhibit 401 was admitted.)

17 BY MS. O'BOYLE:

18 Q.  You said this was the signature card for this particular

19 account?

20 A.  Yes.

21 Q.  And what is the address of Prime Spectrum LLC?

22 A.  4301 Commuter Drive, Virginia Beach, Virginia.

23 Q.  Whose address is that?

24 A.  Dominion Investment Group.

25 Q.  And who were the signatories on this account?

D. Brown - Direct

1   A.   Daryl Bank, Raeann Gibson, and Mike Binetti.

2          MS. O'BOYLE:   If you could go -- Mr. Bosse, if you

3   could pull up 1012A for the witness, please.

4   BY MS. O'BOYLE:

5   Q.   Do you recognize 1012A?

6   A.   Yes.   It's a wire transfer request.

7   Q.   Okay.   And is it connected to the Prime Spectrum bank

8   account that we were just looking at?

9   A.   Yes.

10          MS. O'BOYLE:   Government moves in Exhibit 1012A.

11          THE COURT:   1012A will be admitted.

12          (Government's Exhibit 1012A was admitted.)

13   BY MS. O'BOYLE:

14   Q.   I believe this is the first wire that we've looked at.

15   Can you -- up here, I've just blown up the top of this

16   document.   What is the system date/time?   What is that?

17   A.   That is the date the wire was sent.

18   Q.   And here, over here on the left-hand, it says "Basic

19   information."   Is that right?

20   A.   Yes.   That is the sender ABA.   That's BayPort Credit

21   Union's routing number.

22   Q.   So that's where this wire comes from?

23   A.   Correct.

24   Q.   It came from BayPort?

25   A.   Correct.

D. Brown - Direct

1   Q.  Where did it go?

2   A.  To Arizona Business, probably, Bank or another financial

3   institution.

4   Q.  Marked "Arizona Business" and then it says "B"?

5   A.  Right.

6   Q.  What is the amount?

7   A.  $41,200.

8   Q.  Just taking a step back, what is a wire transfer?

9   A.  It is a function that's done through the Federal Reserve

10  where funds are withdrawn from one account and deposited into

11  another account.

12  Q.  Okay.  And so in this instance, which account were these

13  funds drawn from -- the 41,000 drawn from?

14  A.  Prime Spectrum account.

15  Q.  So the one that we had just gone over?

16  A.  Uh-huh.

17  Q.  And where did it go to?

18  A.  To an account in Arizona for Janus Spectrum LLC.

19  Q.  And during 2012 through 2015, where did BayPort Credit

20  Union process its wire transfers?

21  A.  Newport News.

22  Q.  Was that true for all wire transfers?

23  A.  Yes.

24  Q.  And so when money was wired from BayPort to another

25  bank -- in this instance, Arizona Business Bank -- did the

D. Brown - Direct

```
 1   wire begin here in the Eastern District of Virginia?
 2   A.  Correct.
 3   Q.  And when wires were sent from other banking institutions
 4   to BayPort Credit Union, did the wire end here in Virginia?
 5   A.  Yes.
 6   Q.  And specifically in Newport News?
 7   A.  Yes.
 8           MS. O'BOYLE:  Let's go to Government's Exhibit 403,
 9   for the witness.
10   BY MS. O'BOYLE:
11   Q.  Do you recognize Government's Exhibit 403?
12   A.  Yes.  It's a signature card for Prime Spectrum Management
13   LLC.
14           MS. O'BOYLE:  Government moves in Exhibit 403.
15           THE COURT:  Exhibit 403 will be admitted.
16           (Government's Exhibit 403 was admitted.)
17   BY MS. O'BOYLE:
18   Q.  If we can go to Government's Exhibit 409B, Bravo.  Do you
19   recognize 409B?
20   A.  Yes.
21   Q.  What is it?
22   A.  It's a bank account statement for Prime Spectrum LLC.
23           MS. O'BOYLE:  Government moves in Exhibit 409B.
24           THE COURT:  409B will be admitted.
25           (Government's Exhibit 409B was admitted.)
```

———— D. Brown - Direct ————

1          MS. O'BOYLE:  If we could have Government's Exhibit

2     410B.

3     BY MS. O'BOYLE:

4     Q.  Do you recognize 410B?

5     A.  Yes.  That's a bank account statement for Prime Spectrum

6     Management LLC.

7     Q.  And this is the bank account for that account?

8     A.  Yes.  Correct.

9          MS. O'BOYLE:  Government moves in Exhibit 410B.

10          THE COURT:  410B, bravo, will be admitted.

11          (Government's Exhibit 410B was admitted.)

12          MS. O'BOYLE:  If we would have Government

13     Exhibit 501.

14     BY MS. O'BOYLE:

15     Q.  Do you recognize Government's Exhibit 501?

16     A.  Yes.

17     Q.  What is it?

18     A.  It's a signature card package for Spectrum 100 LLC.

19          MS. O'BOYLE:  Government moves in Exhibit 501.

20          THE COURT:  501 will be admitted.

21          (Government's Exhibit 501 was admitted.)

22     BY MS. O'BOYLE:

23     Q.  So, for the jury, so which bank account is this in

24     connection with?  Who owns this account?

25     A.  Daryl Bank is the prime member, the managing member of

420

D. Brown - Direct

1  that LLC.  Raeann Gibson was a member of that LLC, and Mike

2  Binetti was a member of that LLC.

3  Q.  You said he was the managing member.  Where did you get

4  that information?

5  A.  In the articles of -- or in the Operating Agreement of

6  the LLC, they would designate a manager.

7  Q.  And what is the address of Spectrum 100 LLC?

8  A.  4301 Commuter Drive, Virginia Beach.

9  Q.  Whose address is that?

10 A.  Dominion Investment Group.

11 Q.  If you could take a look at --

12         MS. O'BOYLE:  If we could have, for the witness,

13 Government's Exhibit 1013.

14 BY MS. O'BOYLE:

15 Q.  Do you recognize 1013?

16 A.  Yes.  It's a wire transfer request.

17         MS. O'BOYLE:  Government moves in Exhibit 1013.

18         THE COURT:  1013 will be admitted.

19         (Government's Exhibit 1013 was admitted.)

20 BY MS. O'BOYLE:

21 Q.  And is this a wire transfer similar to the one that we

22 just went over?

23 A.  Yes, except for it's from a different account.

24 Q.  Great.  So let's walk through it.

25         What was the date of this wire transfer?

———D. Brown - Direct———

1   A.   That's up at the top.  April 8th, 2014.  And the wire --

2   go ahead.

3   Q.   Go ahead.

4   A.   The wire is out of the Spectrum 100 LLC account in the

5   sum of $123,600, and it's to Janus Spectrum LLC in Arizona at

6   a different financial institution.

7   Q.   Okay.  So to be clear, where did this wire originate

8   from?

9   A.   Newport News --

10  Q.   And it went --

11  A.   -- from BayPort Credit Union, from the Spectrum 100 LLC

12  account.

13  Q.   And then it went to Arizona Business Bank?

14  A.   Correct.

15       MS. O'BOYLE:  Okay.  If you could pull up, for the

16  witness, 1014, please.

17  BY MS. O'BOYLE:

18  Q.   Do you recognize 1014?

19  A.   Yes.  That's also a wire.

20  Q.   Is it related to the Spectrum 100 account?

21  A.   Yes, it is.

22       MS. O'BOYLE:  Government moves in Exhibit 1014.

23       THE COURT:  1014 will be admitted.

24       (Government's Exhibit 1014 was admitted.)

25  BY MS. O'BOYLE:

D. Brown - Direct

1   Q.  What was the date of this wire?

2   A.  April 24th, 2014.

3   Q.  Who sent the wire?  What company sent the wire?

4   A.  Spectrum 100 LLC.

5   Q.  Where did the money go?

6   A.  To an account for Janus Spectrum LLC at Arizona Business

7   Bank, I guess.

8   Q.  And so where did this wire originate from?

9   A.  From BayPort Credit Union in Newport News.

10  Q.  And then it went out to Arizona Business Bank?

11  A.  Yes.

12         MS. O'BOYLE:  If we can pull up, for the witness,

13  Government's Exhibit 1015.

14  BY MS. O'BOYLE:

15  Q.  Do you recognize 1015?

16  A.  Yes.

17  Q.  What is it?

18  A.  It's a wire request.

19  Q.  Again, related to Spectrum 100?

20  A.  From Spectrum 100.

21         MS. O'BOYLE:  Government moves in Exhibit 1015.

22         THE COURT:  1015 will be admitted.

23         (Government's Exhibit 1015 was admitted.)

24  BY MS. O'BOYLE:

25  Q.  What is the date of this wire?

─────D. Brown - Direct─────

1    A.   May 15th, 2014.

2    Q.   What company sent this wire?

3    A.   Spectrum 100 LLC.

4    Q.   And where did the money go?

5    A.   Janus Spectrum LLC.

6    Q.   And how much money went to Janus Spectrum LLC out of this

7    wire?

8    A.   $288,400.

9    Q.   And so where did this wire originate?

10   A.   In Newport News.

11   Q.   In Newport News at BayPort Credit Union?

12   A.   Correct.

13   Q.   And where did it go?

14   A.   To Arizona Business Bank.

15   Q.   All right.

16        MS. O'BOYLE:  If we could go to, just for the

17   witness, Government's Exhibit 503.

18   BY MS. O'BOYLE:

19   Q.   Do you recognize 503?

20   A.   Yes.  It's a signature card package for Spectrum 100

21   Management LLC.

22        MS. O'BOYLE:  Government moves in Exhibit 503.

23        THE COURT:  503 will be admitted.

24        (Government's Exhibit 503 was admitted.)

25        MS. O'BOYLE:  Go to 517 bravo.

Carol L. Naughton, Official Court Reporter

D. Brown - Direct

1   BY MS. O'BOYLE:

2   Q.  Do you recognize 517B, bravo?

3   A.  Yes.  It's a bank statement for Spectrum 100 LLC for

4   April 2013.

5   Q.  And then does this exhibit contain the full account?

6   A.  Yes.

7           MS. O'BOYLE:  Government moves in Exhibit 517B.

8           THE COURT:  517B is admitted.

9           (Government's Exhibit 517B was admitted.)

10          MS. O'BOYLE:  518B, please.

11  BY MS. O'BOYLE:

12  Q.  Do you recognize 518B?

13  A.  Yes.  It's a bank statement for Spectrum 100 Management

14  LLC.

15  Q.  Okay.

16  A.  For April 2013.

17  Q.  And is this the full bank account of Spectrum 100

18  Management LLC as well?

19  A.  Yes.

20          MS. O'BOYLE:  Government moves in Exhibit 518B, as

21  in Bravo.

22          THE COURT:  518B is admitted.

23          (Government's Exhibit 518B was admitted.)

24          MS. O'BOYLE:  Go to 604, please.

25  BY MS. O'BOYLE:

Carol L. Naughton, Official Court Reporter

```
                          ────D. Brown - Direct────
 1   Q.  Do you recognize 604?
 2   A.  Yes.  This is a signature card package for Diversified
 3   Financing LLC.
 4           MS. O'BOYLE:  Government moves in Exhibit 604.
 5           THE COURT:  Exhibit 604 is admitted.
 6           (Government's Exhibit 604 was admitted.)
 7   BY MS. O'BOYLE:
 8   Q.  Is this Diversified Financing LLC, was the street address
 9   of this entity the same as all the others, the Dominion
10   Investment offices?
11   A.  Yes.
12           MS. O'BOYLE:  If you go to 604A.
13   BY MS. O'BOYLE:
14   Q.  Do you recognize 604A?
15   A.  Yes.  It's a signature card package for Accelerator
16   Management LLC.
17           MS. O'BOYLE:  Government moves in Exhibit 604A.
18           THE COURT:  604A is admitted.
19           (Government's Exhibit 604A was admitted.)
20   BY MS. O'BOYLE:
21   Q.  Who was the managing member of 604A?
22   A.  Daryl Bank.
23   Q.  And what address did Accelerator Management operate out
24   of?
25   A.  4301 Commuter Drive, Virginia Beach.
```

D. Brown - Direct

```
 1          MS. O'BOYLE:  If we could have Government's
 2   Exhibit 65.
 3   BY MS. O'BOYLE:
 4   Q.  Do you recognize Government's Exhibit 65?
 5   A.  Yes.  It is a signature card package for Dominion
 6   Investment Group LLC.
 7          MS. O'BOYLE:  Government moves in Exhibit 65.
 8          THE COURT:  Exhibit 65 is admitted.
 9          (Government's Exhibit 65 was admitted.)
10          MS. O'BOYLE:  Can I have Government's Exhibit 67,
11   please.
12   BY MS. O'BOYLE:
13   Q.  Do you recognize 67?
14   A.  Yes.  It's a bank statement for Dominion Investment Group
15   LLC from December 2011.
16   Q.  Does this include the full banking package for this
17   account?
18   A.  Yes.
19          MS. O'BOYLE:  Government moves in Exhibit 67.
20          THE COURT:  Exhibit 67 is admitted.
21          (Government's Exhibit 67 was admitted.)
22          MS. O'BOYLE:  If I could have Government's
23   Exhibit 70.
24   BY MS. O'BOYLE:
25   Q.  Do you recognize Government's Exhibit 70?
```

D. Brown - Direct

1   A.  It's a signature card package for Dominion Private Client

2   Group LLC.

3           MS. O'BOYLE:  Government moves in Exhibit 70.

4           THE COURT:  Exhibit 70 is admitted.

5           (Government's Exhibit 70 was admitted.)

6           MS. O'BOYLE:  If we could have Government's

7   Exhibit 72.

8   BY MS. O'BOYLE:

9   Q.  Do you recognize Government's Exhibit 72?

10  A.  Yes.  It's a bank statement for Dominion Private Client

11  Group LLC.

12  Q.  Is it the bank statements and the checks for this

13  account?

14  A.  Yes.

15          MS. O'BOYLE:  Government moves in Exhibit 72.

16          THE COURT:  Exhibit 72 is admitted.

17          (Government's Exhibit 72 was admitted.)

18          MS. O'BOYLE:  If we could have Government's

19  Exhibit 77.

20  BY MS. O'BOYLE:

21  Q.  Do you recognize this?

22  A.  Yes.  It's a signature card package for Dominion

23  Franchise Group LLC.

24          MS. O'BOYLE:  Government moves in Exhibit 77.

25          THE COURT:  Exhibit 77 is admitted.

---
D. Brown - Direct
---

 1           (Government's Exhibit 77 was admitted.)

 2           MS. O'BOYLE:  Can we have Government's Exhibit 78.

 3  BY MS. O'BOYLE:

 4  Q.  Do you recognize that?

 5  A.  Yes.  That's a bank statement for Dominion Franchise

 6  Group LLC.

 7  Q.  Is this the full bank account for that entity or that

 8  bank account as well?

 9  A.  Yes.

10           MS. O'BOYLE:  Government moves in Exhibit 78.

11           THE COURT:  Exhibit 78 is admitted.

12           (Government's Exhibit 78 was admitted.)

13           MS. O'BOYLE:  Two more bank accounts.  If we could

14  have 81, please.

15  BY MS. O'BOYLE:

16  Q.  Do you recognize this?

17  A.  Yes.  It's a signature card package for Dominion

18  Diversified Strategies LLC.

19  Q.  Where does it operate out of?

20  A.  4301 Commuter Drive, Virginia Beach.

21  Q.  And who is on the signatory card for this entity?

22  A.  Daryl Bank, Raeann Gibson, and Mike Binetti.

23           MS. O'BOYLE:  Government moves in Exhibit 81.

24           THE COURT:  Exhibit 81 is admitted.

25           (Government's Exhibit 81 was admitted.)

───────────D. Brown - Direct───────────

1          MS. O'BOYLE:  If we could have Government's

2    Exhibit 83.

3    BY MS. O'BOYLE:

4    Q.  Do you recognize this?

5    A.  It's a bank statement for Dominion Diversified Strategies

6    LLC.

7          MS. O'BOYLE:  Government moves in Exhibit 83.

8          THE COURT:  Exhibit 83 is admitted.

9          (Government's Exhibit 83 was admitted.)

10   BY MS. O'BOYLE:

11   Q.  Now, we looked at a number of wire transfers.  If you

12   could take a look at Government's Exhibit 15.  Do you

13   recognize this?

14   A.  Yes.

15   Q.  What is it?

16   A.  It's a wire transfer that was incoming into BayPort.

17   Q.  Coming into BayPort?

18   A.  Correct.

19   Q.  And landing in the DSPF Group LLC account?

20   A.  Correct.

21          MS. O'BOYLE:  Government moves in Exhibit 15.

22          THE COURT:  Exhibit 15 is admitted.

23          (Government's Exhibit 15 was admitted.)

24          MS. O'BOYLE:  Go to 17, please.

25   BY MS. O'BOYLE:

————D. Brown - Direct————

1   Q.  Do you recognize this?

2   A.  It's another incoming wire.

3   Q.  And is it going to the Spectrum 100 account?

4   A.  Yes, it is.

5          MS. O'BOYLE:  Government moves in Exhibit 17.

6          THE COURT:  Exhibit 17 is admitted.

7          (Government's Exhibit 17 was admitted.)

8   BY MS. O'BOYLE:

9   Q.  And so this is actually a wire of $50,000 that came to

10  the Spectrum 100 account?  Is that right?

11  A.  That's correct.

12  Q.  And it says here -- what is the text box here under --

13  A.  That's, like, a memo section on a check, if you were

14  writing a check and you wanted to remember what it was for

15  later.  That FBO stands for "for benefit of."

16  Q.  So in this instance, it would be for the benefit of

17  Lucille Zenke?

18  A.  Correct.

19         MS. O'BOYLE:  Sorry.  Government moves in

20  Exhibit 17.

21         THE COURT:  Exhibit 17 is admitted.

22         (Government's Exhibit 17 was previously admitted.)

23         MS. O'BOYLE:  Pull up 29, please.

24  BY MS. O'BOYLE:

25  Q.  Do you recognize 29?

———— D. Brown - Direct ————

1    A.   Yes.

2    Q.   What is it?

3    A.   It is an incoming wire for Prime Spectrum LLC.

4           MS. O'BOYLE:   Government moves in Exhibit 29.

5           THE COURT:   Exhibit 29 is admitted.

6           (Government's Exhibit 29 was admitted.)

7    BY MS. O'BOYLE:

8    Q.   And how much money was this incoming wire for?

9    A.   $45,000.

10   Q.   And what was the text reference in this wire?

11   A.   Clark/Berrett.

12   Q.   And where did this money land?

13   A.   Prime Spectrum LLC.

14   Q.   And the wire landed here in Newport News?

15   A.   In Newport News at BayPort.

16          MS. O'BOYLE:   If we could go to 265.

17   BY MS. O'BOYLE:

18   Q.   Do you recognize this?

19   A.   Yes.

20   Q.   What is it?

21   A.   This is a wire request from DSPF Group LLC.

22          MS. O'BOYLE:   Government moves in Exhibit 265.

23          THE COURT:   Exhibit 265 is admitted.

24          (Government's Exhibit 265 was admitted.)

25   BY MS. O'BOYLE:

D. Brown - Direct

1   Q.  This is the first time we've seen this document.  Could
2   you walk the jury through what this is.
3   A.  This would be more of a manual request.  So if Daryl or
4   Raeann had e-mailed me or someone else in my department and
5   said, hey, I need to send a wire, we would fill out this
6   form.  The other one was an online wire.  It's a little bit
7   different.
8   Q.  And for this particular wire, how much money was being
9   wired?
10  A.  $40,000 was debited from DSPF Group LLC, and it was sent
11  to Zions Bank, and it was credited to Tony Sellers.
12  Q.  And down here, do you recognize the signature on this
13  wire?
14  A.  Raeann Gibson.
15          MS. O'BOYLE:  If we could go to 863, please.
16  BY MS. O'BOYLE:
17  Q.  Do you recognize this?
18  A.  That is an incoming wire.
19          MS. O'BOYLE:  Government moves in Exhibit 863.
20          THE COURT:  Exhibit 863 is admitted.
21          (Government's Exhibit 863 was admitted.)
22  BY MS. O'BOYLE:
23  Q.  You said this was an incoming wire?
24  A.  Yes.
25  Q.  So these funds -- where did these funds ultimately land?

———D. Brown - Direct———

1   A.   In Newport News and credited to the account of
2   Spectrum 100 LLC.
3   Q.   And what is the text line here?
4   A.   From Summit -- oh, from Summit Trust for benefit of Adan
5   Rangel IRA.
6   Q.   And how much money was wired?
7   A.   $87,000.
8           MS. O'BOYLE:  If we could have 878, please.
9   BY MS. O'BOYLE:
10  Q.   Do you recognize 878?
11  A.   878 is an incoming wire from Summit Trust Company to
12  Summit [sic] 100 LLC for benefit of Nicholas J. Gentile IRA.
13          MS. O'BOYLE:  Government moves in Exhibit 878.
14          THE COURT:  878 is admitted.
15          (Government's Exhibit 878 was admitted.)
16  BY MS. O'BOYLE:
17  Q.   You said this was an incoming wire that went to the
18  Spectrum 100 LLC account?
19  A.   Correct.
20  Q.   And what was the amount of the wire?
21  A.   $78,000.
22  Q.   And who was this for the benefit of?
23  A.   Nicholas J. Gentile IRA.
24          MS. O'BOYLE:  If we could go to two more, 890.
25  BY MS. O'BOYLE:

────────── D. Brown - Direct ──────────

1   Q.  Do you recognize this?

2   A.  Yes.  That's also an incoming wire.

3          MS. O'BOYLE:  Government moves in Exhibit 890.

4          THE COURT:  Exhibit 890 is admitted.

5          (Government's Exhibit 890 was admitted.)

6   BY MS. O'BOYLE:

7   Q.  And where is this wire from?

8   A.  It is from Summit Trust Company.

9   Q.  And who is it for the benefit of?

10  A.  Craig Raelene Gastman, 100 units, and Bradley Parker -- I

11  can't tell.  It might say eight units.

12  Q.  And where were these moneys going?

13  A.  It was deposited into the Spectrum 100 LLC account,

14  $108,000.

15  Q.  So where did this wire land?

16  A.  In Newport News at BayPort.

17          MS. O'BOYLE:  If we could have 1005A.

18          If you could go to 1007A, actually.

19  BY MS. O'BOYLE:

20  Q.  Do you recognize 1007A?

21  A.  Yes.

22  Q.  What is it?

23  A.  It's a check written off of the Prime Spectrum LLC

24  account, payable to Tony Sellers for --

25  Q.  What is the amount?

─────────── D. Brown - Direct ───────────

1    A.  -- $13,500.

2           MS. O'BOYLE:  Government moves in Exhibit 1007A.

3           THE COURT:  1007A is admitted.

4           (Government's Exhibit 1007A was admitted.)

5    BY MS. O'BOYLE:

6    Q.  And you said this was a check written on the Prime

7    Spectrum account to Mr. Sellers?

8    A.  Correct.

9    Q.  And can you read what was on the "for" line?

10   A.  It says "For:  Clark 20K, Berrett 25K."

11   Q.  Now, you talked a little bit about electronic ACH

12   transfers.  What are those?

13   A.  It's similar to a wire.  It's a bank-to-bank fund

14   transfer.  A lot of times when you get your payroll

15   direct-deposited, that's an ACH.  That's credited to your

16   account.

17   Q.  And so you said it's a bank-to-bank transfer.  It's not a

18   wire transfer, but does one bank electronically transfer

19   funds to another bank?

20   A.  Correct.

21   Q.  And for BayPort Credit Union, where -- for the bank

22   employees, where do those funds start?  How is that process

23   initiated?

24   A.  It's in our back office in Newport News.

25   Q.  And so any sort of electronic transfer of funds via a

——————D. Brown - Direct——————

1   payroll account would also start in Newport News; is that

2   correct?

3   A.  That's correct.

4   Q.  Okay.

5           MS. O'BOYLE:  So let's take a look at -- pursuant to

6   the stipulations, if we could have 1008A.

7           Government moves in Exhibit 1008A pursuant to the

8   stipulations related to Intuit.

9           THE COURT:  1008A is admitted.

10          (Government's Exhibit 1008A was admitted.)

11  BY MS. O'BOYLE:

12  Q.  Now, this is not a BayPort Credit Union record, correct?

13  A.  That's correct.

14  Q.  But I'm going to ask you here, this record provides a

15  $58,800 credit via Intuit to a Bill Smith.  Do you see that?

16  A.  Yes.

17  Q.  Do you recognize -- here it says "from bank account."  Do

18  you recognize these numbers, routing and account, listed

19  under "Employer BayPort Credit Union"?

20  A.  Yes.  The routing number is BayPort's routing ABA number.

21  Q.  So this 251481368, that is BayPort Credit Union's routing

22  number?

23  A.  Correct.

24  Q.  And then under "account," it's got a number of stars, and

25  then are the last four digits 6227?

———————D. Brown - Direct———————

1   A.   Correct.

2   Q.   What is that?

3   A.   That is the last four digits of the account number.  So

4   the six-digit account number, when it's an electronic

5   transfer, we use a different number that includes that

6   account number.  Like on the bottom of a check where it's got

7   all of those long numbers, ours are going to be like 11 and

8   then five zeros and then the six digits and then plus an

9   extra digit on the end.

10  Q.   So if we were looking at this, the routing number, you

11  know that it came from your bank, BayPort Credit Union,

12  correct?

13  A.   Correct.

14  Q.   And then we would just have to figure out which bank

15  account this came from.  We'd have to find out which bank

16  account ends in 6227?

17  A.   It would actually -- the six-digit number that's, like,

18  on the signature cards that we've been going over would be

19  622, it would end in.

20  Q.   622 and not the 7?

21  A.   The 7 is an extra digit for the electronic purposes.

22  Q.   Okay.  So it's just the 622?

23  A.   Yes.  Up top it says "Dominion Private Client Group LLC,"

24  though.

25  Q.   So it's --

D. Brown - Direct

1   A.   I'm assuming that that's the account that it was related

2   to.

3   Q.   Okay.  So this is a transfer of $58,800 from Dominion

4   Private Client Group LLC to Mr. Smith?

5   A.   Correct.

6   Q.   And then it says "to bank account."  That's a different

7   routing number and an account number that you don't know

8   anything about?

9   A.   That is correct.

10  Q.   And just below it, there's another -- it says "release

11  date, 5/20/2014."  This has 3,720 Intuit electronic

12  transfer --

13  A.   Correct.

14  Q.   -- from -- go ahead.  From where to where?

15  A.   It's from the BayPort Credit Union account ending in

16  6227, and it's credited to Bill Smith at another financial

17  institution.

18            MS. O'BOYLE:  Okay.  If we could have Government's

19  Exhibit 1009A.

20            And pursuant to the stipulation related to the

21  Intuit records, government moves in Exhibit 1009A.

22            THE COURT:  1009A is admitted.

23            (Government's Exhibit 1009A was admitted.)

24  BY MS. O'BOYLE:

25  Q.   And is this another -- does this represent another

D. Brown - Direct

1    electronic transfer of funds that started in Newport News and
2    went to Mr. Bill Smith?
3    A.  Correct.
4    Q.  What was the amount?
5    A.  $9,360.
6            MS. O'BOYLE:  And if we could go to, two more,
7    Government's Exhibit 1010A.
8            Pursuant to the stipulation, government moves in
9    1010A.
10           THE COURT:  1010A is admitted.
11           (Government's Exhibit 1010A was admitted.)
12   BY MS. O'BOYLE:
13   Q.  And is this another electronic transfer from Dominion
14   Private Client Group's account at BayPort to a Tom Barnett?
15   A.  Yes.
16   Q.  In the amount of $2,600?
17   A.  Correct.
18   Q.  So where did this electronic transfer begin?
19   A.  Newport News at BayPort.
20           MS. O'BOYLE:  The last one here, Government's
21   Exhibit 1011A.
22           THE COURT:  Government's Exhibit 1011A is admitted.
23           (Government's Exhibit 1011A was admitted.)
24   BY MS. O'BOYLE:
25   Q.  And if we take a look here, what does this reflect

———————— D. Brown - Direct ————————

1   occurred at the end of 2014 or at the very beginning of 2015?

2   A.  The account at BayPort was debited for $3,200, and the

3   money was sent to Tom Barnett, The Financial Light

4   Incorporated.

5   Q.  And so is this another electronic funds transfer?

6   A.  Yes.

7   Q.  And where did the electronic funds transfer begin?

8   A.  Newport News.

9   Q.  Now, Ms. Brown, at some point, did Mr. Bank close all of

10  his bank accounts at BayPort Credit Union?

11  A.  Yes.

12  Q.  And approximately when did he close those accounts?

13       MS. O'BOYLE:  Actually, if I could have Government's

14  Exhibit 91 back up, please.

15  BY MS. O'BOYLE:

16  Q.  Let's just focus on the Diversified Financing, number 5.

17  When does it reflect that Mr. Bank closed the Diversified

18  Financing account at BayPort Credit Union?

19  A.  July 13, 2015.

20  Q.  When did he -- when did he close the account?

21  A.  2015, July 13, 2015.

22  Q.  And what about Accelerator Management?  When was it

23  closed?

24  A.  July 10, 2015.

25  Q.  And Spectrum 100 LLC, when was it closed?

———D. Brown - Direct———

1   A.   July 20, 2015.

2   Q.   And Prime Spectrum LLC?

3   A.   July 27, 2015.

4   Q.   Do you know why Mr. Bank closed all of his accounts at

5   that time?

6   A.   He told us that he was relocating to Florida and that he

7   no longer needed to keep his Virginia accounts.

8   Q.   What, if anything, did Mr. Bank tell you about an

9   investigation by the Virginia State Corporation Commission

10  when he closed his accounts?

11  A.   He basically didn't really mention anything about it at

12  all.  I had -- I did find out about something because I

13  personally bought an annuity from Dominion Investment Group.

14  That's just a really safe product.  And that -- I was

15  contacted by the State Corporation Commission.

16  Q.   Don't tell me what they said.

17  A.   I won't.

18  Q.   Okay.  Ms. Brown --

19          MS. O'BOYLE:  If we could have Government's Exhibit,

20  up on the screen, 1002A.  This is a Wells Fargo Bank account

21  signature card related to Janus Spectrum LLC.

22          Pursuant to the stipulation, government moves in

23  1002A.

24          THE COURT:  1002A is admitted.

25          (Government's Exhibit 1002A was admitted.)

————D. Brown - Direct————

 1           MS. O'BOYLE:  If we could publish that for the jury
 2     briefly.
 3     BY MS. O'BOYLE:
 4     Q.  This is not your bank, correct?
 5     A.  That's correct.
 6     Q.  All right.  But can you read the business name that's on
 7     this particular account?
 8     A.  Janus Spectrum LLC.
 9     Q.  And who are the signatories on the account?
10     A.  Norma J. Coffin and Kent Maerki.
11           MS. O'BOYLE:  If we could have Government's
12     Exhibit 1002C.
13           Pursuant to the stipulation, government moves in
14     Exhibit 1002C.
15           THE COURT:  1002C is admitted.
16           (Government's Exhibit 1002C was admitted.)
17           MS. O'BOYLE:  If we could have Government's
18     Exhibit 1002D.
19           Pursuant to the stipulation, government moves in
20     Exhibit 1002D, as in delta.
21           THE COURT:  It is admitted.
22           (Government's Exhibit 1002D was admitted.)
23     BY MS. O'BOYLE:
24     Q.  And again, this is not your bank, correct?  This is a
25     Wells Fargo account?

D. Brown - Direct

```
 1    A.  Correct.

 2    Q.  Can you read what the customer name was?

 3    A.  Janus Spectrum LLC and David A. Alcorn.

 4    Q.  Was the signatory on this account?

 5    A.  Yes.

 6              MS. O'BOYLE:  If we could have Government's

 7    Exhibit 1002F.

 8              Pursuant to the stipulation, government moves in

 9    Exhibit 1002F.

10              THE COURT:  1002F is admitted.

11              (Government's Exhibit 1002F was admitted.)

12              MS. O'BOYLE:  If we could have Government's

13    Exhibit 1002G.

14              Pursuant to the stipulation, the government moves in

15    Exhibit 1002G?

16              THE COURT:  1002G is admitted.

17              (Government's Exhibit 1002G was admitted.)

18    BY MS. O'BOYLE:

19    Q.  And again, Ms. Brown, this is not your bank account

20    signatory card, correct?

21    A.  Correct.

22    Q.  What bank is this a signatory account for?

23    A.  Arizona Business Bank.

24    Q.  And was that the name of the bank that was on all of the

25    wires that we went through?
```

———— D. Brown - Direct ————

1   A.   Yes.

2   Q.   Who is the signatory on this account?

3   A.   David Albert Alcorn.

4          MS. O'BOYLE:  If we could have 1002I.

5          Pursuant to the stipulation, government moves in

6   Exhibit 1002I.

7          THE COURT:  1002I is admitted.

8          (Government's Exhibit 1002I was admitted.)

9          MS. O'BOYLE:  Could we have 1002J, please.

10          Pursuant to the stipulation, government moves in

11   Exhibit 1002J.

12          THE COURT:  It is admitted.

13          (Government's Exhibit 1002J was admitted.)

14   BY MS. O'BOYLE:

15   Q.   This is another Arizona Business Bank account; is that

16   correct?

17   A.   Yes.

18   Q.   And if you could read what -- who is the account owner at

19   this particular bank?

20   A.   Janus Spectrum LLC.

21   Q.   And who is the signatory on the account?

22   A.   David Albert Alcorn.

23          MS. O'BOYLE:  If we could pull up 1002L.

24          Pursuant to the stipulation, government moves in

25   Exhibit 1002L.

Carol L. Naughton, Official Court Reporter

———D. Brown - Direct———

1          THE COURT:  1002L is admitted.

2          (Government's Exhibit 1002L was admitted.)

3          MS. O'BOYLE:  If we could have Exhibit 1108.

4          Pursuant to the stipulation, government moves in

5    Exhibit 1108.

6          THE COURT:  1108 is admitted.

7          (Government's Exhibit 1108 was admitted.)

8          MS. O'BOYLE:  Could we have 1002N.

9          Pursuant to the stipulation, government moves in

10   Exhibit 1002N.

11         THE COURT:  1002N is admitted.

12         (Government's Exhibit 1002N was admitted.)

13         MS. O'BOYLE:  If we could have 1002P.

14         Pursuant to the stipulation, the government moves in

15   Exhibit 1002P.

16         THE COURT:  1002P is admitted.

17         (Government's Exhibit 1002P was admitted.)

18   BY MS. O'BOYLE:

19   Q.  Again, this is not your bank; is that correct, Ms. Brown?

20   A.  Correct.

21   Q.  Is this First Citizens Bank?

22   A.  First Citizens Bank.

23   Q.  What is the account owner of this particular account?

24   A.  Janus Spectrum PMA.

25   Q.  What is the name underneath it?

D. Brown - Direct

1  A.   Norma Coffin.

2           MS. O'BOYLE:  If we could have Exhibit 1102.

3           Pursuant to the stipulation, government moves in

4  Exhibit 1102.

5           THE COURT:  1102 is admitted.

6           (Government's Exhibit 1102 was admitted.)

7           MS. O'BOYLE:  Can we have 1104?

8           Pursuant to the stipulation, government moves in

9  Exhibit 1104.

10           THE COURT:  1104 is admitted.

11           (Government's Exhibit 1104 was admitted.)

12           MS. O'BOYLE:  Can we have 1107?

13           Pursuant to the stipulation, government moves in

14  Exhibit 1107.

15           THE COURT:  1107 is admitted.

16           (Government's Exhibit 1107 was admitted.)

17           MS. O'BOYLE:  Can we have 1110?

18           Pursuant to the stipulation, the government moves in

19  Exhibit 1110.

20           THE COURT:  1110 is admitted.

21           (Government's Exhibit 1110 was admitted.)

22           MS. O'BOYLE:  Can we have 1116?

23           Pursuant to the stipulation, government moves in

24  Exhibit 1116.

25           THE COURT:  1116 is admitted.

D. Brown - Direct

```
 1            (Government's Exhibit 1116 was admitted.)

 2            MS. O'BOYLE:  Can we have 1120?

 3            Pursuant to the stipulation, government moves in

 4   Exhibit 1120.

 5            THE COURT:  Exhibit 1120 is admitted.

 6            (Government's Exhibit 1120 was admitted.)

 7            MS. O'BOYLE:  Can we have 1122?

 8            Government moves in Exhibit 1122 pursuant to the

 9   stipulation.

10            THE COURT:  Exhibit 1122 is admitted.

11            (Government's Exhibit 1122 was admitted.)

12            MS. O'BOYLE:  Can we have 1117?

13            Pursuant to stipulation, government moves in 1117.

14            THE COURT:  Exhibit 1117 is admitted.

15            (Government's Exhibit 1117 was admitted.)

16            MS. O'BOYLE:  If we could have Exhibit 1202.

17            Pursuant to the stipulation, government moves in

18   Exhibit 1202.

19            THE COURT:  Exhibit 1202 is admitted.

20            (Government's Exhibit 1202 was admitted.)

21            MS. O'BOYLE:  Could I have 1204.

22            Government moves in Exhibit 1204 based on

23   stipulation.

24            THE COURT:  1204 is admitted.

25            (Government's Exhibit 1204 was admitted.)
```

D. Brown - Direct

1            THE COURT:  1205.

2            Government moves in Exhibit 1205 based on

3      stipulation.

4            THE COURT:  It is admitted.

5            (Government's Exhibit 1205 was admitted.)

6            MS. O'BOYLE:  Government 1206.

7            Government moves in Exhibit 1206 based on

8      stipulation.

9            THE COURT:  It is admitted.

10           (Government's Exhibit 1206 was admitted.)

11           MS. O'BOYLE:  1207.

12           Government moves in Exhibit 1207 pursuant to

13     stipulation.

14           THE COURT:  It is admitted.

15           (Government's Exhibit 1207 was admitted.)

16           MS. O'BOYLE:  1208.

17           Government moves in Exhibit 1208 based on

18     stipulation.

19           THE COURT:  It is also admitted.

20           (Government's Exhibit 1208 was admitted.)

21           MS. O'BOYLE:  1209.

22           Government moves in Exhibit 1209 based on

23     stipulation.

24           THE COURT:  1209 is admitted.

25           (Government's Exhibit 1209 was admitted.)

———————D. Brown - Direct———————

```
 1              MS. O'BOYLE:  1210.
 2              Government moves in Exhibit 1210 based on
 3    stipulation.
 4              THE COURT:  1210 is admitted.
 5              (Government's Exhibit 1210 was admitted.)
 6              MS. O'BOYLE:  Government's Exhibit 1212.
 7              Government moves in Exhibit 1212 based on
 8    stipulation.
 9              THE COURT:  1212 is admitted.
10              (Government's Exhibit 1212 was admitted.)
11              MS. O'BOYLE:  Almost done.  Government's
12    Exhibit 1001A.
13              Government moves in Exhibit 1001A based on
14    stipulation.
15              THE COURT:  1001A is admitted.
16              (Government's Exhibit 1001A was admitted.)
17              MS. O'BOYLE:  1020C.
18              Government moves in Exhibit 1020C into evidence
19    based on stipulation.
20              THE COURT:  1020C is admitted.
21              (Government's Exhibit 1020C was admitted.)
22              MS. O'BOYLE:  1020E, government moves in based on
23    stipulation.
24              THE COURT:  1020E, as in echo, is admitted.
25              MS. O'BOYLE:  Thank you, Your Honor.
```

─────── D. Brown - Cross (By Mr. Yarow) ───────

1          (Government's Exhibit 1020E was admitted.)

2          MS. O'BOYLE:  Last three.  1019U, government moves

3    in based on stipulation.

4          THE COURT:  1019U is admitted.

5          (Government's Exhibit 1019U was admitted.)

6          MS. O'BOYLE:  1019X.

7          The government moves in 1019X based on stipulation.

8          THE COURT:  Admitted.

9          (Government's Exhibit 1019X was admitted.)

10          MS. O'BOYLE:  Finally, 1020A.

11          Government moves in Exhibit 1020A based on

12    stipulation.

13          THE COURT:  1020A is admitted.

14          (Government's Exhibit 1020A was admitted.)

15          MS. O'BOYLE:  Thank you, Your Honor.  I have no

16    further questions.

17          THE COURT:  Any cross-examination?

18                       CROSS-EXAMINATION

19    BY MR. YAROW:

20    Q.  My name is Rick Yarow.  I represent David Alcorn.  I'll

21    be very brief.

22          MR. YAROW:  If the government would pull up

23    Document 1002L.  I hope I got that right.

24    BY MR. YAROW:

25    Q.  Ma'am, do you see the document?

---
D. Brown - Cross (By Ms. McCaslin)
---

1   A.   Yes.

2   Q.   It's been admitted.

3        Below "Janus Spectrum" at the very top, it says

4   "Debtor in possession," and it gives a case number below

5   that.  What does that mean?  Do you know?

6   A.   I don't.  It could be some legal designation that has to

7   be put on business accounts in Arizona, I don't know.

8        MR. YAROW:  You don't know.  Okay.  Thank you very

9   much.

10                    CROSS-EXAMINATION

11  BY MS. McCASLIN:

12  Q.   Good afternoon, Ms. Brown.

13  A.   Hi.

14  Q.   In the beginning of the direct examination, you spent

15  quite a bit of time going over records regarding Barbara

16  Russell, correct?

17  A.   Yes.

18  Q.   Okay.  Now, did Barbara Russell have access to those bank

19  accounts in BayPort?

20  A.   She was not a signer on the account; however, she was the

21  owner of the funds in the account.

22  Q.   Was she able to log on to the BayPort website and see

23  what was in the account?

24  A.   No.

25  Q.   Was she able to withdraw money from the account?

452

D. Brown - Cross (By Ms. McCaslin)

1   A.   Technically, she could have if she came into the bank and

2   pushed the issue.  She couldn't just write a check because

3   she's not a signer on the account, but since she was the

4   owner of the funds, she could have.

5   Q.   So the only people who typically can see what money is

6   moving in and out of the account are the signatories, right?

7   A.   Correct.

8   Q.   And so for pretty much all of these accounts, the

9   signatories were Daryl Bank?

10  A.   Yes.

11  Q.   Raeann Gibson?

12  A.   Yes.

13  Q.   And usually one other employee?

14  A.   Correct.

15  Q.   And that would include Hilary Hatfield?

16  A.   Hilary Hatfield.

17  Q.   And was Mike Binetti also an employee of Dominion?

18  A.   Yes.

19  Q.   But other than those three employees, nobody else could

20  see what was going on in that account?

21  A.   There were other signatories throughout the time frame

22  for Dominion, but they were always an employee of Dominion

23  Investment Group, and no one else could, no.

24  Q.   Okay.  Thank you.

25  A.   You're welcome.

Carol L. Naughton, Official Court Reporter

```
 1              MS. McCASLIN:  No further questions.
 2              MS. O'BOYLE:  Nothing further from the government.
 3              THE COURT:  May the witness be permanently excused,
 4      counsel?
 5              MS. O'BOYLE:  Yes.
 6              MR. YAROW:  Yes.
 7              MS. McCASLIN:  Yes, Your Honor.
 8              THE COURT:  Ma'am, you may step down and be excused.
 9              (The witness was excused.)
10              THE COURT:  Ladies and gentlemen, we're going to
11      call this a day.  I want you to remember that we're still in
12      the midst of trying this case.  Do not discuss it.  Observe
13      all the precautions the Court gave you about not researching
14      or viewing any news stories and et cetera.
15              So you may be excused, and we're going to start
16      again tomorrow morning at 9:30.
17              (The jury exited the courtroom.)
18              THE COURT:  Now, if you can do seven tomorrow, we
19      might get out of here within a week and a half.
20              MS. O'BOYLE:  Your Honor --
21              THE COURT:  Everyone have a seat.
22              MS. O'BOYLE:  So we had three witnesses get stuck
23      with the storm, which is why the government -- we figured it
24      out today, and we'll figure it out tomorrow.
25              We don't want to rush the Court, but it would help
```

454

 1   us if we figured out some of the objections for the

 2   depositions, because we are -- with the snowstorm, three of

 3   our witnesses from California -- one got stuck in Chicago;

 4   the other two got stuck in Texas.  We believe they will be

 5   here by tomorrow, but we are having some travel issues.

 6          We don't want to rush the Court, but we do -- we'll

 7   have to put the depositions together after the objections are

 8   resolved.

 9          THE COURT:  Okay.  The only thing the Court can do

10   is try to take a look at some of these objections tonight.

11          How many of these -- I've tried to start on some of

12   them already, at least a couple.  So I have to take a look at

13   the rest of them this evening.  I don't know what time you'll

14   be trying to call these witnesses tomorrow.

15          MS. O'BOYLE:  I don't know that we would be able to

16   call them tomorrow because our lit support folks have to put

17   the depositions together.  They'll have to cut out any

18   objections that are sustained.  It takes a lot of work to

19   slice them all back together.

20          We're just worried if this weather continues, we're

21   probably going to have to do this again, and so we

22   front-loaded a lot of our witnesses that might have been

23   filler because we called a lot of local witnesses today.  So

24   if the Court -- we're at the Court's schedule.

25          THE COURT:  The Court is at your mercy right now.

```
 1            MS. O'BOYLE:  Sorry, Your Honor.
 2            THE COURT:  Look, "PY," that was --
 3            MS. O'BOYLE:  Mr. Yee.  I believe there's only one
 4   objection on that one.
 5            THE COURT:  The Court has looked at this one, and
 6   the Court is going to overrule the objection.
 7            MS. O'BOYLE:  Thank you, Your Honor.
 8            THE COURT:  It's as simple as that.  Is Mr. Yee
 9   around to be called?
10            MS. O'BOYLE:  No.  Mr. Yee is in California.  And so
11   we can -- with that answer, we can actually splice that
12   together tonight and be able to play him tomorrow.  That
13   helps out a lot.
14            THE COURT:  And I had something else on my desk, but
15   in the lunch hour, there's too many things going on, and you
16   can't even get through it in a lunch hour, so the Court will
17   do the best it can.
18            MS. O'BOYLE:  Thank you, Your Honor.
19            (Proceedings adjourned at 5:07 p.m.)
20
21
22
23
24
25
```

1

2                              CERTIFICATION

3

4        I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7

8                    _____/s/_____

9                         Carol L. Naughton

10                        August 30, 2022

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25