1          IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
2                  Norfolk Division

3

4  - - - - - - - - - - - - - - - - - -
                                    )
5   UNITED STATES OF AMERICA        )
                                    )
6   v.                              )   CRIMINAL ACTION NO.
                                    )        2:19cr47
7   DAVID ALCORN and                )
   AGHEE WILLIAM SMITH II,          )
8                                   )
          Defendants.               )
9  - - - - - - - - - - - - - - - - - -

10                **  Jury Trial - Day 4  **

11              TRANSCRIPT OF PROCEEDINGS

12                  Norfolk, Virginia

13                 February 4, 2022

14

15  BEFORE:  THE HONORABLE RAYMOND A. JACKSON
            United States District Judge, and a jury

16

17  APPEARANCES:

18          UNITED STATES ATTORNEY'S OFFICE
            By:  Andrew C. Bosse
19               Melissa E. O'Boyle
                 Elizabeth M. Yusi
20               Assistant United States Attorneys
                 Counsel for the United States
21
            RICHARD S. YAROW LLC
22          By:  Richard S. Yarow
                 Counsel for Defendant David Alcorn
23
            FEDERAL PUBLIC DEFENDER'S OFFICE
24          By:  Andrew W. Grindrod
                 Lindsay Jo McCaslin
25               Assistant Federal Public Defenders
                 Counsel for Defendant Aghee William Smith II

457

```
 1                          I N D E X

 2   GOVERNMENT'S
     WITNESSES                                          PAGE
 3
       RAYMOND MARTIN
 4          Direct Examination By Ms. Yusi              459
            Cross-Examination By Mr. Yarow              481
 5          Cross-Examination By Mr. Grindrod           482
            Redirect Examination By Ms. Yusi            492
 6       PETER MELLEY
            Direct Examination By Mr. Bosse             493
 7          Cross-Examination By Mr. Yarow              532
            Cross-Examination By Mr. Grindrod           533
 8       DEBRA BARRY
            Direct Examination By Mr. Bosse             541
 9          Cross-Examination By Mr. Yarow              553
            Cross-Examination By Mr. Grindrod           555
10       PHILLIP YEE (Via videotaped deposition)
            Direct Examination By Ms. Yusi              557
11       ROSIE EADS
            Direct Examination By Ms. Yusi              600
12          Cross-Examination By Mr. Grindrod           617
         ADAN RANGEL
13          Direct Examination By Mr. Bosse             633
         VERA HULLUM (Via videotaped deposition)
14          Direct Examination By Ms. Yusi              647
            Cross-Examination By Mr. Grindrod           662
15          Redirect Examination By Ms. Yusi            674

16

17                        E X H I B I T S

18   GOVERNMENT'S
     NO.                                                PAGE
19
       858                                              469
20     1213                                             478
       3                                                499
21     97A                                              505
       97C                                              511
22     97B                                              514
       4A                                               517
23     2                                                519
       1                                                524
24     4                                                525
       5                                                527
25     6                                                529
```

```
1                          I N D E X
                           (Continued)
2
                         E X H I B I T S
3
    GOVERNMENT'S
4   NO.                                              PAGE

5     249                                            545
      805                                            557
6     807                                            557
      808                                            557
7     809                                            557
      810                                            557
8     812                                            557
      813                                            557
9     814                                            557
      849                                            612
10    200                                            640
      802                                            647
11

12  DEFENDANT SMITH'S
    NO.                                              PAGE
13
      296C                                           626
14    296B                                           628
      515                                            647
15    516                                            647

16

17

18

19

20

21

22

23

24

25
```

Carol L. Naughton, Official Court Reporter

R. Martin - Direct

```
 1              (Proceedings resumed at 9:30 a.m.)
 2              THE COURT:  Good morning, counsel.
 3              MS. O'BOYLE:  Good morning.
 4              MR. YAROW:  Good morning.
 5              THE COURT:  Are we ready to go?
 6              MS. YUSI:  Yes, sir.
 7              (The jury entered the courtroom.)
 8              THE COURT:  The record will reflect that all jurors
 9     are here this morning.
10              Does counsel agree?
11              MS. YUSI:  The government agrees, Your Honor.
12              MR. YAROW:  Mr. Alcorn agrees, Your Honor.
13              THE COURT:  Good morning, ladies and gentlemen.
14              You may call your next witness.
15              MS. YUSI:  Thank you, Your Honor.  We call Raymond
16     Martin.
17              (The witness was sworn.)
18              RAYMOND MARTIN, called by the Government, having
19     been first duly sworn, was examined and testified as follows:
20                          DIRECT EXAMINATION
21     BY MS. YUSI:
22     Q.  Good morning.  Could you introduce yourself to the jury,
23     please.
24     A.  Good morning.  My name is Raymond Martin.
25     Q.  And how old are you today, Mr. Martin?
```

R. Martin - Direct

1    A.   68.

2    Q.   What city and state do you live?

3    A.   Sacramento, California.

4    Q.   Do you work?

5    A.   I'm currently retired.

6    Q.   Retired?

7    A.   Yes.

8    Q.   If you could make sure -- it's hard with the mask -- to

9    bring the microphone right up to you so that everyone can

10   hear.  Thank you.

11   A.   Certainly.

12   Q.   When did you retire?

13   A.   I retired three years ago.

14   Q.   What were you doing before you retired?

15   A.   I was an accountant and tax preparer.

16   Q.   Are you married?

17   A.   Yes, I am.

18   Q.   And what is your wife's name?

19   A.   Debra.

20   Q.   Did she work outside the home?

21   A.   Yes, she did.  She is a schoolteacher.

22   Q.   And while you all were working, did you save money for

23   retirement?

24   A.   Yes, I did.

25   Q.   And what kind of entities or products did you save money

─────R. Martin - Direct─────

1   in?

2   A.  Basically, IRAs and some 401(k)s.

3   Q.  Generally, were you happy how those were going for you?

4   A.  Yes, I was.

5   Q.  Do you have any background, formal background in

6   investments?

7   A.  No, I do not.

8   Q.  Do you consider yourself a sophisticated investor?

9   A.  At this time, I feel I'm a little better than at the time

10  that all this happened, but right now -- at the time, I

11  considered myself an average investor.

12  Q.  All right.  I want to talk to you about Bill Smith, or

13  Aghee William Smith.  Do you know that man?

14  A.  Yes, I do.

15  Q.  Do you see him in the courtroom today?

16  A.  Yes, I do.

17  Q.  Could you point him out and describe what he's wearing.

18  A.  He's the second person in the back row.  I think he's

19  wearing a suit, and he's got white hair.

20          MS. YUSI:  Your Honor, we ask the record to reflect

21  that he identified Mr. Smith.

22          THE COURT:  The record will reflect that the witness

23  has identified Defendant Smith.

24  BY MS. YUSI:

25  Q.  How did you first come to know Mr. Smith?

R. Martin - Direct

1    A.    I heard a radio advertisement on the local radio station.

2    Q.    What kind of radio station was that?

3    A.    It was a Christian radio station in the Sacramento area.

4    Q.    These were advertisements?  What did the advertisements

5    say or hock?

6    A.    They were, both, advertisements, and they had, like, a

7    half-hour radio show talking about his investment knowledge

8    and prowess.

9    Q.    Did there come a time when you called to meet with him?

10   A.    Yes.

11   Q.    Around when did you first meet with Mr. Smith?

12   A.    Near the end of 2012.

13   Q.    And what was the purpose of you going there?

14   A.    To talk to him about some various investments that he had

15   talked about on the radio.

16   Q.    What did Mr. Smith tell you about his background?

17   A.    He said he was a financial planner.

18   Q.    And what did that mean to you?

19   A.    That he had licenses and insurance, possibly stock sales,

20   and other areas of finance that you normally get licenses

21   for.

22   Q.    Did you believe he had any duties to you as a client?

23   A.    Yes, to try to make sure that my investments were made in

24   fairly safe -- safe areas.

25   Q.    How many times did you meet with Mr. Smith in person?

R. Martin - Direct

1  A.  Two to three.

2  Q.  And did you end up trusting Mr. Smith?

3  A.  Yes, I did.

4  Q.  Did Mr. Smith talk to you about an investment known as

5  Dental Support Plus Franchises?

6  A.  Yes.  We went over that thoroughly.

7  Q.  And that was end of 2012 or so that you started talking

8  about that?

9  A.  It was brought up probably in our first meeting and then

10 expanded on more in the follow-up meeting.

11 Q.  What was your understanding of what the DSPF investment

12 was?

13 A.  It was an investment and the -- there was a big

14 spreadsheet that went along with the investment to explain

15 how a marketer was going to be working with dentists across

16 the U.S. to get new patients, and some of the fees from those

17 patients would be routed back through to me and to the other

18 investors.

19 Q.  And did Mr. Smith present you advertisements or marketing

20 materials about the investment?

21 A.  Yes, there were.

22 Q.  What was the return?  What was your understanding the

23 return should be?

24 A.  The return would come over a couple of years, but there

25 was no real percentages that were presented in the

R. Martin - Direct

1   advertising.

2   Q.   Okay.  And how about -- do you recall how quickly you

3   would start receiving money on your investment?

4   A.   The money flow was supposed to start within a couple of

5   months, three to four months.

6   Q.   What was your comfort level with risk in terms of your

7   investments when you were talking with Mr. Smith?

8   A.   At the time, I was looking to diversify a little bit and

9   so -- and I had been in business myself, so my comfort level

10  with what was presented was in line with what I thought would

11  happen.

12  Q.   What did Mr. Smith say in terms about any risk with the

13  DSPF franchises?

14  A.   Since I was not taking an active role in presenting the

15  program to other dentists, he said it would be a lower risk,

16  kind of a silent partner sort of issue.

17  Q.   So you wouldn't have to do anything to run the franchise?

18  A.   No.  Correct.

19  Q.   What, if anything, was your understanding from Mr. Smith

20  about how successful this DSPF was?

21  A.   He said he was involved himself and that he had seen

22  success with the program and was very confident that the

23  marketer was well qualified to use the internet to get the

24  clients to the dentists.

25  Q.   When you say he was involved himself, what does that

R. Martin - Direct

1    mean?

2    A.   He said he had had at least one franchise.

3    Q.   Himself?

4    A.   Yes.

5    Q.   Did he tell you how long he had been selling DSPF

6    franchises?

7    A.   I do not recall a specific amount of time that he had

8    said he had been selling them.

9    Q.   Did he talk to you about how many people he had sold

10   these franchises to?

11   A.   Not specifically, but I did see a list of people who had

12   applied for the program, and some of those had been accepted,

13   and the list was 20, 30 people at least.

14   Q.   Did you talk about fees or commissions that Mr. Smith

15   would be paid?

16   A.   He said that there was normally a 3- to $5,000 fee,

17   commission, and that he probably would waive some of that

18   because I had a smaller investment.

19   Q.   All right.  When did you end up investing in DSPF?

20   A.   About January of 2013.

21   Q.   January 2013?

22   A.   Yes.

23   Q.   How many franchises did you buy?

24   A.   Just one.

25   Q.   How much was the franchise at that time?

Carol L. Naughton, Official Court Reporter

R. Martin - Direct

1    A.  It was a total of 32,000.

2    Q.  And in four to six months -- or a few months, I guess is

3    what you said, did you start making money?

4    A.  No.  I made a whopping $29.

5    Q.  Did you talk to anyone about that?

6    A.  In the first couple of months, I contacted Mr. Smith to

7    find out when the commissions would start.  He said, yes,

8    sir, sometimes there's a little bit of a delay.

9           THE COURT:  Can you keep your voice up, please.

10   Keep your voice up, sir.

11          THE WITNESS:  Oh, I'm sorry.

12          He said there was a little bit of a delay and that

13   the marketing people might be in transition to get a new

14   marketing person, so just be calm, and the commission should

15   start soon.

16   BY MS. YUSI:

17   Q.  All right.  At some point, did the commission start soon?

18   A.  No.

19   Q.  Did you go back to Mr. Smith?

20   A.  Probably -- I did.  And probably at some point, about

21   four or five months, we were starting to talk about the asset

22   possibly being a recovery asset, which to me meant that the

23   commissions weren't going to be starting, and then he brought

24   up another investment to help recapture some of those losses.

25   Q.  What investment did he bring up then?

R. Martin - Direct

1    A.  It was an investment in spectrum.  It was called Spectrum

2    100.

3    Q.  Okay and what -- what was your understanding from

4    Mr. Smith as to what Spectrum 100 was?

5    A.  It was a plan investment that a group of people would be

6    auctioning for -- or be in an auction for Wi-Fi bandwidth,

7    and they would get the bandwidth contracts, and then they

8    were to sell them or lease them back to the large companies,

9    like Verizon or AT&T, and the lease payments on those would

10   be distributed to the investor.

11   Q.  And did Mr. Smith talk to you about how successful the

12   spectrum investment would be?

13   A.  This was supposedly the second round of this investment,

14   and he said that the first one had gone very well, and then

15   he saw no reason that this one would not go just as well.

16   Q.  What was your understanding from Mr. Smith about any risk

17   involved with the spectrum investment?

18   A.  That the risk on this investment was very low.

19   Q.  What about fees or commissions?  Did you talk to

20   Mr. Smith about those?

21   A.  I really don't remember if there was commissions talked

22   about on that.  He did say that I was lucky to able to get

23   into this investment because normally it was for people with

24   larger sums of money.

25   Q.  What, if anything, did Mr. Smith say about any U.S.

R. Martin - Direct

1   Securities and Exchange Commission investigations into
2   spectrum?
3   A.   There was no discussion about that.
4   Q.   What, if anything, did Mr. Smith say about any regulatory
5   issues with some of the businessmen in charge of this
6   investment?
7   A.   There was no discussion about that.
8   Q.   Okay.  How quickly were you expecting to get returns from
9   this?
10  A.   Again, this was a short-term program because the auction
11  was supposedly taking place, again, within six weeks to three
12  months, I think, if I remember correctly, and so that was
13  supposed to start fairly quickly.
14  Q.   Did you end up purchasing or investing in Spectrum 100?
15  A.   Yes, I did.
16  Q.   And how much did you purchase?
17  A.   About $42,000.
18  Q.   43,000?
19  A.   Yes.
20  Q.   Who did the paperwork with you on Spectrum 100 investment
21  initially?
22  A.   Mr. Smith originally did the paperwork.
23  Q.   All right.  If you can look -- there's a binder in front
24  of you.  If you can look at Exhibit 858.
25  A.   Okay.

─────────────── R. Martin - Direct ───────────────

1   Q.  Do you recognize this document?

2   A.  Yes.  This is an e-mail I sent regarding the spectrum

3   investment.

4   Q.  Okay.  And it's between you and Ms. Raeann Gibson; is

5   that right?

6   A.  Yes, that's correct.

7           MS. YUSI:  Your Honor, we move to admit Exhibit 858.

8           THE COURT:  Any objection?

9           MR. GRINDROD:  No, Your Honor.

10          THE COURT:  858 will be admitted.

11          (Government's Exhibit 858 was admitted.)

12  BY MS. YUSI:

13  Q.  After you initially went through the paperwork with

14  Mr. Smith, who else did you deal with?

15  A.  There was another gentleman also named Mr. Kennedy, if I

16  remember correctly.

17  Q.  Mr. Kennedy?

18  A.  Yes.

19  Q.  Where did he work?

20  A.  He was at Mr. Smith's office.

21  Q.  And then on this one, you're speaking to a Raeann Gibson

22  with -- did she help you with your paperwork as well?

23  A.  Yeah.  She took the investment and, as I said, Operating

24  Agreement and sent back -- if I remember correctly, sent back

25  confirmation that the investment had been completed.

R. Martin - Direct

1   Q.   Approximately when did you make the investment into

2   spectrum?

3   A.   The e-mail is showing June of 2013, and that sounds

4   right.

5   Q.   Thank you.

6           Now, after you invested in the spectrum, did you try

7   to keep up to date with how it was doing through any

8   conference calls?

9   A.   Yes.

10  Q.   What were these conference calls?

11  A.   Mr. Smith would send me an e-mail and would say, well,

12  there's going to be a conference call with some of the

13  organizers of the investment, and so I think I was on one or

14  two of the calls.

15  Q.   And so who would talk on those calls, if you recall?

16  A.   I'm sorry, I don't remember the name right now.

17  Q.   Okay.  Were you allowed to talk on those calls?

18  A.   We could ask questions, but normally the calls were short

19  and more of a recap of what was happening with the upcoming

20  auction.

21  Q.   And what did happen with the auctions and your investment

22  with spectrum?  Did you ever get a return?

23  A.   I received no money.

24  Q.   Did you talk to anyone about that?

25  A.   I asked Mr. Smith what was -- initially, I was asking

R. Martin - Direct

 1   Mr. Smith what was the time frame of the auction, and he
 2   would say it was coming or give me information about that,
 3   but then I was contacted by another person in the -- one of
 4   the Virginia finance areas, legal finance areas, who told
 5   me --
 6           THE COURT:  Don't tell us what they told you.
 7   BY MS. YUSI:
 8   Q.  You were contacted by someone -- was it a regulatory
 9   authority in Virginia?
10   A.  Yes.
11   Q.  What was your response after being contacted by them?
12   A.  After a little bit of a shock of some of the information
13   I was given, I contacted an attorney to see if we could get
14   some money back from Mr. Smith for the investments that --
15   for the investment money that I had lost.
16   Q.  Did you end up filing a civil suit against Mr. Smith in
17   California?
18   A.  Yes, I did.
19   Q.  Were any other investors with you on that suit?
20   A.  Yes.  There was one other investor on that suit with me.
21   Q.  And do you remember approximately when you filed that
22   suit?
23   A.  Probably in 2015 or '16.
24   Q.  After you filed a civil suit, were you contacted about
25   Mr. Smith's finances, or did you have any updates on that?

──────R. Martin - Direct──────

1    A.   Later, after going through some of the motions with my

2    attorney to try to go through the suit, I was contacted that

3    he was filing a bankruptcy petition.

4              MS. YUSI:  Your Honor, pursuant to stipulations, at

5    this point, we would move to admit Exhibit 1213, which is the

6    petition for bankruptcy that Mr. Smith filed.

7              THE COURT:  Any objection?

8              MR. YAROW:  (Shaking head.)

9              MR. GRINDROD:  Your Honor, we do have an objection.

10   I think this may relate to a pending motion.

11             THE COURT:  Does this relate to a pending motion

12   that you know of?

13             MS. YUSI:  My understanding was the pending motion

14   was about a recording, but we are going there.

15             MR. GRINDROD:  Yeah.  So I think this may need a

16   ruling now.

17             THE COURT:  Here's what we're going to do.  Unless

18   you're going to question him on 1213 specifically, the Court

19   will defer admission of 1213, and you can move on.

20             MS. YUSI:  Yes, sir.

21             Your Honor, my next admission would be Exhibit 1215,

22   which is a disk which does have the recording that is the

23   basis of the -- of one of their motions.

24             THE COURT:  Okay.  Has the Court ruled on this

25   motion, Mr. Grindrod?

R. Martin - Direct

1          MR. GRINDROD:  I don't believe so, Your Honor.  The

2    government can correct me if I'm wrong, but I don't believe

3    so.

4          MS. YUSI:  I think this was deferred until trial.  I

5    think if we use the headphones, Your Honor...

6          THE COURT:  That's what we're going to try doing

7    right now.

8          Ladies and gentlemen, excuse us.

9          (A sidebar conference was held as follows:)

10         THE COURT:  With respect to Exhibit 1213, what is

11   the objection to the exhibit?

12         MR. GRINDROD:  Your Honor, this is Andrew Grindrod.

13   I believe that the exhibit is related to Mr. Smith's

14   bankruptcy, and it's actually a series of recordings from a

15   hearing, a recorded hearing in those bankruptcy proceedings.

16         We moved to exclude from evidence all this

17   information about his bankruptcy.  This is ECF 367, starting

18   at Page 14.  The government did provide a notice, but the

19   notice, as we've argued, was deficient under 404(b), and also

20   all of this information about the bankruptcy is not relevant

21   to any issue in this case.  Certainly, it's not relevant to

22   this witness, so the Court could exclude it now and deal with

23   this later.

24         THE COURT:  First, for the Court's information,

25   Ms. Yusi, how many pages are in this particular exhibit,

R. Martin - Direct

1  1213?

2       MS. YUSI:  Your Honor, Exhibit 1213 is probably -- I

3  don't have the page numbers right in front of me, but at

4  least 50 to 75 pages.

5       THE COURT:  Now, if you're trying to establish that

6  he filed bankruptcy, what is in this petition that is so

7  necessary that you need to put the whole petition in?

8       MS. YUSI:  Your Honor, he listed -- all of the

9  people that he sold to, he listed as creditors or as -- that

10  he owes debts to or possibly owes debts to, and he listed

11  Mr. Martin.  He lists Sharyon Bean, all the people in the

12  depositions, as potential creditors that he might owe money

13  to in his petition.

14       THE COURT:  What other data, other than trying to

15  get in the list of his potential creditors, is there?

16       MS. YUSI:  There's a petition where he was deposed

17  under oath.  Defense counsel was present when he was deposed

18  by the trustee.  And in that deposition, he talks about his

19  business.  He claims that he never had any clients, that

20  everyone was an insurance client, everyone who -- that he was

21  only a solicitor for these companies, that he didn't

22  represent them at all.

23       And he further talks about in our -- in our trial

24  brief, Your Honor, on Pages 19 and 20, he talks about his

25  business, how "most of my business were seniors, and they

R. Martin - Direct

1    died."  He admits that the DSPF entities closed down in 2013,

2    and he states that spectrum, one of these that Mr. Martin

3    bought from him, collapsed in 2013, which is exactly when

4    Mr. Martin --

5           THE COURT:  Okay.  With respect to the bankruptcy

6    petition, 2013, the Court overrules that objection.  The

7    Court finds it relevant.

8           MR. GRINDROD:  Can I respond to the government's

9    argument before the Court rules?  I mean, this is part of why

10   we objected to the 404(b) notice, is that we didn't have any

11   representation as to how any of this was purportedly

12   relevant.

13          THE COURT:  What is your response to her position

14   that the 2013 bankruptcy is relevant because it lists the

15   name of his creditors and a couple other things?

16          MR. GRINDROD:  Because it's not a 2013 bankruptcy,

17   it's a 2019 bankruptcy petition, and by that point, this is a

18   very different posture.  This case had been filed 2019, and

19   so if Mr. Smith had been on notice that he was at least

20   subject to this whole investigation and had not listed those

21   people as potential creditors, I could guarantee you that the

22   government would have come in and said that he lied by not

23   listing potential creditors.

24          THE COURT:  That doesn't make any difference,

25   Mr. Grindrod.  It's a statement by the defendant against his

──── R. Martin - Direct ────

1   interest, whether he made it today or whether he made it in

2   2019 or 2014.

3          MR. GRINDROD:  It's not against his interest to list

4   potential creditors when he's already knowing that some have

5   filed suit against him.  He had to disclose that.

6          THE COURT:  The Court understands your argument.

7   It's overruled.  It's coming in.  2013 will come in.

8          With respect to the recording...

9          MS. YUSI:  Yes, Your Honor.  We clipped it down to

10  relevant portions, because it goes into a lot of different

11  things, and we clipped it down and provided to both

12  defendants the clips that we did.  We only plan to play a

13  couple today that talk about his stance on not having a

14  client, and he specifically mentions Mr. Martin in his

15  deposition, talking about the creditors who came after him

16  regarding all of the investments.

17         MR. GRINDROD:  Your Honor, first of all, we maintain

18  that this is not relevant, but it's also certainly not

19  something this witness needs to deal with.  This witness was

20  not present.  This witness all happened way after the fact.

21  If the government -- I would ask the Court to look at our

22  filing and make a ruling on this that's not -- you don't have

23  to make a ruling on this right now, but certainly this

24  witness does not have to say anything about it, and those

25  statements -- these statements from the bankruptcy are highly

R. Martin - Direct

```
 1    prejudicial.  They are 404(b) evidence, and the government
 2    failed to provide notice about them in an adequate way, and
 3    it's -- I would urge the Court, if you're inclined to agree
 4    with the government, please consider the written briefing on
 5    this and don't do it right now.
 6             THE COURT:  The Court is aware of the written
 7    briefing, Mr. Grindrod.  The Court just chose not to get to
 8    it because of the number of things that have been filed in
 9    this case.
10             Another thing is, the question becomes for the Court
11    whether some of this, with respect to the conspiracy that was
12    taking place in this case, may very well be intrinsic, so
13    it's not necessarily 404(b).  And even if it is 404(b), the
14    Court has to engage in a balance of whether it's more
15    probative than it is prejudicial.  Anything that is
16    introduced in a trial against a defendant is prejudicial.
17    And so that's the thing the Court has to look at.
18             My question becomes, Ms. Yusi, if you do not put in
19    this Exhibit 215 through this witness, is there any other
20    witness you are going to be introducing it through?
21             MS. YUSI:  Your Honor, we do have the trustee
22    available to come to talk about it, but anything that she
23    says on it is all in context.  It's all Mr. Smith's
24    statements under oath is what we are presenting to the Court.
25             MS. O'BOYLE:  This is Ms. O'Boyle.  We also have a
```

R. Martin - Direct

```
 1   victim that was present for the actual deposition who was
 2   present when Mr. Smith made these statements.
 3              MS. YUSI:  Some of them.
 4              MS. O'BOYLE:  Some of them.
 5              THE COURT:  Will that victim be testifying,
 6   Ms. Yusi?
 7              MS. YUSI:  He will.
 8              THE COURT:  What it boils down to, in terms of
 9   keeping a clean record, if the victim heard the critical
10   parts of what you want to put in on the tape, it's a lot
11   better to have that victim to put that evidence in rather
12   than to put this whole tape in.
13              MS. YUSI:  That's fine, Your Honor.  I understand.
14              THE COURT:  And so what we're doing is, the Court
15   has admitted Exhibit 1213, but we're holding off on
16   introducing 1215.  It's better to have someone with firsthand
17   knowledge of what he said at that hearing.
18              MS. YUSI:  Yes, sir.
19              THE COURT:  So that's where we are.
20              (The sidebar conference concluded.)
21              (Government's Exhibit 1213 was admitted.)
22              THE COURT:  You may continue.
23              MS. YUSI:  Thank you, Your Honor.
24              If we may show Exhibit 1213.
25              THE WITNESS:  Excuse me.  While we're waiting, the
```

R. Martin - Direct

1    main person on the phone calls was a person by the name of

2    Daryl Bank.

3              MS. YUSI:  Okay.  Thank you.

4    BY MS. YUSI:

5    Q.  Now, in terms of Daryl Bank or any other -- well, I'm

6    going to move on.

7              We're looking at 1213.  If you want to look at your

8    screen, Mr. Martin.

9    A.  Okay.

10   Q.  Do you see this is a petition for individuals for filing

11   bankruptcy?

12   A.  Yes.

13   Q.  Did you get notice of the bankruptcy filing?

14   A.  Yes, I did.

15   Q.  And are you named as a potential creditor -- as a

16   potential creditor in that bankruptcy filing?

17   A.  As I recall, I probably was, because I did get the

18   notice.

19   Q.  Okay.  Thank you.

20             Now, have you received any money back besides, I

21   think you said it was $29?

22   A.  Yes.

23   Q.  Have you received any money back from your $32,000

24   investment in DSPF or your 43,000 in Spectrum 100?

25   A.  No, I have not.

─────R. Martin - Direct─────

1          MS. YUSI:  If we can show Exhibit 1001C, Page 2318.

2    BY MS. YUSI:

3    Q.  Do you recognize this as a check?

4    A.  Yes.

5    Q.  And who is the check from?

6    A.  Dental Support Plus.

7    Q.  And the date of the check?

8    A.  April 5, 2013.

9    Q.  And who is the check made out to?

10   A.  Aghee W. Smith.

11   Q.  And how much is it for?

12   A.  $6,400.

13   Q.  And in the memo, what does it say?

14   A.  Raymond Martin Practice Management LLC.

15   Q.  Do you know what Raymond Martin Practice Management is?

16   A.  Yes.

17   Q.  What is it?

18   A.  It was an LLC that was set up, because I was in a

19   self-directed IRA, to accept the funds to be used for the

20   dental management practice.

21   Q.  And I think you said you did discuss fees and

22   commissions.  Did you discuss that Mr. Smith would get $6,400

23   from your investment in DSPF?

24   A.  No.  It was less -- it seemed like when we discussed

25   that, it was less than that.

───────── R. Martin - Cross (By Mr. Yarow)─────────

1           MS. YUSI:  I think those are all my questions right

2    now.  Other counsel will have questions for you.  Thank you.

3           THE COURT:  Cross-examination?

4           MR. YAROW:  Thank you, Your Honor.

5                        CROSS-EXAMINATION

6    BY MR. YAROW:

7    Q.  Mr. Martin, my name is Rick Yarow.  I represent David

8    Alcorn.

9           Do you know David Alcorn?  Have you ever heard of

10   him?

11   A.  No, I do not know him.

12   Q.  When you purchased this -- these investments from

13   Mr. Smith -- I'm going to focus only on the spectrum

14   investment right now.  I'm just going to ask you questions

15   about that one, just to keep that straight.

16   A.  Okay.

17   Q.  Were you told by Mr. Smith that your money would be

18   pooled with other investors?

19   A.  Yes.

20   Q.  And that this money, once it was pooled, it would be used

21   to purchase an application for a license for spectrum?

22   A.  That it would be pooled to invest in the Wi-Fi --

23   different Wi-Fi contracts.

24   Q.  Okay.  Was the word "guard band" used?

25   A.  I don't remember -- I don't remember "guard band" being a

R. Martin - Cross (By Mr. Grindrod)

1    term used at that time, no.

2    Q.  Did you understand that you were, from Mr. Smith, that

3    you were purchasing applications to obtain a license from the

4    FCC, the Federal Communications Commission?

5    A.  I'm sure he had mentioned licenses in these Wi-Fi

6    contracts that were going to be released to the companies,

7    like I said, like AT&T, Verizon, that kind of thing.

8    Q.  Did Mr. Smith tell you that these licenses were not

9    available until they were released by the FCC?

10   A.  Not specifically, no.

11   Q.  Did Mr. Smith tell you that once you received a license,

12   that you would need to take steps to preserve that license

13   within a 12-month period?

14   A.  That -- I don't recall that.  It made it sound like that

15   would happen automatically through the investment.

16          MR. YAROW:  That's all the questions I have.  Thank

17   you.

18          THE COURT:  Mr. Grindrod?

19                      CROSS-EXAMINATION

20   BY MR. GRINDROD:

21   Q.  Good morning, sir.

22   A.  Good morning.

23   Q.  My name is Andrew Grindrod.  I represent Mr. Smith.

24          Mr. Martin, before you met with Mr. Smith, you had a

25   background in business, right?

R. Martin - Cross (By Mr. Grindrod)

1    A.   Yes.

2    Q.   I think you mentioned you worked as an accountant, right?

3    A.   I was doing accounting work, and I had had a tax

4    practice.  So I was also working with taxes at the time, yes.

5    Q.   And how long had you been doing that in that -- before

6    2012?

7    A.   I had been a tax preparer since 1986.

8    Q.   Okay.  And the accounting work?

9    A.   Taxes and accounting kind of go together, but at the time

10   I had been a commercial real estate accountant since 2002.

11   Q.   Okay.  And did you go to school, college, or --

12   A.   Yes.  I graduated with a bachelor's.

13   Q.   In what?

14   A.   In business.

15   Q.   So you mentioned that you had a couple meetings with

16   Mr. Smith, I guess two meetings at least?

17   A.   At least two.

18   Q.   And so you didn't purchase a dental franchise during that

19   first meeting, right?

20   A.   Correct.

21   Q.   You had some -- you got some information and then had

22   some time to think about it?

23   A.   Yes.

24   Q.   And Mr. Smith showed you some marketing materials from

25   Dental Support Plus Franchise, right?

R. Martin - Cross (By Mr. Grindrod)

1   A.   Correct.

2   Q.   And he also sent you some information by e-mail?

3   A.   Probably, yes.

4   Q.   Okay.  At the time that you first met with Mr. Smith, you

5   had a pretty significant net worth, right?

6   A.   My retirement account was still growing.  So -- and I

7   don't recall what the net worth was at that time.

8   Q.   Do you remember it being somewhere in the neighborhood

9   between a half million and three-quarters of a million

10  dollars?

11  A.   It could have been 500,000, 750,000, yes.

12  Q.   Okay.  Ms. Yusi asked you a little bit about your

13  discussion with respect to the risk involved in Dental

14  Support.  Do you remember those questions?

15  A.   Yes.

16  Q.   When you were discussing your investment in Dental

17  Support Plus, you were also discussing investing at the same

18  time in an annuity, right?

19  A.   Discussion was brought up about an annuity, yes.

20  Q.   And so when you and Mr. Smith were talking about Dental

21  Support, one of the options that he presented to you was to

22  put $30,000 in Dental Support and 70,000 into this fixed

23  annuity, right?

24  A.   I don't remember the amount, but yes, there was some

25  discussion about putting an amount into an annuity.

R. Martin - Cross (By Mr. Grindrod)

1  Q.  And the discussion that you had with Mr. Smith about the

2  risk and so forth involving Dental Support was in the context

3  of those conversations, right?

4  A.  Yes.

5  Q.  You did not end up going with that option, buying an

6  annuity, right?

7  A.  Correct.

8  Q.  You just decided to go with the Dental Support

9  investment?

10  A.  Correct.

11  Q.  But Mr. Smith presented that other option?

12  A.  He did.

13  Q.  You also mentioned, on direct examination, that Mr. Smith

14  told you that he was involved himself in Dental Support Plus

15  Franchises?

16  A.  As I recall, he said that he did have a Dental Support

17  franchise himself and/or his family, somebody that --

18  basically he was involved that way.

19  Q.  So is your recollection that he told you that he had some

20  financial stake, some financial interest in DSPF, or did he

21  specifically say, "I own a DSPF franchise"?

22  A.  I got the impression -- as I recall, he said he owned

23  a -- he owned a franchise.

24  Q.  You said you remember that, or that's your impression?  I

25  didn't hear you.

R. Martin - Cross (By Mr. Grindrod)

```
1          MS. YUSI:  Objection.  Asked and answered.
2          THE COURT:  Sustained.  He's answered the question.
3   BY MR. GRINDROD:
4   Q.  You said, though, that at the time that you did this
5   investment, you got a list of everybody who had a Dental
6   Support franchise at the time?
7   A.  There was -- when I made an application for the Dental
8   Support, I did end up seeing a list or getting a list back of
9   people who had been approved for the Dental Support and those
10  that were still being looked at as applying for the program
11  but not yet -- the investment hadn't been completed.
12  Q.  So in that list of people that had Dental Support Plus
13  Franchises, Mr. Smith's name wasn't in there, right?
14  A.  At this point, I don't remember if it was on that list or
15  not.  But he -- as I recall, he had said that he was involved
16  with a franchise with Dental Support.
17  Q.  It would have been odd to tell you "I own a franchise"
18  and then give you a list of everybody who has a franchise and
19  have his name not be on it, right?
20          MS. YUSI:  Objection, Your Honor.  That misstates --
21  he doesn't know if this is everyone in the country or what.
22          THE COURT:  Sustained.  It calls for speculation.
23  BY MR. GRINDROD:
24  Q.  You talked about commissions with respect to Dental
25  Support Plus Franchise.  Do you remember that?
```

--------------------- R. Martin - Cross (By Mr. Grindrod) ---------------------

1   A.  Yes.

2   Q.  And Ms. Yusi showed you a check.  I think it was for a

3   little over $6,000.  Do you remember seeing that check during

4   direct examination?

5   A.  Yes.

6   Q.  And you had a discussion with Mr. Smith at the time that

7   he was going to be getting a commission, right?

8   A.  Yes.

9   Q.  And what you're saying today is that you thought -- you

10  didn't realize it was going to be that high?

11  A.  When --

12          THE COURT:  Wait a minute.  I think your question

13  assumes evidence that is not before the Court.  He hasn't

14  said that.

15          MR. GRINDROD:  He didn't say that?  I misunderstand,

16  then.

17  BY MR. GRINDROD:

18  Q.  You knew that he was going to be getting a commission of

19  several thousand dollars, right?

20  A.  Yes.

21  Q.  And when you were talking with Mr. Smith about Dental

22  Support, he told you that it was a relatively new company,

23  right?

24  A.  Yes.  He presented it that way.

25  Q.  You knew when you invested, when you bought your

R. Martin - Cross (By Mr. Grindrod)

1   franchise, that this was not Mr. Smith's company, right?
2   A.  Correct.  It was -- it was run by a person -- the main
3   person in the group was a person by the name of Mr. Maerki.
4   Q.  Kent Maerki?
5   A.  Yes.
6   Q.  And then you mentioned that when there were delays, when
7   you weren't getting money and you went to Mr. Smith about it,
8   he explained to you that there -- that the company had a
9   change in vendors, right?
10  A.  Yes, at one point, that's correct.
11  Q.  And that this change was supposed to improve things and
12  his understanding was the money would be coming soon?
13  A.  Correct.
14  Q.  Okay.  So with respect to the Dental Support investment,
15  at the end of the day, once -- you didn't get any meaningful
16  amount of money back from Kent Maerki or DSPF, right?
17  A.  That's correct.
18  Q.  And then let's switch gears a little bit and talk about
19  the spectrum investment.  So that was in Spectrum 100, right?
20  A.  Correct.
21  Q.  And Mr. Yarow was asking you some questions about whether
22  Mr. Smith told you you would actually own a license or not,
23  but you understood you were actually investing in a pooled
24  spectrum investment, right?
25  A.  That's correct.  That's the literature I had, too, was

R. Martin - Cross (By Mr. Grindrod)

1   showing that.

2   Q.  You weren't buying licenses of your own from anybody.

3   You were investing in a company that kind of put money in a

4   pot, and the company would own the licenses, right?

5   A.  Yes.

6   Q.  And that spectrum investment, Spectrum 100, you knew that

7   was Daryl Bank's company, he was the one running that, right?

8   A.  Correct.

9   Q.  And you had some direct dealings with Daryl Bank's

10  company?

11  A.  Yes.  There was at least one point that -- one of the

12  conference calls that I was on was in the office with

13  Mr. Smith.  And then there was another one.  I think it was

14  on -- just somehow at home, but I was only on one or two

15  conference calls, but the one was with Mr. Smith.

16  Q.  And --

17  A.  In Mr. Smith's office, excuse me.

18  Q.  Are you saying that that call was with Mr. Smith and

19  Mr. Bank also?

20  A.  I'm saying that the call in Mr. Smith's office was with

21  Daryl Bank, and it's possible Mr. Alcorn was on it, but I do

22  not remember the other participants on the call.

23  Q.  And after you made the investment in Spectrum 100, did

24  you attend or participate in conference calls that gave

25  updates about the spectrum investment or anything?

R. Martin - Cross (By Mr. Grindrod)

1    A.  Other than the one in Mr. Smith's office, I may have been

2    on one other one, but they were usually at a time when I was

3    at work, so I wasn't able to get onto all of the different

4    conference calls that were available.

5    Q.  So you knew they were going on, but you just, because of

6    your schedule, weren't able to attend many of them?

7    A.  Correct.

8    Q.  And after you put your money into Spectrum 100, you never

9    got a meaningful amount of money back from Daryl Bank, right?

10   A.  There was no return on that investment at all.

11   Q.  Okay.  The last thing that I think -- or one of the last

12   things you talked with Ms. Yusi about was this bankruptcy

13   petition, I guess.

14   A.  Yes.  Okay.

15   Q.  So that bankruptcy petition was filed in 2019, right?

16   A.  I don't remember the timing of when I received the

17   notice.

18            MR. GRINDROD:  Ms. McCaslin, can we see Government's

19   Exhibit 1213?

20   BY MR. GRINDROD:

21   Q.  Do you see the file date on that document?

22   A.  Yes.

23   Q.  And that's filed August 2019?

24   A.  Yes.

25   Q.  And so you mentioned that you're listed as a potential

Carol L. Naughton, Official Court Reporter

R. Martin - Cross (By Mr. Grindrod)

1    creditor in that document.

2    A.   Yes.

3    Q.   And just to break that down a little, since you have a

4    business background, a creditor is somebody that Mr. Smith

5    might owe money to, is basically what a creditor is, right?

6    A.   That's correct.

7    Q.   And by 2019, you had already sued Mr. Smith civilly?

8    A.   Yes.

9    Q.   And generally speaking, when someone -- when you are

10   suing someone, there's at least the potential that you could

11   owe that person money, right?

12   A.   Yes, that's correct.

13   Q.   And in a bankruptcy petition, you don't list only people

14   that you definitely owe money to, right?  You have to list

15   everybody that you could potentially owe money to, right?

16   A.   Yes.  During our bankruptcy -- excuse me -- during our

17   civil suit, there was some paperwork that Mr. Smith was

18   supposed to file, supposed to agree to, and it was never

19   agreed to.

20   Q.   I understand.

21          MR. GRINDROD:  I don't have any further questions,

22   Your Honor.

23          THE COURT:  Okay.

24          Redirect?

25          MS. YUSI:  Very briefly, Your Honor.

─────────────── R. Martin - Redirect ───────────────

1                     REDIRECT EXAMINATION

2     BY MS. YUSI:

3     Q.  Mr. Martin, Mr. Grindrod was asking you about your

4     background in tax and accounting.  Had you had any background

5     in alternative investments or anything prior to this?

6     A.  No.  I had not been involved in any kind of partnerships

7     or more exotic investments.  And basically my business

8     background was as a sole proprietorship, so it was just me

9     without a large -- very large staff in the office.  So...

10    Q.  Did you have any background in spectrum?

11    A.  None at all.

12    Q.  How about in running a franchise?  Had you had any

13    background in that?

14    A.  No, I had not.

15    Q.  And you were also asked about the change in vendors.

16    Prior to buying DSPF, did Mr. Smith tell you about any issues

17    that they were having with vendors?

18    A.  No.  There was no discussion of that during our meetings.

19              MS. YUSI:  Thank you.

20              THE COURT:  May the witness be excused?

21              MS. YUSI:  Yes, sir.

22              MR. GRINDROD:  Yes, Your Honor.

23              THE COURT:  Sir, step down.  Thank you.

24              (The witness was excused.)

25              THE COURT:  Next witness.

P. Melley - Direct

```
 1              MR. BOSSE:  Your Honor, the next witness is going to
 2     be a lengthy witness, at least an hour.
 3              THE COURT:  But we're going to start.
 4              MR. BOSSE:  Yes, sir.  The government calls Peter
 5     Melley.
 6              (The witness was sworn.)
 7              PETER MELLEY, called by the Government, having been
 8     first duly sworn, was examined and testified as follows:
 9                         DIRECT EXAMINATION
10     BY MR. BOSSE:
11     Q.  Good morning, sir.  Would you please state your name for
12     the record and spell it for us.
13     A.  Peter Melley, M-e-l-l-e-y.
14     Q.  Where do you work, sir?
15     A.  I'm the director of FINRA's Criminal Prosecution
16     Assistance Group in Washington, D.C.
17     Q.  And tell the jury, what is FINRA?
18     A.  FINRA is a self-regulatory organization of the securities
19     industry.  Its goal is to protect investors and ensure the
20     integrity of various trading markets.  It does this three
21     main ways:
22              One is to conduct surveillance of various trading
23     markets, like the NASDAQ stock market; another is to create
24     rules to govern the conduct of its members, who are brokerage
25     firms and those individuals who work at those firms, to buy
```

P. Melley - Direct

1   and sell securities; and, finally, in order to ensure that

2   customers and investors are confident in those that are

3   handling their funds are qualified and experienced by

4   FINRA-administered licensing exams and also enforces

5   continuing education requirements.

6   Q.  Can you tell the jury, what does FINRA stand for, the

7   acronym?

8   A.  The Financial Industry Regulatory Authority.

9   Q.  In the past, was your group FINRA known by a different

10  name?

11  A.  Yes.  Until 2007, it was known as NASD, National

12  Association of Securities Dealers, then in 2007, it merged

13  with the regulatory function of the New York Stock Exchange

14  to create a new regulatory entity called FINRA.

15  Q.  How long have you worked for this organization?

16  A.  Approximately 26 years, with the last nine years as

17  director of the Criminal Prosecution Assistance Group.

18  Q.  As director of that group, what are your

19  responsibilities?

20  A.  To oversee a unit of four attorneys, to provide

21  assistance in criminal investigations and prosecutions

22  involving securities fraud.  That may range from analyzing

23  trading data, other relevant documents, creating exhibits to

24  summarize my analysis and, if necessary, providing testimony

25  to our analysis.

P. Melley - Direct

1   Q.  Through your work and your job background, are you

2   familiar with the investment industry generally and the

3   regulations that govern investment professionals?

4   A.  Yes, I am.

5   Q.  And are you familiar with the different licensing tests

6   that FINRA administers?

7   A.  I am.

8   Q.  Let's start, if you could tell the jury generally, what

9   is a broker?

10  A.  A broker is an individual -- the official term is a

11  "registered representative" -- whose job is to, on behalf of

12  clients, purchase and sell securities and handle client funds

13  to do so.

14  Q.  Without getting too deep in the weeds, what do we mean by

15  a security?

16  A.  A security is a tradeable financial asset.  The most

17  common would be stock that signifies ownership in a

18  corporation, and then the unit of stock usually is shares

19  that you can then buy and sell in a marketplace.  Other

20  securities would be bonds or options.

21  Q.  Okay.  I've been asked, can you put that up?  It's going

22  to come through clearer, I think.

23          Can a brokerage firm buy and sell securities for its

24  clients without being registered with FINRA?

25  A.  It cannot.  All brokerage firms and the individuals that

P. Melley - Direct

1    work at those firms that handle customer accounts must be
2    licensed and registered with FINRA.
3    Q.  You mentioned licenses.  Are there different licenses for
4    different kinds of financial products that brokers sell?
5    A.  Yes.  Different licenses based on the products that one
6    sells as well as the position within the brokerage firm that
7    that individual assumes.
8    Q.  Are you familiar with what subjects are covered on the
9    FINRA examination to become a broker?
10   A.  Yes, I am.
11   Q.  And are you familiar with the duties and responsibilities
12   of a person who is a licensed broker?
13   A.  Yes.
14   Q.  Is it possible for FINRA to take away somebody's ability
15   to be in the securities industry?
16   A.  Yes.  As I mentioned earlier, one of FINRA's
17   responsibilities is to enforce its own rules of conduct.
18   Again, this is to protect investors.  So if an individual is
19   found to be in violation of FINRA rules, that person can be
20   sanctioned regarding a fine, a suspension, or actually a bar
21   from the industry where they're, in essence, kicked out of
22   the securities industry.
23   Q.  Let's talk first about the license to become a broker.
24          What is the examination you have to take to become a
25   broker, also known as a registered representative?

Carol L. Naughton, Official Court Reporter

P. Melley - Direct

1    A.   The common entrance exam is the Series 7, which is the
2    general registered representative exam.  That is the one you
3    will take to basically ensure and be licensed that you can
4    then handle client accounts.
5    Q.   How does FINRA keep track of who's taken the exam, when
6    they've taken it, whether they've passed or failed?
7    A.   FINRA maintains an online database, registration and
8    licensing information.  It's called CRD, Central Registration
9    Depository.
10            All brokerage firms are responsible for any of their
11   employees who take an exam and pass, to provide that
12   information to FINRA so that it can put that information in
13   the database, and the database then tracks one's history
14   within the securities industry; so any of their employments,
15   any of their licenses, as they move from firm to firm, gain
16   new licenses -- that is all in the database, you know, and
17   shows up in a report, if necessary.
18   Q.   Are you familiar with the subject matter of that
19   examination and the way that people prepare for it?
20   A.   Yes.
21   Q.   Can you describe the test itself?
22   A.   Sure.  The Series 7 commonly -- and I think today we're
23   talking about it during the 1990s.  It was 250 questions,
24   about a six-hour exam covering a range of topics from types
25   of securities markets, types of investment products -- again,

P. Melley - Direct

```
 1   as I mentioned, stocks, bonds, options -- and what kind of
 2   governs overall is the relationship between the rep and the
 3   client in terms of handling funds, truthful communications.
 4           There's also a number of sections that cover the
 5   emphasis on antifraud provisions, whether it's at the federal
 6   level for federal securities laws or FINRA's own rules of
 7   conduct.
 8   Q.  Is the Series 7 considered within the industry to be a
 9   difficult test?
10   A.  It is.  It's not uncommon for someone to have to take it
11   on more than one occasion in order to pass the exam.
12   Q.  And we talked about preparation for the exam.  Is this a
13   test that people spend significant time studying for?
14   A.  Yes.  Usually how the process works is, once someone is
15   hired by a firm, their first responsibilities are really just
16   to study for the test.  So the firm will provide them with a
17   variety of study materials, either provided originally from
18   FINRA or from other vendors.  There may be prep courses.  But
19   because it is a rigorous exam, that is their primary focus
20   once they are hired by the firm.
21   Q.  In preparation, Mr. Melley, for your testimony today, did
22   you review FINRA records related to the defendants in this
23   case, Bill Smith and David Alcorn, and also FINRA records
24   related to some other people, Daryl Bank and Kent Maerki?
25   A.  Yes, I did.
```

P. Melley - Direct

1   Q.  And if you could -- I'm going to pull up on the screen

2   for you, just for the witness, Government's Exhibit 3.  And

3   I'm going to scroll down to Page 3 so you can identify it.

4           What is this document this I'm showing you here?

5   A.  This is a CRD report based off of the CRD system that I

6   generated for Mr. Smith.  As you can see at the top, it

7   includes his name and also a unique identifying number.  Each

8   individual who is in the CRD system has their own unique CRD

9   number.

10          MR. BOSSE:  The government will offer Government's

11  Exhibit 3.

12          THE COURT:  Any objection?

13          MR. GRINDROD:  No, Your Honor.

14          THE COURT:  It will be admitted.

15          (Government's Exhibit 3 was admitted.)

16  BY MR. BOSSE:

17  Q.  And just so the jury also can see what you've just

18  described, this is essentially the FINRA record collection

19  for Mr. Smith, correct?

20  A.  Correct.

21  Q.  What is the first thing that is listed in chronological

22  order here?

23  A.  Again, usually you start with the registration history,

24  meaning the employment history for the individual; if they

25  are currently working with a firm; if not, their historical

P. Melley - Direct

1   firm, history.  So as you can see, as of his latest firm that
2   he worked with in the industry, Stonehurst Securities is
3   listed.  Also it shows the dates that he worked at the firm.
4   Q.  And when is the last time that Mr. Smith worked with a
5   broker?
6   A.  January of 2009.
7   Q.  And so going back in time, what does this show here on
8   Page 4?
9   A.  This shows the other firms.  I believe, altogether,
10  Mr. Smith worked for seven different brokerage firms over a
11  16-year period, from 1993 to 2009.
12  Q.  And going down to the next page, what are we seeing here
13  on 5?  This is a continuation, isn't it, of what we just saw?
14  A.  Correct.  The employment history, that's from -- that's
15  information that's entered in by the individual while the
16  registration history we first looked at is info that comes
17  from the brokerage firm itself that they are working for.
18  Q.  Let's go to Page 7, which I can do by scrolling here.
19  You mentioned that it covers the tests that people took and
20  passed and also any tests they took and didn't pass.
21          Can you walk the jury through, briefly, because
22  we're going to do it in more detail, and give a brief
23  overview of what tests Mr. Smith took and passed?
24  A.  Mr. Smith passed three separate exams, the Series 7,
25  which again is the entrance broker exam, the registered rep

P. Melley - Direct

1    exam; the Series 22, which is a direct participation program
2    exam; and the Series 63, which is a state companion to the 7.
3           In order to buy and sell securities in individual
4    states, you must be registered in that state, so that's why
5    you have to take the Series 63.
6           So he passed three exams.  He did take, on two
7    occasions but failed, the Series 65.  That is the state
8    investment advisor exam.
9    Q.  And you see up here above the exam appointment section,
10   there's a section called "Other Business."  What is this?
11   A.  So all individuals, when they enter the securities
12   industry, they are required to disclose any other businesses
13   or employers that they are associated with.
14          And so for Mr. Smith, this is his disclosure that he
15   was also in the life insurance and annuities business and
16   also had some media ties to a radio show and so forth.
17   Q.  Is that number 2, the *Safe Money Retirement* show?
18   A.  Correct.
19   Q.  This is provided by him, correct, this description?
20   A.  Right.  This is -- the individual is required to disclose
21   this, and what they put on the form is what is then listed on
22   the CRD system.
23   Q.  In the last line of paragraph 2, how does he describe the
24   radio show that he hosted?
25   A.  "To educate the public on the importance of secure

P. Melley - Direct

1    financial plans."

2    Q.  All right.  And as we go down the document, down to the

3    bottom of Page 8, after the main exam results, what are we

4    seeing here under the reference "CE"?

5    A.  CE refers to continuing education.  As I mentioned

6    earlier, FINRA is also responsible for helping enforce the

7    requirement that one continually takes refresher courses

8    regarding, for lack of a better term, the dos and don'ts of

9    the industry.

10            Continuing education is required within two years of

11   entering the industry and every three years thereafter.  It's

12   a computer module course covering ethical sales practice,

13   regulatory and compliance standards.  It basically covers

14   current trends, issues, standards in the industry.

15            Again, it's just as a refresher for the individual,

16   because for many of them, they are in the industry for a

17   number of years.  They may not have, you know -- they took

18   the test a long time ago, but these refresher courses just

19   remind them, again, about how you're supposed to conduct

20   yourself, especially with regards to clients, being truthful,

21   not engaging in fraudulent practices, things of that nature.

22   Q.  Does this show that Mr. Smith did complete those

23   continuing education requirements every two years up until, I

24   guess, 2009 when his license lapsed?

25   A.  Yes.  Over 16 years, he completed it on five separate

P. Melley - Direct

1    occasions.

2    Q.  So after -- and we're going to talk about getting the

3    Series 7 license, but you mentioned that it lapsed in 2009.

4           After 2009, was Mr. Smith allowed to sell

5    investments that could be characterized as securities to

6    clients?

7    A.  No.  Once you are out of the industry, you are no longer

8    current in your registration -- again, you have to be

9    registered with FINRA in order to transact in securities.  So

10   failing to do so, if you're not registered, you are not

11   allowed to do that anymore.

12   Q.  Going back to the examination that you mentioned that he

13   didn't pass.  Was he ever licensed to be an investment

14   advisor to clients?

15   A.  He was not.  He took the Series 65 exam on two occasions,

16   did not pass on either occasion.

17          MR. BOSSE:  If we could show the witness 97D.

18   BY MR. BOSSE:

19   Q.  What are we seeing here, sir?

20   A.  This is a summary chart that I created based on

21   Mr. Smith's CRD report that we previously were reviewing.

22   This shows the three licenses he passed and provides

23   background on what's covered on the exam, when he passed the

24   exam, and the types of products involved.

25          MR. BOSSE:  Your Honor, I would like to show the

P. Melley - Direct

 1    summary chart to the jury.  I'm not planning to offer this

 2    one into evidence.

 3              THE COURT:  Any objection?

 4              MR. GRINDROD:  No, Your Honor.

 5              MR. YAROW:  No, Your Honor.

 6              THE COURT:  It may be shown.

 7    BY MR. BOSSE:

 8    Q.  And so are these the three examinations that we just went

 9    through that he did pass; the 22, the 7, and the 63?

10    A.  Yes.

11    Q.  And let's talk first about the Series 7.  And if you

12    could tell the jury again the license date that he received

13    that.

14    A.  September 1993 he passed that exam.

15    Q.  And let's talk now about the exam itself.

16              MR. BOSSE:  Could we see, for the witness, 97A,

17    please.

18    BY MR. BOSSE:

19    Q.  Are you familiar with what we're seeing here?

20    A.  Yes.  This is a study outline that was relevant at the

21    time Mr. Smith took the exam.  So these would have been the

22    topics and materials covered on the exam when he took it back

23    in September '93.

24    Q.  Is this a document that FINRA maintains, and NASD

25    maintained before, a bank of the old study outlines for the

Carol L. Naughton, Official Court Reporter

P. Melley - Direct

1    examinations?

2    A.   Exactly.

3             MR. BOSSE:  I'll offer 97A.

4             THE COURT:  Hearing no objection, 97A is admitted.

5             (Government's Exhibit 97A was admitted.)

6    BY MR. BOSSE:

7    Q.   What are the main categories of information tested by the

8    Series 7?

9    A.   The various securities markets, where one could trade

10   various products, the types of products themselves, various

11   securities, and so forth.

12            Again, there's a large emphasis on the relationship

13   with the client under Series 7.  For a broker-client

14   relationship, one must have a -- put their investors in

15   suitable investments.  So it's the responsibilities governing

16   that conduct.

17            And then there's also another focus on, again, as

18   I've said, like, the dos and don'ts of the industry, federal

19   securities laws as well as FINRA rules regarding how one must

20   conduct themselves when engaging in the purchase or sale of

21   securities.

22   Q.   So are the people who take the exam tested on the ethical

23   rules, for example, learning that you can't lie to clients

24   when selling investment products?

25   A.   Yes.  The focus is on truthful communications.  For

Carol L. Naughton, Official Court Reporter

P. Melley - Direct

1    FINRA's perspective, it's standards of commercial honor and

2    just and equitable principles of trade.  So, again, the

3    bedrock pillars are that you must conduct yourself in a way

4    that you are providing accurate, thorough, essential

5    information and also not engaging in any conduct or

6    techniques that may be considered fraudulent.

7              MR. BOSSE:  Could we see Page 7 of the document,

8    please.  So it's got to be two leading zeros.

9    BY MR. BOSSE:

10   Q.   What are the critical functions?  What does that mean?

11   A.   Critical functions is just kind of one of the bedrock

12   pillars of the exam in terms of what is going to be covered.

13             This is Critical Function 1, which really is kind of

14   focusing on how the rep is supposed to kind of govern their

15   responsibilities and their relationship with the client; as I

16   said, talking about the standards of truthfulness, good

17   taste, providing accurate information, essential information,

18   because whatever information the investor is receiving, that

19   is going to influence them on how they make an informed

20   decision.

21             And that is true from both a FINRA perspective and

22   the federal securities laws, which the whole purpose is that

23   investors receive that truthful essential info so they can

24   make an informed decision whether to invest or not.

25   Q.   Is what you've just described what is covered under

P. Melley - Direct

1    Module 1.2.1 that everyone taking this exam has to learn
2    about, the general standards of truthfulness and good taste?
3    A.  Correct.  So this is somewhat of an umbrella of how the
4    relationship should be conducted.
5            MR. BOSSE:  Could we just page down to the next
6    page, please.
7    BY MR. BOSSE:
8    Q.  Looking at Critical Function 2, what is that?
9    A.  This kind of focuses more on what one would say is the
10   get to know your customer, try to understand the client's
11   investment objectives.  This would be based on getting
12   background information on the client; what's their age, their
13   risk tolerance, their sophistication when it comes to
14   financial products in the industry, you know, what assets do
15   they have under management, and if they have any liabilities.
16           So again, it is -- you want to get to know and
17   understand what your customer's needs are so that you can
18   then build on, as I think we'll talk about in the next
19   critical function -- put them into what is a suitable
20   investment.
21           MR. BOSSE:  All right.  Could we skip down, then, to
22   Page 28 of this document.
23   BY MR. BOSSE:
24   Q.  And we have skipped a couple.  We are now at Critical
25   Function 5.  Is this what you were just discussing, the

P. Melley - Direct

1   suitability of an investment?

2   A.   Right.  So, again, with the Series 7, the emphasis on the

3   relationship is that the primary responsibility is to the

4   client from the perspective of the registered rep.

5           So by having that information that you've conducted

6   that due diligence on the client's needs and background, you

7   know, what they're willing to tolerate in terms of risk

8   coupled with the due diligence you do on the investment

9   products itself, taken together, the rep and the client

10  should be on the same page in terms of what funds are now

11  going to be the subject of the investment and where it's

12  going to go.

13          So, for instance, this Critical Function 5 is trying

14  to, you know, focus on things like, well, based on your

15  tolerance and your age, what are you willing to risk by

16  putting funds in?  Someone who is older is not going to be

17  looking for taking the chance on losing money for a period of

18  time, or you want to make sure they are going to be able to

19  get that principal back soon, so it's all based on the

20  relationship and the needs of the client.

21  Q.   How does that -- let me ask you first:

22          You are familiar with the term "due diligence"?

23  A.   Yes.

24  Q.   Is that also covered on this examination?

25  A.   Yes.  As I said, the due diligence kind of is from two

P. Melley - Direct

1    different perspectives:  One is identifying the client and
2    what their needs are based on their background and all the
3    relevant factors; and then there's the due diligence of the
4    investment itself and providing that essential information,
5    you know, company structure, size of the investment, where --
6    the use of the proceeds, you know, what type of payment will
7    be made back in terms of the client, in terms of the return
8    of their investment.  All that information is essential for
9    the investor to then make an informed decision.
10   Q.  What is the effect of passing this examination, the
11   Series 7?  What are you allowed to do?
12   A.  Once you pass, you are then allowed to handle client
13   accounts and, more importantly, clients funds.  From the
14   client's perspective, if they are viewing their rep who is
15   licensed, they are thinking they are competent, they are
16   qualified, they are experienced --
17            MR. GRINDROD:  Objection, Your Honor.
18            THE COURT:  Sustained on what they're thinking.
19            MR. BOSSE:  Okay.  That's fine.
20   BY MR. BOSSE:
21   Q.  Did Mr. Smith pass the Series 7 exam on his first attempt
22   at taking it?
23   A.  He did.
24   Q.  Let me ask you, you talked a little bit about the
25   continuing education requirements for the Series 7.  Did

P. Melley - Direct

1   those also include the updates on the ethical components that
2   are tested on the initial Series 7 examination?
3   A.   Correct.
4   Q.   And did Mr. Smith complete all of those every two years
5   as well?
6   A.   He did, five different occasions over 16 years.
7           MR. BOSSE:   Could we have 97D back up again, please.
8   BY MR. BOSSE:
9   Q.   Let's talk about the Series 63.  If you could give a
10  general overview, and then we're going to briefly look at the
11  exam materials for that as well.
12  A.   The Series 63 --
13          THE COURT:   Wait a minute.  We don't need a
14  narrative here, Mr. Bosse.  You ask the questions, and let's
15  move on to it, because you're getting into mighty detailed
16  minutia about these detailed regulations.  So guide him
17  through it.  Cut right to the heart of it, and let's move on.
18          MR. BOSSE:   Yes, sir.
19  BY MR. BOSSE:
20  Q.   Can you describe the Series 63 at a very high level of
21  generality, and we'll get right into it.
22  A.   It is simply the same as the Series 7 in terms of what's
23  covered.  The difference is in order for one to transact in a
24  particular state, dealing with clients, you have to be
25  registered in that state.  In order to be registered, you

P. Melley - Direct

1    need to take the Series 63 exam.

2    Q.  Is that something that we saw on the CRD report for

3    Mr. Smith, that he was selling in Nevada, California, and

4    Utah?

5    A.  Correct.

6           MR. BOSSE:  Let's go to 97C to show the witness.

7    BY MR. BOSSE:

8    Q.  What is this document?

9    A.  This is the study guide that was in play at the time when

10   Mr. Smith passed the Series 63 exam.

11          MR. BOSSE:  I'll offer 97C, Your Honor.

12          THE COURT:  Hearing no objection, 97C is admitted.

13          (Government's Exhibit 97C was admitted.)

14          MR. BOSSE:  If we could go to Page 21, please.

15   BY MR. BOSSE:

16   Q.  And if you could tell us about what's tested on

17   Section IV of the exam.

18   A.  About half of the Series 63 exam covers the

19   responsibilities and how one must not engage in fraudulent

20   and prohibited practices, between a description of what those

21   practices are including misstatements, false statements,

22   omissions, as well as other deceptive techniques.  It also

23   talks about the actual rules that govern that type of

24   activity at the federal level, at the state level, and also

25   the regulatory agencies involved in governing that conduct.

P. Melley - Direct

1   Q.  Let's go down to subject 3, prohibited business

2   practices.  And looking down at 3(a), what does someone who

3   is taking this exam have to learn about prohibited business

4   practices here?

5   A.  That they are not allowed to engage in any misleading or

6   untrue statements.  Again, the focus is on providing truthful

7   communications about essential information so investors can

8   make an informed decision.

9   Q.  And the kinds of topics that people aren't supposed to

10  make misleading and untrue statements about, are those listed

11  here as subparts?

12  A.  Yes.  I think these are the first couple regarding

13  background on the company, like issuer's earnings, trading

14  information, but it also just goes to the actual information

15  regarding the company that you want to convey to an investor

16  to make that informed decision.

17  Q.  All right.  And we can do this briefly.  Does this

18  section also cover -- someone taking this exam will also have

19  to learn about the suitability of recommendations they make

20  to their clients and customers?

21  A.  Yes.  Again, the primary responsibility is to the client,

22  and suitability goes to making an appropriate or, you know,

23  a -- providing pertinent information to make an appropriate

24  recommendation for them to invest based on what you know of

25  the customer.

P. Melley - Direct

1          MR. BOSSE:  Let's go back to 97D for the last time.

2   BY MR. BOSSE:

3   Q.  And we'll briefly cover the Series 22.  This is an exam

4   that Mr. Smith took in October of 1984, correct?

5   A.  Correct.  This is the direct participation program exam.

6   This is a limited license covering issues involving real

7   estate products, gas and oil products, focuses on limited

8   liability partnerships.  But again, this exam covers those

9   same, you know, prohibited practices, again how one must

10  conduct themselves when dealing with clients, from that

11  perspective of providing truthful communication.

12          So every exam has those same kind of pillars that

13  are discussed regarding what you can do and what you should

14  not do in the industry.

15  Q.  And I should have asked, did Mr. Smith pass the Series 63

16  on his first attempt as well?

17  A.  Yes, as well as the Series 22.

18          MR. BOSSE:  Let's look at 97B, please, for the

19  witness.

20  BY MR. BOSSE:

21  Q.  Is this the study outline that was in place for the

22  Series 22 that Mr. Smith took?

23  A.  Yes.

24          MR. BOSSE:  I'll offer 97B.

25          MR. GRINDROD:  No objection.

Carol L. Naughton, Official Court Reporter

—————————————————— P. Melley - Direct ——————————————————

1          THE COURT:  97B will be admitted.

2          (Government's Exhibit 97B was admitted.)

3          MR. BOSSE:  If we could see Page 7.

4          THE COURT:  Before you start into 97B, we're going

5     to take a 15-minute break now, and then we will come back and

6     start with 97B.

7          MR. BOSSE:  Yes, sir.

8          (The jury exited the courtroom.)

9          THE COURT:  You may step down during the break,

10    Mr. Melley.

11         THE WITNESS:  Thank you, Your Honor.

12         THE COURT:  Just do not discuss your testimony.

13         One note, Mr. Bosse.  It's your case, but the Court

14    is concerned about the minutia you're getting into in order

15    to make your case here on these FINRA regulations.

16         MR. BOSSE:  Yes, sir, Your Honor.

17         THE COURT:  We don't need a Ph.D. in FINRA

18    regulations, so cut to the heart of it.  I don't know what

19    you plan for your next witness, but we're not going to spend

20    all this time on the details of these FINRA regulations.

21         MR. BOSSE:  Yes, sir.  I have, I think, two pages to

22    look at on this, and then we're going to talk about the other

23    individuals in the case.

24         THE COURT:  As long as we're not going to go back

25    over these FINRA regulations again.

P. Melley - Direct

```
 1                MR. BOSSE:  No, sir.  This is the only time.
 2                (Recess from 10:57 a.m. to 11:17 a.m.)
 3                (The jury entered the courtroom.)
 4                THE COURT:  The record will reflect that all jurors
 5      are present.
 6                Does counsel concur?
 7                MR. BOSSE:  Yes, sir, Your Honor.
 8                MR. YAROW:  Yes, sir.
 9                MS. McCASLIN:  Yes, sir.
10                THE COURT:  You may continue.
11      BY MR. BOSSE:
12      Q.  Mr. Melley, when we left off, you were talking about the
13      Series 22 exam that Mr. Smith took and passed, and we're just
14      going to look at two pages from the study materials for that
15      exam as far as what was tested on it.
16                MR. BOSSE:  Could we see, please, 97B, Page 7.
17      BY MR. BOSSE:
18      Q.  And again, what concept is required to be learned by
19      someone who is going to sit for this examination?
20      A.  Like most of the other exams we talked about, the
21      Series 7 and Series 63, there's a suitability standard for
22      the relationship with an investor client.
23                MR. BOSSE:  If we could see Page 15 of 97B.
24      BY MR. BOSSE:
25      Q.  And without getting into the detail, is there also -- one
```

P. Melley - Direct

1   of the subject matters that's tested here is the prohibition

2   on the use of manipulative, fraudulent devices?

3   A.   Yes.   This is, again, based on the federal securities

4   laws as well as a myriad of FINRA's own rules regarding how

5   one must conduct themselves in the securities industry and

6   not engage in any fraudulent or other prohibited practices

7   that are outlined.

8   Q.   Is that what we're seeing is Section 2, fairly dealing

9   with customers?

10  A.   Yes.   That goes to the truthfulness and communication and

11  the standards of conduct one must have when, again, making

12  the client the primary responsibility.

13  Q.   All right.   Fair to say that someone taking the three

14  exams that Mr. Smith took and passed on the first try, in

15  each of them it's tested on prohibition about lying to

16  clients?

17  A.   Yes.   Again, those are the same themes that are occurring

18  over and over again in all these exams as well as the

19  continuing education requirements.

20  Q.   How long did he spend in the industry when he was working

21  for brokers, so as a registered representative?

22  A.   Approximately 16 years, between '93 and 2009, I believe.

23  Q.   During those years while he was registered, ending in

24  2009, did he ever get in trouble with FINRA?

25  A.   I did not see any violation of FINRA rules in terms of

P. Melley - Direct

1   investigative or disciplinary matters on his CRD report, no.

2   Q.  Let's move on from Mr. Smith and talk about Mr. Alcorn.

3          MR. BOSSE:  If I could have the witness shown

4   Exhibit 4A.

5   BY MR. BOSSE:

6   Q.  And looking at 4A, I'm going to bring you to Page 3.

7   What is this?

8   A.  Similar to Mr. Smith, this is a CRD report, in this case,

9   for Mr. Alcorn, again, on this page showing his name and

10  unique CRD number.

11         MR. BOSSE:  I'll offer Government's Exhibit 4A.

12         THE COURT:  Any objection?

13         MR. YAROW:  No objection.

14         THE COURT:  Hearing no objection, it's admitted.

15         (Government's Exhibit 4A was admitted.)

16  BY MR. BOSSE:

17  Q.  Let's go down to Page 4 of 4A, now that the jury can see

18  it.  And again, this is for Mr. Alcorn, correct?

19  A.  Correct.

20  Q.  What does it show as far as Mr. Alcorn's examination

21  history?

22  A.  That between 1981 and 1982, Mr. Alcorn sat and passed

23  three exams:  The Series 22, which we discussed, which is the

24  DPP exam; the Series 39, which is a supervisory role or

25  management position for those engaged in the direct

P. Melley - Direct

 1   participation programs that came in on the 22, so those two
 2   related; and then the Series 63, which we discussed, which is
 3   like the state stockbroker exam.
 4   Q.  Without going back into the other documents, would he
 5   have been examined on and had to learn about the same
 6   information; duty to clients, suitability of investments, and
 7   prohibitions against fraud and deceit?
 8   A.  Correct.
 9        MR. BOSSE:  We can take down this exhibit.
10   BY MR. BOSSE:
11   Q.  And I want to now talk about two other men who have been
12   mentioned in this case, Daryl Bank and Kent Maerki.
13        Did you review the CRD reports for both of those men
14   as well?
15   A.  I did.
16   Q.  Let's start with Mr. Bank.
17        MR. BOSSE:  And if we could show the witness
18   Government's Exhibit 2, please.
19        So let me just see.  Only the witness can see this,
20   so if I can just scroll down, I'll see if this is the Bank
21   CRD.  We'll have to correct the marking.  Actually, the
22   exhibit is properly marked for the Court.  The computer
23   screen has this as 1M, but this is the Government's 2,
24   Mr. Bank's CRD.
25   BY MR. BOSSE:

P. Melley - Direct

```
 1    Q.  Do you recognize this as a document that you are familiar
 2    with?
 3    A.  Yes.  This is one that I had originally generated for
 4    Mr. Bank, again with his unique number and shows his time in
 5    the securities industry.
 6            MR. BOSSE:  I'll offer Government's 2, and we'll
 7    confirm we have that right.
 8            MR. GRINDROD:  No objection.
 9            THE COURT:  It will be admitted.
10            (Government's Exhibit 2 was admitted.)
11    BY MR. BOSSE:
12    Q.  So looking at Mr. Bank's CRD report, what does it show as
13    far as his background, his employment background in the
14    securities industry?
15    A.  Mr. Bank worked for five different brokerage films over
16    14 years.  He also was licensed -- had five different
17    licenses altogether, and he completed continuing education
18    requirements on four separate occasions.
19    Q.  And you see that at the top of Page 6 here, from June of
20    2009, Mr. Bank was associated with a company called Dominion
21    Investment Advisors?
22    A.  Correct.  Yeah.  And again, that page is information that
23    is entered in by the individual himself.
24    Q.  All right.  Let's go down to the test history for
25    Mr. Bank, which is here on Pages 8 and 9, and if you could
```

P. Melley - Direct

1  tell the jury -- just describe the tests that he took and
2  passed.
3  A.  He passed the Series 3 exam, which is not a FINRA exam,
4  but it involves futures products, so it's by the National
5  Futures Association.  He passed the Series 7, which we've
6  discussed.  The series 24 is a management or supervisory
7  license connected to the Series 7, so it's somebody who is a
8  manager or a principal, general securities principal.
9          And he also passed the Series 63, again, the state
10 stockbroker exam, and then, finally, he also passed, in '96,
11 the Series 65, which is the state investment advisor exam
12 allowing one to engage in -- or relationships with clients as
13 an investment advisor as opposed to a stockbroker.
14 Q.  And that's the one that Mr. Smith took but did not pass,
15 correct?
16 A.  Correct.
17 Q.  Mr. Bank passed these examinations also on his first try?
18 A.  Yes.
19 Q.  And I should have asked that for Mr. Alcorn.  He also
20 passed all of the exams he passed on his first try, correct?
21 A.  Correct.  Yes.
22 Q.  Did there come a time that a FINRA disciplinary
23 proceeding was started against Mr. Bank from his conduct in
24 his work as a broker?
25 A.  Yes.  FINRA's Department of Enforcement filed a

P. Melley - Direct

1    complaint, I believe, in August of 2008 against Mr. Bank and

2    at least one other individual.

3            MR. BOSSE:  Could we see Page 14 of Government's 2,

4    please.

5    BY MR. BOSSE:

6    Q.  And is this the filing that you're referring to here?

7    A.  Correct.

8    Q.  What were the allegations, speaking generally, against

9    Mr. Bank?

10   A.  It involved misappropriation of funds, client funds, by

11   charging commissions that weren't legitimate as well as

12   providing false information to the firm he was working with,

13   and also providing false information to FINRA pursuant to

14   testimony and production of records.

15   Q.  What is the process for a FINRA disciplinary proceeding?

16   How does it work?

17   A.  Once a complaint is filed by FINRA, the normal course is

18   that if there's no resolution subsequent to that complaint,

19   it will go to a hearing, which is like a court proceeding,

20   before a hearing panel.  That panel will then hear from both

21   sides.  They will render a decision and, if found to be in

22   violation, will impose any sanctions, which could range from

23   a fine, a suspension, to a bar from the industry.

24           Another alternative is after filing that complaint,

25   there may be negotiations between FINRA and the defendant,

P. Melley - Direct

1    and that could result in an offer of settlement and then
2    possibly an acceptance of offer of settlement, which means
3    that it does not have to go to a hearing.  That settlement,
4    though, must still be approved regarding any possible
5    sanctions.
6    Q.  How was Mr. Bank's investigation as to his alleged
7    misconduct -- how was that resolved?
8    A.  I believe there was an offer of settlement to Mr. Bank in
9    January 2010, and then in February 2010, the FINRA Office of
10   Hearing Officers approved a permanent-bar sanction based on
11   the conduct that it saw and that the parties had agreed to.
12         MR. BOSSE:  Could we see, for the witness,
13   Government's 1, please.
14   BY MR. BOSSE:
15   Q.  What are we seeing here, sir?
16   A.  This is the actual decision by FINRA's Office of Hearing
17   Officers in February 2010.  Again, the parties involved are
18   FINRA's Department of Enforcement as well as Mr. Bank and
19   another individual Gregory Bodoh.
20   Q.  You see there's a second proceeding with Daryl G. Bank
21   and RH.  Do you know who RH?
22   A.  I believe RH refers to Roger Hudspeth.
23   Q.  And this is pre-dating -- well, let me ask this:
24         This was from conduct that occurred in the 2008-2009
25   time period, correct?

P. Melley - Direct

```
 1   A.  Correct.
 2   Q.  Let's go down to Page 3, and we're not going to have you
 3   read this document, but just generally, does this describe
 4   the allegations that Mr. Bank misappropriated funds from the
 5   Bank of the Commonwealth?
 6   A.  Yes, it does.
 7           MR. BOSSE:  If we could go to Page 7.
 8   BY MR. BOSSE:
 9   Q.  Is this what you referred to earlier that a second part
10   of the proceeding was the fact that Mr. Bank had provided
11   false information to FINRA?
12   A.  Exactly.
13   Q.  All right.
14           MR. BOSSE:  And if we could go down to Page 13,
15   please.
16   BY MR. BOSSE:
17   Q.  What's happening on Page 13?
18   A.  This just discusses the actual sanction that is put in
19   place by the hearing officers.
20           MR. GRINDROD:  Objection, Your Honor.  Are we going
21   to offer this in evidence?
22           THE COURT:  Stand up.
23           MR. GRINDROD:  Sorry, Your Honor.
24           THE COURT:  What is your objection?
25           MR. BOSSE:  I'll cure it.  He's right.
```

P. Melley - Direct

1          MR. GRINDROD:  I object to the exhibit being

2     discussed without being offered into evidence.

3          MR. BOSSE:  I forgot to offer it.  He's exactly

4     right.  I'll offer Government's 1.

5          THE COURT:  Any objection?

6          MR. GRINDROD:  No, Judge.

7          THE COURT:  Hearing none, it will be admitted.

8          (Government's Exhibit 1 was admitted.)

9     BY MR. BOSSE:

10    Q.  Now we're at the end of Government's 1, but this is the

11    important part.

12         Can you tell the jury, because now they can see it,

13    what happened to Mr. Bank as a result of the investigation

14    and then the settlement that happened?

15    A.  Mr. Bank was -- the sanction was that Mr. Bank would be

16    barred, permanently barred from the securities industry,

17    which, again, prevents him from, as a broker, engaging in the

18    purchase and sell of securities on behalf of clients.

19    Q.  All right.  And at that point, after this ban from the

20    securities industry is entered, is he allowed to have

21    anything to do with the buying and selling of securities for

22    clients?

23    A.  He is not, in terms of buying or selling on behalf of

24    clients.

25    Q.  All right.  When did the ban take effect for Mr. Bank?

────────── P. Melley - Direct ──────────

1    A.   February 2010.

2           MR. BOSSE:  We can take that down.

3    BY MR. BOSSE:

4    Q.   I'd like to move on to Kent Maerki.  Did you also review

5    the CRD report for Mr. Maerki?

6    A.   I did.

7           MR. BOSSE:  Could we see Government's 4, please.

8    BY MR. BOSSE:

9    Q.   I'm going to bring you to Page 3, and if you can identify

10   this for the record.

11   A.   This is Mr. Maerki's CRD report.  And again, just showing

12   similar information in terms of his licenses and times in the

13   securities industry.

14          MR. BOSSE:  I'll offer Government's 4.

15          MR. GRINDROD:  No objection.

16          MR. YAROW:  No objection.

17          THE COURT:  It will be admitted.

18          (Government's Exhibit 4 was admitted.)

19   BY MR. BOSSE:

20   Q.   Looking down at Page 4, what examinations did Mr. Maerki

21   take, and when did he take them?

22   A.   Mr. Maerki, at one point, held three separate securities

23   licenses:  The S-1, or Series 1, which is the -- because he

24   took it in 1968, that was considered the predecessor of the

25   Series 7 that we've discussed here today, the, you know,

P. Melley - Direct

```
 1    entrance exam into the industry as a registered rep;
 2             He also passed, in '73, the S-00 or the Series 00,
 3    which is equivalent to today's Series 24, or the general
 4    securities principal, so it's a management or supervisory
 5    role for someone who already holds the 7;
 6             And then, finally, he had the Series 3, which is not
 7    a FINRA exam.  That, again, is the National Futures
 8    Association exam with regards to futures derivative products.
 9    Q.  And so the series -- so he passed both the basic, the
10    Series 7 and the management-level securities exam?
11    A.  Right.  That were in place at the time.  It just wasn't
12    called the Series 7.
13    Q.  Let's go, if we can, down to Page 7 of this document, and
14    please tell the jury what we're seeing here on Page 7.  What
15    happened to Mr. Maerki?
16    A.  This was an action that was filed by NASD, FINRA's
17    predecessor at the time, against Mr. Maerki resulting in
18    originally, in 1976, a suspension that was later determined
19    to be inadequate, and the DBCC, which was kind of a
20    predecessor of FINRA's hearing officers panel, they decided
21    to upgrade his sanction to a bar based on his actions in this
22    case.
23    Q.  So when was Mr. Maerki barred from the securities
24    industry?
25    A.  1977.
```

P. Melley - Direct

1    Q.   So from 1977 on, Mr. Kent Maerki was not supposed to be

2    involved in the securities industry?

3    A.   Correct.

4    Q.   Did you -- in preparing for this case, did you review

5    other court documents about Mr. Maerki showing that he had

6    gotten in trouble with other regulatory authorities?

7    A.   Yes.

8           MR. BOSSE:   Could we see, for the witness,

9    Government's 5.

10   BY MR. BOSSE:

11   Q.   If you can identify what we're seeing here in

12   Government's 5.

13   A.   This was an SEC complaint and action back in 1984, again,

14   between the SEC and Mr. Maerki as well as other parties.

15          MR. BOSSE:   I'll offer Government's 5.

16          MR. GRINDROD:   No objection.

17          MR. YAROW:   No objection.

18          THE COURT:   It will be admitted, Government's 5.

19          (Government's Exhibit 5 was admitted.)

20   BY MR. BOSSE:

21   Q.   And you've got the filing date is September 21 of 1984?

22   A.   Correct.

23   Q.   What court is this filed in?

24   A.   Northern District of California.

25   Q.   That's a federal court?

P. Melley - Direct

1   A.   Yes.

2   Q.   And along with some other entities and individuals, is

3   this the reference here that Kent Maerki was also named as a

4   defendant?

5   A.   Correct.

6   Q.   All right.  What is the name of the court order that's

7   being entered here?

8   A.   Permanent injunction, which is basically the sanction

9   against Mr. Maerki.

10  Q.   All right.  And what is Mr. Maerki barred from doing as a

11  result of this 1980s-era injunction?

12  A.   You mean in terms of what did he do, or what was he not

13  allowed to do after that?

14  Q.   Well, what was the SEC enjoining him from doing here?

15  And I'm thinking about part A down here.

16  A.   Basically, yeah, he's not allowed to engage in securities

17  transactions based on information that he provided -- false

18  information regarding this particular investment opportunity.

19  Q.   Okay.  And are these court filings, to your knowledge,

20  public documents?

21  A.   Yes.

22          MR. BOSSE:  Could we see, please, Government's 6,

23  for the witness.

24  BY MR. BOSSE:

25  Q.   What is Government's 6?

Carol L. Naughton, Official Court Reporter

P. Melley - Direct

1    A.   This is another filing in the Northern District of

2    California federal court, this time by the FTC, or Federal

3    Trade Commission, against the Cellular Corporation and other

4    defendants.

5    Q.   Do those other defendants include Kent Maerki?

6    A.   Correct.

7              MR. BOSSE:   I'll offer Government's 6.

8              MR. GRINDROD:   No objection.

9              THE COURT:   It will be admitted.

10             (Government's Exhibit 6 was admitted.)

11   BY MR. BOSSE:

12   Q.   And what is the filing year of this particular

13   stipulation?

14   A.   1986.

15   Q.   Again, is this federal court in California?

16   A.   Yes.

17   Q.   And the name of the regulatory agency here?

18   A.   Correct.  Federal Trade Commission.

19   Q.   And again, is this a publicly available document?

20   A.   It is.

21   Q.   And just to confirm, in addition to Kent Maerki, what is

22   this company that's listed in front of his name?

23   A.   Spectra Financial Corporation.

24   Q.   And are the other defendants the Cellular Corporation and

25   Cellular Capital Corporation?

P. Melley - Direct

1   A.  Yes.

2   Q.  I'm going to go down to -- forgive me.  I'm going to

3   scroll down a few pages.

4           And can you tell the jury, what is Mr. Maerki barred

5   from doing by the FTC as a result of the stipulation that he

6   entered into?

7   A.  Due to false statements that were made regarding certain

8   information regarding the investment, he was prevented from

9   engaging in this type of conduct going forward in terms of

10  soliciting new investment opportunities.

11  Q.  And was he particularly barred from telling people, as it

12  shows here, that they were "certain or substantially certain

13  to obtain parts of a cellular telephone license"?

14  A.  Correct.

15  Q.  And is he also barred, as a result of this stipulation,

16  from misrepresenting the value or profit potential of a

17  license awarded through the FCC lottery?

18  A.  Yes.

19          MR. BOSSE:  Could we see Page 9 of the document,

20  please.

21  BY MR. BOSSE:

22  Q.  And is he also barred from misrepresenting the degree of

23  risk involved in investments that he's touting?

24  A.  Correct.

25          MR. BOSSE:  Let me briefly look up to see if there

P. Melley - Direct

1    is anything else that I need to ask.  One moment, please.

2           (Pause in the proceedings.)

3           MR. BOSSE:  Going back to Exhibit 1, could we show

4    that again to the witness.

5    BY MR. BOSSE:

6    Q.  Is this a document that is publicly available as well?

7    A.  It is.  The information is available in terms of, you

8    know, going online to probably, you know, find information

9    regarding that information.

10   Q.  And can you tell the jury about FINRA's service called

11   BrokerCheck, generally?

12   A.  BrokerCheck is the public arm of CRD.  So the reports

13   we've looked at today are things as a FINRA staff member that

14   I'm able to gather and generate.  BrokerCheck is the public

15   version of that where anyone can go online to BrokerCheck.com

16   through the FINRA website and get similar information for

17   individuals and firms, whether it's their licenses, their

18   background with various employers.

19          The difference is, for BrokerCheck, you can only go

20   back ten years in time as opposed to what has been provided

21   today in the CRD reports which covers everything that

22   somebody has done, even if it goes back 20 or 30 years.

23   Q.  So from the 2010 to, say, 2018 time period, if one of the

24   other businessmen working with Mr. Bank wanted to look him

25   up, would they be able to look him up on BrokerCheck?

Carol L. Naughton, Official Court Reporter

P. Melley - Cross (By Mr. Yarow)

1  A.  Yes.  During that time frame, they could go back, and
2  they would get things ten years from the date they do their
3  search.
4  Q.  Would that show that Mr. Bank had been barred from the
5  securities industry?
6  A.  Absolutely.
7          MR. BOSSE:  No further questions.
8          THE COURT:  Cross-examination?
9                  CROSS-EXAMINATION
10 BY MR. YAROW:
11 Q.  Mr. "Melley"?  Did I get that right?
12 A.  "Melley."
13 Q.  "Melley," I'm sorry.
14         My name is Rick Yarow.  I represent David Alcorn.
15         MR. YAROW:  Would the government mind pulling up
16 Exhibit 4A.  I may have the wrong one.  It's Mr. Alcorn's
17 record.
18         THE WITNESS:  I believe this is it that we just
19 scrolled through.  I think you just have to scroll to the
20 third page.
21         MR. YAROW:  Go to Page 4, please.
22 BY MR. YAROW:
23 Q.  So you testified previously that Mr. Alcorn took these
24 series of tests and passed them in '81-'82 time frame?
25 A.  Correct.

P. Melley - Cross (By Mr. Grindrod)

1    Q.  Does it show a work history that Mr. Alcorn would have

2    put down?

3    A.  It doesn't show whether he was employed by any registered

4    brokerage firms at the time, just that he had taken these

5    exams at that time, back in '81 and '82.

6    Q.  Does it show whether or not Mr. Alcorn would have been

7    required to attend any continuing education after he took

8    these exams?

9    A.  Yeah.  At that time, the continuing education

10   requirements were not in place.  That didn't happen until the

11   late 1990s.

12   Q.  Okay.  And do these status dates have an end date that

13   you're able to tell from this document?

14   A.  You mean in terms of how long is the license good for?

15   Q.  Correct.

16   A.  Yeah.  The way it works is, once you have a license in

17   the industry, it's good for approximately two years.  After

18   that point, it expires unless you go to another employer or

19   renew.  So shortly after the '82 time frame, these licenses

20   would have expired or lapsed.

21   Q.  Okay.  And that's what this record reflects?

22   A.  Correct.

23           MR. YAROW:  Thank you.

24                     CROSS-EXAMINATION

25   BY MR. GRINDROD:

Carol L. Naughton, Official Court Reporter

P. Melley - Cross (By Mr. Grindrod)

1   Q.  Good morning, sir.

2   A.  Good morning.

3   Q.  So a couple times on direct examination you mentioned

4   folks working for a brokerage firm.

5   A.  Registered rep.

6   Q.  Right.  So if you're a registered rep, that doesn't

7   necessarily mean you, like, are employed, have a desk at some

8   big brokerage firm, right?

9   A.  Well, I don't know about the size of the firm, but if you

10  are licensed as a registered rep, it means you are working

11  for that particular brokerage firm and that you are allowed

12  to handle client accounts.

13  Q.  Right.  You could be, like, a 1099 contractor, right?

14  A.  No.  You are an official employee of that company as a

15  registered rep or stockbroker for that brokerage firm.

16  Q.  Let me ask it this way:  So --

17  A.  You're not a contractual employer.  You are a

18  full-fledged employee.

19  Q.  At the time that you have that job, right?

20  A.  Correct.

21  Q.  Okay.  And when we're talking about brokerage firms, I

22  guess what I'm asking is, that doesn't mean, like -- that

23  doesn't necessarily mean, like, the big brokerage firms on

24  Wall Street in New York, right?  There can be brokerage firms

25  elsewhere that maybe we don't think of as big brokerage

P. Melley - Cross (By Mr. Grindrod)

1   firms, right?

2          MR. BOSSE:  I object to the last part.  The first

3   part is fine, but who is thinking about what is a big or

4   small firm?  Speculation.

5          THE COURT:  Just rephrase your question,

6   Mr. Grindrod.

7   BY MR. GRINDROD:

8   Q.  So when we're talking about brokerage firms, we're not

9   necessarily talking about the big Wall Street in New York

10  brokerage firms, right?

11  A.  Right.  Not every firm is Morgan Stanley or Goldman

12  Sachs.  But again, in order to be a FINRA-registered

13  brokerage firm, you need to be approved by FINRA, so you need

14  to have the financial wherewithal in order to conduct your

15  business, and you have to go through a series of hoops, so it

16  still is a legitimate operation.

17  Q.  Right.

18  A.  But it could be a small size.

19  Q.  You put it better than I described it, so thank you.

20  A.  Sure.

21  Q.  And we talked about how FINRA has the power to impose

22  sanctions, like a ban or a bar from the securities industry,

23  right?

24  A.  Correct.

25  Q.  And also lesser sanctions, like a suspension?

P. Melley - Cross (By Mr. Grindrod)

1  A.  Correct.  FINRA is not a government entity, so the limit

2  of its authority is to kick people out of the industry.

3  Q.  And Kent Maerki got in trouble like that, right?

4  A.  He received a bar, correct, 1977.

5  Q.  From FINRA?

6  A.  Correct.

7  Q.  Same with Bank, Daryl Bank, same thing; he got in

8  trouble.  Different time, different background, but got in

9  trouble with FINRA, right?

10  A.  Correct.

11  Q.  And I think you discussed on direct, that wasn't related

12  to anything that happened from 2011 on, right?

13  A.  Correct.

14  Q.  And Mr. Smith never got in trouble with FINRA.  He wasn't

15  banned or barred or suspended or anything?

16  A.  He was not.

17  Q.  When we're talking about -- you talked a lot about the

18  rules that apply when someone is dealing in securities or

19  selling a security, right?

20  A.  Correct.

21  Q.  So, obviously, if someone is selling something that is

22  not a security, then the security regulations don't apply,

23  right?

24         MR. BOSSE:  Objection.  Calls for a legal conclusion

25  and also speculation.

P. Melley - Cross (By Mr. Grindrod)

1          THE COURT:  Well, objection overruled.

2          THE WITNESS:  Regardless of the investment, whether

3   it's a security or not, if that individual previously had a

4   license or fulfilled continuing education requirements

5   regarding the dos and don'ts of the industry in how one is

6   supposed to act with regard to investments, they are still

7   supposed to conduct themselves in a certain way.

8          Irrespective of the fact that what they are engaged

9   with at the time, whether it's deemed a security or not, if

10  they have the background in how to conduct themselves when it

11  comes to security investments, they know they are supposed to

12  be truthful, they know what the standards are that they are

13  supposed to conduct themselves.

14  BY MR. GRINDROD:

15  Q.  Sure.  I mean, whether you have a background in

16  securities or not, nobody is allowed to commit fraud, right?

17  A.  Right.  And everybody knows that, but those who are

18  committed to fulfilling his licenses and continuing education

19  requirements, it should be engrained in how they conduct

20  themselves going forward, whether it involves a security or

21  not.

22  Q.  Okay.  To keep a securities license or keep your

23  authority to be a registered rep, you just have to take, I

24  think you said, a continuing education course every two

25  years, right?

P. Melley - Cross (By Mr. Grindrod)

1  A.  Every two years while being employed by a

2  FINRA-registered firm.

3  Q.  And so that continuing education is not an additional

4  test, right?

5  A.  It's a series -- you would almost think of it as a test,

6  yes.  It's a series of computer modules covering compliance,

7  regulatory, ethics, sales practice.

8       Again, the continuing education requirement, because

9  I don't think I mentioned it fully earlier -- this is just

10 one part of it, this series of computer modules.  The firm is

11 also responsible for all the employees to provide various

12 things, like meetings with the compliance officer, other

13 literature, again, all with the purpose of providing what the

14 current trends, standards, and issues are.

15       Especially for individuals that may have taken an

16 exam years ago, it keeps them current so that they can

17 continue to have a proper relationship with their customers.

18 Q.  Fair enough.  But you said you can think of it as a test.

19 I guess, let me ask you this:

20       It's not something that you pass or fail, right?

21 A.  It's not a pass/fail, but in order to complete it, you

22 need to do, like, one module, answer it correctly in order to

23 move on to the next one.  But it's not scored for purposes of

24 I failed it and I have to go back.  You can't advance and

25 complete it until you do each section and answer the

P. Melley - Cross (By Mr. Grindrod)

1    questions that are required.

2    Q.  So if you just click through, you can go to the next

3    module?

4              MR. BOSSE:  That misstates what the witness just

5    said.

6              THE COURT:  Objection sustained.

7              MR. GRINDROD:  I'll move on, Judge.

8    BY MR. GRINDROD:

9    Q.  We talked about the Series 7.  I think you described it

10   as being a rigorous examination?

11   A.  Correct.

12   Q.  At the time, it was 250 multiple-choice questions; is

13   that right?

14   A.  Correct.  I think you had up to six hours to take it,

15   like a full day of multiple-choice questions, correct.

16   Q.  And what is the percentage you have to have to pass?

17   A.  70.

18   Q.  70?

19   A.  Correct.

20   Q.  So it's, like, a C minus?

21             MR. BOSSE:  Objection to that.

22             MR. GRINDROD:  I'm sorry, Your Honor.  I'll withdraw

23   it.  We all had different teachers.

24   BY MR. GRINDROD:

25   Q.  You don't have to have any special training to sit for

P. Melley - Cross (By Mr. Grindrod)

1  the Series 7, right?

2  A.  No.  You just have to, in order to want to pass it, and

3  especially if you're working for a registered broker, they

4  are investing in you to pass it, so they are going to give

5  you all the materials necessary to prepare properly.

6  Q.  Sure.  But you don't have to --

7  A.  Yeah, you don't have to have a business degree or a

8  financial background.

9  Q.  You don't have to have an MBA.

10  A.  No.

11  Q.  You don't have to have a college degree.

12  A.  No, you don't.

13  Q.  You can just take it if you have a GED?

14  A.  You can take it as long as you are sponsored by a

15  FINRA-registered firm who then will sign you up to take the

16  exam.

17  Q.  But education-wise, you can take it if you have a GED,

18  right?

19  A.  Yes.  You can take it with any background.  Again, it's

20  from the firm's perspective.  If they've hired you to take

21  it, they sign you up, and you take it.

22  Q.  That's what Mr. Smith has, a GED, right?

23  A.  I'm not sure of his educational background.  I don't

24  recall.

25  Q.  So 30 years ago, Mr. Smith presumably studied for this

D. Barry - Direct

1    multiple-choice test, right?

2    A.   30 years ago, he took the test, spent 16 years in the

3    industry with seven different firms, completed continuing

4    education requirements on five different opportunities, so,

5    over the course of that time, had the foundation knowledge of

6    how to operate in the securities industry and how to deal

7    with clients in a truthful manner and was aware of the dos

8    and don'ts of how to conduct himself.

9              MR. GRINDROD:  Fair enough.

10             No further questions, Your Honor.

11             THE COURT:  Any redirect?

12             MR. BOSSE:  No, sir.  This witness may be excused.

13             THE COURT:  Any objection to this witness being

14   excused permanently?

15             MR. GRINDROD:  No, Your Honor.

16             THE COURT:  Thank you for coming.  You may be

17   excused.

18             (The witness was excused.)

19             THE COURT:  You may call your next witness.

20             MR. BOSSE:  Your Honor, the government calls Debra

21   Barry.

22             (The witness was sworn.)

23             DEBRA BARRY, called by the Government, having been

24   first duly sworn, was examined and testified as follows:

25                         DIRECT EXAMINATION

────────D. Barry - Direct────────

1   BY MR. BOSSE:

2   Q.  Good morning, Ms. Barry.

3   A.  Good morning.

4   Q.  Could you please state your name for the record and if

5   you could spell your first name for us.

6   A.  Uh-huh.  It's Debra Barry.  D-e-b-r-a.

7   Q.  Is it B-a-r-r-y?

8   A.  B-a-r-r-y.

9   Q.  How old are you?

10  A.  I am 60.

11  Q.  And where are you from?

12  A.  Born and raised in Norfolk.

13  Q.  Where do you live now?

14  A.  We live in Chesapeake now.

15  Q.  Are you married?

16  A.  Yes.

17  Q.  To whom are you married?

18  A.  Wallace Barry.  He goes by Skip.

19  Q.  How long have you and Skip been married?

20  A.  22 years.

21  Q.  I'm guessing you are, from what you are wearing, but are

22  you currently working?

23  A.  Yes.  Currently work in occupational therapy, home

24  health, and I work two jobs.

25  Q.  How long have you been in the home healthcare field?

543

D. Barry - Direct

```
 1   A.   About ten years.
 2   Q.   And how about your husband?  Is he retired?
 3   A.   He is retired.
 4   Q.   What did Skip do before he retired?
 5   A.   He worked for Ford Motor Company at the assembly plant,
 6   and then when they closed that plant down, he went out in the
 7   community and did plumbing.  He worked commercial plumbing.
 8   Q.   You know we're going to talk about some investments here
 9   today.  Before the investments that we're going to talk
10   about, what kind of savings did you and Skip have put
11   together?
12   A.   I had -- my savings mostly were with my employer, USAA,
13   from previously, and his savings were from the Ford plant,
14   Ford savings.
15   Q.   How knowledgeable would you describe yourself and Skip,
16   if you know, about investment matters, thinking back to the
17   2010-2011-2012 time period?
18   A.   Not knowledgeable.
19   Q.   Had you ever been a member before of a limited liability
20   company?
21   A.   No, sir.
22   Q.   Had you ever been involved in the dentistry or wireless
23   spectrum businesses before?
24   A.   No, sir.
25   Q.   Did there come a time that you met a man named Daryl
```

D. Barry - Direct

1    Bank?

2    A.   Yes.

3    Q.   How did you first hear about Mr. Bank?

4    A.   My husband had heard -- on the radio, there was a

5    gentleman that advertised refinancing mortgages.  We went to

6    him.  I do not remember his name.  He was the one that told

7    us about Daryl.

8    Q.   When you went -- you went in to meet with Mr. Bank?

9    A.   Yes.

10   Q.   What did you go to meet with him about?

11   A.   I think the first time my husband had already invested

12   with him, and then I went back with my husband to meet Daryl

13   for the first time.

14   Q.   When you went to meet with him, what were you looking to

15   do?

16   A.   We had -- I had thought about investing with him, and

17   then after we talked to him, we decided I would go ahead and

18   invest with him as well.

19   Q.   So during the course of your conversations with him, did

20   you discuss what kind of investment you were looking for as

21   far as risk versus safety?

22   A.   No, not -- no, not really.  No.

23   Q.   Okay.  Did Mr. Bank become your investment advisor?

24   A.   He did.

25   Q.   And what sort of investment did he put you in initially?

D. Barry - Direct

1    A.   It was a Dental Support building investment.

2    Q.   How did he describe the Dental Support investment to you?

3    A.   I understood it was going to be very similar to something

4    my husband had been invested in previously.  It was like a

5    win-win.  It was just investing and getting returns,

6    basically.

7    Q.   Were you told that you would have to do any work as part

8    of this investment, finding patients for dentists, anything

9    like that?

10   A.   No, sir.

11        MR. BOSSE:  Could we see, for the witness, 249,

12   please.

13   BY MR. BOSSE:

14   Q.   Do you recognize what you're seeing here?

15   A.   Yes, sir.

16   Q.   What is this?

17   A.   It looks like an advertisement brochure with Mr. Bank and

18   Mr. Hudspeth.

19        MR. BOSSE:  I'll offer 249.

20        THE COURT:  Any objection?

21        MR. GRINDROD:  No objection.

22        MR. YAROW:  No objection.

23        THE COURT:  249 will be admitted.

24        (Government's Exhibit 249 was admitted.)

25   BY MR. BOSSE:

Carol L. Naughton, Official Court Reporter

D. Barry - Direct

1    Q.   Just tell the jury, is this a card you got in the mail
2    about Dominion Investment Group?
3    A.   Correct.  It was a mailer.
4    Q.   If I hold the curser over here, do you recognize who that
5    person is there?
6    A.   Yes, sir.
7    Q.   Who is that?
8    A.   Mr. Bank.
9         MR. BOSSE:  We can take that down.
10   BY MR. BOSSE:
11   Q.   Were you told anything when you spoke with Mr. Bank about
12   the dental investment about earlier investors in the same
13   product not getting returns on their franchises?
14   A.   No.
15   Q.   And do you remember seeing papers and documents about the
16   dental investment when you went in to speak with him?
17   A.   I do not remember, no.
18   Q.   Okay.  Let me show you, if I can, Government's 231, just
19   for the witness.
20        Does this refresh your recollection?  Does this look
21   familiar as something you may have seen before?
22   A.   Yes.
23   Q.   And I probably described it wrongly.  Do you remember
24   seeing this Investment Offering document with respect to the
25   DSPF Group investment?

Carol L. Naughton, Official Court Reporter

D. Barry - Direct

1  A.  I don't know if I remember specifically that.  I remember
2  kind of that logo.
3  Q.  Okay.
4        MR. BOSSE:  We can take that down.
5  BY MR. BOSSE:
6  Q.  When you were being described this investment, the Dental
7  Support Plus Franchise Group, were you told at any point by
8  Mr. Bank that the money that you were being asked to put into
9  it was going to be used to buy out earlier investors in
10 Dental Support Plus Franchise?
11 A.  Absolutely not.
12 Q.  Were you told that Mr. Bank would control your money when
13 it came into this LLC?
14 A.  No, sir.
15 Q.  And were you told that -- that's fine.
16       After you had heard from Mr. Bank, heard the pitch
17 that he was making, did you decide to make this investment in
18 Dental Support Plus Franchise Group?
19 A.  Yes.
20 Q.  Do you remember how much the investment was for?
21 A.  I believe it was for about 40,000.  It was straight out
22 of my USAA account.
23 Q.  That's where the money came from that you used to make
24 it?
25 A.  Yes.  Uh-huh.

Carol L. Naughton, Official Court Reporter

D. Barry - Direct

1   Q.   What sort of investment had that money been in before
2   with USAA?
3   A.   I had become vested when I worked for them, and I just
4   left it with them and just let it grow.
5   Q.   Okay.  Was it in a bank account?
6   A.   No.  It was in USAA.  Their investment people had it.
7   Q.   Had it grown over the years?
8   A.   Yes.
9   Q.   And that's the money that went to Mr. Bank?
10  A.   Yes.
11  Q.   Did you get statements after you made the investment
12  about your investment, statements about the status of the
13  investment?
14  A.   Yes, sir.
15  Q.   Where did those statements come from?
16  A.   I think initially it was -- I know Summit was one of
17  them.  It seems like Austin Capital was one.
18  Q.   Fair to say you got regular mailings from different trust
19  companies and other finance companies --
20  A.   Yes, sir.
21  Q.   I'll reask that.  I'll clean that up.
22          Is it fair to say that over the months after you
23  made the investment, you were getting regular statements from
24  different financial companies, possibly Summit Trust and you
25  mentioned Austin Capital?

549

D. Barry - Direct

1    A.   Yes, sir.

2    Q.   Did those statements ever show that the value of the

3    investment you had made with DSPF Group had fallen?

4    A.   I remember it stating mostly the same amount all the

5    time.

6    Q.   Of the $40,000 that you invested, did you get some of

7    that money back at one point?

8    A.   Eventually I contacted them and requested that I get what

9    was left in it, which was about $1,600.

10   Q.   So out of the 40,000, you were able to get back 1,600?

11   A.   Yes, sir.

12   Q.   Did you get anything else out of the investment?

13   A.   No, sir.

14   Q.   Did you get any monthly payments, payment streams from

15   patients going to dentists from that investment?

16   A.   No.

17   Q.   Other than the dental investment, did Mr. Bank pitch

18   other investment vehicles to you and to Skip?

19   A.   He spoke to Skip about a wireless spectrum company.

20   Q.   Okay.  I don't want you to tell me what he told to Skip

21   if you weren't there.  At any point did you and Skip go in

22   together to hear him talk about the wireless spectrum

23   investment?

24   A.   The one time that I invested with him, Skip and I were

25   together, and then he pitched to Skip that same day.

D. Barry - Direct

1    Q.   Okay.  All right.  So tell us what you remember hearing
2    Mr. Bank say about the spectrum investment and what that
3    opportunity was.
4    A.   It was cell towers and wireless business, and he
5    mentioned Sprint being -- getting ready to pull out of the
6    towers, and so there would be this availability.  He made it
7    seem like it was just such a smart thing to do and not a lot
8    of people knew about it.
9    Q.   Did he talk to you about the potential upside of the
10   investment, how it was going to make money or what kind of
11   returns you could expect?
12   A.   He told Skip it would take about two years before he saw
13   any type of return.
14   Q.   Do you know how much of Skip's requirement savings ended
15   up going into the spectrum investments?
16   A.   It was his entire savings.  It was $150,000.
17   Q.   And did you all ever get any return on the spectrum
18   investments that Skip made?
19   A.   No, sir.
20   Q.   Did you ever get that $150,000 back?
21   A.   No, sir.  And he -- Skip did call Daryl a couple times
22   and said he wanted out.  And Daryl told him he would have to
23   find someone to take his place if he wanted out.
24   Q.   That Skip would have to find someone?
25   A.   Yes, Skip would have to find someone.

D. Barry - Direct

1  Q.  Did there come a time after the investment was made that
2  you and Skip were invited to join conference calls about the
3  investment?
4  A.  Yes.
5  Q.  Do you remember joining any of those calls?
6  A.  I was on -- I was with Skip for a couple of them.
7  Q.  Can you tell us whatever you recollect about hearing on
8  those calls; who was speaking and what you heard.
9  A.  Initially, it sounded like people that were in charge of
10 finding the cell towers and locating them, and then towards
11 the end -- I might have listened to three calls, and then
12 people were allowed to talk initially --
13           THE COURT:  Excuse me.  You asked her for a bunch of
14 hearsay.
15 BY MR. BOSSE:
16 Q.  Who is speaking on the calls?
17 A.  The spectrum people, is all I understood, because they
18 were the ones that sent out the information saying if you
19 want to learn, be brought up to date on what's going on, you
20 can participate in this call.
21 Q.  Okay.  So the people on the calls giving the updates were
22 associated with the spectrum companies?
23 A.  Yes.  You dialed in, and there were multiple listeners on
24 the call.
25 Q.  So let's focus on what the people involved with the

D. Barry - Direct

1    spectrum companies were telling you, whatever you can

2    recollect.

3    A.  I just remember them saying --

4               MR. YAROW:  Your Honor, without foundation, it could

5    be hearsay.

6               THE COURT:  Sustained.

7    BY MR. BOSSE:

8    Q.  Were the people who were speaking on the calls associated

9    with the spectrum investments that Skip had made?

10   A.  That was our understanding, yes.

11              MR. BOSSE:  I don't know what other foundation I can

12   lay, Your Honor.

13              THE COURT:  I don't think that you can procure any

14   further information from her if she doesn't know who the

15   people were except they were associated with spectrum, and we

16   don't know who all of those people are, so I think you need

17   to move to something else.

18   BY MR. BOSSE:

19   Q.  Okay.  Don't tell me what anyone said.  I want to ask you

20   one thing that I don't think goes against what the Court

21   said.

22              On those calls, at any point -- don't say what

23   anyone said -- were other investors allowed to speak at one

24   point?

25   A.  Yes.

D. Barry - Cross (By Mr. Yarow)

1   Q.  Without saying what it was, did you hear anything that
2   was disturbing to you on those calls?
3   A.  Yes, sir.
4   Q.  And we'll leave it right there.
5        Did there come a time you found out that the
6   spectrum companies that you all had invested in had failed?
7   A.  I don't think we were ever told that they failed.  All of
8   a sudden it changed to a different type of investment.  It
9   went from wireless cell towers to handheld radios all of a
10  sudden.
11  Q.  Did anyone get your consent or Skip's consent to make
12  that change in the investment?
13  A.  No.
14        MR. BOSSE:  No further questions.  Thank you.  Stand
15  by, though.  They'll have more.
16        THE COURT:  Cross-examination?
17                    CROSS-EXAMINATION
18  BY MR. YAROW:
19  Q.  Ms. Barry, my name is Rick Yarow.  I represent
20  Mr. Alcorn.
21        When you met with Daryl Bank and he told you about
22  the spectrum -- I think that's what you referred to it as --
23  type of investment, did he tell you that you were buying as a
24  member of an LLC?
25  A.  No, sir.

Carol L. Naughton, Official Court Reporter

────────── D. Barry - Cross (By Mr. Yarow) ──────────

1    Q.  Did Mr. Bank tell you that what you were actually

2    investing in was the cost of applying for a license with the

3    Federal Communications Commission?

4           MR. BOSSE:  I object to that question because it

5    misstates the facts and the evidence to the extent that it

6    suggests that it's the cost of the application.

7           THE COURT:  Sustained.

8    BY MR. YAROW:

9    Q.  Did Mr. Bank tell you that you were investing in an

10   application to obtain a license from the Federal

11   Communications Commission?

12   A.  I don't recall that, no, sir.

13   Q.  Did Mr. Bank tell you that there may be certain things

14   that you would have to do affirmatively after you invested?

15          MR. BOSSE:  I object to that also because it -- I

16   think it misstates what is going to come out in this trial.

17          THE COURT:  Wait a minute.  The Court would simply

18   suggest that perhaps your question is based on facts that are

19   not in evidence.

20          MR. YAROW:  Okay.

21   BY MR. YAROW:

22   Q.  All that Mr. Bank told you about the investment was that

23   it was some type of spectrum and towers and eventually

24   radios?

25   A.  There was no mention of radios that I remember.

D. Barry - Cross (By Mr. Grindrod)

1    Q.  Sorry.  You said -- I thought you said -- I thought you

2    said radios.

3            MR. YAROW:  Okay.  That's all the questions I have.

4    Thank you.

5                        CROSS-EXAMINATION

6    BY MR. GRINDROD:

7    Q.  Good afternoon, ma'am.

8    A.  Hi.

9    Q.  I was hoping I could just get some timelines from you.  I

10   know this was a long time ago, so if you don't know the

11   answer, just say so.

12           Do you know about when the first time was that you

13   sat down with Daryl Bank?

14   A.  I don't -- 2012.  I'm not really positive.

15   Q.  Do you remember the last time that you gave him money or

16   invested in one of the things that he was pitching to you?

17   A.  It would have been the one time I met him.  So it would

18   have been that time.

19   Q.  Okay.

20   A.  I don't remember the day.

21   Q.  So you just made the one investment?

22   A.  Yes, sir.

23   Q.  You talked about things that your husband did too.

24   A.  Yes.

25   Q.  Based on just what you know, do you know when the last

———— D. Barry - Cross (By Mr. Grindrod) ————

1  time it was that your husband gave Daryl Bank money?

2  A.  I believe it was the same time.  It was the same meeting,

3  I believe.

4  Q.  That you did the dental and that your husband did the

5  spectrum?

6  A.  I believe, yes, sir.

7  Q.  Okay.  When you met with Daryl Bank, did you find him to

8  be personable?

9  A.  Yes.

10  Q.  Did he seem smart?

11  A.  He seemed flashy.

12  Q.  Flashy?

13  A.  Uh-huh.

14  Q.  And based on what he told you and your impression of him,

15  that's basically -- you were convinced enough to turn over a

16  substantial amount of money to him, right?

17  A.  Yes, sir.

18          MR. GRINDROD:  No further questions, Your Honor.

19          THE COURT:  Any redirect?

20          MR. BOSSE:  No, sir, Your Honor.  This witness may

21  be excused from our perspective.

22          THE COURT:  Does counsel concur?

23          MR. YAROW:  Yes.

24          MR. GRINDROD:  Yes, Judge.

25          THE COURT:  You may step down and be excused, ma'am.

557

─────────────── P. Yee - Direct ───────────────

1           (The witness was excused.)

2           THE COURT:  Next witness?

3           MS. YUSI:  Your Honor, the government is going to

4    call Phillip Yee by deposition.  And, Your Honor, if we can

5    pre-admit some exhibits that we talk about on the deposition?

6    We move to admit Exhibit 805, 807, 808, 809, 810, 812, 813,

7    and 814.

8

9           THE COURT:  Okay.  Exhibits 805, 807, 808, 809, 810,

10   812, 813, and 814 are admitted.

11          (Government's Exhibits 805, 807, 808, 809, 810, 812,

12   813, and 814 were admitted.)

13          MS. YUSI:  Thank you, Your Honor.

14          (Video deposition played in open court as follows:)

15          PHILLIP YEE, called by the Government, having been

16   first duly sworn, was examined and testified as follows:

17                     DIRECT EXAMINATION

18   BY MS. YUSI:

19   Q.  Thank you.  Good morning.  Could you introduce yourself

20   to the Court.

21   A.  My name is Phillip Yee.

22   Q.  How do you spell your last name?

23   A.  Y-e-e.

24   Q.  How old are you today?

25   A.  62.

————————P. Yee - Direct————————

1   Q.   And the city and state you live in?

2   A.   Fremont, California.

3   Q.   And where is that?

4   A.   That's south of San Francisco.

5   Q.   Do you currently work?

6   A.   Yes.

7   Q.   What do you do?

8   A.   I'm a Realtor, advertising designer, and contractor.

9   Q.   Okay.  And are you married?

10  A.   Yes.

11  Q.   Who is your wife?

12  A.   Michelle Yee.

13  Q.   How long have you guys been married -- how long have you

14  been married?

15  A.   35 years.

16  Q.   And while you guys have been working, have you been

17  saving money for retirement?

18  A.   Yes.

19  Q.   And where do you have that?  Is it in a 401, IRA,

20  savings?

21  A.   Both.

22  Q.   Do you have any background in investments?

23  A.   No.

24  Q.   Any training -- does your wife have any background or

25  training in investments?

P. Yee - Direct

1   A.   No.

2   Q.   I want to talk to you about the defendant Thomas Barnett,

3   or Tom Barnett.  Are you familiar with Tom Barnett?

4   A.   Yes.

5   Q.   How did you first come to know Mr. Barnett?

6   A.   First was my brother told me about him, and then I heard

7   him through the KFAX Christian radio show.

8   Q.   What is your brother's name?

9   A.   My brother's name is William Yee.

10  Q.   And you said you heard him on a Christian radio show?

11  A.   Yes.

12  Q.   Can you tell me about that?

13  A.   He was advertising a life insurance.

14  Q.   And so you heard Mr. Barnett on the radio program.  Did

15  he have his own program?

16  A.   No.  I think it was a commercial.

17  Q.   And did you call him?

18  A.   My brother gave me the information first.

19  Q.   And so did you end up meeting with Mr. Barnett in person?

20  A.   Yes.

21  Q.   Do you recall about when that was?

22  A.   2013.

23  Q.   Okay.  And did you meet with him in person?

24  A.   Yes.

25  Q.   Where did you meet with him?

P. Yee - Direct

1    A.   My wife and I at his office.

2    Q.   Where is that located?

3    A.   Sacramento.

4    Q.   When you met with Mr. Barnett, what did he say, if

5    anything, about his background?

6    A.   He does insurance, and he does some kind of finance

7    investment.

8    Q.   Do you understand what a fiduciary duty is?

9    A.   Yes.

10   Q.   What is it?

11   A.   Somebody that would tell me the truth, all the facts, and

12   not put anything behind the facts.

13   Q.   What was your understanding of any fiduciary duty that

14   Mr. Barnett had towards his clients?

15   A.   Just telling me the truth of the investment that I was

16   putting into.

17   Q.   All right.  Did you trust Mr. Barnett?

18   A.   At first I did.

19   Q.   How many times did you meet with him before you invested?

20   A.   Probably three times.

21   Q.   And what were you and your wife looking for in terms of

22   financial advice or investments?

23   A.   Well, the first time we went to him was for life

24   insurance, and there was a tool for, you know, investment

25   that we can take out money from our investment.

P. Yee - Direct

1    Q.   Through life insurance policy?

2    A.   Through life insurance policy.

3    Q.   Did you invest with him on that?

4    A.   Yes, I did.

5    Q.   And I want to talk to you about Dental Support Plus

6    Franchise Group or Dental Support Plus Group?

7    A.   Yes.

8    Q.   When did you first hear about Dental Support Plus Group?

9    A.   He told me about it.  He called me in and told me about

10   the franchise.

11   Q.   Is that -- who is "he"?

12   A.   Tom Barnett.

13   Q.   And I apologize.  I'm just trying to get --

14   A.   Right.

15   Q.   -- a straight record for this.  Mr. Barnett -- and how

16   long after you first invested with him do you think that was?

17   A.   Say a couple months or a month.

18   Q.   So about -- in 2013 still?

19   A.   2013, yeah.

20   Q.   What was your understanding of what Dental Support Plus

21   or Dental Support Plus Group was?

22   A.   It was a marketing company that targets the dental

23   offices that are people who are retiring, the dentists who

24   are retiring, and then the marketing comes in there to boost

25   the sales for the dentistry.

P. Yee - Direct

1    Q.   And how would you or how would an investor make money in
2    this group investment?
3    A.   Well, the extra -- once the dental practice is sold, they
4    make money from it.
5    Q.   Did -- did Mr. Barnett talk to you, or did you ask about
6    risk involved with this investment?
7    A.   Yes.
8    Q.   What was -- what did he say?
9    A.   He said there's some risk, but right now, it seems like
10   it's a win-win situation.
11   Q.   And what, if anything, did you know about Dental Support
12   Plus Franchises, which is a different investment?  Did you
13   talk about that at all?
14   A.   I didn't know anything about it in the beginning.
15   Q.   In the beginning.  Okay.  And did Mr. Barnett say
16   anything about a track record or if this was an ongoing
17   successful investment?
18   A.   Yeah.  He mentioned that it was -- started somewhere in
19   Arizona, it was doing real well, and they have, you know, a
20   dozen offices that are doing really well.
21   Q.   What, if anything, did Mr. Barnett say about fees or
22   commissions?
23   A.   He didn't mention too much about the fees and
24   commissions.
25   Q.   Okay.  Did anything strike you as costly in terms of fees

P. Yee - Direct

1    or commissions in terms of what you spoke about or what you

2    saw?

3    A.   Well, he kept on saying, well, if you invest now, it's,

4    you know -- in the beginning, it was 20,000 with your

5    brother.  Now with you in it, now it's up to $30,000.

6    Q.   Okay.  Just for one investment?

7    A.   Yeah, for one franchise.

8    Q.   What was the expected return based on what Mr. Barnett

9    presented to you?

10   A.   He mentioned something, like, it's a good, you know, 6 or

11   10 percent.

12   Q.   Return on your investment?

13   A.   Return on the investment.

14   Q.   And how quickly would you start realizing profits or

15   money from your investment?

16   A.   Within a year or two.

17   Q.   Did Mr. Barnett say anything -- what, if anything, did

18   Mr. Barnett say about if he had his own money in the

19   investment?

20   A.   I asked him that, and he said yes, he has a couple of

21   franchises he owns.

22   Q.   Did he say anything about how he was doing?

23   A.   He said they're doing well.

24   Q.   In terms of -- what was his suggestion about -- did he

25   give you any advice on whether or not you should do this?

564

P. Yee - Direct

1   A.  Well, he just told me that, you know, franchises are --
2   it can be risky, and it might be risky, but that right now,
3   it seems like it's a good thing.
4   Q.  All right.  I want to talk to you about, at first, how
5   much did you and your wife invest in Dental Support Plus
6   Franchise Group, or DSPF Group.
7   A.  The first franchise, it was about $30,000, I think.
8   Q.  All right.  I'm going to show you -- let's see -- what's
9   been marked as Government Exhibit 805.  If you can take a
10  look at that.  And it's an e-mail, so it's kind of backwards,
11  if you start from the back forwards.
12          What are the dates of these e-mails on Exhibit 805?
13  A.  May 17, 2013.
14  Q.  Let's look at the first page where it says from Tom
15  Barnett, tommylee@mstar.net.
16  A.  Right.
17  Q.  Do you recognize that e-mail address?
18  A.  Yes.  That's his e-mail address.
19  Q.  Tom Barnett's?
20  A.  Tom Barnett's.
21  Q.  And visualgraphics@comcast.net, whose is that?
22  A.  That is mine.
23  Q.  Does this appear to be a true and accurate representation
24  of e-mails between yourself and Mr. Barnett?
25  A.  Yes.

Carol L. Naughton, Official Court Reporter

P. Yee - Direct

1    MS. YUSI:  We move to admit Exhibit 805.

2    THE WITNESS:  Yes.

3    BY MS. YUSI:

4    Q.  So this is in May 2013.  And on Page 2 -- look at Page 2

5    of Exhibit 850 -- Mr. Barnett says, "Yes.  They're supposed

6    to send it.  I need two checks written.  First, 60,000 to

7    Minnesota Life for the new policy.  Second, 30,100 goes to

8    Summit Trust for the investment in the trust fund."

9    What is that referring to, if you know?

10   A.  That was transferring my old insurance -- old mutual

11   insurance into the Minnesota Life, and then, like he said,

12   30,000 goes in the Summit Trust Company.

13   Q.  Was that how much you all were putting into what he

14   called the trust fund?

15   A.  Yes.

16   Q.  I'm going to show you what's been marked for

17   identification as Exhibit 807, Government's Exhibit 807.  And

18   if you could look at Page 1 and Page 2.

19   Were you with your wife when she signed any

20   documents concerning these investments?

21   A.  Yes.  Just for this one.

22   Q.  Okay.  And if we look at Page 2 of Exhibit 807, is that

23   Michelle Yee, your wife's signature?

24   A.  Correct.

25   Q.  And what is the date of that?

P. Yee - Direct

1    A.  5/17/2013.

2         MS. YUSI:  And right now we'll move to admit

3    Exhibit 807.

4    BY MS. YUSI:

5    Q.  Now, this is the asset purchase investment account, and

6    on Page 1 of Exhibit 807, it says "DSPF Group LLC, 30 units

7    at 1,000 each," so for $30,000.  Was that --

8              (Pause in the video.)

9         MS. YUSI:  Sorry.

10             (Videotape resumed:)

11   BY MS. YUSI:

12   Q.  Now, this is the asset purchase investment account, and

13   on Page 1 of Exhibit 807, it says, "DSPF Group LLC, 30 units

14   at 1,000 each," so for $30,000.  Was that your first

15   investment or your -- that was your investment that you knew

16   of in DSPF Group?

17   A.  Yes.

18   Q.  And what, if anything, did Mr. Barnett say about where

19   this money would go to?  Would it be going to the investment

20   or -- or what did he say?

21   A.  The -- well, the remaining was supposed to go into the

22   insurance, and it's supposed to be liquid.

23   Q.  Okay.

24   A.  We can pull out any time.

25   Q.  That's the 60,000?

P. Yee - Direct

1   A.  Right, the 60,000.

2   Q.  All right.

3   A.  The 30,000 was to go to the franchise, the DSPF.

4   Q.  Did Mr. Barnett say anything about this money going into

5   a pool of investors?

6   A.  No.

7   Q.  What, if anything, did you know about your money being

8   used to pay off disgruntled investors in earlier DSPF

9   investments?

10  A.  No, none.

11  Q.  I'm going to show you what's been marked for

12  identification as Government's Exhibit 808.  And if you can

13  look -- just look through that, including the back page -- or

14  back two pages.  The second from the back of Exhibit 808, is

15  that again your wife's signature?

16  A.  Yes, it is.

17  Q.  And is it notarized?

18  A.  Yes.

19  Q.  And if we look at -- does this look like a true and

20  accurate copy of the Operating Agreement of the $30,000

21  investment you all made in May of 2013?

22  A.  Correct.

23         MS. YUSI:  We move to admit this at this time.

24  BY MS. YUSI:

25  Q.  Now, three pages from the end of the Operating Agreement,

Carol L. Naughton, Official Court Reporter

P. Yee - Direct

1   there's a signature page from Daryl Bank.  Had you all ever
2   heard of Daryl Bank when you were speaking with Mr. Barnett?
3   A.  He said he was the owner, CEO.
4   Q.  Of?
5   A.  Of DSPF.
6   Q.  Of the DSPF Group?
7   A.  Right.
8   Q.  Your investment?
9   A.  Yes.
10  Q.  Did he say anything about Kent Maerki?
11  A.  No.
12  Q.  Had you ever heard that name at that time?
13  A.  No.
14  Q.  After a few months or a year, you said a year or so, did
15  you start -- did you and your wife start making money on this
16  investment?
17  A.  None whatsoever.  I've been contacting him every -- every
18  two or three months calling for the annual reports.
19  Q.  This is Tom Barnett you were contacting?
20  A.  Tom Barnett, yes.
21  Q.  What did he say?
22  A.  He said, "Nothing is going out yet, and they're coming
23  soon.  You just have to wait until it comes."
24  Q.  What did he say, if anything, about how the investment
25  was going?

P. Yee - Direct

1   A.  He said everything was fine.

2   Q.  I'm going to show you what's been marked for

3   identification as Government Exhibit 809.  This is an e-mail

4   from February 2014.  Do you recognize these e-mails?

5   A.  Yes.

6   Q.  Are they between you and Mr. Barnett?

7   A.  Yes.

8          MS. YUSI:  We move to admit Exhibit 809.

9   BY MS. YUSI:

10  Q.  This is at the bottom of Page 1.  Mr. Barnett says,

11  "Phillip, good to hear from you.  Sorry for the delay in

12  getting back to you, but let me give you a quick update on

13  DSPF."  And it goes on to say, "David Bailey, the CEO of

14  WebOps, is finding ways to bring new clients to each

15  franchise."

16         Was there any indication that things were not going

17  well with your investment as of February 2014?

18  A.  No.

19  Q.  Talked to you about September 2014.  What did you find

20  out in September of 2014 about your investment?

21  A.  September, that's -- I think that's when he told me DSPF

22  went bankrupt.

23  Q.  Who told you that?

24  A.  Tom Barnett.

25  Q.  All right.  I'm going to show you what's been marked for

P. Yee - Direct

1    identification as Exhibit 810.  Is this another e-mail chain

2    between you and Mr. Barnett?

3    A.   Yes.

4    Q.   Is it from September 2010?

5    A.   Yes.

6    Q.   And on Page 2 --

7            MS. YUSI:  We move to admit Exhibit 810.

8    BY MS. YUSI:

9    Q.   On Page 2 of Exhibit 810, there's an e-mail from you

10   saying, "Hi, Tom.  How do we take our -- the funds in our

11   insurance to pay for the one that is due, Minnesota Life

12   Insurance, for Michelle?"

13           On Page 1, on September 10, 2014, Tom Barnett -- can

14   you read what the first couple sentences of what Mr. Barnett

15   said to you starting with "Phillip"?

16   A.   "Phillip, I am sorry for the delay in getting back to

17   you.  I was a bit confused on what you're referring to.

18   According to my records -- I could be wrong -- you only have

19   the one policy on Michelle."

20   Q.   All right.  What did you find out in September 2014 --

21   besides the DSPF, the 30,000, what did you find out about

22   your -- the other money that you have with Mr. Barnett?

23   A.   The rest of the money was still liquid, supposed to be at

24   the Summit Trust, is what I was told.

25   Q.   Okay.

P. Yee - Direct

```
 1   A.   And -- yeah, we didn't authorize anybody to take anything
 2   out of there.
 3   Q.   So what was your understanding of your entire investment
 4   into DSPF Group?
 5   A.   It was all lost.
 6   Q.   Well, was it -- what was -- when you guys invested, how
 7   much did you believe you had invested in DSPF Group?
 8   A.   30,000.
 9   Q.   I'm going to show you what's been marked for
10   identification as Exhibit 812.  Do you recognize Exhibit 812
11   and -- Page 1 and then the attachment?
12   A.   Yeah.  Yes.
13   Q.   Does it appear to be true and accurate?
14   A.   True.
15   Q.   Is that yes?
16   A.   But we didn't -- we didn't purchase two.
17   Q.   Well, I'm saying is this a true and accurate copy --
18   A.   Yes, it is.
19   Q.   -- of those documents?
20           MS. YUSI:  We move to admit Exhibit 812.
21           THE WITNESS:  Correct.
22   BY MS. YUSI:
23   Q.   Can you read the e-mail from Mr. Barnett on Page 1?
24   A.   Yeah.  "Phillip, I just got this form -- I just got this
25   from my contact at Dominion regarding the whole investment in
```

P. Yee - Direct

1    DSPF.  Michelle Yee actually has 71,000 in DSPF Group.  She

2    did two purchases.  One was for 30,000 on 6/5/13, and the

3    second was 41,000 on 7/15/13.  I have attached a statement of

4    her account from the opening until today so you can see all

5    of the transactions."

6    Q.  Okay.  We'll stop there.

7         If we look at Page 2, what is -- is this an account

8    statement from Summit Trust?

9    A.  Yes.

10   Q.  Had you all ever received any of these statements before

11   you got this e-mail?

12   A.  No.

13   Q.  And if we look at Page 3 of Exhibit 812, it says DSPF

14   Group.  The amount of shares is 71.  What was the total cost

15   that you apparently had in DSPF Group?

16   A.  71,000.

17   Q.  And did you know that you had 71,000 and not 30,000 prior

18   to Mr. Barnett telling you this on that day?

19   A.  No.

20   Q.  I'm going to show you what's been marked for

21   identification as Exhibit 813.  Do you recognize this

22   document?

23   A.  Yeah, I remember it.

24   Q.  Okay.  Does it appear to be a true and accurate copy of

25   that document?

573

P. Yee - Direct

 1   A.  It is a copy, yes.

 2           MS. YUSI:  We move to admit Exhibit 813.

 3   BY MS. YUSI:

 4   Q.  If we look at Page 1 of Exhibit 813, what is that check

 5   apparently for?

 6   A.  Summit Trust Company.  That's supposed to put the rest of

 7   the money in a liquid bank account, is what I thought it was.

 8   Q.  All right.  On Page 2 before -- had you ever seen this,

 9   that there was a DSPF Group apparently made by your wife for

10   41 units for $41,000?

11   A.  I don't think she -- no.  We didn't -- we didn't sign for

12   it.

13   Q.  Okay.  And so you -- you thought the 41,000 --

14   A.  I thought the 41,000 was supposed to go into the

15   insurance fund, is what we were thinking.

16   Q.  Okay.  And not until you found out that DSPF had gone

17   bankrupt or was --

18   A.  Right.

19   Q.  -- a failed investment did you find out you had 71,000?

20   A.  Right.

21   Q.  I'm going to show you Government Exhibit 814.  Do you

22   recognize this document, or have you seen this document?  And

23   if you look at the second to the last page.

24   A.  Yeah.  It looks like the first franchise that we

25   purchased.  They gave us the same -- the same piece of paper

P. Yee - Direct

1    here, right.
2    Q.  Does it appear to be your wife's signature on the second
3    to the last page of Exhibit 814?
4    A.  It appears to be.
5         MS. YUSI:  I'm going to move for admission of
6    Exhibit 814.
7    BY MS. YUSI:
8    Q.  Are there any dates on this document showing when your
9    wife signed this?
10   A.  No whatsoever.
11   Q.  And is it -- is it notarized?
12   A.  No.  That's -- that's my main concern.  The first one was
13   only notarized.  This one is not.
14   Q.  Okay.  And is it -- the initials on the first page, is
15   there a second spot and fully filled out for this Operating
16   Agreement of DSPF Group?
17   A.  No, none.
18   Q.  Where did the money come from when you all put the 30- --
19   the 30,000?
20   A.  It came from my retirement funds, my IRA.
21   Q.  And how about the extra 41,000 that you said was going
22   into kind of a liquid account with Summit Trust?  Where did
23   that -- did that come from the same place?
24   A.  Same place.
25   Q.  After you heard from Mr. Barnett, did he say -- what, if

Carol L. Naughton, Official Court Reporter

575

```
 1    anything, did he say about trying to get your money back, if
 2    at all?
 3    A.  He said if you invest more of your retirement funds with
 4    me, I can get it back within three to four years.
 5    Q.  Did he say how?
 6    A.  He said some other mutual funds that he can put together,
 7    within three, four years you will get your money back.
 8    Q.  What was your response?
 9    A.  I said, "No way."
10    Q.  And did you get any of your money back from either the
11    30,000 that you were aware of or the 41,000 that was -- that
12    ended up in --
13    A.  No.
14    Q.  -- DSPF Group?
15    A.  No.  None.
16         MR. GRINDROD:  This is Andrew Grindrod on behalf of
17    Aghee Smith.  No questions.
18              (The video concluded.)
19         MS. YUSI:  That concludes the deposition, Your
20    Honor.
21         THE COURT:  Okay.  Do you have another witness you
22    can start?
23         MS. YUSI:  I believe we do, Your Honor, we would not
24    be able to finish her, but we would suggest that we might be
25    able to take up some of the depositions that are remaining
```

1    prior to lunch.

2              THE COURT:  Okay.  Fine.

3              Ladies and gentlemen, we have some matters that the

4    Court needs to tend to, so you might have a little longer

5    lunch than usual.  We'll be back at 2:30.

6              (The jury exited the courtroom.)

7              THE COURT:  You may be seated.

8              Last night the Court reviewed the objections to the

9    depositions.  There were some the Court could not rule on

10   because the Court needed some additional information in order

11   to get context.

12             With respect to one deposition, one of the

13   depositions here, with respect to witness deposition KS,

14   there were some outstanding objections to the deposition by

15   the government in that particular deposition, and the Court

16   did not rule on all the outstanding objections, objection

17   number 67.  It was suggested that the Court needed to look at

18   certain pages of the deposition, and the Court has read the

19   deposition.  The Court is prepared to hear any argument that

20   counsel wants to make on that objection.

21             MS. YUSI:  Thank you, Your Honor.

22             For the Kent Sykes, or KS deposition, on Page 54, we

23   start kind of a relevance objection, and it's kind of a 403

24   matter as well, Your Honor.

25             Mr. Grindrod starts going into exhibits between

1    where I was -- I had received an e-mail directly from
2    Mr. Sykes -- he figured out my e-mail from online -- saying
3    that he thinks he was a victim.  I forwarded it to our
4    agents, Your Honor, and asked them to contact him.
5            And Mr. Grindrod goes on about -- well, I'd
6    rather -- Agent Bowers attempts to, I guess, respond to
7    Mr. Sykes saying, "I'd rather talk to you on the phone rather
8    than in writing.  What is a good number for you?"
9            And, Your Honor, we object, first of all, on the
10   relevance.  I don't think -- it's being forwarded to me.  I'm
11   not a part of this case, Your Honor, and Mr. Bowers is not a
12   witness in this case either, but the tone and how he asks
13   these continuing line of questioning, Your Honor, is
14   insinuating that the government has bad faith or that the
15   investigators have bad faith because they asked to speak with
16   him on the phone.
17           There's absolutely no basis at all in this entire
18   investigation that this is somehow a government -- that
19   there's any bad faith in the government here.  And to put me
20   into this e-mail -- and normally -- just so you know, Your
21   Honor, we normally redact my e-mail on this.  We just didn't
22   prior to the deposition for some reason, because it has no
23   relevance, it's not discoverable under Rule 16, and it was
24   inadvertently produced like that.
25           But there's nothing substantive.  I have no problem,

1    Your Honor, with the exhibit if it was redacted only to have

2    Mr. Sykes' statement in it, but to have my e-mail in it and

3    something that -- Mr. Grindrod, from Agent Bowers, suggesting

4    that we somehow have bad faith in trying to contact him on

5    the phone, we find that under 403 to be extremely

6    objectionable.  And the relevance to it -- there's just no

7    relevance to it at all.

8              THE COURT:  Thank you.

9         Mr. Grindrod, what's the relevance of the inquiry

10   about how the witness tried to contact Ms. Yusi and the agent

11   for purposes of this case?  What is the relevance of that?

12             MR. GRINDROD:  Your Honor, this line of questioning

13   is part of a larger line of questioning that is to establish

14   that early on, before Mr. Sykes had received information from

15   government investigators, he was describing himself as being

16   a victim of Daryl Bank, and that after he spoke with IRS

17   agents, his testimony, I believe, was that they told him they

18   were investigating Mr. Smith.

19             And then these e-mails show that early on, when he's

20   first contacting Ms. Yusi, he says, "I think I'm a victim of

21   Daryl Bank," and then later, obviously, he views himself as a

22   victim of Aghee Smith.

23             And so I'm not -- first of all, I would say with

24   respect to Ms. Yusi's e-mail, I don't think it's -- if that

25   gives the government an exceeding amount of heartburn, I

1    think it's fine.  Really the only point there was to show

2    that he reached out to the prosecutors and investigators.

3             The fact that Ms. Yusi had her agent follow up, I

4    think is relevant context for the subsequent conversation

5    that Mr. Sykes had with the agent, but if the Court thinks

6    that highly prejudicial -- I don't really see why it is, but

7    that's fine.

8             The fact that the agent says, "I can't give you any

9    more information over e-mail, but feel free to call me,"

10   again, I don't think is a suggestion of government

11   wrongdoing, but it shows why, A, that we don't have the

12   e-mails that show exactly what the agent told Mr. Sykes as

13   opposed to getting information from Mr. Sykes.  We just don't

14   have it because it was done over a phone call.

15            And it explains that after -- it lays the context

16   for the fact that after that phone conversation with the IRS

17   agent when Mr. Sykes was told that Mr. Smith was actually a

18   target of the investigation, that's when the tune changed,

19   and for him the case became about wrongdoing by Mr. Smith as

20   opposed to Mr. Bank.

21            MS. YUSI:  Your Honor, if I could just briefly

22   respond.

23            THE COURT:  Wait a minute.  Let him finish.

24            You may finish.

25            MR. GRINDROD:  Your Honor, I think I take most of

1    the government's objection today to be relevance rather than

2    hearsay.  The government can correct me if I'm wrong.

3    I'm happy -- if there is a hearsay issue, I'm happy to

4    respond to that, but I took Ms. Yusi's argument to be really

5    about relevance.

6            I'm happy to answer any questions the Court has.

7    That's my response.

8            THE COURT:  Anything else?

9            MS. YUSI:  I just want to say that if that was his

10   point, he didn't ask a single question about "Do you think

11   that you are a victim of Mr. Smith?  Do you think that?"  He

12   just uses this e-mail to insinuate, and he asks three times

13   about "This is the agent that told you to call him and not

14   e-mail him."

15           And the other issue about the hearsay, Your Honor,

16   he attempts to put in an e-mail and an article from the

17   *Virginian-Pilot* that he asked Mr. Sykes about, which is

18   complete hearsay.  And there's no relevance at all -- well,

19   it's hearsay, and it's not admissible.

20           THE COURT:  I've read the transcript.  If you were

21   raising this with me present, I would sustain the objection.

22           You can have a seat, Mr. Grindrod.

23           I would sustain the objection.  It's irrelevant.  It

24   does raise some implication.  It's accusatory.  It's

25   inappropriate.  I sustain the objection.  That whole line of

1    inquiry here, it's not coming into evidence.  It's not

2    relevant, and there is hearsay in here.

3           So I don't know what your intent was in trying to

4    question the witness about whether the witness has switched

5    to now falsely accuse Mr. Smith, but if that was intent, you

6    simply needed to focus in on the witness and the witness

7    previously thinking that it was Mr. Smith who defrauded him

8    as opposed to Mr. Bank, but to focus on that and not all this

9    exchange to and from about the agents calling and Ms. Yusi

10   and et cetera.

11          That's totally irrelevant, and it would not be

12   permitted had you raised it and the Court was sitting there.

13   It would have simply stopped it.  It's a waste in the

14   transcript.  So the Court sustains the objection to that line

15   of questioning.

16          Now, what you're going to use in this transcript, we

17   need to be clear.  This is a witness you're calling by

18   deposition.  What are you going to use in here?  I have

19   stricken all of that exchange, so the question is where are

20   you stopping in here in this transcript so there will be no

21   mistake about when this deposition will end and what is left

22   that Mr. Grindrod has raised that can be used.

23          Now, I did remember reading something in here where

24   Mr. Grindrod indicated that the witness previously believed

25   that he had been defrauded by Bank as opposed to Smith.  To

```
 1    the extent there's a narrow line in there where you can get
 2    to that, that would be permissible.  But all this other who
 3    struck John about the agents -- that's a common expression,
 4    excuse me, "who struck John" -- but what it boils down to is
 5    the relevancy about the calls to and from the agent and to
 6    Ms. Yusi, we're not even getting into that.
 7              So where are we starting and stopping?  What page
 8    did your examination stop on, Ms. Yusi?  I've looked in here,
 9    but I can't remember.
10              MS. YUSI:  Your Honor, my examination ends on
11    Page 39.
12              THE COURT:  Okay.  On Page 39.  And I think
13    somewhere in here -- I'm trying to figure out was it
14    Mr. Gantous or Mr. Grindrod?  Who took over?
15              MS. YUSI:  Mr. Grindrod.
16              THE COURT:  Mr. Grindrod, to the extent that there's
17    something in here that you are trying to show that this
18    particular witness initially accused Mr. Bank, you can
19    narrowly focus on those series of questions.  Identify where
20    it is, absent all this other inquiry the Court has just
21    stricken.  And I think you were over closer to Page 63, as
22    the Court recalls.  Somewhere around Page 63 it looks like
23    you finally got to the point.
24              MR. GRINDROD:  Your Honor, I think that on Page 56,
25    that's really what -- when I'm discussing his e-mail, that's
```

1   his own words, and in the e-mail, you know, starting on
2   Page 56, line 8, I am reading from his e-mail, and it says
3   that you described -- or in his first e-mail, he said, "I may
4   be a victim of Daryl Bank."  And he's asking whether his name
5   is on file with respect to Bank's investment.
6          So that's exactly what I was using the e-mail for.
7   I know the Court doesn't want Ms. Yusi and the agent
8   referenced, but I think his e-mail to Ms. Yusi or to
9   prosecutors is his own words phrasing it as being about Daryl
10  Bank, and I think that, even under the Court's ruling, should
11  come in.
12         MS. YUSI:  And, Your Honor, we have no objection to
13  his e-mail so long as everything else is redacted above that.
14         THE COURT:  Well, you can certainly question him on
15  the e-mail.  This is not about Ms. Yusi or the agent.  And so
16  the way you can do it is you can reference this e-mail.  Now,
17  I don't know where it goes down in the rest of the pages
18  here.
19         MR. GRINDROD:  And then, Your Honor, I think that
20  I'm getting at the same point on Page 62.  The witness talks
21  about doing investigation himself.  He says, "Just by what I
22  investigated myself and what he was involved in back in 2012
23  or whatever," and I -- and that's when the conversation comes
24  up that he -- the witness was Googling around online about
25  Mr. Smith, and that's when he found the *Virginian-Pilot*

584

```
 1   article.
 2         So, again, I think the point -- obviously we're not
 3   offering the Virginian-Pilot article that accuses Mr. Smith
 4   of a bunch of bad things he didn't do.  We're not offering
 5   that for truth.  We're offering it to show that when
 6   Mr. Sykes read that information, that's what put in his head
 7   that Mr. Smith -- or at least I should be able to ask a
 8   question about the fact that that influenced how he viewed in
 9   retrospect his dealings with Mr. Smith.
10         THE COURT:  You will have to deal with it in a very
11   general way, and I don't see where you dealt with it in a
12   very general way here in the transcript, since we are
13   confined to the transcript.
14         MR. GRINDROD:  Yes, sir.
15         THE COURT:  Where is it that you're talking about
16   you want to be able to inquire about his reading the
17   Virginian-Pilot?
18         MR. GRINDROD:  Yes, Your Honor.  So this is Page 62
19   starting at line 13.
20         THE COURT:  Let's see.
21         MR. GRINDROD:  And we could cut line 16 to 18 if
22   there's a problem with the, you know -- the part where I
23   asked about after the fact, after he interviewed with the
24   agent.  I think cutting everything else, there's no kind of
25   suggestion --
```

```
 1              MS. YUSI:  That's not a problem --
 2              THE COURT:  Wait a minute.  One of you all at a
 3    time.
 4              There's no what?
 5              MR. GRINDROD:  I was just going to say, I think
 6    there's not a -- in itself, that 16 to 18 section doesn't
 7    raise the concerns Ms. Yusi had.
 8              And then I go on to ask him, "So you started
 9    Googling Mr. Smith online?"
10              And he -- after an objection, he says, "Yes."
11              "And you found an article about him, right?"
12              THE COURT:  I don't see those lines.
13              MR. GRINDROD:  Page 62, starting at line 18.  "You
14    started Googling Mr. Smith online, right?"
15              There's an objection, but then his answer is "Yes."
16              "QUESTION:  You found an article online about him,
17    right?
18              "ANSWER:  Correct.
19              "QUESTION:  A Virginian-Pilot article?
20              "ANSWER:  Correct.
21              "QUESTION:  And it talked about Mr. Smith being
22    charged in this case, right?
23              "ANSWER:  Correct.
24              "QUESTION:  And the headline of that article, it
25    says 'This is what, quote, the Feds say,' right?"
```

1           THE COURT:  That's all the hearsay she's talking

2     about that you're trying to get in here.

3           MR. GRINDROD:  There's nothing offered for truth in

4     this, Your Honor, not a bit of it.  We contest that any of

5     that is true except for the fact that the article says what

6     it says.  The whole point is we disagree with the fact that

7     the government has accused him of a crime, but he's read

8     that, and he's relying on that.  It's forming his view.

9           I guess what I would say is, if the government

10    believes this is hearsay, what is the statement that they say

11    we are asserting for truth?  That's the threshold inquiry.

12          MS. YUSI:  Your Honor, the government is fine with

13    him saying that's the witness -- and the witness says, "I

14    don't recall that."  So I'm not sure what the purpose of that

15    is anyway.

16          MR. GRINDROD:  Well, because if you continue on,

17    Your Honor, then I show him Exhibit 514.  I say, "Do you

18    recognize this document?

19          "ANSWER:  That's the *Pilot* news article.

20          "QUESTION:  And that's the *Pilot* news article that

21    you found, right?

22          "ANSWER:  Right.

23          "QUESTION:  And the headline says --

24          "ANSWER:  Yeah.

25          "QUESTION:  -- 'This is what the, quote, Feds say,'

```
1   right?
2            "ANSWER:  Uh-huh.
3            "QUESTION:  Is that right?"
4            MS. YUSI:  Your Honor, I have no --
5            THE COURT:  Wait a minute.
6            MS. YUSI:  Sorry.
7            MR. GRINDROD:  "Is that right" --
8            "QUESTION:  Is that right, sir, for the record?
9            "ANSWER:  Yeah, yes.
10           "QUESTION:  And you forwarded that article to the
11   IRS agent, right?
12           "ANSWER:  I did.
13           "QUESTION:  And you said you called Mr. Smith a
14   scumbag, right?
15           "ANSWER:  I did."
16           So, Your Honor, I think that the next question, you
17   know, question 12 -- or starting at line 12:
18           "And the truth is, Mr. Sykes, that it was after you
19   read this article about what the Feds say and after you spoke
20   on the phone with the IRS agent -- that's when the case for
21   you became about wrongdoing by Mr. Smith, right?
22           "ANSWER:  Right."
23           I mean, there's more there, and I know the
24   government is going to say he walked it back, but I'm saying
25   that was the point of what I was trying to do.
```

```
 1              THE COURT:  Thank you.  You can have a seat.
 2              MS. YUSI:  Your Honor, we withdraw our objection to
 3      this portion of it.
 4              THE COURT:  Okay.  Well, you just got out ahead of
 5      the Court because the Court was going to allow him to do it.
 6              MS. YUSI:  Thank you.
 7              THE COURT:  Looking back at this transcript,
 8      hopefully we have gotten it straight here.
 9              MS. YUSI:  Yes, sir.
10              THE COURT:  Where are you going to start?  You're
11      going to start on Page 62.  Let's go up here.  What line were
12      you talking about again?
13              MR. GRINDROD:  I think it would be line 13.  Sorry,
14      Your Honor, I'll stand up.
15              THE COURT:  Start with the question.
16              MR. GRINDROD:  I'm sorry.  Well, it's tough to start
17      with the question because the government objects to my
18      question.  So I can start at 16, perhaps.
19              MS. YUSI:  That's fine with the government.
20              THE COURT:  Okay.  Start at 16, and we're going on
21      down.  We'll keep going down.
22              MS. YUSI:  And the remainders are unobjected to, of
23      all the highlighted things, Your Honor.  Well, until the end,
24      yes, the remainder until the already overruled objections.
25              THE COURT:  So we're going to keep going down to the
```

```
 1    end of the transcript.
 2              MS. YUSI:  Yes, sir.
 3              THE COURT:  At the end of the day, the jury is going
 4    to decide what they decide about what they believe and what
 5    they don't believe.  So that takes care of that one.
 6              The rest of it, from the beginning of your
 7    examination, Mr. Grindrod, down to Page 62, line 16, is
 8    stricken.
 9              MR. GRINDROD:  Not the whole thing, just the part
10    the government objected to, I assume, right?
11              MS. YUSI:  Correct.
12              THE COURT:  Let's be clear about what the government
13    is objecting to.  So we don't have any more problems, let's
14    go right on back to the beginning of your examination, which
15    was on Page -- well, any other objections that the government
16    had in there that the Court has already ruled on would be
17    excluded.
18              MS. YUSI:  Yes, sir.
19              THE COURT:  Now, the question is can you remember
20    exactly what the Court has ruled on?  The Court has ruled on,
21    I think, and overruled a lot of your objections in this
22    transcript.  Go back and look at what the Court put in place
23    last night.  The Court overruled your objections on Pages 17
24    through 18, 37, 38, 39.  The Court sustained the objection on
25    Page 32.
```

```
 1            MS. YUSI:  Yes, sir.

 2            THE COURT:  I thought there was a little bit too

 3   much packed in that question.  Okay.

 4            MR. GRINDROD:  So, Your Honor, just so we're clear

 5   here, the part that, I think, that is cut based on, you know,

 6   me asking about interactions with the agents, is that going

 7   to -- does that cut start on Page 56 about -- before line 16,

 8   I guess?

 9            THE COURT:  Let's go to Page 56.  What are you

10   looking at on 56?

11            MR. GRINDROD:  I'm just trying to -- so the part

12   that I think the Court sustained an objection to is sort of

13   bookended by parts that are coming in, and so I want to make

14   sure that we're on the same page as to when -- I'm allowed to

15   ask about what he said in the e-mail but not about the fact

16   that he then had a follow-up conversation with the agent.

17            So I think that somewhere in the neighborhood of

18   Page 56 is --

19            MS. YUSI:  Your Honor, I believe that --

20            MR. GRINDROD:  Or maybe --

21            MS. YUSI:  I think this is fine so long as you

22   redact everything above his e-mail, and then everything that

23   is highlighted, all the objections will be -- and you and I

24   can sift through this, Andrew, and make sure we're on the

25   same page, but I think we're fine through 17 because that's
```

1   when the other things start until Page -- where we started on
2   62.
3           THE COURT:  Okay.  I'll tell you what you do, the
4   two of you talk about it, and then you let the Court know
5   where you are.
6           MS. YUSI:  Yes, sir.
7           THE COURT:  And we'll get back in here probably
8   around about 2:15, and you tell me where you are so we can be
9   clear before we get started on where we're going.
10          MS. YUSI:  Yes, sir.
11          MR. GRINDROD:  Yes, sir.
12          THE COURT:  That means you have a short lunch.
13          MR. GRINDROD:  We'll work it out fast.
14          THE COURT:  Okay.  What else do we have here?
15          MS. YUSI:  We have Ms. Sharyon Bean.  There's two
16  objections that are Mr. Grindrod's objections, on Page 36 and
17  42, that the Court required more clarity in order to make a
18  ruling.
19          THE COURT:  Oh, yeah, that was Sharyon Bean.  Let me
20  pull it back up here, Page 36 and 42.  The Court was trying
21  to get the full substance of the objection there,
22  Mr. Grindrod.
23          MR. GRINDROD:  I'm sorry, Your Honor is asking for
24  clarity as to what the objection is?
25          THE COURT:  Yes.

```
 1              MR. GRINDROD:  So this is obviously a carryover on

 2    Page 35, and the question was about what Mr. Smith's purpose

 3    was, why he gave her a document.  I think that she can't

 4    speak to what Mr. Smith's motivation was.  It was a

 5    speculation or lack of personal knowledge objection there.

 6    She can testify as to what he did, but not why he did it.

 7              THE COURT:  Ms. Yusi, do you want to respond?  We're

 8    looking down at the question starting on line 23 on Page 35.

 9              MS. YUSI:  Yes, Your Honor, I'm looking at, I

10    believe -- let's see.  I asked what was her understanding as

11    to why he gave it to her.

12              THE COURT:  Okay.  What was her understanding?

13              MS. YUSI:  Yes.

14              MR. GRINDROD:  But, Your Honor --

15              THE COURT:  Not what was his reasons for giving it

16    to her, but what was her understanding.  "Why do you believe

17    you had it?"  That's a different question; why did she

18    believe she had it versus why did he do it.

19              MR. GRINDROD:  Let me just read from the transcript

20    here just so we're all on the same page.  So the question is:

21              "QUESTION:  Okay.  And what was he -- what was your

22    understanding of the purpose of this?  What was he -- what

23    did he give it to you -- why did he give it to you?"

24              THE COURT:  Okay.

25              MR. GRINDROD:  So that is asking why Mr. Smith did
```

593

```
1    something.  She can ask what he did, but that's asking for
2    speculation as to why he did something.
3              THE COURT:  The Court will sustain that on "why did
4    he give it to you," because she cannot penetrate his mind,
5    scrutinize his mind, so I sustain that part.  The question is
6    multitiered here.
7              The question is "what did he give it" -- the Court
8    is going to sustain the objection on that question.  I don't
9    see how to clean that one up.  I don't know how much it adds
10   any way.  So question 23, the objection to that is sustained.
11   We can move on to something else.
12             MS. YUSI:  Page 42, Your Honor.
13             THE COURT:  Let's see if we can get some clarity on
14   Page 42.
15             Well, the Court didn't understand your objection,
16   Mr. Grindrod.  That was the problem the Court had.  I don't
17   understand the relevancy objection here.
18             MR. GRINDROD:  So this was a relevance objection to
19   the government introducing account statements from a
20   Provident Trust Group account from 2019, which was -- I mean,
21   the conspiracy, alleged conspiracy, ended in --
22             If the government could remind me what the
23   indictment says.
24             THE COURT:  2017.
25             MR. GRINDROD:  '17.  I mean, the charges were filed
```

594

1    in '19.  I'm not sure what the relevance of an account

2    statement from 2019 could possibly be to issues that were

3    well over by then.

4            MS. YUSI:  Your Honor, these account statements were

5    showing many of these clients, including Ms. Bean -- that she

6    still had all her money in that account, that it was valued

7    at the same amount that she originally put in there, through

8    2018 and part of 2019.

9            THE COURT:  So nothing had changed?

10           MS. YUSI:  No.  No, Your Honor.

11           MR. GRINDROD:  And, Your Honor, I don't think I

12   would raise an objection if it was during the time period of

13   the alleged conspiracy.  The problem is now we're talking

14   about what happened years after the conspiracy.  If

15   there's -- if Mr. Smith or any of his co-defendants had gone

16   around making changes to what was -- what account statements

17   reflected in 2019, they'd be facing more charges.

18           MS. YUSI:  Your Honor, it was part of a lulling, and

19   second of all, this Provident Trust Group that's telling her

20   she still has $100,000 in there is charging her $400 a year

21   in order to have her money in there, and there's nothing in

22   there.  It's just continued lying and lulling of the

23   investors.

24           THE COURT:  So what you're saying is the conspiracy

25   and the acts are continuing past the dates that you allege

Carol L. Naughton, Official Court Reporter

595

```
 1    the conspiracy occurred?
 2              MS. YUSI:  Yes, Your Honor.
 3              THE COURT:  The Court sustains the objection.  I
 4    don't know how critical this is to your proof, but it's
 5    through August 2017, and to avoid any issues, we don't get
 6    hung up on small things, and I don't know if this is not that
 7    critical to your proof, so the Court will sustain the
 8    objection to this.
 9              All right.  Anything else?  What else did we miss
10    here?
11              MS. YUSI:  I think that's it from your ruling, Your
12    Honor.
13              THE COURT:  Okay.  That's it.
14              MR. GRINDROD:  I just would point out I don't
15    believe the Court has ruled on our broader objection to all
16    these being offered.  So I just --
17              MS. YUSI:  He did.
18              MR. GRINDROD:  Oh, he did?  I'm sorry.  There's been
19    a lot of orders.  My mistake, Your Honor.
20              THE COURT:  Well, I don't know whether you were
21    sleeping, but I wasn't sleeping last night.
22              Now, you did raise another broad 404(b) matter that
23    the government has not responded to at this juncture, and the
24    Court hasn't had an opportunity to look at it, to tell you
25    the truth.
```

```
 1            MS. YUSI:  Is this the bankruptcy information that
 2    we already talked about, Your Honor?
 3            THE COURT:  Maybe that's it.
 4            MS. YUSI:  And, Your Honor, we would request that
 5    the disk that has not been entered, it's Exhibit 1215, and we
 6    ask that the Court listen to that for its relevancy and how
 7    it's inextricably intertwined.
 8            THE COURT:  Hold on a second.
 9            (Pause in the proceedings.)
10            THE COURT:  You might want to take a look at that
11    motion because there's more than just the bankruptcy issue
12    that's raised in it and -- take a look at it.
13            MS. YUSI:  Yes, sir.
14            THE COURT:  I don't know at what point we're going
15    to bump up against what is being raised in that motion, so
16    hopefully we won't bump up against it before this afternoon,
17    so maybe the weekend the Court can get a chance to, really,
18    fully read it, and you can maybe respond to it if you want to
19    respond to it.
20            MS. YUSI:  Yes, sir.  We'll take a look at it over
21    lunch and see if anything has come up.
22            MS. O'BOYLE:  Your Honor, I think, just briefly, in
23    the trial brief, the government focused on the Dazzle Dental
24    issue which we believe is inextricably -- it is entwined, and
25    we also focused on the bankruptcy issue, because those are
```

1    the two key points for us that we think are not 404(b) at

2    all, but we disclosed it in an abundance of caution.

3          The rest of our 404(b) notice, right now we are

4    focused, as the Court may tell, on streamlining this

5    evidence, getting this case in.  It's quite possible that

6    none of the other matters that we focused on in our 404(b)

7    will even come up and so -- but what I would say is, before

8    we actually go there, we would give -- if we have a witness

9    that is going to do that, we would alert the Court that this

10   is going to be an issue, because, for example, the Cullins

11   Asset Group, beyond just maybe -- if a witness says, "I also

12   invested in Cullins," the government doesn't intend to go

13   into everything related to the Cullins Asset Group.  It

14   doesn't intend to present that evidence in its case in chief.

15         If the defendant decides to take the stand, we think

16   that is probably a very pertinent area of cross-examination

17   given the nature of the investment and that it was also with

18   Mr. Bank and that he continued to offer it for a long period

19   of time, but we think that is a different issue if Mr. Smith

20   decides to take the stand.

21         THE COURT:  That reminds the Court.  There was some

22   objection about references to Northridge Holdings, and the

23   Court's view on that is, just as an abundance of caution, the

24   Court would not have to go into it, but if the defendant gets

25   on the stand and denies any fraudulent intent, then certainly

1    it will come into as rebuttal evidence.

2           With respect to Dazzle Dental, the Court believes

3    that is intrinsic to this whole conspiracy, so the Court

4    rejects the objection that that is 404(b) evidence.  I know

5    that it was kind of challenged in that way, but I'm just --

6    you don't think -- you didn't challenge it?

7           MS. McCASLIN:  We did not challenge Dazzle, Your

8    Honor.

9           THE COURT:  Oh, okay.

10          MS. O'BOYLE:  I thought they had challenged Dazzle.

11   Mr. Grindrod did open on it, so I kind of presumed at that

12   point --

13          THE COURT:  That's fine.

14          MR. GRINDROD:  Just to be clear, the 404(b) issue

15   raised a general deficiency in a notice, but we didn't raise

16   a challenge to just Dazzle on substantive grounds, Your

17   Honor.

18          THE COURT:  You have to be specific.  You say

19   general.  We need to know specifically what you're objecting

20   to, what 404(b) evidence you're objecting to so we can deal

21   with it.

22          MR. GRINDROD:  That's what I'm saying, Your Honor.

23   The issues that we identified by bullet point, I think it's

24   pretty clear.  If it's not, Your Honor, definitely let me

25   know, but I think it's pretty clear what we're saying should

1    be kept out of 404(b).

2           THE COURT:  The Court is going back to look at the

3    last filing to which the government has not responded and see

4    where we are on it.  We'll be in recess until 2:15 so we can

5    find out what you worked out.

6           (Recess from 1:15 p.m. to 2:23 p.m.)

7           THE COURT:  Okay.  Ms. Yusi, Mr. Grindrod, are we

8    good to go?

9           MS. YUSI:  We are, Your Honor.

10          THE COURT:  The Court was counting on it.

11          MS. YUSI:  Yes.

12          THE COURT:  All right.  Bring in the jury.

13          Hold up a second.

14          As I understand it, you have a witness that might be

15   coming in late today?

16          MS. YUSI:  Yes, Your Honor, he's been stuck for two

17   days coming from California.  He was delayed again.  He's

18   supposed to be arriving at Norfolk about 4:15.  We're having

19   an agent pick him up and blue-light him to the courthouse,

20   and so we're going to try to get him on today, if at all

21   possible, Your Honor.  He has knee surgery scheduled for next

22   week and needs to get back to California.

23          THE COURT:  All right.

24          MS. YUSI:  Thank you.  And, Your Honor, we're going

25   to give an update at the break.

————————R. Eads - Direct————————

1           THE COURT:  Okay.

2           (The jury entered the courtroom.)

3           THE COURT:  The record will reflect that all jurors

4   are present this afternoon.

5           Does counsel agree?

6           MS. YUSI:  The government agrees, Your Honor.

7           MR. YAROW:  Mr. Alcorn agrees.

8           MS. McCASLIN:  Mr. Smith agrees.

9           THE COURT:  All right.  You may call your next

10  witness.

11          MS. YUSI:  Thank you.  Your Honor, we call Rosie

12  Eads.

13          (The witness was sworn.)

14          ROSIE EADS, called by the Government, having been

15  first duly sworn, was examined and testified as follows:

16                      DIRECT EXAMINATION

17  BY MS. YUSI:

18  Q.  Good afternoon, Ms. Eads.  I'm over here.

19  A.  Hi.  I didn't see you.

20  Q.  Could you introduce yourself to the Court.

21  A.  My name is Rosann Helen Eads.

22  Q.  How do you spell your last name?

23  A.  E as in every, A as in apple, D as in dog, S as in syrup.

24  Q.  And how old are you today?

25  A.  I'm 80, and I'll be 81 next Friday.

R. Eads - Direct

1   Q.  Are you married?

2   A.  Yes, I'm married.

3   Q.  What is your husband's name?

4   A.  Bill Joe Eads, Sr.

5   Q.  Bring the microphone right in front of you so everyone

6   can hear you.

7           Your husband is Bill Eads?

8   A.  Bill Eads, Sr., because there's a junior and a III.

9   Q.  In what city and state do you live?

10  A.  Lincoln, California.

11  Q.  Is that outside of Sacramento?

12  A.  Yes.

13  Q.  How long have you lived in Lincoln?

14  A.  Since 2003.

15  Q.  Do you work?

16  A.  Yes, I do.

17  Q.  What do you do?

18  A.  We own Bill Eads RVs Inc., and I do whatever I'm told.  I

19  have a home office, so I always get the big projects.

20  Q.  Is this a company you and Mr. Eads own together?

21  A.  Yes.

22  Q.  And what does the company do?

23  A.  I'm sorry -- the company retails recreational vehicles.

24  Q.  How long have you all been in business?

25  A.  Since 2014.

─────────── R. Eads - Direct ───────────

1   Q.  And prior to being involved with the RV business, did you

2   work before that?

3   A.  Yes, I did.  I lived in Portland, Oregon, and I was an

4   insurance underwriter.

5   Q.  Did your husband work prior to the RV business?

6   A.  He's been in the RV business forever.

7   Q.  So before he owned his own business, he was in the

8   business?

9   A.  Yes.

10  Q.  How long have you been married?

11  A.  30 years.

12  Q.  And while you all have been working, did you save money

13  for retirement?

14  A.  Not enough -- not enough.  Yes, we saved, but we didn't

15  save enough.

16  Q.  And what did you save?  What kind of vehicles or accounts

17  did you save for retirement?

18  A.  What kind of vehicles?

19  Q.  Well, did you have an IRA or a 401?

20  A.  We don't have 401s.  We have savings.  We have some

21  stock.

22  Q.  Okay.

23  A.  That's about it.

24  Q.  Do you have any background in investments?

25  A.  No.

Carol L. Naughton, Official Court Reporter

603

———R. Eads - Direct———

1    Q.  Does your husband?

2    A.  No.

3    Q.  Would you consider yourselves sophisticated investors?

4    A.  No.

5    Q.  I want to talk to you about a man named Bill Smith.  Do

6    you know Bill Smith?

7    A.  Oh, yes.

8    Q.  And how did you and your husband first hear about Bill

9    Smith?

10   A.  Bill heard an advertisement on a radio station for

11   seniors to invest in this program, and then they would make

12   tons of money.

13   Q.  Do you see Mr. Smith in the courtroom today?  I know

14   there's a lot of screens.

15   A.  I guess -- I guess he would be the guy with the white

16   hair.  I really don't know.

17   Q.  That's fine.

18   A.  It's been a long time since I've seen him.

19   Q.  That's fine.

20        So you said there was a radio show that was talking

21   about an investment for seniors.  Was this Mr. Smith's radio

22   show?

23   A.  Yes.

24   Q.  And --

25   A.  It was an investment show, is what Bill explained to me.

─────────────── R. Eads - Direct ───────────────

1    He heard it on the radio.

2    Q.  What kind of radio show or radio station was this, if you

3    know?

4    A.  I'm sorry?

5    Q.  Was it an AM or an FM?

6    A.  I have no idea.

7    Q.  Do you know what particular investment he was talking

8    about?

9    A.  He just talked about -- Bill said on the radio that you

10   should come and see him because he had ways to make money

11   very quickly and it was guaranteed and it was very safe,

12   something like that.

13   Q.  Now, in the fall of 2012, did you and your husband reach

14   out to Mr. Smith?

15   A.  Bill made an appointment, and we went over to see him,

16   yes.

17   Q.  In what city was Mr. Smith's office?

18   A.  Rosedale, California.  Which we live in Lincoln and it

19   was probably 20 minutes away.

20   Q.  And how many times do you think you and your husband met

21   with Mr. Smith?

22   A.  I'm going to guess five or six.  Filling out papers, even

23   going to the banker -- the bank to meet some other person to

24   set up a bank account.

25   Q.  And what did Mr. Smith tell you about his background, his

R. Eads - Direct

1    professional background?

2    A.   He was very versed in investments and investing money and

3    was very successful in -- people who invested with him were

4    making a lot of money.

5    Q.   Did he say how long he had been working in the investment

6    environment?

7    A.   I don't recall if he said how long.  Sorry.

8    Q.   That's okay.

9         Eventually after meeting him, did you and your

10   husband trust Bill Smith with your money?

11   A.   Eventually -- I'm sorry?

12   Q.   Did you trust Mr. Smith with your money?

13   A.   I didn't, but Bill did.  I'm married to him.  So, yes, he

14   thought it sounded really wonderful.

15   Q.   And we'll get into details as to --

16   A.   Bill is a salesman, and this guy is a salesman, so there

17   you are.

18   Q.   What were you and your husband looking for in terms of

19   financial advice?

20   A.   Well, someone who could point you in the right direction,

21   like a financial advisor, which is more or less what he said

22   he was, and that you could invest in certain products, like

23   certain stocks, and you could make money on it long term or

24   short.  Long term would be best.

25   Q.   And were you looking for money for your retirement?

Carol L. Naughton, Official Court Reporter

R. Eads - Direct

1   A.   Yes, for retirement, that's all, not to get rich quick.

2   Q.   What was your comfort level with risk in your money?

3   A.   My comfort level was 25,000.

4   Q.   In terms of risk, were you willing to lose that 25,000?

5   A.   No.  But Bill was, so, okay, I went along with that.  I

6   was late to one of the appointments, and by the time I got

7   there, he talked him into 50-.

8   Q.   We'll get there in a little bit.

9   A.   Okay.

10  Q.   What did Mr. Smith say in terms of the risk level of this

11  particular investment?

12  A.   It was very low.  Because they had people who found the

13  dentists to join this dental franchise, and every time a

14  dentist joined your particular franchise, you got paid.

15  Q.   Was that the Dental Support Plus Franchise investment?

16  A.   Yes.

17  Q.   And is that the investment you spoke to Mr. Smith about?

18  A.   I'm sorry?

19  Q.   Is that what you all were talking to Mr. Smith about?

20  A.   Yes, the dental franchise program, yes.

21  Q.   What did Mr. Smith say regarding who was in charge of the

22  Dental Support Plus Franchises?

23  A.   He said the man at the top was Kent Merck, M-e-r-c-k, or

24  something like that.  And he was in Arizona, and he was

25  heavily invested in this.  He's the one that found the

R. Eads - Direct

1    program, and he was very, very satisfied with it, and he

2    worked under him, and other people did, too, finding

3    investors.

4    Q.   Okay.  And did he say anything about Mr. Maerki's

5    experience with this investment?

6    A.   He was very experienced.  He had been in many, many

7    investment programs and made very successful profits for

8    investors.

9    Q.   Did Mr. Smith ever describe himself as only a solicitor

10   for these investments, that he --

11   A.   No.  He said he was involved personally himself.

12   Q.   What did he say about that?

13   A.   He said he personally had invested his own money, he and

14   his wife, and they were very satisfied, and they were getting

15   paid already.

16   Q.   Did that make you feel more comfortable with the

17   investment?

18   A.   It made Bill feel more comfortable.

19   Q.   And that's Bill, your husband?

20   A.   Yes, Bill Eads.

21   Q.   Thank you.

22          Did Mr. Smith show you any materials about DSPF or

23   the franchise?  Did he show you any papers or anything like

24   that?

25   A.   Oh, yes.  He showed us all kinds of papers how you make

R. Eads - Direct

1    the money and how the money would double as you went along

2    through the years.  And, also, he had other papers that he

3    showed us that were other investments, and then he said,

4    "First we'll look at this, but when you're ready, we'll look

5    to these others because these are fairly quick as far as

6    return."

7    Q.  And what did he say in terms of the timing for this

8    investment in terms of when you would start seeing money?

9    A.  As soon as the dentists -- and they had people out there

10   looking for the dentists.  As soon as the dentists came in,

11   no matter when, the minute they did, you could -- you were

12   starting to get paid.  You could also find dentists

13   yourselves if you wanted to.

14   Q.  Okay.  Was that a requirement?

15   A.  No, but you just had the choice.

16   Q.  Okay.  And when you say that it would come in quickly, do

17   you remember how much money he said would be coming in

18   regularly or annually?

19   A.  I don't recall that, but I think it was, like,

20   substantial.  I'm not going to guess.  I don't recall.

21   Q.  Sure.

22   A.  Okay.

23   Q.  Did he talk about how much money he would make or the

24   commission that he would make from his money -- or from the

25   money that he got from you all?

609

R. Eads - Direct

1   A.  I don't remember him ever talking about his commission.

2   I'm sorry about that.

3   Q.  That's okay.

4          What about fees that the Dental Support franchise

5   company would take out?  Did he discuss those?

6   A.  No fees.  I never heard anything about fees.  My fee was

7   $50,000.  I never heard anything else.

8   Q.  We'll talk about the exact amount you gave him.

9          Now, did Mr. Smith tell you how long he had been

10  selling these investments with Dental Support Plus?

11  A.  How long?

12  Q.  Yeah.

13  A.  I would say -- I don't recall.

14  Q.  Did he talk to you about having sold a previous

15  investment called Dazzle Dental?

16  A.  Called what?

17  Q.  Dazzle Dental.  Have you ever heard that?

18  A.  No.

19  Q.  Now --

20  A.  Now, that could have been one of those on that piece of

21  paper of the future investment.  I don't recall the name.

22  Q.  Okay.  Was there a sense of urgency in terms of getting

23  involved with this investment?

24  A.  Oh, sure.  It's just like selling an RV, you know.  You

25  better buy this now because somebody else will quickly, you

R. Eads - Direct

```
 1    know.  This is a very good deal.  It's very attractive to
 2    especially seniors because you've got an instant return, so
 3    you can see the return quickly.
 4    Q.  Now, you said that initially you were going to buy one,
 5    and then you ended up buying two.  Tell us, if you recall,
 6    how long from when you first met Mr. Smith to when you all
 7    first purchased a franchise?
 8    A.  I think probably by the second meeting Bill agreed to the
 9    25,000.
10    Q.  So originally it was --
11    A.  One 25,000, yes.
12    Q.  And that's how much the franchise was going to cost at
13    that point?
14    A.  Yes, that's how much it cost, 25,000.
15    Q.  All right.  What happened that it ended up with you
16    buying two franchises?
17    A.  Well, I was late to, like, the third meeting where we
18    were going to start signing papers or something.  By the time
19    I had got there, Bill had bought another one.
20         MR. GRINDROD:  Objection.  Sorry, Your Honor,
21    objection.  Just for the record, if we could try to use maybe
22    last names when we're talking about the different Bills.
23         THE COURT:  Another thing is --
24         THE WITNESS:  Oh, how about I call him --
25         THE COURT:  Ma'am, hold on.  Don't say anything
```

                              ─R. Eads - Direct─

 1    unless she asks you a question.  All right?

 2           THE WITNESS:  Okay.

 3           MS. YUSI:  Thank you.

 4    BY MS. YUSI:

 5    Q.  So you went to sign things, and what did you find out

 6    when you got there?

 7    A.  When I got there, I found out that Bill Eads had bought

 8    another franchise.

 9    Q.  What did you think about that?

10    A.  I was furious.

11    Q.  But you went along with it?

12    A.  He's my husband.  What are you going to do?

13    Q.  Where did this money come from?

14    A.  From straight out of our savings.

15    Q.  And there's a book in front of you, I believe, or a

16    binder.

17    A.  Yes.

18    Q.  And there's a tab with Exhibit 849 or the number 849 on

19    it.  Do you see that?

20    A.  Yes, I do.

21    Q.  And does that appear to be your husband's signature at

22    the bottom?

23    A.  Yeah.

24           MS. YUSI:  Your Honor, we move to admit Government's

25    Exhibit 849.

─────────R. Eads - Direct─────────

 1            THE COURT:  Any objection?

 2            THE WITNESS:  Yes, that's Bill's signature.

 3            MR. GRINDROD:  Your Honor, no objection.  Sorry.

 4            THE COURT:  849 will be admitted.

 5            (Government's Exhibit 849 was admitted.)

 6   BY MS. YUSI:

 7   Q.  At the top of this -- and I'm going to pull up some of

 8   the spots.  Do you see the screen there?

 9   A.  Okay.

10   Q.  It says it's a receipt to the disclosure document.  Do

11   you see what?

12   A.  Yes.

13   Q.  Was there a lot of paperwork involved with this

14   investment?

15   A.  I recall there was a number of papers, yes.

16   Q.  And who went through that paperwork with you and your

17   husband?

18   A.  Mr. Smith.

19   Q.  Did he go page by page, or how did that work?

20   A.  I think he just went through the papers as opposed --

21   that concerned this particular franchise for 25- or 50- or

22   whatever it was.  There was a lot of paperwork.

23   Q.  And this says November 15, 2012, and you said that is

24   your husband's signature?

25   A.  Yes.  It looks like it, uh-huh.

R. Eads - Direct

1   Q.  Does that sound about when you started to meet with him

2   and end up purchasing an investment?

3   A.  Yes.  That's what it says, yes.

4   Q.  And how much were the two total?  How much did you give

5   to Mr. Smith?

6   A.  The first franchise was 25,000, and the second franchise

7   was 50- -- another 25,000, so it was a total of 50-.

8   Q.  $50,000?

9   A.  Yes.

10  Q.  And after a few months, did you start getting a return on

11  that money?

12  A.  No.  It was maybe -- I'll guess six months.  I got a

13  check in the mail for -- as I recall, it was $107 and some

14  cents.

15  Q.  Where did that come from, do you know?

16  A.  It said it was for the dental franchise.

17  Q.  Did you all have a bank account associated with this as

18  well?

19  A.  Yes.  You had to create a bank account.  We were taken by

20  Mr. Smith to a bank and met this banker, because some of the

21  forms had to be a notary.  They had to have a notary.

22  Q.  Did you have to have an LLC?

23  A.  Yes, you had to have an LLC.

24  Q.  All right.  So you got $107 back after six months.  Did

25  you get other money back?

Carol L. Naughton, Official Court Reporter

R. Eads - Direct

1   A.  No.  As I recall, we never got another penny.

2   Q.  And did this concern you?

3   A.  Yes, it did.

4   Q.  Did you do anything to try to find out about it?

5   A.  After a couple of months, I called Mr. Smith and said, "I

6   haven't received anything."  He said, "Well, everything is in

7   the works, the paperwork.  Just be patient.  You'll start

8   getting money."  So I was patient.

9   Q.  And did you call Mr. Smith again?

10  A.  I called Mr. Smith when I got $107 and some cents, and I

11  said, "Is this the amount I'm going to get every time a

12  dentist joins?"  "Well, that's just a portion."  And I don't

13  recall what else he said.

14  Q.  Okay.  Were you ever -- did you ever try to talk to

15  someone at the Dental Support Plus Franchise headquarters in

16  Arizona?

17  A.  Yes, I did.

18  Q.  Who gave you that number?

19  A.  Mr. Smith.

20  Q.  And did you reach anyone at the headquarters in Arizona?

21  A.  As I recall, I reached a young lady, and off the top of

22  my head, I don't recall her name.  It was a very simple name.

23  And she explained that you just had to be patient, that all

24  the returns were in the works, and yes, we were going to get

25  a sizeable check at some point.  I'm gullible.

R. Eads - Direct

1    Q.  And prior to you investing, did Mr. Smith tell you about
2    any issues any of his other clients were having getting
3    returns or money on their investment?
4    A.  Oh, yes.  He said he himself was getting returns and that
5    all of his other investors were receiving money.
6    Q.  Okay.
7    A.  And I asked why were we so slow.
8    Q.  And what did he say?
9    A.  Just paperwork.
10   Q.  And so prior to you putting the 50,000 in, were you aware
11   of any problems with this investment?
12   A.  No.
13   Q.  And as you asked Mr. Smith six months later after you got
14   your $107, did he tell you about any problems that were going
15   on with this investment?
16   A.  Not as I recall.
17   Q.  At some point, did you realize the investment had failed
18   or was closed?
19   A.  We got a letter.
20   Q.  Who did you get the letter from?
21   A.  It said from Kent "Merkl" or whatever his name is, and
22   there wasn't any money left.  And I don't recall when that
23   letter came, but it was a letter, and it was supposedly sent
24   to all the investors.
25   Q.  Did you do anything in response?

616

R. Eads - Direct

1   A.  I tried to call Mr. Smith, and he said, "Well, I'm sorry.

2   It's just one of those things.  It's an investment, and

3   there's no more money left."

4       Then I tried to call Arizona.  That took me two or

5   three days before I got an answer.  And she said, "Well,

6   we're closing out all the dental practices."  And I said, "I

7   can see that, but where did the money go?"

8   Q.  And did she say anything?

9   A.  Well, it's just gone.

10  Q.  I'm going to show you Exhibit 1001C, Page 2342.  And if

11  you can look at your screen on that.  Do you recognize this

12  as a check?

13  A.  Do I recognize what?

14  Q.  Do you recognize this on your screen as a check?

15  A.  A text?

16  Q.  Is it a check?

17  A.  Yes, it's a check.  Dental Support Plus Franchise, yes.

18  Q.  Who is the check from?

19  A.  The check's from Dental Support Plus Franchise.

20  Q.  What is the date on that?

21  A.  4/21/2013.

22  Q.  Who is it made out to?

23  A.  Mr. Smith.  Mr. Smith got $11,000.

24  Q.  And in the memo, what does it say?

25  A.  Eads Practice Management LLC.  He got a lot more money

----R. Eads - Cross (By Mr. Grindrod)----

1    than I did.

2    Q.  Other than the $107 that you got back, did you get any

3    other money back?

4    A.  No, nothing.

5           MS. YUSI:  I believe those are all my questions

6    right now, but there will be some other counsel that would

7    like to talk to you.

8              THE WITNESS:  Sure.

9              THE COURT:  Cross-examination, Mr. Yarow?

10             MR. YAROW:  No cross, Your Honor.

11             THE COURT:  Mr. Grindrod, Ms. McCaslin?

12                        CROSS-EXAMINATION

13   BY MR. GRINDROD:

14   Q.  Good afternoon, ma'am.

15   A.  Good afternoon.

16   Q.  Ma'am, you mentioned that you and your husband have this

17   RV dealership?

18   A.  Yes, we do.

19   Q.  And before that, your husband worked selling RVs other

20   places?

21   A.  He was the GM for Dan Gamel for I don't know how many

22   years, all of his stores, yes.

23   Q.  And then do people who sell RVs for you all -- do they

24   work on commission?

25   A.  Yes.

618

R. Eads - Cross (By Mr. Grindrod)

1   Q.  Okay.  And did your husband work on commission or work

2   with people who worked on commission when he was doing that

3   kind of thing before?

4   A.  Yes.

5   Q.  Okay.  So you were familiar with the -- you know what a

6   commission is, right?

7   A.  Yes, I know what a commission is.

8   Q.  Okay.  And then prior to your work in the RV industry

9   with your husband, did you work as an insurance underwriter?

10  A.  Yes, I did.

11  Q.  And an insurance underwriter's job is basically to

12  evaluate, analyze risk, insurable risk?

13  A.  Yes.

14  Q.  And then to establish pricing based on that risk?

15  A.  That's correct.

16  Q.  Okay.  And around the time that you all invested in

17  Dental Support Plus Franchise, your annual income was about

18  $125,000 a year; is that right?

19  A.  That's correct.

20  Q.  And your net worth was somewhere between 250,000 and a

21  half million dollars?

22  A.  That's correct.

23  Q.  So you mentioned when you met with Mr. Smith and you

24  talked about Dental Support Plus Franchise as one

25  opportunity, I think you mentioned that he gave you other

———R. Eads - Cross (By Mr. Grindrod)———

1    options also, right?

2    A.  No.  He didn't give other options.  He said there were

3    other options that you could choose once you invested in

4    this, and these were other things you could go on to.

5    Q.  I understand.

6    A.  No, he didn't offer them.  He just showed it to us so we

7    could make the choice.

8    Q.  I understand.

9           Sorry.  I'm just skipping some stuff you already

10   covered with Ms. Yusi here.

11          MR. GRINDROD:  So let's take a look, just for the

12   witness if we could, at Smith Exhibit 296 foxtrot.

13          THE WITNESS:  What's 296 foxtrot?

14   BY MR. GRINDROD:

15   Q.  In just a second, it should come up on the screen in

16   front of you, but let's take a look.

17          Do you recognize that exhibit that came up on the

18   screen in front of you?

19   A.  Am I supposed to?

20   Q.  Well, there's no right or wrong answers other than the

21   truth, ma'am.

22   A.  I have no idea.

23          MR. GRINDROD:  Can we flip to the second page of

24   this, Ms. McCaslin, just to see if that helps.

25          THE WITNESS:  I think I remember seeing something

———————R. Eads - Cross (By Mr. Grindrod)———————

1   like that.

2   BY MR. GRINDROD:

3   Q.  Is this the document that Mr. Smith used to discuss

4   Dental Support Plus Franchise investment with you?

5   A.  I think so.  It's a long time ago.  I don't recall that.

6   I know he had a bunch of papers that he showed us.

7   Q.  Did you give some of those papers to investigators when

8   you met with them about this case?

9   A.  I don't recall that I did.  Maybe.  I don't know if I did

10  or not.

11          MR. GRINDROD:  I'll offer 296F.

12          THE COURT:  Any objection?

13          MS. YUSI:  No objection, Your Honor, but I don't

14  think there's a foundation for her to answer any questions

15  about it.

16          THE COURT:  Does she recognize it?  Did she

17  recognize it?

18          MR. GRINDROD:  I'm not sure.

19  BY MR. GRINDROD:

20  Q.  Let me ask -- I know it was a long time ago, ma'am, and

21  like said --

22  A.  I don't recall.  Okay.  I don't recall if it was that.  I

23  know he showed us a lot of papers, but I don't know which

24  one.  Okay?

25  Q.  Yes.

```
                        R. Eads - Cross (By Mr. Grindrod)
```

 1          THE COURT:  The Court will not admit it.

 2          THE WITNESS:  Perhaps Bill will when you talk to

 3   him.  I don't remember.

 4          THE COURT:  Once again, ma'am, don't offer anything

 5   unless you're being asked a question.

 6          MR. GRINDROD:  Just for the record, the Court

 7   declined to admit that?

 8          THE COURT:  She didn't appropriately authenticate

 9   that, so no, the Court didn't admit it.

10   BY MR. GRINDROD:

11   Q.  Take your time, ma'am.  Didn't mean to ask you a question

12   while you were drinking.

13          Bill Smith showed you a number of documents about

14   Dental Support Plus Franchise, right?

15   A.  Yes, he did.

16   Q.  Do you remember, were those in the form of sort of a

17   brochure?

18   A.  I don't recall it was a brochure.  I recall it was just

19   single pieces of paper that he just pulled out and made

20   notations on.

21   Q.  Sure.

22   A.  I don't recall -- if there was any brochure or book, I

23   don't recall that.  I recall he just -- here's a paper,

24   here's a paper, this is dah, dah, dah, dah, dah.

25   Q.  That makes sense.

R. Eads - Cross (By Mr. Grindrod)

1       MR. GRINDROD:  Let's pull up, if we could,
2    Ms. McCaslin, what has been already admitted as Government's
3    Exhibit 849.
4    BY MR. GRINDROD:
5    Q.  So, ma'am, this is a form that your husband signed,
6    right?
7    A.  Yes, he did.
8    Q.  And it's a form in which your husband is basically
9    acknowledging that he received all these documents that are
10   listed here; is that right?
11   A.  Okay.  That's what it says.
12   Q.  And then at the top here, this shows that this was faxed
13   from Bill Eads RV, right?
14   A.  Uh-huh.
15   Q.  Just for the record, is that a "yes," ma'am?
16   A.  Yes.  I'm sorry.
17   Q.  That's okay.
18          And this 916 area code number, do you recognize
19   that?
20   A.  Yes.  That's our area code in Lincoln, California.
21   Q.  And that's the fax number for Bill Eads RV?
22   A.  Yes.
23   Q.  And so all of the information that was in these documents
24   that you received from Dental Support Plus Franchise
25   corporate, those were consistent -- the information in there

R. Eads - Cross (By Mr. Grindrod)

1  was consistent with the information that you received from
2  Mr. Smith, right?
3  A.  I don't recall.  If it says that, I guess they gave it to
4  us.
5  Q.  Right.  Okay.  So my question was about kind of what
6  those documents say, and what I'm asking you is whether
7  generally speaking, the documents that you got in written
8  form, whether those matched up with what Bill Smith was
9  telling you about the investment.
10        THE COURT:  Well, Mr. Grindrod, the witness does not
11 have before her all the documents that she's indicated that
12 Mr. Smith showed her.
13        MR. GRINDROD:  I understand that, Your Honor.  I'm
14 asking, though, based on her recollection of the time, did
15 she remember Mr. Smith telling her something and then the
16 documents saying something very different, or did it all seem
17 to match up?
18        THE WITNESS:  I don't recall.  I'm sorry.
19 BY MR. GRINDROD:
20 Q.  That's okay.  It was a long time ago.
21 A.  We just signed -- I'm not supposed to...
22 Q.  So let's talk a little bit about -- you mentioned a
23 couple times with the prosecutor about Mr. Smith saying he
24 had money in Dental Support Plus?
25 A.  Yes.

R. Eads - Cross (By Mr. Grindrod)

```
1   Q.  So to be clear, did Mr. Smith ever specifically tell you
2   that he owned a franchise, or did he just say that he had an
3   interest in a -- a financial interest in the success of the
4   franchise?
5   A.  As I recall, he said he had invested in the dental
6   franchise, he and his wife, himself.  He bought one for her,
7   and he bought one for him.  However much, I didn't ask.
8   Q.  You specifically remember him telling you that he owned a
9   franchise?
10            THE COURT:  She just said that, Mr. Grindrod.
11            MR. GRINDROD:  I understand, Your Honor.
12  BY MR. GRINDROD:
13  Q.  Where was that conversation?
14  A.  In his office.
15  Q.  Was that the first time or the second time you met?
16  A.  I don't know.  I thought we met four or five times.  We
17  met more than twice.  I don't recall when he said that.  But
18  it seems like on the first, second, or third, he was trying
19  to convince you to give your money.
20  Q.  And at some point, you received a list of all the people
21  who had franchises in a Dental Support; is that right?
22  A.  I don't recall.  I'm sorry.
23  Q.  Do you ever remember Mr. Smith being listed on anything
24  that -- any paperwork that you received as being listed as a
25  franchise owner?
```

R. Eads - Cross (By Mr. Grindrod)

1    A.  No, I don't.

2    Q.  Okay.  And when you had some questions about why you

3    weren't receiving money, you mentioned that you spoke to

4    someone at Dental Support's corporate offices in Arizona?

5    A.  Some young lady answered the phone.

6    Q.  And Mr. Smith was the person who gave you the contact

7    information to get in touch with them, right?

8    A.  Yes, he did.

9    Q.  And he encouraged you to reach out directly to those

10   folks, right?

11   A.  Well, he said, "I can only answer what I'm told.  You've

12   got the letter the same as I do, and there's no more money,

13   but you can call these people."

14   Q.  And you, over the course of -- after you made this

15   investment, you received some -- you received some

16   correspondence from the office in Arizona, from Kent Maerki,

17   right?

18   A.  Yes.

19        MR. GRINDROD:  Let's pull up, just for the witness,

20   please, what's been pre-marked as Smith 296C.

21   BY MR. GRINDROD:

22   Q.  Ma'am, I'm just going to make this a little bigger for

23   you so that you can see it here.

24   A.  Thank you.

25   Q.  Do you recognize this document?

Carol L. Naughton, Official Court Reporter

R. Eads - Cross (By Mr. Grindrod)

1    A.  I recall that he sent several letters just like that,

2    kind of --

3    Q.  Is that the --

4    A.  -- kind of to keep you on -- making you want to be in

5    support of this.

6    Q.  Right.  We can talk about the contents of the letter in a

7    second.  I just want to ask first, you recognize it, right?

8    A.  I don't recognize it specifically, but I do recall he

9    sent several letters just like that.

10   Q.  And the letters that he sent, is this how they would be

11   addressed, some of them, to your husband?

12   A.  I don't know.  I don't recall that.  But I would assume

13   so because that's the name on the franchise.

14   Q.  Right.

15            MR. GRINDROD:  Your Honor, I would offer 296C.

16            MS. YUSI:  Again, this is part of our stipulation,

17   but I will object to any questions about it since she said

18   she doesn't recall it.

19            THE COURT:  We will admit it, but the Court does

20   have a question whether she can even state anything about it.

21   She says she doesn't recall.

22            MR. GRINDROD:  I understand, Your Honor.

23            THE COURT:  But we will admit it.

24            (Defendant Smith's Exhibit 296C was admitted.)

25            MR. GRINDROD:  If we could publish that for the

R. Eads - Cross (By Mr. Grindrod)

1    jury.

2    BY MR. GRINDROD:

3    Q.  And, ma'am, not asking you specifically about the letter,

4    but is your husband Bill Joe, Sr.?

5    A.  Yes, he is.

6    Q.  Okay.  Do you remember receiving -- again not necessarily

7    this letter, but do you remember receiving correspondence

8    from Kent Maerki that said that things were going well, this

9    was going to be productive, that kind of message?

10   A.  Yes.

11   Q.  Okay.  And do you remember receiving that into at least

12   2013, that kind of upbeat --

13   A.  I don't recall the year.  I'm sorry.

14   Q.  Okay.

15              MR. GRINDROD:  Let's take a look at Exhibit Smith

16   296B, as in Bravo, please, Ms. McCaslin, just for the

17   witness.

18   BY MR. GRINDROD:

19   Q.  Okay.  Ma'am, do you see this document in front of you?

20   A.  Uh-huh, yes, I do.

21   Q.  And is this a letter from Kent Maerki to Bill and Rosie?

22   A.  Uh-huh.

23   Q.  From --

24   A.  That's my husband, and I'm Rosie.

25   Q.  And that's from August 2013?

─────────R. Eads - Cross (By Mr. Grindrod)─────────

1    A.  Uh-huh.

2          MR. GRINDROD:  Your Honor, I would offer this

3    exhibit.

4          THE COURT:  Has this exhibit been stipulated to?

5          MS. YUSI:  It has, Your Honor.

6          THE COURT:  It will be admitted.

7          (Defendant Smith's Exhibit 296B was admitted.)

8    BY MR. GRINDROD:

9    Q.  Ma'am, in this letter, Mr. Maerki is talking to you about

10   using patient referral codes.

11   A.  Uh-huh.

12   Q.  And is that a reference to recruiting your own patients

13   for Dental Support Plus?

14          MS. YUSI:  I'm going to object to foundation.  I

15   don't know if she said she remembered getting this letter.

16          THE COURT:  Objection sustained.

17   BY MR. GRINDROD:

18   Q.  Do you remember getting this letter, ma'am?

19   A.  No.  I don't remember getting this letter, but I know he

20   sent correspondence.  I don't recall this specific one, but I

21   do recall when Mr. Smith said we could recruit our own

22   dentists.  I don't recall patients, just dentists.  That's

23   all I recall.

24   Q.  Okay.  Fair enough.

25   A.  Okay.

————————R. Eads - Cross (By Mr. Grindrod)————————

1           MR. GRINDROD:  And let's go to 296D, please, just
2    for the witness.
3    BY MR. GRINDROD:
4    Q.  And, ma'am, I'm just going to zoom into the top here.
5    A.  Uh-huh.
6    Q.  Do you recognize that e-mail address?
7    A.  Yes.  That is my e-mail address.
8    Q.  And do you recognize this as an e-mail chain between you
9    and someone at the law firm of Shelton & Power?
10   A.  No, I don't.
11   Q.  You don't recognize this e-mail chain?
12   A.  I don't recall an attorney, ever.  I recall a banker.
13   Q.  Do you remember you or your husband reaching out to
14   someone at Shelton & Power?
15   A.  No, I don't.
16   Q.  Did anyone else have access to your e-mail account?
17   A.  Not as far as I know.  Did I reach out to this lawyer?
18   That's what you're saying?
19   Q.  Well, I'm asking mostly whether you recognize this
20   document or you remember reaching out to attorneys or the law
21   firm of Shelton & Power about your Dental Support investment?
22   A.  No, I do not.  I answered.  I do not recall that.
23   Q.  And does this document that you see in front of you
24   refresh your recollection about doing that?
25   A.  No.

————R. Eads - Cross (By Mr. Grindrod)————

1  Q.  Let me try --
2  A.  I don't even recognize that name, Jerome.
3        MR. GRINDROD:  Okay.  We can take that down,
4  Ms. McCaslin.  Let's try 296E, as in echo, please.
5  BY MR. GRINDROD:
6  Q.  Do you recall this document, ma'am?
7  A.  I don't recognize that, but I'm sure we had to make
8  something out, a W-9, I'm sure.
9  Q.  Okay.  And do you recognize the address of 2199 Blue
10  Heron Loop in Lincoln?
11  A.  That's our home address, yes.
12  Q.  Do you recognize the name Eads Practice Management LLC?
13  A.  Well, that's what they gave us, yes.
14  Q.  But you don't remember this document?
15  A.  No.
16  Q.  Or receiving a letter in this January -- sorry, January
17  2014 time period?
18  A.  No.  That's not the letter that told us there was no more
19  money.
20  Q.  Okay.  So just for the record, you don't recognize this?
21  A.  No, I don't.
22  Q.  Okay.
23  A.  I'm sure we had to make out a 1099 for taxes.
24        MR. GRINDROD:  We can take that down, Ms. McCaslin.
25  BY MR. GRINDROD:

────────R. Eads - Cross (By Mr. Grindrod)────────

1    Q.  So, Ms. Eads, obviously all of this happened a long time

2    ago, right?

3    A.  Yes, it did.

4    Q.  Is it fair to say that your recollection of exactly what

5    happened back then is maybe not entirely clear?

6    A.  Well, it's clear that he took $50,000 from us and I never

7    got any money back.  That's very clear.

8    Q.  I know.

9    A.  Okay.  No, that part is not confusing me.  What is

10   confusing me is I don't recall the letters because I didn't

11   go through the whole box of letters.  I just went through to

12   try to acquaint myself again with some of the things that

13   were going to come up.

14          He did it.  He did -- he talked us into it.  He's

15   the one that suggested it.  He's the one that said it was

16   going to be wonderful.  He's the one that said it was going

17   to make money.  So, yes, I recall that very well.

18   Q.  Yeah.  And Mr. Smith is the one that told you all those

19   things about how good Dental Support Plus Franchise was

20   supposed to be, right?

21   A.  Yes.

22   Q.  And you never got any of that money back, right?

23   A.  No.

24          THE COURT:  Asked and answered.

25          MR. GRINDROD:  Okay, Your Honor.  Can I ask the next

———————R. Eads - Cross (By Mr. Grindrod)———————

1  question?

2          THE COURT:  As long as it's not something that has

3  already been answered.

4  BY MR. GRINDROD:

5  Q.  You're obviously very upset about having lost all that

6  money.  That's a lot of money to lose, right?

7  A.  Well, what would you do?

8  Q.  It's not a trick question.

9          THE COURT:  Don't ask him questions, ma'am.

10          THE WITNESS:  Well, you could say that.  $50,000 to

11  me at almost 81 years old is a lot of money.  I could buy a

12  lot of wine with that.

13          MR. GRINDROD:  I think that's a great place to leave

14  it, ma'am.

15          THE COURT:  Any redirect?

16          MS. YUSI:  No, sir.

17          THE COURT:  May the witness be permanently excused?

18          MS. YUSI:  Yes, sir.

19          MR. GRINDROD:  Yes, Your Honor.

20          THE COURT:  You may step down, ma'am.

21          (The witness was excused.)

22          THE COURT:  Next witness.

23          MR. BOSSE:  Your Honor, the government calls Adan

24  Rangel.

25          (The witness was sworn.)

A. Rangel - Direct

```
 1              ADAN RANGEL, called by the Government, having been
 2    first duly sworn, was examined and testified as follows:
 3                         DIRECT EXAMINATION
 4    BY MR. BOSSE:
 5    Q.  Hi, sir.
 6    A.  Hello.
 7    Q.  Good afternoon.  If you could, try to lean down almost to
 8    where it's touching, just like that.
 9              Could you state your name for our record, please.
10    A.  Adan F. Rangel.
11    Q.  How do you spell your first name?
12    A.  A-d-a-n.
13    Q.  How do you spell your last name?
14    A.  R-a-n-g-e-l.
15    Q.  How old are you, Mr. Rangel?
16    A.  74.
17    Q.  Where are you from originally?
18    A.  Corpus Christi, Texas.
19    Q.  And where do you live now, which city and state?
20    A.  I live in Virginia Beach, Virginia.
21    Q.  How long have you been in the Tidewater area?
22    A.  I've been here a while.  At least around -- it's over 30
23    years.
24    Q.  If you could, tell the jury a little bit about your
25    career background.
```

A. Rangel - Direct

1    A.   Okay.  Well, I was in the military, and when I got out, I
2    went back home to Corpus Christi, and I went to go work for
3    Montgomery Ward & Company, if you remember that name, and I
4    worked for them 32 years and got into management, and they
5    moved me around a lot.  So I went -- I had a lot of different
6    stores that I managed in Texas, but then I went to Colorado,
7    and then I went to Pennsylvania, and then from Pennsylvania,
8    I came to Virginia.
9    Q.   All right.
10   A.   All with Montgomery Ward.
11   Q.   For anyone who isn't old enough to remember, is that a
12   department store?
13   A.   Yes, catalog and a department store.
14   Q.   All right.  When did you stop working for Montgomery
15   Ward?
16   A.   They shut down in 2000.
17   Q.   Did you continue to work after that, after 2000?
18   A.   I did.  I went to work for -- first I went to a company
19   that's based out of Newport News.  It was called APAC.  And
20   after that -- I wasn't there very long.  I went to another
21   company that was a short while called F GI.  They were down
22   in Virginia Beach, but their home office was in Chapel Hill,
23   North Carolina, and then I went to AAA, and I spent the rest
24   of my time there.  I worked with them for about 13 years.
25   Q.   All right.  And when did you fully retire?

Carol L. Naughton, Official Court Reporter

635

A. Rangel - Direct

1    A.  It was about 2014, and I retired from AAA.

2    Q.  Before you retired, how did you plan to fund your years

3    in retirement?

4    A.  Well, I was putting a lot of money away in my 401(k)

5    plan, so that was going to be one of my big -- money to help

6    me in retirement along with Social Security.

7    Q.  Okay.  Before you retired, had you been married?

8    A.  Oh, yeah.

9    Q.  Who were you married to?

10   A.  Sunny -- we called her Sunny.  Her name was Sun Rangel.

11   Q.  Did your wife pass at one point?

12   A.  Yes.  She passed ten years ago.

13   Q.  Okay.  Did you have any experience in running a franchise

14   before you made the investments we're going to talk about

15   here?

16   A.  No, sir, no.

17   Q.  Had you ever been involved in the wireless spectrum

18   business at all or the dental business?

19   A.  No, I hadn't.

20   Q.  And at the point when you retired, were you interested in

21   running your own franchise where you would have to work day

22   to day?

23   A.  Oh, no, I wasn't.

24   Q.  And I don't ask this to embarrass you, but did you have

25   some medical issues in recent years that may have affected

A. Rangel - Direct

 1    your short-term memory?

 2    A.   Oh, yeah.

 3    Q.   And I want to be clear.  As we've gone through your

 4    career history and all your background, is your long-term

 5    memory still reliable as far as you know?

 6    A.   I think so, yes.

 7    Q.   Okay.  If at any point I ask you something that you don't

 8    remember what the answer is, it's fine to say that.

 9    A.   Okay.

10    Q.   When your wife Sunny passed, did you receive money that

11    came out of that as a result?

12    A.   Yes.

13    Q.   What were you looking to do with that money?

14    A.   Well, with my money -- I have to go back there first

15    because I wanted to protect it.  We had gone through some

16    terrible times, and then when I got my wife's money, I became

17    a little bit more, you know -- taking a little more risk with

18    that money.

19    Q.   Sure.  Did you at any point meet a man named Roger

20    Hudspeth here in the local area?

21    A.   Yes.

22    Q.   How did you meet Mr. Hudspeth?

23    A.   He was recommended to me by my AAA manager, my boss.

24    Because I was talking to my boss about that I wanted to roll

25    over my 401(k) and put it in -- I was looking for a financial

Carol L. Naughton, Official Court Reporter

A. Rangel - Direct

```
 1    advisor or planner or something that I could put this money
 2    to work, you know, be protected.
 3            So he gave me that name, and I went there, and I
 4    liked the guy and all, and so I -- he took care of my money
 5    to this day.  I'm drawing from that fund.
 6    Q.  Sure.  So let me ask you about that.
 7            When you first went to meet with Mr. Hudspeth, did
 8    you make -- before the investments we're talking about here
 9    today, did you make an initial series of investments with
10    him, with Mr. Hudspeth, in annuities and mutual funds, things
11    like that?
12    A.  Right.  That's what I was invested in.
13    Q.  And that money that you initially invested in an annuity
14    and maybe a mutual fund, is that money still safe today?
15    A.  Yes.
16    Q.  After Sunny died, did you go see Mr. Hudspeth again about
17    this other money that you had come into?
18    A.  Yes.
19    Q.  And what did he talk to you about when you came back to
20    him that next time?
21    A.  The first thing he talked to me about was a program
22    called WeMonitor.
23    Q.  I don't want to ask you about that one.  Did he talk to
24    you about a dental program as well?
25    A.  Yeah.  That was the first one.  I'm sorry.  My mistake.
```

A. Rangel - Direct

```
 1   That's the first thing that he talked to me about.
 2   Q.   Okay.  How did he describe the dental program to you?
 3   A.   Well, he said that they had people that were out there
 4   trying to find patients for the dentists, I wouldn't have to
 5   do anything, just enjoy the money coming in, and that sounded
 6   pretty good to me, so that's why I invested in that, yes.
 7   Q.   Did Mr. Hudspeth explain how you would make money on the
 8   investment, how the investment would work?
 9   A.   Not really.  I don't remember how that was supposed to
10   work other than --
11   Q.   Connecting patients with dentists?
12   A.   Yes.
13   Q.   Did you trust Mr. Hudspeth at this point --
14   A.   Yes.  Yes, I did.
15   Q.   -- in your relationship?
16   A.   Yes.
17   Q.   All right.  What, if anything, did he tell you about how
18   much you would be paid or how often you would be paid on the
19   investment?
20   A.   I didn't -- I don't remember any specifics on that as far
21   as when I would get the money or how I would -- I don't
22   remember the specifics.
23   Q.   When he described the business to you, did it sound to
24   you like something that was already up and running?
25   A.   Yes.
```

A. Rangel - Direct

1   Q.  And did he tell you anything about prior investors in

2   Dental Support Plus having trouble and not getting any

3   returns on their money?

4   A.  No.

5   Q.  Do you remember the price that you were told, how much

6   each of these franchise units was going to cost?

7   A.  Yes.  I think it was about $25,000 a unit.

8   Q.  And was there any time pressure you were given about the

9   price was going to go up, anything along those line?

10  A.  Yes.  They told me that there could be a price -- price

11  could be going up to about 30,000, so it might be a good idea

12  to do it now.

13  Q.  When you were meeting with Mr. Hudspeth, did he show you

14  some documents and fliers and things like that?

15  A.  Yes, he showed me some fliers.

16  Q.  I want to show you, just for the witness,

17  Government's 200.  If you could just take a look, it will pop

18  up on the screen there in front of you.

19  A.  Okay.

20  Q.  Are you able to see that, sir?

21  A.  Yes.

22  Q.  Does that look like one of the things that you were shown

23  when you went in to meet with Mr. Hudspeth?

24  A.  It looks familiar.

25  Q.  Okay.

A. Rangel - Direct

1           MR. BOSSE:  Your Honor, I will offer
2    Government's 200.
3           THE COURT:  Any objection?
4           MS. McCASLIN:  No objection.
5           MR. YAROW:  No objection.
6           THE COURT:  It will be admitted.
7           (Government's Exhibit 200 was admitted.)
8    BY MR. BOSSE:
9    Q.  And I won't touch every piece of this document, but is
10   this in line with what you heard from Mr. Hudspeth, that you
11   wouldn't have to work day to day to run this company and that
12   it was an investment that you were going to make and not a
13   business you were going to have to run?
14   A.  Right.
15   Q.  Do you recall him saying anything about the company
16   having a long track record of success?
17   A.  No, I don't remember that.
18   Q.  Okay.
19          MR. BOSSE:  We can take 200 down.
20   BY MR. BOSSE:
21   Q.  After hearing from Mr. Hudspeth and seeing the materials
22   he gave you, did you decide to make this investment in Dental
23   Support?
24   A.  Yes.
25   Q.  How much money did you put into it?

A. Rangel - Direct

1    A.   I think my initial investment was about 100,000.

2    Q.   Okay.  And after you made your initial investment, did

3    you speak with anyone -- Roger Hudspeth or anyone at his

4    company about buying additional units of Dental Support?

5    A.   Yes.

6    Q.   Okay.  How many times did you invest in the franchise?

7    A.   I don't recall exactly.  It might have been once more.

8    Q.   Okay.  And if I gave you the number 105,000 total, does

9    that sound about right?

10   A.   That sounds about right.

11   Q.   Okay.  Did Roger Hudspeth tell you, either before you

12   made the first investment or before you went back and made

13   another one, that the business was having a hard time

14   attracting dentists?

15   A.   No, never heard that.

16   Q.   Did you ever receive any return, any moneys as a result

17   of your dental investment?

18   A.   No, sir, not a penny.

19   Q.   Did you ever try to get your money back from this

20   investment?

21   A.   Yes, I did go to talk to Roger to see what I could do to

22   get some money.

23   Q.   What happened when you asked about --

24   A.   He told me that I would -- there -- I would have to find

25   a buyer for my investment that would be willing to buy it,

A. Rangel - Direct

 1   and that's how I could get my money back.  I remember that.
 2   Q.  And when he told you that, at that point, had you
 3   received any returns on it?
 4   A.  No, nothing.
 5   Q.  Did you ever get your Dental Support Plus money back?
 6   A.  No.
 7   Q.  Let's switch gears and talk about spectrum investments.
 8        Were you also pitched on buying into a spectrum
 9   investment?
10   A.  Yes.
11   Q.  Who did you meet with to talk about spectrum?
12   A.  Well, initially with Roger, but then he quickly connected
13   me with Daryl Banks [sic], who I think at that time he was
14   already in Florida, and we held a teleconference regarding
15   that, where they were trying to explain to me how that would
16   work.
17   Q.  So you are here in Virginia with Roger Hudspeth?
18   A.  Yes.
19   Q.  So you are on the teleconference?
20   A.  On a teleconference call.
21   Q.  I understand.
22        What do you recall Mr. Bank saying about the
23   spectrum investment and how it would work?
24   A.  You know, I don't recall very much of what he said.  I
25   had a hard time understanding what he was saying, you know.

Carol L. Naughton, Official Court Reporter

A. Rangel - Direct

1    He was a very fast talker, and it was difficult to grasp what

2    he was saying.

3            So I decided, you know what, at the end of this,

4    I'll just sit with Roger and tell him to explain it to me in

5    plain English so I can understand what -- I said it sounds

6    interesting, but I'm still not convinced, you know.

7    Q.   Was Mr. Hudspeth able to explain it to you in a little

8    bit more plain English?

9    A.   No, not really.

10   Q.   Do you have any recollection of what the pitch was as far

11   as the spectrum business?

12   A.   Well, the only thing I recollect was -- and this probably

13   is what sold me on it -- that the government, United States

14   government, had allocated these funds or securities to make

15   them available to the average person.  They didn't want the

16   big conglomerate companies like Verizon and AT&T to have it

17   all.  So, you know, they were trying to give it to the -- I

18   call myself the little guy -- you know, the little guys, so

19   that's why.

20   Q.   Pull that mic out a little bit.  It's hitting the mask.

21   That's perfect.

22           So what you recollect -- and I know I'm restating

23   it, but you recollect saying something about the government

24   was making spectrum available to the little guy?

25   A.   Right.

A. Rangel - Direct

```
 1    Q.  Do you recall any statements about how this investment
 2    was going to make money?
 3    A.  Not exactly, no, I don't.
 4    Q.  And I know I'm asking you about a long time ago.  Is this
 5    something you talked about with Mr. Hudspeth before you made
 6    the investment?
 7    A.  Yes, we -- yes.
 8    Q.  Okay.  Did anyone tell you, either Mr. Bank or
 9    Mr. Hudspeth -- did any of them tell you -- what, if
10    anything, did they say to you about the fees that they were
11    going to take out of your investment?
12    A.  No, they didn't say anything.  I don't remember anything
13    about fees.
14    Q.  What, if anything, did they tell you about the fees that
15    would be taken out of the investment by the license
16    application company this related to?
17    A.  I don't recall any of that.
18    Q.  Did you agree to invest in spectrum after you heard the
19    pitch, you know, many years ago?
20    A.  Yes.
21    Q.  And how much money do you recall putting into the
22    spectrum investment?
23    A.  I'm not sure, but I think it was around $87,000.  I'm
24    not -- I'm not real sure, though.
25            MR. BOSSE:  Okay.  Well, let's see, if we can see
```

—————————A. Rangel - Direct—————————

```
1    for the witness, Government's 863.

2    BY MR. BOSSE:

3    Q.  And I'm going to zoom in on the screen for you, sir.

4           MR. BOSSE:  Is this previously admitted?  Okay.

5    Could we just go ahead and publish it.  Thank you.

6    BY MR. BOSSE:

7    Q.  Do you see your name down here, sir, from Summit Trust?

8    A.  Yes.

9    Q.  Adan Rangel IRA?

10   A.  Yes.

11   Q.  Do you see the amount?  I think you got it exactly right.

12   A.  Yeah, 87,000, yeah.

13   Q.  Did you ever make money on the spectrum investment, as

14   far as you can recall?

15   A.  No, not a penny that I can recall.  No.

16   Q.  And were you ever able to get the spectrum investment,

17   the $87,000 back from that investment?

18   A.  No.

19   Q.  Let's look at one more.

20          MR. BOSSE:  I forgot to do an exhibit.  If we could

21   see, just for the witness, 861.

22   BY MR. BOSSE:

23   Q.  And, sir, I'm going to ask, do you recognize what is on

24   the screen in front of you there?

25   A.  Okay.  A check that I signed.
```

```
1    Q.   Okay.
2    A.   Made out to the company, I guess, that I was -- for
3    the -- is that Dental Support Plus?
4    Q.   Well, I was just going to ask, does this refresh you on
5    whether you ever received any of the money back from that
6    Dental Support?
7    A.   No, I never got any money.  Not personally, no.
8              MR. BOSSE:  All right.  We can take that down, then.
9              And I'm just going to look up to confer briefly.
10             All right.  I have no further questions.  I'm going
11   to tender the witness after I wipe down.
12             MR. YAROW:  No questions, Your Honor.
13             THE COURT:  Any questions?
14             MS. McCASLIN:  No questions, Your Honor.
15             THE COURT:  All right, then.  May the witness be
16   permanently excused?
17             MR. BOSSE:  Yes, sir, Your Honor.  Thank you.
18             THE COURT:  You may be excused, Mr. Rangel.
19             THE WITNESS:  Okay.  Thank you.
20             (The witness was excused.)
21             THE COURT:  You may call your next witness.
22             MS. YUSI:  Your Honor, we call Vera Hullum by
23   deposition.
24             Your Honor, prior to the deposition being played, we
25   would like to pre-admit Government's Exhibit 802.
```

647

V. Hullum - Direct

1           THE COURT:  Any objection to 802?

2           MR. GRINDROD:  No objection.

3           MR. YAROW:  No, Your Honor.

4           THE COURT:  802 will be admitted.

5           (Government's Exhibit 802 was admitted.)

6           MS. YUSI:  And I'm not sure if -- the defense during

7    their cross admitted 515 and 516, which we have no objections

8    to those being admitted as well, Defendant's 515 -- Defendant

9    Smith's 515 and Defendant Smith's 516.

10          MR. GRINDROD:  We'll offer them, Your Honor.

11          THE COURT:  They will be admitted.

12          (Defendant Smith's Exhibits 515 and 516 were

13   admitted.)

14          MR. GRINDROD:  Thank you, Ms. Yusi.

15          (Video deposition played in open court as follows:)

16          VERA HULLUM, called by the Government, having been

17   first duly sworn, was examined and testified as follows:

18          MS. YUSI:  Thank you.  And for the record, we do

19   have Aghee Smith in here, and Sylvester Hullum is also in

20   attendance.

21                         DIRECT EXAMINATION

22   BY MS. YUSI:

23   Q.  Good morning, Ms. Hullum.  Thank you for being here.

24   Could you identify yourself.  Introduce yourself to the

25   Court.

V. Hullum - Direct

```
 1    A.   My name is Vera Hullum.

 2    Q.   How do you spell your last name?

 3    A.   H, as in Howard, u-l-l-u-m.

 4    Q.   And how old are you today?

 5    A.   I'm 73.

 6    Q.   And where do you live?

 7    A.   We live in Antelope, California, 8424 Sage Canyon Court.

 8    Q.   Is that outside of Sacramento, California?

 9    A.   Sacramento County.

10    Q.   How long have you lived in Antelope, approximately?

11    A.   We've lived at our present home for 27 years.

12    Q.   Are you working now?

13    A.   No.  I retired.

14    Q.   What did you do prior to retirement?

15    A.   I was a registered nurse.

16    Q.   How -- about how long were you a registered nurse for?

17    A.   Well, the first 15 years, I was an LVN, and then I went

18    back to college, and I was a registered nurse for 30 years.

19    Q.   Okay.  And when did you retire?

20    A.   I retired in November of 2013.

21    Q.   Are you married?

22    A.   I am.

23    Q.   To whom are you married?

24    A.   Sylvester Hullum.

25    Q.   How long have you guys been married?
```

———V. Hullum - Direct———

1   A.   We've been married for 54 years.

2   Q.   Is he retired as well?

3   A.   He is.

4   Q.   What did he do prior to retirement?

5   A.   He was a pipefitter mechanic for Campbell Soup Company.

6   Q.   Was that at a factory?

7   A.   Yes.  It's here on Franklin Boulevard, until they closed

8   the company down.  He took an early out.

9   Q.   When did he retire?

10  A.   2010.

11  Q.   Do you know about how old he was at that --

12  A.   66.

13  Q.   66?

14  A.   Uh-huh.

15  Q.   And while you both were working, were you saving for

16  retirement?

17  A.   Yes.

18  Q.   Was that important to you all?

19  A.   Very important.

20  Q.   Now, I want to talk to you about the defendant Aghee

21  William Smith, also known as Bill Smith.  Do you know the

22  defendant Bill Smith?

23  A.   Yes.

24  Q.   And can you identify him today?

25  A.   Yes.  He's aged a bit.

V. Hullum - Direct

```
 1              Can you pull your mask down a little?
 2              Yes, that's him.
 3    Q.   Okay.  And just for the record --
 4              MR. GRINDROD:  We'll stipulate.
 5              MS. YUSI:  Thank you -- that she identified him.
 6    BY MS. YUSI:
 7    Q.   When did you first meet Bill Smith?
 8    A.   About the time my husband was preparing to retire, late
 9    2009, early 2010, he met him -- well, it was a friend that
10    worked for my husband at Campbell Soup, and my husband would
11    come home and tell me about Mr. Smith being someone who could
12    successfully take care of our retirement funds and, you know,
13    help us with them.
14              And so I agreed to go out to his office, which was
15    on Melody Lane, and meet with Mr. Smith, and we went out and
16    met with him initially, and we decided to go ahead and let
17    him handle our retirement, and from then on, we met with him
18    many, many times.
19    Q.   And at that time, was it -- what was -- your husband, did
20    he get a pension, or was this savings or kind of an employee
21    benefit program from Campbell's?
22    A.   He had his -- while I worked, he did most all the
23    savings, and I kind of used a lot of the money that I made
24    to -- for the household things, so my retirement fund was not
25    as much as -- my husband had quite a bit more retirement
```

651

V. Hullum - Direct

1    funds than I had.  So it was his pension, retirement fund
2    that we decided to put in the hands of Mr. Smith so that he
3    could manage them for us.
4    Q.  Did Mr. -- did your husband, Sylvester Hullum, did he
5    give all -- all of his retirement to Mr. Smith for his -- to
6    help with the retirement?
7    A.  Yes.
8    Q.  About how much was that, if you know?
9    A.  Let's see.  There was 80,000, and then there was another
10   300 and -- close to 400,000.
11   Q.  Did you have anything else to live on in retirement
12   besides that?
13   A.  Well, my retirement was about, maybe, 60,000 or so, and
14   we eventually gave Mr. Smith about 40,000 from that.
15   Q.  Did you -- did you try to check out Mr. Smith's
16   reputation prior to meeting with him?
17   A.  Yes.  I called the Better Business Bureau, and I wrote
18   them a letter.
19   Q.  And did -- don't tell me what they said.  Did you feel
20   comfortable going to Mr. Smith --
21   A.  Yes, I did.
22   Q.  So you checked him out, and then you went to him.  What
23   did Mr. Smith tell you guys about who he was and what he did?
24   A.  He let us know that he did handle retirement funds and
25   that he could invest them for us.  He was an investment

V. Hullum - Direct

 1   person, broker, and he was a specialist at what he did, and
 2   he had a great amount of experience.  And very easy to talk
 3   to, very easygoing person, and we felt that he was a
 4   truthful -- he -- he gave us the impression that he loved God
 5   and that he was a God-fearing man and that many times that he
 6   prayed and that he was a good person.  And of course, we love
 7   God, and we just felt that he was a good person to handle our
 8   retirement.
 9   Q.  Now, when you were looking for assistance in terms of
10   your retirement, were you looking for, like, retirement
11   income to last throughout your retirement?
12   A.  Yes.  Yes.
13   Q.  What did Mr. Smith suggest for investments, just the
14   general type?
15   A.  Well, he had several places that he could invest it, you
16   know.  Was it Northridge and Western -- there were 401(k)s.
17   There were various places that he could invest it.  I can't
18   remember all of them right now, but there was about four or
19   five different places that he diversified our funds.
20   Q.  Okay.  And what -- and what was your comfort level with
21   risk in terms of your funds?  Were you willing to lose your
22   retirement?
23   A.  Well, I felt like this was something that -- that there
24   were people who did this, and as I say, I did talk to the
25   Better Business Bureau.  So, yes, at first, I felt

—————V. Hullum - Direct—————

1   comfortable, yes.

2   Q.   Okay.   Now -- and did Mr. Smith know the entirety of your

3   financial situation?   He knew everything that you all owned

4   and what you planned on retiring on, et cetera?

5   A.   Yes.   Well, we told him what our expectations were and,

6   you know, that we had grandchildren and -- of course, all our

7   children were grown at that time.   And -- and we told him our

8   expectations, and that we wanted to be able to, you know,

9   travel and give to our grandchildren and take them on cruises

10  and if we could help them with college, whatever we could

11  possibly do to help.

12  Q.   Now, when you first met him in 2010, did you ever hear --

13  or when did you first hear about an investment called Dental

14  Support Plus Franchises after the first time you met with him

15  in 2010?

16  A.   It was in about a year.

17  Q.   Okay.

18  A.   About maybe 2011 that we heard about it.

19  Q.   Who told you about that?

20  A.   Mr. Smith.

21  Q.   What did he say about Dental Support Plus?

22  A.   He said there was another avenue that we could venture

23  into that we could get substantial income, as much as -- four

24  or five years down the road, as much as maybe 5,000 a month,

25  you know.

V. Hullum - Direct

```
 1  Q.  Did he say if this was a proven investment, or did it
 2  have a track record?
 3  A.  He said it was solid.
 4  Q.  Okay.
 5  A.  I don't know if that is the exact word, but that's the
 6  impression given, that it was a solid investment and that
 7  there was next to no way that we could lose in this
 8  investment.
 9  Q.  Did he talk to you about a man named Kent Maerki?
10  A.  Yes, he did tell us about Mr. Maerki.
11  Q.  What did he say about Kent Maerki?
12  A.  He said his office was in Scottsdale and that -- I think
13  he was the -- what I would call the CEO more or less, and
14  that he had had many people that -- many people that had
15  invested in this venture, and that it -- it would be a good
16  thing.  Since we had trusted him with all our funds, we felt
17  like him telling us it would be a good thing for us to invest
18  in -- we felt like it would be a good avenue for us to go.
19  Q.  Now, did you or your husband -- do you have any
20  background or training in investments?
21  A.  None.
22  Q.  Okay.  Would you consider yourself a sophisticated
23  investor?
24  A.  I realize that ignorance is no excuse.  I would not
25  consider us sophisticated in any shape or form.  However, we
```

—V. Hullum - Direct—

1    were trusting.

2    Q.  And did Mr. Smith say about the fee or commission that

3    he -- did he talk about any fees or commission that would

4    come out of your money for the Dental Support Plus Franchise?

5    A.  Well, there was an office there in Arizona that -- I'm

6    trying to remember how it all went.  He said everything would

7    be taken out of the money, and the money that we gained, you

8    know, for --

9    Q.  He said the money would be taken out from what you

10   earned?

11   A.  Yes.

12   Q.  What was your answer?

13   A.  Yes.

14   Q.  Thank you.  What did he say about other people investing

15   in this?

16   A.  He said that Kent Maerki had -- it was a very, you know,

17   successful venture, and there were other people, many other

18   people.

19   Q.  And this is what Bill Smith told you?

20   A.  Yes.

21   Q.  Did he say anything about himself investing?

22   A.  He didn't say he invested.  He said he worked with

23   Mr. Maerki with this venture.

24   Q.  Okay.

25   A.  Which gave us another level of confidence because we felt

─────────────────────────V. Hullum - Direct─────────────────────────

1    like he was, you know --

2    Q.  Did you all decide to do an investment with the Dental

3    Support Plus Franchise?

4    A.  Yes, we did.

5    Q.  And how much did you put in?

6    A.  40,000.

7    Q.  And in order to do this investment, did you have to --

8    what did Mr. Smith do in terms of -- what did he do to help

9    you with your investment?

10   A.  Well, he gave us a list of all of the investments that he

11   had made for us, and he took so much out of -- I think it was

12   four or five of them that added up to something like -- it

13   was around 43,000 when we added together what he used.

14   Q.  Did you go to a bank with Mr. Smith?

15   A.  Yes.  There was an account opened at the Wells Fargo Bank

16   there in -- I think it's Citrus Heights.  It's right off of

17   Auburn Boulevard.

18   Q.  What was the purpose of going to the bank?

19   A.  Well, we were told that we would open an account there

20   and all of our funds and -- not all of our funds, but all of

21   our money that we would receive and all the money that would

22   be -- would go through that bank.

23   Q.  Did he introduce you to anyone at that bank?

24   A.  He had a relative.  I believe it was a daughter or a

25   daughter-in-law, someone that was some kin to him that worked

V. Hullum - Direct

1   in that bank, yes.

2   Q.  Okay.  Now, I'm going to show you what's been marked for

3   identification as Exhibit 802.  If you can just look at that

4   real quick.  Do you recognize that document?

5   A.  We had a few that looked like this, yes.

6   Q.  Okay.  And is that -- whose signature is at the bottom of

7   it?

8   A.  My husband's.

9           MS. YUSI:  We move to admit Exhibit 802.

10  BY MS. YUSI:

11  Q.  Now, what is the date of his signature, if you can see

12  that on Exhibit --

13  A.  7/13/11.

14  Q.  Is that -- in July 2011, is that when you all made your

15  investment in Dental Support Franchise?

16  A.  Yes.  About a year after we started working with

17  Mr. Smith.

18  Q.  Okay.  And was there a lot of paperwork that you received

19  concerning the franchise?

20  A.  Books and books.

21  Q.  And did Mr. Smith go through that paperwork with you at

22  all?

23  A.  Well, more or less told that we would read it at our

24  leisure.

25  Q.  Okay.  So --

```
                            ┌V. Hullum - Direct┐
  1    A.   It was a lot of -- a lot.

  2    Q.   So did he ever sit down and go page by page or anything

  3    with you all?

  4    A.   No.  No.  We didn't go page by page.

  5    Q.   What was your understanding when you first invested as to

  6    any work or effort you would have to make in the Dental

  7    Support Plus Franchise?

  8    A.   No -- no work.

  9    Q.   It was hands-off?

 10    A.   At first, yes.  Yes.

 11    Q.   How often would you speak with Mr. Smith?

 12    A.   He was very available.  Any time we called him, he made

 13    himself available, sometimes twice a month, sometimes once a

 14    month.  He was available --

 15    Q.   Okay.

 16    A.   -- at first, yeah.

 17    Q.   And what happened?  You said "at first."  What do you

 18    mean by that?

 19    A.   I mean, of course, towards the end of the whole

 20    situation, he was less approach -- available.  My husband

 21    talked to him, I think, about maybe two months ago on the

 22    phone -- about two, maybe three months.  It's been a while.

 23    And that's the last time we talked to him.  And before then,

 24    it was very sketchy, yeah, you know, two, three months, you

 25    know.
```

Carol L. Naughton, Official Court Reporter

659

V. Hullum - Direct

1   Q.   Okay.  Did Mr. Smith ever say there were any issues with

2   any of your investments?

3   A.   Well, he didn't say anything that he had there was any

4   problems with.

5   Q.   Okay.  What did he say?

6   A.   You mean verbatim what did he say?  Let's see how I can

7   put this.  He -- until we were -- started to get letters from

8   Virginia letting us know there was an ongoing investigation

9   and litigation was in process and things were beginning to

10  happen, we didn't know that we had a real big problem, not

11  with that $40,000, no, we didn't know.

12  Q.   Okay.  And did you ever -- do you recall receiving any

13  money from the Dental Support Plus investment?

14  A.   Now, I don't recall receiving checks, but I understand

15  there were some checks that were signed in the front by

16  someone --

17  Q.   I'm just asking about what you recall.

18  A.   No.  Not initially, no.

19  Q.   Okay.  And did you ever ask for any money back from your

20  investment over the years?

21  A.   The 40,000?  No.

22  Q.   Okay.

23  A.   Not from that.  From the other money he had --

24  Q.   Did you receive any money back from the investments that

25  you made with Mr. Smith?

Carol L. Naughton, Official Court Reporter

660

V. Hullum - Direct

1   A.   Are you talking about the 40,000?

2   Q.   Just all your investments.

3   A.   I remember at one time we wanted to get a car, and I

4   think we got, what, 20,000?  And then I remember that we had

5   an insurance -- a life insurance that he invested money that

6   we received roughly 1,200 a month, and we were promised that

7   after that, we would automatically kick into a higher amount

8   that we would get continually.  And that ran out, and I

9   called them, and they said there were no more funds

10  available, there is no more to be giving you.

11          Since we had lost all of our money, we are reduced

12  to living on Social Security.  That's all I and my husband

13  live on now.  That's all we have.

14  Q.   What, if anything, did Mr. Smith tell you about his

15  involvement with Dazzle Dental?

16  A.   Who?

17  Q.   Dazzle Dental.  Did he ever say anything about his

18  involvement with Dazzle Dental?

19  A.   No.

20  Q.   Did Mr. Smith say anything to you, if anything, about any

21  involvement with other dental franchise or investments that

22  were failed prior to selling this one to you?

23  A.   No.  No.

24  Q.   What, if anything, did Mr. Smith tell you, after your

25  investment, concerning state regulatory investigations into

```
                            ─────────V. Hullum - Direct─────────
```

 1   the Dental Support Plus Franchise?  Did he ever update you on

 2   those?

 3   A.  No.

 4   Q.  Did he --

 5   A.  Not that I remember.

 6   Q.  Did Mr. Smith ever talk to you about testifying on

 7   Mr. Maerki's behalf concerning the franchises?

 8   A.  No.

 9        MS. YUSI:  I think those are all my questions right

10   now, Ms. Hullum.  I believe other counsel will have some.

11        (Video paused.)

12        MS. YUSI:  Your Honor, I'm not sure what you want to

13   do, but there's a cross-exam.

14        THE COURT:  All right.  I'll tell you what we're

15   going to do, we're going to take a 15-minute break, and then

16   we're going to start the cross-examination.

17        (The jury exited the courtroom.)

18        (Recess from 3:55 p.m. to 4:16 p.m.)

19        MS. YUSI:  Your Honor, I just wanted to update you.

20   Our witness is not going to be here before close of business

21   today.  There is now a mechanical problem in his DC flight.

22   So we expect him to hopefully be here Monday -- well, to be

23   available on Monday morning.

24        THE COURT:  Okay.  Fine.

25        MS. YUSI:  We have about 15 minutes, I believe, left

———————V. Hullum - Cross (By Mr. Grindrod)———————

1    on the deposition, and after that, we have Raeann Gibson here

2    as a backup witness, but as you recall, she's a very lengthy

3    witness.  We have a number of out-of-town witnesses coming

4    Monday that we want to get on.

5           THE COURT:  The Court thinks you've done enough for

6    the week.  After cross-examination, we'll be departing the

7    premises.

8           MS. YUSI:  Thank you, Your Honor.

9           THE COURT:  Bring them in.

10          MR. GRINDROD:  So just real quick while the jury is

11   coming in, we can just play right through Smith 515, and I'll

12   show -- I'll pause to show 516.

13          (The jury entered the courtroom.)

14          THE COURT:  You may be seated.

15          All jurors are in the courtroom.

16          Does counsel agree?

17          MS. YUSI:  The government agrees, Your Honor.

18          MS. McCASLIN:  Mr. Smith agrees.

19          MR. YAROW:  Yes, Your Honor.

20          THE COURT:  You may continue.

21          (Video continued as follows:)

22                        CROSS-EXAMINATION

23   BY MR. GRINDROD:

24   Q.  Good morning, ma'am.

25   A.  Good morning.

V. Hullum - Cross (By Mr. Grindrod)

1  Q.  My name is Andrew Grindrod.  I represent Mr. Smith.

2  A.  Yes.

3  Q.  Ma'am, what I would like to do is start off talking about

4  a timeline.  I know this was a long time ago.  So I'm going

5  to show you some documents and walk through some dates with

6  you.  Okay?

7         I'm going to hand you a document that's been marked

8  Government Exhibit 804.  Do you recognize that document?

9  A.  It looks like the front of one of the books that we

10  received.

11  Q.  So now that you've seen that document, do you recognize

12  that document?

13  A.  I would have to go through -- I have so many papers at

14  home in book form that I would have to go through them and

15  find out if I recognize this one, but I do recognize my

16  husband's signature.

17  Q.  And your husband's signature is throughout that document?

18  A.  His signature and initials, yes.

19         MR. GRINDROD:  I offer that, and I can remark it as

20  Smith Exhibit 515.

21         MS. YUSI:  Okay.

22  BY MR. GRINDROD:

23  Q.  Could you go, ma'am, to the very last page of that

24  document.  It's actually on the back.

25  A.  Turn to the back?

—————— V. Hullum - Cross (By Mr. Grindrod) ——————

1    Q.  Yes, ma'am.

2         Now, that's the Dental Support Plus Franchise

3    application, right?

4    A.  Okay.

5    Q.  And you see that there's signatures on that last page?

6    A.  Yes.

7    Q.  Your signature?

8    A.  Yes.

9    Q.  Sorry, ma'am?

10   A.  Yes.

11   Q.  And your husband's signature?

12   A.  Yes.

13   Q.  And there's a date next to that, right?

14   A.  Uh-huh.  3/23/11.  Uh-huh.

15   Q.  And so March 2011 is the general time period where you

16   all started looking into or seriously looking into Dental

17   Support Plus Franchise, right?

18   A.  Okay.

19   Q.  Is that right?

20   A.  It was 2011, yes.  Is this the first page -- paper that

21   we received?  I'm sorry.  I had a lot of surgery done on my

22   mouth.

23   Q.  Oh, no, that's okay.

24   A.  Is this the first one we received?

25   Q.  So I'm not allowed to answer questions for you.

Carol L. Naughton, Official Court Reporter

V. Hullum - Cross (By Mr. Grindrod)

1    A.  Oh, well, if this is the first one we received, I assume

2    the date is proper.

3    Q.  Okay.

4    A.  Yes, sir.

5    Q.  And let's look at what's been pre-marked as Government

6    Exhibit 801 that I'm going to mark as Smith Exhibit 516.

7            Do you recognize that document, ma'am?

8    A.  I've seen this name before, yes.

9    Q.  Is that a letter from Attorney Lynne Shelton to you?

10   A.  This is June.  It has our name on it, yes.  I assume it

11   was sent to us.  I can go through the papers at home and tell

12   you if we have this exact one, but I can't tell you just by

13   looking at it here.

14           (Video paused.)

15           MR. GRINDROD:  And, ma'am, if you could put my

16   screen on just so I can show the jury Smith 516.

17           We can switch back to the government's screen and

18   continue with the cross.

19           (Video continued as follows:)

20           THE WITNESS:  And there's no signature on this one.

21   BY MR. GRINDROD:

22   Q.  Well, turn to Page 2.

23   A.  Uh-huh.

24   Q.  Do you see a signature there at the bottom of Lynne

25   Shelton?

———————V. Hullum - Cross (By Mr. Grindrod)———————

1    A.   Yes.

2    Q.   Okay.  And at the top, is that addressed to Sylvester

3    Hullum?

4    A.   That is our address, yes.

5    Q.   So do you believe you all received this letter in

6    connection with Dental Support --

7    A.   We do have -- we do have letters from this person, yes.

8    Q.   Okay.

9    A.   But I don't know -- but we do have letters from this

10   person, yes.

11   Q.   Okay.

12        MR. GRINDROD:  I'll offer Smith 516.

13        THE WITNESS:  If you would have requested, I would

14   have brought the whole box of stuff in.

15   BY MR. GRINDROD:

16   Q.   You have a whole box of stuff at home?

17   A.   Yeah.

18   Q.   And did you --

19   A.   I keep everything.

20   Q.   Did you remember getting letters from Lynne Shelton

21   about --

22        UNIDENTIFIED SPEAKER:  You are starting to overlap.

23   What is your full question?

24   BY MR. GRINDROD:

25   Q.   Did you get letters like that from Lynn Shelton?

———————V. Hullum - Cross (By Mr. Grindrod)———————

1    A.   I remember that name, yes, sir.

2    Q.   I know you remember the name, but did you get letters

3    about Dental Support Plus Franchise from Lynne Shelton?

4    A.   Yes.

5    Q.   And did Lynne Shelton send you along with those letters

6    lots of documents?

7    A.   Yeah.  In book form.

8    Q.   Thick book form?

9    A.   Uh-huh.

10   Q.   And those documents were about Dental Support Plus

11   Franchise?

12   A.   Yes.

13   Q.   And Ms. Shelton, Attorney Shelton, asked you to review

14   those documents, right?

15   A.   Yes, they always ask us to review them.

16   Q.   Okay.  And Attorney Shelton even told you in those

17   letters to, you know, get your own independent legal advice

18   if you wanted to about anything that was in those documents?

19   A.   I never talked to these people personally.

20   Q.   Sure.

21   A.   In letter form, as I say, because we have no education in

22   legal matters, we -- everybody says you should read what you

23   sign.  But if it's in a -- I don't know.

24   Q.   Do you remember that Ms. Shelton instructed you to -- if

25   you wanted to move forward, to sign the documents and send

———————V. Hullum - Cross (By Mr. Grindrod)———————

1   them somewhere?

2   A.  Any instructions we got, we got through Mr. Smith.

3   Q.  Okay.  So --

4   A.  He -- I don't even remember any of this coming in the

5   mail.  I remember everything coming through Mr. Smith's

6   office.

7   Q.  I believe, ma'am, you said on direct that you remembered

8   the name Kent Maerki.

9   A.  I do.

10  Q.  And I think you said from your perspective, he was the

11  CO?

12  A.  Yeah.

13  Q.  What does that mean?

14  A.  That he was the officer and chief over the whole -- the

15  Dental Plus venture.  I don't think I ever met Mr. Maerki.

16  And I remember one time asking Mr. Smith about the notary

17  public on something that she said Mr. Maerki would sign.  But

18  he says, "When I get back to Scottsdale, they'll have this

19  notarized," and he'll sign it.  I remember that.  But I don't

20  think I ever met -- I could be mistaken, but I don't think I

21  ever met Mr. Maerki.

22  Q.  And, ma'am, I want to turn your attention back to that

23  first document I showed you.

24  A.  Yes, sir.

25  Q.  Which I believe is Smith 515.

669

                    ─────V. Hullum - Cross (By Mr. Grindrod)─────

1              So turn to the very first page of that document, if
2    you would, ma'am.  Now, you said on direct that your
3    understanding was that this was a hands-off business?
4    A.   Yes.
5    Q.   But you understood, obviously, that this was a franchise
6    that you were investing in, right?
7    A.   You want to explain the word "franchise"?
8    Q.   Well, so, do you know, like, what a franchise -- you know
9    McDonald's is a franchise?
10   A.   Okay.  That means it can be independently owned.
11   Q.   I can't -- yeah.  I'm just asking questions.
12             But you knew all along that this was a franchise,
13   right?
14   A.   I saw the wording, but I was going by trust that we had
15   in Mr. Smith that everything would be handled without our
16   having to do anything.
17   Q.   Sure.  And that was because --
18   A.   Money.
19   Q.   That was because, you know, as a franchisee, just like
20   McDonald's can hire a general manager, you can hire vendors,
21   like MetroMedia or Oracare, to actually handle the day-to-day
22   operations of the Dental Support Plus Franchise, right?
23   A.   Okay.
24   Q.   Okay.  So that was your understanding as to how it was
25   going to run.  But you knew all along it was a franchise,

V. Hullum - Cross (By Mr. Grindrod)

1   right, because as you said, the word "franchise" is all over

2   all this stuff, right?

3           So, ma'am, you knew all along that this was a

4   franchise, right?

5   A.  I knew the wording.  I didn't know how much that entailed

6   that we would have to do.

7   Q.  Right.

8   A.  I only knew the wording.  And I only knew the word

9   "franchise" because I knew someone that bought a McDonald's

10  once, and that's the word that she used.

11  Q.  Right.  You -- of this roughly $440,000 that you invested

12  with Mr. Smith -- right?  That was the total amount?

13  A.  Close to it.  I can't give you the exact amount.

14  Q.  Okay.  So $40,000 of that was invested with Dental

15  Support Plus Franchise, right?

16  A.  Yes, sir.

17  Q.  That's Kent Maerki's company?

18  A.  Yes, sir.

19  Q.  The company in Arizona?

20  A.  Yes, sir.

21  Q.  Ma'am, you got about $2,000 in returns related to your

22  Dental Support Plus Franchise investment, right?

23  A.  I don't remember getting $2,000 from Dental Support.  I

24  do remember going into Wells Fargo Bank with my husband.  He

25  signed all the papers.  In fact, this is a shock to me that I

671

———— V. Hullum - Cross (By Mr. Grindrod)————

1  signed it because I remember when -- you have my signature on

2  here.

3        I remember, when we started this, that I told my

4  husband, "I went with you with all of your taking your money

5  out of your account and putting it in what we thought were

6  capable hands of Mr. Smith, but I am not going with you on

7  this Dental Support thing."  I said, "If you want to do this,

8  this is your venture," because I don't remember signing this,

9  but that is my signature.

10 Q.  So it was really your husband who had the involvement in

11 this whole thing?

12 A.  Well, everything he's involved with, I'm sitting beside

13 him.

14 Q.  Sure.

15 A.  That's what we do.  But I don't remember signing -- I

16 don't remember signing this, but that's my signature.

17 Q.  And it is mostly your husband's signature that is

18 throughout that document, right?

19 A.  It must be all his, except that one because I don't

20 remember signing it at all.  I don't remember how it was

21 presented to me that I would sign it.  I don't know.

22 Q.  Okay.

23 A.  As far as getting money, the questions you asked me, I

24 don't remember receiving any tangible money in my hand.  I

25 remember going to the bank signing things, but I don't

──────── V. Hullum - Cross (By Mr. Grindrod) ────────

1    remember getting any money.  I really don't.

2    Q.  Let me show you a document that I marked as Smith 517.

3    A.  Yes.

4    Q.  On the -- each page of that document, do you see there's

5    a check?

6    A.  I see it.

7    Q.  And it's a check with -- that your husband signed by

8    endorsing it?

9    A.  Right.  And I've seen this before.

10   Q.  You've seen those before?

11   A.  Uh-huh.

12   Q.  Okay.  Do they appear to be accurate copies of the

13   deposited checks?  Do you recognize -- let me ask you this,

14   ma'am --

15   A.  Do you mean that's the money given to me to take home, or

16   that's something that he signed that would be deposited?

17   Q.  Let me ask you a different question.

18          Those appear to be checks that are deposited and

19   endorsed by your husband, right?

20   A.  That's his signature.

21   Q.  And what the document is is a check made out to your

22   husband, right?

23   A.  Yes.  But it doesn't mean we took any money home.

24   Q.  So what happens when you endorse a check and put it in

25   the bank?

V. Hullum - Cross (By Mr. Grindrod)

1   A.  It goes into an account.

2   Q.  So if there was money that came back from Dental Support

3   Plus to you all, that would have gone -- that would have been

4   handled by your husband, not by you; is that right?

5   A.  You mean if we actually had money in our hand, it would

6   have been handled by my husband?

7   Q.  If you actually had money coming into your hand or an

8   account that -- you know, your bank account.

9   A.  I do all the bill paying, and I handle all the money.

10  Q.  Including for that account that is related to your

11  franchise?

12  A.  I didn't handle this.

13  Q.  So if money came into that account --

14  A.  And he went in and he signed the checks and it was

15  deposited.  I don't remember getting any money from this

16  account.

17  Q.  I understand.

18       And so from -- by the way, your husband's sitting in

19  this room with us today?

20  A.  Yes, he is.

21  Q.  Okay.  But you are the one that is having to answer all

22  these questions about Dental Support, so I understand.

23  A.  My husband -- one thing, his vision is bad.  They took

24  away his driver's license.  He cannot hear because of working

25  at Campbell's Soup for 30-plus years.  And crawling under the

V. Hullum - Redirect

1   kettles and doing all the welding and stuff that he did, his

2   knees are bad, and they decided that maybe I should be the

3   best person to do it.

4   Q.  I understand.

5       And so from your perspective, you made this $40,000

6   investment in Dental Support Plus Franchise, right?

7   A.  Yes.

8   Q.  And as far as you recall, you don't remember getting any

9   of that back, right?

10  A.  I'm not saying it didn't happen, but I don't remember it.

11  Q.  Fair enough.

12      MR. GRINDROD:  No further questions.

13                  REDIRECT EXAMINATION

14  BY MS. YUSI:

15  Q.  Just a couple follow-ups, Ms. Hullum.

16      The checks in front of you, Smith 517 exhibit, in

17  the memo do they all say "customer appreciation payment"?

18  A.  In the memo?

19  Q.  At the bottom of the check where there's a memo line.

20  A.  Oh, yes.

21  Q.  What does it say there?

22  A.  "Customer appreciation payment," yes.

23  Q.  Okay.  And out of the roughly estimate of 440,000, you

24  said only 40,000 was with DSP.  But did you get any of your

25  investments back?

1    A.   No.

2              (Video concluded.)

3              MS. YUSI:   That concludes the deposition testimony

4    of Ms. Hullum, Your Honor, and I don't know if defense wants

5    to move in Exhibit 517.

6              THE COURT:   Do you wish to move in 517?

7              MR. GRINDROD:   No, Judge.

8              THE COURT:   All right.

9              MS. YUSI:   Thank you.

10             THE COURT:   Ladies and gentlemen, we're going to

11   stop right here for the day.   It's been a long day.   And

12   we're going to ask you to go out and do not do any research

13   on this case.   Don't talk about it on the weekend.   Just let

14   it slip out of your mind.   You have three weeks to put it

15   back in there.

16             So we will see you on Monday morning.   We're going

17   to start again at 9:30.   We're trying to get out of here.   So

18   be safe.   Leave your legal pads with the court security

19   officer, and we will see you Monday morning at 9:30.   Be

20   safe.

21             (The jury exited the courtroom.)

22             (Proceedings adjourned at 4:36 p.m.)

23

24

25

1                       CERTIFICATION

2

3        I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled matter.

5

6

7                    _____/s/_____

8                         Carol L. Naughton

9                         August 30, 2022

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25