```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
 2                         Norfolk Division

 3

 4   - - - - - - - - - - - - - - - - - -
                                        )
 5    UNITED STATES OF AMERICA          )
                                        )
 6    v.                                )      CRIMINAL ACTION NO.
                                        )           2:19cr47
 7    DAVID ALCORN and                  )
      AGHEE WILLIAM SMITH II,           )
 8                                      )
              Defendants.               )
 9   - - - - - - - - - - - - - - - - - -

10                    ** Jury Trial - Day 5 **

11                    TRANSCRIPT OF PROCEEDINGS

12                         Norfolk, Virginia

13                         February 7, 2022

14

15   BEFORE:  THE HONORABLE RAYMOND A. JACKSON
              United States District Judge, and a jury
16

17   APPEARANCES:

18           UNITED STATES ATTORNEY'S OFFICE
             By:  Andrew C. Bosse
19                Melissa E. O'Boyle
                  Elizabeth M. Yusi
20                Assistant United States Attorneys
                  Counsel for the United States
21
             RICHARD S. YAROW LLC
22           By:  Richard S. Yarow
                  Counsel for Defendant David Alcorn
23
             FEDERAL PUBLIC DEFENDER'S OFFICE
24           By:  Andrew W. Grindrod
                  Lindsay Jo McCaslin
25                Assistant Federal Public Defenders
                  Counsel for Defendant Aghee William Smith II
```

1                    I N D E X

2     GOVERNMENT'S
      WITNESSES                                          PAGE
3
       JACOB KURTZ
4          Direct Examination By Ms. Yusi               681
           Cross-Examination By Ms. McCaslin            702
5          Redirect Examination By Ms. Yusi             709
       SUNSHINE GRISSOM
6          Direct Examination By Ms. Yusi               710
           Cross-Examination By Mr. Yarow               739
7          Cross-Examination By Mr. Grindrod            741
           Redirect Examination By Ms. Yusi             750
8      GARY CLAPPER
           Direct Examination By Ms. Yusi               753
9          Cross-Examination By Mr. Grindrod            789
       WILFRIED BERNDT
10         Direct Examination By Ms. Yusi               801
           Cross-Examination By Ms. McCaslin            814
11     SUSAN NEWELL
           Direct Examination By Ms. O'Boyle            819
12

13                   E X H I B I T S

14    GOVERNMENT'S
      NO.                                               PAGE
15
       637                                              686
16     638                                              691
       639                                              698
17     640                                              698
       7                                                716
18     200N                                             718
       200O                                             718
19     200C                                             719
       200H                                             719
20     200S                                             719
       236A                                             719
21     200F                                             724
       318A                                             726
22     243                                              727
       1016A                                            728
23     1017A                                            728
       300                                              737
24     300A                                             737
       300A-1                                           737
25     300B                                             737

I N D E X
(Continued)

E X H I B I T S

GOVERNMENT'S
NO.                                                          PAGE

 300Y                                                        737
 1002Q                                                       737
 1002R                                                       737
 1002S                                                       737
 300X                                                        737
 300Z                                                        737
 1020I                                                       739
 200A                                                        757
 200A-1                                                      758
 200B                                                        759
 200G                                                        760
 200I                                                        763
 200M                                                        764
 221A                                                        766
 224C                                                        768
 286                                                         771
 202                                                         777
 855                                                         811
 700A                                                        827
 703                                                         836
 701                                                         842
 702                                                         845
 702A                                                        847
 704                                                         849
 700                                                         851
 726                                                         854
 705                                                         855
 308                                                         857
 707                                                         860
 316D                                                        863
 708                                                         868
 709                                                         870
 711                                                         872
 712                                                         873
 318D                                                        877
 713                                                         881

```
 1                        I N D E X
                        (Continued)
 2
                      E X H I B I T S
 3
     DEFENDANT SMITH'S
 4   NO.                                         PAGE

 5     132                                       705
       55                                        791
 6     56                                        793

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Proceedings resumed at 9:36 a.m.)

 2              THE COURT:  Good morning, counsel.

 3              MS. YUSI:  Good morning, Your Honor.

 4              MR. YAROW:  Good morning.

 5              MR. GRINDROD:  Good morning.

 6              THE COURT:  The Court had an opportunity over the

 7    weekend to read the defendant's motion to exclude evidence

 8    under Rule 404(b).  The Court is hopeful that none of the

 9    issues raised in that motion will come up this morning.  I

10    would have to end up, really, taking it up at the end of the

11    day because the Court is not going to be available to do it

12    during the lunch hour.

13              I do not have a written response from the

14    United States.  Is the United States filing a written

15    response to this motion?

16              MS. YUSI:  Your Honor, we incorporated some of the

17    issues in our trial brief and addressed it.

18              THE COURT:  All right.  Fine.  Anyway, we'll take it

19    up at the end of the day.  Meanwhile, hopefully you will not

20    reach any of the things they are talking about excluding

21    here.  I know we've had some reference to WeMonitor.  I'll

22    deal with that.  But otherwise, we're prepared to go.

23              Call your first witness and bring in the jury.

24              MS. YUSI:  Your Honor, the government calls Jacob

25    Kurtz.
```

```
                        ──J. Kurtz - Direct──
 1              (The jury entered the courtroom.)
 2              THE COURT:  Good morning, ladies and gentlemen.
 3              Let the record reflect that all jurors are present
 4      this morning.  Does counsel agree?
 5              MS. YUSI:  Government agrees.
 6              MR. YAROW:  Mr. Alcorn agrees.
 7              MS. McCASLIN:  Mr. Smith agrees.
 8              THE COURT:  All right.  You may call your next
 9      witness.
10              MS. YUSI:  Your Honor, the government calls Jacob
11      Kurtz.
12              (Witness sworn.)
13              JACOB KURTZ, called by the Government, having been
14      first duly sworn, was examined and testified as follows:
15                          DIRECT EXAMINATION
16      BY MS. YUSI:
17      Q.  Good morning.  Could you introduce yourself to the Court.
18      A.  Yes.  My name is Jacob Kurtz.
19      Q.  How do you spell your last name?
20      A.  K-u-r-t-z.
21      Q.  How old are you this morning?
22      A.  I'm 69 years old.
23      Q.  In what city and state do you live?
24      A.  Fair Oaks, California.
25      Q.  Is that near Sacramento?
```

J. Kurtz - Direct

1   A.  Yes, a suburb of Sacramento.

2   Q.  Do you still work?

3   A.  I have a small -- couple small businesses.

4   Q.  And what type of small businesses do you have?

5   A.  Well, I'm a real estate broker with a small office and a

6   few agents, and I have a little UPS mail house.

7   Q.  If you can make sure that the microphone is right in

8   front of you and speak clearly into it, as much as you can

9   with a mask on.

10        Is that what you have done for the most part for

11   work throughout your career?

12   A.  Well, I've always had some sort of a small business or

13   been in sales.  The brokerage has been about 11, 12 years.

14   Q.  Okay.

15   A.  And the mail house just came about about a year ago, year

16   and a half ago.

17   Q.  Are you married?

18   A.  Yes, I am.

19   Q.  To whom?

20   A.  Teresa Kurtz.

21   Q.  How long have you all been married?

22   A.  Married 31 years.  Together more than that.

23   Q.  All right.  And does she work?

24   A.  She does.

25   Q.  What does she do?

J. Kurtz - Direct

1   A.   She's in financial services with an automobile

2   dealership, kind of an account person, that's nearby.

3   Q.   And while you all have been working, have you tried to

4   save money for retirement?

5   A.   Yes.

6   Q.   What have you done to do that?

7   A.   Well, we've established retirement accounts with

8   employers at different times.  I've established Roth accounts

9   for my companies.  And we've, you know, invested in the stock

10  market and a few things like that, real estate.

11  Q.   Now, do you consider yourself or your wife a

12  sophisticated investor?

13  A.   No, not really.  Not sophisticated.

14  Q.   Now, do you know a man named Bill Smith?

15  A.   Yes.

16  Q.   Do you see him in the courtroom today?

17  A.   I'm looking.

18  Q.   What is he wearing?

19  A.   Kind of hard to tell with these masks on.

20  Q.   Where is he sitting?

21  A.   I think that's him right there (indicating).

22          MS. YUSI:  Can the record reflect that he's

23  identified Bill Smith?

24          THE COURT:  The record will so reflect.

25          MS. YUSI:  Thank you.

———— J. Kurtz - Direct ————

1   BY MS. YUSI:

2   Q.  How did you first come to hear about Mr. Smith?

3   A.  He had a radio show in our local area.

4   Q.  What was it called?

5   A.  Oh, boy.  Money -- *Money Talks* or Money Talk or something

6   like that.

7   Q.  And was this an AM or FM station?

8   A.  It was an AM station.

9   Q.  What general things would he talk about on *Money Talks*?

10  A.  Investments that were geared for setting yourself up for

11  retirement, that had great returns, and that were safe and --

12  talked about them being similar to annuities but with greater

13  returns, and just a whole bunch of different things like

14  that.

15  Q.  Did you call him at some point?

16  A.  Yes, I did.

17  Q.  Did you end up meeting him in person?

18  A.  Yes, I did.  Eventually, yes.

19  Q.  Do you recall the first time, around when you reached out

20  to him?

21  A.  Let's see.  It would have been on or around the summer of

22  2015, I believe.

23  Q.  2015?

24  A.  I think so.

25  Q.  How many times do you think you met him in person?

─────────────── J. Kurtz - Direct ───────────────

1   A.   In person, we met three or four times at least, maybe

2   more.

3   Q.   Where would you meet?

4   A.   He had a small office adjunct, you know, in a building in

5   a nearby town, Roseville, and I would go over there and meet

6   him there.

7   Q.   What did Mr. Smith tell you about his background?

8   A.   He talked about being an investment banker, a pretty

9   successful investment banker, been in that line of work for

10  many, many years.  He seemed to know what he was talking

11  about at the time, you know.

12  Q.   Okay.

13  A.   Rubbed shoulders with a lot of people in that industry.

14  I don't know how much more specific you want me to get.

15  Q.   That's fine.

16           Can you look at -- there's a binder right in front

17  of you.  Do you see that?

18  A.   Yes.

19  Q.   Can you look at Exhibit 637, which is the first tab.

20  A.   Yes.

21  Q.   Do you recognize that document?

22  A.   Yes.

23  Q.   What is this?

24  A.   It's one of the first things he gave me when we met to

25  sort of explain his investment philosophy and the methodology

J. Kurtz - Direct

1    behind the particular investments that he was familiar with

2    and that he was selling, I guess, at the time.

3              MS. YUSI:  Your Honor, we move to admit Exhibit 637.

4              THE COURT:  Any objection?

5              MS. McCASLIN:  No objection.

6              MR. YAROW:  No objection.

7              THE COURT:  637 will be admitted.

8              (Government's Exhibit 637 was admitted.)

9    BY MS. YUSI:

10   Q.  You said this is something that Mr. Smith provided to you

11   when you first met him?

12   A.  Yes.

13   Q.  All right.  And I want to go to Page 3, the Educational

14   Overview here.  What kind of assets in particular was

15   Mr. Smith talking to you about?

16   A.  Well, he referred to them as investment banker

17   investments.  He started out explaining about some sort of

18   dental franchises.  Spectrum was the primary focus at the

19   time, licenses for wireless and cellular enterprises.

20   Q.  Before we start with that, let's talk about this high

21   cash flow asset.  What was your understanding of what a high

22   cash flow asset was, if you had any?

23   A.  High cash flow asset would be something that, when you

24   invest in it, would return at a pretty high rate of interest

25   on your investment, either monthly or annually.

J. Kurtz - Direct

1   Q.   And in what Mr. Smith gave you, the cash flow asset, it's

2   one that demonstrated a history of success; is that right?

3   A.   Yes.   It made it appear as though this was something he

4   had been doing for many, many years, and in the circles that

5   he traveled with, the people that were in this type of

6   investment, that they were very successful, and there was a

7   good track record that could be pretty much counted on if you

8   set it up properly.

9   Q.   Okay.   And around how much was the goal for the cash flow

10  asset that you all were discussing?

11  A.   On a monthly or yearly?

12  Q.   Just in general.

13  A.   Well, returns anywhere from 10 to 20 percent or more.

14  Q.   What was your understanding of your principal that you

15  would put into that?   Was that at risk with one of these

16  types of assets?

17  A.   Well, the principal would have been returned after a

18  period of three to five years or maybe longer, unless I

19  wanted to reinvest it.   But the returns would grow the

20  account and pay for any fees or any expenses that might be

21  incurred.

22  Q.   And so as far as Mr. Smith told you, was your money that

23  you put into it at risk, if you recall?

24  A.   He tried to make it seem like it wasn't, you know -- I

25  understand investing, and I know that there's an element of

J. Kurtz - Direct

1   risk in anything that you invest in, but the view was that if

2   it was set up properly, that there was virtually no risk.

3   Q.  I want to talk to you about the author section on Page 5

4   of Exhibit 637.  It says he associates and enjoys former

5   Fortune 500 executives and investment banking CEOs.  He's

6   been ranked among the top three financial consultants in the

7   U.S. from 1986.

8          What did he tell you about some of the people he's

9   worked with?

10  A.  Well, he dropped a lot of names.  He also made references

11  to associates in high places.  He went so far as to say that

12  there were people in the President's cabinet that were

13  invested with him and with some of his products.  He dropped

14  names of people that were industry leaders or had been

15  successful in the past, and I just got the impression that he

16  was well connected.

17  Q.  All right.  Thank you.  We're done with that one.

18         Now, did you have any understanding of any duties

19  that Mr. Smith owed to you or what you believed he owed to

20  you when you were talking to him in his professional

21  capacity?

22  A.   Yeah.  I believe there is a certain amount of fiduciary

23  responsibility based upon the way he presented his experience

24  and his -- I believe that he was obligated to present

25  everything in a forthright manner, and his experience would

J. Kurtz - Direct

1    put me into favorable situations and not put me at risk.  I

2    mean, I trusted him.

3    Q.  What was your comfort level?  Were you willing to risk

4    the money that -- your retirement savings?

5    A.  Well, it's a tough decision when you look at that kind of

6    stuff.  We're getting older, and we know that we have to have

7    a certain amount of money to be able to retire comfortably,

8    and so any time I'm looking to investing anything, I'm

9    mindful that there's a potential for some risk.  But yeah,

10   I'm willing to take a certain amount of risk calculated to

11   grow the retirement funds.

12   Q.  Okay.  You talked about spectrum.  Tell us what Mr. Smith

13   told you or how he described the spectrum investment.

14   A.  Well, initially the spectrum investment was presented as

15   licenses that were being purchased at government auctions and

16   that these were pools of money that were going to purchase

17   licenses, and they were later going to be utilized in

18   networks across the country or in different places.

19          And having seen what happened with cellular earlier

20   in the '80s, it seemed reasonable.  It seemed prudent.  His

21   experience seemed to bear what he was telling me.  You know,

22   I figured, okay, this guy knows.  But, you know, just the

23   licenses themselves, I wasn't 100 percent comfortable with.

24   Q.  And how long did you talk to him before you actually

25   ended up investing?

J. Kurtz - Direct

1   A.  Oh, gosh.  Probably -- our conversation started in --

2   like I said, about 2015ish, and we probably were off and on

3   the phone and off and on meetings that we did have, probably,

4   eight months -- six months, eight months, something like

5   that, maybe a little bit more.

6   Q.  Did the spectrum investment change at all while you were

7   talking to him before you invested?

8   A.  Well, the license thing always remained one of the

9   aspects that he was touting, but then other things came in

10  along the way.  And at one meeting, he called me to meet with

11  him to show me that he had purchased licenses.  And he showed

12  me the licenses, and he made it a point to tell me that this

13  was not part of the original investment that he was telling

14  me about, that he had formed his own investment group to

15  purchase these licenses.

16  Q.  Okay.  And what investment did you end up purchasing?

17  A.  The last thing that we talked about that interested me

18  was an investment called RapidLink Wireless, and it was -- it

19  was the purchase of a going concern that supposedly was

20  already successful in Texas, and the investment consisted of

21  hard assets, spectrum licenses, equipment, and a subscriber

22  base that was already in place and generating cash flow.

23  Q.  Okay.  So this was a purchase of an ongoing successful or

24  ongoing profitable business?

25  A.  That was my understanding.

J. Kurtz - Direct

1  Q.  What was the company's name that you were going to

2  purchase, that was going to then take over RapidLink?

3       Let me show you Exhibit 638.  If you can look at

4  that in your book.

5  A.  Oh, yes, yes.

6  Q.  Do you recognize this document?

7  A.  Yes.

8  Q.  What is it?

9  A.  It's an LLC Operating Agreement.

10  Q.  And does it have at the very -- I guess second to third

11  to last page, member signature page?  And it states Teresa

12  Kurtz?

13  A.  Yes.

14  Q.  Is that your wife?

15  A.  Yes, it is.

16       MS. YUSI:  Your Honor, we move to admit Exhibit 638.

17       THE COURT:  Any objection?

18       Hearing no objection, it's admitted.

19       (Government's Exhibit 638 was admitted.)

20  BY MS. YUSI:

21  Q.  So Xcel Bandwidth One -- what was the name of the

22  investment that you were investing in?  Or what membership --

23  what were you going to have a membership of?

24  A.  I was going to be one member of, I think, 30 or 35 people

25  that were going to have a percentage of ownership -- gosh, I

J. Kurtz - Direct

 1   can't remember the numbers -- probably 75 or 80 percent

 2   ownership of the assets and everything else of RapidLink

 3   Wireless.

 4   Q.  Was your membership -- you were getting a membership in

 5   Xcel Bandwidth?

 6   A.  Yes.  The operating manager was Xcel Bandwidth One.  That

 7   was a guy by the name of Daryl Bank.

 8   Q.  Okay.

 9   A.  There was something that had to do with Consolidated

10   Telecom Services, CTS, but I forget what their role was

11   exactly.  I think they might have been managers of some sort.

12   Q.  Okay.

13   A.  Yeah, but what appealed to me was -- and even Mr. Smith

14   commented that this is a far better deal than just licenses

15   because you get cash flow already and you can get hard

16   assets.  He was a proponent of that particular investment.

17   Q.  Did he ever say that he was just a solicitor for the

18   investment?

19   A.  No.

20   Q.  Did he ever tell you he's only passing on information, he

21   had no personal knowledge?

22   A.  No.  No.  In fact, quite the opposite.  He made it sound

23   as though he was very knowledgeable about everything that was

24   going on.

25   Q.  Did he tell you how long he had been --

────────── J. Kurtz - Direct ──────────

1           MS. YUSI:  Thank you, Ms. O'Boyle.

2      BY MS. YUSI:

3      Q.  Did he tell you how long he had been selling spectrum

4      investments?

5      A.  No, not specifically.

6      Q.  Did he tell you about any potential risk with this

7      investment?

8      A.  Again, not specifically.  Quite the opposite, that now

9      would be a good time and that -- gee, how did he put that?

10     Q.  How were you going to make money from this investment?

11     A.  Well, the licenses would then be sold to telecom

12     companies or leased to telecom companies for a high rate of

13     return and that our investment would come back to us through

14     monthly payments from these.  If Verizon bought licenses from

15     us or Sprint or whoever, that they would pay us to lease the

16     spectrum, and that's how we would get a return on our

17     investment.

18     Q.  Did he talk about any fees associated with the money that

19     you would be putting in?

20     A.  Yes.

21     Q.  What did he say?

22     A.  That as part of the investment they were offering, the

23     fees would be paid for; they wouldn't come out of our

24     proceeds, that the company would make the payments, would

25     cover all costs.

J. Kurtz - Direct

1   Q.  What about his commissions?  Did he tell you where those

2   were going to come from?

3   A.  Never talked about his commissions.

4   Q.  Was there any sense of urgency to get in on the Xcel

5   Bandwidth, the purchasing of RapidLink?

6   A.  Initially that seemed to be where his focus was.  He

7   tried to encourage me to invest, and I didn't -- I just

8   wasn't comfortable at that point.

9   Q.  Okay.  Now, you talked -- you mentioned Daryl Bank.  How

10  was Daryl Bank involved with this, if you know?

11  A.  Daryl Bank was the name that was bantered about the most

12  amongst a few others.  Daryl Bank was, I guess, the creator

13  of the opportunity.  He had a company called Dominion

14  Investments or something like that.

15          And Bill would refer to him quite a bit as a highly

16  experienced investment banker, as being very straightforward

17  and honest, and a Christian man, a family man, and all this.

18  And, in fact, when there was -- when I had questions, he

19  arranged, on more than one occasion, for a conference call

20  with Mr. Bank.

21  Q.  How many times do you think you talked to Mr. Bank?

22  A.  I talked with Daryl Bank at least twice, and I'm thinking

23  maybe a third time, about RapidLink before I made the

24  decision.

25  Q.  Was Mr. Smith on any of those calls with you?

J. Kurtz - Direct

1    A.   Yes, he was.  He was on the first one, I believe.

2    Q.   Did Mr. Smith say anything about Daryl Bank's issues with

3    the U.S. Securities and Exchange Commission?

4    A.   No.

5    Q.   Did he talk about any regulatory issues with some of the

6    management of the spectrum investments?

7    A.   No.

8    Q.   All right.  Did they talk about any State Corporation

9    Commission investigations into investments by some of the

10   same people in charge of the spectrum investments?

11   A.   No.

12   Q.   Now, other than -- we'll talk a little bit more about

13   spectrum, but other than that, did he talk to you about any

14   other investments --

15   A.   Yes.

16   Q.   -- opportunities?

17          What did he tell you about?

18   A.   There was some sort of a dental franchise plan that he

19   mentioned early on in our, you know -- in our talkings.

20          THE COURT:  Could you keep your voice up at the end,

21   sir.  Keep your voice up.

22          THE WITNESS:  Keep my voice up?  Okay.  Sorry.

23   BY MS. YUSI:

24   Q.   Yes, thank you.

25   A.   Yes, there was some sort of a dental franchise thing that

J. Kurtz - Direct

1   he told me about, which didn't interest me at all.

2   Q.   And this was in 2015?

3   A.   Yeah.  It would have been one of the first things along

4   with the spectrum licenses.

5   Q.   Now, did you end up investing in Xcel for the RapidLink?

6   A.   Yes.

7   Q.   And how much did you put into it?

8   A.   50,000.

9   Q.   Where did that money come from?

10   A.   Came from one of the 401(k) and -- then it was a

11   self-directed IRA, but it was initially a 401(k) investment

12   account.

13   Q.   How did you do the payment?  Who did you have to write a

14   check to, if you recall?

15   A.   Yes.  The original custodian was Alliance Trust.

16   Q.   Were there any issues or problems with trying to pay?

17   A.   Yes, sort of.  It came about afterwards.  We paid, and

18   then we were told that they wouldn't accept the money, that

19   it needed to be put with a different custodian.  And I called

20   Bill about it --

21   Q.   Who wouldn't accept the money?

22   A.   Oh, I'm sorry, what?

23   Q.   Who wouldn't accept the money?

24   A.   Alliance Trust.

25   Q.   Did they send it back to you?

J. Kurtz - Direct

1  A.  No.  Once I sent it, I never -- it was gone.  I never saw

2  it again.  But it did get moved subsequently.  I called Bill

3  about it.  I had to go to a place called Provident Trust, and

4  I asked him what was going on.  He says, "Oh, it's fairly

5  common for custodians to change," and "Don't worry about it.

6  It's fine."

7        I took him at his word and, you know, approved the

8  transfer from Alliance to Provident, and that was that.

9        MS. YUSI:  If we can look at Exhibit 639, just for

10 the witness.

11 BY MS. YUSI:

12 Q.  And do you recognize this document?

13 A.  Yes.

14 Q.  And what is it?

15 A.  It's a -- let's see.  Well, it's an acknowledgment of the

16 amount that we invested.  This is not the note, though.

17 Q.  Does it say member loan?

18 A.  Yes.

19 Q.  And is that your wife's name at the top?

20 A.  Yes.

21        MS. YUSI:  Your Honor, we move to admit Exhibit 639.

22        THE COURT:  Any objection?

23        MS. McCASLIN:  No objection.

24        MR. YAROW:  No objection.

25        THE COURT:  639 is admitted.

J. Kurtz - Direct

1             (Government's Exhibit 639 was admitted.)

2    BY MS. YUSI:

3    Q.  Were you supposed to get interest payments on this loan?

4    A.  Yes.

5    Q.  Was that part of the investment or the return that you

6    would be getting?

7    A.  Yeah.  It was part of the structured collateralized

8    aspect of the investment.

9    Q.  If you can look at Exhibit 640.  Do you recognize this

10   signature page?

11   A.  Yes.

12   Q.  And is this the signature page for the buyer agreement?

13   A.  Yes.

14             MS. YUSI:  Your Honor, we move to admit Exhibit 640.

15             THE COURT:  Hearing no objection, 640 is admitted.

16             (Government's Exhibit 640 was admitted.)

17   BY MS. YUSI:

18   Q.  This isn't fully executed, not signed, but who is the

19   seller for the buyer agreement that you did?

20   A.  The seller is Daryl Bank.

21   Q.  And when was the offer accepted?

22   A.  June 13th, 2016.

23   Q.  And at the bottom left, it says broker, DOM Business

24   Brokers.  Who signed it as an agent?

25   A.  Bill Smith.

J. Kurtz - Direct

1   Q.   What was his title?

2   A.   Authorized agent for broker.

3   Q.   What was your understanding of what a broker is?

4   A.   Person authorized to represent a company or an individual

5   in the sale of an asset or a business or even a --

6   Q.   Okay.

7   A.   Okay.

8            MS. YUSI:   Thank you, Ms. O'Boyle.

9   BY MS. YUSI:

10  Q.   After you invested, did you keep up with how the -- well,

11  how quickly were you supposed to start seeing returns on

12  this?

13  A.   Well, supposedly, there was cash flow already happening,

14  and I would start to see deposits right away.   And the

15  custodial fees would be the first thing that would be paid

16  from the proceeds, when, in fact, that was the first thing

17  that was subtracted from the moneys that I sent over.

18  Q.   So the money you were going to make was going to take

19  care of all the fees?

20  A.   Uh-huh.

21  Q.   Not from your investment, not from the money from your

22  initial investment?

23  A.   Right, not the principal.

24  Q.   And after you invested, how did you try to keep up to

25  date how things were going?

J. Kurtz - Direct

```
 1   A.  Well, I attempted to communicate with Provident about it
 2   and question them as to the fees that were being deducted,
 3   and they just told me, well, that's what it cost to manage
 4   this asset.  They knew nothing about an arrangement to pay
 5   those fees on my behalf.
 6   Q.  Okay.  Now, did you listen to any conference calls?
 7   A.  Yeah.  There was a couple different conference calls that
 8   I got on about it and listened to --
 9   Q.  About your investment?
10   A.  Yes.
11   Q.  And who -- in general what were those about?
12   A.  Talking about the assets and the time frames and the plan
13   to increase the subscriber base and really ramp it up, to add
14   equipment, add more towers, expand into a different city
15   close by.  Just general business expansion and sales sort of
16   updates.
17   Q.  Now, did you start getting a return after a little bit?
18   A.  No.
19   Q.  Did you talk to Mr. Smith about this?
20   A.  Yes.
21   Q.  How often would you speak with him?
22   A.  I spoke to him several times, and he never really had a
23   concrete explanation as to why this thing wasn't doing what
24   he said it would.  Just other than --
25   Q.  So you told him you were not getting a return -- I
```

J. Kurtz - Direct

1    apologize.  I was cutting you off.

2             So you spoke to Mr. Smith about this?

3    A.  Yes.

4    Q.  And did he understand you were not getting what you

5    thought you were going to get?

6    A.  Yes.  I believe he did, yeah.  There came a time shortly

7    thereafter where he began to communicate with me, because I

8    think he realized something was up.

9             And, in fact, towards the end of my conversations

10   with him, he tried to explain to me that he was -- had a plan

11   he was putting together to make me whole and some of the

12   other investors.  But he couldn't be specific about what that

13   plan was or when that plan might materialize.  Basically it

14   was just all talk.

15   Q.  And in order to make yourself whole, did you need to do

16   anything?

17   A.  No.

18   Q.  Would you have to make another investment?

19   A.  No.

20   Q.  Did he ever pitch any other investments after you were

21   not getting your returns?

22   A.  No.

23   Q.  How long did you talk to him -- or when is the last time

24   you've spoken to Mr. Smith?

25   A.  Wow.  Let's see.  Probably would have been about -- on or

---J. Kurtz - Cross (By Ms. McCaslin)---

1    about the fall of 2016, early 2017.  I'm sorry.  It's been a
2    while ago.
3    Q.  Sure.
4    A.  And I'm not 100 percent clear on the time frame.  But at
5    some point after him telling me about putting together a plan
6    to make us whole, his phone was disconnected, and he was no
7    longer reachable.  And of course, the money was gone.
8    Q.  Did you get any of your money back?
9    A.  No.
10   Q.  Did you ever make any returns as you were told by
11   Mr. Smith?
12   A.  No.
13          MS. YUSI:  I think those are all of my questions for
14   now.  Thank you.
15          THE COURT:  Cross-examination?
16          MR. YAROW:  No questions from Mr. Alcorn, Your
17   Honor.
18          THE COURT:  Okay.
19                      CROSS-EXAMINATION
20   BY MS. McCASLIN:
21   Q.  Good morning, Mr. Kurtz.
22   A.  Good morning.
23   Q.  My name is Lindsay McCaslin.  I represent Mr. Smith.  I
24   have a couple questions about the collateralized fixed-asset
25   planning.

J. Kurtz - Cross (By Ms. McCaslin)

1              MS. McCASLIN:  If we can pull up Government's 637.

2    BY MS. McCASLIN:

3    Q.  So this has already been offered into evidence.  You

4    discussed this with Ms. Yusi, correct?

5    A.  I think so, yeah.  Is that the first sheet that he gave

6    me?  Yes.

7    Q.  Now, if we could scroll down to the second page.

8    A.  Okay.

9    Q.  This handout doesn't mention any specific investment,

10   correct?

11   A.  No.

12   Q.  It doesn't mention anything about spectrum?

13   A.  No, not specifically.

14   Q.  It's just a very general handout.

15   A.  Well, he represented it as being a pretty standardized

16   investment process for sophisticated or high-level investment

17   bankers.

18   Q.  And as part of this plan, it looks at specifically a

19   collateral column and a cash flow column, correct?

20   A.  Uh-huh.

21   Q.  And it was your understanding that the cash flow column

22   would be bringing in money each month or fairly consistently,

23   right?

24   A.  Yes.

25   Q.  Now, the collateral side is going to be something that is

—————— J. Kurtz - Cross (By Ms. McCaslin) ——————

1    very low risk, like an annuity or something, correct?

2    A.  I guess, yes.  I think so.  I'm not 100 percent sure what

3    you're asking.

4              MS. McCASLIN:  If we could scroll down to Page 4,

5    please.

6    BY MS. McCASLIN:

7    Q.  So here we see, on the collateral side, a fixed annuity,

8    which is typically what you were relying on for the safer

9    investment, correct?

10   A.  Yes.

11             MS. McCASLIN:  If we could take that down, please.

12   BY MS. McCASLIN:

13   Q.  Now, you understood that Xcel had existing towers in

14   Texas, right?

15   A.  Yes.

16   Q.  And RapidLink Wireless was going to be updating the

17   system?

18   A.  Yes.

19   Q.  And expanding the system?

20   A.  Yes.

21   Q.  And they were working with Motorola in Texas?

22   A.  I believe Motorola, yes.

23   Q.  And they were working on a push-to-talk system, correct?

24   A.  I remember about that too.  Those were all things that

25   were appealing to me.

J. Kurtz - Cross (By Ms. McCaslin)

1   Q.   Right.

2        MS. McCASLIN:   If we could pull up Smith 132, only

3   for the witness.

4   BY MS. McCASLIN:

5   Q.   Does this look familiar to you?  And we can scroll down

6   to the next couple pages if --

7   A.   Yes.  I looked at this sheet.

8   Q.   So this is one of the handouts that you received about

9   RapidLink Wireless?

10  A.   Yes.

11       MS. McCASLIN:   I move to admit, please.

12       MS. YUSI:   No objection.

13       THE COURT:   The exhibit will be admitted.

14       (Defendant Smith's Exhibit 132 was admitted.)

15       THE WITNESS:   Incidentally, this is one of the

16  sheets that made me feel more comfortable about this as an

17  investment.

18  BY MS. McCASLIN:

19  Q.   Because it talks about Motorola, right?

20  A.   Sure.  There's a lot of reasons why, but it made me feel

21  more comfortable.

22  Q.   It also says that this CTS investment has resulted, in

23  2014, in annual revenue of over 300,000, right?

24  A.   Uh-huh.  Yes, I'm sorry.

25  Q.   Thank you.

J. Kurtz - Cross (By Ms. McCaslin)

1            If we could go to Page 2, please.  And there's a map
2    of where the towers are, right?
3    A.  Yes.  A general layout there, from what I was able to
4    gather.
5    Q.  And this gave you confidence?
6    A.  Yes.
7    Q.  Did you do any of your own research on spectrum and the
8    push-to-talk system?
9    A.  Well, limited.  I relied mostly on what I was told; but,
10   yeah, I mean, a little bit here and there, and it seemed
11   legitimate.
12   Q.  And at one point, you e-mailed Bill an article about a
13   regional wireless system that reminded you of it, correct?
14   A.  Yes.  I found something.  I forget exactly what it was
15   now, but yeah.
16   Q.  And when you had questions about Xcel that Bill perhaps
17   couldn't answer, he got Daryl on the phone for you?
18   A.  Once.
19   Q.  Okay.  So you are, of course, aware that Daryl Bank was
20   in charge of Xcel?
21   A.  Was what?
22   Q.  In charge of Xcel Bandwidth.
23   A.  Yes, eventually.
24   Q.  Okay.  And you listened to the conference calls, you
25   mentioned?

─────────── J. Kurtz - Cross (By Ms. McCaslin) ───────────

1    A.   I listened to two.

2    Q.   And the conference calls that you did hear sounded like

3    business as usual, right?

4    A.   That's what I thought.

5    Q.   Sounded like everything was going really well?

6    A.   That was my hope.

7    Q.   And were those run by Daryl Bank?

8    A.   Were they what?

9    Q.   Were those conference calls held by Daryl Bank?

10   A.   No.  There was a third party, a guy from Texas that was

11   holding them.  I don't remember his name.

12   Q.   Okay.

13   A.   Daryl never held any of those.  He and I spoke

14   separately.

15   Q.   So you were aware that there was another third party

16   involved in this venture?

17   A.   A management company, yes.

18   Q.   And you know from being a businessman that businesses do

19   fail all the time, right?

20   A.   I would say, yeah, there's a high probability of business

21   failure, especially in the first year.

22   Q.   And so when you were considering the risk of investing in

23   something like this, you were considering the business

24   aspects of this venture, correct?

25   A.   I was looking at the hard assets as being the collateral

J. Kurtz - Cross (By Ms. McCaslin)

1   in lieu of an annuity, because this wasn't an annuitized,
2   protected investment.
3   Q.  Right.
4   A.  And hard assets are worth something; spectrum licenses
5   are worth something; equipment is worth something; towers are
6   worth something.  And that gave me the confidence that this
7   is probably the best way to go at the time.
8   Q.  And so when you were evaluating the risk of investing,
9   you weren't in -- you weren't considering that Daryl Bank
10  would be laundering your investor funds, correct?
11  A.  No, I didn't think -- yeah.
12  Q.  You didn't think that Daryl Bank was going to be spending
13  the investor funds on his personal credit card bills?
14  A.  Absolutely did not.
15  Q.  And once you sent your money off to Alliance first, you
16  didn't give that money initially to Bill, right?
17  A.  No.
18  Q.  You didn't write a check to Bill?
19  A.  No.
20  Q.  You wrote it to the trust company that was working with
21  Daryl Bank?
22  A.  The connectivity of the transaction, I'm not 100 percent
23  clear about.  I don't know if it went through CTS or -- I'm
24  not sure how the money got from me into the custodian.
25  Q.  That's fair.  That's fair.

—————J. Kurtz - Redirect—————

1    A.   Okay.

2    Q.   But once you did send your money off to Xcel to invest in

3    Xcel, you never got anything back, right?

4    A.   That's correct.

5            MS. McCASLIN:   Thank you.   I have no further

6    questions.

7            THE COURT:   Any redirect?

8            MS. YUSI:   Very briefly, Your Honor.

9                    REDIRECT EXAMINATION

10   BY MS. YUSI:

11   Q.   Mr. Kurtz, you mentioned a third party.   There was a

12   third party on these conference calls or somehow involved.

13   Did Mr. Smith say anything about the bankruptcy that any

14   third party may have had declared in terms of spectrum

15   investments?

16   A.   No.

17           MS. McCASLIN:   Objection, Your Honor.

18           THE COURT:   Sustained.   Beyond the scope of the

19   cross.

20   BY MS. YUSI:

21   Q.   And you talked about Daryl Bank.   And what, if anything,

22   did -- well, you talked about Daryl Bank.   What, if anything,

23   did Mr. Smith tell you about the United States Securities and

24   Exchange Commission that named Daryl Bank and the spectrum

25   investments that you were looking at?

1    A.   Nothing.

2           MS. YUSI:   Thank you.

3           THE COURT:   May this witness be excused, counsel?

4           MS. YUSI:   Yes, sir.

5           MS. McCASLIN:   Yes, sir.

6           MR. YAROW:   Yes, sir.

7           THE COURT:   Step down, sir.

8           (The witness was excused.)

9           THE COURT:   Next witness.

10           MS. YUSI:   Your Honor, the government calls Sunshine

11   Grissom.

12           (Witness sworn.)

13           SUNSHINE GRISSOM, called by the Government, having

14   been first duly sworn, was examined and testified as follows:

15                          DIRECT EXAMINATION

16   BY MS. YUSI:

17   Q.   Good morning.  Could you introduce yourself to the Court.

18   A.   My name is Sunshine Elaine Marie Grissom.

19           THE COURT:   Ms. Grissom, you are going to have to

20   elevate your voice.

21           THE WITNESS:   Okay.

22   BY MS. YUSI:

23   Q.   In what city and state do you live in?

24   A.   In Spring, Texas.

25   Q.   How far did you go in school?

S. Grissom - Direct

1    A.  High school.

2    Q.  And what do you do for a living?

3    A.  I do bookkeeping work.

4    Q.  How long have you been at your current place?

5    A.  About seven years.

6    Q.  Are you married?

7    A.  Yes.

8    Q.  To whom?

9    A.  Allen Moore.

10   Q.  Allen Moore?

11   A.  Yes.

12   Q.  And if you can talk a little bit slower into the

13   microphone so everyone can hear you in the back.

14   A.  Okay.

15   Q.  Thank you.

16            How long have you all been together?

17   A.  21 years.

18   Q.  What is Allen Moore's mother's name?

19   A.  Nanette Moore.

20   Q.  Is Nanette Moore your mother-in-law, then?

21   A.  Yes.

22   Q.  What does she do for a living?

23   A.  She does bookkeeping as well.

24   Q.  Is she related to Kent Maerki?

25   A.  Yes.

S. Grissom - Direct

1   Q.   How so?

2   A.   He is her brother-in-law.

3   Q.   Who is Kent Maerki married to?

4   A.   Norma Coffin, or Norma Maule.

5   Q.   She goes by both names, Coffin and Norma Maule?

6   A.   Correct.

7   Q.   Now, in 2012 did you start working with your

8   mother-in-law, Nanette Moore?

9   A.   Yes.

10  Q.   What were you doing with her?

11  A.   Just assisting as needed, data entry.

12  Q.   Was it for a particular company?

13  A.   Yes.   Dental Support Plus Franchise.

14  Q.   What was Nanette Moore and her company doing for DSPF?

15  A.   She worked directly for them doing bookkeeping but also

16  had her own company that she would assist bookkeeping for the

17  franchisees.

18  Q.   And how about other relatives?   Besides your

19  mother-in-law, did any other relatives work for Dental

20  Support Plus Franchise and Kent Maerki?

21  A.   Yes.   She had multiple sisters that worked there as well

22  and a sister-in-law.

23  Q.   Who were the sisters that worked --

24  A.   That was Norma Coffin, Shelly Maule, and Lisa Maule.

25  Q.   What did they do?

S. Grissom - Direct

1   A.  Primarily Shelly and Lisa ran errands for Norma.

2   Q.  And you said there was a sister-in-law?

3   A.  Cindy Maule.

4   Q.  Cindy Maule?

5   A.  Yes.

6   Q.  What did she do?

7   A.  Initially she did various tasks for Norma and Kent, and

8   ultimately she handled most of the franchisee contacts.

9   Q.  Franchise contact?

10  A.  Yeah.  So if they would call in with questions or

11  whatnot, she would field those.

12  Q.  Did Kent Maerki's daughter work there sometimes?

13  A.  Yes.  She did some miscellaneous stuff for him at one

14  point.

15  Q.  Do you remember her name?

16  A.  Alicia.

17  Q.  Alicia Maerki?

18  A.  No.  She had a different last name.  She was married.

19  Q.  In general what was your understanding of what DSPF was?

20  A.  It was a company that sold dental franchises and sought

21  out patients and dentists to employ at those franchises and

22  patients to go to those dentists.

23  Q.  And you said you and your mother-in-law were doing

24  bookkeeping.  What did that entail?

25  A.  Mainly she did data entry for DSPF into QuickBooks.  I

S. Grissom - Direct

1    would assist somewhat with that, but my main role then got
2    put as Kent's assistant.
3    Q.   At some point you became Kent's assistant?
4    A.   Correct.
5    Q.   Now, going back to the bookkeeping, were you all dealing
6    with money and checks coming in from investors?
7    A.   I was not.  And I can't say for sure if that's what
8    Nanette was doing or not.
9    Q.   Okay.  Were you all on any bank accounts?
10   A.   No.
11   Q.   How much were you being paid per week?
12   A.   $600.
13   Q.   Do you know about how many hours a week you were working?
14   A.   It was at least 40, if not more.
15   Q.   Who gave you and your mother-in-law directions on the
16   information to put in the QuickBooks accounts?
17   A.   Primarily Norma.
18   Q.   Kent's wife?
19   A.   Yes.
20   Q.   Do you know what her official title was?
21   A.   I don't recall.
22   Q.   What did she do?
23   A.   She made bill payments.  She handled all the bank
24   accounts, directed all the accounting information.
25   Q.   Okay.  Did you all use, like, a Dropbox on the cloud as

S. Grissom - Direct

1    well?

2    A.   Yes.

3    Q.   What did you guys use that for?

4    A.   Everything.  All documents were stored there because we

5    had employees in different states.

6    Q.   Now, you said you became Kent Maerki's personal

7    assistant.  What did that entail?

8    A.   For the most part, it was making appointments for him,

9    including doctor appointments, travel arrangements, things

10   like that.

11   Q.   And you did some work for DSPF as well?

12   A.   Correct.

13   Q.   I'm going to -- there's a binder in front of you.

14   A.   Yes.

15   Q.   And I know there's a couple folders in there, but if you

16   can put those aside for a moment and look at the tabs.  If

17   you'll look at tab 7, or Exhibit 7.

18   A.   Yes.

19   Q.   Do you recognize that document?

20   A.   Yes, I do.

21   Q.   And who is the e-mail from?

22   A.   From Kent Maerki.

23   Q.   And who is it to?

24   A.   To myself.

25   Q.   And the date of it?

———————S. Grissom - Direct———————

1   A.   Is March 23, 2013.

2            MS. YUSI:   Your Honor, we move to admit Exhibit 7.

3            THE COURT:   Any objection?

4            MR. GRINDROD:   Yeah, we object to hearsay.

5            THE COURT:   Objection overruled.   The document will

6    be admitted.

7            (Government's Exhibit 7 was admitted.)

8    BY MS. YUSI:

9    Q.   Now, is that one of Kent Maerki's e-mail addresses, the

10   Kent@DSPF.co?

11   A.   Yes.

12   Q.   And that's your name?

13   A.   Yes.

14   Q.   And he's giving a list of companies.   And what does he

15   say about -- well, if you can read the following.

16   A.   Yeah.   "The following companies I own that provide income

17   for us:   DSPF, DSG, DPM, Janus Spectrum FHMA."

18   Q.   What is DSPF?

19   A.   Dental Support Plus Franchise.

20   Q.   DSG?

21   A.   Dental Support Group.

22   Q.   DPM?

23   A.   Dental Plus Management.

24   Q.   And there's Janus Spectrum.

25            Were these all companies that Kent Maerki -- he

———————————S. Grissom – Direct———————————

1    owned or operated?

2    A.  Yes.  Correct.

3    Q.  And on the third paragraph, what does it say?

4    A.   It lists the following people with whom he works relative

5    to making money:  David Alcorn, Janus Spectrum; Daryl Bank,

6    Dominion, DSPF; Catrina Davis, Dominion, DSPF; Raeann Gibson,

7    Dominion, DSPF; Bruce Goldman, Dominion, DSPF; Ray Chadwick;

8    Terry Johnson; Jon Palmieri; Bobby Jones; Bill Smith; Tony

9    Sellers; and Tom Barnett.

10   Q.  Do you recognize or did you know the names Bill Smith,

11   Tony Sellers, and Tom Barnett?

12   A.  Those three were familiar to me, yes.

13   Q.  Okay.  Do you know what they did for DSPF?

14   A.  They were sales reps.

15   Q.  Okay.  And if you can go in that binder and look at

16   what's been marked as Government's Exhibit 200N and then look

17   at 200O right behind it.

18          And if you can look at the last pages, do you

19   recognize the signature?

20   A.  Yes.

21   Q.  Are these agreements between salespeople?

22   A.  Yes.

23          MS. YUSI:  Your Honor, we move to admit 200N and

24   200O?

25          THE COURT:  Hearing no objection, 200N, and 200O are

S. Grissom - Direct

```
 1    admitted.
 2              (Government's Exhibits 200N and 200O were admitted.)
 3    BY MS. YUSI:
 4    Q.  And 200N, what date is the agreement effective?
 5    A.  February 15th, 2011.
 6    Q.  And who is the agreement between?
 7    A.  Aghee Smith.
 8    Q.  And what company?
 9    A.  Dental Support Plus Franchise.
10    Q.  And if we could go to Page 5 of Exhibit 200N.
11              Are you familiar with Mr. Maerki's signature?
12    A.  Yes.
13    Q.  Is that his signature on the left?
14    A.  Yes.
15    Q.  And he's listed as the president of DSPF?
16    A.  Correct.
17    Q.  All right.  And if we can go to 200O.
18              Who is this agreement between?
19    A.  This is also with Dental Support Plus Franchise, Thomas
20    Barnett.
21    Q.  It's the same agreement?
22    A.  Correct.
23    Q.  All right.  Thank you.
24              Now, did Mr. Maerki and DSPF send out promotional
25    e-mails and update e-mails?
```

———————S. Grissom - Direct———————

1   A.  Yes.

2   Q.  And was there marketing material and advertisements as

3   well?

4   A.  Correct.

5   Q.  Are you familiar with those generally?

6   A.  Yes.

7   Q.  If you can look in the folder in front of you.  Do you

8   see Exhibits 200C, 200H, 200S, and 236A?

9   A.  Yes.

10  Q.  Are those examples of some of the marketing material and

11  e-mails that -- or e-mail material that DSPF would send out?

12  A.  Correct.

13          MS. YUSI:  Your Honor, we move to admit

14  Exhibits 200C, 200H, 200S, and 236A.

15          THE COURT:  Exhibits 200C, 200H, 200S, and 236A are

16  admitted.

17          (Government's Exhibits 200C, 200H, 200S, and 236A

18  were admitted.)

19  BY MS. YUSI:

20  Q.  And just to look at 200C really quick, do you recognize

21  this as one of the advertisements and things that went out?

22  A.  Yes.

23  Q.  Thank you.

24          Now, are you familiar with a company called WebOp?

25  A.  Yes.

S. Grissom - Direct

1    Q.   What was your understanding what WebOp was?

2    A.   They were a marketing company primarily doing SCO

3    promotions for DSPF.

4    Q.   If you can speak louder and just bring it really close to

5    you.

6    A.   They were a promotional company that did advertising with

7    SCO promotions.

8    Q.   What does SCO mean?

9    A.   It's, like, click bait basically on the internet.

10   Q.   Click bait?

11   A.   Yeah.  Well, not click bait, but it's per clicks that

12   somebody would click on a web page.

13   Q.   So they deal primarily with the internet?

14   A.   Yes.

15   Q.   And were they -- did they work with DSPF?

16   A.   Yes.

17   Q.   And what was your understanding what they were supposed

18   to do for DSPF?

19   A.   They were fielding phone calls that came in from dentists

20   and patients that wanted to be a part of DSPF, but they also

21   did all the advertising online.

22   Q.   Okay.  And were they -- as far as you knew, were they

23   contacting potential patients and dentists themselves?

24   A.   No, I don't believe so.

25   Q.   Okay.  Just doing the internet and fielding calls?

S. Grissom - Direct

1   A.   Correct.

2   Q.   Was WebOp's only client DSPF, as far as you knew?

3   A.   No.  There were other clients as well.

4   Q.   Now, at some point did you get involved with tracking

5   fees from the -- for franchisees when patients' money came

6   in?

7   A.   Yes.

8   Q.   How did you do that?

9   A.   We did it all by spreadsheet.

10  Q.   How did you determine which franchisee got the money if

11  any came in?

12  A.   Initially I was told to assign those patients to the

13  franchisees from the top of the list and work my way down as

14  we got new patients.  After a period of time, I was then told

15  to change the way we were doing it, and every time we got a

16  new patient, we started back up at the top of the list and

17  worked our way down.

18  Q.   When you say "the top of the list," was that the earliest

19  franchisees?

20  A.   Correct.

21  Q.   Who told you how to split up the money?

22  A.   Kent Maerki.

23  Q.   Now, in terms of money coming in, was there much coming

24  in?

25  A.   No.

722

S. Grissom - Direct

1   Q.   Now, how long did you work for Kent Maerki and DSPF?

2   A.   It was about two years.

3   Q.   So 2012 to 2014?

4   A.   Yes.

5   Q.   At any point did you ever see much money coming in, in

6   terms of fees for the patients?

7   A.   No.

8   Q.   Did you ever answer phones for DSPF?

9   A.   Yes.

10  Q.   What did you do -- were you doing dentists and patients,

11  or what were you doing?

12  A.   No.  It was more so that they knew I was Kent's

13  assistant, and they had my information from doing the

14  bookkeeping for their franchise side, so I would get phone

15  calls from the franchisees just asking questions, wanting

16  updates.

17  Q.   And the franchisees, those were the actual investors,

18  right?

19  A.   Yes, correct.

20  Q.   What would they ask about or tell you?

21  A.   What I saw as far as the company getting patients in, how

22  things were going, whether WebOp was performing like they

23  should be, things like that.

24  Q.   Did you have upset or disgruntled investors call?

25  A.   Yes.

Carol L. Naughton, Official Court Reporter

S. Grissom - Direct

1   Q.  What were they telling you?

2   A.  That they were tired of waiting.

3           MR. GRINDROD:  Objection.

4           THE COURT:  Ms. Yusi, you're calling for a lot of

5   hearsay in these last several questions.

6           MS. YUSI:  Okay.  I'm sorry.  Thank you.

7   BY MS. YUSI:

8   Q.  What did you do when -- if you had upset investors call,

9   what would you do?

10  A.  Usually those people were directed either to Kim White or

11  to Kent Maerki.

12  Q.  To who?

13  A.  I'm sorry, Max White and Kent Maerki.

14  Q.  Who was Max White?

15  A.  Initially she was the assistant to Kent, and then she

16  moved to a different role in the company when I became his

17  assistant.

18  Q.  At some point did you stop taking investor calls?

19  A.  Yes.

20  Q.  What had happened?

21  A.  They had decided to have a 1-800 number that the

22  franchisees would call, and that was directed to Cindy Maule

23  to answer those questions and phone calls.

24  Q.  That's Kent's sister-in-law?

25  A.  Correct.

S. Grissom - Direct

1   Q.  Now, you mentioned or we talked about the Dropbox and the
2   cloud.  Did you all keep spreadsheets of franchise sales and
3   franchisees and investors, that sort of thing?
4   A.  Yes, correct.
5   Q.  If you can look in front of you, and behind 300E, the tab
6   300E.  Oh, sorry.  That's not it.  Hold on one moment.
7           I'm sorry, 200F, Exhibit 200F.  Do you recognize
8   this?
9   A.  Yes.
10  Q.  Is this one of the spreadsheets that you all had --
11  A.  Yes.
12  Q.  -- at the Dropbox?
13          MS. YUSI:  Your Honor, we move to admit 200F.
14          THE COURT:  200F will be admitted.
15          (Government's Exhibit 200F was admitted.)
16  BY MS. YUSI:
17  Q.  And what is this spreadsheet titled?
18  A.  Dental Support Plus Franchise Sales Tracker.
19  Q.  Let's go through some of the columns here.  If you can
20  walk us through the columns from left to right.
21  A.   To the first name and last name were of the sales
22  representatives, their company names, and then the ETA as far
23  as being paid, source of funds, number of units being
24  purchased, and the cost of those franchise units, and the
25  total amount being purchased.

Carol L. Naughton, Official Court Reporter

S. Grissom - Direct

1    Q.  In terms of these, are these the salespeople or the
2    investors?
3            THE COURT:  You need to speak into the microphone.
4            MS. YUSI:  I'm sorry.
5    BY MS. YUSI:
6    Q.  In terms of the first name, is this the investors or the
7    salespeople?
8    A.  It's a combination, anybody that's purchasing a
9    franchise.  So some salesmen are listed on there.
10   Q.  So some salesmen purchased?
11   A.  Correct.
12   Q.  If we can go to Page 13 of Exhibit 200F.  Actually,
13   Page 9.  We'll go to Page 9 of 200F.
14           Down at the totals, do you see how many franchises
15   were sold?
16   A.  Yes.  It was a total of 493.
17   Q.  And the total amount?
18   A.  Was $11,220,000.
19   Q.  Thank you.
20           Now, did Kent Maerki and DSPF do weekly calls?
21   A.  Yes.
22   Q.  What kind of weekly calls?
23   A.  We had a weekly staff meeting which just involved the
24   administration people, and then he would also have a separate
25   call with all of the salesmen.

S. Grissom - Direct

1   Q.  Were those conference calls?

2   A.  Yes.

3   Q.  And what kind of information was being talked about on

4   those conference calls with the salespeople?

5   A.  Basically just kind of pep talks, what information they

6   were giving to the franchisees that they were trying to get

7   to purchase the franchises, what kind of sales material they

8   were using, things like that.

9   Q.  If you can go inside your binder, I believe there's some

10  disks.  There should be some disks in the pocket.

11          Do you see 318A?

12  A.  Yes.

13  Q.  Do you recognize this?

14  A.  Yes.

15  Q.  Is this one of the salespersons' conference calls?

16  A.  Correct.

17  Q.  And did you initial outside that disk to show that you

18  recognize it?

19  A.  I did.

20          MS. YUSI:  Your Honor, we move to admit

21  Exhibit 318A.

22          THE COURT:  Exhibit 318A will be admitted.

23          (Government's Exhibit 318A was admitted.)

24          MS. YUSI:  And if we can play -- I just have some

25  short clips of this.

─────────────── S. Grissom - Direct ───────────────

1             (An audio was played in open court.)

2   Q.  Janus Spectrum, was that another investment that was

3   going at the same time?

4   A.  Yes.

5   Q.  And were sometimes the sales calls with DSPF and Janus

6   Spectrum talked about in those sales calls?

7   A.  Yes.

8   Q.  If you can look at Exhibit 243.  It's another disk.

9   A.  Yes.

10  Q.  Do you recognize that?

11  A.  Yes, I do.

12  Q.  Does it have your initials on it?

13  A.  It does.

14  Q.  Is this another salesperson conference call?

15  A.  Correct.

16           MS. YUSI:  We move to admit Exhibit 243?

17           THE COURT:  Hearing no objection, 243 will be

18  admitted.

19           (Government's Exhibit 243 was admitted.)

20           MS. YUSI:  If we can play that for the jury.

21           (Audio played in open court.)

22           MS. YUSI:  And the second part.

23           (Audio played in open court.)

24  BY MS. YUSI:

25  Q.  Did Kent Maerki talk about some of the issues going on

---
S. Grissom - Direct
---

 1   with -- or problems with DSPF on these sales calls?

 2   A.  Yes, he did.

 3   Q.  Now, if we can look at another disk, 1016A, which is in

 4   front of you.

 5   A.  Yes.

 6   Q.  And 1017A.

 7   A.  Yes.

 8   Q.  Are those your initials on those?

 9   A.  Correct.

10   Q.  Are those additional conference calls?

11   A.  Yes, they are.

12           MS. YUSI:  Your Honor, we move to admit

13   Exhibits 1016A and 1017A.

14           THE COURT:  1016A and 1017A will be admitted, the

15   Court hearing no objection.

16           (Government's Exhibits 1016A and 1017A were

17   admitted.)

18           MS. YUSI:  Your Honor, these have to do with some of

19   the factual stipulations.  We request to be able to read

20   those to the jury.  They are listed in the factual

21   stipulations, and we'd like to read those to the jury at this

22   time.

23           THE COURT:  Any objection?

24           MR. GRINDROD:  I don't have any objection to reading

25   the stipulations.

S. Grissom - Direct

1            THE COURT:  Mr. Yarow?

2            MR. YAROW:  I have no objection, Your Honor.

3            THE COURT:  You may read them.

4            MS. YUSI:  Thank you.

5            This is stipulation number 5 in Exhibit 2000.  It

6     states:

7            On or about April 7, 2014, a conference call with

8     sales personnel about DSPF and Janus Spectrum contained in

9     Government's Exhibit 1016A commenced outside of the

10    Commonwealth of Virginia, traveled through interstate

11    commerce, and ended in the Eastern District of Virginia.

12    BY MS. YUSI:

13    Q.  Now, these conference calls, where were you all when they

14    were being broadcast?

15    A.  We had people in different areas, so I was in Texas, in

16    Houston.  We had somebody else in Austin.  So Kent would hold

17    these in his office in Arizona with the people that were

18    working from there, and everyone else was conferenced in.

19    Q.  The salesmen from around the country?

20    A.  Yes.

21            MS. YUSI:  If we could play the clip from 1016A.

22    BY MS. YUSI:

23    Q.  Is that you speaking in this one?

24    A.  Yes.

25            (Audio played in open court.)

────────────── S. Grissom - Direct──────────────

1    BY MS. YUSI:

2    Q.  And who is that voice first that was speaking?

3    A.  That's myself.

4    Q.  First, before you.

5    A.  Kent Maerki was speaking first.

6    Q.  And then it was you?

7    A.  Correct.

8    Q.  So were you getting numbers from WebOp in terms of how

9    things were doing for finding patients?

10   A.  Yes, I would get reports from WebOp and SaleAMP.

11   Q.  And CTR, click-through rate, what does that mean?

12   A.  To me, not very much.  I simply relayed the message from

13   the company that was doing the work in regards to the

14   advertising.

15   Q.  Do you know what it meant, what a click-through rate was,

16   though, that they were trying to determine?

17   A.  The rate of the clicks that we were getting on our

18   advertisements on the internet.

19   Q.  So these are peopling using the internet literally

20   clicking?

21   A.  Correct.

22   Q.  Does that mean that they are signing up as patients?

23   A.  No.

24   Q.  And your entire time there, you said there was little

25   money coming in from patients.  Were you aware of any

S. Grissom - Direct

1  dentists that had signed up for DSPF while you were there?

2  A.  No.

3           MS. YUSI:  And then is there a second of that one,

4  or is that --

5           MS. O'BOYLE:  There are eight.

6           MS. YUSI:  If we can go to the next portion.

7           (Audio played in open court.)

8           MS. YUSI:  Go to the next clip from 1016A.

9           (Audio played in open court.)

10  BY MS. YUSI:

11  Q.  And those are phone calls coming in to WebOp?

12  A.  Correct.

13           MS. YUSI:  If we can go to the next one.

14           (Audio played in open court.)

15           MS. YUSI:  If we can go to clip 5.

16           (Audio played in open court.)

17           MS. YUSI:  The next clip, 6.

18           (Audio played in open court.)

19           MS. YUSI:  And 7.

20           (Audio played in open court.)

21           MS. YUSI:  And the last one.

22           (Audio played in open court.)

23           MS. YUSI:  Thank you.

24  BY MS. YUSI:

25  Q.  This is April 2014.  Is this the first time you've ever

S. Grissom - Direct

1    heard Mr. Maerki talk about the franchisees being in default?

2    A.   No.

3    Q.   He had said that previously?

4    A.   Yes.

5    Q.   When you spoke with the franchisees, did you ever tell

6    them that they were in default?

7    A.   No.

8             MS. YUSI:  And if we can look at Exhibit 1017A.  I'm

9    going to read the stipulation first, which again is

10   stipulation number 5, use of the wires.

11            On or about May 19, 2014, the conference call with

12   sales personnel about DSPF and Janus Spectrum contained in

13   Government's Exhibit 1017A commenced outside of the

14   Commonwealth of Virginia, traveled through interstate

15   commerce, and ended in the Eastern District of Virginia.

16            If we can start with 1017A.

17            And before we start --

18            (Audio played in open court.)

19            MS. YUSI:  Can we pause it real quick?

20   BY MS. YUSI:

21   Q.   I'm sorry.  Tina Ellis, who is Tina Ellis?

22   A.   She was also an employee of DSPF.  She was over the sales

23   reps, managed and supervised them.

24   Q.   Did she work on other investments as well, as far as you

25   know?

S. Grissom - Direct

```
 1   A.  Not that I'm aware of.
 2            MS. YUSI:  If we can go back to 1017A.  I apologize.
 3            (Audio played in open court.)
 4   BY MS. YUSI:
 5   Q.  Now, Ms. Grissom, was that a continuous problem that
 6   patients would not show up to appointments that were made?
 7   A.  Yeah.  It was definitely part of the issues of not
 8   following through with the calls that we did get.
 9   Q.  And the franchisees only got money if they actually went
10   and had dental services done; is that correct?
11   A.  Correct, yes.
12            MS. YUSI:  If we can go to part 2 of Exhibit 1017A.
13            (Audio played in open court.)
14   BY MS. YUSI:
15   Q.  Now, you mentioned Janus Spectrum was another investment
16   Kent Maerki was involved in?
17   A.  Correct.
18   Q.  We'll come back to that in a moment, but did you ever go
19   to a retreat for DSPF?
20   A.  Yes.
21   Q.  Where was in?
22   A.  It was in Arizona.
23   Q.  Where was it held?
24   A.  At Kent's office that he had in a retreat there located
25   in the Phoenix area.
```

S. Grissom - Direct

1    Q.   Was it at a resort?

2    A.   Yes.

3    Q.   Who paid for you to go?

4    A.   DSPF.

5    Q.   And were there any meetings regarding DSPF that occurred

6    at the retreat?

7    A.   There was one.

8    Q.   Were there salespeople there as well?

9    A.   Yes.

10   Q.   And what was discussed generally that you recall at that

11   retreat?

12   A.   Just general information, nothing out of the norm or that

13   we didn't usually discuss on a weekly basis on our phone

14   calls.

15   Q.   How much later did DSPF shut down after that retreat, if

16   you recall?

17   A.   It was probably within the next year.

18   Q.   I'll talk to you about spectrum just a little bit.

19        Do you recognize the name David Alcorn?

20   A.   Yes.

21   Q.   And how do you recognize that?

22   A.   Just associated with Janus Spectrum.

23   Q.   He was involved with that?

24   A.   Correct.

25   Q.   There's another folder in front of you with a number of

─────S. Grissom - Direct─────

1    exhibits that I'll read to you, and you can just tell me if

2    you generally recognize them:  Exhibit 300, 300A, 300A-1,

3    300B, 300L, 300X, 300Y, 300Z, 1002Q, and 1002R, and 1002S.

4             Who are those e-mails between, generally?

5    A.   Kent Maerki and David Alcorn.

6             MS. YUSI:  Your Honor, we move to admit

7    Exhibits 300, 300A, 300A-1, 300B, 300L, 300X, 300Y, 300Z,

8    1002Q, 1002R, and 1002S.

9             MR. GRINDROD:  Your Honor, I'm going to need a

10   minute to look at the exhibits.

11            THE COURT:  You need a minute to do what?

12            MR. GRINDROD:  To look at that whole list before I

13   know whether I have an objection, Your Honor.

14            THE COURT:  Well, I'll tell you what we're going to

15   do.  We're going to take a 15-minute break while you look at

16   the list, and we'll come back and address the admission and

17   continue.

18            (The jury exited the courtroom.)

19            THE COURT:  Ms. Grissom, you may step down during

20   the break.  Do not discuss your testimony.

21            THE WITNESS:  Okay.

22            (The witness stepped down.)

23            THE COURT:  The Court advises counsel that the Court

24   will have to terminate around 12:50 today for lunch.  Okay?

25            MS. YUSI:  Yes, sir.

S. Grissom - Direct

```
 1              (Recess from 11:00 a.m. to 11:18 a.m.)
 2              THE COURT:  Are there any objections to these
 3    exhibits, Mr. Grindrod?
 4              MR. GRINDROD:  Judge, we have one objection to 300L,
 5    but I believe Ms. Yusi is going to withdraw the offering of
 6    that exhibit.
 7              MS. YUSI:  We're going to withdraw 300L, but I'll
 8    read the list when we get in front of the jury as to the ones
 9    we do wish to admit.
10              THE COURT:  Okay.  All but 300L?
11              MS. YUSI:  Yes, sir.
12              THE COURT:  Well, if you've already read them, I can
13    simply go through and admit them when the jury comes back and
14    save some time here.
15              MS. YUSI:  All right.  Thank you.
16              THE COURT:  All right.  Bring the jury in.
17              (The jury entered the courtroom.)
18              THE COURT:  You may be seated.
19              The record will reflect that all jurors are now
20    present.
21              Does counsel agree?
22              MS. YUSI:  The government agrees.
23              MR. YAROW:  Mr. Alcorn agrees.
24              MS. McCASLIN:  Mr. Smith agrees.
25              THE COURT:  Over the break, counsel went over a
```

─────── S. Grissom - Direct ───────

1  number of exhibits that should be admitted.  The Court hereby

2  admits Exhibits 300, 300A, 300A-1, 300B, 300Y, 1002Q, 1002R,

3  1002S, and 300Z.

4            MS. YUSI:  And 300X, yes.

5            THE COURT:  And 300X.

6            MS. YUSI:  And 300Z, Your Honor.

7            THE COURT:  Okay.

8            (Government's Exhibits 300, 300A, 300A-1, 300B,

9  300Y, 1002Q, 1002R, 1002S, 300X, and 300Z were admitted.)

10            MS. YUSI:  Thank you, Your Honor.

11  BY MS. YUSI:

12  Q.  I just want to look at one particular e-mail, 1002Q,

13  please.  And just in general, this is David Alcorn.

14            Norma Maule, can you remind us who Norma Maule is?

15  A.  That's Kent Maerki's wife.

16  Q.  She's also Norma Jean Coffin?

17  A.  Yes.

18  Q.  And she dealt with the money, you said?

19  A.  Correct.

20  Q.  Go to Page 3 of Exhibit 1002Q.  Paragraph C that we're

21  looking at here, can you read that?

22  A.  It says, "Your calculation of Kent's February monthly of

23  $28,966, can we please round to the nearest dollar and forget

24  the pennies?  It may very well be correct, but if it is, my

25  monthly amounts are incorrect.  Feel free to write a check

S. Grissom - Direct

```
 1    for February to Kent for that amount less the amounts
 2    received and be above while we resolve the question of what
 3    are the proper amounts."
 4    Q.  So Norma dealt with all the money to the employees and
 5    everyone else involved?
 6    A.  Correct.
 7            MS. YUSI:  Thank you, Ms. O'Boyle.
 8    BY MS. YUSI:
 9    Q.  Were you involved or were you aware that there was an SEC
10    investigation --
11    A.  Yes.
12    Q.  -- going on?
13            And how did you know that?
14    A.  Primarily because of Kent's assistant.  He would have me
15    save documents in Dropbox and file them accordingly for him.
16    Q.  Did you also have to do travel for Mr. Maerki?
17    A.  Yes.
18    Q.  And you worked there from 2012 to 2014?
19    A.  Correct.
20    Q.  If you can look in the binder one more time, and I
21    believe it's the last exhibit, 1020I.  Do you recognize that?
22    A.  Yes.
23    Q.  What are those?
24    A.  Kent and Norma's home, their bathroom.
25    Q.  In Arizona?
```

—————————S. Grissom - Cross (By Mr. Yarow)—————————

1    A.   Correct.

2    Q.   And you can flip further.  Are those all pictures from

3    their home in Arizona?

4    A.   Yes.  These are all their house in Arizona.

5    Q.   Had you been there?

6    A.   Yes, once.

7    Q.   When did you go there?

8    A.   For the retreat we went there.

9             MS. YUSI:  Your Honor, we move to admit 1020I.

10            THE COURT:  1020I will be admitted.

11            (Government's Exhibit 1020I was admitted.)

12            MS. YUSI:  And if we can show Page 2 of 1020I.

13   BY MS. YUSI:

14   Q.   What are we looking at here?

15   A.   That's their pool their background.

16            MS. YUSI:  I believe those are all of my questions

17   at this point.

18            THE COURT:  Any cross?

19            MR. YAROW:  Just a few questions.

20                      CROSS-EXAMINATION

21   BY MR. YAROW:

22   Q.   Good morning, my name is Rick -- Ms. Grissom, my name is

23   Rick Yarow.  I represent David Alcorn.

24            First, you worked at Kent's office?

25   A.   Not in Phoenix.  I worked for the company, but I was

---

S. Grissom - Cross (By Mr. Yarow)

1    located in my home in Texas.

2    Q.  I see.  So it was really a remote job?

3    A.  Yes.

4    Q.  So are you familiar with who worked in Kent's office?

5    A.  No, I am not.

6           MR. YAROW:  Would the government be amenable to

7    pulling up 300, Government's Exhibit 300?

8    BY MR. YAROW:

9    Q.  Ma'am, this is the document you previously identified.

10   It has been admitted, Government's Exhibit 300.  And would

11   you please tell me the date at the top of that, when the

12   e-mail was sent?

13   A.  November 24, 2010.

14          MR. YAROW:  You can take that down.  Thank you.

15   Would you please pull up Government's Exhibit 300B.

16   BY MR. YAROW:

17   Q.  Ma'am, this is the exhibit you previously identified and

18   has been introduced.  It's an e-mail from David Alcorn to

19   Kent Maerki, and this was the -- you did read this e-mail?

20   You are familiar with this e-mail?

21   A.  Yes.

22   Q.  Okay.  And this is the one talking about organizational

23   expenses for Janus Spectrum?

24   A.  Yes, for Janus Spectrum.

25   Q.  And what is the date on this e-mail, please?

---

———————S. Grissom - Cross (By Mr. Grindrod)———————

1    A.   August 16, 2011.

2         MR. YAROW:  Okay.  Thank you very much.

3         You can take it down.

4         THE COURT:  Cross-examination?

5                        CROSS-EXAMINATION

6    BY MR. GRINDROD:

7    Q.   Good morning, ma'am.

8    A.   Good morning.

9    Q.   You mentioned on direct you did bookkeeping for Dental

10   Support Plus Franchise, right?

11   A.   Yeah, for a minimal amount of time.

12   Q.   And you worked with Nanette Moore doing that?

13   A.   Correct.

14   Q.   Was it just the two of you that were in charge of

15   bookkeeping?

16   A.   Aside from Norma, yes.

17   Q.   And you mentioned QuickBooks.  Can you tell the jury just

18   generally what is QuickBooks?

19   A.   It's an online or desktop-supported accounting software

20   where you input transactions and reconcile bank accounts and

21   credit cards.

22   Q.   Did you use that accounting software for the work that

23   you did with DSPF?

24   A.   Correct.

25   Q.   DSPF also had a CPA, right?

S. Grissom - Cross (By Mr. Grindrod)

1    A.   Yes.

2    Q.   And the CPA is the person who oversaw everything?

3    A.   Correct.

4    Q.   The CPA did at least one audit of DSPF that you're aware

5    of, right?

6    A.   From what I know of, yes.

7    Q.   Now, we heard on direct examination some clips from those

8    recorded sales calls.  Do you remember those?

9    A.   Yes.

10   Q.   I want to talk to you about the one where Kent Maerki was

11   talking about the franchisees potentially being in default.

12   Do you remember those?

13   A.   Yes.

14   Q.   That call was from August of 2014, right?

15   A.   Uh-huh.

16   Q.   I'm sorry.  I can't read my own handwriting.  April of

17   2014?

18   A.   Yes.

19   Q.   And the company, DSPF, was shelved in August of 2014?

20   A.   '14, yes.

21   Q.   So that call was just a few months before --

22   A.   Uh-huh.

23   Q.   -- the company ended up closing shop, right?

24   A.   Yes.

25          MR. GRINDROD:  And let's pull up if we could -- this

S. Grissom - Cross (By Mr. Grindrod)

1    has been admitted.  It's Government's Exhibit 200F.

2    BY MR. GRINDROD:

3    Q.  This is 200F.  Do you remember this?

4    A.  Yes.

5    Q.  And this is the Dental Support Plus sales tracker, right?

6    A.  Correct.

7    Q.  And across the top here, it has a column for the sale

8    number, first name, last name.  That's of the person who

9    bought the franchise?

10   A.  Correct.

11   Q.  And then we have here a column for request for

12   consideration received.  What was the request for

13   consideration?

14   A.  That process I was not too familiar with.  That was

15   between, I guess, Kent and more so the sales reps.

16   Q.  Okay.  And then this spreadsheet actually carries over on

17   to a second page.  This column -- let me do it this way:

18        So this column L is the amount received.  So that's

19   the amount that the person who is buying the franchise

20   actually sent to DSPF corporate?

21   A.  Correct.

22   Q.  And then column P would be the salesperson.  That's the

23   salesperson who was responsible for selling that particular

24   franchise, right?

25   A.  Correct.  Yes.

S. Grissom - Cross (By Mr. Grindrod)

```
 1              MR. GRINDROD:  Ms. McCaslin, can you jump to Page 8
 2   for me, please?
 3   BY MR. GRINDROD:
 4   Q.  I want to zoom in here on line 278.
 5   A.  Okay.
 6   Q.  And does that show you who the salesperson was for that
 7   sale?
 8   A.  Bill Smith.
 9   Q.  Okay.  And the date the payment was received by DSPF
10   corporate, was that April 2013?
11   A.  '13, correct.
12   Q.  And that's the last sale on here by Mr. Smith, right?
13   A.  As far as I can see, yes.
14   Q.  And so the last sale by Mr. Smith was a whole year before
15   that call we heard when Mr. Maerki was talking about
16   franchisees potentially being in default, right?
17   A.  Correct.
18              MR. GRINDROD:  We can take that down, Ms. McCaslin.
19   Thank you.
20   BY MR. GRINDROD:
21   Q.  So at DSPF you were involved in marketing work, right?
22   A.  Not so much the marketing.  That was up to the salesmen
23   primarily to disperse.
24   Q.  Thank you for clarifying.
25              So the marketing materials were about selling
```

S. Grissom - Cross (By Mr. Grindrod)

1   franchises, right?

2   A.   Uh-huh.

3   Q.   And then there were efforts to actually get patients and

4   dentists, right?

5   A.   Correct.

6   Q.   And that was -- for the time you were there, that

7   involved a vendor called SaleAMP?

8   A.   Yes.

9   Q.   And a vendor called WebOp?

10  A.   Correct.

11  Q.   And you were involved in that side of things?

12  A.   I was involved in retrieving reports from them on a

13  weekly basis and relaying that information on the sales

14  call -- or on the sales calls or staff meeting.

15  Q.   They did the work?

16  A.   Right.

17  Q.   They reported to you?

18  A.   I reported it to the staff, correct.

19  Q.   And do you remember the name David Bailey being

20  associated with WebOp?

21  A.   Yes.

22  Q.   Do you remember Kent Maerki talking on sales calls about

23  how great David Bailey was?

24  A.   Yes.

25  Q.   How he was this online marketing whiz, basically, right?

──────── S. Grissom - Cross (By Mr. Grindrod) ────────

1  A.  Yes.

2  Q.  Kent Maerki talked about how David Bailey was responsible

3  for the success of companies like Ticketmaster?

4  A.  Right.

5          MS. YUSI:  Objection, Your Honor.  Facts not in

6  evidence.

7          THE COURT:  Sustained.

8  BY MR. GRINDROD:

9  Q.  Do you remember him saying that?

10         MS. YUSI:  Objection, Your Honor.

11         THE COURT:  Sustained.  It's not in evidence.

12         MS. YUSI:  Hearsay too, Your Honor.

13  BY MR. GRINDROD:

14  Q.  Do you remember Mr. Maerki talking on sales calls?

15  A.  Yes.

16  Q.  And was he talking to the sales force?

17  A.  Yes.

18  Q.  And was he telling them things that he wanted them to

19  then go out and tell prospective franchisees?

20         MS. YUSI:  Objection, Your Honor.  Speculation and

21  hearsay.

22         THE COURT:  Not really.  She's been testifying about

23  things that Mr. Maerki said on these tapes.  She can still

24  testify if she heard Mr. Maerki say that.

25  BY MR. GRINDROD:

———— S. Grissom - Cross (By Mr. Grindrod) ————

1   Q.   So let me ask it again.  There was a lot of back and
2   forth.
3            So one of the purposes of the sales calls was for
4   Kent Maerki to give salesmen information that they would then
5   use to talk to prospective buyers of a franchise, right?
6   A.   Correct.
7   Q.   On the sales calls, Mr. Maerki talked up David Bailey,
8   right?
9   A.   Yes.
10  Q.   Talked about his involvement with Ticketmaster?
11           MS. YUSI:  Objection, Your Honor.  Hearsay.
12           MR. GRINDROD:  Your Honor, it's obviously not for
13  truth.
14           THE COURT:  Well, I don't know where you're going
15  with it, but there's been a number of objections.  We're not
16  going to keep gnawing on it.  Let's get to the bottom
17  question that you want to get to with respect to Mr. Maerki
18  talking with Mr. Bailey.
19  BY MR. GRINDROD:
20  Q.   On these calls, Mr. Maerki was very positive about WebOp
21  and David Bailey, right?
22  A.   Yes.
23  Q.   That's what he was telling to the salesmen?
24  A.   Yes.
25  Q.   And you went to WebOp's offices in Arizona, right?

S. Grissom - Cross (By Mr. Grindrod)

1   A.   Yes.

2   Q.   You saw that there were 10 to 15 employees there?

3   A.   Correct.

4   Q.   And actually one of DSPF's own employees eventually went

5   to work for WebOp, right?

6   A.   Correct.

7   Q.   That was Max White?

8   A.   Yes.

9   Q.   In addition to that work you did with SaleAMP and

10  WeMonitor, you were Mr. Maerki's, like, personal assistant,

11  right?

12  A.   Yes.

13  Q.   So that involved everything from -- like, setting

14  meetings was one of your responsibilities?

15  A.   Uh-huh.

16  Q.   Setting up conference calls?

17  A.   Yes.

18  Q.   You found Mr. Maerki to be charming, right?

19  A.   Yeah.

20  Q.   He was motivational?

21  A.   Yes.

22  Q.   He was a good salesman?

23  A.   Yes.

24  Q.   And one of the things that he had you do is to deal with

25  franchise owners when they called, right?

———————— S. Grissom - Cross (By Mr. Grindrod) ————————

1   A.   Initially I would field phone calls.

2   Q.   And when franchise owners reached out to you, you gave

3   explanations or answers to their questions, right?

4   A.   Based on what we were told to answer, yes.

5   Q.   And who told you how to answer?

6   A.   Kent Maerki.

7   Q.   And usually that meant giving information that you had

8   heard in weekly conference calls, right?

9   A.   Sometimes.

10  Q.   Were there other things that Mr. Maerki told you to tell

11  franchisees?

12  A.   Yes.  I don't recall specifically what, you know, each

13  individual thing was, but if there somebody that had a

14  particular question, I would go to him for an answer.

15  Q.   And whatever Kent Maerki told you, you would relay to the

16  person who had the question, right?

17  A.   Yes.

18  Q.   And did you intentionally lie to any of those franchise

19  owners?

20  A.   No.

21  Q.   You passed along the information that Mr. Maerki gave you

22  because you believed it?

23  A.   Correct.

24          MR. GRINDROD:  No further questions, Your Honor.

25          THE COURT:  Any redirect?

S. Grissom - Redirect

```
 1              MS. YUSI:  One moment, Your Honor.
 2              (Pause in the proceedings.)
 3              MS. YUSI:  Very briefly, Your Honor.
 4                      REDIRECT EXAMINATION
 5   BY MS. YUSI:
 6   Q.  Just to clarify, David Bailey, he was with WebOp; is that
 7   right?
 8   A.  Correct.
 9   Q.  They were not calling patients and getting -- receiving
10   patients, correct?
11   A.  No.
12              MR. GRINDROD:  Objection.  Asked and answered on
13   direct.
14              MS. YUSI:  I'm just clarifying.  There's a lot of
15   companies being named about, Your Honor.
16              THE COURT:  Objection overruled.
17              MS. YUSI:  Thank you.
18   BY MS. YUSI:
19   Q.  He only dealt with the web; is that right?
20   A.  Yes.
21   Q.  Thank you.
22              MS. YUSI:  Those are all my questions, Your Honor.
23              THE COURT:  May this witness be permanently excused?
24              MS. YUSI:  Yes, sir.
25              MR. GRINDROD:  We'd like her to be subject to
```

────────── S. Grissom - Redirect ──────────

1    recall.

2         MS. YUSI:  Your Honor, if they have questions they

3    want to direct her on now -- well, I'm not sure -- that's

4    fine.

5         THE COURT:  Ms. Grissom, where did you say you were

6    from?

7         THE WITNESS:  Houston, Texas.

8         THE COURT:  Put on the earphones.

9         Ladies and gentlemen, please excuse us for a minute.

10        (A sidebar conference was held as follows: )

11        THE COURT:  Mr. Grindrod, this witness is in here

12   from Houston, Texas, and we're not going to keep this witness

13   around here because you say keep the witness here, unless you

14   have something specific you want to ask this witness now.  We

15   want to know what it is.

16        MR. GRINDROD:  Your Honor, I don't expect that we

17   would have to call this witness in our case.  The only reason

18   that we would need her to be subject to recall is if some

19   evidence that we're currently expecting to get in through

20   another witness doesn't come in through that witness.

21        THE COURT:  The Court is not going to keep this

22   witness here on that speculative opportunity or likelihood.

23        MR. GRINDROD:  Your Honor, all I'm asking is if it

24   comes to the point where we would need to call that witness,

25   that we be allowed to call the witness.  I'm not asking for

———S. Grissom - Redirect———

1    her to remain in town.  I think the likelihood of us calling

2    her is pretty low, but I'm just asking her to be subject to,

3    and we would fully explain why.  I know the Court could rule

4    at that point that maybe that reason wasn't good enough, but

5    just for now, if the Court would not fully release her so

6    that she doesn't discuss her testimony or otherwise --

7              THE COURT:  Well, I will tell her not to discuss her

8    testimony, but it has to be very serious before we're going

9    to bring this witness back here from Houston, Texas.

10             MR. GRINDROD:  I understand, Your Honor.

11             MS. YUSI:  And, Your Honor, if I just can let the

12   Court know and defense counsel know, she has four children,

13   one of them with special needs, and so she needs quite a

14   heads-up in order to plan to come back.

15             THE COURT:  Well, we will move on, but we will find

16   out, but it's highly unlikely that she's coming back here.

17   It would be a very serious situation for the Court to

18   authorize her to come back here.

19             That's all.  Let's move on.

20             MS. YUSI:  Thank you.

21             (The sidebar conference concluded.)

22             THE COURT:  You may step down, ma'am, and you are

23   subject to recall.

24             (The witness stepped down.)

25             THE COURT:  Next witness.

G. Clapper - Direct

1          MS. YUSI:  Your Honor, the government calls Gary

2     Clapper.

3          (Witness sworn.)

4          GARY CLAPPER, called by the Government, having been

5     first duly sworn, was examined and testified as follows:

6                    DIRECT EXAMINATION

7     BY MS. YUSI:

8     Q.  Good morning.  Could you introduce yourself to the Court.

9     A.  Yes.  My name is Gary Clapper, C-l-a-p-p-e-r.

10    Q.  Where do you live, just the city and state?

11    A.  Phoenix, Arizona.

12    Q.  Where do you work?

13    A.  For the Arizona Corporation Commission with the

14    Securities Division.

15    Q.  What is the Arizona Corporation Commission?

16    A.  Arizona Corporation Commission serves a number of

17    functions, from divisions for forming corporations, railroad

18    and pipeline safety, utilities, and the Securities Division.

19    Q.  What does the Securities Division do?

20    A.  The Securities Division has the function of two sides,

21    one being registration and compliance dealing with registered

22    salespeople and licensed investment advisors, and the

23    enforcement side dealing with people who are not licensed and

24    not registered and the offerings that they are offering are

25    not registered.

G. Clapper - Direct

1    Q.   Registered as securities?

2    A.   Yes.

3    Q.   Are you in the enforcement side?

4    A.   Yes, I am.

5    Q.   What is your title?

6    A.   I am the chief investigator with the Securities Division.

7    Q.   What does that entail?

8    A.   It entails supervising ten investigators, anything from

9    reviewing cases or complaints that come in, entering them in

10   the division enforcement system, assigning them out, and a

11   number of other activities on the supervisory level.

12   Q.   The Arizona Corporation Commission in general, what is

13   its geographical jurisdiction, or how does that work?

14   A.   The jurisdiction throughout the securities division is

15   worded as "within or from," meaning that if we have the

16   investor or the target in Arizona, we have jurisdiction.  So

17   one person, the investor or target, could be out of state as

18   long as we have one of them in state.

19   Q.   And how long have you been with the Securities Division

20   of the Arizona Corporation Commission?

21   A.   I'm on my 21st year right now.

22   Q.   Before that, what did you do?

23   A.   I was an officer with the Tempe Police Department for 20

24   years, and I retired from that.

25   Q.   And that's Tempe, Arizona?

G. Clapper - Direct

1  A.  Yes, ma'am.

2  Q.  Now, just in general, how does an investigation in the

3  enforcement division start?

4  A.  It can start generally from a complaint received from an

5  investor who feels something is wrong, or it can be from

6  proactive enforcement with us doing what we call ad shopping

7  and making undercover pitches.

8  Q.  Are you familiar with or were you involved with an

9  investigation involving Dental Support Plus Franchise, Kent

10 Maerki, and Norma Jean Coffin?

11 A.  Yes, ma'am.

12 Q.  What was your role?

13 A.  I was assigned the case in very early 2012 as a complaint

14 that came in from an investor.

15 Q.  And you said that was early 2012?

16 A.  Correct.

17 Q.  And at that point was Dental Support Plus Franchise --

18 was that a registered security in Arizona?

19 A.  No, it was not.

20 Q.  Were they incorporated in Arizona?

21 A.  Yes, they were.

22 Q.  If you can look -- there's a binder in front of you.  If

23 you can look at Exhibit 200A.

24        MS. YUSI:  And, Your Honor, these next several

25 exhibits deal with another stipulation, if we can read that

─────────G. Clapper - Direct─────────

1    into the record.

2              THE COURT:  What are the exhibit numbers?

3              MS. YUSI:  200A, 200A-1, and 200B.

4              THE COURT:  Okay.  You may.

5              MS. YUSI:  "The parties stipulate and agree that

6    categories of records listed below in numbered paragraphs 1

7    through 34 are authentic and constitute records of a

8    regularly conducted business activity pursuant to Rule 803(6)

9    of the Federal Rules of Evidence or records or statements of

10   a public office pursuant to 803(8) of the Federal Rules of

11   Evidence without requiring further authentication,

12   certification, or testimony of a custodian."

13             Number 5 is records of the Nevada State Corporation

14   Commission, including records related to the creation and

15   dissolution or cancellation of limited liability companies.

16             And number 6 is records of the Arizona State

17   Corporation Commission, including records related to the

18   creation and dissolution or cancellation of limited liability

19   companies.

20             Thank you, Your Honor.

21             THE COURT:  All right.

22   BY MS. YUSI:

23   Q.  Do you recognize Exhibit 200A?

24   A.  Yes, I do.

25   Q.  What is it?

———— G. Clapper - Direct ————

1   A.  It is the Articles of Organization for Dental Support

2   Plus Franchise LLC with the State of Arizona.

3            MS. YUSI:  Your Honor, we move to admit

4   Exhibit 200A.

5            THE COURT:  200A will be admitted.

6            (Government's Exhibit 200A was admitted.)

7   BY MS. YUSI:

8   Q.  And you said this was for Dental Support Plus Franchise?

9   A.  Yes.  Dental Support Plus Franchise LLC.

10  Q.  And what is an Articles of Organization?

11  A.  It is just the formal formation of the company.

12  Q.  And what date was DSPF organized in Arizona?

13  A.  On November 22nd, 2010.

14  Q.  And if we can go to Page 3 of Exhibit 200A.  Who was

15  involved in the management structure of DSPF?

16  A.  Kent Maerki and Norma Jean Coffin.

17  Q.  Do you know the relationship between these two?

18  A.  Yes.  Ms. Coffin is the wife of Mr. Maerki.

19  Q.  And if you could look at Exhibits 200A-1 and 200B in

20  front of you.

21            THE COURT:  I think I'd take one of them at a time.

22            MS. YUSI:  Yes, sir.

23  BY MS. YUSI:

24  Q.  Was DSPF also -- was that also registered in the State of

25  Nevada?

G. Clapper - Direct

1   A.  Yes, it is.

2   Q.  And what is Exhibit 200A?

3   A.  200A, are you talking --

4   Q.  I'm sorry, 200A-1.

5   A.  A-1 is, again, a certified copy of Dental Support Plus

6   Franchise LLC being incorporated in the State of Nevada.

7          MS. YUSI:  Your Honor, we move to admit

8   Exhibit 200A-1.

9          THE COURT:  It will be admitted.

10         (Government's Exhibit 200A-1 was admitted.)

11  BY MS. YUSI:

12  Q.  And if we can to Page 3 of Exhibit 200A-1.  Who is listed

13  as the manager of DSPF in Nevada?

14  A.  Norma Coffin.

15  Q.  And who is the signature of manager or managing member?

16  A.  Debra Jenkins.

17  Q.  What date was this organized?

18  A.  On December 22nd, 2012.

19  Q.  And 200B in your book, if you could briefly look at that.

20  Do you recognize that document?

21  A.  Yes, ma'am.

22  Q.  And what is it?

23  A.  It is from the Secretary of State with the State of

24  Nevada for Dental Support Group LLC.

25         MS. YUSI:  Your Honor, we move to admit 200B.

────────── G. Clapper - Direct ──────────

1           THE COURT:  200B will be admitted.

2           (Government's Exhibit 200B was admitted.)

3    BY MS. YUSI:

4    Q.  Are these Articles of Incorporation of Dental Support

5    Group LLC?

6    A.  Yes, ma'am.

7    Q.  What was Dental Support Group LLC in Nevada, as far as

8    you know, or based on your investigation?

9    A.  To the best of my remembering, Dental Support Group took

10   over part of the aspects of trying to find patients and

11   dentists at one point.

12   Q.  Okay.  Thank you.

13          Now, at the beginning of your investigation, what

14   did you do to start looking into the complaint?

15   A.  I met with the individual who filed the complaint with

16   the division, obtained their documents, interviewed them --

17   or him, I should say, and then started doing the background

18   on the principals and the entities that he had invested with.

19   Q.  And did you find a website for Dental Support Plus Group

20   franchise?

21   A.  Yes, I did.

22   Q.  Can you look at 200G in your notebook, Exhibit 200G.

23          Do you recognize that?

24   A.  Yes, I do.

25   Q.  What is it?

G. Clapper - Direct

1    A.  It is information -- promotional information that is

2    given to potential investors or they have access to to see if

3    they have further interest.

4    Q.  This 200G, is this the website?

5    A.  Yes, it is.

6    Q.  Did your division capture this during their

7    investigation?

8    A.  Yes, we did.

9          MS. YUSI:  Your Honor, we move to admit

10   Exhibit 200G.

11         THE COURT:  Exhibit 200G is admitted.

12         (Government's Exhibit 200G was admitted.)

13   BY MS. YUSI:

14   Q.  Let's just go through this a little bit.

15         What was the URL for the website for this?

16   A.  Http://www.DentalSupportPlus.com/.

17   Q.  Is this the first page that you see when you go to that

18   particular page?

19   A.  Yes, ma'am.

20   Q.  And what is the first thing it says on the first page, if

21   you could read that?

22   A.  "Our unique, carefree business model is a highly

23   qualified patient delivery system designed to provide a

24   dentist with an average of ten new patients weekly, earning

25   the franchise a net annual profit of $6,448."  In

G. Clapper - Direct

1    parentheses:  "A return on equity of 21.49 percent."

2    Q.  And then there's an asterisk that says, "Manager option

3    selected."  Do you know what that referred to based on what

4    you saw in the investigation?

5    A.  I believe that referred to the investor taking the option

6    of having two different groups deal with the dentists and the

7    patients and acquiring those.

8    Q.  In terms of finding the patients and the dentists?

9    A.  Yes, ma'am.

10   Q.  And I'm going to go to Page 2 of Exhibit 200G, and I'm

11   going to highlight this paragraph here.  Could you read what

12   it says on Page 2.

13   A.  "Franchise provides a Dental Support Plus partner dentist

14   with a steady flow of new patients on a monthly basis,

15   increasing cash flow dramatically for the dentist while the

16   dentist incurs no additional overhead expense."

17   Q.  And the second paragraph I've highlighted?

18   A.  "Once dental services are performed, Dental Support Plus

19   Franchise owners then receive 28.4 percent of the new patient

20   fee produced from every patient provided by Dental Support

21   Plus Franchise.  The franchise owner's revenue is from total

22   fees" -- "total fee collections, not from net profit, so it

23   is revenue off the top, not off the bottom."

24   Q.  And the last sentence on Page 2 of this exhibit talks

25   about the day-to-day operation may be conducted by the

G. Clapper - Direct

1    franchise owner or an approved management company.  Is that

2    what you were talking about, the management option?

3    A.  Yes.

4    Q.  Page 3 of the same exhibit, on the second bullet point,

5    what does that say?

6    A.  "The franchise model has been built on a results-proven

7    platform over an eight-year time period which includes seven

8    years of research and development.  Dental Support Plus

9    Franchise owners generally anticipate returns on" --

10   Q.  I'm going to go to the next one.  Sorry.

11   A.  Okay.

12   Q.  Further down, the bullet point, what does this read?

13   A.  "A new franchise is targeted to be fully operational in

14   approximately 180 days."

15          MS. YUSI:  Okay.  Thank you, Ms. O'Boyle.

16   BY MS. YUSI:

17   Q.  Now, in your investigation, did you see or find some

18   recorded advertisements as well?

19   A.  Yes, I did.

20   Q.  In your notebook on the inside cover, do you see a disk

21   labeled 200I?

22   A.  Yes, ma'am.

23   Q.  Did you sign that?  Or did you initial that disk?

24   A.  Yes, I did.

25   Q.  Does that contain one of the advertisements that you

G. Clapper - Direct

1   found during your investigation?

2   A.  Yes, it did.

3          MS. YUSI:  Your Honor, I move to admit Exhibit 200I.

4          THE COURT:  200I will be admitted.

5          (Government's Exhibit 200I was admitted.)

6          MS. YUSI:  Thank you.

7          If we could play that.

8          (Video played in open court.)

9   BY MS. YUSI:

10  Q.  And so when you were doing your investigation, how much

11  was DSPF and the salespeople selling these franchise units

12  for?

13  A.  Well, it varied as the investigation continued, starting

14  out at 20- and then went to 25- and then to 30-, I believe at

15  the very end.

16  Q.  30,000?

17  A.  30,000.

18  Q.  Did you also find marketing material and advertisements

19  in addition to the one on that disk during your

20  investigation?

21  A.  Yes, I did.

22  Q.  If you can look at 200M, as in Mary, in your notebook.

23          Do you recognize this document?

24  A.  Yes, I do.

25  Q.  And what is it, generally?

G. Clapper - Direct

1   A.   This is going through explaining what Dental Support Plus

2   does, what the opportunity will provide the investor, and

3   kind of walks them through the entire system.

4   Q.   Okay.  And does this -- is this one of the items you

5   found that Dental Support Plus was using during your

6   investigation?

7   A.   Yes.

8           MS. YUSI:   Your Honor, we move to admit

9   Exhibit 200M.

10           THE COURT:   200M will be admitted.

11           (Government's Exhibit 200M was admitted.)

12   BY MS. YUSI:

13   Q.   And if we can look at Page 2 of Exhibit 200M.  What does

14   it say there?

15   A.   "Dental Support Plus offers an opportunity to own a

16   managed dental franchise with a six-year track order of

17   success."

18   Q.   And is that -- the six-year track record of success, what

19   did you find during your investigation in terms of the track

20   record claimed?

21   A.   The track record that was claimed, speaking with one of

22   the people from the management companies, there were four

23   dental offices opened under a prior -- prior offering, and he

24   admitted that --

25           THE COURT:   Wait a minute.  Don't tell us what

G. Clapper - Direct

1   anybody said to you.

2   BY MS. YUSI:

3   Q.  We'll talk about -- I'm just talking about the number of

4   years in the track record.  What did you see in the different

5   advertisements?

6   A.  Well, we saw one that was five; we just previously

7   discussed this one, six; and one at eight years.

8   Q.  And if we can go to Page 8 of Exhibit 200M.  This says

9   "DSP platform," and it says "proven and proprietary."

10          What did you find out about the proprietary system

11  that the platform was supposedly based on during your

12  investigation?

13          MR. GRINDROD:  Objection to foundation.

14          THE COURT:  Objection overruled.

15          THE WITNESS:  Just that they were relying on the

16  information from the prior dental offices and their ability

17  to obtain patients and dentists.

18  BY MS. YUSI:

19  Q.  Okay.  Now, who did you speak with, just in general --

20  who did you speak with, just generally, during your

21  investigation?

22  A.  I spent a lot of time with a number of investors either

23  over the phone or in person because they were in different

24  places around the country.

25  Q.  Did you speak with salesmen at all?

G. Clapper - Direct

1   A.  No, ma'am.

2   Q.  At some point did the Arizona Corporation Commission

3   issue subpoenas?

4   A.  Yes, we did.

5   Q.  All right.  I'm going to show you -- if you can look at

6   221A.  Do you recognize that document?

7   A.  Yes, ma'am.

8   Q.  What are they?

9   A.  They are the -- one of the documents sent in reference to

10  the subpoenas that were issued.  This is a cover letter

11  explaining the process.

12  Q.  Okay.  And does this contain the cover letters and the

13  subpoenas that were sent out from your division?

14  A.  Yes, ma'am.

15          MS. YUSI:  Your Honor, we move to admit

16  Exhibit 221A.

17          THE COURT:  Exhibit 221A will be admitted.

18          (Government's Exhibit 221A was admitted.)

19  BY MS. YUSI:

20  Q.  And this is the cover letter here.  What is a subpoena --

21  or what does a subpoena from your office entail?

22  A.  Well, there are primarily two we use:  One that would be

23  for documents for an individual or entity to produce

24  documents in regard to an Exhibit A on the subpoena; the

25  second one could be for an examination under oath, commonly

G. Clapper - Direct

```
 1   referred to as a deposition.
 2   Q.  And Page 2 of Exhibit 221A, what date did the subpoenas
 3   go out?
 4   A.  It was on May 28th of 2013.
 5   Q.  And when you started January 2012 with the investigation
 6   to May 2013, did you have an understanding of whether or not
 7   these franchises were still being sold?
 8   A.  My understanding was that they were still being sold.
 9   Q.  But these went out May 28th, 2013.  And who did you all
10   send these two?
11   A.  The first one went to Norma Coffin.  The second would
12   have been Dental Support Plus Franchise LLC, to the custodian
13   of records.
14   Q.  And I'm going to go down to Page 6 of Exhibit 221A.  And
15   who else did you all subpoena?
16   A.  Dental Support Group LLC, custodian of records.
17   Q.  What were you asking for in these subpoenas?
18   A.  In these subpoenas, we included an Exhibit A asking for
19   information from financial reports.  We would ask for
20   information about investors -- names, addresses, telephone
21   numbers -- Dental Support Plus Franchise, the franchisees,
22   pretty much anything that involved the working of the company
23   with the investor.
24   Q.  Okay.  And did DSPF or DSP Group provide documents to you
25   all?
```

G. Clapper - Direct

1    A.  Yes, they did.

2    Q.  And once you gathered those documents and completed some

3    of your investigation, internally what is the next level, and

4    what did you do?

5    A.  The next level, we could involve an accountant to do

6    accounting work.  In this case, I don't think we did

7    extensive accounting work.  It was more setting up the

8    examinations under oath at that point.

9    Q.  Okay.  And was a notice, an official notice -- was that

10   ever sent to Kent Maerki, Norma Jean Coffin, or DSPF?

11   A.  Yes, it was.

12   Q.  And what is a -- well, look at 224C, if you could, inside

13   your notebook.  Do you see 224C?

14   A.  Yes, ma'am.

15   Q.  And what is that?

16   A.  That is a Notice of Opportunity for Hearing.  That is --

17   we are an administrative agency.  That is what we would

18   consider a charging document equal to like an indictment or a

19   complaint on a criminal case.

20         MS. YUSI:  Your Honor, we move to admit

21   Exhibit 224C.

22         THE COURT:  224C will be admitted.

23         (Government's Exhibit 224C was admitted.)

24   BY MS. YUSI:

25   Q.  So your division, just so it's clear to the jury, is

G. Clapper - Direct

1    civil enforcement, not criminal.  It's civil?

2    A.  Correct.  We are regulatory.

3    Q.  And what was the date that this was issued?

4    A.  It was filed on November 18th of 2013.

5    Q.  And it's titled "Notice of Opportunity for Hearing

6    Regarding Proposed Order of Cease and Desist, Order for

7    Restitution, Order for Administrative Penalties, and Order

8    for Other Affirmative Action."

9    A.  Correct.

10   Q.  Now, what typically happens after a notice is filed?

11   A.  Once a notice is filed, the -- and actually on the notice

12   itself, on the page it says that the respondent has 10 days

13   to request a hearing and 30 days to file an answer to the

14   allegation.

15          MS. YUSI:  And if we can pull up 224C again.  Sorry.

16   BY MS. YUSI:

17   Q.  Who exactly was charged in this document?

18   A.  Kent Maerki, Norma Jean Coffin, who was also known as

19   Norma Jean Maerki and Norma Jean Maule, as husband and wife,

20   and Dental Support Plus Franchise LLC.

21   Q.  So this gives whoever is charged an opportunity to

22   respond?

23   A.  Correct.

24   Q.  Did DSPF file a response?

25   A.  Yes, they did.

G. Clapper - Direct

1    Q.  And you said that they could ask for hearings as well.
2    Did they ask for hearings?
3    A.  Yes, they did.
4    Q.  And at these hearings, what happens, or what could
5    happen?
6    A.  We will, as in any trial, present the state's side first,
7    and they are allowed to cross-examine any witnesses, and the
8    evidence basically is presented from the investors, what they
9    were told, what money they put in, what success or
10   deficiencies may have occurred, that they were promised one
11   thing and received something else.
12   Q.  And do these hearings occur in, like, a federal or a
13   state court?
14   A.  No.  They are in front of an administrative law judge
15   with the State of Arizona.
16   Q.  So administrative judge for the Arizona Corporation
17   Commission?
18   A.  Correct.
19   Q.  And at the hearing can the people that are charged in the
20   notice -- can they present their own evidence as well and
21   witnesses?
22   A.  Yes, they can.
23   Q.  And did DSPF have or -- you said they requested a
24   hearing.  And did those hearings occur?
25   A.  Eventually, yes.

Carol L. Naughton, Official Court Reporter

G. Clapper - Direct

1   Q.   And did you attend these hearings?

2   A.   Yes, I did.

3   Q.   Did Kent Maerki and DSPF call any witnesses on their own?

4   A.   Yes, they did.

5   Q.   Was one of those Aghee William Smith?

6   A.   Yes, it was.

7   Q.   If you can look at Exhibit 286 in your binder.  Do you

8   recognize this document?

9   A.   Yes, I do.

10  Q.   And what is it?

11  A.   It is the transcript relating to Mr. Smith's testimony.

12  Q.   As you said, you attended that and heard this testimony

13  as well?

14  A.   Yes, I did.

15          MS. YUSI:  Your Honor, we move to admit Exhibit 286.

16          THE COURT:  Exhibit 286 is admitted.

17          (Government's Exhibit 286 was admitted.)

18  BY MS. YUSI:

19  Q.   And when witnesses testify in front of the administrative

20  law judge in the Arizona Corporation Commission, are they

21  sworn in to tell the truth?

22  A.   Yes, they are.

23  Q.   And what date did this hearing occur?

24  A.   July 22nd of 2015.

25  Q.   All right.  And who called Mr. Smith as their witness?

G. Clapper - Direct

1    A.   Mr. Maerki.

2    Q.   I just want to go through a few things here.  If we can

3    go to Page 9 of Exhibit 286.

4          And he was asked what he did for a living, and I'll

5    pull this up on your screen to make it a little bit easier

6    for you to follow.  What did Mr. Smith say he did for a

7    living?

8    A.   "I work in the financial services profession, and I help

9    people plan for their retirements with a variety of methods

10   that I have been trained and specialize in."

11   Q.   And did he talk about being a salesman for Dental Support

12   Plus Franchise?

13   A.   Yes, he did.

14   Q.   If we can go to Page 10 that we're looking at right here.

15   He's asked how he learned about DSPF, and in general, how did

16   he say he learned about DSPF?

17          MR. GRINDROD:  Your Honor, I guess I would object to

18   that question.  I mean, if we can ask what he actually said,

19   or we can show the exhibit, but why the witness would

20   summarize generally what he said, I'm not sure.

21          THE COURT:  Well, the transcript is in front of him.

22   The Court would have him refer to what he said.

23          MS. YUSI:  That's fine.  I was trying to summarize

24   to make it quicker.

25          THE COURT:  So the objection was sustained.

Carol L. Naughton, Official Court Reporter

G. Clapper - Direct

```
 1            MS. YUSI:  Thank you.
 2   BY MS. YUSI:
 3   Q.  I'm going to ask the questions.  If you can do his
 4   answers.  Okay?
 5   A.  Yes, ma'am.
 6   Q.  Who is questioning him in this hearing, if you recall?
 7   A.  Mr. Maerki did the direct, and Wendy Coy, who is the
 8   enforcement attorney with our division, did the cross.
 9   Q.  So at the beginning of the direct, is Mr. Maerki asking
10   Mr. Smith questions?
11   A.  Yes, ma'am.
12   Q.  All right.  "QUESTION:  Did you sign a sales agreement?"
13   A.  "Yes."
14   Q.  "How did you learn about" -- and I'll refer to Dental
15   Support Plus Franchise as DSPF.
16            "How did you learn about DSPF?"
17   A.  "It began in -- with a history that was developed over a
18   couple of years with MetroMedia, Oracare, and the founders
19   that led to the Dental Support Plus Franchise."
20   Q.  All right.  And I'm going to go to Page 11.
21            "QUESTION:  Were there any other people associated
22   with MetroMedia, Oracare" -- well, just to stop here.
23            MetroMedia and Oracare, what was your understanding
24   based on your investigation as to what those were?
25   A.  They were the -- what was referred to as the management
```

G. Clapper - Direct

```
 1    that could provide patients or provide -- one dealt with
 2    providing patients, one dealt with providing dentists for the
 3    franchisees.
 4    Q.  For DSPF?
 5    A.  Correct.
 6    Q.  Did they stay throughout the investment?  Did they
 7    continue to work with DSPF?
 8    A.  They did for a period of time, but later on it did
 9    change.
10    Q.  Okay.  We'll go back to this.
11         "QUESTION:  Were there any other people associated
12    with MetroMedia, Oracare, and Steve Vereen with whom you were
13    introduced or involved with?"
14         If you can read the answer.
15    A.  "I was introduced to about 12 individuals running that
16    operation."
17    Q.  ALJ Stern, is that the judge that was over the hearing?
18    A.  Correct.
19    Q.  "This is Judge Stern again.  When you say 12 individuals
20    running the operation, you mean MetroMedia and Oracare?"
21         If you can read the witness's portion.
22    A.  "Well, I was introduced to a staff of about 12
23    individuals who were responsible for running Dazzle Dental
24    Centers as MetroMedia, Oracare, part of that structure."
25    Q.  "About what year was that, do you recall?"
```

G. Clapper - Direct

```
 1            If you can answer.
 2   A.  I'm sorry.
 3   Q.  At the end of it.
 4   A.  Yes.  "I started looking into them around 2007."
 5   Q.  Now, did Dazzle Dental come up in your investigation?
 6   A.  Yes, it did.
 7   Q.  What was your understanding of what Dazzle Dental was?
 8   A.  Dazzle Dental was a similar type dental investment, but
 9   they had the dentist offices and would provision patients to
10   those offices.
11   Q.  And MetroMedia and Oracare worked with Dazzle Dental as
12   well?
13   A.  I believe they may have, yes.
14   Q.  Okay.  Here's the question at the bottom of Page 11.  It
15   says, "What is Dazzle Dental?"
16            And then if you could read the answer.
17   A.  "Dazzle Dental was a series of dental offices that were
18   put together by this -- this group that I mentioned, and they
19   were just running dental operations, as far as I understood
20   it.  They -- they claimed to be specialists in practice
21   management of a multiservice dental center, and that's who
22   they were.  That's who they represented themselves to be."
23   Q.  And further down on Page 12.
24            "QUESTION:  How did you learn about Dental Support
25   Plus Franchise?"
```

G. Clapper - Direct

1    A.   "I learned about Dental Support Plus Franchise after the
2    principals of Dazzle Dental Center had introduced the --
3    their concept of franchising -- franchising their efforts,
4    and that's how I learned about Dental Support Plus Franchise.
5    I learned -- and that's where it began."
6    Q.   According to Mr. Smith, did he sell Dazzle Dental?
7    A.   Yeah.
8    Q.   Pardon?
9    A.   I'm sorry.  I didn't let you finish.
10   Q.   According to Mr. Smith, did he sell Dazzle Dental
11   investments?
12   A.   Yes, he did.
13   Q.   Do you know how much?
14   A.   I believe he said there were around 20.
15          MR. GRINDROD:  Objection, Your Honor.  Speculation.
16          THE COURT:  Sustained on speculation.
17          MS. YUSI:  Sorry.  I'll look for them.
18   BY MS. YUSI:
19   Q.   We'll come back to that.
20          Now, Page 18 of Exhibit 286, at the end.
21          "QUESTION:  Okay.  I'm going to ask you about a
22   tri-fold brochure.  I e-mailed you one this morning."
23          Page 19:  "Did you get that?"
24          Can you read the answer?
25   A.   "Yes.  I do have that in front of me."

G. Clapper - Direct

```
1    Q.  Now, if you can look in your book, Exhibit 202.  Do you
2    recognize 202?
3    A.  Yes, ma'am.
4    Q.  And does it have an exhibit labeled from this hearing
5    that we're talking about in Exhibit 286?
6    A.  Yes.  It's from the hearing the Arizona Corporation
7    Commission had.
8    Q.  And this was R-124 exhibit from that deposition?
9    A.  Yes, ma'am.
10            MS. YUSI:  Your Honor, we move to admit Exhibit 202.
11            THE COURT:  Any objection to 202?
12            MR. GRINDROD:  No, Your Honor.
13            THE COURT:  202 will be admitted.
14            (Government's Exhibit 202 was admitted.)
15   BY MS. YUSI:
16   Q.  If we can go to Page 38 of Exhibit 286.  And we're going
17   to start with line 13.
18            "QUESTION:  Was your job to educate the clients
19   relative to what the choices they had relative to the
20   opportunity to buy or not?"
21   A.  "That was -- yes, that was part of my job."
22   Q.  "Or was it to encourage them to buy and encourage them to
23   contract?"
24   A.  "My job was to educate."
25   Q.  "Okay."
```

———G. Clapper - Direct———

1   A.  "Inform, educate."

2   Q.  Now, you said there was an attorney from the Arizona

3   Corporation Commission as well?

4   A.  Yes, ma'am.

5   Q.  Did she have you -- did she have a chance to

6   cross-examine Mr. Smith?

7   A.  Yes, she did.

8   Q.  If we can go to Page 41, at the bottom of that.  Well,

9   we'll go to the middle so we know what they're talking about

10  here.

11          Did she go back and talk about MetroMedia, Oracare,

12  and Dazzle Dental?

13  A.  Yes, she did.

14  Q.  "QUESTION:  I'm going to ask you on this.  Do you recall

15  what Oracare's responsibility was?"

16  A.  "Oracare?"

17  Q.  "Yes."

18  A.  "Oracare's responsibility was to work with dentists,

19  okay, and provide their services that allowed dentists to

20  receive patients through the franchise -- through the

21  franchises that were structured."

22  Q.  Okay.  And I'm going to go down to the bottom question.

23          "Okay.  Was this -- from all your franchises'

24  standpoints, which would be, to the extent you know, a failed

25  business for each one of them?"

G. Clapper - Direct

1    A.  "Yes."

2    Q.  "And as a result, was it a business -- a failed business

3    for Dental Support Plus Franchise, the company?"

4    A.  "Yes."

5    Q.  "Yes, sir"?

6    A.  "Yes, sir."

7    Q.  And then Ms. Coy starts her examination on the bottom of

8    this page; is that right?

9    A.  Correct.

10   Q.  This is Page 42 and going on to Page 43.  Page 42:

11            "QUESTION:  How long have you been involved with the

12   dental business?"

13            If you can read the answer there.  If you could read

14   the answer.

15   A.  "I started in around 2009 with Dazzle Dental."

16   Q.  "With what?"

17   A.  "With Dazzle Dental."

18   Q.  "What was your role with Dazzle Dental?"

19   A.  "I became a salesperson with Dazzle Dental and offered

20   through my broker-dealer their packaged program for investors

21   to become investors in Dazzle Dental."

22   Q.  And ALJ Stern, Judge Stern:

23            "Quick question, Mr. Smith.  Dazzle Dental, did it

24   sell franchises, or was it stock or what?  How did

25   somebody --"

G. Clapper - Direct

1   A.  "Their original platform was they were a registered

2   security Dazzle Dental Centers."

3   Q.  "So they were a sale of stock or membership units, or

4   what was it?"

5   A.  "They were -- they were LLC membership units in Dazzle

6   Dental Centers."

7   Q.  "Okay.  Go ahead, Ms. Coy.

8        "QUESTION:  Now, Mr. Smith, you mentioned that you

9   were with a broker-dealer.  Who was the broker-dealer?"

10  A.  "Stonehurst Securities."

11  Q.  "And how long were you with Stonehurst Securities?"

12        Let me pull this up here.

13  A.  "For about two years."

14  Q.  "Okay.  And during that time, essentially you raised

15  money for the Dazzle Dental business, correct?"

16  A.  "For their original platform, yes."

17  Q.  "And where was Dazzle Dental located?"

18  A.  "In Arizona."

19  Q.  "Where were -- were you still located in California?"

20  A.  "Yes.  Uh-huh."

21  Q.  "And do you know -- looking at -- do you know what

22  happened to Stonehurst Securities?"

23  A.  "Stonehurst -- Stonehurst Securities, I don't know what

24  happened to them.  I'm not sure where they are today."

25  Q.  "Were you with them to the end of Dazzle Dental?"

G. Clapper - Direct

1   A.   "I was with them to the end of Dazzle Dental, yes."

2   Q.   "Would it surprise you to know that in 2009 Stonehurst

3   Securities was censured by FINRA?"

4   A.   "Was what, now?"

5   Q.   "Was censured by FINRA.  Do you know what FINRA is?"

6   A.   "I'm familiar with them."

7   Q.   I'm going to go to Page 45, the question on line 6.

8        "And who was in charge of Dazzle Dental?"

9   A.   "A fellow by the name of Steven Vereen was the main

10  personality, main person."

11  Q.   Okay.  Page 46, and line 6.

12       "Were you aware that Mr. Vereen has an order against

13  him from the Arizona Corporation Commission for violations of

14  the Arizona Securities Act, including antifraud provisions?"

15  A.   "Not at the point I met him."

16  Q.   "Were you aware this occurred in 1998?"

17  A.   No.

18  Q.   And further down on Page 46.

19       "QUESTION:  Okay.  So do you know approximately how

20  much Dazzle Dental raised in their program?"

21  A.   "I'm not aware of that."

22  Q.   "How much did you sell?"

23  A.   "Oh, it was about 2 million."

24  Q.   "And how many investors did that involve that you sold

25  to?"

G. Clapper - Direct

```
 1            If you could read the answer.
 2    A.  "Probably about 20, somewhere in that neighborhood."
 3    Q.  All right.  Page 48.
 4            "QUESTION:  Mr. Smith, did your investors that you
 5    put into the Dazzle Dental program receive the return of
 6    their principal and whatever their expected profit was?"
 7    A.  "From the Dazzle Dental offer?"
 8    Q.  "Correct."
 9    A.  "No, they did not."
10    Q.  "Isn't it true that few, if any, investors in the Dazzle
11    Dental program -- those investments weren't successful, were
12    they?"
13    A.  "I'm not clear on how many did or didn't."
14    Q.  Then they continue to talk about DSPF, correct, in
15    general?
16    A.  Yes, ma'am.
17    Q.  If we can go to Page 49.  At the bottom, "Okay, okay."
18    And then "At some point" --
19            "QUESTION:  At some point do you recall when you
20    began to sell DSPF franchises?"
21    A.  "After Kent Maerki came in and the founders of Dazzle
22    Dental introduced us to their franchise offer and we --
23    that's when I became involved."
24    Q.  "And what did you know about Mr. Maerki?"
25    A.  "I knew that Mr. Maerki had a history in the financial
```

1    world, that he had some successes with Transamerica Insurance

2    Company, other organizations that he had been involved in,

3    and I also knew that he had a -- he had a reputation for

4    honesty, fairness, and a life dedicated to the truth."

5    Q.  "Okay.  Were you aware that Mr. Maerki had a permanent

6    injunction against him by the Securities and Exchange

7    Commission?"

8    A.  "I was not aware of that."

9    Q.  "Were you aware that there was an action taken by the FTC

10   against Mr. Maerki?"

11   A.  "I was not aware of that."

12   Q.  "Were you aware that there were pending lawsuits

13   involving Mr. Maerki and other business matters he was

14   related to?"

15   A.  "I was not aware of that."

16   Q.  "Is that information you would have wanted to know?"

17   A.  "That probably -- probably, yes, absolutely."

18   Q.  I'll move on to Page 52 at the top.

19          "Now, approximately when did you become a salesman

20   for the franchises in DSPF?"

21   A.  "Around -- when they first started their operation.

22   Around 2012, I believe, as I recall."

23   Q.  "Could it have been 2011?"

24   A.  "It could have been.  I just don't remember the exact

25   date."

G. Clapper - Direct

1   Q.  "Did you buy a franchise for yourself?"

2   A.  "I did not."

3   Q.  I'll continue on Page 53.

4          "QUESTION:  Okay.  Going to the 60 months' proven

5   performance.  Were you aware that Dazzle Dental -- the

6   investors failed to receive a return on their investment, and

7   you were aware that -- to some extent that the offices were

8   closing, but yet you indicate the 60 months' proven

9   performance was on Dazzle Dental, correct?"

10  A.  "That's what -- that's what the performance was, yeah."

11  Q.  "Okay.  But it's not a proven platform with consistent

12  performance if those businesses failed."

13  A.  "That's not true.  They did deliver tens of thousands of

14  patients independent of their centers failing.  It was

15  patient delivery that was represented here, not the success

16  of a center."

17  Q.  And they're talking about the track record.  Is that

18  right, Mr. Clapper?

19  A.  Yes.

20  Q.  "Where does it say that in this document represented as

21  R-124?"

22  A.  "It doesn't say that."

23  Q.  "QUESTION:  Where on here does it say who has the

24  60-month proven performance?"

25  A.  "It doesn't say that."

G. Clapper - Direct

1   Q.  All right.  They go on to the second bullet on our
2   Exhibit 202, their Exhibit 124.
3           "QUESTION:  The second bullet point says 'fully
4   operational after 180 days.'  Do you see that?"
5   A.  "It does say that."
6   Q.  "Were your clients' franchises that you sold fully
7   operational after 180 days?"
8   A.  "That's -- that's a six-month projection, and my
9   understanding was yes."
10  Q.  Further down.
11          "QUESTION:  My question was did your clients that
12  purchased their franchise actually receive their patients and
13  operate the franchise within 180 days?"
14  A.  "That is -- those details were between them and the
15  franchisor."
16  Q.  "Okay."
17  A.  "I received a referral fee, and I was out of it."
18  Q.  "Are the franchisees that you sold to still your
19  clients?"
20  A.  "Yes, they are."
21  Q.  Go to Page 59.
22          "QUESTION:  Now, you indicated that your job was to
23  educate the clients on choices involved with the franchise,
24  correct?"
25  A.  "That is correct."

G. Clapper - Direct

1   Q.   "And did you have salesmen that worked under you selling

2   the franchises?"

3   A.   "Under me?"

4   Q.   "Yes, or did you receive --"

5   A.   "No."

6   Q.   "-- overrides from any other salesmen?"

7   A.   "Yes."

8   Q.   "And how did you determine whether they were selling the

9   franchises appropriately?"

10  A.   "I spent time training the salespeople that I worked with

11  on calls and gave -- that's how I understood."

12  Q.   All right.  And Page 60.

13        "QUESTION:  Were you aware at some point that

14  Oracare and MetroMedia were not supplying the patients that

15  they had agreed to provide to the franchisees?"

16  A.   "Yeah.  I was aware of that at the last minute."

17  Q.   "So when did you find out?"

18  A.   "I found out at the last -- almost the last -- well, the

19  last day that I was involved in it, almost, when I contacted

20  the franchise operation in Arizona.  And there was a woman

21  that I spoke to, and I asked her what was the status on

22  franchisees receiving patients."

23  Q.   It's continued on Page 61.

24  A.   "And then she disclosed to me that they were not hitting

25  their financial targets on patient delivery and that she was

G. Clapper - Direct

1    concerned."

2    Q.  "And do you recall when that was?"

3    A.  "What's that?"

4    Q.  "When was that?"

5    A.  "At the very last day that I had anything to do with

6    these guys."

7    Q.  And the question was about MetroMedia and Oracare.  Was

8    there a second vendor after MetroMedia and -- or a third

9    vendor, if you recall, based on your investigation?

10   A.  They went through a number of other things forming Dental

11   Support Group trying to do it themselves.  There was a

12   gentleman at one point by the name of Mr. Bailey on the

13   internet who said that apparently he was good at raising

14   things.  They went through a number of different things after

15   that.

16   Q.  Okay.  I'll go down to 65, starting at line 15.

17        "QUESTION:  Do you recall or do you know anyone by

18   the name of Daryl Bank?"

19   A.  "Yes, I do."

20   Q.  "Who is Daryl Bank?"

21   A.  "Daryl Bank is a -- is a financial professional who owns

22   a company, but he's an officer in a company called Dominion."

23   Q.  "Do you know what his -- I'm sorry."

24   A.  "What's that?"

25   Q.  "Do you know what his relationship is with DSPF?"

G. Clapper - Direct

1   A.  "Daryl Bank approved DSPF as an asset for his company.

2   He is another marketing resource for the dental operation."

3   Q.  "Did you have any association with Mr. Bank?"

4   A.  "Yes, I did."

5   Q.  "In what way?"

6   A.  "We had long conversations about the dental operation.

7   He was an optimistic" -- "he was as optimistic as anybody

8   else."

9   Q.  All right.  And down towards the bottom.

10          "At any point were you told that in 2010 Mr. Bank

11  was barred by FINRA for their role in misappropriating about

12  $161,000 in commissions and other payments?"

13  A.  "I'm not aware of that at all."

14  Q.  And if we could go to Exhibit 202.

15          That occurred in 2015; is that right?

16  A.  That's correct.

17  Q.  And Exhibit 202, does this say the other -- well, how

18  long does this particular tri-fold say they have a proven

19  platform for?

20  A.  60 months.

21  Q.  All right.  And what does it say in terms of if an

22  investor would have to do anything themselves?

23  A.  "Protected, turnkey dental support business organized in

24  a results-proven franchise format."

25  Q.  Okay.  And in the bottom right of Exhibit 202, what does

—————— G. Clapper - Cross (By Mr. Grindrod) ——————

1   it say?

2   A.  "Our unique, carefree business model is an

3   absentee-owned, turnkey, high-yield, patient delivery system

4   designed to provide a dentist 500,000 of additional new

5   patient revenue while the franchisee's profit is $165 of each

6   $1,000 of paid dental treatments."  In parentheses:

7   "16.5 percent."

8   Q.  And is this the brochure that Mr. Smith, in that

9   deposition -- or that hearing, said that he provided those

10  his clients?

11  A.  Yes.

12  Q.  And that includes Page 2 that we're looking at here, the

13  feasibility modeling illustration?

14  A.  Yes.

15          MS. YUSI:  I believe those are all my questions at

16  this point.  There will be other questions, I'm sure, from

17  counsel.

18          THE COURT:  Any cross-examination, Mr. Yarow?

19          MR. YAROW:  Not from Mr. Alcorn.

20          THE COURT:  Any cross-examination, Mr. Grindrod or

21  Ms. McCaslin?

22          MR. GRINDROD:  Yes, Your Honor.

23                      CROSS-EXAMINATION

24  BY MR. GRINDROD:

25  Q.  How are you doing, sir?

---
G. Clapper - Cross (By Mr. Grindrod)
---

1   A.  I'm good.

2   Q.  My name is Andrew Grindrod.  I represent Mr. Smith.

3   A.  Okay.

4   Q.  So as part of your investigation into Dental Support Plus

5   Franchise, you interviewed a number of people who bought

6   franchises, right?

7   A.  That is correct, sir.

8   Q.  And you didn't just interview them, right?  You collected

9   documents from them?

10  A.  Correct.

11  Q.  Typically, if you interview someone, you ask them to send

12  in all the documents they had related to their investment,

13  right?

14  A.  That is correct.

15  Q.  And why do you do that?

16  A.  To see exactly what the investor received so that we have

17  an understanding of what they expected from the investment.

18  Q.  And the documents that you received could corroborate

19  what the witness told you when you interviewed them, right?

20  A.  They could, yes.

21  Q.  Or they could contradict with what the witness told you?

22  A.  Correct.

23  Q.  And also, documents don't change over time, right?

24  A.  I would agree with that.

25  Q.  Okay.  And even today, we're sitting here talking about

———— G. Clapper - Cross (By Mr. Grindrod) ————

1    stuff that happened in the 2011-to-2014 time period.

2    A.   Yes.

3    Q.   Memories fade, but documents don't change, right?

4    A.   Correct, sir.

5    Q.   So if you knew someone had an entire box of documents

6    related to their investments that you were investigating, you

7    said, "Let me get copies of all that," right?

8    A.   That is correct, sir.

9    Q.   And that's -- let's switch gears and talk about --

10           MR. GRINDROD:  Smith 55, just for the witness,

11   please, Ms. McCaslin.

12   BY MR. GRINDROD:

13   Q.   Do you see that document in front of you, sir?

14   A.   Yes, I do.

15   Q.   And this was a document that you gathered during the

16   course of your investigation?

17   A.   Yes, sir.

18   Q.   Fair and accurate copy?

19   A.   I believe so, sir.

20           MR. GRINDROD:  Your Honor, I would offer it.

21           THE COURT:  Any objection?

22           MS. YUSI:  No, Your Honor.

23           THE COURT:  It will be admitted.

24           (Defendant Smith's Exhibit 55 was admitted.)

25   BY MR. GRINDROD:

———————— G. Clapper - Cross (By Mr. Grindrod) ————————

1  Q.  If we go down to the middle of the page here, this is an
2  e-mail from Dental Support Plus Franchise, right?
3  A.  That is correct.
4  Q.  That's an e-mail address that you know from your
5  investigation is associated with DSPF's corporate offices in
6  Arizona?
7  A.  Correct.
8  Q.  And this is inviting someone to a seminar, right?
9  A.  That is correct.
10  Q.  And the DSPF folks say that they're inviting to educate,
11  inform, and train, right?
12  A.  Correct.
13  Q.  And it's for prospective franchisees, right?
14  A.  Correct.
15  Q.  Prospective salespersons?
16  A.  Yes.
17  Q.  And existing salespersons?
18  A.  Yes.
19  Q.  They are all invited to this same seminar on May 25th,
20  2012, right?
21  A.  Correct.
22  Q.  And people had the option to attend in person?
23  A.  Yes.
24  Q.  And gives the address for where that conference was being
25  held?

G. Clapper - Cross (By Mr. Grindrod)

```
 1    A.   Correct.
 2    Q.   And -- but you also could attend by phone, right?
 3    A.   Yes, sir.
 4    Q.   Okay.  This one is from May 2012, but you've seen -- this
 5    was not a one-time thing, right?
 6    A.   That is correct.
 7              MR. GRINDROD:  Okay.  Let's take a look at, for just
 8    the witness, Smith 56.
 9    BY MR. GRINDROD:
10    Q.   Do you recognize this document?
11    A.   Yes, sir, I do.
12    Q.   This is another e-mail you gathered during the course of
13    your investigation?
14    A.   Yes.
15              MR. GRINDROD:  Your Honor, I would offer Smith 56.
16              MS. YUSI:  No objection.
17              THE COURT:  Smith 56 for the defendant will be
18    admitted.
19              (Defendant Smith's Exhibit 56 was admitted.)
20    BY MR. GRINDROD:
21    Q.   And this is basically the same thing, right?
22    A.   That is correct, sir.
23    Q.   Same kind of seminar, just on a different day?
24    A.   Yes.
25              MR. GRINDROD:  Okay.  We can take that down.
```

G. Clapper - Cross (By Mr. Grindrod)

```
 1          Could we see -- and this has already been admitted,
 2   Ms. McCaslin -- Government 221A.
 3   BY MR. GRINDROD:
 4   Q.  Sir, this was the letter from your office sending out
 5   subpoenas, right?
 6   A.  Correct.  That's the cover letter that goes with it.
 7   Q.  So I think your testimony was that went out -- those
 8   subpoenas went out May 28, 2013?
 9   A.  Yes, sir.
10   Q.  And you didn't send Mr. Smith, Aghee William Smith, also
11   known as Bill Smith -- you didn't send him a subpoena, did
12   you?
13   A.  No, sir.
14   Q.  So that's May 2013.
15          MR. GRINDROD:  If we could go to Government 224C,
16   please, Ms. McCaslin.
17   BY MR. GRINDROD:
18   Q.  This is that Notice of Opportunity for Hearing, right?
19   A.  Yes, sir.
20   Q.  It names certain people.  Mr. Smith is not one of them,
21   right?
22   A.  That is correct.
23   Q.  And this notice was not sent to Mr. Smith, right?
24   A.  No, it was not.
25   Q.  It wasn't sent to any of the salespeople that were
```

G. Clapper - Cross (By Mr. Grindrod)

1   associated with DSPF, right?

2   A.   No, sir.

3   Q.   And it was filed on November 18, 2013; is that right?

4   A.   Correct.

5   Q.   So are you aware of -- well, did you -- let me ask this

6   one more time.

7          Mr. Smith didn't sell any DSPF franchises after

8   those subpoenas went out, right?

9   A.   Without the records in front of me, I couldn't tell you,

10  sir.

11  Q.   Okay.  What about -- do you know whether after that

12  November 2013 notice?

13  A.   Same response.  Without the records, I can't tell you.

14         THE COURT:  Mr. Grindrod, I hate to interrupt you,

15  but as I indicated to counsel, the Court needs to terminate

16  here at 12:50.  And we'll come back and take it up, ladies

17  and gentlemen, around 2:30.  We'll have to come back and take

18  it up.

19         MR. GRINDROD:  Yes, Judge.

20         THE COURT:  Mr. Clapper, you are still under

21  examination for lunch.  Do not discuss your testimony.

22         (The jury exited the courtroom.)

23         (Recess from 12:49 p.m. to 2:30 p.m.)

24         (The jury entered the courtroom.)

25         THE COURT:  Let the record reflect that all jurors

G. Clapper - Cross (By Mr. Grindrod)

1    have returned from lunch.

2            Does counsel concur?

3            MS. YUSI:  The government agrees, Your Honor.

4            MR. GRINDROD:  Mr. Smith agrees, Your Honor.

5            MR. YAROW:  Mr. Alcorn agrees, Your Honor.

6            THE COURT:  You may resume, Mr. Grindrod.

7            MR. GRINDROD:  Thank you, Your Honor.

8    BY MR. GRINDROD:

9    Q.  Mr. Clapper, your investigation into Dental Support Plus

10   Franchise started very early 2012?

11   A.  Yes, sir.

12   Q.  And one of the first things you did was go on to the

13   Dental Support Plus corporate website, right?

14   A.  I don't know if I went there first or talked with the

15   investors first.  Normally, it would be the investor first.

16   Q.  Okay.  But it was pretty early on in your investigative

17   steps that you looked up the company online?

18   A.  Yes, sir.

19   Q.  Okay.  Let's take a look at what has already been

20   admitted as Government's Exhibit 200G.  And you testified

21   earlier this is the screenshots that you took of the Dental

22   Support website, correct?

23   A.  Correct.

24   Q.  Could we go to Page 8.  So on the website, you had access

25   to this three-minute video?

Carol L. Naughton, Official Court Reporter

G. Clapper - Cross (By Mr. Grindrod)

1   A.  Yes, sir.

2   Q.  And was that the one we watched on direct examination?

3   A.  I believe so, yes.

4   Q.  And then just going to the next page, there's a link here

5   on the website to that same three-minute video, right?

6   A.  I thought it was a 30-second video, so I could be

7   mistaken as to which one that is.

8   Q.  Well, they say that you can click here for a three-minute

9   video, right?

10  A.  Correct.

11  Q.  A 15-minute video?

12  A.  Yes, sir.

13  Q.  The FAQ, is that frequently asked questions?

14  A.  Yes, sir.

15  Q.  Feasibility model spreadsheet, right?

16  A.  Correct.

17  Q.  And the executive summary and more, all just by clicking

18  here?

19  A.  Correct.

20  Q.  So you had access to all that information?

21  A.  Yes.

22          MR. GRINDROD:  Let's go to Government's Exhibit 202,

23  please.

24  BY MR. GRINDROD:

25  Q.  This is that tri-fold brochure that was linked to on the

G. Clapper - Cross (By Mr. Grindrod)

1  website, right?

2  A.  Yes, sir.

3  Q.  And this has all these representations about the company?

4  A.  Yes, sir.

5  Q.  So a 60-month proven performance, right?

6  A.  Correct.

7  Q.  And those were the -- "built on a platform with more than

8  five years of research," that was the question that was

9  raised at Mr. Smith's deposition in 2015, right?

10  A.  The questions of timing, yes, but there were various

11  answers.

12  Q.  Sure.  And then -- but I guess what I'm asking you is,

13  that representation about "60 months' proven performance,"

14  that was in this thing that you had very early on, right?

15  A.  That's correct.

16  Q.  And "high-yield patient delivery system," this is talking

17  about what the company was doing and talking about projected

18  returns, profits for the franchisee, right?

19  A.  Correct.

20  Q.  On the second page here, we have the projections about

21  financial performance, right?

22  A.  Yes, sir.

23  Q.  Year over year what the expected or projected net

24  franchise revenue was, right?

25  A.  Correct.

G. Clapper - Cross (By Mr. Grindrod)

1  Q.  So you had all this.  And you're a professional

2  investigator, right?

3  A.  Yes, sir.

4  Q.  You spent 20 years as a police officer?

5  A.  Yes, sir.

6  Q.  And then you've been doing this for 21 years?

7  A.  Correct, sir.

8  Q.  And you're the chief investigator, right?

9  A.  Yes, sir.

10  Q.  You are the guy in charge?

11  A.  I am now.  I was not during the time of this

12  investigation.

13  Q.  And presumably, at least in the 21 years that you spent

14  at the Arizona State Corporation Commission, you received

15  training about businesses, right?

16  A.  Different business models vary between what offering is

17  there.

18  Q.  Sure.  But I guess what I'm suggesting is, it's not like

19  you were just a police officer and you had only done drug

20  work, right?  You had been working in business investigations

21  for a while going into this investigation?

22  A.  Correct.

23  Q.  But you didn't shut down Dental Support Plus Franchise in

24  2012, did you?

25  A.  No, sir.

G. Clapper - Cross (By Mr. Grindrod)

1    Q.  You didn't shut it down in 2013?

2    A.  I would have to look at the date of the notice and then

3    when we went to hearing.  No, sir.

4    Q.  You didn't shut it down even in 2014, right?

5    A.  I believe it was 2015.  No, not in '14.

6    Q.  And you didn't know at the time that Kent Maerki was

7    laundering money out of the company, right?

8    A.  I do not know that, sir.

9    Q.  Okay.  And the information in these marketing materials

10   that we looked at, that information did not send you running

11   down to the police station to get a warrant saying, hey,

12   these guys are stealing money, right?

13   A.  No, sir, I did not.

14   Q.  You didn't know this was a fraud back then, right?

15   A.  No.  We felt it was a fraud, but financial crimes take a

16   long time to put a case together.  With all the accounts, the

17   detail, it takes an extended period of time.

18   Q.  Mr. Clapper, are you testifying that you knew in 2012

19   that this was a fraud, and you let people keep giving money

20   to it in 2012, 2013?  Is that your testimony?

21          MS. YUSI:  Objection.  Argumentative, Your Honor.

22          THE COURT:  Sustained.

23   BY MR. GRINDROD:

24   Q.  Did you know this was a fraud in 2012?

25   A.  There were indications it possibly would be, but the

———W. Berndt - Direct———

1   investigation wasn't complete enough for Ms. Coy, with our

2   division, to file the notice.

3   Q.  There wasn't enough information that you had in 2012 that

4   led you to say, "Stop it.  We've got to get a warrant.  We've

5   got to call the police.  This has to stop now."  Right?

6           THE COURT:  Asked and answered.

7           MR. GRINDROD:  No further questions, Your Honor.

8           MS. YUSI:  No redirect, Your Honor.

9           THE COURT:  May this witness be permanently excused,

10  counsel?

11          MS. YUSI:  Yes, Your Honor.

12          MR. GRINDROD:  Yes, Judge.

13          THE COURT:  Mr. Clapper, you may be excused.

14          (The witness was excused.)

15          THE COURT:  Next witness.

16          MS. YUSI:  Your Honor, the government calls Wilfried

17  Berndt.

18          (Witness sworn.)

19          WILFRIED BERNDT, called by the Government, having

20  been first duly sworn, was examined and testified as follows:

21                      DIRECT EXAMINATION

22  BY MS. YUSI:

23  Q.  Good afternoon.  Could you introduce yourself to the

24  Court, please.

25  A.  My name is Wilfried Heinrich Berndt.

─────W. Berndt - Direct─────

1   Q.   How do you spell your first name?

2   A.   W-i-l-f-r-i-e-d.

3   Q.   And your last name?

4   A.   B-e-r-n-d-t.

5   Q.   How old are you today?

6   A.   68.

7   Q.   What city and state do you live in?

8   A.   In Somerset, California.

9   Q.   Is that Northern California?

10  A.   Northern California, right.

11  Q.   Do you work?

12  A.   I am now semiretired.  I do consulting work.  Yes.

13  Q.   Prior to retiring, did you work -- or where did you work?

14  A.   I was self-employed as a contractor.

15  Q.   And are you married?

16  A.   Yes, I am.

17  Q.   What is your wife's name?

18  A.   Bonnie.

19  Q.   Bonnie?

20  A.   Bonnie.

21  Q.   And did she work?

22  A.   Yes, she did.

23  Q.   What did she do?

24  A.   She's an LVN.

25  Q.   Is that, like, a nurse?

W. Berndt - Direct

1    A.  Yes, licensed vocational nurse.

2    Q.  And while you all were working full time, did you all

3    safe for retirement?

4    A.  Oh, yeah.  We put some money away.  Yes, we did.

5    Q.  And do you or your wife have any background or training

6    in investing?

7    A.  No, we did not.

8    Q.  Do you consider yourself or your wife sophisticated

9    investors?

10   A.  No, we are not.

11   Q.  I want to talk to you about Bill Smith.  Do you see him

12   in the courtroom today?  Or do you know Mr. Smith?

13   A.  Yeah, I know Mr. Smith.

14   Q.  Do you see him in the courtroom today?

15   A.  I think that's him, the gentleman over there.

16   Q.  With the beaded necklace?

17   A.  Yeah, with the white hair.

18         MS. YUSI:  Your Honor, we ask that the record

19   reflect that he identified Mr. Smith.

20         THE COURT:  The record will so reflect.

21         MS. YUSI:  Thank you.

22   BY MS. YUSI:

23   Q.  How did you first come to know or hear of Mr. Smith?

24   A.  I was listening to the radio, an AM station in

25   Sacramento, California, and he was on the radio Saturday

W. Berndt - Direct

1    mornings.  I'm not sure if it was an hour or a half-hour

2    program that he had.

3    Q.  What was the program about?

4    A.  Investments, financial, different ways to put your money

5    safe.

6    Q.  At some point did you decide to call him?

7    A.  Yeah, I called him.  I'm not sure exactly when, sometime,

8    I think, 2011.  I did call him because he had a 916

9    Sacramento number to call, and so I did call it.

10   Q.  Did you meet with him in person?

11   A.  Yes, I did.

12   Q.  Where was that?

13   A.  In Roseville, California.

14   Q.  And did he have an office there?

15   A.  Yes, he did.

16   Q.  Did you ever go to his office?

17   A.  Yes, I did.

18   Q.  About how many times do you think you went there?

19   A.  I think three or four times.

20   Q.  What was his office like?

21   A.  Just a comfortable -- it wasn't very big, nothing

22   extravagant, just an office with a desk and a bookshelf.

23   Q.  Okay.  And did Mr. Smith tell you about his background?

24   A.  I'm not sure if he did.  I'm not really totally sure.

25   Q.  Okay.  Do you recall what he said about what he did or

W. Berndt - Direct

1  what he could do for you?

2  A.  Yeah.  He had different investment -- means of investing

3  money that are safe and paid good returns.

4  Q.  What were you looking for in terms of investment advice?

5  A.  Just -- well, I was looking for somebody that I could

6  trust, that I could put my money that would grow, nothing --

7  I wasn't trying to make a lot of money, just something where

8  it would outpace the inflation rate and something that we can

9  have when we retire.

10 Q.  Did Mr. Smith talk to you about religion at all?

11 A.  I recall when I did go to his office, the few times that

12 I did go there, he had a briefcase with a picture of Jesus

13 Christ, and he told me that his loyalty and his total -- I

14 don't know if it's respect, but it's for Christ first, for

15 his glory, not anybody else.

16         And I'm a Christian, so I kind of thought, well,

17 that's somebody that I would like to deal with because that's

18 what I believe in.

19 Q.  Now, what was your comfort -- well, did you talk to

20 Mr. Smith about your comfort level with risk in your money?

21 A.  I don't think we really had that conversation.  It was

22 just more where to put my money so we can realize a return.

23 Q.  And what did he suggest?

24 A.  He had a few options.  One was an annuity, one was a real

25 estate investment trust, and then, also, the -- the first one

W. Berndt - Direct

```
 1   was Dental Support Plus.
 2   Q.  Okay.  And so those are three.  Did you put money in the
 3   annuity and the real estate investment trust, or the REIT?
 4   A.  Yes, I did.
 5   Q.  And how about DSPF?  Did you put any money in there?
 6   A.  Yes, I did.
 7   Q.  What was your understanding of what DSPF was?
 8   A.  It was a dental support program for dentists that -- it
 9   would kind of help to streamline the office, how they have it
10   set up, so that they can realize a larger income or revenue
11   stream from the present way of operation.  It would help them
12   operate a lot more streamlined.
13   Q.  What, if anything, did Mr. Smith tell you about the
14   success or how the investment was doing?
15   A.  I don't think he told me how it was doing.  It was the
16   potential that it could do.  It was still in the throes of
17   the works, of working out.
18   Q.  Okay.  And had you heard the name Kent Maerki?
19   A.  Yes, I did.
20   Q.  What was your understanding of who Kent Maerki was?
21   A.  Well, he told me that Kent Maerki was very influential in
22   building out unmanned transportation systems for airports
23   around the country and that he was a strong businessman,
24   somebody that was very successful in what he did, and this is
25   just another avenue to success.
```

W. Berndt - Direct

1   Q.   Did Mr. Smith tell you anything about having sold Dazzle

2   Dental prior to the DSPF investment?

3   A.   No, he did not.

4   Q.   Did he say how long he had been selling Dental Support

5   Plus Franchises prior to you?

6   A.   I don't recall if he told me how long.

7   Q.   Okay.  And did he talk to you about the risk of putting

8   money into a franchise?

9   A.   I don't recall the risk conversation.

10  Q.   And how about fees or commissions?  Did Mr. Smith talk to

11  you about those?

12  A.   The only thing I can recall, and it's very vague, that

13  the risks and the fees would be non- -- I don't know the

14  right word.  They wouldn't really amount to much to be

15  concerned about.

16  Q.   And in terms of timing, how long did he say it would be

17  before you started seeing a return?

18  A.   I don't think he said the exact timing.  It just was

19  still in the throes of the building-out process.

20  Q.   And how much did you decide to invest in DSPF?

21  A.   $50,000.

22  Q.   All right.  And do you remember approximately when you

23  invested that?

24  A.   I think it was early 2012.

25  Q.   And where did the money come from, the 50,000 that you

W. Berndt - Direct

1    invested?

2    A.   Well, it was from -- my parents had both passed away, and

3    it was a -- what's it called? -- inheritance from them, yes.

4    Q.   So you put $50,000 in.  Was there a lot of paperwork?

5    A.   There was -- I'm not really sure to recall the exact

6    amount, but there was some paperwork.

7    Q.   Now, after you invested in that, did you talk to

8    Mr. Smith after that about the progress of DSPF?

9    A.   Yes, I did.

10   Q.   How many times would you say you talked to him or tried

11   to reach him?

12   A.   Oh, I think at least a half a dozen.

13   Q.   And what did he say about the progress?

14   A.   He said that they're building out the different

15   franchises, and it takes some time to realize a return.  Once

16   they set it up, it still takes time for the businesses to

17   generate enough money revenue to pay back the investors.

18   Q.   Did he ever indicate there were any problems with the

19   franchises?

20   A.   No.  No.

21   Q.   While you were talking to him, had you received any

22   returns by then?

23   A.   No, I did not.

24   Q.   I want to talk to you about a second -- later on, did you

25   also -- did you invest in a spectrum investment?

Carol L. Naughton, Official Court Reporter

W. Berndt - Direct

1    A.   Yes, I did.

2    Q.   How did that end up happening?

3    A.   Well, I don't recall how I got word that the Dental

4    Support was in trouble or was not producing, and he said that

5    there was another avenue to invest in the spectrum that would

6    easily outpace what Dental Support could have produced as far

7    as a revenue stream, and that would be a good bet to recoup

8    my money from Dental Support, investing in spectrum.

9    Q.   The 50,000 from --

10   A.   Yes.

11   Q.   Did you ever get any money back from the franchises?

12   A.   No, I did not.

13   Q.   All right.  What was your understanding of what the

14   spectrum investment was?

15   A.   Spectrum was an investment in FCC licenses, from an

16   analog license, to convert them to digital licenses,

17   specifically for first responders -- police, fire, and

18   medical -- in different geographical footprints around the

19   country through Motorola, a Motorola system.

20   Q.   Okay.  And how would you make money on this?

21   A.   How did I make money on this?

22   Q.   Whoever invested, how were you supposed to make money on

23   this?

24   A.   It's once they build out the systems and hang the

25   equipment on the towers, the different PSATs, the dispatching

810

W. Berndt - Direct

 1    units around the certain geographic area, would pay for a
 2    certain amount to pay back to use that system, and that would
 3    pay back the investor, or myself.
 4    Q.   And what about risk or success?  Did Mr. Smith talk about
 5    those with the spectrum?
 6    A.   The only thing I can remember that -- it's not that
 7    clear, but I do remember him saying that it's a slam dunk in
 8    putting, you know -- in this avenue of investment.
 9    Q.   All right.  Now, did you have an understanding who was in
10    charge of the spectrum investment?
11    A.   Yes.  I think his name is Daryl Bank.
12    Q.   Okay.
13    A.   And I did get his phone number, and I spoke with him on
14    multiple occasions.
15    Q.   All right.  Did you speak with him one-on-one, or was
16    Mr. Smith with you?
17    A.   One-on-one over the phone.
18    Q.   Did you know if Kent Maerki was involved with the
19    spectrum when you invested?
20    A.   No, I did not.
21    Q.   Okay.  How much did you end up investing in spectrum?
22    A.   $50,000.
23    Q.   Where did that come from?
24    A.   It was my inheritance.
25    Q.   Did Mr. Smith talk to you about fees or the commissions

W. Berndt - Direct

```
 1    that would be taken out of your investment?
 2    A.  I don't recall any specific conversation.
 3            MS. YUSI:  If we can look at Exhibit 855.
 4    BY MS. YUSI:
 5    Q.  There's a binder in front of you, Mr. Berndt.  Do you
 6    recognize Exhibit 855?
 7    A.  Yes.
 8    Q.  And what is that?
 9    A.  That's the -- I think it's the spectrum -- yeah, the
10    Dominion Private Client Group, where I put my money in the
11    Spectrum 100.
12    Q.  All right.
13            MS. YUSI:  Your Honor, we move to admit Exhibit 855.
14            THE COURT:  Hearing no objection, 855 is admitted.
15            (Government's Exhibit 855 was admitted.)
16    BY MS. YUSI:
17    Q.  And if we look at the top here, it says Wilfried and
18    Bonnie Berndt.  That's you and your wife?
19    A.  Right.
20    Q.  What was the name of the asset that you were purchasing
21    over here?
22    A.  The Spectrum 100.
23    Q.  And for 50 units for $50,000?
24    A.  Yes.
25    Q.  And on Page 2 is that your signature?
```

W. Berndt - Direct

1    A.  Yes, it is.

2    Q.  And the date was February 11, 2014, correct?

3    A.  Right, right.

4           MS. YUSI:  Thank you, Ms. O'Boyle.

5    BY MS. YUSI:

6    Q.  Now, prior to investing in Spectrum 100, did Mr. Smith

7    tell you about any other spectrum investments he had been

8    selling?

9    A.  No.

10   Q.  Or how many people he had been selling spectrum

11   investments to?

12   A.  No, he did not.

13   Q.  How about any regulatory issues with the FCC or SCC with

14   principals that were involved with the spectrum investment?

15   A.  I don't recall any problems with converting.

16   Q.  Now, did there come a time when you realized that you

17   were not getting money -- well, how quickly were you going to

18   get money on the spectrum investment, if you recall?

19   A.  I understood that there were some problems with the

20   initial geographic region that they were rolling out the

21   initial converted analog licenses in the Minneapolis,

22   Minnesota area, that there was some kind of competitive

23   company that was competing that somehow they were challenging

24   them in court on something.

25           So I spoke with Daryl Bank, and he told me that they

1  were going to pull all their equipment and move down to --

2  I'm not sure if it was Dallas, but to Texas and set up there.

3  It was a better opportunity to build it out much more

4  quickly.

5  Q.  And did you talk to Bill Smith about this change?

6  A.  Yeah.  Yes, we did.  I did.

7  Q.  What did he say?

8  A.  He said that everything looks good and that it's just

9  unfortunate that it happened that way, but it's moving along

10  down in Texas.

11  Q.  All right.  And after that time, how often did you talk

12  to Mr. Smith about your investment?

13  A.  Oh, probably once a month.

14  Q.  And was there any indication that there were any

15  problems?

16  A.  No.  I didn't hear any problems.

17  Q.  And that was in 2014.  Did you ever start seeing a return

18  on your investment?

19  A.  No, I did not.

20  Q.  Okay.  And when did you realize that there was an issue

21  with your investment?

22  A.  Not sure of the date, but I did receive a letter from the

23  U.S. Justice Department that indicated that I was in a victim

24  program.

25          MS. McCASLIN:  Objection, Your Honor.  Hearsay.

W. Berndt - Cross (By Ms. McCaslin)

1        THE COURT:  Sustained.

2   BY MS. YUSI:

3   Q.  You got a letter from the Department of Justice?

4   A.  Yes.

5   Q.  And is that the first indication you had that something

6   was wrong?

7   A.  Yes.

8   Q.  Were you also notified about Mr. Smith's bankruptcy?

9   A.  Yes, I was.

10  Q.  I'm going to show you what's already been marked and

11  entered into evidence as 1213, Government's Exhibit 1213,

12  Page -- well, look at the first page.

13       Here's the bankruptcy petition.  If we can go to

14  Page 68.  And were you listed as a possible creditor in his

15  bankruptcy?

16  A.  Yes.

17  Q.  Had you ever filed a civil suit or anything against him?

18  A.  No, I did not.

19       MS. YUSI:  I believe those are all my questions for

20  now.  I'm sure counsel will have some questions for you.

21       THE COURT:  Cross-examination?

22       MR. YAROW:  No questions from Mr. Alcorn, Your

23  Honor.

24                    CROSS-EXAMINATION

25  BY MS. McCASLIN:

815

W. Berndt - Cross (By Ms. McCaslin)

1   Q.   Good afternoon, sir.  My name is Lindsay McCaslin.  I
2   represent Bill Smith.
3   A.   Okay.
4   Q.   You mentioned on direct that you have worked as a
5   consultant, correct?
6   A.   Yeah.  I'm -- yeah, I work as a consultant, right.
7   Q.   Is that as a risk management consultant?
8   A.   Yes.
9   Q.   And is that risk management for businesses?
10  A.   It's for a business.
11  Q.   A business?
12  A.   Right.
13  Q.   And so you understand that any investment comes with
14  risk, right?
15  A.   Right.
16  Q.   And you assumed that Bill Smith would be making a
17  commission, right?
18  A.   I'm assuming that -- yeah.  Yes.
19  Q.   And when you heard Bill on the radio, did you look into
20  him at all before you went to meet with him?
21  A.   Yes, I did.
22  Q.   Where did you go look?
23  A.   I went to the Better Business Bureau, and I also did a
24  Google search on him and -- yeah.
25  Q.   And that gave you confidence to go set an appointment

W. Berndt - Cross (By Ms. McCaslin)

1   with him?

2   A.  Yes.

3   Q.  Now, before you met Bill, you obviously had your money in

4   another account, right?

5   A.  Say that again.

6   Q.  You had your money in a different account?

7   A.  Yes.

8   Q.  And I assume you met with Bill so you could look for

9   better options and a better return on your money, right?

10  A.  Yes, ma'am.

11  Q.  Now, you understood for DSPF -- let's just start with

12  DSPF.  DSPF was obviously not Bill's company, right?

13  A.  Yes.

14  Q.  That was Kent Maerki?

15  A.  That's what I understand, yes.

16  Q.  Okay.  And he was headquartered in Arizona?

17  A.  I'm not sure.

18  Q.  That's fine.

19          Now, you know what a franchise is, right?

20  A.  Yes, I do.

21  Q.  And as a franchise owner, you were able to hire some

22  vendors to kind of do the work for you and DSPF, correct?

23  A.  That I could hire?

24  Q.  Yeah.

25  A.  No, I -- that wasn't my job.

W. Berndt - Cross (By Ms. McCaslin)

1   Q.  So DSPF took care of all of that, of hiring the vendors?

2   A.  Right.

3   Q.  Okay.  Thank you.

4       Now, you didn't get the contracts for DSPF on the

5   very first day that you met Bill, right?

6   A.  Right.

7   Q.  And after you decided to invest with DSPF, were they

8   mailed to you?

9   A.  The contracts?

10  Q.  Paperwork, documents to sign.

11  A.  For?

12  Q.  DSPF.

13  A.  Okay.  Yes.

14  Q.  Did you have time to look over it, or did you have to --

15  did you read over everything in one day?

16  A.  Well, I looked -- I didn't have anything sent to me.  I

17  did it in his office.

18  Q.  Okay.  Thank you.

19      And when you were writing a check for your

20  investment for DSPF, did you write it to DSPF?

21  A.  I think it was to Summit.  I'm not sure.  I can't recall

22  who I sent -- I signed it to.

23  Q.  That's fine.  But you didn't write a check to Bill?

24  A.  No, I did not.

25  Q.  Now, did you participate in any of the conference calls

W. Berndt - Cross (By Ms. McCaslin)

1  that DSPF held?

2  A.  In the beginning, yes.  I didn't participate.  I listened

3  in.

4  Q.  Okay.  And they all sounded upbeat and confident in their

5  future?

6  A.  Right.  Yes.

7  Q.  Let's move on to spectrum.  So you bought Spectrum 100

8  about two years after you invested in DSPF, right?

9  A.  Right.  Correct.

10  Q.  And you hadn't received any return from DSPF at that

11  point, correct?

12  A.  Yes, that's correct.

13  Q.  And before you did -- before you invested in

14  Spectrum 100, you did some research on your own about

15  spectrum?

16  A.  Yeah, a little bit.  Yes, I did.  Yes.

17  Q.  You agreed with Bill that it sounded like a good

18  opportunity?

19  A.  Yes.

20  Q.  And like DSPF, you knew that Spectrum 100 was not Bill's

21  company?

22  A.  Yes.

23  Q.  Spectrum 100 was run by Daryl Bank, correct?

24  A.  From what I understand, Dominion Group.

25  Q.  Dominion Group?

────────S. Newell - Direct────────

```
 1  A.  Right.
 2  Q.  Thank you.  And again, when you wrote the check for your
 3  Spectrum 100 investment, you didn't write that to Bill?
 4  A.  No, I did not.
 5  Q.  And once you sent off your money to Dominion, you didn't
 6  get anything back, correct?
 7  A.  No, I did not.
 8  Q.  And you didn't know that Kent Maerki or Daryl Bank were
 9  going to be laundering money, correct?
10  A.  I did not, no.
11            MS. McCASLIN:  No further questions.  Thank you.
12            MS. YUSI:  Nothing further, Your Honor.
13            THE COURT:  May the witness be permanently excused?
14            MS. YUSI:  Yes, sir.
15            THE COURT:  Sir, you may step down.  You are
16  permanently excused.
17            (The witness was excused.)
18            THE COURT:  Your next witness?
19            MS. O'BOYLE:  Government calls Susan Newell.
20            (Witness sworn.)
21            SUSAN NEWELL, called by the Government, having been
22  first duly sworn, was examined and testified as follows:
23                         DIRECT EXAMINATION
24  BY MS. O'BOYLE:
25  Q.  Good afternoon, Mrs. Newell.  Could you please state and
```

—————S. Newell - Direct—————

1   spell your name for the court reporter.

2   A.  My name is Susan Newell, N-e-w-e-l-l.

3   Q.  Ma'am, if you could keep that microphone right up there

4   nice and close.  They have to hear you all the way in the

5   back.  Okay?

6   A.  Okay.

7   Q.  Where do you live, Mrs. Newell, just the city and state,

8   please?

9   A.  Bridgeville, Delaware.

10  Q.  How old are you?

11  A.  71.

12  Q.  Are you married?

13  A.  I am.

14  Q.  Who are you married to?

15  A.  I'm married to Richard Craig Newell.  He goes by his

16  middle name, Craig.

17  Q.  How long have you and Mr. Newell been married?

18  A.  We just celebrated our 47th anniversary.

19  Q.  Congratulations.

20          What is your educational background?

21  A.  I have a year of college, but the most valuable education

22  I have got has been in the last 50 years of being in the

23  workforce.

24  Q.  Are you currently in the workforce?

25  A.  No.  I retired recently.

S. Newell - Direct

1    Q.   Now, approximately when did you retire?

2    A.   I would say April of 2021.

3    Q.   What did you do before you retired, right before you

4    retired?

5    A.   For the last 25 years or so, I operated my own income tax

6    preparation business.

7    Q.   And during that time, did you and your husband save for

8    retirement?

9    A.   We certainly did.  Because we owned our own business, we

10   were able to take advantage of offering a 401(k) plan for our

11   employees and ourselves.

12   Q.   Did Mr. Newell work for the tax business too?

13   A.   I suppose you could say yes to that, yes.

14   Q.   Do you know an individual named David Alcorn?

15   A.   I do.

16   Q.   Do you see him in the Court here today?

17   A.   It's hard to say with everybody's masks on.

18           THE COURT:  Pull down the mask.  Drop the mask just

19   briefly.  Everybody on the left side here, drop your mask.

20           THE WITNESS:  Mr. Alcorn is wearing a navy jacket

21   over on the far right side.

22           MS. O'BOYLE:  Could the record reflect that the

23   witness identified Mr. Alcorn?

24           THE COURT:  The record will so reflect.

25   BY MS. O'BOYLE:

S. Newell - Direct

1   Q.   Approximately when did you first meet Mr. Alcorn?

2   A.   We met Mr. Alcorn in 2011.

3   Q.   How did you first meet him?

4   A.   My husband Craig and I were out in Scottsdale to learn

5   more about the Dental Plus plan that was being offered by

6   Kent Maerki, and through the face-to-face meetings we had

7   there, we met a gentleman by the name of Bob LaBine.

8   Q.   You met Mr. LaBine when you went to investigate Dental

9   Support Plus?

10  A.   Yes, that's correct.

11  Q.   What did Mr. LaBine do?

12  A.   Well, we supposedly were at a meeting of potential

13  investors, but it turns out Mr. LaBine was a marketing

14  representative, and he suggested to my husband Craig and I

15  that he might have some other investments we'd be interested

16  in.

17  Q.   Did Mr. LaBine eventually introduce you to Mr. Alcorn?

18  A.   He did not face-to-face yet, but yes, he was the one that

19  introduced us to the opportunity.

20  Q.   Are you familiar with a company called Janus Spectrum

21  LLC?

22  A.   Yes, I am.

23  Q.   And how are you familiar with this company, ma'am?

24  A.   Craig and I had, through Bob LaBine, made some

25  investments in spectrum, and we were going to make some

─────S. Newell - Direct─────

1   additional investments through the company that he worked

2   with us on, but he told us to hold off on it because there

3   was a new company that was also going to be selling spectrum

4   opportunities and he wanted to help us meet this person.

5   Q.   Okay.  So if we could break that down just a little bit

6   for the jury, you and your husband invested in a different

7   spectrum company at first?

8   A.   Yes.

9   Q.   Was that company called SmartCOMM?

10  A.   It was.

11  Q.   And then eventually did Mr. LaBine suggest that you could

12  work with a new spectrum company?

13  A.   Yes.  We had made more than one investment through

14  SmartCOMM, and we were talking to Mr. LaBine about making

15  some additional investments there, and he told us to hold off

16  because he thought he had an opportunity we might be

17  interested in, which was --

18  Q.   Now, did you and some friends ultimately end up investing

19  in Janus Spectrum LLC?

20  A.   Yes, we did.

21  Q.   And before you invested in Janus Spectrum LLC, did you

22  have conversations with Mr. Alcorn?

23  A.   Yes, we did.

24  Q.   And were these conversations both over the phone and in

25  person?

S. Newell - Direct

```
 1   A.  Yes.  The first communication was over the phone, but
 2   then again, Craig and I wanted to meet the principals of
 3   Janus Spectrum, so we flew out to Scottsdale, Arizona, to
 4   have a meeting with them.
 5   Q.  So I'm going to take you to November of 2011.  Okay,
 6   ma'am?
 7   A.  Uh-huh.
 8   Q.  Did you have a meeting with Mr. Alcorn and Mr. Maerki in
 9   November of 2011?
10   A.  Yes, we did.
11   Q.  And did this meeting take place in Arizona?
12   A.  In a restaurant in Scottsdale, yes.
13   Q.  Okay.  And so did you go -- you said it took place in a
14   restaurant?
15   A.  Yes.
16   Q.  Did Janus Spectrum LLC have an office that you went to
17   while you were there?
18   A.  No.
19   Q.  Okay.  So this meeting took place in a restaurant in
20   Arizona?
21   A.  Yes, that's correct.
22   Q.  Were you in a private room, or were you in an area where
23   everybody else was seated?
24   A.  We were in a private room.
25   Q.  To the best of your recollection, who participated in
```

S. Newell - Direct

```
 1    this meeting in November of 2011?
 2    A.   Besides David Alcorn and Kent Maerki and Bob LaBine, a
 3    gentleman by the name of Jon Palmieri was there.  And besides
 4    my husband Craig and I, we brought one of the members of our
 5    investment group with us, and his name is Charles West.
 6    Q.   So you mentioned Kent Maerki.  What was Mr. Maerki's role
 7    with respect to Janus Spectrum LLC that you understood?
 8    A.   My understanding was that he was a principal of Janus
 9    Spectrum as well as Mr. Alcorn.
10    Q.   So were those the two owners of Janus Spectrum that you
11    understood?
12    A.   Yes.
13    Q.   You mentioned the name Jon Palmieri.  Who was that?
14    A.   He -- I don't know exactly what his responsibility was
15    with Janus Spectrum, but he certainly had the technical
16    knowledge that we were interested in finding out about.
17    Q.   And you said another name, Mr. West.  And was he part of
18    your investment group?
19    A.   Yes, that's correct.
20    Q.   And where was he from?
21    A.   He is from Tuscaloosa, Alabama, and we met him through
22    the tax franchise that Craig and I operated initially.
23    Q.   So Mr. West also had a tax franchise?
24    A.   Yes, he did.
25    Q.   Now, was this the first time that you met Mr. Alcorn
```

—————S. Newell - Direct—————

1   face-to-face?

2   A.  Yes.

3   Q.  How long approximately did this meeting last?

4   A.  The better part of the day.

5   Q.  And based on your conversations with Mr. Alcorn and

6   Mr. Maerki at this meeting, what was your understanding of

7   what Janus Spectrum LLC did?  What did it do?

8   A.  It helped investors to process applications for spectrum

9   licenses and also to monetize those licenses for return on

10  the investment.

11  Q.  Did Mr. Alcorn or Mr. Maerki explain how they would go

12  about monetizing these spectrum licenses?

13  A.  They talked about the fact that Sprint had to move their

14  usage of spectrum to another part of the spectrum and -- but

15  that they had customers on the spectrum they were originally

16  using, and so they would be very anxious to get the spectrum

17  back.  Therefore, if we invested in the spectrum, then Sprint

18  would be anxious to make a deal with us to either lease it

19  back or buy it back from us outright.

20  Q.  So if you purchased your spectrum licenses, that either

21  Sprint -- that Sprint would pay you to lease or buy that

22  license from you?

23  A.  Yes, that's correct.

24  Q.  Was that an attractive concept for you?

25  A.  Very much so.

S. Newell - Direct

1  Q.  Did Mr. Alcorn and Mr. Maerki tell you what type of

2  return you could get on this investment?

3  A.  They eventually presented us with a chart that showed us

4  phenomenal returns on investment.

5  Q.  I would like to show you -- you should have a binder in

6  front of you.  If you could take a look at 700A.

7          And, Mrs. Newell, do you recognize 700A?

8  A.  I do.

9  Q.  What is it?

10  A.  This would be a copy of the chart that they were

11  recommending that we purchase the super package, they called

12  it, that had seven different economic areas, which are in the

13  major cities within those economic areas listed here and

14  it --

15  Q.  I didn't mean to interrupt you, but I'm going to move the

16  document into evidence, and then we'll chat about it.

17          MS. O'BOYLE:  Government moves in Exhibit 700A.

18          MR. YAROW:  No objection.

19          THE COURT:  700A will be admitted.

20          (Government's Exhibit 700A was admitted.)

21  BY MS. O'BOYLE:

22  Q.  If you could, was this a document that was given to you

23  by Janus Spectrum LLC?

24  A.  Yes.

25  Q.  And I'm going to show you up here.  The very top of this

S. Newell - Direct

1    document, it says, "Operating values of 800-megahertz guard
2    band licenses."  Do you see that?
3    A.  I do.
4    Q.  Did they talk about at this meeting what an 800-megahertz
5    guard band license was?
6    A.  Well, sometime between the meeting where Jon Palmieri
7    attended in November and this particular meeting, they were
8    explaining to us, again, that Sprint had their spectrum in
9    the 800-megahertz area and had to move it, and so they
10   explained to us that because they had to move it, that made
11   it available to the general public.
12   Q.  And here it says, "Sprint 2000 data."  So we're talking
13   about Sprint, the cell phone company Sprint?
14   A.  Yes.
15   Q.  It says, "Super Markets A."  What was a super market?
16   A.  Well, they were describing to us that they were making a
17   single offering.  They were looking for one investor to
18   invest in these seven cities.  These particular cities were
19   supposedly going to come up for what's called public notice,
20   which meant that the opportunity to apply for licenses in
21   those cities was going to be made available to the public,
22   and they wanted to show us how valuable the investment was.
23   Q.  Okay.  And so I have blown up for you, ma'am, over here
24   on the left-hand side -- and we're going to walk the jury
25   through this chart.

—————————S. Newell - Direct—————————

1          So under A, it says "Economic Area Name."  Could you
2    explain to the jury what this is.
3    A.  So an economic area would be a general population area
4    that is dominated by a major city, and so the seven areas
5    listed, each of them would be one of those economic areas.
6    And it identifies -- for example, the first one covered the
7    area of Pittsburgh, Pennsylvania and West Virginia, with the
8    knowledge that Pittsburgh is a major city.
9    Q.  Were these the economic areas that you were going to be
10   able to obtain licenses in?
11   A.  Those were the ones that they were offering to obtain the
12   licenses for us in for a fee.
13   Q.  Okay.  And now, there are a number of columns on this
14   particular -- on this particular chart.  Under B, it says,
15   "Population 2000."  What was this?
16   A.  So based on the 2000 census, that was the population of
17   each economic area.
18   Q.  Okay.  And we're going to skip the C, but we're going to
19   go to D, and it says, "Sprint Subscribers 2007."
20          What was that?
21   A.  At the time that the chart was pulled together, I guess,
22   those were the number of customers that Sprint had within the
23   800-megahertz spectrum.
24   Q.  Over here -- I'm going to go all the way down to the
25   right-hand corner, and we're going to take a look at Y, and

S. Newell - Direct

1    it says, "Annual Return on Investment."  Do you see that?

2    A.  Yes, I do.

3    Q.  And so in the very first line, it says 584.86 percent.

4    What is that last column?

5    A.  That last column would represent the net return on

6    investment for the amount of money they were asking us for

7    for a fee.  If they negotiated a lease or a seal for that

8    particular economic area, we could expect to see a return on

9    our investment of 584 -- almost 585 percent.

10   Q.  Okay.  And down here, I'm blowing up what is at the very,

11   very bottom here.  Initially did they give you a chart

12   without any explanations?

13   A.  They did.  But I requested some definition of how they

14   calculated each of the columns, and so this was actually the

15   second chart they produced for us; the same data but an

16   explanation of each column how it was calculated.

17   Q.  The one we just went over was explained here, Y, "Annual

18   Return on Investment"; is that right?

19   A.  That's correct.

20   Q.  And then I'm going to draw your attention to V.  Could

21   you read what I just highlighted there.

22   A.  Yes.  It says that Janus's participation is Janus makes

23   money only if you make money, and so that would be calculated

24   at 18 percent of another column.

25   Q.  Now, it says there "Janus makes money only if you make

———S. Newell - Direct———

1   money."  Did you talk about that at the meeting in November?

2   A.  I'm not sure that -- off the top of my head, I can't say

3   I recall specifically that --

4   Q.  At that meeting?

5   A.  -- at that meeting, yes.

6   Q.  Did you ask them what that meant?

7   A.  Oh, absolutely.

8   Q.  So what did Mr. Alcorn and Mr. Maerki tell you?

9   A.  Well, again, they were going to try to monetize the

10  licenses for us, so on our behalf, and based on the

11  arrangements that they made, the contracts that they made for

12  the leaseback or the sale of the spectrum to Sprint, they

13  were looking for a commission of 18 percent, whether it was

14  an outright sale, 18 percent of the proceeds, or if it was a

15  leaseback, long-term, 18 percent of the monthly income from

16  the deal with Sprint.

17  Q.  Okay.  So they would take 18 percent of whatever you made

18  when you sold those licenses back to Sprint?

19  A.  Yes.

20  Q.  And did you rely on this document in determining whether

21  to invest in Janus Spectrum LLC?

22  A.  Yes, this was a major part.

23  Q.  What risks, if any, did Mr. Alcorn outline with this

24  investment?

25  A.  The message to us was that Sprint had customers on this

S. Newell - Direct

1   spectrum, they were forced to move from the spectrum, and
2   they would be very anxious to get it back.  And if not
3   Sprint, another major carrier, like AT&T or Verizon, would
4   also have an interest in it.  And as a result of that, that's
5   why there are enormous returns on investment.  So it was a
6   major -- it figured significantly in our decision to invest.
7   Q.  Mrs. Newell, at this meeting before you invested, did
8   anyone ever suggest to you that your licenses would be used
9   for push-to-talk radios?
10  A.  No.
11  Q.  How much money -- so you mentioned that they were looking
12  for one investor.
13  A.  Yes.
14  Q.  How much money did it take to invest in spectrum
15  licenses?
16  A.  Through Janus?
17  Q.  Yes.
18  A.  Okay.  They were asking for $50,000 per license or per
19  economic area, and they were looking for one investor to
20  invest in these seven cities, so it was a total of $350,000
21  that they were looking for to be invested.
22  Q.  Did you have $350,000 --
23  A.  Well --
24  Q.  -- that you were looking to invest in this?
25  A.  No.  We were not -- Craig and I were not looking to

S. Newell - Direct

 1   invest personally another $350,000 in spectrum.

 2          THE COURT:  Excuse me one second.  You are cutting

 3   off each other, so you need to let each other finish so that

 4   the court reporter can get the whole line in.  It's too fast.

 5          THE WITNESS:  Yes, sir.

 6          MS. O'BOYLE:  Sorry, Your Honor.  My fault.

 7   BY MS. O'BOYLE:

 8   Q.  So we were talking -- you said that one license cost

 9   $50,000?

10   A.  Correct.

11   Q.  But they wanted $350,000 total?

12   A.  They were not offering a single license.  They wanted one

13   investor to invest $350,000 in the seven economic areas.

14   Q.  Okay.  So what, if anything, did you do to invest in the

15   $350,000?

16   A.  We asked if they were -- if they would allow us to see if

17   any of our colleagues or friends might be interested in a

18   joint venture with us to purchase the entire package.

19   Q.  And did you reach out to friends?

20   A.  Yes, we did.  We reached out to friends and family and

21   business colleagues, other franchisees, and asked to have the

22   Janus people explain the opportunity on a conference call to

23   the interested parties.

24   Q.  And did you end up with a group of individuals that

25   wanted to invest?

Carol L. Naughton, Official Court Reporter

S. Newell - Direct

1   A.   Yes.

2   Q.   Mrs. Newell, did you or your husband get paid to recruit

3   these individuals to invest in this group?

4   A.   No.

5   Q.   Now, did Mr. Alcorn offer to pay you a commission?

6   A.   In essence, yes.  Again, the cost of each economic area

7   was $50,000.  They were willing to pay Craig 20 percent, and

8   we said we didn't want 20 percent, these were our friends and

9   family and colleagues, and if they were willing to apply that

10  20 percent discount to the price of the economic areas, we

11  were amenable to that.

12          These were people that were very important -- these

13  are our friends and family.  We didn't want to be getting a

14  commission for including them in the program.

15  Q.   So as a result of that, did Mr. Alcorn reduce the price

16  of your license?

17  A.   Yes.

18  Q.   And so what was the price reduced to for your group?

19  A.   The price was reduced to $40,000 per economic area.

20  Q.   And so were all of your members of your investment group

21  able to share in that reduction in price?

22  A.   Yes.

23  Q.   Did Mr. Alcorn explain what Janus Spectrum LLC would do

24  with your $40,000 for each license?

25  A.   They said that they would have very little profit in that

S. Newell - Direct

1    price, that they were securing pristine engineering, the best

2    of legal representation, and other supporting -- accounting

3    or whatever, engineering, and that would consume most of the

4    $40,000.

5    Q.   So there was very little left over after all that money

6    was used to go towards the licenses?

7    A.   Correct.

8    Q.   In terms of profit, for Mr. Alcorn and Mr. Maerki?

9    A.   Yes.

10   Q.   Did you rely on that statement in determining whether or

11   not to invest?

12   A.   Yes.

13   Q.   And so how, then, did Mr. Alcorn explain, they would make

14   money from this venture?

15   A.   They explained to us that by monetizing the licenses for

16   us and securing a return on investment, their end gain was at

17   the back end making 18 percent commission on the income that

18   would be generated from the monetization of the licenses.

19   Q.   Okay.  And so at the end of the day, did your investment

20   group decide to invest the money into Janus Spectrum LLC?

21   A.   Yes.

22   Q.   I'm going to show you what's been marked as Government's

23   Exhibit 703.  It should be in your binder in front of you,

24   and it will also be on your screen.

25             Do you recognize Exhibit 703?

836

S. Newell - Direct

1    A.  Yes, I do.

2    Q.  And what is it?

3    A.  This is a chart that I created that summarizes the

4    different investments that our member investment group made

5    through Janus Spectrum.

6    Q.  Right.

7              MS. O'BOYLE:  Government moves in Exhibit 703.

8              THE COURT:  Hearing no objection, 703 is admitted.

9              (Government's Exhibit 703 was admitted.)

10   BY MS. O'BOYLE:

11   Q.  Now, let's start over here in the left-hand column, and

12   there's a list of names, ma'am.  What are these?

13   A.  These are the investors in this super pack offering.

14   Q.  These are all members of your investment group?

15   A.  Yes.  Yes, that's correct.

16   Q.  And so there's a line here that says, "Total Newell," and

17   then there are a number of names that go up.  What are all

18   those?

19   A.  Craig and I invested personal funds as well as funds from

20   self-directed IRAs.  So the first one, for example, Silver

21   Lining is my self-directed Roth IRA account.

22   Q.  I'm sorry.  I didn't mean to interrupt you.  Go ahead and

23   finish your answer.

24   A.  Well, again, so the first four are both Roth and

25   traditional self-directed IRA accounts for Craig and I.

S. Newell - Direct

1   Q.   So the top four are traditional Roth and self-directed

2   IRA accounts?

3   A.   Yes.

4   Q.   Who, if anyone, told you that you could invest IRA money

5   in Janus Spectrum LLC?

6   A.   Kent Maerki.

7   Q.   And what, if anything, did he say about that?

8   A.   Well, he -- he actually talked to us about it when we

9   were looking into DSPF, and he basically said that if you're

10  going to use a self-directed IRA, you should put an LLC

11  within the IRA account so in case any problems occurred, the

12  rest of our IRA accounts would be protected from any legal

13  matters or whatever that might result from investing through

14  the IRA.

15  Q.   Given that you were investing retirement money, were you

16  planning on being an active or a passive participant in this

17  investment?

18  A.   Definitely passive.  We had been working more than 40

19  years at that point in time and working very hard, and we

20  wanted to find investments that would allow us to get a

21  return on our investments without us personally doing the

22  work ourselves.

23  Q.   And then there's "R C Newell and SL Newell."  What is

24  that line?

25  A.   That's Craig and I investing other funds that were not

———S. Newell - Direct———

1   from our IRA account.

2   Q.   Robert Newell?

3   A.   Robert Newell is Craig's brother.

4   Q.   James Newell?

5   A.   Craig's brother.

6   Q.   And then below that we have Missala?

7   A.   Missala is the name of the tax franchise in Tuscaloosa

8   that Charlie West is a partner in.

9   Q.   And then there's a line that says "West"?

10  A.   That would be Charlie West.

11  Q.   Sexton?

12  A.   Linda Sexton was his partner in Missala.

13  Q.   Junkins?

14  A.   That's Linda Sexton's brother.

15  Q.   And then you have a Deb and Joe Cutrone?

16  A.   That is my sister.  And then the next two entries are,

17  again, self-directed IRAs.  One is a Roth, and one is a

18  traditional, for my sister and brother-in-law.

19  Q.   And Brian and Patricia Weeks.

20  A.   Brian and Patricia Weeks are lifetime friends of ours.

21  Q.   Where are they from?

22  A.   They are currently living in Rhode Island now.  They were

23  from Massachusetts at the time.

24  Q.   Liz and Jerel Crist.

25  A.   Jackson Hewitt franchisees, again, and they are out of

S. Newell - Direct

1    Kansas.

2    Q.   George and Marilyn Cushman.

3    A.   George and Marilyn Cushman are college friends of ours.

4    Q.   Rainbow Returns?

5    A.   Rainbow Returns is a gal that worked with us in our tax

6    business.

7    Q.   Wavelength?

8    A.   Wavelength is another Jackson Hewitt franchisee.

9    Q.   And Airwaves Authority?

10   A.   Is also an LLC for another Jackson Hewitt franchisee.

11   Q.   Now, we'll return back to this document from time to

12   time, but I want to focus first on the first two columns.

13   Okay?

14   A.   Yes.

15   Q.   And this first column here, what is this column that was

16   right next to your names?

17   A.   That would indicate the amount of money invested by the

18   particular individual.

19   Q.   Okay.  So what was the name of this particular group,

20   this particular LLC that invested?

21   A.   We formed an LLC called Air Apparent Associates, and all

22   of the people listed on the left with their money figures

23   noted were all members of Air Apparent Associates.

24   Q.   And what is this date, 11/28/2011?

25   A.   That was the date that we signed an agreement with Janus

Carol L. Naughton, Official Court Reporter

S. Newell - Direct

1    to perform their services on our behalf.

2    Q.  And then there's a list of numbers.  What are all these

3    numbers?

4    A.  Those are the actual dollar figures invested by the

5    participants listed out on the left for that particular

6    contract.

7    Q.  And then what is -- what was the total amount down here

8    at the bottom that was invested through Air Apparent

9    Associates?

10   A.  $280,000.

11   Q.  Okay.  Now, if we go right next to it, there's another --

12   what is this number up here, this 7?  Does that have any

13   significance?

14   A.  Yes, it does.

15   Q.  What is it?

16   A.  That would be the number of economic areas that were part

17   of the contract with Air Apparent.  I should mention that

18   initially Air Apparent did buy ten economic areas.  We

19   doubled up on Denver, Minneapolis, and St. Louis because we

20   were told they would probably be the first to be approved.

21        And at some point, David Alcorn suggested that we

22   break up that investment into two entities.  So for those

23   three cities, we broke it down into a second LLC that we

24   established called Choice Communication, which is there on

25   the chart, then we moved three of the cities into -- under

———S. Newell - Direct———

1    the heading of Choice Communication.

2              THE COURT:  This is a narrative.

3              MS. O'BOYLE:  I'll break it up, Your Honor.

4              THE WITNESS:  Sorry, Your Honor.

5    BY MS. O'BOYLE:

6    Q.  So we're moving to the second column here.  It has the

7    number 3.  Is that the number of licenses that that

8    particular entity -- that that particular entity was going to

9    own?

10   A.  Yes.

11   Q.  And what is the LLC that you created with your investor

12   group for those three licenses?

13   A.  Choice Communication LLC.

14   Q.  And what was the date that you invested those funds?

15   A.  Those funds were invested on the same date as the Air

16   Apparent funds.

17   Q.  So that would be November 28, 2011?

18   A.  Yes.  That's the date of the contract.

19   Q.  And what was the total amount of money that was invested

20   by all of the members of your investment group?

21   A.  120,000 for those three.

22   Q.  And so that was the very first investment?

23   A.  Yes, it was.

24   Q.  Now, I would like to show you what's been marked -- you

25   mentioned a minute ago an agreement.  I'm going to show you

─────────────────S. Newell - Direct─────────────────

1    Government's Exhibit 701.  Do you recognize 701?

2    A.   Yes.

3    Q.   What is it?

4    A.   This is an e-mail from David Alcorn sent to my husband

5    and I that has the first agreement attached.

6            MS. O'BOYLE:  Government moves in 701.

7            MR. YAROW:  No objection.

8            THE COURT:  Hearing no objection, 701 will be

9    admitted.

10           (Government's Exhibit 701 was admitted.)

11   BY MS. O'BOYLE:

12   Q.   Let's start at the top here.  Who is this an e-mail from?

13   A.   David Alcorn.

14   Q.   So this DAlcorn@netpca.com, do you recognize that as his

15   e-mail address?

16   A.   At the time, yes.

17   Q.   What is the date of the e-mail?

18   A.   November 29, 2011.

19   Q.   Who is this to?

20   A.   It is to me.

21   Q.   Is that your e-mail address in the "to" line?

22   A.   In the parenthesis, that is my e-mail address.

23   Q.   And if we go down here, Mr. Alcorn is writing you an

24   e-mail?

25   A.   Yes.

S. Newell - Direct

1  Q.  And he says in here, "Our attorney is okay with the

2  proposed changes," and he lists a number of numbers.

3          But then a couple lines down, he says, "However, he

4  advises us the change in 7 creates a potential security and

5  that Janus' compensation needs to be based on gross proceeds

6  as originally written."

7          Do you see that?

8  A.  I do.

9  Q.  What is he talking about?

10  A.  Paragraph 7 of the agreement was the paragraph that said

11  we would agree to pay 18 percent of the gross proceeds of any

12  monetization that he accomplished for us.

13  Q.  Did Mr. Alcorn refuse to make any changes to that

14  paragraph?

15  A.  We did request a change in that paragraph, and he

16  declined to do it.

17  Q.  And so I scrolled down to Page 2 of this e-mail.  Is this

18  the attachment, the Application Services Agreement that you

19  got from Mr. Alcorn?

20  A.  Yes.

21  Q.  And this is between Janus Spectrum LLC and then the

22  client.  This is not an executed one, but was this going to

23  be the agreement with your limited liability company?

24  A.  Yes.

25  Q.  If we could -- let's take a look at paragraph 7.  And

S. Newell - Direct

1   could you please read the first sentence starting with
2   "Client hereby appoints."
3   A.  "Client hereby appoints Janus, or its designated assign,
4   to act as client's agent in any sale, lease, license,
5   disposition, or transfer transaction relating to any
6   application or resulting license for which Janus will receive
7   a commission equal to 18 percent of the gross proceeds from
8   such transaction."  Parentheses:  "Transaction fee."
9   Q.  So what did you think you were getting in return for
10  paying this 18 percent commission to Janus?
11  A.  Janus was going to take our license, and at the time the
12  only thing they offered was to leaseback or sell our spectrum
13  to Sprint, and for that monetization, they expected an
14  18 percent commission.
15  Q.  Now, if we could take a look at Government's Exhibit 702.
16  It's also in your binder.
17          Do you recognize Government's Exhibit 702?
18  A.  I do.
19  Q.  What is it?
20  A.  It's an e-mail about a side letter.
21  Q.  Is it from Mr. Maerki?
22  A.  It is.
23  Q.  And is Mr. Alcorn -- is it to Mr. Alcorn?
24  A.  It is.
25          MS. O'BOYLE:  Government moves in Exhibit 702.

S. Newell - Direct

```
 1              THE COURT:  702 will be admitted.
 2              (Government's Exhibit 702 was admitted.)
 3   BY MS. O'BOYLE:
 4   Q.  So let's just lay a foundation here for this e-mail.  Who
 5   is it an e-mail from?
 6   A.  From Kent Maerki.
 7   Q.  And is this an e-mail that you recognize --
 8   KentMaerki@gmail.com, is that one you communicated with him
 9   on?
10   A.  Yes.
11   Q.  What was the date of the e-mail?
12   A.  November 30, 2011.
13   Q.  Who is it to?
14   A.  David Alcorn.
15   Q.  Is it also -- are you copied?
16   A.  I am.
17   Q.  As well as your husband?
18   A.  Yes.
19   Q.  And can you read the second paragraph starting "It is a
20   side letter"?
21   A.  Yes.  "It is a 'side letter,'" in quotes, "from one party
22   to another, not a bilateral agreement.  Janus is simply
23   stating what it is going to do without permission or
24   agreement from anyone."
25   Q.  And then if you could go to the next paragraph.
```

846

S. Newell - Direct

1   A.  "It is time to get this consummated, or there will be no

2   time to consummate.  Incidentally, the amounts of money that

3   are improbably involved are quite incidental."

4   Q.  And then if you could finish out the e-mail.

5   A.  "Time is of the essence.  The engineers need all the time

6   we can give them against a nebulous quickly approaching

7   deadline."

8   Q.  What did you take Mr. Maerki to mean, "Time is of the

9   essence"?

10  A.  Hurry up and sign up.

11  Q.  Let's take a look at the attachment, which is the side

12  letter.  Who is this a letter from?

13  A.  From Janus Spectrum.

14  Q.  And who is it to?

15  A.  It is to our LLC that our investment group established.

16  Q.  And who is it signed by?

17  A.  It's signed by David Alcorn.

18  Q.  And can you read what Janus agrees to here?

19  A.  "Janus hereby agrees that the cost and related expense

20  associated with tower rentals are exempt from payment as part

21  of the transaction fees referred to in the Application

22  Services Agreement."

23  Q.  What did you understand that to mean?  What is this side

24  letter doing?

25  A.  We expressed a concern that we didn't want to be paying

S. Newell - Direct

1   any more than the 40,000 to acquire the spectrum, and we were

2   concerned that there would be additional expenses associated

3   with activating it, and we also did not want to pay

4   18 percent on gross income but rather on net income, because

5   we knew we would probably be paying rental for the towers.

6   Q.  And so was this an agreement that demonstrated to you

7   that Mr. Alcorn was agreeing to monetize these licenses?

8   A.  Yes.

9   Q.  Now, the documents we just went through were unsigned.

10  Did you ultimately sign these agreements with Mr. Alcorn?

11  A.  Yes.

12  Q.  If you could take a look at Government's Exhibit 702A.

13  It's in your binder, and it will be on your screen as well.

14  Do you recognize this?

15  A.  I do.

16  Q.  What is it?

17  A.  It's the Application Services Agreement.

18  Q.  Are these the executed copies?

19  A.  Yes.

20          THE COURT:  Government moves in Exhibit 702A.

21          MR. YAROW:  No objection.

22          THE COURT:  702A will be admitted.

23          (Government's Exhibit 702A was admitted.)

24  BY MS. O'BOYLE:

25  Q.  Just blowing this up for the jury, is this the

S. Newell - Direct

1    Application Services Agreement that we just saw that was

2    attached to the e-mail?

3    A.   Yes.

4    Q.   Except this one is executed?

5    A.   Yes.

6    Q.   What is the date that it was executed on?

7    A.   November 28, 2011.

8    Q.   And does it contain paragraph 7 related to the 18 percent

9    commission from the monetization of the licenses?

10   A.   It does.

11   Q.   If we go to Page 5, Schedule A, what is this,

12   Mrs. Newell?

13   A.   This is a list of the ten economic areas that were

14   originally purchased under the name of Air Apparent

15   Associates.

16   Q.   Okay.  And just going to the last page here, who signed

17   this document on behalf of Janus Spectrum LLC?

18   A.   David Alcorn.

19   Q.   And who signed on behalf of Air Apparent Associates?

20   A.   I did.

21   Q.   Now, was this the only investment that you made with

22   Janus Spectrum, Mrs. Newell?

23   A.   No.

24   Q.   Let's take a look at Government's Exhibit 704.  Do you

25   recognize 704?

S. Newell - Direct

1    A.   I do.

2    Q.   What is it?

3    A.   It's an e-mail.

4    Q.   From who?

5    A.   From David Alcorn to me.

6    Q.   Is it related to spectrum licenses?

7    A.   It is.

8                MS. O'BOYLE:   Government moves in Exhibit 704.

9                THE COURT:   704 is admitted.

10               (Government's Exhibit 704 was admitted.)

11   BY MS. O'BOYLE:

12   Q.   So just to establish a baseline, is this an e-mail from

13   Mr. Alcorn?

14   A.   It is.

15   Q.   To you and copying Kent Maerki and your husband,

16   Mr. Palmieri, and Mr. LaBine?

17   A.   Yes.

18   Q.   What is the date?

19   A.   June 10, 2012.

20   Q.   So about seven months after your first investment?

21   A.   That sounds about right.

22   Q.   And if you could take a look -- if you could read the

23   sentence starting "In an effort to be fair" through

24   "individually."

25   A.   "In an effort to be fair and because some of these

S. Newell - Direct

1    'glamour,'" in quotes, "markets were not available when AAA
2    did its initial purchase, we are make one application
3    available in any of the top 25 EAs that have not already been
4    purchased by AAA.  The additional applications can be
5    acquired by AAA or AAA members individually."
6    Q.  Okay.  And so let's break that down a little bit.
7            What is a glamour market?  Do you know what a
8    glamour market was?
9    A.  It's -- as he mentioned, it's the top 25 economic areas
10   available for licensing.
11   Q.  Okay.  And what is AAA?
12   A.  AAA is the acronym for our investment group, Air Apparent
13   Associates LLC.
14   Q.  So what is Mr. Alcorn offering you here?
15   A.  He's offering us an opportunity to make additional
16   investments.  Rather than just the investments we made, he's
17   now offering the top 25 in the country.
18   Q.  Okay.  It says EA.  What is an EA?
19   A.  An EA is an economic area, and again, each of the EAs,
20   the top 25, identify a major city in each economic area, and
21   those were not offered to us before.
22   Q.  Okay.  And if you could, please, finish out this e-mail,
23   the last paragraph.
24   A.  Yes.  "This offer will only be available for a short
25   time.  So if AAA or any of the members are interested in

———S. Newell - Direct———

1   purchasing additional applications in the high population

2   areas, please let us know as soon as possible.  As always, do

3   not hesitate to call with any questions."

4   Q.  So what did you understand Mr. Alcorn to say; "This offer

5   will only be available for a short time"?

6   A.  Hurry up and invest.

7   Q.  Did you also receive a spreadsheet of what potential

8   returns could be on this particular investment?

9   A.  Later in the year, yes.

10           MS. O'BOYLE:  If we could pull up Government's

11  Exhibit 700, please.

12  BY MS. O'BOYLE:

13  Q.  There's also a copy in your binder.  Do you recognize

14  Government's Exhibit 700?

15  A.  I do.

16  Q.  What is it?

17  A.  It is an economic market area listing.

18  Q.  Is it for the top 25 markets?

19  A.  And more, yes.

20           MS. O'BOYLE:  Government moves in Exhibit 700.

21           MR. YAROW:  No objection.

22           THE COURT:  Exhibit 700 will be admitted.

23           (Government's Exhibit 700 was admitted.)

24  BY MS. O'BOYLE:

25  Q.  Is this similar to the chart that we just looked at in

—S. Newell - Direct—

1   700A where it lists the city or the economic area on the
2   column for an economic area?
3   A.  Yes, it is.
4   Q.  Okay.  And so let's just look at the first one.  Is this
5   the New York City economic area?
6   A.  Yes.
7   Q.  With a population of more than 25 million?
8   A.  Yes.
9   Q.  And what is listed here as the potential annual return on
10  investment?
11  A.  3,834 percent.
12  Q.  Did you rely on this chart when you decided whether or
13  not to take Mr. Alcorn up on this opportunity?
14  A.  Yes, we did.
15  Q.  And did you ultimately decide to invest in a glamour
16  market?
17  A.  Yes, we did.
18  Q.  If we could return back to Government's Exhibit 703.  I'm
19  going to blow up the third column, ma'am.
20          Did you -- like the other two, did you formulate a
21  limited liability company to invest?
22  A.  We did because not everyone in the first group was
23  necessarily interested in contributing more, so we would
24  start a new LLC --
25  Q.  So --

853

S. Newell - Direct

1    A.   -- with common members.

2    Q.   So it had different members because some folks wanted to

3    invest?

4    A.   Yes.

5    Q.   What was this LLC called?

6    A.   It was called Six Cities LLC.

7    Q.   What was the date of this investment?

8    A.   We signed an agreement on December 21st, 2012.

9    Q.   And how much money did you invest -- did your investment

10   group invest this time?

11   A.   $240,000.

12   Q.   How many licenses did you expect to obtain?

13   A.   Six.

14   Q.   And like the other agreement or -- like the other

15   agreement, did you have a side agreement with respect to this

16   investment as well?

17   A.   We asked for a side agreement with every investment.

18   Q.   Let's pull up Government's Exhibit 726 for the witness,

19   please.  Do you recognize 726?

20   A.   I do.

21   Q.   What is it?

22   A.   It is a side agreement for one of our investments.

23            MS. O'BOYLE:  Government moves in Exhibit 726.

24            THE COURT:  Any objection?

25            MR. YAROW:  No objection.

S. Newell - Direct

```
 1              THE COURT:  726 will be admitted.
 2              (Government's Exhibit 726 was admitted.)
 3    BY MS. O'BOYLE:
 4    Q.  And so this is -- this letter is dated December 21, 2012;
 5    is that right?
 6    A.  Yes.
 7    Q.  It references Six Cities Associates LLC?
 8    A.  Yes.
 9    Q.  This one is to Mr. West.  Do you know why the letter was
10    to Mr. West?
11    A.  Yes.  I was the managing member of the first investment,
12    but I did not want to be the managing member for each of the
13    investments, so Mr. West became the managing member for that
14    investment.
15    Q.  Okay.  Now, you also -- and I believe you also signed an
16    agreement in connection with this investment as well, a
17    Services Agreement?
18    A.  Mr. West would have signed that agreement on our behalf,
19    yes.
20    Q.  If we can take a look at Government's Exhibit 705.  Do
21    you recognize 705?
22    A.  I do.
23    Q.  What is it?
24    A.  It's an e-mail from David Alcorn regarding a new
25    agreement.
```

S. Newell - Direct

```
 1              MS. O'BOYLE:  Government moves in Exhibit 705.
 2              THE COURT:  Any objection?
 3              MR. YAROW:  No objection.
 4              THE COURT:  705 will be admitted.
 5              (Government's Exhibit 705 was admitted.)
 6   BY MS. O'BOYLE:
 7   Q.  Is this an e-mail from Mr. Alcorn to you and your
 8   husband?
 9   A.  Yes.
10   Q.  Dated December 15, 2012?
11   A.  Yes.
12   Q.  Does he attach another Broker Services Agreement?
13   A.  Yes.
14   Q.  And let's just double check.  On Page 2 does this one
15   also include paragraph 7 related to the 18 percent
16   commission?
17   A.  Yes.  That did not change.
18   Q.  All right.  And let's go back briefly to Government's
19   Exhibit 703.  Did you invest a third time with Mr. Alcorn?
20   A.  Yes.
21   Q.  I'm blowing up the fourth column, one marked Nexus.  Do
22   you see that?
23   A.  I do.
24   Q.  And what is this?
25   A.  Nexus would be yet another LLC from the same -- from some
```

—————S. Newell - Direct—————

1  mix of the same members from the first investment who were

2  willing to invest in additional cities.

3  Q.  And how many licenses did you obtain this time -- or were

4  you going to obtain?

5  A.  Five.

6  Q.  What was the total amount invested under the Nexus LLC?

7  A.  $200,000.

8  Q.  And did you rely on the same representations that were

9  made to you earlier in the 2011 investment when you decided

10  to invest the money here?

11  A.  Yes.

12  Q.  Now, Mrs. Newell, have you ever seen a video called

13  "Money From Thin Air"?

14  A.  Yes, I did see that.

15  Q.  And did Mr. Alcorn and Mr. Maerki play it for you at some

16  time in connection with these investments?

17  A.  Yes.  Not necessarily in advance of any of these

18  investments.

19  Q.  Okay.  You saw it along the way?

20  A.  Yes.

21  Q.  Is there a disk sitting in front of you?

22  A.  There is.

23  Q.  Government's Exhibit 308?

24  A.  Yes.

25  Q.  Does that contain clips from the "Money From Thin Air"

S. Newell - Direct

1   presentation that you saw in connection with your spectrum

2   investment?

3   A.   Yes.

4           MS. O'BOYLE:  Government moves in Exhibit 308.

5           THE COURT:  Any objection?

6           MR. YAROW:  No objection.

7           THE COURT:  Exhibit 308 is admitted.

8           (Government's Exhibit 308 was admitted.)

9           MS. O'BOYLE:  Ms. Yusi, if you could play clip 1,

10  please.

11          (Video played in open court.)

12  BY MS. O'BOYLE:

13  Q.   Whose voice is that?

14  A.   Kent Maerki.

15          MS. O'BOYLE:  If we could play clip 2.

16          (Video played in open court.)

17  BY MS. O'BOYLE:

18  Q.   Were these representations consistent with the ones that

19  were made to you during your meetings with Mr. Alcorn and

20  Mr. Maerki?

21  A.   Pretty much, yes.

22          MS. O'BOYLE:  If we could go to clip 4, please.

23          THE COURT:  Before you do, how many more clips do

24  you have on this exhibit?  Because we're going to take a

25  break after you finish your clips.

S. Newell - Direct

```
 1              MS. O'BOYLE:  I have four more clips, Your Honor.
 2              THE COURT:  Then let's take the break, and then
 3    we'll come back and watch the clips.
 4              (The jury exited the courtroom.)
 5              THE COURT:  You may step down during the break,
 6    ma'am.  Just don't discuss your testimony.
 7              (Recess from 4:01 p.m. to 4:23 p.m.)
 8              (The jury entered the courtroom.)
 9              THE COURT:  Let the record reflect that all jurors
10    are back from the break.
11              Do you agree, counsel?
12              MS. O'BOYLE:  The government agrees.
13              MR. YAROW:  Defendant Alcorn agrees.
14              MS. McCASLIN:  Mr. Smith agrees.
15              THE COURT:  You may resume.
16              MS. O'BOYLE:  Thank you, Your Honor.
17    BY MS. O'BOYLE:
18    Q.  Mrs. Newell, when we left off, we were listening to some
19    clips from the "Money From Thin Air" presentation.
20              MS. O'BOYLE:  If we can go ahead and play clip 4,
21    please, from Government's Exhibit 308.
22              (Video played in open court.)
23    BY MS. O'BOYLE:
24    Q.  Mrs. Newell, Mr. Maerki was talking about, in this video,
25    high return and low risk.  Was that what you also heard
```

S. Newell - Direct

1    during the presentations to you?

2    A.   Yes.

3          MS. O'BOYLE:  If we could go ahead and play clip 7,

4    please.

5          (Video played in open court.)

6    BY MS. O'BOYLE:

7    Q.   Mr. Maerki said in clip 7 that it's the Rolls Royce of

8    spectrum.  Did you hear something similar to that during

9    Mr. Alcorn and Mr. Maerki's presentations to you?

10   A.   Yes, we did.

11   Q.   What, if anything, did Mr. Alcorn say?  How did he

12   describe the 800-megahertz spectrum?

13   A.   I'm not sure which one of them described it as beachfront

14   property, but that was how it was described to us.

15   Q.   What did you take that to mean, that the 800-megahertz

16   was beachfront property?

17   A.   It was very desirable.

18         MS. O'BOYLE:  If we could go to clip 8, please.

19         (Video played in open court.)

20   BY MS. O'BOYLE:

21   Q.   Did you rely on representations that Sprint, AT&T,

22   Verizon, the cell phone companies would be interested in

23   leasing or owning your cell phone licenses?

24   A.   Absolutely.

25         MS. O'BOYLE:  And finally, if we could go to clip 9.

Carol L. Naughton, Official Court Reporter

S. Newell - Direct

1           (Video played in open court.)

2   BY MS. O'BOYLE:

3   Q.  Mrs. Newell, did you trust Mr. Maerki and Mr. Alcorn?

4   A.  At that point in time, yes.

5   Q.  A few months after your investment group started

6   investing moneys, did you eventually learn that the

7   Securities and Exchange Commission was investigating Janus

8   Spectrum LLC?

9   A.  Yes.

10  Q.  If you could take a look at Government's Exhibit 707.  Do

11  you recognize 707?

12  A.  Yes.

13  Q.  What is it?

14  A.  It's an e-mail from David Alcorn to my husband and I.

15  Q.  Is it a Janus Spectrum LLC update?

16  A.  Yes.

17          MS. O'BOYLE:  Government moves in Exhibit 707.

18          MR. YAROW:  No objection.

19          THE COURT:  It will be admitted.

20          (Government's Exhibit 707 was admitted.)

21  BY MS. O'BOYLE:

22  Q.  What is the date of this e-mail?

23  A.  July 18, 2013.

24  Q.  Is it from Mr. Alcorn to you and your husband?

25  A.  Yes.

S. Newell - Direct

1   Q.  And so is this almost two years after you invested -- you

2   started investing funds with Mr. Alcorn?

3   A.  Yes.

4   Q.  Had you received any return on your investment to that

5   point?

6   A.  No.

7   Q.  Can you read the first two sentences?

8   A.  "Continuing our open and transparent policy, I write to

9   let you know that Janus, Kent, and I have received SEC

10  subpoenas, as have some of our clients.  Janus and I have

11  hired counsel and are cooperating fully with the SEC."

12  Q.  Was this the first time that you heard about the

13  Securities and Exchange Commission investigation?

14  A.  Yes.

15  Q.  If you could read the second paragraph, the first two

16  sentences, please.

17  A.  "It is important to know the SEC has not made any claims

18  or allegations against us, nor has it asked anyone to

19  testify; it is only seeking documents.  It is also important

20  to know that our business will remain uninterrupted as will

21  our commitment to our clients."

22  Q.  Do you know whether Mr. Alcorn stopped raising funds from

23  investors after the SEC started its investigation?

24  A.  He was definitely continuing to raise funds.

25          MS. O'BOYLE:  If you could pull back up 707,

Carol L. Naughton, Official Court Reporter

S. Newell - Direct

1    Ms. Yusi, I apologize.

2    BY MS. O'BOYLE:

3    Q.  If you could look at this last line.  Does Mr. Alcorn

4    say, "If you would like to speak with our lawyers, I'll be

5    happy to provide their contact information"?

6    A.  Yes.

7    Q.  Did you elect to speak with Mr. Alcorn's lawyers?

8    A.  No.

9    Q.  Why not?

10   A.  We still trusted them at that point.

11   Q.  Okay.  Did you ever speak with Mr. Alcorn about the

12   Securities and Exchange Commission's investigation?

13   A.  I don't recall if we had a conversation about it.  I

14   do -- I did, myself, receive a subpoena to produce documents

15   for that same investigation.

16   Q.  And did you produce documents in connection with --

17   A.  Yes, I did.

18   Q.  Did you spend a lot of time gathering all the materials?

19   A.  Yes, I did.

20   Q.  And we'll talk about that in a little bit more detail

21   later.

22        Did you ever attend a retreat related to Janus

23   Spectrum LLC?

24   A.  Yes, I did.

25   Q.  Who invited you to the retreat?

S. Newell - Direct

1    A.   David Alcorn.

2    Q.   And I'm going to show you what's been marked for

3    identification as Government's Exhibit 316D.  And this is an

4    e-mail from Mr. Alcorn.  Is it related to the 2013 Janus

5    Spectrum retreat?

6    A.   Yes, it does relate to that retreat.

7    Q.   And this is a retreat that you went to?

8    A.   Yes, it is.

9         MS. O'BOYLE:  Government moves in Exhibit 316D.

10        THE COURT:  316D will be admitted.

11        (Government's Exhibit 316D was admitted.)

12   BY MS. O'BOYLE:

13   Q.   And Mr. Alcorn says in this e-mail, "As discussed, the

14   2013 Janus Spectrum LLC client retreat is scheduled for

15   August 20 through 22, 2013, at the Silverado Resort and Spa,"

16   and then it gives an e-mail address, "in legendary Napa

17   Valley, California."  Is that right?

18   A.   Yes.

19   Q.   Did you go to the Silverado Resort and Spa?

20   A.   Yes.

21   Q.   Did you have to pay for your room?

22   A.   No.

23   Q.   Who paid for your room?

24   A.   Janus Spectrum paid for my room.

25   Q.   Now, who from Janus Spectrum was leading the conference

———————S. Newell - Direct———————

1    here in August of 2013?

2    A.   David Alcorn.

3    Q.   Do you recall approximately how many people attended this

4    conference?

5    A.   I estimate it was between 30 and 50 people, perhaps.

6    Q.   Now, did you meet any other individuals associated with

7    Janus Spectrum at this retreat?

8    A.   Yes.

9    Q.   Did you meet any clients at the retreat?

10   A.   The only real clients that I thought were there were the

11   members of our investment group.

12   Q.   And so which members of your investment group went to the

13   retreat?

14   A.   Craig and I, George Cushman, Kenneth Lease, Liz and Jerel

15   Crist.  I'm not sure that there were any others from our

16   group.

17   Q.   And so why do you think that you were the only clients

18   that attended the retreat?

19           MR. GRINDROD:  Objection.  Calls for speculation.

20           THE COURT:  Sustained.

21   BY MS. O'BOYLE:

22   Q.   Who else attended the retreat besides you and members of

23   your investment group that you recall?

24   A.   Shall I name?

25   Q.   Yes, names of people.

S. Newell - Direct

1    A.   Daryl Bank, Terry Johnson, Ray Chadwick, Bobby Jones, Jon

2    Palmieri was there.  Off the top of my head, those are the

3    people I think -- I mean, some of them had spouses with them,

4    et cetera.

5    Q.   And did Mr. Bank -- did you speak with Mr. Bank while you

6    were there or overhear him talking?

7    A.   I overheard him talking.  I didn't really speak with him

8    directly.

9    Q.   And what did Mr. Bank say was his connection with Janus

10   Spectrum LLC?

11   A.   Well, I overheard a conversation on a bus to a venue

12   that -- they were taking us to a winery, and Craig and I were

13   sitting in the back of the bus, as was Mr. Banks, and he was

14   relaying how much he was upcharging his clients for

15   applications for spectrum.

16   Q.   Okay.  So was Mr. Bank -- you said he was upcharging his

17   clients for applications?

18   A.   Yes.  That's right.

19   Q.   So was Mr. Bank himself investing his own personal money

20   with Janus Spectrum LLC, to your knowledge?

21   A.   I don't know --

22           MR. GRINDROD:  Objection.

23           THE COURT:  Wait a minute.  Stand up when you

24   object.

25           MR. GRINDROD:  Yes, Your Honor.

S. Newell - Direct

```
 1              THE COURT:  What was your objection?
 2              MR. GRINDROD:  Foundation.
 3              THE COURT:  Sustained.
 4   BY MS. O'BOYLE:
 5   Q.  Well, what was your understanding of what Mr. Bank is
 6   doing for Janus Spectrum?
 7              THE COURT:  If you know.
 8   BY MS. O'BOYLE:
 9   Q.  You just relayed a conversation that you overheard.  What
10   was Mr. Bank -- based on the conversation that you overheard
11   with Mr. Bank, how was he associated with Janus Spectrum?
12   A.  The impression I got from what he was saying was that he
13   was selling application services to clients of his own.
14   Q.  And were you selling application services to anyone?
15   A.  Absolutely not.
16   Q.  Do you know whether Bobby Jones was a client or was
17   selling application services?
18   A.  Since this was an all-client conference, I got the
19   impression that --
20              MR. YAROW:  Sir, I'm going to object.  Foundation.
21              THE COURT:  Sustained.
22   BY MS. O'BOYLE:
23   Q.  At some point during the resort, while you were there,
24   did Mr. Alcorn -- did you have a meeting in connection with
25   Janus Spectrum?
```

S. Newell - Direct

1   A.  I'm sorry?

2   Q.  I'm sorry.  It was an inartful question.

3       Was there a conference -- was there a meeting of

4   everyone in connection with Janus Spectrum?

5   A.  Yes.

6   Q.  And what did David Alcorn tell the individuals that were

7   there at this meeting?  What was he saying?

8   A.  One of the things he was saying was that Ray Chadwick and

9   Terry Johnson had purchased 25 of the top EAs and was

10  encouraging the rest of us to purchase additional EAs.

11  Q.  And were Terry -- were they selling themselves, or were

12  they themselves investing?

13  A.  I have no idea.

14  Q.  Now, did Mr. Chadwick -- did Mr. Alcorn recognize

15  Mr. Chadwick at this conference?

16  A.  Yes.

17  Q.  And for doing what?

18  A.  Again, for purchasing those economic area license

19  applications.

20  Q.  Now, did Mr. Alcorn introduce anyone else at this

21  retreat?

22  A.  Yes.  One of the people that he introduced was a man by

23  the name of Bill Gray.

24  Q.  Now, at this time did you still have the same expectation

25  that Janus Spectrum LLC would be monetizing the licenses

Carol L. Naughton, Official Court Reporter

—————————————S. Newell - Direct—————————————

 1  through Sprint and Verizon and the other major carriers?
 2  A.  Yes.
 3  Q.  I'd like to take a look at Government's Exhibit 708.  Do
 4  you recognize Government's Exhibit 708?
 5  A.  Yes.
 6  Q.  What is it?
 7  A.  It's a Commercialization Agreement for Air Apparent
 8  Associates LLC and an e-mail from David Alcorn.
 9          MS. O'BOYLE:  Government moves in Exhibit 708.
10          THE COURT:  Exhibit 708 is admitted.
11          (Government's Exhibit 708 was admitted.)
12  BY MS. O'BOYLE:
13  Q.  Who is this an e-mail from, Mrs. Newell?
14  A.  David Alcorn.
15  Q.  Who is it to?
16  A.  It is to me.
17  Q.  And what is the date of the e-mail?
18  A.  September 27, 2013.
19  Q.  And so approximately -- so your first investment was
20  November of 2011?
21  A.  Correct.
22  Q.  So this is approximately -- almost two years later?
23  A.  Correct.
24  Q.  And if you could, if you could read the sentence starting
25  "While our existing Services Agreement."

S. Newell - Direct

```
 1   A.   "While our existing Services Agreement is very clear
 2   about our role as your agent in facilitating approval of the
 3   licenses for your company, perhaps it is not as clear as it
 4   might be regarding our respective roles in commercializing
 5   the spectrum once the licenses are granted."
 6   Q.   Now, what did you understand the phrase "commercializing
 7   the spectrum" to mean?
 8   A.   Monetizing our licenses.
 9   Q.   And so to be clear, what did you believe was Mr. Alcorn's
10   role in commercializing or monetizing your licenses?
11   A.   That he would do that on our behalf.
12   Q.   Okay.  Now, at this stage, did you believe that
13   Mr. Alcorn was changing your original deal by asking you to
14   sign a new agreement?
15   A.   Yes.
16   Q.   Okay.  And so was this -- attached on Page 2, was this
17   the Commercialization Agreement?
18   A.   Yes.
19   Q.   Now, did you sign more than one Commercialization
20   Agreement with Mr. Alcorn?
21   A.   For Air Apparent Associates, yes.
22        MS. O'BOYLE:  If we could go to Page 4, and let's
23   blow up paragraph 5.
24   BY MS. O'BOYLE:
25   Q.   Now, does paragraph 5 state commission?
```

Carol L. Naughton, Official Court Reporter

S. Newell - Direct

1    A.  Yes.

2    Q.  And does it contain the 18 percent provision that the

3    original Services Agreement contained?

4    A.  Yes.

5    Q.  So did you end up signing this agreement with Mr. Alcorn?

6    A.  Yes.

7    Q.  And after signing this agreement, did you still believe

8    that Janus Spectrum would monetize your licenses in exchange

9    for an 18 percent commission?

10   A.  Yes.  We had paid for the application services $40,000.

11   So the 18 percent represented to us the fact that he was

12   still going to monetize regardless of what may or may not be

13   in the contract at this point.

14   Q.  All right.  Let's pull up Government's Exhibit 709.  And

15   is this a signed version of the agreement that we were just

16   looking at?

17   A.  Yes.

18           MS. O'BOYLE:  Government moves in Exhibit 709.

19           MR. YAROW:  No objection.

20           THE COURT:  Exhibit 709 will be admitted.

21           (Government's Exhibit 709 was admitted.)

22   BY MS. O'BOYLE:

23   Q.  What is the date of this Commercialization Agreement,

24   Mrs. Newell?

25   A.  October 1st, 2013.

S. Newell - Direct

1   Q.  If we could go to Page 7, please.  Who signed this
2   Commercialization Agreement?
3   A.  David Alcorn and myself.
4   Q.  Now, I want to move forward a few months to early 2014.
5   A few months after you signed this document in 709, did
6   Mr. Alcorn ask you to sign yet another Commercialization
7   Agreement?
8   A.  Yes.
9   Q.  And do you recall how Mr. Alcorn raised this issue of
10  another new Commercialization Agreement?
11  A.  My recollection is he said his attorneys felt that the
12  agreement still needed some further corrections.
13  Q.  Did he say why?
14  A.  I don't know if he said outright why, but we began to
15  suspect it had something to do with the SEC investigation.
16  Q.  In connection with this new Commercialization Agreement,
17  did you still have an obligation to pay, then, that
18  18 percent fee?
19  A.  Yes.
20  Q.  What about the second one?
21  A.  It's not in the agreement, the second revision, but we
22  had verbal assurances that they were still going to monetize
23  and they were still expecting to be paid 18 percent.
24  Q.  Who gave you those verbal assurances?
25  A.  David Alcorn.

---
S. Newell - Direct
---

1   Q.  And if we could take a look at Government's Exhibit 711.

2   Do you recognize Government's Exhibit 711, Mrs. Newell?

3   A.  Yes.

4   Q.  And what is it?

5   A.  It's an amendment to the Janus Commercialization

6   Agreement in an e-mail to me.

7   Q.  Is it an e-mail from you?

8   A.  I beg your pardon, it is an e-mail from me.

9          MS. O'BOYLE:  Government moves in Exhibit 711.

10         MR. YAROW:  No objection.

11         THE COURT:  Exhibit 711 will be admitted.

12         (Government's Exhibit 711 was admitted.)

13  BY MS. O'BOYLE:

14  Q.  Is this an e-mail from you to Mr. Alcorn and a copy to

15  Shelton & Power Legal Assistance?

16  A.  Yes.

17  Q.  Is it dated 2/17/2014?

18  A.  Yes.

19  Q.  And do you know who Shelton & Power -- who they are?

20  A.  They were attorneys working for David Alcorn and Janus

21  Spectrum LLC regarding the agreements.

22  Q.  And if you could read just the very first paragraph here.

23  A.  "After a thorough review of the amendment to the

24  Commercialization Agreement and a discussion between the

25  managers of clients of Air Apparent, Choice Communications,

S. Newell - Direct

1  Six Cities, and Nexus Spectrum, we are reluctant to sign this
2  agreement in its current form.  We have a few minor
3  corrections but a few major concerns that need to be
4  addressed."
5  Q.  And what were the major concerns that you felt needed to
6  be addressed?
7  A.  This revision no longer mentioned that Janus would be
8  responsible for monetization and no longer -- the 18 percent
9  was no longer in the agreement.
10 Q.  Okay.  Did you have a -- after you sent this e-mail, did
11 you have a conversation with Mr. Alcorn about the concerns
12 that you had?
13 A.  Yes.
14 Q.  Let's take a look at Government's Exhibit 712.  Do you
15 recognize 712?
16 A.  I do.
17 Q.  Okay.  And is it -- what is it?
18 A.  It's an e-mail from me to some of the managers of our
19 investment group regarding a call I had with David Alcorn.
20      MS. O'BOYLE:  Government moves in Exhibit 712.
21      THE COURT:  Exhibit 712 will be admitted.
22      (Government's Exhibit 712 was admitted.)
23 BY MS. O'BOYLE:
24 Q.  And so you say in this e-mail, "I had a very good
25 conversation with Dave Alcorn.  Not only is he amenable to

S. Newell - Direct

1    making changes to the amendment, he agrees that it was pretty

2    poorly written and probably done in a rushed fashion by the

3    attorneys to get it out the door."

4           Do you see that?

5    A.  I do.

6    Q.  Let's go to Page 2 of this document.  And what are these

7    that we're looking at, Mrs. Newell?

8    A.  It's a list of the concerns that we had about the

9    agreement and then a summary by me of what Mr. Alcorn had

10   said about that concern -- those concerns.

11   Q.  Okay.  So if we -- I want to go down to paragraph 5.  And

12   if you could read the first three lines of paragraph 5.

13   A.  "Paragraph 3(b)(1) indicates that Janus will not

14   represent client as client's agent to commercialize, yet

15   paragraph 3(b)(2) indicates Janus will act as an advisor and

16   further indicates in the second sentence that 'as client's

17   advisor and agent, third parties may assist client.'

18          "Who is the advisor and agent referred to in the

19   second sentence, the third parties?  Although I want the

20   assurance that the protocols being described will, in fact,

21   be carried out, it seems curious to have a Commercialization

22   Agreement between our entity and Janus that spells out what

23   the third parties are likely to do."

24   Q.  We'll stop there for a second.

25          What is your concern here that you relayed to

S. Newell - Direct

```
 1    Mr. Alcorn?
 2    A.   He is -- I'm explaining that in prior agreements, Janus
 3    had said they would take care of the monetization for us.
 4    Now all of a sudden we're introducing third parties.  We have
 5    no idea who they are, what they will do for us, how much they
 6    will charge us, and so we have no control over who is going
 7    to take care of the monetization for us.
 8    Q.   Okay.  Now, I've highlighted a sentence that starts,
 9    "Will correct."  And could you please read those two
10    sentences.
11    A.   Yes.  "Will correct.  Paragraph 2 'Engagement' will be
12    completely eliminated.  In these paragraphs, they will be
13    corrected to read Janus and third parties will."
14    Q.   What is the highlighted portion?  When did you add that
15    to your paragraph?
16    A.   That is -- that is me telling the other members of our
17    investment group what Mr. Alcorn had said to me in response
18    to the concern that we expressed in that paragraph.
19    Q.   Okay.  And if you could read -- if you could read the
20    first sentence in the next paragraph.
21    A.   The first sentence?
22         "Based on this Commercialization Agreement, no one
23    is committed to doing anything to commercialize our licenses,
24    and those third parties who may be interested will have their
25    own terms, as yet a mystery to us as clients."
```

S. Newell - Direct

1    Q.  So was that the concern that you've been talking about

2    that under the Commercialization Agreement, Janus Spectrum no

3    longer has an obligation to monetize these licenses for your

4    group?

5    A.  That is the concern.

6    Q.  And so did you add a sentence after you had a

7    conversation with Mr. Alcorn?

8    A.  Yes.  The sentence I added in this e-mail to my investing

9    partners was "I have verbal assurances that we will be

10   satisfied with the outcome.  Call me sometime."

11   Q.  And so you added that statement or sentence after your

12   call with Mr. Alcorn?

13   A.  Yes.

14   Q.  What verbal assurances are you talking about here?

15   A.  In my call with Mr. Alcorn, he said I shouldn't be

16   concerned, that they will be still very involved in

17   monetizing, but he couldn't put it in writing.

18   Q.  Did he say why he couldn't put it in writing?

19   A.  No.

20   Q.  I'm going to go back up to the very first page, and if

21   you could read this sentence that you wrote to your

22   investment group.

23   A.  "Janus fully intends to continue to be very involved in

24   the process."

25   Q.  Why did you write that sentence?

S. Newell - Direct

```
 1   A.  Because that's what he told me.

 2   Q.  What who told you?

 3   A.  David Alcorn told me that on our phone call.

 4   Q.  Now, when you had this conversation with Mr. Alcorn back

 5   in February of 2014, did you discuss anything about his

 6   intention to file for bankruptcy in connection with the

 7   company?

 8   A.  He did tell us that he was going to be doing that in a

 9   March call, I think it was.

10   Q.  If you can take a look at Government's Exhibit 318D.  Do

11   you recognize 318D?

12   A.  I had not seen it before I saw the exhibit, no.

13   Q.  This is --

14          MS. O'BOYLE:  Your Honor, this is a document that is

15   also stipulated to.  The government moves in Exhibit 318D.

16          THE COURT:  Hearing no objection, 318D will be

17   admitted.

18          (Government's Exhibit 318D was admitted.)

19   BY MS. O'BOYLE:

20   Q.  So is this -- this is a bankruptcy filing for the company

21   Janus Spectrum LLC.  Do you see that?

22   A.  I do see that.

23   Q.  What, if anything, do you recall Mr. Alcorn telling you

24   about why they filed -- why he put the company in bankruptcy?

25   A.  Mr. Alcorn was involved in a legal dispute with the other
```

S. Newell - Direct

 1  provider of spectrum application services, SmartCOMM.  And
 2  because SmartCOMM was delaying the granting of licenses, the
 3  licenses we applied for in November of 2011, he wanted to
 4  move the venue of his legal dispute out of Arizona and into
 5  federal court, and so he described to us, on a conference
 6  call with our investing members, that by filing for
 7  bankruptcy, that would, in essence, move it out of the local
 8  district court and into federal courts.
 9  Q.  What, if anything, did he say about whether this
10  bankruptcy would impact his ability to monetize your
11  licenses?
12  A.  He told us not to worry, we're still going in the same
13  direction, and this will speed things up so that this case
14  with SmartCOMM would come to a head sooner.
15  Q.  To your knowledge, did Mr. Alcorn and Mr. Maerki continue
16  to raise funds for Janus Spectrum LLC even after they were in
17  bankruptcy?
18          MR. YAROW:  Objection.  Foundation.
19          THE COURT:  Well, she says to her knowledge.  On
20  cross-examination, you can find out what her knowledge is.
21  If she doesn't have the knowledge, the Court is going to
22  strike it.
23  BY MS. O'BOYLE:
24  Q.  Let me ask it this way:
25          Did you invest additional funds in Janus Spectrum

S. Newell - Direct

1    after they filed for bankruptcy?

2    A.   Yes.

3    Q.   At whose request?

4    A.   David Alcorn.

5    Q.   Now, in the middle of 2014, did your investment group

6    start to have some concerns about Janus Spectrum and the

7    Commercialization Agreements and whether they would monetize

8    your licenses?

9    A.   Yes.

10   Q.   And what, if anything, did you do to get some answers

11   related to your concerns?

12   A.   We communicated with Mr. Alcorn that we would like to

13   have a meeting with him to express our concerns.

14   Q.   And in June of 2014, did you have a meeting with him?

15   A.   We did attend a meeting that Mr. Alcorn set up.

16   Q.   Where was this meeting?

17   A.   The meeting was in Washington, D.C.

18   Q.   Were you able -- did you go to the meeting?

19   A.   We did go to the meeting.  Myself and Craig and a couple

20   of other members of our investment group attended the

21   meeting.

22   Q.   Were you able to ask your questions to Mr. Alcorn at the

23   meeting?

24   A.   The agenda that we had intended when we requested this

25   meeting with Mr. Alcorn was not addressed.

S. Newell - Direct

1    Q.   Okay.  What happened at this meeting?

2    A.   Mr. Alcorn presented some updates about Janus Spectrum's

3    legal situations and also introduced Peter Lewis to talk

4    about the Internet of Things.

5    Q.   We'll talk about that in a minute.

6              By this point, had your investment group received

7    any spectrum licenses, been awarded any licenses, to your

8    knowledge?

9    A.   I believe at this point in time -- the dates are

10   confusing, but I believe at this point in time, we were

11   finally granted the Denver and Minneapolis licenses.

12   Q.   Sorry, where were the licenses?

13   A.   Denver and Minneapolis.

14   Q.   And had they been -- had Janus Spectrum monetized those

15   licenses in any way by mid-2014?

16   A.   No.

17   Q.   Now, let's talk about this meeting.  At this meeting in

18   D.C. in June of 2014, did you take -- were you asked by

19   Mr. Alcorn to take notes?

20   A.   Yes.

21   Q.   If you could take a look at Government's Exhibit 713.  Do

22   you recognize 713?

23   A.   I do.

24   Q.   What is it?

25   A.   It is a typed-up version of the notes that I took at the

S. Newell - Direct

1    workshop meeting.

2              MS. O'BOYLE:  Government moves in Exhibit 713.

3              MR. YAROW:  No objection.

4              THE COURT:  713 will be admitted.

5              (Government's Exhibit 713 was admitted.)

6    BY MS. O'BOYLE:

7    Q.  Now, taking a step back, this meeting in Washington,

8    D.C., where was it conducted?

9    A.  It was at a hotel in Washington, D.C.

10   Q.  And so you mentioned that you and a couple of members

11   from your investment group were there?

12   A.  Yes.

13   Q.  Who else was there?

14   A.  Besides the members of my group?

15   Q.  Yes?

16   A.  Terry Johnson, Ray Chadwick, Bobby Jones.  Although I --

17   I believe Bill Smith was there; a gentleman by the name of

18   Jim Karcz was there; Tripp Forrest, who was responsible for

19   the engineering of our license applications, was there.

20   Q.  And you mentioned a Mr. Peter Lewis?

21   A.  Mr. Peter Lewis and Kent Maerki.

22   Q.  Now, at this point in time, June 2014, had Mr. Kent

23   Maerki's role changed with respect to Janus Spectrum at all?

24   A.  Yes.

25   Q.  Who, if anybody, explained that Mr. Maerki's role would

Carol L. Naughton, Official Court Reporter

—————————S. Newell - Direct—————————

```
1    be changing?
2    A.  We had a conference call back in January of 2014, and in
3    that conference call, Mr. Alcorn advised us that Kent Maerki
4    was no longer a partner but that we weren't going to let him
5    go because his consulting to Janus was very valuable.
6    Q.  So you said that happened in January?
7    A.  January, yes, of 2014.
8    Q.  So who, then, was the sole owner of Janus Spectrum LLC
9    after Mr. Maerki was no longer a principal?
10   A.  David Alcorn.
11   Q.  Let's take a look at these notes from this meeting.  And
12   there's a line here that says, "DA provided updates on
13   various Janus matters."
14           Do you see that?
15   A.  Yes.
16   Q.  Who is DA?
17   A.  David Alcorn.
18   Q.  Did Mr. Alcorn at this meeting talk about the Securities
19   and Exchange inquiry?
20   A.  Briefly.
21   Q.  It says, "SEC inquiry probably about over."  Do you see
22   that?
23   A.  Yes.
24   Q.  Who said that?
25   A.  David Alcorn.
```

1    Q.   "No indication that we were accused of anything."  Who

2    said that?

3    A.   David Alcorn.

4    Q.   "Janus went to L.A. SEC to discuss."

5    A.   David --

6    Q.   Can you explain to the jury what L.A. SEC stands for?

7    A.   Yes.  The SEC case was done out of Los Angeles, and so he

8    told us that he went to Los Angeles.  I believe he said he

9    and his attorneys went to Los Angeles to meet with the SEC.

10   Q.   And then it says, "They may have to come up with some

11   minor infraction, but nothing to date."

12   A.   That's right.

13   Q.   And who said that?

14   A.   David Alcorn.

15   Q.   If we go to Page 2.  I'll scroll down.

16          Did Kent Maerki also talk at this meeting?

17   A.   He did.

18   Q.   And if you could, if you could start and read for the

19   jury "prioritized actions."

20   A.   Yes.  "Mr. Maerki said that Janus's prioritized actions

21   were:  One, get a license; two, secure the license through

22   activation," which they referred to as safe harbor; "three,

23   buy more licenses; and, four, monetize the licenses."

24   Q.   Okay.  So what was your understanding of what Mr. Maerki

25   was saying here?

———S. Newell - Direct———

1    A.   That they weren't going to monetize the licenses for us

2    until they got more.

3    Q.   Okay.  And what was your response to that?

4    A.   We were very upset.

5    Q.   Why?

6    A.   This is now almost four years -- three years since we

7    first invested, at which time we were told it would probably

8    be three, six, nine months after we got granted our licenses

9    that we would be monetized, and here it was June 24, 2014,

10   and nothing had been done yet.

11   Q.   And actually, in connection with the SEC, did Mr. Alcorn

12   tell you at this meeting that he had sat for a deposition at

13   the SEC?

14   A.   No.

15   Q.   The fact that he had sat for a deposition the week before

16   this meeting?

17   A.   Nope, did not tell us that.

18   Q.   All right.  If you could go back to, I'm sorry,

19   Government's Exhibit 713.

20          Now it says here, underneath Mr. Maerki's

21   priorities, that he had introduced a Mr. Peter Lewis.

22   A.   Yes.

23   Q.   And so your notes reflect that Mr. Lewis presented some

24   ideas on how your licenses could be monetized; is that right?

25   A.   Yes.

S. Newell - Direct

1  Q.   What was Mr. Lewis's presentation about?

2  A.   It was about the Internet of Things.

3  Q.   What was the Internet of Things, as Mr. Lewis explained?

4  A.   He was talking about how our spectrum would be good for

5  smaller things than selling or leasing back licenses to

6  Sprint or other major carriers, that they were more suited to

7  smaller packs of information being sent over the radio waves.

8  Q.   What was your response to that?

9  A.   We were wondering why, this meeting that we had

10  requested, all of a sudden now, we're talking about using our

11  spectrum for the Internet of Things.

12  Q.   When you originally invested, had Mr. Alcorn said

13  anything about the Internet of Things?

14  A.   No.

15  Q.   What was the original idea behind of how your licenses

16  were going to be monetized?

17  A.   The licenses were going to be monetized by Janus Spectrum

18  going to Sprint or other major carriers to either leaseback

19  or sell outright the spectrum that we would now own under our

20  licenses.

21  Q.   Now, I'm going to go all the way down to the end of

22  paragraph 5, and if you could read what you wrote in

23  connection with that.

24  A.   "Reminder that Brian Semple, Shelton & Power, Alan

25  Tilles, Peter Lewis, and Tripp Forrest, and their companies

S. Newell - Direct

1    are all agents of Janus.  Janus clients should not contact
2    these agents directly.  It results in fees to Janus."
3    Q.  Who said that at the meeting?
4    A.  David Alcorn.
5    Q.  And so were you able to contact these people directly, or
6    did you have to go through Mr. Alcorn?
7    A.  He was letting us know not to do that because, quite
8    frankly, we had contacted Tripp Forrest directly ourselves.
9    Q.  Now, up here -- I'm moving to Page 6.  If you could read
10   the sentence that starts, "Safe harbor."
11   A.  "Safe harbor solution for anyone whose license may be
12   expiring in September, that is, those licensees who were
13   granted licenses in September 2013 through applications filed
14   by SC, which is SmartCOMM."
15   Q.  And if you could read the line that starts "Jim Karcz."
16   A.  "Jim Karcz, director of Northern Spectrum Advisors LLC,
17   will coordinate activation of licenses at a cost of $400 a
18   month to preserve the license until such time that license is
19   otherwise monetized/utilized in a more permanent contract."
20   Q.  First of all, who was talking here?  Who was telling you
21   this?
22   A.  It was either David Alcorn or Kent Maerki.
23   Q.  And what -- can you explain for the jury what it would
24   mean to pay Mr. Karcz 400 a month to preserve the licenses?
25   A.  Once we're granted a license, we have 12 months to

S. Newell - Direct

1   activate it; otherwise, we will potentially lose the license.
2   And so since the licenses hadn't been monetized yet and some
3   of them were coming up for disqualification, Mr. Karcz was
4   acting on behalf of Janus Spectrum to arrange to have a
5   signal being sent from the licensed towers at a cost of $400
6   a month for us just to keep -- to give the impression to the
7   FCC that those licenses were actively working.
8   Q.   You mentioned that they could be -- that the licenses
9   could be disqualified?
10  A.   That's right.  We could lose the license if it wasn't
11  activated within 12 months of being granted.
12  Q.   So what was your response to either Mr. Alcorn or
13  Mr. Maerki telling you that you had to pay Mr. Karcz $400 a
14  month?
15  A.   We were not happy.
16  Q.   Did you talk to Mr. Alcorn about that?
17  A.   Not at that particular moment.  We weren't -- we weren't
18  in a give-and-take at that point in the conference.  We were
19  being told what the situation was.
20  Q.   By who?
21  A.   David Alcorn.
22  Q.   Now, going down a little bit further down the page, could
23  you please read what you wrote here.
24  A.   "DA," which is David Alcorn, "unable to identify timeline
25  for monetization presently.  Need to get everyone hired to

S. Newell - Direct

1    move forward."

2    Q.  What is that a reference to?

3    A.  They were talking about the Internet of Things and that

4    this might be the best way for us to monetize our licenses,

5    but they needed to get boots on the ground.  They called it

6    they needed to build up their organization to help put this

7    into place.

8    Q.  Right down here, "DA, Janus is a small company to get

9    system on the ground."

10           Do you see that?

11   A.  Yes.

12   Q.  Who said that?

13   A.  David Alcorn.

14   Q.  And then down here there's a line that was highlighted.

15   Did you highlight that?

16   A.  Yes.

17   Q.  And I just put a yellow highlight on it.  Could you

18   please read that for the jury.

19   A.  "Sprint or other providers still a possibility to

20   buy/lease our licenses; not eliminating those negotiations

21   even if we think the Internet of Things may be better in the

22   long run."

23   Q.  So who told you that Sprint or other providers were still

24   a possibility to buy or lease your licenses at this meeting?

25   A.  David Alcorn.

```
 1              THE COURT:  Ms. O'Boyle?

 2              MS. O'BOYLE:  Yes, sir?

 3              THE COURT:  It's obvious to the Court, looking at

 4    the number of exhibits you still have in this notebook, we're

 5    not going to finish this direct, and we still have cross.  So

 6    I think what we're going to have to, we're just going to stop

 7    here and finish the cross tomorrow -- finish the direct and

 8    the cross on this witness.

 9              MS. O'BOYLE:  Thank you, Your Honor.

10              THE COURT:  Okay.  Ladies and gentlemen, we're going

11    to return here tomorrow morning at 9:30.  We're going to take

12    up with the examination of this witness.  Do not discuss this

13    case.  Do not do any research.  Just go home, get some rest,

14    and come back and start again tomorrow.  Leave your notes in

15    the jury room.

16              (The jury exited the courtroom.)

17              THE COURT:  Mrs. Newell, do not discuss your

18    testimony overnight with anybody.  You may step down.

19              THE WITNESS:  Thank you, sir.

20              (The witness stepped down.)

21              THE COURT:  You may have a seat.

22              We're going to deal with a couple of things right

23    quick here.

24              First let me say this:  With respect to defendant's

25    motion to exclude evidence under Rule 404(b), the Court has
```

1    had a chance to read it.  The Court has also had a chance to

2    read the government's trial brief -- it did that last week

3    sometime -- and has read the affidavit from Attorney

4    McCaslin.

5         And as the Court looks at this motion to exclude,

6    there's some things the Court anticipates the Court will

7    sustain that will not come into this trial, does not see the

8    necessity for it.  It just creates problems and some other

9    issues.

10         So, now, I have the defendant's motion.  Does the

11   government want to respond to some of this?  I'll take the

12   government first as it hasn't written a direct response to

13   all of this.

14         MS. O'BOYLE:  Yes, Your Honor.  We might be able to

15   make it a little bit easier for the Court.

16         With respect to the defendant's motion, the letter

17   did provide very specifically that we intended to present

18   evidence under 404(b), and it listed all the justifications

19   and reasons why we would present this evidence.

20         The vast majority -- the pivotal pieces that we

21   intend to actually present, we believe, are actually

22   intrinsic to the case.  The two that we focused on in our

23   trial brief are the two pieces of evidence that we believe

24   are intrinsic to the case, are not 404(b) at all.

25         One is Dazzle Dental, which I understand defense

```
 1    counsel is not objecting to and a number of -- and that came
 2    in today.  The other is the bankruptcy.  And the
 3    government -- we do not intend to put in evidence related to
 4    Mr. Smith's house.  That is not -- that's not part of our
 5    case in chief.  We do intend to present a recording from the
 6    314 hearing that we believe is very relevant and is intrinsic
 7    to the case.
 8              Mr. Smith was charged.  He filed the bankruptcy
 9    after he was charged and went into the 314 hearing under oath
10    knowing full well what the government's case was about and
11    then went on to make a number of very, very relevant
12    admissions, which the government laid out in its trial brief.
13    We believe that they are admissible under 801(d)(2)(A).
14              THE COURT:  Let me go back and do this.  I'm looking
15    at the listings in the motion that they have filed.  Some of
16    the things clearly the Court has already dealt with.
17              For example, they have not -- the Cullins Asset
18    Group, now, that's number 2, and I don't think we've gotten
19    into that, and I don't see any reason to get into that.
20              The government is not planning on getting into that,
21    right?
22              MS. O'BOYLE:  No, Your Honor, we do not intend to
23    get into that.
24              THE COURT:  Okay.
25              MS. O'BOYLE:  The only way the government would ever
```

```
 1   get into it would be perhaps on cross-examination, if -- if
 2   Mr. Smith takes the stand.  We see certain ways in which the
 3   defendant could open the door to other investments if he
 4   denies and says certain things on the stand, but the
 5   government does not intend to put in evidence related to
 6   Cullins Asset Group or WeMonitor, Your Honor, in its case in
 7   chief.  We've got enough investments here.
 8              THE COURT:  I think some reference has already been
 9   made to WeMonitor in here, but it wasn't anything
10   substantial.
11              MS. O'BOYLE:  Sometimes, Your Honor -- so these
12   victims, a lot -- the clients invested oftentimes in more
13   than one thing.  And so there are -- in kind of going over
14   their investment -- their investments, they might say, "I
15   also invested in WeMonitor," but the government does not
16   intend -- we're going to be calling Ms. Gibson this week.  I
17   don't intend to ask her anything about WeMonitor or anything
18   like that.
19              THE COURT:  Let's go back up to the top here.  On
20   SmartCOMM, I understand why you said something about
21   SmartCOMM, but it appears to the Court, without getting into
22   the minutia about SmartCOMM, you can make any point you want
23   to make about who founded Janus Spectrum without dragging
24   details of SmartCOMM into this case.
25              MS. O'BOYLE:  Correct.
```

1          THE COURT:  So I'm sustaining the objection to any
2    details on SmartCOMM.  That's number one.
3          Number two, we've dealt with that.
4          Number 3, we've dealt with that, because Dazzle
5    Dental has already come up.
6          Number 4, Exhibits 1213 and 1215 that's come into
7    the case, the Court understands it.
8          There's been some questions also and testimony
9    regarding number 5 on the insurance license and
10   investigation.  The Court believes it was relevant, so it
11   came in.
12         Number 6, I don't know that we have dealt with
13   number 6, but the question becomes for the Court why do we
14   need to get into number 6, fraudulent conveyances and
15   concealment of related real estate assets?
16         MS. O'BOYLE:  The government does not intend to get
17   into that.
18         THE COURT:  All right.  That's out.
19         MS. O'BOYLE:  Actually, Your Honor, I'm sorry, the
20   government does not intend to -- I should clarify.
21         The government does not intend to get into
22   Mr. Smith's fraudulent conveyance in connection with his
23   bankruptcy.
24         The government does intend to get into a fraudulent
25   conveyance related to Mr. Alcorn's house because

1    Mr. Alcorn -- all of the funds that went from Janus Spectrum

2    went into Mr. Alcorn's personal accounts, and right before

3    the SEC suit -- when he found out about the SEC suit, he

4    transfers over $1 million to a company controlled by his

5    accountant.

6          The accountant then buys the house that Mr. Alcorn

7    is living in, in the accountant's name, in the accountant's

8    company.  Mr. Alcorn continues to live in the house and pays

9    rent purportedly to the accountant on the house that he just

10   bought with Mr. Alcorn's fraudulent proceeds.

11         So it explains, Your Honor -- in one of the checks,

12   the unlawful monetary transaction in this case, the $100,000

13   cashier's check was one of the checks that was used as part

14   of this transaction.  So that is the transaction.  We believe

15   it's intrinsic to the scheme, Your Honor, because it's the

16   transfer from the victims into how Mr. Alcorn concealed his

17   funds and preserved those funds.

18         THE COURT:  All right.  If that be the case,

19   counsel, if those facts be accurate that she stated, the

20   Court would find that it is intrinsic to the conspiracy in

21   this case, and it would not be 404(b).

22         With respect to number 7, the tax complaint on

23   Mr. Alcorn, tax evasion.  He's not charged with tax evasion,

24   and the Court doesn't see any reason to get into tax evasion.

25         MS. O'BOYLE:  No problem, Your Honor.  Thank you.

```
 1              THE COURT:  Thank you.  All right.
 2              Now, those are all the things that was raised here
 3    by the defendants in this motion to exclude.  I think we've
 4    addressed all of them.
 5              Now, the Court wants to deal with this emergency
 6    motion to produce.  The Court has some questions about this.
 7    So whoever is going to handle it.  Let's see.  Let me hear
 8    from Ms. McCaslin first, Mr. Bosse, and then I'll have you
 9    come back up here.
10              MR. BOSSE:  Your Honor, could I have one moment?
11              THE COURT:  Yes.
12              (Pause in the proceedings.)
13              THE COURT:  You can step on up, Ms. McCaslin.
14              MS. McCASLIN:  Before we switch gears, Your Honor, I
15    just wanted to clarify about the bankruptcy, Mr. Smith's
16    bankruptcy.  I know the government said they wanted some of
17    the statements in.  I didn't hear if the government -- or if
18    the Court granted that or sustained the objection.
19              THE COURT:  To the extent the -- the Court will find
20    that with respect to his statements in the bankruptcy, those
21    will probably be statements against his interest, and the
22    Court will also find that particular conduct to be intrinsic
23    to the conspiracy in this case.  So that's not 404(b).  So
24    the Court will not strike that evidence.
25              MS. McCASLIN:  Thank you, Your Honor.
```

1          THE COURT:  Let me ask you a question before you get
2     started here.  I need to get something clarified.
3          With respect to Vera Hullum, you took the video
4     deposition of her?
5          MS. McCASLIN:  Yes, we did.
6          THE COURT:  When that deposition was taken, did the
7     information about the total of the alleged investments --
8     that came up, right?
9          MS. McCASLIN:  Well, Your Honor, first of all, I
10    just want to -- to set the stage here, we did file this
11    motion, of course, ex parte and under seal.  We did notify
12    the government of the new exhibit and who we were asking to
13    subpoena.  But under 17(b), it does indicate that we need to
14    file ex parte for the applications for the subpoenas.
15         We do think that it's appropriate in this case, Your
16    Honor.  The ex parte motion that we sent to the Court is full
17    of work product.  It is full of different strategy, Your
18    Honor.  And the government, of course, doesn't provide us
19    with an outline of what they're going to do with witnesses.
20         THE COURT:  I know that.  But see, before we get to
21    that, whether the Court will deal with that, the Court is
22    trying to get the context.
23         The reason you want to bring all of these witnesses
24    in here is because obviously you're trying to rebut something
25    the government has brought up, right?

1          MS. McCASLIN:  Well, Your Honor, we would be asking

2     to have this conversation with you ex parte.

3          THE COURT:  Well, eventually -- you may call it

4     ex parte, but eventually the Court is going to have to ask

5     the government something about it.

6          MS. McCASLIN:  Understood.

7          THE COURT:  Because they bear some responsibility,

8     depending upon where we are here.

9          So let's put it this way:  I'll have an ex parte

10    conversation with you, but if the government has something to

11    say about this, they see this -- they've seen this proposed

12    order.

13         MS. McCASLIN:  They have not seen the motion that we

14    submitted because that is ex parte and under seal.  I did

15    follow up just minutes afterward with an e-mail to all of

16    counsel in this case letting them know we attached the

17    bankruptcy filing as an exhibit, a new exhibit, and we did

18    list out the six individuals or parties that we were asking

19    to be subpoenaed.  So they are on notice of all of this.

20         THE COURT:  Okay.  Here's what we're going to do.

21    I'm not going to resolve this today.  I want to go back and

22    look at that motion again.  And then what I'm going to do is

23    I'm going to find out, after I go back and look at that

24    motion again, whether the Court then wants to ask the

25    government some more questions about it.

```
 1            Because looking at this motion, the Court is very
 2   cautious about producing a lot of witnesses, and et cetera.
 3   I mean, these witnesses are all the way on the other side of
 4   the country someplace, and they're going to have to be
 5   absolutely necessary before I produce anybody.  If it's
 6   something that could have been prevented or addressed at the
 7   time, the Court needs to go back and take a look at it.
 8            MS. McCASLIN:  Yes, Your Honor.
 9            MR. BOSSE:  Your Honor, if I could just be heard
10   briefly.  I have something to give the Court that is relevant
11   to the Court's review of this matter, and I would like to
12   hand it up under seal.  And the defense has it already.
13            THE COURT:  Okay.  Homework.
14            MR. BOSSE:  Your Honor, of course, we don't know
15   what was filed ex parte or what representations were made
16   there.  We understand that there's a request for a subpoena
17   for Ms. Hullum, who was deposed and was cross-examined by the
18   defense, and also for her husband, who we have an affidavit
19   that he's already suffering from dementia.
20            And these are people -- Ms. Hullum, anyway, the
21   Court already found, made a finding was unavailable, which is
22   why we did a Rule 15 deposition.
23            And then there's four annuities that are referenced
24   here, and I want to hand up to the Court -- Your Honor,
25   before that deposition took place, we gave to the defense an
```

1  interview with Ms. Hullum where she talks about these exact
2  annuities and about her understanding of them.
3       And the defense had this before they cross-examined
4  her.  They didn't cross-examine her on it.  And so to the
5  extent they are asking the Court to bring her here -- number
6  one, she can't travel -- or bring in these four insurance
7  companies here, the Court should know what they had before
8  they did the cross-examination that they didn't ask her
9  about.  So I'll hand that up.  It has her personal
10 information.  I would ask that it be submitted under seal.
11      THE COURT:  All right.  File it under seal, then
12 give it the Court.
13      MR. BOSSE:  Thank you, Your Honor.
14      THE COURT:  Approximately how much more time are you
15 going to need with this witness, just out of curiosity?
16      MS. O'BOYLE:  Your Honor, the government will
17 probably finish up with her in half an hour, I believe.
18      THE COURT:  That's just fine.  Just wondering.
19      MS. O'BOYLE:  Your Honor, Ms. Gibson is coming, and
20 probably tomorrow.  And as the Court recalls, Ms. Gibson was
21 on the stand for about three days in the Bank trial.  We
22 don't anticipate her testimony being that long in this trial,
23 but it will probably take a very significant period of time
24 as well.
25      THE COURT:  All right.  That's fine.  We'll just

1    keep creeping along.  We'll get there.  The Court will be in

2    recess until tomorrow morning at 9:30.

3            (Proceedings adjourned at 5:28 p.m.)

4

5                          CERTIFICATION

6

7        I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10

11                    _____/s/_____

12                         Carol L. Naughton

13                         August 30, 2022

14

15

16

17

18

19

20

21

22

23

24

25