```
                    IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF VIRGINIA
                            Norfolk Division


- - - - - - - - - - - - - - - - - -
                                    )
   UNITED STATES OF AMERICA         )
                                    )
   v.                               )     CRIMINAL ACTION NO.
                                    )           2:19cr47
   DAVID ALCORN and                 )
   AGHEE WILLIAM SMITH II,          )
                                    )
           Defendants.              )
- - - - - - - - - - - - - - - - - -
```

## ** Jury Trial - Day 6 **

TRANSCRIPT OF PROCEEDINGS

Norfolk, Virginia

February 8th, 2022

BEFORE:  THE HONORABLE RAYMOND A. JACKSON
         United States District Judge

APPEARANCES:

        UNITED STATES ATTORNEY'S OFFICE
        By:  Andrew C. Bosse
             Melissa E. O'Boyle
             Elizabeth M. Yusi
             Assistant United States Attorneys
             Counsel for the United States

        RICHARD S. YAROW LLC
        By:  Richard S. Yarow
             Counsel for Defendant David Alcorn

        FEDERAL PUBLIC DEFENDER'S OFFICE
        By:  Andrew W. Grindrod
             Lindsay Jo McCaslin
             Assistant Federal Public Defenders
             Counsel for Defendant Aghee William Smith II

Carol L. Naughton, Official Court Reporter

```
1                            I N D E X

2    GOVERNMENT'S
     WITNESSES                                            PAGE
3
       SUSAN NEWELL
4          Direct Examination (Resumed) By Ms. O'Boyle     905
           Cross-Examination By Mr. Yarow                  935
5          Cross-Examination By Mr. Grindrod               957
           Redirect Examination By Ms. O'Boyle             977
6      MICHAEL WILHELM
           Direct Examination By Mr. Bosse                 982
7          Cross-Examination By Mr. Yarow                  992
           Cross-Examination By Ms. McCaslin               994
8      CAROL GROFF
           Direct Examination By Ms. Yusi                 1003
9          Cross-Examination By Mr. Grindrod              1020
       RAEANN GIBSON
10         Direct Examination By Ms. O'Boyle              1028

11
                            E X H I B I T S
12
     GOVERNMENT'S
13   NO.                                                  PAGE

14     714                                                 912
       1113                                                914
15     719                                                 916
       514                                                 921
16     720                                                 926
       723                                                 930
17     725                                                 931
       845                                                1012
18     847                                                1015
       94                                                 1031
19     64                                                 1034
       69                                                 1038
20     76                                                 1039
       73                                                 1040
21     300E-1                                             1044
       300W                                               1045
22     300E                                               1046
       300V                                               1048
23     309A                                               1058
       309                                                1059
24     300F                                               1060
       301                                                1061
25     302                                                1063
```

Carol L. Naughton, Official Court Reporter

```
1                        I N D E X
                         (Continued)
2
                       E X H I B I T S
3
    GOVERNMENT'S
4   NO.                                              PAGE

5     316                                            1064
      310                                            1065
6     312                                            1067
      314                                            1074
7     316B                                           1078
      311                                            1082
8     311A                                           1086
      311B                                           1086
9     311C                                           1086
      311D                                           1088
10    311E                                           1089
      311F                                           1089
11    311G                                           1090
      311H                                           1090
12    311I                                           1091
      316C                                           1092
13    301A                                           1092
      317A                                           1097
14    505A                                           1099
      400                                            1102
15    400A                                           1104
      400A                                           1105
16    400B                                           1107
      402                                            1109
17    405                                            1110
      404                                            1110
18

19  DEFENDANT ALCORN'S
    NO.                                              PAGE
20
      21                                             942
21

22  DEFENDANT SMITH'S
    NO.                                              PAGE
23
      3                                              960
24    65                                             997
      127                                            1022
25
```

Carol L. Naughton, Official Court Reporter

```
 1              (Proceedings resumed at 9:35 a.m.)

 2              THE COURT:  Good morning, everybody.

 3              MS. O'BOYLE:  Good morning, Your Honor.

 4              MS. McCASLIN:  Good morning.

 5              THE COURT:  We are ready to resume.

 6              With respect to the motion that counsel filed

 7    regarding production of witnesses, the Court will take that

 8    up -- the Court will take that up probably at the end of the

 9    day.  The lunch hour moves so fast with so many things.  Plus

10    it will give the government a chance to, I think, make

11    comments.

12              And first we will have you do your ex parte

13    argument, and then I'll just have the United States come in

14    and add whatever you want to add, because I have some

15    questions for both sides.

16              Okay.  Bring the jury in.

17              (The jury entered the courtroom.)

18              THE COURT:  Good morning, ladies and gentlemen.

19              Let the record reflect that all jurors are here.

20              Does counsel agree?

21              MS. O'BOYLE:  The United States agrees, Your Honor.

22              MS. McCASLIN:  Mr. Smith agrees.

23              MR. YAROW:  Yes, sir.

24              THE COURT:  Okay.  Ladies and gentlemen, we are

25    ready to resume with the examination this morning.
```

S. Newell - Direct

1          MS. O'BOYLE:  Yes, Your Honor.  Thank you.

2          (The witness resumed the stand.)

3          SUSAN NEWELL, called by the Government, having been

4    previously duly sworn, was examined and testified further as

5    follows:

6                    DIRECT EXAMINATION (Resumed)

7    BY MS. O'BOYLE:

8    Q.  Good morning, Mrs. Newell.

9    A.  Good morning, Ms. O'Boyle.

10         MS. O'BOYLE:  Can we have Government's Exhibit 713

11   up, please?

12   BY MS. O'BOYLE:

13   Q.  Mrs. Newell, when we left off, I believe we were

14   discussing a meeting that you and a couple members of your

15   investment group had with Mr. Alcorn in Washington, D.C.

16   A.  Yes.

17   Q.  And just to remind the jury, whose notes are these in

18   Exhibit 713?

19   A.  These were the notes that I took at the meeting.

20   Q.  And what is the date, what was the date of this, what is

21   called the Janus workshop?

22   A.  June 24, 2014.

23   Q.  Just remind the jury, your first investment was when?

24   A.  November 28, 2011.

25   Q.  So this is almost three years later?

S. Newell - Direct

1   A.  Yes.

2   Q.  Okay.  And we were working our way through this document,

3   and if we could please pull up Page 6.  And when we left off,

4   we were talking about this line right here, where you

5   referenced that Mr. Alcorn had been talking about Sprint.

6   A.  Yes.

7   Q.  And so it states "Sprint or other providers still a

8   possibility to buy/lease our licenses, not eliminating those

9   negotiations even if we think IoT may be better in the long

10  run."

11          Where did you get this information?  Who was

12  providing it?

13  A.  Mr. Alcorn stated it.

14  Q.  And so it was your understanding, even at this meeting,

15  that Mr. Alcorn was attempting to monetize your licenses in

16  connection with Sprint?

17  A.  Yes, that's correct.

18  Q.  Now, focusing in down here on the next line, could you

19  please read what you wrote at the very first sentence.

20  A.  "Most licensees in the meeting suggested that a

21  monetization of some of the licenses we currently hold now

22  would satisfy Janus clients in the short run."

23  Q.  And what is that a reference to?

24  A.  Our group as well as, I believe it was, Terry Johnson and

25  Ray Chadwick felt that since some of us had licenses that had

Carol L. Naughton, Official Court Reporter

———S. Newell - Direct———

1    finally been approved, that the investing clients would be

2    happy if they saw some return on investment from their

3    initial investments.

4    Q.  Okay.  And if you could remind the jury, you said by this

5    time you believe you had two licenses?

6    A.  We -- as a group, we actually had four, two in Denver and

7    two in Minneapolis.

8    Q.  I've highlighted the third dash line.  Could you read

9    that.

10   A.  "Hoping to see cash flow by fourth quarter of 2014."

11   Q.  Okay.  Who stated that at the meeting?

12   A.  David Alcorn.

13   Q.  And so what did you take that to mean?

14   A.  That they were actively working on monetizing for us and

15   that it should result in some -- hopefully result in some

16   return on our investment by the fourth quarter of that year.

17   Q.  So in 2014?

18   A.  2014, uh-huh.

19   Q.  And if we could go all the way down here.  Could you read

20   the two lines -- the last two lines you wrote here.

21   A.  "Agreement amongst attendees to seek the 'low-hanging

22   fruit,'" in quotes, "now and align with Peter.  David Alcorn

23   acknowledged that we are all on the same page."

24   Q.  What is with "low-hanging fruit"?

25   A.  Low-hanging fruit was a reference to their efforts to

S. Newell - Direct

```
 1   leaseback or sell our spectrum to Sprint or another major
 2   carrier.
 3   Q.  Who said the words "low-hanging fruit" in this meeting,
 4   if you recall?
 5   A.  It would have been one of the people who had asked
 6   Mr. Alcorn to continue to pursue that or questioned why
 7   aren't we pursuing that at this point.
 8   Q.  And Mr. Alcorn acknowledged that everyone was on the same
 9   page?
10   A.  Yes.
11   Q.  Now, in connection with this meeting, did they also
12   solicit another investment while you were at this meeting?
13   A.  Yes, they did.
14   Q.  Okay.  And if we could go back to -- do you see the line
15   that says "two opportunities presented in the afternoon
16   session"?
17   A.  Yes.
18   Q.  And could you please read this paragraph.
19   A.  "TF" -- and that was Tripp Forrest, their engineer --
20   "explained oversight by another FCC coordinator" -- in
21   parentheses, "not ours" -- "in the first public notice.  A
22   misinterpretation that Milwaukee and Madison, Wisconsin, were
23   not available for licensing, currently available for
24   application with no additional public notice.  Opportunity to
25   commit to application by June 30.  All Milwaukee channels
```

S. Newell - Direct

1    spoken for in the meeting."

2    Q.  Can you explain to the jury what happened in this part of

3    the meeting?

4    A.  Yes.  Mr. Alcorn asked Tripp Forrest to explain that he

5    was mistaken in the first public notice back in 2012 and that

6    Milwaukee and Madison were actually available then, but there

7    was a misinterpretation at the time when he discovered that

8    we could, indeed, apply for a license in Milwaukee and/or

9    Madison and receive approval for that license immediately

10   without another public notice being issued.

11          In other words, the first public notice to send in

12   the applications would have been sufficient.  We would have

13   less than a week to decide whether we wanted to commit to it,

14   and we would get the license right away.

15   Q.  Now, did you ultimately send additional moneys to

16   Mr. Alcorn?

17   A.  I sent -- I did purchase a Milwaukee license.  At that

18   particular time, Mr. Alcorn was not directly signing the

19   license agreement.  Instead, he had appointed Jim Karcz to

20   act as a middleman, and so the agreement was actually under

21   the heading of Northern Spectrum Associates, I believe.

22   Q.  Who was Mr. Karcz?

23   A.  To my understanding, Mr. Karcz was a friend of

24   Mr. Alcorn's, and earlier that year, Kent Maerki had

25   identified to my husband Craig and I in a luncheon that they

S. Newell - Direct

1    were looking for a new liaison between Janus Spectrum and the

2    clients because they did not want to be involved in the

3    monetization any longer.

4    Q.  If you could pull up Government's Exhibit 703.  And this

5    is your -- this was your chart we've been looking at; is that

6    correct?

7    A.  Yes, it is.

8    Q.  And so we've gone through the first four columns.  We're

9    going to go to these two columns here, Spectrum Solutions and

10   Mobile 7.  Do you see that?

11   A.  Yes, I do.

12   Q.  And so what was the date of this investment?

13   A.  Again, we had to commit by the end of June, and so the

14   agreement was actually signed on July 9, 2014.

15   Q.  And how much additional moneys did you invest in spectrum

16   in July of 2014?

17   A.  I personally invested 40,000, and some of the other

18   members of our group also invested 40,000.

19   Q.  And those were for the Milwaukee licenses that we were

20   just talking about?

21   A.  Yes, that's correct.

22   Q.  So let's go down here and take a look at the very last

23   column in your chart.  Down here there's an amount that I

24   just highlighted.  What is that amount?

25   A.  That amount is $920,000.

S. Newell - Direct

1  Q.  And what does that amount signify?

2  A.  That is the total amount that our investing group paid

3  for services from Janus Spectrum.

4  Q.  And up here there's an amount $304,500.  Do you see that?

5  A.  Yes.

6  Q.  And what is that amount?

7  A.  That amount represents the amount that the Newell family,

8  in particular, invested in Janus Spectrum.

9  Q.  Was that the total amount that you invested from 2011

10 through 2014?

11 A.  Yes, it is.

12 Q.  Why, then, if you had concerns, did you invest more money

13 in 2014?

14 A.  It was because they said we would get a license right

15 away; and, therefore, we wouldn't have had the delay to

16 monetize that license as we had in the original investments

17 that we had made.

18       So looking for some cash flow, some return on

19 investment after almost three years, we were anxious to get

20 that on the road.  And although they had talked to us about

21 the Internet of Things in the meeting, that was going to take

22 longer for them to implement.

23 Q.  So how did you believe they were going to implement these

24 licenses in 2014?

25 A.  Since he said that it was not off the table to approach

S. Newell - Direct

1   Sprint about a leaseback or a purchase of our spectrum, we
2   felt that it was worth taking the chance to see some return
3   on our investment quickly.
4            MS. O'BOYLE:  If we could go to, for the witness,
5   Government's Exhibit 714.
6   BY MS. O'BOYLE:
7   Q.  Do you recognize 714, ma'am?  It should also be on your
8   screen.
9   A.  Yes, I do recognize it.
10  Q.  What is it?
11  A.  This is a Janus client workshop report that was mailed on
12  behalf of David Alcorn.
13  Q.  Okay.  Does it also contain your notes of this meeting?
14  A.  It does.
15  Q.  Okay.
16           MS. O'BOYLE:  Government moves in Exhibit 714.
17           THE COURT:  Hearing no objection, 714 is admitted.
18           (Government's Exhibit 714 was admitted.)
19  BY MS. O'BOYLE:
20  Q.  Did you send your notes to Mr. Alcorn after the meeting
21  was over?
22  A.  Yes, I did.
23  Q.  And then did he send those notes out in this e-mail?
24  A.  Yes, that's correct.
25  Q.  Now, let's move on to September 2014, so about a month

Carol L. Naughton, Official Court Reporter

S. Newell - Direct

1    after you invested the additional moneys.  Did you contact
2    Mr. Alcorn to schedule another in-person meeting with him?
3    A.  Yes, we did.
4    Q.  What was the purpose of that meeting?
5    A.  Well, we found out at that point in time that the
6    Milwaukee license was not available, that the information
7    that they gave us in the June 24th meeting was incorrect, and
8    the FCC would not approve the license application.  So our
9    group was really beginning to become concerned about whether
10   we'd ever see any return on our investment.
11   Q.  And where did this meeting take place?
12   A.  In September?
13   Q.  Yes.
14   A.  After some time, we finally arranged to have a meeting
15   with Mr. Alcorn and Mr. Maerki at Mr. Alcorn's home.
16   Q.  And where was Mr. Alcorn's home?  What state?
17   A.  Arizona.
18   Q.  Did you go to Mr. Alcorn's house?
19   A.  Yes, we did.
20   Q.  If we could take a look at Government's Exhibit 1113.  Do
21   you recognize 1113?
22   A.  I do.
23   Q.  What is it?
24   A.  This is Mr. Alcorn's home.
25   Q.  These are pictures of Mr. Alcorn's home?

S. Newell - Direct

```
 1    A.  Yes, that's correct.

 2    Q.  Where you went to have the meeting?

 3    A.  Yes, that's correct.

 4            MS. O'BOYLE:  Government moves in Exhibit 1113.

 5            THE COURT:  Exhibit 1113 will be admitted.

 6            (Government's Exhibit 1113 was admitted.)

 7    BY MS. O'BOYLE:

 8    Q.  This was Mr. Alcorn's house in Arizona that you went to

 9    on September 10, 2014?

10    A.  Yes, it is.

11    Q.  And where did the meeting take place in his house?

12    A.  The picture that you have on the screen right now is the

13    room where we held the meeting.

14    Q.  Was this the living room, it looks like, with a kitchen

15    to the left?

16    A.  That's actually a bar, I believe.

17    Q.  I'm sorry.

18    A.  Not the kitchen.  Yeah.

19    Q.  And who participated in this meeting at Mr. Alcorn's

20    house?

21    A.  Besides Mr. Alcorn and Kent Maerki, it was attended by

22    myself, my husband Craig, and our investing members included

23    George Cushman, I believe Charlie West was there, and Kenneth

24    Lease.

25    Q.  Could you just describe for the jury what happened at
```

Carol L. Naughton, Official Court Reporter

─────────S. Newell - Direct─────────

1    this meeting?

2    A.  We were actually going out, not only to have this

3    face-to-face meeting with Mr. Alcorn, but also to do some due

4    diligence with a gentleman by the name of Dale Gray as a

5    means of monetizing our licenses, and we were anxious to have

6    Mr. Alcorn be involved in the process of determining if this

7    was a good way to monetize our licenses.

8    Q.  Did Mr. Alcorn want to do that?

9    A.  Not at all.  He -- my husband Craig was a bit persistent

10   about encouraging him to join us in the meeting the next day.

11   Q.  How did Mr. Alcorn respond?

12   A.  He told my husband -- he asked my husband why his hair

13   was so on fire about him being involved.

14   Q.  Did you have any discussion with Mr. Alcorn at this

15   meeting about whether he was approaching Sprint?

16   A.  I'm sure we did because we continued -- at that point in

17   time, he had still not admitted to us that they were not

18   going to monetize -- attempt to monetize our licenses through

19   Sprint or another major carrier, so we were desperate at that

20   point in time to try to make our $920,000 investment with

21   Janus Spectrum -- to get a return on investment.  And so we

22   began pursuing possibilities, not that we knew how to do it,

23   but suggested is this a possibility?  Can you pursue this for

24   us?

25   Q.  And, in fact, Mrs. Newell, what background, if any, did

916

S. Newell - Direct

1   you have in monetizing spectrum licenses?

2   A.  None whatsoever.

3   Q.  What background, if any, did Mr. Craig Newell have in

4   monetizing spectrum licenses?

5   A.  None whatsoever.

6   Q.  I'd like to show you Government's Exhibit 719.

7        MS. O'BOYLE:  Just for the witness.

8   BY MS. O'BOYLE:

9   Q.  And is this an e-mail string involving David Alcorn, a

10  Mr. Peter Lewis, and a Mr. Kent Maerki?

11  A.  Yes, it is.

12  Q.  From the day before the meeting at your house?

13  A.  Yes.

14  Q.  And did you eventually see a copy of this e-mail in

15  around 2016?

16  A.  Yes, I did.

17        MS. O'BOYLE:  Government moves in Exhibit 719.

18        THE COURT:  Exhibit 719 is admitted.

19        (Government's Exhibit 719 was admitted.)

20  BY MS. O'BOYLE:

21  Q.  So this is an e-mail from Mr. Alcorn; is that right?

22  A.  That's correct.

23  Q.  And the top one is to Mr. Lewis with a copy to Kent

24  Maerki?

25  A.  Yes.

S. Newell - Direct

1   Q.  And it's dated September 9th, 2014.  So this was the day
2   before you met Mr. Alcorn and Mr. Maerki at Mr. Alcorn's
3   home?
4   A.  Yes.
5   Q.  And you see this is an e-mail from Mr. Lewis.  Could you
6   remind the jury who Mr. Lewis was.
7   A.  Mr. Lewis was the speaker at the June 24, 2014, meeting
8   to explain the Internet of Things to us.
9   Q.  Okay.  And Mr. Lewis says to Mr. Alcorn, "These folks are
10  doing a lot of gum-flapping yet do not want to put more money
11  into the process."
12          What's with that?  Do you see that?
13  A.  I sure do.
14  Q.  Now, Mrs. Newell, before your group invested almost
15  $1 million with Janus Spectrum, what, if anything, did
16  Mr. Alcorn say about needing additional funds to monetize
17  these licenses?
18  A.  He was indicating, especially at the June 24 meeting,
19  that they needed more licenses in order to be big enough to
20  interest Sprint or the major carriers to do business with us.
21  Q.  Was that one of the reasons why you put additional funds
22  into Janus Spectrum?
23  A.  Yes.
24  Q.  And if we could move down to the next page, you see
25  Mr. Lewis says, "Below are answers to the five inquiries in

S. Newell - Direct

1   purple that you asked me to respond to."

2          Do you see that?

3   A.  I do.

4   Q.  And here's a question up here.  "We have seen in

5   correspondence that AT&T is moving toward LTE and our

6   bandwidth is not suitable and that Sprint cannot own any more

7   800-megahertz spectrum."

8          What was 800-megahertz spectrum?  Could you remind

9   the jury.

10  A.  800-megahertz spectrum was the area of the spectrum range

11  that we were invested in through Janus Spectrum.

12  Q.  And if you could read the very first sentence of how

13  Mr. Lewis answers.

14  A.  "800-megahertz EB/GB frequencies are a fraction of what

15  is needed for broadband carriage."

16  Q.  Do you understand what that means?

17  A.  Yes.  We were buying the spectrum through Janus in the

18  expansion band and guard bands, they were called, and what

19  that meant was that those bands were so small -- I'd liken it

20  to a drinking straw.  It was just that thin, when, in fact,

21  what Sprint would need, or the major carriers would need,

22  would be something more along the lines of a firehose so that

23  our spectrum was never going to be adequate to lease back or

24  sell to the major carriers.

25  Q.  Did you know that in 2011 through 2014 when you invested

———S. Newell - Direct———

1    these funds?

2    A.   No.

3    Q.   If we move down a little bit further, Mr. Lewis says, "If

4    I was a cellular phone company, I would be concerned about

5    how I would use someone's frequency in my cell phone that

6    only covers a few cities and is prohibited from being used in

7    other cities because such frequency is not licensed for use

8    except in specific designated cities."

9             Do you see that?

10   A.   I do.

11   Q.   What is your understanding of that?

12   A.   That was never explained to us either.

13   Q.   And Mr. Alcorn -- did he explain this, what we're going

14   over right now, at the meeting that he had with you the very

15   next day?

16   A.   No.

17   Q.   If we go to the lower part between Page 3 and 4,

18   Mr. Peter Lewis says to Mr. Alcorn, "Other than narrowband

19   data applications, I know of no other uses that would

20   generate income."

21             Do you see that?

22   A.   I do.

23   Q.   And what -- do you understand what that means?

24   A.   Yes.  Again --

25   Q.   Was this a reference to what you were just describing

—————S. Newell - Direct—————

1   about the straw, that the band that you had purchased was too

2   small for the cellular license carriers to use?

3   A.   Yes.

4   Q.   Did Mr. Alcorn talk about that at your meeting the very

5   next day?

6   A.   No, he didn't.

7   Q.   When was the first time you saw this e-mail, Mrs. Newell?

8   A.   I had a deposition with the FCC in 2016, and that was the

9   first time I saw this e-mail.

10   Q.   And was Mr. Alcorn on the phone during your deposition?

11   A.   Yes, he was.

12   Q.   And were you surprised when you saw this e-mail?

13   A.   Yes, very much so.

14   Q.   What was your reaction?

15   A.   Well, first the gum-flapping and why aren't these people

16   putting up more money was really insulting.  And I was very

17   upset when I saw the real evidence of the fact that we would

18   never have our licenses sold or leased back to a major

19   carrier.

20   Q.   How did the meeting at Mr. Alcorn's house on

21   September 10, 2014 -- how did it end?

22   A.   I don't -- I don't recall that there was any good

23   solution with Mr. Alcorn.  The next day we were going to have

24   to go and pursue a method of monetization ourselves.

25   Q.   Let's fast-forward to April of 2015.  If you could take a

Carol L. Naughton, Official Court Reporter

—————S. Newell - Direct—————

1    look at Government's Exhibit 514.  Do you recognize

2    Government's Exhibit 514?

3    A.  I do.

4    Q.  What is it?

5    A.  It is the United States District Court in the District of

6    Arizona filing a complaint against Janus Spectrum and others,

7    including David Alcorn.

8            MS. O'BOYLE:  Government moves in Exhibit 514.

9            THE COURT:  514 will be admitted.

10           (Government's Exhibit 514 was admitted.)

11   BY MS. O'BOYLE:

12   Q.  Let's stay on this first page for a moment.  Do you

13   see -- what is the date that this document was filed?

14   A.  April 6, 2015.

15   Q.  And this was a little over four years after your first

16   investment?

17   A.  Yes.

18   Q.  And who filed this complaint?

19   A.  The Securities and Exchange Commission.

20   Q.  And let's take a look at the list of defendants.  Does

21   this complaint charge Janus Spectrum LLC?

22   A.  Yes.

23   Q.  And is it also a civil complaint by the Securities and

24   Exchange Commission against David Alcorn?

25   A.  Yes.

S. Newell - Direct

1  Q.  Is it also a complaint against Mr. Daryl G. Bank?

2  A.  Yes.

3  Q.  Did you meet Mr. Bank at the retreat?

4  A.  Yes.  He was at the Silverado retreat in 2013.

5  Q.  It also is a complaint against a Mr. Bobby D. Jones?

6  A.  Yes.

7  Q.  Did you meet Mr. Jones at the retreat?

8  A.  Yes.

9  Q.  Also a Mr. Terry Johnson and Raymon Chadwick.  Were they

10 also at the retreat?

11 A.  Yes, they were.

12 Q.  Did you see this complaint when -- shortly after it was

13 filed?

14 A.  Yes, I did.  Mr. Alcorn didn't mention it to us until two

15 weeks later.

16 Q.  And then were you able -- was this a publicly available

17 document?

18 A.  It was.

19 Q.  Now, let's go to the first page, and in paragraph 1, can

20 you please read the first two sentences that I've pulled out

21 here, starting with "in these offerings."

22 A.  Yes.  "In these offerings, defendants misled investors by

23 promising that their investments would yield substantial

24 returns through the sale or lease of the FCC licenses to

25 major wireless carriers, when, in fact, defendants knew or

S. Newell - Direct

1   were reckless or negligent in not knowing that the FCC

2   licenses, if obtained, could never be sold or leased by any

3   major wireless carriers.  Defendants further concealed the

4   actual costs associated with obtaining these FCC licenses and

5   pocketed substantial sums of investor moneys for their own,

6   undisclosed uses."

7   Q.  This statement here that they were -- that investors were

8   told that their investments "would yield substantial returns

9   through the sale or lease of the FCC licenses to major

10  wireless carriers" -- was that what was represented to you?

11  A.  Yes.  That first exhibit that they sent us with the seven

12  economic areas was a representation of just that.

13  Q.  And we talked about this a little bit in the beginning.

14  It says, "Defendants further concealed the actual costs

15  associated with obtaining these FCC licenses."

16          What, if anything, did Mr. Alcorn and Mr. Maerki

17  tell you about the amount of money that you were paying for

18  those licenses?

19  A.  We paid $40,000 for each license application, and they

20  told us that that would be pretty much consumed because they

21  were getting pristine engineering, the best of attorneys, the

22  best support legally, accounting, et cetera, and there would

23  be very little profit in that investment for them, for their

24  company.

25  Q.  And I scrolled down to Page 6.  Does it identify the

S. Newell - Direct

1   Jones defendants in paragraphs 19 and 20 including a

2   reference to a Premier Spectrum Group?

3   A.   Yes.

4   Q.   What, if anything, do you know about a Premier Spectrum

5   Group?

6   A.   I knew that Terry Johnson and Ray Chadwick were from

7   Texas, but I didn't really know the name of any investment

8   group they had.

9   Q.   Okay.  And then down here -- you talked about Mr. Johnson

10  and Mr. Chadwick, and there are three references, an

11  Innovative Group and then a Premier Group and a Prosperity

12  Group.  Do you see that?

13  A.   Yes.

14  Q.   What, if anything, do you know about any of those?

15  A.   Really, nothing other than, again, anything coming from

16  Texas I associated with Mr. Johnson and Mr. Chadwick.

17  Q.   Okay.  Let's go to Page 13, paragraph 53.  Could you

18  please read paragraph 53.

19  A.   "In 2010, two years before the first securities offering,

20  a Sprint representative told Alcorn that Sprint would not be

21  able to use the spectrum for which Janus Spectrum was

22  applying because of FCC restrictions.  Alcorn was again

23  advised of this important limitation in 2011, a year before

24  the first securities offering, when Janus Spectrum's primary

25  engineer told Alcorn that he did not see Sprint being a

S. Newell - Direct

1    customer for a long time."
2    Q.  Did you see that paragraph when you reviewed the
3    complaint back in 2015?
4    A.  I remember exactly the moment that I saw that paragraph.
5    Q.  Why do you remember that moment?
6    A.  I was at my home when I read this, and I was just filled
7    with emotions, of anger and guilt and disappointment, because
8    the people that invested with us were my family and my
9    friends, respected colleagues.
10            And Craig and I and Charlie West were the first
11   people to deal with Janus, and we represented the opportunity
12   to those people that we care about so much, and I felt
13   responsible for the losses that I could see were -- we were
14   going to experience.
15   Q.  Now, did your investment group -- after reviewing this
16   complaint, did your investment group write a letter to
17   Mr. Alcorn and Mr. Maerki?
18   A.  Oh, yes.
19   Q.  If we could take a look at Government's Exhibit 720.  And
20   it will just pop up on your screen.  I'm sorry.  I don't
21   think it's in your book.
22            Pages 2 and 3, are they a letter signed by the
23   members of your investment group?
24   A.  Yes.  Those are each the managers of the investment
25   groups we -- the subgroups we had established on behalf of

S. Newell - Direct

1    our investing.

2    Q.  And it's a letter dated May 14, 2015?

3    A.  Yes.

4    Q.  That was sent to Mr. Alcorn and Mr. Maerki on May 14,

5    2015?

6    A.  Yes.

7            MS. O'BOYLE:  Government moves in Exhibit 720.

8            THE COURT:  Any objection?

9            MR. YAROW:  No objection.

10            THE COURT:  720 will be admitted.

11            (Government's Exhibit 720 was admitted.)

12   BY MS. O'BOYLE:

13   Q.  And so this is -- the header e-mail for this is from

14   Mr. Newell.  That's your husband, right?

15   A.  Yes, it is.

16   Q.  To Mr. Alcorn and Mr. Maerki on May 14, 2015?

17   A.  Yes.

18   Q.  And was this a letter that -- it attached a letter that

19   the managers of the group wrote to them?

20   A.  Yes.

21   Q.  And then the first line says, "We are chagrinned that you

22   have not replied to our May 3rd, 2015, e-mail and are

23   becoming increasingly uncomfortable as we review our history

24   with Janus."

25            Do you see that?

Carol L. Naughton, Official Court Reporter

S. Newell - Direct

1    A.   I do.

2    Q.   If you could please read the very first bullet point.

3    A.   Yes.  "Based on your assertions that you would be able to

4    lease back spectrum to Sprint and/or other major carriers and

5    with the additional appeal of detailed financial projections

6    that you had provided us on several occasions starting on the

7    day we met, our groups invested $920,000 with Janus.  We have

8    since learned that your purported leasebacks to Sprint were

9    never a viable possibility, and at the time of our

10   investments, you either knew this to be a fact, or you should

11   have known."

12   Q.   Were you describing the conversations that you had with

13   Mr. Maerki and Mr. Alcorn from the very beginning?

14   A.   Yes.

15   Q.   And if you could go to the next bullet point, please.

16   A.   "You also claim that the $40,000 charged per application

17   was necessary to provide pristine engineering and the best

18   legal support and that the Janus profit margins were minimal.

19   Based on what we now know as fact, equivalent applications

20   can be delivered for approximately one-sixth of the price you

21   charged us.  Thus, either you were grossly mistaken or

22   misled, or we have been."

23   Q.   What are you talking about here, that the applications --

24   "equivalent applications can be delivered for approximately

25   one-sixth the price you charged us"?

Carol L. Naughton, Official Court Reporter

─────────────── S. Newell - Direct ───────────────

1    A.  As we were pursuing monetization through another company,

2    they suggested that we --

3              MR. YAROW:  Your Honor --

4              THE COURT:  Sustained.

5              MS. O'BOYLE:  Sorry, Your Honor.  We'll move on to

6    the next point.

7    BY MS. O'BOYLE:

8    Q.  Can you just read the third bullet point?

9    A.  "The 920,000 in payments we made to you has resulted in

10   six applications filed to the FCC.  The other 17 applications

11   that we have paid for in full have not been filed.  Thus, at

12   least $680,000 of the $920,000 we paid Janus between November

13   of 2011 and July of 2014 remains entirely in your possession

14   or at least your control.  Regardless, there should be more

15   than ample funds to correct problems."

16   Q.  You said in here, "The other 17 applications we have paid

17   for in full have not been filed."  What is that about?

18   A.  Again, the FCC needed to release a public notice in order

19   to file applications.  So all these applications that we've

20   seen that we applied for had yet not come up for public

21   notice, and therefore, Janus still had the -- Janus was in

22   some way in possession of the money we paid them.

23   Q.  Because they had not yet filed for the actual

24   applications?

25   A.  Correct.

S. Newell - Direct

1  Q.  Now, we'll go to the second page here, and if you could
2  read the sentence that I've highlighted here.
3  A.  "We asked and are again" -- sorry.  "We asked and are
4  asking again for a refund of one-half of the 17 open
5  applications, $340,000 to be exact."
6  Q.  So what are you asking for here?
7  A.  Refund of some of our investments.
8  Q.  Did Mr. Alcorn ever refund any of your money for the 17
9  applications that were not filed with the FCC?
10 A.  Not a dime.
11 Q.  And if you could read the last few sentences of your
12 letter to Mr. Alcorn starting with "absent that."
13 A.  "Absent that, your intentions would be clearly suspect
14 from the very beginning.  Absent that, would also leave us
15 dangling like so many others that the SEC is charged with
16 trying to protect.  It is our expectation that you will now
17 prioritize your obligations and take corrective action within
18 the next few days consistent with your representations to us,
19 your clients, as requested herein.  As you are fully aware,
20 time is of the essence."
21 Q.  Did Mr. Alcorn take any corrective action within the next
22 few days?
23 A.  No.
24 Q.  And then did you request another meeting with Mr. Alcorn
25 in person?

─────────────── S. Newell - Direct ───────────────

1    A.   Yes.

2    Q.   If we could take a look -- it will just pop up on your

3    screen -- at Government's Exhibit 723.  And do you recognize

4    the top two e-mails here with Mr. Alcorn?

5    A.   Yes.

6    Q.   And is this to Craig Newell and you as well down here?

7    A.   Yes.  I'm cc'd on it.

8              MS. O'BOYLE:  Government moves in Exhibit 723.

9              THE COURT:  Exhibit 723 will be admitted.

10             (Government's Exhibit 723 was admitted.)

11   BY MS. O'BOYLE:

12   Q.   And so here, is Mr. Alcorn agreeing to meet with

13   Mr. Newell at 7:00 the following Monday at the DoubleTree Inn

14   at Silver Spring, Maryland?

15   A.   Yes.

16   Q.   Were you present for that meeting?

17   A.   No.

18   Q.   So after the meeting, did you send an e-mail to

19   Mr. Alcorn?

20   A.   Yes.

21   Q.   And was this your last -- was that your last

22   communication that you can recall with Mr. Alcorn?

23   A.   Yes.

24   Q.   If we could pull up Government's Exhibit 725.  And do you

25   recognize Government's Exhibit 725?

Carol L. Naughton, Official Court Reporter

S. Newell - Direct

1   A.  Yes.

2   Q.  What is it?

3   A.  It's a recap of the Janus meeting on June 22nd, 2015, in

4   Silver Spring, Maryland, and I wrote the e-mail.

5   Q.  You wrote the e-mail.  It's dated June 26, 2015?

6   A.  Yes.

7           MS. O'BOYLE:  Government moves in Exhibit 725.

8           THE COURT:  Exhibit 725 will be admitted.

9           (Government's Exhibit 725 was admitted.)

10  BY MS. O'BOYLE:

11  Q.  And, Mrs. Newell, do you recall, did Mr. Alcorn ever

12  respond to this e-mail that you wrote, before we go into it?

13  A.  I never heard from him again.

14  Q.  And how much in total have you and your husband

15  personally lost in connection with this investment?

16  A.  With Janus in particular, over $300,000, but more as

17  we've tried to effect monetization ourselves.

18  Q.  How much money did your investment group lose?

19  A.  $920,000 with Janus directly and then more as we tried to

20  monetize on our own.

21  Q.  And so focusing in, as we have with all the other

22  e-mails, on this very last one, is this from you?

23  A.  It is.

24  Q.  And it's dated June 26, 2015?

25  A.  Yes.

S. Newell - Direct

1  Q.  And it's from -- it's to Mr. Cushman and Mr. Alcorn?

2  A.  Yes.

3  Q.  And then it's also copied to Mr. Maerki and Mr. Forrest?

4  A.  Correct.

5  Q.  And then did you copy the members -- a number of the

6  members of your investment group?

7  A.  Those appear to be all the members of our investment

8  groups.

9  Q.  And if you could, going to the second paragraph, could

10 you read the highlighted portion.

11 A.  "To my great dismay, but not surprised, based on your

12 comments from your meeting with Craig and George, there

13 really never has been any plan whatsoever to help us monetize

14 our licenses, contrary to what you told us back in 2011 and

15 right up to the present."

16 Q.  And the third paragraph, if you could read -- start "as

17 to your fulfillment of your contractual obligations."

18 A.  "As to your fulfillment of your contractual obligations

19 to us, the verbal assurances of arranging a deal with Sprint

20 or other major carriers, and the implied commitment to

21 otherwise monetize licenses based on the 18 percent

22 commission to you identified in paragraph 7 of our original

23 Application Service Agreement for action as our 'agent in any

24 sale, lease, license, disposition, or transfer transaction'

25 cannot be overlooked as your obligation to us, no matter how

S. Newell - Direct

1   many times you tried to amend the agreement to hide it.  You

2   lured us into investing with Janus with written and oral

3   assurances of grand returns telling us that the opportunity

4   was so great, that even one license monetized under your plan

5   would more than pay for the investments in the other license

6   applications should they never get awarded."

7   Q.   Your reference to this paragraph 7 with the 18 percent

8   commission, was that the paragraph that we went into in

9   detail at the beginning of your testimony?

10  A.   Yes.  That was in our first agreement.

11  Q.   Going down to the next paragraph, could you read what you

12  wrote here.

13  A.   "And so when questioned about your pursuit of the Sprint

14  leaseback, you answer that you were 'going in another

15  direction then,' was that to your bank or your attorneys with

16  the funds we entrusted to you?"

17  Q.   Did Mr. Alcorn ever respond back to this paragraph that

18  you wrote?

19  A.   Not a word.

20  Q.   Go to the very last page.  In the first full paragraph

21  there, if you could read the sentence starting "after close

22  to three years."

23  A.   "After close to three years of waiting for you to do

24  something, do you think your open-ended solution of $400 a

25  month to save the licenses until monetization, which you

S. Newell - Direct

1    offered at the June 2014 D.C. meeting, had any appeal to us
2    whatsoever?
3    Q.   And what is that a reference to?
4    A.   That we had a responsibility that once a license was
5    granted, it had to be activated within 12 months.  And since
6    they hadn't monetized it, they had to at least send a signal
7    off the tower that we were supposed to use within 12 months.
8    So they are now asking us for another $400 a month to keep
9    that signal going with no idea whatsoever of when
10   monetization might occur.
11   Q.   And then if you could just read the very last paragraph
12   that you wrote to Mr. Alcorn.
13   A.   "I wish I could say that I have the confidence in Janus
14   to turn this into a mutually rewarding situation for us all.
15   But after almost four years of giving you the benefit of the
16   doubt, the only thing I have left is hope that you'll change
17   your behavior and commit yourself to redirecting your efforts
18   to do the things that you talked about doing for four years.
19   Talk is cheap.  Actions speak volumes.  Give us some reason
20   to trust you again as we did the day we committed our first
21   investment to the Janus plan."
22           MS. O'BOYLE:  Thank you, ma'am.  I have no further
23   questions.  Please answer any questions the Court or counsel
24   have for you.
25           THE COURT:  Cross-examination?

S. Newell - Cross (By Mr. Yarow)

1              CROSS-EXAMINATION
2     BY MR. YAROW:
3     Q.  Ms. Newell, my name is Rick Yarow.  I'm the attorney for
4     David Alcorn.  How are you this morning?
5     A.  Fine.  Thank you, sir.
6     Q.  Thank you.
7              You had testified that you and your husband owned a
8     Jackson Hewitt franchise?
9     A.  Yes, sir.
10    Q.  How long have you owned those franchises?
11    A.  We bought the franchise in 1997.  We did leave the
12    franchise in 2017, and from that point on, we became
13    independent income tax operators.
14    Q.  Okay.  And does your husband -- how many franchises did
15    you own?
16    A.  Do you mean how many territories?
17    Q.  How many franchises did you own at the most?
18    A.  At our peak, we had 20 offices and over 200 employees.
19    Q.  Okay.  So in -- was your husband involved in that
20    business with you?
21    A.  Yes, he was.
22    Q.  Okay.  And your husband -- he is an MBA graduate?
23    A.  He graduated from Stanford with an MBA.
24    Q.  Graduated from Stanford with an MBA.  Okay.
25              So during this time that you were dealing with Janus

S. Newell - Cross (By Mr. Yarow)

1   Spectrum, you were also managing the Jackson Hewitt

2   franchises?

3   A.   Yes, indeed.

4   Q.   Okay.  Are you familiar with the term "accredited

5   investor"?

6   A.   I am.

7   Q.   What does that mean?

8   A.   We had to have a certain amount of financial standing in

9   order to be involved in, I guess, speculative investments.

10  Q.   Okay.  And what exactly are those criteria that you have

11  to meet in order to be defined as an accredited investor?

12  A.   I'm sorry.  I didn't hear part of the question.

13  Q.   Yes.  What criteria must you meet to be defined as an

14  accredited investor?

15  A.   It's been a while since we made sure that we were

16  eligible, but you had to have a certain amount of financial

17  standing that didn't include your home, but otherwise

18  financially you were capable.

19  Q.   So I think the term would be investable assets or liquid

20  assets.  You have to have a certain amount that is non- --

21  not associated with your personal residence?

22  A.   Right.  Yeah.

23  Q.   And do you happen to remember what that number was?

24  A.   I want to say it's quarter of a million.

25  Q.   In order to be an accredited investor, do you also need

S. Newell - Cross (By Mr. Yarow)

1  to have any type of experience investing?

2  A.  I don't recall that being criteria.

3  Q.  Okay.  And before Jackson Hewitt, you worked -- you

4  worked for a telecommunications company for 15 years; is that

5  correct?

6  A.  My early career was with New England Telephone and AT&T,

7  yes.

8  Q.  Prior to your first investment in spectrum, you had no

9  knowledge of spectrum; is that correct?

10  A.  Correct.

11  Q.  And are you familiar with a company by the name of

12  SmartCOMM?

13  A.  I am.

14  Q.  And how did you become familiar with SmartCOMM?  From

15  whom?

16  A.  From Bob LaBine.

17  Q.  Bob LaBine?

18  A.  Yes.

19  Q.  Who is Bob LaBine to you?

20  A.  We met Bob LaBine when we were out meeting Kent Maerki to

21  pursue another passive investment through Dental Support

22  Plus.  Bob LaBine was at the meeting we attended.

23  Q.  Okay.  And I think you referred to these as trade shows

24  during your testimony?

25  A.  Well, that was before we went out to Arizona to meet Kent

S. Newell - Cross (By Mr. Yarow)

1   Maerki.  We found out about Dental Support Plus at a

2   Washington, D.C., trade show.

3   Q.  What year would it have been that you first met Bob

4   LaBine, if you can recall, the best of your recollection?

5   A.  To the best of my recollection, 2010 or 2011.

6   Q.  Okay.

7   A.  I think it was 2011.

8   Q.  That would be before the time frame that you had any

9   dealings with Janus Spectrum; is that correct?

10  A.  Yes, that is correct.

11  Q.  Okay.  And did Bob LaBine tell you about SmartCOMM?

12  A.  He did.  He -- when he met us at that meeting, he started

13  chatting with Craig and myself and asked us if we would be

14  interested in learning about some other investments.

15  Q.  Okay.  And based upon what Bob LaBine told you about

16  SmartCOMM, what was your understanding of what they did?

17  A.  They did pretty much --

18          MS. O'BOYLE:  I'm going to object as to relevance

19  related to SmartCOMM.

20          THE COURT:  Sustained.  Counsel has not gotten into

21  SmartCOMM, Mr. Yarow, and we had previous discussions about

22  that.

23  BY MR. YAROW:

24  Q.  Prior to investing with Janus Spectrum, had you and your

25  group already purchased applications for licenses from

S. Newell - Cross (By Mr. Yarow)

1   another company?

2   A.   No.

3   Q.   Okay.

4   A.   My husband and I did.

5   Q.   Your husband and you did.  Okay.

6           So you were already the owner of applications prior

7   to your investment with Janus Spectrum; is that correct?

8   A.   Well, we didn't own any licenses.

9   Q.   No, you owned applications.

10  A.   Yes.

11  Q.   And the application was allowing -- so basically what was

12  required, from your understanding, of an application?  Once

13  an application was prepared, what was the reason to prepare

14  the application?

15  A.   So that once the FCC released a public notice to submit

16  applications, we would be eligible to receive a license.

17  Q.   Now, the application -- your understanding was the

18  application could not be submitted until the FCC released

19  that market or made a public notice --

20  A.   Yes.

21  Q.   -- is that correct?

22          Okay.  Was it your understanding that prior to the

23  application being submitted, certain things had to be done in

24  order for the application to be considered by the FCC?

25  A.   Yes.  It was my understanding that the application needed

S. Newell - Cross (By Mr. Yarow)

1    some engineering work done.

2    Q.   Okay.  So it needed engineering?

3    A.   Yes, sir.

4    Q.   It needed a frequency coordinator?

5    A.   I don't know what happened beyond we were applying for

6    SmartCOMM to take care of whatever was necessary to apply.

7    Q.   Okay.  And how many applications did you own prior to

8    meeting David Alcorn for the spectrum?

9    A.   I can't remember how many.  I will tell you that --

10            MS. O'BOYLE:  Objection.  She can't -- it calls for

11    speculation.

12            THE COURT:  Sustained.

13            MR. YAROW:  How many applications she had purchased?

14            THE COURT:  I think she was saying, "I can't

15    remember, but I think" -- whatever.  The Court believes it

16    was speculation.  You can rephrase your question if you want

17    a more definite answer.

18            MR. YAROW:  Okay.  I think it was Government 703,

19    exhibit.  Would you zoom in on the top four organizations,

20    entities.

21    BY MR. YAROW:

22    Q.   Ma'am, you recognize these four entities.  You, I

23    believe, testified to them previously.  Silver Lining, Golden

24    Nest Egg --

25    A.   Yes.  Those were self-directed IRAs that belonged to my

S. Newell - Cross (By Mr. Yarow)

1   husband and I, two Roth and two traditional.

2   Q.  Are those the LLCs that you used to purchase the

3   applications before Janus Spectrum?

4   A.  Through Janus, yes.

5   Q.  You purchased -- you used these to purchase from Janus

6   Spectrum?

7   A.  Yes, I did.

8        MR. YAROW:  You can take that down.  Thank you.

9   BY MR. YAROW:

10  Q.  Now, did Bob LaBine send you a -- first of all, let me do

11  this.

12       MR. YAROW:  Can you publish Alcorn Exhibit 21 to the

13  witness, please.

14  BY MR. YAROW:

15  Q.  Ms. Newell, can you identify this document?

16  A.  Yes.  This is an e-mail from Bob LaBine in September of

17  2011 with something new.

18       MR. YAROW:  I move to introduce Exhibit 21.

19       THE COURT:  What's the foundation for this exhibit?

20  BY MR. YAROW:

21  Q.  Ma'am, can you tell me about this -- can you tell me what

22  this was in reference to, please?

23  A.  Yes.  Since we had invested with Bob LaBine in spectrum

24  before, we were thinking about doing it again, and he told us

25  to wait --

S. Newell - Cross (By Mr. Yarow)

1          THE COURT:  Wait a minute.  Ma'am, you can't tell us

2    what somebody else said who is not a party to this case, per

3    se.  You can tell us what you did.

4          THE WITNESS:  Yes, sir.

5          We received this e-mail from Mr. LaBine advising us

6    that there was another group that was offering spectrum that

7    we might be interested in, and that's what this e-mail is

8    about.

9          MR. YAROW:  Okay.  I'd move to introduce Alcorn

10   Exhibit 21.

11         THE COURT:  Any objection?

12         MS. O'BOYLE:  No objection, Your Honor.

13         THE COURT:  It will be admitted.

14         (Defendant Alcorn's Exhibit 21 was admitted.)

15         MR. YAROW:  Please publish.

16   BY MR. YAROW:

17   Q.  I don't have the ability to highlight like the government

18   did.  So it's a little more awkward for me.  I'm going to do

19   the best I can and try to expand it to make it larger so you

20   can see it.

21         Do you see the second sentence where it says,

22   "Attached is the model for another company that is doing

23   spectrum"?

24   A.  Yes, sir.

25   Q.  Is it large enough for you to see?

S. Newell - Cross (By Mr. Yarow)

1   A.  Yes, sir.

2   Q.  It is.  Okay.  Maybe that was too large.

3         And what company was Mr. LaBine referring to there,

4   this new company?

5   A.  We didn't know it at the time, but he was referring to

6   Janus Spectrum.

7   Q.  Okay.  And the model that he attached, what is he

8   referring to there?

9   A.  That was the spreadsheet that had seven economic areas

10  and indicated what a return on investment could be if we

11  invested in those economic areas.

12  Q.  Okay.  And was this similar to the spreadsheet that

13  Mr. Alcorn later sent to you?

14  A.  No.  This is a different spreadsheet.  This only

15  identified seven areas.  Mr. Alcorn at some point later sent

16  us a spreadsheet with 176 economic areas.

17  Q.  Right.  But do you recall the spreadsheet that Mr. LaBine

18  sent to you?

19  A.  Oh, yes.

20  Q.  And was it basically doing the same thing, the population

21  of these cities --

22  A.  Yes.

23  Q.  -- times -- the expected usage times a projected income

24  from the usage?

25  A.  Yes, sir.

S. Newell - Cross (By Mr. Yarow)

1  Q.  And then eventually it would come out and give you a

2  projected return on investment?

3  A.  Yes, sir.

4  Q.  Just like the one that Mr. Alcorn sent to you.

5         And do you recall the projections being similar to

6  the one that Mr. Alcorn gave to you?

7  A.  Mr. Alcorn's spreadsheet that he sent to us sometime

8  later in the fall of the year was much more comprehensive, so

9  these seven economic areas were similar in that spreadsheet,

10  but the structure of the spreadsheet itself, column headings,

11  et cetera, calculations, yes, that was similar.

12  Q.  So Mr. Alcorn's was similar but it had more economic

13  areas?

14  A.  Yes, sir.

15  Q.  Okay.  And now, if you look at the sentence beginning

16  with "your referral fee depends."

17  A.  I see that.

18  Q.  And can you read that sentence, please.

19  A.  "Your referral fee depends on how much of the 'selling'

20  you do."

21  Q.  Okay.  Keep going, please.

22  A.  "It could range from 5 to 20 percent."

23  Q.  Next sentence, please.

24  A.  "This is meant for the sophisticated investor who

25  hopefully has some background in spectrum."

S. Newell - Cross (By Mr. Yarow)

1   Q.  Okay.  So it was Mr. LaBine that first, I guess, notified

2   you, made you aware of this investment, and he was telling

3   you it was for the sophisticated investor?

4   A.  Yes, sir.

5   Q.  And he told you that -- he mentioned public notice, that

6   you understood that to be a factor in obtaining the licenses?

7   A.  I don't think this letter refers to public notices but...

8   Q.  I'm sorry.  It was in the sentence before I had you start

9   reading.  "Many are due to be released" --

10  A.  Yes.

11  Q.  Go ahead and finish up that sentence.

12  A.  "Many are due to be released by the public notice

13  expected before the end of the year."

14  Q.  Okay.  So before you met Mr. Alcorn, did you understand

15  that the FCC had to release in a public notice these markets

16  before the applications could be used --

17  A.  Yes, sir.

18  Q.  -- to apply for the spectrum -- to apply for the

19  licenses?

20  A.  Yes, sir.

21  Q.  Okay.  Now, some of these markets had -- some of the

22  markets in the spreadsheet that you saw with Mr. Alcorn, and

23  I'm assuming also Mr. LaBine, had some very large returns on

24  income; is that correct?

25  A.  We had never seen a return on investment so high.

Carol L. Naughton, Official Court Reporter

S. Newell - Cross (By Mr. Yarow)

1   Q.   Okay.  So that was not -- when you saw that, weren't you

2   struck by -- I mean, you would get 4 percent at that time,

3   maybe on a savings, 12 percent in the stock market,

4   14 percent perhaps in a real estate investment, 500-and-some

5   percent return on a spectrum investment.

6          MS. O'BOYLE:  Your Honor, I'm going to object.  It

7   assumes facts not in evidence in terms of the hypothetical

8   returns on investment in 2011.

9          THE COURT:  Sustained.

10          MR. YAROW:  That's fine.

11  BY MR. YAROW:

12  Q.  Didn't it catch you off guard or didn't it give you a

13  moment to pause that you saw such a high return on income?

14  You're an accredited investor.

15  A.  This is our first time in self-directed investments that

16  were not associated with the normal stock exchanges.  So we

17  were learning at this point that there were opportunities out

18  there that, many people who normally invest in the normal

19  stock exchanges, are now available to people that have

20  reached a certain level of financial success.

21  Q.  And you felt that was something that had now become

22  available to you?

23  A.  We were specifically looking for a passive investment

24  because we had been working so hard in putting money away in

25  our retirement accounts, and this was an opportunity that was

———S. Newell - Cross (By Mr. Yarow)———

1    presented to us.

2    Q.  Okay.  You mentioned that this was a passive investment.

3    Have you seen -- I'm sorry.

4          MR. YAROW:  Would you please pull up Government's

5    Exhibit 702A.

6    BY MR. YAROW:

7    Q.  And this has previously been identified and introduced

8    into evidence as the Application Service Agreement that you

9    signed with Janus Spectrum?

10   A.  Yes, that's correct.

11   Q.  Okay.  And in this agreement that -- there was number 3.

12   Can you look --

13         MR. YAROW:  Paragraph number 3, please, if you are

14   able to highlight it for us so she can see it a little

15   better.  Thank you.

16   BY MR. YAROW:

17   Q.  Can you read that, please.

18   A.  Certainly.  "There is no guarantee that either the

19   frequency coordinator or the FCC will approve any

20   application.  Moreover, no assurance can be given that the

21   Commission will grant the license for which the application

22   was filed."

23   Q.  So you understood that you may not get a license, the FCC

24   may not give you a license?

25   A.  That's right, sir.

Carol L. Naughton, Official Court Reporter

S. Newell - Cross (By Mr. Yarow)

1   Q.  And was the theory given to you that you may not need to

2   get a license in every economic area?

3   A.  That was -- we were told that, yes, sir.

4   Q.  But that if you get the license in one economic area, it

5   may be enough to make up for other economic areas you do not

6   get; is that correct?

7   A.  That's what we were told.

8   Q.  Okay.  And were you told that it would be necessary to

9   wait until there was a critical mass of markets released

10  before Janus Spectrum could go to the cell phone companies?

11  A.  Not until 2014, sir.

12  Q.  Okay.  At that time -- so you believed at this time that

13  you could sell one city to a --

14  A.  We were told within three to nine months of being awarded

15  a license in a particular economic area, that we should start

16  to see some return on investment, sir.

17          MR. YAROW:  Okay.  Paragraph number 4, would you

18  please pull that up, if you don't mind.  Thank you.

19          And this paragraph -- you've made reference to this

20  quite a bit -- requires that you -- it gives you knowledge or

21  informs you that you would need to build out the construction

22  of a site within 12 months.

23  A.  We were told that we would not invest in a site other

24  than an existing tower; and, therefore, there would not be a

25  build-out expense.  And also this was an issue --

S. Newell - Cross (By Mr. Yarow)

1   Q.  Who told you this?

2           MS. O'BOYLE:  Objection.  Your Honor, could the

3   witness finish her answer?

4           THE COURT:  I think that you need to keep your "we

5   were told" -- I think that you certainly can intervene and

6   ask her who and what "we" you are referring to.

7           THE WITNESS:  I'm sorry.  Mr. Maerki and Mr. Alcorn

8   told us that they would only engineer existing towers for our

9   applications, and in our discussions with them, we -- the

10  investment group was concerned about investing any more money

11  than we had already invested, and so we got a side agreement

12  with Mr. Alcorn that indicated that they would take care of

13  this particular paragraph for us, to make sure that the tower

14  was activated before the 12 months.

15  BY MR. YAROW:

16  Q.  If you can turn to the last page of this.  Actually, I

17  think the government broke it up into another exhibit.  It

18  may be the very next one.  It's a letter.  I'm not sure if

19  it's on --

20  A.  It's Exhibit 726, sir.

21          MR. YAROW:  The side letter, what exhibit was that?

22          MS. O'BOYLE:  Mr. Yarow, I believe it is

23  Exhibit 702.

24          MR. YAROW:  Yes.  Would you please pull that up.

25  BY MR. YAROW:

Carol L. Naughton, Official Court Reporter

———————S. Newell - Cross (By Mr. Yarow)———————

1    Q.  Is this the -- no.

2              MS. O'BOYLE:  Page 2.

3              MR. YAROW:  Thank you.  That's it.

4    BY MR. YAROW:

5    Q.  Ma'am, is this the agreement, the side agreement you're

6    talking about?

7    A.  That was the one for the first of our agreements.  There

8    were more than that.  There was -- we asked for it with each

9    of our investments.

10   Q.  So this is not the agreement, then, the side agreement

11   that you were referring to?

12   A.  Well, 726 is more representative of the particular issue

13   that you're mentioning.

14   Q.  And this refers only to the cost involved?

15   A.  Yes.  There were two issues for us.  The other one was

16   that Janus Spectrum was asking for 18 percent commission on

17   any monetization of our licenses, and they wanted it on the

18   gross income, and we asked for it to be on the net income,

19   because we knew that if we were getting our license granted

20   on an existing tower, someone else owned the tower, and we

21   would be responsible for monthly lease payments.

22   Q.  Thank you.

23             MR. YAROW:  And if you can -- sorry, if you could go

24   back to 702A, the second page, top paragraph -- partial

25   paragraph above paragraph 5.

S. Newell - Cross (By Mr. Yarow)

1   BY MR. YAROW:

2   Q.  In this portion of the previous paragraph 4, that bleeds

3   over on to the next page, do you see that the FCC -- isn't it

4   true you were notified that the FCC could revoke your

5   licenses if they were not built out within that 12-month

6   period?

7   A.  Yes, sir.

8   Q.  Okay.  So, ma'am, you said you were looking for a passive

9   investment, but there's things in this agreement that require

10  you to do things.  Isn't that true?

11  A.  There are, and we had assurances that they would be taken

12  care of by Janus Spectrum.  Because we were investing through

13  our self-directed IRAs, it is a prohibited transaction for us

14  to be involved in the day-to-day operation of our investment.

15  And the -- I was -- I began using my self-directed IRAs at

16  the suggestion of Kent Maerki when we were pursuing the

17  Dental Plus, which we never invested in.

18          MR. YAROW:  You can take that down.  Thank you.

19          Would you please publish this just for the witness,

20  Alcorn Exhibit 22.

21  BY MR. YAROW:

22  Q.  Ma'am, do you recognize this, Defendant's Exhibit 22,

23  which is down at the bottom?

24  A.  Yes, sir.

25  Q.  Okay.  And what is this?  First of all, who is the go-to

S. Newell - Cross (By Mr. Yarow)

 1    person?

 2    A.   The go-to person was Bob LaBine.

 3    Q.   So this is an e-mail between Bob LaBine and you and

 4    Craig, your husband?

 5    A.   Yes, sir.

 6    Q.   Okay.  And down at the bottom, Bob LaBine -- what is this

 7    e-mail in reference to?  What is this responding to that Bob

 8    wrote you?

 9         MS. O'BOYLE:  Your Honor, I'm going to object as to

10    relevance.  The bottom of the e-mail relates to SmartCOMM.

11         MR. YAROW:  It does.

12         THE COURT:  Sustained.

13         MR. YAROW:  I'm going to take that down.

14    BY MR. YAROW:

15    Q.   What was the time frame that originally David Alcorn

16    relayed to you that these markets would be released by the

17    FCC?

18    A.   We met them in September of 2011 face to face.  We

19    finally made the investment in -- at the end of November in

20    2011, and we were advised that the public notices were likely

21    to be released by the end of the year, so we were encouraged

22    between September and when we finally signed to hurry up and

23    get on with the commitment.

24    Q.   Okay.  And were there -- at this point in time, there

25    were delays in the FCC releasing the markets; is that

S. Newell - Cross (By Mr. Yarow)

1    correct?

2    A.  I was not aware that there were -- there was any reason

3    for delays at that point in time.  They had told us they

4    fully expected them to be released by the end of the year,

5    which is why we went ahead and invested when we did.

6    Q.  Okay.  Now, Air Apparent, that's your LLC?

7    A.  That was the first LLC that our investment group formed.

8    Q.  Okay.  Now, would you -- who was the -- an LLC has a

9    manager, and then it has members; is that correct?

10   A.  Yes, sir.  I was the manager of Air Apparent Associates.

11   Q.  And what is -- what is the responsibilities of the

12   manager?

13   A.  To communicate to the other members of the organization;

14   keep track of the events and keep them informed.

15   Q.  Okay.  And did you attend meetings that Mr. Alcorn had

16   and teleconference meetings that he had, I believe monthly?

17   A.  We hadn't heard much of anything through 2012.  So at

18   some point in time, we did ask Mr. Alcorn if he would meet

19   with us in a teleconference with our investing members, and

20   he agreed to do so.

21   Q.  Okay.  Would all of the members go on -- would all of the

22   LLC members go onto the line on these conference calls, or

23   was it that you would attend and relay any information to

24   them?

25   A.  We always informed our members of the next conference

S. Newell - Cross (By Mr. Yarow)

 1   call, and it was up to them as to whether or not they joined
 2   the call.  They were pretty much relying on me as the
 3   managing member to see to it that any information that was
 4   communicated would be sent to them at a later date if they
 5   were not on the call.
 6   Q.  Okay.  And during the direct examination, some segments
 7   of Kent Maerki's "Money From Thin Air" was played.  Did
 8   anybody ever give that -- send that to you -- or did Bob
 9   LaBine send that to you to use to show to your other -- to
10   prospective LLC members?
11   A.  Definitely not with the first investment, and the first
12   investment had the most members.  At some point down the
13   road, we were encouraged to try to find additional investors,
14   and we were sent the disk that was played for the jury
15   yesterday.  We had no interest whatsoever in selling
16   investments.
17   Q.  Okay.  But did you play the video to the other LLC
18   investors for informational purposes?
19   A.  No, sir.
20           THE COURT:  We're going to stop right here,
21   Mr. Yarow, and we're going to take a 15-minute break, ladies
22   and gentlemen.
23           (The jury exited the courtroom.)
24           THE COURT:  You may step down.
25           THE WITNESS:  Thank you, sir.

1          (The witness stepped down.)

2          (Recess from 11:02 a.m. to 11:22 a.m.)

3          THE COURT:  I understand there is some issue that

4    counsel wishes to address regarding SmartCOMM.

5          MR. YAROW:  Yes, Your Honor.  May I -- since we

6    don't have any witnesses, may I come up?  Thank you.

7          Your Honor, I really need some clarification on what

8    we are able to bring in and not able to bring in regarding

9    SmartCOMM.  The theory of my case, which I laid out in my

10   opening, is that -- is the state of mind of Mr. Alcorn, and I

11   think that's the crux of a fraud case.  The person has to

12   have criminal intent.

13         And Mr. Alcorn worked for SmartCOMM prior to forming

14   his own business, Janus Spectrum.  He learned a bunch of

15   stuff about spectrum that may or may not have been true, but

16   he -- but he believed it, and that, I believe, is an

17   essential element of my defense.

18         And I don't know where -- I need to know where I can

19   go with that with witnesses.

20         THE COURT:  One reason the Court had taken the

21   position it had was because of the motion that had been

22   raised regarding other acts that might be raised, and so with

23   respect to what was in the matters that have been placed

24   before me before by the government about what they intended

25   to address, I think, number one, had to do with SmartCOMM and

S. Newell - Cross (By Mr. Yarow)

1   a subsequent lawsuit, and so I said at that time, in order to

2   avoid any confusion, we would stay out of SmartCOMM.  And so

3   that was the ruling the Court had.

4           Now, you want to go into SmartCOMM to show why

5   Mr. Alcorn is doing what he's doing, because he learned about

6   these things from SmartCOMM?

7           MR. YAROW:  Yes, sir.

8           THE COURT:  How are you going to get it out of this

9   witness?

10          MR. YAROW:  I'm not.  That's fine.  I just want to

11  know -- when I have additional witnesses, I would like to be

12  able to bring in background about what these people learned

13  at SmartCOMM.  Now, she didn't work with SmartCOMM.  She is

14  not going to go.  I would agree that she's not the

15  appropriate witness.

16          THE COURT:  Well, if you want to bring it in, just

17  as long as you don't complain when the government starts

18  talking about SmartCOMM.

19          MR. YAROW:  That's fair.  I mean, I opened the door.

20          THE COURT:  And I don't know what the position of

21  Mr. Smith is, but we can't have it both ways.

22          MR. YAROW:  I agree.

23          THE COURT:  If that's his position that he learned

24  that 800 megahertz is sufficient to sell somebody an FCC

25  license at SmartCOMM, then that's up to you.

S. Newell - Cross (By Mr. Grindrod)

1           MR. YAROW:  Yes, sir.  Thank you.

2           THE COURT:  So we'll keep going on.

3           Bring Mrs. Newell back in here.

4           (The witness resumed the stand.)

5           MR. YAROW:  And, Your Honor, I have no further

6    questions for Mrs. Newell.

7           THE COURT:  Why don't you rest when she gets back on

8    the stand before the jury.

9           MR. YAROW:  Yes, sir.

10          THE COURT:  Do you have any questions?

11          MR. GRINDROD:  Yes, Your Honor.

12          THE COURT:  Okay.  Bring the jury in.

13          (The jury entered the courtroom.)

14          THE COURT:  All jurors have returned to the

15   courtroom.

16          Does counsel concur?

17          MS. O'BOYLE:  The United States agrees.

18          MR. YAROW:  Mr. Alcorn concurs.

19          MS. McCASLIN:  So does Mr. Smith.

20          THE COURT:  You may resume, Mr. Yarow.

21          MR. YAROW:  I have no further questions, Your Honor.

22          THE COURT:  Okay.  Thank you.

23          Cross-examination, Mr. Grindrod?

24                          CROSS-EXAMINATION

25   BY MR. GRINDROD:

S. Newell - Cross (By Mr. Grindrod)

1   Q.   Good morning, ma'am.

2   A.   Good morning.

3   Q.   So, ma'am, you mentioned you learned pretty early on that

4   David Alcorn and Kent Maerki had formed this company called

5   "Janus," right?

6   A.   In 2011 we learned that, yes, sir.

7   Q.   Okay.  And especially in those early days, almost all of

8   the information you got about Janus and spectrum came from

9   either Alcorn or Maerki or some combination of those two

10  people, right?

11  A.   Yes, sir.

12  Q.   And you talked about all those conversations and all the

13  information that was shared with you on direct.  We're not

14  going to go back through all of that.  But basically you

15  found that information that you were getting to be credible,

16  right?

17  A.   Yes, sir.

18  Q.   And you didn't just take their word for it, right; you

19  did some of your own research?

20  A.   We did a little bit of research before we met them.

21  Q.   Right.

22         MR. GRINDROD:  So let's pull up Government's

23  Exhibit 700A, please.  And this has already been admitted.

24  BY MR. GRINDROD:

25  Q.   So, ma'am, do you remember this chart?

S. Newell - Cross (By Mr. Grindrod)

1   A.  I sure do.

2   Q.  And on direct, you said, I think, that all of this

3   information down here was not on the original chart that you

4   got from Alcorn and Maerki, right?

5   A.  That's correct, sir.

6   Q.  So when they gave you information, you asked questions or

7   asked for more information to clarify, right?

8   A.  Yes, sir.

9       MR. GRINDROD:  And we can take that down,

10  Ms. McCaslin.

11  BY MR. GRINDROD:

12  Q.  I'm showing you on the screen here -- this has already

13  been admitted.  This is Alcorn 21.

14      Do you remember this, that you talked about with

15  Mr. Yarow?

16  A.  Yes, sir.

17  Q.  And one of the documents that was attached here was FAQ,

18  right?

19  A.  Yes.

20  Q.  Frequently asked questions about Janus?

21  A.  Right.

22      MR. GRINDROD:  Let's take a look at Smith Exhibit 3,

23  just for the witness, please.  This has not been admitted.

24  BY MR. GRINDROD:

25  Q.  Is this those FAQs about Janus, ma'am?

S. Newell - Cross (By Mr. Grindrod)

1   A.  Yes, sir.

2   Q.  Do you recognize that document?

3   A.  I do.

4          MR. GRINDROD:  Your Honor, I would offer Smith 3.

5          THE COURT:  Any objection?

6          MS. O'BOYLE:  No objection, Your Honor.

7          THE COURT:  It will be admitted.

8          (Defendant Smith's Exhibit 3 was admitted.)

9   BY MR. GRINDROD:

10  Q.  So this is the frequently asked questions, and you got

11  that pretty early on, right?

12  A.  Yes, sir.

13         MR. GRINDROD:  And let's take a look --

14  Ms. McCaslin, could we go to Page 11 -- or sorry, the last

15  page, paragraph 11.

16  BY MR. GRINDROD:

17  Q.  And, ma'am, can you read that part I just highlighted

18  there?

19  A.  Yes.

20         "Verizon and AT&T will be very interested in

21  obtaining access to additional 800-megahertz band spectrum

22  for their respective cellular networks covering a large part

23  of the U.S."

24  Q.  So that's what -- that kind of thing about the major cell

25  carriers being interested in the spectrum was, not just what

S. Newell - Cross (By Mr. Grindrod)

1   they told you, but what they gave you documents about?

2   A.   That's correct.

3   Q.   I'm sorry, I should use an antecedent.  When I say

4   "they," I mean Alcorn and Maerki.  Right?

5   A.   Alcorn and Maerki, yes, sir.

6   Q.   And there were -- this frequently-asked-questions packet

7   that they gave you also gave information on other resources

8   you could look to, right?

9   A.   Yes, sir.

10  Q.   It says you could go to the FCC website and look at

11  certain public documents, right?

12  A.   Yes.

13  Q.   And it refers you to some of those documents?

14  A.   Yes.

15  Q.   It carries over on to the next page, right?

16  A.   Yes, sir.

17  Q.   And so those were the kind of things that you looked at

18  when you were doing your own research, right?

19  A.   We did, sir, yes.

20  Q.   And from what you were seeing, the stuff that Alcorn and

21  Maerki told you still made sense, right?

22  A.   It did, indeed.

23  Q.   Okay.  And this was -- I think you mentioned this with

24  Mr. Yarow.  You didn't have a background in the EG/BG or

25  whatever, this particular kind of spectrum, right?

S. Newell - Cross (By Mr. Grindrod)

1   A.   It was all a learning experience for us, yes, sir.

2   Q.   But you had a pretty extensive background in business?

3   A.   Yes.

4   Q.   And the same with your husband?  He's the Stanford MBA?

5   A.   Yes, that's correct.

6   Q.   And then you had worked in telecom in some capacity for a

7   long time, right?

8   A.   15 years.

9   Q.   And so after all of that, the talking with Alcorn and

10  Maerki, the documents you looked at, this still seemed to you

11  like, hey, this makes sense, right?

12  A.   Yes.

13       MR. GRINDROD:  Okay.  We can take that down,

14  Ms. McCaslin.

15  BY MR. GRINDROD:

16  Q.   And then when it came to the business side of things, you

17  sort of dug into the details there, too, right?

18  A.   I'm detail-oriented, yes.

19  Q.   I wish I were more detail-oriented.

20       So you went back and forth with Mr. Alcorn about

21  what the specific contract provisions were going to say,

22  right?

23  A.   Yes, sir.

24  Q.   Let's just real quick look at Government's Exhibit 712.

25       MR. GRINDROD:  This has been admitted, I believe.

————— S. Newell - Cross (By Mr. Grindrod) —————

1          MS. O'BOYLE:  Yes, it has been admitted.

2    BY MR. GRINDROD:

3    Q.  And so this is an e-mail from you, right?

4    A.  Yes, sir.

5    Q.  And you're talking to some of the other folks in your

6    investment group?

7    A.  Yes, sir.

8    Q.  And you're relaying to them information that you learned

9    in a conversation with David Alcorn, right?

10   A.  Yes, sir.

11   Q.  And you are talking about amendments to the agreements

12   and going back and forth over that, right?

13   A.  That's correct.

14          MR. GRINDROD:  We can take that down, Ms. McCaslin.

15   BY MR. GRINDROD:

16   Q.  So through all of these interactions -- the documents,

17   the e-mails, the conversations -- you were confident enough

18   to want to invest, yourself, right?

19   A.  Yes, sir.

20   Q.  But you were also confident enough that you brought in

21   people that you really cared about to invest also, right?

22   A.  The initial investment, they wanted one investor for

23   350,000, and my husband and I did not want to invest that

24   much, and so we asked would it be agreeable if we talked

25   about this with our friends and family and colleagues.  And

S. Newell - Cross (By Mr. Grindrod)

1   that was agreeable, and so we did.

2   Q.   Right.  But you never would have done that if you thought

3   this was a bad idea, right?

4   A.   That's correct.  Absolutely.

5   Q.   And the people you brought in, I mean, some of them were,

6   I guess, other people who were Jackson Hewitt franchisees?

7   A.   Yes.  I would say about half of them were other Jackson

8   Hewitt franchisees, and the others were family and long-time

9   friends.

10  Q.   Folks like your sister, right?

11  A.   My sister.

12  Q.   And two brothers-in-law?

13  A.   Yes, sir.

14  Q.   And when you were talking to these people in your

15  investment group, you were telling them about what Alcorn and

16  Maerki told you, right?

17  A.   That is correct, sir.

18  Q.   Did you show them some of those materials that you got

19  from Alcorn and Maerki?

20  A.   Yes, sir.

21  Q.   And you told these people that you thought this was a

22  good idea, this is going to be a good investment, right?

23  A.   We went out to meet with them face to face with one of

24  our partners so we could come back and feel more confident

25  telling these people that we all cared about that it was a

S. Newell - Cross (By Mr. Grindrod)

1   good investment.

2   Q.  Right.  When you told these people that you thought this

3   was a good investment, told them your understanding of how it

4   worked, obviously you weren't intentionally lying to these

5   people, right?

6   A.  Never.

7   Q.  You told them that because you believed it?

8   A.  Absolutely, sir.

9   Q.  Let's take a look at Government's Exhibit 707, which also

10  has been admitted.

11          So do you remember talking about this e-mail with

12  the prosecutor?

13  A.  Yes, sir.

14  Q.  Okay.  And this is from -- sorry, I just took it down.

15  This is from July 2013?

16  A.  Yes, sir.

17  Q.  It's an e-mail from Mr. Alcorn to you and your husband,

18  right?

19  A.  That is correct.

20  Q.  And Mr. Alcorn tells you that Janus received SEC

21  subpoenas, right?

22  A.  Yes, sir.

23  Q.  But he's basically telling you in this e-mail it's no big

24  deal, right?

25  A.  That's correct.

——————— S. Newell - Cross (By Mr. Grindrod) ———————

1  Q.  He's saying the SEC has not made any claims -- let me

2  make sure I get the language right.

3  A.  First sentence of the second paragraph.

4  Q.  Thank you, ma'am.  I should invite you up here to do

5  this.

6          THE COURT:  Mrs. Newell, do not do that in the

7  future.

8          THE WITNESS:  Yes, sir.

9  BY MR. GRINDROD:

10  Q.  What does he say in that first sentence of the second

11  paragraph?

12  A.  "It is important to know that the SEC has not made any

13  claims or allegations against us."

14  Q.  What else does he tell you in that paragraph?

15  A.  "Business will remain uninterrupted."

16  Q.  And that explanation, that satisfied you, right?

17  A.  At that time, yes, sir.

18  Q.  Okay.  And Mr. Alcorn also tells you kind of why he's not

19  able to discuss it with you in more detail, right?

20  A.  Yes.

21  Q.  Basically, he's not supposed to -- his lawyers said not

22  to talk more about it, right?

23  A.  Right.

24  Q.  And after this e-mail, you and -- you put more money into

25  Janus investments, right?

S. Newell - Cross (By Mr. Grindrod)

1  A.  Yes.  Every time we invested, something good had

2  happened.

3  Q.  Right.  But I guess here what -- you invested not because

4  David Alcorn hid the SEC investigation from you entirely,

5  right?

6  A.  That's right, sir.

7  Q.  You were able to still have confidence because he

8  convinced you that the SEC investigation was just no big

9  deal?

10 A.  That is correct, sir.

11 Q.  And then we talked about the Napa conference on direct

12 examination, right?

13 A.  At Silverado, yes, sir.

14 Q.  And that was in August of 2013; is that right?

15 A.  That is correct.

16 Q.  So even after that conference -- now jump ahead to

17 September of 2013 with me.

18 A.  Okay.

19 Q.  After that conference, you and your group still believed

20 that Janus was going to be able -- was going to be the group

21 monetizing the licenses, right?

22 A.  Yes, sir.

23 Q.  Your understanding was that it was not up to you to go

24 out and do the groundwork --

25 A.  Absolutely --

S. Newell - Cross (By Mr. Grindrod)

1   Q.   -- Janus was going to do it?

2   A.   I'm sorry.  Yes, sir.

3   Q.   And then we jump ahead to February of 2014, right?

4           MR. GRINDROD:  Let's look at Government's

5   Exhibit 712.  This has already been admitted.

6   BY MR. GRINDROD:

7   Q.   This is another one of these e-mails of you updating your

8   group based on a conversation that you had with Alcorn,

9   right?

10  A.   Yes, sir.

11  Q.   And the conversation that you had with Alcorn was

12  basically that whatever the document said, Janus fully

13  intends to continue to be involved in the process, right?

14  A.   That's correct.

15  Q.   And the process was the process of monetizing the

16  spectrum?

17  A.   That is right.

18  Q.   So when you told Linda and Charlie and George that, you

19  told them that because you believed it was true, right?

20  A.   Yes, sir.

21  Q.   Based on what Mr. Alcorn told you?

22  A.   That's right.

23  Q.   Okay.

24          MR. GRINDROD:  Let's look at Government's

25  Exhibit 713, which has also been admitted.

S. Newell - Cross (By Mr. Grindrod)

1    BY MR. GRINDROD:

2    Q.   So, ma'am, these are your notes from that Janus workshop

3    in Washington, D.C., right?

4    A.   That is correct.

5    Q.   In 2014, June of 2014?

6    A.   Right.

7    Q.   And before this workshop, you knew that Janus had filed

8    for bankruptcy, right?

9    A.   In March of that year.

10   Q.   March of that year?

11   A.   Yes, sir.

12   Q.   And, again, that was something that David Alcorn didn't

13   hide from you, right?

14   A.   Correct.

15   Q.   But he explained it in a way that made it seem like it

16   was no big deal?

17   A.   It had something to do with his other legal issues, yes.

18   Q.   But it wasn't something --

19   A.   It wasn't going to affect us.

20   Q.   Yeah, it wasn't something you needed to worry about or

21   that was going to affect your ability to make money on the

22   spectrum investment?

23   A.   He certainly said not to worry.

24   Q.   And then at this meeting, the SEC inquiry comes up again,

25   doesn't it?

S. Newell - Cross (By Mr. Grindrod)

1   A.   Yes, updating us.

2   Q.   Right.  And these are your notes of what Alcorn told you,

3   right?

4   A.   Correct.

5   Q.   So, again, the message coming from Alcorn and Maerki is

6   "no indication that we're accused of anything," right?

7   A.   Right.

8   Q.   Essentially, the SEC inquiry is no big deal?

9   A.   Right.

10  Q.   Okay.  And, then -- now we're on Page 6.  Again, your

11  notes, right?

12  A.   Yes, sir.

13  Q.   About what Alcorn said?

14  A.   The "DA" to the left of it means that he said it.

15  Q.   And he's telling you here again that it's still possible

16  to monetize these licenses by leasing them back to a major

17  carrier like Sprint, right?

18  A.   That's correct.

19  Q.   That's in June of 2014?

20  A.   Right, sir.

21  Q.   And so in July of 2013, you knew about the SEC

22  investigation, right?

23  A.   Yes, sir.

24  Q.   Knew about the bankruptcy, right?

25  A.   Yes, sir.

S. Newell - Cross (By Mr. Grindrod)

1   Q.  And you're being told you can still license these things

2   back to Sprint or some major carrier?

3   A.  Yes, sir.

4   Q.  So you put more money in in July of 2014, right?

5   A.  Based on this information we were given in that meeting,

6   yes, sir.

7   Q.  Right.  And you never would have done that if you didn't

8   believe the information you were given, right?

9   A.  Correct, sir.

10  Q.  But we're talking about a serious amount of money that

11  you put at stake.  It was like, all told, like, almost a

12  million dollars?

13  A.  That's correct.

14  Q.  So these aren't decisions that you're making lightly or

15  on a whim, right?

16  A.  That is correct.

17          MR. GRINDROD:  Let's look at Government 719, which

18  also has been admitted.

19          Ms. McCaslin, can you jump to Page 9 for me?

20  BY MR. GRINDROD:

21  Q.  Let me scroll up so you can actually see who this e-mail

22  is from.

23          So this is an e-mail from George Cushman, right?

24  A.  He's one of our investing members, yes, sir.

25  Q.  In your little investment group?

S. Newell - Cross (By Mr. Grindrod)

1    A.  Yes, sir.

2    Q.  And this is from September of 2014?

3    A.  Yes, sir.

4    Q.  And Mr. Cushman's asking, still in September of 2014,

5    "Are the major players Sprint, AT&T, and Verizon a prospect

6    for our licenses now in the cities we have or later as we

7    have more cities or not at all?"

8           Right?

9    A.  He was asking that, yes, sir.

10   Q.  And so it's clear, at least some of these people in your

11   investment group, all the way through at least September

12   2014, still don't realize that these licenses can't be leased

13   back to a major carrier, right?

14   A.  We're starting to suspect that's the case, yes, sir.

15   That's why we were asking.

16   Q.  Right.  But it's still like a question at that point --

17   A.  Oh, yeah --

18   Q.  -- nobody's come out and told you --

19          THE COURT:  Wait a minute.  Only one of you can talk

20   at a time, now.

21          THE WITNESS:  I beg your pardon.  I'm sorry, Your

22   Honor.

23          MR. GRINDROD:  I'm sorry.

24   BY MR. GRINDROD:

25   Q.  So it's still just a question at that point.  No one has

S. Newell - Cross (By Mr. Grindrod)

1    come out and told you that, right?

2    A.  Correct, sir.

3    Q.  And so in this September 2014 time period, that's when

4    you had that meeting at Mr. Alcorn's house?

5    A.  Yes, sir.

6    Q.  And if Alcorn or any of the principals knew at that point

7    that these licenses couldn't be leased back to a major

8    carrier, they weren't telling you that, right?

9    A.  We were not told that at that meeting.  As of that point

10   in time, we were not told that that was not possible.

11   Q.  If they knew then, they were covering that up from you?

12   A.  Yes, sir.

13          MR. GRINDROD:  We can take that down, Ms. McCaslin.

14   BY MR. GRINDROD:

15   Q.  So, Mrs. Newell, that meeting you had with Mr. Alcorn in

16   September 2014, I think you mentioned on direct examination

17   that you had a planned meeting the next day with Dale Gray?

18   A.  Yes, sir.

19   Q.  And you said that was to do due diligence?

20   A.  Yes, sir.

21   Q.  Due diligence on what?

22   A.  Because our licenses hadn't been monetized to that point

23   in time and it didn't appear that Janus was actively working

24   on it, we felt compelled to try to save our investment by

25   looking for ways to monetize ourselves, and Dale Gray was the

S. Newell - Cross (By Mr. Grindrod)

1   only option that we were aware of at the time.

2   Q.  And was Dale Gray involved in a company called RapidLink

3   Wireless?

4   A.  I don't believe that he was a partner in RapidLink

5   Wireless, but he was part of the engineering portion of that

6   potentially.

7   Q.  And was that -- was RapidLink Wireless the company you

8   were talking about due diligence, to looking into?

9   A.  Yes, sir.

10  Q.  Was RapidLink Wireless -- was the plan with RapidLink

11  Wireless to use push-to-talk communications with Motorola

12  technology?

13          MS. O'BOYLE:  Objection.  Hearsay and beyond the

14  scope of the direct.

15          THE COURT:  Well, the question is does she know

16  this?  So I will overrule the objection, only if she knows

17  what the plan was.

18  BY MR. GRINDROD:

19  Q.  Do you know what the general plan was with RapidLink

20  Wireless?

21  A.  Based on the meeting we had with Mr. Gray, that's

22  basically what we were told, yes, sir.

23  Q.  What?  What I had asked earlier?

24  A.  That it was a push-to-talk option.

25  Q.  Okay.  And you ended up -- your investment group ended up

S. Newell - Cross (By Mr. Grindrod)

1   spending money basically pursuing that option, that
2   push-to-talk option, right?
3   A.  Yes, sir.
4   Q.  And so even though all this monetization through Janus
5   had not worked out, you hadn't given up on trying to figure
6   out a way to make money with these 800-megahertz spectrum
7   licenses, right?
8   A.  We had invested almost $1 million through Janus with
9   absolutely no evidence of any return on investment, and we
10  felt compelled to try to save -- salvage what we could of the
11  investment, and so we pursued this.
12  Q.  And that was, again, before you -- before you would put a
13  bunch of money into RapidLink Wireless, you did some due
14  diligence, right?
15  A.  Yes, sir.
16  Q.  And, ultimately, you determined that it was worth putting
17  about $500,000 into that?
18  A.  It was the only option we had, yes, sir.
19  Q.  I understand.
20          But that was ultimately what you decided to do,
21  right?
22  A.  I'm not sure it was quite that much, but it was multiple
23  hundred thousand dollars.
24  Q.  Now, obviously, ma'am, none of these investments worked
25  out for you or your friends, right?

S. Newell - Cross (By Mr. Grindrod)

1    A.  Correct, sir.

2    Q.  Not Janus?

3    A.  Right.

4    Q.  Not RapidLink Wireless?

5    A.  Right.

6    Q.  And I think you said on direct examination that you felt,

7    on some level, guilty about your involvement in this?

8    A.  Yes, sir.

9    Q.  And responsible?

10   A.  Yes, sir.

11   Q.  Because you -- and you felt that way, guilty and

12   responsible, because you had brought this opportunity to

13   other people and they lost money too, right?

14   A.  That's correct, sir.

15   Q.  And, ma'am, even if you feel that, of course, you did not

16   intentionally lie to anyone about these investments, right?

17          THE COURT:  That question has been asked before,

18   Mr. Grindrod.

19   BY MR. GRINDROD:

20   Q.  Ma'am, you only ever told people what you believed to be

21   true, right?

22   A.  That's correct, sir.

23          MR. GRINDROD:  I have no further questions for this

24   witness, Your Honor.

25          THE COURT:  Any redirect?

Carol L. Naughton, Official Court Reporter

S. Newell - Redirect

1          MS. O'BOYLE:  Just a few, Your Honor.
2                    REDIRECT EXAMINATION
3    BY MS. O'BOYLE:
4    Q.  Mrs. Newell, if we could pull up Government's Exhibit
5    703; I believe Mr. Yarow showed you this.
6              And this initial group, this over here, this is your
7    investment group, correct?
8    A.  Yes.
9    Q.  And this is the group that got together in 2011?
10   A.  Yes.
11   Q.  Now, are you an investment advisor?
12   A.  No, ma'am.
13   Q.  Did you make any money selling any of these investments?
14   A.  Not a dime.
15   Q.  So you're not getting commissions or referral fees for
16   bringing this group together?
17   A.  We were offered a commission, and instead of accepting
18   the commission, we asked if we could share it with the other
19   members of our group to reduce the price of each of the
20   applications.
21   Q.  And Mr. Grindrod went through a number of things with you
22   about when you invested.  And your last investment was
23   July 9, 2014; is that correct?
24   A.  That was the date of the agreement signed.
25   Q.  And in April of 2015, the Securities and Exchange

S. Newell - Redirect

1   Commission sued Janus Spectrum and David Alcorn; is that
2   correct?
3   A.   Yes, ma'am.
4   Q.   All right.   After the Securities and Exchange Commission
5   sued Mr. Alcorn, did you give Mr. Alcorn any more money?
6   A.   No, ma'am.
7   Q.   And after April 2015, did you ask any of your friends to
8   give Mr. Alcorn any more money?
9   A.   No, ma'am.
10  Q.   Why not?
11  A.   Because we didn't trust him anymore.
12  Q.   Mr. Grindrod talked a little bit about RapidLink --
13  A.   Yes.
14  Q.   -- and your attempt to monetize your investment.   Did you
15  solicit any investors to give money to RapidLink?   Did you
16  sell interest in RapidLink?
17  A.   No.
18  Q.   Did you earn commissions on moneys given to RapidLink?
19  A.   No.
20  Q.   So that $500,000 -- or do you recall how much money you
21  spent to -- you spent in connection with RapidLink?
22  A.   It was something in excess of -- it was between 300- and
23  400,000, I believe, off the top of my head.
24  Q.   And ultimately what happened to that money?
25  A.   Good money after bad.   It went down the drain.

Carol L. Naughton, Official Court Reporter

S. Newell - Redirect

1   Q.  Do you know whether Mr. Alcorn had any involvement in
2   RapidLink?
3   A.  I'm not aware of it.  We were trying to encourage him to
4   do diligence as well on behalf of all Janus clients.
5   Q.  And then last, in connection with some of Mr. Yarow's
6   questions.
7           MS. O'BOYLE:  If we could pull up 702A -- sorry, go
8   to 700A first.
9   BY MS. O'BOYLE:
10  Q.  And I just want to make sure it was clear.  The first
11  document that you got from Janus Spectrum, did it just have
12  the chart without any explanations?
13  A.  Yes, ma'am.
14  Q.  And then were you given -- did you ask for some
15  additional explanations?
16  A.  I did.
17  Q.  So what I just pulled up here, the As, Bs, and Cs and
18  what's written, is that your own information, or where did
19  you get that information?
20  A.  I believe I asked Bob LaBine if he could break down the
21  meaning of each of the columns.
22  Q.  So this was information given to you -- you didn't write
23  this information?
24  A.  Oh, no.
25  Q.  Okay.  Now, if we could go to 702A, which Mr. Yarow

S. Newell - Redirect

1   showed you.  This was your Application Services Agreement; is
2   that correct?
3   A.  That's the first one, yes.
4   Q.  And Mr. Yarow showed you -- he pulled up paragraph 4
5   about the construction of a site within 12 months?
6   A.  Yes, ma'am.
7   Q.  Okay.  And what did Mr. Alcorn and Mr. Maerki tell you
8   about whether the construction of a site would be necessary?
9   A.  They told us that they would not pursue any engineering
10  on a site other than one where a tower already existed to
11  eliminate the need to construct a new tower.
12  Q.  Was that why you felt comfortable that this was going to
13  be a passive investment?
14  A.  Oh, yes.
15  Q.  And if you could -- you also talked about a side
16  agreement with Mr. Yarow.
17          MS. O'BOYLE:  If we could pull up Government's
18  Exhibit 726.
19          THE COURT:  Didn't we pull this side agreement up on
20  your direct examination, Ms. O'Boyle?
21          MS. O'BOYLE:  It was on -- not -- on redirect, what
22  I'm doing right now?  I have not pulled this up before.
23          THE COURT:  Okay.
24          MS. O'BOYLE:  And I only have one more question,
25  Your Honor, and I'll be done.

S. Newell - Redirect

```
 1    BY MS. O'BOYLE:
 2    Q.  This was one of the side agreements with Janus Spectrum,
 3    correct?
 4    A.  Yes, ma'am.
 5    Q.  If you could read the paragraph.
 6    A.  "If construction becomes necessary of a site, as referred
 7    to in paragraph 5, Janus hereby agrees to absorb and pay the
 8    cost of construction of the site."
 9    Q.  So who did you believe was going to be paying to
10    construct the site if one was necessary?
11    A.  Janus.
12            MS. O'BOYLE:  Thank you.  I have no further
13    questions.
14            THE COURT:  May this witness be permanently excused?
15            MS. O'BOYLE:  Yes, Your Honor.
16            MR. YAROW:  Yes, Your Honor.
17            MR. GRINDROD:  Yes, Your Honor.
18            THE COURT:  You may step down, ma'am.  Thank you for
19    coming.
20            THE WITNESS:  Thank you, Your Honor.
21            (The witness was excused.)
22            THE COURT:  Next witness.
23            MR. BOSSE:  The government calls Michael Wilhelm.
24            (Witness sworn.)
25            MICHAEL WILHELM, called by the Government, having
```

M. Wilhelm - Direct

1   been first duly sworn, was examined and testified as follows:

2                   DIRECT EXAMINATION

3   BY MR. BOSSE:

4   Q.  Good afternoon, sir.  Would you please state your name

5   for the record.

6   A.  My name is Michael Wilhelm.  W-i-l-h-e-l-m.

7   Q.  How old are you, sir?

8   A.  I'm 83 years old.

9   Q.  Can you tell the jury just a little bit about your

10  educational background?

11  A.  I hold a bachelor's degree in communication from the

12  University of Detroit, a master's degree in communication

13  from the University of Michigan, and a jurist doctorate

14  degree from the University of Florida.

15  Q.  And did you at certain points in your career practice as

16  an attorney?

17  A.  I have practiced as an attorney since graduation from law

18  school, yes.

19  Q.  Are you currently retired?

20  A.  I am.

21  Q.  When did you retire?

22  A.  I retired in -- on June 31st of last year.

23  Q.  Before you retired, where were you working?

24  A.  I was working at the United States Federal Communications

25  Commission.

M. Wilhelm - Direct

1   Q.   And you'll understand if I refer to that as the FCC, it's

2   the Federal Communications Commission?

3   A.   Correct.

4   Q.   How long had you been at the FCC before retiring?

5   A.   21 years.

6   Q.   Were you involved in the radio and communications

7   business before your time at the FCC?

8   A.   Yes, I was.

9   Q.   During the 2011 to 2015 time period, what position did

10   you hold at the FCC?

11   A.   I was the chief of the Policy and Licensing Division, of

12   the Public Safety, and Homeland Security Bureau.

13   Q.   What were your responsibilities in that role?

14   A.   I administered a staff of attorneys, engineers,

15   economists, licensing specialists, and administrative staff.

16   Q.   As part of your work at the FCC, were you involved in

17   what is called the rebanding process in the 800-megahertz

18   portion of the spectrum?

19   A.   Yes, from the very beginning of that process.

20   Q.   Are you familiar, through your work, with the creation of

21   what are called the guard band and expansion bands within

22   that part of the spectrum?

23   A.   I am.

24   Q.   Why did the FCC want to create what are now called guard

25   band and expansion band?

M. Wilhelm - Direct

1    A.  The fundamental reason for establishing those two bands

2    was the avoidance of interference with the communications of

3    public safety officials; for example, police, fire, and EMS.

4    Q.  And what was causing the interference that led the FCC to

5    this rebanding process?

6    A.  The interference was generated primarily by facilities

7    operated by Nextel Communications Incorporated.  Nextel

8    operated on the spectrum immediately adjacent to the public

9    safety spectrum.

10          When I say "spectrum," I find it useful to describe

11   it in terms of capacity to provide services to subscribers.

12   Q.  Tell the jury, please, what you mean by that.

13   A.  I think the most useful way of explaining it is to

14   analogize it to a multilane, let's say, 15-lane superhighway

15   next to a bike path.

16          In terms of capacity, the bike path can accommodate

17   three, possibly four bicycles; the superhighway can

18   accommodate thousands of simultaneous users.  And for

19   purposes of this analogy, the superhighway is broadband

20   spectrum, and the bike path is analogous to narrowband

21   spectrum.

22   Q.  Narrowband is the analogy to the bike path?

23   A.  That's correct, the facility that serves only a few

24   number of users.

25   Q.  And so what was the problem with Nextel serving many

M. Wilhelm - Direct

1  users adjacent to the public service portions of the

2  spectrum, things like fire and EMS?  What was the problem

3  there?

4  A.  Well, in spectrum engineering, the further a facility is

5  located in the spectrum from another facility, the less

6  interference is going to be created.  In this case, Nextel

7  was operating facilities immediately adjacent to the public

8  safety spectrum.

9          If I may indulge in another example?

10 Q.  Sure.

11 A.  If someone were standing next to you shouting right now,

12 you would probably have difficulty understanding what I'm

13 saying.  On the other hand, if the person shouting were

14 located 100 feet away, you probably could understand me.  The

15 person standing right next to you in the analogy is Nextel's

16 spectrum.

17 Q.  All right.  And so as part of the rebanding that

18 happened, tell the jury about what was the purpose of the

19 guard and expansion bands?

20 A.  They were to serve as a buffer between Sprint's

21 operation -- I said Sprint.  That was the successor to

22 Nextel.  They were intended to buffer interference by

23 locating the public safety spectrum a little distance,

24 2 megahertz, from Nextel's operation.

25 Q.  Okay.  So the rebanding that you're describing put in

M. Wilhelm - Direct

1    place these guard and expansion bands as a buffer?

2    A.  Yes, that's correct.

3    Q.  As part of the rebanding that created the guard and

4    expansion bands, did the FCC -- was it able to issue new

5    spectrum licenses within the guard band and the expansion

6    band as the process went on?

7    A.  Yes.

8    Q.  Was that done through an application process where people

9    could just apply or through a competitive auction?

10   A.  It was a first-come, first-served application process.

11   Q.  And how did the FCC tell prospective applicants about new

12   areas around the country becoming available?

13   A.  We did it through public notices.  The FCC established

14   what we call filing windows.  Those are a period of time in

15   which, in a given portion of the country, the applicants

16   could submit their applications; generally, one month to two

17   months.  After the window closed, they could no longer submit

18   applications.

19   Q.  So there was some time after the notice was issued to

20   allow people to put applications together and submit them; is

21   that right?

22   A.  That is correct.

23   Q.  Was the whole country opened up all at one time, or did

24   this take place one area at a time over a long process?

25   A.  The way you described it, a long period of time.

M. Wilhelm - Direct

1    Q.  And I want to talk now about the guard and expansion
2    bands.  What kind of bandwidth was available to applicants in
3    these guard and expansion bands?
4    A.  The amount of spectrum available was limited to
5    20 kilohertz.
6    Q.  And is 20 kilohertz equivalent to what you described as
7    narrowband or equivalent to what you described as broadband?
8    A.  That is narrowband.
9    Q.  What sort of hertz would be involved in the kind of
10   broadband application that AT&T, Verizon, and Sprint use?
11   A.  At a minimum, 1.4 million hertz, or megahertz, an order
12   of magnitude greater than the spectrum allowed in the
13   expansion and guard bands.
14   Q.  And so going back to the analogy you had, the bike path
15   and the superhighway, the guard and expansion bands, which of
16   those are they?
17   A.  They are the bike path.
18   Q.  Would Sprint, Verizon, and AT&T be allowed to operate
19   their systems on the guard and expansion band under FCC
20   rules?
21   A.  No.  All of those licensees operate what are called high
22   -density cellular systems.  And by specific FCC rule, those
23   systems are forbidden in the guard band and expansion band.
24   Q.  And did you in your role at the FCC ever hear of Sprint
25   or Verizon or AT&T showing any interest in getting guard and

M. Wilhelm - Direct

1   expansion band licenses for their applications?

2   A.   No, absolutely not.  As a matter of fact, that spectrum,

3   guard band and expansion band, was too -- just too narrow for

4   their operations.  They expressed no interest in --

5            MS. McCASLIN:  Objection to what they expressed.

6            THE COURT:  Sustained.

7            MR. BOSSE:  That's fine.

8   BY MR. BOSSE:

9   Q.   I want to imagine that I'm -- pretend that I'm in the

10  industry.  I'm in the industry of people who are doing

11  license applications for guard and expansion band.

12  A.   Okay.

13  Q.   Did the FCC keep these facts -- the fact that this was

14  narrowband and not broadband, the fact that this was a long

15  process that was going to take many years, were those facts

16  kept hidden from people in the industry, or were they somehow

17  secret?

18  A.   No.

19  Q.   I want to ask you now about application services.  Are

20  you familiar with how spectrum application services work

21  generally through your work experience?

22  A.   I am.

23  Q.   What kind of fees are typically charged for a spectrum

24  application at the FCC?

25  A.   The fees are charged by a frequency coordinator.  The

M. Wilhelm - Direct

1    last time I looked, the fee for frequency coordination and
2    submission of applications was nominally $365.
3    Q.   Would there also be a few other hundred dollars in filing
4    fees and that sort of thing?
5    A.   Yes.   There is the nominal filing fee at the FCC.
6    Q.   And the frequency coordinators, tell the jury what the
7    role of a frequency coordinator is, please.
8    A.   Frequency coordinators are FCC-certified organizations
9    which choose the exact frequency that an application will be
10   used in.   The objective of the frequency coordinator is to
11   select a frequency that will be optimum from an interference
12   reduction standpoint.
13   Q.   And these frequency coordinators are approved by the FCC?
14   A.   They are certified by the FCC.   That's correct.
15   Q.   Are you familiar with the fees that were being charged by
16   a company called Janus Spectrum for an application in the
17   narrowband area through your work at the FCC?
18   A.   I am.
19   Q.   How did those fees compare to the application fees that
20   the FCC would typically see?
21   A.   They were an order of magnitude higher.   The figures that
22   I remember were on the order of 40- to $45,000 per
23   application.
24   Q.   And when you say "order of magnitude," you're talking
25   about a factor of 10 or more?

Carol L. Naughton, Official Court Reporter

M. Wilhelm - Direct

1  A.  Yes.

2  Q.  Let's talk about the use requirement the FCC has.  Let's

3  imagine that I have applied for one of these guard band or

4  expansion band licenses, the 20 kilohertz, 20,000 hertz,

5  narrowband licenses, and I've been given a license by the

6  FCC.  Once I have that license in hand, do I need to do

7  anything with it?

8  A.  Yes, you must.

9  Q.  Tell the jury what has to be done and when.

10  A.  You must complete construction of your system and offer

11  service on that system within one year of the day the license

12  and application was granted.  If you do not, the license

13  terminates by operation of law, and you are no longer an FCC

14  licensee.

15  Q.  Does it typically cost money to construct a system to put

16  a license into use?

17  A.  Although there are variations of the cost, one must

18  either erect or lease tower space for the antenna, so the --

19  what is called the base station, and you must have at least

20  one subscriber of a service.

21          Now, as I said, the costs are variable, but it is

22  not unusual for even a modest system to require an

23  expenditure of, say, $100,000 for equipment and services.

24  Q.  And when you mention the base station and equipment and

25  services, would I be allowed to just put a small, little

M. Wilhelm - Direct

 1  transmitter up on a tower that essentially beeps something
 2  out every once in a while?  Would that qualify as putting my
 3  license into use?
 4  A.  Not unless somebody was listening to it.
 5  Q.  So you need an actual customer in order to put it into
 6  use?
 7  A.  Yes, by FCC rule.
 8  Q.  The expansion band/guard band, the rebanding process
 9  we've talked about, that took many years, correct?
10  A.  Yes, it did.  If I may explain?
11  Q.  Please.
12  A.  The proceeding was initiated by Nextel, who wanted to
13  avoid causing interference.  They estimated that the
14  procedure would require three years and an expenditure of
15  $185,000.  As it turns out, the process took 18 years and
16  cost $3.6 billion.
17  Q.  And what that means is that the different economic areas
18  of the country, the different cities of the country, they
19  didn't all have guard and expansion band available --
20          MS. McCASLIN:  Objection.  Leading.
21          THE COURT:  Sustained.
22          MR. BOSSE:  Okay.
23  BY MR. BOSSE:
24  Q.  The different cities in the country, did they all have
25  guard and expansion band frequencies available all at the

Carol L. Naughton, Official Court Reporter

M. Wilhelm - Cross (By Mr. Yarow)

1   same time?

2   A.   No, they did not.

3   Q.   And from the FCC's perspective, would there be any need

4   for license applications to have licenses prepared years in

5   advance of the public notice releasing a particular area?

6   A.   Any advantage to the FCC, did you say?

7   Q.   Or to the license applicant, that you're aware of.

8   A.   Well, to give the license applicant sufficient time to

9   prepare its application.  As far as the FCC is concerned, it

10  would start the application processing period over a period

11  of time.  The FCC processes nominally 31,000 applications a

12  year, so it is to the FCC's advantage to process these

13  applications, if you will, in chunks over a period of time.

14  Q.   Understood.

15           MR. BOSSE:  I think that's probably all I have for

16  the examination.  Thank you.  Please stand by for cross.

17           THE WITNESS:  Thank you.

18           THE COURT:  Any cross?

19                     CROSS-EXAMINATION

20  BY MR. YAROW:

21  Q.   Mr. Wilhelm, my name is Rick Yarow.  I represent David

22  Alcorn.  How are you this afternoon?

23  A.   I'm doing well, counselor.  Yourself?

24  Q.   Fine.  Thank you.

25           So you described the guard band and expansion band

Carol L. Naughton, Official Court Reporter

———— M. Wilhelm - Cross (By Mr. Yarow) ————

1    as a bike path compared to the superhighway of broadband; is

2    that correct?

3    A.  It is correct, yes.

4    Q.  Can the bike paths be combined to form a wider band?  Are

5    they allowed -- in other words, are they allowed to be

6    aggregated?

7          MR. BOSSE:  I'm going to object to that without

8    foundation on these particular bands.

9          THE COURT:  What's the purpose of this question,

10   Mr. Yarow?

11         MR. YAROW:  Your Honor, I really don't want -- I

12   don't want to say it in open court.

13         THE COURT:  The Court sustains the objection.

14         MR. YAROW:  That's fine.  Thank you.

15   BY MR. YAROW:

16   Q.  Sir, when you said that the frequency coordinator would

17   charge 365 per channel, how many channels are in a license

18   when a license is granted by the FCC?

19         MR. BOSSE:  I'm going to object to that.  He didn't

20   say it was 365 per channel.  I'm happy to have that come out,

21   but I don't know that that's the answer.

22         THE COURT:  Tell you what we're going to do.  Think

23   about it.  I'll give you a chance to rephrase it to go after

24   whatever it is you're seeking, Mr. Yarow.

25   BY MR. YAROW:

———— M. Wilhelm - Cross (By Ms. McCaslin) ————

1  Q.  Sir, would you please repeat -- you mentioned something

2  cost $365 from a frequency coordinator.  What was that you

3  testified to?  How much does a frequency coordinator charge

4  for their service in an application?

5  A.  Nominally, $365.

6  Q.  Is that one flat fee, or is that multiplied depending on

7  the number of channels that a license has?

8  A.  It's per application submitted.

9  Q.  Per application.  Okay.

10        MR. YAROW:  Thank you.

11                    CROSS-EXAMINATION

12  BY MS. McCASLIN:

13  Q.  Good afternoon, sir.

14  A.  Good afternoon.

15  Q.  So you said that you had worked with the FCC for 15

16  years, right?

17  A.  Wrong.  21 years.

18  Q.  21 years.  Thank you.

19        How long were you in the communications field as an

20  attorney over all?

21  A.  Since my admission to the Bar in 1976.

22  Q.  Okay.  So you would agree that you've seen the

23  communications field change pretty dramatically over several

24  decades, correct?

25  A.  Correct.

M. Wilhelm - Cross (By Ms. McCaslin)

1    Q.  And the communications field can get fairly complicated?

2    A.  It can, yes.

3    Q.  And so when you are talking to somebody who is not in the

4    communications field, you tend to use a lot of analogies,

5    like the superhighway and the bike path?

6    A.  Sometimes I do, yes.

7    Q.  And when you're talking to somebody who is not in the

8    communications field, you would probably need to explain

9    terms like iDEN technology or cDNA, right?

10   A.  Correct.

11   Q.  The technology is always changing?

12   A.  Yes.

13   Q.  The laws and regulations are also always changing?

14   A.  Yes.

15   Q.  And there is pretty much always some policy or petition

16   that an organization is trying to get approval for from the

17   FCC?

18   A.  That's also correct.

19   Q.  And it's normal for a person or a business to seek a

20   waiver, right?

21          MR. BOSSE:  I'm -- that's fine.

22          THE WITNESS:  No, it's not normal for them to seek

23   waivers.

24   BY MS. McCASLIN:

25   Q.  Okay.  But if somebody wants to do something beyond the

———— M. Wilhelm - Cross (By Ms. McCaslin) ————

1  rules and regulations, they would have to ask for an

2  exception, basically, right?

3  A.  That's correct.

4  Q.  You had mentioned on direct examination that the FCC puts

5  out public notices.

6  A.  Correct.

7       MS. McCASLIN:  Mr. Grindrod, if we can pull up

8  Smith 65, just for the witness.

9  BY MS. McCASLIN:

10  Q.  Do you see that, sir?

11  A.  I do.

12  Q.  Do you recognize this?

13  A.  Yes, I do.

14  Q.  What are we looking at?  And I can blow it up if that

15  helps.

16  A.  I will tell you as soon as I put my glasses on.

17       Yes.  That is an announcement that 800-megahertz

18  bandwidth reconfiguration has been accomplished in a specific

19  geographic area.

20  Q.  And what was the date of that public notice?

21  A.  November 27th, 2012.

22       MS. McCASLIN:  Your Honor, I move to admit.

23       THE COURT:  Any objection?

24       MR. BOSSE:  No objection.

25       THE COURT:  It will be admitted.

M. Wilhelm - Cross (By Ms. McCaslin)

1    (Defendant Smith's Exhibit 65 was admitted.)

2   BY MS. McCASLIN:

3   Q.  And so this public notice is the first public notice that

4   the FCC released some of those frequencies from the

5   rebanding, right?

6   A.  I can't tell whether it was the first one.

7   Q.  But this is a release of some of those frequencies that

8   we've been talking about?

9   A.  Yes, that is correct.

10  Q.  Thank you.

11       MS. McCASLIN:  Mr. Grindrod, we can take that down.

12  BY MS. McCASLIN:

13  Q.  Now, whether a system can be used on the expansion or

14  guard bands depends on a couple different factors, right?

15  A.  Yes.

16  Q.  So it will depend on what bandwidth is required for that

17  technology, like you were talking about the 20 kilohertz or

18  the 1.4 megahertz, right?

19  A.  That's correct.

20  Q.  And it depends on whether the system is using towers that

21  are high or low?

22  A.  Yes.

23  Q.  And it depends on the number of towers in the system and

24  how they can hand off that signal?

25  A.  Yes.

Carol L. Naughton, Official Court Reporter

─────M. Wilhelm - Cross (By Ms. McCaslin)─────

1   Q.  And it also depends on what kind of technology you're

2   using, because older technology might be too outdated for the

3   current tower, right?

4   A.  Correct.

5   Q.  And then there's, of course, also restrictions based on

6   laws and regulations by the FCC and other government

7   entities?

8   A.  That also is correct.

9          MS. McCASLIN:  No further questions.  Thank you.

10          THE WITNESS:  Thank you.

11          THE COURT:  Any redirect?

12          MR. BOSSE:  No, sir, no redirect.  And I'm fine

13   releasing the witness.

14          THE COURT:  Do you concur, counsel, that the

15   witnesses may be released?

16          MR. YAROW:  Yes, sir.

17          MS. McCASLIN:  Yes, sir.

18          THE COURT:  You may be released, sir.  Thank you for

19   coming.

20          (The witness was excused.)

21          THE COURT:  Next witness.

22          MS. YUSI:  Your Honor, the government calls Carol

23   Groff.

24          (Witness sworn.)

25          MR. GRINDROD:  Your Honor, before we get started,

```
 1   could I be heard on sidebar about an issue?
 2            THE COURT:  Let's go to the channels.
 3            (A sidebar conference was held as follows:)
 4            THE COURT:  Mr. Grindrod, what's up?
 5            MR. GRINDROD:  Your Honor, I just wanted to note
 6   that --
 7            THE COURT:  Wait a minute.  I cannot hear.
 8            MR. GRINDROD:  Is that better, Your Honor?
 9            So this witness filed a civil suit against
10   Mr. Smith, and it's our position that shouldn't come in here,
11   but I wanted to bring that to the Court's attention so that
12   the government could -- we can deal with this before the
13   government gets into it if they are planning to.
14            THE COURT:  Are you intending to get into the civil
15   suit?
16            MS. YUSI:  Just as with Mr. Martin, we've asked and
17   it's all about notice.  It happened in 2015, and it's just
18   additional notice to Mr. Smith about issues with the
19   investments that he was selling.
20            We are not going to talk about the resolution of
21   that, but just we do have the complaint with the date on it
22   that we were going to enter into as evidence.
23            MR. GRINDROD:  Your Honor, that complaint has
24   information about a ton of other investments that this Court
25   has already said should not come into this case.
```

```
1              THE COURT:  What exhibit number is that?
2              MS. YUSI:  852, Your Honor.  It's in your notebook.
3              MR. GRINDROD:  It's also, Your Honor, a complaint by
4      some plaintiff's lawyer, so it's only one side of the story.
5      It includes a bunch of information that has no foundation,
6      and it's highly prejudicial.  Are we going to litigate the
7      civil suit in this case?
8              THE COURT:  We didn't say anything about litigating
9      anything here.  The only thing she said is she's going to
10     give notice that she filed suit, and I think we can ask the
11     question why did she file suit, and we don't need to go any
12     further.
13             MS. YUSI:  Your Honor, we would like to just have
14     the date, and what we would do is just file the first page of
15     852 and not the rest of it.
16             THE COURT:  Okay.  Hold on a second.
17             MR. GRINDROD:  Your Honor --
18             THE COURT:  Wait a minute.  Let me see the first
19     page.
20             Mr. Grindrod, the Court doesn't see anything on the
21     first page.  It's that she's filing suit and the reason she's
22     filing suit.
23             MR. GRINDROD:  Your Honor, those reasons include a
24     number of allegations including elder abuse, untrue
25     statements or omissions.  I mean, this goes well beyond
```

```
 1    whatever probative value of putting Mr. Smith on notice.
 2    This affirmatively accuses him of essentially engaging in
 3    fraud and elder abuse and unfair and deceptive business
 4    practices.
 5              The notion that the jury is going to be able to look
 6    at this complaint and just think that all it means is that a
 7    civil suit was filed on a certain date -- I mean, if the
 8    Court is inclined to have the government be able to ask
 9    whether she sued and on what date, those questions are
10    sufficient to get that point across.  We don't need a
11    document that has all of these highly prejudicial
12    accusations.
13              THE COURT:  Well, Mr. Smith is being tried here for
14    alleged fraud.  Which one of these allegations in the
15    complaint addresses that, Ms. Yusi?
16              MS. YUSI:  Your Honor, the violation of -- let's
17    see -- the unlawful, unfair, and deceptive business
18    practices, the number 8 on Page 1; number 1, number 2, and 2
19    say negligent and negligent misrepresentation, number 3,
20    intentional misrepresentation.  We can redact certain parts
21    of Page 1 if needed.
22              THE COURT:  Here's the way we can deal with this.  I
23    will permit her to ask her did she file suit against him, and
24    let her use leading questions on pointing out did she file
25    suit against him for number 1, 2, 3, 6, 8.  And we'll leave
```

1   it there without introducing the document.

2        MS. YUSI:  That's fine, Your Honor.

3        THE COURT:  Now, depending on what you do on cross,

4   we're going to lead back to getting this whole document in,

5   Mr. Grindrod.

6        MR. GRINDROD:  Your Honor, I understand the Court's

7   ruling.  I don't understand how a civil suit for negligence

8   is relevant to any issue in this case or -- I'm sorry, 1, 2,

9   6, and 8?

10       THE COURT:  You're not going to have it all,

11   Mr. Grindrod.  What she's trying to say is she gave Mr. Smith

12   notice that she is complaining about his notice here by suing

13   him.

14       MR. GRINDROD:  Is there a claim that she bought

15   something from him after that?

16       MS. YUSI:  Your Honor, the complaint is that he

17   misrepresented and lied to her in order to get her to make

18   investments, which is the issue here, and he is -- his

19   defense is that he knew nothing, everything was great,

20   because that's what the principals of the investments told

21   him and that he had no personal knowledge that things were

22   not going well.

23       MR. GRINDROD:  But she didn't buy a darn thing from

24   him after this complaint was filed, so how does this put him

25   on notice?

─────────────C. Groff - Direct─────────────

1        THE COURT:  Here's the end of it.  I will permit her

2   to ask the three leading questions, the fact that she filed

3   suit against him and on what grounds, and you can continue

4   with the cross-examination.  Now, if you want to get up and

5   cross-examine, then we'll go back, and the whole document

6   will end up in, Mr. Grindrod.  So you can tiptoe around it

7   just as I'm telling her to work around it.

8        MR. GRINDROD:  Yes, Your Honor.

9        (The sidebar conference concluded.)

10        CAROL GROFF, called by the Government, having been

11   first duly sworn, was examined and testified as follows:

12                      DIRECT EXAMINATION

13   BY MS. YUSI:

14   Q.  Good afternoon.  Could you introduce yourself to the

15   Court.

16   A.  Carol Failor --

17        THE COURT:  Ma'am, you have to raise your voice and

18   sit close to that microphone.  Pull it up to you.

19        THE WITNESS:  Carol Groff.

20   BY MS. YUSI:

21   Q.  Can you spell your first name.

22   A.  C-a-r-o-l.

23   Q.  And if you could put it even closer to you and speak even

24   louder into it so everyone in the back can hear you.

25        How do you spell your last name?

C. Groff - Direct

1   A.  G-r-o-f-f.

2   Q.  And how old are you today?

3   A.  73.

4   Q.  What city and state do you live in?

5   A.  Roseville, California.

6   Q.  Is that Northern California?

7   A.  Yes.

8   Q.  Were you married at one point?

9   A.  Yes.

10  Q.  Are you still married now?

11  A.  I am divorced.

12  Q.  And how long were you married for?

13  A.  27 years.

14  Q.  And approximately when did you get divorced?

15  A.  It was final 2000.

16  Q.  Now, while you were married, for the most part, did you

17  work outside the home, or did you stay at home?

18  A.  I had five children, so mostly I stayed at home.

19  Q.  With five children?

20  A.  Yes.

21  Q.  When you got divorced, did you get any retirement funds

22  through that divorce?

23  A.  No.

24  Q.  At some point after the divorce, was there a time where

25  you inherited some money?

C. Groff - Direct

1    A.  Yes.

2    Q.  Where did that come from?

3    A.  It came from -- my parents had a farm and so -- I worked

4    on the farm for -- since, like, seven or eight years old.  My

5    dad called me out and said, "It's time to milk the cows."  So

6    at 4:00 in the morning and 4:00 at night, I milked the cows,

7    after school as well.  So this was my job, basically, for the

8    20 years that I lived in my family farm.  It was -- the

9    children did the work.

10   Q.  And did you get an inheritance after your parents passed

11   from that farm?

12   A.  Yes.

13   Q.  Now, do you have any background or training in

14   investments?

15   A.  No.

16   Q.  Do you have any experience in investments?

17   A.  No.

18   Q.  I want to talk to you about Bill Smith.  How did you know

19   Bill Smith?

20   A.  We went to the same church together in the same ward.

21   Q.  The same ward?

22   A.  Ward, yes.

23   Q.  Did you know his wife?

24   A.  Yes.

25   Q.  What is her name?

C. Groff - Direct

1   A.   Oh, gosh.

2   Q.   Did you --

3   A.   Sue.  Sorry.

4   Q.   Could you repeat that.

5   A.   Sue.

6   Q.   Sue Smith?

7   A.   Yes.

8   Q.   How did you know her?

9   A.   In the church we have what is called the visiting

10  teachers, and she was assigned me, and so once a month, she

11  either called or visited my home just to make sure that I was

12  okay.  And in turn, each one of the sisters visits other

13  sisters to make sure we're all fine in the church.

14  Q.   And did you ever speak with Sue Smith about the

15  inheritance?

16  A.   I did.  There was just, you know, one time where I just

17  said that I had this money and not exactly sure what to do

18  with it, and so she had said that her --

19            THE COURT:  Don't tell us what she said.

20  BY MS. YUSI:

21  Q.   Based on what she told you, what did you do?

22  A.   I invested the money with Bill.

23  Q.   Did you learn about her husband at that point?

24  A.   Yes.

25  Q.   Did you know the Smiths for some time by that point?

─────────────────── C. Groff - Direct ───────────────────

1  A.  Yes.

2  Q.  Now, did you meet with Mr. Smith in person?

3  A.  Yes.

4  Q.  Where was this?

5  A.  At his office in Roseville.

6  Q.  Do you recall approximately when you first met with him?

7  Or how old you were?

8  A.  I know that I invested -- my first investment was when I

9  turned 65.

10  Q.  And what year was that?  If you know.

11  A.  2013.

12  Q.  And about how many times do you think you met with

13  Mr. Smith in person over all?

14  A.  I'm guessing maybe five to seven.

15  Q.  Were those all at his office?

16  A.  Yes.

17  Q.  What did Mr. Smith tell you about his background?

18  A.  He said that the group of people that he worked with or

19  was associated with, that it was an elite group of men -- or

20  people, I should say, and that because he was very good and

21  one of the top people, that you have to be invited into this

22  group, and so this was his expertise, he knew exactly what he

23  was doing, and that they gave him a title of "Aghee."

24  Q.  That's how he got the title "Aghee"?

25  A.  Yeah.

C. Groff - Direct

1   Q.   You said this group of men -- what was their business?

2   A.   It was, from what I understand, financially, all of them,

3   that was their expertise.

4   Q.   And in meeting with Mr. Smith and having known him for a

5   while, did you trust Mr. Smith?

6   A.   Yes.

7   Q.   Now, do you have some learning disability issues?

8   A.   I do.

9   Q.   And how do those affect you?

10  A.   They affect me to the point that, just reading, I have to

11  read a sentence, a paragraph ten times, and I still may or

12  may not get it.  And so I -- math and any numbers, I'm

13  certainly not even close to where I should be.

14  Q.   Okay.  And was Mr. Smith aware of these limitations?

15  A.   I did, I told him that I had learning disabilities and

16  that he would have to help me with it.

17  Q.   All right.  What were you looking for in terms of what to

18  do with your inheritance?

19  A.   Well, we talked about it, and it was that I needed

20  money -- I needed an income, because I had none, for my

21  future, and so the goal was that I would have the steady

22  income coming in each month, which was sizeable from what he

23  said.

24  Q.   Which was what?

25  A.   Sizeable, a good amount of money.

Carol L. Naughton, Official Court Reporter

C. Groff - Direct

1   Q.   Did he understand your financial situation?

2   A.   Yes.  I took -- he had asked for numbers, and I took my

3   expenses in and -- so he knew everything about my financial

4   situation.

5   Q.   Okay.  Did you talk to Mr. Smith about your comfort level

6   with losing your inheritance in investments?

7   A.   I basically said to him that this is the only money I

8   have and that it was in his hands, and he assured me that I

9   was going to be just fine.

10  Q.   Okay.  And in general what did Mr. Smith suggest to you

11  in terms of investments?

12  A.   Well, he just -- he suggested that -- whatever he

13  suggested in investments, I said fine, because I knew that

14  that was his expertise, not mine.

15  Q.   Now, did he talk to you about an investment called DSPF,

16  or Dental Support Plus?

17  A.   He did.  He said about the investment -- but he said that

18  this was a big past investment or that it was present.  I'm

19  not sure if it was past or present.  But it wasn't a good

20  investment for me because it was -- either failed or failing.

21  Q.   Okay.  And did he talk to you about a spectrum

22  investment?

23  A.   He did.

24  Q.   And what, if anything, did he say whether or not the

25  principal -- one of the principals of the spectrum investment

C. Groff - Direct

1    was the same as the principal of the Dental Support

2    investment?  Did he say anything about that?

3    A.   No.  I didn't know -- I still don't know that they are

4    connected.  To me, they are two different companies.

5    Q.   Okay.  What was your understanding of what the spectrum

6    investment involved?

7    A.   It was radio waves.  And in order for the investment to

8    happen, you had to have a bigger group, so it couldn't just

9    be me.  It had to be a big group of people investing money.

10            And then it was the government was licensing it, so

11   then it had to be approved by license people.  And that --

12   and also had to do with getting enough people in this group,

13   and I just missed the group before me.  So I didn't --

14   couldn't get into that.  So he was just getting enough of

15   people together to get in the next licensing group, and it

16   should happen real soon.

17   Q.   So you were going to be the second wave of this

18   investment?  What did he say anything about the first group

19   of people who had invested?

20   A.   I don't know if it was the first people, but some people

21   ahead of me.  He said they were doing really well in getting

22   their money.

23   Q.   Did he say anything about if this was a high-risk

24   investment or any level of risk?

25   A.   From what I understood of it, it was that it was a sure

Carol L. Naughton, Official Court Reporter

C. Groff - Direct

1   thing, just waiting for the license to go through.
2   Q.  What was the timing in terms of how quickly you would
3   start to see a return on your investment?
4   A.  He couldn't tell me exactly when the license or when he
5   would have all the people collected, but it was relatively
6   recent.  It would happen quickly.
7   Q.  Once you got your license, how quickly would you start
8   getting money?
9   A.  Right away.
10  Q.  Did Mr. Smith talk about fees or commissions?
11  A.  I think I had asked about that, and he said that, no, I
12  didn't pay anything from out of my money, that it came out of
13  the companies that he is putting my money into.
14  Q.  And once you started getting returns or money in this
15  investment, how much -- do you recall how much you were
16  supposed to make?
17  A.  Thousands if not 3- or 4,000 -- 2- to 3,000 each month
18  off of just some of them.  Not all of them would.
19  Q.  Did he say how long that would go on for?
20          THE COURT:  Pull the microphone to you, ma'am.
21          THE WITNESS:  Sorry.
22  BY MS. YUSI:
23  Q.  And speak real clearly into it.
24          Did he say how long you would get 2- to 3,000 a
25  month for?

Carol L. Naughton, Official Court Reporter

C. Groff - Direct

1   A.  The price would only go upwards, and it would be -- even
2   some of them would go to my children and grandchildren.  It
3   would just continue.
4   Q.  All right.  I'm going to show you -- you've got a
5   notebook in front of you.  If you can look at Exhibit 845.
6       Do you recognize that first page or at least the
7   bottom of it?
8   A.  I do.
9   Q.  And if you look at the other pages on here, including the
10  second from the last page, is that your signature?
11  A.  Yes.
12      MS. YUSI:  Your Honor, we move to admit Exhibit 845.
13      THE COURT:  Any objection?
14      845 will be admitted.
15      (Government's Exhibit 845 was admitted.)
16  BY MS. YUSI:
17  Q.  I want to focus on the bottom of Page 1 of Exhibit 845.
18  And do you recognize this at the bottom?
19  A.  Yes.
20  Q.  What is it?
21  A.  That is a check that I gave to Bill.
22  Q.  What was the date of it?
23  A.  October 11th.
24  Q.  What was the amount?
25  A.  $100,100.

C. Groff - Direct

1    Q.   What is in the memo on the bottom left?

2    A.   "Spectrum 100."

3    Q.   And who did you make the check out to?

4    A.   Summit Trust Company.

5    Q.   What was your understanding, if you had any, of what

6    Summit Trust's role was?

7    A.   I had a hard time understanding why, if it was for

8    Spectrum 100, that I was writing to Summit.  So I really

9    didn't know what Summit was.

10   Q.   Was the name of the investment Spectrum 100?

11   A.   That's what I wrote in the check because that's what it

12   was supposed to be for, yes.

13   Q.   Okay.

14            MS. YUSI:  Thank you Mr. Bosse.

15   BY MS. YUSI:

16   Q.   So you put approximately 100,000 into Spectrum 100?

17   A.   Yes.

18   Q.   Now, did you keep up to date with Mr. Smith about this

19   investment?

20   A.   As much as -- yeah.

21   Q.   How did you do that?

22   A.   I would make phone calls, and sometimes I would go and

23   visit him, and he would talk to me about it.

24   Q.   And what was his -- what would he tell you about the

25   Spectrum 100 investment?

C. Groff - Direct

1   A.  That just be patient, that everything will -- it was

2   coming together.

3   Q.  Did he ever refer or say there were any issues or

4   problems with the investment?

5   A.  No.

6   Q.  Now, at some point -- when you met with Mr. Smith, would

7   you discuss the different numbers and things like that that

8   your investments would result?

9   A.  Yes.  We would talk about it, but I would always say to

10  him, you're telling me percentages and numbers, but I really

11  don't get -- I really don't understand what he's saying.  I

12  just took it that he was telling me the truth and that these

13  were the numbers that were correct.

14  Q.  Now, a year and two years later, had you made any money

15  in this investment?

16  A.  In one of the investments, I did --

17  Q.  I want to talk to you just about the spectrum.

18  A.  Just the spectrum, no.

19  Q.  Did you talk to Mr. Smith about that?

20  A.  Yes.

21  Q.  What did he say?

22  A.  "Be patient."

23  Q.  I'm going to show you Exhibit 847.  Do you recognize this

24  as a Summit Trust Company account statement?

25  A.  Yes.

C. Groff - Direct

```
1           MS. YUSI:  Your Honor, we move to admit Exhibit 847.

2           THE COURT:  Any objection?

3           847 will be admitted.

4           (Government's Exhibit 847 was admitted.)

5   BY MS. YUSI:

6   Q.  And would you periodically get account statements from

7   Summit Trust?

8   A.  Yes.

9   Q.  And according to Summit Trust, how much was in your

10  account?

11  A.  $152,936.08.

12  Q.  And what was the date up here?  What was the ending date

13  of this account statement?

14  A.  October 2nd, 2015.

15  Q.  All right.  Now, in June 2015, were you contacted by the

16  United States Securities and Exchange Commission?

17  A.  I was.

18  Q.  Did you have to fill out a questionnaire?

19  A.  I did.

20  Q.  And what was your -- was it about your investments with

21  Mr. Smith?

22  A.  Yes.

23  Q.  What was your reaction to getting this questionnaire?

24  A.  I truly didn't think anything of it.  I thought it was

25  more like an auditing-type thing.  I didn't think anything of
```

C. Groff - Direct

1   it.

2   Q.  Did you talk to Mr. Smith about it?

3   A.  After more questions of finding out about it, yes, I did.

4   Q.  Did you call Mr. Smith?

5   A.  I did.

6   Q.  And what did you ask or talk about?

7   A.  Well, I had called him and asked if I could have some

8   money out of it, that I could use some money, and he

9   basically said that, no, that my investment is not liquid,

10  that you just can't call and get your money out of it.

11  Q.  Did that concern you?

12  A.  Yes.  Because I needed money.

13  Q.  Okay.  What did you do after you spoke with Mr. Smith?

14  A.  I hired an attorney.

15  Q.  And did you have an in-person meeting after you hired an

16  attorney with Mr. Smith?

17  A.  Yes.

18          THE COURT:  Raise your voice.  Raise your voice.

19          THE WITNESS:  Okay.

20          Yes.  Before that, though, I had -- whenever I

21  called and asked for money, I had my daughter -- I put the

22  phone on speaker and asked her to listen, just so she could

23  verify anything that he said.

24  BY MS. YUSI:

25  Q.  That's when you asked him to get money out?

C. Groff - Direct

1    A.   Yes.

2    Q.   All right.   And then you said you hired an attorney.   Did

3    you go meet with Mr. Smith with this attorney and others?

4    A.   Yeah.   I met with the -- my attorney, my new attorney and

5    the bishop of our church.

6    Q.   All right.   And this was after June 2015, after you had

7    gotten the questionnaire?

8    A.   Yes.

9    Q.   And what did you say to Mr. Smith in this meeting?

10   A.   Well, I went to tell him that the -- he's -- he's being

11   investigated by the federal government and there must be

12   something he's doing wrong and to please stop what he is

13   doing and could I please have my money back.

14   Q.   Were you concerned for Mr. Smith?

15   A.   I was.   That's the reason I went there.   My attorney

16   said --

17            THE COURT:   Don't tell us what your attorney told

18   you.

19   BY MS. YUSI:

20   Q.   Don't tell us what your attorney said.

21   A.   I didn't have to meet with him, but I considered him and

22   his wife my friend, and so I took the attorney and my bishop

23   to talk to Bill to say, "Bill, this is something that you

24   could get in a lot of trouble for, and I just wanted to tell

25   you please stop doing what you're doing."

———————C. Groff - Direct———————

1   Q.  What was his response?

2   A.  "Why are we here?"  And just getting very heated.

3   Q.  Was that the last time you spoke with Mr. Smith?

4   A.  Yes.

5   Q.  All right.  On October 22nd, 2015, did you file a civil

6   suit against Mr. Smith?

7   A.  Yes.

8   Q.  And was it concerning your investments?

9   A.  Yes.

10  Q.  And did the complaint charge negligence -- negligent

11  misrepresentation, intentional misrepresentation, breach of

12  fiduciary duty, and unlawful, unfair, and deceptive business

13  practices under California law?

14  A.  Yes.

15          THE COURT:  Let's stop right there.

16          MS. YUSI:  Yes, sir.

17          THE COURT:  We're going to take a break for lunch

18  for an hour and a half, and then we're coming back, and then

19  we're going to continue with the examination.

20          Ma'am, you may step down during the break, but do

21  not discuss your testimony.

22          (The witness stepped down.)

23          (The jury exited the courtroom.)

24          THE COURT:  Counsel, have a seat for a second.

25          The Court just wanted to make one additional comment

─────────────── C. Groff - Direct ───────────────

1   with respect to its ruling regarding reference to the civil

2   complaint.

3           Had the government not raised it, it certainly would

4   have been well within the scope of the cross-examination for

5   the defendant to refer to it as a basis for bias, that she

6   filed a lawsuit against the defendant.  And had you not

7   referred to it as a basis for bias, that could have raised

8   another question.  So the Court believes it's appropriate to

9   do just what we did.  We'll be in recess.

10          (Recess from 1:00 p.m. to 2:31 p.m.)

11          (The witness resumed the stand.)

12          (The jury entered the courtroom.)

13          THE COURT:  Let the record reflect that all jurors

14  are here after lunch.

15          Does counsel concur?

16          MS. YUSI:  The government agrees.

17          MS. McCASLIN:  Mr. Smith agrees.

18          THE COURT:  Mr. Yarow, do you agree?

19          MR. YAROW:  No questions, Your Honor.  I'm sorry.

20  BY MS. YUSI:

21  Q.  Ms. Groff, right before we broke for lunch, we were

22  talking about a civil complaint you filed in October 2015.

23  After that, at some point were you notified of Bill Smith's

24  bankruptcy proceedings?

25  A.  Yes.

———————C. Groff - Cross (By Mr. Grindrod)———————

1    MS. YUSI:  If we can show Exhibit 1213, which is

2    already in evidence.

3    BY MS. YUSI:

4    Q.  Were you notified of his bankruptcy filing by the Court?

5    A.  Yes.

6    Q.  If we can look at Page 28.  And is that your name and

7    information listed as a creditor?

8    A.  Yes.

9    MS. YUSI:  I think those are all of my questions at

10   this time, but I'm sure counsel will have questions for you.

11   THE COURT:  Cross-examination.

12   MR. YAROW:  No questions, Your Honor.

13                    CROSS-EXAMINATION

14   BY MR. GRINDROD:

15   Q.  Hi, Ms. Groff.

16   A.  Hi.

17   Q.  I have some questions for you, but hopefully not too

18   many.

19   So you talked a little bit about your background

20   with Ms. Yusi.  You spent most of your -- most of your adult

21   life not working outside the home but raising five children;

22   is that right?

23   A.  Correct.

24   Q.  And you had this money from an inheritance?

25   A.  From the farm that I worked on, yes.

———————C. Groff - Cross (By Mr. Grindrod)———————

1  Q.  Right.  And it was actually Mr. Smith's wife that

2  suggested you talk to him about what to do --

3  A.  Yes, because I knew her better than I knew Bill.

4  Q.  Sure.  So you went to meet with Bill?

5  A.  Correct.

6  Q.  And one of the things that you all talked about was

7  Spectrum 100, right?

8  A.  Yes.

9  Q.  And Spectrum 100 was not Bill Smith's company, right?

10 A.  I'm guessing.  Do I know for sure?  I don't know.

11 Q.  Let's look at -- well, did you go over some paperwork

12 with Mr. Smith about Spectrum 100 when you met with him?

13 A.  Yes.

14        MR. GRINDROD:  Okay.  Let's look at Smith 127 just

15 for the witness, please.

16 BY MR. GRINDROD:

17 Q.  Did a document appear in front of you, ma'am?

18 A.  Yes.

19 Q.  And that's a multipage document, so I can scroll down,

20 but do you recognize this?

21 A.  Yes.

22 Q.  And is this the paperwork that you went over with

23 Mr. Smith before?

24 A.  Yes.  That's Bill's -- Bill wrote those numbers down.

25 Q.  Okay.

Carol L. Naughton, Official Court Reporter

C. Groff - Cross (By Mr. Grindrod)

```
1              MR. GRINDROD:  Your Honor, I would offer Smith 127.
2              THE COURT:  Any objection?
3              MS. YUSI:  No, Your Honor.
4              THE COURT:  Smith 127 will be admitted.
5              (Defendant Smith's Exhibit 127 was admitted.)
6   BY MR. GRINDROD:
7   Q.  And you mentioned on direct examination that the idea
8   behind Spectrum 100 was to put a group of people together to
9   buy spectrum licenses?
10  A.  Yes.
11  Q.  So you wouldn't buy one yourself, you would be part of a
12  pool basically?
13  A.  Yes.
14  Q.  Okay.  And that's one of the things that Bill explained
15  to you about what you were investing in, right?
16  A.  Yes.
17  Q.  And when you met with Bill to talk about Spectrum 100, he
18  walked through this document with you, right?
19  A.  Yes.  But do I understand it?  No.
20  Q.  Okay.
21  A.  He can walk through it -- and I told him that.  "I'm glad
22  you're showing me this, but does it make sense to me?  No."
23  Q.  But he sat with you for a while and tried to explain
24  everything to you?
25  A.  Yes, he did.
```

C. Groff - Cross (By Mr. Grindrod)

1   Q.  And he showed you -- let's jump, for example --

2          MR. GRINDROD:  Ms. McCaslin, can you jump to

3   Page 18?

4   BY MR. GRINDROD:

5   Q.  Is this Bill's handwriting here?

6   A.  Yes.

7   Q.  Okay.  And do you remember him trying to explain to you

8   kind of what all these numbers meant?

9   A.  Yes.  It was --

10  Q.  I know it was a long time ago but...

11  A.  It's okay.  I remember.

12  Q.  And do you remember -- let's see, one of the things

13  Ms. Yusi asked you about was the timing and what the

14  expectation was as far as the timing of a return.  Do you

15  remember her asking you about that?

16  A.  Yes.

17  Q.  Okay.

18          MR. GRINDROD:  Can we look at Page 9, Ms. McCaslin?

19  BY MR. GRINDROD:

20  Q.  So this was one of those pages that Mr. Smith went over

21  with you, right?

22  A.  I don't remember seeing a risks page.

23  Q.  Okay.  But this is just part of that document that you

24  guys went over, right?

25  A.  It's part of the document, but I don't know that we went

Carol L. Naughton, Official Court Reporter

—— C. Groff - Cross (By Mr. Grindrod) ——

1  over the risks.  It was, like, it's a sure thing.

2  Q.  Okay.  And I know some of the stuff in here, it's long

3  paragraphs, involves some technical information, but here

4  this just says -- at least the top line, it says, "Risks,"

5  and then the bullet point that says "Time," right?

6  A.  Yes.

7  Q.  Okay.  Do you remember Mr. Smith telling you about some

8  of the people who were involved in a company called Janus

9  Spectrum?

10 A.  I remember hearing "Janus Spectrum."

11 Q.  Okay.

12      MR. GRINDROD:  Ms. McCaslin, could you jump to

13 Page 21.

14 BY MR. GRINDROD:

15 Q.  Again, I know it was a long time ago, but do either of

16 these names mean anything to you, David Alcorn or Kent

17 Maerki?

18 A.  I've heard their names.  I'm not great with remembering

19 names.

20 Q.  No, that's fine.  All you can do is tell me what you

21 remember, and if you don't remember, that's fine.

22 A.  Thank you.

23 Q.  So, ma'am, let's --

24      MR. GRINDROD:  Ms. Yusi, could you remind me, I know

25 you offered an exhibit that had the -- I think the first page

———C. Groff - Cross (By Mr. Grindrod)———

1    had that Summit check on it.

2            MS. YUSI:  845.

3            MR. GRINDROD:  Thank you.

4            Could you pull up Government 845.

5    BY MR. GRINDROD:

6    Q.  And so, ma'am, this is a copy of the check that you wrote

7    for your Spectrum 100 investment, right?

8    A.  Yes.

9    Q.  And I think you said on direct you were not sure why it

10   was to Summit Trust; is that right?

11   A.  Yes.

12   Q.  Okay.  But you didn't write the check to Bill.  It was to

13   Summit Trust, right?

14   A.  Correct.

15   Q.  Okay.  And let's go back to Smith 127.  Whose handwriting

16   is this?

17   A.  That's mine.

18   Q.  That's your handwriting?

19   A.  Yes.

20   Q.  And you say, "Summit Trust Company manages the

21   Spectrum 100 account.  See Page 14.  Hence, check was written

22   to Summit Trust Company on October 18, 2013, for $100,100,"

23   and then you have the check number, right?

24   A.  Correct.

25   Q.  So did you know at some point why Summit Trust was

C. Groff - Cross (By Mr. Grindrod)

1   involved?

2   A.  When I wrote that, this is because I was trying to figure

3   out who is Summit and who is the other -- the spectrum.  And

4   so I was trying to make sense of it, that I could make sense

5   of it, so that was my note to say, okay, this is who --

6   somehow they're connected, so it was just my trying to

7   connect companies, I guess.

8   Q.  Right.  And so I understand that you're saying today you

9   don't really remember what Summit Trust was involved with,

10  but you knew at one point, right?

11  A.  I don't know -- Summit Trust is a manager of spectrum, so

12  I'm guessing that Summit Trust must be spectrum, must be all

13  the radio waves.

14  Q.  And you remember when you met with Mr. Smith about this,

15  that he gave you a client brochure on what Summit Trust was

16  and what they do?

17  A.  Yes.

18  Q.  Right.

19  A.  But truth, did I read it?  Because I trusted Bill to know

20  that -- I told him I have learning disabilities.  He can tell

21  me percentages, and he can give me numbers, but it's not

22  going to make sense to me.

23  Q.  Okay.  And you sent your money off to Summit Trust, and

24  it went to Spectrum 100, right?

25  A.  I hand-gave it to Bill.  I was right across the desk from

C. Groff - Cross (By Mr. Grindrod)

1   Bill.

2   Q.  And that check went to Summit Trust and Spectrum 100?

3   A.  I gave it to Bill.

4   Q.  Was it cashed?

5   A.  It was, the check.

6        MR. GRINDROD:  I don't have any further questions,

7   Your Honor.

8        THE COURT:  Any redirect?

9        MS. YUSI:  No, Your Honor.

10        THE COURT:  May the witness be permanently excused,

11   counsel?

12        MS. YUSI:  Yes, Your Honor.

13        MR. YAROW:  Yes, Your Honor.

14        MR. GRINDROD:  Yes, sir.

15        THE COURT:  You may step down, ma'am.  Thank you for

16   coming.

17        (The witness was excused.)

18        THE COURT:  Next witness.

19        MS. O'BOYLE:  Government calls Raeann Gibson.

20        THE COURT:  For your planning, the Court is going to

21   break at about 5:00, 5:15 at the latest, to take up other

22   matters.

23        MS. O'BOYLE:  Thank you, Your Honor.  Ms. Gibson

24   will take the remainder of the day on direct.

25        THE COURT:  Ladies and gentlemen, it takes a little

───R. Gibson - Direct───

 1    bit of time to transport the witness from the United States

 2    Marshal's custody to the courtroom, so she should be in here

 3    very soon.

 4                (Pause in the proceedings.)

 5                (Witness sworn.)

 6                RAEANN GIBSON, called by the Government, having been

 7    first duly sworn, was examined and testified as follows:

 8                        DIRECT EXAMINATION

 9    BY MS. O'BOYLE:

10    Q.   Good afternoon, Ms. Gibson.

11    A.   Good afternoon.

12    Q.   Could you please state and spell your name for the court

13    reporter.

14    A.   Raeann Gibson, R-a-e-a-n-n G-i-b-s-o-n.

15    Q.   Make sure that microphone is right up close because they

16    need to hear you all the way in the back of the courtroom.

17    Okay, ma'am?

18                How old are you, Ms. Gibson?

19    A.   50.

20    Q.   Do you know an individual named David Alcorn?

21    A.   Yes.

22    Q.   Do you see him in the courtroom here today?

23                THE COURT:  We had this problem before.  Everybody

24    on the left side of the courtroom, please pull down the mask.

25                THE WITNESS:  I want to -- it's been a while since

────── R. Gibson - Direct ──────

1    I've seen him.

2    BY MS. O'BOYLE:

3    Q.   Do you know an individual named Bill Smith?

4    A.   Yes.

5    Q.   Do you see Mr. Smith in the courtroom here today?

6    A.   Yes, I do.

7    Q.   Can you point out who he is and describe an article of

8    clothing he's wearing?

9    A.   Yes.  White hair over in the back.  I cannot see the

10   clothing.  The computer screen is right in the way.

11   Q.   Okay.  And so do you see -- do you see anyone on the left

12   side that you identify as Mr. Alcorn?

13   A.   I believe right next to Mr. Smith.

14          MR. GRINDROD:  Let the record reflect I'm not David

15   Alcorn.

16          THE COURT:  The record will reflect she has not

17   identified Mr. Alcorn, but she has identified Mr. Smith.

18   Let's move on.

19          MS. O'BOYLE:  Thank you, Your Honor.

20   BY MS. O'BOYLE:

21   Q.   On May 29th, 2019, did you plead guilty in this Court to

22   conspiracy to commit mail fraud?

23   A.   Yes.

24   Q.   And who did you conspire with to commit mail fraud?

25   A.   Daryl Bank, Billy Seabolt, Kent Maerki, David Alcorn,

R. Gibson - Direct

1   Bill Smith, and others.

2   Q.   Did you engage in a scheme to defraud?

3   A.   Yes.

4   Q.   And who did you defraud?

5   A.   Clients and sales reps' clients.

6   Q.   And just generally, high level, how did you defraud these

7   clients?

8   A.   An investor would make a purchase into one of the

9   Dominion offerings.  That money would come into a bank

10  account set up for that particular deal.  Money was then

11  taken off the top and kept there at Dominion, and the

12  remainder was sent to the company that we raised money for.

13  Q.   Okay.  Now, did you plead guilty because you are, in

14  fact, guilty of conspiring with others to defraud victims

15  across the country?

16  A.   Yes.

17  Q.   On May 29th, 2019, did you also plead guilty in this

18  court to conspiracy to commit money laundering?

19  A.   Yes.

20  Q.   Did you launder investor funds through numerous limited

21  liability accounts?

22  A.   Yes.

23  Q.   Who, if anyone, directed you to move those investor

24  funds?

25  A.   Daryl Bank.

Carol L. Naughton, Official Court Reporter

R. Gibson - Direct

1   Q.   What banks did you use?

2   A.   BayPort Credit Union and Oculina and a few others.

3   Q.   Just generally could you please describe the process

4   through which you laundered those funds?

5   A.   Yes.  So when an investor would make a purchase and that

6   money would come into a Dominion account set up for that deal

7   and the moneys that were taken off and kept there at

8   Dominion, they would be moved from management companies into

9   different ones, for instance, Dominion Investment Group, to

10  pay expenses from there.

11  Q.   Okay.  And I'd like to show you Government's Exhibit 94.

12  In connection with your plea, did you enter into a plea

13  agreement with the government?

14  A.   Yes.

15  Q.   Do you recognize Government's Exhibit 94?

16  A.   I do.

17  Q.   What is it?

18  A.   This is my plea agreement.

19          MS. O'BOYLE:  Government moves in Exhibit 94.

20          THE COURT:  Any objection?

21          94 will come in.

22          (Government's Exhibit 94 was admitted.)

23  BY MS. O'BOYLE:

24  Q.   Now, Ms. Gibson, what is this document?

25  A.   This is the -- my plea agreement.

Carol L. Naughton, Official Court Reporter

─R. Gibson - Direct─

1  Q.  And have you been sentenced in connection with this plea

2  agreement?

3  A.  I have.

4  Q.  And after you testified, what do you hope will occur, if

5  anything?

6  A.  I hope to bring some closure and some peace of mind to

7  all the people that lost money in this, all the victims of

8  this case.

9  Q.  Okay.  Anything else?

10  A.  No.

11  Q.  Okay.  Has the government made any promises to you about

12  what your sentence, your actual sentence will be in this

13  case?

14  A.  No.

15  Q.  Who will ultimately decide whether to reduce your

16  sentence?

17  A.  Judge Jackson.

18  Q.  Let's move on and get into a little bit of your

19  background.

20       Ms. Gibson, where did you grow up?

21  A.  In Westerville, Ohio.

22  Q.  What is your educational background?

23  A.  12th grade, high school.

24  Q.  Did you go to college?

25  A.  I did not.

R. Gibson - Direct

1  Q.  After you graduated from high school, did you start
2  working?
3  A.  Yes.
4  Q.  Where did you start working?
5  A.  Northwestern Mutual Life Insurance Company at that time.
6  Q.  What position did you hold?
7  A.  Administrative/secretarial.
8  Q.  And at some point did you move to Virginia?
9  A.  Yes.
10 Q.  And what part of Virginia did you move to?
11 A.  Virginia Beach.
12 Q.  In or around 2005, did you start working at Resource
13 Bank?
14 A.  Yes.
15 Q.  And who was your boss at Resource Bank?
16 A.  Daryl Bank.
17 Q.  So you started working with him around 2005?
18 A.  Yes.
19 Q.  And what was your position with Resource Bank?
20 A.  Executive assistant.
21 Q.  What types of things did you do as Mr. Bank's executive
22 assistant?
23 A.  Answered phone calls, set up appointments, keep files,
24 client files, do his travel calendar.
25 Q.  And what type of business was Mr. Bank in at Resource

──────R. Gibson - Direct──────

1   Bank?

2   A.  It was brokerage, financial, investment firm.

3   Q.  Are you familiar with an entity called Dominion

4   Investment Group?

5   A.  Yes.

6   Q.  If you could take a look at Government's Exhibit 64.  Do

7   you recognize Government's Exhibit 64?

8   A.  Yes.

9   Q.  What is it?

10  A.  The Virginia Articles of Organization for Dominion

11  Investment Group.

12  Q.  Right.

13          MS. O'BOYLE:  Government moves in Exhibit 64.

14          THE COURT:  Exhibit 64 will be admitted.

15          (Government's Exhibit 64 was admitted.)

16  BY MS. O'BOYLE:

17  Q.  Taking a look at the top of this, what is this -- taking

18  a step back, just generally what is this document?

19  A.  The Articles of Organization are what sets up the -- a

20  company through the State of Virginia for an LLC.

21  Q.  And what is the limited liability company that is the

22  subject of this Articles of Organization?

23  A.  Dominion Investment Group.

24  Q.  And who was the initial registered agent?

25  A.  Daryl Bank.

R. Gibson - Direct

1   Q.   And who made the decisions for Dominion Investment Group?

2   A.   Daryl Bank.

3   Q.   Now, did Mr. Bank eventually leave Resource Bank?

4   A.   Yes.

5   Q.   And when Mr. Bank left there, did you go with him?

6   A.   I did.

7   Q.   Where did you and Mr. Bank go after he left Resource

8   Bank?

9   A.   To Bank of the Commonwealth.

10  Q.   What was Mr. Bank's job at Bank of the Commonwealth?

11  A.   He handled the investment division inside the bank.

12  Q.   And what was your job at Bank of the Commonwealth?

13  A.   Still remained as, like, an executive assistant.

14  Q.   And as Mr. Bank's executive assistant, did you ever deal

15  directly with investor funds?

16  A.   I did not.

17  Q.   So while working there, did you ever -- did you move

18  moneys in between accounts?

19  A.   No.

20  Q.   Now, in fact, were you even living in Virginia when you

21  worked with Mr. Bank at the Bank of the Commonwealth?

22  A.   In the beginning, yes, and I believe it was 2007 when we

23  moved back to Ohio.

24  Q.   At some point did Mr. Bank leave the Bank of the

25  Commonwealth?

R. Gibson - Direct

```
 1    A.  Yes.
 2    Q.  Did you continue to work with Mr. Bank after he left the
 3    Bank of the Commonwealth?
 4    A.  I did.
 5    Q.  Where did you go?
 6    A.  That's where he went independent.  So we were just under
 7    Dominion Investment Group at the time over on -- in Virginia
 8    Beach on Commuter Drive.
 9    Q.  On Commuter Drive in Virginia Beach?
10    A.  Yes.
11    Q.  And what company did you work for after Mr. Bank left
12    Bank of the Commonwealth?
13    A.  Dominion Investment Group.
14    Q.  Was Mr. Bank still providing financial services to
15    clients?
16    A.  Yes.
17    Q.  Now, to your knowledge, did Mr. Bank hold any licenses or
18    certifications during this time?
19    A.  At that point that's right around when he received a
20    FINRA ban.
21    Q.  Let's talk a little bit about that.
22            You said Mr. Bank received a FINRA ban?
23    A.  Yes.
24    Q.  If we could take a look at Government's Exhibit 1.  Do
25    you recognize Government's Exhibit 1?  I believe it's already
```

R. Gibson - Direct

1    in evidence.

2    A.   Yes.

3    Q.   And what is this?

4    A.   This is the complaint from Financial Industry Regulatory

5    Authority, which is FINRA.

6    Q.   Is this document his FINRA ban?

7    A.   Yes.

8    Q.   And after Mr. Bank settled his FINRA regulatory issues,

9    did he still sell securities?

10   A.   He wasn't selling securities, but there was an account

11   that he moved over to where he set up a trust company that

12   may have been on hold and then, at that point, might have

13   been liquidated to purchase into something else.

14   Q.   At some point while you were working for Mr. Bank, did

15   you move back from Ohio, back to Virginia?

16   A.   Yes.

17   Q.   And what, if anything, did Mr. Bank offer you to serve as

18   an incentive to move back to Virginia?

19   A.   He offered to double my salary at the time, to help with

20   our health insurance until my husband at the time got a job

21   and was able to do that, and once things kind of got up and

22   running, he would provide a company car.

23   Q.   And what did you decide to do?

24   A.   We decided to pack our family and move to Virginia.

25   Q.   And now, are you familiar with an entity called Dominion

R. Gibson - Direct

1    Private Client Group?

2    A.   Yes.

3    Q.   What was Dominion Private Client Group?

4    A.   That is where the sales reps would be paid their

5    commissions from, and sometimes Daryl was paid from there and

6    his American Express at times as well.

7    Q.   Who controlled Dominion Private Client Group?

8    A.   Daryl Bank.

9    Q.   Let's look at Government's Exhibit 69.  Do you recognize

10   Government's Exhibit 69?

11   A.   Yes.

12   Q.   What is it?

13   A.   The Virginia Articles of Organization for Dominion

14   Private Client Group LLC.

15          MS. O'BOYLE:  Government moves in Exhibit 69.

16          THE COURT:  Exhibit 69 will be admitted.

17          (Government's Exhibit 69 was admitted.)

18   BY MS. O'BOYLE:

19   Q.   So is this another example of the Articles of

20   Organization of a limited liability company here in Virginia?

21   A.   Yes.

22   Q.   And so who was the initial registered agent of Dominion

23   Private Client Group?

24   A.   Daryl Bank.

25   Q.   Was he also the organizer?

─────────────────────R. Gibson - Direct─────────────────────

1    A.   Yes.

2    Q.   When was it organized?

3    A.   August 2nd, 2008.

4    Q.   Are you familiar with an entity called Dominion Franchise

5    Group?

6    A.   Yes.

7    Q.   Let's look at Government's Exhibit 76.  Do you recognize

8    Government's Exhibit 76?

9    A.   Yes.

10   Q.   What is this?

11   A.   The Articles of Organization for Dominion Franchise Group

12   LLC.

13            MS. O'BOYLE:  Government moves in Exhibit 76.

14            THE COURT:  Exhibit 76 will be admitted.

15            (Government's Exhibit 76 was admitted.)

16   BY MS. O'BOYLE:

17   Q.   And so what was Dominion Franchise Group LLC?

18   A.   That was set up when Daryl connected with Dental Support

19   Plus Franchise and Kent Maerki out of Arizona.

20   Q.   And where did Dominion Franchise operate out of?

21   A.   Out of Dominion offices on Commuter Drive in Virginia

22   Beach.

23   Q.   Let's take a look at Government's Exhibit 73.  Do you

24   recognize Government's Exhibit 73?

25   A.   Yes.

R. Gibson - Direct

```
 1   Q.   What is this?
 2   A.   This is for a sales conference for Dominion.
 3             MS. O'BOYLE:  Government moves in Exhibit 73.
 4             THE COURT:  Exhibit 73 will be admitted.
 5             (Government's Exhibit 73 was admitted.)
 6             MS. O'BOYLE:  Your Honor, may I have one moment?  I
 7   need to get my copy.  I apologize.
 8             (Pause in the proceedings.)
 9   BY MS. O'BOYLE:
10   Q.   If you could skip down to Page 30, please.  And what is
11   the sales conference directory, Ms. Gibson?
12   A.   Sorry, what is the directory?
13   Q.   What was the sales conference that Dominion Private
14   Client Group put on?
15   A.   This was -- there would be conferences every now and then
16   that would, you know -- like, for any sales reps that were
17   interested in working with Dominion, and then the people that
18   we were doing business with would come there to speak.
19   Q.   Okay.  And what is this -- who is this individual?
20   A.   This is David Alcorn.
21   Q.   And what was he?
22   A.   Managing director at Janus Spectrum LLC in Arizona.
23   Q.   And have you met Mr. Alcorn before?
24   A.   Yes.
25   Q.   Have you met him on more than one occasion?
```

R. Gibson - Direct

1    A.   Yes.

2    Q.   And what was your understanding that Mr. Alcorn did?

3    A.   He owned and ran Janus Spectrum out of Arizona.

4    Q.   Okay.  Down here what does it say that Janus Spectrum

5    does?

6    A.   "Janus Spectrum LLC is a boutique wireless spectrum

7    consulting and investment firm based in Scottsdale, Arizona.

8    The Janus mission is to generate healthy competition within

9    the spectrum industry by participation and alliance with

10   other midsized private and institutional investors in the

11   future rewards of the boundless opportunities in the wireless

12   spectrum industry."

13   Q.   Now, after you moved the Dominion Private Client Group

14   offices to Virginia Beach, did you and Mr. Bank remain living

15   in Virginia Beach?

16   A.   For a while, and then we moved to Florida.

17   Q.   And approximately when did you move to Florida?

18   A.   It was 2010.

19   Q.   And so was there a Dominion Investment Group office in

20   Florida as well as Virginia Beach?

21   A.   Yes, there was.

22   Q.   And at first what address did Dominion Investment Group

23   operate out of?

24   A.   That was out of Daryl Bank's home in Port St. Lucie,

25   Florida.

R. Gibson - Direct

1   Q.  You operated the investment company out of Mr. Bank's
2   home?
3   A.  Correct.
4   Q.  How long did you operate out of Mr. Bank's house?
5   A.  For about two and a half years.  I think it was around
6   the summertime 2010 when we moved there, and I think it was
7   January 2013 when we moved into an office space on
8   Port St. Lucie Boulevard.
9   Q.  You said you moved to office space on Port St. Lucie
10  Boulevard?
11  A.  Port St. Lucie Boulevard.
12  Q.  And then at some point did the office move again?
13  A.  Yes.  I think it was early 2017, to St. Lucie West
14  Boulevard, same city.
15  Q.  Now, I want to focus in on the 2011 time frame.  Okay?
16  At that time did you and Mr. Bank meet an individual named Ed
17  Lichtig?
18  A.  Yes.  Daryl did.
19  Q.  Who was Mr. Lichtig?
20  A.  I know he produced or managed radio shows.
21  Q.  Did Mr. Lichtig introduce you to an individual named Kent
22  Maerki?
23  A.  Yes.
24  Q.  Who was Mr. Maerki?
25  A.  Mr. Maerki had founded or ran Dental Support Plus

─────R. Gibson - Direct─────

1    Franchise out of Arizona.

2    Q.   Did Mr. Bank start to work with Mr. Maerki on a variety

3    of investment products?

4    A.   Yes.

5    Q.   Now, did Mr. Maerki introduce you and Mr. Bank to

6    Mr. Alcorn?

7    A.   Yes.

8    Q.   And I know we just looked at the directory.  What was

9    your understanding that Mr. Alcorn did?

10   A.   He ran Janus Spectrum out of Arizona, and his company

11   filed for the licenses, for the FCC licenses for spectrum.

12   Q.   Do you know whether Janus Spectrum LLC had a physical

13   office?

14   A.   I don't know.

15           MS. O'BOYLE:  If we could take a look at

16   Government's Exhibit 300E-1, which is going to be a disk.

17   BY MS. O'BOYLE:

18   Q.   Do you recognize 300E-1, Ms. Gibson?

19   A.   Yes.

20   Q.   Is it a meeting involving Mr. Maerki and Mr. Alcorn with

21   sales representatives?

22   A.   Yes.

23   Q.   Did you listen to all the clips and identify their

24   voices?

25   A.   I did.

R. Gibson - Direct

```
 1              MS. O'BOYLE:  Government moves in Exhibit 300E-1.

 2              THE COURT:  Hearing no objection, the exhibit is

 3    admitted.

 4              (Government's Exhibit 300E-1 was admitted.)

 5              MS. O'BOYLE:  If we could play the first clip of 1A.

 6              (Audio played in open court.)

 7    BY MS. O'BOYLE:

 8    Q.  Whose voice was that, Ms. Gibson?

 9    A.  That was Kent Maerki.

10              MS. O'BOYLE:  If we could go to clip 1B.

11              (Audio played in open court.)

12    BY MS. O'BOYLE:

13    Q.  Okay.  The second voice, was that Mr. Alcorn?

14    A.  Yes.

15              MS. O'BOYLE:  If we could go to clip H, please.

16              (Audio played in open court.)

17    BY MS. O'BOYLE:

18    Q.  Did you and Mr. Bank begin to sell an investment related

19    to Janus Spectrum LLC?

20    A.  Yes.

21    Q.  And did Mr. Bank and Mr. Maerki and Mr. Alcorn meet to

22    talk about this investment?

23    A.  Yes.

24    Q.  What was the name of the very first investment that

25    Mr. Bank structured around Janus Spectrum LLC?
```

─────────R. Gibson - Direct─────────

1    A.   It was called Janus Spectrum Group LLC.

2    Q.   Let's take a look at Government's Exhibit 300W.  Do you

3    recognize 300W, Ms. Gibson?

4    A.   Yes.

5    Q.   What is it?

6    A.   This is the Virginia Articles of Organization for Janus

7    Spectrum Group LLC.

8              MS. O'BOYLE:  Government moves in Exhibit 300W.

9              THE COURT:  300W will be admitted.

10             (Government's Exhibit 300W was admitted.)

11   BY MS. O'BOYLE:

12   Q.   Ms. Gibson, I'm just going to blow this up for the jury.

13   What are you creating here?

14   A.   This is the LLC for Janus Spectrum Group, which is the

15   deal that was built around David Alcorn's Janus Spectrum LLC

16   in Arizona.

17   Q.   We'll break that up here and explain it to the jury in a

18   minute.

19             Who controlled Janus Spectrum Group LLC?

20   A.   Daryl Bank.

21   Q.   And where were the offices for Janus Spectrum Group?

22   A.   They were out of the Dominion office on Commuter Drive in

23   Virginia Beach.

24   Q.   Who organized this entity?

25   A.   I did.

R. Gibson - Direct

1   Q.  What date?

2   A.  July 19, 2012.

3   Q.  And at whose direction did you create Janus Spectrum

4   Group?

5   A.  Daryl Bank.

6   Q.  Now, let's be clear, was Janus Spectrum Group a separate

7   and distinct entity from Mr. Alcorn's Janus Spectrum LLC?

8   A.  Yes.

9   Q.  Let's take a look at Government's Exhibit 300E.  This is

10  the Operating Agreement of Janus Spectrum LLC.  This was the

11  entity in Arizona; is that correct?

12  A.  Yes.

13          MS. O'BOYLE:  Government moves in Exhibit 300E.

14          THE COURT:  Exhibit 300E, as in echo, will be

15  admitted.

16          (Government's Exhibit 300E was admitted.)

17  BY MS. O'BOYLE:

18  Q.  Ms. Gibson, did you have any involvement in creating this

19  Operating Agreement?

20  A.  No, I did not.

21  Q.  Okay.  And so the date on this is September 20 of 2011;

22  is that right?

23  A.  Yes.

24  Q.  If we could go to Page 12.  And there were two signatures

25  here for managers, Kent Maerki and David Alcorn, on behalf of

Carol L. Naughton, Official Court Reporter

R. Gibson - Direct

1    David Alcorn Professional Corp.  Do you see that?

2    A.   Yes.

3    Q.   I'm going to scroll down to Schedule A.  Does this list

4    two members?

5    A.   Yes, it does.

6    Q.   What was -- what does it list for Kent Maerki's initial

7    capital contribution for Janus Spectrum LLC?

8    A.   $45.

9    Q.   And what does it list for David Alcorn Professional

10   Corp's initial capital contribution?

11   A.   $55.

12   Q.   Now, Ms. Gibson, when you were dealing with Janus

13   Spectrum, were you aware that Mr. Maerki was an owner of this

14   entity?

15   A.   No, I wasn't.

16   Q.   Who did you believe owned Janus Spectrum LLC?

17   A.   David Alcorn.

18   Q.   Now, before you created Janus Spectrum Group, the

19   Virginia entity, did Mr. Alcorn visit Mr. Bank in Florida?

20   A.   Yes.

21   Q.   What was the purpose of that meeting?

22   A.   I wasn't involved in that meeting, but I know it was the

23   initial setting up this deal that we were going to be

24   offering through Dominion.

25   Q.   Did Mr. Bank and Mr. Alcorn meet in Florida outside your

R. Gibson - Direct

1    presence?

2    A.  Correct.

3    Q.  Let's take a look at Government's Exhibit 300V, as in

4    victor.  Do you recognize 300V?

5    A.  Yes.

6    Q.  Is it e-mails between Mr. Bank and Mr. Alcorn?

7    A.  Yes.

8            MS. O'BOYLE:  Government moves in Exhibit 300V, as

9    in victor.

10           THE COURT:  Exhibit 300V, as in victor, is admitted.

11           (Government's Exhibit 300V was admitted.)

12   BY MS. O'BOYLE:

13   Q.  We're going to start on Page 3.  And so this first e-mail

14   that we're going to focus on, who is this e-mail from?

15   A.  From Daryl Bank.

16   Q.  And who is it to?

17   A.  David Alcorn.

18   Q.  Is there a copy to someone?

19   A.  Yes.  To Kent Maerki.

20   Q.  And what office were you working out of in June of 2012?

21   A.  This would have been out of Daryl's home.

22   Q.  Okay.  Let's take a look at -- what did Mr. Bank say to

23   Mr. Alcorn?

24   A.  "David, thanks again for the visit.  We're excited to get

25   the ball rolling.  Would you e-mail any and all sales and

R. Gibson - Direct

1    marketing materials?  Also, would you send the underlying
2    PowerPoint Kent used in the video."
3    Q.  So, "excited to get the ball rolling," what was Mr. Bank
4    excited to get the ball rolling on?
5    A.  To get the deal set up so he could start selling that to
6    clients and then clients of sales reps.
7    Q.  And so were you going to be raising funds, investor funds
8    from those clients?
9    A.  Correct.
10   Q.  We'll go up to Page 2.  And does Mr. Alcorn respond to
11   Mr. Bank?
12   A.  Yes.
13   Q.  And looking here at this particular e-mail, he says, "I
14   have not had a chance to review the video, but I will get it
15   done this weekend."  And then he has an estimated use of
16   funds.  Do you see that?
17   A.  Yes.
18   Q.  What was your understanding of how much -- how much a
19   license application was going to cost?
20   A.  I think it started out -- I want to say it was 52,500,
21   was the beginning of where it was.
22   Q.  Did it go down or up after that?
23   A.  It went down from there.
24   Q.  Mr. Alcorn also says, "The total appraised value of five
25   channels in the top 25 economic areas would be approximately

—————R. Gibson - Direct—————

1    61.1 million."

2              Do you know what an economic area was?

3    A.   Yeah.  It's based around, like, a metropolitan area.

4    Q.   Mr. Alcorn continues.  Can you read the sentence that

5    starts "for one to reasonably expect"?

6    A.   "For one to reasonably expect to achieve 10 times their

7    investment, as Kent's clients who sold their licenses after

8    the lottery, is realistic especially when one reviews the

9    projected rental income.  There will be an abundance of

10   prospective purchasers wishing to purchase the projected

11   income stream, including Janus or Janus affiliates."

12   Q.   It says, "There will be an abundance of prospective

13   purchasers wishing to purchase the projected income stream."

14              What is that?

15   A.   I may be getting it confused, but I was thinking as far

16   as the spectrum being bought back to, like, a major wireless

17   type of company.

18   Q.   Was that the plan, for a major wireless company to buy

19   the spectrum back?

20   A.   Yes.

21   Q.   Let's take a look at the top e-mail.  And who is this

22   e-mail from?

23   A.   From David Alcorn.

24   Q.   And who is it to?

25   A.   To Daryl Bank.

R. Gibson - Direct

1   Q.  And what is the date?

2   A.  July 1st, 2012.

3   Q.  And are there two documents that are attached?

4   A.  Yes.

5   Q.  And if you could read what Mr. Alcorn says to Mr. Bank in

6   this e-mail.

7   A.  "The LPTV concept is something entirely different and not

8   something we want to touch.  Attached are two Word documents

9   that were drafted earlier this year by our partner Jon

10  Palmieri.  These might give you a better idea of the

11  concepts.  I am copying Jon also and asking him to reach out

12  with any ideas he has that might be helpful to you."

13  Q.  Okay.  Now, if we could go to Page 5 of this document,

14  please.  And is this one of the documents that was attached

15  to Mr. Alcorn's e-mail?

16  A.  Yes.

17  Q.  And what is this?  If you could read this, from this

18  document.

19  A.  "Historically owners of high-demand spectrum have sold,

20  leased, or joint-ventured these assets to wireless operators

21  generating significant profits and/or cash flow relative to

22  their acquisition costs."

23  Q.  If you could read the sentence starting "investors."

24  A.  "Investors are provided with opportunities to achieve a

25  100 percent annual preferred return on invested capital

R. Gibson - Direct

1    derived from anticipated revenues resulting from the
2    acquisition and monetization of valuable spectrum."
3    Q.  And can you read the sentence that starts with
4    "presently."
5    A.  "Presently an opportunity exists for individuals to file
6    to own valuable spectrum in the top 100 largest markets in
7    the U.S., including New York, Washington, D.C., and Chicago.
8    This spectrum is in close proximity to spectrum for which
9    AT&T and Verizon paid nearly 17 billion in 2008, and it is
10   these channels on which both carriers are building out their
11   modern LTE networks."
12   Q.  Was there any discussion at this time, at the very
13   beginning, that you would monetize these licenses through a
14   push-to-talk radio system?
15   A.  No.
16   Q.  How were you going to monetize these licenses?
17   A.  By selling them back to AT&T or Verizon Wireless.
18   Q.  Can you read the very first sentence of this document
19   that Mr. Alcorn provided.
20   A.  "Today, this targeted 800-megahertz spectrum is among the
21   most coveted spectrum to wireless carriers."
22   Q.  Let's go down to the second document that was attached.
23   Was this -- was this the second document attached from
24   Mr. Alcorn?
25   A.  Yes.

R. Gibson - Direct

1   Q.  And what is the title of this document?

2   A.  "Excerpts from recent articles about the growth of the

3   wireless industry, the growing shortage of spectrum, and its

4   value to wireless carriers."

5   Q.  So you're talking about wireless carriers here?

6   A.  Yes.

7   Q.  And there's a clip -- does the first bullet point relate

8   to T-Mobile?

9   A.  Yes.

10  Q.  The second bullet point relate to Verizon?

11  A.  Yes.

12  Q.  And the third bullet point relate to AT&T and T-Mobile?

13  A.  Yes.

14  Q.  Lastly, down here, can you read what's in italics here at

15  the very top, in the document that you got from Mr. Alcorn.

16  A.  "Spectrum is the most valuable natural resource of the

17  information age."

18  Q.  And then below it, what does it say in italics?

19  A.  "Bandwidth is the new black gold."

20  Q.  And then one more below it.  What does it say?

21  A.  "Each new computing cycle results in 10 times more

22  devices and greater wealth creation than previous cycles."

23  Q.  What, if anything, did Mr. Bank do with these materials

24  that he received from Mr. Alcorn?

25  A.  A lot of this information was copied and put into an

R. Gibson - Direct

1   investment summary and offerings that would be given to our

2   clients or to sales reps for their clients.

3   Q.  Let's take a look at something that is already in

4   evidence, Government's Exhibit 304.  Do you recognize this,

5   Ms. Gibson?

6   A.  Yes.

7   Q.  What is it?

8   A.  This is an Investment Offering booklet for Janus Spectrum

9   Group.

10  Q.  So this was the first offering that Mr. Bank made in

11  August of 2012?

12  A.  Yes.

13  Q.  And what date is this?

14  A.  August 2012.

15  Q.  So it's a couple months after Mr. Alcorn sent those

16  documents to Mr. Bank?

17  A.  Yes.

18  Q.  What was the purpose of this document?

19  A.  This would be given to any clients or sales reps' clients

20  that might be interested in the spectrum offering that

21  Dominion was putting together.

22  Q.  And I scrolled down to Page 3 of this Investment

23  Offering.  And can you read what's in italics on Page 3 of

24  Mr. Bank's Investment Offering.

25  A.  "Spectrum is the most valuable natural resource of the

––––R. Gibson - Direct––––

1   information age."

2   Q.  And then below it, the next italics.

3   A.  "Bandwidth is the new black gold."

4   Q.  And then the next italics.

5   A.  "Each new computing cycle results in 10 times more

6   devices and greater wealth creation than previous cycles."

7   Q.  Where did Mr. Bank get this information?

8   A.  From Mr. David Alcorn.

9        MS. O'BOYLE:  If we could go to Government's

10  Exhibit 305.  Sorry, this is not in yet.  I apologize.

11  BY MS. O'BOYLE:

12  Q.  Do you recognize this?  Oh, no, it is already in.  I'm

13  sorry.

14  A.  Yes, I do.

15  Q.  What is this, Ms. Gibson?

16  A.  This is an opportunity alert for Janus Wireless Spectrum.

17  Q.  What is an opportunity alert?

18  A.  It's a one-page information sheet to give to clients or

19  sales reps for their clients if they were interested in

20  looking at possibly purchasing Janus Spectrum Group.

21  Q.  How did you distribute this document?

22  A.  Either by mail or e-mail.

23  Q.  Highlighting up here in the corner, it provides "Janus

24  Spectrum Group is an offering focused on asset appreciation

25  and income generation.  Investors are provided with

─────R. Gibson - Direct─────

1    opportunities to achieve a 100 percent annual preferred

2    return on invested capital plus 50 percent of additional

3    profits."

4           Is that right?

5    A.   That's right, yeah -- right.

6    Q.   Where did you get that information?

7    A.   From David Alcorn.

8    Q.   And then down here, again, in the left-hand corner of

9    this opportunity alert, what is written in italics?

10   A.   "Spectrum is the most valuable natural resource of the

11   information age."

12   Q.   And then below it.

13   A.   "Bandwidth is the new black gold."

14   Q.   And then below that.

15   A.   "Each new computing cycle results in ten times more

16   devices and greater wealth creation than previous cycles."

17   Q.   Where did you get this information, Ms. Gibson?

18   A.   From David Alcorn.

19   Q.   Now, did Mr. Bank have a radio show?

20   A.   He did.

21   Q.   And can you describe the radio show for the jury.

22   A.   This would be for educational purposes.  He would do one

23   every week.  And a lot of times it would be centered around

24   the current Dominion offerings.  So he might have somebody,

25   for example, Mr. Alcorn come on the radio show as a guest

R. Gibson - Direct

1    with him to talk about spectrum.

2    Q.  Did the radio show play here in Hampton Roads and in

3    Florida?

4    A.  Yes, it did.

5    Q.  Did you sometimes send e-mail links to the radio show to

6    potential customers and potential salesmen?

7    A.  Yes.

8    Q.  And how often was the show?

9    A.  Weekly.

10   Q.  And you said Mr. Alcorn -- was he ever a guest on

11   Mr. Bank's radio show?

12   A.  Yes.

13           MS. O'BOYLE:  If you could hand the witness

14   Government's Exhibit 309A, please.

15   BY MS. O'BOYLE:

16   Q.  And you've just been handed 309A.  Is that a recording

17   that you listened to of Mr. Bank's radio show where

18   Mr. Alcorn was a guest?

19   A.  Yes.

20   Q.  Did you initial the disk to verify that you've listened

21   to it and verified that it's an authentic recording?

22   A.  I did.

23           MS. O'BOYLE:  Government moves in 309A.

24           THE COURT:  Any objection to 309A?

25           MR. YAROW:  No objection.

R. Gibson - Direct

```
1         THE COURT:  It will be admitted.

2         (Government's Exhibit 309A was admitted.)

3         MS. O'BOYLE:  If we could play clip 1.

4         (Audio played in open court.)

5   BY MS. O'BOYLE:

6   Q.  Who was the first individual that you heard on the

7   recording?

8   A.  Daryl Bank.

9   Q.  And who is the other gentleman?

10  A.  Greg Wyatt.

11  Q.  Who is Mr. Wyatt?

12  A.  He owned the radio station.

13  Q.  You heard the "Putting Your Financial House in Order."

14  What was that?

15  A.  That was the name of his radio show.

16  Q.  That's the name of Mr. Bank's radio show?

17  A.  Correct.

18         MS. O'BOYLE:  If we could go to clip 2, please.

19         (Audio played in open court.)

20  BY MS. O'BOYLE:

21  Q.  Is Mr. Bank introducing Mr. Alcorn as his guest?

22  A.  Yes.

23         MS. O'BOYLE:  If we could have clip 3, please.

24         (Audio played in open court.)

25  BY MS. O'BOYLE:
```

Carol L. Naughton, Official Court Reporter

─────R. Gibson - Direct─────

1   Q.   Did Mr. Bank describe this, the 800-megahertz spectrum,

2   as beachfront property?

3   A.   Yes.

4   Q.   And Mr. Alcorn agreed with him?

5   A.   Yes.

6   Q.   And provided that -- did Mr. Alcorn talk about how

7   valuable the 800-megahertz spectrum was?

8   A.   Yes.

9        MS. O'BOYLE:   Now, if you could also have -- if you

10  could hand the witness Government's Exhibit 309.

11  BY MS. O'BOYLE:

12  Q.   Do you recognize Government's Exhibit 309?

13  A.   I do.

14  Q.   Is it a second radio show where Mr. Alcorn was a guest

15  with Mr. Bank?

16  A.   Yes.

17  Q.   Did you listen to it and verify that it was an authentic

18  recording?

19  A.   Yes.

20  Q.   Did you initial the front of the disk?

21  A.   I did.

22       MS. O'BOYLE:   Government moves in Exhibit 309.

23       THE COURT:   Exhibit 309 will be admitted.

24       (Government's Exhibit 309 was admitted.)

25  BY MS. O'BOYLE:

R. Gibson - Direct

1   Q.  We'll move on Government's Exhibit 300F.  That's also a

2   disk.

3           MS. O'BOYLE:  Would you also hand that to the

4   witness, please.

5   BY MS. O'BOYLE:

6   Q.  Do you recognize Government's Exhibit 300F?

7   A.  Yes.

8   Q.  Does this contain a PowerPoint related to Janus Spectrum

9   prepared by Mr. Maerki?

10  A.  Yes.

11  Q.  Did you listen to all the clips and verify that it was an

12  authentic recording?

13  A.  Yes.

14  Q.  And you recognized Mr. Maerki's voice on the PowerPoint?

15  A.  Yes.

16          MS. O'BOYLE:  Government moves in Exhibit 300F.

17          THE COURT:  Government Exhibit 300F, as in foxtrot,

18  is admitted.

19          (Government's Exhibit 300F was admitted.)

20  BY MS. O'BOYLE:

21  Q.  Are you familiar with a video called "Money From Thin

22  Air"?

23  A.  Yes.

24  Q.  And we're not going to play that here at the moment, but

25  what, if anything, did Mr. Bank do with this video?

R. Gibson - Direct

1   A.  This, we would send the link to investors or clients that

2   might be interested or also the sales reps and their clients

3   that might be interested in listening to it to see if they

4   wanted to purchase into that.

5   Q.  Did Mr. Bank actually cut it up where he had his own

6   introduction and then kind of a conclusion where he pitched

7   Janus Spectrum Group?

8   A.  Yes.

9   Q.  And I believe you said you e-mailed links to that video

10  to prospective clients and to salesmen?

11  A.  Yes.

12          MS. O'BOYLE:  If we could have Government's

13  Exhibit 301.  I'm sorry, that's not a disk.  That is an

14  actual document.  I apologize.

15  BY MS. O'BOYLE:

16  Q.  Do you recognize 301, Ms. Gibson?

17  A.  Yes.

18  Q.  And is it an e-mail from Mr. Alcorn to you and Ms. Davis

19  and Mr. Bank?

20  A.  Yes.

21          MS. O'BOYLE:  Government moves in Exhibit 301.

22          THE COURT:  Exhibit 301 is admitted.

23          (Government's Exhibit 301 was admitted.)

24  BY MS. O'BOYLE:

25  Q.  Who is this e-mail from?

R. Gibson - Direct

1    A.   David Alcorn.

2    Q.   Who is it to?

3    A.   Daryl Bank, Catrina Davis, and myself.

4    Q.   This is the first time we've seen the name "Catrina

5    Davis."  Who is Catrina Davis?

6    A.   That was Daryl Bank's wife.

7    Q.   What is the date that Mr. Alcorn sent this e-mail?

8    A.   December 6, 2012.

9    Q.   What is the subject?

10   A.   "Potential spectrum prospects."

11   Q.   Moving down to the substance of the e-mail, could you

12   please read -- could you please read the first three

13   sentences.

14   A.   Yes.  "Daryl, Catrina, and Raeann, below is a list of

15   people who have contacted Janus Spectrum LLC since

16   Thanksgiving and requested to be added to our mailing list.

17   They may or may not already own applications, but they are

18   all interested in being kept informed.  They may or may not

19   be a prospect for additional licenses."

20   Q.   Okay.  And so after that, is there a list of names?

21   A.   Yes.

22   Q.   So what is Mr. Alcorn providing you here?

23   A.   People that are possibly interested in purchasing into

24   the spectrum for licenses.

25   Q.   And so into a Janus Spectrum investment?

R. Gibson - Direct

1    A.   Janus Spectrum Group.

2    Q.   Now, I want to take a step back.  We looked at Janus

3    Spectrum Group and that entity, did you also create another

4    entity, a limited liability company, related to the Janus

5    Spectrum Group investment?

6    A.   Yes.

7    Q.   What was that?

8    A.   That was Spectrum 100 LLC.

9    Q.   I'm sorry.  Was there a management company related?

10   A.   Yes.  Spectrum Management LLC.

11   Q.   Let's take a look at Government's Exhibit 302.

12        Do you recognize this, Ms. Gibson?

13   A.   Yes.

14   Q.   What is it?

15   A.   The Virginia Articles of Organization for Spectrum

16   Management LLC.

17        MS. O'BOYLE:  Government moves in Exhibit 302.

18        THE COURT:  Exhibit 302 is admitted.

19        (Government's Exhibit 302 was admitted.)

20   BY MS. O'BOYLE:

21   Q.   And so could you explain to the jury, what is Spectrum

22   Management LLC.

23   A.   So that was the management company that was created for

24   Janus Spectrum Group.  Each one of the Dominion offerings had

25   a management company that went with it, and that's where part

Carol L. Naughton, Official Court Reporter

─────R. Gibson - Direct─────

1    of the fees from when an investor would put money in, and

2    again, based on the deal, there was a certain percentage that

3    was immediately moved over into the management company.

4    Q.  And what office did this Spectrum Management LLC work out

5    of?

6    A.  This was the Dominion office on Commuter Drive in

7    Virginia Beach.

8    Q.  Did you organize this?

9    A.  I did.

10   Q.  At whose direction?

11   A.  Daryl Bank.

12   Q.  What date?

13   A.  July 19, 2012.

14   Q.  And then did you also create an Operating Agreement for

15   Janus Spectrum Group LLC?

16   A.  Yes.

17   Q.  Let's take a look at Government's Exhibit 316.  Do you

18   recognize this?

19   A.  Yes.

20   Q.  What is it?

21   A.  The Operating Agreement for Janus Spectrum Group LLC.

22          MS. O'BOYLE:  Government moves in Exhibit 316.

23          THE COURT:  Exhibit 316 is admitted.

24          (Government's Exhibit 316 was admitted.)

25   BY MS. O'BOYLE:

R. Gibson - Direct

1   Q.  Let's go to Government's Exhibit 310.  Do you recognize
2   Government's Exhibit 310?
3   A.  I'm sorry, can you scroll back up to the top?
4           Yes, I do recognize this.
5   Q.  You do recognize this?
6   A.  Yes.
7   Q.  Is it an agreement between Janus Spectrum LLC and
8   Dominion Private Client Group?
9   A.  Yes.
10  Q.  Dated July 2nd, 2012?
11  A.  Yes.
12          MS. O'BOYLE:  Government moves in Exhibit 310.
13          THE COURT:  Exhibit 310 is admitted.
14          (Government's Exhibit 310 was admitted.)
15  BY MS. O'BOYLE:
16  Q.  Okay.  And so this -- what is the date of this document?
17  A.  July 2nd, 2012.
18  Q.  And it says, "Janus Spectrum LLC, the company, is pleased
19  to present you with this Sales Associate Agreement for your
20  continuing services to our company."
21          Do you see that?
22  A.  Yes.
23  Q.  Let's be very clear.  Janus Spectrum LLC, which company
24  is that?
25  A.  That is David Alcorn's company in Arizona.

─────R. Gibson - Direct─────

1    Q.  What position was Dominion Private Client Group going to

2    fill?

3    A.  Do you want me to read the whole paragraph?

4    Q.  I'd like you to just read the first sentence.

5    A.  Okay.  "Company shall, upon your execution of this

6    agreement, engage you in the position of sales associate for

7    our spectrum application services, which we will provide to

8    customers pursuant to our Services Agreement, which you

9    acknowledge you have received and reviewed."

10   Q.  Does it also list a potential compensation?

11   A.  Yes.

12   Q.  Does it say, "As a commission, you will receive

13   30 percent of our company's gross sales revenues from each

14   customer who signs a Service Agreement"?

15   A.  Yes.

16   Q.  Now, do you recognize the signature under Dominion

17   Private Client Group?

18   A.  Yes, I do.

19   Q.  Whose signature is that?

20   A.  Daryl Bank's.

21   Q.  Does it have David Alcorn's name as manager for Janus

22   Spectrum LLC?

23   A.  Yes.

24   Q.  Is this copy signed?

25   A.  This copy is not.

R. Gibson - Direct

1    Q.  Did you and Mr. Bank begin to sell investments in Janus

2    Spectrum LLC?

3    A.  Yes.

4    Q.  Let's take a look at Government's Exhibit 312.  Do you

5    recognize 312?

6    A.  I do.

7    Q.  What is it?

8    A.  This is what Daryl give me as far as how to split apart

9    the funds once they came into Janus Spectrum Group LLC from

10   investors.

11              MS. O'BOYLE:  Government moves in Exhibit 312.

12              THE COURT:  Exhibit 312 will be admitted.

13              (Government's Exhibit 312 was admitted.)

14   BY MS. O'BOYLE:

15   Q.  Whose handwriting is on this sheet, Ms. Gibson?

16   A.  Daryl Bank's.

17   Q.  Let's walk through it.  What is the entity in the middle

18   here?

19   A.  Janus Spectrum Group LLC.

20   Q.  And then there is a line from Janus Spectrum Group LLC up

21   to Spectrum Management; is that right?

22   A.  Yes.

23   Q.  And is that the Spectrum Management that we just looked

24   at that you created at the same time?

25   A.  Yes.

R. Gibson - Direct

1    Q.   And what is Mr. Bank directing you here?

2    A.   To move 17.5 percent of each dollar that comes into Janus

3    Spectrum Group over to Spectrum Management.

4    Q.   Now, there's another line going up to another box that

5    says DPCG.  What does that stand for?

6    A.   Dominion Private Client Group.

7    Q.   And what is Mr. Bank directing here?

8    A.   To move 30 percent of every dollar that comes into Janus

9    Spectrum Group over to Dominion Private Client Group.

10   Q.   So of the funds that come in, how much -- what percentage

11   is going to be moved to two totally different companies?

12   A.   Almost 50 percent.

13   Q.   Now, there's a line from Janus Spectrum Group down to a

14   line that says "Janus."  Do you see that?

15   A.   Yes.

16   Q.   And so what is this reflecting?

17   A.   This is reflecting sending the cost of the license

18   application, which at the time was 52,500 -- sending it to

19   Janus Spectrum in Arizona, which is David Alcorn's company.

20   Q.   And so how much was an application at that time?

21   A.   52,500.

22   Q.   So what was Mr. Bank directing you to do with the 52,500?

23   A.   Sending that to Janus Spectrum in Arizona, which is David

24   Alcorn's company.

25   Q.   So did you follow Mr. Bank's instructions as contained in

─────R. Gibson - Direct─────

 1   this document?

 2   A.   Yes.

 3   Q.   Let's go back to the Investment Offering, Exhibit 304.

 4   Now, we looked at this briefly.   This is the Investment

 5   Offering for Janus Spectrum Group, correct?

 6   A.   Yes.

 7   Q.   And we had looked at Page 3, which is the industry

 8   overview?

 9   A.   Yes.

10   Q.   Page 4 contains the opportunity overview, and if you

11   could, read how the -- the first two lines.

12   A.   "Janus Spectrum Group LLC is an offering focused on asset

13   appreciation and income generation.   Investors are provided

14   with opportunities to achieve a 100 percent annual preferred

15   return on invested capital plus 50 percent of additional

16   profits derived from anticipated revenues resulting from the

17   acquisition and monetization of valuable Federal

18   Communications Commission licenses or spectrum."

19   Q.   Where did you get the information to put in this

20   opportunity overview?

21   A.   That came from David Alcorn.

22   Q.   And it came from Janus Spectrum?

23   A.   Yes.

24   Q.   And then down at the bottom, there's a line in the last

25   paragraph that says, "Today, this targeted 800-megahertz

R. Gibson - Direct

1   spectrum is among the most coveted spectrum to wireless
2   carriers."  Do you see that?
3   A.  Yes.
4   Q.  Was that part of the document that we looked at from the
5   e-mail that Mr. Alcorn sent to Mr. Bank?
6   A.  Yes.
7   Q.  If we go to Page 6, there's a whole list of key points
8   here.  Where did these key points come from?
9   A.  That came from David Alcorn's company, and him, Janus
10  Spectrum.
11  Q.  So Janus Spectrum, the Arizona entity?
12  A.  Yes.
13  Q.  If we go to Page 7, is this the information that was
14  attached to the e-mail that we looked at at the beginning of
15  your testimony, that talked about T-Mobile and Verizon and
16  AT&T?
17  A.  Yes.
18  Q.  It's basically cut and pasted from that e-mail into your
19  Investment Offering?
20  A.  Correct.
21  Q.  Where did that information come from?
22  A.  David Alcorn.
23          MS. O'BOYLE:  Mr. Bosse, if you could take us to
24  Page 12.
25  BY MS. O'BOYLE:

─────R. Gibson - Direct─────

1   Q.  There's a listing here on Page 12 called "Pro forma

2   operating revenue and cash flow per channel."  Do you see

3   that?

4   A.  Yes.

5   Q.  If I scroll down to Page 13, the financials continue.  Is

6   that right?

7   A.  Yes.

8   Q.  Where did you get this information?

9   A.  From David Alcorn.

10  Q.  And is the pro forma -- does this provide that for

11  New York City/Long Island area, the potential annual return

12  on investment is 2,024 percent?

13  A.  Yes.

14  Q.  We're going to go to Page 14.  And what does it say at

15  the top of Page 14?

16  A.  Janus Spectrum LLC.

17  Q.  And which entity is that?

18  A.  That is David Alcorn's company in Arizona.

19  Q.  And can you read in the second paragraph the sentence

20  that I've highlighted.

21  A.  "Janus is expected to incur the costs associated with

22  maintenance of the licenses until such costs are assumed by

23  the lessees of our channels."

24  Q.  To be clear, is this Janus Spectrum Group, Mr. Bank's

25  entity, or Janus Spectrum LLC, Mr. Alcorn's entity?

Carol L. Naughton, Official Court Reporter

─────R. Gibson - Direct─────

1   A.   Janus Spectrum LLC, Mr. Alcorn's entity.

2   Q.   Where did you get that information?  How did you know

3   that?

4   A.   From David Alcorn.

5   Q.   And we'll go to Page 15.  It says at the top, "Janus

6   Spectrum LLC team."

7   A.   Yes.

8   Q.   And who does it list as the manager of Janus Spectrum?

9   A.   David Alcorn.

10  Q.   And then who is listed as a senior advisor?

11  A.   Kent Maerki.

12       MS. O'BOYLE:  Mr. Bosse, if we could go back to

13  Page 11.

14  BY MS. O'BOYLE:

15  Q.   Now, in connection with Page 11, can you please read the

16  first sentence.

17  A.   "Spectrum Management has formed Janus Spectrum Group LLC,

18  a Virginia limited liability company, to apply for, purchase,

19  and manage FCC specialized mobile licenses."  In quotations,

20  "Spectrum."

21  Q.   Ms. Gibson, who controlled Spectrum Management?

22  A.   Daryl Bank.

23  Q.   Who controlled Janus Spectrum Group?

24  A.   Daryl Bank.

25  Q.   So Mr. Bank's entity has formed another entity controlled

──────── R. Gibson - Direct ────────

1    by Mr. Bank?

2    A.   Correct.

3    Q.   And if you could read the last sentence.

4    A.   "Summit Trust will receive an asset management fee of

5    2 percent of the gross assets for managing and custodian of

6    the separately managed account."

7    Q.   Ms. Gibson, we just looked at that handwritten chart.

8    Did you only take 2 percent in fees from this investment?

9    A.   No.

10   Q.   How much in fees did you take from this investment?

11   A.   It was close to 50 percent.

12   Q.   And how much did it state that you would raise?

13   A.   $2,500,000.

14   Q.   And does Mr. Bank's name appear anywhere in this

15   document?

16   A.   No.

17   Q.   Is there anything about Mr. Bank's FINRA ban in this

18   document?

19   A.   No.

20   Q.   Did Mr. Bank make this offering available through sales

21   agents to the public?

22   A.   Yes.

23   Q.   Let's take a look at Government's Exhibit 314.  Do you

24   recognize 314?

25   A.   Yes.

R. Gibson - Direct

1   Q.  What is it?

2   A.  This is what I created, what I called a money move sheet.

3   So whenever investor dollars came in, I could keep track of

4   that in the correct amount according to Mr. Bank's -- that

5   handwritten page that we looked at.

6          MS. O'BOYLE:  Government moves in Exhibit 314.

7          THE COURT:  Government's Exhibit 314 will be

8   admitted.

9          MS. O'BOYLE:  Thank you, Your Honor.

10         (Government's Exhibit 314 was admitted.)

11  BY MS. O'BOYLE:

12  Q.  Now, did you create one of these for all the investments

13  that we're going to talk about today?

14  A.  Yes.

15  Q.  Okay.  So we'll walk slowly through this one, and then as

16  we see others, we'll be able to go a little bit more quickly.

17         What did you call this sheet?

18  A.  Money move sheet.

19  Q.  It's called a money move sheet?

20  A.  Yes.

21  Q.  All right.  And so this was in connection with Janus

22  Spectrum Group?

23  A.  Yes.

24  Q.  And the first column over here on the left-hand side,

25  what is that?

R. Gibson - Direct

1   A.   That's the date that funds were received into the
2   Dominion bank account for the Janus Spectrum Group.
3   Q.   And then the second column?
4   A.   The dollar amount that was received at BayPort Credit
5   Union for this account.
6   Q.   And you said it was received at BayPort Credit Union?
7   A.   Correct.
8   Q.   And was that the bank that you and Mr. Bank used?
9   A.   Yes.
10  Q.   And then the third column, what does that reflect?
11  A.   That is the 52,500, 52.5 percent, that was designated to
12  go to Janus Spectrum Arizona, David Alcorn's company, for the
13  license application fee.
14  Q.   So this would be the amount of money that actually would
15  go to Janus Spectrum, Mr. Alcorn's company?
16  A.   Correct.
17  Q.   And then what is the next column labeled DPCG?
18  A.   Yeah.  This is 30 percent that got moved over to Dominion
19  Private Client Group.
20  Q.   Then what is the -- Spectrum Management, 17.5 percent?
21  A.   Yes.
22  Q.   And what does that reflect?
23  A.   Moving, again, 17.5 percent of those funds that were
24  received over into the Spectrum Management account.
25  Q.   And then over here at the last column in this first

R. Gibson - Direct

1  chart, what is this?

2  A.   These are the names of the investors, the clients.

3  Q.   Okay.  And so, for example, let's focus in on the line

4  that says "K. Gerek."  Do you see that?

5  A.   Yes.

6  Q.   Let's just walk step by step through what happens with

7  Mr. Gerek's funds.

8         So on December 4, 2012, how much money was he

9  investing?

10 A.   $60,000.

11 Q.   How much of that money would go to Janus Spectrum,

12 Mr. Alcorn's entity?

13 A.   31,500.

14 Q.   How much did you move to Dominion Private Client Group's

15 account?

16 A.   18,000.

17 Q.   And then how much did you move to Spectrum Management's

18 account?

19 A.   10,500.

20 Q.   Is there also a reference on this sheet to a client

21 Tottossy?

22 A.   Yes.

23 Q.   Was their money also -- did it hit the account at the

24 same time as a Mr. or Mrs. Hanks?

25 A.   Yes.

R. Gibson - Direct

1   Q.   Is there also a reference to a Wallace Barry?

2   A.   Yes.

3   Q.   And so walk the jury through what happened when

4   Mr. Barry's 39,500 came into the account.

5   A.   It came into the account on March 29, 2013, for a total

6   of 39,500.   $20,737.50 was what was designated to go to David

7   Alcorn's company, Janus Spectrum, in Arizona.   11,850 was

8   moved over to Dominion Private Client Group, and $6,912.50

9   was moved over to Spectrum Management.

10   Q.   Now, down here at the bottom, how much money did

11   investors pay into Janus Spectrum Group?

12   A.   2.5 million.

13   Q.   2.4 million?

14   A.   Yes.

15   Q.   And over here, how much -- there's another chart over

16   here on the right-hand side.   What is that?

17   A.   That shows the checks and dollar amounts and the dates

18   that money was sent to Janus Spectrum-Arizona, David Alcorn's

19   entity.

20   Q.   Of the 2.5 million that came in, did you send

21   approximately $1,061,833 to Mr. Alcorn's company in Arizona?

22   A.   Yes.

23   Q.   Now, I want to break down for a minute how you got this

24   money to Mr. Alcorn.   How did you let him know that you had

25   the $52,500 for a license?

R. Gibson - Direct

1   A.  I would send him an e-mail.

2   Q.  You would send him an e-mail?

3   A.  Yes.

4   Q.  And then what, if anything, would he do?

5   A.  Then he would respond back and attach a Service Agreement

6   for whatever economic area that they were going to put in a

7   license for.  So we would -- I would then print that off.

8   Either I would sign it, or Mr. Bank would sign it.  He would

9   cut a check, and then usually overnight that to Mr. Alcorn.

10  Q.  Overnight that through the mail?

11  A.  Yes.

12  Q.  On occasion, did you also wire funds to Mr. Alcorn?

13  A.  Yes.

14          MS. O'BOYLE:  Now, let's take a look at Government's

15  Exhibit 316B, just for the witness, please.

16  BY MS. O'BOYLE:

17  Q.  Do you recognize 316B?

18  A.  Yes.

19  Q.  Is it an e-mail string between you and Mr. Alcorn and

20  Mr. Bank?

21  A.  Yes.

22          MS. O'BOYLE:  Government moves in Exhibit 316B.

23          THE COURT:  316B will be admitted.

24          (Government's Exhibit 316B was admitted.)

25  BY MS. O'BOYLE:

―R. Gibson - Direct―

1   Q.   Let's start with Page 3.  Ms. Gibson, what is the date of
2   this e-mail that you sent to Mr. Alcorn?
3   A.   March 29, 2013.
4   Q.   What is the subject line?
5   A.   "Next check for you."
6   Q.   Did you put a little smiley face?
7   A.   Yes.
8   Q.   Could you please read your e-mail to Mr. Alcorn.
9   A.   "Hi, David, we're ready to send you another 52,500.  Send
10  me another agreement Monday if you can.  Take care and have a
11  wonderful Easter weekend."
12  Q.   Did Mr. Alcorn respond to you?
13  A.   Yes.
14  Q.   If you could, could you just read the first two
15  paragraphs.
16  A.   Attached is the executed BSA for Phoenix, AA good.
17  Strong end to a very good and strong March.  Also attached
18  for your execution is the BSA for Indianapolis.  A good
19  strong beginning for an even better April."
20  Q.   What is a BSA?
21  A.   I don't remember what the B stands for but then Service
22  Agreement.
23  Q.   Services Agreement?
24  A.   Yes.
25  Q.   And he's referencing one for Phoenix and one for

---
R. Gibson - Direct
---

1   Indianapolis.  What are those?

2   A.  Those were the economic areas where they were going to

3   apply for those licenses.

4   Q.  And he was telling -- who selects the economic area?

5   A.  David Alcorn's company did that.

6   Q.  How does he end his e-mail to you?

7   A.  "Congratulations and thank you for a fine job you and

8   your team are doing.  Have a very happy Easter."

9        THE COURT:  We're going to stop with that exhibit

10  and take a 15-minute break, and then we'll take it up

11  afterwards.

12        MS. O'BOYLE:  Thank you, Your Honor.

13        (The jury exited the courtroom.)

14        THE COURT:  Ms. Gibson, you may step down during the

15  break.

16        (Recess from 3:58 p.m. to 4:16 p.m.)

17        (The jury entered the courtroom.)

18        THE COURT:  Let the record reflect that all jurors

19  are now in the courtroom.

20        Does counsel agree?

21        MS. O'BOYLE:  Yes, Your Honor, government agrees.

22        MR. YAROW:  Mr. Alcorn agrees.

23        MS. McCASLIN:  Yes, Your Honor.

24        THE COURT:  You may continue.

25        MS. O'BOYLE:  Thank you, Your Honor.

──────R. Gibson - Direct──────

1   BY MS. O'BOYLE:

2   Q.  Ms. Gibson, when we left off, we were looking at

3   Government's Exhibit 316B; is that right?

4   A.  Yes.

5   Q.  And we had just reviewed your e-mail to Mr. Alcorn on

6   March 30, 2013.  And then did Mr. Bank respond back?

7   A.  Yes.

8   Q.  What did he say?

9   A.  "What do we have to hit to be number one?"

10  Q.  And what is he talking about here; "What do we have to

11  hit to be number one?"

12  A.  Wanting to be the top salesperson for David Alcorn's

13  selling into the spectrum.

14  Q.  And then did Mr. Alcorn respond?

15  A.  Yes.

16  Q.  And if you could read his response to Mr. Bank's e-mail

17  asking him what they have to be to be number one.

18  A.  "You guys are always number one as far as I'm concerned.

19  My guess is you are about to get your machine in high gear

20  and will probably be able to beat the Dallas boys on a

21  monthly basis before long.  They probably average about two

22  applications per week but sometimes get distracted and go

23  through a dry spell for a week or two.  In March they had 13,

24  but that is a little misleading as one investor funded seven

25  applications.  Just keep doing what you're doing.  You guys

─────R. Gibson - Direct─────

1   are doing great, and we appreciate it.  Thanks again."

2   Q.  What were you doing for Mr. Alcorn?

3   A.  Raising funds.

4   Q.  And then how did Mr. Maerki respond to Mr. Alcorn?

5   A.  "David, good e-mail to them.  Kent."

6   Q.  Now, in your very first e-mail, you were asking

7   Mr. Alcorn to send you a BSA.  Was that a Service Agreement?

8   A.  Yes.

9           MS. O'BOYLE:  And so let's take a look at

10  Government's Exhibit 311 just for the witness, please.

11  BY MS. O'BOYLE:

12  Q.  Do you recognize Government's Exhibit 311?

13  A.  Yes.

14  Q.  What is it?

15  A.  This is a check and an executed Service Agreement being

16  overnighted from our office to David Alcorn's company in

17  Janus.

18          MS. O'BOYLE:  Government moves in Exhibit 311.

19          THE COURT:  Exhibit 311 is admitted.

20          (Government's Exhibit 311 was admitted.)

21  BY MS. O'BOYLE:

22  Q.  Okay.  So, Ms. Gibson, this very top, what is this?

23  A.  This is a standard overnight label from FedEx going from

24  me at Dominion Investment Group in Florida to David Alcorn at

25  Janus Spectrum in Scottsdale, Arizona.

R. Gibson - Direct

1  Q.  I believe you mentioned it earlier in your testimony,

2  that you would send a Service Agreement and the check through

3  the mail to Mr. Alcorn?

4  A.  Correct.

5  Q.  And is this a copy of what you sent to him?

6  A.  Yes.

7  Q.  And then what is this that I'm highlighting on your

8  screen?

9  A.  This is a check from that Janus Spectrum Group, which is

10  in our offices, to David Alcorn on November 21, 2012, for

11  $210,000.

12  Q.  And where did you get the $210,000 to send to Mr. Alcorn?

13  A.  That was investor funds.

14  Q.  If we go to Page 2, what is this Services Agreement?

15  A.  So this is a Services Agreement, October 29, 2012,

16  between Janus Spectrum LLC, which is, again, David Alcorn's

17  entity, and it says who has executed this agreement, which

18  would be Janus Spectrum Group.

19  Q.  And so where did you get this Services Agreement?

20  A.  From David Alcorn.

21  Q.  Now, Ms. Gibson, did you review this Services Agreement

22  closely?

23  A.  I did not.

24  Q.  Okay.  And so did you -- for example, paragraph 7, which

25  talks about an 18 percent commission to Janus, did you --

Carol L. Naughton, Official Court Reporter

─────────R. Gibson - Direct─────────

1    when you were involved in this scheme, did you look at this

2    particular paragraph?

3    A.   I did not.

4    Q.   If we could go to Page 7, please.  Now, this is

5    Schedule A; is that correct?

6    A.   Yes.

7    Q.   And so who -- there's a chart at the top.  It says "EA

8    Market"?

9    A.   Yes.

10   Q.   What does that stand for?

11   A.   Economic areas market.

12   Q.   And then there are four separate cities listed.  Could

13   you read those, please.

14   A.   Yes.  New York, Los Angeles, Chicago, San Francisco.

15   Q.   Who put those in this document?

16   A.   David Alcorn.

17   Q.   Okay.  And then what was the service fee?  What is on the

18   right-hand side?

19   A.   For each one of those markets, the service fee was 52,500

20   for a total of 210,000.

21   Q.   What did you think you were getting by sending the

22   210,000 to Mr. Alcorn?

23   A.   For those four areas, the FCC applications going to them.

24   Q.   Now, did you -- who put the -- after you sent the funds

25   to Mr. Alcorn, do you have firsthand knowledge about what

———R. Gibson - Direct———

1    Mr. Alcorn did with those funds?

2    A.   I do not.

3    Q.   You didn't work for Janus Spectrum in Arizona, correct?

4    A.   Correct.

5    Q.   Did your clients in Janus Spectrum Group get any return

6    on their investment whatsoever?

7    A.   No.

8    Q.   Now, did you sign a number of these documents in

9    connection with Janus Spectrum Group?

10   A.   Yes, I did.

11          MS. O'BOYLE:  Let's take a look at another,

12   Government's Exhibit 311A, just for the witness.

13   BY MS. O'BOYLE:

14   Q.   Do you recognize 311A?

15   A.   Yes.

16   Q.   What is it?

17   A.   So this is another FedEx overnight label showing a

18   package going from me at Dominion Investment Group in Florida

19   to David Alcorn in Arizona.

20   Q.   Is there also a Services Agreement attached?

21   A.   Yes.

22   Q.   Where did you get the Services Agreement?

23   A.   From David Alcorn.

24          MS. O'BOYLE:  Government moves in Exhibit 311A.

25          THE COURT:  311A is admitted.

R. Gibson - Direct

```
 1            (Government's Exhibit 311A was admitted.)
 2     BY MS. O'BOYLE:
 3     Q.  Let's go to 311B.  Do you recognize 311B?
 4     A.  Yes.
 5     Q.  What is it?
 6     A.  Another package going overnight by FedEx from -- this
 7     actually shows Crystal in the Dominion office in Virginia
 8     Beach to David Alcorn at Janus in Scottsdale.
 9            MS. O'BOYLE:  Government moves in Exhibit 311B, as
10     in bravo.
11            THE COURT:  311B is admitted.
12            (Government's Exhibit 311B was admitted.)
13     BY MS. O'BOYLE:
14     Q.  If can we go to Government's Exhibit 311C.  Do you
15     recognize 311C?
16     A.  Yes.
17     Q.  What is it?
18     A.  Another FedEx overnight package going from me from
19     Port St. Lucie, Florida, to David Alcorn at Janus in Arizona.
20            MS. O'BOYLE:  Government moves in Exhibit 311C.
21            THE COURT:  311C is admitted.
22            (Government's Exhibit 311C was admitted.)
23            MS. O'BOYLE:  Let's go ahead and pull this one up,
24     because we're going through a number of these.
25     BY MS. O'BOYLE:
```

R. Gibson - Direct

1  Q.  Is this another FedEx package that you sent to Mr. Alcorn

2  at Janus Spectrum?

3  A.  Yes.

4  Q.  In the mail?

5  A.  Yes.

6  Q.  Is this a copy of the check that you sent to his company?

7  A.  Yes.

8  Q.  And so just to distinguish between the two, where are

9  these funds -- what company is paying these funds?

10  A.  Janus Spectrum Group.

11  Q.  And whose entity is that?

12  A.  That is Daryl Bank's.

13  Q.  And who is Janus Spectrum Group paying these funds to?

14  A.  Janus Spectrum LLC.

15  Q.  And whose entity is Janus Spectrum LLC?

16  A.  David Alcorn.

17  Q.  How much money is this check for?

18  A.  105,000.

19  Q.  What's the date of the check?

20  A.  March 5, 2013.

21  Q.  Where did you get the funds to write a $105,000 check to

22  Janus Spectrum LLC?

23  A.  This is investor funds.

24  Q.  If you can go to Page 7 of this document.  And what

25  markets did Mr. Alcorn's company put in here?

R. Gibson - Direct

1   A.  Atlanta and Cleveland.

2   Q.  Were these two application fees for a total of $105,000?

3   A.  Yes.

4   Q.  If we could go to Government's Exhibit 311D.  Do you

5   recognize 311D?

6   A.  Yes.

7   Q.  Is this another packet of investor funds that was sent

8   from you to Mr. Alcorn at Janus Spectrum?

9   A.  Yes.

10          MS. O'BOYLE:  Government moves in Exhibit 311D.

11          THE COURT:  311D will be admitted.

12          (Government's Exhibit 311D was admitted.)

13  BY MS. O'BOYLE:

14  Q.  How much is this check of investor funds going from

15  Mr. Bank's entity, Janus Spectrum Group, to Mr. Alcorn's

16  entity, Janus Spectrum LLC?

17  A.  202,000.

18  Q.  And down here in the memo line -- did you write out this

19  check?  Is this your signature?

20  A.  Yes.

21  Q.  What did you write in the memo line?

22  A.  "Seattle, Puerto Rico, Orlando, and St. Louis economic

23  areas."

24  Q.  And does that match what was put in the Services

25  Agreement that you received from Mr. Alcorn?

--------R. Gibson - Direct--------

1   A.   Yes.

2   Q.   If we could go to 311E, as in echo.  Do you recognize

3   311E?

4   A.   Yes.

5   Q.   What is it?

6   A.   Another package going FedEx from me in Florida to David

7   Alcorn's company in Arizona with a check of investor funds.

8            MS. O'BOYLE:  Government moves in Exhibit 311E.

9            THE COURT:  311E is admitted.

10           (Government's Exhibit 311E was admitted.)

11   BY MS. O'BOYLE:

12   Q.   How much of investor funds went from Mr. Bank's entity to

13   Mr. Alcorn's entity in March of 2013?

14   A.   52,500.

15   Q.   Let's go to 311F.  Do you recognize 311F?

16   A.   Yes.

17   Q.   What is it?

18   A.   Another overnight package going from me in Florida to

19   David Alcorn/Janus in Arizona with investor funds.

20           MS. O'BOYLE:  Government moves in Exhibit 311F.

21           THE COURT:  311F is admitted.

22           (Government's Exhibit 311F was admitted.)

23   BY MS. O'BOYLE:

24   Q.   And how much of investor funds went from Janus Spectrum

25   Group to Mr. Alcorn's entity in Arizona on April 2nd, 2013?

1  A.  52,500.

2  Q.  If we could go to 311G, please.  Is 311G another packet

3  similar to the ones that we've been talking about?

4  A.  Yes.

5          MS. O'BOYLE:  Government moves in Exhibit 311G.

6          THE COURT:  311G is admitted.

7          (Government's Exhibit 311G was admitted.)

8  BY MS. O'BOYLE:

9  Q.  And how much did Janus Spectrum Group send to

10  Mr. Alcorn's entity, Janus Spectrum LLC, on this check?

11  A.  52,500.

12  Q.  If we could go to 311H.  Do you recognize 311H?

13  A.  Yes.

14  Q.  What is it?

15  A.  Another overnight package from me in Florida to David

16  Alcorn/Janus in Arizona.

17          MS. O'BOYLE:  Government moves in Exhibit 311H.

18          THE COURT:  311H is admitted.

19          (Government's Exhibit 311H was admitted.)

20  BY MS. O'BOYLE:

21  Q.  And how much of investor funds was sent to Mr. Alcorn on

22  May 13, 2013?

23  A.  105,000.

24  Q.  And finally, let's take a look at 311I.  Do you recognize

25  311I?

R. Gibson - Direct

1   A.   Yes.

2   Q.   What is it?

3   A.   Another overnight package from me in Florida to David

4   Alcorn at Janus in Arizona.

5            MS. O'BOYLE:  Government moves in Exhibit 311I.

6            THE COURT:  311I is admitted.

7            (Government's Exhibit 311I was admitted.)

8   BY MS. O'BOYLE:

9   Q.   And so is this your signature on this check?

10  A.   Yes.

11  Q.   And what is the amount of the check?

12  A.   52,500.

13  Q.   Where did those funds come from?

14  A.   Investor funds.

15  Q.   And where did you send them to?

16  A.   To Janus Spectrum in Arizona.

17  Q.   Is that Mr. Alcorn's entity?

18  A.   Yes.

19           MS. O'BOYLE:  If we could pull up, just for the

20  witness, Government's Exhibit 316C.

21  BY MS. O'BOYLE:

22  Q.   Do you recognize this document, Ms. Gibson?

23  A.   Yes.

24  Q.   Is it an agreement between Mr. Bank and Mr. Alcorn dated

25  March 6, 2013?

───────R. Gibson - Direct───────

1   A.  Yes.

2          MS. O'BOYLE:  Government moves in Exhibit 316C.

3          THE COURT:  316C, as in Charlie, is admitted.

4          (Government's Exhibit 316C was admitted.)

5   BY MS. O'BOYLE:

6   Q.  If we could have Government's Exhibit 301A.  Do you

7   recognize 301A?

8   A.  Yes.

9   Q.  What is it?

10  A.  E-mail from David Alcorn to Daryl Bank and copying

11  several people, myself included, on there.

12         MS. O'BOYLE:  Government moves in Exhibit 301A.

13         THE COURT:  301A is admitted.

14         (Government's Exhibit 301A was admitted.)

15  BY MS. O'BOYLE:

16  Q.  Ms. Gibson, who is this an e-mail from?

17  A.  David Alcorn.

18  Q.  Who is it to?

19  A.  Daryl Bank.

20  Q.  And are you copied as well?

21  A.  Yes.

22  Q.  And what is the date?

23  A.  February 18, 2013.

24  Q.  And could you please read what Mr. Alcorn wrote to

25  Mr. Bank.

R. Gibson - Direct

1    A.   "Janus wants to help you improve the volume of your

2    business and accelerate your sales.  Putting aside the issue

3    of cost, do you have any marketing ideas you would like to

4    implement and believe would help accelerate sales?  We are

5    willing to consider paying for them or at least fronting the

6    cost for you.  Would you want to have a conference call with

7    a marketing guru with whom Kent and I met last week and has

8    some possible suggestions?  Maybe we can all brainstorm

9    something that might work.  Please let me know.  Thanks."

10   Q.   And so Mr. Alcorn says, "Putting aside the issue of cost,

11   do you have any marketing ideas you would like to implement

12   and believe would help accelerate sales?"

13        What sales is Mr. Alcorn talking about here?

14   A.   Raising funds from investors.

15   Q.   And he said, "We are willing to consider paying for them

16   or at least fronting the cost for you."

17        What did you understand that to mean?

18   A.   If we had ideas of something they wanted to do

19   marketing-wise, whether it be materials or some form of

20   advertising, that they would help cover the costs.

21   Q.   Now, taking a step back, from 2012 through 2017, did

22   Mr. Bank sell his investment products to his own clients?

23   A.   Yes.

24   Q.   Did he also sell products to other sales representatives?

25   A.   Yes.

R. Gibson - Direct

1   Q.  Did Dominion Investment Group, Mr. Bank's entity -- did
2   it have an office here in Norfolk?
3   A.  Yes.
4   Q.  Who worked out of the Dominion Investment Group's offices
5   in Norfolk?
6   A.  Roger Hudspeth and his assistant, Grecie.
7   Q.  Did Mr. Hudspeth sell Mr. Bank's investments?
8   A.  Yes.
9   Q.  And you told the jury you knew the defendant Mr. Smith.
10  How do you know Mr. Smith?
11  A.  I met him through Kent Maerki and through Dental Plus.
12  Q.  What did Mr. Smith do for a living?
13  A.  He, I know, hosted radio shows.
14  Q.  He had a radio show?
15  A.  Yes.
16  Q.  Did he also sell investments for Mr. Bank?
17  A.  He did, yes.
18  Q.  Do you know where he lived?
19  A.  In California.
20  Q.  Do you know an individual named Tony Sellers?
21  A.  Yes.
22  Q.  And was he associated with Mr. Bank?
23  A.  Yes.
24  Q.  And what did he do for a living?
25  A.  He was a sales agent.

R. Gibson - Direct

1   Q.   Where did he live, do you recall?

2   A.   Idaho, I believe it is.

3   Q.   Do you know an individual named Tom Barnett?

4   A.   Yes.

5   Q.   What did Mr. Barnett do for a living?

6   A.   He was also a sales agent.

7   Q.   Where did he live?

8   A.   California.

9   Q.   Did he also sell Mr. Bank's investments?

10  A.   Yes.

11  Q.   Now, let's take a look at Government's Exhibit 316D,

12  which I believe is already in evidence.  And this is an

13  e-mail from Mr. Alcorn.  Do you recognize your name at the

14  top?

15  A.   Yes.

16  Q.   And what is the subject?

17  A.   "2013 Janus Spectrum LLC client retreat, August 20

18  through August 22nd, 2013."

19  Q.   And what was this in connection with?

20  A.   Spectrum.

21  Q.   All right.  Can you read the first sentence?

22  A.   "As discussed, the 2013 Janus Spectrum LLC client retreat

23  is scheduled for August 20th through 22nd, 2013, at Silverado

24  Resort and Spa, www.SilveradoResort.com, in legendary

25  Napa Valley, California."

——————R. Gibson - Direct——————

1   Q.   Is there also a calendar or a schedule of events?

2   A.   Yes.

3   Q.   And did you go to this retreat, Ms. Gibson?

4   A.   I did.

5   Q.   And who was running the retreat?

6   A.   David Alcorn and his company.

7   Q.   And who else from Dominion, from Dominion-Florida,

8   attended?

9   A.   Daryl Bank and his wife; Roger Hudspeth was there; and I

10  was there with my husband at the time.

11  Q.   Do you recall meeting anybody else at the retreat?

12  A.   Yes.

13  Q.   Who else did you meet at the retreat?

14  A.   Bill Smith was there with his wife; of course, David

15  Alcorn was there; Kent Maerki was there; Jon Palmieri was

16  there; the Newells; some of the gentlemen from RapidLink

17  Wireless were there; I think Bob LaBine and Aaron Bobkin.

18  Q.   I'm sorry, you said Bob LaBine and Aaron Bobkin?

19  A.   Yes.

20  Q.   Anybody else that you can recall?

21  A.   There were several other people but not that I recall

22  right off.

23  Q.   And who paid for your rooms for this retreat?

24  A.   David Alcorn and Janus Spectrum LLC.

25  Q.   Did you attend the welcome reception?

R. Gibson - Direct

1    A.   Yes.

2    Q.   And was that at the resort?

3    A.   Yes.

4    Q.   Do you recall much of anything that happened at this

5    retreat?

6    A.   We did a tour of the wineries.  I know there was a

7    business meeting there.  I don't know if I was in attendance

8    of that or not.

9    Q.   Okay.  Now, when Mr. Alcorn -- in the e-mail, when was

10   this retreat scheduled for?

11   A.   August 20th through the 22nd, 2013.

12          MS. O'BOYLE:  Let's go to Government's Exhibit 317A,

13   for the witness, please.

14   BY MS. O'BOYLE:

15   Q.   And do you recognize 317A?

16   A.   Yes.

17   Q.   What is it?

18   A.   This is a notice from the Securities and Exchange

19   Commission to Janus Spectrum Group in the matter of Janus

20   Spectrum.

21          MS. O'BOYLE:  Government moves in Exhibit 317A.

22          THE COURT:  317A will be admitted.

23          (Government's Exhibit 317A was admitted.)

24   BY MS. O'BOYLE:

25   Q.   And so approximately how many days after you were at the

R. Gibson - Direct

1    retreat did you receive a subpoena from the Securities and

2    Exchange Commission?

3    A.   That following week.

4    Q.   And this was to which entity?

5    A.   Janus Spectrum Group LLC.

6    Q.   Is this Mr. Bank's entity?

7    A.   Correct.

8    Q.   And what is it in the -- what is it regarding?

9    A.   In the matter of Janus Spectrum.

10   Q.   Now, while you and Mr. Bank -- did you guys respond to

11   this subpoena?

12   A.   Yes, we did.

13   Q.   While you were responding to this subpoena, did you stop

14   selling the spectrum investment?

15   A.   No.

16   Q.   Why not?

17   A.   Definitely should have stopped if there was any kind of

18   complaint coming out.

19   Q.   Now, was this -- actually, let's go ahead and take a look

20   at Government's Exhibit 505A.  Do you recognize 505A?

21   A.   Yes.

22   Q.   What is it?

23   A.   E-mail from Daryl to Billy Seabolt.

24   Q.   Is it also to a Les Revzon?

25   A.   Yes.

─R. Gibson - Direct─

1   Q.  Are you copied on it?

2   A.  Can you blow it up for me?

3   Q.  Sorry.  Here you go.

4   A.  Yes.  I'm sorry.  E-mail from Daryl Bank to Les Revzon

5   copying Billy Seabolt and myself.

6           MS. O'BOYLE:  Government moves in Exhibit 505A.

7           THE COURT:  505A is admitted.

8           (Government's Exhibit 505A was admitted.)

9   BY MS. O'BOYLE:

10  Q.  Who is this an e-mail from?

11  A.  Daryl Bank.

12  Q.  And what is the date?

13  A.  July 29, 2013.

14  Q.  So was this, like, the week before you went -- or a few

15  weeks before you went to the retreat?

16  A.  Yes.

17  Q.  And who is Les Revzon?

18  A.  He has a company called Revzon Consulting Group, and they

19  handled compliance for Dominion, but also several trust

20  companies, one being Summit Trust Company.

21  Q.  We'll talk about Summit Trust in a little bit.

22          And then are you copied on this e-mail?

23  A.  Yes.

24  Q.  And this is a new e-mail, I don't believe the jury has

25  seen before.  Who is Billy J. Seabolt, Esquire?

Carol L. Naughton, Official Court Reporter

──────R. Gibson - Direct──────

1  A.  He is an attorney that Daryl used in regards to any new

2  dealings or offerings that were put together.

3  Q.  And what is the subject line of this?

4  A.  "Janus Spectrum."

5  Q.  Could you read the first two paragraphs of what Mr. Bank

6  wrote to Mr. Revzon.

7  A.  "Per our conversation, I was notified that Janus Spectrum

8  and some associated persons received subpoenas from the SEC.

9  To the best of my knowledge, Janus Spectrum works with three

10  groups:  One, a group in California with a PPM; two, Dominion

11  via SMA with Summit Trust Company; and, three, a group in

12  Texas through an LLC and private membership."

13  Q.  Do you know who the group in Texas was?

14  A.  I know Ray Chadwick and Terry Johnson, I believe was the

15  other name.

16  Q.  Do you know who was -- the group in California, do you

17  know what that is a reference to?

18  A.  I'm not sure.

19  Q.  Okay.  And can you read the sentence that starts, "I

20  spoke to Kent."

21  A.  "I spoke to Kent.  He is of the opinion that this is a

22  general inquiry.  I think he is way off base since the group

23  in Texas and their administrator in Arizona also received a

24  subpoena."

25  Q.  And who is the "Kent" that he was referring to?

R. Gibson - Direct

1   A.   Kent Maerki of Dental Support Plus Franchise.

2   Q.   And then if you could read the paragraph that starts

3   "Today."

4   A.   "Today, I learned that a salesman I know in Idaho has

5   received an inquiry from the Idaho Securities Department.  It

6   appears that someone internally at Janus set up a collective

7   trust through a law firm for this advisor to sell to his

8   clients.  I can only assume that genius was sparked via our

9   offering through Summit.  I can keep you informed, but I

10  can't help wondering that we could receive an inquiry because

11  of those assclowns."

12  Q.   And eventually you did receive an inquiry, and that's

13  what we just looked at, correct?

14  A.   Yes.

15  Q.   I want to talk a little bit about the salesman in Idaho

16  who has received an inquiry from the Idaho Securities

17  Department.  Who was that?

18  A.   That was Tony Sellers.

19  Q.   And it says that he had set up -- "someone internally at

20  Janus set up a collective trust through a law firm."  Do you

21  know what that was?

22  A.   Yes.  I know that was set up through Lynne Shelton at

23  Shelton & Power.

24  Q.   Did you stop working with Mr. Sellers after learning that

25  he had an inquiry from the Idaho Securities Department?

R. Gibson - Direct

1   A.  No.

2          MS. O'BOYLE:  Let's take a look at Government's

3   Exhibit 400, just for the witness.

4   BY MS. O'BOYLE:

5   Q.  Do you recognize Government's Exhibit 400?

6   A.  Yes.

7   Q.  Is it an e-mail chain between David Alcorn, Kent Maerki,

8   and Mr. Bank?

9   A.  Yes.

10          MS. O'BOYLE:  Government moves in Exhibit 400.

11          THE COURT:  Exhibit 400 is admitted.

12          (Government's Exhibit 400 was admitted.)

13   BY MS. O'BOYLE:

14   Q.  What is the date of Mr. Alcorn's e-mail at the bottom of

15   the page that I've just blown up?

16   A.  November 3rd, 2013.

17   Q.  And is this in regards to -- it references a Tony.  Is

18   this Mr. Sellers that we were just talking about?

19   A.  Yes.

20   Q.  Could you please read the paragraph that Mr. Alcorn wrote

21   to Mr. Maerki.

22   A.  "Tony has pretty much temporarily halted spectrum

23   acquisitions while he deals with his family problems.  This

24   comes at an almost natural time as he is approximately

25   complete on his first batch of applications we agreed to sell

─────────── R. Gibson - Direct ───────────

1   him.  Given his inquiries from the State of Idaho, it occurs
2   to me that it might be better for Tony and a simpler way to
3   proceed if Tony did his future business under the auspices of
4   Summit Trust.  Emotionally it would be less taxing on him,
5   perhaps simpler, and more productive.  We can make all the
6   numbers work for everybody.  I ran it by Daryl, and he is
7   preliminarily okay with it.  My guess is that Lynne might
8   also welcome it."
9   Q.  So Mr. Alcorn references Mr. Sellers's inquiries from the
10  State of Idaho.
11  A.  Yes.
12  Q.  Was that -- what is that?
13  A.  He received a complaint or inquiry from the Idaho State
14  Corporation Commission.
15  Q.  So he was under -- Mr. Sellers was under investigation?
16  A.  Yes.
17  Q.  The same Mr. Sellers from the e-mail that we just looked
18  at?
19  A.  Correct.
20  Q.  And going up in the line, how does Mr. Maerki respond to
21  Mr. Alcorn?
22  A.  "That's fine with me."
23  Q.  And the subject line in this e-mail says "Lincoln
24  Spectrum."  Is that Mr. Sellers's spectrum investment?
25  A.  Yes.

R. Gibson - Direct

```
 1   Q.   That he was selling before he got connected with
 2   Mr. Bank?
 3   A.   Yes.  Under Lynne Shelton, or Shelton & Powers.
 4   Q.   And then ultimately did Mr. Alcorn reach out to Mr. Bank?
 5   A.   Yes.
 6   Q.   And what did Mr. Alcorn say to Mr. Bank?
 7   A.   "Do you want to talk to Tony, or do you want me to do it
 8   first?"
 9   Q.   Okay.  Let's take a look at Government's Exhibit 400A.
10   Is this a continuation of the e-mail string that we were just
11   looking at?
12   A.   Yes.
13           MS. O'BOYLE:  Government moves in Exhibit 400A.
14           THE COURT:  Exhibit 400A is admitted.
15           (Government's Exhibit 400A was admitted.)
16   BY MS. O'BOYLE:
17   Q.   So when we left off that e-mail string, Mr. Alcorn was
18   asking Mr. Bank, "Do you want to talk to Tony, or do you want
19   me to do it first?"  Is that right?
20   A.   Yes.
21   Q.   And then how does Mr. Bank respond on -- in between these
22   two pages?
23   A.   "How about you first so that he knows you're driving this
24   and we are on board with you."
25           MS. O'BOYLE:  Government moves in Exhibit 400A.
```

Carol L. Naughton, Official Court Reporter

R. Gibson - Direct

1        THE COURT:  400A is admitted.

2        (Government's Exhibit 400A was admitted.)

3   BY MS. O'BOYLE:

4   Q.  So is this -- this is a continuation of the e-mail that

5   we were just looking at?

6   A.  Yes.

7   Q.  And so Mr. Alcorn says to Mr. Bank, "Do you want to talk

8   to Tony, or do you want me to do it first?"

9   A.  Yes.

10  Q.  How does Mr. Bank respond to Mr. Alcorn?

11  A.  "How about you first so that he knows you're driving this

12  and we are on board with you."

13  Q.  And then does Mr. Alcorn send another e-mail to Mr. Bank?

14  A.  Yes.

15  Q.  And what does Mr. Alcorn tell Mr. Bank?

16  A.  "I just spoke with him.  He is fine and will reach out to

17  you if he does not hear from you."

18  Q.  And how does Mr. Bank respond?

19  A.  "On phone with him now."

20  Q.  And then how does Mr. Alcorn respond to Mr. Bank?

21  A.  "We certainly are an efficient team."

22  Q.  What does Mr. Bank say to Mr. Alcorn?

23  A.  "He wants us to design a $2.5 million deal.  Any thoughts

24  on ESs, names, et cetera."

25  Q.  What is a $2.5 million deal?

R. Gibson - Direct

1    A.   Putting together a -- kind of like what Janus Spectrum
2    Group was, through an offering where investors can purchase
3    into that specific offering.
4    Q.   Mr. Sellers wanted that?
5    A.   Correct.
6    Q.   And then Mr. Bank says, "Any thoughts on ESs, names,
7    et cetera"; is that right?
8    A.   Yes.
9    Q.   And then Mr. Alcorn asks Mr. Bank, "What is an ES?"
10   A.   Yes.
11   Q.   And how did Mr. Bank respond?
12   A.   "EA is economic areas.  You get a different result when
13   you type it correctly."
14   Q.   And then how did Mr. Alcorn ultimately respond to
15   Mr. Bank?
16   A.   "I think we start with whatever economic areas Tony has
17   not paid for, assuming he has no additional funds that are in
18   transit or otherwise forthcoming.  Enjoy your evening."
19   Q.   As requested, did Mr. Bank set up a second investment in
20   spectrum centered around Mr. Sellers?
21   A.   Yes.
22   Q.   What entity was that?
23   A.   That was called Prime Spectrum Group.
24   Q.   And how was Prime Spectrum different than Janus Spectrum
25   Group?

Carol L. Naughton, Official Court Reporter

R. Gibson - Direct

```
 1   A.   It had -- it was made up of different economic areas.

 2   Q.   Was this sold through the whole sales force, or was it

 3   just created for one person?

 4   A.   It was just created for Tony Sellers and his clients.

 5   Q.   At the time it was created, was Mr. Sellers under

 6   investigation by the Idaho Securities Commission?

 7   A.   Yes.

 8   Q.   Let's take a look at the companies.  I would like to show

 9   you Government's Exhibit 400B, as in bravo.  Do you recognize

10   400B?

11   A.   Yes.

12   Q.   What is it?

13   A.   The Virginia Articles of Organization for Prime Spectrum

14   LLC.

15           MS. O'BOYLE:  Government moves in Exhibit 400B.

16           THE COURT:  400B is admitted.

17           (Government's Exhibit 400B was admitted.)

18   BY MS. O'BOYLE:

19   Q.   So is this very similar to what you did for Janus

20   Spectrum Group?

21   A.   Yes.

22   Q.   So what are we looking at here?

23   A.   The Articles of Organization for Prime Spectrum LLC.

24   Q.   And what do you do with these?  What -- where do these

25   ultimately go, these Articles of Organization?
```

──────R. Gibson - Direct──────

1    A.   They are scanned in and kept in our files.

2    Q.   Okay.  Do you file them with an entity in Virginia?

3    A.   Oh, I'm sorry, yes.  So it is filed through the Virginia

4    State Corporation Commission's website.

5    Q.   Okay.  And so the name of this company was going to be

6    Prime Spectrum LLC?

7    A.   Yes.

8    Q.   And where was Prime Spectrum LLC's offices located?

9    A.   In the Dominion offices on Commuter Drive in Virginia

10   Beach.

11   Q.   Did you organize this entity?

12   A.   Yes.

13   Q.   And on what date?

14   A.   November 22, 2013.

15   Q.   When you organized this entity, was Janus Spectrum under

16   investigation?

17   A.   Yes.

18   Q.   When you organized this entity, was Janus Spectrum Group

19   responding to Securities and Exchange Commission subpoenas?

20   A.   Yes.

21   Q.   Did you also create a management company similar to

22   Spectrum Management for this investment?

23   A.   Yes.

24   Q.   If we could take a look at Government's Exhibit 402.  Do

25   you recognize 402?

R. Gibson - Direct

1   A.   Yes.

2   Q.   What is it?

3   A.   Virginia Articles of Organization for Prime Spectrum

4   Management LLC.

5            MS. O'BOYLE:   Government moves in Exhibit 402.

6            THE COURT:   402 is admitted.

7            (Government's Exhibit 402 was admitted.)

8   BY MS. O'BOYLE:

9   Q.   So this is another document that you used to create Prime

10  Spectrum Management LLC?

11  A.   Yes.

12  Q.   And where was Prime Spectrum Management LLC's office

13  located?

14  A.   In the Dominion offices on Commuter Drive in Virginia

15  Beach.

16  Q.   And did you organize this on the same day as you did

17  Prime Spectrum?

18  A.   Yes.

19  Q.   And so let's take a look at Government's Exhibit 405.   Do

20  you recognize 405?

21  A.   Yes.

22  Q.   What is it?

23  A.   This is the Operating Agreement for Prime Spectrum LLC.

24           MS. O'BOYLE:   Government moves in Exhibit 405.

25           THE COURT:   405 is admitted.

R. Gibson - Direct

1      (Government's Exhibit 405 was admitted.)

2  BY MS. O'BOYLE:

3  Q.  Now, did you also create an Investment Offering for this

4  Prime Spectrum investment?

5  A.  Yes.

6  Q.  If we could take a look at Government's Exhibit 404.  Do

7  you recognize 404?

8  A.  Yes.

9  Q.  What is it?

10  A.  The investment summary for Prime Spectrum.

11          MS. O'BOYLE:  Government moves in Exhibit 404.

12          THE COURT:  Exhibit 404 is admitted.

13          (Government's Exhibit 404 was admitted.)

14  BY MS. O'BOYLE:

15  Q.  Okay.  So let's take a look at this a little bit.  So

16  this was an investment -- soliciting investments into Prime

17  Spectrum?

18  A.  Yes.

19  Q.  And what is the date of this particular Investment

20  Offering?

21  A.  November 2013.

22  Q.  So was this investment created approximately four months

23  after the Securities and Exchange Commission launched an

24  investigation into Janus Spectrum LLC?

25  A.  Yes.

R. Gibson - Direct

1  Q.  Was there a reference anywhere in this document to the

2  fact that there was an ongoing investigation into Janus

3  Spectrum LLC?

4  A.  No.

5  Q.  Did you ask Mr. Bank why you were going to sell

6  additional investments in connection with a company that was

7  under investigation by the Securities and Exchange

8  Commission?

9  A.  No.

10  Q.  Now, in connection with this Investment Offering, is it

11  substantially similar to the Investment Offering that we went

12  through in detail for Janus Spectrum Group?

13  A.  Yes.

14  Q.  And so, for example, I'm looking at Page 3 of

15  Exhibit 404, and it talks about the industry overview.  Do

16  you see that?

17  A.  Yes.

18  Q.  I'm highlighting here, down at the bottom -- what is

19  written in italics?

20  A.  "Spectrum is the most valuable natural resource of the

21  information age."

22  Q.  And below it, the second line?

23  A.  "Bandwidth is the new black gold."

24  Q.  And below it?

25  A.  "Each new computing cycle results in ten times more

─────R. Gibson - Direct─────

1  devices and greater wealth creation than previous cycles."
2  Q.  Is this a reproduction of the original e-mail that we
3  looked at at the very beginning of your testimony?
4  A.  Yes.
5  Q.  Where did you get this information?
6  A.  From David Alcorn.
7  Q.  Moving to Page 4.  We have the Opportunity Overview.
8  Could you read the first two lines.
9  A.  "Prime Spectrum LLC is an offering focused on asset
10  appreciation and income generation.  Investors are provided
11  with opportunities to achieve a 100 percent annual preferred
12  return on invested capital plus 50 percent of additional
13  profits, derived from anticipated revenues resulting from the
14  acquisition and monetization of valuable Federal
15  Communications Commission licenses or spectrum."
16  Q.  Is this the same exact language that was in the Janus
17  Spectrum Group Investment Offering?
18  A.  Yes.
19  Q.  Where did you get this language?
20  A.  From David Alcorn.
21  Q.  Going down to the bottom, does this contain the same
22  language?  "Today, this targeted 800-megahertz spectrum is
23  among the most coveted spectrum to wireless carriers."  Do
24  you see that?
25  A.  Yes.

R. Gibson - Direct

1   Q.   Where did you get that language?

2   A.   From David Alcorn.

3   Q.   Ms. Gibson, I'm going to kind of cut to the end.

4        Was this true?

5   A.   No.

6   Q.   If we go to Page 6, we have another "Key Points."  Is

7   that correct?

8   A.   Yes.

9   Q.   And where did -- is this the same "Key Points" that was

10  listed in the Janus Spectrum Group investment?

11  A.   Yes.

12  Q.   And where did you get this information?

13  A.   From David Alcorn.

14  Q.   And again, Page 7, "Excerpts and Articles."  Is this the

15  same page that was in the Janus Spectrum Group offering?

16  A.   Yes.

17  Q.   It's now being offered again through the Prime Spectrum

18  offering?

19  A.   Yes.

20  Q.   Where did you get all of these -- this information, the

21  excerpts and articles?

22  A.   From David Alcorn.

23        MS. O'BOYLE:  If we could go, Mr. Bosse, to Page 15

24  and 16.

25        THE COURT:  We're going to end with your inquiries

Carol L. Naughton, Official Court Reporter

R. Gibson - Direct

1    on this exhibit.

2          MS. O'BOYLE:  Okay.  Thank you, Your Honor.

3    BY MS. O'BOYLE:

4    Q.  Page 15.  Where did you get the financials, the pro forma

5    cash flow?

6    A.  From David Alcorn.

7    Q.  And this document, again, lists the Janus Spectrum team;

8    is that correct?

9    A.  Yes.

10   Q.  With Mr. Alcorn as the manager?

11   A.  Yes.

12         MS. O'BOYLE:  If you could quickly, Mr. Bosse, go to

13   Page 12.

14   BY MS. O'BOYLE:

15   Q.  And is this where you listed the particulars related to

16   Mr. Bank's investment companies?

17   A.  Yes.

18   Q.  Just briefly, Prime Spectrum Management, who controlled

19   that?

20   A.  Daryl Bank.

21   Q.  "Has formed Prime Spectrum LLC."  Who controlled that?

22   A.  Daryl Bank.

23   Q.  "A Virginia limited liability company to apply for,

24   purchase, and manage FCC specialized mobile licenses."

25         So Mr. Bank formed another entity, controlled by

─────────────────────── R. Gibson - Direct ───────────────────────

1   Mr. Bank, to obtain these licenses?

2   A.   Yes.

3   Q.   And again, does this also contain a fee that's listed

4   here?

5   A.   Yes.

6   Q.   And what is the fee?

7   A.   2 percent to Summit Trust Company.

8   Q.   And was that all that was taken out of investor funds for

9   this investment?

10   A.   No.

11   Q.   Approximately how much did Mr. Bank take out of the

12   investment funds for this investment?

13   A.   This one, I think, was between 50 or 60 percent.

14           THE COURT:   Can you raise your voice, please.

15           THE WITNESS:   I'm sorry.   This was between 50 or 60

16   percent.

17   BY MS. O'BOYLE:

18   Q.   Where did the remainder of the money go?

19   A.   To David Alcorn's company at Janus.

20           MS. O'BOYLE:   I'm done with this document, Your

21   Honor.

22           THE COURT:   Ladies and gentlemen, we're going to

23   stop with this witness and take up in the morning, tomorrow

24   morning at 9:30.   Leave your legal pads with the court

25   security officer.   Be safe.   See you in the morning.

```
 1              (The jury exited the courtroom.)

 2              THE COURT:  You may step down, Ms. Gibson.

 3              (The witness stepped down.)

 4              THE COURT:  You may have a seat.

 5              Concerning the inquiry that we have here, I want the

 6    United States Attorneys and the Court staff to step into my

 7    jury room there for a second, and then I'm going to have you

 8    come back in just a few seconds.

 9              MR. GRINDROD:  And I think the Alcorn team probably,

10    also, Your Honor.  It's ex parte.

11              THE COURT:  Where is the Alcorn team?  I don't see

12    why but -- I don't see why.

13              MR. GRINDROD:  Okay.

14              THE COURT:  Let me hear what you have to argue.  If

15    you believe it adversely affects your ability to argue the

16    motion, then I will let them step out too.  As a matter of

17    fact, they can be excused for the day, if it doesn't pertain

18    to them.

19              MR. GRINDROD:  Your Honor, I think the reason for it

20    being ex parte is so that our work product is protected, and

21    they're outside our circle of --

22              THE COURT:  Okay.  That's fine.  Mr. Yarow, you can

23    be excused, you and Mr. Alcorn.

24              MR. YAROW:  Thank you.

25              (The courtroom having been cleared as indicated, the
```

1    following was heard ex parte:)

2              THE COURT:  Okay.  Let's cut to the heart of it.

3    The Court has read your motion.

4              MR. GRINDROD:  Your Honor, I'm happy to address

5    anything the Court wants.  I guess what I would say, Your

6    Honor, is the question that was asked on --

7              THE COURT:  Hold one second.

8              (Pause in the proceedings.)

9              MR. GRINDROD:  Your Honor, the question that was

10   raised in the redirect examination of Ms. Hullum, I know Your

11   Honor has overruled our objection that it's irrelevant.  It

12   obviously had to do with investments that I think are

13   indisputably entirely unrelated to the investments that are

14   at issue in this case.

15             But the government asked the question:  Out of the

16   roughly estimate of $440,000, you said only 40,000 was with

17   DSP, meaning the dental investment, but did you get any of

18   your investments back?  And the answer was no.

19             THE COURT:  Mr. Grindrod, yeah, the Court has some

20   questions.  The Court has read that transcript.  Read it

21   twice.  You were there.

22             MR. GRINDROD:  Yes.

23             THE COURT:  You heard the testimony that $40,000 was

24   paid to DSP F, to Dental Support.  You heard the witness say

25   that they invested 440,000.  You heard that last question of

1    the witness.  You didn't follow up at any point to ask "What
2    other investments did you make for 440,000 other than the
3    40,000?"  You never asked that question.  You questioned that
4    witness twice.  Why didn't you follow up on that?
5        MR. GRINDROD:  So, Your Honor, I did not question
6    the witness twice.  I questioned the witness once.
7        THE COURT:  But you didn't question the witness
8    about what happened to the other moneys, "When you say that
9    you invested 40,000" -- it's a logical question whether it
10   was relevant or not.  She was saying that she invested
11   440,000 with your client, and you never asked her a question
12   about it, and you had an opportunity.
13       MR. GRINDROD:  Well, Your Honor, in the direct
14   examination, the question came up.  I objected that it wasn't
15   relevant then.  But her answer was essentially nonresponsive.
16   The witness said, "I remember one time when I went to get a
17   car, I think we got $20,000, and then I remember we had a
18   life insurance that we invested money in."  She talked a
19   little bit about that.
20       THE COURT:  I read it.
21       MR. GRINDROD:  I guess what I would say, Your Honor,
22   that question was asked, and we got that answer during direct
23   examination.  I didn't follow up on it because it wasn't
24   relevant, and the answer wasn't terribly prejudicial, but on
25   redirect, after I didn't have a chance to ask any more

```
 1   questions, that's when the devastatingly prejudicial and
 2   entirely irrelevant --
 3           THE COURT:  Tell me why you didn't have a chance to
 4   do recross on a deposition.  No judge was there.  Tell me
 5   why.  Mr. Grindrod, you are quite a zealous attorney, and you
 6   didn't follow up on that last question of where did the other
 7   money go?
 8           MR. GRINDROD:  Your Honor, I didn't know I had the
 9   opportunity to recross.  And I don't -- I don't think it was
10   relevant, anyway, but I didn't know that I had the
11   opportunity to recross.  If that was constitutionally
12   ineffective, then so be it, but there was -- I would agree
13   with Your Honor that the really important point didn't come
14   out until redirect.
15           THE COURT:  And you had an opportunity to ask
16   another question in the deposition.  The other question is --
17           MR. GRINDROD:  If I did, then I did, but there was
18   no reason, I mean --
19           THE COURT:  You had notice that you were going to do
20   a deposition on this witness, right?
21           MR. GRINDROD:  I'm sorry?
22           THE COURT:  You were there.
23           MR. GRINDROD:  I'm sorry, Your Honor?
24           THE COURT:  You had notice that you were going to be
25   deposing this witness -- the government was.
```

```
 1              MR. GRINDROD:  Yes, Your Honor.
 2              THE COURT:  Did you have any discovery, anything
 3     from the government showing about what that witness's
 4     testimony would be?
 5              MR. GRINDROD:  We had -- so we had some discovery
 6     documents generally about the investments that were involved
 7     in this case, and then we had a memorandum of interview from
 8     an interview that -- I forget which agency it was -- I think
 9     it was the IRS agent did of Ms. Hullum.
10              THE COURT:  Did you read it?
11              MR. GRINDROD:  Yes, Your Honor.
12              THE COURT:  And what did that memorandum tell you
13     about what her view was?
14              MR. GRINDROD:  About the --
15              THE COURT:  About the money.
16              MR. GRINDROD:  About the non-DSPF investments?
17              THE COURT:  Yes.
18              MR. GRINDROD:  As best I can recall, it said we
19     had -- she listed off other annuities that she had invested
20     in and talked about how she had called the insurance company,
21     and they told her there was an IRS hold on the money.
22              THE COURT:  So you knew when you went into that
23     deposition exactly what she claimed the other funds were used
24     on, because you had discovery on it.
25              MR. GRINDROD:  Well, we knew what she --
```

1    incidentally, what she said as reported in that memorandum of

2    interview is different from what's listed in the -- I mean,

3    there's some overlap, but the dollars are very different than

4    what we included in our bankruptcy petition exhibit at

5    Smith 59.

6         THE COURT:  The memorandum of interview lays out

7    what she said the funds went to, though the figures were

8    slightly different, and you had that in your possession

9    through discovery before you went to that deposition, and

10   you're telling the Court that though you had a memorandum of

11   interview on the witness, you didn't take the memorandum of

12   interview to the deposition?

13        MR. GRINDROD:  Your Honor, I had the memorandum of

14   interview at the deposition.

15        THE COURT:  So when she was talking about $440,000

16   on something else, you never followed up even though you had

17   the memorandum in your hand?

18        MR. GRINDROD:  That's correct, Your Honor.

19        THE COURT:  Mr. Grindrod, you had what you needed to

20   question this witness about that $440,000.  Now you're asking

21   the Court to bring the witness back in here with her husband

22   with mental deficiencies, physical deficiencies, and to bring

23   in representatives from four financial institutions to follow

24   up on what she allegedly invested her money in when you had

25   an opportunity to make an inquiry, and you didn't.

1    MR. GRINDROD:  Your Honor, so to be clear, it's not

2    so much that -- so it's partially what that money was

3    invested in.  More importantly, it's what happened to the

4    money.  And if I had asked her about that at the deposition

5    based on the MOI, I think that would have been hearsay

6    because all she was saying was what the insurance company

7    told her.

8        At any rate, Your Honor, more importantly, even if I

9    had followed up with her about that at the deposition, I

10   don't understand why that would preclude us from offering

11   evidence to actually show where that money went and why -- if

12   she claims she doesn't get it, why she didn't have it back.

13   We can put on our own evidence on that.

14       And then if I could just briefly, Your Honor, the

15   last thing I would say is, just from an equitable

16   perspective, I mean, if I was a horrible lawyer on this

17   point, fair enough, but what exactly is the government's

18   theory for not bringing the truth into court on this point?

19       If they asked that question repeatedly twice and

20   their theory is that the IRS actually took this money, why

21   would they raise that specter of wrongdoing by Mr. Smith?

22       THE COURT:  Don't shift the inquiry to the

23   government.  Right now I'm talking about you, Mr. Grindrod,

24   who tells this Court to bring witnesses across the country on

25   something you had adequate opportunity to address and make an

```
 1    inquiry on.  You had the documents right there in your
 2    hand -- the Court has read the interview notes, by the way,
 3    and I'm going to file them in the record for your appeal --
 4    and you did nothing.
 5            You did not inquire on it.  You could have asked her
 6    about it.  It talks about it in this interview.  As a matter
 7    of fact, I'm going to bring the government back in here, and
 8    I'm going to file this interview in the record, because it
 9    talks about what happened to the money, that the IRS had a
10    hold on it, et cetera.
11            You could have made that inquiry, Mr. Grindrod, and
12    you're telling the Court as a seasoned lawyer you didn't know
13    you could ask a question after someone has done a redirect on
14    someone.  The Court doesn't buy it.  The Court has seen you
15    too many times in court, Mr. Grindrod.  And you're a zealous
16    lawyer.  Of course, maybe it was a tactical move by you, but
17    don't tell the Court now to bring those witnesses across
18    country.
19            MR. GRINDROD:  Your Honor, we haven't had an
20    opportunity to ask Mr. Sylvester Hullum any questions.  And
21    the critical points, the insurance companies -- if I had
22    cross-examined Ms. Hullum about it, I don't understand how
23    that could possibly preclude us from being able to have the
24    insurance companies come in and tell us what actually
25    happened with that money.
```

```
1          THE COURT:  Let me tell you this much.  Within the
2     scope of what's coming in here over the next four weeks, the
3     Court is highly confident this is not an appellate issue
4     that's going anywhere given the gravity and the scope of
5     what's come in here about Mr. Smith's activities in this
6     case.
7          Number two, the government's focus in this case is
8     on 40,000, not on 440,000.
9          MR. GRINDROD:  But why, then, did they repeatedly
10    ask that question?
11         THE COURT:  It was asked two times in the
12    deposition.
13         MR. GRINDROD:  It was.  It was objected to both
14    times.  I understand the Court overruled that objection, Your
15    Honor, but even if -- if the government wants to ask that
16    question repeatedly, I don't understand why we can't in our
17    case -- I accept the Court's ruling.  If the Court wants to
18    say I should have asked Ms. Hullum, then Mr. Smith can make
19    the appropriate arguments about that at the appropriate time.
20         But we should be able to call our own witnesses,
21    under the Sixth Amendment, use the compulsory power of the
22    Court to bring in an insurance company agent and say, okay,
23    the Court has already ruled that what happened to this
24    entirely unrelated money is relevant, because you overruled
25    our objection, so now let's find out what happened to that
```

 1   money.

 2          THE COURT:  The Court is not bringing anybody across

 3   country for anything.  Here's what's going to happen.

 4          You ignored the fact that, right in this deposition,

 5   Mr. Hullum was sitting there, he's mentally deficient, he's

 6   physically unable.  The wife is the only caretaker for him.

 7   That's why you were taking the deposition in the first place,

 8   because she was unavailable.  And he's unavailable by

 9   anything the Court can measure.

10          Now, if you really are serious about this, you don't

11   need to have an insurance company to come in here and tell

12   you where the money went.  The Court will authorize you,

13   between now and the end of this case, to take a video

14   deposition of some representative from the companies.  The

15   Court will authorize you to retake the deposition of

16   Ms. Hullum on this.

17          But we're not going to bring four witnesses across

18   country under these circumstances.  These two witnesses are

19   unable to travel.  It's a waste of resources, because you had

20   the time, you had an opportunity, and you didn't do it.  And

21   the Court just doesn't understand why you just didn't pursue

22   it.

23          Now, let's bring the government back in here.  The

24   simple truth is --

25          MS. McCASLIN:  Your Honor?

```
 1              THE COURT:  -- if you're doing any deposition,
 2     you're going to end up having to do it with them anyway.
 3              MS. McCASLIN:  I just wanted to clarify that we are
 4     allowed to do depositions and talk to the insurance
 5     companies.
 6              THE COURT:  Do what, now?
 7              MS. McCASLIN:  I just wanted to verify that we are
 8     allowed to do depositions with the insurance companies.
 9              THE COURT:  No, I'm not saying you're going to do a
10     whole lot of depositions either.  We haven't resolved that
11     yet.  We haven't resolved how many depositions you want to
12     do.
13              MS. McCASLIN:  Your Honor, I did just want --
14              THE COURT:  Wait a minute.  The other thing is, I
15     only deal with one lawyer at a time.
16              MS. McCASLIN:  Fair enough.
17              THE COURT:  Go around and talk to your colleague and
18     see what she has to say.  I don't want to argue with two
19     lawyers at one time.
20              MR. GRINDROD:  Yes, Your Honor.
21              MS. McCASLIN:  Sorry, Your Honor.
22              (Pause in the proceedings.)
23              THE COURT:  The Court may reconsider whether you're
24     doing any depositions at all, to tell you the candid truth,
25     because this is inexcusable.
```

1          MR. GRINDROD:  Your Honor, I understand.  I guess

2    what I would say on that point, Your Honor, is regardless of

3    what the Court thinks I should have asked Ms. Hullum at the

4    time, the substantive statement that she made can only be

5    rebutted -- the inference that's drawn from that can only be

6    rebutted by hearing from the insurance companies, because, at

7    best, if I had asked Ms. Hullum, "Ms. Hullum, what did the

8    insurance companies tell you was the reason why you didn't

9    get that money back?"  "Hearsay.  Objection."

10         Right?  And so we were going to have to --

11   regardless of what happened in that deposition, we were going

12   to have to call these insurance companies if what happened to

13   that extra $400,000 really was relevant.

14         THE COURT:  Okay.  I hear you, Mr. Grindrod.  Bring

15   the government back in here.

16         MR. GRINDROD:  Does Your Honor want me to sit down?

17         THE COURT:  Yeah, you can have a seat.

18         (The ex parte hearing having concluded, the

19   following was held in open court:)

20         THE COURT:  Ms. Yusi, if you would step up to the

21   podium, please.

22         Ms. Yusi, in the Hullum deposition that you took,

23   you asked Ms. Hullum about the $40,000 that she invested in

24   Dental Support, and then you asked her about the other money,

25   whether she got anything from Dental Support, and she said,

1    and then you asked her if she got anything else from the

2    other investments.

3            Now, I think you did it one time.  I don't know

4    whether it was two times.  But it came up twice in reference

5    to that $440,000.

6            Now, was the government's intent there that you were

7    trying to establish that Mr. Smith took $440,000 from her

8    fraudulently, or were you focused on the 40,000?

9            MS. YUSI:  Your Honor, I was focused on the 40,000,

10   and she did make a number of investments, and this was not

11   the only fraudulent investment that she had made with

12   Mr. Smith.  But she had talked about focusing on only being

13   on Social Security, and it was all her life savings, and so I

14   asked that question.  But my focus was on the 40,000.

15           THE COURT:  I have a question here.  The Court has

16   in hand a memorandum of interview that was apparently

17   delivered to Mr. Grindrod, to Mr. Smith, during discovery.  I

18   want you to take it, and I want that particular memorandum of

19   interview filed in the record.  I want it filed in the

20   record, because now it's no longer ex parte because whatever

21   happens, the government is going to have to be a part of.

22           It's being requested to interview four insurance

23   companies and, both, Mr. Hullum and Ms. Hullum.  And the

24   Court is saying right now it's in the record that Mr. Hullum

25   is mentally deficient, physically unable to travel, he's

1    banned from driving, he can't travel, so that's not going to

2    happen.

3           He was in the room during the interview, and she's

4    indicated that he's not mentally capable of doing an

5    interview.  And you have already deposed Ms. Hullum.  So the

6    question becomes how are we going to approach this issue?

7           First of all, given the number of allegations of

8    fraud, the allegations -- the jury hasn't convicted Mr. Smith

9    in this case -- this argument about Mr. Smith allegedly

10   taking 440,000 from her, an extra 400,000, the Court believes

11   that given the pattern of evidence coming in here, that

12   there's no need to pursue all of every claim that Mr. Smith

13   did something in this case, because the focus is on $40,000,

14   not $400,000.

15          And that needs to be cleared up for the record,

16   whether we're going to end up doing interviews to clear it

17   up -- Mr. Grindrod proposes that the only way to clear this

18   up is you've got to go depose the four insurance companies.

19          First of all, it's not clear how much money any

20   insurance company got of that $440,000.  That document you

21   gave the Court there is not very clear about how that money

22   was spent.

23          So the Court can do this.  The Court can permit the

24   parties to go back and depose Ms. Hullum again, do another

25   video deposition to follow up on that.

```
 1          MS. YUSI:  Your Honor, if I can clarify as well.  My
 2   understanding is that she also -- if they're going to go into
 3   other investments that she also invested or Mr. Smith had her
 4   invest in Northridge, which you said that -- we said we're
 5   not going into that.  If they're going to open this up to all
 6   the other investments, then the government will plan on going
 7   into Northridge and any other fraudulent investment or other
 8   investments that are under investigation by other regulatory
 9   authorities.
10          THE COURT:  My question is this -- don't jump up,
11   Mr. Grindrod, because you opened this all up.
12          How many total other alleged fraudulent investments
13   are there with respect to Mr. Smith that the Court is
14   basically banning here in this courtroom?
15          MS. YUSI:  How many other?
16          THE COURT:  Yes.
17          MS. YUSI:  Your Honor, I know there's pension
18   income, which has been indicted by the California, I believe,
19   securities regulatory authorities; Northridge, which I
20   believe is the U.S. SEC, is under investigation, which is not
21   in this.  And there are possibly others that I don't -- those
22   are the two that come to mind right now.
23          THE COURT:  The Court will still say the focus here
24   is on this $440,000.  That's what the Court's focus is on,
25   the $440,000.
```

```
 1              And right now, the Court is not suggesting,
 2      notwithstanding what Mr. Grindrod has said, that we're going
 3      back and going to try now to do depositions on five other
 4      individuals, because the Court's view is Mr. Grindrod, the
 5      representative of Mr. Smith, had adequate opportunity to
 6      pursue this matter and had materials that would've provided
 7      him with an opportunity to do it, and he did not do it, did
 8      not do any recross after you mentioned that.  He said
 9      nothing, with the material in his hand.
10              So it's a Johnny-come-lately to come in here now and
11      raise some question of great damage to the defendant.  That's
12      the first thing.  So the Court is not authorizing to go to
13      any insurance company anywhere.
14              The only thing the Court is going to do is authorize
15      the parties to go back to Ms. Hullum and try to clear it up.
16      That's all the Court is going to do.
17              MS. YUSI:  Your Honor, can I ask, can we do this
18      after the government closes its case?
19              THE COURT:  That's fine.  Whenever you get it done,
20      but the Court is authorizing you to get it done.  That's the
21      only remedy the Court is going to provide because the Court
22      doesn't believe that you have a meritorious motion,
23      Mr. Grindrod, given the fact that the government provided you
24      discovery, you were in that deposition, and you didn't open
25      your mouth when the issue came up.
```

1        MR. GRINDROD:  Your Honor, may I ask --

2        THE COURT:  That's the Court's ruling.

3        MR. GRINDROD:  May I ask one question about the

4   insurance companies?  Could we have a subpoena to get records

5   from those companies so that we could aid the resolution of

6   this issue with Ms. Hullum?

7        THE COURT:  The Court will authorize a subpoena for

8   the records.

9        MR. GRINDROD:  Thank you, Your Honor.

10       And I would just note -- I don't know -- I know this

11  issue is coming up, and I don't know if Ms. Yusi was the one

12  who was originally going to handle this when the Court called

13  upon her, but I would just note I don't see in the MOI or

14  anywhere else the suggestion that Mr. Smith sold

15  Ms. Hullum -- or the Hullums other fraudulent investments.

16       Are we talking about --

17       MS. YUSI:  She specifically mentions Northridge when

18  we asked -- when she talked about her investments on direct.

19       THE COURT:  The Court's view on the Northridge

20  matter -- and the Court sticks to it -- the Court is not

21  going to get into that unless Mr. Smith opens the door on

22  Northridge.  We're going to stay with this issue here.

23       So what the Court is saying is you may subpoena any

24  documents you want from the insurance companies, and the

25  Court will authorize a further deposition of Ms. Hullum, not

```
 1    of Mr. Hullum.  Mr. Hullum is unavailable, just like
 2    Ms. Hullum is unavailable.  We're going to authorize the
 3    deposition of her to follow up on this matter and not open
 4    the door to a whole bunch of other unfounded issues.
 5              MS. YUSI:  Your Honor, for the record, not that we
 6    would present it to the jury, but can I ask questions about
 7    that if the door presented -- if the door is opened?
 8              THE COURT:  About Northridge?
 9              MS. YUSI:  Yes.
10              THE COURT:  Well, if the defense opens the door, you
11    can cross-examine on anything they open the door on.
12              MS. YUSI:  Thank you.
13              THE COURT:  It's simple as that.
14              So the Court will get a written order out on what
15    it's done about this motion to exclude testimony.  I will
16    clearly indicate that I'm doing this notwithstanding the
17    defendant's failure to do what it should have done, which was
18    redirect or recross when the issue came up, and to use the
19    document in clear hand pertaining to the issue that they had
20    before the deposition.
21              MS. McCASLIN:  Your Honor?
22              THE COURT:  Yes, ma'am.
23              MS. McCASLIN:  I have a question, if you don't mind,
24    just to clarify.
25              For a deposition, if it is just to clarify the
```

1134

1    400,000, asking only about that for the IRS, it's not going

2    to open the door to other things.  Is that the Court's

3    ruling?

4              THE COURT:  The inquiry is what other investments

5    was the 400,000 used on.

6              Now, if she says that it was used on Northridge,

7    there's nothing the Court can do about that because you

8    opened that up.  If she says she used it on Northridge, then

9    the question about Northridge or brand bridge or brand bray

10   or anything else she raises, about the 400,000.

11             But that's what you're concerned about when you say

12   you're being prejudiced by it.  That means, you know -- with

13   some things, you're better off letting a sleeping dog lie.

14   But you're asking the question.  So you can't say you want to

15   ask her what did they -- what did she invest it in, and then

16   when she tells you, you don't want to hear about it.

17             MS. McCASLIN:  No, Your Honor, we're just trying to

18   clarify that the IRS seized annuities, because suggesting

19   that Mr. Smith pocketed $400,000 is simply not true.

20             THE COURT:  Well, that's what we're trying to clear

21   up here.  You can ask her about the IRS hold.  It was

22   certainly mentioned in the transcript, and there was no

23   follow-up on that by Mr. Grindrod though it's in the

24   transcript.

25             MS. McCASLIN:  Your Honor, Mr. and Mrs. Hullum also

 1    have a box of documents.  Are we able to get copies of those?
 2             THE COURT:  She has what?
 3             MS. McCASLIN:  She has a box of documents about all
 4    the financial stuff that nobody has seen.
 5             THE COURT:  Wait a minute.  Didn't the government
 6    provide you the discovery on Ms. Hullum?
 7             MS. McCASLIN:  We do have discovery, but at the
 8    deposition, Ms. Hullum said that she has a box of documents
 9    that she did not turn over.
10             THE COURT:  I don't know what she has.  The
11    government provided you with discovery that they had.
12             Does the government have the box of documents?
13             MS. YUSI:  We do not, Your Honor.
14             THE COURT:  Okay.  Well, they can only provide you
15    what they have.  You can question her, and if she has
16    something that's helpful, fine, but we're not going to go
17    back now and start discovery all over again on something that
18    you should have done when you had the chance.  And that's
19    what bothers the Court.  Now you bring it in here, and it's a
20    great motion where something has been done, and this
21    shouldn't have happened.
22             MS. McCASLIN:  Understood, Your Honor.  We just want
23    to make sure that the information the jury has is correct.
24             THE COURT:  Well, I think the Court has gone far
25    enough on this.  I mean, you can question her about what she

```
 1   has.  If she has a document that backs up what she says,
 2   fine.  You're not going to come back in here with a big
 3   argument that she didn't find all the documents pertaining to
 4   it.  This is the end of this.
 5           (Proceedings adjourned at 5:30 p.m.)
 6
 7                        CERTIFICATION
 8
 9       I certify that the foregoing is a correct transcript
10   from the record of proceedings in the above-entitled matter.
11
12
13           _____/s/_____
14                    Carol L. Naughton
15                    August 30, 2022
16
17
18
19
20
21
22
23
24
25
```