```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        Norfolk Division

 3

 4    - - - - - - - - - - - - - - - - - -
                                          )
 5     UNITED STATES OF AMERICA           )
                                          )
 6     v.                                 )    CRIMINAL ACTION NO.
                                          )          2:19cr47
 7     DAVID ALCORN and                   )
       AGHEE WILLIAM SMITH II,            )
 8                                        )
              Defendants.                 )
 9    - - - - - - - - - - - - - - - - - -

10
                       ** Jury Trial - Day 7 **
11
                      TRANSCRIPT OF PROCEEDINGS
12
                          Norfolk, Virginia
13
                          February 9, 2022
14

15    BEFORE:  THE HONORABLE RAYMOND A. JACKSON
               United States District Judge, and a jury
16

17    APPEARANCES:

18            UNITED STATES ATTORNEY'S OFFICE
              By:  Andrew C. Bosse
19                 Melissa E. O'Boyle
                   Elizabeth M. Yusi
20                 Assistant United States Attorneys
                   Counsel for the United States
21
              RICHARD S. YAROW LLC
22            By:  Richard S. Yarow
                   Counsel for Defendant David Alcorn
23
              FEDERAL PUBLIC DEFENDER'S OFFICE
24            By:  Andrew W. Grindrod
                   Lindsay Jo McCaslin
25                 Assistant Federal Public Defenders
                   Counsel for Defendant Aghee William Smith II
```

1    I N D E X

2    GOVERNMENT'S
     WITNESSES                                              PAGE
3
       RAEANN GIBSON
4          Direct Examination (Resumed) By Ms. O'Boyle     1144
           Cross-Examination By Mr. Yarow                   1302
5          Cross-Examination By Ms. McCaslin                1317
           Redirect Examination By Ms. O'Boyle              1360
6      LOUIS DOUG DUNN
           Direct Examination By Ms. O'Boyle                1365
7          Cross-Examination By Ms. McCaslin                1376
           Redirect Examination By Ms. O'Boyle              1382
8

9    E X H I B I T S

10   GOVERNMENT'S
     NO.                                                    PAGE
11
       407                                                  1145
12     500                                                  1151
       502                                                  1153
13     80                                                   1154
       318C                                                 1155
14     504                                                  1156
       505                                                  1159
15     509                                                  1160
       516                                                  1161
16     520                                                  1162
       506                                                  1165
17     506A                                                 1167
       506B                                                 1168
18     506C                                                 1168
       506D                                                 1169
19     506E                                                 1169
       506F                                                 1170
20     506G                                                 1170
       506H                                                 1171
21     506I                                                 1171
       506J                                                 1171
22     270A                                                 1177
       510                                                  1180
23     511C                                                 1181
       507                                                  1182
24     311J                                                 1183
       59                                                   1187
25     411                                                  1198

Carol L. Naughton, Official Court Reporter

```
1                              I N D E X
                               (Continued)
2
                             E X H I B I T S
3
      GOVERNMENT'S
4     NO.                                                    PAGE

5        86                                                  1200
         87                                                  1201
6        601                                                 1202
         68                                                  1208
7        74                                                  1208
         84                                                  1209
8        88                                                  1209
         89                                                  1210
9        90                                                  1210
         330                                                 1211
10       331                                                 1213
         523                                                 1213
11       525                                                 1213
         608                                                 1214
12       616                                                 1215
         617                                                 1215
13       618                                                 1215
         615                                                 1217
14       614                                                 1218
         619                                                 1221
15       600E                                                1223
         600D                                                1223
16       600C                                                1224
         600B                                                1224
17       600A                                                1225
         526C                                                1236
18       620                                                 1237
         621                                                 1238
19       623                                                 1238
         633                                                 1238
20       634                                                 1239
         629                                                 1240
21       1J                                                  1244
         323                                                 1244
22       413                                                 1244
         527                                                 1245
23       325                                                 1246
         415                                                 1247
24       529                                                 1247
         635                                                 1248
25       636                                                 1253
```

Carol L. Naughton, Official Court Reporter

```
1                              I N D E X
                              (Continued)
2
                            E X H I B I T S
3
      GOVERNMENT'S
4     NO.                                              PAGE

5       200R                                           1256
        288                                            1258
6       223                                            1259
        224                                            1260
7       204                                            1261
        205                                            1261
8       206                                            1264
        200E                                           1266
9       239                                            1270
        225                                            1271
10      227                                            1272
        231                                            1273
11      235                                            1274
        56                                             1276
12      57                                             1276
        266                                            1279
13      268                                            1281
        270B                                           1283
14      270E                                           1283
        272                                            1284
15      274                                            1285
        278                                            1286
16      281                                            1288
        61                                             1293
17      93                                             1293
        62                                             1295
18      63                                             1297
        617                                            1362
19      1214                                           1369
        1217                                           1370
20

21    DEFENDANT SMITH'S
      NO.                                              PAGE
22
        30                                             1321
23      32                                             1322
        33                                             1323
24      61                                             1336
        10                                             1339
25      482                                            1357
```

Carol L. Naughton, Official Court Reporter

```
1                (Proceedings resumed at 9:30 a.m.)

2                (The witness resumed the stand.)

3           THE COURT:  Good morning, counsel.  The Court needs

4    to briefly revisit its ruling on the motion last night, the

5    emergency motion of the defendant.

6           Mr. Bosse, the Court has a question for you.  You

7    can stay right where you are, and you can answer the

8    question.

9           MS. O'BOYLE:  Your Honor, I don't mean to interrupt,

10   but the witness is on the stand.  Do we want Ms. Gibson to

11   remain in here for this, or should she --

12          THE COURT:  It doesn't have anything to do with this

13   witness.

14          MS. O'BOYLE:  Thank you, Your Honor.

15          THE COURT:  It's nothing to do with this witness.

16          When did you deliver to the defendant this

17   memorandum of interview with Ms. Hullum?

18          MR. BOSSE:  Your Honor, my recollection, it was our

19   second Jencks production, and so -- I don't have the date of

20   the delivery.

21          THE COURT:  I don't need the date of the delivery.

22   Approximately what month?

23          MR. BOSSE:  It was taken in --

24          THE COURT:  The interview was in September.

25          MR. BOSSE:  The interview was in September.  I think
```

1     it was prior to the deposition.  I don't have a date, sir.

2                THE COURT:  Okay.

3                MR. BOSSE:  We can find that out, Your Honor.

4                THE COURT:  All the Court needs to know is that it

5     was prior to the deposition.  The reason I ask this is

6     because in this interview, it lists the names of the

7     insurance companies that Mr. Grindrod has listed in his

8     emergency motion.

9                And the emergency motion contains the addresses,

10    which means, Mr. Grindrod, that you had this information at

11    least three months before this trial.  You had this

12    information at least three months before this trial, and now

13    you've come in and asked the Court to grant an emergency

14    motion to subpoena, first, the custodian and then the

15    records.

16               And the Court finds there's nothing that's an

17    emergency about this, because you had this information at

18    least 90 days before this trial.  And that's undisputed, if

19    we look at what we have in the record.

20               Bottom line is, the Court is revising its relief

21    granted.  The Court will not grant an emergency motion to

22    procure any records from any custodian or bring any custodian

23    in here.  The Court will leave in place the authorization to

24    do a video, further video, or interview of the witness.

25               The Court has read the transcript, and it's clear

1  there's enough information there to put the defendant on

2  notice to ask about what happened to the other $400,000 and

3  to question what she meant by the IRS having a hold, and that

4  alone is sufficient to cure the problem we have here.  So the

5  Court is revising its remedy that it imposed yesterday.

6       MS. YUSI:  Your Honor, just for the record -- just

7  for the record, we had discussed the clips of the deposition

8  prior to playing them for the jury, and Mr. Grindrod did not

9  bring up any of this and talk to the government prior to this

10  in order for us to remove that prior to this and take care of

11  this before it was going.  And I just wanted to put that on

12  the record.

13       THE COURT:  So Mr. Grindrod never raised any

14  question about the other $400,000?

15       MS. YUSI:  No, Your Honor.

16       THE COURT:  Was that clip included in what was

17  played to the jury?

18       MS. YUSI:  It was, Your Honor.

19       THE COURT:  Okay.  Well, then, the Court, just out

20  of an abundance of caution, is permitting him to do the

21  reinterview, but the Court finds there's nothing emergency

22  about any of it, nothing emergency about this motion, but out

23  of an abundance of caution, the Court is authorizing a second

24  deposition.

25       But for the record, there's nothing emergency about

R. Gibson - Direct

1   this motion.  There's an old saying about a delay on one

2   person's part does not mean it's an emergency on the Court's

3   part.  So that's where we are.

4          And the Court got your proposed order, Mr. Grindrod,

5   but the Court finds it inappropriate to enter the order that

6   you drafted and sent to the Court last night.  So that's

7   where we are.  Bring the jury in.

8          (The jury entered the courtroom.)

9          THE COURT:  Good morning, ladies and gentlemen.

10          Let the record reflect that all jurors are present

11  this morning.

12          MS. O'BOYLE:  United States agrees.

13          MR. YAROW:  Mr. Alcorn agrees.

14          MS. McCASLIN:  Mr. Smith agrees.

15          THE COURT:  Okay.  We will continue with the

16  examination of Ms. Gibson this morning.

17          MS. O'BOYLE:  Thank you, Your Honor.

18          RAEANN GIBSON, called by the Government, having been

19  previously sworn, was examined and testified further as

20  follows:

21                  DIRECT EXAMINATION (Resumed)

22  BY MS. O'BOYLE:

23  Q.  Good morning, Ms. Gibson.

24  A.  Good morning.

25  Q.  When we left off yesterday, we were talking about the

R. Gibson - Direct

```
 1   second spectrum investment, Prime Spectrum.  Do you remember
 2   that?
 3   A.  Yes.
 4   Q.  We had just gone over the Investment Offering?
 5   A.  Yes.
 6   Q.  Let's take a look at Government's Exhibit 407.  Do you
 7   recognize 407?
 8   A.  Yes.
 9   Q.  And what is it?
10   A.  This is a -- well, the top section is a money move sheet
11   for Prime Spectrum.
12   Q.  And the second page?
13   A.  That is a -- what I would call a sales tracker sheet.
14            MS. O'BOYLE:  Government moves in Exhibit 407.
15            THE COURT:  Exhibit 407 is admitted.
16            (Government's Exhibit 407 was admitted.)
17   BY MS. O'BOYLE:
18   Q.  Now, let's take the second page first.  And I believe
19   this is the first time that the jury has seen this particular
20   type of spreadsheet.
21            What is this?
22   A.  This is a sales tracker.  So this would keep track of the
23   sales process once an investor decides that they are
24   interested in making a purchase, there are several steps that
25   happen for that to occur.  This keeps tracks of dates, names,
```

R. Gibson - Direct

1    accounts, and dollar amounts of that process.

2    Q.  Over here the first two columns, what are those?

3    A.  This would be the investor name.  So you have the last

4    name on the left side and then their first name on the second

5    column.

6    Q.  Is there a reference to a Ruth -- Bernell and Ruth Clark?

7    A.  Yes.

8    Q.  Then over here on the left-hand side, there's a column

9    that says "Amount to be purchased."  What is that?

10   A.  That's the dollar amount that they would like to invest,

11   so their total amount of their purchase for that.

12   Q.  Then it says "Amounts received at BayPort."  What is

13   that?

14   A.  That's when the funds were actually received into the

15   Dominion BayPort account that was set up for that particular

16   deal.

17   Q.  So that's the BayPort account here in Virginia?

18   A.  Yes.

19   Q.  And then there's a list that says "Agent," and what is

20   the agent?

21   A.  That's the sales representative.

22   Q.  And what was the total amount of the raise here?

23   A.  It was -- 370,000 was the actual that was raised --

24   sorry, 500,000 was the total.  130,000 was the total dollar

25   amount taken in.

R. Gibson - Direct

1   Q.   Was this raise closed before it was completely fulfilled?

2   A.   Yes.

3   Q.   Do you know why?

4   A.   That had to do with Tony Sellers, who was the sales

5   agent, and his inquiry and complaint from the State of Idaho.

6   Q.   The securities department in Idaho?

7   A.   Correct.

8   Q.   Now, we'll move back up to the first sheet.  What is this

9   sheet?

10  A.   This is the -- what I call a money move sheet.  So as the

11  funds come into that BayPort account, this is then, again,

12  per this particular Prime Spectrum deal, the percentages that

13  are split off from that the moment those funds come in.

14  That's what this tracks.

15  Q.   And so in connection with -- let's just take the line

16  here in the middle.  Does it reference B. and R. Clark?

17  A.   Yes.

18  Q.   And an M. Berrett?

19  A.   Correct.

20  Q.   For those two groups of individuals, how much money was

21  received at BayPort?

22  A.   45,000.

23  Q.   And then how much was kept in the Prime Spectrum account?

24  A.   19,125.

25  Q.   What are those funds going to be used for?

─R. Gibson - Direct─

1    A.   That would be sent to David Alcorn's company, Janus

2    Spectrum, in Arizona, for the license application.

3    Q.   And then how much was sent -- did you move over to

4    Dominion Private Client's account?

5    A.   Yes.  13,500.

6    Q.   How much did you move to the Spectrum 100 Management

7    savings account?

8    A.   4,500.

9    Q.   And then how much did you move to the Prime Spectrum

10   Management account?

11   A.   7,875.

12   Q.   And so, in total, how much went from all of these

13   investors to Mr. Alcorn's company?

14   A.   55,250.

15   Q.   And the remaining -- the remainder of the 130,000 that

16   you -- that Mr. Bank took in, where did those go?

17   A.   To Tony Sellers.  He was paid the 30 percent the sales

18   commission, and then the other funds remained in the Dominion

19   accounts.

20   Q.   Let's take a look at Government's Exhibit 1012, which is

21   already in -- sorry, 1012A.  Do you recognize 1012A?

22   A.   Yes.

23   Q.   What is it?

24   A.   This is a wire confirmation sheet from BayPort Credit

25   Union.

R. Gibson - Direct

1    Q.   And where did this wire come from?

2    A.   From the Prime Spectrum account.

3    Q.   Where did it go to?

4    A.   Janus Spectrum LLC in Arizona.

5    Q.   And whose company is Janus Spectrum LLC?

6    A.   David Alcorn.

7    Q.   And how much of investor funds was sent to Mr. Alcorn?

8    A.   41,200.

9    Q.   And was that slightly different from the amount that was

10   in your money move sheet?

11   A.   Yes.

12   Q.   Okay.  Do you know why the amounts were different?

13   A.   I don't recall in this particular one.

14           MS. O'BOYLE:  Your Honor, at this time, we would ask

15   to be able to read one of the stipulations about this wire.

16           THE COURT:  You may.

17           MS. O'BOYLE:  If we could have Government's

18   Exhibit 2000, Page 5.

19           "On or about April 8, 2014, the $41,200 wire

20   transfer from BayPort Credit Union to Arizona Business Bank,

21   as shown in Government's Exhibit 1012A, commenced in the

22   Eastern District of Virginia, traveled through interstate

23   commerce, and ended outside of the Commonwealth of Virginia."

24   BY MS. O'BOYLE:

25   Q.   Now, after Mr. Alcorn received these funds, do you have

Carol L. Naughton, Official Court Reporter

R. Gibson - Direct

1    any firsthand knowledge about what he did with the money?

2    A.  I do not.

3    Q.  Did you also pay Mr. Sellers with investor funds?

4    A.  Yes.

5    Q.  If we could take a look at what has already been admitted

6    as Government Exhibit 1007A.

7            And do you recognize this, what's in 1007A?

8    A.  Yes.

9    Q.  What is it?

10   A.  This is a check from Prime Spectrum LLC to Tony Sellers.

11   Q.  In what amount?

12   A.  The amount is 13,500.

13   Q.  And what does it say in the memo line?

14   A.  It's referencing the clients, one with the last name of

15   Clark for 20,000, the other is Berrett for 25,000.

16   Q.  Why were you sending Mr. Sellers these funds?

17   A.  That was his sales commission.

18   Q.  Did it come out of investor funds?

19   A.  Yes.

20           MS. O'BOYLE:  Your Honor, at this time, we would ask

21   to be able to read a stipulation related to this particular

22   transaction as well.

23           THE COURT:  You may.

24           MS. O'BOYLE:  If we could pull up Government's

25   Exhibit 2000, Page 5.

R. Gibson - Direct

1           "On or about April 4, 2014, the negotiation of the

2   $13,500 check to Tony Sellers from the BayPort Credit Union

3   account of Prime Spectrum LLC in the Eastern District of

4   Virginia contained in Government's Exhibit 1007A caused an

5   interstate wire that traveled through interstate commerce."

6   BY MS. O'BOYLE:

7   Q.  Now, we've covered two separate investment funds -- is

8   that correct? -- related to spectrum?

9   A.  Yes.

10  Q.  Was there a third?

11  A.  There was.

12  Q.  What was the name of the third one?

13  A.  Spectrum 100.

14  Q.  I'd like to show you Government's Exhibit 500.  Do you

15  recognize Government's Exhibit 1500?

16  A.  Yes.

17  Q.  What is it?

18  A.  The Virginia Articles of Organization for Spectrum 100

19  LLC.

20          MS. O'BOYLE:  Government moves in Exhibit 500.

21          THE COURT:  Exhibit 500 will be admitted.

22          (Government's Exhibit 500 was admitted.)

23  BY MS. O'BOYLE:

24  Q.  And what was the name of the company for this third

25  spectrum investment?

Carol L. Naughton, Official Court Reporter

R. Gibson - Direct

1   A.   Spectrum 100 LLC.

2   Q.   And where was that company -- where was its office?

3   A.   In the Dominion offices on Commuter Drive in Virginia

4   Beach.

5   Q.   And who organized this entity?

6   A.   I did.

7   Q.   And what was the date of the organization?

8   A.   April 1, 2013.

9   Q.   And why did you organize this entity?

10  A.   Daryl Bank instructed me to set this up.

11  Q.   And did Spectrum 100 also have a bank account?

12  A.   Yes, it did.

13  Q.   Was it at BayPort Credit Union here in Virginia?

14  A.   Yes.

15  Q.   And did you also create a management account in

16  connection with this particular transaction?

17  A.   Yes.

18          MS. O'BOYLE:  If we could have Government's

19  Exhibit 502.

20  BY MS. O'BOYLE:

21  Q.   Do you recognize 502?

22  A.   Yes.

23  Q.   What is it?

24  A.   The Virginia Articles of Organization for Spectrum 100

25  Management LLC.

R. Gibson - Direct

1          MS. O'BOYLE:  Government moves in Exhibit 502.

2          THE COURT:  Exhibit 502 will be admitted.

3          (Government's Exhibit 502 was admitted.)

4     BY MS. O'BOYLE:

5     Q.  What was the name of the management organization for this

6     investment?

7     A.  Spectrum 100 Management LLC.

8     Q.  What was the address of its office?

9     A.  The Dominion offices on Commuter Drive in Virginia Beach.

10    Q.  Who organized the entity?

11    A.  I did.

12    Q.  On what date?

13    A.  April 1st, 2013.

14    Q.  Did you also organize a company called Dominion

15    Diversified Strategies LLC?

16    A.  Yes.

17         MS. O'BOYLE:  If we could have Government

18    Exhibit 80.

19    BY MS. O'BOYLE:

20    Q.  Do you recognize this?

21    A.  Yes.

22    Q.  What is it?

23    A.  Virginia Articles of Organization for Dominion

24    Diversified Strategies LLC.

25         MS. O'BOYLE:  Government moves in Exhibit 80.

──────R. Gibson - Direct──────

1           THE COURT:  Exhibit 80 will be admitted.

2           (Government's Exhibit 80 was admitted.)

3    BY MS. O'BOYLE:

4    Q.  Was this entity also located at the Dominion offices in

5    Virginia Beach?

6    A.  Yes.

7    Q.  Now, in connection with Spectrum 100, did Mr. Alcorn also

8    talk to some of the Dominion sales reps about this particular

9    investment?

10   A.  Yes.

11          MS. O'BOYLE:  If you could hand the witness, please,

12   Government Exhibit 318C, as in Charlie.

13   BY MS. O'BOYLE:

14   Q.  Do you recognize 318C?

15   A.  Yes.

16   Q.  And is it a recording of Mr. Alcorn talking to some

17   Dominion sales reps at a meeting?

18   A.  Yes.

19   Q.  And did you initial it as being an authentic recording?

20   A.  I did.

21          MS. O'BOYLE:  Government moves in Exhibit 318C.

22          THE COURT:  Any objection?

23          MR. YAROW:  No.  Not from Mr. Alcorn.

24          THE COURT:  What was that?

25          MR. YAROW:  Not from Mr. Alcorn.

R. Gibson - Direct

1    THE COURT:  318C will be admitted.

2    (Government's Exhibit 318C was admitted.)

3    MS. O'BOYLE:  If we could play clip 2.  It's a

4    little long, but we'll just do the first part of it.

5    (Audio played in open court.)

6    BY MS. O'BOYLE:

7    Q.  There was a discussion there about Sprint and a rebanding

8    effort?

9    A.  Yes.

10   Q.  And what was that about?

11   A.  For in 2011 -- or I'm sorry, on 9/11 they said with the

12   frequencies, the first responders were having trouble getting

13   through, so there was rebanding where, I believe it was

14   Sprint was giving up -- or the FCC was taking some of those

15   licenses back, and then other people were able -- individual

16   people were able to purchase into some of those.

17   Q.  Who told you that information?

18   A.  David Alcorn.

19   MS. O'BOYLE:  If we could go to clip 5, please, of

20   Exhibit 318C.

21   (Audio played in open court.)

22   BY MS. O'BOYLE:

23   Q.  Mr. Alcorn in this recording says, "We knew that this

24   would be attractive to Sprint."

25   A.  Yes.

R. Gibson - Direct

1   Q.  What did you understand him to mean?

2   A.  That they would be one of the companies that would want

3   to buy this back from the individuals or investors who

4   purchased into these spectrum licenses.

5           MS. O'BOYLE:  And the jury will have the other clips

6   back in the jury room, but if we could play clip 6.

7           (Audio played in open court.)

8   BY MS. O'BOYLE:

9   Q.  In this clip Mr. Alcorn says that, "The 800-megahertz

10  spectrum is about the best there is out there."  Did you hear

11  him say that?

12  A.  Yes.

13  Q.  And was that something that was repeated in all of your

14  investment offerings related to spectrum?

15  A.  Yes.

16  Q.  Now, do you recognize Government Exhibit 504?

17          MS. O'BOYLE:  Just for the witness, please.

18          THE WITNESS:  Yes.

19  BY MS. O'BOYLE:

20  Q.  What is it?

21  A.  An Investment Offering for Spectrum 100.

22          MS. O'BOYLE:  Government moves in Exhibit 504.

23          THE COURT:  504 will be admitted.

24          (Government's Exhibit 504 was admitted.)

25  BY MS. O'BOYLE:

R. Gibson - Direct

1    Q.  This is the third Investment Offering that we have seen
2    in the spectrum investments; is that correct?
3    A.  Yes.
4    Q.  And what was the name of this particular Investment
5    Offering?
6    A.  Spectrum 100.
7    Q.  And when did Mr. Bank start presenting it?
8    A.  March of 2013.
9    Q.  Ms. Gibson, what was the difference between the Janus
10   Spectrum Group offering and the Spectrum 100 offering?
11   A.  Janus Spectrum Group was around, I believe it was 25
12   economic areas, and the Spectrum 100, there was 100 economic
13   areas.
14   Q.  Okay.  Would they overlap?  Would the areas overlap?
15   A.  I don't believe so.  I'm not 100 percent positive, but I
16   don't believe they did.
17          MS. O'BOYLE:  If we could go to Page 3 of
18   Government's Exhibit 504.
19   BY MS. O'BOYLE:
20   Q.  Here's Page 3.  Is this the same language that we saw in
21   the prior two investment offerings, Ms. Gibson?
22   A.  Yes.
23   Q.  And so in italics does it say, "Spectrum is the most
24   valuable natural resource of the information age"?
25   A.  Yes.

R. Gibson - Direct

1    Q.   Is this what we've seen in the other two investment

2    offerings?

3    A.   Yes.

4    Q.   And where did you get that information?

5    A.   From David Alcorn.

6    Q.   Okay.  And we're not going to go back through this entire

7    thing again.

8            MS. O'BOYLE:  But if you could, please, Ms. Yusi, go

9    to Pages 17 and 18.

10   BY MS. O'BOYLE:

11   Q.   Does this list pro forma cash flow?

12   A.   Yes.

13   Q.   For this investment?

14   A.   Yes.

15   Q.   And where did Mr. Bank get these numbers to put in this

16   Investment Offering?

17   A.   From David Alcorn.

18   Q.   Okay.  Now, how much -- do you recall how much you raised

19   from investors in connection with the Spectrum 100 offering?

20   A.   I want to say it was around 7 million.

21   Q.   Let's take a look at Government's Exhibit 505 first.

22           MS. O'BOYLE:  And this is just for the witness.

23   BY MS. O'BOYLE:

24   Q.   Do you recognize this?

25   A.   Yes.

Carol L. Naughton, Official Court Reporter

R. Gibson - Direct

1   Q.   What is it?

2   A.   This is an opportunity alert for Spectrum 100.

3           MS. O'BOYLE:   Government moves in Exhibit 505.

4           THE COURT:   505 is admitted.

5           (Government's Exhibit 505 was admitted.)

6   BY MS. O'BOYLE:

7   Q.   And this is very similar to the opportunity alert that we

8   saw for Janus Spectrum Group; is that correct?

9   A.   Yes.

10  Q.   What would you do with these opportunity alerts?

11  A.   This would be given to our clients' investors and then

12  sales reps to present their clients' investors.

13  Q.   And then down here in the left-hand corner, what does it

14  say?

15  A.   "Spectrum is the most valuable natural resource of the

16  information age."  "Bandwidth is the new black gold."  "Each

17  new computing cycle results in ten times more devices and

18  greater wealth creation than previous cycles."

19  Q.   Where did Mr. Bank get this information to put in this

20  investment alert?

21  A.   From David Alcorn.

22  Q.   Did Mr. Bank discuss Spectrum 100 with his sales agents

23  on Monday morning conference calls?

24  A.   Yes.

25          MS. O'BOYLE:   If you could please hand the witness

R. Gibson - Direct

1   Government Exhibit 509.

2   BY MS. O'BOYLE:

3   Q.  Do you recognize Government's Exhibit 509?

4   A.  Yes.

5   Q.  Is it initialed by you?

6   A.  It is.

7   Q.  And is it a call that Mr. Maerki and Mr. Bank had with

8   sales agents about November 11, 2013?

9   A.  Yes.

10  Q.  And did you listen to it and verify that it is authentic?

11  A.  I did.

12          MS. O'BOYLE:  Government moves in Exhibit 509.

13          THE COURT:  509 is admitted.

14          (Government's Exhibit 509 was admitted.)

15          MS. O'BOYLE:  If we could please play clip 1.  This

16  is the only clip we'll play.

17          (Audio played in open court.)

18  BY MS. O'BOYLE:

19  Q.  And what were these Monday morning conference calls?

20  A.  They were -- Daryl would put those on, and they would

21  be -- and Kent Maerki -- I'm sorry, I think it was Kent

22  Maerki that actually would put those on.  Daryl would speak

23  on those.  It would be sales representatives on those calls.

24          MS. O'BOYLE:  Let's take a look at Government's

25  Exhibit 516.

─────R. Gibson - Direct─────

1    BY MS. O'BOYLE:

2    Q.  Do you recognize 516?

3    A.  Yes.

4    Q.  What is it?

5    A.  This is a sheet that Daryl give me to -- so I knew how to

6    break out the funds for Spectrum 100 once investors sent them

7    to us.

8            MS. O'BOYLE:  Government moves in Exhibit 516.

9            THE COURT:  Exhibit 516 is admitted.

10           (Government's Exhibit 516 was admitted.)

11   BY MS. O'BOYLE:

12   Q.  Ms. Gibson, you said this is Mr. Bank's handwriting?

13   A.  Yes.

14   Q.  And could you please break this down for the jury what

15   would happen when funds would come in -- when investors would

16   invest in Spectrum 100.

17   A.  Yes.  So the 46.2 percent would go to David Alcorn's

18   company, Janus Spectrum in Arizona.  17.5 percent would be

19   moved over to the Dominion Janus Spectrum 100 Management

20   account.  6.3 percent would be moved over to Dominion

21   Diversified Strategies.  And 30 percent was moved over to

22   Dominion Private Client Group.

23   Q.  Did you follow Mr. Bank's directions as contained in this

24   document when receiving investor funds?

25   A.  I did.

—————————R. Gibson - Direct—————————

1    Q.  Let's take a look at Government's Exhibit 520 for the

2    witness.  Do you recognize 520?

3    A.  Yes.

4    Q.  What is it?

5    A.  This is a money move sheet for Spectrum 100.

6            MS. O'BOYLE:  Government moves in Exhibit 520.

7            THE COURT:  520 is admitted.

8            (Government's Exhibit 520 was admitted.)

9    BY MS. O'BOYLE:

10   Q.  And so I think you talked about a money move sheet and a

11   sales tracker.  Which one is Exhibit 520?

12   A.  This is a money move sheet.

13   Q.  So this is how you were tracking where the funds would

14   go?

15   A.  Yes.

16   Q.  And so if you could, the first line, could you walk

17   through what happened with the clients' money -- first, which

18   client was this?

19   A.  Wallace Barry.

20   Q.  Mr. Barry?

21   A.  Yes.

22   Q.  Does he also go by Skip?

23   A.  I --

24   Q.  Did you ever meet Mr. Barry?

25   A.  I did not.

R. Gibson - Direct

1    Q.   Okay.  So what happened with Mr. Barry's money when it

2    came in on April 10, 2013?

3    A.   $110,000 came into the Spectrum 100 bank account at

4    BayPort.  The 46.2 percent remained in that account to be

5    sent later to David Alcorn's company, Janus, in Arizona, and

6    that was $50,820.  30 percent of that, which is 33,000, was

7    moved over to Dominion Private Client Group.  $6,930 was

8    moved over to Dominion Diversified Strategies.  $19,250 was

9    moved to Spectrum 100 Management.

10   Q.   Okay.  And I'm going to go down and highlight a line

11   related to a Mr. Ray Martin.

12   A.   Yes.

13   Q.   Have you ever met Mr. Martin?

14   A.   I did not.

15   Q.   Could you explain what happened with Mr. Martin's funds

16   when they arrived in the bank account on June 18, 2013?

17   A.   $43,000 arrived at that bank account.  $19,866 remained

18   in that account to later be sent to David Alcorn's company.

19   12,900 was moved over to Dominion Private Client Group.

20   $5,959.80 was moved to Dominion Diversified Strategies.  And

21   $3,870 was moved over to Spectrum 100 Management.

22   Q.   So this chart -- I'm scrolling down to Page 2, and

23   there's a break in the chart.  Do you know why there was a

24   break in the chart, Ms. Gibson?

25   A.   Yes.  So if you notice on the third column in at the top

R. Gibson - Direct

1   where it talks about the money remaining in the account, that
2   46.2 percent, it now changes and goes to 41.2 percent.  So it
3   drops down 5 percent.
4   Q.   And what happened to the other 5 percent?
5   A.   That was moved over to Spectrum 100 Management's savings
6   account.
7   Q.   Do you know why there was a reduction?
8   A.   I remember it being an incentive to be able to offer a
9   bonus to the sales representatives.
10  Q.   So who offered that bonus to the sales representatives?
11  A.   Well, it started at David Alcorn's level, getting the
12  discounts, and then Daryl promoted it out to the sales
13  representatives for an incentive for them.
14  Q.   Let's go to the very bottom, before the chart breaks up.
15  How much investor funds had you received by February of 2014?
16  A.   About 3.4 million.
17  Q.   And then scrolling down further, at the end of the second
18  chart, how much more did you receive?
19  A.   Almost 4.3 million.
20  Q.   So total, how much in investor funds did you receive --
21  did Mr. Bank receive in connection with the Spectrum 100
22  investment?
23  A.   Almost 7.7 million.
24  Q.   Now, let's talk about the investor funds that you sent to
25  Mr. Alcorn and Janus Spectrum LLC.

R. Gibson - Direct

1        MS. O'BOYLE:  If we could take a look at
2   Government's Exhibit 506.
3   BY MS. O'BOYLE:
4   Q.  Do you recognize 506?
5   A.  Yes.
6   Q.  What is it?
7   A.  This is a FedEx overnight package going from myself in
8   Port St. Lucie to David Alcorn in Arizona with a check and an
9   agreement attached.
10       MS. O'BOYLE:  Government moves in Exhibit 506.
11       THE COURT:  506 will be admitted.
12       (Government's Exhibit 506 was admitted.)
13   BY MS. O'BOYLE:
14   Q.  And, Ms. Gibson, I think we saw -- did we see a lot of
15   similar packages with respect to the Janus Spectrum Group
16   investment?
17   A.  Yes.
18   Q.  Could you just remind the jury what I just blew up here.
19   A.  Yes.  Again, this is a FedEx overnight package going from
20   myself in Florida to David Alcorn and Janus Spectrum in
21   Arizona.
22   Q.  And then what is this a copy of, halfway down the page?
23   A.  This is a check from the Spectrum 100 LLC account to
24   David Alcorn's company, Janus Spectrum LLC, in the amount of
25   $46,200.

─────R. Gibson - Direct─────

1   Q.   Okay.  And so Janus Spectrum 100, whose company was that?

2   A.   Daryl Bank's company.

3   Q.   And then Janus Spectrum LLC, whose company was that?

4   A.   David Alcorn.

5   Q.   Where did you get the 46,200 to send to Mr. Alcorn?

6   A.   Those are investor funds.

7   Q.   If we scroll down to Page 2, is this another Services

8   Agreement?

9   A.   Yes.

10  Q.   And where did you get the Services Agreement, Ms. Gibson?

11  A.   From David Alcorn.

12  Q.   And again, did you review the Services Agreement?

13  A.   I did not.

14  Q.   If we could go to Page 3.  Does this contain a

15  paragraph 7 that relates to an 18 percent commission?

16  A.   Yes.

17  Q.   In connection with monetizing the licenses?

18  A.   Correct.

19  Q.   If we could go to Page 7, please.  Who put in the

20  economic area that these investors would be investing in?

21  A.   David Alcorn.

22  Q.   And is this your signature?

23  A.   It is.

24  Q.   After you sent these funds to Mr. Alcorn, do you have

25  firsthand knowledge of what he did with them?

R. Gibson - Direct

1    A.  I do not.

2    Q.  All right.

3          MS. O'BOYLE:  Let's take a look at some more of

4    these just briefly.  If we could have 506A.

5    BY MS. O'BOYLE:

6    Q.  Do you recognize 506A?

7    A.  Yes.

8    Q.  What is it?

9    A.  This is a FedEx overnight package from myself in Florida

10   going to David Alcorn and his company Janus Spectrum in

11   Arizona.

12         MS. O'BOYLE:  Government moves in Exhibit 506A.

13         THE COURT:  506A is admitted.

14         (Government's Exhibit 506A was admitted.)

15         MS. O'BOYLE:  If we could have Government's

16   Exhibit 506B, please.

17   BY MS. O'BOYLE:

18   Q.  Do you recognize 506B?

19   A.  Yes.

20   Q.  What is it?

21   A.  FedEx overnight package from myself in Florida going to

22   David Alcorn in Arizona.

23   Q.  Then it also contains the Services Agreement?

24   A.  Yes, it does.

25         MS. O'BOYLE:  Government moves in Exhibit 506B.

R. Gibson - Direct

1    THE COURT:  506B is admitted.

2    (Government's Exhibit 506B was admitted.)

3  BY MS. O'BOYLE:

4  Q.  I'm going to pull up a copy of the check here,

5  Ms. Gibson.  Could you please explain to the jury what was

6  going on with this check.

7  A.  Yes.  This was coming from Spectrum 100 LLC going to

8  Janus Spectrum LLC, June 5, 2013, for $138,600.

9  Q.  Where did you get the $138,600 from?

10 A.  Investor funds.

11 Q.  This is Mr. Bank's entity sending money to Mr. Alcorn's

12 entity?

13 A.  Correct.

14 Q.  If we could go to 506C, please.  Do you recognize 506C?

15 A.  Yes.

16 Q.  What is it?

17 A.  A FedEx overnight package from myself in Florida going to

18 David Alcorn in Arizona.

19    MS. O'BOYLE:  Government moves in Exhibit 506C.

20    THE COURT:  506C is admitted.

21    (Government's Exhibit 506C was admitted.)

22 BY MS. O'BOYLE:

23 Q.  If we could have Government's Exhibit 506D.  Do you

24 recognize 506D?

25 A.  Yes.

R. Gibson - Direct

1   Q.  What is it?

2   A.  FedEx overnight package going from myself in Florida to

3   David Alcorn in Arizona.

4   Q.  And how much is the check worth?

5   A.  This is $138,600.

6           MS. O'BOYLE:  Government moves in Exhibit 506D.

7           THE COURT:  506D is admitted.

8           (Government's Exhibit 506D was admitted.)

9   BY MS. O'BOYLE:

10  Q.  If we could go to 506E.  Do you recognize 506E?

11  A.  Yes.

12  Q.  What is it?

13  A.  This is a FedEx overnight package from myself in Florida

14  to David Alcorn in Arizona.

15          MS. O'BOYLE:  Government moves in Exhibit 506E.

16          THE COURT:  506E is admitted.

17          (Government's Exhibit 506E was admitted.)

18  BY MS. O'BOYLE:

19  Q.  If we could have Government's Exhibit 506F.  Do you

20  recognize 506F?

21  A.  Yes.

22  Q.  What is it?

23  A.  A FedEx overnight package from myself in Florida to David

24  Alcorn in Arizona.

25          MS. O'BOYLE:  Government moves in Exhibit 506F.

———R. Gibson - Direct———

1           THE COURT:  506F is admitted.

2           (Government's Exhibit 506F was admitted.)

3    BY MS. O'BOYLE:

4    Q.  How much in investor funds did you send to Mr. Alcorn's

5    company with this check?

6    A.  $184,800.

7    Q.  If we could go to 506G.  Do you recognize 506G.

8    A.  Yes.

9    Q.  What is it?

10   A.  FedEx overnight package from myself in Florida to David

11   Alcorn in Arizona.

12           MS. O'BOYLE:  Government moves in Exhibit 506G.

13           THE COURT:  506G is admitted.

14           (Government's Exhibit 506G was admitted.)

15   BY MS. O'BOYLE:

16   Q.  And how much of investor funds did you send to Mr. Alcorn

17   here?

18   A.  $92,400.

19           MS. O'BOYLE:  We have three more.  If we could have

20   Government's Exhibit 506H.

21   BY MS. O'BOYLE:

22   Q.  Do you recognize 506H?

23   A.  Yes.

24   Q.  Is this a Services Agreement?

25   A.  It is.

————R. Gibson - Direct————

1    MS. O'BOYLE:  Government moves in Exhibit 506H.

2    THE COURT:  506H is admitted.

3    (Government's Exhibit 506H was admitted.)

4  BY MS. O'BOYLE:

5  Q.  Go to 506I.  What is this?

6  A.  A Broker Services Agreement.

7  Q.  In connection with another investment with Mr. Alcorn?

8  A.  Yes.  Another economic area, I believe.

9    MS. O'BOYLE:  If we could -- let's go to Page 7,

10  please, Ms. Yusi.  I'm sorry, I can scroll.

11  BY MS. O'BOYLE:

12  Q.  Did you sign this agreement?

13  A.  I did.

14    MS. O'BOYLE:  Government moves in Exhibit 506I.

15    THE COURT:  506I is admitted.

16    (Government's Exhibit 506I was admitted.)

17  BY MS. O'BOYLE:

18  Q.  If we could have 506J.  Is this another Services

19  Agreement dated August 2014?

20  A.  Yes.

21    MS. O'BOYLE:  Government moves in Exhibit 506J.

22    THE COURT:  506J is admitted.

23    (Government's Exhibit 506J was admitted.)

24  BY MS. O'BOYLE:

25  Q.  These were all mailings that we just went over; is that

R. Gibson - Direct

1    right?

2    A.   Yes.

3    Q.   Did you also wire investor funds to Mr. Alcorn?

4    A.   Yes.

5              MS. O'BOYLE:  If we could go to what has already

6    been admitted as Government's Exhibit 1013.

7    BY MS. O'BOYLE:

8    Q.   Ms. Gibson, do you recognize this?

9    A.   Yes.

10   Q.   What is it?

11   A.   This is a wire confirmation sheet.

12   Q.   And is this out of the BayPort Credit Union account here

13   in Virginia?

14   A.   Yes, it is.

15   Q.   How much of investor funds were you sending in this wire?

16   A.   123,600.

17   Q.   And how much -- where did it come from?

18   A.   From the Dominion Spectrum 100 account.

19   Q.   Where did it go to?

20   A.   To Janus Spectrum LLC in Arizona.

21             MS. O'BOYLE:  Your Honor, at this time, we would ask

22   to be able to read a stipulation regarding this exhibit.

23             THE COURT:  You may.

24             MS. O'BOYLE:  If we could have Government's

25   Exhibit 2000, Page 5.

—— R. Gibson - Direct ——

1    "On or about April 8, 2014, the $123,600 wire from

2   BayPort Credit Union to Arizona Business Bank, as shown in

3   Government's Exhibit 1013, commenced in the Eastern District

4   of Virginia, traveled through interstate commerce, and ended

5   outside of the Commonwealth of Virginia."

6       If we could have Government's Exhibit 1014.

7   BY MS. O'BOYLE:

8   Q.  This has already been admitted, Ms. Gibson.  If we could

9   just walk through this wire transfer record the same way.

10  A.  It's for $123,600.  That's investor funds going from the

11  Dominion Spectrum 100 LLC account to Janus Spectrum LLC in

12  Arizona.

13  Q.  We didn't go over this in the last one, but what was the

14  date?

15  A.  April 24, 2014.

16      MS. O'BOYLE:  Your Honor, at this time, we would ask

17  to be able to read a stipulation related to this document.

18      THE COURT:  You may.

19      MS. O'BOYLE:  Government Exhibit 2000, Page 6.

20      "On or about April 24, 2014, the $123,600 wire from

21  BayPort Credit Union to Arizona Business Bank, as shown in

22  Government's Exhibit 1014, commenced in the Eastern District

23  of Virginia, traveled through interstate commerce, and ended

24  outside of the Commonwealth of Virginia."

25  BY MS. O'BOYLE:

Carol L. Naughton, Official Court Reporter

—R. Gibson - Direct—

1    Q.  And lastly, if you could take a look at Government's

2    Exhibit 1015, which has already been admitted.  Ms. Gibson,

3    what was the date of this wire?

4    A.  May 15, 2014.

5    Q.  How much was the wire for?

6    A.  $288,400.

7    Q.  Where did you get the money?

8    A.  Those were investor funds.

9    Q.  And which account did this come out of?

10   A.  It came from the Spectrum 100 account in Virginia.

11   Q.  And where did it go?

12   A.  Janus Spectrum LLC in Scottsdale, Arizona.

13   Q.  So when you were processing -- when you were initiating

14   these wires, where were you physically located?

15   A.  I was in Florida.

16   Q.  And then the bank was in Virginia?

17   A.  Correct.

18   Q.  And then ultimately you're sending funds to Mr. Alcorn's

19   company in Arizona?

20   A.  Yes.

21   Q.  When the funds got to Mr. Alcorn in Arizona, do you have

22   firsthand knowledge of what he did with them?

23   A.  I do not.

24        MS. O'BOYLE:  Your Honor, at this time, we would ask

25   permission to read one more stipulation.

Carol L. Naughton, Official Court Reporter

R. Gibson - Direct

```
 1              THE COURT:  You may do so.
 2              MS. O'BOYLE:  If we could have Government's
 3    Exhibit 2000, Page 6.
 4              "On or about May 15, 2014, the $288,400 wire
 5    transfer from BayPort Credit Union to Arizona Business Bank,
 6    as shown in Government's Exhibit 1015, commenced in the
 7    Eastern District of Virginia, traveled through interstate
 8    commerce, and ended outside of the Commonwealth of Virginia."
 9    BY MS. O'BOYLE:
10    Q.  Ms. Gibson, Mr. Bank, in that conference call that we
11    just listened to with the sales representatives, he referred
12    to a Mr. Maerki.  And who was Mr. Maerki?
13    A.  Kent Maerki was a president and owner of Dental Support
14    Plus Franchise in Arizona.
15    Q.  And we haven't discussed the Dental Support Plus
16    Franchise yet.  We will.  But cutting to the end,
17    approximately how much money did your clients lose in
18    connection with the sale of franchises in DSPF Group LLC?
19    A.  It was approximately 3 million.
20    Q.  And was Mr. Maerki's presentation regarding spectrum part
21    of Mr. Bank's pitch to investors?
22    A.  Yes.
23    Q.  And what, if anything, did you consider doing after your
24    clients lost all of their funds related to Dental Support
25    Plus?
```

Carol L. Naughton, Official Court Reporter

R. Gibson - Direct

1    A.   Leaving the company.

2    Q.   You considered leaving the company?

3    A.   Yes.

4    Q.   Did you talk with Mr. Bank about that?

5    A.   Yes.

6    Q.   And what did you tell him?

7    A.   That I was very concerned over what was happening and

8    finding out that Kent was still -- he was still involved with

9    spectrum and the other deals, but yet his company he just

10   shelved, and our investors lost $3 million.

11   Q.   How did Mr. Bank respond?

12   A.   He was going to talk to David about it.

13   Q.   Did you ultimately end up leaving?

14   A.   No.

15   Q.   Did you stop selling spectrum to your clients after your

16   other clients in DSPF lost over $3 million?

17   A.   No.

18         MS. O'BOYLE:   Let's take a look at Government's

19   Exhibit 270A, just for the witness.

20   BY MS. O'BOYLE:

21   Q.   And do you recognize 270A, Ms. Gibson?

22   A.   Yes.

23   Q.   Is it an e-mail chain between you and Mr. Bank?

24   A.   Yes.

25   Q.   Related to the failure of Dental?

─────────────── R. Gibson - Direct ───────────────

1   A.   Yes.

2             MS. O'BOYLE:   Government moves in Exhibit 270A.

3             THE COURT:   270A will be admitted.

4             (Government's Exhibit 270A was admitted.)

5   BY MS. O'BOYLE:

6   Q.   And just taking a step back, Ms. Gibson, were you

7   surprised in July of 2014 that Dental Support Plus Franchise

8   failed?

9   A.   No.

10  Q.   Why not?

11  A.   It hadn't been performing, ever.

12  Q.   Let's take a look at your e-mail, what you wrote to

13  Mr. Bank on July 3, 2014.   What did you say?

14  A.   "Dealing with the clients is going to be hard, no matter

15  the outcome of Kent.   I'm concerned that he's involved in

16  Janus, no matter how distant, and that he wants to be a part

17  of the meeting with you in July.   Bad gut feeling about

18  that."

19  Q.   What are you communicating here to Mr. Bank?

20  A.   That Kent's still involved.   We just had Dental Support

21  that just failed, you know.   He shelved it.   Our clients lost

22  $3 million, but yet Kent is still involved.   I was very

23  concerned about him being a part of this.   He just had the

24  last one fail.   So if we were being lied to then and things

25  weren't going well, what's to say it still wasn't happening

R. Gibson - Direct

1    here.

2    Q.   How did Mr. Bank respond?

3    A.   "I will take care of with David."  And he says, "You

4    didn't like my calling our whole firm in for a witness?"

5    Q.   And Mr. Bank says, "I will take care of with David."

6             Who is the David?

7    A.   David Alcorn.

8    Q.   Ms. Gibson, this is July 2014.  Did you continue to sell

9    the spectrum investment in 2015?

10   A.   Yes.

11   Q.   Did you and Mr. Alcorn and Mr. Smith continue to sell the

12   spectrum investment in 2016?

13   A.   Yes.

14   Q.   Did you continue with Mr. Alcorn and Mr. Smith to sell an

15   investment in spectrum in 2017?

16   A.   Yes.

17            THE COURT:  Keep your voice up, please.

18            MS. O'BOYLE:  Let's take a look at what has already

19   been admitted as Government's Exhibit 318D.

20   BY MS. O'BOYLE:

21   Q.   Ms. Gibson, this is a filing in the bankruptcy court for

22   Janus Spectrum LLC.  Were you aware that Janus Spectrum LLC

23   had filed for bankruptcy on March 3, 2014?

24   A.   I was told that they were going to be doing a

25   reorganization, and that was a part of getting Kent out of

R. Gibson - Direct

1   the company -- Kent Maerki.

2   Q.  Did you tell all the investors that had invested in your

3   three investment companies related to spectrum that Janus

4   Spectrum LLC had filed for bankruptcy?

5   A.  No.

6   Q.  For the investors that invested in after the bankruptcy

7   in 2014 and through 2015, did you let them know that Janus

8   Spectrum LLC had filed for bankruptcy?

9   A.  No.

10          THE COURT:  Once again, pull the microphone closer

11  to you, and you have to speak up so that we can be sure

12  everybody is hearing you.

13          THE WITNESS:  Yes, sir.

14  BY MS. O'BOYLE:

15  Q.  Now, we talked, I believe, a little bit yesterday about

16  the Securities and Exchange investigation into Janus

17  Spectrum.  Do you remember that?

18  A.  Yes.

19  Q.  Did that investigation go away, or did it continue?

20  A.  It continued.

21          MS. O'BOYLE:  If we could take a look at

22  Government's Exhibit 510, just for the witness.

23  BY MS. O'BOYLE:

24  Q.  Do you recognize Government's Exhibit 510?

25  A.  Yes.

R. Gibson - Direct

1   Q.  And is it a subpoena to Mr. Bank to offer testimony?

2   A.  Yes.

3           MS. O'BOYLE:  Government moves in Exhibit 510.

4           THE COURT:  Exhibit 510 will be admitted.

5           (Government's Exhibit 510 was admitted.)

6   BY MS. O'BOYLE:

7   Q.  And so we're now in -- I guess what is the date of this

8   particular subpoena?

9   A.  April 24, 2014.

10  Q.  And is it still in the matter of Janus Spectrum LLC?

11  A.  Yes.

12  Q.  And if you could read what the subpoena required Mr. Bank

13  to do.

14  A.  "The subpoena requires you to come to SEC's headquarters

15  located at 100 F. Street, NE, Washington, D.C. 20549, at

16  9:00 a.m., on June 11, 2014, to testify under oath.  Your

17  testimony will be recorded by stenographic means."

18  Q.  Did Mr. Bank go to D.C. to take a deposition in June of

19  2014?

20  A.  Yes.

21  Q.  Did you stop selling spectrum after Mr. Bank gave

22  testimony?

23  A.  No.

24          MS. O'BOYLE:  If we can have Government

25  Exhibit 511C.

Carol L. Naughton, Official Court Reporter

R. Gibson - Direct

```
 1    BY MS. O'BOYLE:

 2    Q.  Is this a transcript of Mr. Alcorn's testimony on

 3    June 16, 2014, in connection with the Securities and Exchange

 4    Commission?

 5    A.  Yes.

 6            MS. O'BOYLE:  Government moves in Exhibit 511C.

 7            THE COURT:  511C will be admitted.

 8            (Government's Exhibit 511C was admitted.)

 9    BY MS. O'BOYLE:

10    Q.  Did you stop accepting money into Mr. Bank's Spectrum 100

11    LLC investment after Mr. Alcorn was deposed by the Securities

12    and Exchange Commission on June 16, 2014?

13    A.  No.

14            MS. O'BOYLE:  Now, if we could have Government's

15    Exhibits -- well, let's do 507 first.

16    BY MS. O'BOYLE:

17    Q.  Do you recognize 507?

18    A.  Yes.

19    Q.  What is it?

20    A.  This is an e-mail chain between David Alcorn, myself,

21    Daryl is on there, and I believe Billy Seabolt as well.

22    Q.  Is it in connection with a Commercialization Agreement?

23    A.  Yes.

24            MS. O'BOYLE:  Government moves in Exhibit 507.

25            THE COURT:  507 will be admitted.
```

Carol L. Naughton, Official Court Reporter

R. Gibson - Direct

1    (Government's Exhibit 507 was admitted.)

2    BY MS. O'BOYLE:

3    Q.   And, Ms. Gibson, this first e-mail that I've pulled up at

4    the bottom of the chain, it's from Mr. Alcorn to you?

5    A.   Yes.

6    Q.   And what is the date?

7    A.   September 27, 2013.

8    Q.   He says in here on the second line, "While our original

9    services agreements are very clear about our role as your

10   agent in facilitating approval of the licenses for your

11   company, perhaps they are not as clear as they might be

12   regarding our respective roles in commercializing the

13   spectrum once the licenses are granted."

14        Do you see that?

15   A.   Yes.

16   Q.   What did you understand that to mean?

17   A.   Just that we may not have been clear as far as exactly

18   what their role was versus what our role was.

19   Q.   Okay.  Did you talk with Mr. Bank about any concerns that

20   you might have had related to this?

21   A.   No, I did not.

22   Q.   Did you have any concerns related to it?

23   A.   Yeah.  A lot of this I didn't understand, and I should

24   have raised some concerns, especially where I did not

25   understand something.

Carol L. Naughton, Official Court Reporter

R. Gibson - Direct

1    Q.   And so just to finish out the e-mail chain, what are you
2    doing here on October 4, 2013?
3    A.   Sending an e-mail from myself to Billy Seabolt and Daryl
4    Bank in regards to the Commercialization Agreement, asking if
5    this is the right one.
6    Q.   And could you remind the jury who Mr. Seabolt is.
7    A.   Yes.  He is the attorney that worked with Daryl in
8    regards to the different offerings and stuff that Dominion
9    put together.
10   Q.   Okay.  And then does -- the last two e-mails, does it
11   fill out some conversation about the Commercialization
12   Agreement?
13   A.   Yes.
14   Q.   Do you know whether you signed a new Commercialization
15   Agreement?
16   A.   I'm almost positive we did.
17   Q.   Okay.  If we could take a look at 311J.  Do you recognize
18   311J?
19   A.   Yes.
20   Q.   What is it?
21   A.   This is a Commercialization Agreement.
22            MS. O'BOYLE:  The government moves in Exhibit 311J.
23            THE COURT:  311J is admitted.
24            (Government's Exhibit 311J was admitted.)
25   BY MS. O'BOYLE:

Carol L. Naughton, Official Court Reporter

R. Gibson - Direct

1  Q.  And again, Ms. Gibson, what, if anything, do you know

2  about this Commercialization Agreement?

3  A.  I don't.

4  Q.  Now, on April 6, 2015, did the Securities and Exchange

5  Commission file a complaint against Mr. Alcorn, Janus

6  Spectrum, Mr. Bank, and all of these entities that we've been

7  talking about?

8  A.  Yes.

9       MS. O'BOYLE:  If we could pull up what's already

10  been admitted as Government's Exhibit 514.

11  BY MS. O'BOYLE:

12  Q.  And is this the civil complaint that was filed by the

13  Securities and Exchange Commission on April 6, 2015?

14  A.  Yes.

15  Q.  It's against Janus Spectrum LLC.  Is that the Arizona

16  entity?

17  A.  Yes.

18  Q.  And Mr. Alcorn and Mr. Maerki?

19  A.  Yes.

20  Q.  Could you please read all of the entities that Mr. Bank

21  is involved with that were also sued in this lawsuit?

22  A.  Dominion Private Client Group, Janus Spectrum Group,

23  Spectrum Management, Spectrum 100, Spectrum 100 Management,

24  Prime Spectrum, Prime Spectrum Management, Daryl Bank.  I

25  think that's the last one that involves Daryl.

R. Gibson - Direct

1   Q.   So the ones that involve Daryl start with Dominion

2   Private Client Group and run to his name?

3   A.   Yes.

4   Q.   And let's go to paragraph 1.  Does it allege that, "The

5   defendants misled investors by promising that their

6   investments would yield substantial returns through the sale

7   or lease of the FCC licenses to major wireless carriers when,

8   in fact, defendants knew or were reckless or negligent in not

9   knowing that the FCC licenses, if obtained, could never be

10  sold or leased by any major wireless carriers"?

11  A.   Yes.

12  Q.   And then does it also state that, "Defendants further

13  concealed the actual costs associated with obtaining these

14  FCC licenses and pocketed substantial sums of investor moneys

15  for their own undisclosed uses"?

16  A.   Yes.

17  Q.   Did you stop working with Mr. Alcorn after the SEC filed

18  this complaint?

19  A.   No.

20       MS. O'BOYLE:  If we could go to Page 16 of the

21  complaint, Ms. Yusi.

22  BY MS. O'BOYLE:

23  Q.   Now, this is Page 16 of the complaint, and it's

24  paragraph 68, and this document was filed -- this was what

25  initiated the lawsuit, the public lawsuit against Mr. Bank;

R. Gibson - Direct

1   is that correct?

2   A.  Yes.

3   Q.  Could you start reading here, "In addition to

4   disseminating the misleading information" through the rest of

5   the paragraph.

6        THE COURT:  What question will be associated with

7   that reading?

8        MS. O'BOYLE:  Your Honor, I was going to ask her if

9   it is accurate, the amount of moneys that were siphoned off

10  from the investor funds and whether that was public, in the

11  public domain.

12       THE COURT:  Okay.

13       THE WITNESS:  "In addition to disseminating

14  misleading information to investors, Bank transferred almost

15  4.5 million in investor funds raised through the three

16  entities to his personal and other business accounts and

17  concealed this information from investors.  Of this amount,

18  at least $1,339,681 went to Bank personally, and

19  approximately $3,040,904 was sent to Dominion Private Client

20  Group.  Bank also funneled almost 3.7 million of investor

21  funds to Janus Spectrum."

22  BY MS. O'BOYLE:

23  Q.  Ms. Gibson, based on your involvement with Mr. Bank's

24  entities, do you know whether this paragraph was accurate?

25  A.  Yes.

R. Gibson - Direct

 1   Q.   And was it accurate?

 2   A.   Yes.

 3   Q.   And this was part of the public lawsuit that was filed

 4   against Mr. Bank and Mr. Alcorn?

 5   A.   Yes.

 6   Q.   After this lawsuit was filed, did you -- did Mr. Bank,

 7   and Mr. Alcorn continue to accept money into the Spectrum 100

 8   investment?

 9   A.   Yes.

10        MS. O'BOYLE:   If we could have Government's

11   Exhibit 59, please, just for the witness.

12   BY MS. O'BOYLE:

13   Q.   Do you recognize Government's Exhibit 59?

14   A.   Yes.

15   Q.   What is it?

16   A.   This is the sales tracker sheet for Spectrum 100.

17        MS. O'BOYLE:   Government moves in Exhibit 59.

18        THE COURT:   Exhibit 59 will be admitted.

19        (Government's Exhibit 59 was admitted.)

20   BY MS. O'BOYLE:

21   Q.   Now, so this is -- we've already looked at the money move

22   sheet; is that right?

23   A.   Yes.

24   Q.   So what is this sales tracker sheet?

25   A.   This would keep track of our clients and also sales reps'

R. Gibson - Direct

1   clients who were interested in purchasing the Spectrum 100

2   and the process that goes along through that until the

3   purchase was completed.

4   Q.  Okay.  And when, here, does it reflect that funds were

5   first received into the Spectrum 100 account?

6   A.  This was April 10, 2013.

7   Q.  And who was the client?

8   A.  Wallace Barry.

9   Q.  And when -- and we'll talk about Mr. Smith in a minute,

10  but when -- was the next client related to Mr. Smith?

11  A.  Yes.

12  Q.  And when did that client's funds -- when did you receive

13  that client's funds?

14  A.  April 27, 2013.

15  Q.  Okay.  And now, is this chart in chronological order?

16  A.  Yes.

17  Q.  And so if we could, we'll go -- there's a second page.

18  A.  Yes.

19  Q.  And a third page?

20  A.  Yes.

21  Q.  And then there's also a fourth page; is that right?

22  A.  Yes.

23  Q.  And when was the last date you received funds into the

24  Spectrum 100 account for this investment?

25  A.  This was August 4 of 2015.

R. Gibson - Direct

1  Q.  How much money total was raised?

2  A.  Just over 7.7 million.

3       MS. O'BOYLE:  Now, Ms. Yusi, could you take us back

4  to Page 1, please.

5  BY MS. O'BOYLE:

6  Q.  And just for the jury, is every single line on this

7  document an individual client?

8  A.  Yes.

9  Q.  So every -- now, in every single line of this four-page

10 document, what, if any, returns did they receive?

11 A.  None.

12 Q.  Now, I believe you said that the first investment was in

13 April of 2013.  On this first page -- where on this first

14 page is July 2013?

15 A.  It's -- I believe it's about a quarter way down that

16 page.

17 Q.  About a quarter of the way down?

18 A.  Yes.

19 Q.  So right here?  It starts July of 2013?

20 A.  Yes.

21 Q.  So every individual who invested after that date, were

22 they investing in a company that was under investigation by

23 the Securities and Exchange Commission?

24 A.  Yes.

25 Q.  Now, I want to focus in on the line marked "Agent."  Do

R. Gibson - Direct

1   you see that --

2   A.   Yes.

3   Q.   -- on this chart?

4        And so what is -- what does this list?

5   A.   That lists the sales agent for that particular client.

6   Q.   And so was Mr. Smith listed here as the selling Spectrum

7   100?

8   A.   Yes.

9   Q.   And over here, it says, "Agent paid."  What does this

10  mean?

11  A.   This is the date, and then if there's a number after it,

12  that was the check number that was sent to them.  If it was a

13  DD, that was a direct deposit.

14  Q.   So let's break that down just a little bit.

15       So there's a listing of several transactions

16  involving Mr. Smith; is that correct?

17  A.   Yes.

18  Q.   In 2013?

19  A.   Yes.

20  Q.   And so over here to the right, the column to the right of

21  Mr. Smith's name, there's a line that says "6/13/13-3023."

22  A.   Correct.

23  Q.   What is that?

24  A.   So on June 13 of 2013, he was issued check number 3023.

25  Q.   Can you tell what the amount of the check was?

—————————R. Gibson - Direct—————————

1    A.   6,000.

2    Q.   And so was this -- the number before his name, is that

3    how much the investor invested?

4    A.   Yes.  50,000.

5    Q.   And so this investor on this line invested $50,000.  And

6    how much did Bill Smith get of that?

7    A.   6,000.

8    Q.   Now, let's go down a little bit to July 1st, 2013.  Do

9    you see the column where it says, "Bill Smith"?

10   A.   Yes.

11   Q.   What does it mean to have a "DD" beside the July 1, 2013?

12   A.   That would be his commission funds were direct-deposited

13   into his account on July 1st, 2013.

14   Q.   Could you please walk the jury -- how much of investor

15   funds did you receive?

16   A.   100,000.

17   Q.   And then what happened on July 1st, 2013?

18   A.   He would have received $12,000 through direct deposit,

19   which is an ACH electronic transfer.

20   Q.   How did you get Mr. Smith's information to set up this

21   direct deposit arrangement?

22   A.   Either he would have completed that information on a form

23   or could have also sent an e-mail with that information.

24   Q.   But he gave that information to you?

25   A.   Correct.

─────── R. Gibson - Direct ───────

1   Q.   I'm going to go to -- is there a line marked "Ray
2   Martin"?
3   A.   Yes.
4   Q.   And how much money was deposited in connection with
5   Mr. Martin?
6   A.   43,000.
7   Q.   And how much of Mr. Martin's 43,000 did Mr. Smith
8   receive?
9   A.   5,160.
10  Q.   And how did he get that money?
11  A.   That was check -- I think that says 3025.
12  Q.   If we could go to Page 2, is there a reference on Page 2
13  to a Will and Bonnie Berndt?
14  A.   Yes.
15  Q.   How much did they invest in Spectrum 100?
16  A.   50,000.
17  Q.   And how was Mr. Smith paid?
18  A.   That was a direct deposit.
19  Q.   And how much did he get of the Berndts' funds?
20  A.   6,000.
21  Q.   Now, I'm going to focus you on a line marked "William
22  Scofield."  Do you see that?
23  A.   Yes.
24  Q.   What date did Mr. Scofield invest in Spectrum 100?
25  A.   May 13 -- yeah, May 13, 2014.

R. Gibson - Direct

1    Q.   How much did he invest?

2    A.   426,000.

3    Q.   Who is his sales agent?

4    A.   Bill Smith.

5    Q.   In connection with Bill Smith's -- that investment, how

6    much did Mr. Smith get?

7    A.   $51,120.

8    Q.   And how did he get it?

9    A.   He was paid a direct deposit on May 13, 2014.

10   Q.   Now, right above that, is there another client by the

11   name Michael Burrows?

12   A.   Yes.

13   Q.   And how much did Michael Burrows invest?

14   A.   64,000.

15   Q.   Who was his sales agent?

16   A.   Bill Smith.

17   Q.   And on that same day, was there a direct deposit in

18   connection with that transaction as well?

19   A.   Yes.  In the amount of $7,680.

20   Q.   Now, did you send Mr. Smith -- if you had transactions on

21   the same day, did you send him two separate direct deposits

22   or just one?

23   A.   Just one.

24   Q.   And so by selling Spectrum 100 to these two clients, how

25   much total did Mr. Smith make?

R. Gibson - Direct

1    A.   A little over -- I'm sorry --

2    Q.   I'm asking you to do math.  I'm sorry.  I will take you

3    to Government's Exhibit 1008A, which is already in evidence.

4    Do you recognize 1008A, Ms. Gibson?

5    A.   Yes.

6    Q.   What is this?

7    A.   This is confirmation of the electronic transfer, the

8    direct deposit, from Dominion Private Client Group to Bill

9    Smith on May 14th, 2014, in the amount of $58,800.

10   Q.   And was this electronic funds transfer -- was this

11   arising from Mr. Smith's sale of spectrum that we were just

12   looking at?

13   A.   Yes.

14   Q.   So the total that he received from those two transactions

15   was approximately $58,000?

16   A.   Yes.

17        MS. O'BOYLE:  Your Honor, at this time we would ask

18   permission to read a stipulation related to this exhibit.

19        THE COURT:  You may read it.

20        MS. O'BOYLE:  Government's Exhibit 2000, Page 5,

21   please.

22        "On or about May 14, 2014, the $58,800 electronic

23   fund wire transfer from BayPort Credit Union to Intuit, as

24   shown in Government's Exhibit 1008A, commenced in the Eastern

25   District of Virginia, traveled through interstate commerce,

R. Gibson - Direct

1   and ended outside the Commonwealth of Virginia."

2   BY MS. O'BOYLE:

3   Q.  While we're here, let's take a look at 1009A, which is

4   already in evidence.  Do you recognize 1009A?

5   A.  Yes.

6   Q.  Can you explain to the jury what this is?

7   A.  This is a confirmation from the bank for the direct

8   deposit from Dominion Private Client Group going to Bill

9   Smith on April 11, 2014, in the amount of $9,360.

10  Q.  Was this more commission payments in connection with the

11  sale of investment products for Mr. Bank?

12  A.  Yes.

13          MS. O'BOYLE:  If we could have -- Your Honor, at

14  this time I would ask permission to read a stipulation

15  related to this exhibit.

16          THE COURT:  You may.

17          MS. O'BOYLE:  "On or about April 10, 2014, the

18  $9,360 electronic fund wire transfer from BayPort Credit

19  Union to Intuit, as shown in Government's Exhibit 1009A,

20  commenced in the Eastern District of Virginia, traveled

21  through interstate commerce, and ended outside the

22  Commonwealth of Virginia.

23          And, Your Honor, we're going to these next two

24  transactions next.  I would ask permission to read those two

25  as well.

─────R. Gibson - Direct─────

1          THE COURT:  You may.

2          MS. O'BOYLE:  "On or about July 2, 2014, the $2,600

3    electronic fund wire transfer from BayPort Credit Union to

4    Intuit, as shown in Government's Exhibit 1010A, commenced in

5    the Eastern District of Virginia, traveled through interstate

6    commerce, and ended outside the Commonwealth of Virginia."

7          "On or about December 31, 2014, the $3,200

8    electronic fund wire transfer from BayPort Credit Union to

9    Intuit, as shown in Government's Exhibit 1011A, commenced in

10   the Eastern District of Virginia, traveled through interstate

11   commerce, and ended outside the Commonwealth of Virginia."

12         If we could have Government's Exhibit 1010A, which

13   is already in evidence.

14   BY MS. O'BOYLE:

15   Q.  Ms. Gibson, did you also have a salesman by the name of

16   Tom Barnett?

17   A.  Yes.

18   Q.  Did you also pay Mr. Barnett for his sales through direct

19   deposit?

20   A.  Yes.

21   Q.  If you could explain -- walk the jury through this

22   transaction on 1010A.

23   A.  This is a confirmation, again, of a direct deposit going

24   from Dominion Private Client Group on July 2nd, 2014, in

25   amount of $2,600 to Tom Barnett, The Financial Light Inc.

R. Gibson - Direct

1   Q.  And if we could have Government's Exhibit 1011A, which is

2   also already in evidence.

3           Do you recognize 1011A, Ms. Gibson?

4   A.  Yes.

5   Q.  What is it?

6   A.  A bank confirmation of electronic transfer direct deposit

7   from Dominion Private Client Group on January 2nd, 2015, in

8   the amount of $3,200 to Tom Barnett.

9   Q.  Okay.  And was this paying this particular salesman

10  through direct deposit for the sale of investment products?

11  A.  Yes.

12  Q.  Now, in June of 2015, were you and Mr. Bank sued by

13  another regulatory agency?

14  A.  Yes.

15  Q.  And what agency was that?

16  A.  That was the Virginia State Corporation Commission.

17  Q.  And did that action name you individually?

18  A.  It did.

19  Q.  Did it name Janus Spectrum Group LLC?

20  A.  Yes.

21  Q.  Did it name Prime Spectrum LLC?

22  A.  Yes.

23  Q.  And as well as Spectrum 100 LLC?

24  A.  Yes.

25  Q.  What, if anything, did you tell investors about the

R. Gibson - Direct

1     second regulatory action?

2     A.   Nothing.

3     Q.   And after the Virginia State Corporation Commission filed

4     its filing, what, if anything, did Mr. Bank tell you to do

5     with the limited liability companies in Virginia?

6     A.   Move them from Virginia -- close those down in Virginia,

7     and then new ones were opened up in Florida along with bank

8     accounts.

9     Q.   So did you shut down all of the bank accounts here in

10    Virginia?

11    A.   Yes.

12    Q.   And you opened new bank accounts where?

13    A.   In Florida.

14    Q.   And then you also shut down all the Virginia limited

15    liability companies?

16    A.   Yes.

17    Q.   If we could take a look at two examples of that.

18    Government's Exhibit 411.  Do you recognize 411?

19    A.   Yes.

20    Q.   What is it?

21    A.   This is the Articles of Cancellation from Virginia for

22    Prime Spectrum LLC.

23              MS. O'BOYLE:  Government moves in Exhibit 411.

24              THE COURT:  411 will be admitted.

25              (Government's Exhibit 411 was admitted.)

────────R. Gibson - Direct────────

1   BY MS. O'BOYLE:

2   Q.  So can you explain to the jury what this is?  This is

3   your signature, correct?

4   A.  Correct.

5   Q.  So what are you doing here with this document?

6   A.  This is shutting down the Prime Spectrum LLC in the state

7   of Virginia.  So it's canceling that LLC there.

8   Q.  What date did you do that?

9   A.  June 29, 2015.

10  Q.  Did you also shut down and file a document like this for

11  Janus Spectrum Group?

12  A.  Yes.

13  Q.  Did you also shut down and file a document like this for

14  Spectrum 100?

15  A.  Yes.

16  Q.  Now, are you familiar with a company called FAS Partners?

17  A.  Yes.

18  Q.  And what was FAS Partners?

19  A.  FAS Partners was, instead of going by Dominion Investment

20  Group, we started going by FAS Partners.

21  Q.  Publicly what would people know you as?

22  A.  As FAS Partners.

23  Q.  Why did you change the name from Dominion Investment

24  Group to FAS Partners?

25  A.  Because the Dominion name held too many issues and too

R. Gibson - Direct

1   many bad things along with Daryl Bank's name as well.

2   Q.  Okay.  Let's take a look at Government's Exhibit 86.  Do

3   you recognize Government's Exhibit 86?

4   A.  Yes.

5   Q.  What is it?

6   A.  This is the Florida Articles of Organization for FAS

7   Partners LLC.

8          MS. O'BOYLE:  Government moves in Exhibit 86.

9          THE COURT:  86 will be admitted.

10          (Government's Exhibit 86 was admitted.)

11   BY MS. O'BOYLE:

12   Q.  So this is -- we looked at a lot of these with respect to

13   Virginia; is that correct?

14   A.  Yes.

15   Q.  So now, this is -- you're doing the same thing in Florida

16   that you did in Virginia?

17   A.  Correct.

18   Q.  You're creating a new company.  What was the name of this

19   company?

20   A.  FAS Partners LLC.

21   Q.  Who was the registered agent for this company?

22   A.  Milovan Aleksic.

23   Q.  Who was that?

24   A.  Mike Aleksic, he worked out of our office as a chief

25   investment officer.

R. Gibson - Direct

1   Q.  In addition to leaving the Dominion name behind and
2   starting FAS Partners, did you also start a new company
3   called Sovereign Asset Group?
4   A.  Yes.
5   Q.  If we could take a look at Government's Exhibit 87.  Do
6   you recognize Government's Exhibit 87?
7   A.  Yes.
8   Q.  What is it?
9   A.  This is the Florida Articles of Organization for
10  Sovereign Asset Group LLC.
11  Q.  Was it an application by a foreign limited liability
12  company to transact business in Florida?
13  A.  Yes.
14  Q.  Is it in connect with Sovereign Asset Group?
15  A.  Yes.
16          MS. O'BOYLE:  Government moves in Exhibit 87.
17          THE COURT:  Exhibit 87 will be admitted.
18          (Government's Exhibit 87 was admitted.)
19  BY MS. O'BOYLE:
20  Q.  So are you -- are you requesting permission to transact
21  business in Florida under the name of Sovereign Asset Group?
22  A.  Yes.
23  Q.  And where did Sovereign Asset Group -- where was it
24  originally registered?
25  A.  In Wyoming.

R. Gibson - Direct

1   Q.  Do you know why you registered it in Wyoming?

2   A.  Wyoming is one of those states where when you're creating

3   an LLC, you do not have to list the officers or principals.

4   Q.  And then are you familiar with an entity called

5   Diversified Financing?

6   A.  Yes.

7           MS. O'BOYLE:  Government Exhibit 601.

8   BY MS. O'BOYLE:

9   Q.  Do you recognize 601?

10  A.  Yes.

11  Q.  What is it?

12  A.  The Florida Articles of Organization for Diversified

13  Financing LLC.

14          MS. O'BOYLE:  Government moves in Exhibit 601.

15          THE COURT:  Exhibit 601 is admitted.

16          (Government's Exhibit 601 was admitted.)

17  BY MS. O'BOYLE:

18  Q.  Okay.  After all of these name changes, Ms. Gibson, did

19  you continue to work with Mr. Alcorn?

20  A.  Yes.

21  Q.  And after all of these name changes, did you continue to

22  work with Mr. Smith?

23  A.  Yes.

24  Q.  And I believe you said you opened all new bank accounts

25  in Florida for these companies; is that right?

──────R. Gibson - Direct──────

1    A.   Yes.

2    Q.   And what bank did you use?

3    A.   Oculina Bank.

4    Q.   Okay.

5         MS. O'BOYLE:  Your Honor, I'm going to go through a

6    number of bank accounts in connection with Oculina Bank at

7    this time.

8         THE COURT:  What we're going to do is we'll take a

9    break now.  15 minutes.

10        (The jury exited the courtroom.)

11        THE COURT:  You may step down during the break.

12        THE WITNESS:  Thank you.

13        (The witness stepped down.)

14        MR. GRINDROD:  May I be heard briefly before we take

15   our break?

16        THE COURT:  Have a seat.

17        MR. GRINDROD:  Your Honor, just because I know the

18   timeline is important for the Judge's ruling as to this

19   Hullum issue, I just wanted to set out the timeline that I

20   think answers some of the Court's questions and also explains

21   the emergency nature of our motion, at least as best I can.

22        THE COURT:  Mr. Grindrod, the time to take that up

23   was this morning.  The Court has ruled.

24        MR. GRINDROD:  I understand, Your Honor, but I think

25   it's important that I at least be able to put this on the

R. Gibson - Direct

 1      record because I don't think some of this information is
 2      either in the record or has been accurately described as to
 3      how the timing of this went down.
 4              THE COURT:  I asked you a simple question this
 5      morning.  When did you get the information about the -- no.
 6      When did you have the information about the names of the
 7      investments that Ms. Hullum had, and apparently they were in
 8      that memorandum of interview which you had before the
 9      deposition.
10              MR. GRINDROD:  Yes, Your Honor.  That was one of the
11      things I was going to tell you.  So Mr. Bosse is right.  That
12      was part of the second *Jencks* production that was made
13      available on a disk at the United States Attorney's Office on
14      November 2nd, 2021.
15              The index for that production was seven pages.  It
16      contained over 225 documents, only some of which was *Jencks*,
17      some of which was discovery.  The deposition in this case,
18      that is at issue here, took place on the morning of
19      November 5th, so three days later in California.
20              Ms. Yusi mentioned that we hadn't made this --
21      hadn't made them aware of this issue.  So at the deposition,
22      Your Honor, obviously, we objected to this line of
23      questioning.
24              And I said, "Objection."
25              "MS. YUSI:  What's your basis?

R. Gibson - Direct

1    "MR. GRINDROD:  I object.  I object to relevance as

2    to other investments."

3         And then the question was followed up on two more

4    times, once obviously in redirect, which is the issue that is

5    most concerning to the defense.

6         Jumping forward in time, Your Honor, on

7    January 25th, the government designated the question on

8    direct that is not as prejudicial.  On January 27th, we

9    objected.  And again, this goes to Ms. Yusi's representation

10   that we did not make them aware of this issue.

11        This is an e-mail that I sent to Ms. Yusi on

12   January 27th.  After an introduction, I said, "We maintain

13   our objections as noted here."  And then I say with respect

14   to this issue, quote, "We object to the relevance of whether

15   Ms. Hullum received any money from the investments that she

16   made with" -- "from the investments she made with Mr. Smith.

17   The witness asked whether the government was referring to her

18   DSPF investment, and the government clarified that it was

19   asking about, quote, 'all your investments.'

20        "A broad inquiry into investments entirely unrelated

21   to those at issue in this case is not relevant under Federal

22   Rule of Evidence 401, and any probative value of such

23   testimony is substantially outweighed by the danger of unfair

24   prejudice, confusing the issues, and/or misleading the jury

25   under Federal Rule of Evidence 403."

R. Gibson - Direct

 1          THE COURT:  Mr. Grindrod, stop.  Stop.  The Court

 2   will not revisit this matter.  The Court will not revisit the

 3   matter.  So don't bring it up again.

 4          The Court has ruled.  And no matter what you say,

 5   you had an opportunity to follow up on recross, and you did

 6   not.

 7          MR. GRINDROD:  And, Your Honor --

 8          THE COURT:  I said don't argue it anymore.  It's

 9   over.  The Court has ruled.

10          We'll be in recess.

11          (Recess from 10:56 a.m. to 11:12 a.m.)

12          (The jury entered the courtroom.)

13          (The witness resumed the stand.)

14          THE COURT:  The record will reflect that all jurors

15   have returned to the courtroom.

16          Does counsel agree?

17          MS. O'BOYLE:  The United States agrees.

18          MR. YAROW:  Mr. Alcorn agrees.

19          MS. McCASLIN:  Mr. Smith agrees.

20          THE COURT:  You may resume your examination.

21          MS. O'BOYLE:  Thank you, Your Honor.

22          Your Honor, with the Court's permission, the

23   government would like to read several stipulations as to

24   business records.

25          THE COURT:  You may proceed.

R. Gibson - Direct

1            MS. O'BOYLE:  The business records stipulation 22:

2            "Oculina Bank records, including account

3     applications, signature cards, account statements, deposits,

4     transfers, credits, memoranda, wire transfers, checks, and

5     other banking documents."

6            And number 29:  "Generations Federal Credit Union

7     records, including account applications, signature cards,

8     account statements, deposits, transfers, credits, memoranda,

9     wire transfers, checks, and other banking documents."

10            And finally:  "MIDFLORIDA Federal Credit Union

11     records, including account applications, signature cards,

12     account statements, deposits, transfers, credits, memoranda,

13     wire transfers, checks, and other banking documents."

14     BY MS. O'BOYLE:

15     Q.  Ms. Gibson, before the break, I think you were letting

16     the jury know that you had closed down all the Virginia bank

17     accounts and opened up new ones.  And what bank did you open

18     those accounts in?

19     A.  Oculina Bank.

20            MS. O'BOYLE:  If we could take a look at

21     Government's Exhibit 68, please.

22     BY MS. O'BOYLE:

23     Q.  Do you recognize Government's Exhibit 68?

24     A.  Yes.

25     Q.  And what is it?

R. Gibson - Direct

1    A.  This is a signatory card for Oculina Bank for Dominion

2    Financial LLC dba Dominion Investment Group.

3    Q.  Is it also the -- what follows is the bank account, the

4    full bank account and the signature cards?

5    A.  Yes.

6            MS. O'BOYLE:  Government moves in Exhibit 68.

7            THE COURT:  Exhibit 68 is admitted.

8            (Government's Exhibit 68 was admitted.)

9            MS. O'BOYLE:  If we could have Government's

10   Exhibit 74.

11   BY MS. O'BOYLE:

12   Q.  Do you recognize Government's Exhibit 74?

13   A.  Yes.  This is the Oculina Bank signature card for

14   Dominion Private Client Group.

15   Q.  Are you a signatory on the account with Mr. Bank?

16   A.  Yes.

17   Q.  And does it also follow with the full bank account?

18   A.  Yes.

19           MS. O'BOYLE:  Government moves in Exhibit 74.

20           THE COURT:  Exhibit 74 is admitted.

21           (Government's Exhibit 74 was admitted.)

22           MS. O'BOYLE:  If we could have Government's

23   Exhibit 84.

24   BY MS. O'BOYLE:

25   Q.  Do you recognize 84?

R. Gibson - Direct

1    A.   Yes.

2    Q.   What is it?

3    A.   The signature card from Oculina Bank for Dominion

4    Diversified Strategies.

5    Q.   Is what follows the bank account?

6    A.   Yes.

7              MS. O'BOYLE:   Government moves in Exhibit 84.

8              THE COURT:   Exhibit 84 is admitted.

9              (Government's Exhibit 84 was admitted.)

10   BY MS. O'BOYLE:

11   Q.   Government's Exhibit 88.   Do you recognize 88?

12   A.   Yes.

13   Q.   What is it?

14   A.   The bank signature card from Oculina Bank for Sovereign

15   Asset Group.

16   Q.   Is it the bank account that follows?

17   A.   Yes.

18             MS. O'BOYLE:   Government moves in Exhibit 88.

19             THE COURT:   Exhibit 88 is admitted.

20             (Government's Exhibit 88 was admitted.)

21             MS. O'BOYLE:   Can we have Government Exhibit 89?

22   BY MS. O'BOYLE:

23   Q.   Do you recognize 89?

24   A.   Yes.

25   Q.   What is it?

─────────── R. Gibson - Direct ───────────

1   A.  This is the bank signature card from Oculina Bank for DOM

2   Consulting Services.

3   Q.  Is Mr. Bank and Mike Aleksic the signatories on this bank

4   account?

5   A.  Yes.

6           MS. O'BOYLE:  Government moves in Exhibit 89.

7           THE COURT:  89 is admitted.

8           (Government's Exhibit 89 was admitted.)

9           MS. O'BOYLE:  Can we have 90, please?

10  BY MS. O'BOYLE:

11  Q.  Do you recognize Government's Exhibit 90?

12  A.  Yes.

13  Q.  What is it?

14  A.  This is the bank signature card from Oculina Bank for DOM

15  Business Brokers LLC.

16  Q.  And are you a signatory on the account?

17  A.  Yes.

18  Q.  Who else is?

19  A.  Catrina Bank.

20  Q.  What follows is the bank information or bank account

21  information as well?

22  A.  Yes.

23          MS. O'BOYLE:  Government moves in Exhibit 90.

24          THE COURT:  Exhibit 90 is admitted.

25          (Government's Exhibit 90 was admitted.)

R. Gibson - Direct

```
 1              MS. O'BOYLE:  If we could have Exhibit 330.
 2    BY MS. O'BOYLE:
 3    Q.  Do you recognize Exhibit 330, ma'am?
 4    A.  Yes.
 5    Q.  What is it?
 6    A.  Bank signature card from Oculina Bank for Janus Spectrum
 7    Group LLC.
 8              MS. O'BOYLE:  Government moves in Exhibit 330.
 9              THE COURT:  Exhibit 330 is admitted.
10              (Government's Exhibit 330 was admitted.)
11    BY MS. O'BOYLE:
12    Q.  And just so that these records -- what is the name of the
13    bank up here in the left-hand corner?
14    A.  Oculina Bank.
15    Q.  Where is it located?
16    A.  Palm City, Florida.
17    Q.  And then over here in this box on the right-hand side,
18    what does this reflect?
19    A.  This is Janus Spectrum Group LLC.
20    Q.  Is this the bank account that is now in Florida?
21    A.  Yes.
22    Q.  And who are the signatories on this account?
23    A.  Daryl Bank and myself.
24              MS. O'BOYLE:  And, Ms. Yusi, if you could go to, I
25    guess, Page 10.  Try Page 10 of this document, 330.  Go to
```

—R. Gibson - Direct—

1   Page 30.

2   BY MS. O'BOYLE:

3   Q.  Is this an example of a bank statement from Oculina Bank?

4   A.  Yes.

5   Q.  And so what is the date of this bank statement?

6   A.  August 31st, 2015.

7   Q.  For what account?

8   A.  Janus Spectrum Group LLC.

9   Q.  And what is the balance, the previous balance from the

10  previous month?

11  A.  $2,980.

12  Q.  What is the ending balance on this month's account?

13  A.  $980.

14  Q.  And could you remind the jury approximately how much

15  money in investor funds you took in in connection with Janus

16  Spectrum Group.

17  A.  In Janus Spectrum, it was 2.5 million.

18          MS. O'BOYLE:  If we could have Government's

19  Exhibit 331.

20  BY MS. O'BOYLE:

21  Q.  Do you recognize 331?

22  A.  Yes.

23  Q.  What is it?

24  A.  This is the bank signature card from Oculina Bank for

25  Janus Spectrum Management LLC.

R. Gibson - Direct

1      MS. O'BOYLE:  Government moves in Exhibit 331.

2      THE COURT:  Exhibit 331 is admitted.

3      (Government's Exhibit 331 was admitted.)

4      MS. O'BOYLE:  If we could have 523.

5  BY MS. O'BOYLE:

6  Q.  Do you recognize 523?

7  A.  Yes.

8  Q.  What is it?

9  A.  A signature card from Oculina Bank for Spectrum 100 LLC.

10  Q.  And is it the signature card and then the bank

11  statements?

12  A.  Yes.

13      MS. O'BOYLE:  Government moves in Exhibit 523.

14      THE COURT:  Exhibit 523 is admitted.

15      (Government's Exhibit 523 was admitted.)

16      MS. O'BOYLE:  Can we have Government's Exhibit 525.

17  BY MS. O'BOYLE:

18  Q.  Do you recognize 525?

19  A.  Yes.

20  Q.  What is it?

21  A.  A signature card from Oculina Bank for Spectrum 100

22  Management LLC.

23      MS. O'BOYLE:  Government moves in Exhibit 525.

24      THE COURT:  Exhibit 525 is admitted.

25      (Government's Exhibit 525 was admitted.)

R. Gibson - Direct

1          MS. O'BOYLE:  If we can have Government's
2    Exhibit 608.
3    BY MS. O'BOYLE:
4    Q.  Do you recognize 608?
5    A.  Yes.
6    Q.  What is it?
7    A.  This is a bank signature card from Oculina Bank for
8    Diversified Financing LLC.
9    Q.  And does it have the full bank account and the checks and
10   things in connection with this account?
11   A.  Yes.
12          MS. O'BOYLE:  Government moves in Exhibit 608.
13          THE COURT:  608 is admitted.
14          (Government's Exhibit 608 was admitted.)
15          MS. O'BOYLE:  616.
16   BY MS. O'BOYLE:
17   Q.  Do you recognize 616?
18   A.  Yes.
19   Q.  What is it?
20   A.  Bank signature card from Oculina Bank for Diversified
21   Financing LLC for the benefit of Xcel Broadband.
22   Q.  Is it the signature card and the bank statements and the
23   checks?
24   A.  Yes.
25          MS. O'BOYLE:  Government moves in Exhibit 616.

——————R. Gibson - Direct——————

```
 1            THE COURT:  616 is admitted.

 2            (Government's Exhibit 616 was admitted.)

 3            MS. O'BOYLE:  Two more.  If we could have

 4    Government's Exhibit 617.

 5    BY MS. O'BOYLE:

 6    Q.  Do you recognize 617, ma'am?

 7    A.  Yes.

 8    Q.  What is it?

 9    A.  The bank signature card for Oculina Bank for Xcel

10    Bandwidth LLC.

11            MS. O'BOYLE:  Government moves in Exhibit 617.

12            THE COURT:  617 is admitted.

13            (Government's Exhibit 617 was admitted.)

14            MS. O'BOYLE:  If we could have Government's

15    Exhibit 618.

16    BY MS. O'BOYLE:

17    Q.  Do you recognize Government's Exhibit 618?

18    A.  Yes.

19    Q.  What is it?

20    A.  A bank signature card from Oculina Bank for Accelerator

21    Management LLC.

22            MS. O'BOYLE:  Government moves in Exhibit 618.

23            THE COURT:  618 is admitted.

24            (Government's Exhibit 618 was admitted.)

25    BY MS. O'BOYLE:
```

R. Gibson - Direct

1   Q.   Now, did you open a Prime Spectrum LLC account at Oculina
2   that you can recall?
3   A.   No.
4   Q.   Why not?
5   A.   Prime Spectrum was -- I don't believe at that time there
6   was any funds left in the Prime Spectrum account there in
7   Virginia.
8   Q.   Did Mr. Bank tell the Prime Spectrum investors that their
9   investment was shut down?
10  A.   No.
11  Q.   Now, we saw some bank accounts there for Xcel Bandwidth.
12  After the SEC sued Mr. Alcorn and Mr. Bank, did you all
13  create a fourth investment connected to the spectrum that you
14  offered to investors?
15  A.   Yes.
16  Q.   What was that one called?
17  A.   Xcel Bandwidth.
18  Q.   Now, when you started to sell Xcel Bandwidth, had
19  Mr. Bank or Mr. Alcorn -- had they made a single payment back
20  to the Janus Spectrum Group investors who had invested
21  2.5 million?
22  A.   No.
23  Q.   When you started to sell Xcel Bandwidth, had Mr. Bank or
24  Mr. Alcorn made a single payment back to the Prime Spectrum
25  investors who had invested 130,000?

R. Gibson - Direct

1    A.  No.

2    Q.  And when you started to sell Xcel Bandwidth, had Mr. Bank

3    or Mr. Alcorn made a single payment back to the Spectrum 100

4    investors who invested over $7 million?

5    A.  No.

6    Q.  Now, did you create another limited liability company for

7    Xcel Bandwidth?

8    A.  Yes.

9    Q.  Let's take a look at Government's Exhibit -- actually,

10   let's start with Accelerator Management.  If we can take a

11   look at 615.  Do you recognize 615?

12   A.  Yes.

13   Q.  What is it?

14   A.  The Florida Articles of Organization for Accelerator

15   Management LLC.

16            MS. O'BOYLE:  Government moves in Exhibit 615.

17            THE COURT:  615 will be admitted.

18            (Government's Exhibit 615 was admitted.)

19            MS. O'BOYLE:  Let's take a look at 614.

20   BY MS. O'BOYLE:

21   Q.  Do you recognize 614?

22   A.  Yes.

23   Q.  And what is it?

24   A.  The Florida Articles of Organization for Xcel Broadband

25   LLC.

─────R. Gibson - Direct─────

```
 1              MS. O'BOYLE:  Government moves in Exhibit 614.

 2              THE COURT:  614 will be admitted.

 3              (Government's Exhibit 614 was admitted.)

 4    BY MS. O'BOYLE:

 5    Q.  Let's take a look at this document first.  We'll go to

 6    Page 2.  What was the original name of this limited liability

 7    company?

 8    A.  Xcel Broadband LLC.

 9    Q.  Xcel Broadband?

10    A.  Yes.

11    Q.  Where was -- where was the principal office going to be

12    located?

13    A.  In Port St. Lucie, Florida.

14    Q.  Were there any other businesses located at this address?

15    A.  Yes.

16    Q.  What?  What was there?

17    A.  All of the Dominion companies and offerings, everything

18    was at that point moved to this address.

19    Q.  Is this where you were operating out of as FAS Partners?

20    A.  Yes.

21    Q.  If we could go to Page 3.  Who were the managers of Xcel

22    Broadband?

23    A.  Daryl Bank and myself.

24    Q.  And what was the date that you created Xcel Broadband?

25    A.  July 2nd, 2015.
```

─R. Gibson - Direct─

1   Q.   So in terms of timing, is this approximately three months
2   after the SEC had sued Mr. Alcorn and Mr. Bank?
3   A.   Yes.
4   Q.   Now, let's go to Page 5.  Is this Articles of Amendment
5   to Articles of Organization -- do you know what this is, what
6   this document is?
7   A.   Yes.  This was doing an amendment to the Articles of
8   Organization, changing it from Xcel Broadband LLC to Xcel
9   Bandwidth LLC.
10  Q.   So the original name was Xcel Broadband LLC?
11  A.   Yes.
12  Q.   And then it was changed to what?
13  A.   Xcel Bandwidth LLC.
14  Q.   Why did it change from Xcel Broadband to Xcel Bandwidth?
15  A.   Because it was not broadband.
16  Q.   What wasn't broadband?
17  A.   The spectrum.  Originally it was, you know, we were told
18  that it was for wireless and cell phones, and it wasn't.  It
19  was more bandwidth where it could be used with a push-to-talk
20  network.
21  Q.   Can you explain that to the jury?  How much did investors
22  invest when you believed that it was broadband?
23  A.   Over 7 million.
24  Q.   Okay.  And then at some point you learned that it wasn't
25  to be used for broadband, cell phones?

1   A.  Correct.

2   Q.  And then what was it good for?

3   A.  It was for push-to-talk radios.

4   Q.  Did you tell all the investors that had previously

5   invested in Janus Spectrum Group and Prime Spectrum and

6   Spectrum 100 that their investments could not be used for

7   cell phone companies?

8   A.  No.

9   Q.  Now, so after your client -- did your clients get a

10  couple of licenses awarded to them?

11  A.  Yes.

12  Q.  And do you recall where?

13  A.  I don't.

14  Q.  Okay.  Did Mr. Alcorn contact Sprint and arrange to lease

15  these licenses to them for 100 percent annual rate of return

16  plus 50 percent profit?

17  A.  Not that I'm aware of.

18  Q.  Okay.  And do you know why not?

19  A.  No.

20  Q.  Now, to your knowledge, did Mr. Alcorn ever tell the

21  investors in Janus Spectrum, Spectrum 100, and Prime Spectrum

22  that their licenses could not be used by Sprint?

23  A.  No.

24  Q.  To your knowledge, did Mr. Smith ever tell all of his

25  clients that the licenses could not be used by Sprint?

─────────R. Gibson - Direct─────────

1    A.  Not that I'm aware of.

2    Q.  Now, after it was -- after you knew that the licenses

3    could not be used for broadband technology to power cell

4    phones, did you continue to pitch a spectrum investment to

5    investors?

6    A.  Yes.

7    Q.  And what was the new company?

8    A.  Xcel Bandwidth.

9    Q.  Let's take a look at Government's Exhibit 619.  Do you

10   recognize 619?

11   A.  Yes.

12   Q.  What is it?

13   A.  This is, like -- I think it was used as a PowerPoint, but

14   information in regard to Xcel Bandwidth.

15           MS. O'BOYLE:  Government moves in Exhibit 619.

16           THE COURT:  619 will be admitted.

17           (Government's Exhibit 619 was admitted.)

18   BY MS. O'BOYLE:

19   Q.  You said this is a presentation related to Xcel

20   Bandwidth?

21   A.  Yes.

22   Q.  And then what does Xcel Bandwidth do?

23   A.  "Xcel Bandwidth builds, deploys, and managing a growing

24   portfolio of regional private radio systems for businesses

25   operating the Motorola TRBO radio system that utilizes the

———— R. Gibson - Direct ————

1    800-megahertz frequency."

2    Q.  Let's go to Page 3.  If you could read, in the middle of

3    the page, what --

4    A.  "Where" --

5    Q.  -- go ahead.

6    A.  "Where cell phones fall short."

7    Q.  So what happened to selling and leasing licenses to

8    Verizon, Sprint, and AT&T?

9    A.  That could not be done.  It was a different frequency.

10   Q.  What, in particular, was this investment going to be in?

11   A.  This is into a push-to-talk network.

12   Q.  If we could go to Page 12.  And what type of return on

13   investment are you suggesting that investors can make with a

14   mature site in this investment?

15   A.  45 percent a year.

16   Q.  Do you know what that was based on?

17   A.  It says based on a mature site, but I don't know where

18   the information came from.

19   Q.  Okay.  Are you familiar with an entity called RapidLink?

20   A.  Yes.

21            MS. O'BOYLE:  If we could take a look at

22   Government's Exhibit 600E, for the witness, please.

23   BY MS. O'BOYLE:

24   Q.  Do you recognize 600E?

25   A.  Yes.

R. Gibson - Direct

1  Q.  What is it?

2  A.  E-mail chain between Bob LaBine, myself, and some other

3  people from our office.

4  Q.  Is Mr. Alcorn also on it?

5  A.  Yes, he is.

6  Q.  Is it in connection with RapidLink?

7  A.  Yes.

8        MS. O'BOYLE:  Government moves in Exhibit 619.

9        THE COURT:  619 will be admitted.

10        MS. O'BOYLE:  I apologize, Your Honor, 600E.

11        THE COURT:  600E will be committed.

12        (Government's Exhibit 600E was admitted.)

13  BY MS. O'BOYLE:

14  Q.  We're going to admit a few of these and then go back and

15  talk about them.  Government's Exhibit 600D, do you recognize

16  this?

17  A.  Yes.

18  Q.  And is this an e-mail with you and Mr. LaBine and

19  Mr. Alcorn related to RapidLink?

20  A.  Yes.

21        MS. O'BOYLE:  Government moves in Exhibit 600D, as

22  in delta.

23        THE COURT:  600D is admitted.

24        (Government's Exhibit 600D was admitted.)

25        MS. O'BOYLE:  600C, please.

Carol L. Naughton, Official Court Reporter

R. Gibson - Direct

1   BY MS. O'BOYLE:

2   Q.  And is this also an e-mail involving Mr. Bank and

3   Mr. LaBine and Mr. Alcorn related to RapidLink?

4   A.  Yes.

5           MS. O'BOYLE:  Government moves in Exhibit 600C.

6           THE COURT:  Government's Exhibit 600C, as in

7   Charlie, is admitted.

8           (Government's Exhibit 600C was admitted.)

9           MS. O'BOYLE:  Two more.  600B, please.

10  BY MS. O'BOYLE:

11  Q.  And, Ms. Gibson, is this, again, an e-mail chain between

12  you and -- with you and Mr. Alcorn, Mr. LaBine, Mr. Bobkin,

13  and Mr. Bank?

14  A.  Yes.

15          MS. O'BOYLE:  Government moves in Exhibit 600B.

16          THE COURT:  600B is admitted.

17          (Government's Exhibit 600B was admitted.)

18          MS. O'BOYLE:  And the last one, 600A.

19  BY MS. O'BOYLE:

20  Q.  Is this also an e-mail with Mr. LaBine, Mr. Bank,

21  Mr. Chadwick, Mr. Johnson, Mr. Alcorn, and Mr. Bobby Jones in

22  connection with RapidLink?

23  A.  Yes.

24          MS. O'BOYLE:  Government moves in Exhibit 600A.

25          THE COURT:  600A is admitted.

R. Gibson - Direct

```
 1              (Government's Exhibit 600A was admitted.)
 2    BY MS. O'BOYLE:
 3    Q.  Let's start with 600A.  Who is this an e-mail from?
 4    A.  Bob LaBine.
 5    Q.  And who was Mr. LaBine?
 6    A.  He ran RapidLink Wireless.
 7    Q.  How did you meet him?
 8    A.  We met him through Kent Maerki and David Alcorn.
 9    Q.  Do you know whether Mr. LaBine had any involvement in
10    Dental Support Plus?
11    A.  Yes, he did -- oh, Mr. LaBine?  I'm not sure that he did.
12    The other gentleman, I believe, is who did.
13    Q.  Who was the other gentleman that was associated with
14    RapidLink?
15    A.  Aaron Bobkin.
16    Q.  Who was Mr. Aaron Bobkin?  How did you meet him?
17    A.  Also through Kent Maerki and David Alcorn.
18    Q.  And you said Mr. Bobkin also was connected with Dental
19    Support Plus?
20    A.  Yes.  He was a sales agent, and he also owned some of the
21    dental franchise units.
22    Q.  And so Mr. LaBine is writing to Mr. Bank and also to
23    Mr. Alcorn; is that right?
24    A.  Yes.
25    Q.  And what is the date of this e-mail?
```

─────────R. Gibson - Direct─────────

1   A.   November 2nd, 2015.

2   Q.   And what is the subject?

3   A.   "SEC help."

4   Q.   And what does SEC stand for?

5   A.   Securities and Exchange Commission.

6   Q.   Okay.  And if you could read the first paragraph -- the

7   first sentence.

8   A.   "RLW only wants to provide facts for your upcoming case

9   to help with evaluation.  I hope you have gotten in touch

10  with Tom who I sent out an e-mail two weeks go with his

11  info."

12  Q.   What is RLW?

13  A.   RapidLink Wireless.

14  Q.   And let's skip down to the last paragraph that starts

15  "Once RLW"?

16  A.   "Once RLW has income, then we can present that as a fact.

17  In the meantime, I hope this will help in the 'licenses have

18  no value' statement."

19  Q.   Do you know what he meant when he said -- well, RLW is

20  RapidLink Wireless?

21  A.   Correct.

22  Q.   Do you know what Mr. LaBine meant -- what did you take

23  him to mean when he said, "Once RLW has income"?

24  A.   They don't have income currently.

25  Q.   So it's a brand-new company?

─────────R. Gibson - Direct─────────

1   A.   Yes.

2   Q.   But once they have income, then they can present it as a

3   fact to who?

4   A.   The SEC.

5   Q.   And how, Ms. Gibson, was RapidLink Wireless going to get

6   income?

7   A.   Through investor funds.

8   Q.   Now, Ms. Gibson, for three years Mr. Alcorn and Mr. Bank

9   sold investments in spectrum licenses; is that right?

10  A.   Yes.

11  Q.   We've gone over that today and yesterday?

12  A.   Yes.

13  Q.   Why couldn't they use investor funds to put these

14  licenses to work in this push-to-talk network?

15  A.   Those funds were already gone.  They had been sent

16  between, you know, going to David Alcorn's company and then

17  the other companies that were going out for sales commissions

18  and also through the management company.  So those were

19  already gone and had already been spent.

20  Q.   So you said you sent money to Mr. Alcorn's company.  Do

21  you know what Mr. Alcorn did with the money?

22  A.   I do not.

23  Q.   But did Mr. Alcorn offer to use those investor funds to

24  fund this push-to-talk network?

25  A.   Not that I'm aware of.

─── R. Gibson - Direct ───

1   Q.  And you said Mr. Bank -- the funds that you took in with
2   Mr. Bank, those were gone?
3   A.  Correct.
4   Q.  Did you ever ask Mr. Alcorn where all the investor funds
5   that you sent to him -- where they went?
6   A.  I did not.
7   Q.  Let's take a look at Government's Exhibit 600B, as in
8   bravo, that we just admitted.  And let's go down here to the
9   e-mail at the bottom.  And what is the date of this e-mail?
10  A.  December 29, 2015.
11  Q.  And who is it from?
12  A.  David Alcorn.
13  Q.  And the first line, it says, "Bob, let's discuss how I
14  can help with the following note from Mike at Dominion."
15          Do you see that?
16  A.  Yes.
17  Q.  Who is Mike at Dominion?
18  A.  That's Mike Aleksic.
19  Q.  And then there's a number of dots; is that correct?
20  A.  Yes.
21  Q.  And so what was Mike Aleksic's role at Dominion?
22  A.  He was a chief investment officer.  He would typically do
23  the financial looking into and preparing the numbers and
24  stuff for any deals.
25  Q.  Okay.  And so between the dots, is this a reference of

R. Gibson - Direct

1   what Mike Aleksic needed?

2   A.   Yes.

3   Q.   And if you could read what Mike Aleksic needed under

4   number 1.

5   A.   "1, before I can complete any agreements, I need the name

6   of a Delaware series LLC that they have set up to hold the

7   asset that they are selling."

8   Q.   Okay.  And so do you know what agreements he's talking

9   about?

10  A.   I'm not sure.

11  Q.   Okay.  Let's read number 2?

12  A.   "2, before I can create any sales material, I need them

13  to provide me with the details of what they are selling and

14  how they expect to operate it to make money.  An executive

15  summary will suffice with pro forma financials.  I hope" --

16  Q.   Okay -- I'm sorry.  Go ahead and finish.

17  A.   "I hope you understand we cannot sell anything if we

18  don't have the details of what we are selling.  We cannot

19  draft agreements for a company that does not exist.  You are

20  correct, though, once I have everything, the documents take

21  me a day."

22  Q.   Was Mr. Aleksic creating documents to solicit funds from

23  investors for RapidLink?

24  A.   Yes.

25  Q.   And was he asking whether RapidLink existed?

R. Gibson - Direct

1   A.  Yes.  I'm sorry.  Can I correct myself?  Because I don't

2   think he was asking if RapidLink existed.  He was asking in

3   regards to the Delaware series LLC, I believe, RapidLink was

4   setting up in regards to this.

5   Q.  So RapidLink was going to set up a Delaware series LLC?

6   A.  Yes.

7   Q.  And then there's a number of dots, and then what else did

8   Mr. Alcorn say?

9   A.  "He has the name of the LLC that you gave me but says he

10  needs it set up with a tax ID number.  Let me know if you

11  need help setting up the LLC.  I can handle the pro forma.

12  Let's discuss the content.  Thanks, Bob."

13  Q.  Is that Mr. Alcorn speaking?

14  A.  Yes.

15  Q.  That he can handle the pro forma?

16  A.  Yes.

17  Q.  What is a pro forma?

18  A.  A pro forma is going to show an example of like we saw in

19  that existing mature site or a projection of what the

20  business could be.

21  Q.  And so in December of 2015, is Mr. LaBine sending an

22  e-mail again to you and Mr. Bank and Mr. Aleksic as well as

23  Mr. Alcorn and Mr. Bobkin?

24  A.  Yes.

25  Q.  And here, is Mr. LaBine discussing how RapidLink will be

R. Gibson - Direct

1  set up?

2  A.  Yes.

3  Q.  And it provides in here, "RLW is looking for a consulting

4  agreement from David and Daryl's entities.  It is my

5  understanding each will have their own contract with RLW."

6         Do you know what that is?

7  A.  Yes.  That was for the Xcel Bandwidth.

8  Q.  And then he says, "I will send a separate e-mail with

9  some information of which to base marketing materials on.

10  Unlike Texas, most of these new offerings will not be an

11  asset purchase of an existing system.  It will be built from

12  ground up, so, therefore, the pro forma and business plan are

13  really all we have."

14         Do you see that?

15  A.  Yes.

16  Q.  So are you are soliciting investors to invest in a

17  company that at this point hadn't even been set up yet?

18  A.  Correct.

19  Q.  And didn't have any assets because it would have to be

20  built from the ground up?

21  A.  Yes.

22  Q.  Do you know what the pro forma would be based on if the

23  company didn't have any -- or did you know what the pro forma

24  would be based on if the company didn't exist yet and didn't

25  have any assets?

R. Gibson - Direct

1   A.  They were using an example of another system.

2   Q.  Who is "they"?

3   A.  RapidLink Wireless.

4   Q.  And all of these individuals in this e-mail, ma'am, you

5   were preparing to seek investor funds in Xcel, correct?

6   A.  Yes.  That's correct.

7   Q.  Did you ever suggest to Mr. Alcorn that perhaps RapidLink

8   Wireless could get a loan, a bank loan, to fund its business?

9   A.  I did not.

10  Q.  Did you ever suggest that RapidLink Wireless get a bank

11  loan to --

12          MR. YAROW:  Objection to the leading nature of the

13  question.

14          THE COURT:  Sustained.

15          MS. O'BOYLE:  I'll move on.

16          Government Exhibit 600C.

17  BY MS. O'BOYLE:

18  Q.  Is this from Mr. LaBine to Mr. Alcorn?

19  A.  Yes.

20  Q.  And now we are on January 2nd of 2016?

21  A.  Yes.

22  Q.  And it's RapidLink term sheet.  Do you see that?

23  A.  Yes.

24  Q.  And this is in connection with the company that you were

25  just talking about a couple days earlier?

—R. Gibson - Direct—

1   A.   Yes.

2   Q.   That did not yet exist?

3   A.   Yes.

4   Q.   If we could go to Page 3.  So what is this?

5   A.   RapidLink Wireless, operational push-to-talk network,

6   Texas Triangle.

7   Q.   Down here, the opportunity?

8   A.   "The buyer intends to purchase the assets from the seller

9   for a purchase price of $2 million.  The assets are currently

10  generating annual gross revenues of $295,739, or 15 percent

11  of the purchase price.  The manager will manage and operate

12  the assets on behalf of the buyer.  The buyer may provide

13  additional funds to improve and expand the assets in Texas."

14  Q.   So this is in connection with a company that three days

15  earlier did not exist?

16  A.   Yes.

17  Q.   If we could go to 600D.  And let's start -- now we're a

18  month later, February 25th of 2016.  Do you see that?

19  A.   Yes.

20  Q.   Is this an e-mail from Mr. Alcorn?

21  A.   Yes.

22  Q.   And if you could read the very first sentence.

23  A.   "A big splash as soon as applicable is important."

24  Q.   Do you know what he's talking about?

25  A.   No.

R. Gibson - Direct

1          MS. O'BOYLE:  If we can go to Government's

2    Exhibit 600E.

3    BY MS. O'BOYLE:

4    Q.  And so is this an e-mail from Mr. LaBine to you and

5    Mr. Bank?

6    A.  Yes.

7    Q.  With a copy to Mr. Bobkin and Mr. Alcorn?

8    A.  Yes.

9    Q.  And what is the date?

10   A.  March 14, 2016.

11   Q.  And if you could read what Mr. LaBine says to Mr. Bank.

12   A.  "David and I still need something that tells people what

13   they are getting into for us to refer them to you.  Please

14   send marketing material, documents, etc, that you would be

15   giving someone from start to them investing."

16   Q.  "To them investing"?

17   A.  Yes.

18   Q.  If we go up to the very top, who is Ms. Moss?

19   A.  She was an assistant that worked in the Dominion office

20   in Florida.

21   Q.  Did she send this e-mail to Mr. LaBine with copies to

22   Mr. Alcorn and Mr. Bank?

23   A.  Yes.

24   Q.  And are there attachments, an Xcel Bandwidth term sheet

25   and a RapidLink term sheet?

R. Gibson - Direct

1   A.   Yes.

2   Q.   And who is Ms. Moss?

3   A.   She was the assistant for Daryl Bank and helped myself as

4   well.  She did the operations in the office in Florida.

5   Q.   And she says, "Attached is the marketing materials the

6   reps in the field use for Xcel"?

7   A.   Yes.

8          MS. O'BOYLE:  If we could go to Page 3, please.

9   BY MS. O'BOYLE:

10  Q.   What is this, Ms. Gibson?

11  A.   This is a Diversified Financing/Xcel Bandwidth term

12  sheet.

13  Q.   And again, in this left-hand corner, could you read to

14  the jury what is being advertised.

15  A.   "Spectrum is the most valuable natural resource of the

16  information age."  And "Bandwidth is the new black gold."

17  Q.   And where did you get that?

18  A.   From David Alcorn.

19  Q.   And then is the RapidLink sheet also attached?

20  A.   Yes.

21  Q.   If we could go back to Page 1.  So this is what was

22  provided on March 14th of 2016 in connection with soliciting

23  investor funds into Xcel Bandwidth?

24  A.   Yes.

25  Q.   And the date here is March 14, 2016?

─────R. Gibson - Direct─────

1   A.  Correct.

2   Q.  Was the SEC case still going on?

3   A.  Yes.

4           MS. O'BOYLE:  If we could go to 526C.

5   BY MS. O'BOYLE:

6   Q.  Is this Mr. Alcorn's deposition that was taken at the SEC

7   on March 15th, 2016?

8   A.  Yes.

9   Q.  The next day?

10  A.  Yes.

11          MS. O'BOYLE:  Government moves in Exhibit 526C.

12          THE COURT:  526C is admitted.

13          (Government's Exhibit 526C was admitted.)

14  BY MS. O'BOYLE:

15  Q.  We looked at a number of limited liability companies as

16  to how these investments were sold.  How was Xcel Bandwidth

17  going to be sold?

18  A.  It started off as a secured promissory note that would

19  have been done through Diversified Financing.

20  Q.  And that was the second format that Mr. Bank used in

21  connection with Xcel?

22  A.  Yes.

23  Q.  Did it change a third time?

24  A.  Yes.

25  Q.  And what was that?

R. Gibson - Direct

1   A.   Then it became -- it was member loans through a brokerage

2   services.

3   Q.   So it went from limited liability companies to promissory

4   notes to member loans?

5   A.   Correct.

6   Q.   And the salesmen that you were using, did they follow

7   along on each different format?

8   A.   Yes.

9        MS. O'BOYLE:  If we could go to Government's

10  Exhibit 620.

11  BY MS. O'BOYLE:

12  Q.   Do you recognize 620?

13  A.   Yes.

14  Q.   What is it?

15  A.   This is the Operating Agreement for Xcel Bandwidth Two

16  LLC.

17       MS. O'BOYLE:  Government moves in Exhibit 620.

18       THE COURT:  620 is admitted.

19       (Government's Exhibit 620 was admitted.)

20       MS. O'BOYLE:  If we can go to 621.

21  BY MS. O'BOYLE:

22  Q.   Do you recognize 621?

23  A.   Yes.

24  Q.   What is it?

25  A.   This is the Xcel Bandwidth member loan for, client's

R. Gibson - Direct

1   name, Constance Flammang.

2          MS. O'BOYLE:  Government moves in Exhibit 621.

3          THE COURT:   621 is admitted.

4          (Government's Exhibit 621 was admitted.)

5          MS. O'BOYLE:   623.

6   BY MS. O'BOYLE:

7   Q.   Do you recognize 623?

8   A.   Yes.

9   Q.   What is it?

10  A.   This is the DOM Business Brokers Buyer Agreement, also

11  for the client Constance Flammang.

12         MS. O'BOYLE:  Government moves in Exhibit 623.

13         THE COURT:   623 is admitted.

14         (Government's Exhibit 623 was admitted.)

15         MS. O'BOYLE:  Can we go to 633?

16  BY MS. O'BOYLE:

17  Q.   Do you recognize 633?

18  A.   Yes.

19  Q.   What is it?

20  A.   Operating Agreement for Xcel Bandwidth One LLC.

21         MS. O'BOYLE:  Government moves in Exhibit 633.

22         THE COURT:   633 is admitted.

23         (Government's Exhibit 633 was admitted.)

24  BY MS. O'BOYLE:

25  Q.   And then how about 634?  Do you recognize 634?

—————R. Gibson - Direct—————

1   A.   Yes.

2   Q.   What is it?

3   A.   This is an exchange notice between Xcel Bandwidth One

4   membership interest and Xcel Bandwidth One member loan

5   provided in exchange for Diversified Financing note.

6           MS. O'BOYLE:   Government moves in Exhibit 634.

7           THE COURT:   634 is admitted.

8           (Government's Exhibit 634 was admitted.)

9           MS. O'BOYLE:   We're going to only focus on one of

10   these.   If you could pull up 623, please.

11   BY MS. O'BOYLE:

12   Q.   And, Ms. Gibson, what is this that we're looking at?

13   A.   This is a DOM Business Brokers Buyer Agreement.

14   Q.   And if we go to the first page, this Buyer Agreement,

15   what is the name here?

16   A.   Constance Flammang.

17   Q.   Is that one of the clients?

18   A.   Yes.

19   Q.   And it says -- DOM Business Brokers is -- it's labeled as

20   the broker.   Do you see that?

21   A.   Yes.

22   Q.   And who controlled DOM Business Brokers?

23   A.   Daryl Bank.

24   Q.   And then it says Xcel Bandwidth LLC is the seller.

25   A.   Yes.

R. Gibson - Direct

1    Q.   Who controlled that entity?

2    A.   Daryl Bank.

3    Q.   And Xcel Bandwidth Two, the business, who controlled that

4    entity?

5    A.   Daryl Bank.

6            MS. O'BOYLE:  Okay.  Ms. Yusi, if we could go to the

7    last page of this.

8            Actually, I'll move on, because I can't find it.

9            Let's go to Government's Exhibit 629.

10   BY MS. O'BOYLE:

11   Q.   Do you recognize 629?

12   A.   Yes.

13   Q.   What is it?

14   A.   This is the money move sheet for Xcel Bandwidth through

15   Diversified Financing.

16           MS. O'BOYLE:  Government moves in Exhibit 629.

17           THE COURT:  629 will be admitted.

18           (Government's Exhibit 629 was admitted.)

19   BY MS. O'BOYLE:

20   Q.   So this is what we've been talking about -- is that

21   right? -- the Xcel Bandwidth investment?

22   A.   Yes.

23   Q.   And you said this was an example of your money move

24   sheet?

25   A.   Yes.

R. Gibson - Direct

1  Q.  And so in connection with Xcel Bandwidth, what, if

2  anything, did you do with the investor funds that came in?

3  A.  The investor funds that came in -- so it would come into

4  the account at BayPort, and then later it was Oculina Bank in

5  Florida.  41.2 percent of those funds stayed at the

6  Diversified Financing account for Xcel.  30 percent was moved

7  over either to Dominion Private Client Group or Sovereign

8  Asset Group, depending on where the investor funds came from.

9  6.3 percent was moved to Dominion Diversified Strategies.

10  17.5 percent was moved to Accelerator Management.

11        And you'll see another column where it says an extra

12  5 percent.  That simply occurs when the 41.2 -- before it was

13  discounted, it was 46.2.  So when we got the discount, that

14  was just the additional.  So Accelerator Management should

15  have gotten 22.5 percent.  That's the last two columns.

16  Q.  When did the first investor funds hit the account?

17  A.  July 17, 2015.

18  Q.  So had the SEC already sued Mr. Alcorn and Mr. Bank for

19  securities fraud by this point?

20  A.  Yes.

21  Q.  And this chart is split into two.  Do you know why?

22  A.  This -- I think it shows, again, where it got rid of

23  that one -- the furthest column where it had the 5 percent.

24  So that just kind of separates that out.  And you also see in

25  the top portion, the funds went to Dominion Private Client

R. Gibson - Direct

1   Group.  The bottom portion, they were going to Sovereign
2   Asset Group.
3   Q.  So looking at the first chart, how much money did you
4   take in between July 2015 and November of 2015 from investors
5   into Xcel Bandwidth?
6   A.  Almost 1.6 million.
7   Q.  Let's move to the second chart.  And did Mr. Smith
8   continue to sell Xcel Bandwidth after Mr. Bank and Mr. Alcorn
9   were sued by the Securities and Exchange Commission?
10  A.  Yes.
11  Q.  If we can take a look at -- on February 22, 2016, how
12  much money came in from a T. Kurtz?
13  A.  50,000.
14  Q.  And how much came in from a J. Brown on March 14, 2016?
15  A.  25,000.
16  Q.  And how did you pay Mr. Smith -- or was he paid during
17  this time?
18  A.  Yes, he was.
19  Q.  And how did you pay him in connection with these
20  transactions?
21  A.  So he would have received his commissions either from
22  Dominion Private Client Group or Sovereign Asset Group, just
23  depending on where the funds were transferred into.
24  Q.  Would you have paid, then, electronic transfers?
25  A.  Yes.

R. Gibson - Direct

1    Q.   So the first chart had about 1.5 million; is that right?

2    A.   Yes.

3    Q.   And then the second chart, how much more was sold in the

4    second chart?

5    A.   984,800.

6    Q.   So just based on these two charts, did Mr. Bank take in

7    another 2.5 million in investor funds for this fourth

8    spectrum investment?

9    A.   Yes.

10   Q.   And was Mr. Smith continuing to sell, again, in April and

11   May of 2016?

12   A.   Yes.

13   Q.   So that's a full year after the SEC complaint?

14   A.   Yes.

15   Q.   Now, while Mr. Bank was selling Xcel, did he resolve his

16   SEC action?

17   A.   Yes.

18   Q.   And how did he resolve it?

19   A.   He did a settlement, a "no admit, no deny" settlement.

20   Q.   Okay.

21          MS. O'BOYLE:   And if we could take a look at

22   Government's Exhibit 1J.

23   BY MS. O'BOYLE:

24   Q.   Do you recognize 1J?

25   A.   Yes.

R. Gibson - Direct

1  Q.  Is this the settlement that you were talking about?

2  A.  Yes.

3          MS. O'BOYLE:  Government moves in Exhibit 1J.

4          THE COURT:  Exhibit 1J is admitted.

5          (Government's Exhibit 1J was admitted.)

6          MS. O'BOYLE:  If we could have Exhibit 323.

7  BY MS. O'BOYLE:

8  Q.  Do you recognize 323?

9  A.  Yes.

10  Q.  What is it?

11  A.  This is also a settlement from the SEC.

12  Q.  In connection with what company?

13  A.  I'm sorry.  Janus Spectrum Group.

14          MS. O'BOYLE:  Government moves in Exhibit 323.

15          THE COURT:  Exhibit 323 is admitted.

16          (Government's Exhibit 323 was admitted.)

17          MS. O'BOYLE:  Could I have Government's Exhibit 413.

18  BY MS. O'BOYLE:

19  Q.  Do you recognize Exhibit 413?

20  A.  Yes.

21  Q.  What is it?

22  A.  It's the settlement through the SEC for Prime Spectrum.

23          MS. O'BOYLE:  Government moves in Exhibit 413.

24          THE COURT:  413 is admitted.

25          (Government's Exhibit 413 was admitted.)

R. Gibson - Direct

1      MS. O'BOYLE:  And finally, Government Exhibit 527.

2    BY MS. O'BOYLE:

3    Q.  Do you recognize 527?

4    A.  Yes.

5    Q.  What is it?

6    A.  This is an SEC settlement for Spectrum 100.

7    Q.  Okay.

8          MS. O'BOYLE:  Government moves in Exhibit 527.

9          THE COURT:  Exhibit 527 is admitted.

10         (Government's Exhibit 527 was admitted.)

11         MS. O'BOYLE:  Let's just pull up Exhibit 1J as an

12   example.

13   BY MS. O'BOYLE:

14   Q.  So 1J, I'm pulling up the filing date when this was

15   publicly filed.  When was this consent of Daryl Bank publicly

16   filed?

17   A.  January 13, 2017.

18   Q.  And did Mr. Bank consent to the entry of a judgment

19   which, among other things -- I'm going to read from the

20   document -- "permanently restrains and enjoins defendant from

21   violation of Section 17(a) of the Securities Act of 1933"?

22   A.  Yes.

23   Q.  Did Mr. Bank stop selling Xcel Bandwidth after entering

24   into this public consent agreement with the SEC?

25   A.  No.

─────────────R. Gibson - Direct─────────────

1          MS. O'BOYLE:  Let's take a look at Government's

2    Exhibit 325, just for the witness.

3    BY MS. O'BOYLE:

4    Q.  Do you recognize 325?

5    A.  Yes.

6    Q.  Is it the judgment related to these consents?

7    A.  Yes.

8          MS. O'BOYLE:  Government moves in Exhibit 325.

9          THE COURT:  325 is admitted.

10          (Government's Exhibit 325 was admitted.)

11          MS. O'BOYLE:  Let's go ahead and take a look at this

12    for the jury.

13    BY MS. O'BOYLE:

14    Q.  What date was this judgment filed?

15    A.  April 25, 2017.

16    Q.  And it was filed publicly in court?

17    A.  Yes.

18    Q.  Did you and Mr. Bank and Mr. Alcorn and Mr. Smith -- did

19    you stop selling Xcel Bandwidth after the Court entered this

20    judgment against Mr. Bank and his company?

21    A.  No.

22          MS. O'BOYLE:  Let's take a look at 415, just for the

23    witness.

24    BY MS. O'BOYLE:

25    Q.  Is this the same judgment with respect to Prime Spectrum?

─R. Gibson - Direct─

1   A.  Yes.

2          MS. O'BOYLE:  Government moves in Exhibit 415.

3          THE COURT:  415 is admitted.

4          (Government's Exhibit 415 was admitted.)

5          MS. O'BOYLE:  And finally, 525 -- or 529, I'm sorry.

6   BY MS. O'BOYLE:

7   Q.  Do you recognize 529?

8   A.  Yes.

9   Q.  What is it?

10  A.  This is a judgment for Spectrum 100.

11         MS. O'BOYLE:  Government moves in Exhibit 529.

12         THE COURT:  529 is admitted.

13         (Government's Exhibit 529 was admitted.)

14  BY MS. O'BOYLE:

15  Q.  And so the date, again, all of these were filed on was

16  April 25, 2017; is that right, Ms. Gibson?

17  A.  Yes.

18         MS. O'BOYLE:  Let's take a look at Government's

19  Exhibit 635.

20  BY MS. O'BOYLE:

21  Q.  Do you recognize 635, ma'am?

22  A.  Yes.

23  Q.  What is it?

24  A.  This is the money move sheet for Xcel Bandwidth through

25  the business brokerage.

R. Gibson - Direct

1    MS. O'BOYLE:  Government moves in Exhibit 635.

2    THE COURT:  635 is admitted.

3    (Government's Exhibit 635 was admitted.)

4    BY MS. O'BOYLE:

5    Q.  And so this is another money move sheet; is that right?

6    A.  Correct.

7    Q.  And so this time -- but it's still Xcel Bandwidth.  So

8    were there two money move sheets for the Xcel Bandwidth

9    investment?

10   A.  Yes.

11   Q.  Okay.  Can you explain to the jury why there were two

12   money move sheets for this one investment?

13   A.  Yes.  The first one for Xcel Bandwidth was through

14   Diversified Financing.  That was when they were structured as

15   secured promissory notes.  This one is where the structure is

16   through the member loans through the business brokerage.

17   Q.  And we've walked the jury through these before.  Did you

18   continue to, after receipt of investor funds, move investor

19   funds to multiple different accounts?

20   A.  Yes.

21   Q.  And taking a look, when is the first investment sold in

22   the Xcel Bandwidth business brokerage?

23   A.  May 2nd, 2016.

24   Q.  Okay.  And then who was it sold by?

25   A.  Bill Smith.

R. Gibson - Direct

1  Q.  And did Mr. Smith continue to sell through 2016?

2  A.  Yes.

3  Q.  And did Mr. Smith continue to sell Xcel on this first top

4  sheet through March of 2017?

5  A.  Yes.

6  Q.  And then going to Page 2, did Mr. Smith continue to sell

7  through 2017?

8  A.  Yes.

9  Q.  In fact, what was the last date that Mr. Smith sold Xcel

10  Bandwidth?

11  A.  August 10, 2017.

12  Q.  Was it August 10th -- hold on.

13  A.  August 3rd, 2017.

14  Q.  Okay.  How much money was that?

15  A.  50,000.

16  Q.  And what was the client's name?

17  A.  Judith Tallett.

18  Q.  So did Mr. Smith continue to sell Xcel Bandwidth with

19  Mr. Bank after Mr. Bank resolved his SEC case which

20  permanently enjoined him?

21  A.  Yes.

22  Q.  Now, going to the bottom here, this is the second -- this

23  is the second money move sheet.  How much of investor funds

24  was received into Xcel Bandwidth in the second money move

25  sheet?

R. Gibson - Direct

1    A.   2.9 million.

2    Q.   So that was in addition to the money move sheet that we

3    just looked at; is that right?

4    A.   Yes.

5    Q.   So total, how much of investor funds did you receive

6    related to a push-to-talk Xcel investment?

7    A.   Approximately 5 million.

8    Q.   Now, each one of these lines represents a different

9    client; is that correct?

10   A.   Correct.  Some of them contain a couple of clients.

11   Q.   Okay.  And here, on February 23rd, 2017, did Mr. Smith --

12   was he the agent on a transaction involving a Lawrence Lyon?

13   A.   Yes.

14   Q.   Can you explain to the jury what happened with Mr. Lyon's

15   funds?

16   A.   Can you scroll up to -- move up to the top where I can

17   see the headings.

18   Q.   Of course.

19   A.   Thank you.

20        So $75,000 came into the Xcel Bandwidth account on

21   February 23rd, 2017.  $60,750 was moved over to the -- sorry,

22   that's what stayed within the Xcel Bandwidth account.

23   $14,250 moved to the DOM Business Brokers account.

24   Q.   And in July of 2017, is there funds related to a Sharyon

25   Bean?

Carol L. Naughton, Official Court Reporter

──────R. Gibson - Direct──────

1   A.  Yes.

2   Q.  What happened to Ms. Bean's funds?

3   A.  This is when Oculina Bank shut down our accounts.

4   Q.  And where did you go after that?

5   A.  At that point we went to -- we tried -- there were a

6   couple of different banks, but we ended up opening up an

7   account at MIDFLORIDA Credit Union.

8   Q.  We'll talk about that in a minute.

9       The last investor on this sheet is 8/15/2017.  Do

10  you see that?

11  A.  Yes.

12  Q.  A Larsen Hans?

13  A.  Yes.

14  Q.  Why is that the last investor on the sheet?

15  A.  The following week Daryl Bank and I were indicted and

16  arrested.

17  Q.  Now, we talked a little bit about how Mr. Smith was paid.

18      MS. O'BOYLE:  If we could have Government's

19  Exhibit 1202, which is already in evidence, and take a look

20  at Page 353.

21  BY MS. O'BOYLE:

22  Q.  You see this is the American Estate & Insurance Services?

23  A.  Yes.

24  Q.  Is that Mr. Smith's account that you paid?

25  A.  Yes.

R. Gibson - Direct

1     MS. O'BOYLE:  If you could go to Page 353.

2     BY MS. O'BOYLE:

3     Q.  And on July 18th, 2016, what happened?

4     A.  Mr. Smith was paid a commission of $21,470 from the DOM

5     Business Brokers account.

6     Q.  It says, "Bill SM Xcel"?

7     A.  Yes.

8     Q.  Is that in connection with the sale of Xcel?

9     A.  Yes.

10          MS. O'BOYLE:  If we could take a look at Page 403.

11    BY MS. O'BOYLE:

12    Q.  And this is a bank statement from Mr. Smith's business

13    account from 2017.  And what happened on March 8th of 2017?

14    A.  March 8th, Mr. Smith was paid 42,500 from the DOM

15    Business Brokers account and related to the Xcel for a few of

16    his clients there.

17    Q.  So it's several clients grouped together?

18    A.  Correct.

19    Q.  And this is approximately two years after the Securities

20    and Exchange Commission sued Mr. Bank for fraud?

21    A.  Yes.

22    Q.  Now, did you continue to send investor funds to

23    Mr. Alcorn through 2017?

24    A.  Yes.

25    Q.  And I'd like to show you Government Exhibit 636.  Do you

—————————R. Gibson - Direct—————————

1   recognize 636?

2   A.   Yes.

3   Q.   What is it?

4   A.   This would be an invoice that Mr. Alcorn would have

5   provided to Daryl Bank in regards to his consulting services

6   for us.

7   Q.   Are these just two examples of that?

8   A.   Yes.

9            MS. O'BOYLE:   Government moves in Exhibit 636.

10           THE COURT:   636 is admitted.

11           (Government's Exhibit 636 was admitted.)

12   BY MS. O'BOYLE:

13   Q.   You said you were paying for Mr. Alcorn's consulting

14   services?

15   A.   Yes.

16   Q.   Can you explain that to the jury?  What was Mr. Alcorn

17   doing for Mr. Bank in 2017?

18   A.   He was consulting for us in regards to the CTS system

19   that was purchased in Texas, which was that existing

20   push-to-talk network system.

21   Q.   What did you use to purchase all that?

22   A.   Investor funds.

23   Q.   Through Xcel?

24   A.   Yes.

25   Q.   And it says here -- do you recognize the handwriting on

R. Gibson - Direct

1    the bottom page?

2    A.   Yes.

3    Q.   Whose handwriting is that?

4    A.   Daryl Bank's.

5    Q.   And what does it say?

6    A.   "Pay to Steph Court."  And then his signature.

7    Q.   What was Steph Court?

8    A.   That was David's LLC or company that we paid.

9    Q.   Why did you pay these funds to Steph Court?

10   A.   He sent us the invoice for it, Daryl signed off on it,

11   and so we paid them.

12   Q.   Paid who?

13   A.   Sorry, Steph Court.

14   Q.   Who gave the invoice?

15   A.   Daryl Bank.

16   Q.   Who gave him the invoice?

17   A.   David Alcorn.

18   Q.   And so down here, do you know whose handwriting this is?

19   A.   Yes.  I believe that was Corinne, who was a bookkeeper in

20   our office.

21   Q.   And what does it say?

22   A.   "Paid by ACH March 8th, 2017."

23   Q.   And the second invoice dated April of 2017?

24   A.   "Paid by ACH, Xcel, 5/16 of 2017."

25   Q.   Ms. Gibson, I think we just went through Xcel Bandwidth

R. Gibson - Direct

1    in total.  I believe you said there were about $5 million of

2    additional investor funds?

3    A.  Correct.

4    Q.  And what happened with Xcel Bandwidth?  Did those

5    investors ever get repaid?

6    A.  There was a very small amount that came in.  It was

7    pennies on the dollar compared to what was put in.

8    Q.  And with respect to the four spectrum investments alone,

9    just the ones that we've gone through over the past two days,

10   what was the total approximate amount of loss for your

11   investors?

12   A.  Approximately 15 million.

13   Q.  Let's move on and talk about Dental Support Plus

14   Franchise and DSPF Group.  I believe you said that that was

15   owned by Mr. Maerki?

16   A.  Correct.

17   Q.  And when you met Mr. Maerki, did he already have a group

18   of sales agents selling Dental Support Plus?

19   A.  Yes.

20   Q.  Did Mr. Bank start to work with some of those sales

21   agents after forming this relationship with Mr. Maerki?

22   A.  Yes.

23   Q.  Now, after meeting Mr. Maerki, did Mr. Bank sign up to

24   sell the franchises?

25   A.  Yes, he did.

R. Gibson - Direct

1   Q.  Let's take a look at 200R.  Do you recognize 200R?

2   A.  Yes.

3   Q.  And what is it?

4   A.  This is an agreement between Dental Support Plus

5   Franchise, which is in Arizona, and Daryl Bank as a

6   salesperson.

7           MS. O'BOYLE:  Government moves in Exhibit 200R.

8           THE COURT:  200R is admitted.

9           (Government's Exhibit 200R was admitted.)

10  BY MS. O'BOYLE:

11  Q.  And the date of this agreement is March 4th, 2011?

12  A.  Yes.

13  Q.  Did you also set up Dominion Franchise to assist with

14  this process?

15  A.  Yes.

16  Q.  And did Dominion Franchise use fliers to advertise this

17  product?

18  A.  Yes, we did.

19          MS. O'BOYLE:  If we can take a look at 200, which is

20  already in.

21  BY MS. O'BOYLE:

22  Q.  I'm going to blow up on the right-hand side.  Could you

23  read what it says here in the Dominion Investment Group

24  flier.

25  A.  "Dominion Investment Group offers an absentee-owned,

Carol L. Naughton, Official Court Reporter

R. Gibson - Direct

1    fully managed dental support franchise with a five-year track

2    record producing annual profits up to 40 percent or more."

3    Q.  Ms. Gibson, do you know what the basis was for a

4    five-year track record?

5    A.  I don't.

6    Q.  Do you know what the basis was for annual profits of up

7    to 40 percent or more?

8    A.  No.

9    Q.  Did you ever sell an investment called Dazzle Dental?

10   A.  No.

11   Q.  To your knowledge, did Mr. Bank ever sell an investment

12   called Dazzle Dental?

13   A.  No.

14   Q.  Did anyone ever tell you that the five-year track record

15   was based on Dazzle Dental's statistics as opposed to Dental

16   Support Plus's statistics?

17   A.  No.

18           MS. O'BOYLE:  In fact, if we could take a look at

19   Government's Exhibit 288, which is not in evidence yet.

20   BY MS. O'BOYLE:

21   Q.  Do you recognize 288?

22   A.  Yes.

23   Q.  What is it?

24   A.  This is a Federal Disclosure Document for Dental Support

25   Plus.

R. Gibson - Direct

```
 1  Q.  Dental Support Plus Franchise?
 2  A.  Yes.
 3          MS. O'BOYLE:  Government moves in Exhibit 288.
 4          THE COURT:  It will be admitted.
 5          (Government's Exhibit 288 was admitted.)
 6  BY MS. O'BOYLE:
 7  Q.  If we could go to Page 6.  And approximately when did you
 8  begin selling Dental Support Plus Franchises?
 9  A.  In 2011, mid or halfway through, I believe.
10  Q.  And could you read the first sentence in this Franchise
11  Disclosure Document.
12  A.  "We were organized as a limited liability company in
13  Arizona on November 19, 2010."
14  Q.  Ms. Gibson, did you read this Franchise Disclosure
15  Document before you sold it to your clients?
16  A.  I did not.
17  Q.  Do you know how a company that was created in November of
18  2010 could have had a five-year track order by 2011?
19  A.  Impossible.
20          MS. O'BOYLE:  And then if we could take a look at
21  Government's Exhibit 223, just for the witness.
22  BY MS. O'BOYLE:
23  Q.  Is this an e-mail from you to a Mr. Binetti?
24  A.  Yes.
25  Q.  And are you attaching some documents related to Dental
```

—R. Gibson - Direct—

1    Support Plus Franchise?

2    A.   Yes.

3            MS. O'BOYLE:   Government moves in Exhibit 223.

4            THE COURT:   223 will be admitted.

5            (Government's Exhibit 223 was admitted.)

6            MS. O'BOYLE:   And if we could go -- Ms. Yusi, if we

7    could just go to Page 7.

8    BY MS. O'BOYLE:

9    Q.   What does this slide state?

10   A.   "Fully managed dental franchise with a six-year track

11   record of success."

12   Q.   Let's go to Page 1.   What is the date of your e-mail?

13   A.   July 19, 2012.

14   Q.   Do you know how a company that was created in 2010 could

15   have a six-year track record by 2012?

16   A.   No.

17   Q.   When you were giving this to Mr. Binetti, did you review

18   this material carefully?

19   A.   I did not.

20           MS. O'BOYLE:   If we could go to Government's

21   Exhibit 224.

22   BY MS. O'BOYLE:

23   Q.   Do you recognize this?

24   A.   Yes.

25   Q.   Is this an e-mail string with an attachment?

R. Gibson - Direct

1   A.  Yes.

2          MS. O'BOYLE:  Government moves in Exhibit 224.

3          THE COURT:  Exhibit 224 will be admitted.

4          (Government's Exhibit 224 was admitted.)

5   BY MS. O'BOYLE:

6   Q.  And this is an e-mail from you to Mr. Sellers; is that

7   right?

8   A.  Yes.

9   Q.  And now it's September 17th, 2012, so just a couple

10  months later from the previous e-mail, right?

11  A.  Yes.

12         MS. O'BOYLE:  If we could go to Page 4, please,

13  Ms. Yusi.

14  BY MS. O'BOYLE:

15  Q.  And what is the track record of success now?

16  A.  Nine-year track record of success.

17  Q.  So in three months, the company went from having a

18  six-year track record to a nine-year track record?

19  A.  Right.  It's not possible.

20         MS. O'BOYLE:  If we could go to Government's

21  Exhibit 204, please.

22  BY MS. O'BOYLE:

23  Q.  Do you recognize Government's Exhibit 204?

24  A.  Yes.

25  Q.  What is it?

—R. Gibson - Direct—

```
 1    A.   This is the Dental Support Plus Franchise Agreement.
 2              MS. O'BOYLE:  Government moves in Exhibit 204.
 3              THE COURT:  204 is admitted.
 4              (Government's Exhibit 204 was admitted.)
 5              MS. O'BOYLE:  If we can go to Government's
 6    Exhibit 205.
 7    BY MS. O'BOYLE:
 8    Q.   Do you recognize 205?
 9    A.   Yes.
10    Q.   What is it?
11    A.   This is the Dental Support Plus Area Development
12    agreement.
13              MS. O'BOYLE:  Government moves in Exhibit 205.
14              THE COURT:  205 is admitted.
15              (Government's Exhibit 205 was admitted.)
16    BY MS. O'BOYLE:
17    Q.   And so 204, you said, was --
18              MS. O'BOYLE:  If we could go to 204 for a moment.
19    BY MS. O'BOYLE:
20    Q.   This is a Franchise Agreement?
21    A.   Correct.
22    Q.   Is this different than the Franchise Disclosure Document?
23    A.   Yes.
24    Q.   Was this another document that the clients had to sign?
25    A.   Yes.
```

1262

R. Gibson - Direct

1    Q.  Was it voluminous?

2    A.  Yes.

3    Q.  Did you or anyone at the office walk people through the

4    Franchise Agreement or the Franchise Disclosure Document?

5    A.  No.

6          MS. O'BOYLE:  If you could go to Government's

7    Exhibit 205.

8    BY MS. O'BOYLE:

9    Q.  This is -- what is this agreement?

10   A.  This is the Area Development Agreement.

11   Q.  Is this different than the Franchise Disclosure Document

12   and the Franchise Agreement that we just looked at?

13   A.  Yes.

14   Q.  And so was this something else that you asked the clients

15   to sign?

16   A.  I don't know if they had to sign this one or not.  They

17   may not have.

18   Q.  Was this voluminous as well?

19   A.  That one was small.  Compared to the other ones, it was

20   very small.

21   Q.  Compared to the others?

22   A.  It was maybe 23 pages.  That one wasn't big.

23          MS. O'BOYLE:  And if we could go to the Franchise

24   Disclosure Document, Page 288.  I'm sorry.  Exhibit 203,

25   Page 288.  Sorry, Ms. Yusi.

—————R. Gibson - Direct—————

 1   BY MS. O'BOYLE:

 2   Q.  You sold a number of these in Virginia; is that correct?

 3   A.  Yes.

 4   Q.  And there was an addendum that was attached to the

 5   Franchise Disclosure Document that was specific to the State

 6   of Virginia.

 7   A.  Yes.

 8   Q.  Did you ever review that?

 9   A.  I did not.

10   Q.  Could you please read number 2.

11   A.  "The Virginia State Corporation Commission's Division of

12   Securities and Retail Franchising requires us to defer

13   payments of the initial franchise fee and other initial

14   payments owed by franchisees to the franchisor until the

15   franchisor has completed its pre-opening obligations under

16   the Franchise Agreement."

17   Q.  Ms. Gibson, when Mr. Bank sold these franchises to

18   clients, did you defer the fee until Dental Support Plus

19   Franchise engaged in its pre-opening obligations?

20   A.  We would either hold on to the fee or have it there

21   before it was sent to Dental Support Plus, but there wasn't

22   anything done to make sure that these pre-opening obligations

23   were completed.

24   Q.  Did you ultimately send the full franchise fee to

25   Mr. Maerki's company?

R. Gibson - Direct

1  A.  Yes, we did.

2  Q.  Did you verify that they had done anything on their end

3  before you sent the money?

4  A.  Not that I'm aware of.

5  Q.  Did Mr. Bank actually sell franchises to your parents?

6  A.  He did, yes.

7  Q.  Did he sell franchises through his sales representatives?

8  A.  Yes.

9  Q.  Did you keep track of how many units Dominion Franchise

10  Group sold to clients?

11  A.  Yes.

12        MS. O'BOYLE:  If we could take a look at

13  Government's Exhibit 206.

14  BY MS. O'BOYLE:

15  Q.  Do you recognize 206?

16  A.  Yes.

17  Q.  What is it?

18  A.  This is a sales tracker for Dental Plus Franchise units.

19        MS. O'BOYLE:  Government moves in Exhibit 206.

20        THE COURT:  206 is admitted.

21        (Government's Exhibit 206 was admitted.)

22  BY MS. O'BOYLE:

23  Q.  We've looked at sales trackers -- several so far; is that

24  right?

25  A.  Yes.

Carol L. Naughton, Official Court Reporter

─────────── R. Gibson - Direct ───────────

1   Q.   This is documenting who was sold and the amount and where

2   the moneys -- when the moneys were received?

3   A.   Correct.

4   Q.   And so here -- go to Page 2, Page 3.  In total, how much

5   money did investors pay into this investment?

6   A.   2,645,000.

7   Q.   And over here, does it reflect an investment by Andrea

8   Tottossy, and Joe and Andrea Tottossy?

9   A.   Yes.

10  Q.   And here, there's a limited liability company referenced,

11  Teaching and Learning for All.  What was that?

12  A.   That was the LLC that they already had established

13  that -- they used that to put their funds in to make the

14  purchase of the dental franchise.

15  Q.   And so here we have a Mr. Rangel.  What was the name of

16  his LLC?

17  A.   DSPF Rangel LLC.

18  Q.   And what about Ms. Russell?

19  A.   Hers was Barbara Russell LLC.

20  Q.   And here, Mr. Ray Chandler, who is that?

21  A.   That's my father.

22  Q.   What was his LLC?

23  A.   Ray Chandler LLC.

24  Q.   And there's a reference -- a few references to a

25  Ms. Terri Walsh.

———R. Gibson - Direct———

1    A.   Yes.

2    Q.   Was she also a client?

3    A.   Yes, she was.

4    Q.   From here in Virginia?

5    A.   Yes.

6    Q.   Now, unlike the spectrum investments that we went over,

7    what happened with an investor's funds to purchase a

8    franchise?  Did Mr. Bank keep those and take money off the

9    top like he did with the spectrum investments?

10   A.   Not when it was dental franchise units.  So 100 percent

11   of the money would go into their LLC account, and then we

12   would send that money, 100 percent of that, to Dental Support

13   Plus Franchise in Arizona, Kent Maerki's company.

14   Q.   Then how would Mr. Bank get paid?

15   A.   Mr. Maerki's company would pay a referral or a sales fee

16   to Mr. Bank.

17           MS. O'BOYLE:  Let's take a look at Government's

18   Exhibit 200E, for the witness.

19   BY MS. O'BOYLE:

20   Q.   And do you recognize down here 200E, Transaction Report?

21   A.   Yes.

22           MS. O'BOYLE:  Government moves in Exhibit 200E.

23           THE COURT:  200E is admitted.

24           (Government's Exhibit 200E was admitted.)

25   BY MS. O'BOYLE:

R. Gibson - Direct

1    Q.  We're going to go to Page 6, and you see this is a
2    Transaction Report from January to December of 2012.  So just
3    that year; is that correct?
4    A.  Correct.
5    Q.  And if you could go to Page -- let's see.  Actually,
6    right here.  Can you read the name on this Transaction
7    Report?
8    A.  Aaron Bobkin.
9    Q.  And who is Mr. Bobkin?
10   A.  He worked with Bob LaBine under RapidLink Wireless and
11   also was an agent of Dental Support Plus and also purchased
12   units himself.
13   Q.  So Mr. Bobkin in 2012 is associated with Dental Support
14   Plus Franchise?
15   A.  Yes.
16   Q.  And then we've seen e-mails with Mr. Bobkin related to
17   RapidLink Wireless?
18   A.  Correct.
19   Q.  Three years later?
20   A.  Yes.
21          MS. O'BOYLE:  And if we could go to Page 9, please,
22   Ms. Yusi.
23   BY MS. O'BOYLE:
24   Q.  And so here the column starts with Dominion Franchise
25   Group.  Do you see that?

R. Gibson - Direct

1    A.   Yes.

2    Q.   And so it's listing a number of checks.  What are those

3    checks?

4    A.   These would be the referral fees that Mr. Maerki's

5    company was paying to Dominion.

6    Q.   So these are checks coming from Dental Support Plus

7    Franchise to Dominion?

8    A.   Correct.

9    Q.   Including for Ms. Walsh?

10   A.   Yes.

11   Q.   And Mr. Chandler, your father?

12   A.   Yes.

13   Q.   If we could go to Page 6.  Can you read the name on the

14   left that I just pulled up?

15   A.   Aghee W. Smith.

16   Q.   Did you first meet Mr. Smith in connection with Dental

17   Support Plus?

18   A.   Yes.

19   Q.   Is there a number of checks that are listed going to

20   Mr. Smith?

21   A.   Yes.

22   Q.   Going to Page 7, what transpired on January 24, 2012?

23   A.   He received a check in the amount of $1,600 in regards to

24   Ray Chandler LLC.

25   Q.   Is that your father?

R. Gibson - Direct

1   A.   Yes.

2   Q.   Do you know why Mr. Smith is getting a portion of your

3   father's investment?

4   A.   I do not.

5   Q.   Were you aware back in 2012 that Mr. Smith was going to

6   get a portion of your father's money?

7   A.   No.

8   Q.   A couple lines down, does it reflect an $800 check to

9   Ms. Walsh --

10   A.   Yes --

11   Q.   -- or in connection with Ms. Walsh?

12   A.   Yes.

13   Q.   Did you know that Mr. Smith was going to get a check in

14   connection with Ms. Walsh?

15   A.   No.

16   Q.   Do you recognize the name Patricia Hundley?

17   A.   Yes.

18   Q.   Was she also an investor from here in Virginia?

19   A.   Yes, she was.

20   Q.   Were you aware that Mr. Smith was going to get $1,000 in

21   connection with Ms. Hundley?

22   A.   No.

23   Q.   Now, there are a number of references to Virginia clients

24   on this list related to Mr. Smith.

25   A.   Yes.

R. Gibson - Direct

1          MS. O'BOYLE:  Let's take a look at Government

2   Exhibit -- if you could hand her Government's Exhibit 239.

3   BY MS. O'BOYLE:

4   Q.  Do you recognize 239?

5   A.  Yes.

6   Q.  Is this a recording of a Monday morning sales meeting

7   with Mr. Maerki and Mr. Bank from October of 2013?

8   A.  Yes.

9   Q.  Did you put -- did you listen to all the clips on that

10  disk and put your initials?

11  A.  I did.

12         MS. O'BOYLE:  Government moves in Exhibit 239.

13         THE COURT:  239 will be admitted.

14         (Government's Exhibit 239 was admitted.)

15  BY MS. O'BOYLE:

16  Q.  Now, were clients getting the expected returns from this

17  investment, Ms. Gibson?

18  A.  No, they were not.

19  Q.  And who did Mr. Bank's clients call when they had

20  concerns?

21  A.  Typically they called our office.

22  Q.  And then who did they speak to at your office?

23  A.  A lot of times it was me.

24  Q.  And were you also concerned about your father's

25  investment?

R. Gibson - Direct

1    A.   Yes.

2    Q.   So you were aware of the problems in connection with this

3    investment?

4    A.   Yes, I was.

5    Q.   Despite those problems, did Mr. Bank create an entirely

6    new investment centered on Dental Support Plus?

7    A.   Yes.

8    Q.   What was that called?

9    A.   DSPF Group.

10           MS. O'BOYLE:   Let's take a look at Government's

11   Exhibit 225.

12   BY MS. O'BOYLE:

13   Q.   Do you recognize 225?

14   A.   Yes.

15   Q.   What is it?

16   A.   This is the Virginia Articles of Organization for DSPF

17   Group LLC.

18           MS. O'BOYLE:   Government moves in Exhibit 225.

19           THE COURT:   225 is admitted.

20           (Government's Exhibit 225 was admitted.)

21   BY MS. O'BOYLE:

22   Q.   So when did Mr. Bank organize this DSPF Group?

23   A.   October 5th, 2012.

24   Q.   So from 2011 through 2012, were you selling interest in

25   Group, or were you selling franchises?

R. Gibson - Direct

1   A.  Franchises.

2   Q.  And then -- but now this company is called DSPF Group,

3   and where were its offices?

4   A.  In the Dominion offices on Commuter Drive in Virginia

5   Beach.

6   Q.  Is that where all the other spectrum offices were located

7   as well?

8   A.  Yes.

9          MS. O'BOYLE:  Let's take a look at Government's

10  Exhibit 227.

11  BY MS. O'BOYLE:

12  Q.  Do you recognize 227?

13  A.  Yes.

14  Q.  What is it?

15  A.  The Articles of Organization for DSP Management LLC.

16         MS. O'BOYLE:  Government moves in Exhibit 227.

17         THE COURT:  227 is admitted.

18         (Government's Exhibit 227 was admitted.)

19         MS. O'BOYLE:  And then let's take a look at

20  Government's Exhibit 231.

21  BY MS. O'BOYLE:

22  Q.  Do you recognize 231, Ms. Gibson?

23  A.  Yes.

24  Q.  What is it?

25  A.  The Investment Offering for DSPF Group LLC.

R. Gibson - Direct

1           MS. O'BOYLE:  Government moves in Exhibit 231.

2           THE COURT:  231 is admitted.

3           (Government's Exhibit 231 was admitted.)

4    BY MS. O'BOYLE:

5    Q.  So after selling the franchises, did Mr. Bank establish a

6    pooled group of investors to invest again in Dental Support

7    Plus?

8    A.  Yes.

9    Q.  And so what is the date of this particular document?

10   A.  October of 2012.

11   Q.  If we go to Page 3, can you read the first sentence on

12   Page 3?

13   A.  "For some time Dental Support Plus has been offering

14   franchise opportunities to investors in its proven strategy."

15   Q.  Ms. Gibson, based on the returns that your clients were

16   receiving, was this a proven strategy?

17   A.  No.

18   Q.  If we could go to Page 7.  On Page 7 it talks about

19   investment fees.  It says, "An investment into the investment

20   group incurs no fees to the investor.  100 percent of the

21   investment participates directly in 100 percent of the pool

22   of franchisees in the group."

23           Do you see that?

24   A.  Yes.

25   Q.  Was that true?

Carol L. Naughton, Official Court Reporter

─────────R. Gibson - Direct─────────

1    A.   No.

2    Q.   Now, did Mr. Bank sell DSPF Group through sells agents to

3    the public?

4    A.   Yes.

5            MS. O'BOYLE:  If we can take a look at Government's

6    Exhibit 235, which is a disk.

7    BY MS. O'BOYLE:

8    Q.   Do you recognize that disk?

9    A.   Yes.

10   Q.   Is it another Monday morning conference call with

11   Mr. Maerki and Mr. Bank?

12   A.   Yes.

13   Q.   Did you initial it to verify that you've heard it and

14   that it's authentic?

15   A.   I did.

16           MS. O'BOYLE:  Government moves in Exhibit 235.

17           THE COURT:  235 is admitted.

18           (Government's Exhibit 235 was admitted.)

19           MS. O'BOYLE:  If you could play clip 1, Ms. Yusi.

20           (Audio played in open court.)

21           MS. O'BOYLE:  If you could play clip 2, please.

22           (Audio played in open court.)

23   BY MS. O'BOYLE:

24   Q.   Who was listening to these calls?

25   A.   Sales representatives.

R. Gibson - Direct

1   Q.  So he's just telling the sales representatives that they

2   all got a pay raise?

3   A.  Yes.

4           MS. O'BOYLE:  Go to clip 3.

5           (Audio played in open court.)

6   BY MS. O'BOYLE:

7   Q.  What is Mr. Bank talking about here in the conference

8   call?

9   A.  That this DSPF Group is a unitized fund.  So if somebody

10  invests in it, it's only going into DSPF, the dental

11  franchise units.

12  Q.  Is he talking about the pool?

13  A.  Correct.

14          MS. O'BOYLE:  If you could play the next clip.

15          (Audio played in open court.)

16  BY MS. O'BOYLE:

17  Q.  What did Mr. Bank mean when he says it's fully managed?

18  A.  Right off, as we saw on some of the sales materials for

19  Dental Support Plus Franchise, where it advertises a fully

20  managed existing turnkey type of investment.

21  Q.  Let's take a look at Government's Exhibit 56.  Do you

22  recognize 56?

23  A.  Yes.

24  Q.  What is it?

25  A.  This is a sales tracker for DSPF Group.

─────R. Gibson - Direct─────

1           MS. O'BOYLE:  Government moves in Exhibit 56.

2           THE COURT:  56 is admitted.

3           (Government's Exhibit 56 was admitted.)

4   BY MS. O'BOYLE:

5   Q.  And so this is -- again, the jury has seen a number of

6   these.  This is the sales tracker sheet noting who has

7   purchased?

8   A.  Correct.

9   Q.  And the first individual that purchased into DSPF Group

10  was who?

11  A.  Debra Barry.

12          MS. O'BOYLE:  If we could go to Government's

13  Exhibit 57.

14  BY MS. O'BOYLE:

15  Q.  Do you recognize Government's Exhibit 57?

16  A.  Yes.

17  Q.  What is it?

18  A.  This is the money move sheet for DSPF Group.

19          MS. O'BOYLE:  Government moves in Exhibit 57.

20          THE COURT:  57 is admitted.

21          (Government's Exhibit 57 was admitted.)

22  BY MS. O'BOYLE:

23  Q.  And, Ms. Gibson, did this money move sheet work like all

24  the others?

25  A.  Yes, it did.

R. Gibson - Direct

1    Q.  So what are you documenting here?

2    A.  The date that the funds come in, the amount that is

3    received at BayPort Credit Union into the DSPF Group account,

4    then you have the 68.333 percent that stays in the DSPF Group

5    account.  15 percent gets moved over to Dominion Private

6    Client Group.  16.666 percent gets moved over to DSP

7    Management.

8    Q.  Didn't the investment summary that we looked at state

9    that 100 percent of the funds would participate 100 percent

10   in the fund, the DSPF Group?

11   A.  Yes.

12   Q.  Was that true?

13   A.  No.

14   Q.  Let's go to Page 2.  What is reflected here on Page 2?

15   A.  This reflects ones that were sold.  So if someone owned

16   an actual franchise unit that they purchased, the DSPF Group

17   could purchase that unit and then sell it through the funds

18   that came in through new investor funds.

19   Q.  So everyone on this column, the seller column, was this

20   an earlier investor into the franchises?

21   A.  Yes.

22   Q.  Was Mr. Bank using new investor funds in his DSPF Group

23   to repay earlier investors?

24   A.  Yes.

25   Q.  Was there anything in the investment summary that stated

R. Gibson - Direct

1    that it was going to do that?

2    A.   No.

3    Q.   And, in fact, was one of the individuals that was paid

4    back for a unit your father?

5    A.   Yes.

6    Q.   And then if we can go to Page -- actually, there's

7    another individual, Mr. Tony Sellers?

8    A.   Yes.

9    Q.   And who is Mr. Sellers?

10   A.   He was a sales agent.  We met him through -- he was a

11   sales agent under Kent for Dental Support Plus Franchise.

12   Q.   Did he also end up selling Prime Spectrum?

13   A.   Yes, he did.

14           MS. O'BOYLE:  If we could go back to Government's

15   Exhibit 56, Page 2, please.

16   BY MS. O'BOYLE:

17   Q.   What are we looking at here on Page 2 of Government's

18   Exhibit 56?

19   A.   These are the completed transactions of people who wanted

20   to sell their units and were able to either get a portion or

21   all of their funds back through the DSPF Group.

22   Q.   And did you eventually start a queue of individuals that

23   wanted to get out of their DSPF franchises?

24   A.   Yes.

25   Q.   And is that what is listed here on Page 2?

—————R. Gibson - Direct—————

1   A.  Yes, it is.

2   Q.  Did you and Mr. Bank continue to sell DSPF Group to new

3   investors so that you could repay older investors?

4   A.  Yes.

5   Q.  We talked a little bit about Mr. Sellers.  Did he execute

6   any documents with respect to this transaction where he sold

7   his earlier franchises?

8   A.  Yes.

9        MS. O'BOYLE:  Let's take a look at Government's

10  Exhibit 266.

11  BY MS. O'BOYLE:

12  Q.  Do you recognize 266?

13  A.  Yes.

14  Q.  What is it?

15  A.  This is an Asset Purchase Agreement.

16  Q.  What is the date?

17  A.  September 24, 2013.

18  Q.  And is it in connection with Mr. Sellers?

19  A.  Yes, it is.

20        MS. O'BOYLE:  Government moves in Exhibit 266.

21        THE COURT:  Exhibit 266 will be admitted.

22        (Government's Exhibit 266 was admitted.)

23        MS. O'BOYLE:  And if we could go to Page 3, please.

24  BY MS. O'BOYLE:

25  Q.  What was -- how much were you going to -- was the Group

R. Gibson - Direct

1   going to pay for Mr. Sellers's franchise?

2   A.   $20,000.

3   Q.   Was that what Mr. Sellers paid originally?

4   A.   Yes.

5   Q.   And the assets here that are listed, that was for the

6   franchise territory and goodwill?

7   A.   Yes.

8   Q.   What was listed as the amount for the inventory?

9   A.   Zero.

10   Q.   What about seller's machinery?

11   A.   Zero.

12   Q.   If we could go to Page 10.  Is this a listing of accounts

13   receivable?

14   A.   Yes.

15   Q.   Are there any accounts receivable?

16   A.   No.

17   Q.   Page 14.  Was this supposed to include a list of

18   customers?

19   A.   Yes.

20   Q.   Are there any customers listed?

21   A.   No.

22   Q.   Did the Group pay the exact same amount that Mr. Sellers

23   originally paid for his franchise?

24   A.   Yes.

25   Q.   Even though there were no customers, no territory, and no

R. Gibson - Direct

1    assets?

2    A.  Correct.

3            MS. O'BOYLE:  If we could go to Government's

4    Exhibit 268.

5    BY MS. O'BOYLE:

6    Q.  Do you recognize 268?

7    A.  Yes.

8    Q.  What is it?

9    A.  This is an e-mail from Daryl Bank to Kent Maerki copying

10   myself and several other people as well.

11           MS. O'BOYLE:  Government moves in Exhibit 268.

12           THE COURT:  Exhibit 268 will be admitted.

13           (Government's Exhibit 268 was admitted.)

14   BY MS. O'BOYLE:

15   Q.  And was this in connection with the sale of Mr. Sellers's

16   units?

17   A.  Yes.

18   Q.  And what did you -- you write an e-mail here to a Cindy.

19   Who is this to?

20   A.  Cindy Maule, she worked for Kent Maerki at Dental Support

21   Plus in Arizona.

22   Q.  What is the date of your e-mail?

23   A.  October 17th, 2013.

24   Q.  And what did you tell Cindy in the first line?

25   A.  "We did a cross-transaction through the fund so Tony

R. Gibson - Direct

1    could stay anonymous."

2    Q.  That's Mr. Sellers?

3    A.  Correct.

4    Q.  And how did Mr. Maerki respond?

5    A.  "Why did Tony have to stay anonymous?"

6    Q.  And how did Mr. Bank respond to Mr. Maerki?

7    A.  "His desire to remain anonymous were several:  One, his

8    privacy; two, not broadcasting to his clients he is selling;

9    three, not broadcasting to the sales force that a top

10   salesman was liquidating; four, to avoid all the rumor and

11   conjecture that accompanies the aforementioned; and, five, I

12   also shared and agreed with Tony on all of these concerns."

13   Q.  And how did Mr. Maerki respond?  Just the first sentence.

14   A.  "I am a strong proponent of transparency, not anonymity."

15           MS. O'BOYLE:  If we can take a look at Government's

16   Exhibit 270B, as in bravo.

17   BY MS. O'BOYLE:

18   Q.  Do you recognize 270B?

19   A.  Yes.

20   Q.  What is it?

21   A.  This is an e-mail from Daryl to myself in regards to the

22   windup of DSPF Group.

23   Q.  Is this in July of 2014?

24   A.  Yes.

25           MS. O'BOYLE:  Government moves in Exhibit 270B.

Carol L. Naughton, Official Court Reporter

R. Gibson - Direct

```
 1            THE COURT:  270B is admitted.
 2            (Government's Exhibit 270B was admitted.)
 3   BY MS. O'BOYLE:
 4   Q.  In July of 2014, did Mr. Maerki start to communicate with
 5   you and Mr. Bank about shutting down Dental Support Plus?
 6   A.  Yes.
 7            MS. O'BOYLE:  If we can take a look at Government's
 8   Exhibit 270E.
 9   BY MS. O'BOYLE:
10   Q.  Do you recognize 270E?
11   A.  Yes.
12   Q.  What is it?
13   A.  An e-mail from Daryl to myself and, again, in regards to
14   the winding up and final draft of this.
15   Q.  And then is there an e-mail below that involving
16   Mr. Maerki, Mr. Bank, and Mr. Alcorn?
17   A.  Yes.
18            MS. O'BOYLE:  Government moves in Exhibit 270E.
19            THE WITNESS:  270E is admitted.
20            (Government's Exhibit 270E was admitted.)
21   BY MS. O'BOYLE:
22   Q.  This e-mail starts with an e-mail from who?
23   A.  Kent Maerki.
24   Q.  To whom?
25   A.  Daryl Bank and David Alcorn.
```

R. Gibson - Direct

1   Q.  What is the date of it?

2   A.  July 5th, 2014.

3   Q.  And what is he attaching?

4   A.  This is a memorandum that he was going to send out in

5   regards to the explanation of why DSPF was shutting down.

6          MS. O'BOYLE:  If we can take a look at Government's

7   Exhibit 272.

8   BY MS. O'BOYLE:

9   Q.  Do you recognize 272?

10  A.  Yes.

11  Q.  What is it?

12  A.  Daryl forwarding me an e-mail in regards to the -- not

13  sending out the initial response that Kent wanted to send out

14  to the franchisees.

15         MS. O'BOYLE:  Government moves in Exhibit 272.

16         THE COURT:  272 is admitted.

17         (Government's Exhibit 272 was admitted.)

18  BY MS. O'BOYLE:

19  Q.  Who is this an e-mail from?

20  A.  From Kent Maerki.

21  Q.  And who is it to?

22  A.  Lynne Shelton.

23  Q.  Who is Ms. Shelton?

24  A.  She is an attorney that Kent used.

25  Q.  And is Mr. Alcorn also on this e-mail?

R. Gibson - Direct

1    A.  Yes, he is.

2    Q.  And if you could read the first two lines of this e-mail.

3    A.  "Please do not send your letter to DSPF franchisees.

4    Upon sending it to the salespersons, I received calls that

5    frankly scare me as a result of the 'line in the sand,' 'call

6    to arms' theme of the letter."

7    Q.  And did that letter -- was there another letter that

8    ultimately went out to the franchisees?

9    A.  Yes.

10          MS. O'BOYLE:  If we could take a look at

11   Government's Exhibit 274.

12   BY MS. O'BOYLE:

13   Q.  Do you recognize 274?

14   A.  Yes.

15   Q.  What is it?

16   A.  This is a notice that did go out to the franchisees in

17   regards to shelving Dental Support Plus.

18          MS. O'BOYLE:  Government moves in Exhibit 274.

19          THE COURT:  274 is admitted.

20          (Government's Exhibit 274 was admitted.)

21   BY MS. O'BOYLE:

22   Q.  And what is the date of this memo?

23   A.  August 8th, 2014.

24   Q.  And did you continue to work with Mr. Maerki after this

25   date?

R. Gibson - Direct

1    A.  Yes.

2           MS. O'BOYLE:  If we could take a look at

3    Government's Exhibit 278.

4    BY MS. O'BOYLE:

5    Q.  Do you recognize 278?

6    A.  Yes.

7    Q.  What is it?

8    A.  This is an e-mail from me to Jennifer Revzon in regard to

9    the asset value of DSPF Group.

10          MS. O'BOYLE:  Government moves in Exhibit 278.

11          THE COURT:  278 is admitted.

12          (Government's Exhibit 278 was admitted.)

13   BY MS. O'BOYLE:

14   Q.  And, Ms. Gibson, can you tell the jury who Jennifer

15   Revzon was?

16   A.  She worked for Les Revzon at Revzon Consulting Group.

17   They were the consultants for Summit Trust Company, but they

18   also handled all the transactions and the operations for that

19   trust company.

20   Q.  And so was she connected to Summit?

21   A.  Yes.

22   Q.  What are you telling Ms. Revzon here?

23   A.  "This is the LLC that is shutting down and was used for

24   the purchase of Dental Support Plus Franchises, which has

25   failed.  Right now the asset has a $1,000-per-unit value.  We

—————R. Gibson - Direct—————

1   need to make that a zero before year end.  What do you need

2   from us to accomplish that?"

3   Q.  Why are you telling Ms. Revzon to change the value of

4   that investment?

5   A.  Because Dental Support Plus had failed, so it was now

6   shut down, and if the value remained on a client's account,

7   especially if it was an IRA and they were over 70 years old,

8   they would be required to do a required minimum distribution.

9   So they were still being charged asset fees, having to do

10  distributions on an asset that had absolutely zero value.

11          MS. O'BOYLE:  Your Honor, I have probably about 20

12  minutes or 25 minutes left.

13          THE COURT:  The Court has 1:00 anyway.

14          MS. O'BOYLE:  Thank you, Your Honor.

15          THE COURT:  Ladies and gentlemen, we're going to

16  take a break until 2:30.

17          (The jury exited the courtroom.)

18          (Recess from 12:59 p.m. to 2:34 p.m.)

19          (The jury entered the courtroom.)

20          THE COURT:  Let the record reflect the jury has

21  returned after lunch.

22          Does counsel concur?

23          MS. O'BOYLE:  The United States agrees.

24          MS. McCASLIN:  Mr. Smith agrees.

25          MR. YAROW:  Mr. Alcorn agrees.

———R. Gibson - Direct———

```
 1              THE COURT:  You may resume your examination.
 2              MS. O'BOYLE:  Thank you, Your Honor.
 3    BY MS. O'BOYLE:
 4    Q.  Good afternoon, Ms. Gibson.
 5    A.  Good afternoon.
 6    Q.  When we left off, we were talking a little bit about
 7    Summit Trust, and I'd like to pull up Government Exhibit 281.
 8    Do you recognize Government's Exhibit 281?
 9    A.  Yes.
10    Q.  And what is it?
11    A.  This is an account statement from Summit Trust Company
12    for the client Debra Barry.
13              MS. O'BOYLE:  Government moves in Exhibit 281.
14              THE COURT:  Exhibit 281 will be admitted.
15              (Government's Exhibit 281 was admitted.)
16    BY MS. O'BOYLE:
17    Q.  And so where was Summit Trust Company?
18    A.  They were in Las Vegas, Nevada.
19    Q.  And what is this statement date?
20    A.  This is from January 1st, 2013 to March 31st of 2013.
21    Q.  And what was the client?
22    A.  Debra Barry.
23              MS. O'BOYLE:  If you could go to Page 2, please,
24    Mr. Bosse.
25    BY MS. O'BOYLE:
```

R. Gibson - Direct

1   Q.  I'm going to go down here at the bottom and pull up --

2   what happened on January 25, 2013?

3   A.  The purchase of asset DSPF Group LLC, 40,500.

4   Q.  For which amount?  How much did she invest?

5   A.  $40,500.

6   Q.  When Ms. Barry made her investment into DSPF Group, what

7   did she write her check to?

8   A.  Well, first the funds went to Summit Trust Company into

9   this account.

10  Q.  And then after they went into Summit Trust, where did

11  they go?

12  A.  Then they went into the DSPF Group LLC bank account,

13  which is one of Dominion's accounts.

14  Q.  And so for someone who invested -- for example, her

15  husband, Mr. Barry, who invested in Janus Spectrum Group,

16  where did his funds go first?

17  A.  That would have gone into Summit Trust Company and then

18  into the Janus Spectrum Group account at Dominion.

19  Q.  Okay.  Now, after getting the funds and investing the

20  funds in DSPF Group, does this statement reflect that

21  Ms. Barry's $40,500 was valued at $40,500?

22  A.  Yes.

23  Q.  If we could go to Page 4.  So is this the next -- the

24  statement for Ms. Barry, the next quarter?

25  A.  Yes, it is.

R. Gibson - Direct

1   Q.   So from April 1st, 2013 to June 30th, 2013?

2   A.   Yes.

3   Q.   And what does it reflect Ms. Barry's investment is valued

4   at?

5   A.   $40,500.

6   Q.   And if we could go to Page 12.  What is this quarter?

7   A.   This is April 1st, 2014 to June 30th of 2014.

8   Q.   And what is Ms. Barry's investment valued at?

9   A.   40,500.

10  Q.   And if you could go to Page 14.  Is this the very next

11  quarterly statement?

12  A.   Yes.

13  Q.   The next quarter, what is the value of Ms. Barry's funds?

14  A.   Zero.

15  Q.   So the quarter before this she got a statement that

16  reflected that her investment was still valued at 40,500?

17  A.   Yes.

18  Q.   And then the very next quarter, it went to zero?

19  A.   Yes.

20  Q.   Why did it go to zero?

21  A.   That's when Dental Support Plus had shut down in

22  August -- right at the beginning of August of 2014.  So this

23  reflects that being shut down.

24  Q.   Okay.  And so who gave Ms. -- how did this happen?  How

25  did it end up getting to zero?  Where did that information

Carol L. Naughton, Official Court Reporter

R. Gibson - Direct

1    come from?

2    A.   That was in an e-mail that I sent to Jennifer Revzon and

3    asking what they needed from us in order to value the LLC at

4    a zero balance for that asset.

5    Q.   Now, did you always -- throughout 2012 to 2017, were you

6    always using Summit?

7    A.   I can't remember what point we stopped, but I think

8    during that period of time it was all Summit.

9    Q.   At some point during 2012 to 2017, did Summit end up in

10   receivership?

11   A.   Yes, they did.

12   Q.   What, if any, trust company did you use?

13   A.   Alliance Trust Company.

14   Q.   And so did you continue to use Alliance Trust Company?

15   A.   Yes.

16   Q.   And then at some point did you have to shift to another

17   trust company?

18   A.   Yes.  I think there was a couple other ones after that.

19   I think Provident Trust Company was one of them, IRA Services

20   Trust Company.

21   Q.   Why did you have to move out of Alliance?

22   A.   They didn't want to do business with us any longer.

23   Q.   Now, Ms. Gibson, I want to talk a little bit about what

24   you received from participating in this scheme to defraud.

25   Okay?

R. Gibson - Direct

1    A.   Okay.

2    Q.   Approximately how much money did you make from working at

3    Dominion between 2012 and 2017?

4    A.   Over that six-year period, I made approximately 500,000.

5    Q.   $500,000 total?

6    A.   Yes.

7    Q.   Did Mr. Bank provide you with a company car?

8    A.   Yes, he did.

9    Q.   What kind of a vehicle did he provide you?

10   A.   A BMW.

11   Q.   Now, what, if anything, else did you get from working at

12   Dominion?  Any other benefits?

13   A.   I can't recall right off.

14   Q.   What about Mr. Bank?  How much money did he make from

15   this scheme between 2012 and 2017?

16   A.   I know it was in the millions.

17   Q.   Could you give the jury an idea of the types of things

18   that Mr. Bank purchased with the proceeds he earned from this

19   fraud?

20   A.   I know he had very nice vehicles, there were lots of

21   jewelry, there was even a protection dog at some point.

22   Those types of items.

23   Q.   You said a protection dog?

24   A.   Yes.

25   Q.   What kind of a dog did he buy?

Carol L. Naughton, Official Court Reporter

R. Gibson - Direct

1  A.  Belgian Malinois.

2  Q.  Do you know how much he paid for that dog?

3  A.  25,000.

4  Q.  If you could take a look at Government's Exhibit 61.

5       MS. O'BOYLE:  Just for the witness, please.

6  BY MS. O'BOYLE:

7  Q.  Is this Mr. Bank's personal checking account at Wells

8  Fargo?

9  A.  Yes.

10       MS. O'BOYLE:  Government moves in Exhibit 61.

11       THE COURT:  Exhibit 61 will be admitted.

12       (Government's Exhibit 61 was admitted.)

13  BY MS. O'BOYLE:

14  Q.  In July of 2017, what, if anything, happened at the

15  Oculina Bank in Florida?

16  A.  Those accounts were shut down.

17  Q.  If you could take a look at Government's Exhibit 93.  Do

18  you recognize this?

19  A.  Yes.

20  Q.  Is this your signature?

21  A.  It is.

22       MS. O'BOYLE:  Government moves in Exhibit 93.

23       THE COURT:  Exhibit 93 comes in.

24       (Government's Exhibit 93 was admitted.)

25  BY MS. O'BOYLE:

1294

R. Gibson - Direct

1    Q.   This is a close-account authorization?

2    A.   Yes.

3    Q.   And when did you sign this?

4    A.   July 14, 2017.

5    Q.   And was this where all of Mr. Bank's investor accounts

6    were located?

7    A.   Yes.

8    Q.   Did you know why you were closing all these accounts?

9    A.   Daryl told me at that time it was because they said the

10   type of business we had and the volume of business was just

11   too much for them to handle.

12   Q.   And so were all of your accounts closed?

13   A.   Yes.

14   Q.   Were you still, even after the Oculina Bank -- after all

15   your accounts were closed out, were you still selling

16   Mr. Bank's Xcel Bandwidth investment to clients?

17   A.   Yes.

18   Q.   Were they still sending money?

19   A.   Yes.

20   Q.   What did you do after Oculina Bank closed all of your

21   bank accounts?

22   A.   We went searching for another bank.

23   Q.   Okay.  And how many other banks did you go to?

24   A.   There was a couple we went to.  I think one was PNC.

25   There might have been one other one that we didn't have any

R. Gibson - Direct

1   luck with, and we went to MIDFLORIDA Credit Union, which was
2   the next bank that opened accounts with us.
3   Q.  You said you didn't have any luck with those banks.  What
4   do you mean by that?
5   A.  Yeah.  They just said, "No, we can't open accounts for
6   you."
7   Q.  If we could go to Government's Exhibit 62.  Do you
8   recognize Government's Exhibit 62?
9   A.  Yes.
10  Q.  What is this?
11  A.  This is the application from MIDFLORIDA Credit Union.
12  Q.  Okay.  And what date did you open this account?
13  A.  July 20, 2017.
14          MS. O'BOYLE:  Government moves in Exhibit 62.
15          THE COURT:  Exhibit 62 is admitted.
16          (Government's Exhibit 62 was admitted.)
17  BY MS. O'BOYLE:
18  Q.  Ms. Gibson, is this your signature?
19  A.  It is.
20          MS. O'BOYLE:  And if we could go to Page 8,
21  Mr. Bosse.
22  BY MS. O'BOYLE:
23  Q.  Now, were there only two account statements ever issued
24  to your company by the MIDFLORIDA Credit Union?
25  A.  Yes.

Carol L. Naughton, Official Court Reporter

R. Gibson - Direct

1   Q.   Why was that?

2   A.   Because they ended up shutting our accounts down as well.

3   Q.   So MIDFLORIDA Credit Union ended up shutting your

4   accounts down as well?

5   A.   Yes.

6   Q.   So what does it reflect your starting balance was on

7   August 1st?

8   A.   $543,400.28.

9   Q.   And seven days later?

10   A.   The closeout withdrawal amount was $143,137.28.

11   Q.   Did you ask Mr. Bank why MIDFLORIDA Credit Union was --

12   you were closing your accounts there?

13   A.   I don't remember what they said as far as why the

14   accounts were closed, but it was similar to, sorry, we can't

15   do business with you, we need to close the accounts.

16   Q.   Were you concerned?

17   A.   Yes.

18   Q.   What did you say to Mr. Bank?

19   A.   I felt like we were being blackballed in the banking

20   industry.

21        MS. O'BOYLE:  If we could go to Government's

22   Exhibit 63, please.

23   BY MS. O'BOYLE:

24   Q.   Do you recognize Government Exhibit 63?

25   A.   Yes.

R. Gibson - Direct

1   Q.   What is it?

2   A.   This is an account application for Generations Credit

3   Union.

4            MS. O'BOYLE:   Government moves in Exhibit 63.

5            THE COURT:   Exhibit 63 is admitted.

6            (Government's Exhibit 63 was admitted.)

7   BY MS. O'BOYLE:

8   Q.   And up here, what date did you open the Generations

9   Federal Credit Union account?

10  A.   August 10th of 2017.

11  Q.   And was this -- this was an account in Texas?

12  A.   Correct.

13  Q.   And then after you opened this account, what happened?

14  A.   We were arrested within a couple of weeks of it.

15  Q.   Ms. Gibson, from 2012 through 2017, who did the clients

16  call after they made their investments at Dominion?  Who did

17  they speak to?

18  A.   Typically it would be me.

19  Q.   When you spoke to these clients, what did you say to

20  them?

21  A.   Depends on what they were calling in reference to or what

22  they were asking about.  I handled more on the operations

23  side of the business.  So if it was something technical or

24  things like that, I would talk to them, just kind of a

25  general high overview of things.  If they had a lot of deep

R. Gibson - Direct

1   questions, I would either set up a time that they could speak
2   with Daryl --
3   Q.   Did clients raise concerns with you?
4   A.   Yes, they did.
5   Q.   What did you do when the clients raised concerns?
6   A.   Let Daryl know.  And other than that, just talked to them
7   and, you know -- nothing changed.  Nothing happened.
8   Q.   Did you ever challenge Mr. Bank about what you all were
9   doing?
10  A.   Other than as you saw in one of the e-mails where I would
11  raise some concerns where I was upset about some things and
12  not comfortable with things, that was about as far as I took
13  it.
14  Q.   Did you trust Mr. Bank?
15  A.   Yes.
16  Q.   Can you explain to the jury how you -- how you went to
17  work every day and transferred 50 percent or 60 percent of
18  victim retirement funds into Mr. Bank's control?
19  A.   There's no good excuse for that.  There is none.
20  Q.   After the Virginia State Corporation Commission sued you,
21  did you think about leaving?
22  A.   Yes.
23  Q.   And that was in 2015?
24  A.   Yes.
25  Q.   Did you leave?

————R. Gibson - Direct————

1    A.   I did not.

2    Q.   Why?

3    A.   I was the primary breadwinner in my family.  I cared a

4    lot about Mr. Bank.  And I didn't do what I should have done

5    then and walked away and called the authorities.

6    Q.   You were the primary breadwinner for your family?

7    A.   Yes.

8    Q.   Do you have children?

9    A.   Yes.

10   Q.   How many children do you have?

11   A.   Five.

12   Q.   Did you have to have funds to pay an attorney to

13   represent you with the Virginia State Corporation Commission?

14   A.   Yes.

15   Q.   Did anybody give you funds to hire an attorney?

16   A.   It was paid for through the company.

17   Q.   Through which company?

18   A.   Daryl Bank and Dominion.

19   Q.   And did Mr. Bank also get attorneys through the company?

20   A.   Yes.

21   Q.   Did you have the same lawyers or different lawyers?

22   A.   For the civil case with the Virginia State Corporation

23   Commission, it was the same.  Once it went to criminal,

24   that's when different lawyers were hired.

25   Q.   Ms. Gibson, at one point, did you leave?

─────R. Gibson - Direct─────

1   A.   Yes.

2   Q.   And do you recall approximately when you left?

3   A.   It was January of 2017.

4   Q.   And before you left, what, if anything, did Mr. Bank give

5   you?

6   A.   $10,000 in cash.

7   Q.   Did you need this money?

8   A.   Yes.

9   Q.   After Mr. Bank gave you $10,000 in cash, did you

10  eventually decide to return to work with him?

11  A.   I did.

12  Q.   And why did you do that, Ms. Gibson?

13  A.   Again, being the breadwinner for my family and needing a

14  job, caring a lot about Mr. Bank, the people we worked for, I

15  made some really bad decisions.

16  Q.   When you returned -- how long were you gone for, do you

17  recall?

18  A.   I would say about three months, two or three months.

19  Q.   Two or three months?  After those two or three months and

20  you returned, had anything changed?

21  A.   No.

22  Q.   Were you still taking large amounts of investor funds

23  straight off the top of investments?

24  A.   Yes.

25  Q.   Were you still selling spectrum investments?

———R. Gibson - Direct———

1  A.  Yes.

2  Q.  After you were arrested in August of 2017, did you

3  continue to work with Mr. Bank?

4  A.  Yes.

5  Q.  And what, if anything, changed after that, after you were

6  arrested and working with Mr. Bank?  Did anything change?

7  A.  At that point, it was working with him and preparing a

8  defense for this case.

9  Q.  For the next two years, did you work side by side with

10  Mr. Bank in defense of your case?

11  A.  Yes.

12  Q.  And why was that?

13  A.  Same role.  What I had always done for him, I just kept

14  continuing to do it.

15  Q.  And then ultimately, Ms. Gibson, what did you decide to

16  do in 2019?

17  A.  Take a plea agreement.

18  Q.  Why did you finally take a plea agreement in connection

19  with your case?

20  A.  It was the right thing to do.

21  Q.  Ms. Gibson, do you regret the conduct that you engaged in

22  between 2012 and 2017?

23  A.  Yes, I do.

24        MS. O'BOYLE:  Thank you, Ms. Gibson.  Please answer

25  any questions that the Court or counsel have for you.

———————— R. Gibson - Cross (By Mr. Yarow) ————————

1    THE COURT:  Cross-examination.

2                    CROSS-EXAMINATION

3  BY MR. YAROW:

4  Q.  Good afternoon, Ms. Gibson.  My name is Rick Yarow.  I

5  represent David Alcorn.

6  A.  Good afternoon.

7  Q.  You say you took the plea agreement in 2019?

8  A.  Correct.

9  Q.  And in that plea agreement, there was a provision, that

10  I'm sure your lawyer explained to you, that if you cooperate,

11  that you would get credit for that?

12  A.  I was told that you could get credit for that, but

13  there's certainly no guarantees of what could happen at that

14  point.

15  Q.  No guarantees but that there's a possibility that if you

16  cooperate, you would receive credit for that?

17  A.  Yes.

18  Q.  And the credit would be you go back before the judge and

19  receive a reduction in your sentence?

20  A.  Yes.

21  Q.  That's why you're here today testifying -- well, part of

22  the reason, perhaps, why you are here today testifying is

23  that you would like to receive that credit in reduction in

24  your sentence; is that correct?

25  A.  I would like to.  I do not expect to.

———————R. Gibson - Cross (By Mr. Yarow)———————

1   Q.  Mr. Alcorn -- to your knowledge, he was not involved with

2   the Dental Support franchise, was he?

3   A.  Not to my knowledge.

4   Q.  Okay.

5           MR. YAROW:  Would the government mind pulling up

6   Government Exhibit 311.

7   BY MR. YAROW:

8   Q.  And, Ms. Gibson, I'm just going to ask you about this

9   because it struck me.  This was a series of checks that you

10  sent to Mr. Alcorn that the government went through --

11  A.  Yes.

12  Q.  -- that were introduced.

13          And the first one is made out to David Alcorn rather

14  than Janus Spectrum.  Do you see that?

15  A.  Correct.  Yes.

16  Q.  Was that just a mistake on your part?  You didn't know

17  who to make that out to?

18  A.  Yeah.  When Daryl had said -- "Hey, with these invested

19  funds," I said, "who do I need to pay, or where does this

20  go?"  He said, "Send the funds to David Alcorn."  So I wrote

21  the check out to him personally, not realizing it needed to

22  go to the company.

23  Q.  And all the other checks, you corrected that?

24  A.  I did, yes.

25  Q.  And there was also -- if you scroll down to the next page

R. Gibson - Cross (By Mr. Yarow)

1  below the check, there's a Services Agreement.

2  A.   Yes.

3  Q.   And this Services Agreement would -- so when you --

4  Mr. Alcorn would send you a Services Agreement for the LLC?

5  A.   Yes.

6  Q.   And you would create it?

7  A.   Yes.

8  Q.   And when you sent a check to Mr. Alcorn, it seems like

9  you signed the Services Agreement and sent it back with the

10 check; is that correct?

11 A.   Correct.

12 Q.   And the Services Agreement dictated the terms of the

13 relationship between Janus Spectrum LLC and the LLC that

14 Daryl Bank formed?

15 A.   Correct.

16 Q.   Okay.  And when Daryl Bank or his salespeople would go

17 out and sell what they called an investment, would they, to

18 your knowledge, make the customer aware of the relationship

19 that the LLC had with Janus Spectrum?

20 A.   I was not involved in sales, so I'm not sure what was

21 presented at that point.

22 Q.   Okay.  Can you look at the second paragraph of this

23 Services Agreement?

24 A.   Okay.

25 Q.   I know you said that you did not read it when you first

——————— R. Gibson - Cross (By Mr. Yarow)———————

1   received it.

2   A.   Right.

3   Q.   But at this point you've probably read these, haven't

4   you?

5   A.   I have read through them.  It's been a while.  So...

6   Q.   We'll walk through it.  The first paragraph where it

7   starts with "whereas," can you go ahead and read that?

8   A.   If you can blow it up for me.

9   Q.   Thank you.

10  A.   "Whereas Janus is in the business of brokering and

11  coordinating the preparation and filing with the Federal

12  Communications Commission Form 601-FCC, Application For Radio

13  Service Authorization, application for the purpose of

14  obtaining 800-megahertz specialized mobile radio SMR."

15  Q.   Going forward, I'm going to ask you about a couple of

16  paragraphs.  You can read to yourself, and then I'm going to

17  ask you questions about that paragraph.

18  A.   Okay.

19  Q.   On this paragraph, it plainly states that what is being

20  done by Janus Spectrum is that they are -- they are preparing

21  and filing a Form 601-FCC application with the FCC; is that

22  correct?

23  A.   Correct, yes.

24  Q.   Okay.  Do you know if Daryl Bank or any of his

25  salespeople related that that's what Janus Spectrum was

R. Gibson - Cross (By Mr. Yarow)

1    doing, this was an application service?

2    A.  I know I had always heard it was, yeah, that David

3    Alcorn's company was preparing the applications for the FCC

4    licenses.

5    Q.  Was that explained to the members of the LLC?

6    A.  That, I don't know.

7    Q.  Okay.  If you go to -- I'm sorry, I'm having a hard time

8    reading.  I think it's on the next page.  It's the language

9    about no guarantee.  I think it's on the second page.

10            Yes.  Can you read to yourself paragraph 4, please,

11   after it's blown up?

12   A.  Yes.

13   Q.  Let me know when you're done.

14   A.  (Witness complies.)

15            Okay.

16   Q.  Were you aware that there was no guarantee that the FCC

17   would even grant a license?

18   A.  No.

19   Q.  Were you aware that Janus Spectrum was -- had it in their

20   agreement with the LLC that there was no guarantee that a

21   license would be granted?

22   A.  I did not realize that.

23   Q.  And if you can go to paragraph number 5, please.  Would

24   you read that -- just if you can read that paragraph to

25   yourself, please.

─────────────── R. Gibson - Cross (By Mr. Yarow)───────────────

 1  A.  (Witness complies.)

 2       Okay.

 3  Q.  So were you aware that there was the construction -- that

 4  the federal FCC required the construction of a site in order

 5  to maintain the license if it was granted?

 6  A.  No, I was not.

 7  Q.  To your knowledge, did Daryl Bank or his salespeople

 8  relate that to the members of the LLC?

 9  A.  That, I don't know.

10  Q.  Okay.

11       MR. YAROW:  I'm sorry, if you can keep that

12  paragraph blown up, please.  Thank you.

13  BY MR. YAROW:

14  Q.  And the second full sentence that, "It's the

15  responsibility for the construction and maintenance of the

16  site by the person that has the license."  Were you aware of

17  that?

18  A.  No.

19  Q.  Was that information, to your knowledge, related by Daryl

20  Bank or his sales associates to the members of the LLCs?

21  A.  That, I don't know.

22  Q.  Okay.

23       MR. YAROW:  And if you can reduce that, please.  If

24  you can blow up paragraph number 7.

25  BY MR. YAROW:

─────────────── R. Gibson - Cross (By Mr. Yarow)───────────────

1   Q.  If you can just read the first sentence to yourself,

2   please.

3   A.  (Witness complies.)

4          Okay.

5   Q.  Did you realize that Janus Spectrum was expecting an

6   18 percent commission on any profits derived from the use or

7   sale or lease of that license --

8   A.  I didn't --

9   Q.  -- that came from the FCC?

10  A.  I'm sorry.

11  Q.  Are you aware whether or not Daryl Bank or his sales

12  associates related that to the members of the LLC?

13  A.  That, I don't know.

14  Q.  I'm going to ask you a little bit of an unfair question,

15  but the government did the same.

16          18 percent times zero is what?

17  A.  Zero.

18  Q.  Right.  So if there's no profit made, then there's no

19  18 -- 18 percent is zero?

20  A.  Correct.

21  Q.  And at some point in time, were you -- there was a -- the

22  first agreement was called the Service Agreement that Janus

23  Spectrum was using that they sent to you.

24  A.  Yes.

25  Q.  Did there come a time that there was another agreement

R. Gibson - Cross (By Mr. Yarow)

1   that replaced it?

2   A.   Yes.

3   Q.   Okay.  And do you recall the name of that agreement?  Was

4   it called Commercialization Agreement?

5   A.   Commercialization Agreement.

6   Q.   So when you received the Commercialization Agreement, did

7   you read that?

8   A.   I did not.

9   Q.   Okay.  Do you know whether or not that changed any of the

10  terms of what I had previously gone through?

11  A.   I don't know.

12  Q.   Do you know if it had changed its terms, do you know

13  whether or not Daryl Bank had related that information to the

14  members or his sales agents relayed that information to the

15  members of the LLC?

16  A.   I don't know.

17  Q.   And do you have any knowledge of whether or not there

18  were any applications that were ever submitted by Janus

19  Spectrum?

20  A.   I know there were a few licenses that were granted, so

21  that would tell me the applications were submitted.

22  Q.   Did you receive copies of those licenses?

23  A.   I believe we did.

24  Q.   So you contracted for the application of a license?

25  A.   Yes.

——— R. Gibson - Cross (By Mr. Yarow)———

1   Q.  You received the license?

2   A.  Yes.  It was -- I remember logging into a website to be

3   able to see the ownership of the license, so it may have just

4   been on that too.  I'm not sure.

5   Q.  But it did confirm that your LLC was now the owner -- the

6   LLC that was created, whether it be Prime Spectrum, Janus,

7   whatever, this, that, all the different names of either

8   Spectrum or Janus -- that the license had been obtained by

9   that entity?

10  A.  Correct.

11  Q.  Okay.  And it is a bit confusing.  Daryl loved using the

12  word "Janus," and he loved using the word "spectrum."  None

13  of those entities have any relationship, any legal

14  relationship -- let me rephrase that question.

15          Janus Spectrum LLC, the organization owned by David

16  Alcorn, or partially owned by David Alcorn, it had no

17  ownership interest in any of these other LLCs; is that

18  correct?

19  A.  Correct.

20  Q.  And Janus Spectrum had no management control of any of

21  these LLCs?

22  A.  Correct.

23  Q.  Daryl was the sole manager, or maybe you were on some of

24  them?

25  A.  That's right.

---

R. Gibson - Cross (By Mr. Yarow)

1   Q.  I notice that when you sent the check to Janus Spectrum
2   along with the signed agreement, that it did not list who the
3   members of the LLC were; is that correct?
4   A.  Correct.
5   Q.  So is there any way for David, that you know of, for
6   David to have known who the members of the LLC were?
7   A.  No.
8        MS. O'BOYLE:  Objection.  Lack of foundation as to
9   what's going on in David's head.
10       THE COURT:  Sustained.  You might want to rephrase
11  it, Counsel.
12       MR. YAROW:  Yes, sir.
13  BY MR. YAROW:
14  Q.  How were the members of the LLC determined?
15  A.  They would get into the LLC as far as when they made
16  their purchase.  So when their investor funds came in, then
17  now they purchased into that member LLC, so that they were
18  then a part of that LLC.
19  Q.  Would you maintain a list -- would the name and contact
20  information of that person be recorded with the LLC
21  documents?
22  A.  So you saw my sales tracker sheet.  That would have the
23  names of the individuals, and then we would have some type of
24  contact software management system that had their contact
25  information.

---

-------- R. Gibson - Cross (By Mr. Yarow) --------

1   Q.  Okay.  Were either of those pieces of information
2   available to David Alcorn?
3   A.  No.
4   Q.  So as far as you knew -- you may have already answered
5   this, and I apologize.  As far as you know, David Alcorn did
6   not know who the members of the LLC were or their contact
7   information?
8           THE COURT:  Sustained.
9           MR. YAROW:  I may have asked that already.
10          THE COURT:  It calls for speculation.
11          MR. YAROW:  If you can pull up Government 312,
12  please.
13  BY MR. YAROW:
14  Q.  This is the -- when Daryl first started the Janus group,
15  this is the instructions he gave you on how to divide the
16  money up?
17  A.  Correct.
18  Q.  Did David Alcorn or Janus Spectrum have any say in how
19  this was done?
20  A.  Not that I'm aware of.
21  Q.  Okay.  He was not part of the conversation between you
22  and Daryl?
23  A.  Daryl simply handed this to me and said, "Here's how to
24  use the money move sheet for the new Janus Spectrum deal."
25  Q.  And as far as you know, David Alcorn or Janus Spectrum

——————R. Gibson - Cross (By Mr. Yarow)——————

1    was never a member of any of these LLCs?

2    A.  Correct.

3    Q.  I'm going to jump to the Xcel Bandwidth company.  You

4    testified David Alcorn was a -- he provided consulting

5    services.

6    A.  Correct.

7    Q.  Did David Alcorn or -- was it David Alcorn that was

8    providing it, or was it Janus Spectrum that was providing the

9    consulting services?

10   A.  David Alcorn.

11   Q.  And did David Alcorn have any ownership in that company

12   that you know of?

13          MS. O'BOYLE:  Object to lack of foundation as to

14   what company.  There's a lot of companies.

15          THE COURT:  All right.  Clean it up.

16   BY MR. YAROW:

17   Q.  The first company was Xcel Broadband, and it became Xcel

18   Bandwidth?

19   A.  Yes.

20   Q.  Xcel Bandwidth is the company that hired David Alcorn as

21   a consultant; is that correct?

22   A.  Correct.

23   Q.  Xcel Bandwidth, did David have any ownership in that

24   company?

25   A.  No, he did not.

R. Gibson - Cross (By Mr. Yarow)

1  Q.  Did David have any control in that company other than the

2  services he offered for consulting?

3  A.  No, he did not.

4  Q.  And was David paid for that consulting?

5  A.  Yes, he was.

6  Q.  Was he paid on an hourly basis?

7  A.  It -- I don't know if it was hourly.  Once he provided

8  the invoices to Daryl, then -- and Daryl approved them, then

9  they were paid.  I have to look back at the actual invoices

10  to see what was on them.

11  Q.  The invoices have been entered.  We don't need to pull

12  them back up, but if they show this many hours, that means he

13  was paid by the hour; is that correct?

14  A.  Yes.

15  Q.  Janus Spectrum received a flat fee for their services in

16  relation to the various LLCs with the spectrum business; is

17  that correct?

18  A.  Can you ask that one more time?  Sorry.

19  Q.  Yes.

20        When Janus Spectrum was paid the checks that were

21  sent on -- when I showed you Government 311 --

22  A.  Yes.

23  Q.  -- just a minute ago, it was $42,000?

24  A.  There was one, I think, in that amount, yes.

25  Q.  Those checks, they were $42,000 or a multiple of $42,000

——————— R. Gibson - Cross (By Mr. Yarow) ———————

1   depending on how many applications were being submitted; is
2   that correct?
3   A.  Yes.  I think it was 42,600 for each one.
4   Q.  42,600?
5   A.  Yes.
6   Q.  So if Janus Spectrum was being paid, if they did two --
7   if they did two applications, it would be two times the 42-6;
8   is that correct?
9          MS. O'BOYLE:  I'm just going to object.  Calls for
10  speculation and lack of --
11         THE COURT:  Sustained.  I think, Mr. Yarow, you may
12  need to pull out a specific application to help her calculate
13  what you're talking about.
14         MR. YAROW:  Okay.  Then we'll go -- if the
15  government would pull up G-311A.  I think that's one that has
16  multiples, I think.
17             If you can go to B.
18             C.  There you go.  Thank you.
19  BY MR. YAROW:
20  Q.  This check is more than the $42,600.  How was this check
21  determined, if you recall?  The amount of the check, how was
22  it determined?
23  A.  Yeah.  In the beginning, it was 52,500 per economic area
24  for the license application.
25  Q.  Okay.  And then the price was later reduced?

———————————— R. Gibson - Cross (By Mr. Yarow)————————————

1    A.   Correct.

2    Q.   Okay.  And does this check reflect a pay for more than

3    one application?

4    A.   If you scroll down, I think in the Service Agreement, it

5    will show the exact economic areas for which licenses were

6    obtained.

7    Q.   I think it's the last page.

8    A.   Yes.

9    Q.   Am I able to scroll?

10   A.   Yeah.  So there's two economic areas for license

11   applications, each at 52,500.

12   Q.   And there was -- it was Government's Exhibit 318C.  It

13   was an audio clip.  I'm not going to ask to replay it.  But

14   do you recall where David Alcorn stated Sprint would be --

15   would not be interested in only two markets during his sales

16   meeting?

17   A.   Not that I recall.

18   Q.   Okay.  Thank you.

19        And are you familiar with what it means -- I'm

20   sorry.

21        Do you recall David in a sales meeting ever saying

22   that the applications could not be submitted to the FCC until

23   a market is released or a public notice is made by the FCC?

24        MS. O'BOYLE:  Objection.  Hearsay.  He's trying to

25   get his own client's statements in.

—————————— R. Gibson - Cross (By Ms. McCaslin) ——————————

1           THE COURT:  Sustained.

2           MR. YAROW:  That's all the questions I have, Your

3    Honor.

4           Thank you, Ms. Raeann.

5           THE WITNESS:  Thank you.

6                        CROSS-EXAMINATION

7    BY MS. McCASLIN:

8    Q.  Good afternoon, Ms. Gibson.  My name is Lindsay McCaslin.

9    I represent Bill Smith.

10   A.  Good afternoon.

11   Q.  I just want to start off with some questions about Daryl

12   Bank.  You said that you worked with him at Resource Bank

13   first, right?

14   A.  Correct.

15   Q.  And he was an investment banker there?

16   A.  Investment advisor, financial advisor.

17   Q.  So did he sell stocks, bonds, mutual funds?

18   A.  Yes.

19   Q.  And he was successful?

20   A.  Correct.

21   Q.  And then he had a similar role at Bank of the

22   Commonwealth?

23   A.  Yes.

24   Q.  And there, was he in charge of the investment division?

25   A.  Yes.

R. Gibson - Cross (By Ms. McCaslin)

1   Q.   So between 2005 and 2017, so about a 12-year period, when

2   Daryl moved employers, you went with him?

3   A.   I did.

4   Q.   You didn't have to go with him, right?

5   A.   No, I didn't.

6   Q.   You didn't get fired from them?

7   A.   No.

8   Q.   You just chose to go with him?

9   A.   Yes.

10  Q.   One of the reasons you stayed with him is because you

11  trusted him?

12  A.   I did.

13  Q.   And Daryl can be very enthusiastic, right?

14  A.   Yes.

15  Q.   He's believable and persuasive?

16  A.   Yes.

17  Q.   And beyond just a boss or a colleague, you loved him,

18  right?

19  A.   I did.

20  Q.   And there was almost nothing Daryl knew that you didn't

21  in the company?

22          MS. O'BOYLE:   Well, objection as to calls for

23  speculation as to what went on in Mr. Bank's head.

24          THE COURT:   Sustained.

25  BY MS. McCASLIN:

————— R. Gibson - Cross (By Ms. McCaslin) —————

1   Q.   You worked with Daryl every day?

2   A.   Yes.

3   Q.   You were copied on just about every e-mail?

4   A.   Several.  Not all, but several.

5   Q.   And he confided in you?

6   A.   What do you mean by "confided" in me?

7           THE COURT:  Don't ask her questions.

8           THE WITNESS:  I'm sorry.

9   BY MS. McCASLIN:

10  Q.   So you were in on every meeting, almost?

11  A.   No.

12  Q.   No?

13  A.   No.

14  Q.   Okay.  You guys had lunch every day together?

15  A.   Not every day.

16  Q.   Most days?

17  A.   All depends.  Many days we didn't take lunch.

18  Q.   Okay.  And any time that you were about to quit, he gave

19  you a raise or a reason to stay, right?

20  A.   No.

21  Q.   No?

22  A.   No.

23  Q.   Okay.  So when you were going to leave after DSPF, you

24  decided to stay with Daryl, right?

25  A.   Yes.

R. Gibson - Cross (By Ms. McCaslin)

1   Q.   Okay.  And when you were thinking about leaving in 2017,
2   Daryl gave you $10,000, right?
3   A.   That's correct.
4   Q.   And when you were living in Ohio earlier on, he got you
5   to move to Virginia by doubling your pay, right?
6   A.   Correct.
7   Q.   I want to start off by talking about DSPF, and we'll
8   leave DSPF Group for a little bit later.  Okay?
9   A.   Okay.
10  Q.   So DSPF was created by Kent Maerki in Arizona, right?
11  A.   Yes.
12  Q.   And your office was selling franchises of DSPF to the
13  clients?
14  A.   Correct.
15  Q.   Now, many of the clients that Daryl and Roger sold
16  franchises to had clients here in Virginia?
17  A.   Yes.
18  Q.   And your office was able to sell franchises in Virginia
19  because it had been approved as a franchise by the state?
20  A.   Correct.
21          MS. McCASLIN:  Mr. Grindrod, if we can bring up,
22  just for the witness, Smith 30.
23          And for the Court, pursuant to our stipulation,
24  Government 2000, under category A-1, I move to admit this
25  under the State Corporation Commission.

Carol L. Naughton, Official Court Reporter

—————— R. Gibson - Cross (By Ms. McCaslin) ——————

1    THE COURT:  Any objection?

2    MS. O'BOYLE:  No objection, Your Honor.

3    THE COURT:  Smith 30 will be admitted.

4    (Defendant Smith's Exhibit 30 was admitted.)

5  BY MS. McCASLIN:

6  Q.  Ms. Gibson, who is this from?

7  A.  Commonwealth of Virginia, State Corporation Commission.

8  Q.  And who is the letter to?

9  A.  Lynne Shelton, Esquire, of Shelton & Power LLC.

10 Q.  Do you know what kind of law Lynne Shelton specialized

11 in?

12 A.  I know one of her specialties was franchises.

13 Q.  And if we can look at this first paragraph, can you read

14 that first sentence, please?

15 A.  "The Division of Securities and Retail Franchising,

16 'Division,' has received the application to renew

17 registration of the above-named franchise in the Commonwealth

18 of Virginia."

19 Q.  Okay.  And the next sentence, please.

20 A.  "Please be advised that the renewal application has been

21 approved with an effective date of June 9, 2012."

22 Q.  Thank you.

23    MS. McCASLIN:  Mr. Grindrod, if we could bring up

24 Smith 32, just for the witness, please.

25    And for the Court, pursuant to the stipulation,

-------- R. Gibson - Cross (By Ms. McCaslin) --------

1    Government 2000, under A-18, we move to admit Smith 32.

2           THE COURT:  Any objection?

3           MS. O'BOYLE:  No objection, Your Honor.

4           THE COURT:  Smith 32 will be admitted.

5           (Defendant Smith's Exhibit 32 was admitted.)

6    BY MS. McCASLIN:

7    Q.  Who is this letter from?

8    A.  Shelton & Power LLC, Attorneys At Law.

9    Q.  And it is going to who?

10   A.  The Franchise Examiner of the Virginia State Corporation

11   Commission, Securities and Franchising Division.

12   Q.  Now, if I scroll down here a bit, you see that there's a

13   certification here.

14   A.  Yes.

15   Q.  And whose name appears to be signed here at the bottom?

16   A.  Kent Maerki.

17   Q.  Correct.

18          And if you don't mind reading that first paragraph

19   or that first sentence under "Certification."

20   A.  "I certify and swear under penalty of the law that I have

21   read and know the contents of this application, including the

22   Franchise Disclosure Document with an issuance date of

23   January 4, 2011, attached as an exhibit, and that all

24   material facts stated in all those documents are accurate,

25   and those documents do not contain any material omissions."

Carol L. Naughton, Official Court Reporter

R. Gibson - Cross (By Ms. McCaslin)

1   Q.  Thank you, Ms. Gibson.

2   A.  Yes.

3   Q.  I just have one more similar document.

4        MS. McCASLIN:  Mr. Grindrod, for the witness, could

5   you bring up Smith 33.

6        Pursuant to the stipulations under A-18, I move to

7   admit this.

8        MS. O'BOYLE:  No objection, Your Honor.

9        THE COURT:  Smith 33 is admitted.

10       (Defendant Smith's Exhibit 33 was admitted.)

11  BY MS. McCASLIN:

12  Q.  What is this?

13  A.  Uniform Franchise Registration Application.

14  Q.  And who received it?

15  A.  Department of Corporations, San Francisco.

16  Q.  And that was on April 20, 2011?

17  A.  Yes.

18  Q.  Thank you.

19       MS. McCASLIN:  We can take that down, Mr. Grindrod.

20  Thank you.

21  BY MS. McCASLIN:

22  Q.  The franchise of DSPF kept getting approved every year in

23  Virginia until Mr. Maerki shut it down, right?

24  A.  Yes.

25  Q.  And that was in 2014?

———— R. Gibson - Cross (By Ms. McCaslin) ————

1  A.  Yes.

2  Q.  For the marketing materials for Dental Support Plus

3  Franchise, that all came from Mr. Maerki?

4  A.  Yes, it did.

5  Q.  And Mr. Maerki kept the salesmen and the clients informed

6  with memos that he sent out?

7  A.  Yes.

8  Q.  And weekly calls?

9  A.  Yes.

10  Q.  And did you ever join those calls?

11  A.  I didn't.

12  Q.  Okay.  Did you ever have a chance to talk to Mr. Maerki

13  about Dental Support Plus Franchise?

14  A.  I mean, I had conversations with him.  Of course, I'm

15  sure some were about Dental, but not as far as deals.  Again,

16  I handled more on the operational side.  So if I talked to

17  him, it probably would have been about a process, you know,

18  paperwork or sales, things like that.

19  Q.  Mr. Maerki, though, was always optimistic about DSPF?

20          MS. O'BOYLE:  Objection.  Hearsay.

21          THE COURT:  Sustained.

22  BY MS. McCASLIN:

23  Q.  His mood, when you talked to him about DSPF, was

24  positive?

25  A.  Yes.

R. Gibson - Cross (By Ms. McCaslin)

1   Q.   And he was -- this was such a good plan, that you
2   actually convinced your parents, or your parents were
3   convinced to buy $40,000 worth of DSPF?
4   A.   Yes.
5   Q.   So they gave $40,000 to Mr. Maerki?
6   A.   Correct.
7   Q.   And you wouldn't have recommended this to your parents if
8   you had originally thought that DSPF was going to fail,
9   right?
10  A.   Correct.
11  Q.   Now, as we just said, we know that DSPF was shelved in
12  August 2014, right?
13  A.   Yes.
14  Q.   Now, just a few months before Mr. Maerki shut down DSPF,
15  do you recall a conference in Las Vegas?
16  A.   Yes.
17  Q.   Was that around March 2014?
18  A.   Yes, it was.
19  Q.   Did you attend that?
20  A.   I did.
21  Q.   Mr. Maerki spoke at the conference, right?
22  A.   Yes, he did.
23  Q.   Was he very energetic?
24  A.   Yeah.
25  Q.   Encouraging for sales?

———— R. Gibson - Cross (By Ms. McCaslin)————

1    MS. O'BOYLE:  Objection.  Hearsay.

2    MS. McCASLIN:  Your Honor, it's encouraging.

3    THE COURT:  I think she can testify about how she

4    perceived it.  So the Court will overrule it.

5    THE WITNESS:  Yes.

6    BY MS. McCASLIN:

7    Q.  He was encouraging?

8    A.  Yes.

9    Q.  And there was never any advice to stop selling?

10   A.  No.

11   Q.  Now, you and all of the salesmen received a memo from

12   Mr. Maerki on July 5, 2014, that DSPF was out of money,

13   right?

14   A.  Yes.

15   Q.  But two days before that, on July 3rd, Daryl talked to

16   Mr. Maerki individually, right?

17   A.  Yes.

18   Q.  Okay.  So before everybody else, you and Daryl knew that

19   Kent Maerki was about to shelve DSPF?

20   MS. O'BOYLE:  Well, objection.  Lack of foundation.

21   THE COURT:  Sustained.  Sustained as to what Daryl

22   knew.

23   MS. McCASLIN:  Mr. Grindrod, can you bring up

24   Government 271?

25   BY MS. McCASLIN:

————— R. Gibson - Cross (By Ms. McCaslin) —————

1   Q.  Do you recognize this?

2   A.  I don't think I'm on that e-mail.

3   Q.  Okay.  I believe you did testify to it on direct,

4   correct?

5           MS. O'BOYLE:  Objection.  Lack of foundation.  No,

6   she did not.

7           THE COURT:  Wait a minute.

8           MS. McCASLIN:  If we can bring up Government 270A.

9           THE COURT:  Hold on.  With respect to the objection,

10  I didn't rule on the objection.

11          It was not clear what you were asking the witness.

12  "I believe you did testify to it."  Are you talking about the

13  exhibit or a specific question or what?

14          MS. McCASLIN:  Your Honor, I'm going to just move on

15  to a different -- I'm just going to move on to a different

16  exhibit.  It will be much more clear.

17          THE COURT:  All right.

18          MS. McCASLIN:  If we can bring up Government's

19  Exhibit 270A, which has been admitted by the government.

20          Just technical difficulties.  Just one moment.

21          (Pause in the proceedings.)

22  BY MS. McCASLIN:

23  Q.  Now, you saw this e-mail just recently, right, just

24  today?

25  A.  Yes, I did.

R. Gibson - Cross (By Ms. McCaslin)

1  Q.  And if I scroll down, you and Daryl are talking on
2  July 3rd, correct?
3  A.  Yes.
4  Q.  And you were talking about how dealing with the clients
5  is going to be hard, right?
6  A.  Yes.
7  Q.  And you are talking about DSPF closing down?
8  A.  Correct.
9  Q.  And you know this two days before the major e-mail gets
10 sent out to all the salesmen?
11 A.  Yes.
12 Q.  Now, the day after this, Mr. Maerki had sent you and
13 Daryl a draft letter from Shelton & Power, right?
14 A.  I don't recall right off.
15 Q.  But Mr. Maerki did continue to send you and Mr. Bank
16 draft memos that he was going to send to the clients?
17 A.  He probably sent them to Mr. Bank, and Mr. Bank might
18 have forwarded them or shown them to me.
19 Q.  So those conversations were going on between Mr. Maerki
20 and Mr. Bank pretty regularly?
21 A.  Yes.
22 Q.  I do want to ask about DSPF Group.
23      MS. McCASLIN:  We can take that exhibit down.
24 BY MS. McCASLIN:
25 Q.  You said on direct that DSPF Group was to help unhappy

Carol L. Naughton, Official Court Reporter

─────────── R. Gibson - Cross (By Ms. McCaslin) ───────────

1    clients find new buyers for their franchises, right?

2    A.  Yes.

3    Q.  Okay.  And that was managed by Daryl?

4    A.  Yes.

5         MS. McCASLIN:  If we can pull up Government 56,

6    which is admitted.

7    BY MS. McCASLIN:

8    Q.  I'm just going to zero in on the agents.  So we've

9    already gone over that each of these lines is a sale to a

10   different person, right?

11   A.  Correct.

12   Q.  And there's a column for what agent was involved?

13   A.  Yes.

14   Q.  Now, Bill Smith was not involved in any of these for DSPF

15   Group, correct?

16   A.  Correct.

17   Q.  Tom Barnett was?

18   A.  Yes, he was.

19   Q.  And if I can scroll down, this was where you were

20   tracking the actual transfers, right?

21   A.  Yes.  This is the queue for anyone who was not happy and

22   wanted to put in a request to sell their franchise units.

23   Q.  And so, again, there is a column here for rep?

24   A.  Yes.

25   Q.  That's for the sales representative?

———— R. Gibson - Cross (By Ms. McCaslin) ————

1   A.   Correct.

2   Q.   Now, we see Tony Sellers is one of the reps, right?

3   A.   Yes.

4   Q.   Roger and Daryl?

5   A.   Yes.

6   Q.   Mr. Smith is not on this section, correct?

7   A.   No, he's not.

8   Q.   He's not anywhere on these sheets for DSPF Group?

9   A.   No, he's not.

10   Q.   Thank you.

11        So Mr. Smith only sold through Kent Maerki in

12   Arizona?

13   A.   Yes.

14   Q.   Now, you talked about Tony Sellers being on this list to

15   sell his units, right?

16   A.   Yes.

17   Q.   And the one he sold was September 2013?

18   A.   I think there was a few he sold.

19   Q.   Okay.  Now, I am going to bring up, if I can -- just one

20   second -- Government 268.

21        You went over this on direct, right?

22   A.   Yes.

23   Q.   So when we scroll down, this e-mail is about how Tony

24   wanted to sell some of his units, correct?

25   A.   Yes.

Carol L. Naughton, Official Court Reporter

─────────── R. Gibson - Cross (By Ms. McCaslin) ───────────

1    Q.   And Tom Barnett had a client who wanted to buy units?

2    A.   Yes.

3    Q.   Now, you guys had set this up as a blind sale, correct?

4    A.   Yes.

5    Q.   So Tom Barnett didn't know whose units his client was

6    buying from?

7              MS. O'BOYLE:   Objection as to what Tom Barnett knew.

8              THE COURT:   Sustained.

9    BY MS. McCASLIN:

10   Q.   You didn't tell Tom Barnett that his client was buying

11   units from Tony Sellers?

12   A.   I did not.

13   Q.   And on this e-mail up at the top, is this Tony Sellers's

14   e-mail address?

15   A.   Yes, it is.

16   Q.   Is this Tom Barnett's e-mail address?

17   A.   Yes, it is.

18   Q.   And you're on this as well, right?

19   A.   Yes.

20   Q.   Now, Daryl says that Tony Sellers desires to remain

21   anonymous.

22   A.   Yes.

23   Q.   He gave several reasons.  Two of them are not

24   broadcasting to his clients that he is selling --

25   A.   Yes.

1332

R. Gibson - Cross (By Ms. McCaslin)

1  Q.   -- and the next one is not broadcasting to the sales

2  force that a top salesman was liquidating.

3  A.   Correct.

4  Q.   Now, Tony had actually purchased 15 units of DSPF, right?

5  A.   I don't know exactly how many units he purchased.

6       MS. McCASLIN:   Can we bring up Government 200F?

7  BY MS. McCASLIN:

8  Q.   Tony Sellers is on this spreadsheet for DSPF?

9  A.   Yes.

10 Q.   And does it show how many units over here?

11 A.   Yes.

12 Q.   How many?

13 A.   15.

14 Q.   Now, the amount being purchased on the third line down,

15 how much was Tony Sellers buying of DSPF?

16 A.   300,000.

17 Q.   And if I could just scroll down a bit, this is the amount

18 that DSPF actually received from Tony Sellers, right?

19 A.   This isn't my spreadsheet.

20 Q.   Correct.

21 A.   This was created from Kent Maerki's company.

22 Q.   Correct.

23 A.   It states that this was the amount received.  Where it

24 was received or who by, I didn't know.

25 Q.   How much does it say that was received?

R. Gibson - Cross (By Ms. McCaslin)

1  A.  On that third line, 200,000.

2  Q.  Thank you.

3         Now, of all the people, Tony selling his franchises

4  would have signaled that he had lost faith in DSPF, right?

5  A.  I don't know why Tony Sellers was selling his units.

6  Q.  Correct.

7         But Daryl said that he did not want to broadcast

8  Tony's sales to the other salesmen.

9  A.  Correct.

10  Q.  And the fact that Tony did sell a unit and was trying to

11  sell units was never broadcast on any of the weekly calls or

12  memos that were sent out to salesmen, that you saw, right?

13         MS. O'BOYLE:  Objection.  Lack of foundation.

14         THE COURT:  Sustained.

15  BY MS. McCASLIN:

16  Q.  Did you see any of the memos or marketing materials for

17  DSPF?

18  A.  Did I see any of them?  Yes.

19  Q.  So you saw some of the written materials from Kent Maerki

20  about updates on DSPF?

21  A.  Yes.

22  Q.  Did any of those say that Tony Sellers wants to sell his

23  units?

24  A.  No.

25  Q.  Thank you.

──────── R. Gibson - Cross (By Ms. McCaslin) ────────

1       MS. McCASLIN:  And if we could go back to

2   Government 268, just briefly.

3   BY MS. McCASLIN:

4   Q.  Now, after Mr. Maerki says that he's a strong proponent

5   of transparency -- just a moment, Ms. Gibson.

6       So Daryl says to Kent "You and I had numerous

7   conversations about this transaction."

8       Correct?

9   A.  Yes.

10  Q.  And "This should not be aired through cc'ing the whole

11  group"?

12  A.  Yes.

13  Q.  Thank you.

14      MS. McCASLIN:  We can take that down.

15  BY MS. McCASLIN:

16  Q.  To switch gears a bit and talk about Dominion, how many

17  people worked in the office at Dominion?

18  A.  It depends on the time frame.  Early on, it was just

19  Daryl and I.  Towards the end, there was, I want to say,

20  maybe 10 to 15 total, probably was the most we had.

21  Q.  And Dominion also had an attorney that you regularly

22  worked with, right?

23  A.  Yes.

24  Q.  What was his name?

25  A.  Billy Seabolt.

─────── R. Gibson - Cross (By Ms. McCaslin)───────

1   Q.   And you and Daryl spoke to Mr. Seabolt often?

2   A.   Yes.

3   Q.   The only people that had contact with Mr. Seabolt,

4   though, were inside your office typically, right?

5   A.   Yes.

6   Q.   The salesmen weren't part of those calls with the

7   attorney?

8   A.   No.

9   Q.   And your office worked with other attorneys at various

10  times?

11  A.   Yes.

12  Q.   You also worked with Revzon Consulting?

13  A.   Yes.

14  Q.   And am I correct that Revzon Consulting, or Mr. Revzon,

15  was a compliance officer for Dominion?

16  A.   He was a -- he was one that we consulted or contracted

17  with for compliance.

18  Q.   And you and Daryl also spoke to Mr. Revzon regularly?

19  A.   Yes.

20  Q.   And the salesmen were not part of those calls, either,

21  right?

22  A.   He actually came to a couple of our seminars where he

23  spoke at the seminars where the sales representatives were at

24  as well.

25  Q.   Right.  But on the phone calls, he wasn't part of

———R. Gibson - Cross (By Ms. McCaslin)———

1    those -- or they weren't part of those?

2    A.  No, correct.

3    Q.  Now that you mention conferences...

4          MS. McCASLIN:  Mr. Grindrod, can we pull up

5    Smith 61, just for the witness.

6    BY MS. McCASLIN:

7    Q.  Ms. Gibson, do you recognize this?

8    A.  Yes.

9    Q.  Is this an accurate representation of what was posted for

10   your business?

11   A.  Yes.

12         MS. McCASLIN:  I move to admit Smith 61.

13         THE COURT:  Any objection?

14         MS. O'BOYLE:  No objection, Your Honor.

15         THE COURT:  Smith 61 will be admitted.

16         (Defendant Smith's Exhibit 61 was admitted.)

17   BY MS. McCASLIN:

18   Q.  So who is this person by the podium?

19   A.  That is Les Revzon.

20   Q.  And he has a board next to him, and what does it say in

21   large letters?

22   A.  "Compliance."

23   Q.  And the two pictures below show a variety of men in

24   seats, correct?

25   A.  Correct.

──────── R. Gibson - Cross  (By Ms. McCaslin)────────

1   Q.   So they are kind of in a seminar room?

2   A.   Yes.

3   Q.   And are they listening to a presentation by Les Revzon?

4   A.   Yes.

5   Q.   Thank you.

6           And this was through Dominion Investment Group?

7   A.   Yes.

8           MS. McCASLIN:   We can take that down, please.

9   BY MS. McCASLIN:

10  Q.   Now, you also worked with Summit Trust?

11  A.   Yes.

12          MS. McCASLIN:   If we could bring up Government 73,

13  which is already admitted, and if we could go to Page 29.

14  BY MS. McCASLIN:

15  Q.   Who is Kevin Brown?

16  A.   He's the president of Summit Trust Company.

17  Q.   And this bio says that he has nearly -- he has 26 years

18  of experience in virtually all aspects of running a

19  broker/dealer, right?

20  A.   Correct.

21  Q.   I'll just scroll.

22          And who is this?

23  A.   George Brown.  He's the chief marketing officer for

24  Summit Trust Company.

25  Q.   So they are kind of the two that are in charge of Summit,

R. Gibson - Cross (By Ms. McCaslin)

1  right?

2  A.  Yes.

3  Q.  Under his picture, it says that for the past 22 years,

4  he's been actively involved in choosing money managers for

5  both his personal high-net-worth clients and for his

6  institutional clients, right?

7  A.  Yes.

8  Q.  Now, Mr. Bank also had a CPA?

9  A.  Yes.

10  Q.  That happened with accounting and taxes?

11  A.  Yes.

12  Q.  And at one point, Daryl had an independent audit of the

13  financials of DIG, right, Dominion Investment Group?

14  A.  Yes.

15  Q.  And do you recall that CPA was Robert Guest?

16  A.  Yes.

17        MS. McCASLIN:  If we could bring up Smith 10, just

18  for the witness.

19  BY MS. McCASLIN:

20  Q.  Does this look familiar to you?

21  A.  Yes.

22  Q.  And what is it?

23  A.  This is a letter from Robert Guest at Guest, Peavy &

24  Guest, in regards to his findings of doing an audit.

25        MS. McCASLIN:  Your Honor, under the stipulations

———————— R. Gibson - Cross (By Ms. McCaslin) ————————

1  for Government's Exhibit 2000, under A-18, we move to admit

2  Smith 10.

3          THE COURT:  Any objection to Smith 10?

4          MS. O'BOYLE:  No objection, Your Honor.

5          THE COURT:  Smith 10 will be admitted.

6          (Defendant Smith's Exhibit 10 was admitted.)

7  BY MS. McCASLIN:

8  Q.  Now, can you read this second paragraph from Mr. Guest?

9  A.  Yes.

10          "The date of my engagement began on May 19, 2014.

11  Mr. Bank hired me due to concerns he had regarding the

12  previous CFO, specifically relating to any misappropriation

13  of funds within the accounting system.  Mr. Bank gave me

14  complete access to all of the accounting records.  During my

15  time spent, which was over a six-week period, I found no

16  substantiation to the concerned allegations."

17  Q.  Thank you.

18          MS. McCASLIN:  We can take that down.

19  BY MS. McCASLIN:

20  Q.  Now, obviously, Daryl was the head of the office.

21  A.  Yes.

22  Q.  And you're aware that he had the FINRA ban?

23  A.  Yes.

24  Q.  And he didn't necessarily hide it, correct?

25  A.  No, he didn't.

R. Gibson - Cross (By Ms. McCaslin)

1  Q.  But you and Daryl would tell people that Daryl was kind
2  of a whistleblower?
3  A.  Yes.
4  Q.  Or that there was a personality conflict and that Daryl
5  took the high road by not fighting it?
6  A.  I never heard that.
7  Q.  So the whistleblower was the more common?
8  A.  Yes.
9  Q.  Now, you did mention on direct that when the company was
10  moving from Virginia to Florida in 2015, it was because of
11  the Virginia State Corporation Commission investigation; is
12  that right?
13  A.  Yes.
14  Q.  You didn't tell people that that's why the company was
15  shutting down all the businesses and reopening them in
16  Florida, right?
17  A.  No, we did not.
18  Q.  Moving on to spectrum, the salesmen had Monday calls for
19  spectrum as well; is that right?
20  A.  Some of it was -- spectrum was brought into some of those
21  Monday morning calls that Kent Maerki did.
22  Q.  And Daryl presented on those?
23  A.  Yes, he did.
24  Q.  Because spectrum and dental, DSPF, were happening at the
25  same time?

—————— R. Gibson - Cross (By Ms. McCaslin) ——————

1   A.   Correct.

2   Q.   And those calls, if you're aware, have sales agents that

3   are across the country?

4   A.   Yes.

5   Q.   Now, you first heard about spectrum through Kent Maerki?

6   A.   Yes.

7   Q.   Did Mr. Maerki -- well, Mr. Maerki regularly brags about

8   his past business experiences, right?

9   A.   Yes.

10  Q.   He's talked about how he made clients millions of dollars

11  in the '80s and '90s?

12  A.   Yes.

13  Q.   And he said that he's mentioned in two books written

14  about spectrum?

15  A.   Yes.

16  Q.   Do you know the names?

17  A.   "Money From Thin Air" and "Wireless Network" or "Wireless

18  Nation."

19  Q.   And you've also heard Mr. Maerki referred to as an icon

20  in the spectrum industry?

21  A.   Yes.

22  Q.   And you and Daryl told people that as well, right?

23  A.   I, probably, not so much.  Daryl is the one who would

24  have been presenting more.  So, yes.

25  Q.   You saw it on the marketing materials, though, as well,

─────────── R. Gibson - Cross (By Ms. McCaslin) ───────────

1    right?

2    A.   Yes.

3    Q.   So if a salesman was going to offer one of Daryl's

4    products, like Spectrum 100, they would get the information

5    about Spectrum 100 from your office?

6    A.   Correct.

7    Q.   And most of the information in those marketing materials,

8    you said, came from David Alcorn and Kent Maerki?

9    A.   Yes.

10   Q.   Now, we've seen a lot of advertisements in the last two

11   days, so I won't open that up again.  But you didn't --

12   you're not aware of any salesmen providing input into those

13   marketing materials, are you?

14   A.   No.

15   Q.   Now, salesmen were able to call Daryl and set up a

16   conference call for him to do a sales pitch for spectrum,

17   right?

18   A.   Yes.

19   Q.   And salesmen took him up on that offer?

20   A.   Yes, they did.

21   Q.   And Bill called Daryl to have Daryl give pitches for his

22   clients?

23   A.   Yes.

24   Q.   And Bill Smith would also call Daryl if he and/or a

25   client had questions about the offering?

1   A.   Yes.

2   Q.   Now, when a client purchased an investment, the salesman

3   got a commission?

4   A.   Correct.

5   Q.   And you worked in multiple banks before Dominion.

6   Salesmen often get paid by commission?

7   A.   Yes.

8           MS. McCASLIN:   If we could bring up Government 206,

9   please, which is admitted.

10  BY MS. McCASLIN:

11  Q.   Now, we are looking at the DSPF units but only for the

12  Dominion office, right?

13  A.   Yes.

14  Q.   So if we look on the right-hand side, the agents listed

15  down are pretty much all Daryl?

16  A.   Yes.

17  Q.   And then when we get to a second page, there's a couple

18  other names but not Mr. Smith?

19  A.   Correct.

20  Q.   Now, the second-to-the-last column is called "Override

21  Received"; is that right?

22  A.   Yes.

23  Q.   What is an override?

24  A.   It would be like if there was a bonus or an additional --

25  if Kent's office, if they -- they sent a referral fee, so if

———————— R. Gibson - Cross (By Ms. McCaslin) ————————

1   there was an override for somebody or, again, an additional

2   incentive, they would put that on there.

3   Q.  Okay.  So, for example, one of the overrides went to

4   Terri Walsh?

5   A.  Yes.  And, actually, let me correct myself a little bit.

6        Ms. Walsh referred a client; I think it was Patricia

7   Hundley.  So if we had a client to refer somebody else in,

8   they would get paid a referral fee for that.

9   Q.  Right.

10       And so the salesmen and the clients could both get

11  referral fees?

12  A.  Correct.

13  Q.  And the salesmen could get bonuses from or referral fees

14  from Kent Maerki by bringing on other salesmen, correct?

15  A.  I don't know what Kent's arrangement was or how he set

16  those up for them.

17  Q.  Now, there were conferences for spectrum, right?

18  A.  Yes.

19  Q.  And there was one in Napa in August 2013?

20  A.  Yes.

21  Q.  And you were at that?

22  A.  I was.

23  Q.  Now, the Janus Spectrum had just recently gotten the

24  first round of their FCC licenses.  Do you remember that?

25  A.  I don't remember that being right at that time.

1345

R. Gibson - Cross (By Ms. McCaslin)

1   Q.   Do you remember the mood being very upbeat?

2   A.   Yes.

3   Q.   And for the spectrum offerings through Dominion, Summit

4   Trust was involved, at least in the beginning?

5   A.   Yes.

6   Q.   And you mentioned that if a client had paid $50,000 for a

7   Spectrum 100 license, their Summit account would show

8   $50,000?

9   A.   That's correct.

10  Q.   That amount, until it failed, never went up or down,

11  right?

12  A.   Correct.  Did not.

13  Q.   And it wouldn't have gone up and down unless you had

14  called Summit or e-mailed them and asked to change it?

15  A.   That's right.

16  Q.   And so the amount didn't fluctuate depending on how well

17  the business was doing?

18  A.   Correct.

19  Q.   And so it looked like $50,000 was always in the account?

20  A.   Yes.

21  Q.   Now, the salesmen weren't able to change the amount that

22  showed in the Summit Trust statements, right?

23  A.   They were not.

24  Q.   Now, I know that there's a lot of entities, and the word

25  "spectrum" has been thrown around, so I just want to be

Carol L. Naughton, Official Court Reporter

———— R. Gibson - Cross  (By Ms. McCaslin) ————

1    clear.

2              Spectrum 100, Prime Spectrum --

3              Which is Tony Sellers, right?

4    A.  Correct.

5    Q.  -- and Janus Spectrum Group, they are all similar in that

6    they are pooling people together to get an FCC license?

7    A.  Yes.

8              MS. McCASLIN:  If we could pull up Government 314,

9    which is admitted.

10   BY MS. McCASLIN:

11   Q.  Now, what spreadsheet is this for?

12   A.  This page here is the sales tracker for Janus Spectrum

13   Group.

14   Q.  There's a column for agent, right?

15   A.  Yes.

16   Q.  None of these are Bill Smith?

17   A.  No.

18   Q.  And if I continue down, none of the agents for Janus

19   Spectrum Group are going to be Bill Smith?

20   A.  Nope.

21             MS. McCASLIN:  If we could bring up Government 59.

22   BY MS. McCASLIN:

23   Q.  And what spreadsheet is this for?

24   A.  This is the sales tracker sheet for Spectrum 100.

25   Q.  Okay.  And, of course, Bill Smith did sell under

———————— R. Gibson - Cross (By Ms. McCaslin)————————

1   Spectrum 100?

2   A.  Yes.

3   Q.  So if we could take -- I know the writing is very small,

4   so bear with me.  If we can look at that second line down, it

5   says -- line 21 -- for Sandra Bear, right?

6   A.  Yes.

7   Q.  How much did she invest?

8   A.  100,000.

9   Q.  Move over to the rest of that line.

10          So we see the 100,000 on the far left now, right?

11  A.  Yes.

12  Q.  And Bill Smith sold that?

13  A.  He did.

14  Q.  And his commission was 12,000?

15  A.  Yes.  At that time, it was -- they were at 12 percent.

16  Q.  Right.  So it's 12 percent across the board?

17  A.  Correct.

18  Q.  So it didn't fluctuate depending on if 25,000 were sold

19  or 500,000 were sold?

20  A.  Correct.

21          MS. McCASLIN:  We can take that down, please.  Thank

22  you.

23  BY MS. McCASLIN:

24  Q.  And for all of those groups -- Spectrum 100, Prime

25  Spectrum, Janus Spectrum Group -- all of the marketing

R. Gibson - Cross (By Ms. McCaslin)

1   materials always said stuff like "Spectrum is the new black

2   gold," right?

3   A.   Yes.

4   Q.   And "beachfront property"?

5   A.   Yes.

6   Q.   And then a bit later, we have Xcel Bandwidth?

7   A.   Yes.

8   Q.   Now, Xcel Bandwidth, unlike the other ones, actually had

9   an existing tower system in Texas, right?

10  A.   That's correct.

11  Q.   It had actual towers with actual signals?

12  A.   Yes.

13  Q.   And it had existing customers on that system?

14  A.   Yes, it did.

15  Q.   And Xcel Bandwidth was working with a company called

16  BearCom?

17  A.   Yes.

18  Q.   And BearCom is a Motorola dealer, right?

19  A.   Yes.

20  Q.   And a lot of the marketing materials talk about how Xcel

21  is working with Motorola, right?

22  A.   Yes, I believe it did.

23  Q.   And BearCom, because they have already been working with

24  the system, is familiar with the customers on the system,

25  right?

R. Gibson - Cross (By Ms. McCaslin)

1   A.   Yes.

2   Q.   And the customers that were already on the system

3   included independent school districts?

4   A.   Yes.

5   Q.   Towing companies?

6   A.   Yes.

7   Q.   Concrete companies?

8   A.   Yes.

9   Q.   Car service companies?

10  A.   Yes.

11  Q.   Landscaping companies?

12  A.   Yes.

13  Q.   And so that push-to-talk is really geared toward

14  industries?

15  A.   Yes.

16  Q.   And you went to Texas and saw the tower system, right?

17  A.   Yes.

18  Q.   And you met with customers that were using the system?

19  A.   I did not meet with actual customers.

20  Q.   You did not.  Okay.  But you did see towers?

21  A.   The actual equipment, yes.

22  Q.   Okay.  You saw the equipment.

23        And, in fact, Bill went to Texas to learn about Xcel

24  as well, right?

25  A.   Yes.

—————— R. Gibson - Cross (By Ms. McCaslin)——————

1  Q.  He went down there to see the system and meet the team?

2  A.  Yes.

3  Q.  And the point of Xcel was to expand that existing network

4  to other areas of the country, right?

5  A.  Yes.

6  Q.  Now, we had mentioned earlier that Daryl was also working

7  with Bob LaBine with RapidLink Wireless to do this?

8  A.  Correct.

9  Q.  And Bob LaBine had applied for his own spectrum licenses,

10  too, right?

11  A.  That, I don't know.

12  Q.  Okay.  That's fair enough.

13         THE COURT:  We're going to stop right here for a

14  break.  We'll take a 15-minute break at least.

15         (The jury exited the courtroom.)

16         (Recess from 3:59 p.m. to 4:20 p.m.)

17         THE COURT:  We may have to go at least to 5:30 to

18  accomplish what you want to do, but we'll see if we can

19  accommodate both parties here.

20         MS. O'BOYLE:  Thank you, Your Honor.

21         (The jury entered the courtroom.)

22         THE COURT:  Let the record reflect all jurors are

23  present in the courtroom.

24         MS. O'BOYLE:  The United States agrees.

25         MR. YAROW:  Mr. Alcorn agrees.

───── R. Gibson - Cross (By Ms. McCaslin) ─────

1          THE COURT:  You may be seated.

2          Ladies and gentlemen, before we get started, I want

3     to address one thing here.

4          To the extent you cannot see or hear, raise your

5     hand, and we will recognize you, and we will make the

6     adjustment with respect to documents on the screen, or if you

7     cannot hear, I think I said early on raise your hand, and

8     someone up here will recognize it, and we will get the

9     witness to speak louder or do what we need to do.

10          One other thing I want to mention.  I think several

11    of you indicated you would like permission to go outside for

12    lunch.  This building has 11 courtrooms in it.  Usually we

13    might be running 11 courtrooms in a day.  Because of the

14    pandemic, we can only run two trials in the courthouse at a

15    time.  We're using three courtrooms.  You are assembling in

16    one; the public is over here on the left; and we're using

17    this courtroom to space you and to keep you apart.

18          The Chief Judge for the United States District Court

19    for the Eastern District of Virginia, where we're located,

20    has issued protocols that we're to follow to avoid having a

21    problem; wearing a mask, separating, avoiding having jurors

22    have to go out in the street for lunch, and et cetera.  They

23    are among the protocols that we are to follow.  So it's

24    painful for everybody, but we have to follow the protocols to

25    make sure we don't have any problems.  So far, we haven't

————— R. Gibson - Cross (By Ms. McCaslin) —————

1   developed any problems doing business in here in the

2   courthouse because we've been following the protocols.

3          So I understand.  I would love to be under a tree

4   doing this trial in warm weather, but it's not happening.  So

5   we're going to have to follow the protocols, so please bear

6   with us for a while.

7          All right.  You may continue.

8   BY MS. McCASLIN:

9   Q.  All right.  So before we broke for a short recess, we

10  were talking about RapidLink Wireless working with Xcel,

11  right?

12  A.  Yes.

13  Q.  Now, RapidLink was supposed to be trying to help expand

14  the Texas system, correct?

15  A.  Yes.

16  Q.  Now, Bob LaBine and RapidLink Wireless, if you recall,

17  would let Daryl know how much money they needed in order to

18  keep expanding it.

19          Are you aware of that?

20  A.  That, I don't know.

21  Q.  Okay.  So you're not sure, or are you sure -- do you know

22  whether or not Daryl was able to keep up with the payments to

23  Bob LaBine?

24  A.  I don't know.  I know we took over at some point and

25  purchased that CTS system, instead of RapidLink doing it, but

—————— R. Gibson - Cross - (By Ms. McCaslin) ——————

1    I don't recall what happened in that instance.

2    Q.  Okay.  And that's fine.

3         Now, eventually, Xcel did default, right?  Somebody

4    else took over that tower system?

5         MS. O'BOYLE:  Well, objection.  Lack of foundation.

6         THE COURT:  She said she didn't know.  So let's see

7    if you can give her further details or something so that she

8    can answer you specifically.

9         MS. McCASLIN:  Yes, Your Honor.

10   BY MS. McCASLIN:

11   Q.  Daryl no longer owns that tower system in Texas, right?

12   A.  Correct.

13   Q.  Are you aware of who else owns it?

14   A.  I'm not.

15   Q.  Okay.  But we did see on direct examination the money

16   move sheet for Xcel, right?

17   A.  Yes.

18   Q.  And there was about 41 percent of the investor money that

19   stayed with that investment.  Does that sound right?

20   A.  Yes.

21   Q.  Now, the money move sheet wasn't available to the

22   clients, was it?

23   A.  No, it wasn't.

24   Q.  It wasn't available to the salesmen?

25   A.  No.

1354

—————— R. Gibson - Cross  (By Ms. McCaslin)——————

1  Q.  And you can't fund a project that big when somebody is
2  stealing 60 percent of the money, right?
3  A.  Correct.
4  Q.  I do have just a few questions about the financials of
5  the company.
6       You had access to all the bank accounts for
7  Dominion; is that right?
8  A.  Yes.
9  Q.  The salesmen did not have access to those accounts?
10  A.  They did not.
11  Q.  And neither did the clients?
12  A.  No.
13  Q.  And the only people who had access to the money move
14  sheet were in your office?
15  A.  Correct.
16  Q.  None of the paperwork for Spectrum 100 or the others
17  explained to the clients how the money was being moved,
18  right?
19  A.  Correct.
20  Q.  The investment summary for them didn't explain it?
21  A.  It did not.
22  Q.  On top of that, there were several people in the office
23  who had an American Express card under Daryl's name, right?
24  A.  Yes.
25  Q.  You had a credit card under Daryl's name?

Carol L. Naughton, Official Court Reporter

--------R. Gibson - Cross (By Ms. McCaslin)--------

1    A.  I did.

2    Q.  Daryl obviously had one?

3    A.  Yes.

4    Q.  Roger Hudspeth?

5    A.  Yes.

6    Q.  Daryl's wife?

7    A.  Yes.

8    Q.  And Doug Dunn?

9    A.  Correct.

10   Q.  And Daryl paid for all the bills for those cards?

11   A.  Yes.

12   Q.  Now, you all had access to the monthly statements online?

13   A.  I know Daryl and I did, and probably Catrina.  I don't

14   think the others did.

15   Q.  Okay.  But you typically handled actually paying the bill

16   for Daryl; is that right?

17   A.  Most of the time.

18   Q.  And you were aware that some of the employees, like Doug

19   Dunn, were using the American Express card on themselves,

20   right?

21   A.  We didn't find that out until after the fact.

22   Q.  So when Doug Dunn left Dominion --

23           Right?

24   A.  Yes.

25   Q.  -- Daryl accused him of stealing funds?

———————— R. Gibson - Cross (By Ms. McCaslin)————————

1      MS. O'BOYLE:  Objection.  This is beyond the scope

2  of direct.

3      MS. McCASLIN:  It's not.  It's going to where all

4  the money is going in Dominion.

5      MS. O'BOYLE:  Objection.  She is attempting to

6  pre-impeach a witness.

7      THE COURT:  Objection sustained.

8      And the Court was going to raise a relevancy on it.

9  I mean, you're talking about someone taking some money out of

10  the American Express card, and this whole case is about

11  something basically different, about how the money is being

12  handled with respect to these investments.  So the Court

13  sustains that objection.

14  BY MS. McCASLIN:

15  Q.  Bill didn't have an American Express card, though, right?

16  A.  He did not.

17  Q.  And Daryl did use investor funds for his own personal

18  use, right?

19  A.  Yes.

20      MS. McCASLIN:  If we could pull up, just for the

21  witness, Smith 482, Mr. Grindrod.

22  BY MS. McCASLIN:

23  Q.  I'm aware you haven't seen this in a while, so I'm just

24  going to scroll so that you know what you're looking at.

25  Okay?

─────────────── R. Gibson - Cross (By Ms. McCaslin) ───────────────

1   A.  All right.  Thank you.

2   Q.  Does this look familiar?

3   A.  Yes.

4   Q.  And does this look familiar?

5   A.  Yes.

6   Q.  So what are you looking at right now?

7   A.  These are wire request forms, and the first page that we

8   saw was a wire confirmation from the bank.

9           MS. McCASLIN:  I move to admit Smith 482.

10          MS. O'BOYLE:  No objection.

11          THE COURT:  Smith 482 will be admitted.

12          (Defendant Smith's Exhibit 482 was admitted.)

13  BY MS. McCASLIN:

14  Q.  Now, this was, you said on the first page, a wire

15  confirmation; is that right?

16  A.  Yes.

17  Q.  For how much money?

18  A.  $78,000.

19  Q.  Going from what account?

20  A.  Dominion Private Client Group.

21  Q.  To where?

22  A.  To Daryl or Catrina Bank.

23  Q.  And what is this sheet?  It looks different than the

24  other one.

25  A.  Yes.  This is the wire request form that had to be

——————— R. Gibson - Cross (By Ms. McCaslin) ———————

1    completed and signed off on and sent to the bank to request

2    for that wire to be done.

3    Q.   Now, who is the accountholder?

4    A.   Dominion Private Client Group.

5    Q.   And how much money is being wired?

6    A.   $19,100.

7    Q.   And down below, what is it for?

8    A.   It says the name is "Watch U Want, Inc."

9    Q.   Do you know what Daryl was buying?

10   A.   A watch.

11   Q.   And that happened on December 20 of 2013, right?

12   A.   Yes.

13   Q.   And this came out of the business account?

14   A.   Yes, it did.

15   Q.   And just a couple days later, on December 23rd, 2013,

16   there's another wire transfer, right?

17   A.   Yes.

18   Q.   And how much is that for?

19   A.   That is 8,000.

20   Q.   And what is it for?

21   A.   "Watch U Want."

22   Q.   What was Daryl buying?

23   A.   A watch.

24   Q.   And just a couple weeks later, in January 2014, did he

25   buy another watch?

R. Gibson - Cross (By Ms. McCaslin)

1    A.   Yes.

2    Q.   How much was it for?

3    A.   12,300.

4    Q.   Were these for his personal use?

5    A.   As far as I know, yes.

6    Q.   This is another wire.  How much is it for?

7    A.   $65,000.

8    Q.   And it's leaving the business account and going to where?

9    A.   Going to Daryl and Catrina Bank.

10   Q.   This is another wire.  How much is it for?

11   A.   110,000.

12   Q.   Going from the business account to where?

13   A.   Daryl and Catrina Bank.

14   Q.   How about this one?

15   A.   $100,000, going from Dominion Private Client Group to

16   Daryl and Catrina Bank.

17   Q.   And this is just a small sample of the wires going to

18   Daryl and his wife, right?

19   A.   Correct.

20   Q.   I think you mentioned on direct that Daryl also bought a

21   $25,000 dog?

22   A.   Yes.

23   Q.   Now, before you were indicted, you never went to the

24   police and told them that there was a fraud going on in

25   Dominion, right?

─────R. Gibson - Redirect─────

1    A.  I did not.

2    Q.  And, in fact, the first time that you publicly spoke

3    about everything going on in Dominion was at Daryl's trial,

4    right?

5    A.  Yes.

6    Q.  Was that in April 2021?

7    A.  Yes.

8    Q.  And you never told Daryl to stop stealing the funds,

9    right?

10   A.  I did not.

11   Q.  And you didn't speak up in your office to the other

12   employees, right?

13   A.  I did not.

14          MS. McCASLIN:  Thank you.  No further questions.

15          THE COURT:  Any redirect?

16          MS. O'BOYLE:  Just a couple of questions, Your

17   Honor.  Not much.

18                    REDIRECT EXAMINATION

19   BY MS. O'BOYLE:

20   Q.  Ms. Gibson, Ms. McCaslin showed you some pictures of the

21   gentleman that ran Summit.

22   A.  Yes.

23   Q.  And Summit Trust Company went into receivership in 2015,

24   correct?

25   A.  Yes.

R. Gibson - Redirect

1  Q.  And we talked a little bit -- she also talked to you a
2  little bit about Xcel and the walkie-talkie system.
3  A.  Yes.
4  Q.  Was Mr. Bank -- throughout his career, was he a financial
5  advisor?
6  A.  Yes.
7  Q.  And then with Xcel, was he going to be running a
8  push-to-talk system?
9  A.  Yes.
10  Q.  How much money total did you take in in connection with
11  the spectrum investment from investors?
12  A.  All of the --
13         MS. McCASLIN:  Objection, Your Honor.  Asked and
14  answered.
15         THE COURT:  Sustained.
16  BY MS. O'BOYLE:
17  Q.  All right.  Ms. McCaslin talked to you about the
18  walkie-talkie system and the clients that you had in Texas?
19  A.  Yes.
20  Q.  If we could go to Exhibit 617, Page 116.
21         Ms. Gibson, is this -- what is this check?
22  A.  This is a check from Willis --
23  Q.  Hold on.
24         MR. BOSSE:  We've got to admit it.
25         THE COURT:  Hold on a second.

R. Gibson - Redirect

1    THE CLERK:  617 is not admitted.

2    MS. O'BOYLE:  I'm very sorry.  Let's go to the first

3    page of 617.  I'll readmit it, Your Honor.

4    BY MS. O'BOYLE:

5    Q.  This is -- do you recognize Government's Exhibit 617?

6    A.  Yes.

7    Q.  And what is it?

8    A.  This is the signature card for Oculina Bank for Xcel

9    Bandwidth.

10   Q.  Okay.  And is this in connection with an Xcel investment?

11   A.  Yes, it is.

12   MS. O'BOYLE:  Government moves in Exhibit 617.

13   THE COURT:  Hearing no objection, it's admitted.

14   (Government's Exhibit 617 was admitted.)

15   BY MS. O'BOYLE:

16   Q.  If we could go to Page 116, please, Mr. Bosse.

17   Ms. McCaslin asked you about the clients of the

18   walkie-talkie system.

19   A.  Yes.

20   Q.  What is the check that we're looking at here?

21   A.  This is a check from one of those clients.  The name is

22   Willis Plumbing.

23   Q.  What is the amount?

24   A.  The amount is $92.

25   Q.  And going to another check, what is this?

Carol L. Naughton, Official Court Reporter

R. Gibson - Redirect

1 A.  This is from Steve and -- I can't see quite the name at
2 the top -- it's a little bit blurry -- but also going to Xcel
3 in the amount of $102.84.
4 Q.  What was the total amount of investor funds that you had
5 obtained by this point?
6       MS. McCASLIN:  Objection, Your Honor.  Asked and
7 answered.
8       THE COURT:  Objection overruled.
9       THE WITNESS:  For Xcel Bandwidth, it was
10 approximately 5 million.
11 BY MS. O'BOYLE:
12 Q.  And were you continuing to solicit investors for this
13 walkie-talkie system?
14 A.  Yes.
15 Q.  And for the walkie-talkie system, were the clients
16 writing checks that could possibly have repaid the investors
17 in this investment?
18 A.  No.
19       MS. McCASLIN:  Your Honor, objection.  Argumentative
20 and calls for speculation.
21       THE COURT:  You can rephrase that question.
22       MS. O'BOYLE:  I'll rephrase it, Your Honor.
23       THE COURT:  Sustained.  You can rephrase the
24 question.
25 BY MS. O'BOYLE:

R. Gibson - Redirect

1    Q.   The first three investments that we went to, Ms. McCaslin

2    talked about Spectrum 100 that Mr. Smith sold?

3    A.   Yes.

4    Q.   And we went through the Investment Offering in connection

5    with that?

6    A.   Yes.

7    Q.   And what did the investment -- was that for

8    walkie-talkies?

9    A.   The Spectrum 100 was not.

10   Q.   And what did -- what was told to the investors as to how

11   much they would make in connection with that investment?

12   A.   That one was 100 percent annual return plus an

13   additional, I think, deferred -- or an additional 50 percent

14   later.

15   Q.   And did you discuss with Mr. Bank how you expected to

16   make that rate of return for a walkie-talkie system?

17   A.   I did not.

18   Q.   Were you still soliciting investors in Xcel Bandwidth in

19   2017?

20   A.   Yes.

21   Q.   And do you recall the rate of return that was in the

22   presentation to investors with respect to Xcel Bandwidth?

23   A.   That, I don't recall.

24   Q.   Okay.

25            MS. O'BOYLE:   Thank you, Ms. Gibson.   I have no

L. D. Dunn - Direct

```
 1   further questions.
 2              THE WITNESS:  Thank you.
 3              THE COURT:  May the witness be permanently excused?
 4              MS. McCASLIN:  Your Honor, we would ask Ms. Gibson
 5   to remain in case she's needed.
 6              THE COURT:  I want you to think about that.  For the
 7   time being, the Court will have her stay, but I want you to
 8   think about that.
 9              MS. McCASLIN:  Thank you, Your Honor.
10              THE COURT:  All right.
11              (The witness stepped down.)
12              THE COURT:  For the Marshals, for the time being,
13   until the Court indicates, she stays.
14              THE MARSHAL:  Yes, sir.
15              THE COURT:  Next witness.
16              MS. O'BOYLE:  Yes, Your Honor.  Government calls
17   Louis Doug Dunn.
18              (Witness sworn.)
19              LOUIS DOUG DUNN, called by the Government, having
20   been first duly sworn, was examined and testified as follows:
21                        DIRECT EXAMINATION
22   BY MS. O'BOYLE:
23   Q.  Good afternoon.
24   A.  Good afternoon.
25   Q.  Could you please state and spell your name.
```

L. D. Dunn - Direct

1   A.   Louis Dunn, L-o-u-i-s D-u-n-n.

2   Q.   Where do you live, just the city and state?

3   A.   Virginia Beach, Virginia.

4   Q.   What do you do for a living?

5   A.   I'm a professional musician, singer/songwriter.

6   Q.   I want to take you back to 2014.  Okay.  And in early

7   2014, did you start a new job?

8   A.   I did.

9   Q.   What was the job?

10  A.   I was operational support for managing partner Mike

11  Binetti at Dominion Insurance Brokerage.

12  Q.   Dominion Insurance Brokerage?

13  A.   Yes, ma'am.

14  Q.   Who was Mr. Binetti?

15  A.   Mike Binetti was the managing partner of Dominion

16  Insurance Brokerage.

17  Q.   And where was Dominion Insurance Brokerage located?

18  A.   Virginia Beach, Virginia.

19  Q.   Now, was it connected in any way with Dominion Private

20  Client Group?

21  A.   No.

22  Q.   Do you know an individual named Daryl Bank?

23  A.   Yes.

24  Q.   What role did Mr. Bank have, if any, with respect to

25  Dominion Insurance Brokerage?

L. D. Dunn - Direct

1   A.   No operational role.  He owned the LLC, Dominion

2   Insurance Brokerage LLC, which was a Virginia LLC.

3   Q.   Now, what was your job at Dominion Insurance Brokerage?

4   A.   When Mike first brought me in, my role was to help him

5   streamline his insurance practice.  He had started a new

6   business model where he was giving seminars, and it was being

7   very successful, and he was finding himself not having near

8   enough time to handle the clients that he was getting, so he

9   asked for some operational support, how could he better

10  streamline his practice.

11  Q.   Did you sell to clients?

12  A.   No.

13  Q.   Did you sell any products to clients?

14  A.   No.

15  Q.   So were you helping with paperwork and things of that

16  nature?

17  A.   Yes.  I would help process some paperwork, getting it out

18  to the field marketing organization Gradient as well as just

19  also critiquing and working with Mr. Binetti on his office

20  performance.

21  Q.   Did you hold a license to sell securities, ever?

22  A.   Never.

23  Q.   And when you were working for Dominion Insurance

24  Brokerage, did you hold a license to sell insurance?

25  A.   No, I did not.

L. D. Dunn - Direct

1   Q.   Now, what role, if any, did you have with Dominion

2   Private Client Group?

3   A.   No role at all.

4   Q.   Do you know an individual -- I guess, do you know an

5   individual named Mr. Smith?

6   A.   Yes.

7   Q.   Aghee William Smith?

8   A.   Yes.

9   Q.   How did you first meet Mr. Smith?

10  A.   Through Dominion Insurance Brokerage.  Daryl Bank had

11  referred him over to us to be an insurance producer.  My

12  understanding, when it was first relayed to me, is that

13  Mr. Smith was a long-term financial consultant and a large

14  annuity producer.  So I was asked to first speak with

15  Mr. Smith to try and recruit him to sell his insurance

16  products through Dominion Insurance Brokerage.

17  Q.   Where was Mr. Smith located?

18  A.   California.

19  Q.   If I could show you Government Exhibit 1214.  Do you

20  recognize 1214?

21  A.   I do.

22  Q.   What is it?

23  A.   It is a Gradient Insurance Brokerage contracting kit for

24  Mr. Smith.

25            MS. O'BOYLE:   Government moves in Exhibit 1214.

Carol L. Naughton, Official Court Reporter

L. D. Dunn - Direct

1      THE COURT:  1214 is admitted.

2      (Government's Exhibit 1214 was admitted.)

3  BY MS. O'BOYLE:

4  Q.  Now, over the course of 2014, did you have you have

5  numerous occasions to speak with Mr. Smith?

6  A.  I did.

7  Q.  Could you describe your -- the type of relationship that

8  you had with him at that time.

9  A.  Professional, friendly relationship.

10  Q.  And during that time in November of 2015, did you and

11  Mr. Smith actually see each other in Nashville, Tennessee?

12  A.  We did.

13  Q.  Why were you in Nashville?

14  A.  I am now a lifetime member of the Country Music

15  Association.  I had been a member for a number of years and

16  now a lifetime member.  As such, every November, we have the

17  CMA Awards there in Nashville.

18      That year -- because I'm a member, I'm also able to

19  provide some tickets for individuals to join us at the awards

20  show.  So we used two of those tickets for an insurance sales

21  contest, of which Bill Smith won.  He was the highest annuity

22  producer.

23      So as a result, Mr. Smith and his wife were flown

24  out to Nashville, and we had dinner and went to the awards

25  show and also to the CMA songwriters' night.

L. D. Dunn - Direct

1    Q.  If we can take a look at Government's Exhibit 1217.  Do
2    you recognize Government's Exhibit 1217, sir?
3    A.  I do.
4    Q.  What is it?
5    A.  That's before the CMA songwriters' event, which I believe
6    was the night either before or right after the CMA Awards,
7    and that was over at the CMA Hall of Fame or the CMA Music --
8    excuse me, the Country Music Hall of Fame in the CMA
9    auditorium.
10   Q.  Is that a picture of you and Mr. Smith?
11   A.  It is.
12          MS. O'BOYLE:  Government moves in Exhibit 1217.
13          THE COURT:  1217 will be admitted.
14          (Government's Exhibit 1217 was admitted.)
15   BY MS. O'BOYLE:
16   Q.  Okay.  Now, in early 2015, did you become aware of
17   Mr. Bank's -- investigations into Mr. Bank's other companies
18   unrelated to Dominion Insurance Brokerage?
19   A.  Yes.
20   Q.  And how many investigations were you aware of?
21   A.  There were too many to keep track of them.  I didn't know
22   the number.  All of the LLCs were Virginia LLCs, and as such,
23   paperwork would come up to the Virginia Beach office, at
24   which point it would just be sent down to Port St. Lucie,
25   which is where Daryl was.

L. D. Dunn - Direct

1   Q.   In 2015, did you speak with Mr. Smith about Mr. Bank?

2   A.   I did.

3   Q.   And what, if anything, did you tell Mr. Smith?

4   A.   Bill and I had a number of conversations about it because

5   when the State Corporation Commission and the federal

6   government executed search warrants on the Dominion offices,

7   needless to say, that was very disconcerting.

8        At that point, Mr. Bank indicated to us all that it

9   was a tremendous misunderstanding and that they would get to

10  the bottom of everything.  And we all did believe that for a

11  while.  And Bill and I talked at length, and then as the year

12  kept going on and more and more things were coming out, more

13  and more allegations were coming forth, I indicated to Bill

14  that usually where there's this much smoke, there's fire.

15  Q.   And this was in 2015?

16  A.   Yes.

17  Q.   Can you cabin that in at some time?

18  A.   I would say probably late summer, early fall, before the

19  November trip.

20  Q.   And so what, if anything, did Mr. Smith say in response

21  to your concerns about Mr. Bank?

22  A.   Bill was very adamant all along that he truly believed

23  that Daryl was being framed by the government.  And he would

24  argue the point that nothing had been proven at that point by

25  any government agency and that he believed because the

L. D. Dunn - Direct

1  government was framing Daryl.

2  Q.  Okay.  And so in November of 2015, did Dominion Insurance

3  Brokerage ultimately shut down?

4  A.  Yes.

5  Q.  And did you inform Mr. Bank of that?

6  A.  I did.

7  Q.  And did you have a conversation with him and let him know

8  that it was shutting down?

9  A.  Yes.

10  Q.  What, if anything, did Mr. Bank say in response to that?

11  A.  Well, in that conversation, I explained the reason DIB

12  was shutting down, which was that Gradient, which was our

13  back office field marketing organization, had terminated our

14  contract.  In essence, all of the marketing support that we

15  were able to provide the agency -- agents, rather, nationwide

16  was gone.

17  Q.  And how did Mr. Bank respond to that?

18  A.  His initial response, of course, was shock.  He was

19  upset.  I had told him before that phone call, and then he

20  told me not to worry, we'll just find another FMO, he knows

21  enough people.  He said -- then he said, look, I can shut the

22  lights off, go home, and wake up tomorrow and just start a

23  new hustle.

24  Q.  Start a new what?

25  A.  "Hustle" was the term he used.

L. D. Dunn - Direct

1   Q.  Did you actually record this call?

2   A.  I did record the entire conversation.

3   Q.  And why did you record it?

4   A.  Because the purpose of that phone call was to let Daryl

5   know that I was shutting down the Virginia Beach office of

6   DIB and I wanted to have some kind of proof, because by this

7   point there were a lot of allegations being waged against

8   Daryl, and I just wanted to have proof that that conversation

9   had taken place.

10  Q.  Now, the next day after you had this conversation with

11  Mr. Bank, what, if anything, did you do with Dominion

12  Insurance Brokerage?

13  A.  I cleared my office out of any personal belongings.

14  Q.  And how did Mr. Bank respond after you cleared your

15  personal belongings out of the office?

16  A.  He contacted the Virginia Beach Police Department and

17  alleged I had stolen personal property of his as well as

18  company property.

19  Q.  Mr. Dunn, had you stolen personal property of Mr. Bank?

20  A.  I had not.

21  Q.  And had you stolen company property?

22  A.  I had not.

23  Q.  Was there a particular item that Mr. Bank accused you of

24  stealing?

25  A.  Yes, there was.  On the personal side, he accused me of

L. D. Dunn - Direct

1   stealing some of his business suits that had come to the
2   office as well as some type of racing bicycle.
3   Q.  Okay.  And had you taken either of those things?
4   A.  I had not taken them.  I had removed them from the
5   office, which Mr. Bank had knew because he had been to the
6   office.  They had been removed from the office, well, like,
7   nine months before that ever took place, and the reason was
8   just to put them in a storage shed right up the street.  And
9   Daryl knew they were there.
10          And by the time he actually made that report to the
11  police, he had already called the landlord and had the locks
12  changed.  So I had gone to return those items to the office,
13  to get them out of my storage shed, only to find the office
14  door was locked.
15          So when the police contacted me, I immediately told
16  them I was in possession of the bike.  I took it to the
17  Fourth Precinct, and the detective looked at it and said,
18  "Yeah, I see it's still covered in dust like you said," so it
19  had been sitting in the storage shed.
20  Q.  Was that the only complaint that Mr. Bank made against
21  you?
22  A.  No.  He alleged that I had taken company property and
23  that I illegally used a company credit card.
24  Q.  Did you illegally use a company credit card?
25  A.  I had not.

1375

L. D. Dunn - Direct

1  Q.  After you disassociated from Mr. Bank, where did you go
2  to work?
3  A.  Regent Insurance Agency.
4  Q.  And what role, if any, did Mr. Smith play at Regent
5  Insurance Agency?
6  A.  Bill signed on to become a sales agent with Regent also.
7  Q.  Prior to Mr. Smith signing on as a sales agent for
8  Regent, did you have a discussion with him about Mr. Bank?
9  A.  I did.
10 Q.  What did you tell him?
11 A.  Well, we told Bill as well as any agent who was signing
12 on who had come from Dominion that if they wanted to market
13 their products -- rather, excuse me -- if they wanted to
14 market their business through Regent, we would love to have
15 them and would love to support them and help them grow their
16 practice; however, they could not have any relationship with
17 Daryl Bank at all, at least until all of Daryl's stuff was
18 finished.
19 Q.  And how did Mr. Smith respond to that?
20 A.  He initially agreed and said that was fine.
21 Q.  Okay.  And then at some point later, what, if anything,
22 did you learn about Mr. Smith's relationship with Mr. Bank?
23 A.  That he had not completely terminated the relationship
24 and he was still marketing some of those products.
25 Q.  And after you learned that Mr. Smith was still selling

L. D. Dunn - Cross (By Ms. McCaslin)

1   Mr. Bank's investment products, what, if anything, did you

2   do?

3   A.  We had to terminate his contract with Regent.

4   Q.  Did you explain that to Mr. Smith?

5   A.  I did.

6   Q.  And how did Mr. Smith respond to his contract being

7   terminated?

8   A.  Bill understood.  And at the time, it wasn't as

9   concerning to him.  He did not have a lot -- well, at that

10  point, any annuities in the pipeline at all that he was

11  working on case-wise.  The prior year, he had had a

12  tremendous annuity year -- great annuity salesman -- but his

13  practice in the annuities had dropped, so he didn't seem too

14  concerned at that point.

15  Q.  How much longer did you continue to work for Regent?

16  A.  Maybe two more months.

17          MS. O'BOYLE:  Thank you, Mr. Dunn.  I have no

18  further questions.  Please answer any questions defense

19  counsels have.

20          THE WITNESS:  Yes, ma'am.

21          THE COURT:  Cross?

22          MR. YAROW:  Mr. Alcorn has no questions.

23                      CROSS-EXAMINATION

24  BY MS. McCASLIN:

25  Q.  Hi, Mr. Dunn.  My name is Lindsay McCaslin.  I represent

—————— L. D. Dunn - Cross (By Ms. McCaslin) ——————

1   Bill Smith.

2   A.  Hi, Counselor.

3   Q.  Now, in the office -- I understand that the insurance

4   side was a little bit separate, but in the office, Daryl was

5   the top of the chain, right?

6   A.  Define "the office."

7   Q.  Under Dominion, Daryl was the top boss?

8   A.  Daryl was Dominion.

9   Q.  Right.  Okay.  Raeann was considered second?

10  A.  Raeann was, as Daryl put it at every seminar, his

11  right-hand man, but woman.

12  Q.  And she seemed to be with him at any meeting that he

13  needed to go to?

14  A.  Every meeting.

15  Q.  Every meeting?

16  A.  Yeah, to my knowledge.

17  Q.  He included her on everything, pretty much, that you're

18  aware of?

19  A.  Everything I'm aware of, she was included in.

20  Q.  Kind of inseparable?

21  A.  Attached at the hip.

22  Q.  Now, Raeann handled -- you know Raeann handled money

23  between various bank accounts, right?

24  A.  Correct.

25  Q.  You didn't have access to moving money between accounts,

L. D. Dunn - Cross (By Ms. McCaslin)

1   right?

2   A.   No, ma'am.

3   Q.   And you're aware that Daryl had the FINRA ban?

4   A.   I became aware of that, yes.

5   Q.   Is it fair to say that he made it sound like he was the

6   good guy, downplayed it?

7   A.   Oh, that's one way of putting it.

8   Q.   Did he consider himself a whistleblower?

9   A.   Oh, yes, he was a hero.

10  Q.   And while you worked there, did you participate in the

11  weekly Monday calls that Daryl held?

12  A.   Sometimes, yes, ma'am.

13  Q.   And you never heard anything on those calls about an SEC

14  investigation, did you?

15  A.   In all honesty, Counselor, I can't say "yes" or "no"

16  because he would reference "a investigation."  I don't recall

17  Daryl specifically saying "SEC investigation."  He referenced

18  something, I want to say, Arizona.  There was the things that

19  we knew because paperwork was coming into the office that we

20  were then sending to Florida.  So I cannot say, with

21  100 percent certainty, "yes" or "no."

22  Q.   Because the mail coming in was being delivered to the

23  Dominion office, right?

24  A.   To the Virginia Beach office on Commuter Drive, yes,

25  ma'am, because Daryl, when he moved the companies out of

──────── L. D. Dunn - Cross (By Ms. McCaslin) ────────

1    Virginia, he never changed the LLC address.  All of the LLCs
2    were still registered as Virginia LLCs located at Commuter
3    Drive.
4    Q.  Right.
5    A.  Even though Dominion Private Client Group, Daryl Bank,
6    all those operations, nothing happened at Virginia Beach at
7    that point forward.
8    Q.  So we saw that you met Bill at the Country Music Awards.
9    A.  Yes, ma'am.
10   Q.  Is that the only time you met him in person?
11   A.  No.  I want to say there was one other time, and I'm
12   trying to remember where it was.
13   Q.  But you didn't see him often --
14   A.  Oh, no.
15   Q.  -- because you two were on opposite sides of the coast.
16   A.  No.  He was on the left coast; I was on the right coast.
17   Q.  Now, when you left Dominion, it sounds like you packed up
18   your office really quickly.
19   A.  Yes, ma'am.
20   Q.  You didn't exactly tell the salesmen, like, "I'm putting
21   in a two-week notice," right?
22   A.  There wasn't a two-week notice.
23   Q.  So one day you were just gone?
24   A.  One day Dominion Insurance Brokerage was gone.
25   Q.  And right after you left, you're aware that Daryl and

──────── L. D. Dunn - Cross (By Ms. McCaslin) ────────

1   Raeann were smearing your name?

2   A.  I have no direct knowledge.  They never said anything to

3   me.  I'm sure they were.  I'm aware of the police reports

4   that were filed.

5   Q.  Right.  So you're aware that you were accused of

6   stealing?

7   A.  Correct.

8   Q.  You are aware that Daryl accused you of stealing over

9   $60,000 from the company?

10  A.  No, I didn't know that.

11  Q.  Daryl did file a public lawsuit against you in Florida,

12  right?

13  A.  Yes, somewhere in Florida.  I haven't seen it, but I was

14  told about it.

15  Q.  But that got dismissed, right?

16  A.  I have no idea.  And if you have knowledge, I would

17  appreciate it.  I would like to know.

18  Q.  Well, are you aware that you were accused of stealing

19  $20,000 from Raeann's credit card?

20  A.  No.

21  Q.  Okay.  But you're aware that there was a lawsuit?

22  A.  Yes.

23  Q.  And Bill only did that one insurance deal with Regent?

24  A.  With Regent?

25  Q.  Yes.  It was just for a very brief time, right?

───── L. D. Dunn - Cross (By Ms. McCaslin) ─────

1   A.   Oh, very brief time.  I don't remember that Bill

2   submitted a case with Regent.

3   Q.   And you were there for a very short time because you

4   weren't really bringing in business there, either, right?

5   A.   My role was never to bring in business.  I did not bring

6   business into either company.  My role was agent support.

7   Q.   Okay.

8   A.   And I left Regent because, quite frankly, when I first

9   came to help Mike Binetti at Dominion Insurance Brokerage,

10  the prior year the practice had done approximately

11  1.2 million in annuities; nothing impressive.  The first

12  year, that year, we did 12.8 million.  Bill was certainly a

13  part of that 12.8 million in production.

14         So we were excited with the growth of Dominion

15  Insurance and what the future looked like.  Gradient was a

16  huge part of that.  So when they pulled their back office

17  support out, that, in essence, killed Dominion Insurance

18  Brokerage.

19  Q.   Right.

20  A.   With Regent, in all honesty, I just lost the desire.

21  Q.   Now, the insurance was mostly annuities, you mentioned?

22  A.   Yes, ma'am.  Well, fixed index annuities and then

23  permanent and term life insurance.  There were no variable

24  items sold, no security products of any type sold through

25  Dominion Insurance Brokerage.

────────L. D. Dunn - Redirect────────

1          MS. McCASLIN:  Okay.  No further questions.

2          THE COURT:  Thank you.

3          MS. O'BOYLE:  One clarifying point that I can do in

4    two questions.

5          THE COURT:  Let's hope it's clarifying.

6                    REDIRECT EXAMINATION

7    BY MS. O'BOYLE:

8    Q.  Mr. Dunn, when you were working for Dominion Insurance

9    Brokerage, where were you going to work every single day?

10   A.  Commuter Drive, Virginia Beach.

11   Q.  And where were Raeann and Daryl going to work every

12   single day?

13   A.  Port St. Lucie, Florida.

14         MS. O'BOYLE:  Thank you.  No further questions.

15         THE COURT:  May this witness be permanently excused?

16         MS. O'BOYLE:  Yes, Your Honor.

17         MR. YAROW:  Yes, Your Honor.

18         MS. McCASLIN:  Yes, Your Honor.

19         THE COURT:  You may step down, sir.

20         (The witness was excused.)

21         THE COURT:  Ladies and gentlemen, we're going to

22   terminate right here for the day.  Be safe.  Leave your legal

23   pads with the court security officer, and we'll see you

24   tomorrow morning at 9:30.

25         (The jury exited the courtroom.)

Carol L. Naughton, Official Court Reporter

```
 1            THE COURT:  Now, was there a matter that someone
 2   wanted to raise?
 3            MS. McCASLIN:  Yes, Your Honor.  We received an
 4   e-mail early this morning from the government letting us know
 5   that they think they might be done with their case in chief
 6   on Tuesday, it could be early, it could be later.  But with
 7   both the defense sides trying to coordinate with travel, the
 8   Marshals are anxious to figure out when we should plan to
 9   have our witnesses here.  So I was just hoping for a little
10   direction.
11            THE COURT:  Can you update us?
12            MS. O'BOYLE:  Your Honor, we do believe that we will
13   be finishing up on Tuesday or Wednesday, but we think likely
14   Tuesday.  We did not know, with Ms. Gibson's testimony, how
15   long that would go.  It was really, I think, a factor for us.
16   So if we could have tonight to kind of take a look and plan,
17   and we can give them an idea of whether we're going to be
18   finishing early on Tuesday or late on Tuesday.
19            THE COURT:  Okay.  Inquiry:  Are your witnesses out
20   of state and need to be flown in here by the U.S. Marshal?
21            MS. McCASLIN:  Yes, Your Honor.  Some of them, not
22   all of them.
23            THE COURT:  Okay.  I think the earlier we give them
24   notice -- I think giving them notice that they need to get
25   them in here at least by Tuesday, and if they are to stay
```

```
 1   overnight, then they have to stay overnight, but no later
 2   than Tuesday you need to get them in here.
 3          I know you are going to give them an update, but
 4   even if that pushes you to Wednesday, they need all the time
 5   they can get, and we have an intervening weekend here.  You
 6   can give them a more definite time if you can tomorrow, but
 7   that's just something the Court would suggest.
 8          MS. O'BOYLE:  Okay.
 9          MR. YAROW:  Your Honor, I also have an inquiry.  And
10   the government doesn't have to give an answer, but they can
11   mull on it overnight.
12          They have on their list two witnesses I also have on
13   my list, Jere Friedman and Jon Palmieri.
14          So if you would just let me know tomorrow whether or
15   not I need to bring them in next week or --
16          MS. O'BOYLE:  We will certainly let you know
17   tomorrow whether or not we intend to call either one of those
18   witnesses.
19          MR. YAROW:  Thank you.
20          THE COURT:  Okay.  That's it.
21          (Proceedings adjourned at 5:05 p.m.)
22
23
24
25
```

```
1                        CERTIFICATION

2

3        I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled matter.

5

6

7              _____/s/_____

8                     Carol L. Naughton

9                     August 30, 2022

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```