1     IN THE UNITED STATES DISTRICT COURT
      FOR THE EASTERN DISTRICT OF VIRGINIA
2        Norfolk Division

3

4 - - - - - - - - - - - - - - - - - -
             )
5  UNITED STATES OF AMERICA  )
             )
6  v.         )  CRIMINAL ACTION NO.
             )    2:19cr47
7  DAVID ALCORN and    )
  AGHEE WILLIAM SMITH II,  )
8             )
     Defendants.    )
9 - - - - - - - - - - - - - - - - - - )

10        ** Jury Trial - Day 8 **

11       TRANSCRIPT OF PROCEEDINGS

12        Norfolk, Virginia

13        February 10, 2022

14

15 BEFORE: THE HONORABLE RAYMOND A. JACKSON
      United States District Judge, and a jury
16

17 APPEARANCES:

18     UNITED STATES ATTORNEY'S OFFICE
      By: Andrew C. Bosse
19       Melissa E. O'Boyle
       Elizabeth M. Yusi
20       Assistant United States Attorneys
       Counsel for the United States
21
     RICHARD S. YAROW LLC
22      By: Richard S. Yarow
       Counsel for Defendant David Alcorn
23
     FEDERAL PUBLIC DEFENDER'S OFFICE
24      By: Andrew W. Grindrod
       Lindsay Jo McCaslin
25       Assistant Federal Public Defenders
       Counsel for Defendant Aghee William Smith II

1                     I N D E X

2     GOVERNMENT'S
      WITNESSES                                        PAGE
3
       NICHOLAS GENTILE
4            Direct Examination By Ms. Yusi            1388
             Cross-Examination By Mr. Yarow            1405
5            Cross-Examination By Mr. Grindrod         1406
      GEORGE CUSHMAN
6            Direct Examination By Mr. Bosse           1412
             Cross-Examination By Mr. Yarow            1441
7            Cross-Examination By Mr. Grindrod         1449
             Redirect Examination By Mr. Bosse         1453
8      ALAIN MARTELL
             Direct Examination By Ms. O'Boyle         1454
9            Cross-Examination By Ms. McCaslin         1577

10


11                   E X H I B I T S

12    GOVERNMENT'S
      NO.                                              PAGE
13
       877                                             1397
14     879                                             1399
       887                                             1402
15     300H                                            1417
       716                                             1430
16     717                                             1432
       718                                             1437
17     300C                                            1459
       300D                                            1459
18     1002B                                           1462
       1002H                                           1473
19     1002E                                           1479
       1002K                                           1480
20     1002M                                           1482
       1002O                                           1483
21     1100                                            1487
       1101                                            1492
22     1103                                            1500
       1105                                            1503
23     1106                                            1506
       1109                                            1514
24     1111                                            1516
       1114                                            1518
25     1115                                            1523

1                         I N D E X
                              (Continued)
2
                          E X H I B I T S
3
GOVERNMENT'S
4   NO.                                                PAGE

5    1112                                              1524
     1118                                              1528
6    1121                                              1529
     1123                                              1530
7    250                                               1532
     285                                               1534
8    313                                               1535
     409                                               1536
9    28                                                1537
     517                                               1538
10   543                                               1539
     544                                               1540
11   545                                               1540
     538                                               1541
12   313A                                              1542
     409A                                              1543
13   517A                                              1545
     523A                                              1546
14   624                                               1548
     625                                               1549
15   1001B                                             1550
     60                                                1552
16   250A                                              1553
     1019T                                             1555
17   1019V                                             1556
     1019W                                             1557
18   1019Y                                             1558
     1019Z                                             1559
19   1020B                                             1561
     1020G                                             1561
20   1020H                                             1563
     1202A                                             1568
21   1203                                              1571
     1211                                              1572
22   1200                                              1573
     1201                                              1576
23


24   DEFENDANT SMITH'S
     NO.                                               PAGE
25
     309              (For ID Only)                    1411

```
 1              (Proceedings resumed at 9:35 a.m.)
 2              THE COURT:  Good morning, counsel and ladies and
 3    gentlemen, since everyone is not counsel in here.
 4              Okay.  Bring the jury in.
 5              (The jury entered the courtroom.)
 6              THE COURT:  Good morning, ladies and gentlemen.  We
 7    can hear you this morning.  Let the record reflect all jurors
 8    are here this morning.  Does counsel agree?
 9              MS. YUSI:  The government agrees, Your Honor.
10              MR. YAROW:  Mr. Alcorn agrees, Your Honor.
11              MS. McCASLIN:  Mr. Smith agrees.
12              THE COURT:  All right.  Then we will get started on
13    your next witness.
14              MS. YUSI:  Thank you, Your Honor.  We call Nicholas
15    Gentile.
16              (Witness sworn.)
17              NICHOLAS GENTILE, called by the Government, having
18    been first duly sworn, was examined and testified as follows:
19                        DIRECT EXAMINATION
20    BY MS. YUSI:
21    Q.  Good morning.
22    A.  Good morning.
23    Q.  I'm over here.
24    A.  Oh, there you are.
25    Q.  Thank you.  Could you introduce yourself to the Court.
```

N. Gentile - Direct

1    A.   I'm Nicholas Gentile.

2    Q.   How do you spell your last name?

3    A.   G-e-n-t-i-l-e.

4    Q.   And how old are you today, sir?

5    A.   70.

6    Q.   And the city and state where you live?

7    A.   Roseville, California.

8    Q.   That's near Sacramento?

9    A.   Yes.

10   Q.   How long have you lived there?

11   A.   Fifteen years.

12   Q.   And do you work?

13   A.   No, I'm retired.

14   Q.   What did you retire from?

15   A.   San Francisco Fire Department.

16   Q.   How long were you with the fire department?

17   A.   Thirty years.

18   Q.   Are you married?

19   A.   Yes.

20   Q.   To whom?

21   A.   Darcy Oliver.

22   Q.   And is she working right now?

23   A.   No.  She's filed for Social Security.  She's retired.

24   Q.   What did she do before retirement?

25   A.   She was a dental hygienist.

N. Gentile - Direct

```
1   Q.  While you and your wife were working, did you all save
2   money for retirement?
3   A.  Yes, I did.
4   Q.  How did you save money for retirement?
5   A.  Deferred compensation through the fire department.
6   Q.  What does that mean?
7   A.  That means you put money into the -- it's an IRA, is what
8   it is.
9   Q.  Sir, if you can talk just a little slower, and you can
10  pull the microphone right up to you, if you want.  There you
11  go.
12          Is it a matching compensation thing?
13  A.  No.
14  Q.  It's just you saving money?
15  A.  Yes.
16  Q.  All right.  How much did you save each pay period?
17  A.  I had $98,930 in there.
18  Q.  After 30 years?
19  A.  Yes.
20  Q.  And how about your wife?  Did she save while working?
21  A.  Yeah.  She had 41,000.
22  Q.  Do either you or your wife have any background or
23  training in investments?
24  A.  No.
25  Q.  How about any experience in investing?
```

———— N. Gentile - Direct ————

1   A.   No.

2   Q.   Now, I want to talk to you about a man named Bill Smith.

3   How did you come to know Mr. Smith?

4   A.   He was referred to us by my brother-in-law, Bob Farley.

5   Q.   And how had your brother heard of him?

6   A.   Through his radio show.

7   Q.   And what was your understanding of what his radio show

8   was?

9   A.   It was retirement planning.

10  Q.   And what was your understanding of what Mr. Smith did for

11  a living?

12  A.   He was a financial advisor, basically.

13  Q.   Okay.  And did you and your wife check him out on your

14  own at all?

15  A.   My wife did.

16  Q.   What did she do?

17  A.   She checked him out on Better Business Bureau, and she

18  heard his radio show a couple of times.

19  Q.   Now, did you two reach out to him to help with your

20  retirement?

21  A.   We did.

22  Q.   And around when did you first meet Mr. Smith, just an

23  approximate time period?

24  A.   March of 2013.

25  Q.   And did you guys go together?

N. Gentile - Direct

```
 1   A.  We did.
 2   Q.  What were you all looking for in terms of financial
 3   advice?
 4   A.  We were trying to better our situation.  I had gone
 5   through a divorce in 2007, and I was just trying to rebuild
 6   my life and trying to maximize what money I did have.
 7   Q.  Okay.  And how many times do you think you met with
 8   Mr. Smith in person?
 9   A.  I believe it was three times.
10   Q.  Did you know a person named John Kennedy?
11   A.  Yes.  He was his secretary or the fellow that arranged
12   the appointments.
13   Q.  Okay.  And where was Mr. Smith's office located?
14   A.  It was on Normandy Lane in Roseville.
15   Q.  What was his office like?
16   A.  Just looked like a basic office that anybody would have
17   in a business building.
18   Q.  Okay.  Did you discuss religion or faith with Mr. Smith?
19   A.  We did, actually.  He had pictures of Jesus Christ and
20   little things that looked like religious objects in his
21   office.
22   Q.  And did he talk about religion at all?
23   A.  Yeah.  He said he was a believer and that he had his
24   faith in God, and his wife too, and he mentioned a fellow
25   named Daryl Bank was also a Godly man.
```

N. Gentile - Direct

```
1   Q.  And how did that make you feel?
2   A.  Comfortable.
3   Q.  Did you trust Mr. Smith?
4   A.  Yes.
5   Q.  And did he understand your and Ms. Oliver's financial
6   situation in terms of any retirement money you had?
7   A.  He asked us how much money we had.
8   Q.  And did you tell him your full picture?
9   A.  Basically, yes, I did.
10  Q.  All right.  What -- after speaking with Mr. Smith, what
11  did he suggest in terms of investments, if anything?
12  A.  He suggested the Spectrum 100.
13  Q.  And what was your understanding of what Spectrum 100 was?
14  A.  It was you were going to invest in these cell phone
15  towers through the -- it was -- well, give me a minute.
16  Q.  Well, you mentioned cell phone towers.  How did the
17  investment work?  Like, what -- would you own the towers, or
18  how would it work?
19  A.  No.  You would invest your money, and they would do the
20  build-out.  They call them build-outs.
21  Q.  And how would that result in money for the investor?
22  A.  Well, what you did was you invested your money, and then
23  they had these -- you had -- once these towers were built,
24  and it was based on the broadband wave, wavelength, which is
25  what all, everything -- all the communications are funneled
```

N. Gentile - Direct

 1  through that wavelength.
 2  Q.  Okay.  And you would get -- were these towers already
 3  built, or these were something that had to be built?
 4  A.  That had to be built.
 5  Q.  Were any major companies already involved that you
 6  recall?
 7  A.  Yeah.  He mentioned a couple, like, you know, the cell
 8  phone people, Verizon and AT&T, and Motorola was a big deal.
 9  Q.  Did he say anything about others who had investments in
10  this and how they were doing?
11  A.  Yeah.  He showed us money that people were making in
12  upwards of 20 percent return on your money.
13  Q.  Okay.  And these were people that had already invested in
14  the same investment?
15  A.  Yes.
16  Q.  What was your understanding, if any, if Mr. Smith had any
17  personal investment in this?
18  A.  Yeah.  Mr. Smith indicated to me that he -- because I
19  asked him pointblank, "How much money do you have invested?"
20  And he said, "Well, I have, between myself and my family,
21  $300,000 invested."
22  Q.  And was that just in spectrum or Spectrum 100?
23  A.  Spectrum 100.
24  Q.  In terms of timing, what did he say as to how quickly you
25  would start seeing returns on this?

N. Gentile - Direct

1   A.   He said it might take two years to start seeing a return
2   on your investment.
3   Q.   Okay.  And what about fees or commission?  Did he talk
4   about that?
5   A.   He didn't mention any of that.
6   Q.   Did you talk to Mr. Smith in terms of what you were
7   willing to risk in terms of your principal that you would
8   invest?
9   A.   Yeah, yeah.  I did.
10  Q.   What did you say?
11  A.   I said, well, I have $98,000 I can invest.  That's my
12  deferred comp.  My wife had 41,000 that she could invest.
13  Q.   Okay.  And did he talk about any risk?
14  A.   He said the risk was very minimal, maybe 10 percent.
15  Q.   Okay.  And what, if anything, did you understand about
16  the urgency of getting involved in this?
17  A.   Well, the first meeting he said that, "I don't know if I
18  can get you into this because it might be too late."
19  Q.   And what did that make you feel?
20  A.   Well, we'll see, because we had a second meeting, and
21  that's when he told us, "Yeah, we got you in.  I was able to
22  get you into this Spectrum 100."
23  Q.   You said he mentioned Daryl Bank.  What was your
24  understanding of who that was?
25  A.   He was the fellow that ran the operation, basically, from

N. Gentile - Direct

1    what I gathered from Mr. Smith.

2    Q.   Did he give you any information about his background?

3    A.   No.

4    Q.   All right.  Did you ever talk to Mr. Bank yourself?

5    A.   No.

6    Q.   I'm going to show you, if you can look on your screen in

7    front of you, Exhibit 504, which has already been admitted.

8            Do you recognize this document?

9    A.   Yes, I do.  That's what he presented to us.

10   Q.   "He" being Mr. Smith?

11   A.   Mr. Smith, yes.

12   Q.   Okay.  And did he go through this in terms of page by

13   page and how this investment was supposed to work?

14   A.   Not really.

15   Q.   Okay.  If we can go to Page 15, Page 15 of Exhibit 504.

16   Were you ever shown any financials?  You said he showed you

17   numbers.  Did he show you financials and pro formas for this

18   investment?

19   A.   Yes, he did.

20   Q.   Did he explain them to you?

21   A.   He had a bunch of arrows pointing to different numbers.

22   Q.   And having no background in investments, did you follow

23   along, or were you able to fully understand it?

24   A.   It was pretty much mumbo-jumbo to me because I'm not a

25   financial guy.

N. Gentile - Direct

1  Q.  If we can go to Page 20 of Exhibit 504.  And you talked

2  about Daryl Bank.  Did you have any understanding of who

3  David Alcorn was in terms of this investment?

4  A.  No.

5  Q.  Or how about Kent Maerki?  Did he ever mention Kent

6  Maerki?

7  A.  No, no.

8  Q.  Now, did you and your wife end up investing in

9  Spectrum 100?

10  A.  Yes, we did.

11  Q.  I'm going to show you Exhibit 877.  There's a binder in

12  front of you, sir.

13  A.  Yeah.

14  Q.  And one of the tabs is Exhibit 877.  Do you recognize

15  this document?

16  A.  I do.

17  Q.  And is this a copy of the asset purchase agreement for

18  your first purchase in Spectrum 100?

19  A.  Yes, it is.

20          MS. YUSI:  Your Honor, we move to admit Exhibit 877.

21          THE COURT:  Any objection?

22          877 will be admitted.

23          (Government's Exhibit 877 was admitted.)

24  BY MS. O'BOYLE:

25  Q.  All right.  And what was your first purchase into

N. Gentile - Direct

1   Spectrum 100?

2   A.  It was 78,000.

3   Q.  How many times do you think you met with -- with

4   Mr. Smith concerning this before you invested?

5   A.  I think it was two times.

6   Q.  Okay.  And who provided the paperwork, if you recall?

7   A.  Mr. Smith did.

8   Q.  And if we can go to Page 20 of Exhibit 877.  Is that your

9   signature on Page 23 of Exhibit 877?

10  A.  Yes, it is.

11  Q.  Do you recall when you made your first investment into

12  Spectrum 100?

13  A.  I think it was June of 2013.

14  Q.  Okay.  And if we can look at -- did you make a second

15  investment into Spectrum 100 as well?

16  A.  Yes.

17  Q.  And when was that, if you recall?

18  A.  Probably July of that same year.

19  Q.  If we can -- if you can look at Exhibit 879.  Do you

20  recognize this document?

21  A.  Yes.

22  Q.  Is this your second purchase of Spectrum 100?

23  A.  Yes.

24  Q.  And how much did you purchase?

25  A.  15,000.

N. Gentile - Direct

1   Q.   If we can go to Page 2.  Is that your signature?

2   A.   Yes.

3   Q.   And what is the date on here?  And you can look at the

4   screen too.  I have made it larger.

5   A.   7/21/14.

6   Q.   All right.  Now, did you do two purchases relatively

7   close together, your first two purchases of Spectrum 100?

8   A.   Yes.

9   Q.   And were they -- could it have been in 2014?

10  A.   Yeah, it could have been.  Yeah.

11  Q.   And what made you get the second with spectrum?

12  A.   Actually, the 78,000 was the bulk of what I had, and this

13  was -- I had a little bit more left in there, so I figured

14  why not just put it all in there.

15          MS. YUSI:  All right.  Your Honor, we move to admit

16  Exhibit 879.

17          THE COURT:  Exhibit 879 is admitted.

18          (Government's Exhibit 879 was admitted.)

19  BY MS. YUSI:

20  Q.   If we can just go back for one moment to your first

21  purchase at Exhibit 877, which has already been admitted,

22  Page 2.

23          Okay.  And if you recall, this is your first 78,000?

24  A.   Yes.

25  Q.   And what is the date of your first purchase?

N. Gentile - Direct

1   A.  3/12/14.

2   Q.  Okay.  So you did your first purchase in March 2014 and

3   your second in July 2014.  Did Mr. Smith give you any updates

4   between those in terms of how the investment was doing?

5   A.  No.

6   Q.  Did he tell you of any issues or investigations -- or,

7   I'm sorry -- the fact that Janus Spectrum, the main company,

8   had filed bankruptcy prior to your second investment?

9   A.  No.

10  Q.  Now, did Ms. Oliver make her own investment into this as

11  well?

12  A.  She did.

13  Q.  How much did she put in?

14  A.  31,000 originally and another 10,000 on top of that.

15  Q.  And approximately when did she make those investments?

16  A.  Probably around the same time I did.

17  Q.  And were those also through Bill Smith?

18  A.  Yes.

19  Q.  And did you all do these together, these investments?  Or

20  you were together when you did the paperwork and things like

21  that?

22  A.  Yes.

23  Q.  Now, after your first two initial investments in 2014,

24  did you check on the investments with Mr. Smith?

25  A.  No.

N. Gentile - Direct

```
1    Q.  How did you keep up with how the investment was doing?
2    A.  I went through the Summit Trust, because what happened
3    was we -- I wanted to, you know, give the money to Mr. Smith.
4    He said, "No, you have to send it to Raeann Gibson in
5    Port Lucie, Florida."
6    Q.  Okay.
7    A.  So that's what I did.  And they gave us an account number
8    and a website which you could access and look at your
9    investment.
10   Q.  That was a Summit Trust account that you could look at?
11   A.  Yes.
12   Q.  How often would you look at it?
13   A.  I would look at it, like, every third day.
14   Q.  And what did you see?
15   A.  The money was just sitting there doing nothing.
16   Q.  All right.  Did you make a third investment into
17   Spectrum 100 as well?
18   A.  I did.
19   Q.  If you can look at Exhibit 887 in your notebook.  Do you
20   recognize this document?
21   A.  I do.
22   Q.  And what is it?
23   A.  A third investment.
24   Q.  All right.
25            MS. YUSI:  Your Honor, we move to admit Exhibit 887.
```

N. Gentile - Direct

```
 1              THE COURT:  Exhibit 887 is admitted.
 2              (Government's Exhibit 887 was admitted.)
 3    BY MS. YUSI:
 4    Q.  And how much was your third investment into Spectrum 100?
 5    A.  They've got 5,500 here.  I thought it was 5,800.
 6    Q.  Okay.  And what was the date on Page 2 of
 7    Exhibit 887 that you made this investment?
 8    A.  6/19/15.
 9    Q.  And this was almost a year after you made your first two
10    investments?
11    A.  Yeah.  This was the last of the money that I had in my
12    deferred compensation account.
13    Q.  All right.  Prior to your third investment, did Mr. Smith
14    update you as to how the investment was doing?
15    A.  No.
16    Q.  Did you ever listen to conference calls concerning this
17    investment?
18    A.  I did.
19    Q.  And how often were these conference calls, if you recall?
20    A.  It seemed like every couple of months they had a
21    conference call.
22    Q.  Was it for customers?
23    A.  No.  It's for the investors.
24    Q.  Oh, the investors.
25              And what was the general tone of the conference
```

Carol L. Naughton, Official Court Reporter

N. Gentile - Direct

1    calls?
2    A.  Well, it was always promoting -- Daryl Bank headed up the
3    thing, and he said -- it was always, "The build-outs are
4    going great.  We're doing fine."
5    Q.  And do you recall any particular speaker that they had on
6    those conference calls?
7    A.  One time he had a fellow from Motorola that had --
8    supposedly had 20 years' experience with Motorola, and he was
9    saying that, you know, "Things are going great.  Hang in
10   there."
11   Q.  And what, if anything, did they say on the conference
12   calls about an SEC investigation into the spectrum
13   investments?
14   A.  Never heard that.
15   Q.  Did Bill Smith ever update you on the SEC investigation?
16   A.  No.
17   Q.  Did you all call Mr. Smith?  Did you and your wife ever
18   call Mr. Smith and talk to him?
19   A.  Yeah.  I believe my wife did over the course of this
20   situation, but I never did.
21   Q.  All right.  Did it cause you any concern?
22   A.  No.
23   Q.  All right.  Did you start seeing any return after two
24   years?
25   A.  No.

——————N. Gentile - Direct——————

```
 1   Q.  What did you do?
 2   A.  I just kept going on the website and checking it out.
 3   That was it.
 4   Q.  Did you ever call Mr. Smith to ask about how -- if your
 5   money was still there?
 6           MR. GRINDROD:  Objection.  Asked and answered.
 7           THE WITNESS:  No, I didn't.
 8           THE COURT:  Wait a minute.  Hold on.
 9           Objection overruled.  I think -- well, objection
10   overruled.
11           MS. YUSI:  Thank you, Your Honor.
12   BY MS. YUSI:
13   Q.  And just temporally speaking, you said your wife called
14   at one point.  Did you meet with Mr. Smith at some point to
15   try to get your money back?
16   A.  Yes, we did.  He called us in for a third time, which
17   from what I remember, he tried to get us to invest in this
18   legion, another investment opportunity.
19   Q.  And what was his reasoning in trying to get you to invest
20   in a different investment?
21   A.  He said, "I'll try to get our money back."
22   Q.  So at that point did he say or what was your impression
23   about the 140,000 or so that you all had put into
24   Spectrum 100?
25   A.  At that point I figured that's what we lost.  It somehow
```

-N. Gentile - Cross (By Mr. Yarow)-

1   was stolen or confiscated, or it's not there.

2   Q.  And when Mr. Smith offered to get you your money back

3   through another investment, did you take him up on that?

4   A.  No, we didn't.

5   Q.  Did you ever speak to him again?

6   A.  No, not that I recall.

7   Q.  All right.  And did you or your wife get any of your

8   money back?

9   A.  No, we didn't.

10          MS. YUSI:  I think those are all my questions right

11   now, sir.  Other counsel might have questions for you as

12   well.

13          THE COURT:  Cross-examination.

14                      CROSS-EXAMINATION

15   BY MR. YAROW:

16   Q.  Mr. Gentile, my name is Rick Yarow.  I represent David

17   Alcorn.  I just have a couple of questions for you.

18          When Mr. Smith was telling you about the investments

19   in the spectrum, did he tell you that you were, in essence,

20   purchasing an application service for the investment?

21   A.  No, I never heard that.

22   Q.  Did he tell you that there was no guarantee the

23   application would be approved and the license would be

24   granted for the spectrum?

25   A.  Yes, he did say that they might not get those licenses,

Carol L. Naughton, Official Court Reporter

——————N. Gentile - Cross (By Mr. Grindrod)——————

 1   but there was a very slim chance that that would happen.
 2   Q.  Okay.  And did he tell you that you were investing in the
 3   guard band of 800-megahertz spectrum?
 4   A.  800 megahertz, yes.
 5   Q.  He didn't tell you it was guard band, though, narrowband?
 6   A.  Never heard that.
 7   Q.  Never heard the word "narrowband"?
 8   A.  No.
 9   Q.  Do you know the difference between narrowband and
10   broadband?
11   A.  No, I don't.
12   Q.  Did he tell you that in order to keep your license, that
13   the construction of a site was required within a 12-month
14   period of the license being issued?
15   A.  He didn't say that.
16          MR. YAROW:  Okay.  Thank you very much.  That's all
17   the questions I have.
18          THE COURT:  Cross-examination?
19                     CROSS-EXAMINATION
20   BY MR. GRINDROD:
21   Q.  Good morning, sir.
22   A.  Good morning.
23   Q.  So you mentioned looking up Mr. Smith on the Better
24   Business Bureau, with Ms. Yusi.  Do you remember that?
25   A.  My wife did that.

N. Gentile - Cross (By Mr. Grindrod)

1   Q.   Okay.  Was that before you all went to meet with him?

2   A.   No.  It was after.

3   Q.   And was it after the last time you met with him or after

4   the -- was it somewhere in the middle of those series of

5   meetings?

6   A.   I believe it was in the middle somewhere.

7   Q.   Okay.  And so you didn't see anything on the Better

8   Business Bureau that dissuaded you from meeting with him

9   again, right?

10  A.   No, I didn't see anything.  Like I said, my wife did it.

11  Q.   Well, your wife didn't say, boy, I don't think we should

12  go meet with Mr. Smith based on X, Y, Z, right?

13  A.   No, she didn't say that.

14          MS. YUSI:  Objection, Your Honor.  Hearsay.

15          THE COURT:  Sustained.

16          MR. GRINDROD:  Your Honor, it's, just for the

17  record, not offered for truth but offered to show --

18          THE COURT:  Sustained.

19          MR. GRINDROD:  I understand.

20  BY MR. GRINDROD:

21  Q.   You understood that Daryl Bank was the person who oversaw

22  the Spectrum 100 investment, right?

23  A.   Yes.

24  Q.   And you and your wife interacted directly with Daryl

25  Bank's office, right?

———N. Gentile - Cross (By Mr. Grindrod)———

 1   A.  I don't know if it was in his office, but we had dealt

 2   with Raeann Gibson.

 3   Q.  Right.  Raeann Gibson.

 4        And she, Raeann Gibson, told you that she was the

 5   person that you could contact for statements about your

 6   account, right?

 7        MS. YUSI:  Objection, Your Honor.  Hearsay.

 8        THE COURT:  Sustained.

 9   BY MR. GRINDROD:

10   Q.  What was your understanding as far as who you could

11   contact to get statements about your account?

12   A.  It was through Summit Trust.

13   Q.  Did you understand that you could get statements from

14   Raeann Gibson?

15   A.  No.

16   Q.  Okay.  I'm going to show you a document, if I could, sir.

17        MR. GRINDROD:  This will be just for the witness.

18        (Pause in the proceedings.)

19   BY MR. GRINDROD:

20   Q.  Do you recognize this document, sir?

21   A.  I do.

22   Q.  And is this an e-mail from Raeann Gibson to your wife?

23   A.  It is.

24   Q.  Okay.  Could you read this paragraph here to yourself?

25        MS. YUSI:  Your Honor, I'm going to object.  It's

———— N. Gentile - Cross (By Mr. Grindrod) ————

1   not in evidence, and I'm going to object because it's all

2   hearsay as well.

3          THE COURT:  I think you have to go back and see if

4   you can get this into evidence, Mr. Grindrod; and then I

5   think you have to deal with the hearsay matter.

6          MR. GRINDROD:  Your Honor -- okay.

7   BY MR. GRINDROD:

8   Q.  Mr. Gentile, do you not remember whether Ms. Gibson was

9   someone you could get statements from?

10  A.  I don't remember that, but I never saw any money.

11  Q.  Okay.  Sorry, I just didn't hear what you said.  Could

12  you repeat that for me?

13  A.  I didn't see any money in any account.

14  Q.  Okay.  I'm just trying to figure out what your

15  understanding was as far as who would get you the statements.

16  Do you remember if it was Raeann Gibson or do you not

17  remember?

18  A.  I don't remember any statements or anybody saying we're

19  going to send you statements.

20  Q.  Okay.

21  A.  All I had was the website that I went on.

22  Q.  And if I showed you an e-mail that was forwarded to you

23  about who could provide you statements, would that refresh

24  your recollection?

25  A.  Possibly.

─────N. Gentile - Cross (By Mr. Grindrod)─────

1  Q.  Okay.  So I'm putting on the screen, just for you, an

2  e-mail.  This is the same one you just looked at that was

3  forwarded to you.  Feel free to read the whole thing, but if

4  you want to read down here.

5  A.  The middle one, it says, "Summit will send off" --

6  Q.  If you could just read it to yourself, sir, and see if

7  anything in here refreshes your recollection as to who could

8  pull statements from you about your account.

9         THE COURT:  If any document is used to refresh

10  recollection, you have to mark that document so we'll know

11  what it is.  What exhibit number are you using to attempt to

12  refresh his recollection?

13         MR. GRINDROD:  Your Honor, it hasn't been previously

14  marked as a --

15         THE COURT:  But it has to be given a number.

16         MR. GRINDROD:  Okay.

17         THE COURT:  What number do you want to call it?

18         It may not be admitted, but it still must be marked

19  for identification so we know what he used to refresh his

20  recollection.

21         MR. GRINDROD:  Yes, Your Honor.

22         THE WITNESS:  I never saw this e-mail.

23         THE COURT:  Don't say anything, sir, unless a

24  question is being asked to you.

25         Just select any number that's beyond the numbers you

N. Gentile - Cross (By Mr. Grindrod)

1   are using.

2        MS. McCASLIN:  309 should be open.

3        THE COURT:  309 for identification.

4        (Defendant Smith's Exhibit 309 was marked for

5   identification only.)

6        THE COURT:  Read it silently, and look at it, then

7   let him know whether it refreshes your recollection.  That's

8   all you have to say.  Does it refresh your recollection?

9        THE WITNESS:  No, this doesn't -- I don't remember

10  this at all.

11  BY MR. GRINDROD:

12  Q.  Okay.  That's all right.

13       Did you participate in the conference calls about

14  Spectrum 100?

15  A.  Yeah, I listened in on them.

16  Q.  And that was Daryl Bank talking on those calls for the

17  most part?

18  A.  Yes.  He would be the host.

19  Q.  Okay.  Is it fair to say that basically everything Daryl

20  Bank said on those calls was positive?

21  A.  It was always positive.

22  Q.  Okay.  And you mentioned on direct that you might have

23  wanted to give your money directly to Mr. Smith, but you

24  didn't give your money to Mr. Smith, did you?

25  A.  No.

G. Cushman - Direct

1    Q.  You sent your money to Raeann Gibson in Port St. Lucie,
2    Florida, right?
3    A.  Yes.
4    Q.  And once Raeann Gibson got your money, you didn't get any
5    money back, right?
6    A.  That's correct.
7          MR. GRINDROD:  No further questions, Your Honor.
8          THE COURT:  All right.  Is there any redirect?
9          MS. YUSI:  No, sir.
10          THE COURT:  May the witness be excused permanently,
11    counsel?
12          MR. GRINDROD:  Yes, Your Honor.
13          MS. YUSI:  Yes, Your Honor.
14          THE COURT:  Sir, you may step down.  You may be
15    excused permanently.
16          (The witness was excused.)
17          THE COURT:  Next witness?
18          MR. BOSSE:  Your Honor, the government calls George
19    Cushman.
20          (Witness sworn.)
21          GEORGE CUSHMAN, called by the Government, having
22    been first duly sworn, was examined and testified as follows:
23                     DIRECT EXAMINATION
24    BY MR. BOSSE:
25    Q.  Please introduce yourself to the Court.

G. Cushman - Direct

1    A.  My name is George Cushman.

2    Q.  C-u-s-h-m-a-n?

3    A.  C-u-s-h-m-a-n.

4    Q.  How old are you, Mr. Cushman?

5    A.  68.

6    Q.  Where do you live?

7    A.  Canandaigua, New York.

8    Q.  Please spell Canandaigua for the record.

9    A.  C-a-n-a-n-d-a-i-g-u-a.

10   Q.  And where did you live -- is that where you've moved as

11   you get close to retirement?

12   A.  Precisely.  My son lives there and my grandchildren live

13   there.

14   Q.  Where did you live before Canandaigua?

15   A.  In Washington, D.C.

16   Q.  Are you currently married, sir?

17   A.  I am.

18   Q.  To whom?

19   A.  Marilyn Cushman.

20   Q.  And are you retired or still working?

21   A.  I'm still working.

22   Q.  Tell the jury a little bit about your career background,

23   just a brief overview.

24   A.  Worked in business most of my life, in management.  I was

25   kind of a turnaround manager and wound up becoming a

G. Cushman - Direct

1   turnaround CEO for several companies.  I left that due to an

2   acquisition, had to move into a different skill, worked with

3   low-income, underserved students across the country helping

4   to develop them into graduating high school and being able to

5   get into a college and then into a career.  And then I helped

6   a nonprofit community college support -- build better

7   outcomes for students and more equitable, marketable outcomes

8   for students.

9   Q.  If you could pull that mic in just a little bit.  You

10  don't want it touching the mask, but close.  If you could

11  raise your voice a little bit so the folks in the back can

12  hear you.

13  A.  Thank you.  I tend to be soft-spoken.

14          And from there -- as of right now, I'm working with

15  the U.S. Department of Labor on realigning the American

16  Apprenticeship system.

17  Q.  Did your wife work outside the home?

18  A.  She did.

19  Q.  And does she still?

20  A.  No.

21  Q.  What does she do?

22  A.  She was with the college board, which was -- in the

23  policy and advocacy side of the college board.

24  Q.  Okay.  I want you to think back to the 2011/2012 time

25  period.  Did you and your wife have significant experience in

G. Cushman - Direct

1    investing in companies at that point?

2    A.  No.  We invested in, you know, working with a financial

3    advisor, just, you know, annuities and things of that nature.

4    Q.  All right.  Would you describe your investment style as

5    more risky, more conservative?

6    A.  We were very conservative.

7    Q.  And did you have any previous experience in your business

8    background in the spectrum or telecommunications industries?

9    A.  No.  I touched a number of industries but never got

10   anywhere near spectrum.

11   Q.  Let me ask you about Craig and Susan Newell.  Do you know

12   the Newells?

13   A.  I do.

14   Q.  How did you get to know them?

15   A.  Craig and I went to college at UMass in Amherst way back

16   in the early '70s, and we've been friends, close friends ever

17   since.

18   Q.  And do you know his wife Susan as well?

19   A.  Yes.  He was dating her at the time as I was my wife at

20   the time.

21   Q.  Did there come a time long after college that you formed

22   or joined an investment group with the Newells?

23   A.  Well, this investment group for the spectrum.  That was

24   the only one.

25            THE COURT:  Sir, your voice is dropping.  You have

G. Cushman - Direct

```
 1    to be the loudest you have ever been so that we can hear you
 2    in the back.
 3              THE WITNESS:  Thank you, sir.  I will.
 4    BY MR. BOSSE:
 5    Q.  Okay.  So you were mentioning an investment group having
 6    to do with spectrum?
 7    A.  Yes.
 8    Q.  Tell us how that came about.
 9    A.  In conversations with Craig, we had been looking for
10    something to invest in that would help us long term.  We were
11    looking for an investment that would help us for our
12    long-term retirement to provide some source of income.
13    Q.  And is that how you ended up joining this investment
14    group?
15    A.  That is, yes.
16    Q.  How did you hear about it first?
17    A.  Heard about it from Craig.  He -- as I mentioned, we were
18    friends.  He had been at a convention of some kind for
19    franchises, and he had been looking at a couple of things,
20    something with dental that didn't have any interest for me.
21    But the one was -- the spectrum was intriguing and it felt
22    pretty hands-off.
23    Q.  How did you learn about the particulars of the spectrum
24    investment that was being pitched?
25    A.  I had no background in it.  I could find limited amount
```

G. Cushman - Direct

1   of information on the Internet at the time.  But I did get

2   information from Craig's spreadsheet that was very

3   optimistic, but we felt even if it hit a fraction of what

4   that they suggested, it would be good, and there was some

5   marketing material.

6   Q.  You said marketing material?

7   A.  Yeah.

8           MR. BOSSE:  Let me show, just for the witness if I

9   could, Government's 300H.

10  BY MR. BOSSE:

11  Q.  If you look on your screen there, is this the kind of

12  projection that you were given before this investment was

13  made?

14  A.  That's precisely what we received.

15          MR. BOSSE:  I'll offer 300H.

16          THE COURT:  300H is admitted.

17          (Government's Exhibit 300H was admitted.)

18  BY MR. BOSSE:

19  Q.  And I think what you said, correct me if I'm wrong, is

20  that this looked optimistic, but even if it was a fraction of

21  this, you would be happy?

22  A.  Very much so.

23          MR. BOSSE:  We can take that down.

24  BY MR. BOSSE:

25  Q.  Let me ask you, did you learn who the principals were

G. Cushman - Direct

1   behind the investment that was being offered?

2   A.  The -- Craig had indicated it was two gentlemen that he

3   was working with, David Alcorn and the older gentleman.  I've

4   just lost that thought.

5   Q.  Let me show, if I could -- well, you know, we'll get

6   there as we go through this.

7           But Mr. Alcorn and an older gentleman?

8   A.  Yes.

9   Q.  All right.  Were you able to interact or speak with them

10  before making these investments?

11  A.  Yes.  We had some calls, phone calls.

12  Q.  Tell the jury whatever you recall about what you were

13  told by the principals, Mr. Alcorn and this other man, about

14  the investment?

15  A.  Well, the investment was a very, I guess, high-need --

16  high-need, low-supply type of investment which would yield a

17  very strong return, that there was a history of these strong

18  returns, and their goal was to help us get that -- get the

19  licenses purchased and then actually help us get them

20  monetized, so, in other words, so that the licenses could

21  operate on a tower and generate income for us.

22  Q.  Did they talk about how they were going to monetize or

23  what partners they were going to use to monetize?

24  A.  They mentioned large carriers that had great interest in

25  this and that the carriers couldn't apparently carry these

G. Cushman - Direct

 1    because they needed to have a lot of small -- FCC required a

 2    lot of small owners of these so nobody had a monopoly on

 3    towers and radios, so there was a need for us.

 4    Q.   When you say "large carriers," what are you talking

 5    about?

 6    A.   Sprint, Verizon, AT&T.

 7    Q.   Okay.  And that's what you heard from Mr. Alcorn and the

 8    other man before the investment was made?

 9    A.   Very clearly, yes.

10    Q.   Did Mr. Alcorn or the other man describe at any point the

11    amount of risk in the investment?

12    A.   Kent Maerki.

13    Q.   Kent Maerki?

14    A.   Yes, sir.

15    Q.   I'll refer to him as Kent Maerki from now on.

16    A.   Thank you.

17    Q.   So the two men, Mr. Alcorn and Mr. Maerki, did they

18    describe at any point the amount of risk that was involved in

19    this investment?

20    A.   They indicated it was a low risk.  These were extremely

21    valuable, these licenses.

22    Q.   And I don't want you to shout, but I do want you to

23    almost shout with your normal voice.  Really raise it up,

24    okay?

25    A.   Uh-huh.

Carol L. Naughton, Official Court Reporter

G. Cushman - Direct

1  Q.  The jury is normally right there, but they can't be right

2  now.

3          Did Mr. Maerki and Mr. Alcorn tell you about how

4  much it would actually cost them to apply for the licenses

5  they're talking about, the actual cost?

6  A.  I knew the cost that they were charging.  That's all.  I

7  had no idea what they cost when purchasing directly from the

8  FCC.

9  Q.  Did you later learn how much it would actually cost?

10 A.  Much later.

11 Q.  Was it a surprise to you?

12 A.  Yes.  Actually, it was.  We suspected that they were less

13 than what we were paying because of the other services that

14 they were providing, but we had no idea it would be that much

15 less.

16 Q.  Did Mr. Maerki or Mr. Alcorn tell you that between the

17 two of them together they'd be taking more than half of the

18 money that you invested as profit to themselves?

19 A.  There was no discussion of that.

20 Q.  Before the investment was made, did Mr. Alcorn or

21 Mr. Maerki tell you at any point that large carriers, like

22 AT&T and Verizon, would not be able to use these narrowband

23 licenses?

24 A.  They did not.

25 Q.  How much did you invest with your wife?

G. Cushman - Direct

1  A.  We invested about, I believe it was 90,000 in the

2  licenses, and we had further investment toward the end where

3  we were trying to operationalize them ourselves, about

4  another 20,000.

5          MR. BOSSE:  Could we see, for everyone because it's

6  been admitted, 703.

7  BY MR. BOSSE:

8  Q.  And have you seen this chart before, sir?

9  A.  Oh, yes.  That was our group.

10 Q.  And is this you right here where I'm holding the curser,

11 George and Marilyn Cushman?

12 A.  Yes, sir.

13 Q.  Okay.  And as I move rightward, are these the three

14 rounds that you invested in with the Newells and their

15 investment group?

16 A.  That's correct.

17 Q.  Okay.  And for 35-, 15-, and $40,000?

18 A.  Correct.

19 Q.  And you said there was additional moneys involved.  Tell

20 the jury about that.

21 A.  It was much further down the road, after several meetings

22 with the -- Janus that we determined we have to do this on

23 our own if we're going to recover any of this money.  So we

24 needed to invest in actually having somebody that did

25 understand towers and radios to help buy radios, put them on

G. Cushman - Direct

1   towers, and then try to hire people to actually sell the
2   bandwidth.
3   Q.  You actually tried to do that on your own?
4   A.  We did.
5   Q.  Where did the money come from that you put into this
6   investment?
7   A.  My -- both my parents had, unfortunately, died within a
8   very short time of one another, and it was an inheritance
9   that I had.
10  Q.  Okay.  Let me ask you about some things that happened
11  after the investment was made.  So you put the money in with
12  the group for these licenses, and I want to go down to the
13  time period after you made the investment.  Okay?
14  A.  Okay.
15  Q.  After the investment was made, did you have phone calls
16  with Mr. Alcorn and Mr. Maerki about the investment?
17  A.  Yeah.  We had regular phone calls.
18  Q.  Would both men speak on the calls?
19  A.  Yes.
20  Q.  Generally, what were those post-investment calls like?
21  What were they telling you?
22  A.  There was a bit of discussion about a competitor called
23  SmartCOMM and that they were evil and trying to challenge
24  Janus.  There was a lot of discussion about buying more
25  licenses and about how valuable the licenses are.

G. Cushman - Direct

 1   Q.  And on those initial calls, was there ever backpedaling
 2   on the plan to lease these back to the large carriers, Sprint
 3   and Verizon?
 4   A.  There was never a clear plan voiced about how that would
 5   happen.
 6   Q.  Anything unusual about those calls that you remember that
 7   jumps out at you today?
 8   A.  That they requested that they not be recorded in any way.
 9   Q.  Who requested that?
10   A.  I believe it was David Alcorn.
11   Q.  I want to move on to something the jury has heard about.
12   Did you attend a conference in Napa Valley at one point
13   having to do with these investments?
14   A.  I did.
15        MR. BOSSE:  Can we see 316D.  It's been admitted.
16   BY MR. BOSSE:
17   Q.  And is this the conference that you attended at the
18   Silverado Resort and Spa in August of 2013?
19   A.  Yes, sir.
20   Q.  All right.  How did that come about?
21   A.  Our lead was Craig Newell, and Craig was very much a
22   pebble in the shoe, so to speak, constantly badgering,
23   looking for answers, looking for meetings to get face to face
24   to ask these questions; how are we going to get these
25   licenses monetized?

G. Cushman - Direct

1   Q.   Let me ask you about that.  Before you made the

2   investment, was that part of the pitch that was made to you,

3   that not only would you have licenses, but they would be

4   monetized as well?

5   A.   Yes.

6   Q.   Is that what Craig is following up on?

7   A.   Absolutely, yes.

8   Q.   And he did that again and again?

9   A.   Again and again.

10  Q.   Who from Janus Spectrum was at the Napa Valley meeting

11  that you recall?

12  A.   Both Kent Maerki and David Alcorn were there.

13  Q.   Who else was there, as far as you recall?

14  A.   There was a fellow by the name of Billy Smith.  There was

15  a few other people that I can't recall that were associated

16  with -- I don't know if they were a part of spectrum, but

17  they were associated with spectrum.

18  Q.   Do you think you remember a Bill Smith being there?

19  A.   I do.

20  Q.   What was happening at the meeting?  What did you hear?

21  Let me strike all that and try that again.

22         Did you hear people talk at the Napa Valley

23  conference?

24  A.   Yes.

25  Q.   Tell the jury what you heard.

G. Cushman - Direct

```
 1              THE COURT:  Now, let's be clear on who is talking,
 2    if you can, Mr. Bosse, because I don't know whether everybody
 3    at the conference were alleged co-conspirators in this case.
 4              MR. BOSSE:  Yes, sir.
 5    BY MR. BOSSE:
 6    Q.  Without saying what they said exactly, what kind of
 7    conversations were being held at this conference in Napa
 8    Valley about the spectrum licenses at issue here?
 9    A.  It was being suggested that -- a fellow was brought in
10    from Texas, and he was asking -- he was suggesting that
11    there's a way to --
12              MR. YAROW:  Your Honor --
13              THE COURT:  Sustained.  Wait a minute.
14    BY MR. BOSSE:
15    Q.  Who brought the fellow in from Texas?
16    A.  Janus brought in a gentleman by the name of Bill Gray,
17    and Bill Gray was from Texas, and he was indicating that --
18              MR. YAROW:  Objection.
19              THE COURT:  Wait a minute.  You're saying you
20    object?
21              MR. YAROW:  Object to what Bill Gray says.
22              THE COURT:  Is it Bray or is it Gray?  Which one is
23    it?
24              MR. BOSSE:  It's Mr. Bill Gray, and he was --
25    testimony is that he was brought in to speak by Janus
```

G. Cushman - Direct

1    Spectrum to the investors at the conference.

2         THE COURT:  The Court is going to sustain that.  He

3    was brought in to speak, but has there been any indication

4    that he is one who is a part of a conspiracy here?

5         MR. BOSSE:  Your Honor, if he's brought in to

6    speak -- well, I'll ask a clarifying question, but I'm going

7    to argue that when he's brought in to speak by Janus Spectrum

8    about monetization of the licenses, he's working as an agent

9    of Janus, and what he says about monetization is being

10   presented on behalf of Janus.  It goes directly to the case.

11   So I think I need to ask that clarifying question.

12        MR. YAROW:  That's a foundation that I did not --

13        THE COURT:  Well, they can lay the foundation.

14        MR. BOSSE:  That's fair.

15   BY MR. BOSSE:

16   Q.  Did Mr. Gray talk about potential avenues to monetization

17   of the licenses?

18   A.  Yes.

19   Q.  Okay.  What did he say?

20   A.  He suggested that there was a concept of adding radios

21   and towers to the tops of a number of buildings in a city

22   providing some density that would result in cities having

23   Wi-Fi and working with city governments to actually put

24   something like that together.

25   Q.  Was that different from the pitch you heard from

G. Cushman - Direct

1   Mr. Alcorn and Mr. Maerki?

2   A.  It was kind of -- it felt odd that this wasn't Verizon or

3   AT&T or Sprint talking, that they were talking about this

4   other concept that seemed very hypothetical.

5   Q.  At the Napa Valley conference, did you get the sense that

6   there was a firm plan to monetize the licenses in place?

7   A.  No.

8   Q.  At any point during that conference, were you asked to

9   make new investments?

10  A.  Yes.  Including by this Bill Gray.  On the side, he was

11  asking for us to invest in him.

12  Q.  Okay.  Let's move on to another meeting that you had.  I

13  want to direct your attention to the meeting that happened in

14  Washington, D.C.  Do you remember that?

15  A.  I do.

16          MR. BOSSE:  And if we could see 713, please, just to

17  get the timeline.

18  BY MR. BOSSE:

19  Q.  Sir, do you recollect this being the date of the Janus

20  emerging technologies for connectivity and communications

21  workshop?

22  A.  I do.

23  Q.  Okay.  And do you recall these people who are listed here

24  being present there?

25  A.  I do.  I recall Tripp Forrest more from the first meeting

G. Cushman - Direct

1   in California than this one.

2   Q.  Tripp was in Napa Valley as well -- Mr. Forrest?

3   A.  He was.

4   Q.  Okay.  Do you recall Mr. Alcorn and Mr. Maerki and Peter

5   Lewis being in Washington, D.C.?

6   A.  Yes, sir.

7   Q.  All right.  Why did that meeting take place, if you know?

8   A.  Again, we had requested to get more answers and pushed

9   again for a face-to-face meeting to get answers.

10  Q.  Who from your investment group attended?

11  A.  Craig Newell, Susan Newell, Charlie West, Billy Sissom.

12  There was another gentleman.  I'm not remembering his name.

13  It was the only time I ever met him.

14  Q.  Was everybody who spoke to the group at that meeting

15  invited there or associated with Janus Spectrum?

16  A.  Yes.

17  Q.  And were the topics that were being discussed having to

18  do with the Janus Spectrum licenses that we're talking about

19  here today?

20  A.  Yes.

21  Q.  Do you remember a man named Peter Lewis?

22  A.  I do.

23  Q.  What did Mr. Lewis talk about at the meeting?

24  A.  Mr. Lewis was pitching a concept about the -- using our

25  licenses for the Internet of Things; in other words, to use

G. Cushman - Direct

1   them to communicate with refrigerators or vacuum cleaners or
2   what have you, things that would be connected to the
3   internet.
4   Q.  Okay.  Had that -- did that sound at all like what you
5   had been told before you made the investment?
6   A.  It was another confusing moment because it didn't have
7   anything to do with those major carriers that we thought we
8   were going to be courting.  The other big surprise was that
9   that's where we learned that the bandwidth wasn't suitable
10  for those large carriers.  It needed -- it was the wrong
11  wavelength, and it was better in short bursts for things
12  versus phones.
13  Q.  Did this meeting happened in June 2014?
14  A.  That's correct.
15  Q.  When did you all first make the investments at issue
16  here?
17  A.  It was several years prior.
18  Q.  After that meeting when you're learning about the fact
19  that you have narrowband licenses, what did you want to do as
20  far as next steps with the investment group?
21  A.  Again, our next steps were -- thinking through the
22  meeting and what we heard, I put together a series of
23  specific questions that I really wanted to get answered, and
24  I surfaced them to our group being consensus, and then we
25  actually put those to David Alcorn.

Carol L. Naughton, Official Court Reporter

G. Cushman - Direct

 1              MR. BOSSE:  I'm going to show, just for the witness,

 2      716, please.

 3      BY MR. BOSSE:

 4      Q.  Have you seen this before, sir?

 5      A.  It's a little blurry, but yes.  I recognize it.

 6      Q.  Is this the e-mail you sent to your group with the

 7      questions that you wanted to ask David Alcorn?

 8      A.  That's correct.

 9      Q.  Were these questions, in fact, then sent to David Alcorn,

10      and he responded to them?

11      A.  Yeah, that's correct.

12      Q.  Okay.  And does the e-mail include your summary of

13      statements that Mr. Maerki and among other people made at the

14      Washington, D.C., and earlier meetings?

15      A.  I put those in quotations.

16              MR. BOSSE:  I'll offer 716.

17              THE COURT:  Exhibit 716 will be admitted.

18              (Government's Exhibit 716 was admitted.)

19      BY MR. BOSSE:

20      Q.  And let's look up at the top.  Who is the e-mail, the top

21      e-mail from?

22      A.  That's my e-mail address.

23      Q.  Okay.  And what is the date of the e-mail?

24      A.  7/15/2014.

25      Q.  And this is to AirApparentAssociatesLLC@GoogleGroups.  Is

Carol L. Naughton, Official Court Reporter

G. Cushman - Direct

1   this an e-mail that would go to everyone in the investment
2   group?
3   A.  Our group had a Google group so we could coordinate our
4   communication.
5   Q.  All right.  And what are you suggesting to the group that
6   you all do next?
7   A.  That we take a few of the group and get directly with
8   David Alcorn and hopefully Kent Maerki and without any other
9   Peter Lewises or anybody else involved, but just a straight
10  us-and-them conversation.
11  Q.  And then do you have an agenda listed below?
12  A.  Yes, sir.
13  Q.  All right.  And we're not going to look at every single
14  one of these because they are going to come up in our next
15  exhibit, but is this the agenda and a list of questions that
16  you sent to David Alcorn?
17  A.  It is.
18          MR. BOSSE:  Could we see 717, please, just for the
19  witness.
20  BY MR. BOSSE:
21  Q.  Is this the same e-mail now forwarded to David Alcorn
22  with his answers to some of your inquiries?
23  A.  Yes.
24          MR. BOSSE:  I'll offer 717.
25          THE COURT:  Exhibit 717 will be admitted.

Carol L. Naughton, Official Court Reporter

G. Cushman - Direct

```
 1              (Government's Exhibit 717 was admitted.)
 2    BY MR. BOSSE:
 3    Q.  Let's start with your e-mail at the top.
 4              "Dear David, thank you for your willingness to speak
 5    with us."
 6              Is this your cover e-mail to David Alcorn?
 7    A.  Yes, it is.
 8    Q.  Sent on what date?
 9    A.  July 18th, 2014.
10    Q.  Okay.  Let's go through the agenda that you sent and the
11    questions you asked and the answers you got.
12              You said, "KM declared that the goal was to get
13    licenses, activate licenses, buy more licenses, then monetize
14    licenses."
15              What was Mr. Alcorn's response to this?
16    A.  "Yes" -- KM refers to Kent Maerki.
17              He says, "Yes, I recall Kent saying this."
18    Q.  So did Mr. Alcorn intersperse his answers among your
19    questions?
20    A.  Essentially.  He interspersed them on the reply e-mail.
21    Q.  All right.  And did you ask for a clearer understanding
22    of what Janus's plan for monetization is?
23    A.  Yeah.  We hadn't gotten one.
24    Q.  All right.  What did Mr. Alcorn respond down here?
25    A.  "Janus will be putting licenses in contact with vendors
```

G. Cushman - Direct

1    such as Peter and/or Jim."

2    Q.  Did you ask for better communication from Janus?

3    A.  Yes.

4    Q.  And what was Mr. Alcorn's response to that?

5    A.  "We are fine with having calls or meetings when

6    appropriate, but I am not a big fan of meeting for the sake

7    of meeting, especially at this point in the process.  We are

8    talking to a lot of people about it."

9    Q.  And did you have some very basic questions about spectrum

10   that you posed to him?  Like here, "The value of spectrum

11   varies.  How so and where does ours stand?"

12   A.  Yes.

13   Q.  I want you -- well, what did Mr. Alcorn say in response

14   to that, your question about how the value of spectrum

15   varies?

16   A.  He said that it was determined by someone who is willing

17   to pay for it, the value of the revenue and flow it

18   generates.  Obviously, they had two markets at this point,

19   and he recalled Peter saying that the 8-and-a-half-by-11

20   paper is worth more than we paid for it.

21   Q.  Okay.  Was that a surprise to you to hear that the paper

22   was worth more than you paid for it?

23   A.  Yes.  We didn't think it was going in a good direction,

24   but that was even worse.

25   Q.  Okay.  Let's go down here.  You're asking, "Bandwidth,

G. Cushman - Direct

1  ours is relatively narrow, thus better for local data only,

2  IoT, Internet of Things, and for voice streaming

3  applications, yet we supposedly can handle LTE 4G."

4        Had you been told, even at this late date, that this

5  could still handle 4G technology?

6  A.  It still kept coming up.

7  Q.  Then you asked, "Can we truly handle needs of big players

8  or not?"  And what was Mr. Alcorn's response?

9  A.  Not sure what I meant.

10 Q.  How did you feel when you read that?

11 A.  That -- that warm feeling of anger that comes over you.

12 Felt a bit disingenuous.

13 Q.  It's been years now?

14 A.  Yeah.

15 Q.  You asked, "Do we need neighboring license holders to

16 become desirable to Verizon, Sprint, AT&T, et cetera?"

17        Did he respond to that?

18 A.  Yes.

19 Q.  Did he give a response to that part?

20 A.  Yes, sir.

21 Q.  Well, do you see one here, or did he leave that blank?

22 A.  Actually, yeah, it is blank.

23 Q.  All right.  You asked, "What's the reality for us?"

24        What did he say in response?

25 A.  He said, "We own a product that is relatively low supply

Carol L. Naughton, Official Court Reporter

1   and high demand.  That was something that we heard right from

2   the very beginning.  Always a good recipe for success," in

3   his opinion.  "The reality is we will do very, very well, but

4   on the time frame it sounds as if you're pushing, which, of

5   course, I do not know what it is."

6   Q.  When you asked again for Janus's plan for monetization,

7   what was his answer?

8   A.  "See above."

9   Q.  Did you ever get an answer for the plan for monetization?

10  A.  No.  No time frames, no plan.

11  Q.  All right.  And did you ask some questions about Peter

12  Lewis and got some response from Mr. Alcorn?

13  A.  Yes.

14  Q.  Were the licenses ever, to your knowledge, monetized

15  through Peter Lewis's Internet of Things?

16  A.  No.

17          MR. BOSSE:  If I could bring that up.  I've got one

18  more page to go through there.  That's 717, please.

19  BY MR. BOSSE:

20  Q.  Did you ask him when the process for monetization would

21  begin?

22  A.  Yes.

23  Q.  What did he tell you?

24  A.  He said it began about 60 days ago, which is a long time

25  after we purchased these licenses.

G. Cushman - Direct

1   Q.   All right.  And did you ever hear about what monetization

2   he actually started 60 days ago?

3   A.   It wasn't clear to me by his answer.

4   Q.   And down at the end, last one here, are you telling him

5   that you would like to offer constructive recommendations?

6   A.   Uh-huh.

7   Q.   What does he say in response?

8   A.   He said he appreciated it.  "It's an exciting time.  We

9   can appreciate our partners perhaps getting a little antsy."

10  Q.   That's you who is getting antsy?

11  A.   We are -- indicating that we are getting a little antsy.

12  But they control things.

13          MR. BOSSE:  We can take that down.  Thank you.

14  BY MR. BOSSE:

15  Q.   After that e-mail -- that was setting up another meeting,

16  correct?

17  A.   Yes.

18  Q.   Did you then have that meeting with Mr. Alcorn?

19  A.   We did.  That was the meeting we requested in Arizona.

20  We wanted to be just face to face with David and Kent.

21  Q.   Who all went out to Arizona to do that meeting?

22  A.   It was Craig and Susan, Charlie West and Billy Sissom, I

23  believe.

24          MR. BOSSE:  Could we see Government 718, please,

25  just for the witness.

G. Cushman - Direct

```
 1   BY MR. BOSSE:
 2   Q.  Sir, is this the e-mail chain that sets up this in-person
 3   meeting we're talking about here?
 4   A.  Yes, that's correct.
 5   Q.  All right.  And it's an e-mail from you to Mr. Alcorn and
 6   then a response from Mr. Alcorn to you?
 7   A.  That's correct.
 8            MR. BOSSE:  I'll offer 718.
 9            THE COURT:  718 is admitted.
10            (Government's Exhibit 718 was admitted.)
11   BY MR. BOSSE:
12   Q.  And so before you go out to this meeting, is this what
13   you were hearing from Mr. Alcorn in his response to you?
14   A.  Yes.
15   Q.  Okay.  That "Some of the questions you asked simply
16   cannot be answered with a specific degree of accuracy."  And
17   does he mention, "the overwhelming support and understanding
18   we are receiving from all of the other Janus clients"?
19   A.  Yes, "all" in caps.
20            MR. BOSSE:  We can take that down.
21   BY MR. BOSSE:
22   Q.  Where did the meeting take place that you had, the
23   in-person meeting?
24   A.  We went to David Alcorn's home.
25   Q.  Where was that?
```

G. Cushman - Direct

 1  A.  It was in Scottsdale.  It was in a gated community.
 2        MR. BOSSE:  Can we see 1113, please.
 3  BY MR. BOSSE:
 4  Q.  Do you recognize this?
 5  A.  I do.
 6  Q.  What is it?
 7  A.  David Alcorn's home.
 8  Q.  And is this where the meeting was held?
 9  A.  We did.  We went in and we sat at that couch grouping by
10  the window.
11  Q.  Did you tour the house or just went straight into the
12  kitchen?
13  A.  We just went straight into that room.  There was no tour.
14  We sat down; they did not.  It was fairly clear they didn't
15  want us there for very long.
16  Q.  What did you think when you drove up to that house and
17  went in to meet with Mr. Alcorn?  What was your impression of
18  the place and --
19        MR. YAROW:  Your Honor, I'm going to object to
20  relevancy.
21        THE COURT:  Sustained.
22        MR. BOSSE:  I'll withdraw it.
23  BY MR. BOSSE:
24  Q.  You said they weren't happy to see you?
25  A.  It did not appear as though they were.  They were late.

G. Cushman - Direct

1  Q.  What was the tenor of the meeting?  Were you all sitting

2  around chatting or what?

3  A.  We sat down.  We were asking those specific questions.

4  Mr. Alcorn was leaning against the wet bar and indicated

5  something to the effect that we were being driven by fear.

6  Q.  That was his response to your questions about

7  monetization?

8  A.  Yes.

9  Q.  All right.  As you're doing that meeting, is there any

10  talk of -- more talk of the Internet of Things, more talk of

11  AT&T or Verizon?  Did they have anything specific for you?

12  A.  No.

13  Q.  Did David Alcorn tell you that he and his companies at

14  that point were under investigation by the Securities and

15  Exchange Commission?

16  A.  No.

17  Q.  And did he tell you later on, in April 2015, that the SEC

18  had sued him and Janus for fraud?

19  A.  No.

20  Q.  Did you ever get a return on your investment?

21  A.  No.

22  Q.  Did you ever get any of the money you put into it back?

23  A.  No.

24  Q.  You mentioned earlier that you actually tried to monetize

25  the licenses yourself, this group?

G. Cushman - Direct

1    A.  We did.

2    Q.  Was anyone in the group involved before in the telecom

3    industry?

4    A.  No.

5    Q.  How did you try to monetize the licenses?

6    A.  We were referred to -- and I can't remember how we got

7    referred to him -- but a fellow by the name of Dale Gray, no

8    relation to Bill Gray, in Arizona, and he built towers, and

9    he had some knowledge.  Dale helped us purchase the radios to

10   put on some of our towers that we were licensed for, and that

11   was really so we could initially get them up and send a ping

12   to the -- which meant that it was now active, which if we did

13   not do that, the licenses would expire.  FCC would -- they

14   have to be enabled within a certain amount of time and --

15   Q.  Let me stop you there.

16   A.  Yes.

17   Q.  So did Janus Spectrum spend money to send out this beam

18   from a tower to activate the licenses, or was that your cash?

19   A.  That was all our cash.  That was -- Janus did nothing in

20   this.

21   Q.  What happened to the licenses in the end?

22   A.  They, I assume, went back to the FC C.  They expired

23   because we could not monetize them, couldn't get them active.

24   FCC doesn't want licenses sitting that aren't being used.

25           MR. BOSSE:  No further questions.  Please stand by,

—————— G. Cushman - Cross (By Mr. Yarow) ——————

1    though, sir.

2              THE WITNESS:  Thank you.

3              THE COURT:  Any cross?

4                        CROSS-EXAMINATION

5    BY MR. YAROW:

6    Q.  Mr. Cushman, my name is Rick Yarow.  I represent David

7    Alcorn.  How are you today?

8    A.  Very good.  Thank you.

9    Q.  So you had first -- before purchasing or becoming an

10   investor in the spectrum, Craig relayed to you that he had

11   already invested before in this; is that correct?

12   A.  I don't recall that.

13   Q.  Okay.  Well, either Craig or Susan?

14   A.  I don't recall that.  I recall him coming to me and

15   suggesting that he had went with other family and friends to

16   get in on this particular investment.

17   Q.  Okay.  And Craig and Susan didn't say we're -- well,

18   we've already purchased applications, and we'd like you to

19   join in future ones?

20   A.  He did ask us to join in future ones.  I just don't

21   recall him saying that he had already invested in them.

22   Q.  That's fine.

23              And did either Craig or Susan explain to you what

24   the investment was?

25   A.  Yes.  They provided the spreadsheets that were previously

G. Cushman - Cross (By Mr. Yarow)

1   shown and various marketing material that they had gotten

2   from Janus.

3   Q.  Okay.  And did they explain to you that you were

4   purchasing an application to receive a license from the

5   Federal Communications Commission?

6   A.  They indicated that we were purchasing licenses that

7   would be monetized through this process.

8   Q.  They didn't tell you that you were purchasing an

9   application to obtain a license?

10          MR. BOSSE:  It's been asked and answered.

11  Objection.

12          THE COURT:  Why isn't this hearsay?

13          MR. YAROW:  I'm sorry?

14          THE COURT:  And why isn't this hearsay?

15          MR. YAROW:  Withdraw the question.

16  BY MR. YAROW:

17  Q.  And you testified that you invested another -- after the

18  investment with Janus Spectrum, you invested another $20,000

19  to, I think you said operationalize?

20  A.  Correct.

21  Q.  Okay.  And what exactly does that mean?

22  A.  That meant buying the radio, the actual unit that goes on

23  the tower that the licenses would be associated with, and

24  also to -- we actually hired a couple people within a couple

25  of cities that we had chosen to try to sell the bandwidth.

G. Cushman - Cross (By Mr. Yarow)

1   Q.   Okay.  Sell or use the bandwidth?

2   A.   Sell access to the bandwidth.

3   Q.   Okay.  Sell access.  In other words, to lease the

4   bandwidth?

5   A.   Right.

6   Q.   Okay.  And was this with RapidLink Wireless?  Do you

7   recall that name?

8   A.   The name is familiar.  I don't recall working with

9   RapidLink.  We were -- the main person we were using for

10  guidance was Dale Gray.  I'm not sure if that is RapidLink or

11  not.

12  Q.   And what did Bill Gray say that -- what did Bill Gray

13  represent that he did?

14  A.   Bill Gray was not involved.  Dale.

15  Q.   Sorry?

16  A.   David Gray was.

17  Q.   Is it David or Dale?

18  A.   Dale.

19  Q.   Dale Gray.  Okay.  So what did Dale Gray say his

20  involvement was?

21          MR. BOSSE:  Objection.  Hearsay.  And it's been

22  asked, I think.

23          THE COURT:  Did you elicit anything on Dale Gray

24  during your direct examination?

25          MR. BOSSE:  Yes.

Carol L. Naughton, Official Court Reporter

G. Cushman - Cross (By Mr. Yarow)

 1          THE COURT:  You asked him what Dale Gray said on

 2   direct examination?

 3          MR. BOSSE:  He mentioned, Your Honor, that Dale Gray

 4   was the person they tried to help -- get to help them.

 5          THE COURT:  Oh, okay.  Sustained.

 6   BY MR. YAROW:

 7   Q.  At the Napa Valley meeting, was it explained to you by

 8   David Alcorn that -- were there any licenses obtained at the

 9   point of the Napa Valley conference?

10   A.  Previous to the conference, licenses had been purchased,

11   yes.

12   Q.  Okay.  So the applications had been approved, and

13   licenses had been issued at that point in time?

14   A.  You know, I'm not sure whether they had been issued or

15   not at that time.

16   Q.  Okay.

17   A.  I can't recall the timing of that.  I know that the

18   investments were made, moneys were given to Janus by that

19   time.

20   Q.  Do you recall licenses eventually being issued at some

21   point in time?

22   A.  Yes.

23   Q.  Okay.  Did you receive a copy of the license?

24   A.  I received a notification from the FCC.

25   Q.  Okay.  That your license had been received?

G. Cushman - Cross (By Mr. Yarow)

1    A.   (Inaudible response.)

2    Q.   And did you receive a copy of the application at the time

3    that it was submitted to the -- or at the time it was

4    prepared to be submitted to the FCC?

5    A.   I don't recall ever seeing the application.

6    Q.   Okay.  And at the Napa Valley conference, was it

7    explained to you by Mr. Alcorn that -- well, first of all --

8    let me back up.

9         How many licenses did you have at the time, or

10   shortly thereafter, you referred to at the Napa Valley?  How

11   many cities?

12   A.   Again, there was a series of these purchases.  I can't

13   remember the exact sequence and timing related to the

14   Silverado event.  There was at least -- we had at least one

15   round of purchases, maybe two.  So it would have been several

16   cities; Denver, Minneapolis --

17   Q.   Right.  I was going to ask you does it ring a bell.  It

18   was Denver and Minneapolis.  Were those the two cities that

19   had been --

20   A.   That rings a bell, uh-huh.

21   Q.   Okay.  And did Mr. Alcorn explain at that time that if

22   they were to be successful going to the cell phone companies,

23   that they were not going to be interested in only two

24   markets, they needed to obtain more?

25        MR. BOSSE:  I'm going to object to any elicitation

Carol L. Naughton, Official Court Reporter

G. Cushman - Cross (By Mr. Yarow)

1   of Mr. Alcorn's statements.

2            THE COURT:  Sustained.

3   BY MR. YAROW:

4   Q.  Was that your understanding at the time that you went to

5   the Napa Valley conference?

6   A.  I'm sorry.  Could you repeat what my understanding was?

7   Q.  Yes.  Was it your understanding that more than those two

8   licenses had to be obtained before the cell phone companies

9   would consider leasing or purchasing?

10  A.  No.  We were asked to buy more licenses on a regular

11  basis, at virtually every meeting we had by phone or in

12  person.  And when I -- one of the questions that I had for

13  Mr. Alcorn when I wrote to him after the Washington, D.C.,

14  was do they need more density to be able to make those

15  licenses attractive to those large carriers?  We had never

16  gotten an answer on that prior to that point.

17  Q.  And did you go back and -- did you go back and discuss

18  that issue with either Craig or Susan Newell?

19  A.  After the --

20  Q.  Did you ever go back and discuss the need to have more

21  cities, licenses in more cities, with Craig and Susan Newell?

22  A.  Early on, we were kind of caught up in the excitement of

23  a high-value license that had great potential.  So we were

24  working mostly on that basis, not because we felt we needed

25  more to be more attractive to a large carrier.

———————————G. Cushman - Cross (By Mr. Yarow)———————————

1   Q.  I see.  Okay.

2          And at the meeting with Peter Lewis in Washington,

3   D.C., did Mr. Lewis present opportunities to monetize these

4   licenses?

5   A.  He provided a concept about the Internet of Things.

6   There was no firm offer of any kind of a -- we had no idea

7   how that would become an actual product, if you will.

8   Q.  Did Mr. Lewis explain to you what the Internet of Things

9   was?

10  A.  Yeah.  It was just kind of a general overview of where

11  things were going -- where things were going in the Internet

12  of Things, where the market was going for the Internet of

13  Things.

14  Q.  And based upon what he told you, it was a growing market?

15  A.  It was a market with high potential --

16  Q.  Okay.

17  A.  -- in the future.

18  Q.  And your group chose not to go that route?

19         MR. BOSSE:  Objection.  That misstates everything.

20  There's no fair basis for that question.

21         THE COURT:  Well, that was -- it's a leading

22  question.  He can deny it or he can answer it.

23         THE WITNESS:  Would you mind repeating the question?

24  BY MR. YAROW:

25  Q.  Yes.  And your group chose not to go that route?

G. Cushman - Cross (By Mr. Yarow)

 1            MR. BOSSE:  Same objection.  Facts not in evidence.

 2            THE COURT:  Sustained.

 3            MR. YAROW:  That's all the questions I have, Your

 4    Honor.  Thank you.

 5            THE COURT:  Ladies and gentlemen, we're going to

 6    take a 15-minute break here, and then we'll come back, and we

 7    will address any other cross-examination that needs to take

 8    place.

 9            (The jury exited the courtroom.)

10            THE COURT:  You may step down during the

11    cross-examination, but you cannot discuss your testimony.

12            (Recess from 10:57 a.m. to 11:22 a.m.)

13            (The jury entered the courtroom.)

14            THE COURT:  Let the record reflect all jurors are

15    present in the courtroom.

16            Does counsel concur?

17            MR. BOSSE:  Yes, sir, Your Honor.

18            MR. YAROW:  Mr. Alcorn concurs.

19            MS. McCASLIN:  Mr. Smith agrees.

20            THE COURT:  All right.  Further cross-examination?

21    Does Mr. Smith have any cross-examination?

22            MR. GRINDROD:  I do, Your Honor.  I didn't know if

23    Mr. Alcorn was done.  I'm sorry.  I didn't remember that.

24            THE COURT:  I thought you were done.

25            MR. YAROW:  Yes, I am.

———————— G. Cushman - Cross (By Mr. Grindrod) ————————

1          THE COURT:  Okay.

2                        CROSS-EXAMINATION

3    BY MR. GRINDROD:

4    Q.  Good morning, sir.

5    A.  Good morning.

6    Q.  So on direct examination I think you described yourself

7    as a relatively conservative investor?

8    A.  Yes.

9    Q.  And you said you work as a CEO for several companies?

10   A.  For -- as a CEO, I was for several subsidiaries of

11   ServiceMaster.

12   Q.  I'm sorry?

13   A.  A company called ServiceMaster.

14   Q.  Okay.

15   A.  Pretty much.

16   Q.  And you spent most of your life in the business field in

17   one way or another?

18   A.  Yes.

19   Q.  And based on the information that you had at the time, I

20   guess you believed that this investment with Janus Spectrum

21   fit what you were looking for?

22   A.  It was a portion of what we had, and it felt like this

23   would be a reasonable risk.

24   Q.  Okay.  And early on, the information or a lot of the

25   information that you had about these spectrum investments was

G. Cushman - Cross (By Mr. Grindrod)

1   provided to you by the Newells, right?

2   A.  Correct.

3   Q.  The Newells actually asked you to join in these spectrum

4   investments?

5   A.  They offered it, yes.

6   Q.  And they gave you some marketing materials?

7   A.  Correct.

8   Q.  Do you know who created those marketing materials?

9   A.  They were created by Janus and provided to the Newells

10  who, in turn, provided them to us.

11  Q.  Okay.  Do you know whether the Newells were intentionally

12  misrepresenting to you anything about Janus?

13          MR. BOSSE:  Objection.  Foundation and calls for

14  speculation of what is in the Newells' minds.

15          THE COURT:  Sustained.

16  BY MR. GRINDROD:

17  Q.  You mentioned on direct examination that you looked

18  around for information about spectrum online?

19  A.  About the concept of spectrum, yes, uh-huh.

20          MR. GRINDROD:  Could we pull up for everyone -- this

21  has been admitted -- Smith 65.

22          (Pause in the proceedings.)

23  BY MR. GRINDROD:

24  Q.  Sir, this is a public notice from the FCC, right?

25  A.  Appears so, yes.

G. Cushman - Cross (By Mr. Grindrod)

1    Q.   And it's dated a release date of November 27, 2012?

2    A.   Yes.

3    Q.   Was this one of the documents that you found online about

4    spectrum?

5    A.   I don't recall this.  I thought I was looking at the

6    information in 2011.

7    Q.   You made another $40,000 investment in Janus in December,

8    December 21st, 2012, right?

9    A.   Correct.

10   Q.   Do you remember whether, in searching online, you found

11   this report that is referenced here from 2004?

12   A.   No, I don't.

13   Q.   Okay.  Or on Page 2, this supplemental order from 2004 --

14   A.   No.

15   Q.   -- about the 800-megahertz band?

16   A.   No.  Neither did I understand 800 megahertz from anything

17   else at that point in time.

18   Q.   Okay.  So if there was information that was publicly

19   available from the FCC, you didn't find it before you made

20   your investment?

21   A.   No.

22   Q.   Okay.  But it's fair to say you -- this was not a trivial

23   investment for you, right?

24   A.   It was not.

25   Q.   So we talked on direct examination about when -- or what

G. Cushman - Cross (By Mr. Grindrod)

1   your understanding was about being able to lease these

2   licenses back to major wireless carriers.  Do you remember

3   that line of questioning?

4   A.  Yes.

5   Q.  Okay.  And let's look at Government 717, which was

6   admitted.  So this is in July of 2014, right?

7   A.  Correct.

8   Q.  And if we go down to Page 3 of this document, this is

9   what you wrote, right?

10  A.  Correct.

11  Q.  And so you're asking at that point about whether these

12  licenses can truly handle the needs of those big wireless

13  carriers, right?

14  A.  That's correct.

15  Q.  So at best, in July of 2014, it was -- you still thought

16  it was possible that those could be -- they could be used for

17  that purpose, right?

18  A.  What we had heard from Peter Lewis gave us the question

19  which I was looking for an answer to.

20  Q.  Right.  But it hadn't -- in your mind, at least, it was

21  still up in the air.  You thought it was at least possible,

22  these could still be used for --

23  A.  We were hearing conflicting information, so, yes.

24  Q.  And that holds true through September 2014, right?

25  A.  Yes.

—————————————G. Cushman - Redirect—————————————

1   Q.  This is Government's Exhibit 718.  This is another e-mail

2   from you, right?

3   A.  That's correct.

4   Q.  And this is -- again, you're still under the impression

5   that it's at least possible that you can lease these back to

6   the major wireless carriers, right?

7   A.  Yes.  That's what we were hearing from Janus, which we

8   assumed was the expert, yes.

9           MR. GRINDROD:  I have no further questions for this

10  witness, Your Honor.

11          THE COURT:  Any redirect?

12          MR. BOSSE:  Yes, just briefly.

13                      REDIRECT EXAMINATION

14  BY MR. BOSSE:

15  Q.  Mr. Cushman, counsel asked if you had looked up some

16  specific FCC documents when you were looking into the

17  investment.

18  A.  Yes.

19  Q.  Okay.  Were you at any point a salesman for this

20  investment making tens and tens of thousands of dollars in

21  commissions for selling this to inexperienced investors?

22          MR. GRINDROD:  Objection, Your Honor --

23          MR. YAROW:  Objection.

24          MR. GRINDROD:  -- scope, argumentative.

25          THE COURT:  Sustained.

```
                         ─G. Cushman - Redirect─
```

1           MR. BOSSE:  That's all I have.  I don't have

2      anything else, Your Honor.

3           THE COURT:  All right.  May the witness be

4      permanently excused, counsel?

5           MR. BOSSE:  Yes, Your Honor.

6           MR. GRINDROD:  Yes, sir.

7           MR. YAROW:  Yes, sir.

8           THE COURT:  You may step down.

9           (The witness was excused.)

10          THE COURT:  Your next witness?

11          MS. O'BOYLE:  Government calls Alain Martell.

12          (Witness sworn.)

13          MS. O'BOYLE:  Your Honor, at this time may I please

14     read several factual stipulations in connection with

15     Government's Exhibit 2000?

16          THE COURT:  You may.

17          MS. O'BOYLE:  Thank you, Your Honor.

18          Stipulation number 2:  National Credit Union Share

19     Insurance Funds.

20          "From January 2011 through August 2017, deposits

21     held by BayPort Credit Union, Generations Federal Credit

22     Union, MIDFLORIDA Federal Credit Union, and the Golden One

23     Credit Union were insured by the National Credit Union Share

24     Insurance Fund."

25          Stipulation number 3:  Federal Deposit Insurance

——————A. Martell - Direct——————

1    Corporation.

2         "From January 2011 through August 2017, deposits

3    held by Wells Fargo Bank, Oculina Bank, SunTrust Bank,

4    JPMorgan Chase Bank, First Citizens Bank, Arizona Business

5    Bank, CoBiz Financial, Bank of Nevada, Charles Schwab Bank,

6    and Bank of Kansas City were insured by the Federal Deposit

7    Insurance Corporation."

8         Stipulation number 4:  Financial transactions

9    affected interstate and foreign commerce.

10        "From January 2011 through August 2017, BayPort

11   Credit Union, Generations Federal Credit Union, MIDFLORIDA

12   Federal Credit Union, the Golden One Credit Union, Wells

13   Fargo Bank, Oculina Bank, SunTrust Bank, JPMorgan Chase Bank,

14   citizens Bank, Arizona Business Bank, Bank of Nevada, Charles

15   Schwab Bank, and Bank of Kansas City conducted financial

16   transactions that affected interstate and foreign commerce."

17        Thank you, Your Honor.

18        THE COURT:  Thank you.

19        ALAIN MARTELL, called by the Government, having been

20   first duly sworn, was examined and testified as follows:

21                       DIRECT EXAMINATION

22   BY MS. O'BOYLE:

23   Q.  Could you please state and spell your name for the court

24   reporter.

25   A.  Yes.  Alain Martell, A-l-a-i-n M-a-r-t-e-l-l.

A. Martell - Direct

1   Q.  And how are you currently employed, Mr. Martell?

2   A.  I'm a forensic accountant with the FBI.

3   Q.  Before you were employed as a forensic accountant for the

4   FBI, how were you employed?

5   A.  I was 26 years with the Virginia State Police.

6   Q.  What did you specifically do for the Virginia State

7   Police?

8   A.  I was a special agent accountant for about 16 years where

9   I investigated financial crimes.  For the last six years, I

10  supervised my special agent accountants.

11  Q.  How long have you been at the FBI?

12  A.  Six and a half years.

13  Q.  And over those six and a half years, what have you

14  focused on?

15  A.  White-collar crime.

16  Q.  What degrees do you hold?

17  A.  I have a degree in finance and management, and a

18  concentration in accounting.

19  Q.  Now, as part of the -- were you part of the law

20  enforcement team that investigated this case?

21  A.  I was.

22  Q.  And what was your role in connection with that

23  investigation?

24  A.  To follow the money that was coming -- going into the

25  investments and also leaving the investments.

A. Martell - Direct

1    Q.  Did you also look at another -- a number of personal bank
2    accounts?
3    A.  I did.
4            THE COURT:  Hold a second.  I need you to make sure
5    the microphone is closer to your mouth.  Pull it up.
6            Thank you, sir.
7            THE WITNESS:  Yes, sir.
8            THE COURT:  So that they can hear you in the back.
9            THE WITNESS:  Yes, sir.
10   BY MS. O'BOYLE:
11   Q.  Now, in connection with the investigation, you said you
12   reviewed a lot of bank accounts?
13   A.  I did.
14   Q.  And approximately how many bank accounts did you review
15   in connection with this investigation?
16   A.  There was over 130.
17   Q.  And how was it that you were able to -- how did you get
18   these records?
19   A.  A lot of them came in paper form, but what I did was I
20   got them in electronic form and then through electronic form
21   got them into spreadsheets.
22   Q.  As a forensic accountant, what was the purpose of your
23   analysis?
24   A.  The purpose was to actually follow the money.
25   Q.  Now, did you conduct an analysis for most of the bank

A. Martell - Direct

1    accounts in this case?

2    A.  I did.

3    Q.  And were these records voluminous?

4    A.  Yes, they were.

5    Q.  Did they include statements, bank statements, wire

6    records, checks, deposits, and other types of transfers?

7    A.  They did.

8    Q.  With respect to the BayPort Federal Credit Union

9    accounts, did all the wires coming from Wells Fargo and other

10   banks outside of the State of Virginia ultimately land in

11   Newport News?

12   A.  Yes, they did.

13   Q.  Is Newport News, Virginia, within the Eastern District of

14   Virginia?

15   A.  It is.

16   Q.  Is Chesapeake, Virginia, in the Eastern District of

17   Virginia?

18   A.  It is.

19   Q.  Is Suffolk in the Eastern District of Virginia?

20   A.  It is.

21   Q.  Is Virginia Beach in the Eastern District of Virginia?

22   A.  It is.

23   Q.  And is Norfolk in the Eastern District of Virginia?

24   A.  Yes, it is.

25   Q.  And so if items were sent via the mail and landed here in

A. Martell - Direct

1  the cities that I just listed, did the mailings land in the
2  Eastern District of Virginia?
3  A.  Yes, they did.
4  Q.  Okay.  Before we get into your analysis, let's take a
5  look just briefly --
6       MS. O'BOYLE:  Per stipulations, if we could pull up
7  Government's Exhibit 300C.
8  BY MS. O'BOYLE:
9  Q.  And this is the State Corporation Commission records for
10  Janus Spectrum for the State of New Mexico?
11  A.  Yes.
12       MS. O'BOYLE:  Government moves in Exhibit 300C.
13       THE COURT:  300C will be admitted.
14       (Government's Exhibit 300C was admitted.)
15       MS. O'BOYLE:  And then 300D, as in delta.  These are
16  State of Arizona State Corporation Commission records related
17  to Janus Spectrum.  Government moves in Exhibit 300D.
18       THE COURT:  300D is admitted.
19       (Government's Exhibit 300D was admitted.)
20  BY MS. O'BOYLE:
21  Q.  And we're going to go to Page 3 of this.  Well, let's go
22  to the first page.  This is an application for registration
23  of a foreign limited liability company, and what is the --
24  what company was this in connection with, sir?
25  A.  Janus Spectrum LLC.

A. Martell - Direct

1   Q.  If we go to the third page, who was the statutory agent

2   in Arizona?

3   A.  Brian F. Semple.

4   Q.  Right.

5        MS. O'BOYLE:  Let's go to Government's Exhibit

6   1002B, as in Brava, just for the witness, please.

7   BY MS. O'BOYLE:

8   Q.  Mr. Martell, do you recognize the exhibit in 1002B?

9   A.  I do.

10  Q.  What is it?

11  A.  This is a summary chart for Janus Spectrum LLC.

12  Q.  Is it the Wells Fargo Bank checking account ending in

13  7384?

14  A.  That's correct.  And it's for the time frame of

15  January 1st, 2012, through March 31st, 2014, and it's the net

16  deposit account activity, which is $8,942,631.98.

17  Q.  So we'll go through this high level, we'll get it

18  admitted, and then we'll talk through it.  Okay?

19  A.  Okay.

20  Q.  And just so we can verify what else is in this document.

21       Did you create a number of summary charts all in the

22  same way?

23  A.  I did.

24  Q.  Okay.  So this reflects deposits going into the account?

25  A.  Yes, ma'am.

A. Martell - Direct

1   Q.   Page 2 is listed as an attachment.  What was this?

2   A.   This was an attachment to the summary chart.  If you go

3   back to the summary chart, you'll see I have an attachment

4   where I couldn't fit everything on, so I put it actually on

5   one form as an attachment.

6   Q.   And then Page 3, is this a summary related to the

7   withdrawals of the checking account?

8   A.   The net withdrawals, yes.

9   Q.   And Page 4, is this an attachment B again referenced on

10  the previous page?

11  A.   Yes, it is.

12  Q.   And then Page 9, is that what's called or referred to as

13  a pivot table?

14  A.   It is.

15  Q.   Is that another type of summary chart that you used in

16  your analysis?

17  A.   It is.

18  Q.   And then Pages 14 through the remainder of the exhibit,

19  is that a spreadsheet of the account?

20  A.   Yes, it is.

21  Q.   That you created as well?

22  A.   It is.

23  Q.   Now, what documents did you review, Mr. Martell, to

24  prepare this chart?

25  A.   The bank statements, all checks, deposits, wire

A. Martell - Direct

1   transfers.

2   Q.  And were the documents voluminous?

3   A.  They were.

4   Q.  And how did you prepare this chart?

5   A.  This was actually done through a program that we have

6   that we actually download and put these forms into a

7   spreadsheet form.  Once I have it in a spreadsheet form, I

8   prepare a pivot table, and then from the private table is how

9   I create the summary charts.

10  Q.  Did you verify the accuracy of the information contained

11  in this chart?

12  A.  I did.

13  Q.  How so?

14  A.  Through peer review, through my colleagues.

15          MS. O'BOYLE:  Government moves in Exhibit 1002B as a

16  Rule 1006 summary chart.

17          THE COURT:  Any objection?

18          Hearing no objection, 1002B is admitted.

19          (Government's Exhibit 1002B was admitted.)

20  BY MS. O'BOYLE:

21  Q.  So now this is the first time that the jury has seen one

22  of your summary charts, Mr. Martell, so we're going to walk

23  through it pretty carefully.  Okay?

24  A.  Okay.

25          THE COURT:  Ladies and gentlemen, if you cannot see

Carol L. Naughton, Official Court Reporter

A. Martell - Direct

1    or cannot hear what is said at any time, raise your hand.

2    BY MS. O'BOYLE:

3    Q.   Let's go to the top here.  What -- explain to the jury

4    what this chart is summarizing.

5    A.   This is a summary chart for Janus Spectrum LLC, Wells

6    Fargo Bank checking account ending in 7384 for the period of

7    January 1st, 2012 through March 31st, 2014.  And it's the net

8    deposit account activity, which totaled $8,942,631.98.

9    Q.   You reference that these are net deposits.

10   A.   Correct.

11   Q.   Does that differ from gross deposits?

12   A.   It does.

13   Q.   Can you explain to the jury the difference?

14   A.   The gross deposits would have a tendency sometimes to

15   overinflate the numbers because if there was -- for example,

16   on Spectrum 100, if there would have been, for example,

17   $1 million that went in, and then also there was $1 million

18   that went back -- well, let's say 900,000 went back, then the

19   actual activity was only $100,000.

20   Q.   So did you use net deposit activity to avoid potentially

21   inflating numbers?

22   A.   I did.

23   Q.   So the total activity, the net deposits here were

24   8 million -- were almost 9 million?

25   A.   Correct.

A. Martell - Direct

1    Q.  And let's go through the next -- we're going to go to
2    Page 3.  And so this is Page 3.  What is reflected here on
3    Page 3?
4    A.  Once again, it's Janus Spectrum LLC, Wells Fargo Bank
5    checking account ending in 7384 for the same time period,
6    January 1st, 2012 through March 31st, 2014.  This is the net
7    withdrawal account activity, which is the same amount,
8    $8,942,631.98.
9    Q.  Okay.  And so is this -- what is a withdrawal?
10   A.  Withdrawal is just money coming out of the account.
11   Q.  So deposits were the money coming in, and the withdrawals
12   are the money coming out?
13   A.  Yes, ma'am.
14   Q.  If we could go to Page 9.  You mentioned, when we were
15   describing this document prior to admitting it, that you
16   created a pivot table.  What is this that we're looking at
17   right here?
18   A.  It's the same information from the summary chart except
19   for it's all in the summary on the chart itself, by itself.
20   So, for example, you will see the Spectrum 100 LLC, the first
21   amount of deposits for $1,604,400.  That's also summarized on
22   the chart itself.
23   Q.  So is this -- what you're summarizing in picture form,
24   this is in spreadsheet form?
25   A.  It is.

A. Martell - Direct

1    Q.  If we could finally go to Page 14.  And you also
2    mentioned, in describing this exhibit, that this is the
3    spreadsheet.  What is this spreadsheet that you created?
4    A.  The spreadsheet is all the individual transactions that
5    occurred on the account for that time frame, January 1st,
6    2012 through March 31st, 2014.
7    Q.  Okay.  So, now, did the records that you obtained related
8    to this account, when did those records start?
9    A.  January 4th, 2012.  It had a beginning balance of
10   $51,823.72.
11   Q.  So, now, there will be some accounts that were opened
12   after January, but were some accounts opened before, and
13   could you get those records?
14   A.  We could have gotten those records.  We just started it
15   at 2012.
16   Q.  Did you start the investigation subpoenaing records
17   related to 2012?
18   A.  Yes, ma'am.
19   Q.  Let's go back to the first page as we've now summarized
20   the full document, what it is.
21        Okay.  So we've talked about the top of the
22   document.  Can you explain to the jury, sir, how you went
23   about creating the lines and where they're going to.  How did
24   you do that?
25   A.  These are the individual deposits that went into the

A. Martell - Direct

1   account, and like, for example, the very first one, the
2   Spectrum 100 LLC, what this is showing that from the time
3   frame of April 3rd, 2013 through January 27th, 2014,
4   $1,604,400 went into the account, which was 17.94 percent of
5   the amount that went into that account.
6   Q.  Okay.  And then going up to the block above it, what did
7   Redwater Funding Group LLC -- how much went there to Janus
8   Spectrum LLC?
9   A.  In the time frame of May 3rd, 2012 through December 24th,
10  2012, $1,396,000 went into the account.
11  Q.  And is there a reference here to Janus Spectrum Group?
12  A.  There is.
13  Q.  Are you familiar with the BayPort Credit Union account
14  for Janus Spectrum Group?
15  A.  I am.
16  Q.  Did you do analysis of that particular account?
17  A.  I did.
18  Q.  And so how much from Janus Spectrum Group went to Janus
19  Spectrum LLC in Arizona?
20  A.  $1,312,500.
21  Q.  And just finishing up around the top of this sheet, how
22  much went from Shelton & Power LLC?
23  A.  $727,089.74.
24  Q.  What about Sedona Asset Management?
25  A.  675,000.

A. Martell - Direct

1   Q.   Premier Group?

2   A.   520,000.

3   Q.   And Innovative Group?

4   A.   511,000.

5   Q.   Now, over here what -- you said there's a line that says

6   attachment, a little bubble that says attachment A?

7   A.   Correct.

8   Q.   And what was the amount that went into the account from

9   attachment A?

10  A.   $2,196,642.24.

11  Q.   Okay.  And we're going to go down to the next page.  The

12  very next page, is this attachment A?

13  A.   It is.

14  Q.   And so what am I looking at here?

15  A.   Those are the additional deposits that went into the

16  account that totaled the $2 million.

17  Q.   And I'm going to highlight a line a little bit of the way

18  down.  How much did Air Apparent Associates deposit into this

19  account?

20  A.   $200,000.

21  Q.   And how much went into this account from Nexus Spectrum?

22  A.   180,000.

23  Q.   How much went into the account from Six Cities

24  Associates?

25  A.   120,000.

A. Martell - Direct

1   Q.  We're going to move down to the next page.

2          MR. BOSSE:  Can we go to Page 3, Ms. Yusi.

3   BY MR. BOSSE:

4   Q.  All right.  So I believe you said this page were the

5   withdrawals, so this is where the money is going?

6   A.  That's correct.

7   Q.  And so starting up here in the left-hand, there's a line.

8   Can you please read to the jury what this is?

9   A.  During the time frame of January 4th, 2012, through

10  February 21st, 2014, $3,086,091 went into David Alcorn

11  Professional Corporation, Wells Fargo business checking

12  account ending in 7417.

13  Q.  And let's continue around to the next two.  Is there a

14  line to an NJM Spectrum, Wells Fargo Bank?

15  A.  Yes, there is.

16  Q.  Do you know who that was connected with?

17  A.  The NJM, not looking at the statements.

18  Q.  Okay.  But how much went there?

19  A.  $2,479,939.28.

20  Q.  And then were there debits related to a Janus Spectrum

21  LLC business high yield savings account?

22  A.  There was.

23  Q.  How much went there?

24  A.  $365,639.35.

25  Q.  And then now there's a line to Intellection LLC.  How

—————————A. Martell - Direct—————————

1   much went to Intellection LLC?

2   A.   $210,535.07.

3   Q.   Do you know who Intellection LLC was connected with?

4   A.   That was with Kent Maerki and Norma Coffin.

5   Q.   Norma Coffin, his wife?

6   A.   Yes.

7   Q.   And then there's another line going to David and

8   Elizabeth Alcorn, Wells Fargo Bank savings account 1474.   How

9   much went there?

10   A.   $51,700.

11   Q.   And then going on to the right, how much went to Janus

12   Spectrum, Arizona Business Bank checking account?

13   A.   $25,084.81.

14   Q.   And finishing up going up the side, how much went to a

15   Pacific Capital Advisors LLC?

16   A.   14,000.

17   Q.   And then was there a line to Sellers Financial?

18   A.   Yes.

19   Q.   And how much went there?

20   A.   $4,252.

21   Q.   Then is there a $683 transfer to David and Elizabeth

22   Alcorn checking account?

23   A.   That's correct.

24   Q.   So over here there's a listing that says attachment B.

25   How much went to attachment B?

———A. Martell - Direct———

1    A.   $2,704,707.47.

2    Q.   And let's go to the next -- if we can go to the next

3    page, Ms. Yusi, and take a look at attachment B.  Do you see

4    there's a line that says Tusa Consulting Services LLC?

5    A.   Yes.

6    Q.   How much went to Tusa Consulting Services?

7    A.   $976,617.62.

8    Q.   And it says negative 10.92 percent.  What does that stand

9    for?

10   A.   It made up 10.92 percent of the total withdrawals during

11   that time frame.

12   Q.   Okay.  If we could go back to Page 1, please.  I'm sorry.

13   Page 3.

14          So the Tusa Consulting represented 10 percent.  How

15   much did the withdrawals related to David Alcorn Professional

16   Corp. relate to?

17   A.   34.51 percent.

18   Q.   And what about this money that went to NJM Spectrum?  How

19   much -- what percentage was that?

20   A.   27.73 percent.

21   Q.   All right.  If we could take a look at Government's

22   Exhibit 1002G, which is already in evidence.  This is a bank

23   account.  It starts with the signature card of Arizona

24   Business Bank.  Is that right, Mr. Martell?

25   A.   Yes.

A. Martell - Direct

1  Q.  What is the account owner?

2  A.  That's Janus Spectrum LLC, debtor in possession.

3  Q.  And so this is a second bank account related to Janus

4  Spectrum?

5  A.  It is.

6  Q.  And who is the only signatory on this account?

7  A.  David Albert Alcorn.

8  Q.  Is Mr. Maerki on this account anywhere that you can see?

9  A.  No, ma'am.

10 Q.  And when was this account opened?

11 A.  Date opened is March 3rd, 2014.

12 Q.  Did you also prepare a summary chart related to this

13 account?

14 A.  Yes, I did.

15 Q.  Let's take a look at Government's Exhibit 1002H.  And is

16 this summary chart prepared the same way that the previous

17 one was prepared?

18 A.  Yes, it is.

19 Q.  So Page 1, what is reflected on Page 1 of this particular

20 chart?

21 A.  This is the net deposits that went into the Janus

22 Spectrum LLC, debtor in possession.

23 Q.  And then is Page 2 the withdrawals?

24 A.  Yes, it is.

25 Q.  And then this particular withdrawal, it has an

A. Martell - Direct

1    attachment A?

2    A.  Yes, it does.

3    Q.  Is that what is on -- starts on Page 3?

4    A.  Yes, it is.

5    Q.  And then on Page --

6         MS. O'BOYLE:  Ms. Yusi, if you could go to Page 6.

7    BY MS. O'BOYLE:

8    Q.  Is this the pivot table?

9    A.  Yes, it is.

10   Q.  And then also the schedule or the summary of the account

11   on Page 9?

12   A.  Yes.

13   Q.  Is that what this is?

14   A.  Yes, ma'am, yes, it is.

15   Q.  So does this summarize the entire account?

16   A.  It does.

17   Q.  What documents did you review to prepare this summary

18   chart?

19   A.  The bank statements, checks, deposits, and wire

20   transfers.

21   Q.  Were the documents voluminous?

22   A.  Yes, they were.

23   Q.  And then how did you prepare this chart?

24   A.  Through a pivot table once I prepared the spreadsheets.

25   Q.  And did you verify the accuracy of the information

———A. Martell - Direct———

1   contained in this chart?

2   A.  I did through --

3   Q.  How so?

4   A.  Through peer review, my colleagues.

5          MS. O'BOYLE:  Government moves in Exhibit 1002H as a

6   Rule 1006 summary chart.

7          THE COURT:  Government's Exhibit 1002H is admitted.

8          (Government's Exhibit 1002H was admitted.)

9   BY MS. O'BOYLE:

10  Q.  So what account did you summarize here in this chart?

11  A.  This is the Janus Spectrum LLC, debtor in possession,

12  Arizona Business Bank, CoBiz Financial, checking account

13  ending in 4974.

14  Q.  What is the time frame?

15  A.  It's for March 4th, 2014 through September 2nd, 2015.

16  Q.  What were the total net deposits into this account during

17  that time?

18  A.  $1,582,905.24.

19  Q.  And so let's take a look at the first arrow of the

20  deposits.  How much was deposited into the account from

21  Spectrum 100 LLC's BayPort Credit Union account?

22  A.  $906,400.

23  Q.  What percentage of the deposits did those funds make up?

24  A.  57.26 percent.

25  Q.  And is there a line for Shelton & Power?

Carol L. Naughton, Official Court Reporter

A. Martell - Direct

1    A.   Yes, there was.

2    Q.   And what is it?

3    A.   It was for $460,460 which made up 29.22 percent in net

4    deposits.

5    Q.   And then is there a line from a Delia Elaine Cooke?

6    A.   There is.

7    Q.   And how much did -- went in from that line?

8    A.   The 100,000, which made up 6.32 percent.

9    Q.   And then is there a line going in from Prime Spectrum

10   LLC?

11   A.   There is.

12   Q.   And how much went in from Prime Spectrum?

13   A.   It was $21,200, which made up 2.6 percent in net

14   deposits.

15   Q.   And then is there a reference to the Janus Spectrum

16   account that we just looked at?

17   A.   There is.

18   Q.   And how much money was transferred from that Janus

19   Spectrum LLC account into this Janus Spectrum account?

20   A.   $25,084.81.

21   Q.   And then there are two other lines.  One is from Bobby

22   Jones.  How much came in from Bobby Jones?

23   A.   $8,350.

24   Q.   And then what is the $410.43?  What is that?

25   A.   That made up interest of $328.94, a bank credit of

A. Martell - Direct

1    $66.49, and there was another one that was marked as BP fee

2    per J. Stromberg, and it was for $15.

3    Q.  Let's go to Page 2, please.  So what are we looking at in

4    Page 2, Mr. Martell?

5    A.  This is the Janus Spectrum LLC, debtor in possession,

6    Arizona Business Bank account ending in 4974 for the time

7    frame of March 4th, 2014 through September 2nd, 2015, which

8    was the net withdrawal account activity which totaled

9    $1,582,905.24.

10   Q.  Okay.  Just going first to the line -- the first arrow,

11   how much money went to the item -- well, first, what is the

12   item?  Where did it go?

13   A.  That was David Alcorn Professional Corp., Wells Fargo

14   Bank checking account ending in 7417.

15   Q.  And between April 3rd, 2014 through May 5th, 2015, how

16   much money from this account went into the David Alcorn

17   Professional Corp. account?

18   A.  $808,274.

19   Q.  And what percentage of the withdrawals did that make up?

20   A.  51.06 percent.

21   Q.  Now, the second line underneath it, there's a line to a

22   Thomas E. Littler, Esquire.  Do you see that?

23   A.  Yes.

24   Q.  And how much went to Mr. Littler?

25   A.  $266,852.40, which made up 16.86 percent of the net

Carol L. Naughton, Official Court Reporter

A. Martell - Direct

1    withdrawals.
2    Q.  Now, there's a line over to Tusa Consulting Services,
3    like the last one, right?
4    A.  Yes.
5    Q.  And how much went to Tusa Consulting Services?
6    A.  $192,127.77.
7    Q.  And what percentage of funds -- what percentage of the
8    withdrawals did that make up?
9    A.  12.14 percent.
10   Q.  Now, there's also a line here to a P. Lewis?
11   A.  Yes.
12   Q.  And how much went to P. Lewis?
13   A.  $162,500, which made up 10.27 percent of the withdrawals.
14   Q.  Now, is there also a $29,000 -- approximately $29,000
15   withdrawal to another Janus Spectrum account?
16   A.  Yes, there is.
17   Q.  I'm going to blow up the right-hand side of the
18   withdrawal chart.  How much went to Semple, Marchal & Cooper?
19   A.  $15,147.50.
20   Q.  And how much went to a Mirch Law Firm?
21   A.  $13,000.
22   Q.  And how much went to David A. and Elizabeth J. Alcorn,
23   Wells Fargo checking account, over here on the right-hand
24   side?
25   A.  $2,568.

A. Martell - Direct

1   Q.  And is there a $647 transfer to another Janus Spectrum

2   account?

3   A.  Yes, there is.

4   Q.  And then there's a $432 transfer to a Sugar Time

5   Management?

6   A.  That's correct.

7   Q.  Do you know who is connected to Sugar Time Management?

8   A.  Kent Maerki and Norma Coffin, his wife.

9   Q.  And then over here on -- I just scrolled down to the next

10  page that lists attachment A.  Do you see that?

11  A.  I do.

12  Q.  And the first one is Southwest Airlines.  How did -- how

13  did you prepare the attachment A?

14  A.  Attachment A just made up the balance of the withdrawals

15  that would, you know -- on the summary charts.

16  Q.  So this is the remaining withdrawals that were in the

17  account?

18  A.  Yes, it is.

19  Q.  Let's please take a look at Government's Exhibit 1002D,

20  which is already in evidence.

21          And is this another Janus Spectrum account?

22  A.  Yes, it is.

23  Q.  And when was it opened?

24  A.  June 15th, 2012.

25  Q.  And is Mr. Alcorn, his wife, Elizabeth Alcorn, and Norma

A. Martell - Direct

1    J. Coffin -- are they signers on this account?

2    A.  Yes, they are.

3    Q.  Did you prepare a summary of this account as well?

4    A.  Yes, I did.

5           MS. O'BOYLE:  Let's go to Government's Exhibit

6    1002E, just for the witness.

7    BY MS. O'BOYLE:

8    Q.  Do you recognize 1002E?

9    A.  Yes, I do.

10   Q.  What is it?

11   A.  This is a Janus Spectrum LLC, Wells Fargo Bank savings

12   account ending in 5290 for the time period of June 15th, 2012

13   through April 30th, 2014.  And it shows the net account

14   activity of $380,201.56.

15   Q.  Okay.  And what documents did you review to prepare this

16   chart?

17   A.  The bank statements, checks, deposits, and wire

18   transfers.

19   Q.  Were the documents voluminous?

20   A.  Yes, they were.

21   Q.  And did you prepare this chart the same way you did the

22   other two?

23   A.  Yes.

24   Q.  Did you verify the accuracy in the chart?

25   A.  I did.

—————A. Martell - Direct—————

1   Q.   And how so?

2   A.   Through peer review, my colleagues.

3           MS. O'BOYLE:  Government moves in Exhibit 1002E.

4           THE COURT:  Exhibit 1002E, as in echo, is admitted.

5           (Government's Exhibit 1002E was admitted.)

6   BY MS. O'BOYLE:

7   Q.   Okay.  Now, this one, the net account activity was only

8   $380,000, approximately; is that correct?

9   A.   That's correct.

10  Q.   And so where did the funds come from into this account?

11  A.   From the time frame of June 15th, 2012 through April 3rd,

12  2014, $365,639.35 came from Janus Spectrum LLC, Wells Fargo

13  Bank checking account ending in 7384.  Also, on January 22nd,

14  2013, $14,000 came from Pacific Capital Advisors, Wells Fargo

15  Bank savings account ending in 8706, and also during the time

16  frame of June 29th, 2012 through March 31st of 2014, $562.21

17  came in through interest payments.

18  Q.   And here, did 99.96 percent of the moneys go somewhere

19  else?

20  A.   Yes, it did.

21  Q.   And where did it go?

22  A.   It went to Janus Spectrum LLC, Arizona Business Bank

23  checking account ending in 6142.

24  Q.   If we could go to Government's Exhibit 1002K.  Do you

25  recognize 1002K?

A. Martell - Direct

1    A.   I do.

2    Q.   What is it?

3    A.   This is the Janus Spectrum LLC, debtor in possession,

4    Arizona Business Bank checking account ending in 6142 for the

5    time frame of March 3rd, 2014 through August 12th, 2015.   And

6    the net account activity was $410,670.54.

7    Q.   And so is this also the summary chart, the pivot table,

8    and the spreadsheet?

9    A.   Yes, it is.

10   Q.   What documents did you review to prepare this chart?

11   A.   The bank statements, checks, deposits, and wire

12   transfers.

13   Q.   Were the documents voluminous?

14   A.   Yes, they were.

15   Q.   And how did you prepare the chart?

16   A.   The chart was prepared from the information from the

17   spreadsheets.

18   Q.   Did you verify the accuracy of the information contained

19   in the chart through peer review?

20   A.   I did.

21           MS. O'BOYLE:   Government moves in Exhibit 1002K.

22           THE COURT:   1002K is admitted.

23           (Government's Exhibit 1002K was admitted.)

24   BY MS. O'BOYLE:

25   Q.   And just generally, Mr. Martell, can you explain what

Carol L. Naughton, Official Court Reporter

A. Martell - Direct

1  happened to the funds in this Janus Spectrum account?
2  A.  Okay.  On March 3rd, 2014, $380,042.77 came from Janus
3  Spectrum, Wells Fargo bank savings account ending in 5290.
4  Also, between the period of March 31st, 2014, and August 12,
5  2015, $29,995.59 was deposited from Janus Spectrum LLC,
6  Arizona Business Bank checking account ending in 4974.  Also,
7  from March 16th, 2014 through July 15th, 2015, there were
8  interest payments of $632.17.  And there was a closing entry
9  fee for one penny on August 12th, 2015.
10 Q.  And then where did those funds go?
11 A.  On July 14th, 2015, $317,711.54 went to Janus Spectrum
12 LLC, Bank of Kansas City checking account ending in 1778.
13 Also, in the time frame of January 9th, 2015 through
14 June 25th, 2015, $92,750 went to Radio Soft Incorporated.
15 Q.  And then was there a $209 withdrawal down at the bottom?
16 A.  Yes.  That was from wire fees and service charges.
17        MS. O'BOYLE:  We have two more Janus Spectrum
18 accounts, and then we'll move into something else.  If we can
19 go to Government's Exhibit 1002M.
20 BY MS. O'BOYLE:
21 Q.  Do you recognize 1002M?
22 A.  I do.
23 Q.  What is it?
24 A.  This is the Janus Spectrum LLC, debtor bankruptcy
25 account, Maureen Gaughan was the trustee.

A. Martell - Direct

1  Q.  And is this a summary chart that you prepared?  Does it
2  have the summary and then the pivot table and the
3  spreadsheet?
4  A.  It does.
5  Q.  Did you review the bank documents to prepare this chart?
6  A.  I did.
7  Q.  Were the documents voluminous?
8  A.  They were.
9  Q.  Did you prepare the chart the same way as the others we
10  discussed?
11  A.  I did.
12  Q.  Did you use peer review as well?
13  A.  I did.
14        MS. O'BOYLE:  Government moves in Exhibit 1002M.
15        THE COURT:  Exhibit 1002M is admitted.
16        (Government's Exhibit 1002M was admitted.)
17  BY MS. O'BOYLE:
18  Q.  And here, Mr. Martell, how much money went from the CoBiz
19  Bank, Arizona Business Bank, account, debtor in possession
20  into the Janus Spectrum bankruptcy account?
21  A.  $317,711.54.
22  Q.  And then over here, what happened, on the left-hand
23  side -- what happened on March 2nd, 2016?
24  A.  $260,027.76 went to the clerk of the U.S. District Court.
25  Q.  Last one, if we could go to 1002O.  Do you recognize

A. Martell - Direct

1    1002O?

2    A.   I do.

3    Q.   What is it?

4    A.   That is the Janus Spectrum PMA Norma Coffin account at

5    First Citizens Bank checking account ending in 0990 in the

6    time frame of April 23rd, 2014 through April 30th, 2015, and

7    it had a net account activity of $63,955.

8    Q.   Okay.  And is the second page of this the pivot table?

9    A.   It is.

10   Q.   And then the third page is the spreadsheet?

11   A.   Yes, it is.

12   Q.   Did you review the bank account statements and checks and

13   other documents to prepare this chart?

14   A.   I did.

15   Q.   Were those documents voluminous?

16   A.   They were.

17   Q.   Did you prepare the chart the same way as we discussed

18   with respect to the charts previously?

19   A.   I did.

20   Q.   And did you verify the accuracy of the charts through

21   peer review?

22   A.   I did.

23            MS. O'BOYLE:  Government moves in Exhibit 1002O.

24            THE COURT:  1002O is admitted.

25            (Government's Exhibit 1002O was admitted.)

A. Martell - Direct

1   BY MS. O'BOYLE:

2   Q.  So this is a bank account at First Citizens Bank, the

3   checking account 0990 -- it ends in 0990; is that correct?

4   A.  That's correct.

5   Q.  And up here on the left-hand side, how much went from

6   Janus Spectrum PMA, JPMorgan Chase Bank?

7   A.  $24,000.

8   Q.  And then how much went in from Nexus Spectrum LLC?

9   A.  20,000.

10  Q.  Benefit Enhancing Services LLC?

11  A.  $19,800.

12  Q.  And then there's miscellaneous deposits in the amount of

13  $155?

14  A.  That's correct.

15  Q.  And the withdrawals, how much went to Intellection?

16  A.  22,900.

17  Q.  Was that about 35 percent of the withdrawals?

18  A.  It was.

19  Q.  Again, is Intellection connected with Mr. Maerki and

20  Ms. Coffin?

21  A.  It is.  It is.

22  Q.  There's also $16,000 to a Cosmalite Franchising.  Who --

23  do you remember who was connected to Cosmalite Franchising?

24  A.  That was also Norma Coffin and Kent Maerki.

25  Q.  And there's a $15,000 to Dental Support Group.  Do you

A. Martell - Direct

1    know who was connected to Dental Support Group?

2    A.  That was Norma Coffin and Kent Maerki.

3    Q.  And then $9,800 of this money went to Tusa Consulting

4    Services; is that right?

5    A.  Correct.

6    Q.  So about 15 percent of the withdrawals?

7    A.  Correct.

8              MS. O'BOYLE:  And if we could take a look at -- I

9    believe Government's Exhibit 1002P, as in Paul, is in.

10             Thank you.

11             And if we could go to Page 23.

12   BY MS. O'BOYLE:

13   Q.  Can you read what the company was that wrote this check?

14   A.  It was Nexus Spectrum LLC.

15   Q.  And what is the amount?

16   A.  $20,000.

17   Q.  And how much -- what is it written to?

18   A.  It's written to Janus Spectrum LLC.

19   Q.  And down here in the memo line, what does it say?

20   A.  Newell.  N-e-w-e-l-l.

21             MS. O'BOYLE:  If we could go to Government's Exhibit

22   1100, just for the witness.

23   BY MS. O'BOYLE:

24   Q.  Do you recognize Government's Exhibit 1100, sir?

25   A.  I do.

A. Martell - Direct

1    Q.   What is it?

2    A.   This is the -- shows the flow of the funds to David

3    Alcorn's various accounts.

4    Q.   Okay.  From Janus Spectrum to Mr. Alcorn?

5    A.   Yes, it is.

6    Q.   And did you -- what did you review to prepare this chart?

7    A.   From this one here, all the bank statements that you see

8    on chart were reviewed.  If you go through, there's the David

9    Alcorn checking account ending in 6604; Capital Advisors

10   account ending in 8706; David and Elizabeth Alcorn's savings

11   account ending in 1474; David Alcorn's Professional Corp.'s

12   checking account ending in 7417; and the two Janus accounts

13   that the deposits went into and went out of, which were the

14   Janus Spectrum LLC, debtor-in-possession account ending 4974;

15   and Janus Spectrum, Wells Fargo Bank checking account ending

16   in 7384.

17   Q.   Were these documents voluminous?

18   A.   Yes, they were.

19   Q.   And you prepared this chart based on your review of the

20   bank accounts?

21   A.   I did.

22   Q.   Did you verify the accuracy of the information contained

23   in this chart through peer review?

24   A.   I did.

25            MS. O'BOYLE:   Government moves in Exhibit 1100.

A. Martell - Direct

```
1           THE COURT:  Exhibit 1100 is admitted.
2           (Government's Exhibit 1100 was admitted.)
3   BY MS. O'BOYLE:
4   Q.  Let's go to the top of this chart.  Can you please read
5   the first two lines.
6   A.  Yes.  This is a Janus Spectrum, Wells Fargo account
7   ending in 7384 with the net payments to David Alcorn
8   entities, which totaled $3,153,074.
9   Q.  And right beneath it, the second group of lines?
10  A.  Janus Spectrum, Arizona Business Bank account ending in
11  4974, it shows the net payments to David Alcorn entities
12  totaling $810,842.
13  Q.  So if you could read the last line, please.
14  A.  The Janus Spectrum total payments were $3,963,916.
15  Q.  Okay.  And next we're going to walk through this chart.
16  Can you please -- where did these funds begin?
17  A.  These were the net deposits from investors that went into
18  the Janus Spectrum account, Wells Fargo Bank checking account
19  ending in 7384.
20  Q.  So between January 1st, 2012 and March 31st, 2014, how
21  much money from investors went into the Janus Spectrum LLC
22  account at Wells Fargo Bank?
23  A.  $8,942,631.98.
24  Q.  And then over here, were there also funds that went into
25  a second account, one that we just looked at?
```

Carol L. Naughton, Official Court Reporter

A. Martell - Direct

1   A.  Yes.

2   Q.  Okay.  So over here on the right-hand side, how much

3   money went from investor funds into the Janus Spectrum

4   debtor-in-possession account between March 4th, 2014, and

5   September 2nd, 2015?

6   A.  $1,582,905.24.

7   Q.  Now I'm going to go right there in the middle and look at

8   the deposits that went to David Alcorn Professional Corp.,

9   Wells Fargo Bank checking account 7417.  Do you see that?

10  A.  Yes.

11  Q.  Could you explain, starting with the group, the Janus

12  Spectrum account on the left, the Wells Fargo Bank checking

13  account 7384, how much went into David Alcorn Professional

14  Corp. checking?

15  A.  In the time frame of January 4th, 2012 to February 21st,

16  2014, was $3,086,091 which made up 34.51 percent of the

17  withdrawals in that account went to David Alcorn Professional

18  Corp., Wells Fargo Bank checking account ending in 7417.

19  Q.  Did it also receive -- that particular account also

20  receive investor funds from the debtor-in-possession account

21  at Arizona Business Bank?

22  A.  It did.

23  Q.  How much did it receive from that account?

24  A.  From the time frame of April 2nd, 2014 through May 5th,

25  2015, $808,274, which made up 51.06 percent of the account

─────A. Martell - Direct─────

 1   went into David Alcorn's Professional Corp. account ending in

 2   7417.

 3   Q.   Okay.  So that's just one account that the funds, the

 4   investor funds went into?

 5   A.   That's correct.

 6   Q.   I'm going to focus on a second account that investor

 7   funds went into.  There's a line to a Pacific Capital

 8   Advisors.  Do you see that?

 9   A.   Yes.

10   Q.   How much went there?

11   A.   On January 22nd, 2013, $14,000 went there.

12   Q.   And now there's a third account, a checking account where

13   funds went; is that correct?

14   A.   Yes.

15   Q.   And did this particular checking account receive funds

16   from both the debtor-in-possession account as well as the

17   other Janus Spectrum account?

18   A.   It did.

19   Q.   So on the right-hand side, how much of investor funds

20   went into the checking account 6604 from the

21   debtor-in-possession account?

22   A.   $2,568.

23   Q.   And then over here on the left, how much went from the

24   Janus Spectrum account at Wells Fargo into their checking

25   account?

─────A. Martell - Direct─────

1  A.  $683.

2  Q.  And then was there also a fourth account associated with

3  Mr. Alcorn where these funds landed?

4  A.  Yes, there was.

5  Q.  Okay.  And so the -- how much of investor funds that went

6  into the Janus Spectrum, Wells Fargo Bank account 7384 -- how

7  much went to Mr. Alcorn's savings account at Wells Fargo

8  Bank?

9  A.  $51,700.

10  Q.  And so total net payments to Mr. Alcorn on this chart was

11  how much?

12  A.  $3,963,916.

13  Q.  Now, I'm going to start here with the account that

14  received, I guess, almost $4 million, the Wells Fargo Bank

15  checking account 7417.  Okay?

16  A.  Okay.

17  Q.  Let's go to Government's Exhibit 1102 that I think is

18  already in evidence.  And so this is the David Alcorn

19  Professional Corporation ending in 7417?

20  A.  That's correct.

21  Q.  Who are the authorized signers on this account?

22  A.  David A. Alcorn and Elizabeth J. Alcorn.

23  Q.  Let's go to Government's Exhibit 1101, and is this a

24  summary chart for the David Alcorn Professional Corporation

25  checking account ending in 7417?

A. Martell - Direct

```
 1   A.  It is.

 2   Q.  And Page 1, does this reflect the deposits?

 3   A.  The net deposits, yes, it does.

 4   Q.  Thank you.  And then Page 2, what does this reflect?

 5   A.  The net withdrawals.

 6   Q.  Page 3, is this the attachment A related to more

 7   withdrawals?

 8   A.  It is.

 9   Q.  Page 4, is it the pivot table?

10   A.  That's correct.

11   Q.  Page 5 -- and then Page 6, is this the spreadsheet that

12   summarizes the entire account?

13   A.  It is.

14   Q.  And did you review the banking documents, the checks, the

15   deposits, and the statements for 7417 when you prepared this

16   chart?

17   A.  I did.

18   Q.  Were the documents voluminous?

19   A.  Yes, they were.

20   Q.  Did you prepare this chart in the same way that we've

21   been going over for the other charts?

22   A.  I have -- I did.

23   Q.  Did you verify the accuracy of the information contained

24   in this chart?

25   A.  I did, through --
```

A. Martell - Direct

1   Q.   Through peer review?

2   A.   I did.

3           MS. O'BOYLE:   Government moves in Exhibit 1101.

4           THE COURT:   1101 is admitted.

5           (Government's Exhibit 1101 was admitted.)

6   BY MS. O'BOYLE:

7   Q.   Let's start first on Page 6, please, Ms. Yusi.   And I'm

8   going to pull up here -- this is your spreadsheet, correct?

9   A.   That's correct.

10  Q.   And if you walk through the spreadsheet -- if the jurors

11  walk through the spreadsheet, what are they going to -- what

12  is this based on?

13  A.   Well, it's based on the bank statements, and what I've

14  done is I've broken it down to the date posted, what the

15  description was in the bank statement, and the debits and

16  credits, and then what the balance was at any given point in

17  time.

18  Q.   So you're scheduling out basically the bank statement?

19  A.   That's correct.

20  Q.   And so this checking account, did you get the records

21  starting in January of 2012?

22  A.   I did.

23  Q.   And what was the beginning balance in January 2012 in

24  this account?

25  A.   On January 3rd, 2012, the balance was $7,579.21.

Carol L. Naughton, Official Court Reporter

1493

A. Martell - Direct

1   Q.  Okay.  If we could go to page -- up to Page 1.  So after

2   the beginning balance of $7,500, what was the net deposit

3   account activity in this account?

4   A.  The net deposit account activity was $4,154,888.46.

5   Q.  All right.  Let's start over here.  This first page, are

6   these the deposits -- a summary of the deposits that went

7   into this checking account?

8   A.  It is the net deposits, yes.

9   Q.  Thank you.  And so going all the way over on the

10  left-hand corner, there's a line from Janus Spectrum LLC,

11  Wells Fargo Bank account into the David Alcorn Professional

12  Corporation.  Could you explain to the jury the time frame

13  and the amount of money that went into the account during

14  that time.

15  A.  From January 4th, 2012 through February 21st, 2014,

16  $3,086,091, which made up of 74.28 percent of the net

17  deposits went into the David Alcorn Professional Corp., Wells

18  Fargo Bank checking account ending in 7417.

19  Q.  All right.  And I'm going to go right up the line to the

20  next line.  The following year, from April 2nd, 2014 through

21  May 5th, 2015, how much money went from the

22  debtor-in-possession bank account into the David Alcorn

23  Professional Corporation?

24  A.  $808,274.

25  Q.  Now, just finishing out the chart, how much went from a

1494

A. Martell - Direct

1  Northern Spectrum LLC on September 25th, 2015?

2  A.  $150,000.

3  Q.  And over here, is there a deposit from a McLeod Zei,

4  Inc.?

5  A.  Yes, there is.

6  Q.  Okay.  And what was that deposit?  Or was it over a

7  period of time?

8  A.  It was.  From January 17th, 2012 through January 3rd,

9  2013, $55,896.20 went to the account.

10  Q.  And were there also deposits from a San Diego Yacht

11  Sales?

12  A.  There was.

13  Q.  How much was that deposit?

14  A.  On November 18th, 2013, and November 20th, 2015, there's

15  a total of $41,000 that went into the account for San Diego

16  Yacht Sales.

17  Q.  And what percentage of the account did that deposit make

18  up?

19  A.  0.99 percent.

20  Q.  We're going to go to Page 2, and so what was the net

21  withdrawal account activity in this account?

22  A.  It was $4,154,888.46.

23  Q.  Let's start up in the left-hand corner.  After the funds

24  from Janus Spectrum LLC and the debtor-in-possession account

25  LLC went into the David Alcorn Professional Corporation

Carol L. Naughton, Official Court Reporter

A. Martell - Direct

1   account, can you please explain at the top here where
2   16.84 percent of those funds went?
3   A.  Between the time frame of March 11th, 2013 through
4   January 28th, 2016, $699,500 went to David A. and Elizabeth
5   J. Alcorn's Wells Fargo Bank savings account ending in 1474.
6   Q.  And just proceeding down the next line, where does the
7   next arrow point to?
8   A.  The David Alcorn Professional Corp. retirement plan,
9   Arizona Business Bank checking account ending in 5760.
10  Q.  How much went there?
11  A.  During the time frame of -- actually, it was on
12  August 12th, 2013 and October 29th, 2013, there was a total
13  of $660,000, which made up of 15.88 percent of the
14  withdrawals.
15  Q.  So were these two separate deposits into the retirement
16  plan account that occurred on two separate days?
17  A.  It was.
18  Q.  Moving down to the next item, there's an arrow that
19  points to David Alcorn Charles Schwab checking account, 9732.
20  How much went there?
21  A.  During the time frame of April 12th, 2012 through
22  June 1st, 2015, $614,496 went to his Charles Schwab account.
23  Q.  And then continuing down the side, is there an arrow that
24  points to David Alcorn Professional Corp., Wells Fargo Bank
25  market rate savings account 8435?

─────A. Martell - Direct─────

1   A.  Yes, there is.

2   Q.  Is this another David Alcorn Professional Corp. account?

3   A.  Yes, it is.

4   Q.  How much went there?

5   A.  During the time frame of January 11th, 2013 through

6   January 28th, 2016, $490,900 went to the account.

7   Q.  And then right next to it there's an arrow to a David A.

8   and Elizabeth J. Alcorn Wells Fargo Bank checking account

9   6604.  How much went there?

10  A.  $347,754.32 during the time frame of January 3rd, 2012

11  through February 18th, 2016.

12  Q.  There's a line to David Alcorn's brokerage account, 8925.

13  How much went there?

14  A.  $50,000 went into his brokerage account.

15  Q.  On what date?

16  A.  I'm sorry.  On January 8th, 2013.

17  Q.  Continuing on the right side.  How much went to David

18  Alcorn, Wells Fargo Visa?

19  A.  During the time frame of September 23rd, 2013, through

20  February 8th, 2016, $42,291.25 went to his Visa card.

21  Q.  And the next line, the next icon, how much went to Brooks

22  ham LLC?

23  A.  I'm sorry, it should say Brooksam.

24  Q.  I'm sorry, it should say what?

25  A.  Brooksam.

A. Martell - Direct

1   Q.   Brooksam instead of Brooksham?

2   A.   Yes.

3   Q.   How much went there?

4   A.   $36,962.50 during the time frame of February 4th, 2014,

5   through March 3rd, 2015.

6   Q.   How much went to the David Alcorn Wells Fargo secured

7   credit card account?

8   A.   During the time frame of October 7th, 2014, through

9   January 5th, 2016, $20,297.33 went into his secured credit

10  card.

11  Q.   And then is there a line to another credit secured card?

12  A.   Yes, there is.

13  Q.   How much went there?

14  A.   During the time frame of August 21st, 2014 -- excuse

15  me -- on August 24th -- 21st, 2014, and October 9th, 2014,

16  there was a total of $20,000 that went into the secured card.

17  Q.   And then finally, how much went to the Pacific Capital

18  Advisors, Wells Fargo account?

19  A.   During the time frame of January 27th, 2012, through

20  September 28th, 2015, $5,589.29 went to his Pacific Capital

21  Advisors account.

22  Q.   Is that another account that is controlled by Mr. Alcorn?

23  A.   It is.

24  Q.   And then over here, you've got a little over a million

25  dollars going to an attachment A; is that right?

A. Martell - Direct

1   A.  Yes, that's correct.

2   Q.  Okay.  And if we go to the next page, we're not going to

3   spend a ton of time on this, but the second line, could you

4   please read that for the jury and how much went out of this

5   particular account to Kent Maerki?

6   A.  $178,993 went to Kent Maerki, Sugar Time Management

7   Trust, Wells Fargo checking account ending in 5884.

8   Q.  And how much went to a Mr. Brian Semple?

9   A.  $40,285.

10  Q.  And then finally there's a Kent Maerki, NJM Spectrum

11  account ending in 5704.

12  A.  $23,335.

13  Q.  All right.  Now, one of the accounts that we just looked

14  at, there was -- actually, let's go back.

15         MS. O'BOYLE:  Ms. Yusi, could you go back to Page 2,

16  please.

17  BY MS. O'BOYLE:

18  Q.  Up here, there was almost $700,000 that went into a

19  savings account; is that correct?

20  A.  I'm sorry.  Could you repeat that?

21  Q.  There's almost $700,000 that went into a savings account?

22  A.  Yes, that's correct.

23  Q.  And here, how much went into the savings account with the

24  ending -- the last four digits 8435?

25  A.  $490,900.

—A. Martell - Direct—

1   Q.  If we could go to Government's Exhibit 1104, which I
2   believe is already in evidence.  Is this -- when was this --
3   oh, first of all -- sorry about that.
4           What is this a signature card for?  What company?
5   A.  That's for the David Alcorn Professional Corporation.
6   Q.  And when was this account opened?
7   A.  On January 11th, 2013.
8   Q.  If we could go to Page 6, please.  So on January 11th,
9   what was the balance in the account, the opening deposit?
10  A.  The opening deposit was $500.
11  Q.  And then what happened on January 23rd?
12  A.  On January 23rd there was an online transfer from David
13  Alcorn Professional Corp. checking account totaling $134,500.
14  Q.  And so if we could go to Government's Exhibit 1103.  Do
15  you recognize this?
16  A.  I do.
17  Q.  What is this?
18  A.  This is the David Alcorn Professional Corp. Wells Fargo
19  Bank business market rate savings account ending in 8435 for
20  the time frame of January 11th, 2013, through August 31st,
21  2016, and it shows a net account activity of $491,072.26.
22  Q.  Okay.  And so is this the first page of the summary, is
23  the second page the pivot table, and the third page the
24  spreadsheet?
25  A.  Yes.

Carol L. Naughton, Official Court Reporter

A. Martell - Direct

1   Q.  Did you review the bank accounts to prepare this chart?

2   A.  I did.

3   Q.  Were the documents voluminous?

4   A.  Yes, they were.

5   Q.  Did you prepare the chart the same way we've discussed

6   previously?

7   A.  I did.

8   Q.  Did you verify the accuracy of the information contained

9   in this chart via peer review?

10  A.  I did.

11          MS. O'BOYLE:  Government moves in Exhibit 1103.

12          THE COURT:  With respect to all of these summary

13  charts, was the underlying data also available to the

14  opposing parties?

15          MS. O'BOYLE:  The underlying data was available to

16  the opposing parties since 2019, Your Honor.  The summary

17  charts were produced -- I don't have the actual date, but at

18  least six months, maybe a year, and many of the accounts

19  actually are in evidence, as well.

20          THE COURT:  I just raise that because that's also

21  one of the grounds for admission, is that very statement.

22          MS. O'BOYLE:  Yes, sorry, Your Honor.  I should have

23  made that clear to be begin with.

24          THE COURT:  1103 will be admitted.

25          (Government's Exhibit 1103 was admitted.)

A. Martell - Direct

1   BY MS. O'BOYLE:
2   Q.  All right.  And so just to -- is this one of the
3   accounts, I believe we've got -- this is the second David
4   Alcorn Professional Corporation account that we're looking
5   at; is that correct?
6   A.  That's correct.
7   Q.  So we had the Janus Spectrum funds going to the first
8   David Alcorn Professional Corp. --
9   A.  Checking account.
10  Q.  -- that we reviewed in the prior summary chart; is that
11  correct?
12  A.  Correct.
13  Q.  And then funds went from there into this particular
14  account?
15  A.  That's correct.
16  Q.  All right.  Now, let's go ahead and take a look.  To the
17  left, how much funds went into -- from the David Alcorn
18  Professional Corporation account ending in 7417 to the David
19  Alcorn Professional Corporation account ending in 8435?
20  A.  There was $490,900.
21  Q.  And what was the time frame?
22  A.  January 11th, 2013, through January 28th, 2016.
23  Q.  And what percentage of the total deposits in this account
24  did those funds make up?
25  A.  99.96 percent.

A. Martell - Direct

1    Q.   Okay.  And then looking at the withdrawals here, what --
2    where did -- it says, the first line, the first arrow goes
3    down to a David Alcorn Professional Corp. retirement plan; is
4    that right?
5    A.   Yes, it is.
6    Q.   How much money went there?
7    A.   On August 12th, 2013, $490,000 went into that account,
8    which made up of 99.78 percent of the account.
9    Q.   Okay.  So funds went from one David Alcorn Professional
10   Corporation to this savings account and then ultimately to a
11   retirement plan?
12   A.   That's correct.
13   Q.   All right.  Let's go back to 1101, and here, Page 2, we
14   just finished the savings account over here; is that correct?
15   A.   That's correct.
16   Q.   Now we're going to go to the David and Elizabeth Alcorn
17   checking account, the 6604 account, which how much did that
18   account receive?
19   A.   It received $347,754.32.
20   Q.   That's the 664.  Is there also a savings account
21   connected with this -- with that account as well?
22   A.   There is.
23   Q.   And how much did account 1474 receive?
24   A.   699,500.
25   Q.   So let's go to Government's Exhibit 1105.  Is this a

A. Martell - Direct

1    summary chart for the savings account we just looked at, the
2    1474?
3    A.  It is.
4    Q.  Is the first page the summary chart?
5    A.  It is.
6    Q.  What is in the second page?  Is it the pivot table?
7    A.  Yes.
8    Q.  And the third page, is that the spreadsheet?
9    A.  Yes.
10   Q.  And what documents did you review to prepare this chart?
11   A.  The bank statements, checks, deposits, and any wire
12   transfers.
13   Q.  And were the documents voluminous?
14   A.  Yes, they were.
15   Q.  How did you prepare the chart?
16   A.  It was prepared from the information from the
17   spreadsheet.
18   Q.  And did you verify the accuracy of the information
19   contained in the chart with peer review?
20   A.  I did.
21          MS. O'BOYLE:  Government moves in Exhibit 1105.
22          THE COURT:  Exhibit 1105 is admitted.
23          (Government's Exhibit 1105 was admitted.)
24          MS. O'BOYLE:  If we could start at Page 3, Ms. Yusi.
25   BY MS. O'BOYLE:

A. Martell - Direct

1  Q.  What was the beginning balance in the savings account
2  1474 on January 6th, 2012?
3  A.  It was $26.22.
4  Q.  Let's go back to Page 1.  What is the net account
5  activity for this savings account 1474?
6  A.  It was $810,311.23.
7  Q.  We're going to focus on the deposits into the account.
8  Starting on the left-hand side, was there a deposit from the
9  David Alcorn Professional Corporation checking account ending
10 in 7417?
11 A.  There was.
12 Q.  How much?
13 A.  During the time frame of March 11th, 2013, through
14 January 28th, 2016, $699,500 went into the account.
15 Q.  And what percentage of deposits was -- were those
16 deposits, the total deposits that went into the account?
17 A.  It made up 86.32 percent of the deposits.
18 Q.  Going to the -- moving to the right, that second arrow,
19 how much went in from a David Alcorn Charles Schwab checking
20 account 9732?
21 A.  During the time frame of November 3rd, 2014 -- excuse me,
22 on November 3rd, 2014, and July 6th, 2015, there was a total
23 of $58,069 that went into the account, which made up
24 7.17 percent of the deposits.
25 Q.  Was there also a deposit directly from Janus Spectrum

A. Martell - Direct

1   LLC, the Wells Fargo checking account 7384?

2   A.  There was.

3   Q.  Okay.  When was that and how much was it?

4   A.  On December 17th, 2012, $51,700 went into the account,

5   which made up of 6.38 percent of the deposits.

6   Q.  Now let's look at where the funds went after it hit the

7   savings account.  Starting on the left-hand side, there's an

8   arrow to the David and Elizabeth Alcorn Wells Fargo Bank

9   checking account ending in 6604.  How much went there?

10  A.  During the time frame of March 12th, 2012, and

11  January 5th, 2016, $759,560 went into that account, which

12  made up of 93.74 percent of the withdrawals.

13  Q.  And then this chart continues on going up the right; is

14  that correct?

15  A.  That's correct.

16  Q.  With other withdrawals?

17  A.  Yes.

18  Q.  Let's go to Government's Exhibit 1106.  And is this a

19  summary chart for the checking account where all those funds

20  went to from the savings account, account --

21  A.  That's correct.  These are the -- yes.

22  Q.  Is this account 6604?

23  A.  6604, correct.

24  Q.  And Page 1, is this a summary of the deposits?

25  A.  This is a summary of the net deposits, yes.

A. Martell - Direct

1  Q.  Page 2, is it a summary of the net withdrawals?

2  A.  Yes, it is.

3  Q.  And is Page 3 the attachment A?

4  A.  Yes, it is.

5  Q.  Is Page 4 the pivot table?

6  A.  Yes, it is.

7  Q.  And Page 6, is that the spreadsheet?

8  A.  It is.

9  Q.  And did you summarize that entire -- the entire account?

10  A.  I did.

11  Q.  And so did you use the account documents in order to

12  prepare the chart?

13  A.  I did.

14  Q.  Were the documents voluminous?

15  A.  Yes, they were.

16  Q.  Did you prepare the chart the same way you have all the

17  others?

18  A.  I did.

19  Q.  Did you verify the accuracy of the chart with peer review

20  information?

21  A.  I did.

22          MS. O'BOYLE:  Government moves in Exhibit 1106.

23          THE COURT:  1106 is admitted.

24          (Government's Exhibit 1106 was admitted.)

25  BY MS. O'BOYLE:

A. Martell - Direct

1   Q.  And so this is the David A. and Elizabeth Alcorn checking

2   account ending in 6604; is that right?

3   A.  That's correct.

4   Q.  And what were the net deposit account activity into this

5   account?

6   A.  It was $1,238,599.76.

7          MS. O'BOYLE:  And, Ms. Yusi, if you could go to

8   Page 6, please.

9   BY MS. O'BOYLE:

10  Q.  On January 3rd, 2012, what was the beginning balance for

11  this checking account?

12  A.  It was $87.17.

13  Q.  If we could go back up to Page 1, please.

14          So let's take a look at where the deposits came into

15  Mr. Alcorn's checking account.  Start here on the left-hand

16  side.  How much came from the savings account 1474?

17  A.  During the time frame of March 12th, 2012, and

18  January 5th, 2016, $759,560 went into the account, which made

19  up of 61.32 percent of the account.

20  Q.  How much came in from the David Alcorn Professional Corp.

21  account ending in 7417?

22  A.  During the time frame of January 3rd, 2012, through

23  February 18th, 2016, $347,071.32, which made up of

24  28.02 percent of the deposits went into the account.

25  Q.  Up here in the upper left, what is that?

—————A. Martell - Direct—————

1    A.   It shows that Social Security Treasury 310 for David
2    Alcorn during the time frame of October 12 -- excuse me,
3    October 10th, 2012, through March 9th, 2016, there was
4    $74,614.70 that went into the account.
5    Q.   And so that is coming into the checking account?
6    A.   That's correct.
7    Q.   And then there's a reference to a Ted Marek?
8    A.   Yes.
9    Q.   And then it's another $25,000 deposit?
10   A.   That's correct.
11   Q.   And how much did that make up of the total deposits
12   during this time frame?
13   A.   That was 2.02 percent.
14   Q.   Is there another treasury deposit, U.S. Treasury deposit
15   in the amount of 16,173?
16   A.   Yes, there was.
17   Q.   And that was over the time frame of -- what time frame?
18   A.   January 11th, 2012, through September 12th, 2012.
19   Q.   Then up here, just finishing out the deposits, how much
20   cash came in on December 11th, 2013?
21   A.   $9,000.
22   Q.   And then how much came in from Lincoln Financial Group on
23   September 9th, 2015?
24   A.   $6,000.
25   Q.   And then is there a $683 deposit from Janus Spectrum's

—————————————A. Martell - Direct—————————————

1   checking account?

2   A.  Yes, there was.

3         THE COURT:  Counsel, before you switch to another

4   exhibit, I don't know whether you are getting ready to

5   switch, but the Court is going to take the lunch break at

6   this juncture.

7         MS. O'BOYLE:  Okay.  Thank you, Your Honor.

8         THE COURT:  Ladies and gentlemen, we're going to be

9   excused for lunch for an hour and a half.  Be back at 2:30.

10        (The jury exited the courtroom.)

11        THE COURT:  You may step down during the lunch

12  break.  Do not discuss your testimony.

13        MS. McCASLIN:  Your Honor, this is Lindsay McCaslin.

14  Before we break, can I ask you a question?

15        THE COURT:  Everyone be seated.

16        Yes, ma'am.

17        MS. McCASLIN:  Thank you.  When we left court

18  yesterday, at the very end of the day, I believe the

19  government was going to get together and talk about the rest

20  of their case for timing purposes.  I know the Marshals are

21  anxious to just nail down, as much as possible, the timing.

22        THE COURT:  So you did not get together?

23        MS. McCASLIN:  Well, they were going to discuss last

24  night what their plan was going forward.  So we just wanted

25  to clarify.

———————A. Martell - Direct———————

1          MS. O'BOYLE:  Your Honor, I think the government is
2    still, we believe, on track to finish on Tuesday.  We think
3    we probably will end up taking most of the day on Tuesday,
4    but we also -- the government also remembered that defense
5    counsel wanted to do a voir dire of Daryl Bank, and so we
6    wondered if whether or not -- to determine whether or not he
7    had waived his Fifth Amendment rights.  That was a motion
8    that was filed a while ago.
9          I don't know if they still intend to call him or
10   not.  But we also, we could potentially argue or decide that
11   on Tuesday afternoon, if the government gets done a little
12   bit earlier than anticipated.
13         THE COURT:  I would think this, counsel, just so you
14   won't be scrambling trying to get a witness in here on
15   Tuesday if the government ends early, is that direct the
16   Marshals to make sure they have your witness in here by
17   Tuesday so that you can start Wednesday, and if you end
18   earlier Wednesday, we'll just have to have a day break or
19   whatever, which we all can use.  So just do that.  Make sure
20   they have your witnesses in here so you are ready to go on
21   Wednesday.
22         MS. McCASLIN:  Your Honor, I just want to make sure.
23   So for Tuesday, we can make sure to have Daryl Bank here to
24   do the voir dire.  As for the rest of the witnesses, were you
25   going to have Mr. Alcorn go first for defense or Mr. Smith?

A. Martell - Direct

1          THE COURT:  Well, I hadn't thought about that, but I
2     can have Mr. Alcorn go first.
3          MS. McCASLIN:  Thank you.
4          THE COURT:  We'll go alphabetically.  Alcorn before
5     Smith.
6          MS. McCASLIN:  But we will still have Mr. Bank here
7     to at least take care of potentially the voir dire aspect
8     outside of the presence of the jury.
9          THE COURT:  Sure.  If you still intend to call him
10    as a witness.
11         MS. McCASLIN:  Of course.  Thank you.
12         MS. O'BOYLE:  Your Honor, the government just
13    raises -- I don't know if Mr. Bank has counsel for the
14    purposes of this.  He had appellate counsel, and there's been
15    a recent substitution due to that appellate counsel having
16    some medical issues.
17         I believe he is now represented by the Federal
18    Public Defender's office in the Western District of Virginia.
19    I don't know if they intend to have someone represent him for
20    the purposes of this voir dire or if this Court needs to
21    appoint someone else, but it's the government's understanding
22    that Mr. Broccoletti no longer represents Mr. Bank.
23         MS. McCASLIN:  Your Honor, we have been in
24    communication with the prior appellate attorney.  He
25    indicated that he was not representing Mr. Bank on this

A. Martell - Direct

1   matter, and we have been communicating with James

2   Broccoletti, who represented him in the trial for the past

3   couple years.  So we have been communicating with James

4   Broccoletti.

5           THE COURT:  So is it your understanding

6   Mr. Broccoletti will represent him with respect to any voir

7   dire?

8           MS. McCASLIN:  I don't know if he will be here.  I

9   can find out thought, though.  But we have been communicating

10  with Mr. Broccoletti.

11          THE COURT:  Let's see if we can clear this up by

12  next week so if we have to look at the possibility of

13  appointing someone else, if he needs someone else, we will

14  have to try to take care of it.

15          MS. McCASLIN:  Thank you, Judge.

16          THE COURT:  All right.

17          (Recess from 1:04 p.m. to 2:34 p.m.)

18          THE COURT:  Let the record reflect that all jurors

19  have returned from the lunch break.

20          MS. O'BOYLE:  The United States agrees.

21          MR. YAROW:  Mr. Alcorn agrees.

22          MS. McCASLIN:  Mr. Smith agrees.

23          THE COURT:  You may resume your examination.

24          MS. O'BOYLE:  Thank you, Your Honor.

25  BY MS. O'BOYLE:

—————————A. Martell - Direct—————————

1   Q.   Good afternoon, Mr. Martell.

2   A.   Good afternoon.

3   Q.   Let's go to Government's Exhibit 1110, and this is

4   already in evidence.  And what bank account is this for?

5   A.   This is David Alcorn Professional Corporation, checking

6   account ending in 5760.

7   Q.   Is it for the retirement plan?

8   A.   Yes, retirement plan account.

9   Q.   And who are the signatories on this account?

10  A.   Brian F. Semple, David Albert Alcorn, and Elizabeth

11  Alcorn.

12  Q.   What date was this opened?

13  A.   June 28th, 2013.

14  Q.   Let's go to Government's Exhibit 1109.  Do you recognize

15  this?

16  A.   I do.

17  Q.   What is it?

18  A.   This is the David Alcorn Professional Corporation

19  retirement plan, Arizona Business Bank account ending in 5760

20  for the period of June 28th, 2013, through January 31st,

21  2016, and it's the net account activity totaling

22  $1,150,515.54.

23  Q.   And is this the summary chart showing deposits in and

24  withdrawals out?

25  A.   It is.

A. Martell - Direct

1    Q.   And do you also have on Page 2, is there the pivot table?

2    A.   Yes.

3    Q.   And then Page 3 is the spreadsheet?

4    A.   That's correct.

5    Q.   And it summarizes the entire account?

6    A.   Yes.

7    Q.   What documents did you review to prepare this chart?

8    A.   The bank statements, checks, deposits, and any wire

9    transfers.

10   Q.   Were the documents voluminous?

11   A.   Yes, they were.

12   Q.   And did you prepare this chart the same way we've been

13   talking about the other charts?

14   A.   I did.

15   Q.   And did you verify the accuracy of the information

16   contained in this chart through peer review?

17   A.   I did.

18            MS. O'BOYLE:   The government moves in Exhibit 1109.

19            THE COURT:   Exhibit 1109 is admitted.

20            (Government's Exhibit 1109 was admitted.)

21   BY MS. O'BOYLE:

22   Q.   And so let's focus first on the deposits into this

23   account.   There were two primary deposits into this account;

24   is that correct?

25   A.   That's correct.

A. Martell - Direct

1   Q.   Let's start with the one on the left.

2   A.   That's David Alcorn Professional Corp., Wells Fargo Bank

3   checking account ending in 7417.

4   Q.   And how much money went into the retirement plan from

5   that account?

6   A.   August 12th, 2013, and October 29th, 2013, there was a

7   total of $660,000 that went into the account, which made up

8   57.37 percent of deposits going into that account.

9   Q.   Okay.  The second deposit?

10  A.   The second one is David Alcorn Professional Corporation,

11  Wells Fargo Bank market rate savings account ending in 8435,

12  and then August 12th, 2013, $490,000 went into the account,

13  which consists of 42.59 percent of the total deposits.

14  Q.   Are the vast majority of the deposits over 90 percent

15  coming from these two accounts?

16  A.   That's correct.

17  Q.   And let's take a look at two separate withdrawals.

18  Starting with the one on the left, what is that?

19  A.   That is Brooksam LLC, Arizona Business Bank checking

20  account ending in 3854.

21  Q.   And how much went there?

22  A.   On August 15th, 2013, and December 16th, 2013, a total of

23  $689,500 went into the account.

24  Q.   And then focusing in on the second, what is this?

25  A.   That is FRGC Properties LLC.

———A. Martell - Direct———

1    Q.   And how much went there?

2    A.   On January 15th, 2016, $400,000 went into the account.

3    Q.   So is it a little over a million dollars went to these

4    two separate bank accounts from Mr. David Alcorn's retirement

5    plan?

6    A.   Yes.  That's correct.

7    Q.   If we could take a look at -- it's not in yet --

8    Government's Exhibit 1111.  And do you recognize this?

9    A.   Yes.

10   Q.   What is it?

11   A.   That's a deposit of a certified check in the amount of

12   $100,093.05 made payable to David Alcorn -- I can't read it.

13   Q.   I can blow it up a little bit bigger.

14   A.   David Alcorn Professional Corporation.

15          MS. O'BOYLE:  Government moves in Exhibit 1111.

16          THE COURT:  Exhibit 1111 is admitted.

17          (Government's Exhibit 1111 was admitted.)

18   BY MS. O'BOYLE:

19   Q.   What is the date of this cashier's check?

20   A.   It's May 1st, 2015.

21   Q.   And what is -- who is the remitter?

22   A.   David Albert Alcorn, a business of Janus Spectrum.

23   Q.   And how much is it for?

24   A.   $100,093.05.

25   Q.   And where did it go?

─A. Martell - Direct─

1    A.  It went to David Alcorn Professional Corporation

2    retirement plan.

3    Q.  Now, let's take a look at Government's Exhibit 1114.

4    And, Mr. Martell, do you recognize this exhibit?

5    A.  I do.

6    Q.  And what is it?

7    A.  That is the flow of funds for the purchase of 12040 North

8    133rd Way, Scottsdale, Arizona 85259.

9    Q.  And is it showing the flow of funds from investors to the

10   purchase of this house?

11   A.  It is.

12   Q.  And then are all the documents that support this chart --

13   do they underlie this particular summary chart?

14   A.  Yes, they do.

15   Q.  What documents did you review to prepare this chart?

16   A.  All the bank statements, checks, deposits, and any wire

17   transfers that were made.

18   Q.  Were the documents voluminous?

19   A.  They were.

20   Q.  And did you verify the accuracy of the information

21   contained in this chart through peer review?

22   A.  I did.

23   Q.  And did you take the bank statements and then trace all

24   the funds going from the Janus Spectrum LLC account to the

25   purchase of this house?

A. Martell - Direct

```
 1   A.  I did.
 2         MS. O'BOYLE:  Government moves in Exhibit 1114.
 3         THE COURT:  Exhibit 1114 is admitted.
 4         (Government's Exhibit 1114 was admitted.)
 5   BY MS. O'BOYLE:
 6   Q.  Okay.  So let's start over here on the left-hand side.
 7   Okay.  Mr. Martell, what is this first bank account at the
 8   top?
 9   A.  That is the investment account, which is the Janus
10   Spectrum LLC Wells Fargo Bank checking account ending in
11   7384.
12   Q.  Okay.  And so is this where investor funds landed?
13   A.  That's correct.
14   Q.  Now, what -- and then there's an arrow pointing down to
15   David Alcorn Professional Corp., account number 7417.  What
16   does that reflect?
17   A.  Okay.  Between the period of January 4th, 2012, and
18   August 13th, 2013, there were transfers totaling $2,187,822
19   into David Alcorn Professional Corporation, Wells Fargo Bank
20   checking account ending in 7417.
21   Q.  Now, let's -- after funds land there, were funds -- those
22   funds transferred then to the David Alcorn Professional
23   Corporation account ending in 8435?
24   A.  Yes.
25   Q.  And how much money was transferred down there?
```

A. Martell - Direct

1  A.  $50,500.

2  Q.  After those funds landed in account 8435, where did they

3  go?

4  A.  There was a cashier's check totaling 490,000 on

5  August 12th, 2013, that went into David Alcorn's Professional

6  Corporation retirement plan, Arizona Business Bank account

7  ending in 5760.

8  Q.  Was that the account we were just looking at?

9  A.  Yes, it was.

10  Q.  Now, I'm going to go and take a look at -- were there

11  funds that were deposited into that account from the David

12  Alcorn Professional Corp. accounts ending in 7417 as well?

13  A.  There was.

14  Q.  Okay.  Can you explain that to the jury?

15  A.  On that same date, August 12th, 2013, there was a

16  cashier's check in the amount of $310,000 that went from

17  David Alcorn Professional Corporation, Wells Fargo Bank

18  checking account ending in 7417, into David Alcorn

19  Professional Corporation retirement plan, Arizona Business

20  Bank account ending in 5760.

21  Q.  All right.  Now, staying with that checking account 7417,

22  were there also transfers from that account into Mr. Alcorn's

23  Charles Schwab bank account?

24  A.  There was.

25  Q.  And can you explain that to the jury?

A. Martell - Direct

1   A.  Between the dates of April 12th, 2012, and April 3rd,

2   2013, there were checks totaling $559,504 that went from

3   David Alcorn Professional Corporation, Wells Fargo Bank

4   checking account ending in 7417, to David Alcorn Charles

5   Schwab Bank checking account ending in 9732.

6   Q.  And then up here at the top, was there a transfer of

7   funds from David Alcorn Professional Corp. 7417 to

8   Mr. Alcorn's savings account ending in 1474?

9   A.  There was.

10  Q.  Can you describe that to the jury.

11  A.  Between the dates of March 11th, 2013, and May 20th,

12  2013, there were transfers totaling $400,000 that went from

13  David Alcorn's Professional Corp, Wells Fargo Bank checking

14  account ending in 7417, to David Alcorn, Wells Fargo Bank

15  savings account ending in 1474.

16  Q.  Okay.  After those funds landed in 1474, where did they

17  go?

18  A.  They went to David and Elizabeth Alcorn's Wells Fargo

19  Bank checking account ending in 6604.

20  Q.  So a total of $446,860 was transferred there?

21  A.  That's correct.

22  Q.  After that transfer into the David and Elizabeth Alcorn

23  checking account, what happened?

24  A.  On August 13th, 2013, there was a cashier's check in the

25  amount of $400,000 that went into Brooksam LLC, Arizona

A. Martell - Direct

1  Business Bank account ending in 3854.

2  Q.  Sorry.  I should have blown that up a little better.  I

3  apologize.

4          And so then moving over here to the -- those funds

5  went into the Brooksam account?

6  A.  That's correct.

7  Q.  And then on that same day, was there a transfer from

8  Mr. Alcorn's Charles Schwab bank account into the Brooksam

9  account?

10  A.  There was.  On August 13th, 2013, the same day, check

11  number 1150 totaling $141,152.52 went to the Brooksam LLC,

12  Arizona Business Bank account ending in 3854.

13  Q.  Okay.  And then focusing back in on the retirement plan

14  account, two days later was there a transfer from the

15  retirement plan account also to the Brooksam account?

16  A.  There was.

17  Q.  Okay.  And what was that?

18  A.  On August 15th, 2013, there was a transfer for $700,000

19  that went from the David Alcorn Professional Corp. retirement

20  plan, Arizona business account ending in 5760 to the Brooksam

21  LLC, Arizona Business Bank account ending in 3854.

22  Q.  And then ultimately after all those funds end up in the

23  Brooksam LLC account, what happens?

24  A.  On August 15th, 2013, there was a cashier's check in the

25  amount of $1,240,000 that went to California Reconveyance

──────────A. Martell - Direct──────────

1   closing on -- for closing on property 12047 [sic] North 133rd

2   Way, Scottsdale, Arizona.

3   Q.  Okay.  Could you take a look at Government's Exhibit

4   1116, which is already in evidence.  What is the name of this

5   account, sir?

6   A.  That's the Brooksam LLC account ending in 3854.

7   Q.  And this is where the over a million dollars landed to

8   purchase that house?

9   A.  That's correct.

10  Q.  And who are the signatories on this account?

11  A.  Brian F. Semple and James J. Karcz.

12  Q.  And what day was it opened?

13  A.  August 13th, 2013.

14  Q.  Was that two days before the purchase of the house?

15  A.  That's correct.

16  Q.  Did you do a summary chart for the Brooksam account as

17  well?

18  A.  I did.

19  Q.  Let's take a look at Government's Exhibit 1115.  Do you

20  recognize this?

21  A.  Yes.

22  Q.  And is this the summary chart for Brooksam?

23  A.  Yes, it is.

24  Q.  And does it contain the net deposits and the withdrawals,

25  the pivot table, and the spreadsheet?

A. Martell - Direct

```
 1   A.  It does.
 2   Q.  And what documents did you review to prepare this chart?
 3   A.  The Brooksam bank statements, checks, deposits, and any
 4   wire transfers.
 5   Q.  Were the documents voluminous?
 6   A.  Yes, they were.
 7   Q.  Did you prepare this chart in the same way that you
 8   prepared the others?
 9   A.  Yes, I did.
10   Q.  Did you verify the accuracy of the information contained
11   in this chart through peer review?
12   A.  I did.
13          MS. O'BOYLE:  Government moves in Exhibit 1115.
14          THE COURT:  Exhibit 1115 is admitted.
15          (Government's Exhibit 1115 was admitted.)
16   BY MS. O'BOYLE:
17   Q.  Let's just take a look for a second at the withdrawals
18   from the account on Page 2.  The first line, what is this
19   line?
20   A.  That's the transfer for $1,240,000 that went to
21   California Reconveyance.
22   Q.  And what is -- what percentage of the withdrawals does
23   this $1.2 million transfer equal?
24   A.  80.32 percent.
25   Q.  And does this chart reflect, very similar to the last
```

A. Martell - Direct

1   chart, all of the funds that are going into this Brooksam
2   account?
3   A.  Yes, ma'am.
4   Q.  From Mr. Alcorn's various accounts?
5   A.  Yes.
6   Q.  In the retirement account, there was also a transfer to
7   FRGC Properties; is that right?
8   A.  Yes.
9   Q.  Let's go ahead and take a look at Government's Exhibit
10  1112.  And do you recognize 1112?
11  A.  I do.
12  Q.  What is it?
13  A.  That is the flow of funds for FRGC Properties LLC.
14  Q.  And behind there, do you have the supporting documents
15  related to this transaction?
16  A.  Yes, I do.
17          MS. O'BOYLE:  Government moves in Exhibit 1112.
18          THE COURT:  Exhibit 1112 is admitted.
19          (Government's Exhibit 1112 was admitted.)
20  BY MS. O'BOYLE:
21  Q.  And, Mr. Martell, if you could just, for the jury, could
22  you explain the flow of funds into the FRGC Properties.
23  A.  It starts off with Janus Spectrum, Wells Fargo Bank
24  checking account ending in 7384.  Between the period of
25  January 4th, 2012, and February 21st, 2014, there were

A. Martell - Direct

1    transfers totaling $3,087,091 that went into David Alcorn's

2    Professional Corp. Wells Fargo Bank checking account ending

3    in 7417.

4            On October 29th, 2013, there was a check number 1001

5    totaling $350,000 that went into David Alcorn Professional

6    Corp. retirement plan, Arizona Business Bank account ending

7    in 5760.

8            On January 15th, 2016, there was a cashier's check

9    in the amount of $400,000 that went to FRGC Properties LLC.

10   Q.  Okay.  And there are two notes underneath the retirement

11   plan icon?

12   A.  Yes.

13   Q.  What is this first note?

14   A.  It was a note indicating that there was $100,000 account

15   balance after there was the $700,000 transfer to California

16   Reconveyance for the purchase of the Scottsdale property on

17   August 15th, 2013.

18           There's also a second note indicating that the

19   $450,000 account balance after 350,000 -- excuse me -- there

20   was a $450,000 account balance after the $350,000 deposit on

21   October 29th, 2013.

22   Q.  So we already looked at all the amounts of funds that

23   went into the retirement plan -- in the retirement plan

24   account; is that correct?

25   A.  That's correct.

A. Martell - Direct

1    Q.  And were all of those funds ultimately funneled through a
2    number of entities from the investor funds that landed in
3    Janus Spectrum's account?
4    A.  That's correct.
5    Q.  And so that makes up the $400,000 that was transferred to
6    FRGC Properties?
7    A.  That's correct.
8    Q.  Let's take a look at Government's Exhibit 1117.  It's
9    already in evidence.  And if we could, if we could just go to
10   Page 513, please.
11        And this is -- we saw on the spreadsheet related to
12   the purchase of the house, there was a reference to a check
13   from the Charles Schwab account; is that correct?
14   A.  Yes.
15   Q.  And what is this that we're looking at on Page 513 of
16   this exhibit?
17   A.  This is a check made payable to Brooksam LLC in the
18   amount of $141,152.52 that was drawn on the David Alcorn
19   Charles Schwab bank account ending in 9732, which was signed
20   by Elizabeth Alcorn.
21   Q.  What other here -- if we can take a look at exhibit -- or
22   go to Page 533.  Is this another check out of the David
23   Alcorn Charles Schwab account?
24   A.  It is.
25   Q.  On December 21st, 2013?

A. Martell - Direct

```
 1   A.   Yes.
 2   Q.   And what is the amount of this check?
 3   A.   It's for $88,122.15.
 4   Q.   And can you read what's written on the check?
 5   A.   Yes.  It's for a -- the memo is for a Range Rover.  The
 6   payee information is Royal, and I can't make out the second
 7   word, but it's Land Rover.
 8   Q.   If we can go to Government's Exhibit 1118, just for the
 9   witness, please.  And do you recognize 1118?
10   A.   I do.
11   Q.   What is it?
12   A.   It is the Pacific Capital Advisors' Wells Fargo Bank
13   savings account ending in 8706 for the period of January 1st,
14   2012, through December 31st, 2014, and it's the net account
15   activity, which was $14,224.83.
16   Q.   Okay.  And is this the summary chart, and the second page
17   the pivot table, and the third page the spreadsheet?
18   A.   Yes, ma'am.
19   Q.   Did you review the bank documents to prepare this chart?
20   A.   I did.
21   Q.   And were they voluminous?
22   A.   Yes.
23   Q.   Did you prepare this chart in the same way that you did
24   the others?
25   A.   I did.
```

A. Martell - Direct

1   Q.  Did you verify the accuracy of the information contained
2   in this chart with peer review?
3   A.  I did.
4           MS. O'BOYLE:  Government moves in Exhibit 1118.
5           THE COURT:  Exhibit 1118 is admitted.
6           (Government's Exhibit 1118 was admitted.)
7   BY MS. O'BOYLE:
8   Q.  Can you just explain to the jury what happened in
9   Exhibit 1118 on the left-hand side.
10  A.  On January 22nd, 2013, there was $14,000 that was
11  deposited into Pacific Capital Advisors' Wells Fargo Bank
12  savings account ending in 8706, which came from Janus
13  Spectrum LLC, Wells Fargo Bank checking account ending in
14  7384.
15  Q.  If we could have Government's Exhibit 1122, please, which
16  I believe is already in evidence.
17          And is this the bank account statement for a company
18  called Steph Court LLC?
19  A.  Yes.
20  Q.  And who is the signatory on Steph Court LLC?
21  A.  Brian F. Semple.
22  Q.  Is that the same -- one of the signatories that was also
23  on the Brooksam account?
24  A.  Yes, that's correct.
25  Q.  Did you do a summary of this account as well?

———————A. Martell - Direct———————

1   A.  I believe I did.

2   Q.  If we could have Government's Exhibit 1121.  Do you

3   recognize 1121?

4   A.  I do.

5   Q.  What is it?

6   A.  It's a summary chart for Steph Court LLC, Arizona

7   Business Bank checking account ending in 5689 for the period

8   of March 9th, 2017, through July 31st, 2017.  It's the net

9   account activity, which totaled $141,389.63.

10  Q.  So the first page is the summary, and then do you have

11  the pivot table and the spreadsheet as well?

12  A.  Yes, ma'am.

13  Q.  And did you prepare -- were the documents that you

14  reviewed voluminous to prepare this chart?

15  A.  They were.

16  Q.  Did you prepare it in the same way as the others that

17  we've been discussing?

18  A.  I did.

19  Q.  And did you do a peer review?

20  A.  I did.

21          MS. O'BOYLE:  Government moves in Exhibit 1121.

22          THE COURT:  Exhibit 1121 is admitted.

23          (Government's Exhibit 1121 was admitted.)

24  BY MS. O'BOYLE:

25  Q.  Mr. Martell, what does it reflect -- there's a -- there

—————A. Martell - Direct—————

1    are deposits into this account from an Xcel Bandwidth at

2    Oculina Bank.  Can you explain that to the jury.

3    A.  That was on the Dominion side of the investigation, but

4    it was Oculina Bandwidth LLC, Oculina Bank account ending in

5    7718.  It was March 7th, 2017, through June 27th, 2017.  It

6    was $51,703 that went there.

7            MS. O'BOYLE:  If you could pull up, just for the

8    witness, Government's Exhibit 1123.

9    BY MS. O'BOYLE:

10   Q.  And are these Wells Fargo Visa credit card statements for

11   Mr. Alcorn?

12   A.  I'd have to see the front of it.

13   Q.  I'm sorry.  I apologize.

14   A.  Yes, it is.

15           MS. O'BOYLE:  Government moves in Exhibit 1123.

16           THE COURT:  Exhibit 1123 will be admitted.

17           (Government's Exhibit 1123 was admitted.)

18   BY MS. O'BOYLE:

19   Q.  Okay.  In connection with this investigation, did you

20   also review a number of companies related to Mr. Bank?

21   A.  I did.

22   Q.  Did you trace funds from investors to -- from investors

23   through Mr. Bank's companies and to where they went?

24   A.  Yes, I did.

25   Q.  Let's take a look first at several binders that I believe

A. Martell - Direct

1   you prepared.

2           MS. O'BOYLE:  If you could give the witness

3   Government's Exhibit 250.

4   BY MS. O'BOYLE:

5   Q.  Do you recognize Government's Exhibit 250?

6   A.  I do.

7   Q.  What is it?

8   A.  It's the binder that I prepared for DSPF Group LLC,

9   BayPort Federal Credit Union account ending in 9219, and it

10  was for a period of January 25th, 2013, through

11  November 26th, 2014.

12  Q.  And just generally high level, how did you create this

13  binder of materials?

14  A.  Prepared them from the bank statements for DSPF Group

15  LLC, the checks, deposits, and any wire transfers.

16  Q.  Now, the very first page of that document, does it

17  contain an index of investors?

18  A.  Yes, it does.

19  Q.  And then does the binder have tabs related to each

20  investor?

21  A.  It does.

22  Q.  Okay.  And then behind the tab are all the documents that

23  relate to that investor's funds and where they went?

24  A.  Yes, ma'am.

25          MS. O'BOYLE:  All right.  Government's moves in

A. Martell - Direct

 1    Exhibit 250.

 2              THE COURT:  Exhibit 250 is admitted.

 3              (Government's Exhibit 250 was admitted.)

 4    BY MS. O'BOYLE:

 5    Q.  Okay.  And let's just -- we're going to use this one as

 6    an example, we'll walk through it, and if we use this one as

 7    an example, are the other binders that you prepared similar

 8    to that one?

 9    A.  Yes.

10    Q.  Okay.  So let's -- if we could go to Page 10 of

11    Exhibit 250.  Actually, let's go to Page 2 first.

12              So, Mr. Martell, what is on Page 2 of this binder?

13    A.  That is a summary of all the investors into DSPF Group

14    from the period of January 25th, 2013, through November 26th,

15    2014.

16    Q.  You mean January 30th, 2014?

17    A.  Yeah, I'm sorry, January 30th.

18    Q.  Okay.  And right beside one it says Debra L. Barry.  Do

19    you see that?

20    A.  Yes.  Uh-huh.

21    Q.  Now, does that relate to anything in your binder?

22    A.  It does.

23    Q.  Okay.  What does it relate to?

24    A.  It relates to the movement of the funds for Ms. Barry.

25    Q.  So if you go behind tab 1 in the binder --

A. Martell - Direct

1          MS. O'BOYLE:  If we could go to Page 10 here.  I'm
2    sorry, if we could go -- actually, if we could go to Page 3.
3    Sorry about that, Ms. Yusi.
4    BY MS. O'BOYLE:
5    Q.  So what are we looking at here behind tab 1?
6    A.  That's the wire transfer for Ms. Barry.  The money --
7    $50,500 is coming out from Summit Trust Company to DSPF Group
8    LLC.
9    Q.  Okay.
10   A.  The 50,500 is split between Debra L. Barry and Ellen M.
11   Regal Logistics LLC.
12          MS. O'BOYLE:  And if we could go to the very next
13   page, Ms. Yusi.
14   BY MS. O'BOYLE:
15   Q.  Does this reflect -- or what bank account statement is
16   this?
17   A.  That's the bank account statement for DSPF Group LLC.
18   Q.  And what does it reflect happened, indeed, on
19   January 25th?
20   A.  That the $50,500 -- there was a $50,500 wire transfer.
21   Q.  Okay.  And then after that $50,000 wire transfer hit the
22   account, what happened?
23   A.  There was a transfer to Dominion Private Client Group in
24   the amount of $7,575.  There was a withdrawal to DSPF
25   Management $8,416.

A. Martell - Direct

1    Q.  And then did -- as you continue behind, did you follow

2    those flow of funds and where they went?

3    A.  I did.

4    Q.  If we could go to Government's Exhibit 285.  Do you

5    recognize 285?

6    A.  I do.

7    Q.  And what is it?

8    A.  That is a -- also a chart that I made showing the flow of

9    funds for that transaction totaling $50,500.

10            MS. O'BOYLE:  Government moves in Exhibit 285.

11            THE COURT:  Exhibit 285 is admitted.

12            (Government's Exhibit 285 was admitted.)

13   BY MS. O'BOYLE:

14   Q.  So, Mr. Martell, could you explain what happened with

15   Barry's funds when it hit the DSPF Group account.

16   A.  On January 25th, 2013, the wire transfer totaling -- her

17   portion of it was 40,500 that went to DSPF Group LLC, BayPort

18   Credit Union account ending in 9219.  On that same day, there

19   was $10,000 that went into DSPF Group, BayPort Credit Union

20   account ending in 9219, from Ellen M. Regal Logistics LLC.

21   Q.  Then after those funds hit the DSPF Group account, what

22   happened to them?

23   A.  You can see where it split off 15 percent on

24   January 29th, 2013.  It went to Dominion Private Client

25   Group, BayPort Credit Union account ending in 8622, and also

A. Martell - Direct

1    on that same date, 16.665 percent totaling 8,416 went to DSP
2    Management LLC, BayPort Federal Credit Union ending in 9359.
3    Q.  Okay.  And so did you create investor binders that track
4    the flow of funds for the other spectrum investments as well?
5    A.  I did.
6           MS. O'BOYLE:  Okay.  So let's go to Government's
7    Exhibit 313.  It's in a blue binder.  If you could hand that
8    to the witness, please.
9    BY MS. O'BOYLE:
10   Q.  Did you prepare that binder?
11   A.  I did.
12   Q.  Did you prepare it in the same way that you prepared the
13   DSPF Group investor binder?
14   A.  I did.
15          MS. O'BOYLE:  All right.  Government moves in
16   Exhibit 313.
17          THE COURT:  Exhibit 313 is admitted.
18          (Government's Exhibit 313 was admitted.)
19          MS. O'BOYLE:  If we could just go to Page 2,
20   Ms. Yusi.
21   BY MS. O'BOYLE:
22   Q.  And so what am I looking at here?
23   A.  That is the -- all the investors into Janus Spectrum
24   Group LLC account ending in 8580 for the period of
25   September 27th, 2012, through July 22nd, 2014.

1536

A. Martell - Direct

1   Q.  And then as you walk through your binder, are all the

2   materials related to each investor behind the corresponding

3   tab?

4   A.  They are.

5        MS. O'BOYLE:  Okay.  If you could please hand the

6   witness Government's Exhibit 409.

7   BY MS. O'BOYLE:

8   Q.  Do you recognize that?

9   A.  I do.

10  Q.  Okay.  What is it?

11  A.  This is the binder I prepared for the investments into

12  Prime Spectrum LLC, BayPort Credit Union account ending in

13  5296, the period of December 9th, 2013, through July 27th,

14  2015.

15       MS. O'BOYLE:  Okay.  Government moves in

16  Exhibit 409.

17       THE COURT:  Exhibit 409 is admitted.

18       (Government's Exhibit 409 was admitted.)

19       MS. O'BOYLE:  Let's take a look just briefly at

20  Government's Exhibit 28.  And this is just for the witness.

21  BY MS. O'BOYLE:

22  Q.  And is this a summary chart related to Bernell and Ruth

23  Clark and Maryam Baird's investment in Prime Spectrum?

24  A.  It is.

25  Q.  And does it show the flow of funds from their investment?

———A. Martell - Direct———

1   A.  Yes, it does.

2          MS. O'BOYLE:  Government moves in Exhibit 28.

3          THE COURT:  Exhibit 28 is admitted.

4          (Government's Exhibit 28 was admitted.)

5   BY MS. O'BOYLE:

6   Q.  And so just briefly, did Mr. and Mrs. Ruth Clark invest

7   $20,000 on March 7th, 2014, into Prime Spectrum?

8   A.  Yes, they did.

9   Q.  And after they invested those funds, did 30 percent of

10  their moneys go to Dominion Private Client Group?

11  A.  It did.

12  Q.  And did 10 percent of their funds go to Spectrum 100

13  Management?

14  A.  It did.

15  Q.  And then 6,000 of their funds go to Mr. Tony Sellers?

16  A.  Yes.

17  Q.  And then did the remainder of those funds go to Janus

18  Spectrum?

19  A.  Yes.

20  Q.  All right.  Let's move on to Government's Exhibit 517,

21  and it should be four blue binders.

22          Do you recognize 517?

23  A.  Yes.

24  Q.  And what is 517?

25  A.  These are four binders that I prepared for spectrum

A. Martell - Direct

```
 1   investments into Spectrum 100.  Book 1 has the investments --
 2   Q.  Well, I can just ask you.  Did you create those in the
 3   same way that you created the investor binders for DSPF
 4   Group, Janus Spectrum Group, and Prime Spectrum?
 5   A.  I did.
 6   Q.  And it's in four binders?
 7   A.  Yes.
 8          MS. O'BOYLE:  Government moves in Exhibit 517.
 9          THE COURT:  Exhibit 517 will be admitted.
10          (Government's Exhibit 517 was admitted.)
11   BY MS. O'BOYLE:
12   Q.  And let's just take a look here --
13          MS. O'BOYLE:  Let's pull up Government's
14   Exhibit 543, just for the witness.
15   BY MS. O'BOYLE:
16   Q.  Do you recognize 543?
17   A.  I do.
18   Q.  And what is it?
19   A.  That is the flow of the funds for the investment by
20   Nicholas J. Gentile, which shows that on April 4th, 2014,
21   there was a $78,000 wire transfer.
22   Q.  Hold on one second, Mr. Martell.  Let me move it into
23   evidence first, and then we'll talk about it.  I apologize.
24   I didn't mean to interrupt you.
25          MS. O'BOYLE:  Government moves in Exhibit 543.
```

A. Martell - Direct

 1          THE COURT:  Exhibit 543 is admitted.

 2          (Government's Exhibit 543 was admitted.)

 3   BY MS. O'BOYLE:

 4   Q.  All right.  So can you -- how much did Mr. Gentile

 5   invest?

 6   A.  He invested $78,000 into Spectrum 100.

 7   Q.  And then after his funds hit Spectrum 100, where did it

 8   go?

 9   A.  On April 4th, 2014, 23,400, which was 30 percent of his

10   investment, went to Dominion Private Client Group, BayPort

11   Credit Union account ending in 8622.  On that same day,

12   $13,650 went into Spectrum 100 Management account, BayPort

13   account ending in 5690.  That was the checking account.  And

14   then also on that same day, $3,900 went into Spectrum 100

15   Management, BayPort Credit Union savings account at 5690.

16          On April 4th, 2013, another 6.3 percent, which was

17   $4,914 went to Dominion Diversified Strategies LLC, BayPort

18   Credit Union account ending in 5984.

19   Q.  Did the remainder of Mr. Gentile's money go to Janus

20   Spectrum LLC in Arizona?

21   A.  Yes.

22   Q.  Okay.  Let's just look at three more of these.  We're not

23   going to talk about them in-depth, but we will move them in.

24   We can go to Government's Exhibit 544.

25          Is this a summary chart for another one of

A. Martell - Direct

```
 1    Mr. Gentile's investment into Spectrum 100?
 2    A.  It is.
 3              MS. O'BOYLE:  Government moves in Exhibit 544.
 4              THE COURT:  Exhibit 544 is admitted.
 5              (Government's Exhibit 544 was admitted.)
 6    BY MS. O'BOYLE:
 7    Q.  Then can we go to Government's Exhibit 545.  Do you
 8    recognize this?
 9    A.  Yes.
10    Q.  What is it?
11    A.  It's another investment by Mr. Gentile that went into
12    Spectrum 100 LLC, Oculina Bank account ending in 3054.
13              MS. O'BOYLE:  Government moves in Exhibit 545.
14              THE COURT:  Exhibit 545 is admitted.
15              (Government's Exhibit 545 was admitted.)
16    BY MS. O'BOYLE:
17    Q.  If we could have Government 538.  Do you recognize 538?
18    A.  I do.
19    Q.  And what is it?
20    A.  This is a wire transfer totaling $158,000 from Luann
21    Virkler, which her portion totaled 58,000, and Carol Groff,
22    which was 100,000.
23    Q.  And is it the flow of funds from Spectrum 100 into other
24    accounts?
25    A.  It is.
```

A. Martell - Direct

```
 1          MS. O'BOYLE:  Government moves in Exhibit 538.
 2          THE COURT:  Exhibit 538 is admitted.
 3          (Government's Exhibit 538 was admitted.)
 4   BY MS. O'BOYLE:
 5   Q.  Let's go to Government's Exhibit 313A.  And do you
 6   recognize 313A?
 7   A.  Yes, I do.
 8   Q.  What is it?
 9   A.  This is the summary chart for Janus Spectrum Group LLC,
10   BayPort Credit Union checking account ending in 8580 for the
11   period of September 27th, 2012, through July 10th, 2015.
12   This is the net account activity, which was a total of
13   $2,533,375.
14   Q.  And is the first page -- did you summarize the entire
15   account, the BayPort Credit Union account for Janus Spectrum
16   Group?
17   A.  On this chart, yes.
18   Q.  Then does it also have the pivot table and the
19   spreadsheets that follow?
20   A.  Yes, it does.
21   Q.  Did you review the bank documents to prepare this chart?
22   A.  I did.
23   Q.  Were the documents voluminous?
24   A.  Yes.
25   Q.  Did you prepare this chart the same way you did the
```

A. Martell - Direct

1    others related to Mr. Alcorn's accounts?

2    A.   I did.

3    Q.   And did you verify the accuracy by peer review?

4    A.   I did.

5             MS. O'BOYLE:   Government moves in Exhibit 313A.

6             THE COURT:   Exhibit 313A is admitted.

7             (Government's Exhibit 313A was admitted.)

8    BY MS. O'BOYLE:

9    Q.   Okay.  And I'm just going to focus in here for -- on the

10   left-hand side.  It shows money coming from Summit Trust

11   accounts; is that correct?

12   A.   Yes.

13   Q.   How much went into the Janus Spectrum Group account from

14   the Summit Trust accounts?

15   A.   $2,515,000.

16   Q.   Okay.  Is it 99 percent of the funds that went into this

17   account?

18   A.   It is.

19   Q.   And were those investor funds?

20   A.   They are all investor funds, yes.

21   Q.   And over here on the left-hand side, where did 1 point --

22   $1,312,500 go?

23   A.   It went to Janus Spectrum LLC.

24   Q.   If we could go to Government's Exhibit 409A.  Do you

25   recognize 409A?

A. Martell - Direct

1   A.   Yes.

2   Q.   What is it?

3   A.   This is a summary chart for Prime Spectrum LLC, BayPort

4   Credit Union checking account ending in 5296 for the period

5   of December 9th, 2013, through July 27th, 2015, and it's the

6   net account activity, which totaled $130,000.

7   Q.   Did you review the bank accounts and the checks and the

8   wires to prepare this chart?

9   A.   I did.

10  Q.   Were the documents voluminous?

11  A.   Yes.

12  Q.   Did you prepare the chart in the same way you have the

13  others?

14  A.   I did.

15  Q.   Did you verify it through peer review?

16  A.   I did.

17          MS. O'BOYLE:  Government moves in Exhibit 409A.

18          THE COURT:  409A is admitted.

19          (Government's Exhibit 409A was admitted.)

20  BY MS. O'BOYLE:

21  Q.   Okay.  Again, does this chart start with the money coming

22  from the investors?

23  A.   It does.

24  Q.   And how much money came from the investors into the Prime

25  Spectrum LLC account here in Virginia?

A. Martell - Direct

```
 1    A.   $130,000, which was the total amount of the investment.
 2    Q.   And it was 100 percent of the funds?
 3    A.   Yes, it was.
 4    Q.   To the left, where did 31.69 percent of those funds go?
 5    A.   To Janus Spectrum LLC.
 6    Q.   And if we could take a look at Government's Exhibit 517A.
 7    Is this a similar chart for Spectrum 100 LLC like the ones we
 8    just saw from Janus Spectrum Group and Prime Spectrum?
 9    A.   Yes.
10    Q.   And what documents did you review to prepare this chart?
11    A.   The bank statements, checks, deposits, and wire
12    transfers.
13    Q.   Were the documents voluminous?
14    A.   Yes, they were.
15    Q.   And did you prepare this chart in the same way you did
16    the others?
17    A.   I did.
18    Q.   Summarizing bank accounts?
19    A.   Yes.
20              THE COURT:  Keep your voice up, please.
21              THE WITNESS:  Oh, yes, sir.
22              THE COURT:  You are floating down.
23              THE WITNESS:  Sorry.  I apologize.
24    BY MS. O'BOYLE:
25    Q.   They have to hear you all the way in the back,
```

A. Martell - Direct

1    Mr. Martell, so speak loudly.

2            Did you verify the accuracy of the information

3    contained in this chart via peer review?

4    A.  I did.

5            MS. O'BOYLE:  Government moves in Exhibit 517A.

6            THE COURT:  517A is admitted.

7            (Government's Exhibit 517A was admitted.)

8    BY MS. O'BOYLE:

9    Q.  Okay.  So let's start again with Summit Trust Company,

10   the investor funds.  How much in investor funds went into the

11   Spectrum 100 LLC account here in Virginia?

12   A.  $7,328,210.56.

13   Q.  And over here on the left, how much money went to Janus

14   Spectrum LLC?

15   A.  $2,510,800.

16   Q.  If we could have Government's Exhibit 523A.  Do you

17   recognize 523A?

18   A.  I do.

19   Q.  And what is it?

20   A.  This is the summary chart for Spectrum 100 LLC, Oculina

21   Bank checking account ending in 3054, the period of

22   June 25th, 2015, through July 11th, 2017.  It's the net

23   account activity, which totaled $689,322.19.

24   Q.  And is there also a pivot table and a spreadsheet in

25   connection with this account?

A. Martell - Direct

1    A.   There is.

2    Q.   Did you review the bank accounts and the wires and the

3    credits and the checks to prepare this chart?

4    A.   I did.

5    Q.   Were the documents voluminous?

6    A.   Yes, they were.

7    Q.   Did you prepare the chart in the same way you did the

8    others?

9    A.   I did.

10   Q.   Did you verify its accuracy through peer review?

11   A.   I did.

12        MS. O'BOYLE:  Government moves in Exhibit 523A.

13        THE COURT:  523A is admitted.

14        (Government's Exhibit 523A was admitted.)

15   BY MS. O'BOYLE:

16   Q.   And here, how much money came in from Summit Trust client

17   accounts into Spectrum 100 at Oculina Bank?

18   A.   $374,897.49.

19   Q.   And how much came in from Spectrum 100, the Virginia

20   account, into the Oculina account?

21   A.   $156,450.

22   Q.   Now, there's also a line here for Diversified Financing

23   for the benefit of Xcel Bandwidth.  How much investor funds

24   came in from that account?

25   A.   $154,093.08.

A. Martell - Direct

```
1   Q.  And to the left here, how much went to an entity called
2   RapidLink Wireless?
3   A.  $153,091.96.
4   Q.  If we could take a look at Government's Exhibit 624.  Do
5   you recognize this?
6   A.  Yes.
7   Q.  What is it?
8   A.  This is a summary chart that I prepared for Diversified
9   Financing FBO Xcel Bandwidth LLC, Oculina Bank checking
10  account ending in 3747, for the period of August 6th, 2015,
11  through September 2nd, 2016.  The net account activity was
12  $2,580,431.98.
13  Q.  Did you review the bank account statements and the wires
14  and the checks to prepare this chart?
15  A.  I did.
16  Q.  Were they voluminous?
17  A.  Yes, they were.
18  Q.  Did you verify the accuracy of this chart via peer
19  review?
20  A.  I did.
21  Q.  And did you prepare it in the same way as you did the
22  others?
23  A.  I did.
24          MS. O'BOYLE:  Government moves in Exhibit 624.
25          THE COURT:  Exhibit 624 is admitted.
```

———A. Martell - Direct———

1    (Government's Exhibit 624 was admitted.)

2   BY MS. O'BOYLE:

3   Q.  And, again, does this reflect another 2.4 million in

4   investor funds coming into the Diversified Financing Xcel

5   Bandwidth Oculina account?

6   A.  Yes, it is.

7   Q.  Is there $987,464.17 that goes to RapidLink Wireless?

8   A.  Yes, it does.

9   Q.  And if we could go to 625.  Do you recognize 625?

10  A.  Yes.

11  Q.  What is it?

12  A.  This is the summary chart for Xcel Bandwidth LLC at

13  Oculina Bank, checking account number ending in 7718 for the

14  period of May 2nd, 2016, through July 14th, 2017.  It was net

15  deposits totaling $2,853,567.38.

16  Q.  Okay.  And did you review the bank account statements to

17  prepare this chart?

18  A.  I did.

19  Q.  Were the documents voluminous?

20  A.  Yes, they were.

21  Q.  Did you prepare this chart in the same way as you did the

22  others?

23  A.  I did.

24  Q.  Did you verify the accuracy of the information through

25  peer review?

A. Martell - Direct

1    A.  I did.

2           MS. O'BOYLE:  Government moves in Exhibit 625.

3           THE COURT:  Exhibit 625 is admitted.

4           (Government's Exhibit 625 was admitted.)

5    BY MS. O'BOYLE:

6    Q.  Does this down here, does it reflect $25,000 coming in

7    for Ms. Sharyon Bean in July 11, 2017?

8    A.  Yes, it does.

9    Q.  How much money did Mr. Lyon invest in February of 2017?

10   A.  $75,000.

11   Q.  Did you review a Dental Support Plus Franchise account at

12   Wells Fargo?

13   A.  I did.

14          MS. O'BOYLE:  If we could have Government's Exhibit

15   1001B.

16   BY MS. O'BOYLE:

17   Q.  Do you recognize this?

18   A.  I do.

19   Q.  What is it?

20   A.  This is a summary chart for Dental Support Plus Franchise

21   LLC at Wells Fargo Bank, checking account ending in 4423.

22   It's for the period of January 1st, 2012, through July 31st,

23   2014.  It shows the net deposit account activity, which

24   totaled $8,038,031.38.

25   Q.  Okay.  And does this contain the withdrawal as well as an

A. Martell - Direct

1    attachment related to the withdrawals, the pivot table, and
2    the spreadsheet?
3    A.  It does.
4    Q.  Okay.  And what documents did you review to prepare this
5    chart?
6    A.  The bank statements, checks, deposits, any wire
7    transfers.
8    Q.  Were the documents voluminous?
9    A.  They were.
10   Q.  And did you prepare this chart the same way you did the
11   others?
12   A.  I did.
13   Q.  Did you verify its accuracy via peer review?
14   A.  I did.
15          MS. O'BOYLE:  Government moves in Exhibit 1001B.
16          THE COURT:  Government's Exhibit 1001B is admitted.
17          (Government's Exhibit 1001B was admitted.)
18   BY MS. O'BOYLE:
19   Q.  Now, Mr. Martell, this bank account -- did you summarize
20   the entirety of the bank account that you had?
21   A.  I did.
22   Q.  And so was this -- but, again, this account -- this
23   summary starts on January 1st, 2012.  Did you get records
24   going back to 2011?
25   A.  I only summarized from January 1st, 2012.  It had a

─────A. Martell - Direct─────

1   beginning balance at that time of the $419,968.51.

2   Q.  But you didn't have the records from 2011 to analyze?

3   A.  I don't recall if I did or not.  This was when we

4   started, was January 1st.

5   Q.  And I'm going to pull up here NJM Spectrum LLC.  How much

6   did NJM Spectrum LLC deposit into the DSPF account?

7   A.  $21,648.56.

8   Q.  Do you know what NJM Spectrum was?

9   A.  That was Kent Maerki's side of the...

10  Q.  Okay.  Do you know why spectrum funds were going into the

11  Dental Support Plus account?

12  A.  I do not.

13  Q.  Now, if we could go to Government's Exhibit 60.  Do you

14  recognize Government's Exhibit 60?

15  A.  I do.

16  Q.  What is it?

17  A.  This is a summary chart for total deposits from Dominion

18  accounts that went into Daryl G. Bank's Wachovia/Wells Fargo

19  Bank account ending in 7355.

20  Q.  And so what did you review to prepare this particular

21  summary chart?

22  A.  The bank statements, any checks and deposits and wire

23  transfers.

24  Q.  Were the documents voluminous?

25  A.  Yes, they were.

1552

A. Martell - Direct

```
1    Q.  Did you prepare this chart the same way as you did the
2    others?
3    A.  I did.
4    Q.  And did you verify the accuracy of the information
5    contained in this chart through peer review?
6    A.  I did.
7            MS. O'BOYLE:  Government moves in Exhibit 60.
8            THE COURT:  Exhibit 60 is admitted.
9            (Government's Exhibit 60 was admitted.)
10   BY MS. O'BOYLE:
11   Q.  And we'll just cut to the chase here.  Mr. Martell, what
12   were the total deposits from Dominion entities into
13   Mr. Bank's Wells Fargo Bank account during the period January
14   2012 through July 19, 2017?
15   A.  The total that went into his personal account was
16   $3,553,846.49.
17           MS. O'BOYLE:  If we could have Government's
18   Exhibit 250A.
19   BY MS. O'BOYLE:
20   Q.  Do you recognize 250A?
21   A.  I do.
22   Q.  What is it?
23   A.  This is a summary chart for DSPF Group LLC, BayPort
24   Credit Union checking account ending in 9219, for the period
25   of January 25th, 2013, through November 26th, 2014.  It's net
```

─────────A. Martell - Direct─────────

1   account activity, which totaled $893,500.

2   Q.  Does this summarize the whole bank account?

3   A.  It does.

4   Q.  And did you review the bank statements and wires and

5   checks to prepare this chart?

6   A.  I did.

7   Q.  Were the documents voluminous?

8   A.  They were.

9   Q.  And did you prepare it the same way we talked about with

10  respect to Mr. Alcorn's charts?

11  A.  I did.

12  Q.  And did you subject this to peer review as well?

13  A.  I did.

14          MS. O'BOYLE:  Government moves in Exhibit 250A.

15          THE COURT:  Exhibit 250A is admitted.

16          (Government's Exhibit 250A was admitted.)

17  BY MS. O'BOYLE:

18  Q.  Let's move on and talk about some of Mr. Maerki's

19  documents.

20          MS. O'BOYLE:  If we could have Government's Exhibit

21  1019U.

22  BY MS. O'BOYLE:

23  Q.  Do you recognize 1019U?

24  A.  I do.

25  Q.  What is it?

A. Martell - Direct

1   A.  That's the PEC's Management trust account at Chase Bank.

2   Q.  And what was PEC's Management?  Who controlled that?

3   A.  That was Kent Maerki and Norma Coffin.

4   Q.  I believe this is already in evidence.

5        So let's -- you said this is a PEC's Management

6   account?

7   A.  Yes.

8   Q.  Did you summarize this account as well?

9   A.  I did.

10  Q.  Let's take a look at Government's Exhibit 1019T.  Do you

11  recognize 1019T?

12  A.  I do.

13  Q.  What is it?

14  A.  This is a summary chart for PEC's Management LLC at

15  JPMorgan Chase Bank checking account ending in 7179 for the

16  period of December 15th, 2011, through May 23rd, 2013.  It

17  shows a net account activity of $1,255,123.77.

18  Q.  Do you have the summary chart, the pivot table, and the

19  spreadsheet for this account?

20  A.  I do.

21  Q.  Did you review the bank statements to prepare it?

22  A.  I did.

23  Q.  And were the documents voluminous?

24  A.  They were.

25  Q.  You prepared the chart in the same way as we did for

A. Martell - Direct

1   Mr. Alcorn's account and the Janus Spectrum accounts?

2   A.  I did.

3   Q.  Did you verify the accuracy of the information through

4   peer review?

5   A.  I did.

6        MS. O'BOYLE:  If we could move in Government's

7   Exhibit 1019T.

8        THE COURT:  Exhibit 1019T is admitted.

9        (Government's Exhibit 1019T was admitted.)

10  BY MS. O'BOYLE:

11  Q.  And we're going to look at here -- I believe you said --

12  for the jury, what was the net account activity into this

13  PEC's Management account?

14  A.  $1,255,123.77.

15  Q.  Now, most of the deposits into this account came from an

16  account called Intellection; is that right?

17  A.  That's correct.

18  Q.  Whose account was Intellection?

19  A.  That was Norma Coffin and Kent Maerki.

20  Q.  And where did 95.41 percent of the funds go after hitting

21  this PEC's Management account?

22  A.  To pay off their American Express credit card.

23       MS. O'BOYLE:  If we could take a look at 1019V, as

24  in victor.  This is not in, so if we could just have it for

25  the witness, please.

A. Martell - Direct

 1    BY MS. O'BOYLE:

 2    Q.  And do you recognize this?

 3    A.  I do.

 4    Q.  What is it?

 5    A.  That's the PEC's Management LLC account at Chase Bank.

 6          MS. O'BOYLE:  Government moves in Exhibit 1019V, as

 7    in victor.

 8          THE COURT:  1019V, as in victor, is admitted.

 9          (Government's Exhibit 1019V was admitted.)

10    BY MS. O'BOYLE:

11    Q.  So who are the signatories on this second PEC's

12    Management account?

13    A.  It was Norma J. Coffin and her son Paul E. Coffin.

14    Q.  And did you do a summary of this as well?

15    A.  I did.

16    Q.  If we could go to Government's Exhibit 1019W.  Do you

17    recognize this?

18    A.  I do.

19    Q.  What is it?

20    A.  This is a summary chart for PEC's Management LLC,

21    JPMorgan Chase Bank checking account ending in 7080 for the

22    period of December 21st, 2012, through March 27th, 2014.

23    Q.  And so is this the summary chart, the pivot table, and

24    the spreadsheet?

25    A.  It is.

A. Martell - Direct

1   Q.  Did you review the bank account statements to prepare
2   this chart?
3   A.  I did.
4   Q.  Were the documents voluminous?
5   A.  They were.
6   Q.  Did you verify the accuracy of the information contained
7   in this chart through peer review?
8   A.  I did.
9           MS. O'BOYLE:  Government moves in Exhibit 1019W.
10          THE COURT:  1019W is admitted.
11          (Government's Exhibit 1019W was admitted.)
12  BY MS. O'BOYLE:
13  Q.  And up here, I'm blowing up some of the accounts that
14  sent funds into this PEC's Management account.  Do you see
15  that?
16  A.  Yes.
17  Q.  And so there's an Intellection LLC checking account 7820.
18  Who controlled that account?
19  A.  Norma Coffin and Kent Maerki.
20  Q.  And there's an Intellection savings account 8878.  Who
21  controlled that account?
22  A.  Norma Coffin and Kent Maerki.
23  Q.  And we already talked about the NJM Spectrum.  What about
24  the Cosmalite Franchising?  Who controlled that account?
25  A.  Norma Coffin and Kent Maerki.

———A. Martell - Direct———

 1   Q.  And down here, the 2.1 million of the moneys that went
 2   into this account, where did it go?
 3   A.  It went into paying their American Express credit card
 4   bill.
 5          MS. O'BOYLE:  And if we could take a look at
 6   Government's Exhibit, just for the witness, Government's
 7   Exhibit 1019W -- or 1019Y, I'm sorry.
 8   BY MS. O'BOYLE:
 9   Q.  Do you recognize 1019Y?
10   A.  Yes, I do.
11   Q.  And what is it?
12   A.  That is also a PEC's Management LLC account at Wells
13   Fargo.
14   Q.  Is this a third PEC's Management account?
15   A.  It is.
16   Q.  Is Ms. Coffin the signer?
17   A.  She is.
18          MS. O'BOYLE:  Government moves in Exhibit 1019Y.
19          THE COURT:  1019Y is admitted.
20          (Government's Exhibit 1019Y was admitted.)
21   BY MS. O'BOYLE:
22   Q.  Did you prepare a summary chart for this account?
23   A.  I did.
24   Q.  If we can go to 1019Z.  Is this the summary chart for the
25   PEC's Management account we were just talking about?

A. Martell - Direct

1   A.   It is.

2   Q.   Do you have the summary chart, the pivot table, and the

3   spreadsheet?

4   A.   Yes.

5   Q.   Did you review the bank statements and checks and wires

6   to prepare this chart?

7   A.   I did.

8   Q.   Were the documents voluminous?

9   A.   Yes, they were.

10  Q.   And you prepared it the same way you did the others --

11  A.   I did.

12  Q.   -- that summarized bank accounts?

13  A.   Yes.

14  Q.   And you verified the accuracy through peer review?

15  A.   I did.

16          MS. O'BOYLE:  Government moves in Exhibit 1019Z.

17          THE WITNESS:  1019Z is admitted.

18          (Government's Exhibit 1019Z was admitted.)

19  BY MS. O'BOYLE:

20  Q.   Okay.  What was the total net account activity in this

21  particular account?

22  A.   It was $771,674.27.

23  Q.   And up here, did Mr. Alcorn send funds into this account?

24  A.   He did.

25  Q.   How much?

---A. Martell - Direct---

1   A.   On February 9th, 2015, there was a transfer of $22,500

2   from his Charles Schwab account.

3   Q.   Into the PEC's Management account?

4   A.   Yes.

5   Q.   And then we talked about Intellection.   Sugar Time

6   Management trust, who controlled that?

7   A.   That was Norma Coffin.

8   Q.   And then CT Program, do you know who controlled that?

9   A.   That was Norma Coffin.

10  Q.   And Ms. Coffin, that's Mr. Maerki's wife?

11  A.   Yes.

12  Q.   And just down here in the left-hand corner, where did

13  99 percent of the funds go for this account?

14  A.   To pay off their American Express credit card or make

15  payments on their American Express credit card.

16  Q.   Okay.

17       MS. O'BOYLE:  Let's take a look, just for the

18  witness, Government's Exhibit 1020B.

19  BY MS. O'BOYLE:

20  Q.   And do you recognize this?

21  A.   Yes.

22  Q.   And what is it?

23  A.   This is the American Express credit card for Kent Maerki,

24  Paul Coffin, and Norma Coffin.

25  Q.   Did they all have a credit card under Mr. Paul E.

Carol L. Naughton, Official Court Reporter

A. Martell - Direct

1    Coffin's name?

2    A.  Yes.

3    Q.  Is this a number of American Express bills?

4    A.  Yes.

5           MS. O'BOYLE:  Government moves in Exhibit 1020B, as

6    in bravo.

7           THE COURT:  Government's Exhibit 1020B, as in bravo,

8    is admitted.

9           (Government's Exhibit 1020B was admitted.)

10   BY MS. O'BOYLE:

11   Q.  Let's take a look at Government's Exhibit 1020G.  Do you

12   recognize 1020G?

13   A.  Yes.

14   Q.  What is it?

15   A.  This is a summary chart of the flow of funds for the

16   PEC's Management LLC, JPMorgan Chase Bank checking account

17   ending in 7179.  It's a flow of funds -- flow of the investor

18   funds to show the payments made to the American Express card.

19          MS. O'BOYLE:  Government moves in Exhibit 1020G.

20          THE COURT:  Government's Exhibit 1020G, as in golf,

21   is admitted.

22          (Government's Exhibit 1020G was admitted.)

23   BY MS. O'BOYLE:

24   Q.  Just down here at the bottom, where did the funds from

25   the Janus Spectrum LLC account go?

──────────A. Martell - Direct──────────

1   A.  For the period of April 6th, 2012, through September 5th,

2   2012, $194,263.40 went into Intellection LLC, JPMorgan Chase

3   Bank checking account ending 7820.

4   Q.  And then up here, there's an account related to Dental

5   Support Plus Franchise?

6   A.  Yes.

7   Q.  And where did the Dental Support Plus Franchise funds,

8   investor funds go?

9   A.  Okay.  For the period of July 24th, 2012, through

10  August 21st 2012, there was $100,000 that went to PEC's

11  Management LLC, Wells Fargo Bank checking account ending in

12  7179.

13          From the period of January 4th, 2012, through

14  December 7th, 2012, $677,760 went to Practice Enhancement

15  Systems LLC, Wells Fargo Bank checking account ending in

16  7545.  Then on -- between January 3rd, 2012, and

17  November 29th, 2012, $481,000 -- wait, excuse me, $481,155.61

18  went into Intellection LLC.

19  Q.  And then what happened -- once the funds hit

20  Intellection, what happened to those funds from the 7820

21  account?

22  A.  Between the dates of January 3rd, 2012, and

23  December 10th, 2012, $1,111,880 went to the PEC's Management

24  LLC, Wells Fargo checking account ending in 7179.

25          And then from January 3rd, 2012, through

A. Martell - Direct

 1    December 10th, 2012, $1,167,530.35 went to pay on the

 2    American Express credit card.

 3    Q.  Last one for Mr. Maerki.  If we can go to 1020H.  Do you

 4    recognize 1020H?

 5    A.  I do.

 6    Q.  What is it?

 7    A.  This is the flow of investor funds for the PEC's

 8    Management LLC, JPMorgan Chase Bank checking account ending

 9    in 7080, and it's the payments to the American Express credit

10    card.

11           MS. O'BOYLE:  Government moves in Exhibit 1020H.

12           THE COURT:  1020H is admitted.

13           (Government's Exhibit 1020H was admitted.)

14    BY MS. O'BOYLE:

15    Q.  We'll just cut to the chase on this one.  How much money

16    ended up going from PEC's Management to the Amex?

17    A.  It was $2,181,122.34.

18    Q.  Okay.  Let's take a look at Government's Exhibit 1202,

19    which is already in evidence.

20           And which account is this?

21    A.  It's the -- excuse me one second.  This is the American

22    Estate & Insurance Services Incorporated account.

23    Q.  And whose account is this?

24    A.  That is Mr. Smith's.

25    Q.  Did you do a summary of this account like you did the

A. Martell - Direct

1    others?

2    A.  I did.

3         MS. O'BOYLE:  If we could have Government's Exhibit

4    1202A.

5    BY MS. O'BOYLE:

6    Q.  Do you recognize 1202A?

7    A.  I do.

8    Q.  What is it?

9    A.  This is the summary chart for American Estate & Insurance

10   Services Incorporated, Wells Fargo Bank checking account

11   ending in 6406 for the period of January 3rd, 2012, through

12   August 30th, 2017.

13   Q.  Okay.  And is it the deposits in -- do you also have an

14   attachment A on Page 2?

15   A.  I do.

16   Q.  Is Page 4 the withdrawals?

17   A.  It is.

18   Q.  And then you also have a pivot table and a spreadsheet

19   for this account?

20   A.  I do.

21   Q.  What documents did you review to prepare this chart?

22   A.  The bank statements, checks, deposits, and wire

23   transfers.

24   Q.  Were the documents voluminous?

25   A.  Yes, they were.

A. Martell - Direct

1    Q.  Did you prepare this chart in the same way --

2    A.  I did.

3    Q.  -- as you did the others?

4         Did you verify the accuracy of the information

5    contained in this chart?

6    A.  I did.

7              MS. O'BOYLE:  Government moves in Exhibit 1202A.

8              MS. McCASLIN:  I object, Your Honor.  I just need to

9    meet with the government briefly to edit something on the --

10   to discuss the chart, please.

11             MS. O'BOYLE:  Your Honor, the government met with

12   Ms. McCaslin last night and discussed with her three separate

13   charts, which we redacted per her request.

14             MS. McCASLIN:  No.  This one is --

15             THE COURT:  Hold it.  Put the headphones on.

16             (A sidebar conference was held as follows:)

17             THE COURT:  Ms. McCaslin, what is the nature of your

18   objection?

19             MS. McCASLIN:  Your Honor, the government and I did

20   speak last night about three different charts that I asked to

21   be redacted in certain places that dealt with other

22   investments that we don't want to open the door to, such as

23   Sonoqui or WeMonitor.  The government did agree to redact

24   just those portions like we had discussed.

25             For this particular chart, there are still two

A. Martell - Direct

```
 1    investments that say Sonoqui on it.  The other one does just
 2    say other investments, which is perfect.  The other two,
 3    however, still say the investment.
 4              THE COURT:  So what named investments are on this
 5    chart that should be deleted, in your view?
 6              MS. McCASLIN:  I believe it's just the other two.
 7    Let me just bring it up.  Just a moment.  There are two
 8    investments on it.  One is at the very middle top that says
 9    Sonoqui LLC, and then the other one is -- if you see on the
10    right-hand side, it says "other investments."  Right above it
11    is another Sonoqui account.
12              THE COURT:  Okay.  Do you see that, Ms. O'Boyle?
13              MS. O'BOYLE:  I do, Your Honor.  We will redact that
14    chart and use the -- we probably won't be able to do it on
15    the TrialDirector, but we'll go ahead and put it on the
16    monitor.
17              THE COURT:  So what the Court will do is the Court
18    will admit it subject to the redactions as discussed on this
19    call.
20              MS. McCASLIN:  Thank you, Your Honor.
21              THE COURT:  We're going to take a break in about
22    five minutes anyway.
23              (The sidebar conference concluded.)
24              MS. O'BOYLE:  Your Honor, we would request that we
25    take our afternoon break now so we can redact the document.
```

A. Martell - Direct

```
 1            THE COURT:  That's fine.
 2            MS. O'BOYLE:  Thank you, Your Honor.
 3            THE COURT:  All right, ladies and gentlemen.  We're
 4   going to take a five-minute break.  It might be more than
 5   five -- I'm sorry.  We will start with a 15-minute break.
 6            One other thing before you leave, ladies and
 7   gentlemen.  The Court forgot to tell you, tomorrow we will
 8   not be holding court.  We will not be holding court on
 9   Friday, the 18th also, for your planning.
10            (The jury exited the courtroom.)
11            THE COURT:  Ms. O'Boyle, do you anticipate you will
12   be finishing with this witness today?
13            MS. O'BOYLE:  Oh, yes, Your Honor, I probably --
14            THE COURT:  I mean, your direct, not the cross.
15            MS. O'BOYLE:  Yes.  I'll be finished probably in 15
16   minutes.
17            THE COURT:  All right.  Fine.
18            (Recess from 3:52 p.m. to 4:19 p.m.)
19            (The jury entered the courtroom.)
20            THE COURT:  The record should reflect that all
21   jurors are present.
22            Does counsel agree?
23            MS. O'BOYLE:  United States agrees.
24            MR. YAROW:  Mr. Alcorn agrees.
25            MS. McCASLIN:  Mr. Smith agrees.
```

———————————A. Martell - Direct———————————

```
 1          THE COURT:  Then fine.  You may resume your
 2   examination.
 3          MS. O'BOYLE:  Thank you, Your Honor.
 4   BY MS. O'BOYLE:
 5   Q.  Mr. Martell, we were just talking about 1202A.
 6          MS. O'BOYLE:  And I'm going to go ahead and move
 7   that into evidence now.  Government moves 1202A into
 8   evidence.
 9          THE COURT:  Exhibit 1202A will be admitted.
10          MS. O'BOYLE:  Thank you, Your Honor.
11          (Government's Exhibit 1202A was admitted.)
12   BY MS. O'BOYLE:
13   Q.  Mr. Martell, what we have on the document camera, what is
14   this account?
15   A.  This is the summary chart for American Estate & Insurance
16   Services Incorporated, Wells Fargo Bank business checking
17   account ending in 6406, for the time frame of January 3rd,
18   2012, through June 30th, 2017, which shows net deposits of
19   $2,002,502.68.
20   Q.  Is this Mr. Smith's account?
21   A.  Yes, it is.
22   Q.  So if we go from the left, how much was sent to that
23   account during that time -- during the time frame of April
24   2013 to June 2015?
25   A.  It was $412,605 that was deposited from Dominion Private
```

1569

————A. Martell - Direct————

1    Client Group, BayPort checking account ending in 8622.

2    Q.  And then what about from DOM Business Brokers?  How much

3    money was deposited?

4    A.  $324,615.

5    Q.  How much from Dental Support Plus Franchise?

6    A.  $232,900.

7    Q.  And that was starting in 2012?

8    A.  That's correct.

9    Q.  What about Sovereign Asset Group?

10   A.  Sovereign Asset Group was $172,490.

11   Q.  And then Dominion Private Client Group, Oculina Bank?

12   A.  That was $64,845.

13   Q.  And then Dominion Insurance Brokerage?

14   A.  $55,864.35.

15   Q.  And if we could go to Page 4.  If we could switch back.

16   Is this showing the withdrawals from that account?

17   A.  It is.

18   Q.  And what were the net withdrawals from that account?

19   A.  $2,002,502.68.

20   Q.  And here, how much went into Golden One Credit Union

21   checking account?

22   A.  $1,046,438.37.

23   Q.  And how much went into the MBP Advisory account?

24   A.  $86,001.

25           MS. O'BOYLE:  Let's go to Government's Exhibit 1203

Carol L. Naughton, Official Court Reporter

———A. Martell - Direct———

1    just for the witness.

2    BY MS. O'BOYLE:

3    Q.  Do you recognize Government's Exhibit 1203?

4    A.  I do.

5    Q.  What is it?

6    A.  It's a summary chart for American Estate & Insurance

7    Services Incorporated doing business as A.W. Smith &

8    Associates, Wells Fargo Bank checking account ending in 7629

9    for the period of November 19th, 2013, through March 8th,

10   2018, which shows a net account activity of $756,457.10.

11   Q.  What documents did you review to prepare this chart?

12   A.  The bank statements, checks, deposits, and wire

13   transfers.

14   Q.  Were the documents voluminous?

15   A.  Yes, they were.

16   Q.  And how did you prepare this chart?  The same way as you

17   did the others?

18   A.  Yes, I did.

19   Q.  And did you verify the accuracy of the information

20   contained in this chart via peer review?

21   A.  I did.

22   Q.  And does this also contain the attachments and the pivot

23   table and the spreadsheet?

24   A.  It does.

25           MS. O'BOYLE:  Government moves in Exhibit 1203.

A. Martell - Direct

```
 1            THE COURT:  Exhibit 1203 is admitted.
 2            (Government's Exhibit 1203 was admitted.)
 3   BY MS. O'BOYLE:
 4   Q.  And what is the -- just the number, what is the net
 5   account activity into this account?
 6   A.  $756,457.10.
 7   Q.  And how much came in from Shelton & Power LLC?
 8   A.  $732,440.79.
 9   Q.  And how much from MBP Advisory?
10   A.  $9,160.
11   Q.  And then all of the items that are listed here below, are
12   those all of the withdrawals?
13   A.  Yes, it is.
14            MS. O'BOYLE:  Let's go to Government's Exhibit 1211,
15   please, just for the witness.
16   BY MS. O'BOYLE:
17   Q.  Do you recognize Government's Exhibit 1211?
18   A.  I do.
19   Q.  What is it?
20   A.  This is a summary chart for A. William and Susan B.
21   Smith, Golden One Credit Union checking account ending in
22   0346 for the time period of January 1st, 2012, through
23   December 31st, 2017.  It shows that there were net deposits
24   totaling $1,326,230.77.
25   Q.  Okay.  And does this document also contain the
```

A. Martell - Direct

```
 1    attachment A, a summary chart of withdrawals, the pivot
 2    table, and the spreadsheet?
 3    A.  Yes, it does.
 4    Q.  And did you review this particular bank account to
 5    prepare this spreadsheet?
 6    A.  I did.
 7    Q.  And were the documents voluminous?
 8    A.  They were.
 9    Q.  Did you prepare this chart in the same way you did the
10    others?
11    A.  I did.
12    Q.  And did you verify the accuracy via peer review?
13    A.  I did.
14            MS. O'BOYLE:  Government moves in Exhibit 1211.
15            THE COURT:  Exhibit 1203 is admitted.
16            MS. O'BOYLE:  1211, Your Honor.
17            THE COURT:  Exhibit 1211.
18            (Government's Exhibit 1211 was admitted.)
19    BY MS. O'BOYLE:
20    Q.  What were the deposits into this checking account?
21    A.  $1,326,230.77.
22    Q.  Right.  Let's move on and go to Government's
23    Exhibit 1200.  Do you recognize Government's Exhibit 1200?
24    A.  I do.
25    Q.  And what is it?
```

A. Martell - Direct

1    A.  These are payments that were made to Mr. Smith through

2    various investments.

3    Q.  Okay.  Is it a summary of the payments to Mr. Smith?

4    A.  It is.

5    Q.  Is it from the Dominion companies as well as Dental

6    Support Plus Franchise?

7    A.  It is.

8           MS. O'BOYLE:  Government moves in Exhibit 1200.

9           THE COURT:  Exhibit 1200 is admitted.

10          (Government's Exhibit 1200 was admitted.)

11          MS. O'BOYLE:  If we could go to the first page,

12   please, Ms. Yusi.

13   BY MS. O'BOYLE:

14   Q.  Mr. Martell, could you just explain what this chart is

15   showing.

16   A.  It's showing the payments from -- that Mr. Smith received

17   from Dominion Franchise Group, Dominion Private Client Group,

18   Dominion Investments -- Investment Group, and then the

19   Dominion Private Client Group payroll.

20   Q.  We'll go to Page 2.

21   A.  And the payments from Dominion Insurance Brokerage

22   through QuickBooks through Sovereign Asset Group, DOM

23   Business Brokers.

24   Q.  If you could go down to the next page.  And does this go

25   all the way through Dominion Business Brokers?

─────A. Martell - Direct─────

1   A.  It does.

2   Q.  And so this amount right here, what is that amount?

3   A.  That's the total amount from the investments I just told

4   you, totaling $1,162,698.94.

5   Q.  And 94 cents?

6   A.  Yes.

7   Q.  And this is the total from the -- Mr. Smith received from

8   the Dominion group of companies?

9   A.  That's correct.

10  Q.  Now, did you also do -- is there a split in this chart?

11  A.  There is.

12  Q.  And then is there -- what's the back half of this chart?

13  A.  It's what he received from Dental Support Plus Franchise.

14  Q.  So is this Mr. Maerki's company?

15  A.  It is.

16  Q.  And so this starts -- what date did this chart start?

17  A.  On January 4th, 2012.

18  Q.  Did you have any -- you did not -- did you include any

19  records related to 2011 on this chart?

20  A.  I did not.

21  Q.  Going down to Page 5, what was the total in 2012 and 2013

22  from Dental Support Plus Franchise?

23  A.  $234,900.

24  Q.  So what are the total payments from both the Dominion

25  entities as well as Dental Support Plus Franchise to

A. Martell - Direct

1   Mr. Smith?

2   A.  $1,397,598.94.

3   Q.  Does this include payments from -- payments from Shelton

4   & Power that we saw in one of your summaries?

5   A.  It does not.

6   Q.  Last chart, sir.  If we could go to Government's

7   Exhibit 1201.  Do you recognize 1201?

8   A.  I do.

9   Q.  What is it?

10  A.  It's a summary chart of -- a summary of the information

11  that we just went over for just Dominion, payments from

12  Dominion at BayPort Credit Union.

13  Q.  Okay.  And then Page 2, what is Page 2?  Is it a summary

14  of what?

15  A.  It's the payments also from Dominion but through Oculina

16  Bank.

17  Q.  Okay.  And then number 3, what is Page 3?

18  A.  Is the Dental Support Plus Franchise.

19  Q.  What documents did you review to prepare this chart?

20  A.  The bank statements, any checks and deposits from those

21  accounts.

22          THE COURT:  Excuse me.  Your voice is dropping

23  again.

24          THE WITNESS:  Sorry.  I apologize, Your Honor.

25  BY MS. O'BOYLE:

A. Martell - Direct

1   Q.  Were the documents voluminous?

2   A.  They were.

3   Q.  And did you prepare this chart in the same way you did

4   the other summary charts?

5   A.  I did.

6   Q.  Did you verify the accuracy of the information contained

7   in this chart through peer review?

8   A.  I did.

9           MS. O'BOYLE:  Government moves in Exhibit 1201.

10          THE COURT:  Exhibit 1201 is admitted.

11          (Government's Exhibit 1201 was admitted.)

12  BY MS. O'BOYLE:

13  Q.  And so in this Page 1, what was the total amount that

14  Mr. Smith received from the Dominion accounts at BayPort

15  Credit Union?

16  A.  It was $529,369.35.

17          MS. O'BOYLE:  And then Page 2.  Could you go to

18  Page 2, please, Ms. Yusi.  Thank you.

19  BY MS. O'BOYLE:

20  Q.  What was the total payments from the Oculina Bank from

21  Dominion?

22  A.  It was $633,329.59.

23  Q.  And then finally Page 3, if you go to Page 3.  How much

24  from Dental Support Plus Franchise from 2012 on?

25  A.  $234,900.

——————A. Martell - Cross (By Ms. McCaslin)——————

1   Q.  So what was the total amount?

2   A.  $1,397,598.94.

3          MS. O'BOYLE:  Thank you, sir.  I have no further

4   questions.  Please answer any questions that the defense

5   counsel or the Court have for you.

6          THE COURT:  Cross-examination.

7          MR. YAROW:  Your Honor, Mr. Alcorn does not have any

8   cross.

9          THE COURT:  Thank you.

10          Counsel, which one of you are going to be doing the

11   examination?

12          MS. McCASLIN:  I am, Your Honor.  We are having

13   technical difficulties at our table, so we need to bring our

14   computer up here.

15          MR. GRINDROD:  Just setting her up, Judge.

16          THE COURT:  Okay.

17                       CROSS-EXAMINATION

18   BY MS. McCASLIN:

19   Q.  Good afternoon, sir.  My name is Lindsay McCaslin.  I

20   represent Bill Smith.

21   A.  Hello.

22   Q.  So for all of these charts, you are tracking the money

23   going in and out of all of the accounts, right?

24   A.  All -- yes, all the accounts.

25   Q.  And you looked at some of the bank accounts and discussed

———— A. Martell - Cross (By Ms. McCaslin) ————

1  who the signatories were on each of the bank accounts, right?

2  A.  Yes.

3  Q.  And so if there were signatories that included David

4  Alcorn, his wife, and Norma Jean Coffin, who were the ones

5  who were able to go in and see what is in that account?

6      MS. O'BOYLE:  Objection.  Lack of foundation.  He

7  doesn't work at the bank.

8      MS. McCASLIN:  Okay.  I'll rephrase, Your Honor.

9      THE COURT:  All right.

10 BY MS. McCASLIN:

11 Q.  What is a signatory?

12 A.  A signatory is who has signatory authority on the

13 account.

14 Q.  So who can control it?

15 A.  Who can write checks, who can do transfers, yes.

16 Q.  Thank you.

17      Now, for all the charts that you went over regarding

18 Janus, Janus Spectrum Group, Spectrum 100, Dental Support

19 Plus, Bill Smith was not a signatory on any of those

20 accounts, right?

21 A.  That's correct.

22 Q.  I'm going to pull up Government 1201, which is already in

23 evidence.  So we just looked at this on direct examination,

24 right?

25 A.  Correct.

———A. Martell - Cross (By Ms. McCaslin)———

1   Q.   And this is all the money that is coming into Mr. Smith's

2   business account?

3   A.   Into?

4   Q.   This business account.

5   A.   It's money going into Practice Management and going into

6   American Estate & Insurance Services.

7   Q.   Right.

8   A.   Yes.

9   Q.   And the money coming in isn't coming in from individuals;

10  it's coming in from companies, correct?

11  A.   It's coming from the companies that you see on the

12  left-hand side, correct.

13  Q.   Right.  Now, and these are from commissions from these

14  companies?

15  A.   As far as I know, yes.

16  Q.   Okay.  Thank you.

17          I'm going to pull up Government 1202A, which is

18  going to be on the overhead.  So this is looking at every

19  cent that is coming into this account, correct?

20  A.   Yes.  Plus the attachment.

21  Q.   Right.  And so the attachment A is basically just a

22  catch-all for everything else?

23  A.   Yes, correct.

24  Q.   Okay.  Now, this is covering an almost six-year period,

25  five and a half, six years?

A. Martell - Cross (By Ms. McCaslin)

1    A.  Yes.

2    Q.  And a business owner, after looking at many financial

3    documents in your career, a business owner often needs to

4    rent space for an office, right?

5    A.  Okay.  Yes.

6    Q.  They would need to pay employee salaries?

7    A.  Okay.

8    Q.  Is that right?

9    A.  Yes.

10   Q.  They would need to pay for a consultant if they needed?

11   A.  If needed, yes.

12   Q.  They would need to pay for radio or any advertisements?

13   A.  Depending on the business, yes.

14   Q.  And owning a business is different than those of us who

15   get W-2s.  They get a regular paycheck every other week,

16   right?

17   A.  Correct.

18   Q.  And so somebody who has just a regular paycheck who works

19   for the government or is a teacher, works for Target,

20   whatever, those taxes are taken out before we get our

21   paycheck, typically, right?

22   A.  Okay.  Yes.

23   Q.  But for people who own a business, they have to pay their

24   taxes out of their own accounts, right?

25           MS. O'BOYLE:  I'm going to object.  Calls for

————— A. Martell - Cross (By Ms. McCaslin) —————

1   speculation, and it's beyond the scope of direct.

2          THE COURT:  Well, I assume you have a point in mind,

3   Ms. McCaslin, but the question does assume some things that

4   are not in evidence.

5          MS. McCASLIN:  Well, Your Honor, every cent that

6   he's ever received or spent is in evidence.

7          MS. O'BOYLE:  Your Honor --

8          THE COURT:  No, no, no, just go on and rephrase and

9   ask him a question.  The Court thinks it has an understanding

10  of where you're going, but just rephrase it.

11         MS. McCASLIN:  Thank you.

12         I will actually go to another page.  If we could

13  take this down, please.  And for just the witness right now,

14  if -- I'm going to bring up another document.  It's the

15  remainder of Government 1202.  I'm sorry.  Government 1202A.

16         Can we just take it off momentarily?

17         THE COURT:  You mean you want to take it off the

18  screen?

19         MS. McCASLIN:  For the jurors, yes.  I would like

20  the witness to only see it for just a moment.

21         THE COURT:  But it's already admitted in evidence,

22  and the jury has already seen it.

23         MS. McCASLIN:  This is the first page that needs to

24  be included on it, so I would like to see the rest of the

25  document.

────A. Martell - Cross (By Ms. McCaslin)────

1          THE COURT:  Okay.  Put up the rest of the document.
2    All of it has been admitted, though.
3          THE CLERK:  Just show the witness?
4          THE COURT:  Sure.
5          MS. McCASLIN:  If we could publish the 1202A,
6    please.  Thank you.
7    BY MS. McCASLIN:
8    Q.  Now I'm going to Page 4.  This is all the money that is
9    going out of this business account, correct?
10   A.  This and what is in attachment B.
11   Q.  Right.  And so, again, attachment B is just a catch-all?
12   A.  Well, it's a large catch-all.  It's 35 percent, but yes,
13   it's a catch-all.
14   Q.  Right.  And so on this chart, these are Mr. Smith's
15   accounts, correct?
16   A.  Yes, they are.
17   Q.  And the one up here at the top for the Golden, that is
18   the personal account for Mr. Smith and his wife, right?
19   A.  Yes.
20   Q.  And this, again, covers a five-and-a-half to six-year
21   period, right?
22   A.  Yes, it does.
23   Q.  I'm going to go to Page 5.  This is a combination of
24   categories.  So every single FedEx expense would be all
25   combined into one category on the sheet, correct?

─────A. Martell - Cross (By Ms. McCaslin)─────

1   A.  Right.  Could have been check card purchase or point of

2   sale, debit card.

3   Q.  Right.

4   A.  To see the individual ones, you'd have to look at the

5   spreadsheet.

6   Q.  So Salem Communications Talk Radio, that's obviously a

7   radio station, correct?

8   A.  Correct.

9   Q.  And John Kennedy, are you aware whether or not that is

10  one of Mr. Smith's employees?

11  A.  I noticed on the memo -- on several of the memos it

12  showed consulting, so I'm assuming that he was a consultant.

13  Q.  Okay.

14  A.  Or was being paid for consulting fees, but it just had

15  "consulting" on there.  So...

16  Q.  So these are some of the business expenses that we had

17  just discussed that you might have for your own personal

18  business?

19  A.  Okay.  Yes.

20  Q.  I'm going to go to Government 1211, and this is the

21  Golden checking account.  That is the personal account of

22  Bill and Susan Smith, right?

23  A.  Yes, it is.

24  Q.  Now, this is all the money coming in, including

25  attachment A, and this is all the money going out, correct?

––––––––A. Martell - Cross (By Ms. McCaslin)––––––––

1   A.   Correct.

2   Q.   So it's every single cent, basically?

3   A.   That plus attachment B, correct.

4   Q.   Correct.  And so some of the larger categories that you

5   included here were Mr. Smith's mortgage, right?

6   A.   Correct.

7   Q.   U.S. Treasury?

8   A.   Correct.

9   Q.   His church?

10   A.   Correct.

11   Q.   Going to Page 5, again, this is one of the charts that

12   you have that combines similar charges across the six years,

13   right?

14   A.   Yes.

15   Q.   So, for example, Mr. Smith, over that six-year period,

16   paid for his insurance $19,664.64, right?

17   A.   Correct.

18   Q.   And various debits over the six years for AT&T?

19   A.   Yes.

20   Q.   And a little bit further down, we've got fast food,

21   right?

22   A.   Yes.

23   Q.   I'm going to go to Page 186.  I will pull up

24   Government's 1001B.  This is one of the documents that you

25   had been discussing regarding Mr. Maerki, right?

A. Martell - Cross (By Ms. McCaslin)

1  A.  That's the summary chart that I prepared for -- yes, for
2  Dental Support Plus Franchise.
3  Q.  Right.  And so the money coming into Dental Support Plus
4  Franchise obviously has a lot of the investor funds, but
5  these four companies up here are either Daryl Bank or Kent
6  Maerki's, right?
7  A.  Yes.
8  Q.  Because Sugar Time and NJM are Kent Maerki, basically?
9  A.  Yes.
10  Q.  And for the money coming out of DSPF, Dental Support
11  Group is Maerki, correct?
12  A.  Yes.
13  Q.  MetroMedia and Oracare are related to Dental Support
14  Plus, right?
15  A.  I don't know where they are.
16  Q.  That's fine.
17       Practice Enhancement Systems, is that Kent Maerki?
18  A.  Yes.
19  Q.  And Intellection is Kent Maerki?
20  A.  Yes.
21  Q.  Dominion Franchise Group would be Daryl Bank, right?
22  A.  Correct.
23  Q.  And you also said that PEC's is Kent Maerki?
24  A.  Yes.
25  Q.  I'm going to go to Government 1019W.  Now, all of these

---A. Martell - Cross (By Ms. McCaslin)---

1   companies that are going into this PEC's Management checking

2   account in the middle, they are all Kent Maerki, correct?

3   A.   Except for the unknown deposit, yes.   Unknown deposit, I

4   don't know.

5   Q.   Thank you.

6          Going to Government 1020H, this is one of the last

7   charts I believe you looked at on direct with the government,

8   right?

9   A.   Correct.

10  Q.   And this chart is one of the more complicated charts that

11  you have created for us today, right?

12  A.   It is.

13  Q.   But every single entity on here is Kent Maerki, right?

14  A.   Yes.

15  Q.   So when the money is going from DSPF --

16  A.   I take that back, I'm sorry.   Everything on here is Kent

17  Maerki, like the DSPF, Wells Fargo, but the Janus Spectrum is

18  both Maerki and Alcorn.

19  Q.   Thank you.   Yes.   Thank you very much.

20          But we can watch the funds going from DSPF to Dental

21  Support Group up to Intellection, right?

22  A.   Correct.

23  Q.   And then down to a different Intellection and all the way

24  back to PEC's, right?

25  A.   Correct.

Carol L. Naughton, Official Court Reporter

A. Martell - Cross (By Ms. McCaslin)

1   Q.  And then down to American Express?

2   A.  Yes.

3   Q.  And this chart is very complicated because this is

4   essentially what money laundering looks like, right?

5   A.  I don't know if it's money laundering, but it's layering

6   between accounts in order to make a payment.

7   Q.  Thank you.  And, once again, Mr. Smith was not a

8   signatory on any of these accounts, correct?

9   A.  He was not.

10          MS. McCASLIN:  Thank you.  I have no further

11  questions.

12          THE COURT:  Any redirect?

13          MS. O'BOYLE:  No, Your Honor.

14          THE COURT:  May the witness be permanently excused?

15          MS. O'BOYLE:  Yes.  Your Honor, actually, I would

16  ask that the witness be held over in case we need to call him

17  in rebuttal in connection with the redacted items that were

18  redacted on the chart if the door gets opened.

19          THE COURT:  All right.  Sir, just be prepared to

20  return if necessary.

21          THE WITNESS:  Yes, sir.

22          THE COURT:  You may step down.

23          (The witness stepped down.)

24          THE COURT:  Unless you have a witness that is going

25  to take 10 or 15 minutes, we are going to terminate.

1      MS. O'BOYLE:  Your Honor, I think the next witness
2  probably will take at least 25 or 30 minutes.
3      THE COURT:  Okay.  Ladies and gentlemen, we're just
4  simply going to terminate right here.  We will see you Monday
5  morning, and Monday morning I have a surprise.  We're going
6  to start at 10:00.  So be safe this weekend.  Don't worry
7  about this case.  Leave your notebooks in there.  We'll see
8  you prepared to start promptly at 10:00 Monday morning.
9      (The jury exited the courtroom.)
10      (Proceedings adjourned at 4:52 p.m.)
11
12                      CERTIFICATION
13
14    I certify that the foregoing is a correct transcript
15  from the record of proceedings in the above-entitled matter.
16
17
18              _____/s/_____
19                  Carol L. Naughton
20                  August 30, 2022
21
22
23
24
25

Carol L. Naughton, Official Court Reporter