1             IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF VIRGINIA
2                Norfolk Division

3

4  - - - - - - - - - - - - - - - - - -
                        )
5   UNITED STATES OF AMERICA     )
                        )
6   v.                  )   CRIMINAL ACTION NO.
                        )      2:19cr47
7   DAVID ALCORN and         )
   AGHEE WILLIAM SMITH II,     )
8                        )
        Defendants.       )
9  - - - - - - - - - - - - - - - - - -

10                 **\*\* Jury Trial - Day 9 \*\***

11             TRANSCRIPT OF PROCEEDINGS

12               Norfolk, Virginia

13              February 14, 2022

14

15  BEFORE:  THE HONORABLE RAYMOND A. JACKSON
         United States District Judge, and a jury
16

17  APPEARANCES:

18       UNITED STATES ATTORNEY'S OFFICE
       By:  Andrew C. Bosse
19           Melissa E. O'Boyle
           Elizabeth M. Yusi
20           Assistant United States Attorneys
           Counsel for the United States
21

22       RICHARD S. YAROW LLC
       By:  Richard S. Yarow
           Counsel for Defendant David Alcorn
23

24       FEDERAL PUBLIC DEFENDER'S OFFICE
       By:  Andrew W. Grindrod
           Lindsay Jo McCaslin
25           Assistant Federal Public Defenders
           Counsel for Defendant Aghee William Smith II

```
 1                     I N D E X

 2  GOVERNMENT'S
    WITNESSES                                    PAGE
 3
      JEFFREY BROWNE
 4        Direct Examination By Ms. Yusi         1592
          Cross-Examination By Mr. Grindrod      1629
 5        Redirect Examination By Ms. Yusi       1647
      COLEMAN BAZELON
 6        Direct Examination By Mr. Bosse        1649
          Cross-Examination By Mr. Yarow         1714
 7        Cross-Examination By Ms. McCaslin      1730
          Redirect Examination By Mr. Bosse      1745
 8    ALAN BASKIN
          Direct Examination By Ms. O'Boyle      1749
 9

10

11                   E X H I B I T S

12  GOVERNMENT'S
    NO.                                          PAGE
13
      860                                        1596
14    1216                                       1600
      898                                        1604
15    900                                        1606
      901                                        1606
16    899                                        1607
      902                                        1608
17    904                                        1609
      903                                        1611
18    907                                        1611
      908                                        1611
19    840                                        1615
      1215                                       1623
20    500B                                       1751
      300O                                       1757
21    300P                                       1758
      300Q                                       1759
22    511D                                       1761
      505B                                       1764
23    509C                                       1768
      508                                        1769
24    509A                                       1771

25
```

Carol L. Naughton, Official Court Reporter

1591

```
                         I N D E X
                        (Continued)

                     E X H I B I T S

DEFENDANT SMITH'S
NO.                                              PAGE

  1000          (For ID Only)                    1640
  563                                            1642
  243                                            1644
  252                                            1646
  308                                            1742


DEFENDANT ALCORN'S
NO.                                              PAGE

  1                                              1720
```

```
────────────────────J. Browne - Direct────────────────────
```

 1              (Proceedings resumed at 10:02 a.m.)

 2              THE COURT:  Good morning.  There are a series of

 3     issues that the Court needs to take up, but we're going to

 4     take those up at the lunch hour when we have more time.  And

 5     the evidentiary issue, I think we can take that up maybe at

 6     the lunch hour too and hopefully still leave us an hour for

 7     lunch.

 8              Bring the jury in.

 9              (The jury entered the courtroom.)

10              THE COURT:  Good morning, ladies and gentlemen.

11              Let the record reflect that all jurors are here on

12     Valentine's Day.

13              Does counsel agree?

14              MS. YUSI:  We agree, Your Honor.

15              MR. YAROW:  Mr. Alcorn agrees.

16              MS. McCASLIN:  Mr. Smith agrees.

17              THE COURT:  You may call your next witness.

18              MS. YUSI:  Your Honor, we call Jeffrey Browne.

19              (Witness sworn.)

20              JEFFREY BROWNE, called by the Government, having

21     been first duly sworn, was examined and testified as follows:

22                          DIRECT EXAMINATION

23     BY MS. YUSI:

24     Q.  Good morning.  Could you introduce yourself to the Court.

25     A.  Yes.  My name is Jeff Browne.

———J. Browne - Direct———

1   Q.  How do you spell your last name?

2   A.  B-r-o-w-n-e.

3   Q.  How old are you today?

4   A.  74.

5   Q.  Okay.  And what city and state do you live in?

6   A.  Piney Flats, Tennessee.

7   Q.  How long have you been in Piney Flats?

8   A.  A year and a half.

9   Q.  Where did you live before that?

10  A.  Shingle Springs, California.

11  Q.  Is that outside of Sacramento?

12  A.  Yes.

13  Q.  How long did you live in Shingle Springs?

14  A.  33 years.

15  Q.  Do you work right now?

16  A.  No.

17  Q.  Are you retired?

18  A.  Yes.

19  Q.  When did you retire?

20  A.  2015, I think.  Might have been 2016.

21  Q.  And what did you retire from?

22  A.  I was a radio broadcast engineer.

23  Q.  What does that mean?

24  A.  In my case, it meant constructing radio stations.

25  Q.  Did you do towers?

J. Browne - Direct

1    A.  Yes.

2    Q.  Did you only deal with radio, or did you ever deal with

3    cellular?

4    A.  Only -- yes, radio, but only to the cellular extent that

5    I was involved with leasing space on our towers for cellular

6    customers.

7    Q.  Are you married?

8    A.  Yes.

9    Q.  To whom?

10   A.  Carol Browne.

11   Q.  And did she work outside the home?

12   A.  Yes.

13   Q.  What did she do?

14   A.  She was a court stenographer, and also she's a church

15   organist.

16   Q.  Is she retired now?

17   A.  More or less.

18   Q.  And while you two were working, did you save money for

19   retirement?

20   A.  Yes, we did.

21   Q.  And what sort of vehicles did you use to save for

22   retirement?

23   A.  Well, people I worked for had a -- I think it was a

24   401(k) plan, and for a long time, I used just that, but at

25   one point I rolled about half of that over to an IRA from

————J. Browne - Direct————

1   another company.

2   Q.  And were you satisfied with those accounts?

3   A.  No.

4   Q.  How so?

5   A.  Well, the account that the company had for me was a

6   company by the name of Genovese Burford & Brothers.  They

7   were very good, but shortly before I retired, one of the

8   principals called me into his office and said --

9           THE COURT:  Don't tell us what someone else said

10  other than the two defendants here.

11  BY MS. YUSI:

12  Q.  What did you do after you had that conversation?

13  A.  I started looking for other ways to invest my retirement

14  money.

15  Q.  Do you have any -- do you or your wife have any

16  background or training in investments?

17  A.  No.

18  Q.  Do you consider yourself sophisticated investors?

19  A.  No.

20  Q.  How did you first come to know Bill Smith?

21  A.  I heard him on the radio.

22  Q.  And what kind of show did you hear him on?

23  A.  It was an investment advisory show, and it was

24  alternatives to investing money in retirement securities.

25  Q.  Was it a talk radio?

J. Browne - Direct

```
 1   A.  Yes.
 2   Q.  If you can -- there's a binder in front of you there.
 3   And if you can look on the inside cover, there are some
 4   disks, one that is labeled Exhibit 860.  It should be on the
 5   inside cover.
 6   A.  Are you talking about the --
 7   Q.  The CDs.
 8   A.  The disks here?
 9   Q.  Yes.  Do you see one labeled 860?
10   A.  Yes.
11   Q.  Okay.  And did you provide recordings to the government
12   of part of at least one of the radio shows?
13   A.  Yes, I did.
14   Q.  And did you review this disk prior to coming on the
15   stand?
16   A.  Yes.
17   Q.  And does it contain advertisements from the radio show
18   that you recorded for the -- and gave to the government?
19   A.  Yes.
20           MS. YUSI:  Your Honor, we move to admit Exhibit 860.
21           THE COURT:  Hearing no objection, 860 is admitted.
22           (Government's Exhibit 860 was admitted.)
23   BY MS. YUSI:
24   Q.  Do you recall about when you recorded the radio show?
25   A.  I can't remember the exact -- it was probably 2017,
```

─────────────── J. Browne - Direct ───────────────

1   maybe, 2018, somewhere in there.

2   Q.   I'm going to play part 1 of 860.

3           (Audio played in open court.)

4   BY MS. YUSI:

5   Q.   Was "Money Talks" the name of the show that you would

6   listen to?

7   A.   Yes.

8   Q.   And were there advertisements for his business within his

9   show?

10  A.   I believe so, yes.

11          MS. YUSI:  If we can play part 2.

12          (Audio played in open court.)

13  BY MS. YUSI:

14  Q.   And did you call Mr. Smith at one point to speak with

15  him?

16  A.   Yes, I did.

17  Q.   And do you recall around when that was?

18  A.   No, I don't.  I want to say 20 -- it was 2015 or 2016,

19  but I couldn't be sure.

20  Q.   Did you meet with Mr. Smith in person?

21  A.   Yes.

22  Q.   And what did Mr. Smith tell you about his background, or

23  what was your understanding?

24  A.   I'm trying to remember.  I do remember that his card, his

25  business card had lots and lots of initials after it, of his

─────────────── J. Browne - Direct ───────────────

 1    credentials.  And, you know, the investment banking and that
 2    sort of thing, you know, he talked about, and it sounded to
 3    me like he really knew what he was doing.
 4    Q.  And did you learn to trust Mr. Smith?
 5    A.  Oh, yes, uh-huh.
 6    Q.  As a person, did he talk about his family or religion?
 7    A.  Yes, uh-huh.
 8    Q.  What did he say?
 9    A.  About which?
10    Q.  Both.
11    A.  Well, he came off as being a very good family man and a
12    very religious man, was affiliated with the -- I'm trying to
13    remember the name of the church.  I can't think of it right
14    now.  But...
15    Q.  And did that give you another level of trust?
16    A.  Well, certainly, yes.  And he had a big picture of Jesus
17    on his wall.
18    Q.  Now, what were you looking for in terms of financial
19    advice?
20    A.  For stability, mainly, because at the time the stock
21    market was on a roller coaster, and I wanted to ensure that I
22    had sufficient funds to retire comfortably.
23    Q.  Were you willing to risk your principal that you would
24    invest?
25    A.  Not much, no.

J. Browne - Direct

1    Q.   How long after you first met Mr. Smith do you think you

2    made your first investment with him?

3    A.   It was fairly recent.

4    Q.   It was --

5    A.   Probably within 60 days, probably more like 30.

6    Q.   So quickly after, shortly after you met him?

7    A.   That's right, uh-huh.

8    Q.   And one of the investments that he talked to you about,

9    was it the spectrum investment?

10   A.   Right.

11   Q.   And did he provide you advertisements and things like

12   that regarding the spectrum investments?

13   A.   Yes, uh-huh.

14   Q.   I'm going to show another disk that you probably already

15   took out, but Exhibit 1216, another CD.  Do you see 1216?

16   A.   Yes.

17   Q.   And prior to getting on the stand, did you review that

18   disk as an advertisement that Mr. Smith -- with Mr. Smith

19   talking about spectrum?

20   A.   Mr. Smith went over the mechanics of that investment

21   before I saw that, but that just confirmed that what he was

22   talking about was...

23   Q.   And let me --

24           MS. YUSI:  Your Honor, we move to admit

25   Exhibit 1216.

—————J. Browne - Direct—————

```
 1              THE COURT:  Hearing no objection, 1216 is admitted.
 2              (Government's Exhibit 1216 was admitted.)
 3   BY MS. YUSI:
 4   Q.  And you said he went over the mechanics of spectrum
 5   before you spoke, and we'll look at what was talked about,
 6   and I'll ask a few questions as well.  Okay?
 7   A.  Okay.
 8              MS. YUSI:  If we can start 1216.
 9              (Video played in open court.)
10   BY MS. YUSI:
11   Q.  Did Mr. Smith talk to you about Henry Ford?
12   A.  Yes.
13   Q.  He did.
14              MS. YUSI:  If we can go to 4:59.
15              (Video played in open court.)
16   BY MS. YUSI:
17   Q.  Did Mr. Smith talk to you about risk in terms of any
18   spectrum investment?
19   A.  Not really, no.  And based on my experience outside of
20   dealing with Mr. Smith, what he did say made a lot of sense
21   because I had friends in the business that had made quite a
22   substantial amount of money.
23   Q.  Did you have any understanding of the particular type of
24   spectrum he was talking about or personal knowledge of that
25   type of spectrum?
```

J. Browne - Direct

1   A.  Not initially.  I assumed it was cellular telephones at

2   that time.

3            MS. YUSI:  If we can go to 6:56.

4            (Video played in open court.)

5   BY MS. YUSI:

6   Q.  Now, did Mr. Smith talk about Verizon and Sprint being

7   interested in the spectrum?

8   A.  Yes.

9   Q.  And did he talk about the success of this particular

10  investment?

11  A.  Only to the extent that it would be very successful.

12           MS. YUSI:  If we can go to 11.

13           (Video played in open court.)

14  BY MS. YUSI:

15  Q.  Now, was there a sense of urgency in terms of making an

16  investment into spectrum?

17  A.  I suppose so.  I was very interested in his sales of this

18  because of other information I had received from other people

19  that were not involved with this respect.

20           MS. YUSI:  If we can go to 13:25.

21           (Video played in open court.)

22  BY MS. YUSI:

23  Q.  Now, you said you knew something about other friends or

24  people that had been involved with spectrum.  Did Mr. Smith

25  differentiate this type of 800-megahertz spectrum from others

J. Browne - Direct

1  you were familiar with?

2  A.  Not at all.  And I'm familiar with this 800 megahertz --

3  800 and 900 megahertz having been peripherally listening to

4  all the fighting going on between broadcasters who used that

5  spectrum for microwave and the cellular companies who were

6  desperate for more spectrum.  And Mr. Smith was right in

7  saying that because it's very valuable spectrum for that

8  particular use.

9  Q.  For that particular megahertz, did he tell you of any

10 limitations as to who was allowed to use that particular

11 800 megahertz?

12 A.  Well, they are all under FCC license, and obtaining the

13 license is what grants you the use of those frequencies.

14            MS. YUSI:  If we can go to the next portion.

15            (Video played in open court.)

16 BY MS. YUSI:

17 Q.  Now, with the major carriers, did Mr. Smith tell you

18 about any limitations as to their being able to use this

19 particular type of spectrum?

20 A.  He was not specific, but I have to say that I was

21 involved with a lease on one of my towers with Sprint.

22 Q.  And was that an 800-megahertz spectrum?

23 A.  Yeah.  And Sprint was losing that.  In fact, that whole

24 lease was finally ending because Sprint could no longer use

25 that service anymore, so they abandoned their site with us.

—J. Browne - Direct—

1        MS. YUSI:  If we can go to 19.
2        (Video played in open court.)
3   BY MS. YUSI:
4   Q.  Now, I want to talk to you about an investment called
5   Western Spectrum.  What was your understanding of what
6   Western Spectrum was?
7   A.  Well, my understanding from Bill Smith was that they had
8   the licenses for this equipment, for the spectrum space, and
9   these were in underserved markets at the time.  He said they
10  were developing that service, and it was my understanding my
11  money would be put into some of the equipment that would be
12  needed to build that out.
13  Q.  So the licenses were not an issue; it was just the
14  machinery?
15  A.  That's what I understood, yeah.
16  Q.  All right.  And who was handling -- was there a company
17  or someone that was handling the investment for Western
18  Spectrum?
19  A.  There was a law firm that was managing that, yes.
20  Q.  How would the money come in, or how would you make money?
21  A.  Well, Bill had me set up a bank account with Wells Fargo
22  that would handle the money.  So this law firm would receive
23  the proceeds from, I guess, the rental of the spectrum, and
24  they would distribute the proceeds to our bank accounts of
25  all the investors.  Then since the money I put in was IRA

J. Browne - Direct

1    money, I had to remove that money from that account and

2    transfer it to an IRA investment firm so that I would not be

3    taxed on it.

4    Q.   Okay.  Did you have to set up an LLC?

5    A.   Yes.

6    Q.   And I'm going to show you -- if you can go into that and

7    look under 898.  Exhibit 898.  If you can look in your binder

8    under tab 898.

9         Do you recognize this document?

10   A.   Oh, yes.

11   Q.   Is it a letter from Shelton & Power to you concerning

12   Browne Spectrum Ventures?

13   A.   Yes.

14        MS. YUSI:  Your Honor, we move to admit Exhibit 898.

15        THE COURT:  Exhibit 898 will be admitted.

16        (Government's Exhibit 898 was admitted.)

17   BY MS. YUSI:

18   Q.   Shelton & Power, who is Shelton & Power, to your

19   understanding?

20   A.   They were attorneys handling this investment.

21   Q.   That's the law firm you were talking about?

22   A.   Yes.

23   Q.   And what date did you receive or did they send this

24   letter?

25   A.   July 7, 2015.

J. Browne - Direct

1    Q.  And Browne Spectrum Ventures LLC, what was that?

2    A.  That was the company that Bill had me set up to make

3    this -- this investment work.

4    Q.  Okay.  And who was their client, according to their

5    regards line?

6    A.  Oh, yeah, Western Spectrum Ventures 2.

7    Q.  Is that the investment that Mr. Smith was talking to you

8    about?

9    A.  Yes.

10   Q.  And did they provide all the agreements for Western

11   Spectrum Ventures 2?

12   A.  Yes.

13   Q.  What, if anything, did you understand about Mr. Smith

14   having his own money in Western Spectrum?

15   A.  Well, I understood that he had a substantial investment

16   in it, and it was the -- it was a bigger investment than the

17   rest of the investors.

18   Q.  Okay.  And why did you understand that?

19   A.  I saw some paperwork that had the percentage of the

20   people that were investing, and his was more than the others.

21   Q.  I'm going to show you --

22          MS. YUSI:  Your Honor, pursuant to our stipulations,

23   pursuant to the Secretary of the State of Texas documents, we

24   move to admit Exhibit 900 and 901.

25          THE COURT:  Exhibit 900?

─────────────── J. Browne - Direct ───────────────

1          MS. YUSI:  900 and 901.

2          THE COURT:  900 and 901, without objection, are

3    admitted.

4          (Government's Exhibits 900 and 901 were admitted.)

5          MS. YUSI:  Thank you.

6          If we can look at 900.

7          THE COURT:  That was 900 and 901?

8          MS. YUSI:  Yes, sir.

9    BY MS. YUSI:

10   Q.  We see here there's a Certificate of Formation from the

11   Secretary of State for Western Spectrum Ventures 2 LLC?

12   A.  Yes.

13   Q.  What is the filing date of this particular company?  And

14   you can look on your screen as well.

15   A.  Okay.  January 27, 2015.

16   Q.  And who is the manager of the LLC?

17   A.  Well, William Smith.

18   Q.  So did you understand this to be Mr. Smith's company?

19   A.  Yes.

20   Q.  Now, how quickly were you supposed to expect a return for

21   any investment into Western Spectrum Ventures 2?

22   A.  Mr. Smith said that the return wouldn't be immediate

23   because they're building out the -- with the spectrum and the

24   licenses, and that once they build it out and started using

25   it, that the money would start coming in.

J. Browne - Direct

1   Q.   Okay.  And if you can -- did you end up investing in

2   Western Spectrum?

3   A.   Yes.

4   Q.   If you can look at 899 in your binder.  Do you recognize

5   this document?

6   A.   Yes.

7   Q.   Is this the Operating Agreement for your LLC, the Browne

8   Spectrum Ventures?

9   A.   Yes, it is.

10            MS. YUSI:  Your Honor, we move to admit Exhibit 899.

11            THE COURT:  899 will be admitted.

12            (Government's Exhibit 899 was admitted.)

13   BY MS. YUSI:

14   Q.   If we can go to Page 23 of Exhibit 899.  Is that your

15   signature, Mr. Browne?

16   A.   Yes.

17   Q.   You were the sole member of this LLC; is that right?

18   A.   Right.

19   Q.   What was the date that you signed this?

20   A.   August 6th, 2015.

21   Q.   Now, you said you met with Mr. Smith in either 2015 or

22   2016.  Does this help remind you when you would have met with

23   him at first?

24   A.   It certainly does.  And I met with him many times.  So

25   this was one of the earlier ones.

J. Browne - Direct

1    Q.   If we can look at Exhibit 902.  How much did you invest

2    in Western Spectrum Ventures 2?

3    A.   $108,000.

4    Q.   Is Exhibit 902 a copy of a check that you wrote?

5    A.   Yes.

6            MS. YUSI:  Your Honor, we move to admit Exhibit 902.

7            THE COURT:  Exhibit 902 will be admitted.

8            (Government's Exhibit 902 was admitted.)

9    BY MS. YUSI:

10   Q.   All right.  And who did you have to make your check out

11   to?

12   A.   Shelton & Power LLC.  That was the legal firm.

13   Q.   And where did the money come from?

14   A.   My IRA.

15   Q.   And the date that you wrote this check?

16   A.   August 6, 2015.

17   Q.   Did you ask about the amount of fees that were going to

18   be taken out of your investment?

19   A.   You know, I might have.  I don't remember.  But I felt

20   since the return was going to be very reasonable that the

21   fees wouldn't be an issue.

22   Q.   And how about commission?  Did you ask Mr. Smith about

23   what commission he would make on this?

24   A.   No.

25   Q.   What, if anything, did Mr. Smith tell you about his

---

J. Browne - Direct

1  investment in spectrum, in general?

2  A.  Only that it was a really good deal, but that's all I

3  recollect.

4  Q.  If you can look at Exhibit 904.  Do you recognize this

5  document?

6  A.  Yes.

7  Q.  And is this the agreement when you -- that you entered

8  when you purchased or made investment in Western Spectrum

9  Ventures 2?

10  A.  It looks like it, yes.

11        MS. YUSI:  Your Honor, we move to admit Exhibit 904.

12        THE COURT:  904 is admitted.

13        (Government's Exhibit 904 was admitted.)

14  BY MS. YUSI:

15  Q.  Okay.  And the registration for the -- the common trust

16  fund agreement, this is Western Spectrum Ventures 2.  That

17  was what you were investing in, correct?

18  A.  That's right.

19  Q.  Do you recognize the address 1100 Melody Lane in

20  Roseville?

21  A.  Yes.  That's Bill Smith's office address.

22  Q.  Okay.  And if we can go to Page 6 of Exhibit 904.  This

23  is your signature in July 2015; is that right?

24  A.  Yes.

25  Q.  And who signed on behalf of Western Spectrum 2?

---

J. Browne - Direct

1   A.  Well, there's my signature, and there's Bill Smith's

2   signature at the bottom there.

3   Q.  What was your understanding about other investors in this

4   LLC, Western Spectrum Ventures 2?

5   A.  I didn't know any of them.  I believe there were 11 of us

6   at that time.

7          MS. YUSI:  And if we can go to 901, which has been

8   admitted.

9   BY MS. YUSI:

10  Q.  You can look at the screen as well, if it's easier for

11  you.  Is this the Texas Franchise Tax Public Information

12  Report for Western Spectrum Ventures 2?

13  A.  It looks like it, yes.

14  Q.  And Mr. Smith is listed as the managing member?

15  A.  Yes.

16  Q.  And Page 2 of Exhibit 901 has listing of members.  Do you

17  see your name on there?

18  A.  Yes, I do.

19  Q.  Okay.  And other names that you later found out were

20  parts of this LLC?

21  A.  Yes.  I never met any of these other people; however, I

22  did speak with one of them on the phone.

23  Q.  Okay.  If you can look at 903 in your binder.  Do you see

24  903, sir?

25  A.  Yes.

—J. Browne - Direct—

1   Q.  Do you recognize this document?

2   A.  Yes.

3   Q.  Is this a deposit agreement for your investment into

4   Western Spectrum?

5   A.  It looks like it, yes.

6           MS. YUSI:  Your Honor, we move to admit Exhibit 903.

7           THE COURT:  Exhibit 903 will be admitted.

8           (Government's Exhibit 903 was admitted.)

9   BY MS. YUSI:

10  Q.  And on the fourth paragraph, does it talk about

11  Mr. Smith's ownership in the property?

12  A.  Yes, it does.

13  Q.  And what does it say?

14  A.  He has 20 percent ownership stake in the property.

15  Q.  And if we can look --

16          MS. YUSI:  Your Honor, at this time we would like to

17  admit 907 and 908 pursuant to the parties' stipulation

18  regarding the Texas Secretary of State.

19          THE COURT:  907 and 908 will be admitted.

20          (Government's Exhibits 907 and 908 were admitted.)

21  BY MS. YUSI:

22  Q.  If we can look at 907.  And this is a Certificate of

23  Amendment for the Secretary of State.  Can you see what the

24  name of the initial filing entity was?

25  A.  Smith Spectrum LLC.

J. Browne - Direct

1   Q.  And what did he change the name of the filing entity to?

2   A.  Western Spectrum Ventures LLC.

3   Q.  And what is the date of this filing?  If you can see in

4   the upper right corner.

5   A.  Oh, okay.  July 5th, 2013.

6   Q.  And this is Western Spectrum Ventures, no number at the

7   end, but you had invested in Western Spectrum Ventures 2,

8   correct?

9   A.  That's correct.

10  Q.  And 908, we'll just look at that really quickly.  This is

11  another public information report.  This one is for Western

12  Spectrum Ventures 1, the original one, correct?

13  A.  It looks like it, yeah.

14  Q.  And again, on Page 2, do they list the members there as

15  well?

16  A.  Yes, they do.

17          MS. YUSI:  Thank you, Mr. Bosse.

18  BY MS. YUSI:

19  Q.  Now, within a year or so, did you -- did you talk to

20  Mr. Smith about another investment?

21  A.  Yes.

22  Q.  How did that happen?

23  A.  Well, Western Spectrum Ventures 2 was not paying out, and

24  I was told that it might be a while before it would pay out,

25  but meanwhile, his partners had purchased another spectrum

J. Browne - Direct

1    offer in Texas.

2    Q.   Do you know who his partners were?

3    A.   Not that I remember, no.

4    Q.   Was Western Spectrum going to give anything to this new

5    venture?

6    A.   Well, my understanding was that since things weren't

7    going as well as had been expected, that the electronic

8    assets would be moved to this Texas outfit because that was a

9    going concern and they needed it badly.

10   Q.   And was this the Xcel investments?

11   A.   Yes.

12   Q.   And so did he transfer, or what was your understanding --

13   was your money or your investment in Western Spectrum

14   Ventures 2 transferred to Xcel?

15   A.   Well, I asked that question, and I never got an answer.

16   Q.   Did Mr. Smith suggest you put additional money in Xcel?

17   A.   Oh, he did.  And he said this was a sure-fire investment

18   and that I would have no trouble in, I guess, earning money

19   from that investment.

20   Q.   And in terms of timing, when would you start seeing money

21   coming in from the Xcel investment?

22   A.   Fairly quickly.

23   Q.   And did you end up investing in Xcel?

24   A.   Yes.

25   Q.   How many times?

—— J. Browne - Direct ——

1    A.   Twice.

2    Q.   When was the first time, if you recall?

3    A.   I have a cheat sheet in my pocket.  I can look it up if

4    you want.

5            THE COURT:  Not unless you have it marked as a

6    document that refreshes his recollection.

7    BY MS. YUSI:

8    Q.   Was it within a year of your first investment in

9    spectrum?

10   A.   I believe so.

11   Q.   And how much did you first invest?

12   A.   I'm trying to remember.  One of them was 25,100, and I

13   think the other one was 20,000.  I couldn't be sure about

14   that.

15   Q.   Okay.

16           MS. YUSI:  And, Your Honor, I have no problem

17   marking his cheat sheet if we need to.

18           THE COURT:  All right.  Then he needs to deliver it

19   to you.

20   BY MS. YUSI:

21   Q.   If you want to use that, we'll mark it as Exhibit 2001.

22           THE COURT:  Give it to the court security officer,

23   and you also need to show it to opposing counsel.

24           MS. YUSI:  Yes, sir.

25           THE WITNESS:  I may not have brought it.  I thought

────────────────J. Browne - Direct────────────────

1    I did.

2         THE COURT:  Ms. Yusi, if there are documents

3    reflecting those investments among what you have, it would

4    save time to --

5         MS. YUSI:  We have some, Your Honor.

6         THE COURT:  Well, then, we haven't introduced this

7    document.  This is an unnecessary step if you already have

8    the document.

9    BY MS. YUSI:

10   Q.  I'm going to show you a document, Mr. Browne, that might

11   help with this.

12   A.  Okay.

13   Q.  If you can look in your binder at Exhibit 840.  Do you

14   recognize Exhibit 840?

15   A.  Yes.

16   Q.  Was that one of the two investments you made in Xcel that

17   you just mentioned?

18   A.  Right.  That was the first one, and that was $27,000.

19         MS. YUSI:  Your Honor, we move to admit Exhibit 840.

20         THE COURT:  Exhibit 840 will be admitted.

21         (Government's Exhibit 840 was admitted.)

22   BY MS. YUSI:

23   Q.  So this was August 2016?

24   A.  Right.

25   Q.  And for $27,000?

————— J. Browne - Direct —————

1   A.   That's correct.

2   Q.   And on Page 7 of Exhibit 840, who is listed as the

3   broker?

4   A.   Bill Smith.

5   Q.   And up here it says IRA Services Trust.  What was IRA

6   Services Trust to the best of your knowledge?

7   A.   They were handling my IRA money.

8   Q.   Okay.  So any money, they would be the ones -- well, was

9   your money with IRA Services at that point?

10  A.   Yes.

11  Q.   And prior to your investment in Xcel, did the name Daryl

12  Bank ever get mentioned?

13  A.   Not at first, no.

14  Q.   Okay.  Did you talk to anyone else about the Xcel

15  investment, or just Mr. Smith?

16  A.   Just Mr. Smith.

17  Q.   Did you ever have a trust with Alliance?

18  A.   Yes.

19  Q.   And was that before IRA Services or after?  If you

20  recall.

21  A.   That was -- I believe it was after.

22  Q.   And so you made a $27,000 investment in August 2016.  How

23  much was your second investment in Xcel?

24  A.   I believe it was 25,000.

25  Q.   And do you know how much later it was than your first

─────────────────── J. Browne - Direct ───────────────────

1    one, if you recall?

2    A.  I don't recall, but it was under a year, I believe.

3    Q.  And did any of your family ever go with you to meet

4    Mr. Smith?

5    A.  Yes.

6    Q.  Who was that?

7    A.  My sister.

8    Q.  And did she invest in Xcel?

9    A.  Yes, she did.

10   Q.  Do you remember approximately when that was?

11   A.  No, but it was after I made my investments.

12   Q.  And how much did your sister -- what was your sister's

13   name?

14   A.  Priscilla Johnson.

15   Q.  How much did Ms. Johnson put into Xcel?

16           MR. GRINDROD:  Objection.  Foundation.

17           MS. YUSI:  I can rephrase.

18           THE COURT:  Objection overruled.  Well, on second

19   thought, sustained.  Develop it more.

20   BY MS. YUSI:

21   Q.  Do you know how much Ms. Johnson put into Xcel?

22   A.  Yes.  It was $50,000.

23           MR. GRINDROD:  Objection.

24           THE COURT:  How does he know?

25   BY MS. YUSI:

J. Browne - Direct

1   Q.  You went with Ms. Johnson to see --

2   A.  That's correct.

3   Q.  Were you with her when she made her investment?

4   A.  Yes.

5   Q.  And how much did she put into Xcel?

6   A.  It was a $50,000 check, but I believe I wrote that check

7   on my dad's trust because that was her trust money and she

8   wanted it invested.

9   Q.  Okay.  And did you also make an additional investment, a

10  third investment through a charitable trust?

11  A.  Yes.

12  Q.  What was this charitable trust?

13  A.  Well, when my dad passed away, he left in his trust

14  $180,000 to be put into charity.  I put 80,000 directly into

15  two university accounts that we talked about before he passed

16  away.

17          The 100,000, I was going to do the same thing;

18  however, in talking to Bill Smith, he strongly suggested that

19  instead of putting all that money in the charities right

20  away, what I should do is invest it so that the proceeds of

21  the investment could be an ongoing thing.  To me, that

22  sounded like a good idea.

23  Q.  So how much did you invest from your dad's charitable

24  trust?

25  A.  It was $100,000.

J. Browne - Direct

1   Q.  What did you invest in?

2   A.  Xcel for that.

3   Q.  Did you receive any money from any of your Xcel

4   investments?

5   A.  Yes.  Actually, I did.  And I can't remember because I

6   received three payments, but it was not from the trust money,

7   it was from my own that I got.

8   Q.  Do you know about how much you got?

9   A.  I'd have to guess.  I think one of them was $1,200,

10  roughly, or 1,220, and one was, like, 600, and the last one I

11  think was 300, roughly.

12  Q.  Did it appear that things were starting to move for Xcel?

13  A.  Oh, yeah.

14  Q.  Did those payments continue?

15  A.  No.

16  Q.  Did you talk to Mr. Smith about that?

17  A.  Yes.

18  Q.  What did he say?

19  A.  He said that there was some kind of a legal situation

20  going on with Daryl Bank, who was controlling a lot of this.

21  Q.  Had you heard Mr. Bank's name before this?

22  A.  I think I did, but in looking back in the documentation,

23  I noticed that with the Xcel instruments of authorization, he

24  had signed them.

25  Q.  That's the only time you saw his name?

J. Browne - Direct

```
 1   A.   Right.
 2   Q.   And did Mr. Smith go into the type of legal troubles that
 3   Mr. Bank was experiencing?
 4   A.   No.  He just downplayed them as it's just a minor thing
 5   and that the government was after him and it was a witch hunt
 6   and that they would take care of it.
 7   Q.   Prior to any of your investments, did Mr. Smith -- you
 8   said he never even mentioned Daryl Bank; is that right?
 9   A.   I don't remember him ever mentioning him at first, no.
10   Q.   Did he ever mention a Kent Maerki?
11   A.   No.
12   Q.   Did he say how long he had been selling spectrum
13   investments prior to selling the Western Spectrum to you?
14   A.   No.  I do not remember him saying much about the history
15   of the spectrum as far as he was concerned with it.
16   Q.   Now, did the FBI reach out to you at some point?
17   A.   Yes.
18   Q.   And did you eventually speak with them?
19   A.   Yes.
20   Q.   After you spoke with the FBI, did you talk to Mr. Smith?
21   A.   Yes.
22   Q.   What did Mr. Smith say?
23   A.   He mentioned that it was a witch hunt on the part of
24   Daryl Bank and that it was going to be over soon and no big
25   deal.
```

J. Browne - Direct

1   Q.  Did you ask about your investments and if they were okay?

2   A.  Yes.

3   Q.  What did he say?

4   A.  He assured me everything was fine and I would just have

5   to wait a little longer.

6   Q.  And when was that or what year was that, if you recall?

7   A.  I don't recall.  I'd like to guess 2017.  It might have

8   been 2018, though.

9   Q.  Did you ever try to call Lynne Shelton of Shelton &

10  Power?

11  A.  Yes.

12  Q.  Did you speak with her?

13  A.  No.  She was very evasive.

14  Q.  Did she ever return your call?

15  A.  No.

16  Q.  Now, at some point were you given notice that Mr. Smith

17  had declared bankruptcy?

18  A.  Yes.

19        MS. YUSI:  If we can look at Exhibit 1213, which has

20  already been admitted.  And if we can go to Page 41.

21  BY MS. YUSI:

22  Q.  And were you listed as a creditor in Mr. Smith's

23  bankruptcy?

24  A.  Yes.

25  Q.  Now, as part of his bankruptcy proceedings, did Mr. Smith

Carol L. Naughton, Official Court Reporter

—————————J. Browne - Direct—————————

 1   have to submit to questioning under oath by a bankruptcy

 2   trustee?

 3   A.   Yes.

 4   Q.   And did you attend some of these sessions?

 5   A.   The first two of them, yes.

 6           MS. YUSI:   Your Honor, we would like to admit,

 7   pursuant to the stipulation, Exhibit 1215 -- well --

 8   BY MS. YUSI:

 9   Q.   If you can look inside your notebook at the disk, 1215.

10   There's a CD.

11   A.   Here it is.

12   Q.   Did you listen to that prior to coming today?

13   A.   Yes.

14   Q.   And did you initial it?

15   A.   Yes.

16   Q.   And are these cut from the proceedings before the

17   bankruptcy trustee?

18   A.   I believe so, yeah.

19           MS. YUSI:   Your Honor, we move to admit

20   Exhibit 1215.

21           MR. GRINDROD:   Your Honor, this is something I think

22   we should discuss at sidebar.

23           THE COURT:   Has this matter been previously raised,

24   Mr. Grindrod?  The Court believes you've previously raised

25   this matter.  I thought the Court had previously ruled on

────── J. Browne - Direct ──────

1    whether this matter would be admissible or not.

2           MR. GRINDROD:  I just have a question as to what

3    exactly is being admitted right now, but I can confer with

4    Ms. Yusi.

5           THE COURT:  Let me confirm.  Are you getting ready

6    to play something that Mr. Smith allegedly said at the

7    hearing?

8           MS. YUSI:  We are, Your Honor, and it's not the

9    entirety of all the transcripts.  It's the clips.

10          MR. GRINDROD:  That answers my question.  Thank you,

11   Judge.

12          THE COURT:  All right.  We're not playing everything

13   that was said in the bankruptcy hearing?

14          MS. YUSI:  No, sir.  We would be here for days.

15          THE COURT:  You would be here -- you.

16          1215 is admitted.

17          (Government's Exhibit 1215 was admitted.)

18          (Audio played in open court.)

19   BY MS. YUSI:

20   Q.  Do you recognize that woman's voice?

21   A.  Yes.

22   Q.  Was that the bankruptcy trustee who asked all the

23   questions?

24   A.  Yes.

25   Q.  In general was she asking about Mr. Smith's businesses

J. Browne - Direct

```
 1   and any debts and creditors, that sort of thing?
 2   A.  Oh, yes, yes.
 3           MS. YUSI:  If we can look at part 4.
 4           (Audio played in open court.)
 5   BY MS. YUSI:
 6   Q.  Was that man speaking -- was that Bill Smith?
 7   A.  Yes.
 8           MS. YUSI:  If we can go to part 6.
 9           (Audio played in open court.)
10   BY MS. YUSI:
11   Q.  Did you know a man name Matt Fowles?
12   A.  No.
13   Q.  Were you ever a client of his?
14   A.  No.
15   Q.  If you didn't know him, did he ever refer you to Bill
16   Smith?
17   A.  I never heard or talked to him.  So I don't know --
18   Q.  Well, Mr. Smith says that Matt Fowles is the one who
19   provided documents to you?  Who provided documents --
20           MR. GRINDROD:  Objection, Your Honor.  That's not
21   what the testimony was there.
22           THE COURT:  Sustained.
23           MR. GRINDROD:  Misstates the facts.
24           MS. YUSI:  I apologize.
25   BY MS. YUSI:
```

————————J. Browne - Direct————————

1   Q.  Who provided documents to you in your -- when you were

2   doing your investments?

3   A.  Bill Smith did.  I did get periodical documents from

4   Provident.

5   Q.  That trust company?

6   A.  Yeah.

7   Q.  But other than that, Mr. Smith provided the documents to

8   you?

9   A.  As far as I know, that's where they came from because I

10  had no discussion or anything about anyone else.

11  Q.  Who were you a client of?

12  A.  That's a good question.  I thought I was a client of Bill

13  Smith's.

14          MS. YUSI:  If we can look at part 7.

15          (Audio played in open court.)

16  BY MS. YUSI:

17  Q.  Did Mr. Smith talk to you about or tell you about any

18  spectrum investments he was involved with that had collapsed

19  in 2013?

20  A.  No.

21          MS. YUSI:  If we can go to part 8.

22          (Audio played in open court.)

23  BY MS. YUSI:

24  Q.  Were you ever referred to the makers of Xcel or the

25  managers of Xcel?

J. Browne - Direct

```
 1   A.  No.

 2   Q.  And were you ever a client of Xcel?

 3   A.  No.

 4   Q.  Did Mr. Smith ever refer to himself as a solicitor when

 5   you were talking to him?

 6   A.  Not that I recall, no.

 7           MS. YUSI:  We can go to part 10.

 8           (Audio played in open court.)

 9   BY MS. YUSI:

10   Q.  Did the trustee ask Mr. Smith about his different bank

11   accounts and finances as well, if you recall?

12   A.  I don't really recall.  I think they did, but...

13           MS. YUSI:  If we can go to part 11.

14           (Audio played in open court.)

15   BY MS. YUSI:

16   Q.  Did you ever deal with Diversified Financing?

17   A.  Not directly, but their name came up on documentation

18   that I had.

19           MS. YUSI:  If we can play parts 12 and 13.

20           (Audio played in open court.)

21   BY MS. YUSI:

22   Q.  Now, does this correspond to what Mr. Smith was telling

23   you about the government?

24   A.  Yes.

25           MS. YUSI:  We can go to part 14.
```

J. Browne - Direct

1           (Audio played in open court.)

2           THE COURT:  Stop the tape.

3           Ms. Yusi, the Court has permitted you to play

4    excerpts, but I want you to get more specific in what you're

5    playing.  We're going through something about the assistant

6    organizing files.  Let's ask a question.  Let's get more

7    pointed here and move on through it.

8           MS. YUSI:  Yes, sir.

9           THE COURT:  We don't want to hear the rest of this

10   tape for the next 20 minutes.

11          MS. YUSI:  Your Honor, I only have one more tape

12   after this one.

13          THE COURT:  As long as it's specific.

14          MS. YUSI:  Yes, sir.

15   BY MS. YUSI:

16   Q.  Did Mr. Smith -- when you were listening to this, did he

17   talk about shredding his files?

18   A.  I think I heard something to that effect at the

19   bankruptcy proceedings.

20          (Audio played in open court.)

21          MR. GRINDROD:  Your Honor, this is what we just

22   listened to.

23          THE COURT:  Hold on.  When the Court told her to

24   stop the tape, this is what we were listening to.  Now I

25   assume what is being played now is responsive to the question

J. Browne - Direct

```
 1  just asked.
 2          MS. YUSI:  It is, Your Honor.
 3          THE COURT:  Overruled.
 4          (Audio played in open court.)
 5  BY MS. YUSI:
 6  Q.  And did Mr. Smith ever refer you to others in terms of
 7  your looking at your retirement plan?
 8  A.  No.
 9          MS. YUSI:  If we can play part 15.
10          (Audio played in open court.)
11  BY MS. YUSI:
12  Q.  Mr. Browne, did you receive any money back besides the
13  small dividends you talked about briefly, any money back from
14  your Xcel investments?
15  A.  You mean aside from the --
16  Q.  Just Xcel investments, did you get any money back from
17  your Xcel investments, besides the dividends?
18  A.  Oh, no.
19  Q.  How about your Western Spectrum?  Did you get any of that
20  money back?
21  A.  No.
22          MS. YUSI:  Thank you.  Those are all my questions,
23  Your Honor.
24          THE COURT:  Okay.  Cross-examination.  Tell you what
25  we're going to do.  Do you have any cross-examination,
```

J. Browne - Cross (By Mr. Grindrod)

1    Mr. Yarow?

2            MR. YAROW:  No questions for Mr. Alcorn.

3            THE COURT:  So what we're going to do, Mr. Grindrod,

4    I don't know how long your cross may be, so the Court will

5    just take the 15-minute break so we won't interrupt your

6    cross-examination.

7            MR. GRINDROD:  Thank you, Your Honor.

8            THE COURT:  All right, ladies and gentlemen, all

9    rise.

10           Mr. Browne, you can step down during the break.  Do

11   not discuss your testimony.

12           (The jury exited the courtroom.)

13           (Recess from 11:18 a.m. to 11:36 a.m.)

14           (The jury entered the courtroom.)

15           THE COURT:  Let the record reflect that all jurors

16   have returned from the break.

17           Does counsel agree?

18           MS. YUSI:  Yes, Your Honor.

19           MR. YAROW:  Mr. Alcorn does.

20           MS. McCASLIN:  Yes, Your Honor.

21           THE COURT:  Commence your cross-examination,

22   Mr. Grindrod.

23                        CROSS-EXAMINATION

24   BY MR. GRINDROD:

25   Q.  Good morning, Mr. Browne.  My name is Andrew Grindrod.  I

Carol L. Naughton, Official Court Reporter

---
J. Browne - Cross (By Mr. Grindrod)
---

1   represent Mr. Smith.

2           So we sort of ended up -- finished your testimony

3   earlier listening to those tapes from the bankruptcy hearing.

4   A.  Uh-huh.

5   Q.  And you were physically there, right?

6   A.  On two occasions.

7   Q.  For the ones we listened to?

8   A.  Yes.

9   Q.  And those hearings, the ones we listened to, were from

10  2019, right?

11  A.  I believe so.

12  Q.  And Daryl Bank's trial was in 2021, right?

13  A.  I don't know.

14  Q.  You don't know?

15  A.  No.

16  Q.  The first time that Daryl Bank's internal accounting was

17  publicly revealed, do you remember that being in 2021?

18  A.  I don't remember --

19          MS. YUSI:  Objection, Your Honor.  Foundation.

20          MR. GRINDROD:  I asked if he remembered.

21          THE COURT:  Well, he said he doesn't remember.

22  BY MR. GRINDROD:

23  Q.  Before 2021, had you ever seen something from Dominion

24  called a money move sheet?

25  A.  No.

————— J. Browne - Cross (By Mr. Grindrod) —————

1   Q.  But you eventually learned that Daryl Bank had stolen

2   millions from investors, right?

3   A.  Right.

4   Q.  And so at that hearing, Daryl Bank -- let me ask you

5   this:

6           When Daryl Bank was first arrested, you talked to

7   Mr. Smith about that, right?

8   A.  Yes.

9   Q.  And Mr. Smith said something to the effect of --

10          THE COURT:  Wait a minute --

11          MS. YUSI:  Objection.  Hearsay.

12          THE COURT:  Sustained.

13  BY MR. GRINDROD:

14  Q.  What was your understanding of the situation with respect

15  to Daryl Bank based on your conversations with Mr. Smith?

16  A.  My understanding was that he -- that it was some kind of

17  a witch hunt, that the government was dealing with Daryl Bank

18  and --

19  Q.  Sorry.  Did you finish your answer?

20  A.  And that it was minor, that it would be over soon.

21  Q.  Do you know what Mr. Smith's understanding was based on?

22          THE COURT:  Sustained.

23          THE WITNESS:  No.  No.

24  BY MR. GRINDROD:

25  Q.  But at this hearing, the way that Mr. Smith talked about

J. Browne - Cross (By Mr. Grindrod)

1    predatory government, whatever words we listened to earlier,

2    was that consistent with what you had heard earlier about

3    Daryl Bank and the government's investigation?

4    A.   Through Bill Smith, yes.

5    Q.   At this hearing we heard a reference to the fact that

6    Mr. Smith had been sued.  Do you remember that?

7    A.   Vaguely.

8    Q.   Do you remember him talking about the lawyers coming

9    after him, specifically Ray Martin and Carol Groff's lawyer?

10   A.   Yes.

11   Q.   And Mr. Smith was being blamed at that point, right?

12   A.   I couldn't tell you.

13   Q.   Okay.  Do you remember on those tapes when he talked

14   about these innocent clients being damaged?  It was on

15   clip 12.  I don't know if that helps.

16   A.   I don't really remember it.  But, yeah, I'm sure I was

17   there and heard it.

18   Q.   Mr. Smith's demeanor when he was talking at that hearing,

19   did you observe him to be emotional?

20   A.   On the first hearing, yes.  On the second hearing, he was

21   not very cooperative at all.

22   Q.   Well, what about the one when he said he was going to try

23   to keep his voice down.  I mean, was that a reference to

24   him -- did you observe him to seem upset at that point?

25   A.   He seemed upset, yeah.

J. Browne - Cross (By Mr. Grindrod)

1    Q.  At the hearing there was some mention of dates.  I don't
2    know if you remember Ms. Yusi talking to you about dates when
3    certain investments failed.  Do you remember that?
4    A.  I can't give you accurate readings, no.
5    Q.  Sure.  Well, I guess just generally, then, dates in 2019,
6    anything that had happened in 2013, or '14, or '15 was years
7    before, right?
8    A.  That's right.
9    Q.  And I think you said earlier that to prepare for your
10   testimony today, you brought a little cheat sheet with some
11   dates or at least you tried to?
12   A.  Well, I thought I did.  I think it's in my jacket pocket.
13   Q.  And that's just because when stuff happens a long time
14   ago, obviously dates can be hard to remember?
15   A.  Well, we're talking six years.
16   Q.  Sure.  So Mr. Smith, when he was speaking at this
17   hearing, he was speaking extemporaneously.  He wasn't reading
18   from notes?
19   A.  Right.
20   Q.  And so dates about -- if he said Dental Support failed in
21   August of 2013, would you be surprised if, in fact, it failed
22   in August of 2014?
23              MS. YUSI:  Objection.  Speculation.
24              THE COURT:  Sustained.
25              When the Court sustains something, that means you do

──────── J. Browne - Cross (By Mr. Grindrod)────────

1    not respond to that.

2           Continue.

3    BY MR. GRINDROD:

4    Q.  So -- well, with respect to spectrum investments --

5           THE COURT:  Wait a minute, now.  Let's get something

6    straight.  Do not ask another question that calls for the

7    witness to speculate about a date.  The Court just sustained

8    with respect to him speculating about a date.  So let's go

9    somewhere else.

10          MR. GRINDROD:  Okay.  Just so -- Your Honor can stop

11   me if I'm not doing what the Court wants.

12          THE COURT:  I think what the Court said is clear.

13   BY MR. GRINDROD:

14   Q.  So you don't know the dates that certain spectrum

15   investments failed, right?

16   A.  Right.  I don't know.

17   Q.  So let's switch gears and talk a little bit about your

18   background.  You said you worked as a broadcast engineer and

19   built radio stations?

20   A.  That's right.

21   Q.  Can you tell us a little bit about what that means?

22   A.  Well, from microphone to tower, everything -- and

23   everything in between.  Planning and constructing something

24   and then turning it on and making it work and then

25   maintaining it too.

J. Browne - Cross (By Mr. Grindrod)

1   Q.  And you spoke a little bit about towers and your work

2   involving renting tower space to cell companies?

3   A.  That's right.  The cell companies came a little later,

4   and they were looking for tower space.  They called it

5   vertical real estate, and it was a prime thing for them.

6   Q.  What were your dealings there?

7   A.  I'd help negotiate leases with them.

8   Q.  And then you mentioned on direct examination that you had

9   some info -- information about spectrum that didn't come from

10  Mr. Smith.  Can you tell us a little bit about that?

11  A.  Well, in my business, I essentially rub shoulders with a

12  lot of radio, RF, radio frequency-related engineers, and on

13  more than one occasion, I've talked to people about their use

14  of spectrum, getting spectrum, and then renting it out and

15  ultimately selling it.  And these -- one particular friend of

16  mine, it was quite lucrative for him.

17  Q.  And so when this spectrum opportunity came around with

18  Mr. Smith, did it seem like a reasonable thing for you?

19  A.  It sure did.

20  Q.  So you originally came to Mr. Smith because you wanted to

21  pursue alternatives to the stock market, right?

22  A.  That's correct.

23  Q.  And you understood that alternative investments, like

24  Xcel Bandwidth, for example, involved substantial risks,

25  right?

J. Browne - Cross (By Mr. Grindrod)

1   A.   I didn't feel that they were that risky because of what I
2   had been hearing from other people in the business.
3   Q.   But you knew there was a normal amount of investment risk
4   like any other investment, right?
5   A.   Probably, yeah.
6   Q.   Obviously you weren't knowingly taking on the risk that
7   somebody was going to steal your money?
8   A.   That's right.
9   Q.   But normal investment risk?
10  A.   Right.
11  Q.   And so Western Spectrum, that was one of the first --
12  that was the first alternative investment that you did,
13  right?
14  A.   Right.
15  Q.   Okay.  And you had your own LLC, Browne Spectrum
16  Ventures?
17  A.   Yes.
18  Q.   That LLC was set up through Shelton & Power, right?
19  A.   Right.
20  Q.   And Lynne Shelton was the principal at that firm that you
21  dealt with?
22  A.   Yes.
23  Q.   It was your understanding that she was going to be
24  administering the IRA part of your investment, right?
25            MS. YUSI:  Objection, Your Honor.  Foundation.

J. Browne - Cross (By Mr. Grindrod)

1    THE COURT:  Sustained.

2    BY MR. GRINDROD:

3    Q.  Was that your understanding?

4         THE COURT:  No.  I just sustained the objection.

5    You can't ask him to answer the question.

6    BY MR. GRINDROD:

7    Q.  Did you have an understanding as to who was going to be

8    administering the IRA part of your investment?

9    A.  It would be IRA Services.

10   Q.  Did you -- when you were writing a check for this Western

11   Spectrum investment, who did you make that check out to?

12   A.  Shelton & Power.

13   Q.  And that was Lynne Shelton's firm?

14   A.  Yes.

15   Q.  And that check was deposited into the law firm's trust

16   account, right?

17   A.  I --

18        MS. YUSI:  Objection, Your Honor.  Foundation.

19        THE COURT:  Sustained.

20   BY MR. GRINDROD:

21   Q.  Let's pull up Government's Exhibit 902, which I think has

22   been admitted.

23        MR. GRINDROD:  This has been admitted, right?

24        MS. YUSI:  Yes.

25   BY MR. GRINDROD:

———— J. Browne - Cross (By Mr. Grindrod) ————

1   Q.  Mr. Browne, I'm going to ask you to read sideways.  I

2   apologize.  But does that say deposit only, Shelton & Power

3   LLC trust account?

4   A.  Yes, it does.

5   Q.  And that's the endorsement?

6   A.  Yes.

7   Q.  And this is the check you wrote?

8   A.  Yes.

9   Q.  And from early on, Attorney Shelton told you to call her

10  if you had any questions about your dealings with the firm,

11  right?

12  A.  Yes.  And I have that in writing, too.

13  Q.  Okay.  And we looked at paperwork regarding spectrum that

14  had Aghee's Smith name on it as managing and so forth.  But

15  your understanding was that Western Spectrum was actually

16  controlled by Daryl Bank?

17          MS. YUSI:  Objection.  Misstates evidence and lack

18  of foundation.

19          THE COURT:  Sustained.

20  BY MR. GRINDROD:

21  Q.  Is it your understanding that Daryl Bank -- sorry, that

22  Western Spectrum LLC was controlled by Daryl Bank?

23  A.  No.  I did not know that.

24  Q.  Did you prepare a summary of investments made by Jeff

25  Browne and submit it to the United States Attorney's office?

————— J. Browne - Cross (By Mr. Grindrod) —————

1  A.  Yes.

2  Q.  Okay.  I'm going to show you a copy of a document, if I

3  could.

4          MR. GRINDROD:  Just for the witness.

5  BY MR. GRINDROD:

6  Q.  Is this that document, the first page of it?

7  A.  Yes.

8  Q.  And you wrote this document, right?

9  A.  Yes.

10  Q.  Okay.  I'm going to direct your attention to the

11  highlighted portion here.

12          MS. YUSI:  Your Honor, I'm going to object and ask

13  for a quick sidebar.

14          THE COURT:  Well, I think Mr. Grindrod asked the

15  witness a direct question, and this document --

16          MS. YUSI:  He did, Your Honor; however, there's not

17  a good-faith basis as to the reality of the control of

18  Western Spectrum.

19          THE COURT:  The Court, at the time being, is going

20  to -- if the question is specific as to the question he asked

21  and whether he knew whether Daryl Bank controlled spectrum

22  investments, then the Court will permit him to just go

23  forward with this document to refresh his recollection.

24          Have him read it and see if it refreshes his

25  recollection, and then let's move on.

——————J. Browne - Cross (By Mr. Grindrod)——————

```
 1          Read the highlighted part.  Read the highlighted
 2   portion on that document he gave you.
 3          THE WITNESS:  Okay.
 4          THE COURT:  Now, the question is does it refresh
 5   your recollection regarding the question he asked you.
 6          THE WITNESS:  Can he ask one more time?
 7   BY MR. GRINDROD:
 8   Q.  Was it your understanding that Western Spectrum LLC was
 9   controlled by Daryl Bank?
10   A.  Not at first, it was not.  But I learned later that he
11   had a handle -- hand in that.
12          THE COURT:  That he had a hand in it.
13          THE WITNESS:  Sorry?
14          THE COURT:  That he had a hand in it?
15          THE WITNESS:  Yeah.  That he --
16          THE COURT:  Okay.  You can mark it for
17   identification only.
18          THE CLERK:  1000.
19          THE COURT:  1000 for identification.
20          (Defendant Smith's Exhibit 1000 was marked for
21   identification only.)
22   BY MR. GRINDROD:
23   Q.  Was it your understanding that Western Spectrum had to do
24   with RapidLink?
25   A.  Not originally, no.
```

———————J. Browne - Cross (By Mr. Grindrod)———————

 1              MR. GRINDROD:  Okay.  Let's take a look at
 2   Smith 563, just for the witness.
 3   BY MR. GRINDROD:
 4   Q.  Do you see a document on the screen in front of you, sir?
 5   A.  Yes.
 6   Q.  Do you recognize it?  I can zoom out or in if it's easier
 7   for you.
 8   A.  I believe -- yeah, I think I've seen this before.
 9   Q.  Is this an accurate copy of the letter from Lynne Shelton
10   to you?
11   A.  Right.
12              MR. GRINDROD:  Your Honor, I offer Smith 563.
13              THE COURT:  For what purpose?
14              MR. GRINDROD:  As --
15              THE COURT:  The Court assumed that when you pulled
16   Smith 563 up, it was to refresh his recollection.
17              MR. GRINDROD:  No, Your Honor, I'm offering this as
18   evidence.
19              THE COURT:  Of what?
20              MR. GRINDROD:  Of the relationship between Western
21   Spectrum Ventures and RapidLink Wireless.
22              THE COURT:  Any objection to the exhibit?
23              MS. YUSI:  No, Your Honor.
24              THE COURT:  Okay.  Then Exhibit Smith 563 will be
25   admitted.

J. Browne - Cross (By Mr. Grindrod)

1          (Defendant Smith's Exhibit 563 was admitted.)

2    BY MR. GRINDROD:

3    Q.  And so this letter tells you that RapidLink expects to be

4    funding in the near future, right?

5    A.  That's correct.

6    Q.  And it's in reference to your investment in Western

7    Spectrum Ventures?

8          MS. YUSI:  I'm going to object, Your Honor.  This

9    misstates -- he invested in Western Spectrum Ventures 2,

10   which is a separate LLC.

11         THE COURT:  Mr. Grindrod, if it's the same Western

12   Spectrum.

13         MR. GRINDROD:  Your Honor, other than -- I don't

14   know whether there's a typo or what the issue is, but I think

15   the evidence was pretty clear on direct that he invested in

16   Western Spectrum 2.

17         THE COURT:  Was the first one Western Spectrum LLC 2

18   as opposed to Western Spectrum LLC?  So if there are two

19   different entities, Mr. --

20   BY MR. GRINDROD:

21   Q.  Did you --

22         THE COURT:  Mr. Grindrod, let me finish.

23         MR. GRINDROD:  Yes, sir.

24         THE COURT:  If there are two different entities,

25   then the Court will sustain the objection, if there's

──────── J. Browne - Cross (By Mr. Grindrod) ────────

1    testimony about a different Western Spectrum entity.

2           MR. GRINDROD:  Yes, Your Honor.  I'll follow up

3    on --

4    BY MR. GRINDROD:

5    Q.  Did you have any investment in Western Spectrum LLC

6    without the 2?

7    A.  No.

8    Q.  Okay.  So when you got correspondence from Lynne Shelton

9    about Western Spectrum, did you understand that to be about

10   the investment you had already made in Western Spectrum 2?

11   A.  I assumed that's what it was from, right.

12   Q.  And obviously this document doesn't have the 2, right?

13   A.  That's correct.

14   Q.  But did you understand this to be talking about your

15   investment?

16   A.  That's what I assumed when I read it, yes.

17   Q.  And this says that RapidLink expects to be funding in the

18   near future.

19   A.  That's right.

20   Q.  And so your understanding was the investment you had with

21   Western Spectrum was related to RapidLink, right?

22   A.  Once I saw that, yeah.

23          MR. GRINDROD:  We can take that down, Ms. McCaslin.

24   BY MR. GRINDROD:

25   Q.  So Xcel Bandwidth was the second kind of investment that

J. Browne - Cross (By Mr. Grindrod)

1   you made through Mr. Smith with respect to spectrum?

2   A.   That's right.

3   Q.   And before you invested in Xcel, do you remember

4   receiving information about it?

5   A.   I probably did.

6        MR. GRINDROD:   Let's take a look at Smith 243, just

7   for the witness, please.

8   BY MR. GRINDROD:

9   Q.   Sir, I'm putting a document on the screen in front of

10   you.   It's two pages, so I'm going to scroll through so you

11   can see the whole thing.

12        Do you recognize this?

13   A.   Yes, I do.

14        MR. GRINDROD:   I'd offer Smith 243, Your Honor.

15        THE COURT:   Any objection?

16        MS. YUSI:   No objection, Your Honor.

17        THE COURT:   Smith 243 is admitted.

18        (Defendant Smith's Exhibit 243 was admitted.)

19   BY MR. GRINDROD:

20   Q.   So this is one of the documents that you received about

21   Xcel?

22   A.   Yes.

23   Q.   And it gave some basic information about the company,

24   right?

25   A.   Yes.

J. Browne - Cross (By Mr. Grindrod)

1    Q.  Up here it talks about Xcel being involved in a

2    nationwide operational push-to-talk network sector, right?

3    A.  Yes.

4    Q.  And then on Page 2, it talks about different companies

5    that are involved in the operation, right?

6    A.  Yes.

7    Q.  And there's obviously the Xcel entities, but also

8    RapidLink Wireless, right?

9    A.  Yes.

10   Q.  And then down here is where you say that you signed

11   saying that you have read and understand it, right?

12   A.  Yes.

13   Q.  And then there were some more documents that I think you

14   looked at actually on direct examination.  So let's look at

15   Government's Exhibit 840.

16          MR. GRINDROD:  And this can go to everyone because

17   it's already been admitted.

18   BY MR. GRINDROD:

19   Q.  So these were at least one of the documents that governed

20   your investment, right?

21   A.  Yes.

22   Q.  And this was an investment in Xcel, right?

23   A.  Right.

24   Q.  And so this is the last page, the signature page?

25   A.  It appears to be, yes.

───────── J. Browne - Cross (By Mr. Grindrod) ─────────

1   Q.  Okay.  And this is where you signed as the buyer, right?

2   A.  Right.

3   Q.  And who signs as the seller?

4   A.  Daryl Bank.

5   Q.  So you knew obviously when you signed this that Daryl

6   Bank was the person who was involved in Xcel, right?

7   A.  That's right.

8            MR. GRINDROD:  And let's take a look, finally, at

9   Smith 252, just for the witness, please.

10  BY MR. GRINDROD:

11  Q.  Do you recognize this document, sir?  That's zoomed in,

12  and then after you've had a chance to look at what I zoomed

13  in on, just let me know, and I can zoom back out so you can

14  see the whole document.

15  A.  Yes.  That -- that check is from the Browne trust.

16  Q.  Okay.

17           MR. GRINDROD:  I offer Smith 252.

18           THE COURT:  Any objection?

19           MS. YUSI:  No, Your Honor.

20           THE COURT:  Smith 252 will be admitted.

21           (Defendant Smith's Exhibit 252 was admitted.)

22  BY MR. GRINDROD:

23  Q.  So these were checks that you wrote for your investment

24  in Xcel, right?

25  A.  Through the trust, yes.

J. Browne - Redirect

1   Q.  Okay.  And those checks were cashed by Daryl Bank and
2   Xcel, right?
3           MS. YUSI:  Objection, Your Honor.  I don't know
4   where he's getting that.
5           THE COURT:  You don't know what?
6           MS. YUSI:  Objection.  This misstates what we're
7   looking at.
8           THE COURT:  Objection sustained.
9   BY MR. GRINDROD:
10  Q.  Were those checks cashed by Xcel?  Do you know?
11  A.  Yes.
12          MR. GRINDROD:  No further questions, Your Honor.
13          THE COURT:  Any redirect?
14          MS. YUSI:  Briefly, Your Honor.
15                      REDIRECT EXAMINATION
16  BY MS. YUSI:
17  Q.  If we can go to Exhibit 840, Page 7.  And you can look on
18  your screen there, sir, if you want.  You were just looking
19  at this.
20          Now, had you heard Daryl Bank's name prior to
21  signing documents for the Xcel investment?
22  A.  You know, I don't remember.  I know his name came up in
23  due time.  I learned a lot more about him on the internet as
24  things came up.
25  Q.  Later on?

J. Browne - Redirect

1   A.   Yes.

2   Q.   If we can go to Exhibit 901, which is also in, and in the

3   public information report for Western Spectrum Ventures 2,

4   did you see Mr. Bank's name in any of those?

5   A.   No.

6   Q.   And for RapidLink, you were just looking at that write-up

7   that involved RapidLink.  What, if anything, did Mr. Smith

8   tell you about RapidLink being a brand-new company?

9   A.   I don't remember much about it being a brand-new company.

10  I remember him talking a little bit about what it does.

11  Q.   Okay.  Did he talk about whether or not they even had any

12  assets?

13  A.   It was my understanding that they had purchased another

14  company in Texas that was going strong and that this was a

15  good investment to get into because they were going to expand

16  it.

17  Q.   And you had said you were supposed to get money right

18  away?

19  A.   Yes.

20  Q.   Did that happen?

21  A.   I believe it did happen fairly quickly.  I don't --

22  Q.   The dividends that you got?

23  A.   Yes.

24  Q.   And then after those small dividends, anything else?

25  A.   Nothing.

C. Bazelon - Direct

1  Q.  What, if anything, did Mr. Smith tell you that RapidLink
2  was formed after the SEC filed a securities fraud complaint
3  against Daryl Bank?  Did he tell you that an SEC filing had
4  been made against Daryl Bank prior to RapidLink being formed?
5  A.  No.
6          MS. YUSI:  Those are all my questions.
7          THE COURT:  May this witness be permanently excused?
8          MS. YUSI:  Yes, sir.
9          MR. GRINDROD:  Yes, Your Honor.
10          MR. YAROW:  Yes, Your Honor.
11          THE COURT:  Mr. Browne, you may be excused.  Step
12  down.
13          (The witness was excused.)
14          MR. BOSSE:  The government calls Coleman Bazelon.
15          (Witness affirmed.)
16          COLEMAN BAZELON, called by the Government, having
17  first affirmed, was examined and testified as follows:
18                      DIRECT EXAMINATION
19  BY MR. BOSSE:
20  Q.  Good morning, sir.
21  A.  Good morning.
22  Q.  Or good afternoon.  Would you please introduce yourself
23  to the Court and spell your first and last names for our
24  record.
25  A.  I'm Coleman Bazelon.  C-o-l-e-m-a-n B-a-z-e-l-o-n.

C. Bazelon - Direct

 1    Q.  Would you tell us about your educational background,
 2    please.
 3    A.  I have a Ph.D. and a master's from the Agricultural and
 4    Resource Economics at the University of California at
 5    Berkeley.  I have a diploma in economics from the London
 6    School of Economics and a BA from Wesleyan University in
 7    Connecticut.
 8    Q.  Where do you currently work, sir?
 9    A.  I'm a principal at The Brattle Group, an economic
10    consulting firm.
11    Q.  Before you were with The Brattle Group, the economic
12    consultancy firm, where did you work?
13    A.  Prior to that, I was with Analysis Group, a different
14    economic consulting firm, and I started my career for six
15    years at the Congressional Budget Office working for
16    Congress.
17    Q.  How long have you been involved in the study of the
18    spectrum market and spectrum value?
19    A.  Since my first day at the Congressional Budget Office in
20    1995.
21    Q.  Have you published articles on the economics of spectrum
22    and spectrum valuation in scholarly journals?
23    A.  I have.  I've published several, including one called
24    "Spectrum Value" that is the single article that explains
25    spectrum value.

C. Bazelon - Direct

1   Q.  Have you been asked to testify before Congress about
2   matters involving spectrum?
3   A.  Yes, several times.
4   Q.  Have you been involved in FCC -- and by that I mean
5   Federal Communications Commission -- filings related to
6   spectrum?
7   A.  Yes.  Many dozens.
8   Q.  Have you worked with people who are making applications
9   or preparing for auctions for spectrum?
10  A.  Yes.  I regularly advise companies that are going to bid
11  in spectrum auctions and help them with the process of
12  preparing for the auction through value in spectrum,
13  preparing their war room to bid, and then helping them with
14  the bidding during the auction.  And my clients have
15  purchased in excess of $5 billion worth of radio spectrum
16  licenses.
17  Q.  Have you been designated, sir, an expert in the subject
18  area of spectrum and spectrum valuation before in courts?
19  A.  Yes, I have.
20  Q.  Including in this Court?
21  A.  Yes.
22  Q.  About how many times?
23  A.  I've been designated an expert probably a dozen times;
24  maybe half of them have been in spectrum-related proceedings.
25  Q.  Have you served on advisory panels for the FCC?

C. Bazelon - Direct

1   A.   I have.

2        MR. BOSSE:   Your Honor, the government tenders

3   Dr. Bazelon as an expert in the field of spectrum and

4   wireless telecommunications economics.

5        MS. McCASLIN:   No objection, Your Honor.

6        MR. YAROW:   No objection from Mr. Alcorn.

7        THE COURT:   Ladies and gentlemen, you may accept

8   this witness, Mr. Bazelon, as an expert in the valuation of

9   wireless telecom communications.

10       MR. BOSSE:   Yes, sir.

11  BY MR. BOSSE:

12  Q.   Dr. Bazelon, let's start with the very basics for the

13  jury.  At a high level, what is spectrum?

14  A.   Spectrum refers to the electromagnetic spectrum.  And to

15  understand it, there is an electromagnetic field that is

16  throughout the universe, and much like when you drop a rock

17  on a pond and make a wave, you can make waves in this

18  electromagnetic field that is throughout the universe, and

19  the electromagnetic spectrum is what we refer to as the

20  different waves -- small, short waves, long waves, and so

21  forth -- the set of waves that you can make in the

22  electromagnetic field.

23  Q.   What part of the spectrum is involved in things like the

24  radio, phone communications, Wi-Fi, things like that?

25  A.   So a subset of the electromagnet spectrum is referred to

C. Bazelon - Direct

1   as the radio spectrum, and it's just a set of frequencies, a
2   certain length of those waves that make up a subset of this,
3   and that's what's used for wireless communications.
4   Q.  And tell the jury, what is frequency?  When we use that
5   phrase, what does that mean?
6   A.  The way we distinguish different waves in radio spectrum
7   is by their frequency.  The frequency refers to how many
8   times the peak of the wave passes a fixed point in one
9   second.
10          So to give an example, when I was driving over this
11  morning, I tuned my radio and found a station at 96.1 on the
12  FM radio dial.  That refers to 96.1 megahertz or 96.1 million
13  hertz.  Hertz is the measure of the peak of the wave.  So
14  when you tune to that FM radio station, you are tuning to a
15  station that is broadcasting at 96,100,000 peaks per second
16  past a fixed point.
17  Q.  Sir, did you prepare a series of slides to help you talk
18  about spectrum issues today with the jury?
19  A.  I did.
20          MR. BOSSE:  Your Honor, these have been provided to
21  the defense and marked as Government's Exhibit 336.  And just
22  for the Court, as we move through the testimony, I would like
23  to show these as demonstrative exhibits.  I don't intend to
24  offer them.
25          THE COURT:  All right.  You may do so.

Carol L. Naughton, Official Court Reporter

C. Bazelon - Direct

1        MR. BOSSE:  Could we please see Government's 336 at

2    Page 2.

3    BY MR. BOSSE:

4    Q.  Okay.  Can you tell the jury what it is we're seeing

5    here?

6    A.  So this is a map that represents the entire

7    electromagnetic spectrum.  As I mentioned, it goes well

8    beyond just the radio spectrum.  The orange highlighted part

9    is the subset of that.  That is the radio spectrum from about

10   300 hertz to 300 gigahertz, or 300 to 300 billion hertz.

11   That's the area that we're going to be focused on here.

12   Q.  So the parts we don't use include things like x-rays,

13   gamma rays, cosmic rays, things at the high end of the

14   spectrum?

15   A.  That's correct.  And even visible light.

16   Q.  You've mentioned megahertz.  Can you tell the jury, what

17   is a kilohertz as opposed to a megahertz?

18   A.  A kilohertz is 1,000 hertz.  A megahertz is a million

19   hertz.  Gigahertz is a billion hertz.  So these are different

20   frequency measures.  Kilohertz are the lower end of the

21   range.

22   Q.  All right.  And let's look at the next page, please,

23   figure 2.  Now, this is too small for the jury to see every

24   part of this, so can you explain generally what we're seeing

25   here on this figure?

C. Bazelon - Direct

```
1    A.  So for that subset in orange that we saw in the previous
2    slide, that is, the radio spectrum, this is the United States
3    frequency allocations.  So what the government does through
4    the FCC, the Federal Communications Commission, and another
5    agency called NTIA, or the National Telecommunications and
6    Information Agency, they organize the spectrum so that the
7    users don't interfere with each other.
8           And the first step of that is allocating pieces of
9    the radio spectrum to different types of uses, and this map,
10   very colorful, well-known map, lays out the different types
11   of uses that are authorized at different areas on the
12   spectrum.
13   Q.  And so would I be right in saying that there's a part of
14   what is shown on this map that is used by things like cell
15   phones and walkie-talkies, things like that?
16   A.  That's correct.  Actually, all of these would be
17   represented -- just to give an example, the blue, which we
18   see a fair bit of, is what's designated as broadcasting,
19   different broadcasting uses.  So on that second line, the big
20   blue bar there represents the frequencies that are set aside
21   for AM radio.
22          If you look two lines below, you will see some more
23   blue blocks that are additional broadcasting.  That will
24   include FM radio and some of the television channels, over
25   the television channels.  And on the fifth line down, you
```

————C. Bazelon - Direct————

1    will see a couple of blue blocks.  Those are the remaining

2    television channels.

3    Q.  All right.  And so, in other words, the FCC tells the

4    different sectors in our industry what they can and can't

5    use.  Is that fair?

6    A.  Yes.  A band dedicated to broadcasting, say, the FM radio

7    band, cannot be used by cell phone companies to transmit data

8    to your cell phone.  It's restricted to the allocated use; in

9    that case -- or in that example, FM broadcasting.

10              MR. BOSSE:  We can take that down momentarily.

11   BY MR. BOSSE:

12   Q.  Can you tell the jury about the concept of bandwidth?

13   What does bandwidth mean?

14   A.  Bandwidth is the -- what we refer to as the amount of

15   spectrum that is available for a given use.  It's a little

16   confusing in that on that map of the spectrum, we refer to a

17   location on the map by its frequency.  So you will hear this

18   matter about the 800-megahertz band.  That's referring to

19   where on that map it is around 800 megahertz.

20              But you will also hear megahertz used to refer to a

21   distance between two points on that map.  So the expansion

22   and guard band licenses we're going to talk about are a total

23   of 4 megahertz of spectrum, meaning the distance on that map

24   is 4 megahertz wide.

25   Q.  All right.  And are we going to talk about the bandwidth

C. Bazelon - Direct

1    of different channels within that group as we go on?
2    A.  Yes.  The FCC, after it allocates a band of frequency to
3    a use, it will then create a licensing scheme which will then
4    further allocate it to channels, and then those licenses will
5    then be allocated or given out or sold to individuals or
6    companies.
7    Q.  All right.  Can you tell the jury, how do radio towers,
8    TV towers, cell phone towers -- how do they broadcast over a
9    given channel of spectrum?
10   A.  Well, at the top of the tower will be a radio
11   transmitter, and it will broadcast out at the assigned
12   frequencies or the frequency of frequencies that they are
13   allowed to use, a wave through the electromagnetic spectrum,
14   and through techniques that some consider close to magic,
15   they are able to transmit information on those waves.
16           And that's what is received, whether it's your
17   television receiver receiving the television signal over the
18   air or your cell phone receiving a voice call or data -- data
19   to your cell phone, that's transmitted over those frequencies
20   from that transmitter.
21   Q.  And so thinking about the -- imagining a tower up there
22   with a transmitter on it, are there limits on how much power
23   can be used on, say, a cell phone tower?
24   A.  Yes.  The FCC, when it issues its licenses and allows
25   users to use specific pieces of spectrum, always has limits

C. Bazelon - Direct

1    on what you can do with it.  Limits could include power

2    limits.  For a broadcast transmitter like a television or a

3    radio station, it will also specify where that antenna is,

4    the height of that antenna, sometimes even the angle that the

5    radio is set at to broadcast, as well as the power level.

6    Q.  And so what are the practical effects of a power level

7    limitation as far as how far a signal can go?

8    A.  So the more power a signal has, the further it can go.

9    There's other characteristics of the spectrum that will

10   define the sort of footprint or area that a tower can reach.

11   Lower frequencies tend to go further for the same amount of

12   power, and that can be useful in some applications.  But the

13   power limits will, in essence, define the footprint of the

14   signal from the tower.

15   Q.  Tell the jury, what is a cellular network?

16   A.  So it contrasts with a broadcast-type network.  So for

17   television or radio signal, there's one big tower that

18   broadcasts over, say, all of Norfolk.

19         The invention of cellular recognized that instead of

20   using one tower to cover a large area, you could use a series

21   of smaller towers.  These are the towers you see on the road

22   side that aren't nearly as tall as a broadcast tower but have

23   radios on them.  And by using smaller towers that don't

24   broadcast as far, you can reuse the spectrum in each tower's

25   footprint, and that increases the total amount of capacity

C. Bazelon - Direct

1  that you can get out of the radio spectrum.

2  Q.  So how does a cellular network function?  Imagine you're

3  driving and talking on your phone, which maybe you shouldn't

4  do, but imagine that you are.

5  A.  Well, or your kids playing a game in the back seat.

6  Q.  That's better.

7  A.  What makes the system work is the fact that your phone is

8  talking to one tower using some of the bandwidth to that

9  tower, and as it drives along and out of the range of the

10  first tower and into the range of the second tower, your cell

11  phone will switch which tower it's communicating to, and to

12  seamlessly be able to do this is what enabled cellular

13  technology.

14          Back when it was mostly phone calls, voice calls

15  that were being done, you would drive around and switch from

16  tower to tower.  And back in the '80s, in the first

17  generation of technology, you might hear a little click as

18  it's switching, but starting 25, 30 years ago, the technology

19  improved, and you don't even notice when you're switching

20  from one radio to another, it's so seamless.

21  Q.  You mentioned that for broadcasters they will have one

22  giant tower that you might see, and the cell providers have a

23  bunch of towers.

24          Practically speaking, is building out a cell tower

25  network around a city -- is that an expensive process or an

C. Bazelon - Direct

1   inexpensive process?

2   A.  It's quite expensive.  The cell phone companies invest

3   tens -- collectively hundreds of billions of dollars into

4   building out the cell phone network with a number of these

5   small towers, each with a series of radios to use different

6   frequencies.  They each have backhaul connections back to

7   their central offices so that the information can go back.

8          There was a -- to give an order of magnitude, a rule

9   of thumb we used to use at the Congressional Budget Office,

10  and in my work afterwards, was that a cell phone company

11  would ultimately spend about -- as much as it spent on buying

12  the spectrum, would spend about that much on deploying the

13  spectrum.

14  Q.  Let's talk a little bit now about spectrum ownership.

15  Who owns the spectrum in the United States?

16  A.  Spectrum is legally owned by all of us.  It's owned by

17  the public, but it has various types of private-use rights.

18  Q.  And who determines the private-use rights and grants

19  licenses here in the United States?

20  A.  So the first division is between federal government and

21  private users.  Private and state and local go together.  The

22  federal government users are regulated by the NTIA, the

23  National Telecommunications and Information Agency, and the

24  private and state and local users are regulated by the

25  Federal Communications Commission.  So in that colorful

————C. Bazelon - Direct————

1  chart, there were some divisions between those two agencies.

2        Within the private sector side, the FCC manages the

3  spectrum.  They make a distinction between licensed and

4  unlicensed spectrum.  So unlicensed spectrum is spectrum that

5  anybody can use, have access to, but there's no guarantees of

6  freedom from interference or anything like that.  The most

7  common example of that that we're familiar with is your Wi-Fi

8  at home or on your phone, is using an unlicensed band that

9  everybody is allowed access to.

10        The FCC then allocates or decides on licensed

11  spectrum.  It then decides how to license it.  And then how

12  they go about it depends on what the use is and -- the nature

13  of the use and the demand for the use.

14  Q.  And so if you have a license, get a license from the FCC,

15  does that mean you have an exclusive right to use that

16  frequency, and other people can't interfere with it?

17  A.  For the licensed side of it, yes.  The advantage of a

18  license is that when you have access -- for example, the FM

19  station I was referring to earlier that broadcasts at 96.1

20  megahertz, nobody else in the Norfolk area is allowed to use

21  that frequency.  They have the exclusive use of that

22  frequency, so that when they broadcast, they don't have to

23  worry about you being able to receive their signal; there's

24  nobody else that's allowed to interfere with that signal.

25  Q.  Can the right to use spectrum at a certain frequency in a

────────────C. Bazelon - Direct────────────

1   certain area -- can that be a valuable right in some cases?
2   A.  It can be incredibly valuable.  In particular, the cell
3   phone networks, which these days are really wireless
4   broadband networks that are just transmitting incredible
5   amounts of data to your phone, the frequencies that enable
6   that service are quite valuable, and for the last 25 years,
7   the government has been auctioning those frequencies off when
8   they sell them.  When they license them to the cell phone
9   companies, they sell them to them instead of giving them
10  away, and government has raised a couple of hundred billion
11  dollars in those auctions.
12  Q.  What are the companies that are typically bidding on this
13  broadband type of spectrum?
14  A.  The ones you're familiar with, AT&T, Verizon, and
15  T-Mobile are the three biggest ones, national mobile network
16  carriers, but there's others, like you will see DISH is a new
17  entrant in this area, and there are others that will bid, but
18  the vast majority of the money spent in licenses are acquired
19  by those three companies.
20  Q.  And so if we look back -- and we don't need to do it, but
21  if we look back at the big map, are there certain parts of
22  that map that the Verizons and AT&Ts of the world are allowed
23  to use and then certain parts that they're not?
24  A.  Yes.  There are the bands that are designated for
25  commercial mobile services.  So the FCC says these are

C. Bazelon - Direct

 1   licenses that can be used to support this mobile broadband
 2   service.  And in those areas, they are all broadband
 3   licenses, meaning that instead of it being sliced up into
 4   small channels, there's a fair number of megahertz, whether
 5   10 or 20 or 50 megahertz, that's available in the license.
 6        And those are all allowed to be deployed in the
 7   cellular architecture that we talked about which allows for
 8   spectrum reuse and has all the capital investment.
 9   Q.  So if the FCC has designated part of the spectrum for
10   some other use, not for broadband, could a cell phone company
11   like AT&T swoop in and use it for its cellular network?
12   A.  It cannot.  This is the issue of spectrum reallocation.
13   So the spectrum is available for cell phone uses.  25 years
14   ago it was only 50 megahertz in total, and now it's probably
15   closer to 1,000 megahertz.  That's because over time the FCC
16   has chosen to reallocate or reband, change how spectrum is
17   used.
18        A number of the television channels -- you might
19   recall that the television dial used to go up to channel 69
20   and it doesn't anymore.  Some of those frequencies were
21   reallocated to spectrum.  More recently, some satellite bands
22   were reallocated for terrestrial use.  So the reallocations
23   happen all the time.
24   Q.  So talking about how people get these licenses, you
25   talked about the auction method that's used when there's sort

C. Bazelon - Direct

1    of high demand broadband, AT&T and Verizon bidding on those.

2    Is there another method used for low demand spectrum?

3    A.   Yes.   The FCC is required by a law that was passed 25

4    years ago that if there is going to be multiple applicants

5    for the same spectrum, they then need to auction it so that

6    the spectrum will go first to the entity that values it the

7    most, but also so that the government will receive some of

8    the value of that spectrum.   And those are -- the bands that

9    are auctioned are mostly the ones for the mobile phone

10   networks.

11          When there is not excess demand for a band of

12   spectrum, that is, when there is no anticipation that

13   there'll be competing applicants vying for the same

14   frequency, then the FCC typically hands those out on a

15   first-come, first-served basis.   In essence, you apply and

16   say I need a little bit of frequency here for this use, and

17   then they'll issue a license.

18   Q.   So if you as an economist are looking at how a license is

19   issued, an auction versus a first-come, first-served

20   application, what does that tell you about the relative value

21   of those licenses?

22   A.   That legally, if it's being -- if it's not being

23   auctioned, it must be the case that the FCC does not

24   anticipate a lot of demand for this.

25   Q.   All right.   Once you get a license, either by application

—————C. Bazelon - Direct—————

1   or by auction, is there anything you need to do to keep it,

2   or can you just sit on it?

3   A.  The FCC strongly discourages speculation and warehousing

4   of spectrum.  So they typically, for most licenses, have a

5   build-out requirement, in essence saying that we're going to

6   issue a license, but you have to show us that you are

7   actually using the license within some reasonable amount of

8   time.  That typically means putting up a radio and showing

9   that you are actually transmitting electromagnetic energy

10  over the frequencies that you're licensed to.

11  Q.  What are the main factors that affect the value of a

12  given spectrum license?

13  A.  Well, a number of things go into value.  I mentioned

14  earlier that the frequency it's on can have an effect.  Lower

15  bands that might go further, that can be more valuable in

16  some applications.  But the biggest drivers really are where

17  the frequency -- what geographic area the frequency covers.

18          Most licenses are not national in scope.  They are

19  usually -- the FCC divides the country up into a number of

20  geographic areas.  Sometimes it will divide it up into 50,

21  you know, something like a state; other times it will be a

22  couple hundred licenses that cover the U.S.

23          But the licenses that cover urban areas are a lot

24  more valuable than the licenses that cover rural areas, for a

25  number of reasons.  One is it can be more efficient or less

C. Bazelon - Direct

```
 1    costly to build your infrastructure when you are covering a
 2    lot of people.  You tend to get more use, and it can be a
 3    higher income customer that's in an urban area, and there's
 4    very clear patterns of value that even once you adjust for
 5    the number of people that are covered and even once you
 6    adjust for the number of megahertz covered by license, urban
 7    areas tend to be more valuable than rural areas.
 8    Q.  You've talked about broadband spectrum AT&T and Verizon
 9    use.  How does that compare to what's called narrowband
10    spectrum?
11    A.  So narrowband is where the channel is measured in
12    kilohertz and not -- and the license you get for a channel
13    will be for a channel or two.  So a narrow slice of spectrum
14    that is appropriate for communications between parties but
15    where there's not a lot of information, it's not typically
16    used for serving the public.  It's typically used for more
17    internal or private wireless-type applications.
18    Q.  Okay.  So here at the Port of Virginia, the people
19    talking on walkie-talkies, that sort of thing?
20    A.  Yes.  Coordinating with the truckers, perhaps at the
21    port, the crane operators, I'm sure, have a wireless
22    communication system, those sorts of things.  It's very
23    common around factories, construction sites, so forth.
24    Q.  How about the value of a narrowband license versus a
25    broadband license?  How do those differ?
```

C. Bazelon - Direct

1    A.  The narrowband ones tend to be much less valuable because
2    the uses they are put to are not as valuable as can be
3    created from the broadband networks.  So it is a worthwhile
4    thing to be able to communicate to a network of taxi drivers,
5    for example.  You need to coordinate there.  But there's a
6    lot of different frequencies that can be used for it.  And
7    today, you can even use your cell phone.  An app on your cell
8    phone could allow you to communicate in a way that 20 years
9    ago you might have needed your own radio system to manage.
10   Q.  All right.  When spectrum is available on what we call
11   the first-come, first-served, a low-demand application
12   process, who can apply to get a spectrum license that they
13   just apply for?
14   A.  Any U.S. person or firm.
15   Q.  Can you give a brief overview of the application process,
16   not the auction, but the application?
17   A.  So for -- I'll speak to private wireless spectrum uses
18   because that's the type of use that the expansion and guard
19   bands were designed for.
20          So these are frequencies that are set aside for
21   these internal business type of communications, like at the
22   port or around a factory.  And if you have a need for a
23   system like that, you would go to a frequency coordinator,
24   which is a private entity that works with the FCC to sort of
25   fill out the licensing and do -- make sure the license will

C. Bazelon - Direct

1    work.

2           What the frequency coordinator is doing is saying

3    for where you need it geographically and the frequencies over

4    that geographic area that you're looking at, what's

5    available, what's not being used by somebody else.

6           And I like to think of it as it's sort of a

7    three-dimensional jigsaw puzzle where they're trying to

8    figure out this channel in this neighborhood might be

9    available, and the frequency coordinator checks to make sure

10   that that is available to you and then will fill out the

11   application and take it to the FCC.

12          The FCC is relying on the frequency coordinator to

13   make sure that when they issue that license, it won't

14   interfere with anybody else's already-issued licenses.

15   Q.  How does the FCC make people aware when there's new

16   spectrum that can be gotten through this application process?

17   A.  The entire FCC regulatory structure is very open.  Their

18   proceedings are open.  They have these very strong sunshine

19   laws too.  It's very strange.

20          The FCC commissioners are not allowed to meet

21   outside of a public meeting, and that leads to these very

22   funny stories that they will tell you about when the three of

23   them want to talk, two of them will be in the room and one in

24   the hall and then one will leave and the other will come in,

25   because they have these very strict public sunshine laws that

————————C. Bazelon - Direct————————

1    they live under.

2           So they put out notices about reallocations.

3    They'll tell you we're planning on doing a reallocation, and

4    they'll invite public comment.  They review the public

5    comment, and they put out an order saying there's a

6    reallocation.

7           And then after that, when it comes back to licensing

8    the spectrum from the rebanded portion of the radio spectrum,

9    they will put out a public notice saying we now have these

10   licenses in these areas available, here's a window to figure

11   out, you know -- to coordinate your application, and here's a

12   window for actually doing the application.

13   Q.  So the people who are in the business, the telecom or

14   spectrum business, the fact of what's available and what

15   channels are available, is any of that hidden from them or

16   kept secret from them?

17   A.  Not at all.  The FCC is in the business of making

18   spectrum useful to the public.  And so they very much want

19   people to know about what's available, when it's available,

20   and how to use it.

21   Q.  Let's talk about the types of spectrum at issue in this

22   case.  What band of spectrum is at issue here?

23   A.  It's what's referred to as the expansion and guard band

24   in the 800-megahertz band.

25   Q.  And before the rebanding that we're going to talk about,

C. Bazelon - Direct

1   what were these parts of the 800-megahertz spectrum used for?

2   A.  So they were used for narrowband communications, some of

3   the them for private entities, like most typically taxi

4   dispatch-type services, and then also public safety uses, so

5   your police and fire departments also.  When an officer in

6   the police car communicates, they are communicating to a

7   tower that covers an area on a set of narrowband channels.

8           MR. BOSSE:  Can we see 336, Page 4, please.

9   BY MR. BOSSE:

10  Q.  So you will see figure 3 here is called "800-megahertz

11  Spectrum Allocation Pre-rebanding."  So tell the jury what

12  it's seeing here, starting with what we're seeing right here.

13  A.  So that top line is just a small piece of that big

14  colorful chart we saw earlier that talks about the

15  allocations.  These are the types of uses that are used.

16  Here, in this subset, we're looking at what was going on in

17  these frequencies before the rebanding.

18          One thing to note, because it might lead to some

19  confusion, is that these frequencies are paired.  So the

20  narrowband and the broadband, they are paired so there's a

21  dedicated frequency that is for the uplink, from your phone

22  to the tower, and a different frequency that is dedicated for

23  the downlink, from the tower to your phone.

24          So, for example, you'll see in this area, it goes

25  from 806 to 824, but then it also goes from 851 to 869.

Carol L. Naughton, Official Court Reporter

C. Bazelon - Direct

1   That's just referring to the fact that the top line, I think,

2   is the uplink frequencies, and the bottom line is referring

3   to the downlink portion of this band.

4   Q.   So this is how -- focusing in here on the blown-up

5   portion, this is how this band used to look, not anymore.

6   A.   Correct.  So the relevant parts are the interleaved and

7   the ESMR portions.

8   Q.   Let's start with interleaved.  What are each of these

9   little lines here in the interleaved spectrum portion?

10  A.   So each of those are one channel that -- and that's the

11  one allowed to broadcast on.  But what was weird about this,

12  or what ended up causing a problem, was that the way the FCC

13  assigned it was that there would be one channel that would be

14  available for public safety uses -- police, fire, something

15  like that -- and then the next channel up, the channel right

16  next to it would be available for private use, maybe a pizza

17  dispatch company, and then the next channel over would then

18  be available for the public safety uses again, and back and

19  forth and back and forth, so that every other channel is

20  available for public safety, and then the intervening

21  channels were available for private uses.

22  Q.   What, if any, problems did that cause?

23  A.   Well, this worked okay when it was first allocated this

24  way back in the analog world, because the way the private

25  companies were using it was very similar to the way the

C. Bazelon - Direct

1   public safety entities were using it in that they typically

2   broadcast from a tower over a large area on a narrowband.

3         What happened was the cellular revolution I talked

4   about, where companies found out that by broadcasting from

5   shorter towers, they were able to reuse their spectrum and

6   have a lot more capacity.  That technology was introduced

7   30-plus years ago.

8         And on the interleaved spectrum, the channels that

9   were assigned for private uses ended up that they changed how

10  they used it.  Instead of a high site over a big area, they

11  then moved to smaller sites.  And what that did is it created

12  interference with the public safety users.

13        So by having more smaller sites that were actually

14  able to broadcast at a higher power level, the private users

15  would drown out or prevent the public safety users from being

16  able to hear their radios in certain areas and created these

17  dead spots, and so that was a problem that needed to be

18  fixed, and that's what led to the rebanding that created the

19  guard and expansion bands.

20  Q.  So what did the FCC decide to do about this issue of the

21  dead zones for public safety systems?

22  A.  Well, it struck a deal with a company called Nextel, that

23  was then bought by Sprint and is now owned -- which was

24  bought by T-Mobile.  Nextel owned most of the spectrum in the

25  ESMR bands that you see, that white block next to the

1    interleave spectrum.

2           And the FCC's deal with them was if Nextel paid to

3    have everybody's radios retuned so that they could reorganize

4    the use of this band -- that meant going to all the private

5    users and all the public safety users and buying them new

6    radios and making sure that their towers were in the right

7    places and that sort of thing -- that in exchange for that

8    effort, they would get some spectrum elsewhere, some valuable

9    spectrum elsewhere.  In essence, the FCC paid them in

10   spectrum to reorganize this band to make it more useful.

11   Q.  And to leave this portion of the band?

12   A.  For the interleaved channels that they owned and were

13   using, they would move away.  I think the next chart will

14   show what happens after the reallocation happened, but in

15   essence, it was -- the most important thing that happened

16   here is that they separated the uses, put the public safety

17   users all together and the commercial users all together and

18   separated them so that they no longer interfered with each

19   other's transmissions.

20   Q.  Let's look at the next page there, and this is now

21   post-rebanding.  So same -- we're looking at the same block

22   of 800 megahertz, correct?

23   A.  Yes.  The same piece on the big colorful chart.

24   Q.  Tell the jury now what happened -- this is down here --

25   what happened after the process you've just described.

C. Bazelon - Direct

1    A.   So, in essence, by keeping the public safety as narrow --
2    there's still narrowband channels, for the most part, but
3    putting them all together, you now have similar uses next to
4    each other, big transmitter covering a wide area on a high
5    tower, and they're no longer interfering with each other.
6            And then in exchange for that, all the -- or not
7    all, but a number of the private channels were sort of moved
8    over to this ESMR band, and that created a broadband
9    allocation, so no longer these narrow channels, but nice big
10   thick bandwidth that the cellular companies found valuable
11   and could be used in their cellular networks.
12   Q.   Let me stop you right there.  Are you referring to this
13   ESMR group that's to the right of the guard and expansion
14   bands?
15   A.   That's correct.
16   Q.   And how about the guard and expansion bands?
17   A.   So to make this work, to allow -- remember, the original
18   problem was that you have two different types of uses, high
19   site, wide area versus cellular uses right next to each
20   other.
21           So they separated them into two distinct areas on
22   the frequency, but in order to make them work, they had to
23   sacrifice a little of the spectrum in between them, put in a
24   guard band -- they called it part of the expansion band --
25   but a band that was neither of those that had restrictions on

C. Bazelon - Direct

1   it so that they didn't interfere with, on the one hand, the

2   public safety users on one side of the band or, on the other

3   hand, the cellular-type uses on the other side of the band.

4   Q.   For the record, is that what we're seeing in figure 4

5   here, the expansion band in orange and the guard band in

6   blue, separating the public safety uses from the broadband

7   uses?

8   A.   That's correct.

9   Q.   Let's talk now about the qualities of the expansion band

10   and the guard band.  How, if at all, do they differ from the

11   kind of broadband that's used and wanted by AT&T, Sprint,

12   Verizon?

13   A.   So to make sure that these expansion and guard bands did

14   not interfere with their neighboring bands, the FCC put a

15   number of restrictions on them.

16        The first one was that these were not licensed in

17   big wide areas.  They were site licenses.  So in the example

18   I gave earlier of the private wireless user in the

19   three-dimensional jigsaw puzzle, that's how these were

20   licensed.

21        There were a number of channels, but you get to put

22   a transmitter up at a specific spot that will cover a certain

23   area.  There's power limitations on height when you use it,

24   so you can't cover a very big area with that transmitter, and

25   there are restrictions on not using cellular architecture in

C. Bazelon - Direct

1   that band.
2   Q.  All right.  And tell me what you mean by that, the
3   restrictions on the use of cellular architecture.
4   A.  That you could not use these channels the way the old
5   channels had been used by using a number of sites that were
6   connected to each other and where the radios would sort of --
7   as you went across a geographic area, the radios would change
8   which tower it went to.
9           One way to think about it is, the way that it's
10  intended to be used is, if you drive across town to another
11  tower, the FCC wanted you to change the channel on your radio
12  instead of having that happen automatically in the
13  background.
14  Q.  And that's a limitation on the guard and expansion bands?
15  A.  Correct.
16  Q.  How about the bandwidth that was available in the
17  channels that were being offered?  Were these narrowband or
18  broadband channels?
19  A.  These were channels that were about, I think,
20  20 kilohertz each, so just enough, really, in essence, for
21  one conversation at a time on the channel, completely
22  different than the ESMR band and next to it or the other
23  bands available for the commercial mobile networks, which
24  used channels that are -- typically they would like to use
25  channels that are 5 or 10 megahertz, which is 5 to 10 million

C. Bazelon - Direct

1    hertz as opposed to a couple thousand.

2    Q.  So 25 to 50 times broader than what's available in the

3    guard and expansion bands?

4    A.  That's correct.

5    Q.  And the limitations that you've just talked about, the

6    fact that it was narrow, so maybe a conversation at a time,

7    the fact that this couldn't be used for cellular

8    architecture, were those hidden from people who were involved

9    in the industry?

10   A.  It wasn't hidden from anybody.  When the FCC did this

11   reallocation -- as I noted earlier, they do everything

12   publicly.  They had proceedings.  They said here's our

13   problem, here's our thoughts about it.  They invited public

14   comment.  They finally worked out this deal with Nextel, and

15   they said here's what we're going to do.

16          And that's a public document.  And the FCC is quite

17   good in those documents, by the way, of giving the history of

18   what got you there; who argued for what, what the issues

19   were.  So the whole issue about why you needed to separate

20   these two types of spectrum were very clear there, and as

21   part of that, the expansion and guard bands were created.

22          And in the order, the FCC said explicitly that we're

23   putting these restrictions on this band, and it's very

24   unlikely we will ever remove them because doing so would undo

25   the benefits we just created by separating these two other --

C. Bazelon - Direct

1    these two bands.

2    Q.  In other words, by making a buffer?

3    A.  Correct.  Splicing the spectrum so that the other two

4    bands could be more productive.

5    Q.  So to be clear, are the major wireless carriers --

6    Verizon, Sprint, AT&T -- were they able to or allowed to

7    operate their systems in the guard and expansion bands?

8    A.  They were not allowed to use the -- they were quite

9    explicitly not allowed to use these bands, these newly

10   created frequencies in their valuable commercial systems.

11   Q.  And so how did the restrictions you've just described on

12   the guard and expansion bands affect the value of the

13   spectrum of these bands vis-à-vis broadband, the kind that we

14   use our phones on?

15   A.  Well, it made them much less valuable, and that is

16   illustrated by the fact that the FCC licensed these on a

17   first-come, first-served basis.  Had they thought it had more

18   valuable uses, they would have been obliged to auction them,

19   and they didn't.

20   Q.  Do the guard and expansion bands have any significant

21   commercial value for public use?

22   A.  I would say not significant.  Again, the operations

23   around the port are important, and you need -- there are

24   times when you need your own private system to do that.  But

25   these aren't the only bands that are available for it.  So

C. Bazelon - Direct

1   even if the use is valuable, there's other alternatives;

2   meaning the value of the spectrum to enable that use has to

3   be limited.

4   Q.  And how about the comparative value of the Internet of

5   Things or, for example, a walkie-talkie network?  How does

6   that compare to the value of broadband?

7   A.  So let me take each of those separately.

8           The walkie-talkie, as I noted, that is the common,

9   sort of, you know, around a construction site or around a

10  fleet, you need to talk to people.  And before we all had

11  cell phones, a private radio system was useful.  There was --

12  there were applications on the commercial networks that could

13  mimic that.

14          Nextel used to sell a push-to-talk service that was

15  using the cellular networks but in a way where instead of

16  having to phone somebody, you just push a button, and they

17  could hear you, but that's just, in essence, a software

18  application on the network.

19          They shut that network down a long time ago, and

20  that functionality is available on your cell phone through

21  apps.  So it's not that talking between two people

22  automatically is invaluable; it's just that there's a lot of

23  ways to do it now, so the frequencies to do that are not

24  especially valuable.

25          Similarly with the Internet of Things, this is where

———C. Bazelon - Direct———

1   people are not involved, so it might be your meter, your gas
2   meter reporting how much usage you use, or it could be, as we
3   love to say, you know, your toaster and your refrigerator
4   communicating with each other in your house.  But whatever
5   those uses, those tend to be narrowband uses, and although
6   they have some value, again there's a lot of options for how
7   that is going to happen, and the spectrum that is needed to
8   enable it is not wildly valuable.
9   Q.  So your toaster communicating with your smart
10  refrigerator, not the same as video streaming?
11  A.  It's not, and you probably pay around 40, $50 a month for
12  a cell phone service.  You might pay something to allow
13  appliances in your house to talk to each other, but you're
14  not going to pay 40 to $50 a month to allow them to talk to
15  each other.
16        MR. BOSSE:  Your Honor, I'm cognizant of the time.
17  I'm about to start a new section of the exam, so I wanted to
18  just alert the Court to that.
19        THE COURT:  I do not know how long your examination
20  will be, but I think it would be appropriate to take a break
21  right now for lunch.  We will come back at 2:30 and continue.
22        MR. BOSSE:  Thank you, sir.
23        (The jury exited the courtroom.)
24        THE COURT:  You may step down.  Do not discuss your
25  testimony during lunch.

1           THE WITNESS:  Understood.

2           THE COURT:  You may be seated.

3           The Court indicated the Court would take up a couple

4    of matters at lunch.

5           MR. BOSSE:  Your Honor, should we have the witness

6    leave?

7           THE COURT:  Oh, yes.

8           (The witness exited the courtroom.)

9           THE COURT:  The Court is aware that what the Court

10   is about to discuss has nothing to do with that witness.

11          MR. BOSSE:  Yes, sir.

12          THE COURT:  First, we have a situation here that the

13   Court wanted to address with respect to Juror 117.

14   Juror 117's grandmother passed on Friday, and the home-going

15   services are on Wednesday, and the juror wishes to attend his

16   grandmother's home-going services.

17          So far we've not excused a single juror, but the

18   Court is of the view that to deny this request would be cruel

19   and unusual, and you're not likely to keep the attention and

20   dedication of that juror while his grandmother is being

21   buried.

22          So the Court would be inclined to dismiss Juror 117,

23   and when we get down to the end, we will substitute the first

24   alternate for Juror 117.

25          Any objection?

—————————C. Bazelon - Direct—————————

1          MR. BOSSE:  Not from the government, sir.

2          MR. YAROW:  Not from Mr. Alcorn, Your Honor.

3          MS. McCASLIN:  Not from Mr. Smith.

4          THE COURT:  Juror 117, last name ███████ on your

5     list.

6          The next issue has to do with a witness Jon Palmieri

7     that Mr. Yarow intended to call, and the Court has gotten an

8     update indicating that Mr. Yarow said he was diagnosed with

9     COVID-19 about 10 days ago, and he still is not fully

10    recovered and having bad bouts of coughing, real bad sore

11    throat.

12         His concern is with these symptoms, getting on a

13    plane and traveling for five hours here to testify.  There's

14    some indication, but his doctor suspects it could very well

15    be pneumonia, but the doctors do not think it's a good idea

16    for him to be on an airplane with those symptoms flying here.

17         The inquiry came of whether it would be possible to

18    have Mr. Palmieri's testimony be obtained virtually.  Is that

19    correct, Mr. Yarow?

20         MR. YAROW:  Your Honor, quite frankly -- his name is

21    Jon Palmieri.  And, quite frankly, I would like to have him

22    here.  He has represented to me that he had COVID ten days

23    ago.

24         Would Your Honor prefer that I go to the podium?

25         THE COURT:  You can go to the podium.

Carol L. Naughton, Official Court Reporter

———————C. Bazelon - Direct———————

1    Have you seen this e-mail dated February 13th?

2    MR. YAROW:  I'm the one that forwarded it to the

3  Court.

4    THE COURT:  You forwarded it to me.

5    MR. YAROW:  So Mr. Palmieri represented that he had

6  COVID, he was diagnosed with COVID -- self-diagnosed.  He

7  took a home test.  The home test picture that I sent to the

8  Court doesn't have a date, doesn't have a name.  There is no

9  doctor's report.  That's just Mr. Palmieri's narrative that

10 he gave to me in the e-mail.

11    I asked him to send -- I would like to state a

12 couple things for the record before I go on and let the Court

13 know what I've done to address Mr. Palmieri.

14    Mr. Palmieri was originally subpoenaed for the

15 November 16 trial date.  That trial -- that was 2021.  That

16 trial was continued by order of the Court to February 1st,

17 2022.  The Court, on its own motion, recognized the witnesses

18 who had been subpoenaed for the previous trial date, that

19 they would need to appear at the new trial date without the

20 need for reissuance of a subpoena.

21    Mr. Palmieri is a necessary witness for the defense

22 of Mr. Alcorn.  He is -- I think the government might

23 classify him as an unindicted co-conspirator, and he may --

24 his initials may have been in the indictment.  I don't recall

25 that.  But Mr. Palmieri said nothing to me.

C. Bazelon - Direct

1    I've spoken to him -- I'm not going to say -- I

2  communicated with him probably three times or four times in

3  the last two weeks, and he said nothing to me about the COVID

4  until last night at 6:47, I believe is the time of my e-mail.

5    THE COURT:  6:43.

6    MR. YAROW:  6:43.  That was the first I heard of

7  that.  And then he sent me the request that he would like to

8  testify by live video.  I told him that -- I asked him to

9  send me any doctor's instructions he has, any test results,

10  and I received what I already represented to the Court.

11    I e-mailed him back last night and said,

12  Mr. Palmieri, you're going to need to get an actual PCR test,

13  you're going to need to get a rapid test, and you're going to

14  need to forward the results to me ASAP, which would have his

15  name and date and so forth on it.

16    I have not received that as of this moment.  But

17  again, he's in California, so the time difference is three

18  hours earlier there.  At this point, I would -- unless he's

19  able to produce something -- unless he's able to produce

20  something that he does have COVID -- and I did go online this

21  morning also and confirm with the CDC's updated

22  recommendations, that they've narrowed the time frame once

23  you are positive for COVID, if you no longer have a fever,

24  it's five days' isolation versus what used to be ten.

25    THE COURT:  Well, the Court has read this e-mail

 1   here, and I guess the e-mail in some way is misleading.  What
 2   the Court is going to do is the Court is going to file this
 3   just in case there's any issue about it.
 4          So what the Court recommends we do is we just
 5   maintain the status quo, and you see if you can get another
 6   test.  If that comes back positive, then we're going to have
 7   to reevaluate, but if it does not, then he needs to
 8   understand he needs to still continue to move toward
 9   Virginia, travel toward Virginia --
10          MR. YAROW:  Yes, sir.
11          THE COURT:  -- if at all possible.  So just keep the
12   Court updated.
13          MR. YAROW:  Okay.  Your Honor, I really am not
14   familiar -- I know that during the COVID, there was a lot of
15   things that were done electronically versus the defendants or
16   parties being in court.  Is it even possible?  Does the Court
17   have the resources that it is possible we can do that, if he
18   does come back with a positive test result?
19          THE CLERK:  I have to check with IT.
20          THE COURT:  We'll check and let you know.
21          MR. YAROW:  Thank you.  That's all I have, Your
22   Honor.
23          MR. BOSSE:  Your Honor, just to make sure we have a
24   record on it, that would probably take us into some uncharted
25   territory, and even if that were technically possible, we

C. Bazelon - Direct

1    would have to confer with Mr. Smith's attorneys on it.  And

2    in any event, if that is where we end up, if he can make the

3    findings for a Rule 15 deposition, it's certainly preferable

4    from a constitutional perspective to do that, especially

5    where the parties are already planning to go to California

6    for another Rule 15 deposition this weekend.  But obviously,

7    best of all is if he can get here.  And it doesn't sound like

8    there's any reason he can't.

9            THE COURT:  Are the parties planning to do a virtual

10   deposition or to go to California to do a deposition?

11           MR. BOSSE:  The parties -- the deposition has been

12   noticed.  The party taking the deposition needs to go to the

13   deposition.  I believe we will also attend in person for

14   Ms. Hullum, the one that the defense has asked for.

15           THE COURT:  Okay.  Well, maybe the Court got it

16   wrong, but the Court was anticipating that the parties would

17   be doing a virtual deposition with her and you would not be

18   traveling, but if you can do that, that's fine with the

19   Court.

20           MR. BOSSE:  Yes, sir.

21           THE COURT:  That being the case, let's see can we

22   get this resolved -- what part of California is he located

23   in?

24           MR. YAROW:  I'd have to look at my notes, Your

25   Honor, but I believe it's Central California.

——————C. Bazelon - Direct——————

1          THE COURT:  What part is Ms. Hullum located in?

2          MR. BOSSE:  Sacramento area.

3          MR. YAROW:  That's Central.  That's what I would

4    call Central, anyway.

5          THE COURT:  Okay.  I'll tell you what to do.  I want

6    you to talk to the United States about where Mr. Palmieri is

7    located, and let's see what we can work out.

8          MR. YAROW:  Thank you.

9          THE COURT:  Now, there was some evidentiary issue

10   that I understood that Mr. Smith wished to raise,

11   Ms. McCaslin.

12         MS. McCASLIN:  Yes, Your Honor, I have two issues to

13   raise.  May I approach?

14         The first issue is that Mr. Smith has decided to not

15   call Daryl Bank as a witness.  So there will be no need for

16   the Court to voir dire him before testifying.  And I know we

17   had talked last week about James Broccoletti being here to

18   represent Mr. Bank during that, and that will no longer be

19   necessary.

20         THE COURT:  So Mr. Bank is not being called?

21         MS. McCASLIN:  Correct.

22         THE COURT:  Okay.

23         MS. McCASLIN:  The other question I have for you,

24   Your Honor, as we were just talking about Ms. Hullum, the

25   prosecution did indicate that we have a potential deposition

C. Bazelon - Direct

1    coming up later this week.  I am asking the Court to consider

2    ruling on an evidentiary issue right now so that we don't

3    have a lengthy sidebar in court.  I'm not rehashing the

4    Court's old rulings.  This is a new question.

5            As the Court is aware, there was the final question

6    in Ms. Hullum's redirect about an extra $400,000 that she did

7    not get returned.  We have, of course, objected.  It was

8    overruled.  And the fact that they received none of that

9    $400,000 back is before the jury right now.

10           So the -- we appreciate the Court granting us the

11   ability to depose Ms. Hullum again.  The testimony, though,

12   is only one type of evidence, in order to rebut it, and so we

13   are asking the Court to consider allowing us to submit

14   Ms. Hullum's bankruptcy petition.

15           I would argue that it is allowed under our

16   stipulations with the government.  Government 2000,

17   Section A-13 specifically allows the authentication and

18   business records for records coming from the United States

19   Bankruptcy Court for the Eastern District of Virginia --

20   sorry, Eastern District of California, which these are, and

21   so it would be in the same category as any of the bank

22   statements that came in.

23           THE COURT:  My question is this:  And that

24   bankruptcy court record will reflect that she's listed as

25   being owed only how much?

C. Bazelon - Direct

1          MS. McCASLIN:  It lists that she owes to the IRS

2    397,000.

3          THE COURT:  She owes 397- -- Ms. Hullum owes

4    $397,000 to the IRS?

5          MS. McCASLIN:  She and her husband.

6          THE COURT:  Okay.  And what, if anything, does that

7    bankruptcy court say about what, if anything, is owed to any

8    defendant associated with this case?

9          MS. McCASLIN:  Your Honor, I don't think that it has

10   anything.  It does list DSPF as a potential personal property

11   that she could have value in, because this was filed in 2013,

12   so it was a while ago.  Other than that, she just lists a

13   couple annuities that they had, but I don't see anything in

14   here that references Mr. Smith or other defendants.

15         THE COURT:  Well, this would have to be in context.

16   If you're cross-examining Ms. Hullum about that 400,000 and

17   she makes any misstatements about the 400,000, then the Court

18   sees certainly it would be appropriate if you have a document

19   here that you can use to refresh her recollection or to

20   impeach her, then the Court would have no problem evidentiary

21   with that.

22         MS. McCASLIN:  Would the Court allow us to put this

23   into evidence regardless of witness because of our

24   stipulations?

25         THE COURT:  No.  Because the context is -- you have

———— C. Bazelon - Direct ————

1   no context if you just stick the 397,000 in there.  How are
2   you going to argue by putting that into evidence without
3   something being said by Ms. Hullum about her tax, what she
4   owes the IRS?
5           MS. McCASLIN:  Your Honor, I would argue it's no
6   different than having Ms. Gibson testify about the documents
7   from the California franchise department or the Virginia SCC
8   that she had never seen before.  It was allowed under the
9   stipulation.  I had her read it.  It was testified to.  And
10  the government called Ms. Denise Brown who testified about
11  bank records that were not part of her bank because it's part
12  of the stipulations.
13          THE COURT:  It doesn't seem the same to the Court.
14          My simple question is this:  You can't put the
15  $397,000 that she owes the IRS unless you can put it, I
16  think, in context on the issue you want to raise.  She
17  testified, and you didn't cross-examine her on it.
18          You know, the Court's got a great mind to just let
19  you appeal it, and just rule and don't do anything.  The
20  Court tried to reach a middle ground on dealing with this,
21  but the more and more the Court thinks about it, maybe the
22  Court should overrule it and let you take your chances on
23  appeal on it.
24          MS. McCASLIN:  Your Honor, we're just trying to get
25  rulings in advance so that we don't do this again.

C. Bazelon - Direct

1    THE COURT:  I understand you are, but the Court is

2    trying to tell you in advance, if you are going to go out

3    there and you're going to question her on this, let's not

4    blow it again.  If you're going to question her on whether

5    she owes the IRS $400,000, let's get something in context

6    here, then we'll talk about whether we're going to put the

7    $397,000 question before the jury.

8         You have an opportunity to refresh her recollection

9    about whether she owes the IRS $397,000, take it back to the

10   bankruptcy, then I think the document becomes appropriate, or

11   if you refresh her recollection with it.  But you're saying

12   put it in notwithstanding.  We're clearly not going to do

13   that if you're going to cross-examine the witness and you're

14   going all the way back to California for a deposition.

15        You're going to cross-examine her about the 400,000,

16   aren't you?

17        MS. McCASLIN:  Well, Your Honor, we were considering

18   putting this into evidence and not needing to make everybody

19   go to California.

20        THE COURT:  Oh.

21        MS. McCASLIN:  Because this is allowed under the

22   stipulations.  It is fairly clear about the $397,000, and it

23   is proper evidence under the Sixth Amendment that Mr. Smith

24   can call in his defense.

25        THE COURT:  We sure have botched this big time.

Carol L. Naughton, Official Court Reporter

C. Bazelon - Direct

```
 1   Look, in that deposition on Ms. Hullum, is there a
 2   reference -- I think I recall -- is there a reference to the
 3   IRS having a hold on her money?  Isn't there something in
 4   that deposition?
 5            MS. McCASLIN:  Not in the deposition, there was in
 6   the MOI from the agent.
 7            THE COURT:  From the agent but not in the
 8   deposition?
 9            MS. McCASLIN:  Correct.
10            THE COURT:  Well, you know, again, I have the same
11   problem with simply putting that document in.  So what are
12   you going to argue?  Are you going to argue independent
13   of getting anything -- you can't rely on what the agent said
14   in the memorandum.
15            So you're just going to argue it to the jury saying
16   that the bankruptcy court records say she owes the IRS
17   $397,000, so it's like speculation about that's where her
18   400,000 went.
19            MS. McCASLIN:  And that would be part of argument,
20   Your Honor, yes.  But the government has put in a lot of bank
21   records that the jury hasn't really seen.
22            THE COURT:  It's very clear you can't argue things
23   that clearly are not in evidence.  You don't have anything in
24   evidence with the IRS saying they're owed 400,000.  So to put
25   that into evidence and to argue that without anything to
```

──────── C. Bazelon - Direct ────────

1    connect it, that's clearly, in the Court's view, just not

2    what you need to do.

3            MS. McCASLIN:  Well, it is in evidence that they did

4    not get the $400,000 back, and so this is going to be to

5    rebut that on Mr. Smith's behalf.

6            THE COURT:  Based on what evidence?

7            MS. McCASLIN:  A bankruptcy petition filed just two

8    years after.

9            THE COURT:  So you're going to make believe that

10   that must be because they owe the IRS $400,000, right?

11           MS. McCASLIN:  And I'll probably make the argument

12   that they do not have the complete picture, and

13   unfortunately, the questioning in that redirect -- and I'm

14   not accusing Ms. Yusi of anything -- but the questioning was

15   misleading.  That was the impact, not necessarily the intent.

16   But there was an impact that the jury was misled about what

17   happened to that $400,000 because it made it sound like he

18   swindled it and pocketed it.

19           THE COURT:  For the life of this judge, the Court

20   doesn't understand why Mr. Grindrod didn't ask a single

21   question about it, and the question becomes now whether there

22   was an intentional calculation to not ask about it.

23           MS. McCASLIN:  No, Your Honor, I think it's a

24   misunderstanding about depositions because we are taking --

25   Your Honor, we are taking this as testimony.

C. Bazelon - Direct

```
1          THE COURT:  The Court does not accept that defense
2     counsel doesn't understand you have the capacity to recross.
3     Don't argue that to this judge.
4          MS. McCASLIN:  That's fine, Your Honor.  But even if
5     we did have the opportunity and did or didn't cross-examine
6     Ms. Hullum, that isn't the only way that we can get evidence
7     in.  We are allowed to call evidence in other manners.
8          THE COURT:  As long as you do it according to the
9     Rules of Evidence, but what you're asking, the Court has
10    explained it as clear as the Court can; you can't grab it out
11    of thin air and stick it into the record.  Now, the Court has
12    deliberately not let anyone just throw something out of thin
13    air in here.
14         What is the government's position on this?  Do you
15    want to stipulate to it?  You can stipulate and save the trip
16    to California if you can sit down and look at the documents
17    and do a stipulation.
18         MS. YUSI:  Your Honor, we spoke with Ms. McCaslin
19    about that, and we said based on the record that they've made
20    asking for this deposition, we feel like we have to go
21    forward with this deposition, and they can ask about it there
22    so there is context because -- and I told Ms. McCaslin, you
23    know, there's a chance -- or I don't know, because we don't
24    know anything about the IRS lien -- that this was based on
25    the rollover that Mr. Smith took and whether or not they paid
```

─────C. Bazelon - Direct─────

 1    taxes on that.  So we think there's a lot of context in there

 2    that needs to be asked about.

 3              MS. McCASLIN:  Your Honor, that is not accurate.

 4    The bankruptcy petition clearly lists back taxes from the

 5    '80s and '90s and 2000s.

 6              THE COURT:  Here's the way it's going to work.

 7    You're going to California, and you're going to do this

 8    deposition.  And then based upon what happens, the Court will

 9    determine then if you can go on and ask about that bankruptcy

10    record.  And the Court will decide whether it's going to be

11    admitted or not.

12              But you are forewarned.  You know how to have a

13    recollection refreshed and how to impeach a witness and how

14    to ask a witness a direct question.  If it's done right, then

15    the document can come in.  If it's not, then it's going to be

16    excluded.  It's simple as that.  But this has created a whole

17    lot.

18              And let me say this.  If you're thinking about it

19    for purposes of appeal -- and I'll put it on the record --

20    you have to put this all in context.  This case is not going

21    to rise or fall based on this cross-examination, because the

22    Court of Appeals is going to weigh this failure to put this

23    cross-examination in or this Court's refusal to let you do

24    what you want to do in the context of whatever else is in

25    this case.  They are going to weigh it.  And based on this

C. Bazelon - Direct

 1   Court's experience, the Court doesn't believe it's going to
 2   make that much difference given the weight of the evidence
 3   you have already in the case.
 4          So that's the Court's view on it.  You can think
 5   about it, and you can decide whether your case is going to
 6   rise or fall based on whether it was $400,000 versus 40,000.
 7   That's where we are.
 8          So unless you all can work it out, just go right on
 9   to the deposition.  Depending on what you ask and how you
10   handle it, the bankruptcy record will come in.
11          (Recess from 1:16 p.m. to 2:36 p.m.)
12          (The jury entered the courtroom.)
13          (The witness resumed the stand.)
14          THE COURT:  Let the record reflect that all jurors
15   have returned to the courtroom.
16          Does counsel agree?
17          MR. BOSSE:  The government agrees.
18          MR. YAROW:  Mr. Alcorn agrees, Your Honor.
19          MS. McCASLIN:  Mr. Smith agrees.
20          THE COURT:  You may resume your examination.
21          MR. BOSSE:  Thank you, sir.
22   BY MR. BOSSE:
23   Q.  Dr. Bazelon, before we broke for lunch, we sort of went
24   through the background of spectrum and some of the main
25   concepts we're going to use here.  I want to talk now about

C. Bazelon - Direct

 1    some of the investments that are at issue here.

 2         Have you reviewed statements about the 800-megahertz

 3    spectrum that were made to investors by the Janus Spectrum

 4    company that David Alcorn ran and by other companies that

 5    worked with Janus?

 6    A.  Yes, I have.

 7    Q.  In reviewing the Janus offering materials and sales

 8    materials, did you see claims that this spectrum would be

 9    useful to major wireless carriers, like the Sprints and

10    Verizons of the world?

11    A.  That seemed to be the central value proposition.

12    Q.  And that this part of the spectrum was compatible with

13    their technology?

14    A.  Correct.

15    Q.  I want to ask you about a couple of these particular

16    claims in the documents, and then I want to ask you about a

17    couple of the statements made by Mr. Alcorn and Mr. Smith and

18    I think one by Mr. Maerki in a video or audio fashion.  So

19    let's start with the documents.

20         MR. BOSSE:  Could we see Government's Exhibit 304,

21    please, Page 1.

22    BY MR. BOSSE:

23    Q.  And is this one of the documents that you reviewed in

24    preparing today?

25    A.  Yes.

1698

C. Bazelon - Direct

1    Q.  If we could go down to Page 4, please.  And I want to

2    draw your attention to a couple portions of this.  There's a

3    statement here that "Owners of high-demand spectrum have

4    leased -- have sold, leased, or joint-ventured these assets

5    to wireless operators generating significant profits or cash

6    flow."

7             Is that statement applicable to the kind of spectrum

8    that we're dealing with here in the guard and expansion

9    bands?

10   A.  It's not.

11   Q.  And likewise, the statement that "These provide

12   attractive income opportunities through a lease or

13   joint-venture arrangement with one or more wireless service

14   providers," for the reasons we went through before the lunch

15   break, is that an accurate statement to be made to investors?

16   A.  It's not.  As we discussed, the wireless carriers -- the

17   AT&Ts, Verizons, T-Mobiles of the world -- were not allowed

18   to use this spectrum in their networks.  So this is not an

19   attractive opportunity for them.

20   Q.  Are you familiar with whether Sprint made public

21   statements about whether they could buy spectrum in these

22   bands?

23   A.  Yes.  Because this was spectrum that was owned by Sprint

24   before the band reallocation and the rebanding, there was a

25   question -- there was an obvious question as to whether they

C. Bazelon - Direct

1    would find it attractive.  They were clear that if they owned

2    the spectrum, they would have to give it back to the FCC

3    because they would not be allowed to use it with their

4    wireless system.

5    Q.  And so for that reason, is it accurate to tell investors

6    that, "Today, this targeted 800-megahertz spectrum is among

7    the most coveted spectrum to wireless carriers"?

8    A.  No, it was not this 800-megahertz spectrum that was

9    coveted.

10   Q.  And I'm going to page up to Page 3, and I'm going to ask

11   you about a statement in the second paragraph of Page 3 that

12   "The owners of this spectrum that's being offered here, guard

13   and expansion band spectrum, can benefit from a true supply

14   crunch created by exponentially increasing demand from

15   consumers, businesses, and government."

16        Was there a supply crunch for this type of

17   narrowband spectrum?

18   A.  There was not.  The supply crunch in spectrum was for the

19   spectrum that was broadband and available for the cellular

20   networks.

21        MR. BOSSE:  If we could see Government's 305,

22   please.

23   BY MR. BOSSE:

24   Q.  The jury has seen different versions of this, but the

25   language is the same.  I want to draw your attention here.

C. Bazelon - Direct

1    The idea that this offering focused on asset appreciation and

2    income generation that would provide investors with

3    opportunities to achieve a 100 percent annual preferred

4    return on invested capital plus 50 percent of additional

5    profits, from an economist standpoint in the spectrum

6    industry, is that anything close to a fair approximation to

7    make to investors?

8    A.   No.   Those are truly outsized returns, and as the FCC

9    says itself about spectrum investments, things that look to

10   be too good to be true usually are.

11   Q.   I want to ask you about this section right here.   There's

12   a reference in here to the 1980s and that now, again, they

13   are helping investors take advantage of a similar

14   little-recognized opportunity to acquire FCC licenses.

15          Is owning narrowband FCC licenses a

16   little-recognized opportunity only available through the

17   guard and expansion bands?

18   A.   It's not an opportunity.   What they're referring to there

19   are the original cellular licenses that were given away

20   through a lottery, and there were investors that made

21   significant amounts of money from that, and that, in fact, is

22   why the law was passed, and the FCC now auctions spectrum

23   when it's in high demand so that such windfalls don't accrue

24   to the private sector.

25          MR. BOSSE:   Could we go back to 304, Page 4.

──────── C. Bazelon - Direct ────────

1    BY MR. BOSSE:

2    Q.  And here the statement to investors, "The wireless

3    industry has already acknowledged that future mobile

4    broadband connections will run over this lower band

5    spectrum."

6           Is that a true statement?

7    A.  Not this lower band spectrum.  What they are referring to

8    is that spectrum below 1 gigahertz, the 800-megahertz band,

9    the 600, and the 700 are valuable.  The carriers will

10   integrate portions of those bands that are allocated for

11   their use into their networks, but that is not true of the

12   expansion and guard band.

13   Q.  And you've reviewed this document.  Is it accurate to say

14   that nowhere in this document or the other offering documents

15   you reviewed does it say anything to the investors about the

16   fact that this is guard and expansion band, narrowband

17   spectrum?

18   A.  I don't recall whether it labels the band, but it

19   certainly never explains the issue with this spectrum as to

20   why it's not of the type comparable that they're touting.

21   Q.  If I could, I'm going to page down a few pages.  This is

22   another page from the same offering document.  It's titled

23   "Excerpts and Articles," and it has excerpts from articles

24   about T-Mobile and its spectrum needs, Verizon and its

25   spectrum needs, and AT&T.

C. Bazelon - Direct

1      In the context of what you've told the jury about
2  here this morning, does that have anything to do with the
3  spectrum being offered in this document?
4  A.  No.  These articles are referring to the broadband
5  spectrum that's available to these companies in their
6  cellular mobile broadband networks, not referring to
7  narrowband spectrum in the guard and expansion bands.
8  Q.  Can you tell the jury --
9      MR. BOSSE:  We can take that down.  Thank you.
10 BY MR. BOSSE:
11 Q.  Can you tell the jury a little bit about the economic
12 term "opportunity cost"?
13 A.  It's a principle economists apply that you're not likely
14 to pay more for something than the next best alternative or
15 way to get it.
16      And the relevance here, if I might, is that even
17 though there are uses for narrowband spectrum, there are
18 other narrowband spectrum allocated and available, and so
19 even if you had something useful to do with a guard band
20 license, you wouldn't pay that much for the license because
21 if somebody charged you a lot, there was another band of
22 spectrum that had as good spectrum that you could use, and
23 therefore, that limits how much value you could associate
24 with the guard band.
25 Q.  Let me try an analogy and tell me if I get it right.

C. Bazelon - Direct

1          If there's two ice cream shops across the street
2    from each other and one charges $1.00 for a cone and the
3    other charges $10.00 for a cone, is that the sort of
4    opportunity -- the economist's view of why would you pay 10
5    instead of 1?
6    A.  That would be an example.  Gas station prices are often
7    quite similar for the same reasons.
8    Q.  Did you look at whether -- did you and your team look at
9    whether there were other licenses available, narrowband
10   licenses available in some of the markets that have been
11   discussed in this case?
12   A.  Yes.  When I did some analysis a few years ago, looking
13   at which of the licenses in the markets here had been
14   assigned and looking at the available spectrum that was still
15   in those markets, many of those markets still had available
16   spectrum that somebody could apply for and get for the cost
17   of the application and the engineering, a nominal amount,
18   suggesting that owning the license doesn't give you something
19   that's a barrier to entry or something that has great value.
20   Q.  Let me ask you about what you just mentioned, the
21   application fees for these narrowband licenses.
22          How much does it cost to get a narrowband license?
23   And you can tell the different component costs, if you would,
24   to the jury.
25   A.  So for an application for one of these licenses, there's

C. Bazelon - Direct

```
 1   a couple of different costs that go with it.  You have to
 2   file a few forms and pay some fees to the FCC.  Those are on
 3   the order of a couple hundred dollars.
 4           And then the frequency coordinator I mentioned
 5   earlier, the FCC has a private entity to make sure that the
 6   license you're applying for is available and won't interfere
 7   with anybody else.  That might require a little bit of
 8   engineering work.  It depends on the specifics of the license
 9   and what you're trying to do, but the cost of those services
10   are in the -- maybe a couple thousand dollars tops.
11   Q.  So not $40,000?
12   A.  Nowhere near.
13   Q.  I want to ask you about a couple of the statements made
14   by the defendants in this case and Mr. Maerki.  Let's start
15   with a statement Mr. Maerki made in a video called "Money
16   From Thin Air."  Are you familiar with that video?
17   A.  Yes.  It's got a certain notoriety.
18           MR. BOSSE:  If we could play Government's 308,
19   clip 4, please.
20           (Video played in open court.)
21   BY MR. BOSSE:
22   Q.  The guard and expansion band spectrum at issue here, is
23   that actually cellular spectrum?
24   A.  It's not.  In fact, as we noted earlier, you're
25   prohibited from using it in the way that he was talking about
```

C. Bazelon - Direct

```
1    as the high-demand cellular spectrum.

2    Q.  So it's not unfair to say "high demand" -- sorry.

3            Is it fair to describe this as high-demand spectrum?

4    A.  The guard band, no.  If it was in high demand, the FCC

5    would have been obliged to auction it off and not give it out

6    for free.

7    Q.  There's a statement in there that there are already

8    current income streams related to the spectrum.  Were there

9    current income streams related to the guard and expansion

10   band spectrums in the midst of this rebanding process?

11   A.  There were not.  Prior to the rebanding, the spectrum was

12   being used by Nextel and then Sprint, but the whole point of

13   the rebanding was that whatever they were doing there, they

14   had to stop and get off the spectrum before it was available

15   to be relicensed through this process.

16           MR. BOSSE:  Could we please play, from Mr. Alcorn,

17   Government's Exhibit 309A, and it's clip 3.  If you pull it

18   up, I'll start us out.

19           (Audio played in open court.)

20   BY MR. BOSSE:

21   Q.  The statement that the value of the spectrum more than

22   quadrupled as a result of the rebanding process, is that an

23   accurate thing to tell anyone?

24   A.  It's not.  The FCC had its own valuation estimate that

25   suggested that the rebanding increased the value by something
```

C. Bazelon - Direct

1   like 12-and-a-half percent.

2   Q.  That's the value as narrowband channels, not broadband?

3   A.  Yeah.  The increasing it -- the whole reallocation

4   increased the value by 12 percent, but that was in an

5   application where it could be used by a cellular architect

6   and integrated with mobile carriers.

7   Q.  And, in fact, after the rebanding, could that happen?

8   Could they be used by cellular and mobile carriers?

9   A.  No.  That's when the use restrictions were put on -- the

10  low power, the site licenses, the lack of cellular

11  architecture -- that made them not valuable for those uses.

12          MR. BOSSE:  Could we play 318C, clip 5, and I can

13  take us to the right spot.

14          (Audio played in open court.)

15  BY MR. BOSSE:

16  Q.  So just to make a verbal record, Mr. Alcorn said, "We

17  knew that this would be attractive to Sprint."

18          Was this ever attractive to Sprint, this rebanded

19  guard and expansion bands?

20  A.  It was not.  After the rebanding, Sprint couldn't use it.

21  They knew they couldn't use it.  They publicly said they

22  couldn't use it.  The FCC said they couldn't use it.

23  Q.  So Sprint didn't try to hide the ball and say that --

24  about whether they could use it or not use it?

25  A.  No.  They were quoted in articles saying they would not

C. Bazelon - Direct

1    be able to use this spectrum.

2    Q.  I want to go now to a video from Mr. Smith.

3            MR. BOSSE:  Could we please pull 1216 up.

4            Your Honor, we're just going to do a few short

5    clips.  There will be a little bit of overlap with the

6    morning, but I've tried to narrow them down.

7            THE COURT:  Thank you.

8    BY MR. BOSSE:

9    Q.  If you could listen.

10           (Audio played in open court.)

11   BY MR. BOSSE:

12   Q.  And I want to ask you about that statement that "The

13   asset value of the spectrum here exceeds 25 times the

14   investment amount."  Is that an accurate statement in any

15   context?

16   A.  No.  No, it's not.

17           MR. BOSSE:  And if we could keep that up because I'm

18   going to play a few portions of it.  Thank you.

19           The next clip starts around the 7:55 mark.

20           (Audio played in open court.)

21   BY MR. BOSSE:

22   Q.  I want to ask you about the statement that there's three

23   decades of proven history for the spectrum licenses we're

24   talking about here.  When did the rebanding process take

25   place?

Carol L. Naughton, Official Court Reporter

C. Bazelon - Direct

1  A.  The FCC made the decision and announced it in 2004 and
2  the process then continued from there.  In fact, it was just
3  this last year that the FCC officially said that Sprint, now
4  T-Mobile, has finished its part of the rebanding, but they
5  still have not made all of these guard band licenses
6  available yet.

7  Q.  But it didn't reach back 30 years into the past, the
8  guard and expansion band concept?

9  A.  No.  That was an outgrowth of the 2004 order.

10 Q.  All right.

11         MR. BOSSE:  If I could have the screen back.  I'm
12 going to play the next portion starting at around 11:28.

13         (Audio played in open court.)

14 BY MR. BOSSE:

15 Q.  And as an economist, the supply and demand is sort of
16 your bread and butter; is that fair?

17 A.  I like to say I'd give back my degree if I didn't agree
18 with you there.

19         THE COURT:  If you could keep your voice up.  Your
20 voice trails down as you talk.

21         THE WITNESS:  I will try.  Thank you.

22 BY MR. BOSSE:

23 Q.  Is it fair to tell investors based on what was publicly
24 available through FCC notices that this was going to be
25 high-demand spectrum in the guard and expansion bands?

---

C. Bazelon - Direct

1  A.  It was not.  The high-demand spectrum, as we said, is the
2  spectrum that the carriers could use in their national mobile
3  cellular networks.
4          MR. BOSSE:  All right.  The next clip picks up
5  around 13:27.
6          (Audio played in open court.)
7  BY MR. BOSSE:
8  Q.  Are those statements that you just heard played about the
9  Rolls Royce and the beachfront of spectrum and, again,
10  statements about high demand -- are those accurate as applied
11  to the guard and expansion bands?
12  A.  They are not.  He is talking about, again, the spectrum
13  that's available for the mobile carriers for their national
14  networks.  It's like saying beachfront property is valuable,
15  the stuff that is zoned for housing is very valuable, but the
16  little pieces that are zoned for drainage ditches or
17  something like that don't carry the same value.
18          MR. BOSSE:  I think I have two more short clips.
19  This next one picks up at 16:50.
20          (Audio played in open court.)
21  BY MR. BOSSE:
22  Q.  And we've talked about Sprint, but were Verizon and
23  T-Mobile, before it merged with Sprint, were they in the
24  market to take guard and expansion band spectrum at this
25  point in time?

---

———————C. Bazelon - Direct———————

1    A.  No.  For the same reasons that Sprint couldn't take it,

2    the other major carriers could not integrate it into their

3    networks either.

4              MR. BOSSE:  And last clip, 17:51.

5              (Audio played in open court.)

6    BY MR. BOSSE:

7    Q.  I want to pause it right there on the statement "You're

8    buying and owning broadband licenses."  Were these broadband

9    licenses being marketed to investors?

10   A.  No.  The expansion and guard band licenses were classic

11   narrowband licenses that each channel that they applied for

12   was 20 kilohertz, very narrow licenses.

13   Q.  And if we could now talk about some of the value

14   projections that were given to investors.

15             MR. BOSSE:  I'd like to look back at 304 and go to

16   Page 12, please.

17   BY MR. BOSSE:

18   Q.  It's the same document we looked at before.  You're

19   familiar with this pro forma?

20   A.  I am.

21   Q.  And it starts with New York and ends with Kansas City,

22   and then there's an annual return on investment projection

23   here at the right-most column, again starting with New York

24   and going down to Kansas City.  And this is called the pro

25   forma cash flow lease and ROI on five channels per economic

C. Bazelon - Direct

1   area.

2        Do you see the top annual return on investment

3   labeled here for New York being 2,024 percent?

4   A.   Correct.

5   Q.   And the very lowest amount, in the Kansas City area,

6   being 194 percent?

7   A.   Yes.

8   Q.   From an economist's standpoint, someone who studies

9   spectrum value, are these even in the ballpark of being fair

10  and accurate ROI projections to be given to investors?

11  A.   No.  These analyses are riddled with errors, and the

12  return on investments that come out the other end are quite

13  outsized.

14       MR. BOSSE:  We can take that down.

15  BY MR. BOSSE:

16  Q.   Do you have an understanding in your review of the

17  materials in this case that as time went by, there was a

18  pitch to monetize licenses in some kind of push-to-talk

19  network in parts of Texas?

20  A.   Yes.

21  Q.   Tell the jury again.  We hit on it briefly before.  I

22  don't want to ask you to plow back over it, but what is

23  push-to-talk?  What does that mean?

24  A.   It's mimicking a walkie-talkie functionality.

25  Q.   Okay.  Did you review documents related to a company

C. Bazelon - Direct

1    called RapidLink?

2    A.  I did.

3    Q.  And do you recall what was the business plan of RapidLink

4    supposed to be?

5    A.  To piece together small regional licenses for a

6    push-to-talk service that could be offered over a larger

7    geography by piecing together the smaller licenses.

8    Q.  Are you familiar from your review with how this company

9    was supposed to make a profit to return to investors?

10   A.  Well, their projections were based on signing up

11   subscribers to this push-to-talk network.

12          MR. BOSSE:  Let's go, please, to -- and this is in

13   evidence -- Government's 619.

14   BY MR. BOSSE:

15   Q.  It should be there on your screen.  Are you familiar with

16   this offering document -- I'm sorry, Xcel Bandwidth, regional

17   private radio systems for business?

18   A.  Yes.  I've reviewed this.

19   Q.  I want to ask you about, just so we have a record -- what

20   is the date of this document?

21   A.  The date you're showing me is March 11, 2017.

22   Q.  All right.  And if we go to Page 2, "About Xcel

23   Bandwidth," you see that this is a regional push-to-talk

24   radio system that's going to use some of the licenses we've

25   talked about at issue here; is that right?

C. Bazelon - Direct

1   A.   I think their intent was to try to use some of these

2   expansion and guard band licenses.

3   Q.   From your perspective as someone who is familiar with

4   spectrum value and the market, the telecom market, was this a

5   lucrative business proposition in -- even before the 2017

6   time period, going back to 2015 to 2017, the idea of a

7   walkie-talkie network, was that a lucrative business

8   proposition at the time?

9   A.   I don't believe so.  By 2017, smartphones were fairly

10  ubiquitous, and the functionality that they were offering is

11  something that is basically an app on your phone.  So even if

12  there was a market for it, it can't have been particularly

13  large or particularly lucrative given that you could have

14  gotten the same functionality out of a cell phone.

15  Q.   And I can proffer to you that there were several million

16  dollars in investor funds taken in through the Xcel Bandwidth

17  investment sales.  Is there a world where a network of

18  Motorola walkie-talkies in parts of Texas would earn that

19  money back for investors and then turn a profit?

20  A.   I can't imagine -- again, I can't imagine what the value

21  proposition was that would have returned a nice return to

22  investors.

23          MR. BOSSE:  Could we see Page 12, please, of 619.

24  BY MR. BOSSE:

25  Q.   And this is the same document, same business proposition.

Carol L. Naughton, Official Court Reporter

C. Bazelon - Cross (By Mr. Yarow)

1    You see they now have, in 2017, a new pro forma.  It's dated

2    March 11, 2017.  Did you look at this and analyze this?

3    A.  I did.

4    Q.  What is your take on this pro forma?

5    A.  Well, it strikes me as wildly optimistic.  Here, they are

6    suggesting that for each tower in your system, you would have

7    500 customers paying $20 a month for their walkie-talkie

8    functionality.  That strikes me as an awfully large market,

9    an awfully large number of customers, but the $20 a month to

10   pay for your walkie-talkie functionality on top of the fact

11   that everybody already has a cell phone strikes me as an

12   awful lot to be charging.

13   Q.  You see down here at the bottom the ROI.  You understand

14   that as return on investment --

15   A.  Yes.

16   Q.  -- from a mature site being 45 percent a year.

17           Are you aware of any push-to-talk or walkie-talkie

18   vendors that were returning 45 percent a year ROI on this

19   kind of a system?

20   A.  No.

21           MR. BOSSE:  That's all the questions I have for the

22   witness on direct.

23           If you could stand by for cross-exam, please.

24           THE COURT:  Okay.  Mr. Yarow.

25                     CROSS-EXAMINATION

C. Bazelon - Cross (By Mr. Yarow)

1   BY MR. YAROW:
2   Q.  It's Dr. Bazelon, right?
3   A.  Yes.
4   Q.  My name is Rick Yarow.  I'm an attorney for David Alcorn.
5   How are you doing today?
6   A.  Doing well.  Thank you.
7   Q.  Thank you.
8        Mr. Bazelon, you've been qualified here today as an
9   expert witness.  That means that you hold specialized
10  knowledge in this subject of spectrum and the economic value
11  of spectrum beyond what the average person is going to know;
12  is that correct?
13  A.  I believe that's a fair interpretation, yes.
14  Q.  And you hold very prestigious degrees in economics?
15  A.  Yes.
16  Q.  You've testified before Congress?
17  A.  I have.
18  Q.  You've worked in the industry for how long?
19  A.  27 years.
20  Q.  I'm going to go through a couple different areas of some
21  misperceptions that I've noticed on the spectrum, and I'd
22  like you to sort of walk me through it, if you could.
23        So with the spectrum, the lower bandwidths will
24  travel further than the higher bandwidths; is that correct?
25  A.  For the same amount of energy, they will travel further.

C. Bazelon - Cross (By Mr. Yarow)

1    The waves are longer, and they tend to travel further.

2    Q.  So in a certain logic, the lower bands would be more

3    valuable than the higher bands; is that correct?

4    A.  Rather than say "certain logic," I would say in certain

5    applications that would be true.  When you're trying to get a

6    network to cover an area, you can do it with fewer towers

7    with lower band spectrum, but when capacity, the amount of

8    traffic per tower becomes your constraint, that advantage

9    diminishes.

10   Q.  Okay.  And we've all been in an elevator and we've

11   dropped a call or been driving around and we drop a call on

12   our cell phone.  We've all experienced that, correct?  Well,

13   you've experienced that, correct?

14   A.  Speaking for myself, I've experienced it for sure.

15   Q.  I've experienced it also.

16        Are there certain bandwidths that don't -- tend not

17   to drop the call as much as others?

18   A.  Being in an elevator in the middle of a building is like

19   being farther away from the cell tower.  So for the same

20   system, a lower frequency is more likely to make it to an

21   elevator, and when these systems were first deployed, that

22   was certainly an advantage.  But now, as other higher

23   frequencies are deployed more intensively and there's more

24   cell division, this issue is less of an advantage for the

25   lower frequencies.

C. Bazelon - Cross (By Mr. Yarow)

1  Q.  Okay.  But in the 2011, 2012, 2014 time frame, it was

2  more of an issue than it may be today; is that correct?

3  A.  It was more of an advantage than today but much less an

4  advantage than it was 10 and 15 years earlier.

5  Q.  Okay.  Now, where does the 800 megahertz -- I'm not

6  talking just short band or broadband.  I'm just talking the

7  800 megahertz.  Where is that on the spectrum as far as the

8  high or low?

9  A.  When we speak of low-band spectrum, we typically are

10 speaking of below 1 gigahertz or below 1,000 megahertz.  So

11 the 600, 700, 800, and 900 megahertz bands or the low bands

12 spectrum.

13 Q.  So those generally are considered -- that's the bands

14 that are generally considered to be good for use with a

15 telephone, in a general sense?

16 A.  As I noted, those are the ones that are kind of an

17 advantage for the coverage aspects of a network.

18 Q.  And also the 800 would be less likely to drop a call

19 than, say, 1200?

20 A.  I'm hesitating because the higher -- it's not 12, let's

21 say 2 gigahertz networks that are also integrated and today

22 are deployed in a way that they are not very likely to drop a

23 call either.  But when they were first deployed, it was true

24 that the lower bands had this advantage.

25 Q.  Okay.  And so the -- you mentioned there was a lot of

C. Bazelon - Cross (By Mr. Yarow)

1  money that was made in the 1980s at these auctions.  What
2  kind of money?  What is a lot of money?
3  A.  So in the 1980s -- that was before the era of auctions --
4  the first cellular licenses were given away by lotteries, and
5  there was a lot of money made, and that is what motivated the
6  auctions.
7       The auctions started in 1994, and the federal
8  government has raised approximately $200 billion from selling
9  spectrum licenses in the last 25, 27 years.
10 Q.  Okay.  So somebody that purchased one of these licenses
11 in the auction was able to get a share of that money you just
12 described?
13      MR. BOSSE:  I'm going to object.  That misstates
14 what's been said, auction versus lottery and also time
15 frame --
16      MR. YAROW:  Sorry.  I meant lottery, Your Honor, I'm
17 sorry.
18      THE COURT:  Rephrase.
19 BY MR. YAROW:
20 Q.  Someone that was able to get the spectrum in the lottery,
21 they made a share of this big pot of money you're talking
22 about, the couple hundred million dollars -- a couple
23 billion, rather?
24 A.  So I'm not counting those licenses in the couple hundred
25 billion dollars, but it is true that they were able to make a

———————C. Bazelon - Cross (By Mr. Yarow)———————

1    lot of money, some of them immediately flipping the licenses.
2    There's famous stories of auction winners selling the license
3    the next day for tens of millions of dollars, and others held
4    onto it and developed it and made money that way.
5    Q.   During your years in the industry, have you heard a lot
6    of these war stories, I'll call them, where people made a lot
7    of money, lucky few?
8    A.   I have heard plenty of war stories, yes.
9    Q.   And that's -- okay.
10          Are you familiar with -- it was in one of the
11   documents that we just looked at -- WTO255 document?  Are you
12   familiar with this?
13          MR. YAROW:  Your Honor, may I get my computer?
14          THE COURT:  You may.
15          MR. YAROW:  Thank you.
16          (Pause in the proceedings.)
17          MR. YAROW:  Can you publish this, what's been
18   identified as Alcorn Number 1 to the witness, please.
19   BY MR. YAROW:
20   Q.   And I do apologize.  I'm not able to zoom in like some of
21   the other attorneys here.  Do you recognize this document I'm
22   scrolling through?
23   A.   So this is an FCC document.  I can tell it's related to
24   the 800-megahertz rebanding.  If you scroll down just a
25   little bit, it says it's a Supplemental Order and Order on

C. Bazelon - Cross (By Mr. Yarow)

1    Reconsideration, and it's from 2004.

2    Q.  Are you familiar with this document?

3    A.  It appears to be one in the proceeding that ultimately

4    led to this rebanding, but I couldn't from memory tell you

5    how it places in the regulatory history.

6    Q.  But you're able to identify it as an FCC document?

7    A.  Yes.

8            MR. YAROW:  Your Honor, I move to introduce.

9            THE COURT:  Any objection?

10           MR. BOSSE:  No objection.

11   BY MR. YAROW:

12   Q.  Okay.  I'm going to turn to --

13           THE COURT:  Wait a minute.  I have to admit it.

14           The document is admitted.

15           (Defendant Alcorn's Exhibit 1 was admitted.)

16           MR. YAROW:  Thank you, Your Honor.

17   BY MR. YAROW:

18   Q.  I'm going to turn to Page 16.  And I'm sorry, it's a

19   little clumsy doing this by myself.  So you see the top of

20   this page?

21   A.  I do.

22   Q.  And it says "guard band" on there.  Do you see that,

23   about the third line down on the top?

24   A.  I do.

25   Q.  Okay.  And across from that, it says "Value,"

C. Bazelon - Cross (By Mr. Yarow)

 1   "Megahertz," "POP."  Do you know what POP refers to in this

 2   document?

 3   A.   Person.  So a common valuation metric in spectrum is to

 4   express the value per person per megahertz so that you can

 5   compare values across licenses of different sizes and

 6   licenses that cover different geographies.

 7   Q.   Does that POP refer to a thousand people?

 8   A.   A single person.

 9   Q.   A single person.  Okay.

10        So if a New York City metropolitan area has, say,

11   25 million people and a Norfolk area has 1.7 million people,

12   the New York City area would have -- would be -- would have

13   more value or more population for sure; is that correct?

14   A.   Yes.

15   Q.   I'm sorry.  It would have more population, but it also

16   would have more value according to this since it multiplies

17   that number by this number here?

18   A.   Yes.  I want to caution you that the $1.70 there is a

19   national average number, and we would actually use different

20   numbers for New York and Norfolk to multiply times the

21   population, and the disparity actually between those two

22   markets would be larger than just the population disparity.

23   Q.   Are you familiar with why a value of $1.70 per megahertz

24   POP would be assigned to the guard band in this chart?

25   A.   So this is -- I can explain where the $1.70 comes from,

C. Bazelon - Cross (By Mr. Yarow)

1    and I can also talk about why it might be associated with the
2    guard band.  I'm not sure which of those two you're asking.
3    Q.  Well, first of all, the first question first, where it
4    comes from or why it's there.
5    A.  So in the bargain that the FCC made with Nextel to do the
6    reorganization of the band, there was pieces of spectrum that
7    Nextel was giving up, and there was pieces of spectrum that
8    they were going to give Nextel, and they had to put a value,
9    a dollar value on those, and this was their estimate.
10        The $1.70 comes from the FCC looking at other
11   spectrum license sales and making an adjustment for the fact
12   that this value covers a national footprint.
13   Q.  So if in -- so here you would say it's worth 1.70.  They
14   are assigning a value of $1.70 per person?
15   A.  That's the $1.70 per person per megahertz.  So I do need
16   to say that that is not what they are saying the guard band
17   is worth.  But to understand this calculation, there's two
18   megahertz next to the guard band.  And there's 247 million
19   people.  So if you multiply those two together, that's the
20   megahertz POPs, and if you multiply that number times the
21   1.70, that's where you get the 839- --
22   Q.  What is the value, the total value that's published
23   here of the -- on this document, what do they say the value
24   of -- actual value of the guard band is?
25        MR. BOSSE:  I'm going to object to that question.

C. Bazelon - Cross (By Mr. Yarow)

1   That is horribly misleading about what the value of it is.

2   That number is not the value of it.

3            MR. YAROW:  Well, that's what it says, Your Honor.

4   It says "Actual Value."

5            THE COURT:  Okay.  I will have the expert respond to

6   that question.  The Court doesn't know whether to sustain the

7   objection.

8            First of all, is that a question that you can

9   respond to?

10           THE WITNESS:  I think I can.

11           THE COURT:  All right.  Then let's try it.

12           THE WITNESS:  For clarity, could you ask it again to

13  make sure I respond accurately.

14           MR. YAROW:  So if you could republish that number on

15  the screen.

16  BY MR. YAROW:

17  Q.  Okay.  The one column says "Actual Value" at the top, and

18  then if you run across from -- if you go right across from

19  guard band, there's a number that says $839,975,515.

20  A.  That is the calculated compensation in this bigger

21  calculus of the rebanding that the FCC is allocating to the

22  2 megahertz of guard band spectrum that Nextel is giving up

23  from its prior use as part of its national cellular systems.

24  It's not telling you what its value as guard band spectrum

25  is.

Carol L. Naughton, Official Court Reporter

———————C. Bazelon - Cross (By Mr. Yarow)———————

1    Q.  Is this a typical document that the FCC will -- I mean,

2    is this the typical type of language that the FCC uses when

3    they publish a document?

4            THE COURT:  Mr. Yarow, that's a rather vague

5    statement.

6            MR. YAROW:  I will rephrase, Your Honor.

7    BY MR. YAROW:

8    Q.  When the FCC publishes a document, do they use a lot of

9    technicalese-type language?

10           THE COURT:  "When the FCC publishes a document,"

11   they publish many documents.  So I think you need to be

12   specific of what you're saying here, Mr. Yarow.

13   BY MR. YAROW:

14   Q.  This document in particular contains a lot of

15   technicalese.  Would that be correct?

16           MR. BOSSE:  I'm still going to object.  He said that

17   he may have seen this document, but this is a 67-page

18   document.  I don't know how he's going to answer that in any

19   fairness.

20           THE COURT:  Well, the Court asked you to be

21   specific, and you're asking about the chart here on this

22   page.  And perhaps I think the more appropriate thing is to

23   limit your question to this chart, not to when it publishes

24   documents, whatever documents.

25   BY MR. YAROW:

C. Bazelon - Cross (By Mr. Yarow)

1  Q.  This chart is not something that's easily understood by
2  somebody that's not trained in reading this type of chart.
3  Would you agree?
4  A.  No.  Although I have not reviewed this document recently,
5  I am confident that if you read the paragraphs around this
6  chart, there would be no misunderstanding about the
7  interpretation of that value as not being the value of the
8  guard band spectrum after the allocation but rather the
9  compensation to Nextel for that spectrum in the context of
10  the reorganization.
11  Q.  Fair enough.  But you are a Ph.D.; is that correct?
12  A.  That's correct.
13  Q.  Now, when the FCC releases the licenses, do they release
14  it for a certain -- actually, you testified they release them
15  for a certain geographic area; is that correct?
16  A.  Yes.  A license always covers -- virtually always covers
17  a geographic area.  In the case of the guard and expansion
18  band licenses, they released them in packages for different
19  areas of the country, and they still have not completed the
20  release of all of them.
21  Q.  All right.  So in other words, you would need to have --
22  if you wanted to have a nationwide network, you would need to
23  have licenses in each of the -- well, the cell phone
24  companies need to have licenses in each of the markets -- is
25  that correct? -- across the country?

C. Bazelon - Cross (By Mr. Yarow)

1  A.  They do, yes.  And the licenses that the cell phone
2  companies buy are what are called area licenses that will
3  cover a set of counties or a state or something like that.
4  That is very different than the guard band and expansion band
5  where the license is not for an area but for a specific point
6  where your tower is and the few miles around that tower.
7  Q.  Okay.  In spectrum -- spectrum is a natural resource?
8  A.  It is.
9  Q.  And it is something that is limited in the fact that no
10  more of it is being created?
11  A.  That's correct.  The same amount of spectrum exists today
12  as did in 1980.
13  Q.  And when you -- you testified that the frequency -- the
14  engineer might cost a certain amount of money.  I forget what
15  you said.  Would you repeat that?
16  A.  The engineer could be as much as a thousand or two.
17  Q.  A thousand or two.  And the frequency coordinator might
18  be a few thousand dollars?
19  A.  That really is the engineer.  That's what I meant.  The
20  frequency coordinator might charge a couple hundred dollars
21  for putting the application together, and then there was a
22  couple hundred dollars in FCC fees that also would be
23  charged.
24  Q.  Okay.  And so you've formed an opinion that the amount
25  charged was excessive relative to the cost by these various

——————— C. Bazelon - Cross (By Mr. Yarow)———————

1   spectrum companies.

2   A.  I would actually think the opinion is that it's excessive

3   relative to the value provided, but probably it's also

4   excessive compared to the cost of providing it.

5   Q.  And in your evaluation, you did not include any soft

6   costs, like operating the business, advertising, legal fees?

7   A.  So the fees that I used to compare it to, the few hundred

8   dollars for the coordinator organizing the license, those are

9   all fees from companies that are including their soft

10  costs -- recovering those soft costs in the fees, so at a

11  conceptual level they are accounted for in my analysis.

12  Q.  And in economics there's nothing wrong with -- as long as

13  it's not fraudulent, there's nothing wrong with charging or

14  making a profit in our economic system; is that correct?

15  A.  There's nothing wrong with making a profit.  Usually it

16  comes from adding value.

17  Q.  I've also heard some things by various individuals that

18  it is possible to combine these individual guard band

19  channels to achieve a larger broader channel that can carry

20  more data; is that correct?

21  A.  I'm not actually sure if you can really do that with

22  these channels.  The principle that you can take a couple of

23  channels and combine them is true, but the way these channels

24  are licensed, it's unclear that you would actually be able to

25  do that.

C. Bazelon - Cross (By Mr. Yarow)

1   Q.   Okay.  So in other words, if you have a -- a bike path is

2   a certain width and a superhighway is a certain width, it

3   might take 30 bike paths to equal the width of that --

4            THE COURT:  Hold, Dr. Bazelon.

5            Mr. Yarow, the hypothetical question that you asked

6   him appears to assume facts not in evidence here about

7   anybody combining any of these channels.

8            MR. YAROW:  Your Honor, I believe one of the

9   government witnesses testified using almost the exact

10  language of the bike lane and the superhighway.

11           THE COURT:  Well, if the witness did, then the Court

12  will withdraw it, but the Court didn't recall that.

13           MR. BOSSE:  Your Honor, I don't have any objection

14  to the question if it's phrased in terms of the guard and

15  expansion bands as opposed to just some free-floating

16  hypothetical.

17           THE COURT:  I think the Court probably didn't get as

18  specific as that.  If you can point specifically to someone

19  that raised exactly what you're asking the witness.

20           MR. YAROW:  Your Honor, I cannot recall who.  I

21  cannot recall who said that at this point.

22  BY MR. YAROW:

23  Q.   You testified that building out a tower can be quite

24  expensive.

25  A.   It takes a capital investment to put up a tower, put

C. Bazelon - Cross (By Mr. Yarow)

1   radios on it, the back -- what we call the backhaul, which is
2   the connection from the tower back to your central office.
3   Q.  Isn't it -- and there's also a requirement by the FCC
4   that a license holder build out so that their license will
5   produce a signal within 12 months?
6   A.  Yes.  That's the basic idea here, is that you have 12
7   months to use the license, put a signal on it --
8   Q.  Using the license does not necessarily include building a
9   tower; is that correct?
10  A.  Well, you can rent space on an existing tower.  You can
11  put a radio on a building roof instead of building a tower.
12  But it does require a radio-transmitting electromagnetic
13  energy.
14  Q.  And it requires also, I believe, one person receiving
15  that?
16  A.  Correct.
17  Q.  And that, on the most rudimentary level, can be done for
18  a lot less than the cost of a tower; is that correct?
19  A.  If you're trying to meet the technical requirement for
20  the build-out, you can do it on the cheap, but the FCC looks
21  very badly on that activity because they understand what is
22  going on, and you couldn't do it for long.
23  Q.  In your experience working in spectrum, are you familiar
24  with a company by the name of SmartCOMM?
25  A.  Yes.

——————— C. Bazelon - Cross (By Ms. McCaslin)———————

1  Q.  And can you tell me about their business model in the

2  early 2010-'11 time frame?

3         MR. BOSSE:  Your Honor, I think that's beyond the

4  scope and --

5         THE COURT:  Sustained.

6         MR. BOSSE:  -- I'm not even sure that he can answer a

7  question phrased that broadly.

8         THE COURT:  Sustained, beyond the scope.  There's no

9  mention of SmartCOMM in the direct examination.

10         MR. YAROW:  That's all the questions I have, Your

11  Honor.

12         THE COURT:  Any cross-examination by

13  Defendant Smith?

14         MS. McCASLIN:  Yes, Your Honor.

15                        CROSS-EXAMINATION

16  BY MS. McCASLIN:

17  Q.  Good afternoon, sir.  My name is Lindsay McCaslin.  I

18  represent Bill Smith.

19         Now, you had mentioned on direct examination that

20  the value of spectrum kind of depends on its use, right?

21  A.  That's correct.  The value comes from ultimately being

22  able to use it.

23  Q.  And the use -- or whether you're able to use it and how

24  might depend on a couple of factors, including what

25  technology is available now, right?

C. Bazelon - Cross (By Ms. McCaslin)

1    A.  That's one of the things for sure.
2    Q.  And the value would also depend on what technology is
3    likely to come available soon?
4    A.  Yes.
5    Q.  Now, if we're looking farther into the future, that would
6    be more speculative in terms of technology, right?
7    A.  That's correct.  It's worth noting, though, that whether
8    now or in the future, your license for the spectrum and the
9    license to use it would also have to allow you to use that
10   technology.
11   Q.  Right.  And so I'm actually going right there.
12        In terms of the value that you can get from a
13   license, it would depend on the laws that allow you to use a
14   certain section of the spectrum, right?
15   A.  They're regulations, but yes.
16   Q.  Thank you.
17        It would depend on any restrictions on the geography
18   of the spectrum?
19   A.  Yes.  The license would be for a specific geography for
20   sure.
21   Q.  It depends on what kind of technology is allowed to be
22   used with that section according to the FCC?
23   A.  Yes.  The example of the "not cellular" in this band
24   would be an example of that.
25   Q.  And there are also -- there's like a band in the spectrum

——————— C. Bazelon - Cross (By Ms. McCaslin) ———————

1  for television, I think you mentioned, right?

2  A.  Correct.

3  Q.  There can also be differences in value depending on the

4  height that you're allowed to have a signal on a tower.  Does

5  that matter?

6  A.  The height of an antenna will affect its ability to

7  propagate, and so being able to put it on a higher antenna

8  will allow it to propagate further, and that could affect its

9  value.

10  Q.  And also how close towers are together so they can hand

11  off, right?

12  A.  That's more of a design issue for the network operator.

13  The cellular principle is that when a cell tower fills up

14  with capacity, you have enough subscribers that you fill it

15  up, you can then shrink the footprint of that tower, spend

16  capital and build more towers, and reuse that same frequency

17  on the additional towers that you've added thereby increasing

18  the capacity of your system.  So the distance between the

19  towers is largely determined by the demands in the network

20  build and where they are in that cycle.

21  Q.  There's some systems, though, where you're not allowed to

22  hand off to more than five towers.  Is that correct?

23  A.  One of the restrictions on the guard and expansion bands

24  is that you cannot have a cellular system that has more than

25  five towers in it.

C. Bazelon - Cross (By Ms. McCaslin)

1   Q.   The FCC regulates most of these factors, right, many of

2   them?

3   A.   It regulates virtually all of them.

4   Q.   Okay.  And the FCC does change its rules.  It's a

5   continually evolving process, right?

6   A.   That's correct.  In the reorganization, this band is an

7   exam of them changing how the band was used.

8   Q.   And to change that involves a whole different process

9   or -- it can be a big process, small process, right?

10  A.   Not sure it's ever a small process.  But how big, I

11  guess, it varies.

12  Q.   Okay.  Now you had mentioned that the frequency

13  coordinator's job is kind of like a jigsaw puzzle, right?

14  A.   Correct.

15  Q.   From my understanding -- and you can correct me if I'm

16  wrong -- it's because you're trying to piece together all the

17  requirements that the company or the person is looking for in

18  terms of geography and strength and technology, right?

19  A.   You're trying to do it in a way where it will not

20  interfere with any of the existing users in the band.

21  Q.   Because if somebody already has a frequency, somebody

22  else can't take it, right?

23  A.   For these exclusive-use licenses, it's one licensee or

24  the other.

25          MS. McCASLIN:  Can we pull up, Mr. Grindrod,

Carol L. Naughton, Official Court Reporter

1   Smith 65.

2   BY MS. McCASLIN:

3   Q.  This has already been admitted into evidence.  This is a

4   public notice from November 27, 2012.  Do you recognize this?

5   A.  This looks like one of the public notices about some of

6   these licenses becoming available.

7   Q.  So when the licenses in the expansion band became

8   available, the FCC would create something like this?

9   A.  For a subset of them as they became available.  And as I

10  noted earlier, they still haven't completed this process.

11  Q.  Right.  And so if this was released on November 27, 2012,

12  they give you a couple -- a month or two for you to get ready

13  for your application, right?

14  A.  It should say there what the times are.

15  Q.  Okay.

16      MS. McCASLIN:  If we could jump to Page 5, please.

17  BY MS. McCASLIN:

18  Q.  So we see here the applications were going to be due

19  January 17, 2013.  I'm sorry.  I can make that...

20  A.  Correct.  That's the date that you can put in your

21  application.

22  Q.  So we've looked at a couple of public documents from the

23  FCC, including this one, one with Mr. Alcorn's attorney, and

24  there was a public document that you looked at with the

25  government, correct?

──────── C. Bazelon - Cross (By Ms. McCaslin) ────────

1   A.  I believe that's correct, yes.

2   Q.  And you mentioned that these aren't hidden from anybody.

3   They're available to the public.

4   A.  Correct.

5   Q.  And that would be available to anyone, not just someone

6   in telecommunications, right?

7   A.  That's correct.

8   Q.  So anybody who is personally interested in getting a

9   license can also view these?

10  A.  It's available to anybody who makes the effort to

11  explore.

12  Q.  Okay.

13          MS. McCASLIN:  We can take that down.  Thank you.

14          If we can look at Government's Exhibit 700A, which

15  has already been admitted.

16  BY MS. McCASLIN:

17  Q.  Now, I know the font is very small, so I can move in.

18  You have seen similar pro forma charts about the rate of

19  returns and the population numbers for various cities related

20  to this case, right?

21  A.  I would say similar.  This one does not look familiar,

22  but I have seen similar analyses.

23  Q.  My questions are going to be fairly generic.  I'm just

24  trying to understand.  So I'm going to cue in on this

25  Minneapolis, the second one from the bottom.

───────── C. Bazelon - Cross (By Ms. McCaslin)─────────

1          Back in -- I think this is going to be 2000.  So if
2    you have a population of around 4.4 million and they
3    estimated Sprint subscribers in 2007 to be around 337,000,
4    for cell users, even though that's broadband, would that be a
5    realistic number?
6          MR. BOSSE:  I'm going to object to that, on the
7    basis of what is the foundation for the witness's knowledge
8    of whether that's reasonable in Minneapolis?
9          MS. McCASLIN:  Your Honor, I'm just -- the witness
10   testified about the pro forma on direct -- or a similar pro
11   forma on direct, so I am just trying to understand which
12   numbers are realistic and which ones aren't because he has
13   been testifying about that.
14         MR. BOSSE:  Your Honor --
15         THE COURT:  Hold on.  I'm confident you have to lay
16   a better foundation for him in order for him to respond to
17   that question.
18         MR. BOSSE:  Can I make a record, Your Honor?  The
19   witness testified that these pro formas were riddled with
20   error, and I don't think it's fair to ask him about the
21   reality of any of these.
22         MS. McCASLIN:  Your Honor, if it's asked on direct,
23   I have a right to cross-examine.
24         THE COURT:  The Court knows your rights.
25         MS. McCASLIN:  Yes.

─────── C. Bazelon - Cross (By Ms. McCaslin) ───────

1    THE COURT:  But he testified that these numbers were

2  riddled with errors.

3    MS. McCASLIN:  Correct.

4    THE COURT:  You're asking him questions based on

5  something that he says is riddled with errors.

6    Now, if you can answer that Mr. Bazelon, you can

7  answer that question.

8    THE WITNESS:  And the question was is this a

9  reasonable number to come out?

10  BY MS. McCASLIN:

11  Q.  Yeah, based on your knowledge of broadband users, is that

12  a reasonable number, or is that one of the numbers that is

13  riddled with errors?

14  A.  As -- it's portraying what the Sprint subscribers are,

15  not what -- a pro forma having to do with the spectrum -- the

16  guard band licenses are about.  And the number is a

17  mechanical calculation based on the population of the market

18  and a 7-and-a-half-percent penetration.

19    The 7-and-a-half-percent penetration is more likely

20  a national number, and it certainly would vary market to

21  market, but as a ballpark figure.  If their national

22  penetration is at 7 and a half, a few hundred thousand

23  subscribers is likely what that implies.

24  Q.  So would it be fair to say that these -- and you can

25  correct me -- these numbers are taken out of context from

———— C. Bazelon - Cross (By Ms. McCaslin)————

1  various places and used to create a pro forma?

2  A.  I really don't know their origin, but certainly, as I

3  pointed out on the market penetration numbers, it is almost

4  impossible that it would be the same penetration in each

5  market.  You would expect some variation there.

6  Q.  And you have reviewed documents in this case, including

7  e-mails, correct?

8  A.  Yes.

9  Q.  And you're aware that Kent Maerki and David Alcorn

10  received feedback on their pro forma numbers from attorneys

11  and other people, right?

12  A.  I have seen some of that, yes.

13  Q.  They never revised the numbers significantly in the

14  pro formas, though, correct?

15  A.  That I just don't know which version when, sort of thing.

16  Q.  Fair enough.

17       Now, in doing your research, did you hear repeatedly

18  about Kent Maerki's experience in cellular in the '80s?

19  A.  Yes.

20  Q.  And is it true that he was part of a company called The

21  Cellular Corporation?  If you know.

22  A.  That sounds right.  I don't -- if it matters, we should

23  look it up.  But that sounds right.  And that he made money

24  off of these original cellular licenses, I understand -- I

25  understand that to be true.

C. Bazelon - Cross (By Ms. McCaslin)

1   Q.  Have you heard -- are you aware of the book or familiar
2   with the book called "Wireless Nation"?
3   A.  Yes.  I own a copy.
4           MS. McCASLIN:  If I can show the witness on the
5   overhead -- just for the witness, please.  This is going to
6   be marked as Smith 1001.
7   BY MS. McCASLIN:
8   Q.  Sir, do you recognize this?
9   A.  It looks familiar.  Like I said, I believe we have a copy
10  at my office, and I've probably cited to it in some report
11  somewhere.
12  Q.  Okay.
13          MS. McCASLIN:  Your Honor, I would move to admit
14  Smith 1001 with the understanding that, for the jury, I will
15  only be submitting the front page and one additional page and
16  an index, not the entire --
17          THE COURT:  You'll have to give the Court a little
18  more foundation than that before the Court is going to admit
19  even the front page.  What is the question to the witness?
20  BY MS. McCASLIN:
21  Q.  Sir, if we turn to the index --
22          MR. BOSSE:  Before this next question is posed, I
23  think I have to ask for a sidebar, because there's a
24  completeness issue that I need to bring up, I think, before
25  the index comes in.  I don't object to the front page if the

C. Bazelon - Cross (By Ms. McCaslin)

1  Court lets it in.

2          THE COURT:  Well, the Court hasn't said she can

3  introduce the index, first of all.  The Court is interested

4  in the question that is going to be asked the witness.  The

5  Court is not just going to admit an index.

6          Let's see if she can propound a specific question to

7  this witness, and then the Court will know where we're going,

8  because she can really consult any dictionary, commentary,

9  book, or anything.  So we want to know what the question is.

10          MR. BOSSE:  I don't want to surprise defense counsel

11  with my -- my argument is going to be this opens the door to

12  something.  I don't want to surprise defense counsel with it.

13  Can we confer?

14          THE COURT:  Tell you what we're going to do.  We're

15  not going to take a break.  You step over there and tell her

16  what you have in mind.  Let's just save some time.

17          (Pause in the proceedings.)

18          THE COURT:  If you can't agree, the Court will have

19  to go on the headphones here to resolve this.  So where are

20  we?

21          MS. McCASLIN:  Your Honor, I just have one brief

22  question.

23          THE COURT:  Okay.

24  BY MS. McCASLIN:

25  Q.  In listening to Mr. Maerki talk about himself and his

——————C. Bazelon - Cross (By Ms. McCaslin)——————

1  history, you've heard him mention that he is mentioned in two

2  books?

3  A.  That sounds familiar.

4  Q.  Is "Wireless Nation" one of them?

5  A.  I believe so.

6  Q.  And "Wireless Nation," you said, is something that you

7  probably have on your bookshelf?

8  A.  Correct.

9  Q.  While you were doing your research to prepare for this,

10  you obviously did review "Money From Thin Air" that Kent

11  Maerki made, right?

12  A.  Correct.

13  Q.  And then we also discussed the video from Mr. Smith.

14  A.  The clips that we -- yes.

15  Q.  The clips.

16  A.  Yes.

17  Q.  Thank you.

18        There are a lot of similarities throughout those two

19  videos, correct?

20  A.  That's my understanding.

21        MS. McCASLIN:  If we could play a couple clips

22  starting with -- is Government 308 entered in its entirety?

23        THE COURT:  Madam Clerk, is 308 in?

24        MR. BOSSE:  Is that "Money From Thin Air"?

25        THE CLERK:  308 is in.

C. Bazelon - Cross (By Ms. McCaslin)

1          MR. BOSSE:  We've entered the 15 clips.

2          MS. McCASLIN:  If I could admit Smith 834, which is

3     the "Money From Thin Air."  It's just the entirety.  I'm not

4     playing it.

5          THE COURT:  You're going to admit the whole clip?

6          MS. McCASLIN:  I'm going to admit the whole video,

7     but I'm only just going to show a couple of clips for the

8     jury.

9          MR. BOSSE:  We have no objection to that.

10          THE COURT:  Okay.  It will be admitted.

11          (Defendant Smith's Exhibit 308 was admitted.)

12          MS. McCASLIN:  Mr. Grindrod, if we could bring up

13     Smith 834, and we will also be comparing it to

14     Government 1216, which is already in evidence.  Beginning

15     with Mr. Maerki's please.

16          (Pause in the proceedings.)

17          MS. McCASLIN:  Just a moment while we fix the volume

18     issue.

19          (Pause in the proceedings.)

20          MS. McCASLIN:  If we can start with Mr. Maerki's

21     "Money From Thin Air."

22          (Video played in open court.)

23          MS. McCASLIN:  If we could show Mr. Smith's clip,

24     number 1, from Government 1216.

25          (Video played in open court.)

——————— C. Bazelon - Cross (By Ms. McCaslin) ———————

1  BY MS. McCASLIN:

2  Q.  So in those two clips, we do see that Mr. Smith is using

3  the exact same slide as Mr. Maerki in "Money From Thin Air,"

4  right?

5  A.  Yes.

6            THE COURT:  You guess?

7            THE WITNESS:  Yes.

8            THE COURT:  You said yes.  Oh, okay.

9            THE WITNESS:  Yes.  There's one line at the bottom

10 that hadn't come up yet, but I suspect it will if you ran the

11 clip further.

12           MS. McCASLIN:  Thank you.  If we could go on to

13 clip 2 from the same exhibits.

14           MR. GRINDROD:  Do you want the Maerki one first?

15           MS. McCASLIN:  Yes, please.

16           (Video played in open court.)

17           MS. McCASLIN:  If we could compare it to

18 Mr. Smith's.

19           (Video played in open court.)

20 BY MS. McCASLIN:

21 Q.  And once again with these, these two slides match;

22 Mr. Smith's looks like Mr. Maerki's?

23 A.  It appears he's clipping from him, yes.

24           MS. McCASLIN:  I believe we have one more.

25           (Video played in open court.)

C. Bazelon - Cross (By Ms. McCaslin)

1        (Video played in open court.)

2    BY MS. McCASLIN:

3    Q.  Now, you've already said that the 800 megahertz cannot

4    be -- is not going to be valuable or wanted by Sprint and

5    Verizon and T-Mobile, correct?

6    A.  The 800-megahertz guard band and expansion band licenses

7    will not be valuable.

8    Q.  Thank you.

9        If we could bring up -- just one moment.  I don't

10   want to ask you questions that have already been asked

11   already.

12       MS. McCASLIN:  If we could bring up Government 304.

13   Page 3, please.

14   BY MS. McCASLIN:

15   Q.  Now, we've seen this a lot.  You've seen this a lot, this

16   section of marketing material a lot, too, correct?

17   A.  I've seen it, yes.

18   Q.  Now, here in the middle where it says, "Bandwidth is the

19   new black gold, *Time Magazine*," that was actually the

20   headline of an article out of *Time Magazine,* right?

21       MR. BOSSE:  Object to foundation as to the original

22   *Time Magazine* issue.

23       MS. McCASLIN:  That's fine, Your Honor.  I can

24   rephrase.

25       THE COURT:  All right.  Rephrase.

C. Bazelon - Redirect

1    BY MS. McCASLIN:

2    Q.  Are you familiar with whether or not *Time Magazine* has

3    discussed bandwidth and spectrum?

4    A.  I can't say I'm familiar with this specific quote other

5    than through this case.

6    Q.  That's fine.

7             Are you familiar with either of the other two, from

8    Morgan Stanley or the *New York Times*?

9    A.  So, like, all three of them, I really couldn't say if I

10   saw them in their original format, but the sentiments of all

11   three are sentiments that I am familiar with from the public

12   press.

13   Q.  And so a lot of the numbers that we're seeing in the pro

14   formas, the quotes, the articles that you discussed on direct

15   examination, those really apply to the broadband and major

16   cell phone carriers, right?

17   A.  Correct.

18   Q.  But when it's completely out of context and you're

19   dealing with the expansion band, it just doesn't apply,

20   right?

21   A.  That's correct.

22             MS. McCASLIN:  No more questions.  Thank you.

23             THE COURT:  Any redirect?

24             MR. BOSSE:  I have a brief -- it really is brief.

25                          REDIRECT EXAMINATION

———C. Bazelon - Redirect———

1    BY MR. BOSSE:

2    Q.  Good afternoon, Dr. Bazelon.  You were asked a little bit

3    about the build-out requirements for spectrum licenses.  Did

4    you look to see whether licenses that were granted with

5    respect to the licenses in this case had been canceled

6    shortly after they were issued?

7    A.  Yes.  I did look up the licenses owned by Janus and a

8    couple other companies, and a number of them had been

9    canceled.

10   Q.  Canceled sometimes within a year of being issued from the

11   beginning?

12   A.  Yes.  It wasn't -- it certainly wasn't that long after

13   they were issued.  I don't know that I remember the specific

14   time period that they were canceled.  It wouldn't be less

15   than a year because you have that long to do the build-out

16   requirement.

17   Q.  You were asked a little bit about the cell phone

18   lotteries, the spectrum application lotteries that occurred

19   in the 1980s?

20   A.  Yes.

21   Q.  Is it common knowledge in the industry, the telecom

22   wireless industry, that those lotteries were rife with fraud

23   via application rules?

24   A.  Yes.

25           MR. BOSSE:  If we could see Government 6, which is

C. Bazelon - Redirect

1    in evidence.
2    BY MR. BOSSE:
3    Q.  In preparing your report and the research for the case,
4    did you become familiar with the fact that there's a public
5    order against The Cellular Corporation and Kent Maerki having
6    to do with them running an application mill in the 1980s?
7    A.  Yes.  This looks familiar.
8              MR. BOSSE:  And we can take that down.
9    BY MR. BOSSE:
10   Q.  You were asked a couple of questions about using a cell
11   phone in an elevator.
12   A.  Yes.
13   Q.  To your knowledge, is anyone in the world today using the
14   guard and expansion band on their smartphones in an elevator
15   or anywhere?
16   A.  Not in an elevator, not out in the field, not in their
17   car, not anywhere.
18             MR. BOSSE:  That's all I have.  Thank you.
19             THE COURT:  All right.  May this witness be
20   permanently excused?
21             MR. BOSSE:  Your Honor, we're asking, in case we
22   need him on rebuttal, which I think is unlikely, to have him
23   remain under subpoena.
24             THE COURT:  Where are you from, again?
25             THE WITNESS:  Maryland.

C. Bazelon - Redirect

```
 1              THE COURT:  Maryland.  All right.  You may be
 2   subject to recall.  You may step down.
 3              THE WITNESS:  Understood.
 4              (The witness stepped down.)
 5              THE COURT:  Ladies and gentlemen, we're going to
 6   take a brief 15-minute break.
 7              (The jury exited the courtroom.)
 8              (Recess from 4:01 p.m. to 4:24 p.m.)
 9              (The jury entered the courtroom.)
10              THE COURT:  You may be seated.
11              All jurors are now present.  Does counsel agree?
12              MR. YAROW:  Your Honor, I believe someone is
13   missing.
14              THE COURT:  Ladies and gentlemen, one juror was
15   excused by the Court because of a death in the family.  Okay?
16   So we have all but one.
17              MS. O'BOYLE:  The government agrees, Your Honor.
18              MR. YAROW:  Mr. Alcorn agrees.
19              MS. McCASLIN:  Mr. Smith agrees.
20              THE COURT:  Next witness.
21              MS. O'BOYLE:  Your Honor, the government calls Alan
22   Baskin.
23              (Witness sworn.)
24              ALAN BASKIN, called by the Government, having been
25   first duly sworn, was examined and testified as follows:
```

A. Baskin - Direct

                        DIRECT EXAMINATION

1

2  BY MS. O'BOYLE:

3  Q.  Good afternoon, Mr. Baskin.  You and I have never met.

4  My name is Melissa O'Boyle, and I represent the United States

5  in this case.

6  A.  Hi.

7  Q.  Could you please state and spell your name for the court

8  reporter.

9  A.  Sure.  It's -- sorry.  It's Alan Baskin, A-l-a-n

10 B-a-s-k-i-n.  It feels like I have a lisp now or something

11 now.  Am I okay?

12 Q.  Just make sure you keep that microphone right up to you

13 because they need to hear you all the way in the back.  Okay,

14 Mr. Baskin?

15          Where do you live, sir?  Just the city and state,

16 please.

17 A.  Scottsdale, Arizona.

18 Q.  What do you do for a living?

19 A.  I'm an attorney.

20 Q.  Where did you go to law school?

21 A.  Arizona State University.

22 Q.  When did you graduate?

23 A.  1990.

24 Q.  Now, I want to take you back to July of 2013.  Okay?

25 Where did you work at that time?

─────A. Baskin - Direct─────

1    A.   That's a good question.  I had a firm at that time

2    called -- I think at that time it was Bade Baskin Richards.

3    Q.   You said you had a firm.  Was that your own firm?

4    A.   It was my firm, yes.

5    Q.   And how many people worked in the firm at the time?

6    A.   I believe at the time there would have been five or six

7    attorneys and then some support staff.

8    Q.   And do you have a particular specialized area of law in

9    which you practice?

10   A.   I can't say "specialized" in Arizona.  That's a

11   four-letter word, but my practice emphasized securities,

12   litigation matters, things like what we're doing here, cases

13   before state and federal securities regulators, disputes in

14   the securities industry, things like that.

15   Q.   Okay.  And in July of 2013, did you meet an individual

16   named David Alcorn?

17   A.   I did.

18   Q.   And how did you meet him?  What was the reason why you

19   met him?

20   A.   David was referred to me by another attorney because he

21   had gotten a subpoena from the SEC's offices in Los Angeles.

22   Q.   Okay.  And let's take a look at Government's

23   Exhibit 500B.  It should be on your screen.  And I believe --

24   I think this one might have been left out of your binder,

25   sir, but if you could take a look on your screen, do you

A. Baskin - Direct

1   recognize this subpoena from the Securities and Exchange

2   Commission?

3   A.  Can we browse through it?

4   Q.  Yes, sir.

5        MS. O'BOYLE:  Can you page down for Mr. Baskin,

6   please.  Thank you.

7   BY MS. O'BOYLE:

8   Q.  And it's the subpoena dated June 27, 2013?

9   A.  I don't have a specific recollection, but, you know, I

10  have no reason not to believe that that's the subpoena that

11  Mr. Alcorn was served with.

12       MS. O'BOYLE:  Government moves in Exhibit 500B.

13       MR. YAROW:  No objection.

14       THE COURT:  500B will be admitted.

15       (Government's Exhibit 500B was admitted.)

16  BY MS. O'BOYLE:

17  Q.  Just generally taking a step back, sir, what is the

18  United States Securities and Exchange Commission?

19  A.  They are the primary, if not the only, federal securities

20  regulatory agency, so they are the folks that if you're

21  listed on an exchange, for example, you go through the SEC.

22  For purposes of a case like this, they enforce the federal

23  securities laws, and they can do that administratively or

24  civilly.

25  Q.  And is the Securities and Exchange Commission charged

1752

————A. Baskin - Direct————

 1   with, among other things, protecting investors in connection

 2   with enforcing the securities laws?

 3   A.  Yes.

 4   Q.  Now, this says "In the matter of Janus Spectrum."  Do you

 5   see that?

 6   A.  I do.

 7   Q.  And the first line of this says "The staff of the

 8   Securities and Exchange Commission is conducting an

 9   investigation in the matter identified above."

10           What did you understand that to mean?

11   A.  I understood that to mean it was like any other

12   investigation.  There's a procedure called a formal order of

13   investigation, and in essence, someone or somehow has gotten

14   to the SEC's attention.  There could have been violations of

15   the federal security laws, and Mr. Alcorn got a subpoena.

16   Q.  Eventually Mr. Alcorn got a formal order; is that

17   correct?

18   A.  We may be talking about different things.  When the SEC

19   opens an investigation, there's what's called a formal order

20   of investigation.  So that would have been issued already.

21   You can probably see a reference to it if you took that thing

22   away.

23   Q.  Okay.  But this was -- this is why Mr. Alcorn came to see

24   you, correct?

25   A.  Yes.  And I'm sorry if I'm being a bad witness, but if

A. Baskin - Direct

1   you look at the "re," you can see that there's a number at

2   the end.  That means that the SEC had formally opened an

3   investigation.

4   Q.  You said at the end, is that the LA-04280?

5   A.  That's correct.

6   Q.  So that indicates to you that there was a formal

7   investigation opened into Janus Spectrum?

8   A.  Yes, out of the Los Angeles office.

9   Q.  Now, just to be clear, did Mr. Alcorn ultimately hire you

10  as his attorney in July of 2013?

11  A.  He did.

12  Q.  And what was the purpose of your engagement?

13  A.  The purpose of my engagement was to represent and defend

14  him as it related to this investigation.

15  Q.  Okay.  And just to be clear, the date on this subpoena is

16  June 27, 2013; is that right?

17  A.  Yes.

18  Q.  Had you even met Mr. Alcorn before July of 2013?

19  A.  I had not.

20  Q.  After Mr. Alcorn hired you, did you talk with him about

21  his business, Janus Spectrum?

22  A.  Oh, yes.  Yes.

23  Q.  And was he the primary source of information that you

24  received in connection with this representation?

25  A.  Yes.

A. Baskin - Direct

1    Q.  Were you ever present at any of Mr. Alcorn's pitches to
2    his clients?
3    A.  No.  No.
4    Q.  And throughout your representation of Mr. Alcorn, what
5    conversations, if any, did you have with his clients?
6    A.  His clients?
7    Q.  His clients.
8    A.  I did not have any.
9    Q.  During your representation -- I guess at any time, what
10   conversations, if any, did you have with any of Mr. Alcorn's
11   investors?
12   A.  None.
13   Q.  So your understanding of what Mr. Alcorn represented to
14   clients and investors were based on information that you
15   received from Mr. Alcorn?
16   A.  That's correct.
17   Q.  Now, during your representation of Mr. Alcorn, did he
18   give you access to his accountant, Mr. Brian Semple?
19   A.  Yes, he did.
20   Q.  Did you speak with Mr. Semple?
21   A.  I did.
22   Q.  Did Mr. Brian Semple or Mr. Alcorn give you access to
23   Janus Spectrum's bank accounts?
24   A.  I believe they did, yes.
25   Q.  Did you review and do a full accounting of Mr. Alcorn's

A. Baskin - Direct

1   bank accounts?

2   A.   A full accounting, no.

3   Q.   What, if any, information did you have regarding

4   Mr. Semple's involvement in purchasing Mr. Alcorn's -- the

5   house that he was living in?

6   A.   Mr. Semple's involvement in purchasing Mr. Alcorn's home?

7   Today, I do not recall anything about that.

8   Q.   So did you have -- did you give any legal advice to

9   Mr. Alcorn about transferring funds into Mr. Semple's

10  accounts?

11  A.   Not that I recall, no.

12  Q.   Now, Mr. Baskin, in July of 2013, what background, if

13  any, did you have in spectrum?

14  A.   Spectrum?

15  Q.   Spectrum.

16  A.   None.

17  Q.   And what independent knowledge, if any, did you have on

18  how to value 800-megahertz spectrum?  Any at all?

19  A.   Independent knowledge, like what I brought to the table?

20  Q.   Yes.

21  A.   None.

22  Q.   Did Mr. Alcorn have another attorney that was

23  representing him with respect to spectrum?

24  A.   Yes, he did.

25  Q.   And was that an individual Mr. Alan Tilles?

A. Baskin - Direct

1    A.   Yes.

2    Q.   And Mr. Tilles was hired by Mr. Alcorn to advise him with

3    respect to the spectrum piece of his business; is that right?

4    A.   Yes.

5    Q.   And during your representation, did Mr. Alcorn encourage

6    you and Mr. Tilles to talk?

7    A.   Oh, yes.

8    Q.   So you had access to Mr. Tilles?

9    A.   I did.

10   Q.   And that was so that you could understand, at least a

11   little bit, the spectrum side of things?

12   A.   Both ways.  For him to understand what was going on with

13   me and for me to understand, and then there was some other

14   litigation out there; so a couple of things.

15   Q.   So Mr. Alcorn had two attorneys, and you communicated

16   with each other about your representation of Mr. Alcorn?

17   A.   And to be fair, I believe there were three attorneys.

18   Q.   Who was the third one?

19   A.   Lance Broberg.

20   Q.   Did you speak with him as well?

21   A.   Yes.  He is the gentleman that referred the case.

22   Q.   If you could take a look at Government's Exhibit 300O.  I

23   believe it should be in the binder in front of you, but it's

24   also going to end up on your screen.

25        Sir, this is an e-mail chain.  There's an e-mail

─────────────────A. Baskin - Direct─────────────────

1    from Mr. Tilles to Mr. Alcorn and then a later e-mail from

2    Mr. Tilles to you; is that correct?

3    A.  Yes.

4            MS. O'BOYLE:  Government moves in Exhibit 300O.

5            THE COURT:  Any objection?

6            300O will be admitted.

7            (Government's Exhibit 300O was admitted.)

8    BY MS. O'BOYLE:

9    Q.  This is an e-mail that you received on August 2nd of

10   2013; is that right?

11   A.  Yes.

12   Q.  From Mr. Tilles?

13   A.  Yes.

14   Q.  And so this was a little after Mr. Alcorn had hired you?

15   A.  That's correct.

16   Q.  And the e-mail that he forwarded you is dated March 20,

17   2012.  Do you see that?

18   A.  Yes.

19   Q.  And it's from Mr. Tilles to Mr. Alcorn?

20   A.  Correct.

21   Q.  And do you see that focusing in on his e-mail, he --

22   Mr. Tilles tells Mr. Alcorn on March 20 of 2012, "There's no

23   spectrum below 861 megahertz and above 851 megahertz that can

24   be used for any kind of broadband because there are too many

25   incumbents.  What are you going to do, move them?  Not after

Carol L. Naughton, Official Court Reporter

A. Baskin - Direct

1   eight years of rebanding.  And to where?"

2          Do you see that?

3   A.  I do.

4   Q.  Do you know what Mr. Tilles meant here?

5   A.  I know in general, but I don't know with any technical

6   knowledge.

7   Q.  Okay.  But Mr. Tilles forwarded this e-mail to you?

8   A.  Yes.

9   Q.  If we can go to Government's Exhibit 300P.  And, again,

10  this is an e-mail from Mr. Tilles to Mr. Alcorn that

11  Mr. Tilles then forwards on to you in connection with your

12  representation of Mr. Alcorn; is that right?

13  A.  Yes.

14          MS. O'BOYLE:  Government moves in Exhibit 300P.

15          THE COURT:  300P will be admitted.

16          (Government's Exhibit 300P was admitted.)

17  BY MS. O'BOYLE:

18  Q.  Again, let's just go directly to Mr. Tilles's e-mail

19  here.  Mr. Tilles on March 26, 2012, sends an e-mail to

20  Mr. Alcorn; is that right?

21  A.  Yes.

22  Q.  And Mr. Tilles says, "Um, we need to chat.  I just saw

23  your website.  It's almost a carbon copy of Pen's.  I was not

24  aware that you were selling applications.  I can't be

25  involved in this."

A. Baskin - Direct

1          Do you see that?

2   A.  Yes.

3   Q.  Do you know who -- "It's almost a carbon copy of Pen's."

4   Do you know what that is in reference to?

5   A.  That's another gentleman who was in a similar business.

6   Q.  To Mr. Alcorn?

7   A.  Yes.

8   Q.  If we could go to Government's Exhibit 300Q.  Is this an

9   e-mail from Mr. Tilles to Mr. Alcorn that he then forwards to

10  you?

11  A.  Yes.

12  Q.  And this is in connection with your representation of

13  Mr. Alcorn?

14  A.  Correct.

15          MS. O'BOYLE:  Government moves in Exhibit 300Q.

16          THE COURT:  300Q will be admitted.

17          (Government's Exhibit 300Q was admitted.)

18  BY MS. O'BOYLE:

19  Q.  And so this is another e-mail from Mr. Tilles to

20  Mr. Alcorn, focusing on that one first, and it's dated

21  March 26, 2012.  Do you see that?

22  A.  I do.

23  Q.  And it's copied to a NickTusa@TusaConsulting.com.  Do you

24  know who that is?

25  A.  I do not.

1760

A. Baskin - Direct

1   Q.  Focused in here on the very first statement, it's in
2   quotes, "We estimate that our clients will begin to realize
3   income via a lease or sale or other form of commercial
4   exploitation of their licenses 12 to 18 months from the date
5   of payment to Janus Spectrum."
6          And then does Mr. Tilles then underneath there say,
7   "Not a chance in h-e-l-l.  Plus the suggestion that one is
8   doing this strictly for resale makes you look like total
9   speculators."  Do you see that?
10  A.  I do.
11  Q.  And then below that, there's another quote, and does
12  Mr. Tilles say to Mr. Alcorn, "Misleading.  As I discussed
13  with you in the very beginning, enhanced ESMR operation is
14  barred in the guard band from the FCC's rebanding order."
15  A.  Yes.
16  Q.  And Mr. Tilles forwards this to you; is that correct?
17  A.  Yes.
18  Q.  And Mr. Broberg was the other lawyer that you mentioned?
19  A.  Yes.
20  Q.  What did he say here?
21  A.  "Could I have been more clear," with the "more" in all
22  caps.
23  Q.  Do you know what he was talking about here?
24  A.  Oh, yes.
25  Q.  What was he talking about?

─────A. Baskin - Direct─────

```
 1  A.  He was explaining that -- the unlikelihood of some of the
 2  things that had been represented in some of the promotional
 3  materials occurring -- or occurring in the timeline as
 4  suggested by Janus, but also that part of it, in essence, he
 5  couldn't foresee happening.
 6  Q.  Okay.  And then the last one, if you could go to 511D, as
 7  in delta.  Is this an e-mail from Mr. Alcorn to -- sorry,
 8  Mr. Tilles to Mr. Alcorn and then a response from Mr. Alcorn,
 9  that Mr. Alcorn, I guess, then forwards to Mr. Maerki?
10  A.  Yes.
11          MS. O'BOYLE:  Government moves in Exhibit 511D.
12          THE COURT:  511D is admitted.
13          (Government's Exhibit 511D was admitted.)
14  BY MS. O'BOYLE:
15  Q.  Let's take a look just briefly at this e-mail sent from
16  Mr. Tilles on August 2nd of 2014.
17          And he says in here, "This just all makes me ill.  A
18  Des Moines license for an 800-megahertz guard band channel
19  worth 2.5 million, you're kidding me right?  The annual
20  income from a license in Seattle is 840,000?  I'm sick to my
21  stomach.  I really want out of this."
22          Now, Mr. Tilles did not forward this e-mail to you;
23  is that right?
24  A.  That's correct.
25  Q.  Now, did you ever see the projections that Mr. Alcorn was
```

A. Baskin - Direct

```
 1   providing to prospective clients and investors?
 2   A.  I can't remember, but something tells me I may have seen
 3   them.
 4   Q.  Did you ever --
 5            THE COURT:  Hold on.  You have to hold that
 6   microphone up to you so you can clearly project.
 7            THE WITNESS:  Okay.  Sorry, Your Honor.  Am I doing
 8   better?
 9            THE COURT:  That's better.  Just keep it there.
10            THE WITNESS:  I'm trying.
11   BY MS. O'BOYLE:
12   Q.  I asked you about whether you had ever seen the
13   projections, the pro forma that Mr. Alcorn was providing to
14   prospective clients and investors.  Did you ever see that,
15   that you recall?
16   A.  I am not positive, but I believe I saw them.
17   Q.  Did you ever ask Mr. Alcorn directly what those
18   projections were based on that you can recall?
19            MR. YAROW:  Your Honor, I object.  He said he can't
20   remember seeing the projections.
21            THE COURT:  Wait a minute.  I think you need to
22   rephrase, Counsel, and lay a better foundation.  The Court
23   sustains the objection.
24            MS. O'BOYLE:  I'll move on, Your Honor.
25   BY MS. O'BOYLE:
```

A. Baskin - Direct

1  Q.  Did you yourself do any independent investigation into

2  whether the representations regarding spectrum were true and

3  accurate?

4  A.  The -- I don't know if you would call it independent, but

5  the conversations that I had with Mr. Tilles were

6  informative.

7  Q.  Were you concerned after speaking with Mr. Tilles?

8  A.  Oh, yes, yes.

9  Q.  Did you relay those concerns to Mr. Alcorn, your client?

10  A.  I don't have a specific recollection, but that's -- those

11  are things we would have talked about for sure.

12  Q.  You don't have a specific recollection of a specific

13  conversation that you had with Mr. Alcorn?

14  A.  No specific recollection of a specific conversation.

15  Q.  But that is the type of conversation, if you had

16  concerns, that you would have had with your client?

17  A.  Oh, yes, of course.

18  Q.  Now, if you could take a look at Government's

19  Exhibit 505B, as in bravo.  And before we get there, in

20  connection with your representation of Mr. Alcorn, did you

21  eventually suggest that he hire another lawyer to work on a

22  commercialization agreement?

23  A.  Yes, I did.

24  Q.  And who was that?

25  A.  His name was Jere, J-e-r-e, Friedman.

─────A. Baskin - Direct─────

1   Q.  And so did Mr. Alcorn hire Mr. Friedman to also assist in

2   the representation of Mr. Alcorn?

3   A.  He did.

4   Q.  If you could take a look at 505B.  Is this an e-mail from

5   you to Mr. Alcorn?

6   A.  Yes, it is.

7   Q.  And is it in connection with your representation of him?

8   A.  Yes.

9        MS. O'BOYLE:  Government moves in Exhibit 505B.

10        THE COURT:  505B is admitted.

11        (Government's Exhibit 505B was admitted.)

12  BY MS. O'BOYLE:

13  Q.  Mr. Baskin, what is the date of this e-mail that you're

14  sending to Mr. Alcorn?

15  A.  August 8, 2013.

16  Q.  So was this relatively early on in your representation of

17  Mr. Alcorn?

18  A.  Yes.

19  Q.  And who is Mr. James D. Griffith?

20  A.  He was a contract paralegal that worked with me.

21  Q.  So he worked in your office?

22  A.  Yes.

23  Q.  If you could please, if you could read the first three --

24  these lines in your e-mail to Mr. Alcorn on August 8 of 2013.

25  A.  Sure.

A. Baskin - Direct

```
1          "Daryl," which is D-a-r-y-l, "Bank has been barred
2    from the securities industry since 2010.  See the link found
3    below.  We had better hope that all of the Dominion money
4    came from him, not a group of investors.  I will not be
5    discussing him in my letter."
6    Q.  And so your e-mail references a link; is that right?
7    A.  Correct.
8    Q.  I've highlighted a link that is BrokerCheck.FINRA.org.
9          Do you see that?
10   A.  Yes.
11   Q.  What is that?
12   A.  There's an entity called FINRA, without getting too
13   granular, that also regulates the securities industry, and if
14   you have ever been licensed to sell securities, BrokerCheck
15   is a document that basically allows you to look at someone's
16   rap sheet.
17         It will tell you where someone worked, how long they
18   worked, what licenses they have, and what state they are
19   licensed, and then there are a number of categories within
20   BrokerCheck about whether there have been lawsuits,
21   disciplinary proceedings, someone has been fired, things like
22   that.
23   Q.  When you said Daryl Bank has been barred from the
24   securities industry since 2010, what did you mean?
25   A.  I had -- I was doing some research, and I pulled up his
```

2019-cr-00047-RAJ-LRL   Document 500   Filed 08/30/22   Page 178 of 193 PageID# 7436

─────A. Baskin - Direct─────

 1   BrokerCheck, and he literally had been barred -- FINRA has
 2   the ability to issue these things called bars, and Bank was
 3   barred, and what that meant was he wouldn't be able to get a
 4   license with any registered brokerage firm, securities firm.
 5   Q.  Was it your understanding that Mr. Bank was providing
 6   funds to Mr. Alcorn?
 7   A.  Yes.
 8   Q.  Were you concerned about that?
 9   A.  Yes.
10   Q.  Why?
11   A.  Because I did not believe it was a good idea to do
12   business with someone who had been kicked out of the
13   securities industry, especially when you're under
14   investigation by the SEC.  And I was also concerned that he
15   was not just investing Daryl Bank's money but that he was
16   raising money from other individuals and pooling it for
17   investment in Janus.
18   Q.  And so that second part that you were concerned that he
19   was raising money from other investors and pooling it and
20   sending it to Janus, why did that give you concern?
21   A.  Because just the act of Bank raising money from a pool of
22   investors, in essence, would be offering and selling
23   securities before you even put the money into Janus.
24   Q.  And you explained all of -- what you just explained to
25   the jury, did you explain that to Mr. Alcorn?

Carol L. Naughton, Official Court Reporter

A. Baskin - Direct

1   A.   Yes.  Yes.

2   Q.   Do you know whether Mr. Alcorn continued to take funds

3   from Mr. Bank after he received your e-mail on August 8,

4   2013?

5   A.   I cannot tell you one way or the other.

6   Q.   You don't know?

7   A.   I don't know.

8   Q.   Did Mr. Alcorn also give you a couple of videos related

9   to the sale of spectrum?

10  A.   He did.

11  Q.   Was one of them called "Money From Thin Air"?

12  A.   That sounds right.

13  Q.   And did Mr. Alcorn explain what he did with these videos?

14  A.   Could you be a little bit more specific?

15  Q.   Well, did he tell you that he forwarded these videos to

16  clients?

17  A.   He did, but not to every client.

18  Q.   Did these videos concern you?

19  A.   Yes, they did.

20  Q.   And why?

21  A.   Because a couple of reasons.  Number one, they made it

22  apparent to me, at least, that whomever it was that was

23  offering -- that was putting this out was offering and

24  selling securities, number one; and, number two, it in

25  essence portrayed the particular investment as no risk.

A. Baskin - Direct

1    Q.  Okay.  And did you explain that to Mr. Alcorn?

2    A.  Yes.  Yes.

3    Q.  Okay.  Let's see.  If we can go to Government's

4    Exhibit 509C.  And is 509C an e-mail from your paralegal,

5    Mr. Griffith, to Mr. Alcorn and Mr. Alcorn's response?

6    A.  Yes.

7            MS. O'BOYLE:  Government moves in Exhibit 509C.

8            THE COURT:  509C is admitted.

9            (Government's Exhibit 509C was admitted.)

10   BY MS. O'BOYLE:

11   Q.  Could you please read what Mr. Griffith, your paralegal,

12   asked Mr. Alcorn on November 25, 2013.

13   A.  "As a follow-up question to our conversation, did your

14   clients (or any of them) know Janus's estimated

15   costs/expenses and/or its (expected) profit for the services

16   provided?"

17   Q.  How did Mr. Alcorn respond?

18   A.  "Not as far as I know."

19   Q.  And so during your representation of Mr. Alcorn, did you

20   have any idea of the level of profit margin Mr. Alcorn and

21   Mr. Maerki were receiving from investors?

22   A.  I don't recall.

23   Q.  Okay.  Now, we talked a little bit about Mr. Friedman,

24   and he was another attorney that Mr. Alcorn hired, correct?

25   A.  Yes.

A. Baskin - Direct

1   Q.  If we could go to Government's Exhibit 508.  Do you
2   recognize Government's Exhibit 508 as an e-mail string
3   involving you and Mr. Friedman and Mr. Alcorn?
4   A.  I do.
5           MS. O'BOYLE:  Government moves in Exhibit 508.
6           THE COURT:  508 is admitted.
7           (Government's Exhibit 508 was admitted.)
8   BY MS. O'BOYLE:
9   Q.  We're going to go here to the second e-mail, and this is
10  an e-mail from you to Mr. Alcorn with a copy to Mr. Friedman;
11  is that correct?
12  A.  Yes.
13  Q.  It's dated October 16, 2013?
14  A.  Yes.
15  Q.  And could you please read the second paragraph that you
16  wrote to Mr. Alcorn on October 16, 2013.
17  A.  "David, we have discussed this before, but there is
18  obvious risk in taking on new clients during a pending SEC
19  investigation.  My meeting will certainly shed more light on
20  that issue."
21  Q.  And so you informed Mr. Alcorn in this e-mail that there
22  was risk in continuing to take on new clients while the SEC
23  investigation is pending; is that right?
24  A.  Yes.
25  Q.  And this was something that you had actually talked to

A. Baskin - Direct

```
 1   Mr. Alcorn before?
 2   A.  Oh, yes.
 3   Q.  And why were you concerned about Mr. Alcorn continuing to
 4   take in client funds while the SEC investigation was pending?
 5   A.  As a general statement, it's never a good idea.  Specific
 6   to Mr. Alcorn, the documents that had been drafted originally
 7   to me were pretty clearly involving the sale of securities,
 8   and the other information that I was gathering and some of
 9   the other kind of cast of characters led me to believe that
10   it was not a good idea to be going out and raising money
11   because it could just make things worse.
12   Q.  And Mr. Friedman -- or did you communicate that with
13   Mr. Alcorn both in writing in this e-mail as well as
14   verbally?
15   A.  Oh, yes, yes.
16   Q.  And this is an e-mail, the top e-mail on the chain,
17   Mr. Friedman to you and Mr. Alcorn.  Do you see that?
18   A.  Yes.
19   Q.  And could you please read what Mr. Friedman said.
20   A.  "Yes, taking on more clients without knowing how the SEC
21   investigation will go gives me considerable concern.  If
22   there is a problem that cannot be easily resolved with the
23   SEC, then you're just making a bad situation that much
24   worse."
25   Q.  So you and Mr. Friedman -- you both agreed and told
```

—————————A. Baskin - Direct—————————

1   Mr. Alcorn that he should not continue to accept funds during

2   the pendency of the SEC investigation?

3            MR. YAROW:  Your Honor, I'm sorry, could we have the

4   witness speak up a little bit.

5            THE COURT:  Yes.  Once again, we have the same

6   problem, Mr. Baskin.

7            THE WITNESS:  I apologize to the Court.

8            THE COURT:  Just hold the mic right there.  Imagine

9   you're a rock star and you need to scream into the

10  microphone.

11           THE WITNESS:  I promise not to break into song.

12  BY MS. O'BOYLE:

13  Q.  So let's take a look at Government's Exhibit 509A.  And

14  509A, this is an e-mail from you to Mr. Alcorn dated

15  November 21, 2013; is that right?

16  A.  Correct.

17           MS. O'BOYLE:  Government moves in Exhibit 509A.

18           THE COURT:  509A is admitted.

19           (Government's Exhibit 509A was admitted.)

20  BY MS. O'BOYLE:

21  Q.  So this is just one e-mail on this exhibit, and it's from

22  you to Mr. Alcorn and Mr. Maerki; is that correct?

23  A.  Yes.

24  Q.  And you also copied the other two lawyers, Mr. Broberg

25  and Mr. Friedman?

A. Baskin - Direct

1    A.   Correct.

2    Q.   It's dated November 21, 2013.  So we're about, what, four

3    months into your representation now, approximately?

4    A.   Yes.  Yes.

5    Q.   And let's go down to number 1.  Could you please read

6    this paragraph.

7    A.   "When I spoke with Marty, he indicated that David was

8    unaware that the SEC investigation involved potential

9    securities fraud claims, as opposed to the narrow issue of

10   whether Janus's program is a security.  I find that hard to

11   believe and can only hope there was some misunderstanding.

12   We have spoken at length about the SEC's powers to

13   investigate and bring claims of securities fraud; that is

14   their bread and butter.  In addition, we provided David a

15   copy of the formal order of investigation which specifically

16   references the securities fraud statutes."

17   Q.   So when you said you spoke with Marty, who is Marty?

18   A.   Marty Galbut was another attorney in Phoenix.

19   Q.   Was he also representing Mr. Alcorn?

20   A.   I can't remember exactly what happened, but I know that

21   at some point David had talked to him.

22   Q.   And so you said in here that David was unaware that the

23   SEC investigation involved potential securities fraud claims.

24   A.   I said that when I talked to Marty, Marty told me that.

25   Q.   Did you discuss with Mr. Alcorn that the SEC was

A. Baskin - Direct

1   investigating Janus Spectrum LLC for securities fraud?
2   A.   Yes.
3   Q.   And does that go back to the conversation we had a few
4   minutes ago, the concerns that you relayed to him?
5   A.   Yes.
6   Q.   Because given the materials that you had reviewed, were
7   you worried about allegations of fraud?
8   A.   I would have been worried the day the subpoena came in.
9   Q.   Okay.  Let's go over to number 2.  And if you could start
10  reading "substance prevails over form."
11  A.   "Substance prevails over form, so regardless of the
12  language of the agreements, if the SEC can convince a court
13  that Janus performs the essential managerial functions, the
14  program will be considered a security.  This is where things
15  like the recorded presentations by Kent that have been
16  provided to a number of clients come into play because they
17  support the argument that investment in Janus is passive (or
18  'work-free,' as the presentation states) and also has very
19  little risk ('or less than no risk').  The recordings do not
20  help; they support an argument that the clients are passive
21  and the program is a security."
22  Q.   And here it talks about -- you started that sentence with
23  what I had you read, "Substance prevails over form."  And
24  what does that mean, Mr. Baskin?
25  A.   That's kind of some lingo from cases that analyze whether

─────A. Baskin - Direct─────

1   a particular program or investment is a security.  And what

2   it means is that no matter how something is papered, that if

3   informed someone is acting or a business operates in a

4   certain way that constitutes the sale of securities, that the

5   conduct of substance prevails over the written document.

6   Q.  So if investors believe that they don't have any

7   obligation whatsoever to monetize the licenses, is that

8   something that would concern you related to a passive

9   investment?

10  A.  Yes.  That would be part of one of the elements or things

11  that you would look at when you determine whether something

12  is a security.

13  Q.  And the videos that you're referencing in here, are those

14  the "Money From Thin Air"?

15  A.  Not -- I didn't get videos; I got recordings.  But, yes,

16  it's a reference to the recordings.

17  Q.  Sorry.  We're going to go down to the next page and pull

18  up paragraph 5 of this e-mail.  Could you please read the

19  first two sentences of paragraph 5.

20  A.  "So while Jere has developed new agreements, the recent

21  developments make it such that I cannot recommend that Janus

22  solicit new clients or take money from old clients.  This may

23  only make matters worse, and nothing about the recent

24  developments in the investigation is making me feel good.  In

25  addition, I do not know how the program is being marketed, by

A. Baskin - Direct

1  whom, and what, if any, disclosures are being made about the
2  SEC investigation.  If the tape-recorded presentations are
3  being used, that must also stop; again, they are very harmful
4  from a securities regulator's standpoint.  Just remember that
5  the SEC is watching everything that Janus is doing, and now
6  is not a good time to be adding any complications."
7  Q.  So the first two sentences up here, are you recommending
8  again that Mr. Alcorn stop soliciting new clients or take any
9  additional funds from old clients?
10  A.  Yes.
11  Q.  So this is the second time that you're providing that
12  information in writing to Mr. Alcorn; is that right?
13  A.  If those are the -- if that's the chronology of the
14  e-mails, yes.
15  Q.  And then you have lines that started with "In addition,"
16  and I want to focus in on that line for a moment.
17          "I do not know how the program is being marketed."
18          Do you see that?
19  A.  Yes.
20  Q.  Now, you're approximately five months into your
21  representation, but you're telling Mr. Alcorn that you do not
22  know how the program is being marketed?
23  A.  That's correct.
24  Q.  Why do you not know?
25  A.  I don't know because there are a number of actors out

A. Baskin - Direct

1    there that are raising money, and there were very little, if
2    any, promotional materials that talked about how the program
3    worked.  So it wasn't like someone was getting a ton of
4    documents that would help explain it.  A lot of it would
5    happen organically at meetings and things like that.
6    Q.  And so Mr. Alcorn was not providing you documents related
7    to the marketing of this -- of this program?
8    A.  I have a memory that there were some documents, but I
9    don't believe it was a very robust series of documents.
10   Q.  And it says, "by whom and what, if any, disclosures are
11   being made about the SEC investigation."
12         Do you see that?
13   A.  Yes.
14   Q.  And why are you concerned about disclosures being made to
15   potential investors about the ongoing SEC investigation?
16   A.  Because if you are raising money and the SEC is
17   investigating, that's something that we would call material
18   such that a reasonable investor would want to know that that
19   was going on.
20   Q.  So you would want to ensure that investors who are
21   investing at this time, in November of 2013, were aware of
22   the SEC investigation before handing your money over to
23   Mr. Alcorn?
24   A.  Yes.
25   Q.  And you explained that to Mr. Alcorn?

```
1    A.  Yes.
2    Q.  Let's go to Government's Exhibit 509B, as in bravo.
3              THE COURT:  Before you do that, let's get an
4    estimate of how much time you're going to have because we're
5    now after 5:00, and the Court suspects we're not going to be
6    able to finish this witness and get through cross-examination
7    by two defendants today.
8              MS. O'BOYLE:  Yes, Your Honor, I probably -- I
9    believe I probably have another, probably, 30 minutes.
10             THE COURT:  Well, the Court is not going to do
11   another 30 minutes, because still there has to be
12   cross-examination, which means this witness unfortunately has
13   to come back tomorrow.
14             MS. O'BOYLE:  Okay.  Thank you, Your Honor.
15             THE COURT:  So, ladies and gentlemen, we're just
16   going to stop right here, and we're going to take it up again
17   tomorrow morning.  We're going to come back at 9:30.  So I
18   will see you in the morning at 9:30.  Leave your tablets with
19   the security officer.
20             (The jury exited the courtroom.)
21             THE COURT:  Attorney Baskin, you can step down.  Do
22   not discuss your testimony overnight.  Unfortunately we'll
23   see you in the morning.
24             THE WITNESS:  I'll be here.
25             (The witness stepped down.)
```

```
 1              THE COURT:  Be seated.
 2              Now, the Court thought that it had finished with the
 3    Hullum matter, but is there something else about that matter?
 4              MS. McCASLIN:  There is, Your Honor.  May I
 5    approach?
 6              THE COURT:  You may, as long as we're not going to
 7    rehash what the Court has already ruled on.
 8              MS. McCASLIN:  It is not, Your Honor.
 9              I did talk to the government earlier today and let
10    them know that we were going to make a decision by the end of
11    the day.  Based on information that we have, we don't have
12    sufficient records on Ms. Hullum.  I'm not asking the Court
13    to revise its opinion, but some information from the
14    government indicates that Ms. Hullum doesn't really remember,
15    know much about her finances.
16              Without supporting and factual documentation, which
17    we attempted to get through the subpoenas for the insurance
18    companies, we do not have sufficient evidence to effectively
19    cross-examine her, impeach her, or refresh her recollection.
20    So we will not be going forward with the deposition of
21    Ms. Hullum.
22              THE COURT:  So the bottom line is because the Court
23    didn't authorize you to subpoena four insurance companies for
24    records, the custodians, you can't question Ms. Hullum.  Is
25    that it?
```

Carol L. Naughton, Official Court Reporter

1        MS. McCASLIN:  Not effectively, Your Honor.  We

2   don't have the underlying documents to know what the facts

3   are to effectively challenge her.

4        THE COURT:  Well, the simple truth is, the Court

5   will go back to where it was earlier with respect to that.

6   The Court has already ruled that we're not going to issue any

7   subpoenas.  If you decide not to go there to ask her the

8   basic questions, then that's up to the defendant.

9        The Court also notes that the document that contains

10  the name of those insurance companies, you had that back in

11  November, and you had an opportunity to subpoena those

12  records.  You've had, also, the interview of the agent's,

13  which means you know/knew of the reference to the IRS tax

14  lien.  So that's fine.  I think the Court has done all it's

15  going to do there.

16       MS. McCASLIN:  We did not have the name of the

17  insurance companies.  We did have the record from the MOI

18  with the agent, but we did not know about the insurance

19  companies.

20       THE COURT:  What was in the record of the memorandum

21  of interview?

22       MS. McCASLIN:  It stated that there may be -- I

23  don't have it in front of me -- a lien and --

24       Do you guys have that?

25       THE COURT:  I thought the Court had asked where did

```
 1    the defendants get the names of the insurance companies and
 2    addresses?
 3           MS. YUSI:  Some of them were listed in the
 4    memorandum of interview, I believe.  Some of the names of the
 5    insurance companies were listed in the memorandum of
 6    interview.
 7           MS. McCASLIN:  I'm sorry.  Mr. Grindrod is
 8    correcting me that there were some of them in there.  Most of
 9    them were listed in the bankruptcy petition, so that was what
10    I was relying on.  I apologize.
11           THE COURT:  Well, the Court stands by that the Court
12    authorized you to depose the witness again, and if you think
13    that you have insufficient information, that's your decision,
14    so that is the end of the Court's effort on that.  Thank you
15    very much.
16           MS. McCASLIN:  Thank you.
17           THE COURT:  The Court will be in recess until
18    tomorrow morning at 9:30.
19           (Proceedings adjourned at 5:10 p.m.)
20
21
22
23
24
25
```

1                          <u>CERTIFICATION</u>

2

3        I certify that the foregoing is a correct transcript

4   from the record of proceedings in the above-entitled matter.

5

6

7                   _____/s/_____

8                          Carol L. Naughton

9                          August 30, 2022

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Carol L. Naughton, Official Court Reporter