```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
 2                      Norfolk Division

 3

 4  - - - - - - - - - - - - - - - - - -
                                      )
 5   UNITED STATES OF AMERICA         )
                                      )
 6   v.                               )    CRIMINAL ACTION NO.
                                      )         2:19cr47
 7   DAVID ALCORN and                 )
     AGHEE WILLIAM SMITH II,          )
 8                                    )
             Defendants.              )
 9  - - - - - - - - - - - - - - - - - -

10                ** Jury Trial - Day 10 **

11                TRANSCRIPT OF PROCEEDINGS

12                    Norfolk, Virginia

13                    February 15, 2022

14

15  BEFORE:  THE HONORABLE RAYMOND A. JACKSON
             United States District Judge, and a jury
16

17  APPEARANCES:

18          UNITED STATES ATTORNEY'S OFFICE
            By:  Andrew C. Bosse
19               Melissa E. O'Boyle
                 Elizabeth M. Yusi
20               Assistant United States Attorneys
                 Counsel for the United States
21
            RICHARD S. YAROW LLC
22          By:  Richard S. Yarow
                 Counsel for Defendant David Alcorn
23
            FEDERAL PUBLIC DEFENDER'S OFFICE
24          By:  Andrew W. Grindrod
                 Lindsay Jo McCaslin
25               Assistant Federal Public Defenders
                 Counsel for Defendant Aghee William Smith II
```

1 I N D E X

2 GOVERNMENT'S
 WITNESSES           PAGE
3

 ALAN BASKIN
4  Direct Examination By Ms. O'Boyle (Resumed) 1784
  Cross-Examination By Mr. Yarow 1810
5  Cross-Examination By Mr. Grindrod 1822
  Redirect Examination By Ms. O'Boyle 1830
6 DENNIS McCRUMB
  Direct Examination By Ms. Yusi 1833
7  Cross-Examination By Mr. Grindrod 1841
 TONY SELLERS
8  Direct Examination By Mr. Bosse 1845
  Cross-Examination By Mr. Yarow 1897
9  Cross-Examination By Mr. Grindrod 1902
  Redirect Examination By Mr. Bosse 1942
10 KENNETH SYKES (Via videotaped deposition)
  Direct Examination By Ms. Yusi 1949
11  Cross-Examination By Mr. Grindrod 1973
  Redirect Examination By Ms. Yusi 1989
12 LAWRENCE LYON
  Direct Examination By Ms. Yusi 1990
13  Cross-Examination By Ms. McCaslin 2000

14

15 E X H I B I T S

 GOVERNMENT'S
16 NO.           PAGE

17 509B 1785
 509D 1789
18 509E 1795
 509F 1798
19 95 1848
 200Q 1852
20 246 1860
 267 1864
21 730 1870
 731 1875
22 732 1879
 736 1880
23 737 1882
 735 1884
24 406 1889
 30 1892
25 408 1893

1

                              I N D E X
                             (Continued)

2

                          E X H I B I T S

3
GOVERNMENT'S

4  NO.                                                   PAGE

5   738                                                  1895
    826                                                  1948
6   827                                                  1948
    828                                                  1948
7   830                                                  1948
    831                                                  1948
8   832                                                  1948
    833                                                  1948
9   835                                                  1948
    891                                                  1997

10

11 DEFENDANT SMITH'S
   NO.                                                   PAGE

12
    196              For ID Only                         1914
13  173                                                  1926
    185E             For ID Only                         1932
14  513                                                  1948
    520                                                  1948
15  368                                                  2002

16

17

18

19

20

21

22

23

24

25

                Carol L. Naughton, Official Court Reporter

A. Baskin - Direct

```
 1            (Proceedings resumed at 9:41 a.m.)
 2            (The witness resumed the stand.)
 3            THE COURT:  Good morning, ladies and gentlemen.
 4       Bring in the jury.
 5       Good morning, sir.
 6            THE WITNESS:  Good morning.
 7            (The jury entered the courtroom.)
 8            THE COURT:  You may be seated.
 9       Good morning, ladies and gentlemen.
10            Let the record reflect that all jurors are present
11  this morning.
12            MS. O'BOYLE:  United States agrees.
13            MR. YAROW:  Mr. Alcorn agrees.
14            MS. McCASLIN:  Mr. Smith agrees.
15            THE COURT:  You may resume your examination.
16            ALAN BASKIN, called by the Government, having been
17  previously sworn, was examined and testified further as
18  follows:
19                    DIRECT EXAMINATION (Resumed)
20  BY MS. O'BOYLE:
21  Q.  Good morning, Mr. Baskin.
22  A.  Good morning.
23  Q.  So when we left off, if you could just remind the jury,
24  your representation of Mr. Alcorn started in around July of
25  2013?
```

A. Baskin - Direct

1    A.  Yes.

2    Q.  Okay.  And it was in connection with the subpoena that he

3    received from the Securities and Exchange Commission?

4    A.  That's correct.

5    Q.  Now, we're going to go to -- when we left off, I was

6    going to show you Government's Exhibit 509B, as in bravo.

7    And there's an e-mail on the second page from you to

8    Mr. Alcorn which we've already been over, and then this is a

9    continuation of that e-mail string -- is that right? -- with

10   an e-mail from Mr. Friedman and then an e-mail from

11   Mr. Maerki?

12   A.  It appears to be the case.

13           MS. O'BOYLE:  Government moves in Exhibit 509B.

14           THE COURT:  Exhibit 509B, as in bravo, is admitted.

15           (Government's Exhibit 509B was admitted.)

16           MS. O'BOYLE:  Okay.  And we'll move down to -- if we

17   could go to Page 2, just to center ourselves, Ms. Yusi.

18   BY MS. O'BOYLE:

19   Q.  So, Mr. Baskin, this is the e-mail that we went over at

20   the very tail end of your testimony yesterday; is that right?

21   A.  Yes.

22   Q.  Dated November 21, 2013?

23   A.  Yes.

24           MS. O'BOYLE:  And if you could go to Page 4,

25   Ms. Yusi, please.

A. Baskin - Direct

 1   BY MS. O'BOYLE:

 2   Q.  And we had just left off talking about your paragraph

 3   number 5.  Is that right?

 4   A.  Yes.

 5   Q.  And that you were making the recommendation to Mr. Alcorn

 6   that Janus -- that you not -- that they not solicit new

 7   clients or take money from old clients; is that right?

 8   A.  Yes.

 9        MS. O'BOYLE:  If we could go back to Page 1,

10   Ms. Yusi, please.

11   BY MS. O'BOYLE:

12   Q.  And so Mr. Friedman, who was also serving as Mr. Alcorn's

13   counsel, chimed in as well after your e-mail on the same day;

14   is that right?

15   A.  Correct.

16   Q.  And so if we could -- if you could, please, just read the

17   highlighted portion.

18   A.  "Dave and Kent, I spoke with Alan and Martin Galbut

19   yesterday as well, and I completely agree with Alan's

20   assessment and recommendations in his e-mail below.  Given

21   the recent turn of events with the SEC investigation, I also

22   advise both of you as owners and representatives of Janus

23   Spectrum LLC to completely cease any activity" --

24        THE COURT:  We have a problem in the back.  The

25   jurors are raising their hands.  They cannot hear you.

A. Baskin - Direct

```
1          THE WITNESS:  I'll go back to rock-star mode, Your
2    Honor.  Sorry.
3          -- "to completely cease any activity related to
4    bringing on new clients or taking funds from existing clients
5    until you know that you are 'out of the woods' with the SEC."
6    BY MS. O'BOYLE:
7    Q.  So Mr. Friedman was agreeing with your assessment of your
8    e-mail that you wrote to Mr. Alcorn, correct?
9    A.  Yes.
10   Q.  And he also was advising both Mr. Alcorn and Mr. Maerki
11   to completely stop taking on any new clients or investor
12   funds until the SEC investigation was completed?
13   A.  If Maerki was copied in this string, this part of the
14   string, I don't know, but I know Mr. Alcorn was.
15   Q.  But the gist of what he is saying here is that don't take
16   any more funds until you're done with the SEC investigation?
17   A.  Yes.  Yes.
18   Q.  And Mr. Friedman was also an attorney; is that right?
19   A.  Yes.
20   Q.  And he focused on an area of securities?
21   A.  Yes.  He was a business lawyer who did securities.
22   Q.  And then there's an e-mail at the top of this string, and
23   it's from Kent Maerki to Mr. Friedman.  Do you see that?
24   A.  Yes.
25   Q.  But then who does he write -- in the first line, who was
```

A. Baskin - Direct

```
 1   this e-mail to?
 2   A.  It says "David."
 3   Q.  And so is the only person that you dealt with from Janus
 4   Spectrum named David David Alcorn?
 5   A.  Yes.
 6   Q.  If you could just read the first two lines.
 7   A.  "I am at a point of hating 98 percent of all attorneys.
 8   They take your money then do CYA."
 9   Q.  Do you know what CYA stands for?
10   A.  I can tell you what the common understanding is.
11   Q.  Okay.  What is your -- what is the common understanding?
12   A.  Am I allowed to use -- okay.  "Cover your ass."
13   Q.  Okay.  Mr. Baskin, in your recommendations to Mr. Alcorn,
14   were you doing a CYA?
15   A.  Not at all.
16   Q.  I'm sorry?
17   A.  Not at all.
18   Q.  Why were you making these recommendations to Mr. Alcorn?
19   A.  Because he's my client, and his interests have to go
20   first, ahead of anyone, and I did not want him to see -- I
21   did not want to see him get in trouble.  It was already a
22   very, very, very serious matter to be subject to this
23   investigation, and to be raising money in the teeth of it
24   is -- I've heard of very, very few situations where that's
25   something that I would think is a good idea.
```

─────────A. Baskin - Direct─────────

1   Q.  All right.  Let's go to Government's Exhibit 509D, as in

2   delta.  And is this another e-mail from you to your client,

3   Mr. Alcorn, dated December 9, 2013?

4   A.  Yes.

5   Q.  And was there an attachment in connection with some

6   SmartCOMM litigation?

7   A.  Yes.

8           MS. O'BOYLE:  Government moves in Exhibit 509D, as

9   in delta.

10          THE COURT:  509D, as in delta, is admitted.

11          (Government's Exhibit 509D was admitted.)

12  BY MS. O'BOYLE:

13  Q.  Just to center the jury, who is this an e-mail from, sir?

14  A.  Me.

15  Q.  And who is it to?

16  A.  David Alcorn with copies to Jere Friedman and Lance

17  Broberg.

18  Q.  What is the date?

19  A.  December 9, 2013.

20  Q.  Is this a couple of weeks after the e-mail that we just

21  looked at?

22  A.  Correct.

23  Q.  If you could please read the first paragraph that you

24  sent to Mr. Alcorn.

25  A.  "I am sure you have seen the attached by now.  While it

─────────────A. Baskin - Direct─────────────

1    is not my purpose to interfere with your vacation, I cannot

2    hold off any longer on sharing my thoughts, and this e-mail

3    will give you something to contemplate on the way home."

4    Q.   So were you -- you were sending an e-mail to Mr. Alcorn

5    while he was on vacation?

6    A.   Correct.

7    Q.   Did Mr. Alcorn tell you that he was going to be on

8    vacation?

9    A.   I can't specifically recall, but I can draw that

10   inference from the correspondence.

11   Q.   But you thought it important to provide information right

12   away?

13   A.   Yes.

14   Q.   Let's move down to the next paragraph in your e-mail.

15   Could us please read this paragraph to the jury.

16   A.   The entire paragraph?

17   Q.   Well, you can start with the "as to the ACC proceeding"

18   and then continue to the end, please.

19   A.   "As to the ACC proceeding against Kent, this is another

20   reason it is in your and Janus's best interests to find a

21   proper way to split from Kent and why I believe you and Janus

22   need separate representation.  I know only Kent is named, but

23   it doesn't help you either.  And did you know about the ACC

24   matter prior to seeing it as an exhibit to SmartCOMM's

25   filing?  I am hoping you didn't because I would be very

A. Baskin - Direct

 1   surprised if you knew and did not share it with any of your
 2   lawyers."
 3   Q.   So let's break this apart a little bit.
 4          You said, "As to the ACC proceeding against Kent,"
 5   what does ACC stand for?
 6   A.   That's the Arizona Corporation Commission.
 7   Q.   And what was the ACC proceeding against Kent that you're
 8   referring to here?
 9   A.   The Arizona Corporation Commission is the state
10   equivalent of the SEC, which we talked about yesterday and
11   talked about some today.  They have parallel actions that
12   they bring but at the state level.  And I don't recall the
13   details, but there was what's called a cease-and-desist
14   proceeding that had been -- or notice had been filed against
15   Mr. Maerki.
16   Q.   Okay.  Was this the first that you were hearing of it,
17   reading the filing that's attached to this document?
18   A.   Looking at it today, I believe so.
19   Q.   Do you recall whether that proceeding involved an
20   investment called Dental Support Plus Franchise?
21   A.   That sounds familiar, yes.
22   Q.   And you say in here, "This is another reason it is in
23   your and Janus's best interests to find a proper way to split
24   from Kent."  What are you talking about there?
25   A.   I did not believe that Mr. Maerki was a good business

A. Baskin - Direct

 1   partner for Mr. Alcorn.

 2   Q.  Had you talked with Mr. Alcorn about that?

 3   A.  I cannot recall specific conversations with him about

 4   that.

 5   Q.  Do you recall a general conversation with Mr. Alcorn

 6   about his relationship with Mr. Maerki?

 7   A.  Yes, yes.

 8   Q.  Is that what you're referencing here in your e-mail and

 9   writing to Mr. Alcorn?

10   A.  Yes.  For the use of the word "another," it implies that

11   we had been talking about that issue.

12   Q.  And then if we go down to the second paragraph, if you

13   could read the sentence that starts with "I believe" through

14   the third sentence.

15   A.  "I believe, however, that as to you, the Daryl Bank

16   recording may be even worse.  I don't know the date of the

17   call, but the attached states that it was 'recent.'  Bank

18   discusses the exact opposite of what Jere and I have said is

19   okay and the thing I feared the most, pooling money to invest

20   with Janus."

21   Q.  Let's talk a little bit about that.  What did you mean

22   when you told Mr. Alcorn in this e-mail that "Bank discusses

23   the exact opposite of what Jere and I have said is okay and

24   the thing I feared the most"?

25   A.  Well, to unwind that, I think there's a couple of things

A. Baskin - Direct

1    in there.

2            First is our ongoing concern about Mr. Alcorn taking

3    money from investors at that time given the conversations

4    that we had -- had been having with him, number one;

5    number two was a concern about doing business with Mr. Bank;

6    number three gets you into the securities law geek part of

7    this, which is pooling money is an element of the definition

8    of whether something is a security.

9            So the recording from Bank made it apparent that

10   these gentlemen were offering and selling securities, and so

11   that triggered me.

12   Q.  And the reason why, your second reason, continuing to do

13   business with Mr. Bank, that was in connection with his FINRA

14   ban, doing business with someone who had already been barred

15   from the securities industry?

16   A.  Yes.  Yes.

17   Q.  And then the third thing that you mentioned, the pooling

18   money for investors, you were concerned that that brought

19   this whole relationship into the securities area, correct?

20   A.  To be doing something -- yes.  My answer is yes.

21   Q.  Okay.  We're now going to go down to the -- I'm sorry.

22            If you could start with the word "finally" and go

23   through the last part of that paragraph, please.

24   A.  "Finally, as I told you a few months ago, Daryl Bank has

25   been barred from the securities industry.  It is hard to pick

A. Baskin - Direct

1    a worse person with whom to raise money.  It is unfathomable

2    to me how that could have happened (or be continuing) in the

3    midst of the SEC investigation and in light of our comments

4    and concerns.  If it hasn't already, it needs to stop.  Now."

5    Q.  You said in here, "It is hard to pick a worse person with

6    whom to raise money."

7            What did you mean by that?

8    A.  As I mentioned, to be offering securities with someone

9    barred from the securities industry was not something I

10   thought was a particularly good idea.

11   Q.  And you state in here, "It is unfathomable to me how that

12   could have happened or be continuing."

13           What are you referring to there?

14   A.  Let's just say that when I looked at the materials that

15   triggered this, I was surprised.

16   Q.  You were surprised?

17   A.  Yes.

18   Q.  What was so surprising?

19   A.  To see that the conduct was ongoing, number one; and

20   that, number two, Mr. Bank was involved; and, number three,

21   the representations of the potential returns.

22   Q.  Did you know whether Mr. Alcorn was, in fact, at this

23   very time, still receiving funds from Mr. Bank?

24   A.  I cannot recall if I knew that.

25   Q.  Okay.  When you said, "If it hasn't already, it needs to

A. Baskin - Direct

1    stop.  Now," what were you talking about?  What needed to
2    stop now?
3    A.   Raising -- raising money and doing business with
4    Mr. Bank.
5    Q.   And do you know whether after December 2013 Mr. Alcorn
6    followed your advice to stop raising money with Mr. Bank?
7    A.   I do not.
8    Q.   If we can go to Government's Exhibit 509E, as in echo.
9    Do you recognize 509E?
10   A.   Yes.
11   Q.   So the first e-mail in the chain, is that the e-mail that
12   we've just been discussing?
13   A.   Yes.
14   Q.   And then the second e-mail, is that an e-mail -- a
15   response from Mr. Alcorn to you?
16   A.   Yes.
17           MS. O'BOYLE:  Government moves in Exhibit 509E.
18           THE COURT:  509E is admitted.
19           (Government's Exhibit 509E was admitted.)
20   BY MS. O'BOYLE:
21   Q.   We've already walked through the bottom e-mail, so let's
22   just focus on the top.  Who is this e-mail from?
23   A.   From David Alcorn to me, copying Jere Friedman and Lance
24   Broberg.
25   Q.   Mr. Alcorn says, "Martin --

─────A. Baskin - Direct─────

1           How do you say that individual's name?

2   A.   "Galbut."

3   Q.   -- "Galbut sent me a copy of the ACC action against Kent

4   a couple of days before I left the country.  I did nothing

5   with it."

6           Do you see that?

7   A.   Yes.

8   Q.   That's a reference to Mr. Alcorn receiving a copy of the

9   cease-and-desist action against Mr. Maerki related to Dental

10  Support Plus?

11  A.   Yes.

12  Q.   He says he did nothing with it?

13  A.   Correct.

14  Q.   And then going further, if you could read the next

15  paragraph.

16  A.   "Tonight is the first I have seen or heard about the

17  Daryl Bank phone call and will withhold judgment until I know

18  the facts."

19  Q.   Okay.  Did you ever participate in a phone call with

20  Mr. Bank?

21  A.   No.  I -- not directly.  I may have spoken with his

22  attorney, but I'm just not sure.

23  Q.   Okay.  His attorney in connection with the Securities and

24  Exchange Commission investigation?

25  A.   No.  And I'm sorry if I'm confusing this with something

A. Baskin - Direct

1   else.  Another attorney.

2   Q.  Do you remember the attorney's name?

3   A.  I do not.

4   Q.  If you could read the last paragraph.

5   A.  "I am learning you are apparently a 'the glass is half

6   empty' guy, and that is fine, but what if the PMAs are

7   exactly what the Dallas boys told me they are (earlier you

8   thought that would be a good thing), and what if Daryl Bank

9   knows what he is doing with the trust company arrangement and

10  is legit?  I will call Daryl tomorrow to sort it out."

11  Q.  What was a PMA?

12  A.  I can't remember what the acronym means.  I don't want to

13  speculate, but it was the entity that some of these other

14  gentlemen that were raising money for Janus or to go to Janus

15  were using to take investor money and, in essence, pool it

16  into this entity or thing called a PMA and then invest it

17  with Janus.

18  Q.  Did you think that taking money and pooling it and

19  investing it in Janus was a good thing in the context of a

20  Securities and Exchange Commission investigation?

21  A.  Once -- if I heard about pooling, then it was not going

22  to be a good thing.

23  Q.  And he references here, "I will call Daryl tomorrow to

24  sort it out."  Did you participate in any calls with

25  Mr. Alcorn, Mr. Bank, and yourself?

A. Baskin - Direct

1   A.  No.  No.

2   Q.  Did Mr. Alcorn's e-mail to you alleviate any of the

3   concerns that you had that you outlined in your e-mail to

4   him?

5   A.  No.

6   Q.  Let's take a look at Government's Exhibit 509F, as in

7   frank.  Do you recognize 509F as a number of e-mails between

8   yourself and Mr. Alcorn?

9   A.  I do.

10          MS. O'BOYLE:  Government moves in Exhibit 509F.

11          THE COURT:  509F will be admitted.

12          (Government's Exhibit 509F was admitted.)

13  BY MS. O'BOYLE:

14  Q.  We're going to start on Page 2 here.  Is there an e-mail

15  from Mr. Alcorn to you and Mr. Friedman on December 12, 2013?

16  A.  Yes.

17  Q.  So this is around the same time of the other e-mails that

18  we've been covering, the last two e-mails?

19  A.  Yes.

20  Q.  And so if you could read the first sentence of

21  Mr. Alcorn's e-mail to you.

22  A.  "First the easy part.  Kent and I are close to an

23  agreement for me to buy out his interest in Janus."

24  Q.  And so what did you understand Mr. Alcorn to be talking

25  about here?

A. Baskin - Direct

1   A.   The Janus -- there's an entity called Janus -- or I can't
2   recall the exact name of it -- that I believe Mr. Alcorn had
3   55 percent of and Mr. Maerki had 45 percent of, and
4   Mr. Alcorn was going buy him out, buy Maerki out.
5   Q.   If you could read the next sentence, please.
6   A.   "A suggestion to shut down the business and wait to see
7   if we are out of the woods is not a solution, and the timing
8   of the suggestion is disturbing."
9   Q.   Was that how Mr. Alcorn responded to your suggestion to
10  stop taking investor funds at this time?
11  A.   Yes.
12  Q.   And could you read the next highlighted portion at the
13  end of the paragraph.
14  A.   "Alan, you went to LA and basically came back with
15  nothing different, and to my knowledge, the only things that
16  have happened since are they issued us an additional
17  subpoena, which we complied with, plus they are taking an
18  enforcement action against our Dallas clients for not
19  complying with the subpoena.  Doing new business with the
20  Dallas boys at this time is not a problem as they are at
21  least partially to blame for the situation they are in with
22  the SEC."
23  Q.   So there's a reference here to your meeting in LA.  What
24  is that about?
25  A.   I took a trip to Los Angeles, I can't remember exactly

A. Baskin - Direct

1  but a couple of months after I was hired, and met with the

2  attorney who was leading the investigation and her boss.

3  Q.  When you came back from that meeting, did you suggest to

4  Mr. Alcorn that he was out of the woods?

5  A.  No.

6  Q.  What did you tell Mr. Alcorn about your meeting with the

7  SEC?

8  A.  I told him that -- well, to back up, I never think it --

9  I always think it's a good idea to go and meet your

10  regulator.  I'm in Phoenix; the regulator is in Los Angeles.

11  It's a trip you can take in a day.

12          And regulators typically don't tell you very much,

13  so I went to meet face to face and see if I could tease out

14  some information about what was going on.  And it was a very

15  pleasant meeting, but I wasn't really able to get any

16  details.

17          So when Mr. Alcorn writes "You came back with

18  nothing different," I understand where he was coming from.  I

19  didn't get any indication, though, that it wasn't a big deal

20  or they were going away.  I just didn't get any information

21  at all.

22  Q.  Well, you said when you go to meet the regulators, they

23  typically don't provide details?

24  A.  Correct.

25  Q.  But when you met with them, did it alleviate your

A. Baskin - Direct

1    concerns that Mr. Alcorn was in the clear?

2    A.   No.  No, he was not in the clear.

3    Q.   Did you tell Mr. Alcorn that he was perfectly fine after

4    you got back from the LA meeting?

5    A.   Perfectly fine?

6    Q.   That the investigation was going to go away and that

7    there wasn't anything to it.

8    A.   No, no, not at all.

9    Q.   And if you could read what Mr. Alcorn said to you at the

10   very end of his e-mail.

11   A.   "If this is a CYA letter for your benefit, I am fine with

12   it, and it is much less disturbing.  I should be around all

13   next week, so give me a call to chat if I am missing

14   something here."

15   Q.   So Mr. Alcorn is, again, suggesting that your e-mail was

16   a CYA e-mail for your benefit?

17   A.   Yes.

18   Q.   Was your e-mail to him a CYA for your benefit?

19   A.   If we're accepting the same definition for CYA as before,

20   not at all.  Not at all.

21   Q.   Were you attempting to CYA when you raised concerns with

22   Mr. Alcorn and told him to stop raising investor funds?

23   A.   No.

24   Q.   Let's go up to Page 1.

25            MS. O'BOYLE:  Ms. Yusi, could you pull up Page 1 for

A. Baskin - Direct

1   me, please.

2   BY MS. O'BOYLE:

3   Q.  And is this your lengthy e-mail in response to

4   Mr. Alcorn's e-mail to you?

5   A.  It looks like it.

6   Q.  We're going to start with the third paragraph.  If you

7   could start with the "I first need" and read it to the end of

8   the paragraph, please.

9   A.  "I first need to make clear that my job is to try to help

10  you, not to prepare CYA e-mails.  My focus has been and

11  always will be on what is best for you, not me.  That is the

12  purpose behind all of my communications.  (And of course I am

13  subject to our ethical rules, so I can only make

14  recommendations consistent with those rules.)  Sometimes I

15  have to tell clients things they don't want to hear.  I

16  cannot shy away from that, but again, it is with your best

17  interest in mind."

18  Q.  So when you said in here, "Sometimes I have to tell

19  clients things they don't want to hear," what are you telling

20  Mr. Alcorn?

21  A.  Stop raising money.

22  Q.  If we could go -- we're going to go to paragraph 3.  If

23  you could read the first line starting with "Please bear in

24  mind" and ending with "complete disclosure."

25  A.  "Please bear in mind that our recommendations are subject

A. Baskin - Direct

1    to the information you provide us.  I keep learning things

2    that are inconsistent with my understanding of prior events

3    and/or the understanding of the Janus-client relationship,

4    with the Daryl Bank tape being the latest example.  We need

5    complete disclosure."

6    Q.  Why are you telling Mr. Alcorn in December of 2013, about

7    five months after you started your representation of him,

8    that you needed complete disclosure?

9    A.  I believe that the sentences before that provide the

10   context.

11   Q.  And what is that context?

12   A.  That as time evolved, we were learning things that were

13   disturbing.  I was learning things that were disturbing.

14   Q.  Were those things that Mr. Alcorn had told you from the

15   onset of the relationship?

16   A.  No.  No.

17   Q.  Can you continue on with "The changes to the Service

18   Agreement."

19   A.  "The changes to the Service Agreement and 'it's not a

20   security' letter to the SEC were done in conjunction with

21   each other and resting on the simple premise that the clients

22   were very active as it related to their spectrum.  I have

23   continually told you that the securities laws favor substance

24   over form and that regardless of what the agreements say, if

25   at the end of the day there are passive investors, you will

A. Baskin - Direct

1    have a problem.  This has not changed."

2    Q.  Now, yesterday when we were talking about your

3    representation of Mr. Alcorn, you were discussing your

4    conclusion that he potentially had a problem with the

5    Securities and Exchange Commission, correct?

6    A.  Yes.

7    Q.  Now, there's a reference here to a "'it's not a security'

8    letter" to the SEC.  What was that?

9    A.  We -- early on, what -- with a lot of these cases, you

10   try to get the regulators to go away quickly; the less time

11   with them the better.  And so we wrote a letter to the SEC

12   and argued that the program, as constituted and as sold, did

13   not involve the offer of sale of securities, in the hopes

14   that we could deter the SEC.

15   Q.  Were you serving as an advocate on behalf of your client

16   making an argument to a regulator?

17   A.  Yes.

18   Q.  At the same time, were you informing Mr. Alcorn of the

19   concerns that you had related to his program?

20   A.  Yes.  Yes.

21   Q.  So did you make it clear to him that you believed that he

22   was offering a security?

23   A.  Yes.  Yes.

24   Q.  Let's jump down to the sixth paragraph, the very end.

25           If you could start with "this" and read to the end

─A. Baskin - Direct─

```
 1   of that paragraph.
 2   A.  "This, along with the Premier Spectrum website issue and
 3   the Daryl Bank tape recording cause real concerns that the
 4   substance of Janus's client relationships was not and is not
 5   structured as explained to Jere and me and that Janus and you
 6   and others may have violated and continue to violate
 7   securities laws.  When all of those things are put together,
 8   it becomes apparent that we cannot recommend that you
 9   continue taking client money in the midst of the SEC
10   investigation because it can make things worse for you with
11   the SEC.  It is that simple."
12   Q.  There's a reference up here to the "Premier Spectrum
13   website issue."  Do you know what that is a reference to?
14            MR. YAROW:  Judge, we cannot hear this witness.
15            THE COURT:  You know something, we're having the
16   same problem, Attorney Baskin.  Now, the Court can't do
17   anything else other than tell you to keep that microphone up
18   to your mouth.  Your voice drops.
19            THE WITNESS:  Is this better?
20            THE COURT:  When you keep it up to your mouth, it's
21   better.
22            THE WITNESS:  I don't want to take the option, so I
23   will do the best I can, Your Honor.
24   BY MS. O'BOYLE:
25   Q.  Be a rock star, like Judge Jackson said.  Okay?  All the
```

A. Baskin - Direct

```
 1    way out to the back, keep your voice up and keep that
 2    microphone right there in front of you.  Okay, sir?
 3            THE COURT:  What we're going to do is we're going to
 4    get the handheld mic and see if it's any better.
 5            (Brief pause.)
 6            THE WITNESS:  Your Honor, I apologize to you and
 7    everyone here.  I'm not trying to make this difficult.  I'm
 8    sorry.
 9            THE COURT:  Oh, I know.
10            Okay.  Continue.
11            MS. O'BOYLE:  Thank you, Your Honor.
12    BY MS. O'BOYLE:
13    Q.  So my question was, this e-mail, the very end that you
14    read, it references the Premier Spectrum website issue.  What
15    was that?
16    A.  To the best of my memory, there were some other folks
17    that were involved in raising money for or parallel to Janus,
18    and they had put up a website, and it had some language on it
19    that caused some concerns, some of the marketing language or
20    explanations of the program.
21    Q.  Do you remember the name Bobby Jones?
22    A.  Yes.  Yes.
23    Q.  Was that -- was his company Premier Spectrum?
24    A.  That sounds right.
25    Q.  Was he also -- in the same way that Mr. Bank was raising
```

Carol L. Naughton, Official Court Reporter

A. Baskin - Direct

1  funds for Mr. Alcorn's company, was Mr. Jones also raising

2  funds for Mr. Alcorn's company?

3  A.  To the best of my recollection, that's correct.

4  Q.  And do you recall what your advice was with respect to

5  this Premier Spectrum website issue to Mr. Alcorn?

6  A.  I recall some advice either to the effect of you need to

7  make these changes or just take it down.

8  Q.  And then the Daryl Bank tape recording, was -- that's in

9  connection with the e-mail that we just looked at?

10  A.  Same thing.

11  Q.  And again, at the very end, you are advising Mr. Alcorn,

12  again in writing, that he not continue to take client money

13  in the midst of an SEC investigation; is that right?

14  A.  Yes.

15  Q.  And the date of this e-mail was December 13, 2013; is

16  that correct?

17  A.  Friday the 13th, yes.

18  Q.  Thank you.  That's right.

19       Do you know whether Mr. Alcorn continued to accept

20  investor funds after this e-mail?

21  A.  I do not.

22  Q.  Do you know whether Mr. Alcorn filed for bankruptcy for

23  Janus Spectrum after this e-mail?

24  A.  I do not recall.

25  Q.  Did you have any conversations with Mr. Alcorn's

A. Baskin - Direct

1    bankruptcy lawyer?

2    A.   I do not recall.

3    Q.   Do you remember who his bankruptcy lawyer was?

4    A.   No.

5    Q.   Now, as Mr. Alcorn's counsel, did you receive a subpoena

6    for him to testify in the SEC investigation in mid-2014?

7    A.   I did.  And I guess to amend my answer, it's possible

8    that the gentleman who represented him when I testified was

9    the bankruptcy lawyer, but I just don't recall.

10   Q.   The --

11   A.   When I gave testimony, Mr. Alcorn had another gentleman

12   representing him as his attorney, and I just don't know if

13   that gentleman was involved in the bankruptcy proceeding or

14   not.  I just want to make sure my testimony is accurate.

15   Q.   Okay.  Thank you.

16        Did you contact Mr. Alcorn and inform him about the

17   Securities and Exchange Commission's subpoena for his

18   testimony?

19   A.   His or mine?

20   Q.   His, his testimony in mid-2014.

21   A.   Oh, I'm sorry.  I got totally turned around.  I thought

22   you were talking about my testimony.

23   Q.   I apologize.  I'm sorry, sir.  Yeah, let's -- so I'm

24   referring to the time frame of mid-2014.  Were you still

25   representing Mr. Alcorn in around that time?

A. Baskin - Direct

1   A.  So during the investigation we've been talking about --

2   okay.  I apologize.  I can't remember when the relationship

3   ended, but I definitely got the subpoena from Mr. Alcorn,

4   knew that he was going to be testifying, and things like

5   that, yes.

6   Q.  Did you talk with Mr. Alcorn about the subpoena for his

7   testimony?

8   A.  Yes.  Yes.

9   Q.  And how did Mr. Alcorn respond when you told him that he

10  was going to be deposed by the SEC in mid-2014?

11  A.  He was -- he was going to do it.  He didn't believe he

12  needed the help of an attorney to testify.

13  Q.  That's what he communicated to you?

14  A.  Yes.

15  Q.  And how did you respond to that?

16  A.  I told him that he -- in no uncertain terms, that he

17  should have an attorney.

18  Q.  Why did you tell him that?

19  A.  There's an expression that he who represents himself has

20  a fool for a client.  So I did not believe it was a good

21  idea, not to mention everything that had gone on over the

22  past several months.  I did not want to see him testify

23  alone.

24  Q.  And did you end up representing Mr. Alcorn at his

25  deposition before the SEC?

————————A. Baskin - Cross (By Mr. Yarow)————————

1   A.   No.

2   Q.   And why not?

3   A.   He, by then, either terminated the engagement or had --

4   he had to have terminated the engagement or else I -- I

5   wouldn't have been his lawyer with him testifying by himself.

6   So either he terminated or I did.  I can't remember which

7   came first.

8   Q.   So either Mr. Alcorn terminated the relationship or you

9   did, but in any event, your representation of him ended in

10  mid-2014?

11  A.   It ended before his SEC testimony, whenever that was.

12  Q.   So whatever date that was?

13  A.   Yes.

14  Q.   And when your relationship ended in that time, do you

15  know whether Mr. Alcorn was following your advice and

16  Mr. Friedman's advice to stop taking investor funds?

17  A.   I do not know that.

18        MS. O'BOYLE:  Thank you, sir.  I have no further

19  questions.  Please answer any questions that defense counsel

20  or the Court have for you.

21                    CROSS-EXAMINATION

22  BY MR. YAROW:

23  Q.   Good morning, Mr. Baskin.  My name is Rick Yarow.  I

24  represent David Alcorn in this case.

25  A.   Good morning, sir.

A. Baskin - Cross (By Mr. Yarow)

1  Q.  Good morning.

2         Who was it that you represented?  Was it Janus

3  Spectrum, David Alcorn, or Kent Maerki?

4  A.  It was Janus Spectrum and Mr. Alcorn, I believe.

5  Q.  Okay.  So your primary concern was to Janus Spectrum and

6  to David Alcorn?

7  A.  That's correct.

8  Q.  And had you ever met Kent Maerki?

9  A.  No.

10 Q.  Had you ever had any conversations with Kent Maerki on

11 the telephone?

12 A.  I don't believe so.

13 Q.  So your only real contact, other than maybe being a part

14 of e-mail chains, was with David Alcorn?

15 A.  Yes.  Yes.

16 Q.  Okay.  And how would you describe David, Mr. Alcorn,

17 as -- how would you describe his ability to get along with as

18 a client?

19 A.  I thought he was a great guy.  I loved David.  We got

20 along terrifically.  He communicated well.  He was pleasant.

21 He wasn't disrespectful.  I very much liked the relationship.

22 Things changed over time, but even when things were

23 challenging, he was a gentleman.

24 Q.  And it was Kent Maerki that sent you that e-mail about

25 the "I'm at the point of hating 98 percent of attorneys."

A. Baskin - Cross (By Mr. Yarow)

1  That was Kent Maerki?

2  A.  It actually looks like he sent that to Jere Friedman by

3  mistake, and I can't recall if Jere forwarded it to me or

4  not, but I did not get that e-mail directly.

5  Q.  And when David came to you, how did he first -- describe

6  your first time you met David, how the conversation went.

7  A.  Well, I remember the first conversation because this

8  gentleman, Lance Broberg, referred him to me, and I think it

9  was on July 3rd, because I was in San Diego with my family on

10 vacation, and I remember sitting out somewhere early in the

11 morning and having a call with him, and then ultimately we

12 made arrangements to meet in person a week or two after that.

13 Q.  And did David -- David had the subpoena that he brought

14 and showed to you; is that correct?

15 A.  At some point, yes, he got me the subpoena.

16 Q.  Do you recall that David seemed to be primarily concerned

17 with whether or not what he was doing would be deemed a

18 security?

19 A.  Oh, very much.  Yes.

20 Q.  And that seemed to be his primary concern?

21 A.  Yes.  He was worried about whether it was a security.

22 Q.  And is there a quick definition you are able to provide

23 of a security?

24 A.  Yes.

25 Q.  What would that be?

A. Baskin - Cross (By Mr. Yarow)

1  A.  It's called the Howey test, and a security is an
2  investment of money in a common enterprise with the
3  expectation of profits from the efforts of others; so three
4  parts:  investment, common enterprise, expectation of
5  profits.  I could go further, but it might put everyone to
6  sleep.
7  Q.  That's okay.  So you explained the Howey test to --
8  probably the first thing you do when you meet with a client
9  is you explain the Howey test?
10 A.  I don't know if it's the first thing, but in a case like
11 this, it definitely would have been something that Dave and I
12 talked about, and we talked about it a lot.
13 Q.  Okay.  And if what's being sold is not a security, then
14 the SEC does not have jurisdiction; is that correct?
15 A.  That's correct.
16 Q.  So the primary concern for David when he first came in
17 was whether or not this is a security?
18 A.  Primary concern, yes.
19 Q.  And if it is a security, he seemed amenable to fixing the
20 language in his contract to make it not a security; is that
21 correct?
22 A.  That's correct.
23 Q.  And would you -- were you able to ascertain whether or
24 not David believed that he was selling a security when he
25 came in?

```
                        A. Baskin - Cross (By Mr. Yarow)
```

 1           MS. O'BOYLE:  Objection.  Calls for speculation.

 2           THE COURT:  Sustained.

 3           MR. YAROW:  Would the government be willing to pull

 4   up Government's Exhibit 508?

 5   BY MR. YAROW:

 6   Q.  So Jere Friedman is who this e-mail chain originates

 7   from?

 8   A.  At least at the bottom.  The first e-mail is from Jere,

 9   yes.

10   Q.  I think you testified Jere Friedman is a -- he's also a

11   security attorney?

12   A.  Yeah.  To help folks understand, I do stuff that is kind

13   of like business litigation oriented.  I don't draft papers

14   and documents and stuff like that.  Jere Friedman is one of

15   those guys who doesn't go to court.  He drafts papers and

16   agreements and stuff to make sure they are in compliance with

17   securities laws and other business things.  So he's a

18   business lawyer; I'm a litigator.

19   Q.  So you and David had a conversation about going to

20   Jere -- you referred him to Jere Friedman?

21   A.  Correct.

22   Q.  And the idea was that Jere Friedman is going to help to

23   get your Service Agreement or contract that you used right so

24   that it's not a security?

25   A.  Exactly.

A. Baskin - Cross (By Mr. Yarow)

1    Q.  And David had in his contract that he brought to you --
2    do you remember there being an 18 percent commission?
3    A.  That rings a bell, yes.
4    Q.  And what do you recall of that part of his contract?
5    A.  I don't really recall much beyond what he said, which is
6    when money came in -- I can't recall if it was David or Janus
7    would have received a commission.  There's nothing else that
8    resonates about that.
9    Q.  So that wasn't a large part of your conversation --
10   A.  No.
11   Q.  -- whether or not that 18 percent is appropriate?
12   A.  Oh, I think we're talking about two different things.  I
13   don't remember exactly what the language was, but 18 percent
14   would have definitely raised questions.
15   Q.  And did you -- do you remember if you advised David that
16   he should drop that 18 percent?
17   A.  I believe that Jere or I did.  I'm just not certain about
18   that, though.
19   Q.  Okay.  And did you -- were you able to ascertain why
20   David believed that 18 percent was important?
21            THE COURT:  Well, wait a minute.
22            MS. O'BOYLE:  Objection.  Calls for speculation.
23   BY MR. YAROW:
24   Q.  Did David tell you why the 18 percent was important to
25   him?

A. Baskin - Cross (By Mr. Yarow)

1          MS. O'BOYLE:  Objection.  Hearsay.

2          THE COURT:  Sustained.  You cannot put in the

3    statements or beliefs or thoughts of your client.

4          MR. YAROW:  Yes, sir.  I do apologize.

5    BY MR. YAROW:

6    Q.  And you seemed to be very -- you seemed to be genuinely

7    concerned with David dealing with Kent Maerki and Daryl Bank.

8    A.  Oh, yes.

9    Q.  And you felt that those two were a problem for David to

10   be associated with?

11   A.  Yes.

12   Q.  And you encouraged David to break off his association

13   with those two?

14   A.  Yes.

15   Q.  Do you know whether or not -- and you testified that

16   David took steps to buy out Kent Maerki --

17   A.  I saw that in his e-mail --

18   Q.  -- of Janus Spectrum?

19   A.  I'm sorry.  He told me he was doing that.

20   Q.  Okay.  Do you know whether or not that was ever

21   completed?

22   A.  I don't.

23   Q.  And at the time that -- is there a difference between an

24   investigation by the SEC and a formal complaint by the SEC?

25   A.  If you are referring to an enforcement action, yes,

A. Baskin - Cross (By Mr. Yarow)

1    there's a difference.  Or the filing of a complaint in

2    federal court, there's a big difference.

3    Q.   The process is that you get that little number assigned

4    to you, that you testified to, that opens up the

5    investigation?

6    A.   Correct.

7    Q.   Then it goes to the investigation?

8    A.   Correct.

9    Q.   Which may include subpoenas?

10   A.   Yes.

11   Q.   May include depositions?

12   A.   Yes.

13   Q.   And then, finally, there is a suit, an actual piece of

14   paper that is filed in a court to bring an action?

15   A.   Well, I want to -- three things happen:  Either nothing

16   happens; there's a settlement prelitigation; or the lawsuit

17   gets filed.

18   Q.   So at this point in your representation of David and

19   Janus Spectrum, it was just an investigation; is that

20   correct?

21   A.   Yes, sir.

22   Q.   Okay.  And isn't it true that you were not able to tell

23   David how long it would take for the investigation to end?

24   A.   That is correct.

25   Q.   You recommended that David stop business while the

A. Baskin - Cross (By Mr. Yarow)

1    investigation was ongoing?

2    A.  Correct.

3    Q.  But you were not able to tell him at what point in time

4    he would be able to resume business?

5    A.  No.

6    Q.  And you were also not able to tell David whether or not

7    the process -- the investigation would eventually result in a

8    formal complaint by the SEC?

9    A.  I could not predict that; that's correct.

10   Q.  And the fact that Mr. Alcorn was being investigated did

11   not bar him from selling securities by the SEC; is that

12   correct?  I'm sorry.  Actually, it would not have barred --

13           MR. YAROW:  I'm going to withdraw that question,

14   Your Honor.

15   BY MR. YAROW:

16   Q.  Did David discuss with you he did not want to cease

17   activities because he believed it was necessary to acquire

18   additional markets for Janus?

19           MS. O'BOYLE:  Objection.  Hearsay.

20           THE COURT:  Sustained.

21   BY MR. YAROW:

22   Q.  Did you and David have any conversations about the need

23   for him to continue business so that Janus Spectrum could

24   acquire additional markets?

25   A.  I don't recall specifics, but that does sound familiar,

A. Baskin - Cross (By Mr. Yarow)

1   sir.

2   Q.  Okay.

3           MR. YAROW:  If the government would pull up G-300O.

4   BY MR. YAROW:

5   Q.  And this is the e-mail that was previously introduced

6   from Alan Tilles where he says that there is no spectrum

7   below 861 and above 851 that could be used for any type of

8   broadband.  Do you see that --

9   A.  Yes.

10  Q.  -- in the second full paragraph?

11  A.  I do.

12  Q.  Okay.  Was it your understanding that Janus Spectrum was

13  selling guard band applications?

14  A.  At this point I have -- I can't recall the details.  I

15  didn't know anything about spectrum before, and the details

16  of what it was are gone now.

17  Q.  Are you aware that guard band is not located within that

18  range of 851 to 861 megahertz?

19  A.  No, sir.

20          MR. YAROW:  You can take that down.  Thank you very

21  much.  And if you could bring up Government's Exhibit 300P.

22  BY MR. YAROW:

23  Q.  And this e-mail from Alan Tilles to you at the top, it

24  says "almost a carbon copy of Pen's," referring to the

25  website.  Who is Pen?

A. Baskin - Cross (By Mr. Yarow)

1   A.  I think there was a little bit of discussion yesterday.

2   I can't remember the fellow's last name, but I believe it was

3   a gentleman who was in a -- providing a similar service.  I

4   can't remember if it was connected to Janus or a standalone,

5   but it was someone doing the same thing as David.

6   Q.  Does Pendleton Waugh ring a bell?

7   A.  Yes.

8   Q.  Do you know what company he worked for?

9   A.  I don't recall.

10  Q.  Does SmartCOMM ring a bell?

11          THE COURT:  Don't guess if you don't know.

12          THE WITNESS:  Sitting here today, I don't recall if

13  he was SmartCOMM or not.

14  BY MR. YAROW:

15  Q.  That's fine.  Thank you.

16          And did you review Janus Spectrum's website as a

17  part of your representation?

18  A.  Yes.

19  Q.  And did you come to the conclusion that the website was

20  not advertising or soliciting?

21  A.  I would have to see some documents to refresh my

22  recollection.  I don't recall right now.

23  Q.  Okay.  That's fine.

24          And you wrote a letter to the SEC.  I believe the

25  government has introduced it.  No?  Maybe they have not.

——————A. Baskin - Cross (By Mr. Yarow)——————

1          Do you remember writing a long letter to the SEC?

2    A.   Yes.

3    Q.   And in your letter you had mentioned that many of Janus's

4    clients had been involved in spectrum longer than Mr. Alcorn

5    and understood the process of risk.  Do you remember that?

6    A.   Yes.

7    Q.   Did you conduct an independent investigation to make a

8    determination?

9    A.   We would have done legal research, and then I would have

10   relied on what David and I talked about.

11   Q.   Okay.  Fair enough.

12          Do you know whether or not Mr. Alcorn had any

13   special knowledge of spectrum?

14   A.   I wouldn't know enough spectrum to know if he had special

15   knowledge.

16   Q.   Do you know that -- are you aware that his background was

17   in commercial real estate?

18   A.   Yes.  That I remember.

19   Q.   And did David seem to be proactive in the -- in assisting

20   you in the representation?

21   A.   He was very active, yes.

22   Q.   And did he seem to have a good relationship with his

23   previous attorneys?

24   A.   Yes, yes.  They, again, might not see eye to eye on

25   issues, but no one said that David was disagreeable or

A. Baskin - Cross (By Mr. Grindrod)

1    anything like that.

2    Q.   David was easy to get along with?

3    A.   Very.

4         MR. YAROW:   That's all the questions I have.   Thank

5    you very much.

6         THE COURT:   Any cross?

7                      CROSS-EXAMINATION

8    BY MR. GRINDROD:

9    Q.   Good morning, Mr. Baskin.   My name is Andrew Grindrod.   I

10   represent Bill Smith.

11   A.   Good morning, sir.

12   Q.   Mr. Baskin, SEC investigations are conducted on a

13   confidential basis, right?

14   A.   Yes.

15   Q.   The SEC's enforcement division does not confirm or deny

16   the existence of even an -- whether an investigation exists,

17   right?

18   A.   To whom?

19   Q.   To somebody who is not a party to the investigation.

20   A.   They won't typically tell a nonparty that there's an

21   investigation.   That's correct, sir.

22   Q.   And this investigation specifically was not public,

23   right?

24   A.   Yes.

25   Q.   Let's take a look at Government's Exhibit 500B, which has

──────── A. Baskin - Cross (By Mr. Grindrod) ────────

1   already been admitted.  This is the letter that was sent from

2   the SEC to David Alcorn?

3   A.  Yes, sir.

4          MR. GRINDROD:  And if we could go to Page 3,

5   Ms. McCaslin.

6   BY MR. GRINDROD:

7   Q.  And this document also confirms this investigation is a

8   non-public, fact-finding inquiry, right?

9   A.  Yes, sir.

10         MR. GRINDROD:  We can take that down.

11  BY MR. GRINDROD:

12  Q.  And SEC investigations are civil or administrative,

13  right?

14  A.  Yes.

15  Q.  They are not criminal investigations, not criminal cases?

16  A.  That's correct, sir.

17  Q.  And so the SEC can bring an enforcement action to charge

18  someone with a violation of securities laws, right?

19  A.  Yes, sir.

20  Q.  And the SEC can seek certain remedies?

21  A.  Correct.

22  Q.  Like monetary penalties?

23  A.  Yes.

24  Q.  They can seek injunctions?

25  A.  Yes, sir.

—————A. Baskin - Cross (By Mr. Grindrod)—————

1   Q.   Restrictions on a person's ability to engage in the

2   securities industry?

3   A.   True.

4   Q.   But the SEC enforcement division cannot put someone in

5   jail, right?

6   A.   They cannot put someone in jail.

7   Q.   So I want to switch gears and see if you can help me

8   differentiate between some of the concerns that you raise in

9   all these e-mails that we've reviewed.

10  A.   Sure.

11  Q.   So first, we have certain concerns over representations

12  about how spectrum can be used.   Do you remember those?

13  A.   Yes.

14  Q.   And those are the issues that Attorney Alan Tilles

15  typically weighed in on, right?

16  A.   That was his venue, yes.

17  Q.   And then we have some other concerns that you raised

18  about the passive nature of these investments, right?

19  A.   Correct.

20  Q.   Let's pull up Government's Exhibit 509A.   So this is an

21  e-mail from you to David Alcorn and Kent Maerki?

22  A.   Yes, sir.

23  Q.   And then there are some other attorneys copied?

24  A.   Yes, sir.

25  Q.   And so here you're talking about the SEC having certain

A. Baskin - Cross (By Mr. Grindrod)

1   paths to pursue to argue that the program is a security,

2   right?

3   A.   Correct.

4   Q.   And then down here, you're talking about "If the SEC can

5   convince a court that Janus performed certain managerial

6   functions, the program could be considered a security,"

7   right?

8   A.   Yes.

9   Q.   And in that context, you're talking about the Janus

10  investment being considered passive or work-free?

11  A.   Yes.

12  Q.   And so these concerns about whether Janus was marketed as

13  being work-free or passive, that went to your concerns over

14  whether this was a security or not, right?

15  A.   Work-free and passive, yes.

16  Q.   And then same thing down here when you talk about the

17  pooled money for investment, again, that went to your concern

18  as to whether these Janus investments were -- would be

19  designated as a security, right?

20  A.   I'm sorry, yes, sir.

21  Q.   And so you're talking about specifically a concern over

22  whether this would involve the sale of unregistered,

23  nonexempt securities, right?

24  A.   In the context of the questions you're asking, yes.

25  Q.   And when we're talking about securities laws, you

———A. Baskin - Cross (By Mr. Grindrod)———

1  understand that this case today does not involve an

2  allegation of violating the securities laws, right?

3  A.  I do.

4  Q.  This case doesn't involve questions about whether

5  anything was or was not a security, right?

6  A.  That's my understanding.

7  Q.  And certainly, today, you're not here testifying about

8  whether something was or was not a security, right?

9  A.  Trying to avoid that.

10  Q.  You're just a fact witness about what e-mails you sent

11  back when?

12  A.  Correct.

13  Q.  Okay.

14        MR. GRINDROD:  We can take that down, Ms. McCaslin.

15  BY MR. GRINDROD:

16  Q.  So talking about Alan Tilles, remind us again who Alan

17  Tilles was.

18  A.  Alan Tilles was an FCC attorney who is in Maryland, and

19  he preceded me.  He was the fellow that was helping David and

20  Janus as it related to getting applications submitted to the

21  FCC and things like that.

22  Q.  And I just want to be clear.  I think you said he was an

23  FCC attorney.  You mean he practices in that area, not that

24  he actually works for the FCC, right?

25  A.  Right.  Thank you for clarifying.  Yes, he practices in

A. Baskin - Cross (By Mr. Grindrod)

 1   the -- in that space.  He was the bandwidth guy.

 2   Q.  The bandwidth guy.

 3        And so did you have any independent knowledge about

 4   the intricacies of spectrum?

 5   A.  No.

 6   Q.  To what degree did you count on Mr. Tilles to help you

 7   understand those things?

 8   A.  Can you rephrase the question?

 9   Q.  Sure.  So like --

10        MR. GRINDROD:  Let's pull up Smith 65, which has

11   already been admitted.

12   BY MR. GRINDROD:

13   Q.  When you wanted to find out -- when you had questions

14   about the spectrum side of things, did you go pull up

15   documents like this?

16   A.  No.

17   Q.  But it says right here it's a public notice.

18   A.  Correct.

19        MS. O'BOYLE:  Well --

20        THE COURT:  Let's see what the question is here.  I

21   assume you're getting to the question, Mr. Grindrod.

22        MR. GRINDROD:  Yes.

23   BY MR. GRINDROD:

24   Q.  But even though this was public, you didn't go pull it

25   up?

A. Baskin - Cross (By Mr. Grindrod)

1    A.   I don't believe I did.

2    Q.   And why not?

3    A.   Well, I don't know what particular document this is or

4    its relevance to the case, but in the context of my

5    representation, I did not need to go hunting for documents

6    like this.

7    Q.   Because if there were concerns or questions about

8    spectrum, Alan Tilles would tell you what you needed to know?

9    A.   Either Alan Tilles or I would get information from David.

10             MR. GRINDROD:   We can take that down, Ms. McCaslin.

11   BY MR. GRINDROD:

12   Q.   So these concerns that you raised in your e-mails to Kent

13   Maerki and David Alcorn, you were not broadcasting those

14   concerns publicly, right?

15   A.   Oh, gosh, no.   No.

16   Q.   These were communications between you and your client?

17   A.   Yes.

18   Q.   And your client was Janus and/or David Alcorn?

19   A.   Yes.

20   Q.   So when you represent a company, you can communicate with

21   the principals of that company, right?

22   A.   Yes.   That's why I included Maerki in a couple of the

23   e-mails.

24   Q.   And specifically, when you sent e-mails to the Janus

25   principals, you warned them against forwarding those e-mails

——————A. Baskin - Cross (By Mr. Grindrod)——————

1   to people who were outside of that small group of Janus

2   principals, right?

3   A.  I may have even done it in italics and bold, but yes, I

4   did.

5   Q.  And so when you sent e-mails about your recommendation to

6   stop taking funds, did you ever send an e-mail like that to

7   Bill Smith?

8   A.  No.  No.

9   Q.  Do you know whether Mr. Alcorn was telling people during

10  this time period that the SEC investigation was basically no

11  big deal?

12          MS. O'BOYLE:  Well, objection.  Calls for

13  speculation and hearsay.

14          THE COURT:  Sustained.

15          MR. GRINDROD:  Your Honor, it's -- Your Honor, if I

16  could respond briefly.  I'm asking whether he knows.

17          THE COURT:  I know what you're asking.  Sustained.

18  BY MR. GRINDROD:

19  Q.  Do you know anything about what Mr. Alcorn was telling

20  people publicly about the SEC investigation?

21          MS. O'BOYLE:  Objection.  Calls for --

22          MR. YAROW:  Objection.

23          THE COURT:  I don't know what the problem is.

24  Sustained.  Let's move on to another question.

25          MR. GRINDROD:  Just for the record, what is the

A. Baskin - Redirect

1   basis for the objection?

2          THE COURT:  Sustained.  Ask your next question.

3          MR. GRINDROD:  Okay.

4   BY MR. GRINDROD:

5   Q.  All of these e-mails that we've talked about between

6   today and yesterday, did you ever write an e-mail like that

7   to Bill Smith?

8   A.  No.

9   Q.  Have you ever represented Bill Smith as your client?

10  A.  No.

11  Q.  Have you ever met him?

12  A.  No.

13  Q.  Have you ever spoken with him?

14  A.  Not that I recall.

15  Q.  And not only did you not send him an e-mail, of all of

16  those e-mails that we've looked at over the last two days,

17  Bill Smith wasn't even copied on one of them, right?

18  A.  That's correct.

19          MR. GRINDROD:  No further questions, Your Honor.

20          THE COURT:  Any redirect?

21          MS. O'BOYLE:  Just a couple, Your Honor.

22                  REDIRECT EXAMINATION

23  BY MS. O'BOYLE:

24  Q.  Mr. Baskin, Mr. Yarow asked you about Mr. Alcorn's focus

25  on whether or not what he was offering was a security.  Do

A. Baskin - Redirect

1    you remember that?

2    A.   Yes.

3    Q.   You made it clear when you spoke with him that this

4    investigation was not just whether this was a security, it

5    also involved securities fraud allegations?

6    A.   Oh, yes.  Yes.

7            THE COURT:  That's a leading question, Counsel.

8            MS. O'BOYLE:  Yes, Your Honor, I'm sorry.

9    BY MS. O'BOYLE:

10   Q.   Mr. Grindrod asked you about whether this investigation

11   was in the public domain.  Do you remember that?

12   A.   Yes.

13           MS. O'BOYLE:  And if we could have Government's

14   Exhibit 514.  This is already in evidence.

15   BY MS. O'BOYLE:

16   Q.   This is an SEC action against Mr. Alcorn and Janus

17   Spectrum; is that correct?

18   A.   Yes.

19   Q.   Is this in the public domain?

20   A.   Yes.

21   Q.   Mr. Yarow asked you some questions about a letter that

22   you wrote and whether it was your representation that many of

23   the Janus clients involved had background in spectrum.  Do

24   you remember that?

25   A.   Yes.

A. Baskin - Redirect

1   Q.  What was the basis for that statement, that the clients

2   had background in spectrum?  Who told you that?

3   A.  David.

4   Q.  And finally, you mentioned that you thought that

5   Mr. Alcorn was a great guy and a real gentleman.  Do you

6   remember that?

7   A.  Yes.  My statement about love was probably overstated a

8   little bit, but yes, I very much liked David.

9   Q.  You never met Carol Groff, have you?

10  A.  Who?

11  Q.  An investor in Janus Spectrum.  Have you ever met her?

12  A.  No, no.

13  Q.  Have you ever met any of the investors in Mr. Alcorn's

14  company?

15  A.  No.

16          MS. O'BOYLE:  Thank you, Your Honor.  I have no

17  further questions.

18          THE COURT:  May this witness be permanently excused?

19          MS. O'BOYLE:  Yes, from the government, Your Honor.

20          MR. YAROW:  Yes, Your Honor.

21          MR. GRINDROD:  Yes, Your Honor.

22          THE COURT:  All right.  Mr. Baskin, you may be

23  permanently excused.

24          (The witness was excused.)

25          THE COURT:  Ladies and gentlemen, we're close enough

———D. McCrumb - Direct———

 1   to our break that we're going to take a 15-minute break here.

 2            (The jury exited the courtroom.)

 3            THE COURT:  You may be excused, Mr. Baskin.

 4            THE WITNESS:  Thank you, Your Honor.

 5            (Recess from 10:53 a.m. to 11:14 a.m.)

 6            (The jury entered the courtroom.)

 7            THE COURT:  You may be seated.

 8            Let the record reflect that all jurors are now

 9   present in the courtroom.

10            Does counsel agree?

11            MS. YUSI:  The government agrees, Your Honor.

12            MR. YAROW:  Mr. Alcorn agrees, Your Honor.

13            MS. McCASLIN:  Mr. Smith agrees.

14            THE COURT:  You may call your next witness.

15            MS. YUSI:  Your Honor, the government calls Dennis

16   McCrumb.

17            (Witness sworn.)

18            DENNIS McCRUMB, called by the Government, having

19   been first duly sworn, was examined and testified as follows:

20                         DIRECT EXAMINATION

21   BY MS. YUSI:

22   Q.  Good morning, Mr. McCrumb.  I'm over here.

23   A.  Good morning.

24   Q.  Can you introduce yourself to the Court?

25   A.  Yes.  My name is Dennis McCrumb.

D. McCrumb - Direct

1   Q.  How do you spell your last name?

2   A.  M-c-C-r-u-m-b.

3   Q.  How old are you today?

4   A.  Pardon me?

5   Q.  How old are you today?

6   A.  77.

7   Q.  And in what city and state do you live?

8   A.  I live in Lacey, Washington.

9   Q.  What is the main city around there?

10  A.  It's a suburb of Olympia.

11  Q.  How long have you lived in that area?

12  A.  Almost ten years.

13  Q.  And prior to that, where did you live?

14  A.  I lived in Fair Oaks, California.

15  Q.  Is that close to Sacramento?

16  A.  It is a suburb of Sacramento.

17  Q.  Are you married?

18  A.  Yes.

19  Q.  To whom?

20  A.  To my wife Diane.

21  Q.  And how long have you been married?

22  A.  52 years.

23  Q.  And are you working?

24  A.  No.  I'm retired now.

25  Q.  When did you retire?

D. McCrumb - Direct

```
 1   A.  May of last year.
 2   Q.  And what did you do for work?
 3   A.  I was a project manager for a consulting firm.
 4   Q.  And what kind of consulting?
 5   A.  Environmental consulting.  I have a degree in geology.
 6   So we were working on projects to clean up contaminated soil
 7   and water.
 8   Q.  And did your wife work outside the home?
 9   A.  No.
10   Q.  While you were working, did you save money for
11   retirement?
12   A.  Yes.  I had 401(k) plans with most companies I worked
13   with.
14   Q.  Do you or your wife have any background or training in
15   investments?
16   A.  No.
17   Q.  Do you consider yourselves sophisticated investors?
18   A.  No.
19   Q.  Do you know a man named Bill Smith?
20   A.  Yes.
21   Q.  How did you first come to know Mr. Smith?
22   A.  When we were contemplating retirement in 2012, we heard
23   him on a radio show, and so we contacted him looking for some
24   financial advice.  I think he was a certified financial
25   planner, family planner.
```

D. McCrumb - Direct

1  Q.  You said that was in 2012.  Did you meet with him in
2  person?
3  A.  Yes.  We met with him several times.
4  Q.  Do you remember around the first time you met with him?
5  A.  I believe it was near the end of March or first of April
6  in 2012.
7  Q.  And did Mr. Smith ever describe himself as a solicitor
8  for companies?
9  A.  No.
10  Q.  Did you believe he had a fiduciary duty?
11  A.  Yes.
12  Q.  Did he talk about his family or religion?
13  A.  During our meetings, we talked a great deal about family.
14  He talked about his religion, Mormon religion.  He provided
15  us with a number of the *Book of Mormon* and other books.
16  Q.  Did you end up trusting Mr. Smith?
17  A.  Yes.  We built a level of trust because of our meetings.
18  He was a family man, and we talked quite a bit about our
19  families.
20  Q.  What were you looking for in terms of financial advice in
21  terms of planning for your retirement?
22  A.  We were looking for a place to roll over my IRA to
23  investments that would take us through the rest of our lives,
24  I guess.
25  Q.  I want to talk to you about an investment called Dental

D. McCrumb - Direct

1   Support Plus Franchise.  Did Mr. Smith suggest this

2   investment to you?

3   A.  Yes, he did.

4   Q.  And what did he say about it?

5   A.  Well, he provided us with a copy of the kinds of returns

6   we could expect on the investment after purchasing

7   independent franchises for that -- for Dental Support Plus,

8   and the returns that he showed us on the things were very

9   attractive.  They were well over 10 percent, which at that

10  time was a good return and kind of what we were more looking

11  for.

12  Q.  Compared to your IRAs?

13  A.  Pardon me?

14  Q.  Compared to your IRA account?

15  A.  Yes.  The IRA was primarily mutual funds, and Mr. Smith

16  had a belief at that time that the stock market was not going

17  to go, it was going to drop down significantly, and he felt

18  getting out of the stock market would be in our best interest

19  for the -- for our retirement funds.

20  Q.  And did he talk about risk in terms of the stock market?

21  A.  Well, he thought the stock market was very risky at that

22  time, and the Dental Support Plus he suggested was much lower

23  risk because it was a franchise and he talked about how

24  the -- well, how the returns, you know, would go throughout,

25  I think, the upcoming ten-year period or so.

D. McCrumb - Direct

1    Q.  Did he talk about how Dental Support Plus Franchise had
2    been performing?
3    A.  Well, he did talk about one particular dental group that
4    he said was performing very well.
5    Q.  Did you talk about fees or commissions that would be
6    taken out of your investment?
7    A.  No.
8    Q.  And in terms of timing, how long would it be before you
9    started seeing money coming in?
10   A.  He expected within about six months' time, we should have
11   the franchise in place, and we should start seeing a return.
12   Q.  Before you invested, did Mr. Smith talk about a product
13   he sold called Dazzle Dental?
14   A.  I don't believe so.
15   Q.  In May 2012, did you purchase DSPF franchise?
16   A.  We purchased two.
17   Q.  How much were they at that point?
18   A.  $25,000 each.
19   Q.  And do you recall who you gave the money to?
20   A.  The money went to -- well, Kent Maerki, I think.  We
21   rolled over our IRA into a self-directed IRA in order that we
22   could purchase the franchises.
23   Q.  And that was $50,000 for the franchises?
24   A.  That's how much for the franchises, yes.
25   Q.  Within six months, did you start making money from your

D. McCrumb - Direct

```
 1   franchises?
 2   A.  No, we did not.
 3   Q.  Did you talk to Bill Smith about that?
 4   A.  I did.  And he said to be patient, that the money would
 5   be coming.
 6   Q.  Did you talk with him in 2013 about not getting money?
 7   A.  I talked to him several times in 2013, and again, he told
 8   me that things were not progressing as quickly as they
 9   should, but be patient and we'll receive the money.
10   Q.  At any point did you start getting a return on your
11   investment?
12   A.  In, I think, January or so of 2014, we received one check
13   that was under $100 and he -- I called him about that.  He
14   said that was just the initial check to verify the tracking
15   of the money into our account.
16   Q.  Did he say you should be expecting more money after that?
17   A.  Yes.
18   Q.  And did you get any more money after that?
19   A.  No.
20   Q.  Did you ever try to contact Kent Maerki or anyone at DSPF
21   in Arizona?
22   A.  I tried by e-mail after we were not receiving money, and
23   I tried by the phone number that was, I think, listed on one
24   of his memos that was talking about Dental Support.
25   Q.  Did you get any contact back?
```

D. McCrumb - Direct

1    A.   No.

2    Q.   In August 2014, did you get an e-mail from -- with an

3    attachment from Kent Maerki saying that they were shelving

4    the investment?

5    A.   Yes.

6    Q.   Did this concern you?

7    A.   Well, it did concern me a great deal because that was

8    probably the year I was going to be 70 and a half, and I was

9    worried about the kind of -- if I would have to draw money

10   out of the self-directed IRA to satisfy the required minimum

11   distribution.

12   Q.   And did you think you still had money in your

13   self-directed IRA?

14   A.   Well, the IRA showed that we still had all of the money

15   that we rolled over from my IRA.  It didn't really indicate

16   any reduction in that cost for any of the products we

17   purchased.

18   Q.   And did it show that you had your 50,000 in there even in

19   August of 2014 when you heard that it was no longer --

20   A.   Yes, my self-directed IRA still indicated that I had a

21   $50,000 asset for Dental Support Plus.

22   Q.   Did you try to call Mr. Smith about that?

23   A.   I did.

24   Q.   What happened?

25   A.   After the January -- early January and February or so of

——— D. McCrumb - Cross (By Mr. Grindrod) ———

1    2014, I never was able to get in touch with Mr. Smith.

2    Q.  Did you leave messages?

3    A.  I left messages, I sent e-mails, yes.

4    Q.  And you heard no response?

5    A.  No response.

6           MS. YUSI:  I believe those are all my questions, but

7    I think other counsel will have some for you.

8           THE COURT:  Cross-examination?

9           MR. YAROW:  No questions from Mr. Alcorn.

10                        CROSS-EXAMINATION

11   BY MR. GRINDROD:

12   Q.  Good morning, sir.  You mentioned on direct examination

13   your geology degree?

14   A.  Yes.

15   Q.  Do you also have an engineering degree?

16   A.  I do not.

17   Q.  You said you did consulting work.  Can you tell us a

18   little bit more about that?

19   A.  I worked for a number of companies after graduating with

20   my degree in geology, and it was sort of engineering geology

21   or environmental geology.  We worked on investigations for

22   large construction projects, nuclear power plants, and dam

23   sites.  And then later in my career, that transitioned more

24   to environmental geology where we were evaluating groundwater

25   contamination and soil contamination.

D. McCrumb - Cross (By Mr. Grindrod)

1   Q.  That first part must have been where I got the
2   engineering part.  I'm sorry.
3           You mentioned that when you spoke with Mr. Smith
4   about Dental Support, he gave you an information sheet with
5   some information written down?  Did he give you some written
6   information about the dental program?
7   A.  Yeah.  We got information about the returns.  We also got
8   information about the franchises.
9           MR. GRINDROD:  Could we pull up Government's
10  Exhibit 202, which has been admitted.
11  BY MR. GRINDROD:
12  Q.  Sir, does this look like the kind of thing that you got?
13  A.  Yes.
14  Q.  And you mentioned that Mr. Smith told you that the dental
15  franchise would be up and running in about six months?
16  A.  Yes.
17          MR. GRINDROD:  And, Ms. McCaslin, could we zoom in
18  on the bottom left corner, the bottom line.
19  BY MR. GRINDROD:
20  Q.  So that's what this sheet says, too, right, "fully
21  operational after 180 days"?
22  A.  Yes.
23  Q.  Okay.  And 180 days is about six months, right?
24  A.  Yes.
25          MR. GRINDROD:  We can take that down and flip to

D. McCrumb - Cross (By Mr. Grindrod)

1    Page 2, if we could, Ms. McCaslin.

2            THE WITNESS:  I'm sorry, I didn't hear you.

3            MR. GRINDROD:  Sorry.  I was telling her where to

4    take us on the screen.

5    BY MR. GRINDROD:

6    Q.  So this is some financial numbers here, right?  Is this

7    the kind of thing that Mr. Smith used to talk with you about,

8    I think you said, financial projections or --

9    A.  Yes.

10   Q.  This is the kind of thing that you all used to have those

11   conversations?

12   A.  Yes.

13           MR. GRINDROD:  We can take that down, Ms. McCaslin.

14   BY MR. GRINDROD:

15   Q.  You mentioned on direct examination some memos from Kent

16   Maerki.  Do you remember getting memos from Kent Maerki?

17   A.  Well, I certainly remember the one in August of 2014, and

18   it seems like there were other memos prior to that.  I don't

19   recall exactly, but I knew that Kent Maerki was the

20   initiator, I think, or whatever, you know, of that particular

21   financial product.

22   Q.  You knew that DSPF was essentially Kent Maerki's company,

23   right?

24   A.  I knew that Kent Maerki was -- and, in fact, Bill Smith

25   mentioned that Kent Maerki had a great track record in

D. McCrumb - Cross (By Mr. Grindrod)

1   setting up these kinds of franchises.  So, yes.

2   Q.  Do you remember SuperShuttle coming up?

3   A.  Yes.

4   Q.  What do you remember about that?

5   A.  That was one of the examples that Bill Smith used as Kent

6   Maerki's -- to demonstrate his success in franchises, and at

7   that time, the SuperShuttle, the blue vans going to the

8   airports was very popular.

9   Q.  Okay.  And so you sent your money to Kent Maerki and

10  DSPF?

11  A.  We -- okay.  Can I explain?

12  Q.  Sure.

13  A.  It's not a trick question.  I'm just asking, you

14  eventually invested in DSPF, right?

15  A.  I invested in DSPF.

16  Q.  And you didn't -- I think you mentioned a small amount of

17  money, but basically you didn't get any meaningful amount of

18  money back, correct?

19  A.  Correct.

20          MR. GRINDROD:  I have no further questions.

21          THE COURT:  Any redirect?

22          MS. YUSI:  No further questions.

23          THE COURT:  May the witness be permanently excused?

24          MS. YUSI:  Yes, sir.

25          MR. GRINDROD:  Yes, Your Honor.

—T. Sellers - Direct—

1        THE COURT:  All right, sir.  You may step down.

2            (The witness was excused.)

3        THE COURT:  Next witness?

4        MR. BOSSE:  Your Honor, the government calls Tony

5    Sellers.

6            (Witness sworn.)

7        TONY SELLERS, called by the Government, having been

8    first duly sworn, was examined and testified as follows:

9                    DIRECT EXAMINATION

10   BY MR. BOSSE:

11   Q.  Good afternoon, sir -- or good morning.  Would you speak

12   into the mic as best you can.

13           State your name for the record.

14   A.  Tony Scott Sellers.

15   Q.  How old are you, Mr. Sellers?

16   A.  62.

17   Q.  What city and state do you currently live in?

18   A.  Salt Lake City, Utah.

19   Q.  Thinking back to the 2010 to 2015 time period, where were

20   you living then?

21   A.  Primarily Idaho Falls, Idaho.

22   Q.  And do you have a college degree?

23   A.  I do.

24   Q.  When was that?  When did you earn that?

25   A.  1989, bachelor's degree in business administration.

T. Sellers - Direct

1   Q.  What industry did you work in primarily after college?

2   A.  Insurance industry.

3   Q.  Tell the jury a little bit about being an insurance

4   agent.  Do you sell for one insurer or for more than one

5   insurer?

6   A.  More than one insurer.

7   Q.  All right.  And what states did you do most of your

8   insurance sales work in?

9   A.  Most of it was in the state of Idaho.

10  Q.  What kinds of insurance did you sell?

11  A.  Primarily annuities.

12  Q.  And did you also sell life or health or anything like

13  that?

14  A.  I did.  I was licensed in life and health.  I did some

15  health, some disability, some life, but primarily it was the

16  fixed index annuities.

17  Q.  Do you have to have a license to sell insurance in Idaho?

18  A.  Correct.

19  Q.  Were you licensed there?

20  A.  Yes.

21  Q.  Were you licensed in any other states to sell insurance?

22  A.  Yes.  I had a non-resident in Utah, Colorado, and I think

23  that's it, I believe.

24  Q.  Does your insurance license allow you to sell

25  noninsurance investment products?

─────────── T. Sellers - Direct ───────────

1  A.  Does not.

2  Q.  Did you at any point hold a brokers license, a Series 7

3  or a Series 63 state brokers license?

4  A.  No, I did not.

5  Q.  Did you ever hold a Series 65 investment advisor license?

6  A.  No, I did not.

7  Q.  Did there come a time that you became involved in selling

8  Dental Support Plus Franchise units?

9  A.  Yes, I did.

10  Q.  Did there later come a time you became involved in

11  selling spectrum investments with Kent Maerki and David

12  Alcorn?

13  A.  Yes, I did.

14  Q.  Were you charged in this criminal case?

15  A.  Yes, I was.

16  Q.  Did you plead guilty to a felony?

17  A.  I did.

18  Q.  What did you plead guilty to?

19  A.  Wire fraud.

20  Q.  And who was defrauded?

21  A.  Among others, my clients.

22  Q.  How were they defrauded?

23  A.  Well, I feel like they were misled and were defrauded.

24  Q.  Who created the investments that you sold as part of this

25  fraud?

─────────── T. Sellers - Direct ───────────

1   A.  The investments through Dental Support Plus primarily was

2   Kent Maerki, and also I was involved in spectrum.  That was

3   David Alcorn and Kent Maerki.

4   Q.  And in connection with your -- did you plead guilty in

5   this case?

6   A.  Yes.

7   Q.  In connection with your plea, did you enter into a plea

8   agreement with the government?

9   A.  I did.

10  Q.  If you could look, just for the witness, at Government's

11  Exhibit 95.  It will pop up on your screen.  Do you recognize

12  this document?

13  A.  Let me get my reading glasses.

14          Yes, I do.

15  Q.  What is it?

16  A.  It's a plea agreement.

17  Q.  The one that you signed?

18  A.  Correct.

19          MR. BOSSE: I'll offer Government's 95.

20          THE COURT:  Government's 95 will be admitted.

21          (Government's Exhibit 95 was admitted.)

22          MR. BOSSE:  We can take that down.

23  BY MR. BOSSE:

24  Q.  Sir, have you already been sentenced in your case?

25  A.  I have.

—————— T. Sellers - Direct ——————

1    Q.  Without telling me your sentence, how is it that you're

2    not already at the Bureau of Prisons?

3    A.  I was allowed to self-surrender by Judge Jackson.

4    Q.  What is your understanding of your obligation under the

5    plea agreement as far as your cooperation with the government

6    goes?

7    A.  That I testify in this current case, which I'm doing.

8    Q.  And what are you hoping if you testify truthfully in this

9    case?

10   A.  Reduce the sentence.

11   Q.  And you understand that my office would have to ask the

12   Court for you to get a reduced sentence?

13   A.  I do.

14   Q.  Do you know who makes the final decision on whether your

15   sentence is reduced?

16   A.  Yes.  Judge Jackson.

17   Q.  Sir, how did you first meet Kent Maerki?

18   A.  I was introduced to Kent Maerki through a gentleman in

19   California.  It was Ed Lichtig that approached me to start

20   looking into the Dental Support Plus Franchise.

21   Q.  Did you eventually speak to Kent Maerki about this

22   franchise program?

23   A.  I did.

24   Q.  What did Mr. Maerki say as far as describing it to you?

25   A.  It was very convincing, that it was set up through a

T. Sellers - Direct

 1    franchise attorney, Lynne Shelton, that it was excellent
 2    returns, and it was going to be operated by kind of a
 3    hands-off position with clients, and the returns were quite
 4    impressive, from what he told me in the initial conversation.
 5    Q.   Had you ever been involved before this in selling
 6    franchises?
 7    A.   No.
 8    Q.   What, if anything, did Mr. Maerki say about whether this
 9    business had a track record of success?
10    A.   Well, that conversation did come up, and of course, I
11    asked about that initially.  He said there was a five-year
12    track record by Oracare and MetroMedia on some existing
13    dentists.  I believe there were four or five in the Phoenix,
14    Arizona area, and it was very successful, and they decided to
15    franchise it because of the success they had.
16    Q.   And what, if anything, did he tell you about whether that
17    business shut down and everyone lost all their money in it?
18    A.   I did not know anything about that.
19    Q.   Did you sell at any point investment shares in a company
20    called Dazzle Dental?
21    A.   I did not.
22    Q.   Were you looking to run your own franchise at this point
23    in your career, or was this going to be a passive investment?
24    A.   Definitely passive investment.
25    Q.   Do you recall how long it was supposed to take to get up

—T. Sellers - Direct—

1   and running?

2   A.   Six months.

3   Q.   And based on what you heard from Mr. Maerki, did you

4   yourself invest money in Dental Support Plus Franchises?

5   A.   I did.  I invested $200,000, ten franchises.

6   Q.   At that point it was $20,000 per franchise?

7   A.   Correct.

8   Q.   What, if anything, were you told about extra incentives

9   to being one of the first investors?

10  A.   I was told that the people that were initially going to

11  invest the money up front would have priority on receiving

12  patients first throughout the term.

13  Q.   Did you then also agree to sell Dental Support Plus

14  Franchises to your clients?

15  A.   I did.

16  Q.   How were you compensated from making those sales?

17  A.   Commission.

18          MR. BOSSE:  Could we see, for the witness, please,

19  200Q.

20  BY MR. BOSSE:

21  Q.   Do you recognize this document, Mr. Sellers?

22  A.   I do.

23  Q.   And what is this?

24  A.   This is an agreement to sell the Dental Support Plus

25  Franchises.

─────────────T. Sellers - Direct─────────────

 1          MR. BOSSE:  I'll offer Government's Exhibit 200Q,

 2   Your Honor.

 3          THE COURT:  200Q is admitted.

 4          (Government's Exhibit 200Q was admitted.)

 5   BY MR. BOSSE:

 6   Q.  Just for the jury, what is the date on which you agreed

 7   to become a salesman for Dental Support Plus?

 8   A.  It was February 18, 2011.

 9   Q.  And that's not filled in there, but you know the date to

10   be 2011?

11   A.  Yes.

12          MR. BOSSE:  We can take that down.

13   BY MR. BOSSE:

14   Q.  Mr. Sellers, after you make this investment -- which you

15   made before you signed the agreement, correct?

16   A.  Yes.

17   Q.  Within six months, did you get the kind of returns that

18   you had been promised on your investments?

19   A.  Did not.

20   Q.  Did you get some amount of returns at some point on these

21   ten franchises?

22   A.  The first notice I had of any revenue coming through was

23   the ninth month.

24   Q.  And were you getting revenue in the thousands and

25   thousands of dollars or less than that?

————T. Sellers - Direct————

1   A.   No.  Less than that.

2   Q.   And that's for ten separate franchises?

3   A.   Correct.

4   Q.   Did you call up and ask at any point about where your

5   money was?

6   A.   Every week, multiple times a week, for weeks and months

7   on end.

8   Q.   Were the returns that you got for those couple of months

9   anything close to what you had been told you could expect?

10  A.   Not even close.

11  Q.   What did you hear from Mr. Maerki when you called up to

12  ask about what was going on with your personal franchises?

13  A.   Well, that the accounting department is working on it.

14  And so I contacted the accounting department.  I think it was

15  his sister-in-law, I believe, and one other person, and they

16  just kept telling me they're working on it.  That's all they

17  could say.  And then at one point they said that they were

18  having a hard time getting the money out of the dentists,

19  they didn't want to pay.

20  Q.   The dentists didn't want to pay?

21  A.   Yes.

22  Q.   So would it be fair to say, then, that you knew because

23  of your own experience that this investment was not

24  performing as it was being described in the marketing

25  materials?

———T. Sellers - Direct———

1   A.   Definitely, yes.

2   Q.   Knowing that, did you continue to sell Dental Support

3   Plus Franchise to your own clients?

4   A.   I did.

5   Q.   And did you tell the clients that you were selling to

6   about the problems you knew about with the business?

7   A.   I did not.

8   Q.   How old were most of your clients who bought Dental

9   Support Plus?

10  A.   All my clients are primarily senior clients, 60-plus.

11  Q.   Do you know how many franchise units you sold

12  approximately?

13  A.   If I were to guess, probably in the range of 30 to 40,

14  possibly more.

15  Q.   In order to help you make these sales, were you given

16  information, brochures, things like that, offering documents

17  to help you make the pitch?

18  A.   I was.

19  Q.   And as time went on and you learned that things were not

20  happening as promised, did you tell that to your clients, or

21  did you continue to use the same pitch and the same

22  materials?

23  A.   I -- yeah, I used the same pitch, I used the same

24  materials.  I would like to add something as well, is that I

25  ended up eventually getting a spreadsheet of information with

──────────────── T. Sellers - Direct ────────────────

1   the dentist, the client, the procedure, and the amount of

2   revenue I was supposed to receive.  It was a spreadsheet at

3   one time that totaled over $50,000 in revenue I was supposed

4   to expect.  Shameful to admit that I used that spreadsheet

5   when I talked to my clients to let them see what kind of

6   revenue was being generated, and it was very misleading.

7   Q.  Let's look, if we could, at Government's Exhibit 202.

8   This is in.  The jury has seen this probably ad nauseam at

9   this point, but just to talk about some of the

10  representations that you were making, did you talk about the

11  60 months' proven performance and use this brochure when you

12  were doing the advertisements?

13  A.  That was a big part of the sales pitch, yes.

14  Q.  And did you talk about the fact that this would be --

15  they could expect money in about six months, that it would be

16  fully operational after 180 days?

17  A.  Correct.

18  Q.  All right.  And these kind of projections, as far as how

19  much money would be earned, 16.5 percent of patient

20  collections and an annual projected income of 10,620 per

21  franchise unit, are these figures that you used in describing

22  it to your clients?

23  A.  Another big part of my sales pitch, yes.

24  Q.  Were those things true?

25  A.  No, not even close.

T. Sellers - Direct

1   Q.  And as time went on and you continued to sell, did you

2   know that those things weren't true?

3   A.  I did, but I ignored it.

4   Q.  All right.

5          MR. BOSSE:  Let's go to Government's Exhibit 224.

6   This is in.

7   BY MR. BOSSE:

8   Q.  And you see that this is an e-mail sent September 2012

9   from a woman named Raeann Gibson.  Who is it to?

10  A.  To me.  Sellers Financial is my e-mail address, correct.

11  Q.  And is this Ms. Gibson forwarding you the mailer letter

12  and postcard and other marketing materials?

13  A.  Correct.

14  Q.  Is this a form letter that was prepared for you to use?

15  A.  Correct.

16  Q.  And you see here in the form letter that now the track

17  record of success is now a nine-year track record of success;

18  is that right?

19  A.  That's correct.

20  Q.  You knew that it had been offered as a five-year track

21  record and a nine-year track record?

22  A.  Yeah.  When I saw that, I -- honestly, I ignored it.  But

23  that did stand out in the letter.

24  Q.  And you did not tell your clients at any point, did you,

25  about the difference in the number of years of the track

———T. Sellers - Direct———

1  record of success of the company?

2  A.  I did not.

3  Q.  Okay.

4        MR. BOSSE:  We can take that down.

5  BY MR. BOSSE:

6  Q.  After you started making these sales in 2011, I

7  believe -- is that right?

8  A.  Correct.

9  Q.  You make your first sales, and let's say six months go

10 by.  So for those initial investors, are they then calling

11 you asking where their money is?

12 A.  Right after the six months.  Each one of them were asking

13 me how come they haven't received their first revenue check,

14 correct.

15 Q.  And so six months after you sold to your clients, you

16 have your own experience of your own ten franchises, correct?

17 A.  Yes.

18 Q.  And you have your own clients calling you and telling you

19 that they are not making any money, correct?

20 A.  Correct.

21 Q.  Did you continue to market Dental Support Plus Franchises

22 to new clients without telling them that?

23 A.  I did.

24 Q.  And did you continue to pitch it in the same way?

25 A.  I did.

T. Sellers - Direct

1   Q.  Sir, while you were selling the Dental Support program,
2   did you come in contact with a man named Daryl Bank?
3   A.  I did.
4   Q.  What did you understand his role to be?
5   A.  Daryl Bank's role was a -- to be the national sales
6   manager for Dental Support Plus.
7   Q.  Did you participate in weekly or regular conference calls
8   with Daryl Bank and Kent Maerki and other salesmen about the
9   Dental Support Plus program?
10  A.  I did.
11  Q.  What was the general tone of those calls with the
12  salesmen?
13  A.  The general tone was extremely upbeat all the time
14  throughout the calls, and to me it was -- I couldn't quite
15  justify that knowing what my own personal experience was and
16  the problem I was having with getting revenue coming in, but,
17  yeah.
18  Q.  Did the tone of those sales calls match what you were
19  hearing from your own clients about the investment that they
20  had made in the program?
21  A.  Completely opposite.
22  Q.  Now, you said the calls were generally upbeat, but did
23  they talk -- what, if anything, did you hear about problems
24  with the number of dentists who were being signed up?
25  A.  Well, it fluctuated.  They had a hard time obtaining

T. Sellers - Direct

1  dentists, unlike what we were told initially, so that was --
2  that was a problem.  Figuring how many franchises were being
3  sold and the number of dentists they had supposedly signed
4  up, the numbers just wouldn't match.
5  Q.  And that was said on these sales calls with the salesmen
6  for this product?
7  A.  Yes.
8  Q.  At any point did you hear anything on those calls that
9  raised even more concerns for you?
10  A.  Always.  Yeah.  There were several things that were said.
11  Q.  All right.  And what, if anything, do you recall about
12  hearing Kent Maerki say something about you needing to
13  continue to market to keep this thing going?
14  A.  I remember that call.
15  Q.  Tell us what you recall about it and -- tell us what you
16  recall about it.
17  A.  Well, it was alarming, you know, to hear that because the
18  first thing that entered my mind is, are we now involved in a
19  Ponzi scheme here, you know, because he wants new money to
20  come in basically to pay the bills and keep this afloat, and
21  it was very concerning.  The focus wasn't on getting new
22  dentists, getting new patients in the seats and taking care
23  of the franchisees that were coming in.  It was all about
24  trying to stay afloat.
25  Q.  And did you continue, though, to market the program

─────────── T. Sellers - Direct ───────────

1  without changing the script and the pitch?

2  A.  I did.

3  Q.  Did there come a time you learned that the Idaho

4  Department of Finance was asking questions about your sales

5  of Dental Support?

6  A.  Correct.

7        MR. BOSSE:  Could we see, please, for the witness,

8  Government's Exhibit 246.

9  BY MR. BOSSE:

10  Q.  And just to identify it, sir, do you see this is an

11  e-mail chain that involves you, Mr. Maerki, Catrina Davis,

12  about what we just talked about, the Idaho Department of

13  Finance's looking into you?

14  A.  Yes.

15        MR. BOSSE:  I'll offer Government's Exhibit 246,

16  please.

17        THE COURT:  Any objection?

18        Hearing no objection, 246 is admitted.

19        (Government's Exhibit 246 was admitted.)

20  BY MR. BOSSE:

21  Q.  And this goes in reverse chronological order, so we'll

22  start at the bottom here.  Who is writing to you on March 1st

23  of 2013?

24  A.  This is one of my clients, Beverly Stucki.

25  Q.  And she's telling you that she received a three-page

─────────── T. Sellers - Direct ───────────

1   investment questionnaire from the Idaho Department of Finance

2   and asking for your help filling it out; is that right?

3   A.  Correct.

4   Q.  And what does she say here at the bottom where my curser

5   is?  I can highlight it for you.

6   A.  Yeah.  She felt like it was just overwhelming for her

7   with everything going on.

8   Q.  And she was looking to you for help?

9   A.  Correct.

10  Q.  All right.

11          MR. BOSSE:  If we could page up to Page 3.

12  BY MR. BOSSE:

13  Q.  And what does Catrina Davis, the director of marketing at

14  Dominion, tell you?

15  A.  That, yeah, that Catrina reached out to Kent about the

16  issue.

17  Q.  Does she say that Daryl and Kent are on top of this

18  issue?

19  A.  And Lynne.  Yes, correct.

20  Q.  Who is Lynne?

21  A.  Lynne Shelton, the franchise attorney.

22          MR. BOSSE:  If we could page up, please.

23  BY MR. BOSSE:

24  Q.  And do you see now -- you're copied on this.  You are not

25  the one who receives it directly, but do you see that through

--------T. Sellers - Direct--------

1  the writer of this e-mail, Kim White, who is Kent Maerki's

2  assistant, they were telling how Beverly should respond to

3  this inquiry?  "DSP is not an investment.  I bought a

4  franchise.  That's it and nothing more."

5  A.  Correct.

6         THE COURT:  I think you should let the witness

7  testify about what it says, Mr. Bosse.  Instead of him saying

8  yes or no, ask the witness.

9         MR. BOSSE:  Yes, sir.

10  BY MR. BOSSE:

11  Q.  Would it be easier, sir, for you to read it on the screen

12  with your glasses or from the book?

13  A.  Probably the screen.  If you could highlight it like

14  that, that would be great.

15  Q.  Sure.

16         MR. BOSSE:  Let's go up to -- well, we can take that

17  down.

18  BY MR. BOSSE:

19  Q.  Mr. Sellers, you had been in trouble with regulators in

20  Idaho before for selling other investment products, correct?

21  A.  Correct.

22  Q.  But you never were licensed to do that?

23  A.  Correct.

24  Q.  And you knew you weren't allowed to sell securities?

25  A.  Yes, correct.

─────────T. Sellers - Direct─────────

1   Q.  Did you eventually stop selling these Dental Support Plus

2   Franchises?

3   A.  I did.

4   Q.  Approximately when was that?

5   A.  It was about right at a year after I received notice from

6   David White that my first initial deposit was being

7   generated, so it would have been about October, November of

8   2013, I believe.

9   Q.  Did there come a time after you stopped selling the

10  franchises that you asked to get some of your money back that

11  you put into them?

12  A.  I did.

13  Q.  And had you heard about other people also trying to get

14  out of this investment and get their money back?

15  A.  Yes.

16  Q.  Did those include some of your own clients?

17  A.  Correct.

18  Q.  Were you able to get some of your money back?

19  A.  I was.

20  Q.  How did that happen?

21  A.  I was told to contact Daryl Bank.  He was the one to

22  initiate that if it was going to happen.  And that's what I

23  did.  And then soon after that, I ended up getting two

24  franchises sold through Daryl's office.

25  Q.  So two of the ten?

————————T. Sellers - Direct————————

1   A.   Two of the ten.

2   Q.   How much money did you get?

3   A.   40,000.

4        MR. BOSSE:  Could we see, for the witness, 267,

5   please.

6   BY MR. BOSSE:

7   Q.   Do you see that on your screen there?

8   A.   Yes.

9   Q.   What is this?

10  A.   This is a bill of sale selling my two franchises.

11  Q.   And what is the date?

12  A.   24th of September, 2013.

13       MR. BOSSE:  I'll offer, Your Honor, Government's

14  Exhibit's 267.

15       THE COURT:  Government's Exhibit 267 will be

16  admitted.

17       (Government's Exhibit 267 was admitted.)

18  BY MR. BOSSE:

19  Q.   And now that the jury can see it, who is the buyer of

20  your franchise units?

21  A.   That's Dental Support Group.

22  Q.   A separate entity from Dental Support Plus Franchise?

23  A.   Correct.

24       MR. BOSSE:  Could we go, please, to Page 4.

25  BY MR. BOSSE:

T. Sellers - Direct

1   Q.  And you see here what the accounts receivable are listed

2   as.  You don't have to read it.

3   A.  Okay.

4   Q.  Were there actually any accounts receivable, to your

5   knowledge, at this point?

6   A.  No.

7          MR. BOSSE:  And could we see Government's 265,

8   please.  This should be in evidence already.

9   BY MR. BOSSE:

10  Q.  Do you see what this is, sir?

11  A.  Yes.

12  Q.  What is it?

13  A.  It's a funds transfer request for the 40,000 to be sent

14  over to me.

15  Q.  And did you, in fact, get that money back?

16  A.  I did.

17  Q.  You said you bought ten franchises.  At any point were

18  you told that you were getting other franchises?

19  A.  Yes.  There was a sales incentive from time to time that

20  with X amount of business, you would be awarded a free

21  franchise.

22  Q.  And were you copied on an e-mail string with Kent Maerki

23  and Daryl Bank and a man named Tom Barnett about this

24  transaction where you were able to get some of your money

25  back through Dental Support Plus Franchise Group?

_____ T. Sellers - Direct _____

1   A.  Without seeing that e-mail, I know there was

2   correspondence for that, yes.  I believe so.  I would say

3   yes.

4   Q.  What, if anything, did you tell Daryl Bank about wanting

5   this to be done secretly?

6   A.  Just the fact that I was going through a divorce and I

7   didn't want it to be brought up in the divorce.  That was the

8   main thing.

9   Q.  Is it fair to say you also didn't want to advertise to

10  your own clients that you were getting your money back --

11  A.  Absolutely.

12  Q.  -- but they were not?

13  A.  Yeah.

14  Q.  And if we could go -- let's look at that e-mail, 268, and

15  if we could go to Page 3, please.  And this is an e-mail from

16  Cindy Maule.  You didn't write this, but you're copied on the

17  string.  Can you read what Ms. Maule writes starting with "we

18  were"?

19  A.  "We were told there was a bit of a waitlist for Dental

20  Support Plus Group LLC as far as buying used units.  Tony

21  must have been on that list for quite a long time, then."

22  Q.  So to your knowledge, does this ring true for you that

23  you knew there was a waitlist of people who were trying to

24  get out of this investment?

25  A.  I knew there was a waitlist, correct.

─────────────────────T. Sellers - Direct─────────────────────

1          MR. BOSSE:  One moment, please.  We can take that

2     down.

3     BY MR. BOSSE:

4     Q.  Mr. Sellers, did there come a time that Kent Maerki came

5     to Idaho to meet with your dental clients?

6     A.  Yes.

7     Q.  When did that meeting take place?

8     A.  When?

9     Q.  I'm sorry, where?

10    A.  Where?  It was the Idaho Falls Public Library.

11    Q.  Did this happen before or after you stopped selling the

12    investment?

13    A.  This happened probably pretty close to after I stopped

14    selling it.

15    Q.  How many of your clients attended, as best as you can

16    recall?

17    A.  Probably -- actually most of them, maybe 20 to 30, yeah.

18    Q.  So most of your clients wanted to come to this meeting to

19    find out what was going on with their investment?

20    A.  Yes.

21    Q.  Who set up the meeting?

22    A.  I arranged it with my clients.

23    Q.  And what happened at the meeting?  Let me start with

24    this:  Who was speaking at the meeting?

25    A.  Kent Maerki.

Carol L. Naughton, Official Court Reporter

—————————————————T. Sellers - Direct—————————————————

1   Q.  What was the tone of the meeting?

2   A.  Well, from my clients' perspective, it was kind of doom

3   and gloom kind of feeling.  From Kent Maerki's perspective,

4   it was all upbeat.

5   Q.  Was there a question-and-answer period?

6   A.  There was a question-and-answer period, correct.

7   Q.  Did Mr. Maerki answer questions from clients who appeared

8   visibly disgruntled?

9   A.  Yes, sir.

10  Q.  I want to switch gears now and talk about spectrum.

11          THE COURT:  As you go forward, Mr. Bosse, could you

12  put time frames on some of these things, like that last

13  meeting you just talked about.

14          MR. BOSSE:  Yes, sir.

15  BY MR. BOSSE:

16  Q.  Do you recall when that was?

17  A.  You know, honestly, I can't remember when that meeting

18  was.  I'd just have to speculate, and I don't want to do

19  that, but it had been quite some time after they had invested

20  the money in the franchise, and it had to have been after I

21  stopped selling it, because it was just an ongoing thing

22  because they had passed their six months' time and then some.

23  So if I were to estimate, it would have been sometime in

24  probably --

25          THE COURT:  Don't guess.

─────────────T. Sellers - Direct─────────────

1      THE WITNESS:  Okay.  Sorry.

2      Yeah -- I'll leave it at that.  I can't remember the

3  dates.

4  BY MR. BOSSE:

5  Q.  All right.  Let's talk about spectrum.  Did you also sell

6  investments related to spectrum?

7  A.  Yes, sir, I did.

8  Q.  Who approached you about that?

9  A.  That was Kent Maerki and David Alcorn.

10  Q.  The same Kent Maerki involved in DSPF?

11  A.  Correct.

12  Q.  You knew that that investment had been a failure?

13  A.  Yes.

14  Q.  And yet you agreed to sell spectrum for Kent Maerki?

15  A.  Yes, I did.

16  Q.  Do you recall the name of the entity that Mr. Alcorn and

17  Mr. Maerki used to sell the spectrum investment?

18  A.  Yes.  That was Janus Spectrum.

19  Q.  Did you speak with Mr. Alcorn and Mr. Maerki about this

20  investment program, this new investment program, before you

21  started selling it?

22  A.  Yes, I did.

23  Q.  Where did that conversation take place?

24  A.  That took place in Idaho Falls at a hotel, kind of in a

25  semi-conference room.

─────────────────── T. Sellers - Direct ───────────────────

1   Q.  Do you recall when that was?  You know what, let me show

2   you a document.

3   A.  Okay.

4            MR. BOSSE:  Could we see, for the witness, 730.

5   BY MR. BOSSE:

6   Q.  Sir, do you recognize this document?

7   A.  I do.

8   Q.  Is this an e-mail between you and Kent Maerki and David

9   Alcorn about the -- selling the spectrum investment?

10  A.  Correct.

11           MR. BOSSE:  I'll offer 730, Your Honor.

12           THE COURT:  Hearing no objection, 730 will be

13  admitted.

14           (Government's Exhibit 730 was admitted.)

15  BY MR. BOSSE:

16  Q.  Do you see the date that this e-mail is sent by you?

17  A.  Correct.

18  Q.  What is it?

19  A.  It's Monday, 27th of May, 2013.

20  Q.  Who is the e-mail sent to?

21  A.  It's sent to Kent Maerki and David Alcorn.

22  Q.  Well, is it sent to Kent Maerki or just Mr. Alcorn?

23  A.  Oh, it was sent to David Alcorn, but Kent's name is on

24  there.  Sorry, yeah, it was sent to just David Alcorn.

25  Q.  And what is the first line of the e-mail from you?

T. Sellers - Direct

1   A.  "I have decided to be on board with you and Janus

2   Spectrum.  This looks incredible."

3   Q.  And so does that help you place the date of when you must

4   have met with Mr. Maerki and Mr. Alcorn?

5   A.  Yes.  It was before this, just maybe a week or two before

6   this.

7   Q.  So we're talking the front half of 2013?

8   A.  Correct.

9   Q.  And this is, I guess, then, two years after you got

10  involved first with Mr. Maerki?

11  A.  Yes.

12          MR. BOSSE:  We can take that down.

13  BY MR. BOSSE:

14  Q.  Did Mr. Maerki and Mr. Alcorn give you the pitch on the

15  spectrum investment?

16  A.  Yes, sir.

17  Q.  Who took the lead in describing the investment to you?

18  A.  Primarily David Alcorn.

19  Q.  Why did they come to see you in Idaho?  Did they say?

20  A.  Well, they -- I guess initially it was told that they are

21  very selective in who they are going to bring on board to be

22  able to offer this, and I had a lot of success with Dental

23  Support Plus, so I guess I was one of their primary targets

24  to offer this.

25  Q.  And how did they describe the investment to you?

Carol L. Naughton, Official Court Reporter

T. Sellers - Direct

1    A.  Well, I didn't understand at the time what spectrum was.

2    David proceeded on pencil and pad to try to explain the

3    concept and how it worked.

4    Q.  And what is your recollection of how Mr. Alcorn described

5    the investment at that initial meeting?

6    A.  That it's a once-in-a-lifetime opportunity because of

7    Sprint having to give up their certain amount of licenses

8    and how they initially obtained these licenses, so it was an

9    agreement from the FCC and Sprint that they're going to

10   release these licenses, and the returns were, you know --

11   potentially could be very, very good.

12   Q.  Did Mr. Alcorn tell you who was going to be interested in

13   leasing or buying the licenses from the investors?

14   A.  The 800 megahertz, again, this has been quite a few years

15   ago, so the 800 megahertz was, I was told, was the coveted

16   megahertz that all the cell phone companies wanted and

17   needed.

18   Q.  Did you actually invest some of your own money again in

19   the spectrum investment?

20   A.  I did.

21   Q.  And that is after hearing from Mr. Alcorn and Mr. Maerki?

22   A.  Correct.

23   Q.  How much did you invest in spectrum?

24   A.  $75,000.

25   Q.  And as the investment was described to you, if you got

────────────────T. Sellers - Direct────────────────

1    the licenses you were investing to get, were you going to

2    have to work to get money from them and monetize them, or was

3    Janus Spectrum going to monetize them for you?

4    A.   Janus Spectrum was going to do that.

5    Q.   And were you given marketing materials to use related to

6    Janus Spectrum with your own clients?

7    A.   Yes, I was.

8    Q.   Who gave you those marketing materials?

9    A.   Janus Spectrum.

10   Q.   Well, which people gave them to you?

11   A.   Kent Maerki and David Alcorn.

12   Q.   All right.

13          MR. BOSSE:  If we could see, please, just for the

14   witness -- no, I'm sorry.  730 is in.  If we could see 730,

15   Page 5, please.

16   BY MR. BOSSE:

17   Q.   What are we looking at here, sir?

18   A.   This is a marketing piece that was provided to me from

19   David Alcorn, Kent Maerki to hold a meeting at the Idaho

20   Falls Public Library for my clients.

21   Q.   When was the meeting to take place?

22   A.   Thursday, June 27, 2013.

23          MR. BOSSE:  If we could see the next page, please.

24   BY MR. BOSSE:

25   Q.   Are these additional marketing materials you got from

Carol L. Naughton, Official Court Reporter

—————————T. Sellers - Direct—————————

1   Mr. Alcorn and Mr. Maerki?

2   A.  Yes, sir.

3   Q.  Talking about -- you see here references to smartphones,

4   Android and iPhone and things like that?

5   A.  Yes.

6          MR. BOSSE:  And if we could see Page 7, please, the

7   next page.

8   BY MR. BOSSE:

9   Q.  And is this a *Time Magazine* article called "Bandwidth is

10  the new black gold"?

11  A.  Correct.

12  Q.  Who provided that to you?

13  A.  That, again, was provided by Kent Maerki and David

14  Alcorn.

15         MR. BOSSE:  We can take that down.

16  BY MR. BOSSE:

17  Q.  So did you agree not only to buy the spectrum license

18  investment yourself, but to then pitch it to your clients?

19  A.  I did.

20  Q.  And this is -- so we're talking 2013, the same time

21  you're stopping to sell Dental Support?

22  A.  Correct.

23         MR. BOSSE:  Could we see, for the witness, please,

24  731.

25  BY MR. BOSSE:

─────T. Sellers - Direct─────

1   Q.  And is this an e-mail string between you and Kent Maerki

2   in May of 2013 about selling this investment?

3   A.  Correct.

4   Q.  Okay.

5          MR. BOSSE:  Let me -- if we could go down to the

6   next page.

7          Oh, I'll offer 731.

8          THE COURT:  Exhibit 731 is admitted.

9          (Government's Exhibit 731 was admitted.)

10  BY MR. BOSSE:

11  Q.  And you see that this is the portion of the e-mail here

12  to you from Mr. Maerki?

13  A.  Correct.

14  Q.  All right.  And I want to focus right here on what he

15  tells you about selling the Janus Spectrum product.  Can you

16  read that, for example, and pick up with the first bullet

17  point?

18  A.  You bet.  "You can mark up the Janus price and take a

19  higher upfront commission."

20  Q.  And the second bullet point?

21  A.  "You may participate with your clients with subsequent

22  revenue; i.e., 80 percent is directed to the investors with

23  20 percent directed to you."

24  Q.  I want to ask you about that first line, "You can mark up

25  the Janus price and take a higher upfront commission."

Carol L. Naughton, Official Court Reporter

─────────────────────T. Sellers - Direct─────────────────────

1          In any of the insurance annuity products you sold,

2    were you ever told by the company that you could mark up the

3    price and take a higher upfront commission?

4    A.   Never.

5    Q.   Did any other products you ever sold offer that as an

6    option?

7    A.   No.

8    Q.   And when you were selling insurance, Mr. Sellers, did you

9    ever make anything close to the kinds of commissions that you

10   made on the spectrum investments?

11   A.   Not even close.

12          MR. BOSSE:   We can take that down.

13   BY MR. BOSSE:

14   Q.   Sir, did you, in fact, hold that seminar in Idaho Falls

15   at the public library in the summer of 2013?

16   A.   Yes, sir.

17   Q.   Who was attending as the audience?

18   A.   My clients.

19   Q.   And again, these are older insurance clients?

20   A.   Correct.

21   Q.   Who was there to speak to the clients?

22   A.   David Alcorn and Kent Maerki.

23   Q.   They came to town in person?

24   A.   Correct.

25   Q.   Before this happened, before this speech from Mr. Alcorn

─────────── T. Sellers - Direct ───────────

1  and Mr. Maerki happened, did you do anything to warn your
2  clients that Mr. Maerki had sold a different investment that
3  was also involving you that had not made money?
4  A.  No, sir.
5  Q.  Who spoke first at the meeting that you recall?
6  A.  David Alcorn introduced Kent and some of his accolades,
7  and Kent primarily did the meeting.
8  Q.  Was there a video played at the meeting?
9  A.  Yes, sir.
10  Q.  Are you familiar with the "Money From Thin Air" video?
11  A.  I am.
12  Q.  Do you recall whether that was the one played?
13  A.  Yes.
14  Q.  Did you also use that video in pitching this product to
15  your clients?
16  A.  I did.  We were provided a -- kind of like a tablet
17  device with that video on there that we could show to our
18  clients as we met with them.
19  Q.  Did Mr. Alcorn or Mr. Maerki say anything during that
20  meeting that the spectrum channels that were being pitched
21  were narrowband channels that could not be used by major
22  carriers?
23  A.  No.
24  Q.  Did they say anything during that meeting that they
25  planned to make money on this investment through some sort of

T. Sellers - Direct

1    walkie-talkie business?

2    A.   No.

3    Q.   Did they say anything at that meeting that they planned

4    to make money through this investment through something

5    called the Internet of Things?

6    A.   No.

7    Q.   Did David Alcorn or Kent Maerki tell anyone at that

8    conference that they would charge clients about five times

9    the actual price of applying for a license?

10   A.   No.

11   Q.   Was there a talk at that meeting about time pressure and

12   the need to make a timely investment?  If you recall.

13   A.   I don't recall.

14   Q.   Do you remember clients of yours named Ruth Clark and

15   Bernell Clark?

16   A.   Yes.

17   Q.   Do you recall seeing Mr. Alcorn speaking to them at any

18   point?

19   A.   Correct.

20   Q.   Was it a friendly conversation, as best you can

21   recollect?

22   A.   It was.

23   Q.   Sir, did you have a company that was made specifically

24   for you to sell these spectrum investments through?

25   A.   I did.

———————T. Sellers - Direct———————

1      MR. BOSSE:  Could we see, please, for the witness,

2  732.

3  BY MR. BOSSE:

4  Q.  And I'm going to make it a little larger here because

5  this is probably a copy of a copy at this point.  But do you

6  see the name of the LLC here?

7  A.  Correct.

8  Q.  Do you recognize that as the LLC that was created for you

9  to sell spectrum?

10  A.  I do.

11      MR. BOSSE:  Your Honor, I will offer 732.

12      THE COURT:  732 will be admitted.

13      (Government's Exhibit 732 was admitted.)

14  BY MR. BOSSE:

15  Q.  So for the jury, what is name of the group that was set

16  up for you -- the company set up for you to sell spectrum

17  through?

18  A.  Lincoln Spectrum LLC.

19  Q.  And who, if you know, set that company up for you?

20  A.  Lynne Shelton.

21      MR. BOSSE:  We can take that down.  Could we see

22  736, please, just for the witness.

23  BY MR. BOSSE:

24  Q.  And is this the Broker Services Agreement between that

25  entity and Janus Spectrum?

T. Sellers - Direct

```
 1   A.  Yes, sir.
 2           MR. BOSSE:  I'll offer 736.
 3           THE COURT:  736 will be admitted.
 4           (Government's Exhibit 736 was admitted.)
 5   BY MR. BOSSE:
 6   Q.  And without getting into the weeds of this legal
 7   document, does this outline the fees that Lincoln clients are
 8   going to end up paying to Janus?
 9   A.  Yes, sir.
10   Q.  If we go to Page 2 and we look at paragraph 7, I'll
11   ask -- I'll ask you to read it.  If you could read the
12   highlighted portion.
13   A.  "Client hereby appoints Janus or its designee assigned to
14   act as client's agent in any sale, lease, license,
15   disposition, or transfer transaction related to any
16   application or resulting license for which Janus will receive
17   a commission equal to 18 percent of the gross proceeds minus
18   18 percent of related costs and expenses preapproved by
19   Janus."
20           MR. BOSSE:  And we can take that down.
21   BY MR. BOSSE:
22   Q.  Does that ring true with your memory of Mr. Alcorn
23   talking about the fact that Janus is going to make its money
24   on the back end by having an interest in what the clients
25   made?
```

Carol L. Naughton, Official Court Reporter

———T. Sellers - Direct———

1   A.  We were told that Janus would be making the money on the
2   back end.
3   Q.  What, if anything, did Mr. Alcorn say to you -- or
4   Mr. Maerki -- about the fact that they were actually having
5   pretty low margins on the fees they were charging; in other
6   words, that they were going to be spending most of the money
7   that they made from selling these application services?
8   A.  Could you repeat that, please.
9   Q.  Yes.  Sorry.
10         What, if anything, did Mr. Alcorn or Mr. Maerki tell
11  you about the fact that they were going to be using most of
12  the fees they generated and spending them for their clients?
13  A.  So there were fees, obviously, that was going to be paid
14  to salespeople, fees to monetize, obtain the license, get the
15  licenses prepared so when they were released by the FCC, they
16  could jump on it right away.
17  Q.  Were you given marketing materials to use for Lincoln
18  Spectrum in the same way that you were given marketing
19  materials for Dental Support?
20  A.  Yes.
21  Q.  Who did those come from?
22  A.  David Alcorn, Kent Maerki.
23         MR. BOSSE:  For the witness, please, could we see
24  737.
25  BY MR. BOSSE:

———————T. Sellers - Direct———————

1   Q.  Do you recognize this document?

2   A.  I do.

3   Q.  Is this the offering document for Lincoln Spectrum?

4   A.  Correct.

5          MR. BOSSE:  Your Honor, I offer Government's

6   Exhibit 737.

7          THE COURT:  Government 737 will be admitted.

8          (Government's Exhibit 737 was admitted.)

9   BY MR. BOSSE:

10  Q.  That's the name of your company there?

11  A.  Correct.

12  Q.  And what is the date, if you can read it?

13  A.  June 2013.

14  Q.  All right.  And presented exclusively by who?

15  A.  Sellers Financial Advisors.  That was my company before.

16  Q.  Could we go down to Page 3 of the document, please.  And

17  is this industry overview and these quotations -- these were

18  included in the offering document that you used to present

19  this to clients?

20  A.  Correct.

21          MR. BOSSE:  If we could go to the next page, please.

22  BY MR. BOSSE:

23  Q.  Did you present this to clients as an opportunity to

24  achieve a 100 percent annual return with 50 percent of

25  additional profits?

T. Sellers - Direct

1  A.  I did.

2  Q.  If we could go to Page 20, please.  And is this, included

3  in your offering document, a pro forma or an estimated return

4  on investment?

5  A.  Yes.

6  Q.  And you used this to present this opportunity to your

7  clients?

8  A.  I did.

9  Q.  All right.  And if we could go to Page 22, please.  And

10 you see the Janus Spectrum team listed there.  Could you read

11 just the names of the four people who are being told to your

12 clients that are members of the Janus Spectrum team.

13 A.  Sure.  David Alcorn, Kent Maerki, Jon Palmieri, Jack

14 Forrest.

15 Q.  Did you do anything -- knowing what you knew, did you do

16 anything to verify the statements included in these offering

17 documents?

18 A.  No.

19 Q.  Sir, after attending that conference at the Idaho Falls

20 library, where Mr. Maerki and Mr. Alcorn spoke, did some of

21 your clients invest in spectrum through your Lincoln Spectrum

22 entity?

23 A.  Yes.

24        MR. BOSSE:  Could we see, for the witness, please,

25 735.

─────────────── T. Sellers - Direct ───────────────

1   BY MR. BOSSE:

2   Q.  Is this the Operating Agreement of Lincoln Spectrum?

3   A.  Yes.

4   Q.  And is this an example of the Operating Agreement that

5   one of your clients would sign when they invested?

6   A.  Yes.

7            MR. BOSSE:  I'll offer 735.

8            THE COURT:  Hearing no objection, 735 is admitted.

9            (Government's Exhibit 735 was admitted.)

10           MR. BOSSE:  And if we could see, which is already

11  in, Government's 733, please.

12  BY MR. BOSSE:

13  Q.  And do you recognize this, sir, as a resolution of the

14  managers of Lincoln Spectrum, that being essentially you?

15  Tony Sellers, president; Tony Sellers, secretary; and Tony

16  Sellers, treasurer?

17  A.  Correct.

18           MR. BOSSE:  Could we see Page 5, please.

19  BY MR. BOSSE:

20  Q.  Are these some of the clients who invested in your

21  spectrum entity?

22  A.  Yes.

23  Q.  And you see Bernell Clark and Ruth Clark listed there

24  investing $235,000?

25  A.  Yes.

Carol L. Naughton, Official Court Reporter

T. Sellers - Direct

1  Q.  Mr. Sellers, you knew the Clarks' financial situation,

2  correct?

3  A.  Yes.

4  Q.  You knew that a high-risk speculative investment was

5  inappropriate for them?

6          MR. GRINDROD:  Object to the form, Your Honor.

7          MR. BOSSE:  I can rephrase.

8          THE COURT:  Yeah, because it's leading.

9  BY MR. BOSSE:

10  Q.  What, if anything, did you do to warn Ms. Clark and

11  Mr. Clark that this was a high-risk investment?

12  A.  Well, unfortunately, instead of putting this money into a

13  CD at the bank, I convinced them to put this into the Janus

14  Spectrum, which I regret, of course.  And they had a lot of

15  trust in me, and I lost that trust with them.

16          And they -- yeah, and I -- everything I heard from

17  especially Kent on his history and how much money he raised

18  in the '80s -- and he raised 75 million, got lots of

19  licenses, ended up being worth 3 billion -- was all

20  convincing and everything, and I just relayed to them, and

21  they were hoping to make a difference in their finances at

22  that time.

23  Q.  Did you tell them at any point that you knew that Kent

24  Maerki was behind a different failed investment?

25  A.  I did not.

1886

```
─────────────────T. Sellers - Direct─────────────────
```

1   Q.  I want to talk about an investment called Prime Spectrum.

2   You are familiar with that investment?

3   A.  I am.

4   Q.  Who set up Prime Spectrum?

5   A.  Daryl Bank.

6        MR. BOSSE:  Could we see Government's 400, which is

7   already in.

8   BY MR. BOSSE:

9   Q.  You see an e-mail here from David Alcorn to Kent Maerki.

10  What is the date of this e-mail?

11  A.  November 3, 2013.

12  Q.  And talking about how you've temporarily halted spectrum

13  acquisitions while you deal with family problems.  I want you

14  to read what Mr. Alcorn says starting with "given his

15  inquiries."

16  A.  "Given his inquiries from the State of Idaho, it occurs

17  to me that it might be better for Tony and a simpler way to

18  proceed if Tony did his future business under the auspices of

19  Summit Trust.  Emotionally, it would be less taxing on him,

20  perhaps simpler and more productive.  We can all make -- we

21  can make all the numbers work for everybody.  I ran it by

22  Daryl, and he primarily is okay with it."

23  Q.  So is the timing of this e-mail correct that after you

24  get inquiries from the State of Idaho, Mr. Alcorn is talking

25  about switching you over to a new entity?

──────────────T. Sellers - Direct──────────────

1   A.   Yes.

2   Q.   Were you the sole salesperson for Prime Spectrum?

3   A.   I was.

4   Q.   And I want to show you what's been entered already,

5   Government's 404.  You are familiar with this?

6   A.   Yes.

7   Q.   Is this the offering document that you used with your

8   clients in Prime Spectrum?

9   A.   Yes.

10  Q.   And so is this a later investment vehicle after Lincoln

11  Spectrum?

12  A.   Yes.

13  Q.   Mr. Sellers, by this point in time, when you're offering

14  Prime, had any of the Lincoln Spectrum investors, including

15  yourself, made any money on their investment?

16  A.   Not at all.

17  Q.   Were you hearing the same calls and complaints that you

18  heard for the dental investment?

19  A.   I was.

20  Q.   And so without telling me what your client said in

21  Lincoln, was it fair to say they were disgruntled?

22  A.   Very disgruntled.

23  Q.   And yet did you continue to sell spectrum using the same

24  pitch and the same offering documents under a new package?

25  A.   I did.

─────────────T. Sellers - Direct─────────────

```
 1              MR. BOSSE:  Could we see, please, Page 3 of this
 2      document.
 3      BY MR. BOSSE:
 4      Q.   Same industry overview, same quotations, correct?
 5      A.   Correct.
 6      Q.   Could we see Page 4 of this document.  Same opportunity
 7      overview; is that right?
 8              MR. GRINDROD:  Object to form, Your Honor.
 9              THE COURT:  Sustained.
10      BY MR. BOSSE:
11      Q.   Is this the same opportunity overview?
12      A.   It is.
13      Q.   Did you tell the clients who were investing in Prime
14      Spectrum, the people you were pitching this new investment
15      to, did you tell them "My earlier investors in Lincoln have
16      not made money"?
17      A.   I did not.
18      Q.   Did you continue to tout it as being -- with the same
19      glowing statements about the potential for returns?
20      A.   Yes.
21      Q.   Are you familiar with an updated version of this Prime
22      Spectrum offering later being prepared?
23              Let me do this.  Let me show you 406 on your screen.
24              MR. BOSSE:  Only for the witness.
25      BY MR. BOSSE:
```

T. Sellers - Direct

1   Q.  Now, you're not on this e-mail, but are you familiar with
2   this -- the attached document, which is Prime Spectrum, a new
3   draft from December of 2014?
4          MR. BOSSE:  And we can go down to the next page,
5   please.
6          THE WITNESS:  Yes.  Okay.  Yeah.
7   BY MR. BOSSE:
8   Q.  Is this just a later-dated version of the same Prime
9   Spectrum investment summary?
10  A.  Yes.
11         MR. BOSSE:  I'll offer 406.
12         THE COURT:  Exhibit 406 will be admitted.
13         (Government's Exhibit 406 was admitted.)
14  BY MR. BOSSE:
15  Q.  And you saw that this is now -- we're into December of
16  2014?
17  A.  Correct.
18  Q.  Had any of your spectrum investors, either in Lincoln or
19  in Prime, made any money by this point?
20  A.  No.
21  Q.  Had you made any money on your own spectrum investment?
22  A.  No.
23  Q.  And had you been getting the same calls from your clients
24  complaining?
25  A.  Yes.

———————T. Sellers - Direct———————

1   Q.  If we go through this -- and we'll save everyone some

2   time.  If we go through this, is it essentially the same

3   document with Kent Maerki removed from it?

4   A.  Correct.

5            MR. BOSSE:  We can take that down.

6   BY MR. BOSSE:

7   Q.  Did that document or the pitches that you made ever

8   disclose what you knew about the lack of performance of this

9   investment?

10  A.  No.

11  Q.  Did you actually ever get any licenses that you're aware

12  of, sir?

13  A.  Yes.  There was one license that did come through.  I

14  don't remember where the license was, but yes, we were

15  notified that one license went through.

16  Q.  Were you ever notified whether Janus Spectrum had been

17  able to monetize that one license or make any money from it?

18  A.  It was never monetized.

19  Q.  Do you know if it relates to Prime or whether it relates

20  to Lincoln, the license that actually came through?

21  A.  It would have been Lincoln, I believe.

22  Q.  And do you know how much your investors put into Lincoln

23  Financial, Lincoln Spectrum?

24  A.  Over a million.  I can't remember the exact amount.

25  Q.  And your recollection is one license?

T. Sellers - Direct

1    A.  Correct.

2    Q.  Do you remember the city?

3    A.  I don't.

4    Q.  Do you know whether that license ever, either at the time

5    or later, was used to make any money for those clients by

6    Janus?

7    A.  I believe it was not.

8    Q.  Did you continue to sell Prime Spectrum into 2014?

9    A.  Yes.

10   Q.  And did you ever update your pitch as time went on,

11   including about the fact that there was a single license

12   granted that hadn't made money?

13   A.  That's the only thing, just the one license was granted,

14   but it had not made any money.

15   Q.  Did you tell your last investors that in the prior two

16   and a half years, a million dollars invested, plus a single

17   license had been granted and had made no money?  Did you

18   disclose that to new investors?

19   A.  No.

20           MR. BOSSE:  Could we see, already in,

21   Government's 407, please.

22   BY MR. BOSSE:

23   Q.  And is this a list of the sales you made in Prime

24   Spectrum?

25   A.  Yes.

Carol L. Naughton, Official Court Reporter

─────────────────T. Sellers - Direct─────────────────

1   Q.  Do you recognize the names -- I'm sorry.  Do you

2   recognize some of the names over here, the Clarks, a

3   different Larry Clark?

4   A.  Yes.

5   Q.  And does this show, this money move chart show your

6   30 percent commission that you received on these investments?

7   A.  Yes.

8   Q.  So for Ruth and Bernell Clark and someone named M.

9   Berrett, for their 45,000, 13,500 went to you; is that right?

10  A.  Correct.

11          MR. BOSSE:  Could we see, for the witness,

12  Government's 30.

13  BY MR. BOSSE:

14  Q.  Do you recognize what I'm showing you here as

15  Government's 30?

16  A.  Yes, I do.  It's a check issued to me.

17  Q.  In relation to Prime Spectrum LLC?

18  A.  Yes.

19          MR. BOSSE:  I'll offer 30.

20          THE COURT:  Exhibit 30 is admitted.

21          (Government's Exhibit 30 was admitted.)

22  BY MR. BOSSE:

23  Q.  Is this the $13,500 commission check related to the

24  Clarks and the Berretts?

25  A.  Yes.

———————T. Sellers - Direct———————

1          MR. BOSSE:  And just so we have a record of it,

2    could we see 1007A also.

3    BY MR. BOSSE:

4    Q.  Does this document -- this is already in evidence.  Does

5    this document have a picture of the same check for the Clarks

6    and the Berretts?  I should say, the commission you received

7    for the sale to the Clarks and the Berretts?

8    A.  Yes.

9    Q.  Did you cash this check outside the Commonwealth of

10   Virginia?

11   A.  Yes.

12         MR. BOSSE:  Could we see, please, for the witness,

13   Government's 408.

14   BY MR. BOSSE:

15   Q.  And do you recognize, sir, the names on this document?

16   And I'm going to do my best.

17   A.  I do.

18   Q.  Are these clients of yours?

19   A.  Correct.

20   Q.  And is this a Summit Trust statement showing their

21   investment into Prime?

22   A.  Yes.

23         MR. BOSSE:  I'll offer 408.

24         THE COURT:  408 is admitted.

25         (Government's Exhibit 408 was admitted.)

———T. Sellers - Direct———

1   BY MR. BOSSE:

2   Q.  To your knowledge, did any of these clients receive any

3   income from the Prime Spectrum investment?

4   A.  No.

5   Q.  To your knowledge, do you know whether the Prime Spectrum

6   people even got a license?

7   A.  I don't know that.

8   Q.  But in any event, did you hear anything about a license

9   being leased back to Sprint or AT&T or Verizon for any amount

10  of money?

11  A.  No.

12  Q.  Did your clients get any of their money back, the

13  principal they invested?

14  A.  No.

15  Q.  In Lincoln?

16  A.  No.

17  Q.  And in Prime?

18  A.  Nothing.

19  Q.  Mr. Sellers, did Daryl Bank ask you to sell any other

20  investments he had?

21  A.  Yes, he did.  He continually tried to get me to come to

22  Florida and meet with him and review his portfolio of other

23  investments that he had, and I just never felt comfortable

24  with what he was doing, so I never did do it.

25  Q.  Why didn't you feel comfortable with what he was doing?

T. Sellers - Direct

1    A.  The type of investments that he was dealing in, very

2    alternative, and I just -- I thought that it was kind of

3    crazy, honestly.

4    Q.  Is this after your experience in Dental Support Plus

5    Franchise and the spectrum?

6    A.  Yeah.

7    Q.  Did you ever sell an investment for Daryl Bank called

8    Xcel Bandwidth?

9    A.  No.

10   Q.  Or RapidLink?

11   A.  No.

12   Q.  And is 2014 the year that you stopped selling these

13   spectrum investments?

14   A.  Yes.

15         MR. BOSSE:  Could we see, for the witness, please,

16   738.

17   BY MR. BOSSE:

18   Q.  Do you recognize this, sir?

19   A.  Yes.

20   Q.  Is this a letter you wrote to your clients about getting

21   out of the business?

22   A.  Yes.

23         MR. BOSSE:  I'll offer, Your Honor, 738.

24         THE COURT:  Hearing no objection, 738 is admitted.

25         (Government's Exhibit 738 was admitted.)

Carol L. Naughton, Official Court Reporter

─────────────────── T. Sellers - Direct ───────────────────

1    BY MR. BOSSE:

2    Q.   Okay.  And just so we have it, what is the date, sir?

3    A.   December 12, 2016.

4    Q.   And what are you telling your clients?  You don't have to

5    read the whole thing, but what are you telling your clients?

6    A.   Basically that I'm retiring from the insurance business

7    and to contact -- with the spectrum, the ones in spectrum to

8    contact Bob LaBine for any further information.

9    Q.   All right.  And if some of the clients have spectrum

10   through Daryl Bank's office, did you give them Daryl Bank's

11   phone number?

12   A.   Yes.

13   Q.   At this point -- so we're in 2016 now.  You stopped

14   selling in 2014.  Were you continuing to be contacted by

15   clients about the Dental Support Plus Franchise program and

16   the spectrum investments who hadn't made money?

17   A.   Yes.

18   Q.   Is that one of the reasons you decided to hang it up?

19   A.   Yeah.  It is one of the reasons.  I kind of had enough

20   and wanted to get away from it.

21   Q.   Are you still licensed, sir, to sell insurance?

22   A.   I am not.

23   Q.   Why not?

24   A.   I lost my license.

25          MR. BOSSE:  We can take that down.

```
                          ─T. Sellers - Cross (By Mr. Yarow)─
 1    BY MR. BOSSE:
 2    Q.  Do you know Bill Smith?
 3    A.  I do.
 4    Q.  Did you speak with Bill Smith during the time period
 5    we've been talking about here today?
 6    A.  Yes.
 7    Q.  Did you ever meet with him in person?
 8    A.  Yes.
 9    Q.  What, if anything, did you talk with Mr. Smith about
10    getting client complaints about these investments not
11    performing?
12    A.  Well, it happened quite often.  I would talk to him on
13    the phone about the concerns that I had and kind of go back
14    and forth, and he had faith and optimism that things would be
15    fine, would turn out fine, which I didn't have the same
16    feelings.
17    Q.  And did you all talk about the fact that your clients
18    were calling and complaining about not making money on the
19    dental and the spectrum investments?
20    A.  Yes.
21              MR. BOSSE:  No further questions.  Please stand by
22    for cross-examination.
23              THE WITNESS:  Okay.
24              THE COURT:  Cross.
25                        CROSS-EXAMINATION
```

————————T. Sellers - Cross (By Mr. Yarow)————————

1   BY MR. YAROW:

2   Q.  Mr. Sellers, my name is Rick Yarow.  I represent David

3   Alcorn.

4         We'll work backwards.  From the Prime Spectrum

5   investment, who did you receive your checks from for that

6   LLC?

7   A.  From the Prime Spectrum?

8   Q.  Yes.

9   A.  That would have been through Prime Spectrum.

10  Q.  Okay.  And do you know who signed the checks?  Do you

11  know who wrote the checks to you?

12  A.  I don't remember who signed it.  It was either Catrina, I

13  believe, or Daryl.  I can't remember.  It was somebody from

14  his office.

15  Q.  But the checks came from Daryl's office --

16  A.  Correct.

17  Q.  -- Daryl Bank's office?

18  A.  Yes.

19  Q.  Is that correct?

20  A.  Yes.

21  Q.  And the other company that you had, Lincoln -- I think it

22  was Lincoln --

23  A.  Yeah.

24  Q.  -- Lincoln Spectrum.  Where did those checks come from?

25  A.  Well, Lynne Shelton at Shelton & Power is the one that

T. Sellers - Cross (By Mr. Yarow)

 1   had set everything up, so I believe it came from their

 2   office.

 3   Q.  All right.  You never received any checks from Janus

 4   Spectrum -- is that correct? -- for either of these

 5   investments that you sold?

 6   A.  I don't remember.

 7   Q.  You knew Mr. Maerki before you were introduced to the

 8   Janus Spectrum concept because of Dental Support; is that

 9   correct?

10   A.  Correct.

11   Q.  And you lost your own money on this investment.  You

12   purchased it and lost it?

13   A.  Yes.

14   Q.  As far as you know, none of your clients that you sold to

15   made any money back or made any significant money; is that

16   correct?

17   A.  Right.

18   Q.  And then you moved away from that investment, and you

19   started with the Janus Spectrum after Mr. Maerki had already

20   taken your money and your clients' money, as far as you were

21   concerned?

22   A.  Yes.

23   Q.  And why did you think Mr. Maerki was going to do better

24   this time?

25   A.  Good question.  Kent had a very good story.  He had

```
                        ────────T. Sellers - Cross (By Mr. Yarow)────────
```

 1   mentioned that in the '80s he was one of the forefathers of

 2   spectrum, that he -- when the licenses were issued in a

 3   lottery system, that he had a mathematical formula he figured

 4   out where he could obtain most of the licenses.

 5          He went around the country; he said he raised

 6   75 million to purchase these licenses.  At one point in time,

 7   it was worth over $3 billion.  And he mentioned he was in a

 8   book.  He had these initial investors to put the money in

 9   that became very wealthy.

10          And so it was a great story, and I was thinking, you

11   know, I lost my money in Dental Support Plus, this is an

12   opportunity to make this money back in the spectrum.

13   Q.  Okay.  So after having lost money on the Dental Support,

14   did you put any of your own money into the spectrum?

15   A.  75,000.

16   Q.  Mr. Maerki is a pretty good salesman?

17   A.  He is a good salesman.

18   Q.  And he is believable -- or was believable at that time?

19   A.  Say that again.

20   Q.  He was believable --

21   A.  He was believable, yes.

22   Q.  -- at the time?

23          And at the Idaho Falls library meeting, you said it

24   was primarily Kent Maerki that was speaking at that event?

25   A.  Correct.

T. Sellers - Cross (By Mr. Yarow)

1   Q.   And David Alcorn was just kind of there with him --

2   A.   He was there with him --

3   Q.   -- introducing, I think you said?

4   A.   He introduced Kent Maerki and proceeded to mention all

5   Kent's accolades and his successes in the past, and then Kent

6   primarily conducted the meeting.

7   Q.   And Ruth and Bernell Clark were at this meeting?

8   A.   Correct.

9   Q.   And they would have heard Mr. Maerki's presentation?

10  A.   Correct.

11  Q.   And so they ended up purchasing $235 worth of investments

12  based upon Mr. Maerki's presentation?

13  A.   $235,000.

14  Q.   Sorry.  $235,000, based upon the presentation they saw?

15  A.   Correct.

16  Q.   And isn't it true that -- well, let me ask you.  Did

17  Mr. Alcorn speak to the Clarks about -- did Mr. Alcorn speak

18  to the Clarks?

19  A.   Bernell Clark had a sight impairment, and so they

20  connected in that manner of kind of discussing, you know --

21  they just connected.  And so I am not privy to the private

22  conversation that they had there at the meeting.  I was

23  there, but it was Ruth and David and Bernell that kind of had

24  a conversation together.

25  Q.   Okay.  And why would the -- why would Bernell's eyesight

—————— T. Sellers - Cross (By Mr. Grindrod)——————

1    spark a conversation with Mr. Alcorn?

2         THE COURT:  Calls for speculation, Mr. Yarow.

3         MR. YAROW:  Thank you.

4         That's all the questions I have.

5                    CROSS-EXAMINATION

6    BY MR. GRINDROD:

7    Q.  Good afternoon, Mr. Sellers.

8    A.  Good afternoon.

9    Q.  You mentioned with Mr. Yarow that Mr. Maerki had a great

10   story about the spectrum.

11   A.  Yes.

12   Q.  But when you first met Mr. Maerki, you were talking about

13   dental, right?

14   A.  Correct.

15   Q.  And part of what was convincing about Mr. Maerki was what

16   you learned about his background, right?

17   A.  I would say yes.

18   Q.  You learned about him raising funds for SuperShuttle?

19   A.  Yes.

20         MR. BOSSE:  I'd object.  That's facts not in

21   evidence, and I'm not even sure if that's true or not.

22         THE COURT:  The Court will overrule.  There was some

23   reference to the SuperShuttle in the previous examination, so

24   the Court will overrule it.

25   BY MR. GRINDROD:

———————T. Sellers - Cross (By Mr. Grindrod)———————

1   Q.   Was it your understanding that Mr. Maerki was a CPA?

2   A.   Yes.

3   Q.   That he had run an investment firm?

4   A.   Yes.

5   Q.   And then he talked about his history in the spectrum

6   industry specifically, right?

7   A.   Correct.

8   Q.   And with respect to that, did you learn that he was

9   actually in a book that was written about spectrum?

10  A.   Yes.

11  Q.   And you went and looked that up, right?

12  A.   I did.

13  Q.   And sure enough, there he is, right in the book?

14  A.   He was there.

15  Q.   And of all the glowing things that you were told about

16  Kent Maerki, you weren't told anything about regulatory

17  issues that he had had, right?

18  A.   Correct.

19  Q.   So switching gears a little bit to talk about dental, you

20  put $200,000 of your own money into Dental Support Plus

21  Franchises, right?

22  A.   Correct.

23  Q.   And one of the big things for you was the five-year

24  history of success, the five-year track record, right?

25  A.   Yes.

1904

———— T. Sellers - Cross (By Mr. Grindrod)————

1  Q.  And that history was a reference to MetroMedia's patient
2  acquisition model, right?
3  A.  MetroMedia and Oracare, yes.
4  Q.  MetroMedia was the -- one of them was responsible for
5  getting patients and one of them for dentists, right?
6  A.  Yes.
7  Q.  And so you understood at the time that that's what the
8  five-year track record was referencing, right?
9  A.  Yes.
10  Q.  That it was a reference to David White and his group with
11  MetroMedia and Oracare, not about Dental Support Plus, right?
12  A.  Correct.
13  Q.  But you decided to put $200,000 of your own money into
14  Dental Support Plus?
15  A.  Let me add to that, if I can.
16  Q.  That's okay.  If you can just answer the question.
17        THE COURT:  Well, the witness may explain; yes or no
18  and then explain his or her answer.
19        So you may explain.
20        THE WITNESS:  Thank you.
21        THE COURT:  Concisely.
22        THE WITNESS:  So with the history that Oracare had,
23  it was told to me, based on that history, tremendous success
24  in that period of time, that Kent Maerki wanted to franchise
25  the concept, and that had a bigger part into my decision than

——————T. Sellers - Cross (By Mr. Grindrod)——————

1   what you previously mentioned.

2   BY MR. GRINDROD:

3   Q.  So it was the combination of taking the track record from

4   MetroMedia and Oracare and this new franchising model?

5   A.  Yes.

6   Q.  And obviously you invested $200,000 of your own money

7   because you believed that the company was going to be a

8   success, right?

9   A.  Yes.

10  Q.  You didn't believe that Dental Support Plus was a fraud

11  when you put your money into it, right?

12  A.  Not when I put it in, no.

13  Q.  And you didn't understand Dental Support Plus to just be

14  a money laundering operation for Kent Maerki, right?

15  A.  I wouldn't have put my money in it if I felt that way.

16  Q.  Right.  And even later when you say you had some

17  concerns, you still didn't realize that Kent Maerki was just

18  stealing straight out of DSPF, right?

19  A.  When you say "later," after I -- it took nine months to

20  get my first notice of revenue being generated.  And then if

21  you define "later" -- I don't know how far you're going into

22  the future here.

23  Q.  I'll just narrow it down.  Let's talk 2012 calendar year.

24  A.  Okay.  So rephrase the question, please.

25  Q.  So 2012 calendar year, did you know at that time that

——————— T. Sellers - Cross (By Mr. Grindrod) ———————

1  Kent Maerki was just stealing millions of dollars of investor

2  funds?

3  A.  Well, I wouldn't have known he was stealing money, but I

4  knew that I wasn't getting revenue that was promised.

5  Q.  Sure.  But my question is about him stealing money.  Did

6  you know that he was stealing money in 2012?

7          MR. BOSSE:  That's been asked and answered now

8  twice.

9          THE COURT:  Sustained.

10 BY MR. GRINDROD:

11 Q.  And as time went by, you did get some money on your

12 Dental Support investment, right?

13 A.  I did.

14 Q.  5-, $600 a month?

15 A.  It really varied, you know, so -- maybe close to that.

16 Q.  Okay.  And you expressed concerns with Kent Maerki and

17 the folks at Dental Support about how much money you were

18 receiving, right?

19 A.  Oh, yeah.  On a continuous basis.

20 Q.  And they gave you explanations, right?  They said it was

21 accounting delays, or they had some answer?

22 A.  Yeah, various answers.

23 Q.  Okay.  And you continued to receive mailers that had

24 updates about Dental Support from Kent Maerki, right?

25 A.  Mailers?  Yes.  Yeah.

———————T. Sellers - Cross (By Mr. Grindrod)———————

1   Q.   Things --

2   A.   About every quarter, I believe, something came out.

3   Q.   Sometimes they said at the top "Memo from the desk of

4   Kent Maerki"?

5   A.   Yeah.

6   Q.   It had his picture on it?

7   A.   Yeah.

8   Q.   And every single one of those was positive, right?

9   A.   He was always positive.

10  Q.   And even when Mr. Maerki acknowledged a problem,

11  Mr. Bosse was asking you about problems or not generating

12  enough patients and those kind of problems.  Do you remember

13  that?

14  A.   Yeah.

15  Q.   Mr. Maerki, when he talked about those problems, he

16  always talked about them in terms of his solution to those

17  problems, right?

18  A.   Yeah.

19  Q.   And so when MetroMedia was to blame for patient

20  acquisition problems, he was going to bring in this expert

21  from Utah, right?

22          MR. BOSSE:  I'm going to object to that as hearsay

23  about what Mr. Maerki said.

24          THE COURT:  Sustained.

25          MR. GRINDROD:  May I be heard on that?  It's not

———————T. Sellers - Cross (By Mr. Grindrod)———————

1   offered for truth.  It's offered --

2          THE COURT:  Doesn't matter.  He's a co-conspirator

3   in here, and the Court sustained the objection.

4          MR. GRINDROD:  Okay.

5   BY MR. GRINDROD:

6   Q.  Do you remember hearing about David Bailey and WebOp?

7   A.  Absolutely.

8   Q.  What was your understanding of David Bailey's resume?

9   A.  That he was an internet guru that had a great track

10  record, had a high-power team that was going to turn things

11  around and help the company.

12  Q.  Sounded impressive to you?

13  A.  Very impressive.

14  Q.  And so in addition to buying Dental Support yourself, you

15  sold Dental Support franchises, right?

16  A.  I did, yes.

17  Q.  So let's look at Government's Exhibit 202.  Did you put

18  this together?

19  A.  I did not.

20  Q.  Did you help put it together?

21  A.  I did not.

22  Q.  Did you have any input into the substance of any of the

23  claims in here?

24  A.  Nothing, no.

25  Q.  And we talked about this.  This is the "built on a

────────── T. Sellers - Cross (By Mr. Grindrod) ──────────

1   platform of proven performance."  That was what we talked

2   about earlier, right?

3   A.  Correct.

4   Q.  And you understood that to be a reference to MetroMedia

5   and Oracare?

6   A.  Yes.

7   Q.  And then absentee-owned -- references down here to it

8   being a turnkey, absentee-owned -- so those were references

9   to basically it being passive, right?

10  A.  Correct.

11  Q.  And that was your actual understanding of how it ran,

12  right?

13  A.  Yes.

14  Q.  Your understanding was that Dental Support was going to

15  do basically all the work, right?

16  A.  Correct.

17          MR. GRINDROD:  We can take that down, Ms. McCaslin.

18  BY MR. GRINDROD:

19  Q.  Commissions.  Your commission for DSPF was somewhere

20  between 8 and 10 percent, right?

21  A.  I believe it was higher than that initially, and then it

22  increased later on.

23  Q.  You believe it was higher than 8 to 10 percent?

24  A.  I believe so.  I don't have the contract in front of me,

25  so I...

─────── T. Sellers - Cross (By Mr. Grindrod) ───────

1   Q.  Okay.  We'll come back to that.

2           So spectrum, so you invested in spectrum?

3   A.  I did.

4   Q.  $75,000 of your own money?

5   A.  Correct.

6   Q.  And you did that because you believed in this investment,

7   right?

8   A.  I sure did.

9   Q.  Let's look at Government's Exhibit 730, which I believe

10  has been admitted.  This is an e-mail from you?

11  A.  Correct.

12  Q.  And you're talking to David Alcorn, but you address it to

13  Kent and Dave, right?

14  A.  Correct.

15  Q.  So you sort of -- did you mean to send this to both Kent

16  Maerki and David Alcorn?

17  A.  Yes.

18  Q.  But you say, "This looks incredible," right?

19  A.  Yes.

20  Q.  You thank them for thinking of you and offering this

21  incredible opportunity.  Right?

22  A.  Correct.

23  Q.  And you say, "I want to put some of my own money into

24  this also"?

25  A.  Yes.

─────────T. Sellers - Cross (By Mr. Grindrod)─────────

1   Q.   And then down here, this is an e-mail from Kurt Koenig?

2   A.   Okay.  Yes.

3   Q.   And it's to you?

4   A.   Yes.

5   Q.   And attached are a number of marketing materials, right?

6   A.   Yes.

7   Q.   One of those materials is that *Time Magazine* article --

8   A.   Yes.

9   Q.   -- on spectrum being the new black gold or bandwidth

10  being the new black gold?

11  A.   Yes.

12  Q.   And at one point in here, Kurt tells you that he's

13  sending you a proposed mailer, right?

14  A.   Yes.

15  Q.   And that mailer had Kent's picture on it?

16  A.   Yes.

17  Q.   But he's telling you, look, you can't send this out with

18  Kent's picture on it.  These are an example.  Right?

19  A.   Yes.

20  Q.   And you took -- you understood that what they were saying

21  was you can take this message and just put your own picture

22  on it, right?

23  A.   Yeah.  I believe the reason -- well, I don't know exactly

24  the reason, but he had used it, I guess, on a meeting in

25  Arizona, and so I guess they wanted me to put my picture on

Carol L. Naughton, Official Court Reporter

```
                        ─T. Sellers - Cross (By Mr. Grindrod)─
 1    there instead.
 2    Q.  But all this marketing material came from Kent Maerki's
 3    people, essentially?
 4    A.  Yes.
 5    Q.  Do you remember --
 6            MR. GRINDROD:  We can take that down, Ms. McCaslin.
 7            And, Judge, whenever you want me to stop, just let
 8    me know.
 9            THE COURT:  Now is a good time.
10            Ladies and gentlemen, we're going to take a
11    one-and-a-half-hour break for lunch.
12            (The jury exited the courtroom.)
13            THE COURT:  Mr. Sellers, you may step down during
14    lunch, but do not discuss your testimony with anyone.
15            THE WITNESS:  Thank you.
16            (Recess from 12:59 p.m. to 2:31 p.m.)
17            (The jury entered the courtroom.)
18            THE COURT:  The record will reflect that all jurors
19    have returned to the courtroom.
20            Does counsel concur?
21            MS. O'BOYLE:  Yes, Your Honor.
22            MR. YAROW:  Mr. Alcorn agrees.
23            MS. McCASLIN:  Mr. Smith agrees.
24            THE COURT:  All right.  You may resume your cross,
25    Mr. Grindrod.
```

—————— T. Sellers - Cross (By Mr. Grindrod) ——————

1    MR. GRINDROD:  Thank you, Your Honor.

2    BY MR. GRINDROD:

3    Q.  Mr. Sellers, I want to go back to the DSPF commissions

4    structure.  I think you said the commissions -- you recalled

5    that they changed --

6    A.  I did.

7    Q.  -- at various points?

8    A.  Yeah.

9    Q.  So the first ten DSPF units that you sold, you got an

10   8 percent commission, right?

11   A.  I honestly don't remember what the commission was.

12   Q.  Do you remember testifying in grand jury in 2017 in this

13   case?

14   A.  Yes.

15   Q.  And do you remember testifying about the commissions at

16   that time?

17   A.  I'm sure that was brought up, yes.

18   Q.  If I showed you your deposition testimony on that, would

19   that help refresh your recollection?

20   A.  Yes.

21       MR. GRINDROD:  Just for the witness, could we have

22   Smith 196 at Page 45 on to 46.

23       THE COURT:  Are we going to mark that?  We have to

24   unfortunately mark it.

25       MR. GRINDROD:  It's premarked as a Smith exhibit,

———————T. Sellers - Cross (By Mr. Grindrod)———————

1   Your Honor, Smith 196.

2          (Defendant Smith's Exhibit 196 was marked for

3   identification only.)

4          THE COURT:  Could you point him to the page and line

5   to help him move along.

6   BY MR. GRINDROD:

7   Q.  Yes.  So it's starting on Page 45, line 20, and carrying

8   on to 46, line 2.  If you need to see more context, sir, let

9   me know, and I can scroll up and down for you.

10  A.  Yeah, I can see it.

11  Q.  You've read that?

12  A.  Yes.

13  Q.  Does that refresh your recollection?

14  A.  Yes.

15  Q.  And so for the first ten DSPF units sold, it was an

16  8 percent commission?

17  A.  Yes.

18  Q.  And then after you sold ten, from ten on it would be a

19  10 percent commission, right?

20  A.  Yes.

21  Q.  Now, you worked in the insurance industry selling

22  annuities and stuff?

23  A.  Correct.

24  Q.  And how long did you do that for?

25  A.  25-plus years.

—————T. Sellers - Cross (By Mr. Grindrod)—————

1  Q.  And you talked a little bit about your annuity business

2  with Mr. Bosse on direct, but when you sell an annuity, do

3  you generally earn a commission on that?

4  A.  Correct.

5  Q.  Is that the standard way that the person, the agent who

6  is selling the commission -- sorry, selling the annuity makes

7  their money on that?

8  A.  Paid by commission, yes.

9  Q.  And the standard commission for a fixed index annuity, in

10  your experience, is 8 to 10 percent, right?

11  A.  Some cases are lower, but generally speaking, I would say

12  closer to 7 to maybe 10 at the high.

13  Q.  7 to 10.

14      But you could earn up to 15 percent commission on

15  some annuities, right?

16  A.  Yeah, but very rarely, and there wouldn't be that

17  attractive of a product.

18  Q.  Rarely but it's not unheard of to see a 15 percent --

19  A.  It is unheard of.

20  Q.  It is what?

21  A.  It is unheard of.  It is very rare that you get that high

22  commission on an annuity.

23  Q.  So that's what I'm asking.  You're saying it's rare but

24  unheard of, so help me reconcile that.

25  A.  15 percent would be very rare that you would earn that,

————— T. Sellers - Cross (By Mr. Grindrod) —————

1    more so between the 7 and 10 percent.
2    Q.  Okay.  When you sold annuities, did you tell your client
3    what your commission was?
4    A.  No.
5    Q.  Do you know anyone in the insurance industry who would
6    bring up the commission out of the blue?
7              MR. BOSSE:  Object to hearsay and speculation.
8              THE COURT:  It calls for speculation.  I'll sustain
9    it on that basis.
10   BY MR. GRINDROD:
11   Q.  Have you ever bought a car or an RV?
12   A.  Yes.
13   Q.  Did that salesperson tell you how much their commission
14   was?
15   A.  Generally no.
16   Q.  And so was it unique to DSPF for you not to bring up what
17   your commission was when you were talking with a prospective
18   client or investor?
19   A.  Was it unique not to bring it up?
20   Q.  Yeah.  In your experience, though --
21   A.  Right.
22   Q.  -- having done this for 25 years, if you didn't bring up
23   your commission with DSPF, was that unique to DSPF, or was
24   that just generally the way you dealt with commissions?
25   A.  I would say generally the way I dealt with commissions,

```
                      T. Sellers - Cross (By Mr. Grindrod)
```

 1    yes.

 2    Q.  Okay.  So I want to talk to you a little bit about a

 3    woman named Lynne Shelton.  Does that name sound familiar to

 4    you?

 5    A.  Yes, it does.

 6    Q.  And Lynne Shelton was an attorney, right?

 7    A.  Correct.

 8    Q.  Lynne Shelton was involved in both DSPF and spectrum,

 9    right?

10    A.  Yes.

11    Q.  And your understanding was that Attorney Shelton reviewed

12    everything that was coming out of DSPF, right?

13           MR. BOSSE:  Your Honor, I'm going to object to

14    questions that are essentially asking for hearsay from

15    Ms. Shelton in the guise of "your understanding."  She could

16    be called by any side here.

17           MR. GRINDROD:  Your Honor --

18           THE COURT:  I think the Court will sustain it in

19    part, and you can rephrase the question to determine "do you

20    know whether," not the way -- even though you can ask leading

21    questions, I think you can rephrase that.

22    BY MR. GRINDROD:

23    Q.  You know that Attorney Shelton reviewed everything that

24    came out of DSPF, right?

25           THE COURT:  Once again, do you know whether she

——————— T. Sellers - Cross (By Mr. Grindrod) ———————

1   reviewed everything?

2   BY MR. GRINDROD:

3   Q.  Do you know whether she reviewed everything that came out

4   of DSPF?

5   A.  To my understanding, that's correct.

6   Q.  And did that give you confidence in the accuracy of the

7   materials that you were giving to clients?

8   A.  Yes.

9   Q.  You mentioned with Mr. Bosse that you and my client, Bill

10  Smith, spoke on the phone sometimes.

11  A.  Yes.

12  Q.  Did Bill talk to you about his family?

13          MR. BOSSE:  I'm going to object to any elicitation

14  of Bill Smith's statements through this witness.  That's the

15  defendant.

16          THE COURT:  Sustained on what Mr. Smith talked with

17  him about.

18          MR. GRINDROD:  And, Your Honor, just so you know,

19  it's not -- we're not offering any of this to prove the truth

20  of whether or not Bill Smith had a family; it's just to show

21  the nature of their relationship and the context of their

22  conversations.

23          THE COURT:  So long as you don't ascertain anything

24  that Mr. Smith said to him.  If Mr. Smith talked to him about

25  his family, as long as you don't tell him what he said, then

———— T. Sellers - Cross (By Mr. Grindrod)————

1   the Court may even let this go, but we're kind of nibbling

2   around this matter of trying to avoid putting in statements

3   of the defendant.

4           MR. GRINDROD:  Sure.

5   BY MR. GRINDROD:

6   Q.  Without telling me the specifics of anything, any

7   assertion that Mr. Smith might have conveyed, did he talk to

8   you about his family?

9   A.  I think we both did, yes.

10  Q.  And he also talked to you about his faith, right?

11  A.  Yes.

12  Q.  And Mr. Smith wasn't trying to sell you anything on those

13  phone calls, was he?

14          MR. BOSSE:  Objection for Mr. Smith's intent in his

15  mind.

16          THE COURT:  Sustained.

17  BY MR. GRINDROD:

18  Q.  Did Mr. Smith ask you to buy anything from him during

19  those phone calls?

20  A.  No.

21  Q.  Was your sense from those phone calls that he's a deeply

22  religious person?

23  A.  Yes.

24  Q.  Now, we heard -- you weren't here for some of it, but

25  we've heard about several investigations involving various

———————— T. Sellers - Cross (By Mr. Grindrod) ————————

1  agencies, but I want to talk to you about some specific ones.

2         So in March of 2013 or thereabouts, you learned that

3  the Idaho Department of Finance was investigating you, right?

4  A.  Yes.

5  Q.  And this was not just something that you heard through

6  the grapevine, right?

7  A.  Correct.

8  Q.  You knew about this investigation because the Idaho

9  authorities themselves reached out to you?

10 A.  Correct.

11 Q.  And this investigation wasn't into just somebody that you

12 knew or did business with, right, it was into you personally?

13 A.  Yes.

14 Q.  You told Daryl Bank about the investigation, right?

15 A.  I reached out to some people.  I don't remember

16 specifically Daryl.  Maybe it was Daryl, Kent, and Lynne

17 Shelton, I believe.

18 Q.  And those people -- well, let's take a look at -- this is

19 Government 246, which has already been admitted, and is this

20 an e-mail from Catrina Davis at Dominion?

21 A.  Yes.

22 Q.  And she's saying that Daryl and Kent are on top of this,

23 right?

24 A.  Yes.

25 Q.  And is she referring to "this" being the investigation by

——————T. Sellers - Cross (By Mr. Grindrod)——————

1    the Idaho authorities?

2    A.   I believe so, yes.

3    Q.   And this e-mail is from Kim White?

4    A.   Yes.

5    Q.   And Kim went by "Max" sometimes, right?

6    A.   Correct.

7    Q.   Max White was somebody that worked at DSPF corporate,

8    right?

9    A.   Yes.

10   Q.   And Kim White sends this e-mail to Catrina Davis.  Who is

11   Catrina Davis?

12   A.   I believe that's Daryl's -- one of those two, Raeann or

13   Catrina, is Daryl's spouse.  I don't remember.

14   Q.   And she worked --

15   A.   She worked at Daryl's office.

16   Q.   Both of them worked at Daryl's office?

17   A.   Yes.

18   Q.   And then you're copied on this?

19   A.   Yes.

20   Q.   And Daryl Bank is copied on this?

21   A.   Yes.

22   Q.   And Kent Maerki is copied on this, right?

23   A.   Correct.

24   Q.   And in this e-mail, Kim White is saying what the response

25   should be to the Idaho investigators, right?

———————— T. Sellers - Cross (By Mr. Grindrod) ————————

1    A.   Right.

2    Q.   And this is essentially instructions to interfere with

3    the Idaho investigation, right?

4             THE COURT:   What's the objection, Mr. Bosse?

5             MR. BOSSE:   No objection.

6             THE WITNESS:   I don't know if it's to interfere or

7    respond to --

8             THE COURT:   Hold on.   You may not have an objection,

9    but the Court believes that you're calling for his opinion,

10   for him to interpret what this is doing, Mr. Grindrod.

11            MR. GRINDROD:   I'll break it down, Your Honor.

12   BY MR. GRINDROD:

13   Q.   So in this e-mail, Kim White, a DSPF corporate insider,

14   is saying what should be the response of your client to the

15   Idaho authorities, right?

16   A.   Yes.

17   Q.   And the whole idea here is to have all these people on

18   this e-mail get together and make sure that this is how your

19   client responds to that investigation?

20   A.   Seems so, yes.

21   Q.   And you are in on this, right?

22   A.   Yes.   Well, because it's my client, so, yes.

23   Q.   I mean, you are in on this plan.   You're copied on this

24   e-mail, right?

25   A.   I'm not in on the plan.   I'm copied on the e-mail.

————T. Sellers - Cross (By Mr. Grindrod)————

1  Q.  You say you know about the plan?

2  A.  I didn't conclude any decisions here on how to respond.

3  It did not come from me.  I was reaching out asking for

4  questions.

5  Q.  Right.  You were reaching out with questions, and that

6  was the answer you got, right?

7  A.  Yes.

8  Q.  And then there's more e-mails after, aren't there?

9  E-mails from Catrina?

10  A.  Catrina to Kent, yes.

11  Q.  Well, Catrina to who?

12  A.  Okay.  Yeah.

13  Q.  Catrina to who?

14  A.  Well, I was, I guess, forwarded the e-mail as well.

15  Q.  Right.  And it's not just that you were forwarded the

16  e-mail, it starts, "Tony," right?

17  A.  That's my name, correct.

18  Q.  Traditional way to address an e-mail to someone?

19  A.  Yeah.

20  Q.  And here we have more planning, right, about how to

21  handle this?

22  A.  Correct.

23  Q.  Plans on how you can nix all questions that the

24  Department has, right?

25  A.  I don't know about nixing.  I see where I respond.

---
T. Sellers - Cross (By Mr. Grindrod)
---

1   Q.  Let's look at the words.  "This should nix all questions

2   that the Department has."  Did I read that correctly?

3   A.  You did.

4   Q.  That's what she said to you?

5   A.  Okay.

6   Q.  Right?

7   A.  That's what she said, correct.

8   Q.  Are there any e-mails on here from you saying, "Whoa,

9   whoa, guys, I don't want to be part of a big conspiracy to

10  interfere with an investigation"?  Do we see those e-mails?

11  A.  Hold on.

12          No, I did not interject with this.  I left it in the

13  hands of the attorney and -- Lynne Shelton and the company to

14  handle it.

15  Q.  And so just to be clear, this investigation that

16  everybody is talking about how to handle, this is an

17  investigation into you, Mr. Sellers, isn't it?

18  A.  Well, the Idaho Department of Finance did contact me,

19  correct.

20          MR. GRINDROD:  Let's pull up Smith 173, I think just

21  for the witness.  I don't believe this has been admitted.

22  BY MR. GRINDROD:

23  Q.  Do you recognize this?

24  A.  Yes.

25  Q.  What is this?

T. Sellers - Cross (By Mr. Grindrod)

1   A.   Letter from the Idaho Department of Finance regarding the

2   spectrum.

3            MR. GRINDROD:   I offer Smith 173.

4            MR. BOSSE:   This letter is hearsay.   He can ask him

5   about, which he has, the investigation, but this letter is

6   hearsay.

7            THE COURT:   I think the Court is going to overrule

8   that, Mr. Bosse.   We've had other letters in here directed to

9   various defendants and witnesses in here.   This one is

10  directed to Mr. Sellers.

11           MR. BOSSE:   That's right, Your Honor.   We stipulated

12  to the other letters being business records.   There's no

13  stipulation, I don't think, covering this.   I'm fine either

14  way.   I'm just fine either way.

15           THE COURT:   First of all -- well, it's a business

16  record.   The question is whether the witness here can

17  identify this as a letter that he received regarding his

18  status and investigation with the Idaho Department of

19  Finance.

20           MR. BOSSE:   That's fine.   I'll withdraw it.

21           THE COURT:   All right.   He's already testified to

22  all of this, Mr. Grindrod, but if there's no objection to the

23  letter, hearing what the Court said, the Court will admit it.

24  What number is it again?

25           MR. GRINDROD:   Smith 173.

---

T. Sellers - Cross (By Mr. Grindrod)

1    THE COURT:  Smith 173.

2         (Defendant Smith's Exhibit 173 was admitted.)

3  BY MR. GRINDROD:

4  Q.  Letter from the Idaho Department of Finance, sir?

5  A.  Yeah.

6  Q.  To you?

7  A.  Yes.

8  Q.  And this is actually a little different than what we were

9  just talking about earlier, isn't it?  We were talking

10 earlier about an investigation involving your sale of dental

11 franchises, right?

12 A.  Let me read this.  Hold on.

13 Q.  Sure.

14 A.  (Witness reading.)

15      Yeah, this is related to the spectrum seminar that

16 we had.

17 Q.  Right.  So this would be a second Idaho Department of

18 Finance investigation into you personally?

19 A.  Yeah.

20 Q.  And even then -- so we've got now these two, but you

21 mentioned with Mr. Bosse you had a history with the Idaho

22 Department of Finance even before these, right?

23 A.  I believe, yes, there were some inquiries.

24 Q.  Inquiries, is that different from an investigation, or is

25 that just a different spin on it?

---

Carol L. Naughton, Official Court Reporter

———————————— T. Sellers - Cross (By Mr. Grindrod) ————————————

1        MR. BOSSE:  Object to the tone and the way that he's
2   phrasing these questions.
3        THE COURT:  Sustained.  Just ask him a question.
4   BY MR. GRINDROD:
5   Q.  Was the prior interaction you had with the Idaho
6   Department of Finance different procedurally than the kind of
7   notice that you just looked at?
8   A.  I don't remember exactly, but I don't think they were
9   like these two, no.
10  Q.  With respect to these two that involve dental and
11  spectrum, you knew how serious that was based on your own
12  personal experience, right?
13  A.  Oh, yeah.  Any time you get something like this, it's
14  serious.
15  Q.  Right.  You didn't have to rely on what anyone was
16  telling you about these investigations, right?
17  A.  Right.
18  Q.  And you interacted directly with Investigator Hobson from
19  the Idaho Department of Finance, right?
20  A.  Correct.
21  Q.  Let's talk a little bit about your sale of these dental
22  franchises and -- sorry.  Let me phrase it this way:
23        You owned $200,000 worth of dental franchises,
24  right?
25  A.  Yes.

———————T. Sellers - Cross (By Mr. Grindrod)———————

1   Q.  And then you sold some of your own, right?

2   A.  Two of them.

3   Q.  Sorry?

4   A.  Sold to clients?

5   Q.  You dumped two of your own?

6   A.  Yes, I sold two of my own.

7   Q.  And I want to talk to you about you selling your own, not

8   just selling them to clients generally.

9   A.  Got it.

10  Q.  Let's look at Government's Exhibit 266, which is already

11  in evidence.  Is this an Asset Purchase Agreement?

12  A.  Yes.

13  Q.  And are you the buyer or the seller?  So let me walk you

14  through this.  This is Sellers Dental Group LLC.  Is that

15  you?

16  A.  Okay.  Yes, so that would be buying with this.

17  Q.  Let's walk through this just one step at a time.

18        Is Sellers Dental Group LLC you?

19  A.  Yes.

20  Q.  And that's what it says, "through its trustee Tony

21  Sellers"?

22  A.  Yes.

23  Q.  And it says that you are the owner of two dental units,

24  right?

25  A.  Yes.

1929

──────T. Sellers - Cross (By Mr. Grindrod)──────

1   Q.   And then you're referred to as "the seller," right?

2   A.   Yes.

3   Q.   And Dental Support Plus Group is referred to as "the

4   buyer," right?

5   A.   Okay.

6   Q.   And so this is you selling those two units, correct?

7   A.   Right, yes.

8   Q.   And who controlled DSPF Group?

9   A.   I believe Daryl Bank.

10   Q.   Did Daryl Bank put this agreement together?

11   A.   I don't know.

12   Q.   Did you previously testify in grand jury that Daryl Bank

13   put this agreement together?

14   A.   Possibly.  I don't remember.  But it came from his

15   office, so I'm assuming he did.

16   Q.   Now, you and Daryl Bank agreed to cover up this deal,

17   right?

18   A.   The word "cover up," I don't know about that, but I

19   requested to have these sold and was notified that they were

20   going to be sold.  But I don't think I would use the word

21   "cover up."  I just needed to keep it on the low key because

22   I was going through a divorce.  I didn't want any issues of

23   putting this down on a house, down payment on a house.

24   Q.   Let's break that down little.  You're going through a

25   divorce at this time?

Carol L. Naughton, Official Court Reporter

T. Sellers - Cross (By Mr. Grindrod)

1   A.   Yes.

2   Q.   And you were selling these two franchises, right?

3   A.   Yes.

4   Q.   And you were expecting to get $40,000 in exchange for

5   them, right?

6   A.   Yes.

7   Q.   And you reached out to Daryl Bank about helping you hide

8   where that money was going to go, right?

9   A.   No.

10  Q.   No?

11  A.   No.

12  Q.   Do you remember calling Daryl Bank and asking him to do

13  something different about how he wired this money?

14  A.   Well, I just told him I wanted whatever I could sell to

15  be sold, and he said he had a buyer for two units, and I

16  said, "Well, I'm going through a divorce, so I just don't

17  want to have an issue with this money now."  And it went

18  directly on the house that I ended up purchasing.

19        I guess the other thing would be I just didn't want

20  my clients to know that I was selling when they were trying

21  to sell too, which was wrong on my part.

22  Q.   So let's break that down into two pieces.  First I want

23  to talk about how it related to your personal financial

24  situation.

25  A.   Okay.

—————— T. Sellers - Cross (By Mr. Grindrod) ——————

1  Q.  Isn't it true that you specifically asked Daryl Bank to

2  structure this deal in a way that would help you hide these

3  funds in discovery in litigation?

4  A.  No.

5        MR. GRINDROD:  Okay.  Let's take a look at Smith

6  Exhibit 185E, just for the witness, please.

7  BY MR. GRINDROD:

8  Q.  Do you recognize this document?

9  A.  Oh, yeah, I recognize it.  I was reading through it.

10       MR. GRINDROD:  If we could flip to Page 8,

11  Ms. McCaslin.

12  BY MR. GRINDROD:

13  Q.  So, Mr. Sellers, in September of 2013 --

14       MR. BOSSE:  This document is not in evidence.  I'm

15  happy to have it used for refreshing.

16       THE COURT:  Well, I think that's what he's doing.

17  You're using it to refresh recollection, but it's not in

18  evidence.

19       MR. GRINDROD:  Your Honor, I was going to use it to

20  impeach.

21       THE COURT:  Even if you're impeaching or refreshing

22  recollection, it's still not coming into evidence, but it has

23  to be marked.

24       MR. GRINDROD:  This has been premarked as Smith 185E

25  for those purposes, Your Honor.

———————T. Sellers - Cross (By Mr. Grindrod)———————

1       (Defendant Smith's Exhibit 185E was marked for
2   identification only.)
3       MR. BOSSE:  Well, Your Honor, if he's going to
4   confront him with a document, he should let him read it and
5   then answer the question if he can answer it.
6       THE COURT:  Well, that's the usual procedure if
7   you're refreshing recollection.  You say you're impeaching.
8       You have that document in front of you, right?  You
9   have the document itself in front of you, right?
10      THE WITNESS:  Yeah, I have it here.  41.
11      THE COURT:  Okay.  He's highlighted a section there,
12  so I assume he's going to have him read it.  Let's continue.
13  BY MR. GRINDROD:
14  Q.  On September 14, 2013, sir, you called Mr. Bank and asked
15  him to structure this in a way so that you didn't have to
16  account for all of the funds in the account when they did
17  their discovery on you, right?
18  A.  Okay.
19  Q.  Is that right?
20  A.  Yeah.
21  Q.  Okay.  So you did ask for Mr. Bank's help to set this up
22  in a way that would allow you to hide those funds in
23  discovery proceedings?
24  A.  Yeah.  There was a discovery that was required or that
25  they were doing, and I just didn't want that to come up.

Carol L. Naughton, Official Court Reporter

———— T. Sellers - Cross (By Mr. Grindrod) ————

1    Q.   What was the discovery about?

2    A.   Divorce, assets.

3    Q.   So you were trying to hide these assets from your wife?

4    A.   I would probably have to say yes.  Yeah.  I didn't want

5    any issues with -- yeah, with the divorce.  So...

6             MR. GRINDROD:  We can take that down.

7    BY MR. GRINDROD:

8    Q.   So you asked Daryl Bank to help you out in structuring

9    these wires in a way that would help you hide that $40,000

10   from your wife, right?

11            THE COURT:  Asked and answered --

12            THE WITNESS:  Yeah, to send it somewhere else

13   besides directly to me.

14            THE COURT:  When the Court starts talking, you stop,

15   please.

16            THE WITNESS:  I'm sorry.

17            THE COURT:  Asked and answered.

18            MR. GRINDROD:  Yes, Your Honor.

19   BY MR. GRINDROD:

20   Q.   And Mr. Bank, he wanted this whole thing to -- well, you

21   and Mr. Bank had discussions about keeping this whole thing

22   quiet, right?

23   A.   I don't remember the discussion that I had with him.

24   Q.   Let's look at Government's Exhibit 268, which is already

25   in evidence.  So this is an e-mail from Daryl Bank, right?

———————— T. Sellers - Cross (By Mr. Grindrod) ————————

1   A.   Yes.

2   Q.   And he's talking about your desire to remain anonymous,

3   right?

4   A.   Yes.

5   Q.   And anonymous with respect to this deal for the $40,000,

6   your sale of your own DSPF units, right?

7   A.   Yes.

8   Q.   And Mr. Bank says that one of the reasons to keep this

9   quiet is not broadcasting to the sales force that a top

10  salesman was liquidating, right?

11  A.   Okay.  Yes.

12  Q.   And Mr. Bank says, "I also shared and agreed with Tony on

13  all of these concerns."  Right?

14  A.   Yes.

15  Q.   And the concern that you shared with Mr. Bank was that if

16  the salesmen knew that you were selling your interest, they

17  might doubt the value of the DSPF product, right?

18  A.   Yes.

19  Q.   And the DSPF sales depended on the salespeople believing

20  in the product, right?

21  A.   Yeah.

22  Q.   And so right here on number 5, when it says, "I also

23  shared and agreed with Tony," what do you call an agreement

24  to do something illegal?

25            THE COURT:  Hold on.  What is the objection?

────── T. Sellers - Cross (By Mr. Grindrod) ──────

1    MR. BOSSE:  It calls for speculation.  It sounds

2    like a legal conclusion.  I don't know what is happening now.

3    THE COURT:  The Court sustains the objection.  I

4    mean, he doesn't profess to be a lawyer.  That's a legal

5    question.

6    BY MR. GRINDROD:

7    Q.  Did you enter into a conspiracy with Mr. Bank at this

8    point?

9    A.  No.

10   Q.  You didn't?

11   A.  No.

12   Q.  Hmm.  But you agreed to help him cover up the sale?

13   THE COURT:  You know --

14   THE WITNESS:  This was prepared by Daryl on his own

15   efforts and was sent to me.  My issue when I visited with him

16   was I don't want any issues with my ongoing divorce, and

17   that's it.  He's the one that put the rest of this together.

18   I didn't do it.

19   THE COURT:  I think this subject on the sale of

20   these assets and not letting it be revealed in the divorce

21   has been covered in sufficient detail.  Let's move on to

22   something else, Mr. Grindrod.

23   MR. GRINDROD:  Your Honor, could I just follow up on

24   that one thing, that he didn't know about it?

25   THE COURT:  What one thing?

```
                    ┌─ T. Sellers - Cross (By Mr. Grindrod) ─┐
```

1        MR. GRINDROD:  I think his testimony just there was

2   that he wasn't really part of it, and I just want to show

3   that he was copied on this very e-mail.

4        MR. BOSSE:  That's not what he said.  And the e-mail

5   is in evidence.

6        THE COURT:  The Court is getting a little bit

7   confused on what you're doing here, Mr. Grindrod.  What last

8   statement are you suggesting that you need to follow up on?

9        MR. GRINDROD:  Mr. Sellers's statement that he just

10  made, I thought, was to the effect that Daryl Bank put this

11  together and he was on the outside, or something to that

12  effect.

13       THE COURT:  What did you say, Mr. Sellers?

14       THE WITNESS:  I'm sorry?

15       THE COURT:  What was the last statement you made?

16       THE WITNESS:  The last statement I made was, in my

17  conversations with Daryl in trying to liquidate what I could

18  here on those two units, was that my main concern was not

19  having any issue with my divorce.  The e-mail that he had put

20  together, that he had sent over, was on his own efforts,

21  received by me.  I didn't list those other items in there.

22       THE COURT:  Once again, we've covered this.  Let's

23  move to another subject.

24  BY MR. GRINDROD:

25  Q.  So after those e-mails that we just reviewed -- those

T. Sellers - Cross (By Mr. Grindrod)

1    e-mails were from October of 2013, right?

2    A.  Yeah.  Yeah.

3    Q.  And in November of 2013, Mr. Bank set up Prime Spectrum,

4    right?

5    A.  I don't know the date of that.  I'm assuming that's

6    close.

7            MR. GRINDROD:  Is 400B in evidence, Government's

8    Exhibit 400B?  It is?

9            Could I have 400B for everyone, please.

10   BY MR. GRINDROD:

11   Q.  This is the Articles of Organization for Prime Spectrum.

12   A.  Okay.

13   Q.  The organizer is Raeann Gibson, right?

14   A.  Okay.  Yes.

15   Q.  Date, November 22, 2013, right?

16   A.  Okay.

17   Q.  So this is the month after those e-mails we just looked

18   at with you and Daryl Bank, right?

19   A.  Yes.

20           MR. GRINDROD:  We can take that down, Ms. McCaslin.

21   BY MR. GRINDROD:

22   Q.  So Prime Spectrum was set up for you to make sales on,

23   right?

24   A.  Correct.

25   Q.  And had you heard of Spectrum 100?

Carol L. Naughton, Official Court Reporter

———— T. Sellers - Cross (By Mr. Grindrod)————

1   A.  Yes, but I don't recollect the details on it.

2   Q.  Do you know whether Prime Spectrum and Spectrum 100 were

3   set up to do similar things?

4   A.  I do not know that.  I'm assuming they were.

5   Q.  But on Prime Spectrum, you made a 30 percent commission,

6   right?

7   A.  Yes.

8   Q.  And on Spectrum 100 the salesmen made a 12 percent

9   commission, right?

10          MR. BOSSE:  He just said he didn't know anything

11   about it, the company.  I mean, he can show a document.

12          MR. GRINDROD:  Let's look at --

13          THE COURT:  Wait a minute.  Let me respond to the

14   objection, Mr. Grindrod.

15          MR. GRINDROD:  I'm sorry, Your Honor.  I jumped the

16   gun.

17          THE COURT:  The objection is sustained.  He said he

18   didn't know anything about it.

19          MR. GRINDROD:  Let's look at Government's

20   Exhibit 59, which is in.

21   BY MR. GRINDROD:

22   Q.  And just to use a round number here, do we see a sale for

23   $100,000?

24   A.  Okay.

25   Q.  And a commission of 12,000?

————— T. Sellers - Cross (By Mr. Grindrod) —————

1   A.   Okay.

2   Q.   12,000 is 12 percent of 100,000, correct?

3   A.   Correct.

4          THE COURT:   Question, Mr. Grindrod.   You showed this

5   witness this Exhibit 59.   For what purpose are you showing

6   him this exhibit?

7          MR. GRINDROD:   I'm done with it, Your Honor.   It was

8   just that.

9          THE COURT:   Because the question is whether he knows

10  anything about this exhibit.

11         MR. GRINDROD:   We're done with it, Your Honor.

12         THE COURT:   Okay.

13  BY MR. GRINDROD:

14  Q.   So, Mr. Sellers, I want to talk with you about your

15  experience with Daryl Bank, Kent Maerki, and David Alcorn

16  before the e-mail with those bullet points about your sale of

17  your own units.   Okay?

18  A.   Okay.

19  Q.   Before that, did Kent Maerki tell you that he had

20  designed a scheme to steal from people?

21         MR. BOSSE:   Your Honor, I don't want -- objection

22  again.   He keeps asking what other people in the scheme said.

23  He can't bring that out through this witness.

24         MR. GRINDROD:   Your Honor, obviously I'm not asking

25  for an assertion of any kind.

––––––––T. Sellers - Cross (By Mr. Grindrod)––––––––

1    THE COURT:  You just asked him what Kent Maerki said

2    to him.

3    MR. GRINDROD:  But not to prove the truth -- I am

4    not saying Kent Maerki said a thing that was true.  I'm just

5    asking whether he told this person to put Mr. Sellers on

6    notice.  "Did Kent Maerki say 'I'm stealing from people'?"  I

7    don't think there's a whole lot of dispute on that.

8    THE COURT:  Ask that question.

9    BY MR. GRINDROD:

10   Q.  Did Kent Maerki tell you "I'm stealing from people, and I

11   want your help"?

12   A.  No.

13   Q.  No.  What about with respect to spectrum?  Did David

14   Alcorn or Kent Maerki -- you talked about David Alcorn and

15   Kent Maerki coming out to Idaho, right?

16   A.  Yes.

17   Q.  Talking about spectrum at the library?

18   A.  Yes.

19   Q.  You went out to dinner with them before all that, right?

20   A.  Yes.

21   Q.  They told you about spectrum?

22   A.  Yes.

23   Q.  And did they -- did your -- were you left with the

24   impression that this was a good idea at that point --

25   spectrum?

———— T. Sellers - Cross (By Mr. Grindrod)————

1   A.  Yeah, I did.

2   Q.  At any point in those conversations, did Kent Maerki or

3   David Alcorn say, "We want your help stealing from people"?

4   A.  It's pretty obvious, no.

5   Q.  Is it fair to say that the way they got you to agree to

6   sell these products was by making you believe in the product?

7   A.  I didn't know the product, obviously, as well as they

8   did.  I put trust in David Alcorn and Kent Maerki and Kent's

9   supposed history and success in the industry beginning in the

10  '80s.

11  Q.  And even after the sale of your own dental units, even

12  after Prime Spectrum was set up, those guys -- Kent Maerki,

13  David Alcorn, and Daryl Bank -- they didn't tell you

14  everything, did they?

15  A.  No.

16          THE COURT:  Wait a minute.

17          MR. BOSSE:  How could he possibly know that?  I

18  mean -- calls for speculation.

19          THE COURT:  Sustained.

20  BY MR. GRINDROD:

21  Q.  Did they tell you in 2015 that an SEC complaint had been

22  filed?

23  A.  No.

24  Q.  And isn't it true, sir, that you didn't know Daryl Bank

25  was stealing most of the money off the top of these

T. Sellers - Redirect

1    investments until you testified at grand jury and the
2    prosecutor showed you that on the chart?
3    A.  I did not know that.  I didn't know what Kent or David
4    Alcorn was doing behind closed doors.  I just had no
5    knowledge of that.
6              MR. GRINDROD:  No further questions, Your Honor.
7              THE COURT:  Any redirect?
8              MR. BOSSE:  I have a couple.
9                        REDIRECT EXAMINATION
10   BY MR. BOSSE:
11   Q.  Good afternoon, Mr. Sellers.  You were asked about a book
12   that Kent Maerki appeared in.
13   A.  Yes.
14   Q.  And you said you looked him up in the book?
15   A.  Yes, I did.
16   Q.  When you looked him up in the book, did you see that the
17   references to him were about his involvement in a different
18   spectrum application license fraud from the 1980s?
19   A.  Yes.
20   Q.  Okay.  And looking at Government's 202 --
21             MR. BOSSE:  Could we see that again, please.
22   BY MR. BOSSE:
23   Q.  You were asked about the 60-month proven performance and
24   what you were told about it.
25   A.  Yes.

─────T. Sellers - Redirect─────

1  Q.  At any point did you know that that reference was to a

2  business venture that had failed and lost millions and

3  millions of dollars for its clients?

4  A.  I was not aware of that.

5  Q.  And that's because you never sold Dazzle Dental?

6  A.  Correct --

7        MR. GRINDROD:  Objection to form.

8        THE COURT:  Objection sustained in terms of --

9  BY MR. BOSSE:

10  Q.  Did you ever sell Dazzle Dental?

11  A.  No.

12        THE COURT:  The Court didn't finish.

13        MR. BOSSE:  What's that, Your Honor?

14        THE COURT:  I was in the process of telling the

15  reason the Court sustained the objection.

16        MR. BOSSE:  Yes, sir.

17        THE COURT:  But go on.

18        MR. BOSSE:  I apologize, Your Honor.

19  BY MR. BOSSE:

20  Q.  You never sold Dazzle Dental?

21  A.  I did not.

22  Q.  And you were asked about hearing that someone named David

23  Bailey was coming in to help the DSPF company.

24  A.  Yes.

25  Q.  You knew at the time, and that's because --

——————T. Sellers - Redirect——————

```
 1              MR. GRINDROD:  Object to form.
 2    BY MR. BOSSE:
 3    Q.  Did you know at the time that that was because the
 4    vendors that had been hired were failing and losing millions
 5    of dollars?
 6    A.  Correct.
 7    Q.  You didn't tell the clients that?
 8    A.  No.
 9    Q.  Was that kept secret from the salesmen --
10              MR. GRINDROD:  Object to speculation, Your Honor.
11              MR. BOSSE:  Please let me finish.
12              THE COURT:  The Court can rule once it hears the
13    question.  So now let's repeat the question.
14    BY MR. BOSSE:
15    Q.  Was it kept secret from the salesmen that Oracare and
16    MetroMedia had failed and that's why David Bailey was coming
17    in?
18              MR. GRINDROD:  Objection.  Lack of personal
19    knowledge as to all the salesmen.
20              THE COURT:  And the Court will sustain that,
21    Mr. Bosse, because he can't speak for what all the salesmen
22    knew.
23              MR. BOSSE:  Yes, sir.
24    BY MR. BOSSE:
25    Q.  Let me try it a different way.  Were you on calls with
```

```
                         ┌─T. Sellers - Redirect─┐
```

 1   many salesmen from around the country on Dental Support Plus

 2   Franchise?

 3   A.  Yes.

 4   Q.  Was it kept secret on those calls that Oracare and

 5   MetroMedia had failed and lost millions of dollars?

 6   A.  Kent Maerki had stated for several weeks that they were

 7   on -- what's the word to use? -- in jeopardy of losing the

 8   opportunity to function as needed.  So we were aware of that

 9   for quite some time.  And then he gave them a deadline, and

10   if they didn't meet the deadline, he was going to fire them.

11   So that's when David Bailey came in.

12   Q.  This was publicly aired on sales calls with --

13           MR. GRINDROD:  Objection to form.

14   BY MR. BOSSE:

15   Q.  -- salesmen from around the country?

16   A.  Yes.

17           MR. BOSSE:  Please let me finish the question before

18   he objects.

19           THE COURT:  Here's the deal.  Here's the way it

20   works.  Do not lead the witness.  You have to start off with

21   something else other than giving him a declarative statement.

22           MR. BOSSE:  Yes, sir.

23           THE COURT:  You're answering your own question.

24           MR. BOSSE:  All right.  Let me try it again.

25   BY MR. BOSSE:

1946

T. Sellers - Redirect

1   Q.  What we just talked about, was that aired on sales calls

2   that involved salesmen from all around the country that were

3   held regularly?

4   A.  It was.  Several times.

5   Q.  You were asked about whether you knew about other

6   investigations that were going on other than the Idaho

7   investigation.  Do you recall that?

8   A.  Yes.

9   Q.  Did you ever testify for Kent Maerki in connection with a

10  separate investigation into Kent Maerki by a different state

11  securities regulator?

12  A.  No, I did not.

13  Q.  You were asked about Government's 268, that series of

14  e-mails in October of 2013 about the sale of DSPF.  Do you

15  remember that?

16  A.  Yes.

17  Q.  Okay.  By October of 2013, when those e-mails were sent,

18  was it any secret to you that Dental Support Plus Franchise

19  was failing?

20  A.  No.  It was very obvious.

21  Q.  Okay.  And by that point were your clients asking to get

22  out of the investment?

23  A.  Almost every day.

24  Q.  Okay.  And you were asked about -- were you ever told

25  about an SEC complaint in the year 2015?  Do you remember

1    that?

2    A.   Yes.

3    Q.   Were you still selling the stuff in 2015?

4    A.   Dental Support Plus, no; spectrum, I don't remember when

5    I stopped selling it, honestly.  I don't remember the date.

6    Q.   Okay.  That's fine.

7              MR. BOSSE:  Nothing further.

8              THE COURT:  May this witness be permanently excused?

9              MR. BOSSE:  Yes, sir, Your Honor.

10             MR. GRINDROD:  Yes, Your Honor, that's fine.

11             THE COURT:  Okay.  Step down.

12             (The witness was excused.)

13             THE COURT:  Next witness.

14             MS. YUSI:  Your Honor, the government is going to

15   call Ken Sykes by deposition, and there's a number of

16   exhibits that we would like to pre-admit prior to the

17   deposition.

18             THE COURT:  Okay.  What are the exhibits?

19             MS. YUSI:  It's Government's Exhibit 826, 827, 828,

20   830, 831, 832, 833, and 835.  I can read those again, Your

21   Honor.

22             THE COURT:  I think the Court has all of them.

23             MS. YUSI:  Okay.

24             THE COURT:  I don't hear an objection to any of

25   them, so the Court is going to admit them.

```
 1            MS. YUSI:  I don't know if the defense is going

 2   to -- if they're going to move for admission of theirs if

 3   we're going to play anything about them.

 4            THE COURT:  Let's deal with these first.

 5            The Court will admit Exhibits 826, 827, 828, 830,

 6   831, 832, 833, and 835.

 7            (Government's Exhibits 826, 827, 828, 830, 831, 832,

 8   833, and 835 were admitted.)

 9            THE COURT:  Are there any more?

10            MR. GRINDROD:  Yes, Your Honor.  It would be

11   Smith 513 and 520.

12            THE COURT:  Any objection to those?

13            MS. YUSI:  No, Your Honor.

14            I think you discussed 514 as well.  I have 512, 514,

15   520.

16            MR. GRINDROD:  You have 12, 14, and 20?  Can I take

17   a look, and I'll let you know?

18            MS. YUSI:  We can play the direct, though, Your

19   Honor.

20            THE COURT:  Okay.  So we're going to move forward

21   with the admission of Smith Exhibits 513 and 520, and we'll

22   wait to see if there are others.

23            (Defendant Smith's Exhibits 513 and 520 were

24   admitted.)

25            MR. GRINDROD:  Thank you, Your Honor.
```

─────────────────── K. Sykes - Direct ───────────────────

1        MS. YUSI:  Thank you.

2        (Video deposition played in open court as follows:)

3        KENNETH SYKES, called by the Government, having been

4    first duly sworn, was examined and testified as follows:

5                         DIRECT EXAMINATION

6    BY MS. YUSI:

7    Q.  Good afternoon.  Can you introduce yourself to the Court?

8    A.  My name is Kenneth Frank Sykes.

9    Q.  How do you spell your last name?

10   A.  S-y-k-e-s.

11   Q.  And how old are you?

12   A.  I'm 64.

13   Q.  What city and state do you live in?

14   A.  I live in El Dorado Hills, California.

15   Q.  Is that near Sacramento?

16   A.  Yes.  It's east of Sacramento.

17   Q.  Do you currently work?

18   A.  We have our own small business.

19   Q.  What kind of business is that?

20   A.  We sell industrial parts, various industries.

21   Q.  And how long have you all owned your business?

22   A.  About 20 years now.

23   Q.  And are you married?

24   A.  Yes, I am.

25   Q.  What is your wife's name?

1950

K. Sykes - Direct

1  A.  Kathleen Ann Sykes.

2  Q.  Does she work with you in the business?

3  A.  Yes, she does.

4  Q.  Now, as you've been -- what is the name of your business?

5  A.  The name of the company is American Bearing Works

6  Incorporated.

7  Q.  And since you've been owning that, have you guys been

8  saving money for retirement?

9  A.  My previous company, I had a pretty good 401, so yeah,

10  we've been investing some money, but not -- with the economy

11  ups and downs, you know, it's very difficult to do that at

12  times.

13  Q.  Do you have any background or training in investments?

14  A.  No, I don't.  Just reading books, listening to other

15  people.

16  Q.  Self-taught?

17  A.  Yeah, I'm self-taught.

18  Q.  Do you know the defendant Aghee William Smith also known

19  as Bill Smith?

20  A.  Right, correct, yes.

21  Q.  You do know him?

22  A.  Yes.

23  Q.  How did you first come to hear of him?

24  A.  I believe it was around 2014, 2015 I heard him on the --

25  on the radio, his radio show "Money Talks," which was 1380 on

K. Sykes - Direct

1    the local radio station in Sacramento.

2    Q.  Was it an advertisement, or what did you hear?

3    A.  Well, basically I was traveling north to my parents'

4    estate.  They passed away.  So I was listening to various

5    radio shows and came across him, and that's where I got his

6    information.

7    Q.  And what was your understanding based on his radio show

8    as to who he was or what he did?

9    A.  Well, he was talking about his investments and how normal

10   investing in the stock market was nothing but a casino, you

11   know, high risk, and he was talking about how he could make

12   you more money, you know, less fees, that type of thing.

13   Q.  And so did you end up calling him?

14   A.  Eventually I did.  I listened to him -- I don't know how

15   many road trips I was on.  It was quite a few.  But

16   eventually I wrote down his phone number and got ahold of his

17   partner, John Kennedy.

18   Q.  What were you looking for in terms of financial advice?

19   A.  Well, what he was saying, you know, kind of lit my eye

20   up -- eyes up a little bit, you know, about the fees and that

21   type of thing, what normal investment brokers charge.  So

22   that sounded pretty interesting to me.

23   Q.  Okay.

24   A.  And so --

25   Q.  Did you make an appointment to meet with him?

K. Sykes - Direct

1   A.  Yes, I did.

2   Q.  And when do you think you first met with him?

3   A.  It was -- it had to be 2015 -- sometimes in 2015.  I

4   don't know the exact date.

5   Q.  Okay.  And what did -- when you met with Mr. Smith, what

6   did he tell you about his background and experience?

7   A.  When I checked out his website, you know, it all looked,

8   you know, pretty legit to me, so -- but we talked, and he

9   threw out some ideas what I could invest in.

10  Q.  Did he talk about his experience in the past dealing with

11  other people's money?

12  A.  Yes, he did.  He bragged -- he was talking about that he

13  invested for a former President.  I believe it was Busch,

14  maybe Reagan, and then I believe, if I recall, he was -- he

15  had the inside in Washington, D.C., helping the military,

16  some officers in the military, I believe, in investments.

17  So...

18  Q.  And what was his role towards you?  What was your

19  understanding of what he would be doing for you?  What would

20  his role be?

21  A.  Well, he -- like I say, he offered -- he was -- showed me

22  some options on investments, and there was three.  There was

23  one, I think it was on debt, making money off of other

24  people's debts.  I can't remember the name of the company

25  but -- and there might have been another one, but the

K. Sykes - Direct

1  spectrum deal is what seemed like what he was pushing.

2  Q.  Okay.

3  A.  He had -- he had the DVD there and talking about, you

4  know, how -- what the potential was there in Texas and, I

5  think, Missouri as well.

6  Q.  Did you trust Mr. Smith?

7  A.  Yeah.  He was nice to me and, you know -- you know, we

8  got along well.  I had the first meeting.  It was just Smith

9  and myself, and then the second meeting I brought in my wife,

10  and it didn't go off very well between my wife and I because

11  she -- he didn't impress her too much, especially when he

12  fell out of his chair, so it was kind of an embarrassing

13  moment for everybody.

14  Q.  So when -- when you stayed with him, this was between you

15  and him, and your wife was not really --

16  A.  Right, the first go-round.

17  Q.  What did Mr. Smith -- I want to talk to you about Xcel.

18  What is your understanding of what Xcel was?

19  A.  Well, Xcel was -- it was building towers.  It was part of

20  RapidLink Communications, having these towers, these cell

21  towers in the -- in the Texas area where, you know, there was

22  a lot of oil and shale.

23       And he gave me the information on RapidLink, and it

24  was now owned with part of Daryl Bank's deal, and so not

25  knowing who Daryl Bank was at the time, it all looked pretty

K. Sykes - Direct

1  good on -- on the returns with what Mr. Smith was -- was
2  telling me about.  So...
3  Q.  What did he say about the returns?
4  A.  He was promising -- he would say it was, like, 9 to
5  12 percent returns, you know, I could get my money back at
6  any time I want, and, you know, it was -- it sounded, you
7  know, now that I look back, too-good-to-be-true-type thing.
8  He was definitely being a salesman.
9  Q.  Did he talk about any risk?
10  A.  No, not really.  He --his -- what he told me about risk
11  is how -- how the money I -- my money with my current
12  investments were more at risk than what he was selling.
13  Q.  So this was a safer option?
14  A.  Yeah.
15  Q.  And what about timing?  What was your understanding based
16  on what Mr. Smith said about how quickly you would start
17  seeing returns?
18  A.  It was going to be pretty quick.  It was going to be
19  pretty quick.  So he set me up with a conference call with --
20  with Daryl Bank, and Daryl Bank, you know, doing his
21  smooth-talking with me, you know, it all sounded good, but
22  then -- but then from there, it kind of went downhill --
23  Q.  And we'll talk about --
24  A.  -- I mean, quick.
25  Q.  -- that, you know --

1955

K. Sykes - Direct

1   A.  Okay.

2   Q.  I'm talking about prior to the investment for now.

3   A.  Okay.  Okay.  Okay.

4   Q.  Who was on the conference call with you and Daryl Bank?

5   A.  Mr. Smith.

6   Q.  Was that in his office?

7   A.  It was on the phone.  It was a conference call.  I was in

8   my office.

9   Q.  What, if anything, did Mr. Smith say about his own

10  investment in this?

11  A.  Oh, he said he was -- he was invested in it as well.

12  Q.  Okay.

13  A.  I think he said he had 300,000 in it or -- if I recall.

14  Q.  And did he say anything about the success or track record

15  of this type of investment?

16  A.  Pretty much it was a -- to him, it was a sure thing.

17  Q.  And that's what he told you?

18  A.  Right.

19  Q.  What was your understanding of who Daryl Bank was?

20  A.  Daryl Bank.  According to Mr. Smith, he -- he had the

21  inside on -- in Washington, D.C., with various people, if I

22  recall.

23  Q.  Prior to making a decision about your investment, did

24  Mr. Smith say anything about an SEC investigation into

25  spectrum investments?  Go ahead.  Did he say anything?

Carol L. Naughton, Official Court Reporter

K. Sykes - Direct

1    A.  No.

2    Q.  Did he say anything about any other regulatories looking

3    into other investments that had the same principals involved?

4    A.  No.

5    Q.  How much did you end up -- well, I'm going to show you

6    some e-mails.  Did you provide some e-mails between yourself

7    and Mr. Smith to the government?

8    A.  Yes, I did.

9    Q.  I'm going to go over a few of these with you.  If you can

10   look at what's been marked as Government's Exhibit 826.  What

11   is the date of this?

12   A.  This would be two thousand -- excuse me, December 14,

13   2015.

14   Q.  And who is the e-mail from?

15   A.  It is from Mr. Smith.

16   Q.  And to whom?

17   A.  To -- that is my e-mail.

18        MS. YUSI:  Move to admit Exhibit 826.

19   BY MS. YUSI:

20   Q.  What is he sending here?

21   A.  "I want to reach out to" --

22   Q.  And if you need a minute to review this --

23   A.  Yeah.

24   Q.  -- there's a couple pages.  Please take that.

25   A.  All right.  Yes.  This is regarding the three different

K. Sykes - Direct

1   assets that we talked about.  One is a cash account; the
2   second is the spectrum asset; and the last is the Collins
3   8 percent secure funds.
4   Q.  And if we can look at Page 3, was this one of the
5   attachments he forwarded you?
6   A.  Yes.  Yes.
7   Q.  So Page 3 of Exhibit 826, what was your understanding of
8   what this was?
9   A.  This -- this was scenario A income plan, and he has the
10  spectrum, the Collins investing.  I don't know if that's the
11  total income that -- money that I invested -- accounts, yeah.
12  What my return would be, after so many years, would be
13  $753,600.
14  Q.  And at the top of this, this was a structured income plan
15  for you and your wife; is that right?
16  A.  Yes.
17  Q.  And Mr. Smith prepared this?
18  A.  Yes, he did.
19  Q.  And the $753,000, that's on the bottom right of Page 3.
20  Is that what you're looking at?
21  A.  Correct.  Yeah, it looks like that's based on the two,
22  spectrum and Collins.  That's the total amount.
23  Q.  And this December 14, 2015 e-mail, is this around the
24  time when you first met him that he sent these?
25  A.  Yes.  Yes.

Carol L. Naughton, Official Court Reporter

K. Sykes - Direct

1   Q.   We're done with that one.  I'm going to give you another
2   e-mail here.
3   A.   Okay.
4   Q.   This is Exhibit 827 that's been marked.
5   A.   Okay.
6   Q.   And we're going to have to go kind of backwards, I guess,
7   from this because it's an e-mail.  Do you recognize this
8   document?  Do you recognize this?
9   A.   Yes, I do.
10  Q.   And are these e-mails between yourself and Mr. Smith?
11  A.   Yes.  That's -- that is me.
12       MS. YUSI:  I'm going to move to admit Exhibit 827.
13  BY MS. YUSI:
14  Q.   On Page 2 of Exhibit 827, you have an e-mail at the top
15  of that.  Could you read that for us.
16  A.   The e-mail at the top is --
17  Q.   Yes.
18  A.   -- awscep2@sbcglobal.net.
19  Q.   Whose e-mail is that?
20  A.   That -- that is Mr. Smith's.
21  Q.   And can you read starting with "Hi, Bill"?
22  A.   "Hi, Bill, thank you very much."
23  Q.   And keep going.
24  A.   "Like I mentioned in our phone conversation, Kathy is on
25  the fence with this, and she's led to believe the other way

Carol L. Naughton, Official Court Reporter

K. Sykes - Direct

1   with the books she -- she -- she reads" -- excuse me -- "led

2   to believe the other way with the books she reads with and so

3   on.  We might have to set up another meeting or maybe change

4   some numbers around.  She would like to see or read about

5   other clients who have benefitted like this.  I'll need some

6   ammo.  I've been reading up when I can, and there will be no

7   shortage of spectrum.  I'm excited about it."

8   Q.  On Page 1 of Exhibit 827, is that Mr. Smith's response to

9   your questions?

10  A.  Yes.  "My team has already demonstrated decades of

11  expertise with each asset independent of the good opinions of

12  others.  1982 with the spectrum asset till today.  1981 --

13  1991 with the collateralized 8 percent secured funds.  I have

14  follow-up e-mails we will also provide.  The brief spectrum

15  two discloses my team's history of client returns from the

16  early 1980s.  We are allowed to disclose in general terms

17  historic facts.  Specific client references are not allowed

18  and violate both state and federal laws.  Feel free to

19  contact me with further questions or observations."

20  Q.  When Mr. Smith says since 1982 or 1991, what was your

21  understanding of what that meant?

22  A.  That he's been doing it a long time.

23  Q.  These particular investments?

24  A.  Just investments in general is the way I took it.

25  Q.  Okay.  I'm going to show you Exhibit 828 here.  I think

1    we're done with that one.

2    A.  Okay.

3    Q.  And what is Exhibit 828?

4    A.  Related to spectrum.

5    Q.  Is this another e-mail and attachment?

6    A.  This would -- yes.  This is to -- oh, this is from John

7    Kennedy.  So...

8    Q.  To whom?

9    A.  To me, the client, Ken Sykes.

10   Q.  And what was the date?

11   A.  That was December 14, 2015.

12   Q.  And you mentioned John Kennedy.  What was your

13   understanding of who John Kennedy was?

14   A.  John Kennedy worked in the backroom.  He was -- I don't

15   think I put a foot in his office.  I can't remember.

16   Q.  Was he in the same office as Mr. Smith?

17   A.  Yes.

18           MS. YUSI:  And we move to admit Exhibit 828.

19   BY MS. YUSI:

20   Q.  Now, it says, "Sincerely, John Kennedy," and it says on

21   the first page, "News Talk Radio, 'Money Talks.'"

22           What was "Money Talks" radio program, if you know?

23   A.  What was it?

24   Q.  Yeah.

25   A.  That was Mr. Smith's radio show.

K. Sykes - Direct

1   Q.   Okay.

2   A.   Talking about investing.

3   Q.   And what was your understanding of what these attachments

4   were that he sent to you?

5   A.   Yeah, just explaining the spectrum deal with RapidLink.

6   Motorola, that was another name that was thrown out there,

7   you know.  A big company like Motorola gave me some comfort

8   to know that -- that this was a legit thing.

9   Q.   I'm going to point you to the back three pages of

10  Exhibit 828.

11  A.   The very back?

12  Q.   Yeah.  Just all the way to the back, the back three

13  pages.

14  A.   Oh, okay.

15  Q.   Do you know what we're looking at here?

16  A.   Yeah.  This is another chart on how much could be made.

17  Q.   Are those -- and those are projections --

18  A.   Projections, yes.

19  Q.   -- of profits?

20  A.   Yes.

21  Q.   All right.  Did it take you a few months to decide to put

22  money in this investment?

23  A.   Yeah.  My wife and I, we went back on it.  She did not

24  want me to do it, but I went ahead forward and said, well,

25  you know, it's coming out of my account, not hers.  Now, I

K. Sykes - Direct

1  can say this, that Bill tried to get me to take all my money
2  out of my current investments and then -- and same with
3  Kath's.
4  Q.  Your wife's?
5  A.  Yeah, Kathy's investments.
6  Q.  About how much was that?
7  A.  I didn't give Bill all my -- all my numbers, but I think,
8  you know, I might have said 180,000, and Kathy was maybe half
9  that.
10 Q.  And how much did you end up investing?
11 A.  25,000.
12 Q.  I'm going to show you what's been marked for
13 identification as Government's Exhibit 830.  And we're done
14 with that one if you want to put that aside.
15 A.  Okay.
16 Q.  Is this another e-mail string between you and Bill Smith?
17 A.  Yes, it is.  Yes.  I talked to my investor.  Then I -- I
18 had them wire money out of my account.
19          MS. YUSI:  We're going to move to admit Exhibit 830.
20 BY MS. YUSI:
21 Q.  So in April -- this e-mail is from April 2016; is that
22 right?
23 A.  Yes.
24 Q.  Where did you have to move the money from in order to
25 make this investment?  Was this your savings for retirement?

Carol L. Naughton, Official Court Reporter

K. Sykes - Direct

1   A.   Yes.  Yeah, I -- with my prior company, I was pretty
2   aggressive in putting money away.
3   Q.   Okay.  And if we can -- if I can have that --
4   A.   Sure.
5   Q.   -- exhibit, and I'm going to show you what's been marked
6   for identification as Exhibit 831.
7   A.   Yeah.
8   Q.   Do you recognize this?
9   A.   Yes, I do.
10  Q.   What is it?
11  A.   That's the money that went into IRA Services that we
12  wired.
13  Q.   As an investment authorization?
14  A.   Yes.
15          MS. YUSI:  We move to admit Exhibit 831.
16          THE WITNESS:  Yeah.  There was a -- it's got Xcel
17  Bandwidth.  And there was some -- something was -- if I
18  recall, something strange happened there.  He had me wire --
19  wire money to one location, then he called back and said, oh,
20  no, it's got to go somewhere else, but I don't -- I don't --
21  I think the first one went to Arizona, and then the second
22  one went to -- was going to Florida to Bank's location.
23  BY MS. YUSI:
24  Q.   This was -- on Page 1 of 831, it says, "Invest exactly
25  24,000."  Is that how much you ended up putting in for Xcel?

K. Sykes - Direct

```
1   A.   Yeah.  I think the -- I think -- yeah.  I had to keep a
2   thousand to IRA Services for the fees, which I got a whopping
3   $75 back a couple months ago.
4   Q.   And then on the second page, is that your signature?
5   A.   That is my signature.
6   Q.   And that was May 19, 2016?
7   A.   Correct.
8   Q.   I'm going to show you -- I can take that one back --
9   what's been marked as Exhibit 832, which says Representative
10  Authorization.  Do you recognize this?
11  A.   Yes, I do.
12  Q.   Is that your signature on Page 2?
13  A.   Yes, it is.
14           MS. YUSI:  We move to admit Exhibit 832.
15  BY MS. YUSI:
16  Q.   Now, this says Representative Authorization, and the
17  second one says "Add a representative to my account."
18           Who is the representative that you signed to be on
19  this account?
20  A.   My wife.
21  Q.   Look on Page 1, please.
22  A.   Oh, Page 1.
23  Q.   Sorry.  Under "Add a representative to my account," who
24  does it say in there was your representative?
25  A.   Oh, Bill -- Bill Smith.
```

K. Sykes - Direct

1  Q.  All right.  I'm going to show you what's been marked for

2  identification as Exhibit 833.  I'll take the other one.

3  Thank you.  Do you recognize this document?

4  A.  I do.

5  Q.  And what does it state it is?

6  A.  The date on this is 6/24/16, and this was --

7  Q.  6/24/16?

8  A.  Uh-huh.

9  Q.  And what does it say at the top it is?  What kind of

10  agreement?

11  A.  It's a buyer's agreement.

12  Q.  And on the last page, is that your signature?

13  A.  Yes, it is.

14         MS. YUSI:  We move to admit Exhibit 833.

15  BY MS. YUSI:

16  Q.  So this is a buyer agreement.  Was this one of the things

17  that you had to sign for this investment?

18  A.  Right.

19  Q.  And who provided all of this documentation to you?

20  A.  Smith did.

21  Q.  And did he go paragraph by paragraph and explain what

22  these all meant?

23  A.  I don't recall that at all.  He told me to look over it

24  and read it.  He told me to, you know, read it, look over it.

25  So I did.

Carol L. Naughton, Official Court Reporter

K. Sykes - Direct

1  Q.  And did you have an understanding -- on the first page,

2  it references DOM Business Brokers -- who DOM Business

3  Brokers were?

4  A.  Well, that would be Daryl Bank's, I believe.

5  Q.  Did you know that at the time?

6  A.  No, I did not.

7  Q.  And the seller's name on Page 1 says Xcel Bandwidth.

8  A.  Uh-huh.  That's what -- yeah.

9  Q.  Did you know who controlled Xcel Bandwidth?

10  A.  I think I did by then because I did have the conversation

11  with Daryl Bank.

12  Q.  Okay.

13  A.  Yeah.

14  Q.  And what about Xcel Bandwidth Two?  What was your

15  understanding of who controlled that?

16  A.  Everything that I'm aware of was controlled by Mr. Smith

17  and Daryl Bank.

18  Q.  Did you have a good understanding as to why the seller,

19  Xcel Bandwidth, was selling an equity into Xcel Bandwidth Two

20  and how that worked?

21  A.  No.  I don't.

22  Q.  And the last page where your signature is, under

23  "Broker," who is listed as the DOM Business Broker?

24  A.  Bill Smith.

25  Q.  And I'm going to show you what's been marked as

K. Sykes - Direct

1    Government's Exhibit 835.  Do you recognize this?

2    A.  The Operating Agreement.  Yes.

3    Q.  And what was that?  Did you have any idea what that --

4    the purpose of that?

5    A.  Well, it's just all the legalities that are part of this

6    investment that I signed off on.

7            MS. YUSI:  We move to admit Exhibit 835.

8    BY MS. YUSI:

9    Q.  Did you understand the structure of what was going on?

10   A.  Not really.  I tried.

11   Q.  Did you discuss --

12           (Video was paused.)

13           MS. YUSI:  Sorry, Your Honor.

14           (Video resumed as follows:)

15   BY MS. YUSI:

16   Q.  Did you discuss -- or what was your understanding of any

17   fees or commissions that would be taken out of your

18   investment?

19   A.  The fees that came out were through IRA Services, the way

20   I understood that.

21   Q.  Were those the only fees you were aware of?

22   A.  Yeah.  And then Mr. Smith was just talking about how

23   great the returns were going to be.

24   Q.  Okay.

25   A.  And --

K. Sykes - Direct

1   Q.  Did he talk about how much money he was going to get?
2   A.  I don't -- I don't think so.  I don't recall that.  But
3   when I see the membership interest, I remember -- I remember
4   getting the phone call from Smith on our home phone saying,
5   you know -- saying we're in now, we're all good.  I remember
6   that.  I remember that number.
7   Q.  Saying everything was official and --
8   A.  Yeah.  Yeah.  Yeah.
9   Q.  -- that you were a member?
10          I'm sorry.  He said that --
11  A.  Everything was official, and you're in.
12  Q.  Okay.  Now, after you made this investment in 2016, May
13  2016, did you keep up to date with your investment and what
14  was going on?
15  A.  I always -- I would get -- I would get a statement from
16  IRA Services.
17  Q.  Did you ever listen to any phone calls or conference
18  calls?
19  A.  I was in -- I was in, I believe, five conference calls.
20  Q.  What were the conference calls?
21  A.  It was Daryl Bank, and then there was other voices in the
22  background, but I don't know who they were.
23  Q.  And what did they say in terms of how the investment was
24  going?
25  A.  Bank was saying that, you know, the equipment, you know,

———K. Sykes - Direct———

1   is moving in, things are happening.  They were very short

2   conference calls.  And then one of the last conference calls,

3   Bank wasn't there, and I found out that Bank was arrested, so

4   I called up Mr. Smith, I go -- Bill Smith -- "I hear Bank's

5   been arrested.  What's going on?"

6        "Oh, that has nothing to do with Xcel.  That's

7   something else that happened."

8   Q.  Okay.

9   A.  Okay.

10  Q.  He said it has nothing to do with your investment?

11  A.  Right, it has nothing to do with my investment.  So the

12  red flag obviously went up with me, and so I contacted Bill

13  again.  I don't know how many times I set up a couple of

14  meetings with him when I was making some sales calls out in

15  Roseville with my company.  He assured me that everything was

16  still good.

17       But I said, "Well, what's happening with Bank?"  And

18  then he started laying some other company on me.  And I can't

19  remember that name.  But all I remember is, like -- it was on

20  his computer.  It had, like, a bullet train on the front of

21  it.

22       So I'm going, "Wait a minute.  Is this company

23  taking over what Bank initially started?"

24       "Oh, no, no.  This is something else we can look

25  at."

K. Sykes - Direct

1          I go, "Well, I want my money.  This is not working."
2   Q.  So he was offering you another investment?
3   A.  Right.  And then -- so I said, "This -- this is not going
4   well," because the statements I was getting, I don't know --
5   from IRA Services, the quarterly statements, there was --
6   there was nothing coming in.  There was no return on
7   investment at all.  So I called -- I called these meetings
8   and said, "You've got to tell me what's going on here."
9          And he just kind of blew me off and laughed it off.
10  And he also told me if the FBI calls me, not to say anything.
11  I'm going, "What?"
12         So that's about the time I -- I -- and I was already
13  probably looking into it, checking the backgrounds, and I saw
14  the article in the *Virginian Pilot*, and I contacted the
15  writer when seeing Daryl Bank's arrest and -- and Smith was
16  involved with something back in 2012, I think.  I think it
17  had something to do with that phony dental franchise.
18  Q.  So that's the only -- the first time that you ever found
19  out that something was --
20  A.  Yeah.
21  Q.  -- truly wrong with your investment?
22  A.  True -- truly wrong.
23  Q.  What, if anything, did Mr. Smith say about trying to get
24  your money back?
25  A.  He -- he started talking about another investment, and

K. Sykes - Direct

1    this is with the Hilton family.  So he tells -- he says, "I
2    can get you $7,500 back right now, Kenny.  You just give me,
3    you know, 2,000 bucks.  Write the check now for $2,000, and
4    I'll get you $7,500 right away."
5            So he has his sidekick, Kennedy, go in his office,
6    gives me the FedEx envelope.  He says, "Here."  And here's
7    the paperwork -- paperwork stuffed inside, and it's sending
8    the money to another Florida address.
9    Q.  Did you get -- ever -- ever get any of your money back?
10   A.  No, I did not.  Other than I -- I contacted IRA Services.
11   I said -- I said, "Look, I'm -- I've been part of a scam
12   here."  And I go, "I want my money back."
13           And they said, "Well, you've got to contact Bill
14   Smith on that."  And they wouldn't -- they wouldn't tell
15   me how much money was -- I knew there was -- there was cash
16   in there, but I had no idea where my money went to.
17   Obviously it went to Bank, and he did what he did with it.
18   Q.  So did you end up getting any money back IRA Services?
19   A.  I got $75 back.
20   Q.  And that's all you got back from your investment --
21   A.  That was all I got.
22   Q.  Is that all you got back from your investment?
23   A.  Yes.
24           MS. YUSI:  I think those are all my questions right
25   now.  I'm sure Mr. Smith's attorney will have some for you.

Carol L. Naughton, Official Court Reporter

K. Sykes - Direct

1   If you could answer --

2            (Videotape was paused.)

3            THE COURT:  Approximately how long is the

4   cross-examination?

5            MS. YUSI:  We have about 22 minutes left with the

6   cross and redirect.

7            THE COURT:  Okay.  So what we're going to do, we are

8   at four minutes of, we're going to take the break now and

9   come back and do the cross.

10           MS. YUSI:  Yes, sir.

11           (The jury exited the courtroom.)

12           (Recess from 3:55 p.m. to 4:15 p.m.)

13           THE COURT:  To help you with your planning, the

14  Court decided we're going to go to about 5:00, and then we're

15  going to quit.  So I hope that works.

16           MS. YUSI:  Yes, sir.

17           THE COURT:  Bring the jury in.

18           (The jury entered the courtroom.)

19           THE COURT:  You may be seated.

20           Let the record reflect all jurors have returned.

21           Does counsel agree?

22           MR. BOSSE:  The government agrees.

23           MR. YAROW:  Mr. Alcorn agrees.

24           MS. McCASLIN:  Mr. Smith agrees.

25           THE COURT:  You may resume the deposition.

—————— K. Sykes - Cross (By Mr. Grindrod) ——————

1    (The videotaped deposition continued as follows:)
2                    CROSS-EXAMINATION
3    BY MR. GRINDROD:
4    Q.  Mr. Sykes, my name is Andrew Grindrod.  I represent
5    Mr. Smith.  I'm just going to ask you some questions today.
6    A.  Okay.
7    Q.  So I want to start by going back to the beginning, like
8    when you first met Mr. Smith.
9    A.  Uh-huh.
10   Q.  So you said that was in late 2015, maybe December 2015?
11   A.  It was in -- I think it was 2015.  I can't give you the
12   exact date.
13   Q.  And at that time, you were the president of that company
14   you referred to, American Bearing Works --
15   A.  Yeah.  That's -- that's our company, my wife and I.
16   Q.  And you came to Mr. Smith because you were trying to make
17   up for not having saved enough money in retirement over the
18   last 15 years, right?
19   A.  Yeah.  I was hit with the dot-com bust and, of course,
20   the financial crisis.
21   Q.  So --
22   A.  Like everybody.
23   Q.  Sure.
24           And so you were, in some sense, looking to make up
25   for that lost time saving?

K. Sykes - Cross (By Mr. Grindrod)

1    A.   Sure.

2    Q.   And Mr. Smith told you about this company called Xcel

3    Bandwidth?

4    A.   Correct.

5    Q.   Among other things but --

6    A.   Right.

7    Q.   And you knew that alternative investments like this, like

8    notes and private investments, carry significant risk, right?

9    A.   I -- of course.

10   Q.   Let's look at -- well, specifically, you know that

11   they -- among the risks that are involved is the risk of

12   losing your entire investment, right?

13   A.   Right.

14   Q.   And as part of your meetings and going over forms with

15   Mr. Smith, he told you about the risks?

16   A.   He -- all he talked about, how much money we would make.

17   Q.   Do you remember him giving you a form that explicitly

18   told you, look, investments like this carry a substantial

19   risk, including the risk that you'll lose everything?

20   A.   Well, yeah.  All investments carry that, so I -- I

21   understood that.

22   Q.   And just to talk in general terms about the timing, so

23   sometime 2015 time period, generally, is when you start

24   talking to Mr. Smith, right?

25   A.   Right.

---

K. Sykes - Cross (By Mr. Grindrod)

1  Q.  And you didn't actually invest in Xcel until summer, May,
2  June 2016?
3  A.  Yeah, that sounds about right.
4  Q.  So there was -- this wasn't something where, you know,
5  you came in, signed on the dotted line on the first meeting,
6  and that was it, right?
7  A.  No, I -- he gave me -- he gave me information.  He gave
8  me a DVD.  I did -- I did go on the web and -- and check up
9  on spectrum and that type of thing.  So -- but unfortunately
10  I did not -- I did not check on them -- on Mr. Smith and
11  Daryl Bank until later on.
12  Q.  And --
13  A.  Especially after my returns were -- there's nothing
14  coming in.
15  Q.  On direct examination you said that you didn't talk to
16  Mr. Smith, I guess, one way or the other on him getting a
17  commission, right?
18  A.  The commission -- I wasn't -- I don't know about his
19  commission.  I'm sure, you know, like anything, he -- he had
20  a deal struck with Bank, you know.
21  Q.  So you assumed he was getting some sort of --
22  A.  Right, right --
23  Q.  -- commission off this?
24  A.  -- right.
25  Q.  Okay.  And you mentioned on direct that Mr. Smith

---

K. Sykes - Cross (By Mr. Grindrod)

1  mentioned to you that he and his family, I guess, had some
2  amount of money in spectrum investments or had something at
3  stake there?
4  A.  Right, right.  I recall that.  And there's -- in fact, I
5  came in there to visit, and he just got off the phone with
6  somebody else who was making an investment in the same thing
7  I was doing.  So...
8  Q.  Just to be clear, though, Mr. Smith didn't tell you
9  specifically that he had purchased $300,000 in equity in some
10 specific company, right?
11 A.  I don't recall that.
12 Q.  He was just saying he had stake -- he had some stake in
13 spectrum investments?
14 A.  Right.
15 Q.  Okay.  Let's look at Government Exhibit 826, which was
16 one that Ms. Yusi talked with you about.
17 A.  Okay.
18 Q.  So just to reorient you with that, this is the one, the
19 e-mail that has that scenario A chart attached to it?
20 A.  Right, right, right.
21 Q.  That scenario chart is on Page 3.  I want you to flip to
22 Page 2, if you could.
23 A.  Okay.
24 Q.  And Page 2 was part of this e-mail that Mr. Smith sent
25 you, right?

K. Sykes - Cross (By Mr. Grindrod)

1    A.   Okay.

2    Q.   Is that right?

3    A.   If it has my name -- yes, it has my name on there.  I'm

4    sure I received it.

5    Q.   And right in the middle of Page 2, it says "Important

6    note.  The values on the income plan in orange are

7    hypothetical returns," right?

8    A.   Right.  I see that.

9    Q.   And then in the section below that, it says "This is a

10   hypothetical example only, and it's not intended to predict

11   the actual performance of any specific product," right?

12   A.   Correct.

13   Q.   And it tells you, again, "All investments have risks

14   associated with them, and future loss is possible," right?

15   A.   Right.

16   Q.   And then it says, again, in the second-to-the-last line

17   of that paragraph, "All income projections are hypothetical

18   and should not be considered indicative of actual income,"

19   right?

20   A.   Right.

21   Q.   And then if you flip to Page 3, the assumption here about

22   the amount that was going to be invested is $100,000, right?

23   A.   Right.

24   Q.   So that's just not what you ever ended up investing in

25   Xcel or otherwise, right?

K. Sykes - Cross (By Mr. Grindrod)

1   A.  No, it's not.

2   Q.  So these numbers don't reflect anything about what you

3   actually did as far as an investment with Mr. Smith, right?

4   A.  Right, right.

5   Q.  Okay.  So, sir, I'm handing you what's now been marked as

6   Smith Exhibit 520.

7   A.  I'm quite familiar with that.

8   Q.  So you've seen this before?

9   A.  Yep.  That's what -- I would get this occasionally

10  from -- in my e-mail from Bank.

11  Q.  From Daryl Bank?

12  A.  Daryl Bank, I believe it came from.

13  Q.  Okay.  And does this appear -- I guess flip to Page 2,

14  which is on the back there.

15  A.  Oh.

16  Q.  That's your signature there?

17  A.  Right.

18  Q.  And the date on it is June 24, 2016?

19  A.  Okay.

20          MR. GRINDROD:  I'd offer Smith Exhibit 520.

21  BY MR. GRINDROD:

22  Q.  And basically, you know, what this is is an overview of

23  Xcel Bandwidth Two, right?

24  A.  Uh-huh.

25  Q.  It talks about -- it gives basic information about the

—————— K. Sykes - Cross (By Mr. Grindrod) ——————

1   company, right?

2   A.  Right.

3   Q.  And it's more unlike a kind of layman explanation, not

4   like those big, long legal, technical documents we were

5   looking at earlier, right?

6   A.  Right, right.

7   Q.  And it says that it's an operational push-to-talk

8   network, right?

9   A.  Right.  Uh-huh.

10  Q.  Describes the concept?

11  A.  Uh-huh.

12  Q.  Sorry, for the court reporter, can you just say yes or

13  no?

14  A.  Yes.  Sorry.

15  Q.  And the concept is basically to create a seamless

16  push-to-talk radio for transportation, construction, oil and

17  gas, those kind of businesses, correct?

18  A.  Correct, correct.

19  Q.  And I think you had said on direct you had specifically

20  talked about the shale in Texas, right?

21  A.  Right, right, right.

22  Q.  It talks about the relationship between Xcel One and Xcel

23  Two and RapidLink Wireless, right?

24  A.  Correct.

25  Q.  And Page 2 describes some of the assets and projects that

K. Sykes - Cross (By Mr. Grindrod)

1  Xcel Two was working on?

2  A.  Right.

3  Q.  And you read this and understood it, right?

4  A.  I did.

5  Q.  Can we flip to Government's Exhibit 828, which you spoke

6  about with Ms. Yusi.

7          So this is an e-mail that has some attachments to

8  it, and one of them is a slide deck, right, those PowerPoint

9  slides there?

10 A.  All right.

11 Q.  So this e-mail came from that John Kennedy guy, right?

12 A.  Yes, that came from John -- John Kennedy with -- cc'd to

13 Smith.

14 Q.  And to you, right?

15 A.  And to me.

16 Q.  Could you flip to Page 8.  So that's a PowerPoint

17 presentation --

18 A.  Right.

19 Q.  -- about RapidLink Wireless?

20 A.  Uh-huh.

21 Q.  Is that a yes?

22 A.  Yes.

23 Q.  And it says that that slide deck was prepared by a guy

24 named Dale Gray, right?

25 A.  Yes.

K. Sykes - Cross (By Mr. Grindrod)

1   Q.  So you knew that Mr. Smith had not prepared that slide

2   deck?

3   A.  Correct.

4   Q.  And those -- if you flip all the way to the very end,

5   last three pages that you talked about with Ms. Yusi, those

6   charts.

7   A.  Okay.

8   Q.  So these charts that were prepared by somebody else, if

9   you look at the bottom, it says that these are intended only

10  as an estimate of potential earnings, right?

11  A.  Okay.

12  Q.  Is that correct?

13  A.  This is correct.

14  Q.  And you understood that at the time?

15  A.  Yes, I did.

16  Q.  And, also, this slide deck is about RapidLink Wireless,

17  right?

18  A.  Right.

19  Q.  Which was a company that worked in the same space and

20  with Xcel Two but wasn't the company you actually invested

21  in, right?

22  A.  Right.

23  Q.  Okay.  So -- you can set that aside.  We're done with

24  that for now.

25  A.  Thank you.

Carol L. Naughton, Official Court Reporter

K. Sykes - Cross (By Mr. Grindrod)

1   Q.  Xcel Bandwidth and Xcel Bandwidth Two, these were not

2   Mr. Smith's companies, right?

3   A.  Correct.  He was working with Bank.

4   Q.  Back then, when you were looking into investing in these,

5   did you know back then that these companies were not

6   Mr. Smith's companies?

7   A.  I'm aware of that.

8   Q.  Okay.

9   A.  But I knew it was Bank's.

10  Q.  Okay.  So you knew back then that they were run by this

11  guy named Daryl Bank?

12  A.  Correct.

13  Q.  And you believed that -- specifically that Mr. Bank was

14  the guy who was putting the Xcel investment together?

15  A.  Correct.

16  Q.  And before making the investment, you received written

17  materials.  We talked about some of those.  But you were

18  also, before investing, were on a call, conference call with

19  Daryl Bank, right?

20  A.  And with Smith.

21  Q.  Right.  With you, Mr. Smith, and Mr. Bank?

22  A.  Right.

23  Q.  And so you got to hear about Xcel Bandwidth sort of

24  straight from the horse's mouth?

25  A.  Correct.

K. Sykes - Cross (By Mr. Grindrod)

1  Q.  So at least some of the materials -- you had some
2  materials about Xcel before that conference call with
3  Mr. Bank; is that right?
4  A.  Yes.
5  Q.  Okay.  So on that conference call, you would have had the
6  opportunity to, you know, ask Mr. Bank, hey, I don't
7  understand what this is, or I have a question about that,
8  right?
9  A.  Correct.
10  Q.  Do you remember whether you had asked Mr. Bank any
11  questions?
12  A.  I probably asked a few questions, but off the top of my
13  head, I can't remember.  That's, you know --
14  Q.  It's been forever.  I get it.
15  A.  Not getting any easier.
16  Q.  But as far as you can recall, if you had questions,
17  Mr. Bank answered them?
18  A.  Right.  But primarily I went to Bill for -- for
19  questions.
20  Q.  I understand.
21          So after you invested in Xcel --
22  A.  Uh-huh.
23  Q.  -- Daryl Bank was the contact person as far as
24  substantive updates, right?
25  A.  Right.

Carol L. Naughton, Official Court Reporter

1984

K. Sykes - Cross (By Mr. Grindrod)

1    Q.  And there were -- specifically there were regular
2    conference calls with Daryl Bank?
3    A.  Yeah.  I believe I was on four or five of those, and then
4    he disappeared.
5    Q.  And those calls came from Xcel out of Bank's office
6    in St. Port Lucie -- St. --
7    A.  I believe they did, yes.
8    Q.  Sorry.  I was trying to say Port St. Lucie, Florida.
9    A.  Right.
10   Q.  And like you just said, I mean, those calls went kind of
11   all the way up until he got arrested, basically, right?
12   A.  Correct.
13   Q.  And when those calls stopped is when, you know -- you
14   said he dropped off the map.  That's because, as you later
15   found out, he got picked up by the Feds, right?
16   A.  Right.
17   Q.  And there's obviously no question, right, that you did
18   not get money back that went to Daryl Bank and Xcel?
19   A.  I did not.
20   Q.  Okay.  So in 2019, you reached out to --
21   A.  Though I did ask for it back --
22   Q.  Sure.
23   A.  -- but he gave me a song and dance.
24   Q.  Sure.  So in 2019, you reached out to Ms. Yusi, this
25   federal prosecutor, right?

```
                         K. Sykes - Cross (By Mr. Grindrod)
```

1  A.  I -- first I contacted the writer of Daryl Bank's arrest

2  in the *Virginian Pilot* --

3  Q.  Sure.

4  A.  -- and then, I believe, she forwarded the -- forwarded me

5  Elizabeth's information, contact information.

6  Q.  And after you got Ms. Yusi's contact information, you

7  contacted her, right?  Is that right?

8  A.  Yes.

9  Q.  I'm going to show you what's been premarked as Smith

10 Exhibit 513.  And because it's an e-mail chain, sir, the

11 oldest e-mail is all the way at the bottom.  So if you turn

12 to Page 2, that, I think, is the oldest e-mail.  And are

13 these e-mails between you and the federal prosecutors, and

14 you and the federal investigators?

15 A.  Yes.

16 Q.  So all the way on Page 2, all the way at the bottom,

17 that's that first e-mail from you to Ms. Yusi.

18 A.  Correct.

19 Q.  And you told Ms. Yusi, "I may be a victim of Daryl Bank,"

20 right?

21 A.  Correct.

22 Q.  And then in the same e-mail, you say -- oh, the second to

23 the last line into the last line, you say -- you're asking if

24 your name is on file with respect to "Bank's fraud

25 investments," right?  Do you remember saying that?

——————K. Sykes - Cross (By Mr. Grindrod)——————

1   A.   When I contacted Andrew Bowers --

2   Q.   So we're --

3   A.   -- he -- he did not have my name on file with Bank.

4   Q.   Right.

5   A.   And then that's when I started forwarding the information

6   that I was invested with Mr. Bank and --

7   Q.   Right.  And --

8   A.   -- Bill Smith.

9   Q.   We're going to walk through that, but I'm just asking --

10  A.   Okay.

11  Q.   -- this -- this first e-mail you said -- you say, "I may

12  be a victim of Daryl Bank," and you're asking whether your

13  name is on file with respect to Bank's fraud investments,

14  right?

15  A.   Right.

16  Q.   Okay.

17  A.   Because I heard nothing.

18  Q.   Right.

19  A.   I was expecting a call from the FBI because he told me

20  not to talk to them.

21  Q.   And then the very first sentence there, you refer to this

22  as "my investment with Daryl Bank," right?

23  A.   Correct.

24  Q.   And then in the second paragraph, you refer to Xcel as an

25  investment you made, quote, "through smooth-talking Bank"?

K. Sykes - Cross (By Mr. Grindrod)

1   A.   Right.

2   Q.   So you're talking about Daryl Bank there, right?

3   A.   I am.

4   Q.   And so from early on, all the way up to -- what is

5   this? -- June 24, 2019, you're talking about this investment

6   in terms of Daryl Bank, right?

7   A.   Correct.

8   Q.   And then three days after this e-mail chain, on June 27,

9   2019, you spoke with IRS Agent Bowers?

10  A.   Correct.

11  Q.   So let's talk about that.  So after -- about a week after

12  you get -- you finish that interview with the IRS agent, you

13  start Googling Mr. Smith online, right?  Is that right?

14  A.   Yes.

15  Q.   And you found an article online about him, right?

16  A.   Correct.

17  Q.   A *Virginian Pilot* article?

18  A.   Correct.

19  Q.   And it talked about Mr. Smith being charged in this case,

20  right?

21  A.   Correct.

22  Q.   And in the headline of the article, it said "This is what

23  the, quote, Feds say," right?

24  A.   I don't -- I can't recall that.

25  Q.   I'm handing you what's been premarked as Smith

K. Sykes - Cross (By Mr. Grindrod)

1    Exhibit 514.  Do you recognize that document?

2    A.   That's the *Pilot* news article.

3    Q.   And that's the *Pilot* news article that you found, right?

4    A.   Right.

5    Q.   And the headline says --

6    A.   Yep.

7    Q.   -- "This is what the, quote, Feds say," right?

8    A.   Uh-huh.

9    Q.   Is that right?  Is that right, sir, for the record?

10   A.   Yes.

11   Q.   And you forward that article to the IRS agent, right?

12   A.   I did.

13   Q.   And you said -- you called Mr. Smith a scumbag, right?

14   A.   I did.  And I still hold that.

15   Q.   Right.

16          And the truth is, Mr. Sykes, that it was after you

17   read this article about what the Feds say and after you spoke

18   on the phone with the IRS agent -- that's when this case for

19   you became about wrongdoing by Mr. Smith, right?

20   A.   Right.

21   Q.   Because before that, before you read those articles and

22   when you talked to investigators, you were talking about the

23   loss of your money through Xcel being about Daryl Bank,

24   right?  Yes or no?

25   A.   Aghee Smith was representing Bank.  So I grouped them

K. Sykes - Redirect

1   together as ripping me off.

2   Q.  Sure.  But in all those e-mails we saw, before you spoke

3   with the IRS agent, right, you were talking about the loss

4   and about being a victim of Daryl Bank, right?

5   A.  Right.  Because Daryl Bank was the head of the whole

6   deal.  And he represented Bank.

7   Q.  I understand.

8          MR. GRINDROD:  No further questions.

9                  REDIRECT EXAMINATION

10  BY MS. YUSI:

11  Q.  I have a few follow-up, Mr. Sykes, and I'll be done.

12         Mr. Grindrod was asking you quite a bit about

13  Mr. Bank.  Did Mr. Smith say what his relationship was or how

14  long he had known and been selling things for Mr. Bank prior

15  to your investment?

16  A.  He just -- he talked about him, that, you know, he was

17  the -- of course, in thinking back, that he was in with the

18  people in D.C. doing investments and that type of thing.  And

19  he did -- he's saying the same thing, you know -- you know,

20  doing investments for the President and other people.

21  Q.  That Mr. Bank was?  Or that he was --

22  A.  Yeah.

23  Q.  Okay.  Did he say how long he had been selling Mr. Bank's

24  products?

25  A.  No.  I don't recall that.

Carol L. Naughton, Official Court Reporter

```
────────────────── L. Lyon - Direct ──────────────────
```

 1    Q.  Did he talk about having had to testify in regulatory or

 2    courts concerning these products and issues that have been

 3    going on?

 4    A.  Nothing was ever brought up.  I found all that on my own,

 5    doing my own research.

 6    Q.  And you spoke with Mr. Bank that one time, but who

 7    provided you all the documentation to sign?

 8    A.  Mr. Smith did.

 9    Q.  And who did you contact when you wanted to know how your

10    investment was doing?

11    A.  I contacted Mr. Smith.

12            MS. YUSI:  Thank you, Mr. Sykes.

13            (Video deposition concluded.)

14            THE COURT:  Okay.  You may call your next witness.

15            MS. YUSI:  Your Honor, the government calls Lawrence

16    Lyon.

17            (Witness sworn.)

18            LAWRENCE LYON, called by the Government, having been

19    first duly sworn, was examined and testified as follows:

20                        DIRECT EXAMINATION

21    BY MS. YUSI:

22    Q.  Good afternoon.  Could you introduce yourself to the

23    Court.

24    A.  My name is Lawrence Lyon.

25    Q.  How do you spell your last name?

L. Lyon - Direct

```
 1   A.   L-y-o-n.

 2   Q.   And how old are you today?

 3   A.   I'm 58.

 4   Q.   Where do you live, just the city and state?

 5   A.   In St. Charles, Illinois.

 6   Q.   How long have you been in St. Charles, Illinois?

 7   A.   Since 2018.

 8   Q.   Where did you live prior to that?

 9   A.   I lived in Iona, Idaho.

10   Q.   Iona, Idaho?

11   A.   Correct.

12   Q.   Did you grow up in Idaho?

13   A.   I did.  I grew up in Blackfoot, Idaho.

14   Q.   Do you still work?

15   A.   Yes, I do.

16   Q.   What do you do?

17   A.   I'm a safety coordinator.

18   Q.   And what kind of places do you work at coordinating

19   safety?

20   A.   I work in construction sites.  Right now I'm working with

21   crews that are installing gas mains and service

22   residentially.

23   Q.   How long have you been in that line of work?

24   A.   I've been doing safety since 1996.

25   Q.   While you've been working, have you been saving money for
```

L. Lyon - Direct

1   retirement?

2   A.   Yes.

3   Q.   Do you have any background or training in investments?

4   A.   No.  No.

5   Q.   I want to talk to you about a man named Bill Smith.  Do

6   you know Bill Smith?

7   A.   I've never met Bill Smith in person, but I do know who he

8   is.

9   Q.   When did you first meet Mr. Smith?

10  A.   I met him in late 2016.

11  Q.   How did you come to know him?

12  A.   He called me.  He -- my recollection is that he told me

13  that he had been given my name and number by a friend of

14  mine, and he was contacting me.

15  Q.   And who was this friend?

16  A.   Her name was Deb Jenkins.

17  Q.   How do you know her?

18  A.   I met her through another friend of mine, and we had

19  become friends.

20  Q.   And do you have any reason why -- do you have any

21  understanding why she gave Mr. Smith your number?

22  A.   I believe it was because --

23          THE COURT:  Don't --

24  BY MS. YUSI:

25  Q.   If you don't know, that's fine.

—————————————— L. Lyon - Direct ——————————————

1    A.   Okay.

2    Q.   Now, at that time were you looking for investment advice?

3    A.   I was not actively looking for investment advice, no.

4    Q.   And what did Deb Jenkins do for a living, if you know?

5    A.   I don't know exactly what she did for a living.

6    Q.   Okay.  And how did Mr. Smith introduce himself to you?

7    A.   He introduced himself as a financial planner, somebody

8    that, you know, was a professional in helping, you know,

9    people -- matching people to investments.

10   Q.   And did he seem trustworthy?

11   A.   He did seem trustworthy.

12   Q.   Why do you say that?

13   A.   Well, one reason was because, you know, he was introduced

14   to me through a friend who I felt was trustworthy.  And we

15   also belonged to the same denomination, religious

16   denomination.

17   Q.   Did you all talk about that?

18   A.   We did.

19   Q.   You said you never met him in person?

20   A.   That is correct.

21   Q.   How many times do you think you talked on the phone with

22   Mr. Smith?

23   A.   Approximately a half a dozen times.

24   Q.   And would you e-mail as well?

25   A.   I don't -- I don't recall an e-mail.

L. Lyon - Direct

1   Q.   Okay.  What type of investments did Mr. Smith suggest for

2   you?

3   A.   He suggested an investment into some communications

4   infrastructure in the state of Texas.

5   Q.   And what was your understanding -- or what did you tell

6   Mr. Smith in terms of what you were looking for in terms of

7   advice?

8   A.   Well, I wasn't -- you know, I wasn't really looking for

9   any advice from him.  But I always try to maintain an open

10  mind, you know, when it comes to, you know, opportunity,

11  investment opportunities, and so I was willing to listen.

12  Q.   So Mr. Smith introduced you to something going on in

13  Texas.  Was this the Xcel investment?

14  A.   Yes, I believe so.

15  Q.   And what was your understanding of what this investment

16  was about?

17  A.   My recollection of his description of it was that it was

18  a communications infrastructure that was being built out

19  specifically on a push-to-talk technology, that it was driven

20  by -- the necessity for this infrastructure was driven by

21  federal regulations and, you know -- and that it was an

22  extremely secure investment because of that.

23  Q.   And you said it was mandated by federal regulations.

24  What do you mean by that?

25  A.   What I mean is that he told me that federal regulations

L. Lyon - Direct

1    are requiring this type of communications, specifically

2    push-to-talk, as opposed to just a regular cell phone, and so

3    it was for a safety factor.

4    Q.  And that was your understanding based on what Mr. Smith

5    explained to you?

6    A.  That was any understanding.

7    Q.  And would you own part of this business if you made an

8    investment?

9    A.  That was my understanding, that I was actually buying,

10   you know, buying in to part of, you know, the business or the

11   opportunity, that I would have an ownership stake.

12   Q.  And was this a limited opportunity, or could you sit on

13   this for a while?

14   A.  He portrayed it as a limited opportunity, that there was

15   some urgency, that there was only a limited amount available,

16   and that I needed to act quickly.

17   Q.  And what did he say about risk in terms of your

18   investment?

19   A.  Well, my understanding was that it was an extremely

20   secure investment, again, because it was based on this

21   infrastructure build-out that was necessitated by federal

22   regulations and so -- I mean, how could you lose?  That

23   was --

24   Q.  That was your understanding?

25   A.  That was my understanding.

L. Lyon - Direct

1   Q.   And what, if anything, did Mr. Smith say about any due

2   diligence that he had done himself?

3   A.   He had indicated to me that he had spent $5,000 in

4   attorney fees, you know, investigating this and -- this

5   investment for himself and was satisfied that it was

6   rock-solid.

7   Q.   Now, in terms of returns, how much did Mr. Smith say you

8   would be getting on such an investment?

9   A.   The returns would be based on the amount invested, but in

10  the scenario that we discussed, that -- he said I was looking

11  at approximately a $36,000-a-year return in retirement

12  income.

13  Q.   In retirement income?

14  A.   Yes.

15  Q.   And when would you start seeing those returns?

16  A.   He indicated that I would start seeing them immediately,

17  but they would build over time.

18  Q.   And did you talk to anyone else, or did Mr. Smith have

19  you talk to anyone else involved in the investment?

20  A.   He did.

21  Q.   Who was this?

22  A.   He set up a conference call with himself and a man named

23  Daryl Bank and someone else, whose name I don't recall, but

24  we got on a conference call, and they basically gave me the

25  same pitch that Bill did.

Carol L. Naughton, Official Court Reporter

L. Lyon - Direct

1    Q.   How many times did you talk to Mr. Bank?

2    A.   Just the one time.

3    Q.   What, if anything, were you told about an SEC

4    investigation into the spectrum investments involving Daryl

5    Bank?

6    A.   Nothing.

7    Q.   And what, if anything, did Mr. Smith tell you about other

8    failed investments he sold involving Daryl Bank?

9    A.   Nothing.

10   Q.   And did Mr. Smith tell you anything about him having to

11   testify in court about a failed investment involving Daryl

12   Bank?

13   A.   He did not.

14   Q.   And did you end up investing in Xcel?

15   A.   I did.

16   Q.   And if we can show you Exhibit 891.  And do you recognize

17   this?

18   A.   I do.

19   Q.   And what is this?

20   A.   This is a copy of the check that I wrote.

21          MS. YUSI:  Your Honor, we move to admit Exhibit 891.

22          THE COURT:  Exhibit 891 will be admitted.

23          (Government's Exhibit 891 was admitted.)

24   BY MS. YUSI:

25   Q.   What was the date that you made this investment or the

L. Lyon - Direct

1   check?

2   A.   The check is dated February 22, 2017.

3   Q.   And did you start seeing a return right away?

4   A.   I did.   Within a month or two, there was a deposit into

5   my checking account for a little over $400.

6   Q.   And did that continue?

7   A.   It did not.

8   Q.   Did you talk to Mr. Smith about that?

9   A.   I did.

10  Q.   And what did he say?

11  A.   He said that they had changed from what I understood to

12  be a monthly deposit to a quarterly deposit, and he explained

13  that this was going to be more efficient and, you know, work

14  out better.   And so that was his --

15  Q.   Did you get any quarterly deposits after that?

16  A.   I did not.

17  Q.   Did you talk to Mr. Smith again?

18  A.   I did.   I did.

19  Q.   And tell us about what he said.

20  A.   My recollection is that about the time that I would have

21  anticipated that quarterly deposit, I was thinking about

22  calling him.   He called me to tell me that, in so many words,

23  that the Feds had raided Daryl Bank, that he was in prison.

24  Q.   And what did he say about your investment in Xcel?

25  A.   He said that that was -- that it was still secure.

L. Lyon - Direct

1   Q.  And did you ever ask for your money back?

2   A.  You know, I did not directly ask for my money back.  What

3   I wanted, I just wanted my investment to play out the way

4   that he had indicated that it would.

5   Q.  And what did he say?

6   A.  He said that it was -- that it was secure, that

7   everything was fine, that they were, you know, working on --

8   he was never specific, but just in general that they were,

9   you know, working on, you know, I guess making things right

10  or, you know, keeping things going or something like that.

11  Q.  And did you ever get your -- did you ever get any money

12  besides that first deposit?

13  A.  No, I did not.

14  Q.  Did Mr. Smith ever offer any other investments after this

15  failed?

16          MS. McCASLIN:  Objection.  Relevance and outside the

17  scope.

18          THE COURT:  Sustained.

19  BY MS. YUSI:

20  Q.  What, if anything, did you talk about with Mr. Smith

21  about a class action?

22  A.  Some -- I communicated with him several times after the

23  call where he told me that Daryl Bank had been arrested.  I

24  was seeking information and reassurance that things would be

25  back on track, and at one point in one of those calls, he

———————L. Lyon - Cross (By Ms. McCaslin)———————

1   indicated that there was or may be, I don't remember exactly,

2   some kind of class action, and he advised me that I should

3   stay away from that and not participate.

4           MS. YUSI:  I believe those are all my questions

5   right now.  I'm sure counsel will have some for you.

6           THE COURT:  Cross-examination?

7           MR. YAROW:  No questions from Mr. Alcorn.

8           THE COURT:  Okay.  Ms. McCaslin?

9           MS. McCASLIN:  Yes, Your Honor.

10                       CROSS-EXAMINATION

11  BY MS. McCASLIN:

12  Q.  Hi, Mr. Lyon.  My name is Lindsay McCaslin.  I represent

13  Bill Smith.

14          So you are aware that Bill Smith did not run the

15  Xcel company, correct?

16  A.  I --

17  Q.  That Daryl Bank did?

18  A.  You know, I'm not -- I am not sure of that, you know,

19  that relationship.

20  Q.  Okay.  So before you invested, you did have a conference

21  call with Daryl Bank, correct?

22  A.  Correct.

23  Q.  And he told you about the system that was being set up in

24  Texas?

25  A.  Correct.

L. Lyon - Cross (By Ms. McCaslin)

1   Q.  And you understood that there was an actual radio system
2   with existing towers, right?
3   A.  That was my understanding.
4   Q.  And they were trying to expand the system?
5   A.  That was my understanding, yes.
6   Q.  It was also your understanding that they were working
7   with Motorola?
8   A.  That's correct.
9   Q.  And you knew that the profits coming from this were going
10  to be coming from businesses, such as construction sites,
11  oil, gas, et cetera?
12  A.  Yeah.  Those -- those specifics, I'm not sure.  I just
13  knew that he told me that I was going to end up with $36,000
14  in retirement income, and that's my most vivid recollection.
15          MS. McCASLIN:  If we could bring up, just for the
16  witness, Smith 368.
17  BY MS. McCASLIN:
18  Q.  Have you seen this document, sir?  And I can blow it up
19  or scroll down if you need it.
20  A.  I may have -- well, if you scroll down, I see, you
21  know -- I see my signature there on the bottom.  So I don't
22  remember seeing it, at first, but with my signature on it, I
23  have to say that I've seen it.
24  Q.  Okay.
25          MS. McCASLIN:  I move to admit Smith 368.

———————L. Lyon - Cross (By Ms. McCaslin)———————

1          MS. YUSI:  No objection.

2          THE COURT:  It will be admitted.

3          (Defendant Smith's Exhibit 368 was admitted.)

4    BY MS. McCASLIN:

5    Q.  Now, in this handout, you said that your -- scrolling

6    down to Page 2, your signature is on it, correct?

7    A.  That is correct.

8    Q.  Okay.  And this document talks about working with

9    Motorola, right?

10          MS. YUSI:  Your Honor, I'm going to object.  He says

11   he doesn't remember it.  He says he must have seen it, but I

12   don't think he can testify about the contents.

13          MS. McCASLIN:  Your Honor, he did say that he was

14   aware of the -- of Motorola being involved.

15          THE COURT:  He did make a reference to Motorola, but

16   the Court is not confident that this document -- what are you

17   trying to do with the document, first?  He signed it, but he

18   said maybe he saw it because he signed it.  What are you

19   trying to do with the document?

20          MS. McCASLIN:  Your Honor, we're just walking

21   through the information that was given to him in advance

22   about what he was purchasing, and under the stipulations,

23   this document does come in as business record and authentic.

24          THE COURT:  Well, it might come in, but there still

25   needs to be a proper foundation, proper refresh, all of that

———————— L. Lyon - Cross (By Ms. McCaslin)————————

1   still applies.  So I just ask what you're trying to do, and

2   I'm going to let you go on for a while, but we'll see where

3   we go.

4             MS. YUSI:  Your Honor, just to clarify, I

5   just don't -- I will object if there's any

6   mischaracterization.  This has Motorola's name in it, but it

7   doesn't say they partnered with them or anything like that.

8             THE COURT:  Let's be very specific about what you're

9   asking here.

10  BY MS. McCASLIN:

11  Q.  So, sir, when you were obtaining information about Xcel

12  Bandwidth to determine whether or not you wanted to invest in

13  it, you looked at some marketing materials, right?

14  A.  I did look at this, yes.

15  Q.  And in those marketing materials, it does mention that

16  this is going to be a private radio system for business,

17  right?

18  A.  Yes.  Looking at it now, yes.

19  Q.  And it's going to be operating the Motorola TRBO radio

20  system, right?

21  A.  That's what it says, yes.

22  Q.  Now, you work -- and correct me if I'm wrong; you work in

23  industries such as coal plants and natural gas, railways; is

24  that correct?

25  A.  Yes.  Coal-fired -- I've worked in coal-fired power

L. Lyon - Cross (By Ms. McCaslin)

1   plants, rail yards, natural gas plants, things like that,
2   natural gas compressor stations.
3   Q.  And in your work, you've seen employees use push-to-talk
4   or walkie-talkies on site?
5   A.  Yes.
6   Q.  And obviously when you had talked to Daryl Bank right
7   before you invested, it sounded like a good plan, right?
8   A.  He made it sound very good.
9   Q.  And Bill was the one who called you and told you when
10  Daryl had been arrested, right?
11  A.  I don't -- my recollection is that he called me.
12  Q.  Okay.
13          THE COURT:  Could you clarify?  She asked you a
14  question.  You said your recollection was that "he called
15  me."  What "he" are you referring to?
16          THE WITNESS:  That he -- that he called -- that he
17  called me to tell me that Daryl Bank had been arrested.
18          THE COURT:  Okay.
19  BY MS. McCASLIN:
20  Q.  Now, after you found that out, did you also find out that
21  Xcel had gone into default?
22  A.  I don't remember that.
23  Q.  Okay.  Did you ever learn about a new owner of the
24  system?
25  A.  I don't remember that.  I just remember -- I remember

───────────── L. Lyon - Cross (By Ms. McCaslin) ─────────────

1   Bill's, you know, trying to reassure me that everything was
2   going to be, you know, okay.
3          MS. McCASLIN:  If I could bring up -- no, withdraw
4   that.
5   BY MS. McCASLIN:
6   Q.  Does the name BearCom sound familiar or John Hunter?
7   A.  That sounds vaguely familiar.
8   Q.  And so it is your understanding that after Daryl Bank was
9   arrested, that system continued to exist in Texas?
10  A.  Can you state the question again, please?
11  Q.  Yes.
12          So after Daryl Bank was arrested, when you were
13  making phone calls to Mr. Smith or anybody else to figure out
14  what was going on, you confirmed that that radio system in
15  Texas does, in fact, exist, correct?
16  A.  That's what Bill led me to believe, that it was -- yeah,
17  everything was going to be fine.
18  Q.  And you did speak to people -- other people after Daryl
19  was arrested?
20  A.  I did.
21  Q.  Okay.  Now, obviously you didn't probably learn until a
22  bit later that Daryl Bank was using your investor funds to
23  pay his personal credit cards, right?
24  A.  I didn't know where my money, you know, was exactly.  I
25  thought my money was in -- invested and being used

————————— L. Lyon - Cross (By Ms. McCaslin) —————————

 1    responsibly.
 2    Q.  Right.  Or else you wouldn't have obviously invested,
 3    right?
 4    A.  Right.
 5    Q.  And you didn't have access to Daryl Bank's bank accounts
 6    or books, right, for accounting?
 7    A.  No.
 8    Q.  And you would agree that even the best of ideas for
 9    business probably aren't going to succeed if the owner is
10    taking off 50, 60 percent off the top?
11    A.  That sounds reasonable.
12            MS. McCASLIN:  Thank you.  No further questions,
13    Mr. Lyon.
14            THE COURT:  Any redirect?
15            MS. YUSI:  No, Your Honor.
16            THE COURT:  May this witness be permanently excused?
17            MS. YUSI:  Yes, Your Honor.
18            MS. McCASLIN:  Yes, Your Honor.
19            (The witness was excused.)
20            THE COURT:  Ladies and gentlemen, we're going to
21    conclude right here for the day.  Be back here tomorrow
22    morning at 9:30.  Just let the case go tonight.  We'll start
23    again tomorrow morning.  Be safe.  Turn in your notes.
24            (The jury exited the courtroom.)
25            THE COURT:  You may step down.

```
 1              You may be seated.

 2              Okay.  Is there a matter that the United States

 3      wanted to take up?

 4              MR. BOSSE:  Yes, sir, Your Honor.

 5              And, Judge, this is more in lines of just sort of a

 6      preventative measure here.  I understand that they still have

 7      Mr. Maerki on the witness list, and he may be brought over as

 8      early as tomorrow, possibly, to testify -- Kent Maerki.

 9      Obviously he's in local custody.

10              And just because I've run into this before where it

11      sort of became clear during or before testimony that someone

12      like that needed counsel, I think Mr. Maerki had counsel, and

13      I don't know if he still does, and I just wanted to bring it

14      to the Court's attention in case the Court wanted to have

15      standby counsel or something available for him, or make sure

16      that Mr. Connell is here just because -- otherwise, you have

17      to pause the proceedings and move on from there.

18              THE COURT:  Who is calling Mr. Maerki?

19              MS. McCASLIN:  Your Honor, we are.  He is on our

20      witness list for Mr. Smith.

21              THE COURT:  Do you know whether he has counsel?

22              MS. McCASLIN:  Your Honor, we have spoken to

23      Christian Connell who did represent him.  He does not think

24      that he represents him currently.  And we did think that

25      Mr. Maerki was in a different posture than Daryl Bank, since
```

2008

1    Daryl Bank had pled not guilty and obviously has a pending

2    appeal, so his Fifth Amendment right is going to be -- to

3    remain silent is going to be quite different.

4          MR. BOSSE:  Just to be clear, Your Honor, we're

5    happy to have Mr. Maerki testify.  I'm just noting that this

6    has happened in a different case I had before where someone

7    like Mr. Maerki -- it became clear they needed counsel.

8    Mr. Maerki is, you know, going to be asked to testify about

9    things that, the defense's theory of the case is, that he

10   lied about for years, as is ours.

11         And the idea that he's going to come in here -- it

12   may be helpful just to have someone on standby so we don't

13   have to waste half a day trying to find him counsel in case

14   he needs it, and Mr. Connell has already represented him.  I

15   just wanted to bring it up so we didn't find ourselves at an

16   impasse and lose half a day of trial.

17         THE COURT:  What time, if any, are you -- wait a

18   minute.  Is the government resting?

19         MR. BOSSE:  We're going to rest, Your Honor, we

20   believe tomorrow morning, yes, sir, and then Mr. Alcorn's

21   case will begin.

22         THE COURT:  Okay.  At what point would Mr. Maerki be

23   coming in; the first witness, second witness, or what?  I'm

24   trying to find out how much time the Court has to react

25   because we still -- even if you're going to appoint him

Carol L. Naughton, Official Court Reporter

1    counsel, then the Court is wondering how you're going to

2    appoint him counsel.

3            He hasn't expressed any need for counsel.  That

4    becomes a problem to just pluck some counsel off the CJA list

5    when the individual hasn't indicated a need for counsel.

6            Mr. Maerki does not have an appeal pending, does he?

7            MS. McCASLIN:  Not that I'm aware of, Your Honor,

8    and I believe he waived his right to appeal when he pled

9    guilty.

10           MR. BOSSE:  That's right.

11           THE COURT:  His time to appeal has passed, for

12   direct appeal has passed.

13           MR. BOSSE:  It has, yes, sir.

14           THE COURT:  So that's the only question.  What time

15   would he approximately be coming in here, to see how much

16   time we have to work to try to find someone if he, in fact,

17   needs counsel?  For what, the Court doesn't know.

18           MS. McCASLIN:  Your Honor, I'm assuming we wouldn't

19   need somebody until Thursday.  It kind of depends on -- well,

20   I don't know how long Mr. Alcorn's case is, but he would be

21   one of our last witnesses.  So we would have several before

22   Mr. Maerki if we call him.

23           THE COURT:  Okay.  Thank you.

24           MR. BOSSE:  Thank you.

25           Now, Mr. Yarow.

```
1              MR. YAROW:  Yes, sir.

2              THE COURT:  How many witnesses, if any, since the

3    defendant has no burden --

4              You can have a seat, Mr. Bosse.

5              MR. BOSSE:  Thank you, sir.

6              THE COURT:  Does Mr. Alcorn plan to call any

7    witnesses?

8              MR. YAROW:  Your Honor, we have four people we're

9    planning to call.  It's not going to be a very long case.

10             THE COURT:  Okay.  It will be at least four

11   witnesses.  Okay.  That gives the Court time to think about

12   this and to see whether we can have someone that maybe could

13   come over.  But the problem is that lawyers, as you well

14   know, have clients, have businesses, and things that they're

15   involved in.

16             Right now, the Court doesn't know what time to tell

17   them, per se, to come over.  Maybe Thursday.  Counsel can't

18   sit around all day seeing whether they are going to be called

19   or not, so we have to do something to get a little closer to

20   figure out where we are.

21             The Court is not dismissing the fact that it's not a

22   bad idea to maybe have someone potentially we can call.  It's

23   just a question of who would be available on short notice to

24   show up under these circumstances.  So the Court will give it

25   some thought.  Meanwhile, if you can give the Court more
```

2011

```
 1    definitive information about what you're doing and when,
 2    fine.
 3              Now, if the government rests, let's say, tomorrow
 4    morning, are you prepared to go forward with any of your
 5    witnesses?  I'm assuming, Mr. Yarow, you're going first.  The
 6    Court can designate who goes first, whether it's Mr. Smith or
 7    whether it's Mr. Alcorn.
 8              MR. YAROW:  Yeah, I'm ready.
 9              THE COURT:  All right.  You're ready to call
10    witnesses tomorrow afternoon?
11              MR. YAROW:  I'm sorry, Your Honor?
12              THE COURT:  You're ready to call witnesses tomorrow
13    afternoon if necessary?
14              MR. YAROW:  Yes, sir.
15              THE COURT:  All right.
16              MR. YAROW:  Or before.
17              THE COURT:  Okay.  If there's nothing else, then we
18    will press on.
19              MR. BOSSE:  Thank you, Your Honor.
20              (Proceedings adjourned at 5:10 p.m.)
21
22
23
24
25
```

Carol L. Naughton, Official Court Reporter

1                          CERTIFICATION

2

3         I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6

7         _____/s/_____

8                       Carol L. Naughton

9                       August 30, 2022

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Carol L. Naughton, Official Court Reporter