IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

```
- - - - - - - - - - - - - - - - - - -
                                    )
   UNITED STATES OF AMERICA         )
                                    )
   v.                               )    CRIMINAL ACTION NO.
                                    )        2:19cr47
   DAVID ALCORN and                 )
   AGHEE WILLIAM SMITH II,          )
                                    )
           Defendants.              )
- - - - - - - - - - - - - - - - - - -
```

**\*\* Jury Trial - Day 11 \*\***

TRANSCRIPT OF PROCEEDINGS

Norfolk, Virginia

February 16, 2022

BEFORE:  THE HONORABLE RAYMOND A. JACKSON
         United States District Judge, and a jury

APPEARANCES:

         UNITED STATES ATTORNEY'S OFFICE
         By:  Andrew C. Bosse
              Melissa E. O'Boyle
              Elizabeth M. Yusi
              Assistant United States Attorneys
              Counsel for the United States

         RICHARD S. YAROW LLC
         By:  Richard S. Yarow
              Counsel for Defendant David Alcorn

         FEDERAL PUBLIC DEFENDER'S OFFICE
         By:  Andrew W. Grindrod
              Lindsay Jo McCaslin
              Assistant Federal Public Defenders
              Counsel for Defendant Aghee William Smith II

Carol L. Naughton, Official Court Reporter

2013

1                          I N D E X

2   GOVERNMENT'S
    WITNESS                                              PAGE
3
      SHARYON BEAN
4         Direct Examination By Ms. Yusi                 2020
          Cross-Examination By Mr. Grindrod              2045
5         Redirect Examination By Ms. Yusi              2058

6

7   DEFENDANT ALCORN'S
    WITNESSES                                            PAGE
8
      JON PALMIERI
9         Direct Examination By Mr. Yarow                2074
          Cross-Examination By Ms. McCaslin              2098
10        Cross-Examination By Mr. Bosse                 2103
      BOBBY JONES
11        Direct Examination By Mr. Yarow                2136
          Cross-Examination By Mr. Grindrod              2144
12        Cross-Examination By Ms. Yusi                  2145
          Redirect Examination By Mr. Yarow              2166
13        Cross-Examination By Mr. Grindrod              2167
      AARON BOBKIN
14        Direct Examination By Mr. Yarow                2169
          Cross-Examination By Ms. McCaslin              2173
15        Cross-Examination By M. O'Boyle                2175
      THOMAS LITTLER
16        Direct Examination By Mr. Yarow                2193
          Cross-Examination By Ms. Yusi                  2200
17

18

19  DEFENDANT SMITH'S
    WITNESS                                              PAGE
20
      PETER LEWIS
          Direct Examination By Mr. Grindrod             2218
21        Cross-Examination By Mr. Yarow                 2233

22

23

24

25

2014

```
 1                          I N D E X
                           (Continued)
 2

 3                       E X H I B I T S

 4   GOVERNMENT'S
     NO.                                              PAGE
 5
       815                                            2019
 6     817                                            2019
       818                                            2019
 7     819                                            2019
       820                                            2019
 8     821                                            2019
       823                                            2019
 9     824                                            2019
       1018W                                          2121
10     2202                                           2128
       300K                                           2130
11     300M                                           2131
       300L                                           2151
12     2111                                           2153
       2103                                           2161
13     2301                                           2185
       2108                                           2212
14     2109                                           2213

15

16   DEFENDANT ALCORN'S
     NO.                                              PAGE
17
       7                                              2076
18     23                                             2085

19

20   DEFENDANT SMITH'S
     NO.                                              PAGE
21
       504                                            2020
22     131                                            2221

23

24

25
```

Carol L. Naughton, Official Court Reporter

```
 1              (Proceedings resumed at 9:32 a.m.)
 2         THE COURT:  Good morning, ladies and gentlemen.
 3         MR. BOSSE:  Good morning, Your Honor.
 4         MS. YUSI:  Good morning, Your Honor.
 5         THE COURT:  The Court has discovered that we have a
 6  juror who sits all day and then works at night and lives
 7  almost in North Carolina and then struggles to get back in
 8  here all day.  Had the Court known that in the beginning, the
 9  Court doesn't usually require jurors to work at night and try
10  to sit in the trial all day and then run out of here and run
11  to work at a pretty good distance from here.
12              So I'm trying to discover what juror number it is,
13  but I'm simply suggesting to counsel that we just plain
14  excuse that juror because the last couple of days that juror
15  has struggled to get in here.
16         THE CLERK:  I believe it's Juror Number 23, Your
17  Honor.
18         THE COURT:  Is there any objection?  We have lost
19  one alternate.  We still have four.
20         MR. BOSSE:  No objection from the government, sir.
21         MR. YAROW:  No objection from Mr. Alcorn.
22         MS. McCASLIN:  If we can have just a moment, Your
23  Honor.
24         THE COURT:  Is that an alternate or a regular juror?
25         THE CLERK:  He's a regular juror.
```

```
1              MR. GRINDROD:  What was the number?

2              THE CLERK:  23.

3              (Pause in the proceedings.)

4              MS. McCASLIN:  No objection, Your Honor.

5              THE COURT:  You go back in there and you tell Juror

6    Number 23 the Court has excused Juror Number 23.  Well, wait

7    a minute.  You talk to Jerome, and Jerome will handle it.

8    Bring the rest of the jurors in.

9              MR. GRINDROD:  Your Honor, just so you know, we have

10   an objection to some exhibits that we expect the government

11   is going to move to pre-admit.  I don't know if you want to

12   do that before the jury comes in or not.

13             THE COURT:  All right.  Then we need to hold the

14   jury up.

15             How many exhibits are we talking about?  What are we

16   talking about, Mr. Grindrod?

17             MR. GRINDROD:  Your Honor, I think the government is

18   going to offer several, but we only have objections to two.

19             THE COURT:  What are we talking about here?

20             MS. YUSI:  Your Honor, just for background, these

21   are exhibits that we provided to the judge when we did --

22   this is within depositions, Your Honor.  You've already ruled

23   on these.

24             THE COURT:  Oh.

25             MR. GRINDROD:  Yeah, and I don't know -- I mean, if
```

```
 1    Your Honor has already ruled to the admissibility of
 2    documents that were discussed in the deposition, I agree.  I
 3    just wanted to make note of our objections to the actual
 4    admission of the exhibits.  I'm not asking the Court to
 5    revisit rulings it's made.  I just want to make sure we noted
 6    our objections.
 7              THE COURT:  Which witness was this?
 8              MS. YUSI:  Sharyon Bean.
 9              THE COURT:  Now the Court remembers.  Your objection
10    is noted for the record.
11              MR. GRINDROD:  Thank you, Your Honor.  Can I just
12    briefly state the basis for it?
13              THE COURT:  Yes.
14              MR. GRINDROD:  Your Honor, we did object in the
15    deposition transcript, at Page 37, to 821.  That document is
16    from 2019, which is -- the alleged conspiracy ended in 2017,
17    and Ms. Bean's transaction was in 2017, so we object to the
18    relevance since it's so late after the time.
19              824, similar objection, we made it at Page 41 of the
20    transcript.  This document is from 2020, so it would be from
21    essentially, you know -- this conspiracy ended in 2017.  This
22    was 2020.  We object on relevancy grounds.
23              THE COURT:  As long as Mr. Grindrod is making a
24    record, then you need to make a record on the reasons you
25    believe you can use a document from 2019.
```

1           MS. YUSI:  Yes, sir.  Your Honor, for both exhibits,

2    821 and 824, the government was asking Ms. Bean about what

3    her understanding of where her money was, the falsehoods that

4    Mr. Smith continued to tell her in a lulling position with

5    this, and so these are relevant.  The hearsay, these are

6    documents that were either stipulated to because they are

7    from trusts or they're from Mr. Smith that he adopted and

8    gave to Ms. Bean.

9           THE COURT:  These documents from 2019 and 2020, the

10   Court knows that the Court ruled, but do these documents show

11   where her money is?

12          MS. YUSI:  Where she believed it to be.  It shows

13   that -- I believe it shows -- let me look at them real quick,

14   Your Honor.

15          THE COURT:  If the money is in the same place it was

16   in 2017, then the Court would find certainly, as the Court's

17   already ruled, it's admissible.

18          MS. YUSI:  Yes, it is.  But it says that it's still

19   there.  These are Provident Trust statements, Your Honor, and

20   one of them has a bunch of handwriting from Mr. Smith on it.

21          THE COURT:  All right.  Okay.  The record is clear.

22          Let's bring in the jury.  If Jerome is not there,

23   just tell her to hold up and you let everybody else come in.

24          MR. GRINDROD:  Ms. Yusi, like yesterday, I can do

25   the cross on our side, if that's okay.

2019

```
 1              MS. YUSI:  Okay.
 2              THE COURT:  Does the United States anticipate it
 3     will finish today?
 4              MS. YUSI:  Yes, Your Honor.
 5              (The jury entered the courtroom.)
 6              THE COURT:  Good morning, ladies and gentlemen.
 7              Let the record reflect that all jurors, as the Court
 8     has discussed with counsel, are now present.
 9              Does counsel agree?
10              MS. YUSI:  Government agrees, Your Honor.
11              MR. YAROW:  Mr. Alcorn agrees, Your Honor.
12              MS. McCASLIN:  Mr. Smith agrees.
13              THE COURT:  You may resume calling witnesses.
14              MS. YUSI:  Your Honor, we're going to call Sharyon
15     Bean via deposition, and prior to that, we would like to
16     pre-admit exhibits that are shown to her.  We move to admit
17     Exhibits 815, 817, 818, 819, 820, 821, 823, 824.
18              THE COURT:  All right.  All objections having been
19     made, the Court will admit Exhibits 810, 817, 818, 819, 820,
20     821, 823, and 824.
21              MS. YUSI:  And, Your Honor, the first one was not
22     810, it's 815.
23              THE COURT:  815, not 810.
24              MS. YUSI:  Yes, sir.
25              (Government's Exhibits 815, 817, 818, 819, 820, 821,
```

——————————S. Bean - Direct——————————

1    823, and 824 were admitted.)

2          MR. GRINDROD:  And, Your Honor, we have one exhibit

3    as part of this deposition.  It's Smith 504.  We move that.

4          THE COURT:  All right.  Smith 504, hearing no

5    objection, is admitted.

6          (Defendant Smith's Exhibit 504 was admitted.)

7          (Video deposition played in open court as follows:)

8          SHARYON BEAN, called by the Government, having been

9    first duly sworn, was examined and testified as follows:

10                    DIRECT EXAMINATION

11   BY MS. YUSI:

12   Q.  Good afternoon.  Can you introduce yourself to the Court?

13   A.  Sharyon Lee Bean.

14   Q.  How do you spell your first name?

15   A.  S-h-a-r-y-o-n.

16   Q.  And your last name?

17   A.  B-e-a-n.

18   Q.  How old are you today?

19   A.  I'm 81.

20   Q.  And what city and state do you live in?

21   A.  Citrus Heights, California.

22   Q.  Is that outside of Sacramento?

23   A.  Just on the outskirts, yes.

24   Q.  How long have you lived in Citrus Heights?

25   A.  20 years.

─────────────── S. Bean - Direct ───────────────

1   Q.  Do you work right now?

2   A.  No.

3   Q.  What did you do for a living prior to now?

4   A.  I worked at the telephone company, and then I spent the

5   last eight and a half working years at a law firm downtown

6   here at 3rd and Capital Mall.

7   Q.  How long did you work at the telephone company for?

8   A.  25 years.

9   Q.  And when did you stop working?

10  A.  When I had a complete mental and emotional breakdown on

11  the job.

12  Q.  When was that, do you recall, approximately?

13  A.  I don't know.  Somewhere in the -- I don't know if it was

14  the '80s or the '70s.

15  Q.  Okay.

16  A.  I don't know.  It's just a long time ago.

17  Q.  Were you on disability after that?

18  A.  Yes.  Until they switched me over at 65 to regular Social

19  Security.

20  Q.  While you were working, did you save money for

21  retirement?

22  A.  No.  I didn't really have, well, any to save.

23  Q.  Now, I want to talk to you about the defendant Aghee

24  William Smith.  Do you know Aghee William Smith also known as

25  Bill Smith?

2022

S. Bean - Direct

1   A.   Yes.

2   Q.   How -- about when or -- and how did you get to know him?

3   A.   He came to a spiritual study group meditation and all

4   that, and I was there.

5   Q.   Do you remember around how long ago that was?

6   A.   Probably -- oh, I don't know.  I just don't remember.

7   Q.   That's okay.

8   A.   A long time ago.

9   Q.   Okay.  And what was your relationship with him when you

10  first got to know him?

11  A.   Just acquaintances --

12  Q.   And --

13  A.   -- from the spiritual study group.

14  Q.   And then did you develop a friendship with him?

15  A.   Well, you know, we'd just see each other at meetings.

16  Q.   What kind of meetings were these?

17  A.   Spiritual meetings, classes, meditations, that kind of

18  thing.

19  Q.   Were those -- where were those held?

20  A.   Usually at different people's homes.  The teacher had a

21  lot of the classes at her home at the time.

22  Q.   Okay.  Did you ever have any of these meetings at your

23  home?

24  A.   No.

25  Q.   Did you ever go to Mr. Smith's office?

2023

S. Bean - Direct

1   A.   Yes.

2   Q.   How about his home?

3   A.   Yes.

4   Q.   Did he ever go to your home?

5   A.   Yes.

6   Q.   What kind of home is that?

7   A.   My mobile home.

8   Q.   And is that the home you've lived in since you've lived

9   in Citrus Heights?

10  A.   20 years, yeah.

11  Q.   Now, in 2017 did you come into some money?

12  A.   I did.  I got a letter from AT&T saying that they had 12

13  years back pension for me, and I had no idea that I had that

14  coming.

15  Q.   And about how much was that?

16  A.   It was 100,000 plus 2- to 3,000, that I used to pay some

17  bills.  The rest I gave to Bill Smith --

18  Q.   Okay.

19  A.   -- to invest for me, supposedly.

20  Q.   What kind of money was this?  Was the check free and

21  clear, you could do whatever you want with?

22  A.   I believe so.  And I knew that I had to roll it over or

23  the taxes would be crazy.  My son sent me a letter off the

24  internet from an attorney in Hollywood that handles that kind

25  of issues with Hollywood people.

S. Bean - Direct

1  Q.  And what -- did you talk to Bill Smith about this money,
2  or what did he know about the money?
3  A.  Well, I think in the group, you know, we just always
4  shared, you know, what was going on in our lives and all,
5  because we were there to meditate our way through it and
6  learn how to detach from things of the world and all that.
7  So I'm sure that I said something about it.
8  Q.  And how did you end up having Mr. Smith -- how did Bill
9  Smith end up with your money?
10  A.  Well, I don't remember exactly all that went on, but I
11  know that I was made aware that for 42 years that had been
12  his business, investing money for people.
13          And I said, "Well, you know, this is all I have for
14  retirement, and so you've got to take really good care of
15  that and really good care of me.  And I don't understand all
16  this stuff, so you have to really, you know, be available to
17  explain it."
18          And, of course, explain, explain, explain.  If you
19  don't know it, it just, like, goes over your head.  You
20  just --
21  Q.  Who did you tell all that to?
22  A.  Bill.
23  Q.  And you said he had 42 years of experience.  What else
24  did you know about his business, if anything?
25  A.  Well, I knew he was Mormon.

S. Bean - Direct

1  Q.  Okay.  Did he talk about religion?

2  A.  He did.  He had me -- he and his wife had me over one day

3  when the -- the two kids, you know, riding the bicycles

4  around and stuff, and they came, and they talked to me, gave

5  me the book, which I wasn't interested in.  I just put it on

6  my shelf and later threw it away.

7  Q.  Did you trust Mr. Smith in general?

8  A.  I had no reason not to.

9  Q.  Okay.

10  A.  Until I investigated what was going on.

11  Q.  What, if anything, did Mr. Smith know about why you

12  stopped working?

13  A.  Well, I'm kind of an open-book person, so being together

14  in groups and stuff, I'm sure it must have come out somewhere

15  there.  But then we'd talk, you know, and I'd go -- I'd go to

16  his house sometimes for meditation.  He usually came to mine

17  when it was about trying to keep me calm about the money and

18  why it wasn't coming in and, you know, all that.

19  Q.  We'll talk a little bit more about that in a minute.

20       Now, when you started talking to Mr. Smith about

21  this retirement money that you had --

22  A.  Uh-huh.

23  Q.  -- what investments or what did Mr. Smith suggest you do

24  with it?

25  A.  Well, there were two tech companies, Sonoqui and Xcel,

S. Bean - Direct

1   that, you know -- he gave me these nice booklets that a

2   company would put out to inform people that either they

3   wanted them to invest, or they just wanted them to know about

4   the company.  I don't know.  Anyway, I got those.

5   Q.  About the Xcel investment, what type of -- what was your

6   understanding of what type of company or product --

7   A.  Just that they were a tech company, which I knew nothing

8   about.

9   Q.  Do you own a cell phone?

10  A.  No.

11  Q.  Do you own a computer?

12  A.  No.

13  Q.  Did you --

14  A.  I wouldn't have them in my life, ever.

15  Q.  Did you understand what Xcel was?

16  A.  I -- only slightly, you know.  I knew from pictures and

17  stuff in the book that they were, I think -- I don't remember

18  if they were the ones, but one of them was, like, putting up

19  cell towers over a large area of, say, maybe sort of

20  northeast -- anyway, a big area, and they were supposed to be

21  big on growth.  Sonoqui, I don't remember what I thought

22  about them.

23  Q.  And who explained all this, you know, what it was to you?

24  Who explained all this to you when you spoke with Mr. Smith?

25  A.  Bill, yeah, just he and I.

Carol L. Naughton, Official Court Reporter

S. Bean - Direct

1   Q.  What was your understanding of the return on this

2   investment?

3   A.  Well, you have paperwork with the notes that he made to

4   show a picture that turned out to not be reality.

5   Q.  What do you recall, though, just sitting there without

6   looking at the documents that --

7   A.  What I recall is just lots of handwritten numbers and

8   notes and things.  And then --

9   Q.  I'm going to talk to you about some of the documents and

10  show you a few of these things.  I'm going to show you what's

11  been marked for identification as Government's Exhibit 815.

12  A.  Well, let me put on my glasses so I can see better.

13  Q.  Oh, sure.

14          And before talking about the document, did you

15  provide a box of documents to the government that --

16  A.  Yes.

17  Q.  -- you had kept from these investments?

18  A.  Yes.  Everything from the first letter from AT&T through

19  every single piece of paper that I got from Bill's office.

20  Q.  And so was that the entirety of all of the documentation

21  you ever received?

22  A.  As far as I know, yes.  I just put everything in a box

23  and kept it.

24  Q.  Okay.  If you can look at 815, Government's Exhibit 815.

25  It says "Xcel Bandwidth Member Loan," and it's two pages.  If

─────────────── S. Bean - Direct ───────────────

1  you look at the second page.

2  A.  Oh, Xcel, 25-.  Okay.  Yes.

3  Q.  Is that your signature?

4  A.  My signature, yes.

5       MS. YUSI:  I'm going to move to admit Exhibit 815.

6  BY MS. YUSI:

7  Q.  Now, this says, on Page 1 of Exhibit 815, "$25,000 member

8  loan," and it says, "For value received, the undersigned,

9  Xcel Bandwidth Two, hereby promises to pay to the order of

10  Sharyon Bean the principal sum," which was $25,000.

11       Do you see that?

12  A.  Yes, I see that.

13  Q.  And then the rest of it is -- on number 3 on Page 1,

14  that's blank, correct?

15  A.  Yes.

16  Q.  On Page 2 of Exhibit 815, you said that's your signature?

17  A.  Yes, it is.

18  Q.  We don't know what date -- the date on any of these is

19  not filled out; is that right?

20  A.  Correct.

21  Q.  And did you ever get a fully executed member loan from

22  Mr. Smith concerning this $25,000?

23  A.  I don't know what that would have looked like.

24  Q.  Well, did you ever get a piece -- a member loan with all

25  of this information signed by Xcel and everything filled out?

S. Bean - Direct

1   A.  I don't believe so.  But like I said, my memory isn't as

2   good as it used to be.

3   Q.  Sure.

4           Did you understand what a member loan was?

5   A.  I still don't understand it, so not really.  I mean, I

6   was a member of this company now on paper, and so I was

7   loaning them money.  I think that's probably what it would

8   have meant.

9   Q.  Okay.  And any questions that you had, who would you ask

10  about this?

11  A.  Only Bill.

12  Q.  Mr. Smith?

13  A.  Mr. Smith, yes.  Thank you for correcting me.

14  Q.  Oh, no, I'm not.  I'm just trying to make the record

15  clear.

16          I'm going to show you what's been marked for

17  identification as Government Exhibit 817.  Do you recognize

18  that document?

19  A.  Not really.  I recognize the heading on it as "Xcel

20  Bandwidth."

21  Q.  Okay.  If you can go to the last page of Exhibit 817.  Is

22  that your signature?

23  A.  Page 17?

24  Q.  The last page of Exhibit 817, the very last page of that

25  exhibit.

———S. Bean - Direct———

1   A.  Oh, I'm sorry.  They're stuck together.  I didn't realize

2   that.

3   Q.  Is that your signature?

4   A.  Yes.

5   Q.  Okay.

6   A.  It is.

7           MS. YUSI:  We move to admit Exhibit 817.

8   BY MS. YUSI:

9   Q.  And this says it's an Operating Agreement of Xcel

10  Bandwidth Two.  Did Mr. Smith go through this with you as to

11  what it meant?

12  A.  I don't remember, but he -- I always asked him.  I said,

13  "I don't understand this."  And so I went to his house a lot

14  of times to try and understand all this stuff, but I know --

15  you know, I have no background or training or money, so all

16  of this was like foreign territory.

17  Q.  Okay.  And did he -- so any information you had in terms

18  of trying to understand, is that through Mr. Smith?

19  A.  Yes.

20  Q.  And if we look to the back page again of Exhibit 817.

21  And feel free to get a glass of water if you need that.

22  A.  Thank you.

23  Q.  The very last page.

24  A.  Yeah, the one with my signature.

25  Q.  Sure.  It says "Buyer" with your name, correct, at the

S. Bean - Direct

1   top?

2   A.   Uh-huh.

3   Q.   "Seller" says --

4   A.   Yes.

5   Q.   -- "Xcel Bandwidth," and that's blank and not filled out,

6   right?

7   A.   Correct.

8   Q.   And then the broker, DOM Business Brokers LLC by Bill

9   Smith, and agent name, Bill Smith.  Is that Mr. Smith's

10  signature, if you know?

11  A.   Yes.

12  Q.   And do you know what a broker is?

13  A.   I -- is that a person, like, between the customer and

14  the -- whoops.  I don't really know the exact definition.  I

15  would think maybe it's between some representative of the

16  company and the person who was selling me this stock or

17  whatever it is.

18  Q.   And DOM Business Brokers, did you know what DOM Business

19  Brokers or who was behind that?

20  A.   I don't think I ever looked at that, you know.  All of

21  this stuff is, like -- you might as well be talking in Greek

22  because I don't understand it.  I don't have a background, I

23  don't have training, or anything.  So it was kind of, like,

24  all Greek to me, but he always took my calls.

25  Q.   Okay.  And what were you calling him about after you made

S. Bean - Direct

1    your investment?

2    A.  Well, anything -- mostly, "When is the money supposed to

3    be coming in?"  And according to documents that he scribbled

4    information on, I thought I should have been getting

5    something, so I just kept checking in with him, or if I had

6    questions, I would just call him.

7    Q.  Okay.  I'm going to show you -- I don't know if you've

8    seen this, but it's a -- I'm going to show you what's been

9    marked for identification --

10            (Video paused.)

11   BY MS. O'BOYLE:

12   Q.  Okay.  I'm going to show you -- I don't know if you've

13   seen this, but it's a -- I'm going to show you what's been

14   marked for identification as Government Exhibit 818.

15   A.  Are we through with this one?

16   Q.  Yes, we are.  Thank you.

17   A.  This doesn't look familiar.

18   Q.  Well, this is a wire record.

19   A.  Uh-huh.

20   Q.  And you see the amount, $25,000, which is about --

21   A.  Oh, yes.

22   Q.  Uh-huh.  From Provident Trust Group.  Did you have an

23   account with Provident Trust Group?

24   A.  I ended up with one.

25   Q.  Why did you end up with one?

—————— S. Bean - Direct ——————

1    A.  Well, they were supposed to be, like, I don't know,

2    keeping track, keeping a record of this money flow.  I don't

3    really know what they actually did, except I know they sent

4    me a bill for $400 every year.

5    Q.  Okay.  Who suggested that you have an account with

6    Provident Trust?  If you know.

7    A.  I think it just was, like, part of the package.  I don't

8    know.

9    Q.  It was part of doing your business with Xcel Bandwidth?

10   A.  With Bill Smith, yeah.

11   Q.  And then at the bottom, when it's under the beneficiary

12   information, it says "Xcel Bandwidth."

13   A.  Uh-huh.

14   Q.  And at the top is the date, July --

15          MR. GRINDROD:  Are you moving this?

16          MS. YUSI:  I will be.

17          MR. GRINDROD:  Okay.

18   BY MS. YUSI:

19   Q.  July 10th, 2017.  Do you see that?

20   A.  Yes.

21   Q.  Okay.  Does that appear to be around the date that you

22   put money into Xcel Bandwidth?

23   A.  That probably was the date.

24   Q.  Okay.

25   A.  Not good with dates.

S. Bean - Direct

1   Q.  All right.

2           MS. YUSI:  We're going to move to admit Exhibit 818.

3   BY MS. YUSI:

4   Q.  So that was July 2017.  You said you would call -- how

5   long was it going to be before you started seeing any returns

6   on this money?

7   A.  Well, I never knew.  That's why I kept calling.

8   Q.  Do you recall anything that was said or that you read

9   that told you about how quickly you would start seeing money

10  come in before you made the investment?

11  A.  Well, he made copies, which I kept, of course, of things

12  off the computer and wrote down dates to show me --

13  Q.  Okay.

14  A.  -- how it was supposed to work.  I didn't understand it.

15  I just accepted he knew what he was doing, and I didn't have

16  any -- any clue.  So I just trusted him.

17  Q.  Did your son ever have an occasion to try to speak with

18  Mr. Smith?

19  A.  Yes.

20  Q.  Was that after your investments?

21  A.  Yes.

22  Q.  And were you there for the conversation?

23  A.  Yes.

24  Q.  Can you tell us what -- well, what was the purpose of

25  your son talking to Mr. Smith?  And I don't want you to tell

S. Bean - Direct

1  me what he was saying, but how did this come about?

2  A.  My son lives in -- near Washington, D.C., in Virginia.

3  Q.  Okay.

4  A.  Because he works on government contracts.  He works for a

5  private company, but he's retired Air Force.  And he was here

6  visiting, and because I had trusted my whole retirement to

7  Bill Smith, I just wanted them to meet, thinking Bill was a

8  friend that was watching out for me and all that stuff.

9  So...

10 Q.  So did your son call or meet with him?

11 A.  We both went so I could introduce him to Bill.  I think

12 we went into a conference room, and Bill was talking --

13 started talking about some Legion, whatever it's called,

14 Legion -- some small investment and -- which I ended up

15 investing in and can't get ahold of them anymore.

16         But anyway -- but he was talking to my son.  He

17 wanted my son to invest, but my son is smart about this.  He

18 manages his money, and, you know, he's very well educated on

19 all that.  So he asked questions which he was not given any

20 answers to.

21 Q.  Okay.  Who was not answering his questions?

22 A.  Bill Smith.

23 Q.  And did Mr. Smith say anything about the questions?

24 A.  I asked Bill later, and he said, "Oh, I don't answer

25 questions because," he said, "if people want in, they want

S. Bean - Direct

1   in.  If they want out, fine."  So he made it okay that he

2   didn't answer questions.  He just doesn't do business that

3   way.

4   Q.  Okay.  And when you were deciding to make this

5   investment, did you ask if you could get your money back if

6   you weren't happy with it, or did you have any understanding

7   of whether or not this was a possibility that you could get

8   out if you weren't happy?

9   A.  I don't recall having that thought.

10  Q.  Okay.  After you made your investment in 2017, how often

11  would you contact Mr. Smith about your investments?

12  A.  Whenever I had questions about anything, when is the

13  money coming, what's going on with it, whatever.

14  Q.  And what was his general response?

15  A.  Well, when I finally got a -- the answer that was given

16  to me eventually was, oh, the damn government is

17  investigating, I don't know, Daryl Banks or something.

18  Q.  I'm going to show you what's been marked as Exhibit --

19  Government's Exhibit 819, and it's a few pages.  If you can

20  look at that document.

21  A.  Are we through with this one?

22  Q.  Yes.  Thank you.

23          Do you recognize this as an account statement?

24  A.  Yes.  Something I would have taken to Bill's office and

25  asked him to explain, since I didn't understand any of this.

—————S. Bean - Direct—————

1           MS. YUSI:  We move to admit Exhibit 819.

2    BY MS. YUSI:

3    Q.  Looking at Exhibit 819, Provident Trust Group, you said

4    that was part of your -- that was part of the deal --

5           UNIDENTIFIED SPEAKER:  One at a time.

6    BY MS. YUSI:

7    Q.  Provident Trust Group, you said that was part of the

8    deal, that you had to have an account there when you made

9    this investment?

10   A.  That was my understanding.

11   Q.  And would you routinely get account statements from them

12   in the mail or -- yes?

13   A.  Yes.  And mostly with a bill attached.

14   Q.  Okay.  And what would you do with those account

15   statements?

16   A.  Put them in the box, just like this one.

17   Q.  What would you do with these statements?

18   A.  I would first contact Bill and say, "I don't understand

19   this."  And we would get together, and he would -- that's his

20   writing on here.  And he would try and -- he tried to make it

21   clear.

22          MS. YUSI:  I'm going to admit Exhibit 819.

23   BY MS. YUSI:

24   Q.  The handwriting on this exhibit, whose handwriting is

25   this?

─────────────── S. Bean - Direct ───────────────

1    A.   Bill Smith.

2    Q.   Did he do this handwriting in front of you?

3    A.   Yes.

4    Q.   Do you recognize Mr. Smith's handwriting?

5    A.   Yes.  I'd seen it on other forms before, so I recognized

6    it.

7    Q.   Thank you.

8    A.   His writing is better than mine, but I recognized it.  I

9    will never forget.  The whole thing is burned into my brain.

10   Q.   And so this was end of October, October 31st, 2017.

11   Let's look at Page 2.

12   A.   Same, Exhibit 819?

13   Q.   Yes, yes.  Exhibit 819, Page 2.

14            UNIDENTIFIED SPEAKER:  Wait for the question,

15   please.

16   BY MS. YUSI:

17   Q.   And there's a circle, the 25,000.  That's what you put

18   into the Xcel, correct?

19   A.   Yes.

20   Q.   And if we look at Page 3 of Exhibit 819, what is the

21   circled number there?

22   A.   99,000.

23   Q.   Was that -- what was that 99,000, if you know?  It

24   says -- to the left, it says, "June 27, 2017, rollover

25   contribution."

─────── S. Bean - Direct ───────

1   A.   Right.

2   Q.   Where is that -- what was the $99,000, if you know?   And

3   if you don't, that's totally fine.   That's okay.

4           Now, I'm going to show you Exhibit 820.

5   A.   Okay.

6   Q.   We're done with that one.

7   A.   Okay.   Good.

8   Q.   Do you recognize Exhibit 820?

9   A.   Yes, I've seen this before.

10  Q.   And what is --

11  A.   In with him, or if I had questions, I would just call

12  him.

13  Q.   Okay.   I'm going --

14  A.   Excuse me.

15  Q.   -- to show you -- I don't know if you've seen this, but

16  it's a -- I'm going to show you what's been marked for

17  identification as Government's Exhibit 818.

18  A.   Are we through with this one?

19  Q.   Yes, for now.   Thank you.

20  A.   Oh, this doesn't look familiar.

21          (Video paused.)

22  BY MS. YUSI:

23  Q.   How did you end up getting this income plan?

24  A.   When I was meeting with Bill in his office.

25  Q.   Well, what were these numbers in particular, if you know?

1    A.  I -- I don't know.

2    Q.  Okay.  And the handwriting on the right --

3    A.  Uh-huh.

4    Q.  -- I can't really read it.  Whose handwriting is that?

5    A.  The money market account --

6    Q.  Okay.

7    A.  -- and all that's encircled was mine.  The rest was Bill.

8    Q.  Okay.  All right.  We're done with that one.

9    A.  Okay.

10   Q.  I'm going to show you Government's Exhibit 821.

11   A.  This looks really familiar.

12   Q.  Okay.  Do you recognize this document?

13   A.  Absolutely.

14   Q.  And what is it?

15   A.  It's a statement from Provident Trust Group.

16   Q.  Did you receive this from Provident Trust Group?

17   A.  I believe I did.

18   Q.  And did you provide this to the government?

19   A.  Yes, I did.

20   Q.  All right.

21           MS. YUSI:  We move to admit Exhibit 821.

22   BY MS. YUSI:

23   Q.  And we've got -- the date on this account statement on

24   the upper right says January 1st, 2018, to December 31st,

25   2018, correct?

S. Bean - Direct

1   A.   Yes.

2   Q.   So was this a year-end statement you received?  If you

3   know.

4   A.   Probably, yes.

5   Q.   And whose -- I'm looking at the handwriting under "Your

6   Account Summary."  Do you recognize that handwriting?

7   A.   "Your Account Summary."  Yes.

8   Q.   Okay.  I see under "Secured Notes," there's Sonoqui and

9   then Xcel and then Legion.  Whose handwriting is the cursive?

10  A.   That was mine.

11  Q.   How about the numbers?  Who wrote the numbers?

12  A.   Bill Smith.

13  Q.   Did he do that in front of you?

14  A.   Yes.

15  Q.   All right.  What was he doing?  This is, I guess, after

16  December 31st, 2018.  Did you bring this to him to look at?

17  A.   Yes, I believe I did.

18  Q.   And why did you do that?

19  A.   Because I needed to know what was -- what it was and all

20  that.

21  Q.   What was your -- what did Mr. -- did you ask Mr. Smith

22  how your investments were doing?

23  A.   Let's see.  I would -- you know, "What's the holdup?"

24  Yeah, I wasn't getting anything, and I thought I should have

25  been getting something by then according to some of the other

S. Bean - Direct

1    notes that he gave me.

2    Q.  Okay.  What, if anything, did Mr. Smith talk to you about

3    having to -- or giving testimony on behalf of Mr. Maerki in

4    another investment?  Did he say anything about that prior to

5    your investment?  If you recall, did he say anything about

6    having to go to court?

7    A.  No, absolutely not.

8    Q.  Okay.  And what, if anything, did Mr. Smith say to you

9    about any judgments by the SEC concerning spectrum

10   investments that you invested in?

11   A.  I never heard any of that.

12   Q.  What, if anything, did Mr. Smith tell you about his

13   knowledge of the Securities and Exchange Commission

14   investigating the Xcel spectrum investment?

15   A.  The only thing I remember was he was angry with the

16   government, when I, you know -- I kept questioning,

17   questioning like -- to shut me up, I guess.

18   Q.  What did he say?

19   A.  He was angry with the government for -- I'm trying to

20   think of how he put it, something like messing with whatever

21   was going on with all of this, and that may be when Daryl

22   Banks was getting zapped, but I don't know.

23   Q.  What did you hear from Mr. Smith about Daryl Bank?

24   A.  Just -- I just heard his name several times.  I don't

25   remember exactly, but I know when I asked, you know, what's

─────────────────────── S. Bean - Direct ───────────────────────

1   holding my money up, it was like, oh, no, it's the

2   government's fault.

3   Q.  And did Mr. Smith ever tell you that -- or did -- were

4   you ever informed by Mr. Smith that your money was gone?

5   A.  No, never.

6   Q.  Now, you said you were never informed about -- let's see.

7   You said you were never informed about any issues, just that

8   the government was messing things up?

9   A.  Yes.  And that's about the exact words, too.  I couldn't

10  think of that, but yeah.  That sounds really like --

11  Q.  I'm going to show you Exhibit 823.

12  A.  Uh-huh.

13  Q.  Do you recognize this document?

14  A.  Oh, the bankruptcy court.  Yes, I do remember this.

15  Q.  Did you provide this to the government?

16  A.  Everything in that box, yes.

17          MS. YUSI:  I'm going to move to admit Exhibit 823.

18  BY MS. YUSI:

19  Q.  So at the bottom of Exhibit 823, it says "Dated."

20  A.  Uh-huh.

21  Q.  What was the date that this notice of -- to file proof of

22  claim due to possible recovery of assets, what date was this?

23  A.  9/30/2019.

24  Q.  And did you do anything after you received this Notice to

25  File Proof of Claim?

─────S. Bean - Direct─────

1    A.   Actually, I did.  I'm trying to think who I called.  Oh,

2    I know.  I called the Vogt law firm.  My -- one of my best

3    friends is married to the owner.  She is a paralegal there.

4    And I said, "Would you and George take a look at this.  I

5    need a bankruptcy attorney to tell me what to do, if I need

6    to do anything."  So I had to get a bankruptcy attorney and

7    pay him.

8    Q.   And what was your understanding of what this notice was?

9    A.   I think protection of his assets.

10   Q.   Well, why did you get this?  What started this?

11   A.   Well --

12   Q.   If you know.

13   A.   I don't know why I got the copy.

14   Q.   Okay.  But this was sent to you, and up here at the top,

15   what court was issuing this notice?

16   A.   United States Bankruptcy Court, Eastern District of

17   California.

18   Q.   And debtor name?  Do you see that a little bit farther

19   down?

20   A.   Yes.

21   Q.   Who were the debtors?

22   A.   Aghee Will Smith, Susan Blair Smith.

23   Q.   Did you call Mr. Smith after you received this

24   notification?

25   A.   No.  I had no more communication with him.

—————————S. Bean - Cross (By Mr. Grindrod)—————————

```
 1            MS. YUSI:  Those are all my questions right now.  I

 2    believe Mr. Smith's attorney will have some questions for

 3    you, if you can answer them in the same respectful manner.

 4            THE WITNESS:  Respectfully, yes.  I am a respectful

 5    person.

 6                        CROSS-EXAMINATION

 7    BY MR. GRINDROD:

 8    Q.  Ma'am, I'd like to start off by talking about your

 9    relationship with Mr. Smith before you made this investment.

10            You had a personal relationship with Mr. Smith

11    before this investment, right?

12    A.  We just saw each other at different spiritual functions

13    and that, so -- and I did go to a couple -- a few times to

14    his home for meditation groups that he was sponsoring and

15    stuff.  So...

16    Q.  You would refer to him as having been your spiritual

17    friend?

18    A.  No.  Just an acquaintance that I met at these functions.

19    Q.  Do you remember, ma'am, meeting with an FBI agent when

20    you were first interviewed about this case?

21    A.  Only the gentleman -- only on the phone?

22    Q.  Right.

23    A.  And the gentleman that came to pick up the box of all my

24    paperwork.

25    Q.  Just in October, just, like, less than a month ago, do
```

S. Bean - Cross (By Mr. Grindrod)

1   you remember telling the FBI agent that you had been

2   spiritual friends with Bill Smith for approximately ten years

3   before you invested money with him?

4   A.   I had been spiritual acquaintances, yes.  I possibly used

5   that terminology.

6   Q.   And you and Mr. Smith meditated together?

7   A.   From time to time, yes.

8   Q.   You took classes together?

9   A.   Yes.  He joined the group from time to time that I was

10  associated with.

11  Q.   You knew him for about ten years?

12  A.   I don't know.  Maybe eight to ten years.  I don't really

13  remember how long exactly.

14  Q.   You had been to his home several times?

15  A.   I wouldn't say "several."  But I had been to his home a

16  few times.

17  Q.   Met his wife?

18  A.   Yes, I met his wife.

19  Q.   He would come to your house?

20  A.   Only when he was trying to explain to me what was going

21  on with this paperwork with my money.

22  Q.   And I think you mentioned on direct, even though you

23  hadn't invested any money with him at that point, you learned

24  that he had handled investments for 42 years or something

25  like that?

S. Bean - Cross (By Mr. Grindrod)

1   A.   Yes, exactly.  Yeah, that's what I was told.

2   Q.   And over your relationship with him before you made any

3   investments, you found him to be honest, right?

4   A.   I didn't really have -- the appearance was, yes.

5   Q.   He was kind to you?

6   A.   He was kind to everybody.

7   Q.   Okay.  And so before you invested with Mr. Smith, you

8   knew that he was somebody that had built a reputation in this

9   industry for 40-some years, right?

10  A.   That's what I was told.

11  Q.   And you knew that he had built up a relationship with you

12  of some kind for about ten years, eight to ten years?

13  A.   I don't know if it was that long, but that's my guess.

14  Q.   Okay.  And then in 2017, I think that's when you received

15  this money from AT&T, right?

16  A.   Yes.

17  Q.   And back -- you had worked for AT&T for 25 years, right?

18  A.   Yes.

19  Q.   You were a marketing representative?

20  A.   I had a lot of different jobs and worked my way up in the

21  company, yes.

22  Q.   One of those jobs was marketing representative, right?

23  A.   Yes.

24  Q.   Another one was doing work with, like, telephone orders,

25  taking orders --

2237d42d1f4d14b8

S. Bean - Cross (By Mr. Grindrod)

1  A.  Absolutely.

2  Q.  -- and setting up -- I'm sorry, setting up systems,

3  moving systems, telephone systems?

4  A.  Yes.

5  Q.  And then you worked as a computer operations manager

6  there, right?

7  A.  Yes.

8  Q.  And then after you left AT&T, you were -- you sometimes

9  were a speaker at business women's groups?

10  A.  After I recovered from having an on-the-job mental and

11  emotional breakdown, when I recovered, after eight years

12  working with a counselor, yes, I did do a little speaking of,

13  you know, don't push yourself over the edge because you don't

14  know if you can get back, because it took me a long time to

15  get back.

16  Q.  And so you had this money from AT&T, and you went to

17  Mr. Smith, right?

18  A.  I wouldn't say I went to him, because I really didn't

19  know until he mentioned that, oh, I've been doing --

20  investing for people for 42 years.  And I knew nothing.  What

21  do I do with this money?  Except I knew I had to roll it

22  over, so, anyway, when I knew what he did, then I thought,

23  oh, great, I can, you know, have someone who knows how to do

24  this handle it.

25  Q.  Sure.  And when you were having these conversations with

————S. Bean - Cross (By Mr. Grindrod)————

1   Mr. Smith about what to do with your money, one of the

2   options that he gave you information about was Xcel Bandwidth

3   Two, right?

4   A.  Yes.

5   Q.  And Mr. Smith gave you some written information about

6   Xcel Bandwidth, right?

7   A.  Yes.

8   Q.  I'm going to show you what's been marked as

9   Defendant Smith Exhibit 504.  It's a two-page document,

10  ma'am.  If you could just kind of briefly look at both pages.

11  And the second page has your signature on the bottom, right?

12  A.  Uh-huh.  It does.

13  Q.  So you've seen this document before?

14  A.  Yes.  It was probably in that booklet that I got about

15  from -- from this and Sonoqui.

16  Q.  And you actually sent this document to the prosecutors in

17  this case, right?

18  A.  Yes.

19        MR. GRINDROD:  Move to admit Smith 504.

20  BY MR. GRINDROD:

21  Q.  So what this document does is essentially it describes

22  Xcel Bandwidth Two, right?

23  A.  I guess so, yeah.

24  Q.  It gives an overview of what the company does, right?

25  A.  I don't -- I don't know if I even read it.

S. Bean - Cross (By Mr. Grindrod)

1   Q.   Okay.  Well --

2   A.   It's over my head.

3   Q.   Flip to the second page for me, if you would.

4   A.   Yes.  Okay.

5   Q.   And right above your signature, it says, "I have read and

6   understood this business term sheet," right?

7   A.   Yes.

8   Q.   And then you signed below indicating that you had read

9   and understood this business term sheet, right?

10  A.   Yes.

11  Q.   So --

12  A.   That's what it would appear to be.  Not that I did.

13  But...

14  Q.   Well, you signed --

15  A.   Yes.

16  Q.   -- on the dotted --

17  A.   Yes.

18  Q.   -- line certifying that you did read and understand it,

19  right?

20  A.   This was given to me, and I was asked to please sign it.

21  Q.   Okay.

22  A.   Not that I understood it.

23  Q.   So you -- your testimony today is that you signed this

24  document right below the line that says, "I've read and

25  understand this," but you didn't read or understand it?

S. Bean - Cross (By Mr. Grindrod)

1    A.  I don't know.  What did you say?

2    Q.  Sure.  So your testimony today is that you signed your

3    name right below this statement that says, "I have read and

4    understand this business term sheet."  You did that even

5    though you did not --

6    A.  I did not.

7    Q.  -- read or understand it?

8    A.  Right.

9    Q.  Okay.

10   A.  I was just -- just signing a bunch of things that I had

11   to sign while I was there.

12   Q.  Sure.  But after you signed this saying that you read and

13   understood it, right, you gave it to Mr. Smith?  Right?

14   A.  Yes, I did.

15   Q.  So you were telling Mr. Smith that you had read this and

16   understood it, right?

17   A.  I suppose, yes.

18   Q.  And you signed it, ma'am, on Page 2.  It says 6/22/2017,

19   right?

20   A.  I don't know.  Does it?  Yes.

21   Q.  Okay.  And you didn't actually -- the money was not

22   actually wired to Xcel until July 10th of that year, right?

23   A.  I have no idea what happened to my money.

24   Q.  Well, let's go back to Government's Exhibit 818, which is

25   already in front of you.

S. Bean - Cross (By Mr. Grindrod)

1      Do you have 818 in front of you, ma'am?

2  A.  Yes.

3  Q.  And at the very top, it says July 10th, 2017, right?

4  A.  Yes.

5  Q.  So that's when the money was wired to Xcel, right?

6  A.  I assume so.

7  Q.  Okay.  Could you turn, ma'am, to Government Exhibit 820.

8  And Ms. Yusi asked you some questions about this document on

9  direct examination.  Do you remember those questions?

10 A.  No, but I remember this document.

11 Q.  Okay.  Well, this document was in your paper files at

12 home before you sent it to the prosecutors, right?

13 A.  Yes.

14 Q.  And on the top, it says "Date, October 31st, 2017,"

15 right?

16 A.  Yes.

17 Q.  And on the bottom left, all the way in the bottom corner,

18 it says "Printed on October 31st, 2017," right?

19 A.  Yes.

20 Q.  So you only ever made one investment with Xcel Bandwidth,

21 right?

22 A.  I don't know what happened to my money.

23 Q.  Okay.  Well, all the documents we looked at showed that

24 there was one $25,000 investment in Xcel Bandwidth; is that

25 right?

S. Bean - Cross (By Mr. Grindrod)

1   A.  Yes.

2   Q.  And that shows that that one investment went through --

3   the wire was sent on July 10th, 2017, right?

4   A.  Yes.

5   Q.  So this document that we're looking at at Government's

6   Exhibit 820 was created more than three months after you had

7   already invested the one time in Xcel Bandwidth, right?

8   A.  Yes.

9   Q.  So it's fair to say this document is not something that

10  you considered when you were deciding whether or not to

11  invest in Xcel Bandwidth, right?

12  A.  I don't know.

13  Q.  Well, for that to be the case, that would have meant that

14  you relied on a document that was created three months after

15  you actually made the investment.  So that's probably not

16  what happened, right?

17  A.  I don't know.

18  Q.  Okay.

19  A.  It was -- it was a while back.

20  Q.  Do you see the handwriting across the bottom of that --

21  A.  Yes.

22  Q.  -- document, ma'am?

23  A.  I do.

24  Q.  Whose handwriting is that?

25  A.  Bill.

S. Bean - Cross (By Mr. Grindrod)

1   Q.   What does it say in all caps across the bottom?

2   A.   "For illustration purposes only.  Results may vary."

3   Q.   And so Mr. Smith wrote that on there, right?

4   A.   Yes.

5   Q.   And he also told you that orally, right?

6   A.   Probably, yes.

7   Q.   Okay.  And the money -- you can set that aside, ma'am.

8   We're done with that one.

9        The money for your Xcel investment, that money

10  actually went to Xcel, right?

11  A.   I have no idea what happened to my money.

12  Q.   Well, go back to Government Exhibit 818 that the

13  government offered and that you went through with Ms. Yusi,

14  please.

15  A.   Okay.

16  Q.   And Government 818, is that the wire?  Right?  It's the

17  one we talked about, the wire going through on July 10th,

18  2017?

19  A.   Yeah.  Yeah.

20  Q.   And in the bottom right, it shows that the wire went to

21  an account associated with Xcel Bandwidth, and it lists an

22  address in St. Lucie West -- St. Lucie West Boulevard in

23  Port St. Lucie, Florida, right?

24  A.   I see that.

25  Q.   So the money went to Xcel Bandwidth in July of 2017,

─────────S. Bean - Cross (By Mr. Grindrod)─────────

1    right?

2    A.  I suppose.  I really don't know.

3    Q.  You know that Xcel Bandwidth had an address in

4    Port St. Lucie, Florida, right?

5    A.  I don't know that.  I could never reach them.

6    Q.  You know that Daryl Bank was the manager of Xcel

7    Bandwidth, right?

8    A.  I only know that I heard his name.

9    Q.  Let's go to what has already been admitted as Government

10   Exhibit 817, ma'am.

11   A.  Okay.

12   Q.  If you could go to Page 14 of that document.  The

13   numbering is very small at the bottom, but it's Page 14 of

14   17.

15   A.  I see it.  I see it.  Page 14?

16   Q.  Yes, ma'am.

17   A.  Okay.

18   Q.  And you see a signature there?

19   A.  Yes.

20   Q.  And then below the signature, it says "Daryl Bank"?

21   A.  Yes.

22   Q.  And then it says manager, "Xcel Bandwidth LLC"?

23   A.  Yes.

24   Q.  So you had documents showing that Daryl Bank was the

25   manager of Xcel Bandwidth, right?

──────S. Bean - Cross (By Mr. Grindrod)──────

1  A.  That's what the document says.

2  Q.  And --

3  A.  And I have the documents.

4  Q.  Right.  And, ma'am, you know that -- you eventually

5  learned that Daryl Bank had been accused of fraud, right?

6  A.  Yes.

7  Q.  And that he had been taking money from people who

8  invested with him?

9  A.  I didn't hear anything about the case except the final

10  result.

11  Q.  You heard that he had been convicted of fraud?

12  A.  Yes.

13  Q.  And, ma'am, you -- you physically gave Mr. Smith your

14  money, right?

15  A.  Yes.

16  Q.  And you didn't get a dime back?

17  A.  No.

18  Q.  And you are very upset about that, right?

19  A.  Yes.

20  Q.  But sitting here today, you cannot think of a single

21  thing that Bill ever said to you that was not true, right?

22  Ma'am, is that right?  You can't --

23  A.  It was a long time ago.

24  Q.  Uh-huh.

25  A.  God only knows what he might have said.  I don't know.

─────────── S. Bean - Cross (By Mr. Grindrod) ───────────

1   Q.  I understand that.  And it was a long time ago.  I

2   understand all that.  But what I'm asking you, ma'am, is,

3   under oath, sitting here today, can you think of anything

4   that Bill Smith told you related to this investment that

5   wasn't true?  You don't know whether you can think of

6   anything?

7   A.  I can think that I don't understand.  Whatever he might

8   have said or done doesn't register with me.  I don't

9   understand it.  I know he mentioned Daryl Bank to me several

10  times as well as all of the people he knew at Lincoln --

11  whatever it's called.  I can't even think now.

12          Yeah, he mentioned all the hoity-toits that were at

13  the top of these -- all these companies that ripped people

14  off.

15  Q.  Well, I understand that you believe in your heart that

16  Bill Smith ripped you off.  Right?

17  A.  I believe he mishandled my money, yes.

18  Q.  Okay.  And you believe that because you didn't get any of

19  your money back, right?

20  A.  Didn't get a dime, no.

21  Q.  But what I'm asking you is:  Can you tell me anything

22  that Bill told you that was a lie?  Is the answer no, ma'am?

23  A.  No.  I'm not giving an answer.

24  Q.  You are refusing to answer the question?  Ma'am, are you

25  declining to answer the question of whether Bill Smith ever

—————S. Bean - Redirect—————

1   told you anything that was a lie?

2   A.  He could have told me there was an elephant in the room

3   and it was painted purple, I wouldn't have known the

4   difference.  I didn't understand the things he was saying.

5   No matter how -- he tried so hard to make it clear to me so I

6   would understand.  What he was making me understand, later I

7   found out -- I don't know what to think about that.

8   Q.  I understand.

9           MR. GRINDROD:  No further questions at this time.

10                  REDIRECT EXAMINATION

11  BY MS. YUSI:

12  Q.  I just have a couple follow-ups, Ms. Bean.  I know it's

13  been a long afternoon.

14  A.  That's okay.

15  Q.  All of the information, the loan agreements, the

16  operating agreements, the charts, things like that, who gave

17  those to you?

18  A.  Bill Smith.

19  Q.  And who gave you all your information about this

20  investment that you made?

21  A.  Bill Smith.

22  Q.  Did you have any other sources of information besides

23  what he gave and told you?

24  A.  No.  I trusted him completely.

25  Q.  And did he explain page by page and paragraph by

S. Bean - Redirect

1  paragraph when you told him you didn't understand things?
2  A.  If I needed it, he drew pictures, wrote notes, and
3  things, and I still didn't really understand.
4  Q.  And how often would you go to him and try to get
5  explanations or for understanding?
6  A.  Any time I was getting to the point where, you know,
7  "what happened to my money," "when are things going to loosen
8  up and I might see something" -- when I needed to, I could
9  reach him.  He would call me back.
10 Q.  And during all those conversations, did he say this is --
11 none of my clients are -- did he ever say anything about any
12 of his clients not doing well in these investments?
13 A.  I only heard about all of that later.
14 Q.  Okay.  After -- after the federal government made
15 arrests?
16 A.  Yes.  Yes.
17 Q.  Did Mr. Smith ever ask you, "Do you understand all this?"
18 A.  I don't know whether he did or didn't.  But, you know,
19 who am I?  I just -- yeah, I go along with the program
20 thinking I was working with someone who cared about me and
21 was looking out for my best interest.
22 Q.  When you heard that he had 42 years in the business in
23 doing this, who told you that?
24 A.  He did.
25        MS. YUSI:  Those are all of my questions.

```
 1              (The video concluded.)

 2              MR. BOSSE:  Your Honor, the government rests its

 3    case.

 4              THE COURT:  All right.  Ladies and gentlemen, the

 5    United States has rested its case.  At this juncture, the

 6    Court has to take up certain administrative matters that you

 7    cannot be a part of, so I think what it means is you're going

 8    to probably have a long break.  You ordinarily have a

 9    15-minute break.  It may be 30 minutes today.  So we're going

10    to be in here, but you will be in the jury room.

11              (The jury exited the courtroom.)

12              THE COURT:  You may be seated.

13              Okay.  The United States has rested its case.  At

14    this point the Court is prepared to hear any type of motions,

15    if any, that the defense counsel wishes to raise.

16              Do we need to take a 15-minute break before we

17    start?  Or we can start right now.  All right.

18              MR. YAROW:  Your Honor, on behalf of Mr. Alcorn, I

19    move for a motion for judgment of acquittal.

20              The government is always charged with, in criminal

21    fraud-type cases and conspiracy, wire fraud, unlawful

22    monetary -- required to show that the defendant knowingly

23    engaged in the conduct, and they must show that beyond a

24    reasonable doubt.

25              Here, I would argue that the government has failed
```

1    to meet that burden.  Mr. Alcorn was dealing with Mr. Bank,
2    but the evidence that came in during trial from Ms. Gibson
3    was that Mr. Alcorn really had no control, no knowledge of
4    who it was being sold.  He didn't know that Bank and his
5    people were selling investments that were entirely
6    inappropriate to elderly people in their retirement incomes.
7            The other folks that the government has, I believe,
8    proven that Mr. Alcorn sold directly to are the Newells --
9    sold the spectrum application service to were the Newells.
10   These were people that described themselves as sophisticated
11   investors, and they were the ones that solicited people for
12   their groups, according to Ms. Newell.
13           We have Ruth Clark, who is very tangential at best.
14   Ms. Clark, in her deposition, video deposition, testified
15   that she heard a presentation by Kent Maerki.  Mr. Alcorn was
16   simply a presenter of Kent Maerki.  It was Kent Maerki that
17   did all the talking.  And the only evidence that the Court
18   has before it with Ms. Clark is that Mr. Alcorn had some
19   conversations with Ms. Clark's husband about their mutual
20   blindness or difficulty in seeing.
21           Your Honor, the government brought in a lot of
22   e-mails and statements by Mr. Alcorn through Mr. Baskin.
23   That would be Mr. Alcorn's former attorney.  And while
24   Mr. Alcorn didn't show good judgment in not listening to his
25   good advice of counsel, the evidence was that he was not

 1    precluded from continuing to do business.

 2            None of this, added together, arises to the point

 3    that the defendant, Mr. Alcorn, had the requisite knowledge

 4    for the government to meet their burden beyond a reasonable

 5    doubt.  Thank you.

 6            THE COURT:  United States' response?

 7            MS. YUSI:  Your Honor, the government submits that

 8    we have more than met our burden on all the counts against

 9    Mr. Alcorn.  He is not named in Count One, but he is named in

10    Count Two, which is the conspiracy to commit mail and wire

11    fraud concerning the spectrum investments.  He also is named

12    in Counts Seven through Seventeen, which are the wire fraud

13    counts, and Count Nineteen, which is the unlawful monetary

14    transaction count.

15            And in regards to the conspiracy count, we've heard

16    from a variety of different players in the conspiracy along

17    with the victims.  We've heard from Raeann Gibson who talked

18    about the inside workings and showed the money that was

19    going -- the millions of dollars that were going to

20    Mr. Alcorn.

21            We also heard from Mr. Sellers who talked about how

22    it was clear that this was not going anywhere, but he

23    continued to sell.  To say that Mr. and Mrs. Clark's

24    investment after having met Mr. Alcorn was tangential, they

25    put over $200,000, I believe, Your Honor, their entire life

```
 1    savings into the spectrum investments with Lincoln Spectrum
 2    and then Prime Spectrum, all of which Mr. Alcorn was getting
 3    money from.
 4            As we stated in our opening, everyone has a role to
 5    play in this, and you don't need to know every little thing
 6    that every other conspirator is doing, including the splits
 7    that Daryl Bank and Dominion were doing with the money and
 8    then sending it to him.  But Mr. Alcorn was very clear.  This
 9    was a years-long proposition or conspiracy that -- and
10    nothing was working.
11            And we heard from the Newells -- or Susan Newell and
12    George Cushman about direct statements and misrepresentations
13    that Mr. Alcorn was telling them on a routine basis to lead
14    them along and to convince them to put more money, good money
15    after bad in this particular -- into this particular
16    investment.  So we think the conspiracy charge has been more
17    than proven.
18            In terms of the wire fraud, Your Honor, we point to
19    the stipulations that have been entered at Exhibit 2000.  And
20    on Page 5, Stipulation 5, use of the wires, corresponds to
21    each -- Counts Seven through Seventeen, starting with
22    Exhibit 1007A going to 1008A, which corresponds to
23    Count Seven, Count Eight, where we have stipulated that the
24    wires came in and out of the Eastern District of Virginia.
25            And we had plenty of Eastern Virginia victims, along
```

1    with the BayPort Credit Union, talking about how these

2    wires -- along with the mails from the first thing -- came

3    into the Eastern District of Virginia.  Ms. Barry and others

4    talked about mailers, things like that they were getting on

5    this.  But the use of the wires was clearly set up along with

6    what they were doing in the conspiracy in fraudulently

7    getting these people to put their life savings into these

8    investments.

9            In terms of Count Nineteen, Your Honor, which is the

10   money laundering count, if I can just pull that -- in terms

11   of the money laundering count, if the Court looks to -- that

12   concerns the May 1st, 2015, cashier's check for over -- it's

13   $100,093.05, which is Exhibit 1111.

14           This happened in 2015, so after Mr. Alcorn knew of

15   the SEC investigation, right before he -- or before he

16   testified for a second time, I believe, in the SEC

17   investigation, and he transfers that money into his

18   retirement account, into his personal retirement account, and

19   eventually then sends it to FRGC Properties, which is an LLC

20   owned by Brian Semple, who is his accountant, and that's the

21   same accountant that took the money in and bought the house

22   for him that he lived in.

23           So in terms of the unlawful monetary transaction,

24   it's clearly over $10,000.  It's clearly money that was made

25   by ill-gotten gains which he was aware of, and he used it for

1    his own personal use.

2         THE COURT:  Thank you.

3         Rule 29 gives the Court some options.  The Court can

4    grant the motion at this time; it can deny the motion; it can

5    defer the motion until all the evidence has come in.

6         But the Court has been sitting here listening at

7    this case, and as the evidence came in in the case, the Court

8    would look at the indictment to try and see whether the

9    evidence would match the counts that had been laid out.  And

10   the Court specifically remembers, without going through each

11   and every count, the evidence coming in with respect to the

12   wire fraud and the mail fraud counts and checked to see if

13   the government was going to put any evidence in on those

14   counts.

15        The Court has heard this evidence with respect to

16   the question of the conspiracy, and both direct evidence as

17   well as circumstantial evidence has been produced in this

18   case to the point that the Court concludes that there is

19   sufficient evidence in here for a jury to return a conviction

20   if it deems appropriate.

21        So without going through each count, marshalling all

22   the evidence to each count, the Court concludes, having

23   listened at this case, that there is sufficient evidence for

24   a jury to convict the defendant on each and every count if

25   they decide to do so.

1          So that motion for a judgment of acquittal under
2    Rule 29 with respect to all counts regarding Mr. Alcorn is
3    denied.
4          All right.  Any motion with respect to Mr. Smith?
5          MS. McCASLIN:  Yes, Your Honor.  If I could just
6    have one moment.
7          (Brief pause.)
8          MS. McCASLIN:  Your Honor, Mr. Smith is here on
9    Counts One and Two, which are both conspiracy counts, and
10   four counts of wire fraud.  In the indictment it's
11   Counts Eight, Nine, Sixteen, and Seventeen.
12         Pursuant to Rule 29 of criminal procedure rules, we
13   are moving for a judgment of acquittal on all counts.  The
14   government has presented evidence, but it is not enough to
15   sustain a conviction.
16         Your Honor, the government has not shown that
17   Mr. Smith entered into an agreement with Kent Maerki, Daryl
18   Bank, David Alcorn, or the others, knowingly and
19   intentionally.  When it comes to a conspiracy, the person
20   needs to have knowledge of the purpose of the conspiracy and
21   then deliberately join it, and that has not been shown;
22   association or assembling together is not enough.
23         With respect to the wire fraud, wire fraud is more
24   than just sending money or a recording over a wire.  There
25   does need to be knowing participation with the intent to

 1    defraud, and that intent has not been shown here in this
 2    trial.
 3            We have heard from multiple witnesses, including
 4    Doug Dunn and Tony Sellers, that Mr. Smith had faith in
 5    these -- in these investments and in Daryl Bank, and he
 6    believed them.  So it wasn't just victims who stated that it
 7    was a witch hunt against Daryl Bank, but other people that
 8    worked in the industry stated that he had faith.
 9            Mr. Smith did not have access to bank accounts.  He
10    did not have access to the money move sheets.  He didn't have
11    anything showing any evidence of money laundering by any of
12    the parties, like Daryl Bank or Kent Maerki and his wife.  He
13    just was not privy to the information regarding the expansion
14    band and guard band that Mr. Alcorn or Mr. Maerki were privy
15    to through their lawyers.
16            With respect specifically to the wire fraud,
17    Counts Sixteen and Seventeen, those calls, I believe, did
18    come in at Government's Exhibit 1016A and 1017A.  However, I
19    think it's unclear whether or not those dates were actually
20    put into evidence, so I would also be moving for judgment of
21    acquittal on Sixteen and Seventeen.
22            And furthermore, Your Honor, at the end of the day,
23    any participation in wire fraud or in conspiracy needs to be
24    done knowingly and willfully; it needs to be deliberate, and
25    reckless is not enough for a criminal standard.  Thank you.

1          THE COURT:  Thank you.  The same standard the Court

2     articulated a few minutes ago with respect to Mr. Alcorn, of

3     course, applies, and counsel has, quite appropriately, I

4     think, referred to the Rule 29 requirement, and we have to be

5     sure that there is intentional conduct by the defendant to

6     engage in conduct sufficient to convict him on any of these

7     counts.

8          With respect to the conspiracy, the conspiracy law

9     is very clear on what one has to do to be convicted of a

10    conspiracy.  Number one, the conspiracy has to exist, and I

11    think the evidence has shown the conspiracy existed; and,

12    number two, there has to be established proof that the

13    defendant had knowledge of the conspiracy; third, the

14    defendant voluntarily engaged in that conspiracy.  And I have

15    to go back and look and see if the overt act is required or

16    not required in this case.

17         The evidence is abundantly clear that Mr. Smith

18    became cognizant of the conspiracy, he participated in the

19    conspiracy, and his effort to declare deliberate ignorance is

20    insufficient, the Court believes, to save him from being a

21    co-conspirator in this case.  He attended the meetings, the

22    Napa Valley meeting.  There was any number of times he had an

23    opportunity to find out that what he was engaged in was

24    illegal conduct.

25         So the Court finds that Mr. Smith through his

1    conduct has participated in such a way that there's

2    sufficient evidence here for a jury to determine, if it

3    wishes, to sustain the conviction of conspiracy and for each

4    wire fraud count that is set forth in this indictment.

5         Now, the Court understands that the defendants may

6    renew their motions for judgment of acquittal at the end of

7    the evidence in this case, if they choose to present some, or

8    even to move to set aside the verdict after the jury makes a

9    determination.

10        So there are two more bites at the apple here, as

11   the saying goes, with respect to these counts.  So we will

12   have the total picture in front of us at the end of this

13   case, but at this juncture, the Court cannot grant any motion

14   for judgment of acquittal on any of these counts.

15        Now, Mr. Alcorn, will you please stand up.

16        Mr. Alcorn, as the defendant in this case, you have

17   a right to testify in this case.  Whether you testify or not

18   is your decision.  If you choose to testify, you may do so,

19   but in the event you are convicted, if the jury should

20   convict you and it's later determined that you committed

21   perjury during the time you testified, at sentencing you

22   could face an enhancement for obstruction of justice, which

23   means your advisory guidelines would be higher, if you take

24   the stand and testify falsely.

25        Now, have you consulted with your counsel to

```
 1    determine whether you wish to testify or not?
 2              DEFENDANT ALCORN:  Yes, Your Honor.
 3              THE COURT:  And what determination have you made?
 4              DEFENDANT ALCORN:  I'm not going to testify, Your
 5    Honor.
 6              THE COURT:  Now, is the decision to not testify your
 7    decision?
 8              DEFENDANT ALCORN:  Yes, Your Honor.
 9              THE COURT:  Did anyone coerce you into making a
10    decision not to testify?
11              DEFENDANT ALCORN:  No, Your Honor.
12              THE COURT:  All right.  The record will reflect that
13    the defendant has given those answers.
14              I didn't ask you to give me those answers under
15    oath, but it's going to suffice.  It's on the record as your
16    position.  You may have a seat.
17              Mr. Smith.
18              MS. McCASLIN:  Your Honor, we would ask for this
19    colloquy to be done after Mr. Alcorn's case.
20              THE COURT:  After his case?
21              MS. McCASLIN:  After Mr. Alcorn's case in chief, if
22    he decides to put one on.
23              THE COURT:  Okay.  We will do that.
24              MS. McCASLIN:  Thank you.
25              MS. YUSI:  Your Honor, I would ask that in the
```

```
 1    spirit of efficiency and everything, we have been telling the

 2    defense counsel every day who their witnesses are going to

 3    be.  So we do need to know if tomorrow, assuming Mr. Alcorn

 4    rests today, who their witnesses are going to be, and that

 5    would include Mr. Smith.

 6            MS. McCASLIN:  And, Your Honor, we will let them

 7    know later this evening.  They did let us know in the

 8    evenings before the next day who their witnesses were going

 9    to be.  We will be doing the same this evening once we have

10    more concrete information.

11            THE COURT:  Okay.  Thank you.

12            Have you been told what witnesses, if any,

13    Mr. Alcorn will be calling?

14            MS. YUSI:  Absolutely, yes.

15            THE COURT:  All right.  Okay.  So we're reserving

16    the opportunity for Mr. Smith to indicate whether he wishes

17    to testify or not.  That being the case, we will go into a

18    break for 15 minutes.

19            (Recess from 10:55 a.m. to 11:14 a.m.)

20            THE COURT:  Is there another matter?

21            MS. McCASLIN:  Yes, Your Honor, just briefly.

22            Of the witnesses that Mr. Alcorn intends to call,

23    some of them may or may not be unindicted co-conspirators, I

24    don't know, and so I was just going to inquire if there is

25    knowledge of any of them intending to plead the Fifth.  If
```

```
 1    they are going to, we would ask that that be done outside the
 2    presence of the jury because of undue prejudice.
 3              THE COURT:  The Court doesn't know who you're
 4    calling.
 5              Does the government know whether these individuals
 6    are unindicted co-conspirators?  I mean, you know who he's
 7    calling.
 8              MR. BOSSE:  Could we confer for a moment,
 9    Your Honor?
10              THE COURT:  Please.
11              And the other thing, Ms. McCaslin, the Court doesn't
12    know whether that is going to be something the Court could
13    really control, about when a witness is going to be reluctant
14    to answer and if the issue is going to come up.  But I don't
15    know that you can make a fulsome argument that this is undue
16    prejudice to your client.
17              That would be an interesting argument, but I
18    understand you have a responsibility to make any arguments
19    that you believe may be plausible.  The Court will see.  If
20    we can navigate around the problem, we will.
21              MS. McCASLIN:  Thank you, Your Honor.
22              THE COURT:  Mr. Yarow, you're calling these
23    witnesses.  What is your understanding about the witnesses
24    you're calling?  How many are you calling?
25              MR. YAROW:  Four.  I would classify three of them as
```

```
 1    potentially unindicted co-conspirators, but I have no
 2    indication they want to invoke any rights to not testify.
 3              THE COURT:  All right.  Then, Government, you know
 4    who the witnesses are.  What is the situation?  Do you know
 5    whether the government is going to be pursuing them for some
 6    criminal conduct also?
 7              MR. BOSSE:  We do know who they are, Your Honor.  Of
 8    the three that Mr. Yarow is referencing, we've only ever
 9    spoken to Mr. Palmieri, and it was not in the sense of him
10    being a target of an investigation.
11              I think they were certainly all involved in the
12    spectrum scheme, but I can say, as of sitting here today, we
13    don't have any open investigations on any of these
14    individuals.  But I don't want to downplay the fact that they
15    were deep in, in some cases, into the spectrum.  The evidence
16    we presented earlier today, they all are on some of these
17    documents because they fit into what happened.
18              THE COURT:  Well, we'll have to move along and deal
19    with it as it arises.
20              Now, you had raised a question about -- by the way,
21    how did his test come back -- Mr. Palmieri?
22              MR. YAROW:  Very healthy, Your Honor.
23              THE COURT:  Bring the jury in.
24              I usually hate to break in the middle of a witness's
25    examination, but we're still going to stay on schedule for a
```

J. Palmieri - Direct

```
 1    1:00 break.  Unless we just end up five minutes past, we're
 2    going to stay on schedule for a 1:00 break.
 3              (The jury entered the courtroom.)
 4              THE COURT:  You may be seated.
 5              The record will reflect that all jurors are present
 6    in the courtroom once again.
 7              Does counsel agree?
 8              MR. BOSSE:  Yes, sir, Your Honor.
 9              MR. YAROW:  Yes, from Mr. Alcorn.
10              MS. McCASLIN:  Mr. Smith agrees.
11              THE COURT:  All right.  Ladies and gentlemen, as the
12    Court instructed you in the beginning of this case, the
13    United States has now rested.  The defendant has no burden to
14    produce any witnesses in this case, but the defendant has
15    made a determination, Mr. Yarow did, that he wishes to call
16    witnesses; Mr. Alcorn has made the determination.
17              MR. YAROW:  Your Honor, I call Jon Palmieri.
18              (Witness sworn.)
19              JON PALMIERI, called by the Defendant, having been
20    first duly sworn, was examined and testified as follows:
21                        DIRECT EXAMINATION
22    BY MR. YAROW:
23    Q.  Mr. Palmieri, my name is Rick Yarow.  I represent David
24    Alcorn.  Would you please state your full name for the record
25    and spell it.
```

---
J. Palmieri - Direct
---

1  A.  Jon Anthony Palmieri, first name J-o-n; last name

2  P-a-l-m-i-e-r-i.

3  Q.  And keep your voice up, if you can.

4          Mr. Palmieri, what is your educational background?

5  A.  I attended college, and I was six credits away from

6  having a bachelor's in business.

7  Q.  Okay.  And do you have any -- do you have any formal

8  education in the area of spectrum?

9  A.  Not formal, no.

10  Q.  And what is your -- would you tell the jury what your

11  work background is.

12  A.  Started early in my career with a company called Spectra

13  Financial Network, and that's my first introduction to the

14  cellular or spectrum industry-wise.  From there I went into

15  insurance, and now I'm currently in residential real estate

16  and real estate development.

17  Q.  Okay.  Did you ever work for a company by the name of

18  SmartCOMM?

19  A.  I didn't work for them.  I was actually a representative

20  for them.

21  Q.  Describe what that relationship means.

22  A.  Basically they offered an opportunity or service of

23  preparing applications that they would submit on behalf of

24  their clients.

25  Q.  My question was what was your -- what was your position

Carol L. Naughton, Official Court Reporter

J. Palmieri - Direct

1    there?

2    A.   My role was an independent representative.

3    Q.   So you were not an employee, but you were a 1099?

4    A.   Correct, yes.

5    Q.   Did you hold yourself out to be an agent of SmartCOMM?

6    A.   I don't think I ever used that term.

7          MR. YAROW:   Okay.   I'm going to pull up an exhibit

8    for the witness only.

9    BY MR. YAROW:

10   Q.   Can you see that?

11   A.   Yes, I can.

12   Q.   Can you identify what is in that picture?

13   A.   It's a tight shot, but it looks like the building where

14   SmartCOMM was based on Camelback Road in Phoenix.

15   Q.   And that is where you worked?

16   A.   That's where I attended meetings that SmartCOMM held,

17   yes.

18         MR. YAROW:   Your Honor, I would move to introduce,

19   it's Exhibit Alcorn 7.

20         THE COURT:   Any objection?

21         MR. BOSSE:   No, sir.

22         THE COURT:   Exhibit 7 for Alcorn will be admitted.

23         (Defendant Alcorn's Exhibit 7 was admitted.)

24   BY MR. YAROW:

25   Q.   And would you report into this building on occasion?

J. Palmieri - Direct

1    A.   Yes.  Again, they would have training, or if I needed to

2    go to get materials or to get questions answered, if I were

3    in town, I would go to that facility, yes.

4    Q.   And how large of a space did SmartCOMM have there?

5    A.   Fairly large.  I believe it took up a good part of one

6    floor.

7    Q.   Okay.  And do you recall generally the number of people

8    that worked there?

9    A.   I would say somewhere between 10 and 20.

10   Q.   When did you first start at SmartCOMM?

11   A.   I believe it was around 2009.

12   Q.   Now you can tell me what you did at SmartCOMM.

13   A.   So SmartCOMM offered services of preparing applications

14   on behalf of individuals to apply for spectrum --

15   Q.   Slow down a little bit.

16   A.   Okay.  To apply to the FCC for what was called vacated

17   spectrum.  And I would talk to -- mainly myself and my wife,

18   who participated, but also friends and family members of mine

19   who had an interest in potentially getting some of the

20   spectrum that we anticipated would be vacated.

21   Q.   Okay.  And who were these applications that they were

22   prepared to be filed with?

23   A.   I'm sorry?

24   Q.   The applications that were being prepared by SmartCOMM,

25   who were they to be filed with?  Who were they applying to?

────────────────── J. Palmieri - Direct ──────────────────

1   A.   So the -- it's been a while, so bear with me.  So the FCC

2   would open the window by virtue -- or through an announcement

3   of a public notice and provide an application date, and it's

4   my understanding that they, at that point, my recollection,

5   would have filed those applications with the FCC on behalf of

6   the person's name on the application.

7   Q.   And was the application filed in the hopes of obtaining a

8   license?

9   A.   Well, they call it a construction permit, but ultimately

10  it would evolve into a license if you did everything that the

11  FCC asked you to do.

12  Q.   Okay.  And what frequency of spectrum was SmartCOMM

13  making applications for?

14  A.   Primarily in the 800 band.  There were talks about them

15  doing things in the 900 band, but to my recollection, it

16  never evolved to that.

17  Q.   And this newly -- you described some newly available

18  spectrum.  What band -- within the 800.  What was that

19  called?

20  A.   I don't remember the channels in the 800, but it was --

21  there were what were called then, and maybe still called

22  today, I don't know, guard and expansion bands, which

23  resulted from the merger -- or the acquisition, excuse me, of

24  Sprint when Sprint acquired Nextel.  The FCC required them

25  to -- what they call to reband and make those -- relinquish

J. Palmieri - Direct

1   those channels and make them available for application by

2   others.

3   Q.   Okay.  And did you ever attend any training sessions at

4   SmartCOMM?

5   A.   Many of them, yes.

6   Q.   And who would conduct the training?

7   A.   A number of individuals.  Usually Pendleton Waugh, who

8   was one of the founders; Carol Downs sometimes; her daughter,

9   Shannon Downs; and one or two other individuals, who were

10  specific topic experts, would talk about a specific aspect of

11  what they were -- what their services offered or --

12  Q.   Was Kent Maerki one of these experts called into the

13  training?

14  A.   Kent Maerki was -- definitely spoke often.  I don't know

15  that I would call him the expert, but he certainly spoke

16  often, yes, and often introduced the topic, and then Pen or

17  Shannon or whoever would take it from there.

18  Q.   And how long did your training at SmartCOMM last?

19  A.   There were multiple -- sometimes they were single days,

20  sometimes they were multiday, sometimes they were four hours,

21  depending on the topic and depending on what had evolved

22  during that process since the last training.

23  Q.   When you were initially hired in 2009, did you go to an

24  initial training?

25  A.   Yes.

─────────────── J. Palmieri - Direct ───────────────

1   Q.  And how long was that initial training?

2   A.  I believe those were the longer ones, maybe two days.

3   Q.  During the training, did you receive any literature or

4   brochures describing the business plan of SmartCOMM?

5   A.  Yes.  A lot of brochures.  They had a whole room filled

6   with different brochures.

7   Q.  And then after that initial training, did you receive

8   additional or continuing training with SmartCOMM?

9   A.  Yes.

10  Q.  And how frequently would you receive that training?

11  A.  I'm working off of memory here, but I would guess

12  probably every three months, maybe four months.

13          MR. YAROW:  Okay.  And I'm going to ask the

14  government if they don't mind pulling up Exhibit 700, which

15  has previously been introduced.  If you don't mind, maybe

16  zooming in on, like, just maybe the top five.  There you go.

17  That's perfect.  Actually, if it will allow you to go all the

18  way across or not, I don't know, or more further across.

19  BY MR. YAROW:

20  Q.  Looking at Government's Exhibit 700, which has previously

21  been admitted, do you recognize this document?

22  A.  I mean, I can't say I recognize this specific document,

23  but the format is definitely familiar.  This is the format

24  that SmartCOMM used to kind of demonstrate what the potential

25  cash flows would be from this spectrum that they were going

J. Palmieri - Direct

1   to apply on your behalf for, assuming that a carrier would

2   either lease or buy that spectrum from you.

3   Q.  And were you given a spreadsheet that looks similar to

4   this by SmartCOMM?

5   A.  Yes.  Multiple of them.

6   Q.  This spreadsheet right here, was this an active

7   spreadsheet, in other words, where you could modify the

8   cells, or was it a printed spreadsheet like that?

9   A.  I can't speak for others, but for me it was only a hard

10  copy of print.  Sometimes they would give us a PDF if we

11  asked for it, but these were so colorful and big and bold,

12  but I don't recall ever asking for a PDF of it.

13  Q.  Did SmartCOMM make this a big deal in their presentation

14  to you?

15  A.  They did.  Yes, they did.

16          MR. YAROW:  If the government would take that down

17  and pull up 700A.  And I do appreciate that.  If you could

18  perhaps zoom in across the top.

19  BY MR. YAROW:

20  Q.  This is Government's Exhibit 700A, which has been

21  previously introduced.  And does this look familiar to you?

22  A.  Yes.  That's the coloring that they would use, if I

23  recall.

24  Q.  Okay.

25  A.  As well as the format.

---J. Palmieri - Direct---

1   Q.   And who is "they"?

2   A.   SmartCOMM.

3        MR. YAROW:  Okay.  If the government can take that

4   down and pull up 304.  And go to the second page.  I'm sorry,

5   I guess keep going down.  Third page.  Thank you.

6        If you can zoom in on starting with the *New York*

7   *Times* and the Morgan Stanley.

8   BY MR. YAROW:

9   Q.   Does this look familiar to you?

10  A.   Yes.

11  Q.   Where have you seen this before?

12  A.   Well, SmartCOMM used this when these reports came out to

13  tout what they were -- had been saying previous to that,

14  which was that the spectrum that they were going after on

15  behalf of their potential clients had value.

16       MR. YAROW:  Okay.  And if the government would take

17  that down and bring up 305 and go to the third page,

18  Government 305.

19       MR. BOSSE:  It's one page.

20       MR. YAROW:  I think it's the third page.  It's only

21  one page.  I'm sorry.  I have a hard time seeing this.  If

22  you could zoom in on the -- starting with *New York Times*.

23  BY MR. YAROW:

24  Q.   Again, does this look familiar to you?

25  A.   Yes.  Same quote.

———————J. Palmieri - Direct———————

1                MR. YAROW:  If you could take that down and bring up

2      Government 404 and go to the second page, please.  Third

3      page.  Zooming in on the same area.

4      BY MR. YAROW:

5      Q.  Again, does that look familiar?

6      A.  Yes.  Same quotes.

7                MR. YAROW:  Okay.  You can take that down.

8      BY MR. YAROW:

9      Q.  I'm going to show you one more.  It would be Government's

10     Exhibit 505, and on the first page, same area.

11               Again, does this look familiar to you?

12     A.  Yes.  Same quotes.

13     Q.  I'm sorry?

14     A.  I'm sorry, yes, these are the same quotes.

15     Q.  Same ones you used at SmartCOMM?

16     A.  Correct.

17     Q.  Okay.

18               MR. YAROW:  If the Public Defender's Office, or

19     Mr. Smith's attorneys, wouldn't mind pulling up --

20               THE COURT:  If you'd like a moment to go talk to

21     them, you can; otherwise, you can't stand there and talk to

22     them.

23               MR. YAROW:  I was going to ask them to pull up one

24     of their exhibits.

25               THE COURT:  Oh, pull up one of their documents,

—————————J. Palmieri - Direct—————————

1    okay.

2             MR. YAROW:  Yes, sir.  Smith 180.  It has not been

3    entered into evidence, Your Honor, just for the witness.

4    Okay.  And if you could zoom in on the first page, please.

5    BY MR. YAROW:

6    Q.  Are you able to identify this document?

7    A.  Yes.

8    Q.  And what is this document?

9    A.  It looks to me like the same document that SmartCOMM

10   provided to anybody who would listen, and in this case, the

11   representatives, like myself, that showed that the

12   investigation against or by the -- by the SEC was -- they

13   were effectively cleared of wrongdoing, in Pendleton Waugh's

14   words.

15            MR. BOSSE:  I'll object to that last statement about

16   cleared of wrongdoing.  The document speaks for itself.

17            THE COURT:  Sustained.

18            MR. YAROW:  Your Honor, I have already asked Smith's

19   attorneys, and they do not object to me introducing this

20   document into evidence at this time.

21            THE COURT:  Okay.  That's fine.  But the Court

22   sustained any effort by the witness to state what the

23   document says.

24            MR. YAROW:  That's fine.

25   BY MR. YAROW:

Carol L. Naughton, Official Court Reporter

———J. Palmieri - Direct———

1  Q.  Don't tell me if that's what the document says, but you

2  answered you saw this document before at SmartCOMM?

3  A.  Yes.  It was distributed by SmartCOMM to tout what they

4  said was a favorable ruling by the SEC.

5  Q.  Okay.

6          THE CLERK:  Is this document in?

7          THE COURT:  He had moved it in.

8          MR. YAROW:  I did, Your Honor.

9          THE COURT:  Then it's admitted.

10          MR. YAROW:  Smith 180.

11          THE CLERK:  Do you want it remarked as an Alcorn

12  exhibit?

13          THE COURT:  Yes.  It's going to be remarked as an

14  Alcorn exhibit.

15          MR. YAROW:  Alcorn 22?

16          THE CLERK:  Alcorn 23.

17          MR. YAROW:  Alcorn 23.  Okay.  You can take that

18  down.  Thank you.

19          (Defendant Alcorn's Exhibit 23 was admitted.)

20  BY MR. YAROW:

21  Q.  The spreadsheet that I previously showed to you, is that

22  something that would -- you would be encouraged to use in

23  your marketing with SmartCOMM, the SmartCOMM product?

24  A.  They encouraged us to use it, yes, because it again

25  showed the value of what they thought the spectrum would be

J. Palmieri - Direct

1   worth or could be worth.

2   Q.  Okay.  And during the training, would Kent Maerki do any

3   of the talking and the explaining of what this technology

4   was?

5   A.  Yes.  From a, for lack of a better word, promotional

6   perspective, he wasn't really a subject matter expert other

7   than he would tout the potential financial benefits and then

8   turn it over to somebody that could speak to the specifics.

9   Q.  Okay.  I understand.  And would Mr. Maerki share his

10  experiences from the 1980s?

11  A.  Yes, he would.

12  Q.  Okay.  And what were those experiences?

13          THE COURT:  That's a broad question.

14  BY MR. YAROW:

15  Q.  What would Mr. Maerki say?

16          MR. BOSSE:  Well, I'll object to Maerki's statement

17  without some statement of what this is for.

18          THE COURT:  Sustained.  We've been through this

19  before.

20  BY MR. YAROW:

21  Q.  And at SmartCOMM were the limitations on the guard band

22  frequency discussed?

23  A.  Yes.  The limitations on -- yes, they were discussed.

24  Q.  Okay.  And what were those limitations?

25  A.  Forgive me if I don't recall the difference between the

─────J. Palmieri - Direct─────

1    guard and expansion band, but the limitations, as I recall,
2    there was -- one of those were more valuable than the other
3    because of their proximity to, I believe, public safety,
4    which allowed for fewer number of channels.  And again, I'm
5    working off of memory here, but I believe -- and I can't
6    recall if it's the guard band or the expansion band, but one
7    of them was unique to the other.
8    Q.  Would SmartCOMM describe the 800 megahertz as being very
9    desirable?
10   A.  Beachfront property is, I think, the term that they used
11   to call it, yes.
12   Q.  Beachfront property.  Okay.
13         And what exactly does that analogy mean to you?
14         MR. BOSSE:  I'm going to object on calling for
15   speculation about that.
16         THE COURT:  Well, the Court will sustain it in part.
17   The witness certainly can testify what was beachfront
18   property.  How did they teach what beachfront property was?
19   BY MR. YAROW:
20   Q.  What did they mean by beachfront property?
21   A.  That was their way of saying that this was valuable
22   spectrum because of the nature of lower band spectrum versus
23   upper band spectrum.
24   Q.  Were you taught anything about the superiority of the
25   800-megahertz range?

———————J. Palmieri - Direct———————

1    A.  All of the time, yes.

2    Q.  Okay.  And what was the -- and what were you taught?

3    A.  Well, lower band spectrum, as I recall, required fewer

4    towers between -- fewer number of cell sites, so fewer

5    towers, which would lower the cost, and lower band spectrum

6    also penetrates buildings better than higher, than upper band

7    spectrum, and, therefore, it was valuable, and there was a

8    lot less of it because most of it was granted in the early

9    stages, in the '80s or '90s of the cellular industry.

10   Q.  And was the risk of this -- was the risk of applying for

11   the guard band discussed at SmartCOMM?

12   A.  Yes.  Yes.  Mr. Waugh himself was not one to emphasize

13   the risk, but he did talk about the fact that there were a

14   number of moving parts that would have to come into play for

15   this to happen, but that everybody involved had similar

16   motives, so hopefully, realistically something good could

17   come of it.

18   Q.  Was the general understanding at SmartCOMM that this

19   would be a not-so-risky investment?

20          THE COURT:  Wait a minute.  Let's back up.  You

21   cannot testify to what some third party said other than the

22   two defendants in here.  You referred to a Mr. Waugh.  You

23   cannot do that.  So limit what was said to the two parties

24   that are on trial.  Otherwise, you cannot do that.

25   BY MR. YAROW:

J. Palmieri - Direct

1    Q.  And was it explained at SmartCOMM who would be the best
2    end user for the guard band frequencies -- licenses, rather?
3    A.  Yes.  It was always the cellular providers, whether it
4    was Sprint or anybody else, that at that time would have the
5    most -- it had the most valuable value to them, and,
6    therefore, it would presumably equate to a better return on
7    investment for the person that owns that spectrum either
8    through leasing it or selling it to a carrier.
9    Q.  Okay.  And was there one particular carrier that was most
10   often discussed in your training?
11   A.  Well, it was Sprint, because Sprint was the one
12   relinquishing the channels, and, at least in my discussions
13   or recollection on the topic, there was no barrier for them
14   to buy the channels back or lease the channels back, if they
15   wanted them.
16   Q.  And was it discussed why the carriers -- why Sprint would
17   just not go and purchase the license themselves?
18           MR. BOSSE:  I want to ask by whom?  We keep hearing
19   "was it discussed."
20   BY MR. YAROW:
21   Q.  Was it part of the SmartCOMM training that as to the --
22   was it described in the SmartCOMM training why the phone
23   carriers just did not go and purchase these licenses
24   themselves?
25   A.  Well, the rebanded spectrum could not be purchased.  The

—————J. Palmieri - Direct—————

1    way that the wording of the rebanding process went was that

2    part of the agreement for Sprint to be able to buy Nextel was

3    that they relinquish those channels and pay for the rebanding

4    to free up -- or to buffer, if you will, public safety.

5              They were not -- so once they were released back

6    into the public domain for application, then it was my

7    understanding that they could apply for them but probably

8    wouldn't and would decide to either lease or acquire them at

9    some other point if they wanted them either early on or in

10   the future.

11   Q.  Okay.  During your training, was it discussed there was a

12   need to -- once a license was obtained, there was a need to

13   build it out within 12 months?

14   A.  Yeah.  If I recall, I think it was a 12-month window the

15   FCC provided.  I mentioned earlier, you are awarded -- or you

16   would have been awarded a building -- a construction permit

17   to issue or to build out some infrastructure with --

18   utilizing that spectrum, and then you would be granted an

19   operating -- for lack of a better word, an operating permit

20   by the FCC.

21             So, yes, you had some period of time in which you

22   had to perform some function.  You couldn't just sit on the

23   spectrum.  You had to do something with it pretty

24   immediately.

25   Q.  Okay.  And did SmartCOMM during their training represent

J. Palmieri - Direct

1    how quickly these licenses could be monetized?

2    A.  It certainly wasn't a long time.  Their business model,

3    per se, was to have something in place to help any of these

4    successful applicants move to the construction phase and then

5    help them find a suitor for them, if you will, somebody to

6    lease it or buy it.

7    Q.  And did you on -- prior to selling as an independent

8    marketing rep for SmartCOMM, did you do any of your own due

9    diligence in regard to this guard band frequency?

10   A.  I believe that I did, yes.  I mean, part of that

11   required -- I believe that the acquirers or the successful

12   applicants would want to work together to make that block of

13   spectrum larger, which in the cellular world makes it more

14   appealing or more valuable.

15   Q.  Okay.  And did you invest any of your own money in these

16   applications?

17   A.  I did.  My wife and I invested almost a quarter of a

18   million dollars of our own money into it.

19   Q.  And do you remember when David Alcorn started working at

20   SmartCOMM?

21   A.  I don't remember when.  I remember, I think, the first

22   time meeting him at a SmartCOMM training at their offices on

23   a weekend or something like that.

24   Q.  Okay.  And do you know whether he had the same position

25   you did there?

J. Palmieri - Direct

1    A.  I believe he was a -- they called him an SMR or a rep,
2    yeah.
3    Q.  And how long, approximately, had you been working there
4    before you first saw David there?
5    A.  I honestly don't recall.  I would guess it was six
6    months, maybe.
7    Q.  Okay.  And do you have any personal knowledge of whether
8    or not David had any experience in spectrum?
9    A.  I don't.
10   Q.  Okay.  Do you have personal knowledge of what David's
11   background was prior to working for SmartCOMM?
12   A.  I do now, having gotten to know David, that he was in
13   real estate.  And, you know, I was involved in real estate at
14   the time, too, so we had those conversations.
15   Q.  Okay.  And did David also attend the SmartCOMM training?
16   A.  I remember meeting him at a SmartCOMM training, and I
17   don't recall others that he was there, but I presume that he
18   was.
19   Q.  Okay.  And eventually did you and David end up leaving
20   SmartCOMM?
21   A.  I would use a different term than "leaving."  The
22   SmartCOMM management got sideways with Mr. Maerki and
23   relinquished -- or terminated his agreement, and by extension
24   they had terminated mine because Kent had introduced me to
25   SmartCOMM.

---

J. Palmieri - Direct

1  Q.  I see.  Okay.  And are you familiar with Janus Spectrum?

2  A.  Yes.

3  Q.  And did you originally have a position, or a consulting

4  position at least, with Janus Spectrum?

5  A.  I never had a formal position with them, no.

6  Q.  Okay.  Were you called upon by Janus Spectrum to help out

7  sometimes?

8  A.  So if I can give you the long answer to that question.

9  My background started in the '80s when spectrum was first

10  introduced, and, therefore, even at SmartCOMM, I became the

11  kind of go-to person to, say, tell us again, Jon, what

12  happened in the '80s and how everybody, through a similar

13  process, was able to successfully -- individuals, through a

14  similar process, were successfully able to get very, very

15  valuable spectrum.

16         And so people -- they talked about what happened in

17  the '80s, and I was one of not many that were around to give

18  them my recounting of it.  So they would -- I wouldn't say

19  often but sometimes would call on me to, say, can you tell us

20  about what happened in the '80s, Jon?

21  Q.  Okay.  And what happened in the '80s?

22         THE COURT:  Well, wait a minute, Counsel.  That's a

23  broad-based question.

24         MR. YAROW:  I'm asking -- specifically asking what

25  he's referring to from the 1980s.

---

Carol L. Naughton, Official Court Reporter

─────────────── J. Palmieri - Direct ───────────────

1            THE COURT:  That's a broad-based question.  Let's be

2     specific.

3     BY MR. YAROW:

4     Q.  And are you aware of people making a lot of money in the

5     spectrum business in the 1980s?

6     A.  Yes.  The first job out of college was with a company

7     called Spectra Financial Network.  They partnered with a

8     company called The Cellular Corporation, which was one of the

9     first companies to realize that the way that the FCC was

10    doling out spectrum for the very first cellular system that

11    we all utilize today was, in part, through a lottery process,

12    and they effectively put a program together where you and me

13    and anybody could apply for that lottery -- apply to that

14    lottery, and then hopefully your number was picked, and you

15    won literally the ability to operate a cellular system in

16    that particular market.  You didn't have to have any

17    qualifications.

18            What Cellular Corporation saw was that if you knew

19    that there were 50 people applying, you had a 1 in 50 chance.

20    So what they said is let's all agree ahead of time, if we're

21    all applying for the Des Moines, Iowa, license, that if one

22    wins, we all share it, and that worked in many cases, not

23    every case.  And a lot of the investors -- a lot of the

24    applicants back then were very -- won those licenses and were

25    very -- and went on to be very successful, monetarily

---

J. Palmieri - Direct

1   speaking.

2   Q.  Thank you.

3        And what was Janus Spectrum's business model?  Can

4   you describe Janus Spectrum's business model?

5   A.  My recollection is it was very similar to what

6   SmartCOMM's was, which was providing application services to

7   individuals who wanted to apply for this vacated spectrum in

8   the 800-megahertz band that resulted from the rebanding

9   process that they called it.

10  Q.  And do you recall whether or not Janus Spectrum had any

11  former customers from SmartCOMM that were purchasing

12  applications?

13  A.  I do recall -- I cannot answer that specifically to the

14  individual, but I do recall there were a number of

15  individuals who had looked into the SmartCOMM opportunity,

16  for lack of a better word, and became soured on the

17  management decisions that SmartCOMM was making and decided or

18  wanted to find another avenue to potentially file

19  applications on their behalf, and that's where I think Janus

20  stepped in.

21  Q.  Can you think of the names of any of those people?

22  A.  I know there were individuals out of Texas that had kind

23  of banded together.  They got a couple of LLCs, and they were

24  looking to buy a lot -- apply for a lot of these -- a lot of

25  the spectrum in a lot of the markets, and I -- I mean, I

---

—————J. Palmieri - Direct—————

1  believe I -- yes, so -- but I don't recall names, no.

2  Q.  Okay.  That's fine.

3       And would you walk me through the process of what is

4  involved with applying or preparing an application to apply

5  with the SEC for a license?

6       THE COURT:  And in responding, I want you to avoid a

7  long, drawn-out narrative.  You may have to walk him through

8  it.

9       MR. YAROW:  Yes, sir.  I just don't want to lead,

10  Your Honor.  I apologize.

11  BY MR. YAROW:

12  Q.  What would -- how does the process -- what would be

13  involved with the application process?  What would be the

14  first step?

15  A.  So the FCC requires an application have engineering of

16  what you are planning to do with that license, if they were

17  awarded, and then they had to hire what's called a frequency

18  coordinator that the FCC required to basically bless your

19  engineering to ensure that your proposed network that you're

20  going to build there does not interfere with anybody around

21  it.

22  Q.  And then once all this was done, then were you able to

23  make an application -- were you able to make an application

24  with the FCC?

25  A.  Yes.  In this case SmartCOMM would apply on your behalf

J. Palmieri - Direct

1    with the application they prepared.

2    Q.  Was there a process where the FCC would release markets

3    before you could apply?

4    A.  I'm trying to answer that as clearly as possible.  The

5    rebanding process was nationwide, and some markets were

6    smaller and got rebanded really quickly.  Others had more

7    public safety, so it took longer.  So it was a multiple-year

8    process, but, yes, once a district or an area -- I forget

9    what they called it -- was ready, in other words, all the

10   public safety channels had been cleared, then they would make

11   it available for application.

12   Q.  Okay.  And was this called public notice, or is that

13   something that was used when the release was available?

14   A.  Yeah, relative to the rebanding process, the FCC's

15   notification to the public, we called a public notice, maybe

16   they use that for other things, too, but I know they used it

17   for this.

18           MR. YAROW:  Okay.  Thank you very much.  Please

19   answer any questions any of the other attorneys may have.

20           THE COURT:  First, cross-examination by the

21   United States.

22           First of all, do you have any questions?

23           MS. McCASLIN:  I do, Your Honor.

24           THE COURT:  We can save time by having you go and

25   then the government goes.

J. Palmieri - Cross (By Ms. McCaslin)

 1             MR. BOSSE:  All right.  Thank you.
 2                       CROSS-EXAMINATION
 3   BY MS. McCASLIN:
 4   Q.  Hi, Mr. Palmieri.  My name is Lindsay McCaslin.  I
 5   represent Bill Smith.
 6             All right.  You mentioned that you worked with
 7   Spectra in the '80s, right?
 8   A.  Yes.  Spectra Financial Network.
 9   Q.  What was your role with Spectra Financial Network?
10   A.  I was very green, just out of school, and I would kind of
11   do everything -- I would mostly speak to financial planners
12   and others in the -- others who represented clients who were
13   looking for investment products for those clients.
14   Q.  And how long were you involved in that company?
15   A.  Probably two and a half to three years.
16   Q.  And how long did you work at SmartCOMM?
17   A.  I was a representative for SmartCOMM for probably the
18   better part of a year and a half, I'm guessing.
19   Q.  And you sold these frequency applications through
20   SmartCOMM?
21   A.  Correct.
22   Q.  And do you know about how many applications you sold?
23   A.  Well, I bought more than I sold, but probably 40, maybe
24   50.
25   Q.  Do you remember what the cost was at SmartCOMM?

———————J. Palmieri - Cross (By Ms. McCaslin)———————

1    A.  It varied by the size of the market.  The larger markets,

2    New York, Los Angeles, was -- depending on the guard or

3    expansion band, I think the guard band was more expensive, if

4    my memory serves me, 50- or 60,000, and the smaller markets

5    were sometimes in the teens.

6    Q.  And when you were with Janus Spectrum, did you sell

7    applications?

8    A.  I was never with Janus Spectrum, and, no, I did not.

9         MS. McCASLIN:  Now, if we could pull up,

10   Mr. Grindrod, Government 304.  It's been admitted.

11   BY MS. McCASLIN:

12   Q.  And, sir, are you familiar with a document similar to

13   this?

14   A.  Not that specific document.  I've never seen a Dominion

15   Private Client Group, that I recall.

16   Q.  If we could go down to Page 15, please.  So you see at

17   the top here we have a heading for the Janus Spectrum team,

18   correct?

19   A.  Yes.

20   Q.  And David Alcorn is listed first, Kent Maerki is listed

21   second, and then you are listed third as a senior advisor.

22   A.  Okay.

23   Q.  Are you aware that you were considered a senior advisor

24   with Janus?

25   A.  I was not aware I had that title, no.

J. Palmieri - Cross (By Ms. McCaslin)

1    Q.  And it says in here -- if you could read this one
2    sentence, please.
3    A.  "Mr. Palmieri is an 800-megahertz authority and the Janus
4    go-to guy for technical consulting."
5    Q.  Why were you -- what was your background with the
6    technical side of spectrum?
7    A.  So as I said earlier, I was most popular because I knew
8    what -- I witnessed what happened in the '80s, in the
9    beginning part of it; second to that, I listened during the
10   SmartCOMM trainings when most people -- I shouldn't say most
11   people, but I seemed to listen more than others, and,
12   therefore, I really understood how the 800 rebanding process
13   worked, and people would ask me questions about that,
14   technical questions about it.
15   Q.  And so were you following, at least somewhat, the
16   announcements that the FCC would put out publicly?
17   A.  I tried to, yes, because I had applications as well.
18   Q.  And so when the public notice came out, the first one --
19          MS. McCASLIN:  If we could bring up Smith 65,
20   please, and it's in evidence already.
21   BY MS. McCASLIN:
22   Q.  Have you seen this first public notice before?
23   A.  I likely saw it, but, I'm sorry, I don't recall it
24   specifically.
25   Q.  That's fine.  Was it clear to you, reading over the FCC

─────── J. Palmieri - Cross (By Ms. McCaslin) ───────

 1   documents, that these 800-megahertz frequencies could not be
 2   leased back to Sprint?
 3   A.  It's still not clear to me whether they could or could
 4   not be leased back to Sprint.
 5   Q.  Okay.  So you at least believed that they could be leased
 6   back to Sprint?
 7           MR. BOSSE:  I'm going to object to that.  That's not
 8   what the witness said.
 9           THE COURT:  Sustained.
10   BY MS. McCASLIN:
11   Q.  Well, you invested $250,000 of your own money, right?
12   A.  Yes, ma'am.
13   Q.  Was that through SmartCOMM or Janus?
14   A.  SmartCOMM.
15   Q.  And you wouldn't have invested if you thought that this
16   was a sure failure, right?
17   A.  Absolutely not.
18   Q.  Did any of your clients at SmartCOMM make money off of
19   their licenses, do you know?
20   A.  I do not.  SmartCOMM stopped -- well, announced to
21   everybody they would not be filing applications because they
22   didn't have the money, and every individual applicant was on
23   their own to decide how they wanted to move forward.
24   Q.  So of the applications that you did sell, did you
25   intentionally lie to your clients that these could be sold

———————J. Palmieri - Cross (By Ms. McCaslin)———————

1    back or leased back to Sprint?

2          MR. BOSSE:  I'm going to object.  There's been no

3    testimony that he told any clients they could be leased back

4    to Sprint.

5          THE COURT:  Sustained.  The question assumes

6    evidence --

7          MS. McCASLIN:  It does.

8          THE COURT:  -- that does not exist.

9          MS. McCASLIN:  I will back up, Your Honor.

10   BY MS. McCASLIN:

11   Q.  When you were selling applications with SmartCOMM, were

12   you discussing the possibility of leasing these back to

13   Sprint?

14   A.  My discussions relative to the value -- and I still

15   believe it today -- is that that spectrum, if aggregated with

16   others, would have value to some commercial entity.  It may

17   be a network provider like Sprint, AT&T, Verizon, or it may

18   be something that is -- you know, some other commercial use

19   of it.

20   Q.  And so the information that you're passing on to your

21   clients, is it fair to say that you believed what you were

22   telling them?

23   A.  Absolutely, because I invested myself.

24   Q.  And if it turned out that you could not use these to

25   lease back to Sprint, would that be an intentional lie?

—————————— J. Palmieri - Cross (By Mr. Bosse) ——————————

1          MR. BOSSE:  That calls for speculation with a

2     hypothetical.

3          THE COURT:  Sustained.

4          MS. McCASLIN:  I have no further questions.

5                     CROSS-EXAMINATION

6     BY MR. BOSSE:

7     Q.  Good afternoon, sir.  My name is Andrew Bosse.  I'm with

8     the government.

9          You're currently working as a real estate agent; is

10    that right?

11    A.  Correct.

12    Q.  And you've been working as a real estate agent, I think,

13    since 2009; is that about right?

14    A.  I think I got my license in 2010.

15    Q.  Okay.  And back in the mid-1980s, you said you worked for

16    a company called Spectra Financial?

17    A.  Correct.

18    Q.  Okay.  And you worked there with Kent Maerki?

19    A.  Correct.

20    Q.  What was Mr. Maerki's role at Spectra?

21    A.  He was the owner and founder of the company.

22    Q.  So you said --

23    A.  I'm sorry.  He was the owner and founder of the company.

24          MR. BOSSE:  Okay.  Could we see for everybody --

25    it's in evidence -- Government 6, please.

—————— J. Palmieri - Cross (By Mr. Bosse) ——————

1    BY MR. BOSSE:

2    Q.  It should be up there on your screen.  It's marked as

3    Government's Exhibit 6.  Do you see this is a Federal Trade

4    Commission stipulation and consent decree and permanent

5    injunction against The Cellular Corporation from 1986?

6    A.  I do.

7    Q.  Okay.  And do you see down here that the defendants are

8    The Cellular Corporation, Spectra Financial Corporation, and

9    Kent Maerki?

10   A.  Yes.

11   Q.  Could we go to Page 4 of the document, please.  Do you

12   see down here at the bottom that this an order from the FTC

13   decreeing that Maerki and Spectra and their employees -- and

14   if we go down to the next page -- are each of them restrained

15   and enjoined from doing a number of things, including

16   representing that past agreements to share licenses are a

17   basis for concluding that future applicants in the FCC

18   lottery are likely to receive an interest and misrepresenting

19   the value of a profit potential or license awarded through

20   the FCC lottery?  Do you see that there?

21   A.  I do.

22   Q.  So you were subject to this FTC decree when you worked at

23   Spectra Financial, correct?

24   A.  This is the first time I've seen it, but yeah, it sounds

25   like that was, yes.

J. Palmieri - Cross (By Mr. Bosse)

1  Q.  And you are aware that Spectra Financial and The Cellular

2  Corporation are what is commonly known today as application

3  mills?

4  A.  Yes.

5  Q.  Again, you are aware that in the 1980s the FTC, the FCC,

6  and numerous other federal regulators took an interest in

7  application mills for various fraudulent activities they were

8  involved in?

9          MR. YAROW:  Your Honor, I'm going to object.

10         MR. BOSSE:  He's talked about Spectra, Your Honor,

11  and his background in the '80s.

12         THE COURT:  Objection is overruled.

13         THE WITNESS:  Can you repeat the question?

14  BY MR. BOSSE:

15  Q.  Sure.  You knew, because you worked in the industry in

16  the 1980s at something that is commonly described as an

17  application mill, that the FCC, the FTC, and numerous other

18  regulators were active in trying to stop fraud happening at

19  application mills.  You knew that, right?

20  A.  I did know that, yes.

21  Q.  And if we could go to -- it's your work at Spectra

22  Financial in the '80s with Kent Maerki and The Cellular

23  Corporation that gave you this experience that you later

24  talked about with clients; is that fair?

25  A.  That's fair, yes.

Carol L. Naughton, Official Court Reporter

———————— J. Palmieri - Cross (By Mr. Bosse) ————————

1   Q.  You left Spectra around 1989?

2   A.  I think it was '87 or '88, but...

3   Q.  Let me show you -- we should have a binder for you.

4   A.  Yes.

5   Q.  It's there.  Do you have that?  If you can look at --

6   there's a document marked 2200.  There are little tabs that

7   mark the documents.  Do you see 2200 there?

8   A.  I do.

9   Q.  If -- well, the first page, that's the deposition that

10  you gave under oath with the Securities and Exchange

11  Commission, correct?

12  A.  I believe so.

13  Q.  Okay.  What's the date of the deposition?

14  A.  May 16, 2014.

15  Q.  And I'm just using this to refresh your recollection at

16  this point.  If you could turn to Page -- it's four pages per

17  page, so it's Page 26 of the deposition -- and look at line 7

18  to 8, if you would.

19       MR. BOSSE:  And we can pull that up for the witness

20  on the screen.

21       THE WITNESS:  I'm sorry, what page, sir -- I mean,

22  what line?

23  BY MR. BOSSE:

24  Q.  Okay.  Well, let's go to Page 8, please.  I'll show it to

25  you.

—————————— J. Palmieri - Cross (By Mr. Bosse) ——————————

1    A.  Okay.

2    Q.  PDF Page 8, please.  And just to refresh your

3    recollection, if you could read that and tell me if you

4    remember when you stopped working for Spectra.

5         THE COURT:  You read it silently.

6    BY MR. BOSSE:

7    Q.  Oh, yeah, don't read it out loud.

8    A.  I'm sorry.  Do you want me to read it out loud?

9    Q.  No, I don't.  I'm going to ask you if it refreshes your

10   recollection about when you left Spectra Financial.

11   A.  Just as I said before.  I used the word "about."  It

12   was -- we had -- yes, '87 to '89.  I don't think it was as

13   late as '89.  It was probably '87, '88.

14   Q.  And then you didn't work for Kent Maerki again for many,

15   many years until we get to this 2009 time period, correct?

16   A.  We worked together up until, I think, 1991 doing some

17   other things that had nothing to do with spectrum.

18   Q.  Okay.  So if you said in there that you never worked with

19   Kent again, that would be a reference to spectrum?

20   A.  Yes.

21   Q.  Okay.  Other than your work at Spectra with Kent Maerki

22   in the 1980s, for about the next 20 years, you didn't have

23   any work experience related to spectrum, right?

24   A.  Not until I was re -- well, introduced to SmartCOMM,

25   correct.

J. Palmieri - Cross (By Mr. Bosse)

1   Q.  You don't have any kind of educational background that
2   relates to spectrum?
3   A.  No, sir.
4   Q.  And you're not an engineer, correct?
5   A.  No, I am not.
6   Q.  And you've not been offered here as an expert on
7   spectrum, to your knowledge?
8   A.  Not to my knowledge, yes.
9   Q.  And until your involvement with SmartCOMM, you've never
10  been involved in anything having to do with the guard and
11  expansion bands, right?
12  A.  Correct.  That's the first time I heard of it.
13  Q.  And you understood that the guard and expansion bands
14  were part of the rebanding process that the FCC was
15  undertaking to create a buffer next to the public safety
16  area, correct?
17  A.  Correct.
18  Q.  Okay.  I want to go back to a little bit of what you
19  talked about at SmartCOMM.  You became involved with them
20  when, do you think?
21  A.  It was either 2009 or 2010.
22  Q.  Was Kent Maerki already there when you started at
23  SmartCOMM?
24  A.  Yes.
25  Q.  Is he the one who brought you into it?

J. Palmieri - Cross (By Mr. Bosse)

1   A.  Yes.

2   Q.  All right.  And you said that a man named Pendleton Waugh

3   was running SmartCOMM and giving the training?

4   A.  Yes, sir.

5   Q.  You know, don't you, that Pendleton Waugh is a convicted

6   felon for fraud?

7   A.  Yes, I do.

8   Q.  And you know he's actually been to jail for fraud,

9   correct?

10  A.  Yes, I do.

11  Q.  Okay.  And did you know that he's also been subject to,

12  from the Securities and Exchange Commission, an injunction to

13  stop committing securities fraud?

14  A.  I did not know that, but...

15  Q.  But you knew he had been to jail?

16  A.  Yes.

17  Q.  Okay.  And you knew, in the 2009 time period, that

18  SmartCOMM was under investigation by the Securities and

19  Exchange Commission, correct?

20  A.  Honestly, I didn't know that until just a month or two

21  before the document you showed me recently, which I guess

22  cleared them, or whatever that document was that we looked at

23  earlier.

24  Q.  So no one -- Pendleton Waugh didn't tell you and Kent

25  Maerki didn't tell you that SmartCOMM was under SEC

J. Palmieri - Cross (By Mr. Bosse)

1    investigation?

2    A.   Not that I recall.

3    Q.   And you knew that Kent Maerki was not an expert in

4    800 megahertz or any other kind of spectrum in a technical

5    perspective, right?

6    A.   Yes.

7    Q.   And he had great stories about the heydays in the 1980s;

8    is that fair to say?

9    A.   Yes, sir.

10   Q.   And you bought license applications yourself, you said,

11   from SmartCOMM?

12   A.   Yes.

13   Q.   Were those in the guard or expansion band, do you

14   remember?

15   A.   I don't remember.  But I think in -- collectively, there

16   were some in each.

17   Q.   Okay.  And, in fact, all the licenses that people were

18   applying for through SmartCOMM, and then later through Janus,

19   were in the guard and expansion bands, correct?

20   A.   That's my -- I can't speak for Janus, but I know for

21   SmartCOMM, yes.

22   Q.   Okay.  And so at SmartCOMM you knew you were applying for

23   what are called narrowband licenses, 20-kilohertz site

24   licenses?

25   A.   Yes.

J. Palmieri - Cross (By Mr. Bosse)

1  Q.  Okay.  And you knew that Sprint and Verizon and AT&T

2  operate their broadband mobile networks on kilohertz channels

3  that measure in the millions of hertz, many times larger than

4  20 kilohertz.  You knew that, right?

5  A.  The answer to that is yes, and can I clarify my answer?

6  Q.  Sure.

7  A.  Okay.  I've said this earlier.  The premise under

8  which -- I can't speak for anybody else -- at least I

9  invested is because of my background in cellular in the '80s

10  where all of the applicants had to agree to work together for

11  it to monetize sufficiently, and I believe that was the case

12  in this particular issue.

13        The individual-sized frequencies that they were

14  issuing were not of value in and among themselves unless they

15  were aggregated together.

16  Q.  Right, because you knew that you had to aggregate

17  possibly hundreds of these bands together to even approach a

18  single megahertz channel width, right?

19  A.  That's -- my understanding is it was 25 megahertz in size

20  each.  So, yes.  So 25 megahertz each that we were applying

21  for.

22  Q.  Do you mean kilohertz, sir?

23  A.  It could be -- I'm sorry, I believe it may have been

24  kilohertz, yes.

25  Q.  And kilo is a thousand and mega is a million; is that

———————— J. Palmieri - Cross (By Mr. Bosse) ————————

1   right?

2   A.   Yes.

3   Q.   So an order of magnitude difference of, you know, 1,000

4   between the two?

5   A.   Yes.

6   Q.   And I'm sorry to ask you math, but a thousand times a

7   thousand is a million, fair?

8   A.   I -- before I wholeheartedly agree to that, I just want

9   to make -- I don't recollect -- it was my understanding, and

10  I invested my own money in it, so it's not something that I

11  took lightly, that the aggregated number of spectrum,

12  assuming that every applicant worked together, would be

13  sufficient enough to have value.

14  Q.   Sufficient enough to have value?

15  A.   To an end user, correct.

16  Q.   And you knew at the time that the guard and expansion

17  bands were being built as a buffer and that it was costing

18  billions of dollars for the FCC to build that buffer.  You

19  know that, right?

20  A.   Billions of dollars for Sprint, yes.

21  Q.   And you knew that -- right.  And you knew that the

22  process was going to take years, right?

23  A.   As I recall, sir, nobody really knew what the time frame

24  was.  Looking back, it took much longer than anybody

25  expected, but I don't believe anybody thought it would take

──────── J. Palmieri - Cross (By Mr. Bosse) ────────

1    this long.  But maybe some did.

2    Q.  Okay.  But to be clear, no one back then knew what the

3    time frame was at the time these application services were

4    being sold?

5    A.  That is correct.  They could only assume.

6    Q.  Okay.  And do you happen to know that the process just

7    ended just a little bit ago?

8    A.  Yes, I do know that.

9    Q.  And you know that they still haven't doled out and opened

10   up for application all of the guard and expansion band

11   channels?

12   A.  I understood that.  I haven't researched it entirely

13   recently.

14   Q.  You knew from your own experience that you weren't able

15   to monetize any of those channels that you bought, the

16   licenses you bought?

17   A.  Yes, sir, because what I had anticipated would happen did

18   not come to pass.

19   Q.  Okay.  In other words, you never leased them back to

20   Sprint or AT&T and Verizon?

21   A.  No, I did not.

22   Q.  As a matter of fact, you knew that the FCC would have to

23   grant a number of rulemaking waivers that hadn't even been

24   started in order for any Sprint or Verizon or anybody else

25   like that to use those channels, right?

---
J. Palmieri - Cross (By Mr. Bosse)
---

1  A.  There were a number of things that had to come to pass,
2  absolutely.  Again, my experience from the '80s maybe colored
3  my favorable view that that could happen and my belief that
4  everybody had a -- everybody would be motivated to make that
5  work.
6  Q.  Okay.  And did you petition the FCC for rulemaking to use
7  the guard and expansion band that had been set up as a buffer
8  in order to carry broadband channels?  Did you make that
9  rulemaking petition?
10  A.  I did not, no.
11  Q.  Did you know anybody who did?
12  A.  It's my understanding that there were some entities,
13  including SmartCOMM, that were going to do that.  Mr. Waugh
14  died, as you know, so I don't know what happened after that.
15  He was, as I understood it -- in my experience, he was kind
16  of the brains behind the operation.  So...
17  Q.  And a lot of what you've said today came from Pendleton
18  Waugh, right?
19  A.  Most of it did, yes, sir.
20  Q.  Pendleton Waugh, who -- SmartCOMM went into bankruptcy in
21  the end, right?
22  A.  Yes.
23  Q.  Company failed completely?
24  A.  Yes, sir.
25  Q.  Just like Janus Spectrum also did?

J. Palmieri - Cross (By Mr. Bosse)

1    A.  I can't speak why Janus failed.  But...

2    Q.  Okay.  Let's switch over and talk a little bit about

3    Janus.  You said you weren't an employee, and I understand

4    that.  You were never an employee of Janus Spectrum?

5    A.  Correct.

6    Q.  But you did work with David Alcorn and Kent Maerki with

7    the company called Janus Spectrum?

8    A.  In the beginning, they, you know, would ask me questions,

9    would, you know, ask me if I would participate in a

10   conference call.  I had discussed with my wife that I wanted

11   to go back into real estate, and the issue that was going on

12   at the time with SmartCOMM kind of soured me to the industry

13   because of the individuals involved, specifically SmartCOMM.

14   Q.  All right.  I think I got lost there.  Did you do

15   consulting work for Janus Spectrum?

16   A.  I wouldn't call it consulting work.  I was the sounding

17   board for them if they had questions.

18   Q.  So you were a sounding board for David Alcorn and Kent

19   Maerki?

20   A.  Yes, but it wasn't on a regular basis.  It was just

21   whenever they had a question.

22   Q.  Okay.  And between the two of them, the person you

23   interacted most with at Janus was David Alcorn, correct?

24   A.  I would say it was probably Kent, but I'm sorry, I don't

25   recall.

J. Palmieri - Cross (By Mr. Bosse)

1   Q.  So if you don't -- and that's fine.  I know we're talking
2   about years ago.  If you don't recall --
3           MR. BOSSE:  Let's go ahead and look again at the
4   same exhibit number, the deposition, just for the witness,
5   please.  So 2200, and if we could have Page 7, please.
6   BY MR. BOSSE:
7   Q.  And, sir, this is very small type.  I'm going to pull it
8   up here for you to read.
9           Do you see -- it's on your screen.  It's going to be
10  easier than trying to decipher that.  Do you see lines 12 to
11  14?
12  A.  I do.
13  Q.  Does that refresh your recollection about who you
14  actually talked with more at Janus?
15  A.  It does now, I guess, yeah.
16  Q.  Okay.  And who was that?
17  A.  It says David.  That was my -- when was this taken?  Back
18  in 2014.  So, yes, I would have known more then than I know
19  now because it's been so long.
20  Q.  And you understand that David Alcorn, although he may not
21  have had as much background as you did, he had above-average
22  knowledge about the 800-megahertz spectrum at issue?  You
23  understood that?
24  A.  I'm sorry.  Repeat your question.
25  Q.  Yes.  You would agree that David Alcorn had above-average

J. Palmieri - Cross (By Mr. Bosse)

1    knowledge about the 800-megahertz spectrum at issue here?
2    A.  Knowledge that he would have learned the same place I
3    did, which was SmartCOMM, and he didn't have the benefit of
4    the '80s that I had, so...
5    Q.  But you'd characterize his knowledge as being above
6    average about the band, correct?
7    A.  I could have.  I don't know that I would have used those
8    terms, but maybe I did.
9    Q.  Okay.  Let's go to the same document, Page 9, please.
10   It's 2200, Page 9.  Okay.  If you could just read that to
11   yourself.  And I think I missed a line, but see if this
12   helps.
13   A.  (Witness reading.)
14          This is Page 30, sir?
15   Q.  Yes.
16   A.  Okay.
17   Q.  And I did, I cut it off.  If you could look on the
18   screen.  I'm just asking you what you essentially said back
19   then.  It's not a trick question.
20   A.  Yeah, I said that.  If I said that in deposition, then I
21   said it, yes.
22   Q.  Okay.  And that deposition was taken closer in time to
23   the events we're talking about, than us sitting here today,
24   right?
25   A.  Correct.

J. Palmieri - Cross (By Mr. Bosse)

1   Q.   You were paid through a limited liability company that
2   you had set up called Benefit Enhancement Systems, right?
3   A.   Benefit Enhancement Services LLC.
4   Q.   And that's how you were paid, for the work you did for
5   Janus, by Mr. Maerki, right?
6   A.   That was my LLC that I used for any business dealings
7   that I did.
8   Q.   Okay.  So the money didn't come to you, it wasn't a check
9   written to you, it was a check written through Benefit
10  Enhancement?
11  A.   To Benefit Enhancement, which is my company.
12  Q.   Okay.  And you also did some consulting work for Kent
13  Maerki with respect to a dental company he was involved with,
14  right, Dental Support Plus Franchise?
15  A.   In the very beginning, he would bounce ideas off me, but
16  I -- that I recall.  I certainly didn't invest in it.  I
17  didn't recommend any investors invest in it.
18  Q.   You know that one also --
19  A.   I do.
20       MS. McCASLIN:  Objection, Your Honor.  This is
21  beyond the scope of direct.
22       MR. BOSSE:  Well, Your Honor, he's paid by
23  Mr. Maerki for his work with both entities.  They are both
24  involved in the case.  There's no way for me to separate out
25  dental versus spectrum, especially as we get into some of

J. Palmieri - Cross (By Mr. Bosse)

1   what I'm about to get into.

2          THE COURT:  Objection overruled.

3   BY MR. BOSSE:

4   Q.  All right.  You were paid -- between September 7th, 2012,

5   and February 18th, 2014, so about a year and a half, you were

6   paid over $740,000 by Kent Maerki for your consulting work,

7   right?

8   A.  I don't recall the number, but could be.

9   Q.  Does that sound right?

10  A.  Again, I don't recall.

11  Q.  Okay.  And what you said was that this was for bouncing

12  ideas off of you?

13  A.  There were numerous calls between Kent and I where I said

14  to him, "You don't need to pay me for this," and because we

15  were starting to go through the process of being sued by

16  SmartCOMM, I think he felt bad that I was involved with that

17  and having to spend money.  So he paid me.  I didn't ask for

18  it.  I didn't know when he was going to pay me.  He decided

19  to pay me, not Janus.

20  Q.  Well, but he paid you for consulting work you were doing

21  for Janus.  You knew that, right?

22  A.  He paid me -- he paid me.  Janus didn't pay me.  And I

23  told him, "I don't work for Janus.  If you want to pay me,

24  great, but this is -- we don't have a formal relationship.

25  If you have guilt to pay me, then pay me, but don't -- I'm

J. Palmieri - Cross (By Mr. Bosse)

1    not asking for this."  And I told him that numerous times.
2    Q.  In fact, you were very careful not to have a formal
3    relationship with Janus as far as being a part owner, right?
4    A.  They asked me to be an owner in the beginning, and I
5    ultimately decided no.
6    Q.  Okay.  Why did you decide no?
7    A.  As I mentioned earlier, my wife and I just decided I --
8    this was an industry that, because of the bad taste left in
9    our mouths from SmartCOMM, that I just didn't want to pursue
10   further.
11          MR. BOSSE:  Could we see on the screen, please,
12   Government's Exhibit 1018W.  This is not in evidence.
13   BY MR. BOSSE:
14   Q.  And you see that on your screen there?
15   A.  Yes, sir.
16   Q.  Just so we have a record of what this is, because I'm
17   going to offer it here in a moment, does this look like
18   banking documents related to NJM Spectrum LLC?
19   A.  Yes.
20   Q.  And that's the entity that Kent Maerki used to pay you
21   through Benefit Enhancement, correct?
22   A.  If you have all the records, I don't believe that all of
23   the checks came from NJM Spectrum, but if you say so, then
24   yes.
25   Q.  Oh, no, I'm not saying that.  I'm saying some of the

———————J. Palmieri - Cross (By Mr. Bosse)———————

1   checks came from NJM Spectrum.  Correct?

2   A.  Yes.

3   Q.  You may have gotten checks from Mr. Maerki through other

4   entities and LLCs that he ran.  I'm not saying you didn't.

5   A.  Okay.

6        MR. BOSSE:  Your Honor, pursuant to the stipulation

7   1018W, which relates to business records of Wells Fargo, I

8   will offer -- I'm sorry, the stipulation is A-21, and I will

9   offer 1018W.

10       THE COURT:  Hearing no objection, 1018W is admitted.

11       (Government's Exhibit 1018W was admitted.)

12       MR. BOSSE:  Ms. Yusi, could we please see Page 305.

13  BY MR. BOSSE:

14  Q.  And you see that on your screen right there, sir?

15  A.  Yes.

16  Q.  And it's a check -- well, I don't want to say it's a

17  check.  It's a bank draft, right, dated September 5th, 2012,

18  to the order of Benefit Enhancement for a little north of

19  $61,000?

20  A.  Yes.

21  Q.  Okay.  And you see the memo line is "Janus balance"?

22  A.  Yes.

23  Q.  That's paid by a Kent Maerki LLC to your LLC, correct?

24  A.  Yes.

25  Q.  And this is for consulting work you were doing?

J. Palmieri - Cross (By Mr. Bosse)

1   A.  Again, sir, I don't recall.  I imagine it was if it's at
2   the time and if it came from one of his LLCs.
3   Q.  Okay.  And I don't mean to limit you.  You talked about
4   consulting, but you also said that sometimes you get on the
5   phone with people and talk about the -- your experience in
6   the 1980s, correct?
7   A.  Generally, yes.
8   Q.  And that included clients who were purchasing application
9   services from Janus Spectrum LLC?
10  A.  I don't recall, sir.  I'm sorry.  I don't recall who I
11  spoke to about that.
12  Q.  Okay.  Let me ask you this:  After you left SmartCOMM and
13  started working -- continued to work with Kent Maerki and
14  David Alcorn, did you ever speak to people about the '80s who
15  were getting involved in license applications, that you
16  remember?
17  A.  I may have.  But I don't recall specifically.
18  Q.  Okay.  I'm going to try to page down here.  Okay.  And
19  we're going to do this a little bit quickly but not too
20  quickly for the court reporter, because I just want to show
21  that they are just -- these are all checks to Benefit, drafts
22  to Benefit Enhancement in various amounts signed by Norma
23  Coffin.  You knew that to be Kent's wife, correct?
24  A.  Correct.
25  Q.  Okay.  So this one is for $625.  $4,088.  And you see

J. Palmieri - Cross (By Mr. Bosse)

1   the memo there being "Apps 1 through 15"?

2   A.   Yes.

3   Q.   What do you understand that to mean?

4   A.   I have no idea.

5   Q.   But you did take the money, though, right?

6   A.   Yes, sir.

7   Q.   And then Apps 1 through 25, the next page, the amount

8   being $5,818, correct?

9   A.   Correct.

10  Q.   Innovative 1 through 4, the amount being $12,348.

11         Do you know what Innovative was?

12  A.   No, sir.

13  Q.   Did you talk with Innovative or anyone at Innovative

14  about your experience in the '80s, or was Kent bouncing ideas

15  off you related to this?

16  A.   I don't recall who Innovative was or is.

17  Q.   And if I keep going down, there are just

18  multi-thousand-dollar checks.  This one's for spectrum.

19  Innovative is $6,174.  And another Janus Spectrum Group,

20  Apps 1 through 4, for $16,720.  Do you see that?

21  A.   I do.

22  Q.   Let me see if there's any others I want to ask about.

23         Okay.  Yeah.  This one on Page 320.  You see this

24  one, Six Cities Associates, Apps 1 through 3?

25  A.   Yes.

—————————— J. Palmieri - Cross (By Mr. Bosse) ——————————

1   Q.  For $5,670, correct?

2   A.  Yes.

3   Q.  Do you know that that's the Newells, Susan Newell's

4   entity?

5   A.  I don't know that.

6   Q.  Did you speak to Susan Newell or Craig Newell or George

7   Cushman about their spectrum investments?

8   A.  I remember speaking to them at SmartCOMM.  I don't

9   remember speaking specifically to them about Janus.

10  Q.  The date here on this check, being January 29th, 2013, is

11  that before or after you left SmartCOMM?

12  A.  After.

13  Q.  Okay.

14          MR. BOSSE:  And if we could have, just for the

15  witness, a summary chart.  I'd like to show just the witness

16  1018V, Page 2.

17  BY MR. BOSSE:

18  Q.  And this summarizes, sir, the bank account that we just

19  looked at.  Rather than going through all the pages, I'm

20  going to ask you, do you have any reason to doubt that you

21  received, in about a 15-month period, $747,033.67 from Kent

22  Maerki's LLC?

23  A.  I would have to verify that.  So I'll just take it on

24  faith that your numbers are accurate.

25  Q.  You weren't doing other work for Kent Maerki during this

J. Palmieri - Cross (By Mr. Bosse)

1  time period, that you recall, right?

2  A.  Again, when he was starting his dental thing, he would

3  bounce ideas off me.  But that was the extent of it.

4  Q.  Okay.

5       MR. BOSSE:  We can take that down.

6  BY MR. BOSSE:

7  Q.  You also got an undocumented $90,000 loan from Janus

8  Spectrum, correct?

9  A.  I vaguely recall that.

10 Q.  Okay.  And -- well, did you get an undocumented $90,000

11 loan from Janus Spectrum, the company?

12 A.  Sorry, sir.  Define "undocumented."

13 Q.  I'm -- I'm asking you do you recall that?  Do you recall

14 getting a loan from Janus Spectrum, for which no loan

15 documents were written, in the amount of approximately

16 $90,000?

17 A.  I remember borrowing money from either Kent or David for

18 a short-term real estate transaction that I was shy of, and I

19 believe it was paid back pretty relatively quick.

20 Q.  Again, and that -- the money came through Janus Spectrum,

21 right?

22 A.  I don't recall, sir.

23       MR. BOSSE:  Could we see 1002B, Page 2, and this is

24 in evidence.

25 BY MR. BOSSE:

J. Palmieri - Cross (By Mr. Bosse)

1  Q.  Do you see here a withdrawal to Jon Palmieri of $90,000?

2  A.  Yes.

3  Q.  Okay.  And you see this relates to the Janus Spectrum LLC

4  Wells Fargo Bank checking account?

5  A.  Yes.

6  Q.  And if I page up again, and now do you see a deposit from

7  Benefit Enhancement Services, not from Jon Palmieri, but from

8  Benefit Enhancement Services, in the amount of $83,463?

9  A.  Yes.

10  Q.  And that's the undocumented loan that you got in your own

11  name but paid back through your LLC, correct?

12  A.  I'm sorry, sir.  I don't recall the details of the

13  transaction, but it looks like it.

14  Q.  Okay.  You knew that Kent Maerki and David Alcorn were

15  raising money from investors, right?

16  A.  I knew they were selling application services like

17  SmartCOMM was.

18  Q.  Okay.  And you knew that they were doing that years after

19  you left SmartCOMM.  So looking down the road, 2012, 2013,

20  2014, you knew that they were doing that years after you left

21  SmartCOMM?

22  A.  Yes.

23  Q.  All right.  And you knew that when you were being paid

24  money by Kent Maerki through KJM, that that was coming from

25  investor funds, right?

J. Palmieri - Cross (By Mr. Bosse)

1    A.  Again, sir, I don't know where the money was coming from.

2    He offered to pay me and thanked me for my time and

3    apologetically for what I was going through being sued by

4    SmartCOMM.

5    Q.  So I don't mean to be flippant, but he apologetically

6    gave you three-quarters of a million dollars?

7    A.  Again, sir, as I said earlier, I didn't ask him to pay

8    me.  He offered to pay me.  I don't know what the basis was.

9    It looks like those unrounded numbers may have been a

10   percentage of some form.  I can't understand why they were

11   that.  I had multiple conversations with him.  "You don't

12   have to pay me.  I'm not working for you.  Happy to give my

13   experience in the '80s because you're my friend."

14   Q.  You all were friends and remain friends?

15   A.  Well, yes.

16   Q.  You didn't know Kent Maerki to have any other source of

17   income other than investor funds during the time that you

18   knew him, correct?

19   A.  I didn't know that he did or didn't.  Sorry.

20   Q.  You didn't have any day-to-day responsibilities at Janus

21   Spectrum, correct?

22   A.  Not that I recall.

23   Q.  You didn't have a title with Janus Spectrum?

24   A.  Not that I -- not that I gave myself or I was given.

25   Q.  All right.

———— J. Palmieri - Cross (By Mr. Bosse) ————

1          MR. BOSSE:  Let me show, please, the witness
2     Government's 2202.
3     BY MR. BOSSE:
4     Q.  This will be on your scene, sir.  This isn't yet
5     admitted.  So we can go in chronological order, I'm going to
6     start down here at the bottom.  I don't want you to read it
7     because it's not in evidence.
8          Do you see that this is an e-mail from Mr. Maerki to
9     you about a check that Norma had sent you?
10    A.  Yes.
11    Q.  And the time period being the March of 2013 time period?
12    A.  Yes.
13    Q.  And do you see some more correspondence from you about
14    the way the money would be paid to you, generally, in this
15    March of 2013 time period?
16    A.  Yes.
17          MR. BOSSE:  I'll offer 2202, Your Honor.
18          THE COURT:  2202 is admitted.
19          (Government's Exhibit 2202 was admitted.)
20    BY MR. BOSSE:
21    Q.  So this is from Mr. Maerki to you.  Can you read that,
22    please.
23    A.  "Jon, Norma just sent you a check for $19,174.28.  Now do
24    something productive."
25    Q.  It says, "Now do something productive."

—————— J. Palmieri - Cross (By Mr. Bosse) ——————

1   A.  Yes.

2   Q.  And then you write back, and this is what you say -- I'm

3   going to read this one -- "Kent, is there any way we can

4   switch the paying entity from your spectrum company to

5   Intellection" -- and I'm not going to read it all -- "just

6   trying to think like a f-word, no good, good for nothing

7   legal professional."

8           You did write that, right?

9   A.  I don't recall writing it, but if it's on the record, I

10  guess I did.

11  Q.  And then Kent Maerki asks you, "Is that imperative?"  And

12  then your response is, "Just trying to avert any issues which

13  may come up in our ongoing legal issues.  Given all the work

14  I do for your other companies, like Dental Support Plus, it

15  would be better to show that the dollars I receive from you

16  are from those efforts, not from that with Janus."

17          Did I read that correctly?

18  A.  You did.

19  Q.  All right.  Were you familiar with a man, an attorney

20  named Nate Dodson?

21  A.  Yes.

22  Q.  You knew that he was an attorney who was working with

23  Mr. Alcorn and Mr. Maerki with respect to Janus Spectrum?

24  A.  I don't recall, but I remember his name.

25  Q.  I'm going to show you what's been marked as 300K, just

J. Palmieri - Cross (By Mr. Bosse)

 1    for the witness, please.

 2            And just so we can get this in evidence and talk

 3    about it, is this an e-mail from Mr. Dodson to Mr. Alcorn

 4    copying you and Mr. Maerki about pro forma assumptions in the

 5    February 2012 time period?

 6    A.  Okay.

 7    Q.  Did I accurately state that?

 8    A.  Yes.

 9            MR. BOSSE:  All right.  Your Honor, I'll offer 300K.

10            THE COURT:  300K is admitted.

11            (Government's Exhibit 300K was admitted.)

12    BY MR. BOSSE:

13    Q.  Going down, so going backward in time, the first e-mail,

14    you see this is an e-mail from you to Mr. Dodson at

15    Dodsonlegal.com copying Mr. Maerki and Mr. Alcorn,

16    February 14th, 2012.  It says, "Nate, attached are the

17    assumptions you've been waiting on," and then you sent him an

18    article as well.

19            Do you recall Mr. Dodson asking you and Mr. Alcorn

20    and Mr. Maerki to justify some of the assumptions that were

21    being made in the pro formas being shown to clients?

22    A.  I don't.  But if it's there, then yes.

23    Q.  You see that this is you responding to that sort of

24    query, correct?

25    A.  Yes.

J. Palmieri - Cross (By Mr. Bosse)

1   Q.  Okay.  And if I page up, you see that Mr. Dodson is

2   asking, in all caps, "I need back-up explanations of how you

3   came up with the 500 percent annual return."

4           Do you see that there?

5   A.  Yes.

6   Q.  Okay.  Did you ever give Mr. Dodson a back-up explanation

7   of how you came up with the 500 -- and I say you, Mr. Maerki,

8   and Mr. Alcorn came up with a 500 percent annual return?

9   A.  I don't recall.  I'm sorry.  It was years ago.

10  Q.  You don't need to apologize.

11          MR. BOSSE:  If we could look at 300M, as in Mary,

12  please.  Just for the witness.

13  BY MR. BOSSE:

14  Q.  Okay.  And, sir, just to orient ourselves to get this

15  into evidence, you see this is another e-mail from the

16  attorney Nate Dodson, Nathaniel Dodson, now March of 2012

17  time period, and it's about lease income projections with

18  respect to Infinite Spectrum to you, Mr. Alcorn, and

19  Mr. Maerki.  Correct?

20  A.  It looks like it, yes.

21          MR. BOSSE:  Your Honor, I'll offer 300M.

22          THE COURT:  300M is admitted.

23          (Government's Exhibit 300M was admitted.)

24  BY MR. BOSSE:

25  Q.  All right.  And so in this e-mail from Mr. Dodson sent

—————— J. Palmieri - Cross (By Mr. Bosse) ——————

1   March 18th of 2012, again, the pro forma assumptions -- one

2   moment.

3          Mr. Dodson writes:  "So I'll await your explanation

4   if different for how we reach the numbers anticipated, if not

5   explained consistent with the pro forma provided.  It's

6   complicated if you provide one number calculation and explain

7   it another way."

8          Did you see that there?

9   A.  I just saw it, yes.

10  Q.  Okay.  Well, you got this e-mail, as far as you know?

11  A.  Well, if I'm copied on it, I guess I did, yeah.

12  Q.  Do you know whether Mr. Dodson's concerns about the pro

13  forma projections were ever answered by you or Mr. Alcorn or

14  Mr. Maerki, if you know?

15  A.  I do not know.  I don't recall.

16  Q.  But you see now that he was raising them at the time

17  period?

18  A.  Yes.  And I honestly don't know what Mr. Dodson's role

19  was in this process, but yes.

20  Q.  Okay.  Well, let's look -- but you do know he was an

21  attorney who was hired by Janus, as far as you knew?

22  A.  I knew he was an attorney.  I didn't know if he

23  represented -- who he represented, but clearly if David was

24  copied and Kent was copied, then it was likely.

25  Q.  You've worked with attorneys in the real estate business?

———————— J. Palmieri - Cross (By Mr. Bosse) ————————

1    A.  Yes, sir.

2    Q.  Do you know generally whether an attorney -- well, have

3    you ever had an experience before of an attorney writing this

4    kind of e-mail to someone who was not a client about

5    pro forma assumptions or reviewing documents like that?

6    A.  No, sir, but I'm not an attorney, so...  No, I have not

7    had that experience.

8    Q.  Fair enough.

9            MR. BOSSE:  We can take that down.  Thank you.

10   BY MR. BOSSE:

11   Q.  Earlier, we talked about -- so you talked about with

12   Mr. Smith's counsel the fact that you didn't know your name

13   was being used in these marketing materials?

14   A.  I don't recall that I was.  I certainly didn't have a

15   card.  I didn't hold myself out as a member of Janus.  So...

16   Q.  Okay.  And you certainly weren't consulted in the

17   capacity of a technical consultant about the offerings that

18   were being made or the pro forma assumptions that were

19   backing them, correct?

20   A.  Not that I recall.

21   Q.  Okay.  Now, did you know that you were described to

22   investors as an authority on the 800-megahertz spectrum?

23   A.  Not that I recall.

24   Q.  And you didn't know what David Alcorn or Kent Maerki were

25   offering to investors or were charging their clients,

———— J. Palmieri - Cross (By Mr. Bosse) ————

1  correct?

2  A.  Not that I recall, sir.  I wasn't in investor meetings.

3  Q.  You didn't know what the salesmen who were selling this

4  stuff to make money for Janus Spectrum -- you didn't know

5  what they were telling their clients, correct?

6  A.  I was not in any sales meetings.  No, I can't tell you

7  what they were telling their clients.

8  Q.  And you also didn't attend client presentations?

9  A.  Not that I recall.

10 Q.  You didn't do frequency engineering for any of those

11 applications?

12 A.  Frequency engineering?  No, sir, I'm not an engineer.

13 Q.  You're not a frequency coordinator?

14 A.  No, sir.

15 Q.  And you didn't actually do the applications themselves?

16 A.  No, not that I recall.  I wasn't qualified to do that.

17 Q.  And you didn't make any attempts to monetize licenses for

18 Janus Spectrum clients, correct?

19 A.  Monetize after they were awarded?

20 Q.  Sure.

21 A.  No.

22 Q.  Okay.  You knew because -- now let's say we're in the

23 2013 time period.  You are now three years into your own

24 investment.  And you knew from your own experience that

25 Sprint wasn't knocking down the door to get your licenses,

J. Palmieri - Cross (By Mr. Bosse)

1   correct?

2   A.  I didn't know that.  I didn't know -- I still don't know,

3   in fact.  I still don't know.

4   Q.  Let me ask you a clarifying question.  Has Sprint come

5   knocking down your door to get those licenses from you?

6   A.  No, sir.

7   Q.  So it's the year 2022.  When did you get those licenses?

8   A.  Well, I was never awarded licenses.

9   Q.  You were never awarded licenses?

10  A.  No, sir.

11  Q.  I'm sorry.  You never spoke -- let me wrap up.  You never

12  spoke with anybody at Sprint or AT&T or Verizon or any other

13  major wireless carrier about them wanting to use the

14  expansion band and the guard band narrowband licenses?

15  A.  No, but I did have a conversation with one of the top FCC

16  attorneys that I met at a SmartCOMM training, specific e-mail

17  to him about that, and he said --

18  Q.  Well, hold on.

19  A.  Okay.  In the e-mail, he said.

20  Q.  Do you have this e-mail with you?

21  A.  I do not.

22  Q.  I mean, you can say it.  I'm going to move to strike it

23  as hearsay but --

24          THE COURT:  Well, then, no need to say it.

25          MR. BOSSE:  That's fine.  I don't have any more

Carol L. Naughton, Official Court Reporter

———————B. Jones - Direct———————

```
 1    questions for the witness.

 2            And, Mr. Palmieri, I'm sorry, I didn't know you

 3    didn't get licenses.  I didn't know that.

 4            THE COURT:  May this witness be permanently excused,

 5    ladies and gentlemen?

 6            MR. YAROW:  Yes, sir, from Mr. Alcorn.

 7            MS. McCASLIN:  Yes, sir.

 8            MR. BOSSE:  Yes, sir.  Thank you.

 9            THE COURT:  You may step down, Mr. Palmieri.  You

10    may be permanently excused.

11            (The witness was excused.)

12            THE COURT:  Mr. Yarow, I'll leave it to you.  Do you

13    have another witness you want to call for 15 minutes to

14    start, or would you prefer -- I'll give you a choice.  I

15    don't know how long your direct is going to be on that

16    witness.

17            MR. YAROW:  Your Honor, I can finish him in 15

18    minutes.

19            THE COURT:  You can call your next witness.

20            MR. YAROW:  Bobby Jones.

21            (Witness sworn.)

22            BOBBY JONES, called by the Defendant, having been

23    first duly sworn, was examined and testified as follows:

24                         DIRECT EXAMINATION

25    BY MR. YAROW:
```

B. Jones - Direct

1   Q.   Sir, my name is Rick Yarow.   I represent David Alcorn.

2   Would you, for the record, please state and spell your name.

3   A.   Bobby Jones, B-o-b-b-y J-o-n-e-s.

4   Q.   Okay.   Mr. Jones, what is your educational background?

5   A.   College and two years of seminary.

6   Q.   Okay.   What is your degree in for college?   What kind of

7   degree do you have?

8   A.   That's for business administration, marketing.

9   Q.   And do you have any formal training related to spectrum?

10  A.   Not -- not prior -- not during my formal education, no.

11  Q.   And what type of work -- how old are you, sir?

12  A.   St. Patrick's Day I'll be 75.

13  Q.   And you're retired now?

14  A.   Yes.

15  Q.   When you were working -- let's go back to the -- I don't

16  want to go back any farther than, say, 2000s.   What were you

17  doing as your line of work?

18  A.   In 2000?

19  Q.   2000s.   Starting the year 2000, what did you do?

20  A.   I was in Phoenix.   I was working with Aflac selling

21  insurance --

22  Q.   Okay.

23  A.   -- products for Aflac.

24  Q.   All right.   And you did that in -- how long did you do

25  that with Aflac?

————————B. Jones - Direct————————

1    A.  Till '6 or '7, '8 -- I don't remember.  The best of my

2    recollection is mid-2000s.

3    Q.  Okay.  And have you always had sales positions?  Are you

4    a salesman by trade?

5    A.  Yes, sir.

6    Q.  And did you -- or, first of all, can you -- this has

7    already been marked and introduced as Alcorn Exhibit 7.  Sir,

8    can you see that on your screen?

9    A.  Yes.

10   Q.  And do you know what that picture -- what is that a

11   picture of?

12   A.  That's the building that SmartCOMM had their offices in.

13            MR. YAROW:  You can take that down.

14   BY MR. YAROW:

15   Q.  And did you go to work for SmartCOMM?

16   A.  As an independent contractor, 1099, yes.

17   Q.  Okay.  All right.  So you were an -- an independent

18   marketing rep.  Is that the word that was used?

19   A.  I think that's probably what they used, yes.

20   Q.  And while you were at -- prior to going to work for

21   SmartCOMM, did you have any background or knowledge in

22   spectrum?

23   A.  No, sir.  Well, I'm sorry, yes, I did.  It didn't hit me

24   at the time, but when I lived in Houston, my father-in-law at

25   that time -- this was back in the late '70s, early '80s -- we

―――――――B. Jones - Direct―――――――

1   were involved in pagers, which is, I think, in Smithsonian

2   now, but we had pagers, and I didn't -- and we had towers at

3   the top of the Pennzoil power building in Houston, and it

4   didn't hit me until sometime later, when I was trying to

5   figure out what spectrum was all about, that it resonated

6   that that was spectrum.  That was radio frequencies that we

7   were using.

8   Q.  That's your only experience in spectrum, is back with the

9   pagers?

10  A.  Yes, sir.

11  Q.  And when you were at -- approximately when did you start

12  working at -- working as an independent marketing rep for

13  SmartCOMM?

14  A.  I think late 2009 or early 2010, to the best of my

15  recollection.

16  Q.  Did you receive any training when you went to work for

17  SmartCOMM?

18  A.  Yes, with the other people that were marketing.

19  Q.  Okay.  And do you remember who conducted the training?

20  A.  A lot of it was done by Pendleton Waugh, who was one of

21  the founders of SmartCOMM.

22  Q.  Okay.  And how about a man by the name of Kent Maerki?

23  A.  He didn't do so much training but he did some.

24  Q.  And was Kent Maerki held out by SmartCOMM to be somewhat

25  of an expert in spectrum?

B. Jones - Direct

1   A.   I believe so.

2   Q.   And did -- was he held out by SmartCOMM to have had

3   experience during -- with spectrum in the 1980s, during the

4   lotteries?

5   A.   Yes.

6            MR. YAROW:  And if the government would not mind

7   pulling up Exhibit 700.

8            THE COURT:  Exhibit 700?

9            MR. YAROW:  Yes, sir.

10  BY MR. YAROW:

11  Q.   This exhibit has been previously introduced as

12  Government's Exhibit 700.  Do you recognize this?

13  A.   It's really blurry, but, yes, I've seen something similar

14  to this, yes.

15  Q.   And where have you seen this?

16  A.   SmartCOMM showed it to us with a population of the areas

17  of licensees, potential licensees.

18  Q.   Did SmartCOMM train you to use this in your sales, in

19  your sales material?

20  A.   Yes.

21           MR. YAROW:  Take that down.  Would the government

22  pull up Government's Exhibit 304, and I believe that was --

23  go to Page 3 on that one.  If you would zoom in starting with

24  the *New York Times*.

25  BY MR. YAROW:

B. Jones - Direct

1  Q.  Do you recognize this, Mr. Jones?

2  A.  Yes, I do.

3  Q.  Where have you seen this before?

4  A.  At SmartCOMM training.

5  Q.  Okay.  And what was the SmartCOMM -- what was -- how did

6  SmartCOMM make their money and do their business?

7  A.  Selling license applications for these particular market

8  areas.

9  Q.  Okay.  And were they selling -- were they selling the

10  applications for a particular area of spectrum?

11  A.  Yes, I believe so.

12  Q.  And what was that area?  What was that called?

13  A.  Economic areas, I believe.

14  Q.  Okay.  All right.  And who did SmartCOMM represent would

15  be interested in these licenses that they were granted -- if

16  they were granted by the FCC?

17  A.  People that maybe were interested in the cellular market

18  at that time.

19  Q.  Okay.  And why would the cellular market be interested in

20  these licenses?

21          MS. YUSI:  Your Honor, I'm going to object.  Calls

22  for speculation.

23          THE COURT:  Sustained.

24  BY MR. YAROW:

25  Q.  Was it represented to you why, during your training at

─────────── B. Jones - Direct ───────────

1   SmartCOMM, why the cell phone market might be interested in

2   these licenses?

3            THE COURT:  Well, unfortunately, that goes back to

4   the same thing, Mr. Yarow.

5            MR. YAROW:  Yes, sir.

6            THE COURT:  To the same question.

7   BY MR. YAROW:

8   Q.  And did you invest in any of these applications while you

9   worked at SmartCOMM?

10  A.  Yes.

11  Q.  While you were at SmartCOMM?

12  A.  Yes.

13  Q.  And how much did you purchase in applications?

14  A.  I don't remember.

15  Q.  Okay.  Was it more than one application?

16  A.  Yes.

17  Q.  Do you have any family members that invested?

18  A.  Say again.

19  Q.  Do you have any family members that invested in these

20  applications?

21  A.  Yes.

22  Q.  Has anybody made any money off of these applications, as

23  far as you know?  Has anybody made any money off these

24  applications, as far as you know?

25  A.  No, sir.

————————— B. Jones - Direct —————————

1          MR. YAROW:  Okay.  That's all the questions I have.
2    Thank you.
3          THE COURT:  Any cross-examination or any direct
4    examination of this witness?
5          MR. GRINDROD:  Your Honor, I have an examination.
6          THE COURT:  You have an examination.  Depending upon
7    the length of it, we'll take it after lunch.
8          MR. GRINDROD:  I don't want to make anybody wait for
9    their lunch, but it shouldn't be too long.
10         THE COURT:  Well, they'll just blame you.
11         Tell you what, ladies and gentlemen, since the
12   government also has to cross-examine, we're just going to
13   wait until after lunch.  We'll be in recess until 2:30.
14         (The jury exited the courtroom.)
15         THE COURT:  You may step down.  Do not discuss your
16   testimony over lunch.
17         THE WITNESS:  Okay.
18         THE COURT:  Mr. Grindrod, I just want you to know
19   that every once in a while, it's fine, that in a tense trial,
20   a little humor is in order.
21         MR. GRINDROD:  That's fine.  I didn't take offense,
22   Your Honor.
23         THE COURT:  Okay.  All right.
24         (Recess from 12:58 p.m. to 2:32 p.m.)
25         (The jury entered the courtroom.)

Carol L. Naughton, Official Court Reporter

B. Jones - Cross (By Mr. Grindrod)

 1            THE COURT:  You may be seated.

 2            Let the record reflect that all 16 jurors are

 3     present in the courtroom.  Does counsel agree?

 4            MS. YUSI:  The government agrees, Your Honor.

 5            MR. YAROW:  Mr. Alcorn agrees, Your Honor.

 6            MS. McCASLIN:  Mr. Smith agrees.

 7            THE COURT:  You may resume your cross -- or commence

 8     your cross.

 9                      CROSS-EXAMINATION

10     BY MR. GRINDROD:

11     Q.  Good afternoon, Mr. Jones.  My name is Andrew Grindrod.

12     I represent Bill Smith.

13            Mr. Jones, did you sell Dental Support Plus

14     Franchise?

15     A.  Yes.

16     Q.  And you mentioned on direct examination you also sold

17     spectrum licenses?

18     A.  Yes.

19     Q.  When you were selling those investments, did you

20     intentionally deceive the people that you were trying to sell

21     those to?

22     A.  Not at all.

23            MR. GRINDROD:  No further questions, Your Honor.

24            THE COURT:  Cross-examination, United States?

25            MS. YUSI:  Yes, sir.

Carol L. Naughton, Official Court Reporter

B. Jones - Cross (By Ms. Yusi)

1                    CROSS-EXAMINATION

2    BY MS. YUSI:

3    Q.  Good afternoon, Mr. Jones.  My name is Elizabeth Yusi,

4    and I represent the United States.

5    A.  Good afternoon.

6    Q.  Now, you had stated you -- the only training you got in

7    spectrum was what you received at SmartCOMM when you were

8    working there?

9    A.  Yes, ma'am.

10   Q.  And you said the majority of that was from Pendleton

11   Waugh?

12   A.  That's to the best of my knowledge, yes, recollection.

13   Q.  And you understood that Pendleton Waugh is a convicted

14   felon, correct?

15   A.  He's dead.

16   Q.  Right.  But he was a convicted felon?

17   A.  I don't remember that.

18   Q.  You didn't know he went to jail prior to SmartCOMM for

19   fraud?

20   A.  I don't recall that.

21   Q.  Okay.  And Kent Maerki worked at SmartCOMM as well,

22   right?

23   A.  Yes, ma'am.

24   Q.  And he was an independent contractor, just like you; is

25   that right?

B. Jones - Cross (By Ms. Yusi)

1   A.   To the best of my knowledge, yes.

2   Q.   And along with Robert Palmieri, he was another

3   independent contractor for SmartCOMM?

4   A.   I don't know Robert Palmieri.

5   Q.   Okay.  How about David Alcorn?  Was he an independent

6   contractor for SmartCOMM?

7   A.   Yes.  To the best of my knowledge, yes.

8   Q.   And there were quite a few independent contractors

9   selling SmartCOMM licenses, about 40 to 50 people, if you

10  recall?

11  A.   A lot.

12  Q.   And neither you nor Mr. Maerki nor Mr. Alcorn were in

13  management or anything at SmartCOMM, right?

14  A.   No.

15  Q.   Just a line salesman?

16  A.   Yes.

17  Q.   And SmartCOMM is what has come to be known as a license

18  application mill; is that right?

19  A.   At least they sold license applications.  I don't know

20  about the "mill" part.

21  Q.   And did you ever do any due diligence into SmartCOMM and

22  their product and what they were selling?

23  A.   A little bit, yes.

24  Q.   Okay.  And what did you do?

25  A.   Asked a lot of questions to make sure that it was legit

B. Jones - Cross (By Ms. Yusi)

1    and what it should be, and they brought out a letter from the
2    SEC stating that the SEC had checked them out, and they found
3    nothing to pursue.
4    Q.  And you understand the SEC deals with securities,
5    correct?
6    A.  Yes, ma'am.
7    Q.  All right.  Did you ask anyone else besides SmartCOMM to
8    do your due diligence?
9    A.  That's 13 years ago.  I don't recall.
10   Q.  Okay.  Now, you created a trust at some point called
11   "Because He Lives"?
12   A.  Yes, ma'am.
13   Q.  And initially did you have SmartCOMM -- Because He Lives,
14   that trust, did they have SmartCOMM applying for licenses on
15   its behalf?
16   A.  Did the trust --
17   Q.  -- engage SmartCOMM to purchase --
18   A.  We purchased license applications from them through that,
19   yes.
20   Q.  From SmartCOMM.  Okay.
21        And you got into -- at some point in 2011, you were
22   terminated by SmartCOMM; is that right?
23   A.  Yes, ma'am.
24   Q.  All right.  And then after that, Mr. Maerki -- just to
25   clarify, you knew Mr. Maerki for about 20 years prior to

B. Jones - Cross (By Ms. Yusi)

1   this; is that right?

2   A.   No, ma'am, not that long.  I didn't -- I don't think I

3   met him until early 2000s.

4   Q.   Okay.  So around 2010, 2011, you knew him for about a

5   decade?

6   A.   Possibly.

7   Q.   And at that point he introduced you to Janus Spectrum; is

8   that right?

9   A.   Yes.

10  Q.   And after you were terminated by SmartCOMM, you started

11  working for Kent Maerki and selling spectrum for Janus; is

12  that right?

13  A.   Yes, ma'am.

14  Q.   Did you ever go to the Janus offices?

15  A.   I don't remember an office.

16  Q.   They didn't have --

17  A.   Not a physical office.

18  Q.   They didn't have a physical office, correct?

19  A.   Not to my recollection.

20  Q.   So you started selling licenses, you were referring

21  people to Janus, and then you would get a referral fee; is

22  that right?

23  A.   Yes, ma'am.

24  Q.   And, in fact, you referred Daryl Bank to Janus Spectrum

25  at some point, correct?

——————————— B. Jones - Cross (By Ms. Yusi)———————————

1    A.   Not that I recall.

2    Q.   You never introduced Daryl Bank to the spectrum

3    investment?

4    A.   I think I was introduced to Daryl Bank from somebody

5    through that process.  I don't remember exactly how it all

6    came together.

7    Q.   You don't remember getting a referral fee --

8    A.   For Daryl Bank, no.

9    Q.   No.  From Janus Spectrum for Daryl Bank's referral.

10   A.   Not that I recall.

11   Q.   So you have the Because He Lives trust.  You also have

12   your own spectrum group as well, right?

13   A.   I don't understand the question.

14   Q.   Did you create an entity known as Premier Spectrum Group?

15   A.   Yes, ma'am.

16   Q.   And you sold membership to this group, correct?

17   A.   Yes, ma'am.

18   Q.   And the goal was to sell $1.6 million worth of

19   memberships in this group, right?

20   A.   I do not recall that.

21   Q.   Okay.  Do you recall you were paid a 12 percent

22   commission for each sale of this?

23   A.   There was some figure, but, like I said, that's been a

24   decade ago.

25   Q.   Well, the Premier Spectrum Group -- let's see.  I'm going

———— B. Jones - Cross (By Ms. Yusi) ————

 1   to show you Exhibit 300L, just for the witness.  We'll come

 2   back to Premier Spectrum Group.

 3           Do you see the top of Exhibit 300L is an e-mail?

 4   A.  Yes, ma'am.

 5   Q.  And it's from a Tina Ellis to Kent Maerki and yourself?

 6   A.  Yes, ma'am.

 7           MS. YUSI:  Your Honor, we move to admit

 8   Exhibit 300L.

 9           THE WITNESS:  Yes, ma'am.

10           THE COURT:  Hold on.  What is the purpose of this

11   exhibit?

12           MS. YUSI:  This was sent to him, Your Honor, by Tina

13   Ellis, who worked with Janus Spectrum, concerning the

14   SmartCOMM and what they were selling with the Premier

15   Spectrum Group and Janus Spectrum.

16           THE COURT:  Before the Court admits it, can we see

17   what the balance of that document is?

18           MS. YUSI:  Yes, sir.  There are several articles,

19   Your Honor, and -- let's see.  If we can go to Page 6.

20           THE COURT:  He's already admitted a relationship

21   between himself and Kent Maerki and --

22           MS. YUSI:  Yes, he was, Your Honor, but if you look

23   here on Page 6, this is where I'm getting at, and there's an

24   article in 2012 that was sent to Kent Maerki and Bobby Jones.

25           THE COURT:  Okay.  The Court will admit the

———————B. Jones - Cross (By Ms. Yusi)———————

1   document.

2           MS. YUSI:  Thank you.

3           (Government's Exhibit 300L was admitted.)

4   BY MS. YUSI:

5   Q.  Go back to Page 1 of Exhibit 300L.  And what was the date

6   of this e-mail?

7   A.  March 5th, 2012.

8   Q.  And Tina Ellis, she worked with Kent Maerki and David

9   Alcorn at Janus; is that right?

10  A.  I don't recall.  I know she worked at SmartCOMM.

11  Q.  And did she continue to work with Kent Maerki?

12  A.  I kind of recall that.

13  Q.  Well, she sent you and Kent Maerki a copy of an article

14  concerning Waugh, Pendleton Waugh and SmartCOMM?

15          Do you see that?

16  A.  Yes.

17  Q.  If we can go to Page 6 of Exhibit 300L.  And what is the

18  title of this article?  Could you read that for us?

19  A.  "Phoenix company prepares license applications for

20  not-yet-available spectrum."

21  Q.  And then it continues, "An Arizona company is marketing

22  license preparation services for spectrum.  The FCC is not

23  even close to making available, is not accepting applications

24  for and which may have little value when it does.  This

25  company, SmartCOMM LLC, is in Phoenix."

──────── B. Jones - Cross (By Ms. Yusi) ────────

1              Do you see that?

2    A.  Yes, ma'am.

3    Q.  Do you recall getting this article from Ms. Ellis in

4    2012?

5    A.  No, I do not recall that.

6    Q.  Okay.  But you agree that was your e-mail address,

7    correct?

8    A.  Yes, I believe so.

9    Q.  All right.  I'm going to go to the next page, Page 7, up

10   here.

11             How much were you charging for SmartCOMM -- how much

12   per application fee when you were selling those, do you

13   remember?

14   A.  Somewhere between 15- -- I think 12- or 15,000 off the

15   low end, and I don't remember what the top end was.  It was

16   based on population.

17   Q.  Okay.  And in the first full paragraph, the last sentence

18   says, "The spectrum located in the expansion and guard bands

19   will not work for broadband because each channel is only

20   25 kilohertz and is most attractive to private businesses,

21   like pizza restaurants that might use it to communicate with

22   delivery drivers, industry experts said."

23             Do you see that?

24   A.  Yes, ma'am.

25   Q.  And this is prior -- or is around the time that you

———————— B. Jones - Cross (By Ms. Yusi)————————

1   started selling Janus Spectrum, correct, 2012?

2   A.  I don't recall.

3   Q.  We're going to go to Page 8.

4          THE COURT:  It's beyond the scope now.  He's

5   indicated with respect to that article that you're using that

6   he doesn't recall that article.  You're asking him questions

7   about it.  The Court didn't say anything last time but --

8          MS. YUSI:  I'll move on, Your Honor.

9          THE COURT:  All right.

10          MS. YUSI:  Can we look at Exhibit 2111, just for the

11   witness?

12   BY MS. YUSI:

13   Q.  Do you recognize this document?

14   A.  It looks very familiar, yes.

15   Q.  Premier Spectrum Group membership fee offering?

16   A.  Yes, ma'am.

17          MS. YUSI:  Your Honor, we move to admit

18   Exhibit 2111.

19          THE COURT:  Any objection?

20          MR. YAROW:  No objection, Your Honor.

21          THE COURT:  Hearing none, this document will be

22   admitted.

23          (Government's Exhibit 2111 was admitted.)

24   BY MS. O'BOYLE:

25   Q.  And Premier Spectrum Group was -- that was your company,

———— B. Jones - Cross (By Ms. Yusi)————

1    correct?

2    A.  It was a group that I founded, yes.

3    Q.  All right.  And that you were selling spectrum in 2013,

4    it looks like, from the date on this?

5    A.  Yes.  That's the date, yes.

6    Q.  All right.  And if we can go to Page 6 -- I'm sorry,

7    Page 3.  And this talks about spectrum and cellular wireless

8    spectrum licenses.  Do you see that?  I'm going to highlight

9    the second paragraph, "What is cellular wireless spectrum?"

10   Do you see that?

11   A.  Yes, ma'am.

12   Q.  And did you create this document?

13   A.  Not that I know of.  Not that I remember.

14   Q.  This is your group, right?

15   A.  I understand.  You asked if I created it.  I don't --

16   Q.  You don't recall creating it?

17   A.  No.

18   Q.  And did you have any understanding that you were selling

19   narrowband spectrum to people through the Janus Spectrum and

20   Private Spectrum Group?

21   A.  I'm sorry.  I don't follow your question.

22   Q.  What kind of spectrum did you think you were selling to

23   prospective investors or buyers?

24   A.  We weren't selling spectrum.  We were selling license

25   applications.

B. Jones - Cross (By Ms. Yusi)

1    Q.  What kind of spectrum were these license applications

2    for?

3    A.  I'm sorry.  I'm not --

4    Q.  Did you understand the technical parts of what you were

5    selling back then?

6    A.  Not totally.

7    Q.  All right.  That's fine.  If we can go to Page 7.  Oh,

8    I'm sorry, Page 8 of Exhibit 2111.  And this talks about you

9    were selling $25,000 membership units.  Does that look right

10   there?

11   A.  Yes, ma'am.

12   Q.  Okay.  And this was in the Premier Spectrum Group, which

13   was your group, right?

14   A.  Yes, ma'am.

15   Q.  And if we can go to Page 13.  And this is what you listed

16   as your team here.  Do you see that?

17   A.  Yes, ma'am.

18   Q.  And David Alcorn, you said he's the member of Pacific

19   Capital Advisors; is that right?

20   A.  Yes, ma'am.

21   Q.  And he was also one of the founders of Janus Spectrum,

22   correct?

23   A.  To my knowledge, yes.

24   Q.  And Kent Maerki, you list him there as well?

25   A.  Yes.

────────── B. Jones - Cross (By Ms. Yusi) ──────────

1   Q.  And Mr. Palmieri, you list him as a senior advisor?

2   A.  Yes.

3   Q.  And that's the person you said you don't know who that

4   is?

5   A.  I know Jon Palmieri.  He asked me about Robert Palmieri.

6   Q.  I'm sorry, Jon Palmieri.  That's who I was thinking of.

7   He was another independent rep at SmartCOMM with you?

8   A.  Yes, ma'am.

9   Q.  Thank you.  I apologize.

10  A.  I didn't know if you were referring to Robert, a brother,

11  cousin, or --

12  Q.  That's fine.  I apologize.  If we can look at Page 15.

13          And you list a bunch of articles in here at the end

14  of your offering; is that right?

15  A.  I see that, yes.

16  Q.  And you have "Bandwidth is the new black gold"?

17  A.  Yes.

18  Q.  And you would agree that at least the headline, that's

19  the same as what was in the earlier Janus offering you were

20  looking at with Mr. Alcorn's attorney?

21  A.  Yes.  And that was from *Time* magazine.

22  Q.  And then you have the same team that Janus Spectrum had

23  on their offering; is that right?

24  A.  I'm sorry.  I'm not following the question.

25          MS. YUSI:  If we can keep that up here.  Go back to

B. Jones - Cross (By Ms. Yusi)

1   Page 13 and pull up side by side Exhibit 304, Page 15.

2   BY MS. YUSI:

3   Q.  Do you see this has "Janus Spectrum team" at the top?

4   A.  Yes.

5   Q.  And then this is on the left.  It's Premier Spectrum

6   Group, right?

7   A.  Yes, ma'am.

8   Q.  And so these are just the exact same teams that are

9   listed in both offerings?

10  A.  Yes.

11  Q.  Now -- thank you.

12        Premier Spectrum Group, was that a client of Janus?

13  A.  I don't think so.

14  Q.  You didn't give money to Janus to get applications from

15  the FCC?

16  A.  I don't remember.

17  Q.  Okay.  Let's look at Exhibit 7.  This has already been in

18  evidence.  You see up here this is an e-mail from Kent Maerki

19  to a Sunshine Grissom.  Do you see that from March of 2013?

20  A.  Yes, ma'am.

21  Q.  And he lists in here, "The following people with whom I

22  work relative to making money."  Do you see that?

23  A.  Yes, ma'am.

24  Q.  And do you see your name there, Bobby Jones?

25  A.  Yes, ma'am.

```
                        B. Jones - Cross (By Ms. Yusi)
```

 1  Q.  And do you see Ray Chadwick and Terry Johnson?

 2  A.  Yes, ma'am.

 3  Q.  Do you know who they are?

 4  A.  Yes, ma'am.

 5  Q.  Who are they?

 6  A.  Friends of mine from Dallas.

 7  Q.  And did they also have their own spectrum group as well?

 8  A.  I believe so.

 9  Q.  And they also sold on behalf of Janus?

10  A.  Yes.

11  Q.  All right.  And if we can look at -- let's see.  From

12  after you were done with SmartCOMM for about a year and a

13  half or two, you received a significant amount of money from

14  Janus Spectrum for referrals; is that right?

15  A.  I don't know about significant.  I don't remember the

16  number.  I did receive money, yes.

17  Q.  Okay.  If we could go to Exhibit 1002B.  This has already

18  been entered by a forensic analyst who went through all the

19  accounting, Mr. Jones.  And this is from Janus Spectrum

20  Group -- or, I'm sorry, Janus Spectrum LLC into one of their

21  Wells Fargo Bank accounts.  Do you see that?

22  A.  Yes, ma'am.

23  Q.  And I just want to go through a couple of the names here.

24  Red Water Funding Group, do you recall, is that a Ray

25  Chadwick and Terry Johnson entity?

B. Jones - Cross (By Ms. Yusi)

1    A.  I don't know.  I'm sorry.

2    Q.  All right.  Premier Group, whose was that?  That's

3    another one of your entities, right?

4    A.  Mine was Premier Spectrum Group.  That's Premier Group.

5    Q.  Did you have a management group too?

6    A.  Yes.

7    Q.  And what was that called?

8    A.  Premier Spectrum Management.  I'm not sure.

9    Q.  How about Innovative Group?  Were you a part of that one

10   as well?

11   A.  Not to my recollection.

12   Q.  All right.  Now, and then this is all money coming in to

13   Janus Spectrum LLC.  And if you go to attachment A, Premier

14   Spectrum Group, is that yours?

15   A.  Yes, ma'am.

16   Q.  And the deposits were 350,000 to Spectrum -- or Janus

17   Spectrum?

18   A.  Okay.

19   Q.  Well, did you all -- did your group, Premier Spectrum

20   Group, did you give money to Janus Spectrum?

21   A.  If this says that we did, we must have.

22   Q.  Okay.  Any idea what for?

23   A.  No.

24   Q.  All right.  If we can go to -- I'm going to go to Page 3

25   here of Exhibit 1002B.  This is where that same bank account

B. Jones - Cross (By Ms. Yusi)

1   was spending their money.  Okay?  Do you see that, the Wells
2   Fargo ending in 7384?
3   A.  Yes, ma'am.
4   Q.  And it was going to the David Alcorn Professional Group,
5   NJM Spectrum, and then if we go to attachment B, Because He
6   Lives trust.  Is that your trust?
7   A.  Yes, ma'am.
8   Q.  And do you see how much money they paid you there?
9   $567,140?
10  A.  Yes, I see that.
11  Q.  Okay.  Would you call that a significant amount of money?
12  A.  Yes, ma'am.
13  Q.  And that's how much you made in a little over a year and
14  a half from Janus, correct?
15  A.  I don't know that.
16  Q.  Well, let's look at Exhibit 2103, which is a new exhibit.
17  Was your Because He Lives trust based at Wells Fargo?
18  A.  Yes, ma'am.
19  Q.  All right.  And you understand that that was -- the SEC
20  provided or -- if we can look at 2103.
21          Do you recognize this?
22  A.  That's 12 years ago, 10 years ago.  I don't recall it.
23  Q.  What is the name at the top?
24  A.  Because He Lives trust.
25  Q.  Okay.  And is that your name, Bobby D. Jones, trustee?

———————— B. Jones - Cross (By Ms. Yusi) ————————

1    A.  Yes, ma'am.

2    Q.  Is that right?

3    A.  Yes, ma'am.

4           MS. YUSI:  And under our stipulation, Your Honor,

5    we'd move to admit Exhibit 2103.

6           THE COURT:  2103 will be admitted.

7           (Government's Exhibit 2103 was admitted.)

8    BY MS. YUSI:

9    Q.  And if we can look at -- this is for $20,000.  I'm just

10   going to go to Page 2.  You were also selling Dental Support

11   Plus Franchises the same time you were selling Janus

12   Spectrum; is that right?

13   A.  Yes, a few of them.

14   Q.  And then you would get money from Dental Support Plus

15   Franchise?

16   A.  Yes, ma'am.

17          THE COURT:  Counsel, I think you need to correct

18   that reference to the check.  It wasn't $20,000.

19   BY MS. YUSI:

20   Q.  I'm sorry.  $2,000.  This one is for $2,000 on Page 2.

21   Do you see that?

22   A.  Yeah, I was going to say.  When you said 20-, I couldn't

23   find 20- either.

24   Q.  Okay.  I'm sorry about that.

25          If we can go to Page 10 of Exhibit 2103.  And this

—————— B. Jones - Cross (By Ms. Yusi)——————

1   is a $15,000 check.  Do you see that?

2   A.  Yes, ma'am.

3   Q.  And it was May of 2012?

4   A.  That's what it says, yes.

5   Q.  Okay.  And I'm just going to go down to Page 12.  Here's

6   a $25,000 check, May 23rd, 2012, from Janus Spectrum to your

7   trust.

8   A.  Okay.

9   Q.  If we can go to Page 24.  And this is another Janus

10  Spectrum for $35,000.  Do you see that?

11  A.  Yes, ma'am.

12  Q.  That's April 2012?

13  A.  Yes, ma'am.  That's June -- July.

14  Q.  I'm sorry?

15  A.  7/23.

16  Q.  7/23.  I'm sorry.  I couldn't read the 7.  I thought it

17  was a 4.

18          And a 25,000 in August 2012?

19  A.  Yes, ma'am.

20  Q.  25,000, August 26, 2012?

21  A.  Yes.

22  Q.  All right.  So you got a significant amount of money from

23  Janus.

24          MS. YUSI:  And if we can show Page 153 of

25  Exhibit 2103.  Page 153.

———— B. Jones - Cross (By Ms. Yusi) ————

1    BY MS. YUSI:

2    Q.  And so the first ones were in 2012.  This one is

3    February of 2017 -- it's February 17, 2014.  Do you see that?

4    A.  Yes, ma'am.

5    Q.  You so you were selling this for a year and a half,

6    almost two years?

7    A.  Okay.

8    Q.  Do you agree with that?

9    A.  Say the question again.

10   Q.  So you were selling this for about a year and a half or

11   two for Janus Spectrum?

12   A.  It appears that way, yes.

13         MS. YUSI:  Now, if we can look at Exhibit 514, which

14   is in evidence.

15   BY MS. YUSI:

16   Q.  You were also named in the SEC complaint that was filed

17   in April 2015; is that right?

18   A.  Yes, ma'am.

19   Q.  And you were named along with Janus Spectrum, David

20   Alcorn.  Premier Spectrum Group was in there as well.  Do you

21   see that?

22   A.  Yes, ma'am.

23   Q.  Innovative Group was in there?  That was included?

24   A.  I see that, yes.

25   Q.  And Terry Jackson and Raymon Chadwick?

————— B. Jones - Cross (By Ms. Yusi) —————

1    A.  Yes.

2    Q.  And just to go back briefly, you said you were also

3    selling DSPF; is that right?  Is that Dental Support Plus

4    Franchises?

5    A.  I did some, yes.

6           MS. YUSI:  And if we can look at Exhibit 202F.

7    BY MS. YUSI:

8    Q.  Did you -- does this look familiar?

9           MR. YAROW:  Your Honor, I didn't ask him one

10   question about Dental Support.

11          MS. YUSI:  It's all the same time, Your Honor, and

12   it goes to bias as well.

13          THE COURT:  The Court will overrule that.

14   BY MS. YUSI:

15   Q.  Did you use this particular -- do you recall if you used

16   this to sell DSPF?

17   A.  I don't recall.

18   Q.  You don't recall.  Okay.

19          THE COURT:  If he sold DSPF, whom was he, you're

20   suggesting, he was selling it for?

21          MS. YUSI:  Pardon?

22          THE COURT:  For whom are you suggesting he was

23   selling --

24          MS. YUSI:  He was selling it for Kent Maerki, Your

25   Honor, and I can show that here in a minute.

————————B. Jones - Cross (By Ms. Yusi)————————

1          THE COURT:  Okay.

2   BY MS. YUSI:

3   Q.  If we can go to 200F.  This is a Dental Support Plus

4   Franchise sales tracker that has already been admitted into

5   evidence.

6          And Dental Support Plus Franchise, who owned that

7   company?

8   A.  Who owned that company?

9   Q.  Yes.

10  A.  To the best of my knowledge, Kent Maerki.

11  Q.  Okay.  And I'm going to go to page 3 here, line 83.  Do

12  you recall a person named -- a couple named Greg and Mary

13  Klement?

14  A.  Yes.

15  Q.  Okay.  And did you sell Dental Support Plus to them?

16  A.  I believe so.

17  Q.  Okay.  And I'll show you it here.  As the salesman here,

18  Bobby Jones, selling it, money received December 7th, 2011.

19  Do you see that?

20  A.  Yes, ma'am.

21  Q.  And you continued to sell these -- you had bought your

22  own franchise as well; is that right?

23  A.  I think so.

24  Q.  You're not sure?

25  A.  No.

—————————— B. Jones - Redirect ——————————

1     THE COURT:  Hold the microphone up to you.

2     THE WITNESS:  I'm sorry.

3  BY MS. YUSI:

4  Q.  Well, that was in December '11, but you continued to sell

5  this after six months, and you knew that this was not a

6  working franchise, correct?

7  A.  No.

8  Q.  You never realized that no one was making money?

9  A.  Oh, I knew people weren't making money yet, yes.

10  Q.  That they were what?

11  A.  That they were not making money yet.

12  Q.  But you continued to sell it on behalf of Mr. Maerki and

13  DSPF?

14  A.  I don't recall.

15     MS. YUSI:  All right.  I think those are all my

16  questions right now.  Thank you.

17     THE COURT:  Any redirect?

18     MR. YAROW:  Real quick question, Your Honor.

19     Would you be willing to pull up Government 2111,

20  Page 13.

21                 REDIRECT EXAMINATION

22  BY MR. YAROW:

23  Q.  Mr. Jones, was Mr. Alcorn the manager of Premier Spectrum

24  Group?

25  A.  No.

B. Jones - Recross (By Mr. Grindrod)

1  Q.  Did Mr. Alcorn know that you had him as the manager in

2  your prospective for Premier Spectrum Group?

3  A.  I don't recall.

4       MR. YAROW:  Thank you.  That's all the questions I

5  have.

6       THE COURT:  May the witness be permanently excused?

7       MR. GRINDROD:  Your Honor, I have a brief redirect

8  also, if I could.

9       THE COURT:  Oh, okay.

10                 RECROSS-EXAMINATION

11  BY MR. GRINDROD:

12  Q.  Mr. Jones, you spent some time talking about Premier

13  Spectrum Group.  Did you also sell spectrum through Spectrum

14  100?

15  A.  Not that I recall.

16  Q.  I'm going to show you -- I only have this in paper.  I

17  think it's probably easier to do it this way.  But this is

18  from Government's Exhibit 2103.  I'm not sure whether the

19  page numbering is the same.

20       THE COURT:  Mr. Grindrod, the Court needs to correct

21  itself.  Mr. Yarow called him as his witness on direct, and

22  so, therefore, the cross would be by the government and by

23  you, unless you called him as your witness on direct.

24       MR. GRINDROD:  Okay.  I guess what I meant to say is

25  I had some questions based on what the government asked.

—— B. Jones - Recross (By Mr. Grindrod)——

```
 1           THE COURT:  That's recross.  Let's make that real
 2    brief because the Court doesn't do a lot of recross.
 3           MR. GRINDROD:  Yes, Your Honor.
 4           THE COURT:  All right.
 5    BY MR. GRINDROD:
 6    Q.  This is from Government's Exhibit 2103, which you talked
 7    about a minute ago.  Is this a check to your trust?
 8    A.  It looks like it, yes, sir.
 9    Q.  And I'm not sure what the numbering is, but up in the top
10    corner it says Page 143 of 202, for the record.  And in the
11    memo line it says "Spectrum 100 15 and 16," right?
12    A.  Yes, I see that.
13    Q.  Okay.  So do you believe you sold for Spectrum 100, or
14    you still don't think you did?
15    A.  I don't recall that.
16    Q.  Okay.  Any idea why you would get a check with
17    "Spectrum 100" in the memo line?
18    A.  I don't know who Spectrum 100 was.
19    Q.  Okay.  But you did cash this check?
20    A.  It looks like it, yes.
21    Q.  Okay.  Did you receive immunity in exchange for your
22    testimony today?
23    A.  I haven't received anything.
24    Q.  Nothing in exchange for your testimony today?
25    A.  No.
```

A. Bobkin - Direct

 1          MR. GRINDROD:  No further questions, Your Honor.

 2          THE COURT:  Now may the witness be permanently

 3   excused?

 4          MR. GRINDROD:  Yes, Your Honor.

 5          MR. YAROW:  Yes, Your Honor.

 6          MS. YUSI:  Yes, sir.

 7          THE COURT:  You may step down, sir.  You may be

 8   excused.

 9          (The witness was excused.)

10          THE COURT:  Your next witness.

11          MR. YAROW:  Aaron Bobkin.

12          (Witness sworn.)

13          AARON BOBKIN, called by the Defendant, having been

14   first duly sworn, was examined and testified as follows:

15                      DIRECT EXAMINATION

16   BY MR. YAROW:

17   Q.  Mr. Bobkin, my name is Rick Yarow.  I represent David

18   Alcorn.

19          Would you please state and say your full name for

20   the record.

21   A.  Aaron Bobkin.

22   Q.  Spell that, please.

23   A.  A-a-r-o-n B-o-b-k-i-n.

24   Q.  I would ask you to keep your voice up.  Keep the

25   microphone by your mouth.

Carol L. Naughton, Official Court Reporter

A. Bobkin - Direct

1          Mr. Bobkin, what is your educational background?

2   A.  I have a BS degree in electrical engineering.

3   Q.  Electrical engineering?

4   A.  Yes.

5   Q.  Okay.  Do you have any form of formal education in the

6   area of spectrum?

7   A.  Not formal.

8   Q.  Okay.  And what is your work background?  What have you

9   done?  Are you retired now?

10  A.  Yes.

11  Q.  How old are you?

12  A.  67.

13  Q.  Okay.  And what did you do before you retired?

14  A.  I worked as an automation engineer for the auto

15  companies.

16  Q.  Okay.

17  A.  And then I moved out to Arizona, and I worked with -- I

18  met some individuals, and I got involved with SmartCOMM.

19  Q.  Okay.  And when you worked at SmartCOMM, what was your

20  position at SmartCOMM?

21  A.  I was just a salesperson.

22  Q.  Okay.  Were you a W-2 employee?

23  A.  No.

24  Q.  You were a 1099 --

25  A.  Yes.

─A. Bobkin - Direct─

1   Q.  -- contractor?  Okay.

2       And can you describe to me the -- SmartCOMM was in

3   the business -- what was their business plan?  What did they

4   do?

5   A.  To sell spectrum.

6   Q.  Okay.  Were they selling applications?

7   A.  For selling applications for spectrum, correct.

8   Q.  Okay.  And did you do that for SmartCOMM?

9   A.  A few times, yes.

10  Q.  Okay.  How many applications do you believe you sold

11  while you were at SmartCOMM?

12  A.  Maybe 15.

13  Q.  Okay.  And did you go through the SmartCOMM training?

14  A.  Yes.

15  Q.  And how long -- what type of training did you receive at

16  SmartCOMM?

17  A.  Just how to present it.

18  Q.  Okay.  And did you learn about the guard band?

19  A.  Yes.

20  Q.  And did you learn at SmartCOMM that the guard band would

21  be of interest to the major cell phone carriers?

22  A.  That's the way it was presented to everybody, yes.

23  Q.  Do you know a person by the name of -- actually, do you

24  know people by the name of Susan and Craig Newell?

25  A.  Yes.

A. Bobkin - Direct

1    Q.   How do you know Susan or Craig Newell?

2    A.   They purchased some spectrum applications.

3    Q.   And who did they purchase them from?

4    A.   Me.

5    Q.   What year was it they purchased them?

6    A.   I don't remember exactly.

7    Q.   Was it while you worked at SmartCOMM?

8    A.   Yes, it was.  I just don't remember when.

9    Q.   Okay.  Do you remember when you left SmartCOMM?

10   A.   Had to be sometime in 2012.

11   Q.   Okay.  How many applications did the Newells purchase

12   from you or the Newell entities?

13   A.   I don't remember exactly.

14   Q.   Okay.  Was it more than one?

15        MS. O'BOYLE:  Well, objection.  Calls for

16   speculation.  He just said he doesn't remember.

17        THE COURT:  Sustained.

18        MR. YAROW:  That's fine.

19   BY MR. YAROW:

20   Q.   Did you purchase any of these applications yourself?

21   A.   Yes.

22   Q.   Who did you purchase them from?

23   A.   SmartCOMM.

24   Q.   Okay.  And why did you purchase them?

25   A.   I thought it was a good deal, a good investment.

——————A. Bobkin - Cross - (By Ms. McCaslin)——————

1   Q.  Okay.  Did you think it was going to make you money?

2   A.  Yes.

3        MR. YAROW:  That's all the questions I have.  Please

4   answer any questions that the other attorneys may have for

5   you.

6                        CROSS-EXAMINATION

7   BY MS. McCASLIN:

8   Q.  Good afternoon, sir.  My name is Lindsay McCaslin.  I

9   represent Bill Smith.

10  A.  Okay.

11  Q.  So when you sold applications through SmartCOMM, did you

12  believe that the licenses could be leased to Sprint?

13  A.  That's what was -- that's what SmartCOMM presented to

14  everybody.

15  Q.  Did you rely on that when you invested your money?

16  A.  That was one of the major things, yes.

17  Q.  And was that part of your sales pitch to clients who

18  might be interested in investing?

19  A.  That was one -- there were several documents that

20  SmartCOMM created, and that was a big portion of it.

21        MR. YAROW:  Your Honor, can that microphone go a

22  little closer.  My client can't hear.

23        THE COURT:  Keep your mouth up to the microphone and

24  raise your voice.

25        THE WITNESS:  Yes, sir.

A. Bobkin - Cross (By Ms. McCaslin)

1  BY MS. McCASLIN:

2  Q.  So when you were explaining to potential clients that

3  these licenses could be leased back to Sprint or one of the

4  other major carriers, were you intentionally deceiving your

5  clients?

6  A.  No.

7  Q.  Now, you also invested in Dental Support Plus Franchise,

8  right?

9  A.  Correct.

10  Q.  How much did you invest of your own money?

11  A.  One franchise.

12  Q.  One franchise?

13  A.  Uh-huh.

14  Q.  Do you remember how much?

15  A.  No.

16      MS. McCASLIN:  Mr. Grindrod, if we could pull up

17  Government 200F.  This is already in evidence.  If we could,

18  Mr. Grindrod, focus in on line 8 on the far side.

19  BY MS. McCASLIN:

20  Q.  On that bottom line, does it show that you invested

21  $20,000?

22  A.  Yes.

23      MS. McCASLIN:  Thank you, Mr. Grindrod.

24  BY MS. McCASLIN:

25  Q.  And did you also sell DSPF, Dental Support Plus?

—————A. Bobkin - Cross (By Ms. O'Boyle)—————

1  A.  Yes, I did.

2  Q.  And do you know how many units you sold?

3  A.  No.  I don't remember.

4  Q.  When you were selling to your clients, did you ever

5  deliberately lie to them?

6  A.  No.

7       MS. McCASLIN:  Thank you.  No further questions.

8       THE COURT:  Let me ask you something -- okay.

9  That's okay.  Continue.

10                    CROSS-EXAMINATION

11  BY MS. O'BOYLE:

12  Q.  Hello, Mr. Bobkin.  Good afternoon.

13  A.  Hello.

14  Q.  My name is Melissa O'Boyle, and I represent the

15  government.  I have a few questions for you.  Okay?

16  A.  Okay.

17  Q.  So you worked at SmartCOMM, and SmartCOMM was run by a

18  guy by the name of Pendleton Waugh; is that right?

19  A.  I don't know who owned it.

20  Q.  Did you meet --

21  A.  He was one of them.

22  Q.  And you knew that Mr. Waugh was a multiple-time convicted

23  felon?

24  A.  No.  That I didn't know.

25  Q.  Is that a surprise to you?

A. Bobkin - Cross (By Ms. O'Boyle)

1    A.   Yeah.  I know he had issues, but I didn't know he was
2    convicted.
3    Q.   Okay.  And you sold application services to a number of
4    people -- is that right? -- through SmartCOMM?
5    A.   Yes.
6    Q.   And you told those folks that the 800-megahertz licenses
7    could be used by Sprint and other cell phone carriers at that
8    time, right?
9    A.   That's what was presented.
10             THE COURT:  Raise your voice.
11             THE WITNESS:   That's what was presented.
12   BY MS. O'BOYLE:
13   Q.   And you know now that that absolutely was not true,
14   correct?
15   A.   After a few years later, after I wasn't selling anymore,
16   I had found out that -- or there was information that said
17   that the carriers would not be leasing.
18   Q.   And so Sprint/Verizon could not actually use the licenses
19   that you, yourself, obtained, right?
20   A.   Correct.
21   Q.   And the licenses that you sold to people, including the
22   Newells, right?
23   A.   Correct.
24   Q.   And the 800-megahertz system, the licenses were actually
25   only good for walkie-talkies, correct?

A. Bobkin - Cross (By Ms. O'Boyle)

1   A.   I don't know what was -- all the different things they
2   could be used for, but push-to-talk, yes.
3   Q.   Push-to-talk.  And so you decided to start a company, a
4   push-to-talk company, right?
5   A.   Correct.
6   Q.   And it's called RapidLink?
7   A.   Correct.
8   Q.   And that's your company?
9   A.   Correct.
10  Q.   About Mr. LaBine?
11  A.   Correct.
12  Q.   You also started 800 Frequency LLC; isn't that right?
13  A.   Correct.
14  Q.   That's also your company?
15  A.   Correct.
16  Q.   And so this company was also -- 800 Frequency was also
17  purchasing spectrum licenses, correct?
18  A.   Yes.
19  Q.   And you know -- you now sold them for $5,500 a piece; is
20  that right?
21  A.   We didn't sell any of them.
22  Q.   You didn't sell any?
23  A.   No.  Those were for us, for the company.
24  Q.   Okay.  So but did -- how much did you spend, then, on
25  getting the licenses?

A. Bobkin - Cross (By Ms. O'Boyle)

1    A.   I don't remember.

2    Q.   You don't remember it being about $5,500?

3    A.   No.  I don't remember.

4    Q.   If we could take a look -- you were deposed by the

5    Securities and Exchange Commission in 2016; is that right?

6    Do you remember that?

7    A.   I know I was deposed.  I don't remember what...

8    Q.   You don't remember what year?

9    A.   Yeah.

10   Q.   It's no problem.  It's a while ago.

11          MS. O'BOYLE:  If we could take a look at 2300, just

12   for the witness, the first page first.

13   BY MS. O'BOYLE:

14   Q.   You see this is --

15   A.   Oh, okay.

16   Q.   You were deposed on March 16, 2016; is that right?

17   A.   If that's the date.

18   Q.   By the Securities and Exchange Commission?

19   A.   Okay.

20   Q.   If we could go to Page 21.  And I'm focusing in here on

21   Page 79, lines 8 through 18.  Can you take a look?  Just read

22   that to yourself and see if that refreshes your recollection

23   that you paid about $5,500 per license.

24   A.   I don't know where the -- what the 200,000 is.  So I

25   don't -- I don't know where the number 5,500 comes from.  I

A. Bobkin - Cross (By Ms. O'Boyle)

1   don't recollect.

2   Q.  Okay.  Now, when you decided to form RapidLink, you had

3   no experience in monetizing spectrum licenses, fair?

4   A.  Correct.

5   Q.  And you mentioned that you were an electrical engineer,

6   but in 2008, you got out of electrical engineering

7   altogether, right?

8   A.  Correct.

9   Q.  And you actually started working in investments?

10  A.  I don't remember what I did right away after that.

11  Q.  Well, did you form an investment company called Lyons

12  Investments?

13  A.  Yes.  I had that as an investment, yes.

14  Q.  Was that a -- do you have any background or education in

15  investments?

16  A.  No.

17  Q.  Have you ever had a Series 7 license to sell securities?

18  A.  No.

19  Q.  Have you ever been a licensed insurance salesman?

20  A.  No.

21  Q.  And so what did Lyons Investments do?

22  A.  It was just for my personal investment.  That's all it

23  was.

24  Q.  All right.  And then you also worked for -- did you ever

25  work for a company called Dazzle Dental?

A. Bobkin - Cross (By Ms. O'Boyle)

1   A.   No.

2   Q.   Did you ever work for a company called Oracare?

3   A.   No.

4   Q.   You never worked for a company called Oracare?

5   A.   No.

6   Q.   Did you ever -- but you did work for Dental Support Plus?

7   A.   Yes.

8   Q.   And you bought a -- one franchise; is that right?

9   A.   Yes.

10  Q.   And then you also -- you sold franchises.  Do you

11  remember approximately selling about four different

12  franchises?

13  A.   I was selling them.  I don't remember how many.

14  Q.   And so the individuals that you sold to, they didn't get

15  any of their money back, right?

16  A.   Some did.

17  Q.   You think the people that you sold to got their money

18  back?

19  A.   I got some money back.

20  Q.   How much money did you get back, sir?

21  A.   Not very much.

22  Q.   How much?

23  A.   A few hundred dollars.  I don't know.  I don't remember.

24  Q.   Okay.  And that was Mr. Maerki's company, correct?

25  A.   Yes.

A. Bobkin - Cross (By Ms. O'Boyle)

1   Q.   And so you also worked around this 2012 time frame at an

2   entity called Frye's as a maintenance manager?

3   A.   Yes.

4   Q.   And how long were you there?

5   A.   A year maybe.

6   Q.   And you also started a company called NuMoxie Health?

7   A.   I partnered up with somebody.

8   Q.   And who was that?

9   A.   Steven Vereen.

10   Q.   Who is Mr. Vereen?

11   A.   He's just an individual that I met from the Dental Plus.

12   Q.   Okay.  Do you know if he had any involvement in Dazzle

13   Dental?

14   A.   Yes, he did.

15   Q.   Okay.  And do you know whether he sold Dazzle Dental to a

16   number of investors who lost all their money?

17   A.   I don't know anything about those companies.

18   Q.   But you do know about NuMoxie Health with Mr. Vereen.

19   Did you raise money from investors in connection with NuMoxie

20   Health?

21   A.   I didn't.

22   Q.   Did anybody raise money from investors?

23   A.   Steven did.

24        MR. YAROW:  Your Honor, I mean --

25        THE COURT:  Yes, sir.  Stand up or talk in the

```
                          A. Bobkin - Cross (By Ms. O'Boyle)
```

 1    microphone so we can hear you.

 2            MR. YAROW:  "Did anybody," I think it's an overly

 3    broad question.

 4            THE COURT:  Well, the Court sustains it on the

 5    grounds of a little beyond the scope.

 6            MS. O'BOYLE:  I'll get back to the focus, Your

 7    Honor.

 8    BY MS. O'BOYLE:

 9    Q.  So you talked about RapidLink and 800 Frequency Group.

10    Where did RapidLink have an office?

11    A.  In Arizona.

12    Q.  Okay.  Where was it located?

13    A.  It was just at our house.

14    Q.  At your house?

15    A.  Yes.

16    Q.  What about 800 Frequency Group, where was it located?

17    A.  Same thing.  The house.

18    Q.  At your house?

19    A.  Yes.

20    Q.  How many employees did RapidLink have?

21    A.  Just two.

22    Q.  You and who else?

23    A.  Me and my partner, Bob, and my wife was like an office

24    person.

25    Q.  Okay.  And what about 800 Frequency, how many employees

———————A. Bobkin - Cross (By Ms. O'Boyle)———————

1   did they have?

2   A.   None.

3   Q.   Now, you certainly -- how much did you invest to start

4   up -- of your own money to start RapidLink?

5   A.   None.

6   Q.   You didn't invest any money at all --

7   A.   None.

8   Q.   -- yourself?

9   A.   Yes.

10  Q.   What about 800 Frequency Group, did you invest any money

11  of your own in 800 Frequency Group?

12  A.   I don't remember if we put money into it or not.

13  Q.   Okay.

14  A.   It was -- yeah.

15  Q.   Now, you, for RapidLink, when you started that, you said

16  you didn't put any money into it.  Did you get a bank loan to

17  fund RapidLink?

18  A.   No.  My partners found individuals that were interested

19  in developing push-to-talk networks, so we helped them

20  develop them.

21  Q.   That wasn't my question.  My question was did you get a

22  bank loan --

23  A.   No.

24  Q.   Okay.  Because RapidLink was going to create a

25  walkie-talkie network; isn't that right?

                        ─A. Bobkin - Cross (By Ms. O'Boyle)─

1    A.   Correct.

2    Q.   For people like the Newells, correct?

3    A.   Correct.

4    Q.   And you took about $300,000 from the Newells; isn't that

5    right?

6    A.   I don't know the number.

7    Q.   You took hundreds of thousands of dollars from the

8    Newells, correct, as RapidLink?

9    A.   Okay.  I don't remember the number.

10   Q.   All right.  Now, in connection with RapidLink, you

11   decided to, instead of getting a loan, you decided to fund it

12   through funding partners, correct?

13   A.   My partner found individuals that wanted to build the

14   networks.

15   Q.   Well, you had funding partners, people like Daryl Bank,

16   correct?

17   A.   We just -- he wasn't a partner, and he just wanted to buy

18   a system.

19   Q.   Right.  If we could --

20   A.   He wanted to buy a system.

21   Q.   I'm sorry.  I didn't mean to interrupt you.  You said he

22   wanted to buy a system?

23   A.   Yeah.  He wanted to develop a network.

24   Q.   If we could go to Government's Exhibit 2301, which is not

25   in evidence yet.  Do you recognize 2301, sir?  It says here

—————A. Bobkin - Cross (By Ms. O'Boyle)—————

1    "RapidLink Business Plan."

2    A.   Yes.

3    Q.   And then Page 2 is the Deployment Plan, right, for your

4    company?

5    A.   That's what it looks like.

6    Q.   And then Page 3, going down is a pro forma.

7    A.   Okay.

8            MS. O'BOYLE:  Government moves in Exhibit 2301.

9            THE COURT:  2301 is admitted.

10           (Government's Exhibit 2301 was admitted.)

11           THE COURT:  And I say, Counselor, the Court still

12   wants to confine the scope of this examination.  It's getting

13   a little far, in the Court's view, out here.

14           MS. O'BOYLE:  Your Honor, this goes to bias.

15           THE COURT:  I know it does, but let's pull it real

16   tight.

17           MS. O'BOYLE:  Okay.

18   BY MS. O'BOYLE:

19   Q.   Mr. Bobkin, focusing in on 2301, you wrote in the

20   business plan, "We believe that we have a technologically

21   mature solution with a proven business model which is well

22   engineered and financed to be deployed within the requested

23   time frame."

24   A.   Okay.  I see it.

25   Q.   You were a brand-new company in 2015, correct?

A. Bobkin - Cross (By Ms. O'Boyle)

1    A.   Uh-huh.

2    Q.   You had two employees, you and your business partner?

3    A.   Yes.

4    Q.   And you were getting ready to raise funds through funding

5    partners like Mr. Bank, correct?

6    A.   Okay.

7    Q.   Was that correct?

8    A.   Well, we weren't -- I wasn't part of that part, so I

9    don't know what he developed.  It was my partner.

10   Q.   Well, sir, this is -- RapidLink was your company, right?

11   A.   Okay.  Yes.

12   Q.   All right.  And given that it's your company and you're

13   going to go through funding partners, it's serious business

14   taking money from investors; isn't that right?

15   A.   They were providing the equipment for their selves from

16   themselves.

17   Q.   You are an honest businessman, right, Mr. Bobkin?

18   A.   Pardon me?

19   Q.   You are an honest businessman?

20   A.   Yes, I believe so.

21   Q.   And you were going to try to deploy these spectrum

22   licenses, correct?

23   A.   Yes.

24   Q.   And you wanted to run your business in an honest way?

25   A.   Yes.

—————— A. Bobkin - Cross (By Ms. O'Boyle) ——————

1    Q.  You would never lie to investors to get funds for your

2    company, right?

3    A.  No.

4    Q.  Because you know that would be wrong?

5    A.  Correct.

6    Q.  And the best way to run a company in an honest way is to

7    surround yourself with folks, people who are honest, right?

8    A.  Correct.

9    Q.  And you wouldn't want people -- you wouldn't want to

10   associate with people who had been accused of fraud?

11   A.  No.

12   Q.  All right.  And so you knew, when you signed Mr. Bank up

13   in Xcel Bandwidth as a funding partner, that he had already

14   been accused by the SEC of fraud, correct?

15   A.  No, I did not.

16   Q.  Okay.  Let's go to Government's Exhibit 514.  This is --

17   it's already in evidence.  This is a public complaint dated

18   April 6 of 2015.  Do you see that?

19   A.  Yes.

20   Q.  And it's a Securities and Exchange Commission complaint

21   against David Alcorn and Mr. Bank.

22   A.  Okay.

23   Q.  And a number of other entities, right?

24   A.  Okay.  Yes.

25   Q.  And, sir, you actually received a subpoena in connection

A. Bobkin - Cross (By Ms. O'Boyle)

1   with this actual litigation, correct?

2   A.  I don't remember.  I don't remember.

3   Q.  You don't remember receiving a subpoena in December of

4   2015?

5   A.  Yes.

6   Q.  That required you to produce documents in connection with

7   this very complaint?

8   A.  I don't remember what the complaint was.  I'm at a loss.

9   I don't remember.

10  Q.  Okay.  And you were actually deposed in March of 2016?

11  A.  That, I remember.

12  Q.  And so when you were deposed, you never went back and

13  looked at the complaint to see what Mr. Bank or Mr. Alcorn

14  were accused of?

15  A.  I don't remember.

16  Q.  Okay.  Let's take a look at Page 2.  Do you see in

17  paragraph 1 that this complaint alleges that defendants,

18  which included Mr. Alcorn and Mr. Bank, misled investors by

19  promising that their investments would yield substantial

20  returns through the sale or lease of the FCC licenses to

21  major wireless carriers, when, in fact, defendants knew or

22  were reckless and negligent in not knowing that the FCC

23  licenses, if obtained, could never be sold or leased by any

24  major wireless carriers?  Do you see that?

25  A.  Yes.

A. Bobkin - Cross (By Ms. O'Boyle)

1   Q.  And you see that defendants further concealed the actual

2   costs associated with obtaining these licenses and pocketed

3   substantial sums of investor moneys for their own undisclosed

4   uses.  Do you see that?

5   A.  Yes.

6   Q.  And these are the very people that you received funds

7   from in 2016 -- 2015, 2016, correct?

8   A.  Yes.

9   Q.  And if we could go to Page 15.  And in paragraph 67 it

10  provides that many of the investors were unsophisticated.  Do

11  you see that?

12  A.  Okay.  Yes.

13  Q.  And so, Mr. Bobkin, you recognize that you partnered with

14  an individual who -- two individuals who were charged with

15  misleading unsophisticated investors, correct?

16  A.  That's what it says.  Yes.

17  Q.  And if we go to Page 16.

18          THE COURT:  I think your point has been made in

19  trying to establish what knowledge he believed he should have

20  had because of this subpoena.  So we can move on.

21          MS. O'BOYLE:  Okay, Your Honor, I will move on.

22  BY MS. O'BOYLE:

23  Q.  You set up RapidLink Wireless and ultimately you got

24  almost a million dollars from Mr. Bank's entity Xcel

25  Bandwidth; isn't that right?

—————A. Bobkin - Cross (By Ms. O'Boyle)—————

1    A.   I don't know numbers.

2    Q.   All right.  If we can take a look at Government's

3    Exhibit 624, please, which is already in evidence.

4             This is a summary chart that was prepared by a

5    forensic accountant for the Xcel Bandwidth bank account.  The

6    date's August 6, 2015, through September 2nd, 2016.  Do you

7    see that?

8    A.   Okay.

9    Q.   And you are familiar with Xcel Bandwidth, right?

10   A.   Xcel Bandwidth?

11   Q.   Yes.

12   A.   Doesn't ring -- right off the top of my head, it doesn't

13   ring a bell.

14            THE COURT:  Put the microphone down to your mouth.

15   BY MS. O'BOYLE:

16   Q.   Well, you see here, sir, that this particular bank

17   account was funded with $2.4 million of investor funds during

18   that time, which is months after the SEC complaint was filed?

19   A.   Okay.

20   Q.   Do you also see here that your company that had two

21   employees in a home office got $987,464.17?

22   A.   Okay.  Yes.

23   Q.   Did you receive those funds?

24   A.   Yes.  I received them, and they went right back out to

25   pay for equipment.

A. Bobkin - Cross (By Ms. O'Boyle)

1   Q.   Okay.  And if we could go ahead and take a look at

2   Page 2.  And, so, sir, you knew that Mr. Bank, who had been

3   accused in the SEC complaint of taking victims' funds,

4   investor funds for himself, was receiving funds from a

5   Ms. Kurtz of $50,000.  Do you see that?

6   A.   Yes.

7   Q.   And was transferring -- taking a portion of those funds

8   for himself and sending the remainder to you and your

9   company, correct?

10  A.   I don't know who the money came from.

11  Q.   And so if we could go to Exhibit 616, Page 49.  This is a

12  wire transfer from Oculina Bank showing a $300,000 transfer

13  from Diversified Financing to your company RapidLink

14  Wireless.  Do you see that?

15  A.   Yes.

16  Q.   If we could go to Page 52, please.  And this is another

17  $150,000 of investor funds going to your company RapidLink

18  Wireless?

19  A.   Yes.

20  Q.   Page 54.  This is another $21,000 going from investors to

21  your company RapidLink Wireless?

22  A.   Yes.

23  Q.   Right?

24  A.   Yes.

25  Q.   And this continued into 2017 as well, correct?

```
1    A.   2017?  I think I was out of business in 2017.

2    Q.   When did you go out of business?

3    A.   '16, I believe.

4    Q.   Why did you go out of business?

5    A.   Because people that were funding the installation of

6    their equipment stopped sending the money to develop their

7    networks.

8    Q.   So investors stopped sending you money, and so your

9    company went under, correct?

10   A.   Yes.  But they weren't investors.  They were just buying

11   their own equipment.

12         MS. O'BOYLE:  Thank you.  I have no further

13   questions.

14         THE COURT:  All right.  May this witness be

15   permanently excused?

16         MS. O'BOYLE:  Yes.

17         MR. YAROW:  Yes, Your Honor.

18         MS. McCASLIN:  Yes, Your Honor.

19         (The witness was excused.)

20         THE COURT:  You may call your next witness,

21   Mr. Yarow.

22         MR. YAROW:  Yes, sir.  Your Honor, I call Tom

23   Littler.

24         (Witness sworn.)

25         THOMAS LITTLER, called by the Defendant, having been
```

———————T. Littler - Direct———————

1    first duly sworn, was examined and testified as follows:

2                          DIRECT EXAMINATION

3    BY MR. YAROW:

4    Q.  Sir, would you please state your full name and spell it

5    for the record.

6    A.  Thomas Edward Littler, L-i-t-t-l-e-r.

7    Q.  Okay.  And what is your educational background, sir?

8    A.  Undergraduate 1978 ASU, Arizona State University, and in

9    1981 law school at Arizona State University.

10   Q.  Okay.  Are you a practicing attorney?

11   A.  I am.

12   Q.  And how long have you been -- how long have you been in

13   the legal practice?

14   A.  41 years now.

15           THE COURT REPORTER:  Pull the mic closer, please.

16   BY MR. YAROW:

17   Q.  I'm sorry?

18   A.  I have to hold the mic closer.

19   Q.  It's very difficult to hear.

20           What areas of practice have you -- what area of

21   practice are you in?

22   A.  I'm in commercial litigation and Chapter 11 restructuring

23   and bankruptcy.

24   Q.  Okay.  And during your career, how many bankruptcies have

25   you filed on behalf of clients?  Approximately.

—————T. Littler - Direct—————

1   A.   I would say probably 50 plus.

2   Q.   Okay.  And do you know an individual by the name of David

3   Alcorn?

4   A.   I do.

5   Q.   And how do you know David?

6   A.   I got to know David through meeting him before the filing

7   of a bankruptcy for Janus Spectrum LLC.

8   Q.   Okay.  So you represented Mr. Alcorn?

9   A.   Not -- I represented the company Janus Spectrum LLC in

10   that case, and I represented David later in another case.

11   Q.   So you were the bankruptcy attorney for Janus Spectrum?

12   A.   Correct.

13        MR. YAROW:  I would ask the government to pull up

14   Exhibit 318D.

15   BY MR. YAROW:

16   Q.   Sir --

17        MR. YAROW:  Can you zoom in, maybe, to the top

18   third.

19   BY MR. YAROW:

20   Q.   This document has been previously introduced as

21   Government's Exhibit 318D.  Do you recognize this document?

22   A.   It appears to be the bankruptcy petition which would

23   commence the case in the District of Arizona for Janus

24   Spectrum LLC.

25   Q.   Okay.  And what type of bankruptcy is this?

———————T. Littler - Direct———————

1   A.   The chapter -- it's Chapter 11.

2   Q.   And what is a Chapter 11 bankruptcy?

3   A.   A Chapter 11 bankruptcy is a restructuring of the debts

4   of an entity or an individual.

5   Q.   Okay.  And what is a Chapter 7 bankruptcy?

6   A.   A Chapter 7 is a liquidation of a company or individuals

7   where all the nonexempt assets are turned over to a trustee

8   and sold and money distributed to creditors.

9   Q.   Okay.  And did you discuss with Mr. Alcorn the type of

10  bankruptcy that would be appropriate for him?

11  A.   I don't recall --

12  Q.   For Janus Spectrum, I'm sorry.

13  A.   I don't recall specifically, but I always do that, so...

14  Q.   Okay.  And you chose -- you and Mr. Alcorn chose a

15  Chapter 11 for Janus Spectrum?

16  A.   Correct.

17  Q.   And what was the -- briefly, what was the background and

18  the reason for filing this bankruptcy, the Chapter 11?

19  A.   Janus Spectrum and Mr. Alcorn were involved in some very

20  contentious litigation with a company called SmartCOMM and

21  SmartCOMM License Services.

22  Q.   Okay.

23  A.   It was scorched-earth type litigation and was very

24  aggressive, and it was costing Janus and Mr. Alcorn a lot of

25  money.  And after some consideration, we thought it might

—————T. Littler - Direct—————

1    be a vehicle -- Chapter 11 might be a vehicle to bring that

2    to a close.

3    Q.   Okay.

4         MR. YAROW:   I would ask that you zoom out, please,

5    and go to Page 22 of this exhibit.  Can you zoom in on that

6    so we can see what that is?

7    BY MR. YAROW:

8    Q.   Okay.  And this is the last page of the petition.  Would

9    you tell the Court and jury what exactly this is.

10   A.   Well, it appears to be a Janus Spectrum LLC balance

11   sheet, and you have to attach one to a Chapter 11 petition.

12   Q.   Okay.  And what does it list for total assets?

13   A.   $672,225.14.

14   Q.   And what does it list for total liabilities?

15   A.   $190,000.

16   Q.   Okay.  So this is a solvent company.  In other words, it

17   has more assets than liabilities?

18   A.   There's different definitions of "solvency," but on a

19   balance-sheet solvency question, yes.

20   Q.   Okay.  Thank you.

21        MR. YAROW:   And now, on page -- would you go to

22   Page 18, please.  Okay.  This page -- and if you can zoom in

23   on the name, David Alcorn Professional Corp. and the

24   percentages down about midway.  Thank you.

25   BY MR. YAROW:

─────────────T. Littler - Direct─────────────

1    Q.  Okay.  Does this show that Mr. Alcorn is 55 percent owner
2    of Janus Spectrum?
3    A.  At the time of this document, yes.
4             MR. YAROW:  If you can go to Page 20, please.  If
5    you can zoom in on the NBI Holding.
6    BY MR. YAROW:
7    Q.  Who is NBI Holding?
8    A.  To my recollection, that was Kent Maerki's company.
9    Q.  Okay.  And does it show that Kent Maerki is a 45 percent
10   owner of Janus Spectrum?
11   A.  It shows that NBI Holding is the --
12   Q.  I'm sorry, NBI Holding, which is owned by Kent Maerki, is
13   a 45 percent owner?
14   A.  Correct.
15   Q.  Okay.  And are you aware of whether David Alcorn bought
16   out NBI Holding or Kent Maerki from Janus Spectrum?
17   A.  Yes, I am.
18   Q.  Okay.  And when did that occur?
19   A.  Before the filing of the Chapter 11, commencing the
20   Chapter 11.
21   Q.  Okay.  And what was the reason for that?
22   A.  David wanted to, you know, get Kent out of the business,
23   but I can't remember why.
24   Q.  Okay.  All right.  And so David wanted to terminate that
25   relationship?

———T. Littler - Direct———

1    A.   Correct.

2    Q.   Was there any issue on whether it was to be before or

3    after the bankruptcy filing?

4    A.   David wanted to get it done before the bankruptcy filing.

5    Q.   And why would that be?  Do you know?

6    A.   You know, I'm sorry, I don't recall.

7    Q.   That's okay.

8              MR. YAROW:  I am going to pull up another -- you can

9    take that down.  Thank you.  Just give me one minute here to

10   pull this up.

11             I'm going to try to make this a little larger.  This

12   is just for the witness.

13   BY MR. YAROW:

14   Q.   This is an exhibit that's been marked Alcorn 19.  Do you

15   recognize this?  I can scroll through it if you'd like.

16   A.   Could you just go down a little bit so I can see.

17   Q.   I sure can.  As a matter of fact, I'm going to go all the

18   way through it so you can see it.

19   A.   Yes, I do recognize this.

20   Q.   Okay.  And what is this?

21   A.   This is an expert report that I commissioned regarding

22   the amounts of money that came from Janus through to the

23   various entities.  It was prepared for litigation.

24   Q.   Okay.  And does this particular report show how much

25   David Alcorn PC earned from between January 1st, 2012, and

─────────T. Littler - Direct─────────

```
 1    December 31st of 2015?
 2           MS. YUSI:  Your Honor, I'm going to object here.
 3    It's not in evidence.  I'm not sure -- we do object to this
 4    coming into evidence.  It's complete hearsay.  It's an expert
 5    report.
 6           MR. YAROW:  I'm sorry, Your Honor.  I forgot to
 7    ask --
 8           THE COURT:  For what purpose are you using the
 9    document in the first place?  The Court assumed you were
10    using it to refresh recollection or something, because it
11    wasn't shown to the jury, and you never moved it into
12    evidence.
13           MR. YAROW:  I did not.
14           THE COURT:  It's hearsay anyway.  You can use it to
15    refresh his recollection, if that's the purpose.  Otherwise,
16    the objection is sustained.
17    BY MR. YAROW:
18    Q.  Okay.  During that time frame, if you take a look at the
19    last page of the document, summarized to refresh your memory,
20    do you recall how much --
21           THE COURT:  Excuse me, Mr. Yarow.  I'm sorry to
22    interrupt you, but I don't think -- did the witness express a
23    failure of recollection of what the question was?  I lost
24    track of what the question was that put you into this
25    document in the first place.
```

———————T. Littler - Cross (By Ms. Yusi)———————

1          MR. YAROW:  Your Honor, I'm just trying to -- I

2    can -- I'm going to withdraw.  It is hearsay.

3          Mr. Littler, if you would answer any questions that

4    the other attorneys may have.

5          THE COURT:  Do you have any cross, Mr. Smith?

6          MR. GRINDROD:  No questions, Your Honor.

7          THE COURT:  Does the United States have any

8    questions?

9          MS. YUSI:  We do, Your Honor.

10          THE COURT:  A narrow cross.

11                         CROSS-EXAMINATION

12   BY MS. YUSI:

13   Q.  Good afternoon, Mr. Littler.  I'm Beth Yusi.  I'm with

14   the U.S. Attorney's Office.

15   A.  Good afternoon.

16   Q.  Now, you did not start working with Mr. Alcorn until

17   2014; is that right?

18   A.  I think I might have met him right at the end of 2013,

19   but either that or the beginning of 2014.

20   Q.  And you were initially hired as a bankruptcy attorney,

21   correct?

22   A.  Correct.

23   Q.  And then you also during that -- some of that same time

24   period, you represented Mr. Alcorn with the SEC

25   investigation?

──────T. Littler - Cross (By Ms. Yusi)──────

1   A.   What's the time period?   Yes, I did represent him in the

2   SEC lawsuit, not the investigation.

3   Q.   With the lawsuit.   So when did your representation of

4   Mr. Alcorn start for that, the SEC investigation?

5   A.   I don't recall working with him in the investigation.   I

6   worked with him defending the lawsuit.

7   Q.   In the lawsuit.   So once the complaint was filed?

8   A.   Correct.

9   Q.   All right.   And we'll talk about that in a minute.

10        MS. YUSI:   If we can look at 1002B.

11   BY MS. YUSI:

12   Q.   And you originally -- actually, I'm going to scratch

13   that.   I'm sorry.   If we can look at 1002C, Page 123.

14        Where did -- who paid you or under what account were

15   you getting paid for the Janus bankruptcy, if you recall?

16   A.   I can only remember two payments.   One was going into the

17   bankruptcy, and I don't know what bank account that was in

18   2014.

19   Q.   Okay.

20   A.   The last payment was from the funds being held by the

21   district court.

22   Q.   Okay.

23   A.   So it was the district court clerk for the District of

24   Arizona paid me my last payment that was allowed.

25   Q.   Okay.   Here we have on, let's see, 1/7/14 -- do you see

─────────── T. Littler - Cross (By Ms. Yusi) ───────────

1    that bill pay, Thomas E. Littler online for $25,000.  Does

2    that appear to be a payment to you?

3    A.  That appears to be the advance payment that was paid to

4    me.  Spelled my name wrong but...

5    Q.  And that was 2014?

6    A.  Yes.

7    Q.  And if we can go to Page 1 of Exhibit 1002C.  And this

8    came from Janus Spectrum, correct?

9    A.  That's what it says, yes.

10   Q.  Okay.  Now, if we can look at 318D.  You were just

11   looking at this with Mr. Yarow.  This is the bankruptcy

12   petition filed on March 3rd, I believe, 2014.  Does that

13   sound correct?

14   A.  That is correct, yes.

15   Q.  Okay.  And if we go to Page 10.  This shows that

16   Mr. Alcorn owned the majority, correct, 55 percent of Janus?

17   A.  He did, yes, until the agreement with Mr. Maerki's

18   company.

19   Q.  All right.  And did you understand that Mr. Maerki

20   continued to consult and be paid by Janus after Mr. Alcorn

21   became --

22        MR. YAROW:  Your Honor, I'm going to object because

23   it is outside the scope of direct, and I don't think that

24   she's trying to show bias of this witness.

25        MS. YUSI:  Your Honor, the point of a lot of this is

──────T. Littler - Cross (By Ms. Yusi)──────

1   you are only as good as what your client tells you in certain

2   aspects, and so I'm trying to show different things that

3   Mr. Alcorn said or didn't say.

4            THE COURT:  Well, I'm going to sustain the

5   objection.

6   BY MS. YUSI:

7   Q.  Now, on Page 14 of Exhibit 318D, the biggest expense --

8   these are expenses; is that right?

9   A.  Yeah, I'm sorry.  This is an IRS form or --

10  Q.  Okay.  We can go to Page -- hold on.  I'll do this.

11           This is Page 22, the balance sheet you were looking

12  at.

13  A.  Yes.

14  Q.  And you testified about this, and you understand what it

15  is saying?

16  A.  I can read a balance sheet.  I have a business undergrad.

17  Q.  Okay.  And it says here that the members' equity -- do

18  you see that?  How much does it say that the members' equity

19  put into this?

20  A.  $424,802.46.

21  Q.  And who provided this balance sheet?

22  A.  I don't know for sure.  I don't remember.

23  Q.  All right.  Did you have an accountant working with you

24  or Mr. Alcorn?

25  A.  No.  But I believe the Semple firm might have been

———————T. Littler - Cross (By Ms. Yusi)———————

1    working with him so it may have come from them.  That's why I
2    don't --
3    Q.  Is that Brian and Robert Semple?
4    A.  Yes.  They are part of the Semple firm, the Semple
5    Marchal Cooper firm.
6    Q.  And they are an accounting firm that Mr. Alcorn worked
7    with?
8    A.  Yes.
9    Q.  All right.  Now, this says that there is member equity.
10   What does member equity mean?
11   A.  Well, I'm not an accountant, but I believe it's
12   accumulation on the balance sheet of the equity which comes
13   from the initial contribution and the moneys that are left in
14   the company as equity.  It can be different things.  It's
15   challenging my 1978 accounting class.
16   Q.  I apologize.  I'll try to make it simple.  Let's look at
17   Exhibit 300E, which is already in evidence.
18           And this is the Operating Agreement of Janus
19   Spectrum; is that right?
20   A.  It appears to be one page from it, yes.
21   Q.  Okay.  And if we can look at Page 13 of Exhibit 300E.
22   And this talks about the percentage ownership; is that right?
23   A.  Yes.
24   Q.  And this corresponds to what was supplied in the
25   bankruptcy petition, that Mr. Maerki had 45 percent and David

────── T. Littler - Cross (By Ms. Yusi) ──────

1   Alcorn Professional Corp. had 55?

2   A.  Yes.

3   Q.  And what was the initial capital contribution by each of

4   them?

5   A.  Kent Maerki, $45, and David Alcorn Professional

6   Corporation, $55.

7   Q.  And it was now listed at over $400,000 on the balance

8   sheet?

9   A.  That's what we just looked at, yes.

10  Q.  And then at some point you said you became involved with

11  the SEC investigation.  Let's look at Exhibit 514.

12  A.  I never said that.

13  Q.  I'm sorry.  The SEC lawsuit.

14  A.  Yes.

15  Q.  All right.  It we could look at 514.  I apologize.  I'll

16  try to be more precise.

17          Is this the complaint you're talking about?

18  A.  Yeah.  It appears to be the first page of the complaint,

19  yes.

20  Q.  And this was August 6, 2015?

21  A.  April.

22  Q.  April 6.  It's been a long couple of weeks.  I apologize.

23          And who was your client?  Who were you representing

24  in the SEC lawsuit?

25  A.  I believe I represented both Janus Spectrum -- oh, wait,

────────── T. Littler - Cross (By Ms. Yusi) ──────────

1   no, maybe not.  I know I represented David Alcorn.  I might

2   have represented Janus Spectrum, but I don't remember if I

3   did or whether I didn't at this point.  I think I probably

4   did.

5   Q.  And you understood prior to your representing the

6   lawsuit, Mr. Alcorn and Janus had representation for the

7   investigation?

8   A.  Yes.

9   Q.  And was one of those -- does the name Alan Baskin sound

10  familiar?

11  A.  Yes.  He was one of the attorneys.  I think he was

12  involved in the investigation.

13  Q.  Did you ever speak with Mr. Baskin about his

14  representation of Janus?

15  A.  I don't recall.

16  Q.  All right.  Did David Alcorn share with you the

17  communications he had with Alan Baskin?

18          THE COURT:  This appears to be beyond the scope of

19  the direct.

20          MS. YUSI:  Your Honor, I think that's just to say

21  that he did a bankruptcy and to leave it there.  I can go

22  into the payments, Your Honor, to show that.

23          THE COURT:  As long as you can connect it more

24  directly for the Court, you can go right on.

25          MS. YUSI:  Thank you.

————————T. Littler - Cross (By Ms. Yusi)————————

 1          If we can go to Exhibit 1002H.

 2    BY MS. YUSI:

 3    Q.  This is a -- we had an FBI analyst come that did all the

 4    banking records, et cetera, on some of the business accounts

 5    that were doing that.  This is Janus Spectrum LLC, debtor in

 6    possession, Arizona Business Bank ending in 4974.

 7          Do you know what that means, debtor in possession,

 8    why it says that on the bank account?

 9    A.  Yes.  When you start a new Chapter 11, you're required to

10    close all your existing bank accounts and open up new

11    accounts.  How many or when are guided by the United States

12    Trustee's office, which is a division of the Department of

13    Justice.  So -- and it is required that you put on the

14    account and on the checks "debtor in possession."

15    Q.  So they know that you are involved or you are going

16    through some sort of either reorganization or liquidation?

17    A.  No, not liquidation.  If you're a debtor in possession,

18    that means that there is no trustee.  That means that you are

19    a debtor in possession of the entity that is in Chapter 11.

20    Q.  Okay.

21    A.  So it wouldn't be in a 7 because that's just --

22    everything -- the trustee just takes care of everything.

23    Q.  Okay.  Page 1 of Exhibit 1002H shows the moneys going

24    into the debtor-in-possession account ending in 4974.  Do you

25    see that?

———————— T. Littler - Cross (By Ms. Yusi)————————

1    A.   All the arrows pointing to the Janus Spectrum LLC

2    debtor-in-possession account, yes.

3    Q.   If we can go to Page 16 of this exhibit.  And on

4    September 12th, 2014, is this a second payment for the

5    bankruptcy?

6    A.   Yeah.  I don't remember.

7    Q.   Well, how much is it for?

8    A.   $72,131.

9    Q.   And the SEC lawsuit was not filed till 2015, correct?

10   A.   So this was another payment that I had forgotten about.

11   Q.   All right.  For 72,000?

12   A.   Yes.

13   Q.   Okay.  And if we can go to Page 20.

14        And 1/20/2015, how much were you paid on January

15   2015?

16   A.   $74,721.40.

17   Q.   And was that for the bankruptcy?

18   A.   You know, I'm sorry, I don't remember.  They all have to

19   be approved by the bankruptcy court, so I just didn't

20   remember these, or if it went to pay down the fees or not.

21   Q.   Okay.  If we can go to Page 23 of Exhibit 1002H.

22        In April of 2015 was when the SEC lawsuit was filed.

23   And Page 23 from the debtor in possession, May 4th, 2015, how

24   much money did you get from the Janus Spectrum

25   debtor-in-possession account?

————T. Littler - Cross (By Ms. Yusi)————

1    A.   It says 100,000.

2    Q.   All right.  Any idea what that was for?

3    A.   No.  I mean, it would all be in the bankruptcy court

4    records, but I don't remember.

5    Q.   Okay.  And so you were being paid from the same account

6    for the bankruptcy along with -- along with the SEC

7    representation?

8    A.   No, this would have all been bankruptcy, I think.

9    Q.   Okay.  We can look at Page 23 again of Exhibit 1002H, and

10   6/10/2015.  So the next month did you get another 20,000?

11   A.   That's what this says.  I just don't recall it.

12   Q.   Okay.  And you said that there was -- this is a

13   reorganization.  So you didn't have a bunch of debtors and

14   things like that to -- or creditors to pay off, that sort of

15   thing; is that right?

16   A.   A debtor in possession has to pay off its administrative

17   fees on an ongoing basis.  Those are ongoing bills and

18   whatever.  But creditors are not paid until there's a

19   confirmed plan of reorganization.  Prefiling creditors are

20   not paid.

21   Q.   If we go back to 1002H, sorry.  I'm going to go to right

22   here.

23          This is the same account.  So within nine months,

24   April 2014 to May -- I'm sorry -- let's see.  September 2014

25   to June 2015, you were paid over $266,000?

———————T. Littler - Cross (By Ms. Yusi)———————

1   A.   That's what this says, but I don't recall, you know.

2   Q.   Do you have any reason to doubt that?

3   A.   I don't recall it, but like I said, it would all be in

4   the bankruptcy court records as to what I was authorized to

5   get paid.

6   Q.   And did you have any understanding that Janus Spectrum

7   was never a capitalized LLC, that all the money came from

8   investor money?

9   A.   No.

10  Q.   Okay.  So if all the money came from investor money, then

11  all the money -- everything that you were paid through Janus

12  was investor funds; is that right?

13  A.   I don't know that.

14  Q.   All right.  And then you said later on you got paid from

15  the bankruptcy trustee, as well, out of their funds?

16  A.   The district court for the District of Arizona out of the

17  funds held by the clerk of the court.

18  Q.   And you got another 54,000 from that?

19  A.   That sounds about right, yeah.

20  Q.   And while you were representing them in the bankruptcy,

21  you had to file operating reports, correct?

22  A.   Correct.

23  Q.   What are operating reports?

24  A.   Debtors in possessions have to file a monthly operating

25  report that provides certain information to creditors and to

Carol L. Naughton, Official Court Reporter

```
                       ──T. Littler - Cross (By Ms. Yusi)──
 1   the United States Trustee's office.
 2   Q.  Okay.  And I want to just show you one or two of these.
 3          MS. YUSI:  If we can look at Exhibit 2108, just for
 4   the witness.
 5          THE COURT:  The Court is going to take a break in
 6   about five minutes.
 7          MS. YUSI:  Okay.  That's fine.
 8   BY MS. YUSI:
 9   Q.  Do you recognize this document?  And I can page down for
10   you.
11   A.  It appears to be the monthly operating report form that
12   was being used at the time.
13   Q.  If we can go back to Page 1.
14          And did you -- were you the one that put this
15   together?
16   A.  I don't usually do it.  I usually let the client do it.
17   Q.  Okay.  Do you check it over before it's filed?
18   A.  I usually do.
19   Q.  And this was April 2014.  So I guess right after the
20   filing?
21   A.  Yes.
22   Q.  All right.  And if we can go to -- next, is that
23   Mr. Alcorn's signature on Page 1?
24   A.  I believe it is.
25   Q.  And on Page 2 of this, in terms of expenses, commissions
```

—————T. Littler - Cross (By Ms. Yusi)—————

1  are $49,000.  This is for Janus in April 2014.  Do you see

2  that?

3  A.  Yes.

4  Q.  And Page 12 of Exhibit 2108 --

5          MS. YUSI:  I'm sorry, Your Honor.  We move to admit

6  Exhibit 2108.

7          THE COURT:  Exhibit 2108 will be admitted.

8          (Government's Exhibit 2108 was admitted.)

9  BY MS. YUSI:

10  Q.  And if you go to Page 12 of this, it talks about the

11  checks issued.  So these are the sort of expenses that you

12  have to provide to the bankruptcy court?

13  A.  Yes.

14  Q.  And the commission, who was getting paid for all the

15  commissions in April 2014?

16  A.  David Alcorn PC.

17  Q.  All right.  And did you ever question the commissions, or

18  you're just there to report what the client gave you?

19  A.  Initially, the latter, just report what the client gave

20  me, but it became an issue as to whether or not we had to get

21  him approved, so we filed the document to do that.

22          MS. YUSI:  If we can look at 2109 just for the

23  witness.

24  BY MS. YUSI:

25  Q.  Is this another operating report from May 2014?

---

T. Littler - Cross (By Ms. Yusi)

1   A.  Yes.

2          MS. YUSI:  Okay.  And, Your Honor, we move to admit

3   2109.

4          THE COURT:  2109 is admitted.

5          (Government's Exhibit 2109 was admitted.)

6   BY MS. YUSI:

7   Q.  Go to Page 5.  Cash sales for May 2014, what were those?

8   A.  $340,900.

9   Q.  And if we can go to Page 11 of the same, 2109.  And how

10  much did David Alcorn pay David Alcorn PC in commissions that

11  month?

12  A.  Janus Spectrum paid $101,292 to David Alcorn PC in May of

13  2014.

14         MS. YUSI:  Your Honor, this might be a good time to

15  break to see if I have anything else.

16         THE COURT:  How much further is your

17  cross-examination?

18         MS. YUSI:  I'd like to consult with my colleagues

19  before.

20         THE COURT:  You wind it up right after the break.

21  We will take a 15-minute break.

22         (The jury exited the courtroom.)

23         THE COURT:  You may step down during the break.

24  Just don't discuss your testimony.

25         MR. GRINDROD:  Your Honor, this is Andrew Grindrod.

---

—————T. Littler - Cross (By Ms. Yusi)—————

1   Just real quick, I just wanted to bring to the Court's

2   attention, I know the timing is what the timing is, but we do

3   have a witness that we're trying to get on today, if at all

4   possible.  I understand this is Mr. Yarow's last witness, but

5   I just wanted to put that on the Court's radar.

6           THE COURT:  Well, we have to see where we are here

7   whether we can do that or not.  It all -- everybody sit down.

8   Have a seat.

9           It all depends on how long that witness will be

10  because we also have to account for cross-examination, and I

11  don't know how long cross-examination is going to be, but

12  I've made a commitment that I'm not going to keep the jury in

13  here much past 5:15.

14          MR. GRINDROD:  I understand completely.  I was just

15  trying to put it on the Court's radar.

16          THE COURT:  If we can do it, we will.  Otherwise, we

17  will see.  It may be that you put on your direct and they do

18  the cross in the morning.  We'll see.  Okay.

19          (Recess from 4:10 p.m. to 4:28 p.m.)

20          THE COURT:  For purposes of planning, the Court

21  understands that this is your last witness; is that correct?

22          MR. YAROW:  Yes, sir.

23          THE COURT:  And if your cross is finished, then you

24  are resting; is that correct?

25          MR. YAROW:  Yes, sir.

2215

```
 1              THE COURT:  All right.  That means if I bring the
 2    jury back in, then I have to send them right back out again
 3    because I've got to address Mr. Smith.  So what I want to
 4    know is, is the government finished with the examination?
 5              MS. YUSI:  We are, Your Honor.
 6              THE COURT:  All right.
 7              MR. YAROW:  Your Honor, this witness -- I have no
 8    redirect on the witness, and the defense rests.
 9              THE COURT:  All right.  Thank you for coming, sir.
10    You may be excused.
11              THE WITNESS:  Thank you, sir.
12              (The witness was excused.)
13              MR. YAROW:  Your Honor, I would renew my motion with
14    no additional argument.
15              THE COURT:  Okay.
16              MR. YAROW:  Or I can wait and do it after Smith's.
17              THE COURT:  Well, I think the prudent thing to do
18    now is -- well, the Court will defer its ruling on your
19    motion.
20              MR. YAROW:  Okay.
21              THE COURT:  That takes care of that.
22              Now, Mr. Smith, if you would please stand.
23              Mr. Smith, you've heard the precautions that the
24    Court gave Mr. Alcorn, but I'm going to give them to you.
25              As a defendant, you have a right to decide whether
```

1    you wish to testify or not.  You are not called upon to
2    testify as a defendant.  It cannot be mentioned when the jury
3    is deliberating.  It cannot be used against you.
4          If you testify and you end up getting convicted and
5    it's later determined that you falsely testified.  Or
6    committed perjury, you suffer the likelihood that you will be
7    getting an enhancement for perjury, which means that it
8    increases the severity of your sentencing guidelines.
9          So have you consulted with your counsel to determine
10   whether you wish to testify or not?  That's the first
11   question.  Have you consulted with your counsel?
12         DEFENDANT SMITH:  Yes, Your Honor, I have.
13         THE COURT:  Have you made an independent decision on
14   whether you wish to testify?
15         DEFENDANT SMITH:  I have, Your Honor.
16         THE COURT:  What independent decision have you made?
17         DEFENDANT SMITH:  I have decided not to testify.
18         THE COURT:  All right.  Then thank you very much.
19   You may be seated.
20         Now, Mr. Grindrod, the Court has got at least 45
21   minutes to work with this witness on direct, and then after
22   that, we will just have to come back tomorrow for the cross.
23         MR. GRINDROD:  That's fine, Your Honor.  I conferred
24   with Mr. Bosse.  I think it's not going to wrap up today, but
25   I'm fine starting.

```
 1            THE COURT:  Okay.  Well, we'll get started, then.
 2    Bring the jury in.
 3            MS. YUSI:  Your Honor, I will say I have no further
 4    questions on the record in front of the jury, and then he can
 5    say what he needs to.
 6            THE COURT:  All right, fine.
 7            I'll have him rest again in front of the jury.
 8            (The jury entered the courtroom.)
 9            THE COURT:  You may be seated.
10            The record will reflect that all jurors are present.
11            Does counsel agree?
12            MS. YUSI:  Government agrees, Your Honor.
13            MR. YAROW:  Mr. Alcorn agrees, Your Honor.
14            MS. McCASLIN:  Mr. Smith agrees.
15            THE COURT:  Okay.  Ms. Yusi, does the United States
16    have any further questions for the witness?
17            MS. YUSI:  We don't, Your Honor.
18            THE COURT:  All right.  Ladies and gentlemen, the
19    United States has concluded its examination of the witness.
20            Mr. Yarow, do you have another witness?
21            MR. YAROW:  No other witnesses, Your Honor.
22    Mr. Alcorn rests.
23            THE COURT:  Ladies and gentlemen, Mr. Alcorn rests.
24    Again, as I told you, no defendant is required to call a
25    witness, but the Court understands that Mr. Smith does wish
```

P. Lewis - Direct

1    to call some witnesses.

2            So Mr. Grindrod?

3            MR. GRINDROD:  Yes, Your Honor.  We call Peter Lewis

4    to the stand.

5            (Witness sworn.)

6            PETER LEWIS, called by the Defendant, having been

7    first duly sworn, was examined and testified as follows:

8                      DIRECT EXAMINATION

9    BY MR. GRINDROD:

10   Q.  Good afternoon, sir.

11   A.  Good afternoon.

12   Q.  And I'm going to ask you to hold that microphone right up

13   as close to the mask as you can, because it's pretty hard to

14   hear all the way in the back of the courtroom.

15   A.  All right.

16   Q.  Thank you, sir.  Could you please introduce yourself to

17   the jury.

18   A.  My name is Peter Lewis.

19   Q.  And spell your last name for us, if you could.

20   A.  L-e-w-i-s.

21   Q.  Where do you live?  Just the city and state, sir.

22   A.  I live in Washington, D.C.

23   Q.  And back in the 2014 time period, did you work as a

24   consultant for Janus Spectrum LLC?

25   A.  Yes.

2219

P. Lewis - Direct

1   Q.  Did you make a presentation at a Janus conference in
2   Washington, D.C., in June of 2014?
3   A.  Yes, I did.
4   Q.  And we'll talk specifically about that conference
5   presentation in a moment, but first can you please tell the
6   jury, when roughly did you start working with Janus?
7   A.  It was, I think, just before June 2014.
8   Q.  Okay.  And who, as far as people, who were your primary
9   contacts at Janus?
10  A.  David Alcorn.
11  Q.  Did you also correspond at all with a gentleman named
12  Kent Maerki?
13  A.  Yes.
14  Q.  Okay.  And, again, just kind of at a high level to orient
15  the jury, what were you asked to do in your role as a
16  consultant with Janus?
17  A.  I was asked to help develop monetization for frequencies
18  that Janus clients had won at the FCC, frequencies that they
19  had applied for in an FCC application.
20  Q.  And just to break that down a little, by "monetization,"
21  do you mean basically generating money?
22  A.  Yeah.  What would be the best uses for those applications
23  for those frequencies to generate the revenue.
24  Q.  Okay.  And were you paid for your work as a consultant?
25  A.  Yes.

Carol L. Naughton, Official Court Reporter

P. Lewis - Direct

1    Q.   Do you know about how much you were paid?

2    A.   About 12,500 a month.

3    Q.   Were you involved in creating Janus's marketing materials

4    that they gave to people who might want to buy applications

5    through them?

6    A.   No, I wasn't involved in that.

7    Q.   And did you solicit any clients, anybody?  Did you go up

8    to anybody and say, hey, you should buy a spectrum license

9    through Janus?

10   A.   No.

11   Q.   So let's jump ahead to that D.C. conference in June of

12   2014.  I know it was in D.C., but where was it held?

13   A.   It was at the Embassy Suites Hotel in Georgetown, in the

14   Georgetown portion of D.C.

15   Q.   Okay.  Do you know roughly how many people attended?

16   A.   I would say 45 to 50.

17   Q.   And did you use PowerPoint slides for your presentation?

18   A.   Yes, I did.

19   Q.   I'm going to show you a document, just for the witness,

20   Smith 131, which is not in evidence.

21   A.   Yes.  That's the document.

22   Q.   Okay.  These are the slides that you used to make your

23   presentation?

24   A.   Correct.

25             MR. GRINDROD:  Your Honor, I offer Smith 131.

                           ─── P. Lewis - Direct ───

 1          THE COURT:  Any objection?

 2          MR. BOSSE:  Your Honor, as long as it's clear this

 3   isn't coming in for the truth of what it presents, I don't

 4   have any objection.

 5          MR. GRINDROD:  That's fine, Your Honor.  I'm just

 6   using it to kind of walk through what was said at that

 7   meeting, and so we don't need it for truth.

 8          THE COURT:  Okay.

 9          MR. BOSSE:  No objection.

10          THE COURT:  It will be admitted.  Smith 131 is

11   admitted.

12          (Defendant Smith's Exhibit 131 was admitted.)

13          MR. GRINDROD:  Thank you, Your Honor.

14          And, Ms. McCaslin, if we could jump to Page 4.

15   BY MR. GRINDROD:

16   Q.  So as part of your presentation, did you talk about your

17   background generally in this space?

18   A.  Yes.

19   Q.  Okay.  And just to walk through that a little bit, can

20   you tell the jury about your military career, and I guess

21   specifically how it relates to the spectrum industry.

22   A.  Certainly.  I was a military officer, a signal officer,

23   telecommunications officer, and also a nuclear battery

24   control central officer in charge.  That means I controlled a

25   third of NATO's first nuclear strike force.  I was also a

P. Lewis - Direct

1  signal or a telecommunications commander of the largest

2  signal company in the U.S. Army.

3  Q.  And what were your responsibilities in those roles?

4  A.  Well, as a signal commander at Fort Meade, Maryland, my

5  responsibilities were command of the unit, and my part-time

6  job was for tactical telecommunications for all presidential

7  out-of-states visits, like summit meetings, and then we would

8  be with the Advance Team and Secret Service to set up

9  telecommunications prior to the President's arrival.

10 Q.  Okay.  And did you -- I guess switching to your kind of

11 civilian career, what -- how did you start off working in

12 spectrum?  What were some of your earlier projects?

13 A.  Well, one of the first things I did when I got out of the

14 Army was to incorporate, because I wanted to go after

15 frequencies for this new system called cellular -- Domestic

16 Public Cellular Telecommunications service.  So I

17 incorporated a company.

18      We started out of the basement of my town home, an

19 unfinished basement, and we started putting the engineering

20 or what we thought would be the engineering requirements and

21 market research requirements and finance requirements and

22 operations planning requirements, and so forth.

23      And we -- by the time the rules came out, which I

24 helped develop because the FCC asked if I would be a member

25 of the Land Mobile Advisory Committee to come up with the

P. Lewis - Direct

1    rules and technology as to how cellular would work and how
2    they would evaluate these systems.  And there were ten of us
3    on that committee, and that's, you know, what we developed.
4    Q.  And what's the time frame we're talking about here?
5    A.  That was 1980, is when I incorporated the company.
6    Q.  And was that Cellular One?
7    A.  Well, yeah.  It ended up after we litigated with, you
8    know, the mutually exclusive companies that also wanted the
9    first system in the country, which was D.C. and Baltimore.
10   We had what was called the comparative hearing that was
11   presided over by an Administrative Law Judge and -- but in
12   the throes of that, after about a year of litigating, *The*
13   *Washington Post* and my other partners settled, and we formed
14   the Washington/Baltimore Cellular Telephone Company, Inc.,
15   and then gave it the marketing name Cellular One.
16   Q.  And what was the significance of Cellular One?
17   A.  That was the first cellular telephone company in the U.S.
18   Q.  Okay.  And later in your career, did you work -- continue
19   working in the spectrum industry?
20   A.  Yes.
21   Q.  Tell the jury a little bit about that experience.
22   A.  Well, my next big thing was just purely consulting for
23   companies that wanted to also apply, and I also got into GPS
24   as that was developing, and things of that nature.
25   Q.  And did you consult just with private companies or also

P. Lewis - Direct

 1  with the government?

 2  A.  With the government as well.  Not just for cellular, but

 3  for, you know, wireless and telecommunications-related

 4  projects as well.

 5  Q.  And what agencies do you remember consulting with, just

 6  with respect to the spectrum?

 7  A.  Yeah, U.S. Army LandWarNet, also the U.S. Air Force.  I

 8  was their wireless subject matter expert for expanding and

 9  correcting a lot of the flaws in Air Force wireless, but I

10  also consulted the Secret Service for how to better, you

11  know, protect presidential movements and things of that

12  nature, U.S. Marshals Office on using GIS systems and others.

13          THE COURT:  The Court needs to know something.  Are

14  you calling this witness as an expert?

15          MR. GRINDROD:  Just -- no, Your Honor, just as a

16  fact witness.

17          THE COURT:  Fact witness.  Okay.

18  BY MR. GRINDROD:

19  Q.  And so did you kind of give that sort of overview of your

20  background when you were at the D.C. conference in 2014?

21  A.  Yes.

22  Q.  Okay.  Let's jump to Page 7, if we could.  So this is

23  from your slide.  There are references to NetMoby.

24  A.  Yes.

25  Q.  Just so the jury understands, what is NetMoby?

P. Lewis - Direct

1    A.   That's NetMoby, Inc.   That was the name of my company at
2    that time.
3    Q.   So that's you?
4    A.   Yes.
5    Q.   When you're talking about NetMoby, that's your
6    consulting --
7    A.   That's correct.
8    Q.   Okay.   And if we could jump to Page 10, please.   So the
9    top of this slide -- this was one of the slides you used to
10   present; is that right?
11   A.   That's correct.
12   Q.   And the top says, "You own a license.   What does that
13   mean?"
14            Can you -- well, I guess, let me ask you this:   When
15   you're giving a presentation to a group like this, are you
16   expecting your audience to have read all of the relevant FCC
17   filings?
18   A.   Not generally yet --
19            MR. BOSSE:   Object to the question because it calls
20   for what is in other people's minds.
21            THE COURT:   Well, instead of calling for what's in
22   his mind, but we can still just move on past that.
23   BY MR. GRINDROD:
24   Q.   I guess, when you give this presentation, did you try to
25   make it digestible for everyday people?

P. Lewis - Direct

1    A.   Yes.

2    Q.   Okay.  And again, I don't want you to give your whole

3    presentation here, but can you give the jury a sense of kind

4    of what you were talking about when this slide was up?

5    A.   Basically that the frequencies were a finite resource,

6    unlike things like fiberoptic, you know, you had a limited

7    amount of frequency spectrum.  And then when you have

8    licensed spectrum, it's better than unlicensed spectrum.  It

9    has more value than unlicensed spectrum like what you would

10   use for Wi-Fi in your home because you can commercialize it,

11   and that's...

12   Q.   Okay.  And I guess why were you talking -- what was the

13   context in which you were giving this presentation?

14   A.   The whole presentation?

15   Q.   Yes.

16   A.   Basically to show the people in the audience, which I

17   understood were people that applied with Janus Spectrum and

18   had won licenses through that application process, to show

19   them what they could use these frequencies for that would

20   earn them revenue.

21   Q.   Okay.  And let's just jump ahead a couple to Page 12.  So

22   this was something you mentioned in the beginning of your

23   presentation, license -- or at the beginning of your

24   testimony, license monetization.

25   A.   Yes.

P. Lewis - Direct

1  Q.  And so what were you talking about to the conference when
2  you were talking about license monetization?
3  A.  What applications they could use to make money, such as
4  Internet of Things and -- where you're basically connecting
5  devices so that they could be monitored when they had an
6  issue, like a red light control system or a streetlight when
7  it would burn out, you know.  It would basically report the
8  fact that it was having a malfunction.
9  Q.  Let me have you pause right there because I want to go to
10  the next slide, and then I'll ask you a little bit about what
11  you were getting ready to discuss.
12        MR. GRINDROD:  If we could go to Page 13,
13  Ms. McCaslin.
14  BY MR. GRINDROD:
15  Q.  So this is -- you mentioned Internet of Things a second
16  ago?
17  A.  Yes.
18  Q.  So tell the jury a little bit about what Internet of
19  Things means in the context of your presentation in D.C.
20  A.  Yeah.  Internet of Things, when you look at the internet,
21  it basically has gone through three evolutionary stages.  The
22  first stage of the internet was computer connectivity, or PC
23  connectivity; the second was social networking; and the third
24  is device connectivity, where basically managers of those
25  devices, whether it's vending machines in hospitals, like

P. Lewis - Direct

1    soda machines or -- and you need to know how many sodas are
2    in the machine or how much cash is in the machine, or whether
3    you are a traffic manager in a municipality, and you need to
4    know whether a traffic signal has malfunctioned in some way
5    or another -- those are the sort of devices that people
6    previous to Internet of Things would have to roll a truck
7    there at a cost with a crew to open up the cabinet to see do
8    you have green lights, or they would have to wait for someone
9    to report the fact that a red light at an intersection had
10   gone haywire.

11           Whereas, this system would, you know, automatically
12   report, and that would be -- result in better constituent
13   services in that city because a crew would be there to fix it
14   right away instead of 24 or 5 hours later.
15   Q.  So let me ask you a question, and you can tell me if I
16   have it wrong.

17           Is the idea basically to take these, you know,
18   everyday kind of not traditionally thought of as smart things
19   and make them internet connected in some way?
20   A.  To take dumb devices and make them smart, correct.
21   Q.  And if we can flip forward to Page 16.  What were you
22   telling the conference attendees when this slide was up?
23           MR. BOSSE:  If I could, I'm going to object to
24   anything where he's talking about making future predictions
25   about value that may cross over into the kind of testimony

P. Lewis - Direct

1    that an expert would give.  If we keep it real limited to

2    what did he say and what did they hear, that's fine, but he's

3    not qualified as an expert, nor can he speculate.

4              MR. GRINDROD:  And just to be clear, Your Honor, I'm

5    trying to do that.  I mean, I know he can't say word for word

6    what he said back then but as best -- I can rephrase.

7    BY MR. GRINDROD:

8    Q.  As best you can remember, what were the -- what did you

9    actually say at the time?  I don't want your expert opinion

10   now as to anything.

11             THE COURT:  Except to the extent he's going to try

12   to predict or talk about what the future would hold for all

13   of this internet, et cetera, he can merge into potential

14   expert information.

15             So the question becomes for the Court, can you get

16   enough out of this witness about his background and his daily

17   activity and his on-hand experience and let him testify

18   without going through every detail that he presented to that

19   conference?

20             MR. GRINDROD:  Sure.  Let me try to take it up one

21   level of generality.  Maybe that will help.

22   BY MR. GRINDROD:

23   Q.  So, Mr. Lewis, at the D.C. conference, the Janus

24   conference we've been talking about, did you tell the

25   attendees, in essence, that the Internet of Things was a

P. Lewis - Direct

1   valuable application of the frequencies at issue?

2   A.   Yes.  I was trying to convey to them basically that there

3   were strong indicators that this was going to be a really big

4   industry, and that was the objective to convey to them, and

5   that's why some of these examples were used.

6   Q.   Okay.  And did you get into the weeds of the details of

7   that more than we're getting into today?

8   A.   A little bit more, yeah.

9   Q.   Okay.  And what about -- did you discuss the use of these

10  licenses in cell phones during the conference?

11  A.   No.  That was not the topic of my presentation.

12  Q.   Okay.  And if we could jump forward to slide 21.  So what

13  we've been talking about, was that the first part of your

14  presentation?

15  A.   Yes.

16  Q.   The morning part?

17  A.   Yes.  It was IoT, or Internet of Things.

18  Q.   Did you also give a talk in the afternoon?

19  A.   Yes.  That was on Connect America Fund.

20  Q.   And so was the Connect America that was the second part

21  of your presentation -- what was that about generally?

22  A.   Generally, it was about even what's going on right now.

23  The FCC generally allocates large amounts of money, like

24  right now $20.4 billion, to build out areas that are either

25  unserved or unserved with internet service.

P. Lewis - Direct

```
 1              So you apply to them on various forums, supply
 2    different attendant exhibits to that, and you go into what is
 3    called a reverse auction, and you want a large amount of
 4    money, and you start building up that unserved area so that
 5    people in that area have internet.
 6    Q.  Okay.
 7    A.  It was conveying to them what these -- what this whole
 8    thing meant, that they were certainly -- they should be aware
 9    of it.
10    Q.  Okay.  And so this second part of your presentation, did
11    that relate to the Janus licenses that Janus investors or
12    Janus license holders had already acquired, or was this
13    something different?
14    A.  It was -- to an extent, there were some of these
15    applications that, with those systems in unserved areas, that
16    they could use those frequencies for, but it was more so to
17    address a whole new subject of this Connect America Fund that
18    the FCC had.
19    Q.  And it was -- in the context of this kind of different
20    project, did you talk about broadband in that context?
21    A.  Yes.  Because that was the whole premise of Connect
22    America Fund, is, you know, people -- there are still about
23    14 to 20 million people estimated in the U.S. that still have
24    no internet connectivity for broadband-type applications,
25    yeah.
```

P. Lewis - Direct

1    Q.  Right.  And just to be clear, that was a different --

2    that wasn't about monetizing the Janus licenses?

3    A.  That's correct.

4           MR. GRINDROD:  And then if we can go to the last

5    slide, Ms. McCaslin, or slide -- Page 35.

6    BY MR. GRINDROD:

7    Q.  And this last part has your contact information?

8    A.  Yes.

9    Q.  And did you attend -- so let me ask you this:  Were you

10   the only person that spoke at the Janus conference in June of

11   2014?

12   A.  No.  I'm pretty sure that it was a multiday thing.  I was

13   there for a part of one day.

14   Q.  And were you present for -- like, did you attend as an

15   attendee?  Did you watch other people's presentations, or was

16   it basically you gave your part and then --

17   A.  I was introduced, and I gave my two presentations in the

18   morning and then Connect America Fund in the afternoon, and

19   then there was a, you know, kind of open house at the bar to

20   mingle with everybody, and then I left.

21   Q.  At the bar afterward, did you -- did people come up to

22   you and talk to you about your presentation?

23   A.  We talked about Internet of Things and, you know, got

24   into one-on-one conversations about that.

25   Q.  Okay.

—————————— P. Lewis - Cross (By Mr. Yarow)——————————

1            MR. GRINDROD:  If I could just have a very quick

2      moment, Your Honor.

3            (Pause in the proceedings.)

4            MR. GRINDROD:  Your Honor, I don't have any further

5      questions for this witness.

6            But, Mr. Lewis, please answer any questions that the

7      other lawyers have for you today.  Okay.

8            THE WITNESS:  Okay.

9            THE COURT:  Cross-examination?

10                          CROSS-EXAMINATION

11     BY MR. YAROW:

12     Q.  Mr. Lewis, my name is Rick Yarow.  I represent David

13     Alcorn.

14            So Janus Spectrum is who hired you?

15     A.  Yes.

16     Q.  Okay.  And they paid you $12,500 per month?

17     A.  Yes.

18     Q.  How many months were you consulting for Janus Spectrum?

19     A.  About 12 months.

20     Q.  Okay.  And David Alcorn was your primary contact at Janus

21     Spectrum?

22     A.  Yes.

23     Q.  Okay.  And the purpose of your being hired was to find

24     ways to help license holders of Janus Spectrum to monetize

25     their licenses; is that correct?

P. Lewis - Cross (By Mr. Yarow)

1    A.   That's correct.

2            MR. YAROW:  That's all the questions I have.  Thank

3    you.

4            MR. BOSSE:  Your Honor, I have a lengthy and, I

5    hope, very exciting cross-examination, but it's going to go

6    on for at least probably 40 minutes.

7            THE COURT:  How many?

8            MR. BOSSE:  About 30, maybe, to 40, and I would

9    rather not break it in half.

10           THE COURT:  Just keep cutting it down.

11           MR. BOSSE:  What's that?

12           THE COURT:  Just keep cutting it.

13           MR. BOSSE:  Do you want me to -- I can start.

14           THE COURT:  I said keep cutting it, 20.

15           MR. BOSSE:  Oh, I will work on it overnight, Your

16   Honor.

17           THE COURT:  The Court just has one question, and we

18   can take up in the morning.

19           Mr. Lewis, how long were you in the United States

20   Army?

21           THE WITNESS:  Six years.

22           THE COURT:  What was the highest rank acquired?

23           THE WITNESS:  Captain.

24           THE COURT:  Thank you.

25           Now, ladies and gentlemen, since he has, he

Carol L. Naughton, Official Court Reporter

1    believes, a 40-minute examination, we're not going to start

2    on it, not tonight.  Thank you for coming in.  I'll see you

3    tomorrow morning, and we will start again tomorrow morning at

4    9:30.

5            Mr. Lewis, you may be excused but do not discuss

6    your testimony with anybody overnight.

7            THE WITNESS:  Understood.

8            (The witness stepped down.)

9            (The jury exited the courtroom.)

10           THE COURT:  You can have a seat.  The Court wants to

11   make a comment.

12           Now, Mr. Bosse, the Court heard this witness's

13   testimony.  You said you need 40 minutes to cross-examine

14   him.  The Court is simply saying to you 40 minutes on what he

15   testified to?  So we're going to keep it within bounds, and

16   the Court doubts it's going to be 40 minutes.

17           MR. BOSSE:  I will try to carve it down tonight.

18           THE COURT:  You carve it down tonight because the

19   Court doesn't see 40 minutes on that witness.

20           MR. BOSSE:  Yes, sir.  But just so Your Honor knows,

21   he exchanged a number of e-mails with Mr. Alcorn that relate

22   to his work there, and I do need to walk through a few of

23   them, sir.

24           THE COURT:  All right.  The Court likes to allow

25   counsel latitude, but you know in a heartbeat the Court will

```
 1    tell you all to cut it short, get to the point.
 2            One other thing.  Ms. McCaslin, how many witnesses
 3    does the defendant wish to call, anticipate calling?
 4            MS. McCASLIN:  We are anticipating four tomorrow.
 5            THE COURT:  You are anticipating four tomorrow.  I'm
 6    just trying to see where we are.  What day of the week is
 7    that?  Thursday.  So what we'll do is we will go tomorrow,
 8    and if you don't finish tomorrow, we'll be coming back Monday
 9    morning because we're not going on Friday.
10            THE CLERK:  Tuesday.
11            MS. McCASLIN:  Monday is a holiday.
12            THE COURT:  Tuesday.  Monday is a holiday.
13            MS. O'BOYLE:  Your Honor, this is Melissa O'Boyle.
14    We were wondering, and I don't know if Ms. McCaslin would let
15    us know, but Ms. Gibson is still being held at Western
16    Tidewater, and she has been there for over a year, and so if
17    she is going to be released, we would like to get her on her
18    way to her BOP facility, if possible.
19            MS. McCASLIN:  Your Honor, we do understand that.
20    We would like her to stay for just a couple more days, and as
21    soon as we can release her, we will.  We have been
22    communicating with the Marshals to release any witnesses we
23    have a hold on.
24            THE COURT:  As we stand here today, you still don't
25    know whether you are going to call her as a witness?
```

1          MS. McCASLIN:  That depends on what kind of evidence
2    we are able to get in with our witnesses and whether we need
3    her.
4          THE COURT:  All right.  She's been here a year.  The
5    Court will let her go a couple more days.
6          All right.  The Court will be in recess.
7          (Proceedings adjourned at 5:02 p.m.)
8
9                        CERTIFICATION
10
11       I certify that the foregoing is a correct transcript
12   from the record of proceedings in the above-entitled matter.
13
14
15       _____/s/_____
16                   Carol L. Naughton
17                   August 30, 2022
18
19
20
21
22
23
24
25