<pre>
                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
                            Norfolk Division


- - - - - - - - - - - - - - - - - -
                                    )
   UNITED STATES OF AMERICA         )
                                    )
   v.                               )     CRIMINAL ACTION NO.
                                    )          2:19cr47
   DAVID ALCORN and                 )
   AGHEE WILLIAM SMITH II,          )
                                    )
            Defendants.             )
- - - - - - - - - - - - - - - - - -


                     ** Jury Trial - Day 13 **

                     TRANSCRIPT OF PROCEEDINGS

                        Norfolk, Virginia

                        February 22, 2022


BEFORE:  THE HONORABLE RAYMOND A. JACKSON
         United States District Judge, and a jury


APPEARANCES:

         UNITED STATES ATTORNEY'S OFFICE
         By:  Andrew C. Bosse
              Melissa E. O'Boyle
              Elizabeth M. Yusi
              Assistant United States Attorneys
              Counsel for the United States

         RICHARD S. YAROW LLC
         By:  Richard S. Yarow
              Counsel for Defendant David Alcorn

         FEDERAL PUBLIC DEFENDER'S OFFICE
         By:  Andrew W. Grindrod
              Lindsay Jo McCaslin
              Assistant Federal Public Defenders
              Counsel for Defendant Aghee William Smith II
</pre>

1              I N D E X

2

3              E X H I B I T S

4   DEFENDANT SMITH'S                                    PAGE
    NO.

5    37           Refused; See Day 12, Page 2323,    2514
                  line 13

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings resumed at 10:59 a.m.)

2          THE COURT:  Counsel, we were due back in here at

3   10:45.  It was a wonderful time for the chamber's printer to

4   have a problem, but we got through it.

5          We conducted a charge conference early on, and I

6   wanted to take up any objections to the instructions on the

7   record.

8          All right.  Mr. Bosse, or someone from the

9   United States, are there any objections you're raising?

10          MR. BOSSE:  No objections from the government, sir.

11          THE COURT:  Mr. Yarow, are there any objections that

12   you're raising to the instructions contemplated?

13          MR. YAROW:  I don't have any independent objections.

14   I believe the -- I believe that Mr. Grindrod may raise an

15   objection that I would like to join with.  As for an

16   instruction to be inserted, I mean.

17          THE COURT:  Which instruction do you want to join?

18          MR. YAROW:  The theory of defense instruction.

19          THE COURT:  Okay.  The theory of defense

20   instruction.

21          Mr. Grindrod, the Court notes that you filed an

22   instruction entitled "Theory of Defense," and the Court did

23   not include that particular instruction.  Anything you want

24   to say concisely for the record about that?

25          MR. GRINDROD:  Just briefly, Your Honor.  I know

1    that Your Honor has mentioned when we were off the record

2    that you thought the theory of defense instruction was

3    covered by other instructions.  I just would direct specific

4    attention to the distinction that our theory of defense --

5    proposed theory of defense instruction draws between the use

6    of deception generally and an intent to defraud.  And that is

7    set out at ECF 276, Page 57.  Essentially the second

8    paragraph is the part that we really think is not covered by

9    another instruction, Your Honor.

10           THE COURT:  Okay.

11           MR. GRINDROD:  If I could also briefly, the other

12   instruction that we requested, that I know the Court has

13   declined to give, just for the record, was our scheme or

14   artifice to defraud instruction, which is our proposed

15   instruction 35 at ECF 276, Page 51.

16           Specifically, we wanted the last paragraph on that

17   page, carrying over on to the next page, that instructed the

18   jury that a scheme to defraud has to specifically refer to

19   lies about the nature of the bargain itself as opposed to

20   lies that are about something else.

21           And specifically in this case, there's, I think,

22   been some testimony elicited alleging that Mr. Smith made

23   allegedly false statements that don't go to the nature of the

24   bargain itself, and so we do ask for that instruction.  I

25   understand the Court has overruled that instruction, but

1    that's why we asked for it.

2            THE COURT:  Okay.  Thank you.

3            With respect to the Court's refusal to give the

4    theory of defense instruction, the Court relied on

5    *United States of America vs. Green* at 599 F.3d 360, a 2010

6    decision from the Fourth Circuit.

7            And the Court, during the charge conference, noted

8    that the Court on appeal reviews the instructions as a whole

9    and not in an isolated manner and reviews the Court's failure

10   to give an instruction for abuse of discretion.

11           The Court refused to give this requested theory of

12   defense instruction because it believes that the instructions

13   as a whole given by the Court are sufficient to cover the

14   theory that Mr. Smith had advanced his theory being that he

15   was deceived and misled and that he did not act

16   intentionally.

17           As the Court pointed out, there are several

18   instructions that provide the jury sufficient guidance on the

19   intent of the defendant; specifically, the proof of intent

20   instruction, the instruction that defines "knowingly," the

21   instructions that deal with materiality of the conduct.

22           So there's any number of instructions, certainly,

23   that would address any theories with respect to use of

24   deception versus intent to defraud.  So it believes that its

25   instructions have substantially covered the theory that the

 1   defendant wishes to advocate.

 2          With respect to the failure to give a different

 3   instruction on artifice or intent to defraud, Mr. Smith

 4   wishes the Court to incorporate specific language into the

 5   instruction.

 6          The Court believes that the instruction given is an

 7   accurate statement of the law, and it provides the latitude

 8   for counsel to apply the specific facts to his defense to

 9   that instruction.  So there's no need for the Court to put

10   the specific paragraph that the Defendant Smith wants into

11   that instruction.

12          So the Court will tender -- the instruction on the

13   theory of defense will be placed in the record for appellate

14   purposes.

15          There being nothing else, the Court will bring the

16   jury in.

17          Also, on the record, we need to excuse Juror 118.

18   The Court was advised that they tested positive for COVID-19

19   over the absence of court proceedings.  But that juror was

20   masked and separate and apart from other jurors.

21          (The jury entered the courtroom.)

22          THE COURT:  Good morning, ladies and gentlemen.

23          The record will reflect that all jurors are present

24   this morning with the exception of those excused.

25          MR. BOSSE:  The government agrees, Your Honor.

—Closing Argument - By Mr. Bosse—

1          MR. YAROW:  Mr. Alcorn agrees, Your Honor.

2          MS. McCASLIN:  Mr. Smith agrees.

3          THE COURT:  Okay.  Now, ladies and gentlemen, we are

4    at the juncture now where all the evidence is into the case,

5    and so you are hearing today the closing arguments of

6    counsel.

7          Remember, closing arguments do not constitute

8    evidence.  It's not evidence in the case.  It's a summary of

9    what each party believes the evidence has shown.

10         So the United States will start with the first

11   argument about what they believe the evidence has shown

12   respecting the guilt of the defendants, and then we will have

13   arguments from the defendants respecting what the evidence

14   has shown which reflects the innocence of the defendants.

15   And then since the United States has the burden of proof, the

16   law provides that they get to do a rebuttal argument, or last

17   argument.

18         So that is the way we'll proceed.  We will still go

19   to lunch at 1:00 or maybe a few minutes after 1:00, depending

20   upon how we operate.

21         Okay.  We're prepared.  You may go forward for the

22   United States.

23         MR. BOSSE:  Thank you, Your Honor.

24         May it please the Court, counsel, ladies and

25   gentlemen of the jury.  David Alcorn and Bill Smith never

———Closing Argument - By Mr. Bosse———

1    stopped.  They lied and misled again and again for years.

2    They told these lies to sell worthless investments to people

3    who put real money, often their life savings into them.  This

4    fraud spanned the entire country, including, as you heard,

5    right here in Hampton Roads, but also in California, Utah,

6    all over.

7          And it was massive; millions and millions of dollars

8    that investors were misled into putting into worthless

9    investments by these two defendants working alongside others.

10          Of course, none of the investments worked.  They

11   were vehicles for fraud.  These two men knew they were not

12   working, but they never changed their pitch, they never

13   changed their story, they never told people the truth about

14   these junk investments, because they knew that if they told

15   the truth about what they were selling, no one would buy and

16   they wouldn't make money.

17          And it was the constant flow of new investor funds

18   that these men lived on.  That's why they never stopped.

19   David Alcorn and Kent Maerki just straight up stole half of

20   the investor funds they got and spent them on their personal

21   expenses, dressed up as fees.

22          Bill Smith found himself a more lucrative business

23   model than selling annuities.  He started selling these

24   fraudulent investments for the generous commission money he

25   made from them, and he never stopped up to the very end.

─Closing Argument - By Mr. Bosse─

1              What I'm going to do now in this closing argument is
2    take you back through some of the key pieces of evidence in
3    the case and match that evidence up to elements of the
4    charges you are going to consider against these men.
5              When you do that, there's only one fair conclusion
6    from the evidence, and that is that David Alcorn and Bill
7    Smith are guilty of every crime they've been charged with.
8    And you know that because you got to see what these men knew
9    versus what they told their clients and what they didn't tell
10   their clients.
11             You got to see what these men made sure their
12   clients never found out but couldn't keep from coming out
13   here in this courtroom.  And you know, having been with us
14   through the weeks of trial, that David Alcorn and Bill Smith
15   knew, as well as anyone, what they were doing.  They knew
16   they were using false information to get people to buy these
17   investments, not just for a few months or even for a year,
18   but year after year after year.
19             So as we walk back through the testimony and the
20   evidence that you've seen, I want you to keep a few key
21   things in mind.  And the first one is the concept of choice.
22   Everyone agrees that fraud occurred here.  The question is
23   did these men intend to engage in fraud?  Did they choose to
24   join in a conspiracy to defraud investors?
25             As we go through the timeline of the case, I want

─Closing Argument - By Mr. Bosse─

1  you to consider this:  Every step of the way, these men had a

2  choice.  They could continue down the road they were on, or

3  they could stop and walk away.  Every time they told a lie to

4  an investor, they were continuing to engage in this fraud

5  conspiracy.  You aren't allowed to sell investments by

6  telling people things that are not true, which you heard they

7  did again and again.

8          As each of Bill Smith's investors complained to him,

9  asked him what was going on, told him they weren't making

10  money on their investment, he could have stopped, or he could

11  have used that knowledge and told new investors the truth

12  about these products, but he didn't.

13          He kept peddling the same lies about the

14  investments, which he knew were lies because he knew that the

15  earlier investors he had sold to were not making money and

16  the investments were not performing.  And that's just one of

17  the many examples of the lies that Bill Smith chose to tell

18  as he made the conscious choice to ride this fraud to the

19  bitter end, taking in almost $2 million along the way.

20          David Alcorn made the same choice.  He knew, and

21  we're going to see, that the spectrum investments were not

22  worth a tiny fraction of what he and Kent Maerki were selling

23  them for.  He knew his earlier investors weren't making

24  anything like the kind of money he told them they would make,

25  and they weren't making anything like the kind of timeline

Closing Argument - By Mr. Bosse

1    that he told; that they would be making money soon, 6 months,

2    12 months.  He knew that wasn't happening.

3          He also knew what was happening to the money once it

4    hit the Janus Spectrum account, but of course, he never told

5    anybody that, what he and Kent Maerki were doing with it.

6    And he never stopped.  He kept the scheme running because he

7    was making millions of dollars, stealing millions of dollars

8    right off the top of the investors' money that made its way

9    to Janus Spectrum.

10         Every time these men sold these junk investments to

11   another innocent victim, knowing what they knew, they chose

12   to continue the fraud.  And nothing stopped them, not an

13   investigation by the Arizona State Corporation Commission

14   into Kent Maerki and the dental investment, not an

15   investigation by the Federal Securities and Exchange

16   Commission, not the collapse and failure of each and every

17   investment they were peddling.

18         They never stopped, which is why we are here in this

19   courtroom today and which is why we are now asking you, the

20   jury, to hold them accountable for what they did.

21         A second concept I want you to keep in mind sounds a

22   little more complicated than choice, but it's really not;

23   that's the legal concept of what is called deliberate

24   ignorance.  And Judge Jackson is going to give you an

25   instruction of what that means.

1          What you're going to hear is that in our law you

2     don't get to make, what's sometimes called the ostrich

3     defense.  You can't put your head in the sand, turn a blind

4     eye to what is obvious and say, "Well, I made sure I never

5     really knew," "I just did what I was told," "I just passed on

6     the information I was given."  Those are not defenses to

7     these crimes.

8          I don't think when you go back to deliberate you're

9     actually going to have to talk about deliberate ignorance

10    because the evidence is overwhelming that these men knew what

11    they were doing, and they chose to keep going.  The timeline

12    we're going to talk about makes that clear.

13          But to the extent the defense argues that they

14    didn't really know what was going on or that they are somehow

15    victims in this case, I want you to keep in mind that

16    ignoring what is obvious so you can say you didn't really

17    know is not a defense.

18          The last thing I want you to bear in mind as we go

19    back through the evidence in this case is the victims; who

20    they were, what they told you from that witness stand, the

21    trust they placed in these men, and the betrayal of that

22    trust.

23          These were regular people, most of them at or near

24    the end of their working life, looking to shore up their

25    retirements.  Why were they targeted?  Because they were the

─Closing Argument - By Mr. Bosse─

1   ones who had money to invest, and these two defendants
2   literally lived off of investor funds.
3          Now, you've seen a lot of evidence in this case.
4   It's a fraud case, and so there's a lot of paper.  What I
5   want to do briefly, to help you as you deliberate, is tell
6   you a little bit about how we structured the evidence you're
7   going to have back in that room.  And we structured them
8   using the numbers that you heard us calling out again and
9   again.
10         So numbers 1 through 99 are regulatory documents and
11  documents that relate to the Virginia victims of the case.
12  You will see that the 200 series relates to the Dental
13  Support Plus Franchise investment.
14         The 300, 400, and 500 series all relate to
15  Mr. Alcorn's company, Janus Spectrum, and then to the three
16  entities that Daryl Bank created to sell into Janus.  300,
17  Janus Spectrum Group; 400, Prime Spectrum, Tony Sellers'
18  device; and 500, the largest, Spectrum 100, where Bill Smith
19  was the leading salesman.
20         The 600 series deals with the last investment in
21  this case, the one called Xcel Bandwidth and RapidLink.  700
22  series, specific documents about Janus Spectrum, including
23  e-mails and other things you saw related to the Newells and
24  the Lincoln venture.  The 8- and 900 series, that's Western
25  Spectrum, Mr. Smith's own spectrum company and victim

Carol L. Naughton, Official Court Reporter

Closing Argument - By Mr. Bosse

1    documents.

2         And then in the 1000s, you've got bank documents,

3    summary charts.  In the 1100s, Mr. Alcorn's money and what he

4    did with it.  In the 1200 series, Mr. Smith's money, what he

5    did with it.  And then the stipulations, Exhibit 2000, the

6    things that the parties have agreed on ahead of time.

7         You will also see, as I go through this, I'll pop up

8    for everything that I show you an exhibit number, and these

9    are what we think are some of the important exhibits for you

10   to consider as you go back through the evidence.

11        What I'm going to do now is walk through the counts

12   one at a time.  We'll spend the most time talking about the

13   conspiracy charge, Count One, for dental against Bill Smith,

14   and Count Two, against both defendants, for the spectrum

15   investments, because really that's the core of the case.

16        And then we'll pick up speed as we go through the

17   individual wire fraud counts, because once it's been shown

18   that this scheme was fraudulent, that those wires were done

19   in furtherance of the scheme, the elements of wire fraud,

20   you'll see, will be met.

21        So we'll start with an overview of the law of

22   conspiracy.  First, there has to be a conspiracy formed,

23   reached, or entered into by two or more persons.

24        And Judge Jackson is going to read you all these.

25   You don't need to take them down now.

─────Closing Argument - By Mr. Bosse─────

1            A conspiracy is an illegal agreement.  And here, the
2    purpose of the conspiracy was to make money through the
3    fraudulent sale of investments.
4            The third element, the defendants have to join the
5    conspiracy knowing what it is.  In other words, if there's a
6    group of people who are working together to do a fraud, that
7    these defendants deliberately joined that group.
8            A couple of important points about conspiracy.  The
9    first one is that the crime here is an unlawful agreement.
10   To be guilty of conspiracy, Bill Smith and David Alcorn don't
11   actually have to do a single act in furtherance of the
12   conspiracy because the crime is the agreement; people working
13   together to commit fraud.  But here, as you've heard, these
14   men took any number of steps and played an active role in
15   this massive investor fraud.
16           The second point is the government does not have to
17   produce a formal written agreement laying out the terms of
18   how this crime is going to happen.  Bill Smith, David Alcorn,
19   and the other people you've heard about -- Kent Maerki,
20   Raeann Gibson, Daryl Bank, Tony Sellers -- they don't have to
21   meet in a backroom somewhere and hammer out a formal
22   agreement to do a conspiracy for fraud.
23           We don't have to show that anyone said or wrote "I'm
24   agreeing to join this conspiracy."  Instead, you look at the
25   actions the people took and the words they said, and you use

Closing Argument - By Mr. Bosse

1    that to determine did these defendants knowingly join in this

2    investor fraud, and as we go through the evidence, you will

3    see there's no doubt that they did.

4         Another point and then we'll get into the evidence.

5    The conspiracy alleged in Count One and Count Two is alleged

6    to have two purposes, mail fraud and wire fraud.  And the

7    defendant is guilty if all 12 of you agree that he committed

8    either mail or wire fraud, conspired to commit mail or wire

9    fraud.

10        You have to be unanimous, in other words, about what

11   type of fraud was committed.  So it could be unanimous as to

12   mail, unanimous as to wire, or, really, as you're going to

13   see, because there's hundreds of wires and mailings in this

14   case, unanimous as to both, they used both of these elements

15   to commit this kind of fraud.

16        In a conspiracy everyone has a role to play, and it

17   doesn't matter, in a legal sense, whether everyone has all of

18   the same information.  And you've heard in this case that

19   salesmen like Bill Smith played one role and the people who

20   created these investments, including David Alcorn, played

21   another.

22        And sometimes these roles overlapped, like when

23   David Alcorn was making sales of his application services

24   directly to victims or when Bill Smith founded his own

25   spectrum company.

———Closing Argument - By Mr. Bosse———

1              Looking specifically at Count One, Bill Smith's role

2    was as a salesman, using lies and misstatements to sell what

3    he knew was a failing investment run by Kent Maerki.  And he

4    was good.  As you'll see when we walk through the timeline,

5    through the dental franchise and then into spectrum, he was a

6    top salesman and Bill Smith stuck with the scheme the

7    longest.

8              An investment scheme is nothing without salesmen,

9    the people who are on the ground actually doing the work of

10   feeding the money into this machine, and Bill Smith was good

11   at what he did.

12             You've heard that these men preyed on the elderly

13   and unsophisticated.  That's a mark of this particular type

14   of elder fraud.  But as you've heard, they were also happy to

15   take money from the younger and the more sophisticated.  It

16   was the money that drove them.

17             The question you have to answer is:  By their words,

18   by their actions, did Bill Smith and David Alcorn knowingly

19   join this fraud?  And you'll see they absolutely did.  They

20   told investors things they knew were not true about these

21   investments, and they made millions of dollars by doing so.

22   The defendants got millions, and the victims lost everything.

23             So let's start with Bill Smith.  He knew as much or

24   more than anyone else in the case that he was not allowed to

25   sell junk investments.  You heard he passed the Series 7 exam

──Closing Argument - By Mr. Bosse──

1   to become a broker on his first try, among the other tests

2   that he passed.  You heard from Peter Melley from FINRA about

3   how difficult that test is and what you have to learn and

4   study for in order to pass it and that you hear time and time

5   again the bedrock principle that you cannot be dishonest with

6   the people you're selling investments to.

7           You can't lie to them.  You can't mislead them.

8   It's drilled into everyone who works in the industry, and

9   Bill Smith, unlike Tony Sellers and some of the other people

10  in this case who were only insurance salesmen, he worked for

11  years in the finance and investment industry.  And he got a

12  refresher if he needed it on the ethics portion every two

13  years.

14          He was also an insurance salesman.  You heard from

15  Andrew Gulcher of the California Department of Insurance that

16  Bill Smith held an insurance license throughout this scheme.

17  And you also heard that when he got that license and held it,

18  he had to learn the same things again; you cannot mislead,

19  you cannot lie to people to get them to buy investment

20  products from you.

21          You have to take into account someone's age, their

22  sophistication, how much money they have, what they're

23  looking to accomplish with their investments.  That all has

24  to be taken into account.  It's called suitability.  You

25  can't put them into inappropriate products, and you cannot

---Closing Argument - By Mr. Bosse---

 1   mislead them.

 2        Bill Smith used his years of experience in the

 3   industry as a selling point.  And you saw that in a couple of

 4   exhibits, including this one, 637, that he was a top

 5   financial consultant with industry-leading accomplishments,

 6   working with Fortune 500 CEOs.  Everything he said, he said

 7   to build trust and confidence in his victims.

 8        He's got a radio show on a Sacramento Christian

 9   radio station you heard about, "Money Talks," where his

10   specialty is retirement planning, making sure his clients

11   have enough to retire on.

12        (Audio played in open court.)

13        MR. BOSSE:  That's from one of the commercials that

14   he ran on his station.  And so Bill Smith worked in the

15   securities industry, alongside the insurance industry, for

16   years up until the Dazzle Dental meltdown; Dazzle Dental,

17   which, as you heard, was the precursor to DSPF.

18        I'm going to use "DSPF" to refer to Dental Support

19   Plus Franchise.

20        And you heard that Arizona actually ended up

21   investigating DSPF and Kent Maerki and that Kent Maerki

22   called Bill Smith as his witness in that investigation.  And

23   Bill Smith testifies under oath about being involved with

24   Dazzle Dental since 2009, and you have that exhibit.  It's

25   286.

1          He also ties together Dazzle Dental and DSPF.  He

2    ties it together and says, "Kent Maerki came in, and the

3    founders of Dazzle Dental introduced us to their franchise

4    offer, and that's when I became involved," meaning that Bill

5    Smith's knowledge of the fraud in this case goes back further

6    than anyone's, including Kent Maerki, because he was directly

7    involved in Dazzle before Kent Maerki repackaged it as a

8    franchise with the same vendors you've heard about, Oracare

9    and MetroMedia.

10          Dazzle Dental got transformed into DSPF by Kent

11   Maerki, but Bill Smith was there first.  And before DSPF,

12   Bill Smith sold millions of dollars of investments into

13   Dazzle, and he stays with Dazzle until the end and sells

14   $2 million worth of it to his investors, and he never bought

15   it for himself.  It's the start of a theme we're going to see

16   play out through this presentation.

17          And he acknowledges under oath those investors lost

18   their entire investments, millions of dollars.  And after

19   that, Bill Smith let's his brokerage license lapse, leaving

20   him just with the insurance license, but he never stopped

21   selling investment products.

22          Kent Maerki starts up this so-called franchise,

23   using the Dazzle Dental plan, matching patients and dentists.

24   Bill Smith signs on to sell it knowing what happened to his

25   investors in the earlier version of this company.  And here

Carol L. Naughton, Official Court Reporter

─────Closing Argument - By Mr. Bosse─────

1    he is signing on to sell DSPF in February of 2011.  He

2    markets this repackaged version of Dazzle Dental to his

3    insurance and his retirement-planning clients, people

4    normally looking for annuities, which as you heard is one of

5    the safest investments out there, and he pushes them into

6    this completely speculative start-up company that he knows

7    better than anyone else is based on a failure.

8            Bill Smith was not some naive salesman who didn't

9    know what he was allowed and not allowed to do.  He knew

10   exactly what he was doing.  And to show you the tri-fold

11   brochure you've seen so many times in this case, Bill Smith

12   knew more than anyone else involved that the marketing

13   materials he was using to sell this were chocked full of

14   lies.

15           This tri-fold -- it's hard, when you look at it, to

16   find anything on it that is not a lie, and Bill Smith knew

17   that from the first day that he used it.  It sold as a

18   hands-off, work-free investment for older clients going into

19   retirement.

20           "60 months of proven performance."  Bill Smith knows

21   that is not true.  It doesn't say anywhere on here "based on

22   the performance of an earlier dental business that went

23   belly-up where my clients lost the $2 million they put into

24   it."  That's the truth.  That's not what he tells the first

25   people he is selling DSPF to.

─────Closing Argument - By Mr. Bosse─────

1          It talks about a five-year track record of success,
2    and that's what he tells people, knowing it's false.  Does he
3    tell anyone about his experience selling Dazzle Dental, that
4    his earlier investors lost anything?  Of course not, because
5    if he had done that, who would have bought this, and how
6    would he have made any money on it?
7          Even the other salesmen, like Tony Sellers, who
8    didn't have the experience, you heard, knew that this track
9    record claim was false because it kept changing.  At one
10   point it was five years, then it became six years, and then
11   in Government's 224, it turns into nine years.  It's
12   nonsense.  And Bill Smith knew that.
13         "Fully operational after 180 days," after six
14   months.  He knows this is a brand-new venture, a start-up.
15   He's got no basis for saying that, but he sells this to his
16   clients as a business that is already up and running, already
17   successful, and that's going to make money for them in six
18   months.  That's another lie, and he knows it.
19         "Proven, proprietary, new patient system, five
20   years' performance."  He's touting it knowing it's not true.
21   And "win-win," win-win is a phrase you've heard victims say
22   again and again in this case, along with "significant monthly
23   cash flow," neither of them true, and he knows it from the
24   start.
25         Remember Vera Hullum, one of the depositions you

─Closing Argument - By Mr. Bosse─

1  saw?  He starts out by talking with her about prayer, and he
2  gets her into DSPF, which he portrays is a solid and
3  successful investment, so she understood that "there was next
4  to no way we could lose."
5       He tells her that other people had been successful
6  investing in this.  He tells Vera Hullum that other people
7  had been successful in investing in this, which he knew was
8  not true, because no one was ever successful investing in
9  this.  He got $40,000 of the Hullums' money.  Of course they
10  didn't get it back.
11       If you flip that document over, 202, you'll see
12  there's a pro forma, the business projections.  A 720 percent
13  return after ten years.  This is someone who has spent his
14  life in the finance industry.  He knows there's no basis for
15  these numbers, but he's using it to sell it anyway.
16       Unlike the other salesmen, like Tony Sellers who
17  only learned the truth after he put a substantial amount of
18  his own money into this, Bill Smith knows this is nonsense
19  from the start because unlike those other salesmen, Bill
20  Smith doesn't put a single dollar of his own money into DSPF.
21       Why not?  Because he already knew how this story
22  ended.  He sold Dazzle and seen his clients lose everything.
23  He knows he's pushing junk.  And those are just some of the
24  lies in the offering documents, just the highlights that he
25  uses to sell the program.  And that's fraud.

─Closing Argument - By Mr. Bosse─

1              When you tell people things that you know are not
2     true to get them to buy an investment product, that is
3     investment fraud.  When you do it knowingly, as part of a
4     large scheme, you heard here, spread out across the country
5     pushing this junk, that's a conspiracy.  And here, as you
6     heard, it involved both the mail and the wires, covered both
7     mail and wire fraud.
8              But Bill Smith goes further.  For him, the basic
9     lies in the offering documents, that's just the start of it.
10    On top of those, he layers in his own.  He tells his clients
11    one of the most malicious lies of all.  He tells them that he
12    himself has bought these dental franchises and they're making
13    money.  Neither of those things is true.  And he knows that.
14             He told it to Rosie Eads.  You remember Ms. Eads,
15    who got a laugh when she talked about how much wine she could
16    have bought if this all hadn't gone south in her early 80s.
17             Bill Smith said he and his wife were heavily
18    invested in DSPF franchises.  He got one for himself and one
19    for his wife and they were already making money and there's
20    other investors who were already making money.
21             Those statements are material lies.  Ask yourself
22    would that be an important factor for a reasonable investor
23    to weigh in deciding whether to invest?  Of course, it would.
24    Hearing from your own financial advisor, "I myself am a
25    client, and it's already working," what more core lie could

1    he tell?

2         Remember what Ms. Eads -- what he told her at the

3    end of all this?  "Sorry, it's just one of those things."

4    What he didn't tell her is he made $11,000 by selling her

5    those franchises.

6         Mr. Ray Martin.  Bill Smith also told Ray Martin

7    that he was a DSPF franchise owner and that it was a low-risk

8    investment.  Ray Martin, if you recall, in the end made $29.

9    But if you're an investor wondering whether you should invest

10   your own money in this, what more devastating lie could you

11   hear?  "I've invested, and I'm making money, and it's

12   working."

13        Remember Dennis McCrumb.  Mr. Smith talked with him

14   about family and religion, following his typical script.  He

15   told him, "The stock market is going to drop, so get your

16   money out of it and put it into DSPF."  He told him he would

17   make 10 percent returns and that the dental investment is

18   performing very well, which he knew was a lie because he knew

19   it never performed at all.

20        He said, "You'll get your money in six months," and

21   Mr. McCrumb puts in $50,000.  And six months later, there's

22   nothing.  And so just like almost every other victim you

23   heard in this case, Mr. McCrumb calls Bill Smith to ask

24   where's the money, what's happening, what's going on?

25        And he hears, "Don't worry.  Be patient.  Be

—Closing Argument - By Mr. Bosse—

1    patient."  And that is called lulling, where you try to
2    prevent people from finding out the truth of what happened to
3    their money.  It's a hallmark of this kind of fraud, and you
4    heard it throughout this trial.  And in the end, of course,
5    Mr. McCrumb loses everything, and Bill Smith is not picking
6    up his calls or answering his e-mails.
7          Bill Smith started selling DSPF in March of 2011,
8    and so by September of 2011, six months later, he knows his
9    clients aren't making money, because you heard from all of
10   his clients, or almost all of them, and you heard Tony
11   Sellers say, himself, when that six-month period passed and
12   people weren't making money, they started calling, and they
13   didn't stop calling.  They wanted to know what was going on.
14         So by late 2011, Bill Smith knows DSPF is not making
15   anything close to the returns he's been promising, but he
16   never stops.  He doubles down.  In those first six months, he
17   sells 12 franchises.  After those six months pass, at the
18   point when he knows, he sells 18 more in 2011 alone.
19         In 2012, knowing this is false, he sells 24 more
20   franchises.  And even in 2013, he doesn't stop; he sells
21   seven more, including one to Ray Martin in April and two to
22   Ms. Rosie Eads in April, two years after knowing his clients
23   weren't making money, using the same lies that he used at the
24   start.
25         This is just from 2012.  And you see the name in the

Carol L. Naughton, Official Court Reporter

—Closing Argument - By Mr. Bosse—

1   middle column there, Aghee W. Smith, including some of his

2   override payments, which we'll talk about.  Here's more.  And

3   here's more in Government's Exhibit 200E, racking in almost

4   $200,000.

5           Bill Smith said whatever he needed to say to make

6   these sales, to make that commission.  He bonds with his

7   clients over religion, over family.  He's got a picture of

8   Jesus Christ on his wall and another in his briefcase.

9           You heard that from Wilfried Berndt.  You heard him

10   talk about, with Mr. Berndt, loyalty and total respect is for

11   Christ first, for His glory, not anyone else's.  And that

12   resonated with Mr. Berndt.  That built the trust that Bill

13   Smith betrayed.

14           He talks about his and his own family's investment

15   in these products, and he closes the sale.  "Slam dunk,"

16   "virtually risk-free," "a win-win" -- he says whatever he

17   needs to say to close these sales knowing it's false.  He

18   tells people that the other people he's put into it are

19   making money, knowing that's not true.

20           I anticipate that you are going to hear from the

21   defense that this was all Kent Maerki, that Kent Maerki

22   pulled the wool over Bill Smith's eyes, and that Bill Smith

23   was just using the materials he was given to sell these

24   products.

25           And I should say that, because I'm going to talk

─Closing Argument - By Mr. Bosse─

1    about some of the themes the defense has raised, the defense

2    never has the burden of proof.  We do.  The government has

3    the burden of proof.  It never shifts over to the defense.

4    But when the defense puts on a case as they did here, we can

5    comment on it.

6        And the idea that Bill Smith was fooled or

7    victimized by Kent Maerki does not hold water because he sold

8    Dazzle Dental before he met Kent Maerki.  More than any other

9    salesman, he knows these marketing materials are false, and

10   he uses them anyway, and then on top of that, as we've

11   mentioned, he layers in his own lies.

12       Remember Tony Sellers?  Tony Sellers was actually

13   fooled by Kent Maerki at the beginning.  He put in $200,000

14   of his own money into DSPF, unlike Bill Smith who put in

15   zero.  What did Tony Sellers find out 180 days later?  He

16   found out he wasn't making money, he found out his clients

17   weren't making money, and he mentioned that he shamefully

18   continued to sell.

19       What he found out after putting his own money into

20   it, Bill Smith knew from the start.  And so even if you

21   believe for a second the idea that Bill Smith was somehow

22   hoodwinked by Kent Maerki, that buys him six months of grace,

23   because you heard his own clients talk about how they called

24   him when their investment wasn't performing, and you heard

25   that he never changed the script, he never stopped selling,

─────Closing Argument - By Mr. Bosse─────

1   using the same lies.

2          You also heard from Dee Pinkston, one of Mr. Smith's

3   witnesses, about how Kent Maerki was always positive and

4   enthusiastic and he wanted to control what the salesmen knew.

5   But you also heard from Mr. Pinkston that it was not kept a

6   secret that they were having trouble getting dentists,

7   getting patients, that they never got much north of 20

8   dentists in this multi-multimillion-dollar program, and that

9   the numbers actually went down from there.

10          You heard that from Ms. Sunshine Grissom as well,

11   who worked at DSPF.  And you heard there was supposed

12   excitement when they brought someone new in to help with

13   marketing, a man named David Bailey, who was going to help

14   them with internet marketing, what Ms. Grissom called "click

15   bait," and that's because the earlier vendors, MetroMedia and

16   Oracare, you heard, had failed.  And that's what spawned with

17   this exciting development, but it was not kept secret from

18   the salesmen or from anyone that the vendors, Metromedia and

19   Oracare, that they spent millions of dollars on had failed.

20          Did Bill Smith ever tell his clients, "By the way,

21   they brought in a new vendor, and they did it because the

22   original vendors have completely failed to deliver"?  Did he

23   tell any of his clients, "This business is having real

24   problems signing up dentists and collecting from them"?  Of

25   course he didn't.

───Closing Argument - By Mr. Bosse───

1          He used the same lies that he used at the very start
2    of this when he first started selling it in 2011.  He never
3    changed his pitch, and he added in his own lies on top of
4    other ones.
5          Ladies and gentlemen, that's fraud, in a nutshell.
6    Those lies are black and white, and whatever the attorneys
7    tell you when they come up here to argue, they will not be
8    able to get away from the fact that he lied to his clients
9    again and again.
10         He sold his last DSPF investment in April 2013.  The
11   evidence shows he didn't stop making money on it even then.
12   He'd actually trained other DSPF salesmen to make the pitch,
13   which goes to conspiracy, and so he got what are called
14   overrides, portions of those other salesmen's payments
15   flowing into his bank account, and he continued to get those
16   through September of 2013, including for Terri Walsh, one of
17   the Virginia victims you heard about.
18         You heard about other victims earlier in this trial
19   who were touched by this fraud:  Barbara Russell; Adan
20   Rangel; Kyle Gerek, who got all his mailings from Kent
21   Maerki.  You heard all of them, all victimized by the same
22   lies and the same script.  Here's the override for Andrea
23   Tottossy who you saw, and here he is getting them all the way
24   through September of 2013.
25         It all comes crashing down in August of 2014, and

──────Closing Argument - By Mr. Bosse──────

1   you will have this in evidence, one of the many letters you

2   saw that Kent Maerki mailed to investors all over the

3   country, including here in Virginia.

4        Bill Smith, knowing all of this, knowing that it had

5   failed, continued to work with Kent Maerki, even after he

6   knew Mr. Maerki was being investigated by Arizona, which, of

7   course, he never told a single client.

8        One thing you might hear from the defense is this

9   was all somehow okay because some lawyers looked at the

10   documents or because the franchise was registered in

11   different states.  That's wrong.

12        Having lawyers look at something that you know

13   contains falsehoods and then using those things to sell, it

14   doesn't wipe away the falsehoods or your knowledge.

15   Registering a franchise doesn't wipe away the fraud used to

16   sell it.  You cannot lie to your clients about an investment

17   you're getting them to buy, full stop.

18        You might also hear that because Bill Smith didn't

19   know every single thing happening at DSPF headquarters, that

20   he is somehow absolved of his role in this fraud, or because

21   he never confirmed the truth, he didn't have the intent to

22   commit fraud.

23        Now, none of that is factually correct based on the

24   evidence you've seen in this trial, but it's also not a

25   defense under our law, because of that concept of deliberate

———Closing Argument - By Mr. Bosse———

1    ignorance that we talked earlier at the beginning.  You

2    cannot avoid responsibility for a crime by ignoring what is

3    obvious.

4           Mr. Smith and Mr. Alcorn as well cannot escape

5    liability by putting their heads in the sand and closing

6    their eyes to the obvious.  They can't say, "I was just

7    following orders," "I was just passing on what I heard."

8    That's not a defense when the orders you are passing on and

9    the words you're passing on are part of a criminal conspiracy

10   that you know what's going on because you do it for years.

11          All right.  Count Two.  That covers dental.  Now

12   we're going to talk about spectrum.  And we're going to start

13   by talking about David Alcorn and what he knew about

14   spectrum.  We'll come back to Bill Smith again soon.

15          David Alcorn, as you heard, was in the real estate

16   business.  You also saw he took and passed two of the same

17   exams that Bill Smith took, the ones where you learn again

18   and again the bedrock principle; you can't tell clients

19   things that are false.

20          And then after 2008, things are apparently not going

21   well for Mr. Alcorn, and he first comes on our radar when he

22   goes to a company called SmartCOMM to become a salesman of

23   spectrum license application services.  That's where he runs

24   into Kent Maerki and all the people he called to the stand as

25   witnesses for himself; Jon Palmieri, Bobby Jones, Aaron

─Closing Argument - By Mr. Bosse─

1   Bobkin.  They're all sales associates of this company.  Every
2   one of them, by the way, later works with Mr. Alcorn in the
3   spectrum scheme and makes hundreds of thousands of dollars
4   off of individual investors.  Those are the witnesses he
5   called.
6           He talks about SmartCOMM when he's deposed under
7   oath by the Securities and Exchange Commission in 2014.  And
8   here's what he said:  "It's the brainchild of a man named
9   Pendleton Waugh," an ex-con and a disbarred attorney who is
10  in the spectrum business.  Mr. Alcorn knows that.  That's who
11  he is learning about this from.
12          And his witnesses all got up here and said, well, we
13  were trained at SmartCOMM, we thought this spectrum was
14  valuable and could be used by these major carriers -- trained
15  by Pendleton Waugh, convicted felon.
16          The evidence you've seen in this case shows
17  conclusively that David Alcorn knew the truth about spectrum.
18  And you also know the truth, and we're not going to go back
19  through all the science of it again, but you heard from the
20  FCC attorney, Michael Wilhelm; you heard from the expert,
21  Dr. Bazelon.
22          And you heard the same things from two defense
23  witnesses, Trip p Forrest and Peter Lewis; the guard and
24  expansion bands are a buffer to protect the public safety
25  channels, and they were narrowband, 25 kilohertz, a tiny

Closing Argument - By Mr. Bosse

1    sliver measured against the million hertz that's broadband.
2    It's not even close.  It's not even in the same ballpark.
3           Mr. Wilhelm described it as the difference between a
4    bike path and a superhighway.  These were never valuable to
5    Sprint, AT&T.  Those companies couldn't have cared less about
6    this, because as you heard from them and from Mr. Lewis, they
7    cannot run cellular broadband systems on these channels.
8    They're not allowed to.  It's also physically impossible.
9           And these channels are given out on a first-come,
10   first-served basis, site licenses by application.  If you
11   want one, you can get one for what turned out to be a very
12   small fee.
13          One of the things that you might hear also in this
14   case is that this spectrum stuff is just too complicated.
15   All these public notices and regulations, it's too
16   complicated to understand, even if you're in the business of
17   selling it to investors.
18          Now, I'm sure there might be some physics concepts
19   that we could have learned about that are complicated, but
20   that's not what we're talking about here.  What is not
21   complicated are these most basic questions:  What kind of
22   spectrum is this?  What can it be used for?  And is it
23   valuable?
24          And you heard Mr. Wilhelm and Dr. Bazelon explain
25   that all very easily, narrowband versus broadband, narrowband

―Closing Argument - By Mr. Bosse―

1    being so narrow it can carry a single voice conversation.
2    Well, what Peter Lewis said, a PowerPoint like the one I'm
3    using here might take 12 hours to go over one of these
4    narrowband channels.
5           David Alcorn, after he's let go from SmartCOMM,
6    starts up Janus Spectrum.  He's an executive in the spectrum
7    industry.  He's running his own company, which he basically
8    lifts straight from SmartCOMM.  And remember this document?
9    It shows the initial contributions Mr. Maerki and Mr. Alcorn
10   made, $100.  They funded their company with $100 and then
11   really funded it with investor money.
12          He's also the boss.  David Alcorn says under oath
13   that he's got all the duties and responsibilities.  And most
14   of this comes from his SEC transcript, which is 511C.  He
15   also says he doesn't have any employees.  And you heard that.
16   He's running this company out of his house.
17          Kent Maerki, the person David Alcorn wants to blame,
18   Mr. Alcorn testifies under oath that he didn't even know
19   whether Kent Maerki had dealt with this 800 megahertz in the
20   past.  And even if you hadn't seen the evidence you've seen,
21   the idea that someone who's business for years is spectrum
22   applications, takes in millions of dollars -- the idea that
23   he doesn't know the basic core facts about the spectrum that
24   he is selling is impossible.  And as you saw, he did know.
25   You don't have to wonder about that because it's clear.

Closing Argument - By Mr. Bosse

 1          Tripp Forrest testified that he told David Alcorn
 2     this is narrowband as early as 2010 or 2011, right when they
 3     started working together.  Peter Lewis told him the same
 4     thing when they started working together years later.  Peter
 5     Lewis and Tripp Forrest are two of the defense witnesses.
 6          Here's Mr. Lewis in an e-mail.  "They're a fraction
 7     of what's needed for broadband carriage."  And here he is
 8     again.  "Other than narrowband data applications, I know of
 9     no other uses that would generate income."
10          His own spectrum attorneys -- Alan Tilles, his own
11     attorney, tells him that it cannot be used for broadband.
12     See 300O.  This is back in 2012.  Here is Mr. Tilles:  "We
13     need to chat.  I just saw your website.  It's almost a carbon
14     copy of Pen's," Pendleton Waugh.  "I was not aware you were
15     selling applications.  I can't be involved in this."
16          That's his lawyer telling him that, because his
17     lawyer knows that this is a license application mill, a
18     vehicle for fraud.  Here he is again in 2012.  The statement
19     about clients getting money in 12 to 18 months, he says, "Not
20     a chance in hell."
21          That's Mr. Alcorn's own attorney telling him that
22     the things he's telling the investors are false.  And if
23     there is any suggestion David Alcorn didn't know these were
24     narrowband channels, it's all here in black and white from
25     his attorney.  Government's Exhibit 300Q.  They tell him.  He

─Closing Argument - By Mr. Bosse─

1    chooses to continue.  Choice.

2            And then he confirms it himself.  He said this at

3    his deposition.

4            He's asked, "Did you talk with anyone at Sprint?"

5            And he says, "I did.  I don't remember her name."

6            "What did you discuss?"

7            "The rebanding process."

8            "What did she say?"

9            "She said she didn't think that they would have an

10   interest in it, that she thought they were forbidden from

11   buying it."

12           "What did you understand her to mean?"

13           "She clearly was discouraging us from applying for

14   the spectrum and expecting to turn around and sell it to

15   them."

16           He says that under oath at his deposition.  That is

17   exactly the lie that he and Kent Maerki pass on to the

18   investors.  This was a sham from the start.  And just like

19   Bill Smith, he layered lies on top of those core lies.

20           The end result, this is a vehicle for fraud.  He and

21   Kent Maerki take more than half of the investors' money for

22   themselves straight off the top.  David Alcorn takes in

23   millions of dollars of investment funds at Janus Spectrum,

24   takes them in from everybody; the Newells, Daryl Bank's

25   companies, Mr. Bobby Jones who you heard from in this case, a

─────Closing Argument - By Mr. Bosse─────

 1    co-conspirator who testified for him and conveniently forgot
 2    everything, you might remember, when he was asked about
 3    whether he was taking investor funds.
 4            David Alcorn layered on his own lies on top of this,
 5    as we're going to see, but he transferred half of the money,
 6    more than half of the money that came into Janus Spectrum
 7    into his and Kent Maerki's own personal accounts, and they
 8    spent it on their personal expenses, including, as you heard,
 9    the lawyers he hired to defend him from the fraud
10    allegations.  He paid those lawyers with the very money he
11    was taking in through the same fraud.  It's breathtaking.
12            We're going to do briefly a couple of the lies,
13    because you all have seen these documents many times, and you
14    know the way he is selling them.
15            Here he is talking about 800 megahertz being
16    superior, the value just quadrupled, the best way to describe
17    it is it's like owning beachfront property.  And you also
18    heard the phrase the "Rolls Royce of spectrum," "coveted by
19    Sprint and AT&T."  And you heard where Daryl Bank got the
20    information he used to make these marketing materials.
21            This is 504.  You also have 304 and 404.
22            That all came from David Alcorn and Janus Spectrum,
23    and it's repackaged, and then it's sold by salesmen like Bill
24    Smith.  That's a fraud conspiracy that I just described.
25            Okay.  You see the same notes recycled again and

──────Closing Argument - By Mr. Bosse──────

 1    again, the same "100 percent annual return plus 50 percent of
 2    additional profits," and the same statement that this is
 3    going to give the little guy a chance to get involved in
 4    spectrum, in highly coveted spectrum.  And again, you see
 5    there the "most coveted spectrum to wireless carriers."
 6    "Future mobile broadband will run in this lower band
 7    spectrum."  That's just a bald lie.
 8            And here he is touted with Kent Maerki as the
 9    manager of Janus Spectrum.  And here's one of the many pro
10    formas.  I'm going to save you from that.  We're only going
11    to see, I think, one more of these during this closing.  This
12    one isn't even the worst one.  This one just has 1,000
13    percent annual return projected.  It's not the worst.
14            What did his own attorney say about these kinds of
15    projections?  His own attorney says, "This just all makes me
16    ill.  You're kidding me, right?  I'm sick to my stomach.  I
17    really want out of this."
18            When your lawyer tells you that and he tells you
19    that and you keep on and you have the choice -- here you know
20    it's not going to work and you have the choice, as he had in
21    2011, 2012, 2013, and now in 2014 -- you have the choice to
22    walk away, and you never stop.
23            Here he is at his deposition.  This is all false,
24    and he knew it.  He didn't even try to sell this stuff back
25    to the major wireless carriers.

Carol L. Naughton, Official Court Reporter

Closing Argument - By Mr. Bosse

1          "Did you ever contact AT&T to determine whether they

2     were interested?"

3          "No."

4          "Do you know if anyone else at Janus did?"

5          "No."

6          He knew they couldn't use it, but that's how he sold

7     it.  David Alcorn even had his own license applications that

8     he got when he was at SmartCOMM.  And they made nothing.  So

9     he knew from his own experience that these weren't valuable,

10    but he never changed the pitch.

11         And David Alcorn is there at the Idaho Falls Public

12    Library, you remember that, with Tony Sellers, meeting all

13    these investors in Idaho.  He's introducing Kent Maerki as a

14    spectrum genius and letting Kent Maerki play that "Money From

15    Thin Air" video to people like Ruth Clark and then happily

16    taking their money through Tony Sellers, from people like

17    Ruth and her blind husband Bernell.

18         David Alcorn could have gotten out after SmartCOMM,

19    he could have gotten out after he knew his own licenses were

20    worthless, after he knew the carriers couldn't use this

21    stuff, after his own lawyers told him that, but at each step,

22    he chose to continue in this obvious lie.  This is a money

23    grab.

24         (Audio played in open court.)

25         MR. BOSSE:  There's the second lie, in his own

2403

—Closing Argument - By Mr. Bosse—

1   voice:  We're going to be spending all this application money

2   on the front end to get these licenses, for the engineering

3   and marketing, and we're going to make our profit on the back

4   end with this 18 percent commission we're going to get when

5   we actually monetize these things.

6          He said that on the call.  You heard him tell the

7   Newells and other people the same thing.  But you saw what

8   really happened.  They didn't profit on the back end.  They

9   profited right up front by looting half of what came into the

10  company and spending it on themselves.

11         The idea where this is a narrow-margin business,

12  that they're charging clients 40-plus-thousand dollars for

13  these licenses so you can get a site license where you can

14  use a walkie-talkie and calling that beachfront property,

15  it's nonsense.

16         And you saw what they actually cost, and you have it

17  here in 337.  You can do the math.  $410 to the FCC, $300 per

18  channel to the frequency coordinator.  So rounding up and

19  adding in Tripp Forrest's costs for engineering, giving them

20  the benefit of the doubt and rounding up, it's about $6,000

21  for a license that he's charging $40,000 for and pocketing

22  most of the difference.  That's lie number 2.

23         And here in 300T -- this is his e-mail.  Remember

24  this?  He's asking for an invoice from his engineering firm

25  that he can show to clients, but he doesn't want the invoice

—Closing Argument - By Mr. Bosse—

1    to show the amount of money that Janus is paying, and it's
2    obvious why, because if clients saw this, they would wonder
3    where their money was going.  And here he is confirming his
4    clients don't know what Janus is actually paying for these
5    applications.
6          One of the most extraordinary things you heard in
7    this trial was the number of applications Janus filed.  It
8    used Tripp Forrest to prepare and file them, and in round
9    one, the first release, he estimated he filed 20 to 30
10   applications.  For round 2, he prepared many more than that,
11   and they were never filed because Janus stopped paying.
12         And then, of course, you heard that when people
13   actually did get one of these site licenses, it was usually
14   never activated because they didn't do anything to put it
15   into use because David Alcorn told them he was going to be
16   monetizing them and he never did.  The entire venture was a
17   failure from start to finish, and it goes on for years.
18         And lie number 3 is that Janus is going to monetize.
19   These were sold across the board to investors as hands-off
20   investments.  No one was ever told you're going to have to
21   run your own walkie-talkie business when they were made this
22   pitch.
23         But David Alcorn, as he writes in 2015 to Peter
24   Lewis, one of the defense witnesses, never had an option to
25   present.  "I accept the fact I did not do so, monetize, but I

─Closing Argument - By Mr. Bosse─

```
 1     never had any viable monetization options to present."
 2             It's incredible.  He wrote that after spending years
 3     telling people that he was working to monetize these and they
 4     just needed to wait a little longer.  It was completely
 5     false, and he acknowledges it in black and white.  And here
 6     he is testifying that as of June 2014, after he starts this
 7     process, he has no idea when he's going to be able to
 8     monetize these licenses.  No idea.
 9             And then he's under investigation by the SEC for
10     fraud.  His lawyers find out about it.  And one of the
11     ironies in this case is Mr. Alcorn actually got good legal
12     advice throughout this whole endeavor.  His lawyers have
13     simple and good advice:  Stop selling.  But he doesn't.  He
14     has a choice, and he chooses to continue the fraud.
15             Here are his lawyers:  "Stop taking money from old
16     clients.  Stop pitching this to new clients."
17             Here are his lawyers again:  "Completely cease any
18     activity related to bringing on new clients or taking funds
19     from existing clients."
20             And here's one from Mr. Baskin.  It's unfathomable
21     to him how this could have happened, that David Alcorn, while
22     he's being investigated for fraud by the SEC, is raising
23     money with Daryl Bank, the other person in the same
24     investigation, who has been barred from the securities
25     industry, and through it all, he's raking in investor money
```

—Closing Argument - By Mr. Bosse—

1    from people who are sold to using marketing materials with

2    false information that he provided.

3           And now we turn back to Bill Smith and spectrum.

4    Bill Smith sold millions more dollars of spectrum

5    investments, mostly through Daryl Bank's company,

6    Spectrum 100.  A lot of the lies that he told to sell

7    spectrum overlap with the lies we saw him tell to sell DSPF,

8    but there's some new ones here too.

9           His approach doesn't change, and who the clients

10   were doesn't change.  These are people looking for retirement

11   advice, who hear him on his radio show, looking for stability

12   through a trusted advisor, and that's the role he played from

13   the show to his pictures on the wall.  Bill Smith was a

14   master at gaining people's trust.

15          He even went back to the well with clients who lost

16   money in DSPF.  Talk about adding insult to injury.

17   Mr. Smith turned Wilfried Berndt's loss of his retirement

18   funds into a win for Bill Smith, another opportunity to get a

19   commission.  Mr. Berndt lost everything he put in to DSPF,

20   and Bill Smith tells him, "Hey, here's something else that's

21   going to do even better so you can recover your DSPF losses.

22   It's a slam dunk."

23          And Mr. Berndt put $50,000 into Spectrum 100 and

24   lost it all.  Bill Smith did all this without warning a

25   single person that Kent Maerki was also involved in this

──────Closing Argument - By Mr. Bosse──────

1    venture, which he knew.  And on top of the lies in the

2    offering documents we've just talked about, he is once again

3    adding fraud on top of fraud by telling his own lies about

4    these investments.

5              (Audio played in open court.)

6              MR. BOSSE:  Ladies and gentlemen, if you want to

7    hear what Bill Smith's clients heard, play Exhibit 1216.  You

8    are going to have it back there on a disk in the jury room.

9    That's just part of it.

10             The rest of it is mostly him lifting the same

11   presentation Kent Maerki used, "Money From Thin Air," and

12   telling people the same lies that are in that presentation

13   and handing this out in the year 2015, years after he knew

14   that this stuff wasn't working; the same nonsense as "Money

15   From Thin Air":  High income, low risk; results are proven;

16   Sprint is losing capacity; they're going to want this, so is

17   Verizon, so is T-Mobile.

18             (Audio played in open court.)

19             MR. BOSSE:  Ladies and gentlemen, he handed that

20   disk to an investor in the year 2015, three years after he

21   started putting people into spectrum, years after he knew

22   that this stuff wasn't working, that it was junk, and he's

23   handing this out in 2015.  That's the tone of the pitch he's

24   making.  You got to hear it yourselves.

25             So on top of these lies, the basic ones, what does

─────Closing Argument - By Mr. Bosse─────

1    he tell investors?  More lies.  Fraud on fraud.

2           Ray Martin lost money in DSPF, and Bill Smith tells

3    him spectrum is going to be leased back to AT&T, and he tells

4    him that the first round of the spectrum investments had gone

5    very well; a clearcut lie saying that earlier investors in

6    the same product had gotten good returns.  He knew that

7    wasn't true because nobody got any returns.  Good or bad,

8    there were none.

9           He told him the investment would return money

10   quickly, that it was low risk.  And when Mr. Martin invested

11   and didn't get anything, he calls, and Bill Smith tells him,

12   "Hang on.  The money is coming."

13          Jacob Kurtz he tells the spectrum investment is very

14   successful, it has a good track record.  That's impossible,

15   and he knows it.  There is no track record.  He talks about

16   10, 20 percent or higher returns, and if you set this up the

17   right way, virtually no risk.

18          Bill Smith knows that every one of those things that

19   he's saying is a lie and it's designed to ensnare another

20   investor to put more money into this product so he can make a

21   commission.

22          And let's talk about two of the other victims now.

23   Nicholas Gentile first.  You remember Mr. Gentile, a tall

24   man.  He was the former 30-year San Francisco Fire Department

25   employee.  His wife was Darcy Oliver, a dental hygienist.  He

———Closing Argument - By Mr. Bosse———

1   said that Bill was religious, just like him, made him feel

2   comfortable, that the investment is in some cell phone tower

3   build-outs, something about broadband and major carriers, and

4   then the key lie:

5         Bill Smith tells him that other people who had

6   invested in this are making 20 percent or more, the same

7   thing he told the dental investors, the same crucial key lie,

8   fraud on top of fraud.

9         And Bill Smith says, "I have $300,000 involved in

10  Spectrum 100 between myself and family members."  Another key

11  lie, "I myself am an investor.  The risk is minimal."  And

12  they believed that.  They trusted him, and they bought, and

13  he went back to them four more times.

14        He bled them dry over the coming years.  As he

15  learned more and more about the failure of this investment,

16  he kept going back to them for more investments.  And in the

17  end, Mr. Gentile made his last $5,000 investment in June of

18  2015, long after Bill Smith knew this was a failure and

19  after, by the way, Janus Spectrum and Spectrum 100 are sued

20  for fraud by the SEC.

21        After that happens, he takes more of Nicholas

22  Gentile's money.  He never tells him that.  The one thing he

23  wanted to know the most is "The company I'm about to give you

24  money for, are they being sued for fraud by the U.S.

25  Securities and Exchange Commission?"  He doesn't tell them

─────Closing Argument - By Mr. Bosse─────

1    that.  He just takes their money.

2          And one of the saddest things that I've heard in

3    this case was Mr. Gentile telling you that he was checking

4    online every three days.  He checked to see how his

5    investment was doing.  Bill Smith knew how his investment was

6    doing.  He could have told him.  It was nothing.

7          They lost, unsurprisingly, everything, and he and

8    Darcy go to meet with Bill Smith after they've lost

9    everything, and what does Mr. Smith do?  Tries to pitch them

10   on some other investment.

11         Here's the bankruptcy filed by Janus Spectrum in

12   March of 2014.

13         Carol Groff went to church with Bill Smith and his

14   wife.  Bill Smith's wife would visit her at home.  She talked

15   about having serious cognitive limitations, learning

16   disabilities, and she was up-front about that.  Bill Smith

17   knew about them.  He knew she was 65, that this was her

18   retirement money, and he told her whatever he needed to to

19   get her in.  He told her he was working with an elite group

20   you have to be invited into.

21         She trusted him.  He assured her that her money is

22   safe with him, and he tells her you just missed an earlier

23   round of investment in spectrum and that earlier group is

24   doing well, it's a sure thing, you just have to wait for the

25   licenses to go through, and the money will flow, 2- to $3,000

—Closing Argument - By Mr. Bosse—

1    a month, and you can pass it on to your children and your

2    grandchildren.  And she makes this investment, and obviously

3    nothing happens.

4           And then the lulling starts.  He's telling her to

5    hold on, just be patient, everything is coming together.  So

6    she gets an attorney.  She brings the bishop from their

7    church to meet with Bill, tells him the federal government is

8    investigating, and warns and begs him to stop doing this.

9    And his response was to get heated with them.

10          So she files a lawsuit to try to get her money back.

11   And here's what Bill Smith says about her lawsuit.

12          (Audio played in open court.)

13          MR. BOSSE:  Ladies and gentlemen, you saw Carol

14   Groff.  You saw her here.  Who's the predator?  She filed

15   this lawsuit in 2015.  Was this the wake-up call that Bill

16   Smith needed to stop selling these junk investments, even at

17   this late date, to stop working with David Alcorn and Daryl

18   Bank?

19          No.  He goes into 2016, and he goes into 2017.  And

20   you heard in the same deposition how much Bill Smith cared

21   about these clients.

22          (Audio played in open court.)

23          MR. BOSSE:  Did you catch that at the end there?

24   That's Bill Smith laughing at the end of that clip.  And

25   you'll have it with you if you want to listen to it again.

Carol L. Naughton, Official Court Reporter

───Closing Argument - By Mr. Bosse───

 1    It's 1215.

 2            Just like with DSPF, Bill Smith knew from his own

 3    experience and his clients' experience that these spectrum

 4    investments were not working, but he never stopped, and he

 5    never changed the pitch.  He started with Spectrum 100, Daryl

 6    Bank's company, in 2013, telling some of his victims they

 7    could expect quick returns.

 8            And you heard that when they didn't, they started

 9    calling him.  What's going on?  Where's the money?  What's

10    happening with my investment?  Can I get out of the

11    investment?  So he knows from his own clients that he's put

12    into this, early in 2013, that it's not working, and he

13    continues to sell it using the same pitch.

14            There's more than that when we get to spectrum.  He

15    wasn't just selling clients into Daryl Bank's Spectrum 100

16    investment.  Bill Smith had his own spectrum company called

17    Western Spectrum Ventures, and he's selling into that as

18    well.  He's the head of the company, and so he knows for a

19    fact that this investment is not working as promised.  And

20    these corporate documents are in the 900 series; 907, 901.

21            He took in hundreds of thousands of dollars of

22    investor funds through his own spectrum company, never

23    stopping, never changing his pitch.  Just like Tony Sellers,

24    who did actually put his own money into spectrum at first,

25    his own clients are telling him it's not working.  They're

1   calling and visiting and asking what's going on, but he

2   continues to tout it.

3          Ladies and gentlemen, that's fraud, pure and simple,

4   in concert with everyone else; David Alcorn, Kent Maerki,

5   Daryl Bank.  That's what a fraud conspiracy looks like.  You

6   saw it play out here in court.

7          Bill Smith is at the Washington, D.C., conference in

8   2014 where Peter Lewis, who you got to see, was pitching this

9   Internet of Things idea, where it's clear that they've not

10  found a way to monetize these licenses, and so they're

11  floundering around looking for something, anything to do with

12  them, where Mr. Lewis talks about how these licenses are only

13  good for small-packet data transfer.

14         Think about if you ever heard Bill Smith tell a

15  client that.  They have no idea how they're going to monetize

16  these things.  They're floundering.  These licenses are only

17  good for small-packet data transfers, not broadband.  He

18  never changes the pitch.

19         There's talk there, by the way, about the SEC

20  investigation as well.  He never mentions that to his clients

21  either, the thing they most want to know.  You also didn't

22  hear a single one of his clients tell them -- talk about him

23  pitching them on this because it could be used for this

24  Internet of Things, that they can make their money back on a

25  low-value proposition, like traffic light monitoring or

—Closing Argument - By Mr. Bosse—

1    counting fish in a stream.

2         He used the same pitch knowing these licenses

3    weren't valuable and weren't going to make money in the way

4    that he was talking about.  And, in fact, it's after that

5    D.C. meeting that he founds his second spectrum company,

6    Western Spectrum Ventures 2, in 2015, years after he starts.

7    And here it is, Government's Exhibit 900, Western Spectrum

8    Ventures 2, January 2015.

9         And then the company he's been working alongside

10   this whole time, Janus Spectrum, is sued for fraud by the

11   Securities and Exchange Commission in April 2015 along with

12   Mr. Alcorn, along with Mr. Maerki, along with Mr. Bank.

13        And by the way, if you hear counsel suggest that

14   Bill Smith had no idea what Daryl Bank was doing with his

15   clients' money, look at paragraph 68 of this exhibit.  It's

16   514.  And it lays out exactly what Bill Smith was doing with

17   his clients' money.  This is a public document of fraud --

18   civil fraud charges against all the people that Bill Smith is

19   working with.  The idea that he didn't know this is

20   outlandish.

21        And so in 2015 after Janus Spectrum files for

22   bankruptcy, after the SEC sues Janus and Daryl Bank and Kent

23   Maerki and David Alcorn for fraud in federal court, he's

24   handing Jeff Browne that disk with his own version of "Money

25   From Thin Air" after his clients have put hundreds of

————Closing Argument - By Mr. Bosse————

1    thousands of dollars into his own spectrum company and got

2    nothing back.

3          He knows this information is wrong.  He knows that

4    Kent Maerki is a fraud, and he's still using it to try to

5    sell more of these investments.  He's telling people it's the

6    truth, and Jeff Browne spends more than $100,000 on this junk

7    at this late date, August 2015.

8          Bill Smith made hundreds of thousands of dollars

9    from investors in his own spectrum companies -- you have that

10   in 1203 -- completely separate from the commissions he was

11   getting from Daryl Bank, if you hear Daryl Bank pointed to as

12   the bad guy in this case.

13         Bill Smith made over $700,000 of commissions into

14   his own spectrum company.  The idea that he's different from

15   Daryl Bank or Kent Maerki or David Alcorn doesn't hold water.

16         And that gets us to the last investment in this

17   case, yet another spectrum scheme.  Now it's reformulated and

18   renamed as Xcel.  We're in 2015.  No one's made any money on

19   these spectrum licenses.  No one from Sprint or T-Mobile is

20   knocking down the door or shown even the slightest interest

21   in leasing or buying the spectrum.

22         The SEC has sued them for fraud.  Bill Smith is

23   testifying in a different fraud investigation for Kent Maerki

24   in Arizona.  These men choose to continue.  They don't stop

25   taking investor money.  They just change the pitch.  And if

─Closing Argument - By Mr. Bosse─

1    you look at 600A, you'll see the background reason for why
2    they did this in the first place.  They were trying to show
3    the SEC that they were somehow monetizing these licenses.
4    That's what this company is about.  They're trying to gin up
5    good facts for the fraud case with the SEC, and so they make
6    this Xcel/RapidLink company.
7           And how do they fund the company?  How do they
8    capitalize it?  Do they get a bank loan like a normal
9    business would?  Do they use their own money to get this
10   company up and off the ground?  Of course not, because it's
11   just a continuation of the same scam.
12          It's another funnel for investor money, another
13   money grab, now years down the road; three, four, five years
14   after they start.  And one thing that is constant, they're
15   continuing to use outlandish projections to sell this.
16          Dr. Bazelon talked about how unreal this was.  Even
17   Peter Lewis -- you'll see this if you dig through these
18   e-mails -- talked about how far off David Alcorn's user
19   projections for walkie-talkie users was.
20          And this business involved a man named Aaron Bobkin,
21   who you got to hear from because David Alcorn called him as a
22   witness, another man supposedly running a telecom business
23   out of his house, taking in millions of dollars in investor
24   funds; in other words, another conspirator.
25          And by this point, if you look back at the tracking

─────Closing Argument - By Mr. Bosse─────

1    sheets showing the sales of Spectrum 100 and the other

2    spectrum companies, you will notice something.  You will

3    notice the salesmen who are listed in the salesman columns,

4    they're starting to drop off.  They're stopping.

5            Tony Sellers, who acknowledged his guilt in this

6    case, he stopped long before.  Even Kent Maerki has stopped

7    by this point.  But David Alcorn and Daryl Bank continue on

8    to the bitter end, and their top salesman, Bill Smith, is

9    right there with them continuing to sell what he knows is

10   another repackage of the same junk to investors into 2017.

11           And David Alcorn stays on as a consultant and

12   continues to take investor money from Daryl Bank.  But

13   between the two of them at this point, Mr. Alcorn and

14   Mr. Smith, it's Bill Smith who is making the real money,

15   because he's the top salesman for this last spectrum

16   investment.

17           And if you go into Exhibit 629, you'll see the list

18   of the sales he made, and you'll see some familiar names.

19   You'll see a few people you've seen testify at this trial.

20           635, we're going to blow that up.  If you look at

21   635 and you look in the column listing the salesman's name,

22   look at the right.  Bill Smith is the agent.  Bill Smith is

23   the agent.  Bill Smith is the agent.  Almost $3 million more

24   taken in at this late stage, selling this to people like

25   Sharyon Bean and Ken Sykes, two people you met by deposition,

Closing Argument - By Mr. Bosse

1    into late 2017.  The last check is actually clearing after

2    Daryl Bank has been arrested on criminal charges.

3            Sharyon Bean, who he was in a spiritual study group

4    with, lives in a mobile home, doesn't have a computer or a

5    cell phone, and finds out she has an unexpected $100,000 from

6    an old job at the phone company and turns to Bill Smith for

7    help, and he tells her about Xcel and putting up towers.

8    "They're big on growth.  Your money is safe."

9            The pitch didn't change.  Bill Smith is still

10   assuring people he's going to take care of their money, that

11   it's safe with them, that they will make good returns on a

12   low-risk investment in what was, in fact, the riskiest of all

13   classes of investment, an uncapitalized start-up company

14   founded by men who are being sued for fraud by the SEC.

15           He knows all of that, and he sells it, and he got

16   $25,000 out of Ms. Bean.  This is six months, by the way,

17   after Daryl Bank and Spectrum 100, which he sold millions of

18   dollars of, have entered into what's called a consent order

19   with the SEC, allowing a judgment to be entered against them.

20           Here's is the consent.  It's 1J.  And here is the

21   date, January 6, 2017.

22           Bill Smith never tells Sharyon Bean or any other

23   Xcel investor that the man who runs this company just had a

24   judgment entered against him in a fraud case by the SEC or

25   that the earlier spectrum company he sold millions of dollars

———Closing Argument - By Mr. Bosse———

 1   of also had a judgment entered against it by the SEC or that

 2   it had failed.

 3          As you think about his intent, think about that.

 4   What kind of salesman leaves out the most important

 5   information an investor would want while telling them

 6   affirmative lies about the investment?  The kind of salesman

 7   who is defrauding them.  The timeline in this case tells the

 8   story.

 9          Remember Ms. Bean testifying about her son asking

10   Mr. Smith questions, and Mr. Smith was trying to pitch to the

11   son as well?  And Bill Smith didn't like being asked hard

12   questions about these investments by someone who saw a red

13   flag.  And he tells Ms. Bean, "I'm not going to answer.  I

14   don't answer questions."

15          And, of course, with Ms. Bean, you have the same

16   lulling.  She keeps coming back to him asking about what's

17   happening with the investment, and he's stringing her along.

18          Lawrence Lyon, another late investor, he has a new

19   lie that he tells Mr. Lyon along with all the other ones.  He

20   tells him that he spent his own money doing due diligence on

21   the Xcel investment, yet another lie layered on top of that.

22   The irony of that, by the way, is breathtaking because Bill

23   Smith didn't need to do any more due diligence.  He already

24   knew everything there was to know about these investments.

25          And Ken Sykes.  You heard from Mr. Sykes in a video

Closing Argument - By Mr. Bosse

1    deposition.  He's told by Bill Smith that he can get his

2    money back out at any time, that Xcel is safer than stocks,

3    that he'll get returns -- it's made to sound like a sure

4    thing -- all things Bill Smith knows are not true.  And then

5    the kicker, Bill Smith says that he himself has some kind of

6    $300,000 stake in spectrum investments, recycling the same

7    lies that he's been using for years and doing it now at the

8    bitter end.

9          When Mr. Sykes' wife wants more information about

10   the investment because she's on the fence, Bill Smith sends

11   an e-mail saying that he and his team have been working in

12   this field since 1982; bald-faced lie.  Bill Smith tried to

13   get him to put all the money that they had with him.  They

14   only put some of it with him.

15         They make the investment.  They get nothing

16   obviously by this point, and after the investment, there's

17   more lulling, and he assures them everything is still good

18   and tries to pitch yet another company to him, and when

19   nothing's coming in, you heard his testimony by video.  Bill

20   Smith laughed it off.

21         And the other thing Bill Smith told him, "If the FBI

22   calls, don't say anything."  Does that sounds like a

23   statement of someone who is innocent, who has no intent to

24   join a fraud?

25         Do you remember the first line from Bill Smith's

─Closing Argument - By Mr. Bosse─

1   opening?  "The dupe doesn't know that he's been taken until
2   it's too late."  And you may hear from the defense in this
3   case that the real victims here are David Alcorn and Bill
4   Smith.  They're going to point the finger at anyone and
5   everyone else, but this quote is exactly right.

6          You've seen this trial.  You've been here with us.
7   You know this doesn't apply to Mr. Smith but to his victims.
8   The idea that Bill Smith was duped, that he's the real victim
9   here is outlandish, and the same goes with David Alcorn.

10          They could've gotten off this ride at any time, and
11   they didn't.  They continued to dupe client after client,
12   telling them whatever they needed to so they could make
13   money.  When you think about whether Bill Smith and David
14   Alcorn are the victims here, let's talk a little bit about
15   the money, because these men's words and actions show they
16   were motivated by greed.

17          We'll start with David Alcorn.  Nearly $4 million to
18   David Alcorn through the funnel of Janus Spectrum.  That's
19   1100.  What did he do with it?  He laundered it.  He used it
20   to buy things like an $88,000 Range Rover.  He siphoned it
21   into David Alcorn Professional Corporation, his main funnel
22   for investment funds.

23          And then -- and this is too complicated to even try
24   to walk through standing up here right now -- he launders it
25   through multiple accounts to his accountant who uses it to

———Closing Argument - By Mr. Bosse———

1   buy an over-the-top house for David Alcorn to use in the name

2   of the accountant.  And he does that -- David Alcorn does

3   that after he gets an SEC subpoena telling him there's an

4   investigation.

5           And if you want to look at the house, it's 1113.

6   That's the fruits of this fraud.

7           Bill Smith also made massive amounts of money

8   through these schemes, certainly more than an insurance agent

9   would normally make; 1.4 million from DSPF and from Daryl

10  Bank's companies -- and that doesn't count the 2011

11  commissions, so it's higher -- plus more than $700,000 from

12  his own spectrum companies, total of over $2 million.

13          And Bill Smith never invested his own money in any

14  of this.  He knew better than anyone that it was all junk.

15  His victims made next to nothing.

16          So looking back at the elements of the conspiracy to

17  commit mail and wire fraud, everything I've just gone through

18  goes to these elements.

19          There was a fraud conspiracy here.  I think even the

20  defendants agree with that in their opening statements.  And

21  there's no question this conspiracy involved hundreds,

22  thousands of uses of the mails and wires, when you think

23  about the nationwide scope of what this was.  All those

24  letters, calls, e-mails, wire transfers, bank drafts, they're

25  all part of the fraud.

Closing Argument - By Mr. Bosse

1          The defendants, for the reasons we've just walked

2     through, worked with other conspirators for years to defraud

3     investors.  They knew it was going on.  They and everyone

4     else in the conspiracy were making money by selling these

5     junk investments, and the evidence that they joined in on

6     this, that they knew what they were doing is overwhelming for

7     all the reasons we've just talked about as we talked about

8     Counts One and Two.

9          And that brings us to the individual wire fraud

10    counts against Mr. Smith and Mr. Alcorn.  And I can tell you

11    we're on the downward slope here.  We're getting to the end.

12         Mr. Alcorn is charged in all 11 of the wire fraud

13    counts you're going to consider, Seven through Seventeen, and

14    Mr. Smith is charged in four of them; Eight, Nine, Sixteen,

15    and Seventeen.

16         And so I'm going to start with Count Eight where

17    they're both charged, and then because all these counts work

18    the same way, I'm going to move quickly through the others,

19    and at that point we'll have only one more charge left to

20    discuss.

21         Before we talk about these wire counts, I want to

22    point to another instruction which is important here.  And

23    you should, by the way, only pay attention to Judge Jackson's

24    version.  This is what I think is going to be on the paper,

25    but it's his version that controls.

─────Closing Argument - By Mr. Bosse─────

1           And this says that a conspirator is responsible for

2   offenses committed by another conspirator if they're a member

3   of the conspiracy and if the offense was committed in

4   furtherance of or as a foreseeable consequence of the

5   conspiracy.

6           And that's a bunch of legalese, but what it means is

7   that if these men willingly joined this conspiracy and became

8   part of it, they're liable for what they did in furtherance

9   of the conspiracy and for what the other people in it did, as

10  long as it's reasonably foreseeable.

11          And it was reasonably foreseeable what happened here

12  because the whole goal of the conspiracy was investment

13  fraud.  There's no mystery about what was going on.  And that

14  applies to the wire fraud counts as well.

15          Here are the elements that we're going to go through

16  at the end.  I'm going to go through them now, and we'll pick

17  them up briefly at the end.  And let's look at Count Eight.

18          For each of the counts of wire fraud, you have a

19  wire.  And we tried to number these in a way that would help

20  you find them.  So for Count Eight it's 1008A.  You'll see

21  that that numbering system tracks through the wire fraud

22  counts.  So it's in the 1000 series, and if you look at 1007

23  through 1017, you will have all the wires that are actually

24  alleged.

25          This charges Mr. Alcorn and Mr. Smith with wire

—Closing Argument - By Mr. Bosse—

1   fraud related to one of Mr. Smith's commission checks.  In

2   other words, Mr. Smith makes a sale of spectrum, and the

3   money goes to Daryl Bank's BayPort account.  Daryl Bank pays

4   Bill Smith this commission, this significant commission of

5   $58,800.

6          Eventually, Daryl Bank does his own fraud, takes

7   some of the money, and shifts the rest to Mr. Alcorn, and

8   then Mr. Alcorn does his own fraud and takes the money, so

9   it's all part of the same scheme.  And this wire is one wire

10  in furtherance of the scheme.

11         And you will note the number is 1008.  And you'll

12  also see here I've referenced the stipulation.  If you look

13  on the stipulations, Exhibit 2000, the parties have agreed

14  that all of these wires moved in what's called interstate

15  commerce.

16         In other words, it started, in this case, in Newport

17  News and ended in this case where Mr. Smith happened to be at

18  the time, not in Virginia.  So we've hit the element of

19  interstate commerce for each of these.  And that's

20  Count Eight, and it's relatively -- these are relatively

21  straightforward.

22         In this case, I'll track you back.  If you look at

23  Exhibit 59, you'll see where the money came from.  Mr. Smith,

24  in May of 2014, so sort of at the end of Spectrum 100, he

25  sold, in one day, almost half a million dollars' worth of

―Closing Argument - By Mr. Bosse―

1    this investment, and his commission is that $58,000 figure.
2    That's wire fraud.  So it's one instance of wire fraud that
3    was part of the larger conspiracy that we talked about in
4    Count One and Count Two.
5         And we can go through the rest a little bit more
6    quickly.  The next one is Count Nine, another wire fraud
7    count related to one of Mr. Smith's commission checks.  And
8    so the exhibit is 1009A, and you'll see there he's getting a
9    commission check for a little bit north of $9,000.
10        And you'll see the stipulation there in Government's
11   Exhibit 2000.  This was an interstate commerce transaction,
12   and because the money is flowing from Daryl Bank to Bill
13   Smith and then from Daryl Bank to David Alcorn, this is part
14   of the same scheme.
15        And again, if you track back, you'll see the sales
16   that Mr. Smith made that led up to this commission, sales in
17   April of 2014.  This was only 80,000 as compared to the last
18   one which was much larger.
19        Count Seven.  This relates to Tony Sellers; Tony
20   Sellers and David Alcorn.  Remember when David Alcorn found
21   out that Tony Sellers was under investigation by Idaho and he
22   suggested you might want to start up a new company, you can
23   work with Daryl Bank and use a new company to sell, after the
24   investigation -- after it was clear he was under
25   investigation.

─Closing Argument - By Mr. Bosse─

1        Well, you heard from Tony Sellers.  He did that, and
2   the company was called Prime Spectrum.  And he sold to the
3   Clarks, among others, and this is one of the commission
4   checks that Daryl Bank's Prime Spectrum company pays to Tony
5   Sellers for $13,500.
6        The remainder of the money, after Daryl Bank looted
7   it, went to Mr. Alcorn where Mr. Alcorn looted it, all part
8   of the same conspiracy.  And again, the check for Count Seven
9   is 1007A, and we have the interstate commerce reference.
10        Count Ten, you're looking at 1010A for the wire.
11   This is against David Alcorn.  It relates to a different
12   salesman, Tom Barnett.
13        Remember, when you're in a conspiracy together,
14   you're liable for the other people's reasonably foreseeable
15   acts, and you'll see -- when you go back through the sales
16   trackers, you'll see Tom Barnett's name as one of the
17   salesmen in this.  He sold to Mr. Yee, who you saw early in
18   this case on a video deposition.
19        All of the salesmen that were making money in this
20   fraud, each one of the payments they received is another
21   instance of wire fraud.  And there's the stipulation for
22   interstate commerce.
23        Count 11, briefly, is another Tom Barnett
24   commission.  And this instance of wire fraud is charged again
25   against David Alcorn, who ends up getting the end result of

─────Closing Argument - By Mr. Bosse─────

1   this sale, ultimately being the one who benefits from Tom

2   Barnett's work, along with Tom Barnett, obviously, who is

3   getting these commission payments.

4           And with Count Twelve, we pick up counts that

5   directly relate to Mr. Alcorn.  This is Mr. Alcorn's own

6   receipt of north of $41,000 from Prime Spectrum, the company

7   that Daryl Bank made for Tony Sellers to use.

8           Remember what you heard about this, by the way.

9   None of these Prime Spectrum investors even got a license.

10  And you have the stipulation there.  The number is 1012A.

11          For Count Thirteen, it's another wire to David

12  Alcorn of investor money.  Here he's being wired from Daryl

13  Bank's BayPort account for Spectrum 100 over $123,000 into

14  Janus Spectrum.  And you've seen from the other charts what

15  happened to that money after Mr. Alcorn and Mr. Maerki got

16  hold of it.

17          Count Fourteen is another Spectrum 100 wire into

18  David Alcorn's Janus Spectrum account, same amount, $123,600.

19  You've got the exhibit number there and the stipulation.

20          Count Fifteen, another Spectrum 100 wire.  This is

21  from May 2014 from David Alcorn's -- into David Alcorn's

22  Janus Spectrum account.  This one is for $288,000.

23          And we could have charged every single one of these

24  wires.  We just selected a few to charge.

25          Counts Sixteen and Seventeen are a little bit

Closing Argument - By Mr. Bosse

1   different because another way you can use the wires is by
2   making phone calls that go, in this case, interstate.  And
3   you heard from Sunshine Grissom and also from Dee Pinkston
4   about these weekly calls that Kent Maerki and sometimes -- I
5   think sometimes David Alcorn would pop up on, updating the
6   salesmen about what's going on with the dental investment but
7   also with the spectrum investments.
8           And you heard the constant theme was sell, sell,
9   sell.  So these calls are also made in furtherance of the
10  same fraud scheme that Mr. Alcorn and Mr. Smith are knowingly
11  and willingly a part of, and so the exhibit for Count Sixteen
12  is 1016A.  And you have the stipulation there as well.
13          And here's the last one, Count Seventeen, another
14  sales call.  It's 1017A.  And you'll see that it's Kent
15  Maerki talking about filing applications just last week and
16  hiring Peter Lewis as a consultant.  All of this is done as
17  part of the same scheme we've been talking about this entire
18  time.
19          We're getting close to the end now.  Thank you for
20  your patience.
21          Looking at Counts Seven through Seventeen,
22  everything we talked about shows this was a scheme and
23  artifice to defraud and to get money by what's called false
24  and fraudulent pretenses.  The lies are material.  A
25  reasonable investor would have found these lies important in

```
                    ─Closing Argument - By Mr. Bosse─
```

 1    deciding whether to invest.

 2            And for all of the reasons we discussed here, these

 3    men acted with the intent to defraud, and once you get there,

 4    all the wires of the money and the phone calls that are done

 5    in furtherance of the scheme, they're all individual

 6    instances of wire fraud, and that's what's charged in Seven

 7    through Seventeen.

 8            Okay.  Last count, Count Nineteen, an unlawful

 9    monetary transaction.  This one only involves Mr. Alcorn.

10    And it relates to his deposit on May 15, 2015, of $100,093

11    into the David Alcorn Professional Corporation Retirement

12    Plan, different account from the main one he was using for

13    laundering.

14            And you'll see that this charge is one link in a

15    long chain of money laundering that Mr. Alcorn did with these

16    particular funds.

17            The elements:

18            The defendant has to engage in a monetary

19    transaction affecting interstate commerce.  And here, the

20    parties have agreed, in Exhibit 2000, that this did involve

21    interstate commerce.

22            Number two, the monetary transaction involved

23    criminally derived property of a value greater than $10,000.

24    Here, the draft is for 100,000, north of 100,000, and all of

25    the funds that were coming into these accounts for Mr. Alcorn

────Closing Argument - By Mr. Bosse────

1   derived from investor funds.  They're all criminally derived.

2        And let's start tracing the money.  First, we have

3   the main funnel that David Alcorn used, his professional

4   corporation checking account, and you see that there,

5   referenced at the bottom right, account 7417.

6        And looking at Government's Exhibit 1109, in 2013,

7   he sends more than $600,000 from that account into his

8   retirement plan account, which is there in the bottom right,

9   5760.

10       And then he moves the money from the retirement

11  account into a separate Janus Spectrum account at a different

12  bank, the Arizona Business Bank, 100,000, and you see that in

13  Government's Exhibit 1109, where it sits for almost a year

14  collecting some small amounts of interest.

15       And then he closes out that account and gets the

16  cashier's check.  That's the one we're talking about here,

17  and it's for $100,093, and he sends it back to his retirement

18  plan.

19       And, ladies and gentlemen, if you're scratching your

20  heads about this bizarre chain of money going from bank

21  account to bank account, it's because this is what money

22  laundering looks like.  These kinds of circular transactions

23  have no financial reality.  It's just laundering.

24       And here's the exhibit that you need for this count.

25  It's 1111.  And it's a cashier's check for that amount of

—Closing Argument - By Mr. Bosse—

1   money.  That's the basis for the charge in this count.

2         And then -- so the money goes to the retirement plan

3   at Arizona Business Bank.  And, in fact, he later empties out

4   that retirement plan account as well and sends it to a

5   completely separate company controlled by his accountant,

6   Brian Semple, the same person that did the transaction to buy

7   his house in someone else's name.  Right before his second

8   SEC deposition is when this transfer occurs.

9         And so the property was derived from specified

10  unlawful activity, investor fraud.  The defendant acted

11  knowingly, with knowledge that the transaction involved

12  proceeds of a criminal offense, and Mr. Alcorn knew from the

13  start, years before this transaction, that this entire

14  enterprise was fraudulent, and he continued to take investor

15  funds, including the funds that ended up in this particular

16  $100,000 cashier's check.  And no one is going to dispute

17  that the transaction took place in the United States.

18        That gets us close to the end.  I have two more

19  minutes that I'm going to talk to you for, because when you

20  go back to deliberate, you're going to have all the physical

21  evidence; you're going to have your recollection of what you

22  saw from the witness stand; and you're going to have

23  something equally important to take back with you as you

24  deliberate -- I want you to think about this -- you're going

25  to have your common sense as jurors.

─────Closing Argument - By Mr. Bosse─────

1          As you listen to the arguments today and then as you

2    consider the evidence and you deliberate together, let your

3    experience and your common sense guide you.  These defendants

4    are not victims.  They're fraudsters.  And the evidence that

5    you have and that you observed is overwhelming on that count.

6          There's no reasonable doubt about what these men did

7    or that they knew what they were doing.  Alongside their

8    co-conspirators, they lied to sell these junk investments for

9    their own profit.  Like fool's gold versus real gold, the

10   investments were nearly worthless.  They knew that, and they

11   sold them like gold, and they did it for greed.

12         They knew the people they were selling to weren't

13   getting something valuable, but they never stopped because

14   the money was too good.

15         Throughout all the regulatory investigations, the

16   federal SEC investigation, the FBI investigating Daryl Bank,

17   did they even pause?  They didn't.  They'd rebrand when they

18   had to.  They changed the corporation name when they had to.

19   They changed the investment when they had to, but they kept

20   going, and they used the same lies from the start.

21         This was a scam from top to bottom.  And as you hear

22   the arguments today, I want you to bear in mind the concepts

23   I started with; the choices that these men made at every

24   step, the fact that deliberate ignorance is not a defense,

25   and, finally, the stories of the victims.

────Closing Argument - By Mr. Bosse────

1          I'm going to close by saying this:  Because this is

2   a fraud case, you've seen a lot of spreadsheets and charts --

3   we've looked at some today -- a lot of names and numbers on

4   them, and you've heard about just some of the many, many

5   victims in this case, but because you have those charts, you

6   can see how many people were victimized, how many investor

7   names are on those charts.

8          And those are not just names, and they're not just

9   numbers.  Those are real people.  That's real money.  They

10  saved up, in many cases, over a lifetime of work.  And these

11  men took that money without a second thought, and they

12  started taking it in 2011, and they never stopped.  The

13  victims and what was stolen from them are not numbers on a

14  spreadsheet, but that is how these men treated them.

15         There's nothing that happened in this trial that is

16  going to undo the harm that David Alcorn and Bill Smith

17  caused out of their own greed.  But what we can do is ask you

18  for justice under the law, and the only just verdict in this

19  case is a verdict of guilty on all counts that holds these

20  men accountable for what they've done, and that's what we ask

21  you to do.

22         I thank you for your time, for your service.  Thank

23  you.

24         THE COURT:  Thank you.

25         We can, in fact, take an early lunch, or we can go

──────Closing Argument - By Mr. Yarow──────

1   now with respect to arguments.

2          MR. YAROW:  Judge, I would prefer to go now.  I

3   think I can --

4          THE COURT:  You prefer what?

5          MR. YAROW:  I'd prefer to go now, if that's okay

6   with the Court.

7          THE COURT:  That's fine.  We can do that.  You may

8   go now.  We may run a little after 1:00, but we still will be

9   taking a lunch break.

10          (Pause in the proceedings.)

11          MR. YAROW:  I do apologize if I do run a little bit

12   over your lunch break, but this may result in an earlier day

13   for all of us.

14          First of all, I would like to thank everybody very

15   much for serving on this jury and for what you're doing.

16   It's very important.

17          What did the evidence presented at trial tell us

18   about David Alcorn?  You heard from witness Jon Palmieri

19   about David's real estate background.  You heard David had no

20   real experience in spectrum or securities.  He received

21   training on the expansion band and guard band from SmartCOMM.

22          We heard from multiple witnesses -- Jon Palmieri,

23   Bobby Jones, and Aaron Bobkin -- about what SmartCOMM

24   training taught them and how it was pivotal in them forming

25   their beliefs in the guard band and how Kent Maerki was the

---
Closing Argument - By Mr. Yarow
---

1    icon.

2          I'm going to go through some of the exhibits that

3    you've already seen before.  The first one is what all the

4    salespeople, including David Alcorn when he worked at

5    SmartCOMM, learned.  You heard this was a SmartCOMM document.

6    SmartCOMM used it in their presentation.  David Alcorn copied

7    the same thing.

8          You've seen the advertisement here over and over

9    again.  This is something else all the salesmen advertised

10   they saw while they were at SmartCOMM -- I'm sorry, that they

11   saw while they were at SmartCOMM.

12         "Spectrum is the most valuable natural resource in

13   the information age."  "Bandwidth is the new black gold."

14   "Each new computing cycle results in ten times more devices."

15         You saw those over and over.

16         You heard about how at SmartCOMM they said, "Well,

17   we've been investigated by the SEC.  The SEC sent us a

18   good-boy letter and told us that we're fine.  Our business

19   model is okay."  Carefully read this letter.  That's not

20   exactly what it says.

21         SmartCOMM misled these people -- and Kent Maerki.

22   SmartCOMM and Kent Maerki hid the truth about the limitations

23   of the guard band but instead presented the rebanding as a

24   new opportunity.  SmartCOMM and Maerki would present the

25   guard band as an opportunity like what they had seen in the

—————————Closing Argument - By Mr. Yarow—————————

1    lotteries in the 1980s with the spectrum.

2         Dr. Bazelon, the government's expert witness,

3    testified there was a lot of money made during that time

4    period with the spectrum lotteries.  Jon Palmieri, Bobby

5    Jones, and Aaron Bobkin, who were all in the same position as

6    David, were believers.  They said they were believers.

7    David, too, was a believer.

8         Armed with his mistaken understanding of the

9    spectrum and the guard band, David partnered with Maerki and

10   formed Janus Spectrum after leaving SmartCOMM.  Partnering

11   with Maerki was a major error on David's part, but with his

12   limited experience and knowledge, David felt like he needed

13   what Maerki could bring to the table as a so-called expert or

14   icon.

15        Janus Spectrum basically copied the business plan of

16   SmartCOMM.  As a matter of fact, they were sued by SmartCOMM

17   for the very act of copying the business plan.  Janus

18   Spectrum set out to be an application service company.  And

19   the government talked a lot about why did they not apply for

20   the licenses right away?

21        Well, what was required was the FCC to release these

22   markets, and they could not apply for the markets until they

23   were actually released, and then once they were released, the

24   plan was to pool these markets together so we have a critical

25   mass and then go to the cell phone companies and market

Closing Argument - By Mr. Yarow

1    ourselves as available bandwidth that these cell phone

2    companies, that they mistakenly believed, would be interested

3    in.

4           The government showed you a copy of a bankruptcy

5    petition filed by Janus Spectrum.  David's bankruptcy

6    attorney, Tom Littler, testified this was a reorganization

7    filed by Janus Spectrum and was filed to prompt the

8    settlement of the SmartCOMM lawsuit.  It was in the best

9    interest of everyone, including Janus Spectrum customers.

10          We've heard from another of David's previous

11   attorneys, Alan Baskin, about his advice to David to not

12   continue in business pending an SEC investigation and not

13   dealing with Daryl Bank.  Attorney Baskin was not able to

14   offer David a time frame when the SEC investigation would

15   end.

16          We heard from Baskin David was focused on the

17   securities issue of whether Janus Spectrum was or was not

18   selling a security, the same issue that he had seen SmartCOMM

19   address.

20          Mr. Baskin offered David very good advice, and he

21   should have listened.  However, David was still swayed by

22   what he had learned at SmartCOMM when they shared the SEC

23   investigation and letter from the SEC which, they were told

24   by SmartCOMM, exonerated them and their business model.

25   David was doing the same thing as SmartCOMM, and he expected

―――――Closing Argument - By Mr. Yarow―――――

1    he would receive the same letter.

2         We heard from Tripp Forrest, the engineer with Tusa

3    Consulting, who was hired by Janus Spectrum.  Tripp was at

4    the time, as he testified, a young engineer, a few years out

5    of college, with limited experience.  He stated an opinion

6    that we would have to wait for wounds to heal before

7    necessary waivers would be granted by the FCC.  These waivers

8    were necessary in order to remove the limitations of the

9    guard band.

10        David took this opinion with a grain of salt and

11   continued to rely on others' opinions, including what he had

12   been told at SmartCOMM and by Kent Maerki.

13        Let's look at Kent Maerki, salesman extraordinaire.

14   He could sell ice cubes in the Arctic and sand in the desert.

15   Terry Pinkston testified concerning Kent Maerki, and his

16   impression of Kent Maerki was that Kent was larger than life.

17   He was very authoritarian in his control, able to convince

18   people what he wanted them to believe.

19        There was evidence that came in that he had been

20   enjoined from selling securities by the SEC.  I don't believe

21   there was any evidence in this trial that David knew about

22   this until much later.  David came around, and when he

23   realized who and what Kent Maerki really was, you heard

24   evidence that David bought Kent Maerki out from Janus

25   Spectrum.

Closing Argument - By Mr. Yarow

1          Daryl Bank.  We heard from the government witness
2   Raeann Gibson.  Raeann worked for Daryl Bank and was close
3   with Daryl and an integral part of his organization.  She
4   testified that David had no control of the entities Daryl
5   Bank created.  Daryl is the one that would sit down with
6   Raeann Gibson and say this is the way we're going to move the
7   money around, this is what we're going to do.
8          There was no contact between David with the people
9   who were investing in Bank's various entities, like
10  Spectrum 100, Janus Spectrum Group, Prime Spectrum, and
11  others.  Daryl bundled the individual investors' money in
12  these LLCs.  When the applications were sold by one of these
13  LLCs, David would receive a check from Bank along with the
14  signed agreement.
15         The government introduced agreement after agreement
16  after agreement, with check after check, and these checks
17  came from the LLCs, not any individual investors.  From
18  David's perspective, Daryl's LLCs were the client, not the
19  individuals who invested in those LLCs.  He didn't know who
20  they were.
21         You heard multiple witnesses testify Daryl and his
22  organization sought out older people who were not financially
23  savvy and needed someone to offer good advice on safe
24  investments to see them through their retirement.  Daryl
25  betrayed these people, including as we heard from Raeann

————Closing Argument - By Mr. Yarow————

1    Gibson, her own parents, who purchased membership in one of

2    Daryl's entities.

3          There was no evidence David had knowledge of the

4    types of people Daryl was putting in these LLCs.  David,

5    through Janus Spectrum, offered what he believed was an

6    opportunity for people with a higher level of sophistication

7    and means.  David, had he known who Bank was bringing into

8    these LLCs, would never have gone along with what Daryl Bank

9    was doing.

10          The government introduced evidence David received

11    money from another entity, Xcel Bandwidth 2.  David was only

12    a paid consultant for Xcel Bandwidth 2.  Raeann Gibson

13    testified his interactions with that company were very

14    limited to just the consulting.

15          Now, we also heard from Susan Newell.  She was a

16    government witness who purchased applications from Janus

17    Spectrum.  Susan was an experienced businessperson.  She

18    described herself as an accredited investor.  She owned

19    multiple Jackson Hewitt franchises.  Her husband Craig was an

20    MBA from Stanford.

21          We heard testimony from Aaron Bobkin, who testified

22    he had sold them multiple applications for the guard band

23    spectrum with SmartCOMM prior to her introduction to Janus

24    Spectrum -- sorry, I may have said that incorrectly -- sold

25    from SmartCOMM before her introduction to Janus Spectrum.

Closing Argument - By Mr. Yarow

1          It was Aaron Bobkin who gave her the spreadsheet,
2   the first spreadsheet.  That was not introduced to her by
3   David.  It was a man by the name of Robert LaBine, who we
4   heard about, who told Susan about the new opportunity for
5   larger markets with a new company doing the same service as
6   SmartCOMM.  That was Janus Spectrum.
7          Susan Newell, who had already purchased applications
8   for the guard band spectrum from SmartCOMM, wanted more
9   applications for the licenses.  It was Susan Newell who put
10  together additional LLCs with members she sought out and
11  knew, her friends and business associates.
12         Let's walk through what Susan Newell's entities
13  contracted for with Janus Spectrum.  This is Susan Newell's
14  Application Service Agreement with the date it was entered
15  into, her signature signing as manager on behalf of Air
16  Apparent Associates.
17         Janus was offering to prepare and file Form 601-FCC
18  Application for 800-megahertz licenses for clients.  Janus
19  agreed to prepare the application and submit the application
20  for each economic area the clients were applying for.
21         Janus agreed to provide the necessary engineering,
22  submit to a frequency coordinator, all of which they did.
23  "Janus will provide a copy of the proprietary engineering
24  along with a paid-in-full receipt for engineering prior to
25  submission," which we also heard that they did.

―Closing Argument - By Mr. Yarow―

1          We heard the government made a deal out of David

2     asking that the amount he paid for the engineering not be put

3     on the receipts.  It is not a requirement of a business to

4     tell the customer how much something they provide to the

5     customer cost them.  This is the way businesses operate.

6     Applications were submitted to the FCC as markets were

7     released by the public notice by the FCC.

8          Susan also knew there was no guarantee that the

9     frequency coordinator or the FCC will approve any of these

10    applications, that a license would even be granted.  There

11    was no guarantee.  And these poor people that bought into

12    Daryl Bank's entities, they would have known none of this

13    because Daryl didn't share this information with them.  But

14    Susan Newell knew.

15          Susan knew that she would be required after the

16    licenses were granted to build out -- to construct and build

17    out a site within 12 months, and she hereby acknowledges that

18    she agreed to do this and that it was her responsibility for

19    the construction and maintenance of each of these sites.

20          Janus Spectrum simply offered to act as an agent for

21    the licensees.  If they were to be successful in monetizing

22    these licenses, then Janus Spectrum and David would benefit

23    just like the clients who purchased the applications would.

24    Their success was tied together.

25          Janus Spectrum was going to make their best efforts

—————Closing Argument - By Mr. Yarow—————

1    to monetize but did not guarantee anything.  And these are

2    the markets that Susan Newell's entity received for

3    Minneapolis and Denver.  And she actually received those

4    licenses.

5          The Newells pursued their own course and attempted

6    to monetize with a company called RapidLink Wireless before

7    the build-out deadline.  The Newells would only have their

8    first license a few months before the meeting in D.C. where

9    Peter Lewis spoke in June of 2014.

10          It was Peter Lewis's advice which started to bring

11   David around to a new understanding concerning the limited

12   potential uses of the guard band frequency.  David, the

13   Newells, and others had been misled by SmartCOMM and Maerki.

14          The major phone carriers were not going to lease or

15   purchase the guard band channels.  David wanted to make

16   things right.  He initiates seeking out alternative ideas for

17   monetization.  He messed up.  He made a mistake.  He made a

18   mistake based upon mistaken information, and he did what was

19   right.

20          He hired Peter Lewis as a consultant to help

21   monetize in May of 2014.  Peter Lewis spoke at a conference

22   about monetization alternatives other than phone carriers.

23   Peter stated at the conference that guard band had advantages

24   in the Internet of Things applications.  Now, the government

25   downplayed this, but the Internet of Things is a big deal

──────Closing Argument - By Mr. Yarow──────

1    today.

2           David and Janus Spectrum paid $12,500 per month for

3    a 12-month period to Lewis.  This is something that David did

4    not have to do.  He did it on his own because he felt like "I

5    needed to do something to help monetize these licenses above

6    and beyond what I've contracted for."

7           The Newells weren't interested in Internet of

8    Things, and that was their choice.  And I'm sure they were

9    very embarrassed bringing a lot of their friends and business

10   associates into their organizations, but that's what they

11   did.

12          And we heard from Ruth and Bernell Clark.  That was

13   the -- the government made mention of them.  That was at the

14   library in Idaho.  David's participation was to introduce

15   Kent Maerki as a speaker.  Kent made the entire presentation.

16          We heard from Tony Sellers, who was the only one who

17   knew the Clarks and whether an application for spectrum would

18   have been appropriate for them.  He was their salesman.  He

19   was their financial advisor.  He was the one that knew the

20   Clarks.  David was there but only spoke with Bernell Clark

21   about a common visual disability.  They both have difficulty

22   seeing.

23          The Clarks purchased applications through Tony

24   Sellers' entities.  The Clarks did not rely upon David or

25   anything David said to them.  They relied upon what they

———Closing Argument - By Mr. Yarow———

1    heard from Maerki and Tony Sellers.

2           After the closing arguments by all the attorneys,

3    the judge will instruct you on the law.  And one point, one

4    of the instructions will be that there must be knowledge.

5    And by "knowledge" what we mean is there must be criminal

6    intent.  A person must knowingly act with the intent to do

7    something wrong.  It simply cannot be out of ignorance, and

8    if you believe that David acted out of ignorance, it's not

9    enough.  It cannot be a mistake.  If you believe that David

10   acted out of a mistake, a mistaken belief, that cannot be

11   enough.

12          And, also, the Court will read an instruction to you

13   about beyond a reasonable doubt.  We are all familiar with

14   this concept.  The government must prove to you beyond a

15   reasonable doubt David acted knowingly and not out of

16   ignorance or mistake.

17          In any criminal case, the government has the burden.

18   And you briefly saw a picture of what I call the scales of

19   justice.  The government must prove beyond a reasonable doubt

20   that David engaged, knowingly engaged in the criminal

21   activities that they've alleged.

22          And if you think about the scales -- I'm going to be

23   very careful with these shields -- think about the scales of

24   justice.  The government has the burden of not convincing you

25   ever so slightly or even more, but beyond a reasonable doubt.

```
                      ─Closing Argument - By Mr. Yarow─
 1    The evidence must rise to that level.

 2             During my opening statement, I told you at the

 3    conclusion of the trial, it will be up to you to determine

 4    whether David's belief concerning the spectrum was real and

 5    whether his intentions were genuine.

 6             I asked you to focus on David's intentions and not

 7    on whether he was right or wrong about his understanding of

 8    the limitations and intricacies of this technology.  He was

 9    mistaken.  That is not enough to prove David committed a

10    crime beyond a reasonable doubt, and I ask you to find my

11    client, David Alcorn, not guilty.

12             Thank you.

13             THE COURT:  Thank you, Mr. Yarow.

14             Ladies and gentlemen, we're going to take a break

15    until 2:30.  At 2:30 we'll come back and continue with the

16    closing arguments.

17             (The jury exited the courtroom.)

18             (Recess from 12:59 p.m. to 2:39 p.m.)

19             (The jury entered the courtroom.)

20             THE COURT:  You may be seated.  All jurors are

21    present in the courtroom.

22             Does counsel concur?

23             MS. O'BOYLE:  United States agrees.

24             MR. YAROW:  Mr. Alcorn concurs.

25             MS. McCASLIN:  Mr. Smith concurs.
```

Carol L. Naughton, Official Court Reporter

Closing Argument - By Ms. McCaslin

```
 1          THE COURT:  We will hear closing arguments by
 2   Mr. Smith.
 3          MS. McCASLIN:  Thank you, Your Honor.
 4          You cannot have a good con without a fool.  And this
 5   was a good con.
 6          Kent Maerki, Daryl Bank stole millions of dollars
 7   from people, and they were masters at manipulating people
 8   around them.  We know now that there was a fraud.  We know
 9   now that they were just pocketing money, laundering it, and
10   we don't dispute any of that.  But Bill didn't know that
11   then, and neither did a lot of other people, and that's the
12   difference between a fraudster and a fool.
13          Now, do you want to see what a conspiracy to commit
14   fraud looks like when it is actually proven beyond a
15   reasonable doubt?
16          Kent Maerki owned all of these companies.  And so
17   when the money from investors came into him, because the
18   money didn't go to Bill, it went to Kent, that money got
19   swished around between all these different accounts,
20   ultimately to pay a $2.1 million credit card.  That's money
21   laundering.  That's fraud.
22          Want to see another?  DSPF Group.  This is the one
23   that was run by Daryl Bank.  And it was designed to pay off
24   disgruntled investors of DSPF, which is pretty terrible.
25   You're offloading a franchise on an unsuspecting person.
```

───────Closing Argument - By Ms. McCaslin───────

1   Bill wasn't part of DSPF Group at all.  He had no part in it,

2   and neither did his clients.

3           You know who did?  Tony Sellers.  But Tony Sellers

4   was so convinced in how smart of an idea DSPF is that he

5   invested $200,000 of his own money.  He was so convinced, but

6   eventually he realized that he made a mistake.  And when he

7   decided that he wanted out, he went to Daryl, and they made a

8   secretive plan to have somebody else buy his franchises.  And

9   that unfortunate person was one of Tom Barnett's clients.

10          You didn't hear much about Tom Barnett, but Tom

11  didn't originally know who his client was buying units from.

12  He didn't know it was Tony.  But Tony and Tom ended up on

13  this e-mail together.  And when Raeann and Daryl saw that

14  those two salesmen were on the e-mail together, they were

15  mad.  "You should not be airing this through the whole group.

16  Stop copying salesmen."

17          Daryl even lays out exactly why he doesn't want them

18  on the e-mail.  He doesn't want the sales force to know that

19  a top salesman is liquidating.  And Raeann testified that

20  even after this, there was no mention of any of this on the

21  DSPF calls, on the memos, nothing, which is just the way they

22  wanted it.

23          Bill and the other salesmen were not included, and

24  they weren't on any of these e-mails.  Bill wasn't.  Keeping

25  the salesmen in the dark, just like the investors, was

─────Closing Argument - By Ms. McCaslin─────

1    critical to continuing the fraud.

2         Now, beyond that, Tony had a lot of other regulatory

3    issues that you heard about.  He had been notified by the

4    State of Idaho about some of his prior activities, got

5    notified by DSPF -- or because of DSPF, and then got notified

6    again because of Lincoln Spectrum.

7         And instead of closing down, he contacted Daryl and

8    Kent and just started Prime Spectrum up.  They effectively

9    evaded law enforcement and obstructed justice.  That is

10   fraud, and all that talk about Tony asked Daryl to hide his

11   30 percent commissions so that it didn't come out in his

12   divorce proceedings.

13        None of those facts exist for Bill.  Bill has never

14   been in trouble with any of the regulators, not FINRA, not

15   the states.  And you've heard from clients who checked out

16   Bill on the Better Business Bureau before they went to him,

17   before they went to get advice from him, and they were

18   pleased with what they saw.

19        The government wants you to believe that because

20   Tony Sellers was part of it and he was a salesman, Bill must

21   be too.  But it doesn't work that way.

22        One more conspiracy that is proven beyond a

23   reasonable doubt:

24        The money move sheets.  Raeann Gibson and Daryl

25   Bank, they're fraudsters, they're not fools.  They know

———Closing Argument - By Ms. McCaslin———

1   exactly what they're doing.  And Doug Dunn testified that
2   those two were joined at the hip.  Daryl would just scribble
3   on a piece of paper how to divide up the investor money, and
4   then Raeann would carry it out.  They were literal partners
5   in crime.
6          But Raeann also said that no one else had access to
7   these money move sheets.  Doug Dunn didn't, and he worked for
8   Dominion.  And Raeann said that she never spoke up about the
9   money move sheets or the accounts publicly until she
10  testified against Daryl in April 2021.
11         She also didn't speak up until that trial about the
12  10- and $20,000 watches he was buying, the money that was
13  just getting sent to he and his wife's bank account, and that
14  $25,000 dog.
15         In fact, Dominion's accounting was covered up so
16  well that an independent accountant came in in 2015, and he
17  thought that he had access to all of the accounts, and he
18  found no evidence of fraud.
19         Bill didn't have access to the money move sheets or
20  the bank accounts.  He didn't have one of Daryl's credit
21  cards, and he didn't know the inner workings of Dominion, and
22  there isn't a single e-mail that shows otherwise.
23         And that's important because Daryl and Raeann
24  documented their fraud.  They kept it between the two of
25  them, but it was well-documented.  It's all over the e-mails,

———Closing Argument - By Ms. McCaslin———

1   all these spreadsheets.  They were not discreet.  And Bill

2   isn't on a single one.  He wasn't in Daryl's inner circle.

3   He was the fool that they needed, though.

4           Now, because that evidence does not exist for Bill,

5   the government is reaching out for other things to try to

6   show you conspiracy, to try to show you fraud, like Bill's

7   bankruptcy.  This is not evidence of fraud or conspiracy.

8   Granted it is not his finest moment.  I do not disagree with

9   that.  You're also watching a man's life fall apart, a man

10  who hasn't yet realized how badly he's been taken advantage

11  of.

12          After working as an insurance salesman since the

13  '70s, he gets indicted in federal court, arrested, sued,

14  bankrupt, closed up shop, and is about to lose everything.

15  And to add insult to injury, he's being accused of being a

16  liar.  He did not react well.  He's clearly upset.  He's

17  trying to keep himself calm at times.  He's laughing

18  inappropriately.  He's blaming the government and lawyers.

19          But Bill isn't reading a statement.  He isn't

20  writing an e-mail.  He's speaking off the cuff, getting all

21  the dates wrong.  And he's feeling attacked, and he is upset

22  about not just his damages but his innocent clients.  Bill is

23  not saying that he's a victim, but he was fooled, and he's

24  upset about his clients.

25          (Audio played in open court.)

1          MS. McCASLIN:  Now, remember the timing of this.

2    This was in 2019.  Raeann didn't testify about all the money

3    move sheets and the money being pocketed until April 2021, so

4    there's still a lot that has not come out yet.

5          And you've heard from numerous people that Bill

6    thought that there was a government witch hunt against Daryl.

7    Take one guess where he got that idea from.  But it wasn't

8    just Bill's clients who said that.  Doug Dunn said that Bill

9    believed that there was a witch hunt against Daryl.  He's not

10   selling anything to Doug.

11         And that situation is actually interesting because

12   you have Doug on one side and Daryl on the other, and Doug is

13   telling Bill, "Don't trust Daryl, not trustworthy."  But

14   nobody knows about the money move sheets yet.

15         And then you have Daryl on the other side telling

16   everybody that Doug just up and left, left the business one

17   day, he stole property from Daryl, he stole money from Daryl.

18   Daryl is suing him publicly.  And so when both of them are

19   telling Bill don't trust the other, he believed Daryl, and he

20   chose wrong.  But choosing wrong doesn't mean it's fraud.  It

21   makes him a fool.

22         And the thing is it's easy for the government to

23   look at all this now and say he must have known.  And you've

24   seen in the bankruptcy a guy who is closing up his business,

25   who is shredding copies of old files, even though every

————Closing Argument - By Ms. McCaslin————

1   meaningful document in this case has pretty much been an

2   electronic document or an e-mail because that's today's

3   world.  So don't let the government turn that into something

4   that it's not.

5           To show guilt beyond a reasonable doubt there needs

6   to be evidence, not just victims.  Show me one e-mail that

7   shows that Bill knew what was going on.  We've seen that for

8   Kent.  You've seen it for Daryl.  You've seen it for Raeann.

9   You've seen it for Tony.  Where is Bill's?

10          And the government wants you to believe that it's

11  impossible for Bill to have fallen for all of this and that

12  only the other unsophisticated people could have fallen for

13  this.  And that's just not true.

14          First of all, Bill is selling to people his age.

15  They're his peer group.  Second of all, let's look at some of

16  the investors that you saw in this very trial.

17          Jeffrey Browne, radio broadcast engineer,

18  constructed radio stations, leased space on the towers to

19  cell phone providers.  He talked to the radio engineers that

20  he worked with who agreed that this sounded good.

21          Do you really think that Bill knows more about radio

22  engineering than Jeffrey Browne?

23          Barbara Russell, she testified pretty early on in

24  this case.  She did economic analysis for 30 years for the

25  federal government in D.C.  She is a sharp woman.

2455

——————Closing Argument - By Ms. McCaslin——————

1          Kyle Gerek, also very early on in the trial, young

2     guy, real estate broker.  I asked him if Daryl was

3     persuasive, and he said, "Oh, yeah."

4          Denise Brown, she actually testified for BayPort

5     Credit Union, but she also testified that she bought an

6     annuity through Daryl, and she opened up all those accounts

7     for him, and she knows him from the banking world, and she

8     still got pulled into this.

9          You have Ray Martin, an accountant who works in

10    taxes, also commercial real estate.  He has a bachelor's

11    degree in business.

12         Rosie Eads spent her career as an insurance

13    underwriter, which means she literally evaluates risk for

14    business.  And her husband owns a business.

15         Jacob Kurtz owns a couple of small businesses.  His

16    wife worked in financial services.  He previously invested in

17    Roths, IRAs, stocks, real estate.

18         Wilfried Berndt is a risk management consultant.

19         Andrea Tottossy has a Ph.D., and she said, "I'm

20    astonished that I fell for it."  And she was working with

21    Daryl and Roger Hudspeth.  She said it's pretty

22    extraordinary.

23         These are smart people, and they were given the same

24    marketing materials and the same information, the same

25    message as Bill.

———Closing Argument - By Ms. McCaslin———

1          Now, the government wants you to think that Dazzle

2    and DSPF are basically one and the same, a repeat, and that

3    Xcel is just another spectrum deal.  That's not quite

4    accurate.

5          So let's start with dental.  Dazzle had

6    brick-and-mortar dental buildings.  They had dental offices

7    with dentists, with orthodontists, all in one place.  And

8    MetroMedia did provide patients for Dazzle, and they

9    apparently did very well.  Dazzle failed.  But also consider

10   that it failed before DSPF; so around 2009.

11         You've heard throughout this trial what happened in

12   2009.  That was the economic collapse.  People lost a lot of

13   money.  People lost property, businesses.  It was a hard time

14   for a lot of people.

15         But what if you focused purely on what worked well

16   in Dazzle?  You focus on getting patients, and you get rid of

17   the real estate.  You get rid of the buildings, all the

18   overhead, and you use MetroMedia's successful track record of

19   getting patients but helping existing dentists with their

20   business so they can focus on the dentistry.  It's a good

21   idea.

22         And DSPF was relying on MetroMedia's numbers.  Dee

23   Pinkston told you that too.  19,000 patients for three

24   corporate dental practices.  And on top of that, you have new

25   leadership.  You do have Kent Maerki.  He was not part of

```
                    ─────Closing Argument - By Ms. McCaslin─────
```

 1   Dazzle.

 2           And he comes in to create this new business with the

 3   patients -- the patient system that works.  And Kent Maerki,

 4   who is supposedly known for franchising SuperShuttle, who is

 5   known for raising $75 million for spectrum in the '80s that's

 6   now worth 3.6 billion -- this guy knows business.  That was

 7   the reputation.

 8           He knows how to build franchises, and he's bringing

 9   in Shelton & Power, a law firm that specializes in

10   franchises.  This isn't a Dazzle repeat.  This is a new

11   business model that leverages the piece that worked before.

12   They're not the same.

13           Now, the salesmen believed in DSPF so much that Tony

14   bought $200,000 worth.  Raeann bought -- her parents bought

15   $40,000 worth.  And you heard from Bobby Jones and Aaron

16   Bobkin.  They were also salesmen.  They also invested

17   $20,000.  And they weren't the only ones.

18           And that's because the messaging coming out of DSPF

19   to both the salesmen and the clients was tightly controlled.

20   The message to the salesmen is that DSPF is going to be a

21   success, it is going to make a lot of money.  He made

22   believers out of the salesmen.  And you can see that in Smith

23   Exhibits 1 and 2.

24           DSPF employees had strict rules about talking to the

25   salesmen.  The only acceptable answer was the one that Kent

Closing Argument - By Ms. McCaslin

1    wanted.  Kent was very worried about damaging this delicate

2    formula by having an employee tell the truth about DSPF.

3    That didn't align with Kent's master plan, to the point where

4    they weren't supposed to answer questions at all unless it

5    was Kent's rehearsed answer.  And he explicitly tells you in

6    Smith 2, "Any insider info is the wrong answer."

7            This was designed to create a pervasive message

8    across all of DSPF, all the salesmen, all the investors, that

9    this was destined to be a big success, and you are lucky to

10   get in on the ground floor.

11           Terence, Dee, described Maerki as a master

12   puppeteer.  And Sunshine Grissom told you how she always

13   checked with Kent before she gave an answer on the phone.

14   And she worked there for years up until near the end.  And

15   she believed what she was saying because she believed Kent.

16   She wasn't intentionally lying.

17           And so when Rosie Eads called Bill to ask about when

18   income was going to start for DSPF, he says, "Oh, just be

19   patient with DSPF.  The money is going to start coming."  And

20   she's not satisfied with that, so she calls DSPF

21   headquarters, and they tell her, "Oh, just be patient.

22   You're going to be getting a big check soon."  Bill is being

23   told the exact same thing as the investors.

24           Smith 1 and 2, they're not about how to convince

25   clients to invest.  It's about how to keep the salesmen

—Closing Argument - By Ms. McCaslin—

1    believing in it, and these rules wouldn't be necessary if the

2    salesmen were part of the conspiracy.

3          Now, Dee Pinkston worked at DSPF headquarters.  He

4    worked with Kent Maerki every day.  And he believed in this.

5    He had far more access to the insider information that

6    everybody else was shut out of.  He had far more access to

7    Kent Maerki on a daily basis.

8          And Kent made sure that this positive messaging even

9    enveloped the struggles, because towards the end of 2012,

10   you've all heard that they were going to be bringing on David

11   Bailey.

12         And Dee told you he is impressive, he's met him, he

13   went to his offices, they have screens everywhere, it looks

14   like Wall Street.  And he's supposedly responsible for

15   Match.com, Ticketmaster.com.

16         And everything from Kent reinforced that David

17   Bailey is a computer whiz and he is the solution.  And with

18   DSPF franchise supposedly in the top 1 percent of all

19   franchises, things looked good.

20         Because, yeah, new businesses are going to have

21   obstacles.  Every business has obstacles.  But if you trust

22   the person in charge who has a lot of business experience,

23   who can get ahead of these obstacles and focus on the

24   solutions, it looks like a company that is being transparent,

25   proactive, and is trustworthy by just acknowledging a bit of

1    the struggle.

2          Now, you've heard that there were weekly calls

3    between 2011 and 2014, so about three years.  I believe the

4    government has entered four of those calls into evidence.

5    Two of them are from the end of 2013, October, November; and

6    the other two are in April and May of 2014, so just shortly

7    before Kent decides to shelve DSPF.

8          But Bill stopped selling DSPF in early 2013.  This

9    was long before Tony Sellers sold his units.  This is before

10   Tony Sellers stopped selling.  This was shortly after Dee

11   Pinkston left.  And throughout this whole time, the messaging

12   coming out of headquarters is that everything is going to be

13   great.

14         And just look what happened when Terence questioned

15   Kent Maerki once.  He wasn't just fired.  He was locked out

16   of everything, not told he was fired.  Nobody would call him

17   back.  He was just shut off.  And that makes sense because

18   Terence's questions might infect all the people who believe

19   Kent, so you need to cut him out quickly.

20         His con artists need fools, and this con doesn't

21   work without the salesmen believing that this is legit.

22         Now, I want to switch gears a bit and talk about

23   spectrum.  You all know that Kent Maerki touts himself as an

24   expert and an icon.  You can hear it from him.

25         (Audio played in open court.)

─────Closing Argument - By Ms. McCaslin─────

1          MS. McCASLIN:  He is even in two books about

2     cellular.

3               (Audio played in open court.)

4          MS. McCASLIN:  Kent's expertise is all over these

5     marketing materials, all of which came from Janus.  You heard

6     that from Raeann.  All the language came from them.  But it's

7     not just Kent Maerki who is holding himself out to be an

8     expert.  He's surrounding himself with people who

9     legitimately are experts in the spectrum field.

10          You don't need to read all of this.  I know you've

11     seen it before.  But look at Tripp Forrest.  He was in charge

12     of the entire state of Florida's radio system for law

13     enforcement.  They rely on that system every day.  It was

14     800 megahertz.  Tripp knows what he's doing.

15          You have Peter Lewis.  He was setting up

16     communications in foreign countries when the President

17     landed.  That was his job in the United States Army.  And

18     since he left the Army, he has consulted with the U.S. Army,

19     with the FAA, and various other federal agencies.  He was a

20     founder of the very first cell phone company.  Peter Lewis is

21     impressive, and he is well connected in D.C.

22          And of course you have Alan Tilles.  You didn't meet

23     him, but he's an attorney who specializes in spectrum.

24          They were touted in all of the written materials.

25     And Janus had Forrest -- Tripp Forrest and Peter Lewis make

─────Closing Argument - By Ms. McCaslin─────

1   appearances at conferences, which lends credibility to Kent.

2   It lends credibility to everything that they're saying, even

3   if it's completely wrong, because they are surrounded by

4   legitimate people.  But these experts had told Kent Maerki

5   and David Alcorn that the licenses couldn't be leased back to

6   Sprint, couldn't be used for broadband.

7          You have Alan Tilles.  "There's no spectrum below

8   861 megahertz that can be used for broadband."  He's talking

9   about these frequencies.  "Not a chance."  "Could I have been

10  more clear?"

11         Tripp Forrest told them that it can't be leased back

12  to Sprint because old wounds need to heal first.

13         And then there's Peter Lewis.  He is very clear that

14  you can't aggregate those frequencies, and the major carriers

15  aren't going to want them.

16         But this wasn't the message that was going to the

17  salesmen and to the investors.  Bill isn't on any of these

18  e-mails.  These are between attorney, the experts, and Kent

19  and David.

20         And so when you have Ray Martin who talks to Bill

21  and heard that the first round went well, consider the timing

22  of that.  That's in June 2013.  Right around the time of the

23  Napa conference.  And Tripp Forrest told you that they had

24  just gotten their first round of licenses, the applications

25  went well.  He got nearly everything that he applied for.

———Closing Argument - By Ms. McCaslin———

1    And they were really excited about that.

2           But all of this was hidden from the salesmen and the

3    investors, like Susan Newell, because the exact opposite was

4    told to them in public.

5           On top of that, they were told, even in 2014, even

6    in September when the Newells went to Mr. Alcorn's house,

7    that these could still be leased back to Sprint, the major

8    carriers still want them.

9           (Audio played in open court.)

10          MS. McCASLIN:  Now, at that D.C. conference, Susan

11   Newell took very good notes.  Go take a look at those.  And

12   Peter Lewis was talking about Internet of Things and other

13   ways to monetize, but her notes are also very clear that

14   Sprint and other providers are still going to want these

15   frequencies, and they're all told that the experts cannot be

16   contacted by the salesmen and by the investors.

17          But it's not the only thing that got covered up; the

18   SEC investigation did too.  But they knew the truth about the

19   SEC investigation.  Daryl Bank says right here, "It's

20   supposedly a general inquiry.  I think it's way off base."

21          And they hid the truth from the Newells and Bill at

22   both of the conferences and at the September meeting with the

23   Newells that the Newells requested.  And all that time, the

24   attorneys for Janus were telling them to stop taking any more

25   clients, completely cease operations, it needs to stop now.

─────Closing Argument - By Ms. McCaslin─────

1   And the salesmen and the investors weren't told any of that,

2   and Bill is not on a single one of those e-mails.

3         Susan Newell testified that she knew about the SEC

4   investigation, but she was also told that there was no

5   allegations of wrongdoing, that the business is going to

6   remain uninterrupted, routine inquiry.  And since the

7   investigations aren't public, there's not really anything

8   else to go on.  They were told at D.C. that the SEC inquiry

9   is probably about over.  But it's a nonpublic fact-finding

10  inquiry, so nobody could verify.

11        And even so, the SEC investigates regulatory

12  violations, not criminal prosecutions, right?  So if there's

13  a problem, people might need to change some of their forms,

14  some of their documents; they might get fined; they might

15  lose a license.  Maybe nothing happens at all.  But we are

16  dealing here with a civil regulatory matter with, according

17  to them, a fact-finding inquiry.

18        Now, the Newells also knew about Janus's bankruptcy.

19  And you have heard from the bankruptcy attorney that it was

20  called a reorganization, it wouldn't affect monetization.

21  And so Susan Newell and her husband and her friends, they

22  knew about the SEC investigation, they knew about the

23  bankruptcy, and they invested yet again in July of 2014,

24  believing still that these licenses could be leased back to

25  major carriers.

Closing Argument - By Ms. McCaslin

1          And then in 2015, in April, the SEC complaint was
2     publicly filed.  Now, the government argues that at this
3     point, Bill should be on notice because this is public.  But
4     within two months of that being filed, Bill had stopped
5     selling.  His last Spectrum 100 sale is in June 2015.
6          But Bill isn't on this SEC complaint at all.  None
7     of those entities are his, so this complaint wouldn't have
8     been served on him.  So who would have told him about it?
9     Who would have told him about it the day it came out?
10          Janus hasn't been very forthcoming with information
11     yet, and unless there's some big announcement or there's some
12     indication that a complaint is about to be filed soon, why
13     would Bill go look at the public records in the federal
14     district court of Arizona for a possible SEC complaint?  It's
15     just not realistic.
16          And then you go to the push-to-talk systems.  Now,
17     the issue with the whole SEC complaint was that these
18     licenses couldn't be leased back to Sprint, and that is
19     completely true.  Licenses need to be put to use.  You can't
20     just sit on them.  And push-to-talk is a legitimate use of
21     800 megahertz.
22          The government wants you to think that Xcel was just
23     another spectrum investment like the others, trying to get
24     frequencies.  And that's not true.  Xcel had a real system in
25     Texas with real towers.  And Raeann told you Bill went down

2466

———Closing Argument - By Ms. McCaslin———

1  to Texas.  He did the due diligence.  He went and saw the

2  system.  He went and met the people involved.  They had

3  customers on the system.  He checked it out.

4         And Bill's client Jeffrey Browne, he invested in

5  both Xcel and Western.  He knew Western Spectrum wasn't going

6  to be any time soon, that it was going to be further into the

7  future, but for a bit, Mr. Browne was earning income on Xcel.

8  He testified that he received checks for $300, $600, $1,200.

9  And if that had continued, that could have been a good

10 investment.

11        But it was run by Daryl Bank.  Daryl Bank obviously

12 got arrested.  But even on top of that, no business is going

13 to be successful when the owner is taking 40 to 60 percent

14 off the top for his own pockets.  It's just not going to

15 work.  But imagine, if all that money was going into this

16 Texas system, this could have been good.

17        And the thing is is that the Newells decide to do

18 essentially the same thing.  They did their due diligence

19 before getting into push-to-talk.  They researched it.  And

20 apart from the licenses, they spent hundreds of thousands of

21 dollars on this push-to-talk network.  That's not a Hail

22 Mary.  You don't drop that kind of money unless you believe

23 this is going to work.

24        But Susan and Craig Newell, of course, aren't

25 charged here today.  They're not charged with fraud and

2467

─────Closing Argument - By Ms. McCaslin─────

 1   conspiracy.  Did they commit fraud?  They did their research.
 2   They reviewed the same materials as Bill.  They recruited
 3   their family.  They recruited their friends.  They
 4   recommended they invest, and they did, to almost $1 million
 5   for the licenses alone.
 6          Did Susan commit fraud?  Of course not.  Nobody
 7   thinks that Susan and Craig committed fraud, because she
 8   didn't know that the information that she was passing on was
 9   false.  Her friends lost a lot of money.  Her family lost a
10   lot of money, but that still doesn't make it fraud because
11   she didn't know that the licenses couldn't be leased back to
12   Sprint.  She believed they could.
13          Now, the government is also essentially arguing or
14   is going to probably get a chance to argue why the Newells
15   and Bill are very different from each other.  So I do want to
16   talk about three ways that they could be different from each
17   other, but they're not.
18          The first one is income and commissions.  You have
19   all of Bill's bank records, every single cent.  Every penny
20   he spent at Burger King and fast food, you'll see it, just
21   like the rest of us.
22          If you look at his primary business account, you'll
23   see that the money is going to paying the radio station for
24   his radio show, paying for the rental space, paying his
25   part-time employee John Kennedy, paying FedEx bills.

Carol L. Naughton, Official Court Reporter

─────Closing Argument - By Ms. McCaslin─────

1          And if you look at the money coming in, the
2   government showed you that there was around $700,000 from
3   Shelton & Power, and the government said that that was all
4   from Western, and there is no evidence of that.  None.
5          Go look at the documents, Government's Exhibit 1203
6   and 1204.  He's getting commissions or money from Shelton &
7   Power.  It doesn't say that's from Western.  And remember,
8   what the attorneys say is not evidence.
9          Now, when you look at his personal account, this is
10  the Golden Credit Union account.  Bill is self-employed.  So
11  a lot of us have taxes taken out of our paycheck every week
12  or every other week, and we might have health care expenses
13  taken out, and it's a little bit at a time so when tax season
14  comes around, you don't have this giant bill.
15         Bill, though, works for himself, and so he needs to
16  save up all of those taxes to make bulk payments, and so you
17  see he's paying the U.S. Treasury a lot, Franchise Tax Board,
18  and the City of Roseville, which is probably local taxes, and
19  health care because he doesn't have an employer helping him
20  with that.
21         These are four major expenses that most people who
22  have that kind of every-other-week paycheck -- it's going to
23  be taken care of by the job.  A large amount of his money
24  also went to pay the mortgage, and almost $100,000 got paid
25  to his church, donated to his church.

─────Closing Argument - By Ms. McCaslin─────

1          You've heard a lot in this trial about how Bill
2     talks about God and Jesus Christ and his faith.  You've also
3     heard from Tony Sellers who agreed that Bill is deeply
4     religious.  And that's not just a front.  It's not just lip
5     service.  He's tithing almost $100,000 in just a few years'
6     time.  This is a major part of his life.
7          Now, did Bill make more money than a lot of us?
8     Yeah.  Sure.  But if he had lived in a palace like Mr. Maerki
9     or Mr. Alcorn, you would have seen pictures.  And you've
10     heard about his office.  It's a little office with a desk and
11     a couple chairs, nothing fancy.  And who knows how long he's
12     had that setup for.
13          But the government has issues with the commissions.
14     Of course Bill gets commissions.  He works in sales.  Most of
15     his clients agree that, yeah, they expected Bill to get a
16     commission from the company.
17          And Tony Sellers testified about how commissions
18     work in the financial industry.  He said that for most of his
19     career, he worked in annuities, just like Bill, and that the
20     commissions were typically around 8 percent, 10 percent,
21     could go as high, but rarely, as 15 percent.
22          Now, at DSPF, Tony also testified that the
23     commissions started at 8 percent.  And when you sell ten
24     units, it bumps up to 10 percent.
25          So if Bill stuck with annuities, he's going to be

─────Closing Argument - By Ms. McCaslin─────

1    making the same amount, right?  The government is arguing

2    that he's making tons more money with these investments, but

3    he's making the same commission on annuities.  So why would

4    he risk everything for something that he knows to be false if

5    he knows that these investments aren't real?

6          Now, at Spectrum 100, Bill earned 12 percent.  And

7    you'll have access to that sheet.  At the top of the sheet

8    for some reason, it does say 17 percent, but if you look at

9    the actual numbers, on an investment for $100,000, Bill made

10   12,000.  That's 12 percent.  $25,000 investment, he made 3-.

11   He's making a flat 12 percent across the board.

12         It's a decent commission, but it's not outlandish.

13   It's not the 30 percent that Tony Sellers is making on Prime

14   Spectrum while he's evading law enforcement.  And remember

15   that with Prime Spectrum, Tony said that he could get a

16   higher commission up front, or he could get 20 percent on the

17   back end.  Right?

18         Obviously Tony chose the much higher commission up

19   front, but according to documents for Western Spectrum, the

20   documents show that Bill chose the 20 percent stake of future

21   revenues.  And this is the only evidence that you ever saw

22   about any compensation for Western.  There's no real

23   testimony about it.

24         Now, I want you for just a moment to consider the

25   commissions from Bill's perspective only, forgetting

──────Closing Argument - By Ms. McCaslin──────

1  everything that is going on in the background that we all

2  know exists now.

3          Bill's client decides to invest in DSPF.  They send

4  the money to Kent, not to him, to Kent.  And then at some

5  point later, Bill gets a check in the mail from DSPF, from

6  the business account, with his commission.

7          Mr. Gulcher testified early on in this trial how

8  commissions and the flow of money works for annuities, the

9  super-safe annuities.  And he said that the client sends the

10  money to the insurance company, and the insurance company

11  sends a commission to the salesman.

12          They look exactly the same.  Why would a salesman

13  think that these commissions are any different?  And how

14  would it look any different than Mr. Eads getting a

15  commission from the store where he sold an RV?  Because he

16  used to get paid on commissions too.  They wouldn't look any

17  different.

18          So that was income and commissions.  The second way

19  that the Newells and Bill might be distinguished is the

20  history, the history of the investments.

21          The government will probably argue that Bill's

22  involvement in DSPF puts him in a very different category

23  than the Newells, but that also makes it sound like dental

24  and spectrum were happening sequentially.  And they're not.

25  They're happening at the same time.  They're both being sold

─────Closing Argument - By Ms. McCaslin─────

1    between 2011 and 2014.  Kent Maerki is involved in both.

2          And by the time that DSPF fails in August 2014, Kent

3    Maerki is already out of Janus.  David has already bought him

4    out.  So even if somebody is concerned about Kent because of

5    the DSPF failure, Kent's out of the spectrum.  And so the

6    Newells and Bill and other people stick with it.

7          And we know now that the Arizona Corporation

8    Commission started investigating DSPF in 2012.  The thing is

9    there's not a single e-mail or memo or call that discusses

10   this investigation.  For spectrum, they downplayed it.  For

11   DSPF, you hear nothing.  And the only subpoenas that got sent

12   out were for Kent Maerki and his wife.

13         And Mr. Clapper, the investigator with the Arizona

14   Corporation Commission, testified that he did not shut down

15   DSPF.  Kent did that on his own.  He did not contact the

16   salesmen.  He didn't contact Bill.  He didn't notify Bill.

17         So when Bill testified at that hearing, that was in

18   2015, it was two years after Bill stopped selling DSPF.  And

19   there's still a lot that Bill doesn't know at that time about

20   Kent Maerki.  And we'll still get to that.

21         Now, the differences between Susan Newell and Bill

22   Smith for the spectrum and push-to-talk.  There's no

23   meaningful difference between them here.  Susan Newell

24   actually started investing in spectrum in 2011, or earlier if

25   you consider SmartCOMM.  And so she was investing in spectrum

```
─────Closing Argument - By Ms. McCaslin─────
```

1   for a couple years before Bill got involved.

2          But the salesmen and the investors were all told

3   that the number-one risk was time, because nobody can control

4   when the FCC is going to release these frequencies, so you

5   have to wait.  And so when things were delayed -- well, the

6   government delays things.

7          And Susan recruited her friends, her family, and

8   they created Air Apparent and a couple other pooled

9   investment groups, just like Spectrum 100, Janus Spectrum

10  Group, just like Western and Prime Spectrum.  And Susan was

11  in charge of these.  Air Apparent was actually one of the

12  earliest groups formed.

13         Now, Bill was part of Spectrum 100.  You have all

14  seen that.  Bill wasn't involved in Janus Spectrum Group.  He

15  wasn't involved in Prime Spectrum, obviously, because that

16  was just Tony Sellers.

17         And so Susan and Bill continue to believe that these

18  can all be leased back to Sprint, and that's happening

19  throughout 2014.  Susan is still investing.  And so they

20  really don't figure out they can't until mid-2015, and it's

21  only then that they realize that the investment failed when

22  it really had failed from the very beginning, but they didn't

23  have the information to know that.

24         And that's when they get involved in the

25  push-to-talk.  The Newells got involved with RapidLink

———Closing Argument - By Ms. McCaslin———

1   Wireless.  Bill got involved in Xcel and Western Spectrum 2,

2   which also worked with RapidLink Wireless.

3         So if the government is saying that Bill is on

4   notice because his clients weren't getting money yet and that

5   makes it fraud, explain the Newells.  How are the Newells

6   different?  They keep putting in money based on what they're

7   being told.

8         And then we come to due diligence.  Susan and her

9   husband Craig and their friend Charlie West flew to Arizona

10  to meet with Kent and David very early on.  They reviewed

11  documents.  They got this pro forma.  Susan even sent it back

12  requesting additional information about what all these

13  numbers are.  Because they own tax franchises, Susan is not

14  going to be afraid of some numbers.  She is very

15  detail-oriented.

16        And she provided these same materials to friends,

17  recommending that they invest, and she didn't just take

18  Janus's word for it.  She looked into it herself.  They even

19  had a written side agreement with Janus because Susan knows

20  to get things in writing.

21        And Bill went to Texas to check out the system.  Why

22  would you do that if you think it's all fake?  The government

23  argues that Bill should have known because the FCC documents

24  were public record like all FCC documents.

25        But we also heard from Susan Newell and George

─────Closing Argument - By Ms. McCaslin─────

1   Cushman that they looked for this information online and
2   either didn't see it or didn't understand it.  They didn't
3   remember seeing this.
4          So if it's public and if it's that easy to find and
5   it's that easy to understand, you would think the Newells
6   would have read it.  They have every incentive to understand
7   what is going on here because they have a million dollars
8   invested amongst them and their friends.  But they relied on
9   information from David and Kent.
10          Even Mr. Alcorn's SEC attorney, Alan Baskin, who you
11   guys did see here, he didn't look up the FCC notices when
12   they had questions about spectrum.  He asked David, or he
13   asked Alan Tilles, the other attorney.
14          Now, we put a couple of the FCC notices into
15   evidence.  They are Smith 1009, Smith 65, and Alcorn 1.
16          You don't have to read them, because you obviously
17   understand spectrum from all the witnesses so far, but go
18   take a look at them.  You are not going to see some simple
19   analogy about superhighways and bike paths.  These are
20   complicated documents.  Imagine that an engineer and an
21   attorney get together to write a document.  Good luck.  Take
22   a look at them.
23          Now, Susan and Craig Newell owned 20 tax franchises,
24   Jackson Hewitt.  They have run them for 25 years.  They have
25   200 employees.  Craig has an MBA from Stanford.

2476

———Closing Argument - By Ms. McCaslin———

 1            And then there's Bill, an insurance salesman since
 2    the 1970s, who apparently passed a multiple-choice exam in
 3    1993 with maybe a C minus, failed a Series 65 twice and never
 4    passed, falls out of his chair occasionally.
 5            Do you really think that if the Newells didn't
 6    figure it out, that Bill must have, should have, had to have
 7    figured it out before the Newells, before the Stanford MBA?
 8    No.  Because this is tough stuff, and they trusted David,
 9    they trusted Kent.
10            Even George Cushman, he was a CEO of multiple
11    companies.  He did not pick up on this.  Daryl Bank and Kent
12    Maerki also lied about their backgrounds.  Andrea Tottossy,
13    the one with the Ph.D., she bought DSPF and spectrum from
14    Daryl and Roger.
15            She actually got a phone call from FINRA saying
16    there's a problem with FINRA and Daryl Bank, and so she
17    called Daryl and Roger and talked to them, and she was
18    satisfied with the answer she got.  And it's not her fault.
19    Of course it's not her fault.  She trusted them.
20            And Raeann agreed that the story that they told
21    people about Daryl and FINRA was that he was a whistleblower.
22    And Doug Dunn said that in Daryl's story, he's the hero.
23    Many people believed him.  Many very smart people believed
24    him, because Daryl is that good of a con artist.
25            Now, as for Kent being a spectrum expert, that story

2477

──────Closing Argument - By Ms. McCaslin──────

1     about how much money he raised and he's an icon, he

2     conveniently leaves out that that is why he got banned from

3     the FTC.  He got a permanent injunction issued against him

4     for that activity in the '80s with Spectra.

5           It takes a special kind of fraudster to boast about

6     that big of a failure, to make it sound like it is the height

7     of your business success.  But it works.  With his name

8     written in two books, who's going to dig too much?  Tony

9     Sellers kind of checked it out and ended up investing $75,000

10    into spectrum.

11          And it's not just the individuals who got tricked by

12    Kent Maerki.  This came out in the trial, but probably not

13    very explicitly.  DSPF was approved in California to be sold

14    as a franchise and in Virginia.  These are Smith's

15    Exhibits 30 and 32.

16          The documents show that Kent is the owner and

17    principal of DSPF.  Virginia checked the audited financial

18    documents for DSPF.  And you'll see in some of these

19    documents they ask for a lot more information.  They got

20    really nit-picky, and they asked Shelton & Power to provide

21    additional information on lots of little points.  This isn't

22    a rubber stamp.

23          And you heard from Raeann, DSPF was approved every

24    year in the State of Virginia until Kent shut it down.  And

25    the reason that this is important is because Arizona found

Carol L. Naughton, Official Court Reporter

────Closing Argument - By Ms. McCaslin────

1    out, figured out, that in the financial -- or the Franchise

2    Disclosure Document, which is submitted to the states, Kent

3    omitted his FINRA ban.  He didn't include it.  It just wasn't

4    there.

5          Eventually Arizona issued the cease-and-desist

6    because of it.  But Kent signed under oath, and these were

7    what we showed you during trial.  Kent swore under penalty of

8    law that the Franchise Disclosure Document was accurate and

9    those documents did not contain any material omissions.  He

10   committed perjury, and not just in Virginia.  They submitted

11   these to many states.

12         If Kent is going to commit perjury, why wouldn't he

13   lie to Bill?

14         And the government finds it ridiculous, though, that

15   Bill and the salesmen were actually bolstered by the idea

16   that these franchises were approved by states.  It was

17   approved by the State of California, by the Commonwealth of

18   Virginia.

19         But apparently they're also expecting a solo guy

20   with a solo office to dig further into DSPF and to Kent

21   Maerki's background than the state departments that are

22   designed to look into these franchises before approving them.

23         Now, I know that this is a sad and very frustrating

24   case.  A lot of people lost a lot of money that they worked

25   very hard for, and it shouldn't have happened.

———Closing Argument - By Ms. McCaslin———

 1           When you're listening to their testimony -- or when
 2    you did, I want you to remember, though, that everyone's
 3    memory is colored by additional information that they get
 4    over time, by information they have now.  They obviously know
 5    much more now than five or ten years ago.  And the specifics
 6    are going to be difficult to get right by memory from that
 7    long ago.  If you can barely remember a month ago, try eight
 8    years ago.
 9           And so when you have Ken Sykes, he was originally --
10    he originally contacted the government and told them that he
11    thinks he had been defrauded by Daryl Bank.  And after he
12    talked to the government was when that switched to "I've been
13    defrauded by Bill Smith," because the memory changes as you
14    gather more information.
15           And people remember Bill saying that he invested,
16    but how accurate is that because if Bill is telling people
17    that he personally invested in the DSPF franchises and then
18    gives them a document where all the franchisees are listed in
19    alphabetical order, according to state, and he's not in it,
20    why would he do that?  And why would it take ten years for
21    people to figure that out?
22           I'm not saying that the victims are lying.  I'm not
23    saying the investors are lying.  Memories are not perfect,
24    and they change as we gather more information.
25           And an example of that is, on direct examination

```
                    ─────Closing Argument - By Ms. McCaslin─────
 1   with the government, Mr. Sykes first said that Bill had
 2   $300,000 in spectrum.  But on cross-examination, when he had
 3   time and was asked to rethink about it, he agreed that Bill
 4   didn't say that he purchased it, he said that he had a stake
 5   in it.  Those aren't the same thing.
 6           Memories aren't perfect, especially when you are
 7   upset with the person who is sitting across from you, because
 8   Bill was the face of this for all these people.  He's the one
 9   sitting across from them at the desk.  Of course they're
10   upset with Bill.  Anybody would be.
11           And so in the last few minutes, I do want to just
12   talk about, briefly, the law.
13           The jury instructions are going to tell you that you
14   can't decide this case based on sympathy or speculation.  The
15   United States Constitution tells you that Bill is presumed
16   innocent of all charges.  That is the starting point.
17           And he remains innocent unless and until the
18   government can prove beyond a reasonable doubt otherwise.
19   And that is a high burden.  And it can't be done here,
20   because it doesn't matter what Bill knows now, or it doesn't
21   matter what we all know now, it doesn't matter how clear
22   everything is in hindsight.
23           What matters is what he knew then, just like it
24   matters what the Newells knew then.  And the two people that
25   the government called to testify who were part of the
```

1    conspiracy, Raeann Gibson and Tony Sellers, they really

2    didn't have anything to say about Bill.  There's no real

3    facts there.

4         Raeann mostly testified about Daryl and the bank

5    accounts and the money move sheets, and she said that Bill

6    didn't have access to any of that.  And there's not a single

7    e-mail with his name on.  Even Tony Sellers, who is on this,

8    who is involved, testified that Bill always had faith in

9    these.  He believed in them.  And that's the key difference

10   between a fraudster and a fool.

11        You're going to hear the elements of the crimes, and

12   those are very important, but a lot of what this case comes

13   down to is intent.  To convict for wire fraud or conspiracy,

14   he had to do it deliberately.  And for conspiracy, the

15   government has to prove that Bill knew the purpose of the

16   conspiracy and deliberately joined it.

17        And you're going to hear that mere similarity of

18   conduct and the fact that they may have associated with each

19   other is not enough to prove that someone is a conspirator.

20        You're also going to hear from the judge that in

21   order to commit fraud it has to be done willfully,

22   intentionally, deliberately.  It's not a fraud if it was done

23   accidentally or carelessly or mistakenly, just like the

24   Newells.

25        You're going to hear about deliberate ignorance.

─────Closing Argument - By Ms. McCaslin─────

1    That's when a person deliberately avoids certain information.

2    It's not he should have known.  That's hindsight.  It's

3    always easier to see things after the fact.  Deliberate

4    ignorance requires a person to intentionally prevent learning

5    information.  It still requires intent, not poor judgment.

6        Guilt cannot be found from a belief and an

7    inaccurate proposition.  You're going to hear that from the

8    judge.  And that's just a fancier way of saying just because

9    you're a fool, it doesn't make you a fraudster.

10       Now, I know this has been a very long three weeks

11   for everybody, but these three weeks have also been really

12   important to Bill.  This is an important event in his life,

13   and obviously, in a criminal prosecution, his liberty is at

14   stake.

15       And we've seen how attentive you all have been

16   listening to the witnesses and looking at all the exhibits on

17   the screen, and we really appreciate how attentive you have

18   been in this case.

19       Now, when you go to deliberate, you're going to be

20   in a room with 11 other people who are still essentially

21   strangers, and I know it can be awkward and uncomfortable to

22   speak up, especially if you're going to disagree with them.

23       But each one of your voices is so important, and it

24   should be considered, because our jury system only works if

25   each person decides for themselves if the government has

─────Closing Argument - By Ms. McCaslin─────

1   proven each and every element of each and every charge and if

2   they've proven them beyond a reasonable doubt.  And after you

3   consider everything, you can maintain your opinion and your

4   decision, even if it's at odds with others.

5           Now, the government is going to have one more chance

6   to talk to you.  It's their burden, so they get the last

7   word.  While you're listening to the argument and while

8   you're in deliberations poring over your notes and all the

9   exhibits, just occasionally ask yourself what would Andrew

10  and Lindsay say to this?  Because at the end of the day, with

11  the many e-mails that you've seen, the forwards, the replies,

12  including confidential e-mails between client and attorneys,

13  there's not one that shows Bill knowing anything.

14          If David Alcorn or Kent Maerki or Daryl Bank or

15  Raeann Gibson had forwarded any of those e-mails that you've

16  seen to Bill, you better believe the government would have

17  shown it to you.  But there isn't, because Bill wasn't an

18  insider.  He was not part of the inner circle, because Bill

19  was a fool, a big fool, but not a fraudster.

20          And that's why we're asking you to return a verdict

21  of not guilty on all counts.  Thank you.

22          THE COURT:  Ladies and gentlemen, we're going to

23  take a 15-minute break before the government goes to rebuttal

24  argument.

25          (The jury exited the courtroom.)

```
                        Rebuttal Argument - By Ms. O'Boyle
 1              (Recess from 3:49 p.m. to 4:08 p.m.)

 2              (The jury entered the courtroom.)

 3              THE COURT:  Let the record reflect that all jurors

 4    are present in the courtroom.

 5              Does counsel concur?

 6              MS. O'BOYLE:  United States agrees.

 7              MR. YAROW:  Mr. Alcorn agrees, Your Honor.

 8              MS. McCASLIN:  Mr. Smith agrees.

 9              THE COURT:  All right.  Okay.  We're ready for

10    rebuttal argument.

11              MS. O'BOYLE:  Thank you, Your Honor.

12              May it please the Court, defense counsel, ladies and

13    gentlemen of the jury.  This case just got a whole lot easier

14    for you, and the reason why it got a whole lot easier is

15    because we've been here for three weeks, and there are a ton

16    of facts that are not disputed:

17              The victims were defrauded; DSPF never had a

18    five-year track record; DSPF was never going to produce

19    profits of between 40 to 60 percent or more; 800-megahertz

20    spectrum is not beachfront property; Sprint, Verizon, AT&T

21    were never ever options to monetize these licenses, and so on

22    and so forth.

23              And the wires are undisputed.  I'll put this up one

24    more time.  Mr. Bosse noted this in his opening argument.

25    You're about to get a mountain of paper, a mountain of
```

---
Rebuttal Argument - By Ms. O'Boyle
---

1   evidence.  And when you're looking for the specific wires in

2   those specific wire fraud counts, again, we've tried to make

3   it easy.

4          Count Seven relates to Exhibit 107A and the

5   stipulation that connects that fact is on Page 5 of

6   Exhibit 2000.  And if you go straight through, Count Eight is

7   1008A, Count Nine is 1009A.  The wires are undisputed, and

8   that's another fact that the government has to prove that

9   everyone agrees has been proven.

10          And you will also find mailings were not stipulated

11   to, but you'll see a ton of mailings, FedExes, things like

12   that, in the evidence once you get it.  All of those facts

13   have been proven.

14          So back there in the jury room, really, truly, the

15   only issue that you're going to have to resolve is were these

16   defendants victims, fools, dupes, or were they conspirators

17   involved in a nationwide fraud scheme that lasted, in

18   connection with Bill Smith, seven years.

19          The defendants have argued that they're fools, that

20   they're dupes, and that they were, in some sense, in a lot of

21   ways, they compare -- Mr. Smith in particular has compared

22   himself to the victims of this fraud.  And we'll deal with

23   Ms. Newell here in a minute.

24          But the judge is getting ready to, hopefully

25   tomorrow morning, give you some jury instructions, and

---
Rebuttal Argument - By Ms. O'Boyle
---

1   there's a jury instruction that relates to evidence, and, for

2   instance, direct and circumstantial.

3        Judge Jackson will tell you that you may make

4   deductions or reach conclusions which reason and common sense

5   lead you to draw from the facts which have been established

6   by the testimony and evidence in this case.  That means you

7   get to use good old-fashioned common sense when you go back

8   there in the jury room.

9        And so as I respond to some of the arguments that

10  defense counsel have made over the course of the day, I'm

11  going to ask you to think about what makes logical sense.

12  Were these defendants victims?  Were they dupes?  Were they

13  fools?  Or were they co-conspirators?

14        So let's talk about Mr. Bill Smith.  Was Mr. Smith a

15  naive victim in this fraud who, like a puppet, merely

16  repeated the lies that were fed to him, or was Bill Smith a

17  conspirator?  Did he lie to his clients for seven years,

18  reaping millions of dollars from unsuspecting victims?  And

19  again, we submit that Mr. Smith knew exactly what he was

20  doing over the course of seven years.

21        And I want to just go ahead and address really

22  quickly, because if I don't do it right now, I'm going to

23  keep going back to Mrs. Newell, and I don't want to do that

24  because it's a bit of a distraction, because defense counsel

25  for Mr. Smith focused a lot on her, and so let's just talk

—————Rebuttal Argument - By Ms. O'Boyle—————

1   about her real quick and get her out of the way.

2          Mrs. Newell was a victim in this case.  Mrs. Newell

3   did not hold herself out as a financial advisor with 40 years

4   of investment experience.  Bill Smith did.  Mrs. Newell did

5   not sell Dazzle Dental, $2 million worth to his clients, an

6   investment that completely failed.  Bill Smith did.

7   Ms. Newell did not sell DSPF franchises to many, many

8   unsuspecting clients.  Bill Smith did.

9          Ms. Newell did invest in Janus Spectrum.  Bill Smith

10  did not.  Bill Smith sold multiple different spectrum

11  investments to his clients.  Mrs. Newell does not have

12  clients.  Mrs. Newell did not take a single cent from Janus

13  Spectrum, Alcorn, Maerki, Bank -- anybody -- in connection

14  with the investments that her group made.

15         Mr. Alcorn offered to Craig Newell to give him a

16  commission.  He said no.  What he did was he negotiated a

17  lower rate for everybody that was involved in their

18  investment group.  That is completely and totally different

19  than what Bill Smith did for years upon years upon years.

20         And when the SEC filed a complaint against

21  Mr. Alcorn and Mr. Bank, Mrs. Newell had nothing to do with

22  them after that point, nothing at all.  Mr. Smith continued

23  to sell Mr. Bank's fraudulent investments.

24         Mrs. Newell paid another $300,000 to RapidLink in

25  the hopes of doing something with these fraudulent licenses

———Rebuttal Argument - By Ms. O'Boyle———

1   that Mr. Alcorn convinced her to buy.  That was their own

2   money.  Again, Mr. Smith did not invest a single cent in

3   RapidLink but, between 2016 and 2017, sold again to many,

4   many, many investors, reaping hundreds of thousands of

5   dollars in commissions.

6            So, no, ladies and gentlemen, Mrs. Newell is not the

7   moral equivalent of Mr. Smith.  She is a victim.  And if you

8   look at the victims in this case, they were unsophisticated,

9   and when we say "unsophisticated," what we're talking about

10  here is financially.  They didn't have a background.

11           Ms. Barbara Russell is perhaps the most

12  sophisticated woman I've ever met, when she walks in here and

13  she's articulate and she's beautiful.  But we're talking

14  financially.  She didn't have the background that Mr. Smith

15  did.  He had 40 years in this business.  He did pass the

16  Series 7 exam.  This defendant was -- he chose, he elected to

17  be a financial advisor with clients.

18           The victims, they were not financial advisors.  They

19  were welders, and they were firemen and a teacher and a

20  housewife.  The victims did not see investments.  Mr. Smith

21  sold these investments to over 100 victims in connection with

22  this case.

23           They had no background in connection with these

24  specific investments, and Mr. Smith certainly did.  Mr. Smith

25  sold failed investment after failed investment after failed

─────Rebuttal Argument - By Ms. O'Boyle─────

1    investment for seven years.  The victims had no knowledge of

2    any of the regulatory issues before they invested.

3          Mr. Smith certainly knew all about it.  He knew

4    about the Arizona Corporation Commission investigation.  He

5    testified for Mr. Maerki there.  He knew about the SEC

6    investigation.  They talked about it in the June D.C.

7    workshop.

8          And Doug Dunn warned him about Mr. Bank in 2015.

9    Mr. Smith kept all this information to himself.  You did not

10   hear a single victim get on that stand and talk about the

11   disclosures that Mr. Smith made about any of these regulatory

12   investigations.

13         Now, the other difference between Bill Smith and the

14   victims is that these victims actually invested their

15   hard-earned retirement funds into all of these investments.

16   Mr. Smith did not invest a single dime.

17         The investors lost all of their funds.  With the

18   exception of some miniscule payments, they lost all their

19   money.  Mr. Smith, he didn't lose a dime.  And he made

20   millions, millions of dollars.  Exhibits 1200, 1201, 1203,

21   they outline Mr. Smith's ill-gotten gains from his

22   involvement in these conspiracies.

23         Mr. Smith was getting paid from Dominion Private

24   Client Group; he was getting paid from Sovereign Asset Group;

25   DOM Business Brokers.  It didn't matter where the money came

──────Rebuttal Argument - By Ms. O'Boyle──────

1    from.  It totaled over $1 million.

2         He got paid by DSPF over $200,000, and that's

3    without the 2011 checks.  And, yes, he got paid

4    three-quarters of a million dollars from Shelton & Power,

5    which we submit to you was absolutely in connection with the

6    Western Spectrum investment.

7         So the victims -- the difference between Mr. Smith

8    and the victims in this case, the victims got miniscule

9    payments, if any, and no return on their principal;

10   meanwhile, Mr. Smith made 2.1 million.

11        Now, Mr. Smith is asking you to believe that he was

12   a fool, that he was victimized and used by Daryl Bank and

13   Kent Maerki and David Alcorn.  But, ladies and gentlemen, I

14   submit to you that he was certainly a well-paid fool, and he

15   got approximately $300,000 per year to participate in this

16   conspiracy.

17        This is what happens in white-collar conspiracies,

18   ladies and gentlemen.  Everybody gets paid.  And when you go

19   and you have a group of folks that go and rob a bank, after

20   they go and rob the bank, they go back and divvy up the

21   proceeds.

22        That is exactly what happened here in this

23   white-collar conspiracy.  Everybody got paid.  Mr. Maerki got

24   paid; Mr. Alcorn got paid; Mr. Bank got paid.  Ms. Gibson

25   told you she got $500,000 from this conspiracy and a company

─────Rebuttal Argument - By Ms. O'Boyle─────

1   car.  Even the unindicted co-conspirators who testified in

2   this case got paid; Bobby Jones and Jon Palmieri.

3           And, yes, Mr. Smith got millions of dollars for the

4   role he played in these frauds.  He told you that these were

5   just normal commissions, just like insurance commissions that

6   he would get as an annuity provider.

7           But, ladies and gentlemen, Daryl Bank was a lot of

8   things, but he was not an insurance company.  And these

9   investments were not annuity investments.  And someone who

10  has 40 years of experience in this industry knew that fact

11  100 percent.

12          All of these men and Ms. Gibson chose to be involved

13  in this scheme and took their share of the victim funds and

14  left them with nothing.

15          And there's not an exception to the fraud laws,

16  ladies and gentlemen, that permits a defendant to spend the

17  money supporting his business because he chose to be a

18  financial advisor and run his own company.  Mr. Maerki did

19  the same thing.  Mr. Bank did the same thing.  Mr. Alcorn did

20  the same thing.  Some of these funds went to support their

21  ongoing criminal enterprises.

22          Another way Mr. Smith is distinguished from these

23  victims is in connection with the treatment of records.

24          Remember, Sharyon Bean handed over her box of

25  documents.  She talked about that in her deposition.

──────Rebuttal Argument - By Ms. O'Boyle──────

1    Mr. Smith, on the other hand, admitted under oath that after

2    the creditors, like Mrs. Groff's lawyer, came after him for

3    fraud, he joyfully shredded his records, shredded his client

4    files, and cleaned his computers.

5              (Audio played in open court.)

6              MS. O'BOYLE:   Mr. Smith under oath admitted that he

7    joyfully shredded his documents and cleaned his computers.

8    Who does that?  Ask yourselves back there in the jury room,

9    are those the actions of a fool?  Are those the actions of a

10   dupe?  Are those the actions of a man with something to hide?

11             This type of evidence is what is called

12   consciousness of guilt, and it's because they're the actions

13   of someone who knows that they've done something wrong.

14   Mr. Smith shredded his documents and cleaned his computers

15   because he knew full well that they contained evidence of his

16   guilt in connection with the charges in this case.  But

17   that's not all he did in connection with consciousness of

18   guilt.

19             Mr. Smith also listed the majority of his victims as

20   potential creditors in his bankruptcy.  Exhibit 1213.  Why

21   would he list them as potential creditors?  Because he knew

22   that they might have valid fraud claims against him.  Who

23   does that but someone who knows that they did something

24   wrong?

25             And then the last point in connection with this,

──────Rebuttal Argument - By Ms. O'Boyle──────

1   Mr. Smith also told his client, Mr. Ken Sykes, not to talk to

2   the FBI.

3           Now, Ms. McCaslin just told you -- she talked about

4   Tony Sellers and evading law enforcement, and she told you

5   that Bill didn't do that.  Well, we respectfully submit to

6   you that a defendant who shreds relevant documents, who

7   cleans his computers, and attempts to obstruct a federal

8   investigation by instructing his client not to cooperate with

9   that federal investigation is a defendant who knows exactly

10  what he was involved in, is a defendant who is desperate to

11  shut that investigation down.  Those are not the actions of a

12  fool.  Those are the actions of a guilty man.

13          Now, the last big point here is you've got victims

14  who met with Mr. Smith on a variety of occasions, short,

15  segmented periods of time.  Contrast that with Mr. Smith.

16  Mr. Smith sold these junk investments for seven years; 2011,

17  2012, '13, '14, '15, '16, and '17.

18          For seven years he got up every single day and chose

19  to peddle these investments.  He was an insurance salesman.

20  He could have stuck to annuities.  He didn't do it.  And

21  through failure after investment failure, regulatory action

22  after regulatory action, warning after warning, he never

23  stopped.

24          Is that the timeline of a fool?  Is that a timeline

25  of someone who is victimized or an unwitting dupe?  This man

Carol L. Naughton, Official Court Reporter

─────Rebuttal Argument - By Ms. O'Boyle─────

1   knew what he was doing was wrong, and he did it anyway

2   because he needed to continue to have funds coming in.

3          Mr. Smith would have you believe that instead of

4   being a conspirator in this scheme, he was an unknowing

5   victim.  This list lists all the fraudulent vehicles that he

6   used in connection with this scheme.

7          It didn't matter what it was.  The investment was a

8   means to an end.  It was a means to a commission check.

9   Arguably, this list from 2011 and 2017 actually could start

10  two years earlier.  It could start in 2009 with Dazzle

11  Dental.

12         And when you're back there in the jury room, please

13  take a look at the definition of "intent to defraud."  Okay?

14  And that definition talks about someone who acts knowingly

15  and with the intention or purpose to deceive or to cheat.

16         And I would like you for a moment to think about

17  Mr. Berndt, who Mr. Bosse talked about briefly in his closing

18  today.  That gentleman invested in DSPF at Mr. Smith's

19  suggestion, and the investment failed.  He lost the entirety

20  of his investment.  And Mr. Smith -- what does he do?  He

21  tells him that he can make it all up by investing in

22  spectrum.

23         And consider for a second how extraordinary that is.

24  Mr. Smith did not say to Mr. Berndt, I realize you just lost

25  your precious retirement funds through the fraudulent DSPF

─────────Rebuttal Argument - By Ms. O'Boyle─────────

1    investment, but how about you make up all those funds by
2    investing in another product associated with the exact same
3    man who just lost you $50,000?
4            He turned Mr. Berndt's losses into more money for
5    himself.  And Mr. Maerki wasn't sitting on his shoulder when
6    he said those words to Mr. Berndt.  Mr. Smith did that all by
7    himself.  That is knowing and intentional deceit.  Mr. Smith
8    is cheating Mr. Berndt.  He is leading that gentleman down
9    the path of fraud and loss again because he knows that
10   there's a big fat commission check waiting at the end of it.
11   Mr. Smith turned failure into opportunity for himself.
12           His scheme made him millions of dollars and left his
13   clients with nothing.  And he would have you believe that
14   this is just one big mistake.  Oops.  That is what he's
15   asking you to suggest -- that's what he is suggesting when
16   he's calling himself a fool.  Does that make any sense at
17   all?
18           A couple more quick responses to Mr. Smith's
19   argument.  First that he had no idea that DSPF wasn't doing
20   well because Mr. Maerki controlled all of the information.
21           Smith argued that he did not know what Mr. Maerki
22   was doing with DSPF, and he had hoped that it would all work
23   out.  He talked about the memo, about keeping things close at
24   hand and not discussing things with salespeople, but here's
25   the problem with that:

Rebuttal Argument - By Ms. O'Boyle

1            Mr. Smith knew from his prior involvement in Dazzle

2    Dental that the whole thing was a fraud from the very

3    beginning.  In fact, Mr. Smith's involvement in these

4    fraudulent dental practices predates Mr. Maerki's

5    involvement.

6            Take a look at Exhibit 286, which is that transcript

7    when Mr. Maerki called him to testify, and this is a

8    statement that Mr. Smith made under oath:

9            Mr. Maerki asked Mr. Smith:  "Of the 12 people that

10   you were involved with relative to Dazzle Dental, MetroMedia,

11   Oracare, and Steven Vereen, was I one of those 12 people?"

12           And Mr. Smith answered:  "No, you were not."

13           Mr. Maerki was not involved in Dazzle Dental.  Tony

14   Sellers was not involved in Dazzle Dental.  But Bill Smith

15   was, and he testified under oath that he started selling

16   Dazzle in 2009.  He admitted that he sold $2 million worth of

17   it.  And did they lose their investment?  They did.

18           And later, at Page 962, it's all the way back at the

19   end of the transcript, Mr. Maerki asks some questions again.

20   And he asks a question about whether Dazzle Dental failed,

21   and Mr. Smith is very, very clear here.  He says, "Dazzle

22   Dental as a business failed.  It's a fact."  And his clients

23   lost $2 million in that dental investment.

24           Let's look how Mr. Smith described Dazzle Dental in

25   the deposition.  What did Dazzle Dental, the failed

─────Rebuttal Argument - By Ms. O'Boyle─────

1    investment, offer?  Well according to Mr. Smith, the purpose

2    of Dazzle Dental was to provide investors an opportunity to

3    participate in a dental operation that was presented to be

4    successful.  They presented it to be a total turnkey

5    operation, a highly successful business model.

6          "Total turnkey operation," where have we heard that

7    before?  Exhibit 202.  The infamous tri-fold brochure that

8    outlined the Dental Support Plus investment.  How did it

9    describe the opportunity?

10          "Dental Support Franchise is a protected turnkey

11   dental support business organized in a results-proven

12   franchise format.  A turnkey dental operation."

13          From his experience with Dazzle Dental, Mr. Smith

14   knew that this was a complete and total lie, that it wasn't a

15   turnkey operation, it was a total failure that did not, by

16   the way, provide proven results for his clients.  His clients

17   lost $2 million.

18          Ladies and gentlemen, Mr. Smith did not naively

19   follow the charismatic Kent Maerki down a trail of fraud.

20   This was not some sort of mistake on his part.  From day one,

21   the sale of his very first franchise in January of 2011, this

22   defendant knew exactly what it was.  He knew that the DSPF

23   investment was a house of cards built on quicksand.

24          But he told Mrs. Hullum and Mrs. Eads and Mr. Martin

25   that it was great.  And he did it so that he could keep the

────────Rebuttal Argument - By Ms. O'Boyle────────

1    commissions coming.  And we know that Mr. Smith didn't invest

2    his own money in it, not like Mr. Sellers.

3         And Mr. Smith did not just receive commissions from

4    his own sales, he also trained other salespeople on how to

5    sell these franchises and received overrides on those sales.

6    This is how Bill Smith, a man who never met Virginia

7    residents Andrea Tottossy and Peter or Margo Perry or Terri

8    Walsh, ended up with part of their investor funds in his bank

9    account.

10        Mr. Smith's tentacles of fraud reached from

11   California all the way across the country, right here in

12   Hampton Roads, to take funds away from retirees here.

13        Now, Ms. McCaslin told you that Mr. Smith was a

14   fool, but the evidence you'll see is that in 2011, Mr. Smith

15   absolutely had a choice.  She told you that he cared deeply

16   about his clients.  She played a part of the bankruptcy

17   deposition where he talked about how he was so upset about

18   the client losses, the losses that the clients had sustained.

19        But in 2011, he is sending out -- he has fliers that

20   talk about -- advertise his services.  He talks about if they

21   want a "proven, consistent, and secure future that gives you

22   peace of mind," and here, the Dazzle Dental investment lost

23   clients $2 million.  That is the exact opposite of proven,

24   consistent, and secure.

25        And so when his clients lose all that money in 2011

——————Rebuttal Argument - By Ms. O'Boyle——————

```
 1   and Mr. Maerki decides that we're going to do the same thing

 2   and we're going to do it in franchises, does Mr. Smith,

 3   because he's concerned about these clients and the future

 4   clients that he's going to be pitching this to -- does he

 5   tell Mr. Maerki, like, get away, I'm not going to touch this

 6   with a ten-foot pole, my clients just lost $2 million with

 7   this same exact business model?

 8              No.  What he does is he sells.  And he looked

 9   Mrs. Hullum and Mr. Martin in the eye and convinces them to

10   invest their retirement funds in something that he knew was a

11   fraud.

12              This was an illegal course of conduct by someone who

13   cared more about the commissions he made than the safety and

14   security of his clients' retirement funds.  And the same is

15   true for this assertion that he was shocked and appalled to

16   learn that Mr. Bank had misappropriated investment funds,

17   that he was not a signatory on those bank accounts and so

18   there was no possible way that he could know that Mr. Bank

19   was stealing.

20              Now, let's set aside the fact that Mr. Bank's FINRA

21   ban was a publicly available document.  It's Exhibit 1 in the

22   documents that you're going to get there.  And set aside the

23   fact that a financial advisor, who is going to be suggesting

24   to clients that they send thousands and thousands and

25   thousands of dollars to this man -- he could have at least
```

--------Rebuttal Argument - By Ms. O'Boyle--------

1    researched him a little bit.

2            Well, set that aside.  Mr. Smith was well aware that

3    Daryl Bank was intimately connected with DSPF and that it

4    failed.  Why would any reasonable financial advisor associate

5    with anybody in connection with that investment after it went

6    belly-up in August of 2014?

7            But Mr. Smith was also aware of the SEC

8    investigation.  It was discussed at the very meeting that he

9    attended in D.C., in Washington, D.C., with Peter Lewis.  You

10   can take a look at Ms. Newell's notes in connection with

11   that.  It's in the 700 series.

12           And if you take a look closely at Government's

13   Exhibit 514, which is the SEC's complaint, and in addition to

14   outlining the fraud and allegations against Alcorn and Bank

15   and others, paragraph 68, it outlines in very specific terms

16   that Mr. Bank was transferring 4.5 million in investor funds

17   to his personal and other business accounts and concealed

18   this information from investors.

19           Mr. Smith did not need to be a signatory on

20   Mr. Bank's bank accounts to know that Mr. Bank was stealing

21   funds from investors.  This is in a public document with the

22   Securities and Exchange Commission, an investigation that he

23   knew full well was going on in 2015.

24           And Mr. Smith was also well aware of Daryl Bank's

25   FINRA ban for misappropriating client funds.  Again take a

─────Rebuttal Argument - By Ms. O'Boyle─────

1  look at Government's Exhibit 286.  This is the deposition

2  where he testified -- or the hearing where he testified for

3  Mr. Maerki.  And he claims at that time, in July 2015, that

4  he did not know about Daryl's FINRA ban.

5          But, ladies and gentlemen, he certainly knows about

6  it after July 2015 because he talked about it under oath.

7  Mr. Smith learns under no uncertain terms that the man he is

8  sending millions of investor funds to is a man banned from

9  the securities industry, and not just banned from the

10 securities industry, he's banned for misappropriating client

11 funds.

12         Ask yourselves what kind of a financial advisor

13 would continue to associate with Mr. Bank after learning this

14 information at this deposition in July of 2015?

15         And he continues to associate with Mr. Bank and send

16 him client funds until August of 2017, two more years, which

17 brings us to the very last way that Mr. Smith was warned

18 about Mr. Bank.  It brings us to Mr. Doug Dunn.

19         Now, in 2015, Carol Groff sued him for civil fraud

20 because of these investments.  Mr. Smith continues to sell.

21 Also in 2015, resident country singer Doug Dunn warned

22 Mr. Smith, talked to him about all the investigations that

23 were going on, and told Mr. Smith, "There's too much smoke

24 for there not to be a fire."

25         Doug Dunn even gave Mr. Smith an offering from all

—————Rebuttal Argument - By Ms. O'Boyle—————

1   of this.  Mr. Dunn completely cuts ties with Mr. Bank in

2   2015, and he goes to work for another insurance company, and

3   he tells Mr. Smith that he can come and work for him.  "The

4   only limitation, you've got to cut ties with Mr. Bank."

5       He chooses Mr. Bank.  Ask yourselves why?  Why, at

6   this point in 2015, did Mr. Smith choose to continue to work

7   with Mr. Bank, a man the SEC had charged with fraud and

8   misappropriation of client funds, the Virginia SEC had

9   charged with civil fraud, the creator of multiple failed

10  investments at this point that Mr. Smith had sold, and who

11  was barred by FINRA for misappropriation of funds?

12      Mr. Smith knows all of this.  And he decides -- he

13  chooses Mr. Bank.  We submit to you that there is one reason

14  and one reason only that Mr. Smith continued to work with

15  Mr. Bank, and that was to keep the money coming in.

16      And Mr. Bosse touched on this.  If you take a look

17  at Exhibit 629 and 635, these are Raeann's money move sheets

18  for the very last investment, the Xcel/RapidLink that was

19  connected with Mr. Bobkin, who you met in Mr. Alcorn's case,

20  who was running the telecom company out of his house with two

21  employees.

22      After Mrs. Groff sued him for fraud and after

23  Mr. Dunn's warnings, look at the salesmen listed on 629 and

24  635.  How many of them are there?  You will have those

25  documents back there in the jury room.  Take a look at them.

Rebuttal Argument - By Ms. O'Boyle

1    Tony Sellers isn't there.  He got out in 2015 -- 2014.  Tom
2    Barnett isn't there.  Roger Hudspeth isn't there.  Goodness,
3    even Kent Maerki isn't there.
4         And look who is selling the most; Mr. Smith.
5    Nothing deterred Mr. Smith from continuing to work with the
6    people that were bringing in the money for him.  It didn't
7    matter that his investors were losing the entirety of their
8    funds.  He continued to sell again and again and again.
9         Ladies and gentlemen, Mr. Smith has done his best to
10   misdirect your attention, to kind of cloud the role that he
11   played in this scheme, and to place the blame solely in the
12   hands of others, but we ask you to review all of this
13   evidence using your basic common sense and conclude, as we
14   submit, that he is guilty on each and every count that he is
15   charged with in this indictment.
16        I'm going to quickly go through Mr. Alcorn, and then
17   I will wrap up, and then we will be finished with all the
18   arguments.
19        Mr. Alcorn, he is asking you to believe that he also
20   did not intend to commit fraud.  It all comes down to intent.
21   He told you that he learned all about what he learned about
22   spectrum at SmartCOMM and that he was a believer.  But this
23   defense doesn't make sense for at least three logical
24   reasons:
25        And the first one is 511C.  This is the deposition,

Carol L. Naughton, Official Court Reporter

─────Rebuttal Argument - By Ms. O'Boyle─────

1   and we didn't focus a whole lot on it during our case, but it
2   was admitted into evidence, and you will have it back there
3   in the jury room.
4        And so if you take a look at Pages 64 through 65 and
5   75 to 76, Mr. Alcorn talks under oath about Pendleton Waugh
6   and about SmartCOMM, and he admits that Pendleton Waugh -- he
7   knew Pendleton Waugh was a convicted felon.
8        He says, "I didn't want Waugh going in -- after we
9   found out Waugh's background and his reputation in the
10  industry and his volatility as we -- as I got to know him a
11  little bit better, I didn't want him talking to Sprint or
12  anybody else on my behalf."
13       Mr. Alcorn knows this fact, chooses to copy a
14  convicted felon's business model, and is telling you that he
15  is shocked and surprised to learn that it was all a fraud.
16       I'm not sure why he would be shocked by that,
17  because his attorney told him in no uncertain terms in 300P
18  that he cannot be involved in this.  "I just saw your
19  website.  It's almost a carbon copy of Pen's.  I was not
20  aware you were selling applications.  I can't be involved in
21  this."
22       Mr. Alcorn wants you to believe that he had all good
23  intentions when he set up his own application mill to rival
24  that controlled by a disbarred convicted felon.  Does that
25  make any sense whatsoever?

Carol L. Naughton, Official Court Reporter

─────────Rebuttal Argument - By Ms. O'Boyle─────────

 1          Mr. Bosse walked you through all of the documents in
 2   the closing that demonstrate Mr. Alcorn's intent, and I'm not
 3   going to do it again, but I will just point out that
 4   Mr. Yarow did not rebut a single document that demonstrated
 5   what Mr. Alcorn knew and when he knew it.
 6          A second reason you know Mr. Alcorn absolutely
 7   intended to commit fraud, he knew straight from the beginning
 8   that Sprint was never an option to monetize the 800-megahertz
 9   licenses.
10          Again, 511C, Pages 339 to 341 of his deposition, he
11   makes it very clear that he reached out to a person at
12   Sprint, he talked to this Sprint representative, and she told
13   him that she didn't think they would have an interest in the
14   spectrum being released.
15          He said, "She was clearly discouraging us from
16   applying for the spectrum and expecting to turn around and
17   sell it to them.  She thought they wouldn't be interested."
18          This is absolutely stunning, ladies and gentlemen,
19   when you think about what you heard in this case.  A
20   representative from Sprint tells Mr. Alcorn, "Do not expect
21   to sell these licenses back to Sprint," and what does he do
22   with the information?
23          He spent years telling investors the exact opposite
24   proposition.  This is not a mistake, ladies and gentlemen.
25   It's not an oops.  This is knowing and intentional fraudulent

```
                     ─Rebuttal Argument - By Ms. O'Boyle─
```

 1    conduct that this defendant engaged in for years.

 2            Now, Ms. Newell is a favorite here, it seems, and

 3    Mr. Alcorn's counsel spent a lot of time talking about her as

 4    well, and you saw and heard from Ms. Newell, as well as a

 5    member from her investment group, Mr. Cushman.  She was very

 6    clear that they did not just buy application services, that

 7    they bought monetization, which is why she cared so much

 8    about that paragraph 7 that had the 18 percent tail in the

 9    contract.

10            Exhibits 700 to 726, they tell the full Newell

11    story.  There's a lot of paper and a lot of e-mails in

12    connection with that, and they document everything that went

13    on between the two.  So in addition to her testimony, you

14    have all of that entire story in evidence.

15            Mr. Yarow told you that the evidence is that

16    Ms. Newell's obligation to construct towers and put the

17    licenses to use -- it was her job, except Exhibit 726 was the

18    side agreement that Mr. Alcorn signed where he promised that

19    if construction became necessary, "Janus hereby agrees to

20    absorb and to pay the cost of construction of the site."

21            Mr. Yarow also told you when they got paid for

22    license applications what -- Mr. Yarow also told you that

23    they did all of the applications that Ms. Newell and her

24    group paid for, that they got what they paid for, that they

25    got the applications submitted.

────────Rebuttal Argument - By Ms. O'Boyle────────

1        But you'll see the evidence demonstrates that that's

2   not accurate either.  If you take a look at 720, it's a

3   letter written to Mr. Alcorn in 2015 by the members of this

4   group, and they articulate in that letter a point which notes

5   that of the -- that they paid $920,000 in payments, has

6   resulted in six applications filed to the FCC.  "The other 17

7   we have paid for in full have not been filed."

8        So the evidence in this case is actually the

9   opposite, that Mr. Alcorn, in connection with this, got

10  $680,000 and did not deliver the spectrum applications that

11  he promised.  And he never sold or leased anything back to

12  Sprint.

13       Now, Mr. Alcorn started Janus Spectrum and lied to

14  investors for years so that he and his conspirators could

15  make millions, and Mr. Bosse went closely through all of the

16  advice that counselors gave to Mr. Alcorn.  Those are

17  Exhibits 509A through 509F.

18       And you will remember, they're basically begging him

19  to shut down the business and warning him repeatedly to stop

20  raising funds for Mr. Bank.  Mr. Alcorn's response in

21  Exhibit 509:  "No.  No way."

22       Mr. Yarow told you that this is the way businesses

23  operate.  We respectfully disagree.  We submit to you that

24  this is the way that criminal enterprises operate.

25       Ask yourselves, read this e-mail and see, is this

2508

─────Rebuttal Argument - By Ms. O'Boyle─────

1    the response of a naive businessman, or is this the response

2    of someone who simply does not care that he was lying,

3    cheating, and stealing from investors all across the country

4    so that he could get rich?

5           And Mr. Alcorn, despite the warnings to stop working

6    with Mr. Bank from his lawyers, Mr. Alcorn continues to raise

7    investor funds with Mr. Bank for four more years after that

8    e-mail, first as Janus Spectrum and then later as a

9    consultant for Xcel Bandwidth and RapidLink.

10          That last year and a half, Mr. Alcorn asked his

11   conspirator Mr. Bank to pay an entity called Steph Court,

12   which Ms. Gibson did.  You have the Steph Court bank account,

13   and once again, you'll see that Mr. Alcorn's trusted

14   accountant, Mr. Semple, was the signatory on that account.

15          And make no mistake about it, ladies and gentlemen,

16   Mr. Alcorn certainly shared in the riches of this fraud the

17   same way Mr. Smith did.  From January 2012 through

18   September 2nd, 2015, alone, Mr. Alcorn received almost

19   $4 million.

20          The government exhibits starting at 1100 and going

21   all the way through 1123 will walk you through Mr. Alcorn's

22   money trail.  Mr. Alcorn had almost 4 million reasons why he

23   told his attorneys that their suggestion to shut down his

24   fraudulent criminal enterprise was disturbing.  And now you

25   know why.

────────Rebuttal Argument - By Ms. O'Boyle────────

 1          He chose his future, his retirement, his house, as

 2   seen here in Exhibit 1113, his Land Rover over that of his

 3   victims who trusted retirement funds into his hands based on

 4   lies that they could own valuable cellular spectrum that

 5   Sprint so desperately wanted and needed.

 6          Ask yourselves, ladies and gentlemen, is Mr. Alcorn

 7   a victim of this fraud, duped by his co-conspirators, or did

 8   he knowingly and intentionally choose to engage in a

 9   fraudulent scheme aimed at defrauding investors all over the

10   country, including right here in Hampton Roads?

11          We submit that the only reasonable and logical

12   answer to that question is the latter and that Mr. Alcorn is

13   guilty of conspiracy, wire fraud, and money laundering.

14          Ladies and gentlemen, you have sat here and listened

15   to hours and hours of argument today, and I only have two

16   more things to tell you.

17          First, as Judge Jackson told you when you walked in

18   here in early February, Mr. Alcorn and Mr. Smith, they came

19   into this courtroom with a clean slate.  Every single

20   defendant has the right to hold the government to its

21   burden -- every single one.

22          Every single one has the right to have the evidence

23   presented, both testimony and evidence, to a jury.  And they

24   have the right to hold us to our burden, which is evidence

25   that proves beyond a reasonable doubt that they committed the

─────Rebuttal Argument - By Ms. O'Boyle─────

1    crimes that are before you.

2         You all have been wonderfully patient and attentive

3    over the last three weeks, and now you will get an

4    opportunity to go back into the jury room and render a

5    verdict in this very, very important case.

6         We entrust this case to you for your consideration,

7    and we submit that there is overwhelming evidence; logical,

8    commonsense, overwhelming evidence beyond a reasonable doubt

9    that these two defendants orchestrated, executed, and

10   profited from a massive nationwide scheme to defraud.

11        The West Coast victims that you heard from trusted

12   Bill Smith with their retirement funds.  They had worked

13   their whole lives to save.  Bill Smith abused that trust for

14   his own personal financial gain.

15        He sat across the table from each and every one of

16   those individuals, looked them in the eye and lied repeatedly

17   to their faces so that he could get money to fund his life

18   and his business.

19        With the exception of the Newells, Mr. Alcorn did

20   not have to look his victims in the eye.  He let other

21   conspirators do that dirty work while he sat back and reaped

22   in the financial benefits of this fraud.

23        As Ms. Yusi said at the very beginning, everybody in

24   this conspiracy had a role to play, and the conduct that

25   these men engaged in directly impacted individuals here in

──────Rebuttal Argument - By Ms. O'Boyle──────

1   Hampton Roads; Barbara Russell, Adan Rangel, Mrs. Tottossy,

2   and many, many more.

3           This, ladies and gentlemen, this is what a

4   nationwide criminal white-collar conspiracy looks like.  This

5   scheme was sophisticated.  It was deliberate.  And it was --

6   it lasted for seven years.

7           These defendants knowingly and intentionally

8   targeted some of the most vulnerable individuals in our

9   society; older, financially unsophisticated investors.  They

10  told them lies, and they took their money.  We ask you to

11  hold them accountable, and we ask you to find them guilty of

12  all counts in the indictment.

13          Thank you.

14          THE COURT:  Okay.  Ladies and gentlemen, this will

15  conclude your work for today.  You've heard the closing

16  arguments, but you're not finished yet.  You cannot go

17  deliberate.  You cannot discuss the case.  Tomorrow you will

18  have to return, and the Court has a bunch of instructions

19  here that it will read to you and give you a copy of those

20  instructions and send you into the jury room, along with the

21  exhibits, to begin deliberating.

22          So do not discuss the case with anyone.  Do not do

23  any research but return here tomorrow morning at 10:00 a.m.,

24  at 10:00, not 11:00, not 9:30, but 10:00 a.m., and we will be

25  prepared to go forward.  Remember to leave your notes with

```
 1    the court security officer.
 2              (The jury exited the courtroom.)
 3              THE COURT:  There are a few matters we need to
 4    address.  One thing we did not do is the Court did not make
 5    any reference to the verdict sheet that was provided to you,
 6    and I wanted to find out whether there were any objections to
 7    the verdict sheet.
 8              Mr. Yarow?
 9              MR. YAROW:  Judge, I have no objection to the
10    verdict sheet.
11              THE COURT:  Ms. McCaslin?
12              MS. McCASLIN:  We don't have any objections, Your
13    Honor.
14              THE COURT:  Ms. O'Boyle?
15              MS. O'BOYLE:  No objections, Your Honor.
16              THE COURT:  The other thing is I understand that
17    there's an exhibit that the defense wants marked and put in
18    the record.  Which exhibit is that?
19              MS. McCASLIN:  Yes, Your Honor, it's Smith 37.  I
20    attempted to introduce it with Terence Pinkston.  The Court
21    denied it, but I do want it just marked so that it can go up
22    to the appellate court.
23              THE COURT:  What was the exhibit?
24              MS. McCASLIN:  The exhibit was the cease-and-desist
25    from California.
```

```
 1          THE COURT:  The Court doesn't remember the context,

 2  but I'm sure if the Court refused it, it had good grounds for

 3  it, so you can pass it up, and the Court will mark it

 4  refused.  If that's the document, she is going to pick it up

 5  and bring it to the Court.

 6          MS. McCASLIN:  Your Honor, I believe the Court

 7  already has it.

 8          THE CLERK:  I have it.  It's in the binders.  I have

 9  it, sir.

10          THE COURT:  Okay.  You need to give it to me so I

11  can mark it refused and put it in the record.

12          We can save a little trouble going through the

13  binders just by passing up the copy that you have.

14          MR. GRINDROD:  We don't have a copy sitting in front

15  of us.  She was just reading from her notes, Your Honor.

16          THE COURT:  Okay.  While she's doing that, there's

17  one other thing.

18          The Court's listened at these closing arguments and

19  all the reference to Dazzle Dental and the conduct of

20  Mr. Smith with respect to that enterprise, and the Court

21  believes it's appropriate to go back and put the 404(b)

22  instruction back in the package, just so there will be no

23  mistake about how they're to consider that involvement with

24  Dazzle Dental.

25          And so the Court is going to put the 404(b)
```

```
 1    instruction back in there so that it makes it clear that they
 2    can only consider that for specific purposes, not for
 3    purposes of finding him guilty on any of these charges.
 4            I'm just putting today's date on there, but I don't
 5    know what date, Ms. Yusi --
 6            MS. YUSI:  I believe it was Thursday.
 7            MS. McCASLIN:  Yes, Your Honor, I believe it was
 8    Thursday.  It was the last day of evidence.
 9            THE COURT:  The 17th?
10            MS. McCASLIN:  Yes.
11            (Defendant Smith's Exhibit 37 was marked as refused;
12    See Day 12, Page 2323, line 13.)
13            THE COURT:  You will be given a copy of -- it's the
14    same 404(b) instruction that we had in the pack before.
15    We're just putting it back in there.  There's a number in
16    there.
17            If there's nothing else, we'll be in recess until
18    tomorrow morning at --
19            MS. McCASLIN:  Your Honor, just real quick before we
20    recess.  I would like to renew the Rule 29 motion, Your
21    Honor.  I can reargue it, or I can rest on my previous
22    argument.
23            THE COURT:  Well, I clearly understand your previous
24    argument, and you are right, that is something the Court
25    needed to revisit.
```

1              The Court having heard all of the evidence in the

2    case now, the Court believes that there is sufficient

3    evidence for the jury to find the defendant guilty if they

4    deem it appropriate, so the Court would deny the motion.

5              Of course that doesn't stop you from raising another

6    motion after the verdict.  So that's where we are.

7              Anything else?

8              Okay.  See you in the morning.

9              (Proceedings adjourned at 5:02 p.m.)

10

11                           CERTIFICATION

12

13        I certify that the foregoing is a correct transcript

14   from the record of proceedings in the above-entitled matter.

15

16

17             _____/s/_____

18                      Carol L. Naughton

19                      August 30, 2022

20

21

22

23

24

25