```
1                   IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF VIRGINIA
2                           Norfolk Division

3

4     - - - - - - - - - - - - - - - - - - -
                                          )
5      UNITED STATES OF AMERICA           )
                                          )
6      v.                                 )      CRIMINAL ACTION NO.
                                          )            2:19cr47
7      AGHEE WILLIAM SMITH, II,           )
                                          )
8            Defendant.                   )
                                          )
9     - - - - - - - - - - - - - - - - - - -

10

11

12                      TRANSCRIPT OF PROCEEDINGS
                          (Sentencing Hearing)

13                        Norfolk, Virginia

14                        August 24, 2022

15

16    BEFORE:  THE HONORABLE RAYMOND A. JACKSON
                 United States District Judge
17

18

19    APPEARANCES:

20            UNITED STATES ATTORNEY'S OFFICE
              By:  Andrew C. Bosse
21                 Melissa E. O'Boyle
                   Elizabeth M. Yusi
22                 Assistant United States Attorneys
                   Counsel for the United States
23
              FEDERAL PUBLIC DEFENDER'S OFFICE
24            By:  Andrew W. Grindrod
                   Lindsay Jo McCaslin
25                 Assistant Federal Public Defenders
                   Counsel for the Defendant
```

```
 1                 (Proceedings commenced at 11:02 a.m.)
 2            THE CLERK:  United States of America vs. Aghee
 3    William Smith, II, in Criminal Action 2:19cr47.
 4            Ms. Yusi, is the government ready to proceed?
 5            MS. YUSI:  We are.  Good morning, Your Honor.
 6            THE COURT:  Good morning.
 7            THE CLERK:  Ms. McCaslin, is the defendant ready to
 8    proceed?
 9            MS. McCASLIN:  We are.  Good morning, Your Honor.
10            THE COURT:  Good morning.
11            If you would please stand, Mr. Smith.  Mr. Smith,
12    have you conferred with your counsel to prepare for the
13    hearing this morning?
14            THE DEFENDANT:  I have, Your Honor.
15            THE COURT:  Have you been satisfied with the advice
16    and counsel you're receiving?
17            THE DEFENDANT:  I have so far.
18            THE COURT:  Fine.  You may have a seat.
19            Counsel, the Court has received the Presentence
20    Report and reviewed it with all the exhibits and attachments
21    and the position papers and other documents filed in the
22    case, and the Court finds that there are a series of
23    objections outstanding in this case, and the Court wants to
24    know if the United States still has no objections outstanding
25    in this case?
```

```
 1              MS. YUSI:  No objection, Your Honor.
 2              THE COURT:  All right.  And, Ms. McCaslin, I
 3    understand the defendant made some objections.  I think there
 4    were four.  Are all four of those objections still
 5    outstanding?
 6              MR. GRINDROD:  Yes, Your Honor.
 7              THE COURT:  Mr. Grindrod.
 8              MR. GRINDROD:  Sorry.  If it pleases the Court, I'll
 9    be handling the objections, and Ms. McCaslin will be doing
10    the general sentencing argument today.
11              THE COURT:  All right, then.  Okay.  We will turn,
12    then, to the first objection that the Court wishes to
13    address, and it appears here that Mr. Smith objected to --
14    it's a general objection to the PSR factual contentions
15    proven at trial, and you object to numerous paragraphs in the
16    Presentence Report; paragraphs 12, 21 through 26, 30, 33
17    through 36, 42, 95 through 96.
18              And as you well know, Mr. Grindrod, before the Court
19    is going to even address this, you have the burden of making
20    some affirmative showing that the information in the
21    Presentence Report is unreliable and articulate some reasons
22    why the facts contained in the report are untrue or
23    inaccurate, of course recognizing that we tried this case
24    where witnesses were put under oath to testify beyond a
25    reasonable doubt truthfully; to testify truthfully.
```

1          So with that, what is the reason that you contend

2    that the report should not be accepted?  What are you

3    challenging as being untrue?

4          MR. GRINDROD:  Your Honor, would you like me to step

5    to the podium?

6          THE COURT:  Sure.

7          MR. GRINDROD:  Your Honor, obviously Mr. Smith

8    pleaded not guilty and went to trial, and as we argued at

9    trial, the government had not proven that Mr. Smith

10   intentionally engaged in fraud or that he had awareness of

11   the extensive fraud that was being conducted by people above

12   him in these various organizations.

13         And so I understand the Court's position, and we

14   understand the jury's verdict, but just to be clear for the

15   record and for any further proceedings, Mr. Smith is

16   objecting to those portions of the PSR that attribute him

17   with fraudulent intent and attribute him with the conduct

18   that resulted in his conviction in this case, Your Honor.

19         THE COURT:  Okay.  Thank you very much.

20         Having understood what you have articulated here,

21   the Court believes the defendant has failed to meet his

22   burden to establish that the report is unreliable or there

23   are factual inaccuracies, and the mere fact that the

24   defendant disagreed with the verdict is insufficient.

25         So without more, this first general objection to the

1    PSR factual contentions which have been proven at trial is

2    overruled.

3            We next turn to the 20-level enhancement for loss

4    amount between $9.5 million and $25 million.  And, once

5    again, the defendant objects to the accuracy of the entire

6    loss amount.  It's calculated in paragraphs 27 through 29 and

7    37 through 40.  And what this means, with this objection, is

8    that we would have to go back and retry the case on the

9    losses, but that is not where we're going.

10           First, as the Court has already articulated, the

11   burden is on the defendant, once again.  What is inaccurate

12   about the losses?  Articulate what is inaccurate or untrue

13   about these losses here.

14           MR. GRINDROD:  Your Honor, our position on this is

15   different than our position on the first objection that the

16   Court inquired about, and we tried to set out in as much

17   detail as we could, in ECF 470, the PSR objections.  I'm

18   happy to go through it in detail, but I think we make at

19   least five, maybe six distinct arguments there about various

20   losses attributed in various paragraphs.

21           And so there are, I think -- I'm happy to go through

22   each one of those distinct arguments.  I think that, framing

23   those more broadly, there are essentially two problems with

24   the government's loss proof:

25           One is there are a number of losses described in the

1   PSR that are not attributed to any specific victim, any

2   specific date, and so those -- we think that the proof that's

3   required to substantiate a loss here is not met when the PSR

4   doesn't articulate who suffered the loss, when the loss was

5   suffered, and how Mr. Smith may or may not have been involved

6   in causing that loss.  So that's one kind of category

7   objection.

8          And the other is, accepting that a loss was felt to

9   a victim, there are certain categories of losses to which the

10   government has not sufficiently tied Mr. Smith.

11          And so the government can prove losses, for example,

12   associated with Dental Support Group.  We acknowledge that

13   the government offered at trial testimony about people who

14   made investments through Dental Support Group; they offered

15   testimony about what the purpose of that entity was; and that

16   it was created by Daryl Bank.  The government's theory, I

17   believe, is that it was created essentially as a way of

18   buying out disgruntled DSPF franchise investors.

19          But the problem with those losses and attributing

20   those losses to Mr. Smith is that there is no evidence that

21   Mr. Smith was in any way involved in that separate

22   enterprise, DSPF Group or Dental Support Group.  And, in

23   fact, the very business model that the government describes

24   seems to suggest that Dental Support Group was a competitor

25   in some ways, in fundamental ways, with DSPF.

1          If someone was buying a franchise from an existing
2     franchisee, then instead of doing that, one might think that
3     they could have bought a franchise that had not yet been
4     established by DSPF, Kent Maerki's organization in Arizona.
5     And so every time someone bought a franchise from a
6     disgruntled investor through Dental Support Group, that was
7     costing DSPF in Arizona a potential franchise sale.
8          And so Mr. Bank may have had significant incentives
9     on why he created Dental Support Group.  Mr. Maerki, it's
10     unclear whether he thought it was -- whether he was aware of
11     that or not.  But what the government hasn't established in
12     any way is how Mr. Smith was tied into those when he never
13     made a sale, and there's no record of evidence that he had
14     been.
15          So I'm happy to go through in that much detail for
16     all of them, but those are the categories of losses, and we
17     tried to describe them in our position paper.
18          THE COURT:  Thank you, Mr. Grindrod.
19          The Court understands that when there's an
20     enhancement, the Court has to have the government meet its
21     burden by a preponderance of the evidence.  The Court simply
22     wanted you to clearly specify your objection.
23          So the United States has the burden to state what
24     the losses are by a preponderance of the evidence to overcome
25     this objection, so the Court is prepared to hear from the

```
 1    United States.
 2              MS. O'BOYLE:  Thank you, Your Honor.
 3              Your Honor, the government would rely on the
 4    evidence at trial that was presented by, well, in particular,
 5    Al Martell, who testified for the better part of a day and
 6    who submitted a number of exhibits -- and I will go through
 7    them -- related to the losses in this case, specifically the
 8    investments that were set out in the Presentence Report.
 9              The government has one document that it would like
10    to proffer up, Government Exhibit 1, which is a synthesis,
11    basically, of all -- it puts all the losses in one area, and
12    it lists all the victims related to the investment.  It
13    basically is the binders kind of broken out into one document
14    that is created.  We would ask that it be filed under seal,
15    and it's Government's Exhibit 1 at the sentencing.
16              THE COURT:  Okay.
17              MS. O'BOYLE:  And I'll be referring to that, Your
18    Honor, as I go through this.  And it's the -- it would be
19    this, and it has little red tabs for ease to kind of go
20    through.
21              So in connection with this particular -- with
22    Government's Exhibit 1, the very first set of losses are
23    losses related to Spectrum 100, and these come from
24    Exhibit 517, which was Al Martell's binder related
25    specifically to Spectrum 100.  It lists every single
```

1    individual, the investment that they invested in, the amount

2    of the loss, and their address, which is why we would ask

3    that it be placed under seal.

4            And, Your Honor, if you go to the first red tab,

5    there is ultimately a total for losses related to

6    Spectrum 100, and that was $7,746,510.56.

7            The next investment that we focused on was Western

8    Spectrum.  We specifically called Jeff Browne, who was an

9    investor in connection with that particular investment.  If

10   you'll recall, there were two separate Western Spectrum

11   investments.  This is where the defendant actually created

12   his own spectrum investment and sold it to specific victims.

13           The total loss amount related to these investors was

14   1.3 million, approximately, and that comes directly from

15   Exhibit 102C, which is -- the way that we figured this one,

16   this probably understates the amount of money that they

17   invested, because that's the amount that Janus Spectrum LLC,

18   Mr. Alcorn and Mr. Maerki's entity, received and does not

19   include any moneys that could have potentially been stripped

20   before it got there.

21           If we go to the next -- so then the next listing of

22   investors related to investors in Xcel Bandwidth, but they

23   did it through the entity called Diversified Financing, and

24   if you go to the third tab, the loss attributed to that

25   particular investment, which Mr. Smith sold a substantial

1    amount of, is approximately 2.4 million.  And the basis for
2    this is Exhibits 624 and 629.
3          624, Your Honor, is the summary chart that Al
4    Martell created, where he traced all the funds and analyzed
5    the bank account; and 629 was Ms. Gibson's sales tracker for
6    this particular investment, which reflected, in particular,
7    that Mr. Smith continued to sell and sold a substantial
8    amount of this investment late in 2016 and 2017.
9          The next tab is Xcel Bandwidth.  This was -- if you
10   recall, Raeann Gibson said that they sold Xcel Bandwidth in
11   two different mechanisms:  One was secured promissory notes,
12   and the other was through another entity, another limited
13   liability company.  And so this was the second variation of
14   how they invested in Xcel Bandwidth.
15         And the total here was another 2.7 million.  The
16   basis for this is, again, Exhibit 625, which was
17   Mr. Martell's summary chart of this particular bank account,
18   as well as 629 again, which was Ms. Gibson's tracker that
19   tracked all of the investors in this particular investment,
20   this form of it; and, once again, as the government presented
21   at trial, Mr. Smith continued to sell this investment all the
22   way through August of 2017, until the whole scheme collapsed
23   because Mr. Bank was finally arrested.
24         The next set is every individual who invested in the
25   Dental Support Plus Franchise.  These are the franchise

1    piece, Your Honor.  These are the actual franchises where

2    limited liability companies were created for the investors,

3    that Mr. Smith was involved on the ground floor in connection

4    with this particular investment.

5         The total for Dental Support Plus was $7,322,631.

6    And again, this was -- the basis is Exhibit 200F and the bank

7    accounts that were in the 1001 series.  And, also, we know

8    that this was a total loss because Exhibit 274 was the

9    August 8, 2014, letter that Mr. Maerki sent letting everybody

10   know that he was going to put Dental Support Plus on the

11   shelf.

12        The last tab, Your Honor, the very last investment

13   that's listed through here is DSPF Group, again listing each

14   individual and the amount that they invested, and the total

15   here for DSPF Group is $892,500.  And the basis for that part

16   of the chart is Exhibit 250, which is, once again, Al

17   Martell's summary chart binder that traced all of the funds

18   related to DSPF Group.

19        That, Your Honor, brings the total losses to

20   $22,428,888.48.  And it's the government's position that the

21   20-level enhancement for losses exceeding 9.5 million, that

22   the government is squarely within that.  In fact, we're

23   actually closer to the next band which goes -- we're about

24   3 million away from the 25 million.

25        This is a conservative -- from the government's

1   perspective, this is actually a very conservative loss.  We

2   did not include WeMonitor, which was not part of this trial.

3   We did not feel the need at this stage to add on another

4   investment and prove it up here at the sentencing.

5        We did not include that.  The defendant sold

6   WeMonitor, but we didn't include those -- we actually had a

7   discussion about that prior to coming in here, when the

8   Presentence Report was prepared, and we agreed to remove

9   losses related to WeMonitor from the calculation.

10       It also doesn't include Janus Spectrum Group.  It

11  doesn't include Prime Spectrum.  Those are two other spectrum

12  investments that Mr. Bank presented, which the defendant,

13  because he was involved in all of those conference calls and

14  he was involved in this conspiracy and knew full well what

15  Mr. Bank and Mr. Maerki and Mr. Alcorn were selling -- those

16  arguably could be reasonably foreseeable to him as well, but

17  the government, because he didn't sell Janus Spectrum Group

18  and he did not sell -- he didn't sell Prime Spectrum, we left

19  those to the side.

20       But the government -- here, the defendant was

21  convicted of Count One, which was the conspiracy to commit

22  mail and wire fraud related to Dental Support Plus Franchise

23  and DSPF Group.  That was listed and we presented evidence,

24  and we believe that all of the losses related to those

25  entities were reasonably foreseeable.

1            This defendant, in particular, related to Dental

2    Support Plus.  We had testimony; we presented a transcript

3    that reflected -- specifically, it was Exhibit 286, where the

4    defendant testified in front of the Arizona State Corporation

5    Commission about Dental Support Plus and his involvement in

6    it.  And in that transcript, it reflects that he was involved

7    in a failed investment called Dazzle Dental, which was then

8    repackaged and sold as DSPF.

9            Bill Smith was on the ground floor of this

10   investment.  He was involved in Dental Support Plus Franchise

11   before Daryl Bank was involved in Dental Support Plus

12   Franchise.  He was there at the genesis of this investment,

13   and the government also demonstrated that this defendant was

14   getting overrides on sales to other people's clients.

15           So what Mr. Smith is essentially arguing to the

16   Court is that he doesn't want to be held accountable for

17   sales to victims that he never met and he never spoke to, but

18   he had no problem taking money from them when he was involved

19   in this conspiracy.

20           If the Court recalls, AUSA Yusi showed a copy of a

21   check from DSPF to Bill Smith from Virginia victim Terri

22   Walsh, and Terri replied something to the effect of "He

23   received more money from this investment than I did."

24           And the jury, by convicting him of Count One, they

25   concluded that Bill Smith knowingly and intentionally entered

Carol L. Naughton, Official Court Reporter

1    into this conspiracy to sell DSPF to victims across the

2    country and certainly reaped the financial rewards from doing

3    so, and so as a result, he should be held responsible for the

4    over 7 million in losses related to those entities.

5            He also should be responsible for the losses related

6    to DSPF Group, which were appropriately included in the loss

7    calculation.  He asserts that the group was a competitor to

8    DSPF.

9            I'm at a loss as to how an entity that was created

10   so that you could defraud new investors so that you could

11   repay old investors who were complaining, and salesmen --

12   Tony Sellers, his conspirator Tony Sellers, was paid from

13   these funds -- how that is somehow in competition with the

14   original DSPF.

15           As a conspirator with Daryl Bank, he was on the

16   conference calls, Your Honor.  Exhibit 235 is a conference

17   call where Daryl Bank specifically talks about DSPF Group and

18   the creation of DSPF Group, and it was discussed by

19   Mr. Maerki at different times.  And Mr. Smith, more

20   importantly, continued to work with Daryl Bank and Kent

21   Maerki even after Dental collapsed and all the investors lost

22   their money in August of 2014.

23           So the $892,500 in losses were certainly foreseeable

24   to Smith, and he should be held accountable for them,

25   particularly given that the jury found him guilty of

1    Count One for the DSPF conspiracy in total.  They want to try

2    to extract it and make it a totally separate thing, and it

3    wasn't, Your Honor.

4              Focusing just specifically on the last two -- what I

5    kind of view as the last two objections that Mr. Grindrod and

6    Mr. Smith made related to Diversified Financing and then

7    Spectrum 100 -- those were, as the government read it, those

8    were the last two issues that he had.

9              Diversified Financing, I was a little perplexed

10   because as the Court can see -- and you can see in the

11   exhibits of Government 629, 624, and 625 -- the only losses

12   related to Diversified Financing that the government is

13   relying on here are those related to Xcel Bandwidth.

14             And it was very clear from Ms. Gibson's testimony,

15   from Mr. Martell's testimony, and from the victims who

16   invested in Xcel, that Mr. Smith was very involved in selling

17   this.  He sold more of it than any other salesman at this

18   point in the conspiracy, because most folks had actually --

19   Mr. Sellers, Mr. Barnett, the two other conspirators in this

20   case, had already withdrawn from the conspiracy at this

21   point.

22             So I think there might be a little bit of confusion

23   with the reference to Diversified Financing, but make no

24   mistake, the evidence was that these relate to Xcel

25   Bandwidth, and the only amounts that are included here in the

1    losses are related to the sale of Xcel Bandwidth by Daryl

2    Bank, Bill Smith, and a couple of other salesmen who were

3    relatively new to this venture and who had not been involved

4    as long as Mr. Smith had.

5         So these losses, as well, were within the scope of

6    this criminal activity, are squarely within the heart of

7    Count Two -- which is conspiracy to commit mail and wire

8    fraud related to the spectrum investments -- and were

9    certainly reasonably foreseeable from Mr. Smith because he

10   sold a ton of it.

11        So the last objection that I believe he had was

12   related to the losses for Spectrum 100.  And again, the

13   government believes that it was very appropriate to include

14   losses related to the full investment here because he was

15   involved in a conspiracy.  Count Two charged the conspiracy

16   related to spectrum investments.

17        And Spectrum 100 was, by far, the largest investment

18   that Daryl Bank created and solicited investors for.  It was

19   the largest loss.  And Bill Smith sold a ton of Spectrum 100

20   as well.  It was talked about again in the conference calls

21   amongst all the sales folks.  When there were conferences in

22   Vegas, it was discussed.

23        And again, this particular defendant was warned.

24   Doug Dunn specifically testified that he warned Bill Smith

25   about Daryl Bank and continuing to work with him, and yet the

1    defendant never stopped.  And that was a theme that was at

2    trial amongst the witnesses in this case and that the

3    government argued to the jury.  And even after Spectrum 100

4    failed to provide any return on investment, he didn't

5    disassociate, and he continued to sell fraudulent

6    investments.

7           So the defendant here was involved knowingly and

8    intentionally in a conspiracy to defraud investors related to

9    spectrum.

10          We have -- we have conservatively calculated those

11   losses based on an investment that this defendant sold, and

12   he knew full well that Daryl Bank was selling this through a

13   number of other people, including Tom Barnett, including

14   others that were selling it, and as a result, they were

15   reasonably foreseeable to him and were appropriately included

16   in this loss calculation, Your Honor.

17          I think that would conclude the government's

18   presentation related to losses, unless the Court has any

19   questions.

20          THE COURT:  The Court has no questions.

21          MS. O'BOYLE:  Thank you.

22          THE COURT:  Government's Exhibit 1 will be admitted.

23          Any response, Mr. Grindrod?

24          THE CLERK:  Under seal?

25          THE COURT:  Under seal.

```
 1              (Government Exhibit 1 was admitted under seal.)
 2              MR. GRINDROD:  Yes, Your Honor, I'll start with the
 3    reference to Western Spectrum losses.
 4              And so our objection to the Western Spectrum losses,
 5    as set out in ECF 470, was that there was just a conclusory
 6    assertion without dates, investor names, or any other
 7    information about losses related to Western Spectrum.  This
 8    is at the bottom of Page 3 of our objections.
 9              THE COURT:  Okay.  Let's take that back to the
10    Presentence Report.  It's the bottom of your objections.
11    Let's take it back to the Presentence Report, to the
12    paragraph you're objecting to.
13              MR. GRINDROD:  Paragraph 38, Your Honor.
14              THE COURT:  Hold one second.
15              So those were losses of $1,300,390.
16              MR. GRINDROD:  Correct, Your Honor.
17              So our position before today's hearing was that's
18    just a conclusory label.  There's not evidence to support it.
19              The government's response this morning was to look
20    at Government's Exhibit 1, which the pages aren't numbered,
21    but when you flip to the section -- I think yours might be
22    tabbed, Your Honor.
23              THE COURT:  Pass Exhibit 1 back up.
24              THE CLERK:  You still have it there.
25              THE COURT:  Oh, I sure do.  Let's see if we can find
```

1    what page you're on, Mr. Grindrod.  Okay.  I think the Court

2    has it.

3            MR. GRINDROD:  It's just after the Spectrum 100 and

4    before the Diversified Financing FBO Xcel Bandwidth.  And all

5    we have here, unlike the government's other alleged losses in

6    this exhibit, there's no name, there's no date, there's no

7    investor amount.  It just says Western Spectrum investments

8    and then lists that same conclusory number.

9            Now, this Court obviously has to make specific

10   findings about losses.  Those losses can be estimated, but

11   there has to be some factual basis for them, and here it's

12   just the government's say-so.  They didn't prove these losses

13   at trial.  They certainly haven't done anything more to add

14   to that at sentencing, and so we would ask that those be

15   stricken.

16           The only other reference, I believe -- and I was

17   trying to pay attention, and Ms. O'Boyle can correct me if I

18   was wrong, but I think the only other reference as far as

19   factual support for that objection that was offered today was

20   a reference to Government's Exhibit 1002C, which appears to

21   be a Janus Spectrum account statement from their Wells Fargo

22   Bank account.

23           It's unclear to me -- and I couldn't go through it

24   in great detail sitting there at the table this morning, but

25   it's unclear to me where the factual support is for that

1   objection.

2          So that's my response to that, Your Honor.  I'm

3   happy to answer any factual questions.

4          With respect to Diversified and distinguishing

5   Diversified versus Xcel, I agree with Ms. O'Boyle that the

6   clarification that was offered this morning was helpful in

7   the sense that it wasn't clear in the PSR, and perhaps the

8   defense just didn't put together what the government thought

9   was obvious, but the government, I think, has clarified that

10  the Diversified reference in the PSR was a reference to Xcel

11  Bandwidth-type losses.

12         THE COURT:  So you're withdrawing your objection to

13  that?

14         MR. GRINDROD:  Well, I withdraw that aspect of the

15  objection, that we don't even know what this is.  I guess my

16  objection to that is still the same as it is for the excess

17  losses associated with Spectrum 100 or Xcel or DSPF, which

18  is, in our view, Mr. Smith shouldn't be held accountable for

19  losses that are tied to transactions that there isn't any

20  factual tie to.

21         And so we still have, essentially, the lack of a

22  nexus between Mr. Smith and the loss that's suffered other

23  than he sold this product and so every loss associated with

24  that product is attributable to him.

25         And Ms. O'Boyle's response to that, at least with

1    respect to Dental Support Plus Franchise this morning, was,

2    well, Terri Walsh didn't have any interactions with Mr. Smith

3    and yet Mr. Smith got paid.  I think that begs the question,

4    right?  Our whole point is, okay, well, then, that goes into

5    the bucket of transactions in which he can be factually tied

6    or to which he received some -- from which he received some

7    sort of benefit.

8            The whole point is what about all of the other sales

9    that there is no connection between Mr. Smith and that sale

10   other than the fact that he was one of many salesmen working

11   for these companies?

12           THE COURT:  But that's not the law.  That's not the

13   law, that he has to be factually involved or be a

14   beneficiary.  That's not the law, when he's convicted of a

15   conspiracy, that he's aware and he's a participant in the

16   conspiracy.  He's responsible for conduct of conspirators,

17   co-conspirators.

18           MR. GRINDROD:  Conspiratorial liability along the

19   lines that Your Honor just discussed is broader than relevant

20   conduct and the government's duty to -- burden of proving

21   jointly undertaken criminal activity.

22           And so I think what Your Honor said is not wrong,

23   but it's not -- it doesn't answer this question, which is

24   when you have to make specific factual findings as to what is

25   the scope of the jointly undertaken criminal activity, what

1  transactions fell within the scope of that jointly undertaken

2  activity?

3         Those are the questions that are going to lead to

4  the loss-amount answer, and those are the -- I think what I'm

5  describing is certainly one way the government can prove it.

6  If the government wants to point to other cases in which a

7  broader theory is available, then so be it, but I think that

8  our argument is that the conspiracy question is something

9  that may be relevant for some purposes but doesn't answer the

10  relevant conduct inquiry under the cases that we cite in our

11  position paper.

12         THE COURT:  There are three things that the Court

13  has to answer, and the Court knows what those three questions

14  are.  And you go on and continue with your argument.

15         MR. GRINDROD:  Your Honor, I think that our

16  objection with respect to the Spectrum 100 losses, the

17  Diversified as clarified by Ms. O'Boyle, the other Xcel

18  losses, and the DSPF losses are all that same category of

19  objection, and so I think, whether the Court agrees with our

20  view of the law on that or not, I think those probably all

21  cash out the same way depending on how Your Honor rules.

22         So I'll just turn briefly to Dental Support Group.

23  I mentioned this in my kind of opening remark.  Just to

24  respond to Ms. O'Boyle, I think it is pretty clear how they

25  are, in function, acting as competitors.

1          When you have a finite amount of money, if some
2    person or group of people has $25,000 to buy an investment
3    and they're going to buy a Dental Support franchise, if they
4    buy it directly from Kent Maerki, Kent Maerki puts 25,000 in
5    his pocket.  If they buy it from somebody who bought that
6    same franchise eight months earlier, Kent Maerki does not
7    have $25,000 in his pocket; that person does.
8          And so, again, the leaders of the scheme who were
9    concerned about people, you know, figuring out what Kent
10   Maerki and Daryl Bank were doing, I can understand why they
11   would want to buy off disgruntled investors, but if the scope
12   of Mr. Smith's jointly undertaken criminal activity is the
13   success of DSPF, then why would someone want to take a sale
14   of a franchise away from DSPF and instead have that sale
15   coming from a private seller?
16         I think that's how they're competitors.  I don't
17   know if the Court has questions about that, but that's our
18   theory on that.
19         THE COURT:  Okay.  Thank you.
20         Ms. O'Boyle, can you respond to that last question
21   that he just raised, about the relationship between Dental
22   Support Plus and Dental Support Group?
23         MS. O'BOYLE:  Yes, Your Honor.
24         THE COURT:  I think the Court heard you initially
25   when you talked about the way Dental Support came about, but

1   let's further amplify on that, please.

2           MS. O'BOYLE:  Just so we can be very clear, they are

3   not competitors because at the end of the day, the money was

4   ending up at Dental Support Plus Franchise.  Daryl Bank was

5   taking 30 percent off the top, and he was sending the money

6   back to Kent Maerki and the entity, and it was continuing to

7   sustain this criminal enterprise that Mr. Smith was a part

8   of, was one of the very -- one of the people who was there at

9   the genesis of the event.

10          So the fact that Daryl and Kent created an entity so

11  that they could continue to rip off customers is certainly an

12  entity that is supporting the criminal enterprise that

13  Mr. Smith knowingly and intentionally engaged in.

14          So the exhibit that I would point you to, Your

15  Honor, that provides that -- that summarizes that is 250A,

16  which is the summary chart of the DSPF Group account.  And

17  that particular summary chart shows exactly what the

18  government said, which is they would get money from investors

19  and it would go into the DSPF Group account.

20          Daryl Bank and Raeann Gibson would take 30 percent

21  straight off the top into their entities and then send 70

22  percent of the money to either pay off disgruntled investors

23  or send money back to Kent Maerki, who then would pay off

24  disgruntled investors.

25          So at the end of the day, it wasn't in competition

1   with Dental Support Plus.  It was an entity that was created

2   to continue the fraud, because at the end of the day, the

3   franchises were not performing, and at this point, everybody

4   knew it.  And the only way that you could continue to keep

5   this enterprise afloat was to create a new entity, not tell

6   people that it was failing, and rip off new investors so that

7   you could repay old investors, and in one instance,

8   Mr. Sellers, a conspirator, got $40,000 himself in connection

9   with this investment.

10          So it's not in competition with Dental Support Plus.

11  It was a way to continue the fraud.  And this particular

12  defendant -- the government proved it at trial; the jury

13  convicted him of Count One that alleged this whole criminal

14  enterprise related to DSPF and DSPF Group that started in

15  January of 2011 and went all the way through August of 2014.

16          And this defendant was involved in all of it, and he

17  never disassociates himself from Mr. Bank even knowing that

18  all this is going on.  He continues to sell Mr. Bank's

19  investments all the way through August of 2017.

20          So that's the government's response to that

21  question, unless the Court has any other questions.

22          THE COURT:  No.  I think the Court has heard enough

23  from both parties here about the tendered loss in this case.

24  And the Court understands the defendant's objection to the

25  loss amount here.

1          The defendant objects to the accuracy of the entire
2    loss that's been calculated in this case, essentially because
3    the defendant contends that he wasn't involved in the
4    planning, the organizing, or the supervising of the broader
5    conduct in this conspiracy, and so the defendant really wants
6    to limit his loss to those things that he says he was
7    personally involved in or maybe with people that he was
8    closely connected with.
9          But the Court has a different approach to this, and
10   that is, the Court understands that this defendant is charged
11   with conspiracy.  It's a broad conspiracy that's been charged
12   in this indictment.  And what the evidence has shown is --
13   and the Court sat through this trial, and the Court's handled
14   a number of other sentencings involving this same trial --
15   that we're dealing with a jointly undertaken criminal
16   activity here; jointly undertaken criminal activity.
17         And when that happens, the law is a defendant is
18   accountable for the conduct -- acts and omissions -- of other
19   folks that were within the scope of the jointly undertaken
20   criminal activity, in furtherance of that criminal activity,
21   and for things reasonably foreseeable in connection with the
22   criminal activity.
23         So as we approach the determination of what the law
24   should be, the Court has to focus really on the scope of the
25   jointly undertaken criminal activity, acts that were taken in

1  furtherance of that criminal activity, and what was

2  foreseeable from the conduct that took place in that criminal

3  activity.  And as the Court understands here, the Court is

4  clearly recalling the defendant's involvement in this case.

5       The government has approached its burden to prove by

6  a preponderance of the evidence what the loss is by referring

7  back to the record and exhibits, and they have introduced

8  Government's Exhibit 1 to identify the amounts of the loss

9  involved in this particular case.

10      Now, in terms of whether the defendant was involved

11  in the conspiracy, the jury has found that he was criminally

12  involved in this conspiracy; the evidence at trial showed

13  that he was criminally involved.  He was involved with

14  Mr. Maerki and Mr. Bank when they conducted phone calls in

15  support of the criminal activity.  So he was aware of what

16  was going on when they were talking about the offerings and

17  how to make pitches to the clients; he was involved.

18      He was involved in a number of these sales and

19  offerings from the beginning and stayed in it through 2017.

20  So he cannot say he was not aware of what was going on.  It

21  does not matter that he didn't know every other sale that was

22  made by an individual, but he does know that he was involved

23  in criminal activity to sell fraudulent franchises,

24  fraudulent investments.  He knew that much, and he profited

25  from it.

1          So he was in a position where, the evidence shows,

2    that he could reasonably foresee harm to other people.

3    Though he did not know every sale that was being made by

4    other salespersons, he knew the sales were taking place, and

5    he knew the sales were fraudulent, and that's what it boils

6    down to, in a nutshell.

7          So he has some accountability for the acts of other

8    people who did things within the scope of this criminal

9    episode, and the criminal episode here was the provision of

10   fraudulent franchises and other investments to people from

11   which they profited.

12         Now, if we go back and look at the Government's

13   Exhibit 1, the United States has pointed out some of the

14   exhibits in trial that support what is set forth in the

15   exhibits.  They refer to Exhibit 102 on Xcel Bandwidth,

16   Exhibit 624 and 629, the testimony of Raeann Gibson that

17   supported the figures there.

18         They also referred to other exhibits, Exhibit 200F

19   and 250, for support of the figures set forth on Dental

20   Support franchise.  Mr. Smith was involved in the Dental

21   Support franchise offerings from the beginning.  That loss is

22   calculated at $7,322,631.  Okay?  That was Exhibit 250.

23         They also pointed out that the Dental Support

24   franchise group was also involved in these -- in this

25   fraudulent investment scheme, and the moneys coming from that

1    were used to repay old investors.  This was Exhibit -- I
2    think 235 was involved.
3           Then there's Diversified Financing that both parties
4    have referred to here that was also involved in this scheme,
5    as well as Spectrum 100, from which funds were lost.
6           The Court adopts the loss amount set forth in the
7    exhibit, except the Court will strike and will not consider
8    the spectrum investors in paragraph 38 of the Presentence
9    Report because the Court doesn't believe that the government
10   has laid out sufficient detail to support that amount.
11          So what the Court is going to do is the Court is
12   going to subtract that amount of loss from the loss that they
13   have stated the defendant should be responsible for.  The
14   ultimate loss was $22,428,888.48, and we're going to have to
15   subtract that $1,300,390 from that amount to come up with the
16   final amount of loss.
17          Otherwise, I think that the government has shown by
18   a preponderance of the evidence, referring back to the trial
19   evidence and Exhibit 1, that the defendant is responsible for
20   a loss far in excess of 9.5 million and well within the scope
21   of the sentencing guideline which would support the 20-point
22   enhancement.  It's far more than 9.5 million.
23          Even if the Court strikes a substantial portion of
24   what the government has said here -- even the Spectrum 100
25   has a loss of $7,746,000, then we look over at the Dental

1    Support franchise, and that has a significant amount.  So

2    we're far beyond $9,500,000.

3              So the bottom line is, the Court believes that

4    there's sufficient evidence here, based on what was submitted

5    at trial and the summary the Court has right here now, to

6    support the 20-point enhancement.  The only thing the Court

7    has to do is redo the math, unless somebody else has already

8    done the math.

9              MS. O'BOYLE:  Your Honor, I think I've done the

10   math, if someone could check me.  I believe the loss now

11   is -- and we'll have to alter the restitution order as well,

12   but that will be easy to do -- $21,128,498.48.

13             THE COURT:  Okay.  Now, Mr. Grindrod, I'll give you

14   a chance to recheck that, and the Court will also, with its

15   slow calculator.

16             (Pause)

17             MR. GRINDROD:  We agree with that calculation.

18             THE COURT:  Okay.  All right.  So we now shift the

19   loss here to $21,128,498.48.  Okay.  That's the Court's

20   finding with respect to the loss amount.  The Court grants

21   the objection and denies the objection in part by changing

22   the amount of the loss.

23             We now go to the third objection that the defendant

24   raises here in the case.  And that has to do with the

25   four-level enhancement for an offense involving securities

1    law.  And the government has the burden here.  I think when

2    it all boils down, we've got to determine whether this

3    enhancement should apply and whether the defendant is engaged

4    in conduct involving securities law when we break it all

5    down.

6            And the government has the burden to show that;

7    otherwise, the Court is going to strike the four-level

8    enhancement.  So the Court is prepared to hear from the

9    United States.

10           Does the defendant's violation involve securities

11   law sufficient to warrant an enhancement under 2B1.1(b)(20)?

12           MS. YUSI:  Thank you, Your Honor.  The government

13   does believe -- as we stated in our position on sentencing,

14   we do believe the four-level enhancement is appropriate.

15           And defendant is right that he wasn't charged with a

16   violation of securities law, but he doesn't have to be

17   charged with a violation of securities law in order to get

18   this enhancement.

19           He held himself out as an investment adviser,

20   whether he used those words specifically or not.  But the

21   definition of "investment adviser" is "any person who, for

22   compensation, engages in the business of advising others,

23   either directly or through publications or writings, as to

24   the value of securities or to the advisability of investing

25   in, purchasing, or selling securities, or who, for

1    compensation and as part of a regular business, issues or

2    promulgates analyses or reports concerning securities,"

3    which, as the Court saw throughout the entire trial, he

4    clearly was engaged with, and we had several different

5    witnesses specifically say that they believed he was their

6    investment adviser, being Ms. Sharyon Bean, Ken Sykes, Carol

7    Groff.

8            And in terms of whether or not these were

9    securities, Your Honor, we didn't, again, have to prove that

10   at trial; however, under the Howey Test, which I know this

11   Court is familiar with, a security is considered a security

12   if it's an investment of money, there's an expectation of

13   profits from the investment, the investment of money is in a

14   common enterprise or pooled together, and any profit from the

15   efforts of -- any profit comes from the efforts of a promoter

16   or a third party.

17           And, Your Honor, particularly in the spectrum

18   investments, Your Honor, those were all investments of

19   moneys; all of the people that invested in it expected

20   profits based on Mr. Smith's promises and fraudulent

21   representations; it was all pooled together, as we saw

22   throughout the summaries that Ms. O'Boyle mentioned; and any

23   profit comes from the efforts of a promoter or third party.

24   The promoter here was Mr. Smith, and so these were clearly

25   securities.  Whether or not we had to call them securities,

1   it was a whole nother level that we didn't need to do at

2   trial, but we do so now.

3          Your Honor, in terms of specific evidence, other

4   than the testimony we mentioned that was presented at trial,

5   where Mr. Smith does present himself as an investment adviser

6   as that is defined, we look at:

7          Government's Exhibit 202, which is one of the

8   advertisements for Dental Support Plus that Mr. Smith would

9   give to his potential clients or his clients, and that was

10  that tri-fold brochure, Your Honor, that we saw again and

11  again during the trial, that included the feasibility

12  modeling illustration, talking about the potential revenue

13  and profits that each of these clients would make;

14         Exhibit 637, Your Honor, which was a PowerPoint that

15  Mr. Smith provided to clients entitled "Collateralized Fixed

16  Asset Planning" and talking to them specifically about

17  investing in the collateral side of different investment

18  opportunities;

19         And on the last page of Exhibit 637 where it talks

20  about "About the Author," that A. W. Smith of A. W. Smith &

21  Associates has been ranked among the top three financial

22  consultants in the U.S.A. from 1986, and he talks about all

23  of his background, where he's talking to people that he's

24  going to help them invest for the future, for profit, and

25  these are all in common enterprises, in particular for the

1    spectrum investments;

2         Exhibit 826 that was presented at trial through

3    Mr. Sykes is an e-mail where he attaches, again, an

4    investment, a structured income planning report that he

5    prepared for the Sykeses that talks about the income plan for

6    the Sykeses if they invest in those particular things;

7         We've seen the agreements, Your Honor, again and

8    again -- just as an example, the one with Mr. Sykes was

9    Exhibit 833 -- the agreements where they're putting in money

10   into a joint venture or pooled money, and we saw again and

11   again all the different types of agreements or promissory

12   notes, or however they decided to call it.  All it was was an

13   investment into pooled money;

14        We also have Exhibit 860, Your Honor, which was one

15   of the audio recordings from Mr. Smith's radio show where

16   there was a clip of an advertisement for people to call him

17   for all their financial planning needs;

18        Exhibit 1216, Your Honor, which was the video that

19   we saw where A. W. Smith presents spectrum, which was the one

20   that he used.  I think Mr. Maerki had done one; Mr. Smith did

21   a voiceover and presented the whole video, as well, trying to

22   hock the spectrum investments;

23        And in terms of whether Mr. Smith had any awareness

24   that these were in violation of securities laws, you can look

25   at Government's Exhibit 3, which was the background,

1    Mr. Smith's background in FINRA, and all the different levels
2    of testing that he had taken and had kept up to date at some
3    point.  He had let them lapse by the time he was selling most
4    of these products, Your Honor, but he knew these were
5    investments, and he knew that these people were -- that they
6    were trusting him as investment advisers.
7          And, Your Honor, we believe, based on these, the
8    defendant's objection should be overruled.
9          THE COURT:  So you're saying to the Court because he
10   held himself out as an investment adviser and he was selling
11   securities, he was involved in violations of securities law?
12         MS. YUSI:  Correct, Your Honor.  These were
13   unregistered securities, Your Honor, based on the Howey Test.
14   Like I said, he didn't have to be charged with violations of
15   securities law, but he held himself out as an investment
16   adviser, and under the Howey Test on whether or not these
17   were investment contracts or securities, they tick all the
18   boxes, Your Honor.
19         THE COURT:  Okay.
20         MS. YUSI:  Thank you.
21         THE COURT:  Mr. Grindrod?
22         MR. GRINDROD:  So, Your Honor, there are two
23   questions that the Court has to answer in the affirmative to
24   sustain the government's position here and overrule our
25   objection.  They haven't met either.

1           The fundamental question, though -- this is a very

2   easy question to answer now because the government had to

3   show that Mr. Smith violated the securities laws.  As defined

4   by the guideline, the guideline says "Securities law means,"

5   and then it lists a number of statutes, and it lists -- and

6   it says, "includes the rules, regulations, and orders by the

7   Securities and Exchange Commission" that are issued pursuant

8   to those statutes.

9           THE COURT:  What section of the guidelines are you

10  talking about?

11          MR. GRINDROD:  Your Honor, this is in 2B1.1, and

12  it's comment note 16(A).

13          THE COURT:  The Court simply wanted to go right back

14  to where you were, Mr. Grindrod, and you said you were in

15  2B1.1.

16          MR. GRINDROD:  Yes.  The definition of "securities

17  law" appears in the comment 16(A).  The guideline provision

18  that the term appears in is 2B1.1(b)(20)(A)(iii).

19          THE COURT:  The Court's got it.  Okay.

20          MR. GRINDROD:  I don't want to get too lost in the

21  weeds here.  My point is they have to show a violation of a

22  statute or an SEC rule or regulation implementing that

23  statute.

24          They did not cite in their position paper a single

25  securities statute or securities regulation implementing

1    those statutes.  Ms. Yusi talked this morning.  She did not

2    cite a single securities law.  So how can they have possibly

3    met their burden when they have not even identified the

4    securities law that they claim Mr. Smith violated?

5           They're right; they don't have to charge him with it

6    and prove it at trial, but they have to at least mention a

7    statute when they're saying that the threshold question of a

8    violation of securities law has been satisfied.

9           The second point, Your Honor, is what Ms. Yusi spent

10   most of her time on this morning, which was whether Mr. Smith

11   qualified as an investment adviser.  Again, this is not an

12   investment adviser and you just figure out what the ordinary

13   meaning of that term is.  This is a statutorily defined term,

14   and the statutory definition is incorporated into the

15   guideline provision.

16          We dealt extensively with the specific statutory

17   definition and what is necessary to make that showing in our

18   position paper.  The government says, well, people thought of

19   him as advising them, he held himself out as being an

20   investment adviser.  That's not how you answer a question of

21   statutory interpretation whether someone actually meets a

22   statutory definition.

23          The whole point of the investment adviser definition

24   was to distinguish between people who are compensated

25   basically for providing advice about whether or not it was a

1    good idea to invest in this security or that security versus

2    people who are compensated on a transaction basis, like

3    broker-dealers or other people who were compensated through

4    commissions.

5            Now, I think the uncontradicted testimony at trial

6    was that Mr. Smith was compensated by commissions.  If

7    someone came in and sat down in his office for an hour and a

8    half and they talked but he didn't sell an investment

9    product, he wasn't compensated for that.

10           If, on the other hand, somebody came in and said

11   "this is what I want, I know right away, you don't have to

12   talk to me about it at all" and he sold a DSPF unit, he got

13   his commission for that unit.

14           And so the government can't just say, at a high

15   level, everyday folks might call him an investment adviser.

16   That's not the regime that the statute sets up or that the

17   guidelines incorporate.

18           And I'd be happy to answer any questions the Court

19   has about those positions, but I think the easiest way to

20   revolve this is just at the threshold question of the fact

21   that it was the government's burden, and in their entire

22   written filing and in their entire oral presentation today,

23   they haven't identified what securities law they say he

24   violated.

25           THE COURT:  Okay.  We have a four-level enhancement

1    for an offense involving securities law.  It's

2    Section 2B1.1(b)(20)(A)(iii).  And the defendant has objected

3    to this particular enhancement.  The enhancement applies in

4    the case of a defendant convicted under a general fraud

5    statute if the defendant's conduct violated securities law or

6    a commodities law, even if the officer is convicted of wire

7    fraud.

8         Now, there's no question the evidence has shown, if

9    you look at the definition of an investment adviser under the

10   Investment Advisers Act of 1940, the defendant has held

11   himself out as an investment adviser.

12        If we look further down to determine whether under

13   the Investment Advisers Act of 1940, which the guidelines

14   certainly refer to, whether he is engaged in dealing with

15   securities, the Investment Advisers Act clearly defines

16   securities, and when you look through these definitions,

17   there's no question in the Court's mind that the defendant

18   was selling securities.

19        The only question the Court has is -- and the

20   defendant has raised this -- the government had the burden to

21   show the defendant's violations involved securities law to

22   warrant an enhancement under 2B1.1(b)(20).

23        Now, there are any number of statutes -- there's

24   several statutes certainly named that involve violations of

25   securities law:  18 U.S.C. Section 1348, 1350, and 3(a)(47)

1  of the Securities Exchange Act of 1934.  And certain rules

2  and regulations under the SEC certainly could be relied upon

3  as securities law that the defendant violated.

4        The Court does not clearly see that this has been

5  laid out in the government's position paper, and certainly

6  none of those statutes were argued this morning by the

7  United States.

8        The bottom line is the Court will find the

9  government has not met its burden to establish by a

10  preponderance of the evidence that he was involved in

11  violations of securities law, so the Court will strike the

12  four-point enhancement on this particular point, on this

13  particular objection.

14        Now let's move on to the fourth objection.

15        MR. GRINDROD:  Your Honor, this has -- I'm sorry,

16  did Your Honor want me to start, or did you have comments

17  before I start?

18        THE COURT:  No, not yet.

19        MR. GRINDROD:  Your Honor, I'll really rely on our

20  written submission on this, unless the Court has any

21  particular questions.  We tried to describe our objection to

22  the -- our objection to the obstruction enhancement in our

23  filing.

24        In very brief summary, with respect to the alleged

25  comments by Mr. Sykes, accepting for the sake of argument

1   that his testimony would be credited, which we don't admit

2   but we understand the Court might credit that testimony,

3   there's still an absence of evidence as to why Mr. Smith may

4   have said that, and the government has the burden of proving

5   that Mr. Smith acted with a particular purpose, the purpose

6   of obstructing an investigation.  So we think that evidence

7   is lacking here.

8            And with respect to the destruction or shredding of

9   any evidence, the government has to show that the destroyed

10  evidence was material.  Here, I think the evidence is

11  undisputed; the government never made any attempt to try to

12  obtain records from Mr. Smith or determine what records were

13  even destroyed, if any were, and so the showing as to the

14  materiality of any records that were destroyed, I think is

15  belied by the government's own conduct.

16           If they thought that Mr. Smith had material

17  information, presumably it would have got a search warrant or

18  asked for some way of obtaining that information, none of

19  which the government did.

20           Other than -- I can answer the Court's questions or

21  elaborate more, but we tried to set it out in our filing.

22           THE COURT:  Thank you.

23           MS. YUSI:  Your Honor, as we discussed in our

24  position paper, there were two aspects that we were focused

25  on as to why Mr. Smith deserves the two-level enhancement for

1    obstruction of justice; the first being Mr. Sykes asking

2    where his money was, getting excuses from Mr. Smith, and

3    Mr. Smith blaming government investigations and government

4    interference, and then he said, "Do not talk to the FBI if

5    they call you."

6           And we heard from Mr. Dunn during trial, Your Honor,

7    when they met up at a conference, or somewhere like that, he

8    had warned Mr. Smith that there were too many investigations

9    and that where there's smoke, there's fire.  Mr. Smith knew

10   about these investigations for many years.

11          In terms of when he was deposed by the bankruptcy

12   trustee, Your Honor, he stated that it was around the

13   beginning of 2018 that he decided not to renew his license

14   and that he joyfully got rid of -- as the creditors started

15   coming after him, that he joyfully shredded all the documents

16   and cleaned his computers.

17          And as this Court knows, Mr. Bank was indicted in

18   2017, so in terms of his knowledge that there were active

19   investigations going on and that he intended to obstruct

20   justice, we believe that the evidence has shown that.

21          THE COURT:  Okay.  Thank you.

22          Before the Court is the defendant's objection to a

23   two-level enhancement for obstruction of justice under 3C1.1.

24          Under 3C1.1, the defendant should receive this

25   two-level enhancement if he "willfully obstructed or impeded,

1    or attempted to obstruct or impede, the administration of

2    justice with respect to the investigation, prosecution, or

3    sentencing" et cetera, "the obstructive conduct related to

4    (A) the defendant's offense of conviction and any relevant

5    conduct; or a closely related offense."

6            And the government is suggesting here that the

7    defendant has willfully, or for the purpose of obstructing

8    the investigation, that he has engaged in conduct that was

9    material.

10           The allegation is -- and I don't think it's

11   disputed -- that the defendant attempted to persuade an

12   individual, K.S., not to basically cooperate with law

13   enforcement by not talking to them;

14           Secondly, that he shredded certain files in evidence

15   when he knew an investigation was ongoing certainly

16   pertaining to some of his co-conspirators' conduct, and he

17   was a co-conspirator, and he did this prior to the time --

18   after one of the primary co-conspirators had already been

19   investigated.  And it's on this ground that the government

20   seeks to have him receive a two-level enhancement.

21           Now, I have another question for the government, and

22   that is, since he clearly had not been focused upon -- I

23   don't know that Mr. Smith had been approached by the

24   United States or anyone at that juncture about his conduct --

25   do we know whether what he destroyed was, in fact, material

1    to what the United States really wanted from Mr. Smith?

2    That's what the Court is beginning to wonder about.

3            He shredded his files.  What files?  Were they files

4    related directly to this case or his other conduct, since he

5    was involved in other conduct?  In other words, the Court has

6    some concern about the materiality of what he was doing.

7            "Do not speak to law enforcement," and he joyfully

8    shredded certain files that he had.  He was dealing with the

9    State of Arizona at that time.

10           This is a multipronged, multiyear conspiracy here,

11   and at this juncture, it's not very clear to the Court that

12   the government has met its burden, unless the government has

13   something else they want to add on this two-level enhancement

14   here.  If not, the Court will strike the two-level

15   enhancement.

16           I don't think it has been shown by a preponderance

17   of the evidence that it should be applied, even though

18   Mr. Smith's conduct was questionable here.

19           So what it boils down to, in effect, the Court has

20   taken out a four-level enhancement and a two-level

21   enhancement, so the Court believes that where we started off

22   with an offense level of 39, we are down now to an offense

23   level of 36.  That's the Court's calculation.

24           MR. GRINDROD:  I'm sorry, Your Honor, I think it

25   might be 33.  So 39 minus the 4 for the one and 2 for the

1    other.  That's 6 off.

2         THE COURT:  That's just plain bad math on the part

3    of the Court.

4         MR. GRINDROD:  That's all right.  We did the hard

5    math earlier with the millions of dollars.

6         THE COURT:  I think I learned to do that in

7    elementary school.

8         Okay.  It's 33.  Anything else?

9         MS. YUSI:  Your Honor?

10        THE COURT:  Yes, ma'am.

11        MS. YUSI:  We had agreed based on that it would be

12   double-counting if he had received -- Mr. Smith received both

13   the four-level for the investment adviser as well as the

14   abuse of trust, and we agreed that it would be inappropriate

15   to get both of those; however, considering the Court's

16   ruling, we do believe that he should get the two-level

17   enhancement for abuse of trust.

18        MR. GRINDROD:  Your Honor, we set out our

19   substantive objection to that at Pages 10 and 11 of our

20   filing.  I don't think the government even addressed it in

21   their filing.  Perhaps they can point me to it if I'm just

22   missing it.

23        But the government hasn't raised this at all in

24   their written filings when they had the opportunity to.  I

25   think it's been either waived or forfeited.  But I'm happy to

1    address the substance if you want.

2           THE COURT:  Well, the United States -- first of all,

3    there's no objection.  There was nothing in the position

4    papers, that the Court recalls, arguing for the two-level

5    enhancement for abuse of trust in the event the Court did not

6    find that the four-level enhancement was appropriate.

7           It was not there, and for the sake of -- I withdraw

8    that statement.  It was not there, and so the Court is not

9    inclined to go back now and add that, so I think we're going

10   to have to go on with what we have here.

11          MS. YUSI:  That's fine, Your Honor.

12          THE COURT:  All right.  Anything else, Mr. Grindrod?

13          MR. GRINDROD:  No, Your Honor.

14          THE COURT:  All right, then.  Stand up, Mr. Smith.

15          Mr. Smith, the Court finds that you have a Criminal

16   History Category of I, an offense level of 33.  The advisory

17   guideline range is 135 to 168 months.

18          You may produce evidence this morning in the form of

19   character witnesses, your own personal testimony, or exhibits

20   to assist the Court in determining what sentence is

21   sufficient but not greater than necessary.

22          If you testify under oath this morning, you're going

23   to be subject to cross-examination by one of the Assistant

24   United States Attorneys.  You may make an unsworn statement

25   just before being sentenced, and you will not be

```
1   cross-examined by the United States.  Or you may remain
2   silent and have one of your counsel to handle all matters for
3   you.  Do you understand this?
4              THE DEFENDANT:  Yes, Your Honor, I understand.
5              THE COURT:  I will note for the record the Court has
6   received a number of written character statements from you.
7              The Court will note that we found, I think, a number
8   of character statements from you, Mr. Smith, including your
9   wife and a number of other family members, friends,
10  neighbors, and et cetera.  So the Court has read those.  Are
11  there other character letters you wish to submit?
12             MS. McCASLIN:  No, Your Honor, we're relying on the
13  ones that we've submitted.
14             THE COURT:  Are there any live witnesses you have?
15             MS. McCASLIN:  No, Your Honor.
16             THE COURT:  Fine.  You may have a seat.
17             Does the United States have any witnesses?
18             Oh, there's one other thing the Court would point
19  out.  From the United States' standpoint, the Court notes
20  that the United States submitted by disk a substantial number
21  of victims in this case, so the Court is aware of that.
22             Does the United States have any witnesses?
23             MS. YUSI:  Your Honor, we have one victim that would
24  like to read his statement -- Mr. Wilfried Berndt.
25             THE COURT:  Okay.  You may come forward.
```

1          MR. BERNDT:  Can I take my mask off?

2          THE COURT:  Are you vaccinated?

3          MR. BERNDT:  Say again?

4          THE COURT:  Have you been vaccinated?

5          MR. BERNDT:  No.

6          THE COURT:  Keep it on.

7          MR. BERNDT:  Leave it on?

8          THE COURT:  Keep it on.

9          MR. BERNDT:  All right.

10          It's very awkward for me to be here.  I wrote this

11   down ahead of time, and I'm here to get closure on it for

12   myself.

13          I've struggled with this situation and loss for the

14   past several years.  The impact to me and my wife is both

15   financially and emotionally over the course of this ordeal.

16   We are recovering slowly financially, but emotionally we are

17   healed.

18          This impacted me on a personal level since you,

19   Bill, and I established a financial relationship and a

20   friendship over the course of several years that we grew, and

21   I had grown to trust you through that time period.

22          I learned about you listening to your radio program

23   on a station in Sacramento.  I was interested in the

24   investments you promoted on air.  I called you on the phone

25   to give you -- and you gave me your -- you gave on your

1    program.  I met you in person numerous times as our

2    relationship grew over the course of several years.

3            Before investing through you -- sorry about that --

4    I checked with the Sacramento area Better Business Bureau,

5    which they had a five-star AAA meeting at that time.  Every

6    time we met, you began by telling me your first devotion and

7    loyalty is to your Savior, Jesus Christ.  I share the same

8    belief, and this gave me the comfort in trusting you.

9            I'm saddened that you fell to temptation in your

10   dealings with Kent Maerki and David Alcorn and others who

11   committed fraud and then promoted their products.

12           When I testified during the trial, your defense

13   attorney asked me if I knew what I was getting into when I

14   invested in these types of ventures.  I said, yes, I know the

15   risk that I could lose all my investment; however, I would

16   not have invested if I had known that this was a fraudulent

17   venture.

18           So, anyway, I will pray for you.  I'm sad to see you

19   here.

20           That's all.

21           THE COURT:  Thank you very much.

22           Do you have any other witnesses?

23           MS. YUSI:  No, Your Honor, just argument.

24           THE COURT:  Okay.  The Court will hear your

25   argument.

1          MS. YUSI:  Thank you, Your Honor.

2          Your Honor, based on the Court's rulings today in

3    terms of the guidelines sentence, we are now asking for at

4    least 14 years, which would be the top of the guideline

5    sentence for incarceration of Mr. Smith, and we believe that

6    the 3553 factors would support such a request.

7          Now, the Court at this point is extremely aware of

8    the defendant's conduct, along with his co-conspirators, and

9    this particular defendant used his religion and his supposed

10   vast experience in the financial industry to manipulate

11   countless victims into giving him, many times, their life

12   savings.

13         We heard from many of them at trial.  We've heard

14   from Mr. Berndt today and others through their victim impact

15   statements about the damage he caused them; to their

16   families, their trust, and their life savings in which they

17   were going to retire on.

18         The betrayal went well beyond the loss of money, and

19   what's pretty shocking is that he's asking to be treated

20   along the lines of his co-defendants who have accepted

21   responsibility.

22         As the Court is aware, several of the defendant's

23   co-defendants were given very beneficial plea agreements,

24   partly due to COVID, with a max of 60 months, and the

25   defendant is now asking that he should only be given a few

1    months above this.

2         And this is way off base, Your Honor.  His

3    co-defendants were given a benefit with those plea

4    agreements.  That doesn't mean the government is now treating

5    the defendant more harshly or punishing him for not pleading.

6    He's in the exact same position that anyone who did not plead

7    guilty and accept responsibility would be in today.

8         The defendant is one of the most prolific master

9    manipulators in this nationwide scheme.  He had more direct

10   sales to victims than almost any of the other defendants,

11   except perhaps, maybe, Daryl Bank and Roger Hudspeth, to whom

12   he was about equivalent in terms of the number of direct

13   victims.

14        Roger Hudspeth, who Judge Doumar -- he was the first

15   person to plead guilty to this scheme, and he accepted

16   responsibility and was given well over ten years'

17   imprisonment, fully accepting his role in the conspiracy and

18   also cooperating with the government in the trial of Daryl

19   Bank and Billy Seabolt.

20        To this day, the defendant has not expressed one

21   iota of regret, not a single admission of responsibility.

22   We're asking for a significant sentence, not because he went

23   to trial, but because he has not taken any steps towards

24   acceptance of responsibility and because he was heavily

25   involved in stealing millions of dollars from victims who

1    were especially vulnerable, whether it be to their age; their

2    education level; their learning difficulties, as we heard

3    from Ms. Groff; or their vulnerability to their religious or

4    spiritual beliefs which they thought they shared with the

5    defendant.

6            And not just that the defendant has no remorse, Your

7    Honor, nor apparently any consciousness or care for the pain

8    and damage he has caused, he also went out of his way to

9    further try to trick his victims and never giving them the

10   straight story; that he knew that everyone else had lost

11   their money or that no one had given their money -- to keep

12   the victims from the truth.

13           Mr. Sykes and others, along with the deposition that

14   he gave -- that Mr. Smith gave in the deposition with the

15   bankruptcy trustee, the government believes that that

16   recording showed great insight into the defendant's psyche;

17   he blames everyone else for money losses and never himself,

18   and that's because he still doesn't think he's done anything

19   wrong.  It's everyone else's fault, and everyone else did

20   wrong or is wrong, just not him.

21           In his position paper, the defendant still touts

22   himself as a religious, family-oriented man.  A lot of his

23   letters in support talk about this.  And this is in direct

24   contrast to the evidence shown in this case.

25           The evidence showed, and the government avers, that

1    he's a greedy, arrogant, and selfish man with no regard to

2    anyone else.  His true self, which the Court saw in trial and

3    the victim impact statements, is the antithesis of someone

4    who claims to be godly.  He used his supposed faith as a

5    sword and tool to trick victims.  It's abhorrent and should

6    be considered in fashioning an appropriate sentence.

7            Now, the notion, as one of the letters and the

8    defendant talks about in his position paper, that Mr. Smith

9    ended up in this situation because he is too trusting and

10   naive is simply outrageous, Your Honor.

11           He knew before any of the defendants, based all the

12   way back in Dazzle Dental, that Kent Maerki and Dental

13   Support was a sham.  He knew for years that everything Kent

14   Maerki and Daryl Bank touched or did was a failure and a

15   fraud, and he continued to sell because it gave him money.

16           Pure and simple greed, Your Honor.

17           As for any medical issues the defendant claims as a

18   basis for downward departure, the Bureau of Prisons is well

19   equipped to deal with all of these.  They serve as no basis

20   for any downward departure.

21           The majority of his victims were his age or even

22   older that he sold to, Your Honor, and some in considerably

23   worse health than he claims to be.  The defendant does not

24   deserve any benefit that he did not grant his own victims.

25           And, Your Honor, for all of these reasons, we

1    believe that the sentence of at least 14 years' imprisonment

2    is well supported by the 3553 factors, and we ask the Court

3    to impose such a sentence.

4           THE COURT:  Thank you.

5           MS. McCASLIN:  Your Honor, Mr. Smith is a salesman,

6    just like Mr. Sellers and just like Mr. Barnett.  The

7    government, in their position paper, asked for 25 years, and

8    today they're asking for at least 14.  This is in stark

9    contrast to what Mr. Sellers and Mr. Barnett received.  They

10   both pled; they both received a sentence of five years.

11          The same plea was available to Mr. Smith.  The only

12   difference now is that he chose to exercise his

13   constitutional right to go to trial, his right to hold the

14   government to their burden of proof, and his right to remain

15   silent under the Fifth Amendment.

16          The government says that this is not a trial

17   penalty, it's because he didn't admit anything.  I object to

18   that because they are essentially punishing him for invoking

19   his right to remain silent.  He has a right to plead not

20   guilty and hold the government to their burden, and because

21   he chose to do that, his sentence is now three times higher.

22          If you look at Mr. Sellers and Mr. Barnett, though,

23   which the government argues that they've been helpful to the

24   government in many ways, that they cooperated, that they

25   are -- and according to their paperwork, they are most likely

1    eligible for a Rule 35 for their cooperation.

2            Mr. Sellers testified.  He sat right there and

3    testified, and he perjured himself on the stand.  He denied

4    using Daryl Bank to hide money in his divorce assets, which

5    is fraudulent.  Asked repeatedly, he said, "No, I did not do

6    that," "No, I did not do that," until he was given his own

7    Statement of Facts that he had already pled to where he

8    admitted he had done that.  And still, he's likely eligible

9    for a Rule 35 despite his perjury.

10           Now, Mr. Barnett did not testify, though that begs

11   the question of why.  Mr. Barnett clearly sat down for a

12   proffer, and so him not testifying either means that his

13   testimony was not going to be helpful for the government and

14   that he did not stick with that Statement of Facts that he

15   had already pled to -- walked it back, minimized it -- that

16   means he either lied to law enforcement in his proffer, or he

17   committed perjury when he pled guilty to the Statement of

18   Facts and had pled guilty because he was guilty, because, of

19   course, *Alford* pleas don't exist in federal court.

20           In comparison to a couple of the other cases

21   involved here, Mr. Maerki received 16 years.  He is the top

22   of the indictment in this case.  He is the most culpable.  He

23   is the creator of these investments.  He is a self-proclaimed

24   expert on spectrum, and even his own employees described him

25   as a mastermind.

1          Ms. Gibson was not a creator, but she coordinated
2    everything for Daryl Bank.  She was involved in day-to-day
3    activities, with the spreadsheets, the bank accounts.  She
4    was moving money left and right.  She received ten years.
5          Now, Mr. Smith facing three times what he would have
6    been given for a plea doesn't just affect Mr. Smith; it's a
7    message to all defendants that this is what happens if you
8    don't plead.
9          The government has substantial resources, leverage,
10   power.  And 98 percent of the defendants plead guilty in the
11   federal system.  But if you dare to be in that 2 percent,
12   your sentence is going to be triple or five times what they
13   had offered you, so don't you dare go to trial.
14         This is a very coercive pressure that will have
15   effect on other cases in the future.
16         We understand that acceptance of responsibility does
17   give a benefit to defendants, as it should, but it's supposed
18   to be a modest amount of two to three points, not three times
19   higher for somebody who chooses to exercise his
20   constitutional rights.
21         Now, in terms of history and characteristics,
22   Mr. Smith is 70 years old with medical issues.  He has no
23   criminal history, no civil injunctions, or previous
24   reprimands.  He's been sober for 40 years.  He attends AA
25   nearly every day; or, at the very least, several times a

1   week.

2          And he's been at the same church for decades.  We

3   understand that there are victims at the church.  But his

4   whole life also revolves around that church, and you can see

5   that he is highly involved.  You can see it in the letters.

6          Some of his own friends lost money, people he is

7   still very close with, people who he is still friends with,

8   who he still loves.  And of course, he's been married to his

9   wife, Sue, for over 30 years.  He stepped up as a father to

10  her children, raised the youngest as his own.

11         And I do just want to let the Court know that when

12  this was scheduled for sentencing in June, his wife, Sue, and

13  one of his daughters did fly out here to be present for the

14  sentencing.  They weren't able to fly out again, but I did

15  want to let the Court know that they would have liked to be

16  present here today.  So he does still have the support of his

17  family.

18         You can also see in the letters that, especially

19  from his daughter Rebecca, Mr. Smith brings home fairly

20  random people who he thinks are struggling.  He has done this

21  for decades.  If somebody needs a good meal, if somebody

22  needs a shower, or if they need a little bit of money, he'll

23  help try to find them some daywork.  This isn't newsworthy.

24  It's not somebody that anybody is going to write a newspaper

25  article on.  It's just the little day-to-day things.

1           These offenses do not represent his whole life.  And
2   all of these positive factors in his life all factor into the
3   3553(a) factors.
4           Your Honor, he's not a risk of recidivating.  Unlike
5   Mr. Maerki who continued fraudulent activity while on bond
6   and had his bond revoked, Mr. Smith went out and got his CDL
7   license and was driving.  He only stopped driving because of
8   medical issues.  He had to get hospitalized.
9           He gave up the financial world.
10          In terms of a sentence, Your Honor, we are arguing
11  for a sentence between 70 and 87 months, which would take
12  into consideration the sentence he could have received under
13  a guilty plea but taking away any acceptance of
14  responsibility of that benefit of the guilty plea.  And
15  according to the guidelines, that's where it lands.
16          Your Honor, a sentence of 15 years at his age could
17  easily be a life sentence.  A sentence of 70 to 87 months
18  could easily be a life sentence, but age is something that
19  the Court should consider, that Mr. Smith should not be
20  looking at a de facto life sentence.
21          We understand that justice is multifaceted, Your
22  Honor.  The Court has to consider punishment based on
23  compassion for the victims, rehabilitation, restitution that
24  they are owed, and also compassion for Mr. Smith; that is
25  part of justice, and avoiding a de facto life sentence is

```
 1    part of that.
 2             Three times the sentence he would have received, or
 3    five times, is not justice.  It is punishment for exercising
 4    his trial rights.  It's punishment for invoking his Fifth
 5    Amendment right, not testifying, his right to remain silent.
 6    It's punishment for holding the government to their burden of
 7    proof, and it's punishment for making them do their jobs.
 8    And that is not justice, Your Honor.
 9             One final request, Your Honor, is that we do ask for
10    a recommendation to a prison, FCI Dublin, which is in
11    California near his family, so that he can maintain contact
12    with his family easily.
13             THE COURT:  Thank you.
14             MS. McCASLIN:  Thank you.
15             THE COURT:  All right.  Mr. Smith, would you
16    approach the podium.
17             Did Mr. Smith indicate whether he wished to make any
18    comment or not?
19             MS. McCASLIN:  No, Your Honor, he will not be making
20    a comment.
21             THE COURT:  All right.  Mr. Smith, the Court has to
22    give you a sentence that's sufficient but not greater than
23    necessary, and you have heard argument of the counsel; the
24    government asks for the equivalent of 14 years, and your
25    counsel asks for something like 6 years and 10 months, or 70
```

1    to 87 months.  There's a big difference there.

2         The Court has to decide what is sufficient but what

3    is not greater than necessary, and there are what are called

4    sentencing factors to help the Court to decide that, but

5    there's one thing I want to address before the Court even

6    starts with that, and that is the argument of your counsel

7    that you have been penalized for going to trial and it

8    undermines justice.

9         The Court couldn't disagree more with that argument.

10   It sounds rational, but it's not the case here.  Your

11   sentence is greater because you were convicted of six counts.

12   It is your decision if you want to plead guilty in a case to

13   one count or not.  That's your right.  It's your right to go

14   to a trial, and you're not penalized for that.  You're

15   penalized based on what you're convicted on.  It's as simple

16   as that.

17        You're not penalized for not testifying.  That's

18   your right.  But the Court may consider the lack of remorse.

19   It doesn't have to come forward based on what you say on the

20   witness stand, but let's just be honest about this and

21   straight about this.

22        You're not penalized because you went to trial.  The

23   penalty is based on the number of counts on which you stand

24   convicted.  If you had 30 counts, the penalty would be even

25   more, but it's six counts versus one count for some of your

1    co-conspirators.  It's as simple as that.

2           The first thing the Court has to consider is what

3    did you do to bring you here, Mr. Smith.  We've talked about

4    this.  You were engaged in a conspiracy that defrauded

5    investors; a multifaceted, multipronged conspiracy that

6    ripped off people of their hard-earned dollars, their

7    retirement; a multifaceted conspiracy that was based on slick

8    talk, manipulation, and all kinds of skills that a salesman

9    can use to get people to depart with their money.

10          You were involved in this scheme with multiple

11   people, many of whom have been convicted in this case, and

12   some have been sentenced, all except two.

13          The record reflects that you used your religious

14   background to manipulate your victims.  To get them to trust

15   you, you used religion to reel in your victims and to get

16   them to depart with their money.

17          You lied continuously to victims about what they

18   could reap from their investments.  The Court had a victim

19   impact statement for you for around 46 different people here

20   on this list who lost significant money because of your

21   conduct.

22          But the Court doesn't stop there.  The Court has to

23   consider who you are as an individual, which means that the

24   Court has to consider what's referred to as the 3553 factors,

25   which talks about your personal history and your

Carol L. Naughton, Official Court Reporter

1    characteristics.  And the Court has read the Presentence
2    Report and read the letters.
3            I will tell you, your letters from various people do
4    reflect, to a certain extent, a different man from the person
5    standing here.  You certainly persuaded a lot of people about
6    the good things that you did as a religious leader and other
7    things in the community, but you also had a dark side that
8    was evidencing itself at the same time you were preaching
9    redemption and repentance to your flock.
10           You're 70 years old.  The record reflects that you
11   have three siblings; one sister, two brothers.  The record
12   reflects a few other things.  You indicated your parents were
13   supportive, your father was a strong man, a principled
14   individual.  You grew up in a strong Christian, value-based
15   family.
16           You talked about your parents here, and your parents
17   are deceased, based on what the Court is reading in the
18   record here.
19           You've been married four times during your life.
20   The first marriage, you were 19.  And your couple other
21   marriages didn't last very long, based on what's in the
22   Court's record here.  You have two children as a result of
23   your first marriage.  You have four stepchildren.  So you
24   have family out here that are supportive of you.
25           You were first ordained back in 1970.  You served as

Carol L. Naughton, Official Court Reporter

1    a priest and various roles in your church, and that's where

2    you met a number of your victims.

3            High school graduate; received a GED.  I don't have

4    any additional information on your education here.  You

5    dropped out of school, out of high school, but you managed to

6    go back and get a GED.

7            Employment.  You declined to provide any information

8    regarding your past employment during the Presentence Report

9    interview, so the Court doesn't know much about that.

10           From 2008 to when you were detained, apparently you

11   were self-employed as a host of a "Money Talks" radio show.

12   From 1999 forward, you were employed with American Estate

13   Insurance Services.  You were doing business through

14   Executive Planning and Advisory Services as well as involved

15   in selling investments in these fraudulent franchises that

16   the Court has before it.

17           You apparently worked for Union Carbide from 1970 to

18   1981.  So that's just some of the things about your

19   employment background.

20           The Court has some information on your physical

21   condition, and the Court is aware that you've had some issues

22   pertaining to your heart, systolic heart failure, and some

23   other issues in the report.  The Court is aware of that.

24           Now, the Court is not going to ignore the fact that

25   your counsel has asked for a downward departure pursuant to

1    Section 5H1.1 and 5H1.4 of the sentencing guidelines.  The

2    Court is aware of that.  But the downward departure that the

3    Court could give must be based on some extraordinary

4    circumstances, some extraordinary medical condition.

5         You are among many Americans that have some form of

6    heart condition, and the Court does not see that the heart

7    condition that you have is not one that the Bureau of Prisons

8    is not capable of addressing.  The Court deals with that all

9    the time.  So the Court doesn't find sufficient basis,

10   factually, in the record to justify a downward departure for

11   a physical or medical condition.

12        The Court notes that you were hospitalized in 2021

13   for approximately 60 days and you were diagnosed with

14   systolic heart failure, sepsis, syncope, left lower leg

15   cellulitis, but these are conditions, once again I say, that

16   can be treated in the Bureau of Prisons.

17        And you had a few issues in Western Tidewater

18   Regional Jail, but they also addressed those.  The record

19   contains prescriptions you are taking at the current time.

20   The Court is not going to list those in the record.  The

21   Court is aware of those.

22        You have no serious substance abuse problem.  You've

23   had some recovery from alcohol.  You describe yourself as an

24   alcoholic in recovery, but you've had the benefit of AA

25   meetings over the last 40 years.  But you've never received

1   any formal treatment or inpatient treatment for alcoholism,
2   so that is not an issue, and you don't have any negative
3   screens for any drugs or anything of that nature.  So that's
4   not an issue.
5           You don't reflect a lot of financial resources here.
6           You have no juvenile or adult convictions.
7           Those are some of the things personal about you.
8           But, now, the Court has to consider a few other
9   things also, in addition to your personal history and
10  characteristics and what you did to commit this offense.  The
11  Court has to be concerned about deterrence; deterring people
12  who would do what you do, go out here and rip people off in
13  some big investment scheme, so the Court has to be concerned
14  about that.
15          The Court also has to be concerned about
16  disparities.  The Court does not want to create substantial
17  disparities with respect to the penalties you receive.
18  That's one reason the Court talked about the reason your
19  penalties might be heavier than some others.
20          The Court has to, of course, protect the public from
21  schemes.  I just said that a few minutes ago.  And the
22  sentence has to reflect the seriousness of the offense you
23  committed.  It is a serious offense when you deprive people
24  of their money through theft.
25          So we have to promote respect for the law.  At the

1    same time, the law provides that I must provide, as a judge,

2    for any medical care you need or any other correctional needs

3    you may have, treatment you may need, any educational or

4    vocational needs.  I don't think that those loom large in

5    what the Court has to consider here.

6            With respect to disparities, sentences in this big

7    scheme range from 35 years back to 5 years.  Some have

8    received ten years; 16 years; and a vast range, depending

9    upon the role they had in this offense and what was the

10   nature of their conviction, how many convictions they had.  I

11   skipped 12.5 years, 10 years, 35 years, 16 years.  So it's

12   varied.

13           And it's always a challenge, Mr. Smith, to determine

14   what is the best penalty and the most appropriate penalty and

15   what is sufficient but not greater than necessary, is the

16   standard, to impose in a case.

17           The Court understands the arguments made by your

18   counsel, but the Court believes a 70-to-87-month sentence is

19   just plain too low.  The Court believes it's inappropriate,

20   so the Court will not impose that.  At the same time, the

21   Court has not followed through on the government's original

22   recommendation, the 25 years.  The Court has not gone there.

23           So having balanced out any number of things in this

24   case, the Court will sentence you as follows:

25           Pursuant to the Sentencing Reform Act of 1984, it's

the judgement of the Court that the defendant, Aghee William
Smith, is hereby committed to the custody of the
United States Bureau of Prisons to be in prison for a total
of 156 months.

The term consists of 156 months on Count One, a term
of 60 months on Count Two, to be run concurrently; 156 months
on Counts Eight, Nine, Sixteen, and Seventeen, all to run
concurrent with Count One.

Upon release from imprisonment, you shall be placed
on supervised release for a term of three years.  This term
consists of three years on Counts One, Two, Eight, Nine,
Sixteen, and Seventeen, all to run concurrently.

As reflected in the Presentence Report, you present
a low risk of future substance abuse, and therefore, the
Court hereby suspends the mandatory condition of substance
abuse testing as defined in 18 U.S.C. Section 3563(a)(5);
however, this does not preclude the probation officer from
administering drug tests as they deem appropriate.

You shall comply with the standard conditions of
supervision that have been adopted by this Court and have
been incorporated into this judgment by reference; that is,
the standard conditions of supervised release as adopted by
the Eastern District of Virginia.  They are incorporated by
reference into this judgment.

You shall also comply with the following additional

1    conditions:

2         You shall apply all moneys received from income tax

3    refunds, lottery winnings, inheritances, judgments, and any

4    anticipated or unexpected financial gains to the outstanding

5    court-ordered financial obligation or in a lesser amount to

6    be determined by the Court upon the recommendation of the

7    probation officer.

8         You shall not incur new credit charges or open

9    additional lines of credit without the approval of the

10   probation officer.  You shall provide the probation officer

11   access to any requested financial information.

12        You are prohibited from being employed in any

13   capacity involving investments.

14        You shall participate in the Treasury Offset Program

15   as directed by the probation officer.

16        You shall participate in a program approved by the

17   United States Probation Office -- hold one second, please.

18        (Pause)

19        THE COURT:  Okay.  We will strike the last statement

20   the Court started to make.

21        I will state for the record that there's some record

22   that you believe at some point in the past you suffered from

23   depression, but there's insufficient evidence in this record

24   to indicate that you are in need of mental health treatment.

25        So we turn to the financial penalties.  The Court

1    has considered the amount of losses sustained by the victims

2    as a result of these offenses, your net worth and liquid

3    assets, your lifestyle and financial needs as reflected in

4    the Presentence Report, your earning potential, and your lack

5    of dependents relying on you for support.

6         The Court finds that you're not capable of paying a

7    fine, but you are capable of making full restitution as

8    required by statute.  Accordingly, you shall pay the

9    following total penalties:

10        As to Counts One and Two, you shall pay a special

11   assessment in the amount of $100 on each count.  As to

12   Counts Eight, Nine, Sixteen, and Seventeen, you shall pay a

13   special assessment in the amount of $100 on each count, for a

14   total special assessment of $600.

15        You are required to pay restitution, which shall be

16   paid proportionately among the payees named.  You are jointly

17   and severally liable for restitution with the following

18   co-defendants:  Kent Maerki, David Alcorn, Tony Sellers,

19   Norma Jean Coffin, all of case 2:19cr47; Daryl G. Bank,

20   Raeann Gibson, Billy Seabolt, all of case 2:17cr126; and

21   Roger Odell Hudspeth in Case 2:17cr122.

22        The Court has a restitution order here on the bench.

23   Pursuant to the restitution that has been determined by this

24   Court that's in the order, you shall pay $21,128,490.48.

25   Interest on this restitution is waived.

1          The restitution is due today.  If it's not fully

2    paid, you shall pay to the Clerk at least $400 per month or

3    25 percent of your net income, whichever is greater,

4    beginning 60 days after your release from confinement.

5          Now, the Court notes that you have not signed this

6    particular restitution order.  Is that correct?

7          MS. McCASLIN:  That's correct, Your Honor.

8          THE COURT:  And neither counsel signed it.

9          MS. McCASLIN:  Correct.

10          THE COURT:  But you are aware of the restitution

11    order; is that correct, Mr. Smith?

12          THE DEFENDANT:  Yes.

13          THE COURT:  Okay.  The Court will enter the

14    restitution order apparently over the defendant's objection.

15    Am I correct, Ms. McCaslin?

16          MS. McCASLIN:  Yes, Your Honor.

17          THE COURT:  I think what the Court is going to do is

18    have it "seen and objected to."  I'll just pass it back and

19    have you write "seen and objected to."

20          (Pause)

21          THE COURT:  As I indicated, your first payment will

22    be due 60 days after your supervision begins.

23          With respect to the $600 special assessment, any

24    balance not paid on those today shall be paid by you in

25    installments of not less than $50 per month until paid in

Carol L. Naughton, Official Court Reporter

```
 1    full, and the first such payment shall commence 60 days after
 2    your supervision begins.
 3            The Court recommends to the Bureau of Prisons that
 4    you be incarcerated in California, in the Dublin correctional
 5    facility if possible.
 6            You have a right to appeal the judgment entered in
 7    this case, Mr. Smith.  If you wish to appeal, you simply note
 8    it for your counsel, and they will effect an appeal for you.
 9    Do you understand this?
10            THE DEFENDANT:  I do.
11            THE COURT:  Is there anything else from the
12    United States?
13            MS. YUSI:  No, Your Honor, thank you.
14            THE COURT:  Anything else?
15            MS. McCASLIN:  No, Your Honor, thank you.
16            THE COURT:  If there's nothing else, the Court will
17    be in recess.
18            (Proceedings adjourned at 1:01 p.m.)
19
20
21
22
23
24
25
```

1                           CERTIFICATION

2

3          I certify that the foregoing is a correct transcript

4     from the record of proceedings in the above-entitled matter.

5

6

7          _____/s/_____

8                          Carol L. Naughton

9                          October 27, 2022

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Carol L. Naughton, Official Court Reporter