```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF VIRGINIA
 2                         Norfolk Division

 3

 4  - - - - - - - - - - - - - - - - - -
                                       )
 5     UNITED STATES OF AMERICA        )
                                       )
 6     v.                              )    CRIMINAL ACTION NO.
                                       )         2:19cr47
 7     DAVID ALCORN and                )
       AGHEE WILLIAM SMITH II,         )
 8                                     )
              Defendants.              )
 9  - - - - - - - - - - - - - - - - - -

10

11                EXCERPT TRANSCRIPT OF PROCEEDINGS
             (Jury Trial - Day 4 - Testimony of P. Melley)
12
                          Norfolk, Virginia
13
                          February 4, 2022
14

15  BEFORE:  THE HONORABLE RAYMOND A. JACKSON
              United States District Judge, and a jury
16

17  APPEARANCES:

18          UNITED STATES ATTORNEY'S OFFICE
            By:  Andrew C. Bosse
19               Melissa E. O'Boyle
                 Elizabeth M. Yusi
20               Assistant United States Attorneys
                 Counsel for the United States
21
            RICHARD S. YAROW LLC
22          By:  Richard S. Yarow
                 Counsel for Defendant David Alcorn
23
            FEDERAL PUBLIC DEFENDER'S OFFICE
24          By:  Andrew W. Grindrod
                 Lindsay Jo McCaslin
25               Assistant Federal Public Defenders
                 Counsel for Defendant Aghee William Smith II
```

```
 1                         I N D E X

 2   GOVERNMENT'S
     WITNESS                                          PAGE
 3
       PETER MELLEY
 4         Direct Examination By Mr. Bosse              3
           Cross-Examination By Mr. Yarow             42
 5         Cross-Examination By Mr. Grindrod          43

 6

 7                       E X H I B I T S

 8   GOVERNMENT'S
     NO.                                              PAGE
 9
       3                                                9
10     97A                                             14
       97C                                             21
11     97B                                             23
       4A                                              27
12     2                                               29
       1                                               34
13     4                                               35
       5                                               37
14     6                                               39

15

16

17

18

19

20

21

22

23

24

25
```

```
                           ┌─── P. Melley - Direct ───┐
```

 1                          * * * * * * *

 2              PETER MELLEY, called by the Government, having been

 3     first duly sworn, was examined and testified as follows:

 4                            DIRECT EXAMINATION

 5     BY MR. BOSSE:

 6     Q.  Good morning, sir.  Would you please state your name for

 7     the record and spell it for us.

 8     A.  Peter Melley, M-e-l-l-e-y.

 9     Q.  Where do you work, sir?

10     A.  I'm the director of FINRA's Criminal Prosecution

11     Assistance Group in Washington, D.C.

12     Q.  And tell the jury, what is FINRA?

13     A.  FINRA is a self-regulatory organization of the securities

14     industry.  Its goal is to protect investors and ensure the

15     integrity of various trading markets.  It does this three

16     main ways:

17              One is to conduct surveillance of various trading

18     markets, like the NASDAQ stock market; another is to create

19     rules to govern the conduct of its members, who are brokerage

20     firms and those individuals who work at those firms, to buy

21     and sell securities; and, finally, in order to ensure that

22     customers and investors are confident in those that are

23     handling their funds are qualified and experienced by

24     FINRA-administered licensing exams and also enforces

25     continuing education requirements.

P. Melley - Direct

1   Q.  Can you tell the jury, what does FINRA stand for, the
2   acronym?
3   A.  The Financial Industry Regulatory Authority.
4   Q.  In the past, was your group FINRA known by a different
5   name?
6   A.  Yes.  Until 2007, it was known as NASD, National
7   Association of Securities Dealers, then in 2007, it merged
8   with the regulatory function of the New York Stock Exchange
9   to create a new regulatory entity called FINRA.
10  Q.  How long have you worked for this organization?
11  A.  Approximately 26 years, with the last nine years as
12  director of the Criminal Prosecution Assistance Group.
13  Q.  As director of that group, what are your
14  responsibilities?
15  A.  To oversee a unit of four attorneys, to provide
16  assistance in criminal investigations and prosecutions
17  involving securities fraud.  That may range from analyzing
18  trading data, other relevant documents, creating exhibits to
19  summarize my analysis and, if necessary, providing testimony
20  to our analysis.
21  Q.  Through your work and your job background, are you
22  familiar with the investment industry generally and the
23  regulations that govern investment professionals?
24  A.  Yes, I am.
25  Q.  And are you familiar with the different licensing tests

P. Melley - Direct

1    that FINRA administers?

2    A.  I am.

3    Q.  Let's start, if you could tell the jury generally, what

4    is a broker?

5    A.  A broker is an individual -- the official term is a

6    "registered representative" -- whose job is to, on behalf of

7    clients, purchase and sell securities and handle client funds

8    to do so.

9    Q.  Without getting too deep in the weeds, what do we mean by

10   a security?

11   A.  A security is a tradeable financial asset.  The most

12   common would be stock that signifies ownership in a

13   corporation, and then the unit of stock usually is shares

14   that you can then buy and sell in a marketplace.  Other

15   securities would be bonds or options.

16   Q.  Okay.  I've been asked, can you put that up?  It's going

17   to come through clearer, I think.

18          Can a brokerage firm buy and sell securities for its

19   clients without being registered with FINRA?

20   A.  It cannot.  All brokerage firms and the individuals that

21   work at those firms that handle customer accounts must be

22   licensed and registered with FINRA.

23   Q.  You mentioned licenses.  Are there different licenses for

24   different kinds of financial products that brokers sell?

25   A.  Yes.  Different licenses based on the products that one

P. Melley - Direct

1    sells as well as the position within the brokerage firm that
2    that individual assumes.
3    Q.  Are you familiar with what subjects are covered on the
4    FINRA examination to become a broker?
5    A.  Yes, I am.
6    Q.  And are you familiar with the duties and responsibilities
7    of a person who is a licensed broker?
8    A.  Yes.
9    Q.  Is it possible for FINRA to take away somebody's ability
10   to be in the securities industry?
11   A.  Yes.  As I mentioned earlier, one of FINRA's
12   responsibilities is to enforce its own rules of conduct.
13   Again, this is to protect investors.  So if an individual is
14   found to be in violation of FINRA rules, that person can be
15   sanctioned regarding a fine, a suspension, or actually a bar
16   from the industry where they're, in essence, kicked out of
17   the securities industry.
18   Q.  Let's talk first about the license to become a broker.
19        What is the examination you have to take to become a
20   broker, also known as a registered representative?
21   A.  The common entrance exam is the Series 7, which is the
22   general registered representative exam.  That is the one you
23   will take to basically ensure and be licensed that you can
24   then handle client accounts.
25   Q.  How does FINRA keep track of who's taken the exam, when

P. Melley - Direct

1   they've taken it, whether they've passed or failed?

2   A.  FINRA maintains an online database, registration and

3   licensing information.  It's called CRD, Central Registration

4   Depository.

5           All brokerage firms are responsible for any of their

6   employees who take an exam and pass, to provide that

7   information to FINRA so that it can put that information in

8   the database, and the database then tracks one's history

9   within the securities industry; so any of their employments,

10  any of their licenses, as they move from firm to firm, gain

11  new licenses -- that is all in the database, you know, and

12  shows up in a report, if necessary.

13  Q.  Are you familiar with the subject matter of that

14  examination and the way that people prepare for it?

15  A.  Yes.

16  Q.  Can you describe the test itself?

17  A.  Sure.  The Series 7 commonly -- and I think today we're

18  talking about it during the 1990s.  It was 250 questions,

19  about a six-hour exam covering a range of topics from types

20  of securities markets, types of investment products -- again,

21  as I mentioned, stocks, bonds, options -- and what kind of

22  governs overall is the relationship between the rep and the

23  client in terms of handling funds, truthful communications.

24          There's also a number of sections that cover the

25  emphasis on antifraud provisions, whether it's at the federal

P. Melley - Direct

1   level for federal securities laws or FINRA's own rules of

2   conduct.

3   Q.  Is the Series 7 considered within the industry to be a

4   difficult test?

5   A.  It is.  It's not uncommon for someone to have to take it

6   on more than one occasion in order to pass the exam.

7   Q.  And we talked about preparation for the exam.  Is this a

8   test that people spend significant time studying for?

9   A.  Yes.  Usually how the process works is, once someone is

10  hired by a firm, their first responsibilities are really just

11  to study for the test.  So the firm will provide them with a

12  variety of study materials, either provided originally from

13  FINRA or from other vendors.  There may be prep courses.  But

14  because it is a rigorous exam, that is their primary focus

15  once they are hired by the firm.

16  Q.  In preparation, Mr. Melley, for your testimony today, did

17  you review FINRA records related to the defendants in this

18  case, Bill Smith and David Alcorn, and also FINRA records

19  related to some other people, Daryl Bank and Kent Maerki?

20  A.  Yes, I did.

21  Q.  And if you could -- I'm going to pull up on the screen

22  for you, just for the witness, Government's Exhibit 3.  And

23  I'm going to scroll down to Page 3 so you can identify it.

24          What is this document this I'm showing you here?

25  A.  This is a CRD report based off of the CRD system that I

P. Melley - Direct

1   generated for Mr. Smith.  As you can see at the top, it

2   includes his name and also a unique identifying number.  Each

3   individual who is in the CRD system has their own unique CRD

4   number.

5           MR. BOSSE:  The government will offer Government's

6   Exhibit 3.

7           THE COURT:  Any objection?

8           MR. GRINDROD:  No, Your Honor.

9           THE COURT:  It will be admitted.

10          (Government's Exhibit 3 was admitted.)

11  BY MR. BOSSE:

12  Q.  And just so the jury also can see what you've just

13  described, this is essentially the FINRA record collection

14  for Mr. Smith, correct?

15  A.  Correct.

16  Q.  What is the first thing that is listed in chronological

17  order here?

18  A.  Again, usually you start with the registration history,

19  meaning the employment history for the individual; if they

20  are currently working with a firm; if not, their historical

21  firm, history.  So as you can see, as of his latest firm that

22  he worked with in the industry, Stonehurst Securities is

23  listed.  Also it shows the dates that he worked at the firm.

24  Q.  And when is the last time that Mr. Smith worked with a

25  broker?

P. Melley - Direct

1   A.   January of 2009.

2   Q.   And so going back in time, what does this show here on

3   Page 4?

4   A.   This shows the other firms.  I believe, altogether,

5   Mr. Smith worked for seven different brokerage firms over a

6   16-year period, from 1993 to 2009.

7   Q.   And going down to the next page, what are we seeing here

8   on 5?  This is a continuation, isn't it, of what we just saw?

9   A.   Correct.  The employment history, that's from -- that's

10   information that's entered in by the individual while the

11   registration history we first looked at is info that comes

12   from the brokerage firm itself that they are working for.

13   Q.   Let's go to Page 7, which I can do by scrolling here.

14   You mentioned that it covers the tests that people took and

15   passed and also any tests they took and didn't pass.

16        Can you walk the jury through, briefly, because

17   we're going to do it in more detail, and give a brief

18   overview of what tests Mr. Smith took and passed?

19   A.   Mr. Smith passed three separate exams, the Series 7,

20   which again is the entrance broker exam, the registered rep

21   exam; the Series 22, which is a direct participation program

22   exam; and the Series 63, which is a state companion to the 7.

23        In order to buy and sell securities in individual

24   states, you must be registered in that state, so that's why

25   you have to take the Series 63.

P. Melley - Direct

1          So he passed three exams.  He did take, on two

2    occasions but failed, the Series 65.  That is the state

3    investment advisor exam.

4    Q.  And you see up here above the exam appointment section,

5    there's a section called "Other Business."  What is this?

6    A.  So all individuals, when they enter the securities

7    industry, they are required to disclose any other businesses

8    or employers that they are associated with.

9          And so for Mr. Smith, this is his disclosure that he

10   was also in the life insurance and annuities business and

11   also had some media ties to a radio show and so forth.

12   Q.  Is that number 2, the *Safe Money Retirement* show?

13   A.  Correct.

14   Q.  This is provided by him, correct, this description?

15   A.  Right.  This is -- the individual is required to disclose

16   this, and what they put on the form is what is then listed on

17   the CRD system.

18   Q.  In the last line of paragraph 2, how does he describe the

19   radio show that he hosted?

20   A.  "To educate the public on the importance of secure

21   financial plans."

22   Q.  All right.  And as we go down the document, down to the

23   bottom of Page 8, after the main exam results, what are we

24   seeing here under the reference "CE"?

25   A.  CE refers to continuing education.  As I mentioned

————————P. Melley - Direct————————

1    earlier, FINRA is also responsible for helping enforce the

2    requirement that one continually takes refresher courses

3    regarding, for lack of a better term, the dos and don'ts of

4    the industry.

5         Continuing education is required within two years of

6    entering the industry and every three years thereafter.  It's

7    a computer module course covering ethical sales practice,

8    regulatory and compliance standards.  It basically covers

9    current trends, issues, standards in the industry.

10        Again, it's just as a refresher for the individual,

11   because for many of them, they are in the industry for a

12   number of years.  They may not have, you know -- they took

13   the test a long time ago, but these refresher courses just

14   remind them, again, about how you're supposed to conduct

15   yourself, especially with regards to clients, being truthful,

16   not engaging in fraudulent practices, things of that nature.

17   Q.  Does this show that Mr. Smith did complete those

18   continuing education requirements every two years up until, I

19   guess, 2009 when his license lapsed?

20   A.  Yes.  Over 16 years, he completed it on five separate

21   occasions.

22   Q.  So after -- and we're going to talk about getting the

23   Series 7 license, but you mentioned that it lapsed in 2009.

24        After 2009, was Mr. Smith allowed to sell

25   investments that could be characterized as securities to

--------P. Melley - Direct--------

1   clients?

2   A.  No.  Once you are out of the industry, you are no longer

3   current in your registration -- again, you have to be

4   registered with FINRA in order to transact in securities.  So

5   failing to do so, if you're not registered, you are not

6   allowed to do that anymore.

7   Q.  Going back to the examination that you mentioned that he

8   didn't pass.  Was he ever licensed to be an investment

9   advisor to clients?

10  A.  He was not.  He took the Series 65 exam on two occasions,

11  did not pass on either occasion.

12          MR. BOSSE:  If we could show the witness 97D.

13  BY MR. BOSSE:

14  Q.  What are we seeing here, sir?

15  A.  This is a summary chart that I created based on

16  Mr. Smith's CRD report that we previously were reviewing.

17  This shows the three licenses he passed and provides

18  background on what's covered on the exam, when he passed the

19  exam, and the types of products involved.

20          MR. BOSSE:  Your Honor, I would like to show the

21  summary chart to the jury.  I'm not planning to offer this

22  one into evidence.

23          THE COURT:  Any objection?

24          MR. GRINDROD:  No, Your Honor.

25          MR. YAROW:  No, Your Honor.

P. Melley - Direct

```
 1            THE COURT:  It may be shown.
 2   BY MR. BOSSE:
 3   Q.  And so are these the three examinations that we just went
 4   through that he did pass; the 22, the 7, and the 63?
 5   A.  Yes.
 6   Q.  And let's talk first about the Series 7.  And if you
 7   could tell the jury again the license date that he received
 8   that.
 9   A.  September 1993 he passed that exam.
10   Q.  And let's talk now about the exam itself.
11            MR. BOSSE:  Could we see, for the witness, 97A,
12   please.
13   BY MR. BOSSE:
14   Q.  Are you familiar with what we're seeing here?
15   A.  Yes.  This is a study outline that was relevant at the
16   time Mr. Smith took the exam.  So these would have been the
17   topics and materials covered on the exam when he took it back
18   in September '93.
19   Q.  Is this a document that FINRA maintains, and NASD
20   maintained before, a bank of the old study outlines for the
21   examinations?
22   A.  Exactly.
23            MR. BOSSE:  I'll offer 97A.
24            THE COURT:  Hearing no objection, 97A is admitted.
25            (Government's Exhibit 97A was admitted.)
```

P. Melley - Direct

1   BY MR. BOSSE:

2   Q.  What are the main categories of information tested by the

3   Series 7?

4   A.  The various securities markets, where one could trade

5   various products, the types of products themselves, various

6   securities, and so forth.

7          Again, there's a large emphasis on the relationship

8   with the client under Series 7.  For a broker-client

9   relationship, one must have a -- put their investors in

10  suitable investments.  So it's the responsibilities governing

11  that conduct.

12         And then there's also another focus on, again, as

13  I've said, like, the dos and don'ts of the industry, federal

14  securities laws as well as FINRA rules regarding how one must

15  conduct themselves when engaging in the purchase or sale of

16  securities.

17  Q.  So are the people who take the exam tested on the ethical

18  rules, for example, learning that you can't lie to clients

19  when selling investment products?

20  A.  Yes.  The focus is on truthful communications.  For

21  FINRA's perspective, it's standards of commercial honor and

22  just and equitable principles of trade.  So, again, the

23  bedrock pillars are that you must conduct yourself in a way

24  that you are providing accurate, thorough, essential

25  information and also not engaging in any conduct or

P. Melley - Direct

1    techniques that may be considered fraudulent.

2           MR. BOSSE:  Could we see Page 7 of the document,

3    please.  So it's got to be two leading zeros.

4    BY MR. BOSSE:

5    Q.  What are the critical functions?  What does that mean?

6    A.  Critical functions is just kind of one of the bedrock

7    pillars of the exam in terms of what is going to be covered.

8           This is Critical Function 1, which really is kind of

9    focusing on how the rep is supposed to kind of govern their

10   responsibilities and their relationship with the client; as I

11   said, talking about the standards of truthfulness, good

12   taste, providing accurate information, essential information,

13   because whatever information the investor is receiving, that

14   is going to influence them on how they make an informed

15   decision.

16          And that is true from both a FINRA perspective and

17   the federal securities laws, which the whole purpose is that

18   investors receive that truthful essential info so they can

19   make an informed decision whether to invest or not.

20   Q.  Is what you've just described what is covered under

21   Module 1.2.1 that everyone taking this exam has to learn

22   about, the general standards of truthfulness and good taste?

23   A.  Correct.  So this is somewhat of an umbrella of how the

24   relationship should be conducted.

25          MR. BOSSE:  Could we just page down to the next

P. Melley - Direct

1   page, please.

2   BY MR. BOSSE:

3   Q.  Looking at Critical Function 2, what is that?

4   A.  This kind of focuses more on what one would say is the

5   get to know your customer, try to understand the client's

6   investment objectives.  This would be based on getting

7   background information on the client; what's their age, their

8   risk tolerance, their sophistication when it comes to

9   financial products in the industry, you know, what assets do

10  they have under management, and if they have any liabilities.

11          So again, it is -- you want to get to know and

12  understand what your customer's needs are so that you can

13  then build on, as I think we'll talk about in the next

14  critical function -- put them into what is a suitable

15  investment.

16          MR. BOSSE:  All right.  Could we skip down, then, to

17  Page 28 of this document.

18  BY MR. BOSSE:

19  Q.  And we have skipped a couple.  We are now at Critical

20  Function 5.  Is this what you were just discussing, the

21  suitability of an investment?

22  A.  Right.  So, again, with the Series 7, the emphasis on the

23  relationship is that the primary responsibility is to the

24  client from the perspective of the registered rep.

25          So by having that information that you've conducted

P. Melley - Direct

1    that due diligence on the client's needs and background, you

2    know, what they're willing to tolerate in terms of risk

3    coupled with the due diligence you do on the investment

4    products itself, taken together, the rep and the client

5    should be on the same page in terms of what funds are now

6    going to be the subject of the investment and where it's

7    going to go.

8            So, for instance, this Critical Function 5 is trying

9    to, you know, focus on things like, well, based on your

10   tolerance and your age, what are you willing to risk by

11   putting funds in?  Someone who is older is not going to be

12   looking for taking the chance on losing money for a period of

13   time, or you want to make sure they are going to be able to

14   get that principal back soon, so it's all based on the

15   relationship and the needs of the client.

16   Q.   How does that -- let me ask you first:

17           You are familiar with the term "due diligence"?

18   A.   Yes.

19   Q.   Is that also covered on this examination?

20   A.   Yes.  As I said, the due diligence kind of is from two

21   different perspectives:  One is identifying the client and

22   what their needs are based on their background and all the

23   relevant factors; and then there's the due diligence of the

24   investment itself and providing that essential information,

25   you know, company structure, size of the investment, where --

P. Melley - Direct

 1   the use of the proceeds, you know, what type of payment will

 2   be made back in terms of the client, in terms of the return

 3   of their investment.  All that information is essential for

 4   the investor to then make an informed decision.

 5   Q.  What is the effect of passing this examination, the

 6   Series 7?  What are you allowed to do?

 7   A.  Once you pass, you are then allowed to handle client

 8   accounts and, more importantly, clients funds.  From the

 9   client's perspective, if they are viewing their rep who is

10   licensed, they are thinking they are competent, they are

11   qualified, they are experienced --

12         MR. GRINDROD:  Objection, Your Honor.

13         THE COURT:  Sustained on what they're thinking.

14         MR. BOSSE:  Okay.  That's fine.

15   BY MR. BOSSE:

16   Q.  Did Mr. Smith pass the Series 7 exam on his first attempt

17   at taking it?

18   A.  He did.

19   Q.  Let me ask you, you talked a little bit about the

20   continuing education requirements for the Series 7.  Did

21   those also include the updates on the ethical components that

22   are tested on the initial Series 7 examination?

23   A.  Correct.

24   Q.  And did Mr. Smith complete all of those every two years

25   as well?

P. Melley - Direct

1  A.  He did, five different occasions over 16 years.

2          MR. BOSSE:  Could we have 97D back up again, please.

3  BY MR. BOSSE:

4  Q.  Let's talk about the Series 63.  If you could give a

5  general overview, and then we're going to briefly look at the

6  exam materials for that as well.

7  A.  The Series 63 --

8          THE COURT:  Wait a minute.  We don't need a

9  narrative here, Mr. Bosse.  You ask the questions, and let's

10  move on to it, because you're getting into mighty detailed

11  minutia about these detailed regulations.  So guide him

12  through it.  Cut right to the heart of it, and let's move on.

13          MR. BOSSE:  Yes, sir.

14  BY MR. BOSSE:

15  Q.  Can you describe the Series 63 at a very high level of

16  generality, and we'll get right into it.

17  A.  It is simply the same as the Series 7 in terms of what's

18  covered.  The difference is in order for one to transact in a

19  particular state, dealing with clients, you have to be

20  registered in that state.  In order to be registered, you

21  need to take the Series 63 exam.

22  Q.  Is that something that we saw on the CRD report for

23  Mr. Smith, that he was selling in Nevada, California, and

24  Utah?

25  A.  Correct.

P. Melley - Direct

```
 1            MR. BOSSE:  Let's go to 97C to show the witness.
 2   BY MR. BOSSE:
 3   Q.  What is this document?
 4   A.  This is the study guide that was in play at the time when
 5   Mr. Smith passed the Series 63 exam.
 6            MR. BOSSE:  I'll offer 97C, Your Honor.
 7            THE COURT:  Hearing no objection, 97C is admitted.
 8            (Government's Exhibit 97C was admitted.)
 9            MR. BOSSE:  If we could go to Page 21, please.
10   BY MR. BOSSE:
11   Q.  And if you could tell us about what's tested on
12   Section IV of the exam.
13   A.  About half of the Series 63 exam covers the
14   responsibilities and how one must not engage in fraudulent
15   and prohibited practices, between a description of what those
16   practices are including misstatements, false statements,
17   omissions, as well as other deceptive techniques.  It also
18   talks about the actual rules that govern that type of
19   activity at the federal level, at the state level, and also
20   the regulatory agencies involved in governing that conduct.
21   Q.  Let's go down to subject 3, prohibited business
22   practices.  And looking down at 3(a), what does someone who
23   is taking this exam have to learn about prohibited business
24   practices here?
25   A.  That they are not allowed to engage in any misleading or
```

1   untrue statements.  Again, the focus is on providing truthful

2   communications about essential information so investors can

3   make an informed decision.

4   Q.  And the kinds of topics that people aren't supposed to

5   make misleading and untrue statements about, are those listed

6   here as subparts?

7   A.  Yes.  I think these are the first couple regarding

8   background on the company, like issuer's earnings, trading

9   information, but it also just goes to the actual information

10  regarding the company that you want to convey to an investor

11  to make that informed decision.

12  Q.  All right.  And we can do this briefly.  Does this

13  section also cover -- someone taking this exam will also have

14  to learn about the suitability of recommendations they make

15  to their clients and customers?

16  A.  Yes.  Again, the primary responsibility is to the client,

17  and suitability goes to making an appropriate or, you know,

18  a -- providing pertinent information to make an appropriate

19  recommendation for them to invest based on what you know of

20  the customer.

21         MR. BOSSE:  Let's go back to 97D for the last time.

22  BY MR. BOSSE:

23  Q.  And we'll briefly cover the Series 22.  This is an exam

24  that Mr. Smith took in October of 1984, correct?

25  A.  Correct.  This is the direct participation program exam.

P. Melley - Direct

1    This is a limited license covering issues involving real

2    estate products, gas and oil products, focuses on limited

3    liability partnerships.  But again, this exam covers those

4    same, you know, prohibited practices, again how one must

5    conduct themselves when dealing with clients, from that

6    perspective of providing truthful communication.

7           So every exam has those same kind of pillars that

8    are discussed regarding what you can do and what you should

9    not do in the industry.

10   Q.  And I should have asked, did Mr. Smith pass the Series 63

11   on his first attempt as well?

12   A.  Yes, as well as the Series 22.

13          MR. BOSSE:  Let's look at 97B, please, for the

14   witness.

15   BY MR. BOSSE:

16   Q.  Is this the study outline that was in place for the

17   Series 22 that Mr. Smith took?

18   A.  Yes.

19          MR. BOSSE:  I'll offer 97B.

20          MR. GRINDROD:  No objection.

21          THE COURT:  97B will be admitted.

22          (Government's Exhibit 97B was admitted.)

23          MR. BOSSE:  If we could see Page 7.

24          THE COURT:  Before you start into 97B, we're going

25   to take a 15-minute break now, and then we will come back and

P. Melley - Direct

```
 1   start with 97B.

 2              MR. BOSSE:  Yes, sir.

 3              (The jury exited the courtroom.)

 4              THE COURT:  You may step down during the break,

 5   Mr. Melley.

 6              THE WITNESS:  Thank you, Your Honor.

 7              THE COURT:  Just do not discuss your testimony.

 8              One note, Mr. Bosse.  It's your case, but the Court

 9   is concerned about the minutia you're getting into in order

10   to make your case here on these FINRA regulations.

11              MR. BOSSE:  Yes, sir, Your Honor.

12              THE COURT:  We don't need a Ph.D. in FINRA

13   regulations, so cut to the heart of it.  I don't know what

14   you plan for your next witness, but we're not going to spend

15   all this time on the details of these FINRA regulations.

16              MR. BOSSE:  Yes, sir.  I have, I think, two pages to

17   look at on this, and then we're going to talk about the other

18   individuals in the case.

19              THE COURT:  As long as we're not going to go back

20   over these FINRA regulations again.

21              MR. BOSSE:  No, sir.  This is the only time.

22              (Recess from 10:57 a.m. to 11:17 a.m.)

23              (The jury entered the courtroom.)

24              THE COURT:  The record will reflect that all jurors

25   are present.
```

—————————— P. Melley - Direct ——————————

1          Does counsel concur?

2          MR. BOSSE:  Yes, sir, Your Honor.

3          MR. YAROW:  Yes, sir.

4          MS. McCASLIN:  Yes, sir.

5          THE COURT:  You may continue.

6    BY MR. BOSSE:

7    Q.  Mr. Melley, when we left off, you were talking about the

8    Series 22 exam that Mr. Smith took and passed, and we're just

9    going to look at two pages from the study materials for that

10   exam as far as what was tested on it.

11         MR. BOSSE:  Could we see, please, 97B, Page 7.

12   BY MR. BOSSE:

13   Q.  And again, what concept is required to be learned by

14   someone who is going to sit for this examination?

15   A.  Like most of the other exams we talked about, the

16   Series 7 and Series 63, there's a suitability standard for

17   the relationship with an investor client.

18         MR. BOSSE:  If we could see Page 15 of 97B.

19   BY MR. BOSSE:

20   Q.  And without getting into the detail, is there also -- one

21   of the subject matters that's tested here is the prohibition

22   on the use of manipulative, fraudulent devices?

23   A.  Yes.  This is, again, based on the federal securities

24   laws as well as a myriad of FINRA's own rules regarding how

25   one must conduct themselves in the securities industry and

————— P. Melley - Direct —————

1   not engage in any fraudulent or other prohibited practices

2   that are outlined.

3   Q.  Is that what we're seeing is Section 2, fairly dealing

4   with customers?

5   A.  Yes.  That goes to the truthfulness and communication and

6   the standards of conduct one must have when, again, making

7   the client the primary responsibility.

8   Q.  All right.  Fair to say that someone taking the three

9   exams that Mr. Smith took and passed on the first try, in

10  each of them it's tested on prohibition about lying to

11  clients?

12  A.  Yes.  Again, those are the same themes that are occurring

13  over and over again in all these exams as well as the

14  continuing education requirements.

15  Q.  How long did he spend in the industry when he was working

16  for brokers, so as a registered representative?

17  A.  Approximately 16 years, between '93 and 2009, I believe.

18  Q.  During those years while he was registered, ending in

19  2009, did he ever get in trouble with FINRA?

20  A.  I did not see any violation of FINRA rules in terms of

21  investigative or disciplinary matters on his CRD report, no.

22  Q.  Let's move on from Mr. Smith and talk about Mr. Alcorn.

23          MR. BOSSE:  If I could have the witness shown

24  Exhibit 4A.

25  BY MR. BOSSE:

1   Q.  And looking at 4A, I'm going to bring you to Page 3.

2   What is this?

3   A.  Similar to Mr. Smith, this is a CRD report, in this case,

4   for Mr. Alcorn, again, on this page showing his name and

5   unique CRD number.

6           MR. BOSSE:  I'll offer Government's Exhibit 4A.

7           THE COURT:  Any objection?

8           MR. YAROW:  No objection.

9           THE COURT:  Hearing no objection, it's admitted.

10          (Government's Exhibit 4A was admitted.)

11  BY MR. BOSSE:

12  Q.  Let's go down to Page 4 of 4A, now that the jury can see

13  it.  And again, this is for Mr. Alcorn, correct?

14  A.  Correct.

15  Q.  What does it show as far as Mr. Alcorn's examination

16  history?

17  A.  That between 1981 and 1982, Mr. Alcorn sat and passed

18  three exams:  The Series 22, which we discussed, which is the

19  DPP exam; the Series 39, which is a supervisory role or

20  management position for those engaged in the direct

21  participation programs that came in on the 22, so those two

22  related; and then the Series 63, which we discussed, which is

23  like the state stockbroker exam.

24  Q.  Without going back into the other documents, would he

25  have been examined on and had to learn about the same

P. Melley - Direct

1  information; duty to clients, suitability of investments, and
2  prohibitions against fraud and deceit?
3  A.  Correct.
4        MR. BOSSE:  We can take down this exhibit.
5  BY MR. BOSSE:
6  Q.  And I want to now talk about two other men who have been
7  mentioned in this case, Daryl Bank and Kent Maerki.
8        Did you review the CRD reports for both of those men
9  as well?
10 A.  I did.
11 Q.  Let's start with Mr. Bank.
12       MR. BOSSE:  And if we could show the witness
13 Government's Exhibit 2, please.
14       So let me just see.  Only the witness can see this,
15 so if I can just scroll down, I'll see if this is the Bank
16 CRD.  We'll have to correct the marking.  Actually, the
17 exhibit is properly marked for the Court.  The computer
18 screen has this as 1M, but this is the Government's 2,
19 Mr. Bank's CRD.
20 BY MR. BOSSE:
21 Q.  Do you recognize this as a document that you are familiar
22 with?
23 A.  Yes.  This is one that I had originally generated for
24 Mr. Bank, again with his unique number and shows his time in
25 the securities industry.

P. Melley - Direct

1          MR. BOSSE:  I'll offer Government's 2, and we'll

2     confirm we have that right.

3          MR. GRINDROD:  No objection.

4          THE COURT:  It will be admitted.

5          (Government's Exhibit 2 was admitted.)

6     BY MR. BOSSE:

7     Q.  So looking at Mr. Bank's CRD report, what does it show as

8     far as his background, his employment background in the

9     securities industry?

10    A.  Mr. Bank worked for five different brokerage films over

11    14 years.  He also was licensed -- had five different

12    licenses altogether, and he completed continuing education

13    requirements on four separate occasions.

14    Q.  And you see that at the top of Page 6 here, from June of

15    2009, Mr. Bank was associated with a company called Dominion

16    Investment Advisors?

17    A.  Correct.  Yeah.  And again, that page is information that

18    is entered in by the individual himself.

19    Q.  All right.  Let's go down to the test history for

20    Mr. Bank, which is here on Pages 8 and 9, and if you could

21    tell the jury -- just describe the tests that he took and

22    passed.

23    A.  He passed the Series 3 exam, which is not a FINRA exam,

24    but it involves futures products, so it's by the National

25    Futures Association.  He passed the Series 7, which we've

Carol L. Naughton, Official Court Reporter

P. Melley - Direct

1    discussed.  The series 24 is a management or supervisory

2    license connected to the Series 7, so it's somebody who is a

3    manager or a principal, general securities principal.

4            And he also passed the Series 63, again, the state

5    stockbroker exam, and then, finally, he also passed, in '96,

6    the Series 65, which is the state investment advisor exam

7    allowing one to engage in -- or relationships with clients as

8    an investment advisor as opposed to a stockbroker.

9    Q.  And that's the one that Mr. Smith took but did not pass,

10   correct?

11   A.  Correct.

12   Q.  Mr. Bank passed these examinations also on his first try?

13   A.  Yes.

14   Q.  And I should have asked that for Mr. Alcorn.  He also

15   passed all of the exams he passed on his first try, correct?

16   A.  Correct.  Yes.

17   Q.  Did there come a time that a FINRA disciplinary

18   proceeding was started against Mr. Bank from his conduct in

19   his work as a broker?

20   A.  Yes.  FINRA's Department of Enforcement filed a

21   complaint, I believe, in August of 2008 against Mr. Bank and

22   at least one other individual.

23           MR. BOSSE:  Could we see Page 14 of Government's 2,

24   please.

25   BY MR. BOSSE:

P. Melley - Direct

1   Q.  And is this the filing that you're referring to here?

2   A.  Correct.

3   Q.  What were the allegations, speaking generally, against

4   Mr. Bank?

5   A.  It involved misappropriation of funds, client funds, by

6   charging commissions that weren't legitimate as well as

7   providing false information to the firm he was working with,

8   and also providing false information to FINRA pursuant to

9   testimony and production of records.

10  Q.  What is the process for a FINRA disciplinary proceeding?

11  How does it work?

12  A.  Once a complaint is filed by FINRA, the normal course is

13  that if there's no resolution subsequent to that complaint,

14  it will go to a hearing, which is like a court proceeding,

15  before a hearing panel.  That panel will then hear from both

16  sides.  They will render a decision and, if found to be in

17  violation, will impose any sanctions, which could range from

18  a fine, a suspension, to a bar from the industry.

19          Another alternative is after filing that complaint,

20  there may be negotiations between FINRA and the defendant,

21  and that could result in an offer of settlement and then

22  possibly an acceptance of offer of settlement, which means

23  that it does not have to go to a hearing.  That settlement,

24  though, must still be approved regarding any possible

25  sanctions.

P. Melley - Direct

1   Q.   How was Mr. Bank's investigation as to his alleged

2   misconduct -- how was that resolved?

3   A.   I believe there was an offer of settlement to Mr. Bank in

4   January 2010, and then in February 2010, the FINRA Office of

5   Hearing Officers approved a permanent-bar sanction based on

6   the conduct that it saw and that the parties had agreed to.

7          MR. BOSSE:  Could we see, for the witness,

8   Government's 1, please.

9   BY MR. BOSSE:

10  Q.   What are we seeing here, sir?

11  A.   This is the actual decision by FINRA's Office of Hearing

12  Officers in February 2010.  Again, the parties involved are

13  FINRA's Department of Enforcement as well as Mr. Bank and

14  another individual Gregory Bodoh.

15  Q.   You see there's a second proceeding with Daryl G. Bank

16  and RH.  Do you know who RH?

17  A.   I believe RH refers to Roger Hudspeth.

18  Q.   And this is pre-dating -- well, let me ask this:

19          This was from conduct that occurred in the 2008-2009

20  time period, correct?

21  A.   Correct.

22  Q.   Let's go down to Page 3, and we're not going to have you

23  read this document, but just generally, does this describe

24  the allegations that Mr. Bank misappropriated funds from the

25  Bank of the Commonwealth?

P. Melley - Direct

1   A.  Yes, it does.

2           MR. BOSSE:  If we could go to Page 7.

3   BY MR. BOSSE:

4   Q.  Is this what you referred to earlier that a second part

5   of the proceeding was the fact that Mr. Bank had provided

6   false information to FINRA?

7   A.  Exactly.

8   Q.  All right.

9           MR. BOSSE:  And if we could go down to Page 13,

10  please.

11  BY MR. BOSSE:

12  Q.  What's happening on Page 13?

13  A.  This just discusses the actual sanction that is put in

14  place by the hearing officers.

15          MR. GRINDROD:  Objection, Your Honor.  Are we going

16  to offer this in evidence?

17          THE COURT:  Stand up.

18          MR. GRINDROD:  Sorry, Your Honor.

19          THE COURT:  What is your objection?

20          MR. BOSSE:  I'll cure it.  He's right.

21          MR. GRINDROD:  I object to the exhibit being

22  discussed without being offered into evidence.

23          MR. BOSSE:  I forgot to offer it.  He's exactly

24  right.  I'll offer Government's 1.

25          THE COURT:  Any objection?

─────────────────── P. Melley - Direct ───────────────────

1           MR. GRINDROD:  No, Judge.

2           THE COURT:  Hearing none, it will be admitted.

3           (Government's Exhibit 1 was admitted.)

4   BY MR. BOSSE:

5   Q.  Now we're at the end of Government's 1, but this is the

6   important part.

7           Can you tell the jury, because now they can see it,

8   what happened to Mr. Bank as a result of the investigation

9   and then the settlement that happened?

10  A.  Mr. Bank was -- the sanction was that Mr. Bank would be

11  barred, permanently barred from the securities industry,

12  which, again, prevents him from, as a broker, engaging in the

13  purchase and sell of securities on behalf of clients.

14  Q.  All right.  And at that point, after this ban from the

15  securities industry is entered, is he allowed to have

16  anything to do with the buying and selling of securities for

17  clients?

18  A.  He is not, in terms of buying or selling on behalf of

19  clients.

20  Q.  All right.  When did the ban take effect for Mr. Bank?

21  A.  February 2010.

22          MR. BOSSE:  We can take that down.

23  BY MR. BOSSE:

24  Q.  I'd like to move on to Kent Maerki.  Did you also review

25  the CRD report for Mr. Maerki?

P. Melley - Direct

1    A.  I did.

2        MR. BOSSE:  Could we see Government's 4, please.

3    BY MR. BOSSE:

4    Q.  I'm going to bring you to Page 3, and if you can identify

5    this for the record.

6    A.  This is Mr. Maerki's CRD report.  And again, just showing

7    similar information in terms of his licenses and times in the

8    securities industry.

9        MR. BOSSE:  I'll offer Government's 4.

10       MR. GRINDROD:  No objection.

11       MR. YAROW:  No objection.

12       THE COURT:  It will be admitted.

13       (Government's Exhibit 4 was admitted.)

14   BY MR. BOSSE:

15   Q.  Looking down at Page 4, what examinations did Mr. Maerki

16   take, and when did he take them?

17   A.  Mr. Maerki, at one point, held three separate securities

18   licenses:  The S-1, or Series 1, which is the -- because he

19   took it in 1968, that was considered the predecessor of the

20   Series 7 that we've discussed here today, the, you know,

21   entrance exam into the industry as a registered rep;

22       He also passed, in '73, the S-00 or the Series 00,

23   which is equivalent to today's Series 24, or the general

24   securities principal, so it's a management or supervisory

25   role for someone who already holds the 7;

─────────────────────────── P. Melley - Direct ───────────────────────────

1          And then, finally, he had the Series 3, which is not

2     a FINRA exam.  That, again, is the National Futures

3     Association exam with regards to futures derivative products.

4     Q.  And so the series -- so he passed both the basic, the

5     Series 7 and the management-level securities exam?

6     A.  Right.  That were in place at the time.  It just wasn't

7     called the Series 7.

8     Q.  Let's go, if we can, down to Page 7 of this document, and

9     please tell the jury what we're seeing here on Page 7.  What

10    happened to Mr. Maerki?

11    A.  This was an action that was filed by NASD, FINRA's

12    predecessor at the time, against Mr. Maerki resulting in

13    originally, in 1976, a suspension that was later determined

14    to be inadequate, and the DBCC, which was kind of a

15    predecessor of FINRA's hearing officers panel, they decided

16    to upgrade his sanction to a bar based on his actions in this

17    case.

18    Q.  So when was Mr. Maerki barred from the securities

19    industry?

20    A.  1977.

21    Q.  So from 1977 on, Mr. Kent Maerki was not supposed to be

22    involved in the securities industry?

23    A.  Correct.

24    Q.  Did you -- in preparing for this case, did you review

25    other court documents about Mr. Maerki showing that he had

P. Melley - Direct

1   gotten in trouble with other regulatory authorities?

2   A.  Yes.

3           MR. BOSSE:  Could we see, for the witness,

4   Government's 5.

5   BY MR. BOSSE:

6   Q.  If you can identify what we're seeing here in

7   Government's 5.

8   A.  This was an SEC complaint and action back in 1984, again,

9   between the SEC and Mr. Maerki as well as other parties.

10          MR. BOSSE:  I'll offer Government's 5.

11          MR. GRINDROD:  No objection.

12          MR. YAROW:  No objection.

13          THE COURT:  It will be admitted, Government's 5.

14          (Government's Exhibit 5 was admitted.)

15  BY MR. BOSSE:

16  Q.  And you've got the filing date is September 21 of 1984?

17  A.  Correct.

18  Q.  What court is this filed in?

19  A.  Northern District of California.

20  Q.  That's a federal court?

21  A.  Yes.

22  Q.  And along with some other entities and individuals, is

23  this the reference here that Kent Maerki was also named as a

24  defendant?

25  A.  Correct.

P. Melley - Direct

1   Q.  All right.  What is the name of the court order that's

2   being entered here?

3   A.  Permanent injunction, which is basically the sanction

4   against Mr. Maerki.

5   Q.  All right.  And what is Mr. Maerki barred from doing as a

6   result of this 1980s-era injunction?

7   A.  You mean in terms of what did he do, or what was he not

8   allowed to do after that?

9   Q.  Well, what was the SEC enjoining him from doing here?

10  And I'm thinking about part A down here.

11  A.  Basically, yeah, he's not allowed to engage in securities

12  transactions based on information that he provided -- false

13  information regarding this particular investment opportunity.

14  Q.  Okay.  And are these court filings, to your knowledge,

15  public documents?

16  A.  Yes.

17        MR. BOSSE:  Could we see, please, Government's 6,

18  for the witness.

19  BY MR. BOSSE:

20  Q.  What is Government's 6?

21  A.  This is another filing in the Northern District of

22  California federal court, this time by the FTC, or Federal

23  Trade Commission, against the Cellular Corporation and other

24  defendants.

25  Q.  Do those other defendants include Kent Maerki?

P. Melley - Direct

1   A.   Correct.

2          MR. BOSSE:  I'll offer Government's 6.

3          MR. GRINDROD:  No objection.

4          THE COURT:  It will be admitted.

5          (Government's Exhibit 6 was admitted.)

6   BY MR. BOSSE:

7   Q.   And what is the filing year of this particular

8   stipulation?

9   A.   1986.

10  Q.   Again, is this federal court in California?

11  A.   Yes.

12  Q.   And the name of the regulatory agency here?

13  A.   Correct.  Federal Trade Commission.

14  Q.   And again, is this a publicly available document?

15  A.   It is.

16  Q.   And just to confirm, in addition to Kent Maerki, what is

17  this company that's listed in front of his name?

18  A.   Spectra Financial Corporation.

19  Q.   And are the other defendants the Cellular Corporation and

20  Cellular Capital Corporation?

21  A.   Yes.

22  Q.   I'm going to go down to -- forgive me.  I'm going to

23  scroll down a few pages.

24          And can you tell the jury, what is Mr. Maerki barred

25  from doing by the FTC as a result of the stipulation that he

P. Melley - Direct

1   entered into?

2   A.  Due to false statements that were made regarding certain

3   information regarding the investment, he was prevented from

4   engaging in this type of conduct going forward in terms of

5   soliciting new investment opportunities.

6   Q.  And was he particularly barred from telling people, as it

7   shows here, that they were "certain or substantially certain

8   to obtain parts of a cellular telephone license"?

9   A.  Correct.

10  Q.  And is he also barred, as a result of this stipulation,

11  from misrepresenting the value or profit potential of a

12  license awarded through the FCC lottery?

13  A.  Yes.

14          MR. BOSSE:  Could we see Page 9 of the document,

15  please.

16  BY MR. BOSSE:

17  Q.  And is he also barred from misrepresenting the degree of

18  risk involved in investments that he's touting?

19  A.  Correct.

20          MR. BOSSE:  Let me briefly look up to see if there

21  is anything else that I need to ask.  One moment, please.

22          (Pause in the proceedings.)

23          MR. BOSSE:  Going back to Exhibit 1, could we show

24  that again to the witness.

25  BY MR. BOSSE:

P. Melley - Direct

1   Q.  Is this a document that is publicly available as well?

2   A.  It is.  The information is available in terms of, you

3   know, going online to probably, you know, find information

4   regarding that information.

5   Q.  And can you tell the jury about FINRA's service called

6   BrokerCheck, generally?

7   A.  BrokerCheck is the public arm of CRD.  So the reports

8   we've looked at today are things as a FINRA staff member that

9   I'm able to gather and generate.  BrokerCheck is the public

10  version of that where anyone can go online to BrokerCheck.com

11  through the FINRA website and get similar information for

12  individuals and firms, whether it's their licenses, their

13  background with various employers.

14          The difference is, for BrokerCheck, you can only go

15  back ten years in time as opposed to what has been provided

16  today in the CRD reports which covers everything that

17  somebody has done, even if it goes back 20 or 30 years.

18  Q.  So from the 2010 to, say, 2018 time period, if one of the

19  other businessmen working with Mr. Bank wanted to look him

20  up, would they be able to look him up on BrokerCheck?

21  A.  Yes.  During that time frame, they could go back, and

22  they would get things ten years from the date they do their

23  search.

24  Q.  Would that show that Mr. Bank had been barred from the

25  securities industry?

```
                      ┌──── P. Melley - Cross (By Mr. Yarow) ────
  1                   │ A.   Absolutely.
```

P. Melley - Cross (By Mr. Yarow)

 1   A.   Absolutely.

 2           MR. BOSSE:  No further questions.

 3           THE COURT:  Cross-examination?

 4                     CROSS-EXAMINATION

 5   BY MR. YAROW:

 6   Q.  Mr. "Melley"?  Did I get that right?

 7   A.  "Melley."

 8   Q.  "Melley," I'm sorry.

 9           My name is Rick Yarow.  I represent David Alcorn.

10           MR. YAROW:  Would the government mind pulling up

11   Exhibit 4A.  I may have the wrong one.  It's Mr. Alcorn's

12   record.

13           THE WITNESS:  I believe this is it that we just

14   scrolled through.  I think you just have to scroll to the

15   third page.

16           MR. YAROW:  Go to Page 4, please.

17   BY MR. YAROW:

18   Q.  So you testified previously that Mr. Alcorn took these

19   series of tests and passed them in '81-'82 time frame?

20   A.  Correct.

21   Q.  Does it show a work history that Mr. Alcorn would have

22   put down?

23   A.  It doesn't show whether he was employed by any registered

24   brokerage firms at the time, just that he had taken these

25   exams at that time, back in '81 and '82.

P. Melley - Cross (By Mr. Grindrod)

1   Q.  Does it show whether or not Mr. Alcorn would have been
2   required to attend any continuing education after he took
3   these exams?
4   A.  Yeah.  At that time, the continuing education
5   requirements were not in place.  That didn't happen until the
6   late 1990s.
7   Q.  Okay.  And do these status dates have an end date that
8   you're able to tell from this document?
9   A.  You mean in terms of how long is the license good for?
10  Q.  Correct.
11  A.  Yeah.  The way it works is, once you have a license in
12  the industry, it's good for approximately two years.  After
13  that point, it expires unless you go to another employer or
14  renew.  So shortly after the '82 time frame, these licenses
15  would have expired or lapsed.
16  Q.  Okay.  And that's what this record reflects?
17  A.  Correct.
18          MR. YAROW:  Thank you.
19                      CROSS-EXAMINATION
20  BY MR. GRINDROD:
21  Q.  Good morning, sir.
22  A.  Good morning.
23  Q.  So a couple times on direct examination you mentioned
24  folks working for a brokerage firm.
25  A.  Registered rep.

P. Melley - Cross (By Mr. Grindrod)

1   Q.  Right.  So if you're a registered rep, that doesn't
2   necessarily mean you, like, are employed, have a desk at some
3   big brokerage firm, right?
4   A.  Well, I don't know about the size of the firm, but if you
5   are licensed as a registered rep, it means you are working
6   for that particular brokerage firm and that you are allowed
7   to handle client accounts.
8   Q.  Right.  You could be, like, a 1099 contractor, right?
9   A.  No.  You are an official employee of that company as a
10  registered rep or stockbroker for that brokerage firm.
11  Q.  Let me ask it this way:  So --
12  A.  You're not a contractual employer.  You are a
13  full-fledged employee.
14  Q.  At the time that you have that job, right?
15  A.  Correct.
16  Q.  Okay.  And when we're talking about brokerage firms, I
17  guess what I'm asking is, that doesn't mean, like -- that
18  doesn't necessarily mean, like, the big brokerage firms on
19  Wall Street in New York, right?  There can be brokerage firms
20  elsewhere that maybe we don't think of as big brokerage
21  firms, right?
22        MR. BOSSE:  I object to the last part.  The first
23  part is fine, but who is thinking about what is a big or
24  small firm?  Speculation.
25        THE COURT:  Just rephrase your question,

P. Melley - Cross (By Mr. Grindrod)

1   Mr. Grindrod.

2   BY MR. GRINDROD:

3   Q.  So when we're talking about brokerage firms, we're not

4   necessarily talking about the big Wall Street in New York

5   brokerage firms, right?

6   A.  Right.  Not every firm is Morgan Stanley or Goldman

7   Sachs.  But again, in order to be a FINRA-registered

8   brokerage firm, you need to be approved by FINRA, so you need

9   to have the financial wherewithal in order to conduct your

10  business, and you have to go through a series of hoops, so it

11  still is a legitimate operation.

12  Q.  Right.

13  A.  But it could be a small size.

14  Q.  You put it better than I described it, so thank you.

15  A.  Sure.

16  Q.  And we talked about how FINRA has the power to impose

17  sanctions, like a ban or a bar from the securities industry,

18  right?

19  A.  Correct.

20  Q.  And also lesser sanctions, like a suspension?

21  A.  Correct.  FINRA is not a government entity, so the limit

22  of its authority is to kick people out of the industry.

23  Q.  And Kent Maerki got in trouble like that, right?

24  A.  He received a bar, correct, 1977.

25  Q.  From FINRA?

P. Melley - Cross (By Mr. Grindrod)

1   A.  Correct.

2   Q.  Same with Bank, Daryl Bank, same thing; he got in

3   trouble.  Different time, different background, but got in

4   trouble with FINRA, right?

5   A.  Correct.

6   Q.  And I think you discussed on direct, that wasn't related

7   to anything that happened from 2011 on, right?

8   A.  Correct.

9   Q.  And Mr. Smith never got in trouble with FINRA.  He wasn't

10  banned or barred or suspended or anything?

11  A.  He was not.

12  Q.  When we're talking about -- you talked a lot about the

13  rules that apply when someone is dealing in securities or

14  selling a security, right?

15  A.  Correct.

16  Q.  So, obviously, if someone is selling something that is

17  not a security, then the security regulations don't apply,

18  right?

19          MR. BOSSE:  Objection.  Calls for a legal conclusion

20  and also speculation.

21          THE COURT:  Well, objection overruled.

22          THE WITNESS:  Regardless of the investment, whether

23  it's a security or not, if that individual previously had a

24  license or fulfilled continuing education requirements

25  regarding the dos and don'ts of the industry in how one is

P. Melley - Cross (By Mr. Grindrod)

1  supposed to act with regard to investments, they are still

2  supposed to conduct themselves in a certain way.

3          Irrespective of the fact that what they are engaged

4  with at the time, whether it's deemed a security or not, if

5  they have the background in how to conduct themselves when it

6  comes to security investments, they know they are supposed to

7  be truthful, they know what the standards are that they are

8  supposed to conduct themselves.

9  BY MR. GRINDROD:

10 Q.  Sure.  I mean, whether you have a background in

11 securities or not, nobody is allowed to commit fraud, right?

12 A.  Right.  And everybody knows that, but those who are

13 committed to fulfilling his licenses and continuing education

14 requirements, it should be engrained in how they conduct

15 themselves going forward, whether it involves a security or

16 not.

17 Q.  Okay.  To keep a securities license or keep your

18 authority to be a registered rep, you just have to take, I

19 think you said, a continuing education course every two

20 years, right?

21 A.  Every two years while being employed by a

22 FINRA-registered firm.

23 Q.  And so that continuing education is not an additional

24 test, right?

25 A.  It's a series -- you would almost think of it as a test,

P. Melley - Cross (By Mr. Grindrod)

1    yes.  It's a series of computer modules covering compliance,

2    regulatory, ethics, sales practice.

3              Again, the continuing education requirement, because

4    I don't think I mentioned it fully earlier -- this is just

5    one part of it, this series of computer modules.  The firm is

6    also responsible for all the employees to provide various

7    things, like meetings with the compliance officer, other

8    literature, again, all with the purpose of providing what the

9    current trends, standards, and issues are.

10             Especially for individuals that may have taken an

11   exam years ago, it keeps them current so that they can

12   continue to have a proper relationship with their customers.

13   Q.  Fair enough.  But you said you can think of it as a test.

14   I guess, let me ask you this:

15             It's not something that you pass or fail, right?

16   A.  It's not a pass/fail, but in order to complete it, you

17   need to do, like, one module, answer it correctly in order to

18   move on to the next one.  But it's not scored for purposes of

19   I failed it and I have to go back.  You can't advance and

20   complete it until you do each section and answer the

21   questions that are required.

22   Q.  So if you just click through, you can go to the next

23   module?

24             MR. BOSSE:  That misstates what the witness just

25   said.

P. Melley - Cross (By Mr. Grindrod)

1   THE COURT:  Objection sustained.

2   MR. GRINDROD:  I'll move on, Judge.

3   BY MR. GRINDROD:

4   Q.  We talked about the Series 7.  I think you described it

5   as being a rigorous examination?

6   A.  Correct.

7   Q.  At the time, it was 250 multiple-choice questions; is

8   that right?

9   A.  Correct.  I think you had up to six hours to take it,

10  like a full day of multiple-choice questions, correct.

11  Q.  And what is the percentage you have to have to pass?

12  A.  70.

13  Q.  70?

14  A.  Correct.

15  Q.  So it's, like, a C minus?

16  MR. BOSSE:  Objection to that.

17  MR. GRINDROD:  I'm sorry, Your Honor.  I'll withdraw

18  it.  We all had different teachers.

19  BY MR. GRINDROD:

20  Q.  You don't have to have any special training to sit for

21  the Series 7, right?

22  A.  No.  You just have to, in order to want to pass it, and

23  especially if you're working for a registered broker, they

24  are investing in you to pass it, so they are going to give

25  you all the materials necessary to prepare properly.

Carol L. Naughton, Official Court Reporter

P. Melley - Cross (By Mr. Grindrod)

1  Q.  Sure.  But you don't have to --

2  A.  Yeah, you don't have to have a business degree or a

3  financial background.

4  Q.  You don't have to have an MBA.

5  A.  No.

6  Q.  You don't have to have a college degree.

7  A.  No, you don't.

8  Q.  You can just take it if you have a GED?

9  A.  You can take it as long as you are sponsored by a

10 FINRA-registered firm who then will sign you up to take the

11 exam.

12 Q.  But education-wise, you can take it if you have a GED,

13 right?

14 A.  Yes.  You can take it with any background.  Again, it's

15 from the firm's perspective.  If they've hired you to take

16 it, they sign you up, and you take it.

17 Q.  That's what Mr. Smith has, a GED, right?

18 A.  I'm not sure of his educational background.  I don't

19 recall.

20 Q.  So 30 years ago, Mr. Smith presumably studied for this

21 multiple-choice test, right?

22 A.  30 years ago, he took the test, spent 16 years in the

23 industry with seven different firms, completed continuing

24 education requirements on five different opportunities, so,

25 over the course of that time, had the foundation knowledge of

────────────── P. Melley - Cross (By Mr. Grindrod) ──────────────

1    how to operate in the securities industry and how to deal

2    with clients in a truthful manner and was aware of the dos

3    and don'ts of how to conduct himself.

4            MR. GRINDROD:  Fair enough.

5            No further questions, Your Honor.

6            THE COURT:  Any redirect?

7            MR. BOSSE:  No, sir.  This witness may be excused.

8            THE COURT:  Any objection to this witness being

9    excused permanently?

10           MR. GRINDROD:  No, Your Honor.

11           THE COURT:  Thank you for coming.  You may be

12   excused.

13           (The witness was excused.)

14                      * * * * * * *

15

16                      CERTIFICATION

17

18       I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled matter.

20

21

22       _____/s/_____

23                      Carol L. Naughton

24                      November 9, 2022

25